# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

———————————————————

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff-Appellee,* | ) |
| | ) |
| | )  No. 14-4451 |
| v. | )  (1:04-cr-385-LMB) |
| | ) |
| ALI AL-TIMIMI , | ) |
| | ) |
| *Defendant-Appellant.* | ) |

———————————————————

## APPELLANT'S MOTION FOR 30-DAY EXTENSION OF TIME TO FILE JOINT APPENDIX AND OPENING APPELLATE BRIEF

Appellant Dr. Ali Al-Timimi respectfully moves this Court for a 30-day extension of time—from October 1, 2024 to October 31, 2024—to file his opening brief and joint appendix to accommodate his ongoing efforts to (1) retain substitute CJA counsel, (2) research several unusually complex legal questions, and (3) determine the logistics of classified briefing and secure at least one defense attorney with an active security clearance. The parties have conferred, and government's position is detailed below at pp. 18-19.

**Background**

1.     This direct appeal stems from a complex national security prosecution with a litigation history spanning more than 15 years. Although the defendant-appellant, Dr. Ali Al-Timimi, was tried and convicted in 2005, his direct appeal has not yet occurred owing to a series of complex remand issues, some involving classified briefing and evidence and others involving intervening legal authority. The case implicates multiple issues of exceptional complexity—including a post-trial discovery proceeding involving classified briefing, multiple intervening Supreme Court decisions, a controversial theory of inchoate criminal liability that has divided federal courts, several novel charges with little or no legal precedent, and a widely debated First Amendment issue.

2.     At its core, the case centers on allegations that Al-Timimi—a former assistant professor of biomedical genomics at George Mason University and well-known Muslim lecturer in Northern Virginia— made comments at a dinner shortly after 9/11 that the government claims helped to motivate certain men in attendance to go forward with a plan to travel to a camp in Pakistan called Lashkar-e-Taiba (LET), a

group the United States would later designate as a terrorist organization. Under various theories of inchoate liability—some novel and never before considered by this Court—Al-Timimi was charged with and convicted of ten felonies. In a result that the district court described at sentencing as "very draconian," Dkt. No. 147 at 20, he received a mandatory lifetime prison sentence. See Dkt. No. 132 (judgment).

3.     As the district court observed in a 2020 conditional release order, "Al-Timimi noticed his direct appeal two days after sentencing and has vigorously pursued that appeal ever since." Dkt. No. 532 at 3, n.1. Throughout 19 years of post-trial litigation, Al-Timimi has either satisfied or won judgments of acquittal on eight of his ten convictions. See Dkt. No. 519 at 3 (explaining that Al-Timimi's prison sentences under Counts 1-6 were fully discharged); Dkt. No. 555 (ordering judgments of acquittal on Counts 1, 7, and 8). Consequently, only two remaining counts—Counts 9 and 10 of the operative indictment—continue to subject him to imprisonment.

4.     These remaining Counts 9 and 10 charged Al-Timimi as an accomplice to certain unlawful weapons activities that principals Kwon

and Hasan engaged in at the LET camp they attended in Pakistan.

Both men admitted to briefly handling an RPG weapon during a

training exercise, for which each subsequently admitted guilt to the

crime of carrying an explosive during the commission of a felony in

violation of 18 U.S.C. § 844(h)(2). See Dkt. No. 47 at 16 (superseding

indictment). Although both principals testified that they had never

spoken to Al-Timimi about their use of any weapons in any context, see

Dkt. No. 449 at 6-7, the government charged and convicted Al-Timimi

as an accomplice to these crimes based on its broader allegation that his

comments at a dinner induced them to attend LET. The government's

2005 post-trial brief grounded the convictions in a *Pinkerton* theory of

co-conspirator liability. See Dkt. No. 125 at 37-40.

5.     In 2020, the district court expressly found that Al-Timimi's

appeal raised several complex legal issues. *See* Mem. Op., August 18,

2020 [Dkt. No. 519] at 7-12 (upheld by this Court on appeal in Case No.

20-4441). Observing at oral argument that "this case has a ton of what I

think are complex and difficult legal issues," the district court described

the outcome as "draconian," "disconcerting," "unique," and "troubling."

Transcript of June 11, 2020 Hearing [Dkt. No. 481] at 9.

