**No. 14-4451**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

———————

**UNITED STATES OF AMERICA,**
                    *Plaintiff/Appellee*,

**v.**

**ALI AL-TIMIMI,**
                    *Defendant/Appellant.*

———————

**On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)**

———————

**BRIEF OF THE APPELLANT**

———————

**Geremy C. Kamens
Federal Public Defender for the
  Eastern District of Virginia
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Geremy_Kamens@fd.org**

## <u>TABLE OF CONTENTS</u>

Table of Authorities ....................................................................................v

Statement of Jurisdiction.............................................................................1

Statement of the Issues................................................................................2

Statement of the Case..................................................................................4

      A.    Dar al Arqam Islamic Center ............................................6

      B.    Paintball and the Pre-9/11 Conspiracy to Travel Abroad for Jihad ....................................................................................7

      C.    Lashkar-e-Taiba (LET)......................................................10

      D.    September 16, 2001, Dinner at Kwon's Apartment...........11

      E.    The Decision to Train with LET ......................................16

      F.    Events After September 16, 2001 .....................................17

      G.    Procedural History...........................................................19

      H.    First Remand (2006-2014) ...............................................21

      I.    Second Remand (2015-2024)............................................23

      J.    Release From Federal Prison Pending Appeal (2020).......................25

Summary of Argument................................................................................26

Argument....................................................................................................29

I.    The Evidence Failed to Establish "Active Participation" With Actual Foreknowledge of the Carrying of Explosives Required for Aiding and Abetting Liability on Counts 9 and 10 .........................................................32

      A.    Standard of Review for Review of a Denial of Rule 29 Motion ........33

i

B.     Aiding and Abetting Requires Active Participation That Helps Another to Commit the Charged Offense .............................................35

C.     The Evidence at Trial Was Insufficient to Show that Al-Timimi's Words Helped Anyone to Commit a Criminal Offense .....................41

D.     The Supreme Court's Intervening Decision in *Rosemond* Requires Vacatur Because the Evidence Was Insufficient to Establish That Al-Timimi Had Actual Advance Knowledge That Kwon and Hasan Would Carry RPGs During Their Training Exercises at LET .............................................................................44

     1.     The Evidence at Trial Was Insufficient to Establish Proof of Advance Knowledge That Hasan and Kwon Would Carry RPGs ..............................................................................46

     2.     The District Court's Jury Instructions Failed to Require Proof of Advance Knowledge of RPGs .....................................53

II.     *Pinkerton* Liability Does Not Apply in This Case .........................................54

A.     No *Pinkerton* Instruction Was Given at Trial .....................................56

B.     *Pinkerton* Liability Could Not Apply Because Al-Timimi Was Charged Only With Aiding and Abetting Conspiracies.....................63

     1.     *Pinkerton* Liability Is Premised on Conviction of Membership in a Conspiracy .....................................................63

     2.     *Rosemond* Forecloses *Pinkerton* Liability Based Upon Aiding and Abetting a Conspiracy.............................................64

     3.     Aiding and Abetting a Conspiracy Is Not a Viable Theory of Criminal Liability in This Case .............................................65

     4.     Assuming Arguendo That the *Pinkerton* Doctrine Is a Valid Theory of Liability in This Case, Counts 9 and 10 Must Be Vacated Because the District Court Granted a Motion for Judgment of Acquittal on Count 1 .........................68

    C.     Insufficient Evidence Exists With Respect to the Remaining Conspiracy Charges in Counts 3 and 6 ................................................72

          1.     Insufficient Evidence Supports Conviction on Count 3: Aiding and Abetting Others to Engage in a Seditious Conspiracy in Violation of 18 U.S.C. § 2384 ..........................72

          2.     Insufficient Evidence Supports Conviction on Count 6: Aiding and Abetting Others to Conspire to Violate the Neutrality Act ...............................................................75

III.    Insufficient Evidence Exists With Respect to Counts 2, 4, and 5 of the Superseding Indictment ..................................................................78

    A.     Standard of Review .........................................................78

    B.     Count 2: Solicitating Others to Levy War in Violation of 18 U.S.C. § 373 ........................................................................79

          1.     "Levying War" in Violation of 18 U.S.C. § 2381 Is Not Categorically a Crime of Violence ...........................................80

          2.     Al-Timimi Did Not Solicit Treason in Violation of 18 U.S.C. §§ 373 and 2381 ....................................................84

    C.     Counts 4 and 5: Attempting to Contribute Services to the Taliban and Aiding and Abetting Others to Aid the Taliban in Violation of 50 U.S.C. § 1705 ..........................................89

          1.     Counts 4 and 5 Are Multiplicitous ...........................................89

          2.     The Evidence Is Insufficient to Support Conviction for Aiding and Abetting an Attempted Provision of Services to the Taliban in Violation of 50 U.S.C. § 1705 ......................90

          3.     The District Court Failed to Properly Define "Attempt" ..........94

IV.    Al-Timimi's Speech Was Protected From Criminal Liability by the First Amendment ..................................................................95

    A.     Standard of Review .........................................................97

B.    Al-Timimi's Speech Was Protected From Criminal Liability By the First Amendment ...........................................................98

1.    General Advocacy to Join a Disfavored Group Is Protected Speech .........................................................................98

2.    Al-Timimi's General Statements Did Not Constitute Facilitation or Solicitation of a Specific Crime ....................100

3.    Al-Timimi's Words Did Not Satisfy *Brandenburg*'s Imminence Requirement to Be Subject to Criminal Sanction .........................................................................105

Conclusion ........................................................................................107

Request for Oral Argument ...............................................................108

Certificate of Compliance

## TABLE OF AUTHORITIES

### Cases

*Abuelhawa v. United States*, 556 U.S. 816 (2009) ...................................................36

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ........................................98

*Backun v. United States*, 112 F.2d 635 (4th Cir. 1940) ...........................................36

*Baldwin v. Franks*, 120 U.S. 678 (1887) ......................................................73, 74, 75

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293 (4th Cir. 2018) .........................................................................................................39, 44

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984)......................97

*Brandenburg v. Ohio*, 395 U.S. 444 (1969).............................. 4, 28, 39, 98, 99, 105

*Bryan v. United States*, 524 U.S. 184 (1998)............................................................93

*Burgman v. United States*, 188 F.2d 637 (D.C. Cir. 1951).....................................82

*Case v. Bowles*, 327 U.S. 92 (1946) ........................................................................81

*Clay v. United States*, 403 U.S. 698 (1971)...............................................................7

*Counterman v. Colorado*, 600 U.S. 66 (2023).......................................................105

*County Court of Ulster County, N.Y. v. Allen*, 442 U.S. 140 (1979)......................34

*Dawson v. Delaware*, 503 U.S. 159 (1992) ...................................................... 99-100

*Evans-Smith v. Taylor*, 19 F.3d 899 (4th Cir. 1994)...............................................34

*Ex parte Bollman*, 8 U.S. 75 (1807) .......................................................................80

*Federal Communications Commission v. Consumers Research*, S. Ct. Nos. 24-354 & 24-422 (argued Mar. 26, 2025) .........................................................89

*Gillars v. United States*, 182 F.2d 962 (D.C. Cir. 1950) ..................................74, 82

*Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007) ...................................................36

*Griffin v. United States*, 502 U.S. 46 (1991)................................................... 70-71

*Henderson v. United States*, 568 U.S. 266 (2013)..............................................54, 81

*Hess v. Indiana*, 414 U.S. 105 (1973)..........................................................105, 106

*Hilliard v. United States*, 121 F.2d 992 (4th Cir. 1941) .................................. 60-61

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ....................................100

*Iannelli v. United States*, 420 U.S. 770 (1975)..........................................56, 63, 64

*In re Winship*, 397 U.S. 358 (1970) ........................................................34

*Indep. U. S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908 (D.C. Cir. 1982)
...................................................................................................82

*Ingram v. United States*, 360 U.S. 672 (1959).........................................................76

*Jackson v. Virginia*, 443 U.S. 307 (1979)................................................................34

*Jensen v. Farrell Lines, Inc.*, 625 F.2d 379 (2d Cir. 1980) ....................................82

*Johnson v. United States*, 576 U.S. 591 (2015) ...................................................5, 24

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967) ..........99

*Liparota v. United States*, 471 U.S. 419 (1985) ....................................................89

*Logan v. United States*, 144 U.S. 263 (1892) .........................................................61

*N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).............................105

*Neder v. United States*, 527 U.S. 1 (1999)..............................................................70

*Noto v. United States*, 367 U.S. 290 (1961).............................................78, 98, 103

*Nye & Nissen v. United States*, 336 U.S. 613 (1949) .............. 30, 39, 55, 63, 66, 69

*Ocasio v. United States*, 578 U.S. 282 (2016) .......................................................76

vi

*Pereira v. United States*, 347 U.S. 1 (1954) ..................................................44, 56, 66

*Pinkerton v. United States*, 328 U.S. 640 (1946)...............................................*passim*

*Rosemond v. United States*, 572 U.S. 65 (2014)................................................*passim*

*Rosales-Mireles v. United States*, 585 U.S. 129 (2018) ................................... 53-54

*Standefer v. United States*, 447 U.S. 10 (1980) ...............................................35, 36

*Staples v. United States*, 511 U.S. 600 (1994).........................................................46

*Stromberg v. California*, 283 U.S. 359 (1931) .......................................................71

*United States v. Alahmedalabdaloklah*, 2017 WL 2730978 (D. Ariz. June 26, 2017) .........................................................................................................65

*United States v. Al-Timimi*, No. 1:04-CR-385 (LMB), 2020 WL 4810120, (E.D. Va. Aug. 18, 2020), *aff'd*, No. 20-4441, 2020 WL 8618188 (4th Cir. Aug. 31, 2020) .................................................................................................6

*United States v. Al-Timimi*, 741 F. Supp. 3d 365 (E.D. Va. 2024)........................91

*United States v. Amirnazmi*, 645 F.3d 564 (3d Cir. 2011)......................................93

*United States v. Apple*, 915 F.2d 899 (4th Cir. 1990)....................................... 24-25

*United States v. Arch Trading Co.*, 987 F.2d 1087 (4th Cir. 1993)........................89

*United States v. Barefoot*, 754 F.3d 226 (4th Cir. 2014) ......................................85

*United States v. Bartow*, 997 F.3d 203 (4th Cir. 2021) ...........................................97

*United States v. Benson*, 957 F.3d 218 (4th Cir. 2020) ...........................................51

*United States v. Campbell*, 102 F.4th 238 (4th Cir. 2024) .....................................78

*United States v. Cardwell*, 433 F.3d 378 (4th Cir. 2005) ..................................79, 84

*United States v. Cone*, 714 F.3d 197 (4th Cir. 2013).............................................71

*United States v. D'Aquino*, 192 F.2d 338 (9th Cir. 1951) ......................................82

vii

*United States v. Dinkins*, 691 F.3d 358 (4th Cir. 2012)...........................................63

*United States v. Dinkins*, 928 F.3d 349 (4th Cir. 2019)....................................66-67

*United States v. Donel*, 211 F. App'x 180 (4th Cir. 2006) .....................................51

*United States v. Encarnacion-Ruiz*, 787 F.3d 581 (1st Cir. 2015) .........................45

*United States v. Engle*, 676 F.3d 405 (4th Cir. 2012)............................................91

*United States v. Falcone*, 311 U.S. 205 (1940) .....................................................66

*United States v. Gillis*, 938 F.3d 1181 (11th Cir. 2019) .........................................80

*United States v. Gladish*, 536 F.3d 646 (7th Cir. 2008) .........................................92

*United States v. Greathouse*, 26 F. Cas. 18 (C.C.N.D. Cal. 1863)...................74, 80

*United States v. Groves*, 65 F.4th 166 (4th Cir. 2023) ..........................................90

*United States v. Hansen*, 599 U.S. 762 (2023) ..................................................*passim*

*United States v. Hansen*, 40 F.4th 1049 (9th Cir. 2022)......................................102

*United States v. Henning*, 286 F.3d 914 (6th Cir. 2002) ........................................68

*United States v. Heyward*, 42 F.4th 460 (4th Cir. 2022) ........................................83

*United States v. Hickman*, 626 F.3d 756 (4th Cir. 2010)........................................34

*United States v. Horton*, 921 F.2d 540 (4th Cir. 1990) ..........................................36

*United States v. Kaiser*, 660 F.2d 724 (9th Cir. 1981) ...........................................69

*United States v. Kasvin*, 757 F.2d 887 (7th Cir. 1985)...........................................65

*United States v. Khan*, 461 F.3d 477 (4th Cir. 2006) .............................................73

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) ....................24

*United States v. Labat*, 905 F.2d 18 (2d Cir. 1990)................................................63

*United States v. Laffitte*, 121 F.4th 472 (4th Cir. 2024) .........................................71

viii

*United States v. Langston*, 970 F.2d 692 (10th Cir. 1992) .....................................65

*United States v. Lockhart*, 947 F.3d 187 (4th Cir. 2020) (en banc) .......................84

*United States v. Lumsden*, 26 F. Cas. 1013 (S.D. Ohio 1856)................................70

*United States v. Medina-Campo*, 714 F.3d 232 (4th Cir. 2013)............................79

*United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013) .........................................13

*United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020) ...................................*passim*

*United States v. Mitchell*, 104 F.3d 649 (4th Cir. 1997).........................................46

*United States v. Nordean*, 2022 WL 17583799 (D.D.C. Dec. 11, 2022) ....70, 73, 75

*United States v. O'Nan*, 452 F. App'x 280 (4th Cir. 2011) ....................................97

*United States v. Olano*, 507 U.S. 725 (1993) ....................................................54, 95

*United States v. Oreto*, 37 F.3d 739 (1st Cir. 1994) ..............................................66

*United States v. Perry*, 643 F.2d 38 (2d Cir. 1981) ................................................65

*United States v. Portac, Inc.*, 869 F.2d 1288 (9th Cir. 1989)................................66

*United States v. Pratt*, 351 F.3d 131 (4th Cir. 2003).............................................91

*United States v. Pugh*, 945 F.3d 9 (2d Cir. 2019)..................................................13

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999).....................................72, 87

*United States v. Rahman*, 83 F.3d 89 (4th Cir. 1996).............................................61

*United States v. Reyes*, 270 F.3d 1158 (7th Cir. 2001)..........................................93

*United States v. Rhodes*, 610 F. Supp. 3d 29 (D.D.C. 2022)..................................73

*United States v. Rodriguez*, 803 F.2d 318 (7th Cir. 1986)......................................74

*United States v. Rosas-Fuentes*, 970 F.2d 1379 (5th Cir. 1992) ............................69

*United States v. Sanders*, 107 F.4th 234 (4th Cir. 2024).......................................23

*United States v. Simms*, 914 F.3d 229 (4th Cir. 2019) (en banc) ...........................81

*United States v. Slocum*, 106 F.4th 308 (4th Cir. 2024) ...........................................90

*United States v. Smithers*, 92 F.4th 237 (4th Cir. 2024) ..........................................31

*United States v. Spinney*, 65 F.3d 231 (1st Cir. 1995) ..............................................51

*United States v. Standefer*, 610 F.2d 1076 (3d Cir. 1979) ........................................67

*United States v. Stevens*, 559 U.S. 460 (2010) .........................................................98

*United States v. Strayhorn*, 743 F.3d 917 (4th Cir. 2014) ...........................34, 43, 78

*United States v. Taylor*, 596 U.S. 845 (2022) ...........................................................81

*United States v. Thomas*, 58 F. App'x 952 (4th Cir. 2003) ...............................49, 50

*United States v. Ulbricht*, 2015 WL 413426 (S.D.N.Y. Feb. 2, 2015) ...................65

*United States v. Walker*, 621 F.2d 163 (5th Cir. 1980) ...................................... 65-66

*United States v. Ward*, 171 F.3d 188 (4th Cir. 1999) ...............................................81

*United States v. Williams*, 341 U.S. 58 (1951) .........................................................36

*United States v. Williams*, 553 U.S. 285 (2008) ..............................86, 98, 102, 105

*United States v. Winstead*, 708 F.2d 925 (4th Cir. 1983) .........................................40

*United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994)..................................46

*United States v. Zandi*, 769 F.2d 229 (4th Cir. 1985)...............................................60

*Wasson v. Trowbridge*, 382 F.2d 807 (2d Cir. 1967) ...............................................82

*Wiborg v. United States*, 163 U.S. 632 (1896) .........................................................76

*Yates v. United States*, 354 U.S. 298 (1957)..............................................................71

*Yates v. United States*, 574 U.S. 528 (2015).............................................................38

## Constitutional Provisions, Statutes, and Rules

U.S. Const. amend. I ...................................................................................*passim*

18 U.S.C. § 2 ...............................................................................................*passim*

18 U.S.C. § 371 ...............................................................................5, 19, 20, 75, 76

18 U.S.C. § 373 ...........................................................................................*passim*

18 U.S.C. § 844(h) .......................................................................................*passim*

18 U.S.C. § 924(c) ................................................ 5, 19-20, 32, 45-46, 48-51, 62, 69

18 U.S.C. § 924(o) ...............................................................................4, 20, 68, 69

18 U.S.C. § 960.................................................................5, 19, 20, 31, 70, 75

18 U.S.C. § 2339B ..............................................................................................100

18 U.S.C. § 2381 .........................................................................................*passim*

18 U.S.C. § 2384.............................................................. 19, 31, 70, 72, 73, 74, 75

18 U.S.C. § 3231 .....................................................................................................1

28 U.S.C. § 1291 .....................................................................................................2

50 U.S.C. § 1705 .........................................................................................*passim*

Fed. R. App. P. 4 ....................................................................................................1

Fed. R. Crim. P. 16................................................................................................22, 23

Fed. R. Crim. P. 29 (judgment of acquittal) .....................................................*passim*

Fed. R. Crim. P. 33 (new trial)..........................................................................54, 95

## Other Authorities

American Law Institute, Model Penal Code (1985).........................................79, 101

American Bar Association Antitrust Section, Model Jury Instructions in Civil Antitrust Cases (A.B.A. Chicago, Ill)..................................................58, 60

Black's Law Dictionary (10th ed. 2014) ................................................36

Blackstone, Commentaries on the Laws of England (1765) ....................................84

Center for Constitutional Rights, *The Darkest Corner: Special Administrative Measures and Extreme Isolation in the Federal Bureau of Prisons* 1 (2017) ..............................................................6

Department of Justice, *Report on the Availability of Bombmaking Information Department of Justice, the Extent to Which Its Dissemination is Controlled by Federal Law, and the Extent to Which Such Dissemination May Be Subject to Regulation Consistent with the First Amendment to the United States Constitution* (April 1997) .....................39

*Developments in the Law—Criminal Conspiracy*, 72 Harv. L. Rev. 922 (1959)..................................................................67

William H. Freivogel, *Tom Eagleton and the "Curse to Our Constitution"*, 52 St. Louis U. L.J. 109 (2007) ........................................96

David Goldberger, *Protecting Speech We Hate*, 32(2) Litigation 40 (Winter 2006) ...................................................................96

Thomas Healy, *Brandenburg in a Time of Terror*, 84 Notre Dame L. Rev. 655 (2009).........................................................96

International Emergency Economic Powers Enhancement Act, Pub. L. 110-96, 121 Stat. 1011 (Oct. 16, 2007)....................................28

Judiciary Committee Report on the Criminal Code Reform Act of 1981, S. Rep. 97-307, 97th Cong.,1st Sess. 183 (1981) ................................85

Elisa Kantor, *New Threats, Old Problems: Adhering to Brandenburg's Imminence Requirement in Terrorism Prosecutions*, 76 Geo. Wash. L. Rev. 752 (2008) ....................................................97

John C. Knechtle, *When to Regulate Hate Speech*, 110 Penn. St. L. Rev. 539 (2006)....................................................97

LaFave, Substantive Criminal Law (3d ed. 2022) ...................................................101

Wayne McCormack, *Inchoate Terrorism: Liberalism Clashes with Fundamentalism*, 37 Geo. J. Int'l L. 1 (2005) .....................................................97

Merchant Marine Act of 1970, S. Rep. 91-1080, reprinted at 1970 U.S.C.C.A.N. 4188 ................................................................................82

O'Malley, Grenig, & Lee, Fed. Jury Prac. & Instr. (6th ed. 2008) ..................58, 59

Oxford Dictionary of Islam (Esposito ed. 2003) ................................................11, 14

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012).......................................37

Michael J. Sherman, *Brandenburg v. Twitter*, 28 Geo. Mason U. Civ. Rts. L.J. 127 (2018)............................................................................................97

U.S. Dep't of Defense Law of War Manual (2023) ..........................................82, 83

Milton Viorst, *The Education of Ali Al-Timimi*, The Atlantic Monthly (June 2006) ..............................................................................................................6

Wharton's Criminal Law (16th ed.)..........................................................................37

No. 14-4451

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH COURT

_____

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

ALI AL-TIMIMI,
*Defendant/Appellant*.

