No. 14-4451

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH COURT

————————

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

ALI AL-TIMIMI,
*Defendant/Appellant.*

————————

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)

————————

JOINT APPENDIX

VOLUME III of XIII (pages 373 - 656)

————————

**ERIC S. SIEBERT**
**United States Attorney**

**Gordon D. Kromberg**
**Assistant U.S. Attorney**
**Counsel for Appellee**
**2100 Jamieson Avenue**
**Alexandria, VA 22314**
**(703) 299-3700**

**Joseph Attias**
**Attorney**
**Counsel for Appellee**
**Nat'l Security Division**
**U.S. Dep't of Justice**
**Washington, DC 20530**

**GEREMY C. KAMENS**
**Federal Public Defender**

**Geremy C. Kamens**
**Federal Public Defender**
**Counsel for Dr. Al-Timimi**
**1650 King Street, Suite 500**
**Alexandria, VA 22314**
**(703) 600-0800**

This page intentionally left blank for double-sided pagination and printing

# <u>TABLE OF CONTENTS</u>

## VOLUME I (pages 1 - 122)

District Court Docket Sheet (as of Apr. 28, 2025) ......................................................1

Indictment (Sept. 23, 2004, Doc. 1)...................................................................49

Superseding Indictment (Feb. 3, 2005, Doc. 47) .....................................................64

Government's Proposed Jury Instructions (Mar. 28, 2005, Doc. 84).....................80

## VOLUME II (pages 123 - 372)

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 294) (defense opening
    statement).....................................................................................123

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 148)........................................144

  Opening statements ..........................................................................148

    By the government.........................................................................148
    By the defense...................................................................*see* J.A. 126

  Government's evidence ......................................................................167

    Stipulation.......................................................................................167

    Nabil Gharbieh                  Direct examination...................................171
                                    Cross examination....................................233
                                    Redirect examination ...............................274
                                    Recross examination ................................281

    Muhammad Aatique               Direct examination...................................283

  Concluding matters .........................................................................369

i

## VOLUME III (pages 373 - 656)

Transcript, Jury Trial, Day 2 (Apr. 5, 2005, Doc. 149) ..........................................373

    Preliminary matters ....................................................................377

    Government's evidence, cont'd ...................................................377

        Muhammad Aatique       Direct examination (resumed) ................378
                                            Cross examination...................................398
                                            Redirect examination ..............................468
                                            Recross examination ...............................489

        Stipulations ........................................................................492

        Donald Surratt            Direct examination..................................504
                                                Cross examination...................................570
                                            Redirect examination ..............................585
                                            Recross examination ...............................588

        Detective John Hodge       Direct examination..................................589
                                              Cross examination...................................592
                                            Redirect examination ..............................592

        Stipulations ........................................................................594

        Playing of audiotapes.........................................................598

        Yong Ki Kwon            Direct examination..................................604

    Concluding matters ........................................................................655

## VOLUME IV (pages 657 - 972)

Transcript, Jury Trial, Day 3 (Apr. 6, 2005, Doc. 150) ..........................................657

    Preliminary matters ....................................................................661

Government's evidence, cont'd .......................................................665

    Evan Francois Kohlmann    Direct examination...................................665
                                            Cross examination....................................817
                                            Redirect examination .............................895
                                            Recross examination ..............................903

    Stipulations ...........................................................905

    Playing of audiotape .............................................914

Concluding matters ........................................................970


## VOLUME V (pages 973 - 1270)

Transcript, Jury Trial, Day 4 (Apr. 7, 2005, Doc. 151) ........................973

Preliminary matters.........................................................977

Government's evidence, cont'd .......................................................980

    Playing of audiotapes and videotape ...........................980

    S.A. Tracy Kneisler    Direct examination.................................1093
                                           Cross examination..................................1099

    S.A. Christopher Paul Mamula  Direct examination.................................1100

    S.A. Donald L. Monday    Direct examination.................................1105
                                           Cross examination..................................1127

    Stipulations ...........................................................1131

    Yong Ki Kwon    Direct examination (resumed) ..............1146
                                           Cross examination..................................1238

Concluding matters ........................................................1268

iii

## VOLUME VI (pages 1271 - 1550)

Transcript, Jury Trial, Day 5 (Apr. 11, 2005, Doc. 152) .....................................1271

    Preliminary matters ...........................................................................1275

    Government's evidence, cont'd ..........................................................1279

        Yong Ki Kwon        Cross examination (resumed) ...............1279
                                        Redirect examination ...........................1446
                                        Recross examination ............................1475

        S.A. Wade Ammerman        Direct examination ................................1481
                                        Cross examination.................................1539

    Concluding matters ............................................................................1548

## VOLUME VII (pages 1551 - 1804)

Transcript, Jury Trial, Day 6 (Apr. 12, 2005, Doc. 153) .....................................1551

    Government's evidence, cont'd ..........................................................1555

        S.A. Wade Ammerman        Cross examination (resumed) ...............1556
                                          Redirect examination ...........................1582
                                        Recross examination ............................1593

        Stipulations .....................................................................1600

        Playing of audiotapes........................................................1610

        S.A. John Wyman        Direct examination ................................1656

    Concluding matters ............................................................................1799

iv

VOLUME VIII (pages 1805 - 2058)

Transcript, Jury Trial, Day 7 (Apr. 13, 2005, Doc. 154) ....................................1805

   Preliminary matters ..................................................................1808

   Government's evidence, cont'd ..................................................1810

      S.A. John Wyman          Direct examination (resumed) ..............1810
                                   Cross examination.................................1852
                                   Redirect examination ...........................1916
                                   Recross examination ............................1923

      Alex Daghestani            Direct examination.................................1927
                                   Cross examination.................................1935

      Andre Thompson         Direct examination.................................1940
                                   Cross examination.................................1951

      Playing of audiotapes..............................................................1954

      Government rests.............................................................1955, 1965

   Defendant's Rule 29 motion ....................................................1958

   Defendant's evidence ...............................................................1965

      Sherdil Loynab           Direct examination.................................1966
                                   Cross examination.................................1970
                                   Redirect examination ...........................1976

      Yousuf Jaafar Idris      Direct examination.................................1977
                                   Cross examination.................................2018

   Concluding matters ..................................................................2056

## VOLUME IX (pages 2059 - 2318)

Transcript, Jury Trial, Day 8 (Apr. 14, 2005, Doc. 155) ....................................2059

    Defendant's evidence, cont'd ........................................................................2063

        Yousuf Jaafar Idris           Cross examination (resumed) ...............2063

        Luther Kennedy              Direct examination..................................2136
                                            Cross examination..................................2144
                                          Redirect examination ...........................2163
                                          Recross examination .............................2168

        Curtis Jamison               Direct examination..................................2172
                                              Cross examination..................................2189

        Defendant rests ......................................................................2198

    Government's rebuttal evidence ...................................................................2198

        Khwaja Mahmood Hasan      Direct examination..................................2199
                                            Cross examination..................................2235
                                          Redirect examination ...........................2278
                                          Recross examination .............................2284

        Muhammad Aatique, recalled   Direct examination..................................2290

        Conclusion of evidence ..........................................................2293

    Preliminary charge conference ...................................................................2306

## VOLUME X (pages 2319 - 2568)

Transcript, Jury Trial, Day 9 (Apr. 18, 2005, Doc. 156) ....................................2319

    Charge conference ........................................................................................2322

vi

Closing arguments ..................................................................2346

    By the government....................................................2346
    By the defense...........................................................2376
    Rebuttal by the government......................................2415

Jury charge ...........................................................................2429

Jury deliberations ................................................................2500

    Jury question ............................................................2500

Transcript, Jury Trial, Day 10 (Apr. 19, 2005, Doc. 157)...........2506

    Jury deliberations, cont'd.........................................2507

    Jury question ............................................................2507

Transcript, Jury Trial, Day 11 (Apr. 20, 2005, Doc. 158)...........2515

    Jury deliberations, cont'd.........................................2517

    Jury question ............................................................2517

    Jury questions ...........................................................2520

Transcript, Jury Trial, Day 12 (Apr. 22, 2005, Doc. 159)...........2535

    Jury deliberations, cont'd.........................................2537

Transcript, Jury Trial, Day 13 (Apr. 25, 2005, Doc. 160)...........2540

    Jury deliberations, cont'd.........................................2542

    Jury questions ...........................................................2542

Transcript, Jury Trial, Day 14 (Apr. 26, 2005, Doc. 161)...........2553

    Return of verdict ......................................................2555

Concluding matters ........................................................................2560

Verdict Form (Apr. 26, 2005, Doc. 107) ......................................2566


VOLUME XI (pages 2569 - 2770)

Defendant's Motion for Judgment of Acquittal (June 6, 2005, Doc. 118)..........2569

Defendant's Corrected Motion for New Trial (June 14, 2005, Doc. 124) ..........2630

Government's Response to Defendant's Post-Trial Motions (June 20, 2005, Doc. 125)............................................................................2647

Defendant's Reply to the Government's Response to Defendant's Post-Trial Motions (June 28, 2005, Doc. 126) (attachments omitted from appendix)........................................................................2688

Transcript, Sentencing Hearing (July 13, 2005, Doc. 147) ................................2719

    Argument and ruling on Rule 29 motion...................................2720
    Argument and ruling on Rule 33 motion...................................2724
    Ruling on Guidelines objections..............................................2735
    Argument on sentencing ..........................................................2739
    Allocution ................................................................................2746
    Imposition of sentence ............................................................2750

Judgment in a Criminal Case (July 13, 2005, Doc. 132)....................................2758

Notice of Appeal (July 15, 2005, doc. 133)......................................................2765

Fourth Circuit Judgment (corrected) (with copy of Apr. 25, 2006 order) (May 19, 2006, Doc. 168)..............................................................2767


VOLUME XII (pages 2771 - 2998)

Transcript, Hearing (Aug. 24, 2007, Doc. 239)................................................2771

Transcript, Hearing (Nov. 20, 2007, Doc. 245)......................................................2790

Transcript, Hearing (May 16, 2008, Doc. 263) .....................................................2795

Transcript, Hearing (Oct. 23, 2008, Doc. 272).....................................................2802

Transcript, Hearing (Feb. 19, 2009, Doc. 297).....................................................2827

Transcript, Hearing (Oct. 4, 2013, Doc. 340) ......................................................2834

(Redacted) Memorandum Opinion (denying motions to compel) (Apr. 28, 2014, Doc. 350)..........................................................................................2864

Order (May 21, 2014, Doc. 357).............................................................................2887

Notice of Appeal (June 4, 2014, Doc. 358) ...........................................................2889

Fourth Circuit Order (remanding case for further proceedings) (Aug. 4, 2015, Doc. 406).................................................................................................2892

Fourth Circuit Order (expanding scope of remand) (July 26, 2016, Doc. 431)...............................................................................................................2894

Government's Response in Opposition to Defendant's Second Motion for Acquittal on Count 1 (Aug. 29, 2018, Doc. 447) ...........................................2896

Defendant's Reply to Government's Supplemental Memorandum on *United States v. Davis* (Aug. 19, 2019, Doc. 459) .........................................2905

Government's Reply in Further Support of Its Supplemental Memorandum on *United States v. United States* (Aug. 26, 2019, Doc. 461) .......................2936

(Redacted) Memorandum Opinion (granting release pending appeal) (Aug. 18, 2020, Doc. 519) .....................................................................................2953

Order (granting release pending appeal) (Aug. 18, 2020, Doc. 520) .................2969

Fourth Circuit Order (affirming grant of release pending appeal) (Aug. 31, 2020, Doc. 535)................................................................................................2971

ix

Memorandum Opinion (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 549)..............................................................................2972

Order (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 550)...........................2998


VOLUME XIII (pages 2999 - end)

Selected Government Trial Exhibits.................................................................2999

Gov't Exh. 1B1a: transcript of Apr. 7, 2003 consensually monitored call between Kwon and Royer..........................................................2999

Gov't Exh. 1B2a: transcript of Apr. 8, 2003 consensually monitored call between Kwon and Royer..........................................................3053

Gov't Exh. 1B4a: transcript of Apr. 17, 2003 consensually recorded CCTV hotel meeting between Kwon and Royer.......................................3084

Gov't Exh. 1D27: Taiba Bulletin, Oct. 17, 2000..........................................3131

Gov't Exh. 1D28: Taiba Bulletin, Oct. 27, 2000..........................................3134

Gov't Exh. 1D29: Taiba Bulletin, Nov. 7, 2000...........................................3137

Gov't Exh. 1D45: Taiba Bulletin, Sept. 26, 2001 (post from nadqpk@yahoo.com)..............................................................3139

Gov't Exh. 1D48: Taiba Bulletin, Oct. 13, 2001 (post from nadqpk@yahoo.com)..............................................................3141

Gov't Exh. 1D52: Taiba Bulletin, June 24, 2001 (post from nadqpk@yahoo.com)..............................................................3144

Gov't Exh. 1F1: LET Poster, image 1 .........................................................3151

Gov't Exh. 1F3: LET Poster, image 3 .........................................................3152

Gov't Exh. 1F4: LET Poster, image 4 .........................................................3153

Gov't Exh. 1G10a: transcript of Apr. 1, 2003 recorded telephone call (Hammad and Royer call Al-Timimi) ..................................................... 3154

Gov't Exh. 4G7: email dated June 19, 2001 from pballaz@yahoo.com, regarding praying in a moving car ............................................................. 3164

Gov't Exh. 7A19: Uqla fatwa on events of 9/11, in English, taken from Surratt's residence on May 8, 2003 .......................................................... 3168

Gov't Exh. 7A23; Hawali's *Statement to the Ummah* in English ................. 3178

Gov't Exh. 7A39a: translation of website containing Space Shuttle article in Arabic ................................................................................................ 3200

Gov't Exh. 7C31: email dated Sept. 20, 2001 from Kwon to Belton Harris ....................................................................................................................... 3203

Gov't Exh. 7D3: email dated Oct. 15, 2001 from Surratt re. Hawali's *Statement to the Ummah* ..................................................................................... 3204

Gov't Exh. 7F24a: UPI News article dated Sept. 16, 2001 titled *Taliban Leaders Seek Islamic Support* .................................................................... 3206

Gov't Exh. 7H12: plea agreement and statement of facts for Muhammed Aatique ................................................................................................................... 3207

Gov't Exh. 10A3: document entitled *Suicide Attacks, Are They Suicide? A Shariah Viewpoint* ..................................................................................... 3223

Gov't Exh. 10A41: email dated Oct. 23, 2000 from Nabil to Timimi re: trip to Delaware ............................................................................................ 3227

Gov't Exh. 10D19: email dated Oct. 21, 2001 email from altimimi@yahoo.com to aqdcksa@yahoo.com re. "Utter Nonsense" ...... 3229

Gov't Exh. 10H1A: record of instant messaging session with Bin Laden statement preamble ..................................................................................... 3233

Gov't Exh. 10J7: article, *Sheikh Ali Timimi on the Taliban and the Statues* .................................................................................................................. 3260

Gov't Exh. 10J9: email dated December 13, 2001 from Timimi re. "A call to reflect and repentance" ...................................................3262

Gov't Exh. 10J15: affidavit of Youseff Idris...................................3265

Gov't Exh. 10S1: summary chart of Timimi / Kwon telephone calls, Sept. 16, 2001 .........................................................................3266

Gov't Exh. 10S2: summary chart of Timimi / Kwon telephone calls, Sept. 19, 2001 .........................................................................3267

Gov't Exh. 10S3: summary chart of Kwon telephone calls, Sept. 16, 2001 ...........................................................................................3268

Gov't Exh. 10T1: photograph, package of "New World Order" cassette tapes .........................................................................................3272

Gov't Exh. 12-1: stipulation re. background facts............ 3273; *see* J.A. 167-171

Gov't Exh. 12-60: stipulation re. electronic surveillance of calls and email...............................................................................................3277

Gov't Exh. 12-61: stipulation re. Al-Timimi lectures ............3278; *see* J.A. 2344

Selected Defense Trial Exhibits.........................................................3280

Def't Exh. 33: Al-Timimi lecture titled *Muslims in America in the Face of Accusations of "Fundamentalism" and "Terrorism"* delivered at Purdue University on Oct. 20, 1993 ........................................3280

Def't Exh. 57: letter dated from AUSA Gordon Kromberg to Yong Kwon's attorneys ...................................................................3293

Def't Exh. 80: stipulation regarding Al-Timimi's unsubscription from Taiba Bulletin List .................................................................3295

Def't Exh. 81: summary report of an interview with Ismail Royer by Evan Kohlmann ..................................................................3298

Def't Exh. 82: photo of front of Yong Kwon's apartment .............................3303

Def't Exh. 83: photo of back of Yong Kwon's apartment ...........................3304

Def't Exh. 85: summary of Yong Kwon's phone calls on Sept. 16, 2001 ................................................................................................. 3305

Def't Exh. 86: summary of Yong Kwon's phone calls on Sept. 13-15, 2001 .................................................................................3306

Def't Exh. 87: summary of Al-Timimi's calls on evening of Sept. 19, 2001 .................................................................................3307

Def't Exh. 90: summary of Al-Timimi's calls on evening of Sept. 19, 2001 .................................................................................3308

This page intentionally left blank for double-sided pagination and printing

229

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,    .        Criminal No. 1:04cr385
                             .
     vs.                     .        Alexandria, Virginia
                             .        April 5, 2005
ALI AL-TIMIMI,               .        9:45 a.m.
                             .
           Defendant.        .
                             .

.  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME II

APPEARANCES:

FOR THE GOVERNMENT:          GORDON D  KROMBERG, AUSA
                             United     es Attorney's Office
                             2100 Ja       Avenue
                             Alexandria, VA 22314
                               and
                             JOHN T. GIBBS, ESQ.
                             Counterterrorism Section
                             Criminal Division
                             United States Department of Justice
                             601 D Street, N.W.
                             Washington, D.C. 20004

FOR THE DEFENDANT:           EDWARD B. MAC MAHON, JR., ESQ.
                             107 East Washington Street
                             P.O. Box 903
                             Middleburg, VA 20118
                               and
                             ALAN H. YAMAMOTO, ESQ.
                             643 S. Washington Street
                             Alexandria, VA 22314

ALSO PRESENT:                S.A. WADE AMMERMAN
                             BOBBY WILLIAMS
                             S.A. JOHN WYMAN

(Pages 229 - 511)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

**J.A. 373**

230

```
 1   OFFICIAL COURT REPORTER:      ANNELIESE J. THOMSON, RDR, CRR
                                   U.S. District Court, Fifth Floor
 2                                 401 Courthouse Square
                                   Alexandria, VA 22314
 3                                 (703)299-8595

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                                  DIRECT   CROSS   REDIRECT   RECROSS

3  WITNESSES ON BEHALF OF
   THE GOVERNMENT:

4
   Muhammad Aatique            234      254      324       345
5  (Resumed)

6  Donald Surratt              360      426      441       444

7  Detective John Hodge        445      448      448

8  Yong Ki Kwon                460

9

10                          EXHIBITS

11                                      MARKED     RECEIVED

12 GOVERNMENT'S:

13 Nos. 1B1, 1B1a, 1B2, 1B2a, 1B4, 1B4a, 1B4b         453
        1C1                                           482
14      1D23 thru 1D48                                351
        1D50                                          351
15      1D52                                          351

16      1F5                                           492
        1F6                                           492
17      1G3, 1G3a, 1G4, 1G4a, 1G5, 1G5a               453
        1G10, 1G10a, 1G11, and 1G11a                  453
18      1H1                                           358

19      1H2                                           358
        2B2                                           240
20      2C4                                           357
        7A3                                           246
21      7A19                                          410

22      7A31                                          244
        7A36                                          386
23      7C33                                          505
        7C33a                                         505
24      7D3                                           396

25      7D9                                           421
        7D10                                          423

232

1                          EXHIBITS (Cont'd.)

2                                              MARKED    RECEIVED

3   GOVERNMENT'S:

4   No.   10A24                                            474
          12-3                                             450
5         12-4                                             450
          12-5                                             450
6         12-6                                             357

7         12-7                                             450
          12-8                                             450
8         12-9                                             450
          12-10                                            450
9         12-11                                            450

10        12-12                                            450
          12-13                                            450
11        12-14                                            450
          12-15                                            450
12        12-16                                            450

13        12-25                                            358
          12-28                                            357
14        12-29                                            357
          12-30                                            357
15        12-31                                            357

16        12-33                                            357
          12-35                                            357
17        12-39                                            357
          12-40                                            357
18        12-41                                            357

19
    DEFENDANT'S:
20
    No. 80                                        353       353
21

22

23

24

25

233

1                    P R O C E E D I N G S

2                    (Defendant and Jury present.)

3         THE COURT:  Good morning, Ladies and Gentlemen.  I see

4   we have another TV set for you-all.  Now, if the glare from the

5   window interferes with your ability to see the screen, let us

6   know, all right?  It's nice to have the windows open, but

7   sometimes it's a problem.

8         And I assume there was no problem with any media

9   coverage?  Anybody have any issues from last night?  No?

10        All right.  Mr. Kromberg, I want this -- both the

11  prosecution and the defense, because we are dealing with so many

12  names from foreign cultures that are hard to understand and some

13  of these names sound the same, to be extremely careful in your

14  questioning of witnesses to make sure that you're using consistent

15  names, and make sure that they're clear.

16        I think the jury may be having some difficulties in

17  keeping all these people straight.  So both sides need to be

18  careful about that.

19        MR. KROMBERG:  Thank you, Your Honor.

20        THE COURT:  All right.  All right, are you ready to go?

21        MR. KROMBERG:  Yes, Your Honor.

22        THE COURT:  Mr. Aatique, you're still under your

23  affirmation from yesterday.

24             MUHAMMAD AATIQUE, GOVERNMENT'S WITNESS,

25                  PREVIOUSLY AFFIRMED, RESUMED

**J.A. 377**

**Aatique - direct**

```
 1                         DIRECT EXAMINATION
 2   BY MR. KROMBERG:
 3   Q.   Good morning, Mr. Aatique.  I think the last thing we talked
 4   about was your bank statement reflecting the money that you had
 5   sent to Royer, right?
 6   A.   That is correct.
 7   Q.   Okay.
 8             THE COURT:  And just so we're clear, Royer you've also
 9   called Ismail; is that correct?  What's Royer's first name?
10             THE WITNESS:  Royer is his last name, and Ismail is his
11   first name, his Islamic first name.
12             THE COURT:  All right, Ismail Royer.
13   BY MR. KROMBERG:
14   Q.   And sometimes he goes by Randall Royer, correct?
15   A.   That was his birth name, I think.
16   Q.   Just to go over the people that we spoke about yesterday, the
17   people at the meeting on the 16th were Yong Kwon?
18   A.   Yes.
19   Q.   Randall Royer, also known as Ismail Royer?
20   A.   Yes.
21   Q.   Masaud Khan?
22   A.   Correct.
23   Q.   Well, I think your pronunciation is "Khan"?
24   A.   Yes, that's correct.
25   Q.   Hammad Abdur-Raheem?
```

**Aatique - direct**

1  A.   That's correct.

2  Q.   Caliph Abdur-Raheem?

3  A.   Yes.

4  Q.   Khwaja Mahmood Hasan?

5  A.   Yes.

6  Q.   Nabil Gharbieh came in later and left with someone you didn't

7  know?

8  A.   Yeah, for a very, very short while.

9            MR. KROMBERG:  How many is that?

10           MR. MAC MAHON:  Seven.

11           MR. KROMBERG:  Thank you.

12  Q.   I think you also mentioned not at that meeting Ibrahim,

13  Ibrahim Al-Hamdi, right?

14  A.   I mentioned him in the context of paintball group and also

15  that he had come from, from an LET camp after his training.

16  Q.   Okay.

17  A.   Not in that meeting.

18  Q.   That was Ibrahim Al-Hamdi?

19  A.   That's correct.

20  Q.   Did you mention Seifullah Chapman?

21  A.   Yes, but he was not in that meeting.  He was also, I knew him

22  from the Dar al-Arqam and paintball group.

23  Q.   Okay.  And you -- did you mention Idris Surratt?

24  A.   Yes.  He was also one of the paintball players, and he was

25  not in that meeting.

**Aatique - direct**

1  Q.   Okay.  Was his -- did he also go by Donald Surratt?

2  A.   I think that's his birth name.  Idris is his Islamic name.

3  Q.   Thank you.

4        Okay.  I'd like to ask you about when law enforcement

5  first approached you about your travel to Lashkar-e-Taiba.  When

6  did that happen?

7  A.   8th of May, 2003.

8  Q.   What happened on May 8?

9  A.   They came to execute a search warrant at my home.

10 Q.   And this was in Pennsylvania?

11 A.   That's correct.  Norristown, Pennsylvania.

12 Q.   When they came to do the search warrant at your home, did

13 they ask you to cooperate with them?

14 A.   Yes.

15 Q.   And what did you do?

16 A.   I talked with them and informed them of what I know, all the

17 questions they asked.

18 Q.   What contact did you have with other people from that meeting

19 on September 16, 2001, as a result of your cooperation with the

20 FBI?

21 A.   The FBI came back the next day, and I agreed to make a call

22 to Masaud Khan on their behalf, and also, I came down to Virginia

23 to meet Ismail Royer.  That was, I think, June.

24 Q.   Okay.  Well, let's talk first about the call to Masaud Khan.

25      MR. YAMAMOTO:  Your Honor, this is outside the scope of

# Aatique - direct

1  the conspiracy and also doesn't involve Dr. Al-Timimi.

2          THE COURT:  Well, I don't know where we're going with

3  this yet.  Let me find out if it's -- if it's extraneous, I'll

4  have it stricken, but at this point, I don't think it is.  Go

5  ahead.

6          MR. KROMBERG:  I was going to ask to play the tape of

7  the call with Masaud Khan.  Your Honor, you've heard that call,

8  and it should -- well, I don't know if you want me to say in

9  open --

10          THE COURT:  No.  Is there an objection to the call being

11  played?

12          MR. YAMAMOTO:  Yes, Your Honor.

13          THE COURT:  All right, approach the bench.

14          (Bench conference on the record.)

15          THE COURT:  All right.  Now, the basis for the objection

16  is what?

17          MR. YAMAMOTO:  It's outside the scope of the conspiracy.

18  It does not involve Dr. Al-Timimi.  It's the witness cooperating

19  with the government on behalf of other members, other individuals

20  that they want to target.

21          THE COURT:  Well, evidence of activity post the time

22  frame of the conspiracy is -- can be admissible if it relates

23  back, if it's evidence of intent, knowledge, if it corroborates

24  information of what happened during the conspiracy.

25          MR. YAMAMOTO:  It's not, it's not 801(d)(2)(E) type of

**J.A. 381**

# Aatique - direct

1   information because it's not within the scope of the conspiracy.

2                THE COURT:  Well, remind me as to --

3                MR. KROMBERG:  First, it happened one day after the date

4   in the conspiracy.  That's on or about May 8, and this happened

5   the next day, when Masaud Khan -- when Aatique called Khan and

6   said, remember -- "What should I say?  I'm going to -- what should

7   I say about going to the camp?"

8                And Masaud Khan says, "I don't know anything about any

9   camp."

10               And the tone of Masaud Khan's voice was as interesting

11  as the fact that he was telling -- as him telling, in essence,

12  Aatique to lie and say that he didn't -- and just tell Aatique not

13  to go to the camp itself.

14               MR. YAMAMOTO:  That's got nothing to do with

15  Dr. Al-Timimi.

16               THE COURT:  Well, it has to do with the nature of the

17  conspiracy and whether or not the members of this group understood

18  that what they were doing was against the law.

19               I agree that he's not mentioned, but in a conspiracy,

20  just because the evidence doesn't come in against every

21  coconspirator doesn't mean --

22               MR. YAMAMOTO:  This is no longer part of the conspiracy

23  because he's been arrested and now cooperating.  So it can't be in

24  furtherance of the conspiracy.

25               THE COURT:  Well, is the objection that it's hearsay?

## Aatique - direct

1   What is the objection?

2           MR. YAMAMOTO:  It's hearsay, also, Your Honor.

3           THE COURT:  But this witness is here and can testify as

4   to what he said.  You've got the tape recording.  It says what it

5   says.  A hearsay problem isn't really there.  If he were just

6   recounting the conversation, you might have a problem, but if you

7   can actually hear it --

8           MR. YAMAMOTO:  Well, it still -- it does not have

9   anything to do with Dr. Al-Timimi.  He didn't counsel Khan.  He

10  didn't tell Khan to go to the camps.  He has nothing to do with

11  what Khan is saying or doing.

12          MR. KROMBERG:  Judge --

13          MR. YAMAMOTO:  Khan was not a paintballer.

14          THE COURT:  I think that's argument to be made at the

15  end of the trial, but I think this is adequately within -- it

16  certainly is relevant in my view to the conspiracy because it's

17  these two people talking about core elements of the alleged

18  conspiracy, and I think therefore that it's properly relevant, and

19  I don't think you have a hearsay problem because you've actually

20  got the tape.  So what it was that was said is not subject to the

21  problems of hearsay.

22          So I'm going to go ahead and allow it in.

23          MR. KROMBERG:  Thank you, Judge.

24          (End of bench conference.)

25          MR. KROMBERG:  Mr. Aatique, I'm going to ask you to

**Aatique - direct**

1  listen to the following recording, and at the end of the

2  recording, I'd like you to tell the jury whether that, in fact,

3  was a tape recording of the call that you made at the request of

4  the FBI to Masaud Khan.

5          2B2, please?

6          THE COURT:  Exhibit 2B2?

7          MR. KROMBERG:  Correct.

8          THE COURT:  All right.  It is in evidence over the

9  defendant's objection.

10             (Government's Exhibit No. 2B2 was received in evidence.)

11             (Excerpt of Government's Exhibit No. 2B2 was played as

12              follows:)

13             "MASAUD KHAN:  Yes, ah, Aatique.

14             MUHAMMAD AATIQUE:  Hey, hey, Masaud.

15             MASAUD KHAN:  How are you?

16             MUHAMMAD AATIQUE:  How, how are you?

17             MASAUD KHAN:  I'm fine.

18             MUHAMMAD AATIQUE:  Um, um, um, I got raided last day

19  yesterday.

20             MASAUD KHAN:  Yeah, so did I.

21             MUHAMMAD AATIQUE:  Um, um, um, um, they, they, they know

22  everything.

23             MASAUD KHAN:  Yeah.  And I'm sure they're listening on

24  the phone, too.

25             MUHAMMAD AATIQUE:  Ah.

## Aatique - direct

1     MASAUD KHAN:  And, um, and they, they should be
2  following you around and everything.  But, ah, you know, ah, we're
3  clean, and, ah, you know that, ah --

4     MUHAMMAD AATIQUE:  Yeah.  I mean, I mean, ah, I, I, I,
5  I, I, I, I told them, I mean, they, they -- I told them
6  everything.

7     MASAUD KHAN:  Yeah.  Like, yeah, I mean, just tell them,
8  you know, the truth, and you should be okay.

9     MUHAMMAD AATIQUE:  Ah, okay.

10     MASAUD KHAN:  So what did you tell them?

11     MUHAMMAD AATIQUE:  Ah, I told them about the paintball
12  and, and, and, ah, about the camp and, and, and, and how we go,
13  how we, how we, how we, how we go there.

14     MASAUD KHAN:  What camp?

15     MUHAMMAD AATIQUE:  Ah, ah, the, the camp?

16     MASAUD KHAN:  Over here?

17     MUHAMMAD AATIQUE:  Ah, there.

18     MASAUD KHAN:  I didn't go to any camp, and, ah, I don't
19  know what you're talking about, but, ah, what you want to do is
20  get a lawyer.

21     MUHAMMAD AATIQUE:  Ah, okay.  Ah --

22     MASAUD KHAN:  Yeah.  'Cause, you know, I went for my
23  legal purposes, and I don't know if you went there or not, but I
24  thought you were going there to visit your family in Pakistan,
25  Karachi.

**Aatique - direct**

1           MUHAMMAD AATIQUE:  Um, ah, okay.

2           MASAUD KHAN:  Yeah.

3           MUHAMMAD AATIQUE:  Okay.

4           MASAUD KHAN:  You -- by the way, you know, your rights

5    are you don't have to say anything to them, and you shouldn't

6    really say anything to them whatsoever, and say that I know my

7    rights and, um, my, my lawyer will contact you and, ah, you know.

8           MUHAMMAD AATIQUE:  Okay.

9           MASAUD KHAN:  Yeah.

10           MUHAMMAD AATIQUE:  Okay.  Okay, Masaud.

11           MASAUD KHAN:  You understand what I'm saying, right?

12           MUHAMMAD AATIQUE:  Yeah, yeah.  I, I, I understand.

13           MASAUD KHAN:  So what I would do is I would get yourself

14    a lawyer and, ah, and, ah, have him represent you and advise you.

15           MUHAMMAD AATIQUE:  Okay.

16           MASAUD KHAN:  Yeah.

17           MUHAMMAD AATIQUE:  Okay.

18           MASAUD KHAN:  Okay?

19           MUHAMMAD AATIQUE:  Okay.  Bye-bye."

20           (End of excerpt.)

21    BY MR. KROMBERG:

22    Q.   Was that an accurate tape recording of the phone call that

23    you made to Masaud Khan?

24    A.   Yes, it sounds so.

25    Q.   Now, you mentioned that you had contact with Royer as well.

# Aatique - direct

1  What happened with Royer?

2  A.   I drove down to Virginia something, first or second week of

3  June to meet him here from Pennsylvania.

4  Q.   And what happened when you got here?

5  A.   I, I came to be set up to meet at Dar al-Hijrah mosque, which

6  is in Falls Church, and we met at the sunset prayer, after the

7  sunset prayer there.

8  Q.   And what did you do after the sunset prayer?

9  A.   We -- I mean, the agents had given me some questions to ask

10 him and get his opinion, so I talked to him and -- but I ended up

11 telling him that the FBI had sent me and that, I mean, I couldn't,

12 I couldn't do exactly what the FBI had asked me to do.

13 Q.   What questions had the FBI -- did the FBI ask you to ask

14 Royer?

15 A.   Basically just to, just to let him know that I'm cooperating

16 and what does he think, I mean, legally your situation is and show

17 him some printouts of some bulletins that he had supposedly sent

18 some time ago.

19 Q.   The Taiba Bulletins?

20 A.   Yes.   Things along these lines.

21 Q.   Why did you tell Royer that you were -- in the course of your

22 meeting with him, that you were cooperating with the FBI at the

23 time?

24 A.   When talking with him, it became very difficult for me to, to

25 act, so I ended up telling him.

**Aatique - direct**

1   Q.   When you listen to yourself on that phone call with Masaud

2   Khan, is that the way you typically speak?

3   A.   No.

4   Q.   Why were you stuttering when you were speaking to Masaud

5   Khan?

6   A.   I found it very difficult to, to be deceptive on the phone.

7   Q.   Now, I'd like you to look at 7A31, which if it comes up on

8   the screen, it should be the -- and, Judge, I think we have a

9   stipulation which we haven't yet read into the record, but we have

10  a stipulation that 7A31 is Mr. Aatique's passport.

11           THE COURT:  I assume there's no objection to it going

12  into evidence then.

13           MR. YAMAMOTO:  No, Your Honor.

14           THE COURT:  All right, it's in.

15           (Government's Exhibit No. 7A31 was received in

16  evidence.)

17  BY MR. KROMBERG:

18  Q.   Take a look, if you would, in the book, in your book at 7A3.

19  Mr. Aatique, look at the one that you're being given in the book,

20  if you would.

21           THE COURT SECURITY OFFICER:  7A3?

22           MR. KROMBERG:  7A3.

23           THE COURT:  No, 7A3 is a different document.  7A3 in my

24  book also is not -- is that the passport in your --

25           MR. KROMBERG:  No, no, we're done with the passport.

**Aatique - direct**                                             245

1          THE COURT:  I'm sorry.

2          MR. KROMBERG:  I want him to look at the document, 7A3.

3  Q.   And can you -- was that a document that you had in your house

4  in May of 2003?

5  A.   That's correct.

6  Q.   Okay.  And is that a document by Ali Al-Timimi?

7  A.   That's correct.

8          MR. KROMBERG:  Judge, we move in 7A3.

9          THE COURT:  Any objection?

10          MR. YAMAMOTO:  Your Honor, this is way outside the scope

11  of this conspiracy.  We're talking about a '94 conference.

12          THE COURT:  Well, evidence outside the time frame of the

13  conspiracy is not, is not prohibited if it's relevant and if it

14  would help the trier of fact understand some of the events that

15  occurred during the conspiracy.  I mean, is there any dispute that

16  this is a statement of the defendant?

17          MR. YAMAMOTO:  No, Your Honor, but, I mean, are we going

18  to go through all of Dr. Al-Timimi's lectures and --

19          THE COURT:  I don't know.  I don't know.  I mean, I

20  would assume that if it's not relevant, the jury will disregard it

21  when they go to their -- in their evaluation, but I think at this

22  point, there's no basis not to let it in, so I'm going to let it

23  in.

24          MR KROMBERG:  Thank you, Your Honor.

25          THE COURT:  7A3.

**J.A. 389**

**Aatique - direct**

1           (Government's Exhibit No. 7A3 was received in evidence.)

2           MR. KROMBERG:  If we can put 7A3 on the screen now?

3    Q.   Now, this article, "Reflections," by Ali Al-Timimi, why did

4    you have that in your house?

5    A.   I had, I had taken a course in AOU, American Open University,

6    some time ago, and this article was part of the course that I

7    received.

8           THE COURT:  When did you take the course?

9           THE WITNESS:  I think fall of '98.

10          THE COURT:  And where did you take it?

11          THE WITNESS:  I was living in San Diego, California, at

12   that time, and it was a correspondence course from here, Falls

13   Church.

14   BY MR. KROMBERG:

15   Q.   Now, if you would turn in the book to page 6 of

16   "Reflections"?

17   A.   Okay.

18   Q.   Where it says "Wage jihad in the path of Allah."

19   A.   Okay.

20   Q.   Can you read the first paragraph of that as what Ali Timimi

21   said a principle of al-wala' wal-bara'?

22          MR. YAMAMOTO:  Your Honor, the government here is

23   starting to take things out of context.  If they're going to look

24   at the document, the jury should look at the entire document.

25          THE COURT:  Well, the entire document will be in

**J.A. 390**

# Aatique - direct

1  evidence, and the jury should certainly -- because this case does
2  involve serious allegations involving First Amendment issues,
3  you're going to have to be careful about taking things out of
4  context.  So I think that's fair, but in terms of presenting this
5  trial, we can move along in this fashion, and certainly again on
6  cross examination, you can go into more of the document.

7              Go ahead.

8              MR. KROMBERG:  Well, in fact, I'll put more context in,
9  Judge.

10  Q.  Turn to page 5.  At the top of the second column, where it
11  says, "al-Wala' wal-Bara,'" if you could read the first paragraph
12  on the second column of page 5?

13  A.  First paragraph of the second column of page 5?

14  Q.  Yes.

15  A.  It says, "It is required upon every Muslim to love and
16  support those who adhere to the testimony 'there is no god but
17  Allah and Muhammad is the Messenger of God" -- sallallahu alaihi
18  wa sallam -- "and hate and show enmity toward those who reject
19  this testimony, or al-wala' wal-bara'.  It is a consequence of our
20  testimony that 'there is no god but Allah and Muhammad" --
21  sallallahu alaihi wa sallam -- "is the Messenger of Allah."

22  Q.  Okay.  Now, if you go down to page 6 on the left-hand side,
23  I've circled a line.  If you could read that on the screen?

24  A.  It says, "The principle of al-wala' wal-bara' is manifested
25  in a number of ways."

**Aatique - direct**

1  Q.  Now, what is al-wala' wal-bara'?

2  A.  Roughly, al-wala' means loyalty and friendship, something

3  along these lines.

4  Q.  Wala' is loyalty and friendship, and bara'?

5  A.  To disavow.  I mean, bara', I mean, is opposite of that, I

6  mean, disavow you can say.

7  Q.  Hatred, disavowal and hatred?

8  A.  I don't know hatred, but bara' would mean disavow.

9          THE COURT:  Disavow?

10          THE WITNESS:  To disavow or opposite of being loyal or

11  being friend.

12          THE COURT:  So reject perhaps?

13          THE WITNESS:  Yes, that will do that.

14  BY MR. KROMBERG:

15  Q.  Well, go back to the top of page 5, the second column.  So

16  Ali Timimi wrote in that, well, that bara' is to hate and show

17  enmity to those who reject, not just disavow, correct?

18  A.  Yeah, that's what it says here.

19  Q.  Okay.  Now, back on page 6, "The principle of al-wala'

20  wal-bara' is manifested in a number of ways."  If you go to the

21  bottom of page 6, could you read the paragraph I've just circled?

22  A.  No. 6?

23  Q.  Yes.

24  A.  "A fifth manifestation of this principle of al-wala'

25  wal-bara' is that we, we -- when required -- wage jihad against

## Aatique - direct

1  the infidels.  Allah -- ta'ala -- has said:  'Slay the idolaters
2  wherever you find them, and take them (captive), and beseige them,
3  and lie in wait for them at every place of ambush.'  (The Qur'an
4  9:5)  Fight those who believe not in Allah and the Last Day and do
5  not forbid what Allah and His Messenger have forbidden, and
6  practice not the true religion (Islam), being of those who have
7  been given the Scripture (the Jews and the Christians) -- until
8  they pay tribute readily and have been brought low. (The Qur'an
9  9:29)"

10  Q.  Okay.  Thank you.

11           I would like, Judge, at this time to read a stipulation

12  into the record.  I need to pull it out, though.

13           THE COURT:  All right.  Is this stipulation No. 2, or

14  does it have some other label?

15           MR. KROMBERG:  I have different numbers on it.

16           Never mind.  Sorry about that.

17           This would be stipulation No. 32:  The United States and

18  the defendant hereby stipulate and agree that Government

19  Exhibits -- that Government Exhibits 6A12 and 10D19 constitute

20  authentic copies of records of Yahoo!, Inc., maintained in the

21  ordinary course of business.

22           THE COURT:  All right.

23  BY MR. KROMBERG:

24  Q.  I'd like you to take a look, Mr. Aatique, on the screen at

25  10D19, which appears to be from altimimi@yahoo.

**J.A. 393**

**Aatique - direct**

1      MR. YAMAMOTO:  Your Honor, could you give me a second?
2  I'm trying to find it.

3      THE COURT:  Yes, sir.

4      MR. KROMBERG:  Oh, I'm sorry.

5      MR. YAMAMOTO:  Your Honor, can we get some foundation
6  for this and how this witness is going to be able to identify this
7  document?

8      THE COURT:  Yes, I think that's a fair --

9      MR. KROMBERG:  I'm not asking him to identify the
10  document.  The document's been moved -- we stipulate that it's an
11  authentic record, saying it's by Ali Timimi, and I'm just going to
12  ask him about a statement by Ali Timimi on this document and ask
13  him if it's consistent with what was said at the meeting on
14  September 16, 2001.

15      MR. YAMAMOTO:  Again, we're taking a document this
16  person has never seen, taking statements here and there out of
17  context.

18      THE COURT:  For the limited purpose for which it's being
19  offered, I'm going to permit it in.  Go ahead.

20      MR. KROMBERG:  Well, first, Judge, I'd like to move in
21  Government Exhibit 10D19.  It's stipulated as it's authentic.  It
22  appears to be from altimimi@yahoo.com, and I would like to move it
23  into evidence.

24      MR. YAMAMOTO:  We would object, Your Honor.

25      THE COURT:  And the basis for the objection is what?

**Aatique - direct**

1    MR. YAMAMOTO:  The document is authentic.  This witness
2  has nothing to do with this document.

3    THE COURT:  Well, as I understand it, the document is
4  almost being used as a demonstrative really as to something that
5  might have been said or not said.

6    MR. KROMBERG:  Well, Judge, at this moment with this
7  witness, it's being used as a demonstrative, but I do -- it should
8  be in on its own as an authentic --

9    THE COURT:  I understand.  Let's see what the witness
10  has to say about what is contained within the document.

11  BY MR. KROMBERG:

12  Q.  Now, Mr. Aatique, if you'd turn to the bottom of the last
13  page of the document?

14  A.  Yes.

15  Q.  Can you read that last paragraph?

16  A.  "As Muslims, we are to deal with the facts.  If the Taliban
17  and Mullah Umar and the Arabs with them turn out to be the Dajjaal
18  and his army, we will deal with that then when it is apparent.
19  Until that time, they are Muslim whom we are obligate to support
20  by body, wealth, and word even if some find that distasteful."

21  Q.  That last sentence, "Until that time, they are Muslim whom we
22  are obligate to support by body, wealth, and word even if some
23  find that distasteful," how consistent is that statement by Ali
24  Timimi in this e-mail on October 21, 2001, with what you heard him
25  say to you on September 16, 2001?

**Aatique - direct**

1    MR. YAMAMOTO:  Objection, Your Honor.  My recollection
2  is that this witness has said after going back and forth that he
3  does not recall Dr. Al-Timimi saying anything about the amir of
4  Afghanistan asking for support.

5    THE COURT:  Well, let him answer the question.  If he
6  can answer it, he can answer it, and if you can't answer it, say
7  you can't answer it, all right?

8    THE WITNESS:  I remember him saying almost verbatim the
9  fact that, that although Taliban have problems in their
10  implementation and the way they practice Islam, but they are
11  Muslims, and we should help them.  What I wasn't sure about, the
12  Mullah Umar call, not the fact that, that we should help Taliban.
13  BY MR. KROMBERG:

14  Q.   Now, to clarify the issue that Mr. Yamamoto brought up -- and
15  as the judge instructed you before, just focus on what you recall
16  happened on September 16, not what you looked at after that made
17  you question your recollection.

18  A.   Okay.

19  Q.   What do you recall Ali Timimi said on September 16 about
20  Mullah Omar?

21    MR. YAMAMOTO:  Your Honor, he's already gone through
22  this.

23    THE COURT:  I thought he testified to that yesterday.

24    MR. KROMBERG:  Well, he did, and then Mr. Yamamoto just
25  said that that was unclear.  So I wanted him to clarify it.

**Aatique - direct**

1    MR. YAMAMOTO: He just -- he clarified it again just in
2 this statement.

3    THE COURT: All right. We're going to in part because
4 this witness does have a thick accent that can sometimes be
5 difficult to understand, we'll just do this one last time, and
6 then on cross, if there's something that needs to be probed, it
7 can be done. Go ahead.

8 BY MR. KROMBERG:

9 Q.  Mr. Aatique, again, not -- don't think about what you learned
10 afterward, but just what you recall from September 16, 2001, what
11 did Ali Timimi say about Mullah Omar that you recall?

12 A.  About -- just about Mullah Omar?

13 Q.  Yes.

14 A.  I had remembered him saying that -- and, and my recollection
15 was that he was reading from the fatwa that he had from Sheikh
16 al-Uqla that Mullah Omar has given a call for help and we should
17 help them, has issued a call for help from Muslims.

18 Q.  And that's still your recollection today of what happened,
19 correct?

20 A.  Yes.

21 Q.  Your confusion is because you've since seen the Uqla fatwa,
22 correct?

23 A.  That's correct.

24 Q.  And the Uqla fatwa does not say Mullah Omar called for help?

25 A.  Yes.  The portions that I read, yes, that's correct.

**J.A. 397**

**Aatique - cross**

1          MR. KROMBERG:  Okay.  Thank you, Judge.  Nothing further

2   for this witness at this time.

3          THE COURT:  All right, Mr. Yamamoto?

4                      CROSS EXAMINATION

5   BY MR. YAMAMOTO:

6   Q.   Mr. Aatique, we're going to sort of go out of order here.

7   Let's go backwards.  Do you recall talking to the FBI on a number

8   of occasions?

9   A.   That's correct.

10  Q.   Do you recall back possibly in August of 2003, telling the

11  FBI at that time you don't recall Dr. Al-Timimi saying that the

12  amir of Afghanistan, which would be Mullah Omar, had called for

13  Muslims to come help?

14  A.   I don't recall that meeting, but I read my own 302 later on

15  so --

16  Q.   And it's in there?

17  A.   Yes.

18  Q.   So though you don't recall it, that would refresh your

19  recollection that you probably had said that to them back in 2003?

20  A.   I don't have any recollection, but -- I don't have a clear

21  recollection, but, I mean, I may have said that.

22  Q.   Okay.  Now -- is this loud enough?  Can you hear?

23          I was told to speak into the mike.

24          THE COURT:  Oh, all right.

25          MR. YAMAMOTO:  I can't reach the mike.

**Aatique - cross**

1  Q.  You were shown Exhibit 10D19.

2  A.  Just now, yes.

3  Q.  And you were shown the last paragraph, and it was read to

4  you.

5  A.  Yes.

6  Q.  Now, the first sentence of that says, "As Muslims, we are to

7  deal with the facts.  If the Taliban and Mullah Umar and the Arabs

8  with them turn out to be the Dajjaal --

9  A.  Yes.

10  Q.  -- and his army, we will deal with that then when it is

11  apparent."

12       What is a dajjal?

13  A.  "Dajjal" literally means, I mean, literally means a master

14  deceiver, but it's equivalent to what's in Christian beliefs --

15  Q.  Anti-Christ?

16  A.  It's the anti-Christ, yeah.

17  Q.  So what it says is that he's a Muslim, and we should support

18  our brother Muslims, but if it turns out that he's not a true

19  Muslim but the anti-Christ, then we'll deal with that situation,

20  meaning you won't support him?

21  A.  Yeah.  It says if he turns out to be the anti-Christ and his

22  followers of anti-Christ, then we will deal with them when it is

23  apparent, which means we won't support them if it turns out like

24  that.

25  Q.  So this is not, not saying you have to support them; they're

# Aatique - cross

1   our brothers.  It's saying right now we support them, but let's,
2   let's look and see what the situation is.  Let's see what these
3   people are about?
4   A.   Yeah.  Perhaps not exactly that.  It's saying that we are
5   going to support them right now because they are Muslims, and if
6   it turn out, if it turns out that they are different later on,
7   then we might change our position.
8   Q.   Okay.  Now, again going sort of backwards, you took this
9   correspondence course, you say, when you were in San Diego?
10  A.   That's correct.
11  Q.   What was the course?
12  A.   It was about, I think, the basics of Islamic belief.
13  Q.   And you were shown this "Reflections" document.  Were there
14  other documents involved or books?
15  A.   The course had a lot of material, and it was one of the
16  documents I kept.
17  Q.   You say there was a lot of material?
18  A.   Yeah.  I mean, that was not the only document.  There were
19  other course material, also.
20  Q.   Books?  Were you told to read certain books, also, as part of
21  the course?
22  A.   Yes.
23  Q.   And what was the course about?
24  A.   I forgot the exact title, but it was Basics of Tawheed or
25  something along those lines.

**Aatique - cross**

1  Q.  What's that?

2  A.  Tawheed is Islamic concept of the monotheism.

3  Q.  Can you spell that?

4  A.  T-a-w-h-e-e-d is how you spell it.

5  Q.  And can you tell me again what it is?

6  A.  It's difficult to exactly translate it.  I mean, I would put

7  it as, I mean, the Islamic monotheism, the Islamic concept of

8  monotheism.

9  Q.  Of monotheism?  And what is monotheism?

10  A.  Belief in one god, oneness of God.

11  Q.  Is this a basic course?

12  A.  Yes, I would say it's a basic course.

13  Q.  Is it a basic course on Islam?

14  A.  It can be said.

15  Q.  Is it to teach somebody who is learning Islam the tenets of

16  Islam?

17  A.  Somebody learning Islam can take it, and also, Muslims can

18  take it to learn the belief system better.

19  Q.  Why did you take it?

20  A.  I wanted to increase my knowledge of Islam.

21  Q.  And did it help you?

22  A.  Yes.

23  Q.  You were shown particular statements and asked to read them.

24  Were those statements or the context of those types of statements

25  what the course was about?  Was it about jihad and war?

**J.A. 401**

**Aatique - cross**

1  A.   The course was about, I mean, the course was about the basics

2  of belief, but it dwells into different topics.  I mean, it's

3  difficult for me to, to just say what was in context and what was

4  not in context.

5  Q.   But it was a, it was a religious course?

6  A.   Yes.

7  Q.   And it was based on the Koran and the hadeeths?

8  A.   Yes.

9  Q.   That last phrase you read on page 6, that was a quote from

10  the Koran?

11  A.   You said page 6?

12  Q.   Page 6.

13  A.   That's correct.

14  Q.   The principle of al-wala wal-bara' -- I'm sorry if I screw

15  these up -- is an Islamic concept; is that correct?

16  A.   That's correct.

17  Q.   And it's taught in the Koran?

18  A.   Yes.

19  Q.   And the hadeeths?

20  A.   Yes.

21  Q.   Now, what is the Koran?

22  A.   Say it again?

23  Q.   What is the Koran?  Is it like the, the Christian Bible?

24  A.   It's the, it's the, I mean, not to go into exact Islamic

25  definition, it's the Islamic Holy Scripture.

**Aatique - cross**

1  Q.   And hadeeths, what are hadeeths?

2  A.   Hadeeths are the sayings of the Prophet Muhammad, sallallahu

3  alaihi wa sallam.

4  Q.   And the sayings of the Prophet Muhammad by his followers, his

5  companions?

6  A.   No, his own words.

7  Q.   His own words, but they are, they are written by other

8  people; is that correct?

9  A.   Yes.

10  Q.   And those other people were his companions?

11  A.   His companions and the next generations that followed him.

12  Q.   The generations that followed him?

13  A.   Yes.

14  Q.   And interpret his writings?

15  A.   Say it again?

16  Q.   The generations that followed and interpret what he said?

17  A.   A hadeeth is usually, it's verbatim.  People try to, try to

18  quote every word as he said and try to write it down the way it

19  was said.

20  Q.   So it's repeated the same thing over and over?

21  A.   Before it got written down.

22  Q.   Okay.  So this is -- this was -- the hadeeths were the verbal

23  history or the verbal teachings, is that right, of Islam?

24  A.   Of -- when you say hadeeth of the Prophet, it means what he,

25  I mean, what he said and what he approved or what he did.

**J.A. 403**

# Aatique - cross

1  Q.   And, and the people tried to relate that to following

2  generations verbatim so they would understand and have it?

3  A.   That's correct.

4  Q.   Eventually, it was written down?

5  A.   Yeah, within the first few generations.

6  Q.   But from what I understand what you're saying, initially, it

7  was, it was passed on verbally and not written?

8  A.   No.  Actually, it's -- it's a topic of compilation.  It was

9  written down during his life and the next generation, but then the

10  larger and larger collection were made later on.

11  Q.   Dr. Al-Timimi gave a number of lectures, and I think you

12  talked a little bit about them yesterday:  The End of Time

13  lectures and The New World Order lectures?

14  A.   The Signs of the End of Time was a very long lecture series

15  that he gave in Dar al-Arqam.  I think it lasted about one year,

16  '99 to 2000.  That was a lecture series that I attended live

17  mostly.

18          But as far as his tape set, "The New World Order," that

19  was a -- I got the tape set, and I listened to the cassettes.

20  Q.   And that was a six-cassette set?

21  A.   Something like that, yeah.

22  Q.   And again, all, all these lectures were based on the Koran

23  and hadeeths?

24  A.   To the best of my knowledge.

25  Q.   He would be going back and citing from various passages

**Aatique - cross**

1  and --
2  A.  Well, he would -- well, he would have to quote.  A lot of it
3  was also current events and then commentary on them.
4  Q.  Now -- right.  He would, he would take current events and use
5  the Koran to do parables about these current events?
6  A.  I don't understand, fully understand the term "parables,"
7  but --
8  Q.  He would take the current events and relate them to the
9  Koran?
10  A.  Koran and the hadeeths.
11  Q.  And the hadeeths, okay.
12          Now, the end of time is an Islamic religious concept?
13  A.  I mean, Islam has -- I mean, we all know certain events that
14  will happen at the end of time, yes.
15  Q.  Okay.  So it's, it's the Prophet Muhammad describing what's
16  going to happen before the Day of Judgment and the end of humanity
17  and Muslims going to heaven; is that correct?
18  A.  Yes.  Along these lines, that's correct.
19  Q.  Okay.  Now, the six pillars of faith are -- in Muslim --
20  Islamic religion are God, the angels, the scriptures, the
21  prophets, the Last Day, and God's decree, correct?
22  A.  That's correct.
23  Q.  And Dr. Al-Timimi taught the six pillars of faith?
24  A.  Yes, in some lectures.
25  Q.  Part of the Last Day is a belief that the signs of the Day of

# Aatique - cross

1  Judgment -- I mean, are beliefs in the signs of the Day of

2  Judgment and is based on the Koran and the hadeeths?

3  A.    I can't say about the signs.  I mean, maybe it is there, but

4  I don't have the knowledge of commenting on that, but what -- as I

5  understand when we say we believe in the Last Day, which means you

6  believe in whatever we've been authentically told from the Prophet

7  about what's going to happen when a person dies is a state after

8  death, what happens in the grave, what happens on the Day of

9  Judgment or whatever the details are.

10  Q.    Do you recall Dr. Al-Timimi using the book The Signs of the

11  Last Day by Ibn Kathir?

12  A.    That's correct.

13  Q.    I'm holding a paperback volume.  Would that be the book

14  you --

15  A.    Exactly the title I remember.

16  Q.    Now, Ibn Kathir is a scholar who lived about 700 years ago?

17  A.    That's correct.

18  Q.    Now -- a Mehdi -- is that --

19  A.    Mehdi probably.

20  Q.    Okay.  Say that again?

21  A.    "Mehdi."

22  Q.    He's the righteous ruler who's going to appear before the Day

23  of Judgment?

24  A.    That's correct.

25  Q.    And he's going to unify the Muslims?

**Aatique - cross**

1   A.   He'll be the unified leader, yes.

2   Q.   And he will rule from Jerusalem?

3   A.   I don't know.  I don't know about that.

4   Q.   Okay.  And during his time, the Christians and the Muslims

5   are going to get together and wage war against a common enemy?

6   A.   I, I don't know about that.  I think it's different.  From

7   what I know, it's different.

8   Q.   From what you understand?  What do you understand?

9           MR. KROMBERG:  Objection, Judge.  What is the difference

10  between what Mr. Aatique understands about whether the Christians

11  and Jews are going to get together and attack the Muslims or not?

12          THE COURT:  I'm going to give the defense some leeway on

13  this cross examination.

14          But can you spell the word "Mehdi"?

15          THE WITNESS:  I mean, in English, you can approximate

16  m-e-h-d-i.

17          THE COURT:  And that's the title for a person?

18          THE WITNESS:  I think that's the title, yes.

19          THE COURT:  Go ahead, Mr. Yamamoto.

20  BY MR. YAMAMOTO:

21  Q.   What's your interpretation?

22  A.   From what little I know, I mean, he, he will come near the

23  end of time, and, and he would be the unified leader of the

24  Muslims, a khalif, and it was during his reign that Jesus, the son

25  of Mary, will come down.

**J.A. 407**

**Aatique - cross**

1   Q.   And does the anti-Christ appear?

2   A.   Yes.  Anti-Christ appears, I think, during his time, from

3   what I know, before Jesus comes down.

4   Q.   Okay.  And there's a battle with the anti-Christ?

5   A.   At the end, yes.

6   Q.   And the Muslims defeat the anti-Christ?

7   A.   That's correct.

8   Q.   And this battle is done with swords and horses?

9   A.   That's how it's described.

10  Q.   And at that point, the world comes to an end, and Muslims go

11  to heaven?

12  A.   Not really.  I mean, there are events that are going to

13  happen after that, also.

14  Q.   Okay.  What are those events?

15  A.   I mean, do you want me to go into detail?

16  Q.   Yes, please.

17  A.   Some of the things I remember is that after, after the

18  anti-Christ is killed, that Jesus is not going to accept any other

19  legion on earth except Islam, and then he'll live for 40 years,

20  and he'll marry, have children, and die, because we believe he did

21  not die, and Muslims will pray over them, and I don't know about

22  all the other details, but that will be very close to the Day of

23  Judgment.

24  Q.   Okay.  So Muslims believe in the same god as Christians do?

25  A.   We don't believe in the Christian concept of Trinity, that

265

**Aatique - cross**

1  father and son and ghost are simultaneously God.

2  Q.  Right.  But you believe in God and Jesus?

3  A.  We believe in God, yes.

4  Q.  And Jesus?

5  A.  And Jesus is a human being; that's what we believe, prophet

6  and human being.

7  Q.  Now, during the meeting on September 16 --

8  A.  Okay.

9  Q.  -- Dr. Al-Timimi was making reference to some of these types

10  of things.

11  A.  I don't remember right now any explicit reference he made to

12  what we just talked about.

13  Q.  Well, you indicated that, that what he was saying made you

14  think about his lectures and what he was saying in his lectures.

15  A.  The first thing he said when he said, "Now you're going to

16  see the signs and the promises come true," that's what I

17  understood it to refer to, what we just talked about, but when I

18  said he did not say anything explicit, was not to go into detail.

19  Q.  And the signs he was talking about were these signs that we

20  just talked about?

21  A.  That's what I understood, yes.

22  Q.  None of those signs have -- had appeared at that point?

23  A.  Yes.

24  Q.  That's correct, right?  None had appeared?

25  A.  Yes, none of the explicit ones we had talked about.

**J.A. 409**

266

**Aatique - cross**

1  Q.   So until those signs start to appear, there is no end of time
2  battle?

3  A.   That's right.

4  Q.   So he couldn't have been talking about an end of time battle
5  theologically?

6  A.   Say it again?

7  Q.   He couldn't be talking about the -- an end of time battle
8  according to the Muslim religion?

9  A.   It's difficult for me to say yes or no because even before
10 Mehdi comes, there's lot of talk in the religious text about a lot
11 of tribulations and wars and difficult times on the Muslims, and,
12 and what's happening now can be related to that.

13 Q.   Okay.  The course you took, how long was it?

14 A.   It was a semester-long course, one semester.

15 Q.·  One semester?

16       And you would, you would prepare papers and send them
17 back, or how did it --

18 A.   Yeah.  I mean, it was basically, I mean, I was given a number
19 to talk to my instructor at certain hours he was available, and I
20 was, I was in correspondence contact with him through letters, and
21 that's how I'd send my homework or exams.

22 Q.   Did you take other courses?

23 A.   During that semester, yes.

24 Q.   And at other times, did you take courses?

25 A.   No.  Actually, I -- later on in that December, I got married,

**Aatique - cross**

1  and I also moved to Virginia after a couple of months later, so it

2  all got dropped.

3  Q.    Did -- what did that course teach you?

4  A.    I remember it being a basic course about the belief system of

5  Islam.  I may not be able to recall all the specifics, not like a

6  different philosophical argument about the -- and the

7  counter-arguments about, about, say, at the beginning about the

8  existence of God and how to, I mean, different arguments and

9  counter-arguments and some things along these lines.

10  Q.    It wasn't, it wasn't something that made you think about

11  jihad, war, fighting, something like that?  Jihad in the sense of

12  combat jihad.

13  A.    Not entirely.

14  Q.    Okay.  You went to Virginia Tech.

15  A.    That's correct.

16  Q.    And you knew Kwon from Virginia Tech.

17  A.    Yeah.  I came to know -- Omer Khan was Masaud Khan's younger

18  brother, and Omer Khan was there doing his bachelor's in

19  something, and through him, I came to know Yong Kwon.

20  Q.    Were you roommates with either one of these individuals?

21  A.    No.

22  Q.    Did you hang around with them at all?

23  A.    Sometimes.

24  Q.    Did they ever talk about terrorism, jihad, combat jihad?

25  A.    We did talk about jihad, I think.

**Aatique - cross**

1  Q.   What kind of jihad?

2  A.   I mean, jihad means fighting like fighting that's going on in

3  Kashmir and some other places.

4  Q.   Did -- can you show him, please, 2A6a and 2A6b, Government's?

5          Were these just philosophical-type talks or talks about

6  what's going on over there?

7  A.   It was a long time back, so I can't recall any specifics, but

8  I would say, I mean, different things about what's going on there,

9  something like that.   I don't recall any specifics.

10 Q.   Muslims were interested in Chechnya and Bosnia, correct?

11 A.   Yes.

12 Q.   Because of the atrocities that were going on there?

13 A.   You're talking about that particular time in '96-'97?

14 Q.   Yes.

15 A.   Bosnia was a bit old because Bosnia was somewhat settled in

16 '93, but Chechnya, there were things going on in Chechnya back

17 then I remember, the first war.

18 Q.   Muslims were being persecuted in Chechnya?

19 A.   Yes.

20          THE COURT:   2A?

21          MR. YAMAMOTO:   2A6a and 2A6b.

22          THE COURT:   All right.   Those are not in evidence yet.

23 Are you moving them in?

24          MR. YAMAMOTO:   No.

25          THE COURT:   Okay.

**Aatique - cross**

1              MR. KROMBERG:  I'll move them in.

2              THE COURT:  Well --

3              MR. YAMAMOTO:  Wait.

4    Q.   Do you recognize those documents?

5    A.   2A6a?

6    Q.   Yes.

7    A.   No.

8    Q.   Do you recognize 2A6b?

9    A.   No, I've never seen that before.

10   Q.   Okay.  Flip through there.  There's two or three documents

11   attached.

12   A.   You mean 2 --

13   Q.   On the b part.  Just flip through lots of pages at a time.

14        Nothing?  You don't recognize any of that?

15   A.   No, I'm sure I've never seen that.

16   Q.   Okay.  That's all.

17        How long did you go to Virginia Tech?

18   A.   From January of '96 to September of '97, so about 18-19

19   months.

20   Q.   And you got your master's there in EE?

21   A.   That's correct.

22   Q.   Electrical engineering?

23   A.   That's correct.

24        THE COURT:  Mr. Yamamoto, if you can, keep your voice up

25   a little bit.

**J.A. 413**

**Aatique - cross**

1              MR. YAMAMOTO:  Yes, ma'am.

2              THE COURT:  All right.

3  BY MR. YAMAMOTO:

4  Q.   Were there Muslim organizations at Virginia Tech?

5  A.   Yes.

6  Q.   Did you take part in them?

7  A.   Yes.

8  Q.   Did you-all raise money or do anything on behalf of Chechens?

9  A.   No.

10 Q.   And raise money or do anything on behalf of any other Muslim

11 organizations or groups around the world?

12 A.   Oh, I don't remember there being a fund-raising for any, any

13 outside cause.  We had a lot of fund-raising for the mosque they

14 were trying to build there, but that's all that I remember.

15 Q.   So you were more involved with local Muslim issues?

16 A.   Yeah, you can say practically -- yes.

17 Q.   Would you talk about foreign -- things going on in foreign

18 lands with respect to Muslims?

19 A.   It must have come up.  I mean, I can't recall any specifics,

20 but it must have.

21 Q.   Okay.  Now, when you came to Virginia from San Diego, was the

22 Dar al-Arqam open?

23 A.   You mean Dar al-Arqam as the, as the physical place with an

24 address?

25 Q.   In the office building in Falls Church.

1  A.    360 South Washington?

2  Q.    Right.

3  A.    That -- I came in February of '99.

4  Q.    So they were still holding meetings at various locations like

5  Sheikh Jaafar's basement and things like that?

6  A.    Actually, the first meeting that I went to was very late that

7  evening, I think, sometime in the fall or winter of '99.

8  Q.    Um-hum.

9  A.    And the first meeting I went to was at the upper floor room

10  in the building of American Open University.

11  Q.    Okay.  Eventually, they started having meetings at 360 South

12  Washington?

13  A.    Yeah.  Sometime spring or summer of 2000.

14  Q.    Were you attending during this period of time at these

15  various locations, were you fairly good about going to these

16  meetings?

17  A.    I'm not 100 percent sure, but I think initially, I wasn't

18  very regular.

19  Q.    You were not?

20  A.    Initially, I wasn't very regular, yeah.

21  Q.    Did you become a regular?

22  A.    Say again?

23  Q.    Did you become a regular?

24  A.    I think when it moved to that address, I remember being there

25  almost every Friday.

**J.A. 415**

**Aatique - cross**

1  Q.   Okay.  Now, you mentioned Dr. Al-Timimi was one of the

2  speakers.  Were there other speakers?

3  A.   Yes.

4  Q.   Lots of other speakers?

5  A.   He was the most frequent speaker, I'd say.  Then sometimes

6  Jaafar Idris -- Sheikh Jaafar Idris would speak.  His son, Yousuf

7  Idris, might speak.  A couple of times we had some, maybe once in

8  a while, somebody else came.

9  Q.   Did you have guest speakers?

10  A.   Yes.

11  Q.   And the lectures were all religious lectures on Islam?

12  A.   Yeah.  I mean, they were on different topics, but they all

13  related to Islam.  They were all religious in nature.

14  Q.   No political talks?

15  A.   No.  As far as lecture topics, I can't remember anything

16  that, that can be called political.

17  Q.   Would current events be worked into some of these themes

18  during the lectures?

19  A.   Sometimes they'd come up, yeah.

20  Q.   Most of these lectures were taped?

21  A.   Almost all of them were, I think.

22  Q.   So Dr. Al-Timimi's and Sheikh Jaafar's and Yousuf's and the

23  guest lecturers', all these lectures were taped as far as you

24  knew?

25  A.   I don't know about, like, Yousuf Idris.  By, like, Ali

**Aatique - cross**

1  Timimi, especially his lecture series, sometimes when Sheikh

2  Jaafar Idris would speak, they would be taped or broadcasted,

3  yeah.

4  Q.    And they would be made public?  You could purchase them or

5  get copies of these lectures?

6  A.    Later on, yes.

7  Q.    Neither Dr. Al-Timimi nor any of the lecturers during their

8  lectures advocated combat jihad, did they?

9  A.    I can't recall any specific instance, but I'd say that

10  sometimes if the topic of mujahideen or jihad came up, then it was

11  mentioned in a noble manner.

12  Q.    That these people were fighting for a noble cause?

13  A.    That's correct.

14  Q.    Now, the -- when was the End of Time lectures?

15  A.    The Signs of the End of Time?

16  Q.    The Signs of the End of Time.

17  A.    At the end of '99 to fall of 2000, something like that.

18  Q.    And "The New World Order" tapes that you had, do you recall

19  when those were initially given?

20  A.    I bought them in '96-'97, that tape set, but I did some

21  research to try to find when the lecture was given.  I think it

22  was early '94 maybe.

23  Q.    Okay.  You took part in paintball.

24  A.    That's correct.

25  Q.    Masaud Khan didn't take part in paintball.

**Aatique - cross**

1   A.   No.   I think he came maybe once or twice.   Maybe just once.

2   Q.   Dr. Al-Timimi never went to any of the paintball sessions?

3   A.   No.

4   Q.   You never talked to Dr. Al-Timimi about paintball?

5   A.   Not me.

6   Q.   You don't know if Dr. Al-Timimi even knew who was involved in

7   paintball?

8   A.   I think he did know.

9   Q.   You think he did know?

10  A.   Yeah.

11  Q.   How do you think he knew?

12  A.   Once what happened in, I think that was late 2000, when FBI

13  came to visit Seif Chapman, and then he -- during the next Friday,

14  when we were at the lecture place, he took some of the people out

15  and told us that he had, he had been visited and he got questioned

16  and he lost a job because of that, something like that.

17  Q.   This is Chapman saying that?

18  A.   Chapman saying that.

19          So later on, I commented to Kwon that, that we shouldn't

20  have been gathering in, in front of the Islamic Institute, where

21  we used to gather, wearing fatigues and cars, like, in open.   So

22  Kwon said Ali Timimi said the same thing.

23  Q.   You were -- you didn't go to Dr. Al-Timimi about Chapman

24  being approached; somebody else did?

25  A.   Yeah, I came to know it through somebody else.

**Aatique - cross**

1  Q.   And Dr. Al-Timimi didn't meet with the paintballers as they

2  met outside the Dar al-Arqam, did they -- did he?

3  A.   You mean when, when Seif Chapman told us about --

4  Q.   Right.

5  A.   No, he was not there.

6  Q.   Was it your understanding that Dr. Al-Timimi told them to go

7  play soccer instead of play paintball?

8  A.   Say it again?

9  Q.   Was it -- did you understand Dr. Al-Timimi to tell whoever

10  spoke to him about Chapman that they could go play soccer instead

11  of going to do paintball?

12  A.   No, he did not say that.  I mean, what I understood him

13  saying, the context that I got was that you -- that what he said

14  was that you've got to be more careful, something like that.

15  Q.   That's what you were told what Dr. Al-Timimi said?

16  A.   Yes.

17  Q.   Okay.  So you didn't hear anything about playing soccer?

18  A.   From him?

19  Q.   No, from whoever was talking.

20  A.   No, nothing about soccer.

21  Q.   You never talked to Dr. Al-Timimi about paintball?

22  A.   No.  Not myself, never.

23  Q.   So everything related to you or you're saying Dr. Al-Timimi

24  said is from somebody else?

25  A.   That's correct.

**J.A. 419**

**Aatique - cross**

1  Q.   And after the Seif Chapman incident, nobody indicated that

2  Dr. Al-Timimi had said, "Go play soccer"?  That wasn't related to

3  you?

4  A.   No.

5  Q.   The only part that was related to you was, "Be careful"?

6            MR. KROMBERG:  Objection to the question.

7            MR. YAMAMOTO:  I withdraw it.

8  Q.   The only thing that you were told is what you just said

9  previously?

10 A.   Yes.

11 Q.   Okay.  The paintball group, were you in it from the

12 beginning?

13 A.   Almost.  I mean, I wasn't -- I was in it from the second or

14 the third outing.

15 Q.   And how long did you stay in it?

16 A.   I think that outing that I went for the first time, I think

17 it was in May of 2000, and then we played through the summer of

18 that year.  Then, of course, we stopped in winter.  Then we

19 restarted in the spring of 2001, and until I -- before I moved to

20 Pennsylvania in the first week of July, I went to visit Pakistan

21 in the month of June, so I may have been playing until, until

22 going there, late May or something like that.

23            And I actually, I came back down again a couple of times

24 in July and August, I think, but that wasn't the regular paintball

25 outing.  We went to a commercial paintball place in Leesburg.

**Aatique - cross**

1  That was one more outing of paintball.

2  Q.  Was that with these same people?

3  A.  Some, some of those same people, but we went to -- when we

4  went to that place, there were a lot of people from -- who come to

5  play paintball, so they make teams.  So we tried to be on one

6  team, but it was a chaos basically.

7  Q.  How many of you were there?

8  A.  You mean us, of the, of the group?

9  Q.  Right, at Leesburg.

10  A.  Maybe -- I'm not sure, maybe five or six.

11  Q.  Okay.  And when you say "commercial paintball," is this

12  inside or outside?

13  A.  What does that mean?

14  Q.  In a building or out, outside of a building, in an open area?

15  A.  I've heard that commercial places are of both types, whatever

16  you want to --

17  Q.  The one that you went to.

18  A.  It was outdoors, but they had cardboard structures made, like

19  cardboard towers or cardboard huts.

20  Q.  So it was set up to play these paintball games with forts --

21  A.  Yes.

22  Q.  -- and bunkers and hiding places and all that kind of stuff?

23  A.  That's correct.

24  Q.  So you could play war?

25  A.  Yes.

**Aatique - cross**

1  Q.   And that's essentially what paintball was, playing war?

2  A.   What paintball is or what we were doing?

3  Q.   What you were doing playing paintball.

4  A.   What we were doing was to, was to train for combat using

5  paintball and, of course, recreation.

6  Q.   Okay.  Now, you would break up into two teams, right?

7  A.   At the paintball, yes.

8  Q.   And were there different types of paintball games played or

9  just one type?

10  A.   What do you mean by "type"?

11  Q.   Well, was it two sides fighting against each other to see who

12  wins, or one side has a command center and you guys are trying to

13  attack it and take the command center --

14  A.   That's correct.

15  Q.   -- or --

16  A.   We simulated different scenarios like two sides trying to

17  finish each other off or one side has a base and they just have to

18  defend it and the one side has to get the flag or whatever.

19  Q.   So there were different types of scenarios that were used?

20  A.   Scenarios, yes.

21  Q.   When you -- was there any difference when you played

22  paintball with your group, the paintballers from the Dar al-Arqam,

23  and the commercial paintball?  Was it the same type of thing, two

24  sides fighting against each other trying to win?

25  A.   There were similarities and there were differences.

**Aatique - cross**

1   Q.   Okay.  What were the similarities?

2   A.   Similarities, it's a paintball game, I mean, you try to win,

3   but there were differences like people lying, people cursing in

4   the regular field, people getting hit and trying to cheat, a lot

5   of cursing going on, which was --

6   Q.   And that didn't happen in your group?

7   A.   No.

8   Q.   You didn't curse?

9   A.   No.

10  Q.   Okay.  Now, for paintball, you need a paintball gun, right?

11  A.   Yes.

12  Q.   You went and -- everybody bought their own paintball gun?

13  A.   From what I know, yeah.

14  Q.   They're about 150 bucks?

15  A.   I mean, they go in different range.  Usually the typical ones

16  we had, 100 to 200 dollars, yeah.

17  Q.   You have a helmet?

18  A.   Yeah, goggles to protect the eyes.

19  Q.   Goggles to protect your eyes.

20         And then after that, it's whatever you want to wear?

21  A.   Of course, the balls, you have to buy the paintballs

22  themselves.

23  Q.   Right, paintball balls and the air cartridges?

24  A.   Yes.  I mean, yeah, you can buy cylinders, and you have to

25  buy $CO_2$ to pressurize them every time.

**Aatique - cross**

1  Q.  Now, if you're going to play paintball, everybody tried to
2  wear camouflage or dark colors or green or black or something like
3  that, right?
4  A.  Almost all of us wore camouflage.
5  Q.  And that's so when you played paintball, you wouldn't stand
6  out and get shot?
7  A.  Yes.  Because we are playing in the woods out there, and if
8  you, if you are anything different, then you'll stand out from,
9  from hundreds of yards away.
10 Q.  And that's the same whether you played commercial paintball
11 or your private paintball?
12 A.  That's what we wore when we went to commercial paintball, but
13 people were wearing there all kinds of things.
14 Q.  Some people had just come just for the first or second time,
15 so they didn't have any clothes?
16 A.  Yeah, or they were perhaps not as serious.
17 Q.  Okay.  You owned your own gun?
18 A.  You mean paintball?
19 Q.  Paintball gun.
20 A.  Yes.
21 Q.  Did you play paintball with any other groups besides the Dar
22 al-Arqam group?
23 A.  No.  I mean, that Leesburg outing was, you can say, partially
24 with outside people, but I don't remember ever playing paintball
25 with anybody else.

**J.A. 424**

**Aatique - cross**

1  Q.   Did you play different groups, like people from D.C., North
2  Carolina, New Jersey?
3  A.   Yes.  We had, we had some Muslims we knew visit us a couple
4  of times from Maryland, I think that was from Laurel, Maryland,
5  and we also had teams coming from New Jersey, North Carolina.
6  Q.   How did you get to meet these people to set this up?
7  A.   Not me, I mean, but people -- I think the people who were
8  organizing it knew other Muslims from other areas, and when they
9  came to know that we are playing paintball, they told us, "Well,
10 we also play paintball," so we thought of having a match -- having
11 matches together.
12 Q.   I think at some point, you indicated -- withdraw that.
13      So the group wasn't secret; I mean, it was public?
14 People knew about the paintball group?  People in other states
15 knew about the paintball group because you played with them,
16 right?
17 A.   Yeah, but I wouldn't call that it was open for all because we
18 were actually especially in the later, second summer, we were
19 specifically told not to, not to mention paintball activity to
20 anybody and not --
21 Q.   Is this after Chapman was visited?
22 A.   There was something like that before, also, but it was not as
23 strictly understood as later on in the second summer.
24 Q.   Now, did you think you were doing anything wrong?
25 A.   Not at that time.

**Aatique - cross**

1  Q.  At any time?

2  A.  Once, once, once I was charged and I, I understood -- I did

3  not understand the conspiracy law before.

4  Q.  Okay.  So while you were playing paintball -- before you were

5  arrested in 2003, when you were playing paintball, you thought it

6  was perfectly legal?

7  A.  When I was playing paintball, yes.

8  Q.  You didn't have any ulterior motive.  You weren't a terrorist

9  organization in training?

10  A.  Personally, I had, I had no such motives.  I can't say for

11  other people.

12  Q.  Why did you join paintball?

13  A.  It was, it was described to me in, when it was about to start

14  by Yong Kwon and Ibrahim Al-Hamdi, what they were planning to do,

15  we would play paintball and we'd train for fighting this way.  So

16  it appeared very exciting to me, so I joined it.

17  Q.  The fighting part of it, did you take military training in

18  Pakistan?

19  A.  Not really.  I mean, when I was there in ROTC going into high

20  school there, they had something like, there's something like ROTC

21  here, where you just do a lot of drills and fire some weapons.

22  Q.  So it's like a class you would take in high school?

23  A.  Yeah, but that isn't any serious military training.

24  Q.  Is that everybody took the classes?

25  A.  There in Pakistan?  In those days, almost everybody used to

**Aatique - cross**

1  take it.

2  Q.   How about females?

3  A.   They also had -- it was slightly different, but they had a

4  counterpart for that, also.

5  Q.   Did you dress in uniforms?

6  A.   Military khakis, yeah.

7  Q.   Carry rifles and do drills, marching?

8  A.   They wouldn't give us rifles very often back then, but we

9  were, we were shown how to manage a rifle, yeah.

10  Q.   How to take a rifle apart and how to clean it?

11  A.   Basically, we were just told how to fire it at that time.

12  Q.   Did you fire it?

13  A.   Yes, in '89-'90, when I was taking that course.

14  Q.   So you would -- they would take you to a range, and everybody

15  would shoot?

16  A.   Yeah.  That program is organized by the Pakistan Army, and

17  they have their own ranges.  So they would take the -- when --

18  at -- for, I mean, it was for two years, so at the end of each

19  session and each year, they'd take us to fire some rounds.

20  Q.   So the, the classes taught by the Pakistani Army?

21  A.   Yes, regular Army people.

22  Q.   Was there encouragement to go on for further training?

23  A.   You mean in that course?

24  Q.   Yeah.

25  A.   I don't recall any.

**Aatique - cross**

1  Q.   Okay.  Were there classroom instructions, too, for that
2  ROTC-type class?

3  A.   Yes.

4  Q.   What was in there?

5  A.   It's a long way back, but it was, like, something about war
6  formations and military hierarchy and wartime preparedness,
7  something like that.

8  Q.   So they would teach you things like the table of organization
9  and equipment, how a military group is organized and what the
10  various groups are called and who's responsible to who, that type
11  of thing?

12  A.   Something like that, yeah.

13  Q.   They taught you some basic tactics, some military tactics?

14  A.   Very basic:  how to move or how to, like, how to carry a
15  rifle, how to crawl, different fighting positions, stuff like
16  that.

17  Q.   Did they teach you some military history?

18  A.   I don't recall.

19  Q.   What else would they teach?

20  A.   I just remember a lot of drilling.

21  Q.   A lot of drilling?

22  A.   Yeah.

23  Q.   Marching?

24  A.   Yeah.

25  Q.   With the rifle on your shoulder?

**Aatique - cross**

1    A.    No.   Just in heavy boots and the hot sun.

2    Q.    Marching in step together?

3    A.    Yeah.   Something like that, yeah.

4    Q.    Was it hard?

5    A.    It was not fun.

6    Q.    Why did you want to do it again if it wasn't fun then?

7    A.    I wasn't drilling this time.

8    Q.    So you'd had some experience of basic military stuff:

9    tactics --

10   A.    Very rudimentary.   I won't -- can't even call it basic.

11   Q.    When you started paintball, would you-all talk about

12   Chechnya --

13   A.    A lot.

14   Q.    -- what's going on there?

15   A.    Yes.

16   Q.    You-all were concerned about Chechnya and the Muslims in

17   Chechnya?

18   A.    That's correct.

19   Q.    The Muslims were fighting the Russian Army; is that right?

20   A.    Yes.

21   Q.    The Muslims were more like a guerilla army?

22   A.    That's correct.

23   Q.    They were outnumbered?

24   A.    That's correct.

25   Q.    So you-all looked at the Muslim fighters there

**Aatique - cross**

1  idealistically, like these people are fighting for the right, and
2  they're outnumbered, and they're still going at it?
3  A.   That's correct.
4  Q.   Did that inspire you?
5  A.   Yes.
6  Q.   Now, at some point, were you told about Internet sites
7  involving Chechnya?
8  A.   Yes.
9  Q.   Qoqaz and Kavkaz?
10  A.   The first one you mentioned, Qoqaz, was very commonly
11  mentioned.
12  Q.   Did you go to that site?
13  A.   During those days, almost, almost daily.
14  Q.   Almost daily?
15  A.   Yes.
16  Q.   What was on it?
17  A.   Updates about what was happening in the, in the fighting
18  there.
19  Q.   In the war in Chechnya?
20  A.   Yes.
21  Q.   Do you believe that was more accurate than, than BBC, NBC,
22  CNN?
23  A.   That was my belief, yes.
24  Q.   Were there also descriptions of the fighting and what was
25  going on with -- and videos of what was going on?

**Aatique - cross**

1  A.  Sometimes they would post videos.

2  Q.  Would you look at those?

3  A.  Yes.  Not on that site, but they would have links to go to

4  some other sites where they would post videos.  I did see them.

5  Q.  Were there articles on the site, also?

6  A.  Yes.

7  Q.  You'd read them?

8  A.  Yes.

9  Q.  Would you guys talk about them?

10  A.  Yes, sometimes.

11  Q.  So everybody was going to the sites, and then when you'd meet

12  up, you'd all talk about what you'd seen and read?

13  A.  I think everybody I knew was going to those sites, and

14  topics -- I won't say that every time we met, we discussed

15  everything, but those topics came up fairly regularly, I think.

16  Q.  How often did you play paintball?

17  A.  I remember initially, it was every week, but after some

18  months, it was too taxing on the people, so we make it every,

19  every other week.

20  Q.  And then did it fall off even more?

21  A.  There was a -- you can see sort of core group of 10-12-14

22  people who would show up every outing except for if somebody has

23  something important to do, and there were, like, other people who

24  would come more irregularly.

25  Q.  How often were you going?

**Aatique - cross**

1  A.   I missed very few outings.

2  Q.   So you went every other week?

3  A.   Almost, yeah.

4  Q.   Was there talk about -- apparently, there was -- there was

5  talk about this paintball being good training for jihad and for,

6  for joining fighting; is that right?

7  A.   I don't remember any explicit talk, but we, we tried to make

8  it as serious as possible to -- so that people could learn things,

9  and, like, if -- like trying to practice ambush or attacking a

10 military bunker.

11 Q.   These are some of the different games you played?

12 A.   Yes.

13 Q.   And you'd indicated earlier that some of these people had

14 some military background.

15 A.   Yes.

16 Q.   They gave you some training, also?

17 A.   Yes.

18 Q.   Was that the same type of training you received in classrooms

19 in Pakistan?

20 A.   Some of it.  Some of it is overlapping.

21 Q.   So what you received was sort of basic military training when

22 you played paintball?

23 A.   Yes.

24 Q.   I mean, it wasn't advanced army college tactics or anything

25 like that?

**Aatique - cross**

1   A.   I've never been to an army college, so I don't know.

2   Q.   But it was stuff that was fairly common sense?

3   A.   Some of it was common sense, yeah.

4   Q.   Was, was this training at every session or just sometimes?

5   A.   Initially, there was a lot of stress on training, like having

6   a training drill before you would go to a game or physical.  Like

7   initially, we had -- used to have almost three sessions:  training

8   sessions, physical training, and games.  But later on, things got

9   dropped, and it only -- only games left.

10  Q.   They stopped the physical training?

11  A.   Yes.

12  Q.   Why?

13  A.   I don't know.  Maybe it was boring.

14  Q.   Because you didn't like it, that's why, right?

15  A.   I mean, I wasn't making the decisions mostly, so -- but in

16  the end, it was just we'd make teams and play games, as many games

17  as possible.

18  Q.   How did you go from total recreation, you guys were having

19  fun, to, okay, now we're going to do this serious training?  How

20  did that come about?

21  A.   I wouldn't say there was the transition as you're describing.

22  It was, it was always serious in the sense, okay, we are doing

23  this to train for jihad.  That was our purpose.  I mean, that was

24  how it was told when I was first joining, and that's how we used

25  to discuss about it.

**J.A. 433**

**Aatique - cross**

1   Q.   Now, training for jihad, you mean training for military
2   fighting jihad?
3   A.   Yes.
4   Q.   There are other kinds of jihad, right?
5   A.   Yes.
6   Q.   Okay.  So your belief was always that it's fun, but we're
7   doing this to learn military tactics?
8   A.   Yes.
9   Q.   And is, is this really sort of part of the Islamic religion,
10  to be prepared militarily?
11  A.   Yes.
12  Q.   You're taught to be ready to fight to defend yourselves?
13  A.   Yes.
14  Q.   And that's because Muslims have always been oppressed; is
15  that right?
16  A.   Well, I won't say they've always been oppressed, but if
17  you're weak, you'll be oppressed.
18  Q.   So to keep from being oppressed, you're strong?
19  A.   Um-hum.
20  Q.   And to be strong, you need to train?
21  A.   Yes.
22  Q.   To be prepared?
23  A.   Um-hum.
24  Q.   But this doesn't mean --
25              THE COURT:  I'm sorry, wait one second, Mr. Aatique.

**J.A. 434**

**Aatique - cross**

1  Don't say "um-hum."  We can't get that down.

2            THE WITNESS:  I'm sorry.

3            THE COURT:  Yes or no.

4            THE WITNESS:  Okay.

5  BY MR. YAMAMOTO:

6  Q.  This doesn't mean you're training to go out and start a war?

7  A.  No.

8  Q.  That was never in your mind, was it?

9  A.  Never in my mind, yes.

10 Q.  It was to train to be able to protect yourself and your

11 family?

12 A.  Yeah.  I mean, my purpose was to, was to be militarily

13 trained and militarily capable in case if it's ever needed in the

14 future.

15 Q.  Also to be in shape?

16 A.  Yes, but I think one outing every two weeks is not enough for

17 that.

18 Q.  And you didn't like the physical training.

19            So you -- were you in good shape?

20 A.  No, I don't think I was in good shape back then.

21 Q.  So this didn't do much to put you in good physical shape?

22 A.  No.

23 Q.  Did it help you mentally?

24 A.  Could you, could you explain that?

25 Q.  Well, did it give you some peace of mind that yes, I'm

**Aatique - cross**

1  training here.  I'm getting myself prepared, that if I ever have

2  to defend myself in the future, I can do it?

3  A.   I surely realized that I know more than I would have if I had

4  not done this.

5  Q.   But you didn't still -- you didn't feel totally prepared --

6  A.   No.

7  Q.   -- playing paintball?

8  A.   Yeah.  Mainly because I never -- I mean, what I felt a lot of

9  times was that almost everybody else had firearms, and I never

10 owned firearms here.

11 Q.   You never owned a gun?

12 A.   Not here.  A military, never.

13 Q.   Did you ever buy one?

14 A.   No.

15 Q.   Did you have one in Pakistan?

16 A.   No.

17 Q.   Did you ever fire a weapon here in the United States?

18 A.   Here?

19 Q.   Yeah.

20 A.   No.

21 Q.   Just in Pakistan?

22 A.   Yes.

23 Q.   Okay.  Now, throughout all of this, Dr. Al-Timimi is not

24 involved with any of this to your knowledge, right?

25 A.   That's a very general statement.  I'll say when we're going

# Aatique - cross

1  to the paintball field, he was never there, and in front of me, he

2  never discussed paintball.

3  Q.  As, as time went on and you guys got serious talking about

4  Chechnya, watching the Qoqaz site, then people started leaving.

5  Al-Hamdi left at some point?

6  A.  That was the first person I came to know, although later I

7  came to know that Ismail Royer had traveled before.

8  Q.  Before Hamdi?

9  A.  Yes.

10 Q.  That -- you learned that Royer had fought in Bosnia?

11 A.  Yeah.  I knew during the paintball outings that -- I came to

12 know that he had fought in Bosnia.

13 Q.  You also learned that he went to the LET camps in Pakistan at

14 some point?

15 A.  That I came to know much later actually, 2001.

16 Q.  So the first person you'd heard about was Al-Hamdi?

17 A.  That's correct.

18 Q.  And did you go to the airport when he left?

19 A.  Yes.

20 Q.  Did you see him off?

21 A.  Yes.

22          THE COURT:  Can we get a time frame for this, please?

23          THE WITNESS:  That's September of 2000, my guess.

24 BY MR. YAMAMOTO:

25 Q.  Did you know where he was going?

**J.A. 437**

**Aatique - cross**

1  A.   Yes.   At that time, I knew.

2  Q.   And where was he going?

3  A.   I knew that he was going to, to train with LET in Pakistan in

4  some camp.

5  Q.   And do you know what he was going to do next?

6  A.   At that time, I came to know that his intention was to go

7  fight in Kashmir and not to come back, to become a martyr.

8  Q.   So it was your understanding that Al-Hamdi wanted to train,

9  fight, and get killed in Kashmir?

10 A.   That's -- yes.

11 Q.   So he would be shaheed?

12 A.   Yes.

13 Q.   What is "shaheed"?

14 A.   "Shaheed" --

15 Q.   How do you spell "shaheed"?

16 A.   In English, we can say s-h-a-h-e-e-d.

17 Q.   Okay.   Now, what is "shaheed"?

18 A.   "Shaheed" literally means a witness, but it's an Islamic

19 term, also, and it has different meanings, sort of like the

20 word "jihad," but the most well-known use is for the people who

21 die in combat, in a just combat.

22 Q.   And what happens to them when they die?

23 A.   If -- all their sins are forgiven.

24 Q.   And they go to heaven?

25 A.   Yes.

**Aatique - cross**

1   Q.   Immediately?

2   A.   Yes.  I mean, that's a theological question because nobody

3   will go to heaven until the Day of Judgment, but they are in a

4   state of bliss, yeah.

5   Q.   So even if they're not in heaven, they're not sitting there

6   waiting.  They're happy?

7   A.   Yes.

8   Q.   People that are not shaheed are just waiting for the Day of

9   Judgment?

10  A.   Yeah, but in Islamic belief, you'll have an idea of what's

11  waiting for you as soon as you die.

12  Q.   Do you know while you're alive?

13  A.   Say it again?

14  Q.   You say as soon as you die.  So you don't know what's going

15  to happen to you while you're alive?

16  A.   There will be signs of, of goodness or wretchedness, but, I

17  mean, death is when you, when your deeds are closed.

18  Q.   Signs, does the Islamic faith have a lot of signs and omens?

19  A.   I don't know about the word "omens" because that might imply

20  a belief in things we don't believe in, but we -- through

21  authentic text, we are told some signs of what a good death is and

22  what a bad death is.

23  Q.   Are there signs for other things, too?

24  A.   That's a very general question.  I mean, what signs and what

25  things are you talking about?

**Aatique - cross**

1  Q.   Okay.  So you can't answer that generally?  That's fine if
2  you can't.
3  A.   No, I cannot.
4  Q.   Did you know how Al-Hamdi made his preparations?  Do you know
5  if anybody helped him?
6  A.   To go to prepare?
7  Q.   To go to Pakistan.
8  A.   No.  I came to know it very late, when he was going, and I
9  just saw him off at the airport.  I did not know of any details of
10  how he prepared.
11         I did come -- actually, the outing before he was
12  going --
13  Q.   Um-hum.
14  A.   -- that's when I think I knew for sure he was going.
15  Q.   Did he say he was going?
16  A.   He told everybody, and that day I was late, so I was made to
17  do some punishment, and then, then I was told that that's what he
18  just told people just before I came there.
19  Q.   So you didn't hear it from him?
20  A.   No, not then.
21  Q.   What was your punishment?
22  A.   I did 50 push-ups.
23  Q.   Did you do them?
24  A.   Yes.
25  Q.   Were they hard?

**J.A. 440**

**Aatique - cross**

1  A.    At that time, yeah.

2  Q.    Did anybody else talk about going to LET camp or anywhere

3  else during this period of time?

4  A.    No.

5  Q.    So he was the only one?

6  A.    Of, of the people I knew, yeah.

7  Q.    Did you guys talk about it in general, getting training?

8  A.    You mean talking about going to the camp and getting trained?

9  Q.    Right.

10  A.    I don't remember.

11  Q.    Okay.  Did it surprise you that Al-Hamdi wanted to go?

12  A.    He was, he was a type of person who, I mean, he's, he's not

13  the typical run-of-the-mill people that I know who just follow

14  things the way everybody else does, so I was not very surprised.

15  Q.    You were not very surprised?

16  A.    Of course, it's not a common decision what he took, but it

17  was not -- it was not very surprising to come of him, knowing him

18  from before.

19  Q.    And based on you-all watching all these videos of combat and

20  talking about combat and -- so it didn't surprise you that he took

21  it one step further and decided he was going to go train?

22  A.    It was still surprising because it was a big step, but it

23  wasn't very surprising.

24  Q.    Okay.

25          THE COURT:  All right, Mr. Yamamoto, I think the jury

# Aatique - cross

1  has been sitting for an hour and a half.  This is a good time to

2  take the morning break.

3          We'll be in recess until 11:30, Ladies and Gentlemen.

4          (Recess from 11:15 a.m., until 11:32 a.m.)

5                  (Defendant and Jury present.)

6          THE COURT:  Mr. Yamamoto.

7  BY MR. YAMAMOTO:

8  Q.  Mr. Aatique, when you watched the videos, who did you watch

9  them with?

10 A.  Say it again?

11 Q.  When you watched the Chechen videos, who did you watch them

12 with?

13 A.  Almost all the videos that I watched were through the

14 Internet at my home PC, so nobody was with me.

15 Q.  You were by yourself?

16 A.  Yes.

17 Q.  Did you ever watch videos with anybody?

18 A.  I don't remember.

19 Q.  Did Dr. Al-Timimi ever watch them with you?

20 A.  Not with me.

21 Q.  Do you know if he ever saw them?

22 A.  I don't know.

23 Q.  "Russian Hell 2000," did you watch that video?

24 A.  I remember watching it over the PC.

25 Q.  Did you buy the video?

**Aatique - cross**

1    A.    No.    It was, it was available as a streaming link on the

2    Internet, so I clicked it and watched it live.

3    Q.    How many times?

4    A.    It's fairly long, I think maybe half an hour if I were to

5    guess.    Maybe I watched it just once, I think.

6    Q.    Just once?

7    A.    Yeah.

8    Q.    You watched other videos like that, like the "Russian Hell"

9    video?

10   A.    Yeah, some short clips off and on sometimes.

11   Q.    All by yourself?

12   A.    Yes.

13   Q.    Did you know anybody to bring back videos?

14   A.    Say it again?

15   Q.    Did you know that Donald Surratt brought back some videos?

16   A.    I came to know much later actually that these people, when

17   they traveled overseas, they bought some of these videos.

18   Q.    Did you ever watch them?

19   A.    No.

20   Q.    Do you know if Dr. Al-Timimi ever watched them?

21   A.    I don't know.

22   Q.    The "Russian Hell 2000" video romanticizes the fight in

23   Chechnya, right?

24   A.    Can be said.

25   Q.    And it idealizes the martyrs, the people that died?

**J.A. 443**

**Aatique - cross**

1  A.    Yes.

2  Q.    And it's to make people want to go fight, go support the

3  Chechens?

4  A.    That can be a purpose, yeah.

5  Q.    Did Dr. Al-Timimi -- did Dr. Al-Timimi ever encourage anybody

6  to go fight in Chechnya?

7  A.    In person?  I don't remember.

8  Q.    Did he ever encourage you to go fight in Chechnya?

9  A.    Not me.

10  Q.    Do you know if he encouraged anybody?

11  A.    When we were -- when the lectures were being given in AOU, I

12  remember he mentioned that there was a person who was very eager

13  to go and he left, but he did not give his name.

14  Q.    Well, he didn't say that he encouraged them?

15  A.    He --

16  Q.    This person went.

17  A.    He did not say that, yeah.

18  Q.    So as far as you know, Dr. Al-Timimi didn't encourage

19  anybody?

20  A.    Not, not that I witnessed.

21  Q.    Did you know that Ismail Royer helped Al-Hamdi make

22  preparations to go to Pakistan?

23         MR. KROMBERG:  Objection, Judge.  This would be double

24  hearsay of what Hamdi said Royer said.

25         MR. YAMAMOTO:  I asked if he knew.

**Aatique - cross**

```
 1              THE COURT:  I think just this question by itself is not
 2   hearsay or does not ask for a hearsay answer.
 3              THE WITNESS:  I came to know later that after --
 4              THE COURT:  Wait, the question is simply did you know,
 5   and the answer is either yes, you knew, or no, you didn't.
 6              THE WITNESS:  I came to know that he went through -- he
 7   got his contact through --
 8              MR. KROMBERG:  Objection.
 9              THE COURT:  Wait.
10              MR. KROMBERG:  We should at least ask if he came to know
11   it from Royer or he came to know it from Hamdi or he came to know
12   it from some third person.
13              THE COURT:  The question is did you know.  The answer is
14   yes or no, and if it's yes, then not what you knew but how did you
15   know, because that way, we can tell whether or not the next answer
16   will be permitted.
17              So you said you did know at some point.
18              THE WITNESS:  Yes, but it was told to me by a third
19   person.
20              THE COURT:  All right.
21   BY MR. YAMAMOTO:
22   Q.   It wasn't told to you by Al-Hamdi or by Royer?
23   A.   No.
24   Q.   Royer told you at some point that he'd gone to LET in Bosnia?
25   A.   Yes.
```

**J.A. 445**

**Aatique - cross**

1  Q.  And when Al-Hamdi came back, were you surprised he came back?

2  A.  Yes.

3  Q.  And he started telling you about his experiences at the LET

4  camp and in Kashmir, right?

5  A.  Yes.

6  Q.  And that made you want to go?

7  A.  That was one of the reasons, yes.

8  Q.  Did Dr. Al-Timimi have anything to do with that?

9  A.  In my decision to go?

10  Q.  Right.

11  A.  Not directly.

12  Q.  Not at that time he didn't have anything to do with your

13  deciding to go.  It was listening to the stories of Al-Timimi --

14  Al-Hamdi and Royer?

15  A.  Yes.

16  Q.  Now, you were going to ask Al-Hamdi about how to go, right?

17  A.  Yes.

18  Q.  Kwon told you, "No, don't ask Al-Hamdi; Royer's the man.  Go

19  ask Royer"?

20  A.  That's correct.

21  Q.  So you went to talk to Royer?

22  A.  Yes.

23  Q.  Did Kwon talk about going?

24  A.  Not at that time.

25  Q.  And you met with Royer at his house?

**Aatique - cross**

1   A.   Yes.

2   Q.   And you had dinner there with Kwon and Royer and somebody

3   else?

4   A.   Yes.

5   Q.   And that's when Royer made calls for you so you could go to

6   LET camp?

7   A.   That's correct.

8   Q.   He told them -- he gave them your kunya, your alias name, and

9   told them when you would arrive?

10  A.   Yes.  And he gave me a letter to carry.

11  Q.   And this is all when, in July or August of 2001?

12  A.   It was probably August of 2001.

13  Q.   Dr. Al-Timimi doesn't know anything about this?

14  A.   No, I don't think he knew.

15  Q.   You didn't tell him?

16  A.   No.

17  Q.   Royer also gave you a letter --

18  A.   Yes.

19  Q.   -- introducing you, telling them that you were a good person.

20  A.   Yes, something along these lines, three or four lines.

21  Q.   He gave you the phone number to call when you got to Lahore?

22  A.   Yes.

23  Q.   Did you talk to the person on the phone on that day?

24  A.   Me?  No.  I myself did not talk.

25  Q.   Was Kwon interested in going at that point?  Did he talk

**Aatique - cross**

1  about it?

2  A.    No, I don't think so.

3  Q.    Why was Kwon there, do you know?

4  A.    It so happened that when I told -- when I had told -- talked

5  with him in person, when I had met him in July, late July

6  probably, that, okay, I want to go and this and that, so he said,

7  "Yeah, okay, I can give you a reference letter and contact for

8  that purpose."

9          And then either, either during that time when I told him

10 or sometime later, he invited me to come to a dinner at his home.

11 He was making something for us, and he invited me, and he invited

12 Kwon, also, and there was a fourth person, which I can't recall

13 who it was.

14 Q.    These people knew you were going to the camp?

15 A.    No, not at that -- actually --

16 Q.    They found out at the dinner that you were going to the camp?

17 A.    I'm not, I'm not sure because we didn't -- I mean, it was not

18 my purpose to keep it a secret because I trusted them, but, but

19 when he wrote the letter, we walked away from these people, and

20 when he called, he went to his basement, so --

21 Q.    But Kwon already knew that you were going to go.

22 A.    I'm not sure.

23 Q.    Well, Kwon told you to talk to Royer about going.

24 A.    Yes, he knew that I was -- yeah, this is correct, that he

25 told me that Royer is a person to talk to, but I'm not sure if he

# Aatique - cross

1  knew that my plans had become concrete and I was going.

2  Q.    Okay.  That other person that was there was not

3  Dr. Al-Timimi?

4  A.    No.

5  Q.    Now, you thought about going to train with the U.S. Army, but

6  you were concerned about being sent overseas and fighting Muslims?

7  A.    I never really seriously thought about it.  Actually, this

8  question was asked to me by the agents, why didn't you train, this

9  and that, and I told them that even if I thought about it, it

10 was -- because in most places, if you train, you have to sign some

11 commitment.

12        I know with U.S. reserves that you can be part of the

13 reserve even if you're not a citizen, but then they may call you

14 up anytime.

15 Q.    Your intention was to go to LET camp for a few days, three or

16 four or five days?

17 A.    Yes.

18        MR. KROMBERG:  Judge, can we have a time frame?  We

19 heard on direct that there were different -- intentions changed.

20        THE COURT:  All right, all right.

21 BY MR. YAMAMOTO:

22 Q.    Initially, when you thought about going and talked to Royer,

23 your plan was to go for three or four or five days?

24 A.    Up to a week initially when I talked to him.

25 Q.    Up to a week.

**Aatique - cross**

1        But ultimately, you were going to bring your family back

2   to America?

3   A.    That was my -- I mean, that was why my trip was planned in

4   the first place, because my family went there in June, June, when

5   I dropped my wife and children, I mean, there, and I came back,

6   and I was thinking I would go in September to pick them up, so

7   that's when I thought that I could, I could take a week off from a

8   vacation and travel to the camp, also.

9   Q.    So it was to go to the camp, do some training, come back, get

10  your family, come back to America, correct?

11  A.    That's correct.

12  Q.    Now, over time, you're Pakistani, and you read the Pakistani

13  newspapers; is that right?

14  A.    Yes.

15  Q.    Watch Pakistani news on TV?

16  A.    If there are -- I mean, I don't have a satellite TV here, so

17  I can't watch channels from there.

18  Q.    Okay.  LET, Lashkar-e-Taiba is a political organization in

19  Pakistan; is that right?

20  A.    No, I wouldn't call it a political organization.  It's, it's

21  a social organization in terms of the social activities they do,

22  and they have a military wing.

23  Q.    Okay.  So it's more than just a military group.  It's a much

24  larger group than that.  They have social obligations?  They run

25  schools, libraries, hospitals?

**Aatique - cross**

1  A.    That's correct.

2  Q.    LET offices are all over the place?

3  A.    That's what I came to know when I went there, although I

4  don't know if they're out and open, but -- or they were out and

5  open, I don't know, but when I visited there, I came to know that

6  they had offices in a lot of towns and cities all over Pakistan.

7  Q.    Now, in some towns and cities, they have more than one

8  office?

9  A.    It's got to be like that, yeah.

10 Q.    Is -- LET is not -- is it a religious organization?

11 A.    It's built on the foundation of Islamic principles as they

12 understand them, so it can be called a religious organization.

13 Q.    Are they Suni?

14 A.    Yes.

15 Q.    Are they Salafi?

16 A.    I would say yes.

17         THE COURT:    You'd better explain what that means.

18 BY MR. YAMAMOTO:

19 Q.    Spell it first.

20 A.    S-a-l-a-f-i.

21 Q.    And what does it mean?

22 A.    This term is -- people who are Salafi or not Salafi sometimes

23 use this term to reference people who -- a Salafi, the term comes

24 from the word "salaf," s-a-l-a-f, which references to the early

25 generations, the first three generations after, after the Prophet,

**J.A. 451**

**Aatique - cross**

1  including his generation, and ideally it refers to people whose

2  understanding of religion and practice is based on the example of

3  those generations.

4  Q.    On the word of the Prophet?

5  A.    On the, on the way he and his generation and the subsequent

6  one or two generations understood it and implemented it.

7  Q.    There are other Muslim organizations that follow other

8  tenets, other -- don't follow that?

9  A.    It's a matter of perspective, because if you talk to them,

10 they might claim something similar, but they, they go by different

11 names and different groups.

12 Q.    Now, you were aware that the, the LET organization was being

13 supported by the Pakistani government in its fight in Kashmir?

14 A.    I never explicitly knew that, but it was sometimes in the

15 media that, that Pakistani Army used to facilitate the fighters

16 going in and out of Kashmir because it's -- the line of control is

17 heavily patrolled by both sides which divides the Kashmir region,

18 so it's difficult to go in and out.

19       MR. KROMBERG:  Your Honor, if I could -- we can enter a

20 stipulation at this time, I left it in my office, but in

21 essence -- and will bring it later -- but in essence, it is that

22 until December 2001, at various times, various operations of

23 Lashkar-e-Taiba were facilitated by various parts of the Pakistani

24 government.

25       THE COURT:  Mr. Yamamoto, any objection to that

**J.A. 452**

**Aatique - cross**

1  stipulation?

2          MR. YAMAMOTO:  No, thank you.

3          THE COURT:  All right, that's fine.

4  BY MR. YAMAMOTO:

5  Q.  Now, you were shown a number of LET posters.

6  A.  Yes.

7  Q.  That was the first time you'd seen those posters or you'd

8  maybe seen -- they'd shown them to you before, but --

9  A.  The first time I saw LET posters was when Ibrahim Al-Hamdi

10 came back, at his home in Northern Virginia.

11 Q.  At Al-Hamdi's home?

12 A.  Yes.

13 Q.  Okay.  Dr. Al-Timimi didn't have any LET posters, did he?

14 A.  Not that I know of.

15          MR. KROMBERG:  Objection, Judge.  The witness has no

16 knowledge of whether Dr. Al-Timimi had posters.

17 BY MR. YAMAMOTO:

18 Q.  To your knowledge.

19          THE COURT:  All right, rephrase the question.

20 BY MR. YAMAMOTO:

21 Q.  To your knowledge, Dr. Al-Timimi had no LET posters?

22 A.  Not to my knowledge.

23 Q.  To your knowledge, Dr. Al-Timimi didn't see the LET posters

24 you saw?

25 A.  To my knowledge -- I don't know that he saw them or not.

**Aatique - cross**

1   Q.   Dr. Al-Timimi doesn't speak Urdu, does he?  He speaks Arabic.

2   A.   I don't think he can speak Urdu.

3   Q.   So he wouldn't be able to read -- withdraw that.

4        You decide you want to go get some training but you're

5   not going on to fight; is that right?

6   A.   Until, until that meeting and for some time after, it was my

7   intention not to go fight except for some time after that meeting,

8   during that meeting and after the meeting on the 16th.

9   Q.   At the meeting with Royer, your intention was to go train,

10  come back?

11       MR. KROMBERG:  Objection, Judge, because Royer was at

12  more than one meeting.

13       THE COURT:  I think you need to make it specific what

14  meetings you're talking about.

15  BY MR. YAMAMOTO:

16  Q.   At the meeting at Royer's house in August, you made plans to

17  go train for up to a week, come back?

18  A.   At that time in August of 2001, it was not my intention to go

19  and fight.

20  Q.   You made plane reservations to leave in late August/early

21  September?

22  A.   Yes.

23  Q.   That plane reservation was for the 19th of September?

24  A.   That's correct.

25  Q.   Your tickets didn't come until the 10th or 12th or somewhere

**Aatique - cross**

1  in there, right?

2  A.    Actually, I received them after 9/11, maybe the 17th or --

3  Q.    17th?

4  A.    That's when the FedEx came.  It got disturbed because of

5  9/11.

6  Q.    But the tickets and the reservations had been made

7  previously?

8  A.    Yes.

9  Q.    Now, you intended to go by yourself, right?

10  A.    Yes.  I was planning to go alone, yeah.

11          MR. KROMBERG:  Objection, Judge.  Again, we need to know

12  intent when?

13          THE COURT:  Yes.

14          MR. YAMAMOTO:  I will ask the next question that will

15  help him, Your Honor.

16  Q.    Ultimately, Khan went with you?

17  A.    On the 19th, ultimately, he went with me, yes.

18  Q.    Now, it turns out that when you went to that meeting at

19  Kwon's on the 16th, you told people you were going to LET camp and

20  that you could -- they could go with you and you would help them

21  get ready to go.

22  A.    Yeah.  After, after Ali Timimi had left and -- actually, even

23  while he was here and during his presence and also after he had

24  gone, because I told people that I'm going anyway and I have these

25  arrangements, so I told them if anybody wants, they can go with

312

**Aatique - cross**

1   me.  I can give them a ride from Pennsylvania onwards.

2   Q.   That was your decision.  You just told everybody, "I'm going;

3   you can come with me"?

4   A.   You mean my decision to tell the people at that point?

5   Q.   Right.

6   A.   Yes.

7   Q.   Nobody told you to tell anybody.

8   A.   Nobody told me to share that with anybody, yes.

9   Q.   Your actions influenced some other people to go, like Khan?

10  A.   Say it again?

11  Q.   Your actions, your telling them that you were going to camp

12  influenced people like Khan to go to camp?

13  A.   If you ask my opinion about individuals, I'm not so sure

14  about Masaud Khan, but probably influenced more Kwon and Hasan.

15  Q.   Your saying you're going influenced Kwon and Hasan you're

16  saying?

17  A.   Yeah.

18  Q.   You think that's why they made their arrangements to go about

19  the same time as you, to meet you up in camp?

20  A.   That may be one of the reasons, although, I mean, I would say

21  that the whole atmosphere of the talk encouraged everyone to go.

22  Q.   You didn't tell people you were only going to go for a week,

23  did you?

24  A.   No, I stayed quiet.  I mean, if, if people got the impression

25  that I was going to go and fight somewhere, I let that be at that

**J.A. 456**

**Aatique - cross**

1  point of time.  I did not, I did not tell anybody that, okay,
2  whatever, whatever he's saying, I mean, I'm going to come back.  I
3  did not tell them that.
4  Q.   You didn't tell them that, but that's what you intended, that
5  you were coming back?
6  A.   Well, at that point of time, I was in an excited state of
7  mind, so I thought, okay, I'm going there anyway, so let me see
8  what happens.  Let me go there.
9  Q.   You were in an excited state of mind because Royer was
10  talking about it, other people were talking about going and
11  fighting and --
12  A.   It was because basically by the talk that Al-Timimi gave.
13  He, he described the events and the way he was forcing things to
14  be.  That, that was the main motivation for me to think, okay,
15  I'll see something if I go to the camp, what's going to happen
16  after that.
17  Q.   "What's going to happen" meaning you wanted to see if what
18  Dr. Al-Timimi was talking about was going to come to pass, these
19  signs of the end of time?
20  A.   Yeah, roughly around -- yeah.
21  Q.   And that's what he was giving you, wasn't he?  He was giving
22  you the lecture about the signs of the end of time.  This is what
23  you're looking for.  This may be the event; it may not be the
24  event.  You need to look for these signs?
25  A.   No, he didn't say, "Look for these signs."  He said with very

**Aatique - cross**

1  certainty that, that now, this is the start of, I mean, now you're

2  going to see the signs and the promises come true, and so you've

3  got to be part of what's going to happen.

4  Q.   But he didn't tell you you had to go be part of the fighting

5  combat.  He also said you could go do hijra and go to another

6  country and live where you could live with good Muslim people?

7  A.   He said -- he recommended these two or three things.  None of

8  them was in exclusion to any other.  He said that go and fight,

9  encourage to be with the mujahideen wherever, and also, of course,

10  he said about that you should leave this country and be with the

11  good folks.

12  Q.   He also said if you couldn't leave the country, didn't want

13  to go fight, you should stay home and pray, and as good Muslims,

14  you would pray and repent to God?

15  A.   He may have said that, but, I mean, I don't have a memory of

16  him saying these things.  He may have said this, but I don't

17  remember.

18  Q.   He didn't tell you you had to go fight.  He didn't tell you

19  you had to go on hijra.

20  A.   He did encourage us to go and be with the mujahideen, take

21  part in these battles if we can or be with the good people or just

22  leave the country.  He gave us these two or three things to do.

23  Q.   He gave you choices?

24  A.   It can be said, yeah.

25  Q.   And for those that couldn't leave, there must have been a

**Aatique - cross**

1  choice for them?

2  A.   I don't remember.  I mean, I remember him very strongly

3  encouraging to leave.

4  Q.   But not necessarily leave to fight.  To leave, go hijra to

5  another country?

6  A.   Yeah.  Not necessarily to fight but, I mean, to fight or to,

7  or to leave the country or to be with the better people at other

8  places.

9  Q.   And in fact, Donald Surratt -- Idris Surratt took his family

10  and went to Egypt?

11         MR. KROMBERG:  Objection, Judge.  Donald Surratt didn't

12  come to this meeting on the 16th, as we've heard.

13         THE COURT:  All right.

14         MR. YAMAMOTO:  I'll withdraw the question, Your Honor.

15         THE COURT:  Sustained.

16  BY MR. YAMAMOTO:

17  Q.   When you went to that meeting -- let me back up before the

18  meeting.

19         When 9/11 happened --

20  A.   Yes.

21  Q.   -- you were scared?

22  A.   That was one of the feelings, yeah.

23  Q.   You were afraid of being attacked?

24  A.   Yeah, I was careful and keeping a low profile.

25  Q.   Because you were Muslim?

316

**Aatique - cross**

1   A.    Yes.

2   Q.    And you -- people could look at you and see that you were of

3   Middle Eastern descent?

4   A.    I'm not exactly from Middle East, but people here generally

5   don't know much about, I mean, don't have a good idea --

6   Q.    People would think you're of Middle Eastern descent --

7   A.    Yeah.

8   Q.    -- because of your beard and your demeanor?

9   A.    Yeah.

10  Q.    They'd think you were Muslim?

11  A.    Um-hum -- yes.

12          THE COURT:    Thank you.

13  BY MR. YAMAMOTO:

14  Q.    When you went to this meeting on the 16th, everybody felt the

15  same, didn't they?  Everybody was scared?

16  A.    Yes.  It can be said, yeah.  People were apprehensive and,

17  like, "scared" may be a strong word, but you can say people

18  were --

19  Q.    Fearful?

20  A.    Fearful, yeah.

21  Q.    What did you-all talk about before Dr. Al-Timimi came?  Is

22  this what you were talking about?

23  A.    Before he came, there was very little talk actually.  I

24  reached there, and we just -- I prayed my sunset prayer, and then

25  some minutes later, Yong Kwon left.  At that time, I did not know

**Aatique - cross**

1   where he was going.

2   Q.   Okay.  Now, Masaud Khan talked about he was afraid, he was

3   afraid that, that Muslims were going to be attacked in their

4   homes, have their homes burned, and the Muslims being chopped to

5   pieces like they were in India, right?

6   A.   I remember him saying something along these lines.

7   Q.   Other people said other things similar to that?

8   A.   Not perhaps in such strong words but, but I remember somebody

9   saying, "What should we do?  Should we gather our families?"  I

10  don't remember who said.  Something like that.

11  Q.   So the feeling was we're Muslims, we're in the United States,

12  we're subject to possible attack by other Americans.  What should

13  we do?

14  A.   Yes.  That's one of the subjects, yeah.

15  Q.   And when Dr. Al-Timimi, that was some of the things he was

16  asked:  "What should we do?  Should we stay?  Should we go?  What

17  should we do?  Are we in danger?"

18  A.   I think, I think somebody put a question along these lines to

19  him, yeah, what should we be doing?

20  Q.   And this was part of what he was telling you, about going on

21  hijra, going to a safe Muslim country?

22  A.   In nearly all of his recommendations answered that way, so

23  one of his three recommendations, the recommendation of hijra, of

24  course, also answers that way of if you're worried about your

25  safety here, then leave.

318

# Aatique - cross

1  Q.   Leave and go to a Muslim country?

2  A.   Yeah.

3  Q.   With other Muslims to be safe?

4  A.   Yes.

5  Q.   That's what he's talking about:  being safe, protecting

6  yourself and your family?

7  A.   The way he talked, the topic of discussion was more about the

8  impending attack on Afghanistan and that -- it was more along

9  these lines when he start talking.  It was not exactly about how

10 we protect ourselves here.

11 Q.   But he was talking about how you protect yourself, talking

12 about leaving the country to protect yourself?

13 A.   Yes.  I mean, that was a part of his talk, yeah.

14 Q.   Well, he's also saying some, some scholars, some people would

15 say that you should go do some other stuff, do combat?

16 A.   Say it again?

17 Q.   Withdraw it.

18        Kwon's apartment is on the second floor, isn't it?

19 A.   It's not on -- I think it's top floor of his -- it's a three-

20 or four-floor building, apartment building.

21 Q.   Three or four --

22 A.   I think it's on the top floor.  I remember that.

23 Q.   On the third or fourth floor?

24 A.   Yeah.

25 Q.   Now, it was never your intention to go train and fight

**J.A. 462**

# Aatique - cross

1  against the United States?

2  A.    Not explicitly.  I mean, I never explicitly imagined any

3  place or any, any enemy that I'd fight against, but at that

4  meeting and for maybe a couple of days later, I was thinking,

5  okay, I'm going to go there, and I'll see what happens, and I may

6  go and fight somewhere.  That was my intention.

7  Q.    That you may fight somewhere but you didn't know where?

8  A.    I never imagined any specific enemy or specific place.

9  Q.    You know Nabil Gharbieh?

10 A.    Yes.

11 Q.    He came for a few minutes at that meeting?

12 A.    Yes, maybe couple of minutes.

13 Q.    He came with somebody else?

14 A.    Yes.

15 Q.    That other person came in, you were all sitting in a group,

16 he sat down with you?

17 A.    No.  He just came, and he did not sit down.  He just left

18 within a couple of minutes.

19 Q.    So they just came and were gone immediately?

20 A.    Yes.  I mean, he came, and we exchanged greetings, and what I

21 remember is that he -- I mean, it was something like people gave

22 him looks or something like that that he -- from what I recall, he

23 sort of understood that, and he just left immediately with that

24 person.

25 Q.    You're talking about -- I'm talking about not Gharbieh.  The

1  person that came with him --

2  A.   Um-hum.

3  Q.   -- came and gave greetings, and everybody greeted him?

4  A.   Yeah.  Of course, we greeted both of them, and they greeted

5  us.

6  Q.   And then a few minutes later, they just left?

7  A.   Not even few minutes.  I'd say maybe one or two minutes.

8  Q.   So they were there for a minute or two at most?

9  A.   Yes.

10 Q.   Now, the decisions you made, you made yourself.  Nobody told

11 you what to do?

12       MR. KROMBERG:  Objection, Your Honor.  That's a compound

13 question.

14       THE COURT:  I also think it's been asked and answered

15 several times now.

16       MR. YAMAMOTO:  Okay.

17       THE COURT:  I'm going to sustain the objection.

18 BY MR. YAMAMOTO:

19 Q.   You met with Randall Royer?

20 A.   Many times.

21 Q.   After you met with the FBI?

22 A.   Once, yeah.

23 Q.   They asked you to meet with him?

24 A.   Yes.

25 Q.   They gave you some Taiba Bulletins to show him?

**Aatique - cross**                                    321

1   A.    Yes.

2   Q.    He looked at them, and he told you that he had set up the

3   website --

4             MR. KROMBERG:  Objection, Judge.  Objection to what

5   Randall Royer said if it's introduced for the truth of what

6   Randall -- of what --

7             THE COURT:  I'm going to sustain that objection unless

8   you have --

9             MR. YAMAMOTO:  All I'm introducing it for is that

10  Randall Royer said it, not for the truth of the matter.

11            MR. KROMBERG:  Then what's the relevance of it if he

12  said it if it's not for the truth?

13            THE COURT:  I'm going to sustain that objection.

14            MR. YAMAMOTO:  Your Honor, may we approach?

15            THE COURT:  Yes, sir.

16            (Bench conference on the record.)

17            THE COURT:  Yes, Mr. Yamamoto.

18            MR. YAMAMOTO:  We've gone through this before when I

19  objected to the government introducing Royer's statements during

20  these conversations, and the Court permitted the government to go

21  into them.  Now, I'm not sure why I'm not permitted to go into

22  them at this point.

23            THE COURT:  We heard the -- what is it that Royer --

24  what do you think he is going to say on this?

25            MR. YAMAMOTO:  He is going to say that Royer set up,

**J.A. 465**

## Aatique - cross

1    Royer set up the website for the Taiba Bulletin.

2        THE COURT:  That's not a -- you even said that in your

3    opening statement.

4        MR. KROMBERG:  What's the real agenda, Judge, is they're

5    trying to get Randall Royer in without having Randall Royer

6    testify.  We are not putting in that Randall Royer set up a Taiba

7    Bulletin.  We just want to show that Ali Timimi read the Taiba

8    Bulletin.

9        If they want to have Randall Royer come in and say he

10   set up the Taiba Bulletin, they should call him as a witness.

11       THE COURT:  What's your next question?  Is that the only

12   issue you want?

13       MR. YAMAMOTO:  And the next question is, "What did

14   Randall Royer tell you about the Taiba Bulletin?"

15       And the response should be, because he's told the FBI

16   this, that Randall Royer told him that the bulletins that he put

17   on the website dealt with reconciliation with the United States.

18   And that's it.

19       THE COURT:  The latter statement doesn't add anything to

20   this case, and that's just too speculative.

21       MR. YAMAMOTO:  Well, the government --

22       THE COURT:  The government was allowed to play the tape

23   with Khan because that's actually a tape.  You don't have the

24   hearsay problems of seepage there, but here you're asking this --

25   and I think I had said earlier that if what the government was

**Aatique - cross**

1  trying to do with the Khan statement was to have this witness
2  characterize what Khan said to him, I would have not permitted it
3  in.

4        I did permit the tape because it's a different evidence
5  because it's more trustworthy, but here there's no way of
6  cross-examining or evaluating what Royer would have said to him,
7  and so it is not proper evidence, and it is different from my
8  ruling on Khan for those reasons.

9        So I'm sustaining the objection.

10       MR. KROMBERG:  Thank you, Your Honor.

11       (End of bench conference.)

12  BY MR. YAMAMOTO:

13  Q.  In -- before you went to LET, you looked up LET to see what
14  it was?

15  A.  Yes.

16  Q.  You saw that LET was not associated with Al-Qaeda?

17  A.  From what I knew, it wasn't.

18  Q.  You were not truthful to the FBI about your meeting with
19  Royer, were you?

20  A.  You mean immediately after I came back from the meeting?

21  Q.  Immediately afterwards.

22  A.  Yes.

23  Q.  You didn't tell them that you had told Royer what you were
24  doing?

25  A.  Immediately after when I came back from meeting Royer, I told

**Aatique - redirect**

1  them that I, I did everything as they told me to do.

2  Q.   Right.  And that's not true.  You didn't.  You told Royer

3  what you were doing.

4  A.   Yes.

5  Q.   Subsequently, you did 'fess up?

6  A.   Next day.

7  Q.   Now, subsequently, you entered a plea.

8  A.   Yes.

9  Q.   And as part of that plea, you were told to cooperate?

10  A.   Yes.

11  Q.   In exchange for your cooperation, the government has filed a

12  motion on your behalf asking the Court to reduce your sentence?

13  A.   Yes.

14  Q.   And what you're hoping for with your cooperation is that your

15  sentence of -- 126 months, is it?

16  A.   That's correct.

17  Q.   Is going to be substantially reduced.

18  A.   Yes.

19          MR. YAMAMOTO:  Thank you.  Nothing further at this time,

20  Your Honor.

21          THE COURT:  All right.  Any redirect?

22          MR. KROMBERG:  Yes, Your Honor.

23                    REDIRECT EXAMINATION

24  BY MR. KROMBERG:

25  Q.   Mr. Aatique, I apologize in advance; I'm going to be asking

**Aatique - redirect**

1  questions in a rather disorganized way, I'm afraid, because I just
2  wrote down notes to ask on things that Mr. Yamamoto asked you.
3        Mr. Yamamoto asked you whether "Russian Hell 2000"
4  romanticized the people who died in Chechnya; is that right?
5  A.  I mean, Russians died, and the mujahideen died, so it -- I
6  don't remember exactly if I can recall any scene, but generally,
7  those videos, they idealized the Muslim fighters who died fighting
8  Russians.
9  Q.  Not the Russians who died?
10 A.  No.
11 Q.  One of the questions was that, I think, was whether jihad is
12 always to protect Muslims who are oppressed.  Do you recall that?
13 A.  There was some questions along these lines.
14 Q.  Is jihad a -- violent jihad only used for defense?
15 A.  This is a theological question, but from what I know, defense
16 would, of course, be jihad, but it can be an offensive -- in
17 certain circumstances, it can be an offensive word, also.
18 Q.  Where did Islam start?
19 A.  We believe that Adam was the first Muslim.
20 Q.  Where did Muhammad live?
21 A.  Arabia, Mecca.  That's where he was born.
22 Q.  What relationship did offensive jihad have to the spread of
23 Islam from Arabia to elsewhere in the world, if any?
24 A.  This is, this is a historical debate, because a lot of
25 Orientalists accuse that Islam was spread by sword, but we Muslims

**Aatique - redirect**

1  don't believe in that.  There was, of course, as soon as Arabia
2  was united under Muslims, it came in contact with the powers of
3  Persia and Romans, and because Persia was close by, they
4  immediately entered war with Persia, and those regions that
5  immediately came under Muslim rule slowly became Muslims over
6  centuries.
7  Q.   How did Arabia become unified?  Excuse me, what relationship
8  did jihad by the sword have to the unification of Arabia under
9  Islamic rule?
10 A.   Most of them entered after the eighth year of hijrah, when
11 the Mecca was reconquered, because most of the Arabs were watching
12 to see who, who wins this struggle between the new Prophet and the
13 Meccan-established aristocracy, and they lost out, so most of them
14 gave their oath of allegiance to the Prophet before he died.
15 Q.   Was there a question -- do you recall a question from
16 Mr. Yamamoto about -- excuse me, do you recall an answer to a
17 question of Mr. Yamamoto's where you mentioned that mujahideen and
18 jihad was mentioned in a noble manner at lectures at Dar al-Arqam?
19 A.   That's correct.
20 Q.   Can you expand on that?  In what sense were mujahideen
21 mentioned in a noble manner at those lectures?
22 A.   One example, I think I talked about yesterday where Ibn
23 Khatab and the, and the commanders of mujahideen were referred to
24 as, as being a noble example that, I mean, not everybody,
25 everybody can achieve that status along these lines.

**Aatique - redirect**

1   Q.   You mentioned the Salafis.  Is it Salafi or "Salafi"?

2   A.   "Salafi."

3   Q.   "Salafi."  What creed, do you know, is Al-Timimi?

4   A.   To the best of my knowledge, he, he is on the creed of

5   Salafi.

6   Q.   Do all Muslims interpret what it is to be a Muslim the same

7   way as Salafis?

8   A.   No.

9   Q.   Do all Muslims place the same emphasis on jihad as being an

10  external struggle versus an internal struggle as the Salafis do?

11  A.   No.

12  Q.   Do they -- on the range, in the spectrum of Muslims, are the

13  Salafis the ones who tend to put more emphasis on the external

14  jihad versus the internal jihad?

15  A.   I won't say external versus internal, but, but Salafis

16  generally stress jihad more than non-Salafis.

17  Q.   Are there -- is there any sect of Islam or any people who

18  call themselves Muslim who emphasize violent jihad more than

19  Salafis?

20         MR. YAMAMOTO:  Your Honor, these are all his opinions.

21         THE COURT:  Well, I'll warn the jury that this witness

22  is not an expert witness; however, he is a lifelong member of that

23  faith, and just the way a Christian or a Jew, to the extent

24  they've been a lifelong member of their faith, could explain their

25  understanding of their faith, I think he has sufficient background

## Aatique - redirect

1  to answer these questions, and if there are expert witnesses in
2  this case or others who disagree, that can be brought out during
3  the trial.

4          MR. KROMBERG:  Thank you, Your Honor.

5          THE COURT:  Overruled.

6  BY MR. KROMBERG:

7  Q.   On the spectrum of belief, is there any -- a group of people
8  who call themselves Muslims who are -- place more emphasis on
9  violent jihad than the Salafis?

10 A.   Among the big groups, I don't know of any.

11 Q.   Go back just a second.  When you mentioned that it was said
12 at Dar al-Arqam that Khatab was a noble example of mujahideen, who
13 said that at Dar al-Arqam?

14 A.   Ali Timimi.

15 Q.   There was -- correct me if I'm wrong:  I think you made a
16 response to Mr. Yamamoto that Timimi mentioned in a lecture
17 someone who left for Chechnya; is that correct?

18 A.   I don't exactly recall he left for Chechnya, but it was at a
19 talk at AOU, and he mentioned something like, "I just talked with
20 a person yesterday" -- or today, something like that -- "and
21 he" -- and the way he said was that he, he just, he just wanted to
22 die shaheed, and he left -- he's leaving, something like that.

23 Q.   And this was Ali Timimi saying this?

24 A.   Yes.

25 Q.   Did Ali Timimi characterize what this person was doing as

**Aatique - redirect**

1   something noble or not noble?

2   A.   He mentioned that in a very praiseworthy way.

3            THE COURT:   I'm sorry, in a what?

4            THE WITNESS:   Praiseworthy.

5   BY MR. KROMBERG:

6   Q.   I think you said -- correct me if I'm wrong -- that Ali

7   Timimi had no direct impact on your initial decision to go to the

8   camp.

9   A.   Yes.

10  Q.   That that was made before 9/11.

11  A.   Yes.

12  Q.   Did he have any indirect impact?

13  A.   Well, as I testified before, after 9/11, I wasn't -- I became

14  unsure about whether this is a good idea to go there right now or

15  not, but after the talk that I listened at Kwon's home, the talk

16  firmed up my decision that, okay, I should go.

17  Q.   Mr. Yamamoto asked you whether to your knowledge, Ali Timimi

18  had any LET posters in his house.  Had you ever been to his house?

19  A.   No.

20  Q.   In response to one of Mr. Yamamoto's questions -- correct me

21  if I'm wrong -- I think you said that you do not think that you

22  influenced Masaud Khan in his decisions to go to Pakistan and LET;

23  is that right?

24  A.   Maybe not to that extent because --

25  Q.   Why do you -- my question is, first question is is that

**Aatique - redirect**

1  correct, that that's what you said?

2  A.   Yes.

3  Q.   Okay.  The second question is why do you say that you don't

4  think you influenced Khan in his decision?

5  A.   Because in that meeting, he was -- it seemed that he was

6  enthusiastic.  I remember him being more enthusiastic than others

7  and more, more firmed up.  And I also thought that since long time

8  before, when the Russians and Communists were there, he had fought

9  there.

10       So this -- for a person who has never been to such

11  things, it will be a -- I mean, for him, it's more easy to be

12  influenced by me than a person who's there, he knows everything,

13  and he can make decisions on his own.

14  Q.   Did Masaud Khan speak Urdu?

15  A.   Yes.

16  Q.   He had family in Pakistan?

17  A.   Not immediate family.  Only his younger brother was there in

18  Karachi.

19  Q.   Did Masaud Khan look up to you as a scholar?

20  A.   No.

21  Q.   Were you -- did he look up to you at all?

22  A.   I don't know -- I really didn't hang out with him that much.

23  I met him perhaps once in Blacksburg and once or twice before

24  that, but very little contact.  I did not have a lot of contact

25  with him.

# Aatique - redirect

1  Q.   Did Masaud Khan appear to look up to Ali Timimi?

2  A.   Yes.

3  Q.   Why do you think that you influenced Kwon -- excuse me, in

4  what sense do you believe that you influenced Kwon and Hasan in

5  their decisions?

6  A.   That's, that's speculation on my part, but I think that when

7  I -- when the talk happened and I told, and I told everybody,

8  "Well, I'm going anyway," so they might have realized that when

9  he's going, so why should we stay behind?  Something like that.

10  Q.   Did Kwon look up to you as a scholar?

11  A.   No.

12  Q.   Did Hasan look up to you as a scholar?

13  A.   No.

14  Q.   Did they appear to look up to Ali Timimi as a scholar?

15  A.   Yes.

16  Q.   Whose -- who had more influence on them in your view, you or

17  Ali Timimi?

18  A.   Ali Timimi, of course.

19  Q.   Why do you say "of course"?

20          MR. YAMAMOTO:  Your Honor, this is all speculation at

21  this point.

22          THE COURT:  Well, you opened it on the direct -- I mean,

23  in the cross examination, so this is not inappropriate for

24  redirect.  Overruled.

25  BY MR. KROMBERG:

**J.A. 475**

## Aatique - redirect

1  Q.   Mr. Aatique, why do you say of course Ali Timimi would have

2  more influence over them than you?

3  A.   I mean, I'm, I'm not a scholar in any way, and I've never

4  studied religion formally, and I don't think I have, I have any

5  credentials to give talks or being a lecturer or something.

6  Q.   Was your relationship to Kwon and Hasan of being a peer?

7  A.   Yes, that's more like it.

8  Q.   Was -- how was that different from their relationship with

9  Ali Timimi?

10  A.   Well, people of the Dar al-Arqam group used to look up at him

11  as a scholar, and he was one of the regular lecturers there, so

12  they looked up to him for advice and guidance.

13  Q.   Was Randall Royer considered to be a scholar?

14  A.   No.

15  Q.   Was Randall Royer considered to be a peer of you, Kwon, and

16  Hasan?

17  A.   More so.  He did have some fighting experience, but other

18  than that, he was considered one of the, one of the regular

19  attendees.

20  Q.   What impact on the change in your mind that occurred at that

21  9/16 meeting, what impact did Randall Royer have on the change in

22  your mind at that meeting?

23  A.   None, because, I mean, he, he had helped me get the contact

24  from before, but once I got the phone number and the contact from

25  him and he asked me to come to that meeting later on, I really did

**Aatique - redirect**

1   not have any meaningful interaction with him.

2   Q.   You mentioned the Qoqaz website.  Is that also known as the

3   Kavkaz website?  Is that a related website?

4   A.   These are related websites but two different websites.

5   Q.   Are either one related to the Azzam website?

6   A.   I think they are, they're interlinked websites, but they are

7   two different websites.

8   Q.   And Azzam is A-z-z-a-m?

9   A.   Correct.

10  Q.   Was Azzam one of the websites that was well known in your

11  circles?

12  A.   It wasn't as well known as Qoqaz, but it was known.

13  Q.   At any of the lectures that you ever went to at Dar al-Arqam

14  or American Open University, did Ali Timimi ever tell people to

15  close the blinds?

16  A.   Say it again?

17  Q.   At any of the lectures you ever went to where Ali Timimi

18  spoke other than on September 16, 2001, did Ali Timimi ever tell

19  people to close the blinds?

20        MR. YAMAMOTO:  Your Honor, the witness should be asked

21  whether there were blinds at the Dar al-Arqam anyway.

22        THE COURT:  Well, that would be a follow-up question

23  that you can do on recross.

24        THE WITNESS:  No, I don't ever recall.

25  BY MR. KROMBERG:

**Aatique - redirect**

1  Q.  Draw the curtains?

2  A.  No.

3  Q.  People should turn off their cell phones?

4  A.  No.

5  Q.  Unplug phones?

6  A.  No.

7  Q.  Unplug answering machines?

8  A.  No.

9  Q.  Did Ali Timimi at any lecture you'd ever been to other than

10  September 16, 2001, ever exhibit any concern that outsiders might

11  hear what he was saying?

12  A.  I don't remember.

13  Q.  Mr. Yamamoto was asking you about what Ali Timimi said

14  about -- on the 9/16 meeting about safety and how people should

15  plan for their safety.  What relationship on 9/16 temporally, in

16  time, what relationship was there between the questions that were

17  asked of him and the talk that he gave?

18  A.  Initially, initially, when he came, I think people started

19  asking him questions, and he had mentioned something like, okay,

20  everybody ask one question, and then I'm going to talk.

21        So we were sitting in circles.  Everybody said -- asked

22  a question, and then he talked uninterrupted for a duration, I

23  think, except when --

24  Q.  He talked --

25  A.  Uninterrupted for some duration except for a couple of

**J.A. 478**

## Aatique - redirect

1 minutes when Nabil came. Then at the end -- then the food was
2 served, and it was more a free-flowing discussion. People were
3 asking questions then.

4 Q.  To your recollection, was the question about what we should
5 do to protect ourselves, was that one of the questions before the
6 talk or after the talk?

7 A.  Not exactly this question but a similar question, I think,
8 was asked by Masaud Khan, what should we be doing here, something
9 like that.

10 Q.  And was that before the main lecture, the main presentation,
11 or after?

12 A.  This question, I think, was asked, asked before.  I think
13 that was Masaud Khan's question, but something -- I don't think
14 anything similar along these lines was discussed after, later on.

15 Q.  When Ali Timimi said that each of you got one question, why
16 didn't anybody say, "No, I want more than one question"?

17          MR. YAMAMOTO:  Objection, Your Honor.

18          THE COURT:  I'm going to sustain that objection.

19 BY MR. KROMBERG:

20 Q.  Mr. Aatique, why didn't you say, "Why should we be limited to
21 only one question apiece?"

22 A.  As I understood, he wanted -- I mean, that's my
23 understanding, that the reason for that may be that he wanted to
24 talk uninterrupted for some time and -- so that he may have some
25 preconceived talk in his mind, and he --

**Aatique - redirect**

1            MR. YAMAMOTO:  This is all his --

2            THE COURT:  That's speculation.

3            MR. KROMBERG:  Well, Judge, I was asking why he did not

4  ask -- say he wanted to ask more than one question, and this is

5  his answer.

6            THE COURT:  Did you have more than one question you

7  wanted to ask that night?

8            THE WITNESS:  No.  Not -- I mean, I had one basic

9  question, which I put to him.

10           THE COURT:  All right, I think that's all he can answer.

11           MR. KROMBERG:  Okay.

12  Q.   Has Kwon ever told you, "You can ask him one question, and

13  then he's going to talk to you"?

14  A.   Say it again?

15  Q.   Has Kwon ever told you, "You can have one question, and then

16  he's going to give you a lecture"?

17           MR. YAMAMOTO:  Objection.

18           THE COURT:  I'm going to sustain that objection.  Move

19  on to a different line of questioning, Mr. Kromberg.

20           MR. KROMBERG:  Okay.

21  Q.   In response to Mr. Yamamoto's questions, you were talking

22  about, I think, what Timimi said about leaving the country and

23  being with the good -- or being with the good people.  If you're

24  leaving the country -- what's the relationship between leaving the

25  country and being with good people?

**Aatique - redirect**

1  A.    When -- this was, I mean, this is what I understood out of
2  his talk, that --

3          MR. YAMAMOTO:  Objection as to what he understood, Your
4  Honor.

5          THE COURT:  It should only be what Dr. Al-Timimi said.

6          THE WITNESS:  That's what I'm saying, my impression of
7  him saying, was that he was recommending that you should either, I
8  think the most better of the options that you can take is to, is
9  to go and join the mujahideen, go and fight.

10         And also, when he had said that, okay, fighting might be
11 in one of these three places, so you should go there and be with
12 the good people, an example was giving of LET -- in Pakistan, the
13 example was given of the LET people.

14         And also, the topic of hijra came up, generally leaving
15 this country.  So one may also leave this country, just leave the
16 country and leave to the Muslim lands.

17 BY MR. KROMBERG:

18 Q.    Mr. Aatique, is the concept of hijra inconsistent in any way
19 with being with the good people?

20 A.    No, it's not inconsistent.

21 Q.    Is it inconsistent in any way with engaging in violent jihad?

22 A.    Hijra can be a preceding thing before you go and -- go to
23 jihad.

24 Q.    Mr. Yamamoto asked you did you ever intend to fight against
25 the United States, I think.  Who did you understand from Timimi's

**Aatique - redirect**                          338

1  talk on September 16 was the enemy to be fought against in

2  Afghanistan?

3        MR. YAMAMOTO:  Objection to what his understanding was

4  of enemy.

5        THE COURT:  We need to confine this, it's getting too

6  far afield, to what was said, all right?  And then in response to

7  what was said, you can ask what was done, all right?  But

8  that's -- so I'll sustain the objection to that question.

9  BY MR. KROMBERG:

10 Q.  Mr. Aatique, under your understanding of Islamic law, when an

11 esteemed scholar tells you it's obligatory to fight on behalf of a

12 group of Muslims, is it part of your religion to heed that call?

13       MR. YAMAMOTO:  Objection, Your Honor.  He's asking again

14 for his understanding.

15       MR. KROMBERG:  Judge, Mr. Yamamoto asked at length --

16       THE COURT:  Wait, wait, yes.  I think you did get a

17 great deal into through this witness his understanding of basic

18 tenets of Islam.  I've already ruled that as a practitioner of the

19 religion, he can testify about his understanding, and that can

20 certainly be probed with other witnesses or on recross.

21 Overruled.

22 BY MR. KROMBERG:

23 Q.  Mr. Aatique, in your understanding of Islamic law, when an

24 esteemed scholar tells you it's obligatory to fight on behalf of a

25 group of Muslims under attack --

339

**Aatique - redirect**

1        MR. YAMAMOTO:  He's asking now a hypothetical.

2        THE COURT:  I think that it's not when; it's if.  "If"

3  is a proper way of phrasing that question.

4        MR. YAMAMOTO:  He's still asking a hypothetical.

5        THE COURT:  Well, no, because he's asking again within

6  the context of the religious understanding that this man has.  I'm

7  going to permit that.  Go ahead.

8  BY MR. KROMBERG:

9  Q.   Mr. Aatique, if an esteemed scholar tells you it's obligatory

10 to fight on behalf of a group of oppressed Muslims, what does your

11 religion say you should do?

12 A.   If, if, if it's a scholar that has correct religious beliefs

13 and understanding and right standing among such people and if it's

14 his determination that some people should be -- I mean, that

15 Muslims should go and fight on behalf of such people, then such

16 calls should be heeded.

17 Q.   In September 2001, was Ali Timimi in your view such a

18 respected scholar?

19 A.   Yes.

20 Q.   Mr. Yamamoto in a question to you asked about whether if the

21 signs of the end of time had not occurred, doesn't that mean that,

22 that the situation on 9/16 was not the time for fighting?  Is that

23 correct?

24 A.   Could you repeat that?

25 Q.   Let me try it again.  Do you recall a question being asked of

**J.A. 483**

**Aatique - redirect**

1  you about whether the signs of the end of time had already

2  occurred as of 9/16, and your response something to the effect of,

3  well, there are things that happened before the signs of the end

4  of time?

5  A.    Yeah.

6  Q.    Could you expand on that?

7  A.    Yeah.  It's been classified as major signs and minor signs.

8  Major signs is about which there is no doubt, like if --

9  Q.    Say again?

10 A.    Major signs are considered signs about which there is no

11 doubt, like the appearance of Mehdi or the coming down of Jesus,

12 son of Mary.  But the minor signs about which there can be doubt,

13 like the increase in the corruption and the increased wars and the

14 increased national calamities and the, and the decline in the

15 religious practice of the Muslims, so it's -- a lot of people

16 believe that all the minor signs have occurred.

17 Q.    That the minor signs that precede the major signs --

18 A.    Have occurred.

19 Q.    -- have occurred?

20 A.    Yes.

21 Q.    What relationship did the minor signs that you just talked

22 about have, if any, to what Ali Timimi talked about on September

23 16?

24 A.    Could you repeat that?

25 Q.    What relationship was there between the minor signs that

## Aatique - redirect

1    you've just described, was there to the talk that Ali Timimi gave

2    on September 16 about now you'll see the signs?

3    A.    It was all -- when he says the signs and promises are coming

4    true, I understood it to mean in the context of what he was

5    saying, what he had said before in The Signs of the End of Time

6    series, and he's now continuing on that, on that theme and saying,

7    "Now you're going to see bigger signs or major signs."

8    Q.    Was it -- is it correct that you understood what it -- the

9    war that was coming and looming in Afghanistan to be one of the

10   minor signs?

11   A.    What I understood was that -- is that he's saying that this

12   will turn out to be one of the major events or one of the major

13   signs before the end of time, because one of the signs is a big

14   battle between the, between the Muslims and the Western

15   Christians, an unparalleled battle.

16   Q.    A what battle?

17   A.    I mean, a battle which has no other battle in the history.

18   Q.    An unparalleled battle?

19   A.    Yes.

20   Q.    Between Muslims and Christians?

21   A.    Muslims and Christians, yeah.

22   Q.    In response to one of Mr. Yamamoto's questions, you mentioned

23   the khalif?

24   A.    Yes.

25   Q.    What is the khalif?

## Aatique - redirect

1  A.    Khalif literally means, the term is applied to a Muslim ruler
2  who's who has inherited, I mean, because Prophet Muhammad --
3  Sallallahu alaihi wa sallam -- was the last prophet, so after him,
4  there will be khalifs in the sense they inherit the right to --
5  they inherit the authority of rulership of the Muslims, and
6  usually khalif is considered one.  There can't be more than one
7  khalif.

8  Q.    When was the last khalif?

9  A.    Symbolically speaking, people used to consider the Ottoman
10 ruler and the Ottoman Empire, and he -- after -- when the Ottoman
11 Empire began and once they start controlling parts of the Arabian
12 peninsula like the cities of Mecca and Medina, after some times,
13 because there was no other khalif -- I don't recall the exact
14 history, but they assume that -- the Ottoman ruler assumed the
15 title of khalif somewhere around these middle centuries, like 15th
16 Century.

17 Q.    And so the Ottoman Empire fell after World War I?

18 A.    Yeah, 19- -- early '20s.

19 Q.    From 1920 until September 11, 2001, who, if anyone, was
20 considered the khalif?

21 A.    Nobody.

22 Q.    Okay.  Who, if anyone, in 2000 and 2001 was discussed in the
23 circle -- in Dar al-Arqam circles that you traveled in as
24 potentially the first khalif since the Ottoman Empire?

25             THE COURT:  Is there an objection?

**Aatique - redirect**

1          MR. YAMAMOTO:  Objection, Your Honor.

2          THE COURT:  And the basis for the objection?

3          MR. YAMAMOTO:  Again, if he knows.

4          THE COURT:  Yes.  The question is if you know.  In other

5   words, when you were present at any of those meetings, was this

6   particular topic discussed?

7          THE WITNESS:  I discussed it with the other individual

8   who -- I mean, I discussed it with Yong Kwon, and he informed me

9   of some other discussion in a bigger setting where he told me that

10  Al-Timimi was there.

11         THE COURT:  Well, I'm not going to let that come in.

12  Strike that, Ladies and Gentlemen.  That's not appropriate.

13         MR. KROMBERG:  Judge, what I'm getting at, what I'm

14  trying to get at is if --

15         THE COURT:  Only if this witness was present when the

16  topic was being discussed can he properly talk about it.

17  BY MR. KROMBERG:

18  Q.   Have you seen on the websites that you've talked about before

19  discussions about who, if anyone, was the Khalif?

20         THE COURT:  Is there an objection to that question?

21         MR. YAMAMOTO:  Objection, Your Honor.

22         THE COURT:  And what is the objection?

23         MR. YAMAMOTO:  Well, now we're going outside the scope

24  of Dr. Al-Timimi.

25         THE COURT:  All right.  This is not just on any website.

### Aatique - redirect

```
 1              MR. KROMBERG:  Qoqaz, Azzam, Kavkaz, Judge.

 2              THE COURT:  All right.  On those three websites, did you

 3   see any discussion of a khalif issue?

 4              THE WITNESS:  Definitely not on Qoqaz or Kavkaz.  Maybe

 5   something on azzam.com about Mullah Omar being -- "khalif" is a

 6   very big term for anybody to assume.  So maybe there was some,

 7   some discussion there or some news article referring to him as the

 8   Chief of Believers.

 9              THE COURT:  You say maybe.  Do you know or don't you?

10              THE WITNESS:  I'm not 100 percent certain if I read it

11   on azzam.com or not.

12              THE COURT:  All right.

13              THE WITNESS:  Maybe on some other websites, not on these

14   three.

15   BY MR. KROMBERG:

16   Q.   What other websites?

17   A.   There were, there were some websites some time ago which were

18   dedicated to keeping track of Taliban.  I think they were based

19   from Pakistan.

20              MR. YAMAMOTO:  These aren't the websites we're talking

21   about, Your Honor.  I move to strike all of this.

22              THE COURT:  This is getting too far afield.  I'm

23   sustaining the objection.  Let's move on.

24              MR. KROMBERG:  That will be it.  Thank you.

25              THE COURT:  All right, any recross?
```

**Aatique - recross**

1                    RECROSS EXAMINATION

2  BY MR. YAMAMOTO:

3  Q.    Did you know that Khan had ordered a coat prior to this

4  meeting?

5  A.    Say it again?

6  Q.    Did you know that Khan had ordered a coat to take to the LET

7  camps prior to this meeting?

8  A.    I knew about Yong Kwon, not Masaud Khan.  I knew about Yong

9  Kwon, I knew that he was going to order something, and he was

10  going to order for one or two more other people, also.

11  Q.    That Kwon was ordering coats for people to --

12  A.    Yeah.  Something like that, yeah.

13  Q.    -- wear at the camps prior to the meeting?

14  A.    Yes, for high altitude, cold weather.

15  Q.    Being a martyr is respected or looked favorably upon by the

16  Koran and the hadeeths, isn't it?

17  A.    Yes.

18  Q.    Fighting in Chechnya at the time in 2000-early 2001 was

19  looked upon as a noble cause?

20  A.    Yes.

21  Q.    When Kwon and Hasan brought Khan to your house the night

22  before you left, you mentioned that Kwon told you that they were

23  going to go get their visas and tickets the next day?

24  A.    Yes.

25  Q.    And they also talked to you about what to do with

**J.A. 489**

**Aatique - recross**

1  authorities; is that right?

2  A.   I remember them advising me not to carry anything which might

3  identify me as being a religious Muslim, something like that.

4  Q.   That's right.  They told you not to take a Koran or to

5  wear -- take camouflage boots?

6  A.   Yeah.

7  Q.   Did they tell you what to do in case authorities stopped you,

8  to cry and ask for your mother?

9  A.   No.

10 Q.   Did they talk about doing anything else?

11 A.   We talked about a lot of things, but, I mean, you mean -- it

12 was -- in a religious topic, it was discussed that, what to say if

13 the authorities stopped.  Me and Masaud were immediately going the

14 next day, so we discussed this about what he was going to say and

15 what I was going to say if we got stopped.

16 Q.   You're Pakistani?

17 A.   Yes.

18 Q.   He's Pakistani?

19 A.   No, he is a U.S. citizen.

20 Q.   Okay.  So there was no problem with you going?

21 A.   Not -- I mean, that's what I was expecting, that I'm going

22 back to my country.

23 Q.   So Kwon had mentioned they were picking up their visas.  They

24 had already gone to the embassy and were picking up their visas

25 the next day?

**Aatique - recross**

1  A.    Yes.

2          MR. KROMBERG:  Objection, Judge.  This is beyond the

3  scope of redirect.

4          THE COURT:  It is.  I was waiting for that objection.

5  I'll sustain it.

6  BY MR. YAMAMOTO:

7  Q.    Mr. Kromberg was asking you about the end of time battles,

8  and you were trying to talk about the war between Muslims and

9  Christians.  That happens after the Mehdi comes, right?

10  A.    I don't know the same time line, but it's around the same

11  time when Mehdi is here but before Jesus comes down.

12  Q.    But this is a sign you look for, for the Mehdi to come?

13  A.    I don't know.  I don't know what's the time frame of Mehdi's

14  appearance and the battle between Muslims and the Western

15  Christians.

16  Q.    The Mehdi hasn't appeared at this point yet, has he?

17  A.    Not that I know of.

18          MR. YAMAMOTO:  Thank you.  Nothing further.

19          THE COURT:  All right.

20          MR. KROMBERG:  Just to clarify --

21          THE COURT:  No, no, no, no.  That would be the fifth

22  shot.

23          MR. KROMBERG:  If I may, Judge?

24          THE COURT:  No.

25          MR. KROMBERG:  Can we approach?

348

1          THE COURT:  Direct, redirect --

2          MR. KROMBERG:  It's something, a new matter that was

3   brought up here that was not brought up on --

4          THE COURT:  It doesn't make any difference.  You get two

5   shots at it.

6          Is anyone going to recall this witness?

7          MR. KROMBERG:  I think I want to recall him to ask a

8   question, Judge.

9          THE COURT:  No, you're not going to recall him right

10  now.

11         MR. MAC MAHON:  No, Your Honor.

12         MR. KROMBERG:  Then yes, we want to recall him.

13         THE COURT:  All right.  So the defendant -- sorry, the

14  witness should be excused at this time.

15         Mr. Aatique, you're not to discuss your testimony with

16  anybody who has not yet testified, but you're free to go at this

17  point with the marshal.

18                      (Witness stood down.)

19         THE COURT:  All right, your next witness?

20         MR. KROMBERG:  Judge, we have a number of stipulations

21  we'd like to enter.

22         THE COURT:  All right.

23         MR. KROMBERG:  The first, Stipulation No. 6, which we've

24  marked Government Exhibit 12-6, "The United States and the

25  defendant hereby stipulate and agree that Government Exhibits 1D23

**J.A. 492**

1    through 1D48, and 1D50 and 1D52 are authentic copies of records

2    maintained by Yahoo!, Inc., in the regular course of business."

3            And at this point, we'd move into evidence Government

4    Exhibits 1D23 through 1D48, 1D50, and 1D52.

5            THE COURT:  All right, any objection?

6            MR. MAC MAHON:  The stipulation was they were authentic,

7    Your Honor.  They still have to be tied up somehow to the

8    defendant in this case.

9            THE COURT:  All right.  Well, then I'm going to not let

10   them in at this point.  There'll have to be a foundation for them.

11           MR. KROMBERG:  Stipulation No. 31, which is Government

12   Exhibit 12-31, "The United States and the defendant hereby

13   stipulate and agree that Government Exhibit 10A11 constitutes an

14   authentic copy of a business record of Yahoo!, Inc., reflecting

15   (among other things) that between 2000 and 2003,

16   markazdawa@hotmail.com was the account of the moderator of a group

17   that received and distributed numerous postings known as

18   'taiba_bulletin.'

19           "On September 19, 2000, the group moderator subscribed

20   the e-mail address altimimi@myself.com to the group.  On March 25,

21   2001, the action 'received mail to owner' was logged for e-mail

22   altimimi@myself.com.

23           "On May 21, 2003, an individual using the e-mail address

24   altimimi@myself.com unsubscribed from the group.  One way to

25   unsubscribe from the group was to check a box on the website

350

1  without sending any e-mail to the group moderator."

2          And that's Government Exhibit 12-31, Stipulation 31.

3          And at this point, government now moves into evidence

4  Taiba Bulletins 1D23 to 1D48 and 1D50 and 52.

5          THE COURT:  Wait, I'm sorry, give me these numbers

6  again.

7          MR. KROMBERG:  1D23 through 1D48 and 1D50 and 1D52.

8          MR. MAC MAHON:  The same objection still, Your Honor.

9  Even the stipulation that they read doesn't show that these things

10 were actually read by this person at Yahoo! or that -- some of

11 these are even outside the scope of the stipulation that was just

12 read.  So it still hasn't been tied up sufficiently, Your Honor.

13         MR. KROMBERG:  Judge, we just put in a stipulation that

14 Mr. Timimi subscribed to 1D23 to --

15         MR. MAC MAHON:  Your Honor, I object to that.  The

16 stipulation is that somebody else subscribed him to the website if

17 you read it.  It's not that he subscribed.

18         MR. KROMBERG:  Mr. MacMahon is correct, that he was

19 subscribed to this website to get this newsletter for the time

20 period of 1D23 through 1D48.

21         THE COURT:  Well, look, if we had evidence that

22 Mr. Kromberg was subscribed to a particular website, whether he

23 ever saw anything is a separate question, but that's enough

24 connection at least at this point to let that in, and obviously,

25 this is a very smart jury.  They understand that a lot of times

**J.A. 494**

1  people subscribe to things doesn't mean they've read what's there.

2           So I'm going to allow it in at this point, with

3  absolutely no evidence at this point that the defendant ever read

4  any of this stuff.

5           (Government's Exhibit Nos. 1D23 through 1D48, 1D50, and

6  1D52 were received in evidence.)

7           MR. MAC MAHON:  Can we read 56 to put this in context,

8  Your Honor, at this time?

9           MR. KROMBERG:  Judge, that's not part of the

10 government's case.  56 is part of defense case, and if they want

11 to put it in, they can try putting it in.

12          THE COURT:  Well, nothing's been published to the jury

13 yet.  We just have these documents in the record, and at some

14 point, you can move 56 in.  Is there an objection to 56?

15          MR. KROMBERG:  Yeah.  We've agreed that some things are

16 facts, but the government thinks that those facts are totally

17 irrelevant to the case.

18          THE COURT:  Well, I don't have 56 in front of me.  Let

19 me take a look at it.

20          Well, let's do this later on because these are not being

21 published at this time.

22          MR. MAC MAHON:  I don't have Stipulation 56 right in my

23 hands, Your Honor.

24          MR. KROMBERG:  I might.

25          MR. MAC MAHON:  It's 55, Your Honor, anyway.

352

1           THE COURT:  And when you say 55, are you saying ID 55
2    or --
3           MR. MAC MAHON:  Stipulation No. 55, signed by the
4    government, signed by counsel and Dr. Al-Timimi.
5           THE COURT:  Well, then it should -- if everybody has
6    signed off on it --
7           MR. KROMBERG:  We agree to the stipulation, but we don't
8    agree that it's relevant.  So therefore, we object to its
9    admission.
10           THE COURT:  The admission of the stipulation or the
11    exhibit to which it refers?
12           MR. KROMBERG:  It doesn't refer to -- this is different,
13    Judge.  This is a stipulation that certain facts exist, but the
14    government says that these facts are irrelevant and have no place
15    in this trial.
16           THE COURT:  All right, let me take a look at it.
17           MR. MAC MAHON:  We should probably approach on this,
18    Judge.
19           THE COURT:  Well, I need to read it first, so --
20           MR. MAC MAHON:  It deals with the log from which the
21    last stipulation came --
22           THE COURT:  Well, wait a minute.
23           All right, so Stipulation No. 55, there's no dispute
24    about the facts contained within it?
25           MR. KROMBERG:  That's correct, Judge.

**J.A. 496**

353

1              THE COURT:  All right, I'm letting it in.  It's

2  relevant.  It's in.  So this is Defense Exhibit -- I don't even

3  know how we're going to name this thing.

4              MR. MAC MAHON:  Make it Defense Exhibit, I'm not sure

5  what the last one, what number we're up to.

6              THE COURT:  Wait, Ms. Travers will tell you what number

7  it's going to be.

8              It's Defense Exhibit 80, and it's in evidence.

9              (Defendant's Exhibit No. 80 was marked and received in

10  evidence.)

11             MR. MAC MAHON:  And may I read it, Your Honor?

12             THE COURT:  Yes.

13             MR. MAC MAHON:  "The United States and the defendant

14  hereby stipulate and agree that within one month of

15  Dr. Al-Timimi's being added by the moderator to the Taiba Bulletin

16  list, the following U.S. citizens were also added by the moderator

17  to the Taiba Bulletin list:

18             "William Jefferson Clinton, president@whitehouse.com, on

19  October 3, 2000; Hillary Clinton, first.lady@whitehouse.com, on

20  October 3, 2000; Albert Gore, Jr., vice president --

21  vice.president@whitehouse.gov, on October 6, 2000; Tipper Gore,

22  mrs.gore@whitehouse.com, on October 6, 2000; John Ashcroft,

23  john_ashcroft@ashcroft.senate.gov, on October 18, 2000.

24             "With the exception of Dr. Al-Timimi, none of the

25  above-named U.S. citizens ever unsubscribed from the Taiba

**J.A. 497**

1    Bulletin.

2           "In addition to Dr. Al-Timimi, William Jefferson

3    Clinton, Hillary Clinton, Al Gore, Tipper Gore, and John Ashcroft,

4    1,064 other individuals (both known and unknown) were added by the

5    moderator to the Taiba Bulletin list.  Among the 1,064 are 46

6    United States senators, including Senator Phil Gramm of Texas,

7    Senator Richard Shelby of Alabama, Senator Strom Thurmond of South

8    Carolina, Senator John McCain of Arizona, Senator Ted Stevens of

9    Alaska, Senator John Warner of Virginia, Senator Fred Thompson of

10   Tennessee, Senator John Kerry of Massachusetts, Senator Edward

11   Kennedy of Massachusetts, Senator Robert Byrd of West Virginia,

12   Senator J. Rockefeller of West Virginia, Senator Barbara Mikulski

13   of Maryland, and Senator Paul Sarbanes of Maryland.

14          "The action 'received mail to owner' was done 1,207

15   times on the Taiba Bulletin list.  This action was done 43 times

16   by e-mail senator@akaka.senate.gov, identified via Internet search

17   as Daniel Akaka, Democrat senator of Hawaii; 14 times by e-mail

18   senator@conrad.senate.gov, identified by Internet search with Kent

19   Conrad, Democratic Senator at North Dakota; eight times by e-mail

20   senator_mccain@mccain.senate.gov, identified via Internet search

21   with John McCain, Republican Senator of Arizona; and one time by

22   altimimi@myself.com on March 25, 2001, at 2:43 p.m. Pacific

23   Standard Time.

24          "The following foreign national's e-mail was also

25   identified on the logs of the Taiba Bulletin:

1  president@pak.gov.pk.

2          "An Internet search has identified this individual as

3  General Parvez Musharraf, president of Pakistan, a nation located

4  in the Indian Subcontinent, and which according to the CIA World

5  Fact Book is currently in a dispute with India over a mountainous

6  region known as Kashmir.

7          "The following e-mails were voluntarily subscribed to

8  the Taiba Bulletin log: affairsofmuslims@hotmail.com, September

9  28, 2001, and ismailroyer@yahoo.com, January 2, 2002.

10         "All posts shown on the Taiba Bulletin log were posted

11  by the list moderator."

12         That's the full stipulation, Your Honor.

13         THE COURT:  All right.  Any more stipulations at this

14  time?

15         MR. KROMBERG:  Yes.  Stipulation No. 29, which is marked

16  12-29, "The United States and the defendant hereby stipulate and

17  agree that Government Exhibits 3A1, 3A2, 3A2a, 3A8, and 3A12 were

18  seized from the residence or person of Ibrahim Al-Hamdi on

19  February 25, 2003."

20         No. 30, Government Exhibit 12-30, "The United States and

21  the defendant hereby stipulate and agree that Government Exhibit

22  3H1 is an authentic copy of a passport of Ibrahim Al-Hamdi and

23  Government Exhibit 7H21 is an authentic copy of the passport of

24  Ali Asad Chandia."

25         Stipulation No. 41, Government Exhibit 12-41, "The

**J.A. 499**

356

1  United States and the defendant hereby stipulate and agree that
2  Government Exhibits 7F5e, 7F9a, 7F24a, 7F24b, and 7F24c are
3  authentic copies of newspapers or items that appeared in the
4  newspapers listed in the respected exhibits."

5          Stipulation No. 33, marked 12-33, "The United States and
6  the defendant hereby stipulate and agree that Government Exhibits
7  7A1, 7A20, 7A38, 7A39, 10A9, 10A24, 10A25, 10A26, 10A27, 10A29,
8  and 10A33 were seized from the residence of Ali Timimi on or about
9  February 25, 2003."

10         Stipulation No. 40, marked 12-40, "The United States and
11 the defendant hereby stipulate and agree that Government Exhibits
12 7F3 and 7F3a are authentic copies of items that appeared on ABC
13 News and its website on April 24, 2000."

14         Stipulation No. 39, marked as 12-39, is something that
15 we already talked about, Judge.  "The United States and the
16 defendant hereby stipulate and agree that Government Exhibits 7F2
17 and 7F2a are accurate maps of the area of Pakistan, Kashmir,
18 India, and Afghanistan relevant to this case."

19         Stipulation No. 35, marked as 12-35, "The United States
20 and the defendant hereby stipulate and agree that Government
21 Exhibits 7A12 and 7A15 as well as the firearm depicted in the
22 photograph that is Government Exhibit 7A36 were seized from the
23 residence of Donald Surratt on or about May 8, 2003."

24         Stipulation 28, Government Exhibit 12-28, "The United
25 States and the defendant hereby stipulate and agree that

1    Government Exhibit 2C4 constitutes copies of authentic records of

2    Super Travel Agency maintained in the ordinary course of its

3    business."

4            We move in 2C4 at this time, Judge.  This is Masaud

5    Khan's travel records.

6            THE COURT:  Any objection?

7            MR. MAC MAHON:  No objection, Your Honor.

8            THE COURT:  All right.  Now, just so we're clear, the

9    stipulations themselves have exhibit numbers on them.

10           MR. KROMBERG:  Correct.

11           THE COURT:  I think given the complexity of this case,

12   stipulations, all of the ones that we admit, should go into

13   evidence.  Any objection to that?

14           MR. MAC MAHON:  No objection to that, Your Honor.

15           THE COURT:  All right.  So to the extent that all the

16   stipulations that have been mentioned at Exhibit 12 dash the

17   stipulation number have been agreed to, the stipulations are all

18   in evidence now.

19           MR. KROMBERG:  Thank you, Judge.

20           THE COURT:  All right?  As is substantive Exhibit 2C4.

21           MR. KROMBERG:  Thank you, Judge.

22           (Government's Exhibit Nos. 2C4, 12-6, 12-28 through

23   12-31, 12-33, 12-35, and 12-39 through 12-41 were received in

24   evidence.)

25           MR. KROMBERG:  "The United States and defendant hereby

358

1  stipulate and agree that Government Exhibits 1H1 and 1H2 were

2  seized from Randall Royer's car in connection with a traffic stop

3  in the City of Alexandria on September 22, 2001."

4           And with that exhibit, we'd like to move in 1H1 and 1H2,

5  if that could be shown to the jury?

6           THE COURT:  Any objection?

7           MR. MAC MAHON:  Subject to our prior objection, Your

8  Honor.

9           THE COURT:  All right.  Then --

10          MR. KROMBERG:  They would be -- that's a gun, gun and

11  ammunition, 1H1 and 1H2.

12          THE COURT:  And what was the stipulation number for

13  that?

14          MR. KROMBERG:  No. 12-25.

15          THE COURT:  25?  And those exhibits are in as well.

16  Okay.

17          (Government's Exhibit Nos. 1H1, 1H2, and 12-25 were

18  received in evidence.)

19          THE COURT:  That's 1H1.

20          MR. KROMBERG:  And 1H2 should be ammunition.  Perhaps in

21  a bag at the bottom.

22          THE COURT:  All right, Mr. Wood, if you'd just walk over

23  with them to the jury and let them see?

24          Ladies and Gentlemen, I'm not planning to send the

25  ammunition and the weapons into the jury room with you.  I think

1  we have photographic substitutes, don't we, for the record?

2         MR. KROMBERG:  I'll check, Judge.  I believe -- I know

3  we do for some.  I don't know if for all.

4         THE COURT:  All right.  You have a right to reexamine

5  the evidence at any point.  If you do, then we'll arrange for you

6  to come back in here and look at it or have Mr. Wood take it in to

7  you, all right?

8         MR. KROMBERG:  Judge, there are other stipulations which

9  we'll move in later that -- when it gets more pertinent to what

10  we're talking about.  We thank Mr. Yamamoto and Mr. MacMahon and

11  Mr. Timimi.  They did save a lot of time and effort on probably

12  things that were really not in dispute.

13         THE COURT:  All right, that's fine.  And we always

14  encourage people to stipulate to facts that really don't need to

15  take up the time for proof because they don't really add, I mean,

16  it's not a fact that's in dispute.

17         All right, I think since it's 1:00, it's time for our

18  lunch recess, Ladies and Gentlemen, the standard one hour.  We'll

19  see you back here at 2:00.  Thank you.

20         (Recess from 1:00 p.m., until 2:00 p.m.)

21

22

23

24

25

# Surratt - direct

```
 1                  A F T E R N O O N   S E S S I O N
 2                      (Defendant and Jury present)
 3              THE COURT:   All right, your next witness, Mr. Gibbs?
 4              MR. GIBBS:   Judge, the government calls Donald Surratt
 5    to the stand.
 6              THE COURT:  All right.
 7              DONALD SURRATT, GOVERNMENT'S WITNESS, AFFIRMED
 8                         DIRECT EXAMINATION
 9    BY MR. GIBBS:
10    Q.   Good afternoon, sir.
11    A.   Good afternoon.
12    Q.   Sir, will you please state your name for the record and also
13    spell it for the record?
14    A.   It's Donald Surratt.  It's spelled D-o-n-a-l-d S-u-r-r-a-t-t.
15    Q.   And, Mr. Surratt, you are currently in prison; is that
16    correct?
17    A.   Yes, I am.
18    Q.   And what were you convicted of?
19    A.   Conspiracy to break the Neutrality Act and transporting
20    firearms across the state line for purpose of an illegal activity.
21    Q.   All right.  Transporting a firearm in interstate commerce?
22    A.   Something like that, yeah.
23    Q.   With intent to commit a crime, is that correct?
24    A.   Yes.
25    Q.   Where was it that you were convicted of those crimes?
```

**J.A. 504**

**Surratt - direct**

1   A.   In this court.

2   Q.   Here in the Eastern District of Virginia?

3   A.   Yes.

4   Q.   And when you were convicted of those crimes, how much time

5   did you receive?

6   A.   Three years and ten months.

7   Q.   And you have a plea agreement in this case?

8   A.   Yes, I do.

9   Q.   And what is your obligation under your plea agreement if

10  you're called to testify as a witness?

11  A.   To tell the truth.

12  Q.   And what happens to you -- or what's your understanding of

13  what could happen to you under your plea agreement if you're found

14  to lie while you're testifying?

15  A. ' They could withdraw the plea agreement.

16  Q.   Now, Mr. Surratt, do you know what a rule 35 motion is?

17  A.   Yes, I do.

18  Q.   What is a rule 35 motion?

19  A.   It's a reduction in sentence that's requested from the judge

20  or the -- I forgot who asks for it.

21  Q.   Okay.  And what's your understanding of what you have to do

22  in order to be eligible for a reduction in sentence?

23  A.   One of the reasons is substantial assistance or something

24  like that.

25  Q.   All right.  So if you are found to provide substantial

**Surratt - direct**

```
 1  assistance to the government, your sentence potentially could be
 2  reduced.  Is that your understanding?
 3  A.   Yes.  Potentially, yes.
 4  Q.   All right.  And who actually makes the final decision to
 5  reduce your sentence?
 6  A.   I think Judge Brinkema does.
 7  Q.   And is it your desire to receive a rule 35 substantial
 8  assistance motion in this case?
 9  A.   Yes, it is.
10  Q.   All right.  Now, Mr. Surratt, I'd like to move on to a
11  different topic.  Are you familiar with an organization called the
12  Dar al-Arqam Islamic Center in Falls Church, Virginia?
13  A.   Yes, I am.
14  Q.   And what is the Dar al-Arqam?
15  A.   It's a place where they used to have to try to teach Muslims
16  or non-Muslims about Islam basically.
17  Q.   And was this teaching about Islam, was it primarily done in
18  English?
19  A.   Yes, it was.
20  Q.   And what sorts of things occurred at the Dar al-Arqam?
21  A.   Lectures, sometimes they would have dinners, that sort of
22  thing.
23  Q.   And in terms of the lectures, let's talk about the lectures
24  first of all.  Who were the primary lecturers at the Dar
25  al-Arqam -- well, actually, let me back up a little bit.  When did
```

**J.A. 506**

**Surratt - direct**

1  you attend the Dar al-Arqam?  During what period?

2  A.   I don't know exact years that I attended.  For a long time,

3  because -- I don't know exact years.

4  Q.   Okay.  But did you attend some of these lectures even before

5  the Dar al-Arqam at 360 South Washington Street had been

6  established?

7  A.   Yes, I did.

8  Q.   So you had gone to some of the lectures at American Open

9  University?

10 A.   Yes, I did.

11 Q.   And at Sheikh Jaafar's basement?

12 A.   Yes, I did.

13 Q.   All right.  In terms of the lectures, once the Dar al-Arqam

14 had its own space there at 360 South Washington, who were the

15 primary lecturers at the Dar al-Arqam?

16 A.   The main lecturer is Sheikh Jaafar Idris, and if he's not

17 there, then it was usually Ali Timimi.

18 Q.   And who actually spent more time lecturing during the time

19 period that Dar al-Arqam was located at 360 South Washington,

20 Timimi or Sheikh Jaafar Idris?

21 A.   Ali Timimi.

22 Q.   And what's the relationship between Sheikh Jaafar and Ali

23 Timimi?

24 A.   The relationship that I know of is that from what I see, it

25 seems to me that Ali Timimi has more respect for Sheikh Jaafar as

**Surratt - direct**

1  a person of more knowledge and as his, more of a, I guess,

2  teacher.

3  Q.   And is Sheikh Jaafar older than Ali Timimi?

4  A.   I believe so, yes.

5  Q.   Okay.  And did -- but in your observation, did Ali Timimi and

6  Sheikh Jaafar appear to have a friendly relationship?

7  A.   Yes.

8  Q.   And were they part of the leadership there at the Dar

9  al-Arqam?

10  A.   I believe so, yes.  Both of them, yes.

11  Q.   Now, you mentioned the two of those as being some of the

12  lecturers at the Dar al-Arqam.  How about an individual by the

13  name of Yousuf Idris?  Was he also a lecturer there?

14  A.   Sometimes.  I think that's Sheikh Jaafar's son you're

15  referring to.

16  Q.   Okay.  Now, you mentioned that Timimi was the most regular

17  lecturer at the Dar al-Arqam.  What specific lectures that he's

18  given are you familiar with?

19  A.   He's given a lot of lectures, but just from memory right now,

20  I mean, Purification of the Soul was a long series we did.  He

21  talked about the events that happened with the Buddhist statues in

22  Afghanistan, when they destroyed it, and how -- there's more, but

23  I can't think of any more that I actually attended.

24  Q.   Okay.  That's fine.  Let me just put up -- pull up an exhibit

25  if I could.  This is Exhibit 10T1.  This is in evidence.  And do

**Surratt - direct**

1  you recognize this particular lecture by Ali Timimi?

2  A.    The New World -- The New World Order?

3  Q.    Correct.  Is that the best TV for you to look at?

4  A.    Yes.

5  Q.    Okay.  Good.

6          THE COURT:  Mr. Surratt, there's one to your left, too.

7  No, to your left.

8          THE WITNESS:  Oh, yes.

9  BY MR. GIBBS:

10 Q.    And what is 10T1?

11 A.    That's a lecture that was given by Ali Timimi.  I'm not sure

12 where it was given, but it wasn't given at Dar al-Arqam.

13 Q.    All right.  And this lecture, in fact, was for sale on

14 audiotapes at the Dar al-Arqam, correct?

15 A.    Yes, it was.

16 Q.    And did you yourself buy this particular lecture?

17 A.    Yes, I did.

18 Q.    Where did you get it from?

19 A.    From Dar al-Arqam.

20 Q.    And did you have this -- well, your house was searched by the

21 FBI in the spring of 2003, correct?

22 A.    Yes.

23 Q.    All right.  Was this particular lecture one of the items that

24 was located in your home by the FBI in the spring of 2003?

25 A.    Yes, it was.

**Surratt - direct**

1  Q.   Now, the lectures that Ali Timimi gave at the Dar al-Arqam,

2  were these open to the public?

3  A.   Yes, they were.

4  Q.   And how many people usually attended Ali Timimi's lectures?

5  A.   It varied.  I mean, it could be anywhere from 20 people to

6  maybe 80 people.  So it depends.

7  Q.   Okay.  Just depending on how big the crowd was and what day

8  of the week?

9  A.   Yes.

10  Q.   Were these lectures primarily on Friday nights?

11  A.   Yes, they were.

12  Q.   And you talk about the fact that you could have from 20 to 80

13  people for a particular lecture.  Would these be men and women, or

14  was it segregated?

15  A.   Men and women.

16  Q.   And did the women have to attend the lecture in a different

17  location than the men?

18  A.   Yes.  Well, not different location but in the same room, but

19  we had a little, small curtain so there would be separation

20  between the men and women.

21  Q.   Now, you mention that this particular lecture -- we can take

22  that off now, thank you -- "The New World Order," that you had

23  bought that at Dar al-Arqam.  Do you know anybody else among your

24  friends who owned any of Timimi's lectures on tape?

25  A.   I knew that Nabil, Nabil, he had some.  Hammad, a friend of

**Surratt - direct**

1   mine, had some.

2   Q.    Is that Hammad Abdur-Raheem?

3   A.    Yes.

4           THE COURT:  And Nabil is Nabil Gharbieh?

5           THE WITNESS:  Yes.

6           THE COURT:  Okay.

7           THE WITNESS:  Ibrahim Hamdi had some.  Caliph Basha had

8   some.

9   BY MR. GIBBS:

10  Q.    All right.  And is that Caliph Basha Ibn Abdur-Raheem?

11  A.    Yes.

12  Q.    And these are all friends of yours?

13  A.    Yes.  That's all I can remember.  There's more probably, but

14  I don't know.

15  Q.    All right.  Well, in terms of the more, how about an

16  individual named Abdullah Zikria?  Do you know him?

17  A.    Yes, I do.

18  Q.    All right.  Do you know if he owned any of Timimi's lectures

19  on tape?

20  A.    Yes, he did.

21  Q.    And did Abdullah Zikria, did he have any duties at the Dar

22  al-Arqam with regards to the lectures that were recorded there?

23  A.    As far as I know, he used to edit the tapes and stuff from

24  the lectures.

25  Q.    And was this done right there at the Dar al-Arqam?

**Surratt - direct**

1  A.   I believe so, yes.

2  Q.   All right, thank you.

3       Now, Mr. Surratt, the people you just mentioned --

4  Hammad Abdur-Raheem, Caliph Basha, Ibrahim Hamdi, Nabil

5  Gharbieh -- these people were all friends of yours?

6  A.   Yes, they are.

7  Q.   And what sorts of thing did you do together with them?

8  A.   All sorts of things.  We'd eat dinner, go play basketball,

9  sometimes volleyball, and just hang out, all kind of things.

10 Q.   And did you ever watch any videos with any of these people?

11 A.   Yes, I did.

12 Q.   And what sorts of videos would you watch with some of these

13 individuals?

14 A.   Sometimes we'd watch videos of, like, conflict areas that are

15 happening, things were happening, like Chechnya or Bosnia, or

16 sometimes we'd watch the news, stuff like that.

17 Q.   All right.  And in terms -- you mentioned some of the

18 conflict areas in Chechnya.

19       If we could pull up Exhibit 3A8?  And we just need the

20 cover.  Again, that's in evidence.

21       If you'd take a look at that?  Mr. Surratt, do you

22 recognize Government Exhibit 3A8?

23 A.   Yes, I do.

24 Q.   And what is that?

25 A.   It's a tape about -- or it's actually a CD about the conflict

## Surratt - direct

1  in Chechnya.

2  Q.   And did you yourself get a copy of this CD from anyone?

3  A.   Yes.  I actually got that from Nabil because he had it at his

4  house when I was there, and I saw it, and I asked him -- he

5  actually showed me a little clip of it and told me that it was

6  long, that I could take it home if I wanted to watch it later.

7  Q.   And do you remember roughly -- you know, for all these

8  questions, to the extent we can try to pin down a time frame, it's

9  helpful, but do you recall if this was before or after September

10  11, 2001?

11  A.   Before.

12  Q.   And you said that you were at his house and he showed you a

13  few clips, and the clips that he showed you, were they interesting

14  to you?

15  A.  ` Yes, they were interesting.

16  Q.   And at this time amongst you and your friends, was the

17  conflict in Chechnya an area of particular interest?

18  A.   It's one of the areas, yes.

19  Q.   And you say it was one of the areas.  What were some of the

20  other areas?

21  A.   Kashmir, Bosnia, Saudi Arabia, those type of places.

22  Q.   And did -- you said that Nabil -- you asked Nabil Gharbieh if

23  you could borrow it or take it; is that correct?

24  A.   Yes.

25  Q.   And he gave it to you?

**J.A. 513**

**Surratt - direct**

1  A.    Yes.

2  Q.    And at some point later, did you then pass it on to somebody

3  else?

4  A.    Yes.  I had it for a while, and then I actually forgot that I

5  had it, and I had it in my stuff and totally forgot all about it.

6  Then later on, Ibrahim, he came and asked me if I had any videos

7  for him.  I told him I didn't know; I'd go home and look.  When I

8  went home, I realized I still had it, and I told him that I'll let

9  him use it, but it's not mine, so I let him use it, and, of

10  course, I never got it back.

11  Q.    And this is -- when you say Ibrahim, this is Ibrahim Hamdi?

12  A.    Yes.

13  Q.    All right.  And was he one of the -- a friend of yours from

14  the Dar al-Arqam?

15  A.    Yes, he is.

16  Q.    All right.  Did there -- did you ever go to Ibrahim Hamdi's

17  house when Ali Timimi was there?

18  A.    Yes.  I remember once when he was there.

19  Q.    And is that the only time that you've ever been to the home

20  of one of your friends from Dar al-Arqam when Ali Timimi was there

21  as well?

22  A.    Yes.

23  Q.    Now, Mr. Surratt, you testified a moment ago about some of

24  the conflicts around the world that were of interest to you and

25  your friends, including Kashmir.  Now, are you familiar with a

371

**Surratt - direct**

1   group in that part of the world called Lashkar-e-Taiba?

2   A.   Yes, I am.

3   Q.   What is that?

4   A.   It's a group that's involved in the problems of Kashmir from

5   the Indians who are doing a lot of atrocities there.  They're

6   trying to basically help the Muslims there.

7   Q.   And how did you first learn about Lashkar-e-Taiba?

8   A.   From Ismail Royer.

9   Q.   And after you found out about Lashkar-e-Taiba, did you ever

10  hear Ali Timimi talk about this group?

11  A.   Not specifically in a lecture or anything, but I asked him

12  about it once just to see if he knew what he could tell me about

13  it.

14  Q.   And when you said you asked him about it, was there something

15  about your relationship -- well, first of all, with Timimi, did

16  you view him as a scholar or person of knowledge?

17  A.   I did -- he doesn't view himself as a scholar as far as I

18  know, but I view him as a brilliant man, yes.

19  Q.   And what is it about him that causes you to view him as a

20  brilliant man?

21  A.   I think, to me, he has a lot of knowledge about Islam and

22  about a lot of other subjects, also.

23  Q.   And when you wanted some information about LET, specifically

24  what did you ask Timimi?

25          MR. MAC MAHON:  Your Honor, if I could object to that, a

**Surratt - direct**

1  time frame here, please?

2            THE COURT: Yes, we need a time frame.

3            THE WITNESS: Time frame that I asked him?

4  BY MR. GIBBS:

5  Q.  Yeah, asked him about Lashkar-e-Taiba.

6  A.  It was before 9/11. I don't know besides that.

7  Q.  Okay. I mean, do you think it was a year before, you know,

8  within a year or two years?

9  A.  I don't know. I couldn't narrow it down. It was just a

10  casual question. I don't remember exactly -- I didn't think

11  anything of it at the time.

12  Q.  Okay. But at some point prior to September 11, you asked

13  Timimi about Lashkar-e-Taiba, and what did he tell you?

14  A.  He just said they were okay, that they -- because I was

15  concerned whether, you know, what kind of organization it was. He

16  said that they weren't the type of organization that involved

17  themselves in harming innocent people.

18  Q.  And did he talk about their belief system at all?

19  A.  No. He just said they were okay, so I took that to mean that

20  their beliefs were okay.

21  Q.  Now, Mr. Surratt, moving forward now up to September 11,

22  2001, did you go to a gathering at the Dar al-Arqam that day?

23  A.  September 11? Yes.

24  Q.  Yes, sir. And what happened at the Dar al-Arqam on September

25  11?

**Surratt - direct**

1  A.    I don't even remember how I heard about it, but somebody told
2  me they were having a --

3         MR. MAC MAHON:  Objection, Your Honor.  "I don't
4  remember what I heard about it."

5         THE COURT:  Right.  Mr. Surratt, just answer what -- I
6  think the question was when you got there, what did you hear or
7  what was going on.  That's what you should testify to.

8         THE WITNESS:  Okay.  Well, I got there to the place, and
9  they were having a full dinner.  It was on the floor, and it was
10 us sitting around in a long, I guess you'd call it, rectangle, and
11 everybody was just talking and talking.  It wasn't like a formal
12 speech or anything.  It was kind of just dinner.

13 BY MR. GIBBS:
14 Q.    And was the -- were the attacks that had occurred that day on
15 September 11, were those being discussed?
16 A.    Amongst people, yes.
17 Q.    All right.  And what, if anything, happened with regards to
18 Ali Timimi and those discussions?
19 A.    Well, a discussion between Ali Timimi and Haytham, I don't
20 know his last name.
21 Q.    And do you know what Haytham's role at the Dar al-Arqam is?
22 A.    I have no idea.
23 Q.    Okay.  But is he, is he a part of the organization?

24        MR. MAC MAHON:  Your Honor, if he doesn't know what his
25 role is, he can't lead him into suggesting to him what it is.

**J.A. 517**

**Surratt - direct**

1              THE COURT:  Sustained.  Sustained.

2              MR. MAC MAHON:  Thank you.

3   BY MR. GIBBS:

4   Q.    And go ahead and describe for the jury what, what took place

5   between Haytham and Ali Timimi.

6   A.    Well, there was a discussion about -- Haytham was basically

7   saying that what happened on 9/11 was a tragedy and that the

8   people who were involved in it, they committed murder, and they

9   basically also committed suicide, and it was no good.

10             Then Ali Timimi told him that, you know, he shouldn't

11  say these things, that he doesn't know what he's talking about,

12  because first of all, he doesn't know if who they say did it did

13  it, and second of all, he doesn't know that -- whether or not what

14  they did was allowable or not.  He doesn't know anything, so he

15  shouldn't open his mouth and speak bad about these Muslims who

16  they were accused of doing it.

17  Q.    And what was Haytham's reaction when Timimi said those things

18  to him?

19  A.    He became to me visibly upset, turned a little red, was mad,

20  and then he tried to say, you know, continued to argue his point.

21  Q.    And what did he say as he continued to argue his point?

22  A.    He was telling him that it's wrong to commit suicide and

23  commit murder, and they just kind of went back and forth like

24  that.  I don't know the exact words because it was too long ago.

25  Q.    And what, if anything, did Timimi say about whether the

**Surratt - direct**

1  events that had occurred that day were justifiable or not?

2  A.    He didn't really say if they were justifiable or not, but he

3  gave him counter-arguments to show that he didn't know whether or

4  not -- what he was talking about.  His counter-arguments were, one

5  was where he talked about, talked about where -- that they had a

6  battle during the Prophet's time, and I think a noncombatant was

7  killed by accident, it was at nighttime, and that person -- they

8  went to the Prophet and told him, look, the person was killed, it

9  was an accident, it was dark, it wasn't on purpose, and he told

10 them that, you know, they're from him, meaning that it wasn't on

11 purpose, that, you know, it was just something that happened.

12 They didn't mean to kill the person; it was an accident.

13 Q.    And you testified that this is one of the counter-arguments

14 that Timimi made to Haytham.  Is there a particular term to

15 describe the counter-argument that Timimi made?

16       MR. MAC MAHON:  Objection, Your Honor.  What Mr. Timimi

17 said, I don't know -- if that's what he used in the word, that

18 would be admissible, but --

19       THE COURT:  Well, I'm not sure where the question is

20 going, but if you think you understand that question, you can

21 answer it.  Go ahead, Mr. Surratt.

22       THE WITNESS:  It was in the form of a hadeeth.

23 BY MR. GIBBS:

24 Q.    And can you explain what a hadeeth is?

25 A.    A hadeeth is, well, roughly, it's a saying or doing or

**J.A. 519**

**Surratt - direct**

 1  approval of the Prophet, peace be upon him.

 2  Q.   And what was Haytham's reaction when Timimi talked about this

 3  hadeeth related to the nighttime battle and somebody, you know,

 4  collateral damage occurring during that battle?

 5  A.   He wasn't really listening.  He just kind of kept continuing

 6  to say the same things.

 7  Q.   And what was -- so Haytham continued to argue with him?

 8  A.   I don't know exactly when, if he said anything afterwards,

 9  because at some point during the time that Sheikh Jaafar was

10  there, and he kind of broke in and told him to, you know, said

11  something, I don't remember his exact words, but whatever it is,

12  he told him, you know, cool it.

13  Q.   All right.  So Sheikh Jaafar stepped in and told them,

14  meaning Haytham and Timimi, to cool it?

15  A.   Yeah.  Not in those words, but yes.

16  Q.   And had you ever seen Sheikh Jaafar do that with Timimi

17  before?

18  A.   No, because I've never seen him actually, you know, engage in

19  a debate, sort of argument or debate with anybody.  Usually he

20  doesn't argue.

21  Q.   And is it unusual in your experience at the Dar al-Arqam to

22  have anyone question what Timimi says when he's speaking?

23  A.   That's -- I've never seen it, no.

24  Q.   Now, when Sheikh Jaafar stepped in, and I know these weren't

25  the exact words, but in effect told Timimi and Haytham to cool it,

**J.A. 520**

**Surratt - direct**

1  did Timimi and Haytham cool it?

2  A.   Yes, they did.

3  Q.   And did Timimi stop lecturing at the Dar al-Arqam after that

4  night?

5  A.   Yes.  I don't know if he lectured that night at all, but I

6  just came, it was a dinner, but I never seen him come after 9/11,

7  no.

8  Q.   Right.  That's what I was getting at.  So after 9/11, you

9  never saw him lecture there again?

10 A.   No.

11 Q.   And did you ever get an opportunity to ask Timimi why he

12 wasn't lecturing at Dar al-Arqam anymore?

13 A.   Yes.  I, I asked him, you know, was he not allowed to come

14 talk at Dar al-Arqam anymore, and he said that he's allowed to

15 still come, but it was just a difference of opinion, just of

16 agreement between him and some of the guys there, so he chose not

17 to come on his own.

18 Q.   And did he tell you what the disagreement or the difference

19 of opinion was?

20 A.   No.  I didn't ask.

21 Q.   And did he tell you who he was having the disagreement with?

22 A.   No, he didn't say.

23 Q.   Now, Mr. Surratt, at some point after that gathering at the

24 Dar al-Arqam on September 11, were you contacted by an individual

25 by the name of Yong Kwon?

**Surratt - direct**

1   A.   Yes, I was.

2   Q.   And how did that come about?

3   A.   He called me on my cell phone when I was at work, and he said

4   he wanted to meet with me, so I told him that I'll meet him --

5   I'll try to meet him at my friend Hammad's house because it's

6   close to my job, and I'll call Hammad and confirm with him, which

7   I did, and I told him that we could meet there.

8   Q.   And where were you working at that time?

9   A.   At the time, I was working at Booz Allen Hamilton.

10  Q.   And which office was that?

11  A.   It's not the McLean office.  It's the Falls Church office, I

12  believe.

13  Q.   And did -- and ultimately, did Hammad Abdur-Raheem -- this is

14  Hammad Abdur-Raheem, correct?

15  A.   Yes.

16  Q.   All right.  Did he agree that you'd come to his house and

17  meet Kwon there?

18  A.   Yes, he did.

19  Q.   And did you go to Hammad Abdur-Raheem's house?

20  A.   Yes.  After work, I went over there, and we had pizza while I

21  was watching TV and waiting for Yong to come.

22  Q.   And what was your relationship with Hammad Abdur-Raheem at

23  that time?

24  A.   Friends, really good friends.

25  Q.   So he was one of your better friends?

379

**Surratt - direct**

1  A.    Yes.

2  Q.    And the plan was to have Yong Kwon come meet you there; is

3  that correct?

4  A.    Yes, it was.

5  Q.    And did Kwon ever show up?

6  A.    No, he never showed up.

7  Q.    So what happened?

8  A.    He called me about 10:30-11:00 on my cell phone and told me

9  that he couldn't come, that he's busy and he's taking care of some

10 things.  So I told him that, you know, why do you have me waiting

11 out here?  You know I have to work the next day.  Why do you have

12 me waiting out here until, like, 11:00, knowing that I live in

13 Maryland?

14 Q.    Is it fair to say you were a little bit upset with him?

15 A.    Yeah, I was.

16 Q.    And what was his reaction when you told him that?

17 A.    He said that he can't tell me, that perhaps one day I'll

18 understand it why he couldn't come.

19 Q.    And is that all he told you on your cell phone?

20 A.    Yeah, that's all.

21 Q.    So after you hung up, did you talk to Hammad Abdur-Raheem?

22 A.    After I hung up, yeah, Hammad saw that I was visibly upset

23 and I was getting ready to leave, so he told me -- he couldn't

24 tell me because Yong was planning to go to Pakistan.

25 Q.    And did Hammad Abdur-Raheem explain to you how it came about

# Surratt - direct

1  that Yong Kwon was planning to go to Pakistan?

2  A.  Just briefly, he just told me that they had a meeting over

3  somewhere with Ali Timimi and that Yong had decided that he wanted

4  to go to Pakistan.

5  Q.  And did Hammad Abdur-Raheem tell you that he himself had

6  attended that meeting with Ali Timimi?

7  A.  Yes, he did.

8  Q.  And what did he tell you that Ali Timimi had said in that

9  meeting?

10  A.  He didn't say.  He just said that it was a powerful thing,

11  that he can't repeat everything he said; he doesn't know.  I can

12  ask him when I see him.

13  Q.  Well, when he said it was a powerful thing, did he give you

14  any insights into what it was about the meeting that was powerful?

15        MR. MAC MAHON:  Your Honor, I think the witness answered

16  everything that the gentleman said.  To suggest that there might

17  be more or some emphasis is improper.

18        MR. GIBBS:  Judge, I don't believe that he said that's

19  everything he said.

20        THE COURT:  I don't think that's leading.  I'm going to

21  permit that.  Go ahead.

22        THE WITNESS:  He said that -- that's all I remember him

23  saying really is that he -- it was a powerful speech and that, you

24  know, he decided that -- a few of them had decided that they were

25  going to go to Pakistan, that he couldn't tell me everything that

**Surratt - direct**

```
 1  he said because it's too much, he doesn't know -- can't repeat it
 2  all, doesn't know how to repeat everything.
 3  BY MR. GIBBS:
 4  Q.   And he said a few of them had decided to go to Pakistan.  Do
 5  you know who that was?
 6  A.   Yes.  It was Yong Kwon and Mahmood.
 7  Q.   And how did you know those two individuals?
 8  A.   From Dar al-Arqam.
 9  Q.   And when Hammad Abdur-Raheem told you about this powerful
10  speech that Ali Timimi had given, was that of interest to you?
11  A.   Yes, it was.
12  Q.   And ultimately, at some time after that night at Hammad
13  Abdur-Raheem's house, did there come a time that you got invited
14  to a meeting at Timimi's house yourself?
15  A.   ·Yes, there was.
16  Q.   When was that roughly?
17  A.   Roughly in October sometime.  I don't know the exact date.
18  Q.   And who was it that invited you to Timimi's house?
19  A.   Hammad told me.
20  Q.   This is Hammad Abdur-Raheem?
21  A.   Yes.
22  Q.   And had you ever been to Timimi's house before?
23  A.   No, I'd never been.
24  Q.   And when Hammad invited you, what did he say the reason for
25  the meeting was?
```

382

**Surratt - direct**

1  A.    He said it was just going to be a lecture, kind of sort of
2  continuing, like, his series of lectures, and that he would also
3  touch up on some of the things that he said at the meeting that I
4  wasn't able to attend that he went to at first.

5  Q.    That first meeting he talked about as being a powerful
6  lecture?

7  A.    Yes.

8  Q.    And you said you'd never been to Timimi's house before.  Had
9  he ever been to your house before?

10  A.    No, he had not.

11  Q.    And if you'd never been to his house before, how did you get
12  there?

13  A.    I met with Hammad, and then I rode with him in his car
14  because Hammad knew where he lived.

15  Q.    And when you got to Timimi's neighborhood, where did you and
16  Hammad park your car -- or park his car?

17  A.    We parked it along a side street which is near his house and
18  waited for some other people to meet us.

19  Q.    And was there any reason you parked it off on a side street
20  and waited for some of the other people to arrive?

21  A.    Hammad told me that's what -- he was supposed to meet
22  Ibrahim, and supposedly they don't want everybody coming to his
23  house at different times and coming in and creating a big
24  commotion at night.

25          MR. MAC MAHON:  Your Honor, I object.  I think the

**J.A. 526**

# Surratt - direct

1  witness said that he said that.  I couldn't tell if Al-Timimi told
2  him to do that or if it was somebody else.
3        THE COURT:  All right, make your answer -- rephrase the
4  question, and let's see what the answer is.
5        MR. GIBBS:  Sure.
6  Q.  Who was it that told you that you had to enter the house a
7  certain way?
8  A.  It was Hammad who told me.
9  Q.  And you said you were waiting for certain people.  Did some
10 more people arrive after you and Hammad parked?
11 A.  Yes.  There's more than -- the only person I remember was
12 Ibrahim Al-Hamdi, but I don't remember.  There's more people that
13 came, also.
14 Q.  And did Ibrahim Hamdi join you and Hammad in his car when he
15 first got there?
16 A.  Yes.
17 Q.  And did he wait for some period of time?
18 A.  Yes.  We waited for a few other people to show up, and when
19 they showed up, then we all drove to the front of his house and
20 went in at the same time.
21 Q.  And who exactly was it that all went into Timimi's house at
22 the same time?
23 A.  Who was it?
24 Q.  Yeah.  Who were the people there with you besides -- well, it
25 was you and Hammad, correct?

# Surratt - direct

1  A.    Me, Hammad, and Ibrahim, and I remember Omar Madini, and

2  there's some more people, but I'm not sure if I remember all of

3  them right now.

4  Q.    And where, where were these people from?  Were they people

5  you knew from Dar al-Arqam?

6  A.    Yes.

7  Q.    All right.  And were they people you knew from anywhere else?

8  A.    I didn't know them from anywhere else, no.

9  Q.    And I think we're going to need a spelling.  You said Omar

10  Madini?

11  A.    Yes.  I can spell it, but I don't know how he spells his

12  name.  I can spell it how it sounds, I mean.

13  Q.    Okay.  Yeah, just do the best you can.

14  A.    First name, O-m-a-r.  His last name is M-a-d-a-n-i.

15  Q.    All right.  And if we could pull up, I believe it's in

16  evidence, Exhibit 1J13?

17         Mr. Surratt, do you recognize this individual?

18  A.    Yes.  I think that -- yes, that is.  That's Ali Asad.

19  Q.    And who is Ali Asad?

20  A.    He's just a Muslim guy I know.

21  Q.    Where do you know him from?

22  A.    From around --

23  Q.    And was he one of the people that went to Timimi's house that

24  night as well?

25  A.    Yes, he was.

**Surratt - direct**

1  Q.   Now, the people that went to Timimi's house that night, was

2  there anything that all those people had in common?

3  A.   Most of them attended Dar al-Arqam and were all Muslim.  Some

4  of them -- not all of them but most of us, we had played paintball

5  together sometimes.

6  Q.   And just trying to give us sort of a time frame, when was it

7  that you had played paintball with these individuals?

8  A.   It was before 9/11, 2000 and 2001.

9  Q.   Okay.  And in paintball, you're actually using a paintball

10  gun, correct?

11  A.   Yes.

12  Q.   All right.  Did you know anybody that attended the meeting at

13  Timimi's that day that also owned real guns?

14  A.   Besides myself, Hammad did, Caliph did, and Ibrahim did.

15  Those are the only ones I know.  Oh, Omar Madini, also.

16  Q.   And did you know anybody at the meeting at Timimi's including

17  yourself that was ex-military?

18  A.   Me and Hammad.

19  Q.   And what branch of the -- you were not in the active service

20  at that time, though, correct?

21  A.   No, I was not.

22  Q.   What branch of the service had you been in?

23  A.   Marine Corps.

24  Q.   And how about Hammad?

25  A.   In the Army.

**Surratt - direct**

1  Q.   And, Mr. Surratt, if I could have you take a look at

2  Government's Exhibit 7A36?  And it's -- actually, the court

3  security officer could probably help us.  It's one of the

4  firearms.

5          THE COURT SECURITY OFFICER:  What's the number?

6          THE COURT:  7A --

7          MR. GIBBS:  7A36.  Thank you.

8          Actually, I'm sorry, Judge; it's my mistake.  7A36 is

9  actually a photograph.  This is one of the ones we got a picture

10 of.

11         THE COURT:  That's all right, Mr. Wood.  We don't have

12 it here.

13         MR. GIBBS:  So instead, I think we'll just go ahead and

14 pull it up, if we can.

15         THE COURT:  There's no objection to that exhibit other

16 than what might have been in the past, right?

17         MR. MAC MAHON:  No objection, Your Honor.

18         THE COURT:  All right, it's in.

19         (Government's Exhibit No. 7A36 was received in

20 evidence.)

21 BY MR. GIBBS:

22 Q.   And, Mr. Surratt, if you can take a look at the screen,

23 Exhibit 7A36 is before you.  Do you recognize that item?

24 A.   Yes, it looks like my rifle.

25 Q.   And what type of rifle did you have?

**J.A. 530**

## Surratt - direct

1  A.    It's a Kalashnikov converted into a hunting rifle.

2  Q.    And what's a Kalashnikov?

3  A.    It's an AK-47-type rifle.

4  Q.    And is there a particular reason you got this type of rifle?

5  A.    Well, I bought the rifle for several reasons.  One of them

6  was I was concerned for my home safety around the year 2000; and

7  second of all, it was cheap; and third, because it's widely used

8  around the world, and I wanted to have a little familiarity with

9  it for my own knowledge.

10  Q.    And when you say "widely used around the world," does that

11  include some of the areas you testified about earlier such as

12  Chechnya and Kashmir?

13  A.    Yes.

14  Q.    All right, thank you.

15        And the next one, I don't know if it's a photograph,

16  Exhibit 3A2, if we have a photograph, we'll just go ahead and --

17  actually, this is one, Judge, if we could have the real item?  I

18  think we do have 3A2.

19        Mr. Surratt, Mr. Wood will hold that there for you.  If

20  you would take a look at it and once you've had a chance to

21  identify it?

22  A.    That was Seif's rifle, but Seif sold it to Ibrahim.

23  Q.    And you say "Seif."  What's his full name?

24  A.    Chapman, I believe.

25  Q.    And do you know what type of firearm this is?

# Surratt - direct

1  A.    It's a Kalashnikov rifle also converted into a hunting rifle.

2  Q.    And you say that Chapman gave it to Hamdi; is that correct?

3  A.    He sold it to him, yes.

4  Q.    Do you know how that came about?

5  A.    No, I have no idea.  I just know that he told me that he sold

6  it to him.

7  Q.    That -- okay.  Thank you.  That's fine.

8         Now, Mr. Surratt, you testified that you and these other

9  people went into Timimi's house as a group.  When you first got

10 inside, what did the people in the house do with their cell

11 phones?

12 A.    They turned them off.

13 Q.    And why did you turn off your cell phones?

14 A.    We turned it off because -- for -- probably for multiple

15 reasons.  One reason was because --

16         MR. MAC MAHON:  Objection, Your Honor.  If it was

17 probable reasons, if it was something that the defendant actually

18 said or if someone else said, he should say it.

19         THE COURT:  Right.  We need to -- not probably.  We need

20 to know exactly why you did it and if you were told by anyone to

21 do it.

22         THE WITNESS:  Well, we weren't told, or it wasn't said.

23 It was understood.

24         THE COURT:  All right.

25         THE WITNESS:  So I don't know why about anybody else.  I

## Surratt - direct

1  know why I turned mine off.

2          THE COURT:  Well, why did you turn yours off?

3          THE WITNESS:  Because for one, I didn't want to disturb

4  Ali Timimi while he talked, and two, it was kind of an

5  understanding that we thought -- I thought that they can listen to

6  conversations through a cell phone.

7  BY MR. GIBBS:

8  Q.   That who can listen to conversations through cell phones?

9  A.   The authorities or anyone who had the technology to do it.

10 Q.   And after everyone at Timimi's house turned off their cell

11 phones, what happened at that point?

12 A.   After we turned off the cell phones?

13 Q.   Right.

14 A.   Then we sat down, and we were talking, and he began to talk,

15 basically give a small lecture from a paper that he had.  First,

16 of course, he began to tell us, you know, he was glad that we're

17 there and that type of thing, welcomed us.  It wasn't just he

18 started talking first of all.

19 Q.   All right.  And this is Ali Timimi talking, correct?

20 A.   Yes.

21 Q.   And how were people arranged in the room when he started

22 talking to you?

23 A.   Well, we were sitting in the living room on his floor in a

24 circle.

25 Q.   And just describe for the jury what Timimi said after he

**Surratt - direct**

1  welcomed everybody and he began his talk.  What did he say to the
2  group?
3  A.    Well, he -- like I say, he began by, you know, praising God
4  and his Prophet, and he said that he would -- he wanted to tell us
5  briefly about stuff that he talked about before, but he wasn't
6  going to go into a lot of detail because it was being repetitive.
7  Some of the guys had been there before.  He doesn't want to be
8  repetitive over and over and over again.
9  Q.    All right.  Was it your understanding this was not the first
10 time he had had a meeting like this?
11 A.    It was my understanding this was not the first time.
12 Q.    And he said he didn't want to be repetitive of things he had
13 said previously; is that correct?
14 A.    Yes.
15 Q.    And then what did he say?
16 A.    Then he, he talked about -- he had a paper, and he was, he
17 was basically summarizing it for us.  It was in Arabic, and the
18 first thing the paper was talking about was sort of the history of
19 America and some of the things and the policies and the ways that
20 America has done in the past, and after he talked about that, the
21 next thing I remember he talked about was 9/11.
22          He talked about whether or not it was -- what happened
23 was legal or not legal in Islam, and he kind of -- I don't
24 remember if it actually gave an actual answer.  He kind of was
25 more --

391

**Surratt - direct**

1          MR. MAC MAHON:  Your Honor, I object.  If he doesn't

2    remember, he doesn't remember.

3          MR. GIBBS:  Well, Judge, I think he's testifying to the

4    best of his recollection.

5          THE COURT:  I'm going to allow this, and you can probe

6    it more for detail on cross.  Go ahead.  Overruled.

7          MR. GIBBS:  Thank you, Judge.

8          THE WITNESS:  Well, like I said, the paper was kind of

9    to me, in my opinion, it was leaving it more -- didn't really give

10   a decisive answer as to whether or not it was legal or not legal,

11   what happened on 9/11, but the reason why I think it was because

12   regardless of whether it was or not, the repercussions of what

13   happened make it not a good thing that happened, meaning the

14   position that it put the Muslims in the world in today made it not

15   something that should have happened.

16   BY MR. GIBBS:

17   Q.   Now, is it your opinion, or is that what was said from the

18   paper?

19   A.   That's what was said from the paper.

20   Q.   And you talked about the paper itself.  You said it was in

21   Arabic.  What was Timimi doing with this Arabic paper while he was

22   talking to you?

23   A.   He had it in his hand.

24   Q.   And was he referring to it at various times?

25   A.   He'd glance at it and look at it, but he wasn't reading it

**Surratt - direct**                                                  392

1  verbatim, no.

2  Q.   And after that, after he discussed September 11 and the

3  ramifications of that event, what, if anything, did he say to the

4  group there at his house?

5  A.   After that, he talked about that the area of conflict, which

6  I'll say is Pakistan and Afghanistan, was going to -- they're

7  going to need a lot of help, and they're going to need our

8  support, and that it's obligatory for us to help them in whatever

9  way we can.

10 Q.   Obligatory to help whom?

11 A.   The Muslims of that area.

12 Q.   And when you say "that area," what area specifically are you

13 talking about?

14 A.   Pakistan and Afghanistan.

15 Q.   And at that time, was there any distinction in your mind

16 between Pakistan and Afghanistan?

17 A.   Not really, no.

18 Q.   Now, what, if anything, did Timimi say when he talked to the

19 group there at his house about the Taliban?

20 A.   I never actually heard him talk about the Taliban, say the

21 word "Taliban."  I heard him say the brothers and the Muslims for

22 the area, but he just said that they were going to need our help.

23 Q.   And you talk about the area, but did he specify what area of

24 the world this was that he was talking about?

25          MR. MAC MAHON:   That's asked and answered three times

**J.A. 536**

**Surratt - direct**

1  now, Your Honor. He said Pakistan and Afghanistan.

2          THE COURT: Yes, that's what he said. Sustained.

3  BY MR. GIBBS:

4  Q.   And at that time, Mr. Surratt, were you following the events

5  that were going on in the world in Pakistan and Afghanistan?

6  A.   Yes, I was following them.

7  Q.   And what was going on in that part of the world at the time

8  of that meeting?

9  A.   It was basically they were accusing Usama Bin Laden of being

10  involved in 9/11 at the time, and they wanted the Taliban to hand

11  him over, and the Taliban refused to do it without proof.  They

12  wanted them to, you know, don't just tell us what you want us to

13  do.  Show us, and then we'll work together and see what you have

14  to say.

15          So it was kind of obvious that they weren't going to

16  give him up and that probably America was going to go to war over

17  it, but -- and Pakistan at the time, we weren't sure if they were

18  going to support Afghanistan or if they were going to support

19  America or if they were going to stay out of it.  It was unclear.

20  Q.   And did Timimi talk at all at his house that day about what

21  the people in that room and the people at his house should do

22  given the fact that it was obligatory to support the people in

23  Pakistan and Afghanistan?

24  A.   Yes.  One of the things that we have to do if we're able to

25  was to go there and support them physically in all ways that we

**Surratt - direct**

1 │ can physically.

2 │ Q.   And can you describe the ways that the people in Pakistan and

3 │ Afghanistan can be supported physically?

4 │         MR. MAC MAHON:  Objection, Your Honor, as to what

5 │ Al-Timimi said was the only issue in the case.

6 │         THE COURT:  I think that's correct.  Sustained.  You

7 │ need to rephrase the question.

8 │ BY MR. GIBBS:

9 │ Q.   What was your understanding of what it meant to support the

10 │ people of Afghanistan and Pakistan physically?

11 │         MR. MAC MAHON:  I'm going to object to that, too, as

12 │ well, Your Honor, unless it's something that the defendant told

13 │ him.

14 │         THE COURT:  Sustained.

15 │         What, if anything, did Dr. Ali Timimi say about how you

16 │ would go about physically supporting the people in that area?  Did

17 │ he say anything about that?

18 │         THE WITNESS:  Just all ways physically.  He didn't say

19 │ specifically like, you know, any specifics, no.

20 │         THE COURT:  All right.

21 │ BY MR. GIBBS:

22 │ Q.   Now, when you were there at Timimi's house and he was reading

23 │ from this Arabic document, did you ask him anything about the

24 │ document?

25 │ A.   After he concluded about, you know, supporting them

**J.A. 538**

**Surratt - direct**

1  physically, if you can't support them physically, support them
2  financially, if you can't support them financially, support them
3  through speaking of them good or telling the good of what they are
4  doing, and if you can't do that, then at least pray for them.

5          And then after he finished and he was done talking, I
6  asked him, you know, what was the paper?  Who was, you know, where
7  could I get it?  Even though it was in Arabic, I wanted to know if
8  I could get it and whether or not it was in English or not.

9  Q.   And why were you interested in getting the paper?
10 A.   Because he was only summarizing the paper.  I wanted to read
11 it all and see everything that it was saying.

12 Q.   And what did he tell you about the paper?
13 A.   He said that it's online, that there's probably some people
14 who are translating it, but he used the language, "There are some
15 brothers probably translating it," that I'd probably be able to
16 find it online.

17 Q.   And did he tell you who the author of the Arabic paper was?
18 A.   He didn't tell me, but I looked at the paper, and I saw that
19 it was Safar Hawaali.

20 Q.   Safar Hawaali?
21 A.   Yes.

22 Q.   All right. Can you read any Arabic?
23 A.   I can read it, yes.

24 Q.   Can you read enough that you can make out the name Safar
25 Hawaali on there?

**Surratt - direct**

1   A.   Yes.

2   Q.   And at some point after that meeting at Timimi's house, did

3   you make an effort to find this particular paper online?

4   A.   Yes, I did.  Afterwards, I went online, and I did some search

5   engines, but I didn't really have to go far because I belonged to

6   an e-list called, it was from Al-Jazeera, and there was a link

7   that someone had put on there for the actual, I guess, call it a

8   thesis paper or something from Safar Hawaali.  It was in Arabic,

9   though.

10  Q.   And you were able to get the paper by going through that

11  link?

12  A.   Yes.

13          MR. GIBBS:  All right.  If we could just pull up

14  Government's Exhibit 7D3?

15          THE COURT:  Is this in yet?

16          MR. GIBBS:  I don't know if there's been a stipulation.

17          THE COURT:  Is there any objection to 7D3?

18          MR. MAC MAHON:  I have to see it when it comes up, Your

19  Honor, I'm sorry.  Our exhibit book has fallen apart.

20          THE COURT:  Well, you need to look at it before it goes

21  on the screen.

22          MR. MAC MAHON:  Thank you, Your Honor.

23          No, there's no objection to that.

24          THE COURT:  All right, it's in.

25          (Government's Exhibit No. 7D3 was received in evidence.)

**J.A. 540**

**Surratt - direct**

1  BY MR. GIBBS:

2  Q.  All right.  And actually, Mr. Surratt, before you take a look

3  at that, just very quickly, other than telling you that some of

4  the brothers are translating this document online, did Timimi tell

5  you anything about the name of the paper?

6  A.  That it was Statements, Statements to the Ummah.  I don't

7  know the whole, full name.  He gave me the name of what it was.

8  Q.  So at the meeting, he did tell you the name of the paper?

9  A.  Yes.

10  Q.  And you said Statement to the Ummah.  What does "Ummah" mean?

11  A.  It means like the nation of Muslims.

12  Q.  It means like?

13  A.  Like the collective nation of Muslims.

14  Q.  Okay.  And if you could take a look at the exhibit that's

15  before you?  And actually, why don't we, let's -- if we can

16  enlarge that portion?

17        Mr. Surratt, do you recognize Government's Exhibit 7D3?

18  A.  Yes, I do.

19  Q.  What is that?

20  A.  It's an e-mail from me, and I was thanking somebody, I don't

21  know who they were, somebody who was on the e-list for posting the

22  link to the -- one of his papers.

23  Q.  And is this actually the means that you used to get the paper

24  that Ali Timimi was reading from at his house that day?

25        MR. MAC MAHON:  Objection, Your Honor, as to lack of

**Surratt - direct**

1  foundation.  Maybe we should approach on this.

2              THE COURT:  All right.

3              (Bench conference on the record.)

4              MR. MAC MAHON:  If I can, Your Honor, they haven't

5  identified the date of this meeting.  Sometime in October is what

6  they said.

7              If you look at the exhibit that's in evidence, you'll

8  see that the Safar Hawaali message that they're discussing where

9  this person first finds it on the Internet is Monday night,

10  October 15, 2001.

11             Now, there has to be some foundation that if this

12  meeting happened beforehand and this document didn't exist, that

13  it shouldn't come in this way if it's coming in.  They have to lay

14  some foundation to show that this meeting took place after -- or

15  before this happened.

16             THE COURT:  The testimony right now is this meeting

17  occurred sometime after September 16, and his testimony was it was

18  sometime in October.  That's enough.  I don't -- if that's the

19  basis for the objection, that's not sufficient.

20             And you again can probe that a little more on cross, but

21  I don't see any reason why that would be inappropriate.  I mean,

22  that's what the testimony is.  You're talking about events that

23  occurred over three years.  If a witness can say, "I remember it

24  happened sometime in October, and thereafter, I went on the

25  Internet, and I did such-and-such," obviously, the meeting was

## Surratt - direct

1   sometime before October 15.

2          MR. MAC MAHON:  Excuse me, Your Honor, what I'm trying

3   to say, if that's what he's going to say, the meeting was after

4   October 15 --

5          THE COURT:  No, the meeting --

6          MR. MAC MAHON:  Well, I'll explore it on cross

7   examination.  Thank you, Your Honor.

8          (End of bench conference.)

9          MR. GIBBS:  Thank you, Judge.

10  Q.   Now, Mr. Surratt, when was the first time you became aware of

11  Safar Hawaali's Statement to the Ummah, that paper?

12  A.   At Ali Timimi's house.

13  Q.   When you saw him with it in his hand?

14  A.   Yes.

15  Q.   And then at some point after that, did you take some steps to

16  try to get your own copy?

17  A.   Yes.  That's when I went online.

18  Q.   And can you explain, I believe it's 7D3, the significance of

19  this document?

20  A.   This is -- it was in response to an e-mail that was sent to

21  the e-list from me thanking them for providing the link for that

22  actual document.

23  Q.   And by using this particular e-link, were you able to get a

24  copy of Safar Hawaali's message to the Ummah in English, or at

25  least part of it?

**Surratt - direct**

1   A.   Part of it, yes.

2   Q.   And just real briefly, in the e-mail itself, you talk about a

3   particular individual here, I'll circle it, Sheikh Salman.  Do you

4   know who that is?

5   A.   Yeah.  That's, his name is Salman Al-Ouda.

6   Q.   And who is Salman Al-Ouda?

7   A.   He is a scholar in the Arabian Peninsula, also.

8   Q.   And why did you want to get a copy of his statement?

9   A.   Because he's well-respected by me, also.

10  Q.   By you as well?

11  A.   Yes.

12        MR. GIBBS:  All right.  And if we could move down on

13  that e-mail, please?  Keep going a little further.  All right,

14  that's good.

15  Q.   Now, Mr. Surratt, I also want to circle that paragraph there.

16  You talk about some of the -- there's a discussion in there about

17  some of the peninsular sheikhs, and the first one is Sheikh

18  Shuaibi?

19  A.   Yes.

20  Q.   Do you know first of all that person's full name?

21  A.   Sheikh Hammoud Ibn Uqla Al-Shuaibi or something like that.

22  Q.   And is he ever referred to as Sheikh Uqla?

23  A.   Some people, yes.

24  Q.   And how about the next one, Sheikh Salman?

25  A.   That's Al-Ouda, also.

**Surratt - direct**

1  Q.  And then Sheikh Ibn Jibreen, do you know who that is?

2  A.  Yes.

3  Q.  Who is that?

4  A.  He's also a sheikh from the Arabian Peninsula.

5  Q.  And how about the next one, Sheikh Safar?  Is that Safar

6  Hawaali?

7  A.  Yes, it is.

8  Q.  All right, thank you.

9        Now, as a result of going on this e-link, Mr. Surratt,

10  did you, in fact -- you said you got a copy of the Hawaali

11  Statement to the Ummah?

12  A.  Yes.

13  Q.  And if I could have you take a look at another exhibit, it's

14  Government's Exhibit 7A23.

15        THE COURT:  Any objection?

16        MR. MAC MAHON:  Yes, there is an objection to that

17  exhibit, Your Honor.

18        THE COURT:  Hold on, don't post it.

19        MR. MAC MAHON:  The document is incomplete, Your Honor.

20        THE COURT:  Wait a minute.  I'm trying to see my copy of

21  it.  7A23?

22        MR. MAC MAHON:  Yes, Your Honor.  If you flip to the

23  last page of the exhibit, you'll --

24        THE COURT:  Well, it's supposed to be a 22-page

25  document, right?

**Surratt - direct**

1          MR. MAC MAHON:  22 of 22 is what I have.

2          THE COURT:  Right.

3          MR. MAC MAHON:  If you look at the bottom of page 22,

4   you'll see the basis for the objection.

5          THE COURT:  I don't think that's enough to keep it out.

6   I mean, if you -- I'm not quite sure I know why it's coming in at

7   this point, but the fact that two pages are missing --

8          MR. MAC MAHON:  Excuse me, it's 11 pages that are

9   missing.  It's a full third of the document.

10          THE COURT:  What's the purpose of this document going

11   in?

12          MR. GIBBS:  Judge, this is the English translation of

13   the document that the witness just testified Timimi was holding in

14   his house when he was at that meeting.

15          THE COURT:  Well, did you actually look at the document

16   that the defendant was holding?

17          THE WITNESS:  Yes, I did.

18          THE COURT:  Did you count how many pages were in it?

19          THE WITNESS:  No.  It was -- the document he had was in

20   Arabic.

21          THE COURT:  Well, this would not have been the document

22   that was being held in any case.

23          MR. GIBBS:  No, this is a translation of that document,

24   Judge.

25          THE COURT:  I think you're going to need to tie this up

**Surratt - direct**

1  better than this.  I'm sustaining the objection at this point.

2          MR. GIBBS:  And if I could just clarify a little bit on

3  that, Judge?

4  Q.   In terms of what Timimi told you at his house there when you

5  asked him about the document, well, your testimony was he said

6  that it was being translated?

7  A.   Yes.

8  Q.   And did he give you enough information about the document for

9  you to be able to find it online?

10 A.   Just the name of the document.  That's why I used to do the

11 search --

12 Q.   The name, and did he tell you the author of the document?

13 A.   Safar Hawaali.

14 Q.   And you actually saw that in Arabic on the document?

15 A.   Yes.

16         MR. MAC MAHON:  Yes, Your Honor, this is all asked and

17 answered.

18         THE COURT:  I agree.  Sustained.

19 BY MR. GIBBS:

20 Q.   And when you made efforts to find the document, you testified

21 about Exhibit 7D3 as far as going online to get it.  Did you, in

22 fact, get a copy of Safar Hawaali's Statement to the Ummah?

23 A.   Yes.  The link, actually the one that was on the e-list was a

24 link to the Arabic version.  Then I had to do my own search, which

25 was when I found the English version.

**Surratt - direct**

```
 1  Q.   And how did you -- describe the search you made and the
 2  connection you made between the Arabic document and the English
 3  document that you located.
 4  A.   Oh, they had the same name, same author, and same title.  I
 5  didn't read all through the Arabic one because my Arabic isn't
 6  that good.
 7  Q.   And did you print off a copy of the English document and save
 8  it?
 9  A.   Yes.
10  Q.   And, in fact, did you have that in your house when it was
11  searched by the FBI back in 2003?
12  A.   Yes.
13  Q.   And did you read the document, the Statement to the Ummah
14  that you printed off the Internet?
15  A.   Yes, I did.
16  Q.   And were the things that were said in that document
17  consistent with the things Timimi said at his house the night you
18  went to the meeting there?
19  A.   Yes.
20            MR. MAC MAHON:  Objection as to foundation, Your Honor.
21  All he said was that he summarized a few points in it.
22            THE COURT:   Well --
23            MR. MAC MAHON:  Now he's looking at a 30-page document.
24            THE COURT:  -- a person can testify that a document is
25  consistent or inconsistent with something he heard.  No, I'm going
```

**Surratt - direct**

1    to overrule that objection.

2    BY MR. GIBBS:

3    Q.   And was the, the English document, Safar Hawaali's Statement

4    to the Ummah, consistent with the things Timimi said at his house

5    that day?

6    A.   Yes, it was consistent.

7         MR. GIBBS:  All right.  Now, if we could go back to 7D3

8    for just a moment?  If we could pull up -- if we could just

9    enlarge that, please?

10   Q.   All right.  Now, Mr. Surratt, you testified that in this

11   e-mail, you were responding to another e-mail on this link, and

12   you see the original message from Shibli Zaman.

13   A.   Yes.

14   Q.   Who is Shibli Zaman?

15   A.   I have no idea.

16   Q.   So this was just an individual who had posted to this

17   Al-Jazeera website?

18   A.   Yes.

19   Q.   And can you explain to the jury what an Al-Jazeera website

20   is?

21   A.   It's not really a website.  It's an e-list.  I was told by a

22   friend of mine, Ismail Royer, to -- he gave me the e-mail address.

23   He told me to join it, that it's a good e-mail list, that people

24   talk about a lot of good discussions and Islamic things and

25   topics.  So that's what I did.  I don't know anyone besides Ismail

**Surratt - direct**

1  Royer who was on it, the people's e-mails.

2  Q.  And what types of things did you do on the Al-Jazeera e-list?

3  A.  Sometimes I would respond to whatever the topic was, and

4  sometimes I would just read it.

5  Q.  And when you say "respond," you'd send out e-mails?

6  A.  Oh, I'd send out an e-mail.  When you would send e-mail on

7  the e-list, it goes to everybody on the list.  I'd ask questions,

8  or I'd respond, or I would just read it.

9  Q.  And would people ever respond to your e-mails?

10  A.  Sometimes, yes.

11  Q.  All right, thank you.

12      Now, you testified about one of the individuals in that

13  particular document, 7D3, that Sheikh Uqla.  Do you recall that?

14  A.  Yes.

15      MR. GIBBS:  And if I can pull up another document, 7A19?

16      THE COURT:  All right.  Again, any objection to 7A19?

17      MR. MAC MAHON:  We object to that exhibit, Your Honor.

18      THE COURT:  On what ground?

19      MR. MAC MAHON:  We've already gone around the horn on

20  this one exhibit.  I think that you've seen it before, but it

21  doesn't -- it's not tied in here to the defendant.  It's just

22  something that this person was reading on the Internet.

23      THE COURT:  All right, hold on just a second.

24      All right, to move this along, Mr. Gibbs, in terms of

25  documents which this witness had either in his home when it was

# Surratt - direct

1  searched or at various times during the relevant time period, it's
2  of marginal relevance to this case unless you can connect it to
3  the defendant, all right?  So is there any connection with 7A19 to
4  Dr. Al-Timimi?
5          MR. GIBBS:  There is, Judge.
6          THE COURT:  All right.  Well, then you'll need to do
7  that before you can show it to the jury.  It's not in yet.
8          MR. GIBBS:  Okay.  Can we have the witness take a look
9  at 7A19?
10 Q.  Do you recognize that document?
11 A.  Yes, I do.
12 Q.  All right.  What is that document?
13 A.  It's -- it was a fatwa or a religious ruling that was posted
14 on the -- a link to it from the -- on the e-list, also, and I --
15 this actual document is me.  I copied it, and I kind of edited it
16 and put a little -- changed it a little bit so that it's more --
17 it looks better and printed it out.
18 Q.  And did you actually have this document at your house when it
19 was searched by the FBI in 2003?
20 A.  Yes, I did.
21 Q.  And had you actually printed this document out in 2001 and
22 had a discussion with Ali Timimi about it?
23 A.  Yeah.  I asked him about it, but I didn't give it to him.
24 Q.  All right.  And what was the nature of the discussion you had
25 with Ali Timimi about this document?

**Surratt - direct**

1          THE COURT: I'm sorry, let's get a time frame. About
2    when did you have a discussion with the defendant about this
3    document?
4          THE WITNESS: It was after 9/11. I'm not sure exact
5    date.
6          THE COURT: Where does it fit in between September 11
7    and the October meeting at the defendant's home?
8          THE WITNESS: Are you asking me where I was at when I
9    asked him?
10         THE COURT: No, no, no. In other words, did you discuss
11   this document with the defendant before the October meeting at his
12   home or after that?
13         THE WITNESS: After. I'm not sure where it was.
14         THE COURT: Where did you discuss it with the defendant?
15         THE WITNESS: I'm not sure. I don't remember where.
16         THE COURT: All right.
17         THE WITNESS: It was just -- it was a two-sentence
18   conversation. It wasn't like I had a big discussion about it.
19         THE COURT: Go ahead, Mr. Gibbs.
20   BY MR. GIBBS:
21   Q.   And what did you ask the defendant -- well, first of all, why
22   did you want to ask the defendant about this particular document?
23   A.   Well, at the time, it was one of the only documents that I
24   had where somebody was trying to explain what happened on 9/11
25   using the Koran and hadeeth to explain what their religious ruling

# Surratt - direct

1  is concerning it.  So I was concerned on some parts of it, on the

2  usage of it, and I started to believe it because that's all I was

3  hearing.  I didn't have any refutation of it, so I was seeking a

4  refutation to see if anybody had a scholarly refutation of what he

5  had to say.

6  Q.    And was Timimi one of the people who you felt like could give

7  you a scholarly opinion about this document?

8  A.    Yeah, he was.

9  Q.    And what did he tell you about this document?

10 A.    Well, I asked him if he knew who Sheikh Shuaibi was, and he

11 said that he knew who he was and that he's an okay guy, and I

12 asked him did he read the fatwa, and he said, "Yes, I read it,"

13 and that was it.  He didn't say anything about it.

14 Q.    All right.  And Sheikh Shuaibi, that's also -- it's

15 Shuaibi -- or Bin Uqla Al-Shuaibi, correct?

16 A.    Yeah, Sheikh Hammoud Bin Uqla Al-Shuaibi.

17         MR. GIBBS:  Judge, at this time, I would again move it

18 in, and I would note for the Court that this was the document that

19 the previous witness also testified about.

20         THE COURT:  Well --

21         MR. MAC MAHON:  Objection.  It was not a document.  He

22 said he made this up himself, Your Honor, and I think given the

23 time frame and discussion, that's not enough link in this case to

24 put it in against the defendant.

25         THE COURT:  Oh, I think it is at this point, so I'm

**Surratt - direct**

1   going to let 7A19 in evidence.

2              (Government's Exhibit No. 7A19 was received in

3   evidence.)

4              THE COURT:   7A23 is not in evidence, just so we're clear

5   where we've been.

6   BY MR. GIBBS:

7   Q.   And if we -- yeah, we could put that up there?

8              THE COURT:   7A19.

9              MR. GIBBS:   Correct.  And if we could -- yeah, why don't

10  we go to page 7 of that document if we could.  Actually, one more.

11  Q.   And, Mr. Surratt, we're going to enlarge a paragraph of this

12  particular document and have you take a look at it.

13             Now, you testified that this document related to the

14  events that occurred on September 11?

15  A.   Yes.

16  Q.   And there's a paragraph here you have before you, it

17  says, "Also, whoever says that there are 'innocent victims'

18  without any differentiation between their categories must accept

19  that he is accusing the Prophet and the companions and those after

20  them that they killed 'innocent victims' according to them.

21  Because the Prophet used a catapult in his war against Ta'if, and

22  it is the nature of a catapult is that it does not differentiate.

23  (It only throws what you put in it where you point it.)"

24             Now, Mr. Surratt, is there any similarity between this

25  statement in 7A19 and the things Timimi said at the Dar al-Arqam

**Surratt - direct**

1  on September 11?

2  A.    There's a similarity, yes.

3  Q.    And what is that similarity?

4  A.    It's the uses of collateral damage.

5  Q.    Thank you.

6        Now, Mr. Surratt, going back to the meeting at Timimi's

7  house, other than asking him about the Safar Hawaali Statement to

8  the Ummah, what else did you do after he finished talking to the

9  group?

10 A.    That day or are you talking about a different day?

11 Q.    No, actually at his house, after he finished talking.

12 A.    After he finished talking?  I didn't do too much nothing

13 really.  I just talked amongst other friends and stuff.

14 Q.    All right.  Did you have a conversation with Timimi himself

15 after he finished talking?

16 A.    I had a conversation with him about the paper, trying to see

17 where I can get it from, and also, I told him that, that me

18 myself, I couldn't go to -- I wasn't able to go to Pakistan or

19 that area because I had a wife, and I know she wouldn't be able to

20 handle that environment.

21 Q.    And again, Pakistan, in that area, is Pakistan and

22 Afghanistan?

23 A.    Yes.

24 Q.    Now, why did you feel the need to tell Timimi that you

25 couldn't go to Pakistan or Afghanistan?

**Surratt - direct**

1  A.    Well, because I felt like that, you know, I felt it was my
2  duty to try to help them in the best I could and that, you know, I
3  felt -- I was kind of upset that, you know, I had the
4  responsibility of my wife, and I didn't want to -- it was kind of
5  a conflict in between myself, so I was basically trying to get his
6  opinion on it.
7  Q.    And why did you feel like it was your duty to help those
8  people over there?
9  A.    Because of the situation they were about to face.  They
10 needed help.  That's why.
11 Q.    And what was your understanding of the situation they were
12 about to face?
13         MR. MAC MAHON:  Your Honor, I object unless it's
14 something that Ali Al-Timimi told him that day.
15         THE COURT:  All right, rephrase the question.
16 BY MR. GIBBS:
17 Q.    Well, based on the talk that Timimi gave you at his house
18 there, what was your understanding of what the people in that part
19 of the world were about to face?
20 A.    They were about to face going to war.
21 Q.    With?
22 A.    With America.
23 Q.    And what was Timimi's response to you when you said that
24 because of your obligation to your wife, that you couldn't go over
25 there to help the people in that part of the world?

**Surratt - direct**

1    A.    He just told me that it's okay, that if you can go to another
2    Muslim country and live and be amongst the Muslims and help them,
3    that that's fine, because everybody can't be a doctor, everybody
4    can't be an engineer, that we need all types of people and all
5    types -- there's other places in the world you can go to.
6    Q.    And when he talked about everybody can't be a doctor,
7    everybody can't be an engineer, did he talk about anything else
8    that everybody can't be?
9    A.    Not that I remember, no.
10   Q.    So he just said that if you can't do it because of your wife,
11   that's okay?
12   A.    Yes.
13   Q.    Now, did anybody else that you heard in that meeting talk to
14   Timimi the way you did?
15   A.    I don't know because this is something that I pulled him to
16   the side and I asked him between me and him.  It wasn't something
17   that I asked in front of everybody else.
18   Q.    And did you see anybody else pull him aside and talk to him
19   in the same way?
20   A.    Everybody was talking to him in their own side, like, side
21   conversations.  While maybe me and Hammad were talking, maybe
22   somebody else was talking to him.
23   Q.    And do you know if anybody else from that meeting went
24   overseas?
25   A.    From that meeting?  No, I don't know of anyone else.

# Surratt - direct

1  Q.   All right.  And did you ever discuss with the gentleman you
2  identified as Ali Asad what he was planning to do?
3  A.   No.  I just barely knew the guy.  I didn't discuss anything
4  with him.
5  Q.   All right, Mr. Surratt, I want to go back to one point
6  earlier.  When you first found out that Timimi was meeting with
7  some of the brothers privately from Hammad Abdur-Raheem, did
8  Hammad tell you anything about what Timimi had said to him and the
9  others that prompted them to go overseas to Pakistan?
10           MR. MAC MAHON:  Objection.  Asked and answered, Your
11  Honor, and as to the time frame.
12           THE COURT:  Sustained.
13           MR. GIBBS:  Well, I can clear up the time frame, Judge.
14           THE COURT:  Let's hear you.
15           MR. GIBBS:  All right.
16  Q.   You know what I'm talking about, at Hammad's house, when you
17  were waiting for Yong Kwon.
18  A.   Okay.  Yes.
19  Q.   All right.  During that night at his house, did he tell you
20  anything about what Timimi said that caused those other
21  individuals you've already testified about to leave to go to
22  Pakistan?
23           MR. MAC MAHON:  That asks for hearsay, Your Honor.
24           THE COURT:  That's too far removed.  That's not reliable
25  enough.  Sustained.

**J.A. 558**

## Surratt - direct

1      MR. GIBBS:  All right.  Well, at this point, Judge, I'd

2  like to have Mr. Surratt identify some documents, and I think what

3  I'll do is I can just show them to Mr. MacMahon, and then if

4  they're acceptable, I can put them on the board.

5      THE COURT:  All right.

6      MR. GIBBS:  If we could pull up Government's Exhibit

7  7A12?

8      THE COURT:  Any objection to 7A12?

9      MR. MAC MAHON:  Yes, Your Honor, grounds of relevance.

10      THE COURT:  Well, don't pull it up until I've seen it.

11      You need to lay a foundation for this before it can be

12  shown to anyone.

13      MR. GIBBS:  That's fine, Judge.

14      If Mr. Surratt could take a look at the exhibit?

15      THE WITNESS:  Okay.

16  BY MR. GIBBS:

17  Q.   Do you recognize it?

18  A.   Yes, I do.

19  Q.   And how do you recognize it?

20  A.   It's something that I printed offline from a website called

21  azzam.com.

22  Q.   And what is azzam.com?

23  A.   It's a website that was -- deals with the conflict, basically

24  dealing with the conflict in Chechnya, but they also kind of deal

25  with Indonesia sort of.

**Surratt - direct**

1  Q.   And what was the purpose of printing this particular document

2  off of azzam.com?

3  A.   So that I could see sort of the stance that Sheikh Hammoud

4  al-Uqla, who gave the fatwa about 9/11, what his stance was on the

5  Taliban before even all this happened.

6  Q.   All right.  So this is the same Sheikh Uqla you've testified

7  about earlier?

8  A.   Yes.

9  Q.   And did you save this document, actually have it at your

10  house when it was searched in May of 2003?

11  A.   Yes.

12          MR. GIBBS:  Judge, at this point, I would move 7A12 in.

13          MR. MAC MAHON:  Lack of foundation as to this defendant,

14  Your Honor.  This document is dated November of 2000.

15          THE COURT:  Do you remember when you downloaded this?

16          THE WITNESS:  This is after 9/11 I downloaded it.

17          THE COURT:  Had you heard of this person before -- how

18  had you first heard of this particular scholar?

19          THE WITNESS:  After 9/11.

20          THE COURT:  From what source?

21          THE WITNESS:  From that fatwa.

22          THE COURT:  The fatwa that you saw where?

23          THE WITNESS:  Online, the one where I --

24          THE COURT:  Had this person's name been mentioned to you

25  in any respect at any of your meetings with the defendant?

**Surratt - direct**

1              THE WITNESS:  No.

2              THE COURT:  Had the defendant ever mentioned this man's

3    name in any of his speeches at the center?

4              THE WITNESS:  Not that I remember, no.

5              THE COURT:  So the first time you heard of him was

6    through your own research on the Internet?

7              THE WITNESS:  Yes.  It was from the e-list someone gave

8    a link to.

9              THE COURT:  That's not enough of a link as to this

10   defendant.  I'll sustain the objection.

11             MR. GIBBS:  All right, Judge, let me -- there's a couple

12   other documents I want to have him go through.

13   Q.   You testified earlier about the Jazeera list, correct?  Do

14   you remember that?

15   A.   Yes.

16   Q.   And again, what's the Jazeera list?

17   A.   It's an e-list of people who have a lot of Islamic

18   discussions and topics.

19             MR. GIBBS:  And if I could just have a moment, Judge?

20             All right, if I can have the witness take a look at

21   7D12?

22             MR. MAC MAHON:  Same objection as before, Your Honor.

23             MR. GIBBS:  Judge, I think these were defense exhibits

24   that were provided to us, and again, I could have the witness

25   identify it and authenticate it.

# Surratt - direct

1    THE COURT:  Well, I think the same concerns I had about
2  the previous exhibit would apply to this one, all right?  So this
3  man's reading material is not relevant unless it's connected to
4  the defendant either because the defendant suggested it or had
5  referenced it in his speeches, then I think it's sufficient.  But
6  just because Mr. Surratt had these materials doesn't mean
7  anything.  So you need to lay a foundation.

8  BY MR. GIBBS:

9  Q.  All right, Mr. Surratt, if you could just identify the first
10  one, 7D12?  Take a look at it, and if you recognize it, indicate
11  how you recognize it.

12  A.  Yes, I recognize it.  It's -- it was a discussion that we had
13  on the Al-Jazeera e-list, also.

14  Q.  And you say "a discussion we had."  Who are you speaking of
15  specifically?

16  A.  I don't know the people.  It's just people who belong to the
17  e-list.  I don't know the actual people who were on the e-list.

18  Q.  And what was the date of this particular document?

19  A.  It's September 18.

20  Q.  Of what year?

21  A.  Of 2001.

22    MR. GIBBS:  All right.  And, Judge, I'd like to just
23  have him go through these fairly quickly, have him authenticate
24  it, and then we'll prove it up with subsequent witnesses.

25    THE COURT:  Okay.

## Surratt - direct

1              MR. MAC MAHON:  I don't have any objection to the

2     authenticity of them.  They all came from a CD that the government

3     gave us of e-mails, and if he wants to show them to me, I'll

4     stipulate to the authenticity of the documents.

5              THE COURT:  All right.  Were these documents seized from

6     the defendant -- from the witness, I'm sorry, from Mr. Surratt?

7              MR. GIBBS:  I actually think we got most of these off of

8     a disk, right?

9              MR. KROMBERG:  Excuse me.  If I may, Judge, these were

10    seized in a different case, in a different investigation, and it

11    just happened that Mr. Surratt can say that yes, they were the,

12    the traffic that was going on this particular Al-Jazeera list,

13    which will be tied up later, Judge.

14             THE COURT:  If it's tied up, then it may come in, but in

15    terms of authenticity, there's no foundational objection to these

16    exhibits; is that right?

17             MR. MAC MAHON:  No, Your Honor.

18             THE COURT:  Then we can move this along, Mr. Gibbs.

19             MR. GIBBS:  Right.  That's fine.  And actually, just for

20    the record, these are the 7D exhibits.  I believe it's 7D1 through

21    7D13, if I'm not mistaken.  14?

22             MR. KROMBERG:  16.

23             THE COURT:  I'm sorry, 7D1 through 7D16?

24             MR. GIBBS:  That's correct, Judge.

25             THE COURT:  All right.  So there's no foundational

**Surratt - direct**

```
 1  issue, but whether they come in is another issue.
 2             MR. GIBBS:  And it's actually, Judge, 7D1 to 7D15 --
 3             THE COURT:  All right.
 4             MR. GIBBS:  -- that there's no defense objection to.
 5             MR. MAC MAHON:  Just as to foundation, Your Honor, just
 6  so the record is clear.
 7             THE COURT:  Correct.
 8             MR. MAC MAHON:  Authenticity.
 9             THE COURT:  Authenticity.
10             MR. MAC MAHON:  Thank you.
11  BY MR. GIBBS:
12  Q.    Now, Mr. Surratt, you testified that at the meeting at
13  Timimi's house, you told him that you couldn't go over to Pakistan
14  and Afghanistan because of your wife; is that correct?
15  A.    Yes.
16  Q.    And what did you tell him that you would be doing instead?
17  A.    That I was going to be going to Egypt and going to school and
18  trying to finish -- live there.
19  Q.    Can you keep your voice up a little bit?
20  A.    That I was going to be going to Egypt and live there.
21  Q.    And did you, in fact, do that move with your wife to Egypt to
22  live there?
23  A.    Yes, I did.
24  Q.    And what was your connection to Egypt?
25  A.    Oh, my wife, her mother is from Egypt, and her mother's side
```

**Surratt - direct**

1  of the family is all in Egypt, so that's why I chose that I was

2  going to go.

3  Q.   And after you got to Egypt, did you stay in contact with Ali

4  Timimi?

5  A.   I only contacted him once through an e-mail.

6  Q.   And at this point, I'd like to have you take a look at

7  Government's Exhibit 7D9.

8          MR. MAC MAHON:  No objection to that.

9          THE COURT:  All right, 7D9 is in.

10         (Government's Exhibit No. 7D9 was received in evidence.)

11         THE COURT:  All right, is there a question, Mr. Gibbs?

12  BY MR. GIBBS:

13  Q.   Have you had a chance to look at it?

14  A.   Yes, I have.

15  Q.   Do you recognize it?

16  A.   Yes.  This is an e-mail that I sent to Ali Timimi and that he

17  responded to it, and then I sent another e-mail to him.

18  Q.   And why did you send this particular e-mail to Ali Timimi?

19  A.   Because I had just left and I had just got there.  I wasn't

20  there very long, and I wanted to let him know everything was fine

21  and that I was doing well in Egypt.

22  Q.   All right.  And if you look at the bottom of page 1, it talks

23  about you're describing Cairo and the area a little bit.

24  A.   Okay.

25  Q.   Talking about how you've settled in Cairo and are doing quite

# Surratt - direct

1   well.  "It is nothing more than expected."

2           Then if we can go over to page 2?  Actually, page --

3   yeah, second page.

4           THE COURT:  Put it on the overhead then.

5           MR. GIBBS:  We will.  This one has got handwriting on

6   it, though, Judge.  I'll get a clean copy.

7   Q.   And you then go on to say on the second page, it's not

8   paradise but 1000 percent better than living amongst the Kufar who

9   kill and hate Muslims.  First of all, what's the Kufar?

10  A.   That's non-Muslims.

11  Q.   Non-Muslims?

12  A.   Yes.

13  Q.   All right.  Now, did you have any concern in putting that in

14  the e-mail to Ali Timimi that you would say anything to offend

15  him?

16  A.   No, I didn't.

17  Q.   And was this statement about the Kufar who kill and hate

18  Muslims, was this consistent with the things that were discussed

19  at Timimi's house that night in October?

20          MR. MAC MAHON:  Your Honor, that's very remote.  This is

21  his own writing to Dr. Al-Timimi.

22          THE COURT:  I think the document speaks for itself.  We

23  don't need that question.  I'll sustain the objection.

24          MR. GIBBS:  That's fine, Judge.

25  Q.   And did Ali Timimi actually respond to this e-mail?

**Surratt - direct**

```
 1  A.    Yes, he did.
 2  Q.    And did he say anything to object to this comment on page 2?
 3  A.    No, he did not.
 4  Q.    All right, thank you.
 5              And finally, Mr. Surratt, if you could take a look at
 6  Government Exhibit 7D10?
 7              THE COURT:  Is there any objection to 7D10?
 8              MR. MAC MAHON:  No, Your Honor.
 9              THE COURT:  All right, 7D10 is in.
10              (Government's Exhibit No. 7D10 was received in
11  evidence.)
12  BY MR. GIBBS:
13  Q.    And what is 7D10, Mr. Surratt?
14  A.    It's an e-mail I sent him from a second address that I was
15  using because my other address was being flooded with spam and
16  stuff.
17  Q.    And who did you send the e-mail to?
18  A.    To Ali Timimi.
19  Q.    And what was the purpose of sending this e-mail to Ali
20  Timimi?
21  A.    To just give him an update of how things were for me and what
22  was going on, and I had a question for him about a book that my
23  wife was asking me a question that I didn't have an answer for.
24  Q.    All right.  And if we could just take a look, if we can blow
25  up this portion?  Because I think it relates to what you just
```

**Surratt - direct**

1  testified about.

2        You said, "On that note, I have a question for you.
3  They have a tafseer class, and the only book they will use is one
4  I don't know about personally.  My wife wants me to ask you if
5  there are major problems with it or not and if so, what should she
6  look out for.  The name author of the book is Imam Al'alam Sheikh
7  Abdur Rahman bin Nasir Sa'adee.  It seems to been have reviewed by
8  Sheikh Uthaymeen, but I am not sure completely."

9        Now, what was it about your relationship with Ali Timimi
10 that you wanted to ask him his advice about this particular book?
11 A.    My relationship to him is one out of respect, and I respect
12 that he knew -- he would know if the book had some major problems
13 or if it had minor problems as far as beliefs are concerned or if
14 it had any problems with it.

15 Q.    And did he ever respond to you?

16 A.    No, he didn't.

17 Q.    And who is Sheikh Uthaymeen, if you know?

18 A.    He's another scholar from the Arabian Peninsula.

19 Q.    All right.  So another, I guess they talked about the

20 peninsular sheikhs?

21 A.    He's one of them, yes.

22 Q.    And he would be one?

23       Now, you said you didn't get a response back from

24 Timimi.  At some point, did you move back to the United States

25 from Egypt?

**J.A. 568**

**Surratt - direct**

1  A.   Yes, I did.

2  Q.   And when did that happen?

3  A.   Approximately about five or six months after being there.  I

4  came back due to a lot of problems, marital problems and other

5  problems, also.

6  Q.   And after you got back to the United States, did you maintain

7  any more contact with Ali Timimi?

8  A.   No.

9       MR. GIBBS:  Okay.  If I could just have a moment, Judge?

10      THE COURT:  Yes, sir.

11 BY MR. GIBBS:

12 Q.   Mr. Timimi, you -- excuse me, Mr. Surratt.  You testified

13 about Mr. Timimi and the meeting at his house in October 2001, and

14 you said that one of the things he told you when you said you

15 couldn't go to Afghanistan or Pakistan was that not everybody

16 could be a doctor and not everybody could be an engineer, correct?

17 A.   Yes.

18 Q.   Okay.  But you yourself are not a doctor, correct?

19 A.   No, I'm not a doctor.

20 Q.   And you yourself are not an engineer, correct?

21 A.   No, I'm not an engineer.

22 Q.   Did he elaborate on what he meant by not everybody can be a

23 doctor and not everybody can be an engineer?

24      MR. MAC MAHON:  Your Honor, objection.  It's been asked

25 and answered for one thing.

**J.A. 569**

**Surratt - cross**

```
 1              THE COURT:  Sustained.  I heard it the first time.
 2              MR. MAC MAHON:  Thank you.
 3              MR. GIBBS:  That's all I've got, Judge.  Thank you.
 4              THE COURT:  All right.  Cross examination?
 5                        CROSS EXAMINATION
 6  BY MR. MAC MAHON:
 7  Q.   Good afternoon, Mr. Surratt.  My name is Edward MacMahon.
 8  A.   Good afternoon.
 9  Q.   I'm an attorney for Dr. Al-Timimi.
10       Could you put up the e-mail that you just had up,
11  please, 7 --
12              THE COURT:  The very last one?
13              MR. MAC MAHON:  Yes, Your Honor.
14              THE COURT:  7D10.
15              MR. MAC MAHON:  And Mr. Kromberg taught me how to do
16  that, Your Honor, to circle these things.
17       Could you bring that up a little, the one I just
18  circled, please?  No, go down a little bit, please.
19  Q.   Now, in that same e-mail, sir, you told Dr. Al-Timimi that
20  your wife was pregnant, didn't you?
21  A.   Yes, I did.
22  Q.   And that was the kind of information you'd want to share with
23  him, isn't it?
24  A.   Yes.
25  Q.   And in your presence, Dr. Al-Timimi was always very polite to
```

**Surratt - cross**

```
 1  you, wasn't he?
 2  A.   Yes, always.
 3  Q.   He never acted like a rock star, did he?
 4  A.   No, no.
 5  Q.   He was also a person who was -- had good manners to other
 6  people, correct?
 7  A.   Yes.
 8  Q.   He was respectful to all the women at the Dar al-Arqam Center
 9  as well?
10  A.   Yes.
11  Q.   Okay.  Now, you testified before that you had a rule 35
12  motion pending before the Court, correct?
13  A.   Yes.
14  Q.   And you also know that the government can withdraw that
15  motion if they wish, correct?
16  A.   Yes.
17  Q.   And it's up to them entirely to decide whether or not to
18  withdraw the rule 35 motion, and if they do, you won't get any
19  sentence reduction, right?
20  A.   No.
21  Q.   Okay.  Mr. Gibbs showed you the "Russian Hell 2000" video.
22  Did you see -- do you remember that?
23            You can take this down.  Thank you very much.
24            Do you remember that, sir?
25  A.   Yes, I do.
```

**J.A. 571**

**Surratt - cross**

1  Q.  Okay.  Did you get that in Saudi Arabia?

2  A.  No, I didn't buy it.  I got it from Nabil.

3  Q.  You got it from Nabil Gharbieh?

4  A.  Yes.

5  Q.  Okay.  And that's a very violent video, isn't it, sir?

6  A.  Yes, you could say it's violent.  Yes.

7  Q.  Did you see combat as a United States Marine?

8  A.  No.  Not directly, no.  They didn't consider it combat.  I

9  was in Somalia, but they didn't consider it combat.

10  Q.  And you were in the Marines there, right?

11  A.  Yes.

12  Q.  Okay.  And when you were a Marine, you took orders from

13  people, didn't you?

14  A.  Yes, I did.

15  Q.  Whoever were your superior officers, correct?

16  A.  Yes.

17  Q.  And your relationship with Ali Timimi was nothing like that,

18  was it?

19  A.  No.

20  Q.  He never once gave you any order in the sense that you got

21  orders when you were in the military, correct?

22  A.  No.

23  Q.  Okay.  And the video we saw, we saw it before and didn't have

24  to see it again of the Russian soldier, you never looked at a

25  video like that with Dr. Ali Al-Timimi did you?

**Surratt - cross**

1  A.   No.

2  Q.   You never looked at any jihad video with this gentleman, did

3  you?

4  A.   No, I never did.

5  Q.   And you never discussed such a video with him at any time,

6  did you?

7  A.   No, I never did.

8  Q.   And -- because you knew he was an academic, wasn't he?

9  A.   Academic, what do you mean by that?

10 Q.   He was a person who was well read on Islamic issues?

11 A.   Yes.

12 Q.   He is a person who is well read on Islamic issues even today?

13 A.   Yes.

14 Q.   All right.  So when you had questions of theology, questions

15 of how to live your life as a good Muslim, you would seek out his

16 advice, correct?

17 A.   Yes.

18 Q.   And you would seek out the advice of lots of other people,

19 too, didn't you?

20 A.   Yes, not just him.

21 Q.   All right.  And you were actually, we see a very curious

22 person about Islam and current events, weren't you?

23 A.   Yes, I was.

24 Q.   You're a person who spent a lot of time on the Internet

25 reading different things and trying to find out what was happening

**Surratt - cross**

1  in the world?

2  A.    Yes.

3  Q.    And you did that partially because of your religion.  You

4  wanted to see how it was that your religion shaped and affected

5  these events as well, correct?

6  A.    I don't know if I'd say that I wanted to see how it shaped

7  and reflected.  I wanted to be aware of what was going on in the

8  world, current events.

9  Q.    Okay.  But most of the research you did was on Islamic

10 websites, right?

11 A.    Yes.

12 Q.    Okay.  And you wanted an Islamic perspective of what these --

13 how these events were portrayed and otherwise, correct?

14 A.    Yes.  It wasn't the only ones I went to, but yes.

15 Q.    There was lots of other sources of information you had other

16 than Dr. Ali Al-Timimi, right?

17 A.    Yes, there was.

18 Q.    And never once did you ever hear him advocate the use of

19 violence or force at any time, did you?

20 A.    Advocate?  Well, I'm not sure what it means.

21 Q.    Did Dr. Al-Timimi ever advocate the use of violence in any

22 speech that you ever heard at Dar al-Arqam?

23 A.    No.

24 Q.    At any speech that you bought at Dar al-Arqam and listened to

25 him talk, did you ever hear him advocate the use of violence?

**Surratt - cross**

1    A.   No.

2    Q.   In fact, the whole time that you've known him, you've never

3    once heard him advocate the use of violence, correct?

4    A.   "Advocate" meaning?

5    Q.   Meaning say that that's something that somebody should do,

6    that you're obligated to go use violence.  You never heard him say

7    that, did you?

8    A.   Not in the current affair events, no.

9    Q.   And he would talk about, there are hadeeths and stories in

10   the Koran that are violent, though, aren't they?

11   A.   Yes, there is.

12   Q.   All right.  And you would discuss some of those stories in a

13   theoretical, a theological basis, correct?

14   A.   Yes.

15   Q.   Okay.  Now, the gun, we saw a picture of your gun, sir.  Ali

16   Al-Timimi didn't know that you had a gun, did he?

17   A.   I have no idea if he knew.

18   Q.   Okay.  Well, you never told him that you had a gun, did you?

19   A.   I never told him, no.

20   Q.   All right.  And he never asked you, sir, "Do you have a gun?"

21   A.   No.

22   Q.   Did you ever hear him speak about Muslims owning guns?

23   A.   Not to me, no.

24   Q.   Okay.  Did you go to Mecca on hajj in the year 2001?

25   A.   Yes, I did.

**Surratt - cross**

1  Q.  Okay.  And that was arranged at the last minute, wasn't it?

2  A.  Yes, it was.

3  Q.  All right.  And you took your wife, too?

4  A.  Yes.

5  Q.  And what's your wife's name?

6  A.  Yasmeen.

7  Q.  Right.  And you took Yasmeen to Mecca at the last minute on a

8  trip arranged by Ismail Royer, correct?

9  A.  It wasn't arranged by him, but he's the one who told me about

10  it.

11  Q.  He's the one that suggested to you that it would be a good

12  thing to do?

13  A.  Yes.

14  Q.  And that's something as a good Muslim you wanted to do

15  anyway, right?

16  A.  Yes.

17  Q.  Okay.  And when you were in Mecca, isn't it a fact that

18  Mr. Royer introduced you to an LET official in Mecca?

19  A.  I have no idea.

20  Q.  Did he introduce Mr. Kwon in your presence to someone from

21  LET?

22  A.  No.  He introduced me to a guy who was -- he worked at

23  Anderson Consulting, but I don't know if he was an LET guy.  He

24  didn't say.

25  Q.  So nobody there said anything about LET that you heard of

**Surratt - cross**

```
 1  in --
 2  A.   Not to me, no.
 3  Q.   Okay.  And you said before that you heard from LET -- the
 4  first time you ever heard about LET was from Randall Royer,
 5  correct?
 6  A.   Yes.
 7  Q.   All right.  And then you had -- you engaged in a lot of
 8  Internet research about LET, correct?
 9  A.   Yes.
10  Q.   And you said that you had a very brief discussion with
11  Dr. Al-Timimi about LET, correct?
12  A.   Yes.
13  Q.   All right.  And he never told you you should go over there
14  and go to a camp, did he?
15  A.   No.
16  Q.   Now, when, when Mr. Hammad Abdur-Raheem -- well, if I may,
17  Your Honor, can I put this up on the screen just for a second?
18  They've already seen it.
19            THE COURT:  Any objection?
20            MR. GIBBS:  No, Judge.
21            THE COURT:  Do you want that made as an exhibit?
22            MR. MAC MAHON:  Well, it's just a demonstrative exhibit
23  at this point, Your Honor.
24            THE COURT:  All right.
25  BY MR. MAC MAHON:
```

1  Q.   Mr. Surratt, I'm going to show you a document that we

2  prepared.  It's what we call a demonstrative exhibit which shows

3  phone calls made by Yong Kwon on September 16, 2001.  You've never

4  seen this before, have you?

5  A.   No.

6  Q.   Okay.  Do you see the first call at 2:38 by Yong Kwon on

7  September 16?

8  A.   Yes.

9  Q.   Okay.  Is that your phone number, Mr. Surratt?

10 A.   Yes, it is.

11 Q.   Okay.  And the phone call made at 2:39, is that your phone

12 number as well?

13 A.   Yes, it is.

14 Q.   And then he called you again at 2:40, didn't he?

15 A.   Yes.

16 Q.   Okay.  Do you remember talking to Yong Kwon on the 16th of

17 September, 2001?

18 A.   I'm not sure what -- I don't know if I talked to him or not,

19 but he called me.  I'm not sure if I answered the phone or not.

20 Q.   There was a day in September when he told you he was having a

21 meeting, correct?

22 A.   Yes.

23 Q.   Okay.  And he didn't tell you that Ali Al-Timimi was coming,

24 did he?

25 A.   No.  Are you talking about did he tell me he was having a

**Surratt - cross**

1  meeting?

2  Q.   Yes.

3  A.   No, I never talked to him about a meeting.

4  Q.   For all you know, these calls went straight to your voice

5  mail, for all you know?

6  A.   I'm not sure.

7  Q.   Okay.  Thank you.

8        But there was never a time in the middle of September of

9  2001 that Yong Kwon told you that he was having a meeting where

10  people were going to hear Ali Al-Timimi's views of the events of

11  9/11, correct?

12  A.   I knew nothing about it.

13  Q.   And when you talked to your friend Hammad Abdur-Raheem the

14  next day on September 17, did he tell you anything about security

15  precautions being taken at Yong Kwon's house?

16  A.   No.

17  Q.   Did he tell you that people had to unplug answering machines

18  and turn off their cell phones as a precondition of walking in?

19  A.   He didn't tell me anything about the meeting except for what

20  I already said.

21  Q.   The meeting you had on, on or about October 15, are you able

22  to, to place that meeting any better than that, than on or about

23  October 15?

24  A.   No, I'm not.  It's too long ago.  I'm not very good with

25  dates.

**Surratt - cross**

1  Q.   Do you remember if Dr. Al-Timimi served pizza that day?

2  A.   That day?

3  Q.   The night -- you went over to his house after work, didn't

4  you?

5  A.   Yes.

6  Q.   And it's your recollection, you told the FBI just recently

7  that it was a Friday night, wasn't it?

8  A.   Possibly.

9  Q.   Right.  And do you remember whether he served pizza at any of

10  those dinners?

11  A.   I don't remember.

12  Q.   Okay.  Going back a little bit, Mr. Gibbs asked you about a

13  meeting you went to Ibrahim Al-Hamdi's house and Al-Timimi was

14  present.  Do you remember that question?

15  A.   Yes.

16  Q.   That was a religious dinner after Ramadan, wasn't it?

17  A.   Yes, it was.

18  Q.   There was nothing nefarious or improper discussed at that

19  dinner, was there?

20  A.   No, there was not.

21  Q.   All right.  And October 15, the meeting you talked about,

22  Omar Madini was present as well, correct?

23  A.   Which meeting?

24  Q.   The meeting that you talked about with Dr. Al-Timimi in

25  testimony before.  Wasn't Mr. Madini there as well?

**Surratt - cross**

1  A.  At his house?

2  Q.  Yes.

3  A.  Yes.

4  Q.  At Ali's house.

5  A.  Okay.  Yes.

6  Q.  And Ashraf Ali was there, too?

7  A.  Yes.  He was there as a matter of fact, yes.

8  Q.  And Ashraf Ali is a good friend of yours, isn't he?

9  A.  Yes, he's a friend of mine.

10  Q.  He doesn't own a gun, does he?

11  A.  Not that I know of, no.

12  Q.  And he's a person who really enjoys listening to

13  Dr. Al-Timimi's lectures, doesn't he?

14  A.  As far as I know, yes.

15  Q.  A very attentive person?

16  A.  Yes.

17  Q.  And was Mr. Madini at that meeting, was he paying attention,

18  too?

19  A.  Yes.

20  Q.  Okay.  Now, when you went home from that meeting, you talked

21  to your wife, didn't you?

22  A.  I don't know.

23  Q.  Do you remember telling your wife on or about October 15 that

24  you had -- 2001, that you had gone to a dinner and Ali Al-Timimi

25  had spoken?

**Surratt - cross**

1  A.    She knew that I was going there beforehand.  I don't know if
2  I talked to her when I came home.

3  Q.    Don't you remember telling her, sir, that because of what you
4  heard from Dr. Al-Timimi, you were going to make hijra because you
5  were worried about her?

6  A.    Yeah.  We had that discussion, yes.

7  Q.    And you were worried about your wife.  She was fully veiled
8  at the time, wasn't she?

9  A.    Yes.

10 Q.    All right.  And you were concerned that in the United States,
11 that she might be harassed or injured, correct?

12 A.    Yes.  Because she was already beginning to be harassed
13 already.

14 Q.    And how so?

15 A.    Just like if she was driving my car or something, people
16 would say a lot of things to her, start cussing at her and being
17 real rude to her, calling her a terrorist and stuff like that.

18 Q.    And that scared you, didn't it?

19 A.    Yes.

20 Q.    You cared for your wife, didn't you?

21 A.    Yes.

22 Q.    All right.  And that's the reason that you went overseas,
23 correct?

24 A.    That's one of the reasons, yes.

25 Q.    And you knew you'd be safe and she wouldn't be persecuted and

439

**Surratt - cross**

1  you wouldn't be persecuted in Egypt just for being a Muslim,

2  right, sir?

3  A.   Yeah.   That's one of the reasons, yes.

4  Q.   At the dinner on October 15, do you, do you recall

5  Dr. Al-Timimi saying that he hoped there would be reconciliation

6  between the Muslim world and the West?

7  A.   I don't remember that, no.

8  Q.   You don't remember him saying that?

9  A.   No.

10  Q.   Did -- when Hammad Abdur-Raheem talked to you about the

11  meeting at Kwon's house, did he tell you anything about Al-Timimi

12  saying that the signs of the last battle and the Day of Judgment

13  had finally appeared?

14  A.   Did Hammad tell me that?

15  Q.   Yeah.

16  A.   No.

17  Q.   Hammad came back from that meeting wearing a jacket, didn't

18  he?

19  A.   Wearing one?   No.

20  Q.   Yes.   Well, he had a jacket, didn't he?

21  A.   He had one, but I didn't know he had -- where he got it from.

22  He brought it out to me and showed it to me and said that he got

23  it, it was just like the one that Yong had got because it was

24  supposed to be cold in some parts of Pakistan.

25  Q.   It was a, it was a jacket that had been purchased so that

**J.A. 583**

1   they could go overseas, correct?

2   A.   Yes.

3   Q.   Do you know when that jacket was purchased?

4   A.   No, I have no idea.  He just told me that day I was at his

5   house.

6   Q.   And it was before the dinner at Yong Kwon's house, wasn't it?

7   It had to have been, right?

8   A.   I don't know.  He didn't tell me when he got it.

9   Q.   Did he tell you that he had it the day before?

10  A.   He didn't say when he got it.  He just showed it to me.

11  Q.   Do you remember Dr. Al-Timimi on or about October 15

12  stressing the importance of dialogue between the Muslim world and

13  the West?

14  A.   He said that sometimes but not that day I don't remember him

15  saying that.

16  Q.   That was something he stressed to you all the time, correct?

17  A.   Sometimes, yes.

18  Q.   Right.  And in your, in your plea agreement, sir, which is

19  Government's Exhibit 7H11, paragraph 2 says that in February of

20  2000, in Fairfax County, you transported an AK-47-style rifle in

21  interstate commerce to a firing range in Fairfax, Virginia, with

22  reason to know that by using that firearm to train with another to

23  fight against Indians in Kashmir and Russians in Chechnya.  Do you

24  remember that?

25  A.   Yes, I remember that.

**Surratt - redirect**

1  Q.  That's the gist of what you pled guilty to, correct?

2  A.  Yes.

3  Q.  All right.  And that conspiracy that you pled guilty to was

4  in full force and effect on or about February 24 of the year 2000,

5  wasn't it?

6  A.  Around, yes.

7  Q.  Okay.  And Dr. Al-Timimi had absolutely nothing to do with

8  that conspiracy, did he?

9  A.  Not that I know of, no.

10  Q.  Well, you never told him about it, did you?

11  A.  No, I didn't.

12        MR. MAC MAHON:  I have no further questions, Your Honor.

13        THE COURT:  All right.  Any redirect?

14        MR. GIBBS:  Yes, Judge.

15                REDIRECT EXAMINATION

16  BY MR. GIBBS:

17  Q.  Mr. Surratt, you were asked by defense counsel about Ali

18  Timimi's speeches at the Dar al-Arqam.  Do you recall that?

19  A.  Yes.

20  Q.  And you were asked if any of those speeches at Dar al-Arqam

21  ever advocated violence, and you said you couldn't recall any.  Do

22  you remember that?

23  A.  Yes.

24  Q.  Now, do you ever recall Ali Timimi ever giving a speech at

25  Dar al-Arqam where he stated that it was obligatory to go over to

**Surratt - redirect**

1   physically help the people in Afghanistan and Pakistan from the

2   coming American invasion?

3   A.    At Dar al-Arqam or at --

4   Q.    At Dar al-Arqam.

5   A.    I don't remember him saying that at Dar al-Arqam, no.

6   Q.    So was what he told you at his house in October of 2001

7   different from the things that he said at the Dar al-Arqam in his

8   public speeches?

9   A.    In a way, yes.

10  Q.    And in what way was that?

11  A.    That it was more that it was obligatory for us to assist them

12  and go there if we can.

13  Q.    And "assist them" meaning?

14  A.    The Muslims of Pakistan and Afghanistan.

15  Q.    And you were asked about your wife and the fact that one of

16  your concerns with her was that she's veiled and you didn't want

17  her to be harassed or injured, correct?

18  A.    Yes.

19  Q.    And you had testified earlier that because of your wife, you

20  felt a certain conflict between this obligatory duty and your duty

21  as a husband to your wife.

22  A.    Yes.

23  Q.    Now, can you explain that conflict?  I mean, what was it you

24  were conflicted over?

25  A.    I was conflicted about that I felt like it was my duty to

**Surratt - redirect**

1  come, you know, not sit back and watch Muslims be slaughtered and
2  done in such a way that if I should go help them, but at the same
3  time, I felt like if I did that and something happened to me, my
4  wife wasn't taken care of, then I'd be held responsible for not
5  making sure my wife was taken care of, also.
6  Q.   And when you say you felt like it was your duty to go and
7  help them, go and help them how?
8  A.   Help them --
9           MR. MAC MAHON:  Objection.  Asked and answered, Your
10 Honor.
11           THE COURT:  No, this is redirect.  I'll permit it.
12           THE WITNESS:  Help them physically, whether it be fight
13 with them, feed them, whatever, help them spread Islam, whatever.
14 Help them physically.
15 BY MR. GIBBS:
16 Q.   All right.  And you talked about -- one of the things you
17 said was fighting.  Fighting on their side?
18 A.   Yes.
19 Q.   Against the Americans?
20 A.   Against anybody who came to kill them.
21 Q.   And when you -- at the meeting at Timimi's house in October,
22 when you went and told him that because of your wife, you couldn't
23 go over there and do that, were you looking for him to -- why did
24 you want to tell him that?  Why did you feel it was important to
25 tell Timimi that you couldn't go and fulfill this obligatory duty?

**Surratt - recross**

1  A.   I felt really probably because I wanted to hear him reinforce

2  a decision that I kind of already wanted to -- that I wasn't going

3  to go over there.

4  Q.   And did he reinforce that decision?

5  A.   Yes, he did.

6  Q.   How?

7  A.   By telling me that, you know, that I don't have to go over

8  there to, you know, help them physically, that I can go over to a

9  Muslim country and live and help the Muslims wherever I go, such

10 as Egypt.

11 Q.   And did that make you feel better?

12 A.   Yeah.  It kind of helped me, because I respect what he has to

13 say a whole lot.

14         MR. GIBBS:  One moment, Judge.

15         That's all I have, Your Honor.

16         Thank you, sir.

17         THE COURT:  Mr. MacMahon, any recross?

18                    RECROSS EXAMINATION

19 BY MR. MAC MAHON:

20 Q.   Sir, it was in your mind that you might go fight -- the words

21 that you used -- there, correct?

22 A.   Yes.

23 Q.   All right.  Dr. Al-Timimi never once ever asked you or

24 solicited from you that he thought or wanted you to go over to

25 Afghanistan or Pakistan and fight against Americans, did he?

**Hodge - direct**

1  A.   He never used those words, no.

2          MR. MAC MAHON:  Thank you, Your Honor.

3          THE COURT:  All right.  Anybody going to call

4  Mr. Surratt again during the trial?

5          MR. MAC MAHON:  No, Your Honor.

6          MR. GIBBS:  It's possible we will, Judge.

7          THE COURT:  All right.  You're excused as a witness

8  right now, Mr. Surratt.  You may be coming back again.  Don't

9  discuss your testimony with any witness who has not yet testified.

10          THE WITNESS:  Okay.

11                  (Witness excused.)

12          THE COURT:  All right, we'll take the afternoon break at

13  this point, and I'm going to give you -- I have something I have

14  to take care of in chambers, so we're going to have a 20-minute

15  break until 10 after today.

16          (Recess from 3:50 p.m., until 4:10 p.m.)

17          THE COURT:  Mr. Kromberg?

18          MR. KROMBERG:  Your Honor, the government calls

19  Detective Hodge --

20          THE COURT:  All right.

21          MR. KROMBERG:  -- who is outside, I believe.

22      DETECTIVE JOHN HODGE, GOVERNMENT'S WITNESS, AFFIRMED

23                  DIRECT EXAMINATION

24  BY MR. KROMBERG:

25  Q.   Good afternoon, Detective.  Please state your full name and

**Hodge - direct**

1  spell your last name for the record.

2  A.   Detective John Hodge, H-o-d-g-e.

3  Q.   And how are you employed, Detective Hodge?

4  A.   I'm a Baltimore City police detective in Baltimore, Maryland.

5  Q.   Do you have any relationship with the Joint Terrorism Task

6  Force?

7  A.   I do.  I'm a full-time member since 9/11 of 2001.

8  Q.   Okay.  In your capacity as a member of the Joint Terrorism

9  Task Force -- JTTF, is that what it's called?

10 A.   Yes, sir.

11 Q.   The JTTF, were you involved in the execution of a search

12 warrant on May 8, 2003?

13 A.   Yes, I was.

14 Q.   Where was that?

15 A.   I don't remember the exact address, but it was Golden Meadow

16 Court, in the Gaithersburg, Maryland area.

17 Q.   The residence of who?

18 A.   Ali Chandia.

19 Q.   Did you -- in the course of executing the search warrant at

20 Ali Chandia's house, did you find a -- any computer media?

21 A.   Yes, I did.

22 Q.   What computer media did you find?

23 A.   A Zip disk, a floppy disk, and other CDs.

24 Q.   I want to show you what's been marked 10H2 and 10H3 and ask

25 you if you recognize them.

**Hodge - direct**

1  A.    I do.

2  Q.    What are they?

3  A.    This is the Zip -- I believe this is the Zip disk that I

4  found.  This is my handwriting on this evidence pack.

5  Q.    So if you could describe for the jury what happened -- what

6  did you do when you found the Zip disk and where you found it,

7  what did you do with it?

8  A.    It was found in room H, which was the basement, towards the

9  sliding glass doors.  It's a very open basement area.  I took it

10  out of the cardboard box, placed it on the ground, and we

11  photographed it.

12  Q.    Okay.

13  A.    And then I placed it inside of the evidence bag.

14  Q.    That's correct.  You don't know that that disk in that bag

15  today is the same one you put in there, correct?

16  A.    No, I don't.

17  Q.    But it looks like it?

18  A.    Yes, sir.

19  Q.    Okay.  What did you do with it, the disk that you found,

20  after you found it, what did you do with it?

21  A.    I handed it over to a Washington Field Office -- the seizing

22  agent.  I believe her last name was Kneisler.

23  Q.    Tracy Kneisler?

24  A.    Kneisler, yes.

25  Q.    Did you hand it over just as a disk, or did you put it in a

**Hodge - cross**

1  bag?

2  A.    In this bag.

3  Q.    Okay.  And you took the disk -- Zip disk, put it in the bag,

4  and gave it to Special Agent Kneisler?

5  A.    Yes.

6          MR. KROMBERG:  Okay.  Thank you.  No further questions

7  for this witness, Judge.

8          THE COURT:  Mr. MacMahon?

9                      CROSS EXAMINATION

10  BY MR. MAC MAHON:

11  Q.    You're not sure whether that's the disk that you sized at Ali

12  Asad Chandia's house?

13  A.    I don't know that, sir.

14          MR. MAC MAHON:  Nothing further, Your Honor.

15                    REDIRECT EXAMINATION

16  BY MR. KROMBERG:

17  Q.    Does it look like the disk that you seized?

18  A.    Yes.  And it also looks like the disk that I have a picture

19  of.

20          MR. KROMBERG:  Okay.  Thank you.  That's it for now.  We

21  obviously need more --

22          THE COURT:  Did you put your initials on the disk?

23          THE WITNESS:  Not on the actual evidence, ma'am.  I

24  wrote my name on the evidence tag for the bag and the location and

25  date that I found it.

# Hodge - redirect

1      THE COURT:  And what did you do with the disk vis-a-vis

2  that bag that you're holding in your hand right now?

3      THE WITNESS:  The disk; a resume; another floppy disk,

4  the regular, the old-type floppy disks; and a pay stub were put

5  into this bag; and then this bag was sealed with the evidence tape

6  and given to the WFO agent to record into evidence.

7      THE COURT:  All right.  And just so I'm clear, 10H3, is

8  that the actual plastic bag?

9      MR. KROMBERG:  That's the bag with Detective Hodge's,

10  Detective Hodge's writing on it, and 10H2 is the Zip disk.

11      THE COURT:  Within the bag?

12      MR. KROMBERG:  Within the bag.

13      THE COURT:  All right, that's fine.

14      And there was no cross examination, correct?

15      MR. MAC MAHON:  No, Your Honor.

16      THE COURT:  All right.  Anybody going to call the

17  detective again?

18      MR. KROMBERG:  No, Your Honor.

19      THE COURT:  All right, Detective, thank you.  You can

20  stay in court now and watch the proceedings if you want, but don't

21  discuss your testimony or anything you hear in court with any

22  witness who has not yet testified.  Thank you.

23      THE WITNESS:  Yes, ma'am.

24                     (Witness excused.)

25      THE COURT:  Call your next witness.

**J.A. 593**

450

1           MR. KROMBERG:  Your Honor, we have two things we would
2   want to do next.  One is we've asked Mr. Kohlmann to come, but I
3   think he's on his way.  However, we also were going to play some
4   audiotapes that as long as we have some time, this would be an
5   appropriate time to do it.

6           Before we do that, we have to enter some stipulations
7   into the record.  And if Mr. Kohlmann comes --

8           THE COURT:  All right.  Well, let's just get the tapes
9   started.

10          MR. KROMBERG:  Okay.  Thank you, Your Honor.  These are
11  Stipulations 3, in essence, 3 through 16.  Government Exhibit 12-3
12  is Government Exhibit 1B1a --

13          THE COURT:  Wait, wait, wait, I'm sorry.  Hold on a
14  second.  Government's Exhibits 12-3 through 12-16 are your
15  stipulations, right?

16          MR. KROMBERG:  Correct, Judge.

17          THE COURT:  All right.  So those are in evidence, all
18  right?

19          (Government's Exhibit Nos. 12-3 through 12-5 and 12-7
20  through 12-16 were received in evidence.)

21          THE COURT:  All right.  Now, you're reciting what's in
22  12-3 at this point, right?

23          MR. KROMBERG:  12-3 says, "Government Exhibit 1B1a is an
24  accurate transcript of the telephone conversation that is recorded
25  on Government Exhibit 1B1."

**J.A. 594**

1                THE COURT:  Okay.

2                MR. KROMBERG:  Stipulation 4, 12-4 is the exhibit

3    number:  "Government Exhibit 1B2a is an accurate transcript of the

4    telephone conversation that is recorded on Government Exhibit

5    1B2."

6                Government Exhibit 12-5, Stipulation 5, is, "Government

7    Exhibit 1B4a is an accurate transcript of the conversation that is

8    recorded on Government's Exhibits 1B4 and 1B4b."

9                Government Exhibit 12-7, Stipulation No. 7:  "Government

10   Exhibit 1G3 is an authentic recording of a conversation upon a

11   telephone call from Royer to Hammad that occurred on March 26,

12   2003."

13               Government Exhibit 1G -- sorry, got ahead of myself.

14   Government Exhibit 12-8, Stipulation No. 8, says, "Government

15   Exhibit 1G3a is an accurate transcription of the telephone call

16   recorded in Government Exhibit 1G3."

17               Stipulation 9 is Government Exhibit 12-9:  "Government

18   Exhibit 1G4 is an authentic recording of a conversation upon a

19   telephone call from Hammad to Royer that occurred on April 12,

20   2003."

21               Government Exhibit 12-10 is Stipulation No. 10:

22   "Government Exhibit 1G4a is an accurate transcription of the

23   telephone call recorded in Government Exhibit 1G4."

24               Government Exhibit 12-11 is Stipulation No. 11:

25   "Government Exhibit 1G5 is an authentic recording of a

**J.A. 595**

1  conversation upon a telephone call from Royer to Hammad that

2  occurred on April 18, 2003."

3      Government Exhibit 12-12, Stipulation No. 12:

4  "Government Exhibit 1G5a is an accurate transcription of the

5  telephone call recorded in Government Exhibit 1G5."

6      Government Exhibit 12-13, Stipulation No. 13:

7  "Government Exhibit 1G10 is an authentic recording of a

8  conversation upon a telephone call from Hammad and Royer to

9  Al-Timimi that occurred on April 1, 2003."

10     Government Exhibit 12-14, Stipulation No. 14:

11 "Government Exhibit 1G10a is an accurate transcription of the

12 telephone call recorded in Government Exhibit 1G10."

13     Government Exhibit 12-15, Stipulation No. 15:

14 "Government Exhibit 1G11 is an authentic recording of a

15 conversation upon a telephone call from Hammad to Royer that

16 occurred on March 30, 2003."

17     And Government Exhibit 12-16 is Stipulation No. 16:

18 "Government Exhibit 1G11a is an accurate transcription of the

19 telephone call recorded in Government Exhibit 1G11."

20     Those are -- the government moves in 12-3 to 12-16 and

21 the exhibits that are stipulated to, the transcripts and the

22 recordings that are 1B1, 1B1a, 1B2, 1B2a, 1B4, 1B4a, 1B4b, 1G3,

23 1G3a, 1G4, 1G4a, 1G5, 1G5a, 1G10, 1G10a, 1G11, and 1G11a.

24     THE COURT:  I think there was a 1GB, also, wasn't there

25 in 12A?

453

1           MR. KROMBERG:  There was an unusual one.  Stipulation
2   No. 5 had a 1B4a and a 1B4b.
3           THE COURT:  Right.  What about for 12-8?
4           No, that may be my handwriting.  All right.
5           MR. KROMBERG:  I think, Judge, that was 1G3a is an
6   accurate transcript of a telephone call.
7           THE COURT:  Oh, 1G3.
8           All right.  Now, Ladies and Gentlemen -- I assume
9   there's no objection to these exhibits?
10          MR. MAC MAHON:  No, Your Honor.
11          THE COURT:  All right, they're all in evidence.
12          (Government's Exhibit Nos. 1B1, 1B1a, 1B2, 1B2a, 1B4,
13  1B4a, 1B4b, 1G3, 1G3a, 1G4, 1G4a, 1G5, 1G5a, 1G10, 1G10a, 1G11,
14  and 1G11a were received in evidence.)
15          THE COURT:  I want to make sure you understand, however,
16  that the true evidence is what is on the tape recording.  The
17  transcripts are simply an aid to your listening to the tapes, but
18  if you hear a discrepancy between the transcript and the tape, you
19  go with what you hear on the tape.
20          So make sure that you don't misconstrue this transcript.
21  In other words, if something is written in the transcript and you
22  don't hear the tape that way, you go with what you hear on the
23  tape.  All right?
24          MR. KROMBERG:  And, Your Honor, may I instruct -- I
25  would ask one of our agents to tell Mr. Kohlmann to come in when

**J.A. 597**

454

1 he gets here.  Then we'll stop the tape and --

2              THE COURT:  That's up to you how you put your case on,

3 but let's start playing these tapes since we've gone through this.

4              All right, do you have copies of the transcripts for the

5 jury, or are you going to put them on the machine?

6              MR. GIBBS:  Judge, they're going to go on the screen, I

7 believe, if this works right.

8              THE COURT:  All right.

9              MR. GIBBS:  And the first one, Your Honor, for the

10 record is 1G3, which is a recorded telephone call on March 26,

11 2003, Royer and Hammad, and 1G3a is the transcript.

12              (Government's Exhibit No. 1G3 was played, Government's

13 Exhibit No. 1G3a copied in verbatim as follows:)

14              "HAMMAD:  Asalamalakum.

15              ROYER:  Malakum Salem.  How are you doin' brother?

16              HAMMAD:  Oh, man.  A little stressed out.  That's about

17 it.

18              ROYER:  You are, yeah, I'm, I'm a little stressed but

19 not, but not that stressed actually.

20              HAMMAD:  I mean...did you have any warning that they

21 were going to come search your house?

22              ROYER:  Well, you know, inaudible, that's funny because

23 last night, umm.  Well, are you going to be at the masjid, you

24 think?

25              HAMMAD:  Yeah, I'm still stuck in traffic, man.  But

**J.A. 598**

455

1  even if you go there and just wait, there.  Hopefully I'll be
2  there, in shalla.
3              ROYER:  OK.  Umm, let's see.  What do they pray at
4  eight, right?
5              HAMMAD:  8 o'clock, yeah.
6              ROYER:  8 o'clock. Ummm.  (Royer then talks to Mirsada
7  in his home.)  No, I can walk.
8              MIRSADA:  You're not gonna walk.
9              ROYER:  I can walk.  It's just right up the street.
10             MIRSADA:  You can't walk.
11             ROYER:  It's right up the street.
12             MIRSADA:  You can't walk, it's raining outside (more
13  chatter in the background)
14             ROYER:  Oh, sorry.  Umm.  You there?
15             HAMMAD:  Yeah, I'm here, man.
16             ROYER:  OK.  Umm...well, ah.  So, how long did they talk
17  to you for?
18             HAMMAD:  Two and a half hours
19             ROYER:  Oooooh.  Without a lawyer?
20             HAMMAD:  Yeah.
21             ROYER:  Oh, bro.  You screwed up.
22             HAMMAD:  Well, Well, not really man.  I...I know what to
23  say and what now to say.  So...
24             ROYER:  I know, but this is what everyone thinks.  This
25  is what I thought.  This is what everyone thinks. But

**J.A. 599**

244 of 300

1  really...they're just trying to connect ahh you know what I'm

2  saying, everything.  They're trying to make connections where they

3  don't exist.  They're trying to...you know what I'm saying?

4          HAMMAD:  They...they asked me about particular brothers

5  a lot.

6          ROYER:  Oh really?  Me?

7          HAMMAD:  Ah...Yeah, but I...they asked me about you, Ali

8  Timimi...

9          ROYER:  Yeah.

10         HAMMAD:  Um...Ibrahim...

11         ROYER:  Yeah.

12         HAMMAD:  Uh, you know.

13         ROYER:  Well, uh, here's the thing.  On the search,

14  uh,...on the search warrant it says, it lists the people.  It

15  lists the people they're interested in. I don't know if it's all

16  the people they're interested in, but they list some of the people

17  they are interested in.  Which is me, not that's there's any

18  evidence of furtherance of a conspiracy between Royer, Hamdi,

19  Garbia -- ah, Nabil -- um Ali Timimi, and, uh, that's, if I

20  remember, and Yong.  That's all.  Yong Kwon.

21         HAMMAD:  (Unintelligible) My name wasn't on there?

22         ROYER:  No.  Your name wasn't on there.

23         HAMMAD:  Aaahhh.  That could have fooled me.  The way

24  there were talking to me, man, um...

25         ROYER:  (Laughs) well...

457

1           HAMMAD:  They told me, they told me they're trying to
2    determine what part I play.
3           ROYER:  In what?
4           HAMMAD:  I don't know, that they, Some fantasy stuff
5    whatever they make up.  Even...what, why...what are they bothering
6    you for?
7           ROYER:  Well I have no idea, no idea.  I mean, you know,
8    the fact that I know Ali Timimi.  The fact that I know Yong Kwon.
9    The fact that I know these people.  Maybe...
10          HAMMAD:  Yeah, but I know them, too.
11          ROYER:  Exactly.  Yeah.
12          HAMMAD:  But I got bad news for you.  One of our
13   brothers cracked man.
14          ROYER:  Oh?  For real?  Who?
15          HAMMAD:  Kaliph.
16          ROYER:  Who's that?
17          HAMMAD:  Kalipha.
18          ROYER:  Oh, Kalipha!  Oh, cracked?  For what?  What do
19   you mean?
20          HAMMAD:  They went to question him and he uh was so
21   nervous he said some things, man, that you know.
22          ROYER:  Oh.  Crazy.  Oh, hell.  Anyway.  Doesn't matter
23   to me. (Inaudible-Arabic)  You have to trust Allah, and you know.
24   I don't know.  Look, let's, uh...yeah, let's, let's, let's meet,
25   in shalla, at the masjid if you can.  Do you think you are going

458

1   to be able to make it, in shallah, because...

2            HAMMAD:  Let's see where I am right now.  Let's see,
3   I'm, uh...

4            ROYER:  I can...(audio interference in telephone line)
5   Actually, I can wait there.  Hello?

6            HAMMAD:  Yeah

7            ROYER:  Yeah I think it's the -- the FBI's bugs are
8   shorting out.  (Laughs)

9            HAMMAD:  Oh, Well, they told...Our phones are bugged.
10  You know that?  So,

11           ROYER:  Well, um, try, try to meet me if you can, in
12  shalla at the or uh.  Try to meet me, in shalla, if you can at the
13  masjid.  If not, I'll hang out there later or something, you
14  understand?  I'll try to hang out until 9, something like that.

15           HAMMAD:  Okay, Okay

16           ROYER:  You think you'll be able to get there before 9?

17           HAMMAD:  Yeah, In shalla

18           ROYER:  Okay Brother

19           HAMMAD:  Siakam.

20           ROYER:  Siakam."

21           (End of transcript.)

22           MR. GIBBS:  And, Your Honor, just for the record, the
23  next one is Government's Exhibit 9G11, recorded telephone call
24  March 30, 2003, Hammad and Royer, and transcript is 1G11a.

25           And, Judge, if any of the jurors can't see it, there

**J.A. 602**

459

 1  certainly is no problem if they move down.  I don't know if that
 2  will help with the text on the screen or not.
 3          THE COURT:  Well, let me ask you this, folks:  Is the
 4  glare from the window creating a problem for any of you seeing?
 5          A JUROR:  Bigger.
 6          THE COURT:  I'm sorry?
 7          A JUROR:  Bigger print?
 8          THE COURT:  Bigger print?
 9          You don't have hard copies of the transcripts?  Do you
10  have paper copies of the transcripts?
11          MR. GIBBS:  We don't have enough for the jury now, but
12  we can get them, Your Honor.
13          THE COURT:  Well, it's a little hard to read this as it
14  scrolls, too.  I mean, it's both the movement of the text and the
15  size of it, it's not helping for the jury.  Perhaps it would be
16  better to do this tomorrow, when we have transcripts.
17          Do you have another witness you can put in now?
18          MR. KROMBERG:  One moment, Judge.
19          THE COURT:  Counsel, approach the bench.
20          (Bench conference on the record.)
21          THE COURT:  Where are we in your schedule?  Are we ahead
22  of schedule?
23          MR. KROMBERG:  We're going way ahead of schedule, Judge.
24  That's one thing I wanted to --
25          THE COURT:  How far ahead are we?

**J.A. 603**

# Kwon - direct

1     MR. KROMBERG:  We might finish this week.  I have one

2  witness that's out of town that I told not to come until Monday,

3  but now I'm thinking, gosh, I've got to have him --

4     THE COURT:  That's risky in this court.  But what I'm

5  thinking is should we end early for today?  I'm not going to have

6  the jury just sitting here waiting for Kohlmann.

7     MR. KROMBERG:  Yes, Judge.  Mr. Williams told me if we

8  give him just a minute, he thinks he might be able to make it

9  bigger, which might solve part of the problem.  Other than that,

10  it would be useful to end for the day.

11     THE COURT:  Do you have any other witnesses here?

12     MR. KROMBERG:  Mr. Kwon, but he's a long witness.

13     THE COURT:  Let's start Kwon.  Let's not waste the time,

14  all right?

15     MR. KROMBERG:  Okay.

16     THE COURT:  Okay.

17     MR. MAC MAHON:  Thank you, Your Honor.

18     (End of bench conference.)

19     THE COURT:  Mr. Kromberg, make sure you have that

20  witness on board.

21          YONG KI KWON, GOVERNMENT'S WITNESS, AFFIRMED

22                    DIRECT EXAMINATION

23  BY MR. KROMBERG:

24  Q.   Good afternoon, Mr. Kwon.  Please state your full name and

25  spell your name for the record.

# Kwon - direct

1  A.  Name is Yong Ki Kwon, Y-o-n-g K-i K-w-o-n.

2  Q.  Mr. Kwon, where were you born?

3  A.  In Indonesia.

4  Q.  When were you born?

5  A.  December 31, 1975.

6  Q.  When did you first come to the United States?

7  A.  1986.

8  Q.  What was your immigration status then?

9  A.  I think I was a green card holder.

10  Q.  Did there come a time when you became a citizen?

11  A.  Yes.

12  Q.  When was that?

13  A.  August of 2001.

14  Q.  Where have you lived in the U.S. since you arrived here?

15  A.  Mostly in Fairfax, Virginia.

16  Q.  How about going to college?

17  A.  Oh, Blacksburg, Virginia.

18  Q.  Where, where -- what college were you going to in Blacksburg?

19  A.  Virginia Tech.

20  Q.  What years were you there?

21  A.  From 1993 to 1997.

22  Q.  What were you studying?

23  A.  I was studying industrial and systems engineering.

24  Q.  So in 1997, you graduated from Virginia Tech?

25  A.  Yes, I did.

# Kwon - direct

1   Q.   And where did you move to?

2   A.   I moved to Arlington, Virginia.

3   Q.   And did you start working?

4   A.   Oh, yes.  Once I moved to Arlington, Virginia, I started

5   working.

6   Q.   And where did you start working?

7   A.   Virginia Department of Transportation.

8   Q.   Doing what?

9   A.   As a computer technician.

10  Q.   How long did you stay there?

11  A.   For four months.

12  Q.   And then where did you go?

13  A.   I worked for Sprint, Sprint PCS, in Rockville, Maryland.

14  Q.   How long did you stay there?

15  A.   Seven months.

16  Q.   And where did you go from there?

17  A.   I went to work for Hogan & Hartson, LLP, in Washington, D.C.

18  Q.   That's a law firm?

19  A.   Yes.

20  Q.   And how long did you stay there?

21  A.   About three months.

22  Q.   What did you do after that?

23  A.   I worked for McBride & Associates in Reston, Virginia, for

24  about four or five months.

25  Q.   After that?

**Kwon - direct**

1  A.   I worked for UUNET -- MCI WorldCom.  I worked for UUNET, but
2  it was purchased by MCI WorldCom.

3  Q.   What did you do for UUNET?

4  A.   I was a systems engineer.

5  Q.   Do you remember when you worked for UUNET and then WorldCom?

6  A.   I think when UUNET hired me, WorldCom has already purchased

7  it, but the building I was working in was still under the UUNET

8  name.

9  Q.   Do you remember when that was?

10 A.   April of 2000.

11 Q.   And you left there in September of 2001?

12 A.   Correct.

13 Q.   Okay.  Now, obviously, you're an inmate.  What did you plead

14 guilty to?

15 A.   I pled guilty to conspiracy to violate the Neutrality Act and

16 two counts of firearm violation in furtherance of the conspiracy.

17 Q.   What's your obligation under your plea agreement regarding

18 telling the truth when called as a witness?

19 A.   To tell the truth.

20 Q.   What sentence are you now serving?

21 A.   Eleven-and-a-half years.

22 Q.   How much of that will you ultimately serve?

23 A.   I do not know.

24 Q.   Who will make that decision?

25 A.   The judge will make that decision.

# Kwon - direct

1  Q.   Because a rule 35 motion has already been filed on your

2  behalf --

3  A.   Yes.

4  Q.   -- for your cooperation, your substantial assistance, and in

5  other investigations?

6  A.   Correct.

7  Q.   The jury's heard a bit about Dar al-Arqam, but if you would

8  describe how you -- what your contact with -- your first contact

9  with Dar al-Arqam?

10 A.   My first contact with Dar al-Arqam is it was a place to learn

11 about Islam.  You know, I was new to Islam, and a friend of mine

12 introduced me to a place called Dar al-Arqam.  The first time I

13 went was at a house, Sheikh Jaafar Idris's house.  So I started

14 attending -- they used to give lectures, so I started attending

15 those lectures.

16 Q.   When you say you were a convert, what religion were you born

17 into?  Well, let me change that question.  What religion was your

18 family when you were born?

19 A.   My family is Christian.

20 Q.   And when did you become a Muslim?

21 A.   1996.

22 Q.   All right.  Who introduced you to Dar al-Arqam?

23 A.   A friend of mine named Omer Khan.

24 Q.   Would that be spelled K-h-a-n?

25 A.   Correct.

**Kwon - direct**

1  Q.  Does Omer Khan have a brother, Masaud Khan?

2  A.  Yes, he does.

3  Q.  Now, when you got to Dar al-Arqam, did you make friends

4  there?

5  A.  Yes, I did.

6  Q.  Would those friends include Seif Chapman?

7  A.  Yes.

8  Q.  Hammad Abdur-Raheem?

9  A.  Yes.

10  Q.  Did you know Ibrahim Hamdi?

11  A.  Yes.

12  Q.  How did you meet him?

13  A.  The first time I met Ibrahim was one of these Dar al-Arqam

14  sessions at Sheikh Jaafar Idris's house, but I got to know him

15  better once I started attending the lectures regularly.

16  Q.  How about Khwaja Hasan?

17  A.  Yes, I met him at Dar al-Arqam.

18  Q.  How about Randall Royer?

19  A.  The first time I met him at IANA conference in Chicago in

20  1997.

21  Q.  Was that Islamic Assembly of North America?

22  A.  Yes.

23  Q.  And then did you keep in touch with him until you got to

24  Virginia?

25  A.  No.  And then once I moved to Virginia.  I started seeing him

# Kwon - direct

1   around the masjid and around Dar al-Arqam every once in a while.

2   Q.   When you say "around the masjid," what is the masjid?

3   A.   Place of prayer.

4   Q.   And does the masjid have a particular name?

5   A.   Dar al-Hijrah.

6   Q.   Dar al-Hijrah.  And could you spell "Dar al-Hijrah"?

7   A.   D-a-r a-l-H-i-j-r-a.

8   Q.   Do you know Caliph Basha Ibn Abdur-Raheem?

9   A.   Yes, I do.

10  Q.   How did you meet him?

11  A.   I met him, I met him through Hammad, but it was at, I believe

12  it was at Dar al-Arqam.

13  Q.   How about Muhammad Aatique?

14  A.   He went to Virginia Tech with me.

15  Q.   Was he in your class?

16  A.   No.  I just met him through the local Blacksburg Muslim

17  community.

18  Q.   How about Donald Surratt?

19  A.   I met him, I met him at Dar al-Arqam.

20  Q.   Nabil Gharbieh?

21  A.   Yes.  I also met him -- I don't remember exactly when I first

22  met him, but I got to know him better at Dar al-Arqam.

23  Q.   And how about Ali Asad Chandia?

24  A.   Again, I met him through Omer Khan, when I used to go visit

25  him in Maryland.  He was -- he also lives in Maryland.

**Kwon - direct**

1 Q. Do you know Ali Timimi?

2 A. Yes, I do.

3 Q. How did you meet him?

4 A. First time was IANA conference in 1997 in Chicago.

5 Q. And then what contact did you have with him after that?

6 A. I started attending his lectures at Dar al-Arqam in Virginia.

7 Q. Where were his lectures in Virginia?

8 A. I'm sorry?

9 Q. Where were his lectures in Virginia?

10 A. Most of the lectures I attended was Dar al-Arqam once they

11 moved to Falls Church, Virginia.

12 Q. Were you a -- were you and Mr. Timimi peers?

13 A. No.

14 Q. What was your relationship?

15 A. Ali Timimi was a lecturer, you know, somebody who's much

16 more, very knowledgeable in the religion, somebody who would

17 lecture and teach people like me.

18 Q. And when you say people like you, who are people like you?

19 A. You know, Muslims in general, but, you know, people who are

20 new and who wants to learn about Islam and things like that.

21 Q. Did you -- was there a relationship between regarding giving

22 guidance, one person gives guidance to another?

23 A. Yes. We used to asked advices from Ali Timimi. We used

24 to --

25 THE COURT: Mr. Kwon, keep your voice up, please.

**J.A. 611**

468

# Kwon - direct

1          THE WITNESS:  I used to ask advices from Ali Timimi.

2     BY MR. KROMBERG:

3     Q.    Did you drive him around at all?

4     A.    Yes.  There was a time when he moved closer -- close to my

5     house, and on certain Fridays, I used to drive him to Dar al-Arqam

6     and back.

7     Q.    And what part did he have in that when you drove him to and

8     back?

9     A.    He would be just a passenger.  I'll just drive him there and

10    back.

11    Q.    How did it come about that he would be a passenger?  I mean,

12    how did that happen?

13    A.    Oh, once he moved closer to my residence and he was, you

14    know, he, he would sometimes ask for a ride because he was very

15    busy, and he, you know, he will be tired, and I'll be going to Dar

16    al-Arqam anyway, so, you know, I'll drive him to Dar al-Arqam and

17    back.

18    Q.    Did you ever ask him for a ride?

19    A.    I don't recall a time where I asked him for a ride, no.

20    Q.    Were you in a sort of relationship where you could call him

21    and ask him for a ride?

22    A.    I never did.  I -- I wasn't that -- I wasn't that close where

23    I can just call him and ask for a ride.  Even actually some of the

24    advices when I used to ask, I usually used to go through Nabil.

25    Q.    Nabil Gharbieh?

**J.A. 612**

**Kwon - direct**

1  A.   Yes.

2  Q.   How reciprocal was your relationship with him?

3  A.   Could you clarify that?

4  Q.   Well, we've heard that he asked you for rides but you

5  wouldn't ask him for rides.  Was there, was there a reason why he

6  was asking -- why you would do things for him that you would not

7  ask him to do for you?

8  A.   I mean, well, you know, I knew that he was very busy, you

9  know, he was working and doing his Ph.D. and, you know, giving

10 lectures at Dar al-Arqam, so, you know, I knew he was a very busy

11 person, so I didn't want to bother him with, you know, things like

12 rides and stuff like that.

13 Q.   Well, you were working, too, at the time, weren't you?

14 A.   Yes, I was.

15 Q.   So what was different about the way he was working and the

16 way you were working?

17          MR. MAC MAHON:  Your Honor, objection.  There's no

18 foundation for that, and I don't see the relevance of it anyway.

19          THE COURT:  I think you ought to move on to something

20 else, Mr. Kromberg.  I agree.

21          MR. KROMBERG:  Okay.

22 Q.   Would it be correct to say that you respected Ali Timimi a

23 lot?

24 A.   Yes.

25 Q.   Why did you respect him a lot?

# Kwon - direct

1   A.   Because of his knowledge in Islam. You know, he was a very
2   knowledgeable person, and he, you know, he, he was a very
3   knowledgeable person, and I respected him for that.
4   Q.   How seriously did you try to follow what he told you -- what
5   his advice was?
6   A.   I mean, I tried my best to follow his advices, you know, as
7   much as I could.
8   Q.   How often did you see him at the houses of your friends from
9   Dar al-Arqam?
10   A.   Not very often. I only recall twice at the house of Ibrahim
11   Hamdi and once at a house of a brother, I don't know his name.
12   I'm not very close with him, so --
13   Q.   At the houses -- at the times when he was at the house of
14   Ibrahim Hamdi, do you recall when they were in relation -- well,
15   first, was it before or after 9/11?
16   A.   Before 9/11.
17   Q.   Okay. And second, was it before or after Hamdi came back
18   from his trip to Pakistan and Lashkar-e-Taiba?
19   A.   Once before he left for LET and once after he had come back
20   from LET camp.
21   Q.   And how do you recall that once was before he went and once
22   was after he came back?
23   A.   I recall the once before because, No. 1, he used to live in
24   an apartment near, off of 395, and I remember that was before
25   because the talk we had that night was regarding LET, where

**J.A. 614**

# Kwon - direct

```
 1   Randall Royer was talking about it, and Ibrahim hadn't gone yet,
 2   so, you know, we were listening to him talk about LET.
 3   Q.   And how about the second time?
 4            MR. MAC MAHON:  Your Honor, if I may, I don't -- it's a
 5   very vague answer to this question as to who is where and when.
 6            THE COURT:  I think you need more specifics.  Who was
 7   there?  When you use pronouns, the "him" gets very unclear as a
 8   reference.
 9            MR. MAC MAHON:  Thank you, Your Honor.
10            THE COURT:  So go back over that, Mr. Kromberg.
11            MR. KROMBERG:  Sure.
12   Q.   Mr. Kwon, at the time at the apartment off 395, at whose
13   house was that?
14   A.   It was at Ibrahim Hamdi's house.
15   Q.   Okay.  And was Mr. Timimi there?
16   A.   Yes, he was.
17   Q.   Who else was there besides Mr. Timimi and you?
18   A.   Randall Royer, Ibrahim Hamdi, others which I can't recall at
19   the moment, but there was others.
20   Q.   Okay.  Now, the time after Ibrahim Hamdi came back from his
21   trip to Lashkar-e-Taiba, where was that?
22   A.   It was at a townhouse off of Route 50.  Ibrahim was renting
23   the basement from the guys who owned the house.
24   Q.   And who was there on that occasion when you saw Mr. Timimi at
25   that house of Hamdi's?
```

# Kwon - direct

1  A.    Myself, Ali Timimi, Ibrahim Hamdi.  There's a guy named

2  Feraz, I don't know his last name.

3  Q.    Feraz?

4  A.    Feraz.

5  Q.    Can you spell that, please?

6  A.    F-e-r-a-z.

7         And I seem to recall Nabil being there, also.  There

8  were others.  I just don't remember everybody's, you know, exactly

9  who was there other than the people I just named.

10  Q.    And when did Hamdi move to that house?

11  A.    I don't know the exact date.  I just know that he moved after

12  he came back from LET camp.

13  Q.    Did you help Ibrahim move into that house?

14  A.    I helped him, yes.

15  Q.    Did you help Ali Timimi move into one of his houses or at any

16  time?

17  A.    Yes, I did.

18  Q.    Did Ibrahim Al-Hamdi ever help you move?

19  A.    No.

20  Q.    Did Mr. Timimi ever help you move?

21  A.    No.

22  Q.    Did you ever see Mr. Timimi at the homes of any others of

23  your friends besides Mr. Hamdi's house and I think you mentioned

24  one other guy, correct?

25  A.    Correct.

**Kwon - direct**

1   Q.   Anybody else?

2   A.   No, I do not recall anybody else's house.

3   Q.   Before September 16, 2001, did Mr. Timimi ever come into your

4   house?

5   A.   No.

6   Q.   Had you ever been inside his house?

7   A.   Yes, when I helped him move.

8   Q.   Other than when you helped him move, had you ever been in his

9   house?

10  A.   Yes.  I recall one time I went to visit him.

11  Q.   Do you recall when that was?

12  A.   I don't remember specific dates, but after he has moved into

13  the new house near my residence.

14  Q.   Did you have a meal there?

15  A.   Yes, I did.

16  Q.   Who else was there?

17  A.   Just myself and Ali Timimi.

18  Q.   Did you draw up a will in about February 2001?

19  A.   Yes, I did.

20  Q.   Was there a particular reason why you drew up a will at that

21  time?

22  A.   Yes.  I was leaving for hajj, so I made a will, and I left it

23  with Ali Timimi.

24  Q.   What is "hajj"?

25  A.   It's a pilgrimage that all Muslims should make at least once

# Kwon - direct

1  in his lifetime.

2  Q.    Did Ali Timimi had any role in your will?

3  A.    Writing it up, no, but in the will, I ask him to be in charge

4  of -- in case that, that I would cease to exist, I asked him to

5  take charge of my burial and some of my financial stuff.

6  Q.    Was he to be your executor?

7  A.    Yes.  What -- yes, to execute some of these things, yeah.

8  Q.    Well, let's go back.  On the will, who was appointed to take

9  care of your affairs if something happened to you?

10  A.    Ali Timimi.

11  Q.    I'd like you to look at Exhibit -- probably easier from the

12  book -- 10A24, 10A24.

13         THE COURT:  Is there any objection to this?

14         MR. MAC MAHON:  No objection, Your Honor.

15         THE COURT:  All right, 10A24 is in evidence.

16         (Government's Exhibit No. 10A24 was received in

17  evidence.)

18         THE COURT SECURITY OFFICER:  It's not in there.

19         MR. KROMBERG:  It's not in there.  Okay.  Well, now it's

20  on the screen.

21  Q.    Mr. Kwon, look at the screen.  We're on page 2, now.  Do you

22  recognize that, page 2 of your will?

23  A.    Yes, I do.  Yes, I do.

24  Q.    Okay.  Let's go to page 3.

25         Okay.  Do you recognize that page 3?

**Kwon - direct**

1   A.   Yes, I do.

2   Q.   Okay.  And let's go to page 4.  And if you could look

3   particularly at paragraph 6?

4   A.   Yes.

5   Q.   That's correct that if your body is in this area, then you

6   ask Sheikh Ali Al-Timimi, lecturer at Dar al-Arqam of Falls

7   Church, or whomever the Sheikh Ali appoints to be in charge of

8   your burial?  That was the Sheikh Ali Timimi who's here today,

9   right?

10  A.   Yes.

11  Q.   And you refer to him as sheikh, correct?

12  A.   Yes.

13  Q.   What does "sheikh" mean when you refer to him?

14  A.   In this context, somebody who's -- who, you know, who I

15  respect, who has a lot of knowledge in Islam.

16  Q.   And let's look at paragraph 8, if you could.

17  A.   Yes.

18  Q.   And in that, you're asking Sheikh Ali Timimi or whomever

19  Sheikh Ali appoints to dispose of your wealth according to the

20  shariah, Koran, and the sunnah of the Prophet Muhammad, may peace

21  and blessings of Allah be upon him?

22  A.   Yes.

23  Q.   So when I asked the question "executor," that's what I was

24  referring to.  Is that your understanding?  Is there any other

25  understanding of "executor" that you have?

476

# Kwon - direct

1   A.    No.

2           MR. KROMBERG:  Okay.  Thank you.  You can take that off.

3   Q.    Mr. Kwon, when did you give that will to Ali Timimi?

4   A.    I don't remember exact date, but it was February of 2001,

5   right before I left for hajj.

6   Q.    Did you ever retrieve it from Sheikh Ali when you came back?

7   A.    No, I didn't.

8   Q.    I want to focus your attention to the time period of 2000 and

9   2001 but before 9/11.  What did you believe your obligations were

10  regarding preparing for jihad at that time?

11  A.    As a Muslim, you know, I should, I should be ready to prepare

12  and be physically fit.

13  Q.    What was your attitude during that period about becoming a

14  martyr in violent jihad or dying shaheed?

15  A.    I mean; that's something that as a Muslim, that's something

16  you aspire to be.

17  Q.    Was it something you were looking to do immediately?

18  A.    No.  I mean, I didn't have any immediate plans of being

19  shaheed but just something to look up to, something to, you know,

20  aspire to be.

21  Q.    What were some of the factors that caused you to have that

22  attitude?  This is before 9/11?

23  A.    From what I learned, you know, from some of the lecturers

24  that I listened to at Dar al-Arqam, and also, you know, some of

25  the books that I read.

**J.A. 620**

# Kwon - direct

1  Q.   What impact -- did you ever watch any jihad videos?

2  A.   Yes, I did.

3  Q.   "Russian Hell 2000"?

4  A.   Yes.

5  Q.   What impact did watching the jihad videos like "Russian Hell

6  2000" have on your, your attitude about becoming a martyr?

7  A.   I mean, it, it motivated us.  It gave us kind of like, like

8  an inspiration.

9  Q.   What impact did having -- I take it that you discussed those

10 videos with your fellows at Dar al-Arqam.

11       MR. MAC MAHON:  Your Honor, I object to the broad nature

12 of the "fellows at Dar al-Arqam."

13       THE COURT:  Sustained.  Be more specific, Mr. Kromberg.

14 BY MR. KROMBERG:

15 Q.   Did you discuss the jihad videos with anybody at Dar

16 al-Arqam?

17 A.   Yes, I did.

18 Q.   And who might -- who were those people?

19       MR. MAC MAHON:  And if I could, Your Honor, as to

20 location as well, whether this is actually at the Dar al-Arqam

21 center location and time would be helpful.

22       THE COURT:  Well, we've got the time frame is that

23 2000-2001 pre-9/11 time frame.  That's already been set, but you

24 can get the location, too.

25 BY MR. KROMBERG:

## Kwon - direct

1  Q.   Mr. Kwon, did you have discussions pre-9/11 about jihad

2  videos with Seif Chapman?

3  A.   Yes, I did.

4  Q.   Nabil Gharbieh?

5  A.   Yes, I did.

6  Q.   Hammad Abdur-Raheem?

7  A.   Yes, I did.

8  Q.   Caliph Abdur-Raheem?

9  A.   I don't recall.

10  Q.   Donald Surratt?

11  A.   Yes, I did.

12  Q.   Randall Royer?

13  A.   Yes, I did.

14  Q.   How common a topic of conversation in the group of people

15  that I just named were jihad videos?

16  A.   Several times a month, you know, pretty often.

17  Q.   Was there any particular place that you only had

18  conversation -- was there -- did you only have conversations about

19  this topic in particular places?

20  A.   No, just whenever we met, when we start talking, you know.

21  Q.   Okay.  What impact on your attitude about becoming a martyr

22  or dying shaheed did those discussions that you had with your

23  friends from Dar al-Arqam have?

24  A.   I mean, we all had the same view of, you know, dying shaheed.

25  I mean, we knew that it's not something that's, you know, you just

# Kwon - direct

1  go and die shaheed.  It's not something, you know, it's not
2  something easy like that.  I mean, we'll talk about it.  I don't
3  know how realistic, but it's something, you know, we'll talk about
4  because it was something that's, you know, something that's very
5  noble in our religion.
6  Q.  Why wasn't it easy?  Why couldn't you just go off to Chechnya
7  and get yourself killed?
8  A.  I mean, it's easy to talk about it, but, you know, it's --
9  the reality of things is that, you know, it's not so easy when
10 you --
11 Q.  It's not so easy to make the decision or so easy to get
12 yourself killed?
13 A.  It's not easy in either case.  It's easy to talk about it,
14 but, you know, to take action and to, to commit yourself to
15 something like that, it takes a lot of, you know, a lot of
16 commitment, determination, and faith.
17 Q.  You mentioned the obligation to prepare for jihad.  What did
18 you do before 9/11 to fulfill that obligation regarding preparing
19 for jihad?
20 A.  I purchased some firearms, and I start going to the shooting
21 ranges to practice target shooting.  Also, I played paintball with
22 some of the, some of the friends that I had.
23 Q.  Well, let me ask the deputy marshal to hand you 1H1 and ask
24 if you recognize it.  I believe this has already been admitted
25 into evidence.  Do you recognize that?

**Kwon - direct** 480

1  A.   Yes, I do.

2  Q.   What is that?

3  A.   It's an AK-47.

4  Q.   Well, is it a particular AK-47?  Did you have any contact

5  with that particular AK-47?

6  A.   It's the AK that I sold to Ismail Royer, Randall Royer.

7  Q.   When did you sell it to him?

8  A.   Sometime in 2000.

9  Q.   When you sold it to him, did it look the way it is today?

10 A.   No.

11 Q.   What's different about it?

12 A.   He has modified the hand grip and the stock.

13 Q.   What kind of stock is that now?

14 A.   It's, looks like a folding stock.  It's a carbon fiber or

15 whatever.

16 Q.   A carbon fiber stock?  Now, what was different about the

17 carbon fiber stock --

18          THE COURT:  Wait.  Some jurors may not know what a stock

19 of a firearm is, all right?  Let's explain it to them.

20 BY MR. KROMBERG:

21 Q.   Would you be able to point to the, the piece that you're

22 calling the carbon fiber stock?

23 A.   It's this part right here (indicating).

24 Q.   You have to speak into the microphone.  I know it's hard to

25 lean one way and speak the other way --

**J.A. 624**

**Kwon - direct** 481

1   A.   It's this part right here (indicating).

2   Q.   Okay.  Now, what does the stock -- what did the stock look

3   like when you sold it to Royer?

4   A.   When I sold it to Royer, it was a wood stock, which is how

5   AKs come originally.

6   Q.   What's the advantage of one of those carbon fiber stocks?

7   A.   It's a newer material.  It's lighter.  It's tougher.

8   Q.   Now, did you know -- did you say it was a folding stock?

9   A.   I'm not so sure.  I thought there was a hinge on the side.

10  Q.   Did you discuss with Royer his modification of the weapon?

11  A.   Yes, I did.

12  Q.   And did you discuss the folding stock at that time?

13  A.   Yes, I did.

14  Q.   What was the purpose of having a folding stock on an AK-47?

15  A.   If you fold the stock, the firearm becomes much shorter,

16  which makes it much easier to carry and maneuver around with in

17  confined spaces.

18          MR. KROMBERG:  All right, thank you.  We have no more

19  need for that.

20  Q.   Why did you sell that to Royer?

21  A.   Well, when he came back from LET, he told me that he's

22  looking to buy a firearm, and I had an extra one, so I told him I

23  can sell him mine.

24  Q.   Take a look at Government Exhibit 1C1.  I think it's best to

25  look at it in the book first.

# Kwon - direct

```
 1              THE COURT:  Now, 1H1 is in evidence.  Is there an
 2   objection to 1C1?
 3              MR. MAC MAHON:  No objection, Your Honor.
 4              THE COURT:  All right.
 5              MR. KROMBERG:  In that case, we can just put it right up
 6   on the screen.
 7              THE COURT:  1C1 is in.
 8              (Government's Exhibit No. 1C1 was received in evidence.)
 9              THE COURT:  Mr. Wood, we're just going to put it up on
10   the screen.
11              MR. KROMBERG:  No, never mind, we need it from the book.
12              THE COURT:  No?  All right.
13              MR. KROMBERG:  There's a flaw in our system, Judge.
14              THE COURT:  Well, can you put it on the overhead?  Do
15   you have a hard copy?
16   BY MR. KROMBERG:
17   Q.   Can you see that on either the book or on the screen?
18   A.   Yes.
19              MR. KROMBERG:  The government moves in 1C1, Judge.
20              THE COURT:  There was no objection.  It's in.
21              MR. KROMBERG:  Okay.  Thank you.
22   Q.   Mr. Kwon, you've mentioned that you had other weapons.  What
23   other weapons did you have?
24   A.   I had an AR-15 assault rifle and an H&K Mark 23 pistol.
25   Q.   What's an AR-15 rifle?
```

# Kwon - direct

1  A.   It's a -- basically, it's a semiautomatic version of an M-16.

2  Q.   And what's the H& -- what is an H&K pistol?

3  A.   It's a, it's a pistol, a handgun.

4          MR. KROMBERG:  Okay.  I would note, Judge, that on my

5  copy of 1C1, I had a -- it was a -- I had a page stapled to it.  I

6  want to make sure that the, the original does not have a page

7  stapled to it.

8          THE COURT:  So 1C1 should only be one sheet of paper,

9  all right.

10         MR. MAC MAHON:  I noticed the same thing, Your Honor.

11         THE COURT:  The Court's copy also has a second page.  We

12  should just destroy it.

13         MR. MAC MAHON:  The 302 needs to go away.

14         THE COURT:  We'll make sure that Ms. Travers corrects

15  that for the record.

16         MR. MAC MAHON:  Thank you, Your Honor.

17         MR. KROMBERG:  Thank you, Your Honor.

18         THE COURT:  I'm taking mine out, too, right now.

19  BY MR. KROMBERG:

20  Q.   Mr. Kwon, what weapons did the other guys in the group have?

21  What did, what did Masaud Khan have to your knowledge?  Before

22  9/11 I'm talking about.

23  A.   He had a sniper version of an AR-15 rifle.  He had two

24  pistols made by H&K, one just like my own.  As far as he is

25  concerned, that's what he owned.

**Kwon - direct**

1  Q.   How about Ibrahim Al-Hamdi?

2  A.   He owned, it was a rifle, it was like an AK-47-style rifle

3  except it was more like a, like a hunting.  It had a scope in it,

4  rifle stock instead of assault rifle stock.

5  Q.   How about Seif Chapman?

6  A.   He also had an AR-15 and a handgun.

7  Q.   Donald Surratt?

8  A.   He had an AK-47-style rifle.

9  Q.   Nabil Gharbieh?

10 A.   He had a MAK-90.  It's a Chinese version of AK-47.

11 Q.   And Hammad Abdur-Raheem?

12 A.   I never seen it, but he told me that he had an AK-47 rifle.

13 Q.   Caliph Abdur-Raheem?

14 A.   I'm sorry, Hammad had a Dragunov, and Caliph had an AK-47,

15 which I'd never seen, that he told me that he had.

16 Q.   Mr. Kwon, when did you first hear about a Pakistani group

17 called Lashkar-e-Taiba, or LET?

18 A.   When Royer came back from Pakistan.

19 Q.   Before 9/11?

20 A.   Correct.

21 Q.   Now, before 9/11, had you ever heard about Lashkar-e-Taiba or

22 LET from Sheikh Ali?

23        MR. MAC MAHON:  Your Honor, I object to him referring to

24 him as Sheikh Ali.

25        THE COURT:  All right.

# Kwon - direct

1      MR. MAC MAHON:  That isn't necessary.

2      MR. KROMBERG:  Judge, if I may respond, Mr. MacMahon

3  has -- Dr. MacMahon has been referring to Mr. Timimi as Doctor.

4  What Mr. Kwon knew him as was Sheikh Ali.  We saw that.  He refers

5  to him as Sheikh Ali.

6      No one ever during this case ever referred to Mr. Timimi

7  as Dr. Timimi.  They referred to him as Sheikh Ali, and I should

8  be able to ask him at that time, what did Sheikh Ali say.

9      THE COURT:  I think there are too many names in this

10 case already.  Why don't you just say "the defendant"?

11     MR. KROMBERG:  That's fine, Judge.

12     THE COURT:  And that will be absolutely clear to the

13 jury about whom you are speaking.

14     MR. KROMBERG:  Thank you, Judge.

15 Q.  Mr. Kwon, had the defendant said anything about

16 Lashkar-e-Taiba before 9/11?

17 A.  Yes, he had.

18 Q.  What did he say?

19 A.  He says -- he told us that LET is a group that's on the

20 sunnah, and at one point, he also mentioned that he met --

21     MR. MAC MAHON:  Can I get a time frame for this, please?

22     MR. KROMBERG:  Judge, I'd appreciate it if the

23 witness -- with an objection like that, he should let the witness

24 testify and not interrupt him.

25     THE COURT:  All right.  Now, we've done this case quite

# Kwon - direct

1  civilly so far.  Let's just keep it calm.  I would agree that
2  again, on cross examination, you can also probe those details if
3  they don't come out.  So let's continue.
4          Let the witness finish, and then, Mr. Kromberg, you
5  should try to make it more precise as to where and when.
6          MR. KROMBERG:  Absolutely, Judge.  And if the witness
7  can finish one answer, I will do my best to ask the next question.
8          THE COURT:  Go ahead.
9  BY MR. KROMBERG:
10 Q.   Mr. Kwon, what did the defendant say to you about
11 Lashkar-e-Taiba, or LET, before 9/11?
12 A.   He said that LET was a group that's on the sunnah and --
13          THE COURT:  I'm sorry, I can't understand that
14 expression.  What did he say?
15          THE WITNESS:  On the sunnah.  Basically, you know, means
16 they're on the correct path.
17          THE COURT:  All right.  And how do you spell the word
18 that you were referring to?
19          THE WITNESS:  Sunnah, s-u-n-n-a-h.
20          THE COURT:  All right, under sunnah.
21          THE WITNESS:  They're on the sunnah, yes.
22          THE COURT:  All right.
23 BY MR. KROMBERG:
24 Q.   Let's talk about that for just a moment, Mr. Kwon.  What
25 does -- is there a religious significance to being on the sunnah,

**J.A. 630**

**Kwon - direct**

1  on the correct path?

2  A.   Yes.

3  Q.   Okay.  What is the sunnah?

4  A.   It's the traditions and teachings of the Prophet Muhammad,

5  peace be upon him.

6  Q.   So when someone is on the sunnah, that is the correct path

7  according to the teachings of the Prophet, in the words of the

8  Prophet, correct?

9  A.   Correct.

10  Q.   Now, I think you were saying something in addition to, that

11  the defendant had said that Lashkar was on the sunnah and

12  something else.  What was that something else?

13  A.   He also mentioned that he has met Hafiz Saeed, who is the

14  head of LET at that time, and he has met him, and he has said that

15  he was a very scholarly man.

16  Q.   Is there a connotation in "scholarly" to being good or bad or

17  neutral?

18          MR. MAC MAHON:  Your Honor, object.  If that's what the

19  defendant said, that's one thing.  His interpretation of it is not

20  relevant.

21          THE COURT:  If among your group of people that term, "a

22  scholarly man," has special significance, you can testify.

23  Objection is overruled.

24          THE WITNESS:  Scholarly man as in a good, you know, good

25  way, a knowledgeable person.

# Kwon - direct

1   BY MR. KROMBERG:

2   Q.   In your -- what the judge just asked about in your circle,

3   how -- what is the importance of being a scholarly man?

4   A.   A knowledgeable person is, depending on how much knowledge he

5   has, is very important.  The more knowledge you have, the more,

6   you know, more better off you are, you know, more respectable and

7   more scholarly.

8   Q.   Is it scholarly, does it mean knowledge in a particular area,

9   or is it, or is it knowledge in general?

10  A.   Scholarly in this context, I take it to mean as in Islam.

11  Q.   The more scholarly in Islam, the better, correct?

12  A.   Correct.

13  Q.   Now, on how many occasions before 9/11 had you heard the

14  defendant talk about either Lashkar-e-Taiba or Hafiz Saeed, the

15  leader of LET?

16  A.   How many times?

17  Q.   Right.

18  A.   I can't recall how many times, but I know he mentioned that

19  at least once at Ibrahim's house -- Ibrahim's house -- apartment

20  before he left for LET.

21  Q.   What was the context, if you recall, of why the defendant

22  said that Lashkar was on the sunnah and that Saeed was a scholarly

23  man at Ibrahim's house before Ibrahim left for Lashkar?

24  A.   It just shows that they're --

25          MR. MAC MAHON:  Your Honor, I don't know where this

**J.A. 632**

# Kwon - direct

1  answer -- "it shows that."  If the context, if the defendant said

2  something, it can come out.  What the other people said there

3  would be hearsay.

4          THE COURT:  Wait a minute.  That wasn't -- it was a long

5  question, so repeat the question to him.

6  BY MR. KROMBERG:

7  Q.  What was the context -- when Ali -- when the defendant says,

8  "Lashkar's on the sunnah, and I've met Saeed, and he's a scholarly

9  man," what was said immediately before that or immediately after

10 that to -- how did it come up?

11         MR. MAC MAHON:  If it's not the defendant saying it,

12 Your Honor, it's hearsay in this context.

13         THE COURT:  No, no, no, no.  Wait a minute.  You just

14 testified that you heard the defendant make that statement about

15 LET; is that correct?

16         THE WITNESS:  Correct.

17         THE COURT:  All right, where was that statement made?

18 Was it at Hamdi's house?

19         THE WITNESS:  Yes.

20         THE COURT:  Who was present?

21         THE WITNESS:  Myself, Ali Timimi, Ibrahim Hamdi, Ismail

22 Royer, and there were others which I can't recall right now.

23         THE COURT:  All right.  And Mr. Kromberg's question is

24 what caused the defendant to make that statement?  What was

25 happening that resulted in him making that statement?

# Kwon - direct

1    THE WITNESS:  Well, there are a lot of groups in Kashmir
2  that are fighting, mujahideen groups that are fighting the Indians
3  in Kashmir, and basically, this shows that LET is on the
4  correct --

5    THE COURT:  No, no, why did he make the statement?  Did
6  somebody ask him a question?  Did somebody make a comment?  If you
7  recall, why -- what led to him making that statement?

8    THE WITNESS:  All I remember is -- I know what happened
9  after, but I don't remember what led him to say that.

10    THE COURT:  Was the statement made in response to a
11  question, or was it part of a speech?  Do you remember the context
12  in which it was made?

13    THE WITNESS:  It was, it was just a talk he was giving
14  to us, and he said this in prelude for Royer to talk about his
15  experience at LET.

16    THE COURT:  All right.  Go ahead, Mr. Kromberg.

17    MR. KROMBERG:  Thank you, Your Honor.

18  Q.  What did -- did Royer, in fact, discuss his experience at LET
19  after, after the defendant talked about LET?

20  A.  Yes, he did.

21  Q.  Now, still before 9/11, who besides the defendant and Royer,
22  who else told you anything about LET?

23  A.  Ibrahim told me about LET after he got back from LET camp.

24  Q.  Did he tell you about his experiences at LET?

25  A.  Yes, he did.

# Kwon - direct

1  Q.   Okay.  Did he have anything in his apartment that he brought

2  back to the United States from his time at LET?

3  A.   Yes.  He had some posters made by LET.

4           MR. KROMBERG:  I'm going to show you six posters.  I

5  believe they are already in evidence.

6           Can we see 1F1?  I think we should get that on the

7  screen.

8           I'm sorry, Your Honor, Mr. MacMahon says they're not,

9  but we've already seen them.

10          THE COURT:  There have been pictures on the screen.

11          MR. MAC MAHON:  The translation was given by -- in Urdu

12  by Mr. Aatique.  That's all that happened.

13          MR. KROMBERG:  And Mr. Aatique said he saw them.

14          THE COURT:  Hold on a second.  1F1 through 1F4 are in

15  evidence.

16          MR. KROMBERG:  Not 6?

17          THE CLERK:  Not 5 and not 6.

18          MR. KROMBERG:  Well, at this time, I move in 1F5 and 1F6

19  on the basis of what Mr. Aatique said.  He translated them and

20  said they were similar to what he saw.

21          MR. MAC MAHON:  And the same objection as before is to

22  lack of foundation as to the defendant, Your Honor.

23          THE COURT:  Well, you can probe that.  Whether or not

24  the defendant saw these is a separate issue, but, yes, 5 and 6

25  were shown to the jury and were discussed by that witness, so I'm

# Kwon - direct

1  going to admit those as well.  So 1F1 through 1F6 are in evidence.

2        (Government's Exhibit Nos. 1F5 and 1F6 were received in

3  evidence.)

4        MR. KROMBERG:  Thank you, Your Honor.

5  Q.   Mr. Kwon, if you'd take a look at 1F1, is this a poster that

6  you saw at Ibrahim Al-Hamdi's house to the best of your

7  recollection?

8  A.   I saw a similar poster at Ibrahim's house.

9  Q.   How about take a look at 1F2.  Did you see that at Ibrahim's

10  house?

11  A.   I also saw a similar poster at Ibrahim's house.

12  Q.   1F3, please?  Did you see something like that at Ibrahim's

13  house?

14  A.   Yes, I did.

15  Q.   1F4?  Did you see one of those at Ibrahim's house?

16  A.   Again, a similar poster I saw at Ibrahim's house.

17  Q.   1F5, did you see something like that at Ibrahim's house?

18  A.   Something similar, yes.

19  Q.   And 1F6, please, did you see that one?

20  A.   Same, also similar.

21  Q.   Okay.  Now, where else, if anywhere, did you see these

22  besides at Ibrahim's house?

23  A.   I also saw them at LET office in Lahore, Pakistan.

24  Q.   Okay.  Now, again, before 9/11, you said that Timimi had,

25  excuse me, that the defendant talked about Lashkar being on the

**Kwon - direct**

1   sunnah.  Before 9/11, had the defendant talked about other groups
2   that were on the sunnah in other areas of the world where fighting
3   was going on?
4   A.   I don't recall him saying any other particular group is on
5   the sunnah, but I remember, you know, he talked about the
6   mujahideen in Chechnya, also.
7   Q.   Any particular mujahideen in Chechnya?
8   A.   At one time, he mentioned the mujahideen commander by the
9   name of Ibn Khatab in Chechnya.
10  Q.   Was there a particular incident involving Khatab in "Russian
11  Hell 2000" -- in the video "Russian Hell 2000" that was
12  particularly controversial in some Islamic circles you could see
13  on websites?
14  A.   Yes.  There was a clip from that video where Ibn Khatab
15  executes a Russian prisoner.
16  Q.   What, what was the controversy?
17  A.   There was talk about permissibility of executing a prisoner
18  of war.
19  Q.   What was the -- how was that controversy resolved?
20  A.   Well, on the website called azzam.com, they put a fatwa that
21  said it is permissible to execute prisoners of war.
22  Q.   Do you know who wrote that fatwa?
23  A.   I don't recall.
24  Q.   I'd like to turn to the events -- I'd like to turn to the
25  time of September 11, 2001.  Where were you on the evening of

**Kwon - direct**

1  September 11?

2  A.   I was at Dar al-Arqam, Falls Church, Virginia.

3  Q.   What was your emotional state that evening?

4  A.   You know, I was nervous, you know, a little uncertain.

5  Q.   How did the -- what did it appear to you that the emotional

6  state of the other people you saw at Dar al-Arqam to be?

7  A.   I mean, in the light of what had happened that morning,

8  everybody, I think, was in a similar state.

9  Q.   Did you hear -- overhear a discussion at Dar al-Arqam that

10 evening involving the defendant?

11 A.   Yes.

12 Q.   Can you tell the jury what you heard of the discussion

13 involving the defendant?

14 A.   You know, he told us that -- to, you know, to be careful, not

15 to go outside your homes unnecessarily, you know, to be careful

16 to, not to engage with other people in this topic, you know, just

17 to be safe, you know, to take care of yourself.

18 Q.   What discussion did you hear, if any, that he had with

19 Haytham?

20 A.   At one point, Haytham said -- Haytham said that this -- when

21 he saw the thing happen on 9/11, that he felt that this was not --

22 it wasn't right, it wasn't justified, and --

23 Q.   Was it evil?

24 A.   He said something, it's evil or bad, something bad.

25 Q.   And what -- did the defendant respond to Haytham's

## Kwon - direct

1  characterization of the attacks at all?

2  A.   Well, Ali Timimi said -- I forget all the details, but I

3  remember him saying that Islamically, the issue Islamically you

4  cannot kill innocent people, so Islamically when you go to, you

5  can, you know, engage if combatants, soldiers, and the discussion

6  I remember being that Ali Timimi said that the definition of

7  combatant, and he said that a combatant is not just a person who

8  goes and fights but also a person who supports, you know, who

9  supports monetarily in these fights can also be categorized as

10  combatant.

11  Q.   Do you recall Haytham's reaction to the defendant's response?

12  A.   He wasn't, he wasn't, you know, he wasn't happy or satisfied.

13  I remember they, they went back and forth for a few minutes.

14  Q.   What contact did you have with the defendant when the

15  gathering at Dar al-Arqam ended?

16  A.   I drove him home.

17  Q.   Had you driven him there in the first place?

18  A.   No, I don't recall driving him there in the first place.

19  Q.   Was there anybody else in the car with you when you drove him

20  home?

21  A.   Part of the driving, Mahmood Hasan was with us.

22  Q.   What did he tell you -- excuse me, what was said in the car

23  on the way as you were driving the defendant home?

24  A.   He -- I remember him saying, you know, that this, this event

25  is -- was, you know, it was a punishment, punishment from God,

# Kwon - direct

1  but, you know, he hadn't expected something like this.  He
2  expected something like an earthquake.
3          And he told me that, you know, just expect some, you
4  know, anti-, anti-Muslim activities and hostilities towards
5  Muslims.  So he told me to, you know, told me to gather some
6  brothers and come up with a, with a contingency plan in case
7  something like this happens where there will be, like, you know,
8  mass hostility towards Muslims in America.
9  Q.   So what did you do in response to what he said to you?
10 A.   Well, I e-mailed some brothers asking, you know, inviting
11 them to my house for dinner on that weekend.
12 Q.   Who did you invite?
13 A.   I invited, I invited Nabil, Ismail Royer, Masaud Kahn,
14 Ibrahim Hamdi, Idris Surratt, Hammad, Calipha, Mahmood.
15 Q.   When you say Mahmood, Mahmood Hasan?
16 A.   Yes, correct.  I think that's all.
17 Q.   Did you invite Muhammad Aatique?
18 A.   Actually, I hadn't invited Aatique.
19 Q.   Well, we'll get to that when he eventually showed up.  We'll
20 get to that later, but you talk about the invitations.  Why did
21 you choose to invite these people?  The ones that you invited, why
22 did you choose to invite them?
23 A.   Well, I figured that in order to come up with a plan like
24 this, if something was to happen where there were some anti-Muslim
25 hostilities towards Muslims in America, I wanted to gather

**J.A. 640**

497

# Kwon - direct

1   brothers who are better fit for this, this task, which will be to

2   defend ourselves and our families, more fit, physically more, you

3   know, brothers who are -- who have some physical training, you

4   know, who are more fit.

5            So I called certain brothers from the -- some of them

6   are from paintball group, and some of them are from guys I knew

7   that had firearms which I went to the firing range with.

8   Q.   When you invited these people, did you understand that you

9   were inviting the people that the defendant wanted you to invite,

10  or you were just inviting people that you wanted to invite?

11           MR. MAC MAHON:  Objection to the foundation of the

12  question, Your Honor.  He didn't say anything about what the

13  defendant said to him.

14           THE COURT:  I'm going to sustain the objection to the

15  form of that question.

16  BY MR. KROMBERG:

17  Q.   What relationship was there between when the defendant said

18  to you, "Get some brothers together," and the people that you

19  particularly chose to be the brothers?

20           MR. MAC MAHON:  Same objection, Your Honor.  It doesn't

21  relate to something that the defendant said.

22           THE COURT:  You can probe that on cross.  I mean, this

23  question is somewhat better formed.  I'll overrule the objection.

24           THE WITNESS:  I mean, he didn't say which brothers.

25  When he said "some brothers," I went out and I, you know, based on

# Kwon - direct

1  my understanding of what, what this plan was going to be, I
2  invited the brothers who are best fit for this, this task.
3  BY MR. KROMBERG:
4  Q.   What was your understanding of what the plan was going to be
5  that the defendant suggested you do?
6         MR. MAC MAHON:  Same objection.  It's no -- there has
7  been no testimony that the defendant said there should be a plan.
8         MR. KROMBERG:  I think, Judge, I think that's --
9         THE COURT:  Well, wait.  No, I recall the testimony
10 differently looking at my notes, so I'll overrule the objection.
11        THE WITNESS:  Could you repeat the question?
12        MR. KROMBERG:  I forgot it.
13 Q.   Is it correct that the defendant indicated to you that you
14 should do something when you were driving him home, correct?
15 A.   Right.
16 Q.   You tried to follow what he said, correct?
17 A.   Correct.
18 Q.   You invited these guys, correct?
19 A.   Correct.
20 Q.   Why did you -- what was the relationship between the guys you
21 invited and what you thought he wanted -- what you thought the
22 defendant wanted you to do?
23        MR. MAC MAHON:  Now, that question, Your Honor, I think
24 is three levels into surmise.
25        THE COURT:  Exactly what do you recall the defendant

**J.A. 642**

# Kwon - direct

1  saying to you in the car as you were driving home about something
2  you should do in the future?

3         THE WITNESS:  He -- I don't remember his exact words,
4  but he said, "Get the brothers together in case something, you
5  know, something like this happens so that, you know, you can come
6  up with a plan to, you know, defend yourselves and your families."

7         THE COURT:  All right.  And in response to that, what
8  did you do?

9         THE WITNESS:  I e-mailed some brothers, inviting them to
10 my house so we can come up with this, what the plan was going to
11 be.

12        THE COURT:  All right.  Go ahead, Mr. Kromberg.

13        MR. KROMBERG:  Thank you, Your Honor.

14 Q.   Mr. Kwon, the defendant said, "Get the brothers together."
15 Why did you think that the brothers you were inviting were the
16 brothers he was referring to?

17 A.   Again, I picked the brothers that I, you know, that I thought
18 was best fit for this to come up with this plan, who are -- which
19 are brothers who are more, more, you know, physically active, also
20 has some training with firearms, brothers who I played paintball
21 with who are more, more serious.

22 Q.   Did you believe at the time that you were following through
23 on something that the defendant had asked you to do by inviting
24 these people?

25 A.   Yes.

# Kwon - direct

1  Q.   To your knowledge, did the defendant know that some of the

2  brothers had been engaged in, we've heard the term personal jihad

3  training through paintball?

4  A.   I don't think he knew which individuals, but he knew that

5  some of us were playing paintball.

6  Q.   Playing paintball for some recreation purpose or any other

7  purpose?

8          MR. MAC MAHON:  Your Honor, it depends on what the

9  defendant knew.  Again with foundation.  He said he didn't know

10  who it was.  Now he's going to explore it further.

11          THE COURT:  This is not improper.  I'm going to overrule

12  the objection.  You can get into it on cross.

13          THE WITNESS:  I don't know if he knew that, I don't know

14  if he knew that it was for jihad training, but -- because when we

15  started this, this paintball thing, we had -- I had Nabil ask Ali

16  Timimi what he thought about this, and what Nabil came back and

17  told me was that he said that Ali Timimi said this is something

18  good, you know, the brothers, brothers can do.

19  BY MR. KROMBERG:

20  Q.   Did there come a time that the defendant was asked again

21  about the paintball activities after the FBI approached Seif

22  Chapman?

23  A.   Yes.  After FBI approached Seif, obviously, we got word, so I

24  remember one night Nabil and myself --

25  Q.   Well, let me stop you there.  Why were you worried if -- I

# Kwon - direct

1  mean, what was worrisome about playing paintball?

2  A.   I mean, because, you know, we always believed -- well, I

3  should say I; I don't know about the brothers -- I believed that,

4  you know, as Muslim and being militant and doing these kind of

5  activities, I thought given the current affairs in the world right

6  now, the government wouldn't be very, you know, thrilled to have a

7  bunch of young Muslim guys playing paintball.

8  Q.   Would the government be thrilled to have a bunch of young

9  Muslim guys playing volleyball?

10 A.   No.

11 Q.   The government would be against young Muslim men playing

12 volleyball in your view?

13 A.   No.

14         MR. MAC MAHON:  Your Honor, that's speculative.

15         THE COURT:  He just answered no.  Come on, let's move

16 this along.

17 BY MR. KROMBERG:

18 Q.   So what was different about the volleyball than paintball?

19 A.   Paintball is simulated combat.

20 Q.   Okay.  So you would -- before I interrupted you, you were

21 testifying that you were -- that when Seif Chapman was approached

22 by the FBI, you were worried.  And then what happened?

23         THE COURT:  Wait.  I'm sorry, let's give the jury some

24 context of the time frame.  Do you remember when Chapman was

25 approached by the FBI?

# Kwon - direct

```
 1              THE WITNESS:  I can only generalize between 2000 and
 2   2001.  I'm not too sure exactly when he was approached by the FBI.
 3              THE COURT:  It was before September 11, 2001?
 4              THE WITNESS:  It was before September 11, 2001.
 5              THE COURT:  All right.  Go ahead, Mr. Kromberg.
 6   BY MR. KROMBERG:
 7   Q.  Do you recall whether it was the first season of paintball or
 8   the second?
 9   A.  I'm not sure, but I think it was second season.
10   Q.  All right.  At some point, Seif Chapman comes and says, "I've
11   been approached by the FBI."  What happened then?
12   A.  Well, Nabil and myself, we asked one night, we asked Ali
13   Timimi for his advice.
14   Q.  And what was his advice?
15   A.  He said, "Continue to play because if you stop, it will just
16   look more suspicious," and that, you know, be more discreet, you
17   know, because the whole -- we used to meet in a public place, in a
18   large gathering, and then go to the paintball field.  So, you
19   know, he said that that was very unwise thing to do.  So, you
20   know, he said, "Be more discreet and continue to play."
21   Q.  Was there a parable or something from the Koran or the Bible
22   about Joseph entering through many doors?
23   A.  I seem to recall that, I think this was occasion that he
24   mentioned something about when Joseph's brothers entered the city
25   of Egypt, where Joseph was the aziz, you know, they entered
```

1  through a different door so that they wouldn't, you know, people

2  wouldn't see that they're all together, to be more discreet.

3  Q.   Okay.  Now, going back to the invitations that you sent out,

4  the e-mails that you sent out to get people to come to your house,

5  the dinner was scheduled for when?

6  A.   It was scheduled for September 16, the Sunday.

7  Q.   How do you know it was a Sunday?

8  A.   I remember now that Aatique was present at that meeting, and

9  I remember he had to drive back to Pennsylvania that night because

10 he had to work the next morning.

11 Q.   You've talked about the people that you invited to the

12 meeting.  Who actually attended the meeting?

13 A.   Ismail Royer, Hammad, Calipha, Mahmood, Masaud, Aatique, and

14 Ali Timimi.

15 Q.   Now, just to make sure everybody has the names, that would be

16 Ismail Randall Royer?

17 A.   Correct.

18 Q.   Masaud Khan?

19 A.   Yes.

20 Q.   Mahmood Hasan?

21 A.   Yes.

22 Q.   Caliph -- Calipha Basha Ibn Abdur-Raheem?

23 A.   Correct.

24 Q.   Hammad Abdur-Raheem?

25 A.   Correct.

# Kwon - direct

1  Q.   Muhammad Aatique?

2  A.   Correct.

3  Q.   And the defendant?

4  A.   Correct.

5  Q.   Neither Aatique nor the defendant were on your list of

6  invitations, right?

7  A.   Correct.

8  Q.   How did it happen that Aatique came?

9  A.   He just showed up at my house, and he lives in Pennsylvania,

10 so, you know, I was surprised.  It's about a three-hour drive,

11 and, you know, I didn't tell him anything about this dinner, and

12 he -- that day, he just showed up at my front door, so I figured,

13 you know, he's here.  Might as well include him into the dinner.

14 Q.   How did it happen that the defendant attended the meeting if

15 you had not invited him?

16 A.   I was picking up some food at a local kabob place when I

17 received a call from Ali Timimi.  He asked me what I was up to.  I

18 told him I had invited some brothers for dinner at my house, you

19 know, to talk about what he had told me, and he said -- he asked

20 me if he could come, so I said okay.  I mean, I thought it would

21 be better that he told them himself then than me conveying the

22 message.

23 Q.   I'd like to show you a photo, 7C33a.

24         THE COURT:  Any objection?

25         MR. MAC MAHON:  No, Your Honor.

**J.A. 648**

**Kwon - direct**

1              THE COURT:  All right, 7C?

2              MR. KROMBERG:  33a.

3              THE COURT:  33a is in.

4              (Government's Exhibit No. 7C33a was received in

5    evidence.)

6    BY MR. KROMBERG:

7    Q.   Do you recognize that?

8    A.   Yes, I do.

9    Q.   What is that?

10   A.   That's the kabob place where I picked up the food.

11   Q.   Okay.  And where is that?

12   A.   It's in Chantilly, Virginia.

13   Q.   Okay.  Okay.

14             MR. MAC MAHON:  No objection to this exhibit, either,

15   Your Honor.

16             THE COURT:  What's the number on this?

17             MR. KROMBERG:  7C33.

18             THE COURT:  Without the "a," all right.  That's in as

19   well.

20             (Government's Exhibit No. 7C33 was received in

21   evidence.)

22   BY MR. KROMBERG:

23   Q.   Is that the menu of the Kabobs, Etc.?

24   A.   Yes, it was.

25   Q.   That's where you were when you were picking up the food when

## Kwon - direct

1  you got the phone call from Ali -- from the defendant?

2  A.   Correct.

3  Q.   So where did you go after you left Kabobs, Etc.?

4  A.   I went back to my house.

5  Q.   Did there come a time when you picked up the defendant?

6  A.   Yes.  After I dropped off the food at my house, some of the

7  brothers start arriving, so I told them to, you know, open the

8  doors for other brothers when they come, and I went to pick up Ali

9  Timimi.

10 Q.   Now, if we could just go back a second, when he called you,

11 how often did he telephone you?

12 A.   Not very often.  Only time he used to call me was to give him

13 rides to Dar al-Arqam.

14 Q.   Had he ever called you to say he wanted to come to your

15 house?

16 A.   No.

17 Q.   What did he say on this particular occasion?

18 A.   When I told him that I'm having dinner, I'm having some

19 brothers over, he, he wanted -- he asked if he could come.

20 Q.   Did you tell him who was going to be at your house?

21 A.   No.

22 Q.   Did he say why he wanted to come to your house?

23 A.   No.

24 Q.   Were you expecting him to come to the house and give a

25 lecture?

**Kwon - direct** 507

1  A.   To give a talk.

2  Q.   Why were you expecting him to give a talk when he was coming

3  to your house?

4  A.   I mean, because he's always the lecturer, most knowledgeable

5  out of us, and also, the whole meeting was -- the whole meeting

6  was about this, this plan that he has recommend me to come up.  So

7  I figured that it's better that he himself tell the brothers.

8  Q.   Well, but did you tell him over the phone that that was what

9  the meeting was about?

10  A.   I don't recall telling him anything what the meeting was

11  about.

12  Q.   Had Ali -- had the defendant ever come to your house before

13  that?

14  A.   No.

15  Q.   How did he learn about the meeting in the first place?

16  A.   How did he learn about the meeting?  I don't know.

17           MR. MAC MAHON:  Objection.  No foundation, but he

18  answered it.

19           THE COURT:  All right.

20  BY MR. KROMBERG:

21  Q.   Of the people that you invited that didn't come, where was

22  Ibrahim Al-Hamdi?

23  A.   I do not know.

24  Q.   How about Donald Idris Surratt?

25  A.   I do not know.

**Kwon - direct**                                              508

1  Q.    Was Nabil Gharbieh invited?

2  A.    Yes, he was.

3  Q.    Did he come?

4  A.    Yes, he did.

5  Q.    When did he come in relation to everyone else?

6  A.    He came late.

7  Q.    Now, on September 16, 2001, at your house, what was your

8  emotional state that evening?

9  A.    The same, just uncertainty, you know, I mean, the meeting was

10 let's come up with this plan so, you know, we're -- it was, you

11 know, people still a little nervous from the after effects of

12 9/11.

13 Q.    When you came back to your house with the defendant, what was

14 done regarding the telephone?

15 A.    He told me to unplug the message machine and turn off the

16 phones.

17 Q.    Had he ever told you that before?

18         MR. MAC MAHON:  Objection, Your Honor.  The testimony is

19 he'd never been to his house.

20         THE COURT:  Sustained.

21 BY MR. KROMBERG:

22 Q.    Had you ever overheard him say that at Ibrahim's house?

23 A.    I don't recall.

24 Q.    At the other time, the other friend's house that you were at

25 that he was also there, did you ever hear him say that?

**Kwon - direct**

1   A.    I don't recall him saying that at other places.

2   Q.    Do you ever recall him saying anything about making sure that

3   other people didn't hear what was said at any presentation or

4   lecture he had ever spoken --

5           MR. MAC MAHON:  Your Honor, there's no foundation for

6   that.  He didn't testify that's what the defendant said.

7           THE COURT:  Well, you don't want to hyperbolize the

8   question, Mr. Kromberg, all right?  But you can ask this line of

9   questioning.  I'm going to overrule the objection to that extent.

10          MR. KROMBERG:  Thank you, Your Honor.

11  Q.    At any of the times that you ever heard Ali Timimi speak, had

12  you ever heard him say anything having to do with unplugging

13  phones or closing curtains or -- well, let's start with that --

14  with unplugging phones or closing curtains?

15          MR. MAC MAHON:  Again, Your Honor, there's no testimony

16  he ever said anything about closing curtains.

17          THE COURT:  All right.  What, if anything, did the

18  defendant say to you about your apartment when he got there?

19          THE WITNESS:  He said -- before he started speaking, he

20  told me to unplug the answering machine and turn off the phones.

21          THE COURT:  And anything else?

22          THE WITNESS:  That's it.

23          THE COURT:  That's it?  Okay.  That's what he said.

24  BY MR. KROMBERG:

25  Q.    What did he say about whether the attendees should say

**J.A. 653**

1   anything about the meeting to others?

2   A.   He said that, that we should not repeat anything that was

3   said in the meeting outside of the people who are present.

4   Q.   Had you ever attended a lecture by him where he said that

5   before?

6   A.   Not a lecture, but when we were at Ibrahim's house the first

7   time, when Royer talked about LET, he also said the same thing.

8   Q.   That was the one you testified about earlier where he said

9   Lashkar was on the sunnah?

10  A.   Correct.

11  Q.   Okay.  What was said at that meeting after he said nothing

12  said at the meeting should be repeated?

13  A.   He said that, he said that, you know, that, you know, dawah

14  in America is finished.

15  Q.   Let me stop you.  Dawa, dawa is what?

16  A.   Calling people to Islam.

17  Q.   Okay.  So -- and dawa is something that you should be doing

18  wherever you are; is that correct?

19  A.   Correct.

20  Q.   Calling people to Islam?

21  A.   Correct.

22  Q.   And that because of the events of 9/11, dawa -- calling

23  people to Islam -- in America was finished?

24  A.   Yes.

25  Q.   Okay.  What did he say about any fatwa regarding supporting

# Kwon - direct

1  the Taliban?

2          MR. MAC MAHON:  Your Honor, that's a leading question.

3          THE COURT:  All right, that is a leading question, and I

4  think given the hour of the day -- and I assume this questioning

5  is going to go on for a while?

6          MR. KROMBERG:  Yes, Your Honor.

7          THE COURT:  All right, I think this is a good time for

8  the jury to break.  You've had a long day, Ladies and Gentlemen.

9  I don't want you to become numb.

10         You were all pretty able to be here by 9:30.  Does that

11 work for your schedules as well for tomorrow morning?

12                 (Jurors nodding heads.)

13         THE COURT:  All right, I want you to remember my

14 cautions from before about avoiding any media coverage.

15 Absolutely don't get on that Internet and look at any of these

16 websites that you've heard mentioned.  It might be tempting, but

17 you absolutely cannot do that.  Avoid any contact or discussion

18 with anybody about the case, and we'll see you here at 9:30

19 tomorrow morning.

20         We'll recess court at this time.

21         (Recess from 5:50 p.m., until 9:30 a.m., April 6, 2005.)

22              CERTIFICATE OF THE REPORTER

23    I certify that the foregoing is a correct transcript of the

24 record of proceedings in the above-entitled matter.

25         _____
                    Anneliese J. Thomson

This page intentionally left blank for double-sided pagination and printing