No. 14-4451

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FOURTH COURT

————————

### UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

**v.**

### ALI AL-TIMIMI,
*Defendant/Appellant.*

————————

**On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)**

————————

### JOINT APPENDIX

### VOLUME V of XIII (pages 973 - 1270)

————————

**ERIC S. SIEBERT**
**United States Attorney**

**Gordon D. Kromberg**
**Assistant U.S. Attorney**
**Counsel for Appellee**
**2100 Jamieson Avenue**
**Alexandria, VA 22314**
**(703) 299-3700**

**Joseph Attias**
**Attorney**
**Counsel for Appellee**
**Nat'l Security Division**
**U.S. Dep't of Justice**
**Washington, DC 20530**

**GEREMY C. KAMENS**
**Federal Public Defender**

**Geremy C. Kamens**
**Federal Public Defender**
**Counsel for Dr. Al-Timimi**
**1650 King Street, Suite 500**
**Alexandria, VA 22314**
**(703) 600-0800**

This page intentionally left blank for double-sided pagination and printing

# **TABLE OF CONTENTS**

## VOLUME I (pages 1 - 122)

District Court Docket Sheet (as of Apr. 28, 2025) ......................................1

Indictment (Sept. 23, 2004, Doc. 1)..........................................................49

Superseding Indictment (Feb. 3, 2005, Doc. 47) ......................................64

Government's Proposed Jury Instructions (Mar. 28, 2005, Doc. 84).....................80

## VOLUME II (pages 123 - 372)

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 294) (defense opening
    statement)................................................................................................123

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 148) ........................144

    Opening statements .......................................................................148

        By the government.................................................................148
        By the defense.................................................*see* J.A. 126

    Government's evidence .................................................................167

        Stipulation.................................................................................167

| | | |
|---|---|---|
| Nabil Gharbieh | Direct examination................................... | 171 |
| | Cross examination.................................... | 233 |
| | Redirect examination ............................... | 274 |
| | Recross examination ................................ | 281 |
| Muhammad Aatique | Direct examination................................... | 283 |

    Concluding matters .......................................................................369

## VOLUME III (pages 373 - 656)

Transcript, Jury Trial, Day 2 (Apr. 5, 2005, Doc. 149) ........................................373

    Preliminary matters .................................................................................377

    Government's evidence, cont'd .................................................................377

        Muhammad Aatique       Direct examination (resumed) .................378
                                      Cross examination....................................398
                                        Redirect examination ..............................468
                                        Recross examination ...............................489

        Stipulations ...........................................................................492

        Donald Surratt            Direct examination....................................504
                                        Cross examination....................................570
                                        Redirect examination ..............................585
                                        Recross examination ...............................588

        Detective John Hodge      Direct examination....................................589
                                        Cross examination....................................592
                                        Redirect examination ..............................592

        Stipulations ...........................................................................594

        Playing of audiotapes.............................................................598

        Yong Ki Kwon            Direct examination....................................604

    Concluding matters ................................................................................655

## VOLUME IV (pages 657 - 972)

Transcript, Jury Trial, Day 3 (Apr. 6, 2005, Doc. 150) ........................................657

    Preliminary matters .................................................................................661

Government's evidence, cont'd ......................................................665

    Evan Francois Kohlmann    Direct examination...................................665
                                   Cross examination....................................817
                                   Redirect examination ..............................895
                                   Recross examination ...............................903

    Stipulations .................................................................................905

    Playing of audiotape ....................................................................914

Concluding matters ........................................................................970


VOLUME V (pages 973 - 1270)

Transcript, Jury Trial, Day 4 (Apr. 7, 2005, Doc. 151) ........................973

    Preliminary matters ......................................................................977

    Government's evidence, cont'd ......................................................980

    Playing of audiotapes and videotape ...........................................980

    S.A. Tracy Kneisler    Direct examination.................................1093
                                 Cross examination..................................1099

    S.A. Christopher Paul Mamula  Direct examination.................................1100

    S.A. Donald L. Monday    Direct examination.................................1105
                                 Cross examination..................................1127

    Stipulations ................................................................................1131

    Yong Ki Kwon    Direct examination (resumed) ...............1146
                                 Cross examination..................................1238

Concluding matters ......................................................................1268

## VOLUME VI (pages 1271 - 1550)

Transcript, Jury Trial, Day 5 (Apr. 11, 2005, Doc. 152) ....................................1271

    Preliminary matters .....................................................................1275

    Government's evidence, cont'd ....................................................1279

        Yong Ki Kwon        Cross examination (resumed) ...............1279
                                         Redirect examination ...........................1446
                                         Recross examination ............................1475

        S.A. Wade Ammerman      Direct examination.................................1481
                                         Cross examination.................................1539

    Concluding matters .....................................................................1548

## VOLUME VII (pages 1551 - 1804)

Transcript, Jury Trial, Day 6 (Apr. 12, 2005, Doc. 153) ....................................1551

    Government's evidence, cont'd ....................................................1555

        S.A. Wade Ammerman      Cross examination (resumed) ...............1556
                                         Redirect examination ...........................1582
                                         Recross examination ............................1593

        Stipulations ...............................................................................1600

        Playing of audiotapes.................................................................1610

        S.A. John Wyman           Direct examination.................................1656

    Concluding matters .....................................................................1799

iv

VOLUME VIII (pages 1805 - 2058)

Transcript, Jury Trial, Day 7 (Apr. 13, 2005, Doc. 154) ...................................1805

    Preliminary matters .................................................................1808

    Government's evidence, cont'd .................................................1810

| | | |
|---|---|---|
| S.A. John Wyman | Direct examination (resumed) ..............1810 | |
| | Cross examination..................................1852 | |
| | Redirect examination ............................1916 | |
| | Recross examination .............................1923 | |
| Alex Daghestani | Direct examination.................................1927 | |
| | Cross examination..................................1935 | |
| Andre Thompson | Direct examination.................................1940 | |
| | Cross examination..................................1951 | |

    Playing of audiotapes.............................................................1954

    Government rests ...........................................................1955, 1965

Defendant's Rule 29 motion ........................................................1958

Defendant's evidence ....................................................................1965

| | | |
|---|---|---|
| Sherdil Loynab | Direct examination.................................1966 | |
| | Cross examination..................................1970 | |
| | Redirect examination ............................1976 | |
| Yousuf Jaafar Idris | Direct examination.................................1977 | |
| | Cross examination..................................2018 | |

    Concluding matters ................................................................2056

## VOLUME IX (pages 2059 - 2318)

Transcript, Jury Trial, Day 8 (Apr. 14, 2005, Doc. 155) ....................................2059

    Defendant's evidence, cont'd ........................................................................2063

        Yousuf Jaafar Idris        Cross examination (resumed) ...............2063

        Luther Kennedy        Direct examination..................................2136
                                Cross examination..................................2144
                                Redirect examination .............................2163
                                Recross examination ..............................2168

        Curtis Jamison        Direct examination..................................2172
                                  Cross examination..................................2189

        Defendant rests ........................................................................2198

    Government's rebuttal evidence ....................................................................2198

        Khwaja Mahmood Hasan        Direct examination..................................2199
                                  Cross examination..................................2235
                                Redirect examination .............................2278
                                Recross examination ..............................2284

        Muhammad Aatique, recalled   Direct examination..................................2290

        Conclusion of evidence ..............................................................2293

    Preliminary charge conference ......................................................................2306

## VOLUME X (pages 2319 - 2568)

Transcript, Jury Trial, Day 9 (Apr. 18, 2005, Doc. 156) ....................................2319

    Charge conference .........................................................................................2322

vi

Closing arguments ........................................................2346

    By the government.................................................2346
    By the defense......................................................2376
    Rebuttal by the government...................................2415

Jury charge ...............................................................2429

Jury deliberations ......................................................2500

    Jury question ........................................................2500

Transcript, Jury Trial, Day 10 (Apr. 19, 2005, Doc. 157).................2506

    Jury deliberations, cont'd.....................................2507

    Jury question ........................................................2507

Transcript, Jury Trial, Day 11 (Apr. 20, 2005, Doc. 158).................2515

    Jury deliberations, cont'd.....................................2517

    Jury question ........................................................2517

    Jury questions ......................................................2520

Transcript, Jury Trial, Day 12 (Apr. 22, 2005, Doc. 159).................2535

    Jury deliberations, cont'd.....................................2537

Transcript, Jury Trial, Day 13 (Apr. 25, 2005, Doc. 160).................2540

    Jury deliberations, cont'd.....................................2542

    Jury questions ......................................................2542

Transcript, Jury Trial, Day 14 (Apr. 26, 2005, Doc. 161).................2553

    Return of verdict ..................................................2555

Concluding matters .............................................................................2560

Verdict Form (Apr. 26, 2005, Doc. 107) ............................................2566


### VOLUME XI (pages 2569 - 2770)

Defendant's Motion for Judgment of Acquittal (June 6, 2005, Doc. 118)..........2569

Defendant's Corrected Motion for New Trial (June 14, 2005, Doc. 124) ..........2630

Government's Response to Defendant's Post-Trial Motions (June 20, 2005, Doc. 125)...............................................................................2647

Defendant's Reply to the Government's Response to Defendant's Post-Trial Motions (June 28, 2005, Doc. 126) (attachments omitted from appendix).................................................................................2688

Transcript, Sentencing Hearing (July 13, 2005, Doc. 147) .................................2719

    Argument and ruling on Rule 29 motion..................................................2720
    Argument and ruling on Rule 33 motion..................................................2724
    Ruling on Guidelines objections...............................................................2735
    Argument on sentencing ...........................................................................2739
    Allocution .................................................................................................2746
    Imposition of sentence .............................................................................2750

Judgment in a Criminal Case (July 13, 2005, Doc. 132)....................................2758

Notice of Appeal (July 15, 2005, doc. 133)........................................................2765

Fourth Circuit Judgment (corrected) (with copy of Apr. 25, 2006 order) (May 19, 2006, Doc. 168)................................................................2767


### VOLUME XII (pages 2771 - 2998)

Transcript, Hearing (Aug. 24, 2007, Doc. 239)..................................................2771

Transcript, Hearing (Nov. 20, 2007, Doc. 245)....................................................2790

Transcript, Hearing (May 16, 2008, Doc. 263) ..................................................2795

Transcript, Hearing (Oct. 23, 2008, Doc. 272)..................................................2802

Transcript, Hearing (Feb. 19, 2009, Doc. 297)...................................................2827

Transcript, Hearing (Oct. 4, 2013, Doc. 340) .....................................................2834

(Redacted) Memorandum Opinion (denying motions to compel) (Apr. 28, 2014, Doc. 350)...............................................................................................2864

Order (May 21, 2014, Doc. 357)...........................................................................2887

Notice of Appeal (June 4, 2014, Doc. 358) ..........................................................2889

Fourth Circuit Order (remanding case for further proceedings) (Aug. 4, 2015, Doc. 406)...................................................................................................2892

Fourth Circuit Order (expanding scope of remand) (July 26, 2016, Doc. 431)...............................................................................................................2894

Government's Response in Opposition to Defendant's Second Motion for Acquittal on Count 1 (Aug. 29, 2018, Doc. 447) ..........................................2896

Defendant's Reply to Government's Supplemental Memorandum on *United States v. Davis* (Aug. 19, 2019, Doc. 459) .........................................2905

Government's Reply in Further Support of Its Supplemental Memorandum on *United States v. United States* (Aug. 26, 2019, Doc. 461) .......................2936

(Redacted) Memorandum Opinion (granting release pending appeal) (Aug. 18, 2020, Doc. 519) ....................................................................................2953

Order (granting release pending appeal) (Aug. 18, 2020, Doc. 520) .................2969

Fourth Circuit Order (affirming grant of release pending appeal) (Aug. 31, 2020, Doc. 535)..............................................................................................2971

ix

Memorandum Opinion (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 549)......................................................................................2972

Order (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 550)..........................2998


VOLUME XIII (pages 2999 - end)

Selected Government Trial Exhibits......................................................................2999

Gov't Exh. 1B1a: transcript of Apr. 7, 2003 consensually monitored call between Kwon and Royer..........................................................2999

Gov't Exh. 1B2a: transcript of Apr. 8, 2003 consensually monitored call between Kwon and Royer..........................................................3053

Gov't Exh. 1B4a: transcript of Apr. 17, 2003 consensually recorded CCTV hotel meeting between Kwon and Royer......................................3084

Gov't Exh. 1D27: Taiba Bulletin, Oct. 17, 2000..........................................3131

Gov't Exh. 1D28: Taiba Bulletin, Oct. 27, 2000..........................................3134

Gov't Exh. 1D29: Taiba Bulletin, Nov. 7, 2000..........................................3137

Gov't Exh. 1D45: Taiba Bulletin, Sept. 26, 2001 (post from nadqpk@yahoo.com)..........................................................................3139

Gov't Exh. 1D48: Taiba Bulletin, Oct. 13, 2001 (post from nadqpk@yahoo.com)..........................................................................3141

Gov't Exh. 1D52: Taiba Bulletin, June 24, 2001 (post from nadqpk@yahoo.com)..........................................................................3144

Gov't Exh. 1F1: LET Poster, image 1 ........................................................3151

Gov't Exh. 1F3: LET Poster, image 3 ........................................................3152

Gov't Exh. 1F4: LET Poster, image 4 ........................................................3153

x

Gov't Exh. 1G10a: transcript of Apr. 1, 2003 recorded telephone call (Hammad and Royer call Al-Timimi) ....................................................3154

Gov't Exh. 4G7: email dated June 19, 2001 from pballaz@yahoo.com, regarding praying in a moving car.............................................................3164

Gov't Exh. 7A19: Uqla fatwa on events of 9/11, in English, taken from Surratt's residence on May 8, 2003 ...........................................................3168

Gov't Exh. 7A23; Hawali's *Statement to the Ummah* in English ................3178

Gov't Exh. 7A39a: translation of website containing Space Shuttle article in Arabic .......................................................................................3200

Gov't Exh. 7C31: email dated Sept. 20, 2001 from Kwon to Belton Harris ................................................................................................................3203

Gov't Exh. 7D3: email dated Oct. 15, 2001 from Surratt re. Hawali's *Statement to the Ummah* ..................................................................................3204

Gov't Exh. 7F24a: UPI News article dated Sept. 16, 2001 titled *Taliban Leaders Seek Islamic Support*..................................................................3206

Gov't Exh. 7H12: plea agreement and statement of facts for Muhammed Aatique.............................................................................................................3207

Gov't Exh. 10A3: document entitled *Suicide Attacks, Are They Suicide? A Shariah Viewpoint* .................................................................................3223

Gov't Exh. 10A41: email dated Oct. 23, 2000 from Nabil to Timimi re: trip to Delaware .......................................................................................3227

Gov't Exh. 10D19: email dated Oct. 21, 2001 email from altimimi@yahoo.com to aqdcksa@yahoo.com re. "Utter Nonsense" ......3229

Gov't Exh. 10H1A: record of instant messaging session with Bin Laden statement preamble ....................................................................................3233

Gov't Exh. 10J7: article, *Sheikh Ali Timimi on the Taliban and the Statues* ..............................................................................................................3260

Gov't Exh. 10J9: email dated December 13, 2001 from Timimi re. "A call to reflect and repentance" ...................................................... 3262

Gov't Exh. 10J15: affidavit of Youseff Idris .................................... 3265

Gov't Exh. 10S1: summary chart of Timimi / Kwon telephone calls, Sept. 16, 2001 ................................................................................. 3266

Gov't Exh. 10S2: summary chart of Timimi / Kwon telephone calls, Sept. 19, 2001 ................................................................................. 3267

Gov't Exh. 10S3: summary chart of Kwon telephone calls, Sept. 16, 2001 ............................................................................................... 3268

Gov't Exh. 10T1: photograph, package of "New World Order" cassette tapes ................................................................................................ 3272

Gov't Exh. 12-1: stipulation re. background facts ............ 3273; *see* J.A. 167-171

Gov't Exh. 12-60: stipulation re. electronic surveillance of calls and email ................................................................................................. 3277

Gov't Exh. 12-61: stipulation re. Al-Timimi lectures ............ 3278; *see* J.A. 2344

Selected Defense Trial Exhibits ........................................................... 3280

Def't Exh. 33: Al-Timimi lecture titled *Muslims in America in the Face of Accusations of "Fundamentalism" and "Terrorism"* delivered at Purdue University on Oct. 20, 1993 ......................................... 3280

Def't Exh. 57: letter dated from AUSA Gordon Kromberg to Yong Kwon's attorneys ......................................................................... 3293

Def't Exh. 80: stipulation regarding Al-Timimi's unsubscription from Taiba Bulletin List ...................................................................... 3295

Def't Exh. 81: summary report of an interview with Ismail Royer by Evan Kohlmann ........................................................................... 3298

Def't Exh. 82: photo of front of Yong Kwon's apartment ............................. 3303

Def't Exh. 83: photo of back of Yong Kwon's apartment ............................3304

Def't Exh. 85: summary of Yong Kwon's phone calls on Sept. 16, 2001 ................................................................................. 3305

Def't Exh. 86: summary of Yong Kwon's phone calls on Sept. 13-15, 2001 ...................................................................3306

Def't Exh. 87: summary of Al-Timimi's calls on evening of Sept. 19, 2001 ....................................................................3307

Def't Exh. 90: summary of Al-Timimi's calls on evening of Sept. 19, 2001 ....................................................................3308

This page intentionally left blank for double-sided pagination and printing

828

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .      Criminal No. 1:04cr385
                              .
     vs.                      .      Alexandria, Virginia
                              .      April 7, 2005
ALI AL-TIMIMI,                .      9:41 a.m.
                              .
          Defendant.          .
                              .
.  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME IV

APPEARANCES:

FOR THE GOVERNMENT:          GORDON D. KROMBERG, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314
                               and
                             JOHN T. GIBBS, ESQ.
                             Counterterrorism Section
                             Criminal Division
                             United States Department of Justice
                             601 D Street, N.W.
                             Washington, D.C. 20004

FOR THE DEFENDANT:           EDWARD B. MAC MAHON, JR., ESQ.
                             107 East Washington Street
                             P.O. Box 903
                             Middleburg, VA 20118
                               and
                             ALAN H. YAMAMOTO, ESQ.
                             643 S. Washington Street
                             Alexandria, VA 22314

ALSO PRESENT:                S.A. WADE AMMERMAN
                             BOBBY WILLIAMS
                             S.A. JOHN WYMAN

(Pages 828 - 1125)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

J.A. 973

829

1  OFFICIAL COURT REPORTER:    ANNELIESE J. THOMSON, RDR, CRR
2                           U.S. District Court, Fifth Floor
                           401 Courthouse Square
3                           Alexandria, VA 22314
                           (703)299-8595

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**J.A. 974**

830

<u>I N D E X</u>

|  | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| <u>WITNESSES ON BEHALF OF</u> <u>THE GOVERNMENT</u>: | | | | |
| S.A. Tracy Kneisler | 948 | 954 | | |
| S.A. Christopher Paul Mamula | 955 | | | |
| S.A. Donald L. Monday | 960 | 982 | | |
| Yong Ki Kwon (Resumed) | 1001 | 1093 | | |

<u>EXHIBITS</u>

|  | <u>MARKED</u> | <u>RECEIVED</u> |
|---|---|---|
| <u>GOVERNMENT'S</u>: | | |
| No. 1A1 | | 992 |
| 2A6a | | 1089 |
| 2A6b | | 1089 |
| 2A20a | | 1066 |
| 3A1 | | 987 |
| 3A2 | | 987 |
| 3A2a | | 987 |
| 6A12 | | 988 |
| 7A15 | | 989 |
| 7A41 | | 1017 |
| 7C18 | | 1025 |
| 7C18b | | 1024 |
| 7C19 | | 1024 |
| 7C31 | | 1032 |
| 7H1 | | 1087 |
| 7H17 | | 993 |
| 7H18 | | 993 |
| 10B2 | | 995 |
| 10B2a | | 996 |
| 10B3 | | 997 |
| 10B3a | | 997 |
| 10B4 | | 997 |
| 10B4a | | 998 |

**J.A. 975**

831

1                          EXHIBITS (Cont'd.)

2                                              MARKED        RECEIVED

3    GOVERNMENT'S:

4    No. 10B5                                                998
         10B5a                                               999
5        10H1a                                               981
         10H5                              967
6        10S3                                                1037

7        12-2                                                992
         12-17                                               995
8        12-18                                               996
         12-19                                               997
9        12-20                                               997

10       12-21                                               997
         12-22                                               998
11       12-23                                               998
         12-24                                               999
12       12-26                                               994

13       12-27                                               994
         12-33                                               992
14       12-43                                               993
         12-44                                               993
15       12-56                                               994

16

17

18

19

20

21

22

23

24

25

832

1                    P R O C E E D I N G S

2              (Defendant present, Jury out.)

3         THE COURT:  We have a question from the jury.  It's a

4    very fair question, and it reflects the fact that we didn't really

5    start this case quite the normal way we do.  This question is from

6    Juror No. 30:  "Can we know what violations of law is at issue

7    against the defendant?"

8              Unlike how we often start cases, where we specify the

9    nature of the charges, now what I intend to do unless you have an

10   objection is simply read the caption of the indictment.  I would

11   tell the jury there are ten counts involved in the indictment.

12   Count 1 charges inducing others to conspire to use firearms; Count

13   2, soliciting others to levy war, in other words, just read the

14   caption.

15             Any objection to doing that?

16        MR. KROMBERG:  Your Honor, I think that's a fine idea.

17   My only concern is on the -- some of these charges are so

18   unusual -- or not unusual -- so rarely used that people may not

19   know what, for example, the -- what the Neutrality Act, what that

20   means.  I'm not sure that would clarify much to say a violation --

21        THE COURT:  Well, I think it gives them some structure,

22   and my plan would then be to tell them at the end of the trial,

23   when all the evidence is -- because frankly, we don't know if all

24   these counts are going to go to the jury, and so I don't think

25   it's worth anyone's time going into a lot of detail now about the

833

1  elements, etc., because that may all be -- some of it may be

2  unnecessary.

3        MR. MAC MAHON:  We have no objection to that, Your

4  Honor.  I think if the jury wants that structure, that's -- you're

5  just going to read the caption to them?

6        THE COURT:  That's right.

7        MR. MAC MAHON:  Because you already said you weren't

8  going to actually give them the indictment, right?

9        I'm sorry, I should come to the podium.

10       THE COURT:  I don't give indictments to the jury unless

11  both sides want the Court to.  But again, what I would just do is

12  on the right side of the caption, you know, where the government

13  has its little summary --

14       MR. MAC MAHON:  Right.

15       THE COURT:  -- I would basically just do that with them

16  and then explain to them that at the end of the trial, they're

17  going to get very detailed, specific instructions about the law

18  that applies to these various counts.

19       MR. MAC MAHON:  The defense has no objection to the

20  Court doing that, Your Honor.

21       THE COURT:  All right, let's bring the jury in then.

22                    (Jury present.)

23       THE COURT:  Good morning, Ladies and Gentlemen.  You-all

24  please have a seat.  Again, I assume no one saw anything on

25  television or read anything this morning or anything that you need

**J.A. 978**

834

1    to bring to my attention.

2            Yes, sir?

3            A JUROR:  Should we be worried about the news camera out

4    in the front of the building?

5            THE COURT:  They're not for this case.  I don't believe

6    they're for this case.  There are several other matters going on

7    in the courthouse.  Obviously, you're not to give any interviews.

8            A JUROR:  No, ma'am.

9            THE COURT:  They actually tried to interview one of my

10   law clerks yesterday, and I don't know why, but just avoid them.

11   If they're a problem, let Mr. Wood know.  I mean, if you want an

12   escort out of the building, we can arrange for that, but they

13   shouldn't be bothering you.

14           Now, Juror No. 30 had a question that I think is a fair

15   question, and we're going to give you a preliminary answer to it.

16   The question was, "Could we know what violations of law are at

17   issue against the defendant?"

18           I'm going to just give you basically the title of the

19   statutes that are involved.  The specific instructions as to the

20   law are fairly complicated, and frankly, I always save those until

21   the end of the trial.  There's no sense cluttering up your head

22   with that now, and sometimes things change, and not necessarily

23   every charge will ultimately go to you, but I can tell you right

24   now that the pending indictment against the defendant charges ten

25   counts, or ten offenses.

835

1          Count 1 charges inducing others to conspire to use

2    firearms, Count 2 charges soliciting others to levy war, Count 3

3    charges inducing others to conspire to levy war, Count 4 charges

4    attempting to contribute services to the Taliban, Count 5 --

5          MR. KROMBERG:  Judge, excuse me, could you repeat the

6    last one?  I think there was --

7          THE COURT:  Count 4 charges attempting to contribute

8    services to the Taliban; Count 5 charges inducing others to aid

9    the Taliban; Count 6 charges inducing others to conspire to

10   violate the Neutrality Act; Counts 7 and 8 charge aiding and

11   abetting and inducing others to use firearms; and Counts 9 and 10

12   charge aiding and abetting and inducing others to carry

13   explosives.  Those are the ten charges, all right?

14         And if there's nothing further of a preliminary matter,

15   I think we're going back into tapes, correct?

16         MR. KROMBERG:  That's correct, Your Honor.

17         THE COURT:  And I think we were on page 44 of the

18   transcript when we stopped last night.  If I'm wrong, let me know.

19         Hold on just one second.

20         Do all the jurors have their transcripts?  Yes?  And are

21   we right, we're on page 44?  Yes?

22         MR. KROMBERG:  Yes, Your Honor.

23         THE COURT:  All right.  Then you can start anytime

24   you're ready.

25         (Excerpt of Government's Exhibit No. 1B1 was played,

836

1    excerpt of Government's Exhibit No. 1B1a was copied verbatim into
2    the record as follows:)
3            "YK:  Set, set ....
4            IR:  I think they're gonna try to use ah, I think, I
5    think they're gonna try to use ah, I means I'm sure that, number
6    on I'm sure that they're taping this call.
7            YK:  Ok.
8            IR:  Sure they're listening...
9            YK:  Well I'm not calling from my house.
10           IR:  Look, ok.  Well, you know and so...
11           YK:  Well maybe on your end.
12           IR:  I don't think so, I don't think so because this
13   cell phone is real new and stuff.
14           YK:  I...
15           IR:  Anyway it doesn't matter because I, you know.
16           YK:  What about, do you think it would be wise for me to
17   call Sheikh Ali?
18           IR:  No!  No, no, no, no.  Don't call Sheikh Alii.
19           YK:  Ok.  He'd probably get pissed right?
20           IR:  Yeah.  It, it might hurt him, you know it might
21   hurt his situation.
22           YK:  I see.
23           IR:  So, don't do that, I mean just ah...
24           YK:  It's better to just leave him alone?
25           IR:  Just leave him alone.  Just definitely just leave

837

1  him alone and just um, if you really find it necessary that you

2  have to talk to him and just tell him the truth or whatever, um...

3        YK:  Ok.

4        IR:  ...in terms of what happened um, and I don't know

5  if you remember but I was going round telling everyone what kind

6  of a, a, that, that September 11th was a total um you know, a

7  totally against Islam and stuff like that you know.

8        YK:  Yeah, which is, which is.

9        IR:  Which it was, I mean the, so, you know this is the

10  fact of the, you know, fact of the matter.  I mean it you know, um

11  really not, I don't know um just kind of, um kind of chill'n as a

12  matter of fact to the whole thing.

13        YK:  Ok.

14        IR:  My only regret, my only regret is how the

15  brotherhood is been kind of...

16        YK:  Disintegrated?

17        IR:  ...between brother, yeah.  Then they disappeared

18  and ah, you know no one does anything.  I mean America,

19  (UNINTELLIGIBLE), America turned into a very, very ah, ugly place

20  you know, it, after Sep, yeah, after September 11th.

21        YK:  I can imagine.

22        IR:  And after I came back you know.

23        YK:  Yeah.

24        IR:  Ah, while everyone's around ah, buying duct tape

25  cause they're afraid of terrorist attacks and you know what I'm

838

1  saying, it's just, it's just really lame here and um, all this

2  cracking up. I would actually have left again but you know I don't

3  have any money, now they took my passport and stuff.

4          YK:  They took your passport?

5          IR:  Yeah, they took my passport.  I, I guess for

6  evidence or whatever but ah, un not, I don't know if I can get

7  another one.  They said they wanted it for evidence.

8          YK:  Ok.

9          IR:  Um, I don't know if it was like you know in other

10  words, like seizing my passport to prevent me from traveling.

11          YK:  Ok. (TAKES IN A DEEP BREATH) Well...

12          IR:  Um, anyway, yeah.

13          YK:  ...what, what I'll do is I, I have to think now and

14  ah,...

15          IR:  Yeah.

16          YK:  ...and Im sure these guys will be talking to me for

17  a while.  And if I can...

18          IR:  Just, just, a laugh. Just,...

19          YK:  ...hey if I can...

20          IR:  Yeah.

21          YK:  ....I may have to call you again or I don't know

22  maybe it's not a good idea.

23          IR:  Call me again.

24          YK:  Do you think it's a good idea?

25          IR:  Ah, just call man.  Call me and I...

**J.A. 983**

839

```
 1          YK:  It won't hurt you at all?

 2          IE:  Really I don't care, I don't care.

 3          YK:  You don't care? (LAUGHS)

 4          IR:  I don't care. (LAUGHS)

 5          YK:  That's, that's if um able because I don't know

 6  what's gonna happen.  Maybe they'll lock me up.  I don't know,

 7  maybe they'll, I don't know.

 8          IR:  Don't be, don't be scared of these people you know

 9  cause ah,...

10          YK:  Yeah. Not...

11          IR:  ...don't be scared, don't be nervous.

12          YK:  .. not scared, just a little you know, nervous.

13  Just gotta, just you know....

14          IR:  I know, I know.

15          YK:  ..just gotta be ah, I guess smart or something.

16          IR:  But (UNINTELLIGIBLE) um, I'm really suggesting.

17  I'm really, really, strongly, strongly, suggesting that you right

18  now like somehow, I mean it still maybe before five o'clock here

19  but you right now tell them, look if you guys want to talk to me,

20  call my lawyer.  You know what I'm saying?

21          YK:  Ok.

22          IR:  And, and I would really suggest telling them, let

23  me give you a name.  Ok?

24          YK:  Ok.

25          IR:  Ah, Ashraf, A-s-h-r-a-f.
```

840

1          YK:  A-s-h-r-a-f.

2          IR:  The last name is Nubani.  N, like Nancy, u, b like

3    boy, a, n like Nancy, i.

4          YK:  Ok, Nubani.  Ashraf Nubani.

5          IR:  Ashraf Nubani.  His phone number...

6          YK:  And...

7          IR:  His phone number is 703.

8          YK:  Ok.

9          IR:  256.

10          YK:  256.

11          IR:  1300.

12          YK:  1300.

13          IR:  His ah, hold on a minute.  I got ah, other contact

14    info for him to.  Ah, his ah, ah, his home phone and just call

15    him. Don't worry bout it. (UNINTELLIGIBLE)

16          YK:  Ok, I'll, I'll call, Ashraf Nubani and this is the

17    name I'm gonna give if it comes down to that.

18          IR:  Yes. If, if...

19          YK:  I'll say call my lawyer, Ashraf Nubani in Virginia.

20    This is a (INAUDIBLE, SPEAKING TOO LOW)

21          IR:  Yeah, and so let me give you his ah, home, his cell

22    phone and home phone number.

23          YK:  Ok.

24          IR:  Cell phone is, 703-989-7358.

25          YK:  7358, ok.

**J.A. 985**

841

1    IR:  His home, home phone number is, 703.

2    YK:  703.

3    IR:  658.

4    YK:  658.

5    IR:  0667.

6    YK:  0667, ok.

7    IR:  Ok, that's his home number.  So, so the deal is

8    this brother, when the come in say, look I'm not gonna talk to

9    you.  Call my lawyer.  Call my lawyer, work it out, I'll be happy

10   to, you know, cooperate whatever the heck....

11   YK:  Yeah.

12   IR:  ...but um not gonna talk to you without, without

13   um, without you guys talking to my lawyer first.  Now here's the

14   deal, Ashraf Nubani is also two other brother's lawyer, ok?  So

15   what they're gonna say is, what they might say if they know, if

16   they know this guy is a lawyer, they might say, oh well you know

17   he's ah, you know what I'm saying?  He has a conflict of interest

18   and he can't ah, you know what I'm saying, represent you or

19   whatever?

20   YK:  Yeah.

21   IR:  But see they, they don't have the right to say

22   that.  It is true that there's kind of a conflict of interest

23   thing but if it went to court it would be like...

24   YK:  Ok.

25   IR:  ..you know what I'm saying, the judge would

842

1   probably make, make him get off and make you sign a waiver of

2   some kind.

3            YK:  Ok.

4            IR:  But it doesn't matter.  This is your lawyer and if

5   they say any garbage like that, say look, then if that's the

6   case then get off my back, give me time to get another lawyer, you

7   know what um saying?

8            YK:  Ok.

9            IR:  As for right now if you wanna talk to me you call

10  him.  You, you contact him.  You talk to him.  You know what um

11  saying?

12           YK:  Ok.

13           IR:  Ah, ah, please brother, please, please set a very

14  strongly, I realize your situation because you're in South Korea

15  (LAUGHS)...

16           YK:  Yeah.

17           IR:  ...but consider very strongly not talking to them

18  at all.  Consider just say, look, I'm a, US, American citizen, I

19  know my rights.

20           YK:  Yeah.

21           IR:  For right now I'm exercising my right not to talk

22  to you.  I'm exercising my right to plead the 5th Amendment until

23  such time that I can talk to my lawyer.  Here's my lawyer's phone

24  number if you wanna get in touch with me, if you wanna contact me,

25  you call him.

843

1      YK:  Ok.

2      IR:  I mean that is one hundred percent the smartest

3 move you can possibly make.

4      YK:  Ok.

5      IR:  Ok.  This is my advise you know.

6      YK:  Ok, Something.

7      IR:  But (unintelligible) of whatever happens I, I don't

8 hold, hold any ah,...

9      YK:  Huh?

10      IR:  ...hard feelings or anything like that.

11      YK:  I don't either man, I mean because in the end you

12 know.

13      IR:  Yeah, exactly and ah, just make dawa for me.  I

14 wish ah, I wish you were here.  I wish we were together somewhere,

15 you know what I'm saying, because I value that ah, brotherhood

16 more than anything except maybe my children. (LAUGHS)

17      YK:  Depends (SPEAKS IN A FOREIGN LANGUAGE). (INHALES

18 DEEPLY)...

19      IR:  (UNINTELLIGIBLE, PERHAPS SPEAKING FOREIGN) you

20 know.  Really you know.

21      YK:  ...your family comes first you know.

22      IR:  Well, no, but I mean you know ah, even children,

23 love my children, but there's this thing of ah, I well you just,

24 it hurts me so much you know like I feel like a piece of my heart

25 is missing you know to feel that this, you know what I'm saying?

844

1    I go see a brother you know and say asalamalakum, and he like

2    scurries away from me, you know what I'm saying?

3              YK:  (LAUGHS)

4              IR:  It's just, it's, really, really a sad situation you

5    know and um,...

6              YK:  Uh huh.

7              IR:  ...ah, you know. I just ah, hope that Allah makes

8    everything better and easier you know...

9              YK:  I mean....

10             IR:  ...bring, brings us together and just, even if

11   there was distance you know between us all this ah...

12             YK:  Uh.

13             IR:  ...junk is going on just to keep me in your dawa,

14   you know.

15             YK:  Right.

16             IR:  All that stuff you know?

17             YK:  Ok.  Well...

18             IR:  Alright.

19             YK:  ...if everything works out I'll definitely give you

20   a call um, just...

21             IR:  Yeah, call me and let me know what's going on.

22             YK:  ...just see, you know just see what's going on over

23   there and ah...

24             IR:  How'd you find me by the way?

25             YK:  (LAUGHS) Well I found out you work for MAS.

845

1        IR:  Yeah.

2        YK:  Some brothers and I.  I still talk to some brothers

3 over there.

4        IR:  Oh ok.

5        YK:  Actually, I went to the MSA and mas.org. I got the

6 contact number. (LAUGHS)

7        IR:  Oh, ok, yeah. (LAUGHS)

8        YK:  I didn't know if I, if I would get you or not but

9 yeah it's good thing it was still up.

10       IR:  Yeah, hamdula you did.  Yeah. (LAUGHS)

11       YK:  Yeah.  Yeah.

12       IR:  Just let me know how it goes, you know?

13       YK:  Ok.  Well, if you don't hear from me, you know what

14 happen.  So...

15       IR:  (LAUGHS) Yeah.  I, um, I was gonna say, let me give

16 you an e-mail address but ah, I don't know.  Ok, how bout the ah,

17 well,.. ok, send an e-mail to this address.

18       YK:  Ok.

19       IR:  Um, if, if you like.  Ah U-M-M

20       YK:  U-M-M.

21       IR:  Fatima

22       YK:  Ok, see I,

23       IR:  At Hot Mail dot com.

24       YK:  Ok, well I...I'm trying to avoid e-mails now days

25 because ah, ah....

846

1          IR:  Ok, yeah, then don't.  Don't worry bout it.  No big

2    deal.

3          YK:  No, if I, if I really have to contact you somewhere

4    I, I might do that.

5          IR:  Yeah, yeah I mean you can call me here ah, if you

6    call me at the cell phone ah, I'll try to keep the phone on at all

7    hours, you know?

8          YK:  Ok.

9          IR:  I'll try to keep it on tonight next to my bed or

10   something.

11         YK:  Ok.

12         IR:  So if you wanna give me a call, just go head.

13         YK:  (SOUNDS LIKE ARABIC)

14         IR:  (SOUNDS LIKE ARABIC) I hope everything goes well

15   (UNINTELLIGIBLE).  I don't think you're gonna be in any trouble.

16         YK:  I believe that.  I make dawa, I make dawa for

17   everybody inshalla.

18         IR:  Yeah, definitely.

19         YK:  We'll, we'll come out alright I think.

20         IR:  Inshalla, Ok brother.

21         YK:  Ok Asalamalakum.

22         IR:  Malakum Salam."

23         (End of excerpt.)

24         MR. KROMBERG:  Judge, the next call is going to be

25   Exhibit 1B2, the central call on April 8, 2003.

**J.A. 991**

847

1          THE COURT:  Ladies and Gentlemen, I don't know whether

2    you took notes on your transcripts or not.  If you give them back

3    to Mr. Wood, we'll give them back to you at the end of the case.

4    I think otherwise you'll start collecting too much stuff.

5          All right, everybody have a transcript?  All right,

6    we'll start 1B2.

7          (Excerpt of Government's Exhibit No. 1B2 was played,

8    excerpt of Government's Exhibit No. 1B2a was copied verbatim into

9    the record as follows:)

10         "WA:  (Already in progress) 2003, 305 p.m., 3:05 p.m.

11   Call between Yong Kwon and Randell Royer.

12             RR:  Hello?

13             YK:  Asalamalakum

14             RR:  Malakum Salam

15             YK:  (Laughs)

16             RR:  Have you been trying to call me?

17             YK:  No this is my first time.

18             RR:  Oh okay 'cause ah, someone's been calling me but

19   this ah, (inaudible) whatever.

20             YK:  Um hum.  No.

21             RR:  So.

22             YK:  Yeah ah.

23             RR:  You got good news or bad news.

24             YK:  Well I think it went better then I expected ah.

25             RR:  Oh, okay good.

**J.A. 992**

848

```
 1          YK:  Be, because ah, I'm not locked up or anything.
 2  (Laughs)
 3          RR:  (Laughs) You're, you're not in a torture chamber.
 4          YK:  Yeah I'm not in a torture chamber so.  Well
 5  actually I didn't have to deal with ah, ah, those, those Korean
 6  guys but.
 7          RR:  Okay.
 8          YK:  Actually I didn't wanna stay with them, ah, I'll
 9  stay with ah, you know, the, the, I, I, BI guy.
10          RR:  Uh huh, yeah.
11          YK:  The, you know, and then the (inaudible) and then if
12  my parents wasn't with me I would be (inaudible) so.
13          RR:  Yeah.
14          YK:  So anyway um.
15          RR:  Did you tell them you had a lawyer?"
16          (End of excerpt.)
17          THE COURT:  Mr. Kromberg, that's -- stop it.
18          Mr. MacMahon, do you-all have transcripts?
19          MR. MAC MAHON:  I was waiting for another screen, Your
20  Honor.  We don't have a paper one.  We have them somewhere in the
21  files.
22          THE COURT:  Well, you looked like you were looking for
23  one.  Do you want a paper copy?
24          MR. MAC MAHON:  No, I'm fine, Your Honor.
25          THE COURT:  All right.
```

849

```
 1              MR. MAC MAHON:  Thank you.
 2              THE COURT:  But if this is not more audible,
 3   Mr. Kromberg, we'll move on to another one.
 4              MR. KROMBERG:  Yes, Your Honor.
 5              Judge, all we have is the audio on this one.  We have
 6   not synchronized it with the transcript --
 7              THE COURT:  When you say "not synchronized," I mean, we
 8   have a paper transcript?
 9              MR. KROMBERG:  Correct.  But it's not synchronized to
10   the screen.
11              THE COURT:  Oh, that's fine.  I think most of the jurors
12   were watching the paper anyway; weren't you all?
13              THE JURORS:  (Nodding heads.)
14              THE COURT:  Yes.
15              As long as it's clear.  Right now, it's just garbled.
16              MR. KROMBERG:  Well, Judge, Judge, there's a second call
17   here.  There's a call that is made and then he's called again, and
18   I hope that at least the second call will be clearer.
19              THE COURT:  Well, I would assume you'll fast-forward it.
20   Where would it be on the transcript, the second call?  Page 6?  I
21   think it's page 6, fourth line down indicates another call.
22              MR. KROMBERG:  That's correct, Your Honor.
23              THE COURT:  All right.  Well, I hope you can
24   fast-forward it.  You should be able to do that so we don't have
25   to listen to five pages of garbage.
```

850

1          (Excerpt of Government's Exhibit No. 1B2 was played,
2     excerpt of Government's Exhibit No. 1B2a was copied verbatim into
3     the record as follows:)
4          "YK:  No actually I didn't find a lawyer, but, but I
5     didn't really actually (inaudible)
6          RR:  Oh.
7          YK:  Ah, I kinda pulled off one of those (inaudible) um,
8     you know, I don't know about that, I don't know what you're
9     talking about. (Laughs)
10          RR:  Yeah.  Being dangerous (inaudible) by the way you
11     know that ah, if you lied to them in any way, shape, or form it's
12     five years in jail automatically.
13          YK:  Are you serious?
14          RR:  Yeah, I, I guess I forgot to tell you that little
15     bit of important news.
16          YK:  Yeah. Yeah.
17          RR:  Yeah if you.....
18          YK:  Hey, hey, can......
19          RR:  Ah, if, if you say anything to a Federal agent
20     that's not, that's not the truth you know?
21          YK:  Um hum.
22          RR:  Ah, you go to jail for five years.
23          YK:  Oh yeah."
24          (End of excerpt.)
25          MR. KROMBERG:  Judge, if I could stop here, we're at the

851

1    top of page 3 now of the transcript.

2           THE COURT:  All right.

3           (Excerpt of Government's Exhibit No. 1B2 was played,

4    excerpt of Government's Exhibit No. 1B2a was copied verbatim into

5    the record as follows:)

6           "RR:  Yeah. In, in fact the, they kind of built these

7    sort of questions into the questions they ask you to try to see,

8    you know, to try make you lie so that they can hold something over

9    your head later.  Anyway, ah.

10          YK:  Um hum.

11          RR:  Ah, well anyway you know that for the future.

12          YK:  Ah, yeah, they, they had a lot of questions for me

13   but ah, in the beginning I guess they were trying to ask me

14   things like, open ended, and the question to where I, you know, I

15   just had, I had to like keep on talking.

16          RR:  Yeah.

17          YK:  I was, I was just like ah, no I, I don't know about

18   that so. (Laughs)

19          RR:  (Laughs) Yeah (inaudable).  But didn't you just

20   tell them that basically, I mean I understand, I mean internal and

21   personal decision understand......

22          YK:  Um hum.

23          RR:  .....if you wanna talk to a lawyer but.

24          YK:  But I mean they're like, I mean they're telling me

25   you know that we know you went to the camp you know that you know

**J.A. 996**

852

1    you went with different persons, different person.

2              RR:  Yeah.

3              YK:  And I was just like well if they know that I went

4    to, you know, Pakistan.

5              RR:  Yeah.

6              YK:  So I was like yeah I went that for, you know, with

7    Mahmood for marriage, and just to see, and career and stuff like

8    that, you know.

9              RR:  Yeah.

10             YK:  Ah, they have all of the, ah, we did stay with

11   Mahmood's uncle and aunt and stuff like that.

12             RR:  What did they ask you about the camp, ah camping.

13             YK:  Um hum.  Um, yeah, yeah.  Hey, ah, hey let me, let

14   me call you back because I, maybe I should talk from another

15   number.

16             RR:  Ah, yeah call me, call me from another number, but

17   by the way what the......

18             YK:  Ah, is this, is this number, is it okay, is this

19   number okay?

20             RR:  For me yeah it's fine, yeah.

21             YK:  Okay.

22             RR:  Yeah it's fine, yeah.  Ah, I went to the lawyer for

23   you today, ah, to Ashraf's place and I told him that, you know,

24   you had called me and to expect ah.

25             YK:  Okay.

**J.A. 997**

853

```
 1              RR:  For me to call you.....

 2              YK:  Okay.

 3              RR:  .....ah, for him to call you (inaudible)

 4              YK:  Okay.

 5              RR:  Ah, I, I mean I didn't know if you were going to or

 6    not but just basically not to be surprised if, you know, if you

 7    had called him (inaudible) but he, he, he saids ah, um, really the

 8    best thing for you to do is to arrange ah, you know, it, it, it's

 9    fine to see him like the first time as stop gap measure you know

10    but.

11              YK:  Okay.

12              RR:  Ah, really the best thing to do is to arrange ah,

13    for a lawyer her in D.C. or you know.....

14              YK:  In D.C.?

15              RR:  .....for you, for you.

16              YK:  Okay.

17              RR:  Ah, not him basically because if the issue with the

18    ah.

19              YK:  Not him?

20              RR:  With the.  (Coughs) No.

21              YK:  Well I'd say, well I'm gonna give him his name so I

22    guess I'll......

23              RR:  No, no, no he, he's fine, he said it's fine just

24    like, you know what I'm saying for until, if you can get another

25    lawyer but I mean.
```

854

1          YK:  Um hum.

2          RR:  I, I told him how you were like, you know,

3    confident that you could talk to them without a lawyer and he was

4    just like yeah.

5          YK:  (Laughs)

6          RR:  You know, he knows better.

7          YK:  That's.

8          RR:  It's very (inaudible), I mean see 'cause you, you

9    know the problem is that you haven't been here watching.

10         YK:  Yeah.

11         RR:  What's been happening and, and learning from

12   experience that went on so you're kind of an disadvantage in that

13   you know you don't realize how incredibly crucial it is to get a

14   lawyer.

15         YK:  Um hum.  Hey, ah, are you gonna be around in five

16   minutes?  Hey let me call you back because......

17         RR:  Oh yeah, yeah, yeah.

18         YK:  ....you know I don't think this is, my parents are

19   around so.

20         RR:  Okay just call me back that's all.

21         YK:  Okay, inshallah.

22         RR:  Okay.

23         YK:  Okay.

24         RR:  Salam.    (Call ends)

25              (Another call begins)

855

1          WA:   Wade Ammerman with the FBI, WFO, April the 8th,

2     2003.  It's 3:25 p.m., 3:25 p.m., call between Yong Kwon and

3     Ismail Randell Royer.

4          RR:   Asalamalakum.

5          YK:   Malakum Salam

6          RR:   (Inaudible)

7          YK:   (Inaudible) Sorry man my parents were. (Laughs)

8          RR:   Oh okay.

9          YK:   Yeah so.

10          RR:   Well. (Sighs)

11          YK:   So anyway um, like I said.....

12          RR:   You know man.

13          YK:   Like I said those guys came, I, they're coming back

14     by the way because ah, they weren't too happy with my little ah.

15          RR:   Wait, ah, I, I can't hear you, hold on a second.

16     Okay go ahead.

17          YK:   Yeah, I can't, I can't, I can't hear you very well

18     myself.

19          RR:   Um.

20          YK:   Hello?

21          RR:   You're, you're kind of breaking up a little bit,

22     are you on a cell phone?

23          YK:   Yeah I'm on my cell phone.  It's not mine it's my

24     company's cell phone, it's under my company's name so I think it's

25     a little bit safer.

856

1          RR:  Okay I can, I keep trying to.

2          YK:  Hello?

3          RR:  Ah.

4          YK:  Hello?

5          RR:  Yeah I, I can't hear you through that maybe if you

6    move ah, move a little bit or something somewhere else.

7          YK:  Um.  Hold on, hold on one second okay, let me move.

8    Hello?

9          RR:  Yeah, yeah, okay now I can hear you.

10         YK:  Ah, is it better?

11         RR:  Yeah, yeah I can hear you now.

12         YK:  Okay.

13         RR:  Okay.

14         YK:  Okay but I, still your voice is a little, a little

15   bit like distant but.

16         RR:  Okay that's, that's all right I can hear you fine

17   now.

18         YK:  Okay. That's good.

19         RR:  Right.

20         YK:  So anyway don't, don't, well they're, they're, well

21   they're coming back you know.

22         RR:  Uh huh.

23         YK:  So.  Because they weren't so happy with my little

24   um, ambiguous answers

25         RR:  Yeah.

857

1          YK:  That I gave them.

2          RR:  Yeah.

3          YK:  And so.

4          RR:  Yeah, be careful it's a very dangerous dance you
5   know because if you, if you try to, you know, like I said if you
6   say anything that's not true or something like this.

7          YK:  Um hum.

8          RR:  You know they, they really will hold it over you
9   and they, they actually, this is kind of one of their, you know,
10  things that they try to do, it's called a perjury trap you know?

11         YK:  Um.

12         RR:  They, ah, they try to um, they try to encourage
13  you, ah, they ask you questions, you know, encourage you to why or
14  to not tell the truth.

15         YK:  Right.

16         RR:  And then, then so they can later hold it over you
17  or something, you know it's like a, you know I told you I was
18  arrested for um, for driving while suspended.

19         YK:  Yeah.

20         RR:  Hamdi was arrested for some ah, immigration thing.

21         YK:  Right.

22         RR:  You know so they're looking for any way that they
23  can so um. (Sighs)

24         YK:  I see.

25         RR:  I, I would really suggest to um, right away ah, ah,

858

1   calling ah.

2          YK:  (Inaudible)

3          RR:  Noubani, Ashraf Noubani

4          YK:  Okay.

5          RR:  And I would say like you know um, these guys are

6   coming back and when they do come back.

7          YK:  Um.

8          RR:  I would tell them, you know, talk to my lawyer, you

9   know, don't talk to me talk to my lawyer, I'd like to talk to my

10   lawyer.  There's, you can't win, there's no, ah, there's no

11   benefit in you talking.

12          YK:  Okay. And so I shouldn't talk to them at all now?

13          RR:  No don't talk to them at all, are you, are you a

14   U.S. citizen?

15          YK:  Yeah I am.

16          RR:  (Laughs) Oh no don't talk to them at all, say go

17   away.  Call my lawyer and if, no matter what they tell you, you

18   are under ab, constitutionally, legally, you are under no

19   obligation to talk to them.  Ever.  The only obligation, the only

20   time you're ever obligated to talk to them is if you're subpoenaed

21   and you're a witness on the witness stand and even then you can

22   plead the 5th Amendment.

23          YK:  I see.

24          RR:  And, yeah and, and then you, you're still not under

25   any obligation to talk.  The only time you really have to talk is

859

1  if they give you immunity and what not and then, and then the, the
2  judge can punish you for not talking but at the stage.......
3          YK:  (Laughs)
4          RR:  ....you are at now, there's, there is no benefit
5  whatsoever.  Now I'm not saying this just for me because I'm
6  looking out for my own (inaudible).
7          YK:  Yeah.
8          RR:  I'm saying it for you, ah, there's, ah, see if they
9  wanna go through the whole hassle of okay, they can't, first of
10 all they can't, they can not......
11         YK:  Yeah.
12         RR:  .....ah, ah......
13         YK:  Well it seems like from the questions they're
14 asking me they know a whole lot.
15         RR:  They do they know a whole lot, they......
16         YK:  They know a whole lot and, and.....
17         RR:  But they.
18         YK:  ....they, they even know like specifics and
19 people's names......
20         RR:  Yeah.
21         YK:  ....and places and.
22         RR:  Yeah.  Yeah, they know all of this, because they've
23 been talking to everyone, now everyone here has been talking
24 except me.  Every single person, I'm the only one who has not
25 talked to them.

860

1        YK:  I see.

2        RR:  As far, and maybe Ali I, I.

3        YK:  Well do, do, ah, yeah I don't think I would try.

4   (Laughs)

5        RR:  No, no I don't.......

6        YK:  If they'd tell me what's in my best, ah, you know,

7   if I talk to them or whatever and obviously the Koreans said

8   something to my parents, um.

9        RR:  Oh yeah.

10       YK:  Saying something to the effect of listen, they have

11  to give me the one liner before they left, you know like.

12       RR:  Yeah.

13       YK:  Something like it's in you best interest not to

14  (inaudible) not just for yourself but for your, family,

15       RR:  Ah.

16       YK:  If you cooperate with us, with um, you know, them

17  and us obviously or whatever man.  But um.

18       RR:  But they're threatening your family basically.

19       YK:  (Laughs) They didn't say anything like specific but

20  they're like man, I think that's it's not just, you know, you and

21  your family and I was like okay whatever.

22       RR:  Well I, I told Ashraf, I said look you know um, I

23  told him what you were afraid of, you know.

24       YK:  Yeah they, they can't do anything to me from what I

25  understand.

861

```
 1          RR:  No, they, they can't, they can't......

 2          YK:  Yeah they can't......

 3          RR:  But the South Africans, I mean the South Koreans

 4  can, can, I mean, you know, these guys are famous, you know,

 5  they're the K- CIA as they're called ah, ah, they were trained by

 6  the ah, CIA don't you?

 7          YK:  (Laughs) Yeah, yeah.

 8          RR:  You know they were in torture, you know, the Green

 9  Berets have trained them and so this is well know, and so I mean,

10  I told ah, I told Ashraf you know look I'm concerned about him,

11  not, and not because of my situation, I'm concerned about him

12  because I, I don't wanna see him

13          YK:  Um hum.

14          RR:  I don't wanna see a Muslim brother going through

15  some kind of craziness, he says is there any way you can call them

16  and say look, you know, we know.

17          YK:  Yeah.

18          RR:  All right?  Say I know that my client is over

19  there, I know that you guys have brought with you these ah,

20  Korean, ah, Korean, you know, security forces and....

21          YK:  Yeah.

22          RR:  .....and stuff and you know I don't wanna, ah, ah,

23  I'm here instead of harm you know.

24          YK:  Um hum.

25          RR:  I mean it's, it's, it's just, entirely, entirely in
```

862

1    your interest to ah, you know what I'm saying to.

2              YK:  Get a lawyer?

3              RR:  To get a lawyer, I mean it's, it's, ah, I mean it,

4    it, it's so, well (inaudible) if you only knew I wish there was

5    some way of convincing you (inaudible).

6              YK:  Um hum.

7              RR:  (Inaudible)

8              YK:  Well my father will probably look into getting a

9    lawyer here or something like that.  I mean.

10             RR:  Hey you can, you can get an attorney in America you

11   know?

12             YK:  Um.

13             RR:  You didn't do anything illegal there I mean you

14   know.

15             YK:  Um hum.

16             RR:  I mean I wouldn't, I wouldn't say don't get a

17   lawyer there, it's a good idea but, you know, I mean the fact is

18   that it's a court, it's the Grand Jury in Virginia that's

19   investigating you, I mean.

20             YK:  Um hum.

21             RR:  The FBI in Virginia is ah.

22             YK:  I see.

23             RR:  You know what I saying?

24             YK:  You know.

25             YK:  I see, yeah.

863

1          RR:  You need a lawyer here in Virginia that's gonna
2    represent you.

3          YK:  Um hum.

4          RR:  Well what, you, what, what can I do to convince you
5    of that

6          YK:  (Laughs)

7          YK:  Right, yeah I, I, I guess so.  Ah, just, I, I guess
8    I might give Noubani a call but ah.

9          RR:  Yeah give, give him a call, he's gonna tell you,
10   I'll tell you what he's gonna say.  He's ah, 'cause I just say him
11   today, and he's gonna say, ah, he's gonna say fine, you know, ah,
12   you know, he's real cool you know, and he's gonna say look I'ma
13   try to ah, I'ma try and fine someone for you, I'ma try and find
14   someone for you here, you might, if you have any way of paying
15   anyone?

16         YK:  Yeah I mean I can, I can use the card I guess. I,
17   I.....

18         RR:  Yeah, yeah, okay good......

19         YK:  .....inaudible.

20         RR:  So, so, so that's gonna make it much, much, much,
21   much easier you know?  And, and then Noubani will tell you, that,
22   in fact you can get this ah, I mean you might be able to get like,
23   you know, some really, really good lawyer who might do it for very
24   cheaply you know like this ah.

25         YK:  Yeah.

864

1        RR:  Stanley Colen, he is a Jewish lawyer, who's ah, one

2 of the best attorney's in this nation.

3        YK:  They say (inaudible)

4        RR:  Yeah, yeah.

5        YK:  They say.....

6        RR:  He's a Jewish lawyer, he's great, I mean he's more,

7 he's more (laughs) he's more radical then any of us we ever met I

8 guess.

9        YK:  Are you serious?

10        RR:  Yeah, yeah so, so ah, so call, call Noubani, I mean

11 I, I would really, really (inaudible) I would recommend calling

12 him now and saying look (inaudible) ah, when they come, when these

13 guys come back, can I tell them, ah, you know, contact you or,

14 and, and can you also, and I, and he said he would, you know, he,

15 he already agreed to it.

16        YK:  Um hum.  Okay.

17        RR:  And ah, please, you know, find me a, you know,

18 recommend a good lawyer to me and I can pay him and everything

19 like that.

20        YK:  Um hum.

21        RR:  Find him as soon as possible and I wouldn't, I

22 wouldn't say one other word.

23        YK:  Okay.  Well I mean they're not coming.....

24        RR:  Not one other word......

25        YK:  .....back until, you know, ah.

865

1          RR:  Huh?

2          YK:  They're not coming back until later tonight so.  Is

3    this early.....

4          RR:  Okay ah.....

5          YK:  .....early in the morning.

6          RR:  Don't say another word to them.  Did you get any of

7    their ah, phone numbers or anything?

8          YK:  Phone numbers?

9          RR:  Yeah, did they give you a business card?

10         YK:  Oh yeah, yeah, the, the legal attache or whatever

11   the (inaudible)

12         RR:  Oh good.

13         YK:  Yeah?

14         RR:  No, yeah, good.  Call, call Ashraf, call Ashraf,

15   give him the number of this guy, he knows the legal, the legal

16   attache.

17         YK:  Okay.

18         RR:  And say look please, please call him, you know, see

19   that way you'll feel prevent, that will prevent him from even

20   going to your house, see once, once you have representation they

21   are, their, it is not legal for them to then contact you, they're

22   prevented from contacting you.  And if they do, and any kind of

23   thing that you say to them or anything like this is totally

24   unusable.  You know they can't, they can't touch you, I mean they,

25   they..

866

1          YK:  Um hum.

2          RR:  ....have to deal with your lawyer.  Unless they're
3   gonna arrest you, I mean then in which they'll arrest you know
4   what I'm saying?  But, but (inaudible) see wouldn't you like to,
5   wouldn't like to be able to not have to deal with them again.  You
6   understand? (Laughs)

7          YK:  Yeah, yeah.

8          RR:  And have, and have someone else deal with them?
9   That's the situation you're in so.  Like right now I don't even, I
10  don't even have to talk to them.  I know that ever before every
11  time I talk to them, these guys are smart and they're saying
12  things and they're picking things up from what I'm saying you know
13  what I'm saying about this?

14         YK:  Um hum.

15         RR:  So I, I much prefer not even having to deal with
16  them and my, and my lawyer's dealing with them.

17         YK:  Um.

18         RR:  And the lawyer who knows the law not like me who
19  sort of an igornamous you know.

20         YK:  (Laughs)

21         RR:  (Laughs) You know what I'm saying?  So, so all, all
22  you do is please ah, but I'm just saying I'm not even concerned
23  about myself 'cause everyone, the way everyone else has been
24  talking so it's not gonna hurt me.

25         YK:  Yeah.

867

1          RR:  You know what I'm saying?

2          YK:  But what I, what I, what I'm concerned about these

3  guys, I mean they're talking, nothing, nothing ever happens to

4  them, I mean, ah, ah.

5          RR:  (Sighs) No, no, they ah.

6          YK:  I don't know, do they, do they get......

7          RR:  They, they, the thing is that, you know, maybe

8  they'll get reduced, see, I'm, I'm still very, very confident.

9          YK:  Yeah.

10         RR:  That there's nothing, ah.

11         YK:  I see.

12         RR:  That they have no evidence of any crime that was

13  committed which is normal because no crime was committed and

14  everything's fine.

15         YK:  See ah.....

16         RR:  You're definitely, definitely, definitely safe.

17         YK:  See I, it, it (inaudible)

18         RR:  Okay?

19         YK:  Ibrahim was in jail for what, for some (inaudible)

20         RR:  It's basically for, for ah, while being a

21  undocumented alien ah, you know he was like a.

22         YK:  So something totally different from like ah.

23         RR:  Yeah totally unrelated, I mean.

24         YK:  Oh yeah?

25         RR:  I mean it, it has to do with the rifle he has but,

868

1  but the fact of the matter is it's just that, you know, they, they
2  can't even, you know, it's, it's related to the immigration,
3  it's....
4          YK:  Yeah.
5          RR:  It's related to his immigration status and not
6  being allowed to have a gun and his current immigration status.
7  So it has nothing to do with anything, they haven't charged him,
8  they haven't charged anyone with anything.
9          YK:  I see.
10         RR:  Other then, other then just underlay, you know,
11  it's just like me, you know, driving without a license and having,
12  you know, Hamdi having a gun, being out of status or something or.
13         YK:  Or.
14         RR:  So it's ah, they can't find anything to charge me
15  on.
16         YK:  I see.
17         RR:  They, they know every, they know everything, they
18  know everything, where I live, where I work.....
19         YK:  Yeah, I, I, actually, actually, you know, I was,
20  something, something interesting, they seem to think that I went
21  with like a whole bunch of people.
22         RR:  (Laughs)
23         YK:  Um, (laughs) one, I mean, I mean just like not just
24  the guys I guess
25         RR:  Yeah.

869

1       YK:  You know that I went with, ah, actually......

2       RR:  Right.

3       YK:  ....they know some, some other people that I've

4  never even heard of and they actually mentioned ah, I don't know

5  if you know this guy Ali Chandia or whatever, Ali Asad.

6       RR:  Ali Asad, Oh yeah I think I do, Ali Asad yeah,

7  yeah, yeah.

8       YK:  Yeah, they mentioned his name?

9       RR:  Yeah.

10       YK:  And they mentioned somebody named (inaudible), I

11  mean like.

12       RR:  I don't know.

13       YK:  I, I have no idea (laughs) ah, they, I mean they

14  seem to think that, you know, we are all in, in it together and we

15  all went about the same time.  So they're like, they're like you

16  know you went to (inaudible)

17       RR:  See that's what's dangerous, they, they, if they

18  try to, if they try to link, if they try to link us to some

19  totally unrelated thing you know what I'm saying?

20       YK:  Yeah.

21       RR:  Then they, you know, then, then we're gonna be in a

22  position where we have to prove that we didn't have anything to do

23  with these people, which is very dangerous.

24       YK:  Um hum.

25       RR:  A difficult thing so ah, it's just, it's just no

**J.A. 1014**

1  point in really, you know, helping them you know at this point do

2  anything ah, let them figure out, let them figure out that there's

3  nothing to charge us with, let them figure, you know, try to, try

4  to ah, you know, bust their asses to try to near a thing to come

5  up.......

6          YK:  Yeah.

7          RR:  .....with some type of crap, which they won't be

8  able to do, and you know, stay out of our lives, this is really

9  hung, now I'm, I'm probably gonna have to testify tomorrow.

10         YK:  Are you seriuos?

11         RR:  My lawyer's not telling the ah, um, ah, the, the

12  prosecutor that I'm gonna plead the 5th when I go in so probably,

13  probably, there's a possibility tomorrow that I'll wind up going

14  to jail you understand for, for ah, for ah contempt, for refusing

15  to talk to their ah, which is only a 18 month sentence and my

16  lawyer, and everyone I've talked to, everywhere I've talked to

17  says that this is still preferable.

18         YK:  Um hum.

19         RR:  18 months is still preferable to you know what I'm

20  saying, to talking to them and giving them some kind of ah, you

21  know, ammunition to use against me and everyone else.

22         YK:  I see.

23         RR:  Including you you know what I'm saying?

24         YK:  I see.

25         RR:  So you, ah, Noubani said, he said wouldn't it, ah,

871

1  it would have been so great to have a group of people who all
2  refused to talk you know what I'm saying?
3          YK:  Yeah.
4          RR:  And then we could, you know, and ah, and I was
5  thinking and they would have nothing and then you'd go before the
6  media and you, and you explain what the total ah, charade this
7  whole thing is and how you're being prosecuted which is really
8  depressing.
9          YK:  Yea and that, that would be the best way but it
10 seems like it's not, that's not the case.
11         RR:  It's not because everyone is out for themselves,
12 everyone is looking only at their own, I have 4 children, you
13 know, there's things that, you know what I'm saying, but I, I'm
14 it's not like I'm trying to be a, a martyr in the, you know what
15 I'm saying or what not....
16         YK:  Uh huh.
17         RR:  ....but I, but I just realized that it's in my best
18 interest and the best interest of everyone else furthermore, I
19 told Sheikh Ali I would never tell anyone what was said at that
20 ah, meeting.
21         YK:  Um hum.
22         RR:  Even though he didn't tell us to say anything, to
23 do anything illegal which he did not.  I still don't have any
24 right to sit there and blabber about, you know what I'm
25 saying.....

872

1    YK: Yeah.

2    RR: ....something that I, I swore to Allah (inaudible).

3    YK: Well did, did they, ask, ask a lot about ah, Sheikh

4 Ali

5    RR: Of course, no.

6    YK: And they seem to think that......

7    RR: (Inaudible)

8    YK: They seem to think that he's the one who hook,

9 hooked, hooked me up to go ah.

10    RR: Yes, yes.

11    YK: You know.

12    RR: Yeah that's what they think, they, they, they think

13 I'm like ah, I'm the number two guy in the whole thing.

14    YK: Um hum.

15    RR: But, what the number two in what, they have nothing

16 illegal, even if they could say, even if they could prove yeah,

17 even if I stood up and jumped up and down and, you know what I'm

18 saying, you know, if I sign, sign something saying that I was the

19 guy who or something it wouldn't matter because that was not

20 illegal at the time you know?

21    YK: Um hum.

22    RR: So ah, they're, they're going, they're trying to

23 find some way to make it illegal, you know, they're trying to find

24 some, some, any little thing, you know what I'm saying, to make it

25 look illegal, you should see, ah, well you should see like IANA,

**J.A. 1017**

873

1   you know IANA?

2          YK:  Yeah.

3          RR:  Their web, their web master, they arrested their

4   web master here, um, and it's, it's like, I mean you know, they're

5   gone around arresting everyone from IANA, but you should see like

6   ah, the, the indictments of him, like the charges against him?

7          YK:  Yeah.

8          RR:  It's like, it's like 15 pages and it's all filled

9   with stuff like, you know, and ah, IANA posted ah, fatwas from

10  radical shakes on its web site, ah, something on Ouda and Safar

11  Al-Hawali, radical Saudi Sheikh's you know what I'm saying.

12         YK:  Um hum.

13         RR:  But then like the um, but the actual like illegal

14  part like the, the count that they're, they're charging with

15  there's only one thing.

16         YK:  Yeah.

17         RR:  Which is that on his visa application when he came

18  here to study.

19         YK:  Yeah.

20         RR:  In the United States he put down that he was coming

21  here solely to get his doctorate when in reality he knew when he

22  filled it out that he was coming, ah, he was going to be an IANA's

23  web master.

24         YK:  Oh I see.

25         RR:  Yeah, so that's the only illegal thing they have

874

1  but you should, you should see, it's like, it's like 15 pages of

2  all kinds of stuff, but this is all like context you know, I saw

3  like background to the whole thing but the only thing that they're

4  really charging him with, it is...

5          YK:  Was the.....

6          RR:  .....this teeny tiny thing so what they're gonna

7  try to do is they're gonna try to find, oh and ah, his lawyers, by

8  the way, his lawyers say it's garage and they can get this ah,

9  thrown out.  But you know, I mean he's gonna, (laughs) he's

10  arrested, he's got a 15 page indictment floating around on the

11  Internet and you know.....

12          YK:  (Laughs)

13          RR:  ....his name has been dragged all through the

14  media.

15          YK:  Um hum.

16          RR:  So this is exactly what, you know, this is exactly

17  what they're trying to do, they're trying to examine every moment,

18  everything, they're trying to get everyone to talk, say everything

19  that they can so they can find any little teeny, tiny infraction

20  and then, you know, come out with a hugh ah, thing of you know,

21  conspiracy, you know what I'm saying?

22          YK:  Um hum.

23          RR:  You know it's just not in anyone's interest to say

24  anything to them and, here's, here's, I'll give you two

25  classifications of people and ah, how the brother's turned out

875

1   okay.  One was, one was the total ah, coward, you know?

2           YK:  Um hum.

3           RR:  Like the brother who like just broke down, freaked

4   out, you know what I'm saying?

5           YK:  Yeah, yeah.

6           RR:  He was all scared and said anything that, you know,

7   that came to his mind so the other, the other classification are

8   the brothers who try to be smart, you know what I'm saying?

9           YF:  Um hum.

10          RR:  Try to, yeah man, you know, ah, you know what I'm

11  saying, it's ah, I didn't do anything you know so.

12          YK:  Yeah.

13          RR:  So you know this is, this is the kind of

14  (inaudible).  Most of them are just as, you know, wind up putting

15  their foot in their mouth as much as anyone else and both of these

16  types of people are, you know, are the reason that the FBI came to

17  talk to you today and the reason that I have to testify tomorrow

18  and the reason Sheikh Ali is, you know what I'm saying?

19          YK:  Uh huh.

20          RR:  Ah, these people who talk to them, you know, I mean

21  they're gonna wind up, if, if in deed they find some kind of, you

22  know, little.....

23          YK:  How......

24          RR:  ......teeny, tiny infraction.  These people are

25  gonna get in trouble as much as anyone else.

876

1       YK:  Yeah, I mean but they're, how many people are like
2 talking?  Ah, other then our......

3       RR:  Ah, no, no, uh uh.

4       YK:  Okay.

5       RR:  As far as I know it's just the Nabil, ah, Hamad,
6 ah, Calipha

7       YK:  Um hum.

8       RR:  That's about it as far as I know.

9       YK:  Yeah they're naming some of the guys from Maryland,
10 I don't know if you guys know these guys.

11       RR:  I probably don't even know them so.

12       YK:  Um hum.

13       RR:  So maybe you know?  Maybe but as far as I know it's
14 just those guys.

15       YK:  Okay.

16       RR:  (Inaudible) So.  Yeah.  It's just (inaudible) well.
17 Do the smart thing, do the smart thing and call ah, you know, call
18 the lawyer.  Ah, see if he can just represent you just in the
19 matter of, see if he can call these things, ah, (inaudible)
20 (laughs)

21       YK:  Yeah.

22       RR:  You know what I'm saying before they come today to
23 keep them just even from, just to get them out of your face you
24 know?  And ah, that's what I would really, I would really say,
25 (Inaudible) Ismail called me today, I talked to Ismail.

877

1          YK:  Um hum.

2          RR:  He gave me your number and he told me he'd talk to

3   you or what not.  Would you please call these guys and tell them

4   not to come any where near my, ah, not to, not to, not to come

5   back, deal only with you, and then ah, hold on one second, trying

6   to clear my (inaudible), and then, you know, and then ah.....

7          YK:  Um hum.

8          RR:  .....and then I'll find another lawyer but just,

9   you know, if you can do this for me in the meantime, tell him yow,

10  yow, I can send you a payment, ah, he probably wouldn't ask for

11  more then, probably wouldn't ask for anything if I said no, no,

12  no, but at the most just do an (inaudible) like it wouldn't cost

13  anything but $50 bucks or something like that.

14         YK:  Yeah?

15         RR:  But I doubt he'd charge you at all.

16         YK:  Ah, no, no, I mean money's not the problem now, I

17  mean that's not the point.....

18         RR:  Yeah.  But he's, he's not, he's not gonna charge

19  you, it's just for doing something like that 'cause he's a, I mean

20  he's a Muslim you know so.  But look here's the thing, um, if you

21  don't do this, if you don't do this, I guarantee it for

22  (inaudible) six months from one, one month's not too much from

23  now, you'll be sitting where ever you'll be sitting and you'll be

24  saying I wished I had done what Ismail told me to do.

25         YK:  Okay.

878

1      RR:  So I don't, I really don't know of any other ways
2 to convince you other than saying that.

3      YK:  Yeah.

4      RR:  You know what I'm saying, I mean alhumdala I'm so
5 happy that you didn't get the (laughs)

6      YK:  (Laughs)

7      RR:  If anything happens to you.

8      YK:  (Laughs) Yeah.  Well I'll tell you I'm pretty much
9 of (inaudible) they can't say anything but ah.

10      RR:  Yeah.

11      YK:  I'm sure the, the ah, I'm not sure if this
12 (inaudible) had something against me, you know.

13      RR:  Yeah.

14      YK:  You know.

15      RR:  Well I think the, I think the thing is Ashraf is a
16 very ah, media savvy lawyer, he's getting in, in the media all the
17 time 'cause he's the lawyer for a whole bunch of others and ah,
18 whole bunch of government issues.  Ah but I think, you know, he's
19 gonna know the right things to say to them, you understand, the
20 last thing we want is some kind of, you know, you know, where
21 they've, they've got a U.S. citizen, you know, the, you know,
22 tortured or whatever in anything, you know what I'm saying,
23 by......

24      YK:  Yeah.

25      RR:  .....(inaudible) ah, that's the last thing we said

879

1  we want so I, I, I guarantee if you do this right away, there's
2  (inaudible) gonna come out.
3          YK:  Okay.
4          RR:  (Inaudible) they're not gonna be interested in,
5  they are they're just......
6          YK:  Well (inaudible).....
7          RR:  Yeah but they're gonna be dealing with other, other
8  people, they're gonna be dealing with your lawyer and they're,
9  they're gonna have time to think, the more time you're gonna have
10 time to get your affairs in order, the more time you'll have
11 to......
12         YK:  Um hum.
13         RR:  ....you know what I'm saying, do a lot of things
14 and prepare yourself in case anything happens and there's a very,
15 very strong, strong chance that they're not gonna do anything
16 because they have nothing, by their own admission, they don't have
17 nothing to charge on, I mean if they, if there is something to
18 charge you in, they would have arrested you and the fact that they
19 didn't arrest you means, shows that they don't, um, have anything
20 yet.
21         YK:  Yeah.
22         RR:  You know what I mean, they're hoping they can get
23 it from you. They're hoping that they can get you to say something
24 that's gonna reveal some kind of infraction or another.
25         YK:  That's ah.

880

1        RR:  The only thing that they can start, they can wind
2   up charging you with (inaudible)
3        YK:  I see.
4        RR:  So ah, anyway ah....
5        YK:  Hey ah, you haven't, you didn't tell, you didn't
6   tell anybody that I, I talked to you right?
7        RR:  Only Ashraf.
8        YK:  Only Ashraf, okay that's good.
9        RR:  Yeah.
10       YK:  So you haven't, you haven't talked to anybody about
11  that?
12       RR:  No, uh uh, and I won't actually.
13       YK:  Okay, well that's good, ah, 'cause I don't want
14  anybody, hey, but do you, have you talked to um, Masood?
15       RR:  No, no, I haven't talked to him, the only one I
16  ever see is ah, Hammad and Caliph though Caliph ah, avoids me
17  like, like the Red Plague. (Laughs)
18       YK:  (Laughs) Are you serious?  Because of ah, I said
19  ah.
20       RR:  Yeah he feels embarrassed because he, you know, he
21  went and blabbered mouthed his whole, now he has a lawyer, now he
22  got Ashraf as his lawyer, now Ashraf is dealing with him but in
23  the, when they first came to him he freaked out, they told him
24  they knew everything.  And he's supposed to, by the way he's
25  supposed to testify I think tomorrow also.

881

```
 1        YK:  See I, ah, I guess he, I guess a different time
 2  then you
 3        RR:  Yeah, yeah, I think like probably ah, in the
 4  morning or something like that, I think I might get after him.
 5        YK:  Yeah he.....
 6        RR:  (Inaudible)
 7        YK:  See, oaky.  He might say something though right?
 8        RR:  Well he already did, he said apparently he said a
 9  whole bunch of stuff.
10        YK:  Did Nabil testify?
11        RR:  Ah, I don't know the Nabil has, has completely
12  missing in action, the brother is ah, ah.
13        YK:  Is he hiding out?
14        RR:  Yeah, yeah's he's not with, he's never seen at the
15  majid he's never seen anywhere, I never, I've never seen him
16  anywhere.
17        YK:  See, ah, I guess um, am, Sheikh Ali I just not
18  charged with anything, that, ah, he's not (inaudible).
19        RR:  No, no, no, no.
20        YK:  Okay.
21        YK:  See, see like I told you he's got the toughest
22  lawyer(inaudible)
23        YK:  That's good.
24        RR:  (Inaudible) so.
25        YK:  (Laughs)  Did you, did.....
```

J.A. 1026

882

1      RR:  Yeah but ah, he's been, yeah he's been avoiding me
2  and I'm just avoiding him so.  He, he's paid him a lot of money to
3  do it.

4      YK:  I see.  And ah, I guess, you know, I guess you're
5  not in touch with ah, Ali now

6      RR:  No I called, I talked to him the other night and he
7  got, I told you he got kind of irritated that I called him.

8      YK:  (Laughs)

9      RR:  Yeah (laughs) he was like ah, he was like you know
10  how the situation is ah.

11      YK:  Yeah.

12      RR:  (Inaudible) but then he put it on just ah, just ah,
13  he didn't, you know, just (inaudible) you know (inaudible)

14      YK:  Hum?

15      RR:  Yeah whatever ah, you know, it's, it's really sad
16  and he gave me some ah, you know he said if everyone in this Earth
17  you know, (inaudible)

18      YK:  Yeah, yeah.

19      RR:  (Inaudible) had done this to me, so this is true,
20  you know, but it's, it's time now, I, you know, it's kind of like,
21  you know, magically every, (inaudible) everything's is gonna come
22  off of you and, and, and they won't be able to pay them any money
23  at all (inaudible) the only thing they're gonna be able to do is
24  (inaudible)

25      YK:  Okay.

883

1          RR:  So that's really, really your best bet, even just,
2     um, even though it's only temporary (inaudible)

3          YK:  See, ah, see they're not ah, okay they're, see
4     they're real interest is in our little, little group right?

5          RR:  Yeah, yeah, yeah, yeah, right.

6          YK:  Okay, they're not trying to link us with.. (laughs)

7          RR:  (Inaudible) they're trying to link us with Bin
8     Laden, that's what they're trying to do.

9          YK:  Oh.

10         RR:  That's exactly what they're trying to do.

11         YK:  Are they trying to make us, well, what, bigger then
12    we really are?

13         RR:  Exactly, they......

14         YK:  Okay.

15         RR:  ....they don't know how big it is, they don't know,
16    I mean I think they have a glimpse.  They see the paintball, they
17    see the brothers who went over seas.

18         YK:  Um hum.

19         RR:  And they are hoping upon hope that they can......

20         YK:  So that's, that's probably why they're naming all
21    of these people they probably like I don't like a lot, they said
22    they did name some of the guys from Maryland so.  So they.....

23         RR:  They're ah, in the search warrant, ah, for, when
24    they, for me they took a, a, looking for evidence that we were
25    supporting Bin Laden and Al Qaeda.

884

1        YK:  Really?

2        RR:  Which was, yeah which is total crap, I was, total

3 crap, yeah I mean.  Ah, they're looking for just what they're

4 looking for, and if they can find anything, any mistake,

5 (inaudible) then, you know, it's just enough for them to hang

6 their hat on and, and start charging people then they're gonna do

7 it, yeah, anything, I mean, which is crazy because at ah, at every

8 step of the way I (ianudible) and I was just ah, you know.

9        YK:  Um hum.

10       RR:  But it, it doesn't matter ah, to them it's just

11 (inaudible) looking to see what they can find (inaudible).

12       YK:  Um hum.

13       RR:  It's not in any way that you, let them, let them

14 find, find things or not find things, you know, on their own

15 effort, you know, don't, don't give them a shovel to dig their,

16 their hole.

17       YK:  I see.  That's good, hey do you have um, I don't

18 know because obviously, obviously you know but remember Aatique?

19       RR:  Aatique, yeah.

20       YK:  Did he, did he go back to, did he go back to the

21 States?

22       RR:  Ah, no, I, he came, came back to America and I

23 don't know what ever happened to him, I, I know he is, he's

24 probably in Pennsylvania.

25       YK:  Yeah he, he, well, the last I saw him was in, you

**J.A. 1029**

885

1  know, (inaudible).

2          RR:  Oh okay, okay.

3          YK:  Ah, you know, and then I was wondering like if he

4  did go back because I told him it might be a good idea to go back.

5          RR:  Yeah.  I don't know, I have ah, I haven't heard

6  from him ah, I haven't seen anyone except (inaudible)

7          YK:  Everyone is just like doing their own thing....

8          RR:  (Inaudible)

9          YK:  ....you know, do their own thing?

10         RR:  Yeah.

11         YK:  Okay.

12         RR:  Everyone doing their own thing, it's really

13 depressing. (Laughs)

14         YK:  (Laughs)

15         RR:  (Inaudible)

16         YK:  Yeah?

17         RR:  And.

18         YK:  Well man I hope everything goes well tomorrow, ah.

19         RR:  Oh thank you brother, thank you.

20         YK:  Yeah.

21         RR:  If you don't hear from me, um.

22         YK:  I may, doing whatever.....

23         RR:  Call me, try to call me anyway.

24         YK:  Okay I'll try to call you if, if um, but ah.

25         RR:  But please ah, I think he's hear like about 4

886

1    o'clock, give Ashraf a call (inaudible).

2            YK:  Okay.

3            RR:  I'll recommend he check with me and I'll

4    (inaudible)

5            YK:  Okay. All right but, but ah, I guess (Inaudible)

6            RR:  Yeah.

7            YK:  Whatever happens is, you know, up to Allah.

8            RR:  Yeah that's true.

9            YK:  So.

10           RR:  That's true, that's quite true so.  All right well

11   it was really nice hearing from you brother please try to keep in

12   touch.

13           YK:  Okay Inshalah, you got, I'll let you know ah,

14   whatever happens, I'll try, if I get, if I'm alive, if I'm able

15   I'll try and give you a contact or something, if not, maybe I with

16   (inaudubiele) (Laughs)

17           RR:  (Laughs) Yeah maybe.....

18           YK:  Maybe, maybe, maybe in the summer is I don't know.

19           RR:  Okay inshallah, but please, (inaudible) if you're

20   still not convinced and I'm getting the sense that you're not.

21   (Laughs)

22           YK:  (Laughs)

23           RR:  (Laughs) Ah, but the best thing to do is call a

24   lawyer.  But ah, you know, do it. (Laughs)

25           YK:  Okay.  Okay Inshallah.

887

1           RR:  Okay (inaudible).

2           YK:  (Speaks Arabic)

3           RR:  (Speaks Arabic)

4           YK:  (Speaks Arabic)

5           RR:  (Speaks Arabic)"

6           (End of excerpt.)

7           MR. KROMBERG:  Judge, the next is a videotape, which

8    would be 1B4, and the transcript is 1B4a.

9           THE COURT:  All right.

10          MR. KROMBERG:  This one might be much harder to follow

11   along on the transcript in the juror's hand because the video is

12   going to be going at the same time, so I think we have the --

13          THE COURT:  Is it a clear audio?

14          MR. KROMBERG:  I hope so, Judge.  We actually have two

15   choices on the audio on this.  We have a separate -- the audio

16   comes from two sources, so if it doesn't work on one, we can go to

17   the other.

18          THE COURT:  All right.  Now, I do think these calls are

19   somewhat cumulative, so I expect that something new should be

20   coming out on this.  We don't need to hear Royer and Kwon talking

21   about lawyers and the grand jury 6,000 times.

22          MR. KROMBERG:  There will be new things in here, but

23   there will be some of the same things again, Judge.

24          THE COURT:  All right.  And again, Ladies and Gentlemen,

25   if the glare from the window interferes with your ability to watch

888

1   the screens, let us know because we can close the blinds all the

2   way.  Anyone need them closed?  No?

3              A JUROR:  We're okay.

4              (Government's Exhibit No. 1B4 was played, Government's

5   Exhibit No. 1B4a was copied in verbatim as follows:)

6              "RANDALL ROYER (RR):  Asalaama Alayekum, what's up.

7              YONG KWON (YK):  Alayekum Asalaam

8              RR:  Hamdela

9              YK:  How's everything? How are you?

10             RR:  Ahh, good actually... inshalla.

11             YK:  You look like you're ready to go to the...

12             RR:  Well, I am actually job hunting today.

13             YK:  You are what?

14             RR:  Job hunting.  I'm working,

15             YK:  What?

16             RR:  I am working at MAS, but it's lame because they are

17  not paying me anything, and you know, I've got four kids and I

18  need I need a better job and I've just got a second job like

19  delivering papers and ah, in the morning, that's garbage you know.

20             YK:  You serious?

21             RR:  Yeah, you know, I wake up at 2:30, get there at

22  3:30, uh, get done at 7:30, you know what I am saying, and I go to

23  work and, come home, it's crazy.

24             YK:  You do that straight?

25             RR:  I mean, yeah, you know.

**J.A. 1033**

889

1          YK:  ...the type?

2          RR:  Yeah.  Because they're paying me like, uh, 36

3    basically which is not nothing to.

4          YK:  Not with four kids..

5          RR:  Yeah, anyway, hamdula but actually the, the

6    positive thing is, you know, hamdula, is I have very good

7    experience in public relations and stuff, yeah so I am going to

8    all these... PR firms.

9          YK:  Yeah

10         RR:  ...and stuff

11         YK:  I think it will be all right.

12         RR:  Yeah, inshalla, anyway, well hamdula

13         YK:  I don't know, I mean, right now, I mean the job,

14   more freedom.

15         RR:  Yeah

16         YK:  A job is the furthest thing from my mind...

17         RR:  Yeah I know, I know, I know, I know.

18         YK:  Ah, I'm don't care if I can't get a job for the

19   next whatever.

20         RR:  Yeah, yeah

21         YK:  Ah

22         RR:  I'm exhausted, I just want to go to sleep,

23   laughter.

24         YK:  So I mean...

25         RR:  So do I....

890

1       YK:  ...they, they are supposed to call me, I don't know

2  what's going on.

3       RR:  Yeah

4       YK:  But, uh, I want to tell you what...

5       RR:  Yeah, what, what's happening with you?

6       YK:  Dead boy.  Dead

7       RR:  But there is nothing for them...even if they knew

8  everything, then they would know that's there's nothing, right.

9       YK:  I don't know they....well, they know

10  everything....actually the guy the guy in Korea, the Legal

11  Attache, whatever,

12       RR:  Yeah

13       YK:  The third time he came and he gave me the

14  subpoena.....

15       RR:  Yeah

16       YK:  And uh, you know...'cause I gave him the whole

17  story about like what me...

18       RR:  Right

19       YK:  ...and MAHMOUD, me and MAHMOUD had, you know had

20  worked out.

21       RR:  But, did you tell them, you didn't tell them what

22  you really did right?

23       YK:  No.

24       RR:  Uh, see that, okay...

25       YK:  And then um, and then when he came back with the

**J.A. 1035**

891

1  subpoena, it was like well, you know, you have your story.

2          RR:  Yeah.

3          YK:  And he was like but, like this is what we, you

4  know...

5          RR:  We know (laughs).

6          YK:  ...we know.  And then they, they went and, I mean,

7  they started from the night at my house.

8          RR:  Yeah.

9          YK:  I mean they even knew who was there.

10         RR:  Oh yeah.

11         YK:  They knew Ali was there and you were there.

12         RR:  Yeah

13         YK:  Me and Masoud.

14         RR:  Ah, yeah

15         YK:  Hammad, Calipha

16         RR:  Okay

17         YK:  They even know that... they even know that Nabil

18  came.

19         RR:  Yeah

20         YK:  You know, they even know the name....

21         RR:  They know Nabil came because Nabil told them this.

22         YK:  They knew Nabil came for a few.... They knew

23  details like I didn't tell them...they probably even know what we

24  ate, which I don't even remember.

25         RR:  Chinese food. (Laughs)

892

1          YK:  But

2          RR:  Okay (laughs)

3          YK:  But they said basically some things, I mean they
4    said that, you know, that Ali Timimi told us to, you know, you
5    have to leave the United States.

6          RR:  Yeah

7          YK:  And join the Mujahadeen wherever they are.

8          RR:  Okay

9          YK:  Um. Whatever country and they even have that you,
10   me.....

11         RR:  Um hmm

12         YK:  ....Mahmoud and Masoud actually had like a confirm,
13   like a confirmation that night that we were going to go.

14         RR:  Yeah

15         YK:  And they even know about the phone call we made
16   from the 7-11.

17         RR:  Oh.  Are you serious?

18         YK:  They know, I mean.

19         RR:  To the, to the, to Pakistan

20         YK:  Yeah, they even know my flight, I don't even know,
21   they, they know my flight you know...

22         RR:  Yeah

23         YK:  ...schedule, they knew my date when I left and the
24   whole time I'm just like, you know, I don't know what to say so
25   I'm...

893

1              RR:  Um hum.

2              YK:  ...just like, um, well, you know, I tried to fend

3    off like most of the things didn't happen.

4              RR:  Yeah

5              YK:  ....and I was like well we had dinners in my house,

6    you know.

7              RR:  Yeah.

8              YK:  So, so it could be one of the many but, I mean,

9    they were like.  And then, I mean, they even knew about Aatique.

10             RR:  Oh really?  Wow, Well I'll tell you what...

11             YK:  So

12             RR:  ...and here's the problem.  You're, you're in a

13   bind, because you lied, you lied to them, ah, you know.

14             YK:  Uh huh.  Well this is...

15             RR:  And...

16             YK:  ...this is what he told me, he was like...

17             RR:  Okay

18             YK:  And then, you know, he said, you know, he went over

19   the whole thing how Mahmoud and I got the visa and we left to-,

20   well they know because are tickets were together.

21             RR:  Yeah sure.

22             YK:  And then they were like, and then we know you made

23   your way to camp... and you know what, they even knew what the

24   names of the camps are.

25             RR:  Oh what?

**J.A. 1038**

894

1          YK:  They know.

2          RR:  Wow

3          YK:  I don't know if they know they exact locations...

4          RR:  Yeah

5          YK:  ...but they, they know which town it's in, you

6     know.

7          RR:  Yeah

8          YK:  You know?  Musafrabad.

9          RR:  Yeah, yeah.  Musafrabad.

10          YK:  And then they know that, he even knew the names.

11          RR:  Yeah

12          YK:  And they kind of knew what goes on there, like what

13     kind of training goes on there.

14          RR:  Yeah, yeah

15          YK:  And I was just like, you know.  And then the guy

16     was...

17          RR:  But then, don't they know that the group was not

18     ah, you know....

19          YK:  Well he didn't say anything about that, he was just

20     saying...

21          RR:  Yeah

22          YK:  ...that, you know, what you're looking at is

23     conspiracy charge.

24          RR:  Yeah, but conspiracy to do what?

25          YK:  I don't know.

**J.A. 1039**

1       RR:  This is the thing, it it's, I, know that, because

2  this is on the search warrant, it, ah, you know, conspiracy

3  between, between, and it says...

4       YK:  Yeah he said you're looking at con-, conspiracy

5  charge.

6       RR:  Yeah

7       YK:  And he was like well, you know, I have your story,

8  and we have ours.  So you got, you gotta appear at the Grand Jury

9  and he was like well you made to me, you know, I could charge you

10  with false statements.

11       RR:  Absolutely

12       YK:  But he was like well, you know that's not to define

13  what you, what you, you know, what you have to do next is what

14  really matters and he was like...

15       RR:  Um hum

16       YK:  ...the front of the Grand Jury.  If you lie, this

17  is   perjury.

18       RR:  Absolutely

19       YK:  And he said then you go to jail.

20       RR:  Yep, that's right.  Five years in jail.  Automatic.

21       YK:  And he said if you, you don't talk, then you get

22  contempt.

23       RR:  Yeah, probably.

24       YK:  And then he said, well this is what he told me.

25       RR:  Yeah

896

1        YK:  He was just like, you know, if, actually if you get
2  like con... like perjury or whatever, your might, your sentence
3  might... that sentence might be even longer...

4        RR:  Absolutely right.

5        YK:  ...than the original conspiracy charge.

6        RR:  Probably five years.  Uh, five years is the minimum
7  for a conspiracy.  The maximum, I think...

8        YK:  So

9        RR:  (Inaudible)

10      YK:  So, I mean like, what's the, you know?

11      RR:  Well first of all, you know, I mean first of all
12  you...

13      YK:  Well they know that, I mean I'm, I'm sorry...

14      RR:  Yeah

15      YK:  ...they know that you're the.

16      RR:  Yeah I know, I know.

17      YK:  I think they knew for a long time, they know that
18  you're the contact man for Lashkar.

19      RR:  A contact, yeah I know that, I know that.

20      YK:  They know that you're the one who, you're the one
21  who's.

22      RR:  Yeah

23      YK:  They know that ah, you went...

24      RR:  What?

25      YK:  ...the first time.

897

1     RR:  Yeah, I know, I know that

2     YK:  They know that Ibrahim went the second time?

3     RR:  Yeah

4     YK:  They know that Saif went.

5     RR:  Right, I know

6     YK:  I mean they were on this thing like way before so.
7  I told them like, well I couldn't deny that, you know I didn't go
8  to Pakistan.

9     RR:  Right

10    YK:  So I said yeah I was in Pakistan, um and I couldn't
11  deny about the dinner.

12    RR:  Yeah.

13    YK:  I mean they apparently knew more than ...

14    RR:  Sure

15    YK:  And so. I mean, and then, you know, I was thinking
16  about why you, what you said and we, if we, you know, 'cause
17  Lashkar wasn't on the terrorist list.

18    RR:  Right.  Exactly.

19    YK:  So, I mean, if we we can't get away because, I told
20  him, you know, when I go to the Grand Jury, this is what I told
21  the Legat ...I was like...

22    RR:  Yeah

23    YK:  ...I, I can't tell, I can't say for others but I'm
24  just gonna say what, what, I've done.

25    RR:  Yeah, right

898

1          YK:  You know, what I have done.

2          RR:  Right

3          YK:  I'm not gonna say something I might...

4          RR:  No but they will, no, no, but they will ask, see it
5     gets very detailed.  They'll ask you what do you know, ah, what
6     did so and so do, and what did so and so do, and what did so and
7     so do.  And you say, "Well, I don't know.  Ask them."  And they're
8     not going to take kindly to that.  They're going to say, "No.
9     Tell us what you know."  And you're, you're gonna be like well no
10    I'm not going to tell you, that's, you know, that's obstruction of
11    justice and if you say well I plead the Fifth on that, they're
12    gonna say well you told us everything that you did, you know, why
13    don't you tell us, tell us what they did?  Ah, here's, here's the,
14    here's the thing, you can only plead the Fifth Amendment if um,
15    ah, because the Fifth Amendment protects from ah, from your ah,
16    from incriminating yourself, you have the right not to testify
17    about yourself, right?

18         YK:  Oh, But they...

19         RR:  But you don't have the right to not testify about
20    other people unless testifying about those other people is gonna
21    get you in trouble in, indirectly.  But, the problem about that is
22    if you tell them everything about yourself, what, what's gonna
23    stop you from telling them about somebody else.

24         YK:  Well basically, if you, I mean basically,

25         RR:  Yeah

899

```
 1          YK:  If the penalty's not that big.

 2          RR:  Yeah

 3          YK:  Because at this point I'm thinking they know

 4  everything.

 5          RR:  Yeah, yeah

 6          YK:  And, and, and if I, okay I did somewhat, a small

 7  conspiracy or whatever.

 8          RR:  Um hum

 9          YK:  I'm just like listen, you know, I'm just letting

10  you, instead of lying and contempting...

11          RR:  Right

12          YK:  Adding on to my sentencing, whatever it is.

13          RR:  Yeah

14          YK:  Decide, you know.

15          RR:  Yeah

16          YK:  If I do their charge.

17          RR:  Yeah

18          YK:  I'm just like, my thinking was that at the time...

19          RR:  Yeah

20          YK:  ... with the Legat was okay,

21          RR:  Yeah

22          YK:  I'll, I'll admit what I did.

23          RR:  Right, just tell them what you did.

24          YK:  And then.

25          RR:  Yeah
```

900

1          YK:   You know just give me what I am going to get.

2          RR:   Right.  Exactly, right.

3          YK:   And that's it.

4          RR:   Yeah, yeah

5          YK:   And, you know, then he, he was like you have to go

6    into the Grand Jury and tell your, you know, whatever, whatever

7    you did, um.

8          RR:   Um hum

9          YK:   So I mean that's what I'm thinking right now. I

10   mean what...

11         RR:   Yeah doing that (inaudible).

12         YK:   What do you think? Do you think that's that's

13   smart?

14         RR:   My thought on that is, and I'm just telling you

15   what, what I've heard from the two lawyers that I've had so far, I

16   mean, and the ones I've had so far. That's only a problem for you

17   its, I mean, for, us, for anything, that's only gonna be a problem

18   if any of what of what we did they can make it to appear illegal,

19   you know what I mean?  If you like for example, for bunch...

20         YK:   I don't think, I don't think they'll go through all

21   of this trouble coming to Korea.

22         RR:   Yeah.

23         YK:   And they came to my job the second time they came.

24   I, I mean.

25         RR:   But look, look here's the thing, I mean if, if, ah,

901

1   if like you get ten people, and they all got together and said
2   look let's go, ah, lets go um dye my puppy pink....you know what I
3   saying, you know what I mean?  And they all did it and they got
4   together and one guy went to get the paint and the other guys, you
5   know, they gave him the money for it and they died a puppy pink
6   and they come in there and say all right you know ah, you were
7   arrested because you guys are charged with conspiracy and what not
8   and you wanna tell us what you did, they said yeah, but what we
9   conspired on was not illegal so just the fact that.  So the point
10  is that if um, and, and, and it, it, it is really approaching you
11  know what I mean...
12          YK:  Yeah
13          RR:  ...illegality because the, the group was, was,
14  declared illegal at some point and what not.  But the, the fact of
15  the matter is that what we did, none of what we did, you know.
16          YK:  Then what ah...
17          RR:  Approaches illegality, right.
18          YK:  Well then why don't I just tell them?
19          RR:  Well their response...
20          YK:  Tell them everything, you know.
21          RR:  See.  The response I got to that from lawyers was
22  ah, because if they then wind up um, you know, being able to make
23  some kind of connection because look, they'll find anything,
24  they're, they're, they're gonna, gonna comb through every single
25  one of our actions to find anything that was illegal about it.

**J.A. 1046**

902

 1  You know for example...

 2          YK:  Uh huh

 3          RR:  ...maybe, you know, maybe ah, ah, oh gosh I don't

 4  know, you know, maybe um, maybe they'll say ah, par-,

 5  participation, like with ah, ah, what they're thinking of doing

 6  with Ibrahim, partici-, participation in a conflict in which the

 7  US was not a....

 8          YK:  Yeah

 9          RR:  You know saying something like that.  I mean and

10  that's like something like that, you know, 70 days in jail or

11  something like that.  Right.  But, but see they're, they're

12  looking for any, and apparently they, they decided not to do that,

13  you know what I mean?

14          YK:  Yeah

15          RR:  They're looking for something else. They haven't

16  charged anyone with anything yet and frankly.

17          YK:  This is, this is what the Legat was...

18          RR:  Yeah

19          YK:  ...basically trying to tell, was like, we have the

20  information.

21          RR:  Yeah

22          YK:  We know what happened.

23          RR:  Yeah

24          YK:  You know why you did it, I mean yeah he's trying to

25  scare me...

903

1         RR:  Yeah, but the question is...

2         YK:  But what....

3         RR:  Why don't they charge us then?

4         YK:  Yeah, that's the thing, he was like...

5         RR:  Yeah

6         YK:  ...well we'll go to the Grand Jury, you know, and
it's up to you, you know, you can either make it.

8         RR:  Yeah

9         YK:  Hard on yourself or you make it easy on yourself.

10        RR:  But, but, real, realize as well ah, if if you have
a lawyer, a lawyer will be telling you the other side of the
story.  Because there are two sides to this story, you know what I
am saying?  The one side of the story is a story they want you to
hear which is, you know, um, ah basically, you know, you know you
have, ah, you have no, ah, ah, you, you must talk and you must do
this and if you don't, this is gonna happen and dididididididi which
is all fine and good if, as long as it's like, you know, I mean
but, but what, but what I'm worried about is if you go in there or
I go in there and we say, we say everything, and they find some
little tiny detail of something that we did that was illegal and
then they try to apply that to everyone, you know what I am
saying?

23        YK:  Well.  We didn't do anything else

24        RR:  No we didn't.

25        YK:  (Inaudible.)

904

1          RR:  Yeah.

2          YK:  So I mean if this thing....

3          RR:  Yeah

4          YK:  ....is similar, because I.

5          RR:  I mean, I'm not going to say to you...

6          YK:  I mean I can't say like no.

7          RR:  Yeah

8          YK:  When they have the facts in my face.

9          RR:  Right you can't.

10         YK:  I mean like, you went there I mean.

11         RR:  Right you can't.

12         YK:  You know well I was upset, I could say okay I'm not
13  going to say anything but.

14         RR:  The problem is, you don't know what they know, and
15  that's why you never lie to them, you either don't talk or you
16  tell them everything.  Those are the only two options.

17         YK:  I think this is like the, the chance, this Grand
18  Jury but how much...

19         RR:  Yeah

20         YK:  ...time coming from the Legat in Korea. So I'm
21  just...

22         RR:  Yeah.

23         YK:  I mean

24         RR:  None, none of these people are on your side, you
25  know what I'm saying?  These people want to do their news

**J.A. 1049**

905

1   conference where they busted a cell, you know what I am saying.

2   And I can see something like, you know, you know ah, Ashcroft

3   coming out and ah, you know, he ah, you know, ah, a terrorist cell

4   stretching from ah, the Nation's Capital to Bosnia to Korea has

5   been uncovered.

6          YK:   Laughs

7          RR:   No really, you know what I mean?  And, and, and and,

8   and, making all kinds of, you know what I am saying?  But then the

9   real thing that maybe would charge us, is something like nothing.

10         YK:   Um hum

11         RR:   But the fact is that ah, they did.  You know they

12  um, they um, claimed, they said that they had busted 70 different

13  terrorists last year, but then some media went through it and they

14  found that these people are all actually charged with like, you

15  know, visa violations and had nothing to do with terrorism right,

16  they just want some big show, you know what I am saying?  So this

17  is the problem.  And the problem with going and talking to them is

18  that you give them, you know, you don't know what they know and

19  you don't know what they don't know...

20         YK:   Well they tell me what they know.

21         RR:   ...Yeah, but.

22         YK:   (Laughs) Pretty much everything.

23         RR:   Yeah, yeah

24         YK:   I mean I was just like what they, you know, and of

25  course they know I did business in Pakistan after, you know...

906

1          RR:  But they might suspect some of those things, and

2     then you go on and say yeah we did that and then they're, you

3     know, okay now here's confirmation of it and now we're going to

4     charge you with, where as they might not be able to charge you or

5     us without that you know what I am saying?  I mean, ah.

6          YK:  I mean so what's, what's it mean.

7          RR:  I think we should talk to a lawyer, I mean.

8          YK:  Um

9          RR:  This is a matter, ah a major issue, whatever the

10    lawyer tells, see what the lawyer might tell you go in there and

11    spill your guts, you know what I am saying?  And you gotta do what

12    you gotta do.  But what I am saying is that it, you owe it to

13    yourself to at least get some legal advice on it.  You know, and

14    if you call, here's the deal also, by the way, you call them up

15    and you tell them look I have a lawyer, um and he's um, he needs

16    time to look at this and he needs time to to understand it and

17    everything.  So and, and they'll have no choice to ah, to um to

18    cancel your, your testimony today.  At the very least, doing that

19    is going to buy you a week, ah, ah, at the very least a week, two

20    weeks to talk to a lawyer you know.

21         YK:  Yeah

22         RR:  And it's, it's not going to hurt your situation, it

23    can't hurt you, um, um to talk to a lawyer.

24         YK:  Yeah

25         RR:  I mean you...

907

1        YK:  What I'm afraid of is that... You know there's,

2        RR:  What?

3        YK:  ...there's nothing like I said, the penalties like

4  seventy days right?

5        RR:  Yeah

6        YK:  And, and no reason, you know, to try and put up a

7  fight or whatever.

8        RR:  No, but you.

9        YK:  I mean the good...

10       RR:  But maybe you're lawyer will say go in there and

11  spill your guts, you know, and you'll be all right, at least

12  you'll have a week to, to get yourself together, I know you're

13  kind of thinking on one hand I, I wanna get it over with.

14       YK:  Yeah

15       RR:  Right?

16       YK:  I just wanna get it over with and, you know, my

17  parents are left, I don't know what those Koreans would, you know.

18       RR:  Yeah

19       YK:  I'm sure they've got surveillance on my parents,

20  you know and.

21       RR:  Yeah

22       YK:  And I, you know, it's one thing...

23       RR:  A little rough

24       YK:  ...if I get screwed away.

25       RR:  Oh yeah?

908

1        YK:  But it's another thing.

2        RR:  I know man.

3        YK:  See my parents didn't do anything or have anything

4 to do with it.

5        RR:  Yeah, and those Koreans are infamous, infamous ...

6        YK:  So I'm just like, and he has a business and I don't

7 know what.

8        RR:  Yeah

9        YK:  And they don't have to physically like do something

10 to them. They can like, you know, like, I don't know, do something

11 with his business.

12       RR:  You know I would honestly like to (inaudible,

13 cough).

14       YK:  I just wanna get it over with.

15       RR:  Right, I would honestly like to just go in there

16 and say, look man, this is what we did...

17       YK:  That's what we do.

18       RR:  I mean what we did?

19       YK:  And this is

20       RR:  If it's illegal, charge me, if it's not illegal, go

21 away, you know.

22       YK:  Yeah, Yeah

23       RR:  Leave me alone

24       YK:  If I did something wrong, you know.

25       RR:  Yeah

909

1          YK:   That's what I'm saying, wonder, and that's why I
2    was.

3          RR:   Yeah, yeah, well.

4          YK:   Instead of everybody running around and lying and
5    then, I mean we all...

6          RR:   Oh no, I know.

7          YK:   ....can get perjury and to sit in jail for five
8    years.

9          RR:   No No No... not lying.  Lying, I mean, is
10   definitely the worst possible option.

11         YK:   So why not tell the truth?  They know everything...

12         RR:   Yeah, I know.

13         YK:   They know I went to the camp, they know that.

14         RR:   But

15         YK:   You know

16         RR:   But the question is why play their game you know?
17   Why just not say, "No, I'm not talking."

18         YK:   See, um, basically, the Legat was, "you make it
19   hard on us, we make it hard on you."  You know?

20         RR:   Yeah

21         YK:   Because if I'm like, okay if it's like murder or
22   something.

23         RR:   Um hum

24         YK:   You know, or maybe, you know, if I actually went
25   into combat...

910

1         RR:  If you did something wrong.

2         YK:  Wrong then I might, I, then I have no choice then

3 to fight.

4         RR:  Yeah, yeah, I know.

5         YK:  But if it's not something that we did, we all did

6 is to go to this camp, it's not even a terrorist camp and, you

7 know, you helped us get there or whatever...

8         RR:  Yeah

9         YK:  ...Ali told us to, you know, go there.

10        RR:  Yeah

11        YK:  I mean it's just, if it's not like wrong, why fight

12 to the end if it's not...

13        RR:  'Cause they're not interested in fairness. They're

14 not, they're, they're they're not gonna, they're not just sit

15 there and listen to you say look we, we just went, we went to the

16 camp, the group's not a terrorist organization, we didn't have no

17 intention of going to Afghanistan and fighting Americans.  We just

18 went there to do this and do this they're, they're not gonna go

19 whew, okay I guess we were wrong about, you know, the idea of.

20        YK:  Right

21        RR:  Maybe you guys were going to get to Afghanistan,

22 they're gonna continue to ah, and continue to look and they're

23 gonna pry any statement that you could possibly say out of your

24 mouth that's gonna indicate, you know, they're gonna say so you're

25 telling us that um, that there's no way you would have gone to

1  Afghanistan to fight?  You know, and then and then you're gonna

2  say well you know, ah, you know, maybe, ah, I would have, you know

3  what I am saying and then you know, I mean any little teeny, tiny

4  thing like that, I, I don't know what, I don't how.  But they're

5  gonna try to and these guys are brilliant you know and they're,

6  they're lawyers you know what I am saying and you're just a

7  computer programmer guy you know what I am saying? (Laughs.)

8          RR:  And they, here's, let me tell you something else,

9  they know in their mind about like what constitutes certain

10  crimes.

11          YK:  Um hum.

12          RR:  And, and the, the, the actions that constitute

13  those crimes, and they're, they're trying to fit our ah, what we

14  did.

15          YK:  Um hum

16          RR:  And they're trying to, they're trying to fit those

17  in those cookie cutters.  So they're gonna ask questions to try

18  to, to try um, place what we did within one of those cookie

19  cutters.  I mean I know for example that when they were asking

20  when I, well I went to testify um.

21          YK:  You testified for them?

22          RR:  Yeah in front of the Grand Jury...

23          YK:  And you're out?

24          RR:  No but it had it, this was like ah 8 months ago. It

25  had to do with ah some brothers in the St. Louis.

912

```
 1          YK:  Oh
 2          RR:  And it was like, something like um, you know, ah
 3  some brothers and like that I had met in like '93 that started the
 4  Masjid in St. Louis.  I hadn't seen them for like 7 years so I
 5  went in there and was like, I don't know anything about them other
 6  than the fact that they were nice people and I never heard them
 7  say anything about, you know, fight America or something like
 8  this.  That was all I could say and nothing else, you know, and
 9  then they, but I, but I have a feeling that they used that issue
10  to get me there right 'cause then they start, then they start
11  asking me about Bosnia.  I told them everything about Bosnia, I
12  went to Bosnia.  I fought, I did this, I was with Arabs, I fought,
13  you know what I'm saying?  It wasn't illegally, I fought.
14          YK:  You actually fought in Bosnia?
15          RR:  Yeah
16          YK:  Oh really
17          RR:  Yeah, I told them everything, you know, and um,
18  but.
19          YK:  But that's not illegal is it?
20          RR:  It's not illegal but he kept asking me things like,
21  "did anyone send you any money when you were there you know, any
22  like care packages even like a box of ah, cookies or something
23  like that."
24          YK:  Laughs
25          RR:  You know why he is asking that?
```

**J.A. 1057**

913

```
 1          YK:  No

 2          RR:  Because he's looking for some.

 3          YK:  Yeah

 4          RR:  Means of, of tying like financially because if

 5   there are any finances involved...

 6          YK:  Um hum

 7          RR:  Then it becomes like a RICO, conspiracy which is

 8   like this mafia, law, anti-mafia law right.

 9          YK:  Um hum

10          RR:  And if, if it um, just for the future, I mean I

11   know that ah, ah, going to Bosnia was not illegal but if they can

12   find anything wrong about that, anything illegal about that, and

13   then they find, they tie money into it, it just, it just compounds

14   the whole issue.

15          YK:  Um hum

16          RR:  And if there's no money involved, they can't make

17   it like a, a conspiracy right because the conspiracy is like

18   involving money.

19          YK:  Um hum

20          RR:  That's what the whole Mafia thing, that's why they

21   got Al Capone about the, you know, ah, not paying taxes and the

22   mob finances.  So the issue is, you'll find that if you go in

23   there you'll find that they'll, they'll and, and you, and you

24   really talk to them you'll find that they're gonna ask you

25   questions and you're not gonna understand why they're asking them.
```

914

1   But they're asking them so that they can place what we did within

2   a certain context, a certain rubric you know?  That's exactly what

3   it is, and you don't know what that is.  So the whole thing is

4   you're going in there at a disadvantage, you're going in there

5   without having talked to a lawyer, ah, you're going in there, you

6   know, I mean, essentially with this, you know, false statements

7   hanging over your head 'cause making false statements to an agent,

8   ah government agent is a crime, is a crime.

9          YK:  Um hum

10         RR:  And you did that.

11         YK:  But, un, unfortunately, the ah well perjury is an

12  even bigger crime.

13         RR:  Right but, but if you tell them I'm not gonna talk

14  to you, go to hell, you know, ah, um, you know, on such terms or

15  another, yes they can then say well okay we're giving you...

16         YK:  Well I think, I mean, yes you're right they try to

17  tie in.

18         RR:  No listen, listen, if you tell them I'm not gonna

19  talk to you, you know, they're not just gonna charge you with

20  contempt right away.

21         YK:  Yeah.

22         RR:  What they're gonna do is they're gonna take you

23  before a judge, and they're gonna say to the judge, ah, we wanna

24  talk to him, he's not talking to us.  We want you to grant him

25  immunity and then the judge will say okay why aren't you talking

915

1   and you'll say whatever, you know, because I don't wanna

2   incriminate myself.  And then the judge said okay, I'll grant you

3   immunity to what um, you know, to what you say about yourself and

4   then, you know, you go ahead, you're at least now you're a step

5   ahead of the game, at least now you have immunity about what you

6   say about yourself, anything you say about yourself can't

7   incriminate yourself.  You know what I saying?  There's nothing

8   wrong with that.  They're not just going to instantly charge you

9   with, with perj-, uh contempt.  They're gonna, they ah, if you, if

10  you refuse to talk even after they grant you immunity, then yeah.

11  But what they're gonna do is they're gonna ask you about you and

12  then you're gonna freely be able to talk about yourself because

13  anything you say about yourself isn't incriminate you.  But um,

14  they're...

15          YK:  Yeah

16          RR:  ...gonna ask you about other people and they are

17  gonna say and, and you're gonna have to say everything you're

18  gonna have to because now you have the immunity and now you have

19  no right not to say nothing.

20          YK:  Okay then let's, then what's, what's.

21          RR:  What's wrong with that right?

22          YK:  Yeah.  I mean, what I'm talking about...

23          RR:  But at least you'll, but at least...

24          YK:  ...let's get it over, okay.

25          RR:  Okay, but at least if you do that you're a step

916

1   ahead of the game because now you're not, not every word that

2   comes out of your mouth is gonna be used...

3           YK:   Inaudible..Ah, what's these, I'm a incriminate

4   everybody else.  I'd rather just incriminate myself and not

5   everybody else involved, you know, that's involved.

6           RR:   I'm just telling, I'm just telling you that at

7   least that's one way you know.

8           YK:   I think, I mean this is just me I, I, I mean,

9           RR:   Yeah

10          YK:   I think that that's, I came here thinking.

11          RR:   Yeah

12          YK:   Look you know I, fine, I went to camp, whatever, if

13  I did it wrong.

14          RR:   Yeah

15          YK:   I'll serve my time, whatever it is, hopefully it's

16  not too long you know what I mean?  It's just, if there's nothing

17  wrong, maybe they'll let me go.

18          RR:   Yeah.  Yeah, yeah, I know.

19          YK:   You, you know and I, I just really to tell you the

20  truth, I really just want to get back to Korea.

21          RR:   Yeah.  The thing is, but with the, it's not, it's

22  not that there's nothing wrong then maybe they'll let go.  The

23  thing is, if after you testify and if after examining and going

24  through a fine tooth comb, they can't find anything to charge us

25  with which is what they wanna do, then, then they'll, you know.

917

1          YK:  Um hum

2          RR:  But it's not like, you know, oh okay, now we

3    understand yeah, and they already know everything, like you said,

4    you know And I think...

5          YK:  That's the, that's the thing I don't get. They know

6    everything, but yet...

7          RR:  The fact that they didn't charge us with anything

8    means that they don't have anything to charge us with yet and

9    that fact that they...

10         YK:  But they know...

11         RR:  ...want all of us, they want all of us to testify.

12   The reason they want all of us to testify is so that they can find

13   something to charge us with.  And so if we don't talk to them,

14   they won't have, be, won't have anything to charge us with.

15         YK:  But it's not like they're gonna go, and this thing

16   can just go on and on, they'll be you know, okay, if you don't

17   mind living with, you know the FBI following you everywhere and...

18         RR:  No, no, no

19         YK:  And bug, bugging.

20         RR:  And they'll do that anyway, believe me.

21         YK:  Well, yeah well now I'm pretty much but still.

22         RR:  Yeah. Well

23         YK:  I mean the way I'm thinking is, dif-, obviously I

24   can't just get up my stuff over and go 'cause there are other

25   people involved right?

918

```
 1         RR:  Right.
 2         YK:  Right but just, wish, I wish I could do that.
 3         RR:  Yeah
 4         YK:  You know
 5         RR:  I mean me, my thinking is....
 6         YK:  I may not do it.
 7         RR:  I'm, I'm just, look, you're obviously have to make
 8  your own decision but, you know, my thinking is look, my thinking
 9  is they haven't arrested me with anything.  They can't, they've
10  arrested Ibrahim on some ridiculous immigration ch-, thing and
11  they, and they can't figure out anything to charge him with.  They
12  haven't charged anyone with anything.  So if they haven't charged
13  anyone with anything so far, and this is, this is what my lawyer
14  is telling me, then, there, it makes no sense to talk to them.
15  The reason is that, the reason they want us all to testify is so
16  that they can find something, anything to charge us with right?
17  And then ah, you know, you know, use our words to do it with.  So
18  why help them in this, in this stuff?  You know when, if you, if
19  you refuse to testify even after getting immunity and you're
20  charged with contempt and you're jailed for it, jailed for
21  contempt, which I fully expect to happen to me, you know, that is
22  going to be, you know, the the 18 months in jail, maximum,
23  maximum, maximum.  By the way, they, you can even avoid contempt
24  by the way, but I'll talk, I'll tell you about that in a second.
25  So, okay so I spend 18 months in jail right, I go to jail, I read
```

919

1   Koran, I memorize the Koran, I, you know, hang out, lift weights,

2   know what I am saying.  I don't wanna go to jail, right, but what

3   I am saying if that on the other hand I go there and I tell them

4   everything, you know, and then they manage to find something, as

5   far as I know nothing I did was illegal, but they manage to find

6   anything because they have an interest in doing it.  They want

7   their big old news conference with your face splashed all over the

8   newspapers, and talking about ... . You know what I'm saying?

9   That's what they want right?  So they find any little teeny tiny

10   thing and they, and they build a humongous scenario around it.

11   You know, they get what they want and I go to jail for I don't

12   know, longer.

13        YK:  But the thing is you, you, you hear, I mean what

14   what the Legat was saying that if you go to jail for perjury and

15   we'll find whatever to add on to this thing.

16        RR:  You won't go to jail for perjury, you'll, you'll go

17   for for for ah contempt.

18        YK:  Well contempt, what, whatever you know?

19        RR:  Yeah but yes, that's right but.

20        YK:  So, but what I am saying is that if they's gonna

21   charge us anyway, so ....why, why add 18 months you know?

22        RR:  If they were gonna charge us they would have

23   charged us.  This is what the prosecutor told my lawyer.  He said

24   if, if we had anything 'cause my lawyer says so why don't you just

25   charge him with something if you have something.  He said if he

920

1   had anything to charge him with he wouldn't be walking around on
2   the streets right now.  That's what he told him.
3           YK:  But they told me that they, everything.
4           RR:  Yeah, but they have nothing to...
5           YK:  You know everything in detail...
6           RR:  ... conspiracy to do what?  To paint a, ah, to dye
7   a puppy pink?  Really.  They have nothing, they have conspiracy to
8   do what?  This is the issue, they don't, don't have anything yet.
9           YK:  But ah
10          RR:  They are waiting for someone to say something about
11  Afghanistan.  This is what they are waiting for something to say.
12  For someone to say.  Or someone to imply.  Or somebody to let
13  slip, or, or something like that, which, to my knowledge, never
14  happened, right?  And I hope it didn't happen 'cause that was not
15  what my intention was.  They want someone to say well don't you
16  think Sheik Ali when he said go to um, to go to Mujahadeen
17  anywhere do you think that that anywhere included Afghanistan?
18  This is what he's gonna say, and if you say yes it it's
19  conceivable that it did include that you know then, say he's gonna
20  he's gonna paint this as an enterprise to one way...
21          YK:  But we, okay, but even if I, oh, oh okay, Ali did
22  say, whatever.  Ali did say join the Mujahadeen wherever they may
23  be.
24          RR:  Yeah
25          YK:  In the world.

921

1          RR:   Yeah

2          YK:   And which ever way that's open and then okay, ah,

3  for us, Kashmir was open and then...

4          RR:   Yeah.

5          YK:   ...and then, and, and we knew that, well, from what

6  we knew back then, Lashkar was the...

7          RR:   Yeah, the place to go

8          YK:   You, you know the place to go and they were onto

9  the Sunnah, or whatever,

10         RR:   Yeah, right right

11         YK:   So we chose to go there.  So...

12         RR:   They're gonna say do you, do you think that,

13  they're gonna say do you think that Ali, they're gonna ask, do

14  you think that Ali wanted people, wanted you guys to go to

15  Afghanistan?  Do you think that by saying that, this is what he

16  meant?  You know that Afghanistan was one of those places, see?

17  And they're gonna ask it in such a way that you're not gonna be

18  able to deny it.  You're gonna say no I don't think that's what he

19  meant, they're gonna say why do you think he didn't mean that?

20  And you're gonna be like ah, you know know what I am saying?

21         YK:   Well he, didn't say one place specifically....

22         RR:   No he didn't

23         YK:   ....(inaudible) but he just in general ah, so.

24         RR:   Do you see where I am going with this?  And if you

25  wind up saying anything that gives them the impression, I mean you

**J.A. 1066**

922

might not have personally had the intention of going to
Afghanistan right, but they're gonna say that Sheik Ali intended
this, you know, and you're, and they're gonna say like would you
have gone there?  Did you, did you go there with any intention
whatsoever, um or thought that you might wind up in Afghanistan?
If you say yes, it makes me part of a conspiracy and everyone else
part of the conspiracy and Sheik Ali part of a conspiracy to say,
to go to fight against Americans, you see what I am saying?  See
so he, so they're gonna, they're gonna chop and cut and paste and
parse this stuff to find anything they can do to do this to charge
us with with somehow intending to fight Americans....I know
because the, for example part of the, ah, search warrant said any,
any search, any, um, evidence of any support for Al-Qaeda or Usama
Bin Laden.

            YK:  But we didn't have anything.

            RR:  No but they're looking at some...

            YK:  That's what I'm saying really small time, we just
went to Lashkar and Kashmir..

            RR:  So are all these people that they have been
charging.. You should see, Sami Al Omar the web master for IANA,
they, they charged him with a little in, indictment and with a
little, ah, a little, I told you, some little ah, ah immigration
thing.  But, but it's like ah, ah it's a 15-page indictment and 14
of the pages are about um, um, Sheik, um, ah, um, ah, Al-Sam Auwda
(?inaudible) and how he's a radical you know, and the other page,

923

1   and about some Fatwa that IANA posted on a website that was a

2   retarded Fatwa.  This Fatwa from Shiek Uqla.  And what's he

3   charged with?  For not you know, saying that he's gonna be a

4   webmaster when he came to the U.S., and and leaving that off his

5   application only, only mentioning the doctorate that he was

6   studying for.  It's nothing, but there is 12 pages that was all

7   over the paper.  And not only that by the way, then after that,

8   they got a brother, African American brother, who um, who was an,

9   um, IANA, like wrote for IANA, did was an activist for IANA.  As a

10  result of the Sami Omar thing, so I mean.  They don't care they're

11  they're not gonna say ah, this is small time, they gonna say this

12  is small time, let's let's pump this up as big as we can they know

13  it's small time, but they're I guarantee, no lie.  I could write

14  their press release for them.  I could write Ashcroft's statement

15  for him at his news conference, how this would look, you know.

16          YK:  Who's Ashcroft, anyway

17          RR:  The (laughs) the Attorney General. The guy who...

18          YK:  Oh

19          RR:  But the head of the Justice Department, the FBI's

20  boss and you know what I am saying.

21          YK:  Oh

22          RR:  So that's the, that's the, the dilemma you know.

23  The dilemma is, do we, in the words of, of, as, as Ashraf Nubani

24  the lawyer, puts it, do we eat contempt, you know, eat the

25  contempt charge right?  Or do we testify with the a very, very

924

1    distinct possibility of fulfilling the FBI's hope that we say

2    something, anything, to give them something to charge us with?

3    Right now they have nothing to charge us with.  It's in our legal

4    interest, not just Islamic interest, it's in our legal interests

5    to say, "I am not going to talk to you.  You have something to

6    charge me with, charge me with it, if you don't have something to

7    charge me with it, then go to hell."  It's in our legal interest.

8    If they have something to charge us... all these other people, by

9    the way, they didn't um subpoena them.  I I I honestly went back

10   and I looked at, at at all of these um cases of these brothers, I

11   don't know if you have been paying attention.  They have arrested,

12   indicted a whole lot of people from IANA to the Equan groups to,

13   to other groups, to other things.  All of these people, none of

14   them, they didn't ah, they didn't bring them in to, to talk first,

15   they just got them, 'cause they had something on them...any little

16   tiny thing.  They didn't do anything.

17        YK:  That's what I think, ah, I think they're doing, if,

18   if they have something on you, they'll bring you in and lock you

19   up.

20        RR:  Yeah, look at what they did to Ibrahim, they

21   didn't, they didn't, they didn't say.....

22        YK:  And then, and then but in the end they will charge,

23   they'll get to what they want you know what I mean?

24        RR:  Yeah. But there is no point in trying...

25        YK:  But I mean, okay I understand but.

**J.A. 1069**

925

1          RR:  You, you're not gonna go to jail, your not gonna go

2     for example, if you go, if, if, if, worst case scenario, they jail

3     you for contempt for not talking.  Okay, so you're in jail for um,

4     you, know for, for 18 months, I mean how does that get you, it's,

5     it's, that does-  doesn't hurt you but then they wind up

6     eventually finding something to charge us with, I mean you know,

7     you're already in jail, so what?

8          YK:  I suppose just to add on more (laughs)?

9          RR:  No, but it doesn't add on more, it doesn't add on

10    more, you know what I am saying?  That's going on at the same time

11    as, as something else, you know what I am saying.  It doesn't add

12    on more.  And, uh yes, it is a gamble though, it's a gamble you

13    know?

14         YK:  I, I, do, do, the way I see it is, just the way

15    they told me everything in detail

16         RR:  Of course they, the, the....

17         YK:  I

18         RR:  ...way they told you but, but a lawyer will tell

19    you something different, what I've been telling you is what the

20    lawyers have been telling me, you know?  And these things don't

21    have any, you know, um, these guys have an interest... while they

22    have an interest in jailing you and charging you with something,

23    that's their, that's what they wanna do.  They don't wanna really

24    get to the truth of the matter and then if in fact you haven't

25    done anything then see you later.  They wanna see you behind bars

926

1  okay, they wanna see me behind bars and wanna get a feather in
2  their cap and they wanna get their bonuses, and this is what they
3  want.  So they're gonna tell you anything and they're gonna do
4  anything to make that happen all right?  But a lawyer is gonna do
5  anything and tell you anything he can to keep to keep your butt
6  safe and out of jail right?  You at least need to hear the other
7  side, what I have been telling you is just what I have heard from
8  these lawyers.  You owe it to yourself along with, not just to
9  hear their side of the story, you owe it to yourself to hear the,
10 the other, the real side of the story.  You know what I am saying,
11 so from the another point of view, I mean that's just from what
12 these guys, these guys will tell you anything.  That was my
13 mistake, I listened, I shouldn't have even testified in the first
14 place for these guys should have told them no.  But.  I mean well
15 I, it's in no one's interest, no one is interest that you testify,
16 not in my interest.  Not your interest, I'm not going to talk to
17 them, whatever, whatever and I can't fault you, well I, I'm not
18 gonna say oh that darn Yong, no, he just did what he thought was
19 right.  But uh, if you, knew the situation, I've been going
20 through this for over a year now and I've been where you are and I
21 thought exactly what you thought and I think differently now
22 'cause ah, I've talked to to a couple of lawyers and looked at the
23 situation, and ah, I researched it and I've heard what this
24 prosecutor is saying and how he doesn't have anything to charge
25 anyone with and I realize it.  You know, these guys don't.  The

927

1  way to do it is you go in there and you say I'm I am exercising my

2  5th Amendment right not to incriminate myself.  And, if they want

3  to bad enough, if they want to bad enough and the lawyer,

4  prosecutor by the way told my lawyer that if, that if, if he knew

5  I was gonna go in there and say that, then he's not gonna bring me

6  in 'cause he doesn't wanna go through the whole circus, yeah know.

7  But worse case scenario, they they say okay, they'll take you

8  before a judge, this guy doesn't want to talk with us and you give

9  him, and the judge said son what's going on, you tell him, look I

10  never did anything illegal, I never intended to harm, harm this

11  country, and ah, however, I believe that this is a fishing

12  expedition to ah, ah, ah, in part of an anti-Muslim campaign and

13  to find anything ah, that, that Muslims have done wrong and blow

14  it into something or whatever.  And I'm not going to participate

15  in it, they can do anything that want to Im not gonna, I, I, I

16  don't care what they do, I am not going to help and I'm not gonna

17  be a part of it and so, ah, ah, and, and so you know, say things

18  like that and these people are just shredding the Constitution for

19  what for their for their, their own political benefit, and I'm not

20  gonna help you do that.  And then the judge says, "well all right,

21  ah, I'm gonna give you immunity and well you know, whatever."  And

22  they bring me back, back, back to the prosecutor and the

23  prosecutor says all right now talk and you tell them I'm not gonna

24  talk to you for the very same reasons I told you before.  I am not

25  going to talk to you and you take me before a judge if you want

928

 1   and I'm not, I'm not co-operating and the judge will give

 2   contempt, this is the thing about the contempt, contempt is not a

 3   crime, contempt, ah, charging you with contempt is a coercive

 4   measure to get you to talk.  If the judge thinks that by putting

 5   you in jail you would talk, they'll put you in jail.  If the judge

 6   thinks that whether he puts you in jail or doesn't put you in

 7   jail, legally he can't put you in jail because it's, it's, it's

 8   not it's a coercive measure it's not a punishment, it's it's it's

 9   a way to get you to talk and then if after three months the judge

10   looks at it again and says you're still not going to talk, and you

11   go to the judge and say "Look judge, I'm hap-, I'm reading Koran,

12   I'm I'm studying religion, I'm lifting weights, I'm having the

13   time of my life...

14         YK:  Laughs

15         RR:  And I'm not gonna, I'm not gonna participate in

16   this charade."  And he, he thinks that you have balls, as what

17   Ashraf said, then he say, "all right, get out, you're you're,

18   free, you're not have to talk."  Right?  That's the thing but in

19   the whole scheme of things, grand scheme of things, you haven't

20   helped them.  You haven't given them the shovel to dig your hole

21   with.  You know?  I know I didn't do anything illegal, I know I

22   know you didn't, I know none of us did, but I don't know if you...

23         YK:  Well apparently they seem to think it's some kind

24   of a conspiracy I don't know.

25         RR:  Well think, they do think it's conspiracy, they

929

1   think that it has something to do with sending people...

2          YK:   Otherwise

3          RR:   ... to Afghanistan.

4          YK:   You know we didn't, we went to

5          RR:   Right but we didn't...

6          YK:   Lashkar, we went to the Lashkar camp in Pakistan.

7          RR:   They are looking for any connection they can make.

8   Any connection they can make. And they'll (phone rings) they don't

9   have it, they don't have it. (Phone ringing)

10         YK:   (On the telephone) Hello.  Yes.  Okay.  Three

11  o'clock?  Okay.

12         RR:   (In a whisper) Get a phone number where you can

13  reach them at or something..

14         YK:   (Still on the phone) Okay okay so you're gonna

15  provide what the transportation?  Yes, Comfort Inn.

16         RR:   Get a phone number, you can give them a call back..

17         YK:   (Still on phone) Okay

18         RR:   (In a whisper) Ask them for a phone number.

19         YK:   (Still on phone) Okay, Okay, Okay.  Thank you.

20  (Hangs up the phone) That's not Kromberg, it was somebody else.

21         RR:   Yeah I know but I was gonna say, do you have

22  Kromberg's umber by any chance?

23         YK:   Do we have to call him?

24         RR:   No, no, I'm not gonna, that's what I am saying

25  that, I'm saying that just consider this, in case you wanted to

**J.A. 1074**

930

```
 1  call him, I'm saying just consider this.  Consider calling him up
 2  and saying look, ya know, or, or consider calling a lawyer right
 3  now and having the guy call him and say ah, you know, look my, my
 4  client, I just need to confer with my client, I'm representing
 5  Yong Kwon and I don't know what's going on and you know, you know,
 6  you can't testify right now because you know ah, um, he doesn't,
 7  he didn't, he didn't have representation ah, prior to this and now
 8  he does and, and I need to know, know what's happening before I
 9  can advise him on what to do.  You're, you're you're not, ou but
10  the number one thing that's pushing you to do something right now
11  is that you're stressed out and you're nervous and your upset.
12          YK:  I mean I'm not really, up-, well ...
13          RR:  But you gotta ...
14          YK:  I mean but they ah, I mean they have my.
15          RR:  You can't make a rational decision when you are
16  nervous.  Do I appear nervous to you?  Do I look nervous to you?
17          YK:  No
18          RR:  No I am not nervous, I'm calm, I'm cool.
19          YK:  But when you are faced with this, okay, it's one
20  thing what they tell me...
21          RR:  Yeah
22          YK:  ...but it's one thing if what they tell me is true.
23          RR:  Yeah
24          YK:  It's in my face.
25          RR:  Yeah, but it's not illegal.
```

931

1        YK:  I mean they knew about, like... they knew ....

2        RR:  I know.

3        YK:  They knew we went to 7-11, bought a phone card and

4   made a phone call from the phone booth?

5        RR:  Yeah

6        YK:  How the heck, how did they know, I mean did

7   they....

8        RR:  Because Mahmoud went with us.  That's how they

9   knew.

10       YK:  I mean they even knew that, you know, Mahmoud, me

11  and Masoud were on the side and you were the one who made he

12  call...

13       RR:  Um hum

14       YK:  ...they know that you're the contact, you rang.

15       RR:  I'll give you, I'll give you two words.

16       YK:  What?

17       RR:  Mahmoud and Nabil.  That's how they know.  Now, do

18  you think that Mah, Mahmoud and Nabil they're in the same

19  situation that you are in and I was in and they, they got ah, you

20  know they got the FBI, (inaudible)

21       YK:  Okay they told them....

22       RR:  And ah, ah, ah, you know.

23       YK:  Okay so they told them too.

24       RR:  But it is their word against ours....their word

25  against ours right?

**J.A. 1076**

932

1          YK:  I understand that but it's kind of hard when
2    everything, everything else I did kind of like fits into the
3    picture.
4          RR:  No, but if, if...yeah, but if.
5          YK:  What, what I'm, okay, in the interview, what I am
6    saying, okay.
7          RR:  Yeah.
8          YK:  Give me what you guys have to give me with whatever
9    I did wrong right and that's it, you know, I, I'll admit if I'm
10   going through the Lashkar Office, Lashkar Camp, it's bad, okay.
11         RR:  Yeah
12         YK:  Back, okay.  Because I'm not gonna deny it, you
13   know, whatever.
14         RR:  Right
15         YK:  I'll pay my time, whatever I get, you know, because
16   I don't think it's gonna be very big from my understanding, from.
17   And, and, and just.
18         RR:  But it's
19         YK:  And then I can just be on my way home after maybe
20   two or three years of my...
21         RR:  70 days
22         YK:  70 days, maybe five years I don't know but
23         RR:  Yeah
24         YK:  I sure don't wanna stay in jail for whatever 20
25   years (laughs) or 35 years.

933

1          RR:   Yeah

2          YK:   Yeah

3          RR:   But what if you knew that something that you said

4    and, and something that they box you on or what kind of pressure

5    you are or push you into saying right or you know, could, could

6    wind up puttin' you in jail for 10, 15, 20 years more then you

7    would get if you didn't talk to them at all?  That' the gamble,

8    that's the gamble 'cause there's something that they're gonna be

9    able to, to make you say or appear to say that's gonna wind up

10   hurting you 50 times more then not talking to them at all.  That's

11   the question you have to ask yourself you know.  I mean you could

12   go in there today and you could wind up being pushed into saying

13   something that hurts you 50 times more then, then not talking to

14   them at all.  That's the bottom line.

15          YK:   Boy I wish I knew about all of this stuff before I

16   talked to the Legat.

17          RR:   No it, yeah, you're, you're problem is making false

18   statements to a, to a FBI Agent, to a federal agent but, but, but

19   that's not the ah, you know, that's not that big of a deal and by

20   the way I tell you, I guarantee you, that's something they're

21   gonna hold over your head, oh look, if you talk to us we'll, we'll

22   set aside that making false statement.  So you might have, where

23   right now I'm facing ah, I'm facing the, the threat of a contempt

24   thing you know?  I'm not facing like making false statements

25   because I didn't make any false statements.  You if you say your

934

1  not going to talk to them, you're facing contempt and you're also

2  facing ah, ah, making false statement, they're gonna try to hold

3  that over your head.  And by the way, you know, they also have to

4  prove that you made false statements.  They have to prove that

5  what you said is not true.  So, and, and just taking what someone

6  said about you is isn't, you know what I'm saying, proving

7  anything you know.  So...

8          YK:  Well.

9          RR:  ...I mean even that, even that has something that

10  you could have, you could have a lawyer fight and what not so,

11  they're, they're, they're not, they're not looking to do you any

12  favors.  They're not looking to put you on easy street.  They're

13  looking to jack you up.  They're looking to put your face on the

14  cover of the Washington Post.  That's what they're looking to do.

15  Right?  And everything I've heard from the lawyers is, don't help

16  them do it.  It's just you know, you know.  I mean you're not

17  smarter than them, we're not you know what I am saying that's the

18  smart way to act.  Hammad, I mean Hammad, I told, I already told

19  you, you can divide the brothers up into two groups.  They're the

20  sissies, you know what I am saying, like Nabil and Mahmoud.  And

21  you can divide the brothers you can divide the brothers into a

22  group of the guys that thought they were smart and thought could

23  outsmart the FBI.  And that's how I put you in there because you

24  talked to them (inaudible) "I just went to ..."

25          YK:  I'm not trying to outsmart anyone.

935

1          RR:  No but

2          YK:  I just want to get it over with.

3          RR:  Yeah but talk, ah, no, I'm saying you need to talk

4     to somebody I'm saying.  Anyway, brother, I, I really don't know

5     what I am doing either, honestly, any clear way to put it, that's

6     that's the way I put it and, and one more thing that you can't

7     make rational decisions if you're afraid and if you're nervous,

8     you can't do it.  You can't make rational decisions.  They'd lay

9     it on real thick to you to put you in this state, right?

10         YK:  Um hum.  They did they did, a good job.

11         RR:  Yeah, yeah

12         YK:  Turning me out in Korea

13         RR:  That's their job

14         YK:  Korea...

15         RR:  That's their job

16         YK:  ...the authorities.

17         RR:  That's their job though.  I don't think they went

18    to to Korea because really, I'm, I'm sure they have an FBI office

19    in ah, South Korea.

20         YK:  Well I don't know, Legat is there but he came and

21    he came with a bunch of Korean dudes.

22         RR:  Yeah.  No they didn't, they didn't like fly to

23    South Korea, I mean it's someone just.

24         YK:  Oh no, no, no, he was, he's stationed there.

25         RR:  Yeah, exactly

936

1         YK:  It's, it's just you know.

2         RR:  I would also say though and I'm not saying this to
3 like ah, you know, put a guilt trip on you but I would also say
4 that, you know, anything that you wind up saying, you're, you're
5 not acting just as an individual, you know what I am saying?

6         YK:  I understand.

7         RR:  You are also acting on behalf of...

8         YK:  That just, that's one, one of my main concerns so,
9 that I, I, I plan on this (inaudible) even if I admit to what I
10 did.

11         RR:  Yeah

12         YK:  And there are others involved but

13         RR:  Yeah.  See anything you say is gonna, is gonna
14 apply to us because we were part of the conspiracy...

15         YK:  Yeah

16         RR:  You know so, if, if, there's a conspiracy right
17 like they're saying we all acted together and what not, but
18 nothing bad was done, nothing illegal was done, but if you, if you
19 say something....

20         YK:  That's what I am saying is gonna....

21         RR:  ...it's gonna make it look, make it think they can
22 turn it into something illegal, that, that, that nothing bad that
23 we conspired in is now going to become something bad that we
24 conspired in.  You now?  That's the thing.

25         YK:  And that's the thing, if we didn't do anything

937

1  wrong, why don't we all just...

2        RR:  I told you, they're gonna, they're trying to find

3  something.

4        YK:  But we didn't... we never had contact, we didn't

5  have....

6        RR:  Yeah but Brother, if you look at Sami Omar, the web

7  master for IANA, he, what did he do wrong, all, all, ah, all he

8  did was on his visa application didn't put down that he was going

9  to be a webmaster at IANA.  And now he's all over the place, as

10  being ah, you know, a terrorist connected guy um, all he did was,

11  he was IANA's web master.  Is that doing something wrong, being

12  IANA's webmaster?  I can picture him sitting there saying, "I

13  didn't do anything wrong.  I was just IANA's Webmaster."  But in

14  fact he got a 15 page, a 12 page indictment against him, you know

15  what I am saying, ah 11 pages of which are, are about terrorism,

16  blab, blab, blab, Usama Bin Laden, all totally um, unconnected and

17  unconnected and irrelevant.  You know?  He had nothing to do with

18  anything.  Oh here's here's one thing they found ah, ah, hundreds

19  of pictures of, of the World Trade Center on his computer.  I

20  mean, anyone who reads the news on the Internet, you know what I'm

21  saying, it's gonna all go into, into his cache, you know his

22  cache.  So they're looking, they're looking, they're looking for

23  anything that they can paint a scary picture.  By the way, you go

24  in front of a jury, and you, and you say this and they say all

25  right and they give them something to charge you with, you're

938

1  gonna be something teeny tiny, but if you go in front of a jury

2  here in Virginia, which you know, the jury pool, all you know

3  Pentagon employees and stuff, you know what I am saying.  And you

4  go in front of them and the, prosecutor talks about you, oh yeah,

5  oh yeah, he ah, you know, ah, you know, oh, yeah, blab, blab,

6  blab, Afghanistan, blab, blab, blab, and all this stuff that's

7  just totally irrelevant....

8          YK:  Oh they have nothing to do with.

9          RR:  Right

10         YK:  Nothing to do with Afghanistan.

11         RR:  Ah, I know but I know, but ah, listen, okay, worse

12  case scenario, I mean, I'm just saying a different kind of.

13         YK:  But the answer is no.  You don't have nothing to do

14  with that, all we went to Kashmir

15         RR:  Do you think the Sheik, do you think that Ali

16  Timimi was ah, and saying, ah, ah was including in that

17  Afghanistan when he said Mujahadeen, was he including

18  Afghanistan?  Is that what he's including?  I am playing the part

19  of the prosecutor.

20         YK:  Laughs

21         RR:  Did that, did that include Afghanistan?

22         YK:  Um.. could have.

23         RR:  Could have?, did it?  Yes or no?  Yes or no,

24  Mr. Kwon?

25         YK:  It could have, I don't know.

**J.A. 1083**

939

1          RR:  It could have, okay, so.  The way you're saying is
2     that is, is that, is that, Ali Timimi was ah, was, was, urging you
3     all to go to Afghanistan to fight.  And you went to Pakistan and
4     you went with a group and that group is now on the terrorist list
5     and they tried to send, they sent people over there to fight,
6     according to these intelligence reports from an un-named country
7     and according to unnamed ah, ah, our intelligence sources and so
8     you know, yadidididi....you know what I am saying?  And there it
9     goes you know.  Which is total baloney, its its garbage, it's,
10    it's frankly, you know, excuse my language, it's bullshit.  You
11    didn't go there with the intention of fighting Americans.  You
12    didn't go there.

13         YK:  No I didn't, I didn't

14         RR:  But let me tell you something else. What if they
15    have one of these, ah, ah, ah, Nabil or Mahmoud, these oh these oh
16    you know weak ass brothers, I am sorry to say and they said, "Do
17    you think that ah, that ah Yong, was Yong trying to go there, to
18    Afghanistan?  Did he say anything to you to indicate that he, that
19    he would even consider going to Afghanistan?"  "Well he did say
20    something that sounded like, you know, sound like once he got
21    training there, you know, that ah, and he wanted, wound up getting
22    a chance to go to Afghanistan.  He would like..." I don't know if
23    you said that or not.  Maybe you just said it but you didn't mean
24    it.  Maybe you said it at the time and, ah, in the heat of the
25    moment, but you didn't really mean it, you wouldn't really do

940

1  that.  You know what I am saying, but they got two or three
2  people, they got two brothers who say you did that, say you said
3  that.  That's what your intention was, and it's all based on
4  intention.  See what I am saying?  And they're gonna put you in a
5  situation and they're gonna say did you say that?  And you're
6  gonna be like (inaudible).  Because now all they have is heresay.
7  They have people saying this, you know what I am saying?  But then
8  they're gonna say be like, "Damn, I don't know if I said that or
9  not."  And maybe you did say it, let's say you did say it.  Or I
10 don't know if you said it or not.  But let's say you did, say it
11 just, just BS'ing right but you didn't really mean it.  And later
12 you go well ah, ah, and you say well yeah I said it. (Inaudible)
13 If you say I didn't say it, you, you, you know you don't wanna
14 lie, you can't lie to them.
15         YK:  No.  I didn't say it.
16         RR:  No you didn't say it.  But, but what I'm saying is
17 you're in your mind and you're going well maybe I said it, gosh I
18 don't know, if these two guys are saying it maybe I did it I don't
19 know.  I mean, frankly, I don't know if I said that, you know what
20 I am saying?
21         YK:  Um hum.
22         RR:  I'm sure I didn't say it but I don't know what I
23 said, like you know you just, you remember how at that time when
24 everyone was all jazzed up and stuff?  You know what I am saying?
25 Ah, you don't, you don't wanna lie and say well no I didn't say

941

1    that and they've got two people saying maybe, ah, you don't know

2    if they have it on tape.  You know what I am saying?  And you're

3    sitting there saying no I didn't say it and then later well what

4    is this?  Here's you saying it.  You know what I mean?  In no

5    circumstances does it benefit you to put yourself in that kind of

6    microscope.  It doesn't help.

7          YK:  Yeah

8          RR:  It's not gonna help anything.  Because they're not

9    looking to get to the truth from you.  They're not looking to

10   prove you innocent.  They're looking to find anything that they

11   can find so that they can put your face on the front of the

12   Washington Post saying this is, you know, you're a terrorist cell

13   busted, and you know.  That's what they're trying to do.

14   Desperately and they haven't found it yet.  Haven't found it, if

15   they had found it you'd be in jail and I'd be in jail.  And

16   they're hoping by the time you're done testifying they'll have it.

17   You know what I am saying, that's the bottom line of it.

18         YK:  But have what though?

19         RR:  You know

20         YK:  Like you said, ah, ah, like you said this, this is.

21         RR:  What they will have is garbage.  But what they'll

22   have is, they'll have something to hang their hat on.  They're

23   gonna ask you every question and every possible which way that

24   they can to get something to hang their hat on.  You know?  You

25   and I both know that no one, none of us planned to go into

942

1   Afghanistan to fight Americans, none of us wanted to do any kind
2   of thing like that.  You know?  That's what they want to find.
3   They have a scenario and they're trying to make the facts fit
4   their scenario.  And they'll do anything that can possibly do to
5   do that.  You know.  They not interested in justice, in fairness,
6   in truth, they're interested in putting us in jail and putting us
7   on the front of the paper and getting ah, getting Bush elected and
8   getting promotions and you know, however, ah, that's what they're
9   interested in.  That's what we're up against.  And it's not in any
10  way whatsoever in our interest to help them do that.  You know.
11          So, what I would do is, you know, call some bad ass
12  lawyer.  Who's gonna call them up and he's gonna chew them out,
13  chew out this prosecutor.  And he's gonna say look, you know, you
14  got anything to charge him then you do it, if you don't, you leave
15  him alone, you don't have to talk to yadidididi you know what I am
16  saying?  They'll do it they'll do the same thing they did to me,
17  they cancelled my thing.  And I haven't heard from them.  He just
18  not calling my guy back, my lawyer back.  He told me he didn't
19  want a circus where he put, puts me up, up there and testify, I
20  mean I don't testify and I just plead the 5th and whatnot.  And as
21  far as people following me around me around, you know what I'm
22  saying?
23          YK:  Um hum
24          RR:  I don't care what they do you know?  Charge me,
25  charge me, don't charge me then I'm living my life, you know?  You

943

1  know?  I don't necessarily think it's the wrong thing that you

2  came back here.  It's probably a good thing.  'Cause you know,

3  you're overseas, they can, you know, at least here, your, the

4  Constitution is applying to you, you know what I am saying?

5  (Laughs)

6           YK:  Yeah, that's true.

7           RR:  You know.

8           YK:  (Laughs) that's true.

9           RR:  You know?  And any time in the future if they ever

10  come to you and try to call you just say just call my lawyer, just

11  call my lawyer, just call my lawyer.  You won't ever have to hear

12  their bullshit again, their psychological warfare again, they'll

13  have you, you'll, you'll, they, they have no right to talk to you.

14  Unless they arrest you they have no right to talk to you.  They

15  can only talk to your lawyer, and they're not going to try

16  anything like that with him 'cause he's a lawyer he knows what to

17  do, he knows what's right and what's wrong, your lawyer knows, he

18  knows the situation, he knows the law.  You know, if you, if you

19  can afford it, I would get the toughest lawyer you can find.  You

20  know?  As a matter of fact, ah, I would get like, I would like

21  ah, Stanley Cohen who's this a lawyer in New York, he is like man,

22  this guy he's, he's...

23           YK:  What is he like 100, 10, like a million dollars

24  (laughs).

25           RR:  No, no, he's, he's ah, he's like ah, I mean he

**J.A. 1088**

944

 1  probably, he probably charges, he, he, might even do pro bono, but

 2  if you can afford it, I would pay him 'cause this guy's, this

 3  guy's handling Muslims like all over the place and he needs some,

 4  you know what I am saying.

 5       YK:  I'll call him

 6       RR:  Yeah. Yeah, he probably wouldn't charge more like,

 7  I don't know, probably 100 bucks an hour.  A lot less then what

 8  anyone else would charge, you know.  He's he's he's a lawyer for

 9  like all, this one, Muslim brother, Imam, out in Oregon?  And they

10  ah arrested him saying he was ah, ah, ah, you know, ah, somehow

11  like connected to Bin Laden blab, blab, blab, and ah, everything

12  like that.  And Stanley Cohen took the case for free he got off

13  for like having, ah, ah you know, making a false statement on a

14  Social Security card application or something like that, um, no

15  time.  You know what I'm saying?  So.  And believe me if they know

16  Stanley Cohen is you lawyer, yeah, you know, it's gonna be,

17  they're gonna deal with you in a whole different way.  You know?

18  I would, I would right now, I would commit to not saying one more

19  word to them and not having to deal with it.  You call a, right, a

20  lawyer right now and that, that lawyer will call them, and you'll

21  never have to talk to them again, unless, unless you are arrested.

22  You never have to talk to them again.  Even if you're arrested you

23  don't have to say anything, you know what I'm saying?  You never

24  have to talk to them.  It's all gonna be through the lawyer.  And

25  if the lawyer tells you, "Look, man. You know, here's the

945

1  situation, you know.  Probably it's a good idea to go and talk to

2  them."  You haven't lost anything.  So what?  Okay you know, if

3  that's what you think, you know, if that's what you think is best

4  to serve your interests.  Because that's what he's going to be

5  looking at, is for your interests, you know.  Not to put you in

6  jail, like these guys are.  You know, then do it, but you haven't

7  lost anything.  So what?

8         YK:  Yeah.

9         RR:  You know what I'm saying?

10        YK:  Well, maybe I'll give them a call.  Maybe I'll get

11 there and tell them I'm gonna plead the 5th until I get a lawyer..

12        RR:  That's what I'm gonna do, that's what I'm doing,

13 and to me, 18 mon... and, and by the way you come out of jail for

14 contempt, there's nothing on your record, it's not a crime.

15        YK:  Yeah

16        RR:  It's just a coercive thing.  Believe me brother, 18

17 months in jail with nothing on your record looking a lot better to

18 me than me getting in front of there and saying something stupid

19 and getting put in a situation.  Man I, and, and saying something

20 stupid that's going to wind up getting us there.  And boy if I was

21 asked the questions that, that, I was pretending to ask you, I'd

22 say, do the same thing as probably you would, you would say and

23 I'd probably say something and wind up putting my, my butt and

24 everyone's else's, you know what I'm saying, in hot water.

25        YK:  Well I think, it's all playing (inaudible) you

946

```
 1  know, it's all, you know.

 2         RR:  These guys that are talking, they are not the, the
 3  key people.  Me, you and Ali, these are the key people.  You know
 4  what I am saying.  They don't need people...they don't need these
 5  guys, ah, ah, you know, it, ah, these guys right now are saying
 6  stuff about that's still heresay.

 7         YK:  Well they are making us out to be like the bad guys
 8  you know.

 9         RR:  Probably, but so what?  They, they can say what
10  they wanna say, but that's not enough to charge them with
11  something just because someone says something.  They still have
12  to, this is the crucial, crucial thing to realize about federal
13  ah, federal issues like this.  The federal, federal agencies
14  alright, don't charge someone, don't indict someone unless they
15  know or, or are very certain that they can get a conviction.
16  Cause they don't, 'cause if, if a prosecutor, a prosecutor doesn't
17  charge someone just for, just to pressure them.  He charges them
18  if he knows he can get a conviction because if someone, if a
19  prosecutor charges someone and then can't get a conviction, then
20  it's ah, it looks very bad on his record, you know what I am
21  saying?  It, this this is how these guys work, they, they're,
22  they're careers are based on how many pros-..., how many
23  convictions they get relative to the, to the charges that they
24  file.  So, so, if they're not sure that they can get a conviction
25  they are not gonna do it.  They're not just gonna charge us for,
```

947

1  you know what I am saying, for something.  Now if they, if they

2  thought, if they, wanted to, you know, they would have charged us

3  by now if they had something to charge us with.  And they're not

4  gonna charge us unless they are sure they can get a conviction.

5  Right now they have nothing to charge us on.  That's the thing.

6  So.  And these guys Hammad and, you know, even Hammad tried to be

7  Mr. Smart Guy and his ah, by the way, his thing was cancelled as

8  well you know, he doesn't have to testify either...he started

9  telling them look I am not gonna talk to you, so then they they

10  they cancelled his thing....if he's got to say, you know, to say

11  something or other, ah, you know, that's still that's not enough.

12  That's enough to give them the context and the questions that they

13  can ask us, but that's not enough to charge us with.  And they

14  can't charge them without charging us.  They can't charge them for

15  conspiracy they didn't even do anything.  We are the ones that are

16  really, you know, doing something, you know, it's even though what

17  we did wasn't illegal.  You know.  I would call Ashraf right now.

18  I'd call Ashraf, Ashraf being there just as a stop gap measure and

19  because Ashraf probably won't be able to represent you he is

20  representing like ah Hamdi.  But, Ashraf will call him for you or

21  will call up Stanley Cohen right now and he'll tell him and you

22  should do it quickly, do it quickly."

23          (End of excerpt.)

24          THE COURT:  I've looked at the rest of this.  Let's cut

25  this at this point.  This is highly repetitive, and it's time for

948

## Kneisler - direct

1   the morning break.

2           There are no more tapes, correct, that you're playing?

3           MR. KROMBERG:  Not on this subject, and we're going to

4   go to another witness if we can next.

5           THE COURT:  All right, that's fine.

6           So, Ladies and Gentlemen, we'll have a recess until a

7   quarter of.  Thank you.

8           (Recess from 11:27 a.m., until 11:54 a.m.)

9                       (Defendant and Jury present.)

10          THE COURT:  All right, Mr. Gibbs, I assume you're going

11  back to Mr. Kwon?

12          MR. GIBBS:  Actually, Judge, we're continuing the

13  testimony that Special Agent Hodge provided earlier.  I've got

14  three FBI agents to call to prove up the chain of custody in that

15  particular Zip disk, and we'll start with Special Agent Tracy

16  Kneisler.

17    SPECIAL AGENT TRACY KNEISLER, GOVERNMENT'S WITNESS, AFFIRMED

18                     DIRECT EXAMINATION

19  BY MR. GIBBS:

20  Q.   Ma'am, would you please state your name and also spell it for

21  the record?

22  A.   My name is Tracy Kneisler, T-r-a-c-y K-n-e-i-s-l-e-r.

23  Q.   And, ma'am, who are you employed by?

24  A.   I'm employed by the FBI.

25  Q.   And what particular office?

949

## Kneisler - direct

1   A.    In the Washington Field Office.

2   Q.    Ms. Kneisler, were you involved in the execution of two

3   search warrants on May 8 of 2003?

4   A.    I was.  I was involved in a search of the residence of Masaud

5   Khan and Ali Chandia.

6   Q.    And why was it that you went to the search of Ali Chandia?

7   A.    I was the seizing agent at that search.

8   Q.    And where did Ali Chandia live?

9   A.    He lived on -- in Germantown, on Meadowbrook Court or

10  something like that.

11  Q.    In Germantown, Maryland?

12  A.    Yes.

13  Q.    And what are the responsibilities of a seizing agent?

14  A.    The evidence is collected by the collecting agents, who are

15  actually doing the searches in the individual rooms of the

16  residence, and all of that evidence is brought to a central person

17  who takes custody of that evidence, and that's the seizing agent,

18  and that was my job.

19  Q.    And when the seizing agent takes custody of all the evidence

20  in one central location, what does the seizing agent do with it?

21  A.    The seizing agent makes sure that it's administratively been

22  collected in the way it should be in that all the locations are

23  noted, the items that are actually said to be collected are

24  actually there, and also that -- in this case, I transported that

25  evidence back to our field office, sealed it according to FBI

## Kneisler - direct

1  policy, and checked it into evidence control.

2  Q.   Special Agent Kneisler, I'd like to have you take a look at

3  two items.

4         If I could provide these to the witness?  The defense

5  has already seen these.

6         Now, Special Agent Kneisler, you have before you what

7  have been marked as Government's Exhibits 10H2 and 10H3.  Do you

8  recognize those two items?

9  A.   Yes, I do.

10  Q.   And what are those two items?

11  A.   10H2 is a Zip disk.  10H3 is the storage bag, the collection

12  bag in which the Zip disk was collected from the residence on

13  May 8, 2003, by John Hodge, who's a task force officer in the

14  Baltimore FBI Field Office.

15  Q.   And is 10H2, the disk that's contained in there, is that one

16  of the items that you took into your custody as the seizing agent

17  on May 8, 2003?

18         MR. MAC MAHON:  Your Honor, I'm going to object.

19  Detective Hodge testified yesterday he couldn't identify the

20  actual disk himself.  So if the foundation is that he couldn't

21  identify it and he wasn't sure, I don't see how this witness can.

22         THE COURT:  With evidence collection, if the officer on

23  the scene picks up an item and puts it in an evidence bag, seals

24  the evidence bags, and puts his initials on it, and then that bag

25  is turned over to a second agent, that's normally how a chain of

# Kneisler - direct

1  custody is established.

2  And Hodge, although I don't think he -- as I recall his

3  testimony -- and it's the jury's recollection that always counts

4  anyway -- but as I recall it, Hodge may not have actually put his

5  initials on the item itself, but I thought his testimony was that

6  he initialed the evidence bag in which he put the item, and my

7  understanding is that's what 10H3 purports to be.

8  MR. MAC MAHON:  I thought what he said was -- he did

9  identify the bag, Your Honor --

10  THE COURT:  Correct.

11  MR. MAC MAHON:  -- but he couldn't identify the contents

12  of the bag.

13  The bag isn't --

14  THE COURT:  It doesn't make any difference.  If he put

15  the item in the bag, and that was his testimony, and then sealed

16  the bag and initialed it, and he recognizes the sealed, initialed

17  bag, unless there's evidence that the bag was somehow tampered

18  with, that normally establishes a sufficient chain of custody.

19  Continue with your testimony.  So the objection is

20  overruled.

21  MR. GIBBS:  Thank you, Judge.

22  Q.   Special Agent Kneisler, in terms of the bag itself, 10H3,

23  what did you do with that item?

24  A.   The bag contained a floppy disk, a Zip disk, a resume, and a

25  pay stub, and for our analysis purposes in our investigation,

# Kneisler - direct

1   computer evidence is handled by a different group of people.  It

2   has to be analyzed in a different way than, say, paper evidence,

3   which a resume and a pay stub would be.

4           So I took the floppy disk and the Zip disk and placed it

5   in another package which was sealed and turned in to evidence.

6   It's just a separate item number.

7   Q.   And did you do anything with 10H3, the bag that you had taken

8   it out of?

9   A.   The 10H3 was resealed.

10  Q.   Okay.  And was it sealed when you got it?

11  A.   10H3 was not sealed when I got it.

12  Q.   And again, what was in 10H3 when you received it?

13  A.   A resume, a pay stub, a Zip disk, and a floppy disk.  I don't

14  remember that specifically, but I do know that I checked what was

15  in the bag with what was written on the bag at the time of the

16  search for all of the items because it was my responsibility to

17  clarify any discrepancies that existed there.

18  Q.   And where did you take 10H3, the bag containing the Zip disks

19  and the other items, after you received them from Task Force Agent

20  Hodge?

21  A.   They were transported by me in my vehicle back to our field

22  office in Washington, and custody was turned over to our evidence

23  control room.

24  Q.   And you testified about separating out the computer media

25  from the other items.  Was there a reason that you did that?

953

## Kneisler - direct

1   A.   The reason why I did that was for analysis.  The computer

2   evidence has to be analyzed in a different way than the paper

3   evidence.  More things have to be done to it.  So for chain of

4   custody purposes later, so that -- it would ultimately have to be

5   split, so before it was ever checked in, I split it.

6   Q.   And when you split it, did you use Government Exhibit 10H4 to

7   maintain those items?

8   A.   Yes, I did.

9   Q.   All right.  Can you just hold that up for the jury?

10                      (Witness complying.)

11  Q.   Now, what is that item?

12  A.   This is just the paper envelope that I put the floppy disk

13  and the Zip disk into from the bag that John Hodge gave to me.

14  Q.   And did you -- the Government's Exhibit 10H4, the paper

15  envelope, did you seal that up?

16  A.   Yes, I did.  And I signed it and initialed it with the date,

17  which was the date of the search.

18  Q.   May 8, 2003?

19  A.   Exactly.

20  Q.   And after signing the, the envelope and sealing it up, where

21  again did you put it?

22  A.   We have an evidence control room, facility in our field

23  office, and so I took it to them and handed over custody to them.

24  Q.   And the policy that you just described today for how you

25  handled this evidence, is this consistent with FBI policy?

## Kneisler - cross

1  A.    Yes.

2  Q.    And once you turned in Government's Exhibit 10H4 to the

3  evidence control room at the Washington Field Office, did that

4  conclude your duties with regards to this evidence?

5  A.    It did.

6          MR. GIBBS:  All right, thank you.

7          That's all I have, Judge.

8          THE COURT:  All right.  Mr. MacMahon?

9                      CROSS EXAMINATION

10  BY MR. MAC MAHON:

11  Q.    Did you make any notes on any of the files as to what color

12  the disk was when you got it?

13  A.    I did not.

14  Q.    Do you have any recollection of what color disk was given to

15  you by Officer Hodge?

16  A.    I do not.

17          MR. MAC MAHON:  Nothing further, Your Honor.

18          THE COURT:  All right.  Any redirect?

19          MR. GIBBS:  No, Judge, thank you.

20          Thank you, Special Agent Kneisler.

21          THE COURT:  All right.  Then, Special Agent, you're

22  excused as a witness.

23          I assume no one's going to call this witness again,

24  correct?

25          All right, then you're excused as a witness.  That means

955

## Mamula - direct

1  you can stay in court and watch the proceedings, or you may leave,

2  but you're not to discuss your testimony or anything you hear

3  during the trial with any witness who has not yet testified.

4  Thank you.

5                    (Witness excused.)

6          THE COURT:  Call your next witness.

7          MR. GIBBS:  Special Agent Chris Mamula, Your Honor.

8          THE COURT:  All right.

9            SPECIAL AGENT CHRISTOPHER PAUL MAMULA,

10              GOVERNMENT'S WITNESS, AFFIRMED

11                  DIRECT EXAMINATION

12  BY MR. GIBBS:

13  Q.    Sir, will you please state your name for the record and also

14  spell it?

15  A.    Yes.  Christopher Paul Mamula.  The last name is spelled

16  M-a-m-u-l-a.

17  Q.    Sir, who are you employed by?

18  A.    I'm employed by the Federal Bureau of Investigation.

19  Q.    And what office do you work in?

20  A.    The FBI Washington Field Office.

21  Q.    And were you one of the agents involved in the investigation

22  of Ali Al-Timimi?

23  A.    Yes, I was.

24  Q.    Now, Special Agent Mamula, as part of that investigation, did

25  you receive a Zip disk that was recovered from the residence of

**Mamula - direct**

1    Ali Asad Chandia?

2    A.    Yes, I did.

3    Q.    And what was the reason that you reviewed that Zip disk?

4    A.    As considering Ali Asad Chandia was an unindicted

5    coconspirator in the case and connected to Mr. Ali Timimi --

6         MR. MAC MAHON:    Your Honor, I object to his giving his

7    theory of relevancy.    If he can testify to why he looked at the

8    disk, that's fine.

9         THE COURT:    I'll sustain the objection.    Agent, just

10   explain why you were looking at the disk and what you did.

11        THE WITNESS:    Yes, ma'am.    I was looking at the disk

12   for, for evidence in the investigation of Mr. Timimi and

13   Mr. Chandia.

14   BY MR. GIBBS:

15   Q.    And can you take a look at Government Exhibit 10H4?    I

16   believe it's right there.

17   A.    Okay.

18   Q.    Do you recognize that item?

19   A.    Yes, I do.

20   Q.    And what is that item?

21   A.    This was the envelope that held the Zip disk.

22   Q.    And how can you tell that?

23   A.    Well, I can tell that because my initials and date are on

24   here, and I also recognize the envelope from Special Agent

25   Kneisler's writing on it as well and the evidence number and the

## Mamula - direct

1 item number.

2 Q.   All right.  Now, Special Agent Mamula, how many times did you

3 take Government's Exhibit 10H4 out of the evidence control room in

4 order to examine the Zip disks?

5 A.   Well, I -- in total, I took it out three times:  one time

6 immediately after the search; then the second time on December 13

7 of 2004, and that's when I actually removed it from the envelope

8 to be processed and reviewed; and then I took it out again on the

9 5th of April of 2005 to bring down to the United States Attorney's

10 Office.

11 Q.   This past Tuesday?

12 A.   Yes.

13 Q.   Let's go through all three of those.  First of all, the first

14 time you took it out of the evidence control room immediately

15 after the search, did you break the seal on the envelope?

16 A.   I did not.

17 Q.   And was the envelope maintained properly in terms of FBI

18 procedure regarding custody of evidence?

19 A.   Yes, it was.

20 Q.   And did you return it to the evidence control room?

21 A.   Yes, I did.

22 Q.   Now, how about the second time?  You said in December?

23 A.   Yes.  I took it out, I opened the envelope to see and to

24 actually take a look at the Zip disk, and after just -- I did not

25 put it into any computer.  I just literally just looked in to see

958

## Mamula - direct

1   what was actually in the envelope.  And after that, I sealed it

2   back up.  I put my name and my initials on it -- or my initials

3   and date and returned it to the evidence room.

4   Q.   And what did you do at that point?

5   A.   And at that point, I sent a lead over to our CART squad to

6   have them analyze the disk as they would probably do.

7   Q.   And can you explain what the CART squad is?

8   A.   Yeah.  They're they -- it's the computer analysis team.

9           MR. GIBBS:  All right, thank you, Special Agent Mamula.

10  That's all I have.

11          Thank you, Judge.

12          MR. MAC MAHON:  No questions, Your Honor.

13          THE COURT:  All right.  Anybody going to call this

14  witness again?

15          MR. GIBBS:  I don't believe so, Your Honor.

16          THE COURT:  All right, just so I'm clear then, so you

17  physically handled that exhibit, 10H4, three times?

18          THE WITNESS:  Yes, ma'am.

19          THE COURT:  And the first time, you took it out of the

20  evidence room and then put it just right back in?

21          THE WITNESS:  Yes, ma'am.  It was actually -- I actually

22  took all the evidence out from the search.  That is one piece of I

23  don't know how many documents, just several, several documents.

24  That item itself was packaged in, in an evidence folder with

25  numerous other disks.  So I pulled it out just to get an idea of

959

## Mamula - direct

1   what was all in the search, but I did not do anything with that

2   disk at the time.

3          THE COURT:  All right.  So the only time you did

4   anything with the disk was on the December, the second time you

5   touched it?

6          THE WITNESS:  Yes, ma'am, the second time, and then when

7   I brought it down to the U.S. Attorney's Office on the 5th of

8   April.

9          THE COURT:  What condition was 10H4 in when you picked

10  it up on April 5 to bring to the U.S. Attorney's Office?

11         THE WITNESS:  I actually got it directly from the CART

12  examiner who had examined and had made the, made the copy of that

13  disk, and it was in the -- it was in the envelope, except this

14  time it had an initial on it, the CART examiner's initials.

15         THE COURT:  On the disk itself?

16         THE WITNESS:  Yes, ma'am.

17         THE COURT:  And what condition was 10H4 in?  Was it

18  sealed or unsealed?

19         THE WITNESS:  No, it was unsealed.

20         THE COURT:  All right.  Any follow-up questions from

21  either side?

22         MR. MAC MAHON:  No, Your Honor.

23         MR. GIBBS:  No, Judge.

24         THE COURT:  No?  Is Agent Mamula going to be called

25  again?

# Monday - direct

1          MR. GIBBS:  That's what I was going to say; it's

2    possible.

3          THE COURT:  I can't excuse you.  You'll have to stay

4    outside.

5          THE WITNESS:  Yes, Your Honor.

6                    (Witness stood down.)

7          THE COURT:  All right, call your next witness.

8          MR. GIBBS:  CART Examiner Monday.

9          THE COURT:  Monday?

10         MR. GIBBS:  Yes, Judge.

11         THE COURT:  All right.  Now, unless I've missed it, the

12   witness list that I've got I don't think -- may not be accurate.

13   I'd like you to get me a new one on Monday so I just know which

14   one is going to be called.  That's all.

15         MR. KROMBERG:  That's true, Judge.  And I apologize, but

16   this was a last-minute thing, these custodial witnesses.  We've

17   been so good on the stipulations up to --

18         THE COURT:  That's all right.  I don't need to know why.

19   I just want to make sure I have an updated list.

20         MR. KROMBERG:  If I can say, Judge, you have the updated

21   list after this witness, the list you already have.

22         THE COURT:  All right.

23    SPECIAL AGENT DONALD L. MONDAY, GOVERNMENT'S WITNESS, AFFIRMED

24                    DIRECT EXAMINATION

25   BY MR. GIBBS:

# Monday - direct

1  Q.    Sir, will you please state your name for the record and also

2  spell it?

3  A.    Donald L. Monday, D-o-n-a-l-d L. M-o-n-d-a-y.

4  Q.    And, sir, where do you work?

5  A.    I work for the FBI.

6  Q.    And which office?

7  A.    The Washington Field Office.

8  Q.    And what is your position with the Washington Field Office?

9  A.    I'm a special agent, but I'm also a certified Computer

10 Analysis Response Team forensic examiner.

11 Q.    And does that also go by the acronym of a CART examiner?

12 A.    It does.

13 Q.    And what training do you have as a CART examiner?

14 A.    I've been doing computer crime investigations for over five

15 years.  As a CART examiner, I've been doing this for 34 months,

16 and I've been a certified CART examiner for 19 months.  To

17 become --

18 Q.    I'm sorry, what does it mean to be a certified CART examiner?

19 A.    To become certified as a CART examiner takes approximately 12

20 to 24 months of on-the-job training.  It also means that I've

21 attended a two-week boot camp.  I've also attended and am

22 certified in the use of AccessData's forensic tool kit, and I'm

23 certified to do Windows and Linux examinations.

24 Q.    And what is your experience as a CART examiner?

25 A.    I've done well over 100 CART exams.

962

## Monday - direct

1   Q.    Special Agent Monday, I'd like you to take a look at an

2   exhibit, I believe it's maybe on the table next to you, 10H2 and

3   10H3, the clear plastic bag.

4   A.    Correct.

5   Q.    All right, do you recognize that item?

6   A.    Yes, I recognize 10H2.

7   Q.    And what is 10H2?

8   A.    It's a 100 MB Fuji film Zip disk.

9   Q.    And how do you recognize it?

10  A.    When I took it out of the evidence storage bag, I put my

11  initials on it, and I also wrote in the lower left corner "ZD-1"

12  for Zip disk 1.

13  Q.    All right, you said you took it out of the evidence storage

14  bag.  If I can have you take a look at the second item, which is

15  10H4?  Do you recognize that item?

16  A.    I do.

17  Q.    And what is that item?

18  A.    That is the bag that the evidence was stored in, and it was

19  sealed with evidence tape, which I broke the seal on it.

20  Q.    And after you broke the seal on the evidence tape and took

21  the disk out, did you initial it immediately?

22  A.    I did.

23  Q.    And what did you do with the disk at that point?

24  A.    There were approximately -- there were approximately 20

25  items, including some CD-Roms that were in this same evidence

963

**Monday - direct**

1   chain.

2   Q.   It was all computer media?

3   A.   It was all computer media.

4            And I didn't have a chance to finish this -- imaging

5   this item on the day that I signed it out, so I took it and stored

6   it in the evidence storage area on the case squad, and I didn't

7   actually process it until the -- I signed it out on the 23rd of

8   February at 3:15 p.m., and then I processed it on the 25th of

9   February.

10  Q.   And the location where you maintained it from the 23rd to the

11  25th, is that an approved evidence storage area?

12  A.   It was the evidence storage area for the case squad, so yes.

13  Q.   Okay.  And when you processed that particular disk, the one

14  you have there before you with your initials on it, what exactly

15  did you do with it?

16  A.   I had Windows write blocker software installed on my

17  computer, and then I took the Zip disk and put it in my computer

18  and made an image of it.  The Windows write blocker software

19  prevented any writes to the Zip disk so that I couldn't alter it

20  in any way.  Then I put it back into this evidence storage

21  container, this bag.

22  Q.   Can you hold that up again?

23           All right.  So you put the original disk back in there?

24  A.   Correct.  And I worked off an image copy.

25  Q.   And what did you do with the original disk and the evidence

**Monday - direct**

1    bag?

2    A.    It was -- I transported it after I imaged it on the 25th to

3    our work area at Tysons Corner, where it was stored in an area

4    that's controlled by a key pad and badge access and a combination

5    lock.

6    Q.    And again, is that an approved storage facility for evidence

7    at the Washington Field Office -- or by the Washington Field

8    Office?

9    A.    It is.

10    Q.    And so when you talk about imaging the disk, essentially, you

11    copied it, correct?

12    A.    Correct.  I made a bit-for-bit copy of the original.

13    Q.    All right.  And that way you could work off of the copy and

14    not the original, correct?

15    A.    Correct.

16    Q.    And what did you do once you had made the copy?  What did you

17    do with that image?

18    A.    I took that image and processed it in a forensic program that

19    we use.  It's a program created by a company called AccessData,

20    and the name of the program is Forensic Tool Kit, or FTK is what

21    we call it.

22    Q.    Okay.  And just to go back briefly, the original disk and

23    evidence bag it was contained in, what ultimately happened with

24    those two items?

25    A.    I returned them to Agent Chris Mamula for storage.

965

## Monday - direct

1  Q.   At the evidence control room?

2  A.   He transported them back to the evidence control room, I

3  believe.

4  Q.   All right, thank you.

5        Now, going back to the image of the Zip disk that you

6  made, when you reviewed that, did you find that there were a

7  number of Microsoft Word documents on that disk?

8  A.   Yes, I did.

9  Q.   And, Special Agent Monday, is there any way to tell which

10 Microsoft Word documents are authored by a particular individual?

11 A.   Yes, there is.

12 Q.   And how can that be done?

13 A.   Each Word or any Microsoft Office document has what's called

14 Meta-Data that's associated with it, and Meta-Data includes such

15 fields as a title, the subject, who the author of the document is,

16 who the last author is, how many times the document has been

17 revised, when it was created, when it was last saved, and what

18 Microsoft Office product was used to create the document.

19 Q.   All right.  And let's go back -- just for the record, can you

20 spell Meta-Data?

21 A.   M-e-t-a-hyphen-D-a-t-a.

22 Q.   And you said that among the things that will be included in

23 the Meta-Data is the author of a particular document and the last

24 author of a particular document; is that correct?

25 A.   That's correct.

966

## Monday - direct

1  Q.   And last author means last person to work on it or revise it,
2  right?
3  A.   Correct.
4  Q.   Now, how does the Word program assign authorship to a
5  particular document?
6  A.   When you install Word on your computer, there's a fill-in
7  screen that comes up that asks you what the name of the registerer
8  of the product is, and whatever name that you type in for
9  registering that program is what gets assigned as the author by
10  default whenever you create a document on that particular version
11  of Word.
12  Q.   All right.  And just so we're clear on this then, if I buy a
13  computer and install Word on it, when I have to register and type
14  in a name, if I type my name in, John Gibbs, whenever I work on a
15  document on that computer, it will say "authored by John Gibbs";
16  is that correct?
17  A.   Correct.
18  Q.   Now, you testified that there were a number of files on that
19  particular Zip disk that the Meta-Data made available.  How many
20  files was it approximately?
21  A.   There were 54 files that we were able to find Meta-Data on.
22  Q.   And of those 54 documents, who was listed most often as
23  either the author or the last author of the documents?
24  A.   Mr. Al-Timimi.
25  Q.   Ali Al-Timimi?

## Monday - direct

1  A.    Right.

2          MR. MAC MAHON:  Your Honor, there's a list that the

3  government's given me if they want to put it in evidence.  I

4  assume this is what he did.

5          MR. GIBBS:  Judge, we'd have no objection to putting

6  that in evidence.

7          THE COURT:  All right, go ahead.  What's the number?

8          MR. GIBBS:  Judge, I think we're up to 10H5 in this

9  series, and we'd be happy to make it a government exhibit.

10          (Government's Exhibit No. 10H5 was marked for

11  identification.)

12          THE COURT:  Oh, in other words, it's not in the book?

13          MR. GIBBS:  No, Judge.

14          THE COURT:  Well -- all right, 10H5.  And this is a

15  printout, as I understand it, of this Meta-Data; is that correct?

16          MR. GIBBS:  It's a printout of the names of the

17  documents that were recoverable on the disk; that's correct,

18  Judge.

19          THE COURT:  All right.  Do you want to publish that to

20  the jury?  We've been publishing everything else.  If you don't

21  need to, let's just move along.

22          MR. GIBBS:  Well, yeah, why don't we go ahead and

23  publish it.  That's fine, Judge.

24          MR. MAC MAHON:  If I may, Your Honor, I think it's a

25  printout of the names of the files on the disk just to be --

968

# Monday - direct

1       THE COURT:  The files for which there is Meta-Data or

2  just the file -- is there a difference in what you found?  Were

3  there files without Meta-Data?

4       THE WITNESS:  There were, yes, ma'am.

5       THE COURT:  Well, what is this that we're looking at?

6  Is this every file that you printed out or just the ones with

7  Meta-Data?

8       THE WITNESS:  I did not personally produce that list.

9  It was produced by the case squad.  I believe that every file that

10  I was able to extract that they were able to print, that they

11  included in that, in that particular spreadsheet that he has.

12       MR. GIBBS:  Right.  And it's a three-page spreadsheet,

13  Judge.  I'm happy to have the witness take a look at it.

14       THE COURT:  All right.  Mr. Wood, if you would?

15       THE WITNESS:  Yes, someone manually went through it and

16  recorded who the author was for each one of the documents with

17  Meta-Data in it and who it was last saved by, which is the same as

18  who the last author is.

19  BY MR. GIBBS:

20  Q.   Now, you testified a moment ago -- well, actually, why don't

21  we go ahead and publish that, Judge, really briefly.

22       THE COURT:  All right, if you'd give that back to

23  Mr. Gibbs, please?

24  BY MR. GIBBS:

25  Q.   Now, Special Agent Monday, you testified a moment ago as it

# Monday - direct

1  comes up on the screen regarding the Meta-Data that was available

2  on the Zip disk that you examined, correct?

3  A.    Correct.

4  Q.    And that there -- in the Meta-Data, it will give you the name

5  of the document, author, last author, correct?

6  A.    Correct.

7  Q.    And on the spreadsheet itself, we have author, last saved.

8  The last saved is the same as last author?

9  A.    Correct.

10  Q.    Okay.  And it was your testimony that Ali Timimi was listed

11  most often as the author on the 54 items that you could recover,

12  correct?

13  A.    Correct.

14  Q.    Now, what does that indicate to you, that he was listed most

15  often as author or last author?

16          MR. MAC MAHON:  Your Honor, objection as to that.  The

17  document speaks for itself.  There's been no proffered expert

18  testimony as to this witness.

19          MR. GIBBS:  Judge, I'll proffer him as an expert.

20          THE COURT:  Well, I think he --

21          MR. GIBBS:  He's certainly qualified.

22          THE COURT:  He certainly is qualified to be an expert in

23  the area of forensic computer science.

24          MR. MAC MAHON:  This document says who the author is.

25          THE COURT:  All right.  Well, I'm going to overrule the

970

# Monday - direct

1  objection.  The witness is qualified as an expert and may testify.

2      MR. GIBBS:  Thank you, Judge.

3  Q.  Do you want me to repeat the question?

4  A.  Yes, please.

5  Q.  What does it indicate to you that Ali Al-Timimi was listed

6  most often as the author, last author on the Meta-Data that you

7  reviewed?

8  A.  That the majority of the documents that were saved on this

9  disk were documents that were created with a version of Word that

10  was registered to someone called Ali Al-Timimi or that -- when it

11  comes up as last authored, it means that, that the document was

12  created by someone else but it was opened in his version of Word

13  and then saved again.  Probably some revisions were made.

14  Q.  All right, maybe you can elaborate on that.  If somebody else

15  worked on a document on that particular disk but in a different

16  computer, it would say that it was authored by a different name or

17  a different person?

18  A.  Correct.  I saw two documents that -- where that occurred.

19  Q.  And then you testified that there could be a difference,

20  though, between that individual as the author and last author.

21  How would that come about?

22  A.  The original author created it on a version of Word that was

23  registered to someone else, and then it would have been opened

24  again in Word on the other person's version of Word, and they

25  would have saved it, or they could have gone into Windows Explorer

### Monday - direct

1   and gone into properties and changed the properties there as well.

2   Q.   But without taking those steps, the default function would

3   make the last author the person who had opened it in a computer

4   that Microsoft Word was registered to?

5   A.   Correct.  If they saved it, then they would become the last

6   author.

7   Q.   And that's how you could have a different author versus last

8   author?

9   A.   Correct.

10  Q.   And, in fact, if a disk was swapped back and forth, that

11  could certainly happen, correct?

12  A.   Yes.

13  Q.   Now, other than Ali Timimi, were there any other individuals

14  listed as author, last author?

15  A.   There were.

16  Q.   And do you recall who those were?

17  A.   I do.  I have these notes that I will refer to.

18  Q.   Fine.

19  A.   There were -- Ali Timimi had the majority of the documents.

20  There were also documents authored and last authored by Billy Joe

21  Bob; Soliman, SRA; Helaskar, H-e-l-a-s-k-a-r; Information

22  Technology; Capital CSI; Capital HPFC; Suliman, S-u-l-i-m-a-n; and

23  then two documents just said "a," lower case "a" as the author,

24  with no last author.

25  Q.   Now, after you did that search, did you also run individual

## Monday - direct

1  search terms on the Zip disk?

2  A.    I did.

3  Q.    And did you run some of the names you've just testified

4  about?

5  A.    I did.

6  Q.    And could you give us an indication of how many hits you got

7  for the name Ali Timimi?

8  A.    Well, I just searched on the word "Timimi," and I came back

9  with 804 hits and 85 different files for the word "Timimi."

10  Q.    How about the name "Chandia"?  Did you run that?

11  A.    I did.

12  Q.    How many hits did you get for Chandia?

13  A.    Three hits on one file.

14  Q.    How about the name, you spelled it for us, Suliman?  Did you

15  run that name?

16  A.    I did.

17  Q.    How many hits did you get for Suliman?

18  A.    There were 53 hits on 22 files.

19  Q.    And how about the name Billy Joe?

20  A.    There were 40 hits and 56 files.

21  Q.    And finally, the name Billy Bob?

22  A.    There were 60 hits in three files.

23  Q.    Thank you.

24        Now, Special Agent Monday, are you familiar with the

25  term "free space" or "slack space"?

973

# Monday - direct

1  A.    I am.

2  Q.    And what does that term mean?

3  A.    A good way to think of it is if you think about a VHS tape,

4  if you had a two-hour long VHS tape and you only recorded a

5  30-minute show on the VHS tape, the other hour and a half of the

6  tape would be very similar to the slack space on a computer.

7  Q.    So it's empty space in some sense that can be recorded on; is

8  that correct?

9  A.    It's space that is no longer addressed by the file allocation

10  table.  It's space that the computer doesn't -- it believes that

11  that space that's available to be written to, that it's not being

12  occupied by an unknown file on the media at that time.

13  Q.    And is it possible to search free space?

14  A.    It is.

15        MR. MAC MAHON:  Objection as to possibilities, Your

16  Honor.  If he could rephrase the question?

17        THE COURT:  All right, sustained.  Go ahead.

18  BY MR. GIBBS:

19  Q.    In your experience, can free space be searched?

20  A.    Yes.

21  Q.    And in this case, did you search the free space on the disk

22  there that has your initials on it, 10H2?

23  A.    The program that I use automatically does what's called

24  indexing for every file and all the free space that's on the disk,

25  and it's similar if you've used the Google search engine, it uses

974

# Monday - direct

1  a similar algorithm to index everything that's on there.  So it

2  indexes the free space as well as the files themselves.

3  Q.   And I think I misspoke a few minutes ago.  You searched the

4  actual disk that you had copied, correct?

5  A.   The image of the disk, correct.

6  Q.   The image, right.  And when you searched that free space,

7  what, if anything, did you find?

8  A.   Well, actually, I made it available to the case agent, to

9  Chris Mamula, who came over and typed the search terms that he was

10  interested in, and he searched the term "Ali Timimi," and then he

11  showed me the results that he found, and he found what appeared to

12  be some kind of a --

13          MR. MAC MAHON:  Objection, Your Honor, as to what the

14  other agent found through this agent.

15          THE COURT:  Well, if you saw -- were you looking over

16  his shoulder or looking at the screen?

17          THE WITNESS:  I was in my office, which is -- he was

18  searching just outside of my office, so he asked me to come out

19  and look at what he had found.

20          THE COURT:  So you looked at what he had found?

21          THE WITNESS:  I did.

22          THE COURT:  Then this witness can testify to that.

23  Overruled.

24          THE WITNESS:  Then I went back and repeated the search

25  myself as well.

**J.A. 1119**

## Monday - direct

```
 1              THE COURT:  All right.
 2   BY MR. GIBBS:
 3   Q.    And when you did that, what did you find?
 4   A.    I found a chat session between someone called Ali Timimi and
 5   someone he called aqdcksa.
 6   Q.    Now, can you explain to the jury what a chat session is?
 7   A.    It's a method that you can use via text to communicate with
 8   somebody else who's on the Internet.
 9   Q.    And how can a chat session be recorded on a Zip disk like the
10   type that you looked at?
11   A.    Well, by default, most of the chat software does not have
12   recording turned on, so most likely someone either cut and pasted
13   this document into something like a word processing document, or
14   they had logging turned on, and they had it saved to the Zip disk.
15   Q.    And, sir, if I could have you take a look at Government's
16   Exhibit 10H1a?
17              MR. MAC MAHON:  Can we approach on this, Your Honor?
18              THE COURT:  Yes.
19              (Bench conference on the record.)
20              MR. MAC MAHON:  We don't have it in our book.  I just
21   got it today.
22              THE COURT:  This is something that just came in?
23              MR. GIBBS:  It is.
24              THE COURT:  All right.
25              MR. MAC MAHON:  If I may, Your Honor, this is a brand
```

## Monday - direct

1  new exhibit that was given to me about a day ago.  My objection to

2  all this computer evidence, we never got this drive.  This has

3  been seized two years ago.  We never were given the disk, were

4  never given any access to it.  We don't have any way to search and

5  check these things out ourselves, and at the last minute, we get

6  handed this.

7        This disk has, I assume, has something to do with this

8  case.  It's more of, it looks like one of Bin Laden's speeches.

9  It's totally undated.  It's rule 16 material if they think it's my

10  client talking.

11        MR. KROMBERG:  Judge, I can answer this.  I sent the

12  letter to Mr. MacMahon last fall, saying that every piece of

13  computer equipment and media that was seized by any one of the

14  coconspirators was available for his inspection.  He came to the

15  WFO, he looked at stuff, he had many copies made, and he chose not

16  to look at this particular thing.

17        I gave him that Internet chat session not yesterday but

18  the day I got it, which was, I believe, last week or maybe it was

19  Monday of this week, but I think it was last week.

20        Last night we found that the Internet chat session says

21  Ali Timimi sends to aqdcksa, which is the same guy from 10D19, Ali

22  Timimi says here, "I'm sending you Bin Laden's latest," and the

23  Zip disk had the very latest that was referenced in the Zip disk.

24  That's why it was significant because it shows he was, in fact,

25  Ali Timimi communicating in an Internet instant message thing.

977

# Monday - direct

1      MR. MAC MAHON:  It's irrelevant because no one can date

2 this thing.

3      MR. KROMBERG:  We can date it because Ali Timimi says in

4 the chat session this came out, and Mr. MacMahon knows when it

5 came out, in October of 2001.  Mr. Timimi says, "The FBI just

6 approached my brother.  They're harassing."  We know when that

7 happened as well.

8      THE COURT:  All right, that's enough to put the time

9 frame on it.

10     MR. MAC MAHON:  It's still something -- I asked for --

11 I'm not accusing Mr. Kromberg of doing anything improper.  I asked

12 if there was computer-generated stuff.  We asked for Ali Timimi's

13 computers, couldn't even open those.  There was never any

14 disclosure that there was a disk seized from Ali Chandia that I

15 should look at.

16     They found this thing working on it last night.  It's

17 unfair.

18     MR. KROMBERG:  If I can answer --

19     THE COURT:  Just a second.  Today is the last day this

20 week this trial will be in session.  You've got all day tomorrow

21 and the weekend to digest this.  I don't hear any evidence and I

22 don't, I don't find that the government did anything wrong.

23 They've got a mountain of evidence in this case.

24     I agree that your saying to defense you can come and

25 check anything you've got is a little bit like a needle in a

# Monday - direct

1    haystack, but the point is if they didn't get it until Tuesday or

2    Wednesday, whenever they got it, and they gave it to you as soon

3    as they got it, that's how it is.

4            When did you get this?

5            MR. MAC MAHON:  Just right now I got this.

6            THE COURT:  All right.

7            MR. MAC MAHON:  I got the chat session in a different

8    form, and I'll accept Mr. Kromberg's word as to whether it was

9    Monday or Tuesday of this week.  I don't recall specifically.

10           MR. GIBBS:  And he's right about that.  The first two

11   pages Special Agent Monday went through, and there was additional

12   data before the chat session started.  We initially exhibited it

13   as 10H1.  This is 10H1a, which the last 25 pages or so are

14   identical.  The first two pages are the additional data that

15   Special Agent Monday pulled out today -- or yesterday.

16           MR. KROMBERG:  Which the date of the Bin Laden case is

17   nothing new.  The identical copy was seized in Arabic from

18   Mr. Timimi's house, which we had a stipulation that that's what

19   was seized, and we had a stipulation that it was in the indictment

20   that it was seized from Masaud Khan's house in English.  We have a

21   stipulation that the English was seized from Masaud Khan's house.

22           So the Bin Laden statement itself is nothing new.

23   What's new is that it was filed in free space that was referenced

24   in the IM session, and that's what the reference is of it at this

25   particular moment.

## Monday - direct

1          THE COURT:  Well, again, I'm going to let it in, and if

2    for some reason you can't get whatever you need to digest it, I

3    may give you a little extra time next week to figure out if you

4    need extra time to address this because it's newly discovered

5    evidence.

6          MR. MAC MAHON:  I need the disk, Your Honor.  I need the

7    disk if I'm going to find it.

8          MR. GIBBS:  Sure, we can make that happen.

9          THE COURT:  Do you want a copy of the disk, or do you

10   want the actual one they worked on?

11         MR. MAC MAHON:  If it's an authentic mirror image, that

12   would be good.  If we could get it tomorrow?

13         MR. KROMBERG:  Sure.

14         MR. GIBBS:  Yeah.

15         THE COURT:  You've got to give it to Mr. MacMahon in a

16   format they can use.  I don't want that issue coming up tomorrow,

17   okay?  Yes.  Okay.

18         So you'll get a mirror image of the copy, or I don't

19   have any problem if you want to work off of the copy that Monday

20   worked off of.

21         MR. MAC MAHON:  Well, that has different problems with

22   it.

23         MR. GIBBS:  We can talk about it.

24         MR. MAC MAHON:  In terms of maintaining the evidence.

25         MR. KROMBERG:  Just for the record, by reference -- and

# Monday - direct

1  again, I have wonderful relations with the defense attorneys in

2  this case; I don't mean no suggest otherwise.  I just want to

3  clarify for the record that the hard drive Apple laptop that was

4  seized from Mr. Timimi was returned a year or two ago; I don't

5  even know when.  It was returned a long time ago.

6         It's come to my attention lately that it doesn't -- for

7  some reason, the defendant is not able to read it, but I didn't

8  know that until recently, and I'm not sure what I do about it at

9  this point.  But the issue is not that the computer wasn't

10 returned, just it turns out that the defendant says he can't look

11 at his computer that we returned.

12        THE COURT:  Well, maybe some time tomorrow should be

13 spent talking to your tech people if Mr. MacMahon --

14        MR. MAC MAHON:  It was returned in February, and all the

15 computers, I guess, sat in the storage facilities of the FBI.

16 None of them worked.  He had three of them, and not one of them

17 can be opened up or gotten into at all.

18        And it's not Mr. Kromberg's fault, so I'm not joining

19 his statement of --

20        MR. KROMBERG:  Have you gotten a professional to come

21 and look at them?

22        MR. MAC MAHON:  Yes.

23        MR. KROMBERG:  And they said what the problem --

24        MR. MAC MAHON:  They're done.  They're not working.

25        THE COURT:  Do you want to have Monday look at them?

981

## Monday - direct

1    He's here.

2         MR. KROMBERG:  Yeah.

3         THE COURT:  Let's not take up the jury's time on this.

4         MR. MAC MAHON:  Thank you, Your Honor.

5         (End of bench conference.)

6    BY MR. GIBBS:

7    Q.   Special Agent Monday, you're looking at what's been marked as

8    Government Exhibit 10H1a.  Do you recognize that document?

9    A.   I do.

10   Q.   What is that document?

11   A.   This is information that was found in the free space when the

12   keyword search was done for Ali Timimi.

13   Q.   And that was the free space off of the, the image that you

14   made of Exhibit 10H2, the Zip disk?

15   A.   Correct.

16        MR. GIBBS:  Thank you.  Judge, at this time, I would

17   move 10H1a into evidence.

18        MR. MAC MAHON:  Just subject to the objection we had at

19   the bench, Your Honor.

20        THE COURT:  All right, I'm going to overrule the

21   objection.  It is in.

22        MR. MAC MAHON:  Thank you.

23        (Government's Exhibit No. 10H1a was received in

24   evidence.)

25        THE COURT:  Now, what about the foundational exhibits,

982

## Monday - cross

1  the other 10H series?  I don't think they're in evidence yet, are

2  they?

3          MR. GIBBS:  No.  Judge, realistically, I'm not sure

4  there's any evidentiary significance to them.  That was really

5  primarily related to chain of custody.

6          THE COURT:  All right, that's fine.

7          MR. GIBBS:  And with that, Judge, that's all I have.

8  Thank you.

9          THE COURT:  All right.  Mr. MacMahon?

10                    CROSS EXAMINATION

11 BY MR. MAC MAHON:

12 Q.  Now, how many people have overall saved information on this

13 Zip disk that you were looking at?

14 A.   I can't answer that question.

15 Q.  Do you even know who saved any information on that Zip disk?

16 A.   No.  All I can tell you is who the author of different

17 documents were.  I don't know who physically saved them on the

18 disk.

19 Q.  And you don't know who physically wrote anything that's on

20 the disk, either, do you?

21 A.  No.  All I know is the registered information for the word

22 processing program that was used.

23 Q.  And if somebody downloaded a document off the Internet that

24 had been written by somebody else, what registry would that come

25 up under?

## Monday - cross

1  A.    If it was a Microsoft Office document, it would still have
2  the Meta-Data associated with it for the original author.
3  Q.    So if, if someone in the Chandia home downloaded somebody
4  else's work from the Internet, it would -- and it was in Microsoft
5  Word, it would say -- and it was Ali Al-Timimi's, that's what it
6  would say on it, right?
7  A.    That's correct.  Unless they picked it up and physically
8  altered the properties, it would still have Mr. Timimi's name on
9  it if it was created in a version of Word that was registered to
10 him.
11 Q.    All right.  So if the -- if somebody had a computer that was
12 given to them or lent to them by someone else, then everything
13 they saved on that computer would come up with the properties of
14 the person who originally set up the computer, right?
15 A.    Correct.
16 Q.    And you don't know -- you don't even know which computer this
17 disk drive was attached to, do you?
18 A.    No, I don't.
19 Q.    Didn't make any effort to see?
20 A.    Well, I did search for the OS, and it came up with -- I found
21 where there were three hits for Mac OS-9.
22         THE COURT:  Explain to the jury "OS."  Is that operating
23 system?
24         THE WITNESS:  Oh, I'm sorry.  Yes, it's the Macintosh
25 operating system, version 9.

984

## Monday - cross

1          And I also called Microsoft engineers on three different

2    occasions, and they were not able to give me a definitive way to

3    be able to tell which computer that the disk had been in.

4    BY MR. MAC MAHON:

5    Q.    Okay.  And how many computers were at Ali Chandia's house?

6    A.    I don't know.  I wasn't part of the search.

7    Q.    Did you ever see any kind of a document that told you how

8    many computers were at his house?

9    A.    No, I have not.

10   Q.    Okay.  If someone had created the chat session you looked at

11   on a Mac, you wouldn't be able to tell from looking at that

12   document, would you?

13   A.    No.

14   Q.    No attributes at all would show up?

15   A.    Not necessarily.

16   Q.    Were you able to figure out the chat session that you were

17   looking at, what program that was done in?

18   A.    No.

19   Q.    Does that have any footers saying who initiated or ended that

20   chat session other than what you have on the document?

21   A.    No.

22          MR. MAC MAHON:  Just one second, Your Honor, if I could?

23          THE COURT:  Yes, sir.

24   BY MR. MAC MAHON:

25   Q.    Is there a difference between a Mac -- excuse me.

985

## Monday - cross

1          THE COURT:  That's all right.

2    BY MR. MAC MAHON:

3    Q.   Is there a difference between a Mac OS-10 and a Mac OS-9?

4    A.   Yes, there is.

5    Q.   And what is the difference?

6    A.   It's a -- the Mac OS-10 is a later version of the operating

7    system.

8    Q.   And what, what year was the later version, did that come out?

9    A.   I'm not certified as a Mac examiner, so I don't know.

10   Q.   And do you know when the Mac 9 came out?

11   A.   No, I don't.

12   Q.   Okay.  This chat session that you have in front of you, was

13   that done in Mac or Windows; can you tell?

14   A.   No, I could not tell.

15   Q.   If something was done in Mac 10 as opposed to Mac 9, would

16   there in your experience be a way to tell the difference?

17   A.   I don't know.  I know very little about Macintosh computers.

18   I couldn't --

19   Q.   And you never gave this to a Mac examiner to see where it

20   might have come from in terms of Mac software?

21   A.   No, I did not.

22          MR. MAC MAHON:  Nothing further, Your Honor.

23          THE COURT:  Any redirect?

24          MR. GIBBS:  No, Judge, thank you.

25          Thank you, sir.

## Monday - cross

1    THE COURT:  I assume no one's going to call this witness
2    again, or is there a possibility?
3    MR. GIBBS:  Well, it's probably a possibility, Judge.
4    THE COURT:  All right.  Then, Agent Monday, you'll have
5    to remain outside of the courtroom.  I know you won't be called
6    again today.
7    I mean, is that a fair assumption, he would not be
8    called again today?
9    MR. GIBBS:  That is a fair assumption, Judge.
10   THE COURT:  You can go back to your office.  Do not
11   discuss your testimony or anything you've heard in court with any
12   witness who has not yet testified.  Thank you.
13   THE WITNESS:  Okay.
14   THE COURT:  But you're on recall.  You may have to
15   testify later on.
16              (Witness stood down.)
17   THE COURT:  Your next witness?
18   MR. KROMBERG:  Judge, the next witness, we'd like to
19   continue again with Mr. Kwon, although I do have stipulations I
20   could read in.
21   THE COURT:  Why don't we use the time now for the
22   stipulations rather than having Kwon come up here and then take
23   the lunch break.
24   MR. KROMBERG:  Thank you, Your Honor.
25   THE COURT:  All right.

987

1          MR. KROMBERG:  First, Judge, yesterday there were three

2    stipulations which we put into evidence, but I don't think that we

3    moved in the underlying documents that were referred to on the --

4    on those stipulations.  Stipulation 29 reflected that Exhibits

5    3A1, 3A2, and 3A2a were seized at the home of Ibrahim Al-Hamdi,

6    and that stipulation was entered, and I wanted to move into

7    evidence and proffer to the jury at least 3A1 -- excuse me, at

8    least 3A2, which is Hamdi's rifle.

9          THE COURT:  Is there any objection to those other than

10   what was previously discussed with the Court?

11         MR. MAC MAHON:  No, Your Honor.

12         THE COURT:  All right, those three exhibits are in.

13         (Government's Exhibits 3A1, 3A2, and 3A2a were received

14   in evidence.)

15         THE COURT:  Stipulation 29 is already in.

16         MR. KROMBERG:  Correct, Your Honor.

17         And if we could proffer to the jury 3A2, which is one of

18   the rifles?

19         THE COURT:  Mr. Wood, 3A2?

20         MR. KROMBERG:  3A2a is ammunition, if it's easily

21   findable down there.

22         THE COURT:  All right.  Just so we're clear, this weapon

23   and the ammunition were seized from the what?

24         MR. KROMBERG:  Home of Ibrahim Al-Hamdi.

25         THE COURT:  When?

988

```
 1           MR. KROMBERG:  February 25, 2003.
 2           THE COURT:  All right.  All right, Mr. Kromberg?
 3           MR. KROMBERG:  Thank you.  On Stipulation 32, Judge,
 4  which was admitted yesterday, there were two exhibits referenced.
 5  One was 10D19, which we already moved into evidence and we've had
 6  some discussion about.  There's another exhibit on Stipulation 32,
 7  6A12, that we'd like to move into evidence at this time.
 8           THE COURT:  Any objection?
 9           MR. MAC MAHON:  No objection, Your Honor.
10           THE COURT:  All right, it's in.
11           (Government's Exhibit No. 6A12 was received in
12  evidence.)
13           MR. KROMBERG:  If I could, I'd like to proffer that to
14  the jury.
15           THE COURT:  Yes, sir.  And just so the record reflects,
16  this is an e-mail message?
17           MR. KROMBERG:  That's correct, Judge.  The -- the
18  stipulation was that this is a record of Yahoo! that was kept in
19  the ordinary course of business.  In any event, it's from Caliph
20  Basha Abdur Rahman-Raheem, Thursday, February 6, 4:32, 2003,
21  apparently to altimimi@yahoo.com, and down below, it says, "To:
22  altimimi@yahoo.com; Subject:  Fwd.
23           "Assalaamu Alaikum Rahmahtullah, Kayfa haluka?  kayfa
24  ahluka?  Ya Sheik can you please help this sister out.  To my
25  knowledge the only thing that has to happen when pertaining to
```

J.A. 1133

989

1    divorce The husband just says divorce and this is it.  Allahualm

2    Please help us.  And also Ahkie I really miss you teaching us this

3    deen.  Stay strong and may Allah protect you and your Family and

4    the muslims every where Ameen I love you for the sake of Allah

5    Assalaamu Alaikum Rahmahtullah.

6              "Caliph Basha Ibn-Abdur-Rahman Raheem."

7              Thank you.

8              Judge, Stipulation 35 referred to items seized at

9    Surratt's house, one of which -- I think 7A36, I believe, has

10   already been admitted into evidence and shown to the jury, I

11   think -- excuse me, that was a picture that we had, but 7A15, I

12   believe, has not been moved in yet, and I'd like to move that in

13   and show that to the jury.

14             THE COURT:  Any objection to 7A15?

15             MR. MAC MAHON:  7A15, Your Honor?

16             THE COURT:  Yes.

17             MR. MAC MAHON:  That's found at Mr. Surratt's house?

18             THE COURT:  Yes.

19             MR. MAC MAHON:  No objection, Your Honor.

20             THE COURT:  All right, it's in.

21             (Government's Exhibit No. 7A15 was received in

22   evidence.)

23             MR. KROMBERG:  "Latest statement from Usama Bin Laden

24   Correctly translated.  All praise belongs to Allah.  We praise

25   Him, seek His aid, seek His forgiveness.  And we seek refuge with

him from the wicked [promptings] of our souls and the evil

[consequences] of our deeds.  And I bear witness that there is

none worthy of worship but Allah alone and I bear witness that

Muhammad is His slave and his Messenger.

"To proceed; So here is America, Allah has struck it in

one of its vital points, so He destroyed her greatest of

buildings.  And unto Allah is all praise (al-hamd) and He has

favored us with this blessing (al-minna).  And here is America

filled with terror from its north to its south, from its east to

its west.  And unto Allah is all praise (al-hamd) and He has

favored us with this blessing (al-minna).  So what America tastes

today is just a little of what we have tasted for decades.  For

indeed our ummah for some 80 plus years has tasted this

humiliation; so its children are killed, and its blood shed, and

its holy places transgressed; and it is slaughtered by what Allah

has not sent down.  And there is none to hear or respond [to our

cries].

"So when Allah -- subhanahu wa ta'ala -- led to success

a star from the stars of Islam and a vanguard from the vanguards

of Islam -- [so] Allah gave them victory so they destroyed America

with a great destruction -- I ask Allah -- subhanahu wa ta'ala --

to raise their position and provide them with the high Firdaws.

"So when these [men] replied on behalf of their

oppressed children, and on behalf of their brothers and sisters in

Palestine and in many lands of Islam -- the world in its entirety

991

shouted.  Unbelief (kufr) shouted and hypocrisy (nifaq) followed
it.

          "Until this moment which I am speaking, a million
innocent children have been murdered [and are still being
murdered] for no sin they have committed and we do not hear [any
voice] denouncing that and we do not hear any fatwa from the
scholars of the rulers [regarding that].  And during these days,
Israeli tanks and death machines spread destruction in the
lands -- in Janeen, in Ramallah, in Rafah, in Bait Jaalo, and
elsewhere in the lands of Islam and we do not hear anyone raising
a voice or getting up to do something [about that].

          "So if after 80 years the sword befalls on America, the
head of hypocrisy comes out and feels sorry for those murderers
who played with the blood, honor, and holy places of the Muslims.
The least what can be said regarding [those scholars] is that they
are sinful (fasiqa).  They followed falsehood, and they gave
victory [by their words] to the butcher over the lamb and the gave
victory [by their words] to the oppresser over the innocent
[Muslim] child.  So Allah is sufficient for me against them and I
ask Allah -- subhanahu wa ta'ala -- to show us what they deserve
[from His punishment]."

          Judge, the next stipulation is Stipulation No. 33,
Government Exhibit No. 12-33:  "The United States and the
defendant hereby stipulate and agree that Government Exhibits 7A1,
7A20, 7A38, 7A39, 10A9, 10A24, 10A25, 10A26, 10A27, 10A29, and

992

1    10A33 were seized from the residence of Ali Timimi on or about

2    February 25, 2003."

3            And we move in -- I'd like to hold off moving in those

4    exhibits, just get that stipulation in, 12-33.

5            THE COURT:  Any objection to the stipulation?

6            MR. MAC MAHON:  No, Your Honor.

7            THE COURT:  All right, the stipulation, which is 12-33,

8    is in, and the other exhibits mentioned are not yet.

9            (Government's Exhibit No. 12-33 was received in

10   evidence.)

11           MR. KROMBERG:  Thank you, Your Honor.

12           Stipulation No. 2, marked as Government Exhibit 12-2:

13   "The United States and the defendant hereby stipulate and agree

14   that Government Exhibit 1A1 was seized from Royer's house during

15   the execution of a search warrant in 2003."

16           1A1 is a passport, I believe, Judge.

17           THE COURT:  Any objection to 1A1 or 12-2 going in?

18           MR. MAC MAHON:  No, Your Honor.

19           THE COURT:  All right, they're both in.

20           (Government's Exhibit Nos. 1A1 and 12-2 were received in

21   evidence.)

22           MR. KROMBERG:  Thank you.

23           Stipulation No. 43:  "The United States and the

24   defendant hereby stipulate and agree that Government Exhibits 7H17

25   and 7H18 are authentic representations of the United States

**J.A. 1137**

993

1    Department of State," and we move 12-43, 7H17, and 7H18 into

2    evidence.

3            THE COURT:  Any objection?

4            MR. MAC MAHON:  No, Your Honor.

5            THE COURT:  All right, all three are in.

6            (Government's Exhibit Nos. 7H17, 7H18, and 12-43 were

7    was received in evidence.)

8            MR. KROMBERG:  Stipulation No. 44:  "The United States

9    and the defendant hereby stipulate and agree that at all times

10   relevant to the indictment, the United States was at peace with

11   India and Russia," and that's Government Exhibit 12-44.

12           THE COURT:  Any objection?  If it's been stipulated to,

13   there is none, so it's in.

14           (Government's Exhibit No. 12-44 was received in

15   evidence.)

16           MR. KROMBERG:  Stipulation No. 26, marked as Government

17   Exhibit 12-26:  "Government Exhibits 2A1, 2A2, 2A6a, 2A6b, 2A7,

18   and 2A19 were seized by the government from the residence of

19   Masaud Khan on May 8, 2003.  Government Exhibit 2A20 is an

20   accurate photo of a laptop computer seized from the residence of

21   Masaud Khan on May 8, 2003.  Government Exhibit 2A20a is a copy of

22   an e-mail stored on May 8, 2003, in the laptop computer depicted

23   as 2A20."

24           Now, I'm not moving in the underlying exhibits at this

25   point, but I would like to move in Government Exhibit 12-26, which

994

1   is the stipulation.

2           THE COURT:  All right.

3           MR. MAC MAHON:  No objection, Your Honor.

4           THE COURT:  All right.

5           (Government's Exhibit No. 12-26 was received in

6   evidence.)

7           MR. KROMBERG:  The United States -- excuse me,

8   Government Exhibit 12-27:  "The United States and the defendant

9   hereby stipulate and agree that Government Exhibit 2C2 constitutes

10  copies of authentic records of Vesta Technologies maintained in

11  the ordinary course of its business."

12          We're not moving in 2C2 at this time, but we do want to

13  move in 12-27.

14          THE COURT:  All right, it's in.

15          (Government's Exhibit No. 12-27 was received in

16  evidence.)

17          MR. KROMBERG:  Government Exhibit 12-56, Stipulation No.

18  56:  "The United States and the defendant hereby stipulate and

19  agree that Government Exhibit 10T10 was seized from the residence

20  of Ali Timimi on or about February 25, 2003."

21          We're not moving in 10T10 at this time, just Stipulation

22  12-56.

23          THE COURT:  All right, it's in, 12-56.

24          (Government's Exhibit No. 12-56 was received in

25  evidence.)

995

1          MR. KROMBERG:  I have more, Judge, if this is a good
2   time for them.
3          THE COURT:  Yes, go ahead.
4          MR. KROMBERG:  Okay.  Stipulation No. 17, Government
5   Exhibit 12-17:  "The United States and the defendant hereby
6   stipulate and agree that Government Exhibit 10B2 is an authentic
7   recording of a telephone call involving Ali Al-Timimi and Soliman
8   Al-Buthe on or about January 21, 2003."
9          MR. MAC MAHON:  I think it's January 31, Your Honor.
10          MR. KROMBERG:  I'm sorry, that's what I intended to say.
11          MR. MAC MAHON:  I think you said 21st.
12          MR. KROMBERG:  January 31, 2003.
13          THE COURT:  All right.
14          MR. KROMBERG:  And I'd like to move both of those in at
15   this time.
16          THE COURT:  Any objection?
17          MR. MAC MAHON:  No objection, Your Honor, other than the
18   prior objection that we made before.
19          THE COURT:  All right.  Well, then they're both in.
20          (Government's Exhibit Nos. 10B2 and 12-17 were was
21   received in evidence.)
22          MR. KROMBERG:  All right.  Government Exhibit 12-18,
23   Stipulation 18:  "The United States and the defendant hereby
24   stipulate and agree that Government Exhibit 10B2a is an accurate
25   translation of the transcription of the telephone call recorded on

996

1  Government Exhibit 10B2."

2          THE COURT:  In other words, the 10B2 conversation was in

3  a foreign language?

4          MR. KROMBERG:  Correct.

5          THE COURT:  And 10B2a is the translation of that?

6          MR. KROMBERG:  Correct.

7          MR. MAC MAHON:  That's correct, Your Honor.

8          THE COURT:  All right.  So 12-18 and 10B2a are in.

9          (Government's Exhibit Nos. 10B2a and 12-18 were received

10  in evidence.)

11          MR. KROMBERG:  Thank you, Your Honor.  The next several

12  are going to be similarly structured.  The first stipulation goes

13  to the recording of the telephone call; the next stipulation is

14  the translation of the telephone call.

15          THE COURT:  All right.

16          MR. KROMBERG:  Government Exhibit 12-19, Stipulation No.

17  19:  "The United States and the defendant hereby stipulate and

18  agree that Government Exhibit 10B3 is an authentic recording of a

19  telephone call involving Ali Al-Timimi and Soliman Al-Buthe on or

20  about February 1, 2003, at 3:10 p.m."

21          And we'd move in 10B3 and 12-19 at this time.

22          THE COURT:  All right.  Subject to the same objection, I

23  assume?

24          MR. MAC MAHON:  Yes, Your Honor.

25          THE COURT:  All right, they're both overruled.  They're

**J.A. 1141**

997

1    in.  So 12-19 and 10B3 are both in.

2            (Government's Exhibit Nos. 10B3 and 12-19 were received

3    in evidence.)

4            MR. KROMBERG:  Thank you, Judge.  Stipulation No. 20,

5    which is Government Exhibit 12-20:  "The United States and the

6    defendant hereby stipulate and agree that Government Exhibit 10B3a

7    is an accurate translation of the transcription of the telephone

8    call recorded on Government Exhibit 10B3."

9            And we'd move in 10B3a and 12-20.

10            THE COURT:  All right.  Subject to the same objection,

11    they're both in.

12            MR. MAC MAHON:  Thank you, Your Honor.

13            (Government's Exhibit Nos. 10B3a and 12-20 were received

14    in evidence.)

15            MR. KROMBERG:  Stipulation No. 21, Government Exhibit

16    12-21:  "The United States and the defendant hereby stipulate and

17    agree that Government Exhibit 10B4 is an authentic recording of a

18    telephone call involving Ali Al-Timimi and Soliman Al-Buthe on or

19    about February 1, 2003, at 4:20 p.m."

20            And we move in both 10B -- well, that's what we move in,

21    10B4.

22            THE COURT:  All right.  12-21 and 10B4 are both in.

23            (Government's Exhibit Nos. 10B4 and 12-21 were received

24    in evidence.)

25            MR. KROMBERG:  Thank you, Your Honor.

998

1           Government Exhibit 12-22, Stipulation 22:  "The United
2  States and the defendant hereby stipulate and agree that
3  Government Exhibit 10B4a is an accurate translation of a
4  transcription of the telephone call recorded on Government Exhibit
5  10B4."
6           We move in both 12-22 and 10B4a.
7           THE COURT:  All right, they're both in.
8           (Government's Exhibit Nos. 10B4a and 12-22 were received
9  in evidence.)
10          MR. KROMBERG:  Thank you, Your Honor.
11          Government Exhibit 12-23, Stipulation 23:  "The United
12  States and the defendant hereby stipulate and agree that
13  Government Exhibit 10B5 is an authentic recording of a telephone
14  call involving Ali Al-Timimi and Soliman Al-Buthe on or about
15  February 1, 2003, at 4:32 p.m."
16          And we'd move in Stipulation -- excuse me, Government
17  Exhibit 12-23 and 10B5.
18          THE COURT:  All right, they're both in.
19          (Government's Exhibit Nos. 10B5 and 12-23 were received
20  in evidence.)
21          MR. KROMBERG:  Stipulation 24, Government Exhibit 12-24:
22  "The United States and the defendant hereby stipulate and agree
23  that Government Exhibit 10B5a is an accurate translation of the
24  transcription of the telephone call recorded on Government Exhibit
25  10B5."

999

1          And that's the stipulations we have -- oh, we'd like to

2    move in 10B5 --

3          THE COURT:  Those are both in.

4          (Government's Exhibit Nos. 10B5a and 12-24 were received

5    in evidence.)

6          MR. KROMBERG:  Thank you, Your Honor.

7          And that should be it for the stipulations at least for

8    now.

9          THE COURT:  All right.  Ladies and Gentlemen, then the

10   next matter of business is we're going to go back into the Kwon

11   testimony.  Is that the plan?

12         MR. KROMBERG:  That's correct, Judge.

13         THE COURT:  All right.  So, Ladies and Gentlemen, we'll

14   take our break for lunch now.  Please be back here promptly at

15   2:00, and we'll start up with the Kwon testimony.

16         (Recess from 1:00 p.m., until 2:00 p.m.)

17

18

19

20

21

22

23

24

25

1000

1               A F T E R N O O N   S E S S I O N

2                    (Defendant and Jury present.)

3          THE COURT:  Before we start with the witness, I want to

4    get one thing corrected.  It's a minor issue, but we want to be as

5    precise as we can.  By accident, when you were shown the Hamdi

6    weapon at the end of the morning session, the bullets that were

7    shown with it were actually the bullets that you had previously

8    seen from the Royer weapon.  Some of you may have recognized that.

9          What you should have been shown was Exhibit 3A2a, which

10   are the magazines that were seized with the weapon, and I believe

11   those are in evidence as a photograph, all right?  So we're going

12   to put that on the screen now, Ladies and Gentlemen, so this is

13   what was seized.

14         And within those magazines, there are bullets, correct,

15   or cartridges, whatever you call them?

16         MR. KROMBERG:  You can see the bullets on each end of

17   the magazine.

18         THE COURT:  All right.

19         MR. KROMBERG:  Or maybe you can see them.

20         THE COURT:  All right.  And again, are those available

21   for the jury to see if they want?

22         MR. KROMBERG:  Actually, I think we have a color photo

23   in the original set of exhibits.

24         THE COURT:  All right.  They'll get them then at the end

25   of the trial.

**J.A. 1145**

## Kwon - direct

1          MR. KROMBERG:  Right.

2          THE COURT:  Okay.  Very good.  All right, Ladies and

3   Gentlemen, so we've corrected that issue for the record.

4          And are you ready for Mr. Kwon's testimony?

5          MR. KROMBERG:  Yes, Your Honor.

6          THE COURT:  All right, that's fine.

7          All right, Mr. Kwon is in custody.  Has the marshal gone

8   to get him?

9          THE COURT:  Mr. Kwon, you're still under our earlier

10  affirmation to tell the truth.  Do you understand?

11         THE WITNESS:  Yes.

12         THE COURT:  All right.  Go up to the witness box.  And I

13  want you to speak in a good, loud voice into that microphone,

14  please.

15   YONG KI KWON, GOVERNMENT'S WITNESS, PREVIOUSLY AFFIRMED, RESUMED

16                   DIRECT EXAMINATION (Cont'd.)

17  BY MR. KROMBERG:

18  Q.   Mr. Kwon, good afternoon.

19  A.   Good afternoon.

20  Q.   We were talking on Tuesday, I guess, Tuesday afternoon about

21  September 16, 2001, at your house; do you remember?

22  A.   Yes, I do.

23  Q.   Okay.  You have already described, I think, who was there.

24  Just to reiterate to bring us back up to that point in time, who

25  was at your house at that time on -- when you brought Ali Timimi

1002

## Kwon - direct

1  back with you to your house?

2  A.   Ismail Royer, Hammad Abdur-Raheem, Mahmood Hasan, Calipha,

3  Muhammad Aatique, Masaud Khan, myself.

4  Q.   Okay.  Now, what did Ali Timimi say to the group at --

5  gathered at your house that evening?

6  A.   He said that the dawa in America is finished.  He told us

7  that we need -- he told us that we need to do three things.

8  First, he said we need to repent; second, we need to leave the

9  United States; and third, he said, "Join the mujahideen."

10        And then he also read to us the fatwa by Sheikh Uqla,

11  which --

12        MR. MAC MAHON:  Objection to him saying -- just what Ali

13  Timimi said, Your Honor, not what he thinks is in the fatwa.

14        THE COURT:  He's describing what was done.

15        MR. MAC MAHON:  No, he was about to say what he thinks

16  was in the fatwa.

17        THE COURT:  No, I don't know whether he was or not.  At

18  this point, I'll sustain that objection.

19        MR. KROMBERG:  I'm sorry, Judge, I don't understand what

20  the objection was.  The witness was testifying to what happened at

21  the meeting, and Mr. Kwon was saying that Ali Timimi started

22  reading the Uqla fatwa.  I don't understand what the objection

23  that's sustained is.

24        THE COURT:  That is fine to that point.  I don't know

25  what else is coming next.

1003

## Kwon - direct

1    MR. KROMBERG:  The objection was sustained to that
2  point?
3    THE COURT:  I don't know what's going to be added.  The
4  way the objection was phrased was he didn't want the witness's
5  opinion as to what was said.  An opinion is not what we want.  We
6  want what was actually said.
7    MR. KROMBERG:  Right.
8    THE COURT:  All right.
9  BY MR. KROMBERG:
10  Q.    Mr. Kwon, please tell the ladies and gentlemen of the jury
11  what it was that Mr. Timimi said when he was talking about -- when
12  he was reading from the Uqla fatwa.
13  A.    He said that the amir of Afghanistan has called for help --
14  called for assistance and that it is obligatory on all Muslims to
15  go and defend Afghanistan.
16  Q.    How did he characterize the Taliban that night?
17  A.    He said they are Muslims who needs, who needs our help.
18  Q.    What did he say about the permissibility of killing American
19  troops in Afghanistan?
20  A.    The only thing I can recall is when he said, "Join the
21  mujahideen," he said that it doesn't matter if we fight the
22  Indians or the Russians or the Americans, that this is all
23  legitimate jihad.
24  Q.    What did he say would happen if you stayed in the United
25  States and did not leave?

1004

## Kwon - direct

1  A.    He said that if you stay in the United States and pay taxes,
2  part of that tax money will go -- part of that tax money will go
3  for, for U.S. military, which is fighting the Muslims, so you'll
4  be partly responsible for that.

5  Q.    At some point, did Nabil Gharbieh arrive?

6  A.    Yes, he did.

7  Q.    What happened when Nabil Gharbieh arrived?

8  A.    When Nabil arrived, he brought with him another person, and
9  when he walked through the door, Ali Timimi, he changed his
10  subject all of a sudden, started talking about -- he was giving --
11  he started talking about how we should, you know, stay at home and
12  be careful in the light of, you know, post-9/11 events.

13  Q.    What happened -- was that the end of his talk at that point?

14  A.    No.  At this point, Ismail Royer took Nabil to the side and
15  talked to him, and Nabil came back, he grabbed the person he came
16  with, and they left.

17  Q.    Do you remember who it was that he came with?

18  A.    Yes.  He came with Sherdil.

19  Q.    Okay.

20  A.    So he grabbed Sherdil, and they left the house, at which
21  point Ali Timimi resumed the original topic.

22  Q.    Had you ever seen Ali Timimi wrap up a lecture as abruptly as
23  he did when Nabil walked in with Sherdil?

24  A.    No.

25  Q.    What does the term "fard ayn" mean?

**Kwon - direct**

1    MR. MAC MAHON:  Your Honor, I object unless it has

2 something to do with what Ali Timimi said that night.

3    THE COURT:  Are you going to tie it up?

4    MR. KROMBERG:  I hope so.

5    THE COURT:  All right.

6    MR. KROMBERG:  I'm going to try.

7    THE COURT:  I'll overrule the objection at this point.

8 BY MR. KROMBERG:

9 Q.  What does the term "fard ayn" mean?

10 A.  It means obligatory on all Muslims.

11 Q.  What does the term "fard kifaya" mean?

12 A.  It's a duty that if some Muslims do it, then the rest of the

13 Muslims, they'll be absolved of this duty.

14 Q.  How was the jihad in Afghanistan characterized by Ali Timimi

15 at your house on September 16, 2001?  Was it fard ayn, fard

16 kifaya, and something else entirely?

17    MR. MAC MAHON:  Objection unless that's something Ali

18 Timimi said, Your Honor, using those terms.

19    THE COURT:  Right.  You can't guess.  You have to tell

20 us whether there was some adjective or descriptor for the

21 obligation that was used.  Do you understand the question?

22    THE WITNESS:  Yes.

23    THE COURT:  All right.

24    THE WITNESS:  When he was -- had the fatwa in front of

25 him, he said the fatwa said that it's fard ayn on all Muslims to

**Kwon - direct**

1    go defend Afghanistan.

2    BY MR. KROMBERG:

3    Q.   What did he say, if anything, about any need to get

4    permission from your parents to go?

5    A.   Well, I knew from before that fard ayn, you don't need --

6                MR. MAC MAHON:  Objection, Your Honor.

7                THE COURT:  That's not responsive to the question.

8    BY MR. KROMBERG:

9    Q.   What impact does something being fard ayn have on your

10   obligation to tell your parents?

11               MR. MAC MAHON:  Objection, Your Honor.  Now he's going

12   beyond the scope even of what --

13               THE COURT:  Well, no, if there's a term of art being

14   used and this witness understands the term of art, he can explain

15   his understanding of that word, and if it's different from

16   evidence you've got, you can raise that on cross examination.

17               MR. MAC MAHON:  As long as it's couched in terms of not

18   something that he told him, Your Honor, I don't --

19               THE COURT:  Well, I've overruled the objection.  Go

20   ahead, Mr. Kromberg.

21   BY MR. KROMBERG:

22   Q.   Mr. Kwon, what was your understanding about when you needed

23   to get permission from your parents to engage -- to go out and

24   engage in jihad?

25   A.   In the fard ayn case, you do not need to ask your parents for

**Kwon - direct**

1  permission.

2  Q.   Did you ask your parents for permission after September 16?

3  A.   No.

4  Q.   What did you tell your parents you were doing?

5  A.   I told them that I'm going to study overseas.

6  Q.   On the night of September 16, what did you understand was the

7  relationship between Taliban and Al-Qaeda at the time?

8  A.   My understanding was that Taliban was hosting Al-Qaeda.

9  Q.   What did you understand from what Ali Timimi told you was the

10 reason there was going to be a war in Afghanistan?

11 A.   Well, since Afghanistan was hosting Al-Qaeda, the United

12 States attack on Afghanistan was imminent.

13 Q.   At that point, after hearing what Ali Timimi said to you,

14 were you willing to go fight for the Taliban?

15 A.   Yes.

16 Q.   Why would you be willing to go fight for the Taliban if the

17 Taliban could avoid the attack by not protecting Al-Qaeda?

18       MR. MAC MAHON:  I'm going to object without any

19 foundation that that's what Al-Timimi told him or anything else.

20 He's answered the question he was willing to fight.

21       THE COURT:  I think I'm going to sustain the objection

22 and just have you rephrase your question so it's directly relevant

23 to the issues in this case.

24 BY MR. KROMBERG:

25 Q.   Based on what Ali Timimi said to you that night, why would

**Kwon - direct**

1  you be willing to go fight for the Taliban if the reason the

2  Taliban was being attacked was because they were protecting

3  Al-Qaeda?

4  A.   Because at this point, it didn't matter why the war was going

5  to happen.  The only thing that mattered is that our brothers and

6  sisters in Afghanistan needs help against imminent attack.  So our

7  duty is to go to defend them.

8  Q.   What, if anything, did Timimi say to Hasan, Mahmood Hasan in

9  particular?

10  A.   He told Mahmood that since he's from Pakistani origin, that

11  he shouldn't have problem in getting into Pakistan.

12  Q.   What, if anything, did Timimi say Hasan should do in

13  Pakistan?

14  A.   He said we should join the LET and get some training from the

15  LET camps.

16  Q.   How did he characterize LET at that point?

17  A.   They're, they're on the sunnah.

18  Q.   And the sunnah is the correct path?

19  A.   Correct.

20  Q.   What did Royer say once Ali Timimi brought up LET?

21          MR. MAC MAHON:  Objection to hearsay, Your Honor.

22          THE COURT:  Is it being offered for the truth of its

23  contents?

24          MR. KROMBERG:  First, Judge, Mr. MacMahon has tried to

25  bring this in on several occasions before about how Royer was

## Kwon - direct

1  telling people how Royer was going to be the connection.

2        THE COURT:  But are you offering it for the truth of its

3  contents or what was going -- what information was --

4        MR. KROMBERG:  A, it was a statement by a coconspirator

5  in furtherance of the conspiracy.  B, it's for what motivated

6  Mr. Kwon to do what he did.

7        THE COURT:  Overruled.

8        MR. KROMBERG:  C is --

9        THE COURT:  Objection is overruled.

10       MR. KROMBERG:  Sorry.

11       THE WITNESS:  Royer said that he could help us get to

12  LET camps in Pakistan.

13  BY MR. KROMBERG:

14  Q.    What did Ali Timimi tell you in particular --

15  A.    Oh.

16  Q.    -- about where to go?

17  A.    He told me since I'm Korean, at least I can leave the United

18  States and go to Korea.  That way, you know, I don't have to pay

19  taxes to this government.

20  Q.    What about Pakistan?

21  A.    At that point, I asked him what about if I can go to Pakistan

22  with Mahmood?  And he told me that's better.

23  Q.    Better than what?

24  A.    Than going to Korea.

25  Q.    What, if anything, did he say on how to get to Pakistan?

## Kwon - direct

1  A.    I'm sorry?

2  Q.    What, if anything, did he say about how you should go to

3  Pakistan?

4  A.    How we should go to Pakistan?

5  Q.    How you in particular.

6  A.    That night?

7  Q.    Yes.

8  A.    When I asked him that -- how should I get there?

9  Q.    Well, what, if anything, did he tell you on how to make the

10  connection to go to Pakistan?

11  A.    Oh.

12        MR. MAC MAHON:  Is this still on the night of the 16th,

13  Your Honor?

14        THE COURT:  Well, that's the question.  I mean, did

15  there come a time when the defendant gave you some advice as to

16  how to get to Pakistan?

17        THE WITNESS:  Yes.  He said --

18        THE COURT:  Was that on the 16th, or was that at some

19  other time?

20        THE WITNESS:  This was on the 16th.

21        THE COURT:  All right.

22        THE WITNESS:  He said Royer -- go through Royer.  Royer

23  will help us get there.

24  BY MR. KROMBERG:

25  Q.    Mr. Kwon, what discussion was there that night at your house

**Kwon - direct**

1   on the 16th, September 16, 2001, what discussion was there about

2   getting military training before actually getting involved in the

3   fight in Afghanistan?

4   A.   There was a discussion that we should get training before we

5   engage ourselves in any combat.

6   Q.   Where was Timimi during that discussion?

7   A.   He was in my house.

8   Q.   Where in relation to the people engaged in the discussion was

9   he?

10   A.   He was sitting with us.

11   Q.   Did he participate in that discussion?

12   A.   I don't recall him saying anything.  I just remember him

13   being there.

14   Q.   When did he -- how long did he stay at your house?

15   A.   I'd say about two hours.

16   Q.   How did he get home?

17   A.   I drove him home.

18   Q.   What, if anything, did he say to you while you were driving

19   him home?

20   A.   He said that when the brothers leave my house, that we should

21   leave in ones and twos, with some time interval, that we shouldn't

22   leave all at once in a big group.

23   Q.   What happened -- what did you do after you took Timimi home?

24   A.   I went back to my house.

25   Q.   What was going on at your house at the time?

1012

## Kwon - direct

1  A.    The brothers were discussing what they're going to do.  At

2  this point, Masaud expressed that he, that he wants to go.

3  Q.    When you say "he wants to go," he wants to go what?

4  A.    He wants to go over to Afghanistan to fight.  Well, Mahmood,

5  myself, and Masaud, we expressed that we want to go to LET and get

6  some training.

7  Q.    What discussion was there -- the sentence before, you said

8  you were discussing going to LET to get training, you had

9  mentioned that Masaud said he wanted to go to Afghanistan.  What

10  relationship was there between Masaud saying he wants to go to

11  Afghanistan and you saying you want to go get training?

12  A.    At that time, our idea was that, you know, after we get the

13  training, we'll go to Afghanistan.

14  Q.    What did Hammad Abdur-Raheem say at that time, at the

15  meeting?

16  A.    He said that he, he was concerned for his wife and his infant

17  child and, you know, he had problems leaving them behind at the

18  moment.

19  Q.    What discussion was there about whether the obligation was

20  fard ayn or fard kifaya?

21  A.    At one point, Masaud said, "You know, I hope you brothers

22  understand what 'fard ayn' means.  It means obligatory on all

23  Muslims."

24  Q.    What about Caliph Basha Ibn Abdur-Raheem?

25  A.    He, he didn't want to -- he expressed that he didn't want to

**J.A. 1157**

## Kwon - direct

1  go anywhere, that he does, you know, he doesn't know about this

2  whole thing, you know.

3  Q.   What was his attitude that you could see that he manifested,

4  that he showed while Ali Timimi was speaking?

5  A.   He was actually falling asleep while the, Ali Timimi was

6  speaking.

7  Q.   What was the attitude of everybody else besides Caliph while

8  Ali Timimi was speaking?

9  A.   We were attentive.  We were listening.  You know, we were,

10  you could say, somewhat excited, you know.

11  Q.   What did you guys decide -- you mentioned Masaud, Masaud

12  Khan; Mahmood Hasan; and you.  What about Aatique?  What did he

13  say?

14  A.   Aatique said that he was already planning on going back to

15  Pakistan even prior to this, this meeting, because his wife and

16  his child was in Pakistan, so he was going to go pick them up.  He

17  said while he was there, he can attend the LET camp for a few days

18  before coming back to United States.

19  Q.   When did -- sorry, let me take that back.

20       What was decided by you, Masaud Khan, and Mahmood Hasan

21  about when you three would go?

22  A.   As soon as we can get our visas from the Pakistani embassy,

23  we were going to go.

24  Q.   Why did you make the decision -- why did you make the

25  decision to go as soon as you could get your visas done?

**Kwon - direct**

1    A.   Because I felt that -- I felt that if you don't act as soon

2    as possible, then we won't be able to get there due to all the,

3    all the security reasons and things like that.

4    Q.   And when you say "get there," where is "there"?

5    A.   Initially to a Pakistan LET and then to Afghanistan.

6    Q.   How would you characterize your emotional state after hearing

7    what Ali Timimi had to say to you that night?

8    A.   I was, I was, you know, I was excited, I mean, in a sense

9    that I was fired up.

10   Q.   What impact did Ali Timimi's words have on your decision to

11   go to Afghanistan -- try to go to Afghanistan at that point?

12   A.   Well, I made the decision to go, but his talk was a big

13   factor in my decision to go to Afghanistan.

14           MR. MAC MAHON:  Your Honor, I object.  He never went to

15   Afghanistan.  Phrasing these questions and these answers this way

16   is suggesting something improper.

17           THE COURT:  I don't think so.  I'm going to overrule the

18   objection, but it's clear that there's no evidence in this case

19   that Mr. Kwon went to Afghanistan.

20           MR. KROMBERG:  And we will stipulate with the defense

21   that neither Mr. Masaud Khan, Mahmood Hasan, or Yong Kwon actually

22   made it to Afghanistan, and we're going to get to exactly why they

23   didn't get to Afghanistan shortly.

24           THE COURT:  All right, let's continue.

25           MR. KROMBERG:  Thank you.

1015

**Kwon - direct**

1  Q.    What did you do after you made the decision to go to Pakistan

2  with the intent of getting to Afghanistan?

3  A.    I started preparing.

4  Q.    What did you do to start preparing?

5  A.    Went to the Pakistani embassy, applied for a visa.

6  Q.    What day was that?

7  A.    Monday, on the 17th.

8  Q.    Well, even before we get to Monday the 17th, going to the

9  embassy for the visa, what -- did you do any preparation the night

10  of the 16th or the early morning hours of the 17th in preparation?

11  A.    Yes.  I ordered, I ordered some jackets from Cabela's that I,

12  that I thought it would be useful overseas.

13  Q.    Now, how did you happen to order those -- well, how many

14  jackets did you order?

15  A.    I ordered three jackets.

16  Q.    And how did you happen to -- were they the same jackets?

17  different jackets?

18  A.    They're all the same.

19  Q.    How did you happen to order three of them?

20  A.    One for myself, one for Mahmood, and one for Hammad.

21  Q.    Why did you order one for Hammad?  That's Hammad

22  Abdur-Raheem?

23  A.    Correct.

24  Q.    Why did you order one for Hammad?

25  A.    It was my understanding that he could use that jacket later

1016

## Kwon - direct

1  if he decides to go overseas.

2  Q.  Why did you choose that particular jacket?

3  A.  Actually, it was recommendation by Masaud.  He had the

4  catalog page ripped out from the catalog with him showing this

5  jacket.

6  Q.  Already on the 16th at your house he had that page?

7  A.  Correct.

8  Q.  Had he already ordered a jacket?

9       MR. MAC MAHON:  If he knows, Your Honor.

10       THE COURT:  If you know.

11       MR. MAC MAHON:  Leading the witness.

12       THE COURT:  All right, if you know.  Don't guess.

13       THE WITNESS:  Well, I know if he ordered, but I did not

14  know if he ordered before or after the meeting.

15  BY MR. KROMBERG:

16  Q.  Take a look, if you would, at Government Exhibit 7A41.

17       Do you recognize that?

18  A.  Yes, I do.

19  Q.  Is that the jacket that -- is that one of the three jackets

20  that you ordered?

21  A.  Yes.

22  Q.  Why did you -- what was good about that jacket?  What was the

23  reason you got that particular jacket?

24  A.  Well, it's -- we knew that in the mountains, it's going to be

25  cold, and this jacket is a pretty warm jacket, and it's green,

## Kwon - direct

1  which will blend in well with the surroundings.

2  Q.   It has a -- does it have a reflective stripe on it?

3  A.   Yes, it does.

4  Q.   That wouldn't have been good, right?

5  A.   No, it wouldn't have.

6         MR. KROMBERG:  Judge, I would note that the defense and

7  the government have stipulated to the timing of the purchase of

8  the jacket by both Masaud Khan and Yong Kwon.  We read that to the

9  jury before.

10        THE COURT:  Right.  All right.  And you're moving 7A41

11  into evidence?

12        MR. KROMBERG:  Correct.

13        THE COURT:  Any objection?

14        MR. MAC MAHON:  No objection, Your Honor.

15        THE COURT:  All right, it's in.

16        (Government's Exhibit No. 7A41 was received in

17  evidence.)

18  BY MR. KROMBERG:

19  Q.   Okay.  Now, let's go to Monday the 17th, and you were talking

20  about the visa.  What did you do to try to get a visa on Monday,

21  September 17, 2001?

22  A.   Mahmood and myself, we drove to the Pakistani embassy in

23  Washington, D.C., and we applied for the visa.

24  Q.   Mahmood Hasan also was a U.S. citizen?

25  A.   Yes.

# Kwon - direct

1  Q.   And what was the process to get a Pakistani visa?

2  A.   We had to go there, fill out the application, give the

3  application fee, and also give them photographs.

4  Q.   Did you have the photographs with you?

5  A.   No.

6  Q.   So what happened when you didn't have the photographs?

7  A.   We had to go back and bring the photographs at a later time.

8  And also, we didn't have a money order, either, so we went and

9  brought the money order and photograph at a later time, and they

10  told us to come back on Wednesday -- that the visa should be

11  ready.

12  Q.   So including the trip on Wednesday, you picked it up on

13  Wednesday?

14  A.   Correct.

15  Q.   So how many trips in total were there to the Pakistani

16  embassy?

17  A.   Three trips.

18  Q.   Two on Monday, one on Wednesday?

19  A.   Correct.

20  Q.   How did you make arrangements to actually get admitted by

21  LET?

22  A.   I met with Royer on Wednesday night, where we drove to a

23  nearby 7-Eleven, bought a long distance card, and from a pay

24  phone, Royer called LET office in Lahore for us, where he gave our

25  descriptions, our kunyas, and that -- he told them they would be

**Kwon - direct**

1   coming.

2   Q.   What was your kunya?

3   A.   Abu Ubaydah.

4   Q.   Can you spell "Ubaydah" for the record, please?

5   A.   U-b-a-y-d-a-h.

6   Q.   Do you recall Mahmood Hasan's kunya?

7   A.   Yes.  Abu Qudama.

8           THE COURT:  Can you spell that?

9           THE WITNESS:  Q-u-d-a-m-a.

10  BY MR. KROMBERG:

11  Q.   I'd like you to take a look at Exhibit 7C34.

12          THE COURT:  This is in evidence.

13          MR. KROMBERG:  I don't think we have any objection.

14          THE COURT:  Any objection?

15          MR. MAC MAHON:  No objection to a picture of the

16  7-Eleven, Your Honor.

17          THE COURT:  All right.

18  BY MR. KROMBERG:

19  Q.   Not a great picture of the 7-Eleven, but anyway, is this the

20  7-Eleven you were referring to as best you can tell?

21  Q.   It looks like it.

22          MR. KROMBERG:  Okay.  Take that off.

23  Q.   When was the next time after you took Ali Timimi home on the

24  night of September 16, 2001, when was the next time you saw Ali

25  Timimi?

## Kwon - direct

1  A.    I saw him on Wednesday the 19th.

2  Q.    How did that come about?

3  A.    I don't remember if I called him or Mahmood had called him or

4  maybe he called us.  We, we got in contact with him.  We told him

5  that we're leaving, and he wanted to meet with us for lunch.  So

6  we picked him up from his workplace, went to a local kabob place.

7  Q.    What was his workplace?

8  A.    SRA.

9  Q.    Okay.  Go ahead.

10  A.    And went to the local kabob place, where we ate lunch, and

11  he, he gave us some advice on our coming trip.

12  Q.    Before you get to the advice, what did you tell him you were

13  doing on your upcoming trip?

14  A.    That we were going to Pakistan to, to get to LET training

15  camps.

16  Q.    And what did he tell you in response?

17  A.    He told us that, you know, when we traveled, don't take

18  anything suspicious.  He told us that if Mahmood was to get

19  stopped for some reason at the airport, that I should also stop,

20  stop my trip, because I won't be able to find my way around

21  Pakistan, but he said if I was to stop -- if I was to be stopped,

22  Mahmood should go on since he can get his way around in Pakistan.

23  Q.    What did he say you should say or do if you were stopped by

24  the authorities at the airport?

25  A.    He told us to act scared and ask for our lawyers and our, and

**Kwon - direct**

1  our mothers.

2  Q.   At any time did he indicate to you that you should not go to

3  the camp?

4  A.   I do not recall him telling me not to go.

5  Q.   At any time did he indicate to you that you should not plan

6  to go and fight?

7  A.   No.

8  Q.   What would your reaction have been if he had said to you,

9  "Don't go"?

10        MR. MAC MAHON:  Objection, Your Honor.  He just said he

11  didn't tell him that, so it's speculative.

12        THE COURT:  I'm going to sustain that objection.

13  BY MR. KROMBERG:

14  Q.   How important was Ali Timimi's opinion to you about whether

15  you should go or not as of September 19, 2001?

16  A.   It was important.

17  Q.   By the way, how did he appear to react to you when you told

18  him that you were going to Pakistan to go to the LET camp?

19  A.   Well, he was -- when he gave us his advices, he was approving

20  of our going.

21  Q.   At any time between the September 16, 2001 meeting at your

22  house and when you left, did anyone indicate to you that you

23  should not go to an LET camp?

24  A.   No.

25  Q.   Did anyone indicate to you that you should not go plan to

1022

**Kwon - direct**

1  fight?

2  A.    No.

3  Q.    When next after the September 16 meeting did you see Muhammad

4  Aatique?

5  A.    I saw him on Tuesday night, where I drove Masaud Khan --

6  well, Mahmood and I drove Masaud Khan to Muhammad Aatique's

7  residence in Pennsylvania.

8  Q.    Before we get to that, let me go back a second.  Before the

9  September 16 meeting, correct me if I'm wrong, you had testified

10  that you did not know Aatique was coming, correct?

11  A.    Correct.

12  Q.    When was the last time you had spoken to Aatique before he

13  showed up at your door on September 16?

14  A.    I don't recall, but we used to keep in touch maybe once a

15  week or at least once in two weeks, things like that.

16  Q.    And that's when he was living in Pennsylvania?

17  A.    Correct.

18  Q.    Now, back to the trip to Pennsylvania with Mahmood Hasan and

19  Masaud Khan.  How did that come about?

20  A.    Aatique, when he planned to go back to Pakistan to pick up

21  his family, he already bought the tickets prior to the meeting at

22  my house, and it was for Wednesday the 18th.

23  Q.    Wait.  Sunday was the 16th.

24  A.    Oh, Wednesday the 19th, yeah, so -- and also, Masaud got his

25  visa, which he did on his own, and he also bought a plane ticket

## Kwon - direct

1  leaving the same flight as Aatique.  So he asked me to give him a

2  ride to Aatique's place.

3  Q.   Masaud Kahn asked you to give Masaud Khan a ride to Aatique's

4  place?

5  A.   Correct.

6  Q.   In Pennsylvania?

7  A.   Correct.

8  Q.   Okay.  Go ahead.

9  A.   So we drove him there.  We dropped him off at Aatique's place

10  so that next morning, so they can go up to New York and take the

11  same flight to Pakistan.

12  Q.   What time did you get to Aatique's place?

13  A.   Maybe three-four in the morning.

14  Q.   And did you turn immediately around and come home?

15  A.   No.  We spent -- we slept for about an hour and a half, got

16  up, prayed, and Mahmood and myself came back.

17  Q.   Where did you get -- excuse me, how did you make your own

18  flight reservations?

19  A.   When we came back, we went straight to -- we came back -- we

20  came back to my house and picked up some stuff, went to the

21  Pakistani embassy that morning and picked up our visas, and once

22  we had our visas, we went to a travel agency in Springfield,

23  Virginia, and bought our tickets.

24  Q.   Was that Paragon?

25  A.   Correct.

1024

**Kwon - direct**

1   Q.   I'd like to show you 7C18b.  I hope this one will be a better
2   one.
3            THE COURT:  Is that in evidence yet?
4            MR. KROMBERG:  No, it is not.
5            THE COURT:  Any objection?
6            MR. MAC MAHON:  No objection to this picture, Your
7   Honor.
8            THE COURT:  All right, it's in, 7C18b.
9            (Government's Exhibit No. 7C18b was received in
10  evidence.)
11  BY MR. KROMBERG:
12  Q.   Is that Paragon Travel, where you got your ticket?
13  A.   Correct.
14  Q.   Now, take a look, if you would, at 7C19, please.
15           MR. MAC MAHON:  No objection.
16           THE COURT:  All right, it's in.
17           MR. MAC MAHON:  Excuse me, Your Honor.
18           (Government's Exhibit No. 7C19 was received in
19  evidence.)
20           MR. KROMBERG:  7C19, if we could put it up on the
21  screen?  No, I'm sorry, I'm sorry, not -- 7C18.  7C18, I'm sorry.
22           THE COURT:  7C18.
23           MR. KROMBERG:  7C18.
24           THE COURT:  That's in.
25           MR. KROMBERG:  Thank you.

## Kwon - direct

1    MR. MAC MAHON:  Still no objection.

2    THE COURT:  All right.

3    (Government's Exhibit No. 7C18 was received in

4  evidence.)

5  BY MR. KROMBERG:

6  Q.   Mr. Kwon, can you recognize those, those tickets?

7  A.   Yes.

8  Q.   That's your name there?

9  A.   Yes.

10 Q.   And -- can you make that bigger, please?

11      And Khwaja Mahmood Hasan, that's his ticket?

12 A.   Right.

13 Q.   And your itinerary was United Air Lines from Washington to

14 New York, New York to Karachi on Pakistani Airlines?  Is that PA?

15 A.   Correct.

16 Q.   And then Karachi-New York and New York-Washington.  That was

17 your itinerary?

18 A.   Correct.

19      MR. KROMBERG:  Okay.  Can you make it small again?

20 Q.   Is there a -- can you see the date that's on that ticket?

21      Can we make the one I just circled bigger?  It's hard to

22 say what that is.  Let's try the one on the ticket below that.

23      Okay.  Can you see that as 19 September?

24 A.   Correct.

25 Q.   Okay.  Can you see the price on the tickets?  Can you read

**Kwon - direct**

1    that for us, or do you know?  Do we need to make that bigger?

2    A.    It says $1,171.48.

3    Q.    Okay.  Is that what you recall is about the price of the

4    ticket?

5    A.    Yes.

6    Q.    How did you pay for the tickets?

7    A.    I paid cash.

8    Q.    Where did you get the cash?

9    A.    I stopped by First Union and withdrew cash from my bank

10   account.

11   Q.    If you could take a look at 7C19c?

12        THE COURT:  Any objection?

13        Those are already in, okay.

14        MR. MAC MAHON:  No, Your Honor.

15   BY MR. KROMBERG:

16   Q.    Is that your withdrawal slip?

17   A.    Yes.

18   Q.    September 19, 2001, at 12:41 p.m.?

19   A.    Correct.

20   Q.    Why was it $2,300; do you recall?

21   A.    I remember I wanted to have some cash with me when I traveled

22   to Pakistan, so after paying the ticket with my cash, I had some

23   cash on me.

24   Q.    Did you also pay for Hasan's ticket in cash?

25   A.    I don't recall if, if I paid for his or not.

1027

**Kwon - direct**

1  Q.   So if you paid -- if you didn't pay, it's just a coincidence

2  that the price of his ticket --

3          MR. MAC MAHON:  Objection, Your Honor.  This is clearly

4  the beginning of a leading question.  If he doesn't remember if he

5  paid for it or not, that's the answer.

6          THE COURT:  I'll sustain the objection.  Let's move on.

7  BY MR. KROMBERG:

8  Q.   I'd like you to look at 7C19b, which is in evidence.

9          No, I did that wrong, excuse me.  Make that 7C19f -- as

10  in Frank -- please.

11          Do you recognize that check?

12  A.   Yes, I do.

13  Q.   Now, why did you give a $1,000 check to Randall Royer on --

14  dated September 19?

15  A.   Because he told me that he wanted to move his family, himself

16  and his family to Bosnia, but he was lacking, lacking some funds,

17  so I wanted to help him out.

18  Q.   Was Bosnia his end destination to your knowledge?

19  A.   No.  He told us that after he moved his family to Bosnia,

20  he'll try to join us in Pakistan.

21  Q.   Okay.  Now, take a look, if you would, at 7C19a2, which is in

22  evidence, and if you can -- where I just circled, is that -- is

23  that a $10,253.23 transfer?

24  A.   Correct.

25  Q.   What transfer -- what was that about?

1028

## Kwon - direct

1  A.   I had two, I had two checking accounts, and I had a debit ATM

2  card that's, that's, I guess, tied to one of the accounts.  So I

3  moved all my money from the other account into that account so

4  that when I travel, I could use the ATM card to withdraw money.

5  Q.   Okay.  The date on that that you made that transfer was

6  September 18?

7  A.   Correct.

8       MR. KROMBERG:  And if we could just make it just a bit

9  bigger?

10 Q.   Do you recall on the 20th, the day you left, a deposit of

11 $63.68?

12 A.   No, I don't recall.

13 Q.   How about the deposit on September 21, automated credit?  Was

14 that from your employer?

15 A.   Correct.

16 Q.   Okay.  Okay.  Take a look, if you would -- let's move to

17 7C32, which is in evidence.  Do you recognize that?

18 A.   Yes, I do.

19 Q.   Your credit card bill?

20 A.   Correct.

21 Q.   And if you could, let's see, okay, so you see on the far

22 left, where it says Posting Date, and then after that, it says

23 Transaction Date, and then it has a column with posting date and

24 transaction date?  If we go down these transactions by date,

25 please, let's look at transaction date -- can we make that bigger?

**Kwon - direct**

1       I guess that's sort of bigger.

2       Okay.  Where I've underlined "DMV vehicle renew, $54,"

3   do you see that?

4   A.   Yes, I do.

5   Q.   Do you recall what your charge -- what charge that was for

6   DMV vehicle renew on September 14?

7   A.   I believe it was new plates or new decals but --

8   Q.   For who?

9   A.   For myself.

10  Q.   For what car?

11  A.   I had two cars.  I forget which one.

12  Q.   Why were you renewing your plates or your decals on Friday,

13  September 14, 2001?

14  A.   So that I don't get a ticket.

15  Q.   Okay.  After that, the next one is September 16, and it's

16  from Macy's.  Do you recall what you bought at Macy's on the 16th

17  for 31.31?

18  A.   I don't recall.

19  Q.   Texaco in Chantilly, is that gas?

20  A.   Correct.

21  Q.   J.C. Penney in Fairfax, $41.79, do you remember what that was

22  for?

23  A.   I don't recall.

24  Q.   Okay.  Kabob, Etc., in Chantilly, $77.22, what was that for?

25  A.   That was the food I picked up for the meeting on the night of

**Kwon - direct**

1  the 16th at my house.

2  Q.    Sportsman's Guide on, it appears to be September 17, for

3  $32.48, do you recall what that was for?

4  A.    No, I don't recall.

5  Q.    Was Sportsman -- do you recall whether Sportsman's Guide is a

6  mail order house?

7  A.    Yes.  It was a catalog where you order.

8  Q.    But you don't remember what you were getting?

9  A.    I don't recall what I was ordering.

10  Q.    Next, Cabela's, $617.80, are those the jackets we just talked

11  about?

12  A.    Those were the three jackets that I ordered.

13  Q.    September 18, Olympus Fitness Center, what was that?

14  A.    That was my membership to the gym.

15  Q.    Was that automatically debited?

16  A.    Correct.

17  Q.    And on September 19, which would have been Wednesday -- is

18  that right?

19  A.    Correct.

20  Q.    Galyan's Fair Lakes, do you remember what that was?

21  A.    Yes.  Mahmood and myself, we went to Galyan's to buy some

22  things for our trip.

23  Q.    Do you remember what you bought?

24  A.    I bought a water purifier, pair of ski pants, and fleece

25  jacket -- no, a backpack.

**Kwon - direct**

1  Q.   Actually, so that Galyan's charge was the $329 one, and the
2  FedEx shipment was the $10.60 charge, correct?

3  A.   Correct.

4  Q.   I was thinking that was a great deal for $10.60.

5        Now, that very first line of the transactions, if we can
6  enlarge that?  That payment of $1,590.90 that was posted on
7  September 22, do you recall when you made that payment?

8  A.   I believe on the 19th, the night before I left.  I called my
9  credit card company, and I asked for the remainder of my balance,
10  and I wrote a check for that balance because I sent it out, and I
11  also canceled my credit card that night.

12  Q.   What did you do -- if we can take that off?

13        What did you do about your job after September 16, 2001?

14  A.   I resigned.

15  Q.   When did you notify them?

16  A.   Sometime that week, I believe either Tuesday or Wednesday.

17  Q.   How did you notify them?

18  A.   I sent an e-mail.

19  Q.   Do you recall who you sent it to?

20  A.   I sent to my supervisor and my coworker.

21  Q.   Who was the coworker?

22  A.   Belton Harris.

23  Q.   I'd like you to look at 7C31.  It would be easier if you'd
24  look at it in the book at this point.  7C -- as in Charlie -- 31.

25        Do you have that?

## Kwon - direct

1   A.    Yes, I do.

2   Q.    Do you recognize it?

3   A.    Yes, I do.

4   Q.    And what is that?

5   A.    That's an e-mail I sent to Belton letting him know that I

6   resign and that he should pick up my -- the company-issued

7   equipment and take it back to the company for me.

8           MR. KROMBERG:  Now, the government moves 7C31 into

9   evidence, Judge.

10          THE COURT:  Any objection?

11          MR. MAC MAHON:  No, Your Honor.

12          THE COURT:  All right, it's in.

13          (Government's Exhibit No. 7C31 was received in

14   evidence.)

15          MR. KROMBERG:  Could we put it on the screen?

16          THE COURT:  Can we blow that up more?

17   BY MR. KROMBERG:

18   Q.    So where it says, "Original message, From:  Yong Kwon,

19   ykwon@uu.net," was that your e-mail address?

20   A.    Correct.

21   Q.    Bharris@uu.net, that was Belton Harris's e-mail?

22   A.    Correct.

23   Q.    Mfield and mhodies@uu.net, who were they?

24   A.    M. Field was the manager, and M. Hodies was my supervisor.

25   Q.    You told Belton, "I just resigned today, and I am leaving for

**Kwon - direct**

1  overseas this morning for at least a month.  My badge did not let

2  me into the office late last night."

3          When did you try to get into the office?

4  A.    The night of 19th, I believe.

5  Q.    And you said you have an extreme emergency.  What was your

6  extreme emergency?

7  A.    That I was leaving for Pakistan.

8  Q.    Now, I think you mentioned before that you told your brother

9  you were going to go study?

10 A.    Correct.

11 Q.    Wasn't it sudden for studying?  Was your departure unusually

12 sudden for going to study?

13 A.    Correct.

14 Q.    Why did you tell him you were leaving to study when that's

15 not what was happening?

16 A.    Because if I told him the truth, he would have stopped me.

17 Q.    Take a look at, if you would -- what's your brother's name?

18 A.    His real name is also Yong Kwon, like me.  His middle initial

19 is H.

20 Q.    What does he go by?

21 A.    John.

22 Q.    Okay.  Take a look at Government Exhibit 7C19c, which is in

23 evidence.  It will be on the screen.  It might be easier.

24          No, I blew it again.  Sorry, hold on.

25          THE COURT:  Wrong exhibit?

## Kwon - direct

1      MR. KROMBERG:  G, G as in golf.  7C19g as in golf.

2  Q.   Do you recognize that check to John H. Kwon?

3  A.   Yes, I do.

4  Q.   That's your brother?

5  A.   Correct.

6  Q.   Why did you write him a $1,500 check at this time?

7  A.   Because I was leaving, and I wanted to help him out with some

8  money since I'll be leaving, and I was paying rent.  The house is

9  under his name and mortgage, but I was paying him rent while I was

10 staying there.  So basically, I wanted to help him out a little

11 bit because I'd be leaving and I guess you could say, like,

12 advancement of my rent.

13 Q.   Now, dated there 9/21/01.  Weren't you on the plane on 9/21?

14 A.   Yes, I was.

15 Q.   Did you write that on 9/21?

16 A.   It looks like my handwriting.

17 Q.   Why did you write it on 9/21?

18 A.   I don't recall, but I must have post-dated it, or maybe I

19 made a mistake.

20     MR. MAC MAHON:  Your Honor, I object.  If he doesn't

21 remember, he doesn't remember.  Speculation doesn't help.

22     THE COURT:  I'm going to sustain the objection.  He

23 doesn't know why.

24     MR. KROMBERG:  Okay.

25 Q.   When did you write the check as best you can recall?

**Kwon - direct**

1  A.   I wrote the check the morning when I was leaving, which would
2  be the 20th.
3  Q.   Take a look, if you would, at Government Exhibit 7C19a, which
4  is in evidence.  No, I must have that wrong.  It can't be 7C19a,
5  sorry.
6        7C19e.  Do you recognize 7C19e?
7  A.   Yes.
8  Q.   Was that a check you made out to your brother for rent?
9  A.   Correct.
10 Q.   What date was that?  It may be better to look at the hard
11 copy on that one in your book.
12 A.   It's the 14th of September.
13 Q.   Okay.  Why did you give this check to your brother on Friday,
14 September 14, 2001, saying it was for rent?
15 A.   That was my portion of the rent for the upcoming month or --
16 no, I believe the month of September.
17 Q.   For the month of September.
18       Why did you pay him rent for the month of September on
19 that day?
20 A.   Because he needed to pay rent for September.
21       MR. KROMBERG:  Hang on just a moment, please.
22       THE COURT:  Yes, sir.
23       All right, I see we're giving some jurors our second
24 notebooks.  Does anybody else need another one?
25                     (No response.)

1036

# Kwon - direct

1  BY MR. KROMBERG:

2  Q.   When you wrote that check on the 14th, why did you not make

3  it out to cover rent for September, October, November, and

4  December of 2001?

5  A.   Because at that point, I didn't have any plans to travel.   So

6  I just paid the rent for September.

7          MR. KROMBERG:   By the way, I'd also -- if we can enlarge

8  that part and turn it upside down maybe?   Oh, we can't?   Okay.

9          THE COURT:   Well, you can put it on the Elmo.

10          MR. KROMBERG:   Thank you, Your Honor.   I can put it on

11  the Elmo upside down.

12  Q.   So your brother deposited this check on September 17, 2001 --

13  excuse me, it got processed by First Union Bank on September 17,

14  2001?

15  A.   It appears so.

16  Q.   Take a look, if you would, at Government Exhibit 7C30, which

17  is in evidence.

18          THE COURT:   I'm sorry, 7C13?

19          MR. KROMBERG:   Three-zero, Judge.

20          THE COURT:   Three-zero, 30, okay.

21  BY MR. KROMBERG:

22  Q.   Okay.   Do you recognize that?   Is that your phone bill for

23  the period ending October 8 or 10th, 2001?

24          Could you make that bigger at the top, please?

25          Is that correct?

J.A. 1181

## Kwon - direct

1  A.    Correct.

2  Q.    Okay.  Mr. Kwon, I'm going to use an exhibit that we've

3  marked as 10S3, a summary chart that I believe there's no

4  objection to, to go over the calls that are on -- reflected on the

5  phone bill.

6           THE COURT:  Any objection?

7           MR. MAC MAHON:  No, Your Honor.  We have a similar --

8           THE COURT:  All right, that's fine.

9           MR. MAC MAHON:  -- exhibit.

10           THE COURT:  10S3 is in.

11           MR. MAC MAHON:  Thank you.

12           (Government's Exhibit No. 10S3 was received in

13  evidence.)

14  BY MR. KROMBERG:

15  Q.    Okay.  These are -- this is taken from your phone records of,

16  as best we can reconstruct it, of September 16, on the phone

17  numbers that were called.  Do you recall on September 16, 2001,

18  starting at about 2:38 p.m., calling Donald Surratt?

19  A.    I recall calling Donald that day.

20  Q.    Do you recall calling Randall Royer shortly thereafter?

21  A.    Yes, I do.

22  Q.    And Ibrahim Hamdi?

23  A.    Yes.

24  Q.    Nabil Gharbieh?

25  A.    Yes.

## Kwon - direct

1  Q.   Now, is it correct that you don't recall what was -- what

2  particulars were said on any given call, but you just remember in

3  general these are people you were calling?

4  A.   Yes, I just remember the people.  I don't know what I said on

5  the phone.

6  Q.   Or even if you said anything on the phone.  With these

7  one-minute calls, it could be messages, correct?

8  A.   Correct.

9  Q.   Now, when you call yourself, is that just checking voice

10  mail?

11  A.   Yes.

12  Q.   And then we've got Mahmood Hasan, Masaud Khan.  Kabobs, Etc.,

13  is that the restaurant where you got the food?

14  A.   Correct.

15  Q.   Did you call them to place the order first?

16  A.   Yes.

17  Q.   Then we have September 16, 6:46 p.m., Ali Timimi.  Why did

18  you call Ali Timimi at that time?

19  A.   If I, if I recall, he called me first, I believe, and I was

20  just returning the call.

21  Q.   Okay.  And that's the call you already talked about?

22  A.   Correct.

23  Q.   Okay.  Then Ibrahim Al-Hamdi again.

24        When there are these N/As, do you recall who those

25  people were by any chance?  That's a bad question because you'd

1039

## Kwon - direct

1  have to look at the phone records, but do you recall calling other

2  people or speaking to other people other than the ones that are

3  listed here on this chart?

4  A.   I might have.  I don't know.

5  Q.   Okay.  Now, going down to 7:36 p.m., another call to Ali

6  Timimi.  Do you recall what that call was?

7  A.   I know I made a call later that evening before I went to pick

8  him up.

9  Q.   To say what?

10  A.   That I'm coming to pick him up.

11       MR. KROMBERG:  Okay.  And we can scroll down.

12  Q.   Mr. Kwon, do you recall what number -- who belonged to

13  703-886-2661?

14  A.   I don't recall at the moment.

15       MR. KROMBERG:  Okay.  The next page, please.

16  Q.   So looking at the phone records for the evening of September

17  16, so you have calls all throughout.  They go to 7:51 p.m., an

18  incoming call, and then nothing until the next day, on September

19  17.  Do you recall why that was that you had no phone calls after

20  September 16 -- after 7:51 p.m. on September 16?

21  A.   I had turned off my cell phone.

22       MR. KROMBERG:  Okay.  Let's go to the next page, please.

23  Q.   Do you recognize calling Mahmood Hasan on Monday evening?  Do

24  you recall what you were talking to Mahmood Hasan about on that

25  Monday evening?

1040

**Kwon - direct**

1  A.   I don't know exactly what I was talking about, but, I mean,

2  at that point, we were pretty much trying to coordinate our

3  travel, so --

4       MR. KROMBERG:  Okay.  Let's scroll on down.  So the

5  18th, we get down to -- keep scrolling down, if you would.  The

6  next page.

7  Q.   So you have on the 18th Mahmood Hasan, Yong Kwon, Randall

8  Royer, Masaud Khan, Mahmood Hasan, Masaud Khan, Mahmood Hasan.

9  Then we have a call to Muhammad Aatique at 8:49 p.m.  Do you

10 recall what the call was to Hammad on September 18 in the evening?

11 A.   No, I don't recall what the content of that call was.

12 Q.   Okay.  Who were you calling -- why were you calling Muhammad

13 Aatique at 2:31 and 2:43 a.m. on the morning of September 19?

14 A.   Well, we were driving.  We got lost, and I had to call him

15 for directions.

16      MR. KROMBERG:  Okay.  Let's go to the next one.

17 Q.   So this is the 19th.  Do you recall what the telephone call

18 was on September 19, which was Wednesday, at 1:55, to Ali Timimi?

19 A.   Probably to pick him up for lunch.

20 Q.   Okay.  And then 15 minutes later calling Kabobs, Etc., what

21 was that for?

22 A.   Probably to place an order in advance so the food would be

23 ready when we get there.

24 Q.   Okay.  Thank you.

25      How did you get to the airport when you left for

1041

## Kwon - direct

1  Pakistan?

2  A.   We called a taxi.

3  Q.   And what day of the week was that, do you remember?

4  A.   We left Thursday morning, the 20th.

5  Q.   Okay.  Who did you go with to the airport?

6  A.   With Mahmood Hasan.

7  Q.   What happened when you got to the airport?

8  A.   After the initial luggage screening, Mahmood was stopped by,

9  I guess, some kind of federal agent, but he let him go.  And then

10 we got on our, on our shuttle to New York.

11 Q.   Did anyone speak to you on line while going through security

12 or Customs or Immigration?

13 A.   At Dulles?

14 Q.   Either.

15 A.   Yes.  In New York, when we were boarding the --

16      MR. MAC MAHON:  Objection to what someone in line at the

17 airport told him, Your Honor.

18      MR. KROMBERG:  Judge, if I said, "Did you get pulled out

19 of line and get spoken to," I would have gotten an objection for

20 leading, so I'm just trying to move this along.

21      THE COURT:  There's no basis for that objection.  I'm

22 overruling it.

23      THE WITNESS:  There were immigration officers

24 interviewing everybody boarding the flight from New York City to

25 Pakistan, and they asked me a question.

**Kwon - direct**

 1  BY MR. KROMBERG:

 2  Q.   What did they ask you?

 3  A.   They said, "Are you traveling with Mahmood?"

 4  Q.   And what did you tell them?

 5  A.   "Yes."

 6  Q.   Where did you sit in relation to Mahmood on the plane?

 7  A.   We sat next to each other.

 8  Q.   What did you do when you got to Pakistan?

 9  A.   I'm sorry?

10  Q.   What did you do when you got to Pakistan?

11  A.   Oh, we stayed with Mahmood's uncle for about two weeks in

12  Karachi, where we went shopping preparing -- buying some stuff for

13  the training camp.  Also, we spent some, you know, leisure time.

14           And then we met with -- we also met with Masaud and his

15  brother, Omer, and we planned our trip to Lahore together, bought

16  a train ticket from Karachi to Lahore.

17  Q.   In the course of your trip to Lashkar with Mahmood Hasan and

18  Masaud Khan, who, if anyone, was the leader of the group?

19  A.   Masaud Khan.

20  Q.   How was that determined?

21  A.   Well, we knew that if there's three or more people traveling,

22  that one of us should be the leader, so we, we voted Masaud to be

23  our leader.

24  Q.   Did you use the word "leader"?

25  A.   No, we used the word "amir."

1043

## Kwon - direct

1  Q.   And where does this principle come from that you should have

2  a leader if there's three or more people traveling?

3  A.   It's an Islamic principle.

4  Q.   How did you -- how did you actually get in contact with LET

5  when you were in Pakistan?

6  A.   Before leaving United States, Royer had given me a -- LET's

7  Lahore office phone number for the Lahore office, where I

8  memorized it.  When we got to Lahore, we called the LET office

9  from a local motel, and they came and picked us up.

10 Q.   Before we go on to that, let me ask you one more question

11 about the amir.  Why, why was it that Masaud became the amir?

12 A.   He's the most knowledgeable in Islam.

13 Q.   Okay.

14          THE COURT:  I'm sorry, who was the most knowledgeable?

15          THE WITNESS:  Masaud Khan.

16          THE COURT:  All right.

17 BY MR. KROMBERG:

18 Q.   Okay.  So you get -- please continue about your contact --

19 making contact with LET in Pakistan.

20 A.   So when we reached Lahore train station, we got a taxi.  We

21 went to a nearby motel, and then we called LET office, and then

22 they sent a car for us, and they picked us up and took us to the

23 LET office in Lahore.

24 Q.   How long did you stay in the LET office in Lahore?

25 A.   One night, two days.

1044

**Kwon - direct**

1  Q.    And what happened then?

2  A.    Then they put us on a bus with, with one of their guides and

3  another Pakistani trainee who was intending to go to the camp, and

4  we went from Lahore to Muzafrabad on a bus.

5  Q.    How long did that take?

6  A.    About nine hours.

7  Q.    When you got to Muzafrabad, what happened?

8  A.    When we got to Muzafrabad, myself, Mahmood, Masaud, and the

9  Pakistani guide, we were pulled off the bus by the border police,

10 and we were detained for about two hours, two to three hours, and

11 then let go.

12 Q.    When you say "border police," were you crossing a border?

13 A.    It was a border to Muzafrabad.  I don't know exactly what

14 they were -- I just know that they were policemen at the Kashmir

15 border.

16 Q.    Okay.  So you got back on the bus, and what happened?

17 A.    So after they let us go, we got on a bus to a place called

18 Muree.

19 Q.    Can you spell that, please?

20 A.    M-u-r-e-e.

21 Q.    Okay.

22 A.    And LET had an office in Muree, so we went to that office,

23 and we rested for a little bit.  They gave us some refreshments,

24 and they put us in a taxi, and then we drove to Islamabad to the

25 LET headquarters, where we got in another, another car, it was

## Kwon - direct

1   actually a three-car convoy going from Islamabad to Muzafrabad,

2   the LET base camp at Muzafrabad.  So we got in a car, and they

3   drove us to Muzafrabad.

4   Q.    What happened when you reached Muzafrabad?

5   A.    When we got there, we spent the night at the base camp, and

6   the next day, they put us on a pickup truck, drove us to, drove us

7   to the supply point in the mountains, and then we walked from the

8   supply point to the foreign trainers camp.

9   Q.    Was there a name for the foreign trainers camp?

10  A.    Camp Masada.

11  Q.    Can you describe Camp Masada for the ladies and gentlemen of

12  the jury?

13  A.    Physically or --

14  Q.    Yeah.  What did it look like?

15  A.    It -- on a side of a -- it's actually on a side of a

16  mountain, on a steep hill.  There's three buildings, a training

17  ground.  They had bathrooms and running faucets, a kitchen.

18  Q.    How many people were there?

19  A.    When we, when we reached there, there was about 20 people, 20

20  trainees about.

21  Q.    And were there also trainers?

22  A.    Yes, there was about three trainers.

23  Q.    How long did you stay at the Masada Camp?

24  A.    How long did I stay there?

25  Q.    Yeah.

**Kwon - direct**

1  A.   Probably about two to three weeks.

2  Q.   What did you do there?

3  A.   They trained us in weapons, and they also trained us in

4  command, commander training, like we learned how to camouflage,

5  how to do reconnaissance, how to maneuver at night.

6  Q.   Hand-to-hand combat?

7  A.   A little bit of hand-to-hand combat.

8  Q.   What weapons did you train on when you were there?

9  A.   M-16, AK-47, G-3, G-2, Grenov, Kalashnikov, TT, Makarov,

10  MP-5.

11  Q.   Are those all different -- could you describe what each of

12  those things are?  We already heard about AK-47 and the M-16.

13  What about the Grenov did you say?

14  A.   That's a light machine gun.  And the TT and Makarov, they're

15  pistols, and the other guns I mentioned were assault rifles.

16  Q.   Were they automatic weapons or semiautomatic weapons?

17  A.   They're mostly automatic except for the pistols.

18  Q.   What did you -- when you say you trained on each of these

19  weapons, what did you do?  What did the training consist of?

20  A.   Well, first we'd have a classroom type of training, where

21  we'd sit and they'll go over, like, the history of the weapon,

22  like, who invented it, when was it invented, what was it made for,

23  and then we would go over, like, specifications, the weight, you

24  know, the length, what type of bullets, you know, the maximum

25  range, killing range, things like this.

1047

## Kwon - direct

1    And then we'll take it outside to a shooting range, and
2  we'll shoot the guns.
3  Q.   Did all the trainees that were in your group all shoot the
4  same weapons?
5  A.   Yes.
6  Q.   And did you fire each of the weapons that you already named?
7  A.   Not all of them but most of them.
8  Q.   Do you recall which ones you did not fire?
9  A.   MP-5, and that's it.
10 Q.   Did you come to see someone you knew at the Masada Camp?
11 A.   Yes.  When I reached Masada, Muhammad Aatique was already
12 there.
13 Q.   How long did he stay in the camp with you?
14 A.   He left the next day or day after, after I reached there.
15 Q.   So after the couple of weeks or so that you spent at the
16 Masada Camp, where did you go next?
17 A.   They moved us to a higher camp called Abdullah ibn Masood.
18 Q.   When you say "higher," do you mean higher up the mountain?
19 A.   Yes, higher in altitude.
20    THE COURT:  And can you spell the name of the camp as
21 best you can?
22    THE WITNESS:  A-b-d-u-l-l-a-h i-b-n M-a-s-o-o-d.
23 BY MR. KROMBERG:
24 Q.   What training did you -- how long did you stay at the ibn
25 Masood Camp?

J.A. 1192

1048

**Kwon - direct**

1  A.    About three to four weeks.

2  Q.    Well, how long did Hasan stay at that camp?

3  A.    Same amount of time.

4  Q.    And Masaud Khan?

5  A.    Same.

6  Q.    Did he leave at times in the middle?

7  A.    Oh, Masaud left when we were in the lower camp.  He was gone

8  for about a week, and then he joined us again at the higher camp.

9  Q.    What training did you do at the ibn Masood Camp?

10  A.    We did a lot of physical training and target practicing with

11  different, different weapons.  We learned walkie-talkie.  We

12  learned mostly tactics.  We learned ambush tactics.  We did a lot

13  of hiking, a long march, things like that.

14  Q.    Did you do any training at the Aqsa Camp?

15  A.    Yes.  We -- only training I remember doing at the Aqsa Camp

16  is trying to sneak into the Aqsa Camp one time in the middle of

17  the night and another time during the day without being detected.

18  Q.    When you say you were trying to sneak in, was that part of

19  the training you were assigned, to go sneak in?

20  A.    Right.  It was part of reconnaissance training.

21  Q.    At any time during your training, were you trained on

22  rocket-propelled grenades?

23  A.    Yes, we did.

24  Q.    Where was that?

25  A.    It was at Abdullah ibn Masood Camp.

## Kwon - direct

1  Q.   And what did that training consist of?

2  A.   Shooting just one round of -- well, we learned the RPG, you

3  know, like a classroom style.  We sat and, you know, took notes on

4  it, you know, learned how it works, and then we took it outside

5  and shot one round each.

6  Q.   When you say "we," who was "we" at that point?

7  A.   The trainees.

8  Q.   Was Mahmood Hasan with you at that point?

9  A.   Yes.

10  Q.   And he fired a rocket-propelled grenade?

11  A.   Yes.

12  Q.   And how about Masaud Khan?

13  A.   He also shot -- fired a rocket-propelled grenade.

14          MR. KROMBERG:  If I might have just a moment, Your

15  Honor?

16  Q.   Was there any other training involving rocket-propelled

17  grenades, even not firing it, at the Aqsa Camp?

18  A.   Not Aqsa Camp.  There was another camp called Umm al-Kora,

19  where we had our initial training on RPG, but we didn't fire

20  it.

21  Q.   Did you handle it at that point?

22  A.   Yes.  You know, it was -- they laid it in front of us.  We

23  took notes.  We looked at it.

24  Q.   When you say you looked at it, did you pick it up?

25  A.   Yes.

1050

**Kwon - direct**

1  Q.   Did Muhammad -- did Mahmood Hasan pick it up?

2  A.   I believe everybody picked it up or at least touched it,

3  yeah.

4  Q.   Okay.  How many phases of the training were there at the

5  Lashkar camps?

6  A.   There are three phases of training.

7  Q.   And what were they?

8  A.   The first phase is weapons, where I described moments earlier

9  where you learned the weapons, you fired them, you learned to take

10 it apart, put it back together.

11       Second phase of training is you do a lot of target

12 practice, a lot of hiking, survival training, march, low marches,

13 camouflage, reconnaissances, ambush exercises, more physical

14 training.

15 Q.   Was there a third phase of training?

16 A.   The third phase of training is the final phase of training

17 before you go into, to Kashmir to engage in combat.

18 Q.   Did you participate in the third phase of training?

19 A.   No, I didn't.

20 Q.   Why not?

21 A.   After the second phase of training, the amir of the camp

22 pulled everybody in my, in my training group down from the

23 mountains and sent us to Lahore office, back to Lahore office.

24 Q.   Did you know why?

25       MR. MAC MAHON:  Your Honor, I object.  That could only

1051

## Kwon - direct

1    be hearsay if the amir of a camp told him something.

2            THE COURT:  Well, if it's going simply to explain what

3    was going on in Mr. Kwon's head, it's not being offered for the

4    truth of its contents.  It wouldn't be hearsay.  So I don't know

5    what the purpose --

6            MR. KROMBERG:  It's not for the truth, Judge.  It's for

7    why Mr. Kwon did what he did.

8            THE COURT:  All right, then it's overruled.

9            THE WITNESS:  Did the amir say why?  Was that the

10   question?

11   BY MR. KROMBERG:

12   Q.   Yes.

13   A.   He didn't tell us why.  He just called us one morning, told

14   us that we'd be going down from the mountain back to the Lahore

15   office.

16   Q.   What news had you received at that point regarding the

17   progress of the war in Afghanistan?

18   A.   We heard that the American forces had made a significant

19   progress.

20   Q.   What impact did your hearing that news have on your

21   feeling -- your intentions at that point?

22   A.   Well, you know, at that point, we didn't know what was going

23   to happen, so we were kind of -- well, I was kind of undecided,

24   you know.

25   Q.   What was LET's position stated to you regarding whether they

**Kwon - direct**

1    would enable you to get to Afghanistan at that point?

2         MR. MAC MAHON:  Now, that can only be offered for the

3    truth of the matter asserted, Your Honor.  He's already said he's

4    undecided.  Putting in some unknown person from LET --

5         THE COURT:  Well, did you ask anybody at LET while you

6    were there about going to Afghanistan?

7         THE WITNESS:  No.  I didn't ask myself.

8         MR. KROMBERG:  Judge, if I could try that again?

9    Q.   What were you told about whether LET would facilitate you

10   getting into Afghanistan at that point?

11        MR. MAC MAHON:  And I object, Your Honor.  He just told

12   you he never even asked if he could go to Afghanistan.

13        THE COURT:  Well, you can be told something without

14   asking for it.

15        So was there ever any discussion by any of the LET

16   officials in your presence about going to Afghanistan?

17        THE WITNESS:  Yes.  There was some --

18        THE COURT:  Where and when first, and then what your

19   answer is.

20        THE WITNESS:  When we were brought down to Lahore and

21   then they took us to a place called Muridke, some of the Arab

22   trainees, they were unhappy with our situation.  So they wanted to

23   get into Afghanistan, so they asked Abu Bara --

24        MR. MAC MAHON:  Your Honor, the question was whether he

25   talked to some LET official.  Now he's discussing some unnamed

## Kwon - direct

1   Arab who told us --

2           THE COURT:  Yes, but I think he's about to say that they

3   asked the question, and I'm going to allow this line of

4   questioning.  You can probe it on cross.  Overruled.

5           THE WITNESS:  And they were told that -- Abu Bara says

6   that we're not sending anybody into Afghanistan.

7           THE COURT:  And I'm sorry, who made the statement?

8           THE WITNESS:  This was Abu Bara's statement to us, that

9   LET is not sending anybody into Afghanistan.

10  BY MR. KROMBERG:

11  Q.   What were you told about borders between Pakistan and

12  Afghanistan being open or closed?

13  A.   We were told that the borders are closed.

14  Q.   By whom?

15  A.   By Pakistani aided by the U.S. forces.

16  Q.   What was your reaction to that?

17  A.   Disappointment.

18  Q.   Where did you go -- okay.  What did you do when you were in

19  the LET office in Lahore?

20  A.   What did we do?

21  Q.   Yeah.  How long were you there at the LET office in Lahore?

22  A.   We were there -- we only spent one night.  You know, they fed

23  us, we slept, and the next day, they took us to Muridke.

24  Q.   Did you see anybody you knew at the LET office in Lahore?

25  A.   Yes.  I saw Ali Chandia.

1054

## Kwon - direct

1      MR. KROMBERG:  Could we put up -- never mind.

2  Q.   And you knew Ali Chandia from back in Virginia?

3  A.   Here.  He's from Maryland, yeah.

4  Q.   Now, what did you, what did you and Ali Chandia talk about

5  when you saw him at the LET office in Lahore?

6  A.   He, he just has some news back home here in Virginia and

7  Washington, D.C. area.  He asked us how was the training.  He

8  asked us what's needed in the camp.  He also, he also gave me --

9  he also delivered me some money that another brother owed me.

10 Q.   Okay.  Hold that thought for just a second.  I'd like to put

11 up a picture of Ali Asad Chandia.  It's already in evidence.

12      Is that the individual you saw?

13 A.   Yes.

14 Q.   Now, he repaid money to you.  Could you describe what that

15 was about?

16 A.   There's another brother by name of Husnain.  He borrowed some

17 money from me, and he never got the chance to pay it all back

18 because I left, so he sent the rest of the money with Ali Chandia,

19 and Ali Chandia delivered that money to me in Lahore office in

20 Pakistan, LET office in Lahore.

21 Q.   Take a look, if you would, at -- I'm going to try to get this

22 one right -- 7C19d, which is in evidence, so it could go right up

23 on the screen.  Can you see that on the screen?

24 A.   Yes.

25 Q.   Is that the check that you gave to Husnain Awan?

## Kwon - direct

1  A.    Correct.

2  Q.    Do you recall why you gave him the money?

3  A.    Yes.  He told me that Ali Chandia was driving his car --

4        MR. MAC MAHON:  Your Honor, this witness is not a

5  coconspirator in the case, Mr. Husnain Awan.  There's got to be

6  some limit to the hearsay that can come in.

7        THE COURT:  Well, I think if somebody writes a check for

8  $500 to somebody, it is all right for that person to explain why

9  he wrote someone a check.

10       MR. MAC MAHON:  That's fine.  He can say that.  He

11  doesn't have to tell what other people told him while he does it.

12       THE COURT:  No, but that may be why he did it.  I mean,

13  if I ask you for $500, that explains why I gave you the $500

14  check.  So it's not being offered for the truth of its contents,

15  and as I understand it, it's context.

16       MR. KROMBERG:  I don't even care about the truth of its

17  contents, Judge.

18       THE COURT:  All right.  Overruled.

19       THE WITNESS:  Well, Husnain told me that Ali Chandia was

20  driving his car and got into some minor accident where he needed

21  money to fix the car.  He was short, so he asked me if he can

22  borrow some money.

23  BY MR. KROMBERG:

24  Q.    Okay.  Before you left LET, did anyone from LET approach you

25  about doing things for LET once you got back to America?

1056

## Kwon - direct

1  A.   You mean if I went back to America?  Yes.

2  Q.   Oh, I'm sorry, let me change that question.  Did anyone from

3  LET approach you about doing things for LET after you left the

4  Lashkar camp?

5  A.   Yes.  When I was in Muridke, Abu Bara sent his driver to pick

6  myself and Masaud Khan, pick us up from Muridke, brought us back

7  into Lahore, and he arranged a meeting with an individual which I

8  don't know his name.  They never told us his name.  And he asked

9  us if, if we were willing to do some, do some services for LET in

10  America.

11  Q.   What did you tell him?

12  A.   We asked him what it was, and he said he can't tell us what

13  it was unless we commit to it first.  So we told him we can't

14  commit to it unless you tell us what it is first.

15       So he sent us back to Muridke for a few days, and then

16  he brought us back, and we had a second meeting with him, and only

17  thing that he told us about this, this --

18  Q.   That second meeting, who's "us"?  You and Masaud Khan at this

19  point?

20  A.   Correct.

21  Q.   Where is, where is Mahmood Hasan?

22  A.   Mahmood, when we reached Muridke, he left the next day.  He

23  told me that he's going to just go see his family in Islamabad,

24  and he left.

25  Q.   Okay.  So it was you and Masaud Khan at this point?

**J.A. 1201**

1057

**Kwon - direct**

1  A.    Correct.

2  Q.    All right.  And this was your second meeting with a guy whose

3  name you didn't know.  Did you call him by a particular name?

4  A.    Yes.  He -- at one point when he was talking about himself,

5  he referred to himself as the Disco Mujahid.

6            THE COURT:  I'm sorry, as what?

7            THE WITNESS:  As a Disco Mujahid.

8  BY MR. KROMBERG:

9  Q.    What did that refer to, if you know?

10  A.    It was his appearance.  Because most people at LET have, you

11  know --

12  Q.    Traditional Islamic dress?

13  A.    Yes, and big beard and things like that.  But this individual

14  was wearing, you know, like, a western, tight western clothes, you

15  know, nice trim beard, and at a glance, you wouldn't think him a

16  religious person.

17            And the second meeting, only thing he told us about this

18  job he had for us was to go back to the United States, and he said

19  it involved a lot of information gathering, a lot of e-mailing,

20  and some propaganda.  That's all he told us.

21  Q.    Was there any part of the -- what language was the

22  conversation in?

23  A.    It was mostly in English, but there were times when he spoke

24  Urdu.

25  Q.    And Masaud Khan understands Urdu?

**J.A. 1202**

**Kwon - direct**

1   A.    Correct.

2   Q.    You do not?

3   A.    No.

4   Q.    When did you ultimately leave LET?

5   A.    Around early December.  Masaud and I, we decided that we were

6   going to leave Muridke and go back to Karachi.  At that point,

7   Masaud's younger brother, Omer, was in Karachi.  He came from

8   Karachi to Lahore.  He picked us up, and we left Muridke and went

9   to the Lahore office, told Abu Bara that we were leaving, and then

10  he talked to us, and he let us go, and we came back to Karachi.

11  Q.    Where did Masaud Khan go from there?

12  A.    He came back to the United States.

13  Q.    What did you do?

14  A.    I stayed in Karachi, started a business with Omer Khan and

15  another individual, and I stayed there until August of 2002, and I

16  went to Korea from there.

17  Q.    Why did you not continue in your quest to go fight after

18  leaving LET?

19  A.    Well, there are many, many factors.  No. 1, I was by myself.

20  Masaud had gone back.  Mahmood has gone to see his family.  So I

21  was alone.

22          No. 2, LET is not sending anybody to Afghanistan or

23  Kashmir.

24          No. 3, you know, the war was -- seemed to me at that

25  point, war was pretty much over in Afghanistan.  So I decided not

1059

## Kwon - direct

1  to go forward with this plan.

2  Q.   How would you compare the strength of your desire to go help

3  the Muslims in Afghanistan at that point as it had been on

4  September 16, 2001, in your house?

5  A.   It was -- I wasn't as, I wasn't as enthusiastic about it as I

6  was when I left here.

7  Q.   I'd like you to look at 7C19.  It might be easier if you just

8  look in the book for a moment.  And I want to ask you about the

9  withdrawals of $332.51 that were made on November 22, 23rd, and

10  24th, in Lahore, or if you remember them, you don't even have to

11  go look for them, but they reflect a number of withdrawals on

12  those dates, in fact, six withdrawals.

13          Do you remember what happened with them?

14          MR. MAC MAHON:  I'm sorry, if I could get the exhibit

15  number again, Your Honor?

16          MR. KROMBERG:  7C19.  I just don't remember which, which

17  particular bank statement it was.

18          That would be 7C19a4.

19          MR. MAC MAHON:  Thank you.

20  BY MR. KROMBERG:

21  Q.   Were you making those withdrawals November 23 in Lahore for

22  $332.78?

23  A.   No.

24  Q.   How about -- go to the next page.

25          No, not that page.

## Kwon - direct

1          How about those withdrawals, 11/26, 11/27 -- excuse me,

2   11/26, $332.78, in Lahore?

3   A.    No.

4   Q.    Who was making those withdrawals?

5   A.    Abu Bara was making those withdrawals.

6   Q.    How was Abu Bara making withdrawals from your bank account?

7   A.    Because I gave him my ATM card, and I asked him to withdraw

8   some money for me, and I was in Muridke, and there's no ATM

9   machines in Muridke, so I asked him to do it for me.

10  Q.    Did he give you all that cash?

11  A.    Yes, he did.

12  Q.    Now, the next month, which would be -- the next month, there

13  were -- never mind.

14          The next month, there were withdrawals from Karachi.

15  How did those come about?  Were those you?

16  A.    They would be my withdrawals.

17  Q.    Okay.  What contact did you have with the other members of

18  the Dar al-Arqam group that we've spoken about this week after you

19  left LET?

20  A.    I had e-mail contacts with Masaud.  I had an e-mail and a

21  phone call conversation with Mahmood.  I had an e-mail contact

22  with Seif Chapman.

23  Q.    How did your e-mail contact with Seif Chapman come about?

24  A.    Well, I received -- I was exchanging e-mails with Masaud

25  Khan, and he sent me an e-mail.

1061

## Kwon - direct

1  Q.    Was this -- approximately when was this?

2  A.    May -- between May and June of 2002.

3  Q.    Okay.  In May and June of 2002, you're exchanging e-mails

4  with Masaud Khan?

5  A.    Right.  And he mentioned to me that the British guy that we

6  met at the camp says hello, and I knew who he was talking about.

7  There was an individual who had a British accent in Lahore office,

8  so I assumed that it was him.

9        MR. MAC MAHON:  Your Honor, objection to the assumption.

10 I would ask for some time frame, the kind of communications that

11 we're talking about now.

12       MR. KROMBERG:  Judge, we just had the time frame.

13       THE COURT:  The time frame, I thought, was May to June

14 of 2000.  Isn't that what you just said?

15       MR. KROMBERG:  2002.

16       THE COURT:  2002, all right?

17       How many people at the camps had a British accent?

18       THE WITNESS:  You mean at the Lahore office?

19       THE COURT:  Yes, I'm sorry, the Lahore office.

20       THE WITNESS:  There was only one person.

21       THE COURT:  Was he Pakistani, or was he English, or what

22 did he look like?

23       THE WITNESS:  Ethnically, he's Pakistani.

24       MR. KROMBERG:  Judge, if I could -- I'm sorry to

25 interrupt you, but I think the witness is going to say he got in

J.A. 1206

### Kwon - direct

1  contact directly with this person, so it's going to --

2          THE COURT:  All right.  But I think it's close to the

3  normal break time in the afternoon.  We'll recess until 10 after

4  four and give the jury a chance to stretch their legs and get

5  their afternoon break.

6              (Recess from 3:47 p.m., until 4:10 p.m.)

7                      (Defendant present, Jury out.)

8          THE COURT:  Yet another note from the jury.  Again, it

9  shows you how the jury sees everything that goes on in the

10  courtroom.

11          "During the questioning of Mr. Kwon this afternoon, I

12  turned and noted Mr. Ken Melson in the room.  I believe he is a

13  federal prosecutor.  I know him from church.  I have not spoken to

14  him since before this case began, and I have not spoken to him

15  about this case.

16          "Juror No. 22."

17          Now, do you want me to call the juror in and ask any

18  specific questions, such as would she be inclined to favor the

19  prosecution over the defense because she knows someone from that

20  office?  I'll give you-all a minute to think about that.

21          MR. MAC MAHON:  I think we'd better, Your Honor, just to

22  be safe.  I have nothing but respect for Mr. Melson, but I think

23  it would be fair to ask.

24          THE COURT:  All right.  Juror No. 22, just that juror,

25  please.

1063

# Kwon - direct

1   (Juror No. 22 present.)

2   THE COURT:  Hello, just have a seat in the front --

3   wherever you're comfortable.

4   Thank you very much for your note.  You're doing exactly

5   what we want our jurors to do if something happens during the

6   course of the trial.  I just want to ask you, how close a friend

7   would you consider yourself to Mr. Melson?

8   THE JUROR:  I see him at church.

9   THE COURT:  It's just a --

10  THE JUROR:  (Nodding head.)

11  THE COURT:  Are you on any committee with him or any

12  shared activities at the church with him?

13  THE JUROR:  With his son but not necessarily with him.

14  THE COURT:  All right.  Do you think in any respect you

15  might tend to favor the prosecution's side of this case because

16  you know one of the members of that office?  Because he is in that

17  office.

18  THE JUROR:  No, I don't believe I would favor the

19  prosecution or the defense.

20  THE COURT:  All right, any other questions counsel want

21  me to ask Juror No. 22?

22  MR. MAC MAHON:  No, Your Honor.  Thank you.

23  MR. KROMBERG:  No, Your Honor.

24  THE COURT:  All right, if you'd just step back inside

25  for one second?  Thank you.

1064

## Kwon - direct

1    (Juror No. 22 out.)

2    THE COURT:  I see no reason to strike this juror based

3    on that answer.  Does anybody --

4    MR. MAC MAHON:  I agree, Your Honor.

5    THE COURT:  All right, that's fine.  Let's bring the

6    jury in then.

7    (Jury present.)

8    THE COURT:  You-all can sit as soon as we come in.  We

9    stand for you.  You don't have to stand for us -- for most of us

10   anyway.

11   All right, is everybody set?  Mr. Kwon is back on the

12   stand, and we'll continue the direct examination.

13   MR. KROMBERG:  Thank you, Your Honor.

14   Q.   Mr. Kwon, we had just started on the topic of the British

15   guy.  Why did you -- why were you trying to reach the British --

16   did there come a time when you were trying to reach the British

17   guy?

18   A.   Yes.  My visa had ran out for my stay in Pakistan, and my

19   business partner by the name of Farooq, he was supposed to help me

20   somehow renew the visa, but he couldn't, so -- or up to that time,

21   around May-June, he still hasn't done it.  So I was trying to get

22   in touch with the British guy, whose name is Abu Khalid.

23   Q.   Is that Khalid, K-h-a-l-i-d?

24   A.   Correct.

25   Q.   Okay.

J.A. 1209

**Kwon - direct**

1  A.    And I was, I was looking for his assistance, to see if he can

2  help me with my visa problem.

3  Q.    So what did you do to try to reach Abu Khalid or his

4  assistant?

5  A.    So I e-mailed Masaud Khan back, and I asked him if he can

6  give me his contact information, and Masaud said he doesn't have

7  it, but Seif Chapman has it.  So I e-mailed Seif Chapman, asking

8  for Abu Khalid's contact information, and Seif e-mailed me back

9  with his, Abu Khalid's e-mail.

10 Q.    Do you recall what that was?

11 A.    It was johninformation@yahoo.co.uk or something like that.

12 Q.    Now, were you surprised to hear that Seif Chapman might have

13 known Abu Khalid?

14 A.    No.  When I was in Lahore office, I had engaged in a

15 conversation with Abu Khalid, and he told me himself he knew Seif.

16 Q.    And you had discussed that Seif had been to the Lashkar camps

17 before you?

18 A.    Yes, he had been to a camp before us.

19 Q.    What did you do with the johninformation@yahoo.uk e-mail

20 address?

21 A.    I mailed johninformation, Abu Khalid, asking him to contact

22 me, and he didn't reply back immediately.  It took him about

23 two-three weeks, but he did finally reply with his telephone

24 number in Pakistan.  So I called the telephone number and spoke to

25 him.

1066

**Kwon - direct**

1  Q.    Did he help you with your visa problem?

2  A.    No.  When he got back to me about three weeks later,

3  three-four weeks later, my business partner, Farooq, he had worked

4  something out with the FIA, which is, I guess, the Pakistani

5  equivalent to Immigration, so that I can leave and go to Korea.

6  Q.    Okay.  I'd like you to look at 2A20a, which I believe is in

7  evidence through stipulation 26.

8           MR. MAC MAHON:  Which number?  I'm sorry?

9           THE COURT:  2A20a.

10          MR. KROMBERG:  2A20a, through stipulation No. 26.

11          MR. MAC MAHON:  No objection, Your Honor.

12          THE COURT:  All right.

13          MR. MAC MAHON:  A picture of a computer?

14          MR. KROMBERG:  The picture of the computer was 2A20, and

15  this was the e-mail that was from that computer.

16          THE COURT:  2A20a is in.

17          (Government's Exhibit No. 2A20a was received in

18  evidence.)

19  BY MR. KROMBERG:

20  Q.    Now, that e-mail address from John Smith,

21  johninformation@yahoo.co.uk, is that what you recall Abu Khalid's

22  e-mail address to be?

23  A.    Yes.

24          MR. KROMBERG:  Okay.  Let's scroll down if we could.

25  Hold on just a moment.

**J.A. 1211**

**Kwon - direct**

1  Q.   Now, masaudk@msn.com, was that Masaud Khan's e-mail address?

2  A.   Yes.

3  Q.   Who was Elisabeth Khan?

4  A.   That's his mother.

5  Q.   Okay.  Thank you.

6        Mr. Kwon, you mentioned that you had started a business

7  in Pakistan and then eventually you went to Korea.  Do you recall

8  when you left Pakistan and went to Korea?

9  A.   I don't have the exact date, but it was sometime in August of

10  2002.

11  Q.   What did you do, what did you do when you got to Korea?

12  A.   I was -- well, I saw my family, and one of my main things

13  were that -- was that I was trying to -- Farooq and I, we talked

14  about some more business opportunities, like what I can bring back

15  from Korea to Pakistan, because the type of business we had was

16  import-export business.  So I was looking for also business

17  opportunities, you know, and to see my family.

18  Q.   Were you working?

19  A.   At that time?

20  Q.   Okay.  When you got to Korea, were you working?

21  A.   No, not in August.

22  Q.   Okay.  Did there come a time when you started working in

23  Korea?

24  A.   Yes.  So I went back to Pakistan in October to talk to

25  Farooq, to tell him that, you know, I'm folding up the business in

1068

## Kwon - direct

1  Pakistan and I'm going back to Korea to work for my father.  So in

2  November, I came back to Korea and started working for my father.

3  Q.    Doing what?

4  A.    I was a manager for his company.

5  Q.    What kind of company was it?

6  A.    He, he produces a lot of manufacturing materials like pipes

7  and joints and things like that.

8  Q.    Is that what you were doing in March of 2003?

9  A.    Yes.

10  Q.    When did law enforcement first approach you about your travel

11  to LET?

12  A.    First, my first contact with FBI was around, I don't remember

13  exact date, like March, maybe March 20 or March 19 or so.

14  Q.    And what was that contact?

15  A.    It was Agent Ammerman.

16  Q.    Agent Ammerman sitting next to Mr. Williams?

17  A.    Yes.

18  Q.    What did Mr. Ammerman say to you on the phone?

19  A.    He said that, you know, he said that he has some questions

20  about my travels to Pakistan.  He told me that I'm under

21  investigation.  He told me that he wants to meet with me and speak

22  to me.  He asked me to come back to United States.

23  Q.    What did you decide to do in response to his request?

24  A.    Initially, I told him no.  I did not -- I told him I don't

25  want to go back to United States.

1069

## Kwon - direct

1  Q.    What happened then?

2  A.    Then the FBI agent who's stationed in Seoul, Korea, with the

3  U.S. embassy, he came to my work with Korean authorities, and

4  he -- we sat down.  He talked to me.  He asked me some questions

5  about my travels.  He told me that, you know, if you haven't done

6  anything wrong, why don't you go back and talk to Agent Ammerman,

7  things like this.

8          And then I decided that, that, that I have two choices,

9  you know, I can either try to run or, you know, go, go back and

10  face this issue, try to clear it up, and I decided it's better to

11  face it now than have it hanging over me.

12          And also, there's the prospect of maybe being forced to

13  leave Korea to go back to United States, you know, wasn't a

14  very -- I was worried about my family and things like that.  So,

15  you know, I -- in the end, I decided to voluntarily come back and

16  to talk to Agent Ammerman.

17  Q.    Where did you meet him?

18  A.    We met in Hawaii.

19  Q.    Do you recall when that was?  In March 2003?

20  A.    I believe it was March 22 of 2003.

21  Q.    What happened while you were in Hawaii?

22  A.    Agent Ammerman and Agent Kneisler, they --

23  Q.    Agent Tracy Kneisler?

24  A.    Correct.  They, they took me to the FBI building in Hawaii,

25  and I had an interview with them.

1070

**Kwon - direct**

1  Q.   Did you tell them the truth during that initial interview?

2  A.   No.  Initially, I told them the story that, that myself and

3  Mahmood had worked out if anybody was to ask us.  That's the story

4  I gave them.

5  Q.   And that story was what?

6  A.   That Mahmood and I went to Pakistan for, for a wedding,

7  for -- we went there for, you know, leisure travel, that I stayed

8  with his family, you know, toured Pakistan, had fun, things like

9  that.

10  Q.   Well, if one of the motivations for you was to come back, was

11  to face up to this, then why did you not tell the truth?

12  A.   Well, I figured I had to try, you know, who knows, I could

13  have gotten away with this story, you know?  Maybe -- I thought

14  that maybe they'll go away happy with this story.

15  Q.   Did they go away happy with the story?

16  A.   No.

17  Q.   What happened?

18  A.   Well, after I had told this story, they, they knew it was a

19  bogus story.  They already had certain amount of information.

20  They told me that they knew that, you know, Royer had gone to the

21  camp and --

22         MR. MAC MAHON:  Your Honor, I don't know about putting

23  this in for context, but what the agents told him could be

24  considered by the jury to be true or some factual basis to it, so

25  I don't --

**J.A. 1215**

### Kwon - direct

1    THE COURT:  I'm allowing this line of testimony only to

2  explain the changes in the story that Mr. Kwon made, but what he

3  tells you the agents said to him, what those agents' statements

4  are are not any kind of fact that you can accept at this point.

5    MR. KROMBERG:  Thank you, Your Honor.

6  Q.   Mr. Kwon, you were saying -- I think the question was why --

7  I'm sorry, can you repeat where we were?

8    (Answer read.)

9    MR. KROMBERG:  Thank you.

10 Q.   Mr. Kwon, can you continue your answer?  You were describing

11 what they told you that induced you to realize that maybe you

12 should make a different choice.

13 A.   Well, they told me that, you know, a certain somebody went to

14 a camp and so-and-so went to camp and they know that so-and-so

15 went to camp, and they told me that Ibrahim was in jail.

16 Q.   Ibrahim Al-Hamdi?

17 A.   Correct.  And, you know, they said that they know that, you

18 know, they know all these people went to camp, and they're

19 wondering about me.  They said, you know -- at this point, I

20 figured that they already know, so I admitted that I went to the

21 LET camp.

22 Q.   How long did you stay in Hawaii?

23 A.   Three days.

24 Q.   Where did you go from Hawaii?

25 A.   To Virginia.

1072

## Kwon - direct

1   Q.   Why did you go to Virginia?

2   A.   I was subpoenaed to appear in grand jury.

3   Q.   By whom?  I mean, who gave you the subpoena?

4   A.   Agent Ammerman.

5   Q.   How did you get physically from -- how did -- did you fly?

6   Well, obviously, you flew from Hawaii to Virginia.

7   A.   Correct.

8   Q.   Commercial airliner?

9   A.   Correct.

10  Q.   What did you do then -- where did you live when you got to

11  Virginia?

12  A.   When I got to Virginia, the agents, they put me in a hotel.

13  Q.   Do you remember what hotel?

14  A.   The first hotel, I believe, was the Comfort Inn down the

15  street from here, and then they put me in a Residence Inn in

16  Crystal City.  They moved me a couple times to different places.

17  Q.   What did you do with your time once you were back in

18  Virginia?

19  A.   Well, basically, I was living in a hotel with the FBI agents.

20  There was two agents with me at all times.  So they would ask me

21  questions, and they would ask me to do some things.

22  Q.   You say "some things."  What things are you referring to?

23  A.   They, they asked me to, you know, make some calls for them,

24  things like that.

25  Q.   Why did you decide to do it?

**J.A. 1217**

1073

## Kwon - direct

1  A.    Well, I didn't want to do it, of course.  Who would want to

2  do these things?  But, you know, I didn't -- at the time, I didn't

3  have -- I was in a hotel room with the FBI agents.  I didn't have

4  contact with outside except for my family at limited basis.

5        You know, I, I didn't know what was going on, you know.

6  I had nobody to advise me otherwise.  I didn't have a lawyer, you

7  know, nobody to give me legal advice, and they're pressuring me

8  to, to do these things, you know.

9  Q.    Did you decide that doing those things was the right course

10  of action?

11  A.    At the time, you know, they told me that this is, you know,

12  this is the only hope myself and those people involved, you know,

13  and I believed them, and I agreed to do these things.

14  Q.    How was it the only hope for the other people involved?

15  A.    At the time, I figured that if, if we all just admit to what

16  we did, you know, and, you know, admit to what we did and just,

17  you know, tell the government what we did, and hopefully, you

18  know, try to make -- reduce our penalty as much as we can, and,

19  you know, I thought that was the best way.

20  Q.    Did there ultimately come a time when you were arrested?

21  A.    Yes.

22  Q.    Do you remember when that was?

23  A.    It was April 29, 2003.

24  Q.    Was that a surprise to you?

25  A.    No.

1074

**Kwon - direct**

1   Q.   You had talked about it before with the agents?

2   A.   Correct.

3   Q.   Do you remember what day you got back to Virginia?

4   A.   Approximate -- I don't remember the exact date, but I believe

5   it was March, maybe March 27 or so or 28th.

6   Q.   How many days was it between the day you got back to Virginia

7   and the day you testified in the grand jury?

8   A.   About a week.

9   Q.   Do you recall whether you first admitted that Masaud Khan was

10   with you at the LET camp in Hawaii or in Virginia?

11   A.   In Virginia.

12   Q.   Why did you not admit it when you were in Hawaii?

13   A.   Well, the agents never mentioned Masaud, so I, I figured if I

14   left him out of my story, you know, hopefully, they'll never find

15   out, but somehow they found out, and, you know, when they

16   confronted me with this fact, I admitted that he was there.

17   Q.   When did you first admit that Aatique was with you at the LET

18   camp?  Before -- excuse me, in Hawaii or in Virginia?

19   A.   In Virginia.

20   Q.   Why did you not tell the agents back in Hawaii that Aatique

21   had been with you at the LET camp?

22   A.   For the same reason.  I, you know, I didn't want to implicate

23   any other people.  I didn't want to, you know -- I wanted to

24   protect my friends as much as possible, you know?  But once they

25   found out, you know, I couldn't, I couldn't -- I had to tell them

**J.A. 1219**

**Kwon - direct**

1  the truth.

2  Q.   When did you first tell the agents that Ali Timimi advised

3  the group on September 16 that they should go to Afghanistan to

4  help the Taliban?  In Hawaii or in Virginia?

5  A.   I told about the meeting in Hawaii, but as far as the fatwa

6  and my intention to go to Afghanistan and things like that, I told

7  them, I believe, in August of 2003.

8  Q.   You testified in the grand jury about him reading the Uqla

9  fatwa, correct?

10       MR. MAC MAHON:  Your Honor, that's not a proper way to

11  examine his own witness, with his grand jury testimony.

12       THE COURT:  Well, the witness has not been impeached

13  yet, and I think probably you ought to leave that for rebuttal.

14       MR. KROMBERG:  Your Honor, I think if the -- if the

15  witness is saying something that I know to be incorrect and that

16  he's testified contrary --

17       THE COURT:  Then you need to correct that now.  I will

18  let you do that.

19       MR. KROMBERG:  Thank you, Your Honor.

20       MR. MAC MAHON:  If I may, Your Honor, if I could ask,

21  none of us sitting over here were at any of these meetings.  It's

22  improper for him to suggest what's correct or incorrect about what

23  this witness has said at any time, Your Honor.

24       THE COURT:  Well, a prosecutor does have a certain -- as

25  all lawyers do, have ethical obligations to make sure they're

1076

## Kwon - direct

1  presenting as accurate evidence as they can, and so I'll allow

2  some of this, but as I said, don't try to predict what may happen

3  on cross.  It's better to wait and then take care of it in

4  rebuttal.

5          MR. KROMBERG:  Yes, Your Honor.

6  Q.   Mr. Kwon, didn't you testify in the grand jury on April 3

7  that somebody asked him about Afghanistan, he read the Uqla fatwa?

8          MR. MAC MAHON:  Your Honor, now he is impeaching his own

9  witness.  If that's asking him if he made a false statement at the

10 grand jury, he's impeaching his own witness.

11         THE COURT:  Is that what you're trying to do right now?

12         MR. KROMBERG:  No, Judge.  I'm trying to refresh his

13 recollection about when it was that he first said that Ali Timimi

14 read the Uqla fatwa.  He said August just now.  I want to bring

15 him to the grand jury testimony when he said in April.

16         MR. MAC MAHON:  All right --

17         MR. KROMBERG:  I have the testimony, I have the

18 transcript that he said it in April.  I can't let mistaken

19 testimony come in from a government witness if I have testimony

20 that's different from that.

21         THE COURT:  All right, I'm going to permit it, and you

22 can go into it again on cross if you want to do that.  Go ahead.

23         THE WITNESS:  Correct.  Actually, I mentioned the Uqla

24 fatwa in the grand jury.  What I meant to say was I didn't reveal

25 my intention to go to Afghanistan until August.

1077

**Kwon - direct**

1   BY MR. KROMBERG:

2   Q.   Thank you.  Why did you wait until August to reveal your

3   intention to go to Afghanistan, until August?

4   A.   Well, obviously, I didn't want to -- I want to take the

5   lesser of the penalty.  I didn't want to, you know, take the more

6   severe penalty.

7        Also, at that point, I realized that one of my

8   codefendants has told them about our intention of travel, told the

9   government, so at this point, I figure that I also need to tell

10  them the truth before --

11  Q.   Okay.  Before August, back when you were not telling the

12  government about your intention to go to Afghanistan, what impact

13  did you understand your telling the government about your

14  intention would have on your codefendants?

15  A.   I'm sorry?

16  Q.   What did you -- back in April of 2003, when you testified in

17  the grand jury, what impact did you think you would have on your

18  friends if you told them that -- if you told the government that

19  you had intended to go to Afghanistan?

20       MR. MAC MAHON:  Your Honor, objection.  I'm not sure I

21  understand the question.

22       THE COURT:  Sustained.

23  BY MR. KROMBERG:

24  Q.   What did you think would happen to your friends back in April

25  of 2003 if you told the government at that time that your

1078

## Kwon - direct

1    intention in September 2001 had been to go to Afghanistan?

2            MR. MAC MAHON:  And now he's impeaching his own witness.

3            THE COURT:  I'm sustaining that objection.  You need to

4    get to a different line of questioning, Mr. Kromberg.

5            MR. KROMBERG:  Okay.

6    Q.   When you first were in Hawaii, when you first met Agent

7    Ammerman, did you tell him anything about Royer being the person

8    who told you to go to Lashkar?

9    A.   Yes.

10   Q.   How did that happen?

11   A.   When he was questioning me and I admitted that I went to LET

12   camp, you know, they asked me, you know, who told you to go, who

13   helped you to get there, so I told them Royer, Ismail Royer had

14   facilitated my travels to LET.

15   Q.   You described something about a meeting by a lake?

16   A.   Yes.  We had a meeting on the 19th, the day that I wrote him

17   that check -- the night that he made a phone call for me and

18   Mahmood to LET, we met by a lake near my house.

19           MR. MAC MAHON:  Your Honor, can we approach on this,

20   please?

21           THE COURT:  Yes.

22           MR. MAC MAHON:  Very briefly.

23           (Bench conference on the record.)

24           THE COURT:  Yes, Mr. MacMahon.

25           MR. MAC MAHON:  Your Honor, this is, this is an improper

268 of 314Total Pages:(268 of 314)

**Kwon - direct**

1   method for him to question this witness about what he said, what

2   he heard and saw, and what he's trying to do now, this witness has

3   told so many stories about what's happened, some of them must be

4   true, some of them must be false, and there's fifty 302s.  He's

5   trying to walk him through the ones that are obviously the worst

6   ones, and it's just an attempt to essentially impeach his own

7   witness before I get my chance to do it.

8           In his direct examination, he can ask him what he saw,

9   what he heard, and what he did, but going through these things is

10  not part of the government's case, Your Honor.

11          THE COURT:  I'm going to let -- I'm going to sustain

12  this objection because this is bogging it down, all right?  Finish

13  your direct exam with this witness if you have anything else you

14  want to get out.  And the inconsistent statements are something

15  you have to live or die with.  They're going to get it out on

16  cross, and then you can go back over it in rebuttal and, you know,

17  rehabilitate to the extent that you can, all right?

18          I agree.  Otherwise, it's too murky at this point.

19          MR. MAC MAHON:  And if I may just for the record, Your

20  Honor, if it's not even -- if he's trying to keep the testimony

21  clear, the witness said that his meeting with Royer to go to LET,

22  in the 302 he's discussing, was before the dinner with Ali

23  Al-Timimi.  So it's even misleading as to what's coming in as

24  well.

25          THE COURT:  Well, all right, but I think it's better to

1080

## Kwon - direct

1  just do it in the more traditional way.  Put your witness on.  The

2  testimony he said in court is what he said in court.  If they

3  cross-examine him and open the door, then you go back and

4  rehabilitate him.

5          MR. KROMBERG:  Thank you, Your Honor.

6          MR. MAC MAHON:  Thank you.

7          (End of bench conference.)

8  BY MR. KROMBERG:

9  Q.   Mr. Kwon, when did you first get a lawyer?

10 A.   In May.

11 Q.   Of 2003?

12 A.   Correct.

13 Q.   When was your first contact with Mahmood Hasan after

14 returning to the U.S.?

15 A.   The day of arraignment, I believe.

16 Q.   Was there a phone call involved?

17 A.   Oh, yes.  Yeah.  I called Mahmood at the request of FBI.

18 Q.   What did you discuss?

19         MR. MAC MAHON:  Your Honor, there is a tape of the call

20 if we want to -- if the government wants to play it, but to ask

21 him what was discussed on it wouldn't be the best evidence of what

22 happened.

23         THE COURT:  Is the tape comprehensible?

24         MR. KROMBERG:  Judge, I don't even have the tape with

25 me, maybe Mr. MacMahon has it, but I didn't think it was worth the

**Kwon - direct**

1  time to play the tape.  If Mr. MacMahon thinks in his case it's

2  worth the time, he should play it.

3      THE COURT:  All right, let's let the government -- they

4  can put their case on the way they want, and Mr. Kromberg is

5  correct, if you want to play it, that's fine.

6      MR. MAC MAHON:  He's going to ask him about it, and we

7  have the tape, Your Honor.  It's better evidence.

8      THE COURT:  I've ruled.  Let's continue this.

9      MR. KROMBERG:  Thank you, Your Honor.

10 Q.   What, if anything, did Hasan ask you about coming to Saudi

11 Arabia on that call?

12 A.   He asked me if I wanted to come and work in Saudi Arabia.

13 Q.   What did he say about how you could get a job?

14 A.   He, he -- I recall him mentioning something about talking to

15 Ali Timimi and talking to somebody there to see if he can get me

16 over there.

17 Q.   What was your first contact with Randall Royer after

18 returning to the United States?

19 A.   I gave him a call on behalf of the FBI.

20 Q.   Where did you tell him you were?

21 A.   I told him I was in Korea.

22 Q.   Where were you at the time?

23 A.   I was in Virginia.

24 Q.   Were the statements -- were all the statements you made in

25 that call true?

## Kwon - direct

1  A.    No.

2          MR. MAC MAHON:  Your Honor, here we go again.

3          THE COURT:  No, this is different.  This is different.

4  I'm overruling the objection.

5  BY MR. KROMBERG:

6  Q.    Why did you make the statements that you made that were

7  untrue?

8  A.    Because that's the role that -- that's what the FBI told me

9  to say.  That's the role that they told me to play, you know.

10  Q.    How many times did you call Mr. Royer at the request of the

11  FBI?

12  A.    I believe twice.

13  Q.    Where were the agents when you made those calls?

14  A.    They were right next to me.

15  Q.    In a telephone call on April 8, 2003, when Mr. Royer referred

16  to the only two people that hadn't spoken with the investigators

17  as himself and Ali, who did you understand Ali to be?

18  A.    Ali Timimi.

19  Q.    In a telephone call on April 8, when he said that he told

20  Sheikh Ali he would never tell anyone what was said at that

21  meeting, who did you understand Sheikh Ali to be?

22  A.    Ali Timimi.

23  Q.    When was your first contact with Ali Timimi after returning

24  to the United States?

25  A.    I called him at the request of FBI.

## Kwon - direct

1  Q.   Around the same time as the calls to Royer and Hasan?

2  A.   I believe around the same time.

3  Q.   What was your reaction to Special Agent Ammerman when he

4  asked you to make that call?

5  A.   I was -- I told him I didn't want to do it, you know, you

6  know, I didn't want to do it, but, you know, he's somebody that I,

7  you know, I respect and admire, and, you know, and he's also a

8  very intelligent person, where I knew that he's going to see right

9  through it.

10       MR. MAC MAHON:  Objection, Your Honor, as to what he

11  thought was going to happen if he called him.  There's another

12  transcript of this phone call as well.

13       THE COURT:  All right.  Now, I think that is a bit

14  speculative.  I'll sustain that portion of the --

15  BY MR. KROMBERG:

16  Q.   During the phone call with Ali Timimi, what did he tell you

17  to do?

18  A.   He told me to get a lawyer.

19  Q.   What did he tell you about whether the government was

20  recording this phone call?

21  A.   He said, he said during my conversation with him, I think,

22  twice that -- he told me that obviously this phone call is being

23  taped.

24  Q.   Which was true.

25  A.   Which was true.

1084

## Kwon - direct

1  Q.   When was your first -- do you recall when your first meeting

2  with Mr. Royer was?

3  A.   Yes, in Virginia.

4  Q.   Was that in a hotel room?

5  A.   Correct.

6  Q.   Why did you meet with Mr. Royer in a hotel room?

7  A.   They told me to, you know, they told me to do it.

8  Q.   How did the topic of Afghanistan come up in your discussion

9  with Mr. Royer in a hotel room?

10       MR. MAC MAHON:  Your Honor, there's a tape of that.  We

11  just saw the tape.

12       THE COURT:  Now, wait a minute.  I don't want --

13  remember, we have a rule on witnesses, so the witnesses don't know

14  what's been going on before they testify, and that's not a proper

15  objection in that format, all right?  I'm overruling that.

16       MR. KROMBERG:  Thank you, Your Honor.

17  Q.   Mr. Kwon, how did the topic of Afghanistan come up in your

18  discussion with Mr. Royer?

19  A.   When we were talking about the meeting at my house, you know,

20  Royer said, you know, the topic of -- he mentioned of

21  Afghanistan -- Royer mentioned something about Afghanistan when I

22  referred to the meeting at my house.

23  Q.   What did he say -- what do you recall he said the

24  investigators would try to get you to say about what Ali Timimi

25  said at the meeting on September 16 at your house?

1085

## Kwon - direct

1    A.    Just, just the truth -- just what Ali Timimi said about going
2    and joining the mujahideen.  So, you know, we started talking
3    about the meeting, and, you know, Royer said, he said something
4    like, "But Sheikh Ali never mentioned Afghanistan," and I said
5    yes, I'll agree with him, yeah, you know.
6    Q.    Why did you say that?
7    A.    Because at the time, you know, I was trying to, you know, you
8    can say like trying to play both sides.  I felt that if, if I
9    agreed with him in this thing, that Afghanistan was never
10   mentioned, that it would be better for everybody involved that,
11   you know, that, that we'll get a lesser of a penalty if
12   Afghanistan was somehow left out.
13   Q.    When was your first contact with Masaud Khan after returning
14   to the United States?
15   A.    I called him, you know, I called him to, to meet with him.
16   Q.    Was that in, also in April 2003?
17   A.    Yes.
18   Q.    And why did you call him to try to meet with him?
19   A.    Again, I -- I didn't want to do that, but, you know, they
20   pressured me to do it, and I didn't know, you know, I agreed, you
21   know.
22   Q.    Did you -- there come a time when you actually met with
23   Masaud Khan?
24   A.    Yes.
25   Q.    As a result of the phone call?

**J.A. 1230**

1086

## Kwon - direct

1   A.   Correct.

2   Q.   Do you recall where that was?

3   A.   It was at a parking lot of a hotel that I was staying at.

4   Q.   And the FBI had told you to bring him up to the hotel room?

5   A.   Correct.

6   Q.   Did you do that?

7   A.   No.

8   Q.   Why not?

9   A.   When I saw him, I couldn't, you know, I mean, he was a little

10  suspicious, but I couldn't, I couldn't bring him up to the room,

11  you know.

12  Q.   What did you tell him when you met him outside?

13  A.   Well, I, I was trying to tell him, you know, trying to

14  convince him that, that -- I was trying to convince him that maybe

15  the, you know, that I'm going to -- without telling him directly

16  that I'm already, you know, talking to government, that, you know,

17  maybe the best way is to, just to admit what we did and, you know,

18  and try to just get this over with.

19  Q.   What did he say?

20  A.   He said that -- he told me to get a lawyer.  He told me not

21  to admit to anything, you know, and he said, "If you, if you go

22  down, don't take the other brothers down with you."

23  Q.   I'd like to show you Government Exhibit 7H1 -- which hang on

24  before you put it on the screen.  Let me make sure -- okay.

25          That's not in evidence yet, Judge, so if you can just

1087

**Kwon - direct**

1  look in the book?

2          THE COURT:  Well, is there any objection to 7H1?

3          MR. MAC MAHON:  No.  It's his passport.  I have no

4  objection.

5          THE COURT:  All right, 7H1 is in evidence.

6          (Government's Exhibit No. 7H1 was received in evidence.)

7  BY MR. KROMBERG:

8  Q.   Do you recognize -- well, now you can look at it on the

9  screen.  Do you recognize the document on the screen?

10 A.   Yes, I do.

11 Q.   Is that your passport?

12 A.   Correct.

13         MR. KROMBERG:  And the next page, please?

14 Q.   Do you recall the, what I've just circled on the right side

15 of the screen -- well, it's no longer on the right side of the

16 screen -- in the center of the screen?

17 A.   Yes.

18 Q.   Is that your visa for Pakistan?

19 A.   Correct.

20 Q.   Date of issue, 19/9/2001, is that right?

21 A.   Correct.

22         MR. KROMBERG:  Okay.  Next page, please?

23 Q.   What I've just circled there, which is now being blown up, is

24 that the mark that you got when you entered Pakistan September 22?

25 A.   Correct.

1088

**Kwon - direct**

1  Q.   Okay.  Is that the mark from when you left Pakistan on August
2  2002?

3  A.   Correct.

4         MR. KROMBERG:  Okay.  Next page, please?

5  Q.   Is that when you got to Korea, August 2002?

6  A.   Correct.

7  Q.   And that's when you left Pakistan the second time?

8  A.   Correct.

9  Q.   And that's the visa for the second time?

10 A.   Correct.

11        MR. KROMBERG:  Thank you.

12 Q.   I'd like you to look at 2A6, which I think you have to look

13 at it in the binders.

14        THE COURT:  I have a 2A6a.

15        MR. KROMBERG:  There's a 2A6 and a, sorry, 2A6a and

16 2A6b, I'm sorry, Your Honor, you're correct.

17 Q.   2A6a and 2A6b, if you could please look at them?  It's easier

18 to look at them in the book than on the screen.

19        THE COURT:  And I believe 2A6a is in evidence over the

20 defendant's objection.

21        It's not in evidence yet?

22        MR. MAC MAHON:  I don't know that it had been moved yet.

23        THE COURT:  All right.

24        MR. MAC MAHON:  Same objection as we made before.

25        MR. KROMBERG:  Okay.  I just want to ask the witness

1089

# Kwon - direct

1   whether he's ever seen it before.

2           THE COURT:  That's fine.  It's not in yet.

3           MR. KROMBERG:  We'll move it in later.

4   Q.   Mr. Kwon, 2A6a and 2A6b, have you ever seen those documents

5   before?

6           Let me change that question:  Did you ever see them

7   other than in a courtroom before?

8           THE COURT:  And don't say what they are.  The question

9   is simply have you ever seen the document before court

10  proceedings.

11          THE WITNESS:  I don't have the document.

12          MR. KROMBERG:  Oh, okay.

13          Judge, actually, let me make it easier.  Let me move

14  them in now, and then we can put them on the screen, and I can

15  say -- I can ask him about it.

16          MR. MAC MAHON:  Subject to the same objection.

17          THE COURT:  All right, the objection has been overruled

18  previously, so they're in.  2A6a and b are in.

19          (Government's Exhibit Nos. 2A6a and 2A6b were received

20  in evidence.)

21  BY MR. KROMBERG:

22  Q.   Now, it's called "The Terrorist's Handbook."  Have you

23  ever -- this was obtained in Masaud Khan's house on May 8, 2003.

24  Did you ever possess this before May 8, 2003?

25          MR. MAC MAHON:  Your Honor, if I could just for the

## Kwon - direct

1    jury, the whole top of it has been chopped off, which is the

2    reason why I think he would want to ask this witness.

3              MR. KROMBERG:  Judge, I'll be glad to ask Mr. MacMahon's

4    next question, but first I want to ask him if he's ever seen it.

5              THE COURT:  All right.

6              MR. KROMBERG:  And then we'll go to the question he

7    would like to ask.

8              THE WITNESS:  No, I've never seen this manual.

9              MR. KROMBERG:  If you could scroll down just a bit?

10             No, I'm sorry, scroll up to the top of the page.

11   Q.    Where it says, "This handbook was edited at Virginia Tech,

12   the world's best source of classified and 'questionable' doc's,"

13   you had gone to Virginia Tech, right?

14   A.    Correct.

15   Q.    Is your answer the same, that you never saw this document

16   before it was seized at Khan's house on May 8, 2003?

17   A.    Correct.  I had never seen it before.

18   Q.    Was there a time when you lived at Khan's house?

19   A.    Yes.

20   Q.    When was that?

21   A.    April through June of 2000 -- no, of 1998.

22   Q.    Okay.  I'd ask you to look at Exhibit 2A2.

23             Mr. Wood, that's one of the firearms.

24             2A2, which is, I'd move into evidence at this time to

25   make -- we have a stipulation on it.  This way we can show it

1091

**Kwon - direct**

1    to -- is that 2A2?

2            THE COURT:  2A2.

3            THE COURT SECURITY OFFICER:  2A2.

4            MR. KROMBERG:  Okay.

5    Q.  Was that your weapon?

6    A.  No.

7    Q.  Okay.  Thank you.  That's it, thank you.

8            Mr. Kwon, I think you testified earlier that you became

9    a citizen on August 15, 2001?

10   A.  Correct.

11   Q.  What obligation did you think you had to the United States on

12   September 16, 2001, when the United States was planning on going

13   to war in Afghanistan over Al-Qaeda?

14           MR. MAC MAHON:  Objection, Your Honor --

15           THE COURT:  Whoa.  I'm sustaining that objection.

16           MR. MAC MAHON:  -- to the obligation he has under the

17   law.

18           THE COURT:  First of all, rephrase your question.  Let

19   me hear your question again.

20   BY MR. KROMBERG:

21   Q.  What obligation did you think you had to the United States as

22   a citizen of 33 days on September 16, 2001, when the U.S. was

23   planning on going to war in Afghanistan?

24           THE COURT:  I don't think that's necessary.  I'm going

25   to sustain that objection.

1092

## Kwon - direct

1  BY MR. KROMBERG:

2  Q.   Mr. Kwon, why did you become a U.S. citizen?

3  A.   I had -- I lived here most of my life, and also, I knew there

4  were some benefits associated with an American passport.

5  Q.   With whom did you discuss whether you should become a U.S.

6  citizen?

7  A.   I discussed it with Idris Palmer and Ali Timimi.

8  Q.   What did Ali Timimi tell you about whether you should become

9  a U.S. citizen or not?

10  A.   Well, I asked him if it's permissible for me to become a U.S.

11  citizen.  He said he doesn't see any problems because I was --

12  previously I was a citizen of South Korea, and he said he was --

13  since I'm going from a non-Muslim country citizenship to a

14  non-Muslim country citizenship, he said he doesn't see any

15  problems.

16  Q.   What was the problem that you foresaw in becoming a citizen

17  of the United States that you thought to ask Ali Timimi for his

18  opinion?

19        MR. MAC MAHON:  Objection to form unless he actually

20  informed Dr. Al-Timimi about that.

21        THE COURT:  Why don't you just ask -- why did you ask

22  Dr. Al-Timimi about his views about your becoming a U.S. citizen?

23        THE WITNESS:  I was asking the permissibility in Islam,

24  if it's permissible to become a citizen of a non-Muslim country,

25  non-Muslim country.

# Kwon - cross

1          MR. KROMBERG:  Thank you, Your Honor.

2          Thank you, Mr. Kwon.  Please answer Mr. MacMahon's

3    questions.

4          THE COURT:  All right.  Mr. MacMahon?

5                     CROSS EXAMINATION

6    BY MR. MAC MAHON:

7    Q.   Good afternoon, Mr. Kwon.

8    A.   Hello.

9    Q.   When did you have this talk with Ali Al-Timimi about you

10   becoming an American citizen?

11   A.   I don't remember the exact date but around 2000, '99 or 2000.

12   Q.   Was anybody else with you, sir?

13   A.   I don't recall.

14   Q.   Do you remember your phone call that you taped on behalf of

15   the FBI with Dr. Al-Timimi?

16   A.   Yes.

17   Q.   And he asked you if you were a U.S. citizen, didn't he?

18   A.   Yes.

19   Q.   In fact, in that phone call, he said he didn't even know your

20   last name, did he?

21   A.   Correct.

22   Q.   And that's true, isn't it?

23          MR. KROMBERG:  Objection, Judge.  How can Mr. Kwon know

24   whether Mr. Timimi knew his last name or not?

25          THE COURT:  All right, I'll sustain the objection, but

# Kwon - cross

1   he can lead.  This is cross.

2   BY MR. MAC MAHON:

3   Q.   That was a correct statement that he made.  He didn't even

4   know your last name, did he, sir?

5         MR. KROMBERG:  Objection, Judge.  Mr. Kwon has no basis

6   of knowledge of whether Mr. Timimi actually knows his name.

7         THE COURT:  I'm going to sustain that objection.

8   BY MR. MAC MAHON:

9   Q.   Had he ever called you by your last name, Mr. Kwon?

10   A.   I don't recall him ever calling me by my last name.

11   Q.   And you two weren't, you weren't friends at all, were you?

12   A.   Not friends.

13   Q.   And in fact, you had -- other than the time you helped move,

14   you'd never been to his house at all, had you?

15   A.   Well, there was a time that I visited him.

16   Q.   At his home?

17   A.   At his home.

18   Q.   Was he married?

19   A.   Yes.

20   Q.   What was his wife's name?

21   A.   I do not know.

22   Q.   Never introduced to his wife?

23   A.   No.

24   Q.   When, when was the first time you met him?

25   A.   The first time I met him was IANA conference, 1997, in

**Kwon - cross**

1  Chicago.

2  Q.   All right.  What, did you shake hands?  You saw him somewhere

3  and said hello?

4  A.   I don't know if I shook hands with him, but it was in, like,

5  a group setting.  I was -- I remember Idris Palmer was there.

6         I knew of him.  I just never seen him in person.  That

7  was the first time I saw him in person.

8  Q.   And how long that day did you talk to him?

9  A.   I think other than hello, I didn't talk to him.

10 Q.   That was it, just hello, right?

11 A.   Correct.

12 Q.   When was the next time you met him?

13 A.   I don't know the next time, but once I started attending Dar

14 al-Arqam in Virginia, he was -- he was the lecturer there.

15 Q.   Okay.  And you were one of many people that would sit and

16 watch him speak, right?

17 A.   Correct.

18 Q.   Did you ever have a -- what of his speeches did you listen to

19 at Dar al-Arqam, do you remember?

20 A.   He had a series of lectures, you know.  He had lecture on

21 signs of Day of Judgment, multiple lectures.  He also had multiple

22 lectures on purification of the soul.  From time to time, he'll

23 lecture on current affairs, what's going on, how it relates to

24 Islam.

25 Q.   Okay.  And generally at one of those lectures, how many

**Kwon - cross**

1  people were there?

2  A.    At different times, it was different number of people, but

3  once we moved to -- once Dar al-Arqam moved to Falls Church,

4  Virginia, it was, I would say, maybe 50 people or so.

5  Q.    Okay.  And you drove Dr. Al-Timimi to Dar al-Arqam twice,

6  correct?

7  A.    I don't, I don't remember how many times.  A few times.

8  Q.    Do you remember when that was, Mr. Kwon?

9  A.    I only recall that it's on Friday nights.

10  Q.    You can't tell the jury what, what specific events those were

11  for?

12  A.    Well, Dar al-Arqam used to -- Ali Timimi used to give

13  lectures on Friday nights at Dar al-Arqam, so once he moved into

14  my neighborhood, you know, he was literally a few minutes away

15  from my house.  So I drove him a few times from, from our

16  neighborhood to Dar al-Arqam and back.

17  Q.    All right.  And in those -- when you drove him to the Dar

18  al-Arqam, most of the time, he sat and scribbled out his notes for

19  the presentation he was going to do, correct?

20  A.    Yes.

21  Q.    Right.  And you didn't develop a personal, close relationship

22  with him on either of those two trips, either, did you?

23  A.    No.  He, he wasn't like a friend.  He was, you know, he was

24  like, more like something -- like a teacher, you know, elder

25  person who's very knowledgeable of Islam and, you know, somebody I

**Kwon - cross**

1  can learn from, not -- but not like a personal friend, no.

2  Q.   He was never your friend, was he, sir?

3  A.   I mean, it depends on what you mean by "friend."  I mean, as

4  a friend, we didn't hang out or like that, but, you know, I used

5  to attend his lectures and give him rides.

6  Q.   Okay.  How many times in the phone call that you recorded for

7  the FBI did he tell you just to tell the truth and everything

8  would be fine?

9  A.   I only made one phone call with him.

10  Q.   How many times in that phone call did he tell you to tell the

11  truth?

12  A.   He -- I remember him telling that -- telling me that.  I just

13  don't remember how many times.

14  Q.   In fact, he told you, "You should never lie.  You should

15  never lie when you're under oath, and you should never lie."

16  Isn't that what he told you, Mr. Kwon?

17  A.   Something like that, yes.

18  Q.   But you'd already by that time been lying to the FBI on a

19  repeated basis, hadn't you?

20  A.   Yes.

21        MR. KROMBERG:  Objection to the form of the question.

22  "Had been lying," we need a little more focus.

23        THE COURT:  Well, this is cross.  You can go into it in

24  rebuttal.  Overruled.

25  BY MR. MAC MAHON:

1098

**Kwon - cross**

1  Q.   On April -- by April 11, 2003, you had already told many,

2  many lies to the FBI, hadn't you, Mr. Kwon?

3  A.   I don't want to say "many lies."  Most of the time, I didn't

4  tell them the whole truth.  I held back some information.

5  Q.   You didn't tell any lies to the FBI before April 11, 2003?

6  A.   No, I lied.  I lied to them.

7  Q.   You lied a lot, didn't you?

8  A.   I lied some, yes.

9  Q.   How much money has the FBI paid you in this case?

10 A.   Only money they gave me is my reimbursement for my plane

11 ticket for -- when I went from Korea to Hawaii, I paid for my own

12 plane ticket, and I paid for my own hotel and meals in Hawaii, so

13 they reimbursed me for that.

14         And when I came to Virginia, when they put me in a

15 hotel, I couldn't, you know, I couldn't leave -- come and go as I

16 will.  I wasn't working.  I had to stay in a hotel with the FBI

17 agents, so they gave me an allowance so I can buy my own meals.

18 Q.   The FBI gave you an allowance, Mr. Kwon?

19 A.   I had to eat.

20 Q.   You didn't, you didn't have any money then?

21 A.   I had some money, cash with me, but they told me that since

22 they're, you know, they're putting me up in a hotel and I can't do

23 anything, I wasn't working or anything like that, so they gave me

24 allowance for meals and, you know, whatever personal.

25 Q.   How much did they pay you?

**Kwon - cross**

1  A.   I forget.  $70 a day or $60.  I forget the exact amount.

2  Q.   Would Agent Ammerman bring it to you in cash every day?

3  A.   No.  I remember it being in the form of a check or something

4  from the Marshal Office or something like that.

5  Q.   Do you have any of those checks?

6  A.   Do I have them now?  No.

7  Q.   Do you have any uncashed checks, Mr. Kwon?

8  A.   No.

9  Q.   How many checks did you get from the FBI in the course of

10 your cooperation, Mr. Kwon?

11 A.   About two to three.  About two to three.

12 Q.   And you were paid that money because you were working for the

13 FBI at that time, right?

14 A.   I was told that it wasn't for working for them.  It was for

15 my subsistence.

16 Q.   Mr. Kwon, you haven't stopped working for the FBI since then,

17 have you?

18 A.   Yes, I did.  There was a time where I stopped in May.  It

19 wasn't that I was working for them.  It was that I was, you know,

20 just telling them what information, whatever they asked me.

21 Q.   Okay.  How long in May did you stop working for the FBI?

22 A.   I believe it was from late May to June or maybe even up to, a

23 little bit up to July.

24         THE COURT:  I'm sorry, of what year?

25         THE WITNESS:  Of 2003.

**Kwon - cross**

```
 1              MR. MAC MAHON:  Excuse me, Your Honor.
 2              THE COURT:  Okay.
 3    BY MR. MAC MAHON:
 4    Q.   And since that time in the summer of 2003, you've continued
 5    to work for the FBI up to and including today, right?
 6    A.   I wouldn't say work for them.  They come to jail and ask me
 7    questions, and my obligation under my plea agreement is tell them
 8    the truth.
 9    Q.   Right.  And you want to get out of jail, don't you?
10    A.   Yes.
11    Q.   You cry sometimes at night in jail, sir?
12    A.   No.
13    Q.   When -- have you recently seen Hammad Abdur-Raheem?
14    A.   No.
15    Q.   Did you see him before he was sentenced?
16    A.   Yes.
17    Q.   And you told him that you were sorry you had lied, but there
18    was so much pressure on you and the damage was done.  Isn't that
19    exactly what you told him, sir?
20    A.   No.  I never lied.  Everything I testified to is what I
21    recall.
22    Q.   You've been writing to Masaud Khan in prison, trying to
23    apologize to him, too?
24    A.   I don't think I ever tried to write to Masaud.
25    Q.   You tried to write to Hammad?
```

**Kwon - cross**

```
 1   A.    No.
 2   Q.    You haven't tried to write to any of the people you testified
 3   against?
 4   A.    I, I sent a note to --
 5         MR. KROMBERG:  Objection, Your Honor, to the
 6   characterization of testifying against.  The witness was called as
 7   a witness, and he testified.
 8         THE COURT:  Well, I don't think we need to get upset
 9   about that.  I don't think that question was improper.
10         MR. MAC MAHON:  Thank you, Your Honor.
11         THE COURT:  Overruled.  I want to hear what the answer
12   was on that.
13         THE WITNESS:  I sent a note to Seif Chapman.
14   BY MR. MAC MAHON:
15   Q.    What did the note say?
16   A.    That, you know, I said I was -- please forgive me, you know,
17   for, for testifying for the government, you know, against him.
18   Q.    When did you send him that note?
19   A.    Sometime, I think, in 2004.
20   Q.    Did you tell the FBI that you did that?
21   A.    No.
22   Q.    How long was the note?
23   A.    Maybe a paragraph.
24   Q.    Tell us everything you can remember about what you wrote in
25   that note, Mr. Kwon.
```

**Kwon - cross**

1    A.    I don't, I don't remember word for word.  I basically said,

2    you know, I'm sorry for what happened.  I apologize.  You know,

3    forgive me, you know.  I think that's what I can recall.

4    Q.    Did you tell him that you'd lied?

5    A.    No.

6    Q.    Well, then what were you sorry about?

7    A.    Because I was sorry that I had to testify against him.  Even

8    though I testified to the truth, you know, they're brothers in

9    Islam, you know, so I felt that, you know, it was -- I had to

10   apologize.

11   Q.    How many cases have you testified on behalf of the government

12   in now?

13   A.    This is my third one.

14   Q.    Tell the jury what other cases you've testified in.

15   A.    My case involving my codefendants, Sabri Benkahla's case, and

16   this case.

17   Q.    And you were cooperating with the government investigations

18   in Australia?

19   A.    Correct.

20   Q.    Where else?

21   A.    Great Britain.

22   Q.    Agents from the police from Great Britain have come in to see

23   you with Agent Wyman or Ammerman, haven't they?

24   A.    Correct.

25   Q.    And what did you tell them?

1103

## Kwon - cross

1   A.   I told them what I saw in Pakistan, what they asked me about

2   Abu Khalid.  I mean, all this is part of my plea agreement where

3   the government, when the government asks me questions, I have to

4   tell them the truth.

5   Q.   You just have to do whatever they ask, right, Mr. Kwon?

6   A.   No, I have to tell the truth.

7   Q.   Neither Agent Wyman or Ammerman were at the meeting at your

8   house, were they?

9   A.   No.

10  Q.   And there's no tape recording of what happened at your house,

11  is there?

12  A.   No.

13  Q.   No video of it?

14  A.   No.

15  Q.   So they don't know what the truth is, do they?

16  A.   No.

17       MR. KROMBERG:  Objection, Judge, to what Agent Wyman and

18  Ammerman know.  If they want to have them testify --

19       THE COURT:  Wait.  We don't need a speech, and I know

20  the jury is smart enough to understand that that question doesn't

21  go anyplace.  So I don't mind your cross-examining the witness,

22  but make the questions valuable.

23  BY MR. MAC MAHON:

24  Q.   Now, you're seeking a reduction in your sentence, Mr. Kwon,

25  aren't you?

1104

### Kwon - cross

1   A.   Correct.

2   Q.   What's -- it's called a rule 35, right?

3   A.   Correct.

4   Q.   When was that motion filed?

5   A.   Sometime last year, I believe October or November.

6   Q.   What's holding it up?

7   A.   The government's waiting for me to cooperate, I guess, as

8   much as --

9   Q.   Have you had any discussion with any of the government agents

10  about why you haven't gotten your rule 35 yet?

11  A.   Because, you know, there are some other cases in the works,

12  you know.

13  Q.   Which ones are those?

14       MR. KROMBERG:  Objection, Judge.  I don't think it's

15  appropriate --

16       THE COURT:  I'm sustaining that objection.  That would

17  not be a proper question.

18  BY MR. MAC MAHON:

19  Q.   How many of them are there?

20  A.   I don't know, two, two-three more.

21  Q.   You're prepared to testify in those cases as well?

22  A.   As of now, yeah.

23  Q.   And you know that the government can withdraw their rule 35

24  motion at any time, right?

25  A.   I was told that if I don't tell the truth, then yes, then

**Kwon - cross**

1    they can withdraw.  That will be a violation of my plea agreement.

2    Q.   And it's up to the government, it's up to Mr. Kromberg and

3    his office to decide whether or not you've told the truth if they

4    want to withdraw your rule 35; isn't that right?

5    A.   I'm not sure, but I thought it was up to the judge.

6    Q.   Isn't it up to the judge to decide whether you actually get

7    one if a motion is filed, Mr. Kwon?  Isn't that what you

8    understand?

9         MR. KROMBERG:  Objection, Judge.  This is a question of

10   law that I don't know that he --

11        THE COURT:  Approach the bench.

12        (Bench conference on the record.)

13        THE COURT:  I don't mind a hard cross examination, but

14   you can't mislead the jury about how the court system works.

15        MR. MAC MAHON:  I didn't think I did, Your Honor.  I'm

16   sorry.

17        THE COURT:  You don't want to invite me to have to

18   instruct them on it.  If they have filed a rule 35 motion, they

19   can't withdraw it.  It's been filed in the court if it has been.

20        MR. KROMBERG:  It has been, Judge, and I'd like that

21   instruction.

22        THE COURT:  All right.  That's not fair to leave the

23   jury with that impression.

24        MR. MAC MAHON:  I didn't mean to leave that impression.

25        MR. KROMBERG:  I would appreciate that instruction.

**Kwon - cross**

1          THE COURT:  I need to do that.

2          MR. MAC MAHON:  I apologize.  I misspoke.

3          (End of bench conference.)

4          THE COURT:  Ladies and Gentlemen, I don't want you to

5    get a misunderstanding of how the law works.  If the government

6    has filed a rule 35 motion or, for that matter, if anybody files a

7    motion with a court of law, then that motion belongs to the Court,

8    and they can't withdraw it.

9          Now, whether a judge eventually grants the motion or not

10   is a different issue, but you should not have the impression that

11   Mr. Kromberg or anyone in his office can just withdraw something

12   they have filed with the Court, all right?

13          All right, go ahead, sir.

14          MR. MAC MAHON:  Thank you, Your Honor.

15   Q.   Mr. Kwon, going back to the phone call that you recorded

16   with -- at the behest of the FBI, do you remember that Al-Timimi

17   said to you, "It seems that you brothers were playing paintball at

18   some time"?  Do you remember that?

19   A.   Yes.

20   Q.   You answered that question, "Yes."

21          And then he said, "So that's something that people have

22   been asking about.  I know, I mean, for me, you know, I never

23   played, you know, I never participated in that game and so forth.

24   Do you see what I'm saying?"

25          And you answered, "Yes."

1107

**Kwon - cross**

1        And then he said, "So I have no idea, I mean, if it's
2   true, if it's even true that you guys were playing paintball, why
3   you were playing or when you were playing or so forth.  What was
4   the issue about you guys playing paintball?"
5        Do you remember that?
6   A.   Yes.
7   Q.   Ali Al-Timimi had nothing to do with you setting up
8   paintball, did he?
9   A.   He never participated, true, but he knew about us playing
10  paintball.
11  Q.   Okay.  And -- so this isn't true in that call when he said he
12  didn't know anything about paintball, Mr. Kwon?
13  A.   Yes, but at the time, I was -- like I said, I was playing
14  both sides.  I was trying to minimize damage for all parties,
15  including myself.
16  Q.   Okay.  You said he -- was he there when you started
17  paintball?
18  A.   No.
19  Q.   And you actually played paintball before you even met Ali
20  Al-Timimi, didn't you?
21  A.   No.  I met Al-Timimi in 1997.  I think first time I played
22  paintball was '99.
23  Q.   And he didn't have anything to do with that, did he?
24  A.   Not the first paintball game.
25  Q.   He never went to a paintball game, did he?

**J.A. 1252**

1108

## Kwon - cross

1  A.    No, he didn't participate in paintball games.

2  Q.    And you had this discussion that you talked about, you say

3  that Mr. Chapman was approached by the FBI, and there was a

4  discussion with him about what you should do.  Do you remember

5  that testimony?

6  A.    Yes.

7  Q.    And isn't it a fact that one of the things he told you then

8  was that you should consider playing soccer?

9  A.    Who?

10 Q.    That he said you should consider playing soccer instead of

11 paintball, that you were bringing attention to yourselves?

12 A.    I don't recall that statement.

13 Q.    Was Nabil Gharbieh with you?

14 A.    Yes, he was.

15 Q.    Was he standing right next to you?

16 A.    Correct.

17 Q.    And you didn't hear anything about soccer, right?

18 A.    I don't recall.

19 Q.    Soccer is one of the games you played when you got to

20 Pakistan, right?

21 A.    Yes.

22 Q.    Now, in your plea agreement, you agreed to a statement of

23 facts, didn't you?

24 A.    Yes.

25 Q.    And one of them was that on or about January 10 of 2000, you

**J.A. 1253**

**Kwon - cross**

1  did unlawfully and knowingly aid and abet the transfer of an

2  AK-47-style rifle to Hammad Abdur-Raheem to Caliph Basha Ibn

3  Abdur-Raheem, knowing that such firearm would be used to begin and

4  provide for, prepare a means for, and take part in military

5  expeditions and enterprises to be carried on from the United

6  States against the territory and dominion of foreign states,

7  districts, and peoples with whom the United States was at peace.

8         Do you remember that?

9  A.    Yes.

10 Q.    So there was a conspiracy that you were a member of on

11 January 10 of the year 2000 to violate the Neutrality Act, right?

12 A.    Right.

13 Q.    And did you tell Ali Al-Timimi on or about January 10, 2000,

14 about your conspiracy that you were a part of?

15 A.    No.

16 Q.    Who did you tell?

17 A.    Well, the guys that I was involved with, you know, that --

18 the shootings, playing paintball was all for that some day that we

19 might have to participate in jihad on behalf of Muslims.

20 Q.    Who were the, who were the members of the conspiracy that's

21 described in paragraph 2 of your statement of facts?

22 A.    Nabil, Hammad, myself, Ibrahim, Royer, Seif.  I can't say for

23 other people's intentions, but for these people, we had frequent

24 discussions about jihad and watched videos on jihad and talked

25 about some day, you know, maybe we can participate in jihad and

1110

**Kwon - cross**

1   things like that.

2   Q.   Okay.  And when was it that you entered into this conspiracy?

3   A.   I guess, I guess once we start to practice shooting and

4   playing paintball.

5   Q.   Well, did you make an agreement with these people to enter

6   into a criminal conspiracy?

7   A.   No.

8   Q.   You never did?

9   A.   I mean, you know, at that time, I didn't even know there's

10  such thing as conspiracy, and, you know, to prepare for my, just

11  training myself for jihad or physical training, I didn't even know

12  if that was illegal or not.

13  Q.   Okay.  Well, you signed this plea agreement, didn't you,

14  Mr. Kwon?

15  A.   Correct.

16  Q.   Is it correct then that in January of 2000, you were already

17  engaged in a criminal conspiracy to violate the Neutrality Act?

18  A.   We didn't have any set plans to go overseas and fight, but,

19  you know, it was -- like I said, we did these things in

20  preparation that maybe some day that we might go overseas and

21  fight.

22  Q.   I must be confused by the answer.  Was or was not there a

23  conspiracy --

24       MR. KROMBERG:  Objection, Judge.  I'm objecting to the

25  question.  Mr. MacMahon has shown that he knows law better than

## Kwon - cross

1  Kwon, but he uses illegal conspiracy when it's an agreement

2  that --

3        THE COURT:  Wait.  Do you want me to lecture the jury

4  now on the law of conspiracy?  I mean, again, I don't want you to

5  mislead the jury on the law of conspiracy.

6        MR. MAC MAHON:  I'm trying to find out -- I'll ask the

7  question in a generic way as to when the agreement was entered

8  into with his coconspirators.

9  Q.   When did the conspiracy get formed?

10        THE COURT:  You can ask that question, but be careful

11  because you're close to the line on some --

12        MR. MAC MAHON:  Thank you, Your Honor.

13        THE WITNESS:  I mean, there was no set conspiracy that

14  we were going to do this and do that and go overseas and do that.

15  Before -- like I said, it was in training for what might happen in

16  the future or, you know.

17  BY MR. MAC MAHON:

18  Q.   You never told Ali Al-Timimi about this conspiracy, did you?

19        MR. KROMBERG:  Objection, Judge.  The question is

20  unclear.  If the question is if he never told Ali Al-Timimi about

21  your agreement to train for jihad, but if Mr. Kwon at the time

22  just testified that he didn't know it was a conspiracy, he didn't

23  know about the law of conspiracy --

24        THE COURT:  All right, I'm going to sustain the

25  objection as to the form of the question.  You need to make it

**Kwon - cross**

1  more specific.

2  BY MR. MAC MAHON:

3  Q.   Did you ever tell this man right here, Mr. Kwon, that you had

4  entered into an agreement with other people to violate the

5  Neutrality Act?

6  A.   No.

7          MR. KROMBERG:  Objection, Judge.  At the time, nobody

8  even knew that the Neutrality -- we already heard the tape

9  where he --

10          THE COURT:  This is better on rebuttal, all right?  This

11  is better on rebuttal.  Overruled.

12          MR. MAC MAHON:  It's one of the questions in the case,

13  Your Honor.

14          THE COURT:  I've ruled in your favor.

15          MR. MAC MAHON:  Oh, excuse me.  I'm sorry, Your Honor,

16  thank you.  It's getting late.  I apologize, Your Honor.

17          THE COURT:  I know it is.

18  BY MR. MAC MAHON:

19  Q.   Did you answer my question, Mr. Kwon?

20  A.   The answer is no.

21  Q.   You never told him about it?

22  A.   No.

23  Q.   You, you looked at a firearm that you had there.  You haven't

24  seen that in a while, have you, Mr. Kwon?

25          MR. KROMBERG:  Objection, Judge.  He's looked at at

**Kwon - cross**

1  least two firearms in the course of his examination.

2        MR. MAC MAHON:  That's correct.  All the firearms.  I'll

3  go at it at one time.

4        THE WITNESS:  Correct.

5  BY MR. MAC MAHON:

6  Q.   Okay.  Those were your firearms, weren't they?

7  A.   One of them used to be mine before I sold it to Ismail Royer.

8  The other one was never mine.

9  Q.   And the one you sold to Mr. Royer you actually never charged

10 him for, did you?

11 A.   No.

12 Q.   All right.  And that bill of sale that you -- that

13 Mr. Kromberg showed was actually a completely bogus document,

14 wasn't it?

15 A.   Actually, my initial -- initially, he was supposed to pay me,

16 but later I said that -- he was having some financial troubles.  I

17 said, "Don't worry about it."

18 Q.   He never paid you for the gun, right?

19 A.   No.

20 Q.   And you never once in your whole life told Ali Al-Timimi that

21 you owned a gun, did you?

22 A.   I don't recall telling him that I owned guns.

23 Q.   Okay.  And you never showed him any gun that you had, did

24 you?

25 A.   No.

1114

**Kwon - cross**

1  Q.   And you used to at paintball like to show your friends the

2  guns that were in the trunk of your car, didn't you?

3  A.   The real firearms?

4  Q.   Yes.

5  A.   No.  I usually didn't carry my firearm in my trunk of my car.

6  Q.   You never showed any of your friends your firearms?

7  A.   I did when some of them visited my house, you know, I'd show

8  them my firearms.

9  Q.   How often did you do that?

10  A.   Not very often.  Just the guys that I mentioned, you know.

11  Q.   Did Ali Al-Timimi ever go to the firing range with you while

12  you practiced your target shooting?

13  A.   No.

14  Q.   Did he even know you were going to a target range and

15  shooting?

16  A.   I never told him.

17  Q.   You never saw him at a firing range, either, did you?

18  A.   No.

19  Q.   Paragraph 5 of your plea agreement reads -- excuse me, let's

20  start at paragraph 4.  "Starting in or about January of 2000, Yong

21  Ki Kwon agreed with others to prepare for violent jihad on behalf

22  of Muslims in Kashmir, Chechnya, and other countries against

23  countries, governments, military forces, and peoples that the

24  conspirators believed to be the enemies of Islam.  The defendant

25  and his coconspirators agreed to conduct their preparation for

**Kwon - cross**

1    jihad in secrecy and to refuse to disclose any information about

2    their activities if asked by law enforcement."

3           Do you remember that?

4    A.    Yes.

5    Q.    Okay.  Was that a fair recitation of the intention that you

6    had in January of 2000?

7    A.    Well, as far as the secrecy part, that was after Seif was

8    approached by FBI, so I guess it would be later part of 2000, but

9    as far as training for jihad that some day we might go fight, that

10   has -- that's about, about right.

11   Q.    On or about January of 2000?

12   A.    Yeah.  Maybe even before.

13   Q.    Even before that?

14   A.    Maybe even.  I don't know.

15   Q.    And you never once told Ali Al-Timimi that you were preparing

16   for violent jihad on behalf of Muslims in Kashmir?

17   A.    Not in Kashmir, but, you know, we told him -- I mean, we

18   asked him about his advice as far as playing paintball, and he

19   said it's okay, you know.

20   Q.    In that conversation, Mr. Kwon, didn't he ask you if you were

21   doing anything illegal?

22   A.    We weren't doing anything illegal by playing paintball.

23   Q.    My question was didn't he ask you, "Are you doing anything

24   illegal?"

25   A.    Actually, that, that was asked by Nabil.  I mean, Nabil had

**Kwon - cross**

1  asked Ali Timimi that we were going to play paintball and what --

2  Q.   Is it your testimony now that the meeting with Nabil, that

3  you told Ali Al-Timimi that your paintball was to prepare for

4  violent jihad on behalf of Muslims?

5  A.   No, I never told that to Ali Timimi.  I -- the only

6  conversation I had with Ali Timimi directly about paintball was

7  about when Seif was approached by the FBI and when we asked --

8  when Nabil and myself asked him what we should do.  That's the

9  only time I directly talked to him about paintball.

10  Q.   And in that conversation, you didn't tell him that the

11  paintball had anything to do with violent jihad, did you?

12  A.   Not in those words, no.

13  Q.   Did you tell him that you were preparing for a military

14  expedition against a country that the United States is at peace

15  with?

16  A.   No.

17  Q.   You didn't say anything like that, did you?

18  A.   No, but, I mean, it was -- as for my part, you know, when I

19  say paintball, you know, playing paintball, you know, the

20  understanding was, you know, like a training, simulated combat.

21  Q.   Did -- you established that Al-Timimi had never seen your

22  guns at all before.  He never asked you to commit any crime with a

23  gun, did he?

24  A.   No.

25  Q.   He never asked you to carry explosives in the course of a

**Kwon - cross**

1  crime, did he?

2  A.    No.

3  Q.    He never asked you to fire a machine gun in the course of a

4  crime, either, did he?

5  A.    No.

6           MR. MAC MAHON:  If I may, Your Honor, just get a

7  document here?

8           THE COURT:  Yes, sir.

9  BY MR. MAC MAHON:

10 Q.    Let's see, paragraph 6 of your plea agreement, you say that

11 you understood that in 2000, Ibrahim Al-Hamdi and Randall Todd

12 Royer traveled from the United States to join LET,

13 Lashkar-e-Taiba, at its camps in Pakistan.  Do you remember that?

14 A.    Correct.

15 Q.    Okay.  That's true, isn't it?

16 A.    That's true.

17 Q.    And what did Mr. Royer tell you about his trip to Pakistan?

18 A.    He told me about his experience at the LET camp.  You know,

19 he just told us that, you know, how when he was at the camp, that

20 his faith was very high.  He one time also told me when he was

21 with LET, he traveled with a group of LET mujahideen to the

22 border, where they shot mortar fires into Indian positions.

23 Q.    And you thought that was pretty cool, right?

24 A.    Yeah.

25 Q.    That's the exact word you told the FBI.  You thought

**Kwon - cross**

1  Mr. Royer was cool, right?

2  A.    I mean, yeah.

3  Q.    And Mr. Royer told you about his experiences in Bosnia as

4  well, right?

5  A.    Correct.

6  Q.    And you told the FBI that what he told you he did in Bosnia

7  was cool, right?

8  A.    I don't know, I don't know if I told the FBI it was cool,

9  but, you know, at the time when Royer told me, I was, I was

10  impressed.

11  Q.    Okay.  And Royer was the person you looked up to when it came

12  to the military side of your life, right?

13  A.    I mean, I don't want to say "looked up to," but, you know, I

14  was impressed with his experiences.

15  Q.    Do you remember testifying yesterday -- I think it was

16  yesterday or the day before -- excuse me if I'm getting confused,

17  Your Honor.

18        THE COURT:  Yes, it's been a long week.

19  BY MR. MAC MAHON:

20  Q.    That there was a meeting at Ibrahim Al-Hamdi's house and

21  Dr. Al-Timimi stood up and introduced Mr. Royer?

22        MR. KROMBERG:  Objection, Judge.  The witness never

23  testified that a Dr. Al-Timimi did anything.  He might have said

24  the sheikh; he might have said Ali Timimi.  He did not testify --

25        THE COURT:  Wait, I don't want a repetition in front of

**Kwon - cross**

1  the jury of what different people think is the testimony, but I

2  think that that question needs to be rephrased.

3          MR. MAC MAHON:  I'll try again, Your Honor.

4  Q.  Do you remember testifying that there was a meeting at

5  Ibrahim Al-Hamdi's house where LET was discussed?

6  A.  Correct.

7  Q.  And was it your testimony that, that Ali Al-Timimi was

8  present at that meeting?

9  A.  Correct.

10 Q.  Do you remember being interviewed by the FBI on March 23,

11 2003?

12 A.  I had an interview with them, yes.

13 Q.  Okay.  And you told them that day that Kwon remembers the

14 following people being present at Ibrahim Hamdi's house when

15 Ismail Royer was talking about the Lashkar-e-Taiba camp, and you

16 listed Hammad Abdur-Raheem, Calipha, Idris Surratt, Nabil

17 Gharbieh, Ibrahim Hamdi, Seif Chapman, and Ibrahim Hamdi, Ismail

18 Royer, and Yong Kwon.

19          Do you remember that?

20 A.  Yes.

21 Q.  And your, your memory was much sharper then, wasn't it, sir?

22 A.  Yes, but at that time, I wasn't telling -- I wasn't telling

23 them the whole truth.  I was holding back some stuff.

24 Q.  You had already started talking to them about things you knew

25 about Ali Al-Timimi, hadn't you?

1120

**Kwon - cross**

1  A.    No, not yet.

2  Q.    Well, you knew by then already that that's who the FBI wanted

3  you to talk about, right?

4  A.    I knew that he, he was one of the people that he wanted me to

5  talk about.

6  Q.    Didn't they ask you about him all the time?

7  A.    Yes.  Not all the time, but he asked me about him, yes.

8  Q.    So this was a lie to the FBI on March 23, 2003?  You lied to

9  the FBI?

10  A.    It wasn't the whole truth.  I left out some stuff.

11  Q.    You said that Ali Al-Timimi had met -- Mr. Kromberg asked if

12  you had met Hafiz Saeed, right?

13  A.    Correct.

14  Q.    All right.  And you didn't tell the whole story about that,

15  either, did you?

16  A.    I told him what I could recall of him saying about Hafiz

17  Saeed.

18  Q.    All right.  And what you recall is that he met him at an

19  Islamic conference in the United States or England, right?

20  A.    I seemed to recall something, I thought he said, like, in

21  America or something.

22  Q.    And he told you it was sometime in the early '90s, right?

23  A.    I don't know the year.

24       MR. KROMBERG:  Objection, Judge.  I'd like to approach

25  the bench.

1121

1          THE COURT:  All right.

2          (Bench conference on the record.)

3          THE COURT:  Yes, Mr. Kromberg?

4          MR. KROMBERG:  Your Honor, I provided thousands of pages

5  of discovery and 302s galore of everything from back in March,

6  April, May 2003, on the express condition that Mr. MacMahon agreed

7  to that they would remain in the SCIF unless and until they were

8  identified as Jencks.

9          I did not identify the 302s for Kwon as Jencks.  They

10  were -- he was to read them as a Brady scan to see if there was

11  anything that was Brady in there, and he's using the 302s for

12  exactly the reason that I did not -- that we made an agreement

13  that they had to remain in the SCIF.

14          MR. MAC MAHON:  I did leave these things all in the

15  SCIF, and we haven't used one since, but if that's not Brady, I

16  don't know what it is.  Excuse me, Your Honor.  He completely

17  tells a different story to the FBI.

18          I thought that the prohibition was that I couldn't show

19  them, and I had no intention of putting them up on the screen and

20  using them at all, but I've got to be able to use the evidence of

21  the prior statements of the witness at this time to -- I can't

22  memorize them, Your Honor.  That's clearly a Brady -- a piece of

23  Brady information.

24          THE COURT:  I think inconsistent statements of a key

25  government witness have got to be allowed to come in, and I didn't

**J.A. 1266**

1122

1    understand there to be any classified information.

2        MR. KROMBERG:  I'm not saying they shouldn't come in,

3    Your Honor, but we made the agreement -- the terms of the

4    agreement were that I give you virtually open file discovery.  In

5    return, in return, the 302s stay in the SCIF unless they are

6    Jencks.  I will identify them to you as Jencks.

7        And I wrote this letter specifically saying that in

8    addition to the things that I have identified as Jencks, if you do

9    think that additional materials is Jencks, you let me know, and

10   we'll discuss it, and nothing was brought up to me as in addition

11   to the letter I sent.

12       I identified 1,500 pages as Jencks, I don't know how

13   many hundreds of Jencks, but this was not part --

14       THE COURT:  Wait a minute.  Are you upset because

15   Mr. MacMahon may be quoting from these reports?

16       MR. KROMBERG:  I'm upset because I would not have made

17   the agreement to let him have unfettered access to the 302s rather

18   than identifying for him particular statements that may be Brady.

19   But I gave him virtually -- not completely unfettered -- virtually

20   unfettered access to the 302s in return for the agreement that

21   they stay in the SCIF, and now they're out of the SCIF.

22       MR. MAC MAHON:  I apologize if there's a

23   miscommunication.  I left these things in the SCIF for the last

24   few months I've been working in the SCIF.  I never understood the

25   prohibition to mean that I couldn't use them and develop the

1123

 1  information.  I could have typed the information.

 2          THE COURT:  Here's what we're going to do:  It's late in

 3  the day.  The jury is tired.  We're tired.  The heat is on, not

 4  the air conditioning.  That's on the record.  I don't care what

 5  GSA says; they're not keeping it right.  We're going to call it

 6  quits for today, start out again on Monday.  I expect you to work

 7  out this problem.

 8          MR. KROMBERG:  We can work it out.

 9          MR. MAC MAHON:  It's a misunderstanding.

10          MR. KROMBERG:  And he is correct; I'm sure we'll be able

11  to work it out.  I was just surprised when I saw this.

12          THE COURT:  I expect this particular issue should be

13  worked out.

14          MR. MAC MAHON:  We will, Your Honor.  Thank you.

15          (End of bench conference.)

16          THE COURT:  It's not uncommon, Ladies and Gentlemen, in

17  a complex case like this -- and you can appreciate it's complex --

18  for there to be logistical issues that arise, and I think because

19  they have arisen, the best thing is for us actually to stop for

20  today, let the lawyers work out some of these problems, all right?

21          As I said earlier this week, you don't need to be here

22  tomorrow.  I'm giving you a day off.  We will start Monday morning

23  promptly at 9:30.  I believe we are still well ahead of schedule.

24          Mr. Kromberg and Mr. Gibbs, would you agree with that?

25          MR. KROMBERG:  I think that is correct, Judge.

**J.A. 1268**

1124

1    THE COURT:  All right.  So I don't want you to worry.
2  It may seem like a tedious trial, but given where I thought we
3  might be at this point, we are ahead of that point.  So I'm
4  continuing to work with the attorneys to try to get the case as
5  streamlined as we can, but as you can appreciate, there's a great
6  deal of information.
7    Now, I want to warn you again over the weekend to avoid
8  any media coverage about this case or any issues related to it.
9  Continue to absolutely avoid conducting any investigation about
10  the case.  Avoid any -- do not discuss the case in any respect
11  with family, friends, or colleagues.
12    Again, I don't expect you'll be contacted by anyone,
13  including the media, but if that were to happen, get away from it
14  right away, and then let me know first thing Monday morning.
15  You're not shy about letting me know if you have issues, and
16  that's good.
17    But anyway, leave your notebooks here, and we'll make
18  sure there are extra notebooks for anybody who needs them next
19  week.  Have a good weekend.
20    We'll recess court until nine tomorrow morning for me in
21  other matters.
22    (Recess from 5:43 p.m., until 9:30 a.m., April 11, 2005.)
23
24
25

**J.A. 1269**

1125

1    CERTIFICATE OF THE REPORTER

2        I certify that the foregoing is a correct transcript of the

3    record of proceedings in the above-entitled matter.

4

5

6    _____

                          Anneliese J. Thomson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25