No. 14-4451

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FOURTH COURT

————————————

### UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

**v.**

### ALI AL-TIMIMI,
*Defendant/Appellant.*

————————————

### On Appeal From the United States District Court
### for the Eastern District of Virginia
### Alexandria Division (The Hon. Leonie M. Brinkema)

————————————

### JOINT APPENDIX

### VOLUME VI of XIII (pages 1271 - 1550)

————————————

**ERIC S. SIEBERT**
**United States Attorney**

**Gordon D. Kromberg**
**Assistant U.S. Attorney**
**Counsel for Appellee**
**2100 Jamieson Avenue**
**Alexandria, VA 22314**
**(703) 299-3700**

**Joseph Attias**
**Attorney**
**Counsel for Appellee**
**Nat'l Security Division**
**U.S. Dep't of Justice**
**Washington, DC 20530**

**GEREMY C. KAMENS**
**Federal Public Defender**

**Geremy C. Kamens**
**Federal Public Defender**
**Counsel for Dr. Al-Timimi**
**1650 King Street, Suite 500**
**Alexandria, VA 22314**
**(703) 600-0800**

This page intentionally left blank for double-sided pagination and printing

# **TABLE OF CONTENTS**

### VOLUME I (pages 1 - 122)

District Court Docket Sheet (as of Apr. 28, 2025) ...................................................1

Indictment (Sept. 23, 2004, Doc. 1)................................................................49

Superseding Indictment (Feb. 3, 2005, Doc. 47) ................................................64

Government's Proposed Jury Instructions (Mar. 28, 2005, Doc. 84).....................80

### VOLUME II (pages 123 - 372)

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 294) (defense opening statement)................................................................................................123

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 148).........................................144

   Opening statements ...................................................................................148

      By the government...............................................................................148
      By the defense................................................................*see* J.A. 126

   Government's evidence ...............................................................................167

      Stipulation..........................................................................................167

| | | |
|---|---|---|
| Nabil Gharbieh | Direct examination | 171 |
| | Cross examination | 233 |
| | Redirect examination | 274 |
| | Recross examination | 281 |
| Muhammad Aatique | Direct examination | 283 |

   Concluding matters .....................................................................................369

i

## VOLUME III (pages 373 - 656)

Transcript, Jury Trial, Day 2 (Apr. 5, 2005, Doc. 149) ...........................373

    Preliminary matters ...................................................377

    Government's evidence, cont'd ..................................377

        Muhammad Aatique      Direct examination (resumed) ................378
                                        Cross examination...................................398
                                        Redirect examination .............................468
                                        Recross examination ..............................489

        Stipulations ........................................................492

        Donald Surratt            Direct examination...................................504
                                          Cross examination...................................570
                                        Redirect examination .............................585
                                        Recross examination ..............................588

        Detective John Hodge      Direct examination...................................589
                                            Cross examination...................................592
                                          Redirect examination .............................592

        Stipulations ........................................................594

        Playing of audiotapes...........................................598

        Yong Ki Kwon          Direct examination...................................604

    Concluding matters ..................................................655

## VOLUME IV (pages 657 - 972)

Transcript, Jury Trial, Day 3 (Apr. 6, 2005, Doc. 150) ........................657

    Preliminary matters ...................................................661

Government's evidence, cont'd ..................................................................665

    Evan Francois Kohlmann    Direct examination..................................665
                                  Cross examination...................................817
                                  Redirect examination ............................895
                                  Recross examination ..............................903

    Stipulations ...............................................................................905

    Playing of audiotape .................................................................914

  Concluding matters ..........................................................................970


VOLUME V (pages 973 - 1270)

Transcript, Jury Trial, Day 4 (Apr. 7, 2005, Doc. 151) ........................................973

  Preliminary matters..........................................................................977

  Government's evidence, cont'd ..................................................................980

    Playing of audiotapes and videotape ...........................................980

    S.A. Tracy Kneisler    Direct examination................................1093
                                    Cross examination.................................1099

    S.A. Christopher Paul Mamula  Direct examination................................1100

    S.A. Donald L. Monday    Direct examination................................1105
                                    Cross examination.................................1127

    Stipulations ...............................................................................1131

    Yong Ki Kwon    Direct examination (resumed) ..............1146
                                    Cross examination.................................1238

  Concluding matters ..........................................................................1268

## VOLUME VI (pages 1271 - 1550)

Transcript, Jury Trial, Day 5 (Apr. 11, 2005, Doc. 152) .....................................1271

   Preliminary matters .....................................................................................1275

   Government's evidence, cont'd ...................................................................1279

| | | |
|---|---|---|
| Yong Ki Kwon | Cross examination (resumed) | 1279 |
| | Redirect examination | 1446 |
| | Recross examination | 1475 |
| S.A. Wade Ammerman | Direct examination | 1481 |
| | Cross examination | 1539 |

   Concluding matters ......................................................................................1548


## VOLUME VII (pages 1551 - 1804)

Transcript, Jury Trial, Day 6 (Apr. 12, 2005, Doc. 153) .....................................1551

   Government's evidence, cont'd ...................................................................1555

| | | |
|---|---|---|
| S.A. Wade Ammerman | Cross examination (resumed) | 1556 |
| | Redirect examination | 1582 |
| | Recross examination | 1593 |

   Stipulations ...................................................................................................1600

   Playing of audiotapes ..................................................................................1610

| | | |
|---|---|---|
| S.A. John Wyman | Direct examination | 1656 |

   Concluding matters ......................................................................................1799

## VOLUME VIII (pages 1805 - 2058)

Transcript, Jury Trial, Day 7 (Apr. 13, 2005, Doc. 154) ....................................1805

    Preliminary matters ...................................................................................1808

    Government's evidence, cont'd ................................................................1810

| | | |
|---|---|---|
| S.A. John Wyman | Direct examination (resumed) | 1810 |
| | Cross examination | 1852 |
| | Redirect examination | 1916 |
| | Recross examination | 1923 |
| Alex Daghestani | Direct examination | 1927 |
| | Cross examination | 1935 |
| Andre Thompson | Direct examination | 1940 |
| | Cross examination | 1951 |

    Playing of audiotapes..............................................................................1954

    Government rests ..............................................................................1955, 1965

  Defendant's Rule 29 motion ..........................................................................1958

  Defendant's evidence .....................................................................................1965

| | | |
|---|---|---|
| Sherdil Loynab | Direct examination | 1966 |
| | Cross examination | 1970 |
| | Redirect examination | 1976 |
| Yousuf Jaafar Idris | Direct examination | 1977 |
| | Cross examination | 2018 |

  Concluding matters ........................................................................................2056

## VOLUME IX (pages 2059 - 2318)

Transcript, Jury Trial, Day 8 (Apr. 14, 2005, Doc. 155) .....................................2059

    Defendant's evidence, cont'd ........................................................................2063

        Yousuf Jaafar Idris          Cross examination (resumed) ...............2063

        Luther Kennedy             Direct examination.................................2136
                                                               Cross examination.................................2144
                                                               Redirect examination .............................2163
                                                               Recross examination ..............................2168

        Curtis Jamison               Direct examination.................................2172
                                                                  Cross examination.................................2189

        Defendant rests ........................................................................2198

    Government's rebuttal evidence ....................................................................2198

        Khwaja Mahmood Hasan       Direct examination.................................2199
                                                        Cross examination.................................2235
                                                        Redirect examination .............................2278
                                                        Recross examination ..............................2284

        Muhammad Aatique, recalled    Direct examination.................................2290

        Conclusion of evidence ...........................................................2293

    Preliminary charge conference ....................................................................2306

## VOLUME X (pages 2319 - 2568)

Transcript, Jury Trial, Day 9 (Apr. 18, 2005, Doc. 156) .....................................2319

    Charge conference ............................................................................2322

vi

Closing arguments .........................................................................2346

    By the government...............................................................2346
    By the defense.....................................................................2376
    Rebuttal by the government...............................................2415

Jury charge ....................................................................................2429

Jury deliberations ..........................................................................2500

    Jury question ........................................................................2500

Transcript, Jury Trial, Day 10 (Apr. 19, 2005, Doc. 157).............2506

    Jury deliberations, cont'd..................................................2507

    Jury question ........................................................................2507

Transcript, Jury Trial, Day 11 (Apr. 20, 2005, Doc. 158).............2515

    Jury deliberations, cont'd..................................................2517

    Jury question ........................................................................2517

    Jury questions ......................................................................2520

Transcript, Jury Trial, Day 12 (Apr. 22, 2005, Doc. 159).............2535

    Jury deliberations, cont'd..................................................2537

Transcript, Jury Trial, Day 13 (Apr. 25, 2005, Doc. 160).............2540

    Jury deliberations, cont'd..................................................2542

    Jury questions ......................................................................2542

Transcript, Jury Trial, Day 14 (Apr. 26, 2005, Doc. 161).............2553

    Return of verdict ................................................................2555

Concluding matters ........................................................................2560

Verdict Form (Apr. 26, 2005, Doc. 107) .......................................2566

### VOLUME XI (pages 2569 - 2770)

Defendant's Motion for Judgment of Acquittal (June 6, 2005, Doc. 118)..........2569

Defendant's Corrected Motion for New Trial (June 14, 2005, Doc. 124) ..........2630

Government's Response to Defendant's Post-Trial Motions (June 20, 2005, Doc. 125)................................................................2647

Defendant's Reply to the Government's Response to Defendant's Post-Trial Motions (June 28, 2005, Doc. 126) (attachments omitted from appendix)................................................................2688

Transcript, Sentencing Hearing (July 13, 2005, Doc. 147) ................................2719

    Argument and ruling on Rule 29 motion....................................2720
    Argument and ruling on Rule 33 motion....................................2724
    Ruling on Guidelines objections................................................2735
    Argument on sentencing ............................................................2739
    Allocution ..................................................................................2746
    Imposition of sentence ..............................................................2750

Judgment in a Criminal Case (July 13, 2005, Doc. 132)....................................2758

Notice of Appeal (July 15, 2005, doc. 133)........................................2765

Fourth Circuit Judgment (corrected) (with copy of Apr. 25, 2006 order) (May 19, 2006, Doc. 168)................................................................2767

### VOLUME XII (pages 2771 - 2998)

Transcript, Hearing (Aug. 24, 2007, Doc. 239)................................................2771

Transcript, Hearing (Nov. 20, 2007, Doc. 245).......................................2790

Transcript, Hearing (May 16, 2008, Doc. 263) ...................................2795

Transcript, Hearing (Oct. 23, 2008, Doc. 272)...................................2802

Transcript, Hearing (Feb. 19, 2009, Doc. 297)...................................2827

Transcript, Hearing (Oct. 4, 2013, Doc. 340) .....................................2834

(Redacted) Memorandum Opinion (denying motions to compel) (Apr. 28, 2014, Doc. 350)....................................................................................2864

Order (May 21, 2014, Doc. 357)...........................................................2887

Notice of Appeal (June 4, 2014, Doc. 358) ..........................................2889

Fourth Circuit Order (remanding case for further proceedings) (Aug. 4, 2015, Doc. 406)................................................................................2892

Fourth Circuit Order (expanding scope of remand) (July 26, 2016, Doc. 431)................................................................................................2894

Government's Response in Opposition to Defendant's Second Motion for Acquittal on Count 1 (Aug. 29, 2018, Doc. 447) ...........................2896

Defendant's Reply to Government's Supplemental Memorandum on *United States v. Davis* (Aug. 19, 2019, Doc. 459) .........................2905

Government's Reply in Further Support of Its Supplemental Memorandum on *United States v. United States* (Aug. 26, 2019, Doc. 461) .......................2936

(Redacted) Memorandum Opinion (granting release pending appeal) (Aug. 18, 2020, Doc. 519) ....................................................................2953

Order (granting release pending appeal) (Aug. 18, 2020, Doc. 520) .................2969

Fourth Circuit Order (affirming grant of release pending appeal) (Aug. 31, 2020, Doc. 535)................................................................................2971

ix

Memorandum Opinion (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 549).................................................................................2972

Order (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 550)...........................2998

VOLUME XIII (pages 2999 - end)

Selected Government Trial Exhibits....................................................................2999

Gov't Exh. 1B1a: transcript of Apr. 7, 2003 consensually monitored call between Kwon and Royer........................................................................2999

Gov't Exh. 1B2a: transcript of Apr. 8, 2003 consensually monitored call between Kwon and Royer........................................................................3053

Gov't Exh. 1B4a: transcript of Apr. 17, 2003 consensually recorded CCTV hotel meeting between Kwon and Royer......................................3084

Gov't Exh. 1D27: Taiba Bulletin, Oct. 17, 2000...........................................3131

Gov't Exh. 1D28: Taiba Bulletin, Oct. 27, 2000...........................................3134

Gov't Exh. 1D29: Taiba Bulletin, Nov. 7, 2000............................................3137

Gov't Exh. 1D45: Taiba Bulletin, Sept. 26, 2001 (post from nadqpk@yahoo.com).................................................................3139

Gov't Exh. 1D48: Taiba Bulletin, Oct. 13, 2001 (post from nadqpk@yahoo.com).................................................................3141

Gov't Exh. 1D52: Taiba Bulletin, June 24, 2001 (post from nadqpk@yahoo.com).................................................................3144

Gov't Exh. 1F1: LET Poster, image 1 ..........................................................3151

Gov't Exh. 1F3: LET Poster, image 3 ..........................................................3152

Gov't Exh. 1F4: LET Poster, image 4 ..........................................................3153

Gov't Exh. 1G10a: transcript of Apr. 1, 2003 recorded telephone call (Hammad and Royer call Al-Timimi) .......................................................3154

Gov't Exh. 4G7: email dated June 19, 2001 from pballaz@yahoo.com, regarding praying in a moving car ...........................................................3164

Gov't Exh. 7A19: Uqla fatwa on events of 9/11, in English, taken from Surratt's residence on May 8, 2003 .........................................................3168

Gov't Exh. 7A23; Hawali's *Statement to the Ummah* in English .................3178

Gov't Exh. 7A39a: translation of website containing Space Shuttle article in Arabic .......................................................................................3200

Gov't Exh. 7C31: email dated Sept. 20, 2001 from Kwon to Belton Harris .......................................................................................................3203

Gov't Exh. 7D3: email dated Oct. 15, 2001 from Surratt re. Hawali's *Statement to the Ummah* ...................................................................3204

Gov't Exh. 7F24a: UPI News article dated Sept. 16, 2001 titled *Taliban Leaders Seek Islamic Support* ...................................................................3206

Gov't Exh. 7H12: plea agreement and statement of facts for Muhammed Aatique ........................................................................................................3207

Gov't Exh. 10A3: document entitled *Suicide Attacks, Are They Suicide? A Shariah Viewpoint* ................................................................................3223

Gov't Exh. 10A41: email dated Oct. 23, 2000 from Nabil to Timimi re: trip to Delaware ..........................................................................................3227

Gov't Exh. 10D19: email dated Oct. 21, 2001 email from altimimi@yahoo.com to aqdcksa@yahoo.com re. "Utter Nonsense" ......3229

Gov't Exh. 10H1A: record of instant messaging session with Bin Laden statement preamble ....................................................................................3233

Gov't Exh. 10J7: article, *Sheikh Ali Timimi on the Taliban and the Statues* ...................................................................................................3260

Gov't Exh. 10J9: email dated December 13, 2001 from Timimi re. "A call to reflect and repentance" ...................................................3262

Gov't Exh. 10J15: affidavit of Youseff Idris ...................................3265

Gov't Exh. 10S1: summary chart of Timimi / Kwon telephone calls, Sept. 16, 2001 ....................................................................3266

Gov't Exh. 10S2: summary chart of Timimi / Kwon telephone calls, Sept. 19, 2001 ....................................................................3267

Gov't Exh. 10S3: summary chart of Kwon telephone calls, Sept. 16, 2001 ....................................................................3268

Gov't Exh. 10T1: photograph, package of "New World Order" cassette tapes ..................................................................................3272

Gov't Exh. 12-1: stipulation re. background facts............ 3273; *see* J.A. 167-171

Gov't Exh. 12-60: stipulation re. electronic surveillance of calls and email..................................................................................3277

Gov't Exh. 12-61: stipulation re. Al-Timimi lectures ............3278; *see* J.A. 2344

Selected Defense Trial Exhibits ..........................................................3280

Def't Exh. 33: Al-Timimi lecture titled *Muslims in America in the Face of Accusations of "Fundamentalism" and "Terrorism"* delivered at Purdue University on Oct. 20, 1993 ........................................3280

Def't Exh. 57: letter dated from AUSA Gordon Kromberg to Yong Kwon's attorneys ....................................................................3293

Def't Exh. 80: stipulation regarding Al-Timimi's unsubscription from Taiba Bulletin List ....................................................................3295

Def't Exh. 81: summary report of an interview with Ismail Royer by Evan Kohlmann ....................................................................3298

Def't Exh. 82: photo of front of Yong Kwon's apartment .............................3303

Def't Exh. 83: photo of back of Yong Kwon's apartment .............................3304

Def't Exh. 85: summary of Yong Kwon's phone calls on Sept. 16, 2001 ................................................................................................. 3305

Def't Exh. 86: summary of Yong Kwon's phone calls on Sept. 13-15, 2001 ...............................................................................3306

Def't Exh. 87: summary of Al-Timimi's calls on evening of Sept. 19, 2001 ................................................................................3307

Def't Exh. 90: summary of Al-Timimi's calls on evening of Sept. 19, 2001 ...............................................................................3308

This page intentionally left blank for double-sided pagination and printing

1126

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .      Criminal No. 1:04cr385
                              .
     vs.                      .      Alexandria, Virginia
                              .      April 11, 2005
ALI AL-TIMIMI,                .      9:38 a.m.
                              .
          Defendant.          .
                              .
.  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME V

APPEARANCES:

FOR THE GOVERNMENT:          GORDON D. KROMBERG, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314
                               and
                             JOHN T. GIBBS, ESQ.
                             Counterterrorism Section
                             Criminal Division
                             United States Department of Justice
                             601 D Street, N.W.
                             Washington, D.C. 20004

FOR THE DEFENDANT:           EDWARD B. MAC MAHON, JR., ESQ.
                             107 East Washington Street
                             P.O. Box 903
                             Middleburg, VA 20118
                               and
                             ALAN H. YAMAMOTO, ESQ.
                             643 S. Washington Street
                             Alexandria, VA 22314

ALSO PRESENT:                S.A. WADE AMMERMAN
                             BOBBY WILLIAMS
                             S.A. JOHN WYMAN

(Pages 1126 - 1404)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

J.A. 1271

1127

1    OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Fifth Floor
2                                    401 Courthouse Square
                                     Alexandria, VA 22314
3                                    (703)299-8595

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1128

## I N D E X

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

WITNESSES ON BEHALF OF
THE GOVERNMENT:

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Yong Ki Kwon (Resumed) | | 1134 | 1301 | 1330 |
| S.A. Agent Wade Ammerman | 1336 | 1394 | | |

## EXHIBITS

| | MARKED | RECEIVED |
|---|---|---|

GOVERNMENT'S:

| No. 2A1 | | 1384 |
|---|---|---|
| 2A7 | | 1376 |
| 2A19 | | 1376 |
| 2A20 | | 1378 |
| 2C2 | | 1392 |
| 7A20 | | 1339 |
| 7A38 | | 1340 |
| 7A39 | | 1341 |
| 10A9 | | 1342 |
| 10A16 | | 1343 |
| 10A20 | | 1347 |
| 10A25 | | 1348 |
| 10A26 | | 1349 |
| 10A27 | | 1350 |
| 10A29 | | 1351 |
| 10A33 | | 1351 |
| 10A34 | | 1356 |
| 10A36 | | 1357 |
| 10S1 | | 1387 |
| 10S2 | | 1388 |
| 10T10 | | 1358 |

DEFENDANT'S:

| No. 36 | | 1170 |
|---|---|---|

1129

EXHIBITS (Cont'd.)

|  | MARKED | RECEIVED |
|---|---|---|
| DEFENDANT'S: | | |
| No. 53 | | 1160 |
| 57 | | 1296 |
| 82 | 1220 | 1220 |
| 83 | 1221 | 1221 |
| 84 | 1277 | 1277 |
| 85 | | 1300 |
| 86 | | 1300 |

1130

1            P R O C E E D I N G S

2             (Defendant present, Jury out.)

3       THE COURT:  I understand there's a brief matter we need

4  to take up outside the presence of the jury?

5       MR. MAC MAHON:  Yes, Your Honor.

6       THE COURT:  Yes, sir.

7       MR. MAC MAHON:  If it please the Court, we by writ

8  brought up some of the paintball defendants, however you want to

9  refer to them, and over the weekend, it was my intention to go

10  visit some of them to try to see whether we would call them as

11  witnesses, and at least Mr. Chapman and Mr. Khan to my knowledge

12  are at Northern Neck, which is, you know, four hours' worth of

13  driving in each direction, I mean, there and back, and it's just

14  not possible.

15       I would ask that the marshals -- that the witnesses that

16  are in federal custody be brought to the Alexandria Jail.  We can

17  go talk to them at night.

18       This is not a problem of Mr. Kromberg or the FBI's

19  making, I don't think, but for the brief period of time that we're

20  talking about here, we can't prepare this case if Mr. Yamamoto and

21  I have to drive down to Northern Neck to talk to potential

22  witnesses in the government's control.

23       So we ask that they be -- that the Court order the

24  marshals to bring all of the witnesses that we -- in federal

25  custody up here to Alexandria at least for the duration of the

1131

1  trial.

2          THE COURT:  Have you -- did you discuss this at all with

3  Mr. Kromberg?  I realize the U.S. Attorney's Office doesn't

4  control the marshal.  I would suspect that there are separation

5  orders.

6          MR. KROMBERG:  There are, Judge.  Mr. MacMahon had

7  mentioned this to me in the past, and I had approached the

8  Marshal's Service, and I was told that the issues for Mr. MacMahon

9  involving his witnesses, bringing them in particular places, are

10 things that he should deal with without me and that I shouldn't be

11 putting in requests for his witnesses to do something.

12         THE COURT:  But if to some degree part of the problem

13 is -- I suspect part of the problem is simply that they can't have

14 all of these people within the general population, and they've

15 already got some other folks over at that jail that create issues

16 as well.

17         How many, I'm going to call it, paintball people besides

18 Mr. Kwon -- and we've already heard from Mr. Aatique.  Now, has

19 Aatique been sent back?

20         MR. KROMBERG:  He's at Alexandria Jail, but he's not

21 been released.  We were thinking -- we have told the Court that we

22 may very well be calling him back.

23         Mr. Surratt is there, and he has not been released,

24 either.  Mr. Hasan is there.

25         THE COURT:  Some of the people who are being held in

1132

1   Alexandria, if they're not needed any longer by the government but
2   still need to be in the general area, they could be swapped for
3   the Warsaw people.
4         MR. KROMBERG:  But there is nobody in -- there is nobody
5   in Alexandria that has been released.
6         THE COURT:  However, if we have to prioritize, at this
7   point, it's more important to have the defendant's people up here
8   than yours if that's part of the problem.
9         MR. KROMBERG:  They're not the defendant's people.
10  They've had -- they've had hundreds of pages of transcripts to see
11  what the defendant -- what these people said, and he doesn't know
12  whether they're the defendant's people.
13        THE COURT:  Well, look, but the problem --
14        MR. KROMBERG:  We are calling Aatique back.  We are
15  likely -- we may well be calling Surratt back, and we may be
16  calling Hasan, so why should they be sent away so that someone
17  who -- it will be a very unusual thing for someone like Khan,
18  sentenced to life-plus-65 years, or someone like Chapman to be
19  called as a witness when he's never spoke with them yet and
20  doesn't even know what they would say that might be his witnesses.
21        THE COURT:  Here is the problem:  We're trying to get
22  this case resolved relatively soon.  If the marshal is unable to
23  put any more of these defendants or these people up here because
24  of the four slots that the government has for its witnesses, I may
25  not have any choice but to have to delay by a full day or half a

1133

1  day this trial to give defense counsel enough time to do this.

2         I really don't want to do that because we're not going

3  to be able to hold court on Friday.  My calendar is just too

4  crammed.  And so I'm going to see what we can do.

5         During the break, I will call the marshal and see if

6  they can get Chapman and Khan up here, just those two then, right?

7  Because I know that there are logistical problems up here.  Are

8  those the two critical ones?

9         MR. MAC MAHON:  At this point in time, Your Honor, yes.

10  I'm not sure where the rest -- obviously, you want to look a

11  witness in the eye and talk to them before you call them.  Looking

12  at paper doesn't help you.

13         THE COURT:  I understand that.  If they can get those

14  two up there without having to send any of the government's four

15  someplace else, so be it, but if they tell me that that's going to

16  be overload and they're going to have to swap some folks around,

17  then I am going to speak about whether we can at least -- I mean,

18  I would assume the government's got at least another full day to

19  go with Kwon, and you still have other witnesses.

20         MR. KROMBERG:  That's true, Judge.  I would note that

21  the people at Northern Neck are routinely bought up by the

22  marshals for the day, and, in fact, Randall Royer is here right

23  now being up from Northern Neck, and there's no reason -- I don't

24  know that there's any reason why one of the two defense attorneys

25  cannot be interviewing the witness should he so desire.

1134

## Kwon - cross

1    THE COURT:  Chapman does have diabetes and has to have a

2  lot of medicine with him, so he may be more of a problem, all

3  right?  In any case, I will talk to the marshal and see what can

4  be done, and I'll report back to you, probably it won't be until

5  lunchtime.

6    Let's get this trial going.  Are we all set then?

7    MR. KROMBERG:  Yes, Your Honor.

8    THE COURT:  All right.  Mr. Kwon is out in the lockup,

9  ready to come in?

10    MR. KROMBERG:  Yes, Your Honor.

11    THE COURT:  All right, he can be brought in.  Let's get

12  the jury in.

13    (Jury present.)

14    THE COURT:  Good morning, Ladies and Gentlemen.  You

15  still like those same seats; that's all right.  I'm getting to

16  know all of you pretty well by now by face and location.

17    I hope you-all had a good weekend and, I assume, no

18  problems.  I didn't see any media coverage about the case, and I

19  hope you didn't as well, right?  Good.

20    We're continuing with the testimony of Mr. Kwon.

21  Mr. Kwon, you're still under your affirmation to tell the truth.

22  Do you understand?

23    THE WITNESS:  Yes, I do.

24    THE COURT:  All right.  Go ahead, Mr. MacMahon.

25   YONG KI KWON, GOVERNMENT'S WITNESS, PREVIOUSLY AFFIRMED, RESUMED

**Kwon - cross**

1          CROSS EXAMINATION (Cont'd.)

2     BY MR. MAC MAHON:

3     Q.    Mr. Kwon, when court was about to let out on Friday, I asked

4     you an inartful question, so let me try again:  You understand

5     that your plea agreement could be revoked by the government if

6     they -- if you failed to cooperate, correct?

7     A.    Correct.

8     Q.    Okay.  And if your plea agreement was revoked, what is the

9     maximum sentence of incarceration that you believe you would be

10    facing?

11    A.    Life.

12    Q.    Now, when you -- when did you convert to Islam?

13    A.    1996.

14    Q.    Okay.  And did Ali Al-Timimi have anything to do with you

15    converting to Islam?

16    A.    No.

17    Q.    Okay.  Who did?

18    A.    A friend of mine named Aaron Cambel.

19    Q.    Okay.  That person told you that Christianity was an

20    incorrect religion?

21    A.    Yes.

22    Q.    Now, was -- what was your religion before Islam?

23    A.    Christianity.

24    Q.    Okay.  And your father is a deacon in the church in Korea?

25    A.    Correct.

1136

**Kwon - cross**

1  Q.    Okay.  And was he upset when you converted to Islam?

2  A.    Yes.

3  Q.    Did he beat you with a bat?

4  A.    No.

5  Q.    What did he do?

6  A.    Well, at the time, I was -- he was in Korea, and I was here

7  in the States.  So we had a long conversation on the phone, more

8  like one-way conversation.  He was preaching to me, you know.

9  Q.    Okay.  He was trying to talk you out of it, right?

10  A.    Correct.

11  Q.    Did you tell some of your friends in the paintball that your

12  father beat with you a bat?

13  A.    No.

14  Q.    Are you still a Muslim, sir?

15  A.    Yes, I am.

16  Q.    Okay.  What are the five pillars of Islam?

17  A.    The testimony of faith, there is no God but Allah and that

18  Muhammad is the messenger of Allah; to establish prayer; to pay

19  the obligatory charity; to fast in month of Ramadan; and to make

20  pilgrimage to Mecca, house of God.

21  Q.    And what is, what is the purpose of the pilgrimage to Mecca?

22  A.    It's to -- it's an obligatory duty on us, but it was a --

23  it's to honor Prophet Abraham and the rights that he performed at

24  the -- at Mecca.  So we follow in his footsteps.

25  Q.    Okay.  What happens if your pilgrimage is accepted by God?

**Kwon - cross**

1  A.   All your sins are -- all your sins will be forgiven, past

2  sins will be forgiven.

3  Q.   Now, when you converted to Islam, you were at Virginia Tech,

4  right?

5  A.   Correct.

6  Q.   Okay.  And you knew -- did you convert at Tech?

7  A.   Yes.

8  Q.   And you knew Muhammad Aatique at college, didn't you?

9  A.   Correct.

10  Q.   Was he a good friend of yours?

11  A.   Actually, I met him a few months after I converted.  In

12  college, I didn't know him that well.  He's more like -- actually,

13  in college, I didn't see him that much.  He was in a different

14  department.  He's electrical engineer.

15  Q.   What was your degree in college, I'm sorry?

16  A.   Industrial engineering.

17  Q.   Industrial engineering?

18  A.   Correct.

19  Q.   How about Masaud Khan?  Did you know him from college?

20  A.   No, I met him later.

21  Q.   How about Omer Khan?

22  A.   Yes.

23  Q.   And how did you know Omer Khan at college?

24  A.   My friend, Aaron Cambel, who introduced me to Islam, he came

25  down to Blacksburg, Virginia, Virginia Tech, with Omer, because

1138

**Kwon - cross**

1   Omer had been accepted to Virginia Tech, and he wanted to come

2   down looking for -- check out the campus and look for apartment

3   before enrollment.  So he brought -- Aaron Cambel brought him down

4   to Virginia Tech, and that's how I met him.

5   Q.   So Ali Al-Timimi didn't introduce you to the Khans, did he?

6   A.   No, he didn't.

7   Q.   Okay.  And in 1997, you went to a conference, I think you

8   already testified to, called the IANA conference?

9   A.   Correct.

10   Q.   And you testified that you met Ali Al-Timimi at that

11   conference?

12   A.   Correct.

13   Q.   What did you do, shake his hand in a room?

14   A.   No.  He was -- I don't, I don't think I even shook his hand.

15   He was -- I think he was at, like, a lobby of a hotel, where they

16   have a lot of booths were set up, they were selling Islamic

17   literature and stuff, and I met him with a group of brothers, and,

18   you know, I knew about him because I had some tapes by him, and

19   that's the first time I, I met him face to face.

20   Q.   Was this a one-minute conversation you had?

21   A.   Not even.  I think just a hello.

22   Q.   Was he polite?

23   A.   Yes.

24   Q.   Okay.  Who did you stay with at the IANA conference in 1997?

25   A.   '97, I stayed with -- in a hotel room with Ismail Royer and

**J.A. 1283**

**Kwon - cross**

1  Aaron Cambel.

2  Q.    How did you meet Mr. Royer?

3  A.    At the conference.  He was -- Aaron -- I had another room --

4  when I signed up for the conference, the way they did it was they

5  put you in a room with three other Muslim brothers, you know,

6  could be strangers, but when I got there, I ran into Aaron, Aaron

7  Cambel, and he invited me to stay in his room, so I stayed with

8  them.

9          I mean, there were more brothers in there.  There was

10 maybe, like, six-seven brothers, but I don't remember their names.

11 I just remember Aaron and Randall Royer.

12          THE COURT:  Can you spell Cambel's last name, please?

13          THE WITNESS:  I think it's actually spelled "Cambel,"

14 but I think they pronounce it "Cambel."  It's C-a-m-b-e-l.

15 BY MR. MAC MAHON:

16 Q.    Did -- is that the first time you met Ismail Royer?

17 A.    Yes.

18 Q.    Okay.  Did he tell you about his -- about the fact that he'd

19 fought in Bosnia that day?

20 A.    No.  All I knew at that time was that he had a Bosnian wife.

21 He had just gotten married recently.

22 Q.    All right.  And his wife was with him, right?

23 A.    Yes.  At the conference, yes.

24 Q.    Okay.  Now, didn't you used to brag to your friends at

25 paintball that you cheated your way through college, sir?

**Kwon - cross**

1  A.    No.  I don't call it brag, but, you know, I told them that
2  sometimes I would cut corners in college.
3  Q.    Like what?  Give us an example, sir.
4  A.    Well, my freshman year, you know, we had classes, huge
5  classes with 600-800 students, and, you know, we used to cut
6  corners when we'd take tests, you know.  And later, we used to
7  have projects and homeworks, and sometimes I'll have, you know,
8  another student do, like, the first half of the homework, and I'll
9  have another student do another half, and I'll, you know, exchange
10 the, exchange the homework and have a complete one.
11 Q.    Did you have to sign a pledge in college when you turned in a
12 test that you hadn't cheated?
13 A.    I think it's like an honor code, yeah.  I mean, you don't
14 sign anything, but, you know, you're under honor code.
15 Q.    So it didn't bother you at all to cheat in college, Mr. Kwon?
16 A.    Well, my early years in college, I -- it just seemed to me
17 that everybody was, you know, doing it, so at that time, no, it
18 didn't bother me.
19 Q.    Why did you feel the need to tell your friends at paintball
20 that you cheated in college?
21 A.    I didn't -- I don't remember telling -- I only told a few,
22 few people, like Omer.  He went to college with me, so he, he knew
23 some of this stuff.  So I don't remember bringing it up.  He'll,
24 like, you know, he'll make fun of it.  He'll joke about it.
25 That's how it will come out in conversation.

**Kwon - cross**

1  Q.   Okay.  And you never told Ali Al-Timimi that you cheated in

2  college, did you?

3  A.   No.

4  Q.   Now, when you, when you -- when did you move up to the

5  Washington, D.C. area?

6  A.   Around June of 1998.

7  Q.   Okay.

8  A.   After college.  Before, I was here -- I used to live here

9  before that, but after college, June of 1998.

10 Q.   Okay.  And who did you move in with?

11 A.   My older brother.

12 Q.   Did there come a time when you moved in with Omer Khan?

13 A.   That's before I came from Northern Virginia.  They live in

14 Maryland, so from April to June 1998, I moved in with Omer.

15 Q.   I'm sorry, is that 1998, sir?

16 A.   Correct.

17 Q.   Is your brother a Muslim?

18 A.   No.

19 Q.   And it was Omer Khan who introduced you to the Dar al-Arqam

20 Islamic Center, right?

21 A.   Correct.

22 Q.   And did you -- had Omer Khan told you before that that he had

23 a brother who had fought in the jihad in Afghanistan against the

24 Russians?

25 A.   Correct.

**Kwon - cross**

1   Q.   And who was that?

2   A.   That's Masaud Khan.

3   Q.   And you were very close to the Khans, weren't you?

4   A.   Yes.

5   Q.   Other than the fact that you lived with them, did you

6   socialize with the Khans when you lived here before September 11?

7   A.   Yes.

8   Q.   Did you have a lot of discussions with Omer and Masaud Khan?

9   A.   Yes.

10  Q.   Did you talk to them about jihad?

11  A.   Yes.

12  Q.   Did you talk to them about the plight of the Muslims in

13  Chechnya and Indonesia and other places in the world?

14  A.   In Chechnya, yes.

15  Q.   On many occasions, right?

16  A.   Correct.

17  Q.   And you looked at jihad websites with them, too, didn't you?

18  A.   I don't recall looking at websites with them, but, you know,

19  we'd talk about it.

20  Q.   You watched jihad videos with them, didn't you?

21  A.   Actually, with the Khans, no.  Omer, he left, like, '99 or

22  2000, late '99 or 2000, and, you know, Masaud, he was, you know,

23  he, you know, we used to -- but I never watched videos with them,

24  you know.  We just --

25  Q.   Did you ever talk to Masaud about his -- or what he had done

1143

**Kwon - cross**

1  in Afghanistan in the jihad against the Soviets?

2  A.   Yes.

3        MR. KROMBERG:  Objection, Judge.  There was no testimony

4  it was a jihad that he was in was against the Soviets.

5        MR. MAC MAHON:  Against the Russians, excuse me, Your

6  Honor.

7        MR. KROMBERG:  There is no evidence that it was against

8  the Russians.

9        MR. MAC MAHON:  Okay.

10        MR. KROMBERG:  We heard from Mr. Kohlmann that there was

11  fighting going on, there was a jihad for many years and after

12  198- --

13        THE COURT:  Look, rephrase the question about Khan's

14  fighting experiences in Afghanistan.

15        MR. MAC MAHON:  In Afghanistan, excuse me, Your Honor.

16  Q.   Did Masaud Khan tell you about his jihad experiences in

17  Afghanistan?

18  A.   Yes.

19  Q.   Okay.  And what did he tell you?

20  A.   That first he went to a camp, trained for 40 days.  You know,

21  he used to tell me that, you know, the only thing he owned was his

22  weapon and the clothes on his back when he went to the, you know,

23  front, that he shot at the Russians.  AKs will get hot, so he'd

24  use water bottles to cool the barrels, stuff like that.

25  Q.   When was this?

**Kwon - cross**

1  A.   You know, throughout -- not all at once, you know.  Just from
2  time to time, he'll talk about it, you know.
3  Q.   Did you think -- did you find his -- the experiences he
4  related to you to be interesting?
5  A.   Yes.
6  Q.   Did you look up to him because he had that experience and you
7  didn't?
8  A.   In a way, yes.
9  Q.   And, and you never told Ali Al-Timimi anything about these
10  conversations you were having with Masaud Khan, did you?
11  A.   No.
12  Q.   Why did you leave the Khan's house?
13  A.   I got my own place in Virginia.
14  Q.   Now, you -- then you eventually end up at the Dar al-Arqam
15  listening to lectures, correct?
16  A.   Correct.
17  Q.   Okay.  How many lectures did you attend at the Dar al-Arqam?
18  A.   I started attending regularly starting early '99, January
19  '99.  I started attending late '98, but every Friday, I started
20  attending late '99 -- early '99 to pretty much when I left in
21  2001.
22  Q.   Okay.  And there were -- Ali Al-Timimi wasn't the only
23  speaker, was he?
24  A.   No, he wasn't.
25  Q.   There were lots of speakers, right?

**Kwon - cross**

1   A.   There were other speakers, yes.

2   Q.   And the place was only open on Friday nights, correct?

3   A.   Yes.  Friday night lecture were the main lectures, but

4   sometime they'll have other activities.

5   Q.   Okay.  And, sir, it's fair to say that you never once heard

6   anyone that's giving a lecture at Dar al-Arqam advocate the use of

7   violence against anyone, did you?

8   A.   I mean, in Dar -- you know, we used to -- there used to be

9   some topic lectures on jihad before Day of, you know signs of Day

10  of Judgment.

11  Q.   Well, those were theological lectures, weren't they?

12  A.   Correct.

13  Q.   And you heard lots of -- what's that -- Dar al-Arqam was, was

14  a place to be taught about your religion, right?

15  A.   Correct.

16  Q.   Okay.  And when you heard this lecture about jihad at Dar

17  al-Arqam, how many other people were there?

18  A.   Many, many, you know.

19  Q.   A hundred?

20  A.   No, not that many.  I don't know, like, 40 maybe.

21  Q.   Okay.  And were there, were there sisters behind the curtain

22  as well?

23  A.   Correct.

24  Q.   So these were well attended, right?

25  A.   Yes.

1146

**Kwon - cross**

1  Q.   They were open to the public?

2  A.   Yes.

3  Q.   They were, in fact, taped, weren't they?

4  A.   Yes.

5  Q.   Did you tell the FBI that there's a difference between the

6  lessons you learned at Dar al-Arqam and what Sufis follow?

7  A.   From what I understand, yes.

8  Q.   You told them that the Sufis follow their leaders blindly,

9  correct?

10 A.   Yes.

11 Q.   All right.  You never heard any speech at Dar al-Arqam which

12 told you you had to follow any of your Islamic Muslim leaders

13 blindly, did you?

14 A.   I mean, everybody has some kind of blind following to a

15 certain degree, but no, the way we are taught at Dar al-Arqam is

16 that you should always follow the Koran and the teachings of the

17 Prophet Muhammad.

18 Q.   And you were always taught to, to question orders if you

19 didn't like them or what people were saying, look at all the

20 facts, and then make up your own mind, right?

21 A.   You had to ask for the evidences, yes.

22 Q.   And who told you to ask for the evidences if somebody told

23 you something about Islam?

24 A.   I mean, many people:  Ali Timimi, you know, even Sheikh

25 Jaafar.  Most people who are on, on the sunnah will tell you that

**J.A. 1291**

**Kwon - cross**

1  you should always ask for evidence from the Koran, the sunnah,
2  yeah.
3  Q.    Okay.  And the "sunnah" means what, sir?
4  A.    Sunnah is basically the traditions and teachings of the
5  Prophet, but I guess you can say the correct, the correct way or
6  the correct path.
7  Q.    And that's a theological term, isn't it?
8  A.    Correct.
9  Q.    It's not a political term, is it?
10  A.    No.
11  Q.    There's no political connotations to being on the sunnah,
12  right?
13  A.    When we say "on the sunnah," you know, it's, it's a religious
14  term.
15  Q.    What mosque did you frequent in the -- here in Virginia, sir?
16  A.    Dar al-Hijrah and ADAMS Center when it used to be in
17  Reston -- Herndon.
18  Q.    Okay.  And were -- the people that you played paintball with,
19  they were all members of those two mosques as well, right?
20  A.    Mostly they attended Dar al-Hijrah, I believe, yes.
21  Q.    Who of your paintball friends attended Dar al-Hijrah?
22  A.    Royer, Hammad, Calipha, I'll go sometimes, Nabil, Ibrahim,
23  and some others.  I can't, I can't name -- I mean, I can't recall
24  everybody at the moment.
25  Q.    Most of the people you invited over to your house on

1148

## Kwon - cross

1  September 16, right?

2  A.   Most of them, most of them.

3  Q.   And Al-Timimi never spoke at Dar al-Hijrah, did he?

4  A.   Not that I am aware of.

5  Q.   Now, there was a -- when you -- Mr. Kromberg asked you about

6  your personal jihad training I think was his term.  That began

7  when you started target shooting, didn't it?

8  A.   Yes.

9  Q.   You, you met some ex-military people who took you target

10  shooting, correct?

11  A.   Well, by the time I met them, I was already, already going to

12  the target range, shooting ranges.

13  Q.   I think we went through this before, but Ali Al-Timimi never

14  told you to buy a gun or practice target shooting or anything, did

15  he?

16  A.   I mean, he, he never told us to buy a gun, but as far as

17  being fit, you know, for, for, you know, as far as, as a Muslim,

18  you know, he should be, he should be strong, and he should be --

19  he should have knowledge in these things, yeah.

20  Q.   He should have knowledge of the crossbow, right?

21  A.   I remember him telling us one time, you know, the teachings

22  of the Prophet, you know, like, shooting, you know, shooting is

23  power, and he said it's something that the Muslims should know.

24  Q.   That's something out of the Koran, isn't it?

25  A.   From the hadeeth of the Prophet.

1149

**Kwon - cross**

1  Q.    This was another theological discussion you heard in a crowd
2  at Dar al-Arqam?
3  A.    Yeah.  I think it was, like, a Dar al-Arqam lecture.
4  Q.    And under the, under the hadeeth, Muslims are also supposed
5  to be proficient at horseback, right?
6  A.    All these things you should be, you know, Muslims should
7  know, you know, horseback riding, you know, just being fit and
8  being ready for, you know, warfare or fighting, because you never
9  know when you have to defend yourself, your family, or the Muslims
10 or, you know.
11 Q.    And that's something that, that you learned from reading the
12 Koran, right, and the hadeeths?
13 A.    I learned this from reading books and also from the lectures
14 from Dar al-Arqam.
15 Q.    So when was the first time you went to a target range to
16 shoot?
17 A.    The very first time, the very first time was around '94 or
18 '95.  That's the first time I shot a gun.
19 Q.    When was the first time you went to a rifle range with Hammad
20 Abdur-Raheem?
21 A.    Actually, I met him at the NRA shooting range around the year
22 2000.
23 Q.    You never saw Ali Al-Timimi at the NRA shooting range, did
24 you?
25 A.    No.

**J.A. 1294**

**Kwon - cross**

1  Q.    And you used to go shoot with Mr. Surratt and Mr. Royer as

2  well, didn't you?

3  A.    Correct.

4  Q.    And Mr. Chapman?

5  A.    Correct.

6  Q.    And Mr. Khan, correct?

7  A.    Correct.

8  Q.    How many times do you think you went to the range with those

9  people?

10  A.    Different, different times for different people, you know,

11  but I'll say if you combine everybody, one or at least one person

12  or another, you know, I used to go, like, about twice a month, you

13  know, every other week or so.

14  Q.    It was expensive, wasn't it?

15  A.    It's -- it costs you some money.

16  Q.    Well, you were paying for all the paintball for most of the

17  guys anyway, weren't you?

18  A.    I was paying a lot of it, but -- most of it, but, you know,

19  some brothers would pay me back.

20  Q.    Then at your paintball, you sought out military people to

21  teach you maneuvers, correct?

22  A.    When we started paintball, yes, I mean, we were aware that

23  some of the brothers had military training, so, of course,

24  paintball is a simulated combat -- game of simulated combat, so

25  they would teach us some maneuvers and things -- tactics and

## Kwon - cross

1  things like this.

2  Q.    And you never told Ali Al-Timimi that you were learning

3  maneuvers and tactics as part of your paintball, did you?

4  A.    No.  I never really had detailed discussion with Ali Timimi

5  about paintball other than that one time that Nabil and I asked

6  him about --

7  Q.    Okay.  And at paintball, there were, there were lots of

8  discussions of Kashmir and Chechnya, weren't there?

9  A.    Yes.

10  Q.    And did you, did you ever watch videos before you went to

11  paintball, sir?

12  A.    You mean the same day, right before we'd go?

13  Q.    Yes.

14  A.    No.  We'd watch the videos on other days, you know.

15  Q.    Now, the jury has seen a video here called "Russian Hell

16  2000."  You've seen that before, haven't you?

17  A.    Yes.

18  Q.    How many times did you watch that, Mr. Kwon?

19  A.    I think the whole video once, but I've seen parts of it, you

20  know, over and over, you know, some parts of it many times.

21  Q.    And the part that you watched over and over again was the

22  part where Ibn Khatab executes the Russian soldier, right?

23  A.    That's one of the parts, but, you know, we'll skip over,

24  like, the, you know, like, non-combat parts and get to the combat

25  parts, you know, so --

## Kwon - cross

1   Q.   Because the non-combat stuff was boring to you, wasn't it?

2   A.   In comparison to combat, yeah.

3   Q.   All right.  And when was the first time you looked at that?

4   A.   I don't remember an exact date, but sometime in 2000, when it

5   first came up in the Internet.

6   Q.   And who did you watch it with?

7   A.   I watched it with many people.  At one time or another,

8   Nabil, Ibrahim, Seif, Ismail, you know.

9   Q.   Never once watched it with Ali Al-Timimi, did you?

10  A.   No.

11  Q.   Never told him about it?

12  A.   No.

13  Q.   Never had any discussion with him at all that you were

14  fascinated by videos of people killing Russian prisoners, right?

15  A.   No.

16  Q.   And there was a discussion in your group as to whether or not

17  that was legitimate for the, for the Muslim to have executed the

18  helpless prisoner, right?

19  A.   Correct.

20  Q.   And you decided there had to be some resource that you could

21  use to decide whether this was permissible under Islamic law or

22  not, right?

23  A.   Correct.

24  Q.   Okay.  And you didn't go ask Ali Al-Timimi, did you?

25  A.   No, but we -- the fatwa came up on the Internet in a website,

1153

**Kwon - cross**

1  so I read that, yeah.

2  Q.   So you -- instead of talking to Ali Al-Timimi, you went to a

3  website.  Was it azzam.com?

4  A.   Azzam.com, yes.

5  Q.   And that website told you that that was a legitimate act for

6  a Muslim to do, right?

7  A.   Correct.

8  Q.   Did you question that, Mr. Kwon?

9  A.   Not really.

10  Q.   So you would accept guidance about the killing of an innocent

11  human from a website?

12  A.   Well, in time of war, you know, prisoners, especially in a

13  situation like Chechnya, where the mujahideen are, you know,

14  they're not fighting a conventional warfare, they're fighting a

15  guerilla warfare, you know, even they'll have problems

16  logistically.  They can't hold prisoners.

17         So, I mean, there were many other reasons cited I don't

18  remember, but no, it seemed to me it made sense.

19  Q.   All right.  So sometime in the year 2000, you came to the

20  conclusion yourself that it was Islamically acceptable for Muslims

21  to kill Russian soldiers who had surrendered, right?

22  A.   Correct.

23  Q.   Let me show you, if I could, Government's 7A35.

24         This has already been admitted in evidence, Your Honor.

25         THE COURT:  All right.

**J.A. 1298**

1154

**Kwon - cross**

1 BY MR. MAC MAHON:

2 Q.   Do you have it yet, sir?  I'm sorry, I think it's going to

3 come up on the screen in a second.  35c?

4          THE COURT:  Are these the posters?

5          MR. MAC MAHON:  No, Your Honor.

6          THE COURT:  7A35?

7          MR. MAC MAHON:  I'm not as good as Mr. Kromberg with

8 the -- there we go.

9 Q.   Mr. Kwon, have you ever seen a website called

10 gotojihad@yahoo.com?  I think that's the wrong address.  Have you

11 seen that before?  Have you seen this web page?

12 A.   I don't, I don't recall this web page.

13          MR. MAC MAHON:  Okay.  Could you show him the next

14 exhibit, please, 7A35c1?

15 Q.   Did you ever see any advertisements where LET was on a Jihad

16 by Wealth website, whatever this Jihadland website is?

17 A.   No.

18 Q.   You never saw this before, either?

19 A.   No.

20 Q.   How about 7A35d, please?

21          THE COURT:  D is not in yet.  Do you want that moved in?

22          MR. MAC MAHON:  Well, let's see if he's ever seen it,

23 Your Honor, I'm sorry.  I thought it was in.

24          THE COURT:  Before you show it to the witness -- I mean,

25 to the jury.

1155

**Kwon - cross**

1    Have you ever seen that before, Mr. Kwon, 7A35d, as in

2  David?

3    MR. MAC MAHON:  I think Mr. Wood's getting it for him,

4  Your Honor, I'm sorry.

5    THE COURT:  It's the very last one in that book.

6    THE WITNESS:  No.  I wasn't -- actually, I wasn't aware

7  of any LET websites before I left.

8  BY MR. MAC MAHON:

9  Q.   You didn't tell the FBI that Jihadroad was one of the

10  websites that you looked at with your friends, sir?

11  A.   I think there was something like gotojihad or that link I

12  received from somebody else when he e-mailed.

13  Q.   But before 9/11, you were looking at websites that told you

14  how to go overseas if you wanted to do jihad, right?

15  A.   I don't remember reading any articles that tell me how, but,

16  I mean, I looked at a lot of the websites, jihad websites.

17  Q.   And you looked at a Lashkar-e-Taiba website, didn't you?

18  A.   I wasn't aware that that said LET website.

19  Q.   You never looked at an LET website before 9/11?

20  A.   I wasn't aware gotojihad was an LET website.

21  Q.   Well, I don't know that it was, so I don't -- that wasn't my

22  question.  Putting that aside -- if you haven't seen that, just

23  put it aside.

24  A.   No, I wasn't aware of any LET websites.

25  Q.   When was the first time Mr. Royer came to paintball?

**J.A. 1300**

1156

## Kwon - cross

1  A.    Sometime in 2000.

2  Q.    Okay.  Was this before or after you sold him a gun?

3  A.    I think before I sold him the gun.

4  Q.    Did you tell Ali Al-Timimi that you were selling Randall

5  Royer a gun?

6  A.    No.

7  Q.    How long after you met Mr. Royer did he tell you about what

8  he had done in Bosnia?

9  A.    I mean, he told me sometime in 2000.  Once we started playing

10 paintball and, you know, we went shooting together on a couple

11 occasions, you know, he told me about Bosnia, his experience.

12 Q.    What did he tell you?

13 A.    He didn't tell me anything in detail, just that he was with

14 the mujahideen in Bosnia.

15 Q.    Now, did you -- you knew that in the year 2000, that

16 Mr. Royer arranged for Ibrahim Al-Hamdi to go to an LET camp,

17 didn't you?

18 A.    That's, that's the conclusion I came to because he's the --

19 from our group, Royer is the only person who had contact with LET.

20 Q.    Right.  And you knew that in the year 2000, correct?

21 A.    Correct.

22 Q.    Do you know how it was that Ibrahim Al-Hamdi would -- let me

23 strike that question.

24        You know that Mr. Royer gave a letter of introduction to

25 Ibrahim Al-Hamdi to take to LET, right?

1157

**Kwon - cross**

1   A.   Yeah.  I understood that after Ibrahim came back, that to get

2   to LET, you need, like, a letter of -- like, a reference letter,

3   yeah, letter of introduction.

4   Q.   All right.  And Mr. Royer told you that that was -- that he

5   used a letter of introduction to get into the fight with the

6   Muslims in Bosnia, too, didn't he?

7   A.   I don't recall him telling me that.

8   Q.   Do you know that Mr. Royer gave a kunya name to Ibrahim

9   Al-Hamdi before he went to Pakistan, right?

10  A.   I knew that Ibrahim had a kunya, but I didn't know that Royer

11  gave it to him.  I thought that he gave it to himself.

12  Q.   Well, you knew that in the year 2000, that Royer called over

13  to Pakistan to a number in his possession and told somebody the

14  kunya name for Ibrahim Al-Hamdi?

15  A.   I wasn't aware of that.

16  Q.   Did Mr. Royer tell you that he had given Mr. Al-Hamdi a phone

17  number to use to call LET when he got to Pakistan?

18  A.   I mean, the only thing I know is that Royer was the contact,

19  I guess you could say, facilitator for Ibrahim to go there.  I

20  don't know the details how he, how he managed or how he set up the

21  travels.

22  Q.   Now, in -- didn't Al-Hamdi tell you that at LET, he got to

23  shoot firearms at Indian positions?

24  A.   Yes, that's what he told me.

25  Q.   And you thought that was pretty interesting, didn't you?

**Kwon - cross**

1   A.   Yes.

2   Q.   That was something that you aspired to do yourself, correct?

3   A.   Yes.

4   Q.   And that was in the year 2000, wasn't it, Mr. Kwon?

5   A.   Yes.

6   Q.   And by that time, you had already developed the interest

7   yourself in dying shaheed, right?

8   A.   Yeah.  I mean, that's, that's, you know, like I said, you

9   know, it's something that we -- is to be looked up to.  Dying

10  shaheed is, but, you know, in reality, I don't know how ready I

11  was or even to die shaheed, but as far as just, like, I guess you

12  can say like theoretical or theologically, yes, it was something

13  that we used to look up to.

14  Q.   All right.  And that's something you told Mr. Royer as well

15  in the year 2000, didn't you?

16        MR. KROMBERG:  Objection, Judge.  Can we have a

17  clarification on what it was that he --

18        MR. MAC MAHON:  That he was prepared to die shaheed.

19        THE COURT:  All right.

20  BY MR. MAC MAHON:

21  Q.   In 2001, you told that to Randall Royer, didn't you?

22  A.   I don't recall telling him that I was ready to die shaheed in

23  the year 2000.  I wasn't -- I mean, we'll talk about it, but, you

24  know, I was never ready to, you know, really go do it.  Just

25  something to talk about, you know, just --

**Kwon - cross**

1  Q.   And you never had a discussion at any time with Ali Al-Timimi

2  about your interest in dying shaheed, did you?

3  A.   I mean, like I said, I didn't have any plans at the time to

4  die shaheed.  Just like I say, religious point of view was

5  something that we looked up to, you know, people who die shaheed.

6  Q.   Mr. Kwon, my question was that you never at any time had a

7  discussion with Ali Al-Timimi about your desire to die shaheed,

8  correct?

9  A.   Correct.

10 Q.   Did there, did there come a time when you went on a camping

11 trip with your friends from paintball?

12 A.   Yes.

13 Q.   Okay.  And do you remember sitting around a fire when someone

14 asked you what your favorite hadeeth was?

15 A.   No.  I believe, "Who was your favorite companion of the

16 Prophet?"

17 Q.   Your favorite story of the companions?

18 A.   Correct.

19 Q.   Okay.  And do you remember when that was?

20          Excuse me one second, Your Honor.

21          And what was your answer to that question, sir?  What

22 was your favorite companion story?

23 A.   It wasn't my favorite, but, but some of the guys who went

24 before me already named my favorite companion, so I talked about a

25 companion by the name of Al-Bara ibn Malik.

**Kwon - cross**

1      THE COURT:  You need to spell that, please, as best you
2  can.

3      THE WITNESS:  B-a-r-a i-b-n M-a-l-i-k.

4      MR. MAC MAHON:  Mr. Wood, could you show him Defendant's
5  Exhibit 53, please?

6      THE COURT SECURITY OFFICER:  53?

7      MR. MAC MAHON:  Yes, please.

8  Q.   Is that the story that you identified, sir?

9  A.   Yes.

10  Q.   Okay.  When was this?  This was well before 9/11, wasn't it?

11  A.   Correct.

12  Q.   And what is it about -- I'd move in Exhibit 53, Your Honor,

13      THE COURT:  Any objection?

14      MR. KROMBERG:  No, Your Honor.

15      THE COURT:  All right, it's in.

16      (Defendant's Exhibit No. 53 was received in evidence.)

17  BY MR. MAC MAHON:

18  Q.   And in this story, this, this person suffers hundreds of stab
19  wounds, right?

20  A.   I mean, he suffers wounds, yes.

21  Q.   Eighty sword and arrow wounds, right?

22  A.   Something like, something like that.

23  Q.   He holds onto a sword until all the skin burns off of his
24  hand and only his bones are showing; is that correct?

25  A.   Something like that, yeah.  I think it was a hot chain or

**Kwon - cross**

1  something.

2  Q.    A hot chain?

3  A.    Maybe it's a sword.  I don't remember the details, but --

4  Q.    And this is something that you told your friends after

5  paintball was something that you thought was your favorite story

6  from all the stories of the companions, right?

7  A.    He's one of the favorites.

8  Q.    And this is a story about war and people dying, isn't it,

9  sir?

10  A.    I mean, it's about a person, a companion of the Prophet, but

11  he was a mujahid.  He used to, he used to, you know, fight for the

12  sake of Allah.

13  Q.    And this is a story that glorifies war, isn't it?

14  A.    I mean, it's, it's -- yes.  I mean, it talks about jihad.  I

15  mean, yes, I guess you could say it talks about jihad and his

16  participation in different jihad, what he did, you know,

17  different, you know, physical feats he had accomplished.

18  Q.    It's a very gory story, too, isn't it, sir?

19  A.    I guess in some ways.  Just a story about jihad.

20  Q.    And you found this on your own, didn't you?

21  A.    Yes.

22  Q.    Ali Al-Timimi didn't suggest to you that you read Al-Bara

23  Malik Al-Ansari, did he?

24  A.    No.

25  Q.    Did there come a time when you learned that Mr. Royer had

1162

**Kwon - cross**

1  helped Seif Chapman go to LET?

2  A.   That's what I figured when I got to LET, because Seif left --

3  from what I understand, Seif left around August of 2001, so when I

4  left September, my -- I even thought that maybe I'll run into him,

5  but by the time I got there, he was already gone.  But only

6  person, like, again, only person in our group who had contacts for

7  LET was Royer, so that's what I, that's what I assume he went

8  through.

9  Q.   The only person you knew in the United States with contacts

10 with LET was Royer; is that correct?

11 A.   Yeah, initially Royer and then Ibrahim also when he came

12 back.

13 Q.   So you don't -- you didn't know that Mr. -- is it your

14 testimony that you didn't know that Mr. Royer helped Mr. Chapman

15 with, with fake names and contact information or anything else to

16 get to the LET camps?

17 A.   No.  I don't know the details.

18 Q.   Did you know that he was even -- did you know that

19 Mr. Chapman was talking to Mr. Royer before September 11 about

20 going to LET?

21 A.   I mean, I'm sure they talked about it, but I wasn't there.  I

22 didn't hear any talks -- them talking about LET or Seif wanting to

23 go to LET or stuff like that.

24 Q.   All right.  Now, with Mr. Aatique, you did know, in fact,

25 that Mr. Aatique was talking to Randall Royer about going to LET

1163

## Kwon - cross

1  before September 11, correct?

2  A.   Correct.  Actually, I'll take that to refresh my memory, but

3  it seems that Royer also was facilitating for Aatique to go to

4  LET.

5  Q.   Mr. Kwon, you didn't need your recollection refreshed.

6  You're the one that told him to go talk to Mr. Royer, weren't you?

7  A.   I guess.  That's what, that's what he told me in jail, I

8  mean, but I don't -- I don't remember, but that's what he says.

9  Q.   Mr. Kwon, you don't remember in August of 2001 overhearing

10  Ibrahim Al-Hamdi having a discussion about LET about -- with

11  Mr. Aatique?

12  A.   Ibrahim?

13  Q.   Yes.

14  A.   August of 2001?  I mean, there was times we talked about LET,

15  but maybe in August, also.

16  Q.   Mr. Kwon, do you remember in August of 2001 overhearing a

17  conversation in which Muhammad Aatique was asking Ibrahim Al-Hamdi

18  how he could get to the camps like Al-Hamdi had?

19  A.   I don't recall that, overhearing that.

20  Q.   And didn't you tell Mr. Aatique that he shouldn't be talking

21  to Al-Hamdi, that Royer was the man?

22  A.   I don't remember, but I remember at some point telling

23  Aatique that, you know, if you want to get to LET, Royer, Royer is

24  the person.

25  Q.   And that was before September 11, wasn't it, Mr. Kwon?

**J.A. 1308**

1164

**Kwon - cross**

1  A.    Correct.

2  Q.    All right.  And it took you until November of the year 2003

3  to tell the FBI that you had told Mr. Aatique that he should talk

4  to Royer about going to the LET camps; isn't that correct?

5  A.    Like I said, I don't -- I didn't recall until Aatique told me

6  when I ran into him in jail.  He told me that, that I was there

7  when Royer wrote him an introduction letter, which I don't recall,

8  but that's what he says.

9  Q.    What did the introduction letter say, do you remember?

10 A.    No, I don't recall any --

11 Q.    So you know you can tell this jury that before September 11,

12 Muhammad Aatique had an introduction letter to go to LET that was

13 written by Randall Royer, correct?

14 A.    Correct.

15 Q.    And he also had his plane reservations to go to Pakistan

16 before September 11, didn't he?

17 A.    Correct.  But he told me that that's to go pick up his wife

18 and kids and, I guess, also to attend LET, you know.  Like I said,

19 I don't -- I never really recalled any of this until he told me in

20 jail, you know.

21 Q.    You didn't tell the FBI or remember your role as a recruiter

22 for LET until at least September of 2003, right?

23         MR. KROMBERG:  Objection, Judge.  Asked and answered.

24         THE COURT:  Sustained.

25 BY MR. MAC MAHON:

**J.A. 1309**

1165

**Kwon - cross**

1 Q. Did you go on the hajj in 2001, sir?

2 A. Yes, I did.

3 Q. How long did it take you to take the -- to tell the FBI about

4 what you did on the hajj in Mecca?

5 A. Until -- again, I forgot about that incident, and at some

6 point, the FBI agents came and asked me, which refreshed my

7 memory. So I told -- I don't know what time, what time frame that

8 was.

9 Q. So tell the jury what you do when you're at the hajj. What

10 goes on at the hajj?

11 A. You go to, you know, you go to Mecca. You go to the Ka'ba,

12 and, I mean, there's many things you do, you know, before you, I

13 mean, putting on the white cloth. But when you get there, you

14 know, we have rituals that you do, you know. You go around, you

15 go around the Ka'ba. You pray. You know, you do the -- you walk

16 between these two places, you know.

17 Q. You're pretty busy, aren't you?

18 A. Correct.

19 Q. And it's one of the highest acts of worship that a Muslim can

20 do, right?

21 A. Yes.

22 Q. And I think you told us if you do the hajj and it's accepted,

23 all of your sins are forgiven, correct?

24 A. All your past sins are forgiven, yes.

25 Q. And how was it that you met an LET person during the hajj in

**Kwon - cross**

1  the middle of your active worship?

2  A.    Well, we were put in a building, all the people who were

3  making hajj in my group, in Mecca, but not so close to, to the

4  harram, to Ka'ba, so some days, you know, only days really that

5  you can go to the Mecca and do these rites are the scheduled days

6  where they have buses that will take you to the place.  So some

7  days, we'll stay, you know, in this building.

8           So Royer, apparently he knew somebody in Riyadh, Saudi

9  Arabia, who's an LET person, and he wanted me to meet him.  So

10 Royer got in contact with him, and this, this person, he -- I

11 don't know how he got to Mecca, but he came from Riyadh to talk to

12 myself and Idris and, and Ismail Royer.

13 Q.    Okay.  And Idris is Mr. Surratt, correct?

14 A.    Correct.

15 Q.    Okay.  How many people are at the hajj, 2 million?

16 A.    Something like that.  A lot of people.

17 Q.    Now, who -- how did you -- did Mr. Royer arrange for you to

18 go on this hajj trip?

19 A.    No.  Actually, it was, it was through a Muslim World League,

20 but Seif is the one who helped me to, to go on this trip.

21 Q.    Now, so your testimony is that -- in the building you were

22 living in, it was just Americans, right?

23 A.    Well, I mean, it's the group that we -- from here, the group

24 that left from the United States.

25 Q.    Okay.  So this LET person wasn't part of your group, was he?

1167

**Kwon - cross**

1  A.    No, he wasn't.

2  Q.    And did Mr. Royer tell you as you were flying over to

3  Mecca -- did you fly on the same plane with him?

4  A.    Yes.

5  Q.    Did he tell you that you were going to meet somebody from

6  LET?

7  A.    No.  He was like a sudden thing.  He told me in Mecca.

8  Q.    What exactly did he tell you in Mecca about this sudden

9  meeting with an LET person?

10  A.    He, you know, he said, "There's a man I want you to, you

11  know, meet, and he'd like to talk to you, you know, about LET.

12  Okay?"

13  Q.    What did he tell you about this person's position in LET?

14  A.    I don't remember his, clearly his position.  I don't remember

15  him telling me at any time about his position.  I still don't know

16  what the person's position is.

17        He just came and talked to us about LET and, you know,

18  that we should -- the LET has, you know, schools and camps and,

19  you know, and that we should, you know, if you have time, you

20  know, you should go and check it out, you know?

21  Q.    Did you ever ask Mr. Royer how it was that he found this

22  person in Mecca?

23  A.    No.

24  Q.    Okay.  And didn't this person tell you that you could come

25  and get military training at the LET camps as well?

1168

**Kwon - cross**

1   A.   He told us there's military training camps in LET.

2   Q.   And he told you there were also hospitals and schools and

3   other things that LET ran, correct?

4   A.   Yeah.  He told us there's schools and, you know, other, other

5   things, universities and things like that.

6   Q.   You were pretty impressed with Mr. Royer that he was able to

7   introduce you to an LET person in the middle of the hajj, weren't

8   you?

9   A.   Yeah.  I didn't know he had contacts like that, you know.

10  Q.   Okay.  You never once told Ali Al-Timimi that you met an LET

11  person while you were at the hajj in Mecca, did you?

12  A.   No.

13  Q.   And you didn't tell the FBI until September 9 of 2003,

14  correct?

15  A.   About this story?

16  Q.   Yes.

17  A.   I don't know the exact date.  I know that it was something I

18  had forgotten, and then they came -- you know, like I said, the

19  agents came to me with this story, which refreshed my memory.  But

20  it was, yeah, it was after, you know, it was later.

21  Q.   And you didn't tell them that because you wanted to protect

22  yourself from charges that you were a recruiter for LET; isn't

23  that right, Mr. Kwon?

24  A.   No.  Like I said, I just didn't remember.

25  Q.   You forgot meeting an LET person on the hajj in Mecca, Saudi

1169

**Kwon - cross**

1   Arabia, correct?

2   A.   Right.

3   Q.   Now, you -- Mr. Kromberg showed you the will -- your will

4   that was done before you went on the hajj.  Do you remember seeing

5   that?

6   A.   Yes.

7   Q.   Sir, you never told Ali Al-Timimi that you were going to

8   impose obligations on him under your will, did you?

9   A.   No.  I think I just gave him the will.

10  Q.   Right.  You never told him that it was -- that you expected

11  him to wash your body before it was buried?

12  A.   No.  I just -- but that's not what I -- I just wanted him to

13  oversee the -- because I knew that he was very knowledgeable and,

14  you know, that he will do it the right way.  So that's -- in my

15  will, I just put it in general terms that he should oversee the

16  burial.

17  Q.   But before you signed the will giving him that obligation,

18  you didn't ask him if he was willing to do it, did you?

19  A.   No.

20  Q.   You never mentioned the will to him at all before you handed

21  it to him one day, right?

22  A.   I don't think so.  I don't think I did.

23  Q.   And in fact -- can you show the witness Defendant's Exhibit

24  36, please?

25            THE COURT:  Mr. Kromberg, is there any objection to

**Kwon - cross**

1  this?

2          MR. KROMBERG:  No, Your Honor.

3          THE COURT:  All right, it's in.

4          (Defendant's Exhibit No. 36 was received in evidence.)

5  BY MR. MAC MAHON:

6  Q.   Mr. Kwon, you've seen this before, haven't you?

7  A.   Yes, I've seen this before.

8  Q.   Okay.  Tell the jury what, what that exhibit is.

9  A.   What I did was I typed up, like, a standard bequest form,

10 like, a will with blanks, so -- from a book.  So I sent an

11 electronic copy to the Muslim brothers so they can, you know, so

12 they didn't have to type it up themselves.  They can just fill in

13 the blanks, you know.

14 Q.   This was a form will that you had, right?

15 A.   Correct.

16 Q.   All right.  And this is what you sent telling everyone this

17 is what your will is and this is the one you're going to use,

18 correct?

19 A.   I sent them the one with the blanks, none of my personal

20 information, but like a general so they can put their name and

21 their own information in it, you know.

22 Q.   Let me circle one.  Do you see the one I just circled there,

23 sir?

24 A.   Yes.

25 Q.   Who's farhat@yahoo.com?

**Kwon - cross**

1   A.    He's a brother, Muslim brother.

2   Q.    Lived next door to the Khans?

3   A.    Yes.

4   Q.    Played paintball with you?

5   A.    Yes.

6   Q.    Friend of yours?

7   A.    Yes.

8   Q.    So these were -- just so I can close this point, you giving

9   Ali Al-Timimi a will had absolutely nothing to do with your plans

10  to go engage in jihad, did it?

11  A.    No.  The will, the will I gave to him was because I was going

12  to hajj, and, you know, anything can happen while you're

13  traveling, so, you know, I mean, especially hajj, there are

14  2 million people.  There are accidents, you know, so --

15  Q.    Mr. Kwon, the act of you giving Ali Al-Timimi your will had

16  nothing to do with your interest --

17          MR. KROMBERG:  Objection, Your Honor.  Asked and

18  answered.

19          MR. MAC MAHON:  He didn't answer the question, Your

20  Honor.

21          THE COURT:  I'm going to overrule the objection.  You

22  may ask it.

23  BY MR. MAC MAHON:

24  Q.    Mr. Kwon, the act of you giving Ali Al-Timimi your will had

25  absolutely nothing to do with your interest in doing jihad, did

**Kwon - cross**

1  it?

2  A.    No.

3  Q.    Now, you -- with respect to these jihad videos again, you

4  actually saw this Ibn Khatab person as a role model for you,

5  didn't you?

6  A.    Yes.

7  Q.    And you also watched videos of the Chechen leader, Shamil

8  Basayev, as well, didn't you?

9  A.    He would be in the video "Russian Hell 2000," yes.

10  Q.    And he was another one of your role models, right?

11  A.    Yes.

12  Q.    Okay.  And he's the person who was behind the recent Russian

13  school massacre, right?

14  A.    I mean, that's what -- I don't know how true that is, but

15  that's what the newspapers say.

16  Q.    Right.  That person is your role model, sir?

17  A.    I mean, personally, I don't believe he's behind it, but --

18  because he's -- like I say, Islamically, you don't, you don't kill

19  innocent people, you know.  You kill soldiers, combatants.  So, I

20  mean, I don't believe that he's behind it.  That's just my

21  personal opinion.

22  Q.    Didn't you once send a video of Usama Bin Laden to Sabri

23  Benkahla?

24  A.    Maybe a link to a website but I don't think I sent -- I never

25  owned Usama Bin Laden videotapes, so --

**Kwon - cross**

1   Q.   Okay.  You never, you never agreed with any of Usama Bin

2   Laden's tactics?

3   A.   I mean, like I said, you know, we don't kill innocent people,

4   but at the same time, you know, he -- in the '80s, you know, he

5   went over to Afghanistan and used up all his money to help the

6   Muslims.  So, you know, there was, like, this, you know -- I don't

7   agree with everything he does, but he has done some good, also.

8   Q.   Bin Laden was one of your role models, too, sir?

9   A.   I don't know about role model, but, I mean, he was a mujahid,

10  yeah.

11  Q.   Did you play a game called Counter-Strike at your house, sir?

12  A.   Yes.

13  Q.   Okay.  And that was configured so that you were the Muslims

14  playing against the infidels, right?

15  A.   No.  It has -- the game has two, I guess, sides you can say.

16  There are the counterterrorists -- counterterrorism force, and

17  then there's a terrorist force.  The game has different

18  objectives, depending on which side you're on.

19  Q.   When did you get this game?

20  A.   2000.

21  Q.   Do you play it with your friends from paintball?

22  A.   Not really.  Only person I played with from paintball was

23  Farhat.  Mostly I played with guys at my workplace.

24  Q.   And tell the jury, if you would, a little about the game

25  Counter-Strike.  What happens in that game?  Is there a lot of

1174

# Kwon - cross

1  death and destruction in that game?

2  A.   Yes.  It's first person, you know, you're in a first person

3  point of view, and, you know, you're running around with different

4  weapons, shooting your opponents, and they try to do the same

5  thing to you.  You play online, so everybody is a -- every

6  character is controlled by a person.  So you try to take out the

7  other side, you know.  That's the game.

8  Q.   Okay.  And yours was configured -- you're pretty good with

9  computers, aren't you?

10 A.   I used to be.

11 Q.   And you had yours configured so that if you won, the picture

12 of Usama Bin Laden appeared on the screen, didn't you?

13 A.   No.  Actually, I couldn't figure out how to do that.  I

14 was -- I remember asking some people how I can -- one of the --

15 part of the game is you can leave your mark, like a spray paint,

16 and you can, you can use any pictures, digital pictures you have

17 in your computer to be used, but I never figured out how I could

18 do that, and I ran --

19 Q.   But -- I'm sorry, go ahead.

20 A.   And I did run across people when I played online that their

21 mark, you know, was a picture of Usama Bin Laden, so at one point,

22 I asked somebody while playing the game how he did that, you know.

23 Q.   So you tried to configure your game of Counter-Strike so that

24 when you won, the picture of Usama Bin Laden would appear on the

25 screen of your computer, correct?

J.A. 1319

**Kwon - cross**

1  A.    It wasn't just -- I just wanted to know so that a picture

2  that I wanted to appear on the screen, you know, any picture that

3  I choose, you know.

4  Q.    And the picture you wanted was the one of Usama Bin Laden,

5  wasn't it?

6  A.    It's one of the pictures.

7  Q.    And this was after he was responsible for killing people in

8  the embassies in Kenya and Tanzania, right?

9  A.    Right.

10  Q.    And this was after he was responsible for the bombing of the

11  USS Cole, correct?

12  A.    I guess.  I didn't know USS Cole, he did it, but it was after

13  the bombing of the USS Cole.

14  Q.    Okay.  And even after all those events occurred, you still

15  wanted a game configured so that Bin Laden's picture would appear,

16  right?

17  A.    I mean, like I said, it wasn't just his picture, but I wanted

18  to put my own pictures when I win the game, you know?

19  Q.    And didn't you also try to configure it so that when Bin

20  Laden's face appeared, you could scream "Allah-hu-Akbar" out loud,

21  sir?

22  A.    On the game?

23  Q.    The game would play the words "Allah-hu-Akbar"?

24  A.    No, I wasn't aware that you could play your own audio in that

25  game.

1176

**Kwon - cross**

1   Q.   You didn't try to do that?

2   A.   No.

3   Q.   Okay.  And this Counter-Strike game you never once played

4   with Ali Al-Timimi, correct?

5   A.   Correct.

6   Q.   All right.  And you never told him anything about you trying

7   to configure your computer so that Usama Bin Laden's picture would

8   come up in the middle of a violent game, right?

9   A.   Correct.

10  Q.   And you never discussed with him in any way the -- Usama Bin

11  Laden at all, did you?

12  A.   I mean, I remember, you know, discussing -- we had a talk

13  about, you know, Bin Laden and his point of view and, you know, of

14  course, the night of 9/11, we talked about what happened, you

15  know.

16  Q.   There was never any -- no one at Dar al-Arqam ever voiced any

17  support for Usama Bin Laden, did they?

18  A.   Not publicly, no.

19  Q.   Now, you set up a jihad website, didn't you, for the

20  paintballers?

21  A.   It wasn't a jihad website.  It was just an intranet for the

22  people who play paintball in my group.  It's like a -- it's an

23  intranet -- it's like a website with, you know, you have to have a

24  log-in and password to get in, and it has all the postings

25  about our activities, you know.

**J.A. 1321**

**Kwon - cross**

1  Q.    And it was your idea that you have to have a password and a
2  log-in to get into the Paint Ballaz website, right?
3  A.    Actually, it's an intranet site, so all intranet sites, it's
4  exclusive to a group, so everybody has to have a log-in.
5  Q.    And through that intranet, you sent out regular e-mails on
6  the topic of jihad, correct?
7  A.    Sometimes, yes.
8  Q.    And Ali Al-Timimi was not on the mailing list for your Paint
9  Ballaz website, was he?
10 A.    No.
11 Q.    Do you remember a time before September 11 when you asked if
12 you could use Dar al-Arqam for martial arts training, sir?
13 A.    Yes.
14 Q.    Who did you ask?
15 A.    I asked Nabil to ask, I think, Mohammad Al-Qahtani.
16        THE COURT:  I'm sorry, to ask who?
17        THE WITNESS:  A brother by the name of Mohammad
18 Al-Qahtani.
19        THE COURT:  Can you spell that, please?
20        THE WITNESS:  M-o-h-a-m-m-a-d A-l-Q-a-h-t-a-n-i.
21 BY MR. MAC MAHON:
22 Q.    Now, you were told, weren't you, that you could not use Dar
23 al-Arqam for any kind of physical training, wrestling or any
24 physical activities at all, correct?
25 A.    Correct.

**J.A. 1322**

**Kwon - cross**

1   Q.   You were told it was a place of learning only, correct?

2   A.   Correct.

3   Q.   And before September 11 -- if I could put this up on the

4   screen, Your Honor?

5           THE COURT:  Any objection?

6           MR. KROMBERG:  No objection, Your Honor.

7           THE COURT:  Is there a number for it, Mr. --

8           MR. MAC MAHON:  No, it's a demonstrative exhibit.  His

9   phone bills are in evidence, Your Honor.

10          THE COURT:  All right.

11  BY MR. MAC MAHON:

12  Q.   Do you see the reference to No. 3 there, Mr. Kwon?

13  A.   Yes.

14  Q.   Okay.  And on September 9, 2001, you were calling a martial

15  arts school in Occoquan, Virginia, for more training, correct?

16  A.   Occoquan, that's -- if it's Woodbridge area, yes.

17  Q.   Okay.  What martial arts training were you looking for on

18  September 9, 2001?

19  A.   Actually, I was taking classes in Win Chun.

20  Q.   Can you spell that for Ms. Thomson, please?

21  A.   It's W-i-n -- W-i-n C-h-u-n, Win Chun.

22  Q.   And what were those classes?

23  A.   Martial arts classes.

24  Q.   And how long had you been taking those?

25  A.   Since maybe about six-seven months.

**Kwon - cross**

1  Q.    And on whose advice did you take those classes?

2  A.    I just did on my own.

3  Q.    You didn't ask Ali Al-Timimi, "Should I go take martial arts

4  training?," did you?

5  A.    No.

6  Q.    You never told him that you were taking martial arts

7  training, either, did you?

8  A.    No.

9  Q.    So had you agreed to do -- is it your testimony that you

10  never looked for people to help Mr. Royer take to LET?

11  A.    No.  I mean, when Royer asked me if I knew anybody who was

12  interested, I told him okay.  So I asked, I asked some brothers

13  myself.  I think I asked some brothers myself.

14  Q.    So before September 11, Mr. Royer asked you if you could --

15  if you knew anybody who would be interested in going to an LET

16  camp, correct?

17  A.    Correct.

18  Q.    And what did you tell him?

19  A.    Royer?

20  Q.    Yeah.

21  A.    I told him, "Okay.  I'll ask the brothers," you know.

22  Q.    When was this?

23  A.    When?

24  Q.    When in the year 2001 did you have a conversation with

25  Mr. Royer where he asked you if you knew any brothers who were

**Kwon - cross**

1  interested in going to an LET camp?

2  A.   I don't remember the exact, the exact date and time, but, you

3  know, sometime, sometime in 2001.

4  Q.   Wasn't it during the hajj, Mr. Kwon, when you agreed to be a

5  recruiter for Mr. Royer?

6  A.   It wasn't at this time.  It was definitely the United States

7  when he asked me that and I told him, so it might have even been

8  before the hajj.

9  Q.   It might have been before the hajj?

10  A.   Right.

11  Q.   Okay.  And you referred him Mr. Aatique, didn't you?

12  A.   Yeah.  I mean, like I said, that's what Aatique told me.  So

13  I might have -- because I talked to a lot of brothers, and I told

14  them, "If you're interested, you know, go to" -- like, I was just

15  passing on the message.  You know, I said, "If you're interested

16  in going to LET, talk to Royer."

17  Q.   Okay.  Let's try to focus on a time and date here if we

18  could.  You said you talked to a bunch of brothers about going to

19  LET, correct?

20  A.   Correct.

21  Q.   That was all before September 11, correct?

22  A.   Correct.

23  Q.   Okay.  Tell the jury who it was that you recall asking if

24  they were interested in going to LET before September 11, 2001.

25  A.   Ismail Royer.

**Kwon - cross**

1  Q.   Which of your brothers did you ask if they were interested in
2  going to LET other than Mr. Royer?
3  A.   I don't remember a specific brother, but in general, I can,
4  you know, the paintball guys, you know, some of the paintball
5  guys.  I said, "If you guys are interested and want to go overseas
6  to LET to get to training, you know, talk to Royer, you know."
7  Q.   All right.  So Masaud Khan was one of the people you asked
8  before September 11 if he wanted to go to an LET camp, right?
9  A.   I don't think I ever asked him to go to an LET camp.
10 Q.   How about Hammad Abdur-Raheem?  Did you ask him before
11 September 11?
12 A.   I believe he's one of the people, yes.
13 Q.   All right.  Seif Chapman you asked before September 11 as
14 well, correct?
15 A.   I might have, but he -- he also knew Royer, so he might have
16 been talking to Royer himself, not through me.
17 Q.   Donald Surratt was somebody you talked to about going to LET
18 before September 11, correct?
19 A.   I believe he's one of the people.  I don't remember specific
20 people.  I just remember, like, in general, you know, like, these
21 brothers, you know, who are -- you know, who play paintball and go
22 shooting and things like that.  You know, I remember --
23 Q.   And people that watched the videos, correct?
24 A.   Correct.
25 Q.   And people that owned guns?

1182

**Kwon - cross**

1  A.    Correct.

2  Q.    Right?  Those were the people you talked to before 9/11 about

3  going overseas to go to an LET camp, right?

4  A.    Correct.

5  Q.    And Caliph Abdur-Raheem, Basha Abdur-Raheem was one of them,

6  correct?

7  A.    He's one of the guys, yes.

8  Q.    All right.  And Nabil Gharbieh was one of the guys, correct?

9  A.    Yeah, but he himself knew Royer, you know, better than me,

10 so, you know, he already knew all this, you know, even before I

11 told him anything.

12 Q.    So it turns out that everyone you invited to your house on

13 September 16, 2001, were people that before September 11, 2001,

14 you had asked if they were interested in going to an LET camp;

15 isn't that correct?

16 A.    I think most of them, yes, correct.

17 Q.    Did I miss somebody?

18 A.    Like I said, I don't recall -- maybe I did, but I don't

19 recall telling Masaud, "If you're interesting in going to LET,

20 talk to Royer."

21 Q.    And you never once told Ali Al-Timimi, you never went up to

22 him and asked him if he was interested in going to an LET camp,

23 did you?

24 A.    No.

25 Q.    Because he wasn't one of your friends who watched videos or

1183

## Kwon - cross

1  owned a gun, right?

2  A.   No.   Like I said, he wasn't at, like, a peer level, you know?

3  He was more like a lecturer -- more like a religious teacher, you

4  know, so it's not like I can just go to him and start talking

5  like, like he's one of my buddies, you know?  As a matter of fact,

6  I didn't really go to him straight for many things, you know.   I

7  asked Nabil to ask him for me, you know.

8  Q.   Mr. Kwon, you never asked -- you never approached Ali

9  Al-Timimi before September 11, 2001, and asked him if he wanted to

10 go to an LET camp in Pakistan?

11         MR. KROMBERG:  Objection, Judge.  Asked and answered.

12         THE COURT:  Sustained.  He answered that.

13         MR. MAC MAHON:  I was looking for a yes-or-no answer.

14         THE COURT:  But he already answered it.

15         MR. MAC MAHON:  Thank you, Your Honor.  I'll move along.

16 Q.   And you never told Ali Al-Timimi before September 11, 2001,

17 that you were actually recruiting for LET; isn't that correct?

18 A.   Correct.

19 Q.   Now, on the day of September 11, you had -- strike that

20 question.  I'm sorry.

21         On the Sunday before September 11, you had paintball,

22 didn't you?

23 A.   I mean, we played paintball up, you know, before up to

24 September 11, but I don't remember exactly when is the last time I

25 played before September 11.

**Kwon - cross**

1  Q.   And on the day of September 11, you canceled paintball for
2  the next Sunday, right?
3  A.   Correct.
4  Q.   And you sent an e-mail out on the Paint Ballaz website,
5  right?
6  A.   Correct.
7  Q.   Tell the jury the -- what you remember about the substance of
8  your e-mail.
9  A.   Of course, I can't say word for word, but I remember typing
10 something like, you know, Brothers, due to, due to, you know,
11 weather conditions, our picnics, Sunday outings are canceled, or
12 something like, something like that.
13 Q.   Well, it didn't have anything to do with the weather, did it?
14 A.   No.
15 Q.   So that was a lie, wasn't it?
16 A.   I mean, I was talking about, like, the situation, you know,
17 bad weather meaning, you know, what happened in 9/11 and things
18 going on, you know?
19 Q.   And the reference to a picnic, that was a lie, too, wasn't
20 it?
21 A.   I was referring to the paintball outing, yes.
22 Q.   There wasn't any picnic scheduled for that Sunday, was there?
23 A.   No.
24 Q.   Okay.  And your desire to be secretive about your e-mail
25 arose from your own concerns, didn't they?

1185

## Kwon - cross

1    A.    Right.  I didn't want to be -- you know, it just didn't seem

2    wise, you know, sending e-mails saying, saying these things.  So I

3    coded it, you know.

4    Q.    Okay.  And Ali Al-Timimi didn't tell you to send a coded

5    e-mail message on September 11, did he?

6    A.    No.

7    Q.    He never got this message, either, did he?

8    A.    No.  He's not a member of paintball.

9    Q.    Why didn't -- were you concerned that the FBI was reading

10   your e-mail on September 11, 2001?

11   A.    I was -- I mean, I worked as a systems engineer, so I was

12   worried about just writing anything down on e-mail because I know

13   it can be traced, you know, it can get to the exchange server, and

14   they can always retrieve the e-mails.  So I didn't want to put

15   anything down on paper that would, you know, that might get me

16   into trouble or get anybody else into trouble for that matter.

17   Q.    That's because you knew you were doing something illegal; is

18   that right?

19   A.    No.  I was just being cautious, you know?

20   Q.    So this security precaution of this cryptic e-mail was your

21   own concern about security measures for your group, right?

22   A.    Correct.

23   Q.    Did you consider using a telephone?

24   A.    No, because trying to -- e-mail is much more convenient, you

25   know.

J.A. 1330

1186

**Kwon - cross**

1  Q.   Now, you, you testified that you took Ali Al-Timimi back and

2  forth to the Dar al-Arqam on 9/11?

3  A.   No.  I remember him driving -- I remember driving him back

4  from Dar al-Arqam, but I don't remember taking him to Dar

5  al-Arqam.

6  Q.   Did you -- you didn't have any telephone calls with him that

7  day, did you?

8  A.   No, I don't think so.

9  Q.   And the FBI has shown you your phone bills, haven't they?

10  A.   Yes.

11  Q.   Okay.  And before September 16, 2001, you had had two phone

12  calls with Ali Al-Timimi the entire time you lived in Northern

13  Virginia, right?

14  A.   They showed me the record, yeah, twice.

15  Q.   Twice.  And from starting what year?

16  A.   I have no idea.

17  Q.   1996?

18  A.   No.  I moved to my current address, that neighborhood in '99.

19  Q.   From 1999 to September 11, 2001, you saw your phone bills,

20  and you had placed two phone calls to Ali Al-Timimi, right?

21  A.   Yeah.  I mean, but that's only one of my cell phones.  I had

22  another one before that, you know, so -- but yes.  I mean, he

23  didn't call very often, yes, you're right.

24  Q.   Okay.  So you didn't -- it's your testimony you didn't drive

25  him there.  You just drove him home; is that right?

**Kwon - cross**

1  A.    That's what I recall.

2  Q.    Do you know how he got there?

3  A.    No.  There was a dinner scheduled for Sheikh Jaafar, and I

4  was, you know, I was one of the people invited.  When I showed up,

5  from what I recall, I don't even remember driving him there.  When

6  I showed up there, Ali Timimi also showed up.  So that night, I

7  drove him back.

8  Q.    You didn't see his car in the parking lot?

9  A.    I don't think so.  I don't think I saw his car in the parking

10  lot.

11  Q.    Okay.  And you told the grand jury in this case that you

12  didn't even remember exactly the words of Ali Al-Timimi; isn't

13  that correct?

14  A.    I mean, I don't remember word for word verbatim.  I just

15  remember just general message, you know, what he was telling me.

16  Q.    Okay.  And you told the grand jury that Al-Timimi started off

17  giving a talk, and basically, he didn't dwell too much on what

18  happened.  He said, "We should worry about the future"; isn't that

19  correct?

20  A.    That's correct.

21  Q.    And he told you that you should be worried about the

22  situation of Muslims in the United States, correct?

23  A.    For our own safety, correct, yes.

24  Q.    And everybody was scared, weren't they?

25  A.    Nervous to some degree, yes.

1188

**Kwon - cross**

1  Q.   You were worried about reprisals, weren't you?

2  A.   Yes.

3  Q.   Did you talk about what happened to the Muslims in Bosnia

4  that night?

5  A.   Did I?

6        MR. MAC MAHON:   Let me rephrase the question, Your

7  Honor.

8  Q.   Did you that night discuss what had happened to the Bosnians

9  when their villages were raided?

10  A.   I seem to recall when the Serbs just started, you know,

11  genociding the Muslims in Bosnia, and there was no warning, no

12  nothing, you know, so something like this is possible in the

13  United States, you know.  We talked about something like that.

14  Q.   And you as Muslims on the night of September 11 were

15  concerned you might be the victims of similar attacks, correct?

16  A.   Correct.

17  Q.   And Ali Timimi said that night that you should -- if you were

18  scared, you should stay in your homes, right?

19  A.   Right.

20  Q.   Go out only for necessities, being work or groceries, right?

21  A.   Correct.

22  Q.   Try to avoid discussions with people about September 11?

23  A.   Correct.

24  Q.   That Muslim women dressed in veils shouldn't go out?

25  A.   Correct.

J.A. 1333

1189

**Kwon - cross**

1  Q.   Told you that Islam in America was finished?

2  A.   I remember him -- I recall him saying, like, dawa in America

3  is finished or something like that.

4  Q.   And then you -- he told everyone to be on guard from anti-

5  Muslim violence as well, right?

6  A.   Correct.

7  Q.   And then he had a discussion that you testified to with

8  Haytham Hantash, correct?

9  A.   Correct.

10  Q.   And that was in Arabic, wasn't it?

11  A.   If I recall, at least -- I recall English.  Maybe some

12  portions in Arabic, but I recall him talking about it in English.

13  Q.   You heard, you heard those two speaking to each other in

14  Arabic that night, didn't you?

15  A.   I don't recall them -- it was in a general gathering, so I --

16  the discussion I recall is in English.

17  Q.   Do you remember any Arabic discussion between Hantash and

18  Al-Timimi that --

19          MR. KROMBERG:  Objection, Judge.  Asked and answered.

20          THE COURT:  I'm going to allow it just one last time.

21  Overruled.

22          THE WITNESS:  Maybe personally they did, but when I was

23  there, I don't remember any.

24  BY MR. MAC MAHON:

25  Q.   Okay.  And Ali -- he never once tried to justify the attacks

**J.A. 1334**

**Kwon - cross**

1  of September 11 as Islamically appropriate that night, did he?

2  A.   No.   The discussion was the definition of "combatants," you

3  know, so --

4  Q.   It was a theological discussion, wasn't it?

5  A.   I mean, it was relating to September 11.   Haytham was saying

6  that, you know, this was bad, this was evil, you know.   When he

7  saw this thing, you know, he felt bad.

8            And then Ali Timimi -- I don't remember all --

9  everything leading up to it, but I remember him saying the

10  definition of "combatant" is not just a person who goes and

11  fights, but also a person who gives monetary support is considered

12  a combatant.

13  Q.   All right.   That was a point of Islamic theology, wasn't it?

14  A.   Yes.   I mean -- yes.

15  Q.   Now, the meeting ends, and it's your testimony that you gave

16  Ali Al-Timimi a ride home, right?

17  A.   Correct.

18  Q.   Would this have been -- you've related in some regard to the

19  jury some of the conversation that night.   Was that your first

20  ever private conversation with Ali Al-Timimi that evening?

21  A.   Yes.   From what I recall, I think that is the first.

22  Q.   And what he told you was that you should consider leaving the

23  United States and you should go to Korea, right?

24  A.   Correct.

25  Q.   In fact, he often advised you that you should go overseas and

1191

**Kwon - cross**

1  study Islamic issues in either Saudi Arabia or Egypt, right?

2  A.    He also covered that, yes.

3  Q.    All right.  And he told you that that night, didn't he?

4  A.    I'm not -- I seem to recall him saying something about

5  studying overseas, also.  I remember his main thing is I should

6  leave the United States because so I don't pay taxes, you know, so

7  that I'm not partly responsible for what's going to happen to

8  Muslims.  You know, even Korea is better, you know, or go overseas

9  to study.

10        And another thing he told me was also come up with this

11  contingency plan in case something happens to Muslims in the

12  United States with the brothers.

13  Q.    But you have a specific recollection of him telling you that

14  you should leave the United States and go to Korea, right?

15  A.    That's one of the options, I mean, he talked about.

16  Q.    You told the FBI on March 22, 2003, that Ali Timimi told you

17  to leave the U.S., but he never told you to go to an LET camp;

18  isn't that correct?

19  A.    In March -- initially, that's what I told him.

20  Q.    You told him that's what he said on the night of September

21  11, right?

22  A.    I guess if -- I don't remember exactly what I said on the

23  22nd of March of 2003, but I remember initially I didn't tell them

24  everything.

25  Q.    But on the ride home from Dar al-Arqam on September 11, the

1192

## Kwon - cross

1   discussion of an LET camp never came up at all, did it?

2   A.   Correct.   Correct.

3   Q.   Now, you told the FBI that Ali Al-Timimi told you to make a

4   plan in which Muslims would head to the mountains with canned food

5   and water.  Do you remember that?

6   A.   Yes.  He said that we should have, you know, canned food and

7   water in our cars, you know, have some type of contingency plan,

8   you know, so that we can protect ourselves, get together and

9   protect ourselves, go to the mountains or wherever so we can

10  survive, you know.

11  Q.   Now, do you remember after you dropped Al-Timimi off going to

12  any store to buy canned food and water?

13  A.   I might have.  I don't recall.

14  Q.   As of the -- when you dropped Ali Al-Timimi off at his house

15  on September 11, he still had never mentioned that you should go

16  overseas to an LET camp, had he?

17  A.   No.

18  Q.   Did you ever -- what did you do to put into operation this

19  plan that Ali Al-Timimi had suggested for you after 9/11?

20  A.   Can you repeat the question?

21  Q.   Did you go buy more ammunition?  Did you call your friends

22  and say, "We need to get canned food and water"?  Did you go to a

23  store?

24  A.   I already had a lot of ammunition at my house, so -- but I

25  don't, I don't recall specifically going shopping just for those

1193

**Kwon - cross**

1  things, no.

2  Q.    Do you have any reason to know why Ali Al-Timimi would have

3  selected you as this person to put the plan into effect?

4  A.    Maybe because I was the person driving home.

5  Q.    Did he know that you had experience in survivalist training?

6  A.    I don't have any experience -- at that point, I didn't have

7  any experience in survivalist training.

8  Q.    You didn't even have a family, did you?

9  A.    No.  I mean, my own family, no.

10  Q.    You didn't have a Muslim family to protect, did you?

11  A.    No.

12  Q.    Did you call Mr. Royer or anyone else and tell them that we

13  need to get as much canned food and water as we can together; Ali

14  Al-Timimi's given us a plan?

15  A.    I don't recall telling people to get canned food and water.

16  Q.    You didn't tell anybody that, did you?

17  A.    I don't think so.

18  Q.    You went and got your car repaired the next day, right?

19  A.    I don't know.  I might have.

20  Q.    Did the FBI recently show you your phone records to show that

21  you had called Mr. Aatique on September 13?

22  A.    They showed me a phone record, but we focused on September

23  16.  I don't, I don't recall what phone calls I made before

24  September 16.

25  Q.    Do you recall -- do you recall speaking to Mr. Aatique on

1194

**Kwon - cross**

1 September 13?

2 A.    I mean, I spoke to Aatique, but I don't remember a specific

3 conversation or a time, date, and place.

4 Q.    Sir, look at this as another demonstrative exhibit.

5         Your Honor, I believe Mr. Kwon's phone records are

6 already in evidence.

7         On September 13 at 2001, you placed an eight-minute call

8 to Muhammad Aatique's residence, right?

9 A.    I mean, that's what the records say.  I guess.

10 Q.    Do you remember what you talked about that night?

11 A.    No.

12 Q.    Did you talk about getting food and water together for your

13 survivalist plan?

14 A.    I don't remember what I talked about that night.

15 Q.    Mr. Kwon, you talked to Muhammad Aatique that night about

16 going to LET, didn't you?

17 A.    I don't recall what I talked about.  I mean, I don't even

18 remember this phone call until you showed me the record.

19 Q.    You knew on September 13, 2001, that Muhammad Aatique already

20 had a reference letter signed by Royer to go to LET, didn't you?

21 A.    Like I said, I don't remember.  That's what Aatique tells me,

22 that I was there when Ismail Royer gave him the introductory

23 letter, but I don't recall.  I mean --

24 Q.    Did you tell Muhammad Aatique anything about Al-Timimi's plan

25 that was voiced to you on September 11?

## Kwon - cross

1   A.   I don't, I don't think I told him.

2   Q.   Did you ask him to bring any camping gear or any kind of

3   clothes with him if he was going to come to Virginia?

4   A.   No.

5   Q.   Did the plan involve protecting people in Pennsylvania as

6   well, sir?

7   A.   I mean, the plan was to, to protect any Muslims in our area

8   that are Muslims that we know.  Mainly brothers who had their own

9   families.  I don't remember Aatique -- I don't remember inviting

10  Aatique to be part of this plan, no.

11  Q.   To be part of the Al-Timimi plan, for lack of a better way of

12  describing it --

13  A.   Correct.

14  Q.   -- of going to the mountains, correct?

15  A.   Correct.

16  Q.   And you called Mr. Gharbieh that day as well, right?

17  A.   I used to call Nabil maybe several times a day, you know.

18  Q.   Now, Mr. Kwon, you told the FBI that the purpose of the

19  meeting at your house was to go -- to recruit people to go to LET;

20  isn't that correct?

21  A.   No.  You mean the meeting on the 16th?

22  Q.   Yes.

23  A.   No, I don't recall telling him that the meeting was to

24  recruit people for the LET.

25  Q.   You didn't tell the FBI that?

1196

## Kwon - cross

1  A.   No.

2         MR. MAC MAHON:  Just a second, Your Honor.

3         THE COURT:  Well, actually, since it's almost about

4  where I would have the break for the morning, why don't we take

5  our recess at this time.  Ladies and Gentlemen, we'll reconvene at

6  11:30.

7         (Recess from 11:10 a.m., until 11:30 a.m.)

8              (Defendant and Jury present.)

9         THE COURT:  All right, Mr. MacMahon?

10        MR. MAC MAHON:  May I continue, Your Honor?

11        THE COURT:  Yes, sir.

12        MR. MAC MAHON:  Thank you.

13 Q.   When we broke, Mr. Kwon, I was asking you if you told the FBI

14 on March 24, 2003, that the purpose of the dinner at your house

15 was to discuss the LET and LET camps.  Do you remember that

16 question?

17 A.   Yes.

18 Q.   Okay.  And didn't you tell the FBI that on that date?

19 A.   I don't recall, but that's not why I had the meeting

20 originally.

21        MR. MAC MAHON:  Okay.  Can I show him a document to see

22 if it refreshes his recollection, Your Honor?

23        THE COURT:  All right, Mr. Kromberg, you've got a copy

24 of that?

25        MR. KROMBERG:  Yes, Your Honor.

J.A. 1341

1197

## Kwon - cross

1    THE COURT:  Is there a copy for the Court?  If not --

2    MR. MAC MAHON:  This is the --

3    THE COURT:  All right.

4    MR. MAC MAHON:  Do you want us to approach and explain

5    it?

6    THE COURT:  No, no.  Let's just show it to the witness.

7  BY MR. MAC MAHON:

8  Q.   Have you seen that document before, Mr. Kwon?

9  A.   But I -- I mean, that's --

10    THE COURT:  I'm sorry, I couldn't hear your answer.

11  Have you seen that document before?

12    THE WITNESS:  No.  I mean, I just saw it today.

13    THE COURT:  All right.

14  BY MR. MAC MAHON:

15  Q.   Just when I showed it to you today?

16  A.   Right.

17  Q.   Okay.  Does that refresh your recollection as to whether on

18  March 24, 2003, you told the FBI that the purpose of the dinner

19  was to discuss the LET and LET camps?

20  A.   I mean, that's -- that's not the purpose of the dinner.  The

21  purpose of dinner was that so that I can get the brothers together

22  to come up with this plan.

23  Q.   My question, sir, I'm sorry if I didn't ask it well, was does

24  this refresh your recollection of whether you remember telling the

25  FBI on March 24 --

**Kwon - cross**

1           MR. KROMBERG:  Objection, Judge.

2           THE COURT:  Now, Mr. Kromberg, you should let the

3  question be finished before you object.

4           MR. KROMBERG:  Okay.

5           THE COURT:  However, I assume the objection is going to

6  be it's been asked and answered.

7           MR. KROMBERG:  That's correct, Your Honor.

8           THE COURT:  And I'm sustaining the objection, but let's

9  wait until the question is finished.

10          MR. KROMBERG:  Thank you.

11  BY MR. MAC MAHON:

12  Q.   Sir, you met with the FBI on March 22, 2003, as well, right?

13  A.   Yes.

14  Q.   And you told the FBI on that day that you had -- you met with

15  Mr. Royer after September 11, correct?

16  A.   I don't remember exactly what I told them, but if that's what

17  the notes say, I guess I did.

18  Q.   Okay.  And you told the FBI that Mr. Royer asked you if he

19  could come over for a visit, correct?

20  A.   Again, I don't remember the specifics of what I told him,

21  but --

22  A.   And you told the FBI that after Royer arrived, Kwon and Royer

23  walked to a pond near Kwon's house; isn't that correct?

24  A.   Yes, I remember telling him that.

25  Q.   There is a pond near your house, isn't there?

1199

**Kwon - cross**

1  A.   Correct.

2  Q.   And you told the FBI on that day Royer told you that he had

3  contacts with LET and would call someone and make plans for Kwon

4  to attend a training camp if Kwon was interested.  Do you remember

5  that?

6  A.   Yeah, but again, at that point, I didn't mention the dinner

7  at all because I didn't want them to find out about the dinner.

8  That's -- if I recall correctly, March 22 is the first day that

9  had -- they interviewed me, and, you know, I didn't -- I left out

10  a lot of stuff.

11       So I remember, you know, I had skipped the dinner

12  totally, and I had just told them about Royer and myself having a

13  meeting by the pond near my house.

14  Q.   And on that same day, you told the FBI that Royer told you --

15  Royer told Kwon that others including Hasan had already agreed to

16  go, correct?

17  A.   I mean, when I met Royer, I believe, on the 18th or 19th by

18  the lake, yes, we already decided to go.  So that's correct, yeah.

19  Q.   So you, you lied to the FBI?  There was such a meeting, but

20  it was days later; is that what you're saying?

21  A.   Correct.  There was a meeting definitely, but that was after

22  the dinner.  You know, I don't know exactly what I told them the

23  first time I met FBI.  Like I said, I was making a lot of stuff up

24  as I was going.

25       You know, my initial story was totally bogus, and then,

1200

**Kwon - cross**

1   you know, once they started coming at me with the facts, you know,

2   I was trying to improvise as I go.  So I didn't tell them about

3   the dinner at all on the 22nd of March.

4   Q.   Okay.  You didn't tell them about the dinner that you had

5   planned to talk about Al-Timimi's plan to go to the mountains and

6   take canned water --

7   A.   I didn't tell them about that at all.

8   Q.   You told the FBI on March 23, 2003, that after 9/11, you told

9   Royer that you wanted to go to an LET camp and die shaheed,

10  correct?

11  A.   On March 23?

12  Q.   Yes.

13  A.   I mean, this, this 22nd-23rd is, like, one of the first days

14  of my interviews with the FBI, and I don't know what I -- I don't

15  recall everything that I told them.  Like I said, I was making

16  stuff up.  I mean, I was leaving -- more like I was leaving a lot

17  of stuff out until I was confronted with, with some facts and

18  questions, and then, you know, I'll admit to certain thing.

19          So I don't know exactly what I said and what I left out,

20  what I made up.  So, I mean, if you're asking me if I remember

21  specifically that, if it's in their notes, I guess I said it.  I

22  don't know.

23  Q.   So you were making things up all along, right?

24  A.   At that time, I was, I was making some things up, leaving a

25  lot of stuff out, you know.

**J.A. 1345**

1201

**Kwon - cross**

1   Q.    Okay.  You left out that you had recruited personally all

2   these men before September 11 to try to go to LET.  You left that

3   out entirely, didn't you?

4   A.    I mean, I didn't recruit.  I was just conveying message for

5   Royer.  He asked me if I know any brothers, you know, who was

6   interested in going that he can facilitate.  So when a brother

7   asked me or when a topic came up in a group, I will tell them, you

8   know?

9   Q.    And you left that out to protect yourself, right, sir?

10  A.    I guess.  I mean, I didn't really see it as recruiting for

11  LET, but --

12  Q.    Let's go back to the demonstrative exhibit on the screen, if

13  you could.  On September 14, 2001 -- we've already discussed the

14  telephone call with Muhammad Aatique.  Is it your testimony you

15  don't remember that phone call?

16  A.    No.

17  Q.    Do you recall inviting him to come to your house in that

18  phone call?

19  A.    No.  I remember clearly that I didn't invite Muhammad

20  Aatique.

21  Q.    He just showed up at your house, sir?

22  A.    Correct.

23  Q.    He just happened to show up at your house one day at the

24  door?

25          THE COURT:  That's been asked and answered.

1202

## Kwon - cross

1    MR. MAC MAHON:  Excuse me, Your Honor, I'll move along
2  from that.
3  Q.    So on September 14, 2001, you had an eight-minute phone call
4  with Masaud Khan.  Do you see that?
5  A.    Yes.
6  Q.    Okay.  Do you remember what that phone call was about?
7  A.    No.  I mean, I used to talk to Masaud, you know, pretty
8  often.  I don't know what I talked about.  Most likely, you know,
9  you know, in the light of aftermath of 9/11, you know, probably
10  things of that nature.
11  Q.    And that phone call of September 14, 2001, with Masaud Khan,
12  did you discuss buying jackets that could be worn in the Himalayas
13  at an LET camp?
14  A.    I don't recall talking to him about a jacket to wear in the
15  Himalayas.
16  Q.    How about on the phone call on September 15, 2001, a
17  three-minute phone call with Masaud Khan?  Do you remember that
18  phone call?
19  A.    I don't remember -- I mean, like I said, I used to call him
20  pretty often, but I don't remember any specific conversations with
21  him, you know.
22  Q.    Okay.  So on, on September 15, the call with Masaud Khan, do
23  you remember discussing buying a jacket that could be worn in the
24  Himalayas in that phone call?
25  A.    I don't recall.

1203

## Kwon - cross

1   Q.   Okay.   Before the dinner at your house on September 16, 2001,

2   do you recall any discussions with Masaud Khan about buying a

3   jacket that could be worn in the Himalayas?

4   A.   I know that he was looking to buy, like, jackets and ski

5   pants and things like this, but -- I mean, warm pants, but I don't

6   remember specific for Himalayas.   It was just for general purpose,

7   you know?

8   Q.   Okay.   When did you have that discussion with Mr. Khan about

9   buying ski pants and warm clothes?

10   A.   Before, I mean, way before 9/11.

11   Q.   And did you have any idea why he needed those clothes?

12   A.   I guess just in case.   There were times, you know, that we

13   would talk about, like, well, Masaud, No. 1, is an outdoor kind of

14   guy, but, you know, when we talk about -- we used to talk about,

15   like, Chechnya and stuff, and I guess a lot of these things it's

16   just good to have as just in case, you know?

17   Q.   So you had a discussion with Masaud Khan before September 16,

18   2001, about being prepared clothing-wise to go to cold areas of

19   the world for jihad?

20   A.   I mean, not for jihad but just to have them, you know?   I

21   mean, so, you know, whatever use we might have for survival, for

22   jihad, or whatever, you know.

23   Q.   Okay.   Did you have any discussions with Masaud Khan before

24   September 16, 2001, regarding a company known at Cabela's?

25   A.   Oh, yeah.   I mean, we used to have the same catalogs, so,

## Kwon - cross

1  yeah, I'm sure we have discussed Cabela's.

2  Q.   Do you remember discussing Cabela's with Mr. Khan on

3  September 15, 2001?

4  A.   I don't recall.  I mean, I might have.  Again, I mean, I

5  don't remember any specific conversations or times that I talked

6  to Masaud.

7  Q.   Okay.  Did you know that Masaud Khan purchased a -- the

8  jacket similar to the one that was shown to you as an exhibit on

9  Saturday night, September 15, 2001?

10  A.   No.  I didn't know that he purchased before.  I thought that

11  he purchased on Sunday, like me.

12  Q.   That's because he came to your house, on your testimony, with

13  a catalog page ripped out showing a jacket that you could wear in

14  the Himalayas at an LET camp, right?

15  A.   Yes.  He said that -- on that night, he produced this

16  torn-out page from Cabela's catalog showing the jacket, and he

17  said it's a good jacket, you know, for cold weather, you know.  So

18  I thought that it's a good jacket to have when I would go

19  overseas, so I ordered that night.

20  Q.   Did he tell you whether or not he'd already purchased one?

21  A.   No.  Like I say, I thought, you know -- I don't know what he

22  said, but I had always thought that he had purchased it that

23  night.

24  Q.   Why -- do you have any reason -- can you tell the jury --

25  strike that.

1205

## Kwon - cross

1    Do you know why it is that Masaud Khan brought a catalog
2  page from Cabela's to your house on September 16, 2001?
3  A.   No.
4  Q.   Isn't it because you told him you were recruiting people to
5  go over for training in the Himalayas, sir?
6  A.   I mean, I don't remember telling him that.  I remember
7  specifically even myself that the purpose of the meeting was to
8  basically tell the brothers what Ali Timimi had told me on my car
9  ride back from -- on September 11.  It wasn't, you know, I don't
10  recall it being at all, you know, a purpose being telling people
11  to go to LET or anything like that.
12  Q.   Never at any time, right?
13  A.   No.
14        MR. MAC MAHON:  Can we put up the -- excuse me for just
15  a second, Your Honor.
16        THE COURT:  Again, Mr. MacMahon, make sure you don't put
17  anything on the screen that hasn't been already either admitted or
18  to which the government has an objection.
19        MR. MAC MAHON:  Yes, Your Honor.
20        THE COURT:  Is this a demonstrative or an exhibit?
21        MR. MAC MAHON:  Demonstrative exhibit, Your Honor.
22        THE COURT:  All right.
23  BY MR. MAC MAHON:
24  Q.   Mr. Kwon, when was it that you decided that September 16,
25  2001, was the day that you were going to have this meeting?

## Kwon - cross

1   A.   When did I decide?  I don't know.  Sometime after that talk I

2   had with Ali Timimi on September 11.

3   Q.   And after the September 11 to 6:30, September 16, you didn't

4   have any interaction at all with Ali Al-Timimi, did you?

5   A.   No.

6   Q.   Never told him you were planning a meeting?

7   A.   No.

8   Q.   Never told him who was coming?

9   A.   No.

10  Q.   Never told him anything about it, right?

11  A.   Correct.

12  Q.   And, sir, this -- the demonstrative exhibit on the screen is

13  your, is your -- the -- your phone bills from the day September

14  16, 2001.  You called Donald Surratt first, correct?

15  A.   That's what it says.

16  Q.   Okay.  And he had been with you to Mecca to meet with this

17  LET person, hadn't he?

18  A.   Correct.

19  Q.   Okay.  Then you called Mr. Royer?

20  A.   Correct.

21  Q.   And Mr. Royer had been to Mecca with you as well, correct?

22  A.   Correct.

23  Q.   Then you called Ibrahim Al-Hamdi, correct?

24  A.   Correct.

25  Q.   Mr. Al-Hamdi you knew had already been to the LET camps,

1207

**Kwon - cross**

1  correct?

2  A.    Correct.

3  Q.    Then you called Mr. Royer and spoke to him for seven minutes.

4  Do you see that?

5  A.    Yes, I see it.

6  Q.    Okay.  Do you remember anything about that telephone call?

7  A.    I mean, I can't recall all these conversations.  Probably I

8  was telling him to come over for dinner, you know, or -- I don't

9  know what -- I can't recall specific phone call, what I discussed.

10 Q.    All right.  Well, you wouldn't have been talking about LET on

11 your phone on September 16, 2001, right?

12 A.    I don't think so.  At that time, you know, we were being very

13 careful with what we say on the phone.  I highly doubt that we

14 spoke about LET on the phone.

15 Q.    That was because you personally were worried about security

16 on your own personal telephone, right?

17 A.    Correct.

18 Q.    You thought you were being listened to by the FBI?

19 A.    It was -- I thought it was a possibility, yes.

20 Q.    All right.  And Al-Timimi didn't tell you before September 16

21 that your phone might be bugged, did he?

22 A.    No, but, you know, it's just a precaution.  We always thought

23 as Muslims, you know, and after September 11, you know, and just I

24 thought it was good not to say these things on the phone or send

25 e-mails saying, you know, things like this.

1208

## Kwon - cross

1  Q.   Well, you once told the FBI that you sent out an e-mail to

2  schedule this meeting, correct?

3  A.   Correct.

4  Q.   That was false, wasn't it?

5  A.   That's true.

6  Q.   Anybody ever seen a copy of that e-mail?

7  A.   No, they haven't shown it to me, but I remember sending out

8  an e-mail.

9  Q.   And the e-mail said, "I'm having a dinner at my house," or

10 what did it say?

11 A.   I don't remember exactly what it said.  Basically, I said,

12 "I'm having a dinner.  Please come over," yeah.

13 Q.   Then you called Mr. Gharbieh at 2:54.  And you had talked to

14 Mr. Gharbieh before that date about potentially going to an LET

15 camp, hadn't you?

16 A.   Before September 16?

17 Q.   Yes.

18 A.   We talked about LET, yeah.

19 Q.   Okay.  And Mahmood Hasan was called next.  That's another

20 person you had talked to before this day about going to an LET

21 camp as well, right?

22 A.   Yeah.  I mean, I had discussions about LET with Mahmood,

23 also.

24 Q.   And then two calls to the home of Masaud Khan.  Do you see

25 that?

**J.A. 1353**

1209

**Kwon - cross**

1   A.   Yes.

2   Q.   He's another person you had discussed LET with, correct?

3   A.   Yes, we talked about LET.

4   Q.   And this is the same person that you thought had fought in

5   Afghanistan, correct?

6   A.   Yes.

7   Q.   And then you ordered dinner.  That's what the Kabobs

8   restaurant is?

9   A.   Correct.

10  Q.   And there was no intention as of 5:01 p.m. that Ali Timimi

11  attend this dinner at all, right?

12  A.   Correct.

13  Q.   So you told the FBI that the purpose of the dinner was for

14  everyone to hear Ali speak.  Do you remember telling the FBI that?

15  A.   No.  I -- I mean, I don't know if I told them that, but the

16  purpose was to tell the brothers what Ali had told me, so, you

17  know, the night of the 11th.  I had no idea that he was going to

18  come, you know.

19        I just remember him calling me that day when I was

20  picking up the food, you know, which kind of surprised me, and

21  then -- because he doesn't really usually call me, and he asked me

22  what I was doing.  So I told him, "I'm having the brothers over,

23  you know, for dinner," and he asked me if he can come.  So I said,

24  "Sure."

25        And than, at that point, I was, like, it's better that

**J.A. 1354**

**Kwon - cross**

1  brothers hear it from him than from me, you know?

2  Q.   And that's the plan about heading up into the mountains with

3  the food and the water, right?

4  A.   Correct.

5  Q.   Where was Mr. Aatique at this time?

6  A.   I'm not sure.  I, I think he showed up at my house sometime

7  that day, but I seem to remember later that day.

8  Q.   Do you know what time it was?

9  A.   I don't recall.

10 Q.   Didn't Mr. Royer invite Mr. Aatique to come down to your

11 house?

12 A.   Well, I learned that after all this.  Aatique is my cellie in

13 jail right now, and he told me, you know, we discussed this thing,

14 and he told me that Royer is the one who told him to show up,

15 which I had no idea.  At that time, you know, he just showed up at

16 my door, you know, but now he tells me that he talked to Royer and

17 then Royer told him to come to my house.

18 Q.   Okay.  Do you know why Mr. Royer was inviting someone who had

19 a reference letter to go to an LET camp to the dinner at your

20 house on September 16, 2001?

21 A.   I mean, I have no idea.  I mean, he invited him without my

22 permission, you know.  So -- but then, you know, I know Aatique.

23 So when he showed up, I was, like, okay.

24 Q.   Well, Al-Timimi didn't know Aatique, did he?

25 A.   I think he knew him.

**Kwon - cross**

1  Q.    He might have seen him at the Dar al-Arqam once?

2  A.    Correct.  He used to attend lectures at Dar al-Arqam when he

3  used to live in Virginia.

4  Q.    Did -- was -- Ali was a close friend of Nabil Gharbieh,

5  wasn't he?

6  A.    You mean Ali Timimi?

7  Q.    Yes.

8  A.    I don't know if they are friends, but I know that Gharbieh

9  had, you know, close contact with him.  I usually used to ask --

10  if I had something to ask Ali Timimi, I will ask Nabil to ask him.

11  Q.    And you didn't -- other than Gharbieh, who to your knowledge

12  had helped in the creation of the Dar al-Arqam -- correct?

13  A.    I'm sorry?

14  Q.    You knew that Gharbieh had helped start Dar al-Arqam, right?

15  A.    No, I didn't know that.  I just knew that he was part of --

16  he was, like, the, I guess, coordinator or -- you know, he

17  worked -- not worked for.  You know, he worked with Dar al-Arqam,

18  you know?

19  Q.    He had some role at Dar al-Arqam?

20  A.    Yes, yes.  He had some role at Dar al-Arqam, yes.

21  Q.    And the rest of these people you didn't know to be close,

22  personal friends of Ali Al-Timimi, did you?

23  A.    No.  I mean, I don't know if they were on a personal level,

24  but I always thought that they were like, as I said, you know --

25  Ali Timimi wasn't our peer.  He wasn't, like, my buddy, you know?

**Kwon - cross**

1    He was more like somebody I had, you know --

2    Q.   Well, you have no information --

3            MR. KROMBERG:  Objection, Judge.  Let the witness

4    finish.

5            THE COURT:  Yes, he has not finished.

6            MR. MAC MAHON:  I thought he was finished, Your Honor.

7    Excuse me.

8            THE WITNESS:  He was more like a teacher, you know, and

9    not somebody I just call up and say, "Hey, what's up?"

10   BY MR. MAC MAHON:

11   Q.   And you have no information that Al-Timimi knew that any of

12   these people owned firearms, did you?

13   A.   No.

14   Q.   And you have no information that he knew that any of these

15   people watched jihad videos with you, either, right?

16   A.   Did he?  Ali Timimi?  No.

17   Q.   Now, you told the FBI that you didn't think that Aatique had

18   any intention of attending a jihad training camp or becoming a

19   mujahideen before the dinner at your house.  Do you remember that?

20           MR. KROMBERG:  Objection.  Could we get a time frame on

21   this?

22           THE COURT:  Sustained.

23           MR. MAC MAHON:  It will just take me a second, Your

24   Honor.

25           I'll move along while we find that, Your Honor.  I'm

**Kwon - cross**

1    sorry.

2            THE COURT:  All right.

3    BY MR. MAC MAHON:

4    Q.   On -- do you remember telling the FBI on May 15, 2001,

5    that Aatique probably decided to go to LET after the Kwon dinner?

6            THE COURT:  Wait, wait, wait, wait, wait.  I think --

7    look at that question again.

8            MR. MAC MAHON:  Okay.

9    Q.   Do you remember telling the FBI on May 15, 2001, that Aatique

10   probably decided to go to LET after the Kwon dinner?

11           MR. KROMBERG:  I object, Judge.

12           THE WITNESS:  May 15, 2001?

13           THE COURT:  Wait just a second.

14           May 15, 2001, the way the question is --

15           MR. MAC MAHON:  2003.  I'm sorry, Your Honor, you caught

16   me.

17           THE COURT:  All right.

18           MR. MAC MAHON:  Excuse me.

19           THE COURT:  All right.

20           THE WITNESS:  Yeah, I seem to remember telling the FBI

21   that.

22   BY MR. MAC MAHON:

23   Q.   And you didn't tell them that you had actually already helped

24   Aatique try to get to LET at that time, right?

25   A.   No.  I mean, like I said, you know, I don't recall him.  I

**Kwon - cross**

1  mean, now that he's my cellie, he's telling me all this stuff, and

2  a lot of stuff I don't remember.  But now he tells me that he had

3  planned to go, he had the introduction letter from Royer even

4  before, way before this thing, and that I was there, you know -- I

5  might have been the person to tell Aatique, you know, "Contact

6  Royer if you want to go to LET," but I don't recall any specific

7  things, helping Aatique to go to LET or anything like that.

8  Q.    Do you remember telling the FBI on April 9, 2003, that you

9  didn't believe that Aatique had any intention of attending a jihad

10 training camp or becoming a mujahideen prior to the dinner meeting

11 with Ali Al-Timimi?

12 A.    Correct.

13 Q.    That was false, wasn't it?

14 A.    Well, now it turns out to be false, but at that time, that's

15 what I believed because he just shows up at my house, and, you

16 know, and he listens to the talk by Ali Timimi, and he says, "I

17 was going to Pakistan anyway to pick up my wife and kid.  So when

18 I'm there" -- he's there a few weeks -- so he said, "I'll attend

19 the camp for a few days and come back."

20 Q.    And on April 9, 2003, you also told the FBI that you don't

21 know the specific details of how Aatique's trip was planned, but

22 Kwon is fairly confident that Ismail Royer coordinated Aatique's

23 travel the same way that Royer coordinated the travel for Kwon.

24 A.    Right.  I mean, if he decided that he was going to go to LET,

25 he must have gone through Royer.  Like I said, Royer was the only

**Kwon - cross**

1  person that will facilitate you in our group to get to LET.

2  Q.   Now, there's other people that you invited as well, weren't

3  there?

4  A.   Correct.

5  Q.   Who else did you invite to the dinner?

6  A.   Who didn't show up or --

7  Q.   Yes.

8  A.   Idris -- I invited Idris Surratt; he didn't show up.  I

9  invited Ibrahim Al-Hamdi; he didn't show up.  Those are the only

10  two that I can recall who I invited that didn't show up, but

11  everyone else showed up.

12  Q.   Okay.  Now, you and Mahmood Hasan went over to Maryland to

13  pick up Mr. Khan, didn't you, Masaud Khan?

14  A.   Correct.

15  Q.   And when you, when you got to Mr. Khan's house -- why were

16  you traveling with Mr. Hasan?

17  A.   Pretty much those days after September 16, Mahmood and I were

18  together most of the time because, you know, we were traveling

19  together to Pakistan to attend LET, so --

20  Q.   I misspoke then.  I'm sorry.

21        The dinner -- before the dinner on September 16, you and

22  Mr. Hasan drove to Gaithersburg, Maryland, from Fairfax to pick up

23  Masaud Khan, didn't you?

24  A.   No.  This was September 18.  The night of September 18, we

25  went to Gaithersburg.

1216

**Kwon - cross**

1  Q.   Okay.  Didn't you in Gaithersburg see Mr. Farhat Noor?

2  A.   Yes.

3  Q.   And you invited him to the dinner, too, didn't you?

4  A.   I don't recall.  I don't recall if I invited Farhat to the

5  dinner.

6  Q.   Okay.  Didn't Mr. Noor tell you he had an exam on Monday and

7  he couldn't come?

8  A.   I don't recall.  I might have.  I'm not saying -- but I don't

9  recall inviting Farhat.

10  Q.   So what time did Ali Al-Timimi arrive at your house?

11  A.   You know, I'm not sure, but when I was shown the phone

12  records, I'm guessing around -- between 7:30 and 8:00.

13  Q.   And you picked him up at his house?

14  A.   Yes.

15  Q.   Did he tell you that he had had an argument with his wife?

16  A.   I don't seem to recall that.

17  Q.   What did you talk to him about on the car ride over to your

18  house?

19  A.   I don't recall.  You know, it's like a three-minute car ride.

20  I'm sure he said something, but I don't know if he -- I don't

21  recall anything that sticks out in my mind.

22  Q.   Did he ask you how the plan was going?

23  A.   I don't recall.

24  Q.   Did he ask you if you had flashlights and food and water and

25  a safe place in the mountains to take all the Muslims?

1217

**Kwon - cross**

1  A.    I don't recall.  I mean, I don't recall these things.

2  Q.    Well, you would -- had you been working on his plan in the

3  interim since last time you saw him?

4  A.    Well, that was going to be the, you know, story when I got

5  the brothers together and, you know, started talking to them.

6  Q.    Well, this was the dinner.  This is what this was all for,

7  right?

8  A.    Right.

9  Q.    Okay.  And there was no discussion about how the plan was

10 going in terms of putting it into effect?

11         MR. KROMBERG:  Objection, Judge.  Could we have a time

12 frame when there was no discussion about putting this plan into

13 effect?  Is he talking about the three-minute ride from --

14         THE COURT:  All right, all right.  I think you should

15 make it more precise.

16         MR. MAC MAHON:  Thank you, Your Honor.

17 Q.    In the car ride -- well, let's -- when you got to Al-Timimi's

18 house, did you get out of your car?

19 A.    I don't recall.  I don't recall much -- I mean, some things I

20 remember, but some things I don't know, you know.  I just remember

21 the big things, you know?

22 Q.    Do you remember talking to him on September 16 in his home?

23 A.    In his home?

24 Q.    In his home.

25 A.    I don't recall going to his house on September 16.

1218

**Kwon - cross**

1 Q. Did he meet you outside?

2 A. I think so.  He must have.  I don't remember going to his

3 house.  So maybe I met him outside.  I don't know.

4 Q. Okay.  And do you recall any discussion that took place

5 between you and Ali Al-Timimi between his home and your home?

6 A. No.

7 Q. No discussion of your plan at all, right?

8 A. I don't know.  I don't recall.  I mean, there might have

9 been.  I don't, I don't recall.

10 Q. And then from when you, you got out of the car at your house,

11 walking upstairs, do you remember any discussion at all?

12 A. No.

13 Q. Did you tell him who was going to be at your house?

14 A. No.  Actually, I didn't.  I don't recall telling him who was

15 going to be at my house.

16 Q. Did you tell him that you had cleared all these people, that

17 they were safe to say anything he wanted to in front of?

18 A. I don't, I don't recall telling him that.  He knows these

19 brothers, you know?  I don't recall telling him that.

20 Q. Did he ask you who was coming?

21 A. I don't, I don't think so.  I don't recall telling him who

22 was going to be at my house.  Maybe I did, but I don't recall

23 telling him who was going to be at my house.

24 Q. Did you tell him all these people that were at your house

25 were trustworthy brothers?

1219

**Kwon - cross**

1  A.   I might have said something like that.

2  Q.   Do you remember saying anything like that?

3  A.   No, not really, but they are trustworthy brothers -- well,

4  yeah.

5  Q.   Well, they were trustworthy to you.  You knew them, right?

6  A.   Yeah.

7  Q.   Did you tell Al-Timimi that based on your opinion, that he

8  could say whatever he wanted in front of all of these people?

9  A.   I don't recall telling him that.  I mean, Ali Timimi, you

10  know, he will judge for himself, you know, to say whatever he sees

11  fit, you know.

12  Q.   Did you tell him it was safe to talk about waging war against

13  the United States in front of all these people?

14  A.   I don't recall telling him that.

15  Q.   Did Al-Timimi ask you to draw the blinds in his (sic) house

16  when you got there?

17  A.   No, I don't recall that.  That's something Aatique said, but

18  I don't -- my, I don't recall that.

19  Q.   This is another conversation you recently had with

20  Mr. Aatique in jail; is that right?

21  A.   Correct.

22       MR. MAC MAHON:  Actually, I would like to move this one

23  in to put an exhibit on it, but --

24       THE COURT:  Hold on one second.  You don't have it

25  numbered yet?

**J.A. 1364**

1220

**Kwon - cross**

1      MR. MAC MAHON:  It's not numbered yet, Your Honor.  I'm
2  sorry.
3      THE COURT:  Defense Exhibit 82.
4      And there's no objection, right, Mr. Kromberg?
5      MR. KROMBERG:  No objection, Judge.  If we could have a
6  copy, it would be helpful.
7      MR. MAC MAHON:  I'll get some made at the break, Your
8  Honor.  I didn't -- I can leave it as a demonstrative now and move
9  it in later.
10     THE COURT:  No.  For the record, it's 82, and it's in at
11  this point.
12     (Defendant's Exhibit No. 82 was marked and received in
13  evidence.)
14     MR. MAC MAHON:  Thank you very much.  I'm sorry about
15  that.
16  Q.   Mr. Kwon, what is that a picture of?
17  A.   My apartment complex.
18  Q.   Is your apartment visible in this picture?
19  A.   No.  My apartment is a little bit to the right.
20  Q.   What floor was it on?
21  A.   It's on the third floor.
22  Q.   And it was dark when you brought Ali Al-Timimi there, right?
23  A.   I seem to remember it was, the sun had just gone down
24  recently, something like around that time.
25     MR. MAC MAHON:  And mark this as the next one.  This

**Kwon - cross**

1    would be 83, Your Honor.

2    THE COURT:  Any objection, Mr. Kromberg?

3    MR. KROMBERG:  I don't know.  I haven't seen it.

4    THE COURT:  All right.

5    MR. KROMBERG:  No objection, Judge.

6    THE COURT:  All right, it's in.

7    (Defendant's Exhibit No. 83 was marked and received in

8    evidence.)

9    MR. KROMBERG:  But I'd like a copy of it.

10   THE COURT:  We'll get copies of it over the lunch break.

11   MR. MAC MAHON:  I apologize, Your Honor.

12   Q.   Have you seen Exhibit 83 before, Mr. Kwon?

13   A.   No.  Have I seen this?

14   Q.   What is that a picture of?

15   A.   It also looks like a picture of my apartment complex from the

16   back.

17   Q.   Okay.  And one of these, one of these units up on the third

18   floor, that would have been your unit?

19   A.   Yes, but I'm not sure if that's my building, but it seems

20   like it.

21   Q.   So you were worried about someone looking into that window,

22   Mr. Kwon?

23   A.   Oh, no, I wasn't.  My apartment was on the third floor.

24   Q.   So you never heard anybody say, "We'd better pull the

25   shades," right?

**Kwon - cross**

1  A.   I don't recall.  I don't recall that.

2  Q.   Okay.  Did you check the house before you left to see if it

3  was safe from electronic eavesdropping, Mr. Kwon?

4  A.   No.

5  Q.   You testified that when Al-Timimi arrived, he asked you to

6  unplug your answering machine?

7  A.   Yes.  He said something like, "Unplug the phones; unplug the

8  answering machine," or something like that.

9  Q.   Did you have an answering machine?

10  A.   Yes, I did.

11  Q.   Did you ask him, "Why would we unplug the answering machine?"

12  A.   I don't recall asking why.  I thought it was kind of obvious,

13  you know.

14  Q.   Well, you were going to talk -- at this time, you were going

15  to talk about a plan of defending Muslims up in the mountains,

16  right?

17  A.   I mean, up to that point, yeah, but when he asked me to, I

18  just did it.  I didn't ask why.

19  Q.   When did he ask you relative to when he got there?

20  A.   From what I recall, I think it was beginning of, beginning of

21  the conversation.

22  Q.   When he was beginning to talk about the plan, he asked you to

23  unplug the answering machine, right?  That's your testimony?

24  A.   Correct.

25  Q.   And he asked you to turn off everybody's phones; is that

**Kwon - cross**

1  correct?

2  A.   I remember him saying, "Turn off the phones, and unplug the

3  answering machine," something like that.  Because I remember

4  getting up and unplugging my answering machine and the phone jack.

5  Q.   Sir, you're an engineer, aren't you?

6  A.   Correct.

7  Q.   What eavesdropping device would have been employed in an

8  answering machine?

9  A.   I don't know.  I'm not an electrical engineer.  I was just a

10  computer guy, systems engineer, but I don't know.  I don't know

11  these things very well other than what I've seen in the movies,

12  you know.

13  Q.   Did you see a movie where someone asked someone to unplug an

14  answering machine?

15  A.   No.  No.

16  Q.   Did you unplug your phone as well?

17  A.   My phone shares the same jack with the answering machine, so

18  I unplugged the whole thing.

19  Q.   Did you collect all the brothers that were sitting around,

20  all of their cell phones, too, Mr. Kwon?

21  A.   No.

22  Q.   Did you check to see if they were all turned off?

23  A.   No.  I seem to remember turning mine off.  I think the other

24  brothers turned off theirs, too, but I didn't check.

25  Q.   Is that something else you now remember, Al-Timimi telling

1224

## Kwon - cross

1  them all to turn off their cell phones as well?

2  A.   No.  I remember turning off my phone, but I don't know if Ali

3  Timimi told us to turn off the cell phones.

4  Q.   So who was at your house when Al-Timimi arrived?

5  A.   Different people came at different times.  I just know that

6  when everybody was there excluding Nabil and Sherdil, it was

7  Ismail Royer, Hammad, Calipha, Muhammad Aatique, Masaud Khan,

8  myself, and Mahmood.

9  Q.   Where was everybody sitting, Mr. Kwon?

10 A.   In my living room.

11 Q.   And what -- and who was sitting where?

12 A.   If I remember correctly, we were sitting in, like, a circle.

13 I believe Ali Timimi was sitting in front of the TV, his back

14 towards the TV, and I think Royer was to his left, and then it was

15 Hammad, Calipha, myself, Mahmood, Aatique, and Masaud Khan was to

16 Ali Timimi's right, yeah.

17 Q.   Do you remember that specifically?

18 A.   That's what I seem to.  I mean, I'm not 100 percent sure, but

19 that's what I remember.

20 Q.   Had you talked to any of those people at your house before

21 you went to get Ali Al-Timimi?

22 A.   That day?

23 Q.   Yes.

24 A.   Yes, I called some of them.

25 Q.   After they got to your house and before you went to get Ali

**Kwon - cross**

1  Al-Timimi, did you talk to any of those people?

2  A.   I seem to remember Mahmood came, one of the first guys who

3  came, and I told him that all the brothers hasn't come yet, so I

4  told him to, you know, receive the brothers for me and -- while I

5  go pick up Ali Timimi.  I seem to remember that.

6  Q.   Did you tell them to come in one at a time or in pairs or

7  anything else when you talked to them on the phone?

8  A.   No, no.

9  Q.   Did you tell them that the meeting was going to be to discuss

10 Ali's plan in the mountains?

11 A.   No.  They didn't know anything about -- I just told them to

12 come; we'd have dinner.

13 Q.   General Islamic issues, is that what you told them?

14 A.   No, I don't remember telling them anything.  I just said,

15 "I'm having dinner," but I think the brothers understood because

16 in the light of September 11, I'm sure, you know, brothers wanted

17 to get together to discuss issues, you know, whatever.  But I

18 remember when I sent the e-mail, I didn't say anything about what

19 the topics was going to be.

20 Q.   Okay.  You wanted to get the brothers together and talk about

21 something, right?

22 A.   Correct.

23 Q.   But nobody knew what it was until they got there; is that

24 right?

25 A.   I don't -- I mean, I might have told maybe, like, Royer or

## Kwon - cross

1  Masaud something about the plan Ali Timimi talked about, but I

2  think in general, I didn't tell them anything.

3  Q.   What did you tell Mr. Royer about the plan?

4  A.   I don't recall, but I might have told them that, you know,

5  this meeting is maybe to come up with a plan, you know.  I don't

6  even know if I told them, but I seemed to tell one or two people

7  from the meeting before we met, maybe that day or, you know,

8  earlier that day.

9  Q.   What kind of plan did you tell them?

10  A.   If I told them, it would be what Ali Timimi told me to, to

11  have a contingency plan to have food and water and, you know, to

12  come up with a plan to go into the mountains if you have to, you

13  know.

14  Q.   And you now think you told Masaud Khan the same thing?

15  A.   I think I told Masaud Khan.  I think -- because I went to his

16  house, like, either that Friday or Saturday or something.

17  Q.   Okay.  Do you have any recollection of what anybody was

18  discussing at your house, the brothers inside your home, before

19  Ali Al-Timimi arrived?

20  A.   I don't know what they were talking about.

21  Q.   Anybody talking about LET?

22  A.   I don't know.  I wasn't there.  I don't know.  I only

23  remember Mahmood being there when I --

24  Q.   Mr. Royer was there, wasn't he?

25  A.   Maybe.  Like I said, all the brothers came at different

**Kwon - cross**

1  times.  I don't remember who came first.  I just seem to remember

2  Mahmood being one of the first ones, and I remember Nabil being

3  the last one.

4  Q.   How big is your apartment?

5  A.   It's a three-bedroom condo.

6  Q.   So there were lots of different places for people to have

7  discussions?

8  A.   Yeah.  I mean, if you move into different rooms I guess.

9  Q.   Do you know when it was that Mr. Royer arrived relative to

10  when Mr. Aatique arrived?

11  A.   No, I don't recall when exactly he arrived.  I mean,

12  everybody arrived around that time.

13  Q.   Did you discuss LET with Mr. Royer in any way, shape, or form

14  between September 11 and before the dinner at your house?

15  A.   I don't, I don't recall discussing LET with him, nothing that

16  sticks out in my mind.  I know I was -- I'm sure I had called him,

17  maybe exchanged e-mails, but I don't, I don't recall anything LET.

18  Like I said, at that time, you know, I wasn't on the phone or in

19  the e-mail, I didn't want to discuss these type of things except

20  in person.

21  Q.   Did you go with Mr. Royer to the Dar al-Hijrah mosque on the

22  night of September 11, sleeping upstairs with a weapon?

23  A.   No.

24  Q.   Do you know he did that?

25  A.   No.

1228

## Kwon - cross

1  Q.   So the meeting starts.  Tell us exactly how this meeting
2  started.
3  A.   I mean, I don't remember all the details, but I picked up Ali
4  Timimi, came home.  I think some brothers even came after I
5  brought Ali Timimi, and once, once those people I mentioned were
6  there, I think we ate first.  I think, I think we ate first, and
7  then I believe Ali Timimi started talking.
8  Q.   All right.  How long did you eat?
9  A.   I don't know, maybe -- I don't know.  The food was in front
10 of us, I think, even while he was talking, I believe, but not, not
11 too long.  Maybe -- if I have to guess, maybe 20 minutes.
12 Q.   Was there any discussion that you remember amongst and
13 between the people at your house while everybody was eating?
14 A.   No, not really.
15 Q.   Nothing that you can recall at all, nothing of any
16 significance?
17 A.   No, nothing that sticks out in my mind.
18 Q.   Did you tell Ali who the people were at the meeting?
19 A.   When he got there?
20 Q.   You had to introduce him to some of these people, didn't you?
21 A.   No, he knew all of them.
22 Q.   Did you introduce him to anyone, Mr. Kwon?
23 A.   I don't recall introducing him to any of the brothers.  He
24 knows --
25 Q.   He knows them by face from speaking at the Dar al-Arqam,

**J.A. 1373**

1229

**Kwon - cross**

1  right?

2  A.   Correct.  He knows them by face.  I think some of them he

3  knows also in person, you know.

4  Q.   You think?

5  A.   I mean, I can't say for everybody.  I know he knows Royer.

6  You know, I know that he knows Masaud.  I know that he knows

7  Mahmood.

8  Q.   So then at some point in time, Al-Timimi started to talk,

9  right?

10  A.   Correct.

11  Q.   And he started talking about the situation of Muslims in the

12  United States, correct?

13  A.   I seem to recall him saying something about our, you know,

14  our situation of Muslims.  I think similar things, like the dawa

15  is finished or something like that.

16  Q.   He gave the same speech that he gave at the Dar al-Arqam on

17  September 11, which we've already gone through, right, which was

18  that you should be safe, correct?

19  A.   I remember him saying -- that was part of his talk, also.

20  Q.   He told you again at your house the same things he told you

21  at Dar al-Arqam, that the time for Islam in the United States was

22  finished, right?

23  A.   I seem to recall him saying something like dawa is finished

24  in the United States.

25  Q.   And he told you that women shouldn't go outside with their

**J.A. 1374**

**Kwon - cross**

1  veils on, right?

2  A.    I don't remember details, but I remember pretty much some of

3  the things were the same things that he talked about there at Dar

4  al-Arqam on 9/11.

5  Q.    He told you to go out for necessities only, for work or for

6  groceries, right?

7  A.    I mean, I don't remember that exactly but, you know,

8  something like, something like that, I guess.

9  Q.    And he told you that the time -- that you should be on guard

10 for anti-Muslim violence in the United States, correct?

11 A.    I don't recall if he said that.  He might have.

12 Q.    Well, that was, that was the reason for needing the plan,

13 right?

14 A.    Right.

15 Q.    Do you remember him discussing -- did you -- strike that.

16       Did you ask him, "What do I need to do to help get this

17 plan together, Mr. Al-Timimi?"

18 A.    Well, the plan never materialized because, you know, the

19 topic shifted to Afghanistan.  At one point, some -- one of the

20 brothers asked him about Afghanistan.

21 Q.    All right.  So Ali Al-Timimi --

22       MR. KROMBERG:  Objection, Judge.  Let the witness answer

23 the question.

24       THE COURT:  Sustained.

25       MR. MAC MAHON:  Go ahead.  I'm sorry, Your Honor.

1231

**Kwon - cross**

1    THE WITNESS:  And I remember he had with him in, like, a
2  blue, blue envelope, postal envelope-type thing, he had Sheikh
3  Uqla's fatwa in Arabic, and I remember him pulling that out and
4  reading.  You know, I don't know if he was translating word for
5  word, but he just started talking about, you know, Afghanistan.
6  BY MR. MAC MAHON:
7  Q.    He wasn't talking about Afghanistan until someone asked him a
8  question, right?
9  A.    That's what I seem to remember.
10  Q.    All right.  You told the grand jury, question on page 54 of
11  the grand jury --
12    MR. KROMBERG:  Objection, Judge.  That's not the proper
13  way to either impeach or --
14    THE COURT:  Sustained.
15  BY MR. MAC MAHON:
16  Q.    So that your, your testimony is that he did not on his own
17  bring up Afghanistan at all, correct?
18  A.    Correct.  I seem to remember somebody asking specifically
19  about Afghanistan.
20  Q.    And did you tell him before he came over that it would be a
21  good idea for him to bring some fatwas with him?
22  A.    No, I don't remember telling him that.
23  Q.    He just happened to have it in his, in his pocket?
24  A.    He had it with him, this envelope-type thing.
25  Q.    Who asked the question about Afghanistan?

1232

**Kwon - cross**

1  A.    I'm not exactly sure, but I think it was either -- I think it

2  was either Masaud or Ismail Royer.  I can't seem to remember

3  which, which one.

4  Q.    Was it Masaud Khan?

5  A.    He might have been, because I know it was -- I think it was

6  one of the brothers sitting next to him.  I know Royer was to his

7  left, and Masaud was to his right, and I remember one of -- the

8  way I remember, I don't remember exactly who, but somebody who was

9  sitting next to him had asked this question.

10  Q.    What was the question?

11  A.    "What about Afghanistan?"  I don't remember word for word,

12  but, you know, "What about Afghanistan?"

13  Q.    What does Afghanistan have to do with the plan to go to the

14  mountains with canned food and water?

15  A.    Nothing.

16  Q.    So what was the question?

17  A.    I guess the brothers wanted to know what, what's Islamic --

18  as Muslims, how you should view this Afghanistan issue.

19  Q.    Is that the question you remember someone asking him?

20  A.    Yeah.  I remember it was something like, "What about

21  Afghanistan?," or something like that, and then Ali Timimi went

22  into this thing.

23  Q.    And then he just, he just happened to have a fatwa with him,

24  right?

25  A.    Correct.

## Kwon - cross

1  Q.    Okay.  And this is the Uqla fatwa that you testified to a few

2  days ago?

3  A.    Yes.  I mean, I don't know if -- that's what -- I remember

4  Ali Timimi saying this was Sheikh Uqla's fatwa.

5  Q.    You've never even seen that fatwa, have you?

6  A.    I mean, I saw it in his hand, but I -- me personally after

7  that, I'd never seen it.

8  Q.    The FBI has shown it to you, haven't they?

9  A.    No.  I can't read Arabic, so, I mean, I mean -- I can't read,

10  but I don't understand what it says.

11  Q.    So you haven't seen whether there is a fatwa by Sheikh Uqla

12  that says that it's obligatory for all Muslims to go defend the

13  Muslims and the Taliban, right?

14  A.    At that point, you know, I mean, Ali Timimi said it, so why

15  should he -- why should he make it up, you know?

16  Q.    Did you ask him to see it?

17  A.    Never known him to lie.

18  Q.    Did you ask him if you could see it?

19  A.    No.  It was in Arabic.  There was no point for me to look at

20  it.

21  Q.    There was somebody else there that spoke Arabic, wasn't

22  there?

23  A.    Yes.

24  Q.    Have you talked to Mr. Aatique about the Uqla fatwa?

25  A.    While in jail?

**Kwon - cross**

1  Q.    Yes.

2  A.    Yes, we talked a little bit about it.

3  Q.    And he told you there's nothing in the Uqla fatwa about

4  assisting Mullah Omar, is there?

5         MR. KROMBERG:  Objection, Judge.  This is calling for

6  hearsay about what Mr. Aatique said is in the Uqla fatwa.

7         THE COURT:  Well after the time of the conspiracy.  I'll

8  sustain the objection.

9         MR. MAC MAHON:  Okay.

10 Q.    So you made no effort at any time to get ahold of this fatwa

11 yourself in English and read it, right?

12 A.    No.

13 Q.    You just had to blindly obey whatever Ali had said, right?

14 A.    I mean, why would I -- there's no reason for him to make it

15 up.

16 Q.    And you testified that he told you that Mullah Omar had

17 issued a call for troops to come to Afghanistan?

18 A.    I seem to remember something like, something like the amir of

19 Afghanistan has asked for assistance.

20 Q.    And you were, you were pretty closely watching the news at

21 that time yourself, weren't you?

22 A.    I was watching some news, not a whole lot.

23 Q.    You were on the Internet reading your Muslim websites,

24 weren't you?

25 A.    Correct.

1235

**Kwon - cross**

1  Q.   And you never saw on any of your websites a call by Mullah

2  Omar for Muslims to come to Afghanistan and defend, did you?

3  A.   No.

4  Q.   So when, when Ali Timimi said that, you didn't -- that didn't

5  strike you as something inconsistent with everything you had

6  learned since 9/11?

7  A.   I mean, just because I didn't read it doesn't mean it didn't

8  happen.  I thought at the time it was part of the fatwa, you know.

9  I mean, he was reading from it.  It was Arabic.

10       I mean, like I said, I don't know if he was translating

11  it word for word or putting his own opinions into it, but I seem

12  to recall him mentioning something, amir of Afghanistan has asked

13  for assistance, which makes it obligatory.

14  Q.   Okay.  So you -- but you've never seen this fatwa, right?

15  A.   Correct.

16  Q.   Okay.  Did Al-Timimi tell you that he was supportive of the

17  fatwa?

18  A.   I mean, he was reading it.  I mean, he pulled it up.

19  Q.   So you assumed that he was supportive of it, right?

20  A.   I mean, yeah.  Why else would he read it to us?

21  Q.   Well, he never told you that he was supportive of the fatwa.

22  It was just something that you assumed, correct?

23  A.   Yeah, I guess you could say that.

24  Q.   And when you went to his lectures at Dar al-Arqam, he would

25  often give multiple views of the same situation, wouldn't he, as

**Kwon - cross**

1  an educator for you to see that there were different people saying

2  different things about it, right?

3  A.   Correct.  But that night, he didn't quote any different view

4  on Afghanistan, and later, when he told us that we need to do

5  three things, you know, and that we need to repent and leave

6  United States and join the mujahideen, I remember him saying that

7  it doesn't matter where you go, you know.

8  Q.   Was he reading that from the fatwa, too?

9  A.   No, I don't think so.

10 Q.   Had he put it down by that time?

11 A.   I believe so.

12 Q.   Why didn't you ask him why he wasn't going overseas if it was

13 obligatory on all Muslims to go overseas?

14 A.   I don't know.  He is -- I mean, not everybody was going.  Not

15 even all the brothers who were there were going.  So everybody had

16 their own reasons.  I'm not, I'm not in any position to ask Ali

17 Timimi, you know, why isn't he going.

18 Q.   He tells you that you, Yong Kwon, have an obligation to fly

19 halfway around the world and defend people, and you don't ask him

20 why you don't have the same obligation?

21 A.   I guess take it, you know -- I don't recall asking him about

22 why he himself wasn't going.

23 Q.   That thought didn't cross your mind at all?

24 A.   Not really.

25 Q.   And did he at that, at that night tell you that the -- read

1237

**Kwon - cross**

1  to you about the signs of the end of time and the final battle and

2  all of these other Islamic issues about the end-of-time battle?

3  A.   I don't recall.  Again, this is something that Aatique had

4  told me in jail, but I don't recall him.  That doesn't mean that

5  it didn't happen.  I just, you know, my memory is not perfect.  So

6  I just remember what I remember.

7  Q.   You don't have any recollection of any discussion of the

8  battle of the end of time being discussed, right?

9  A.   I don't recall.

10  Q.   And did he tell you that night that the anti-Christ was going

11  to appear in Mecca and there was going to be a great battle

12  between the Jews and the Christians?

13  A.   I don't remember him saying that at my house.

14  Q.   That was -- did you hear him say the United States was going

15  to flatten Afghanistan that night?

16  A.   I don't know about those exact words, but, you know, that the

17  attack on Afghanistan by the United States was imminent.

18  Q.   And that he told you they were going to use the 9/11 attacks

19  as an excuse to start another war against Muslims, correct?

20  A.   I seem to remember something like that.

21  Q.   Now, he -- you say he told you to repent first.  What does

22  that mean?

23  A.   Well, you know, we -- we all make sins, you know.  We all

24  commit sins.  So, you know, we always need to repent to, you know,

25  purify ourselves.  So he said, "Repent, you know, and leave the

**Kwon - cross**

1  United States, and go join the mujahideen if you can."

2  Q.   Okay.  And he'd already told you that you should go to Korea,

3  hadn't he?

4  A.   Yes.  Actually, at that meeting, he also mentioned Korea

5  again.  I remember him saying that since I'm Korean -- he told

6  Mahmood that since he's Pakistani, he shouldn't have any problem

7  getting into Pakistan, but since I'm Korean, it might be hard.

8  Being a Korean, I would have no business being in Pakistan.  So he

9  said, you know, "Maybe you can still go to Korea.  It's still

10  better than United States -- staying in the United States."

11  Q.   Why would he be advising you to go to Korea if the message

12  was that you had to go to Afghanistan?

13  A.   I mean, the last message I remember him saying is, "Repent.

14  Leave the United States, and join the mujahideen if you can," you

15  know.

16  Q.   Anywhere in the world, right?

17  A.   Right.

18  Q.   And he gave you three options as an Islamic scholar that you

19  could do to deal with this situation you found yourself in, right?

20  A.   Three opinions?

21  Q.   Three different options he gave you, correct?  Is that your

22  testimony?

23  A.   No.  He said, "First, you have to repent, and after you do

24  that, if you can, try to leave United States, and if you can do

25  that, then try to join the mujahideen."  That's what he, he said.

**Kwon - cross**

1  Q.   So he said if you can't leave the United States, then you

2  should go join the mujahideen somewhere else in the world?

3  A.   No, no, no.  I mean, "If you can't leave the United States,

4  then at least you should repent.  No. 1 everybody should do, and

5  if you do that, do No. 2, which is leave United States.  If you're

6  able to do that, then try to do No. 3, which is to join the

7  mujahideen."

8  Q.   All right.  That's what he told you that night?

9  A.   Correct.

10  Q.   Did you repent?

11  A.   Yes.

12  Q.   Did you make plans to try to go to Korea?

13  A.   No.  I made plans to go to Pakistan with Mahmood.

14  Q.   All right.  And you -- he also mentioned that you might go to

15  Indonesia, correct?

16  A.   Actually, I don't recall him mentioning Indonesia.

17  Q.   Well, you were born in Indonesia, correct?

18  A.   Correct.

19  Q.   All right.  And when he was talking about you going to Korea,

20  he was talking about hijra, wasn't he?

21  A.   Hijra is when you go to another -- when you migrate to a

22  Muslim country.  Korea is not a Muslim country.

23  Q.   Did you ever hear him discuss hijra that evening?

24  A.   Yes.  I believe No. 2, leave the United States, make hijra,

25  but in my case, since I'm from Korea -- my parents are from Korea,

**Kwon - cross**

1  you know, it's easy for me to go back.  So at least go to Korea.

2  It's better than staying here.

3  Q.    But he also told you, he mentioned Indonesia because you have

4  some heritage in Indonesia, and that's a Muslim country as well,

5  right?

6  A.    Yeah, Indonesia is a Muslim country, but I don't recall him

7  mentioning Indonesia.

8  Q.    But you do recall him talking about hijra at that dinner?

9  A.    Yes.

10  Q.    Okay.  And there came a time that Sherdil and Nabil showed

11  up, correct?

12  A.    Correct.

13  Q.    Okay.  Why did you let these guys in the house?

14  A.    Well, I had invited Nabil earlier.  I mean, I had invited

15  Nabil when I sent out those e-mails, and I believe he even called

16  me, like, earlier that day that he's coming, and he mentioned

17  Sherdil, but at that point, you know, I thought the talk was going

18  to be just about this plan, and I didn't know that Ali Timimi was

19  going to come, either, so -- at that point earlier that day.  So I

20  told him to just come over, you know.

21        He said he was with Sherdil.  So I said, "Come over."

22  Q.    What was the -- the discussion had just begun when Nabil

23  showed up, correct?

24  A.    I don't know at which point the discussion was.

25  Q.    Well, Ali Al-Timimi was still talking about the problems that

**Kwon - cross**

1  Muslims were going to face in the United States when Nabil showed

2  up, correct?

3  A.   No.  I don't -- that's not the way I recall it.  The way I

4  recall it, he was talking about something else.

5  Q.   What was he talking about?

6  A.   I don't know at which point, but I remember when Nabil came

7  in, he abruptly wrapped up his, his talk, and he was actually

8  trying to leave, you know?

9  Q.   He was trying to leave?

10 A.   Right.

11 Q.   Ali Al-Timimi was trying to leave?

12 A.   Correct.

13 Q.   Because he didn't know Sherdil any better than he knew most

14 of the people at your house, did he?

15 A.   I think he knew -- I know that he knew some people at my

16 house better than Sherdil.  Sherdil was new.  Ali -- Nabil started

17 bringing him around to Dar al-Arqam just recently at that time.

18 So Sherdil was new to a lot of us, you know?  I don't even know if

19 actually Ali Timimi knew Sherdil or not.

20 Q.   Okay.  Did Sherdil -- well, you let Sherdil in the door,

21 right?

22 A.   Correct.

23 Q.   Okay.  And then as soon as you came in, did you give some

24 kind of hand signal to Al-Timimi:  Stop, stop talking; Sherdil is

25 here?

**Kwon - cross**

1  A.    No.

2  Q.    And then Royer, Mr. Royer took Nabil to the side, correct?

3  A.    Correct.

4  Q.    Right.  And Sherdil actually sat down in the middle of the

5  circle, didn't he?

6  A.    Correct.

7  Q.    And he stayed for a few minutes?

8  A.    Correct.

9  Q.    And Royer had said something to Nabil, and they got up and

10 left?

11 A.    Correct.

12 Q.    And Al-Timimi was not able to hear or see any of that, was

13 he?

14 A.    He was there.

15 Q.    No, when Royer took Nabil away from the room -- right?

16 A.    Correct.

17 Q.    He wasn't able to see that at all?

18 A.    No.

19 Q.    And it wasn't long after that that Al-Timimi left himself,

20 was it?

21 A.    I don't know how much longer he stayed, but if I remember

22 correctly, he stayed actually a little bit, you know, a bit longer

23 after that.

24 Q.    And you took him home, correct?

25 A.    Correct.

**Kwon - cross**

1  Q.   And by the time Al-Timimi left your house, there was no plan

2  for any of you to go overseas and join LET, was there?

3  A.   There were no confirmations.  The confirmation was after I,

4  after I dropped off Al-Timimi and came back, you know, we

5  confirmed that Mahmood, myself, Masaud, and Aatique will also

6  attend the training for a few days, but as for myself, Mahmood,

7  and Masaud, we decided we would go.

8  Q.   So there was no discussion -- there was no agreement by any

9  of you to go to Afghanistan and fight before Al-Timimi left and

10 went home, right?

11 A.   I don't recall any solid answer before he left.

12 Q.   You never even -- in your grand jury testimony, did you even

13 mention Mullah Omar?

14 A.   I don't remember if I did or not.

15 Q.   So it was your plan to go to Afghanistan, wasn't it, sir?

16 A.   Yeah.

17 Q.   All right.  And that plan was one that you agreed to with,

18 with Masaud Khan and Mahmood Hasan after you came back from Ali

19 Al-Timimi's house, right?

20 A.   Correct.

21 Q.   And he never asked you at that meeting to go over to

22 Afghanistan and fight, did he?

23 A.   I mean, he said, you know, he read the fatwa, it's

24 obligatory, and when he told us, "Go overseas and join any

25 mujahideen," he actually mentioned, you know, fighting the Indians

1244

## Kwon - cross

1  and Russians and the Americans.  I mean, from that I took that as
2  to be India and Chechnya and Afghanistan.
3          I mean, our first choice was obvious that if it's
4  obligatory on Muslims, then we should go to Afghanistan.
5  Q.   That's what you assumed that he meant, right?
6  A.   That's what I understood from his talk.
7  Q.   Okay.  You -- when you came home, the topic in your house was
8  what was everybody going to do, right?
9  A.   Correct.
10  Q.   Okay.  And you were at your house for at least three hours
11  with everybody else after Al-Timimi left, didn't you?
12  A.   We were there for a while I remember.  We were there for a
13  while because I remember some brothers leaving very late.
14  Q.   And that's when the discussion took place, after Ali left,
15  about what everybody was going to do, correct?
16  A.   Correct.
17  Q.   And it was after 1:00 in the morning Monday -- strike that.
18          What time was it you think Al-Timimi left your house?
19  A.   I don't know.  Maybe ten.
20  Q.   You took him straight home?
21  A.   Yes.
22  Q.   And what did you talk to him about in the car on the way
23  home?
24  A.   I don't remember much.  Only thing I remember Ali Timimi
25  telling me is when the brothers leave my house, that we shouldn't

## Kwon - cross

1  leave all together in a big group, that the brothers should leave,

2  you know, in ones or twos, with some time interval in between.

3  Q.   That's what you told the brothers to do when you came home,

4  isn't it, Mr. Kwon?  That's nothing Ali Timimi told you.

5  A.   That's what he told me.  That's what he advised me actually

6  when I was taking him home.

7  Q.   Is that all he told you on the way home?

8  A.   I don't -- that's the only thing I remember that sticks in my

9  mind.

10  Q.   So your recollection would be that he was home by 10:00

11  approximately?

12  A.   Approximately, yeah.

13  Q.   And then you -- it was after you came back that it turned out

14  that Masaud Khan had with him a Cabela's catalog, correct?

15  A.   Correct.

16  Q.   And how did that subject come up?

17  A.   I don't know exactly.  I guess we were talking about

18  preparation to go to LET.  We knew that it's in the Himalayan

19  region, so we knew that it's in the mountains.  I didn't have any

20  heavy-duty winter jacket.  I remember him pulling it out from his

21  jacket and showing us the catalog.

22  Q.   Were you surprised that Mr. Khan had with him a Cabela's

23  catalog page at your house that he pulled out after Dr. Al-Timimi

24  left?

25  A.   Somewhat.

1246

**Kwon - cross**

1  Q.    You were surprised?

2  A.    Right.  I mean, he had it in his pocket, you know, so --

3  Q.    Did you ask him, "What made you think to bring that,

4  Mr. Khan?"

5  A.    I don't remember asking him that.  I remember saying, "That's

6  a good jacket."  I ordered three of them.

7  Q.    Did you think it was an incredible coincidence that he had

8  this catalog page with him for a jacket in the Himalayas when this

9  subject just popped up at your house?

10 A.    I mean, you know, maybe he was looking to buy a jacket even

11 before then, I don't know, but he had -- I just remember he had

12 the catalog with him, because I remember taking the whatever, the

13 item number and everything from that piece of catalog, and I made

14 the phone call to order those jackets.

15 Q.    So you never had any discussion with him about how is it that

16 you happen to have this with you at my house?

17 A.    No.

18 Q.    Did anybody else ask him, "How is it, Mr. Khan, that you have

19 a Cabela's catalog for a jacket in the Himalayas?"

20 A.    I mean, it's not a jacket for Himalayas, but I don't recall

21 anybody asking him that actually.

22 Q.    That was your intention with the jacket was to go wear it in

23 the Himalayas, wasn't it?

24 A.    To wear it overseas, yes.

25 Q.    Right.  And Mr. Kromberg showed you that jacket before,

**J.A. 1391**

1247

**Kwon - cross**

1  correct?

2  A.   Correct.

3  Q.   And that's the exact same jacket that Mr. Khan ordered the

4  night before, isn't it?

5  A.   Yes.  I mean, I didn't know that he ordered the night before.

6  I knew that he had the same jacket.  I mean, obviously, because

7  when we were overseas, he was wearing it.

8  Q.   And when you were overseas, did you ask him, "How is it that

9  you have the same jacket that I have, Mr. Khan?"

10  A.   No.  Because I ordered it because I remembered that night, he

11  said he was either going to -- I thought he said he was going to

12  order -- I always thought that he ordered after the meeting.  So I

13  knew that he was ordering it.  So I was, like, okay.  I'll order

14  some too, you know.  I remember even talking about the color, that

15  the green will blend in into the --

16  Q.   When did you have that discussion with him?

17         MR. KROMBERG:  Objection, Judge.  Let the witness finish

18  his answer.

19         MR. MAC MAHON:  I thought he was finished, Your Honor.

20  I apologize again.

21         THE COURT:  Sustained.

22         THE WITNESS:  I just remember that we even talked about

23  what color, because it had, like, three colors, that we'll get

24  green, and they have a blend as well, and where we're going and

25  things like that.

1248

**Kwon - cross**

1  BY MR. MAC MAHON:

2  Q.   Now, did you, did you pick the same color that Mr. Khan had?

3  A.   Yes, we all picked green.

4  Q.   Did he tell you when his was due to arrive in the United

5  States?

6  A.   No.  We rushed -- I remember I rush-delivered it because I

7  knew that I might be leaving soon, so -- I think also he must have

8  rush-delivered his, also.

9  Q.   Well, he didn't have it with him that night, did he?

10 A.   No, he didn't have it with him that night.

11 Q.   He hadn't even purchased it yet, had he?

12 A.   I mean --

13      MR. KROMBERG:  Objection.  This has been asked and

14 answered a few times already.

15      THE COURT:  Sustained.

16 BY MR. MAC MAHON:

17 Q.   Do you remember on the night of the 16th Al-Timimi telling

18 Royer he could go back to Bosnia since he was married to a Bosnian

19 woman?

20 A.   He might have, but I don't recall.  I don't recall that.

21 Q.   Now, did -- you testified that when someone mentioned LET at

22 the house, that Ali Al-Timimi said, "You guys should talk to

23 Royer."  Was that your testimony?

24 A.   Yes.  I seem to remember telling the FBI something like that.

25 Q.   Okay.  That's not what happened, though, is it?

**Kwon - cross**

1  A.   I remember when the subject -- what I recall when the subject

2  of LET came up, I remember Royer saying that he can, you know, he

3  can help us make the contacts to get there.  Because I remember

4  the subject of LET came up because we were talking about how you

5  need some training before you get to, get to the front lines.

6          THE COURT:  Now, when did this discussion come up?

7  While the defendant's still there, or had he left?

8          THE WITNESS:  He was there.  He was still there.

9  BY MR. MAC MAHON:

10  Q.   Okay.  Royer was the one who brought up LET, wasn't he?

11  A.   I don't exactly recall who brought up LET, but I know that

12  Royer is the one who said, you know, "I have the contacts."

13  Q.   Sure.  Royer -- and this wasn't news to you, was it?

14  A.   No.  I don't think it was news to any of the brothers, I

15  mean, most of the brothers.

16  Q.   Royer said, "I can -- I know who to talk to.  I know how to

17  get there.  I know everything else," right?

18  A.   He said he can help us get there, he had the contacts.

19  Q.   And that wouldn't have been a surprise to Mr. Aatique, who

20  was there, either, would it?

21  A.   No.

22  Q.   Or Mr. Hamdi?

23  A.   Ibrahim wasn't there.

24  Q.   Ibrahim wasn't there, excuse me.

25          Just a second, Your Honor.

## Kwon - cross

1          Now, you -- the discussion went on for -- what time did
2   you go to bed on the night of -- on the morning of September 17?
3   A.   I don't remember exactly what time, but it was pretty late.
4   Q.   Okay.  It was after 1:00 in the morning when you got online
5   and ordered your jackets, right?
6   A.   The way I recall it, I think I called on the telephone to
7   order the jackets, if I remember correctly, but it was pretty
8   late.  It was pretty late.
9   Q.   And you told the FBI that while Al-Timimi was at your house,
10  he told you to make up a story of going to a wedding?
11  A.   Oh, no, that's -- he didn't tell us that.  We came up with
12  that on our own, Mahmood and myself.
13  Q.   You made that story up yourself, right?
14  A.   Correct.
15  Q.   In the morning, you got up, and you went down to the
16  Pakistani embassy with Mahmood Hasan, right?
17  A.   Right.
18  Q.   And it was your intention that morning to lie to the people
19  at the embassy, wasn't it?
20  A.   I mean, that's the story Mahmood and I worked out when we
21  went to the embassy to request the visa.
22  Q.   What did you talk about with Mr. Hasan as you drove down to
23  the embassy?
24  A.   I don't remember any specific conversation.  I remember
25  looking for the embassy, you know.

1251

**Kwon - cross**

1   Q.    You don't remember any discussion?

2   A.    I mean, there was a lot.  We talked a lot, you know, because

3   we had decided on going, and, you know, we -- I don't exactly, you

4   know, but I'm sure we started talking about preparations, what we

5   need to do first, get the visa, get the tickets, you know, stuff

6   like that.

7   Q.    It was your intention that morning to go to Pakistan to the

8   LET camp, correct?

9   A.    Correct.

10  Q.    Something you'd been talking about doing for at least a year,

11  right?

12  A.    I mean, we talked about LET, but I didn't have any set plans

13  to go to LET until that, until that night.

14          MR. MAC MAHON:   If I could have just a second, Your

15  Honor?

16  Q.    Now, when you got to the Pakistani embassy, did you -- was

17  there a visa form for you to fill out?

18  A.    Yes.

19  Q.    And you filled that form out falsely, didn't you?

20  A.    As far as the purpose of the trip, I believe I lied on the --

21  I put "wedding."

22  Q.    All right.  And Ali Al-Timimi had nothing to do with you

23  putting a false statement that you were going to a wedding on your

24  form, did he?

25  A.    No.

1252

## Kwon - cross

1  Q.   So when you told the FBI that Al-Timimi told you to have a

2  cover story that you're going to a wedding in Pakistan, that was a

3  lie, wasn't it?

4  A.   No.  That was later, when we had lunch with Ali Timimi on the

5  19th.  He asked us if we had a cover story, and I said -- we said,

6  "Yes, we have a cover story."

7  Q.   Do you remember testifying in the Khan trial, sir?

8  A.   Yes.

9  Q.   Did -- and you were asked -- this is at page 1553 and -54.

10      "How did it happen that you had" --

11          THE COURT:  Wait.  Mr. MacMahon, it's too difficult to

12  hear you.

13          MR. MAC MAHON:  Oh, I'm sorry, Your Honor.

14          THE COURT:  And you should really have a copy of the

15  transcript for the witness, all right?

16          MR. MAC MAHON:  Okay.

17          THE COURT:  Whenever anyone is going to use a

18  transcript, that way everybody can be sure what's being read is

19  accurate.  I should have one, too.

20          MR. MAC MAHON:  I can do this after lunch, Your Honor,

21  and get copies for everybody.

22          THE COURT:  All right.

23  BY MR. MAC MAHON:

24  Q.   You weren't able to get your -- you weren't able to get your

25  visa issued that day, were you?

**Kwon - cross**

1  A.   No.

2  Q.   Okay.  And you actually participated in this process of

3  filling out the visa form, didn't you?

4  A.   Correct.

5  Q.   Okay.  And Mahmood Hasan didn't do everything, did he?

6  A.   No.  I remember I wrote -- I filled out my application, and

7  he told me to put "wedding" for the trip, and I put "wedding."

8  Q.   Mahmood Hasan told you that?

9  A.   Yes.  And he took care of the rest.  You know, he was talking

10 to those guys at the embassy in Urdu.

11 Q.   In Urdu, is that what you said, sir?

12 A.   Um-hum.

13 Q.   Could you understand what he was saying?

14 A.   No.

15 Q.   You don't speak Urdu at all, do you?

16 A.   No.  I mean, now I understand a little bit, but at that time,

17 I had no idea.

18 Q.   And you told the embassy that Mahmood Hasan was getting

19 married and you were going along as a friend, right?

20 A.   Correct.

21 Q.   And that was a lie, wasn't it?

22 A.   Correct.

23 Q.   And then you got in your car, and you took Mr. Khan up to

24 Pennsylvania, didn't you?

25 A.   On the night of the 18th, yes.

1254

## Kwon - cross

1  Q.   And you took Mr. Khan up to Pennsylvania so that he could
2  meet up with Mr. Aatique, right?
3  A.   Correct.
4  Q.   And you didn't talk to Ali Al-Timimi after that on the Monday
5  at all, did you?
6  A.   I don't recall talking to Ali Timimi.
7  Q.   All right.  You didn't talk to him on Tuesday or Wednesday,
8  either, did you?
9  A.   No.
10 Q.   You didn't apprise him of the progress of your plans, that
11 you'd been to the embassy and you didn't get a visa?  You didn't
12 tell him that on Monday, did you?
13 A.   No.
14 Q.   And you drove Mr. Khan up to meet Mr. Aatique, right?
15 A.   Yes.  I drove Mahmood's car.  Mahmood was with me, and I
16 don't know why I was driving.  Maybe Mahmood was tired.
17 Q.   Okay.  And the purpose of you taking him up there was to
18 assist him in going overseas to an LET camp, right?
19 A.   Correct.
20 Q.   What time did you get to Mr. Aatique's house?
21 A.   I remember it being very late, maybe 3:30-4:00 in the
22 morning.
23 Q.   And you say you went to bed for a little while?
24 A.   Yes.  I remember sleeping for, like, an hour, hour and a
25 half, getting up.

1255

## Kwon - cross

1  Q.   And you -- when in the morning you got up, you knew that
2  Mr. Aatique already had plane tickets, right?
3  A.   Correct.
4  Q.   And Mr. Khan took care of all his travel arrangements
5  himself, right?
6  A.   Right.
7  Q.   Al-Timimi didn't help him to your knowledge at all in getting
8  his plane tickets, right?
9  A.   No.
10 Q.   And you gave Mr. Aatique some advice on how to behave in the
11 airport so he wouldn't get caught, right?
12 A.   I remember -- the only thing I really remember is he had
13 these boots that he wanted to take with him, and it was camouflage
14 boots.  So I remember telling him, you know, "I wouldn't take that
15 if I was you."
16 Q.   So you were giving him advice on how to get to the camps
17 undetected, sir?
18 A.   I was just giving advice so that he won't get into trouble
19 when he was still at the airport.
20 Q.   Right.  You wanted him to be able to get to the camp
21 undetected, right?
22 A.   Correct.
23 Q.   And so you gave him advice as to how to do that?
24 A.   Yeah.  I didn't want him to get into trouble, you know.
25 Q.   And you told him that he and Masaud should stay apart from

**J.A. 1400**

1256

**Kwon - cross**

1   each other as much as they could, right?

2   A.   That's something they came up with, that they will travel as

3   if they didn't know each other.

4   Q.   That's something that they discussed on the morning of

5   September 18?

6   A.   I guess that would make it September 19, on Wednesday.  17th,

7   18th, 19th.  Yeah, I seem to remember them talking about -- I

8   think it was Masaud actually who said that once they get to

9   airport, they'll travel as if they didn't know each other.

10  Q.   Do you have a specific recollection of that conversation?

11  A.   I remember something, something like that.

12  Q.   What did you say when you heard that?

13  A.   I don't know.  I don't remember, but it seemed like a good

14  idea.

15  Q.   Well, you knew in your mind that Khan had actually been

16  overseas and made it to a camp undetected before, right?

17  A.   Yes, long time ago.

18  Q.   Right.  But you thought that was -- he had experience in

19  these matters, correct?

20  A.   I mean, I don't know if it's experience, but it just, it

21  seemed wise, you know, that they travel different.  The tickets

22  were bought at different times, and, you know, it just seemed

23  wise.

24  Q.   What else do you remember Mr. Khan saying as to what advice

25  he would have on how to reach the camps undetected?

1257

## Kwon - cross

1   A.   Nothing really.  The only thing I remember is Aatique had

2   these boots, and we're telling him, you know, "You don't want to

3   take anything suspicious, you know, especially after 9/11," you

4   know.

5   Q.   Okay.  So on that same day, you also remember a discussion of

6   someone saying, "Don't carry anything suspicious with you as

7   well," right?

8   A.   Yeah.

9   Q.   And this is before you have lunch a day or two later with

10  Al-Timimi, right?

11  A.   Correct.

12  Q.   Did -- was there a discussion from -- between Mr. Khan and

13  Aatique about what to do if they were actually caught at the

14  airport?

15  A.   No, I didn't hear them talking about that.

16  Q.   Did you hear them say they should cry and ask for their

17  mothers?

18  A.   No.

19  Q.   Ask for a lawyer?

20  A.   No.

21  Q.   Anything else that you remember Mr. Khan saying as to good

22  advice as to how to reach a camp undetected?

23          MR. KROMBERG:  Objection, Judge.  Asked and answered.

24          THE COURT:  Sustained.

25  BY MR. MAC MAHON:

**J.A. 1402**

1258

**Kwon - cross**

1  Q.   Then you drove back to Northern Virginia, right?

2  A.   Correct.

3  Q.   You didn't take them to the airport, did you?

4  A.   No.

5  Q.   Okay.  And then you met Mr. Royer, didn't you?

6  A.   I met him that night, I believe.  Yes.

7  Q.   Okay.  And you, you and Mr. Royer went to a 7-Eleven,

8  correct?

9  A.   Correct.

10 Q.   And you bought a calling card so that you could call

11 Pakistan, right?

12 A.   He -- well, I gave him the money, but he went in and bought

13 the calling card.

14 Q.   Well, the two guys you gave coats to, you gave them those,

15 too, right?

16 A.   Two guys -- I'm sorry?

17 Q.   You bought three coats on the night of September 16, right?

18 A.   Right.  So, yes.  Hammad also came by.  I can't remember if

19 it was before I met Royer or after I met Royer.

20 Q.   And you gave them the coats.  You didn't charge them for

21 them, did you?

22 A.   No.

23 Q.   So you gave Mr. Royer the money to buy the calling card as

24 well?

25 A.   Correct.

1259

## Kwon - cross

1  Q.   Is this all money your father had given you, Mr. Kwon?

2  A.   No.  It was money that -- I was working.

3  Q.   Okay.  So, so why did you use a calling card at the 7-Eleven?

4  A.   That's Royer's idea.  He said he can make a call, that he

5  should -- he needs a calling card.  So we went to the 7-Eleven, I

6  gave him the money, he bought the calling card, we went to a pay

7  phone that's around the corner of a 7-Eleven, and he called them.

8  Q.   Why didn't you just use your house phone, Mr. Kwon?

9  A.   We don't want to do that.  I mean, like I said, you know, at

10 that time, we were paranoid, I guess you could say, and I didn't

11 want any phone calls going out of my house to LET office in

12 Pakistan, you know?

13 Q.   Was that the same paranoia you had on September 11, when you

14 sent out the cryptic e-mail, Mr. Kwon?

15 A.   Yeah.

16 Q.   So Mr. Royer calls Pakistan from outside of a 7-Eleven in

17 Fairfax, Virginia, right?

18 A.   Correct.

19 Q.   That blurry picture that we saw it feels like a few days ago?

20 A.   Yeah, correct.

21         THE COURT:  It was a few days ago.

22         MR. MAC MAHON:  Thank you, Your Honor.

23 Q.   And in that phone call, you overheard Royer talking to

24 someone in English in Pakistan, right?

25 A.   I recall him talking to somebody in English, yes.

**J.A. 1404**

1260

**Kwon - cross**

1  Q.   And then he said, "I'm sending two already, and there are two

2  more who are soon to come," correct?

3  A.   I don't remember exactly what he said.  I just remember him

4  giving them our kunyas, and then he at one point gave me the

5  receiver, where I talked to, talked to the person for a few

6  seconds.  I gave the phone back to Ismail.

7  Q.   Okay.  You do recall that he told the person on the other end

8  of the phone that there were two people he was sending who were

9  already on the way, right?

10 A.   Something like that.  He told them that we are coming, you

11 know.

12 Q.   All right.  And he gave that person on the other end of the

13 phone a description of Mr. Khan, correct?

14 A.   Correct.

15 Q.   And he gave him a description of Mr. Aatique?

16 A.   Correct.

17 Q.   And he gave them the kunya, the false name that they would

18 use when they got off the plane?

19       MR. KROMBERG:  Objection to the mischaracterization of a

20 false name, Judge.  We never heard that it was a false name.

21       THE COURT:  Alternate name.

22 BY MR. MAC MAHON:

23 Q.   The alternate name, excuse me.

24 A.   Actually, I don't remember him mentioning Aatique.  From what

25 I recall, he mentioned Khan, myself, and Mahmood, and I remember

**J.A. 1405**

1261

**Kwon - cross**

1  him giving them our kunyas, but I don't remember any Aatique in

2  that phone conversation.

3  Q.    Okay.  And in this call, did you -- at this time, did you ask

4  Mr. Royer whether it was legal for you to be going over to LET?

5  A.    At this point, no, I didn't ask him.  I had asked him, like,

6  that before, way before.

7  Q.    When was that?

8  A.    Earlier, maybe late 2000/early 2001.  I remember asking him

9  when he first told me of -- when he first told me about LET and if

10  I knew any brothers who would like to go, and I said, "Okay," and

11  I told him, "Isn't that, like, kind of illegal?"

12         And he said no.  He said that LET's not on the foreign

13  terrorist list or whatever the U.S. government has.  It's

14  perfectly okay.

15  Q.    All right.  And he told you he was the best evidence he could

16  think of that it was --

17  A.    He was an example, yeah.

18  Q.    He used himself as an example?

19  A.    Right.

20  Q.    And you told the FBI that Royer was a walking advertisement

21  for LET, didn't you?

22  A.    Yes.  I don't know about outside, but as far as Muslim

23  brothers are concerned, he didn't hide the fact.  It seems to me

24  he was making it known, you know, that he's an LET person, contact

25  for LET.

1262

## Kwon - cross

1  Q.    Okay.  So after -- how long was the phone call that

2  Mr. Royer, you overheard Mr. Royer at the 7-Eleven?

3  A.    Probably a few minutes, maybe five-six minutes.

4  Q.    Okay.  And he gave you -- Mr. Royer gave you a phone number,

5  a contact number for you to use once you got to Pakistan, right?

6  A.    Correct.

7  Q.    And did he tell you to memorize it and throw the paper away?

8  A.    No.  I did it on my own.

9  Q.    That's what you did, right?

10  A.    Correct.

11  Q.    Because you were concerned about the security of having that

12  phone number in your pocket?

13  A.    Correct.

14  Q.    Did you ask him for a reference letter to take to LET?

15  A.    No.

16  Q.    Now, on the day that you -- you still hadn't talked to Ali

17  Al-Timimi, right, when you were at the 7-Eleven?

18  A.    I believe I had a meeting with Ali Timimi that morning --

19  that lunch, it was the day before, which would make it Wednesday.

20  Q.    You think that lunch was on a Wednesday?

21  A.    Yes.

22  Q.    All right.  Now, whose idea -- you bought plane tickets next,

23  right?

24  A.    After we got the visas, I remember on Wednesday buying the

25  tickets.

**J.A. 1407**

**Kwon - cross**

1  Q.    Okay.  He didn't drive you down to get your visa, did he?

2  A.    No.

3  Q.    And you bought round-trip tickets, didn't you?

4  A.    Yes.

5  Q.    And that was Mahmood Hasan's idea?

6  A.    I forget whose idea, but we, we thought that it's a good idea

7  to buy round-trip tickets so we don't look suspicious buying

8  one-way tickets to Pakistan after 9/11, you know?

9  Q.    And Al-Timimi didn't tell you to buy one-way versus a

10  round-way ticket, did he?

11  A.    No.

12  Q.    And you paid cash for those tickets?

13  A.    Yes.

14  Q.    And you paid for Mr. Hasan's ticket as well, didn't you?

15  A.    I might have, but I seem to recall I paid for my own.  Even

16  if I did, he paid me back, because I remember I had some cash with

17  me when I went overseas.

18  Q.    When did he pay you back?

19  A.    I don't know.  I mean, that's if I paid for his ticket,

20  because I withdrew, like, you know, over $2,000, and the tickets

21  were, like, 1,100 something, and I remember I had with me about

22  $1,100 in my pocket when, when I reached Karachi, Pakistan.

23  Q.    Now, you had a luncheon -- let me ask you this, excuse me:

24  You testified before that you didn't tell anyone outside -- other

25  than Royer and the people you were with that you were going to

1264

**Kwon - cross**

1    Pakistan, correct?

2    A.    Outside of the people in my house, no, but I did tell one

3    other person.

4    Q.    Who was that?

5    A.    I told Abdullah Zikria.

6    Q.    So when you testified that no one else knew, did you just

7    forget to mention Abdullah Zikria?

8    A.    No.    At that time, I didn't want to mention his name.    I

9    didn't want to get him involved in this thing.

10   Q.    When did you finally tell the FBI that you had, in fact,

11   talked to a person named Abdullah Zikria before you left for

12   Afghanistan?

13   A.    I don't know the exact date.

14   Q.    Wasn't it April 28, 2003, Mr. Kwon?

15   A.    It could be.    It was later than -- it wasn't in the building.

16   I didn't tell them until later.

17   Q.    It was well before you admitted what happened at the hajj,

18   right?

19   A.    Yes.

20           MR. KROMBERG:    Objection, Judge.    There's no evidence

21   that Mr. Kwon denied what happened at the hajj.

22           THE COURT:    All right, sustained.

23           MR. MAC MAHON:    I'd like to put this up on the screen.

24   Q.    Mr. Kwon, I'm showing you what's a demonstrative exhibit of

25   some of your phone calls.    Do you see that on, on September 19,

**Kwon - cross**

1  you had a phone call with Mr. Abdullah Zikria?  Do you see that?

2  A.    Yes, yes.

3  Q.    Is that the phone call in which you told him you were going

4  to Pakistan?

5  A.    No.  The way I recall, I told him in person.

6  Q.    Okay.  And what was --

7  A.    I wouldn't have said these things on the telephone.

8  Q.    You wouldn't have said these kinds of things over the

9  telephone?

10  A.    No, I wouldn't have said this.

11  Q.    Where did you meet him?

12  A.    I seem to remember telling him in front of Dar al-Arqam

13  during the daytime.

14  Q.    Do you have a recollection as to what day it was?

15  A.    Wow.  No.  All I know is sometime after the dinner and

16  sometime before I left.

17  Q.    And what exactly did you tell him?

18  A.    That I'm going overseas to Pakistan, to LET.

19  Q.    And what was his response?

20  A.    I remember him saying, "Let me, let me drive you to the

21  airport."

22          And I said, "No."

23          The last thing we need is someone who has his appearance

24  driving us to the airport, you know?

25  Q.    Now, Abdullah Zikria is the person whose uncle owned the

1266

**Kwon - cross**

1  field where you played paintball, right?

2  A.   Correct.

3  Q.   And you had tried to invite him to dinner at your house on

4  September 16 as well, right?

5  A.   He could have been.  I mean, I sent an e-mail out to a couple

6  of brothers, and I know that a couple of them didn't show up, so

7  he could have been one of them.

8  Q.   Is that everything you told Mr. Zikria about your trip?

9  A.   No.  I remember telling him about my dinner, what Ali Timimi

10  had said.  I remember telling him that myself and Mahmood has

11  decided to go.  That's it.

12  Q.   You didn't tell him you were going to Afghanistan to fight

13  against Americans, did you?

14  A.   I don't recall telling him that.  I seem to recall telling

15  him we were going to Pakistan to LET, you know.  I'm not sure.  I

16  might have, but I don't think so.

17  Q.   Now, didn't Mr. Zikria tell you that you should talk to

18  Sheikh Jaafar before you left?

19  A.   No, I don't recall him telling me that.

20  Q.   Isn't Mr. Zikria actually an Afghani himself?

21  A.   Correct.

22  Q.   Did you tell him that you were going over there to defend the

23  Afghanis and maybe he should join you?

24  A.   No, I didn't ask him to join.  That's, that's his decision.

25  That's not my decision, you know, to tell people what to do.

1267

## Kwon - cross

1    Q.    Now, you told the FBI on April 28, 2003, that you thought

2    that Mahmood Hasan had told Yousuf Idris about your trip.

3              MR. KROMBERG:  Objection, Judge.  Mr. MacMahon is

4    testifying as to what happened with the FBI.  He should be a

5    witness.  But it's an improper question to say that you told the

6    FBI something.

7              THE COURT:  Well, wait.  First of all, it's time for the

8    lunch break, and then you can rephrase that question when we come

9    back.

10              Ladies and Gentlemen, we have an hour lunch break.

11    Remember all my earlier cautions.  It's a beautiful day.  You

12    might want to get a walk; it's perfectly permissible.  Just be

13    back here by two.  Thank you.

14              (Recess from 1:01 p.m., until 2:00 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1268

## Kwon - cross

1        A F T E R N O O N   S E S S I O N

2        (Defendant present, Jury out.)

3      THE COURT:  All right, Mr. MacMahon, I wanted you to

4 know I did speak with Mary Daugherty (phonetic).  Mr. Khan is

5 being brought up as we speak.  He'll be available in the

6 courthouse for you to talk to this afternoon, all right?

7        That being the case, we're going to have to stop the

8 trial a little on the early side today, 5:00-5:15, in that time

9 frame.  And you talk with him and make your decision whether

10 you're going to call him again or not -- or call him, all right?

11        They were not able to bring any of the other people up,

12 and they're going to have to take him back tonight.  There isn't

13 enough bed space.  The problem is, as I suspected, that there are

14 just not enough spots for prisoners that need to be kept separate.

15        And I don't know why Kwon and Aatique were together, but

16 I've reminded the marshal that they should not, any of these

17 witnesses, be jointly celled so we don't have issues.

18        And, Mr. Kromberg, I have told the marshal that if there

19 is not sufficient space and the defense is going to use some of

20 these witnesses, those of your witnesses who have testified don't

21 need to be in Alexandria.  They can go to Warsaw, and we can bring

22 up witnesses who are yet to testify up here.

23        So there shouldn't be a problem, but I'll leave it to

24 you-all, both of you, to talk with her.  But in any case, I'm

25 willing to -- I mean, how much time do you think you need with

**Kwon - cross**

1    Khan?

2           MR. MAC MAHON:  Not that long, Your Honor.  Half an

3    hour, 45 minutes.

4           THE COURT:  All right.  So if I stop the trial at 5:30

5    then, I mean, you know, I'm trying to keep us going on our

6    schedule, because otherwise, it means the agents are having to

7    take him back tonight, and you know what traffic is like on 95.

8           MR. MAC MAHON:  That should be sufficient, Your Honor.

9           THE COURT:  All right, that's fine.

10          MR. MAC MAHON:  Thank you very much.

11          THE COURT:  All right.  Also, when the jury comes in,

12   I'm going to tell them that we'll not be in session on Friday.  Is

13   there any chance this case would get to the jury this week?

14          MR. MAC MAHON:  I think there is.

15          MR. KROMBERG:  Judge, I have no idea what --

16          THE COURT:  Well, at the rate we're going -- I don't

17   know how much longer -- I mean, frankly, I recognize Kwon is a key

18   witness, so I've given you more leeway than I normally would, but

19   about how much longer do you expect the cross to take?

20          MR. MAC MAHON:  An hour at the most, Your Honor.

21          THE COURT:  And I assume there will be some rebuttal.

22   And then after that, Mr. Kromberg, just a ballpark figure as to

23   how much longer you think the government's case will be.

24          MR. KROMBERG:  There'll be one short witness, the

25   translator, one medium witness, Mr. Ammerman --

1270

**Kwon - cross**

1   THE COURT:  You don't have to tell me who they are

2   unless you want to.  That's all right.

3   MR. KROMBERG:  I think we could get another --

4   definitely almost done -- well, again, if we get on by 3:30, we

5   have a shot at getting to our last witness or two by the end of

6   the day, and then we should finish tomorrow, I would think.

7   THE COURT:  So the defense case might be beginning

8   tomorrow.

9   MR. MAC MAHON:  And I've been warning witnesses to be

10   available, so --

11   THE COURT:  All right.  And you anticipate how long

12   roughly?  A day? two? three?

13   MR. MAC MAHON:  A day or two.

14   THE COURT:  All right, then I'm not telling the jury

15   about not being here on Friday because if we can get the case to

16   them Thursday, then they would come in Friday to deliberate.  So I

17   won't address the Friday issue with them.  It's just I can't be

18   holding court on Friday because of the rest of the docket that

19   day.

20   All right, let's bring the jury in.  And Mr. Kwon can be

21   brought back in.  Thank you.

22                    (Jury present.)

23   THE COURT:  Ladies and Gentlemen, for your planning

24   purposes, because of some logistical issues, we're going to

25   actually stop a little early today, probably around 5:20 to 5:30.

1271

**Kwon - cross**

1  So I just wanted you to know that.

2         And at the present time, I think you need to plan to be

3  here on Friday.  You know, I told you that would be a week-by-week

4  decision, and I think at the present time, at the rate we're

5  going -- and I can tell you why.  If we finish all the evidence

6  and I can get the case to you by Thursday night, then you'd be

7  back here on Friday for deliberation.  If we can't finish

8  everything Thursday, because I have too many prescheduled matters

9  on my docket, I can't actually hold court on Friday with this

10 case.

11        If you're deliberating, I can jump back and forth and

12 see you if you have questions, but I can't be taking evidence or

13 instructing you.  I don't have big blocks of time.  Then you'd

14 have to come back on Monday, but you would not be here on Friday.

15        So it's tentative.  You may or may not have to work on

16 Friday.  It depends on how we move.  But we are still quite ahead

17 of schedule.  So I just did want you to know that, all right?

18        All right, Mr. MacMahon?

19        MR. MAC MAHON:  Thank you, Your Honor.

20 Q.  Mr. Kwon, just a couple of other questions about the dinner

21 at your house.  Could you describe for the jury Mr. Al-Timimi's

22 demeanor while he was speaking to the crowd?

23 A.  I mean, just like any other time he'd give a talk.

24 Q.  All right.  He wasn't screaming and yelling or all agitated

25 or anything, right?

1272

**Kwon - cross**

1   A.   No.

2   Q.   And in fact, Caliph fell asleep, right?

3   A.   Right.

4   Q.   Do you know where Caliph is now?

5   A.   Somewhere out there.  No, I don't know exactly where he is.

6   Q.   So he's not in prison, is he?

7   A.   No.

8   Q.   Now, turning again to Abdullah Zikria, did you -- do you know

9   whether Mr. Hasan told anyone else that he was going to Pakistan?

10  A.   Yes.  He told me that he told --

11          MR. KROMBERG:  Objection, Judge.  He's asking Mr. Kwon

12  to talk about what Mr. Hasan told him.

13          THE COURT:  Well, if it -- get the time frame from when

14  this was done.

15  BY MR. MAC MAHON:

16  Q.   On or about September 18 or 19th of 2001, did Mr. Hasan tell

17  you that he had spoken to anyone else about his plans to go

18  overseas?

19  A.   Yes.

20  Q.   And who did he tell you he had spoken to?

21  A.   He said he told Mohammad Al-Qahtani, and he told me that he

22  told Yousuf Idris.

23  Q.   Okay.  Who is Yousuf Idris?

24  A.   He's the son of Sheikh Jaafar Idris.

25  Q.   Okay.  And who is Sheikh Jaafar Idris?

## Kwon - cross

1  A.   He's the -- he's also a lecturer at Dar al-Arqam.  From what

2  I understand, he -- I'm not sure if it's -- I think he's the -- I

3  think he's the one who started Dar al-Arqam.  I believe they used

4  to have these lectures at his house in the beginning, and then he

5  grew out of that into what present day Dar al-Arqam is.

6  Q.   Okay.  And did you go with Mr. Hasan to talk to Yousuf Idris?

7  A.   We went to his house.  I remember Mahmood and I, we went to

8  Yousuf Idris's house sometime that week, maybe Wednesday or

9  Tuesday.

10  Q.   And you went by to drop off some software for Sheikh Jaafar,

11  right?

12  A.   I have no idea.  It was Mahmood's business.  I was just with

13  him.  At that time, we were running around trying to get our stuff

14  together.

15  Q.   You were going to, you were going to Galyan's to buy things

16  for cold weather?

17  A.   Shopping.  We were, you know, trying to get the visas.  We

18  were, you know, we were trying to get our tickets ready.  So I was

19  with him at that time when he, he had business with -- I don't

20  even exactly know who he had business with.  We just went to -- I

21  remember we went to Sheikh Jaafar's house.

22  Q.   All right.  And at Sheikh Jaafar's house -- this was after

23  the dinner at your home, correct?

24  A.   Correct.

25  Q.   And at Sheikh Jaafar's house, you were met at the door by

**Kwon - cross**

1  Yousuf Idris, correct?

2  A.    I don't recall who met us, but he was -- I remember we were

3  invited into the house, and I saw Yousuf Idris inside the house.

4  Q.    Okay.  And you were there, too, weren't you?  It was the both

5  of you?

6  A.    Yeah, I was there.

7  Q.    All right.  And Mahmood Hasan had some -- just strike that.

8          How old is Yousuf Idris?

9  A.    I don't know.  I think he's a few years older than myself.

10  Q.    Is he in his late 30s/early 40s?

11  A.    I think he's in the early 30s or maybe mid-30s.

12  Q.    And he's someone who could lead the prayers actually at the

13  mosque, right?

14  A.    Correct.

15  Q.    A very respected figure in your community?

16  A.    Correct.

17  Q.    Okay.  And you told him there that you two were going to go

18  overseas to Pakistan, didn't you?

19  A.    No, I didn't even tell anything.  I didn't even know that

20  Mahmood told them until he told me later, when we were driving

21  somewhere.  We were driving nighttime when he told me that he told

22  Qahtani and Yousuf Idris.  I was surprised because I was, like, I

23  thought we weren't going to tell anybody, you know?

24  Q.    You thought this was all a secret between the two of you,

25  right?

1275

## Kwon - cross

1   A.   Correct.  Or at least the people in my house.

2   Q.   Right.  And you told Abdullah Zikria, who wasn't at your

3   home, correct?

4   A.   Correct.

5   Q.   Okay.  And Hasan told you that -- in the car that night that

6   Sheikh Jaafar said you should not go to Pakistan; isn't that

7   correct?

8   A.   I don't, I don't recall Mahmood telling me that.

9   Q.   Did he tell you that Yousuf Idris had told you not to go to

10  Pakistan?

11  A.   The only thing that I recall Mahmood saying was that Yousuf

12  Idris said something like those people who are giving dawa in

13  America are also like mujahideen, you know.

14  Q.   He was telling you to stay home, wasn't he?

15  A.   I don't know what he told Hasan.

16  Q.   Didn't you talk to Sheikh Jaafar at the Borders bookstore in

17  Falls Church before you left, Mr. Kwon?

18  A.   No.

19  Q.   Do you know if Mr. Hasan met him at a Borders bookstore in

20  Falls Church before he left?

21  A.   I have no idea.

22  Q.   You didn't go on that trip, right?

23  A.   No.

24  Q.   And did Mr. Hasan tell you this before he left for Pakistan?

25  A.   That he talked to Yousuf?

**J.A. 1420**

1276

## Kwon - cross

1  Q.   Yes.

2  A.   Yes.

3  Q.   And did Yousuf tell him whether or not Yousuf had spoken to

4  Ali Al-Timimi before they had that conversation?

5  A.   I don't know any of these things.  All I know is that he told

6  Qahtani, and he told Yousuf Idris, and I just remember this, this

7  piece that he told me.

8  Q.   What, what did Qahtani say?

9  A.   I remember Mahmood say that Qahtani had -- he didn't say

10 anything.

11 Q.   Did he tell him he was going overseas to fight?

12 A.   That's what Mahmood told me he told him.

13 Q.   And that Qahtani said that that was fine?

14 A.   Mahmood said he wasn't for or against.  He didn't say

15 anything about it.

16 Q.   Didn't you tell these people you were going overseas to a

17 wedding?

18 A.   I didn't tell these people anything.

19 Q.   Isn't that what Mr. Hasan told them, they were going to a

20 wedding?

21 A.   I don't know what he told them.

22 Q.   Well, that was your cover story, wasn't it?

23 A.   The wedding was our cover story, yes.

24 Q.   All right.  Now, on -- if I can put this back up on the

25 screen, Your Honor?  I would mark this as Exhibit No. 84.

## Kwon - cross

```
 1              THE COURT:  All right.  And obviously, it's in evidence.
 2              (Defendant's Exhibit No. 84 was marked and received in
 3     evidence.)
 4     BY MR. MAC MAHON:
 5     Q.    This again, sir, is your phone bills from that day.  You
 6     spoke to Mr. Royer on the 19th in the afternoon, didn't you?
 7     A.    Yes.
 8     Q.    Okay.  Do you remember what any -- the subjects of any of
 9     those phone calls were?
10     A.    I don't remember, but on the 19th, I might have called them
11     to tell them to come over that night or something like that.
12     Q.    And the first voice you heard that morning from a phone, line
13     No. 143, was Mr. Royer calling you as well, wasn't it?
14     A.    I don't know what -- I mean, I can't recall the phone calls
15     coming in, all the phone calls I made that day.
16     Q.    And the last call of the evening -- second-to-the-last phone
17     call of the evening, line 167, that was Mr. Royer as well,
18     correct?
19     A.    I guess.
20     Q.    Do you have any idea what you were talking to Mr. Royer about
21     on that day?
22     A.    Yeah.  We met that night, on the 19th, and I remember he came
23     over to my place, and then we went to that pond, where we walked
24     around.  You know, I told him I was leaving, and he told me about
25     his plans, and we went to 7-Eleven and came back, and he went
```

1278

**Kwon - cross**

1    home.

2    Q.   Okay.  And when you met with him, told him your plan, you

3    didn't tell him anything about going to Afghanistan, did you?

4    A.   I don't recall exactly what I said, but I, I mean, I'm sure

5    he knew from the talk that night.

6    Q.   You didn't say anything to him that night about having any

7    plans for either one of you to go to Afghanistan, did you?

8    A.   I don't recall, but I'm sure he knew because the night -- on

9    Sunday night, when we decided that we were going to go, you know,

10    he was there.

11    Q.   Do you remember testifying in front of the grand jury in -- I

12    have copies of this, Your Honor.

13           THE COURT:  All right.  Mr. Wood, if you'd get those,

14    please?

15    BY MR. MAC MAHON:

16    Q.   "Question:  Did he meet with you again for another purpose?"

17    The question was as to Royer.

18           "Answer:  Yes."

19           Before I go on, you were under oath that day, weren't

20    you?

21    A.   Correct.

22    Q.   Same oath you took before you testified in this case?

23    A.   Correct.

24    Q.   "Answer:  Yes.  We met with -- we met with Royer, I believe,

25    that Wednesday, the night before we left.  I believe it was

**J.A. 1423**

**Kwon - cross**

1  Wednesday night.  It could have been Tuesday -- no, I'm pretty

2  sure it was Wednesday night.  And -- to, you know -- Ismail Royer,

3  I called him to, you know, to come over to my house.

4        "He came over.  We didn't actually go into my house.  We

5  actually met him outside in the parking lot, and we actually took

6  a walk down towards -- we have this, I guess, lake nearby our

7  house.  We went towards the lake, and we started talking, you

8  know.

9        "We told him that we had made all our preparations,

10  we're leaving tomorrow, and, you know, I guess to say our last

11  good-byes.  And, you know, I asked him what his plan was, and he

12  told me that his plan, you know, because, you know, it was Ali's

13  advice that we should leave the United States, I asked him what

14  his plan was, and he told me that he'd most likely go to Bosnia.

15  His in-laws are from Bosnia.  His wife is from Bosnia.  He had, he

16  had family over there.

17        "So he told me that he's planning on going to Bosnia,

18  but he -- and I, and I asked him when, and he said he doesn't know

19  because he actually didn't have enough money.  At this time, he

20  had two kids and a wife.  So he said that he doesn't have enough

21  money to move anytime soon.  So on this, I told him I can help him

22  out, and I wrote him a check for $1,000.

23        "Question:  And you gave him that to help him get to

24  Bosnia?

25        "Answer:  Yes.  I gave that to him so he can move to

1280

**Kwon - cross**

1   Bosnia."

2           Is that your testimony with the grand jury, sir?

3   A.   Correct.

4   Q.   And you did write him a check, didn't you?

5   A.   Correct.

6   Q.   You didn't refer him to Al-Timimi to get some money for his

7   trip to go to Bosnia?

8   A.   No.

9   Q.   Did he tell you he called the Bosnian embassy the morning

10  after he left your house?

11  A.   No.

12  Q.   And he, in fact, went to Bosnia, didn't he?

13  A.   Yes.

14  Q.   And other than you, Khan, and Hasan, no one that was at your

15  house went overseas at all, did they?

16  A.   Not that I know of.

17  Q.   Now, moving forward, you -- on September 19, you called

18  Al-Timimi, didn't you?

19  A.   Yes.

20  Q.   And you told him you wanted to meet him, didn't you?

21  A.   Yes.

22  Q.   And you met him at a kabob restaurant in Fairfax, somewhere

23  in that area, correct?

24  A.   Correct.

25  Q.   And at that meeting, you told him that you were going with

**Kwon - cross**

1  Hasan overseas to go to a wedding, didn't you?

2  A.   No, we told him we were going to LET.

3  Q.   You told him you were going overseas to make hijra in

4  Pakistan with him, didn't you?

5  A.   No.  I remember telling him we were going over to Pakistan to

6  join -- to attend an LET camp.

7  Q.   Those were your exact words?

8  A.   I don't remember my exact words, but I'm pretty sure I told

9  him what our purpose was.

10  Q.   Did you tell him that you had already lied to the Bosnian

11  embassy about the purpose of your trip?

12        THE COURT:  Wait, wait.  Which embassy?

13        MR. MAC MAHON:  Excuse me, I'm sorry, Your Honor.

14  Q.   The Pakistani embassy about your trip?

15  A.   I don't recall.  I might have.  You know, we told him we

16  already had a cover -- when he asked me if we have a cover story,

17  we told him we have a cover story and, you know, we have our story

18  that we're going to -- I'm going to attend Hasan's wedding, you

19  know.  That was our cover story.

20  Q.   So he asked you if you had a cover story, correct?

21  A.   Correct.

22        MR. MAC MAHON:  Your Honor, can I show this to the

23  witness?  And I have copies for you as well.

24        THE COURT:  All right.  You're at page 1553, correct?

25        MR. MAC MAHON:  Yes, Your Honor.

1282

**Kwon - cross**

1   Q.    Mr. Kwon, do you remember testifying in the case of <u>United</u>

2   <u>States v. Khan</u>?

3   A.    Yes.

4   Q.    Were you under oath that day as well, sir?

5   A.    Correct.

6          MR. KROMBERG:  Objection, Judge.  We don't have anything

7   suggesting that there's an inconsistency on this -- last time or

8   this time.

9          THE COURT:  Well, what -- I don't even know what we're

10  talking about here.  What line number are you looking at?

11         MR. MAC MAHON:  I'm looking at starting on, on page

12  1553, line 19, through to 1554, line 10.

13         MR. KROMBERG:  Judge, there's nothing in there that --

14         THE COURT:  Wait just a second, Mr. Kromberg.  I'm

15  trying to read it.

16         This does appear to be completely repetitive.  I don't

17  see what --

18         MR. MAC MAHON:  I think it's entirely different, Your

19  Honor.  I mean, if you want us to approach, I will, but --

20         THE COURT:  Approach.

21         (Bench conference on the record.)

22         THE COURT:  Frankly, Mr. Kromberg, I understand -- I

23  mean, I don't understand why you objected because this strengthens

24  the government's case.  He's repeating, as I see it, basically the

25  same thing he's been saying here.

1283

**Kwon - cross**

1      MR. MAC MAHON:  I don't think so.

2      THE COURT:  What's the subtle difference?

3      MR. MAC MAHON:  Because what he's saying, "It was our

4  plan, myself, Hasan, and Al-Timimi."  He's already testified that

5  it was on Monday at the embassy when they wrote down they were

6  going to a wedding.  This couldn't possibly have been Al-Timimi's

7  plan.

8      "What did he advise you to do?"

9      "To coordinate our story, don't carry anything

10 suspicious, and try to look like a tourist going to a wedding."

11     That's different than what he said about crying and

12 asking for a lawyer.

13     THE COURT:  All right, I'm going to let you do it.  I

14 don't think it helps your case, but go ahead.

15     (End of bench conference.)

16 BY MR. MAC MAHON:

17 Q.   Do you see on page 1553, sir?

18 A.   Yes.

19 Q.   "Question:  What did you discuss before leaving regarding

20 what you would tell the Customs Service and Immigration Service

21 regarding the reason for your trip?

22     "Answer:  We planned to tell them we were going to

23 Pakistan for a wedding.

24     "Question:  When you say 'we,' who's 'we'?

25     "Answer:  Mahmood Hasan, myself, and Ali Timimi.

J.A. 1428

### Kwon - cross

1      "Question:  When did that discussion occur?

2      "Answer:  The day before we left.

3      "Question:  How did it happen that you had a discussion

4 with Mr. Hasan and Mr. Timimi?

5      "Answer:  By this time, Mahmood and I were pretty much

6 together all the time, and we had called Ali Timimi to let them

7 know that we were leaving to go to Pakistan to join the LET.  So

8 he had actually wanted to meet us for lunch, where we met him for

9 lunch and told him, and he advised us, advised us to -- how to go

10 about when asked by Immigration.

11      "Question:  What did he advise you?

12      "Answer:  To coordinate our story and don't carry

13 anything suspicious and try to look like a tourist going to a

14 wedding."

15      Do you remember giving that testimony?

16 A.    Yes.

17 Q.    Did you testify before that Al-Timimi said you should cry

18 like a baby if you were captured by the police?

19 A.    Not cry, but he said we should act scared and ask for our

20 mothers and lawyers.

21 Q.    And did you, did you have some reason to believe that if you

22 were, you were arrested going overseas, that asking for your

23 mother was something that would help you?

24 A.    No.  I didn't really see how that would help, but I guess to

25 show that -- to -- I guess to fool the Immigration or something

**Kwon - cross**

1  that we are scared and we're innocent or something.  I don't know.

2  Q.  So at lunch, the lunch before you left, Al-Timimi told you

3  that it was -- that you should ask for a lawyer or your mother

4  before you left, and that was the way to get to Pakistan

5  undetected?

6  A.  No.  He said if we are stopped or pulled off the airplane or,

7  or held at the airport, he said that's what we should do.  I don't

8  remember everything, but I remember him saying something like, you

9  know, "Act scared and nervous, and ask for a lawyer, ask for your

10  mothers, or stuff like that."

11  Q.  Okay.  Did, did you tell him that you had had a discussion

12  with Aatique and Khan just days before where you gave them advice

13  in how to reach the camp undetected?

14  A.  No.

15  Q.  Didn't mention that to him at all?

16  A.  No.

17  Q.  And, sir, you also say that he told you that you should

18  travel apart, correct?

19  A.  Who?

20  Q.  Al-Timimi advised you one way to get to the camp was to

21  travel apart?

22  A.  No.  He told us -- Mahmood and I were together, and he

23  actually told, told us that if for some reason they take me off

24  the plane or arrest me or whatever, hold me, Mahmood should go

25  ahead because he can speak Urdu, and he can get his way around

**Kwon - cross**

1  Pakistan, but as for me, he said if they take Mahmood off the
2  plane or hold him or arrest him, that I should also, I should also
3  get off the plane because I can't find my way around Pakistan by
4  myself.
5  Q.   All right.  You guys sat next to each other on the plane,
6  didn't you?
7  A.   Correct.
8  Q.   And you were never harassed or bothered by any authorities at
9  all, were you?
10 A.   We were asked some questions in New York, JFK Airport, when
11 we were boarding the Pakistani International Airlines, but other
12 than that, no, not really.
13 Q.   Okay.  And then you flew to Pakistan, right?
14 A.   Correct.
15 Q.   Okay.  Do you know whether Al-Timimi tried to call you that
16 evening?
17 A.   No, I don't, I don't recall.
18 Q.   Do you know whether he talked to Yousuf Idris that exact same
19 day and tried to call you that night?
20 A.   No.
21 Q.   Has the FBI showed you Al-Timimi's phone bills from the same
22 evening?
23 A.   Yes.
24 Q.   And you know that Yousuf Idris called Al-Timimi that night,
25 don't you?

1287

**Kwon - cross**

1   A.   I don't know if Yousuf called, but it seemed like Ali

2   Timimi -- from what they showed me, Ali Timimi called Yousuf Idris

3   and then Mahmood and then me.

4   Q.   Right.  And in order, he, he made a phone call -- or received

5   a phone call from Yousuf Idris.  You saw that.  The FBI showed you

6   that on his phone bills, right?

7   A.   I don't know if he received a call.  I know that from what I

8   could understand from the chart, I thought that Ali Timimi called

9   Yousuf Idris, and then he called Mahmood, and then he called me.

10  Q.   All right.  Right, right before, it turns out, in time before

11  you called a taxi and left the United States, right?

12  A.   I don't know exactly what time.  I thought it was Wednesday

13  night he did -- I'm not sure about the time.  I thought it was

14  Thursday night -- Wednesday night.

15  Q.   But it was right before you left, right?

16  A.   Right, right.

17  Q.   Do you want to see Mr. Timimi's phone bill?  Would that

18  refresh your recollection?

19  A.   Okay.

20       MR. MAC MAHON:  It will just take a second, Your Honor.

21  Excuse me.

22       Just a second.  I have so much paperwork here on the

23  table, it's going to take me a second.  Excuse me.

24       We can get it from the government exhibit book.  Excuse

25  me, Your Honor.

1288

**Kwon - cross**

1    Your Honor, this is a page of Government Exhibit 10A9.
2  It's page 12 of Exhibit 10A9.
3    THE COURT:  Do you want that made a separate defense
4  exhibit or --
5    MR. MAC MAHON:  Yes, Your Honor.  I actually have a -- I
6  have this.  I just can't find it sitting here right away, and I
7  know the pace which the Court works.  We can find the other --
8  it's an exhibit that looks like the other ones I've shown you
9  before.
10    THE COURT:  All right.
11    MR. MAC MAHON:  And if I could --
12  Q.   Sir, this is Dr. Al-Timimi's phone bill, AT&T phone bill from
13  September 19, showing calls from September 19, 2001.
14    Whose phone number is 703-568-1073?
15  A.   I believe that's Mahmood's number.
16  Q.   All right.  Well, you don't have any trouble recognizing
17  703-200-8024, right?
18  A.   That's my cell phone number.
19  Q.   Okay.  Do you know why Al-Timimi was calling you on the
20  evening of September 19, after he had spoken to Yousuf Idris?
21  A.   No.
22    MR. KROMBERG:  Objection to the "after he had spoken to
23  Yousuf Idris."  The only person who said that is Mr. MacMahon,
24  Judge.
25    THE COURT:  Sustained.  The jury should strike that.

1289

## Kwon - cross

1  Remember, Ladies and Gentlemen, what I told you earlier is be

2  careful if lawyers make a statement that appears to be a statement

3  of fact.  Don't accept it as a fact unless you recall a witness or

4  a document basically establishing that fact.

5  BY MR. MAC MAHON:

6  Q.   Mr. Kwon, do you know whose phone number at line 275,

7  703-862-4847, is?

8  A.   I don't seem to recall.  I think from the -- what the agents

9  showed me, I think it might be Yousuf Idris's number.

10       MR. MAC MAHON:  Thank you, Your Honor.

11  Q.   The agent showed you something with that phone number on it

12  that triggered it to Yousuf Idris?

13  A.   He showed me Ali Timimi's phone calls, the numbers and the

14  names next to it.

15  Q.   But you don't have any idea what Yousuf Idris and Ali

16  Al-Timimi were talking about, right?

17       MR. KROMBERG:  Objection, Judge.  There's no evidence

18  that they were talking at all.  It's a one-minute phone call.

19       THE COURT:  Sustained, sustained.  All they know is a

20  phone call was made.

21       MR. MAC MAHON:  Thank you, Your Honor.

22  Q.   Now, Mr. Kwon, you head overseas, and you spent some time in

23  Lahore, correct?

24  A.   Correct.

25  Q.   And you didn't hurry your way up to any camp, did you?

J.A. 1434

1290

**Kwon - cross**

1  A.    No.   Initially, when we got to Karachi, we weren't in a

2  hurry.  We spent about two weeks in Karachi.

3  Q.    Okay.  Well, if you were supposed to be going to help the

4  poor Muslims in Afghanistan, why didn't you hurry?

5  A.    Well, when we first got there, Mahmood had some family

6  obligations as far as visiting them, and we had some shopping to

7  do to get, you know, things that we, we thought we might need in

8  the camp, and also, we had to coordinate our schedule with Masaud

9  Khan.

10 Q.    So it took you two weeks to do all those things?

11 A.    I mean, we could have -- I'm sure we could have took less

12 time, but it turned out we took about two weeks.

13 Q.    Okay.  And you were surfing one day; is that right?

14 A.    We went to the beach.

15 Q.    So you weren't in any hurry at all, right?

16 A.    No.   In -- once we got to Pakistan, our initial sense of

17 urgency was over.

18 Q.    And you never the whole time you were in Pakistan made any

19 effort whatsoever to try to go fight in Kashmir, did you?

20 A.    Once they pulled us down from the -- from the LET camps, no.

21 Q.    Mr. Kwon, even when you were there, you turned down -- they

22 asked you if you wanted to go to Kashmir and fight, and you said

23 no, didn't you?

24 A.    No.  Actually, all the instructor told me was that the next

25 phase of training was the last phase before going to Kashmir, and

**J.A. 1435**

**Kwon - cross**

1  you have to have some kind of commitment as far as going to

2  Kashmir to get, get this training.

3  Q.   Okay.  And you refused to do that, right?  You refused to

4  make that commitment?

5  A.   I didn't give him an answer, you know.  I was, I was

6  undecided.

7  Q.   And you never at any time tried to get on a bus, a train, or

8  anything to go to Afghanistan, did you?

9  A.   No.

10 Q.   You never asked anybody, "How can I get to Afghanistan?  Why

11 is it that we're not in Afghanistan"?

12 A.   No.

13 Q.   Right?

14 A.   Right, I never asked anyone.

15 Q.   And how many mountain ranges away from Afghanistan were you,

16 do you know?

17 A.   I don't know.

18 Q.   And Mr. Khan to your knowledge never once tried to go to

19 Afghanistan, either, did he?

20 A.   No.

21 Q.   And the same with Mr. Hasan, correct?

22 A.   Correct.

23 Q.   And Mr. Aatique just stayed for a couple days, right?

24 A.   Correct.

25 Q.   Now, you -- when you came back to the United States, the

1292

**Kwon - cross**

1  government flew you back to the United States, you agreed to do a

2  consensual phone call with Mr. Royer, didn't you?

3  A.   Correct.

4  Q.   Okay.  And did you have a discussion with the FBI as to how

5  you were supposed to behave on that phone call?

6  A.   Yes.  You know, they just told me that -- to call like I'm

7  calling from Korea, you know, just ask Royer what's going on, you

8  know, back here.

9  Q.   And you'd seen the search warrants by that time.  You'd known

10  they were looking at lots and lots of people in this area,

11  including Ali Al-Timimi, right?

12  A.   Actually, I didn't know.  I didn't see any search warrants.

13  When they brought me back, they put me in a hotel, and I couldn't

14  go anywhere, you know, I had two agents with me at all times, and

15  I didn't know anything.  A lot of these things I learned from my

16  conversation with Royer about these search warrants.

17  Q.   But you'd already been at the grand jury before you even did

18  the phone call with Mr. Royer, right?

19  A.   Correct.

20  Q.   Okay.  And didn't the FBI teach you that you should be

21  deceptive on that phone call?

22  A.   I mean, they told me to play a role, you know.

23  Q.   Tell us more.  What did the FBI tell you when they told you

24  to play a role in that phone call?

25  A.   To make it look as if I'm calling from Korea.

**J.A. 1437**

1293

**Kwon - cross**

1  Q.   And you weren't in Korea, were you?

2  A.   No.

3  Q.   And when you said to Mr. Royer, "I'm in Korea," you were

4  actually at the Washington Field Office of the FBI, weren't you?

5  A.   No, I believe I was in one of the hotels.

6  Q.   Okay.  And which agent was with you?

7  A.   I believe Ammerman and Wyman.

8  Q.   Okay.  Did they tell you that you couldn't lie while you were

9  working for the FBI?

10 A.   They told me while I made a call, they didn't say anything

11 about not lying.  Actually, they --

12 Q.   Well, they could tell that you weren't in Korea.  You were

13 sitting in a hotel room with them, right?

14 A.   Correct.

15 Q.   Okay.  Did you learn that day that you could lie as long as

16 you were working for the FBI, Mr. Kwon?

17 A.   I guess.

18 Q.   They didn't stop giving you checks because you were lying on

19 the phone, did they?

20 A.   No.  I mean, they didn't give me checks for that.  I mean,

21 they put me in a hotel.  I couldn't go anywhere.  I couldn't have

22 contact with outside.  I didn't have money.  They told me this

23 money is to get food and stuff, so --

24 Q.   You were under a lot of pressure, weren't you, Mr. Kwon?

25 A.   Obviously.

**J.A. 1438**

1294

## Kwon - cross

1 Q.    And you wanted to do whatever you could do to help yourself,

2 right?

3 A.    I mean, at the time, I didn't know that I had a choice.  I

4 mean, I knew I had a choice, but it wasn't clear.  Like I said, I

5 had no contact with anybody.  I had nobody to advise me.  I had no

6 lawyer.  I'm in a room, you know, with agents.  You know, they

7 come and tell me I have to do this thing.

8 Q.    How many times on your phone call with Mr. Royer did you lie?

9 A.    I did both times, you know.

10 Q.    But on each phone call, do you have a general idea how many

11 times you lied on those calls?

12        MR. KROMBERG:  Objection, Judge.  The witness didn't say

13 he lied.  He said he was playing a role.

14        THE COURT:  You can get into it on redirect.  The

15 truth -- either it's the truth, or it's not the truth, all right?

16        And we know that he was playing a role, though,

17 Mr. MacMahon.  That's not going very far, all right?  I think you

18 ought to move on.

19 BY MR. MAC MAHON:

20 Q.    Okay.  And in that phone call, Mr. Royer said to you that

21 there was no mention of Afghanistan at that meeting, and you

22 agreed, didn't you?

23 A.    Correct.

24 Q.    And you said that you -- in that same phone call that you

25 assumed Al-Timimi meant Kashmir when he said be with the

1295

**Kwon - cross**

1    mujahideen, correct?

2    A.    I don't remember exactly, but something like that.

3    Q.    Okay.  Did there come a time when you began to change your

4    mind about cooperating with the federal government?

5    A.    Yes.

6    Q.    When was that?

7    A.    I believe either, like -- I think around June of 2003.

8    Q.    Okay.  And why did you change your mind?  Why did you think

9    about changing your mind?

10   A.    I got -- I got paid lawyers, and that's what they -- you

11   know, I talked to them, and they clarified the situation for me

12   and, you know, and then we decided that, you know, I'd stop

13   talking to the government.

14   Q.    And by that time, you hadn't said anything about anybody

15   having any plans to go overseas and fight in Afghanistan, had you?

16   A.    No -- yeah.  At that time, I didn't tell anybody about our

17   intention was to go to Afghanistan.

18   Q.    And you learned later that the government wanted you to

19   testify that people had plans to go to Afghanistan, didn't you?

20   A.    They wanted me to testify to the truth, as our intention to

21   go fight in Afghanistan.

22   Q.    Let me see if I can -- this is Defendant's Exhibit 57, Your

23   Honor.

24           THE COURT:  Any objection, Mr. Kromberg?

25           MR. KROMBERG:  No objection, Judge.

## Kwon - cross

```
 1              THE COURT:  All right, it's in.
 2              (Defendant's Exhibit No. 57 was received in evidence.)
 3  BY MR. MAC MAHON:
 4  Q.    Mr. Kwon, have you ever seen the exhibit, Defendant's Exhibit
 5  57?
 6  A.    Yes.  Yes.
 7  Q.    Okay.  And what is that?
 8  A.    I think it's a letter that Mr. Kromberg sent to my lawyers,
 9  Mark MacDougal and Heather Pellegrino.
10  Q.    Okay.  Could you speak up, sir?  I'm sorry, I didn't --
11  A.    It's a letter that Mr. Kromberg sent to my lawyers, Mark
12  MacDougal and Heather Pellegrino.
13  Q.    Okay.  And did you get a copy of this letter?
14  A.    Yes, they showed it to me.  My lawyers showed it to me while
15  I was in jail.
16  Q.    Were you trying to get out on bond at this time?
17  A.    Correct, yes.
18  Q.    Now, this is a letter from Mr. Kromberg, and do you see --
19  I'll try to -- do you see that where it says, "I realize you are
20  relatively new to the case, but at least with respect to Kwon, the
21  facts are pretty straightforward; not only did he help others to
22  do so, but he himself traveled to Pakistan to die as a martyr in
23  support of violent jihad against India, and he used firearms in
24  Pakistan in connection with his jihad plans.  Multiple witnesses
25  will testify to these facts, and in any event, Mr. Kwon admitted
```

1297

**Kwon - cross**

1  them."

2          Do you see that?

3  A.   Yes.

4  Q.   Okay.  And that was true.  That's what you had actually done,

5  wasn't it?  You traveled to Pakistan to die as a martyr in support

6  of violent jihad against India?

7  A.   I mean, that was one of the plans.  I mean, our initial plan

8  was to go get trained at LET -- well, my intention was to go get

9  trained in LET and then try to get into Afghanistan, and if I

10  can't, go to Kashmir or Chechnya or wherever is available for me

11  to go.

12  Q.   There's no mention of Afghanistan anywhere in this letter, is

13  there, sir?

14  A.   No.

15  Q.   Okay.  And it says here farther down, "Since this case has

16  been indicted, I have perceived troubling signals that Mr. Kwon

17  may no longer be willing to plead guilty and testify truthfully."

18          Do you see that?

19  A.   Which line is that?

20  Q.   We're starting "Nevertheless."  Do you see that?

21  A.   Yes, I do.

22          MR. MAC MAHON:  I'm sorry, I'm getting a tutorial, Your

23  Honor.

24  Q.   This sentence here, do you see where it says, "Charging

25  decisions were made in the indictment and on the assumption that

1298

## Kwon - cross

1  Mr. Kwon was going to continue on the course which he had set
2  forth"?  Do you see that?
3  A.   Yes.
4  Q.   Okay.  Did the government tell you what their charging
5  decisions were based upon your testimony?
6  A.   The charging decisions?  I'm not too clear.  I mean, I think
7  at the time, I understood it as a superseding indictment.
8  Q.   All right.  Now, it says a little further on, "Since this
9  case has been indicted, I have perceived troubling signals that
10  Mr. Kwon may no longer be willing to plead guilty and testify
11  truthfully as to what happened.  For Mr. Kwon's sake as well as
12  that of the government's case, I hope that my impression is
13  incorrect."
14           Do you see that?
15  A.   Yes.
16  Q.   And so you knew from this that your fate, your sentence that
17  you might get was wholly intertwined now with the government's
18  interests, correct?
19  A.   Correct.
20  Q.   Starting on the top of page 2, "As you and I have discussed,
21  Mr. Kwon impressed all of the agents and prosecutors as an
22  individual seeking to accept responsibility for his past actions
23  and take the necessary steps to move past this unfortunate episode
24  in his life."
25           Do you remember that?

1299

## Kwon - cross

1  A.    Yes.

2  Q.    Okay.  You're telling us that as of July 23, 2003, you were

3  still lying to all of the agents and the prosecutors, right?

4  A.    I mean, before I had my lawyers, these paid lawyers, I

5  thought that was the best course of action.

6  Q.    So before 2003, when you were impressing the agents and the

7  prosecutors, you were, in fact, lying to them, right?

8  A.    No, I wasn't really lying to them.  I just felt that that was

9  the best way to go.

10  Q.    That was the best way for you to get a dramatically reduced

11  sentence, correct?

12  A.    No, just best way as in if you accept and not fight, you

13  know, you won't have to sit in prison for the rest of your life.

14  Q.    Well, you knew that the way for you to not sit in prison for

15  the rest of your life was to testify against everybody the

16  government asked you to testify against, right?

17  A.    Right.

18  Q.    And at the bottom, it says, "For Mr. Kwon's sake and that of

19  the prosecution of others, this is one instance where I look

20  forward to being shown that I am wrong; indeed, I am eager to hear

21  that Mr. Kwon is just as interested now as he formerly indicated

22  he was in pleading guilty and seeking a substantial sentence

23  reduction for cooperation."

24         Do you remember that?

25  A.    Yes.

J.A. 1444

1300

## Kwon - cross

1  Q.   And you knew at that time that the only way you were going to

2  avoid a very lengthy prison sentence was to cooperate as much as

3  you could with the federal government, right?

4  A.   Correct.

5          MR. MAC MAHON:  Your Honor, I have a -- I move in three

6  of these exhibits that we turned -- I've given Mr. Kromberg

7  copies -- which are marked 84, 85, and 86.

8          THE COURT:  These are what, telephone records?

9          MR. MAC MAHON:  Yes, Your Honor.  They're --

10          THE COURT:  And I assume there's no objection,

11  Mr. Kromberg?

12          MR. KROMBERG:  No, Your Honor.

13          MR. MAC MAHON:  Can I have a moment with my client, Your

14  Honor?

15          THE COURT:  All right, they're all in.  Those three are

16  in.

17          (Defendant's Exhibit Nos. 85 and 86 were received in

18  evidence.)

19          MR. MAC MAHON:  Nothing further.  We move -- have I

20  moved that exhibit as well?

21          THE COURT:  They come to Ms. Travers.  Those are 84, 85,

22  86.

23          MR. MAC MAHON:  And I think I moved the letter in from

24  Mr. Kromberg as well, didn't I?

25          THE COURT:  That was 57?  Yes, 57 is in if that's the

J.A. 1445

1301

## Kwon - redirect

1  letter.

2          MR. MAC MAHON:  And just with leave, I'll find the other

3  exhibit with that phone record in it as well and give it to

4  counsel, the one I referred to and I can't find in my pile, Your

5  Honor.

6          THE COURT:  It was Government Exhibit 10A9, page 12, and

7  you were going to give that a separate number?

8          MR. MAC MAHON:  Yes, Your Honor.  It looks like the ones

9  I've just handed you.  It just deals with the calls of that day.

10          THE COURT:  All right.

11          MR. MAC MAHON:  And we've exchanged it with the

12  government.

13          THE COURT:  All right.  Ready for redirect now?

14          MR. KROMBERG:  Yes, Your Honor.

15                      REDIRECT EXAMINATION

16  BY MR. KROMBERG:

17  Q.   Good afternoon, Mr. Kwon.

18          Could we have that last defense exhibit back on the

19  screen, please?

20          THE COURT:  That's 57, your letter.

21          MR. KROMBERG:  Correct.

22          THE COURT:  All right.

23  BY MR. KROMBERG:

24  Q.   Mr. Kwon, in your answers to Mr. MacMahon, he asked you if

25  you were still lying at this point.  What was it that you referred

## Kwon - redirect

1  to when you said that you were still lying at this point?

2  A.   I mean, at this point, I haven't told my intention was to go

3  to Afghanistan, if I remember correctly.

4  Q.   At that -- when -- what caused you to talk about your

5  intention to go to Afghanistan after that point?

6  A.   I realized that -- I realized that when the FBI apprehended

7  Mahmood, he had told him what our real intentions were, so at that

8  point, I figured that I'd talk to my lawyers and, you know, talked

9  about our case and what are the chances and things like that, and,

10 you know, we decided that maybe it's best to go with the

11 government.

12        And since Mahmood had told him, which is pretty much the

13 last bit of --

14        MR. MAC MAHON:  Your Honor, I object to what Mr. Hasan

15 told him in terms of after he was arrested.  It wouldn't be in

16 furtherance of the conspiracy.

17        THE COURT:  Well, it doesn't sound as though it's being

18 offered for the truth of its contents but to explain why he

19 changed his mind.

20        MR. MAC MAHON:  He can say that it's because of what he

21 said, but I don't think he can say exactly what Mr. Hasan said.

22 He doesn't have that in front of him anyway.

23        MR. KROMBERG:  Your Honor, Mr. MacMahon brought up a

24 letter --

25        THE COURT:  I'm allowing it because you're not offering

1303

# Kwon - redirect

1  it for the truth of its contents.

2      MR. KROMBERG:  Thank you, Your Honor.

3  Q.   Mr. Kwon, what -- I'm circling this last sentence -- whoops,

4  let me try that again -- where it says, "Finally, as you can

5  imagine, additional evidence continues to be gathered from

6  multiple sources about the existing charges and even new ones."

7      What did you think Hasan's statements to the FBI about

8  his real intention meant for purposes of additional evidence about

9  existing charges and even new ones?

10 A.   I understood that from his -- from this information, that

11 would be superseding indictments.  At this time, I understood as

12 these indictments will have more severe of a prison sentence or

13 penalty.

14 Q.   In the indictment that you pled guilty to, was there any

15 charge in there about you going -- intending to go to Afghanistan?

16 A.   No.

17 Q.   Were you concerned that a superseding indictment would

18 include that based on what Hasan said?

19 A.   Yes.

20 Q.   As of the time of this letter, July 23, 2003, what were

21 you -- what had you said -- what were you -- excuse me, what were

22 you saying that was false about what Ali Timimi said about the

23 dinner at your house on September 16, 2001?

24 A.   Nothing.  I told him -- at that point, if I remember

25 correctly, I told him everything that happened at my house in the

1304

## Kwon - redirect

1 meeting.

2 Q.   When did you -- do you recall whether you first told the FBI

3 about what Mr. Timimi said at your house on September 16, before

4 or after you left Hawaii?

5 A.   Actually, I told them about the dinner before we left Hawaii.

6 Q.   Mr. Kwon, what in your mind did you see that was the benefit

7 to you of making up a story about Ali Al-Timimi's telling you

8 something on September 16, 2001?

9 A.   What benefit to me?

10 Q.   What benefit did you think that you might get by making up a

11 story about Ali Al-Timimi?

12 A.   Nothing.

13 Q.   What detriment did you see that you might get from making up

14 a story about Ali Al-Timimi?

15 A.   I would be involving not just myself but Ali Timimi and

16 everybody at the dinner.

17 Q.   What detriment did you see that it might have for your own

18 sentence if you made up a story about Ali Al-Timimi at the dinner?

19 A.   What detriment it would have on my sentence if I --

20 Q.   On your plea agreement.  What did you, what did you think

21 would happen to you to your sentence if you made up a story about

22 Ali Al-Timimi?

23 A.   If I made up things, it would actually go against me.

24 Q.   What need did you see to make up stuff in addition to the

25 truthful stuff that you did say?

1305

# Kwon - redirect

1  A.    There's no need to make up stuff.

2  Q.    Well, if you already talked about Randall Royer, why -- what

3  need was there to make up stuff about Ali Al-Timimi?

4  A.    I mean, there's no need to make up stories.  It just -- I'm

5  just telling the truth as to what has happened.  I mean, I told

6  the agents the initial story, and there's so many inconsistencies

7  and gaps, you know, they -- and they keep coming back, you know,

8  asking, and also, they're gathering information from other

9  sources.  So at some point, I had to tell them about the dinner.

10 Otherwise, the story wouldn't fit, you know.

11 Q.    And that was back in Hawaii?

12 A.    That was the last day in Hawaii I believe I told them.

13 Q.    So when you testified in the grand jury in April 2003, what,

14 what were you hiding about Ali Al-Timimi's role at the dinner on

15 September 16, 2001?

16 A.    Nothing much.  Just -- I think I pretty much said everything.

17 Q.    About what Ali Al-Timimi said?

18 A.    Correct.

19 Q.    Mr. MacMahon asked you how many times in the phone call that

20 you made to Ali Al-Timimi in April 2003, he asked you how many

21 times Ali Al-Timimi told you to tell the truth during that

22 telephone call.  Do you remember that question?

23 A.    I think two calls, something like that.

24 Q.    What impact -- excuse me, strike that.

25        How did Ali Al-Timimi's telling you that what you ought

**J.A. 1450**

1306

# Kwon - redirect

1    to do is tell the truth affect your decisions regarding what to

2    tell the FBI from then on?

3    A.   I was --

4         MR. MAC MAHON:  Your Honor, I object.  He can't be

5    responsible for what he understood.  If he told him to tell the

6    truth, unless there's some indication that he knew he was talking

7    to him on behalf of the FBI, that's not a fair question.

8         THE COURT:  Well, it's redirect, and I gave you a great

9    deal of leeway on probing credibility.  I'm going to permit this.

10   Overruled.

11        MR. MAC MAHON:  Thank you, Your Honor.

12   BY MR. KROMBERG:

13   Q.   Let me ask it again, Mr. Kwon:  When Mr. Timimi told you

14   repeatedly on the telephone to tell the truth, what impact did

15   that have on your decision on whether to tell the truth or not?

16   A.   At that point, I was still holding back some truth even after

17   he, he told me to tell the truth.

18   Q.   Did it make it easier for you to tell the truth or harder to

19   tell the truth?

20   A.   It didn't make much difference.  I was still holding back

21   some stuff.

22   Q.   Did there come a time when what he told you about telling the

23   truth made it easier for you to tell the truth?

24   A.   Yeah.  I mean, once I, you know, once I decided that, you

25   know, I'll take the plea and cooperate with the government, then I

## Kwon - redirect

1  told the truth because there's nothing to hold back at that point.

2  Q.    Mr. MacMahon suggested in a question that you had been

3  planning to go to the Lashkar camp before Ali Timimi came to your

4  house on September 16.  Do you remember that?

5  A.    Yes.

6  Q.    Before Ali Timimi came to your house on September 16, when

7  were you planning on going to that Lashkar camp?

8  A.    I didn't have a set plan to go to LET.  You know, it was just

9  something that the guys and I used to, you know, the guys that I

10 was involved with, we used to talk about, you know, but I myself

11 didn't have a set plan to go to LET.

12 Q.    What was your --

13 A.    It's like a, I want to say fantasy, but, you know, something

14 like, oh, I might like to do that one day, you know.

15 Q.    Well, what was different about the time that it was just "I

16 might like to do that some day" and the time on September 16,

17 2001, that you decided to go get your visa the very next day?

18 A.    I mean, just, you know, Ali Timimi telling us the fatwa says

19 that it's obligatory on all Muslims, you know, and that's what I

20 understood, and in light of 9/11, I also didn't think that --

21 maybe the best thing is to, to leave United States, you know, and

22 if I could leave the United States, why not go and join the, join

23 the mujahideen, like he asked me or he told us?

24 Q.    You testified earlier that you had two cars in September

25 2001.  What did you do with them when you left?

1308

## Kwon - redirect

1   A.   I gave one of them to a Muslim brother who was at my

2   workplace, at WorldCom.  He didn't have a car -- or his car broke

3   down, and he didn't have a car at the moment.  So I gave one of

4   them to him, and the other one I gave to my brother before

5   leaving.

6   Q.   Which was -- do you recall which was the car that you were

7   renewing a registration or a license for on September 14?

8   A.   I can't recall.  It could be either, either one.

9   Q.   Why did you pay for the renewal of the registration on

10  September 14 if you were planning to -- if you go get your visa on

11  September 17?

12  A.   I didn't have any plans to leave on September 14.

13  Q.   When was the first time that you decided that you were going

14  to leave to go to a Lashkar camp?

15  A.   The night of 16th.

16  Q.   Mr. MacMahon asked you questions suggesting that Mullah Omar

17  had not called for assistance before the meeting on September 16.

18  Do you remember that?

19  A.   Yes.

20  Q.   Based on your phone -- on the phone records that you've seen,

21  when does -- about when does it appear that you picked up Ali

22  Al-Timimi at his house?

23  A.   Probably right before 8:00, maybe 7:45 or so.

24        MR. KROMBERG:  Judge, at this time, the government moves

25  in Government Exhibit 7-5d 7F24a --

# Kwon - redirect

1   THE COURT:  Whoa, whoa, I'm sorry, slow down a second.

2  7A5?

3   MR. KROMBERG:  I'm sorry, 7F5d, 7F24a, 7F24b, 7F24c.

4  The parties have stipulated that they're authentic.  They're not

5  moved in -- they are newspaper articles.  They're not moved in for

6  the truth of what's stated in them but for what was reported at

7  those times and were available in the newspaper and on the

8  Internet.

9   THE COURT:  All right, any objection?

10   MR. MAC MAHON:  Yes, Your Honor.  If I may, we probably

11  should approach on this one.

12   THE COURT:  All right.

13   (Bench conference on the record.)

14   THE COURT:  You've got some sub-numbers:  7F5d and then

15  I have 9116?

16   MR. KROMBERG:  Judge, that's just the date.

17   THE COURT:  All right.  Now, what's the objection?

18   MR. MAC MAHON:  The objection, Your Honor, Mr. Kwon said

19  that the call for troops, Mullah Omar's call for troops came, it

20  was in the fatwa that Al-Timimi read.  That was his testimony.  It

21  wasn't something he said had been reported in the papers or

22  otherwise.

23   And it's not appropriate for him to bootstrap his -- if

24  he'd said it was something that was in the newspapers, I could see

25  how they could get it in, but their own witness said it came from

1310

# Kwon - redirect

1  a fatwa.

2         And plus, we know, we've been through this before, it's

3  the September 17 paper that has something where he's asking for

4  support from his neighboring countries, but this is all beyond the

5  point, doesn't even supplant what their own witness is saying.

6         MR. KROMBERG:  Judge, first, Muhammad Aatique testified

7  already that he recalled Timimi saying Mullah Omar called for

8  help, and he didn't know and he was confused because he thought he

9  recalled it was in the fatwa, but now that he's read the fatwa, he

10  doesn't know.

11         Kwon said that he recalls Timimi saying Mullah Omar

12  called for help.  Whether in the fatwa or not, he doesn't know.

13  He doesn't speak Arabic.  He couldn't read the fatwa.

14         This is just proof that Mullah Omar had, in fact, called

15  for help and it was out there in the news on September 16 on

16  various media.

17         MR. MAC MAHON:  Your Honor, can I close it?  First,

18  Aatique, when he was done, he said he didn't think that he ever

19  called for troops.  The article from September 16 is something

20  we've looked at before.  That's a Reuters story from Islamabad,

21  Pakistan --

22         THE COURT:  I'm going to sustain the defense objection

23  because putting newspaper articles in like this the jury has no

24  way of filtering through, it's too potentially prejudicial.  Plus,

25  as I've said before, I don't think it makes any difference.

## Kwon - redirect

1    The only thing this jury has to believe, if they believe
2  it, if these witnesses are accepted as being accurate in saying
3  the defendant said the call went out, whether it went out or not
4  doesn't make any difference.  It's what he said.
5    MR. KROMBERG:  Judge, if I may, if you could look at
6  7F24a, b, and c, they're not front pages of the newspaper.
7  They're just specific articles talking about what Mullah Omar is
8  calling for.
9    THE COURT:  But even if he called for it, the key in
10  this case and the only issue in this case is whether the defendant
11  told these people that the call had gone out and did that in the
12  context of trying to inspire them to take up arms.
13    MR. KROMBERG:  Mr. MacMahon has already tried to impeach
14  the witness by saying it didn't happen by then.
15    THE COURT:  And it doesn't make any difference whether
16  it happened or not.  The question is whether it was said by the
17  defendant.
18    MR. KROMBERG:  Right.  And the fact that it was in the
19  newspapers and on the Internet on that very day is -- corroborates
20  the fact that it was said.  He's already making it happen.
21    THE COURT:  Well, unless a different door is opened, I'm
22  not letting this in.  Now, again, if it gets opened during other
23  types of questioning, I'll reconsider, but at this point, it's
24  out.
25    MR. MAC MAHON:  Thank you, Your Honor.

# Kwon - redirect

1      MR. KROMBERG:  Judge, is he barred from arguing that

2  Mullah Omar's statement did not come out at that point?

3      THE COURT:  If you make that argument, then this will

4  open the door.

5      MR. MAC MAHON:  All I'm going to argue is that -- what

6  I'm saying is the Mullah Omar statement, the difference between

7  what Aatique said and what he said is the where it came from.

8  Nobody's testified it came from a newspaper article, Your Honor.

9          There's two different stories from these witnesses.  One

10  eventually withdraws it, and, you know, whatever you want me -- I

11  don't --

12      THE COURT:  The defense can clearly argue discrepancies

13  between what the witnesses have said, but if the defense tries to

14  say there's no evidence in this record that such a call ever went

15  out from Omar, then you've opened the door.

16      MR. MAC MAHON:  I won't do that.

17      MR. KROMBERG:  And if --

18      THE COURT:  But it's not there yet.  In other words, I

19  don't believe that this issue is sufficiently at issue in this

20  case from what I've heard.  The focus is on the witness's

21  descriptions as to what the defendant said, and again, it doesn't

22  make any difference what the newspapers say.

23      MR. KROMBERG:  Judge, how could it not be corroborative?

24      THE COURT:  I've ruled on this, Mr. Kromberg.  Let's

25  move on.

## Kwon - redirect

1          MR. MAC MAHON:  Thank you, Your Honor.

2          (End of bench conference.)

3    BY MR. KROMBERG:

4    Q.    Mr. Kwon, Mr. MacMahon asked you about the money that you

5    received from the FBI.  What money from the FBI did you get when

6    you were in Hawaii?

7    A.    Nothing.

8    Q.    Mr. MacMahon asked you whether Ali Al-Timimi ever asked you

9    to carry a gun, right?

10   A.    I'm sorry?

11   Q.    Mr. MacMahon asked you whether Ali Al-Timimi ever asked you

12   to carry a gun, right?

13   A.    Right.

14   Q.    And he asked you whether he ever asked you to carry

15   explosives, right?

16   A.    Right.

17   Q.    Did you fire guns at the LET camp?

18   A.    Yes.

19   Q.    Did he -- did you carry explosives at the LET camp?

20   A.    Yes.

21   Q.    Did Ali Timimi ever counsel or advise you to go to the LET

22   camp?

23   A.    Did Ali Timimi, I'm sorry?

24   Q.    Ever advise you to go to the LET camp.

25   A.    Yes, he did.

1314

## Kwon - redirect

1  Q.    Did he help you plan how to get there undetected?

2  A.    Yes.

3  Q.    Mr. MacMahon asked you whether you looked up to Randall

4  Royer, correct?

5  A.    Correct.

6  Q.    Who did you look up to more as someone whose advice should be

7  heeded, Randall Royer or Ali Timimi?

8  A.    Ali Timimi.

9  Q.    How important to you was Royer's advice compared to Timimi's

10  advice if the two conflicted?

11  A.    Not very important.

12  Q.    Mr. MacMahon was asking you -- had asked you a question, and

13  you had said something about Ali said you should be knowledgeable

14  about these things, and I don't think you had a chance to explain

15  what "these things" were.  This was in the context of when you

16  were talking about the paintball activities and the shooting

17  ranges.

18        What -- when you said that Ali said you should be

19  knowledgeable about these things, do you recall what things you

20  were referring to?

21  A.    I mean, I remember one time he mentioned some hadeeth about

22  knowing how to shoot, and in general, as a Muslim, you know, you

23  should be -- you should be, you know, fit and knowledgeable about

24  these things and, you know, just be ready, you know, physically.

25  Q.    Do you remember the hadeeth?

1315

## Kwon - redirect

1  A.    There's another hadeeth that says something about keeping
2  your war horses ready.
3  Q.    Steeds of war?
4  A.    Steeds of war.
5  Q.    Did that hadeeth mention anything about strength as in
6  shooting?
7  A.    I don't know if it's the same hadeeth, but there's a hadeeth
8  about shooting, that shooting is strength.
9  Q.    And what -- these hadeeths are ones that you recall Ali
10  Timimi talking about?
11  A.    Yes, he talked about them.
12  Q.    What, if anything, did Ali Timimi talk about as the modern
13  equivalent of crossbows and horseback riding?
14  A.    I don't, I don't recall him telling us the modern version of
15  it, but it's obvious.  He doesn't have to tell us.
16         MR. MAC MAHON:  Objection, Your Honor.  If he didn't
17  tell him, he didn't tell him.
18         THE COURT:  Sustained.
19  BY MR. KROMBERG:
20  Q.    Did you testify earlier that you learned that you should be
21  ready for warfare as a Muslim?
22  A.    Correct.
23  Q.    What kind of warfare did you learn that you should be ready
24  for, modern warfare or medieval warfare?
25  A.    Modern warfare.

# Kwon - redirect

1  Q.    Who was -- what part did Ali Timimi have in your learning

2  that you should be prepared for modern warfare?

3  A.    I mean, all I remember is him quoting some of these hadeeths,

4  and to me, it was obvious that we should be --

5         MR. MAC MAHON:  Same thing, Your Honor.

6         THE COURT:  Sustained.

7  BY MR. KROMBERG:

8  Q.    Do you recall an instance where there was a difference of

9  opinion among the guys who were involved in paintball about

10 whether you could shorten your prayers on your way down to the

11 paintball field?

12 A.    Yes, there was some discussion on that.

13 Q.    Do you recall what the opposing viewpoints were?

14 A.    I remember some were saying that they're travelers, so they

15 can shorten their prayers, and the others said that you're not

16 traveling, so you just should pray the regular prayers.

17 Q.    Do you recall how that difference of opinion was resolved?

18 A.    I think Nabil had asked -- I thought Nabil had asked either

19 Ali Timimi or Mohammad Al-Qahtani, I don't know, I forget who, but

20 he had asked one of these, one of these two people, and I remember

21 I think we ruled that travelling or something like that.

22 Q.    You ruled --

23 A.    I think we ruled -- I mean, we followed the opinion that we

24 were travelling.

25 Q.    You were talking with Mr. MacMahon about "Russian Hell 2000,"

## Kwon - redirect

1  the DVD with the scene with Khatab killing the wounded Russian

2  soldier?

3  A.   Correct.

4  Q.   What significance did the fatwa that you found on Azzam have

5  on your conclusion that it didn't make Khatab a bad person?

6  A.   I mean, you know, I mean, the fatwa says permissible to kill

7  prisoners of war, so it's permissible here.

8  Q.   Could anyone put out a fatwa that you'd accept as the end of

9  the story?

10 A.   No.  I mean, it's got to be by somebody who's a scholar.

11 Q.   Well, how about the -- who put out the fatwa about

12 permissibility of executing prisoners of war?

13 A.   I don't exactly -- I don't remember exactly who wrote it, but

14 I remember it was on the azzam.com Internet site, and they gave a

15 lot of evidences, you know, proofs, you know.  So I accepted it.

16 I mean, pretty much a lot of these things they put on Azzam and

17 Qoqaz, we accepted it.

18 Q.   What did you think was the level of scholarship of the person

19 who -- person or people who wrote the fatwa on Azzam?

20 A.   They were scholars, I mean, legitimate scholars.

21 Q.   What did you see your role as questioning the fatwas issued

22 by scholars?

23 A.   I have no knowledge to contend their fatwas.

24 Q.   What impact did what Timimi said to you about Khatab have on

25 the way that you held Khatab in high esteem?

1318

# Kwon - redirect

1 A.    I'm sorry, say that again?

2 Q.    You testified before, did you not, that you held Khatab in

3 high esteem?

4 A.    Correct.

5 Q.    And that Timimi had said that -- had said things to you about

6 Khatab?

7 A.    I remember one time, I recall -- I seem to recall it was at

8 Dar al-Arqam, after the lecture with some group of brothers.  I

9 remember him mentioning Ibn Khatab, about something -- I don't

10 remember the details, but something like not everyone can be like

11 Ibn Khatab or something like that.

12 Q.    What impact on your estimation of Khatab's worth, worth or

13 badness did what Timimi say about him have?

14 A.    What --

15 Q.    How important was what Timimi said about Khatab in your own

16 decision to say that he was someone good to be looked up to?

17 A.    I mean, what he said, I mean, we already -- well, I, I

18 already looked up to him, and what he said just, you know,

19 agreed -- reaffirmed my, my opinion of the -- of Ibn Khatab.

20 Q.    How would you have been affected by his telling you that

21 Khatab should not be looked up to?

22         MR. MAC MAHON:  Your Honor, that's a hypothetical

23 question.

24         THE COURT:  I'm going to sustain the objection.

25 BY MR. KROMBERG:

**J.A. 1463**

1319

# Kwon - redirect

1  Q.   When Timimi told you that someone should not be looked up to,

2  how seriously did you take those opinions?

3  A.   I will consider it definitely.  I mean, Timimi has much more

4  knowledge than I do, so -- but then I wouldn't just take it for

5  face value.  I would ask him what the proof or evidence for such

6  thing will be, and usually from what I know of him, he'll give --

7  whatever he says, he gives very good evidences and proofs, so I'll

8  accept it.

9  Q.   What were the proofs and evidences that he gave you on

10 September 16 at your house regarding your obligations with respect

11 to the Taliban?

12 A.   I mean, he, he read the fatwa, and I don't remember his exact

13 words, but in the end, you know, it's, you know, Muslims versus

14 non-Muslims, and we should go and help our brothers and sisters,

15 you know.

16 Q.   Did the fatwa from Sheikh Uqla contain what you call proofs

17 or evidences?

18      MR. MAC MAHON:  Objection, Your Honor.  He said he never

19 even read it not long ago.

20      THE COURT:  I will sustain the objection, but you can

21 rephrase the question.

22      MR. KROMBERG:  Thank you, Your Honor.

23 Q.   Did what Timimi talk about when he was talking about the

24 Uqla -- when he said he was talking about the Uqla fatwa, did that

25 contain what you were calling evidences and proofs?

## Kwon - redirect

1  A.   Yes.

2  Q.   When Mr. MacMahon asked you about dying shaheed and the

3  benefits of dying shaheed, where did -- where did you learn about

4  the benefits of dying shaheed?

5  A.   I mean, I mean, some books and just, you know, talking to --

6  talking with the other brothers in discussion.  Also, you know,

7  actually, I learned a lot from Masaud.  He used to tell me about

8  the benefits of shaheed.

9  Q.   What impact, if any, did lectures at Dar al-Arqam have on

10  your knowledge about the benefits of dying shaheed?

11        MR. MAC MAHON:  Objection, Your Honor.  He didn't

12  testify he had went to a lecture at Dar al-Arqam.

13        THE COURT:  Wait.  He said what, if any, and so if he

14  says there were none, that answers it.  If there were some, then

15  he can answer it.  Overruled.

16        THE WITNESS:  When I attended lectures in Dar al-Arqam,

17  there were some lectures, especially, you know, signs of Day of

18  Judgment, about a lot of warfare and Muslims dying shaheed, but by

19  that time, I already knew the benefits of shaheed and things like

20  that.

21  BY MR. KROMBERG:

22  Q.   Were the benefits of shaheed discussed at all during lectures

23  at Dar al-Arqam?

24  A.   I don't seem to recall any lectures that talk about benefits

25  of dying shaheed.  I mean, it's, it's given, you know, I think

1321

## Kwon - redirect

1   most Muslims will know that dying shaheed is something, you know,

2   that's, you know, something that's, that's good, you know.

3   Q.    Are there different kinds of dying shaheed?

4   A.    Not that I'm aware of.

5   Q.    Is there a difference between dying, dying on a battlefield

6   in defense of Islam versus dying while fighting diabetes, for

7   example?

8   A.    I would think there's a difference.

9   Q.    And what is that difference?

10  A.    Dying fighting for sake of, sake of Allah is much better, but

11  that's what I would think.

12  Q.    Do you recall where you learned that?

13  A.    I can't recall exactly, but, you know, but, I mean, it seems

14  that, it always seems what I recall now is I always knew this --

15  not always, but even, even before I attended lectures at Dar

16  al-Arqam.

17  Q.    Do you recall talking to the FBI about this issue on March --

18  back in Hawaii on March 23?

19  A.    Yes, I remember talking to them about shaheed.

20  Q.    Do you recall telling them that Timimi had opened your mind

21  to these topics?

22  A.    I mean, I -- I mean, he would talk about, you know, upcoming

23  jihad and, you know, our -- and before signs of Day of Judgment

24  and talk about, you know, jihad, and there would be, of course,

25  people dying martyr, but if I recall now, I mean, I don't -- I

1322

## Kwon - redirect

1  think I always had this -- I always knew about this shaheed

2  before, before, even before attending these lectures because he

3  didn't have to explain the exact benefits of shaheed.  I already

4  knew.

5              And now that I'm trying to recall, I don't -- it was

6  always accepted, you know?  When he says shaheed, that's a good

7  thing, you know?

8  Q.    When he said shaheed, that's a good thing?

9  A.    When he's talking about shaheed and jihad and things like

10  this, yes, it's a good thing.

11  Q.    You mentioned, I think, that -- correct me if I'm wrong --

12  that you and Timimi had a talk about Usama Bin Laden?

13  A.    Oh, yes, I remember we had a talk about Usama Bin Laden.

14  Q.    When was that, before or after 9/11?

15  A.    Before 9/11.

16  Q.    Do you recall about when that was?

17  A.    I don't recall exact time, but I remember it was late night

18  at a restaurant.  It wasn't just me.  I seem to remember other

19  people was also present.

20  Q.    What did Timimi say about Usama Bin Laden at that time?

21  A.    Actually, I don't recall everything, but some things that I

22  recall were Usama Bin Laden's ruling that American blood --

23  American blood is permissible to spill, and, you know, he, he

24  talked about his point of view.

25              And of course, you know, I'm not saying he agreed with

1323

## Kwon - redirect

1  it because I remember him saying that -- I remember Ali Timimi
2  saying that, of course, you know, some of these things we can, we
3  can argue, but coming from his point of view, these are, like,
4  some of the, well, not arguments, some of the, I guess, arguments
5  that Usama Bin Laden has put forth that led to his conclusion of
6  that spilling American blood is permissible.
7  Q.    Did Ali Al-Timimi ever condemn to you -- condemn Usama Bin
8  Laden to you?
9  A.    No, I don't recall him ever condemning Usama Bin Laden.
10  Q.    Did he ever say Usama Bin Laden was on the right path?
11  A.    I don't recall him saying that, either.
12  Q.    You mentioned a couple of times in your testimony that you
13  tended to ask Nabil to ask Ali Timimi things rather than ask him
14  yourself.
15  A.    Right.
16  Q.    Why was that?
17  A.    I mean, like I said, I wasn't, you know, I wasn't in a
18  relationship with Ali Timimi where I can just call him up and ask
19  him questions, so -- and I felt, I felt that Nabil was because
20  Nabil is always -- since he had a role in Dar al-Arqam, it seems
21  to me that he had a lot of contact with Ali Timimi, so I used to
22  ask Nabil to ask questions to Ali Timimi.
23  Q.    Mr. MacMahon was asking you questions about the plan to get
24  canned food and water to prepare for after 9/11, and he asked you
25  why you had not done that, correct?

# Kwon - redirect

1  A.   Correct.

2  Q.   Okay.  Did Ali Al-Timimi say it was fard ayn to get canned

3  food and water after 9/11?

4  A.   No.

5  Q.   "Fard ayn" is obligatory?

6  A.   Correct.

7  Q.   Mr. MacMahon had suggested you had called Muhammad Aatique on

8  or about -- excuse me, on September 13 about going to a Lashkar

9  camp.  Did you speak to Muhammad Aatique after September 11 but

10  before he showed up on your door at September 16 about going to

11  the Lashkar camp?

12  A.   I don't recall.  I mean, like I said, after September 11, I

13  wouldn't even say these things on the phone.

14  Q.   When you were in Hawaii, when you first met Special Agent

15  Ammerman, March 22, 2003, and you told Agent Ammerman about going

16  for the walk around the pond with Royer and how Royer was going to

17  help you get to LET -- right?

18  A.   Correct.

19  Q.   You already testified that you -- that was not the whole

20  truth, right?

21  A.   Correct.

22  Q.   Because that meeting happened later, correct?

23  A.   Correct.

24  Q.   Well, who were you protecting by saying -- by omitting any

25  mention of that dinner on 9/16 when you initially spoke to Agent

# Kwon - redirect

1    Ammerman?

2    A.    Everybody who was present at that dinner.

3    Q.    Well, you certainly weren't protecting Royer at that point,

4    were you?

5    A.    No.

6    Q.    You mentioned that Masaud Khan -- and this was in the context

7    of buying the jacket -- you said that Masaud Khan is an outdoor

8    kind of guy.  What did you mean by that?

9    A.    I mean, you know, we -- actually, it's more like his brother,

10   Omer, Omer and I went hunting sometimes, and Masaud and I will go

11   shooting in York outside range in Pennsylvania, and, you know, he

12   had these boots that are very good outdoors.  I mean, it seems to

13   me that he, he had fondness for these types of things, you know.

14   Q.    What, did he camp?

15   A.    No, not that I can recall.

16   Q.    Did you drive to Gaithersburg, Maryland, on September 16 to

17   pick up Masaud Khan to bring him to your house that night?

18   A.    No.

19   Q.    How long do you think it would take to drive to -- from your

20   house to Masaud Khan's house and bring him back on September 16?

21   A.    It would probably take about an hour and a half.

22   Q.    How often did Ali Timimi ask you to do something for him when

23   you did not do it?

24          MR. MAC MAHON:  Is this in the context of a ride, Your

25   Honor, or general?

## Kwon - redirect

1          MR. KROMBERG:  Ever, Judge.  Ever.

2          MR. MAC MAHON:  I think it's too vague, Your Honor.

3          THE COURT:  Oh, I think it's -- do you understand the

4    question?

5          THE WITNESS:  Yes.

6          THE COURT:  All right, I think it's all right.

7          THE WITNESS:  But the only, only thing that, that I ever

8    recall Ali Timimi asking me was to give him a ride to Dar

9    al-Arqam.

10   BY MR. KROMBERG:

11   Q.    Did you ever turn him down?

12   A.    No.

13   Q.    Did you ever to your knowledge take a position on a matter of

14   Islamic -- on a matter involving Islam contrary to what Ali Timimi

15   told you knowingly?  Did you ever know, know that he said

16   something about Islam and you take a different position?

17         MR. MAC MAHON:  That's awfully broad, Your Honor.  I

18   mean, from 1996 forward?

19         MR. KROMBERG:  And that's what I'm asking.  Awfully

20   broad as it can be.

21         THE COURT:  All right.

22   BY MR. KROMBERG:

23   Q.    Did you ever take a position to your knowledge different from

24   what you knew Ali Timimi to say about Islam?

25   A.    I mean, I don't know everything -- his opinion on everything,

# Kwon - redirect

1  but on almost everything, that if he said it, I'll take -- I'll

2  accept it.

3  Q.   When you say "almost everything," can you recall a single

4  instance when you knew his opinion on something involving Islam

5  that you did not act in accordance with what he said?

6  A.   No.

7  Q.   Mr. MacMahon asked you about at the dinner at your house,

8  what Ali Timimi told you about going to Korea.  Was there more to

9  the story?  Did he tell you anything about going to Pakistan after

10 he told you about going to Korea?

11 A.   I seem to remember him saying, you know, once I get to Korea,

12 it's better than staying here at the United States.  And also, if

13 I want to, you know, I can also try to get to Pakistan from Korea.

14 Q.   What did you say to him at that point?

15 A.   I told him, "What if I can get to Pakistan straight from here

16 with Mahmood?

17 Q.   And what did he say?

18 A.   He said, "That's better."

19 Q.   Better than what?

20 A.   Better than going to Korea.

21 Q.   Mr. MacMahon was asking you earlier about when the agreement

22 was made between you and Hasan and Masaud to go to Pakistan on the

23 way to Afghanistan, and I think you said that there was no solid

24 agreement before Ali Timimi left -- before you took him home that

25 night, correct?

# Kwon - redirect

1  A.    Correct.

2  Q.    When you said "no solid agreement," was there any unsolid

3  agreement made before he left?

4          MR. MAC MAHON:  Objection to the form of the question,

5  Your Honor.  I'm not sure what an unsolid agreement is.

6          THE COURT:  Well, he can't lead.  I don't think the

7  words are that -- do you understand the question?

8          THE WITNESS:  I think so.

9          THE COURT:  Use the word "tentative" rather than

10 "unsolid," all right?

11 BY MR. KROMBERG:

12 Q.    Was there a tentative agreement made before he left?

13 A.    I mean, there was an indication, to me, that it seemed like,

14 you know, Masaud was ready to go, but the way I recall things is

15 that after I dropped off Ali Timimi and came back, that's when,

16 you know, it was 100 percent that we were going.

17 Q.    During that meeting at your house when Ali Timimi said that

18 according to Sheikh Uqla, it was obligatory to help the Taliban,

19 what opinions did he present to you contrary to that that it was

20 not obligatory to help the Taliban?

21 A.    He didn't introduce any contrary opinion.

22 Q.    You were asked about paying for -- whether you had paid for

23 Hasan's ticket at the travel agent, and I think you said that if

24 you paid for it, he paid you back.

25          What I'm getting at, I'd like to ask you if he paid

1329

## Kwon - redirect

1  you -- if you paid for his ticket and he paid you back, when did

2  he pay you back in relation to when you went to Pakistan?

3  A.   He paid me right back because I remember having, like, having

4  about $1,100 in my pocket when I reached Karachi, so if he paid me

5  back, it will be even before we left, actually get on the plane.

6  Q.   You were asked about the night of the 19th, when you spoke

7  with Royer, when you walked around the pond, right?

8  A.   Right.

9  Q.   Is that the night you gave him the money?

10  A.   Correct.

11  Q.   And why did you give him the money?

12  A.   Because he said he didn't have enough money to move to Bosnia

13  right away with his -- all his family.

14  Q.   And you -- what did you understand his ultimate plan to be

15  once he got his family to Bosnia?

16  A.   He said that once he got his family to Bosnia, he himself

17  would try to leave the family back in Bosnia and try to make his

18  way to Bosnia.

19  Q.   Mr. MacMahon asked you about how you went surfing when you

20  got to Pakistan, and it appeared that the original sense of

21  urgency was no longer there.  What was the -- what were the

22  reasons for the original sense of urgency?

23  A.   Our first thing was to leave United States, and our, you

24  know, once we reached Karachi, we felt this relief because we felt

25  that we might not be able to leave the United States, that at some

J.A. 1474

1330

**Kwon - recross**

1  point during our travel, that they can hold us or, you know,

2  detain us or even arrest us.

3         And also, our urgency is to get out of the United States

4  as quick as possible -- as quickly as possible.

5         MR. KROMBERG:  Thank you, Mr. Kwon.

6         Thank you, Your Honor.

7         THE COURT:  All right, Mr. MacMahon, any recross?

8         MR. MAC MAHON:  Just a few, Your Honor.

9                     RECROSS EXAMINATION

10  BY MR. MAC MAHON:

11  Q.   So when -- before you left the United States, your main

12  urgency was just to get out of the United States to avoid any kind

13  of anti-Muslim campaign you felt might be coming, right?

14  A.   That's one of them, yes.

15  Q.   Mr. Kromberg asked you about the -- whether you had ever had

16  a difference of opinion with Ali Al-Timimi.  You have no idea what

17  his opinions are on a whole multitude of issues, do you?

18  A.   Correct.

19         MR. KROMBERG:  Objection, Judge.  My question was, "Did

20  you ever have a disagreement of opinion on something that you knew

21  what his opinion was?"

22         THE COURT:  I'll sustain the objection.

23  BY MR. MAC MAHON:

24  Q.   Do you know what his opinion was on the execution of

25  prisoners in the "Russian Hell 2000" video?

1331

**Kwon - recross**

1  A.    No.

2  Q.    Have you ever on the Internet found a fatwa by Ali Al-Timimi?

3  A.    No.

4  Q.    Have you ever looked for one?

5         MR. KROMBERG:  Objection, Judge.  Beyond the scope of

6  cross.

7         THE COURT:  Sustained.

8         MR. MAC MAHON:  I thought he asked about fatwas, Your

9  Honor.

10        THE COURT:  But I think this goes too far afield.

11        MR. MAC MAHON:  Thank you, Your Honor.

12 Q.    Mr. Kromberg asked you about whether, whether in Hawaii you

13 had already started talking about the dinner, about Ali Al-Timimi,

14 right?

15 A.    Yes.

16 Q.    Do you remember those questions?

17        The very next day, the second day in Hawaii, you told

18 about the dinner at your house, didn't you?

19 A.    On the third day.

20 Q.    Third day.  Before you got back to the United States and

21 received the letter that we looked at before from Mr. Kromberg,

22 right?

23 A.    Correct.

24 Q.    You -- Mr. Kromberg asked you a bunch of questions about the

25 speech about the signs of the Day of Judgment.  Do you remember

1332

## Kwon - recross

1  those?

2          MR. KROMBERG:  Objection, Judge.  I don't remember

3  asking anything about speech about the signs of the Day of

4  Judgment.

5          THE COURT:  I don't think there was a specific question.

6  I think there was some reference made to it in one of the answers.

7          MR. MAC MAHON:  Right, in the question about jihad.

8          THE COURT:  Right.

9          MR. MAC MAHON:  Right, there was.

10 Q.   And that was a public lecture, wasn't it, sir?

11 A.   Correct.

12 Q.   And there were lots and lots of people sitting at the Dar

13 al-Arqam when that was given, right?

14 A.   Correct.

15 Q.   And you said before that you never had a single private

16 conversation with Al-Timimi about dying shaheed, did you?

17 A.   No.

18 Q.   You -- Mr. Kromberg asked you a question about Ali Timimi's

19 plan, the plan to go into the mountains with food and water, and

20 he said to you that, that you ignored that plan because it wasn't

21 fard ayn?  Do you remember that question?

22          MR. KROMBERG:  Objection, Judge.  I never said the

23 word "ignored."

24          THE COURT:  Look, the jury can remember how the

25 questions are formulated.  I don't think that's a material

**Kwon - recross**

1  difference.

2  BY MR. MAC MAHON:

3  Q.   Do you remember that question?

4  A.   Yes.

5  Q.   Okay.  When, when you were riding home from Dar al-Arqam on

6  the night of September 11, did he tell you that it was obligatory

7  upon you to follow through on his plan and get people together and

8  go to the mountains and get batteries and food and water?  Did he

9  use that word, "obligatory"?

10 A.   No.

11 Q.   But if he had, then that morning, you would have gotten

12 everybody together and started collecting food and water and

13 blankets and everything; is that right, Mr. Kwon?

14 A.   I don't know what I would have done, but I might have.

15 Q.   You don't take orders from Ali Al-Timimi, do you?

16 A.   I mean, no, but I take advice from him.

17 Q.   All right.  And then you make your own decision and do

18 whatever you want; isn't that correct?

19 A.   Correct.  I mean, now I refer back to Mr. Kromberg's question

20 about the difference of opinion.  I think I -- even if I don't act

21 upon it doesn't, doesn't mean that I disagree with it.  I might

22 not act upon it, but I usually will accept what he has to say or

23 take what he has to say.

24 Q.   You're a grown man, Mr. Kwon.  You'd make your own decisions,

25 can't you?

## Kwon - recross

1  A.    Of course.

2  Q.    Now, the last question, he asked you if, if -- about the

3  jackets that were purchased at Cabela's.

4  A.    Um-hum.

5  Q.    And Mr. -- you told him, gave an answer that Omer Khan and

6  his brother were outdoors guys?

7  A.    I mean, Omer, Omer was, like, outdoors guy.  We used to go

8  out, go out, you know, hunting, and we used to go shooting, and in

9  Blacksburg, we used to go out at night in the woods and stuff like

10 that.

11        As far as Masaud, you know, it seems to me he just had

12 fondness for this -- because I remember when he bought these

13 boots, very nice, you know, hiking boots, but it could be used as

14 casual and also rough hiking boots at the same time, and I kind of

15 noticed some of his clothing, he likes this, and I'm thinking

16 maybe the jacket is one of those things he, like, you know, that

17 he can use casually and maybe if he had to go outdoors or things

18 like that.

19 Q.    Okay.  Does thinking all that through and answering

20 Mr. Kromberg's question refresh your recollection as to why it is

21 that Mr. Khan would have brought to your house a catalog page on

22 September 16?

23        MR. KROMBERG:  Objection.  Beyond the scope of redirect.

24        MR. MAC MAHON:  He asked him about the coat, Your Honor,

25 and I'm asking if it refreshes his recollection.

1335

## Kwon - recross

1    THE COURT:  I'm going to overrule the objection.  Go
2  ahead.
3  BY MR. MAC MAHON:
4  Q.   Does what you testified about the outdoorsiness of Mr. Khan
5  refresh your recollection in any way as to why it is that Mr. Khan
6  showed up at your house on September 16, 2001, with a catalog page
7  for a jacket that you could wear in the Himalayas, Mr. Kwon?
8  A.   I don't -- I don't know, but maybe because I might have told
9  him about this contingency plan thing, and maybe he thought it was
10  a good thing for even for this plan.  I don't know.
11    MR. MAC MAHON:  I don't have anything further, Your
12  Honor.
13    THE COURT:  All right.  Mr. Kwon -- is he going to be
14  called again as a witness?
15    MR. KROMBERG:  Maybe, Judge.
16    THE COURT:  All right.  Mr. Kwon, you're not to discuss
17  your testimony with any witness who has not yet testified.  Do you
18  understand that?
19    THE WITNESS:  Yes.
20    THE COURT:  Mr. Aatique may be called again, so if
21  you're with him again in a cell, you're not to discuss anything
22  with him.  Do you understand that?
23    THE WITNESS:  I understand.
24    THE COURT:  All right, you're remanded back into custody
25  at this point.

1336

## Ammerman - direct

1              (Witness stood down.)

2         THE COURT:  I think since we're going to stop at 5:30

3    today, this is a good time to take the afternoon break.  We'll

4    reconvene at 4:00.

5              (Recess from 3:40 p.m., until 4:06 p.m.)

6                    (Defendant and Jury present.)

7         THE COURT:  Mr. Gibbs, your next witness?

8         MR. GIBBS:  The government calls Special Agent Wade

9    Ammerman to the stand.

10         THE COURT:  All right.

11      SPECIAL AGENT WADE AMMERMAN, GOVERNMENT'S WITNESS, AFFIRMED

12                    DIRECT EXAMINATION

13   BY MR. GIBBS:

14   Q.   Sir, will you please state your name for the record and also

15   spell it?

16   A.   My name is Wade Ammerman, A-m-m-e-r-m-a-n.

17   Q.   Sir, where are you employed?

18   A.   I'm an FBI agent assigned to the Washington Field Office in

19   Washington, D.C.

20   Q.   How long have you been with the FBI?

21   A.   Approximately ten years.

22   Q.   And what are some of your responsibilities and duties with

23   the FBI?

24   A.   I am assigned to a squad that conducts counterterrorism

25   investigations.

1337

## Ammerman - direct

1  Q.   And as part of your duties with the FBI, were you involved in

2  the investigation of Ali Al-Timimi and others here in Northern

3  Virginia?

4  A.   Yes, sir.

5  Q.   When did that investigation start?

6  A.   February of 2003.

7  Q.   And how did that investigation begin?

8  A.   Initially with a round of search warrants that were conducted

9  at numerous residences, one of which belonged to a Mr. Timimi.

10 Q.   And what was the date that Mr. Timimi's residence was

11 searched?

12 A.   February 25, 2003.

13 Q.   And were there any other searches done that day?

14 A.   Yes, there were.

15 Q.   What other searches were done that day?

16 A.   The residence of Ibrahim Hamdi and Nabil Gharbieh.

17 Q.   And were you involved in a particular search that day?

18 A.   I was at Mr. Timimi's residence.

19 Q.   And where is Mr. Timimi's residence located?

20 A.   It's at 4106 Meadowfield Court, in Fairfax, Virginia.

21 Q.   And was the defendant present when you searched his house?

22 A.   Yes, he was.

23 Q.   And during the course of that search, Special Agent Ammerman,

24 were a number of items seized from Timimi's residence?

25 A.   Yes.

1338

## Ammerman - direct

1    Q.    And at this point, I'd like to have you identify some of

2    those items that were seized, beginning with -- and we'll need

3    some assistance on this one -- Government Exhibit 7A20.

4    A.    I have it in front of me.

5    Q.    And what is Government Exhibit 7A20?

6    A.    This is a document with Arabic writing on it.  Subsequent

7    translation revealed this to be the Uqla fatwa.

8    Q.    And this Arabic document was seized from Ali Timimi's

9    residence?

10   A.    Yes.

11   Q.    And you can identify it?

12   A.    Yes, I can.

13   Q.    And how can you identify it?

14   A.    I recognize the markings on here as containing my

15   handwriting.  I was also the one who removed it from its original

16   evidence packaging.

17            MR. GIBBS:  Okay.  And at this time, Judge, we would

18   move 7A20 in and just publish it to the jury.

19            THE COURT:  Any objection?

20            MR. MAC MAHON:  The exhibit is incomplete, Your Honor.

21            THE COURT:  Well, whether it's complete or incomplete,

22   if this is what was seized from the house --

23            MR. MAC MAHON:  Except what's missing is important, Your

24   Honor, which is the date of the document.

25            THE COURT:  That is an issue that goes perhaps to its

1339

## Ammerman - direct

1   total probativeness, but in terms of its admissibility, it was

2   something seized from the defendant's residence, and it appears to

3   have relevance to the case, so I'm going to allow it in.

4           MR. MAC MAHON:  Thank you, Your Honor.

5           THE COURT:  You can certainly probe the document.

6           All right, it's in.

7           (Government's Exhibit No. 7A20 was received in

8   evidence.)

9           MR. GIBBS:  All right.  And if we could just publish

10  that briefly?

11  Q.   All right.  Now, moving on, Special Agent Ammerman --

12  actually, can you enlarge that?

13          THE COURT:  Well, it's not going to help any.

14          MR. GIBBS:  Yeah.

15                      (Laughter.)

16          THE COURT:  No one's going to be able to read it.

17  BY MR. GIBBS:

18  Q.   And you recognize your handwriting on there?

19  A.   Yes, I do.

20  Q.   Okay.

21          THE COURT:  That's the one thing, where is your

22  handwriting on that document?

23          THE WITNESS:  It's the handwriting that indicates 1B12,

24  item 1, document 3.

25          THE COURT:  All right, the jury can read that.

**J.A. 1484**

1340

**Ammerman - direct**

1        MR. GIBBS:  Thank you.

2   Q.   Next we go to Government Exhibit 7A38.

3   A.   I have it.

4   Q.   All right.  What is that document -- or what is that?

5   A.   This is another document which contains Arabic writing.

6   Again, it was seized from Mr. Timimi's residence.  This is a

7   statement by Usama Bin Laden.

8        MR. GIBBS:  And Judge, at this time, again, we'd move

9   7A38 in and publish it to the jury.

10       THE COURT:  All right.  Any objection?

11       MR. MAC MAHON:  No, Your Honor.

12       THE COURT:  All right, it's in.

13       (Government's Exhibit No. 7A38 was received in

14   evidence.)

15   BY MR. GIBBS:

16   Q.   And, Special Agent Ammerman, turning next to Government

17   Exhibit 7A39?

18   A.   Yes, sir.

19   Q.   It should be the next document in there.

20   A.   I have it.

21   Q.   And do you recognize 7A39?

22   A.   Yes, I do.

23   Q.   What is that?

24   A.   This is another document which contains Arabic writing seized

25   from Mr. Timimi's residence.  Subsequent translation revealed this

**J.A. 1485**

## Ammerman - direct

1  to be an article about the space shuttle crash in February of

2  2003.

3          MR. GIBBS:  All right, thank you.

4          And again, at this time, Judge, we'd move 7A39 into

5  evidence and publish it.

6          THE COURT:  All right.  Subject to your previous

7  objection, I assume?

8          MR. MAC MAHON:  Yes, Your Honor.

9          THE COURT:  Objection overruled, so it's in.

10          MR. MAC MAHON:  Thank you.

11          (Government's Exhibit No. 7A39 was received in

12  evidence.)

13  BY MR. GIBBS:

14  Q.   Now, next, Special Agent Ammerman, I'd like to have you turn

15  to Government Exhibit 10A9.

16  A.   Okay.

17  Q.   I believe it's in a separate volume.

18  A.   Yes, sir, I have it.

19  Q.   And what is Government Exhibit 10A9?

20  A.   This is a telephone statement from AT&T bearing the account

21  name Ali Al-Timimi.  It was seized during the search of

22  Mr. Timimi's residence.

23  Q.   All right.  And these, these are basically his phone records,

24  correct?

25  A.   Yes.

1342

## Ammerman - direct

1   Q.   And you analyzed these records at a later time?

2   A.   Yes, I did.

3   Q.   But you took them into evidence on February 25, 2003?

4   A.   That's correct.

5         MR. GIBBS:  All right.  Judge, at this time, we'd move

6   those in.  We don't need to publish them at this point.

7         THE COURT:  Any objection?

8         MR. MAC MAHON:  No objection, Your Honor.

9         THE COURT:  All right, 10A9 is in.

10         (Government's Exhibit No. 10A9 was received in

11   evidence.)

12         MR. GIBBS:  Thank you.

13   Q.   Next, Special Agent Ammerman, I'd like you to turn to

14   Government Exhibit 10A16.

15   A.   I have it.

16   Q.   And what is 10A16?

17   A.   This is a series of paper copies of what appear to be

18   PowerPoint slides.  It indicates a lecture by Mr. Timimi

19   "Al-Muntada Al-Islami," seized from Mr. Timimi's residence in

20   February 2003.

21         MR. GIBBS:  Thank you.

22         At this time, Judge, we would move 10A16 into evidence.

23         THE COURT:  Any objection?

24         MR. MAC MAHON:  No.

25         THE COURT:  All right, it's in.

1343

## Ammerman - direct

1          (Government's Exhibit No. 10A16 was received in

2    evidence.)

3          MR. GIBBS:  And at this time, we would publish 10A16.

4    Q.   Now, Special Agent Ammerman, is this the first page of that

5    exhibit?

6    A.   Yes, sir.

7    Q.   All right.  There's a couple of pages inside I'd like to take

8    a look at, if we could move forward.

9          MR. MAC MAHON:  Your Honor, if I could, I think it would

10   be helpful if they could see the first page.

11         THE COURT:  Go ahead then.  Mr. Gibbs, show the first

12   page.

13         MR. MAC MAHON:  See the table on it.

14         THE COURT:  Can you blow it up just slightly?

15         MR. GIBBS:  Can we try to enlarge that?

16         Thank you.

17   Q.   And this was a lecture of Ali Al-Timimi, "Al-Muntada

18   Al-Islami," Islamic Studies Course, London, 27th to 29th November

19   1998; is that correct?

20   A.   Correct.

21   Q.   Thank you.

22         Now, if we could look to the next, if we could enlarge

23   that a bit?

24         In the lower left-hand corner, it indicates, "When is

25   jihad required upon each and every Muslim?  General call to arms

1344

## Ammerman - direct

1  by the imam, Attack by the unbelievers, When the ranks of the

2  believers face the ranks of the unbelievers in battle."

3        That's one of the PowerPoint slides you seized on

4  February 25, 2003?

5  A.   Yes, it was.

6  Q.   And then if we could go to the next page?

7        MR. MAC MAHON:  Your Honor, I'm sorry, was the copy

8  found at Al-Timimi's house highlighted in yellow like this, or is

9  this what the government has done to enhance the exhibit?

10        THE COURT:  That's a fair question.

11        THE WITNESS:  I can answer.  That's a highlight that the

12  government added to the exhibit.

13        MR. GIBBS:  And, Judge, since I'm reading from it, I

14  think that's appropriate to have it highlighted, but I would note

15  for the record that I believe throughout these exhibits, if

16  there's any different-colored highlighting, it has been enhanced

17  by the government.

18        THE COURT:  The copy that the Court has is all just

19  plain white paper with black text.

20        MR. GIBBS:  Correct.

21        THE COURT:  Is that how it was received at the

22  residence?

23        THE WITNESS:  Yes, ma'am.

24        THE COURT:  Then that's how it will go to the jury.

25        MR. GIBBS:  I understand.

## Ammerman - direct

```
 1              THE COURT:  In an uncolored version.

 2              But certainly since we use highlighting in court -- but

 3     the problem I have is it's a multi-page document which apparently

 4     doesn't have page numbers.  So the jury can perhaps get to this

 5     page -- what page within this exhibit is this?

 6              MR. GIBBS:  I'm not certain.  Perhaps Special Agent

 7     Ammerman -- it's the 13th page, Judge.

 8              THE COURT:  All right, so the jury knows.  Go ahead.

 9     BY MR. GIBBS:

10     Q.   And then if we could turn to the next page that we've

11     identified?  And is this the next page in the exhibit?

12     A.   I believe so.  I have the original in front of me.  I can

13     tell you definitively.

14              That is the following page in the exhibit, yes.

15              MR. GIBBS:  So for the record, Judge, this would be the

16     14th page.

17              THE COURT:  All right.

18     BY MR. GIBBS:

19     Q.   And, Special Agent Ammerman, in the upper right-hand corner

20     of this PowerPoint slide, it indicates, "The jihad of the

21     victorious party.  Offensive jihad, Sunni Muslim state which has

22     raised the banner of jihad; Defensive jihad, Weak Muslim state,

23     Defend Muslims (beliefs, morals, blood, & lands); No Muslim state,

24     Establish an Islamic state."

25              And then below that, it indicates, "Effect of their
```

1346

## Ammerman - direct

1  jihad in warding off strangeness - 2.  Situation today.  No

2  offensive jihad for centuries, UN, New World Order led by a single

3  super power (USA)."

4           And just for the record, this was another one of the

5  slides that was -- or another one of the pages from that document

6  that was sized in February of 2003?

7  A.   Yes.

8  Q.   Thank you.

9           And if we could, I'd like you to turn to the next

10 exhibit.  I'd like you to identify, it's Government's Exhibit

11 10A20.

12 A.   I have it.

13 Q.   And what is Government's Exhibit 10A20?

14 A.   This is a document bearing the title "The Day of Wrath," by

15 Ibn Abd Al-Rahman Al-Hawali.

16 Q.   And where did you find this document?

17 A.   This was found in Mr. Timimi's residence during the search in

18 February of 2003.

19           MR. GIBBS:  And we would move this document into

20 evidence.

21           THE COURT:  Any objection?

22           MR. MAC MAHON:  Just to relevance, Your Honor.  There

23 are thousands of documents in his house, but --

24           THE COURT:  Well, you'll be allowed to put in those that

25 you wish to as well, but I'll permit this to go in.

**Ammerman - direct**

1          (Government's Exhibit No. 10A20 was received in

2    evidence.)

3          MR. GIBBS:  Thank you, Judge.  And at this time, I'd

4    like to publish it to the jury.  If we could enlarge that first

5    page?

6    Q.   And, Special Agent, that is the opening page of this

7    document, 10A20?

8    A.   Yes.

9    Q.   Then if we could move to page 4 of this document?

10          And do you see the two paragraphs that are on the screen

11   on page 4 of that document?

12   A.   Yes.

13   Q.   And it indicates, "An unprecedented Muslim consensus that the

14   only solution is jihad, these are the words of leaders, scholars,

15   thinkers, strategists, populists, preachers, the illiterate

16   masses, men, women, children...Everyone agrees with these words

17   which no sooner enter the ear and settle into the depths of the

18   heart, then new questions arise:  how?  From where?  With whom?

19   When?  Will the rulers do this?  Will the Americans do that?

20          "A government-appointed scholar of the Azhar declares on

21   the most widely-viewed satellite television channel that the only

22   way to deal with the Jews is with the principle:  'Slay them

23   wherever you find them.'  The interviewer asks, "But Shaykh, do

24   you mean actual killing?'  (That is, 'Do you understand what you

25   are saying?').  'Does the Azhar agree with you?'  And the answer

1348

**Ammerman - direct**

1    is unequivocally:  'Yes.'"

2           And that was from page 4 of Government Exhibit 10A20?

3    A.   Yes.

4    Q.   Thank you.

5           If we could, let's turn to the next exhibit,

6    Government's Exhibit 10A25.  Before we put it on the screen, once

7    you've had a chance to look at that, if you can just identify it?

8    A.   10A25 is a one-page document which bears the letterhead of

9    JIMAS, J-I-M-A-S, and underneath the letterhead, there is a

10   question, a handwritten question.

11          MR. GIBBS:  And, Judge, we would move 10A25 into

12   evidence.

13          THE COURT:  Any objection?

14          MR. MAC MAHON:  No objection, Your Honor.

15          THE COURT:  All right, it's in.

16          (Government's Exhibit No. 10A25 was received in

17   evidence.)

18          MR. GIBBS:  And we would publish that one-page document.

19          And if we could enlarge that?

20   Q.   And, Special Agent Ammerman, the document indicates, the

21   question is, "What is our position when someone asks reference to

22   civilians being killed in Palestine?  Do we say mashallah or do we

23   condone it.  Is this the same for suicide bombers killing

24   civilians."

25          Is that's what's contained on Government Exhibit 10A25?

1349

## Ammerman - direct

1  A.   Yes.

2  Q.   If we could move next to Government Exhibit 10A26?  And what

3  is that document?

4  A.   This is another piece of paper with the same JIMAS

5  letterhead, with another handwritten question below it, again

6  seized from Mr. Timimi's residence in February of 2003.

7       MR. GIBBS:  And again, Judge, we would move 10A26 into

8  evidence.

9       THE COURT:  Any --

10      MR. MAC MAHON:  Subject to the same objections we had

11  before, but other than that, no.

12      THE COURT:  It's in.

13      (Government's Exhibit No. 10A26 was received in

14  evidence.)

15      MR. GIBBS:  And we'd like to publish 10A26 and try to

16  enlarge it if we could.

17 Q.   And the question, Special Agent Ammerman, on the exhibit is,

18 "Please could you advise us Muslims how we can liberate the lands

19 of the Holy City Jerusalem and Masjid Al-Aqsa, which is under the

20 illegal occupation of Jews?"  Is that correct?

21 A.   Yes.

22 Q.   Next we would go to Government Exhibit 10A27.  Do you have

23 that before you?

24 A.   Yes.

25 Q.   What is 10A27?

1350

## Ammerman - direct

1  A.   Another similar piece of paper with JIMAS letterhead, with a

2  handwritten question underneath, seized from Mr. Timimi's

3  residence in February 2003.

4          MR. GIBBS:  Judge, again, we'd move 10A27 into evidence.

5          THE COURT:  I assume it's the same objection?

6          MR. MAC MAHON:  Yes, Your Honor.

7          THE COURT:  All right, it's in.

8          (Government's Exhibit No. 10A27 was received in

9  evidence.)

10         MR. GIBBS:  And if we could enlarge that now that it's

11 been published?

12 Q.   Special Agent Ammerman, 10A27 reads, "Since Jihaad is the

13 only way to get back this land, does one have to go to the

14 battlefield if the person can help otherwise, i.e., charity, etc.?

15 Would this be enough or do we still have to go Jihaad?"

16         And is that what's indicated on that question?

17 A.   Yes.

18 Q.   If you could, please turn to Government's Exhibit 10A29.

19 A.   Okay.

20 Q.   And what is Government's Exhibit 10A29?

21 A.   This is a flier bearing the title "Ali At-Timimi oZ' Tour

22 2000 Tour Guide," seized from Mr. Timimi's residence in February

23 2003.

24         MR. GIBBS:  Judge, we would move 10A29 into evidence.

25         THE COURT:  Any objection?

1351

## Ammerman - direct

1      MR. MAC MAHON:  No objection, Your Honor.

2      THE COURT:  All right, it's in.

3      (Government's Exhibit No. 10A29 was received in

4  evidence.)

5      MR. GIBBS:  And we would publish it.

6  Q.    Now, Special Agent Ammerman, do you see 10A29 on the screen?

7  A.    Yes.

8  Q.    And is that the document you just testified about that was

9  seized from Ali Timimi's house?

10  A.    Yes, it is.

11  Q.    If you could, please turn to Government Exhibit 10A33.

12  A.    Okay.

13  Q.    What is Government Exhibit 10A33?

14  A.    This is a document written in English bearing the title

15  "Sheikh Abdullah Al-Ghunayman's Fatwa on Aiding the Taliban,"

16  seized from Mr. Timimi's residence in February of 2003.

17      MR. GIBBS:  Judge, we would move Government's Exhibit

18  10A33 into evidence.

19      MR. MAC MAHON:  No objection, Your Honor.

20      THE COURT:  All right, it's in.

21      (Government's Exhibit No. 10A33 was received in

22  evidence.)

23      MR. GIBBS:  If we could enlarge the top so we can see

24  the title?

25  Q.    And the title you see there on the screen, is that the, the

## Ammerman - direct

1  heading of this particular document?

2  A.    Yes, it is.

3  Q.    All right.  And if we could turn to the document itself,

4  there's a couple of sections I'd like to have you take a look at.

5  Now, on the first page, the paragraphs you see before you, this is

6  the second paragraph of the first page, correct?

7  A.    That's correct.

8  Q.    And it reads as follows:  "You, may Allah preserve you, are

9  no doubt aware of what is happening in the land of Afghanistan and

10 the gathering of groups from all regions of the earth to fight

11 them.  To further aggravate matters the neighbouring countries

12 have closed off the routes to aiding them; at the same time some

13 of those who adhere to Islam, and some of the scholars have raised

14 their voices to take a stance against the Taliban government and

15 the people of Afghanistan, siding with America and her allies.

16         "1) What is your view, may Allah preserve you,

17 concerning aiding the Taliban government and its subjects?

18         "2) What is the ruling of one who sides with America,

19 Britain and their allies against the Taliban?

20         "3) Does this calamity which has occurred amongst the

21 Muslims allow them to make Qunut for them and supplicate against

22 their enemy?"

23         And that's on page 1?

24 A.    Yes.

25 Q.    If we could move over to the second page?  At the top,

1353

**Ammerman - direct**

1  Special Agent, does it indicate, "Secondly, it is clear that their

2  goal in this war is to humiliate the Muslim nations, to force them

3  into subservience to America and to protect the Jewish land from

4  any danger that may threaten it."

5          And then if we could move further down on page 2?  Does

6  it indicate further down, about midway down page 2, "It is

7  obligatory to help the Muslims of Afghanistan and others in their

8  efforts to defend their religion, lands and honour from the

9  attacks of the disbelievers.  Allah, the Exalted, says, 'if they

10 ask you for help, it is your duty to help them.'  The Messenger of

11 Allah said, 'the Muslim is the brother of the Muslim, he does not

12 oppress him or surrender him.'

13         "Therefore, it is obligatory to aid them as much as is

14 possible.

15         "As for siding with the disbelieving nations and aiding

16 them against them [the Muslims], the one who does is one of them

17 [the sisbelievers].  Allah, the Exalted says, 'O you who believe!

18 Take not the Jews and Christians for your friends and protectors;

19 they are but friends and protectors of each other.  Whoever

20 amongst you turns to them [for friendship and protection] is

21 indeed one of them.'  There are many verses concerning this."

22         Then if we could move to the next section?  And this is

23 at page 3, at the bottom, correct?

24 A.    Yes.

25 Q.    And does it say there, "Thus the Amaanah, then the 'Ukaadh'

1354

**Ammerman - direct**

1  Magazine, and then the rumour-monger website have exposed their
2  own foolishness, in their bid to wage war against the Scholars.
3  And even if they do not accept the fatwa of Sheikh Ibn Jibreen,
4  nor of Humood al-'Uqlaa, then for their information we've had two
5  more senior scholars to give their ruling on aiding the Taliban
6  against the American crusaders, Sheikh 'Abdur-Rahmaan al-Barraak
7  and Sheikh 'Abdullaah al-Ghunayman, and as time passes,
8  InshaaAllah we'll see more of these fatawas from Ahlus-Sunnah
9  pouring in, so Ayna al-Mafar (Where will you run)?"

10        Then if we could turn to the last page, which I believe
11  is page 4, does it indicate in the middle of the page, "Lastly, at
12  this time of crisis, when the Western powers have globally
13  mobilized their efforts to besiege Afghanistan -- not because of
14  terrorism -- but due to the existence of Islam in Afghanistan as a
15  state, it is not sane for a Muslim to write, say or do something
16  that might aid the world coalition of propaganda either directly
17  or indirectly against the Taliban.  Moreover, Muslims should not
18  pay attention to these issues of refutations as they are
19  continuous and will never end.  In fact, these situations are
20  mostly created by the enemies of Islam who always like to create
21  diversions for those who seek to positively remedy the situation.
22  Therefore, do not be diverted by these e-mails and rumours, rather
23  focus on the major issue faced by the Muslims in Afghanistan at
24  present and think how you can be of benefit to them."

25        All right, thank you, Special Agent Ammerman.  Next I'd

1355

### Ammerman - direct

1   like you to turn to another document, it's Government Exhibit

2   10A34.  Do you have that there before you?

3   A.   Yes, I do.

4   Q.   All right, what is that document?

5   A.   10A34 is a multiple-page document.  The first page is

6   entitled "Sheikh 'Abdur-Rahmaan Al-Barraak's Fatwa on Aiding the

7   Taliban."  There are other excerpts in this document that I could,

8   I could name for you.  One is Sheikh Humood Bin Uqla

9   Ash-Shu'aibi's Fatwa on the Recent Events."  It's written in

10  English.

11       There's another part of this document that's written in

12  Arabic.  It appears to be about five pages' worth of Arabic.  And

13  then at the end, there's another Sheikh 'Abdullah Al-Ghunayman's

14  Fatwa on Aiding the Taliban, and at the very end of the document,

15  there is two pages of English that bears the title "The Status of

16  our Senior Scholars and the Clarification of the Lie Upon Them."

17  Q.   And these documents, were they all together when they were

18  seized at Ali Timimi's house?

19  A.   Yes, sir, they were.  It's a double-sided copy of that series

20  of documents.

21       MR. GIBBS:  And, Judge, at this time, we would move

22  Government's Exhibit 10A34 into evidence.

23       THE COURT:  Any objection?

24       MR. MAC MAHON:  No objection.  One of them is repetitive

25  of the last one, but other than that --

1356

## Ammerman - direct

```
 1            THE COURT:  All right, it's still in.
 2            (Government's Exhibit No. 10A34 was received in
 3   evidence.)
 4   BY MR. GIBBS:
 5   Q.   And I just wanted to briefly just go through and for the
 6   record just have you identify the documents on the screen, just
 7   really the first page.
 8            If we could enlarge that a little bit?
 9            Is that the first document in the multi-document stack
10   that you have before you?
11   A.   Yes, it is.
12            MR. GIBBS:  And if we could move to the next one?
13   Q.   And is that the caption of the next document?
14   A.   Yes, it is.
15   Q.   And is this also one of the documents that you -- was part of
16   that multi-document stack that you got?
17   A.   It is.  I think it's the one we just looked at.
18   Q.   Okay.  That's a repeat, okay.
19            And this is Sheikh Uqla's fatwa, correct?
20   A.   Right.
21   Q.   Then if we could just go -- is this the last one you had?
22            Okay.  That's fine.  All right.
23            Special Agent Ammerman, if we can next go to Government
24   Exhibit 10A36?  And this is actually a -- it may be in there, but
25   it's not going to be a document.
```

1357

## Ammerman - direct

1  A.    Yes, I have it.

2  Q.    All right, what is 10A36?

3  A.    10A36 is a, a cassette tape that bears the title "Songs of

4  The Mujahideen" at the bottom.  At the top, it says "Islamic

5  Center Productions."

6  Q.    And where was this item found?

7  A.    This tape was found in Mr. Timimi's automobile, which was

8  also searched at the same time his residence was searched in

9  February of 2003.

10  Q.    And this was taken into evidence at that time, correct?

11  A.    Yes, sir.

12        MR. GIBBS:  All right.  Judge, at this time, we would

13  move 10A36 into evidence.

14        THE COURT:  Any objection?

15        MR. MAC MAHON:  No objection, Your Honor.

16        THE COURT:  All right, it's in.

17        (Government's Exhibit No. 10A36 was received in

18  evidence.)

19  BY MR. GIBBS:

20  Q.    And next we've got Government Exhibit 10T10.  If you could

21  take a look at that item?

22  A.    I have it.

23  Q.    What is Government Exhibit 10T10?

24  A.    10T10 is another cassette tape.  It bears the title "A Word

25  of Advice to the Salafis of the UK."  It was seized from

1358

## Ammerman - direct

1  Mr. Timimi's residence in February of 2003.

2          MR. GIBBS:  And, Judge, at this time, we would move

3  10T10 into evidence.

4          THE COURT:  Any objection?

5          MR. MAC MAHON:  No objection, Your Honor.

6          (Government's Exhibit No. 10T10 was received in

7  evidence.)

8  BY MR. GIBBS:

9  Q.   All right, Special Agent Ammerman, that concludes the items I

10  wanted to ask you about from the search of Ali Timimi's residence,

11  and what I'd like to do is turn your attention to a different

12  topic.  At some point after the search of Ali Timimi's residence,

13  did you determine that you wanted to speak with an individual by

14  the name of Yong Kwon?

15  A.   Yes.

16  Q.   All right.  How did that come about?

17  A.   Yong Kwon was someone that we wanted to speak to with regards

18  to his travel to Pakistan, specifically with regard to what we

19  believed to be his intention to going to Afghanistan to fight

20  against Americans there.

21  Q.   And what efforts did you make to try to locate Yong Kwon?

22  A.   I visited Yong's brothers, who still resided in Fairfax.  I

23  visited them on March 12 of 2003, trying to determine Yong's

24  whereabouts.  At that point, I was able to determine that he was

25  in Korea, so I asked his brothers to call him and have him call

1359

**Ammerman - direct**

1   me.

2   Q.   And did Yong Kwon actually call you?

3   A.   Yes, he did.

4   Q.   And when was that roughly?

5   A.   He called me the next day, on March 13.

6   Q.   And what did you tell him?

7   A.   I told him I wanted to meet with him face to face and talk

8   with him about his travels to Pakistan.

9   Q.   What was his reaction?

10         MR. MAC MAHON:  Your Honor, I object.  Mr. Kwon just got

11   off the stand.  He testified for hours.  It's hearsay for the

12   agent to bring it in -- none of these statements could be in

13   furtherance of the conspiracy at that time.

14         MR. GIBBS:  Judge, I'm simply trying to establish what

15   Yong Kwon said that impacted what the agent next did.

16         THE COURT:  All right, if it's not being offered for the

17   truth of its contents, I'll permit it.

18         MR. GIBBS:  Judge -- I'm just trying to establish the

19   foundation, Judge.

20   Q.   And what was his reaction when you told him you wanted to

21   speak with him?

22   A.   He said okay.  In a series of conversations that ensued, I

23   think I had four conversations with him in total, he ultimately

24   agreed to meet me in Hawaii.

25   Q.   And all four of these conversations were on the telephone

1360

## Ammerman - direct

1   between you here in Washington, D.C., and him in Korea?

2   A.   That's right.

3   Q.   And what was the date you set to meet with him in Hawaii?

4   A.   March 22, 2003.

5   Q.   And is that when you actually did meet with him?

6   A.   Yes.

7   Q.   Was it just you that went to Hawaii, or did anybody else

8   accompany you?

9   A.   I went with another agent assigned to my squad named Special

10  Agent Tracy Kneisler.

11  Q.   And when you first -- what was the date that you first met

12  with him in Hawaii again?

13  A.   March 22, 2003.

14  Q.   And where did that first meeting take place?

15  A.   I picked Yong and his father up at the airport in Honolulu,

16  transported them back to their hotel, allowed him to get some

17  rest, and picked him up a little bit later in the day and

18  interviewed him at the FBI office in Honolulu.

19  Q.   And over the ensuing days, did you have a number of

20  interviews with Yong Kwon?

21  A.   Yes, I did.

22  Q.   And after several days, did you ask Yong Kwon to come back to

23  the United States?

24  A.   Yes.

25  Q.   And did he agree to do so?

## Ammerman - direct

1  A.    Yes, he did.

2  Q.    What was the date that he actually came back to the United

3  States?

4  A.    We landed at Washington Reagan Airport on March 27 of 2003.

5  Q.    And did you travel with him when he came back to the United

6  States?

7  A.    Yes, I did.

8          THE COURT:  You mean the Continental.  People from

9  Hawaii would be very upset about that line of questioning.

10                        (Laughter.)

11         MR. GIBBS:  Thank you, Judge.

12 Q.    What -- at what point or on what date was Yong Kwon

13 eventually arrested?

14 A.    About a month after arriving in the Washington, D.C. area,

15 more specifically, on April 29 of 2003.

16 Q.    And what was Yong Kwon's attitude towards being arrested?

17 A.    He was cooperative.

18 Q.    And how often did you speak with Yong Kwon between the time

19 you met with him in Hawaii and the time that he was arrested on

20 April 29, 2003?

21 A.    On almost a daily basis.

22 Q.    And you indicated that in Hawaii, you had a number of

23 interviews with Yong Kwon?

24 A.    Yes.

25 Q.    And when was the first time Yong Kwon admitted to you that he

1362

# Ammerman - direct

1   had attended an LET camp?

2          MR. MAC MAHON:  Your Honor, I object.  Mr. Kwon just

3   testified.  I was told I couldn't use certain documents, couldn't

4   even show them up in the air, and now we're having an agent

5   testify to all these things?

6          MR. GIBBS:  Judge, this is a prior consistent statement.

7   Mr. Kwon was impeached repeatedly --

8          THE COURT:  I'm going to permit this, and you can go

9   into anything you want in this area on cross, but obviously, Kwon

10  has been probably the longest witness in this case.  He was

11  extensively cross-examined.  The government does have a right to

12  go into this.

13         MR. GIBBS:  Thank you, Judge.

14  Q.   Special Agent Ammerman, when was the first time that Yong

15  Kwon admitted to you that he attended an LET camp?

16  A.   In our first interview.

17  Q.   Now, how long did it take -- or how far into the interview

18  was it before he admitted that fact to you?

19  A.   About an hour and a half into the interview.

20  Q.   And was there anything you had to say to Yong Kwon to get him

21  to admit to that information?

22  A.   Yes.

23  Q.   And what did you say to him, if anything?

24  A.   I told him I knew he was lying and I wanted him to tell me

25  the truth.

1363

## Ammerman - direct

1  Q.   And after that point, he admitted the information about LET?

2  A.   He did.

3  Q.   Specifically, what did he tell you?

4  A.   He told me that --

5         MR. MAC MAHON:  Your Honor --

6         THE COURT:  Well, wait.  On this point now, I'm going to

7  sustain the objection, all right?  We're not going to hear it a

8  second time through the words of an agent.

9         MR. GIBBS:  That's fine, Judge.  Yeah, I can tighten

10  that up.  That's fine.

11  Q.   Now, Special Agent Ammerman, when was the first time that

12  Yong Kwon admitted to you that Mahmood Hasan went to the LET camp

13  as well?

14  A.   During that same interview on March 22.

15  Q.   And when was the first time Yong Kwon admitted to you that he

16  told Ali Timimi that he was going to the LET camp?

17  A.   In that first interview, on March 22, Yong told me that it

18  was his belief that Mr. Timimi was aware of his travels to LET.

19  Q.   And when was the first time that Yong Kwon said anything

20  about Afghanistan in connection with Ali Timimi?

21  A.   In the third interview with Yong, he talked about the meeting

22  on 9/16, and it was in that interview that he told me that

23  Mr. Timimi had advised everyone at the meeting to join the

24  mujahideen anywhere in the world, and it included Chechnya,

25  Kashmir, or Afghanistan.

1364

**Ammerman - direct**

1  Q.   And what was the date of that interview?

2  A.   That was on March 24 of 2003.

3  Q.   All right.  So that's the third day in Hawaii?

4  A.   Yes, sir.

5  Q.   And he hadn't told you that beforehand?

6  A.   He hadn't told me about the 9/16 meeting until that day.

7  Q.   Now, what, if anything, did Kwon tell you that Timimi had

8  said at the Dar al-Arqam on September 11, 2001?

9            MR. MAC MAHON:  Your Honor, now we're --

10           THE COURT:  Yes, I'm going to sustain that objection.

11  We're not going to go into the content of what was said, just

12  dates when things were said.

13           MR. GIBBS:  That's fine, Judge.

14  Q.   Now, when was the first time that Yong Kwon admitted to you

15  that he had a meeting in his house on September 16, 2001?

16           MR. MAC MAHON:  That's asked and answered, Your Honor.

17  He just answered that question.

18           THE COURT:  Yes, sustained.

19  BY MR. GIBBS:

20  Q.   And when was the first time Yong Kwon admitted to you that

21  Timimi was at his house at that meeting on 9/16?

22  A.   That occurred on -- in the third interview, on March 24,

23  2003.

24  Q.   And when was the first time that Yong Kwon told you that

25  Timimi had advised him to leave the United States?

**J.A. 1509**

1365

**Ammerman - direct**

1  A.    That actually occurred in the very first interview, which
2  happened on March 22, 2003.
3  Q.    And when was the first time that Yong Kwon admitted to you
4  that Masaud Khan had also gone to the LET camp?
5  A.    He told me that on April 2 of 2003.
6  Q.    Now, when was the first time that Kwon told you that Timimi
7  said on September 11 that the United States was not a good place
8  for Muslims?
9        MR. MAC MAHON:  Your Honor, this is just a different way
10 to ask the same question you just sustained the objection.
11       THE COURT:  I'm sustaining the objection.  It's also a
12 leading question.
13       MR. MAC MAHON:   Thank you.
14 BY MR. GIBBS:
15 Q.    Now, Special Agent Ammerman, when was the first time that
16 Yong Kwon admitted to you that Muhammad Aatique had also gone to
17 the LET camp?
18 A.    That admission came on April 7 of 2003.
19 Q.    And how did that come about?
20 A.    It occurred in the late afternoon, when I was visiting Yong
21 at a hotel room that he was staying in in Alexandria.  When I
22 entered the room, he told me that he had something to tell me,
23 which was that --
24       MR. MAC MAHON:  Your Honor, we're beyond the scope of
25 what you said they could do.  If you want to put the dates in,

1366

## Ammerman - direct

1   that's fine, but rehashing the statements of the witness --

2           THE COURT:  Sustained.

3   BY MR. GIBBS:

4   Q.   And you said it was April 7 that Kwon first admitted that

5   Muhammad Aatique had gone to an LET camp?

6   A.   That's right.

7           MR. MAC MAHON:  Your Honor, I object to the form.  The

8   word "admitted," I think, is meaning that there's some truth to

9   it.  The first time he said these things --

10          THE COURT:  All right, all right, all right.  I'll

11  sustain the objection to the form of the question.

12  BY MR. GIBBS:

13  Q.   You testified that the first time Kwon told that you Aatique

14  had gone to an LET camp was on April 7 of 2003?

15  A.   Yes, sir.

16  Q.   Now, when Kwon provided that information at that time, did

17  you have any evidence that Aatique had been to Pakistan?

18  A.   No.

19  Q.   That was the first time you'd learned of it?

20  A.   Yes.

21  Q.   Now, did there come a time when Yong Kwon provided

22  information that he had seen Ali Asad Chandia in Lahore, Pakistan?

23          MR. MAC MAHON:  Your Honor, I object.  That's beyond the

24  scope even of what we asked him about in his long direct here, and

25  that can't be a way to put in the evidence of what Ali Asad

1367

## Ammerman - direct

1    Chandia did in Pakistan.

2            MR. GIBBS:  Judge --

3            MR. MAC MAHON:  It would be hearsay for that effect.

4            MR. GIBBS:  Judge, Yong Kwon testified that he saw him

5    at the Lahore office in Pakistan.

6            THE COURT:  He did.  That testimony did come in.  I'm

7    going to allow just this line of questioning as to when particular

8    things were said by the witness.  Overruled.

9            MR. GIBBS:  That's fine, Judge.  Thank you.

10   Q.   Can you answer the question?

11   A.   He also told me that on April 7 of 2003.

12   Q.   And at the time that Kwon first provided that information to

13   you, did you have any information that Ali Asad Chandia had

14   traveled to Pakistan?

15   A.   No.

16   Q.   Now, after you and Yong Kwon had come back to the United

17   States, did you ask Kwon to make any consensual telephone calls?

18   A.   Yes, I did.

19   Q.   And what did you tell Kwon to try to convince him to make

20   these consensual telephone calls?

21   A.   I told him to pretend like he was calling from Korea.  The

22   first set of calls was to Randall Royer, and I gave him a little

23   bit of a script on -- to follow, and he followed the script to the

24   best of his ability.

25   Q.   And when you specifically asked him to make telephone calls

1368

## Ammerman - direct

1  or consensual phone calls to Randall Royer, did he react in any

2  way?

3  A.   He was willing to do it.  His main concern was whether or not

4  he could tell a story that didn't reveal the fact that he was

5  cooperating with the FBI.

6  Q.   So that was his primary concern at that time?

7        MR. MAC MAHON:  Your Honor, if I could, if there's a

8  script that was given to this witness, I've never seen it.  If

9  we're going to continue with the examination of the witness, we

10  would request that it be produced.

11        THE COURT:  All right.

12  BY MR. GIBBS:

13  Q.   Could you explain what you mean by it?

14  A.   Sure.  There was no written script.  Basically, it was

15  verbal, and the verbal instructions or the verbal script were to

16  pretend like he was calling from Korea and try to ask questions

17  that would elicit from Randall Royer his involvement in getting

18  Yong and Mahmood Hasan to the LET camp.  Those were the

19  instructions.

20  Q.   And you were here in court when three consensual phone calls,

21  one of which was videotaped, were played for the jury, correct?

22  A.   Yes.

23  Q.   And were those the three consensual phone calls that Yong

24  Kwon made with Randall Royer?

25  A.   Two phone calls and one hotel room meeting.

1369

## Ammerman - direct

1  Q.   And did there eventually come a time that you also asked Yong

2  Kwon to make a consensual phone call to Ali Timimi?

3  A.   Yes.

4  Q.   And how did Yong Kwon react when you asked him to make a

5  telephone call to Ali Timimi?

6  A.   Yong became visibly upset.  He didn't want to do it.  For a

7  second, I thought he was going to pass out, so I asked him what

8  was wrong.  He said to me if Ali Timimi --

9           THE COURT:  Wait, wait, wait, wait.

10          MR. MAC MAHON:  Objection to what he said.

11          THE COURT:  Sustained.

12  BY MR. GIBBS:

13  Q.   Well, without telling us what he said, you indicated that he

14  became visibly upset.  What was it about him that made him appear

15  visibly upset?

16  A.   He became short of breath.  He started to fidget at his hands

17  and feet.  He bent forward at the waist and started shaking his

18  head from side to side.

19  Q.   Now, were you eventually able to convince him to go through

20  and make the consensual phone call with Ali Timimi?

21  A.   Yes.

22  Q.   And did he make that phone call?

23  A.   He did.

24  Q.   How did that phone call go?

25          MR. MAC MAHON:  Objection, Your Honor.  If they want to

1370

## Ammerman - direct

1  play the phone call, they can play the phone call.  They don't

2  need his characterization of how it went.

3       THE COURT:  Unless there's something besides what's

4  reflected on the tape, I agree with the defense on that objection.

5       MR. GIBBS:  Well, maybe I can ask it a different way.

6  Q.    Special Agent Ammerman, was Yong Kwon's effectiveness in the

7  phone calls with Randall Royer different than it was in the phone

8  call with Ali Timimi?

9       MR. MAC MAHON:  That asks him to --

10       THE COURT:  Sustained.

11       MR. MAC MAHON:  Thank you, Your Honor.

12  BY MR. GIBBS:

13  Q.    Now, you indicated that after he became visibly upset, he

14  eventually did make the undercover phone call; is that correct?

15  A.    Yes.

16  Q.    And how many did you make with Ali Timimi?

17  A.    Just one.

18  Q.    And is there a reason you only did one?

19  A.    Primarily because Yong was unresponsive to our directions

20  during the phone call.

21  Q.    And in what way was he unresponsive to your directions?

22  A.    He was unable to elicit the information that we were asking

23  him to elicit.  We were passing him notes, and he basically

24  ignored them as the phone call progressed.

25       MR. MAC MAHON:  I've never seen these notes, either,

## Ammerman - direct

1    Your Honor.

2              THE COURT:  Did you keep the notes?

3              THE WITNESS:  No, ma'am.

4              THE COURT:  That's why you didn't see them.

5    BY MR. GIBBS:

6    Q.   Now, Special Agent Ammerman, as part of the investigation,

7    did you also participate in a search of the home of Masaud Khan?

8    A.   Yes, I did.

9    Q.   All right.  And who is Masaud Khan?

10   A.   Masaud Khan is a man from Gaithersburg, Maryland, who

11   attended the LET camp with Yong Kwon and Mahmood Hasan, who was

12   also at the 9/16 meeting at Yong Kwon's house.

13   Q.   And what was the date of the search of Masaud Khan's

14   residence?

15   A.   That was May 8, 2003.

16   Q.   And what was your role in the search?

17   A.   I served as the seizing agent for that search.

18   Q.   And can you explain what a seizing agent does?

19   A.   The seizing agent is the person that takes custody and

20   control of the evidence at the conclusion of a search and

21   transports it to the field office for safe storage in the evidence

22   control facility.

23   Q.   Now, Special Agent Ammerman, I'd like to show you a number of

24   items and have you indicate if they were seized during the search

25   of Masaud Khan's residence.  The first one, I believe, is a

**Ammerman - direct**

1   physical item.  It's Exhibit 2A2.  It's a firearm.  I think we

2   actually -- we don't?

3           THE COURT:  They're not up here.

4           MR. GIBBS:  Okay.  If we can -- we may have a

5   photograph; let me see.  If not, that's fine.

6           THE COURT:  2A2 is already in.  2A2 is in evidence.

7           MR. GIBBS:  Yes, Judge.

8           THE COURT:  And there is a photograph of it in the book.

9           MR. GIBBS:  It is, Judge.  So if we can just put it on

10  the screen since it's in evidence?

11  Q.   And do you recognize that item, Special Agent Ammerman?

12  A.   Yes, I do.

13  Q.   What is that item?

14  A.   That's a rifle that was seized from Mr. Khan's residence in

15  May of 2003.

16  Q.   Thank you.

17          Next I'd like to move to a document, it's Government

18  Exhibit 2A6a, and it should be in that same binder.

19  A.   I have it.

20  Q.   All right.  What is that item, sir?

21  A.   This is a document written in English bearing the title "The

22  Terrorist's Handbook."

23          MR. GIBBS:  Judge, at this time, we would move

24  Government Exhibit 2A6a into evidence.

25          MR. MAC MAHON:  I think they're all in already, Your

1373

# Ammerman - direct

1  Honor.

2      THE COURT:  I think -- that's already in.

3      MR. GIBBS:  Actually, you're right, Judge.  These were

4  the ones from the previous hearing, yeah.

5      If we could show the first page initially, do you

6  recognize that, Special Agent Ammerman?

7      MR. MAC MAHON:  We've already been through this with

8  another witness, Your Honor, reading the top of this page.

9      THE COURT:  I think this is cumulative unless you're

10  going to go someplace else with this.

11      MR. GIBBS:  I am, Judge.

12      THE COURT:  Why don't you go right there?

13      MR. GIBBS:  That's fine.  If we can go to page 33,

14  please?

15  Q.  And, Special Agent Ammerman, there is instructions at page 33

16  dealing with how to assemble a pipe bomb.  Do you see that?

17  A.  Yes, I do.

18  Q.  Now, was there anything about this particular section of "The

19  Terrorist's Handbook" that concerned you?

20  A.  This depiction of building a pipe bomb provides instructions

21  for a person without prior knowledge to build such an improvised

22  explosive device.

23  Q.  And does that concern you?

24  A.  Yes.

25      MR. MAC MAHON:  Objection, Your Honor.

1374

**Ammerman - direct**

1  BY MR. GIBBS:

2  Q.   And why does --

3         THE COURT:  Wait.

4         MR. MAC MAHON:  The document speaks for itself.  It's in

5  the basement of somebody else's house.

6         THE COURT:  Well, wait.  Wait, whoa, whoa.  The question

7  that's being asked is whether the FBI agent who's on the stand is

8  concerned about this, and that's the question.  The fact that it's

9  at somebody else's house, I'm not sure I understand what the

10  objection is.

11        MR. MAC MAHON:  Well, the relevance of this, Your Honor,

12  if it's not linked in any way to the defendant.

13        THE COURT:  Well, the jury understands this document

14  came out of the house of somebody other than the defendant.

15  However, the government's got a right in a conspiracy case to try

16  to link things up.  If they can't, they can't, but I'm going to

17  overrule the objection based on that.

18        MR. GIBBS:  Thank you, Judge.

19  Q.   Now, what specifically about the directions for assembling a

20  pipe bomb concerned you?  First of all, maybe by way of

21  background, do you have any special training in this area?

22  A.   Some.  I have been trained by the FBI as a post-blast

23  investigator, which means I've been trained on how to conduct

24  evidence processing at a bomb scene.

25  Q.   And so what specifically about this document when you saw the

**J.A. 1519**

1375

## Ammerman - direct

1 instructions for the pipe bomb concerned you?

2 A.   Just the fact that it contained instructions on how to build

3 a device that could cause bodily harm or death.

4          MR. GIBBS:  Thank you.

5          And next if we could turn to Government Exhibit 2A6b?  I

6 believe this is also in evidence.

7          THE COURT:  I believe so.

8 BY MR. GIBBS:

9 Q.   And was this also one of the items that you seized from

10 Masaud Khan's house on May 8 of 2003?

11 A.   Yes, it was.

12 Q.   And if we can go forward to Government Exhibit 2A7?

13 A.   Okay.  I have it.

14 Q.   What is 2A7?

15 A.   2A7 is a two-page document with English writing.  This is a

16 statement from Usama Bin Laden.

17 Q.   And where was this located?

18 A.   This was located in Mr. Khan's residence in Gaithersburg,

19 Maryland, in May of 2003.

20          MR. GIBBS:  All right.  And, Judge, I'm not sure if this

21 is in evidence or not.  If not, we will move it into evidence.

22          THE COURT:  All right.  Any objection?

23          MR. MAC MAHON:  Same objection as before, Your Honor.

24          THE COURT:  All right, it's overruled.

25          MR. MAC MAHON:  Thank you, Your Honor.

1376

**Ammerman - direct**

1          (Government's Exhibit No. 2A7 was received in evidence.)

2   BY MR. GIBBS:

3   Q.   And, yeah, I don't need to show anything on that one, but we

4   can go next to Government's Exhibit 2A19.

5          What is 2A19?

6   A.   2A19 is Masaud Khan's passport.

7   Q.   And where was that located?

8   A.   Also located in Mr. Khan's residence in Gaithersburg,

9   Maryland, in May of 2003.

10          MR. GIBBS:  And, Judge, at this time, we would move 2A19

11   into evidence.

12          THE COURT:  I assume there's no objection.

13          MR. MAC MAHON:  No, Your Honor.

14          THE COURT:  All right, it's in.

15          (Government's Exhibit No. 2A19 was received in

16   evidence.)

17   BY MR. GIBBS:

18   Q.   And I just want to show the cover quickly and then the inside

19   of the passport.  Does that look like the passport, Special Agent

20   Ammerman?

21   A.   Yes, it does.

22   Q.   And then if you'd look inside the first page, I believe, it

23   has the photograph, and if you could, does it indicate the date of

24   issue for Masaud Khan's passport?

25   A.   It does.  The date indicated is the 17th of September, 2001.

**J.A. 1521**

1377

**Ammerman - direct**

1  Q.   And is there also a visa inside that passport for travel to

2  Pakistan in September 2001?

3  A.   Yes, there is.

4  Q.   And what is listed as the date of issue for that visa to

5  Pakistan?

6  A.   September 18, 2001.

7  Q.   And how about the purpose of the visit?

8  A.   A visit.

9  Q.   And there are also, I believe, in there entry and exit stamps

10 from the trip to Pakistan, correct?

11 A.   Correct.

12 Q.   And for the entry, what is that date?

13 A.   September 20, 2001.

14 Q.   And for the exit, what is that date?

15 A.   December 14, 2001.

16 Q.   Thank you.

17        If we can go to the next exhibit, which is Government

18 Exhibit 2A20?

19 A.   Okay.

20 Q.   What is that?

21 A.   This is a photograph of a laptop computer that was seized

22 from Mr. Khan's residence in Gaithersburg, Maryland, in May of

23 2003.

24 Q.   And were there some items seized off of that computer that

25 were of evidentiary significance in this case?

### Ammerman - direct

1 A.   Yes, there was.

2        MR. GIBBS:  Judge, I would ask to admit Government

3 Exhibit 2A20, the photograph, and just move it into evidence.

4        THE COURT:  Any objection?

5        MR. MAC MAHON:  No objection, Your Honor.

6        THE COURT:  All right, it's in.

7        (Government's Exhibit No. 2A20 was received in

8 evidence.)

9 BY MR. GIBBS:

10 Q.   And that's the computer?

11 A.   Yes, sir.

12 Q.   Thank you.

13        Now, you testified a moment ago that there were some

14 items found on the computer of evidentiary significance.  I'd like

15 to have you take a look at Government Exhibit 2A20a.

16 A.   Okay.  I have it.

17 Q.   And what is that?

18 A.   This is a string of e-mails that I found on the computer.

19 Q.   That was seized at Masaud Khan's house?

20 A.   That's correct.

21 Q.   And just roughly, what's the subject matter of this

22 particular -- or these strings of e-mails?

23 A.   This is a string of e-mail from someone using the e-mail

24 address johninformation@yahoo.com to Elisabeth Khan, which is

25 using an e-mail address which appears to be Masaud Khan.

### Ammerman - direct

1          MR. GIBBS:  Judge, at this time, we would move -- well,

2     actually, 2A20a is in evidence.  If we could pull up the first

3     page of 2A20a?

4     Q.   And if we could -- Special Agent, if you could walk us

5     through the e-mail, let's start at the bottom of page 1.  Okay.

6     Now, first of all, the date of November 28, 2002, is that the

7     earliest e-mail in this e-mail string?

8     A.   Yes, it is.

9     Q.   And you indicated johninformation@yahoo.com, correct?

10    A.   Correct.

11    Q.   All right.  What information did you uncover during the

12    course of this investigation regarding that e-mail address?

13         MR. MAC MAHON:  Your Honor, I object to results of his

14    investigation.  We've already had a witness testify whose e-mail

15    address they thought that was.  The agent can't get on and tell

16    all about their investigation, different things that they found or

17    didn't find.

18         THE COURT:  You've already got evidence on this issue.

19         MR. GIBBS:  Well, I mean, I think the agent can

20    certainly summarize the evidence, though, especially because the

21    e-mail, it takes a little bit --

22         THE COURT:  Why don't you just go straight to it, and

23    then -- I agree with the defense, this has already come in.

24         MR. GIBBS:  All right.  That's fine, Judge.

25    Q.   All right.  The From line is johninformation@yahoo.com?

1380

**Ammerman - direct**

1  A.    Yes.

2  Q.    And you said it's to Elisabeth Khan.  It's also -- what's

3  behind "Elisabeth Khan"?

4  A.    The name masaudk@msn.com.

5  Q.    Do you know who Elisabeth Khan is?

6  A.    Yes, I do.

7  Q.    Who is Elisabeth Khan?

8  A.    Masaud Khan's mother.

9  Q.    And the subject is Re: Khalid paintballs?

10  A.    Right.

11  Q.    And if we go through that e-mail, it says "Order --" well,

12  actually, go back to the first page, if we could.

13         "Order as flows:  1, 8 tipman 98 custom paintball gun

14  package fromm extrempaintball.com price 160 u.s. dollars.  2,

15  50000 JT Elite Premium Paintball 2000 rnd case $33.95 from the

16  paintball store.com."

17         And then if we could maybe bring up the top, just to

18  make it easier to read?  "3, 4 Level 1 GT Commando2 Package

19  $139.95 from thepaintballstore.com.  4, 1 MP1000 SYS price 750 i

20  have attached the form fill and fax it to them."

21         And then it provides a fax number and a phone number,

22  correct?

23  A.    That's correct.

24         MR. GIBBS:  If we could scroll down?

25  Q.    It then has an order form with some -- a blank order form, it

1381

**Ammerman - direct**

1  appears, correct?

2  A.  Right.

3        MR. GIBBS:  And if we could scroll down further?

4  Q.  "Purchase order number: MP1000SYS.  Ship to address:  Radio

5  controlled (RC) model aircraft pilot assist.  2, Personal

6  experimental robotic model aircraft."

7        If we can scroll down a little further?  Not applicable,

8  or "N/A," and then "3, Commercial robotic aircraft Military

9  Unmanned Aerial Vehicle N/A.  4, Other - describe N/A."

10        Then if we can just scroll down a little further?  Then

11  it says, "Thanks bro.  Do this ASAP, again ASAP.  I'll try not to

12  bother you again.  The money should be in UR ACC.  Contact me if

13  not."

14        And, Special Agent Ammerman, during the course of your

15  investigation, did you -- strike that.

16        Do you know what an MP1000SYS is?

17  A.  Yes, I do.

18  Q.  And what is an MP1000SYS?

19  A.  It's a GPS navigation control module for a radio-controlled

20  airplane.

21  Q.  Thank you.

22        Now, if we could go back to page 1, I want to pick up

23  the e-mail string.  Actually, let's scroll down a little bit.

24  Now, the last e-mail was November 28, 2002, correct?

25  A.  Right.

1382

## Ammerman - direct

1      MR. GIBBS:  Let's go to a little further down, to the

2  March 21, 2003.  Yeah.  Actually, if you can go up just a bit?

3  Q.  Okay.  Is there another e-mail dated March 21, 2003, from

4  John Smith, johninformation, to Elisabeth Khan, Masaud Khan?

5  A.  Yes.

6  Q.  And it again says "Subject: Re: khalid paintballs"?

7  A.  Yes.

8  Q.  And it indicates there:  "hi there bro plz cann u give the

9  reloder to umer asap?  I know you besy" -- b-e-s-y -- "but it is

10  importantif u cann do this with in a week be great."

11      And below that, it says "Elisabeth Khan

12  <masaudk@msn.com> wrote:  khalid, can you please make sure you

13  provided the right sites for your orders, because on the site for

14  the paint balls the jt elite was priced at around 39 dollars.

15  they also had some second hands at less than what you quoted.  i

16  also did not see any paint guns for sale on the extreme web site.

17  could you please make it easy on me by providing the websites on

18  an e-mail whereby i can just click on it and make the necessary

19  purchases seeing i don't have the time to browse around looking

20  for desired products.  please respond asap i may have some time

21  off on Thursday too get this done."

22      Is that what that e-mail indicates?

23  A.  Yes.

24  Q.  Now, are you familiar with what a reloader is?

25  A.  Yes, I am.

**Ammerman - direct**

1  Q.    And what's a reloader?

2  A.    It's a devise that a person can use to take expended rifle or

3  shotgun shells and to reload them with either a bullet or shotgun

4  shot.

5  Q.    And during the search at Masaud Khan's house, did you find

6  any reloaders?

7  A.    Yes, I did.

8  Q.    And what did you find a reloader for?

9  A.    The reloader was located in the basement.  It appeared to be

10  for a shotgun shell, although I can't be 100 percent certain about

11  that.  There were a number of expended shotgun shells in the

12  vicinity.  But it was a standard-type reloader that would be used

13  for the purpose of reloading shotgun shells or rifle cartridges.

14  Q.    All right, thank you.

15         And if we could go back to 2A20a and just finish out the

16  e-mail string?  The last e-mail string that we discussed was dated

17  March 21, 2003.  Let's go up to the top and finish it.

18         Yeah, it's dated April 5, 2003, again,

19  johninformation@yahoo.com to Elisabeth Khan, and actually, why

20  don't we do -- let's go a little further down.  Elisabeth Khan

21  wrote, "my internets been done so I didn't get your message until

22  today.  i don't think omar is coming your way anytime soon, so im

23  not sure i know what you mean.  Please elaborate."

24         And then above that, it indicates, "hi bro if you can

25  give him the equipment i have explained to him how to get it to me

1384

## Ammerman - direct

1  let me know when u don plz thanks buy ps HOWS UR LITTLE ONE."

2       And does that conclude that e-mail string?

3  A.   Yes, it does.

4  Q.   All right, thank you.

5       Now, you testified a moment ago that -- about an

6  MP1000SYS, correct?

7  A.   Yes.

8  Q.   All right.  Did you find any documents in the search of

9  Masaud Khan's residence related to that?

10  A.   Yes, I did.

11  Q.   And if you could turn to Government's Exhibit 2A1?

12  A.   Okay.

13  Q.   What is Government Exhibit 2A1?

14  A.   2A1 is an order form to a company called Vesta Technology

15  wherein a part described as an MP1000SYS is available for

16  purchase.

17       MR. GIBBS:  Judge, at this time, I would move

18  Government's Exhibit 2A1 into evidence.

19       THE COURT:  Any objection?

20       MR. MAC MAHON:  No objection, Your Honor.

21       THE COURT:  It's in.

22       (Government's Exhibit No. 2A1 was received in evidence.)

23  BY MR. GIBBS:

24  Q.   Special Agent Ammerman, is this the first page of

25  Government's Exhibit 2A1?

1385

## Ammerman - direct

1   A.   Yes, it is.

2   Q.   And it has on the document itself, it's actually circled, the

3   "Radio Controlled (RC) model aircraft pilot assist," correct?

4   A.   Correct.

5   Q.   Then we go to the second page.  That's where it indicates

6   MP1000SYS?

7   A.   Yes.

8   Q.   And it describes it, correct?

9   A.   Correct.

10  Q.   Thank you.

11          Now, Special Agent Ammerman, after the searches or the

12  search of Masaud Khan's house on May 8 of 2003, did you continue

13  to investigate this case?

14  A.   Yes, I did.

15  Q.   And, in fact, you continued to investigate it right up until

16  this trial, correct?

17  A.   Correct.

18  Q.   And as part of your investigation, did you analyze some phone

19  records?

20  A.   Yes, I did.

21  Q.   If you could take a look at Government's Exhibit 7C30?

22  A.   I have them.

23  Q.   And what is Government's Exhibit 7C30?

24  A.   These are telephone records for Yong Kwon's cellular

25  telephone.

1386

## Ammerman - direct

1  Q.   And how did you get these records?

2  A.   Through a federal grand jury subpoena.

3  Q.   And once you got those records, did you put together some

4  charts tracking telephone calls from Yong Kwon's phone to other

5  subjects of this investigation?

6  A.   Yes, I did.

7       MR. GIBBS:  All right.  Judge, at this time, we would

8  move if it's not already in Government Exhibit 7C30 into evidence.

9       MR. MAC MAHON:  No objection, Your Honor.

10      THE COURT:  It's already in.

11      MR. GIBBS:  Okay.  Yeah, that's fine.

12 Q.   That's the first page of the phone records, right?

13 A.   Right.

14 Q.   Okay.  Next what I'd like to do is have you take a look at

15 Government's Exhibit 10S1 and just ask you briefly when you

16 analyzed the phone records, did you actually put together some

17 charts summarizing different telephone contacts?

18 A.   Yes, I did.

19 Q.   All right.

20 A.   I have it.

21 Q.   What is Government's Exhibit 10S1?

22 A.   10S1 is a summary chart that shows the telephone activity

23 between Yong Kwon and Mr. Timimi on 9/16/01.

24      MR. GIBBS:  Judge, at this time, we would move 10S1 into

25 evidence.

1387

## Ammerman - direct

1          THE COURT:  Any objection?

2          MR. MAC MAHON:  No objection, Your Honor.

3          THE COURT:  All right, it's in.

4          (Government's Exhibit No. 10S1 was received in

5   evidence.)

6   BY MR. GIBBS:

7   Q.   And if we could just put that on the screen and have you

8   explain this chart to the jury if you could?  This is something

9   you put together yourself?

10  A.   Yes, sir.

11  Q.   And if you could just explain this to the jury briefly?

12  A.   This chart is simply a depiction of the telephone activity

13  between Mr. Kwon and Mr. Timimi, indicating three telephone calls

14  from Timimi to Kwon and two calls from Kwon to Timimi on 9/16/01.

15  Q.   And the three phone calls from Timimi to Kwon on 9/16, what

16  was the time of those three calls?

17  A.   One at 6:29 p.m., one at 7:29 p.m., one at 7:36 p.m.

18  Q.   And how about the phone calls from Kwon to Timimi?  What were

19  the times of those two calls?

20  A.   One at 6:46 p.m., one at 7:36 p.m.

21  Q.   Thank you.

22          Next I'd like to move to a second summary chart, which

23  is Government's Exhibit 10S2.  Do you have that there before you?

24  A.   Yes.

25  Q.   And what is 10S2?

1388

## Ammerman - direct

1  A.    10S2 is a similar chart depicting telephone activity between

2  Mr. Kwon and Mr. Timimi, this time on 9/19/01.

3         MR. GIBBS:  Your Honor, at this time, we would move 10S2

4  into evidence.

5         THE COURT:  Any objection?

6         MR. MAC MAHON:  It's incomplete, Your Honor, but, I

7  mean, other than that, it's an accurate reflection of what

8  happened before 2:00.

9         THE COURT:  All right.  Well, Ladies and Gentlemen, I

10  want to make sure you understand that a chart is much like the

11  transcript for the phone conversations that we heard.  In other

12  words, a summary chart is only as good as the information it

13  summarizes.  If you find that the chart is not accurate, you can

14  completely disregard it.  If you find that it is accurate, you may

15  use it to such purposes as you find are helpful in understanding

16  the evidence, all right?

17         But I'll allow it in.  If it's incomplete, you can

18  certainly probe that on cross.

19         MR. MAC MAHON:  Thank you, Your Honor.

20         (Government's Exhibit No. 10S2 was received in

21  evidence.)

22  BY MR. GIBBS:

23  Q.  And, Special Agent Ammerman, you now have before you on the

24  TV screen Government Exhibit 10S2.  Do you recognize that?

25  A.  Yes.

1389

## Ammerman - direct

1  Q.   And this is the summary chart you just testified about?

2  A.   Yes.

3  Q.   And can you just explain this chart to the jury?

4  A.   This chart depicts three telephone calls from Mr. Timimi to

5  Mr. Kwon on 9/19/01 and one call from Kwon to Timimi on the same

6  date.

7  Q.   And the three calls from Timimi to Kwon on 9/19, what were

8  the times of those calls?

9  A.   11:19 a.m., 1:35 p.m., 10:35 p.m.

10 Q.   And how about the one phone call from Kwon to Timimi?  What

11 was the time of that call?

12 A.   1:55 p.m.

13 Q.   And you put this chart together by analyzing the telephone

14 records that you had obtained?

15 A.   Yes.

16 Q.   Thank you.

17      Next I'd like to have you take a look at Government's

18 Exhibit 10S4.

19 A.   I have it.

20 Q.   Do you have that?  And what is that?

21      THE COURT:  Wait, I don't have 10S4 in my book.  Is that

22 done separately?

23      MR. GIBBS:  Judge, I should have a copy I can provide to

24 the Court.  It's a four-page document.

25      THE COURT:  We have it separate here, Mr. Gibbs.  I have

**J.A. 1534**

1390

**Ammerman - direct**

1  it, thank you.

2          I'm sorry, these stopped at 10S3.  Do you have 10S4 for

3  the Court?

4          MR. MAC MAHON:  I don't believe we have 10S4, Your

5  Honor.

6          THE COURT:  Well, then neither of us do.

7          MR. GIBBS:  Judge, there might have been a mislabeling

8  here; I'm not sure.

9          THE COURT:  Is it 10S3 that you intend?

10          MR. GIBBS:  That's what I'm thinking.  It's a four-page

11  document?  Okay.

12          I gave you the wrong document, Judge, I'm sorry.

13          THE COURT:  All right, 10S3.  And you should have that,

14  Mr. MacMahon.  Do you?

15          MR. MAC MAHON:  I'll check, Your Honor.

16          THE COURT:  It's the phone data, so I think you've got

17  it.

18          MR. MAC MAHON:  We don't have such an exhibit, Your

19  Honor.  I have no doubt, Mr. Kromberg says he's given it to us,

20  and I take him at his word.  I just can't find it.

21          THE COURT:  All right.  Give me one second to look at

22  it.  Then you can have my copy.

23          MR. MAC MAHON:  I think it's already in evidence.

24          THE COURT:  It's already in evidence.  We've seen this

25  before.

1391

**Ammerman - direct**

1      10S3 is in evidence already.  This has already been

2  shown to the jury.

3      MR. MAC MAHON:  And I just found it, too, Your Honor.

4  BY MR. GIBBS:

5  Q.   All right.  And do you have 10S3 there before you?

6  A.   Yes.

7  Q.   All right.  And is that the -- well, what is that?

8  A.   This is just a spreadsheet of telephone activity from

9  Mr. Kwon's cell phone bill.

10 Q.   All right.  And this is a spreadsheet that you put together

11 using those telephone records?

12 A.   Yes.

13     MR. GIBBS:  All right.  Since it's in evidence, I don't

14 think we need to publish -- I mean, we can put it up there, but --

15 Q.   And that is 10S3, Special Agent Ammerman?

16 A.   Yes, it is.

17 Q.   All right.  I want to go back to one thing you testified

18 about a moment ago briefly, going back to the search of Masaud

19 Khan's residence.

20 A.   Okay.

21 Q.   You testified about the MP1000SYS.

22 A.   Right.

23 Q.   I'd like to have you take a look at Government's Exhibit 2C2.

24 A.   Okay.

25 Q.   All right.  And do you recognize that?

1392

**Ammerman - direct**

1   A.   Yes, I do.

2          MR. GIBBS:  And, Judge, for the record, this was

3   stipulated to in Stipulation No. 27.

4          THE COURT:  All right.

5          MR. GIBBS:  And I would like to just publish it to the

6   jury and have the witness identify it.

7          THE COURT:  All right.  Is this in evidence already

8   then, 2C2?

9          MR. GIBBS:  If it's not, we would move it into evidence,

10  Judge.

11         THE COURT:  Mr. MacMahon?

12         MR. MAC MAHON:  No objection, Your Honor.

13         THE COURT:  All right, 2C2 is now in evidence.

14         (Government's Exhibit No. 2C2 was received in evidence.)

15  BY MR. GIBBS:

16  Q.   And, Special Agent Ammerman, do you recognize that item?

17  A.   Yes, I do.

18  Q.   What is that item?

19  A.   That's the navigation control module that Masaud Khan ordered

20  from Vesta Technologies in December of 2002.

21  Q.   Thank you.  All right, that's all I have on that one.

22         And finally, Special Agent Ammerman, as part of your

23  investigation, did you also try to verify when Yong Kwon left his

24  job after the 9/16 meeting?

25  A.   Yes, I did.

J.A. 1537

1393

## Ammerman - direct

1   Q.   And how did you go about doing that?

2   A.   By contacting Yong's friend from WorldCom named Belton

3   Harris.

4   Q.   And as a result of contacting Belton Harris, what did you

5   obtain?

6   A.   I was able to obtain an e-mail which constituted Yong's

7   notification of resignation from WorldCom.

8   Q.   All right.  And this is in evidence.  This is 7C31?

9   A.   That's right.

10  Q.   This is the e-mail where Yong Kwon said he was leaving?

11  A.   Yes.

12  Q.   And what's the date on this e-mail?

13        MR. MAC MAHON:  Your Honor, this is cumulative.  We've

14  been through this already.

15        THE COURT:  Yes, I'll sustain the objection.

16        MR. GIBBS:  Well, Judge, if I could be heard, I want to

17  establish when this witness received this e-mail, because it was

18  recent.  It was not back in -- at the time of --

19        THE COURT:  All right.  That's a good question.

20        MR. GIBBS:  Thank you, Judge.

21  Q.   And, Special Agent Ammerman, this is an e-mail from Yong Kwon

22  dated September 20, 2001.  When did you get this e-mail?

23  A.   I got this e-mail from Belton Harris the first week of March

24  2005, this year.

25  Q.   So about a month ago?

J.A. 1538

1394

## Ammerman - cross

1  A.    Correct.

2          MR. GIBBS:  Thank you.  All right.  Well, Special Agent

3  Ammerman, I want to thank you very much.  That's all the questions

4  I have for you.

5          THE COURT:  All right.  Mr. MacMahon?

6                    CROSS EXAMINATION

7  BY MR. MAC MAHON:

8  Q.    Did you, Special Agent, make an effort to find any other

9  e-mails of Yong Kwon's?

10  A.    We did, yes.

11  Q.    And you never found the e-mail of his canceling paintball,

12  did you?

13  A.    We did not.

14  Q.    This -- the search that you made on Mr. Khan's house, did you

15  find all of his phone bills as well?

16  A.    I believe we did find some phone bills.  I don't know if they

17  were directly related to Mr. Khan in terms of a cell phone as

18  opposed to the residence, but I believe we did find some phone

19  bills in the house.

20  Q.    Okay.  Or by subpoena, were you able to find all of his phone

21  bills for a certain period of time?

22  A.    I believe there were some subpoenaed.  I can't recite for you

23  specifically what was found on them, as part of that investigation

24  was handled by the Baltimore Field Office.

25  Q.    And you already had because he had them in his house all of

**J.A. 1539**

**Ammerman - cross**

1  Al-Timimi's phone records, didn't you?

2  A.   We had his phone records for a period of time.

3  Q.   Through the year 1990, is that right?

4  A.   Are you talking about the cellular phone or the residence

5  phone?

6  Q.   Either one.

7  A.   The ones that I specifically recall were for his cellular

8  account, and I believe we had those for a period of about eight or

9  nine months, which covered the September 2001 time frame.

10  Q.   Okay.  And did you get the phone -- by subpoena the cellular

11  phone records for time leading up to when this UAV flight system

12  was ordered?

13  A.   For Mr. Timimi?

14  Q.   Yes.

15  A.   No, I don't believe we did.

16  Q.   Okay.  Were you ever in your -- looking at all these phone

17  bills, ever to find one single phone call from Ali Timimi to

18  Masaud Khan?

19  A.   I'm not sure.

20  Q.   You weren't, were you, sir?

21  A.   I'm not sure.

22  Q.   Well, you looked, didn't you?

23  A.   Well, I'm going to have to clarify.  Some of this

24  investigation was handled by another field office.  There's a very

25  good chance that such a phone call did exist.  Based on my memory

1396

**Ammerman - cross**

1  at present, I don't know if such a phone call did exist.

2  Q.   Do you have a phone bill or something you could tell this

3  jury might have evidence of a phone call from Ali Timimi to Masaud

4  Khan, or are you just making it up, Agent?

5          MR. KROMBERG:   Objection, Judge.

6          THE COURT:   We don't need to get editorial in the

7  questions.   I'll sustain to the form of the question.

8          MR. MAC MAHON:   Excuse me, Your Honor.

9  Q.   Do you have a phone bill that you could refer to, Special

10  Agent?

11  A.   My answer is the same, sir.   I don't know.

12  Q.   Well, you, you showed us a string of e-mails from Masaud Khan

13  to johninformation of someone from United Kingdom, didn't you?

14  Did you see that?

15  A.   I don't believe I said he was from the United Kingdom.

16  Q.   What does yahoo.co.uk mean?

17  A.   Well, if we're going to open the door, I suppose I can say

18  now that he is from the United Kingdom.

19  Q.   Okay.   Did you ever find any e-mails from -- you searched all

20  of Ali Timimi's computers, didn't you?

21  A.   Yes.

22  Q.   All right.   You searched every inch of space you could on

23  every one of his computers, didn't you?

24  A.   That was conducted by a series of computer reviews, yes.

25  Q.   Okay.   And you never found any e-mails to anyone named

**J.A. 1541**

1397

**Ammerman - cross**

1  johninformation@yahoo.co.uk, right?

2  A.    E-mails?  No, I don't believe so.

3  Q.    All right.  And you didn't find anything in Ali Timimi's

4  house about any Unarmed Vehicle Flight Systems, Inc., did you?

5  A.    Not that I can recall.

6  Q.    And you didn't find anything about purchasing paintballs, did

7  you?

8  A.    No, I don't believe so.

9  Q.    You didn't find any guns in his house, did you?

10  A.    No, we didn't.

11  Q.    Did you come in with your weapons drawn when you searched his

12  house?

13  A.    I did not.

14  Q.    Somebody else did, though, right?

15  A.    I can answer for myself.  I know for a fact I did not.  It's

16  a possibility that some agents may have had their weapons out, but

17  I can't attest to it without 100 percent certainty.

18  Q.    Okay.  Did you find any weapons in his house at all?

19  A.    No.

20  Q.    Were you looking for weapons?

21  A.    Certainly.

22  Q.    And you didn't find any?

23  A.    No.

24  Q.    And you were looking for evidence of, of biological

25  capabilities by Dr. Timimi, too, weren't you?

**J.A. 1542**

1398

### Ammerman - cross

1  A.   Yes.

2  Q.   Okay.  And what made you think that you should be worried

3  about Dr. Timimi having some biological weapons in his house?

4  A.   The search warrant allowed us to look for a number of things,

5  one of which was the presence of any item of literature that may

6  relate to Weapons of Mass Destruction.

7  Q.   Didn't find any, did you?

8  A.   We found in Mr. Timimi's car a notebook which contained some

9  notations to anthrax which we could not positively associate with

10  any sort of Weapons of Mass Destruction.  The answer to your

11  question is no, we didn't find any.

12  Q.   Right.  And those notes were something for one of the classes

13  he was taking, right?

14  A.   It appeared to be.

15  Q.   Right.  Some biology notes that you then had analyzed at the

16  weapons lab, didn't you?

17  A.   No, we didn't.

18  Q.   Oh, you didn't take them out for that?

19  A.   To the weapons lab?

20  Q.   No?  Did you test them for anthrax?

21  A.   No.

22  Q.   You -- let me show you Exhibit 10A20, if I could, please.

23       If we could just put the cover up on the screen, I'd

24  appreciate it, please.  10A20.

25  A.   Okay.  I have it.

### Ammerman - cross

1   Q.   This is something you seized in Al-Timimi's house?

2   A.   Yes.

3   Q.   What is this?

4        THE COURT:  Wait just a second.  It's not on the screen

5   yet.

6        MR. MAC MAHON:  Oh, I'm sorry.

7   Q.   What's the Intifadha, Special Agent?

8   A.   The Intifadha, as I understand it, relates to the Palestinian

9   uprising.

10  Q.   In the Occupied West Bank, is that right?

11  A.   I believe that's correct.

12  Q.   Okay.  And you seized this and put stickers on it as evidence

13  that Al-Timimi collected documents?  Is that why you seized this?

14  A.   I'm sorry, could you reask that question?

15  Q.   Well, there were -- there were literally thousands of

16  documents in his house, right?

17  A.   Yes.

18  Q.   And there were hundreds and hundreds of books as well, too,

19  right?

20  A.   Yes.

21  Q.   Did you seize all of his Islamic law books?

22  A.   No.

23  Q.   Did you look through them?

24  A.   At the search scene, we had two Arabic translators onsite

25  that conducted a triage of the things that were in his house in an

**Ammerman - cross**

1  attempt to make an assessment of what we should take and what we

2  shouldn't take.

3  Q.   Okay.  How many Islamic law books were in Dr. Al-Timimi's

4  house?

5  A.   I don't know.

6  Q.   Hundreds?

7  A.   I don't know.

8  Q.   How about biology books?

9  A.   Arabic?  Arabic text biology books or English text biology

10  books?

11  Q.   Either one.

12  A.   I recall there being some academic books in the residence.  I

13  believe there were some upstairs.  I can't attach a number to how

14  many, though.  I don't know.

15  Q.   Okay.  So why did you seize a document about the Intifadha in

16  the Palestinian Occupied West Bank?

17  A.   Name recognition of Safar Hawaali.

18  Q.   You -- look at Exhibit 10A27, I believe.  There's a series of

19  them, 25, 26, and 27, right?

20  A.   Okay.  Yeah, I have those.

21  Q.   Okay. Look at 25 first if you would, please, 10A25.

22  A.   Okay.

23  Q.   Where did you find this in his house?

24  A.   These were found in the basement family room of Mr. Timimi's

25  house.

1401

**Ammerman - cross**

1  Q.    In a box?

2  A.    That I don't know.

3  Q.    Okay.  Have you ever gone to the Dar al-Arqam Center, Special

4  Agent?

5  A.    Only on the outside.  I've never been on the inside.

6  Q.    Have you ever been to a mosque?

7  A.    Yes, I have.

8  Q.    Have you ever seen at a mosque that the ladies hand up

9  questions on pieces of paper around to whoever is speaking?

10  A.    The mosques that I were at, the Dome of the Rock and the Al

11  Aqsa mosque in Jerusalem, that was not the situation.

12  Q.    You've never been to a mosque in the United States of

13  America?

14  A.    Not on the inside, no.

15  Q.    Okay.  But you know that the ladies that have questions for

16  people that are speaking hand up notes, correct?

17  A.    I'm not specifically aware of that.

18  Q.    Nobody's told you that in the course of this investigation?

19  A.    I'm not specifically aware of that.

20  Q.    Okay.  And this is a -- did you -- this note, 10A25, this is

21  something that, that refers to an Islamic center in Suffolk,

22  England, correct?

23  A.    I'm not really sure what "JIMAS" means.  I don't know if

24  that's an Islamic center, but it is in Suffolk, U.K.

25  Q.    And you gave us an exhibit showing the speech that was given

1402

**Ammerman - cross**

1  at the Suffolk Islamic Center, right?  A slide show?

2  A.    I would have to refer to the cover to, to recall the

3  location.

4  Q.    I don't have the cover with -- 10A16.

5  A.    Okay.  I have it.

6  Q.    Okay.  This is a -- 10A16, if we could put that back up, the

7  front of it?  This is a PowerPoint from a lecture, isn't it?

8  A.    It appears to be, yes.

9  Q.    Did you try to get the tapes of this lecture?

10  A.    We got a series of names.  I don't believe this was one of

11  them.  But we did try, yes.  We attempted to get several lectures.

12  Q.    How many of his tapes were for sale when you went looking?

13  A.    I don't know how many were for sale.  I didn't go looking in

14  that matter.  I went looking through a federal grand jury subpoena

15  to the Dar al-Arqam Islamic Center.

16  Q.    You didn't go online to see what you could find publicly

17  first?

18  A.    No.

19  Q.    Did you go online and try to find this lecture, Special

20  Agent?

21  A.    No, I didn't.

22  Q.    This is a theological lecture about a whole bunch of

23  different issues, isn't it?

24  A.    Appears to be, yeah, quite a few issues discussed here.

25  Q.    Okay.  And you don't know anything about any of these issues,

**J.A. 1547**

1403

**Ammerman - cross**

1  do you?

2  A.   Not a whole lot.

3  Q.   Do you know who this Saved Sect is, al-Firqa an-Najiya?

4  A.   I'm sorry, what page is that?

5  Q.   Page 2.

6  A.   Can you direct me to where you're looking at?

7  Q.   Right under "Work of Sh. Salman al-'Awda" -- sorry if I

8  butchered the pronunciation -- "The Saved Sect (al-Firqa

9  an-Najiya)," do you know what that is?

10 A.   I have no idea.

11        THE COURT:  All right, Mr. MacMahon, we did say for the

12 reasons discussed before, we've got to stop at 5:30, so we're at

13 that time.

14        Ladies and Gentlemen, again, I'll ask you to continue to

15 abide by my earlier directions.  Leave your notebooks here.  Don't

16 watch any media coverage.  Avoid any contact with anyone.

17        There are media people around the courthouse for another

18 case down on the sixth floor, so if you've seen extra activity in

19 the courthouse, it has nothing to do with this case, but that's

20 why you'll see the trucks out front, I suspect.

21        And we'll reconvene tomorrow morning at 9:30, all right?

22 All right, we'll recess court.

23     (Recess from 5:30 p.m., until 9:30 a.m., April 12, 2005.)

24

25

**J.A. 1548**

1404

1               CERTIFICATE OF THE REPORTER

2      I certify that the foregoing is a correct transcript of the

3  record of proceedings in the above-entitled matter.

4

5

6

                                    Anneliese J. Thomson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

This page intentionally left blank for double-sided pagination and printing