No. 14-4451

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH COURT

————————————

UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

v.

ALI AL-TIMIMI,
*Defendant/Appellant.*

————————————

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)

————————————

JOINT APPENDIX

VOLUME VII of XIII (pages 1551 - 1804)

————————————

ERIC S. SIEBERT                                    GEREMY C. KAMENS
United States Attorney                             Federal Public Defender

Gordon D. Kromberg      Joseph Attias            Geremy C. Kamens
Assistant U.S. Attorney  Attorney                 Federal Public Defender
Counsel for Appellee     Counsel for Appellee     Counsel for Dr. Al-Timimi
2100 Jamieson Avenue     Nat'l Security Division   1650 King Street, Suite 500
Alexandria, VA 22314     U.S. Dep't of Justice     Alexandria, VA 22314
(703) 299-3700           Washington, DC 20530      (703) 600-0800

This page intentionally left blank for double-sided pagination and printing

# **TABLE OF CONTENTS**

## VOLUME I (pages 1 - 122)

District Court Docket Sheet (as of Apr. 28, 2025) ....................................................1

Indictment (Sept. 23, 2004, Doc. 1).................................................................49

Superseding Indictment (Feb. 3, 2005, Doc. 47) ............................................64

Government's Proposed Jury Instructions (Mar. 28, 2005, Doc. 84).....................80

## VOLUME II (pages 123 - 372)

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 294) (defense opening statement)................................................................................123

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 148) ........................................144

    Opening statements ........................................................................148

        By the government........................................................................148
        By the defense................................................................*see* J.A. 126

    Government's evidence ....................................................................167

        Stipulation........................................................................167

| Nabil Gharbieh | Direct examination.................................171 |
| | Cross examination.................................233 |
| | Redirect examination .............................274 |
| | Recross examination ..............................281 |
| Muhammad Aatique | Direct examination.................................283 |

    Concluding matters ........................................................................369

## VOLUME III (pages 373 - 656)

Transcript, Jury Trial, Day 2 (Apr. 5, 2005, Doc. 149) ........................................373

    Preliminary matters ...................................................................................377

    Government's evidence, cont'd ....................................................................377

        Muhammad Aatique      Direct examination (resumed) .................378
                                            Cross examination....................................398
                                            Redirect examination ..............................468
                                            Recross examination ...............................489

        Stipulations ........................................................................................492

        Donald Surratt             Direct examination...................................504
                                                Cross examination....................................570
                                            Redirect examination ..............................585
                                            Recross examination ...............................588

        Detective John Hodge       Direct examination...................................589
                                                  Cross examination....................................592
                                              Redirect examination ..............................592

        Stipulations ........................................................................................594

        Playing of audiotapes...........................................................................598

        Yong Ki Kwon              Direct examination...................................604

    Concluding matters .....................................................................................655

## VOLUME IV (pages 657 - 972)

Transcript, Jury Trial, Day 3 (Apr. 6, 2005, Doc. 150) ........................................657

    Preliminary matters ...................................................................................661

ii

Government's evidence, cont'd ...................................................................665

    Evan Francois Kohlmann    Direct examination...................................665
                               Cross examination....................................817
                               Redirect examination ..............................895
                               Recross examination ...............................903

    Stipulations ...........................................................................905

    Playing of audiotape .............................................................914

Concluding matters ...........................................................................970


VOLUME V (pages 973 - 1270)

Transcript, Jury Trial, Day 4 (Apr. 7, 2005, Doc. 151) ........................................973

Preliminary matters...........................................................................977

Government's evidence, cont'd ...................................................................980

    Playing of audiotapes and videotape ...........................................980

    S.A. Tracy Kneisler    Direct examination................................1093
                               Cross examination.................................1099

    S.A. Christopher Paul Mamula  Direct examination................................1100

    S.A. Donald L. Monday    Direct examination................................1105
                               Cross examination.................................1127

    Stipulations ...........................................................................1131

    Yong Ki Kwon    Direct examination (resumed) ..............1146
                                 Cross examination.................................1238

Concluding matters ...........................................................................1268

## VOLUME VI (pages 1271 - 1550)

Transcript, Jury Trial, Day 5 (Apr. 11, 2005, Doc. 152) .....................................1271

    Preliminary matters .......................................................................1275

    Government's evidence, cont'd ........................................................1279

        Yong Ki Kwon        Cross examination (resumed) ...............1279
                                        Redirect examination ...........................1446
                                        Recross examination ............................1475

        S.A. Wade Ammerman        Direct examination.................................1481
                                        Cross examination..................................1539

    Concluding matters .......................................................................1548


## VOLUME VII (pages 1551 - 1804)

Transcript, Jury Trial, Day 6 (Apr. 12, 2005, Doc. 153) .....................................1551

    Government's evidence, cont'd ........................................................1555

        S.A. Wade Ammerman        Cross examination (resumed) ...............1556
                                          Redirect examination ...........................1582
                                        Recross examination ............................1593

        Stipulations ..........................................................................1600

        Playing of audiotapes...........................................................1610

        S.A. John Wyman        Direct examination.................................1656

    Concluding matters .......................................................................1799

**VOLUME VIII (pages 1805 - 2058)**

Transcript, Jury Trial, Day 7 (Apr. 13, 2005, Doc. 154) .....................................1805

    Preliminary matters .....................................................................................1808

    Government's evidence, cont'd ..................................................................1810

        S.A. John Wyman        Direct examination (resumed) ..............1810
                                    Cross examination...................................1852
                                    Redirect examination ............................1916
                                    Recross examination .............................1923

        Alex Daghestani           Direct examination...................................1927
                                      Cross examination...................................1935

        Andre Thompson           Direct examination...................................1940
                                      Cross examination...................................1951

        Playing of audiotapes...............................................................1954

        Government rests ..................................................................1955, 1965

    Defendant's Rule 29 motion ......................................................................1958

    Defendant's evidence ................................................................................1965

        Sherdil Loynab           Direct examination...................................1966
                                      Cross examination...................................1970
                                    Redirect examination ............................1976

        Yousuf Jaafar Idris       Direct examination...................................1977
                                      Cross examination...................................2018

    Concluding matters ....................................................................................2056

## VOLUME IX (pages 2059 - 2318)

Transcript, Jury Trial, Day 8 (Apr. 14, 2005, Doc. 155) ....................................2059

    Defendant's evidence, cont'd ........................................................................2063

        Yousuf Jaafar Idris        Cross examination (resumed) ...............2063

        Luther Kennedy        Direct examination..................................2136
                                          Cross examination..................................2144
                                          Redirect examination .............................2163
                                          Recross examination ..............................2168

        Curtis Jamison        Direct examination..................................2172
                                          Cross examination..................................2189

        Defendant rests ........................................................................2198

    Government's rebuttal evidence ....................................................................2198

        Khwaja Mahmood Hasan        Direct examination..................................2199
                                          Cross examination..................................2235
                                          Redirect examination .............................2278
                                          Recross examination ..............................2284

        Muhammad Aatique, recalled   Direct examination..................................2290

        Conclusion of evidence ........................................................................2293

    Preliminary charge conference ....................................................................2306

## VOLUME X (pages 2319 - 2568)

Transcript, Jury Trial, Day 9 (Apr. 18, 2005, Doc. 156) ....................................2319

    Charge conference ........................................................................2322

vi

Closing arguments ........................................................2346

    By the government.................................................2346
    By the defense......................................................2376
    Rebuttal by the government...................................2415

Jury charge .................................................................2429

Jury deliberations .......................................................2500

    Jury question ......................................................2500

Transcript, Jury Trial, Day 10 (Apr. 19, 2005, Doc. 157).................2506

    Jury deliberations, cont'd.....................................2507

    Jury question ......................................................2507

Transcript, Jury Trial, Day 11 (Apr. 20, 2005, Doc. 158)..................2515

    Jury deliberations, cont'd.....................................2517

    Jury question ......................................................2517

    Jury questions ....................................................2520

Transcript, Jury Trial, Day 12 (Apr. 22, 2005, Doc. 159)..................2535

    Jury deliberations, cont'd.....................................2537

Transcript, Jury Trial, Day 13 (Apr. 25, 2005, Doc. 160).................2540

    Jury deliberations, cont'd.....................................2542

    Jury questions ....................................................2542

Transcript, Jury Trial, Day 14 (Apr. 26, 2005, Doc. 161).................2553

    Return of verdict .................................................2555

Concluding matters .......................................................................2560

Verdict Form (Apr. 26, 2005, Doc. 107) .....................................2566


### VOLUME XI (pages 2569 - 2770)

Defendant's Motion for Judgment of Acquittal (June 6, 2005, Doc. 118)..........2569

Defendant's Corrected Motion for New Trial (June 14, 2005, Doc. 124) ..........2630

Government's Response to Defendant's Post-Trial Motions (June 20, 2005, Doc. 125)........................................................................2647

Defendant's Reply to the Government's Response to Defendant's Post-Trial Motions (June 28, 2005, Doc. 126) (attachments omitted from appendix)........................................................................2688

Transcript, Sentencing Hearing (July 13, 2005, Doc. 147) ................................2719

    Argument and ruling on Rule 29 motion....................................2720
    Argument and ruling on Rule 33 motion....................................2724
    Ruling on Guidelines objections................................................2735
    Argument on sentencing .............................................................2739
    Allocution ...................................................................................2746
    Imposition of sentence ...............................................................2750

Judgment in a Criminal Case (July 13, 2005, Doc. 132)....................................2758

Notice of Appeal (July 15, 2005, doc. 133)........................................................2765

Fourth Circuit Judgment (corrected) (with copy of Apr. 25, 2006 order) (May 19, 2006, Doc. 168)............................................................2767


### VOLUME XII (pages 2771 - 2998)

Transcript, Hearing (Aug. 24, 2007, Doc. 239)................................................2771

Transcript, Hearing (Nov. 20, 2007, Doc. 245)....................................................2790

Transcript, Hearing (May 16, 2008, Doc. 263) ...................................................2795

Transcript, Hearing (Oct. 23, 2008, Doc. 272)....................................................2802

Transcript, Hearing (Feb. 19, 2009, Doc. 297)....................................................2827

Transcript, Hearing (Oct. 4, 2013, Doc. 340) .....................................................2834

(Redacted) Memorandum Opinion (denying motions to compel) (Apr. 28, 2014, Doc. 350)....................................................................................................2864

Order (May 21, 2014, Doc. 357)...........................................................................2887

Notice of Appeal (June 4, 2014, Doc. 358) ..........................................................2889

Fourth Circuit Order (remanding case for further proceedings) (Aug. 4, 2015, Doc. 406)....................................................................................................2892

Fourth Circuit Order (expanding scope of remand) (July 26, 2016, Doc. 431)..................................................................................................................2894

Government's Response in Opposition to Defendant's Second Motion for Acquittal on Count 1 (Aug. 29, 2018, Doc. 447) ...........................................2896

Defendant's Reply to Government's Supplemental Memorandum on *United States v. Davis* (Aug. 19, 2019, Doc. 459) ...........................................2905

Government's Reply in Further Support of Its Supplemental Memorandum on *United States v. United States* (Aug. 26, 2019, Doc. 461) ........................2936

(Redacted) Memorandum Opinion (granting release pending appeal) (Aug. 18, 2020, Doc. 519) ...............................................................................2953

Order (granting release pending appeal) (Aug. 18, 2020, Doc. 520) ..................2969

Fourth Circuit Order (affirming grant of release pending appeal) (Aug. 31, 2020, Doc. 535)................................................................................................2971

Memorandum Opinion (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 549)..............................................................................................2972

Order (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 550)..........................2998

VOLUME XIII (pages 2999 - end)

Selected Government Trial Exhibits.................................................................2999

Gov't Exh. 1B1a: transcript of Apr. 7, 2003 consensually monitored call between Kwon and Royer.........................................................................2999

Gov't Exh. 1B2a: transcript of Apr. 8, 2003 consensually monitored call between Kwon and Royer.........................................................................3053

Gov't Exh. 1B4a: transcript of Apr. 17, 2003 consensually recorded CCTV hotel meeting between Kwon and Royer......................................3084

Gov't Exh. 1D27: Taiba Bulletin, Oct. 17, 2000..........................................3131

Gov't Exh. 1D28: Taiba Bulletin, Oct. 27, 2000..........................................3134

Gov't Exh. 1D29: Taiba Bulletin, Nov. 7, 2000............................................3137

Gov't Exh. 1D45: Taiba Bulletin, Sept. 26, 2001 (post from nadqpk@yahoo.com)................................................................................3139

Gov't Exh. 1D48: Taiba Bulletin, Oct. 13, 2001 (post from nadqpk@yahoo.com)................................................................................3141

Gov't Exh. 1D52: Taiba Bulletin, June 24, 2001 (post from nadqpk@yahoo.com)................................................................................3144

Gov't Exh. 1F1: LET Poster, image 1 ...........................................................3151

Gov't Exh. 1F3: LET Poster, image 3 ...........................................................3152

Gov't Exh. 1F4: LET Poster, image 4 ...........................................................3153

Gov't Exh. 1G10a: transcript of Apr. 1, 2003 recorded telephone call (Hammad and Royer call Al-Timimi) ........................................................3154

Gov't Exh. 4G7: email dated June 19, 2001 from pballaz@yahoo.com, regarding praying in a moving car............................................................3164

Gov't Exh. 7A19: Uqla fatwa on events of 9/11, in English, taken from Surratt's residence on May 8, 2003 ...........................................................3168

Gov't Exh. 7A23; Hawali's *Statement to the Ummah* in English .................3178

Gov't Exh. 7A39a: translation of website containing Space Shuttle article in Arabic ...........................................................................................3200

Gov't Exh. 7C31: email dated Sept. 20, 2001 from Kwon to Belton Harris ....................................................................................................3203

Gov't Exh. 7D3: email dated Oct. 15, 2001 from Surratt re. Hawali's *Statement to the Ummah* ......................................................................3204

Gov't Exh. 7F24a: UPI News article dated Sept. 16, 2001 titled *Taliban Leaders Seek Islamic Support*....................................................................3206

Gov't Exh. 7H12: plea agreement and statement of facts for Muhammed Aatique....................................................................................................3207

Gov't Exh. 10A3: document entitled *Suicide Attacks, Are They Suicide? A Shariah Viewpoint* ...............................................................................3223

Gov't Exh. 10A41: email dated Oct. 23, 2000 from Nabil to Timimi re: trip to Delaware ........................................................................................3227

Gov't Exh. 10D19: email dated Oct. 21, 2001 email from altimimi@yahoo.com to aqdcksa@yahoo.com re. "Utter Nonsense" ......3229

Gov't Exh. 10H1A: record of instant messaging session with Bin Laden statement preamble ...................................................................................3233

Gov't Exh. 10J7: article, *Sheikh Ali Timimi on the Taliban and the Statues* ..................................................................................................3260

xi

Gov't Exh. 10J9: email dated December 13, 2001 from Timimi re. "A call to reflect and repentance" ................................................................3262

Gov't Exh. 10J15: affidavit of Youseff Idris ..................................3265

Gov't Exh. 10S1: summary chart of Timimi / Kwon telephone calls, Sept. 16, 2001 ................................................................................3266

Gov't Exh. 10S2: summary chart of Timimi / Kwon telephone calls, Sept. 19, 2001 ................................................................................3267

Gov't Exh. 10S3: summary chart of Kwon telephone calls, Sept. 16, 2001 ................................................................................................3268

Gov't Exh. 10T1: photograph, package of "New World Order" cassette tapes ................................................................................................3272

Gov't Exh. 12-1: stipulation re. background facts ............ 3273; *see* J.A. 167-171

Gov't Exh. 12-60: stipulation re. electronic surveillance of calls and email................................................................................................3277

Gov't Exh. 12-61: stipulation re. Al-Timimi lectures ............3278; *see* J.A. 2344

Selected Defense Trial Exhibits........................................................3280

Def't Exh. 33: Al-Timimi lecture titled *Muslims in America in the Face of Accusations of "Fundamentalism" and "Terrorism"* delivered at Purdue University on Oct. 20, 1993 ........................................................3280

Def't Exh. 57: letter dated from AUSA Gordon Kromberg to Yong Kwon's attorneys ................................................................................3293

Def't Exh. 80: stipulation regarding Al-Timimi's unsubscription from Taiba Bulletin List ....................................................................................3295

Def't Exh. 81: summary report of an interview with Ismail Royer by Evan Kohlmann ................................................................................3298

Def't Exh. 82: photo of front of Yong Kwon's apartment .............................3303

Def't Exh. 83: photo of back of Yong Kwon's apartment ............................3304

Def't Exh. 85: summary of Yong Kwon's phone calls on Sept. 16, 2001 ................................................................................................ 3305

Def't Exh. 86: summary of Yong Kwon's phone calls on Sept. 13-15, 2001 ................................................................................................3306

Def't Exh. 87: summary of Al-Timimi's calls on evening of Sept. 19, 2001 ................................................................................................3307

Def't Exh. 90: summary of Al-Timimi's calls on evening of Sept. 19, 2001 ................................................................................................3308

This page intentionally left blank for double-sided pagination and printing

1405

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,      .       Criminal No. 1:04cr385
                               .
        vs.                    .       Alexandria, Virginia
                               .       April 12, 2005
ALI AL-TIMIMI,                 .       9:43 a.m.
                               .
            Defendant.         .
                               .

. . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME VI

APPEARANCES:

FOR THE GOVERNMENT:          GORDON D. KROMBERG, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314
                               and
                             JOHN T. GIBBS, ESQ.
                             Counterterrorism Section
                             Criminal Division
                             United States Department of Justice
                             601 D Street, N.W.
                             Washington, D.C. 20004

FOR THE DEFENDANT:           EDWARD B. MAC MAHON, JR., ESQ.
                             107 East Washington Street
                             P.O. Box 903
                             Middleburg, VA 20118
                               and
                             ALAN H. YAMAMOTO, ESQ.
                             643 S. Washington Street
                             Alexandria, VA 22314

ALSO PRESENT:                S.A. WADE AMMERMAN
                             BOBBY WILLIAMS
                             S.A. JOHN WYMAN

(Pages 1405 - 1658)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

**J.A. 1551**

1406

1   OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                    U.S. District Court, Fifth Floor
2                                   401 Courthouse Square
                                    Alexandria, VA 22314
3                                   (703)299-8595

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1407

1    I N D E X

2                              DIRECT   CROSS   REDIRECT   RECROSS

3   WITNESSES ON BEHALF OF
    THE GOVERNMENT:

4
    S.A. Wade Ammerman                    1410     1436      1447
5     (Resumed)

6   S.A. John Wyman              1510

7

8                            EXHIBITS

9                                        MARKED      RECEIVED

10  GOVERNMENT'S:

11  No. 1G3                                            1521
        1G3a                                           1521
12      1G11                                           1527
        1G11a                                          1527
13      2A7                                            1459

14      7A1a                                           1463
        7A1b                                           1463
15      7A15                                           1459
        7A19                                           1640
16      7A23                                           1463

17      7A38                                           1460
        7A39                                           1458
18      7A39a                                          1458
        7C13b                                          1457
19      7D16                                           1455

20      10A3                                           1605
        10H1a                                          1459
21      10J2                                           1638
        10J8                                           1588
22      10J9                                           1599

23      10J10                                          1458
        10J11                                          1617
24      10J11f                                         1615
        12-53                                          1458
25      12-58                                          1455
        12-59                                          1457

**J.A. 1553**

1408

1                          EXHIBITS (Cont'd.)

2                                              MARKED    RECEIVED

3    DEFENDANT'S:

4    No.  50                                              1417
           87                               1410          1410
5          88A                              1420          1420
           88B                              1420          1425
6          88C                              1421          1425

7          88D                              1422          1425
           88E                              1423          1425
8          88F                              1424          1425
           88G                              1425          1425

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**J.A. 1554**

1409

1                    P R O C E E D I N G S
2                  (Defendant and Jury present.)
3          THE COURT:  Good morning, Ladies and Gentlemen.  All
4   right, everybody has his or her notebook?  Oh, some extras.  All
5   right, very good.
6          All right, we're ready to proceed, Mr. MacMahon.
7          Agent Ammerman?
8      SPECIAL AGENT WADE AMMERMAN, GOVERNMENT'S WITNESS,
9                  PREVIOUSLY AFFIRMED, RESUMED
10         MR. MAC MAHON:  Good morning, Your Honor.
11         THE COURT:  Good morning.  All your cables are rehooked?
12         That's why we were late this morning.  We had some
13  wiring issues this morning.
14         But they're all set?
15         MR. MAC MAHON:  Lance came up and helped us out, Your
16  Honor.
17         THE COURT:  All right.
18         MR. MAC MAHON:  We appreciate it, Your Honor.  Sorry for
19  the delay.
20         THE COURT:  All right.  And, Agent, you're still under
21  your affirmation from yesterday.
22         THE WITNESS:  Yes, ma'am.
23         MR. MAC MAHON:  Your Honor, the exhibit we talked about
24  yesterday, the demonstrative exhibit with phone calls, I've given
25  Mr. Kromberg a copy of and would ask that we mark it as the next

## Ammerman - cross

1    defense exhibit.

2              THE COURT:  All right, which is Defense Exhibit 87.  And

3    there's no objection so that's in.

4              MR. KROMBERG:  No objection, Judge.

5              (Defendant's Exhibit No. 87 was marked and received in

6    evidence.)

7                        CROSS EXAMINATION (Cont'd.)

8    BY MR. MAC MAHON:

9    Q.    Special Agent Ammerman, good morning.

10   A.    Good morning.

11   Q.    I think when we, when we broke, we were looking at this slide

12   show for a talk that Ali Al-Timimi gave in London, England, in

13   1998.  Do you remember that exhibit?

14   A.    Yes.

15   Q.    Did you ever try to get a copy of this lecture that he gave?

16   A.    I did not.

17   Q.    Didn't go over to London to see what it was?

18   A.    No.

19   Q.    And I was asking if you knew some of these Arabic terms in

20   here.  What Arabic terms do you know other than "jihad"?

21   A.    I don't know that many.  I know a few of some of the more

22   common ones that I hear in conversation, but not very many.

23   Q.    Look at what's the fourth page of this document, if you

24   would, please.  The -- where it lists the number of companions,

25   starting with Abu Huraira --

## Ammerman - cross

1    THE COURT SECURITY OFFICER: Which number?

2    MR. MAC MAHON: Oh, I'm sorry, I thought he still had

3    it. This is Exhibit 10A16.

4    THE WITNESS: Thanks.

5    Did you say page 4?

6    BY MR. MAC MAHON:

7    Q. Yes, sir. Do you know who any of those people are?

8    A. Could you point me to where you're looking at?

9    Q. We'll see if it will come up on the screen. It will be

10   easier. It's loading, excuse me.

11   Yeah, up in the top left corner, what I just circled

12   there. Please try to -- do you know who any of those people are?

13   A. I do not.

14   Q. So you just seized this because the word "jihad" was

15   somewhere in it, correct?

16   A. That was probably part of the reason. The second reason is

17   because it was a lecture by Mr. Timimi.

18   Q. All right. And I asked you yesterday how many lectures of --

19   publicly available lectures there were of Ali Al-Timimi, and did

20   you, did you tell me that you didn't even look for any of them?

21   A. No, I didn't tell you that.

22   Q. Okay. You did not?

23   A. No.

24   Q. You didn't go on the Internet and order any of the lectures

25   of Ali Al-Timimi?

## Ammerman - cross

1  A.    I didn't look on the Internet, no.

2  Q.    The only thing you did was serve a subpoena on the Dar

3  al-Arqam, right?

4  A.    That's right.

5  Q.    And how many did they produce?

6  A.    They produced a boxful.  I can guess at a number, but it may

7  not be completely accurate.  Probably in the neighborhood of 30

8  lectures.

9  Q.    Some of them how long?

10 A.    Some of them were a multi-tape series, maybe as many as four

11 or five, perhaps six tapes, and some of them were just a

12 single-tape series -- or a single-tape lecture.

13 Q.    Did you add up how many hours of his tapes were publicly

14 available?

15 A.    In terms of hours, no, I did not.

16 Q.    In terms of -- did you try to listen to all of them?

17 A.    I listened to some of them.  We had a team of agents that

18 listened to them, but I didn't myself listen to all of them

19 necessarily.

20 Q.    Look at Government's Exhibit 10A26, if you would.

21 A.    Okay.  I have it.

22 Q.    I think we looked at this exhibit yesterday.

23        I'm just waiting for it to come up on the screen,

24 Special Agent.  Excuse me.

25        I'll tell you, while he does that, this is one of the

## Ammerman - cross

1    notes -- thank you.

2           This was seized at Ali Al-Timimi's house, right?

3    A.    Yes, sir.

4    Q.    Okay.  In his home, there were lots of lots of little pieces

5    of paper, weren't there?

6    A.    There were.

7    Q.    Lots of them with questions written on them?

8    A.    I recall these three specifically that had questions written

9    on them.  Other than these three, I can't recall any others.

10   Q.    These were the only three pieces of paper in the whole house

11   that looked like someone was asking him a question?  Is that your

12   testimony, Special Agent?

13   A.    My testimony would be these three are unique.  These were the

14   only three like these that I found.  There are a lot of other

15   little pieces of paper that had various things on them, names,

16   phone numbers, etc., but these were unique.

17   Q.    All right.  These were the only ones that you seized, right?

18   A.    Of the JIMAS letterhead?

19   Q.    Yes.

20   A.    Yes, sir.

21   Q.    Were there others?

22   A.    No.  These were the only ones I found.

23   Q.    Okay.  Did you ask anybody to go look at the tapes in England

24   to see whether these questions were even asked?

25   A.    I don't know that there are tapes in England, but no, I did

1414

## Ammerman - cross

1  not do that.

2  Q.   You don't even know whether he ever even answered these

3  questions, do you?

4  A.   No, I don't.

5  Q.   And your attention was taken to these just because, for

6  example, 10A26 says something about the illegal occupation of the

7  Jews of Jerusalem, right?

8  A.   Yes.

9  Q.   Exhibit 2C2, please?

10  A.   I have it.

11  Q.   And this is the, the disk of the UAV Flight Systems that you

12  got from Vesta Technologies?

13  A.   Correct.

14  Q.   How big is the plane that this would work for?

15  A.   There are dimensions somewhere within this packet of

16  information.  The remote-control airplane that I'm familiar with

17  that this would control would roughly be about the size of maybe

18  the bench that's in front of me in terms of length from the front

19  of the aircraft to the back of the aircraft.

20  Q.   One of the airplanes that people use when they're

21  participating in flying clubs?  We're not talking about a drone

22  aircraft that would -- that the U.S. military is flying, are we?

23  A.   This aircraft that we're talking about, as I understand it,

24  could be used for a number of things.  It could be used, for

25  example, to put a surveillance camera on that could then be used

1415

## Ammerman - cross

1    for any number of commercial applications.

2    Q.   And it could be used just for sport and play, couldn't it,
3    sir?

4    A.   I think the aircraft itself could be used for that, yes.

5    Q.   Okay.  And you didn't find any information in Al-Timimi's
6    home about any unarmed or unmanned flight systems, did you?

7    A.   Did not.

8    Q.   And you looked for that, didn't you?

9    A.   I think probably indirectly.  We conducted the search on
10   Mr. Timimi's house prior to the search of Masaud Khan's house, so
11   we didn't specifically know about the GPS control module at the
12   time that we conducted the search on Mr. Timimi's house.

13   Q.   But you kept, what, 32 boxes of documents and other things
14   taken from his house?

15   A.   Quite a few.  About 32, yes.

16   Q.   All right.  And you had the opportunity to look through all
17   of those boxes for at least a year and a half, didn't you?

18   A.   Yes.

19   Q.   And you made a CD-Rom of everything that you seized in his
20   house, right?

21   A.   Yes.

22   Q.   And in that, you didn't find anything to do with any
23   unarmed -- or unmanned flight vehicles, did you?

24   A.   No.

25   Q.   You looked again after what you found at Mr. Khan's house,

1416

## Ammerman - cross

1   didn't you?

2   A.    I did.  Yes, I did.

3   Q.    Right.  And turned up nothing, right, Special Agent?

4   A.    Not regards to the GPS module, no.

5         MR. MAC MAHON:  Show him if you would, please,

6   Government Exhibit 10A29.

7   Q.    This Exhibit 10A29 was something seized at Ali Al-Timimi's

8   home, wasn't it?

9   A.    Yes.

10  Q.    Okay.  And if you look at the second page, you'll see that

11  there was a whole series of lectures that were given?

12  A.    Right.

13  Q.    Did you ever go look for a copy of any of these lectures?

14  A.    No, I don't believe we have -- if you're referring to audio

15  cassette tapes?

16  Q.    Yes.

17  A.    I don't believe we have any cassette tapes of these lectures.

18  Q.    And these were all public lectures, weren't they?

19  A.    Appear to be, yes.

20        MR. MAC MAHON:  Would you show him, please, Defendant's

21  Exhibit 50?

22        THE COURT:  Are you moving this into evidence?

23        MR. MAC MAHON:  Yes, Your Honor.

24        THE COURT:  Any objection?

25        MR. GIBBS:  No objection.

# Ammerman - cross

1        THE COURT:  It's in.

2           (Defendant's Exhibit No. 50 was received in evidence.)

3    BY MR. MAC MAHON:

4    Q.   Have you seen that before, Special Agent, if you have that in

5    front of you?

6    A.   I do, yes.

7    Q.   Did you seize that at Ali Al-Timimi's home?

8    A.   This looks very familiar.  I think we probably did seize

9    this.

10   Q.   Aren't these the notes for the lecture that's referenced in

11   Government Exhibit 10A29?

12   A.   These notes appear to relate to a course that was given at

13   the Islamic Information & Support Centre of Australia.

14   Q.   Isn't that exactly the same entity that's listed on the top

15   of Exhibit 1B24?

16   A.   I believe it's the same, yes.

17   Q.   Did you compare them, Special Agent Ammerman, to see if this

18   was actually the lecture that he gave that day?

19   A.   I don't believe I paid this a tremendous amount of attention

20   during my review of the evidence.

21   Q.   The actual speech, the notes for the speech that he gave was

22   less important to you than the flier saying that he was speaking;

23   is that correct?

24   A.   I remember reviewing these, these notes, and at the time of

25   the review, it was my opinion that they didn't obtain -- contain

## Ammerman - cross

1  any evidentiary value that would necessitate any further review.

2  Q.  Did you read them?  Did you read the whole thing, Special

3  Agent?

4  A.  I recall looking over this, yes.

5  Q.  And it didn't have any, any incendiary language or anything

6  else that you thought might help you in this case; is that right?

7  A.  Not that I could recall.

8  Q.  But the flier did?

9  A.  The flier was significant from the standpoint of just

10  expressing Mr. Timimi as a well-known lecturer, and that's why it

11  was maintained.

12  Q.  You gave us -- excuse me, Your Honor.  Just a second, Your

13  Honor.  Excuse me.

14        Let me if I could show you some pictures on the screen,

15  Special Agent.  Do you recognize that picture, sir?

16  A.  Yes, sir.

17  Q.  Okay.  That's Ali Timimi's house on the day of the search,

18  correct?

19  A.  Yeah, I believe that's one of our photos.

20  Q.  The FBI came that day with a camera person as well, right?

21  A.  Yes, sir.

22  Q.  Who was that?

23  A.  It was an FBI photographer assigned to the Washington Field

24  Office.

25  Q.  And he didn't offer any resistance to the search, did he?

## Ammerman - cross

1  A.    Mr. Timimi?

2  Q.    Yes.

3  A.    No.

4  Q.    He was polite, wasn't he?

5  A.    He was cooperative, yes.

6          MR. MAC MAHON: Show the next picture.

7          THE COURT: Do you want to move these in or not?

8          MR. MAC MAHON: Yes, Your Honor. When I get done with

9  the whole series, I'll move them in.

10          THE COURT: All right. And I assume there's no

11  objection to these photographs.

12          MR. GIBBS: No, there is no objection, Judge.

13          THE COURT: All right.

14  BY MR. MAC MAHON:

15  Q.    What is that a picture of, Special Agent Ammerman?

16          THE COURT: Well, you know what? To keep these in

17  order, what was the exhibit number of the one we just looked at?

18  Are these not numbered yet?

19          MR. MAC MAHON: They're not numbered, Your Honor. We

20  had -- used them as demonstrative exhibits before, but I have them

21  on a disk -- I can bring them up in copies. I've got the

22  originals downstairs.

23          THE COURT: For purposes of the record so that the

24  discussion makes sense, we should tie it to a specific exhibit.

25  So let's get numbers on these now. Hold on one second.

1420

## Ammerman - cross

1    Do you want to make this the 88 series, and we'll do
2 these with sub-letters?

3    MR. MAC MAHON:  That's fine, Your Honor.

4    THE COURT:  All right.  So 88A, Defense Exhibit 88A,
5 which is in evidence, is a photograph of the defendant's
6 townhouse, correct?

7    MR. MAC MAHON:  That's correct, Your Honor.

8    THE COURT:  All right.

9    (Defendant's Exhibit No. 88A was marked and received in
10 evidence.)

11 BY MR. MAC MAHON:

12 Q.   Agent, what is 88, we'll call this 88B?

13    (Defendant's Exhibit No. 88B was marked for
14 identification.)

15 A.   That's a photograph of Mr. Timimi's basement family room
16 area.

17 Q.   Okay.  And this was taken the day of the search, right?

18 A.   If those are our photographs, yes, it was.

19 Q.   And what are all those books?

20 A.   Various books, many of which are in Arabic.  The majority of
21 those were not seized.  They were left in place during the search.

22 Q.   You don't read Arabic, right?

23 A.   I do not, no.

24 Q.   You brought somebody with you that read Arabic?

25 A.   Right.

**J.A. 1566**

1421

## Ammerman - cross

1  Q.   And did you look at -- this person look at every book?

2  A.   During the times that I was in the basement family room, I

3  observed the translators vigorously attempting to look at, at all

4  the books.  I would be guessing to some degree if I definitively

5  said they looked at each and every one, but I know they, they made

6  an effort to look at least at the cover of each of those.

7  Q.   Well, how long did it take them to look at each and every

8  book just in this picture; do you remember?

9  A.   We entered the residence at about 5:00, and we stayed 'til

10 10:00, so five hours' worth of searching.

11 Q.   5:00 in the morning or 5:00 at night?

12 A.   5 p.m., I'm sorry.

13 Q.   So none of these books were seized in this picture.  This is

14 after you had taken everything that you wanted, right?

15 A.   From that photograph, I can't tell.  We took before search

16 and after search photographs.  Based on the photograph as it

17 exists, I don't know if this is a before or an after search

18 photograph.

19          MR. MAC MAHON:  All right, 88C, please?

20          (Defendant's Exhibit No. 88C was marked for

21 identification.)

22 Q.   What is that?

23 A.   That's another photograph of Mr. Timimi's basement family

24 room.

25 Q.   The same room we were just looking at in 88B, isn't it?

1422

## Ammerman - cross

1  A.    Yes.

2  Q.    And did the translator look through every one of those books,

3  too?

4  A.    I don't know if they looked through every one of those books,

5  but I know they at least made an effort to look at the cover of

6  each book.

7         MR. MAC MAHON:  Next picture, please?

8  Q.    What is that, Special Agent Ammerman?

9         THE COURT:  This is 88D.

10        MR. MAC MAHON:  88D, I'm sorry, Your Honor.

11        (Defendant's Exhibit No. 88D was marked for

12  identification.)

13        THE WITNESS:  That's the garage of Mr. Timimi's

14  residence.

15  BY MR. MAC MAHON:

16  Q.    All right.  And that's the -- these were boxes of -- on

17  different topics, different Islamic topics, marked even and

18  everything, weren't they?

19  A.    Some were marked, and there were quite a number of Arabic

20  documents and books and lectures in those boxes.

21  Q.    Okay.  How many boxes of -- on these various Muslim issues

22  did he have in his garage when you entered the house?

23  A.    There were probably two dozen boxes in the garage containing

24  various things, many of which contained lectures and Arabic

25  documents that you're speaking of.

1423

**Ammerman - cross**

1   Q.   Some of them were marked by topic, too, right?

2   A.   I believe some were, yes.

3   Q.   Like someone who, an academic who was organizing his work,

4   correct?

5   A.   I recall some markings on the boxes.  The one that I recall

6   specifically is the one that was labeled "Yong Kwon."  But I do

7   remember there being some markings on other boxes as well.

8   Q.   Okay.  And that was a box that Mr. Kwon had when he helped

9   him move, right?

10  A.   That was the story I got from Mr. Timimi, yes.

11  Q.   That's the story you got from Mr. Kwon, too, isn't it?

12  A.   Well, Mr. Kwon admitted to helping -- or told me that he

13  helped Mr. Timimi move, but he didn't specifically recall a box

14  with his name on it.

15          MR. MAC MAHON:  The next exhibit, please?  Which would

16  be 88E.

17          (Defendant's Exhibit No. 88E was marked for

18  identification.)

19  BY MR. MAC MAHON:

20  Q.   Have you seen that before?

21  A.   Yes.

22  Q.   That's another -- that's looking the other way in the garage,

23  isn't it?

24  A.   It is.

25  Q.   Did you look through every one of those boxes, too?

## Ammerman - cross

1  A.   We had a team of agents conducting searches, and they looked

2  through each of those boxes.

3       MR. MAC MAHON:   The next picture, please?

4  Q.   This is 88F.

5       (Defendant's Exhibit No. 88F was marked for

6  identification.)

7  BY MR. MAC MAHON:

8  Q.   What is that?

9  A.   That's a photograph, I believe, that was taken of a book that

10  was found in Mr. Timimi's automobile.  It's difficult to recall

11  specifically without the photo log that accompanies these

12  photographs, but I believe that's what it was.

13  Q.   Okay.  Why was a book on cluster analysis seized?

14  A.   I don't know that it was seized.  I believe it was just

15  photographed.

16  Q.   Did you seize this book?

17  A.   I don't think that was seized.

18       MR. GIBBS:   Objection.  He's just testified that the

19  book was photographed.

20       THE COURT:   Well, he said he thought so.  But anyway,

21  I'll sustain the objection.  The agent did not say that he seized

22  it.

23       MR. MAC MAHON:   Okay.  Excuse me, Your Honor.

24  Q.   Did you, did you ask that this photograph be taken?

25  A.   No, I did not ask that.

## Ammerman - cross

1  Q.   Okay.  Were you still looking for evidence of possession of

2  Weapons of Mass Destruction at that time?

3  A.   Well, we were looking for that throughout the duration of the

4  search.

5  Q.   Biological and chemical agents as well?

6  A.   Of course.

7  Q.   All right.  And didn't find anything like that, right?

8  A.   No.

9            MR. MAC MAHON:  The next picture, please.

10           THE COURT:  It's 88G.

11           (Defendant's Exhibit No. 88G was marked for

12  identification.)

13           MR. MAC MAHON:  That's not coming up very well on the

14  screen, Your Honor.  Let's go to the next one.

15           That's enough of those pictures, Your Honor.

16           THE COURT:  All right.  Well, A through G are in

17  evidence.

18           MR. MAC MAHON:  Okay.

19           (Defendant's Exhibit Nos. 88B through 88G were received

20  in evidence.)

21  BY MR. MAC MAHON:

22  Q.   Look at 10A36 -- 10A29, if we could, please.

23           All right, 29a2, please.

24           THE COURT:  I'm sorry, what are you --

25           MR. MAC MAHON:  He's got the wrong -- I'm sorry, I've

## Ammerman - cross

1  got the wrong one, Your Honor.

2          10A36, please.

3          THE COURT:  This is a cassette?

4          MR. MAC MAHON:  Yes, Your Honor.

5          THE COURT:  All right.

6          MR. MAC MAHON:  I have it as 10A36.

7          THE WITNESS:  I have it.

8  BY MR. MAC MAHON:

9  Q.   In your search of Mr. Timimi's car and residence, you found a

10  cassette tape; is that correct?

11  A.   Yes.

12  Q.   Okay.  And what does it say on the cover of that tape?

13  A.   At the top, there's some Arabic writing which I cannot read.

14  Then it says "Islamic Center Productions, Side A, 90 minutes,

15  Songs of The Mujahideen."

16  Q.   Okay.  Were you able to -- did you look into that tape, try

17  to figure out how old it was?

18  A.   I don't know if there's any way to determine how old it is.

19  I tried to listen to it.

20  Q.   Is it in Arabic?

21  A.   It is.

22  Q.   Okay.  Do you know where the Islamic Center is in Washington?

23  A.   Are you talking about the one on Massachusetts Avenue?

24  Q.   Yes.

25  A.   Yes.

## Ammerman - cross

1  Q.   Okay.  Is that a tape from the Islamic Center on Mass. Avenue
2  in Washington?

3  A.   I don't know.

4  Q.   You didn't go over there with a subpoena seeing what tapes
5  they may have, Special Agent Ammerman?

6  A.   No, I didn't.

7  Q.   This just had the word "mujahideen" on it, so you wanted to
8  seize it; is that right?

9  A.   That was why it was seized, because it said "mujahideen."

10 Q.   And you made no effort whatsoever to find out where that tape
11 came from or how old it was at all, did you?

12 A.   I wouldn't even know where to look initially to find out
13 where this tape came from.  In terms of finding out how old it is,
14 I have no idea how old it is.

15 Q.   But you didn't go to the Islamic Center in Washington and ask
16 them if they had that tape on sale?

17 A.   I did not.

18 Q.   How many tapes did Mr. Al-Timimi have in his house when you
19 raided it?

20 A.   I believe we ultimately seized about maybe 10 to 12 cassette
21 tapes.

22 Q.   How many tapes did he have in his house when you raided it,
23 Special Agent Ammerman?

24 A.   I really don't know how many tapes he had total.  I can give
25 you some estimation of how many we, we seized, but in terms of how

1428

## Ammerman - cross

1   many he had total in his house, I really don't know.

2   Q.   About a thousand, Special Agent?

3   A.   He had a lot.  I remember seeing several boxes that were full

4   of tapes.  He had a lot, a lot of cassette tapes.

5   Q.   Did you look through each and every one of the tapes?

6   A.   The agents conducting the search looked through the boxes and

7   looked through the tapes and made decisions on their own

8   contemporaneous with their responsibilities as locating agents as

9   to what they would seize, and some of those they did seize, but

10  many they did not.

11  Q.   Was this the only tape that had the word "mujahideen" on the

12  cover of it?

13  A.   As best I can recall, yes.

14  Q.   So that's why you seized that, right?

15  A.   Right.

16  Q.   You said that -- you say that when you interviewed

17  Mr. Kwon -- talked to Mr. Kwon before he placed a telephone call

18  to Ali Al-Timimi, you gave him some pointers, right?

19  A.   Right.

20  Q.   Tell the jury, did you teach him how to lie?

21  A.   When I asked Mr. Kwon to make that phone call, he did so with

22  the role of being -- having been approached by authorities calling

23  from Korea and seeking advice and guidance on what he should do.

24  Q.   Right.  And you told him as long as he was working for you,

25  he could lie to Ali Al-Timimi on the telephone.  Isn't that what

## Ammerman - cross

1  you told him?

2  A.    No, I didn't tell him that.

3  Q.    You told him to play a role but don't lie?  Is that what you

4  did, Special Agent?

5  A.    I told him to play a role.

6  Q.    To you, that's different than asking him to tell a lie?

7  A.    I told him to play a role.

8  Q.    All right.  You knew he wasn't in Korea, right?

9  A.    He was in Virginia.

10 Q.    He was sitting next to you, right?

11 A.    Yes, he was.

12 Q.    And when he said, "I'm in Korea," did you pat him on the back

13 or encourage him to keep going?

14 A.    No.

15 Q.    And you say that you wrote some notes out for him to see as

16 to how he should proceed, right?

17 A.    No.  We wrote the notes as the conversation progressed, and

18 it appeared that Yong was unable to really engage Mr. Timimi in

19 conversation.  We wrote out a few notes to give him some

20 instructions.

21 Q.    And the instructions were, "Get him to admit he said

22 Afghanistan," something like that, weren't they, sir?

23 A.    No.

24 Q.    What did the notes say?

25 A.    The notes basically said, "Ask him about Royer.  Ask him

## Ammerman - cross

1  about Hasan.  Ask him about Masaud Khan."

2  Q.    Okay.  And you destroyed those notes, right?

3  A.    Oh, yes.

4  Q.    And how did you destroy them?

5  A.    The best I can recall, they were transported back to our

6  office and either put inside of a classified burn bag or shredded.

7  I'm not sure which one or the other.

8  Q.    Now, at that time, you knew there was a -- there were even

9  charges pending against some of these gentlemen, weren't there?

10 A.    In April, I think just Ibrahim Hamdi was arrested on a, on a

11 gun charge, and that was it.

12 Q.    Well, you knew there was going to be -- it was your intention

13 to charge people, wasn't it?

14 A.    We were still in the midst of the investigation at that

15 point, trying to determine exactly what happened and who was

16 involved.

17 Q.    How many other documents that relate to the investigation did

18 you take to a classified place and shred or burn, Special Agent

19 Ammerman?

20 A.    With regard to this investigation?

21 Q.    Yes.

22 A.    With regard to notes?  Probably just the notes from that

23 hotel meeting, the notes from the call that Yong placed to Randall

24 Royer.  Of course, classified information was collected along the

25 way that no longer needs to be retained that we shred as a matter

## Ammerman - cross

1  of policy and routine.

2  Q.  How many documents are we talking about in total that were --

3  that constitute your notes of any of these phone calls that you

4  had shredded or burned?

5  A.  Probably just a couple of pages of scribbling on hotel

6  stationery.

7  Q.  And why did you burn them?

8  A.  It's a secure means of disposal.

9  Q.  Well, you don't normally dispose of information that relates

10  to a pending criminal investigation, do you?

11  A.  No.

12  Q.  And FBI policy actually prohibits the destruction of records

13  that relate to a criminal investigation, doesn't it?

14  A.  Yes.

15  Q.  Who told you to burn these notes?

16  A.  I did it on my own.

17  Q.  Did you tell your supervisor you did that?

18  A.  Probably not.

19  Q.  Who was the first person you told that you destroyed evidence

20  in this case, Special Agent Ammerman?

21  A.  I don't believe I destroyed evidence.

22  Q.  Well, the notes that a -- the notes of you feeding

23  information to Yong Kwon talking to Ali Al-Timimi would certainly

24  be evidence that any defense lawyer would want in a case.  You

25  knew that, right?

## Ammerman - cross

1    A.    Actually, I didn't, I didn't consider that at the time.  They

2    actually seemed to be somewhat irrelevant, and that was kind of

3    the thought process at the time.

4    Q.    How many -- how long have you been an agent with the FBI?

5    A.    Ten years.

6    Q.    And in your training, you were told not to destroy any

7    documents that relate to a pending criminal investigation, weren't

8    you?

9    A.    I'm trying to recall those lessons.  I think that's probably

10   something that I learned somewhere along the way.  I don't know if

11   it was -- I don't know where it was.

12   Q.    Where did you learn that, Special Agent Ammerman?

13   A.    I'm not sure.

14   Q.    There was -- did you have training at Quantico?

15   A.    Yes, I did.

16   Q.    And was there any, any education in retaining evidence for

17   criminal cases?

18   A.    There were certainly some courses of instruction that related

19   to evidence collection and packaging and that sort of thing.

20   Q.    All right.  And the jury has seen many envelopes you have

21   where you, you write on it, and then you seal it, and every time

22   somebody opens it, they have to write their initials on it, and

23   then it's resealed, and then it's held up in a bag in court,

24   right?

25   A.    Right.

## Ammerman - cross

1  Q.   Okay.  Were there any classes on destroying any of that
2  information on your own?

3  A.   No.

4  Q.   What -- you destroyed the notes that you gave to Mr. Kwon
5  when he spoke to Mr. Royer as well?

6  A.   I believe so, yes.

7  Q.   You believe -- do you remember that specifically, or is that
8  just something you believe?

9  A.   I'm having a hard time remembering specifically what I wrote
10 and when I wrote it.  Yong was doing pretty well in the
11 conversations with, with Ismail Royer, and I know there was some,
12 some degree of coaching along the way in terms of ask him about
13 this person or ask him about that person.  It could have been that
14 I wrote them on a note, and I think I did write a few of those
15 coaching tips on hotel stationery, but it was just a very few,
16 maybe one or two.

17 Q.   What were the coaching tips?

18 A.   Ask him about certain people.  Ask about Hasan.  Ask about
19 Aatique.

20 Q.   And did you write him a note when, when Royer said that Ali
21 never mentioned Afghanistan and Mr. Kwon agreed?

22 A.   I don't believe so.

23 Q.   You didn't tell him -- you didn't jump up and down and
24 scream, "Oh, no.  What was that?"

25 A.   No.  During the conversation, we were listening only to

## Ammerman - cross

1  Yong's side of the conversation.

2  Q.    You were just on the other side of the hotel, weren't you?

3  A.    You mean at the hotel meeting?

4  Q.    Yes.

5  A.    I was actually not present at the hotel meeting.  I was on

6  another -- at another location that day.

7  Q.    So the mental process you went through to destroy those notes

8  was what?

9  A.    For the hotel meeting?

10  Q.    Yes.

11  A.    I was not at the hotel meeting.

12  Q.    Well, you said on the telephone call that you had, the

13  consensual telephone call that started out with Mr. Kwon in your

14  office saying, "I'm in Korea," what was the mental process that

15  you went through to decide to destroy the notes of that phone

16  call?

17  A.    Like I mentioned at that point in time, I didn't consider it

18  a material document, and I disposed of it.

19  Q.    Have you told your supervisor now that you destroyed notes

20  relating to a pending criminal investigation?

21         MR. GIBBS:  Judge, this is asked and answered.  He's

22  already gone through this.

23         THE COURT:  I'm going to sustain the objection.  I think

24  you've gone long enough.  Let's move on to something else.

25         MR. MAC MAHON:  Thank you, Your Honor.

# Ammerman - cross

1          Just a second, Your Honor, if I could.

2          THE COURT:  Yes, sir.

3          MR. MAC MAHON:  Just one more, Your Honor.

4   Q.   If I could show this to the -- this is Government Exhibit

5   10S2.  You've seen that before, haven't you?

6   A.   Yes.

7   Q.   When was the first time that you analyzed -- you were asked

8   to analyze Dr. Al-Timimi's phone records for his interaction with

9   Yong Kwon?

10  A.   When was the first time I was asked to?

11  Q.   Yes.

12  A.   I'm not sure I understand what you're asking me.

13  Q.   When was the first time someone asked you to take Ali

14  Al-Timimi's phone records and look for telephone calls to Yong

15  Kwon?

16  A.   We intermittently looked at telephone records throughout the

17  course of the case.  The specific issue of telephone calls between

18  Mr. Kwon and Mr. Timimi became an issue probably about two, maybe

19  three weeks ago in terms of preparing a chart of this nature.

20  Q.   Were you able to determine who Al-Timimi had called on his

21  cell phone records or attempted to call before the 10:35 p.m. call

22  that's listed on this exhibit?

23  A.   Well, I'm speaking strictly from memory at this point, but I

24  believe somewhere around this time frame, there was a call to

25  Masaud -- Mahmood Hasan.

## Ammerman - redirect

1   Q.   And before that, there was a call to someone named Yousuf

2   Idris, wasn't there?

3   A.   I will need to refer to the records really.

4           MR. MAC MAHON:   I don't have anything further, Your

5   Honor.

6           THE COURT:   All right.   Mr. Gibbs, any redirect?

7           MR. GIBBS:   Yes, Judge, thank you.

8           If we could pull up Exhibit 10A16?

9                   REDIRECT EXAMINATION

10  BY MR. GIBBS:

11  Q.   Do you have it there before you?

12  A.   Yes, I do.

13  Q.   All right.   You were asked by defense counsel about this

14  particular lecture, and it indicates -- if we can blow it up a

15  little bit? -- the city that it's in, correct?

16  A.   Right.

17  Q.   And that was London?

18  A.   In London, yes.

19  Q.   All right.   And you were also asked about Government's

20  Exhibit 10A25, 26, and 27, which were the handwritten notes.

21          If we could pull up the first one of those?   And if we

22  can enlarge that?

23          And on this one, Mr. MacMahon suggested that the notes

24  in 10A25, -6, and -7 related to the same lecture.   Do you see

25  that?

**Ammerman - redirect**

1  A.   Yes.

2  Q.   Or do you recall that, rather?

3  A.   I recall the question.

4  Q.   All right.  And, in fact, the --

5         MR. MAC MAHON:  Your Honor, I know the record speaks for

6  itself.  I was talking about the notes -- the only notes I showed

7  him was for the Australian notes.  He said -- that's not my

8  recollection of the question.

9         MR. GIBBS:  Judge, this was yesterday, late afternoon.

10        THE COURT:  I'm permitting it.

11        MR. GIBBS:  Thank you.

12        THE COURT:  Overruled.

13 BY MR. GIBBS:

14 Q.   And, in fact, the three handwritten notes that you found at

15 Timimi's house indicate that they occurred in what city?

16 A.   Suffolk in the U.K., Ipswich, Suffolk in the U.K.

17 Q.   Thank you.

18        Now, you also testified regarding these notes that

19 during the search of Mr. Timimi's house, you couldn't remember any

20 other notes like these except for these three, correct?

21 A.   Right.

22 Q.   And this one here, 10A25, is one of those?

23 A.   Yes.

24 Q.   You testified that these three were unique.

25 A.   Right.

## Ammerman - redirect

1    Q.    Now -- and you were asked about you seized these notes, and
2    he asked you about one of them talked about the illegal occupation
3    of the Jews.  However, aside from the content of the notes, was it
4    also of interest to you that Mr. Timimi had saved these notes?
5    A.    Yes.
6    Q.    Now, if we could go back to 10A16 for a moment, you were
7    asked by Mr. MacMahon yesterday about one of the individuals
8    listed on the first page of 10A16, Sheikh Salman Al-Ouda.  Do you
9    see that?
10   A.    Yes.
11   Q.    And do you recall being asked about Sheikh Salman Al-Ouda
12   yesterday?
13   A.    Yes.
14   Q.    Who is Sheikh Salman Al-Ouda?
15   A.    As I understand, he is a Saudi Sheikh.
16   Q.    And do you know anything else about Sheikh Salman Al-Ouda?
17   A.    Not a tremendous amount.  I believe he may fall under the
18   category of one of the awakening sheikhs in Saudi, but I don't
19   know a tremendous amount of detail on Sheikh Al-Ouda.
20   Q.    Thank you.
21          Now, next you were asked about Government Exhibit 10A20.
22          If we could pull that one up?
23          And, Special Agent Ammerman, you were asked yesterday
24   about 10A20, "The Day of Wrath," by Safar Ibn Abd Al-Rahman
25   Al-Hawali.

1439

## Ammerman - redirect

1  A.   Yes.

2  Q.   First he asked you about what the document was.  Then he

3  asked you about why you seized this document, and you testified it

4  was because of name recognition of Safar Hawaali.

5  A.   Right.

6  Q.   Could you elaborate on that answer a bit?

7  A.   I'm aware that Safar Al-Hawaali is someone that Usama Bin

8  Laden referenced when he declared war on the United States.

9           MR. MAC MAHON:  Your Honor, objection to this.  We had a

10 motion in limine about all of this before.

11          MR. GIBBS:  And, Judge, the defense opened --

12          THE COURT:  Counsel, wait just a second.  I also said if

13 the issue were opened and -- but the government was supposed to

14 approach the bench before they asked, so come up here.

15          (Bench conference on the record.)

16          THE COURT:  I was surprised when you crossed on that,

17 because I felt you opened the door.

18          MR. MAC MAHON:  Well, I'm sorry if you thought I did,

19 but for the record, we've been talking about Safar Hawaali.

20 They've been reading Hawaali fatwas in here day after day.  I

21 crossed on those.

22          THE COURT:  I think the door has been adequately opened.

23 The government can without going into this a great deal just

24 provide this particular area.  The whole issue with your cross is

25 what was it about certain words or certain things that caused the

1440

## Ammerman - redirect

1    agents to seize certain evidence and not other.  This is a fair --

2            MR. MAC MAHON:  But not with respect to the relationship

3    between the defendant --

4            THE COURT:  That's why they're explaining it.  I think

5    now it's been opened, so I'm going to allow it in over your

6    objection.

7            MR. MAC MAHON:  Thank you.

8            MR. GIBBS:  Thank you.

9            (End of bench conference.)

10   BY MR. GIBBS:

11   Q.   All right, Special Agent Ammerman, can you explain what about

12   the name Safar Hawaali caused the name recognition that made you

13   seize this document?

14   A.   Yes.  I was aware at the time of the search that Safar

15   Al-Hawaali was a sheikh that at one time had been imprisoned in

16   Saudi Arabia, and that imprisonment was one of the reasons that

17   Usama Bin Laden cited for his declaration of war against the

18   United States.

19   Q.   And you were also asked on cross examination about the fact

20   that you were searching the house for chemical, radiological, or

21   biological weapons, correct?

22   A.   Right.

23   Q.   How did the information you just testified about relate to

24   the items that you were searching for at Ali Timimi's house?

25   A.   With regards to Safar Hawaali?

## Ammerman - redirect

1  Q.    Yes.

2  A.    There's long been a concern that Usama Bin Laden or someone
3  in the Al-Qaeda network may attempt to detonate a Weapons of Mass
4  Destruction device in the United States, so we were concerned not
5  only about Usama Bin Laden and Al-Qaeda itself but also those who
6  were associated with him.

7  Q.    And so when you saw this document, "The Day of Wrath," the
8  significance of it to you was less the title and the fact that it
9  dealt with the Intifahda and more the author of that document?

10 A.    Correct.

11 Q.    And based on your investigation, Special Agent Ammerman, what
12 is the relationship between Ali Timimi and Safar Hawaali?

13 A.    I've come to know that at one time, Mr. Timimi studied under
14 Safar Hawaali, and I've also come to learn that they are at least
15 associates who talk to each other from time to time.

16 Q.    And you testified a moment ago about Salman Al-Ouda as being
17 one of the awakening sheikhs.  What's your knowledge regarding
18 Safar Hawaali in relation to being one of the awakening sheikhs?

19 A.    It's my understanding he is one of those.

20 Q.    And finally, Special Agent Ammerman, was one of the bases for
21 the search warrant that was obtained on February 25, 2003, the
22 relationship between Safar Hawaali and Ali Timimi?

23 A.    Yes, it was.

24 Q.    And so as a result, when you saw a document with Safar
25 Hawaali's name on it, you took it into evidence?

## Ammerman - redirect

1   A.   Yes.

2   Q.   Now, you were asked by defense counsel about Exhibit 2A2.

3        If we could just pull that up?  Oh, I'm sorry, I've got

4   the wrong number.  UAV flight system.  2C2, I wrote it down wrong.

5        Special Agent Ammerman, you were asked earlier about

6   Exhibit 2C2, the unmanned aerial vehicle flight simulator.

7   A.   Yes.

8   Q.   Do you recall that?

9   A.   I do.

10  Q.   And you testified that it could be used for a number of

11  things, one of which was to mount a camera; is that correct?

12  A.   Yes.

13  Q.   And does that mean that that item could be used for aerial

14  surveillance?

15  A.   Yes.

16  Q.   And did it concern you that Masaud Khan was corresponding

17  with this johninformation individual about that topic?

18  A.   It did.

19  Q.   Why did that concern you?

20  A.   Johninformation is an LET member named Abu Khalid.

21            MR. MAC MAHON:  Your Honor, I object.

22            MR. GIBBS:  If he has knowledge of it, Judge.

23            MR. MAC MAHON:  Johninformation isn't here to testify,

24  Your Honor.  We've asked for information from the government on

25  who they think this person is and have received absolutely

## Ammerman - redirect

1 | nothing.

2 |         MR. GIBBS:  Judge, if I may -- if I may point out, Yong

3 | Kwon testified about his contacts with johninformation to get a

4 | visa in Pakistan, so that is in evidence, and this agent is --

5 |         THE COURT:  That evidence is here, but I don't want the

6 | evidence putting in -- the witness putting in hearsay evidence or

7 | evidence that's not subject to cross examination, so make sure

8 | that you don't get into that, and then I'll overrule the objection

9 | at this point.

10 | BY MR. GIBBS:

11 | Q.   All right.  With that understanding, limiting yourself to the

12 | information that Yong Kwon testified about that you're aware of,

13 | what was the concern that Masaud Khan was corresponding with

14 | johninformation about this unmanned aerial vehicle?

15 | A.   The fact that Masaud was doing -- conducting a transaction on

16 | behalf of a potential LET member.

17 | Q.   Now, Special Agent Ammerman, you were also asked about the

18 | brochure related to the oZ tour.

19 | A.   Yes.

20 | Q.   Ali Timimi's speaking tour in Australia.

21 |         And you testified on cross examination that your

22 | interest in the brochure itself was the fact that Ali Timimi was a

23 | very well-known lecturer, correct?

24 | A.   Right.

25 | Q.   And, in fact, that document indicates that he is a well-known

## Ammerman - redirect

1  lecturer internationally, correct?

2  A.   Correct.

3              MR. MAC MAHON:  This is leading.

4              THE COURT:  Sustained.

5  BY MR. GIBBS:

6  Q.   And what was the interest in establishing that Ali Timimi was

7  a well-known lecturer?

8              MR. MAC MAHON:  That's asked and answered, Your Honor.

9              MR. GIBBS:  If the objection has been sustained, Judge,

10  it hasn't been answered.

11             THE COURT:  The objection was sustained because the

12  first question was a leading question, but the whole scope of the

13  cross examination did focus on the motivation for the agents doing

14  what they did, seizing particular documents and not seizing

15  others, so the government's got a right on redirect to probe more

16  deeply into the motivation for the agent's actions, so I'm

17  overruling this objection.

18             MR. MAC MAHON:  Thank you, Your Honor.

19  BY MR. GIBBS:

20  Q.   Do you want me to repeat the question?

21  A.   Yes, please.

22  Q.   All right.  You indicated that -- well, why was it of

23  interest to you that in seizing 10A29 -- no, strike that.

24             You indicated on cross examination that Ali Timimi was a

25  well-known lecturer.

## Ammerman - redirect

1  A.   Yes.

2  Q.   And that this particular document, 10A29, helps to establish

3  that?

4  A.   Right.

5  Q.   And what else does this help to establish, if anything?

6  A.   Simply that he is known internationally as a lecturer.

7  Q.   Now, you were also asked on cross examination about

8  Government Exhibit 10A36, and that's the audiotape?

9  A.   Yes.

10 Q.   "The Songs of the Mujahideen"?

11 A.   Yes.

12 Q.   And Mr. MacMahon then asked you about the number of

13 audiotapes that were either seized or observed in Ali Timimi's

14 house, correct?

15 A.   Right.

16 Q.   But 10A36 was not seized from his house, was it?

17 A.   No, it was not.

18 Q.   And where was 10A36 seized from?

19 A.   From the automobile.

20 Q.   Mr. Timimi's car?

21 A.   Yes.

22 Q.   Now, you testified on cross examination about the undercover

23 calls with Yong Kwon.  Do you recall that?

24 A.   Yes.

25 Q.   And Mr. MacMahon asked you if you had told Yong Kwon to lie

## Ammerman - redirect

1 on the telephone, and you indicated that you instructed him to

2 play a role, correct?

3 A.    Right.

4 Q.    And is it -- in your experience, is it a standard law

5 enforcement practice to use in an investigation to use an

6 individual the way you used Yong Kwon?

7 A.    Yes.

8 Q.    And approximately how many times have you done that in your

9 ten-year career in law enforcement?

10 A.    I did it a couple of times as what's called a probationary

11 agent, when we're new as FBI agents.  This is one of the first

12 cases where I actually used this as my own investigative tool.

13 Q.    And in your experience, would the truth work?  In other

14 words, if Yong Kwon had said, "I'm working with the FBI; this is

15 being recorded; let me ask you about that meeting at my house," in

16 your experience, would that be an effective law enforcement

17 technique?

18 A.    No.

19 Q.    And why not?

20 A.    That would preclude the party on the other end from speaking

21 openly about the topic at hand.

22          MR. GIBBS:  If I can just have a moment, Judge?

23          THE COURT:  Yes, sir.

24          MR. GIBBS:  All right, Special Agent, that's all I have.

25 Thank you very much.

## Ammerman - recross

1    THE COURT: All right. Mr. MacMahon?

2    RECROSS EXAMINATION

3    BY MR. MAC MAHON:

4    Q.  Special Agent Ammerman, Safar Hawaali is the dean of theology

5    at the University of Mecca in Saudi Arabia, isn't he?

6    A.  I believe he has a position there, but I can't quote what the

7    title of his position is.

8    Q.  He teaches at the university, doesn't he?

9    A.  I know at one time he did.  I don't know if he still does.

10   Q.  To your knowledge, when did he start teaching at the

11   University of Mecca?

12   A.  I'm not really sure.

13   Q.  And you know that Ali Al-Timimi was one of his students.  He

14   studied over there at one time, right?

15   A.  Mr. Timimi told me that.

16   Q.  All right.  And how big a school is the University of Mecca?

17   A.  I really don't know.

18   Q.  Okay.  How many people at the University of Mecca have

19   studied theology under Safar Hawaali?

20   A.  I don't know that, either.

21   Q.  Never, never looked into that, either, Agent?

22   A.  No.

23   Q.  And in your search warrant affidavit, you said you didn't

24   know whether there was any contact between -- strike that, Your

25   Honor.

## Ammerman - recross

1   You said before that you -- do you know when it was that
2   Ali Timimi studied in Mecca at the university?
3   A.   I believe he told us in an interview.  I'd have to refer to
4   the interview 302.  I'd prefer not to guess.
5   Q.   1987, does that refresh your recollection?
6   A.   I need to refer to the 302.
7   Q.   It was a long time ago, wasn't it?
8   A.   I really need to refer to the 302.  I don't want to guess.
9   Q.   You testified that you, you used Yong Kwon, right?  That was
10  your exact words, right?
11        MR. GIBBS:  Judge, I object.  I think those were my
12  words.
13        THE COURT:  All right, why don't you -- it's cross
14  examination, but you still have to make it a question.
15        MR. MAC MAHON:  Okay.
16  Q.   Did you -- you did use Yong Kwon in this investigation,
17  didn't you?
18        THE COURT:  Use as what?
19        MR. MAC MAHON:  Used him in terms of trying to get him
20  to lie to people, Your Honor.
21        THE WITNESS:  Are you asking me if I asked him to
22  conduct a consensually monitored telephone call?  The answer is
23  yes.
24  BY MR. MAC MAHON:
25  Q.   You told him to play a role was your testimony, right?

1449

**Ammerman - recross**

1   A.   Yes.

2   Q.   And that that's a standard law enforcement technique,

3   correct?

4   A.   Yes.

5   Q.   Is destroying your notes of a telephone conversation --

6           MR. GIBBS:   Judge, objection.   It's outside the scope of

7   redirect.

8           THE COURT:   All right, approach the bench.   Approach the

9   bench.

10          (Bench conference on the record.)

11          THE COURT:   Again, while I give everybody leeway on

12  cross, you can't mislead the jury, and I think -- I'm surprised

13  the government didn't do more on redirect on this issue.   I'm not

14  going to -- unless you continue on this line, I'm not going to say

15  anything to the jury, but he hasn't destroyed evidence.   It's no

16  different than destroying his draft of a search warrant affidavit

17  or anything else.

18          MR. MAC MAHON:   This is entirely different, Your Honor.

19          THE COURT:   These are not statements that Kwon said that

20  we don't have.

21          MR. MAC MAHON:   We don't have any idea what they are.

22  He destroyed them, Your Honor.

23          THE COURT:   It doesn't make any difference.   You've got

24  the tape.   The tape is your best evidence.   The tape relates

25  exactly what Kwon said.   What difference does it make what the

## Ammerman - recross

1  agents wanted him to say?

2          MR. MAC MAHON:  It makes a big difference, Your Honor,

3  because you could argue if the notes hadn't been destroyed, it's

4  totally against FBI policy.

5          THE COURT:  I'm not sure about that.

6          MR. MAC MAHON:  You might have, you might have some

7  information that shows that what we were trying to get him to say,

8  which is the testimony, they're trying to lead him into saying

9  these things.

10          I'll move along, Your Honor.  I won't ask any more

11  questions.

12          THE COURT:  This topic is very close to the line of

13  pulling a statement from the Court to the jury to make sure they

14  understand that.  I'm not going to do that, but let's move this

15  along.

16          MR. MAC MAHON:  I won't ask any more questions, Your

17  Honor.  I'll move on.

18          MR. KROMBERG:  Judge?

19          THE COURT:  Wait.

20          MR. KROMBERG:  Does that mean --

21          THE COURT:  This is not your witness.

22          MR. KROMBERG:  I agree, but I'm talking argument,

23  because I'm going to do part of the argument.  If Mr. MacMahon

24  argues this point, can I say -- can we ask the Court to instruct

25  the jury that Mr. MacMahon is giving an inaccurate statement of

## Ammerman - recross

1   the law?

2          THE COURT:  It depends how he argues it.  If he says we

3   don't know exactly what the agents told Kwon to say, I'm leaving

4   that alone.  That's not a problem.  But if he goes on to say FBI

5   policy was violated --

6          MR. MAC MAHON:  That's what he told me, Your Honor.

7          MR. GIBBS:  He never said the policy was violated.

8          THE COURT:  He didn't say that, and as I said, I think

9   you've opened a dangerous door here, because again, this is not

10  evidence.  This is not what he said.  What the agents say to

11  somebody wouldn't be any kind of evidence, and I just think --

12         MR. MAC MAHON:  I respectfully disagree with the Court,

13  but I won't ask any more questions.  I'm done.

14         THE COURT:  Thank you.

15         (End of bench conference.)

16         MR. MAC MAHON:  I have no further questions, Your Honor.

17  Thank you.

18         THE COURT:  All right.

19         MR. MAC MAHON:  Thank you, Special Agent Ammerman.

20         THE COURT:  Agent Ammerman, you may step down.  Thank

21  you.

22                     (Witness excused.)

23         THE COURT:  All right.

24         MR. GIBBS:  Your Honor, the government calls Alex

25  Daghestani to the stand.

1452

1          THE COURT:  All right.

2          MR. MAC MAHON:  Can we approach the bench, Your Honor?

3          THE COURT:  Let's get the witness affirmed first.  Then

4    we'll do it.

5          ALEX DAGHESTANI, GOVERNMENT'S WITNESS, AFFIRMED

6          THE COURT:  All right, approach the bench.

7          (Bench conference on the record.)

8          MR. GIBBS:  Judge, this witness is a translator, and at

9    this point, all I'm calling him for is to indicate that the Arabic

10   documents have been correctly translated into English.

11   Mr. MacMahon indicated he didn't think they had a problem with

12   that.

13         MR. MAC MAHON:  I thought we stipulated to them, but

14   apparently we had so many stipulations, we may be confused, but I

15   think we can stipulate to most of this.  I thought we already had.

16         THE COURT:  Well, I guess most is not all, and I don't

17   want to have problems on that.  So should I give the jury a break

18   now?

19         MR. KROMBERG:  Yes.

20         MR. MAC MAHON:  Yeah, I think so.  I don't have a -- if

21   we see exactly which ones they are, and we'll just stipulate to

22   the ones we can.

23         THE COURT:  Let's do that.

24         MR. MAC MAHON:  Sorry, Your Honor.

25         THE COURT:  That's all right.

1453

1        MR. MAC MAHON:  There are so many of them, I got
2   confused.

3        (End of bench conference.)

4        THE COURT:  Ladies and Gentlemen, I'm going to give you
5   an early break, and the reason for it is there may be some
6   stipulations that will shorten the number of witnesses we need to
7   hear from, and so I think you'd rather have time drinking coffee
8   and being a bit more comfortable in the room than sitting here
9   listening to the white noise machine while they work out the
10  stipulation.

11       So I don't know how long they're going to be.  Let's
12  assume we'll be ready to start up again by 11:00.  It might be a
13  tiny bit later than that, but just be back in the jury room by
14  eleven, all right?

15       You-all stay here, counsel, and try to work it out.

16       MR. MAC MAHON:  Thank you, Your Honor.

17       (Recess from 10:43 a.m., until 11:40 a.m. due to power
18  outage.)

19                    (Defendant and Jury present.)

20       THE COURT:  Ladies and Gentlemen, so you know, I conduct
21  court in the dark, but we cannot conduct without the court
22  reporter, so when we lose power, we have to stop.  And hopefully,
23  they've fixed it.  It's a regional issue.  The PTO is still out,
24  but we're okay now, and hopefully, we will have no more
25  interruptions.

**J.A. 1599**

1454

1        All right, Mr. Kromberg, were you able in the extra
2   time --
3        MR. KROMBERG:  It was a very productive time, Your
4   Honor.
5        THE COURT:  All right.
6        MR. KROMBERG:  Although because of the power outage --
7   no, that's not really correct.  But we did not get to type it up.
8   I'm going to read it into the record, and then we're going to type
9   it up later and bring it back later.
10       THE COURT:  That's fine.  Now, will we need
11  Mr. Daghestani at all as a witness then?
12       MR. KROMBERG:  At this point, we'd like to keep him as a
13  potential witness for later, but he could be released at this
14  time.
15       THE COURT:  Could he go to lunch?  I mean, can he leave
16  the courthouse?
17       MR. KROMBERG:  Absolutely.
18       THE COURT:  Sir, thank you then.  We don't need you
19  right now, and Mr. Kromberg will get in touch with you if we need
20  you later.
21                      (Witness stood down.)
22       MR. KROMBERG:  Judge, what we'd like to do, because, as
23  I say, it was a productive time, we've reached several
24  stipulations that I'd like to put in at this time.  Once again, it
25  should be noted that the defendant and his lawyers have worked

1455

1  very cooperatively to save a lot of time on many of these issues.

2         THE COURT:  All right.

3         MR. KROMBERG:  First, Judge, is that Stipulation No. 58,

4  Government Exhibit 12-58:  "The United States and the defendant

5  hereby stipulate and agree that Government Exhibit 7D16 is a copy

6  of an email of Ali Al-Timimi on January 5, 1998, seized from the

7  computer of Sami Al-Hussayen, the individual in Idaho who

8  maintained the Al-Jazirah e-list."

9         And I'd like to publish if I could, Judge, Government

10 Exhibit 7D16 and move that into evidence.

11        THE COURT:  All right, is there any objection to 7D16?

12        MR. MAC MAHON:  No, Your Honor, thank you.

13        THE COURT:  All right.  So 12-58 and 7D16 are both in

14 evidence.

15        -  (Government's Exhibit Nos. 7D16 and 12-58 were received

16 in evidence.)

17        THE COURT:  Can you make it larger, please?

18        MR. KROMBERG:  Oh, sorry.

19        I'm just going to read that if I could, Judge:  "From:

20 'Ali Al-Timimi' <altimimi@myself.com>, To:  'ALJAZIRAH

21 Maintainer,' <owner-aljazirah@seas.smu.edu>, Monday, January

22 05, 1998 2:15 PM; Subject:  Re: URGET FROM ALZAJIRAH

23 MAINTAINER . . .

24        "As-Salamu alaikum wa rahmatullahi wa barakatuhu:

25        "Ramadan mubarak, Abo Al-Muhanad.  I'm looking forward

1456

1   to rejoin.  As for being part of the Committe again, I don't mind
2   until a suitable replacement is found for me.  Regarding possible
3   committe members, no one comes to mind; but let me suggest that
4   try to have the majority from the Jazirah and may-be one
5   non-Jazirah member.  The reason why I say that so that no one may
6   try to set up an alternative Jazirah forum by arguing that the
7   Jazirah group is being run by non-Jazirah people who have a
8   certain 'agenda.'
9           "Ali."
10          And the next, the e-mail under that:  "From:  ALJAZIRAH
11  Maintainer <owner-aljazirah@seas.smu.edu>, To:
12  altimimi@myself.com; Subject:  URGET FROM ALJAZIRAH
13  MAINTAINER. . .;  Date:  Monday, January 05, 1998 2:03 PM.
14          "Assalam alaykum Br. Ali,
15          "I wish you a MUBARAK RAMADA may Allàh accept from all
16  of us.
17          "I was very happy when I found your e-mail.  It seems to
18  me you are not subscribed to ALJAZIRAH even though you are
19  interested, v. active and it will benefit from your input.
20          "I would like to invite you to rejoin and if possible be
21  a member in the committe and if you have any siggested names to
22  join or be members of the comittee, it will be highly appreciated.
23          "The Urgent in the subject is do to hot discussions
24  going on we would like to cool it down by having your input.
25          "Jazak Allh Khair."

**J.A. 1602**

1       "Sami Al-Hussayen (Abo Al-Muhanad)

2       "samiomar@post.smu.edu."

3       Thank you, Judge.

4       The next stipulation is Government Exhibit 12-59,

5   Stipulation No. 59:  "The United States and the defendant hereby

6   stipulate and agree that Government Exhibit 7C13b constitutes an

7   authentic copy of records of Cabellas, Inc., maintained in the

8   ordinary course of business.  Cabellas, Inc. records reflect that

9   an order for one jacket by Masaud Khan was placed on September 15,

10  2001.  Cabellas, Inc. records further reflect that on September

11  17, 2001, the customer requested an upgrade in shipping from

12  Standard Express shipping to Overnight Air shipping, but the

13  package in question had already gone past the point of Cabellas,

14  Inc., being able to change the shipping method.  The tracking

15  number assigned to the shipment showed the package was delivered

16  on September 20, 2001."

17      And, Judge, I have Government Exhibit 7C13b, which I

18  move into evidence along with 12-59, Stipulation No. 59.

19          THE COURT:  Mr. MacMahon, is there any objection?

20          MR. MAC MAHON:  No objection, Your Honor.

21          THE COURT:  All right, 12-59 and 7C13b are both in.

22          (Government's Exhibit Nos. 7C13b and 12-59 were received

23  in evidence.)

24  BY MR. KROMBERG:

25  Q.   The last stipulation, Judge, is the one I'm going to read in

1458

1   the record and will follow up with a typewritten document later.
2   This is Stipulation No. 53, Government Exhibit 12-53:  "The United
3   States and the defendant hereby stipulate and agree that
4   Government Exhibit 7A39a is an accurate translation of Government
5   Exhibit 7A39 and Government Exhibit 10J10.

6          "The United States and the defendant hereby stipulate
7   and agree that Government Exhibits 2A7, 7A15, and the preamble to
8   Government Exhibit 10H1a are accurate English translations of
9   Government Exhibit 7A38, except 7A38 begins with the following
10  introductory text."

11         Judge, I think it would make more sense when I read this
12  if you could see what I'm -- if we could put the document on the
13  screen so you can --

14         THE COURT:  Well, all right.  Well, first of all, 12-53
15  is in.  That's the stipulation.

16         (Government's Exhibit No. 12-53 was received in
17  evidence.)

18         THE COURT:  Is the defense at all objecting to 7A39a or
19  7A39 or 10J10?  I don't know if they're in evidence yet or not.

20         MR. MAC MAHON:  No objection, Your Honor.

21         THE COURT:  All right, so all those are in evidence.

22         (Government's Exhibit Nos. 7A39, 7A39a, and 10J10 were
23  received in evidence.)

24         MR. KROMBERG:  And, Judge, I would add that there are
25  four parts of the Stipulation 12-53 that I'm going through.

1459

1           THE COURT:  Now we're on the second part, I think.
2           MR. KROMBERG:  Right.
3           THE COURT:  Now, is there an objection to 2A7, 7A15, or
4    10H1a?
5           MR. MAC MAHON:  No objection, Your Honor.
6           THE COURT:  All right.  Just for the record, I want to
7    get those in.
8           (Government's Exhibit Nos. 2A7, 7A15, and 10H1a were
9    received in evidence.)
10          THE COURT:  All right.  Now, then as I understand it,
11   7A38 is not objectionable except that there's some change on the
12   introduction?
13          MR. MAC MAHON:  Well, the translation that the
14   government proffered did not contain the entire text of the
15   document, so we had translated the actual preamble to the
16   statement, and that's what Mr. Kromberg is about to read.
17          THE COURT:  So in other words, what we would be doing is
18   admitting 7A38 plus this preamble.
19          MR. MAC MAHON:  Right, to show --
20          THE COURT:  That would be the complete --
21          MR. MAC MAHON:  To put it into context.
22          MR. KROMBERG:  And we will make this document, the
23   English translation, 12-53a, and provide it in a form that --
24          THE COURT:  No, I would recommend we do it differently.
25   Take 7A38, because I don't want the jury to have to be hunting for

**J.A. 1605**

1460

1  this.  If that makes that a complete document, then you attach
2  that preamble to that exhibit.  So we're only going to admit 7A38,
3  but it will be as amended here in court with that language.
4              (Government's Exhibit No. 7A38 was received in
5  evidence.)
6              THE COURT:  And just to make sure everything for the
7  record is right, I'll ask counsel for each side to just initial
8  the paragraph that's going to be added on.  Okay?
9              MR. KROMBERG:  That will be fine, Judge.
10             THE COURT:  That's how we'll take care of that.
11             MR. KROMBERG:  In that case, I'll just read this into
12 the record so we just have it for the moment, although it's not
13 going to make any sense until we put the rest of the document is.
14             THE COURT:  All right.
15             MR. MAC MAHON:  I don't have any objection to letting
16 the jury see what the rest of the document is, Your Honor, if
17 that's what he wants to do, so that we have some context of what
18 we're doing.
19             MR. KROMBERG:  Okay.  If we could bring up --
20             THE COURT:  7A38.
21             MR. KROMBERG:  Well, that one is Arabic, though, so
22 either 2A7, 7A15, or 10H1a, if any of those are around?
23             THE COURT:  All right.  Just so we're crystal clear,
24 what you're going to read is obviously in English.
25             MR. KROMBERG:  Correct.

1461

1       THE COURT:  And it needs then to really be added to 2A7
2  or 7A15, right, so that they're complete?

3       MR. KROMBERG:  Well, Judge, not exactly.  I think when
4  you see them -- if I can just say, that 2A7 is a document that was
5  seized from the house of Masaud Khan and appears to be Bin Laden's
6  statement made in October of 2001, but it doesn't have any heading
7  on it.  It's just has a statement.

8       THE COURT:  I see.

9       MR. KROMBERG:  7A15 is the same thing, except it says
10 "Latest Statement of Usama Bin Laden correctly Translated!"  And
11 10H1 doesn't have any heading on it, either.

12      The Arabic document has this heading which we will --
13 I'll read into the record.

14      THE COURT:  I see, all right.

15      Now, we're looking at, is that 2A7?

16      MR. KROMBERG:  This is 2A7, Judge.

17      THE COURT:  All right.

18      MR. KROMBERG:  Now --

19      THE COURT:  No, no, no.

20      MR. KROMBERG:  The common denominator on these
21 documents, Judge, is where it starts, "So here is America, Allah
22 has struck it in one of its vital points, so He destroyed her
23 greatest of buildings.  And unto Allah is all praise (al-hamd) and
24 He has favored us with this blessing (al-minna).  And here is
25 America filled with terror from its north to its south," etc.  I

1462

1    think we've published this already to the jury.

2        The additional text translated into English from the
3    Arabic document that was found in Mr. Timimi's house that is in
4    evidence says, "Cairo (Muheet [news agency]):  The Qatari
5    Aljazeera [satellite] station broadcasted a taped video statement
6    of Usama Bin Laden and the leaders of al-Qaeda which contained
7    severe warnings to the United States of America.  News agencies,
8    satellite channels, and the American CNN News broadcasted the
9    statement by Bin Laden shortly following the American President
10   George Bush's statement in which he announced the beginning of the
11   revenge attacks against Afghanistan.  Aljazeera [however]
12   broadcasted the [Bin Laden] tape two hours after the U.S.-British
13   attacks on Afghanistan.  Aljazeera said that [Bin Laden's]
14   statement was taped previously before yesterday Sunday."

15       And that is what we will attach to the Arabic document
16   so that we will be able to see what it is.

17       THE COURT:  All right.

18       MR. KROMBERG:  Okay.  The third part of the stipulation,
19   Judge, which is Government Exhibit 12-53, is that 7A23, which is
20   Hawaali's Statement to the Ummah, is an accurate English
21   translation of a portion of the Arabic documents that are 7A1a and
22   7A1b.

23       THE COURT:  All right.  So at this point then, in case
24   they're not in evidence, is there any objection to 7A23 going into
25   evidence?

1    MR. MAC MAHON:  No, Your Honor.

2    THE COURT:  How about 7A1a and 7A1b?

3    MR. MAC MAHON:  No objection, Your Honor.

4    THE COURT:  All right.  Those are all in in case they're

5  not already.

6    (Government's Exhibit Nos. 7A1a, 7A1b, and 7A23 were

7  received in evidence.)

8    MR. KROMBERG:  And the last portion of this stipulation,

9  Judge, is that Government Exhibit 7A20 is an accurate English

10  translation of the Arabic document identified as 10A34 and also of

11  the partial document identified as -- no, sorry, I have that

12  wrong.

13    I'm sorry, I misspoke, Judge.  7A19 is an accurate

14  English translation of the Arabic document identified as 10A34 and

15  also of the partial document identified as 7A20.  7A20 is a

16  portion of the same document identified as 10A34.

17    THE COURT:  All right.  So I'm assuming with that

18  stipulation, 7A19, 10A34, and 7A20, there's no objection to those

19  going in?

20    MR. YAMAMOTO:  They're already in, Your Honor.

21    THE COURT:  They're already in?  All right, that's fine.

22    MR. KROMBERG:  And that was the Uqla fatwa documents,

23  Judge.

24    THE COURT:  I wanted to make sure.  Okay.

25    MR. KROMBERG:  Thank you, Your Honor, and thanks to

1464

1  defense as well.

2          THE COURT:  All right, thank you, counsel.

3          All right.  So now that takes care of the stipulations.

4  Now, you have another witness; is that correct?

5          MR. GIBBS:  Judge, we have some audiotapes that we'd

6  like to play at this time, and I have -- the first one is, the

7  tape is 10B2, the transcript is 10B2a, which the Court and defense

8  should have in their binders, and we have those transcripts.

9          THE COURT:  All right.  Mr. Wood, if you'd give the

10 transcripts to the jury, please?

11         MR. GIBBS:  And, Your Honor, for the record, this will

12 be a conversation in Arabic.  The transcript is in English, and

13 this is a phone call dated January 31, 2003, at 4:45 p.m., between

14 Al-Timimi --

15         THE COURT:  Now, hold on a second.  The conversation is

16 in Arabic?

17         MR. GIBBS:  Correct.

18         THE COURT:  And we have a translation.  Now, is the

19 defense disputing the accuracy of the translation?

20         MR. MAC MAHON:  No, Your Honor.  We actually did the

21 translation ourselves.

22         THE COURT:  All right.  So this would be an exception --

23 I need to be clear with the jury on this.  This will be an

24 exception to the rule, which is that the jury must listen to the

25 tape and go with what you hear.  That would be impossible in this

1465

1   situation.

2           In essence then, you are both stipulating that the

3   written transcript is a completely accurate recitation not only of

4   what was said but an actual proper translation of what was said;

5   is that the case?

6           MR. GIBBS:  That's the case for the government, Judge.

7           MR. MAC MAHON:  Yes, Your Honor.  As I say, we had a

8   translator do it ourselves.

9           THE COURT:  All right.

10          MR. MAC MAHON:  And we don't have any objection to the

11  audio of it being in Arabic, either.

12          THE COURT:  All right, that's fine.  Let's keep the

13  audio, it doesn't have to be too loud because it's not going to

14  mean anything to anyone, I don't think, in the jury, but we'll

15  look at the transcript while it's being played.

16          And are 10B2 -- is the 10B2 series in evidence yet?

17          MR. GIBBS:  I don't believe so, Judge --

18          THE COURT:  All right.

19          MR. GIBBS:  -- but we would move those in at this time.

20          MR. MAC MAHON:  And just subject to the prior objection.

21          MR. YAMAMOTO:  They're in, Your Honor.

22          THE COURT:  They're already in?

23          MR. MAC MAHON:  Yeah, I think we made our objection in

24  the motion in limine, but subject to that --

25          THE COURT:  That's fine.

1466

1          MR. GIBBS:  And this will be 10B2 through 5, this series
2     of tapes.
3          (Excerpt of Government's Exhibit No. 10B2 was played,
4     excerpt of Government's Exhibit No. 10B2a was copied verbatim into
5     the record as follows:)
6          "AL-TIMIMI:  Hello.
7          UM:  Peace be with you.
8          AL-TIMIMI:  Peace be with you.  How are you, Sheikh?
9          UM:  Praise be to God.
10         AL-TIMIMI:  May God preserve your life.  I want to
11    say ...  I just wanted to know if you received my [in English]
12    e-mail.
13         UM:  I received your [in English] e-mail [in Arabic] and
14    replied to it.
15         AL-TIMIMI:  Yeah.  I did not, I did not receive ...  I
16    did not receive a reply and so ...
17         UM:  and I went to Jeddah ...
18         AL-TIMIMI:  Yeah, may God reward you.
19         UM:  And I called ...  I tried to call the Sheikh but
20    wasn't able to do that.
21         AL-TIMIMI:  Yeah.
22         UM:  He is not at ... place.  He is in Jeddah ...
23         AL-TIMIMI:  Yeah.
24         UM:  ... but there is no way to reach him.
25         AL-TIMIMI:  Not even via Jamal or something?

1467

1    UM:  I called Jamal ... Jamal told me ... he said, "I
2  have no way to reach him.  Call his son, Abdullah."  I called
3  Abdullah but wasn't able ...

4        AL-TIMIMI:  Alright.  Maybe tomorrow?

5        UM:  Huh?

6        AL-TIMIMI:  Maybe ... maybe you ... tomorrow, huh?

7        UM:  God willing, I will try one more time.  I told
8  Jamal to tell the Sheikh, in case he called him, that I want to
9  speak to him about an important matter.

10        AL-TIMIMI:  Yes.

11        UM:  Yes.  But ...  I sent you the reply.  I told you to
12  write it.  Now you are [ui] ...

13        AL-TIMIMI:  Yes.

14        UM:  [In English] The letter you already ...

15        AL-TIMIMI:  [In Arabic] Yes, that's true.

16        UM:  ... For now, write it and we will show it to the
17  Sheikh, if you want.

18        AL-TIMIMI:  Alright, Alright, Alright, God willing,
19  tonight ...

20        UM:  Don't waste the time.

21        AL-TIMIMI:  I'll finish writing it tonight, God willing.

22        UM:  Yes.  Anyway, I was travelling with Sheikh Ja'far
23  because he attended the League's conference in Ta'if.

24        AL-TIMIMI:  Yeah.

25        UM:  I showed it to him.

**J.A. 1613**

1468

1        AL-TIMIMI:  Yeah.

2        UM:  He expressed a favorable view about it.

3        AL-TIMIMI:  Yes.

4        UM:  [In English] He like [sic] it.

5        AL-TIMIMI:  Alright.  Thank God.

6        UM:  O.K.

7        AL-TIMIMI:  Yes, O.K.

8        UM:  He only suggested that we take out one word.

9        AL-TIMIMI:  Yeah."

10       (End of excerpt.)

11       MR. GIBBS:  Judge, we can just stop it.  I just wanted

12   to note for the record we had had the translator synchronize the

13   English text with the audio, so for purposes of the record, that's

14   what that yellow stripe is as the jurors are following along.

15       THE COURT:  All right.

16       (Excerpt of Government's Exhibit No. 10B2 was played,

17   excerpt of Government's Exhibit No. 10B2a was copied verbatim into

18   the record as follows:)

19       "UM:  I wrote to you about it in the e-mail.

20       AL-TIMIMI:  O.K., God willing I'll see it in the e-mail.

21       UM:  [In English] Crazy, crazy ...

22       AL-TIMIMI:  [laughed] Yes, alright, God willing.

23       UM:  [Unintelligible words]

24       AL-TIMIMI:  I meant it as a description of Mandella.

25   That's all.

1469

1        UM:  NO, man, no.  He has told me, I mean, that's
2   better.  He has read it all and says ...
3        AL-TIMIMI:  Alright.
4        UM:  O.K.  There is another suggestion.
5        AL-TIMIMI:  Yeah.
6        UM:  I suggest to write the same letter but in other
7   wording that slightly differs.
8        AL-TIMIMI:  Huh.
9        UM:  And ask another Sheikh to write it.
10       AL-TIMIMI:  Alright.
11       UM:  Nasir and Salman.
12       AL-TIMIMI:  Alright.  That's fine.
13       UM:  That's what I thought of, so that three different
14  people would write two or three letters.
15       AL-TIMIMI:  Alright.  In any case, let me say Sheikh,
16  the time difference between us is seven hours.  Now you are ready
17  to go to bed while the night is still beginning here.  So ...
18       UM:  That's right.  That's right.
19       AL-TIMIMI:  ... so I will write the whole letter, you
20  see.  God willing I will write the whole letter and send it via
21  e-mail.  Then you are ... you are ... you are free in the way to
22  handle it.  Either Abi [LS: Abu] Abdulrahman sends something or
23  changes something and let Salman or Nasir ... I mean you're free
24  to do what you like.  My task ... I want ... if I could protect
25  Muslim blood from facing a disaster, that would be all.  That's

1470

1  all what I want.  So ...

2          UM:  It's only an attempt.

3          AL-TIMIMI:  Yes, it's an attempt and to encourage them.
4  I mean, because you do not know.  Sometimes one word encourages
5  someone to become more resolved.  Even if that someone did not
6  show gratitude.  So ... al right ... As for the translation, I
7  know a French Sister who could translate into French.  So, I will
8  try to send you a French copy.  Maybe tomorrow in the evening you
9  could have it, you know what I mean.

10         UM:  That's fine.  That's fine.

11         AL-TIMIMI:  With my copy, you know what I mean.  I don't
12 know, it might be better if you have your own people.

13         UM:  No, I have a female individual in Canada who works
14 with [pause] so if you already have one ...

15        ` AL-TIMIMI:  Yes.

16         UM: and you trust her, it will be faster.

17         AL-TIMIMI:  As a matter of fact I don't know.  But I
18 have some knowledge of the French language.  I will try to read
19 and understand what she writes but I'm not very good.  Several
20 years have passed without my using the French language which made
21 it a little bit rusty. ... O.K.  That's all what I have.

22         UM:  May God reward you.  [LS: ui]

23         AL-TIMIMI:  It would be nice if you could arrange where
24 you are with someone from the media to make sure that it reached
25 the editor-in-chief of the popular newspaper, I mean over there.

1    UM:  Which editor-in-chief, Le Monde?

2    AL-TIMIMI:  I really don't know who ... who supports the

3  right and who supports the left?  I don't know which is the most

4  popular newspaper in Germany, for example?

5    UM:  Huh.

6    AL-TIMIMI:  All I'm saying is that if there is someone

7  who is from the media in the Kingdom who has an office there, or

8  they know people there so that ... so that the message could be

9  sent.  It's alright if this message is sent by e-mail, but you, in

10 fact, would you like to see the message, I mean ...

11    UM:  In fact e-mail is not enough ...

12    AL-TIMIMI:  Yes.

13    UM:  It is the fastest thing.

14    AL-TIMIMI:  Yes, it is [in English] fast.  [In Arabic]

15 But, I mean ... if there is a media person where you are who knows

16 someone there so that ... I mean he has someone in Le Monde or Le

17 Figaro or I don't know what, maybe the same thing ...

18    UM:  I will call one of the correspondents.  I'll see

19 what I can do.

20    AL-TIMIMI:  Yes, it's just an attempt.

21    UM:  I'll try and make calls tomorrow.

22    AL-TIMIMI:  God willing.  May God reward you.  O.K.  I

23 hope I did not cause you any inconvenience.

24    UM:  No, not at all.

25    AL-TIMIMI:  May God reward you.  O.K., Sheikh.  Is there

**J.A. 1617**

1472

1    anything else you would like me to do?

2           UM:  No, is everything fine with you.

3           AL-TIMIMI:  In fact, you know I'm eager to have my name
4    removed from this unfair list because now I can't travel or move
5    around and so on.  There will be other consequences if my name
6    remains on this list any longer.  Maybe this list gets copied to
7    another list and then they visit me and I only want to shut this
8    door to resume my life and so on.  As for the doctor, he is not in
9    a good position as a matter of fact.

10          UM:  Huh.

11          AL-TIMIMI:  I put up a $100,000.00 bond ... I mean ...
12   taking into consideration that I am ...

13          UM:  Look, find someone else ... so that you would be
14   two and not one ...

15          AL-TIMIMI:  We found someone else, we found someone else
16   so that I would only sign on $50,000.00.  He did not go to court
17   but we hope that the government would agree on that, I mean.  I
18   mean ...

19          UM:  What about CAIR?

20          AL-TIMIMI:  Huh?  CAIR hired a lawyer and they're
21   following up on the case, but the problem, I mean there is
22   something fishy in the matter, there is something behind, behind,
23   behind that matter.  This is not the true story.  There are
24   question marks that surround this story.  Why should he, I mean,
25   they have a [in English] fundraiser [in Arabic] in New York on

1473

1  Sunday and they arrest him there. O.K., why didn't they come here
2  in Washington if there was something? You know what I mean?
3  There was this fundraiser over there. It's obvious they're strict
4  in New York. They wanted to arrest him there because they have no
5  mercy with people over there. Likewise, they seized all his
6  papers here in his house ... they took all his papers and all his
7  books ...

8              UM:   They arrested him in New York, huh? ...

9              AL-TIMIMI:  Yes, in New York.

10             UM:   And they did not say exactly why he was arrested?

11             AL-TIMIMI:  No, they said. They said, "You wrote a

12  check two or three years ago and the check, I mean, [in English]

13  bounced, [in Arabic] like that". That's why he was arrested.

14             UM:   This is not related to CAIR or that ...

15             AL-TIMIMI:  NO, no, no. Of course they say, they say it

16  has no connection to CAIR. However, it's obvious that they're

17  attempting to do something. You see, the check, $6000.00 is the

18  amount of the check, you see.

19             UM:   Yeah.

20             AL-TIMIMI:  He wrote the check and there was no balance

21  in the account when he owned a company, and so the check [in

22  English] bounced. [In Arabic] Later, he wrote another check, and

23  that other check ... the other party was able to cash the check, I

24  mean. So, there's nothing wrong with the account. Later, the

25  company was shut down by order of the government after the

**J.A. 1619**

1474

1    incidents.  So, the check story is three years old or something.
2    And, after all, $6000.00 is considered to be nothing in America, I
3    mean.  In order to release him one should pay $100,000.00" --
4              (End of excerpt.)
5              MR. GIBBS:  Judge, I think that's the relevant portion.
6              THE COURT:  Well, the jury has the whole transcript.  Do
7    you want them not looking any further?
8              MR. GIBBS:  Again, I don't think it's relevant, Judge.
9              THE COURT:  Does the defense want the whole thing
10   played?
11             MR. MAC MAHON:  Your Honor, he's not talking about the
12   person's whole case.
13             THE COURT:  It's totally irrelevant.  I'll ask the jury
14   to stop looking at the transcript.
15             Are you going to 10B3 now?
16             MR. GIBBS:  We are, Judge, 10B3.
17             THE COURT:  I'm sorry, just so I'm clear, this 10B2a
18   occurred on January 31, 2003; is that correct?
19             MR. GIBBS:  That's correct, Judge.
20             THE COURT:  All right.  I'm not sure we knew that
21   before.
22             MR. GIBBS:  And, Your Honor, for the record I have the
23   transcripts for 10B3, which we'll now play.
24             THE COURT:  All right.
25             MR. GIBBS:  This is a telephone call the following day,

1475

1  on February 1, 2003, 3:10 p.m., between Al-Timimi and Al-Buthe.

2           THE COURT:  Do we know the speaker on the first one we

3  just heard?  And if we don't, that's all right.  I'm just curious.

4           MR. GIBBS:  I believe 10B3 is in the binder.  10B3a, I'm

5  sorry.

6           THE COURT:  And the jury is okay?  Did you have one for

7  Ms. Thomson?

8           THE COURT REPORTER:  Yes, I have it.

9           THE COURT:  You have one?  All right, that's fine.

10          And, Mr. Gibbs, before you play it, did we know who the

11 speaker was on the first tape?  And if we don't, we don't.

12          MR. GIBBS:  Judge --

13          THE COURT:  All right, we don't know.  That's fine.

14          MR. GIBBS:  Yeah.  I mean, we have an idea, but the

15 defense doesn't agree, so --

16          THE COURT:  All right.

17          (Government's Exhibit No. 10B3 was played, Government's

18 Exhibit No. 10B3a was copied verbatim into the record as follows:)

19          "Al-Buthe:  Peace unto you.

20          Al-Timimi:  Peace unto you.  How are you O Sheikh?

21          Al-Buthe:  Welcome, may God welcome you.

22          Al-Timimi:  How are you?

23          Al-Buthe:  All praise to God I am well.

24          Al-Timimi:  May God welcome you.  Look here my brother I

25 wrote an article about the event the makook [Note:  mak-kook is

1476

1  Arabic for shuttle].  I don't know what you call it [in Arabic]:
2  [Is it] makook or what is it?
3          Al-Buthe:  Yes.  [Correcting Al-Timimi's pronunciation]
4  Mak-kook.  That is correct.
5          Al-Timimi:  Good, yes.  I want to fax it to you.  And if
6  you find the article to be useful, you can publish it.  If you
7  don't find it such, there is no problem.  It is only some thoughts
8  [on the event].
9          Al-Buthe:  [Is it] in Arabic or English?
10         Al-Timimi:  We wrote it in Arabic.
11         Al-Buthe:  Fine.  OK.  No problem.
12         Al-Timimi:  Do you have a fax there so I can send it?
13         Al-Buthe:  Send it to my house if you wish or to my
14  e-fax.
15         Al-Timimi:  Ok give me the e-fax [number].
16         Al-Buthe:  Do we publish it in your name or just like
17  that [as an unsigned article]?
18         Al-Timimi:  By God, see I wrote it in my name.  I
19  sought ... Take it.  And you have the freedom of control.  Do
20  with it what you wish.  Publish it on the web site or in the
21  forums ...
22         Al-Buthe:  Fine the website is simple.  This matter is
23  easy.
24         Al-Timimi:  No, no, [do] as you like.
25         Al-Buthe:  How about in the newspapers, the dailies?

**J.A. 1622**

1477

1    Al-Timimi:  By God [however] the words might be a bit
2 harsh [for the Saudi newspapers].  Keep yourself free to do what
3 you want.
4    Al-Buthe:  Send it to me and I will see [what's best].
5 I will read it and afterwards [decide] God willing.
6    Al-Timimi:  Fine God willing.  What's the number.
7    Al-Buthe:  Do you want to send it to a regular fax?
8    Al-Timimi:  I want you it to reach you.  How?
9    Al-Buthe:  966.
10    Al-Timimi:  966.
11    Al-Buthe:  1
12    Al-Timimi:  1
13    Al-Buthe:  20
14    Al-Timimi:  120
15    Al-Buthe:  Double 6
16    Al-Timimi:  Double 6
17    Al-Buthe:  Double 3
18    Al-Timimi:  Double 3
19    Al-Buthe:  1
20    Al-Timimi:  1.  Is this your residence or the work?
21    Al-Buthe:  Yes this is my residence.
22    Al-Timinu:  But you won't see it until later.
23    Al-Buthe:  When?
24    Al-Timimi:  Where are you now?
25    Al-Buthe:  When will you expect?

**J.A. 1623**

1478

1    Al-Timimi:  Now, I have written it [already].  I want to
2    send it to you now.

3    Al-Buthe:  Send it now.  I am leaving now to the office.
4    I mean residence.  Within 10 minutes, a quarter hour.  I will be
5    home.  God give you life.

6    Al-Timimi:  Fine.  I say has anything happened regarding
7    the other article.  I was unable to write last night.

8    Al-Buthe:  I am waiting for you.  I told you write and
9    we will immediately send it out.

10    Al-Timimi:  So you haven't spoken to the Sheikh yet?

11    Al-Buthe:  I haven't been able to reach him.

12    Al-Timimi:  Good.  Fine.  God willing.

13    Al-Buthe:  Those in Mecca say he's in Jeddah and we have
14    no communications with him.

15    Al-Timimi:  Fine.  God willing.

16    Al-Buthe:  Whether this or that, write so we don't waste
17    time.

18    Al-Timimi:  The problem is yesterday when I finished
19    with you on the phone, we went to visit the sister.  They have now
20    warned her either you cooperate with us against your husband or we
21    will throw you in jail and take away your children [from you].

22    Al-Buthe:  Who said that?

23    Al-Timimi:  The government they said to the sister such
24    [words].  [They said such to] Bassem's wife.

25    Al-Buthe:  Oh.  Glory' be to God.

1479

1      Al-Timimi:  So yesterday we went to the attorney and
2  tried to see if we could obtain for her some type of immunity.  It
3  is a problem [getting her] immunity.  It is a problem by God.
4           Al-Buthe:  True.
5           Al-Timimi:  They said to her testify against your
6  husband and we will give you money, a home and everything.  If you
7  don't want to cooperate then that's it your children will be taken
8  away from you.  That's it.  We will send your children ...
9           Al-Buthe:  What is her nationality?
10          Al-Timimi:  She is an Egyptian like he is.
11          Al-Buthe:  Oh.  With God we seek help.
12          Al-Timimi:  They say that's it your children are
13 American and we will take them from you and we will deal with them
14 as we want.  You and your husband can be struck with sixty
15 calamities.
16          Al-Buthe:  With God we seek help.
17          Al-Timimi:  Or work with us against him and we will give
18 you a home and residence and you will be at ease in life.  That's
19 it.  You can [afterwards] look for someone else.
20          Al-Buthe:  With God we seek protection.  With God we
21 seek protection.
22          Al-Timimi:  To be frank we became preoccupied with her
23 yesterday.
24          Al-Buthe:  By God, may God reward you.
25          Al-Timimi:  So God willing, I will now, after I send you

**J.A. 1625**

1480

1  the fax, sit and try to write for you the other article.

2          Al-Buthe:  Fine.

3          Al-Timimi:  And you try again with Abu Abdurrahman if

4  you can tomorrow or any other time.

5          Al-Buthe:  I am still trying anyway.

6          Al-Timimi:  Thank you.  I am grateful to you O Sheikh.

7  Peace be unto you.

8          Al-Buthe:  Peace unto you.

9          Al-Buthe:  Hello:

10          Al-Timimi:  Yes.

11          Al-Buthe:  Brother Ahmad is working on the issue of the

12  [Iraqi] tribes.

13          Al-Timimi:  Fine.

14          Al-Buthe:  He wants to speak to you.

15          Al-Timimi:  Fine God willing.

16          Ahmad:  Peace unto you.

17          Al-Timimi:  Peace and God's mercy unto you.

18          Ahmad:  How are you?

19          Al-Timimi:  Welcome.  We praise God.

20          Ahmad:  May God preserve you O Sheikh.  With regards to

21  the tribes, there must be certain [mannerisms for tribal]

22  addressing [that are specific] to each tribe.  For example, we in

23  Qasim, for example, we [address one tribe] by saying, 'O family of

24  Ali.'  Or 'Ali's people' or something like this.

25          Al-Timimi:  Do you mean the tribal call?  If so yes

**J.A. 1626**

1481

1    there is.

2              Ahmad:  Yes.  If that [information] is available to

3    you ...

4              Al-Timimi:  It is available.  It is available for some

5    tribes.

6              Ahmad:  Yes then e-mail it to Soliman.

7              Al-Timimi:  By God it is difficult for me to email [such

8    information] as I have no means of typing in Arabic.  However, we

9    will ...  Let there be a phone call after ...  after ...  OK God

10   willing, I will enumerate that [information] and we will have a

11   phone call tomorrow.  Let Soliman call me tomorrow and I will

12   dictate that to you over the phone.

13             Ahmad:  Fine.  Excellent.

14             Al-Timimi:  May God welcome you.  May God reward you

15   well.

16             Ahmad:  Thank you.

17             Al-Timimi:  Peace unto you.

18             Ahmad:  And unto you peace."

19             (End of tape and transcript.)

20             MR. GIBBS:  And, Judge, just for the record, the Court

21   had asked about the previous call, not that one we just listened

22   to, but the one before, 10B2.  There was actually a stipulation

23   that's been entered into, I believe it's already been read into

24   the record, but it was to the effect that Government Exhibit 10B2

25   is an authentic recording of a telephone call involving Ali

**J.A. 1627**

1482

1   Al-Timimi and Soliman Al-Buthe on or about January 31, 2003, and

2   that was Stipulation Government Exhibit 12-17.

3           THE COURT:  So the same speaker who's on this one.

4           MR. GIBBS:  Correct.

5           THE COURT:  All right.

6           MR. GIBBS:  And, Judge, next we would provide

7   transcripts to the jury of 10B4a, which is the transcript for

8   10B4.  That's a telephone call also on February 1, 2003, between

9   Ali Al-Timimi and Soliman Al-Buthe at 4:20 p.m.

10          THE COURT:  And I do have a copy of that.

11          MR. GIBBS:  Thank you.

12          THE COURT:  Mr. Zwerling, do we need you for anything?

13          MR. ZWERLING:  No, Your Honor.

14          THE COURT:  All right.  And everything that we talked

15  about yesterday has been taken care of?

16          MR. ZWERLING:  It has been taken care of.  I appreciate

17  it.

18          THE COURT:  Fine.

19          The jury is missing some?  All right, hold on one

20  second.  This should be 10B4a.  Does everybody have one now?  All

21  right, we have one more juror who needs one.  Here we go.

22          An abundance of riches here, all right.

23          All right, everybody has 10B4a, yes?  All right.

24          (Government's Exhibit No. 10B4 was played, Government's

25  Exhibit No. 10B4a was copied verbatim into the record as

**J.A. 1628**

1483

1    follows:)

2          "Al-Timimi:  Hello.

3          Al-Buthe:  Peace be unto you.

4          Al-Timimi:  Peace and God's mercy be unto you.  My

5    apologies let me turn this [fax] off.  My apologies.

6          Al-Buthe:  Ok.

7          Al-Buthe:  [Unintelligible due to the background sound

8    of the fax machine.]

9          Al-Timimi:  Just a minute.  Just a minute O Sheikh.  Let

10   me turn this fax off.

11         Al-Buthe:  Fine.  [Sound of fax machine ends.]

12         Al-Timimi:  Yes.  How are you?

13         Al-Buthe:  All praise to God.

14         Al-Timimi:  Do you want me to just read it to you over

15   the phone or is that difficult for you?

16         Al-Buthe:  No, no, just send it, just send it [by fax]

17   and I will read it and call you [right back].

18         Al-Timimi:  No, I must go somewhere else in order to fax

19   it to you.

20         Al-Buthe:  You didn't type it up?

21         Al-Timimi:  There is no [way to] type it up [in Arabic].

22   I wrote it by pen.

23         Al-Buthe:  Oh.  Then just send it [by fax] that's

24   better.  And I will have to type it up.

25         Al-Timimi:  Yeah.

**J.A. 1629**

1484

1        Al-Buthe:  In both cases, I will have to type it up.
2   Just send it [by fax] that's better.
3        Al-Timimi:  Fine God willing.  I will send it by [fax].
4   I will need to get from you the local number and I will go ...
5        Al-Buthe:  The local number is 253.
6        Al-Timimi:  253
7        Al-Buthe:  981
8        Al-Timimi:  981
9        Al-Buthe:  91
10       Al-Timimi:  91
11       Al-Buthe:  50
12       Al-Timimi:  50.  Fine.  Within an hour it will be there
13   with you.
14       Al-Buthe:  Fine
15       Al-Timimi:  You can see it in the morning unless you
16   want me to read it to you over the telephone now.  I don't know?
17       Al-Buthe:  Read it to me now?  Is it not lengthy?
18       Al-Timimi:  By God, it is a page and some.
19       Al-Buthe:  A page?
20       Al-Timimi:  Yeah.  Two pages approximately.
21       Al-Buthe:  Read it but I will still need to get a copy
22   from you.
23       Al-Timimi:  Yeah I will still fax it to you.  Fine, as
24   you like.  If you are tired, sufficient, 1 will not read it to
25   you.  I will not take up your time.

**J.A. 1630**

1485

1      Al-Buthe:  No.  There's no problem.  You want to read it
2  and I write it also.

3      Al-Timimi:  Yes.  I meant such.  If you like.

4      Al-Buthe:  Fine.  Good.  Good.  Then I will call you
5  from the regular phone in this case as 1 am now talking to you
6  from my mobile phone.

7      Al-Timimi:  Fine.  Peace unto you.

8      Al-Buthe:  I will call you.

9      Al-Tinimi:  Fine.  Peace unto you.

10      Al-Buthe:  Peace unto you."

11      (End of tape and transcript.)

12      MR. GIBBS:  Judge, the last tape in this series is 10B5.
13  The transcript is 10B5a.  I have the transcripts here.

14      Thank you, Mr. Wood.

15      THE COURT:  All right.  And I have my copy again.

16      MR. GIBBS:  All right, thank you.  And for the record,
17  this is a telephone call between Timimi and Soliman Al-Buthe on
18  February 1, 2003, at 4:32 p.m.

19      THE COURT:  Just wait a second.  Not all the jurors have
20  their transcripts yet.

21      All right, everybody have one?

22      (Government's Exhibit No. 10B5 was played, Government's
23  Exhibit No. 10B5a was copied verbatim into the record as
24  follows:)

25      "Al-Timimi:  Hello

**J.A. 1631**

1         Al-Buthe:  Peace be unto you

2         Al-Timimi:  Unto you peace and Allah [God]'s mercy.

3         Al-Buthe:  How are you?

4         Al-Timimi:  May Allah [God] give you life Sheikh.  Shall

5  I begin?  Shall I begin?

6         Al-Buthe:  Begin.

7         Al-Timimi:  Fine.  "Truly it is a Divine sign."  That's

8  the title.  Fine?

9         Al-Buthe:  Fine.

10         Al-Timimi:  Imam Malik reports that Umar ibn al-Khattab,

11  may Allah [God] be pleased with him, asked a man regarding his

12  name.  So [the man] replied:  Jamura [which means ember].

13         Al-Buthe:  So [the man] replied:  Jamura [which means

14  ember].

15         Al-Timimi:  Yeah.

16         Al-Buthe:  Ok.

17         Al-Timimi:  So Umar said:  And your father's name?  [The

18  man] replied:  Shihad [which means flame].  So Umar said:

19         Al-Buthe:  Just a moment.

20         Al-Timimi:  Ok.

21         Al-Buthe:  Yes.

22         Al-Timimi:  So Umar said:  From which [tribe]?  [The

23  man] replied:  From al-Hurqa [which means the burning].  So Umar

24  said:  So your residence [is where]?  The man replied, At

25  harratun-nar [which means the plains of Fire].

1487

1          Al-Buthe:  Just a moment O Sheikh.

2          Al-Timimi:  Fine, Sheikh.

3          Al-Buthe:  So Umar said, [after the man] said Shihab.

4   So Umar said what?

5          Al-Timimi:  From which [tribe]?

6          Al-Buthe:  From which [tribe]?  Ok.

7          Al-Timimi:  [The man] replied:  From al-Hurqa [which

8   means the burning].

9          Al-Buthe:  [The man] replied:  From al-Hurqa [which

10  means the burning].  Yes.

11         Al-Timimi:  Ok.  So Umar said:  So your residence [is

12  where]?

13         Al-Buthe:  Yes.

14         Al-Timimi:  The man replied:  At harratun-nar [which

15  means the plains of Fire].

16         Al-Buthe:  At harratun-nar [At the plains of Fire].

17         Al-Timimi:  So Umar said:  Where is your home?

18         Al-Buthe:  Yes.

19         Al-Timimi:  [The man] replied:  At Dhat-Laza [which

20  means that which has a flame].

21         Al-Buthe:  At Dhar-Laza [which means that which has a

22  flame].

23         Al-Timimi:  Yeah. So Umar said:  Go and [you will find]

24  that your home has been burnt down.

25         Al-Buthe:  Go and [you will find] that has been burnt

1488

1 | down.

2 |       Al-Timimi:  Your home.

3 |       Al-Timimi:  So [the man] went and he found that to be as
4 | it is.

5 |       Al-Buthe:  Ok.

6 |       Al-Timimi:  Ok.  I will re-read this paragraph a fresh.

7 |       Al-Timimi:  "Truly it is a Divine sign."  Good.  "Imam
8 | Malik [in his hadith collection] reports that Umar ibn al-Khattab,
9 | may Allah [God] he pleased with him, asked a man regarding his
10 | name.  So [the man] replied:  Jamura [which means ember].  So Umar
11 | said:  And your father's name?  [The man] replied:  Shihab [which
12 | means flame].  So Umar said:  From which [tribe]?  [The man]
13 | replied:  From al-Hurqa [which means the burning].  So Umar said:
14 | So your residence [is where]?  The man replied, At harratun-nar
15 | [which means the plains of Fire So Umar said:  Where is your home?
16 | [The man] replied:  At Dhat-Laza [which means that which has a
17 | flame].  So Umar said:  Go and [you will find] that your home has
18 | been burnt down.  So [the man] went and he found that to be as is
19 | it."

20 |       Al-Buthe:  So the man went.

21 |       Al-Timimi:  Huh?  Yes.  Say Again?

22 |       Al-Buthe:  [You will find] that your home has been burnt
23 | down.  So [the man] went and he found that to be as it is.

24 |       Al-Timimi:  Yes.  [Correcting a misreading]:  your home
25 | has been burnt down.

1489

1          Al-Buthe:  Yeah.

2          Al-Timimi:  Fine.  Imam Shamsud-Din Ibn al-Qayyim, may

3   Allah be merciful with him, has said.

4          Al-Buthe:  Yes.

5          Al-Timimi:  Since there is between names and the objects

6   for which they are named

7          Al-Buthe:  Yes.

8          Al-Timimi:  From links and association and proximity.

9          Al-Buthe:  and association.

10         Al-Timimi:  and proximity.

11         Al-Buthe:  and proximity.

12         Al-Timimi:  Like that [found] between form and content.

13         Al-Buthe:  outer of things.

14         Al-Timimi:  and content.

15         Al-Buthe:  and content.

16         Al-Timimi:  and what is between souls and bodies.

17         Al-Timimi:  The intellect expresses the relationship

18   between the two.

19         Al-Buthe:  from each of them.

20         Al-Timimi:  to the other

21         Al-Buthe:  to the other

22         Al-Timimi:  Fine.  Ibn al-Qayyim's words come to an end.

23   For this reason [the Prophet] may Allah [God]'s peace and blessing

24   be upon him

25         Al-Buthe:  Yes.

**J.A. 1635**

1490

1    Al-Timimi:  would prefer good names as he would dislike

2   places which had evil names and he would hate to travel by those

3   places.  The evidences upon that in [the Prophet's] Sunnah [which

4   means practice] are many.  Ok.  I will read this paragraph to you

5   one more time.  "Imam Shamsud-Din ibn al-Qayyim (may Allah be

6   merciful with him) has said.  Since there is between names and

7   theobjects for which they are named from links and association and

8   proximity like that [found] between form and content and what is

9   between souls and bodies.  The intellect expresses the

10  relationship between the two."  Ibn al-Qavvim's words end.  Ok.

11  "For this reason ....

12          Al-Buthe:  [unintelligible].

13          Al-Timimi:  Say again.

14          Al-Buthe:  Abbara or 'abara [which means expresses or

15  crosses].

16          Al-Timimi:  By Allah [God] I don't know which [is the

17  correct reading] I only copied it from [the book] Zad al-Ma'ad.

18          Al-Buthe:  What I mean ... [unintelligible] ... Zad

19  al-Ma'ad.

20          Al-Timimi:  Huh?

21          Al-Buthe:  Fine.

22          Al-Timimi:  "the relationship between the two."

23          Al-Buthe:  Yes.

24          Al-Timimi:  "For this reason [the Prophet] may Allah

25  [God]'s peace and blessing be upon him would prefer good names as

**J.A. 1636**

1491

1  he would dislike places which had evil names and he would hate to
2  travel by those places."

3          Al-Buthe:  Yes.

4          Al-Timimi:  "The evidences upon that in [the Prophet's]
5  Sunnah [which means practice] are many."  Fine.  Start of a new
6  paragraph.

7          Al-Buthe:  In his Sira [which means biography] or in his
8  Sunnah [which means practice].

9          Al-Timimi:  It is written in his Sunnah [which means
10  practice] or you can say in his Sira [which means biography].
11  They are my words and there is no problem [if you want to change
12  it.]  The whole world heard the event of the crash of the space
13  shuttle this morning.  No doubt the heart of every believer
14  flew in happiness at the calamity that befell their greatest
15  enemy.

16          Al-Buthe:  Just a minute.  The crash of the space
17  shuttle this morning.

18          Al-Timimi:  Yeah.  No doubt that the heart of every
19  believer flew in happiness at the calamity that befell their
20  greatest enemy.

21          Al-Buthe:  Yeah.

22          Al-Timimi:  Fine.  Befalling in my heart

23          Al-Buthe:  Befalling

24          Al-Timimi:  In my heart

25          Al-Buthe:  In my heart

1492

1       Al-Timimi:  Upon hearing the event

2       Al-Buthe:  Yes.

3       Al-Timimi:  From Divinely glad tidings which I wish to

4  spread between my brothers.

5       Al-Buthe:  Yeah.

6       Al-Timimi:  First regarding the name of the shuttle.

7       Al-Buthe:  First, what?

8       Al-Timimi:  The name of the shuttle.

9       Al-Buthe:  The name of the shuttle?

10      Al-Timimi:  The name of the shuttle, the name of this

11  shuttle.

12      Al-Buthe:  Fine.  The name of the shuttle.

13      Al-Timimi:  Whereas the name of the shuttle is Columbia

14  in reference to the seafarer Columbus, the discoverer of the two

15  American continents.

16      Al-Buthe:  The two?

17      Al-Timimi:  Yeah [I mean] north and south.  Or [write

18  just] the American continent.  There is no problem.  Write the

19  American continent [in the singular] alone may Allah [God] reward

20  you.  During the year 1492 and following the fall of Grenada.

21      Al-Buthe:  Yes.

22      Al-Timimi:  The last Muslim citadel in Andalusia.  It is

23  known among historians that with the discovery of the two American

24  continents, the Romans between double parentheses (the Christians

25  of Europe) utilized ...

1493

1        Al-Buthe:  Just a moment.

2        Al-Timimi:  Fine.

3        Al-Buthe:  It is known among

4        Al-Timimi:  The historians

5        Al-Buthe:  with the discovery of the two American

6   continents

7        Al-Timimi:  Yeah.  The Romans between double parentheses

8   (the Christians of Europe) utilized

9        Al-Buthe:  Yes

10       Al-Timimi:  The resources of these two continents to

11   enable [them] to dominate the Islamic world

12       Al-Buthe:  To permit

13       Al-Timimi:  To enable [them] to dominate the Islamic

14   world.

15       Al-Buthe:  Afterwards we will fix the language.

16       Al-Timimi:  Yes.  Fix the language as you wish.  May

17   Allah [God] reward you.  I felt.

18       Al-Buthe:  Yes.

19       Al-Timimi:  that with the fall of Columbia and Allah

20   [God] knows best.

21       Al-Buthe:  with the fall of Columbia.

22       Al-Timimi:  and Allah [God] knows best -- a strong sign

23   that the superiority of the West, between parentheses,

24   (specifically that of America's) which began more than 500 years

25   ago.

1494

1       Al-Buthe:  Yes.

2       Al-Timimi:  Is on the fast track of coming to an end and
3  diminishing.

4       Al-Buthe:  Ok.

5       Al-Timimi:  [Repeating] Let me re-read to you this
6  paragraph.  "The whole world heard the event of the crash of the
7  space shuttle this morning.  No doubt that the heart of every
8  believer flew in happiness at the calamity that befell their
9  greatest enemy.  Befalling in my heart upon hearing the event from
10  [Divinely] glad tidings which I wish to spread between my [Muslim]
11  brethren.  First regarding the name of the shuttle:  Whereas the
12  name of the shuttle is Columbia in reference to the seafarer
13  Columbus, the discoverer of the American continent, during the
14  year 1492 and following the fail of Grenada the last Muslim
15  citadel in Andalusia.  It is known among historians that with the
16  discovery of the two American continents, the Romans (i.e., the
17  Christians of Europe) utilized the resources of these two
18  continents to enable [them] to dominate the Islamic world.  I felt
19  that with the fall of Columbia and Allah [God] knows best a strong
20  sign that the superiority of the West (i.e., specifically that of
21  America's which began more than 500 years ago is on the fast track
22  of coming to an end and diminishing if Allah [God] wills that as
23  had occurred to the shuttle."  Fine.  Second:

24       Al-Buthe:  As had occurred to the shuttle.

25       Al-Timimi:  Yeah.  As had occurred to the shuttle.

**J.A. 1640**

1495

1   Second.  Fine a new paragraph.  With regards to the crew of the
2   shuttle:  The Israeli astronaut regarding whom the Israeli
3   ambassador to the United Nations said that he was carrying with
4   him.
5               Al-Buthe:  Just a moment.
6               Al-Timimi:  Yes.
7               Al-Buthe:  The Israeli astronaut
8               Al-Timimi:  Regarding whom the Israeli ambassador
9               Al-Buthe:  The Israeli ambassador
10              Al-Timimi:  to the United Nations said that he was
11  carrying with him
12              Al-Buthe:  that he was carrying with him
13              Al-Timimi:  all the hopes and aspirations of the Israeli
14  people.
15              Al-Buthe:  the Israeli people.
16              Al-Timimi:  Like such it was burnt up if Allah [God]
17  wills that all these examples and aspirations.
18              Al-Buthe:  [Correcting] These hopes.
19              Al-Timimi:  Yes hopes my apologies with the fall and
20  burning up of the shuttle and its Israeli astronaut.
21              Al-Buthe:  [suggesting alternative language] and one of
22  its astronauts.
23              Al-Timimi:  Fine.  Write it as you wish.  Fine.
24  "Second."  I will re-read the paragraph afresh.  "With regards to
25  the crew of the shuttle:  The Israeli astronaut regarding whom the

1496

1  Israeli ambassador to the United Nations said that he was carrying
2  with him all the hopes and aspirations of the Israeli people.
3  Like such it was burnt up if Allah [God] wills that all these
4  hopes and aspirations with the fall and burning up of the shuttle
5  and its Israeli astronaut."  Third regarding the location of the
6  crash:  As soon as CNN station announced

7          Al-Buthe:  As soon

8          Al-Timimi:  Yeah.  As soon as CNN station announced the
9  crash of the space shuttle near the city of Palestine in the state
10 of Texas

11          Al-Buthe:  The crash

12          Al-Timimi:  Yeah

13          Al-Buthe:  The crash of the shuttle

14          Al-Timimi:  The space shuttle near

15          Al-Buthe:  Near

16          Al-Timimi:  The city of Palestine in the state of Texas

17          Al-Buthe:  [In English] They said that?

18          Al-Timimi:  [In English] Yeah they said that.  First
19 thing they said this morning.  It fell down next to Palestine,
20 Texas.

21          Al-Buthe:  [In English] Is there is something called
22 Palestine

23          Al-Timimi:  [In English] Yes there is something called
24 Palestine, Texas.  [Return to Arabic] You can also see it in the
25 Internet.

1497

1    Al-Buthe:  [In English] Oh.  Ok.

2    Al-Timimi:  Anyway it is something strange [laughing].

3    Glory be to Allah [God].  Fine.  As soon as CNN station announced

4    the crash of the space shuttle near the city of Palestine in the

5    state of Texas.  I said to myself, Allah [God] is greater and like

6    such if Allah [God] wills that America will fall and disappear

7    near Palestine.

8    Al-Buthe:  And like such if Allah [God] wills

9    Al-Timimi:  America will fall and disappear near

10   Palestine.

11   Al-Buthe:  [Suggests a linguistic change].

12   Al-Timimi:  Do as you wish you know the language better.

13   And disappear near Palestine.  I wrote America will fall and

14   disappear near Palestine.

15   Al-Buthe:  We finished with that [part].  And like such

16   if Allah [God] wills that

17   Al-Timimi:  America will fall and disappear near

18   Palestine.

19   Al-Buthe:  Will fall and disappear near Palestine.

20   Al-Timimi:  Then between two parentheses:  (Please refer

21   to the Sheikh Safar's lecture: "al-Intifada and the Neo-Tartars"

22   and his book The Day of Wrath.)

23   Al-Buthe:  Refer to the Sheikh Safar's lecture:

24   Al-Timimi:  "al-Intifada and the neo-Tartars"

25   Al-Buthe:  Yes

**J.A. 1643**

1498

1        Al-Timimi:  and his book The Day of Wrath

2        Al-Buthe:  Yes.

3        Al-Timimi:  We have almost finished.  Fourth.  OK Do you

4   wish I repeat for you this last small paragraph.

5        Al-Buthe:  [unintelligible]

6        Al-Timimi:  Huh?

7        Al-Buthe:  The last to review it.

8        Al-Timimi:  Fine.  "Regarding the location of the crash:

9   As soon as CNN station announced the crash of the space shuttle

10  near the city of Palestine in the state of Texas.  I said to

11  myself, Allah [God] is greater and like such if Allah [God] wills

12  America will fall and disappear near Palestine.  (Please refer to

13  the Scholar Safar's lecture:  "al-Intifada and the Neo-Tartars"

14  and his book The Day of Wrath.)"

15        Al-Buthe:  [Suggesting a chance:]  See the lecture.

16        Al-Timimi:  Fine.  As you see best.

17        Al-Buthe:  [unintelligible]

18        Al-Timimi:  Huh?

19        Al-Buthe:  I wrote see the lecture by Sheikh Jaafar.

20        Al-Timimi:  Fine.  Leave it like that Sheikh Jaafar.

21  There is no problem.

22        Al-Buthe:  I say it does not need to say See ...

23        Al-Timimi:  Fine Allah [God] willing.

24        Al-Buthe:  [unintelligible]

25        Al-Timimi:  You O Sheikh do what you want.  You have the

1499

1   freedom to act as you want. I just have this idea and you see

2   [what is best]. Even if you see it as not appropriate for

3   publication then just drop the topic. There is no problem.

4           Al-Buthe: I think it is useful for publication at fast

5   as possible.

6           Al-Timimi: Ok. Allah [God] willing. Fourth also

7   regarding the location of the crash of theshuttle.

8           Al-Buthe: The location of the crash was the third

9   [point].

10          Al-Timimi: Yes but we have another point to make

11  regarding the location of the crash. Fourth also regarding the

12  location of the crash of the shuttle.

13          Al-Buthe: No reason to say fourth [point].

14          Al-Timimi: Fine. Fine. As you see [it best]. I will

15  dictate to you now and afterwards you do [with it] as you wish.

16          Al-Buthe: Go ahead.

17          Al-Timimi: Also regarding the location of the crash of

18  the shuttle. There is another [Divine] glad tiding if Allah [God]

19  wills. It is the state of Texas.

20          Al-Buthe: There is another [Divine] glad tiding and it

21  is the state of

22          Al-Timimi: Texas

23          Al-Buthe: Yeah.

24          Al-Timimi: The state of the President, the obeyed idiot

25          Al-Buthe: The state of the President, the obeyed idiot

1500

1         Al-Timimi:  Bush, the son

2         Al-Buthe:  Bush W.

3         Al-Timimi:  Fine.  And like such we hope if Allah [God]

4    wills

5         Al-Buthe:  And like such we hope if Allah [God] wills

6    that

7         Al-Timimi:  that as the space shuttle fell upon his

8    state.  In the same way by his idiotic policies

9         Al-Buthe:  idiotic policies

10        Al-Timimi:  the pillars of his administration will break

11   upon his head

12        Al-Buthe:  the pillars of his administration will break

13   upon

14        Al-Timimi:  his head.  Fine.  Fifth.  It should be the

15   fourth [point] with you.

16        Al-Buthe:  And he loses his [re-]election [bid].

17        Al-Timimi:  Say again?

18        Al-Buthe:  I say and he loses his [re-]election [bid].

19        Al-Timimi:  Yes if Allah [God] wills that.  All of them

20   will disappear and go to hell if Allah [God] wills that.  Fine.

21   Let me re-read this paragraph you one more time.  "Fourth also

22   regarding the location of the crash of the shuttle:  there is

23   another [Divine] glad tiding if Allah [God] wills.  It is the

24   state of Texas.  The state of the President, the obeyed idiot,

25   Bush the son.  And like such we hope if Allah [God] wills that as

**J.A. 1646**

1   the space shuttle fell upon his state.  In the same way by his
2   stupid policies the pillars of his administration will break upon
3   his head."  Fine.
4               Al-Buthe:  [unintelligible]
5               Al-Timimi:  Fifth.
6               Al-Buthe:  Allow me to number it.
7               Al-Timimi:  All of it can be done by you [as you wish].
8   We have nothing to do with the language.  Fifth regarding the
9   condolences of the President to the American people.
10              Al-Buthe:  The condolences of the President
11              Al-Timimi:  This is the last point Allah [God] willing.
12              Al-Buthe:  Yes.
13              Al-Timimi:  Fine.  In Bush's very statement
14              Al-Buthe:  In Bush's statement.  Yes
15              Al-Timimi:  he sought to console his people
16              Al-Buthe:  Yes
17              Al-Timimi:  By what he mentioned from words attributed
18  to
19              Al-Buthe:  Attributed
20              Al-Timimi:  to the Prophet Isaiah
21              Al-Buthe:  Attributed
22              Al-Timimi:  to the Prophet Isaiah
23              Al-Buthe:  Isaiah
24              Al-Timimi:  in which is praise
25              Al-Buthe:  in which is praise

1502

1           Al-Timimi:  Of Allah [God], Mighty and Magnificent is
2  He, due to His creating the stars and planets
3           Al-Buthe:  Creating the stars and planets
4           Al-Timimi:  So I said to myself Glory be to Allah [God].
5  In the very book of Isaiah there is Divine glad tiding of [the
6  coming] of the Prophet Muhammad, Allah [God]'s peace and blessings
7  be upon him, and a warning to the Jews regarding their destruction
8  at the end of time.
9           Al-Buthe: A warning to the Jews
10          Al-Timimi:  I wrote here between two parentheses (See
11 [the books] Guidance for the Perplexed by Ibn al-Qayyim and The
12 Day of Wrath by Safar al-Hawaii).  But you see.
13          Al-Buthe:  I don't need them.  I just need you to point
14 out for me those two [specific] passages.
15          Al-Timimi:  Fine.  Fine.  Fine.  However as Allah [God],
16 Exalted be He, says
17          Al-Buthe:  However it is as Allah [God], Exalted be He,
18 says
19          Al-Timimi:  Among them are unlettered folk
20          Al-Buthe:  Among them are unlettered folk
21          Al-Timimi:  Who know the Scripture not except from
22 hearsay.  They but guess.  Fine.  I shall repeat to you this
23 paragraph.
24          Al-Buthe:  Fine.
25          Al-Timimi:  "Fifth regarding the condolences of the

1  President to the American people:  In Bush's very statement he
2  sought to console his people by what he mentioned from words
3  attributed to Isaiah in which is praise of Allah [God], Mighty and
4  Magnificent is He, due to His creating the stars and planets.  So
5  I said to myself, Glory be to Allah [God], in the very book of
6  Isaiah there is [Divine] glad tiding of [the coming] of the
7  Prophet Muhammad, Allah [God]'s peace and blessings be upon him,
8  and a warning to the Jews regarding their destruction at the end
9  of time.  However it is as Allah [God], Exalted be He, says,
10 'Among them are unlettered folk who know the Scripture not except
11 from hearsay.  They but guess [Koran 2:78].'"

12              Al-Buthe:  May Allah [God] reward you good.

13              Al-Timimi:  This.  This is the last paragraph.  This and
14 other indications in the event [that is] too lengthy to mention
15 and expound on them all.

16              Al-Buthe:  This

17              Al-Timimi:  Other indications in the event [that is] too
18 lengthy to mention and expound on them all.

19              Al-Buthe:  To lengthy to mention

20              Al-Timimi:  and expound on them all

21              Al-Buthe:  Yes

22              Al-Timimi:  Among these whenever the Americans imagine

23              Al-Buthe:  whenever the Americans

24              Al-Timimi:  That they have mastery throughout the earth

25              Al-Buthe:  [unintelligible]

1504

1        Al-Timimi:  even the heavens

2        Al-Buthe:  even the heavens

3        Al-Timimi:  A [Divine] sign comes that Allah [God],

4 mighty and magnificent is He, is above His creatures, upon His

5 Throne, controlling the whole matter and that His angels are under

6 His command.

7        Al-Buthe:  controlling the whole matter

8        Al-Timimi:  Yes

9        Al-Buthe:  And that

10       Al-Timimi:  and that his angels are under His command.

11 And likewise

12       Al-Buthe:  Yes.

13       Al-Timimi:  Whoever seeks to raise the Jews and they are

14 a people whom Allah [God] has stamped humiliation and wretchedness

15 upon them and they were visited with wrath upon wrath from Allah

16 [God] [Koran 2:61] then he must be afflicted with humiliation,

17 abasement and Divine wrath

18       Al-Buthe:  Then he must

19       Al-Timimi:  be afflicted with humiliation, abasement and

20 Divine wrath to the degree of his support of them.

21       Al-Buthe:  Yes.

22       Al-Timimi:  Let me re-read to you this paragraph.  Umm.

23 Fine.  "This and other indications in the event [that is] too

24 lengthy to mention and expound on them all.  Among these whenever

25 the Americans imagine that they have mastery throughout the earth

1505

1   even the heavens [so] they can act unrestrictedly a [Divine] sign
2   comes that Allah [God], mighty and magnificent is He, is above His
3   creatures, upon His Throne, controlling the whole matter and that
4   His angels are under His command.  And likewise whoever seeks to
5   raise the Jews and they are a people whom Allah [God] has stamped
6   humiliation and wretchedness upon them and they were visited with
7   wrath upon wrath from Allah [God] [Koran 2:61] then he must be
8   afflicted with humiliation, a basement and Divine wrath to the
9   degree of his support of them."  Fine.  The last sentence.  As I
10  mentioned from the onset these were only passing thoughts which
11  occurred to me when I heard the event and hopes which I hoped for
12  with my Lord.  Knowledge of [the truthfulness of all this] is with
13  Him [alone] glorified and exalted be He.  May Allah [God] bless
14  our Prophet Muhammad and his companions.  Fine.  We will read to
15  you the last sentence.  Shall we begin?

16        Al-Buthe:  Begin.

17        Al-Timimi:  "As I mentioned from the onset these were
18  only passing thoughts which occurred to me when I heard the event
19  and hopes which I hoped for with my Lord.  Knowledge of [the
20  truthfulness of all this] is with Him [alone] glorified and
21  exalted be He.  May Allah [God] bless our Prophet Muhammad and his
22  companions."  OK O Sheikh.  May Allah [God] reward you good.  We
23  have taken much of your time.

24        Al-Buthe:  May Allah [God] give you life.

25        Al-Timimi:  You may do with it as you wish.  Present it

1506

1   to Shaikh Abdul-Wahbab, for example, as tomorrow is Friday.
2   Tomorrow is not Friday.  See I have an upside down thinking.  Show
3   it to one of the [religious] scholars to see if he wishes toadd
4   something or comment on [its accuracy].  [Likewise] in terms of
5   the language, you may do with it as you wish.  [Also] if you seek
6   to publish [or decide not] you can do so anywhere.

7           Al-Timimi:  Allah [God] willing I will fax it to you.
8   Do you need me to fax it to your e-fax likewise?

9           Al-Buthe:  No.

10          Al-Timimi:  Fine, Allah [God] willing.

11          Al-Buthe:  You didn't write it English?

12          Al-Timimi:  I only sought to publish it in Arabic.  So I
13  dictated it to my wife.  She wrote it in her handwriting so we
14  could fax it.

15          Al-Buthe:  I also see that you should write it in
16  English.

17          Al-Timimi:  Ok Allah [God] willing.  If I am able after
18  I complete the other article.  I will write it in English and send
19  it to you.  I can do that by email [unlike the Arabic] that will
20  not be a problem.

21          Al-Buthe:  [unintelligible]

22          Al-Timimi:  Allah [God] willing.  Allah [God] willing.

23          Al-Buthe:  [unintelligible]

24          Al-Timimi:  Fine Allah [God] willing.

25          Al-Buthe:  Group (?) media ...

1507

1       Al-Timimi:  Fine Allah [God] willing.

2       Al-Buthe:  We will send it to France ...

3       Al-Timimi:  Fine let me finish [that other article]

4  tonight.

5       Al-Buthe:  Time is running out [for that project].

6       Al-Buthe:  Also the [third] topic we were talking

7  about ... the tribes.

8       Al-Timimi:  I will try to find all the tribal calls.  I

9  might not have all the tribal calls for every tribe but what I

10  find I will send to you.  Allah [God] willing.

11       Al-Buthe:  Ask your father or Rafil?

12       Al-Timimi:  I do not know if [Rafil] is a member of a

13  tribe or just a city dweller.  I do not know if he has knowledge

14  of any of that.  [My father] he should know but with his advanced

15  age, he tends to forget [things].  However, I should have some of

16  that which is available in [my collection of] books on the tribes

17  of Iraq.

18       Al-Buthe:  Fine.  Fine.  May Allah [God] reward you with

19  good.

20       Al-Timimi:  How is the letter?

21       Al-Buthe:  What letter?

22       Al-Timimi:  The one for the tribes.

23       Al-Buthe:  Allah [God] willing it is ready.

24       Al-Timimi:  Allah [God] willing.

25       Al-Buthe:  If you get [the tribal calls], I will send it

**J.A. 1653**

1508

1   to you tomorrow Allah [God] willing.

2           Al-Timimi:  You do not need to send it to me.

3           Al-Buthe:  Ok fine.

4           Al-Timimi:  If I get occupied with it I already have a

5   lot of things I need to do for you.

6           Al-Buthe:  Ok

7           Al-Timimi:  As you see.  Allah [God] willing.

8           Al-Timimi:  After you have finished everything and you

9   distributed it I will see the final copy.

10          Al-Buthe:  Fine.  Allah [God] willing.

11          Al-Timimi:  The same thing with this article [on the

12  Shuttle].  You don't need to pass it back to me for my review.

13  You are free to do what you wish with it.  Ok Shaikh?

14          Al-Buthe:  Do you want us to publish it your name or the

15  name of anyone else?

16          Al-Timimi:  O Sheikh.  Do what you think that will bring

17  benefit and good.  In reality it doesn't concern me [that it is

18  published in my name.]

19          Al-Buthe:  Do you think there will be a problem if we

20  publish it in your name?

21          Al-Timimi:  I don't think there should be a problem.  I

22  have just dictated it to you over the phone.  I believe they will

23  see it as superstitious or the words of crazy people regarding

24  names and their derivatives [and how these influences events].  Do

25  you see what I mean?

**J.A. 1654**

1509

1       Al-Buthe:  Yes.

2       Al-Timimi:  Ok fine I have no more patience with these

3   people anymore after I heard such bad words last night.  I have

4   reached my end.  May Allah [God] reward you.

5       Al-Buthe:  May Allah [God] reward you.

6       Al-Timimi:  May Allah [God] bless you.  Peace and Allah

7   [God]'s blessings unto you.

8       Al-Buthe:  And unto you peace and Allah [God]'s

9   blessings."

10          (End of tape and transcript.)

11          MR. GIBBS:  And, Judge, that completes the tapes that

12  we'll play during this series.

13          THE COURT:  All right.

14          MR. GIBBS:  Thank you.

15          MR. KROMBERG:  Judge, we're about to call a witness

16  who's going to take some time.

17          THE COURT:  Well, then I think it's a logical time to

18  take the lunch break, and we'll reconvene at 10 of two, Ladies and

19  Gentlemen, all right?  Very good.

20          (Recess from 12:52 p.m., until 1:50 p.m.)

21

22

23

24

25

**Wyman - direct**

1          A F T E R N O O N   S E S S I O N

2                       (Defendant and Jury present.)

3          THE COURT:  All right, Mr. Kromberg, your next witness?

4          MR. KROMBERG:  The government calls Special Agent John

5   Wyman.

6          SPECIAL AGENT JOHN WYMAN, GOVERNMENT'S WITNESS, AFFIRMED

7                       DIRECT EXAMINATION

8   BY MR. KROMBERG:

9   Q.   Special Agent Wyman, please state your full name and spell

10  your last name for the record.

11  A.   My name is John Wyman, W-y-m-a-n.

12  Q.   How are you employed?

13  A.   I'm a special agent with the FBI.

14  Q.   How long have you been a special agent with the FBI?

15  A.   Approximately seven years.

16  Q.   What are your duties with the FBI?

17  A.   I'm assigned to a counterterrorism squad at the Washington

18  Field Office.

19  Q.   Have you been co-case agent with Special Agent Ammerman in

20  the investigation of Yong Kwon, Mahmood Hasan, Masaud Khan, and

21  the other individuals we've heard about so far?

22  A.   I have.

23  Q.   I'd like you to look at Government Exhibit 1J2, which is in

24  evidence.  Do you recognize that person?

25  A.   Yes.   That's Ibrahim Al-Hamdi.

**Wyman - direct**

1  Q.    How did you first meet him?

2  A.    When we were executing a search warrant at his house on

3  February 25, 2003.

4  Q.    Were other searches executed that day at other people's

5  homes?

6  A.    Yes, there were.  One at Mr. Al-Timimi's house and one at the

7  residence of Nabil Gharbieh.

8  Q.    At Mr. Hamdi's house, did you find any weapons?

9  A.    Yes, we did.

10  Q.    Look at Government Exhibit 3A2.  I believe that's in evidence

11  as well.  We actually had the real thing a couple days ago, but is

12  this a picture of what you seized then?

13  A.    Yes.

14  Q.    Did you come to speak with Hamdi?

15        MR. MAC MAHON:  Your Honor, I object to the hearsay of

16  Ibrahim Al-Hamdi.

17        THE COURT:  We're not going to bring Hamdi's statements

18  into this record.

19        MR. KROMBERG:  I know that.  Thank you, Judge.

20        THE COURT:  The question was simply did he speak with

21  him.  The answer would be yes or no, and at that point, it would

22  stop.

23        MR. MAC MAHON:  Thank you.

24  BY MR. KROMBERG:

25  Q.    Did you speak with him?

**Wyman - direct**

1    A.    Yes.

2    Q.    Do you recognize -- take a look at 3H1, which is in evidence.

3    Do you recognize that?

4    A.    Yes, I do.  That's a photocopy of Mr. Al-Hamdi's passport.

5    Q.    After the search was executed on February 25, when next did

6    you see him?

7    A.    When I was returning some property.

8    Q.    And --

9    A.    Approximately a week or two after.

10   Q.    And after that?

11   A.    March 18, when we arrested him.

12   Q.    How often did you speak with him after that time?

13   A.    I spoke with him quite regularly over the next year to a year

14   and a half, maybe a total of somewhere between 10 and 15 --

15   probably 15 times total.

16   Q.    Was he willing to talk to you all throughout that period or

17   just some of the time throughout that period?

18          MR. MAC MAHON:  Your Honor, objection.  There's no

19   relevance.

20          THE COURT:  Why don't we approach the bench before we

21   get too far down this road.

22          (Bench conference on the record.)

23          MR. KROMBERG:  I was going to ask a question about

24   something, Judge.

25          THE COURT:  What's the point?

## Wyman - direct

1      MR. KROMBERG:  The point is Mr. Hamdi's information came
2   in chronologically before Mr. Kwon was spoken to in Hawaii and
3   before Caliph Abdur-Raheem and Hammad was spoken to, and when
4   Caliph was spoken to, I expect Agent Wyman to testify that the
5   subject of the September 6 meeting was not even -- that he did not
6   ask him about it, that there was no discussion about, and I would
7   ask him, "Why?"

8           "Well, I didn't know about it at the time."

9           "Well, then why did you come back later and ask Hammad
10  about it?"

11          "Because I learned about it the first time from Yong
12  Kwon."

13      THE COURT:  I don't think this is adding anything but
14  confusion to the record, and I think it could bump into problems
15  with inadmissible hearsay from people who are not here outside the
16  scope of the dinner, so you need to move on to something else, all
17  right?

18      MR. KROMBERG:  Yes, Judge.  I will not ask him what
19  anyone said.

20      THE COURT:  I don't think this is adding anything to the
21  case.  It's adding a degree of complexity and confusion.  I don't
22  think it's going to help.  I think it's going to muddy up the
23  parties.  I don't see how it's probative of the issue.

24      MR. KROMBERG:  Your Honor, the next thing we're going to
25  do is to play the tapes between Hammad and Royer where Royer and

## Wyman - direct

1    Hammad talked about how Caliph cracked, and I want to set the time
2    for when Agent Wyman spoke to Caliph, when he spoke to Hammad,
3    when he spoke to all these people, so we can play the tapes so
4    there will be some context for these tapes.  I'm not going to ask
5    Agent Wyman about what any of these people said, just to set the
6    time.

7              MR. MAC MAHON:  I object to the way this is going on.
8    The jury is going to be left to wonder what happened with all
9    these investigations and who did what.  It's just asking him to
10   speculate on the facts of this case, Your Honor.  I don't think
11   they should be able to even open the door, "Who did you talk to
12   next?"  The question is, "What happened at these dinners?"

13             THE COURT:  No, I think the critical and the only
14   important facts would be the date when Caliph was interviewed, and
15   that does give context to the conversation about cracking, all
16   right?  But I don't think Al-Hamdi adds anything to it.

17             MR. KROMBERG:  There was a reference in the tapes, Your
18   Honor, to Ibrahim has already been arrested, and Royer was talking
19   about it.

20             THE COURT:  But then the proper thing would be just to
21   have asked what day was Al-Hamdi arrested.

22             MR. MAC MAHON:  And he already asked him that, Your
23   Honor.

24             THE COURT:  But not to suggest that there might have
25   been some nefarious reason why these people stopped cooperating.

**Wyman - direct**

1   That gets problematic, and that's why I called you up here.

2           So let's just get right to the specific question, date

3   of arrest or date of interview, and that's it.

4           MR. KROMBERG:   Thank you.

5           MR. MAC MAHON:   Thank you, Your Honor.

6           (End of bench conference.)

7   BY MR. KROMBERG:

8   Q.   Would you look at, please, Government Exhibit 1J1, which is

9   in evidence?  Do you recognize him?

10  A.   Yes, I do.

11  Q.   That is?

12  A.   Randall Todd Royer, or also known as Ismail Royer.

13  Q.   When did you meet him?

14  A.   I met him when we served -- first time was when we served him

15  a federal grand jury subpoena.  I believe that was on March 20 --

16  Q.   Okay.

17  A.   -- 2003.

18  Q.   Did you speak with him on that date?  And if you could just

19  answer with a "yes" or a "no" on that?

20  A.   Yes.

21  Q.   Take a look at Government Exhibit 1J5, please.

22  A.   I see it.

23  Q.   Do you recognize him?

24  A.   Yes.  Hammad Abdur-Raheem.

25  Q.   When did you meet him?

**Wyman - direct**

1   A.   I met him on -- the first time was on March 24, 2003.

2   Q.   Where did you meet him?

3   A.   At his apartment.

4   Q.   In the course of an interview?

5   A.   Yes, we had an interview.

6   Q.   Who was with you on that interview?

7   A.   Agent Randolph Scott, also from the Washington Field Office.

8   Q.   Where was Agent Ammerman at the time?

9   A.   He was in Hawaii.

10  Q.   Without saying what Hammad told you, was the subject of the

11  meeting at Kwon's house the weekend after 9/11 discussed?

12          MR. MAC MAHON:   Your Honor, we just -- objection.

13  There's no other way for him to put it in.

14          THE COURT:   Sustained.

15  BY MR. KROMBERG:

16  Q.   Did you ask Hammad at that meeting about the meeting at

17  Kwon's house?

18          MR. MAC MAHON:   Your Honor, the same objection.

19          THE COURT:   Well, asking a question is not the same

20  thing as trying to elicit an answer.

21          But, Ladies and Gentlemen, the reason I had the parties

22  come up to the bench is again, hearsay evidence is problematic

23  because the person who made the statement isn't available in court

24  for you-all to see and for the other side to cross-examine.

25          There are some exceptions to the hearsay rule.  They are

**Wyman - direct**

1  made for the statements of alleged coconspirators made during the

2  time of the conspiracy, but we're at a time frame now that is

3  outside the scope of the conspiracy, and so any statements that

4  these people may have made to the agents doesn't come in unless

5  the witness is here in court to be cross-examined, and I don't

6  want you to draw any inferences whatsoever about what those

7  statements might be.  That's not relevant to your consideration.

8           All right.  Now --

9           MR. KROMBERG:  Thank you, Judge.

10          THE COURT:  -- let's go right on what I said in the

11  bench conference, right to it.

12  BY MR. KROMBERG:

13  Q.   Did you ask him about the meeting that occurred at Kwon's

14  house the weekend after September 11?

15  A.   Not on that first interview, no.

16  Q.   Well, why not?

17          MR. MAC MAHON:  Your Honor, now we're -- he's going to

18  ask him when the guy was arrested, and we're just trying to ask

19  the same question we just talked about at the bench.

20          THE COURT:  I thought the only thing we were going to do

21  was you were going to ask when these people were either arrested

22  or first interviewed.  I think we need to move this along,

23  Mr. Kromberg.

24          MR. KROMBERG:  All right.

25          THE COURT:  Sustained.

**Wyman - direct**

1    MR. KROMBERG:  1J6, if you'd put it up?

2  Q.   Do you recognize him?

3  A.   Yes, Caliph Basha Abdur-Raheem.

4  Q.   When did you first meet him?

5  A.   The night of March 24.

6  Q.   How did that come about?

7  A.   Went to his apartment for an interview.

8  Q.   In the course of the interview, did he show you any documents

9  regarding ownership of an AK-47-style rifle?

10  A.   Yes.  He showed a bill of sale.

11  Q.   And did he show you any firearms?

12  A.   Yes, he did.  He showed us an AK-47-style rifle.

13  Q.   Look at, if you would, Government Exhibit 6A2.

14    Actually, this is -- the real thing should be somewhere

15  else.  We had it earlier in the courtroom, but this is just a

16  photograph.  Is that a photograph of 6A2 -- of the rifle that you

17  got from Caliph Basha on March 24, 2003?

18  A.   It appears to be a photograph of it, but my initials will

19  probably appear on the actual weapon, so this looks like it.

20  Q.   Okay.  Is that the rifle that matched up to the receipt that

21  he gave you?

22  A.   No, it's not.  That was -- the receipt or the bill of sale

23  was for a rifle that he owned prior to the one that -- previously

24  to the one that he provided us during the interview.

25  Q.   Okay.  Did you ever speak to Caliph again?

1519

**Wyman - direct**

1   A.   No.

2   Q.   Did there come a time when you executed a search warrant at

3   Royer's house?

4   A.   Yes.

5   Q.   When was that?

6   A.   March 26, 2003.

7          MR. KROMBERG:   Your Honor, at this time, I'd like to

8   play Government Exhibit 1 -- excuse me, Government Exhibit 1G3.

9   The transcript is 1G3a.

10         THE COURT:   Any objection?

11         MR. KROMBERG:   Your Honor, this is the first tape where

12  there's nobody on this call that's been called as a witness in

13  this case, and it would be hearsay and in violation of Crawford

14  for the government to play at this point in time.   Mr. Kwon was

15  there for the talking to in the other ones.

16         THE COURT:   Let me see the transcript for this.

17         MR. KROMBERG:   It will be 1G3a, Judge.

18         THE COURT:   Just a second.

19         Again, counsel, approach the bench.

20         (Bench conference on the record.)

21         THE COURT:   All right, do you want to speak to the

22  objection?

23         MR. KROMBERG:   These are coconspirator statements.

24  Hammad and Royer are talking about how they're going to respond to

25  the investigation, and when we -- I mean, Mr. MacMahon has already

**J.A. 1665**

## Wyman - direct

1  said to the jury that when Royer said to Kwon, "And I said nothing
2  about Afghanistan, right?," that's part of the cover-up.

3          This shows it's part of the cover-up. Royer and Hammad
4  are talking about how, about how they're going to respond. Hammad
5  says, "Hey, Caliph cracked," and they talk about how they've got
6  to stop Caliph from talking to the government anymore, and Hammad
7  tells Royer, "I know what to say," and Royer says, "No, you
8  shouldn't be talking to him."

9          MR. MAC MAHON: Your Honor, this doesn't say anything
10 along that -- part of the problem with these things is none of
11 these people are witnesses for the government to come forward.
12 The conspiracy is long over even by the standards that they put in
13 by the indictment. This doesn't explain the conspiracy or
14 anything else. "Caliph cracked." He was acquitted by this Court.

15         MR. KROMBERG: Your Honor, if I may add, the conspiracy
16 is charged up to May 2003. This occurred in March 2003. Despite
17 what Mr. MacMahon says, it's within the indictment.

18         And we're going to play a call where Hammad and Royer
19 called Timimi after they speak with each other.

20         THE COURT: It is May 2003.

21         MR. MAC MAHON: I thought they had it --

22         THE COURT: All right. So I was wrong on that, too.

23         MR. MAC MAHON: Excuse me, I'm sorry.

24         THE COURT: All right. I'm going to let it in. You
25 also have to a certain degree, this is somewhat overlap because in

# Wyman - direct

1  the Khan-Royer conversation, there's talk about Caliph cracking.

2  Some of this is repetitive. We have already got some of it. This

3  is a little bit more. I'm going to allow it in.

4          MR. KROMBERG: Thank you, Your Honor.

5          THE COURT: It's within the scope of this case.

6          (End of bench conference.)

7          MR. KROMBERG: Your Honor, I'd like to pass to the

8  witness a copy of the 1G3a.

9          THE COURT: The conspiracy is alleged in this case to

10 have gone through May of 2003, and so these statements are within

11 the scope of the conspiracy, and the tape can be played. 1G3 and

12 1G3a are in evidence.

13          (Government's Exhibit Nos. 1G3 and 1G3a were received in

14 evidence.)

15          (Government's Exhibit No. 1G3 was played, Government's

16 Exhibit No. 1G3a was copied verbatim into the record as follows:)

17          "HAMMAD: Asalamalakum.

18          ROYER: Malakum Salem. How are you doin' brother?

19          HAMMAD: Oh, man. A little stressed out. That's about

20 it.

21          ROYER: You are, yeah, I'm, I'm a little stressed but

22 not, but not that stressed actually.

23          HAMMAD: I mean ... did you have any warning that they

24 were going to come search your house?

25          ROYER: Well, you know, inaudible, that's funny because

# Wyman - direct

1 last night, umm.  Well, are you going to be at the masjid, you

2 think?

3        HAMMAD:  Yeah, I'm still stuck in traffic, man.  But

4 even if you go there and just wait, there.  Hopefully I'll be

5 there, in shalla.

6        ROYER:  OK.  Umm, let's see.  What do they pray at

7 eight, right?

8        HAMMAD:  8 o'clock, yeah.

9        ROYER:  8 o'clock.  Ummm.  (Royer then talks to Mirsada

10 in his home.)  No, I can walk.

11        MIRSADA:  You're not gonna walk.

12        ROYER:  I can walk.  It's just right up the street.

13        MIRSADA:  You can't walk.

14        ROYER:  It's right up the street.

15        MIRSADA:  You can't walk, it's raining outside (more

16 chatter in the background)

17        ROYER:  Oh, sorry.  Umm.  You there?

18        HAMMAD:  Yeah, I'm here, man.

19        ROYER:  OK.  Umm ... well, ah.  So, how long did they

20 talk to you for?

21        HAMMAD:  Two and a half hours

22        ROYER:  Oooooh.  Without a lawyer?

23        HAMMAD:  Yeah.

24        ROYER:  Oh, bro.  You screwed up.

25        HAMMAD:  Well, Well, not really man.  I ... I know what

### Wyman - direct

1   to say and what now to say.  So ...

2          ROYER:  I know, but this is what everyone thinks.  This

3   is what I thought.  This is what everyone thinks.  But really ...

4   they're just trying to connect ahh you know what I'm saying,

5   everything.  They're trying to make connections where they don't

6   exist.  They're trying to ... you know what I'm saying?

7          HAMMAD:  They ... they asked me about particular

8   brothers a lot.

9          ROYER:  Oh really?  Me?

10          HAMMAD:  Ah ... Yeah, but I ... they asked me about you,

11   Ali Timimi...

12          ROYER:  Yeah.

13          HAMMAD:  Um ... Ibrahim ...

14          ROYER:  Yeah.

15          HAMMAD:  Uh, you know.

16          ROYER:  Well, uh, here's the thing.  On the search,

17   uh, ... on the search warrant it says, it lists the people.  It

18   lists the people they're interested in.  I don't know if it's all

19   the people they're interested in, but they list some of the people

20   they are interested in.  Which is me, not that's there's any

21   evidence of furtherance of a conspiracy between Royer, Hamdi,

22   Garbia -- ah, Nabil um Ali Timimi..., and uh, that's, if I

23   remember, that's all ... and Yong.  That's all.  Yong Kwon.

24          HAMMAD:  (Unintelligible) My name wasn't on there?

25          ROYER:  No.  Your name wasn't on there.

**Wyman - direct**

1     HAMMAD:  Aaahhh.  That could have fooled me.  The way
2  there were talking to me, man, um ...

3     ROYER:  (Laughs) well ...

4     HAMMAD:  they told me, they told me they're trying to
5  determine what part I play.

6     ROYER:  In what?

7     HAMMAD:  I don't know, that they, ... Some fantasy stuff
8  whatever they make up.  Even what, why ... what are they bothering
9  you for?

10    ROYER:  Well, I have no idea, no idea.  I mean, you
11 know, the fact that I know Ali Timimi. The fact that I know Yong
12 Kwon.  The fact that I know these people.  Maybe ...

13    HAMMAD:  Yeah, but I know them, too.

14    ROYER:  Exactly.  Yeah.

15    HAMMAD:  But I got bad news for you.  One of our
16 brothers cracked man.

17    ROYER:  Oh?  For real?  Who?

18    HAMMAD:  Kaliph.

19    ROYER:  Who's that?

20    HAMMAD:  Kalipha.

21    ROYER:  Oh, Kalipha!  Oh, cracked?  For what?  What do
22 you mean?

23    HAMMAD:  They went to question him and he uh was so
24 nervous he said some things, man, that you know.

25    ROYER:  Oh.  Crazy.  Oh, hell.  Anyway.  Doesn't matter

**Wyman - direct**

1  to me. (Inaudible-Arabic)  You have to trust Allah, and you know.

2  I don't know.  Look, let's, uh ... yeah, let's, let's, let's meet,

3  in shalla, at the masjid if you can.  Do you think you are going

4  to be able to make it, in shallah, because ...

5          HAMMAD:  Let's see where I am right now.  Let's see,

6  I'm, uh ...

7          ROYER:   I can ... (audio interference in telephone

8  line)  Actually, I can wait there.  Hello?

9          HAMMAD:  Yeah.

10          ROYER:  Yeah I think it's the ... the FBI's bugs are

11  shorting out.  (Laughs)

12          HAMMAD:  Oh, Well, they told ... Our phones are bugged.

13  You know that? So, ...

14          ROYER:  Well, um, try, try to meet me if you can, in

15  shalla, at the or uh.  Try to meet me, in shalla, if you can at

16  the masjid. If not, I'll hang out there later or something, you

17  understand? I'll try to hang out until 9, something like that.

18          HAMMAD:  Okay, Okay.

19          ROYER:  You think you'll be able to get there before 9?

20          HAMMAD:  Yeah, In shalla.

21          ROYER:  Okay Brother.

22          HAMMAD:  Siakam.

23          ROYER:  Siakam."

24          (End of tape and transcript.)

25          MR. KROMBERG:  Thank you.

## Wyman - direct

1  Q.  Now, Special Agent Wyman, after that phone call on the 26th,

2  when did you next speak with Hammad Abdur-Raheem?

3  A.  It would be April 5, when I served him with a grand jury

4  subpoena.

5  Q.  Was there a time before that when he gave you his rifle and a

6  receipt for the rifle?

7  A.  Yes.  That would have been March 26.

8  Q.  26th?

9  A.  Sorry, 28th, rather.

10  Q.  Please look at Government Exhibit 5A1, and I think we have a

11  picture of that.  We had the actual firearm here last week.  Does

12  that look like the firearm that Hammad turned over to you on the

13  28th?

14  A.  Yes, it does.

15  Q.  Okay.  And look at 5C1.  Do you recognize that?

16  A.  Yes.  That's a receipt he also gave us during that same

17  interview for his purchase of that rifle.

18  Q.  Okay.  Okay.  April 1, did you say that was the next time you

19  speak with Hammad?

20  A.  Correct.

21          MR. KROMBERG:  All right.  Before we get to that, I'd

22  like to play Government Exhibit 1G11, a phone call between Royer

23  and Hammad Abdur-Raheem on March 30.  The last one we listened to

24  was March 26.  This one is March 30, 1G11.

25          I'd like to pass out --

**Wyman - direct**

1       THE COURT:  Any objection?

2       MR. MAC MAHON:  Same one as before.

3       THE COURT:  All right, same ruling as before.  They're

4  both in.

5       (Government's Exhibit Nos. 1G11 and 1G11a were received

6  in evidence.)

7       THE COURT:  Mr. Wood, start at this end of the jury box

8  this time.  You folks are always at the end.  I don't want you to

9  feel left out.

10       (Government's Exhibit No. 1G11 was played, Government's

11  Exhibit No. 1G11a was copied verbatim into the record as follows:)

12       "MIRSADA:  Hello?  Hello?

13       HAR:  Asalamalakum.  May I speak with Ismail?

14       MIRSADA:  One second.

15       RR:  Hello.

16       HAR:  Asalamalakum brother.

17       RR:  Malakum Salem.

18       HAR:  Ahh, did you talk to Ashraf about that question?

19       RR:  Uhh, oh yeah, I did talk to Ashraf, but I didn't

20  talk to him about that question...

21       HAR:  Oh wow man

22       RR:  Why what's happening?

23       HAR:  No, I need to know, so then I know...

24       RR:  Oh, yeah, yeah, yeah...well, um okay, I am gonna

25  see Ashraf tomorrow because, uh I gotta go, you know, I have this

# Wyman - direct

1  thing, on the second, which is Tuesday, I believe, what's today?

2  Today should be the 30th.

3          HAR:   Today is Sunday the 30th, yeah.

4          RR:   30th.  And there are 30 days in March?

5          HAR:   Yeah.

6          RR:   30, yeah, so um, yeah tomorrow, um Tuesday, is this

7  thing and Ashraf is gonna talk to me on Monday, so...

8          HAR:   What's going on Tuesday for you?

9          RR:   Oh man, I have a Grand Jury. I got subpoenaed

10 before a Grand Jury here in Virginia.

11         HAR:   For what?

12         RR:   Um, well, it says, regarding John Doe, such and,

13 you know uh, John Doe, then there is a code number next to his

14 name.  But I assume that Joe Doe is is Sheik Ali, you know

15 actually.  That's that's my assumption, you know?

16         HAR:   So, they got you as a witness or someone else...

17         RR:   That's right, me as a witness, yeah, exactly.

18         HAR:   Okay

19         RR:   You know, so the outcome of that is going to a

20 little bit, you know...(laughter).

21         HAR:   So that means he is going to be there too huh?

22         RR:   No, no, no, no, no, no, uh it's a Grand Jury, which

23 is like, its not like uh, its not like a court, you know what I

24 mean..., it's a Grand Jury investigates, it's it's a, an

25 investigative, sort of body, of the Justice Department, and, yeah,

## Wyman - direct

1　and the way...Essentially what they do is gather together, 16 to
2　23, um, citizens, just like from a jury pool, exactly like that,
3　you know, exactly like in something else, but then they um, and
4　then they ah, use the Grand Jury to, indict, to subpoena, but
5　essentially, they they just, they just act as the, as like a
6　rubber stamp for the, for the prosecutor, for the Justice
7　Department and so they will say like, for example, we need, uh,
8　you know, the prosecutor will say to the Grand Jury, we need to
9　subpoena Ismail Royer, you know, and he'll say and for this and
10　this and this reason, and he'll ask them to agree to that, but
11　they always agree you know and he'll just go and, and the same
12　with indictments they're the ones who um, um issue indictments, in
13　Federal Crimes, in a Federal...so it would be like, uh, here's
14　evidence and, you know, so what, I am asking to you issue this
15　indictment, which they do...very rarely do Grand Jurys act
16　independently, when it happens it it enrages the heck out of the
17　government, but typically they just are rubber stamps, so, so
18　anyway, they, what it really is in fact, is that the um
19　prosecutor wants me to come, before him, and I have...and it is
20　under oath, also, so, is the thing, and you have to answer, every
21　single, it's exactly like uh you you are testifying, you are
22　under, under oath like you are testifying, you you you are in a
23　box or something or or whatever, and you just sit there and you
24　answer questions, and you answer either, obviously truthfully or
25　you plead the Fifth, uh...

# Wyman - direct

1    HAR:  So you can, you, but, but the Fifth is only to
2  protect yourself, man.

3    RR:  Well it is, but um, but uh, but, you know, I mean,
4  in this situation, see that is what happened to me in St. Louis,
5  because, you know, cause the thing was I was answering, questions,
6  first of all, luckily, hamdula, I had nothing to say you know,
7  bad, or I didn't know anything, but, so I just, I didn't plead the
8  Fifth to anything, I just told them cause there was nothing bad
9  for me to say.  But in this situation, you know what I am saying,
10  and looking at what there, you know, looking at there you know,
11  the garbage basically that they are cobbling together to make look
12  bad...

13    HAR:  That's, that's...

14    RR:  Essentially, essentially anything I say is going to
15  be against me, so you know what I am saying, so Ashraf, as I told
16  you, you know, advised me of my options and, you know I mean, one
17  of them is to plead the Fifth basically to everything, except for
18  questions that are totally innocuous, like what's your name, you
19  know? Because the the thing is that they are intent, on putting
20  together, obviously they are intent on putting together some kind
21  of garbage together, linking up a bunch of stuff that is not
22  illegal to put it in a bad worse possible light, so um, any kind
23  of assistance I give them, in this, regardless, regardless of who
24  it is is going to hurt me, so, I have no incentive whatsoever to
25  answer anything actually.

# Wyman - direct

1           HAR:  Yeah, and let me ask.  Someone had told me that

2  you called the FBI and told them something.

3           RR:  No, I didn't call them up and tell them anything.

4           HAR:  You never called the FBI.

5           RR:  I mean no, actually...

6           HAR:  Wow, that's...okay, this brother had told me that

7  you had called them directly and just told them, you know,

8  something....that was nothing bad, or anything...

9           RR:  Uhhh, uh, no, uh ah, I mean, for the past maybe

10  like two months, I've been just...the only time, the last like

11  voluntary contact I had with these people, and not even voluntary,

12  but I mean in other words without my lawyer, was this St. Louis

13  situation, and that was regarding those brothers, you know in St.

14  Louis, you know, that I haven't seen for seven years, so since

15  then, I have been telling them, every time that they, you know,

16  call me, ah talk to my lawyer, talk to my lawyer, talk to my

17  lawyer.

18           HAR:  And don't they threaten you by saying something?

19           RR:  They said, um, no the, the most they ever said was

20  about this thing about, okay, like, here's, here's their thing,

21  well you can't have Ashraf there because you know, okay, uh

22  because, uh, you know, uh, we want to hear your side of the story,

23  you know and it is going to help you, if we hear your side of the

24  story, but we um, but you, but uh, we can't have Ashraf there,

25  because it is going to prevent us from asking our questions that

# Wyman - direct

1  we want to ask and that's just gonna harm you, you know what I am

2  saying and that sort of thing, in other words, just keep on, in

3  other words, what they are telling me is I should talk to them

4  without a lawyer, you know...

5        HAR:  Right

6        RR:  Um, cause they probably know I am not going to get

7  another lawyer, I I I don't have the funds for that, so,

8  essentially, you know, I have just been telling them, you know, I

9  just told them that Ashraf is my lawyer...I have, I haven't talked

10  to them at all, you know, voluntarily, except for that, you know

11  what I am saying...

12        HAR:  Damn, that means, uh, man I am glad I checked with

13  you, cause some brother said that you had called them and told

14  them something, nothing bad, nothing...

15        RR:  No

16        HAR:  No laws were broken.

17        RR:  No

18        HAR:  But I thought...When he told me that you did that,

19  I though it was smart, that you told them directly, so...

20        RR:  No, ev- even if that was like a smart thing to do,

21  and, and in, in some certain circumstances it might be smart, you

22  know what I'm saying, but, it is not smart to do that without a

23  lawyer cause you don't, you know what I am saying, you don't know,

24  you don't know what you are doing, you don't know what what things

25  can be misconstrued, which things can be taken out of context,

# Wyman - direct

1 whatnot, so um, yeah, so, in any case, you know, I just, uh, no,
2 but anyway, I have heard a lot of other weird things, like
3 someone came up to me and they said at the Masjid oh brother
4 Ismail, I said, yeah, they said, I heard you were in a federal
5 prison in um, in Kansas and we were organizing a road trip to go
6 and visit you. (Laughter) We were just trying to figure out
7 which prison it was. I was like, oh boy, so so things kinda get,
8 you know, get twisted, in the translation...

9          HAR: They, they, they, came to my house again.

10         RR: Oh, they did.

11         HAR: Yes

12         RR: What'd they say?

13         HAR: I told them I ain't speaking without a lawyer.

14         RR: Yeah, very good...

15         HAR: Then they said, okay, but we got you for
16 obstruction of justice, they said, that you talked to everybody,
17 you talked to him and we have proof.

18         RR: Well...whatever. Call Ashraf, let me give you his
19 number. Call him.

20         HAR: No, no, I can't because um, um, that's how I have
21 been trying to tell guys, I told like three people call him and
22 ask him and no one has done it. They don't, think that I really
23 need this information.

24         RR: Well, I don't know, I I apologize for that, but I
25 just haven't gotten a chance to talk to him, you know, I just

## Wyman - direct

1 haven't had a chance to talk to him since then, umm, I'll ask him
2 tomorrow. I have to, I have to talk to him tomorrow you know, I
3 have to, because otherwise I am screwed, that April 2nd thing, you
4 know, about the Tuesday thing, so, uh, you know, uh, but uh, also,
5 uh, just you know, take his number, you know, I mean I told him
6 that you are trying to get a hold of him, you know.

7       HAR: Yeah and someone else told him that, and, and, he
8 was kinda seemed annoyed cause he goes, everyone is trying to get
9 in touch with me.

10       RR: Yeah, but he's, he's, he's annoyed, but he does it.
11 You know what I am saying. I mean he's annoyed that he is helping
12 me but he is helping me, you know, I mean, you know.

13       HAR: Ah, they tried to talk to Caliph again, they went
14 up to his job.

15       RR: Oh yeah.

16       HAR: I think they are trying to get him fired from his
17 job or something.

18       RR: Oh yeah, this is their tactic exactly right,
19 they'll just you know, barge in at your job and stuff, you know,
20 take the number brother.

21       HAR: Um, man, I'll get it later, I I I don't have
22 anything handy to write it down.

23       RR: Okay,

24       HAR: What's up with Ismail, uh, I mean Ibrahim?

25       RR: Man, I don't know, his brother, I talked to his

**Wyman - direct**

1  brother a few days ago, and he said that he is still in jail, he

2  expects him to get out in a week, but...

3          HAR:  Oh, that's a joke.

4          RR:  Yeah, I mean...

5          HAR:  Hopefully he didn't fall for that.

6          RR:  I don't know man, I don't know what he what he

7  expects, what he thinks, whatever, but, you know...I guess that

8  he knows, that he thinks he might get out on bond.

9          RR to MIRSADA:  That's fine sure.  Do you want me to go

10  in the other room?

11          MIRSADA:  Yeah

12          RR:  Okay.  We going to eat? Okay, we're gonna eat.  Ok,

13  um....oh wow.  I got some tacos here [UI].  You know, the thing

14  is, I would not, you know, I wouldn't believe, really anything,

15  you know what I am saying, I mean even if they charge you with

16  something, hold a minute,...

17          HAR:  Yeah, but I don't, I didn't, I didn't...um

18          RR:  ...do anything.

19          HAR:  Do anything, so that's why when you said that,

20  wh-, wh-, wh-, what are you talking about, cause, so I think that

21  they just um...

22          RR:  See brother, this is why you should have had

23  Ashraf's lawyer, uh, number at the time, say, if they had come

24  to you say look, don't say a word to me, talk to my lawyer, don't

25  say a word to me, talk to my lawyer.

**Wyman - direct**

1      HAR:  Oh, yeah but we are going to get you on

2   obstruction of justice.

3      RR:  Say, I don't care what you, tell this to my lawyer,

4   if you have something to charge me with, you know what I am

5   saying, then charge me and talk to my lawyer, if you don't have

6   anything then, you know, leave me alone.  Go talk to my lawyer and

7   I mean, the, every time in the past, when I have said, talk to my

8   lawyer, and I I stupidly only started doing this recently, they

9   never, even followed up, you know, I mean, they can only, they

10  can only put their psychological, play their psychological games

11  with you if thier, if you listen to them and you are willing to

12  talk to them and stuff, which is a total mistake.  I mean I

13  realized that from the very beginning.  I even, every place I

14  worked, you know, I have given out, you know, you know, I have

15  given out the advice of don't talk to the the FBI without a

16  lawyer, and I stupidly didn't follow it, you know what I am saying

17  and I realized only too late how incredibly stupid it was not to

18  follow that advice...

19      HAR:  See the reason that I talked to them is because I

20  didn't do anything.

21      RR:  Yeah, but, but exactly...

22      HAR:  But the thing is, they are not looking for the

23  truth they just looking for anything that that they can twist and

24  make it look guilty.

25      RR:  Brother, what they are trying to do they are trying

# Wyman - direct

1   to say is exactly this, oh, we got you on obstruction of justice,
2   oh you know what they did to me?  Listen to this.  They went to my
3   dad and, in St. Louis and they said, because of the the the
4   testimony in the the, in the St. Louis thing, they went to my dad,
5   they went to my dad, well you know Ray, we've been comparing some
6   of the things that your son said to us at the grand jury and some
7   of the things that other people have been saying, and it looks to
8   us like he might have not been telling the truth and you know,
9   that's a federal crime.  You might want to have a talk with him.
10  (Laughter) See what I am saying.  And so of course my Dad
11  instantly calls me up, oh blah, blah, blah, blah, blah, blah.  So
12  its all pressure, it's all pressure, and they are trying to get
13  people to say, obviously, they are trying to get people to say...
14           MIRSADA:  UI...coming over there.
15           RR (to MIRSADA):  Okay sure.
16           RR:  They are trying to get people to say stuff, about,
17  obviously, about Sheik Ali, and possibly about me, you know, I
18  don't if they think I am, see to me I can't quite figure it out
19  yet, I can't quite figure out, if I am someone that they want to
20  indict, or if I am someone that they want to pressure to say
21  something about Sheik Ali, see you I think are someone, that they,
22  they, want, to pressure to say something about me, or Sheik Ali,
23  you know what I a saying, if, if, indeed I am someone that they
24  are trying to indict.
25           HAR:  Yeah, but you, you, but I told them that this, I

# Wyman - direct

1  said, they haven't done anything, it's real funny and he goes,
2  well we know something that you don't, UI.

3        RR:  Well I will tell you what, I'll tell you what, in
4  in 2003, uh Muslims are guilty until proven innocent and so they
5  are going to come out, if if indeed I am someone that they want to
6  indict, they are going to come out with some kind kind of long,
7  you know long, 50 page indictment with a bunch of crap in it you
8  know what I am saying and they are going to make me prove that
9  that's not true, (laughter), essentially.  See what I am saying?
10  And it is going to be all over the papers and it is going to take
11  CAIR down with it, you know, its going to take MAS down with it,
12  and it is gonna, you know what I am saying, and all this stuff,
13  and by the time, which this has happened by the way, by the time I
14  eventually prove that that all this stuff is crap, then they are
15  going, it doesn't matter, cause the damage has been done, you know
16  what I am saying?

17        HAR:  Cause I think my job would even fire me,

18        RR:  Oh yeah

19        HAR:  Cause they were scared, you know?

20        RR:  Right, right, exactly.  This is exactly their
21  tactic, I mean like um, I mean this is what they did for this uh,
22  BIF, Benevolence International, they are like oh they are the, it
23  is crazy, if you read the indictment, it's a front organization
24  for Usama Bin Laden, it's the main organization that's moving
25  money for Usama Bin Laden, the, the, the central core fund-raising

## Wyman - direct

1  front group for Al-Qaeda in the United States, and what did they
2  eventually plead guilty to, what were they eventually convicted
3  of, um, fraud because they sent ah mon-, they, they sent, they
4  bought combat boots for the Bosnian Army instead of, when they
5  said that, when they told donors that their donations were were
6  solely um for um humanitarian charities.  Nothing about Al-Qaeda,
7  nothing about Usama Bin Laden, you know, all this stuff was
8  garbage.  They had... there was nothing to it, you know what I am
9  saying, and they had to drop it all, of course, and the the the
10 group and the brother that was the head of it, ended up pleading
11 guilty to this, you know what I am saying, and that's the only
12 thing they got on him, and I've seen it, this is, this is like the
13 third thing, that I have seen exactly like that.  Another
14 situation in St. Louis, this thing that I, the brothers, this
15 thing that I testified about in St. Louis, I didn't even know, any
16 of this until afterwards by the way, cause, I was I was sitting
17 there and I am thinking man, they got this whole grand jury, and
18 stuff investigating these brothers, they must have done really
19 been in some craziness, you know, but at least I don't know
20 anything about it, you know what I am saying, so I have I have no
21 clue, so then later, I find, you know what I find out that the
22 whole thing, the whole thing, is based on the Iman there, they,
23 they.  They, uh got him with um a gun, and they found a, uh, oh,
24 okay, no this is what it was, he...uh, on after this um, ah,
25 Zacharias Mossoui or whatever was arrested, 'cause the brother was

**Wyman - direct**

```
 1  living in Oklahoma City at the time, and Zacharias Mossoui was
 2  arrested and the brother who was the Iman at the time knew him, so
 3  he got on TV, he, someone interviewed him, do you know Zacharias
 4  Mossoui, he said yeah, I don't think he was guilty, you know,
 5  blah, blah, blah, you know.  So the FBI, saw him say I don't think
 6  he is guilty, they went to his house, they raided his place, they
 7  found a gun, he he he had plead, he had been convicted of bank
 8  robbery like you know 35, 40 years ago or something like this you
 9  know, so then they charged him with a weapons thing, but the whole
10  indictment was all you know terrorism, blah, blah, blah, blah,
11  blah and eventually what happened, he gets out, he's out of jail
12  now, he was in jail for like a week, he uh, he plead guilty to
13  having a firearm when he is not allowed to because he is a
14  convicted felon, you know, he paid a fine, something like that, he
15  is on probation, you know what I am saying?  And, and but the
16  whole thing was like after that happened, there's footage of the
17  mosque in St. Louis, and there were stories about how this was
18  some kind of Al-Qaeda front group, you know what I am saying?
19  It's all crap, it is total, it's I mean, excuse my language, total
20  bull shit, you know and this is exactly the same situation, so in
21  other words, what they are trying to do, is to trump up a bunch of
22  stuff, and they are trying to get people to say things, and they
23  are going to say to you, obstruction of justice, and they are
24  going to say to me, oh you perjured yourself, and you know, and,
25  and what are they are, I mean, I don't know, maybe I said, uh,
```

**Wyman - direct**

1  maybe I I I I was off by a month, when I said something, or maybe

2  it is nothing at all, you know what I am saying, and they are

3  trying to and they are trying, they know that my dad is going to

4  call me up and they think that I am going to flip out and I am

5  going to be, ahh, they are just piling it all on, on top of me, I

6  better, than they are going to sit down with me and they are going

7  to say, don't you know, don't you think that Ali was really trying

8  to do this and this and this, you know, you don't want to go to

9  jail do you?  You are looking at perjury that's five years, you

10 are looking at this, you are looking at that, you know, but in

11 reality, what I am thinking is, you people are morons, you know

12 what I am saying, I am not falling for this, I am not going to say

13 something that's not true, I am not going to testify something

14 that's not true and I am not going to be intimidated by these kind

15 of tactics, you know, so, frankly, that's, that's exactly the way

16 it is, that's exactly the way they are playing their game, and by

17 the time it is all, it is all said and done, and the situation is

18 over and the people have managed to prove themselves that the are

19 not, you know, all this stuff, that they are saying, it doesn't

20 matter because they have moved on to the next target and they have

21 gotten their promotions, and they have stoked fear into the

22 community, made people hate us worse, you know what I'm saying?

23 They have justified their budgets, this is all that it is all

24 about, so.

25          HAR:   That's that's that's what I figured because, you

# Wyman - direct

1  know, they they they...people are saying your your, name a lot,

2  and, I'm...

3          RR:  Bullshit.  Bullshit.

4          HAR:  Of course it is, that's how when, that when I knew

5  okay they were just playing around.

6          RR:  Yeah

7          HAR:  My name?  People hardly knew my name.  They knew

8  my    face, but hardly knew my name.

9          RR:  Yeah

10          HAR:  Okay, he's...they are playing around, okay no

11  problem.

12          RR:  You know why this, this is another thing, this is

13  what they said to me by the way, people are saying your name.

14  People are saying my name 'cause you are going around saying my

15  name, that's what it is..

16          HAR:  An, an and they told Caliph the same thing, he was

17  laughing about it, they go, yeah, so it's a game, but I caught one

18  of them in a straight lie.

19          RR:  Oh yeah, they're liars.

20          HAR:  I caught him in a lie.

21          RR:  Oh good, what did he say?

22          HAR:  Oh he told me, first he tried to trick me.  He go,

23  do you...

24          RR:  Well, look brother, first off by the way, I don't

25  want to give them any kind of ammunition to say something, I am

## Wyman - direct

1  not a lawyer, I don't know, if what they are saying is true or
2  whatever, so let's not get into, insh'Allah, I'll call Ashraf and
3  ask him this this question for you, you know what I am saying, on
4  on Monday, and you call him too, you know what I am saying, but I
5  will call him tomorrow and ask him, you know what I am saying, so
6  I am just, I am seriously not worried whatsoever I mean the the
7  very very last thing that really concerns me, the very last thing
8  that concerns me is that I go to jail, you know what I am saying,
9  cause I know I did nothing wrong, if I go to jail and I did
10  something wrong and all this then I am going to feel bad, you know
11  what I am saying, I did nothing wrong, you know? Nothing wrong,
12  and you know...

13          HAR: That's what I told them

14          RR:  ...that.  I know that, all of us know that, every
15  one knows that, that I did nothing wrong, you did nothing wrong,
16  none of us brothers, did anything wrong, did anything illegal. And
17  they are going to have to come, you are going to see the
18  indictments, and the indictments are going to be, you know what I
19  am saying, just total total, I mean, crap, you know and it is
20  going to be obvious to everyone, so...

21          HAR:  They are going to say, Al-Qaeda cell, I mean they
22  are just going to exaggerate.

23          RR:  Yeah, exactly, I could write, I could write the
24  press release for them, I could call up Ashcroft, you know,
25  tomorrow, and I can say, you know, I'm in the public relations

**Wyman - direct**

1  business, and I can write this press release, for you, I could
2  write, I could write, I could write your statement for you, you
3  know, I could do it, cause I know exactly what they're gonna say,
4  I know exactly what they're gonna do, and exactly what kind of
5  picture they are going to try to paint.  And I'd be holding up
6  these pictures of you know what I am saying, the brothers and
7  paint ball, I'd be look, they're training, and blah, blah, blah
8  you know and it would be really scary and they will jack up the,
9  uh, maybe they will even, they will jack up the the the terrorism
10  threat level and say maybe there is going to be retaliation
11  because we busted this cell (laughter) you know what I am saying?
12  I could do it for them. I could do it for them, you know. They
13  should hire me as a matter of fact, I don't know maybe I will give
14  them that option (UI).

15          ·    HAR:  I I, it just dawned on me that this is a bunch of
16  bull crap..

17          RR:  It is...it is, it's you know why?  It's because,
18  we're Muslims, it's because we're Muslims.

19          HAR:  Oh brother, I have no doubt about that, okay if
20  anyone doubt that they are a fool.

21          RR:  If we were Jews in Brooklyn raising money for
22  Khana-ki (p) and these terrorist Jewish organizations, they
23  wouldn't be touching us, they wouldn't be concerned whatsoever.

24          HAR:  The proof of that is, you look, you have militia
25  groups in America, with their own website, shooting real guns and

1545

**Wyman - direct**

1  no one touches them.

2          RR:  I know, running around in camo, and talking about

3  how you know, if the government takes away their guns they are

4  gonna you know, do this....

5          HAR:  But the government, the goverment  better not come

6  here or...

7          RR:  Yeah, yeah

8          HAR:  And then nothing happens, it is all because of

9  we're Muslims..

10         RR:  I know

11         HAR:  ...so so we got to remember that when we deal

12  them.

13         RR:  Right, exactly, oh hey by the way, ah you gotta

14  check this out, if you get on the Internet at some point, go to,

15  ah I did this radio interview a couple days ago with this guy

16  in...

17         HAR:  I got rid of my e-mail, my, my, computer.

18         RR:  Oh okay, yeah well

19         HAR:  Cause cause what they do, they don't, remember

20  they  aren't looking for the truth...

21         RR:  Yeah, yeah, yeah

22         HAR:  They are going to say, oh, we found this website

23  that you went to, two years ago, so maybe you're linked.

24         RR:  Oh did you see what they did with Sami Omar, the,

25  the, who was IANA's webmaster? They said and he had thousands of

**J.A. 1691**

1  pictures of the twin towers on his computer, and uh, you know, if
2  you, if anyone like, you know searched the web, read the news you
3  know for a few weeks straight on the Internet they would have
4  like, have these, bazillion of photos in their in their cache, on
5  the computer, you know what I am saying?

6            HAR:  Oh course

7            RR:  You know, so, it is like, you had a bazillion, like
8  thousands, of you know, pictures like, c'mon, you know, golly,
9  which sounds, which sounds, to some little old lady in, uh, you
10 know in Peoria it sounds scary, but to anyone who actually knows
11 you know what I am saying, uh, how these things, uh how computers
12 work, and what not, then it is garbage.  You know, anyway...

13           HAR:  But, but even this guy Wyman, the one that's doing
14 this...

15           RR:  Yeah

16           HAR:  I just just punched his name up in the computer,
17           RR:  Yeah

18           HAR:  Come to find out that he had tried to bust some
19 other brothers and it was thrown out of court.

20           RR:  Oh really?

21           HAR:  And then, even my friend, that he, he, told me
22 yeah it was so sad that he got taken advantage of, I come to find
23 out that he was the very Agent that got him in jail for 9 months
24 when he was innocent and he knew this man was innocent.  So he is
25 a straight...

**Wyman - direct**

1              RR:  Yup, yup, so...

2              HAR:  ...straight liar man,

3              RR:  Well

4              HAR:  Just a straight liar man.

5              RR:  Well yeah, I mean, uh, there are, you know there

6    are still some good judges out there, so maybe you know, if all

7    this...

8              HAR:  That's the only thing that can help us.

9              RR:  Exactly, there are still some decent judges...

10             HAR:  Gonna come up with this bull crap okay.

11             RR:  Alright brother stay strong, Insh'Allah, we'll see

12   how this thing turns out, I'll give Ashraf a call, for you

13   Insh'Allah tomorrow, okay bye.

14             HAR:  Siakam.

15             RR:  Salama Alaikum"

16             (End of tape and transcript.)

17             MR. KROMBERG:  That was 1J -- 1G11.  Now we have call

18   1G10, which is a phone call on April 1, 2003, at 11:41 p.m.

19             THE COURT:  Any objection, Mr. MacMahon?

20             MR. MAC MAHON:  I'm trying to see which one this is,

21   Your Honor.  Excuse me.

22             THE COURT:  1G10.

23             MR. MAC MAHON:  It's already in evidence.

24             THE COURT:  It's already in evidence, yes, I'm sorry.

25   And 1G10a will be the transcript.

**Wyman - direct**

1            MR. MAC MAHON:  Thank you.

2            THE COURT:  All right.

3            (Government's Exhibit NO. 1G10 was played, Government's

4    Exhibit No. 1G10a was copied verbatim into the record as follows:)

5            "Ali AL-TIMIMI  AT: Hello?

6            Hammad ABDUR RAHEEM HA:  [In Arabic] Peace be upon you.

7            AT:  [In Arabic] Peace be upon you, too.  Huh?

8            HA:  This Ali?

9            AT:  Yes, who's this?

10           HA:  This Hammad.

11           AT:  Ok. How are you doing brother? [In Arabic] Peace be

12   upon you.

13           HA:  Fine. [In Arabic] Peace be upon you, too. [In

14   English] I'm with Ismail here.  We just wanted to ... I know it's

15   late·but ... we wanted to meet with you, or talk with you.

16           AT:  Well, I am sorry brother, but it's it's quite late

17   for me [in Arabic] I mean, like that, [in English] this time of

18   night [in Arabic] I mean

19           [Hammad and Ismail ROYER [IR] heard in background about

20   what to say next]

21           Ismail ROYER IR:  [In Arabic] Peace be upon you, Sheik

22           AT:  [In Arabic] Peace be upon you, too.

23           IR:  How you doing brother?

24           AT:  [In Arabic] Thank God.  [In English] Who am I

25   speaking with?

**J.A. 1694**

**Wyman - direct**

1           UI:  Well This is Ismail.

2           AT:  Oh, how ya doing, Ismail?

3           IR:  [In Arabic] Thank God.  [In English] Good.  Ah,

4    listen, brother.  We have uh, I have a serious situation that

5    came up.  Tomorrow 9:30 um I have to be somewhere [laughs].  And

6    uh and uh Hammad, likewise, has to be somewhere um six days from

7    uh from now.

8           AT:  Right.

9           IR:  Ah ... So so I'm just wondering if ah you thought

10   there might be any benefit in ... ah in us ah seeing each other.

11   Whatever and I don't know.  If you don't think there's any benefit

12   in that ...but ...but ... I

13          AT:  I mean ... I mean ... I mean I mean I don't know I

14   mean what what what benefit would be for us to to I mean to see

15   each other, you know.  I'm surprised by this call.  I mean

16   [coughs].  You know the ah you know I mean you guys have ah I mean

17   ah, counsels, I imagine, right?

18          IR:  Yes.

19          AT:  Okay, so what did they tell your counsels, tell you

20   ... your counsels tell you to do?

21          IR:  Uhh ...would You like me to tell you what's what

22   I would like to tell you.

23          AT:  No, I mean, I mean your counsels, I mean, obviously

24   gave you advice, right?

25          IR:  Yeah ... to plead the 5th

**Wyman - direct**

1        AT:  Oh

2        IR:  On everything.

3        AT:  Oh, I mean if that's what they told you then,

4  they're the legal things ... See what I'm saying?  [Ismail tries

5  to interrupt as Timimi is speaking]

6        AT:  I have ... I have no ... I'm not a lawyer.  I have

7  no idea.  You know what I'm saying?  I have no idea what what ah

8  you know, what the issue you know what I mean

9        IR:  Yeah ...

10        AT:  The people at CAIR informed me about you, but I

11  have no idea what the issue is regarding you, concerning what,

12  concerning so forth and so forth

13        IR:  Right ... right ... right ... right

14        AT:  So ...  I mean how can I ... you know ... [sighs]

15.        IR:  Well, I don't know [in Arabic] By God, [in English]

16  I just ... ah...ah ... Because obviously there, you know, I mean,

17  I mean, you know I had ah, I had about thirty armed uh agents bust

18  into my house uh last week, pointing ... pointing ...  MP ...

19  MP-5 machine guns at my uh  baby and ah ...you know ... and uh

20  with, with your name and my name as ...as co-conspirators

21  ...[Laughs] ... on a warrant

22        AT:  That's fine, that's fine, that's fine

23        IR:  I know ... exactly ... I mean so ...

24        AT:  So I mean it happened to me about five weeks ago,

25  too. They busted into my house

**Wyman - direct**

1      IR:  I heard I heard ya ... someone ... I heard it

2  through the grape vine but ... Anyway and they they did the same

3  thing to Hammad, and you probably know they did the same thing to

4  a bunch of people.  But in any case, Um ... I guess, essentially

5  the, the message, ah you know, whatever I wanted to say, is just

6  essentially what I what I just told you, what my what my lawyer

7  told me to do, and which is what I'm going to do

8      AT:  Right, but ah, I mean yeah, you know, what I I what

9  I'm trying to say to you brother is that look is first of all, you

10 know, you are a Muslim, you need, you need to turn to [in Arabic]

11 God Almighty,

12     IR:  That's right

13     AT:  [In English] and ask [in Arabic] God Almighty, [in

14 English] you know to help you in your moment of crisis, okay?

15     IR:  Yeah....

16     AT:  Ah, second of all, you know what I'm saying ... I

17 mean ... I I don't believe ... uh ... from ... what, uh I mean

18 ...we're not we weren't like, you know ... best of friends and so

19 forth, but from what I know of you and other brothers, I don't

20 think anybody has ... did anything which is

21         [Ismail interrupts]

22     IR:  Exactly, right.  Exactly, right.

23     AT:  ...Illegal.  Okay ... So but, but there's a certain

24 climate that exists in the United States where in which where in

25 which people are ... ah ... you know, I mean um... things that are

**Wyman - direct**

1   maybe innocent are are are considered to be ... greater than that.
2   Things that are ... ah...

3        IR:  They, they, they, pulled, they pulled, someone over
4   ... they got ... ah ... ah ... a pamphlet for Disney World in
5   their car ... in their mini-van and they say that he was you know
6   scoping out terrorist targets

7        AT:  Okay, so okay ...

8        IR:  He was taking his family to Disney World ...

9        AT:  Alright.  So, that's fine.  So ... that's, so
10   that's, so that's the climate.  There's a lot of excitement,
11   there's a lot of tension in the air and so forth, and you know
12   being a minority and so forth, you ... you ... you tend to be cast
13   with a big, ah you know, ah light upon on a person.  You know, I
14   mean, you're intelligent young man and so forth ... you have a
15   lawyer, lawyer, you know, lawyer, counsel will give you advice
16   whatever it is and [in Arabic] God willing [in English] I'll make
17   du'aa [Arabic word meaning a prayer] for you and anybody else
18   that...

19        IR:  [In Arabic] God willing [in English] Yeah, please
20   make du'aa for me.  But ah ... just wanted to let you know that
21   thus far ... and [laughing] you know, whatever this this ...ah
22   Faraza [ph] brother told you... is complete ... and frankly, I
23   mean ... please excuse my language ... is complete bullshit.

24        AT:  Which brother?

25        [Royer laughs]

1553

**Wyman - direct**

1        AT:   Which brother?

2        IR:   The Faraza [ph] brother, you know [unintelligible]

3    left a message

4        AT:   Oh, oh, oh, Faraza [ph] brother ... Faraza [ph]

5    IR: Yes ... No ... ah ... I mean ...frankly that's something that

6    really ... and I'm glad you told me, you know, what, what he said

7    but it's something that like really hurt me

8        AT:   Right

9        IR:   Hurt me, hurt me deeply, you know ... and ...

10       [Timimi interrupts at this point]

11       AT:   Well, look. I told you also but but but but when I

12   told you that, even though he ... he ... you know, he thought

13   that, ... right?

14       IR:   Yeah.

15       AT:   Ah what did I tell you? I said that I wasn't going

16   to act that way, right?

17       IR:   Yeah ...

18       AT:   Told you and so I said that my house was always

19   open to you, and your family, and so forth.

20       IR:   But, but, but in a way I'm kinda glad about that

21   because it makes me think that it makes me realize that whatever I

22   do and whatever action I take is for, not to please anyone but is

23   for the sake of Allah. You know what I'm saying?

24       AT:   [In Arabic] God willing, Thank God.

25       IR:   So ... so ... I'm ... I mean I'm going to take the

**J.A. 1699**

1554

**Wyman - direct**

1  action  that my lawyer told me to take for a couple of reasons.
2  One, because this is what ah this is what Islamically is the thing
3  that I must do and the second thing is legally, it just makes more
4  sense for my situation.

5          AT:  Okay.

6          IR:  So, in other words, ah, I mean, and you know ... if
7  it if it makes you happy it doesn't make you happy, ah ... [in
8  Arabic] By God, [in English] it's really of no importance, I mean
9  ... I love you as a Brother, but essentially this is my duty
10 before [in Arabic] God Almighty.  [In English] You know it's it's
11 kinda like ... someone just ... you know those random e-mails that
12 people forward you and stuff, and somewhere you know these -- I
13 keep getting these sorta messages that are reinforcing me and so
14 I've gotta a hadith [Arabic word meaning words of the Prophet]
15 "the one who hands his brother over to an oppressor is a ..."

16         AT:  Sure.

17         IR:  Such and such.

18         AT:  Sure.

19         IR:  So um so, essentially, you know like I said, I
20 mean, um ... um um ah, maybe some part of me is still a little bit
21 angry [laughs], inaudible, but I know you didn't ... you're not
22 the one who was saying that, you know, but I'm just I'm just
23 saying, you know that, but, but in fact, it's like I said, it's a
24 good thing perhaps because I know that it doesn't matter if Hammad
25 here sitting next to and says oh wow that Ismail he's ... he's

# Wyman - direct

1 going down for everyone, hey, he's such a great brother ... I

2 don't care, you know, I don't care, I have to do what I have to do

3 before [in Arabic] God Almighty.

4       AT:  Right.

5       IR:  Um in any case ... alright, brother, well, if you

6 don't think ah, if you think it would be harmful then ... or

7 wouldn't be useful or something.

8       AT:  No ... no ... what what what I'm, what I'm trying

9 what I'm trying to say to you is you, you, you, need, need to be a

10 little bit wise ... I mean ... I wasn't aware that they put my

11 name, ah, next to your name ... in the ... conspiracy...

12       IR:  Yeah, they say we're co-conspirators

13       AT:  Ok so ...

14       IR:  I'm like well I'm in good company. [Laughs]

15       AT:  So I mean, so I meah, so I mean, so I mean ...  I

16 think, I think for us to meet and so forth ... I mean obviously

17 my phone, my phone is tapped so they're gonna...

18       IR:  Yeah

19       AT:  ... the conversation is obviously being recorded,

20 but for us to meet and so forth, they might then assume that there

21 is ... you know ... some sort of thing, a witness tampering or

22 some sort of...ah..

23       IR:  Yeah, that's true.

24       AT:  ... you know some sort of, you know, covering up or

25 you know comparing, comparing our stories.  Way I think and that's

# Wyman - direct

1   not, that's not proper.

2          IR:  I I I agree, I agree with you.  I agree with you

3   ... no, no well, Brother Hammad said that he had heard from

4   someone in Maryland said, oh, you know, Brother Ali is wondering

5   why you guys why no one is calling him why no, you know what I

6   mean et cetera, et cetera.  So, then,

7          AT:  No

8          IR:  That kind of surprised me. I said, oh as a matter

9   of fact, why don't we call him up you know, but anyway

10          AT:  No, no, no, no, that's not true.

11          IR:  Okay.

12          AT:  So I mean.  You know I mean, unfortunately, people

13   you know they have very ah inventive imagination

14          [Both laughing]

15          AT:  And they like and they like to and they like to you

16   know I mean you know ... people like -- people like to feed on

17   this type of gossip and so forth.  I, I, I would think, in

18   general, just you know as I said, [in Arabic] Brother, [in

19   English] I mean, you know that the Prophet [in Arabic] Prayers and

20   Peace be Upon Him, [in English] you know he said that ah you know

21   he said that you know "Keep God in mind and Allah will keep you in

22   mind."  You know what I'm saying?  "If you ask - ask Allah; if you

23   seek aid - seek aid from Allah; and know that if the whole world

24   got together to harm you, it would not be able to harm you unless

25   it is something that Allah has decreed to you, and if they are to

# Wyman - direct

1  gather together to benefit you, they cannot benefit you unless it
2  is something that God has decreed to you.  The pens have been
3  dried and the scrolls have been ah, ah, the records have been
4  " - you know - "  rolled up". So I mean [coughs] what I'm trying
5  to say is that [coughs] whatever happens, this is something which
6  was decreed long before you were born, you know I'm saying ...
7  before you had come to this Earth and so forth.

8              IR:   Yeah

9              AT:   I wouldn't I wouldn't I wouldn't let it phase you
10  and and and I mean a a person who is um, you know if a person did
11  something wrong and then therefore doing something wrong, uh
12  committed a crime ... he stole, he murdered or whatever,

13             IR:   Yeah

14             AT:   Okay ... and then he's faced with a you know a
15  justice system you know be it a Muslim or non-Muslim ... he has
16  something to worry about because there is some sort of infraction
17  that he did against society or against you know that he has to you
18  know pay ammends to. But, I mean, for people who are you know are
19  being you know I mean I haven't spoken to you you know I mean
20  maybe once in all the year of 2002, right?

21             IR:   Right.

22             AT:   And this is just one time here in 2003.  So I mean

23             IR:   Right.

24             AT:   How could there be a conspiracy between you know
25  people who haven't spoken in a year a year and a half?  So I

**Wyman - direct**

1  mean ... so I mean the point is this is just a way to ah ah ... to
2  elicit fear ... a way to you know cause confusion and a way ah ...

3       IR:  Get, get promotions for some of these guys.

4       AT:  Get promotions for some people.  Some people some
5  people are not maybe some people are just see if the job they
6  wanna do is professional ah they might be motivated by you know by
7  trying to get a promotion and so forth, and I and I

8       IR:  Yeah.

9       AT:  Just think that, you know, I just think a person
10 just to I mean, as I told you when you before, you know, and
11 other brothers before [in Arabic] By God [in English] I believe
12 that if a person goes makes [in Arabic] ablution, [in English] you
13 know what I'm saying, and [switches between Arabic and English]
14 kneels twice in prayer [in English] by the morning everything is
15· fine.

16       IR:  Yeah. Yeah that' true, yeah, that's true.

17       IR:  See what I'm saying, so

18       IR:  Okay, [in Arabic] May God reward you. [In English]
19 It was really kind of I guess ah that's the message I needed to
20 hear, you know, Hadith and [iu]

21       AT:  [In Arabic] By God, [in English] I just think I
22 just think [in Arabic] By God, Brother [in English] I just think I
23 just think if you just go make [in Arabic] ablution [in English]
24 and [switches between Arabic and English] prayed, asked for God's
25 guidance and made a prayer so that God put an ease and tranquility

**Wyman - direct**

1   in your heart, [in English] then you then you, face tomorrow you

2   know, what Allah decrees, Allah decrees, see what I'm saying. You

3   have I know

4           IR:   Yeah.

5           AT:   And just, I mean, you know, people who are legal

6   people they know what's best to do and so forth, and you should

7   follow their advice, you know what I'm saying.

8           IR:   Yeah.   That's true, yeah.  And, and frankly,

9   actually I'm not really worried at all 'cause I went through this

10  a a ah same thing after ah ah same thing, I testified in St. Louis

11  and actually like completely unrelated manner matter, but ah

12          AT:   Um hum.

13          IR:   So, [in Arabic] Thank God, He [in English] put [in

14  Arabic] tranquility [in English] in my heart and I ah you know I

15  totally ah you know

16          AT:   Um hum.

17          IR:   I came out uh ahead, you know, [in Arabic] thank God

18  [in English], it was really an excellent experience. (Laughs)

19          AT:   Yeah, yeah.

20          IR:   You know I wound, I wound up making fools out of

21  them, uh the prosecutors (laughs) you know in this past year and

22  so.

23          AT:   Well my, my, my, my, personal opinion is that the

24  the more the more they, the more they dig and the more they see,

25  they'll see that there's nothing there and ah ...

# Wyman - direct

1        IR:   Exactly, right.

2        AT:   And they'll eventually they'll eventually just step

3   back, you know what I'm saying?

4        IR:   Right.

5        AT:   But I it just needs patience for a week or two

6   weeks or a month or two months but ah ...

7        IR:   Yeah.   [In Arabic] correct.   [In English] That's

8   right, that's right.

9        AT:   Yeah okay. So.

10       IR:   Okay, all right Sheik I don't wanna take up any

11  more of your time.

12       AT:   No problem, [in Arabic] God willing. [In English]

13  As I said, do what you have to do and then, you know, anytime you

14  and your wife or, ...

15       IR:   Yeah.

16       AT:   ...your children you know, welcomed to have tea at

17  my house and so forth.

18       IR:   Oh thank you brother, thank you, I hopefully was

19  ah, all this blows over and what not to ah, and ah, you said that

20  you were surprised by the call, I am sorry if it was inappropriate

21  for us ah, to call you or ah.

22       AT:   No, I am surprised at the call because it doesn't,

23  it doesn't make sense because I'm saying, I mean -- in -- in --

24  in a sense that ...

25       IR:   (Laughs) I guess it doesn't.

**Wyman - direct**

1      AT:   That's that's that's the way the way that the way

2  that they ah these people ah think, I mean they're going to try to

3  use this as something against you, you know what I'm saying?

4      IR:   Yeah.

5      AT:   For calling me, by saying that you were trying

6  to ...

7      IR:   Yeah, yeah.

8      AT:   You know, make a story or whatever and so I I think

9  you're just harming yourself in the long run you know what I'm

10  saying but ...

11      IR:   Yeah, yeah.

12      AT:   Nonetheless I mean, I mean [in Arabic] God willing,

13  God willing [in English] the conversation is [in Arabic] God

14  willing [in English] is taped but it's, and so therefore it's, you

15  know

16      IR:   Yeah.

17      AT:   You know what, what has transpired and that's

18      IR:   Yeah, [in Arabic] correct. [In English] Okay Sheik.

19  All right, I I agree I mean, maybe maybe it wasn't the wisest

20  thing but anyway -- however, I just wanted to -- to -- to...

21      AT:   Look, [in Arabic] Brother.  Haste is from Satan.

22      IR:   Yeah.

23      AT:   And calmness and taking time and so forth is from

24  --   from [in Arabic] God

25      IR:   Yeah.

# **Wyman - direct**

1     AT:   As [in Arabic] the Prophet, PBUH, [in English]
2  said.
3     IR:   Yeah.
4     AT:   So, as I said, you know, I mean it's 10:50 now, you
5  know, in less then half an hour [in Arabic], God willing pray and
6  make a prayer to God [in English] and go sleep
7     IR:   Right.
8     AT:   And have a good night's sleep and
9     IR:   Okay.
10    AT:   (Inaudible) and everything shall be [ui] for you
11 and  that other Brothers, [in Arabic] God Willing, [in English]
12 O.K.
13    IR:   All right. Maka a du'aa for me
14    AT:   [In Arabic] God willing, [in English] I will.
15    IR:   Okay brother, [in Arabic] Peace be upon you.
16    AT:   [In Arabic] Peace be upon you, too.
17    (Hangs up telephone)"
18    (End of tape and transcript.)
19 BY MR. KROMBERG:
20 Q.   Agent Wyman, after that phone call on April 1, 2003, in the
21 evening, when next did you speak with Hammad Abdur-Raheem?
22 A.   April 3, the afternoon.
23 Q.   Were you involved in any of the Kwon consensually monitored
24 telephone calls?
25 A.   Yes, I was.

# Wyman - direct

1  Q.    When was the first one?

2  A.    April 7.

3  Q.    That's one we heard, Government Exhibit 1B1?

4  A.    Yes, that's right.

5  Q.    The next day, April 8, did Kwon make any consensual calls?

6  A.    Yes.  He tried calling -- he called Mahmood Hasan and Ismail

7  Royer.

8  Q.    That was 1B1, Government's Exhibit 1B1, the Royer call?

9  A.    The call with Royer, yes.

10  Q.    And there came a time when Yong Kwon made a call to Timimi?

11  A.    That's correct.

12  Q.    When was that?

13  A.    April 11.

14         MR. KROMBERG:  Let's listen to the 1G4, Government

15  Exhibit 1G4 call between Hammad and Royer on April 12.

16         I'm passing to Mr. Wood copies of 1G4a, the transcript,

17  Judge.

18         MR. MAC MAHON:  Is this the Timimi -- which call is

19  this, Your Honor?  I'm sorry.

20         THE COURT:  1G4 is Royer and Hammad on April 12, 2003.

21  I'm reading from what the exhibit says.

22         Is that right, Mr. Kromberg?

23         MR. KROMBERG:  1G4, Royer and Hammad, April 12, 2003.

24         THE COURT:  And I believe that's already in?

25         MR. KROMBERG:  Yes, Your Honor, I believe so.

**Wyman - direct**

1          THE COURT:  Yes, it is, both of them.

2          Do the jurors all have their transcripts, 1G4a?

3   Everybody have one now?  Yes?  Okay.

4          (Government's Exhibit No. 1G4 was played, Government's

5   Exhibit No. 1G4a was copied verbatim into the record as follows:)

6          "Randall Royer(RR):  Hello

7          Hammad Abdur-Raheem(HAR):  As'Salama Alaikum, May I

8   speak with Ismail?

9          RR:  Malakum Salem, yeah, it's me.

10         HAR:  Oh, how are you doing brother?

11         RR:  Hamdala, what's up?

12         HAR:  Um, when's your court date?

13         RR:  Um, well it is postponed um indefinitely. Basically

14  um uh the lawyers are just kind of playing phone tag with them

15  right now, as to what they want to do, he said that um, uh,

16  basically uh, just uh you know that the -- the prosecutor agreed

17  that I wouldn't have to testify if I talked to them outside

18  another environment.  You know what I am saying, another

19  environment.  Right?

20         HAR:  Right

21         RR:  So, um the lawyer said okay, well, let me talk to

22  my client.  And then we'll figure out, um, when, you know, what,

23  you know, what what we are going to do or whatever.  So, we talked

24  and we decided what we are going to do is basically is, I am just

25  not going to talk to them anyway.  And, uh, so he's trying to call

**Wyman - direct**

1  them back and get you know in touch with them and let them know

2  that but.... They haven't been able to get in touch.  So, I

3  haven't gotten any new subpoenas, you know so....

4          HAR:  Okay, see that's what I thought. You know what

5  they are doing.

6          RR:  Um

7          HAR:  Mine has been postponed indefinitely as well.

8          RR:  Oh, really.

9          HAR:  But not Kalif's.

10         RR:  Oh, okay, so there they are just going after the

11 weakest people first.

12         HAR:  Oh, oh, see, you read right through it.

13         RR:  Yeah, yeah.

14         HAR:  Okay, I knew you would.

15         RR:  Yeah

16         Laughter

17         HAR:  So you see what the game they are playing, His, he

18 has a definite one.  But, you and me they postponed. You see how

19 they did that?

20         RR:  Oh, yeah, yeah, yeah, did uh, now does he have a

21 lawyer?  Is he really talk, is he really taking Nubani's advice

22 and everything or?

23         HAR:  Well well right now I tried to tell him to get a

24 lawyer.  He said he um that Ashraf is suppose to be helping him

25 get a lawyer.

**Wyman - direct**

1    RR:  Oh. Right.

2        HAR:  So, I told him he needs to call them, he had

3  called them and postponed it.  His got postponed, that's only

4  because he pushed for it.

5        RR:  Oh yeah, that's good.  I mean, but, but he doesn't

6  need a lawyer to tell him that, but um all the lawyers are saying

7  the same thing.  That they shouldn't talk to them at all, you know

8  but.  But he, it is good to get a lawyer to get in there and he

9  won't have to deal with them at all, you know what I am saying.

10  You see, that is a positive thing.  When you have an attorney,

11  like I have not had to deal with them whatsoever.  You know what I

12  am saying, which is just, makes my life a lot less you know

13  (inaudible) hectic, and you know, stressful, you know, not just

14  have him deal with it.  You know what I am saying.  I'm not going

15  to trip off it, like you know, they don't even call me.  They,

16  they can't call me as a matter of fact.  Which is a nice thing.

17  Uh, so, I don't know I mean uh.  Yeah, It does really seem that's

18  kinda of their strategy, you know.  Um, I have a lot of, uh, the

19  the attorneys, the attorneys have a lot more interesting

20  developments and what not, happening.  Um, you know in terms of

21  the way this is going.  Like, I don't know if you wanna, or if you

22  feel like running into me or coming by or something like at some

23  point or you know.

24        HAR:  Oh please do, I don't mean to bug you at home.

25        RR:  No you are not bugging me at all.  Um, why don't

# Wyman - direct

1  you come over?

2        HAR:  But when I don't hear from you well I, I want to
3  know what, you know.

4        RR:  (Laughter)

5        HAR:  You know..because...

6        RR:  I don't want to, you know, things I don't want to
7  freak you out, you know what I'm saying, I don't want you to be
8  like..you know what I mean.  I don't know, don't know, 'cause.
9  Um, ah, um ah you don't understand, I personally, I um ah I quit
10 caring. I'm like, I'm um like, interested because it's, it you
11 know it effects my life.  You know, but I'm not like, I mean
12 honestly you know it could go either way on this, it's like what I
13 am saying it's like hamdala, you know, whatever.  So, I'm not like
14 really too worried about it all.  Um, you know.  But, I might be
15 getting a Pathfinder again. (Laughter)

16        HAR:  We got to get together and go riding man, if you
17 be getting those..

18        RR:  Goodness gracious man, I went um, I went back out
19 to Manassas to like this place where we use to go, near where I
20 use to live.

21        HAR:  Yeah

22        RR:  Gosh, man, I tore it up, man I'm telling you..I'm
23 telling  you. I was like.. I came out and I was about to throw up
24 'cause um, of the motion sickness.  You know what I mean.

25        HAR:  Oh, oh, then I, then I definitely can't do it.  I,

## **Wyman - direct**

1  I get motion sickness.

2  RR:  No, no, but, I've got the solution which is just

3  take some Dramamine or something beforehand.  You know that motion

4  sickness medicine?  It works so good, you take a couple of them

5  like an hour before anything, like um, I went, like uh, I went,

6  ah, um, I went with the Dar El Hijra Youth group um ah about um ah

7  last summer um, uh, deep sea fishing, and everyone was throwing up

8  and stuff except for the people who who took it.  It worked so

9  good, you know..

10  HAR:  Oh really.

11  RR:  Yeah yeah and I was cool.  Oh yeah.  I'm like super

12  sensitive to motion sickness.

13  HAR:  I thought I was the worst person in the world.

14  RR:  Oh, I thought I was too, you know.

15  HAR:  If if if it worked for you, then it might work for

16  me.

17  RR:  Oh yeah, I bet it will, it works so good. Man, oh

18  gosh, this place, it is like this, it is like this construction

19  area out in the middle of nowhere.  I mean past Manassas, Manassas

20  Battlefield and stuff.  So there is no one ever out there I mean,

21  it's just, it's like you go there just at the time that they are

22  not working, you know, it seems that every time I go there.

23  (Laughter) And like you go there, and like they they have torn,

24  it's really sad tore all the trees out and stuff.  There is now

25  like this wasteland of like a, like a, mountains of mud and dirt

# Wyman - direct

1 and you know what I am saying.  But then, which is fun in it's

2 self, um mud puddles, which is fun in it's self, but then it goes

3 back in the woods and trails and stuff and you go way, oh man, it

4 is awesome.  So I was out there man and I was just like and this

5 Mitsubishi is something, that thing is a monster, man.  I mean...

6          HAR:  Yeah, oh wow.

7          RR:  Yeah, man I'm telling you...but, the Pathfinder is

8 so good, but I think tomorrow I'm going to trade Mitsubishi in

9 for a Pathfinder.  I've got uh, uh, that van.

10          HAR:  Yeah

11          RR:  So I don't need this humongous thing anymore, so

12 I'm just gonna...but, anyway.. that's neither here nor there...are

13 you gonna, are you busy tonight?

14          HAR:  Uh, not really, I'm a right now I'm out with my

15 wife

16          RR:  Uh, huh

17          HAR:  ... at Walmart out here in a um....

18          RR:  Are you at Walmart?  My wife's at Walmart.

19          HAR:  Where is she, is she here now?

20          RR:  Yeah, she is there right now.

21          HAR:  You gotta be kidding!

22          RR:  No. (Laughter)

23          HAR:  I'll go look for her.

24          RR:  Yeah, she is there now.

25          HAR:  I'm in the, in the, I'm in my car, my wife went

**Wyman - direct**

1  in.

2          RR:  Oh, okay.  I bet she's gonna run into my wife.

3          HAR: I bet you she will.  They be walking around.

4  That's cool.

5          RR:  Yeah, yeah.  Yeah, yeah, that's funny, ah okay,

6  but, ah yeah well why don't you, you uh 'cause I'm home, when you

7  guys uh, are done, I mean if you got ah nothing, you know, else to

8  do if you want to swing by I've got some interesting information

9  actually a lot of interesting information.

10          HAR:  Oh wow.

11          RR:  Approaching the level of mind blowing actually.

12          HAR:  Oh wow.

13          RR:  Yeah.  I mean it it really, I I I don't, I don't

14  know how it going to effect things one way or another.  But it is

15  some interesting information.  But uh, oh yeah, yeah no, but

16  actually some very positive uh info uh, as well because uh

17  anyway...Just uh, If you get a chance, uh, come by, inshalla..

18          HAR:  Yeah, ok, I'll call you when I get back into Falls

19  Church.

20          RR:  Okay

21          HAR:  If, if it's not too late...

22          RR:  No it doesn't matter.  It doesn't matter at all.

23  It doesn't matter, like I'll be you know.... You come before like

24  you know twelve thirty, one o'clock.  It's fine.

25          HAR:  Oh, oh yeah, yeah I should be..yeah, yeah,

**Wyman - direct**

1          RR:  Yeah, but I will definitely recommend inshalla we

2    hook up.  Let me update you and such.

3          HAR:  Okay

4          RR:  Okay Bro

5          HAR:  Okay now

6          RR:  Salamalakum

7          HAR:  Salamalakum as well."

8          (End of tape and transcript.)

9    BY MR. KROMBERG:

10   Q.   Special Agent Wyman, after that call, that call was April 12,

11   2003, did there come a time when Hasan made a call to Masaud Khan?

12   A.   Yes, April 16.

13   Q.   And did he have a meeting with Masaud Khan?

14   A.   Yes, he did.

15   Q.   Did anything of significance happen in this investigation on

16   April 12, 2003?

17          MR. MAC MAHON:  I object to the form of the question,

18   Your Honor.

19          THE COURT:  Well, all right.

20   BY MR. KROMBERG:

21   Q.   Did Mr. Kwon have the consensually monitored meeting

22   videotaped at the hotel on April 17, 2003?

23   A.   Yes.

24          MR. KROMBERG:  Thank you.  Let's listen to 1G5, a call

25   between Hammad and Royer on April 18.

**J.A. 1717**

1572

**Wyman - direct**

1      And I'm passing out 1G5a, Judge.

2           THE COURT:  All right.

3           MR. KROMBERG:  It's very short.

4           (Government's Exhibit No. 1G5 was played, Government's

5  Exhibit No. 1G5a was copied verbatim into the record as follows:)

6           "Hammad Abdur-Raheem (HAR):  Salama Alaikum.

7           Randall Royer (RR):  Malakum Salem.

8           HAR:  What's going on man?

9           RR:  Hey, how is it going?

10          HAR:  Hamdela

11          RR:  I actually just called the wrong number. (Laughter)

12          RR:  No that's okay.  Um, I'm going through the um, uh,

13  uh, caller id, trying to find someone's number on it.  Hold on,

14  (talks to Mirsada in background), Dada does she need...does she

15  need this? (To Hammad) Um, yeah, what are you up to?

16          (background noise)

17          HAR:  Uh, just, uh, I'm at work right now.

18          RR:  Anything new?

19          HAR:  Not, well, I heard that um, they called Kalif

20  again.

21          RR:  Oh really?

22          HAR:  Yeah, so they really, want to get him in the Grand

23  Jury.

24          RR:  Yeah, well did I tell you who else testified?

25          HAR:  Huh?

**J.A. 1718**

**Wyman - direct**

1      RR:  Never mind.  I'll, I'll tell you in person.

2      HAR:  Oh no, more bad news?

3      RR:  Some more people, uh, well I don't know bad news.

4  I don't know, maybe yes, maybe no.

5      HAR:  Oh, but more people involved now, huh?

6      RR:  Uh, testifying and stuff.

7      HAR:  Oh.

8      RR:  Yeah, yep, yep, yep, anyway, but I'll tell you next

9  time I see you, inshalla.

10      HAR:  Okay, inshalla.

11      RR:  Alright, well um, I don't know...You get off, give

12  me a call if you want.

13      HAR:  Okay

14      RR:  And I'll tell you what happened.  Okay brother.

15      HAR:  Alright

16      RR:  Salamalakum

17      HAR:  Salamalkum"

18      (End of tape and transcript.)

19  BY MR. KROMBERG:

20  Q.  Special Agent Wyman, the search warrants of the homes of

21  Surratt, Chandia, Khan, Hammad, Caliph, and Aatique were executed

22  on May 8, 2003?

23  A.  That's correct.

24  Q.  Consensual call from Aatique to Khan that we heard earlier,

25  Government Exhibit 2B2, was when?

**Wyman - direct**

1  A.    May 9.

2  Q.    When was the next time you spoke with Hammad?

3  A.    I believe it was May 18.

4  Q.    Over the various times you spoke with Hammad, did his version

5  of the events of what happened at Kwon's house on September 16

6  change?

7        MR. MAC MAHON:  Objection, Your Honor.  If they want to

8  call Hammad, they can ask him that question, but the agent can't

9  let the hearsay testimony in that way.

10       MR. KROMBERG:  Judge, we're not putting anything in for

11 the truth.

12       THE COURT:  If it's not being offered for the truth of

13 its contents, I'm going to permit that.

14 BY MR. KROMBERG:

15 Q.    Did it change?

16 A.    Drastically.

17 Q.    Of the versions he gave you when he claimed to remember, how

18 similar were they to each other?

19       MR. MAC MAHON:  Your Honor, now he's being asked to

20 characterize a hearsay statement that's not being offered for the

21 truth of the matter asserted.

22       THE COURT:  I think I'm going to just allow the first

23 question in, and then we'll move on to something else.

24       MR. KROMBERG:  Thank you, Judge.

25       THE COURT:  Sustained.

# Wyman - direct

1  BY MR. KROMBERG:

2  Q.   To your knowledge, did Masaud Khan ever speak to law

3  enforcement or testify about what happened at the meeting on

4  September 16?

5  A.   Not about the meeting.

6  Q.   How about Royer?  Did you ever speak to him about the

7  meeting?

8  A.   Yes.

9  Q.   On how many occasions?

10  A.   Many.

11  Q.   How consistent was his version of what happened at that

12  meeting?

13          MR. MAC MAHON:  Same objection as before, Your Honor.

14          THE COURT:  I think just that one characterization, one

15  question is permissible.  It's not going into the truth of the

16  contents, so overruled.

17          MR. KROMBERG:  Thank you, Your Honor.

18          THE WITNESS:  He's changed over time on key points as

19  well.

20  BY MR. KROMBERG:

21  Q.   Where is Royer now, do you know?

22  A.   I know that he's in the custody of the U.S. marshals in, I

23  believe he's in Northern Neck, in this district.

24  Q.   Take a look at 1J8, Government Exhibit 1J8.  Do you recognize

25  that?

# Wyman - direct

1   A.   Yes, I do.

2   Q.   That is?

3   A.   That is Mahmood Hasan.

4   Q.   When did you meet him?

5   A.   July 17, 2003, first time on a plane ride back from Saudi

6   Arabia.

7   Q.   Where is he now?

8   A.   He's in Alexandria Detention Center.

9   Q.   Okay.  Special Agent Wyman, did there come a time when you

10  interviewed the defendant, Ali Al-Timimi?

11  A.   Yes, I did.

12  Q.   When were those times?

13  A.   I interviewed him on five different occasions, but for the

14  purpose of my testimony today --

15  Q.   The fifth one had nothing to do with what we're talking about

16  today, correct?  Well, nothing to do with your testimony today?

17  A.   Correct.

18  Q.   Okay.  The first time was when?

19  A.   The first time was June 27, 2003.

20  Q.   And where was that?

21  A.   That was at his lawyer's office, in Washington, D.C.

22  Q.   And who was present then?

23         THE COURT:  I'm sorry, before we get down this road, is

24  there any objection to this line of questioning, Mr. MacMahon?

25         MR. MAC MAHON:  If we could approach, Your Honor?

**Wyman - direct**

1        THE COURT:  Yes.

2        (Bench conference on the record.)

3        MR. MAC MAHON:  He didn't have any kind of immunity or

4   proffer agreement when he came in on any one of these.  They're

5   all outside the -- all these interviews are outside the scope of

6   the conspiracy completely.

7        THE COURT:  Well, I think any admission by the defendant

8   is relevant to the case.  I'm assuming it's on the subject matter

9   of this case.  My concern is whether there are any issues about

10  Miranda warnings or voluntariness or any of the traditional

11  issues.

12       MR. MAC MAHON:  I don't believe he was under arrest.  I

13  think he's --

14       THE COURT:  All right.  Any attorney-client -- I mean,

15  just get it on the record now:  Are there any legal objections you

16  have to the government going into this line of questioning?

17       MR. MAC MAHON:  Well, there's -- there was a proffer

18  agreement with respect to the last session, and I understand that

19  counsel is going to stay away from that one.

20       MR. KROMBERG:  And that's what that -- why Agent Wyman

21  said yes to the five meetings, but for purposes of what he's

22  talking about today, we're only talking about the four meetings,

23  but I couldn't ask him, "How many times did you meet him?," and

24  have him say four if the honest answer was five.

25            So he said, "I met him five times, but we're only

**Wyman - direct**

1    talking about four."

2           THE COURT:  Assuming what you understand, because I

3    don't even know all the details on this, but make sure you're on

4    sometimes delicate territory when you're talking about a counsel

5    and defendant being interviewed, if there's any issue.

6           MR. MAC MAHON:  I don't see any.  He just came in

7    voluntarily and testified.

8           THE COURT:  Okay.

9           MR. MAC MAHON:  Can I ask you a question, Your Honor,

10   anticipating the cross examination?  I'd just ask the Court to

11   revisit this issue:  They keep playing these, these tapes where

12   everybody is saying that they're bugged, and we heard the space

13   shuttle tape, where he speaks very freely on it, and I think

14   they've opened the door up again to this issue that we raised

15   before about the 5,000 hours of these phone calls that they

16   raised, and that would give the jury some perspective of this.

17          THE COURT:  That's legitimate at this point.

18          MR. KROMBERG:  Can I respond to that, Judge?

19          THE COURT:  Yes.

20          MR. KROMBERG:  The space shuttle, two things:  First, it

21   was in Arabic; and second, it was on January 31 and February 1,

22   2003.

23          His house was raided on February 25, 2003, and every

24   call when he says that this call's obviously being taped occurred

25   after his house was raided on February 25, 2003.  So the entire

**Wyman - direct**

1   universe that we're talking about, I think, is from sometime in

2   2003 until the time his house was raided.  That's not thousands of

3   phone calls.

4            MR. MAC MAHON:  But, Your Honor, the government has --

5   we know that there's 5,000 hours of these phone calls, and it's a

6   misleading impression for the government to have just found this

7   one phone call about the space shuttle.

8            THE COURT:  I think the door was sufficiently opened,

9   I'll permit that, but don't bump into any classified issues.

10           MR. MAC MAHON:  I think I know how to do that, Your

11  Honor.

12           THE COURT:  All right.  It shouldn't be long, drawn out.

13           MR. MAC MAHON:  I just want to put this in perspective.

14           MR. KROMBERG:  We're going to need to have a -- I assume

15  we will have a break before then, but I will need to speak to

16  Agent Wyman to let him know what the -- he's not prepared to

17  answer -- to know about the difference between how to answer this

18  question in --

19           THE COURT:  All right.  Because you don't want to bump

20  into --

21           MR. MAC MAHON:  No, I don't have any interest in bumping

22  into the CIPA issues.

23           THE COURT:  That's in cross.  You finish your cross, and

24  then we'll see.

25           Wait, Mr. Kromberg.

# Wyman - direct

1    MR. MAC MAHON:  Oh, that's fair.  Your Honor, one other.

2  I'm not sure, you made a ruling in a motion in limine that they

3  weren't going to be able to ask Agent Wyman the defendant's

4  opinions about certain documents that they showed him, and I don't

5  know whether they intend to go down the road -- I think that's

6  part of where we're heading this morning -- where they show him a

7  document and ask him what his opinion was about it.

8    THE COURT:  I don't think the opinion, but statements, I

9  mean, this case is all about statements.

10    MR. MAC MAHON:  Statements are fine, Your Honor, but his

11  opinions when they show him something, Do you have an opinion

12  about this document or opinion about that one, I thought you had

13  ruled that they couldn't ask those questions.

14    MR. KROMBERG:  I do not recall anything like that,

15  Judge.  What Agent Wyman is going to be testifying to is, "What

16  did the defendant say about Hawaali's Statement to the Ummah?  Was

17  there any statement -- when he had it in front of him, did he

18  disagree with this?  What did he say in response to this point?"

19    "He said he agreed."

20    "What did he say in response to that point?"

21    "He said he agreed."

22    When we're talking about the Statement to the Ummah,

23  which is about supporting the Taliban.

24    MR. MAC MAHON:  Your Honor, if I may, the 302 said he

25  didn't disagree.  Maybe this is wordsmithing on behalf of the

**J.A. 1726**

**Wyman - direct**

1  government to try to make it look like something that was said,

2  might have been said in 2001 was agreed to in the year 2003.

3         THE COURT:  I will say this:  If there's slippage, I

4  think that goes against the credibility of the government's

5  agents.

6         MR. KROMBERG:  Absolutely.

7         THE COURT:  It needs to be direct, all right?

8         MR. KROMBERG:  Absolutely, Judge.

9         THE COURT:  I don't want the agent testifying as to what

10 he surmised the defendant's position is.  It's got to be, "Did you

11 ask him this question?  What did he say?"

12        MR. KROMBERG:  Yes, ma'am.

13        THE COURT:  All right.  I think I'm alert to the issue.

14        MR. MAC MAHON:  Thank you, Your Honor.

15        THE DEFENDANT:  Thank you, Your Honor.

16        (End of bench conference.)

17 BY MR. KROMBERG:

18 Q.   Agent Wyman, let's talk about the first meeting with -- the

19 first interview with Mr. Timimi, you said June 27, 2003, at his

20 lawyer's office.

21 A.   That's right.

22 Q.   How many lawyers do you recall were there with him?  More

23 than one?

24 A.   There were either two or three there.

25 Q.   And the second meeting was where?

**Wyman - direct**

1   A.    That was at the Eastern District of Virginia, U.S. Attorney's

2   Office.

3   Q.    Did he have lawyers with him at that time?

4   A.    Yes.

5   Q.    More than one?

6   A.    Yes.

7   Q.    The next meeting, November 17, 2003?

8   A.    Right.  Also at the U.S. Attorney's Office.

9   Q.    And did he have lawyers with him at that time?

10  A.    Yes, he did.

11  Q.    And the next one, 2004?

12  A.    That was June 24, 2004.

13  Q.    Where was that?

14  A.    The U.S. Attorney's Office again.

15  Q.    Did he have lawyers with him?

16  A.    Yes, he did.

17  Q.    Was he under arrest at any of those times?

18  A.    No.

19          THE COURT:  I'm sorry, I may have missed it, what was

20  the date of the second meeting?

21          THE WITNESS:  August 21.

22  BY MR. KROMBERG:

23  Q.    2003?

24  A.    Yes.

25  Q.    Was Mr. Timimi obligated to answer any questions at any of

# Wyman - direct

1 those interviews?

2 A.   No, he was not.

3 Q.   Did he choose to answer all of your questions?

4 A.   No, there were some questions that he would not answer.

5 Q.   At his lawyer's request, did you find out when else he had

6 been contacted by the FBI?

7 A.   Yes.  He was also contacted after 9/11, I believe it was

8 September 27, 2001, and also interviewed at his attorney's office

9 in Washington, D.C.

10 Q.   Okay.

11 A.   I was not -- that was not -- that interview was not done by

12 me.

13 Q.   Okay.  Now, during the interviews that were done by you, who

14 was there -- were you there by yourself, or was there another

15 agent there?

16 A.   There was always another agent with me.

17 Q.   Okay.  What did -- during the course of those several

18 interviews, what did he tell you about his own background?

19 A.   Well, he said that he's educated on both Islamic and secular

20 topics, told us about his studies at George Mason and also about

21 his studies in, in Islam, and that he's a widely regarded Islamic

22 speaker, with lectures and recording -- lectures around the world

23 and recordings distributed around the world of those lectures.

24 Q.   Did he tell you about studying in Saudi Arabia?

25 A.   Yes, he did.  He said he studied in Medina in 1987.

**Wyman - direct**

1   Q.   What did he say that he typically lectured about?

2   A.   He said he typically lectured about contemporary Islamic

3   issues of interest to Muslims, including the topics of jihad.  He

4   said that his, his lectures focused on Islamic doctrine.

5   Q.   What did he say about whether he issued fatwas or religious

6   rulings?

7   A.   He said he did not do that.  He said he wasn't a cleric.  He

8   said he didn't have a staff, and he wasn't qualified to make

9   fatwas on his own.

10  Q.   How broad did he say his knowledge was about issues that were

11  involved with the -- issues involving the Islamic world?

12  A.   Very broad.  I think he said words to the effect of he's very

13  knowledgeable about, about every aspect of Islam.

14  Q.   Did you discuss with him specific instances when he discussed

15  the concept of jihad during the question-and-answer period of his

16  lectures?

17  A.   Yes.  We talked about -- in particular, we talked about

18  questions that were presented to him at the JIMAS conference.

19  Q.   And those were Government's Exhibits 10A25, 26, 27, those

20  slips of paper that we saw before?

21  A.   That's right.

22           MR. KROMBERG:  Could we put on 10A25?

23           MR. MAC MAHON:  Your Honor, can we get -- since we've

24  broken this up by meetings, can we be specific as to which

25  meetings we're talking about so I can have some look at the 302s

1585

**Wyman - direct**

1   while we're doing that?

2          THE COURT:  Can you do that, Agent Wyman?

3          THE WITNESS:  I can do my best.  I'll have to refer to

4   notes because there were four interviews and 50 pages' worth of

5   302s, and we discussed the same topic sometimes in different

6   interviews.

7          THE COURT:  Just so the jury understands, a 302 is a

8   number that's given to an FBI report.  An FBI agent's report is

9   called a 302.  That's what they mean.

10         MR. KROMBERG:  Your Honor, we have structured to, to try

11  to make it coherent to the jury, not so that it can be followed

12  along on 302s, we've done this by subject, and I'm not sure --

13         THE COURT:  Agent Wyman to the best he can will just try

14  to make a reference.

15         And you can go ahead and look at your notes.

16         THE WITNESS:  I'll do that.

17         THE COURT:  All right, that's fine.

18  BY MR. KROMBERG:

19  Q.   Do you recall which date it was -- which interview it was

20  that you were speaking with Ali Timimi about the JIMAS questions?

21  A.   That was June 24, 2004.

22         MR. KROMBERG:  Can we put on 10A25, please?

23  Q.   What did Mr. Timimi say about this, this document and the two

24  others just like it, 10A25, 26, and 27?

25  A.   He said he didn't recall receiving these questions in

**J.A. 1731**

# Wyman - direct

1  particular, but he said he lectured at this conference and that

2  they looked like questions that he would typically receive on the

3  topic of jihad at lectures that he would have provided.

4  Q.   How did Mr. Timimi describe a Muslim's obligation to engage

5  in violent jihad?

6  A.   Well, he, he broke it down into two categories.  One was a

7  communal --

8  Q.   Well, let me stop you.

9  A.   I'm sorry.

10 Q.   Was this on the August 21, 2003 meeting when he most spoke

11 about this?

12 A.   Yes, August 21, 2003.

13 Q.   Okay.  Please describe again -- tell us how he described

14 obligations to engage in violent jihad.

15 A.   He broke it down into two categories, communal and a

16 noncommunal or individual category.

17 Q.   The communal obligation, what did he say?

18 A.   The communal obligation, the best I could tell, the

19 obligation was there for someone -- the obligation was on the

20 community, and so as long as there were enough people willing and

21 able to carry out the fight, then not everyone was obligated to go

22 and participate.

23 Q.   How about the noncommunal or individual?

24 A.   He said that the noncommunal or individual applied to

25 everyone and that there were, there were certain conditions under

## **Wyman - direct**

1   which that would occur.  He said the first of which was if there

2   was a leader or a Khalifa, the leader of the Muslims who calls you

3   up similar to the draft and says, "You there, you go fight in this

4   war here."

5           The second principle was a geographic principle, and

6   that had to do with if there's a Muslim land attacked, then the

7   obligation fell on those within the land to defend themselves and

8   to fight back, and if they couldn't, they couldn't put up a good

9   enough fight, then that obligation spread out to the people in the

10   surrounding countries, and it went out in concentric circles until

11   there were enough people to -- the obligation went out until there

12   were enough people to fend off the attack.

13   Q.  How about a -- was there a third situation?

14   A.  There was, and that was if someone finds himself on the

15   battlefield when it occurs, he's going about his business, and

16   then all of a sudden, the war starts without any forewarning, and

17   in that case, then he's obligated to fight.

18   Q.  Did Ali Timimi do anything to illustrate his point about

19   these obligations?

20   A.  He did.  He drew down some handwritten notes on a piece of

21   paper.

22   Q.  Can you look at -- before bringing it up on the screen -- but

23   could you look at, Agent Wyman, Government Exhibit 10J8?  I think

24   you're going to have to look at it in the book first.

25           THE COURT:  Is there any objection to 10J8?

**Wyman - direct**

1     MR. MAC MAHON:  No, Your Honor.

2     MR. KROMBERG:  All right.  Well, in that case, let's

3  just put it up on the screen.  It will be easier.

4     THE COURT:  It's in.

5     (Government's Exhibit No. 10J8 was received in

6  evidence.)

7  BY MR. KROMBERG:

8  Q.   Do you recognize that?

9  A.   Yes, I do.

10  Q.   Is that what Ali Timimi wrote before you and gave you on

11  August 21, 2003?

12  A.   Yes, that's correct.

13     MR. KROMBERG:  Judge, we move Government Exhibit --

14     THE COURT:  It's already in.

15     MR. KROMBERG:  Thank you.

16     Oh, there we go.

17  Q.   Is what Ali Timimi told you about the instances in which

18  there would be obligations to engage in jihad consistent with what

19  you have seen him to have said or written elsewhere?

20  A.   Some of it seemed consistent, but then also from my review of

21  other documents, I found things that didn't seem all that

22  consistent.

23  Q.   Take a look at Government Exhibit 10A16, which is the

24  PowerPoint -- the documents reflecting the PowerPoint

25  presentation, which is already in evidence.

# Wyman - direct

1    MR. MAC MAHON:  Your Honor, I object to this.  He hasn't
2    been proffered as an expert on Islamic law and the issues of
3    jihad.  We looked at this before with the other agent.  There's
4    lots of words and --

5    THE COURT:  Wait, I think this is subject to argument
6    rather than this witness testifying.  He's not any better
7    qualified than anyone else on this.  I'm going to sustain that
8    objection.

9    MR. MAC MAHON:  Thank you, Your Honor.

10   BY MR. KROMBERG:

11   Q.   What did Mr. Timimi tell you about whether an individual's
12   participation in a particular jihad is permissible or considered
13   legitimate from a religious perspective?

14   A.   He said the -- whether -- one's participation in jihad as to
15   whether it's permissible, Islamically permissible or not should
16   not be confused with whether it's obligatory or not.  One can
17   participate in a legitimate jihad even when it's not -- when they
18   don't have an obligation, and that -- those -- whether it was
19   legitimate depended on a number of factors, and he described some
20   of them.

21   Q.   Such as?

22   A.   He said if -- a person had to get permission -- if the jihad
23   was not obligatory, then the person who wanted to participate in
24   jihad had to get permission from their parents, pay off their
25   debts, make sure that their family was cared for, things like

**Wyman - direct**

1    that.

2    Q.    But if it was an obligatory jihad?

3    A.    None of that was necessary.

4    Q.    Did you discuss with him a question and answer that he

5    gave in the -- excuse me, a statement that he made in the lecture

6    The Role of Muslim Students in North America?

7    A.    Yes.

8         MR. KROMBERG:    That's Government Exhibit 10T4, which

9    we're going to bring up in a moment.

10   Q.    Did he tell you where -- excuse me, did he tell you whether

11   he made the lecture -- whether he was the person who gave this

12   lecture, The Role of Muslim Students in North America?

13   A.    Yes, he said he did, but he could not recall the time or

14   location of the lecture.

15   Q.    Okay.    What did he tell you about his comments in that

16   lecture?

17   A.    After we reviewed the, the tape, we -- there was a particular

18   part in there that we had written down something that he had said,

19   and it went like this:    We read this to him.    He said -- what he

20   had said was if you have a special skill like that of a military

21   general, then you have an obligation to use that skill to fight in

22   jihad.

23         And we asked him about that statement.

24   Q.    What did he say?

25   A.    He said he recalled giving the lecture and advised that the

# Wyman - direct

1  statements that we read sounded like something he would have said
2  not during a lecture but in response to questions and answers that
3  happened during the lectures.

4          MR. KROMBERG:  Your Honor, I'd like to play that portion
5  of the tape, which is Government Exhibit 10T4.  This is --

6          MR. MAC MAHON:  And I object to just playing snippets
7  out of these tapes, Your Honor.  There are -- it would be taken
8  out of context.  If we're going to hear these tapes, we're going
9  to have to hear all the tapes.

10          MR. KROMBERG:  Judge, this is a particular point that we
11  asked Mr. Timimi about and Mr. Timimi talked about, and that's why
12  we're talking about this snippet.

13          THE COURT:  In the direct case, the government can
14  choose, and on cross, the defense may certainly play more of the
15  tape if context is needed.  So overruled.

16          (Excerpt of Government's Exhibit No. 10T4 was played, no
17  government transcript provided.)

18  BY MR. KROMBERG:

19  Q.   Special Agent Wyman, what did Ali Timimi tell you about the
20  rewards due to a person who died on the battlefield?

21  A.   He just said that those who die on the battlefield are the
22  best of martyrs.

23  Q.   What did he say with respect to whether someone who died in a
24  jihad that was not an obligatory jihad, what benefits would come
25  to them from dying shaheed on the battlefield?

# Wyman - direct

1  A.    If it was a permissible or a legitimate jihad, it would be --

2  that would be -- they would be considered a martyr.

3  Q.    What did he tell you with regard to what part warfare plays

4  in Islamic law and religion?

5  A.    He said that -- he said warfare is, is an integral part of

6  the religion, and it's not a pacifist religion.  You can't -- no

7  one could deny that, he said.

8  Q.    What did he say about some people engaging in jihad that were

9  not authentic?  This I'm referring to August 21 of 2003.

10  A.    Well, he said that -- I guess, although jihad is part of the

11  religion, like I said, it's not a pacifist religion, that what

12  some people do in the name of jihad is not necessarily authentic.

13  It has to do with whether it's legitimate or permissible.

14  Q.    What did Ali Timimi tell you about the jihad in Kashmir and

15  Chechnya?

16  A.    He said that those were considered by many although not

17  obligatory, they were legitimate, permissible jihads.

18  Q.    What did he tell you about his knowledge of Lashkar-e-Taiba?

19  A.    Well, he said, he said he was well aware of being -- based on

20  his experience and his knowledge and his awareness of various

21  Islamic topics, he said he was well acquainted with Lashkar.

22  Q.    What -- how did he describe it?

23  A.    He, he said it was headed by -- formally headed by Hafiz

24  Saeed, and he said it was broken down into two different wings:

25  Markaz-e-Dawa being the religious wing, Lashkar-e-Taiba being the

**Wyman - direct**

1  military wing, and he said that the two were frequently -- the

2  terms were used frequently interchangeably and that the two

3  intermixed and they were essentially the same organization.

4  Q.   What did he tell you about the goals of Lashkar-e-Taiba?

5  A.   He said Lashkar-e-Taiba was fighting a proxy war on behalf of

6  the Indian -- or on behalf of the Pakistanis rather against the

7  India.

8  Q.   Who, if anyone, from Lashkar-e-Taiba did Ali Timimi say that

9  he knew?

10  A.   Hafiz Saeed, head of Lashkar.

11  Q.   And he had met him where?

12  A.   He said that -- he estimated somewhere between '93 and '95,

13  1993 and '95, at a conference in England.

14  Q.   What conference was it, do you remember?

15  A.   It was the Ahle Hadis.

16  Q.   The A-h-l-e H-a-d-i-s?

17  A.   He said it's for people that followed the sunnah.

18  Q.   How did he say that he interacted with Hafiz Saeed during

19  that conference?

20  A.   He said it was a two-day lecture -- two-day series of

21  lectures.  He and Mr. Saeed stayed in the same hotel, and on the

22  second day, he had a private meeting with Hafiz Saeed and a couple

23  other folks, and he said that the -- he had a translator along

24  with him to help him with Urdu conversations.

25  Q.   What did he say that Saeed told him regarding LET and its

**Wyman - direct**

1 role in Kashmir?

2 A.   He spoke to Hafiz Saeed about Lashkar-e-Taiba and what they

3 were doing in Kashmir, and he said Hafiz Saeed had an argument

4 with another person while they were there about whether the

5 solution for Kashmir was a military one or a political one, and it

6 was Hafiz Saeed's assertion or his argument that the only solution

7 for Kashmir was a military solution.

8 Q.   Did he say he knew anyone from LET besides Hafiz Saeed?

9 A.   Well, he said, he said that he'd met -- well, he said he

10 didn't know him but he had received an e-mail from an individual

11 using the name Abu Bara.  This person indicated to Mr. Timimi

12 that, that he knew Ali Timimi, but Ali Timimi said he didn't know

13 him.

14 Q.   How about any other members of Hafiz Saeed's family?

15 A.   Yes.  He said he ran into Hafiz Saeed's brother on two

16 occasions following his meeting with Hafiz Saeed in, in England.

17 Q.   What did he say Hafiz Saeed's brother told Timimi on -- well,

18 what did he say the interaction was with Hafiz Saeed's brother?

19 A.   On the first time, Hafiz Saeed's brother came up to Ali

20 Timimi and said, "Hello.  As-salamu alaikum."  And, you know, "You

21 met my brother, Hafiz Saeed," and, you know, just some standard

22 greetings, nothing -- not an in-depth conversation.

23 Q.   And there was -- did Ali Timimi say that he had met the

24 brother another time?

25 A.   He did another time.  I think it was at a conference in

**Wyman - direct**

1   Boston.

2   Q.   What did Ali Timimi tell you about his awareness of the LET's

3   annual convention?

4   A.   On two different interviews, we talked about this.  Both

5   interviews, he said he was aware that they had an annual

6   convention that they held.

7   Q.   Was that June 27, 2003, and August 21, 2003?

8           THE COURT:   These are the interviews, not the

9   convention?

10          MR. KROMBERG:   Correct, Judge.

11          MR. MAC MAHON:   Thank you, Your Honor.

12          THE COURT:   Well, I mean, it was confusing.

13          MR. KROMBERG:   Absolutely.   I should have made that

14  clear.

15          THE WITNESS:   June 27, 2003, and August 21, 2003.

16  BY MR. KROMBERG:

17  Q.   Were the dates of the interviews with Ali Timimi where he

18  talked about it?

19  A.   Correct.   The interviews, right.

20  Q.   You had said that he said that he had been invited to the

21  annual convention but he didn't attend?

22  A.   Well, that's what -- during one interview, on June 27, he

23  said that he had been invited previously but he, he did not

24  attend.   He didn't go over to attend the conference.

25          On the August 21 interview, he said that he was never

**Wyman - direct**

1    invited but he was aware of it.

2    Q.   What did he say was the level of his awareness of the tactics

3    employed by LET?

4    A.   He said he was well aware of their tactics.  They were well

5    publicized.  He said that they conduct cross-border shelling,

6    raids on police stations and military camps.  They use guerilla

7    tactics and also the use of what he called fidayeen attacks, which

8    are also referred to as suicide missions.

9    Q.   When you say that fidayeen-style attacks are also referred to

10   as suicide missions, is that something that Mr. Timimi said?

11   A.   Yes, that's what he said.

12   Q.   Okay.  When he said that he was aware of it from the media,

13   did he mention any of the forms of the media that he became aware

14   of Lashkar from?

15   A.   Well, he said, let's see --

16   Q.   I'm looking at June 27, 2003, in particular.

17   A.   Okay.  We talked about the media a couple times.

18   Q.   Okay.

19   A.   I just want to make sure about this particular -- when he

20   said that it was well publicized and over the years he'd kept up

21   with various forms of media, including the Washington Post

22   newspaper, later he also talked about receiving the Taiba

23   Bulletin, also getting news from the Internet.

24   Q.   Okay.  Well, what did he say regarding his awareness of the

25   type of training that was offered by LET?

**Wyman - direct**

1  A.   He said it was well known or common knowledge that Lashkar,

2  Lashkar-e-Taiba had military-style training camps in Pakistan.

3  Q.   For, for -- to train who?

4  A.   The purpose was to train fighters to go fight in, in Kashmir.

5  Q.   What did he tell you about -- what did he tell you that he

6  knew about the types of training offered at the LET camps?

7  A.   Well, he said he hadn't been there personally, but based on

8  his knowledge of the types of military tactics they use and his

9  knowledge of what Lashkar does, he knows that they, you know,

10  conduct training on weapons and other forms of military tactics

11  that will enable someone to go fight in a battle.

12  Q.   You've mentioned the fidayeen or suicide attacks.  What did

13  he tell you about suicide attacks?

14  A.   During one interview, we showed him a document that he had

15  written about --

16  Q.   Is that the November 17, 2003 interview?

17  A.   That sounds correct.  Yes, I believe it was in, I think

18  it's -- the name of the document was "Suicide Attacks, Are They

19  Suicide?  A Shariah Viewpoint."

20  Q.   What was the discussion with Mr. Timimi about that document?

21  A.   We told him that we'd found the article on his computer, and

22  we asked him if he had written it and if he could give us some

23  background information on why he had written it.

24  Q.   Did he say that he recognized it?

25  A.   Yes, he did.  He said he -- he -- after reviewing it, he said

**Wyman - direct**

1   it looked like something that he had written not for mass

2   publication or formal release but for posting on the Al-Jazeera

3   list.

4   Q.   The Al-Jazeera list, was to your knowledge that the

5   Al-Jazeera list that we introduced, Government Exhibit 7D16, right

6   when we came back from our break for stipulations earlier today?

7   A.   I might have to look at 7D16.

8           MR. KROMBERG:   Could we have 7D16?

9           THE WITNESS:   Yes, that's correct.

10  BY MR. KROMBERG:

11  Q.   Okay.   While we're on the subject of the Al-Jazeera list,

12  during the course of your interviews, did Ali Timimi say anything

13  else about the Al-Jazeera list?

14  A.   He told us that he saw -- we showed him the UBL statement

15  that we read, I think it was before --

16  Q.   You mean Government Exhibit 2A7 that's in evidence now that

17  we also had the stipulation about?   Statement of Usama Bin Laden?

18  A.   That's correct.

19  Q.   Where it starts out -- so the second paragraph is, "So here

20  is America, Allah has struck it in one of its vital points"?

21  A.   Right.   He said he had seen that on the, on the e-list as

22  well.

23  Q.   And did he refer to the Al-Jazeera e-list in another document

24  you talked with him about that day?

25  A.   Yes.   Also on November 17, we showed him an e-mail where he

**Wyman - direct**

1  in the -- in the e-mail, he referred to postings that he had seen

2  on the Al-Jazeera e-list.

3  Q.    Is that Government Exhibit 10J9?

4  A.    Correct.

5          MR. KROMBERG:  Judge, we'd move in Government Exhibit

6  10J9 at this point.

7          THE COURT:  Any objection?

8          MR. MAC MAHON:  I haven't seen it, Your Honor.  I have

9  to look at my list.  Excuse me.

10          THE COURT:  All right.

11          MR. MAC MAHON:  No objection, Your Honor.

12          THE COURT:  10J9 is in.

13          (Government's Exhibit No. 10J9 was received in

14  evidence.)

15          MR. KROMBERG:  All right, would you bring that up on the

16  screen, please?

17          I think you're going to have to make it bigger than

18  that.

19          THE COURT:  Yes.

20          MR. KROMBERG:  How about we just start the first two

21  paragraphs?

22          THE COURT:  You want to see the date, don't you?

23          MR. KROMBERG:  We need the header information at least

24  to start.  Start with that.  Well, actually, the whole, that

25  entire thing, if you could.  I want to get the handwriting on

**Wyman - direct**

1   there.

2          THE COURT:  Get your squiggle off, yes.

3          MR. KROMBERG:  Terrific.

4   Q.   On the upper right, that's your handwriting, is it not,

5   "Presented to Ali Al-Timimi on 11/17/03, JW"?

6   A.   Yes, it is.

7   Q.   Okay.  And this is an e-mail from altimimi@yahoo.com,

8   Thursday, December 13, 23:01, of 2001?

9   A.   That's right.

10  Q.   And it's entitled "A call to reflect and repentance"?

11  A.   Correct.

12  Q.   Okay.  If we could go -- let's scroll down here, if we could.

13  And could you see -- actually, could you see who it's sent to?

14  A.   Yes, I can.

15  Q.   Flowe@northwestern.edu?  Did you ask Mr. Timimi who these

16  people were?

17  A.   Yes, I did.

18  Q.   If you recall, who was flowe@northwestern.edu?

19  A.   In general terms, Mr. Al-Timimi said that he thought he had

20  met all but one of these people in person.  At first, he didn't

21  recall who flowe was -- or flowe@northwestern.edu, but after

22  thinking about it, he thought he had met him at an IANA

23  convention.

24  Q.   And what was his name?

25  A.   Farooq Lowe.  And I think he lives in Chicago is what

# Wyman - direct

1  Mr. Timimi said.

2  Q.   And nsast6+@pitt.edu?

3  A.   Yeah.  He didn't recognize that e-mail address, but we asked

4  him about the user of the e-mail address, Nazeem al-Afmani

5  (phonetic).  He thought he met him in Saudi Arabia.

6          THE COURT:  Can you try to spell that, please?

7          MR. KROMBERG:  We will have it later on in another

8  document, I believe, Your Honor.

9          THE COURT:  All right.  Make sure you get it to

10 Ms. Thomson.

11         MR. KROMBERG:  Thank you.

12 Q.   Tamim11@yahoo.com?

13 A.   Yes.  He knew him as, I believe, an Afghani living in

14 Florida.

15 Q.   Tamim Popalzai?

16 A.   Yes.

17 Q.   Whose name will come up in a document -- in one of these

18 documents.

19         TariqN@aol.com?

20 A.   He knew -- this guy was either from Tennessee or Kentucky,

21 that general area, and he thought his last name was Nelson, Tariq

22 either Nelson or Nasser.

23 Q.   And Shibli Zaman?

24 A.   He said he didn't know who that was.

25 Q.   Okay.

 1          Could we scroll down, please?

 2          Where it says, "My dear brothers, insha'allah this

 3   e-mail finds each and everyone well.  May Allah accept our deeds

 4   and forgive our sins, enter us into His Paradise and release us

 5   from Hell with the conclusion of this blessed month of Ramadan.

 6   May Allah also give victory to this ummah and raise its rank and

 7   prestiage in this world and the next.

 8          "The reason for this unexpected e-mail on my behalf is

 9   the disturbing comments I recently read from the brothers on the

10   Jazirah list.

11          "So I thought I would offer some words of advice from

12   your elder brothers."

13          Could you scroll down, please?

14          "First of all, I want each and every one of you to know

15   that each and everyone of you has a special place in my heart.  I

16   look at each and every one of you as among the best brothers in

17   the States.  All of you (with the exception of one brother), I

18   have met at least once.  So of you I have had the pleasure of

19   meeting at the Kaaba, the most holiest of places on earth.  And I

20   ask Allah to join us in the best of conditions again in this world

21   and in the hereafter."

22          Now, where he just said, I have met -- with the

23   exception of one brother, I have met the rest of you at least

24   once, that one brother according to what he said to you was Shibli

25   Zaman that he did not meet?

**Wyman - direct**

1  A.    That seems to be the case, yes.

2  Q.    "Many of you have noticed my silence on the recent events.

3  This is not because I am not with opinion; but rather I have

4  decided to apply the Prophetic ordinance (upon our Prophet the

5  best salaah and salaam):  Man samata naja (Whoever is silent will

6  be saved).

7          "Al-hamdulillah, those brothers in my area have been

8  able to benefit from what I have had to say (and all praise

9  belongs to Allah).  But this unfortnately due to the circumstances

10 has been limited to private visits and not public statements.

11         "I do not want to belabor the point, but, my earnest

12 belief is that the brothers have been motivated in their positions

13 by a great amount of emotionalism, and at times, I am afraid to

14 say delusion.

15         "These are without difficult times.  And in reflection

16 of the confusion among the ummah, there is no unamity of opinion

17 among the scholars of Ahlus-Sunnah on these matters.

18         "It is possible to easily find a scholar of good aqeeda,

19 known for his piety and praiseworthy character -- having an

20 opinion from end of the spectrum to the other.  I believe some of

21 these conflicting opinions have been sent on this list."

22         Agent Wyman, was this what you were referring to when

23 you said that there was a reference to the list, to the Al-Jazeera

24 list?

25 A.    That statement there and then also the statement that was on

1604

**Wyman - direct**

1   the first page about the Jazeera list.

2           MR. KROMBERG:  Okay.  Well, we're going to come back to

3   this document.  I just wanted to get some information out about

4   the Al-Jazeera list for the moment.  So we can take that off, if

5   you would.

6   Q.   Okay.  Back to the discussion about suicide attacks.  What

7   did Ali Timimi say about -- excuse me, you showed him an article.

8   Can you look at 10A3?

9           10A3 is not in evidence yet, so don't put it on the

10  screen.

11          THE COURT:  Is there any objection to 10A3?

12          MR. MAC MAHON:  We don't have Exhibit 10A3.

13          THE COURT:  Yes, I don't think I do, either.  Do you

14  have one for the Court?  I go from 7H22 to 10A9.

15        ·   MR. KROMBERG:  It was a late addition, Judge.

16          THE COURT:  All right.

17          MR. KROMBERG:  I hope it's somewhere --

18          THE COURT:  I'll tell you what:  Since it's almost 4:00

19  and we've been trying to break around this time, why don't we take

20  the afternoon recess 'til quarter after, and then we'll see you

21  back here at that time.

22          MR. MAC MAHON:  Thank you.

23          (Recess from 3:56 p.m., until 4:15 p.m.)

24                      (Defendant and Jury present.)

25          THE COURT:  All right, we're looking at 10A3; is that

**J.A. 1750**

**Wyman - direct**

1  right?

2  BY MR. KROMBERG:

3  Q.   All right.  Agent -- Special Agent Wyman, do you recognize

4  10A3 as a document that you presented to Ali Al-Timimi on November

5  17, 2003, and then discussed?

6        Well, it can't come on the screen until it's -- here.

7        THE COURT:  Is there any objection to 10A3?

8        MR. MAC MAHON:  No, Your Honor.

9        MR. KROMBERG:  Oh, in that case, let's just put it on

10  the screen.

11        THE COURT:  All right, then it's in.

12        (Government's Exhibit No. 10A3 was received in

13  evidence.)

14        MR. KROMBERG:  Thank you.

15  Q.   Okay.  Up at the top right, is that your signature -- excuse

16  me, your initials?

17  A.   Yes, it is.

18  Q.   Okay.  And let's just go through this, if we could:  "Suicide

19  Attacks are They Suicide?  A Shariah Viewpoint.

20        "Al-Hamdu lillah was-salatu was-salamu 'ala rasulillah:

21        "Recently, the issue regarding the shariah

22  permissibility of what is referred to as 'suicide operations' has

23  been raised again.

24        "I would like to summarize the opinions of those

25  classical scholars which permit such course of actions and the

# Wyman - direct

1  stipulations they have stated for its permissibility.

2        "Some Background:

3        "It is important to understand that there is a concerted

4  effort to negate jihad among the Muslims today.  This has many

5  shapes and forms.  Among which is a number of erroneous fatawa

6  which are spread regarding this under the guise of the madh-hab of

7  the Salaf.  For example, Shaqra's stipulation [See Hiya

8  as-Salafiya, pp. 196-200] of the existence of a common imam over

9  the Muslims for jihad.  An opinion which is of Shi'ite origin.

10  [See for example, Ibn al-Muttahhar al-Hilli, Tabsira

11  al-Mutaaeallamim fi Ahkam al-Din, a Shi'ite fiqh text.  For this

12  reason, the Rafida were branded as the Khashabiya, as they

13  exchanged their swords of iron for those of wood (khashab).]

14        "Or al-Madkhali's claim that the Muslims of Afghanistan

15  yearn for Communist rule after suffering the in fighting of the

16  jihad groups and that those groups which participated in jihad in

17  Afghanistan hypocritically raised Islamic slogans so that they

18  could achieve their partisian aims.  [Jama's Wahida, p. 73].

19        "Even when the group which is participating in Jihad is

20  clearly Salafi, they will find doubt in there motives and their

21  jihad.  (See for example, the criticisms of the Somali Ansar

22  as-Sunna against al-Ittihad appearing in al-Muslimoon earlier this

23  year.)

24        "Moreover, they have succeded in splitting the ranks of

25  the Salafi jihad groups, as in Eriteria.

# Wyman - direct

1    "And are fully silent against the autrocities of the

2    Conspiratorial attack against the Muslims of Sudan, attempting to

3    reduce the issue to one of fitna, arguing that the conflict there

4    is one of Muslim against Muslim.

5    "While these false fatawa serve the aims of the NWO,

6    they more importantly reduce any effort of jihad by the Muslims to

7    an impossibility that will not result until the appearance of the

8    Mahdi and the descent of Jesus at the end of time.

9    "One needs only to add to this the concerted efforts by

10   governments in the Middle East to arrest all the youth who

11   participated in Afghanistan chasing them to the far ends of the

12   earth.  One Saudi (an imam of a masjid) who was almost arrested

13   informed me that when he was questioned as to why he went to

14   Afghanistan, he informed the questioners but I was part of an

15   official delegation?  While one might face arrest and torture in

16   Saudi, what those youth face elsewhere in the Islamic world, is

17   even worse."

18   Whoops, that doesn't look right.

19   Okay.  "Moreover, Western policy toward those groups

20   which engage in jihad, I believe is well known and does not need

21   much comment.

22   "The Fiqh Issue at Hand:

23   "As for what is erroneously termed as 'suicidal

24   operations,' this issue has been addressed in classical works of

25   fiqh under the title 'hamlu -l-fard al-wahid 'ala l-jama'at mina

# Wyman - direct

1  l-'aduw,' or 'an individual attacking a group of enemies.'  A
2  number of scholars have permitted this course of action.

3          "They normally stipulate the following:

4          "1.  Purity of intention.

5          "2.  The attack brings some benefit to the Muslims or
6  harm to the unbelievers.

7          "They do not stipulate that one must imagine that he
8  will survive or not."

9          Now, rather than read the rest, Judge, unless
10  Mr. MacMahon wants me to --

11          MR. MAC MAHON:  Judge, if we're going to just read
12  documents in evidence, Your Honor, we might as well just go from
13  beginning to end.  I mean, this is --

14          THE COURT:  Well, there's no rule of law that requires
15  everything be published to the jury.  I've allowed some of it.
16  I'm not going to have everything published at this point.  If
17  there's something you need in cross, you can go into it, but I'm
18  permitting this type of sampling.

19          MR. KROMBERG:  Thank you, Judge.

20  Q.  So, Special Agent Wyman, what did Ali Timimi tell you about
21  this article, 10A3?

22  A.  In addition to saying that he had written it for posting on
23  that Al-Jazeera list, he explained to me -- he summarized for me,
24  because we didn't read through it line by line in the interview,
25  either, but he summarized it by saying that the argument was this:

**Wyman - direct**

1  that not -- suicide is not always, not always considered suicide,

2  because it shouldn't be considered suicide when the intentions of

3  the person carrying out the attack are good and the intended

4  result brings either benefit to Muslims or harm to the

5  disbelievers.

6  Q.    What did he say about the permissibility Islamically of

7  killing one's self as part of a military operation?

8  A.    He said, he said that is permissible.  He said it gets tricky

9  as to what you define then as a military operation.

10 Q.    So that suicide is Islamically not permissible, but if you

11 get yourself killed in a military operation carried out with good

12 intentions and with the intended result being of some benefit to

13 Muslims, that's not the Islamically not permitted suicide?

14            MR. MAC MAHON:  Your Honor, that's a leading question.

15            THE COURT:  Sustained.

16            THE WITNESS:  The way I would summarize it --

17            THE COURT:  The objection was sustained.

18            THE WITNESS:  Oh, sorry.

19 BY MR. KROMBERG:

20 Q.    Could you integrate what Mr. Timimi told you with the issue

21 of whether suicide under Islam is permissible?

22            MR. MAC MAHON:  Your Honor, he's --

23            THE COURT:  No, I don't want Agent Wyman interpreting

24 anything.  I only want this line of testimony to be what specific

25 questions he asked the defendant and what, if any, specific

# Wyman - direct

1  answers the defendant gave him, and you can draw things together

2  in closing argument.  It's not proper for the agent to do that.

3          MR. KROMBERG:  Okay.

4  Q.  Was -- what did Mr. Timimi say about the permissibility under

5  Islam of committing suicide in the course of carrying out an

6  attack that would benefit Muslims or bring harm to unbelievers?

7  A.  He said that --

8          MR. MAC MAHON:  That's asked and answered, Your Honor.

9  He just went through that with him.

10          THE COURT:  Are you going to get a different answer from

11  the one he's already given?

12          MR. KROMBERG:  Well, I'm asking it again because I

13  didn't understand it to be clear the first time.  If the Court

14  says it's clear the first time --

15          THE COURT:  All right.  In case the jury didn't hear it,

16  go ahead.  The last time.

17          MR. KROMBERG:  Well, I'm not sure, can you read back the

18  question, please?

19                    (Question read.)

20          THE WITNESS:  That it was permissible and not to be

21  considered suicide.

22  BY MR. KROMBERG:

23  Q.  What did Ali Timimi say about the instances in which LET was

24  accused of attacking civilian targets?

25  A.  We talked about LET's attacks on the Indian Parliament and

# Wyman - direct

1    the Red Fort, and Mr. Al-Timimi said that he was well aware of

2    that, he had read all about it, and he knew that they were

3    civilian targets, but he said that he had his doubts as to whether

4    LET actually carried out the attack on the Indian Parliament.

5    Q.    What did he say about visiting the Lashkar-e-Taiba website?

6    A.    He said he did so regularly.

7    Q.    What did he say about any of his lectures being posted on the

8    LET website?

9    A.    He said one time while surfing the websites, he realized that

10   his lectures were posted on the LET website.

11   Q.    What did he say about the Taiba Bulletin?

12   A.    He said that he received the Taiba Bulletin.

13   Q.    Did he explain what was the period of time that he received

14   it?

15   A.    Well, he, he tried to estimate for us, but the length of time

16   was broad.  He said it was not as long as back to the mid-'90s,

17   but it wasn't as short as just a couple weeks.

18   Q.    Did he tell you when he unsubscribed from it?

19   A.    Yes.  He said that he unsubscribed after learning that

20   Lashkar was designated as a terrorist organization.

21   Q.    Which was when?

22   A.    That was in December 2001.

23   Q.    What discussion was there regarding the Yahoo! records that

24   indicated that he wasn't unsubscribed until 2003?

25   A.    We asked him whether he had an explanation for why the Yahoo!

**Wyman - direct**

1  records would show that he unsubscribed in May 2003 as opposed to

2  when he said, right after their designation.

3  Q.   What did he recall were topics included within the Taiba

4  Bulletins that he read?

5  A.   He said the Taiba Bulletins he read contained military

6  reports, battle reports, and also statements by the leader of LET,

7  Hafiz Saeed.

8  Q.   What did he say about his awareness of the battle reports

9  regarding use of explosives to blow up bridges and buildings?

10 A.   He said he, he was aware of that.

11 Q.   I'd like to bring up a document that is in evidence,

12 Government Exhibit 10J11a.

13           MR. MAC MAHON:  Is this a document they showed him, Your

14 Honor?

15           THE COURT:  Well, I don't know.  Let me look at it.

16           MR. KROMBERG:  Yes.

17           THE COURT:  It would appear to be from what I see in the

18 upper right-hand corner.  Do you have it there?

19           MR. MAC MAHON:  Yeah, I have it in front of me now, Your

20 Honor.

21           THE COURT:  It's in evidence.

22 BY MR. KROMBERG:

23 Q.   Agent Wyman, in the upper right-hand corner, is that your

24 initials?

25 A.   Yes, it is.

**Wyman - direct**

1  Q.   And you showed this and discussed it with Mr. Timimi when?

2  A.   November 17 of 2003.

3  Q.   Okay.  What is this?

4  A.   This is an article that I pulled off the Internet from the

5  Supporters of Shariah website, and it details a story about an

6  American convert to Islam who went and fought and died with the

7  LET.

8  Q.   What did Mr. Timimi tell you about this document?

9  A.   After reviewing the document, he said that he recognized that

10  as the same document that he had sent to his brother and that his

11  brother had been questioned about by the FBI.

12  Q.   What did he say was the reason why he sent this to his

13  brother?

14  A.   He could not recall the reason that he had sent it to his

15  brother.

16  Q.   Okay.  How did you find 10J11a?

17  A.   I used the -- on the Internet, I used the WayBack Machine, or

18  Internet archive.

19  Q.   Take a look at 10J11d.

20       And before you put that on the screen, let me check and

21  see if it's in.

22            THE COURT:  It's in.

23            MR. KROMBERG:  Okay.

24  Q.   Please take a look at 10J11d.

25            Is that what you used?

**Wyman - direct**

1  A.    That's the website, yes.

2  Q.    And what happened after you used the WayBack Machine -- what

3  did you do with that?  Did you put in anything, an address in that

4  box that I've circled?

5  A.    Yes.  I had an idea of what I was looking for because I

6  talked to the agent in -- out of the Los Angeles division who had

7  interviewed Mr. Timimi's brother, and he had fortunately written

8  down the whole link that we were looking for, so I was able to

9  narrow down the search pretty quickly to Supporters of Shariah and

10 a particular day time range.

11 Q.    Okay.  And what did you get when you typed in "Supporters of

12 Shariah" in that box?

13 A.    It brought up a listing of dates that the Internet archive

14 had stored that website.

15 Q.    Can you take a look at 10J11f, which is not in evidence yet,

16 I believe?

17        THE COURT:  Apparently, it already is -- no, I'm sorry,

18 it is not.  Any objection to 10J11f?

19        MR. MAC MAHON:  Just a second, Your Honor.  Excuse me.

20        I don't know what the relevance of it is, Your Honor,

21 where it came from.

22        THE COURT:  Lay a foundation, Mr. Kromberg.

23        MR. KROMBERG:  Thank you, Your Honor.

24 Q.    Mr. Wyman, do you recognize 10J11f?  I guess you'd better

25 look at it in the book.

1  A.    Yes, I do.

2  Q.    Where did you -- have you seen that before?

3  A.    Yes.  This is the listing that I referred to that shows the

4  different dates that that website was archived.

5              MR. KROMBERG:  Okay.  Judge, we'd move in 10J11f.

6              MR. MAC MAHON:  The document itself is in, Your Honor.

7  I don't -- the underlying document.

8              THE COURT:  The American Shaheed article is in.  Do you

9  need this for anything else?

10             MR. KROMBERG:  I'm just trying to show how -- when this

11 document existed on the web and how one got to it --

12             THE COURT:  All right.

13             MR. KROMBERG:  -- because it shows knowledge of anyone

14 who's been to that document.

15             THE COURT:  All right, this certainly is relevant.  It

16 explains how the agent got to the article, so I'm going to allow

17 it in.

18             (Government's Exhibit No. 10J11f was received in

19 evidence.)

20             MR. KROMBERG:  All right, can you put up 10J11f on the

21 screen?

22 Q.    Now, Agent Wyman, can you explain what you did once you got

23 this screen on the WayBack Machine?

24 A.    I clicked on the link there for August 10, 2001.

25 Q.    And what happened when you clicked on the link for August 10,

# Wyman - direct

1   2001?

2   A.   It brought me to an archived version of the Supporters of

3   Shariah website.

4         MR. KROMBERG:  Can you bring up 10J11e, which is in

5   evidence?

6   Q.   Is that the document that you got to when you clicked on that

7   link?

8   A.   Yes.

9   Q.   Okay.  What happened when you clicked on the "Enter S.o.S."

10  document link there?

11  A.   It brought me to another page within the website.

12  Q.   What's been marked 10J11 has not yet been admitted into

13  evidence.  Can you take a look at 10J11, Agent Wyman?

14  A.   I have it.

15  Q.   What is 10J11?

16  A.   It's the, it's the page that I went to after clicking on

17  that "Enter S.o.S." button on the last exhibit.

18        MR. KROMBERG:  Judge, the government moves in 10J11.

19        THE COURT:  Any objection?

20        MR. MAC MAHON:  There's no link to the defendant, Your

21  Honor.  There's a whole bunch of other things he could have

22  clicked on to get to this.  It's awfully removed from the case.

23        THE COURT:  Well, my understanding is this is all

24  background to this one particular article on the American Shaheed,

25  correct?

# Wyman - direct

1    MR. KROMBERG:  The way you get to the article that Agent
2  Wyman says Mr. Timimi says he sent to his brother is through this
3  link.
4    MR. MAC MAHON:  That may be one way to get to it, Your
5  Honor.  It can't possibly be the only way.
6    THE COURT:  Well, it may not be the only way, but it is
7  a way, and it's the way this agent got to it, and I think that's
8  enough to let it in.  So 10J11 is now in.
9    (Government's Exhibit No. 10J11 was received in
10  evidence.)
11    MR. KROMBERG:  Can you put up 10J11?
12  Q.   Agent Wyman, I don't know if you can see that well enough,
13  but do you see where -- what did you do once you got to 10J11?
14  What did you do next?
15  A.   If you scroll down, I could show you.
16        Okay.  Stop there.
17  Q.   And you clicked on that (indicating)?
18  A.   Yes.
19  Q.   Okay.  Now, if we can go back to the main page there?
20        Was there a link --
21    MR. MAC MAHON:  Your Honor, this is now, we're getting
22  well past -- we're going to get into other things he found while
23  he was on this website?
24    THE COURT:  Well, I don't know.  He hasn't asked the
25  question yet, so let's hear what the question is.

## Wyman - direct

1           MR. KROMBERG:  I'll change the question, Judge.

2   Q.   Did you find another document that you presented to

3   Mr. Al-Timimi and discussed with Mr. Al-Timimi on the basis of

4   this web page?

5   A.   Yes, I did.

6           THE COURT:  Go ahead.

7   BY MR. KROMBERG:

8   Q.   Which document was that?

9   A.   It's on page 2 of 10J11.

10  Q.   "Hijra Detailed"?

11  A.   Yes, that document there.

12  Q.   Okay.  And we'll get to that shortly.

13          Special Agent Wyman, what did Ali Timimi say about

14  Lashkar's attitude towards America as -- from his knowledge?

15  A.   He said he expected that they would express anti-American

16  sentiments, but he doesn't recall reading any on the Taiba

17  Bulletins.

18  Q.   What did he tell you about Lashkar's connections to Al-Qaeda?

19  A.   He said that rumors -- after the, after the fall of

20  Afghanistan, the U.S.-led invasion of Afghanistan, he said rumors

21  were widely circulated that Lashkar had been helping Taliban

22  fighters flee Afghanistan.

23  Q.   What did he tell you about the relationship, if any, between

24  his belief system and that of Lashkar-e-Taiba?

25  A.   He said they were very similar.

**J.A. 1764**

**Wyman - direct**

1  Q.   While looking at the Taiba Bulletins that were issued during

2  the time period when Mr. Timimi was subscribed to the Taiba

3  Bulletins, what references did you find regarding Lashkar's

4  express willingness to engage in jihad outside of Kashmir?

5  A.   I found several.

6  Q.   I'd like you to look at 1D27, which is in evidence.

7        If you could just bring it up on the screen?

8        MR. MAC MAHON:  Is this something that he showed the

9  defendant, Your Honor, or this is his investigation now?

10        THE COURT:  I don't know.  I haven't seen it.  Let's

11  look at it.

12        Did you show this one to the defendant at any time?

13        THE WITNESS:  No, ma'am, I did not.

14        THE COURT:  Well, if 1D27 is already in evidence, then

15  again, rather than having the agent testifying, you can make

16  argument, but this would not -- I don't think asking this as a

17  question helps.  So I'll sustain the objection unless there's -- I

18  mean, you're asking the agent to do what you're going to ask the

19  jury to do apparently in your closing argument, which is to draw

20  various connections.

21        MR. KROMBERG:  But you're not going to give me enough

22  time during closing argument, Judge.

23        THE COURT:  All right.  But I mean --

24        MR. KROMBERG:  No, let me try to move this along then.

25        THE COURT:  All right.

**Wyman - direct**

1  BY MR. KROMBERG:

2  Q.   Agent Wyman, when Mr. Timimi told you that his belief system

3  was similar to that of Lashkar's and that he was unaware of the

4  un-American sentiment expressed in the Taiba Bulletins, what

5  comments, if any, did he have with respect to any justification

6  for the comments that were in the Taiba Bulletins?

7            MR. MAC MAHON:  Your Honor, that's --

8            THE COURT:   That question is way too vague, all right?

9  I realize you can't lead, but you still have to ask questions that

10 are more concrete.

11 BY MR. KROMBERG:

12 Q.   What, if anything, did Mr. Timimi say to you or did you

13 discuss with him regarding the comments in the Taiba Bulletin

14 about targeting the Jews and killing them in their own homes?

15 A.   We just discussed the Taiba Bulletins in general, and we did

16 not specifically discuss each of these individual Taiba Bulletins,

17 and that's where he gave the general answer about the

18 anti-American sentiments he didn't see in there.

19 Q.   Okay.  What --

20           MR. MAC MAHON:  Move to strike the question then, Your

21 Honor, if there was no answer to it about him saying something

22 about killing Jews.

23           THE COURT:  Well, whether you strike a question or not,

24 the jury knows the questions are not evidence, so we don't need to

25 do that.

**J.A. 1766**

**Wyman - direct**

```
 1          MR. KROMBERG:  Well, I would note, Judge, it is in
 2  evidence --
 3          THE COURT:  Well, wait.  I just overruled the objection.
 4  Let's move on.
 5  BY MR. KROMBERG:
 6  Q.   With respect to the position of Lashkar-e-Taiba post-9/11,
 7  what, if anything, did Ali Timimi say about Lashkar's espousal of
 8  support for the Taliban?
 9  A.   He said he was not aware of that.
10  Q.   What did Ali Timimi tell you about his relationship with Dar
11  al-Arqam?
12  A.   He said that prior to 9/11/2001, he was a lecturer at Dar
13  al-Arqam, but after 9/11, he stopped lecturing there.
14  Q.   Did he tell you why he stopped lecturing there?
15  A.   Yes.  He said after 9/11, Dar al-Arqam was temporarily
16  closed.  During that time period, he said he had a couple private
17  lectures in his residence.
18          He said after Dar al-Arqam reopened, he decided to stop
19  lecturing there because he wanted to associate with more
20  international and influential figures.  He felt he could have the
21  better impact by doing that as opposed to lecturing to a smaller
22  group of local individuals at the Dar al-Arqam.
23  Q.   Did he mention anybody in particular that he met with on an
24  international level?
25  A.   He mentioned Salman Al-Ouda.
```

**Wyman - direct**

1  Q.    Salman Al-Ouda was one of the awakening sheikhs?

2  A.    That's correct, in Saudi Arabia.

3  Q.    And what relationship was the awakening sheikhs to the Bin

4  Laden's declaration of war against the United States?

5           MR. MAC MAHON:  Your Honor, objection.

6           THE COURT:  Sustained.

7  BY MR. KROMBERG:

8  Q.    Did you find anything -- excuse me, did Ali Timimi say

9  whether his termination of lecturing at Dar al-Arqam was his

10 choice or someone else's choice?

11 A.    He said it was his choice.

12 Q.    Did you find anything -- did you find a document that

13 suggested otherwise?

14           MR. MAC MAHON:  Your Honor, we're talking about what he

15 testified, or now we're back in the investigation that the agent

16 did?

17           THE COURT:  Do you have a document number?

18           MR. KROMBERG:  Yes, Your Honor.

19           THE COURT:  What's the number?

20           MR. KROMBERG:  10H1a, instant messaging session.

21           THE COURT:  Hold on a second.  Just a minute.

22           Wait, wait, wait.  Don't put it on the screen.

23           I think you'd better approach the bench.

24           (Bench conference on the record.)

25           THE COURT:  I thought you were trying to undercut the

**J.A. 1768**

# Wyman - direct

1    defendant's version of how he separated from the center, right?

2         MR. KROMBERG:  Correct.

3         THE COURT:  What's in here that does that?

4         MR. KROMBERG:  After the Bin Laden part, there's an

5    instant messaging section where he says he's been barred from Dar

6    al-Arqam.  There is a line that why I'm not talking about speaking

7    at Dar al-Arqam anymore.

8         "Why not?"

9         "I've been barred."

10        I do not think we published that to the jury yet.

11        THE COURT:  Was this shown to the defendant during his

12   interview?

13        MR. KROMBERG:  We did not have it at that time.

14        MR. MAC MAHON:  Your Honor, if I may, this was a

15   document that was found in the disk drive of Mr. Chandia's house.

16   It hasn't been linked up to the defendant.  It's got his name on

17   it, Al-Timimi, if that's what it is, but there's no proof that it

18   is something that he did or otherwise.

19        THE COURT:  So I'm going to sustain the objection right

20   now.  Again, if the door gets opened, depending on how this case

21   evolves, you might be able to --

22        MR. KROMBERG:  Can I publish this document -- I don't

23   think this instant messaging section has been published to the

24   jury at this point.  It is in evidence, but we didn't publish it.

25   At some point, it would be worthwhile to publish it.

# Wyman - direct

1    THE COURT:  Is 10H1a in, Robin?

2    THE CLERK:  It is in, but it was not published.

3    THE COURT:  Who did it go in through?

4    MR. MAC MAHON:  It went in through the computer agent.

5    THE CLERK:  Monday, Officer Monday, Agent Monday.

6    THE COURT:  Well, if it's in evidence, then it can be

7  published by either side.

8    MR. MAC MAHON:  I understand.  But if he's going to ask

9  this witness that this is evidence that he found, he's going in

10  this in his investigation.  He can argue this to the jury if he

11  wants, but he can't use this FBI agent as a chance to try to

12  summarize his case.

13    THE COURT:  No, no.  He's only going for, as I

14  understand it, one point, that is, that the defendant said to the

15  agent that he voluntarily separated from the center.  This would

16  appear to be a contradictory statement to that effect.

17    MR. MAC MAHON:  Well, I think he's summarizing his case.

18    MR. KROMBERG:  Two points, Judge:  And also, there's a

19  reference to his brother being approached by the FBI, which was in

20  the context of sending the American Born Shaheed article.  So the

21  reference to those two limited points are the only points that

22  we're interested in.

23    THE COURT:  All right, I'll permit it.

24    (End of bench conference.)

25    MR. KROMBERG:  If you could bring up 10H1a on the

**J.A. 1770**

# Wyman - direct

```
 1   screen?  We want to put the instant messaging part of this on.
 2   Q.   Special Agent Wyman, can you find on there the reference
 3   you're referring to about Dar al-Arqam?  And perhaps if you'd tell
 4   Mr. Williams what page it is, we'll get to that quicker.
 5   A.   On mine, it's page 4 of 25.
 6            THE COURT:  Mr. Kromberg, so we have context for this
 7   document, all right, this came in through the testimony of Agent
 8   Monday, correct?
 9            MR. KROMBERG:  Correct, Your Honor.
10            THE COURT:  Who's the computer person.
11            MR. KROMBERG:  For context, we'll have to go through a
12   few more questions on it to get to the date, Judge.
13   BY MR. KROMBERG:
14   Q.   Do you see on page 4 what you were just referring to?
15   A.   It's at the bottom, second-to-the-last line.
16   Q.   Is that page 4 on the screen?
17            Oh, while we have it on the screen, let's go to that
18   because I think it will help put this in context.
19            Do you see where I'm underlying where aqdcksa says, "How
20   can you not hear about that video!?"
21   A.   I see that.
22   Q.   And right above there was, "... i think after yesterdays
23   videos by Usama and crew ... all that is over."
24            Okay.  Let's scroll down, please.
25            "It is all over as well as the transcript."
```

# Wyman - direct

1  A.   Yes, I see that.

2  Q.   Okay.  "Activities curtailed at dar ul arqam?"

3  A.   Right.

4  Q.   And do you want to circle what you were referring to a moment

5  ago as referring to --

6  A.   Al-Timimi's response to that is here:  "i basically have been

7  kicked out of darul-arqam."

8  Q.   Thank you.

9        And I want to turn to the very end of this document,

10  where it says, "Al-Timimi:  by the way ... make lots of dua for

11  zaid my bro, they really rattled his cage because of me,

12  threatened to put him in the pokey for good."

13        What relationship to your knowledge did that have to the

14  Supporters of Shariah American Born Shaheed article?

15  A.   I believe Mr. Timimi is referring to his brother, Zaid

16  Al-Timimi, who, as I said, was interviewed by the FBI about the

17  Supporters of Shariah e-mail.

18  Q.   And what did Mr. Timimi say about sending that American Born

19  Shaheed article to his brother?

20  A.   He said --

21        MR. MAC MAHON:  Objection.  Asked and answered, Your

22  Honor.  We've had that now three times.

23        MR. KROMBERG:  That's fine.

24        MR. MAC MAHON:  He said he sent it to him.

25        THE COURT:  All right, sustained.

## Wyman - direct

1      MR. KROMBERG:  Okay.  You can take that off.  Thank you,
2   Mr. Gibbs.

3   Q.  With respect to the lectures at Dar al-Arqam, how many people
4   did Mr. Timimi say attended his lectures?

5   A.  He said, estimated somewhere between 50 and 100 people.

6   Q.  What, if anything, did he tell you about his relationship
7   with Nabil Gharbieh?

8   A.  He said that he was closer to Nabil than anyone else in the
9   indictment.

10  Q.  Well, now what -- what date was this?  August 21, 2003?

11  A.  Yes, in -- yes, it was.

12  Q.  What -- and the indictment was of the indictment of Kwon and
13  Royer and Khan, those guys?

14  A.  Right.  The conversation -- he was referring to the June 27
15  arrests, and I think it was a June 25 indictment, which we had
16  discussed previously during our June 27 interview.

17  Q.  How did he happen to -- to your knowledge, how did he get a
18  copy of that indictment?

19  A.  Well, prior, prior to the June 27, 2003 interview, he --

20  Q.  That first interview?

21  A.  The first interview we did with him, he and his attorneys had
22  the opportunity to look over the draft indictment for the other,
23  the other people.

24  Q.  Did he give you any information about that draft indictment
25  that caused the superseding indictment in September 2003 to be

**J.A. 1773**

# Wyman - direct

1  changed?

2  A.   Yes.  Some of the information that he provided during our

3  interviews in June and August was able to -- we modified the

4  superseding in September.

5  Q.   Okay.  What did Timimi tell you about his relationship with

6  Khwaja Mahmood Hasan?

7  A.   He said that he knew him and that he had, he had referred him

8  to Soliman Al-Buthe.

9  Q.   Where?

10 A.   In Saudi Arabia.

11 Q.   What did Ali Timimi tell you about Soliman Al-Buthe?

12 A.   He said that he's a long-time friend of his who used to work

13 for Al-Haramayn Foundation in Saudi Arabia and also on a website

14 with Salman Al-Ouda.

15 Q.   What did Al-Timimi tell you about his relationship with

16 Randall Royer?

17 A.   He said he also had known Royer for a long time, although not

18 that well.

19 Q.   How did he characterize how close he was in relation to Yong

20 Kwon, referring to your meeting on June 27, 2003?

21 A.   He's closer to -- he said he, he said he was not as close

22 with Royer as he was with Kwon.

23 Q.   What, if anything, did he say that he knew about Royer's

24 participation in violent jihad?

25 A.   He said that it was well known.

## Wyman - direct

1  Q.   That Royer had done it where?

2  A.   That he had fought in Bosnia.

3  Q.   Did Ali Timimi tell you whether he had ever heard Royer speak

4  publicly about Lashkar-e-Taiba?

5  A.   Yes.  He said prior to 9/11, he had attended a private dinner

6  meeting where Royer talked about Lashkar.

7  Q.   What, if anything, did Ali Timimi tell you about Ibrahim

8  Al-Hamdi?

9  A.   He was acquainted with Ibrahim Al-Hamdi as well.

10  Q.   And Donald Thomas Surratt, also known as Idris Surratt?

11  A.   He was acquainted with him as well, and he actually provided

12  some e-mails documenting some correspondence that he had

13  previously had with Donald Surratt.

14  Q.   And those e-mails are 7D9 and 7D10; is that correct?  It

15  might be easier to just look in the book.

16             THE COURT:  Are those in?

17             MR. KROMBERG:  Yes, Judge, I believe.

18             THE COURT:  They're both in.  You can put them on the

19  screen if you want to.

20  BY MR. KROMBERG:

21  Q.   Can you tell from 7D9 and 7D10 what e-mail addresses Ali

22  Timimi used?

23  A.   Yes.  He used two separate ones.  One was a Hotmail address;

24  one was an address as myself.com.  I can -- would you like me to

25  read them?

**Wyman - direct**

1  Q.    Sure.

2  A.    All right.  Here's one: aaltimim@hotmail.com.

3  Q.    And the other one, the myself.com?  Is that on 7D10?

4  A.    I believe so.

5          MR. KROMBERG:  Could we bring up 7D10?

6          THE WITNESS:  That's altimimi@myself.com.

7  BY MR. KROMBERG:

8  Q.    Did you come across another e-mail address that Ali Al-Timimi

9  used at Yahoo!?

10 A.    Yes.

11 Q.    Take a look, if you would, at Government Exhibit 6A12, which

12 I believe is in.

13          THE COURT:  Is it in, Robin, 6A12?  Hold on one second.

14          THE CLERK:  It's in.

15          THE COURT:  It's in.

16 BY MR. KROMBERG:

17 Q.    And could you -- was that a different e-mail address for the

18 Yahoo! address for Ali Timimi?

19 A.    Yes.

20 Q.    And that was?

21 A.    Altimimi@yahoo.com.

22 Q.    Thank you.

23          What -- back to the interviews, what did Ali Timimi tell

24 you about his relationship with Ali Asad Chandia?

25 A.    He said Chandia was an individual who used to work as a

## Wyman - direct

1    volunteer to Dar al-Arqam, but Chandia also used to help
2    Mr. Timimi with scheduling his lectures, and then also at one
3    point, he helped him with a project where they tried to compile
4    some of his lectures from audio form to a written form.
5    Q.    What did Ali Timimi tell you about his relationship with Yong
6    Kwon?
7    A.    He said that Yong Kwon had attended his lectures both at Dar
8    al-Arqam when it was at 360 South Washington and then also at
9    private homes before.  He said he was somewhat unfamiliar with
10   Kwon, and he remembered him primarily because of his unique
11   appearance.
12   Q.    What did he say, if anything, about establishing a more
13   personal relationship with Kwon?
14   A.    He said when he moved to -- from Falls Church, his residence
15   at Falls Church, Virginia, to Fairfax, Virginia, in June 2001,
16   that Kwon was one of the, one of the brothers who helped him move
17   his belongings, and in the process, Timimi learned that he lived
18   nearby, that they both lived in the same vicinity, and thereafter,
19   Yong Kwon would drive Timimi to Dar al-Arqam.
20   Q.    How many times did Ali Timimi say that Yong Kwon drove him to
21   Dar al-Arqam?
22   A.    He estimated about five.
23   Q.    What did Ali Timimi tell you about the events of 9/11 at Dar
24   al-Arqam?
25   A.    He said that he went there that night and that he spoke to

## Wyman - direct

1   people about the events that had happened, and he, he commented
2   that if it was Bin Laden who had carried out the attacks, then he
3   said it was because they consider Mullah Omar to be the Khalifa
4   and that this is part of their offensive jihad.
5   Q.   Did Ali Timimi say anyone responded at Dar al-Arqam to what
6   he said on 9/11?
7   A.   Yes.  He said an individual named Haytham Abu Hantash became
8   emotional and responded by saying that there, there are no
9   conditions in which killing innocent civilians could be allowed.
10  Q.   What did Ali Timimi say with respect to how he responded, if
11  at all, to what Haytham Hantash had said?
12  A.   He told Haytham that you can't make that sort of an absolute
13  statement, that there are conditions in which innocent people can
14  be killed, and he said he based that on his Islamic knowledge and
15  knowledge of a particular doctrine which refers to human shields.
16  Q.   What did Ali Timimi tell you about the events of the dinner
17  at Yong Kwon's house on September 16?
18  A.   He said that he was invited to the dinner gathering by, by
19  Kwon, and Kwon told him that some, some of the brothers were
20  coming over and that Timimi was asked to provide his, his comments
21  in the, in the wake of the events that had transpired on 9/11.
22  Q.   What did he say about his wife's position with respect to
23  whether he should be going to Kwon's house?
24  A.   He said that he didn't -- his wife didn't want him to go,
25  that he -- he went over the objection of his wife.

## Wyman - direct

1  Q.  Did he say why his wife didn't want him to go?

2  A.  She didn't want to be left alone in -- given the -- given

3  what had happened on 9/11.

4  Q.  Did he say how he got to Kwon's house?

5  A.  Yes.  He said Kwon picked him up.

6  Q.  Did he say what date the dinner occurred?  We've been

7  referring to it as September 16, 2001.  Did he -- did you discuss

8  with him what date it occurred?

9  A.  Yes.  In the first interview, we actually had that

10 discussion.  We -- in the original indictment, we had it listed as

11 on or about September 15, and we were estimating that based on the

12 information we had at the time, and when we interviewed

13 Mr. Al-Timimi, he said that we were off and that the meeting

14 actually occurred on the 16th.

15 Q.  Did he say how he knew that?

16 A.  Well, he said he'd gone back and he'd reviewed the calendar,

17 and he said also that he was a scientist and he pays attention to

18 these types of details.

19 Q.  Who did he say he recalled being at that meeting on the 16th

20 at Kwon's house?

21 A.  He recalled that Yong Kwon was there; Caliph Aatique; Hammad

22 Abdur-Raheem; Randall Royer/Ismail Royer; and Masaud Khan; and he

23 thought perhaps Masaud's brother, Ahmed Khan, was there as well.

24 Q.  Did he recall whether Mahmood Hasan was there?

25 A.  He did not recall Mahmood Hasan being there.

**J.A. 1779**

## Wyman - direct

1  Q.   Did he recall anything about Nabil Gharbieh being there?

2  A.   Yes.  He said that Nabil Gharbieh showed up with someone else

3  but promptly left.

4  Q.   What did he say about his relationship to the men gathered at

5  that meeting?

6  A.   Well, he actually referred to them as kids and said that he

7  only had -- he wasn't well acquainted with them, only had passing

8  knowledge of them, and many of them he didn't even know their last

9  names.

10  Q.   What did he tell you during the interviews regarding how he

11  believed he was perceived by the young men who came to listen to

12  his lectures?

13  A.   He said that he frequently encountered young men who he said

14  were in awe of him.

15  Q.   Why was that?

16  A.   Well, we asked the follow-up question, just that:  "Why are

17  these people in awe of you?"  And he said that he's well, well

18  known for his knowledge on various issues, not just Islamic issues

19  but also secular issues and his life experiences, and that he's

20  well known throughout the world, and his stature as a religious

21  figure is well known as well.

22  Q.   What did Ali Timimi tell you that he advised the guys at

23  Kwon's house to do that night on September 16, 2001?

24  A.   Essentially, he told them to, to leave the country, to go to

25  a Muslim country is what he said.

J.A. 1780

# Wyman - direct

1  Q.  Did he provide -- did he say that he provided them particular
2  steps to take, that first they should do something and second to
3  do something?

4  A.  Oh, yes.  Well, on one interview -- let me see what date it
5  was.

6  Q.  August 21?

7  A.  Yes.  On August 21, he expanded it.  Instead of just
8  summarizing to go live in a Muslim country, he said, "First, turn
9  to God and let this pass; second, avoid public places; and third,
10 if you feel pressure, you should leave."

11 Q.  What did he say that he said on September 16, 2001, about
12 whether the United States was going to declare war on Muslims?

13 A.  He said, he said that the U.S. was going to use the attacks
14 as a catalyst to launch a -- initiate a large-scale attack and
15 that war in Afghanistan was likely.

16 Q.  What did he say he said back on September 16 regarding the
17 possible use of nuclear weapons?

18 A.  He said he couldn't remember if he said it, but he thought at
19 the time that the U.S. would use this as a reason to go ahead and
20 use tactical nuclear weapons and to expand the war outside of
21 Afghanistan to places like Iraq or Yemen.

22 Q.  Did you talk to him about certain comments that Royer had
23 made to newspaper reporters about Timimi's comments at that
24 meeting on 9/16?

25 A.  Yes, we did.

# Wyman - direct

1  Q.    Did you read him a quote attributable to Royer?

2  A.    Yes.  We read him a quote by Royer out of an article written

3  for the St. Louis Post-Dispatch on June 12, 2003.

4  Q.    And did -- what did Timimi say about the quote?

5  A.    And should I read the quote in order to give it context?

6  Q.    Yeah.

7  A.    Okay.  The quote we read him was, "Royer told the

8  reporter, 'We were all kind of confused about this situation, so

9  Ali came and said basically the United States is going to declare

10 war on Muslims, and it's not going to be restricted to any one

11 area.  Ultimately, he thought it was going to be like World War

12 III between the United States and the Muslim world.'"

13 Q.    And what did Royer -- correction, what did Ali Timimi say

14 about the accuracy of what Royer had said?

15 A.    Timimi said that Royer was wrong where he said that he had

16 referred to Muslim -- to World War III.  He said he said nothing

17 about World War III.

18 Q.    What did Ali Timimi tell you that he said on September 16 to

19 the men at Kwon's house about the response of mujahideen to an

20 American attack on Afghanistan?

21 A.    He said he may have told them that mujahideen would flow into

22 Afghanistan.

23 Q.    What did he say about whether he told them -- strike that.

24        What did he say he told them on September 16, 2001,

25 about whether the jihad in Afghanistan was obligatory or

# Wyman - direct

1  permissible?

2  A.   He said he didn't recall telling them that the jihad was

3  obligatory, but he may have told them that jihad in Afghanistan

4  was permissible.

5  Q.   What date was that that he said that he may have told them

6  that the jihad in Afghanistan was permissible?

7  A.   June 24, 2004.

8  Q.   What did Ali Timimi say he -- excuse me, what did he say

9  about his knowledge of a fatwa issued by Uqla after 9/11?

10  A.   He said Uqla was a Saudi scholar who wrote a fatwa after 9/11

11  that justified the attacks of September 11.

12  Q.   Was there more than one Uqla fatwa that was a topic of

13  discussion with Timimi?

14  A.   No.  We just discussed that one, the one that referred to --

15  that justified the attacks on 9/11.

16  Q.   Take a look, if you would, at 10J2 -- and before you put that

17  up on the screen -- no, 10J2 is in.  So take a look at 10J2, and

18  it can be put up on the screen.

19       Because it's in Arabic, we don't have to blow it up I

20  don't think, Judge.

21       THE COURT:   All right.

22  BY MR. KROMBERG:

23  Q.   Special Agent Wyman, do you recognize 10J2?

24  A.   Yes, I do.

25  Q.   And what is 10J2?

# Wyman - direct

1  A.    It's the -- it's an Arabic document that I showed to

2  Mr. Timimi during our interview on November 17.

3            THE COURT:  10J2 may not be in unless it came in with

4  your stipulation, because when Aatique was talking about it, I

5  sustained the objection.

6            MR. KROMBERG:  Okay.  Judge, my records show that it

7  was, but we can go through it and get it in now.

8            THE COURT:  Is there an objection from defense on this,

9  on 10J2?

10            MR. MAC MAHON:  No, I can't remember if we stipulated to

11  this one or not.  If it's something that he showed him --

12            THE COURT:  That's the rule I've been doing.  Anything

13  that was shown to Mr. Timimi, that it is in.  So I'll let it in at

14  this point.  10J2 is in.

15            MR. KROMBERG:  Thank you, Judge.

16            (Government's Exhibit No. 10J2 was received in

17  evidence.)

18  BY MR. KROMBERG:

19  Q.    Special Agent Wyman, looking at 10J2, the part that's in

20  English, if you look up at the screen at what I've circled, the

21  part that's in English, that's showing that you showed that to Ali

22  Al-Timimi on November 17?

23  A.    That's correct.

24  Q.    Okay.  What did Ali Al-Timimi say when you showed him this

25  document?

# Wyman - direct

1  A.    He recognized it as the Uqla fatwa he was referring to, the

2  one that justified the 9/11 attacks.

3  Q.    Now, take a look, if you would, at 7A19, which I again think

4  is in.

5              Hold up before you put it on the screen.

6              THE COURT:    7A19.

7              THE CLERK:    7A19 is in.

8              THE COURT:    Is in?

9              THE CLERK:    Is.

10             MR. MAC MAHON:    I believe it's in, Your Honor.

11             THE COURT:    Yes.

12             MR. KROMBERG:    Okay.

13  Q.    What did Ali Al-Timimi say about the relationship between

14  10J2 and a document with the text that you see on 7A19?

15             MR. MAC MAHON:    Objection, Your Honor.    Did he show it

16  to him?

17             THE COURT:    Yes, that --

18             MR. KROMBERG:    Judge, this is -- if I can, if I can have

19  just 30 seconds with Mr. MacMahon?

20             THE COURT:    All right, take 30 seconds.

21             Did you show this document, this particular document to

22  the defendant at any time?

23             THE WITNESS:    I showed a copy of this document, but the

24  copy that I, that I showed him had some handwritten markings on it

25  as well.

**J.A. 1785**

## Wyman - direct

1       THE COURT:  All right.  This document with some version,

2   I mean, with some handwritten stuff on it?

3       THE WITNESS:  Handwritten notations.

4       MR. KROMBERG:  We had objections to the handwritten

5   notations, so we replaced it with this document, Judge.

6       MR. MAC MAHON:  I don't have any objection to this, Your

7   Honor.  There's just a lot of documents.

8       THE COURT:  All right, 7A19 is in.

9       (Government's Exhibit No. 7A19 was received in

10  evidence.)

11      MR. KROMBERG:  Thank you, Judge.

12  Q.   Now, what did Ali Al-Timimi say was the relationship

13  between -- we're going to -- I'm going to use term "this

14  document," but the document you showed him in English that was

15  like this document, the identical text to the Arabic document?

16  A.   He compared that to the Arabic one, the Arabic version, 10J2,

17  and said that they were the same.  They were the Uqla fatwa that

18  Bin Laden used to justify the attacks.

19  Q.   One was an English translation of the Arabic?

20  A.   Correct.

21  Q.   Did Ali Timimi tell you anything more about Sheikh Uqla?

22  A.   Well, we asked Timimi about Uqla's ties to Bin Laden since

23  Bin Laden was using his fatwa to justify his attacks, and Timimi

24  said that he -- while he knew of ties between Uqla and Bin Laden,

25  he didn't, he didn't realize the strength of those connections

# Wyman - direct

1  until his trip to Saudi Arabia in I believe it was December 2001,
2  and at that time, he learned of a stronger connection between the
3  two, like they maintained direct communication.

4  Q.    What did he tell you with respect to whether at the meeting
5  at Kwon's house on September 16, 2001, he referred to the Uqla
6  fatwa?

7  A.    He said he did not.

8  Q.    What did he tell you with respect to whether he read the
9  Washington Post in September 2001?

10 A.    He said he kept, kept abreast of the current events and read
11 the Washington Post among other news sources.

12 Q.    What did he say he -- what did he say about whether
13 Lashkar-e-Taiba was discussed at the Kwon dinner meeting in his
14 presence on September 16, 2001?

15 A.    He said as he was leaving the meeting, he overheard Royer
16 talking to a couple of the other people there.  He couldn't
17 remember who they were.  And he heard Royer giving them a number
18 for, a contact number for someone in Pakistan, and from that, he
19 surmised that Royer was trying to provide them with a point of
20 contact at Lashkar-e-Taiba so that they could go to
21 Lashkar-e-Taiba.

22 Q.    What did Ali Al-Timimi say that he did after hearing those
23 comments?

24 A.    He said upon hearing those comments, he admonished Ismail
25 Royer and the people that he was talking to for considering even

**J.A. 1787**

## Wyman - direct

1  going to Lashkar-e-Taiba or to Pakistan.

2  Q.    Now, what date did he tell you that?  Was that June 27, 2003?

3  A.    Yes, that was on June 27.

4  Q.    Did Ali Al-Timimi later give you more details about what he

5  said when he -- he said he admonished them.  Did he give you more

6  details later about what the admonishment consisted of?

7  A.    Yes.  On -- during our interview on June 24, 2004, we asked

8  him to tell us what it was that he said when he admonished them

9  not to consider doing such things, and during that interview, he

10  said that he didn't say anything.  He just -- he gave them a

11  disapproving hand motion in a disapproving manner.  He didn't say

12  anything.

13  Q.    What did Ali Al-Timimi say to you regarding what he knew to

14  be Aatique's intentions at the Kwon dinner meeting?

15  A. ' He said Aatique told him that he was planning to travel to

16  Pakistan, but he did not tell him that he was going to join

17  Lashkar.

18  Q.    Did he tell you how he returned to his house from Kwon's

19  house on September 16?

20  A.    Yes.  Yong Kwon took him home.

21  Q.    How long in total did Ali Al-Timimi say that he was at Kwon's

22  house?

23  A.    He estimated between 20 and 30 minutes.

24  Q.    What did he tell you about seeing Kwon and Hasan after that

25  time?

## Wyman - direct

1   A.   He said they had lunch a few days after.

2   Q.   What did he tell you he said -- he told -- excuse me, strike

3   that.

4           What did he say that Hasan and Kwon told him when he had

5   lunch with them a few days after September 16?

6   A.   He said they told him that they were planning a trip to

7   Pakistan and that they were going to make hijra, go to a wedding.

8   Q.   What did he say they told him about fighting in Afghanistan

9   or attending an LET camp?

10  A.   Absolutely nothing.

11  Q.   What did he say he advised them?

12  A.   Even though they didn't tell him anything about going to

13  participate in jihad in Pakistan or Afghanistan, he felt compelled

14  to warn them as they were about to embark on this trip not to go

15  participate in jihad, not to join any groups related to jihad,

16  make it only their intention to travel for hijra and not for

17  jihad.

18  Q.   Why -- did he say why he told them that even though they had

19  not told him that they were going to the Lashkar camp?

20  A.   He said, he said that war drums were beating at the time,

21  that it was clear that the U.S. was going to invade Afghanistan,

22  and that things were kind of spinning out of control.

23  Q.   What did Ali -- I'd like to point you out to that first time

24  he told you this, June 27, 2003.  What did he tell you he did

25  after his lunch with Kwon and Hasan was over with respect to Kwon

## Wyman - direct

1  and Hasan?

2  A.    He said he, he had no other interaction with them.

3  Q.    At that time, June 27, 2003, what information do you know

4  that he had at that time regarding the government's allegations

5  about the sequence of events involving the meeting at Kwon's house

6  in September 2001?

7  A.    Oh, he had a great deal of information due to the

8  conversations that we'd had in the interview.

9  Q.    Well, I'm talking about the first meeting.

10 A.    Right, June 27, 2003.

11 Q.    What information did he have?

12       MR. MAC MAHON:  Your Honor, I'm going to object.  If he

13 gave him something, he can testify to that, but he can't speculate

14 as to --

15       THE COURT:  Right.  The agent has to be able to tell.

16       MR. KROMBERG:  That's what's going to happen, Judge.

17       THE COURT:  Go ahead.

18 BY MR. KROMBERG:

19 Q.    What information did you have?  Did you give him something?

20 A.    I didn't give him the indictment, but he had already been

21 given the draft indictment, which laid out in four pages' worth of

22 text the September 15 -- which he said was the 16th -- meeting.

23 Q.    Okay.  So after that meeting on June 27, 2003, when he told

24 you the information that you just recounted to the jury, did he

25 later provide you additional information about what he did with

## Wyman - direct

1  respect to Kwon and Hasan after that lunch?

2  A.   Yes.   During our next interview on August 21, 2003, Timimi

3  said that in addition to telling them not to go participate in

4  jihad at that lunch meeting, after that, he also -- he was so

5  concerned that he also called someone else and told them -- told

6  that person to try and convince them not to go.

7  Q.   Did he -- who did he say that person was?

8  A.   He wouldn't tell us.

9  Q.   Did you ask him?

10  A.   Yes.

11  Q.   Did you ask him the next meeting, which would have been,

12  what, November 17, 2003?

13  A.   Yes, we asked him again, and he would not tell us.

14  Q.   What was the reason -- did you ask him again on June 24,

15  2004?

16  A.   Yes, we did, and he would not tell us.

17  Q.   What was the reason he gave you in August 2003 why he would

18  not provide you the identity of the person he says that he sent to

19  tell them not to go?

20  A.   Specifically on August 21?

21  Q.   Correct.

22  A.   He said he and his attorneys were working with the individual

23  to try and encourage him to write a statement.

24  Q.   And what did he say on -- when you asked him on November 17,

25  2003?

## Wyman - direct

1   A.    He again said he and his attorneys were working with the
2   person to try and get him to tell the same story to the FBI that
3   he had told -- he would tell -- that Timimi had told to us.
4   Q.    And what did he say on June 24, 2004, when you asked him?
5   A.    He just again refused to provide the name.
6   Q.    Did Timimi or his attorneys provide you with documents that
7   he wanted the government to consider when evaluating what the
8   disposition of the investigation with respect to him should be?
9   A.    Yes.  We were told that there were several people who could,
10  could, could vouch for him and that were willing to write an
11  affidavit and -- in his support, and they provided during the
12  August 21, 2003 interview several affidavits.
13  Q.    And did any of those affidavits mention anything about
14  anybody being sent to tell Kwon and Hasan not to go?
15  A.    No.
16  Q.    By the way, have you ever met Yousuf Idris?
17  A.    Yes.
18  Q.    When was that?
19  A.    March 18 of this year, 2005.
20  Q.    Did he agree to speak with you?
21  A.    No.  We went to his place of employment and asked him whether
22  he would talk to us, and he said no.
23        MR. KROMBERG:  All right.  If we could bring back
24  10J11b, which is in evidence?  Put that up on the screen, please.
25  Q.    Is that a document that you discussed with Mr. Timimi?

## Wyman - direct

1   A.   Yes, it is.

2   Q.   That was from --

3          THE COURT:   Now, wait just for a second.   I don't see

4   your initials on this one, so I want to make sure --

5          MR. KROMBERG:   We'll get to that Judge.   Pages 4 and 5.

6          THE COURT:   Oh, got it.

7   BY MR. KROMBERG:

8   Q.   "Protecting Your Religion, Making Hijra to Save Yourself,"

9   from the Supporters of Shariah website?

10  A.   That's the name of it, yes.

11  Q.   Okay.   Was there a particular part of this document that you

12  showed to Ali Al-Timimi?

13  A.   Yes.   If you'd turn to page 4?

14  Q.   Are those your initials there on the -- that I've circled?

15  A.   Yes.

16  Q.   Special Agent Wyman, what was the conversation about with

17  Mr. Al-Timimi regarding this article about making hijra?

18  A.   This, this document talks about the condition -- conditions

19  under which someone can and should make hijra, and I wanted to

20  ask -- I asked Mr. Timimi whether the, whether the things written

21  on page 4 and carrying over into page 5 talking about the two

22  different categories of hijra, whether those were -- whether he

23  agreed with that understanding of the topic of -- concept of

24  hijra.

25  Q.   Now, what did he say?

# Wyman - direct

1   A.    He said that he -- after reviewing just this portion that
2   deals with hijra, 4 and 5, he said that the -- he said that this
3   was a widely accepted view of hijra.  It sounded right.  It was
4   based on enough -- I can't remember the name of the book, but the
5   book it was based on was a widely accepted authority.

6            MR. KROMBERG:  Okay.  Could we go back to the previous
7   page?

8   Q.    And, Special Agent Wyman, can you please read for the jury
9   the portion that you were talking to Ali Al-Timimi about?

10  A.    After he reviewed it and said that he, he agreed that this
11  was an acceptable definition or explanation of hijra, I asked him
12  about the point No. 2 under the second category, which reads, the
13  second category reads "(Types of Hijrah whose cause is the land of
14  destination)," and the second point under that says, "Traveling
15  for Jihad.  So as to fight the enemies of Allah of Islam who
16  persecute Muslims and to also establish the Deen of Allah."

17  Q.    What did Ali Al-Timimi tell you about other meetings, private
18  meetings he held at his house after the meeting at Kwon's house?

19  A.    He said during the month of October 2001, he had a couple
20  private meetings at his house.

21  Q.    Who did he recall attending?

22  A.    He said Ibrahim Hamdi, Hammad Abdur-Raheem, Caliph
23  Abdur-Raheem.  He might have -- one second.

24  Q.    Did he recall what he spoke about at those meetings?

25  A.    It was -- he said it was general Islamic topics.  He said he

## Wyman - direct

1  didn't talk about jihad or Afghanistan or LET or anything like
2  that.

3  Q.   What did he say about Ali Asad Chandia's plans to travel to
4  Pakistan?

5  A.   He said early November 2001, Chandia told him that he was
6  planning on traveling to Pakistan.

7  Q.   What did he say Chandia told him about going to join LET or
8  fight somewhere?

9  A.   He said Chandia made no mention of going to fight or to
10  joining Lashkar or jihad.

11  Q.   What did he say his, Timimi's reaction was to Chandia's trip?

12  A.   Timimi was concerned that Chandia was planning to go
13  participate in jihad and to join Lashkar when he was in Pakistan.

14  Q.   What did he say was the basis for him being concerned if
15  Chandia hadn't said that he was going to go do that?

16  A.   In the, in the June 27, 2003 interview, he described how
17  Chandia, like all young Muslim men, was very interested in the
18  concept of jihad and martyrdom.  He asked, he asked many questions
19  about jihad, and he had expressed his desire to participate in
20  jihad before.

21  Q.   How did Ali Al-Timimi characterize the number of questions
22  that he fielded regarding jihad from young men?

23  A.   I think he said hundreds.

24  Q.   What did he say with respect to the same topic about why he
25  was concerned about Chandia's plans in the June 2004 meeting?

## Wyman - direct

1  A.    In the June 24, 2004 interview, he said that at the time when
2  Chandia was thinking of going to Pakistan, he knew that Colin
3  Powell had, had indicated that he was considering designating
4  Lashkar-e-Taiba as a terrorist organization.

5  Q.    What did Ali Al-Timimi tell you he did in response to his
6  concerns about Chandia participating in going to Lashkar or
7  participating in jihad?

8  A.    He said he called upon Ibrahim Al-Hamdi and asked him to go
9  visit Chandia and convince him not to go.

10 Q.    Did Ali Al-Timimi explain why he would tell you that it was
11 Hamdi he sent to stop Chandia but he wouldn't tell you who it was
12 that he sent to stop Kwon and Hasan?

13 A.    No, he did not.

14 Q.    After Chandia returned from Pakistan in 2002, what did Ali --
15 no, that's the wrong way to phrase the question.  I'm sorry.

16       What did Ali Timimi tell you with respect to anyone
17 that, that Chandia brought to Timimi's house after Chandia
18 returned from Pakistan in 2002?

19 A.    He said after his return sometime between February and June
20 2002, Chandia came to his house with a Pakistani -- an individual
21 of Pakistani descent who spoke with a British accent.

22 Q.    Did he tell you what the purpose of that meeting was?

23 A.    He said it was to discuss some of the research he and Chandia
24 were working on.

25 Q.    Was it research regarding a particular website?

# Wyman - direct

1    A.    Yes, Salman Al-Ouda's website.

2    Q.    The awakening sheikh guy?

3    A.    Yes.

4              MR. KROMBERG:  Could we see Government Exhibit 2A7,

5    Bobby?  2A7?

6    Q.    Once again, let's just look at the top part.  Did you show

7    Ali Al-Timimi Government Exhibit 2A7 -- what's been marked

8    Government Exhibit 2A7?

9    A.    I -- well, there's so many --

10             MR. KROMBERG:  I have this backwards.  I'm sorry.  Let's

11   bring up 7A38.  Okay.

12             THE COURT:  It's at the beginning of the second volume,

13   Mr. Wood.

14             MR. KROMBERG:  It's now up on the screen, Judge.  It's

15   an Arabic document.

16   Q.    Agent Wyman, did you show Ali Al-Timimi the Arabic document,

17   7A38?

18             Actually, let me try this again.  Go back to 2A7.

19             Now, on November 17, 2003, did you show what's been

20   marked 2A7 to Ali Al-Timimi?

21   A.    Yes.

22   Q.    And what did he tell you that it was?

23   A.    He recognized that as the statement by Usama Bin Laden that

24   had been posted on the Al-Jazeera list.

25             MR. KROMBERG:  Okay.  2A7 is what was from Khan's house,

# Wyman - direct

1 which is already in evidence.

2 Q. Okay. Let's go back to Government Exhibit 10J9, if we could,

3 which is in evidence.

4 A. Okay.

5 Q. Did you show -- I think we went through this. You showed

6 this document to Ali Al-Timimi, correct?

7 A. Yes.

8 Q. And what did he tell you it was?

9 A. He said it was an e-mail that he had written. He recognized

10 it as an e-mail that he had written.

11 Q. Okay. And you testified earlier, I believe, as to what --

12 who the people -- who the recipients were, correct?

13 A. Correct.

14      MR. KROMBERG: Can we scroll down a bit? Hold on.

15 Let's see.

16 Q. At the very top, where it says, "The reason for this

17 unexpected e-mail on my behalf is the disturbing comments I

18 recently read from the brothers on the Jazirah list," have you

19 located comments on the Jazeera list chronologically preceding

20 this message from the people that this message was addressed to?

21 A. Yes.

22 Q. Okay. Could you identify them without stating what's in them

23 at this point, but just identify them by the number in the 7D

24 series, Government Exhibit 7D series?

25      MR. MAC MAHON: I'm sorry, Your Honor, were any of these

1653

# Wyman - direct

1    shown to the defendant, Your Honor?

2              THE COURT:  We don't know that yet.

3              MR. KROMBERG:  Well, I can ask that question.

4    Q.   Special Agent Wyman, did you know of the existence of these

5    e-mails in the 7D series at the time that you spoke to the

6    defendant about this particular e-mail, 10J9?

7    A.   No.

8              MR. MAC MAHON:  Are they going to come in through him,

9    Your Honor, speculating that these are the ones that he's talking

10   about?

11             THE COURT:  I'm going to sustain the objection.

12             MR. KROMBERG:  Judge, could we approach on this?

13             THE COURT:  Actually, yes, but, you know, it's been a

14   long day.  I think the jury is probably getting tired.  I don't

15   want you-all becoming brain dead, because this is technical stuff.

16             I think the best thing is we'll stay in session, and

17   we'll sort this out, but I'm going to let you-all go for today,

18   and we'll start up again at 9:30 tomorrow morning.

19             Same rules and regulations still apply.  Get a good

20   night's sleep, folks.  We'll see you back here in the morning.

21                        (Jury out.)

22             MR. KROMBERG:  Judge, what I wanted to say was these

23   e-mails we're talking about have been authenticated by Donald

24   Surratt as e-mails that came over the Al-Jazeera e-list on the

25   times that they're reflected on them, in September, October,

1654

1  November of 2001.

2          Government Exhibit 7D16 is an e-mail that shows that Ali
3  Al-Timimi was on the Al-Jazeera e-list, and the witness, Special
4  Agent Wyman, has already testified that Ali Al-Timimi said to him
5  that he posted comments on the Al-Jazeera list and that he
6  referred to the Bin Laden statement on the Al-Jazeera list and I
7  think it was, it was --

8          THE COURT:  Yes, but I think -- the problem is I think
9  there's a -- this is a level of detail that is getting to be
10 cumulative.  I don't think it's adding anything more to the case,
11 and frankly, it's becoming, I think, an overload of detail.

12         It's also to some degree speculative.  I mean, I think
13 it's fair to ask the defendant about specific documents and to put
14 those in, as you've been doing, but to then start bringing in
15 other documents sort of in the universe of things, I think, is
16 just getting too far afield.

17         MR. KROMBERG:  Judge, can I say a little more before you
18 rule?

19         THE COURT:  What are the 7Ds that you want to put in?

20         MR. KROMBERG:  If I could just say, this is not a
21 surprise to anyone, that our witnesses, our cooperating witnesses
22 are subject to significant impeachment, and we don't have a tape
23 recording of what happened on September 16.  We have a couple of
24 documents that tend to corroborate what Ali Al-Timimi's position
25 was with respect to his supporting the Taliban.

```
 1              This e-mail says --
 2              THE COURT:  Which one are you talking about?
 3              MR. KROMBERG:  Just the one on the screen now, 10J9
 4    says, "I recently read disturbing comments."  The disturbing
 5    comment in 7D8, for example, is that some of the most respected
 6    scholars have been, remained inexcusably silent.  And then in
 7    10J9, the document on the screen, it says, "Many of you have
 8    noticed my silence on the recent events."
 9              THE COURT:  But these are already in.
10              MR. KROMBERG:  No, they're not.  That's just it, Judge.
11    Surratt had authenticated them, but they were kept out on the
12    grounds that at that time, we did not prove that Ali Timimi was on
13    the Al-Jazeera list.  We've since proved that, and we've now
14    proved that he reads the Al-Jazeera --
15              THE COURT:  Wait, wait, wait.  10J9, if it's not in,
16    will go in because it was presented to the defendant.
17              MR. KROMBERG:  10J9, I believe, is in already.
18              THE COURT:  All right.
19              MR. KROMBERG:  See, Ali Al-Timimi in 10J9 doesn't say
20    why the people complained that he was silent.  He just says, "Many
21    of you have noticed my silence on the recent events.  I have
22    decided to apply the Prophetic ordinance:  Whoever is silent will
23    be saved."
24              But what's key here is what he's responding to is the
25    allegation that esteemed scholars have remained silent,
```

1   inexcusably silent, and it was sent by one of the guys that he --
2   this e-mail is responding to Shibli Zaman. Shibli Zaman sent an
3   e-mail, 7D8, that said, "Some of the most esteemed scholars lack
4   courage of their convictions and have remained silent when they
5   should be standing up for the Taliban. How can you -- if you
6   agree with us, how can you be silent?"

7           And this is a response to that, and this shows that --
8   if I could scroll down, it says, "I have not been completely
9   silent, but I have had private meetings. Those brothers in my
10  area have been able to benefit from what I have had to say. But
11  this unfortnately due to the circumstances has been limited to
12  private visits and not public statements."

13          And that goes to the justification to the -- against the
14  accusation, "You've been silent instead of standing up for the
15  Taliban."

16          THE COURT: Well, I think this document stands on its
17  own. It's fairly clear, I think the context is clear, and I'm not
18  going to have you go into all this other stuff. So I'm sustaining
19  the objection. So tomorrow morning when we set up fresh, you can
20  go into a new line of questioning.

21          And just again, Mr. Kromberg, just to give the Court an
22  estimate, how much longer do you think the government's case will
23  go?

24          MR. KROMBERG: We have one short witness after Special
25  Agent Wyman.

```
 1              THE COURT:  All right.  So the government will be
 2   resting at some point tomorrow.  So have things been worked out --
 3   and I don't need to know for certain, but, I mean, with
 4   Mr. Zwerling, are there going to be any issues with any of your
 5   witnesses, Mr. MacMahon?
 6              MR. MAC MAHON:  I thought you were talking to
 7   Mr. Zwerling.  I'm sorry, Your Honor.
 8              THE COURT:  No.  Mr. Zwerling was here earlier, but, I
 9   mean, I saw him in court earlier.
10              MR. MAC MAHON:  I think everything has been taken care
11   of for Mr. Chapman.  I talked to him this morning, and we're not
12   going to need to call him as a witness.
13              THE COURT:  All right.  Well, any witnesses whom you're
14   planning to call who might be in custody, make sure the marshal
15   knows who they are so that they're here, and if there are none,
16   that's all right, too.
17              MR. MAC MAHON:  I talked to Ms. Daugherty about that
18   already.
19              THE COURT:  All right, that's fine.  Anything further?
20                        (No response.)
21              THE COURT:  No?  Then we'll see you at 9:30 tomorrow
22   morning.
23      (Recess from 5:40 p.m., until 9:30 a.m., April 13, 2005.)
24
25
```

1        CERTIFICATE OF THE REPORTER

2        I certify that the foregoing is a correct transcript of the

3    record of proceedings in the above-entitled matter.

4

5

6                        _____
                                  /Anneliese J. Thomson
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25