6.     Examples of the unusually difficult or complex issues implicated in this appeal include:

**a.     Classified briefing and evidence**: This case has undergone two extended *Brady* remand proceedings concerning arguments that the government has withheld material evidence related to secret surveillance programs—much of which involves classified briefing and evidence. Accordingly, this appeal is likely to involve classified briefing and at least one attorney will need to possess or obtain a TS/SCI security clearance.

**b.     Controversial theories of inchoate liability**: The government's case at trial purported to charge Al-Timimi with the crime of "aiding and abetting a conspiracy"—a disputed legal theory that would allow the government to hold an individual culpable for conspiracy without proof of its definitional element: membership in the conspiracy agreement. As the district court has observed, "courts are split on whether aiding and abetting a conspiracy is a viable theory of criminal liability," see Dkt. No. 519 at 11 (citations omitted), and this Court "has yet to weigh in on this split in authority." *Id.* Notably, the government's own internal

practice manual advises prosecutors to avoid this theory on the grounds that it has "not been widely adopted."[1] This appeal squarely presents that question of first impression to this Circuit.

  **c.** **Novel theories of *Pinkerton* liability**: Even if the concept of "aiding and abetting a conspiracy" were ultimately upheld, this appeal would then raise the question of whether such a theory could be used to subject Al-Timimi to co-conspirator liability under *Pinkerton v. United States*, 328 U.S. 640 (1946). The Supreme Court's *Pinkerton* doctrine expressly relies on a conspirator's act of joining or entering into a conspiracy agreement to establish mens rea for the crimes of his or her co-conspirators. *Id.* at 647. As best as the defense has been able to discover, no federal court has ever permitted *Pinkerton* co-conspirator liability without a jury finding that the defendant entered into a conspiracy agreement. Consequently, this case appears to present a question of first impression for the entire federal judiciary.

---

[1] See U.S. DEPT. OF JUSTICE, USAM CRIMINAL RESOURCE MANUAL § 2483, available at http://www.justice.gov/usam/criminal-resource-manual-2483-conspiracy-aid-and-abet ("The concept of aiding and abetting a conspiracy has not been widely adopted.")

**d.     The impact of Count 1's invalidation on the government's *Pinkerton* theory:** Because the district court has recently issued a judgment of acquittal for the conspiracy charged in Count 1, Dkt. No. 550 at 1, this appeal raises a glaring question of verdict indeterminacy over whether the government's *Pinkerton* theory in support of Counts 9 and 10 remains viable. See Dkt. Nos. 477 at 5-6; 460 at 1-4.

**e.     The Supreme Court's potential reconsideration of *Pinkerton*:** On May 29, 2024, the Supreme Court ordered the government to respond to a petition for a writ of certiorari that presents the question of whether *Pinkerton* should be overturned. See *Gomez* v. *United States*, No. 23-7415 (U.S.); see also Pet. at i. The petitioner subsequently retained a former United States Solicitor General to file his reply brief[2] and the case is scheduled for conference later this month on September 30. Should the

---

[2]     See Reply Br. for Pet., available at: https://www.supremecourt.gov/DocketPDF/23/23-7415/322293/20240812170129927_2024-08-12%20Final%20Gomez%20cert%20reply%20wepco.pdf

Supreme Court grant certiorari, the government's reliance on *Pinkerton* here would be in jeopardy.

      **f.**    **Novel charges**: Al-Timimi appears to be the only defendant in the history of the United States to be convicted of the crime of "soliciting treason"—a charge created (Count 2) by combining 18 U.S.C. § 373 with the federal treason statute, and raises the question of whether treason is categorically a "crime of violence," which in turn requires a determination of whether treason defines one crime or is instead "divisible" into two separate crimes. See Dkt. No. 549 at 23-25 (performing a similar analysis of treason under Count 1). Al-Timimi's appellate defense therefore requires historical analysis of the crime of treason in the United States, with references to Supreme Court decisions dating back to *Ex parte Bollman*, 8 U.S. (4 Cranch) 75 (1807). This appeal also involves the rarely prosecuted crime of seditious conspiracy (Count 3), requiring a similar historical analysis.