_____

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)

_____

BRIEF OF THE APPELLANT

_____

## STATEMENT OF JURISDICTION

This appeal challenges the convictions of Dr. Ali Al-Timimi (Al-Timimi).
The district court had jurisdiction over this federal criminal case pursuant to 18
U.S.C. § 3231. That court entered the order of judgment and conviction on July 13,
2005. J.A. 2758. Al-Timimi filed his initial notice of appeal on July 15, 2005. J.A.
2765; *see* Fed. R. App. P. 4(b)(1), (b)(6). In that appeal, Case No. 05-4761, the Court
granted, without opposition, a motion to vacate and remand to the district court while

1

preserving Al-Timimi's right to "timely file without prejudice a new notice of appeal with this Court" following a final order by the district court. J.A. 2768-2769.

The district court entered a final order on May 21, 2014, J.A. 2887-2888, and Al-Timimi filed a timely notice of appeal on June 4, 2014, J.A. 2889-2890. After accepting jurisdiction over this appeal in Case No. 14-4451 pursuant to 28 U.S.C. § 1291, this Court again remanded while retaining jurisdiction to permit the district court to consider additional evidence of a potential discovery and *Brady* violation, and an intervening change in law related to Al-Timimi's convictions on Counts 1, 7 and 8. J.A. 2892-2893. The district court resolved those issues on July 18, 2024, *see* J.A. 2972-2997, J.A. 2998, and proceedings thereafter resumed in this Court.

## STATEMENT OF THE ISSUES

1.      Whether speech in the days after the September 11 terrorist attacks that Muslims were morally obligated to help to defend Muslims in Afghanistan, and should leave the United States and be with mujahideen anywhere in the world if possible, constitutes aiding and abetting of listeners who subsequently obtained weapons training with explosives overseas?

         A.      Specifically, whether such speech satisfies the requirement of an "affirmative act" that helps another to commit the charged offenses for purposes of criminal aiding and abetting liability as to violations of 18 U.S.C. § 844(h)?

B.     Whether the evidence is sufficient to establish that Al-Timimi possessed actual foreknowledge of a principal's use of an RPG required for aiding and abetting liability under *Rosemond v. United States*, 572 U.S. 65 (2014)?

2.     Whether *Pinkerton* liability applies to substantive firearm offenses in a case where the defendant has not been charged with membership in a conspiracy, but only as an aider and abettor; the jury was not given a *Pinkerton* instruction; and the district court vacated the conspiracy conviction (Count 1) that charged a conspiracy to commit firearms offenses?

3.     Whether sufficient evidence supported Al-Timimi's convictions on Count 3 (aiding and abetting a seditious conspiracy) and Count 6 (aiding and abetting a conspiracy to violate the Neutrality Act)?

4.     Whether "levying war" in violation of 18 U.S.C. § 2381 categorically constitutes a "crime of violence" as required for solicitation liability under 18 U.S.C. § 373, both as properly defined and as defined by the district court, and whether the evidence was sufficient to establish that Al-Timimi solicited treason in violation of 18 U.S.C. §§ 373 and 2381?

5.     Whether Counts 4 and 5, charging attempted provision of services to the Taliban in violation of 50 U.S.C. § 1705, are multiplicitous, whether the jury was properly instructed as to meaning of "attempt," and whether sufficient evidence supported those convictions?

3

6.      Whether Al-Timimi's speech was protected by the First Amendment as abstract advocacy that neither facilitated criminal conduct nor satisfied *Brandenburg*'s imminence requirement?

## STATEMENT OF THE CASE

The convictions in this case arise from comments made by Dr. Ali Al-Timimi—a cancer researcher and well-known Muslim lecturer in Northern Virginia—at a dinner five days after September 11 that the government claims helped to motivate two people in attendance to obtain weapons training at a camp in Pakistan run by Lashkar-e-Taiba (LET), a militant group that would later be designated as a foreign terrorist organization. Under a variety of novel theories of inchoate liability—some never before considered by this Court—Al-Timimi was charged with and convicted of ten felonies. *See* J.A. 64-79 (superseding indictment). At sentencing, the district court described the mandatory punishment required as "very draconian," and imposed the requisite mandatory sentence of life in prison followed by sentences totaling 70 years. *See* J.A. 2738; J.A. 2752-2754; J.A. 2760.

Eight of the ten charges explicitly pleaded aiding and abetting as the theory of criminal liability: Count 1, inducing others to conspire to use firearms in violation of 18 U.S.C. § 924(o), J.A. 67-72; Count 3, inducing others to conspire to levy war in violation of 18 U.S.C. § 373, J.A. 74; Count 5, inducing others to attempt to aid the Taliban in violation of 50 U.S.C. § 1705, J.A. 76; Count 6, inducing others to

4

conspire to violate the neutrality act in violation of 18 U.S.C. §§ 371 & 960, J.A. 77; Counts 7 and 8, inducing others to use firearms during crimes of violence, specifically including Count 1, in violation of 18 U.S.C. § 924(c), J.A. 78; and Counts 9 and 10, inducing others to carry explosives (rocket-propelled grenades) during the commission of federal felonies, specifically including Count 1, in violation of 18 U.S.C. § 844(h)(2), J.A. 79. Only Count 2, which charged solicitation of others to levy war in violation of 18 U.S.C. § 373, and Count 4, which charged attempted contribution of services to the Taliban in violation of 50 U.S.C. § 1705 (but also cited 18 U.S.C. § 2), did not explicitly plead aiding and abetting as the theory of criminal liability. *See* J.A. 73; J.A. 75.

Al-Timimi was originally sentenced to life imprisonment on Count 8; concurrent sentences totaling 121 months on Counts 1–6; 360 months consecutive on Count 7; 120 months consecutive on Count 9; and 240 months consecutive on Count 10. J.A. 2738; J.A. 2752-2754; J.A. 2760.

This is a direct appeal— yes, a direct appeal 20 years after the trial—of seven of those convictions, as the district court granted a post-trial motion for acquittal as to three offenses (Counts 1, 7, and 8) pursuant to *Johnson v. United States*, 576 U.S. 591 (2015), during a lengthy remand from this Court. *See* J.A. 2892-2895; J.A. 2998.

During that remand and while the district court considered post-trial motions (and after Al-Timimi had already served approximately 180 months of

imprisonment, primarily under special administrative measures and almost entirely in solitary confinement),[1] the district court, in an order affirmed by this Court, authorized his release on home confinement pending the outcome of this appeal. J.A. 2969-2970; J.A. 2971; *see* J.A. 2953-2968. Only the sentences on Counts 9 and 10, consecutive terms of 120 and 240 months, remain to be served.

### A.     Dar al Arqam Islamic Center

Al-Timimi, a 61-year old natural-born U.S. citizen who possesses a doctorate in computational biology[2] and was a former assistant professor at the George Mason University Center for Biomedical Genomics, J.A. 2959, *United States v. Al-Timimi*, No. 1:04-CR-385 (LMB), 2020 WL 4810120, at *3 (E.D. Va. Aug. 18, 2020), *aff'd*, No. 20-4441, 2020 WL 8618188 (4th Cir. Aug. 31, 2020) (order release pending

---

[1] 28 C.F.R. § 501.3 permits segregation and limitations on correspondence, visitation, media interviews, and telephone access as "reasonably necessary to protect persons against the risk of acts of violence or terrorism." Such measures "combin[e] the brutality and isolation of maximum security units with additional restrictions that deny individuals almost any connection to the human world." *See* Center for Constitutional Rights, *The Darkest Corner: Special Administrative Measures and Extreme Isolation in the Federal Bureau of Prisons* 1 (2017), available at:

https://ccrjustice.org/sites/default/files/attach/2017/09/SAMs%20Report.Final_.pdf

[2] Al-Timimi's dissertation director told a reporter that "Ali's innovations in computational biology were at the threshold of a significant breakthrough in cancer research." Milton Viorst, *The Education of Ali Al-Timimi*, The Atlantic Monthly (June 2006), available at:

https://www.theatlantic.com/magazine/archive/2006/06/the-education-of-ali-al-timimi/304884/

appeal), and has no previous criminal history, is a devout Muslim and co-founder of the Center for Islamic Information and Education, popularly known as Dar al-Arqam, in Falls Church, Virginia, J.A. 172-173. For approximately a year prior to the terrorist attacks on September 11, 2001, Al-Timimi gave public talks there on Friday nights on religious and political topics, including religious eschatology referencing end-of-time conflicts involving Muslims. He never advocated violence and spoke of "jihad" only in abstract theological terms. J.A. 240; J.A. 242-243; J.A. 404-408; J.A. 574-575; J.A. 1290. The term "jihad" means "struggle," and can encompass efforts ranging "from protecting your house, protecting yourself, your community, to the highest state of jihad, which is fighting against your evil desires," as well as engaging in physical combat. J.A. 182; *see also Clay v. United States*, 403 U.S. 698, 709 (1971) (Douglas, J., concurring) (noting that although "*jihad* is the Moslem's counterpart of the 'just' war as it has been known in the West[,]" "[w]ar is not the exclusive type of *jihad*; there is action by the believer's heart, by his tongue, by his hands, as well as by the sword.").

### B. Paintball and the Pre-9/11 Conspiracy to Travel Abroad for Jihad

Independently of Al-Timimi, and without his participation, a group of Dar al-Arqam attendees began engaging in paintball exercises in early 2000, and actually competed against other paintball teams. J.A. 194; J.A. 245-246. When the group started, it was open to anyone who wanted to play paintball. J.A. 245.

A small subset of this group, however, purchased and engaged in firearms training in a conspiracy to prepare for possible participation in armed conflicts abroad. J.A. 246; J.A. 435; J.A. 1254-1255; J.A. 2243-2245. By all accounts, Al-Timimi had little knowledge of the paintball activities, and absolutely no knowledge or involvement in the conspiracy to engage in firearms training to prepare to fight overseas. J.A. 194-196, J.A. 234-235, J.A. 255-256 (Gharbieh); J.A. 291, J.A. 436-437, J.A. 447 (Aatique); J.A. 585 (Surratt); J.A. 1254, J.A. 1259-1161 (Kwon); J.A. 2243-2245 (Hasan).

Specifically, when Yong Kwon was asked whether he told Al-Timimi that participation in paintball exercises was part of a conspiracy to prepare for participating in armed conflicts overseas, he responded flatly, "no." J.A. 1254. Muhammad Aatique likewise said he never told Al-Timimi of his pre-September-11 plans to obtain military training with Lashkar-e-Taiba (LET). J.A. 447. Another of the paintball participants, Khwaja Mahmood Hasan, testified that he never mentioned paintball to Al-Timimi. J.A. 2245. Although Hasan began preparing himself to potentially participate in armed conflict overseas in January 2000, Al-Timimi "didn't know in any way, shape, or form that [Hasan was] preparing for actual combat." J.A. 2245.

Nor did any of the paintball participants testify that Al-Timimi knew they possessed actual firearms. The government's first witness, Nabil Gharbieh, helped

8

to start the paintball group. J.A. 193-194. He also had a rifle, but did not tell Al-Timimi about the firearm. J.A. 258-259. Kwon likewise never told Al-Timimi that he owned a firearm, never showed him the firearm he owned, and never told him he sold a firearm to another of the paintball participants, Randall Royer. J.A. 1258; J.A. 1301. Kwon also said that Al-Timimi never told him to purchase a gun, J.A. 1293, and he had no information that Al-Timimi knew any of the paintball participants owned firearms, J.A. 1357. Hasan did not tell Al-Timimi about using firearms in the United States either. J.A. 2244. Another participant, Idris Surratt, similarly never told Al-Timimi about his efforts to purchase firearms unlawfully. *See* J.A. 584-585. Nor did any witness testify that Al-Timimi knew about violent videos viewed by members of the paintball group. *See* J.A. 235; J.A. 250.

In fact, Al-Timimi had only a limited relationship with most of the paintball participants aside from seeing them when he lectured at Dar al-Arqam. J.A. 256-258. One of the participants, Yong Ki Kwon, drove Al-Timimi to the Dar al-Arqam Center on a handful of occasions. J.A. 612-613; J.A. 1331. Another participant, Muhammad Aatique, had never socialized with Al-Timimi or been to his home. J.A. 292-293. And a third participant, Khwaja Mahmood Hasan, knew Al-Timimi from listening to his lectures but he "was not a personal friend." J.A. 2238.

### C.    Lashkar-e-Taiba (LET)

Among all of the paintball participants, and the smaller group who engaged in firearms training, trial testimony established that two had traveled overseas for training with LET prior to the September 11 attacks: Ibrahim Al-Hamdi and Randall Royer. J.A. 273. Al-Hamdi went to a camp in Pakistan in approximately September of 2000. J.A. 437-438. Randall Royer had fought in Bosnia prior to his involvement in the paintball group, J.A. 1301, and trained at an LET camp in Pakistan in 2000, J.A. 2246. Kwon first heard of LET when Royer returned from Pakistan, and subsequently agreed to refer people interested in obtaining training with LET to Royer. J.A. 628; J.A. 1324-1325. Kwon did not, however, tell Al-Timimi that he was recruiting people to train with LET. J.A. 1328.

One person Kwon referred was Aatique. J.A. 1325. Aatique had heard about training with LET from Al-Hamdi. J.A. 299-300. Al-Hamdi's description of his training with LET had a "great impact" on Aatique, and he decided he also would travel to Pakistan to seek training from LET in the summer of 2001. J.A. 314. He then obtained a letter of introduction from Royer in August 2001. J.A. 314; J.A. 447. But Aatique did not tell Al-Timimi about his plans. J.A. 447.

10

Kwon testified that at some point before the September 11 attacks, he heard Al-Timimi say that LET was on the "sunnah," or correct path. J.A. 630.[3] Another witness, Nabil Gharbieh, testified that Al-Timimi's comment about LET was in response to a question about which jihad groups have the proper "creed" or "correct understanding of Islam." J.A. 183. Al-Timimi responded that although he "didn't have too much knowledge about the creed" of LET, it was "closer to the proper creed than other creeds that [Al-Timimi] definitely disagreed with" such as Al-Qaeda. J.A. 183; J.A. 249.

When interviewed by a law enforcement agent in 2003, Al-Timimi said that he was aware from the media of LET's tactics, which included cross-border shelling, raids on police stations, and suicide missions. J.A. 1741-1742. He also said that he had never been to a camp, but knew LET provided weapons training at their camps, J.A. 1743, and he had read bulletins issued by LET that discussed using explosives to blow up bridges and buildings, J.A. 1758.

### D.      September 16, 2001, Dinner at Kwon's Apartment

After the September 11 attacks, many Dar al-Arqam attendees feared the possibility of violent reprisals against Muslims in the United States. J.A. 459-461;

---

[3] According to the Oxford Dictionary of Islam, the "sunnah" refers to "[e]stablished custom, normative precedent, conduct, and cumulative tradition, typically based on Muhammad's example." Oxford Dict. Islam 305 (Esposito ed. 2003).

J.A. 652. The evening of September 11, Kwon drove Al-Timimi home from the Dar al-Arqam Center. J.A. 639. While in the car, Al-Timimi told Kwon to "gather some brothers and come up with a [] contingency plan in case … there will be … mass hostility towards Muslims in America." J.A. 640. Al-Timimi reportedly said they should "come up with a plan to [] defend [themselves] and [their] families." J.A. 643.

Al-Timimi did not identify which people Kwon should gather. *See* J.A. 641-642. Kwon decided to email some members of the "paintball group" and others with whom he had gone to firing ranges to invite them to his apartment for dinner. J.A. 640-641. Kwon did not consult with Al-Timimi about his plan, and did not tell him who he had invited. J.A. 1351. In fact, Kwon testified that he had not originally intended to invite Al-Timimi to the dinner. J.A. 1354.

Al-Timimi told the FBI that Kwon invited him to the dinner to provide comments about the "events that had transpired on 9/11." J.A. 1778. Approximately an hour after the other attendees arrived at the apartment, Kwon left to pick up Al-Timimi from his house and bring him back to the apartment. *See* J.A. 317.

Al-Timimi spoke to the attendees for approximately 45 minutes to an hour. J.A. 350. A portion of the speech addressed the purported justification for the September 11 attacks, J.A. 320-321, and emphasized religious and ideological

12

themes, J.A. 322, J.A. 409. Al-Timimi was driven home by Kwon at approximately 10:00 p.m., shortly after he finished speaking. J.A. 1389.

Three attendees—Kwon, Aatique, and Hasan—testified about Al-Timimi's statements at the meeting. All said, with varying degrees of difference, that Al-Timimi: (1) reported that the leader of Afghanistan had called for help from Muslims, J.A. 2345; (2) stated that it was obligatory for Muslims to help; and (3) encouraged the attendees to leave the United States, live among Muslims overseas, and, if possible, be with the mujahideen[4] anywhere in the world, J.A. 458, J.A. 1148, J.A. 1153, J.A. 1382-1384, J.A. 2207, J.A. 2254. Hasan and Kwon also remembered Al-Timimi recommending that if the attendees could not leave the United States, they should stay home and either repent or wait until things calmed down. J.A. 1384; J.A. 2207; J.A. 2254-2276.

Specifically, when an attendee at the dinner asked Al-Timimi his opinion of the September 11 attacks, he responded by reading from a "fatwa," or religious

---

[4] "Mujahid means 'one who struggles' and, in the context of a jihad, 'holy warrior.'" *United States v. Pugh*, 945 F.3d 9, 16 n.2 (2d Cir. 2019). "'Mujahideen'" (singular: 'mujahid') is defined as 'Muslim guerilla warriors engaged in a jihad.'" *United States v. Mehanna*, 735 F.3d 32, 46 (1st Cir. 2013).

ruling, J.A. 334-335,[5] issued by a Saudi cleric, Sheikh Uqla, J.A. 1376-1378. The

fatwa states in part:

> America will definitely seize this opportunity and utilize that in its favor
> and through it to do fresh injustice to the Muslims in Afghanistan,
> Palestine, Chechnya, and other areas …. [so] it is compulsory to assist
> this Islamic Nation [of Afghanistan] in Jihad, with whatever we can….
>
> Thus, it is compulsory to assist them with wealth, persons, opinions and
> advices, and through the Media by defending them and their honor and
> their public image; and through prayers for them that they vanquish the
> enemy and have steadfastness. And like we said, it is compulsory upon
> all Muslims to help the Taliban Government. It is also equally
> compulsory upon the Muslim Governments especially the neighboring
> countries to assist them against the Kufr of the West.

J.A. 3175-3176. At that point, the United States had not yet invaded Afghanistan,

but an invasion seemed likely to occur. J.A. 169-170; J.A. 2213.

**Kwon:** Kwon—the government's central witness—testified that during the

September 16 meeting, Al-Timimi said "First, you have to repent, and after you do

that, if you can, try to leave United States, and if you can do that, then try to join the

mujahideen." *See* J.A. 1147; J.A. 1383. Furthermore, Al-Timimi said "it doesn't

matter where you go," and it could be "[a]nywhere in the world[.]" J.A. 1381; J.A.

1383. Because Kwon's parents were from Korea, Al-Timimi said "at least [you] can

leave the United States and go to Korea. That way, you know, [you] don't have to

---

[5] The Oxford Dictionary of Islam defines a "fatwa" as an "[a]uthoritative legal
opinion given by a mufti (legal scholar) in response to a question posed by an
individual or a court of law." Oxford Dict. Islam 85.

14

pay taxes to this government." J.A. 1154. With respect to joining the mujahideen, Al-Timimi purportedly said "[g]o overseas and join any mujahideen," J.A. 1388, and "it doesn't matter if we fight the Indians or the Russians or the Americans, that this is all legitimate jihad," J.A. 1148. He also remembered Al-Timimi saying that "if you can't leave the United States, at least you should repent." J.A. 1384.

**Aatique:** Aatique had already been making plans to go overseas to train with Lashkar-e-Taiba, J.A. 347-347, J.A. 349, J.A. 446-447, but had no explicit intention of fighting against the United States, J.A. 462-463. Aatique testified that Al-Timimi "recommended these two or three things. None of them was in exclusion to any other. He said that go and fight, encourage to be with the mujahideen wherever, and also, of course, he said about that you should leave this country and be with the good folks." J.A. 458. Aatique understood Al-Timimi's reference to "liv[ing] with the good Muslims," J.A. 341, to refer to "Palestine, Arabia, and the south Asian region[,]" including LET in Pakistan, J.A. 323, J.A. 341, J.A. 481. Aatique did not have a specific memory of Al-Timimi saying that "if you couldn't leave the country, didn't want to go fight, you should stay home and pray," but agreed Al-Timimi may have said that too. J.A. 458. Aatique also agreed that Al-Timimi recommended non-mutually exclusive morally responsible "choices" they could make. J.A. 458.