      **e.**    **The impact of the Supreme Court's intervening *Rosemond* decision on Counts 9 and 10**: As noted above, Counts 9 and 10 charged Al-Timimi as an accomplice to various

weapons crimes that the principal offenders committed in training exercises at a LET training camp—even though it was undisputed that these principals never had any communications with Al-Timimi about their use of such weapons in any context. This appeal thus raises the question of whether such a theory is reconcilable with the Supreme Court's intervening decision in *Rosemond v. United States*, 572 U.S. 65 (2014), which requires an accomplice to have full foreknowledge of any weapons crime he or she is accused of aiding and abetting—including the use of a weapon.

**h.    First Amendment questions over abstract advocacy and a solicitation doctrine**: The First Amendment issues implicated in Al-Timimi's case have been widely debated since his trial in 2005. Indeed, law schools have based First Amendment fact patterns on this very case.[3] In the two decades since, those issues have grown more complex still, with the Supreme Court recognizing—though not yet defining the full

---

[3]    See, e.g., https://scholar.harvard.edu/files/msen/files/ sen_gov1510_speech1hypos.pdf

contours of—a solicitation doctrine to its First Amendment jurisprudence that distinguishes between the "abstract" advocacy of unlawful activity (which is protected) and specific advocacy (which is not). See *United States* v. *Williams*, 553 U.S. 285, 297 (2008) (offering the statement "I encourage you to obtain child pornography" as an example of protected abstract advocacy);[4] see also *United States* v. *Miselis*, 972 F.3d 518, 535-38 (4th Cir. 2020) (invalidating portions of the federal Anti-Riot Act after concluding that its proscription of speech tending to "encourage" or "promote" rioting violated the First Amendment by criminalizing abstract advocacy and explaining that "mere encouragement is quintessential protected advocacy") (citing *Williams*, 553 U.S. at 300 & 294-95); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002) ("[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it"). Al-Timimi's pending

---

[4]     See also Brief for Professor Eugene Volokh as Amicus Curiae, *United States v. Sineneng-Smith*, Case No. 19-67, pp. 3-7, available at: https://www.supremecourt.gov/DocketPDF/19/19-67/124856/20191209115753057_19-67acVolokh.pdf (summarizing solicitation doctrine and noting that *Williams* "distinguished specific advocacy—for instance, of a crime involving a specific item of contraband, a specific victim, or a specific tangible reward—and abstract advocacy").

appeal thus presents a complex First Amendment question over whether his alleged advocacy—in which he is accused of advising others to make "hijra" (leave the country) and be with the mujahideen anywhere in the world—would satisfy the high degree of specificity required for criminal solicitation.

**Attorneys Turley and Huff**

7.     Throughout the post-trial proceedings, Al-Timimi has been principally represented by two attorneys—Jonathan Turley and Thomas Huff—both of whom have worked pro bono before the district court without the resources of a law firm, and frequently at substantial personal expense. But during this case's recent four-year period of dormancy (from August 2020 to May 2024), both attorneys have had to substantially reduce their litigation practices due to changing personal and professional circumstances.

8.     Attorney Jonathan Turley has represented Al-Timimi since 2005, entering the case shortly after trial as a law professor who frequently publishes, comments, and testifies before Congress on matters of national security and the First Amendment. Professor Turley began his legal career as an intern at the NSA, and later established a

public interest litigation practice as a professor that has included a variety of national security matters. In Al-Timimi's case, Mr. Turley has filed numerous post-trial CIPA motions, seeking disclosure of whether and to what extent the government has withheld undisclosed material evidence in connection with classified government surveillance programs. Professor Turley has represented Al-Timimi on a pro bono basis for nearly 20 years, but has recently had to reduce his litigation practice due to a change in personal circumstances.[5]

9.      Attorney Thomas Huff has represented Al-Timimi since 2014. Mr. Huff entered the case with a background in federal firearms law, having previously worked in the national Second Amendment practice of Gura & Possessky. Over the last 10 years, attorney Huff has filed several post-trial motions challenging the government's theories of accomplice liability on various weapons counts that subjected Al-Timimi