**Hasan:** Hasan likewise said that "the three options that were given was that either to, either to go make hijra, which is to leave the country, or to go and defend

Afghanistan and defend the Muslims in Afghanistan, or to, like, lay as a rug in your house as an analogy." J.A. 2207; *see* J.A. 2254. The recommendation about "laying like a rug" meant, given the possibility of retaliatory violence against Muslims in the United States in the wake of the September 11 attacks, "to just stay in the house and not go out until things calm down." J.A. 2255-2256. Hasan also testified that Al-Timimi said it was obligatory to "defend Afghanistan and defend the Muslims in Afghanistan," J.A. 2207, and that because it was a religious obligation, it was not necessary to seek parental permission, J.A. 2209-2210. He also testified that Al-Timimi "didn't make [him] do anything." J.A. 2255.

### E.    The Decision to Train with LET

Kwon, who had already agreed to be a recruiter for LET, didn't remember who brought up LET at the dinner; but he also recalled Royer saying that he could "help [them] get there, he had the contacts." J.A. 1394. Kwon testified that during a discussion about whether the attendees "should get training before [they] engage[d] [themselves] in any combat," Al-Timimi was "sitting with us," but Kwon didn't "recall him saying anything. I just remember him being there." J.A. 1156.

Contradicting himself, Kwon also testified that Al-Timimi told Hasan he "should join the LET and get some training from the LET camps" in Pakistan because Hasan was from Pakistan. J.A. 1153. Hasan's testimony was more consistent with Kwon's other statement that Al-Timimi did not participate in this

16

discussion about training, as he said that it was only "after Timimi left the meeting" that "Royer had suggested to us that we should first get training" with LET. J.A. 2216-2217. Aatique "remember[ed] Al-Timimi being present [] for this discussion" about training with LET, "although [he was] sure part of this happened also after he had gone." J.A. 345-346.

Kwon further testified that no one had confirmed plans to travel to an LET camp when Al-Timimi left the dinner. J.A. 1388; J.A. 1473. Discussion about "what everybody was going to do" thus took place without Al-Timimi. J.A. 1389. Of those present at the dinner, some decided to remain in the United States. Royer decided to go to Bosnia, and Kwon, Hasan, Aatique, and an attendee named Masaud Khan decided to travel to Pakistan to receive training from LET. J.A. 351-355; J.A. 368.

## F.    Events After September 16, 2001

A few days later, Kwon and Hasan saw Al-Timimi at a restaurant and told him that they were "planning to leave" "to go, to go to LET or go to Pakistan." J.A. 2222-2223. They did not mention preparing to fight in Afghanistan. Hasan did not recall Al-Timimi's response, but testified that Al-Timimi did not seem surprised and did not discourage them. J.A. 2224. According to Hasan, Al-Timimi told him to take "precautions" by carrying a magazine, "cry like a baby" and ask for their mothers if they were caught, and keep a distance from one another. J.A. 2223-2224.

Kwon testified that Al-Timimi told them that if Hasan "was to get stopped for some reason at the airport," Kwon should not go because he would not know how to navigate his way in Pakistan. J.A. 1165; J.A. 1430-1431. Kwon said Al-Timimi did not tell them to travel apart from each other, but that Al-Timimi did say to "act scared and nervous, and ask for a lawyer, ask for your mothers, or stuff like that" if they were stopped by authorities. J.A. 1430. Kwon testified that he "didn't really see how [asking for their mothers] would help. J.A. 1429. Kwon and Hasan "sat next to each other" on a flight to Karachi, Pakistan. J.A. 1187.

Another paintball participant who was not present at Kwon's apartment on September 16, 2001, testified that a few weeks later, Al-Timimi advised him, in language resonant of the Sheikh Uqla fatwa, that he should support Muslims in Pakistan and Afghanistan "physically, if you can't support them physically, support them financially, if you can't support them financially, support them through speaking of them good (sic) or telling the good of what they are doing, and if you can't do that, then at least pray for them." J.A. 537-539 (Surratt).

No attendee at the September 16 dinner went to Afghanistan in the fall of 2001. J.A. 1159. Government witnesses Aatique, Kwon, and Hasan, however, subsequently traveled to Pakistan and received training at an LET camp for a period of between a few days, J.A. 365(Aatique), and a few weeks, J.A. 1190-1191 (Kwon, two to three weeks); J.A. 2232 (Hasan, four to five weeks). Kwon testified that he

shot one RPG round in a training exercise at an LET camp, J.A. 1194, but gave no indication that he had any plan in advance to do so. Kwon also said that Al-Timimi "never asked [him] to commit any crime with a gun" or "to carry explosives in the course of a crime." J.A. 1261-1262.

Hasan admitted to training on the use of an RPG weapon at a different LET camp than Kwon, J.A. 2231-2232, but presented no testimony that he ever communicated with Al-Timimi about the training before he left or while he was in Pakistan. Aatique likewise did not testify that he ever spoke with Al-Timimi about weapons training with LET before he left or while in Pakistan. Nor was any evidence adduced that Al-Timimi discussed training with explosives or RPGs with Kwon or Khan prior to or during their travel overseas. In sum, every witness who traveled overseas for weapons training who was asked whether such weapons training was discussed with Al-Timimi denied it.

### G.   Procedural History

On September 23, 2004, a grand jury in the Eastern District of Virginia issued a six-count indictment: Count 1 charged conspiracy in violation of 18 USC § 371 to levy war in violation of 18 U.S.C. § 2384, attempt to aid the Taliban in violation of 50 U.S.C. § 1705, violate the neutrality act, 18 U.S.C. § 960, and carry and discharge firearms during and in relation to crime of violence in violation of 18 U.S.C. § 924(c); Count 2 charged attempting to aid the Taliban in violation of 50 USC

§ 1705; Counts 3 and 4 charged aiding and abetting the discharge of automatic weapons during and in relation to crimes of violence in violation of 18 USC §§ 924(c); and Counts 5 and 6 charged aiding and abetting the carrying of explosives during felonies in violation of 18 USC § 844(h). J.A. 49-61.

Al-Timimi pleaded not guilty and was released on a $75,000 bond. J.A. 5. On February 3, 2005, the grand jury issued a superseding indictment charging: Count 1, inducing others to conspire to use firearms in violation of 18 U.S.C. § 924(o); Count 2, which charged solicitation of others to levy war in violation of 18 U.S.C. § 373; Count 3, inducing others to conspire to levy war in violation of 18 U.S.C. § 373; Count 4, which charged attempted contribution of services to the Taliban in violation of 50 U.S.C. § 1705; Count 5, inducing others to aid the Taliban in violation of 50 U.S.C. § 1705; Count 6, inducing others to conspire to violate the neutrality act in violation of 18 U.S.C. §§ 371 & 960; Counts 7 and 8, inducing others to use firearms during crimes of violence in violation of 18 U.S.C. § 924(c), and Counts 9 and 10, inducing others to carry explosives (rocket-propelled grenades) during the commission of federal felonies. J.A. 64-79.

Trial began on March 31, 2005. J.A. 13. On April 26, 2005, the jury returned guilty verdicts on all counts. J.A. 16. Over the government's objection, the district court continued Al-Timimi's bond with additional restrictions. J.A. 16. The court stated that "I recognize that the—under normal circumstances, convictions for these

20

types of offenses would result in bond being revoked, but Mr. Ali Timimi has not indicated in any respect that there's any likelihood of flight. As I said, he's known that he was under investigation for serious charges for some time. He has not absconded, and he has been here every day on time. Although the underlying crimes are crimes of violence, again, the second-to-third-degree-removed nature of the defendant's activities here is such that I'm not going to revoke his bond at this point. So the government's request is denied." J.A. 2562.

On July 13, 2005, Al-Timimi was sentenced to life imprisonment on Count 8, concurrent sentences totaling 121 months on Counts 1–5, 360 months consecutive on Count 7, 120 months consecutive on Count 9, and 240 months consecutive on Count 10. J.A. 2758-2760.

On July 15, 2005, Al-Timimi filed a timely notice of appeal to this Court. J.A. 2765.

## H.    First Remand (2006-2014)

Following news reports in December 2005 revealing the existence of the NSA Terrorist Surveillance Program (TSP), Al-Timimi filed a motion with the Fourth Circuit on February 17, 2006, to vacate and remand the case to the District Court. *See* Fourth Circuit No. 05-4761; Docs. 54 and 58).

On April 25, 2006, the Fourth Circuit granted an unopposed motion to vacate and remanded the case. J.A. 2768-2769. The remand continued until the district court

21

resolved all outstanding motions in an order dated May 21, 2014. J.A. 2887-2888. During the eight-year remand, Al-Timimi filed numerous motions seeking to obtain discovery with respect to any electronic surveillance of Al-Timimi that had not been disclosed previously, and the district court conducted several hearings. *See, e.g.*, J.A. 28 (docket entry 269); J.A. 31 (docket entry 312).

The crux of Al-Timimi's argument for discovery of undisclosed electronic surveillance of his communications conducted before the criminal investigation was initiated in 2003 was that: (1) documents obtained from the National Archives established the existence of surveillance under the TSP as well as FISA surveillance of Al-Timimi's communications prior to the 2003 surveillance stipulated at trial, *see* J.A. 1915, and (2) Al-Timimi's communications during the time period at issue – before and after the September 11 attacks – would be material to his defenses for purposes of Rule 16 and exculpatory because they would counter the government's allegations as to his criminal intent. Given that the government was able to play portions of lectures given by Al-Timimi in the 1990s at his trial, J.A. 1736-1737, J.A. 3272, Al-Timimi maintained that if his calls and electronic communications during the 2001 time frame were recorded, they would help to show he did not have a culpable state of mind.

In response, the government filed a number of *ex parte* classified responses. As the district court observed, "[t]he problem we have here is that things are

22

classified in such a way that it's very difficult, obviously, to speak about them and very difficult to in many respects understand them." J.A. 2809.

Nonetheless, the district court denied Al-Timimi's motions to compel discovery of previously-undisclosed government surveillance. J.A. 2864-2886. The court determined that "[e]ven acknowledging that [Al-Timimi] faces the difficult prospect of specifying the nature of the material to which he does not have access," the discovery requests were "too vague to grant" and did not permit "unsupervised authority to search through" government surveillance even if it involved him. J.A. 2879.[6] After the district court issued its final order in May 2014, Al-Timimi filed a timely notice of appeal on June 4, 2014. J.A. 2887-2888; J.A. 2889-2980.

## I.    Second Remand (2015-2024)

Following the discovery of additional documents at the National Archives in 2015, however, Al-Timimi filed a motion for a second remand on June 29, 2015. *See* Fourth Circuit No. 14-4451, Doc. 51. On August 4, 2015, the Fourth Circuit

---

[6] The district court denied the motions for disclosure under Rule 16 in part based upon the conclusion that "Rule 16 does not by its terms apply to information that could only yield grounds for a motion to suppress—e.g., evidence of illegal warrantless electronic surveillance—because such information is not, generally speaking, material to the fundamental question of guilt or innocence." J.A. 2881. This construction of Rule 16's materiality requirement was incorrect. *See United States v. Sanders*, 107 F.4th 234, 253 (4th Cir. 2024) ("[E]vidence altering the quantum of proof in a defendant's favor concerning either a *Franks* motion or a suppression motion would satisfy the materiality standard of Rule 16(a)(1)(E).").

remanded the case to the district court a second time for limited purposes. J.A. 2892-2893.

After the Supreme Court issued its decision in *Johnson v. United States*, 576 U.S. 591 (2015), on July 8, 2016, Al-Timimi moved the Fourth Circuit to expand the scope of the remand to permit consideration of motions for acquittal on Counts 1, 7, and 8. Fourth Circuit No. 14-4451, Doc. 70. On July 26, 2016, the Fourth Circuit granted the motion and expanded the scope of the remand. J.A. 2894-2895.

In 2020, the district court conducted a hearing on the pending motions. On July 18, 2024, the court vacated the convictions on Counts 1, 7 and 8 of the superseding indictment and entered judgments of acquittal on those counts. J.A. 2972-2997 (memorandum opinion); J.A. 2998 (order).[7]

---

[7] The district court also denied Al-Timimi's request for additional discovery regarding the pre-2003 counterintelligence investigation, FBI investigation number 199N-WF-217423, during the relevant time frame of the indictment. Appellant's challenge of the government's refusal to turn over such records was denied in part because the government had already provided the two documents obtained from the National Archives to the district court "*ex parte* and under seal," but not to the defense, in 2007. J.A. 2895.

The district court's determination that this partial disclosure "did not contain information that constituted *Brady* material and [was] not otherwise relevant to defendant's theory of defense" without adversarial argument from the defense remains fundamentally at odds with a fair system of justice. As the Supreme Court has recognized, "'[f]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights .... No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.'" *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 55 (1993); *see also United States v. Apple*, 915 F.2d

24

### J.      Release From Federal Prison Pending Appeal (2020)

As a result of the then-ongoing COVID-19 epidemic, the district court ruled on August 18, 2020, that Al-Timimi should be released to home confinement. J.A. 2953-2968 (memorandum opinion); J.A. 2969-2970 (order). At the time of his release, Al-Timimi had served 15 years of his life and 70-year sentence.

On August 26, 2020, the government appealed the release order to this Court. J.A. 46; *see* Fourth Circuit No. 20-4441, Doc. 5. On August 31, 2020, this Court affirmed the district court's order of release. J.A. 2971. On September 1, 2020, Al-Timimi was released from federal custody and placed in home confinement.

On May 29, 2024, the government filed a writ of mandamus seeking an order directing the district court to address Al-Timimi's outstanding motions challenging his convictions on Counts 1, 7, and 8, which this Court denied as moot after the district court granted Al-Timimi's motion for judgment of acquittal as to those counts. *See* Fourth Circuit No. 24-1485, Docs. 2, 11. For the past almost five years since September 2020, Al-Timimi has remained on home confinement with only the sentences on Counts 9 and 10, consisting of approximately 25 years, that remain unserved.

---

899, 910-11 (4th Cir. 1990) (noting that it would be an "absurdity in the law" if the defendant were required to make a claim about intercepted communications without providing "him the means or tools to meet that burden," and thus requiring that if "conversations were intercepted during [a] wiretap, the records of those conversations must be disclosed").

## SUMMARY OF ARGUMENT

This case involves a serious misapplication of criminal law principles to protected First Amendment speech. Twenty years after Al-Timimi's trial, intervening Supreme Court and Fourth Circuit precedent have clarified that his speech in the days after September 11, 2001, does not provide a valid basis for criminal liability in this case.

First, with the exception of Count 2, criminal liability in this case is premised almost entirely on the theory that Al-Timimi aided and abetted others to conspire to commit and travel overseas to commit criminal offenses. The evidence at trial, however, failed to establish the "affirmative acts" to help another to commit a crime required for aiding and abetting liability. The Supreme Court in *Rosemond v. United States*, 572 U.S. 65 (2014) and *United States v. Hansen*, 599 U.S. 762 (2023), clarified that aiding and abetting requires consciously and culpably participating in wrongdoing to help make a substantive crime committed by someone else succeed. Al-Timimi's words did not provide any tangible assistance to others—a fact the government conceded in post-trial briefing.

Second, aiding and abetting firearms offenses—specifically, the remaining convictions for Counts 9 and 10 in violation of 18 U.S.C. § 844(h)—requires proof of advance foreknowledge that confederates would be armed with the charged weapons. No evidence established that Al-Timimi had advance knowledge of the

26

rocket-propelled grenades that Kwon and Hasan carried at two different LET camps weeks after the meeting on September 16, 2001, and the jury instructions failed to require such a finding. This deficiency alone requires reversal of Counts 9 and 10.

Third, the government's alternative *Pinkerton* theory of liability cannot support criminal liability for substantive offenses as charged in Counts 9 and 10 because: (1) the jury received no *Pinkerton* instruction; (2) Al-Timimi was charged only with aiding and abetting conspiracies, not as an actual member of any conspiracy; and (3) aiding and abetting a conspiracy—if such a crime exists—does not establish the agreement necessary for *Pinkerton* liability. Furthermore, the district court's judgment of acquittal on Count 1 also would require vacatur of convictions on Counts 9 and 10 based upon the government's post-trial *Pinkerton* theory of liability if that theory otherwise could support liability in this case.

Fourth, the remaining conspiracy convictions on Counts 3 and 6 lack sufficient evidence. Count 3 (seditious conspiracy) required proof of a conspiracy directed at the governing authority of the United States, evidence missing from this case. Count 6 (Neutrality Act) lacks evidence that Al-Timimi facilitated a conspiracy to attack India or Russia or possessed the specific intent required for this offense.

Fifth, with respect to Count 2, "levying war" in violation of 18 U.S.C. § 2381 does not categorically constitute a "crime of violence" as required for solicitation liability under 18 U.S.C. § 373, both as the district court defined the offense to the

27

jury and as properly defined. Furthermore, the evidence was insufficient to establish the heightened mens rea or the specificity required to solicit a crime of violence in violation of 18 U.S.C. §§ 373 and 2381.

Sixth, Counts 4 and 5 are multiplicitous because they charge the same offense. Moreover, both counts should be vacated due to insufficient evidence of a "substantial step" toward providing services to the Taliban, as distinguished from mere preparation, and no evidence of "willfulness" required by 50 U.S.C. § 1705(c).[8]

Seventh, Al-Timimi's speech was protected by the First Amendment. His words about Muslims' obligation to help Afghanistan, and encouragement to leave the United States and join mujahideen "anywhere in the world," constituted abstract advocacy that did not facilitate any specific criminal act, did not specifically solicit a particular crime, and did not satisfy *Brandenburg*'s imminence requirement. The First Amendment protects such generalized religious and political speech from criminal liability. *See United States v. Miselis*, 972 F.3d 518, 536-39 (4th Cir. 2020).

Twenty years after Al-Timimi's trial, intervening Supreme Court and Fourth Circuit precedent have clarified that his speech in the days after September 11, however controversial, falls squarely within First Amendment protection. The

---

[8] 50 U.S.C. 1705 was amended in 2007, and the willfulness mens rea provision was renumbered from § 1705(b) to § 1705(c). *See* International Emergency Economic Powers Enhancement Act, Pub. L. 110-96, 121 Stat 1011 (Oct. 16, 2007).

convictions must be vacated, and the case remanded for entry of judgments of acquittal on all counts.

## **ARGUMENT**

The government prosecuted Al-Timimi because it claimed his speech inspired others to engage in criminal conduct overseas. But in the two decades since Al-Timimi was tried and convicted based upon his words, it has become clear that four cornerstone legal principles require this Court to vacate all remaining counts of conviction.

First, aiding and abetting liability pursuant to 18 U.S.C. § 2, which prohibits "aid[ing], abet[ting], counsel[ing], command[ing], induc[ing] or procur[ing] [an offense's] commission," requires proof of "active[] participat[ion] in the underlying … crime" such that a defendant's speech "help[ed] another to complete its commission." *Rosemond v. United States*, 572 U.S. 65, 67, 70 (2014). Speech that merely is designed "to influence, to prevail on, to move by persuasion or influence" or "inspire with courage, spirit, or hope" without evidence that it tangibly assisted or was intended to facilitate a specific crime does not satisfy this "specialized, criminal-law" meaning of aiding and abetting. *United States v. Hansen*, 599 U.S. 762, 774 (2023).

Second, aiding and abetting liability in the context of firearms offenses requires an intent to facilitate the firearm offense committed by the principal.

*Rosemond*, 572 U.S. at 81-82. As a result, jury instructions must require, and the evidence must establish, "advance knowledge that a confederate would use or carry a [charged firearm] during the crime's commission," *id.* at 67, instructions and evidence that are entirely missing here.

Third, criminal liability under the *Pinkerton* doctrine requires not only proof beyond a reasonable doubt of membership in a charged conspiracy, but also a jury instruction that submits the question of liability under *Pinkerton* to the jury. *Nye & Nissen v. United States*, 336 U.S. 613, 618 (1949). Because Al-Timimi was not charged as a conspirator, but only as an aider and abettor of conspiracies, neither the district court nor the government raised the issue of *Pinkerton* liability during the trial, and the jury was not instructed that it could find Al-Timimi guilty of substantive offenses based on *Pinkerton*.

Fourth, the First Amendment confines criminal liability for speech to words made with "an intent to bring about a particular unlawful act" that either facilitate or solicit "another person to engage in specific [unlawful] conduct." *Hansen*, 599 U.S. at 771-72. Encouraging unlawful conduct in the abstract, such as promoting, encouraging, or urging others to riot, "is protected speech." *United States v. Miselis*, 972 F.3d 518, 536-39 (4th Cir. 2020).

The district court did not have the benefit of *Rosemond*, *Hansen*, or *Miselis* at the time of trial. But they remain applicable on this direct appeal and require this

Court to vacate and remand for the district court to enter judgements of acquittal on all counts. *See United States v. Smithers*, 92 F.4th 237, 247 (4th Cir. 2024) (intervening decisions govern direct appeal).