---

[5] Due to the private nature of those personal circumstances, Mr. Turley has not disclosed them in public documents. If necessary, Mr. Turley is prepared to file those details *in camera*, and preferably *ex parte*, on request. Mr. Huff can additionally represent his confident belief that they would satisfy any standard for extraordinary circumstances. Huff Decl. at 7-8, ¶ 17. Despite these circumstances, Mr. Turley has continued to assist his client's ongoing effort to secure new counsel by facilitating discussions with multiple law offices. *Id.*

to mandatory minimum sentences. See Huff Decl. at 3-4, ¶¶ 7-8. In 2020, Mr. Huff also briefed and argued a successful motion for Al-Timimi's conditional bail release into home confinement. See *id.* at 4-5, ¶ 9. Like Professor Turley, Mr. Huff has performed all litigation work before the district court on a pro bono basis.[6] But during the case's recent four-year period of inactivity, Mr. Huff has substantially reduced his litigation practice to continue his graduate studies in biomedical research. Huff Decl. at 5-6, ¶¶ 12-14. On July 1, 2024—shortly before the district court resolved the long-outstanding motions in this case— Mr. Huff entered a doctoral program at Georgetown University Medical Center with full-time research and academic obligations. Mr. Huff had applied and interviewed for that program last year. *Id.* at 6-7, ¶¶ 14-16. Thus, the unanticipated timing of the case's sudden reactivation has left him unable to assuming a leading role in its handling the appeal. *Id.* at 7, ¶ 16.

---

[6]     Although Mr. Huff's work before the district court has been exclusively pro bono, he did receive a CJA payment from this Court in 2020 for his representation of Al-Timimi in the government's appeal of the bail-release order.

10.    As reflected in status reports to this Court, litigation at the district court had become effectively dormant from August 2020 and May 2024. See ECF No. 145 at 5-6. Undersigned counsel periodically alerted the district court to new authority or sought minor amendments to the terms of Al-Timimi's conditional release, but Al-Timimi's dispositive motions otherwise remained pending.

11.    Until very recently, the government had not communicated to the defense any sense of exigency in this appeal's immediate resolution. It was at the government's urging, for example, that the defense moved this Court in November of 2020 to reduce the parties' status reporting requirement from every 30 days to every 90 days. Huff Decl. at 8-9, ¶ 19. In separate email communications on January 29 and April 26 of this year, government counsel proposed that the defense ask this Court to reduce that reporting requirement even further to once annually. *Id*.

12.    On May 29, 2024, however, the government petitioned this Court for a writ of mandamus, seeking an order directing the district court to resolve all outstanding motions. See *In re United States*, No. 24-1485, ECF No. 2 (4th Cir.). On July 18, the district court issued an

order and memorandum opinion doing so, Dkt. Nos. 549 & 550, thus suddenly reactivating Al-Timimi's direct appeal to this Court that had been on remand since 2015. This Court then denied the mandamus petition as moot. (No. 24-1485, ECF No. 11.)

13. This sudden reactivation of the appeal after four years of dormancy has thus required undersigned counsel to seek substitute counsel who are in an appropriate position to devote their full attention to litigating the multitude of unusually complex legal questions enumerated above. See pp. 5-11, ¶ 6, *supra*. And as recently as July 26 of this year, the government consent to a 30-day stay of a scheduling order to accommodate the defense's search for substitute counsel. Huff Decl. at 8, ¶ 18.

**Reasons for granting the extension**

14. Undersigned counsel are diligently searching for substitute CJA counsel and have been in active talks with several candidates— including an organization that routinely represents criminal defendants before this Court, and two law firms with specialized appellate litigation practices. The former organization has expressed interest in the representation and has been vetting potential conflict and logistical

issues. The latter two law firms have also expressed interest and are likewise vetting logistical issues. Undersigned counsel are in the process of setting up meetings with their client, and are committed to securing substitute counsel within the next 30 days.

15.   As detailed above, see pp. 5-11, ¶ 6, *supra*, this appeal raises several uniquely complex legal questions that merit vigorous litigation in the interest of justice. The extension will allow substitute counsel to research and prepare those questions for this Court's review. Attorney Huff intends to remain involved in the case to offer assistance and historical background knowledge to substitute counsel.