The argument section is structured as follows: because only the sentences on Counts 9 and 10 remain to be served, Section I addresses criminal liability for those counts under the government's theory of aiding and abetting liability. Section II addresses the government's post-trial assertion of the *Pinkerton* doctrine. In the discussion of the *Pinkerton* doctrine, the brief addresses criminal liability for the remaining conspiracy counts: Count 3, aiding and abetting a seditious conspiracy in violation of 18 U.S.C. § 2384, and Count 6, aiding and abetting a conspiracy to violate the Neutrality Act in violation of 18 U.S.C. § 960.

Section III addresses the remaining substantive counts of conviction, Count 2, soliciting treason in violation of 18 U.S.C. § 373, and Counts 4 and 5, attempting and aiding and abetting attempted provision of services to the Taliban in violation of 50 U.S.C. § 1705.

Finally, Section IV addresses whether Al-Timimi's words—which constitute the basis for his criminal liability on all counts—were protected by the First Amendment.

## I.  THE EVIDENCE FAILED TO ESTABLISH "ACTIVE PARTICIPATION" WITH ACTUAL FOREKNOWLEDGE OF THE CARRYING OF EXPLOSIVES REQUIRED FOR AIDING AND ABETTING LIABILITY ON COUNTS 9 AND 10

Measured in terms of sentencing exposure, by far the most serious convictions in this case are those for Counts 7 and 8 in violation of 18 U.S.C. § 924(c), and Counts 9 and 10 in violation of 18 U.S.C. § 844(h). These four counts carried a mandatory life sentence followed by sixty years of imprisonment. The district court has granted a judgment of acquittal on Counts 7 and 8, but the mandatory consecutive 30-year sentence arising from the convictions on Counts 9 and 10 remains. Nonetheless, Al-Timimi's ostensible culpability on Counts 9 and 10 is not based on evidence that he carried rocket propelled grenades (RPGs) during the commission of a felony in violation of § 844(h). Instead, it is based on the fact that after the dinner on September 16, 2001, two attendees traveled to Pakistan, obtained military training, and during that training picked up or fired RPGs.[9]

Counts 9 and 10 charged that between on or about September 16 and September 18, 2001, Al-Timimi aided and abetted the carrying of rocket propelled grenades (RPGs) by Khwaja Hasan in early November 2001, and Yong Kwon in

---

[9] At Al-Timimi's release hearing in 2020, the district court acknowledged the extraordinary nature of the draconian sentences imposed on "somebody as removed as" Al-Timimi compared to the people who actually carried weapons and whose sentences "did not result in anywhere near as long a sentence as he is now serving." Transcript, Motion Hearing 9 (June 11, 2020, ECF Doc. 481).

32

mid-October 2001, while training at LET camps in Pakistan during the commission of felonies.

In post-trial briefing before this Court when it opposed Al-Timimi's release pending appeal, the government argued that Al-Timimi is criminally liable for Counts 9 and 10 based on two theories: (1) aiding and abetting; and (2) the *Pinkerton* doctrine. *See* Mem. Reply Br. Support Bail Appeal of the United States, *United States v. Al-Timimi*, No. 20-4441, ECF 25 at 5 (4th Cir.). Neither of these theories support criminal liability in this case.

Liability as an aider and abettor requires an accomplice to assist another in the commission of an offense, and such evidence is entirely absent in this case. Accomplice liability also requires actual foreknowledge that runs to every element of the principal's offense, which likewise does not exist in this record. Finally, the government did not pursue, and the district court did not instruct the jury on *Pinkerton* liability at the trial for the simple reason that Al-Timimi was not charged as a conspirator in any conspiracy, but only as an aider and abettor. The government's post-trial efforts to shore up its extraordinarily weak evidence of aiding and abetting liability by relying on *Pinkerton* therefore is unavailing.

## A.    Standard of Review for Review of a Denial of Rule 29 Motion

A Rule 29 motion for judgment of acquittal tests whether the government has met its burden to present evidence that would allow a rational jury to "reach a

subjective state of near certitude of the guilt of the accused." *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). This Court reviews the denial of a motion for judgment of acquittal de novo. *See United States v. Strayhorn*, 743 F.3d 917, 921 (4th Cir. 2014). In conducting that review, the Court must determine whether the evidentiary record, when viewed in the light most favorable to the government, contains "substantial evidence" that a reasonable factfinder could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt. *Id.* Although "this is a 'heavy burden,' it is by no means insuperable." *United States v. Hickman*, 626 F.3d 756, 763 (4th Cir. 2010).

In particular, "[w]hile all inferences must be made in favor of the prosecution, leaps of logic should not be." *Evans-Smith v. Taylor*, 19 F.3d 899, 908 n.22 (4th Cir. 1994). In other words, if "the trier of fact would have had to rely on attenuated inferences" to establish proof of an essential element of an offense, "the finding" as to that element "cannot stand." *Hickman*, 636 F.3d at 763.

Likewise, "[f]avoring the prosecution with all inferences does not mean that [the Court] must ignore evidence that is in the record" that is not consistent with guilt. *Evans-Smith*, 19 F.3d at 910 n.29. Finally, a mere preponderance of evidence supporting a finding of guilt—evidence that only makes it more likely than not that the defendant is guilty—is not sufficient to support a conviction. *In re Winship*, 397 U.S. 358, 365 (1970); *Cty. Ct. of Ulster Cty., N.Y. v. Allen*, 442 U.S. 140, 166 (1979)

(noting that beyond a reasonable doubt is a "more stringent test" than a preponderance of evidence).

### B.    Aiding and Abetting Requires Active Participation That Helps Another to Commit the Charged Offense

At the trial, the defense moved for a judgement of acquittal on Counts 9 and 10 on the ground that there was no evidence Al-Timimi "did anything with respect to those [two] counts." J.A. 1958-1959. The trial evidence failed to establish aiding and abetting liability because Al-Timimi's words at the September 16 meeting did not constitute active participation that helped or assisted in the commission of the violations of 18 U.S.C. § 844(h) charged in Counts 9 and 10.

At common law, criminal participants were divided into four categories: "(1) principals in the first degree who actually perpetrated the offense; (2) principals in the second degree who were actually or constructively present at the scene of the crime and aided or abetted its commission; (3) accessories before the fact who aided or abetted the crime, but were not present at its commission; and (4) accessories after the fact who rendered assistance after the crime was complete." *Standefer v. United States*, 447 U.S. 10, 15 (1980). For accomplices in the second and third categories, "[t]he common law imposed aiding and abetting liability on a person (possessing the requisite intent) who facilitated any part—even though not every part—of a criminal venture." *Rosemond*, 572 U.S. at 72.

35

18 U.S.C. § 2 was originally enacted in 1909 to simplify and make clear that the first three categories of criminal participants were all punishable as principals. *Standefer*, 447 U.S. at 17-18; *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 189-90 (2007) ("In the course of the 20th century, [] American jurisdictions eliminated the distinction among the first three categories."). But the common law requirement of proof of "a contribution to some part of a crime" as the basis for accomplice liability "continues to govern aiding and abetting law under § 2." *Rosemond*, 572 U.S. at 73. Indeed, the Court noted in *Rosemond* that "§ 2 reflects a centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission." *Id.* at 70.

Criminal liability for aiding and abetting thus requires proof of "facilitation." *See Abuelhawa v. United States*, 556 U.S. 816, 821 (2009) (equating aiding and abetting with "facilitation," defined as "an instance of aiding or helping; … the act of making it easier for another person to commit a crime"); *United States v. Williams*, 341 U.S. 58, 64 (1951) ("aiding and abetting means to assist the perpetrator of the crime."); *accord United States v. Horton*, 921 F.2d 540, 543 (4th Cir. 1990) ("aiding and abetting means to assist the perpetrator of the crime") (quoting *Williams*); *Backun v. United States*, 112 F.2d 635, 637 (4th Cir. 1940) ("Guilt as an accessory depends … on aiding and assisting the perpetrators"); Black's Law Dictionary 84 (10th ed. 2014) (defining "aid and abet" as "[t]o assist or facilitate the commission

36

of a crime, or to promote its accomplishment."); 1 Wharton's Criminal Law § 10:11 (16th ed.) (stating that accomplice liability arises from "any act of assistance, encouragement, or aiding and abetting that facilitates the commission of the crime").

Moreover, the Supreme Court recently discussed at length both "the crime of solicitation" on one hand, and "[f]acilitation—also called aiding and abetting" on the other. *United States v. Hansen*, 599 U.S. 762, 771 (2023). As the Court explained, "[f]acilitation—also called aiding and abetting—is the provision of assistance to a wrongdoer with the intent to further an offense's commission." *Id.*

To be sure, § 2 includes a list of verbs to describe the category of persons subject to criminal liability as a principal, namely anyone who "aids, abets, counsels, commands, induces, or procures" the commission of a federal offense. § 2(a). But the meaning of these words is both "clarified and narrowed by [their] statutory neighbors," as well as the common law definition of accomplice liability, because when "Congress transplants a common-law term, the 'old soil' comes with it." *Hansen*, 599 U.S. at 777-78 (construing "encourage" and "induce" in 1917 statute that also prohibited "assist[ing]" and "solicit[ing]" immigration of contract laborers); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law* 195 (2012) (explaining that under the associated-word canon, "words grouped in a list should be given related meanings"). In other words, the words collectively, along with the common-law origin of accomplice liability, work to "cabin the contextual meaning"

and "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (citation omitted).

Aiding, abetting, counseling, commanding, inducing, and procuring in the context of 18 U.S.C. § 2 are terms of art with a "specialized, criminal law" meaning limited to "the provision of assistance to a wrongdoer with the intent to further an offense's commission." *Hansen*, 599 U.S. at 771, 774. Consequently, aiding and abetting liability for a criminal offense only attaches when an individual "(1) takes an affirmative act in furtherance of [an] offense, (2) with the intent of facilitating the offense's commission." *Rosemond*, 572 U.S. at 71. To qualify as a basis for aiding and abetting liability, therefore, speech must "facilitat[e] one or another element" of the actus reus of a charged offense. *Rosemond*, 572 U.S. at 75; *accord Hansen*, 599 U.S. at 771 (defining aiding and abetting as providing either "physical aid" or "assistance rendered by words" with "an intent to bring about a particular unlawful act").

While § 2 includes "inducing" and "counseling" among the actions it proscribes, those words must be understood from the company they keep to require an "affirmative act" that helps another to commit a crime. Otherwise, § 2 would pose a serious constitutional problem. As this Court explained in *Miselis*, "because mere encouragement is quintessential protected advocacy, the Supreme Court has

recognized that '[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it' under *Brandenburg*. It follows that *Brandenburg* protects speech having a mere tendency to encourage others to [commit a crime]." *United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020) (citations omitted); *accord Hansen*, 599 U.S. at 774.[10]

Thus, aiding and abetting liability based on speech retains an "affirmative-act requirement" that limits liability to those who "actively participate" to help the principal in some culpable way to commit the specific offense charged. *Rosemond*, 572 U.S. at 74, 77-78; *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949) (aiding and abetting liability requires proof that a defendant intentionally "participate[d]" in an offense to help "make it succeed"); *see also BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 309 (4th Cir. 2018) ("The necessary intent can be presumed only 'when a person actively participates in a criminal

---

[10] In 1997, the Department of Justice issued a report in which it stated: "We are not aware of any modern case in which culpability under § 2 was premised solely on 'counseling' in the form of encouragement (or advocating that a crime be committed), without any actual aid or assistance to the principal. Insofar as § 2 were construed to permit culpability in such a 'pure' advocacy situation, it is likely—at least absent special circumstances, such as implicit coercion or a fiduciary relationship between the pertinent parties—that the prosecution would be required to satisfy the *Brandenburg* standards." Department of Justice, *Report on the Availability of Bombmaking Information Department of Justice, the Extent to Which Its Dissemination is Controlled by Federal Law, and the Extent to Which Such Dissemination May Be Subject to Regulation Consistent with the First Amendment to the United States Constitution*, 37 n.61 (April 1997).

39

venture with full knowledge of the circumstances constituting the charged offense.'") (quoting *Rosemond*, 572 U.S. at 77-78); *United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983) ("To prove the crime of aiding and abetting the government must show that the defendant knowingly associated himself with and participated in the criminal venture.").

In sum, aiding and abetting liability based on speech depends upon proof that a defendant "help[ed] another to complete [an offense's] commission." *Rosemond*, 572 U.S. at 70. By contrast, mere counseling or inducement in the abstract that does not actually provide any help to bring about a particular crime does not satisfy this essential requirement for criminal liability as an aider and abettor. *See Hansen*, 599 U.S. at 774 (stating that if the statute proscribed "encouragement" or "inducement" of unlawful conduct as those terms are ordinarily understood to mean to "inspire with courage, spirit, or hope," or "to influence; to prevail on; to move by persuasion or influence," the statute's application "might swamp its lawful applications, rendering it vulnerable to an overbreadth challenge").

As discussed below, Al-Timimi's words that the Taliban had called for help, Muslims were obligated to help, and should go overseas and be with the mujahideen anywhere in the world did not actually help Kwon and Hasan to train with rocket-propelled grenades.

### C.    The Evidence at Trial Was Insufficient to Show that Al-Timimi's Words Helped Anyone to Commit a Criminal Offense

In post-trial briefing, the government has argued that Al-Timimi is criminally liable under § 2 for substantive firearms offenses committed by Kwon and Hasan because he "counseled" them to commit those offenses. *See* J.A. 2897-2898. The premise of this argument is a non-existent distinction between "aiding and abetting" liability on one hand, and accomplice liability for "counseling" on the other.

As noted above, witnesses testified that five days after the September 11 attacks, Al-Timimi, in responding to a question about Afghanistan: (1) stated that the leader of Afghanistan had called for help from Muslims; (2) read from a publicly-available religious opinion issued by a Saudi cleric stating that it was obligatory for Muslims to help "with wealth, persons, opinions and advices, and through the Media by defending them and their honor and their public image; and through prayers for them that they vanquish the enemy and have steadfastness;" J.A. 3175-3176; and (3) encouraged the attendees to leave the United States, live among Muslims overseas, and, if possible, be with the mujahideen anywhere in the world. J.A. 458; J.A. 1383-1384; J.A. 2207.

Such statements fail to "help" anyone to commit an element of 18 U.S.C. § 844(h)(2) for purposes of aiding and abetting liability. In other words, there is no evidence that Al-Timimi's words provided specific assistance or concrete help to

41

anyone to assist in their commission of criminal conduct. For example, no evidence establishes that he provided helpful contact information, phone numbers, logistical or financial support, letters of reference, or any tangible assistance to help others to commit federal crimes.

Don't just take our word for it. The government in post-trial briefing conceded (while mischaracterizing the attendees of the September 16 dinner as "followers") that "[n]o proof [] indicated that Timimi helped his followers to reach the LET camps. To the contrary, helping them reach the LET camps was *Royer*'s role. In other words, proof did not establish that Timimi significantly 'aided and abetted' them in doing so." J.A. 2897. To be sure, the government explained that in its view, Al-Timimi's criminal liability was "based not so much on proof that he 'aided and abetted' the charged crimes, or that he induced or procured their commission, but on proof that he solicited and counseled them." J.A. 2898 (describing Al-Timimi's liability for "soliciting" as charged in Count 2 and "counseling" offenses as charged in Counts 1, 3, 5, and 6).

As explained in detail above, all of the verbs in 18 U.S.C. § 2 require proof that an accomplice who "aids, abets, counsels, commands, induces or procures" another to commit a crime must "*help*[] another to complete its commission." *Rosemond*, 572 U.S. at 70 (emphasis added). Consequently, there is no legal basis for aiding and abetting liability grounded in conduct that helps another to commit a

42

crime on one hand, and liability for "counseling" another that does not provide such help, on the other.

In this case, the individuals who carried RPGs during the commission of felonies in violation of 18 U.S.C. § 844(h)—Kwon and Hasan—did not testify that Al-Timimi said anything to them about firearms in general or explosives in particular. Kwon flatly admitted at trial that Al-Timimi "never asked [him] to carry explosives in the course of a crime[.]" J.A. 1261-1262. Hasan testified that Al-Timimi "didn't make [him] do anything." J.A. 2255. In sum, there is absolutely no "substantial evidence" that Al-Timimi's words provided any help or assistance to Kwon and Hasan's violations of § 844(h). *Cf. United States v. Strayhorn*, 743 F.3d 917, 923-24 (4th Cir. 2014) (vacating conviction for robbery based on insufficient evidence that was limited to defendant's fingerprint on duct tape used in offense).

The bottom line is that none of Al-Timimi's words about (a) Afghanistan's call for help; (b) Muslims' obligation to provide help that they can; or (c) a recommendation that people go overseas and join the mujahideen anywhere in the world, if possible, constitute "active participation" or facilitation of offense conduct in violation of 18 U.S.C. § 844(h). None of Al-Timimi's words mentioned the actus reus of the offense, carrying explosives. Nor did his words provide any help or assistance to commit the crimes charged in Counts 9 and 10. The government's concession that Al-Timimi's words did not "aid and abet[]" Hasan and Kwon to

reach the LET camps where they committed violations of § 844(h), therefore, evidences Al-Timimi's lack of culpability for Counts 9 and 10.

**D. The Supreme Court's Intervening Decision in *Rosemond* Requires Vacatur Because the Evidence Was Insufficient to Establish That Al-Timimi Had Actual Advance Knowledge That Kwon and Hasan Would Carry RPGs During Their Training Exercises at LET**

In 2014—nine years after Al-Timimi's conviction—the Supreme Court decided *Rosemond v. United States*, 572 U.S. 65, reaffirming that the federal aiding and abetting statute is grounded in traditional common law principles of accomplice liability that incorporate both an affirmative act and an intent requirement. *Id.* at 70-71. Hence, just "[a]s at common law, a person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Id.* at 71. Establishing intent, in turn, requires the government to prove the accomplice had actual advance knowledge of the crime and thus contributed his act of assistance "with full knowledge of the circumstances constituting the charged offense." *Id.* at 77 (citing *Pereira v. United States*, 347 U.S. 1, 12 (1954)).

In other words, the Supreme Court made clear in *Rosemond* that "an aiding and abetting conviction requires not just an act facilitating one or another element, but also a state of mind extending to the entire crime." *Rosemond*, 572 U.S. at 75-76; *see also BMG Rts. Mgmt. (US) LLC*, 881 F.3d at 309 (stating that mens rea for

aiding and abetting requires "'full *knowledge* of the circumstances constituting the charged offense.'"); *United States v. Encarnacion-Ruiz*, 787 F.3d 581, 588 (1st Cir. 2015) ("Under *Rosemond*, to establish the mens rea required to aid and abet a crime, the government must prove that the defendant participated with advance knowledge of the elements that constitute the charged offense.").

*Rosemond* applied these principles in the special context of what the Court described as a "compound crime"—that is, a statute such as 18 U.S.C. § 924(c) that imposes heightened punishment on a person who commits some predicate offense while also committing an additional aggravating act such as the carrying or use of a firearm. *Rosemond*, 572 U.S. at 75; *see also id.* (explaining that compound crimes "punish[] the temporal and relational conjunction of two separate acts, on the ground that together they pose an extreme risk of harm."). To establish aiding and abetting liability in the context of compound offenses, "the intent must go to the *specific and entire crime charged*—so here, to the full scope (predicate crime plus gun use) of § 924(c)." *Rosemond*, 572 U.S. at 76 (emphasis added). Aiding and abetting a firearm offense thus requires "advance knowledge that a confederate would carry a gun." *Id.* at 78; *see also id.* at 67 (stating that government must prove "that the defendant actively participated in the underlying … violent crime with advance knowledge that a confederate would use or carry a gun during the crime's commission.").

The district court in this case imposed a combined *30-year consecutive sentence* in this case based upon remarks made by Al-Timimi at the dinner. Given the extraordinarily draconian penalties imposed for violations of 18 U.S.C. § 844(h), aiding and abetting liability necessarily requires proof of "active participation" in the offense conduct with advance knowledge that a principal will carry an explosive. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994) (statute's "harsh penalties looms" large in favor of scienter requirement). Accordingly, the same *mens rea* requirement applies to aiding and abetting a violation of 18 U.S.C. § 844(h), which prohibits carrying an explosive during the commission of a predicate felony. *Cf. United States v. Mitchell*, 104 F.3d 649, 653 (4th Cir. 1997) (concluding that "the plain meaning of the term 'carry' as used in § 924(c)(1) requires knowing possession and bearing, movement, conveyance, or transportation of the firearm in some manner"); *Staples v. United States*, 511 U.S. 600, 605-06 (1994) (criminal statutes are presumed to have mens rea).