16.   As an immediate matter, the extension is also required because the briefing of this appeal will require at least one defense attorney to hold an active TS/SCI security clearance to review the various classified pleadings in the record. Attorney Turley believes that his TS/SCI security clearance has not been renewed since 2018 and likely gone inactive during this case's four years of effective dormancy.[7] Emails to the Classified Information Security Officer (CISO) previously

---

[7]   Attorney Huff has never held a security clearance and has not worked on any discovery issues in a classified setting.

assigned to this case have resulted in non-delivery notifications or gone unanswered, and preliminary research suggests that Officer has moved to a different role in a different court. The defense only this week learned of a potential contact for a new CISO from government counsel.

17.    The extension is expected to have minimal burden on the government. Although Al-Timimi's was granted conditional bail-release in 2020 pending his appeal, the conditions of that release are effectively equivalent to home incarceration. Al-Timimi is confined to the home of his mother, Dkt. No. 520 at 1, has no computer or internet access, *id*. at 2, and his location is monitored by GPS. *Id*. at 1-2. Notably, Al-Timimi remained free prior to trial without any GPS monitoring or communications restrictions at all—and with the government's consent. See Dkt. No. 532 at 2. And because of the recent invalidation of his lifetime prison sentence, Dkt. No. 549 at 10, 26, Al-Timimi is no longer subject to presumptive detention pending his appeal at all. See See 18 U.S.C. §§ 3143(b)(2) & 3142(f)(1)(B); see also Dkt. No. 519 at 15-16 (noting that absent a lifetime prison sentence, "the requirements for release pending appeal would be far less onerous.").

**The government's position**

18.    The parties have conferred. Over several email exchanges, the government has stated that it does not oppose a 30-day extension to file an opening brief by October 31, but that it would oppose Al-Timimi's retention of substitute counsel. The government has relayed that position as follows:

> [T]he position of the United States that I hope you will convey to the court is that, just as the United States has consented to the last 12 requests for extensions of the briefing schedule, the United States would not oppose a request to extend the briefing schedule for another 30 days if necessary to enable the appellant's attorneys actually to file a brief by October 31st  - - but the United States opposes the request to extend the briefing schedule to the extent that its purpose is to enable attorneys who entered the case more than 19 years ago (and for the express purpose of representing the defendant on appeal), now to find new lawyers, who will need further extensions in order to analyze the pleadings from the last 20 years worth of litigation before they actually can file the brief.

See Huff Decl., Exhibit A (email exchange between defense and government counsel).

19.    At minimum, the parties agree that the 30-day extension would be appropriate to accommodate the filing of an opening brief implicating the multitude of complex legal issues described above. But because recent changes in the personal circumstances of undersigned

counsel have made their continued representation functionally impossible, the defense cannot agree to an impossible condition that they maintain their representation.

20.     Notably, the government's contention that it "has consented to the last 12 requests for extensions of the briefing schedule" appears to refer to litigation activity from 2005-06 and 2014-15. In 2005-06, the government consented to three extension requests shortly before the parties agreed on a joint motion to remand the case. And although it is true that the government consented to nine extensions in 2014-15, the first seven of these were to allow a Classified Information Security Officer to complete a still-outstanding declassification review that had been ordered by the district court. See Dkt. No. 363. The latter two extensions were to allow this Court to resolve a pending motion for remand—a motion that was ultimately granted. See ECF Nos. 49, 51, 56.

21.     Undersigned counsel describes additional communications with the government in the attached declaration. Huff Decl. at 8-12, ¶¶ 18-23.

## CONCLUSION

The motion for a 30-day extension of time should be granted.

Respectfully submitted,

/s/ Thomas M. Huff_____
Thomas M. Huff
Attorney-at-Law
P.O. Box 2248
Leesburg, VA 20177
(703) 665-3756
thuff@law.gwu.edu

Jonathan Turley
The George Washington University
    Law School
2000 H Street, N.W.
Washington, D.C. 20052
(202) 994-7001
jturley@law.gwu.edu

Counsel for Defendant-Appellant
Dr. Ali Al-Timimi

Dated: September 20, 2024

## CERTIFICATE OF SERVICE

I certify that on September 20, 2024, I will file the foregoing document on the CM/ECF system, which will then electronically serve it on all counsel of record.

/s/ Thomas M. Huff_____
Thomas M. Huff
Attorney-at-Law
P.O. Box 2248
Leesburg, VA 20177
(703) 665-3756
thuff@law.gwu.edu

Counsel for Defendant-Appellant
Dr. Ali Al-Timimi