### 1. The Evidence at Trial Was Insufficient to Establish Proof of Advance Knowledge That Hasan and Kwon Would Carry RPGs

Under *Rosemond*'s framework, Al-Timimi's accomplice liability convictions under Counts 9 and 10 cannot be sustained. These counts charged Al-Timimi as an accomplice to certain illegal weapons activities that principals Kwon and Hasan engaged in at one of the LET camps they attended in Pakistan. Both men admitted

to firing or carrying an RPG device as part of a training exercise, for which each subsequently admitted guilt to the crime of carrying explosives during the commission of a federal felony in violation of 18 U.S.C. § 844(h)(2). The government charged and convicted Al-Timimi as an accomplice to Kwon and Hasan's crimes, based on its broader allegation that his comments at the September 16 dinner encouraged Kwon and Hasan to attend training at LET camps.

But regardless of whether the jury concluded that Al-Timimi encouraged their plan to attend training at LET camps (a plan that all witnesses agree was initiated by another person, Royer), the government's mens rea theory for the very specific crimes charged in Counts 9 and 10 fails because there is no evidence in the record to support an inference that Al-Timimi had actual advance knowledge that Kwon and Hasan would carry RPGs in a training exercise. To the contrary, it was uncontroverted that Al-Timimi was never involved in any discussions with any of the men contemplating their use of weapons—and certainly did not counsel or solicit Kwon or Hasan's use of the particular RPG weapons charged in Counts 9 and 10. Each one of the government's co-operating witness who was asked about such a claim flatly repudiated it.

In this case, the trial record contains absolutely no evidence of such advance knowledge by Al-Timimi—or even Hasan or Kwon, for that matter, at the time of the September 16 meeting. Specifically, there is no testimony supporting a

47

reasonable inference that Al-Timimi had advance knowledge that either Hasan or Kwon would carry RPGs while training at an LET camp.

Although Kwon said that Al-Timimi was present for the discussion about LET, he testified that Al-Timimi did not say anything. J.A. 1156. Kwon also said the decision to travel to Pakistan came after Al-Timimi left his apartment, and explicitly stated that Al-Timimi never asked him to carry explosives while committing a crime. J.A. 1261-1262; J.A. 1388-1389; J.A. 1401.

Hasan testified that the topic of going overseas and training with LET did not come up until after Al-Timimi left the dinner on September 16, J.A. 2216-2217, J.A. 2258, and that there was "no discussion" when Al-Timimi was present about any place other than Afghanistan, J.A. 2256. Nor was there any evidence that Al-Timimi was aware of any specific plans involving weapons, let alone early enough to make a meaningful choice about his involvement. *See Rosemond*, 572 U.S. at 81 (noting that a defendant "incurs the greater liability of § 924(c), when he chooses to participate in a drug transaction knowing it will involve a firearm; but he makes no such choice when that knowledge comes too late for him to be reasonably able to act upon it.").

In post-trial briefing, the government's answer to *Rosemond* has consisted entirely of a loose theory of constructive knowledge, arguing that Al-Timimi had a general awareness of at least some LET attendees participating in training exercises

48

that included RPGs—for example, from an article he had read on the internet and forwarded to his brother. *See, e.g.*, Memorandum Brief of United States, *United States v. Al-Timimi*, Case No. 20-4441, ECF No. 5 at 16 (citing Govt. Exh. 10J11a).[11] Thus, the government argues, because Al-Timimi had heard of instances of LET using explosives or RPGs, he was on notice that Kwon and Hasan might do so as well. But this is precisely the sort of constructive theory of knowledge that *Rosemond* does not tolerate. *See also United States v. Thomas*, 58 F. App'x 952, 959 (4th Cir. 2003) (unpublished) (rejecting theory of constructive knowledge to support accomplice liability for § 924(c)). In other words, general knowledge about LET's training or tactics is not equivalent to the advance knowledge of "the specific and entire crime charged—so here, to the full scope (predicate crime plus [explosive] use) of § [844(h)]" by Kwon and Hasan. *See Rosemond*, 572 U.S. at 76.

In *Rosemond* itself, the defendant "actively participated" in the drug trafficking portion of the offense with confederates. 572 U.S. at 71-72. But a defendant's knowledge that drug transactions with others sometimes, or even often, involve firearms is plainly insufficient to constitute the "advance knowledge of a

---

[11] The parties stipulated at trial that in addition to Al-Timimi, the moderator of a news bulletin publicizing information about LET added former President Bill Clinton, Hillary Clinton, Attorney General John Ashcroft, dozens of U.S. senators, and many others to the distribution list. J.A. 3295.

firearm's presence" required to support liability based on another's possession of a firearm during the transaction. *Id.* at 81.

Moreover, in *United States v. Thomas*, 58 F. App'x 952 (4th Cir. 2003), this Court affirmed a post-trial judgment of acquittal of a conviction for aiding and abetting the brandishing of a firearm during and in relation to a bank robbery in violation of 18 U.S.C. § 924(c). This Court found that the defendant was "on notice of the likelihood that a gun or dangerous weapon would be used in the robbery" given evidence that he "engaged in active planning to commit the robbery[,]" "provided a headquarters at his house for the armed robbers, gave the armed robbers two different getaway cars, and acted as a diversion prior to and throughout the robbery." *Id.* at 956.

Nonetheless, anticipating *Rosemond*'s holding, the Court explained that "proof of constructive knowledge" of a co-defendant's possession of a firearm was insufficient to support accomplice liability for a § 924(c) offense, and only "actual knowledge that a gun would be used" was sufficient. *Id.* at 959. Because "[t]here was no direct proof of [the defendant's] knowledge put forth at trial[, and] the government only offered circumstantial evidence to show that he knew a gun would be used to commit the robbery[,]" this Court affirmed the district court's judgment of acquittal. *Id.*

Likewise, in *United States v. Spinney*, 65 F.3d 231 (1st Cir. 1995), an accomplice's extensive involvement in the planning of a bank robbery was insufficient to establish accomplice liability for a § 924(c) conviction where it was uncontroverted that firearms were not specifically discussed at the planning stages. 65 F.3d at 238-39 (finding that even though defendant "was on notice of the likelihood that a gun would be used in the course of the robbery," evidence was insufficient to show defendant was "practically certain that [his codefendant] would be armed. … In sum, 'likelihood' and 'practical certainty' are not equivalent terms."); *see also United States v. Donel*, 211 F. App'x 180, 181 (4th Cir. 2006) (quoting *Spinney*, 65 F.3d at 237). As these and other cases make clear, the fact that Al-Timimi might have had general knowledge of LET's training and tactics falls far short of the foreknowledge required to create accomplice liability for Kwon and Hasan's particular weapons crimes.

Of course, evidence that a defendant is "the chief organizer of an armed robbery," "travelled with his armed codefendants to the robbery," and engaged in "continued participation 'after a gun was displayed or used by a confederate'" can undoubtedly be sufficient for a jury to find that a defendant had advance knowledge that he was aiding an armed offense. *See United States v. Benson*, 957 F.3d 218, 237-39 (4th Cir. 2020) (affirming organizer's conviction for aiding and abetting

armed robbery resulting in murder). But none of those circumstances apply to this case.

Al-Timimi did not organize or assist others to engage in training with RPGs, he did not attend training at an LET camp and had never attended such training, his charged participation concluded on September 18, 2001—weeks before Kwon and Hasan violated § 844(h)—and he therefore did not participate in the charged offenses after Kwon and Hasan received weapons training with RPGs. Nor was Al-Timimi aware of the pre-existing conspiracy by others, including Kwon and Hasan, to engage in firearms training in the United States to prepare to fight in overseas conflicts. J.A. 1254; J.A. 2243-2244.

In sum, no reasonable inference supports the conclusion that Al-Timimi "knew" on Sept 16, 2001, that Kwon and Hasan would carry RPGs in a training exercise that they never planned or discussed with Al-Timimi — and which *they themselves* appear not to have formed a specific intent to engage in until weeks later when they reached a particular LET camp that offered them that particular training. At best, the evidence supports an inference that Al-Timimi was on notice that a person who attends a LET camp might engage in such training. But mere foreseeability is the standard of *Pinkerton*—not accomplice liability. Because the Supreme Court's intervening opinion in *Rosemond* does not permit Al-Timimi's conviction for aiding and abetting a crime without proof of his actual advance

52

knowledge of its relevant details, this Court should reverse the district court's 2005 denial of his Rule 29 motion on Counts 9 and 10 and enter corresponding judgments of acquittal.

### 2. The District Court's Jury Instructions Failed to Require Proof of Advance Knowledge of RPGs

Nor did the district court require the jury to make a finding that Al-Timimi had advance knowledge of the RPGs carried by Kwon and Hasan. Although the jury instruction as to Counts 9 and 10 required the jury to find "that the defendant knew that the unlawful carrying of explosives … was to be undertaken by Kwon and/or Hasan," J.A. 2483, it also instructed that "it is sufficient that the defendant knew that an explosive was at least *available* to the other person …," J.A. 2484 (emphasis added). In other words, advance knowledge of Kwon and Hasan's use or carrying was not required, only advance knowledge of availability. Evidence of "availability" of RPGs to LET in general is distinct from "foreknowledge" that a "confederate would use or carry a [RPG] during the crime's commission," which is what is required for aiding and abetting liability. *Rosemond*, 572 U.S. at 67. Accordingly, the instruction "failed to convey that [the defendant] needed advance knowledge" of the use of the explosive by the principal. *Id.* at 82.

The flawed instruction requires reversal of the § 844(h) convictions because it is error that is plain, and a reasonable probability exists that, but for the error, the outcome of the proceeding would have been different. *See Rosales-Mireles v. United*

*States*, 585 U.S. 129, 134-35 (2018). The error is indisputably plain now based on *Rosemond*, and plain error is determined at the time of appellate review. *Henderson v. United States*, 568 U.S. 266, 276 (2013).

As recounted above, a reasonable probability exists that the outcome would have been different, but for the error. Although there may have been evidence of Al-Timimi's knowledge of LET's use of explosives in general, there was a total absence of evidence of actual foreknowledge by Al-Timimi that Hasan and Kwon would carry RPGs. Given the absence of evidence that Al-Timimi either assisted Hasan or Kwon to carry RPGs or knew in advance that they would do so, along with the draconian nature of the punishment imposed on Al-Timimi for conduct he neither assisted nor knew anything about, affirming his 30-year sentences notwithstanding the plain error would constitute a miscarriage of justice and would seriously impact the fairness, integrity, and public reputation of judicial proceedings. *See United States v. Olano*, 507 U.S. 725, 736 (1993). Accordingly, if the Court declines to vacate these convictions for insufficient evidence, it should vacate and remand for a new trial based on the district court's failure to require proof of advance knowledge in its instructions to the jury.

## II.    *PINKERTON* LIABILITY DOES NOT APPLY IN THIS CASE

Because of the absence of proof of aiding and abetting liability with respect to Counts 9 and 10, the government has asserted in post-trial briefing in an appeal

of the district court's release order, *see United States v. Al-Timimi*, No. 20-4441, Doc. 25 at 5 (4th Cir.), that Al-Timimi is criminally liable for those offenses based upon the *Pinkerton* doctrine. Specifically, the government has argued that Al-Timimi is responsible for the substantive offenses in Counts 9 and 10 committed by Hasan and Kwon because: (1) he aided and abetted conspiracies charged in Counts 1 (now vacated), 3, and 6; (2) he is therefore liable as a principal for those conspiracies; and (3) pursuant to *Pinkerton v. United States*, 328 U.S. 640 (1946), he is criminally responsible for substantive offenses committed in furtherance of conspiracies he aided and abetted.

To find a conspirator guilty of substantive offenses committed by coconspirators, *Pinkerton* requires a jury to find (1) that the substantive offense was committed in furtherance of the conspiracy; (2) that the offense "fall[s] within the scope of the unlawful project"; and (3) that the substantive offense was reasonably foreseeable as "a necessary or natural consequence of the unlawful agreement." *Pinkerton*, 328 U.S. at 647-48. In other words, *Pinkerton* liability is premised on membership in a conspiratorial agreement that a substantive offense committed by a coconspirator is designed to further. Importantly, "[a] verdict on th[e] [*Pinkerton*] theory requires submission of those fact issues to the jury." *Nye & Nissen v. United States*, 336 U.S. 613, 618 (1949).

As discussed below, neither the parties nor the district court raised the issue of liability under *Pinkerton* at any time during the trial. Accordingly, the *Pinkerton* doctrine is inapplicable because (1) the jury was not instructed as to *Pinkerton* liability in this case; (2) aiding and abetting a conspiracy, if such a crime exists, does not require proof of a criminal agreement necessary for *Pinkerton* liability; (3) aiding and abetting does not permit liability for substantive offenses of which the aider and abettor has no knowledge or intent; and (4) the remaining conspiracy convictions, Counts 3 and Count 6, are not supported by substantial evidence. Accordingly, there is no basis for finding Al-Timimi criminally liable for the substantive offenses charged in Counts 9 and 10 under the *Pinkerton* doctrine in this case.

### A.    No *Pinkerton* Instruction Was Given at Trial

"[A]greement remains the essential element of the crime [of conspiracy], and serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact." *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975); *Pereira v. United States*, 347 U.S. 1, 11 (1954) ("Aiding, abetting, and counseling are not terms which presuppose the existence of an agreement."). The superseding indictment does not charge, and the jury was not required to find beyond a reasonable doubt, that Al-Timimi entered into the three conspiratorial agreements charged in the superseding indictment. Instead, the superseding indictment charged only that he aided and abetted the commission of

three conspiracies charged in Counts 1, 3, and 6 (one of which, the firearms conspiracy charged in Count 1, has since been vacated). As the district court observed, the charges alleged "almost a third level of culpability; that is, you've got the underlying offense, an inchoate offense such as conspiracy to do it, then you've got him one step further removed, aiding and abetting or soliciting or procuring the conspiracy." J.A. 2327.

Because Al-Timimi was charged only with aiding and abetting three conspiracies, and not actually entering any of the conspiratorial agreements, no *Pinkerton* instruction was given in this case. Prior to the trial, the prosecution didn't submit a *Pinkerton* instruction with its proposed jury instructions to the district court. *See* J.A. 80-121. Nor did it mention *Pinkerton* liability in discussing jury instructions with the court, or in closing argument to the jury. J.A. 2322-2326; J.A. 2346-2375; J.A. 2415-2326. Indeed, the *only* theory of criminal liability that the district court instructed the jury with respect to Al-Timimi's liability for Counts 9 and 10 was that he "aided, abetted, counseled, or induced Kwon and/or Hasan or undertook some other action with the intent to procure the engagement of Kwon and/or Hasan in [] carrying of explosives." J.A. 2482-2483.

To be sure, in the context of instructions about witnesses, the district court gave an instruction on the admissibility of coconspirator acts and statements that

resembled a *Pinkerton* instruction. J.A. 2445-2446. But the district court's instruction simply combined, almost verbatim, two instructions on the admissibility of coconspirator acts and statements: Acts and Declarations of Co-Conspirators, 2 O'Malley, Grenig, & Lee, Fed. Jury Prac. & Instr. § 31:06 at 295 (6th ed. 2008), and Acts and Statements of Coconspirators – Admissibility and Use, American Bar Association Antitrust Section, Model Jury Instructions in Civil Antitrust Cases (A.B.A. Chicago, Ill).

Notably, and in contrast to the model instruction from O'Malley quoted below, the district court's instruction did not identify Al-Timimi as a person charged in the indictment as a conspirator. Aside from that, the only changes made by the district court to the pattern instructions were to insert names, omit the third paragraph of the O'Malley instruction as duplicative, and reorder the ABA instruction to begin with paragraphs 4 and 5 before reading paragraphs 1 through 3. J.A. 2445-2446:

| District Court's Instruction | Pattern Instructions |
| --- | --- |
| Evidence has been received in this case that certain persons, such as Randall Royer, Masaud Khan, Yong Kwon, Muhammad Aatique, Khwaja Mahmood Hasan, and Donald Surratt, who are alleged in the indictment to be coconspirators, have done or said things during the existence or life of the alleged conspiracies in order to further or advance their goals. | Evidence has been received in this case that certain persons, who are alleged in Count ___ of the indictment to be co-conspirators of Defendant, have done or said things during the existence or life of the alleged conspiracy in order to further or advance its goal[s]. |
| Such acts and statements of these other individuals may be considered by you in | Such acts and statements of these other individuals may be considered by you in |

| | |
|---|---|
| determining whether or not the government has proven the charges in the indictment against the defendant. | determining whether or not the government has proven the charges in Count ____ of the indictment against Defendant _____.[12] |
| The reason for allowing this evidence to be received against the defendant has to do with the nature of the crime of conspiracy. A conspiracy is often referred to as a partnership in crime. Thus, as in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy. | [4] The reason for allowing this evidence to be admitted and used against the defendant has to do with the nature of the crime of conspiracy. Conspiracy is often referred to as a partnership in crime. Thus, as in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy. |
| Accordingly, the reasonably foreseeable acts, declarations, statements, and omissions of any member of the conspiracy and in furtherance of the common purpose of the conspiracy are deemed under the law to be the acts of all of the members, and all of the members are responsible for each -- all of the members are responsible for such acts, declarations, statements, and omissions. | [5] Accordingly, the reasonably foreseeable acts, declarations, statements, and omissions of any member of the conspiracy made in furtherance of the common purpose of the conspiracy are deemed under the law to be the acts of all of the members, and all of the members are responsible for such acts, declarations, statements, and omissions. |
| As to each conspiracy charged, if you find beyond a reasonable doubt that the defendant whose guilt you are considering was a member of the conspiracy charged in the indictment, then any acts done or statements made | [1] If you find beyond a reasonable doubt that the defendant whose guilt you are considering was a member of the conspiracy charged in the indictment, then any acts done or statements made in furtherance of the conspiracy by persons also found by |

---

[12] Acts and Declarations of Co-Conspirators, 2 O'Malley, Grenig, & Lee, Fed. Jury Prac. & Instr. § 31:06 at 295 (6th ed. 2008) (first two paragraphs).

| | |
|---|---|
| in furtherance of the conspiracy by persons also found by you to have been members of that conspiracy may be considered against the defendant. This is so even if such acts were done and statements were made in the defendant's absence and without his knowledge. | you to have been members of that conspiracy may be considered against the defendant. This is so even if such acts were done and statements were made in the defendant's absence and/or without [his] [her] [its] knowledge. |
| However, before you may consider the statements or acts of a coconspirator in deciding the issue of a defendant's guilt, you must first determine that the acts and statements were made during the existence and in furtherance of the unlawful conspiracy. | [2] Before you may consider the statements or acts of a conspirator in deciding the issue of the defendant's guilt, you must first determine that the acts and statements were made during the existence and in furtherance of the unlawful scheme. |
| If the acts were done or the statements made by someone whom you do not find to have been a member of the conspiracy or if they were not done or said in furtherance of the conspiracy, they may be considered by you as evidence only against the member who did or said them. | [3] If the acts were done or the statements made by someone whom you do not find to be a member of the conspiracy, or if they were not done or said in furtherance of the conspiracy, then they may be considered by you as evidence only against the person who did or said them.[13] |

These are common instructions that explain the *evidentiary admissibility* of co-conspirator acts and statements, which are introduced even in cases that do not contain a conspiracy charge. *United States v. Zandi*, 769 F.2d 229, 235 (4th Cir. 1985) ("[i]t is well recognized that co-conspirator's statements can be admitted even though conspiracy was not charged in the indictment."); *Hilliard v. United States*,

---

[13] Acts and Statements of Coconspirators – Admissibility and Use, American Bar Association Antitrust Section, Model Jury Instructions in Civil Antitrust Cases (A.B.A. Chicago, Ill).

121 F.2d 992, 999 (4th Cir. 1941) ("[W]hen several persons are jointly indicted for the commission of a crime and it is proved that they acted in concert to accomplish their end, evidence of declarations as well as acts of each in furtherance of the criminal design is admissible against all, even though conspiracy is not formally charged."). Indeed, the evidentiary admissibility of coconspirator acts and statements is an issue that long pre-dates, and is distinct from, *Pinkerton* liability. *See, e.g.*, *Logan v. United States*, 144 U.S. 263, 308–09 (1892) (explaining evidentiary admissibility of "acts and declarations" of coconspirators).

Moreover, the context of the instruction makes plain that this was not a *Pinkerton* instruction explaining a theory of criminal liability. *See United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996) (noting that instructions are considered in context of the entire charge). Specifically, the acts and declarations of coconspirators instruction was sandwiched between instructions on the potential bias of witnesses who have entered plea agreements, J.A. 2444, and an instruction on prior inconsistent statements, J.A. 2446.

Indeed, after giving the instruction on the admission of co-conspirator acts and statements, the district court stated: "[t]his is now the last two instructions on witnesses, and then we're going to move on to the indictment itself." J.A. 2446. At the conclusion of the pattern instructions on evidence, the district court then told the jury, "Now we're going to shift to talking about the indictment and the specific

61

charges that are involved in this case." J.A. 2448. And when it subsequently instructed the jury on the charges in the indictment, and Counts 9 and 10 in particular, liability was predicated solely on aiding, abetting, counseling, or inducing under 18 U.S.C. § 2. J.A. 2482-2484.

In moving for a Rule 29 judgment of acquittal as to Counts 7, 8, 9, and 10—the substantive § 924(c) and § 844(h) offenses committed by Kwon and Hasan in which Al-Timimi was explicitly charged as an aider and abettor—Al-Timimi's trial counsel noted, without contradiction by the government or the Court, that "there's no conspiracy involved" as to those counts. J.A. 1959. Furthermore, in closing arguments, neither party mentioned *Pinkerton* liability or the possibility that substantive offenses committed by co-conspirators could be attributed to Al-Timimi as a co-conspirator of Kwon or Hasan.

The government's post-trial argument that Al-Timimi's liability on Counts 9 and 10 is supported by *Pinkerton* liability thus fails because no *Pinkerton* instruction was given by the district court or argued to the jury. As such, "the *Pinkerton* theory is not available on this appeal, for the jury was not instructed that it could find [Al-Timimi] guilty of [offenses] on this basis. [The Court] may not permissibly infer either that the jury found [Al-Timimi] guilty on a theory as to which it was not instructed, or that, had the jury been properly instructed on that theory, it would have

62

found him guilty on that basis." *United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990) (citing *Nye & Nissen*, 336 U.S. at 618).

### B. *Pinkerton* Liability Could Not Apply Because Al-Timimi Was Charged Only With Aiding and Abetting Conspiracies

#### 1. *Pinkerton* Liability Is Premised on Conviction of Membership in a Conspiracy

The obvious reason the government did not propose a *Pinkerton* instruction, and the district court did not give one to the jury, is that Al-Timimi was charged only as an aider and abettor of conspiracies, and not as an actual member of any conspiratorial agreements. *See Iannelli*, 420 U.S. at 777 n.10 (noting that aiding and abetting liability does not require proof of conspiratorial agreement). As noted above, the district court acknowledged that "this is a tough case because it's almost a third level of culpability; …. It certainly is a unique [] legal structure." J.A. 2327.

Consequently, even if the district court had instructed the jury on *Pinkerton*, the necessary prerequisite to *Pinkerton* liability—membership in an agreement—is missing from this legal structure. After all, the *Pinkerton* doctrine is based on the idea that "conspirators are each other's agents; and a principal is bound by the acts of his agents within the scope of the agency." *United States v. Dinkins*, 691 F.3d 358, 384 (4th Cir. 2012) (citation omitted). But if there's no agreement, there's no agency.

*Pinkerton* liability is premised on proof beyond a reasonable doubt of membership in a conspiracy. *Pinkerton*, 328 U.S. at 647 ("The criminal intent to do the [substantive offense] is established by the formation of the conspiracy."). In this case, because the Superseding Indictment alleged only that Al-Timimi was an aider and abettor, not a conspirator, the jury was not required to decide beyond a reasonable doubt that Al-Timimi was a member of any conspiracy as an essential element of any charged offense.

## 2. *Rosemond* Forecloses *Pinkerton* Liability Based Upon Aiding and Abetting a Conspiracy

Although the government claimed before the district court that aiding and abetting liability with respect to a conspiracy is equivalent to conspiratorial membership because accomplices are treated like principals, the key difference is that *Rosemond* limits accomplice liability based upon the intent and knowledge of the accomplice. *See Rosemond*, 572 U.S. at 75-76 ("an aiding and abetting conviction requires not just an act facilitating one or another element, but also a state of mind extending to the entire crime.").

The *Pinkerton* doctrine, by contrast, extends liability to substantive offenses that a conspirator may not know about but could reasonably foresee as within the scope of the conspiratorial agreement. It is the agreement that supplies the requisite intent for liability arising from another conspirator's substantive offense conduct. *Pinkerton*, 328 U.S. at 647. Absent membership in the agreement, no liability exists

under the *Pinkerton* doctrine for substantive offenses committed by others. The government thus wrongly views aiding and abetting a conspiracy as a gateway to *Pinkerton* liability for substantive offenses committed by co-conspirators, when *Rosemond* establishes that aiding and abetting's intent requirement serves as a constraint on the reach of accomplice liability.

### 3.    Aiding and Abetting a Conspiracy Is Not a Viable Theory of Criminal Liability in This Case

Finally, *Pinkerton* liability does not apply in this case because recognition of aiding and abetting a conspiracy as a viable theory of liability would eliminate the distinction between conspiracy and substantive offenses. *See United States v. Perry*, 643 F.2d 38, 46-47 (2d Cir. 1981) (noting that "conspiratorial liability [should not be imposed] on one who, without agreement, merely assists conspirators in achieving their object"); *United States v. Alahmedalabdaloklah*, 2017 WL 2730978, at *2 (D. Ariz. June 26, 2017) ("The object offense itself— conspiracy—is not open to prefatory crimes. …. [A]iding and abetting a conspiracy to come into existence…. [or] [a]ny formulation of such a crime threatens to be unintelligible."); *United States v. Ulbricht*, 2015 WL 413426, at *5-6 (S.D.N.Y. Feb. 2, 2015) ("Defendant is correct that 'aiding and abetting a conspiracy' is not a valid theory of liability."). *But see United States v. Kasvin*, 757 F.2d 887, 892 (7th Cir. 1985) (recognizing liability for aiding and abetting a conspiracy by helping to commit substantive object offense); *United States v. Langston*, 970 F.2d 692, 708 (10th Cir. 1992) (same); *United States*

65

*v. Walker*, 621 F.2d 163, 166 (5th Cir. 1980) (same); *United States v. Oreto*, 37 F.3d 739, 751 (1st Cir. 1994) (same); *United States v. Portac, Inc.*, 869 F.2d 1288, 1293 (9th Cir. 1989) (same).[14]

"It is settled law in this country that the commission of a substantive offense and a conspiracy to commit it are separate and distinct crimes, and a plea of double jeopardy is no defense to a conviction for both." *Pereira v. United States*, 347 U.S. 1, 11–12 (1954). Indeed, because "[c]onspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act[,]" it is a "separate crime[]" from "the completed substantive offense." *Iannelli*, 420 U.S. at 777.

Aiding and abetting, by contrast, is "a rule of criminal responsibility for [criminal] acts which one assists another in performing." *Nye & Nissen*, 336 U.S. at 620. A prerequisite for aiding and abetting liability therefore is the "completion of the underlying substantive felony[.]" *United States v. Dinkins*, 928 F.3d 349, 359

---

[14] In *United States v. Falcone*, 311 U.S. 205, 208 (1940), the Supreme Court declined to address the merits of the government's argument that "one who with knowledge of a conspiracy to distill illicit spirits sells materials to a conspirator knowing that they will be used in the distilling, is himself guilty of the conspiracy…. either because his knowledge combined with his action makes him a participant in the agreement which is the conspiracy, or what is the same thing he is a principal in the conspiracy as an aider or abettor" under § 2's predecessor.

The Court in *Rosemond* likewise expressly declined to consider whether aiding and abetting liability encompassed "defendants who incidentally facilitate a criminal venture rather than actively participate in it…. [such as] the owner of a gun store who sells a firearm to a criminal, knowing but not caring how the gun will be used." 572 U.S. at 77 n.8.

(4th Cir. 2019); *accord United States v. Hansen*, 599 U.S. 762, 771 (2023) ("liability for aiding and abetting requires that a wrongful act be carried out"). Put differently, "to aid and abet a crime it is necessary not merely to help the criminal, but to help him in the commission of the particular criminal offense." *Developments in the Law—Criminal Conspiracy*, 72 Harv. L. Rev. 922, 934 (1959); *see also United States v. Standefer*, 610 F.2d 1076, 1081 (3d Cir. 1979) ("At common law, the prevailing rule was that an accessory to a crime could not be convicted unless and until the principal whom he had assisted had been convicted of committing the substantive offense."), *aff'd*, 447 U.S. 10 (1980).

Consequently, "[a] person does not aid and abet a conspiracy by helping the 'conspiracy' to commit a substantive offense, for the crime of conspiracy is separate from the offense which is its object." *Developments in the Law*, 72 Harv. L. Rev. at 934. In other words, if helping another person to commit a substantive offense was sufficient to support both liability for aiding and abetting the substantive offense *and*—without proof of membership in a conspiratorial agreement—conspiracy to commit the substantive offense, there would be no distinction between the crime of conspiracy and the substantive criminal object of the conspiracy. *Id.* (rejecting as based on a "faulty premise" the argument that "one who aids and abets [conspirators] in the attainment of their object becomes liable as a conspirator").

In this case, there is no evidence that Al-Timimi played any role in introducing or bringing together anyone for the purpose of engaging in a criminal conspiracy that by all accounts began without any involvement from Al-Timimi. Indeed, the evidence at trial established beyond any doubt that the criminal conspiracy to prepare for possible combat overseas was formed by others years before the meeting at Kwon's house on September 16, 2001, and was entirely unbeknownst to Al-Timimi. J.A. 444, J.A. 447 (Aatique); J.A. 585 (Surratt); J.A. 1254, J.A. 1259-1261 (Kwon); J.A. 2243-2244 (Hasan). Because (1) the district court did not instruct the jury on *Pinkerton* liability; (2) Al-Timimi was not charged or convicted of membership in any conspiracy, and (3) aiding and abetting a conspiracy is not a viable theory of criminal liability in this case, Al-Timimi has no criminal liability for the substantive offenses charged in Counts 9 and 10 based on the *Pinkerton* doctrine.

### 4. Assuming Arguendo That the *Pinkerton* Doctrine Is a Valid Theory of Liability in This Case, Counts 9 and 10 Must Be Vacated Because the District Court Granted a Motion for Judgment of Acquittal on Count 1

Apart from the substantive arguments made above, if *Pinkerton* liability were a viable theory of criminal liability at trial, Counts 9 and 10 must be vacated because the jury could have rested its finding as to criminal liability on those counts based on Al-Timimi's conviction on the now-vacated Count 1 conspiracy to violate 18 U.S.C. § 924(o). *See United States v. Henning*, 286 F.3d 914, 920 (6th Cir. 2002)

(finding plain error because district court that gave *Pinkerton* instruction failed to consider viability of convictions on substantive counts after vacating conspiracy count); *United States v. Rosas-Fuentes*, 970 F.2d 1379, 1383 (5th Cir. 1992) ("We also agree that [defendant's] conviction for possession could rest only upon his participation in the conspiracy under the *Pinkerton* rule. A reversal of the conspiracy conviction causes the possession conviction to fall."); *United States v. Kaiser*, 660 F.2d 724, 732 (9th Cir. 1981) ("Our reversal of the conspiracy convictions of Remsing and Schafer precludes the imposition of vicarious liability upon them for the acts of their alleged co-conspirators. Because we cannot now be certain that the jury did not rely upon the vicarious liability theory, we must reverse the convictions of Remsing and Schafer on those counts.").

"The rule of [*Pinkerton*] does service where the conspiracy was one to commit offenses of the character described in the substantive counts." *Nye & Nissen*, 336 U.S. at 620. Count 1 charged aiding and abetting a conspiracy to commit firearms offenses in violation of 18 U.S.C. § 924(o), and the substantive firearms offenses charged in counts 7 through 10 plainly constitute "offenses of the character" within the scope of Count 1. Indeed, each firearms count in the superseding indictment explicitly listed Count 1 as a predicate offense. And in post-trial briefing, the government has characterized the now-dismissed § 924(c) counts charged in

Counts 7 and 8 as "successful" force-clause crimes that co-conspirators "agreed to commit" as charged in Count 1. J.A. 2939.

As a result, a jury that was instructed on the *Pinkerton* doctrine could have concluded that members of the criminal conspiracy charged in Count 1 were substantively responsible for the offenses charged in Counts 9 and 10 as conduct within the scope of the unlawful agreement, in furtherance of that agreement, and reasonably foreseeable to co-conspirators. Although Count 3, charging aiding and abetting a seditious conspiracy, and Count 6, charging aiding and abetting a conspiracy to violate the Neutrality Act, also charged conspiracy offenses, those conspiracies – unlike the vacated Count 1 conspiracy – are not specifically focused on firearms offenses. Indeed, § 2384 "does not require that a seditious conspiracy involve the contemplated use of firearms," *United States v. Nordean*, 2022 WL 17583799, at *9 (D.D.C. Dec. 11, 2022), and neither does 18 U.S.C. § 960, *see United States v. Lumsden*, 26 F. Cas. 1013, 1015 (S.D. Ohio 1856) (noting that statute prohibits "[t]o begin an expedition, to set on foot an expedition, to provide the means of an enterprise, and lastly, to procure those means.").

Moreover, on a direct appeal, reversal is required for a conviction that could rest on a valid or invalid theory if the Court cannot conclude "beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999); *accord Griffin v. United States*, 502

70

U.S. 46, 55 (1991) (citing *Stromberg v. California*, 283 U.S. 359, 367-68 (1931), and *Yates v. United States*, 354 U.S. 298, 312 (1957)); *see also United States v. Cone*, 714 F.3d 197, 211 (4th Cir. 2013) ("reversal is required when a case is submitted to a jury on two or more alternate theories, one of which is legally (as opposed to factually) inadequate, the jury returns a general verdict, and it is impossible to discern the basis on which the jury actually rested its verdict.").

Accordingly, general-verdict convictions that may have rested on an unconstitutional ground (such as an element defined by the residual clause definition of a crime of violence) must be vacated unless the government can overcome the "heavy duty of proving 'beyond a reasonable doubt that the error complained of did not contribute to the [result] obtained.'" *United States v. Laffitte*, 121 F.4th 472, 491 (4th Cir. 2024) (citation omitted). In this case, the government could not meet that high bar even if *Pinkerton* was a viable basis for the jury to find liability.

Indeed, assuming that *Pinkerton* was a viable basis for the jury to find liability on Counts 9 and 10, the jury's general verdict "may have rested on an unconstitutional ground," the now-vacated conspiracy offense charged in Count 1. Again, carrying explosives during military training at an LET camp squarely "fall[s] within the scope of the unlawful project" charged in Count 1. *See Pinkerton*, 328 U.S. at 647-48. Accordingly, if *Pinkerton* liability applied in this case (it doesn't),

71

there is no doubt that Count 1 would have "contribut[ed] to the [result] obtained" with respect to Counts 9 and 10.

### C.    Insufficient Evidence Exists With Respect to the Remaining Conspiracy Charges in Counts 3 and 6

#### 1.    Insufficient Evidence Supports Conviction on Count 3: Aiding and Abetting Others to Engage in a Seditious Conspiracy in Violation of 18 U.S.C. § 2384

Count 3 charged a violation of 18 U.S.C. § 2384, based upon aiding and abetting a "seditious conspiracy" by two or more persons "to … levy war against" the "the Government of the United States." As explained above, the evidence at trial of Al-Timimi's words in the days following the September 11 attacks does not satisfy the definition of criminal aiding and abetting because it didn't help anyone to do anything, which is a prerequisite to criminal liability. *See Rosemond*, 572 U.S. at 70 (aiding and abetting liability requires proof that defendant "help[ed] another to complete [a crime's] commission.").

Count 3 also is subject to the First Amendment defense described below, that Al-Timimi's speech cannot be the basis for criminal sanction because at most it amounted to abstract advocacy supporting non-imminent criminal conduct and was otherwise not integral to any criminal act. *See United States v. Miselis*, 972 F.3d 518, 538-39 (4th Cir. 2020). As the Second Circuit explained in *United States v. Rahman*, 189 F.3d 88, 115 (2d Cir. 1999), "to be convicted under Section 2384, one must conspire to *use* force, not just to *advocate* the use of force." Nor is aiding and

72

abetting a conspiracy based upon a theory of assisting the substantive object a viable theory of criminal liability. *See supra* at section II(B)(3), at 63-66.

But this conviction also has a more basic problem: the evidence at trial did not establish a conspiracy directed at the governing authority of the "Government of the United States." Unlike § 2381, which prohibits levying war or adhering to enemies "within the United States or elsewhere," § 2384's focus is on the U.S. government's power to govern the United States and its territories. *See United States v. Rhodes*, 610 F. Supp. 3d 29, 39 (D.D.C. 2022) ("Congress viewed conspiracies under that provision as crimes against the government."); *United States v. Nordean*, 2022 WL 17583799, at *3 (D.D.C. Dec. 11, 2022) (noting that "conspiracies to 'overthrow, put down, or destroy' the United States government by force or to 'levy war' against it, describe crimes against the government writ large—not those against any particular government official or action"). In other words, § 2384 prohibits conspiracies directed "against the government as a government." *Baldwin v. Franks*, 120 U.S. 678, 693 (1887).[15]

For example, the Seventh Circuit has explained that "Congress enacted Section 2384 to help the government cope with and fend off urban terrorism. It

---

[15] Although this Court upheld a conviction against a paintball participant who traveled overseas, Masoud Ahmad Khan, for conspiring to levy war against the United States, it did not specifically address the argument that a conspiracy in violation of § 2384 must be directed at the governing authority of the United States. *See United States v. Khan*, 461 F.3d 477, 487 (4th Cir. 2006).

protects a different interest than that contemplated by the framers of the Constitution in the 18th century with regard to levying war." *United States v. Rodriguez*, 803 F.2d 318, 320 (7th Cir. 1986). Accordingly, it reasoned, "[u]nlike treason, seditious conspiracy does not extend beyond United States jurisdictional boundaries." *Id.*

The text of § 2381 and § 2384 confirm these observations. Although the inclusion in § 2381 of the words "'within the United States or elsewhere' is strongly indicative of the territorial range" of that statute, *Gillars v. United States*, 182 F.2d 962, 979 (D.C. Cir. 1950), the absence of the words "or elsewhere" in § 2384, and the textual focus on "the Government of the United States," indicates that the object of the conspiracy must be directed at the authority of the United States "as a government." *Baldwin*, 120 U.S. at 693. The offense of seditious conspiracy therefore "is complete, whether the force be directed to the entire overthrow of the government throughout the country, or only in certain portions of the country, or to defeat the execution and compel the repeal of one of its public laws." *United States v. Greathouse*, 26 F. Cas. 18, 22 (C.C.N.D. Cal. 1863).

The United States has never purported to exercise sovereign governing authority in Afghanistan. Indeed, when the Taliban regained control over Afghanistan in 2021, the governing authority of the "Government of the United States," as a government, was unimpaired. Even if the evidence in this case had established a conspiracy to oppose by force the U.S. government's actions in

Afghanistan, therefore, that conspiracy would not have been "against the government writ large" because it was not designed to attack the U.S. government's governing authority within the United States or its territories. *See Nordean*, 2022 WL 17583799 at *3.

Because seditious conspiracy in violation of 18 U.S.C. § 2384 requires proof of an agreement to attack U.S. governing authority, not merely those "against any particular government official or action," *id.*, the district court's instruction that Count 3 prohibited efforts to aid and abet a conspiracy to "wage war or to carry on war" against the United States was incorrect. J.A. 2470. The object of the offense must be either the overthrow of the United States government or at least a part of its governing authority. *Baldwin*, 120 U.S. at 693. The Court should vacate this conviction and remand for the entry of a judgment of acquittal for this reason too.

### 2. Insufficient Evidence Supports Conviction on Count 6: Aiding and Abetting Others to Conspire to Violate the Neutrality Act

Count 6 charged that Al-Timimi aided and abetted a conspiracy by others "to begin, provide for, prepare for, prepare a means for, and take part in military expeditions and enterprises … against the territory and dominion of foreign states … with whom the United States was at peace," in violation of the Neutrality Act, 18 U.S.C. § 960 and 18 U.S.C. § 371. As with Count 3, aiding and abetting a conspiracy

based upon a theory of assisting the substantive object is not a viable theory of criminal liability.

Even if criminal liability could be established for aiding and abetting a conspiracy in this case, the conviction should be vacated for insufficient evidence. The Neutrality Act, the original version of which dates to 1794, was designed to prevent private citizens from entangling the United States in foreign conflicts. *See Wiborg v. United States*, 163 U.S. 632, 647 (1896). Accordingly, the statute prohibits a "hostile expedition" from the United States against another country with whom the United States is not at war. *Id.* at 648.

A "[c]onspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself." *Ingram v. United States*, 360 U.S. 672, 678 (1959). And as described above, aiding and abetting liability likewise requires proof of intent that "go[es] to the specific and entire crime charged," *Rosemond*, 572 U.S. at 76, which in this case means a "'specific intent that the underlying [Neutrality Act] crime be committed' by some member of the conspiracy." *Ocasio v. United States*, 578 U.S. 282, 288 (2016) (describing mens rea for general federal conspiracy in violation of 18 U.S.C. § 371). Accordingly, the government was required to prove that Al-Timimi specifically intended that a conspirator attack "a nation at peace with the United States[.]" *Wiborg*, 163 U.S. at 650-51.

76

In this case, Al-Timimi's liability for aiding and abetting the conspiracy charged in Count 6 is predicated on a conspiracy to attack India and Russia. J.A. 2475 (instruction to the jury "that the United States was at peace with both India and Russia"). Substantial evidence is thus required that Al-Timimi provided assistance and shared a specific purpose that a military attack on Russia and India occur.

The evidence at trial, however, failed to establish that Al-Timimi provided any help toward this end. As conceded by the government, no evidence established that Al-Timimi facilitated others to "reach the LET camps." J.A. 2897. Nor is there any evidence that Al-Timimi's words facilitated in any other way a conspiracy to prepare for military attacks on India or Russia. *See Rosemond*, 572 U.S. at 70 (aiding and abetting liability requires proof that defendant "help[ed] another to complete [a crime's] commission."). On the contrary, the conspiracy among the paintball participants to violate the Neutrality Act was formed in 2000, and Al-Timimi had nothing to do with it. J.A. 444, J.A. 447 (Aatique); J.A. 585 (Surratt); J.A. 1254, J.A. 1259-1261 (Kwon); J.A. 2243-2244 (Hasan).

Moreover, there was no evidence at trial that Al-Timimi possessed the specific intent or purpose that a hostile military expedition be made against Russia or India. The most specific statement Al-Timimi made in this regard was one of ambivalence, that "it doesn't matter if we fight the Indians or the Russians or the Americans, that this is all legitimate jihad." J.A. 1148. That statement simply fails to support

77

conviction for an offense that requires proof of specific intent that a hostile military expedition occur against either Russia or India.

Finally, Al-Timimi's comment in response to a question at the September 16 dinner remains protected First Amendment speech. As discussed in detail below, these words were couched in the context of "moral propriety or even moral necessity," *Noto v. United States*, 367 U.S. 290, 297-98 (1961), and thus at most amounted to abstract advocacy supporting non-imminent criminal conduct that was not integral to any criminal act. *See Miselis*, 972 F.3d at 538-39. For these reasons, the Court should vacate Al-Timimi's conviction on Count 6 and remand for the entry of a judgment of acquittal on this count.

## III.    INSUFFICIENT EVIDENCE EXISTS WITH RESPECT TO COUNTS 2, 4, AND 5 OF THE SUPERSEDING INDICTMENT

### A.    Standard of Review

As explained earlier, the denial of motion for judgment of acquittal is reviewed de novo to determine whether the evidentiary record, viewed in the light most favorable to the government, contains substantial evidence that would support a finding of guilt beyond a reasonable doubt. *United States v. Strayhorn*, 743 F.3d 917, 921 (4th Cir. 2014). Legal issues such as whether an offense constitutes a "crime of violence" are reviewed de novo. *See, e.g.*, *United States v. Campbell*, 102 F.4th 238, 240 (4th Cir. 2024).

**B.      Count 2: Soliciting Others to Levy War in Violation of 18 U.S.C. § 373**

Count 2 of the Superseding Indictment charged that Al-Timimi violated § 373 by soliciting others to commit treason by "levy[ing] war against the United States and adhere to their enemies, while owing allegiance to the United States, giving aid and comfort to the Taliban" in violation of 18 U.S.C. § 2381.[16]

For criminal solicitation, the prosecution was required to prove that Al-Timimi (1) "solicited;" (2) specific criminal conduct constituting a crime of violence; (3) with the purpose of promoting or facilitating that specific crime "and under circumstances strongly corroborative of that intent." *See United States v. Cardwell*, 433 F.3d 378, 390 (4th Cir. 2005). As noted above, "[c]riminal solicitation is the intentional encouragement of an unlawful act." *United States v. Hansen*, 599 U.S. 762, 771 (2023). Like aiding and abetting, however, "solicitation" in this context refers to its "specialized, criminal-law sense" rather than its ordinary meaning. *Id.* at 774. It thus requires proof of a proposal that another "engage in specific [unlawful] conduct." *Id.* at 772 (quoting Model Penal Code § 5.02(1)); *see also United States v. Medina-Campo*, 714 F.3d 232, 237 (4th Cir. 2013) (same).

---

[16] In response to a question from the jury, the district court told the jury to disregard the object of soliciting others to adhere to the enemies of the United States. J.A. 2549-2550.

### 1.    "Levying War" in Violation of 18 U.S.C. § 2381 Is Not Categorically a Crime of Violence

To constitute an object of solicitation in violation of 18 U.S.C. § 373, the object offense must categorically constitute a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another. *United States v. Gillis*, 938 F.3d 1181, 1199 (11th Cir. 2019) (applying categorical approach to § 373 predicate). The charged object of Count 2, "levying war" in violation of 18 U.S.C. § 2381, is not categorically a crime of violence.

The conduct element of § 2381, which prohibits anyone who owes allegiance to the United States from "lev[ying] war against" the United States, means to assemble a military force: "To complete the crime of levying war against the United States, there must be an actual assemblage of men for the purpose of executing a treasonable design." *Ex parte Bollman*, 8 U.S. 75, 127 (1807); *United States v. Greathouse*, 26 F. Cas. 18, 22 (C.C.N.D. Cal. 1863) ("To constitute a levying of war there must be an assemblage of persons in force, to overthrow the government, or to coerce its conduct."). As defense counsel noted to the district court, "in order to levy war, you've got to assemble an army, and that army has to be prepared to go to battle or in the process of going to battle." J.A. 2333. But assemblage alone, like mere possession of a firearm, does not categorically require proof of the use, attempted use, or threatened use of force. In other words, gathering an assembly of people

80

prepared to fight is sufficient to satisfy the elements of the offense even if no force is actually used, attempted to be used, or threatened against anyone else.

To determine whether a predicate offense constitutes a crime of violence, "[t]he only relevant question is whether the federal felony at issue always requires the government to prove—beyond a reasonable doubt, as an element of its case— the use, attempted use, or threatened use of force." *See United States v. Taylor*, 596 U.S. 845, 850 (2022). The assembly of people to use force, just like a conspiracy to commit robbery, does not categorically require proof of such force to qualify as a crime of violence. *See United States v. Simms*, 914 F.3d 229, 233-34 (4th Cir. 2019) (en banc).[17]

Moreover, the district court's instruction explained that "the term 'to levy war' means to wage war or to carry on war." J.A. 2470. But the "carrying on [of] war" includes innumerable activities that do not require the use, attempted use, or threatened use of physical force. *See, e.g.*, *Case v. Bowles*, 327 U.S. 92, 102 (1946) (affirming congressional power "to fix maximum prices in order to carry on war");

---

[17] Of course, it would have been futile for the defense to challenge whether the levying war prong of § 2381 satisfied the force clause at the time of trial. *Cf. United States v. Ward*, 171 F.3d 188, 192-93 (4th Cir. 1999) ("Though Virginia's conspiracy statute does not explicitly include as an element 'the use, attempted use, or threatened use of physical force against the person of another,' that element logically must be proven to support a conviction for conspiracy to commit a violent felony."). Again, legal errors are measured against the law in effect at the time of appeal. *Henderson v. United States*, 568 U.S. 266, 273 (2013).

*Burgman v. United States*, 188 F.2d 637 (D.C. Cir. 1951) (affirming treason conviction for broadcasting Nazi propaganda during World War II); *Gillars v. United States*, 182 F.2d 962 (D.C. Cir. 1950) (same); *United States v. D'Aquino*, 192 F.2d 338 (9th Cir. 1951) (same as to Japanese propaganda).

Logistical support, for example, is an integral part of "carrying on" war. *See, e.g.*, *Indep. U. S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 911 (D.C. Cir. 1982) ("[i]t has long been recognized that an adequate merchant marine … is vital to both the national defense and the commercial welfare of our country."); *Wasson v. Trowbridge*, 382 F.2d 807, 809 (2d Cir. 1967) (noting that Merchant Marine, which transports troops, supplies, and equipment overseas during wartime, has "act[ed] as an auxiliary to the United States Navy …. [B]ecause of the vital national interest served by the merchant marine and the hazards which are commonly encountered, it accurately may be said that the responsibilities of merchant marine personnel are comparable to those of the Navy and Coast Guard."). Accordingly, "[t]he Merchant Marine has been appropriately termed our fourth arm of defense." *Jensen v. Farrell Lines, Inc.*, 625 F.2d 379, 385 (2d Cir. 1980) (quoting S. Rep. 91-1080, Merchant Marine Act of 1970, reprinted at 1970 U.S.C.C.A.N. 4188, 4190). As noted in the Department of Defense's Law of War Manual, persons providing logistical support to armed forces are not permitted under the law of armed conflict

to "commit hostile acts in offensive operations." U.S. Dep't of Defense Law of War Manual § 4.16.1 at 1491 (2023).

In sum, the elements of the offense charged as the object of solicitation in this case, § 2381, do not require the use, attempted use, or threatened use of force because (a) mere "assembly" of men does not categorically require the use, attempted use, or threatened use of force; and (b) "carrying on" of war encompasses a wide variety of conduct that does not require the use of force. As such, the object of Count 2, 18 U.S.C. § 2381, does not categorically constitute a crime of violence and thus cannot support a conviction for violating 18 U.S.C. § 373.

Moreover, the error in classifying a violation of § 2381 categorically as a crime of violence is both plain and requires the conclusion that, but for the error, the outcome of the conviction on this count would have been different. *See, e.g.*, *United States v. Heyward*, 42 F.4th 460, 465 (4th Cir. 2022) (describing plain error standard). This conviction for soliciting a violation of § 2381, entitled "Treason," is also one of the most odious crimes in the federal code. Application of this offense to the facts in this case undermines the extraordinary seriousness and gravity of this offense. As such, permitting this particular conviction to stand, even though it does not satisfy § 373's element of solicitation of a categorical crime of violence, would seriously impact the fairness, integrity, and public reputation of judicial proceedings.

*See United States v. Lockhart*, 947 F.3d 187, 197 (4th Cir. 2020) (en banc) (discussing fourth prong of plain error standard).

### 2. Al-Timimi Did Not Solicit Treason in Violation of 18 U.S.C. §§ 373 and 2381

The evidence at trial was also insufficient to establish "circumstances strongly corroborative" of an intention that another person commit a crime of violence, or a specific request for the commission of a specific crime. *See* 18 U.S.C. § 373(a). Substantial evidence thus does not support a conviction for violating § 373.

As an initial matter, § 373 contains a heightened mens rea requirement that requires proof of "circumstances strongly corroborative" of the defendant's intention to solicit a crime of violence. This additional measure of proof is consistent with the common law limitation that "words spoken amount only to a high misdemeanor, and no treason," because words "may be spoken in heat, without any intention, or be mistaken, or perverted, or misremembered by the hearers …. [Because] there can be nothing more equivocal and ambiguous than words, it would indeed be unreasonable to make them amount to high treason." 4 Blackstone, Commentaries on the Laws of England 80 (1765).

In the context of § 373, circumstances such as "[p]ayment or promises to remunerate the perpetrator of the underlying crime can be strong corroborative evidence of intent." *United States v. Cardwell*, 433 F.3d 378, 390 (4th Cir. 2005). Indeed, a Senate Report often cited in decisions construing § 373 lists examples of

84

"strongly corroborating circumstances" that are "highly probative" of intention to solicit a crime, including "the fact that the defendant offered or promised payment," "threatened harm … to the person solicited if he would not commit the offense," "repeatedly solicited the commission of the offense," "believed or was aware that the person solicited had previously committed similar offenses," and acquisition of "weapons, tools, or information suited for use by the person solicited in the commission of the offense." *See* Judiciary Committee Report on the Criminal Code Reform Act of 1981, S. Rep. 97-307, 97th Cong.,1st Sess. 183 (1981).

In *United States v. Barefoot*, 754 F.3d 226 (4th Cir. 2014), for example, this Court affirmed the conviction of a defendant for soliciting the bombing of a courthouse in which the defendant engaged in a number of acts highly probative of his intention to solicit a crime of violence. Most notably, the defendant repeatedly discussed with another person—with whom he had already helped to commit a murder—that he was planning to blow up a specific courthouse to "get back" at the local sheriff, provided a specific plan to use a canoe or one-man boat to travel down a river near the courthouse and plant an explosive, stated that he wanted someone to commit the crime, already possessed a one-man boat, and obtained explosives a short time after he solicited the crime. *Id.* at 235-40.

Nothing like that exists in this case. There was no specific plan provided, no offer of payment, no threats, no repetition, no knowledge of experience in similar

criminal conduct, and no acquisition of weapons, tools, or information that would be of assistance in carrying out the offense of levying war against the United States.

Al-Timimi's reading of a publicly-available religious opinion written by a Saudi cleric which endorsed the moral obligation of Muslims to help Muslims in Afghanistan did not constitute a specific instruction about any "specific acts known to violate federal law." Although the evidence at trial established that Al-Timimi spoke of the obligation to accede to the leader of Afghanistan's call for help, and endorsed leaving the United States to be with mujahideen anywhere in the world as a morally acceptable choice among several, there is no evidence that he solicited any "actual, specific crime" to be committed imminently. *United States v. Williams*, 553 U.S. 285, 299 (2008). As explained below, like the abstract advocacy of illegal immigration that remained protected in *Hansen*, Al-Timimi's general religious and political speech was therefore fully protected by the First Amendment.

Kwon, for example, testified that Al-Timimi's main recommendation was to leave the United States, and he remembered him saying it doesn't matter where you go. J.A. 1381; J.A. 1383. He actually told Kwon that since he was Korean, he "can leave the United States and go to Korea." J.A. 1154; *see* J.A. 1383. Although Al-Timimi responded that it would be "better" when asked by Kwon if he could go to Pakistan with Hasan, J.A. 1154, no evidence established that Al-Timimi sought to

form an "assemblage" of men to accomplish the specific military objective of treason against the United States.

Even the most incendiary statement attributed to Al-Timimi at the September 16 meeting was generalized and non-specific to American soldiers. When Kwon was asked what Al-Timimi said about the permissibility of killing American troops, Kwon testified that "[t]he only thing I can recall is when he said, 'Join the mujahideen,' he said that it doesn't matter if we fight the Indians or the Russians or the Americans, that this is all legitimate jihad." J.A. 1148.

This case is thus entirely unlike *United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999), in which an Islamic cleric, Sheik Omar Abdel Rahman, was convicted of seditious conspiracy, soliciting the murder of then-Egyptian President Hosni Mubarak and an attack on an American military installation, conspiracy to murder Mubarak, and a conspiracy to commit a bombing in New York. *Id.* at 103-04. Fully aware that a group of followers in New York were engaging in military training, Abdel Rahman asked one, an FBI informant, to commit a specific crime: the assassination of Mubarak. *Id.* at 106.

Abdel Rahman told the informant he "should make up with God ... by turning his rifle's barrel to President Mubarak's chest, and kill[ing] him." *Id.* at 117. After Mubarak announced an upcoming visit to the United States, Abdel Rahman told another follower, while discussing Mubarak's assassination, "[c]arry out this

87

operation…. You are ready in training, but do it. Go ahead." *Id.* After telling another follower that "it's a must, it's a duty" to bomb the United Nations headquarters, he proposed to another that instead of bombing the United Nations headquarters, he should "find a plan to destroy or to bomb or to … inflict damage to the American Army." *Id.*

These statements solicited "actual uses of force" against specific targets, and thus crossed beyond the line from mere "expressions of belief, which are protected by the First Amendment." *Id.* at 115. Abdel Rahman's statements constituted the "the purposeful solicitation and facilitation of specific acts known to violate federal law" that fall outside of the protection of the First Amendment. *See Hansen*, 599 U.S. at 781.

Al-Timimi did not solicit "actual uses of force" against any specific person or location. On the contrary, the trial evidence established that Al-Timimi's words were not directed at soliciting "an assemblage" of men for the specific crime of fighting against the United States, but instead recommended a range of morally appropriate actions that included being with the mujahideen anywhere in the world.

As Al-Timimi's counsel argued in support of a Rule 29 motion at the trial, at most these statements establish only that Al-Timimi generally provided an endorsement for a range of conduct that would be morally permissible. J.A. 1962-1963. Recommending a range of choices does not constitute the specific solicitation

of specific criminal conduct—assembling men into a military force with a treasonous purpose to fight against the United States in Afghanistan—to fall outside the protection of the First Amendment. Nor does it satisfy any of the criteria required to prove the heightened mens rea standard required to violate § 373. Accordingly, the evidence at trial is insufficient for any reasonable jury to conclude that Al-Timimi solicited treason in violation of 18 U.S.C. §§ 373 and 2381.

### C. Counts 4 and 5: Attempting to Contribute Services to the Taliban and Aiding and Abetting Others to Aid the Taliban in Violation of 50 U.S.C. § 1705[18]

#### 1. Counts 4 and 5 Are Multiplicitous

As an initial matter, Counts 4 and 5 are multiplicitous and these counts should have been merged in the judgment. "A multiplicitous indictment is one that charges a single offense in multiple counts. '[T]he 'signal danger' of a multiplicitous indictment is that a defendant might thereby receive multiple punishments for the

---

[18] A case pending before the Supreme Court, *Federal Communications Commission v. Consumers Research*, Case Nos. 24-354 & 24-422 (argued Mar. 26, 2025), involves the non-delegation doctrine, and specifically whether Congress impermissibly delegated legislative authority to the FCC. If the Supreme Court issues an opinion that impacts this Court's precedent in *United States v. Arch Trading Co.*, 987 F.2d 1087, 1092 (4th Cir. 1993) (rejecting argument that "the IEEPA impermissibly delegates to the executive branch legislative authority to create crimes, by authorizing the President to define criminal conduct by executive order"), we respectfully request the opportunity to provide supplemental briefing on whether 50 U.S.C. § 1705 violates the non-delegation doctrine and the basic principle that "[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Liparota v. United States*, 471 U.S. 419, 424 (1985).

same crime.'" *United States v. Slocum*, 106 F.4th 308, 312-13 (4th Cir. 2024) (citation omitted).

Count 4 charges an attempted violation of 50 U.S.C. § 1705 – although the count also, unnecessarily, lists 18 U.S.C. § 2 among the statutory citations. As described at length above, aiding and abetting is implicitly included in every federal criminal charge.

Count 5 explicitly pleads aiding and abetting an attempted violation of 50 U.S.C. § 1705. But "aiding and abetting is not a standalone criminal offense," and simply "describes the way in which a defendant's conduct resulted in a violation of a particular [federal] law," *United States v. Groves*, 65 F.4th 166, 170 (4th Cir. 2023). Charging (a) an attempted violation of § 1705 and (b) aiding and abetting an attempted violation of § 1705, if based on the same conduct, are the same substantive offense.

Because Counts 4 and 5 charge the same criminal offense over the same time period based on identical conduct, the counts must be merged.

### 2. The Evidence Is Insufficient to Support Conviction for Aiding and Abetting an Attempted Provision of Services to the Taliban in Violation of 50 U.S.C. § 1705

The Court should vacate and remand for judgments of acquittal on Counts 4 and 5. Just as there is no evidence that Al-Timimi facilitated others to "reach the LET camps," as the government conceded, J.A. 2897, there is no evidence that Al-

Timimi helped anyone to attempt to provide support to the Taliban. As such, the evidence is insufficient to establish the requisite element of help or facilitation of an attempt for purposes of aiding and abetting liability. *See Rosemond v. United States*, 572 U.S. 65, 70 (2014).

To prove Al-Timimi attempted to provide services to the Taliban in violation of 50 U.S. § 1705, the Government was required to establish both that he had a "culpable intent to commit the crime" and "took a substantial step towards completion of the crime that strongly corroborates that intent." *United States v. Engle*, 676 F.3d 405, 420 (4th Cir. 2012). A substantial step means a "direct, substantial act toward the commission of a crime." *United States v. Pratt*, 351 F.3d 131, 136 (4th Cir. 2003). "Mere preparation for the commission of a crime, however, does not constitute an attempt to commit a crime." *Id*. As the Supreme Court noted in *Hansen*, this specialized meaning of "attempt" is distinct from "'attempt' in its ordinary sense of 'try.'" *Hansen*, 599 U.S. at 775.

As the district court found below, "the government provided no evidence" that anyone "ever traveled to Afghanistan or engaged in armed conflict of any kind against a United States soldier[.]" J.A. 2996; *United States v. Al-Timimi*, 741 F. Supp. 3d 365, 384 (E.D. Va. 2024). For that reason, it concluded that "no reasonable juror could have found Al-Timimi guilty" of committing the offense of levying war against the United States in violation of 18 U.S.C. § 2381. J.A. 2996.

The district court's conclusion, which the government did not appeal, also supports a finding of insufficient evidence of a substantial step to provide assistance to the Taliban. No evidence exists that anyone took a "substantial step" toward providing unauthorized services to the Taliban in violation of § 1705 and Executive Order 13129, which prohibited United States persons from contributing funds, goods, or services to or for the benefit of the Taliban. J.A. 168. Even construed in the light most favorable to the government, military training at an LET camp was "mere preparation" for subsequent conduct defending Muslims in Afghanistan. In other words, training at an LET camp was not itself a "'substantial step' toward the completion of" the crime of providing unauthorized services *to* the Taliban, which could have come later.

Al-Timimi's generalized speech on September 16 does not constitute a "direct act" in either assisting the Taliban or engaging in conflict with the United States. Indeed, "[t]reating speech (even obscene speech) as [a] 'substantial step' would abolish any requirement of a substantial step. It would imply that if X says to Y, 'I'm planning to rob a bank,' X has committed the crime of attempted bank robbery, even though X says such things often and never acts. The requirement of proving a substantial step serves to distinguish people who pose real threats from those who are all hot air." *United States v. Gladish*, 536 F.3d 646, 650 (7th Cir. 2008). Al-Timimi's suggestive speech likewise cannot be counted as a substantial step.

Nor is there any evidence of the essential element of "willfulness" required to violate 50 U.S.C. § 1705(c). The defense stipulated that an Executive Order issued in 1999 prohibited Americans from "making or receiving any contribution of funds, goods, or services to or for the benefit of the Taliban." J.A. 168. But § 1705 only prohibits conduct that is done "willfully," which means "that the defendant acted with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 192 (1998) (firearms trading without a license).

Accordingly, the government was required to prove beyond a reasonable doubt knowledge that "the ultimate destination [for the services] was an embargoed country." *United States v. Reyes*, 270 F.3d 1158, 1170 (7th Cir. 2001) (construing mens rea of 50 U.S.C. § 1705); *accord United States v. Amirnazmi*, 645 F.3d 564, 589 (3d Cir. 2011) ("the government had to prove beyond a reasonable doubt that [the defendant] willfully violated the trade restrictions" to violate § 1705). In this context, "ignorance of the law *is* a defense; the inability to appreciate the meaning of the law negatives the mens rea required for conviction." *Amirnazmi*, 645 F.3d at 589.

In this case, there was no testimony that Al-Timimi knew about either the Executive Order or the legal duty not to provide services to the Taliban. On the contrary, the testimony about Al-Timimi's statements about the Taliban both before and after the September 11 attacks established only that he spoke in religious terms

93

about the theological justification for the Taliban's destruction of Buddhist statues, the obligation to support the Taliban to the extent their actions are "in agreement with Islam," and the role of the Taliban in "the end of time battles" centered in "Palestine, Arabia, and the south Asian region." J.A. 322-325.

Finally, Al-Timimi's generalized speech endorsing the moral obligation of Muslims to accede the call for help is precisely the type of generalized speech that is fully protected by the First Amendment from criminal prohibition. Not only was Al-Timimi's speech in no sense integral to the commission of any criminal conduct, but the claim that the government can bar citizens from speaking about moral obligations is specious. As such, Al-Timimi's suggestive speech about Afghanistan and the moral or religious justification for assisting the Taliban is protected from criminal liability by the First Amendment. *See United States v. Miselis*, 972 F.3d 518, 538-39 (4th Cir. 2020).

### 3.  The District Court Failed to Properly Define "Attempt"

The district court's instruction to the jury defining the meaning of an "attempt" was also erroneous. With respect to Counts 4 and 5, the district court instructed the jury that "the word 'attempt' is an ordinary word. It means try. That's

not a fancy technical word. An attempt is an effort to do something or to try to do something." J.A. 2473.

This instruction was not objected to, but it's plainly wrong. "In a criminal prohibition, we [do] not understand 'attempt' in its ordinary sense of 'try.' We [] instead understand it to mean taking "a substantial step" toward the completion of a crime with the requisite mens rea." *Hansen*, 599 U.S. at 774-75 (citation omitted).

Moreover, a reasonable probability exists that the outcome would have been different, but for the error, given the government's concession that Al-Timimi did not help anyone to travel to an LET camp, J.A. 2897, and the fact that training with LET was at most preparation for defending Muslims in Afghanistan. As such, affirming Al-Timimi's convictions for attempting to provide services to the Taliban—when no one took steps actually directed at providing services to the Taliban—would constitute a miscarriage of justice and would seriously impact the fairness, integrity, and public reputation of judicial proceedings. *See United States v. Olano*, 507 U.S. 725, 736 (1993). If the Court finds sufficient evidence to sustain these convictions on Counts Four and Five, they should be vacated and remanded for a new trial.

## IV.     AL-TIMIMI'S SPEECH WAS PROTECTED FROM CRIMINAL LIABILITY BY THE FIRST AMENDMENT

In denying Al-Timimi's post-trial motion for judgement of acquittal on First Amendment grounds, the district court stated that "this was not a case about speech.

This was a case about intent. Speech was an aspect of the proof of that intent. …

[But] the real issue in this case was what the defendant intended by his speech and actions and whether he intended to incite, induce, or otherwise involve the codefendants in this case in the criminal acts named in the indictment." J.A. 272.

The district court failed to appreciate that words that do not actually help another to commit a crime—even if such words are alleged to encourage *non-imminent* criminal conduct—remain protected by the First Amendment. Al-Timimi's words in which he (1) reported that the leader of Afghanistan had called for help from Muslims; (2) read from a publicly-available religious opinion written by a Saudi cleric stating that it was obligatory for Muslims to help; and (3) encouraged the attendees to leave the United States, live among Muslims overseas, and, if possible, be with the mujahideen anywhere in the world, are not subject to criminal liability because they are protected First Amendment speech.[19] In other

---

[19] Scholarship addressing this case has almost universally supported First Amendment protection for Al-Timimi's speech. *See, e.g.*, William H. Freivogel, *Tom Eagleton and the "Curse to Our Constitution"*, 52 St. Louis U. L.J. 109, 131 (2007) (arguing that because "an attack on American troops or U.S. soil never was imminent or even planned[,] [t]he U.S. Supreme Court should review al Timimi's trial and 'draconian' sentence"); David Goldberger, *Protecting Speech We Hate*, 32(2) Litigation 40, 44 (Winter 2006) ("it is not at all obvious that his speech caused his listeners to do an unlawful act that they had not independently decided to commit as *Brandenburg* requires"); Thomas Healy, *Brandenburg in a Time of Terror*, 84 Notre Dame L. Rev. 655, 679-81 (2009) ("[T]here was nothing to suggest that al-Timimi's speech was directed to inciting imminent lawless conduct. It amounted to nothing more than advocacy of illegal action at some indefinite future time …. [U]nder a careful application of *Brandenburg*, al-Timimi's speech should have been

96

words, it was not a crime then, and is not a crime now, to read a religious opinion

out loud that says "it is compulsory to assist" the Taliban "with wealth, persons,

opinions and advices, and through the Media by defending them and their honor and

their public image; and through prayers for them that they vanquish the enemy and

have steadfastness," and recommend that others follow it. J.A. 3175-3176.

### A.    Standard of Review

The Court is required to conduct a de novo "independent review of the record

both to be sure that the speech in question actually falls within [an] unprotected

category and to confine the perimeters of any unprotected category within

acceptably narrow limits." *United States v. Bartow*, 997 F.3d 203, 208 (4th Cir.

2021) (quoting *Bose Corp. v. Consumers Union of U.S.*, Inc., 466 U.S. 485, 505

(1984)); *United States v. O'Nan*, 452 F. App'x 280, 282 (4th Cir. 2011) (citing *Bose*

---

protected."); Elisa Kantor, *New Threats, Old Problems: Adhering to Brandenburg's Imminence Requirement in Terrorism Prosecutions*, 76 Geo. Wash. L. Rev. 752, 774 (2008) ("Because Al-Timimi's conviction does not satisfy the imminence requirement, it cannot stand up to scrutiny under *Brandenburg's* First Amendment standard."); John C. Knechtle, *When to Regulate Hate Speech*, 110 Penn St. L. Rev. 539, 571 (2006) (arguing that Al-Timimi's "exhortation would require traveling to Afghanistan and training to fight for the Taliban, which would take months if not years, which is certainly not imminent violence under traditional *Brandenburg* analysis"); Wayne McCormack, *Inchoate Terrorism: Liberalism Clashes with Fundamentalism*, 37 Geo. J. Int'l L. 1, 55 (2005) ("The al-Timimi case unquestionably pushes the envelope of incitement law because his speech was several steps removed from actual violence."); Michael J. Sherman, *Brandenburg v. Twitter*, 28 Geo. Mason U. Civ. Rts. L.J. 127, 135 (2018) (stating that there was "little support for a claim that al-Timimi's comments to the group were intended to incite imminent lawless action or that they did so.").

*Corp.*); *see also Bose Corp.*, 466 U.S. at 508 n.27 ("First Amendment questions of 'constitutional fact' compel this Court's de novo review.").

### B.    Al-Timimi's Speech Was Protected From Criminal Liability By the First Amendment

The First Amendment "means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010). Accordingly, the First Amendment protects advocacy even of unlawful action so long as that advocacy is not "directed to inciting or producing imminent lawless action and … likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam). Indeed, it has long been settled that "the teaching of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." *Noto v. United States*, 367 U.S. 290, 297-98 (1961). "The mere tendency of speech to encourage unlawful acts," therefore, "is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002).

### 1.    General Advocacy to Join a Disfavored Group Is Protected Speech

The Supreme Court applied these principles in a decision issued after the trial in this case, *United States v. Williams*, 553 U.S. 285 (2008). In *Williams*, the Court made clear that "abstract advocacy" of child pornography, such as the phrase "I

encourage you to obtain child pornography," constitutes protected speech, even though the "recommendation of a particular piece of purported child pornography with the intent of initiating a transfer" is properly prohibited by federal statute. *Id.* at 300 (internal quotation marks omitted); *accord United States v. Miselis*, 972 F.3d 518, 539-41 (4th Cir. 2020) (discussing First Amendment protection of "abstract advocacy," and striking statutory prohibition against "encouraging," "promoting," or "urging" others to riot).

Urging another person in the abstract to commit a non-imminent crime is thus protected by the First Amendment from criminal liability. *Brandenburg*, 395 U.S. at 447. Put differently, the First Amendment bars criminalizing abstract encouragement of others to engage in non-imminent criminal conduct. *Miselis*, 972 F.3d at 541-42.

In this case, however, the evidence at trial failed to even establish that Al-Timimi encouraged a crime by advocating that the attendees at the September 16 dinner leave the United States and, if possible, be with mujahideen (such as LET) overseas. This country certainly has had experience with disfavored groups like the Communist Party that advocated the use of force and even the overthrow of the government. But "mere Party membership, even with knowledge of the Party's unlawful goals, cannot suffice to justify criminal punishment[.]" *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 607 (1967); *cf. Dawson v. Delaware*,

503 U.S. 159, 165-67 (1992) (holding that defendant's First Amendment rights were violated by admission of membership in white supremacist prison gang to establish defendant's abstract beliefs). It therefore cannot be a crime to say out loud that others should join the Communist Party, the Black Panthers, LET, or other disfavored groups, certainly prior to its designation as a terrorist organization,[20] and likely after.[21]

## 2. Al-Timimi's General Statements Did Not Constitute Facilitation or Solicitation of a Specific Crime

To be sure, speech amounting to "facilitation" of a crime and "solicitation" fall outside of the protection of the First Amendment because such conduct constitutes speech "integral to unlawful conduct." *Hansen*, 599 U.S. at 783. But Al-Timimi's speech did not help or assist anyone to commit any of the charged offenses. Accordingly, the government cannot ban Al-Timimi's words or impose criminal

---

[20] After Hasan, Kwon, Aatique, and Khan left the LET camps, the State Department designated LET as a foreign terrorist organization on December 18, 2001. Designations of Terrorists and Terrorist Organizations Pursuant to Executive Order 13224, 67 FR 12633, 12635 (Mar. 19, 2002).

[21] The Supreme Court made clear in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 26 (2010), that 18 U.S.C. § 2339B, which prohibits material support of designated terrorist groups, "does not prohibit independent advocacy or expression of any kind." *Id.* at 26. As the Court explained, "Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups." *Id.* at 36. Independent abstract encouragement to join a foreign terrorist group, therefore, is not prohibited by § 2339B.

liability for them based on the claim that they assisted someone else's violation of law, because no evidence exists that his words helped anyone else to violate a law.

Nor can the government bar Al-Timimi's speech on the ground that it constitutes criminal "solicitation." Criminal solicitation requires proof of "the intentional encouragement of an unlawful act." *Hansen*, 599 U.S. at 771 (citing ALI, Model Penal Code § 5.02(1), p. 364 (1985), and 2 W. LaFave, Substantive Criminal Law § 11.1 (3d ed. 2022)). The Model Penal Code provision cited in *Hansen* provides that "[a] person is guilty of solicitation to commit a crime if with the purpose of promoting or facilitating its commission he commands, encourages or requests another person to engage in *specific conduct which would constitute such crime* or an attempt to commit such crime or which would establish his complicity in its commission or attempted commission." MPC § 5.02 subd. (1) (emphasis added). Lafave's treatise likewise requires a criminal solicitation to "carry meaning in terms of proposing some concrete course of [criminal] conduct[.]" 2 Subst. Crim. L. § 11.1(c) n.93 (3d ed. 2022).

Words that merely endorse or encourage a violation of law in the abstract remain protected by the First Amendment. *See Miselis*, 972 F.3d at 539-41 (discussing First Amendment protection of "abstract advocacy," and striking statutory prohibition against "encouraging," "promoting," or "urging" others to riot). As this Court explained in *Miselis*, there are an "abundance of hypothetical efforts

101

to persuade that aren't likely to produce an imminent riot." *Id.* at 536. For that reason, the Court struck statutory language barring anyone from "promoting" a riot as unconstitutionally overbroad.

The Court in *Hansen* likewise held that a statute prohibiting "encouraging" or "inducing" violations of immigration law "reache[d] no further than the purposeful solicitation and facilitation of *specific acts* known to violate federal law." *Hansen*, 599 U.S. at 781 (emphasis added). To fall outside of First Amendment protection, solicitation is limited to words that specifically request another to commit a specific crime.

Put differently, the key to this specialized meaning of "solicitation" is specificity and intent. *See Williams*, 553 U.S. at 297 (distinguishing abstract advocacy from specific requests or encouragement of conduct involving specific contraband or a particular victim). *Hansen*, 599 U.S. at 781-82 (rejecting overbreadth challenge because statute only prohibited solicitation of "specific acts known to violate federal law" and the "defendant *intend[ed]* to bring about a specific [unlawful] result"). In other words, "specificity is the dividing line between punishable solicitation and protected advocacy." *United States v. Hansen*, 40 F.4th 1049, 1068 (9th Cir. 2022) (Bumatay, J., dissenting from denial of rehearing en banc) (citation omitted).

102

The record in this case contains no evidence that Al-Timimi did anything other than engage in "abstract advocacy" protected by the First Amendment. As an initial matter, his statements at the September 16 meeting, as recounted by attendees, that the leader of Afghanistan had called for help, and it was the obligation of Muslims to provide help, cannot establish criminal liability because such words constitute constitutionally-protected statements of "moral propriety or even moral necessity." *See Noto*, 367 U.S. at 297-98.

Moreover, attendees who testified about Al-Timimi's words at the September 16 meeting stated that he offered a range of non-specific options for morally-acceptable conduct in response to the September 11 attacks: lay low, or if you can, leave the United States to live with Muslims overseas, or if you can, join the mujahideen anywhere in the world. In fact, the government told the jury in its opening statement that Al-Timimi purportedly said to one person who was not at the September 16 dinner, but who said he couldn't fight because he had a family, "[w]ell, that's okay. If you can't, you can't. Just leave [the country]." J.A. 157. The government even acknowledged to the jury that Al-Timimi offered a set of options, claiming he said on September 16 that "it was time to go and fight *or at least leave*." J.A. 154 (emphasis added).

Proposing a range of options is not a proposal that another "engage in specific [unlawful] conduct." *Hansen*, 599 U.S. at 772. Put differently, the fact that Al-

103

Timimi offered a variety of potential morally-appropriate choices, leaving the decision to the listener, is incompatible with the claim that he made a specific proposal that another engage in a specific crime with intention that that specific crime be committed.

Again, to fall outside of First Amendment protection, criminal solicitation requires proof of a request for a specific unlawful act with intention to bring about a specific unlawful result, not a range of general choices that include lawful conduct. *See Hansen*, 599 at 782. By offering broad choices of morally-acceptable conduct, Al-Timimi's words do not satisfy the high bar of criminally prohibited speech requesting that someone commit a specific crime with intention that the specific crime be carried out.

Furthermore, even the purported recommendation that attendees join the mujahideen "anywhere in the world," J.A. 1383, reflects that Al-Timimi did not make a specific request for a specific crime, but instead engaged in abstract advocacy. In other words, in the fraught days after the September 11 attacks, he offered a set of possible choices and did not request that any specific crime be carried out by those in attendance at the dinner.

In sum, to the extent that Al-Timimi's statements endorsed criminal conduct, his statements providing a range of choices that included lawful conduct in addition to suggesting the possibility of being with the mujahideen anywhere in the world are

104

analogous, if even less specific, than the abstract general encouragement to obtain child pornography the Supreme Court said would be constitutionally protected in *Williams*, 553 U.S. at 300 (2008), or the abstract general encouragement for others to riot found protected by this Court in *Miselis*, 972 F.3d at 539-41.

### 3. Al-Timimi's Words Did Not Satisfy *Brandenburg*'s Imminence Requirement to Be Subject to Criminal Sanction

Finally, Al-Timimi's words did not satisfy the "imminence" requirement to prohibit speech under the *Brandenburg* standard. The First Amendment certainly authorizes restrictions on speech "'directed [at] producing imminent lawless action,' and likely to do so." *Counterman v. Colorado*, 600 U.S. 66, 73 (2023) (quoting *Brandenburg*). That means that "advocacy of lawlessness retains the guarantees of free speech unless it's directed and likely to produce imminent lawlessness." *Miselis*, 972 F.3d at 533.

On the other hand, "advocacy of illegal action at some indefinite future time[] … is not sufficient to permit the State to punish [] speech." *Hess v. Indiana*, 414 U.S. 105, 108 (1973). Indeed, general advocacy of violence contingent upon non-imminent future events fails to satisfy this imminence requirement. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 900 n.28, 928 (1982) (holding statement by an N.A.A.C.P. official threatening to break the necks of black residents if they violated a boycott on stores that enforced segregation "did not transcend the bounds

of protected speech set forth in *Brandenburg*"). Accordingly, the Supreme Court has held that speech advocating violence in general terms remained protected and failed the imminence requirement because "violence did not follow until weeks or months after the speech at issue there." *Id.* at 928-29.

To the extent that Al-Timimi advocated unlawful conduct, it was to be undertaken "at some indefinite future time" contingent upon a set of facts that had not yet occurred, notably including the U.S. invasion of Afghanistan. Indeed, the United States made its demand on September 20 that the Taliban turn over Osama bin Laden, the leader of al-Qaeda, or face a military response. J.A. 168. The United States subsequently launched airstrikes against the Taliban on October 7, 2021, and invaded with ground troops on October 21, 2001. J.A. 168.

Accordingly, Al-Timimi's words on September 16 could not constitute incitement of immediate unlawful conduct. Specifically, Al-Timimi's speech that Muslims were obligated to help defend Muslims in Afghanistan, and encouragement to go overseas and even join mujahideen anywhere in the world, were neither designed nor "likely to produce imminent" lawlessness not only because there was no temporal element to the statements, but also because these words were contingent on future events. The speech thus remained protected by the First Amendment. *See Hess*, 414 U.S. at 108.

In sum, Al-Timimi's speech was constitutionally protected and immune from criminal liability because his words provided no assistance for anyone else to commit a crime, they did not "solicit" the specific commission of a particular crime within the specialized meaning required to authorize criminal liability, and they were not directed or likely to produce "imminent lawless action."

## CONCLUSION

For all of the reasons outlined above, the evidence was insufficient to support Al-Timimi's convictions based upon an aiding and abetting theory of liability, and his words in the days after that attacks on September 11 were protected from criminal liability by the First Amendment. All counts of conviction should be vacated and the case remanded for the entry of judgments of acquittal on all remaining counts.

Respectfully submitted,

s/  Geremy C. Kamens

Geremy C. Kamens
Federal Public Defender for the
 Eastern District of Virginia
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Geremy_Kamens@fd.org

Dated April 30, 2025

## REQUEST FOR ORAL ARGUMENT

Counsel for appellant asserts that the issues raised in this brief may be more fully developed through oral argument.

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief has been prepared using Microsoft Word for Office 365 software, Times New Roman font, 14-point proportional type size.

2.    Excluding the table of contents, table of authorities, signature block, statement with respect to oral argument, and this certificate of compliance, this brief contains no more than 30,000 words, specifically 26,593 words.[22]

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

|  |  |
|---|---|
| April 30, 2024 | s/ Geremy C. Kamens |
| Date | Geremy C. Kamens |
| | Federal Public Defender |

---

[22] By order dated May 17, 2015, the Court granted a motion to file an opening brief of not more than 30,000 words. Doc. 45.