No. 14-4451

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH COURT

————————————

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

ALI AL-TIMIMI,
*Defendant/Appellant*.

————————————

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)

————————————

JOINT APPENDIX

VOLUME VIII of XIII (pages 1805 - 2058)

————————————

**ERIC S. SIEBERT**
**United States Attorney**

**GEREMY C. KAMENS**
**Federal Public Defender**

| | | |
|---|---|---|
| **Gordon D. Kromberg** | **Joseph Attias** | **Geremy C. Kamens** |
| **Assistant U.S. Attorney** | **Attorney** | **Federal Public Defender** |
| **Counsel for Appellee** | **Counsel for Appellee** | **Counsel for Dr. Al-Timimi** |
| **2100 Jamieson Avenue** | **Nat'l Security Division** | **1650 King Street, Suite 500** |
| **Alexandria, VA 22314** | **U.S. Dep't of Justice** | **Alexandria, VA 22314** |
| **(703) 299-3700** | **Washington, DC 20530** | **(703) 600-0800** |

This page intentionally left blank for double-sided pagination and printing

## <u>TABLE OF CONTENTS</u>

VOLUME I (pages 1 - 122)

District Court Docket Sheet (as of Apr. 28, 2025) ..................................................1

Indictment (Sept. 23, 2004, Doc. 1)..................................................................49

Superseding Indictment (Feb. 3, 2005, Doc. 47) ...........................................64

Government's Proposed Jury Instructions (Mar. 28, 2005, Doc. 84)......................80

VOLUME II (pages 123 - 372)

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 294) (defense opening statement)........................................................................................123

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 148) .........................................144

   Opening statements ...................................................................................148

      By the government...............................................................................148
      By the defense...................................................................*see* J.A. 126

   Government's evidence ..............................................................................167

      Stipulation.........................................................................................167

      Nabil Gharbieh           Direct examination...................................171
                                        Cross examination....................................233
                                        Redirect examination ..............................274
                                        Recross examination ...............................281

      Muhammad Aatique      Direct examination...................................283

   Concluding matters ...................................................................................369

i

## VOLUME III (pages 373 - 656)

Transcript, Jury Trial, Day 2 (Apr. 5, 2005, Doc. 149) .........................................373

    Preliminary matters ........................................................................377

    Government's evidence, cont'd ........................................................377

        Muhammad Aatique       Direct examination (resumed) ................378
                                        Cross examination....................................398
                                        Redirect examination ..............................468
                                        Recross examination ...............................489

        Stipulations ........................................................................492

        Donald Surratt              Direct examination...................................504
                                          Cross examination....................................570
                                        Redirect examination ..............................585
                                        Recross examination ...............................588

        Detective John Hodge       Direct examination...................................589
                                            Cross examination....................................592
                                        Redirect examination ..............................592

        Stipulations ........................................................................594

        Playing of audiotapes........................................................598

        Yong Ki Kwon            Direct examination...................................604

    Concluding matters ........................................................................655

## VOLUME IV (pages 657 - 972)

Transcript, Jury Trial, Day 3 (Apr. 6, 2005, Doc. 150) .........................................657

    Preliminary matters ........................................................................661

ii

Government's evidence, cont'd ...................................................................665

    Evan Francois Kohlmann     Direct examination...................................665
                                      Cross examination....................................817
                                      Redirect examination ..............................895
                                      Recross examination ...............................903

    Stipulations ..........................................................................905

    Playing of audiotape ...........................................................914

Concluding matters .......................................................................970


## VOLUME V (pages 973 - 1270)

Transcript, Jury Trial, Day 4 (Apr. 7, 2005, Doc. 151) ........................................973

Preliminary matters...................................................................577

Government's evidence, cont'd ...................................................................980

    Playing of audiotapes and videotape ...........................................980

    S.A. Tracy Kneisler     Direct examination.................................1093
                                        Cross examination..................................1099

    S.A. Christopher Paul Mamula   Direct examination.................................1100

    S.A. Donald L. Monday     Direct examination.................................1105
                                        Cross examination..................................1127

    Stipulations .........................................................................1131

    Yong Ki Kwon     Direct examination (resumed) ..............1146
                                        Cross examination..................................1238

Concluding matters .....................................................................1268

## VOLUME VI (pages 1271 - 1550)

Transcript, Jury Trial, Day 5 (Apr. 11, 2005, Doc. 152) .....................................1271

Preliminary matters ...............................................................................1275

Government's evidence, cont'd ...............................................................1279

Yong Ki Kwon | Cross examination (resumed) ...............1279
Redirect examination ............................1446
Recross examination .............................1475

S.A. Wade Ammerman | Direct examination................................1481
Cross examination................................1539

Concluding matters ...............................................................................1548

## VOLUME VII (pages 1551 - 1804)

Transcript, Jury Trial, Day 6 (Apr. 12, 2005, Doc. 153) .....................................1551

Government's evidence, cont'd ...............................................................1555

S.A. Wade Ammerman | Cross examination (resumed) ...............1556
Redirect examination ............................1582
Recross examination .............................1593

Stipulations ...........................................................................................1600

Playing of audiotapes.............................................................................1610

S.A. John Wyman | Direct examination................................1656

Concluding matters ...............................................................................1799

iv

## VOLUME VIII (pages 1805 - 2058)

Transcript, Jury Trial, Day 7 (Apr. 13, 2005, Doc. 154) ....................................1805

   Preliminary matters ........................................................................1808

   Government's evidence, cont'd ........................................................1810

       S.A. John Wyman          Direct examination (resumed) ..............1810
                                     Cross examination..................................1852
                                     Redirect examination ...........................1916
                                     Recross examination ............................1923

       Alex Daghestani          Direct examination................................1927
                                     Cross examination..................................1935

       Andre Thompson        Direct examination................................1940
                                     Cross examination..................................1951

       Playing of audiotapes..........................................................1954

       Government rests ...........................................................1955, 1965

   Defendant's Rule 29 motion ...........................................................1958

   Defendant's evidence ......................................................................1965

       Sherdil Loynab          Direct examination................................1966
                                     Cross examination..................................1970
                                     Redirect examination ...........................1976

       Yousuf Jaafar Idris      Direct examination................................1977
                                       Cross examination..................................2018

   Concluding matters ........................................................................2056

## VOLUME IX (pages 2059 - 2318)

Transcript, Jury Trial, Day 8 (Apr. 14, 2005, Doc. 155) ....................................2059

    Defendant's evidence, cont'd ........................................................................2063

        Yousuf Jaafar Idris        Cross examination (resumed) ...............2063

        Luther Kennedy        Direct examination..................................2136
                                        Cross examination...................................2144
                                        Redirect examination .............................2163
                                        Recross examination ..............................2168

        Curtis Jamison        Direct examination..................................2172
                                        Cross examination...................................2189

        Defendant rests .........................................................................2198

    Government's rebuttal evidence ....................................................................2198

        Khwaja Mahmood Hasan        Direct examination..................................2199
                                        Cross examination...................................2235
                                        Redirect examination .............................2278
                                        Recross examination ..............................2284

        Muhammad Aatique, recalled    Direct examination..................................2290

        Conclusion of evidence ..........................................................2293

    Preliminary charge conference ....................................................................2306

## VOLUME X (pages 2319 - 2568)

Transcript, Jury Trial, Day 9 (Apr. 18, 2005, Doc. 156) ....................................2319

    Charge conference ........................................................................................2322

vi

Closing arguments ........................................................2346

    By the government...............................................2346
    By the defense......................................................2376
    Rebuttal by the government...............................2415

Jury charge .....................................................................2429

Jury deliberations ........................................................2500

    Jury question ........................................................2500

Transcript, Jury Trial, Day 10 (Apr. 19, 2005, Doc. 157).......................2506

    Jury deliberations, cont'd.................................2507

    Jury question ........................................................2507

Transcript, Jury Trial, Day 11 (Apr. 20, 2005, Doc. 158)......................2515

    Jury deliberations, cont'd.................................2517

    Jury question ........................................................2517

    Jury questions ......................................................2520

Transcript, Jury Trial, Day 12 (Apr. 22, 2005, Doc. 159)......................2535

    Jury deliberations, cont'd.................................2537

Transcript, Jury Trial, Day 13 (Apr. 25, 2005, Doc. 160)......................2540

    Jury deliberations, cont'd.................................2542

    Jury questions ......................................................2542

Transcript, Jury Trial, Day 14 (Apr. 26, 2005, Doc. 161)......................2553

    Return of verdict ................................................2555

Concluding matters ........................................................................2560

Verdict Form (Apr. 26, 2005, Doc. 107) ........................................2566


VOLUME XI (pages 2569 - 2770)

Defendant's Motion for Judgment of Acquittal (June 6, 2005, Doc. 118)..........2569

Defendant's Corrected Motion for New Trial (June 14, 2005, Doc. 124) ..........2630

Government's Response to Defendant's Post-Trial Motions (June 20, 2005, Doc. 125)................................................................2647

Defendant's Reply to the Government's Response to Defendant's Post-Trial Motions (June 28, 2005, Doc. 126) (attachments omitted from appendix)..................................................................2688

Transcript, Sentencing Hearing (July 13, 2005, Doc. 147) ................................2719

    Argument and ruling on Rule 29 motion.................................................2720
    Argument and ruling on Rule 33 motion.................................................2724
    Ruling on Guidelines objections...........................................................2735
    Argument on sentencing ......................................................................2739
    Allocution ...........................................................................................2746
    Imposition of sentence ........................................................................2750

Judgment in a Criminal Case (July 13, 2005, Doc. 132)....................................2758

Notice of Appeal (July 15, 2005, doc. 133)........................................................2765

Fourth Circuit Judgment (corrected) (with copy of Apr. 25, 2006 order) (May 19, 2006, Doc. 168)................................................................2767


VOLUME XII (pages 2771 - 2998)

Transcript, Hearing (Aug. 24, 2007, Doc. 239)...................................................2771

Transcript, Hearing (Nov. 20, 2007, Doc. 245) ....................................................2790

Transcript, Hearing (May 16, 2008, Doc. 263) ...................................................2795

Transcript, Hearing (Oct. 23, 2008, Doc. 272) ...................................................2802

Transcript, Hearing (Feb. 19, 2009, Doc. 297) ...................................................2827

Transcript, Hearing (Oct. 4, 2013, Doc. 340) .....................................................2834

(Redacted) Memorandum Opinion (denying motions to compel) (Apr. 28, 2014, Doc. 350)...............................................................................................2864

Order (May 21, 2014, Doc. 357)............................................................................2887

Notice of Appeal (June 4, 2014, Doc. 358) ..........................................................2889

Fourth Circuit Order (remanding case for further proceedings) (Aug. 4, 2015, Doc. 406).......................................................................................................2892

Fourth Circuit Order (expanding scope of remand) (July 26, 2016, Doc. 431)..........................................................................................................2894

Government's Response in Opposition to Defendant's Second Motion for Acquittal on Count 1 (Aug. 29, 2018, Doc. 447) ...........................................2896

Defendant's Reply to Government's Supplemental Memorandum on *United States v. Davis* (Aug. 19, 2019, Doc. 459) .........................................2905

Government's Reply in Further Support of Its Supplemental Memorandum on *United States v. United States* (Aug. 26, 2019, Doc. 461) .......................2936

(Redacted) Memorandum Opinion (granting release pending appeal) (Aug. 18, 2020, Doc. 519) ...................................................................................2953

Order (granting release pending appeal) (Aug. 18, 2020, Doc. 520) .................2969

Fourth Circuit Order (affirming grant of release pending appeal) (Aug. 31, 2020, Doc. 535)...............................................................................................2971

Memorandum Opinion (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 549)..........................................................................................2972

Order (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 550)..........................2998

VOLUME XIII (pages 2999 - end)

Selected Government Trial Exhibits...................................................................2999

Gov't Exh. 1B1a: transcript of Apr. 7, 2003 consensually monitored call between Kwon and Royer.........................................................................2999

Gov't Exh. 1B2a: transcript of Apr. 8, 2003 consensually monitored call between Kwon and Royer.........................................................................3053

Gov't Exh. 1B4a: transcript of Apr. 17, 2003 consensually recorded CCTV hotel meeting between Kwon and Royer.......................................3084

Gov't Exh. 1D27: Taiba Bulletin, Oct. 17, 2000.........................................3131

Gov't Exh. 1D28: Taiba Bulletin, Oct. 27, 2000.........................................3134

Gov't Exh. 1D29: Taiba Bulletin, Nov. 7, 2000...........................................3137

Gov't Exh. 1D45: Taiba Bulletin, Sept. 26, 2001 (post from nadqpk@yahoo.com)..................................................................................3139

Gov't Exh. 1D48: Taiba Bulletin, Oct. 13, 2001 (post from nadqpk@yahoo.com)..................................................................................3141

Gov't Exh. 1D52: Taiba Bulletin, June 24, 2001 (post from nadqpk@yahoo.com)..................................................................................3144

Gov't Exh. 1F1: LET Poster, image 1 ............................................................3151

Gov't Exh. 1F3: LET Poster, image 3 ............................................................3152

Gov't Exh. 1F4: LET Poster, image 4 ............................................................3153

Gov't Exh. 1G10a: transcript of Apr. 1, 2003 recorded telephone call (Hammad and Royer call Al-Timimi) ....................................................... 3154

Gov't Exh. 4G7: email dated June 19, 2001 from pballaz@yahoo.com, regarding praying in a moving car .............................................................. 3164

Gov't Exh. 7A19: Uqla fatwa on events of 9/11, in English, taken from Surratt's residence on May 8, 2003 ............................................................ 3168

Gov't Exh. 7A23; Hawali's *Statement to the Ummah* in English ................. 3178

Gov't Exh. 7A39a: translation of website containing Space Shuttle article in Arabic ........................................................................................ 3200

Gov't Exh. 7C31: email dated Sept. 20, 2001 from Kwon to Belton Harris ................................................................................................................. 3203

Gov't Exh. 7D3: email dated Oct. 15, 2001 from Surratt re. Hawali's *Statement to the Ummah* ..................................................................................... 3204

Gov't Exh. 7F24a: UPI News article dated Sept. 16, 2001 titled *Taliban Leaders Seek Islamic Support* ....................................................................... 3206

Gov't Exh. 7H12: plea agreement and statement of facts for Muhammed Aatique .................................................................................................................. 3207

Gov't Exh. 10A3: document entitled *Suicide Attacks, Are They Suicide? A Shariah Viewpoint* ........................................................................................ 3223

Gov't Exh. 10A41: email dated Oct. 23, 2000 from Nabil to Timimi re: trip to Delaware ........................................................................................ 3227

Gov't Exh. 10D19: email dated Oct. 21, 2001 email from altimimi@yahoo.com to aqdcksa@yahoo.com re. "Utter Nonsense" ...... 3229

Gov't Exh. 10H1A: record of instant messaging session with Bin Laden statement preamble ................................................................................... 3233

Gov't Exh. 10J7: article, *Sheikh Ali Timimi on the Taliban and the Statues* ................................................................................................................. 3260

Gov't Exh. 10J9: email dated December 13, 2001 from Timimi re. "A call to reflect and repentance" ..................................................3262

Gov't Exh. 10J15: affidavit of Youseff Idris................................3265

Gov't Exh. 10S1: summary chart of Timimi / Kwon telephone calls, Sept. 16, 2001 ...........................................................................3266

Gov't Exh. 10S2: summary chart of Timimi / Kwon telephone calls, Sept. 19, 2001 ...........................................................................3267

Gov't Exh. 10S3: summary chart of Kwon telephone calls, Sept. 16, 2001 ..............................................................................................3268

Gov't Exh. 10T1: photograph, package of "New World Order" cassette tapes ..............................................................................................3272

Gov't Exh. 12-1: stipulation re. background facts............ 3273; *see* J.A. 167-171

Gov't Exh. 12-60: stipulation re. electronic surveillance of calls and email............................................................................................3277

Gov't Exh. 12-61: stipulation re. Al-Timimi lectures ...........3278; *see* J.A. 2344

Selected Defense Trial Exhibits.........................................................3280

Def't Exh. 33: Al-Timimi lecture titled *Muslims in America in the Face of Accusations of "Fundamentalism" and "Terrorism"* delivered at Purdue University on Oct. 20, 1993 .........................................3280

Def't Exh. 57: letter dated from AUSA Gordon Kromberg to Yong Kwon's attorneys ......................................................................3293

Def't Exh. 80: stipulation regarding Al-Timimi's unsubscription from Taiba Bulletin List ..................................................................3295

Def't Exh. 81: summary report of an interview with Ismail Royer by Evan Kohlmann ......................................................................3298

Def't Exh. 82: photo of front of Yong Kwon's apartment ............................3303

Def't Exh. 83: photo of back of Yong Kwon's apartment .............................3304

Def't Exh. 85: summary of Yong Kwon's phone calls on Sept. 16, 2001 ............................................................................................. 3305

Def't Exh. 86: summary of Yong Kwon's phone calls on Sept. 13-15, 2001 ...........................................................................3306

Def't Exh. 87: summary of Al-Timimi's calls on evening of Sept. 19, 2001 ...........................................................................3307

Def't Exh. 90: summary of Al-Timimi's calls on evening of Sept. 19, 2001 ...........................................................................3308

This page intentionally left blank for double-sided pagination and printing

1659

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | Criminal No. 1:04cr385 |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | April 13, 2005 |
| ALI AL-TIMIMI, | . | 9:30 a.m. |
| | . | |
| Defendant. | . | |
| | . | |

. . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME VII

APPEARANCES:

FOR THE GOVERNMENT:              GORDON D. KROMBERG, AUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314
                                   and
                                 JOHN T. GIBBS, ESQ.
                                 Counterterrorism Section
                                 Criminal Division
                                 United States Department of Justice
                                 601 D Street, N.W.
                                 Washington, D.C. 20004

FOR THE DEFENDANT:               EDWARD B. MAC MAHON, JR., ESQ.
                                 107 East Washington Street
                                 P.O. Box 903
                                 Middleburg, VA 20118
                                   and
                                 ALAN H. YAMAMOTO, ESQ.
                                 643 S. Washington Street
                                 Alexandria, VA 22314

ALSO PRESENT:                    S.A. WADE AMMERMAN
                                 BOBBY WILLIAMS
                                 S.A. JOHN WYMAN

(Pages 1659 - 1911)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1   OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Fifth Floor
 2                                   401 Courthouse Square
                                     Alexandria, VA 22314
 3                                   (703)299-8595
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1661

```
 1                          I N D E X

 2                          DIRECT   CROSS   REDIRECT   RECROSS

 3   WITNESSES ON BEHALF OF
     THE GOVERNMENT:
 4
     S.A. John Wyman           1664    1706     1770       1777
 5     (Resumed)

 6   Alex Daghestani           1781    1789

 7   Andre Thompson            1794    1805

 8
     WITNESSES ON BEHALF OF
 9   THE DEFENDANT:

10   Sherdil Loynab            1820    1824     1830

11   Yousuf Jaafar Idris       1831    1872

12

13                          EXHIBITS

14                          MARKED      RECEIVED    WITHDRAWN

15   GOVERNMENT'S:

16   No. 4G7                               1799
         5C1                               1701
17       7C33                              1701
         10F4                              1784
18       10F5                              1787

19       10J10                             1692
         12-60               1769          1769
20

21   DEFENDANT'S:

22   No. 48                                1714
         52                                1738       1741
23       70                                1855
         78                                1741
24       79                                1717       1717

25       89                  1722
         90                                1871
```

**J.A. 1807**

1662

1                    P R O C E E D I N G S

2                 (Defendant present, Jury out.)

3          THE COURT:  All right, Mr. Kromberg, I understand there

4   are some preliminary matters we need to discuss.  I don't want to

5   have the jury always having to come late.  So they're all here,

6   ready to go.

7          MR. KROMBERG:  Your Honor, we wanted to get on the

8   record the resolution of the issue regarding the classified -- a

9   question regarding the classified matter, and I don't know --

10         THE COURT:  Can that be done in open court, or do you

11  need to approach the bench?

12         MR. GIBBS:  I think we need to approach, Judge.

13         THE COURT:  All right.  Now, we don't have the secure --

14  I don't think Ms. Thomson has her secured machine here.  Do we

15  have to do this now, or can we do it at a break?

16         MR. GIBBS:  A break is fine with us.

17         MR. KROMBERG:  There was a question that came up during

18  the cross examination of Special Agent Wyman, who may well get to

19  cross examination before the midmorning break.

20         THE COURT:  We don't even have a court security officer

21  here, do we?

22         MR. MAC MAHON:  I saw her this morning downstairs, Your

23  Honor.  She got away before --

24         THE COURT:  And again, the problem is we will not have a

25  classified disk.  How classified is this discussion going to be?

1663

1    MR. GIBBS:  It's going to be brief and not that
2  classified, Judge.
3    THE COURT:  Is the government uncomfortable, I mean, we
4  can seal this portion of the transcript --
5    MR. GIBBS:  I think at this point, I'm not sure we would
6  want to speak in open court, Judge.
7    THE COURT:  Well, I can have the courtroom cleared,
8  that's not a problem, but the point would be that we wouldn't be
9  100 percent by the book if we're not using a special disk on the
10 court reporter's machine.  Is that a problem for you or not?
11    MR. GIBBS:  Yeah, if we can just clear the courtroom,
12 Judge?
13    THE COURT:  All right.  Mr. Wood, I'll ask that
14 everybody will have to stay out of the courtroom, please.
15    MR. MAC MAHON:  Including the defendant, Your Honor?
16    THE COURT:  That includes Mr. Timimi, yes.  Everybody.
17    I do assume that our agents are cleared?
18    MR. GIBBS:  They are, Judge.
19    THE COURT:  Oh, well, sometimes that is not the case.
20    MR. GIBBS:  That's true.
21    THE COURT:  So everyone out who doesn't have a
22 clearance.  I'll put the burden on the government to ensure that
23 whoever is in here has the appropriate clearance.
24    MR. GIBBS:  They do, Judge.
25    THE COURT:  All right.  All of my staff is cleared, so

# Wyman - direct

1   there's not a problem with that.

2            All right, Mr. Wood, we're sealing the courtroom.  We

3   probably should have the external doors -- everybody outside

4   beyond the external doors.

5            (CIPA HEARING NOT TRANSCRIBED IN THIS VOLUME)

6                    (Defendant and Jury present.)

7            THE COURT:  We should put your names on these chairs --

8   not your names -- your numbers on these chairs.

9            I understand you-all have a nice, fresh supply of pens.

10  All right, we're keeping the jury well supplied.

11           All right, I think we're all set to go.  Very good.

12           All right.  Agent Wyman, I believe, is still on the

13  stand.

14           MR. KROMBERG:  That's correct, Your Honor.

15           THE COURT:  And you're still under your affirmation from

16  yesterday, Agent Wyman.

17           SPECIAL AGENT JOHN WYMAN, GOVERNMENT'S WITNESS,

18                    PREVIOUSLY AFFIRMED, RESUMED

19                    DIRECT EXAMINATION (Cont'd.)

20  BY MR. KROMBERG:

21  Q.   Special Agent Wyman, you were talking yesterday about the

22  course of your interviews with -- your discussions with

23  Mr. Timimi, correct?

24  A.   Correct.

25  Q.   Okay.  You talked about the Taiba Bulletins.  Did you --

**J.A. 1810**

# Wyman - direct

1  what, if anything, did you ask him about Taiba Bulletins that were

2  issued after 9/11?

3  A.    We asked him whether he was familiar with the statements made

4  by Saeed that were reported in the Taiba Bulletins after 9/11.

5  Q.    Do you recall which statements you asked him about?

6  A.    Yes.  I think there were four different posts under the name

7  "Taiba Bulletin."

8  Q.    1D45, 46, 47, and 48?

9  A.    Yes.

10           MR. KROMBERG:  Could we bring up 1D45, please?

11           THE COURT:  These are all in already?

12           MR. KROMBERG:  Yes, Your Honor.

13           THE COURT:  All right.

14           MR. MAC MAHON:  Could we get a date, Your Honor, so I

15  could look at a 302 as to when this was done?

16           THE COURT:  What, the interview?

17           MR. MAC MAHON:  When these were showed.

18           THE COURT:  Yes.

19           MR. MAC MAHON:  If I could, please?

20           THE COURT:  Mr. Kromberg, if you know, just let us --

21           MR. KROMBERG:  I did yesterday, but I got out of order,

22  and now I don't.  I'm sorry, Judge.

23           THE COURT:  That's all right.

24           So the jury -- I think you-all may understand the

25  context of this.  In our -- in the federal legal system, we do

**Wyman - direct**

1   require that the government exchange its discovery with the other
2   side.  It helps in being able to evaluate it and cross-examine it,
3   and so there were four interviews apparently that we're talking
4   about, four different 302s, and Mr. MacMahon, as he said
5   yesterday, needs to know which 302 is being discussed so that he's
6   able to, you know, look at his notes as to that particular
7   interview.

8           THE WITNESS:  August 21, 2003.

9           THE COURT:  August 21, 2003.

10          MR. MAC MAHON:  Thank you, Your Honor.

11  BY MR. KROMBERG:

12  Q.   Now, on 1D45, which is on the screen, what did you ask him
13  about that one?

14  A.   We asked him if -- it was two things:  one, whether he
15  recalled receiving these, these Taiba Bulletins, because they were
16  somewhat different than the others, and he said that he didn't
17  recall seeing these.

18          And we asked him also whether he was familiar with the
19  statements that were contained therein from Saeed right after
20  9/11, which we -- which related to Lashkar's expressed willingness
21  to help the Taliban against the Americans.

22  Q.   Were there any -- did you point out specific statements in
23  them?

24  A.   Well, we presented essentially the first page and read
25  through the headlines.  Like in this one, this is 1D -- I'm not

# Wyman - direct

1  sure what number this is, but --

2  Q.    1D45, from September 25, 2001?

3  A.    Right.  This section here.

4  Q.    "Lashkar-e-Taiba will not leave Afghan brethren in the lurch.

5  They will sacrifice their lives along with other Muslims against

6  America and other disbelievers in case they attack Afghanistan"?

7  A.    Yes.

8  Q.    And what did he say his familiarity with that position

9  espoused by Lashkar-e-Taiba was?

10 A.    He said he was not familiar with that.

11 Q.    How about, take a look at 1D46.  This was October 7, 2001?

12 A.    Okay.  Yes.

13 Q.    And what was the statement on, on October 7, 2001, that you

14 asked him about?

15 A.    ˙If you could scroll down, it would be helpful.

16        Okay.  Just the -- thanks.  This one I don't believe we

17 would have pointed out anything other than just the, just the

18 general headline, the fact that it came from a Taiba Bulletin and

19 that they were reporting about the world against Islam and the

20 Muslim world being launched.

21 Q.    All right.  What did Mr. Timimi say about his knowledge of

22 Taiba Bulletin's position that this was a war against Muslims?

23 A.    Not familiar with that.

24 Q.    1D47, October 7, 2001?

25 A.    Same thing for this one.  The headline there:  "Terrorist

1668

**Wyman - direct**

1  strike of Non-Muslims on Islam and Muslim world and way of

2  survival for Muslims."

3  Q.   That was by Hafiz Saeed?

4  A.   That was by Hafiz Saeed.

5  Q.   What did Mr. Timimi say about his familiarity with that

6  statement by Hafiz Saeed?

7  A.   The same response.  He was not familiar with that.

8  Q.   And how about 1D48, October 12, 2001?

9  A.   It's a general statement again by Saeed saying the ummah

10  should support the oppressed Afghans.

11  Q.   And what did Mr. Timimi say about that position of Hafiz

12  Saeed on behalf of Lashkar?

13  A.   He was not aware of that position.

14  Q.   Now, if we could go back to Government Exhibit 10J9, which is

15  in evidence?

16  A.   Okay.

17  Q.   Could we scroll down?  I think we talked before about "Many

18  of you have noticed my silence on the recent events.  This is not

19  because I am not with opinion; but rather I have decided to apply

20  the Prophetic ordinance (upon our Prophet the best salaah and

21  salaam):  Man samata naja" --

22          THE COURT:  Mr. Kromberg, you're almost mumbling.

23          MR. KROMBERG:  Sorry.

24  Q.   "(Whoever is silent will be saved)."

25          Now, did you ask Mr. Timimi anything about that next

**J.A. 1814**

**Wyman - direct**

1  paragraph: "Al-hamdulillah, those brothers in my area have been
2  able to benefit from what I have had to say (and all praise
3  belongs to Allah). But this unfortnately due to the circumstances
4  has been limited to private visits and not public statements"?
5  A.   Yes, we did.
6  Q.   What did he say?
7  A.   We asked whether those -- whether he was referring to the
8  meetings that he had at Kwon's house and at his house, and he said
9  he didn't know what he was referring to there.
10 Q.   Did he explain to you what he meant when he referred -- when
11 he said his "silence on the recent events"?
12 A.   No, he didn't have an explanation for his silence.

13          MR. MAC MAHON:   Your Honor, I'd move to strike the end.
14 The question was did he ask him about it and what was his answer,
15 not whether or not he had an explanation for it.

16          THE COURT:   All right, just clear it up.  Did you ask
17 the defendant specifically what he meant by talking about his
18 silence?

19          THE WITNESS:   I don't remember asking him about the
20 silence.

21 BY MR. KROMBERG:
22 Q.   Do you remember asking why he sent the e-mail?
23 A.   Yes.
24 Q.   What did he say was the reason why he sent the e-mail in
25 which he said, "Many of you have noticed my silence on the recent

1670

**Wyman - direct**

1  events"?

2  A.    He said he was sending the e-mail in response to postings on

3  the Jazeera list.

4  Q.    On the what?

5  A.    On the Al-Jazeera list.

6  Q.    Did he say what postings there were on the Al-Jazeera list

7  that he was responding to?

8  A.    Well, he said in here --

9  Q.    No, no, not what -- did he say to you what postings on the

10  Al-Jazeera list that he was responding to?

11  A.    He said that it was the differing opinions that were posted

12  on the Al-Jazeera list, and we asked him what those opinions were,

13  and he said he did not know; he couldn't remember.

14  Q.    In the seventh paragraph, where it says -- well, it's tough

15  for me to tell which one is the seventh paragraph.  I think --

16  hold it right there.

17            "I do not want to belabor the point, but, my earnest

18  belief is that the brothers have been motivated in their positions

19  by a great amount of emotionalism, and at times, I am afraid to

20  say delusion."  Did you ask him what positions he was referring to

21  that the brothers were motivated by a great amount of emotionalism

22  and delusion?

23  A.    Yes.  We asked who he was referring to by this statement, and

24  he said it was not to the -- he was not referring to the

25  recipients of the e-mail.  He said he was probably referring to

# Wyman - direct

1  the people that had posted those opinions on the Al-Jazeera list.

2          And we asked him whether he could also have been

3  referring to the 9/11 hijackers.  He said maybe, but it's -- he

4  thought more likely that he was referring to the people that had

5  posted on the Al-Jazeera list.

6  Q.  Did you conduct a search for postings on the Al-Jazeera list

7  posted after 9/11 but before this e-mail that were made by the

8  addressees on this exhibit?

9  A.  Yes.

10          MR. KROMBERG:  Okay.  And, Judge, I would like to go

11  back to that perhaps during a break, but I wanted to lay that

12  foundation.

13          THE COURT:  Well, let me just make sure I understood

14  your answers, though.  Did I understand you correctly, I thought

15  you said that the defendant said he was not responding to anything

16  written by the addressees on this e-mail.

17          THE WITNESS:  Sorry, I didn't make myself clear.

18          THE COURT:  All right.

19          THE WITNESS:  In the, in the point where he says "the

20  brothers have been motivated in their positions by a great amount

21  of emotionalism, and at times, I am afraid to say delusion," we

22  said, who were the brothers that he was referring to by that

23  statement?

24          THE COURT:  All right.

25          THE WITNESS:  He said he did not think that it was the

# Wyman - direct

```
 1  recipients of the e-mail that he was saying were showing
 2  emotionalism and delusion.  He said it was -- he thought it was
 3  the people that had posted to the Al-Jazeera list.
 4           MR. MAC MAHON:  Can we get the date on this one, Your
 5  Honor?  I'm sorry.
 6           THE COURT:  This interview?
 7           MR. MAC MAHON:  Yes.
 8           THE WITNESS:  It's November 17, 2003.
 9           MR. MAC MAHON:  Thank you.
10           MR. KROMBERG:  Judge, I think that the -- all the points
11  I have on this issue are in, and we could go back to it at a break
12  if that's --
13           THE COURT:  That's fine.
14           MR. KROMBERG:  Thank you.
15           If we can scroll down, Mr. Williams?
16  Q.   Now, these are -- when the e-mail -- he writes in the
17  e-mail, "These are without difficult times.  And in reflection of
18  the confusion among the ummah, there is no unamity of opinion
19  among the scholars of Ahlus-Sunnah on these matters."
20           No, we've got to go to the next page.  "It is possible
21  to easily find a scholar of good aqeeda, known for his piety and
22  praiseworthy character -- having an opinion from one end of the
23  spectrum to the other.  I believe some of these conflicting
24  opinions have been sent on this list.  This by no means is to be
25  understood that the truth is not known in this matter.  No, may
```

# Wyman - direct

1    Allah forbid!  For this ummah does not gather on error.  But due
2    to the lack of any unified leadership in this ummah (political or
3    religious) coupled with the Internet age and mass communication --
4    we see a proliferation of opinions.  As Sheikh Safar has commented
5    in his 30 page declaration to the ummah (unfortunately
6    untranslated into English) -- which by the way is a summary of a
7    200 page treatise -- the general body ummah was of a single
8    opinion regarding the events until the scholars began to speak!
9    (What that opinion was, I will refrain from answering.  But I
10   think if everyone notices his initial reaction then he
11   insha'allah, will know what the answer is)."

12            Did you -- hold on.

13            Agent Wyman, did you discuss with Mr. Timimi the
14   reference to Sheikh Safar?

15   A.   Yes, we did.

16   Q.   Who was Sheikh Safar according to Mr. Timimi -- excuse me,
17   who was Mr. Timimi referring to when he referred to Sheikh Safar?

18   A.   Safar Al-Hawaali.

19   Q.   What did Mr. Timimi say about that declaration to the ummah
20   to you?

21   A.   He said that, he said that the statement by Hawaali that he
22   was referring to was the Statement to the Ummah Concerning the
23   Recent Events.

24   Q.   And take a look, if you would, at Government Exhibit 7A23,
25   which is in evidence.

# Wyman - direct

1   　　　　Is that, is that the document he was referring to?

2   A.   Yes.

3   Q.   Is that your handwriting on the upper left?

4   A.   It is.

5   Q.   What did -- actually, also take a look at 7A1.  Government

6   Exhibit 7A1, I believe, is also in evidence.

7   　　　　Did Mr. Timimi comment on this exhibit, Government

8   Exhibit 7A1?

9   A.   Yes, he did.

10  Q.   What did he say?

11  A.   He compared that document to the one that you just showed

12  before, the English document, compared the two, and said that they

13  were both the same document, just one in Arabic and one in

14  English.

15  Q.   Okay.  Let's go back to 7A23, please.

16  　　　　What did Mr. Timimi tell you about Safar Hawaali?

17  A.   You mean about this document or in general?

18  Q.   Just talk about Safar Hawaali first.

19  A.   He told us that he's a Muslim scholar who he respects, holds

20  in high esteem.  He's someone that he respects his opinion and

21  uses them for his own guidance when making his own opinions.

22  Q.   How -- what was the extent of his awareness regarding what

23  Safar Hawaali's positions were, did he say?

24  A.   He said he was well aware of those.

25  Q.   What kinds of positions was he aware of?

1675

**Wyman - direct**

1   A.   He was aware of his positions on America in particular.

2   Q.   What did Ali Al-Timimi tell you about his view of Hawaali's

3   positions on America?

4   A.   He said his views were in line of Mr. Hawaali's.

5   Q.   What did he say about any personal relationship he had with

6   Hawaali?

7   A.   Well, he said he studied under Hawaali back in 1987,

8   maintained contact with him since that time except for the period

9   of time when he was in jail in Saudi Arabia.

10  Q.   When who was in jail?

11  A.   Safar Hawaali was in jail in Saudi Arabia.

12  Q.   What did he say about any discussion he had with Hawaali

13  regarding events surrounding 9/11?

14  A.   He said after 9/11, he called Hawaali in order to get his

15  take on the events that had happened on 9/11.

16  Q.   What did he say about the relationship, if any, between the

17  views on Islam that he had and those that Hawaali had?

18  A.   He said they were the same, similar.

19  Q.   What did he say about the relationship, if any, between the

20  views on Islam that Hawaali had and those that Bin Laden has?

21  A.   Well, he was asked about the connections between Hawaali and

22  Bin Laden, and Mr. Timimi said that he's aware of the belief that

23  Hawaali is one of Bin Laden's spiritual leaders, and, and he said

24  that he's talked to Hawaali about this, and he came to the opinion

25  that he, like Hawaali, is not aligned with, with Bin Laden.

**J.A. 1821**

# Wyman - direct

1  Q.   Did he explain what the basis for the opinion that Hawaali
2  was aligned with Bin Laden was?
3  A.   Yes.  He thought that, he thought that was primarily rooted
4  in the reference by Bin Laden in his declaration of war against
5  the U.S. to the fact that Hawaali and Ouda had been imprisoned by
6  the Saudis on behalf of the U.S. government.
7  Q.   Regarding the e-mail, 10J9, the call to reflect and
8  repentance we were just looking at where he referenced Hawaali's
9  statement, what did he say about having read the Hawaali Statement
10 to the Ummah before referring to it in his e-mail?
11 A.   He said he had read it before he sent it.
12 Q.   Did he say how he first learned about the Hawaali Statement
13 to the Ummah?
14 A.   He said he either received it in an e-mail or had seen it
15 when it was first posted on the Internet.  He said it was widely
16 distributed.
17 Q.   Did there come a time when you summarized Hawaali's message
18 in the Statement to the Ummah and asked Mr. Timimi whether that
19 was an accurate summary?
20 A.   Yes, there did.
21 Q.   What -- how did you summarize Hawaali's message -- Hawaali's
22 Statement to the Ummah?  And this was on November 17, 2003, right?
23 A.   Correct.  I'm going to have to read this one because it's
24 a --
25           THE COURT:  Are you reading it verbatim?

1677

**Wyman - direct**

1       THE WITNESS:  I'm going to -- sorry.

2       THE COURT:  I just want the jury to understand and I

3  need to understand, too, what you're about to give us, is this the

4  exact summary that you presented to the defendant during that

5  interview?

6       THE WITNESS:  What I did was during the interview, I

7  summarized -- I summarized it not reading from, from a written

8  statement, but then almost immediately after the interview was

9  over, I wrote down what it was that I had said.  So it wasn't

10  right at the time, but I wrote down what it was that I had said so

11  I did not forget the summary that I had given him.  And then from

12  that, that was what was put into the 302.

13       So --

14  BY MR. KROMBERG:

15  Q.   So you're reading the 302 at this point?

16  A.   I'm fairly confident that what is written here is, is the

17  summary that I gave to Timimi, and that's what's memorialized in

18  the 302.

19       THE COURT:  All right, I just want the jury to

20  understand exactly how this was done.  All right, go ahead.

21  BY MR. KROMBERG:

22  Q.   Right.  So what you've been reading from now is the FBI

23  report that we've been calling the 302?

24  A.   Right.  And that's why I want to refer to this 302 instead of

25  my memory so that --

# Wyman - direct

1  Q.   Okay.  How did you summarize Hawaali's message to Mr. Timimi
2  when you spoke with him?

3  A.   I said that my summary, after reading the Hawaali statement,
4  this is the message that I get from Hawaali:  that the attacks
5  were only wrong because the attackers acted on their own without
6  consulting the scholars.  Even though the attackers acted without
7  consulting the scholars (jumped the gun) -- and I used that word
8  when presenting it to Mr. Timimi -- they should still be
9  considered mujahideen if their intentions were good, and the
10 actions of the attackers were now history.  What is done is done,
11 and thus, Muslims now have to determine whether they should
12 abandon other Muslims or stand by them, regardless of whether they
13 agree with how the fight started.

14 Q.   How accurate did Mr. Timimi say that summary of what
15 Hawaali's Statement to the Ummah was?

16        MR. MAC MAHON:  Your Honor, I object to this.  We've
17 been through this before with a motion.  He's going to ask him
18 exactly what he said, and I'm looking at the 302 as to what the
19 answer is.  The question wasn't whether it was accurate or not,
20 and if you want to see it, we can approach.

21        THE COURT:  I think this needs to be as close to what
22 the 302 reports as possible, so rephrase your question in light of
23 the 302.

24 BY MR. KROMBERG:

25 Q.   Agent Wyman, is it correct that Ali Timimi responded by

# Wyman - direct

1  affirming that the summary paraphrase presented by the

2  interviewing agent was a good one?

3  A.   Yes.

4        MR. KROMBERG:   Thank you, Your Honor.

5  Q.   What did Ali Timimi say about whether Hawaali's views in the

6  Statement to the Ummah were the same as Timimi's own?

7  A.   Because we were referring to both the e-mail and the Hawaali

8  statement, we were asking Timimi whether the passage where he says

9  that he could not put his own opinions and therefore he was

10 referring them to the ummah, whether he was telling people that in

11 order to know his own opinions, they should look at the statement

12 to the ummah.  Was he saying that those statements should be taken

13 as his own opinion?

14 Q.   And what did he say?

15 A.   He said yes.

16 Q.   Did Mr. Timimi -- did you ask Mr. Timimi whether he could

17 recall anything that Hawaali said about the events of 9/11 that

18 he, Ali Timimi, did not agree with?

19 A.   During the interview, he had the opportunity to look through

20 the document, but he didn't read it -- it would have taken a long

21 time to read through everything.

22        So what we asked him, we said, you know, "Based on your

23 knowledge of the document that you've read and that you've had a

24 chance to look through today, is there anything in there that you

25 recall that you disagree with that Mr. Hawaali said?"

# Wyman - direct

1                 And he said, "No."

2  Q.    Where was that document, Statement to the Ummah, when you

3  were having this discussion with him?

4  A.    In front of him.

5  Q.    Did there come a time when you asked Mr. Timimi about

6  specific texts contained within the Statement to the Ummah?

7  A.    Yes.   In order to clarify whether, whether he disagreed with

8  the statements made by Hawaali, we directed him to specific

9  paragraphs or passages within the declaration.

10                MR. KROMBERG:   Okay.   If we could bring up on 7A23 page

11  14?

12  Q.    Mr. Wyman, can you circle on the screen the particular

13  portion that you asked him about?  Look at the screen if you

14  would.   It might be quicker.

15                If we could make that bigger?

16  A.    Yes.   It's this top part here (indicating).

17  Q.    The one that says, "The enemy has declared a war against us

18  psychologically and against our values.  Some amongst us have been

19  found to be following them and promoting and propagating their

20  ideas and terminologies amongst us.  Otherwise, when was The

21  Pentagon ever regarded 'an innocent'!  Wheras, it is in the words

22  of an American thinker, Ghour Fidal and the likes of him as well

23  as the common folk in America, the Pentagon is regarded as the

24  'hell's retreat,' 'the home of conferences that make mischief in

25  the world,' or the 'Devils' nest' - all of this besides its being

1  the biggest military target in the world.  They made such similar
2  references also of what is the pit of espionage, the nest of
3  Mafia, the centre of usury and the washer away of wealth - i.e.
4  The World Trade Centre."
5         Is that the section you asked him about?
6  A.   Yes.
7  Q.   What did he say?
8  A.   We asked him if he disagreed with that, and he said he did
9  not.
10 Q.   Was there another sentence there regarding the attacks on
11 Aden, East Africa, and America?
12 A.   Yes, it was.
13 Q.   Is that farther down on that page -- or farther up?  I can't
14 see it on the screen that I have before me.
15 A.   It's at the top.
16 Q.   Okay.  Is it the part that says, "Therefore, their acts come
17 in a way that resembles miracles whether it is in Afghanistan,
18 Chechnya, Somalia, Kashmir or Bosnia.  If it is true that the
19 explosions that occurred in Khobar, Aden, East Africa and America
20 is from them, then these are yet another example"?
21 A.   Yes.  We asked whether he disagreed with Hawaali's position
22 on that, and he said he did not.
23 Q.   Okay.  If you'd turn to page 11?  Was there a section that
24 you asked Mr. Timimi about regarding missile attacks allowing
25 Al-Qaeda to take revenge on the United States?

**Wyman - direct**

1  A.    Yes.   I believe it's at the bottom of that paragraph there,
2  the one that I marked.
3  Q.    Can you, can you read the part that you asked him about?
4  A.    "Particularly in this incident, Americans know well that
5  those whom" -- I'm going to read off this document here.

6        "Particularly in this incident, Americans know well that
7  those whom they oppose and who oppose them with animosity between
8  them and those with whom they broke off and who broke off with
9  them are the 'al-Qaida Organization' or more correctly 'the
10 frontline of Jihad against the Crusaders', these people
11 specifically and in particular, whereas the rest of the Muslims
12 don't enter into this matter nor take this ruling.  Thus, while
13 America warns its citizens about them - and not from every
14 Muslim - it is acting accordingly, due to the enmity and present
15 breaking of ties, and while Clinton acknowledged that he ordered
16 the killing of these people, deliberately and knowingly, by the
17 earlier missile attack - this all dictates that it is the right of
18 the other side to do the same."
19 Q.    What did he say about whether he agreed or disagreed with
20 that passage?
21 A.    We asked whether he agreed with that one as well.  He said he
22 did.
23 Q.    He said he what?
24 A.    He said he did.
25 Q.    Is there a statement on page 5 under the heading section

# Wyman - direct

1  "Five," where the 9/11 attackers were described as mujahideen?

2  A.   Yes, there is.

3  Q.   Can you circle where that is and once we make it bigger, read

4  it?

5  A.   The section we directed him to there was, "Thus, if the

6  Mujahideen abided by the Book of Allah and the Sunnah of His

7  Messenger (s.a.w) entirely - and this includes consultation with

8  those who are concerned with this matter and give up separating

9  themselves and isolating from the rest of the ummah - if they were

10 to do this then they would have been successful in striking down

11 the enemy and acquiring a position of strength in a way that

12 actually benefits and does not harm.  And then none would have had

13 anything to object except a hypocrite who is known to be just

14 that."

15 Q.   What did he say in response to your question about that

16 section?

17 A.   He said he was aware of that position and didn't disagree

18 with it.

19 Q.   Go to page 8, if you would.

20        Was there a section on page 8 that you asked him about

21 describing one's obligation to support those who have acted in

22 accordance with their faith and the implications that would befall

23 jihad if the people of knowledge started attacking the people of

24 jihad?

25 A.   Yes.

1684

**Wyman - direct**

1  Q.   Can you circle that and read that, please?

2  A.   "So the Muslims are one Ummah and their responsibility and

3  pacts are undertaken by the least of them [in status] and they are

4  all one single hand on others besides them.  Whoever amongst them

5  stands up to undertake a facet of religion be it to do with

6  knowledge, Dawah or Jihad, loving him and supporting him becomes

7  obligatory, while they ought to all strive to have their efforts

8  done side by side supplementing each other and completing.  But if

9  the people of knowledge started attacking the people of Jihad or

10  the latter deny and disavow the former and so on, then the

11  strength and spirit of the Believers will disappear and their

12  ranks will scatter and split up amongst themselves and they will

13  fall in the way of those who incurred the wrath (of Allah) or the

14  way of the astray."

15  Q.   What did you ask him and what did he say about that section?

16  A.   We asked if he was aware of that position, and he said he was

17  and that he did not disagree.

18  Q.   Finally, on page 12, is there a section there under the

19  heading "Ten" that relates to the intentions of the 9/11

20  attackers?

21  A.   Yes.

22  Q.   Can you circle the section you're referring to, and can you

23  read that, please?

24  A.   "If a Muslim did ijtihad (strove to find the correct

25  standpoint according to Islam) in aiding the religion and taking

**Wyman - direct** 1685

1  revenge against the unjust Kuffar (Non-believers) for his Muslim
2  brothers and in order to cause a loss amongst the Kuffar but he
3  erred in his judgement then he is nevertheless rewarded for his
4  intention despite the mistaken action.  This person is not like
5  (i.e. does not fall in the category of) the one who is waging a
6  war (in the land) with aggression.  This latter one his goal is to
7  loot the wealth, violate the chastity and honour and cut off the
8  roads.  More importantly for the Muslims, [the one who did ijtihad
9  and erred] his rights of the Islamic brotherhood (based on Iman Or
10  Faith) do not cease and amongst the things that show this is the
11  saying of the Prophet (s.a.w), 'The Muslim is the brother of a
12  Muslim, he doesn't desert him nor submit him.'  Deserting him is
13  to leave helping him and submitting him is to draw away from him
14  leaving the enemy to do with him as he pleases."
15  Q.   What did you ask him about that, and what did -- what did you
16  ask Mr. Timimi about that, and what did Mr. Timimi say about that?
17  A.   We asked if he was aware of it and whether he disagreed.  He
18  said he was aware and he did not disagree.
19  Q.   By the way, you mentioned Hawaali is referring to attacks in
20  Aden and East Africa.  Are you aware of Al-Qaeda attacks in Aden
21  and East Africa?
22  A.   Yes.  The USS Cole was attacked in October 2000 in Aden,
23  Yemen, and East Africa bombings were in Kenya and Tanzania August
24  of 1998.
25  Q.   Did you ask Mr. Timimi whether there was anything in this

**Wyman - direct**                                          1686

1    statement that he disagreed with?

2    A.   Yes, we did.  He said that he did not disagree; however, he

3    did say he thought we were being overly harsh in our

4    interpretation of what the document said, that it supported Bin

5    Laden and the attacks.  He said that this paper is a -- he said it

6    was an intellectual analysis of what happened, and he said that --

7    he said that he differs with our, with our opinion of it being

8    such a, such a harsh document, and he said this is more just an

9    intellectual analysis of what happened.

10   Q.   What did -- we can take that off.  Thank you.

11        In your -- the course of your discussions with

12   Mr. Timimi, what did he tell you about whether Mullah Omar or the

13   Taliban was considered the Khalifa or the Amir Mumineem, the

14   leader of the Muslims?

15   A.   He said that there hasn't been a Khalifa or a leader of all

16   Muslims for many years.  I think it goes back to 1500.  He said

17   many -- some people consider Mullah Omar to be the Khalifa in

18   present day, but he does not.

19   Q.   In relation to the discussion about whether Mullah Omar was

20   the Khalifa and whether Ali Al-Timimi considered Mullah Omar the

21   Khalifa, did he present you with any documents?

22   A.   He did.  He said in order to support his position on that

23   aspect about Mullah Omar and the Taliban, he gave us a copy of the

24   documentation of his lecture on the Taliban and the destruction of

25   the statues.

## Wyman - direct

1    MR. KROMBERG:  10J7, can you bring up Government Exhibit
2    10J7, which is already in evidence?
3         Is that the document you're referring to?
4    A.   It is.
5    Q.   And that's the document he gave to you?
6    A.   That's correct.
7    Q.   Did he -- did you discuss with him his response that he
8    said, "In general my response when asked is that while I do not
9    have all the facts to say unequivocally that the Taliban represent
10   THE Islamic state of our time and their emir THE emir of the
11   Muslims -- for to do so has its implications on bay'a, hijra,
12   nusra, etc. -- we can say the following we are obliged to support
13   all that they do which is in agreement with Islam."
14   A.   We didn't have a lengthy discussion about this.  It was in
15   relation to our conversation with the Khalifa or Mullah Omar, and
16   he provided this during the interview, and he directed us to that
17   section there, but there wasn't, there wasn't a whole lot of
18   follow-up conversation about it other than just pointing us to
19   that, to that paragraph or that sentence you just read.
20   Q.   In the paragraph above it, when he says, "Shaikh Ibn Uqla's
21   recent fatwa I think is a positive step in the right direction but
22   there still is a need for more voices to be heard on the topic so
23   a consensus or majority opinion may be formed," did you discuss
24   with Mr. Timimi at that time the Sheikh Uqla's recent fatwa?
25   A.   We did not.

**Wyman - direct**

1   Q.   If you could go back to 7A23, on page 21?

2           Did you discuss with Mr. Timimi --

3           MR. MAC MAHON:  I'm sorry, Your Honor, we're jumping

4   around.  Are we back to the Hawaali statement now?

5           MR. KROMBERG:  Yes, we are, back to the Statement to the

6   Ummah.

7           MR. MAC MAHON:  Thank you.

8   BY MR. KROMBERG:

9   Q.   Where Hawaali said, "it is not possible" -- excuse me, let me

10  start from the beginning:

11          "As for the other problem that actually became the

12  course of all problems (!) - i.e. giving refuge to Terrorists - it

13  is not possible for any one who looks at it with justice and

14  fairness to do any thing but adopt the Islamic position of

15  Taliban, which at the same time is the humane position and the

16  correct position politically with regards to those left behind

17  from the Arab Mujahideen."

18          Did you discuss whether Mr. Timimi agreed with Hawaali

19  that the Taliban's protection of the terrorists was the correct

20  position Islamically?

21  A.   We didn't -- that -- this part was in the document, but this

22  was not one of the ones that we specifically directed him to

23  during the interview.

24          MR. MAC MAHON:  Your Honor, I move to strike the

25  question then.  He should have known the answer to that.

1689

# Wyman - direct

1    MR. KROMBERG:  Your Honor, the witness has testified
2  several times that Mr. Timimi said he was familiar with the
3  document, he had it in front of him, he looked through it, and he
4  was asked several times, "Is there anything in there that you
5  disagree with?"

6    THE COURT:  All right, but I think you make that as an
7  argument.  Again, we're not going to go through everything that is
8  in there that was not acknowledged or specifically discussed with
9  the defendant.  That would take forever.

10    MR. KROMBERG:  Thank you, Your Honor.

11    THE COURT:  I'll sustain the objection.

12    MR. MAC MAHON:  Thank you.

13  BY MR. KROMBERG:

14  Q.  Going back to 10J9, that e-mail, if we could go to the next
15  page, please, scroll down?

16    "As Shaikh Safar has commented in his 30 page
17  declaration to the ummah -- which by the way is a summary of a 200
18  page treatise -- the general body ummah was of a single opinion
19  regarding the events until the scholars began to speak!  (What
20  that opinion was, I will refrain from answering.  But I think if
21  everyone notices his initial reaction then he insha'allah will
22  know what that answer is)."

23    Was there a reference in the Statement to the Ummah
24  about what the opinion of the general body was?

25    MR. MAC MAHON:  Your Honor, objection.

1690

**Wyman - direct**

1       THE COURT:  I'm sustaining the objection for the same

2   reasons.

3       MR. KROMBERG:  Well, Your Honor, this -- we have not I

4   don't think published this portion of the document that is in

5   evidence, and this is -- we're talking about 10J9, and it would be

6   appropriate, I think, at this time to publish that portion of the

7   Statement to the Ummah where that's connected to this.

8       THE COURT:  This is to me argument at the end of the

9   case, where counsel can properly draw together pieces of evidence

10  that have been presented during the trial and ask the jury to draw

11  whatever conclusions they think are appropriate, but again, we

12  were going to confine this examination to what Agent Wyman

13  specifically discussed with the defendant.

14      MR. KROMBERG:  Well --

15      THE COURT:  So I'm sustaining the objection.

16      MR. KROMBERG:  I would note that we provided --

17      THE COURT:  I'm still sustaining the objection.

18      MR. KROMBERG:  I'd like to get something so the Court

19  knows what's happening here.  We provided --

20      THE COURT:  No, no, no, no, no.  Just ask the next

21  question, Mr. Kromberg.  I don't need to know anything more than

22  what --

23      MR. KROMBERG:  Okay.

24  Q.  Agent Wyman, as a projected summary witness, did you compile

25  an exhibit listing the references within admitted exhibits to be

# Wyman - direct

1  as a summary witness?

2  A.   Yes.

3  Q.   Okay.  We'll get to that in a moment.

4        We can take this off.

5        What, if anything, did you discuss with Mr. Timimi about

6  the relationship of war and deception?

7  A.   We asked him to clarify something that we had heard about

8  when a Muslim is allowed to lie, and he said that one can lie when

9  their life is threatened, their life is in danger, and also in a

10  state, when they're in a state of war, which in itself, he said,

11  is deception.

12  Q.   What did he tell you about whether he was at war with the

13  United States?

14  A.   He said that he was not at war with the United States.

15  Q.   What did he tell you about the statements he made about

16  Muslims being overjoyed at the adversity that befell their

17  greatest enemy?

18  A.   He said that he had made those statements.

19  Q.   Can you look at Government Exhibit 10J10, please?

20        THE COURT:  It's not in.

21  BY MR. KROMBERG:

22  Q.   Can you describe what 10J10 is?  It's an Arabic document?

23  A.   It's an Arabic document that we showed Mr. Timimi during our

24  interview.

25        MR. KROMBERG:  Okay.  Judge, we move in 10J10.

1692

# Wyman - direct

1      THE COURT: Any objection?

2      MR. MAC MAHON: No objection, Your Honor.

3      THE COURT: All right, it's in.

4      (Government's Exhibit No. 10J10 was received in

5  evidence.)

6  BY MR. KROMBERG:

7  Q.   Agent Wyman, on the copy that's on the screen, is there a

8  copy of a yellow sticky with your signature on it -- with your

9  initials on it?

10 A.   It's actually the folded-up portion of the paper, yes.

11      MR. KROMBERG: Okay. Can we blow up that circled

12 portion? No, I meant this circled portion.

13 Q.   Agent Wyman, where did you get this document from?

14 A.   The link there is partially obscured, but it was off the -- I

15 pulled it down off the Internet.

16 Q.   What did Ali Timimi say that that document was?

17 A.   He said -- he recognized that as a, as containing an article

18 that he had -- containing statements in an article that he had

19 written about the crash of the space shuttle Columbia.

20      MR. KROMBERG: Judge, I don't -- I think we have

21 admitted at this time, we've admitted by now 7A39 and document

22 7A39a.

23      THE COURT: Hold on. I think so. Let's just let

24 Ms. Travers check.

25      They're both in.

**Wyman - direct**

1          MR. KROMBERG:  Okay.  Could we bring up 7A39 first?

2   Q.   And if you can focus on the link, is that a different link

3   than the one that you found the document on?

4   A.   Yes, it is.

5          MR. KROMBERG:  Okay.  Could we go to 7A39a?

6          7A39a, the parties have stipulated, is an accurate

7   translation of the website pages that were 10J10 and 7A39, and I'd

8   like to ask Agent Wyman to read it for purposes of publishing it

9   to the jury, Your Honor.

10         MR. MAC MAHON:  Your Honor, we just sat in here for 45

11  minutes and listened to him read this.  It's cumulative now to

12  read in now something else.

13         MR. KROMBERG:  Judge, what we listened to him read was

14  what he dictated over the phone to Soliman Al-Buthe.  This is the

15  actual -- the two different websites that carried this article.

16         THE COURT:  I don't think we need to take the jury's

17  time up to read this into the record right now.  We've got enough

18  on that.

19         MR. MAC MAHON:  Thank you, Your Honor.

20         THE COURT:  Sustained.

21  BY MR. KROMBERG:

22  Q.   Agent Wyman, what did Mr. Timimi tell you about this website

23  article?

24  A.   Well, the article we presented to him he recognized as

25  containing the statements he made about the space shuttle, and we

# Wyman - direct

1   asked him -- we didn't have the English translation in front of
2   him to read, but what we did is we'd already had it, and we asked
3   him whether he made particular comments.

4   Q.   What particular comments did you ask him whether he made?
5   A.   That is, whether, whether he made the -- whether he made the
6   statement about Muslims being overjoyed at the adversity that
7   befell their greatest enemy.

8   Q.   Anything else?
9   A.   And also that the shuttle crash made me feel that Western
10  supremacy that began 500 years ago was coming to a quick end.  And
11  he said he had made those statements.

12  Q.   Who did he say actually posted those comments on the web?
13  A.   He said someone else posted them.

14  Q.   What did he say about identifying himself publicly as the
15  author of that article?
16  A.   He said he -- I mean, he was, he was free with himself being
17  connected to it.  He made no attempt to hide his association with
18  these statements.

19  Q.   What did he say about one of his lawyers being quoted in the
20  Washington Post on August 8, 2003, stating that Timimi didn't
21  recall making the statement, and if he did, it was taken out of
22  context?
23  A.   He said that that attorney was wrong, that statement was not
24  accurate.

25  Q.   And that's not one of the attorneys that's here, correct?

# **Wyman - direct**

1   A.   No.  No, it's not.

2   Q.   What did he say about one of his lawyers being quoted in the

3   Washington Post on August 8, 2003, saying that Timimi believed

4   that the posting may have been written by somewhat who overheard a

5   private conversation and misquoted him?

6           MR. MAC MAHON:  Your Honor, it's got to be the same

7   answer.  If he said it's inaccurate, it's inaccurate.

8           THE COURT:  I'm going to overrule that objection.  I

9   think this is relevant.  Go ahead.

10          THE WITNESS:  He said it was not taken out of context

11   and nor was he misquoted.

12   BY MR. KROMBERG:

13   Q.   I'd like you to take a look at Government Exhibit 10S4.

14          THE COURT:  Is that in?  I don't think it is.

15          MR. KROMBERG:  It is not, Your Honor, and it is not

16   going to be put up on the screen.  If the Court does not have a

17   copy, I would like to pass up a copy for the Court to look at.

18          THE COURT:  I do not have it.

19          MR. MAC MAHON:  We will be objecting to this, Your

20   Honor.  You may want us to approach on this.

21          THE COURT:  All right, let me take a look at it first.

22          Now, this is 10S4a which you gave to the Court.

23          MR. KROMBERG:  Correct, Your Honor.

24          THE COURT:  So it's not 10S4.

25          MR. KROMBERG:  Correct.  And I'll clarify that with the

**Wyman - direct**

1  witness.

2          THE COURT:  Hold on a second.  All right, approach the

3  bench.

4          (Bench conference on the record.)

5          THE COURT:  All right, Mr. MacMahon?

6          MR. MAC MAHON:  Your Honor, there's no need for this

7  exhibit to be put in.  They haven't put on a summary witness, and

8  a lot of things in here are simply inaccurate.  There are things

9  stipulated.  There are exhibit numbers.  There are summaries of

10 Taiba Bulletins.

11         He can do this in his closing argument if he wants, but

12 look, for example, at page, at page 10.  First, I don't think

13 there's any need for this kind of an exhibit to come in in this

14 case.  You haven't -- this thing hasn't come in yet.  You haven't

15 let in some Reuters news service by Mullah Omar calling for urgent

16 help.  That's not part of this case at this point in time.  That's

17 not there.

18         I mean, I could go through a bunch of these and show

19 you.  The next page, at the top --

20         MR. KROMBERG:  If I can respond, Judge?

21         MR. MAC MAHON:  -- we have the exact same problem.

22         The government puts in another Taliban leader seeking

23 unanimous support.  That's not what we stipulated to what happened

24 in this case.  Now they're trying to bring in all these newspaper

25 articles through the back door.

## Wyman - direct

1    MR. KROMBERG:  Judge, this was obviously compiled before
2  yesterday, when Mr. Wyman -- Agent Wyman started testifying.  We
3  provided this to Mr. MacMahon and Mr. Yamamoto, the original
4  version was 10S4 before trial, and if I've misspoken about it, it
5  seems like a while ago, but it's definitely a work in progress.

6    Obviously, anything that is not in evidence we will
7  gladly take out of here to make the next version of this 10S4b,
8  but we had asked Mr. MacMahon to tell us what was wrong, what
9  errors there were in this beforehand, and we will be happy to
10  change it.  I think the Court found this to be helpful when it was
11  a fact-finder.

12    THE COURT:  Yes.  But when the Court is a fact-finder
13  versus a jury is somewhat different, I think.  I'm going to have
14  you both brief this issue.  This is a very detailed -- I mean,
15  summary charts -- this is first of all a complex case, and I'll
16  make that finding for the record, and summary charts are usually
17  admissible to some degree in a complex case.  For instance, in a
18  complex conspiracy case, it's not unusual for the government to
19  introduce, you know, a map of the world with people's names and
20  pictures and dates and that sort of thing, sort of showing the
21  interconnection of things.

22    Whether a summary to this degree of detail is a problem
23  because it is to some degree a shadow closing argument of the
24  government in summarizing its evidence gives me some concern with
25  a jury, and so before I rule on this, I'm giving you a chance

**J.A. 1843**

**Wyman - direct**                                    1698

1    since we know we're not going to be in session Friday and I don't

2    see this case ending this week, to -- maybe it will, but I want

3    this issue briefed because I'm uncomfortable with this degree of

4    the summary chart going into evidence.

5              MR. KROMBERG:  Thank you, Your Honor.  I would note that

6    there's not references to testimony on this chart except with

7    respect to the most obvious things, like there was a -- to

8    undisputed things like there was a meeting on September 16.

9              But everything else is a reference to exhibits, and

10   we're trying to do it in a way -- we learned from last time, when

11   there were objections, that there was editorializing in it, and we

12   tried to keep the editorializing out.  And we welcome the input

13   from the other side eliminating any of that that is still in here,

14   but we think it's --

15             THE COURT:  Well, I understand, but I think there's an

16   awful lot of detail here.  I suspect I'm not going to let it go in

17   quite in this format.

18             MR. MAC MAHON:  I think if we went through this in

19   detail, I could have an objection to every other line in this

20   case.  "In or about 1996, Bin Laden" -- it's -- well, we'll brief

21   it, Your Honor, if that's what you want us to do.

22             THE COURT:  You're going to have to brief it because I'm

23   uncomfortable unless you can agree to a much-reduced version of

24   this.  This is like a shadow closing argument for the jury, and I

25   don't think that's fair.  So that's how I feel about this at this

# Wyman - direct

1    point.

2            MR. MAC MAHON:  Thank you, Your Honor.

3            THE COURT:  All right?

4            MR. KROMBERG:  Your Honor, can I -- can you ask -- can

5    you direct Mr. MacMahon to tell -- disclose to the government what

6    the problems he sees in this are?  I've asked him for it, I

7    haven't gotten it, and that's one of the reasons why there may be

8    things in here that are wrong.

9            Last time, Mr. Zwerling and Mr. Cummings and Mr. Grimm

10   pointed out individual things that they saw, but Mr. MacMahon

11   hasn't had the time to do so.  Instead, he's taken the position

12   that it can't come in at all.  Mr. Wyman is identified as the

13   summary --

14            THE COURT:  I've already said the general concept in the

15   law of evidence is that summary charts are admissible and it is

16   permissible, but in a complex case, it can help the jury.  That's

17   fine.

18            I don't know in my own mind where you cross the line.

19   There are two issues.  One is if there are specific facts in here

20   that are clearly wrong that have not been properly, you know, that

21   have not been admitted into evidence and they go beyond, for

22   instance, the scope of the stipulation, then I think, you know,

23   that's one line of objection.

24            MR. MAC MAHON:  Right.

25            THE COURT:  You can't just object in toto to a summary

**Wyman - direct** 1700

1  chart of some kind.

2           MR. MAC MAHON:  I objected to this, I mean, I haven't

3  had time since this trial started, Your Honor, to go through this

4  thing and compare the testimony and the stipulations and the

5  pieces of paper.

6           MR. KROMBERG:  There's no testimony in here, Judge.

7           THE COURT:  All right, it's unfair to the jury to just

8  have them sitting here.  You've heard my views on this.

9           (End of bench conference.)

10 BY MR. KROMBERG:

11 Q.   Let me just ask a foundational question about the exhibit

12 that is not being shown.

13           Mr. Wyman, the dates that are on that exhibit, where did

14 you get them from?  The exhibits that -- correct, the exhibits?

15 A.   I took them from the exhibits that are entered into evidence.

16 Q.   And some -- or that you thought were going to be admitted but

17 were not yet?

18 A.   Correct.  I believe the 7D series --

19           MR. KROMBERG:  Okay.  Just leave it at that if you

20 would.

21           Judge, at this time, I'd like to move in Government

22 Exhibit 5C1, which I think I neglected to do earlier --

23           THE COURT:  All right, hold on a second.

24           MR. KROMBERG:  -- which is a receipt for a firearm that

25 Agent Wyman testified about.

**J.A. 1846**

# Wyman - direct

1            THE COURT:  Is there any objection to 5C1?

2            MR. MAC MAHON:  No, Your Honor.

3            THE COURT:  All right, 5C1 is in.

4            (Government's Exhibit No. 5C1 was received in evidence.)

5            MR. KROMBERG:  And also 7C33, which was, I believe, the

6    menu from the kabob house that I should have offered when Mr. Kwon

7    was testifying but somehow --

8            THE COURT:  I think we saw it, or I remember I saw it.

9            MR. MAC MAHON:  It's in, Your Honor.

10           THE COURT:  I think it's in.

11           MR. KROMBERG:  Okay.  Well, that's fine.

12           THE COURT:  7C --

13           MR. MAC MAHON:  I have no objection to a kabob menu,

14   Your Honor.

15           THE COURT:  All right, 7C33 is in, as is 5C1.

16           (Government's Exhibit No. 7C33 was received in

17   evidence.)

18           MR. KROMBERG:  And thank you, Agent Wyman.

19           Thank you, Your Honor.  No further questions for this

20   witness at this time.

21           THE COURT:  All right, I think this might be a good time

22   to take the morning break so we can get ready for cross.  We'll be

23   in recess until 11:00.

24           (Recess from 10:43 a.m., until 11:00 a.m.)

25                        (Defendant present, Jury out.)

**Wyman - direct**

1          THE COURT:  Yes, Mr. Kromberg?

2          MR. KROMBERG:  Your Honor, I have two matters I'd like

3   to bring up.  The first, I'd like to respectfully ask the Court to

4   reconsider the issues -- the admissibility of the 7D series of

5   Al-Jazeera posts.

6          I understand that the Court is not -- does not want

7   Agent Wyman to be testifying as a summary about tying things

8   together, but the status of the Al-Jazeera posts are now that we

9   have 7 -- excuse me, we have 10J9, which is an e-mail from

10  Mr. Timimi to Shibli Zaman, a man that he told Agent Wyman that he

11  never met, where he said, "Some of you have been -- I'm responding

12  to disturbing comments on the Al-Jazeera list.  I have not -- you

13  have commented on my silence.  I have not been" -- and I'm

14  obviously --

15         THE COURT:  Here's the problem, Mr. Kromberg:  I have no

16  idea how many comments have appeared on the Al-Jazeera list, and I

17  don't think you've been able to put that evidence in.  It is not

18  at all clear from the evidence exactly to what Mr. Timimi is

19  responding, and to just put in certain postings on that website,

20  unless you can prove to the Court that those are the only ones

21  that are on the website, I don't think is fair or appropriate.

22         So unless you have a better foundation than what I

23  currently hear you have, it's not appropriate.

24         MR. KROMBERG:  Well, Your Honor, if -- then can I go

25  back to Agent Wyman and ask him if there are other Shibli Zaman

## Wyman - direct

1  postings during that time frame?  We'll be glad to put them all
2  in, but I have to say that I think the answer is that these are
3  the ones and that -- in fact, perhaps that should be done out of
4  the hearing of the jury.

5          THE COURT:  I'm not taking this jury's time up for this
6  issue.  I think you've already put more than enough evidence in
7  this case as to statements that the defendant has made or
8  subscribed to or affirmed, and this issue is just too far afield.

9          As I said, it would be different if Mr. Timimi had
10 identified, "I was responding to John Doe's statement of March 3."
11 Then putting on John Doe's statement of March 3 would be
12 appropriate.  We don't have that degree of specificity.

13         MR. KROMBERG:  I agree with that, Judge, but in this
14 case, we have Mr. Timimi saying, "I don't remember who I -- I
15 don't recall why I sent this e-mail, and I don't recall what I was
16 responding to," and when the witness says something like that, the
17 government should be able to put in something that immediately
18 precedes it in time from the guy who was -- that was from one of
19 the addressees.

20         Judge, if we could just have one, 7D8 is the one where
21 Shibli Zaman, the man that Timimi said he doesn't know, had never
22 met, where Shibli Zaman said, "Scholars have been inexcusably
23 silent," and then in 10J9, Mr. Timimi says, "Some of you have
24 commented on my silence."

25         THE COURT:  I don't think you need -- I think it's

# Wyman - direct

1 overkill.  I'm going to stay with my ruling.  I don't think

2 there's enough proper foundation to let this go in.  I think to

3 some degree, it's also cumulative.

4          MR. KROMBERG:  Thank you, Judge.

5          The next issue is about the cross examination of Special

6 Agent Wyman.  I suspect knowing my friend, Mr. MacMahon, that he

7 is going to try to elicit from Special Agent Wyman statements that

8 Mr. Timimi admittedly made, there's no dispute he made these

9 statements to Special Agent Wyman that are purely exculpatory, and

10 under the hearsay rules, we are -- what we offer is an exception

11 to the hearsay rule as an admission, but what they offer is not.

12          Obviously, it's appropriate to cross-examine Agent Wyman

13 on whether what he said was accurate, but to elicit other

14 statements that, that Mr. Timimi wants to get in for the truth of,

15 oh, Mr. Timimi said that he's the foremost proponent of peaceful

16 coexistence in the English-speaking world, is not something that

17 should be coming in through this witness.

18          THE COURT:  I'm going to allow it.  It's an even playing

19 field.  The jury has a right to get a complete picture as to the

20 full text of the interviews, and I will permit that.  Mr. MacMahon

21 gets leeway on his cross.

22          MR. KROMBERG:  Well, if I pass up cases to the Court,

23 will that make a difference?

24          THE COURT:  I'm exercising my discretion as the

25 presiding judge in this case, again, especially given the nature

**Wyman - direct**

1   of this case, where a great deal of the evidence is pointed to
2   statements that the defendant has made, and so it is unfair in my
3   view to let the jury have one view as to what was being done
4   during those extensive interviews and not get the whole picture.
5   So I'm going to overrule your concerns about that, all right?
6           Let's get this jury in here.
7           MR. MAC MAHON:  Thank you, Your Honor.
8           THE COURT:  All right.  And, oh, did you get the fax?
9   Are we okay on that other issue, which we can't talk about?
10          MR. KROMBERG:  We're waiting for Karen Spinks to bring
11  it up, and she did not have that.
12          THE COURT:  So, Mr. MacMahon, stay away from that issue.
13          MR. MAC MAHON:  So admonished, Your Honor.
14          THE COURT:  All right.
15                  (Jury present.)
16          THE COURT:  Ladies and Gentlemen, you've been an
17  extremely conscientious jury.  I think you've always been here on
18  time.  Sometimes we have problems with jurors because of the roads
19  around here not being here on time, and I respect that, but I am
20  very frustrated when I can't start exactly on the time I say we're
21  going to start, but I did want you to know we're not just sitting
22  here, you know, twiddling our thumbs.
23          There are often evidentiary or technical issues that
24  come up.  Rather than having you sit through a bench trial, we
25  take care of those at those times.  So that's why there does seem

**Wyman - cross**

1   to be a pretty standard five- or ten-minute lapse between when I

2   say we'll start and when we do start, but I appreciate your

3   understanding that situation, all right?

4           All right, Mr. MacMahon, are you ready for your cross?

5           MR. MAC MAHON:  Yes, Your Honor.  Thank you.

6           THE COURT:  All right.

7                       CROSS EXAMINATION

8   BY MR. MAC MAHON:

9   Q.   Good morning, Special Agent Wyman.

10  A.   Good morning.

11  Q.   You -- I'm going to try to go backwards in my notes, sir.

12  You showed the jury a picture of a couple of guns.  Do you

13  remember that?

14  A.   Yes.

15  Q.   Okay.  And you seized a whole lot of guns from different

16  people in this case, correct?

17  A.   Correct.

18  Q.   Okay.  And all of those guns were legally owned by the people

19  that owned them, with the exception of Mr. Al-Hamdi, who was an

20  illegal alien, right?

21  A.   Correct.

22  Q.   And they all had permits to own all those weapons?

23  A.   No, I don't believe they had permits.

24  Q.   They didn't need permits for the rifles, correct?

25  A.   Not to my knowledge, no.

**Wyman - cross**

1    Q.    And they were lawfully firing those weapons at firing ranges,

2    correct?

3    A.    Well, actually, part of the last trial involved their using

4    those firearms to train for jihad, and that's what some of them

5    pleaded guilty to.

6    Q.    Okay.  But in -- they were using these things at firing

7    ranges, at the NRA range as well, right?

8    A.    That was one of the locations.

9    Q.    Did you check any of the firearms for Al-Timimi's

10   fingerprints?

11   A.    I don't believe we did.

12   Q.    You talked about a brother named Calipha who Mr. Kromberg

13   asked you about who cracked.  Do you remember that person?

14   A.    Yes, I remember him.

15   Q.    Where is Calipha today?

16              MR. KROMBERG:  Objection, Judge.

17              THE COURT:  Sustained.

18              MR. MAC MAHON:  Your Honor, he asked him where Royer was

19   and where other people were.  He opened the door to that.

20              THE COURT:  Actually, you did, didn't you?

21              MR. KROMBERG:  The question then should be, "Is he

22   available to testify if either side calls him?," not where is he

23   today, trying to elicit a particular answer about where he is.

24   The door is open as to whether people are available to testify.

25              MR. MAC MAHON:  Your Honor, it's the exact same question

**J.A. 1853**

**Wyman - cross**

1   that Mr. Kromberg asked this question about another person.

2           MR. KROMBERG:  Because if I had asked the same question

3   that Mr. MacMahon is looking at, I would have been sustained in

4   objection if I asked it.

5           THE COURT:  We all know the motivation for the

6   objection, and I'm going to sustain that.  You can't elicit the

7   other answer, but you can elicit availability for testimony if

8   that's the question you want to ask.

9   BY MR. MAC MAHON:

10  Q.   Is he available for testimony?

11  A.   I don't know.

12  Q.   Do you know where he is?

13  A.   No.

14  Q.   How about the same question with respect to Mr. Chandia?  Do

15  you know where he is?

16  A.   No.

17  Q.   He's not in federal custody, is he?

18  A.   He is not.

19  Q.   You, you interviewed Mr. Al-Timimi how many times?

20  A.   Five times.

21  Q.   Okay.  And over a period of how long did you interview him?

22  A.   June 2003 through August 2004.

23  Q.   And how long did those interviews take in time?

24  A.   Each one -- no, they varied, but we were usually limited by

25  his schedule to about two hours to three hours.  I'd say that each

**Wyman - cross**                                   1709

1  of them took probably about two hours.

2  Q.  Okay.  And he voluntarily came in and talked to you, didn't

3  he?

4  A.  Yes, he did.

5  Q.  Did you have -- was it 20 hours of interviews that you had

6  with him or --

7  A.  I'd say two times five would be ten.

8  Q.  And you said that he wouldn't answer a question about one

9  person who he said had told -- or he had tasked to tell Kwon and

10 Hasan not to go overseas, right?

11 A.  Right.  Well, it was more than one question.  We asked him on

12 three different occasions.

13 Q.  But other than that question, he answered every other

14 question that you asked him, didn't he?

15 A.  No.  He, he told us that he, he wanted to stay -- certain

16 times he said he would go ahead and talk about other areas that we

17 wanted to discuss.  Other times he said, "Well, I want to keep it

18 limited to just my involvement with these people."

19         So he gave general parameters as to where he wanted us

20 to go with our interview.

21 Q.  Okay.  And he told you that he had been visited by the FBI in

22 September of 2001, right?

23 A.  I believe he told us that.  Either he or his attorney did; I

24 can't remember who.

25 Q.  And you looked into that, didn't you?

**Wyman - cross**

1  A.   I did.

2  Q.   And the FBI visited him in September of 2001 to see whether

3  he was involved in the 9/11 attacks personally, didn't they?

4  A.   No.  We -- after 9/11, there was a mass canvass of interviews

5  of people in the community who were known to be in a position

6  where they could maybe provide information.  We went out to these

7  people, asked whether they would sit down and talk to us about

8  whether they knew the hijackers -- hijackers were in this area --

9  going to the Dar al-Hijrah mosque.  So we just did a mass push to

10 interview those folks.  Mr. Timimi was one of them.

11 Q.   Right.  You went to him to ask him if he had any information

12 about the September 11 attacks, right?

13 A.   That's -- yes.

14 Q.   Okay.  And when was that?

15 A.   September 27, 2001.

16 Q.   Okay.  And you also sent an agent to interview his brother in

17 California, didn't you?

18 A.   I didn't do that personally.

19 Q.   But you know that that happened, don't you?

20 A.   I know that his brother was interviewed, yes.

21 Q.   And you know that his brother was accused of being one of the

22 masterminds of the September 11 attacks, right?

23 A.   I have no knowledge of that.

24 Q.   So there was a, there was a mass canvass of prominent Muslim

25 men after September 11; is that what you're telling the jury?

**Wyman - cross**

1  A.    A mass -- repeat the question?

2  Q.    A mass canvass of prominent Muslim men in the United States

3  after September 11, correct?

4  A.    Well, I wouldn't say all prominent like, like Mr. Timimi

5  here.  There were thousands of interviews conducted of basically

6  wherever the leads took us.  We were looking for help from the

7  community.

8  Q.    The largest investigation in the history of the FBI, isn't

9  that correct?

10  A.    That sounds correct.

11  Q.    And, and Mr. Al-Timimi met with the agents, didn't he?

12  A.    He did.

13  Q.    He sat down voluntarily and told them that he had nothing to

14  do with the attacks, correct?

15  A.    Well, just to be clear, I was not at the interview, but I

16  have read the report of the interview, and yes, he didn't claim

17  any involvement in the attacks.

18  Q.    You showed -- if I could, Your Honor, I need to get the

19  exhibit number.

20          10J8, if I could, please?  Could you put that up on the

21  screen?

22          MR. KROMBERG:   Hold on.

23          THE COURT:   Wait a minute.  10J --

24          MR. MAC MAHON:   10J8.

25          THE COURT:   8 or a?

**Wyman - cross**                                        1712

1              MR. MAC MAHON:  Yeah, 10J8 is what I'd like to see.
2              THE COURT:  All right.
3    BY MR. MAC MAHON:
4    Q.    Have you seen that before, Special Agent Wyman?
5    A.    Yes, I have.
6    Q.    Okay.  That's something that, that Al-Timimi wrote up in,
7    either in a lawyer's office or in the U.S. Attorney's Office,
8    correct?
9    A.    I think that was here at the U.S. Attorney's Office.
10   Q.    And then he gave it to you, didn't he?
11   A.    Correct.
12   Q.    Okay.  And this, this document shows what he believes to be
13   the theological -- how the issue of jihad is dealt from a
14   theological standpoint under Islam, right?
15              MR. KROMBERG:  Objection, Your Honor.  The question
16   isn't he believes; it's what he said.  It's not what he believes.
17              THE COURT:  All right, I'm going to sustain the
18   objection.  Rephrase the question.
19              MR. MAC MAHON:  Thank you, Your Honor.
20   Q.    Isn't this what he told you, that this was a theological
21   discussion about jihad?
22   A.    I don't remember him saying that this is a theological
23   discussion about jihad.  This is what he -- he was trying to help
24   us in understanding what he meant by jihad and the different
25   obligations.

**Wyman - cross**                    1713

1  Q.   All right.  And this was something from an academic
2  standpoint he was trying to explain to you?
3  A.   I don't know what you mean by an academic standpoint.
4  Obviously, he's more knowledgeable with the topic than me.
5  Q.   All right.  Well, you don't know anything about Islamic law
6  or theology, do you, Special Agent?
7  A.   I don't know a whole lot.  Just what I know from talking to
8  people.
9  Q.   And one of the people that tried to teach you about it was
10  Ali Al-Timimi, right?
11  A.   Yes, I guess so.
12  Q.   He came in and he showed you lectures that he'd given around
13  the world?
14  A.   He, he brought some documents to the interviews, yes.
15        MR. MAC MAHON:  All right.  And show the defendant, if
16  you would, Exhibit No. 48, if you would, please, Defendant's
17  Exhibit 48.
18        THE COURT SECURITY OFFICER:  4 or 48?
19        MR. MAC MAHON:  Defendant's 48, Mr. Wood, please.
20        THE COURT:  In my copy, that's a passport.  Is that what
21  you mean?
22        MR. MAC MAHON:  That's correct, Your Honor.
23        THE COURT:  All right, that's fine.
24        Is there any objection to 48?
25        MR. KROMBERG:  No objection.

**J.A. 1859**

1714

**Wyman - cross**

1    THE COURT:  All right, it's in -- I assume you're moving
2    it in?
3    MR. MAC MAHON:  I am, Your Honor.
4    THE COURT:  All right, it's in.
5    (Defendant's Exhibit No. 48 was received in evidence.)
6    THE WITNESS:  I see that.
7    BY MR. MAC MAHON:
8    Q.  And this is a -- Exhibit 48 is Mr. Al-Timimi's passport,
9    isn't it?
10   A.  Yes, it appears to be so.
11   Q.  All right.  And he brought that to you and gave it to you,
12   didn't he?
13   A.  He brought a passport to the interview.  I'd have to check my
14   notes to make sure it was this one in particular.
15   Q.  And your response was to seize his passport, right?
16   A.  No, that's not true.  Actually, we made a copy of it and gave
17   it back to him.
18   Q.  You have his passport now, don't you?
19   A.  Yes, we do.  We seized one in the search.  The one he brought
20   to the interview we photocopied, and I believe we returned it to
21   him that day.
22   MR. MAC MAHON:  Excuse me, Your Honor.  Can I have a
23   second, Your Honor?  My exhibit number is confusing me.
24   THE COURT:  All right.
25   MR. MAC MAHON:  Your Honor, I'm sorry, part of Exhibit

**J.A. 1860**

**Wyman - cross**                                              1715

1   48 is also a second passport.  If the agent could thumb through?

2   Q.   Which one do you have on top, sir?

3   A.   Issue date March 31, 1998.

4   Q.   Okay.  And there's another passport in that file, isn't

5   there?  I'll put it up on the screen.

6   A.   Do you want me to refer to the screen?

7   Q.   Right.  This is -- he brought this passport to you as well,

8   right?

9   A.   I believe that's the one he brought, but if you give me a

10  minute, I can just check my 302 and make sure that that's the one.

11  Q.   Take your time, Agent.

12  A.   That's the one that he brought to the interview on November

13  17.

14  Q.   Thank you, sir.

15       Now, you reviewed that passport, didn't you?

16  A.   Yes.

17  Q.   And there were no trips to Chechnya, were there?

18  A.   Not that I can recall.

19  Q.   No trips to Russia?

20  A.   No trips to Russia.

21  Q.   No trips to Pakistan?

22  A.   Correct.

23  Q.   No trips to Afghanistan?

24  A.   I don't recall any.

25  Q.   There were a lot of trips all around the world, though,

**Wyman - cross**                                    1716

1  weren't there?

2  A.    Yes, there were.

3  Q.    And he told you that he had traveled all around the world,

4  hadn't he?

5  A.    Yes, he did.

6  Q.    But he told you he steered clear, he had never been to

7  Pakistan or Afghanistan, correct?

8  A.    That's what he said.

9  Q.    And that's why he gave you the passport, too, right?

10 A.    I don't know why --

11        MR. KROMBERG:  Objection, Judge, to the motivation of

12 why.

13        THE COURT:  Sustained.

14 BY MR. MAC MAHON:

15 Q.    Did he bring you his resume?

16 A.    I believe he did, yes.

17        MR. MAC MAHON:  This is Defendant's Exhibit 74, Your

18 Honor.  We'd move that in evidence and will publish it to the

19 jury.

20        THE COURT:  Any objection?

21        MR. KROMBERG:  As stated earlier, we don't think it's

22 appropriate to do it this way, but --

23        THE COURT:  All right, objection is overruled.  It's in.

24        MR. MAC MAHON:  79, excuse me.

25        THE COURT:  79?

**Wyman - cross**                                            1717

1           (Defendant's Exhibit No. 79 was received in evidence.)

2    BY MR. MAC MAHON:

3    Q.    Is that the resume he brought in?

4    A.    I recall him bringing a resume.  It does not look like --

5    this doesn't look like the one that I remember him bringing, no.

6    Q.    Do you have the resume that he brought in?

7    A.    Not up here, no.

8    Q.    You have it somewhere in your office?

9    A.    I believe so, yes.

10   Q.    You took the one that he gave you?

11   A.    We found lots of resumes, and this one just seems abbreviated

12   than the one he gave me during the interview.

13   Q.    He gave you -- if you don't recognize this as the one he gave

14   you, I'll withdraw it.  I thought this was the same one.  You

15   don't think it is?

16   A.    No, I don't.

17           MR. MAC MAHON:  Okay.  I'll withdraw the exhibit, Your

18   Honor.

19           THE COURT:  79 is withdrawn.

20           (Defendant's Exhibit No. 79 was withdrawn from

21   evidence.)

22   BY MR. MAC MAHON:

23   Q.    But you did learn, didn't you, that he was studying for a

24   Ph.D. in Computational Biology, didn't you?

25   A.    Yes, that's what he said.

**J.A. 1863**

**Wyman - cross**                                          1718

1  Q.  Did you go talk to his teachers?

2  A.  No.

3  Q.  Never went out to the school to see?

4  A.  I did not.

5  Q.  He told you he'd worked for Andy Card, didn't he?

6  A.  He said he had.

7  Q.  Okay.  Did you look into that?

8  A.  No.

9  Q.  He took you he'd been a research scientist for George Mason

10 University as well, correct?

11 A.  I think that was part of his Ph.D. study.  That's what he

12 said, yes.

13 Q.  He said he'd been a senior program analyst in support of HUD

14 in Washington?  He told you that, didn't he?

15 A.  Yes.

16 Q.  Did you look at all into his background to see whether he had

17 held all of these jobs or otherwise?

18 A.  We looked at some of it.  It seemed to be -- it seemed

19 accurate.  It was so long before the investigation we were

20 conducting, we focused our efforts elsewhere.

21 Q.  All right.  And he once worked for a contractor that was

22 working for the Department of Defense, wasn't he?

23 A.  I do not know.

24 Q.  You didn't look into that?

25 A.  No.

**Wyman - cross**                                           1719

1  Q.   You weren't concerned that he had worked on a Defense

2  project?

3  A.   I would be concerned if he was working on a Defense project,

4  yes, but I don't --

5  Q.   He told you --

6           MR. KROMBERG:  Objection, Judge.

7  BY MR. MAC MAHON:

8  Q.   He told you that he did.

9           THE COURT:  He hasn't finished the question.

10          MR. MAC MAHON:  Excuse me.

11 Q.   Go ahead, sir.

12 A.   But I didn't go talk to any Defense contractors to see if he

13 had worked on their projects.

14 Q.   He did tell you that he was working for Defense contractors,

15 right?

16 A.   He told me the names of the companies that he worked for a

17 while back.  I mean, he had a lengthy resume.  But I don't

18 remember what particular work he was doing.  The HUD and the Andy

19 Card thing stick out but not the defense contractor.

20          MR. MAC MAHON:  Can I -- 10J16?

21          THE COURT:  Government 10J16?  No, it's not there.

22          MR. MAC MAHON:  I'll find it and get back to it, Your

23 Honor.  I think that was a slide.

24          10A16, correct.  Thank you, Mr. Kromberg.

25          MR. KROMBERG:  Talking about 10A16, I'll object to the

**Wyman - cross**                                    1720

1    question because this is beyond the scope of the direct.

2              MR. MAC MAHON:  I think he showed him 10A16, Your Honor.

3              MR. KROMBERG:  And I elicited an objection, and I wasn't

4    allowed to show it to him because --

5              THE COURT:  Well, then you'll be able to do it on

6    redirect.  It's called opening the door.  So I'm going to permit

7    it.

8              All right, do you have it there?

9              MR. MAC MAHON:  If it's the one I think it is -- I'll

10   check my notes, Your Honor, before I open any doors.

11             THE COURT:  That stops them every time.

12                         (Laughter.)

13             MR. MAC MAHON:  Excuse me, Judge.

14             Now I know which exhibit that is.  Excuse me, Your

15   Honor.  Exhibit 10M14, I think it is, The Role of Muslim Students

16   in North America.

17             MR. KROMBERG:  10T.

18             MR. MAC MAHON:  10T4.

19             THE COURT:  10T4.

20             MR. MAC MAHON:  I can't read my own handwriting.

21             THE COURT:  And while we're pulling that out, let me

22   advise both the government and the defense that I will want you to

23   prepare for the jury an index of all the exhibits that have been

24   entered into evidence, with the exhibit number and a

25   non-editorialized description of what the exhibit is, all right?

**Wyman - cross**                              1721

1   Because I know that's the first question we'll get from the jury
2   is, "We'd like an index of the exhibits," and we need one from
3   government and one from the defense.
4            MR. YAMAMOTO:  Your Honor, would our exhibit list
5   suffice?
6            THE COURT:  It depends.  I'll need to look at it.  But
7   it will have to be redacted for just those that have gone into
8   evidence.
9            MR. YAMAMOTO:  Fine.
10  BY MR. MAC MAHON:
11  Q.   Sir, Exhibit 10T4 was a, was a clip that we played of
12  Al-Timimi speaking at a conference.  Do you remember that?
13  A.   Yes, I do.
14  Q.   Okay.  When was, when was that speech given?
15  A.   He did not recall.
16  Q.   Did you look into it to see when it was given?
17  A.   I don't know that I was able to ascertain when that speech
18  was given.  I think -- yeah, I don't know.
19  Q.   It was in the early 1990s; is that right?
20  A.   I don't know.
21           MR. MAC MAHON:  Your Honor, I'd move in whatever our
22  next exhibit is, which is the full transcript of that actual
23  speech.
24           MR. KROMBERG:  Objection, Judge.  Who's authenticating
25  it as a full transcript of the actual speech?

**Wyman - cross**                                            1722

 1          THE COURT:  Well, now wait.  As I recall, did we have --
 2    we didn't have a transcript, did we, when we listened to the
 3    government's excerpt?
 4          MR. MAC MAHON:  We just played a piece of the audiotape,
 5    and we've had it all transcribed.
 6          THE COURT:  Well -- and the entire tape is in this
 7    exhibit, right?  The exhibit is the entire speech?
 8          MR. KROMBERG:  Yes, but I've never been told that
 9    there's a transcript for me to check whether this is an accurate
10    transcript, but I can't do it now.  I don't know --
11          THE COURT:  I understand that.  What we'll do is --
12    what's the exhibit number for that?
13          THE CLERK:  89.
14          (Defendant's Exhibit No. 89 was marked for
15    identification.)
16          THE COURT:  All right, that's Defense Exhibit 89.  It's
17    not in evidence yet.  The government will get a chance to listen
18    to it, and if you think it's inaccurate, we'll need to address
19    that issue down the road.
20    BY MR. MAC MAHON:
21    Q.   Did you listen to the whole tape, "The Role of the Muslim
22    Students in North America"?
23    A.   No.
24    Q.   Did you continue listening past the clip that you played for
25    the jury?

**Wyman - cross**                                    1723

1  A.    I listened to parts of that but pretty much just focused on

2  the part that dealt with my interview with him.

3  Q.    Now, didn't he tell you that this tape was a -- this lecture

4  was given at the time of the war in Bosnia?

5  A.    He said he couldn't remember when it was given.

6  Q.    There are references to the war in Bosnia in the tape, aren't

7  there?

8  A.    I don't know.

9  Q.    You don't remember listening to the tape where it said, "If

10 you are a regular Muslim who has never picked up a gun in his life

11 and has no appreciable military skill and you are not from that

12 land or so forth, what would be your obligation now in terms of

13 these people?  The obligation would be to pray for them"?

14 A.    I remember that.  That was part of the clip.

15 Q.    You didn't play that part of the clip for the jury, did you?

16 A.    Actually, yeah, I think we did.

17 Q.    And he told you that's the kind of speech he gave, right,

18 telling people to pray for other Muslims that were having

19 problems?

20 A.    No.

21 Q.    You never heard that in any of his speeches?

22 A.    Did he tell me that in the interviews, or did I ever hear

23 that in his speeches?

24 Q.    You heard that in some of his speeches, didn't you?

25         MR. KROMBERG:  Objection to the question, "Did you ever

**J.A. 1869**

**Wyman - cross**

1  hear it in his speeches?"  A, it's beyond the scope of the direct,

2  and B, there's no foundation that he's ever listened to the

3  speeches.

4         THE COURT:  I'm going to sustain the objection.  You can

5  rephrase the question.

6  BY MR. MAC MAHON:

7  Q.   Did you listen to all of Al-Timimi's speeches?

8  A.   No.

9  Q.   Do you know how many there are?

10  A.   I don't know exact number.  There are, there are many.

11  Q.   More than a hundred?

12  A.   No, probably not that high.  If you add up the number of

13  tapes, there's probably more than a hundred that I'm aware of.  As

14  far as the actual lectures, I don't know.  I guess the ones that

15  I'm aware of would be, say, between 20 and probably 30 different

16  topics or so.

17  Q.   All right.  Did he -- he lectured -- he told you that a lot

18  of his lectures had to do with Paradise and angels and other

19  issues like that, correct?

20  A.   Yes, he said that.

21  Q.   Did you listen to the tape "The New World Order"?

22  A.   I've listened to parts of it.

23  Q.   Did you listen to the part about him saying that every single

24  Muslim youth must think of himself as a soldier in an army.  This

25  doesn't mean you have a gun in your hand and do something crazy,

**Wyman - cross** 1725

1  but it means you have a purpose in your life, and you have a role

2  to fulfill in your ummah and see yourself fulfilling that role,

3  not that by carrying on day by day, month by month, year by year,

4  engaging in a lot of useless discussion concerning a lot of

5  matters which really will bring you no benefit neither in your

6  religion nor in the hereafter."

7        Did you hear that part in "The New World Order"?

8  A.   I don't recall.

9  Q.   How did you decide what portion of these tapes to play for

10 the jury?

11 A.   I think we only played one --

12            MR. KROMBERG:  Objection.

13            THE COURT:  Wait.

14            MR. KROMBERG:  How did Agent Wyman decide what to play

15 for the jury?  I, I --

16            MR. MAC MAHON:  I'll rephrase the question.

17            THE COURT:  Yes, I agree.  Sustained.

18 BY MR. MAC MAHON:

19 Q.   Was part of your duties as an agent in this case to listen to

20 tapes and try to find portions that the government might want to

21 play?

22 A.   Part of my role as the case agent was because of the sheer

23 number of hours that we had in lectures for Mr. Timimi, we had

24 several people go through and review the tapes, summarize them,

25 and I was able to look through and see if there were particular

**J.A. 1871**

**Wyman - cross**                                        1726

1  areas that dealt with the issue at hand and encouraging people to

2  participate in jihad, yes.

3          But I didn't listen to a whole lot of the tapes.  I was

4  doing other things.

5  Q.  So you were looking specifically for the word "jihad" in any

6  tape, and then you would mark that; is that right?

7  A.  No, that's not what I said.  What -- we had people that were

8  listening to the tapes, and they were, they were trying to get a

9  feel for what the topic of discussion was in the tapes, whether it

10 was about, like you said, God and angels, or whether it was about

11 telling people to go fight in Kashmir and Chechnya.

12         We were trying to figure out of all these hours of tapes

13 what it was that he was saying.

14 Q.  But you didn't find any tapes where he said somebody should

15 go to Kashmir or Chechnya and fight, did you?

16 A.  Well, he actually did mention that in some of the tapes.

17 From my review of the summaries, yes, there were.  He talked about

18 that.

19 Q.  You say there's a tape where he says everybody should go to

20 Kashmir and Chechnya and fight?

21 A.  I don't know if those were his exact wards.  It was probably

22 done a little bit more eloquently.

23 Q.  There were tapes where he discussed the problems in Kashmir

24 and Chechnya, right?

25 A.  Probably would be the same tapes, yes.

**J.A. 1872**

**Wyman - cross**

1   Q.   And that was a common topic of discussion by Muslims all over

2   the world, wasn't it?

3            MR. KROMBERG:  Objection, Judge, to what now -- if Agent

4   Wyman is going to be qualified as an expert on what Muslims talk

5   about all over the world, I would ask about that, too.

6            THE COURT:  That calls for an expert conclusion, and

7   he's not an expert, so sustained.

8            MR. KROMBERG:  And, Your Honor, I'd like to put on the

9   record that it's calumnious to suggest as Mr. MacMahon has to this

10  jury that all Muslims believe what Mr. Timimi believes.

11           MR. MAC MAHON:  Your Honor, I object to that comment.

12           THE COURT:  Wait, wait.  Now, counsel, we're not going

13  to argue this case in front of the jury until the time for

14  argument.  I think that that objection was not necessary, and I

15  don't want any more of this today, all right?

16           MR. MAC MAHON:  Thank you, Your Honor.

17  Q.   Dr. Al-Timimi told you that he once met Hafiz Saeed at a

18  conference in Boston, right?

19  A.   No, he met his brother in Boston.  He met Hafiz Saeed in

20  England.

21  Q.   And he had no further contact with him at all, correct?

22  A.   He said they might -- he said they might have run into each

23  other at conferences after that time, brief greetings, but no

24  substantive contact.  He said he didn't maintain e-mail or

25  telephone contact with him.

**Wyman - cross** 1728

1  Q.   And he just told you that he'd once met him at a conference,
2  correct?
3  A.   What do you mean, he just told me?
4  Q.   You didn't know that.  You didn't ask him, "Isn't it a fact
5  that you met Hafiz Saeed at a conference?," right?
6  A.   No, actually, we knew from other people we were interviewing
7  that that's what he used to tell them, that I met Hafiz Saeed, so
8  we knew to ask him.
9  Q.   And he admitted that, right?
10 A.   Yes, he did.
11 Q.   And he met Hafiz Saeed's brother in Boston?
12 A.   That's what he said.
13 Q.   Is he still living in Boston, do you know?
14 A.   I don't know where he is.
15 Q.   He told you on June 27, 2003, that he was not aware of any
16 intentions of Mr. Aatique to partake in jihad with the LET, didn't
17 he?
18 A.   Correct, he said that.
19 Q.   And on that same day, he told you that at the lunch with Kwon
20 and Hasan, he found out they were planning a trip to Pakistan,
21 right?
22 A.   Right.
23 Q.   All right.  And he told you that they told him they were
24 going over partially for a wedding, correct?
25 A.   Are you saying on June 27 or just throughout our interviews?

**Wyman - cross**

1  Q.  Throughout the interviews, he told you that, right?

2  A.  During one of the interviews, he said they were going over

3  for a wedding, yes.

4  Q.  All right.  He told you that that's what they told him at the

5  lunch, right?

6  A.  Yes.

7  Q.  And he then advised them against getting involved with any

8  questionable groups in Pakistan, correct?

9  A.  Yes, he said he told them that.

10  Q.  He told you that he had no idea that they were going to

11  Pakistan to go to LET at all, Lashkar-e-Taiba, right?

12  A.  Right.  He said he had no idea what they were planning on

13  doing there.

14  Q.  Okay.  And you, you said that there was -- he would not tell

15  you who it was who he had tasked to tell them not to go himself,

16  correct?

17  A.  Correct.

18  Q.  Did you, did you look at his phone bills to see who he was

19  talking to in that time frame?

20  A.  Yes, we looked at his phone bills.

21  Q.  Okay.  And you saw a lot of phone calls on or before the 19th

22  of September of 2001 to Yousuf Idris, right?

23  A.  Right.

24  Q.  You --

25  A.  No.  Actually, could you rephrase that question?

**J.A. 1875**

**Wyman - cross**

1  Q.  On the phone bills, his phone bills that you seized --

2  A.  Right.

3  Q.  -- you had his phone bills for September, the week of

4  September 11 to -- all the way through to the 19th, right?

5  A.  Yes.

6  Q.  You had all of his phone bills, right?

7  A.  Well, I don't know about all of them.  We had --

8  Q.  You had years and years of them, didn't you?

9  A.  We had many, yes.

10  Q.  Okay.  And did you analyze at the time that he was telling

11  you that there was someone else who had talked to these -- Kwon

12  and Hasan, to see who that might have been?

13  A.  No.

14  Q.  Now that you've looked at the phone bills, you know that he

15  was speaking to a person named Yousuf Idris in that time frame,

16  right?

17  A.  I believe that's what the chart showed, yes.

18  Q.  Now, you recently went to see Yousuf Idris, didn't you?

19  A.  Yes.

20  Q.  Why is that?

21  A.  We heard that he might have had information about Kwon and

22  Hasan leaving before they went to Pakistan.

23  Q.  You had more information than that, didn't you, sir?

24  A.  Well, what we -- we, we thought that --

25        MR. KROMBERG:  Objection, Judge.

**Wyman - cross**                                            1731

1              THE COURT:  All right, approach the bench.

2              (Bench conference on the record.)

3              MR. KROMBERG:  I expect this answer to be that after we

4    provided in discovery to Mr. MacMahon that Hasan said in a

5    debriefing that he was -- did, in fact, mention to Yousuf Idris

6    that he was going overseas, then that was the -- Agent Wyman put

7    two and two together and said, "Boy, that's probably the guy that

8    Timimi won't tell me about, so I'd better go speak to him."

9              But this is simply a way of eliciting now it's hearsay

10   from what, what Hasan said to Agent Wyman for why Agent Wyman went

11   to speak to Yousuf Idris.  If they want to call Hasan, he's right

12   here.  Call Hasan.

13             MR. MAC MAHON:  Your Honor, will you look at this 302,

14   which was given to me in the last --

15             MR. KROMBERG:  I could put on the record, Judge, that if

16   the door is opened on this, I will say, "Agent Wyman, did you

17   speak to Hasan last night, and what did Hasan say?, and Hasan

18   would say, "Judge, if there was anything in my mind, if I

19   understood in any way that Ali Timimi had anything against my

20   going, I would never have gone," and that's what's going to come

21   in if this door is opened.

22             THE COURT:  Not only that, but I think this can create

23   problems for you because the agent has said Mr. Timimi said he

24   didn't know anything about the plans, and if he didn't know

25   anything about the plans, he couldn't have asked Mr. Idris not to

**Wyman - cross**                                1732

1  do anything, so --

2          MR. MAC MAHON:  That isn't exactly what he said.  He

3  said he was concerned about them, but he didn't know that that's

4  what they were doing.  That's what the agent said.

5          I'll move along, Your Honor, if that's what you want me

6  to do.  Thank you.

7          (End of bench conference.)

8  BY MR. MAC MAHON:

9  Q.  Sir, you, you testified that you asked Al-Timimi about when

10 it was that Muslims could lie?

11 A.  Right.

12 Q.  Someone, someone brought that up?

13 A.  Right.

14 Q.  Who asked you to ask Al-Timimi when it was that Muslims could

15 lie?

16          MR. KROMBERG:  Objection, Judge.  What's the relevance

17 of who it was that asked him -- asked Agent Wyman to ask the

18 question?

19          THE COURT:  I think this is the same problem that you

20 were going to get into with the other question where I sustained

21 the objection, all right?  And so I'm going to sustain it again,

22 and you need to avoid that because I don't think you mean to

23 elicit that.

24 BY MR. MAC MAHON:

25 Q.  Sir, you wrote down a 302 on -- wrote up the 302, right?

**Wyman - cross**                                          1733

1   A.   Yes.

2   Q.   June 27, 2003?

3   A.   Correct.

4   Q.   And there was some reason why you asked him when it was that

5   a Muslim could lie, right?

6   A.   Right.

7   Q.   Was it a theological question?

8   A.   What do you mean by a theological question?

9   Q.   Based in his religion as a Muslim.

10  A.   Yes, it had to do with a Muslim belief.  I'm not a Muslim; he

11  is; and I asked what his belief was as a Muslim on when he could

12  lie.

13  Q.   Okay.  You asked him his religious belief of that, and he

14  told that you a Muslim could lie when they were at war, correct?

15  A.   Correct.

16  Q.   And then he told you that he wasn't at war with the United

17  States, right?

18  A.   He -- yes.  That was the logical next question.  He said that

19  he was not at war.

20  Q.   And you interviewed him again on August 26, 2003, right?

21  A.   I think it was August 21.

22  Q.   Excuse me, I'm looking at your transcription date.  Excuse

23  me.

24       And just so the jury knows, I think the judge asked you

25  some of these questions, but you never taped any of these

**J.A. 1879**

**Wyman - cross**                                        1734

1  interviews with him, did you?

2  A.  No.

3  Q.  The policy is not to tape interviews with people like that,

4  is it?

5  A.  Correct.

6  Q.  And you had a whole bunch of people present, correct?

7  A.  Yes, there were.

8  Q.  And then you would take notes?

9  A.  Myself and the other agents that were there, we would take

10 notes, and then we would write up a 302 afterwards.

11 Q.  And the 302 sometimes is written days after?

12 A.  Sometimes.

13 Q.  Sometimes right away?

14 A.  Sometimes.

15 Q.  Correct.

16      And on the, the 21st of August, Timimi came in again

17 voluntarily to talk to you, didn't he?

18 A.  He did.

19 Q.  And he told you the government was after the wrong man.

20 Isn't that exactly what he told you?

21 A.  I believe that's what he said, yes.

22 Q.  He told you that he's done more than any other

23 English-speaking Muslim lecturer to speak out against terrorism?

24 A.  That's what he said, yes.

25 Q.  And he gave you the speech that we read to the jury a couple

**Wyman - cross** 1735

1   weeks ago, correct?

2           It feels like a couple weeks ago.  I'm sorry, Your

3   Honor.

4   A.   Which speech was that?

5   Q.   The Purdue University speech.

6   A.   I think it was August 21.  He gave it to us on one of those

7   interviews.  I believe it was August 21.  That sounds right.

8   Q.   The speech that I read a portion of in court, he gave to you?

9   A.   I can't remember what you read.  He gave me a speech about

10  Purdue University, though, 1993.

11  Q.   On that same day, he told you that he --

12          THE COURT:  Wait.  Just so we're clear, is this The Role

13  of Muslim Students in America?  Is that the speech you're talking

14  about?

15          MR. MAC MAHON:  No, Your Honor.  This is -- I'll get the

16  exhibit number in a moment.

17          Exhibit 33, Your Honor.  If we could pull that out for

18  the agent, please?

19          THE COURT:  Defense 33?

20          Is there any objection to that exhibit?

21          MR. MAC MAHON:  I think it's already in, Your Honor.

22          THE COURT:  Defense 33 is already in, all right.

23  BY MR. MAC MAHON:

24  Q.   Have you seen this document before, Special Agent Wyman?

25  A.   Yes.

**J.A. 1881**

**Wyman - cross**

1   Q.   This is the document he delivered to you -- to your staff at

2   the U.S. Attorney's Office, right?

3   A.   I don't have a staff here.

4   Q.   Did you read it?

5   A.   Yes, I read through it.

6   Q.   You read the part where he said that it's exceedingly

7   important that Muslims are the first and foremost to condemn and

8   reject actions of violence perpetuated by other Muslims?

9   A.   What page is that on?

10  Q.   Page 7.

11  A.   I remember that.

12  Q.   You do remember that?

13  A.   Yes.

14  Q.   Do you remember him saying that hijacking -- reading that

15  hijacking of airplanes was prohibited under Islam --

16          MR. KROMBERG:   Judge, I object.   Mr. MacMahon read the

17  document to in the course of cross examination Mr. Kohlmann, who

18  had never seen it.   Now we're going through the same thing.   The

19  fact that this agent has seen it, there's no reason that it should

20  be read again.

21          THE COURT:   Well, I think the government has done that a

22  bit, too, and again, what's good for the goose is good for the

23  gander.

24          But I do want to warn the jury -- and I think again

25  you're always astute enough to appreciate this -- it's always

**Wyman - cross**

1   risky to take statements out of context.  Context is very
2   important.  In evaluating the evidence in this case, it consists
3   of statements.  It will be important to look at not just the
4   particular statement but the context, all right?

5           However, there is so much information in this case, and
6   to make it make sense as it goes in to you, I am allowing the
7   lawyers for both sides to summarize and to highlight particular
8   portions, but you are the ultimate finders of fact, and you're
9   going to have to do that evaluation yourselves and just be very
10  careful and be fair about how you do it.

11          MR. MAC MAHON:  Thank you, Your Honor.
12  Q.  Do you remember reading that he condemned the World Trade
13  Center bombing as forbidden in Islam?
14  A.  Yes.

15          MR. KROMBERG:  Objection, Judge.  Get a clarification on
16  the time.  This is the 1993 World Trade Center bombing, not the
17  2001 World Trade Center bombing.

18          THE COURT:  Well, obviously, the document was written in
19  1993.

20          MR. MAC MAHON:  The document was written on October 20,
21  1993, Your Honor.

22          THE COURT:  All right.

23          MR. MAC MAHON:  I thought we brought that out.
24  Q.  He told you willingly that he was the person who had made the
25  comments regarding the space shuttle, didn't he?

**Wyman - cross**                                1738

1   A.   Yes.

2   Q.   He told you he made them in his own name?

3   A.   I'm sorry?

4   Q.   He told you that he made those comments in his own name,

5   correct?

6   A.   Yes.

7   Q.   He wasn't -- he didn't have any problem with you knowing that

8   he had done that?

9   A.   No, he didn't.

10  Q.   Did he bring you any documents that showed that other people

11  had made statements about the crash of the space shuttle and

12  seeing omens in that?

13  A.   Yes.  He brought me something, I think, from Jerry Falwell or

14  something like that.

15          MR. MAC MAHON:  Can you show the witness Exhibit 52,

16  please, Defendant's Exhibit 52?

17          THE COURT:  Any objection to 52?

18          MR. KROMBERG:  Yes, Judge.  The objection, the relevance

19  of the comments on the space shuttle is not that he saw omens but

20  that he saw it as a good omen, glad tidings.  Jerry Falwell didn't

21  say it was glad tidings.

22          THE COURT:  We've addressed this issue before.  I'm

23  going to allow this in.

24          (Defendant's Exhibit No. 52 was received in evidence.)

25          MR. MAC MAHON:  I'm actually asking now about -- I

**Wyman - cross**                               1739

1   haven't gotten to the Falwell one.  These are exhibits that

2   Mr. Al-Timimi brought in with him to the FBI.

3            THE COURT:  Was that a question?

4            MR. MAC MAHON:  I'm just explaining to you, Your Honor;

5   I'm sorry.

6   Q.   Have you seen Exhibit 52 before, sir?

7   A.   It looks familiar.

8   Q.   Do we have the same one?

9   A.   52, "War in Iraq," is that what it says?

10           THE COURT:  Agent Wyman, if Mr. Timimi brought documents

11  to you at any of these interviews, did you collect them at that

12  point?

13           THE WITNESS:  Yes.  Documents that he gave us, we

14  collected them, and we would have retained them back at the

15  office.

16           THE COURT:  And would you have initialed them?

17           THE WITNESS:  Not in every case, no.  Not in every case

18  that he would have provided them to us.  But they would have gone

19  into a -- they would have gone into an envelope that would have

20  been retained with the case file as being the documents he

21  provided on a certain date, and so we'd be able to figure out what

22  documents they were.

23           In some cases, I actually wrote that up on the 302,

24  saying that he gave me this document and this document.

25           THE COURT:  All right.  Mr. MacMahon, what date do you

# Wyman - cross

1  understand your client to have presented Exhibit 52?

2          MR. MAC MAHON:  I believe it was on August 21, 2003.

3          THE COURT:  All right.  Can you check, Agent Wyman, and

4  see if your notes reflect that?

5          THE WITNESS:  Yes, ma'am, I will.

6          MR. MAC MAHON:  I think that's right, Your Honor.  I

7  know that he brought these exhibits in.  That's what it looks like

8  from the 302.

9          THE COURT:  Well, if the agent cannot recall whether --

10          THE WITNESS:  If you could just direct me to the page

11  you're looking at, that would be --

12  BY MR. MAC MAHON:

13  Q.  Is there a page in there -- this is a multi-page exhibit --

14  "Jung and the Columbia Revisited," by Jerry Kroth?

15  A.  I'm actually talking about the 302 that says that I took this

16  document.

17  Q.  Oh, okay.  Excuse me.  Let me see if I can find it.

18          Let me get these exhibits in a little better order and

19  I'll go back to it, okay?

20          THE COURT:  All right, look, rather than taking up the

21  jury's time on this, what I suggest you-all do is over the lunch

22  break, Agent Wyman can call his office.  If, in fact, they kept --

23  if the Bureau was keeping documents presented by the defendant, he

24  ought to be able to have one of the people back at the office

25  confirm that so we don't have to take up the jury's time on this,

**Wyman - cross** 1741

1  all right?

2          MR. MAC MAHON:  Thank you, Your Honor.  I appreciate

3  that.

4          THE COURT:  So at this point then, I'm changing my

5  position that 52 is in evidence.  We don't have a foundation for

6  52 at this point.

7          (Defendant's Exhibit No. 52 was withdrawn from

8  evidence.)

9          MR. KROMBERG:  Judge, given the Court's rulings, we will

10  stipulate to the admissibility of any document that was, in fact,

11  presented --

12          THE COURT:  Fine.

13          MR. KROMBERG:  -- and we'll deal with that at the next

14  break.

15          THE COURT:  Fine.

16          MR. MAC MAHON:  Whichever ones he brought in.

17  Q.   Did he bring you a document called "How We Can Coexist"?  Do

18  you remember that?

19  A.   Yes.

20  Q.   And that's Defense Exhibit 78?  Can you pull that up, please?

21          THE COURT:  Is there any objection to 78?

22          MR. KROMBERG:  Other than I've already stated, Judge.

23          THE COURT:  All right.  Then it's in.

24          (Defendant's Exhibit No. 78 was received in evidence.)

25          THE WITNESS:  I have it.

**Wyman - cross**

1              MR. MAC MAHON:  We move Exhibit 78, Your Honor.

2              THE COURT:  It's in.

3    BY MR. MAC MAHON:

4    Q.   And Mr. Al-Timimi told you that he had written this article,

5    didn't he?

6    A.   No.  He said that he had helped some of the authors with some

7    of the initial ideas or drafting some of the initial language that

8    eventually went into this, but I think what's missing from the one

9    you put in here is the, all the signatories to this, to this

10   statement, and it included a long list of scholars and people like

11   that in Saudi Arabia.  He was not one of them.

12   Q.   All right.  But he told you that he helped draft this thing,

13   correct?

14   A.   That's what he said.

15   Q.   Exhibit 78?

16             And this calls for peaceful coexistence between the

17   Muslim world and the West; isn't that correct?

18             MR. KROMBERG:  Objection, Judge, to the characterization

19   of the document.  I don't think Mr. MacMahon wants the jury to

20   really see what's in the document.

21             THE COURT:  The document speaks for itself, so I think

22   that is a correct objection.  Sustained.

23   BY MR. MAC MAHON:

24   Q.   You asked him at your interview on -- in August about these

25   notes that were found at his house?

**J.A. 1888**

**Wyman - cross**                                          1743

1              MR. KROMBERG:  Objection, Judge.  Could we have a little
2     more --
3              MR. MAC MAHON:  The three question notes from London.
4              THE WITNESS:  The JIMAS questions?
5     BY MR. MAC MAHON:
6     Q.   Right.
7     A.   Yes.
8     Q.   And did you -- you were able to determine when that
9     conference was held?
10    A.   I know he was at a couple JIMAS conferences, one, the most
11    recent being, I think, summer of 2001.  I don't know which
12    conference that was from, though.
13    Q.   You know that he was there in 1998 as well, right?
14    A.   I don't know.  I know about the 2001.
15    Q.   And he told you he had no idea of knowing whether he answered
16    the question or what his answer might have been or anything else,
17    right?
18    A.   No.  He just said that those were questions that he commonly
19    received during his lectures.
20    Q.   Okay.  Have you been to a mosque?
21    A.   Have I been to a mosque?
22    Q.   Yeah.
23    A.   Yeah, I've been to a mosque.
24    Q.   Have you ever seen questions handed up from the ladies'
25    section at a mosque?

**J.A. 1889**

**Wyman - cross**                    1744

1   A.   I've never seen that, no.

2   Q.   You've never seen anybody speaking at a lectern at a mosque

3   and seen children come up from the back with questions from the

4   ladies' section?

5   A.   I've never seen that, no.

6   Q.   Did you ever speak at a mosque?

7   A.   No.

8   Q.   And on the same day in August, he told you that he wasn't a

9   jihadi, right?

10  A.   I believe those were his words, yes.

11  Q.   You have that in quotes in your 302, don't you?

12  A.   Right.  Those were his words.

13  Q.   Told you he'd never participated in any jihad-related combat

14  or training himself?

15  A.   That's what he said.

16  Q.   Told you he'd never encouraged anyone else to do the same?

17  A.   He said that as well.

18  Q.   He told you that during the mid-1980s, many of his peers were

19  going off to Afghanistan to fight against the Russians and that he

20  didn't go?

21  A.   Right.  That's what he said.

22  Q.   He told you that there's now a similar jihadist environment

23  out there in cyberspace, correct?

24  A.   I think so, yes.

25  Q.   And he told you that he's not connected in any way to such

**Wyman - cross**

1  jihadist topics and he stays focused on his academic and

2  intellectual issues, right?

3  A.    Again, that's what he said.

4  Q.    He told you again that day that he didn't know that Kwon and

5  Hasan were planning to attend any training camp by LET when they

6  left the United States after 9/11, right?

7  A.    On the 21st?

8  Q.    Yes.

9  A.    I believe that's correct, but I think one of the, one of the

10  four interviews, that might not have come up, but anytime we

11  talked about it with him, he claimed he did not know that they

12  were going over there to fight in jihad.

13  Q.    And he told you he was worried about them, though, because

14  the war drums were beating.  You have that in quotes, too, right?

15  A.    He said even though -- because we pressed him on this, I

16  mean, why -- you go to lunch with them right after 9/11, right

17  after this meeting, and you sit down, and they tell you they're

18  going to Pakistan, but they tell you nothing about going to fight

19  in jihad, nothing about Lashkar, nothing about Afghanistan, and

20  why was it that you felt compelled that you needed to tell them

21  not to go?

22        That wasn't part of the conversation.  So we, I mean, we

23  really kind of, we went over this quite a bit to really make sure

24  that we could try and make sense of it, and the only thing he said

25  was those statements about the war drums were beating, it's clear

# Wyman - cross

1  U.S. was going to invade Afghanistan, things were spinning out of

2  control, so that's what, that's what prompted him to go ahead and

3  tell them not to do it.

4  Q.    All right.  He told you again that day they told him they

5  were going over there to make hijra, right?

6  A.    He might not have used that term.  One day he said hijra,

7  another day he just said they were traveling to Pakistan, but the

8  concept was the same.  They were leaving the U.S. and going to

9  Pakistan, yes.

10 Q.    And Hasan is a Pakistani, isn't he?

11 A.    He's an American citizen of Pakistani descent.

12 Q.    And on August 21, 2003, you asked him about the ventilation

13 systems at the offices where he worked and whether he could -- had

14 access to the ventilation systems in his buildings; isn't that

15 correct?

16 A.    I think what we asked him about was we were concerned about

17 Mr. Al-Timimi, the location at which he was working at George

18 Mason.  There's some bioresearch labs that deal with anthrax,

19 other, other infectious diseases that we were concerned about, and

20 we were concerned whether he had access to those laboratories,

21 locations, and that's what we were asking him about.

22        I don't know if I asked him -- I don't think I said, "Do

23 you have access to the ventilation systems?"  But we were asking

24 him about the particular facilities and the facility in which he

25 was assigned at George Mason and what his access card gave him

**Wyman - cross**

1  access to.

2  Q.  So as of August of 2003, you were still worried about

3  Mr. Al-Timimi spreading anthrax throughout the United States?

4  A.  I guess you could say that was one of our concerns.

5  Q.  And smallpox maybe?

6  A.  I think anthrax was the main, the main thrust of our

7  questioning there, just based on what we knew about Mason.

8  Q.  Because he was a biologist, you thought he might be

9  responsible for the anthrax attacks in this country; is that

10  right?

11  A.  Not just because he was a biologist.  Because of all the

12  other information we had in our investigation tying him to -- do

13  you want me to answer that?

14  Q.  He didn't have any anthrax in his house, did he?

15  A.  No, I don't think so.

16  Q.  He didn't have any anthrax at his office, did he?

17  A.  Not that I know of.

18  Q.  The e-mail that we talked about, suicide attacks, are they

19  suicide -- is that Exhibit 10J3?

20       Could you put that up, please, on the screen?  10A3,

21  excuse me.

22  A.  It's not on the screen, but I have a copy in front of me.

23  Q.  This is something else that Al-Timimi brought when he met

24  with you, right?

25  A.  No, he did not.  I brought that.

**J.A. 1893**

**Wyman - cross**                                          1748

1  Q.    This was found on his computer?

2  A.    Yes.

3  Q.    And this is the one that's incomplete that he told you about,

4  he didn't get to finish or -- is that the same document we're

5  talking about?

6  A.    No, he didn't indicate that it wasn't complete.  He said it

7  had some grammatical errors, and thus, he said it wasn't for mass

8  publication.  It was probably just going to be sent to the e-list,

9  Al-Jazeera e-list.

10 Q.    And this is a summary of opinions of classical scholars about

11 the issue of suicide operations, correct?

12 A.    It seems to include the writings of some classical scholars

13 or scholars to support a position that -- to support a position

14 that says that suicide attacks are not to be considered suicide if

15 the intentions are good and if it brings benefit to Muslims and

16 harm to disbelievers.

17 Q.    So when it says, "I would like to summarize the opinions of

18 those classical scholars which permit such course of actions and

19 the stipulations they have stated for its permissibility," you

20 took this to mean, Special Agent, these were his own views about

21 suicide and Islam, right?

22              MR. KROMBERG:  Objection, Judge.

23              THE WITNESS:  Well --

24              THE COURT:  Wait, there's an objection.

25              MR. KROMBERG:  I object to the characterization of

1749

**Wyman - cross**

1  whether it's classical or not.  The questions, I thought, were,
2  "What did you ask him, and what did he tell you?"  It doesn't
3  matter what the agent thought about what --

4        THE COURT:  I think that that rule applied to the
5  direct.

6        MR. MAC MAHON:  Fair enough, Your Honor.

7        THE COURT:  Yes.

8        MR. MAC MAHON:  I'll rephrase the question.

9  Q.   Did you ask him if he had adopted the statements as his own
10 or whether this was an academic document he was writing?
11 A.   Well, we didn't ask him to adopt the statements as his own
12 per se.  He reviewed the document, and we asked him what -- the
13 document kind of stands for itself.

14        But he also said that what he was saying was what I just
15 said before about the suicide operations not being considered
16 suicide if the intentions of the attacker are good and it brings
17 benefit to Muslims and harm to disbelievers, and that seemed to
18 coincide with the document, which supported its argument with the
19 scholars but then ends with "Final Note:  To refer to these
20 attacks as 'suicidal operations,' is according to some
21 impermissible in the shariah; but should be referred to as
22 'martyrdom operations.'"

23        That's not from a classical scholar.  That's his own
24 statement.

25 Q.   There's nothing in here about killing civilians, is there,

**J.A. 1895**

**Wyman - cross**

1    Special Agent?

2         MR. KROMBERG:  Objection, Judge.  The question is asking

3    the agent to interpret what's in there.

4         THE COURT:  And you had the same objection when the

5    government did it, so I'm sustaining it.

6    BY MR. MAC MAHON:

7    Q.  The Taiba -- the exhibits you showed -- Mr. Kromberg showed

8    you the list of documents dealing with LET -- I'm trying to find

9    what numbers those are -- the battle reports you said were from

10   the Taiba Bulletin, do you remember those, those exhibits?

11        THE COURT:  You need to direct --

12        MR. MAC MAHON:  Let me get the numbers, Your Honor.

13   Q.  Look at 1D44.  You've seen that exhibit before, haven't you,

14   sir?

15   A.  I have.

16        THE COURT:  I'm sorry, there's no sense putting these

17   things on the screen unless the jurors have, you know, better eyes

18   than I.  They can't see it, so either put it on and blow it up, or

19   don't put it on.

20        MR. MAC MAHON:  Just blow up the top.

21   Q.  Have you seen that before?

22   A.  Yes, I have.

23   Q.  Okay.  And you, you asked Al-Timimi a bunch of questions

24   about the Taiba Bulletin and being on the Taiba mailing list,

25   right?

**Wyman - cross**

1  A.   Yes.

2  Q.   You asked him about being on the Taiba Bulletin?

3  A.   That's correct.

4  Q.   All right.  This isn't a document from the Taiba Bulletin, is

5  it?

6  A.   It's actually -- even though it says from Taiba Bulletin on

7  there, this is a different Taiba Bulletin than we were talking

8  about, the one that we had records from Yahoo! showing he was

9  subscribed to.

10  Q.   Right.  So the documents that you showed him that he said

11  he'd never seen were not the same ones that were issued by the

12  Taiba Bulletin on the list that he was on, correct?

13  A.   Right.  The ones that we showed him -- this is not one that

14  we talked about on direct, but the other ones that came from this

15  address, even though they say Taiba Bulletin and we were referring

16  to Taiba Bulletins with him, these were articles under the name

17  Taiba Bulletin posted on the Internet but not the same ones that

18  he subscribed to, correct.

19  Q.   All right.  This is to muslimworldnews@yahoogroups.com,

20  right?

21  A.   It's a separate Yahoo! news group.

22  Q.   All right.  So the ones that he said he hadn't seen -- didn't

23  know anything about that you showed him were all from

24  muslimworldnews@yahoogroups.com, right?

25  A.   Correct.

**J.A. 1897**

1752

**Wyman - cross**

1  Q.   The American Born Shaheed -- 10J11a is what my notes say -- I
2  hope I'm right.  I got one right.

3           You've seen that before, haven't you, Agent?

4  A.   I have.

5  Q.   Okay.  And this is something that Al-Timimi told you he had

6  sent to his brother?

7  A.   Right.

8  Q.   When did he send it to his brother?

9  A.   He didn't give us a date.

10 Q.   Sometime in the 1990s?

11 A.   He didn't say.  I doubt that would be the case because I

12 don't think it was available on the --

13 Q.   Well, you found it on the WayBack Machine by punching

14 something in the year 2000, right?

15 A.   Or 2001 actually.

16 Q.   Did you go all the way back on the WayBack Machine to see

17 when you could find the first copy of it?

18 A.   No, because I was trying to find the exact copy that he had

19 sent.  The agents in Los Angeles gave me the link, and thus, I was

20 able to tell that it was sent in, I believe, August 2001.

21 Q.   Okay.  So you found that Al-Timimi had sent this article to

22 his own brother in Los Angeles, correct?

23 A.   I didn't find that.  Mr. Timimi told me that, and that was

24 also confirmed by my discussion with the agents out there, yes.

25 Q.   He just -- he admitted it when you asked him about it?

**Wyman - cross**

1  A.   Yes.

2  Q.   The questions about -- that you asked him about the Hawaali

3  fatwa -- the Hawaali Statement to the Ummah, excuse me, you didn't

4  write in your 302s that he approved of anything that was in there,

5  did you, sir?

6  A.   That he approved of anything?

7  Q.   No.   You didn't write in any of your 302s that Al-Timimi

8  approved of anything that was in the Al-Hawaali statement?

9  A.   I don't know whether I used that word or not.  It was whether

10  he, whether he was aware of the statements and whether there was

11  anything in those statements that he disagreed with, including the

12  particular passages.

13  Q.   And the way you wrote it up, if you want to, it's your

14  summary from 11/17/03, you wrote that in no way did Timimi express

15  any disagreement with Al-Hawaali's statements, right?

16  A.   Right.

17  Q.   So he didn't say anything, did he?

18  A.   Well, actually, we asked him.  We said, "Do you disagree with

19  anything in here based on what you know?"

20  Q.   And he didn't express any disagreement?

21  A.   Pardon me?

22  Q.   He didn't express any disagreement?

23  A.   We said, "Based on what you knew about this document" -- he

24  said that he had read it, he was well aware of it before he sent

25  the e-mail.  "Based on what you know of that and also your review

**Wyman - cross**

1   that you had today" -- which as I said earlier, he didn't have

2   time to read through it line by line, so we said, "Based on that,

3   is there anything in there that you recall having any disagreement

4   with? Is there anything that Hawaali said in that statement that

5   you disagreed with?"

6           He said, "No." So that's how he expressed his no

7   disagreement.

8   Q.  So you don't have that in your 302, that you asked him that

9   question and he said no, do you?

10  A.  Well, as you know, in our 302s, they're not verbatim

11  transcripts of the interview. We do the interview, we take the

12  notes, and we summarize it into a 302.

13  Q.  When Al-Timimi says something that you remember specifically,

14  you put it in quotes, don't you?

15  A.  If there are certain words that seem to be of particular

16  importance, like, "I am not a jihadi," or "These guys were kids at

17  the meeting," certain things like that we'll put in quotes, yes,

18  certain words, but like I said, we -- they're not -- they're a

19  summary of the information that was provided by the individual

20  during the interview.

21  Q.  Okay. And so what he was doing -- how long did you give him

22  to look at the document?

23  A.  I mean, however long it was, it wasn't dictated by me; it was

24  dictated by him. We put the document in front of him. He looked

25  through it, I'd say, maybe five minutes. That's when he explained

**Wyman - cross**

1   to us that he was, he was familiar -- he was well aware of the

2   document and what was in there.  So I think it was probably five

3   minutes.

4   Q.   It's a 30-page document, isn't it?  It's a long document,

5   isn't it, sir?

6   A.   I don't know if it was 30 pages.  I think it was 22.

7   Q.   And one paragraph that he agreed with was a recitation of

8   something that an author named Gore Vidal had said?

9   A.   Are you talking about the --

10  Q.   World Trade Center.

11  A.   -- World Trade Center and the Pentagon being legitimate

12  targets?

13  Q.   Something that Gore Vidal said, right?

14  A.   There's a reference to Gore Vidal in there.  I don't think

15  that was all about Gore Vidal.

16  Q.   It says "as the American writer Ghour Fidal says" --

17          MR. KROMBERG:  Objection to disputing what the document

18  says.  The document says what it says.

19          THE COURT:  Sustain the objection.

20  BY MR. MAC MAHON:

21  Q.   Did you ask him whether he agreed that Gore Vidal had

22  actually said that?

23  A.   The focus wasn't on Gore Vidal, no.

24  Q.   Did you ask him whether he agreed with this statement in the

25  Hawaali statement that it was not permissible for any group to

1756

**Wyman - cross**

1  draw the Muslim world into a war?

2  A.    I don't remember referring -- directing him to that

3  particular passage.

4  Q.    You didn't direct him to the passage where it says the

5  Taliban government should hasten to sue for peace?

6  A.    No, I didn't direct him to that passage, either.

7  Q.    You didn't ask him about whether he agreed with the statement

8  that it's incumbent for the Muslims to open the door of dialogue

9  between Muslims and the West?

10 A.    No.

11 Q.    Just picked a few passages that you wanted him to look at?

12 A.    We were surprised that he wasn't expressing -- that he was

13 taking on the whole statement as his own.  We wanted to make sure

14 that we pointed him to the most -- what we considered to be the

15 most blatant statements in support of our case.

16         We read through that, that document, and we picked out

17 the ones that related to supporting the Taliban, to fighting

18 against the enemies of the Taliban, to considering 9/11, and to be

19 an although unfortunate -- well, not unfortunate -- an event that

20 happened and that may not bring all benefit to the Muslim world,

21 it was still something that was legitimate because of the targets

22 and because of the intentions of the attackers.

23         We pointed him to the, to the passages in that document

24 that supported all the things that he had said to these other

25 people.  That's why we, that's why we directed him to those ones,

**Wyman - cross**

1  and we wanted to make sure. We weren't focused on dialogue
2  because that's not what we were investigating.
3  Q.   That's not what you were interested in, right?
4  A.   I'm, I'm interested in dialogue, but the investigation was
5  not about him asking people to do dialogue. It was about asking
6  them to do something much different.
7  Q.   Now, you -- he told you in response to that that you were
8  taking Hawaali's statements out of context, right?
9  A.   No.  I think he, I think he said -- what he said was that my
10  interpretation of the document being supportive of Bin Laden in
11  the 9/11 attacks was overly harsh and that actually the document
12  was just an intellectual analysis of the events that led up to the
13  attacks and what transpired by the attacks.
14  Q.   An intellectual analysis of Islamic law and theology as
15  opposed to what was happening in the world, correct?  That's what
16  he told you what Hawaali's statement was?
17  A.   No, I don't think it was those words.  Intellectual analysis,
18  yes, but your -- I don't understand what you mean by "as opposed
19  to what was happening in the world," because it was all about what
20  was happening in the world.
21  Q.   Well, you wrote in your 302 from November 17, 2003, that
22  Timimi responded to the Al-Hawaali sentiments by putting
23  Al-Hawaali's statements into the context of an intellectual
24  analysis of the situation.  That's what he told you, didn't he?
25  A.   Right.  Yeah, if I didn't make that clear, that's -- he did

**Wyman - cross**

1  say that.

2  Q.   And he told you that you and he had a difference of opinion

3  as to how these statements should be interpreted?

4  A.   True.

5  Q.   So he had a different view of what they said than you did,

6  right?

7  A.   Right.  Like I said, he thought I was being overly harsh in

8  my interpretation.

9  Q.   Well, that's because he told you that he read them as a

10 theological discussion of some of the political issues of the day,

11 didn't he?

12 A.   You're saying theological; he did not.

13 Q.   Did he ever use the word "political"?

14 A.   In our interviews, yes, he used that quite a bit.

15 Q.   He on November 18, 2003, gave you a letter that he had sent

16 to the United States Congress about the use of force in Iraq; is

17 that right?

18 A.   That the one from Hawaali?

19      MR. KROMBERG:  Judge, now we're talking about the war in

20 Iraq?

21      THE COURT:  Iraq is definitely not part of this case, so

22 we're going to curtail it.  I'm going to sustain that objection.

23 BY MR. MAC MAHON:

24 Q.   The Hawaali statement that you showed to Al-Timimi, do you

25 know when that was made public by Safar Hawaali?

**Wyman - cross**

1  A.    I believe that the Arabic version was out around October 6/

2  October 7.  The English version, I think, came out maybe October

3  15 time frame.

4  Q.    After the dinner at Yong Kwon's house, right?

5  A.    Yes.

6  Q.    Okay.  And he actually gave you correct information as to

7  when the dinner at Yong Kwon's house was, didn't he?

8  A.    Yes.

9  Q.    He told you that he could remember the details and gave you

10  the right date for the meeting, correct?

11  A.    He said it was the 16th, yes.

12  Q.    Right.  Then you went with phone records and everything and

13  found out he was telling you the truth, correct?

14  A.    All the other, all the other information we got after that

15  showed that it was not on the 15th, that it actually occurred on

16  the 16th, yes.

17  Q.    Did you say yesterday that you gave him a draft copy of an

18  indictment?

19  A.    I did not.  I did not give him a draft copy of the

20  indictment.

21  Q.    Was it an indictment that hadn't been returned by a grand

22  jury?

23  A.    I believe yes.  I didn't give him a document.  I think the

24  prosecutors gave him -- somehow they had a draft copy of the

25  indictment.

**Wyman - cross**

```
 1            We were trying to -- obviously, we were trying to decide
 2   whether he was going to be in that indictment or not, and we, we
 3   said we wanted all the -- we wanted to give him a chance to go
 4   ahead and tell us what happened, and we wanted him to -- we were
 5   willing to be up front with him as to what it was we were looking
 6   at, what the issues were, what people were saying he did, and in
 7   preparation for that interview on the 27th, I think he was
 8   provided with a draft indictment.
 9   Q.   Have you ever seen the draft indictment?
10   A.   Well, I saw plenty of drafts of the indictment.
11   Q.   Okay.  He wasn't indicted in that case, was he?
12   A.   No, no, he wasn't.
13   Q.   On June 24, 2004, he brought in to you a whole bunch of a
14   tape series of speeches that he'd given, hadn't he?
15   A.   No, he didn't.
16   Q.   He told you about a whole bunch of those speeches?
17   A.   We asked him about speeches he'd given, yes.
18   Q.   And did you go online and try to find any of those speeches?
19   A.   I already had them.
20   Q.   How many of them did you have?
21   A.   Could you be more specific?
22   Q.   How many of Ali Al-Timimi's speeches on tape, CD-Rom, or
23   otherwise do you have?
24   A.   I think I already estimated somewhere between 20, say, 30
25   lectures and -- which would be divided up on, say, north of 100
```

**J.A. 1906**

**Wyman - cross**

1    tapes.  Many of those we got from the Dar al-Arqam through a
2    subpoena, but others we took out of search warrants of the, of the
3    people that attended his lectures and went to his meetings.
4    Q.    He told you in June 2004 that he had not read from any fatwa
5    at Kwon's house, correct?
6    A.    You said June 2004?
7    Q.    June 24, 2004, is the transcription date.
8    A.    What page are you looking at?
9    Q.    It's 3054 is the Bates stamp and page 5 of the actual 302.
10   A.    He said he could not recall reading from any fatwa at Kwon's
11   house.
12   Q.    He said he didn't have any documents with him at all, didn't
13   he?
14   A.    He may have said that, but, I mean, if you can -- he may have
15   said that.  I don't remember it.
16   Q.    Your page 5 of that same 302, which is dated June 24, 2004?
17   A.    I have -- I'm on that page.
18   Q.    "All of the comments to be made at the dinner originated in
19   his head and not from any documentary reference."  That's what you
20   wrote down, isn't it, Agent?
21   A.    I'm just having trouble finding it.
22   Q.    It's the fifth line from the bottom, I think.
23   A.    Oh, right.  That doesn't say that he didn't bring any
24   documents, but yes, you're right, it says that all of the comments
25   came from his head, right.

**Wyman - cross**

1  Q.   And he said he doesn't recall anybody closing the blinds on

2  the windows or unplugging telephones, right?

3  A.   Correct.

4  Q.   In fact, he told you he doesn't even remember Nabil Gharbieh

5  or his friend Sherdil even showing up?

6  A.   No, actually, he told us he did and that they left right

7  away.

8  Q.   On June 24, he told you that?

9  A.   No, during a different interview.

10  Q.   He told you that he never made any comments at that dinner

11  about the signs of the Day of Judgment, right?

12  A.   Right, he said that.

13  Q.   And he told you that the, the Day of Judgment wouldn't come

14  until Jesus arrived on earth, correct?

15  A.   Right.  He said there were several signs.

16  Q.   Right.  And that none of those signs were discussed at that

17  dinner, correct?

18  A.   He said, he said he didn't think that those signs were

19  present at that, at that time.

20  Q.   Right.

21  A.   And he said he didn't talk about the Day of Judgment.

22  Q.   He didn't talk about it at all?

23  A.   Right.

24  Q.   You said that -- you told the jury that Mr. Timimi said that

25  he got Mahmood Hasan a job in Saudi Arabia?

**J.A. 1908**

**Wyman - cross**                                      1763

1   A.    I think he said he referred him to Soliman Al-Buthe in Saudi
2   Arabia but that the job didn't work out.
3   Q.    And that was in what year?
4   A.    2002.
5           MR. MAC MAHON:  Your Honor, I think we're going to get
6   to some of those questions that I need to -- we need to talk to
7   the government about here, so whether you want me to try to keep
8   going or --
9           THE COURT:  What we discussed this morning?
10          MR. MAC MAHON:  Yes, Your Honor.
11          THE COURT:  All right.  I think, Ladies and Gentlemen,
12  because there are some technical matters and I don't want you to
13  waste your time and the weather has gotten beautiful outside, so
14  I'm going to give you your lunch break.  Actually, it may be more
15  than an hour; I hope not.
16          I'll ask you to be back here at 1:30, and if we don't
17  start exactly at 1:30, please understand we're not wasting your
18  time.  There's something going on that you just can't be privy to
19  at this point, all right?  We'll let the jury recess.
20          I'm going to also have the courtroom cleared at this
21  time again, Mr. Wood, so let's get the jury out first.
22                          (Jury out.)
23          THE COURT:  All spectators must leave the courtroom at
24  this time.
25          MR. YAMAMOTO:  Our client, too, Your Honor?

# Wyman - cross

1          THE COURT:  And the defendant.

2          (CIPA HEARING NOT TRANSCRIBED IN THIS VOLUME.)

3          THE COURT:  All right.  Now, Mr. Wood, is Mr. Timimi

4    still out there?

5          THE COURT SECURITY OFFICER:  Yes, ma'am.

6          THE COURT:  All right.  Why don't we bring him back in.

7    We have another comment from a juror.

8                    (Defendant present, Jury out.)

9          THE COURT:  All right, Mr. Timimi, I just wanted you to

10   be aware we've had another note from the jury.  Now, I'm going to

11   need to alert the jury -- I don't want them starting in

12   deliberations, but this jury is really very attentive and

13   obviously very interested in resolving this case.

14          Here's the statement.  I think they're already asking

15   for the following:  Document containing the following:  Timeline

16   (of alleged significant events relevant to charges) names and

17   photos.  All the names used of the alleged coconspirators.  Names

18   with correct spellings of alleged participants in the 9/16 dinner.

19   White board and markers.  Okay?

20          This jury is -- I need to cool them down and tell them

21   you can't get any of this stuff until the case is over.  I am

22   going to tell them, though -- and both sides should agree to

23   this -- a list of the correct spellings of not -- any names either

24   side wants the jury to be sure they're clear about, all right?  So

25   not just coconspirators but any defense witnesses as well that --

**Wyman - cross**

1  or defense names.

2          So I think you should be able to work that out.  Maybe a

3  glossary of people.

4          The government's already got in evidence the photos of

5  the various people, but again, I think there is -- there are some

6  summary charts here that have that.

7          MR. KROMBERG:  The difficulty with the photos, Judge, is

8  we don't have the names of the people on the photos.  They'd have

9  to match up with the exhibit list, which is not such a big deal,

10  but --

11          THE COURT:  Well, you have those two exhibits with the

12  phones where you do have a picture of Kwon and a picture -- so I'm

13  sure over the weekend -- and when I say "the weekend," I don't

14  intend to give this case to the jury until next week regardless of

15  where we are.  I haven't told you yet, but I can't start until ten

16  tomorrow because I've got a plea with an interpreter, and it's a

17  tough language, and I, you know, it's starting at nine, but I'm

18  not sure I'll be done by 9:30.

19          So we're going to start at ten tomorrow, and wherever we

20  are when we finish all the evidence tomorrow, I'm thinking we may

21  finish from what Mr. MacMahon is saying, and if not, we go into

22  evidence on Monday.

23          MR. MAC MAHON:  It's possible we might finish today,

24  Your Honor.

25          THE COURT:  All right.  That's fine if we do, but in any

## Wyman - cross

1  case, I don't think we're going to give this case to the jury

2  until -- well, we'll see.  Maybe the jury will get it late

3  tomorrow afternoon.

4          MR. MAC MAHON:  Mr. Yamamoto just reminded me there are

5  some witnesses who couldn't get here, we're obviously juggling our

6  witnesses, so it couldn't be until tomorrow.

7          THE COURT:  So the government, if you have a rebuttal

8  case, make sure it's ready to go, but the likelihood is if we

9  finish all the evidence tomorrow, then I'll caution the jury to

10  just get a good rest, no deliberation.  Then we would come in on

11  Monday with the closing arguments, the instructions, and the jury

12  gets the case if that's -- if we stay on schedule, all right?

13          So go get lunch.  Hopefully, you've worked this issue

14  out.

15          And in order to prevent the jury from always having to

16  wait for us, can we get back in at 25 after, all right, so that

17  maybe we have the five minutes to resolve this issue, all right?

18          MR. MAC MAHON:  Thank you, Your Honor.

19          THE COURT:  All right, we'll recess court.

20          (Recess from 12:33 p.m., until 1:25 p.m.)

21

22

23

24

25

**J.A. 1912**

**Wyman - cross** 1767

1              A F T E R N O O N   S E S S I O N

2                        (Defendant present, Jury out.)

3              MR. MAC MAHON:  Your Honor, I think you're going to have

4       to clear the courtroom again.  I'm sorry.

5              THE COURT:  All right.

6                  (CIPA HEARING NOT TRANSCRIBED IN THIS VOLUME.)

7                        (Defendant and Jury present.)

8              THE COURT:  Before we get started, Ladies and Gentlemen,

9       I did receive your note.  Now, I can assure you that you would get

10      a white board and markers when the time comes.  The attorneys are

11      going to work to give you a list of all the correct spellings of

12      the names that you're requesting.  I think that there will be

13      something like a timeline, that sort of thing, and I know you

14      won't be shy to ask us questions when you begin deliberating.

15              But I want to remind you again, it's very important you

16      not start any deliberation or any talking among yourselves about

17      the issues in the case because you don't have the whole picture

18      yet.  So I know it's a lot of information to be absorbing at one

19      time, but you've just got to keep an open mind, and when we give

20      the case to you for deliberation, you'll have lots of things to

21      work with; don't worry about that.

22              But thank you for the note, and we'll now continue with

23      the examination of Special Agent Wyman.

24              MR. MAC MAHON:  Thank you, Your Honor.  Just a few more

25      questions.

**Wyman - cross**                                    1768

1  Q.   I think you were clear in your testimony that Mr. Timimi told
2  you that he did not believe that Mullah Omar was the Caliph of all
3  the Muslims, right?
4  A.   Yes, he said that.
5  Q.   And that's why he gave you the document about the Taliban and
6  the statues, to show you that that was his prior position as well?
7  A.   He used that document to support his position, yes.
8  Q.   Now, Special Agent Wyman, some of the tapes we've heard
9  played in court were not consensually monitored tapes, were they?
10 A.   Correct.
11         MR. MAC MAHON:  Okay.  At this point, Your Honor, if the
12 stipulation is ready to be read, I'd like to read that in.  That
13 would be all I would have --
14         THE COURT:  All right.  But I think the jury needs to
15 understand, remember, "consensually monitored tape" means that one
16 of the speakers on the tape knew that that conversation was being
17 tape-recorded.  There is also electronic surveillance in which
18 nobody knows, none of the speakers know that the conversations are
19 being tapped, and that's done under court order.  You may recall
20 that was one of the questions that was on your juror
21 questionnaire, too, was asking your views about court-ordered
22 electronic surveillance.
23         All right, go ahead.  There is a stipulation.  Do you
24 want to read that in?
25         MR. MAC MAHON:  Your Honor, I'm not exactly sure I've

**J.A. 1914**

**Wyman - cross**

1  got it written down exactly the way the Court had.  If you have it
2  right in front of you, would you read it, or do you want me to?
3        THE COURT:  All right, my understanding -- and the
4  parties will correct me if I'm wrong -- is that the parties have
5  entered into a stipulation which we'll need to get marked with an
6  exhibit number down the road, it would be Exhibit 12 -- what's the
7  next one?
8        MR. KROMBERG:  12-60, Judge.
9        THE COURT:  12-60?  All right.
10        (Government's Exhibit No. 12-60 was marked and received
11  in evidence.)
12        THE COURT:  And it is that the United States and the
13  defendant hereby stipulate and agree that the defendant was
14  subject to court-authorized electronic surveillance for a
15  significant portion of 2003.  During that period, several thousand
16  of the defendant's telephone calls were intercepted.  In addition,
17  the government obtained an extensive number of defendant's e-mail
18  messages during the same time period.
19  BY MR. MAC MAHON:
20  Q.   And my last question after that -- thank you, Your Honor --
21  is that the calls of Mr. Al-Buthe that were played in court and
22  translated were calls that were intercepted consistent with the
23  stipulation that the judge read, correct?
24  A.   Correct.
25        MR. MAC MAHON:  I have nothing further, Your Honor.

# Wyman - redirect

1          THE COURT:  All right.

2          MR. KROMBERG:  I have just a few for you, Special Agent

3  Wyman.

4                    REDIRECT EXAMINATION

5  BY MR. KROMBERG:

6  Q.   Mr. MacMahon asked you about the accusation that Zaid Timimi

7  was one of the masterminds of the 9/11 attacks.  Do you remember

8  that?

9  A.   Yes.

10 Q.   What, if anything, do you know about that accusation?

11 A.   I don't know anything about that accusation other than what

12 Mr. MacMahon told me.

13 Q.   Mr. MacMahon asked you about the follow-up you did regarding

14 Mr. Timimi's past work with Andy Card.  Of what relevance to the

15 investigation -- to your investigation did you see that

16 Mr. Timimi's past work with Andy Card had?

17 A.   Very little.  The, the fact that he had previously been

18 employed in a position where he was contracted with the U.S.

19 government, like I say, had no relevance, but we were focused on

20 his actions immediately after 9/11, and the fact that he worked

21 for Andy Card many years before was, was not as high on the

22 priority list of our investigative leads and priorities.

23 Q.   When Mr. MacMahon asked you about that Purdue University

24 speech, the document that Mr. Timimi gave you, did Mr. Timimi give

25 you during the course of your interviews with him any references

**J.A. 1916**

# Wyman - redirect

1  or documents to any time that he condemned the hijacking of

2  airplanes after 9/11?

3  A.    No.

4  Q.    Did he give you -- just let's talk about 2001.  From 2001 to

5  the end of 2001, did he give you any document or speech or e-mail

6  or anything that suggested that he condemned the destruction of

7  the World Trade Center?

8  A.    No.

9  Q.    The murder of the people there?

10  A.    No.

11  Q.    Did he give you anything that suggested that he would -- that

12  he condemned the murder of wounded Russian soldiers?

13  A.    No.

14  Q.    That he condemned Hafiz Saeed saying that you should pull the

15  Jews out of their houses to kill them?

16  A.    No.

17  Q.    Mr. MacMahon asked you about the documents he brought you

18  showing that other people saw the crash of the space shuttle as an

19  omen, correct?

20  A.    Correct.

21  Q.    Did he bring you any documents showing that anyone other than

22  him thought that the crash of the space shuttle was a good omen?

23  A.    His was the only one that I recall saying that it was a good

24  omen.

25  Q.    Mr. MacMahon asked you whether you were really concerned

## **Wyman - redirect**

1   about Mr. Timimi's involvement with laboratories and ventilation
2   systems and the anthrax investigation.  Why were you concerned
3   about, about ventilators and Mr. Timimi's involvement in any
4   anthrax investigation?
5   A.   Well, in addition to the, you know, the investigating --
6   investigation we were conducting, we knew of extensive ties
7   between Timimi, Hawaali, and other elements of the broader
8   Al-Qaeda network.  His --
9        MR. MAC MAHON:  Your Honor, I object to that.  There's
10  no connection between this gentleman and the Al-Qaeda network or
11  Mr. Hawaali either other than something that happened in 1995 in a
12  speech.
13       THE COURT:  Well, whoa, whoa, whoa.  I think the Hawaali
14  connection has been adequately established, but in terms of the
15  other, I think that's beyond where the case has gone.
16       MR. KROMBERG:  That's fine, Judge.
17       THE COURT:  So I'll sustain that portion of the
18  objection.
19  BY MR. KROMBERG:
20  Q.   Mr. MacMahon asked you whether you had listened to particular
21  portions of The New World Order speech.  I'd like to ask you if
22  you've listened to this part of 10T1, which is Clip No. 38.
23       (Government's Exhibit No. 10T1, Clip No. 38, was played;
24  no government transcript provided.)
25  BY MR. KROMBERG:

# Wyman - redirect

1  Q.   Agent Wyman, did you listen to that particular clip?

2  A.   I recall that clip, yes.

3  Q.   How about -- I'd like to play you another one, Clip No. 36 on

4  "New World Order" 10T1.

5        (Government's Exhibit No. 10T1, Clip No. 36, was played;

6  no government transcript provided.)

7  BY MR. KROMBERG:

8  Q.   Do you recall listening to that clip?

9  A.   Yes, I do.

10       MR. KROMBERG:  And the last one that I would like to

11 play at this time, Judge, is clip 53 from Track -- clip 53 is an

12 internal reference number for Mr. Alter -- but 10T1, "New World

13 Order," clip 53.

14       (Government's Exhibit No. 10T1, Clip No. 53, was played;

15 no government transcript provided.)

16 BY MR. KROMBERG:

17 Q.   Do you recall hearing that one, Special Agent Wyman?

18 A.   Yes, I do.

19 Q.   I'd like you to play one more from a different lecture.  This

20 has been admitted into evidence, Government Exhibit 10T10, Word of

21 Advice to the Salafis of the UK.  It would be clip 25.

22       (Government's Exhibit No. 10T10, Clip No. 25, was

23 played; no government transcript provided.)

24 BY MR. KROMBERG:

25 Q.   Special Agent Wyman, did you listen to that clip?

**Wyman - redirect**

1    A.    Yes.

2    Q.    Mr. MacMahon asked you about the date of the Hawaali fatwa,

3    the Statement to the Ummah, correct?

4    A.    Correct.

5    Q.    What was the date of the Uqla fatwa?

6            MR. MAC MAHON:  Your Honor, I'd object to that.  There's

7    some dispute as to that.  Unless he's -- if you want us to

8    approach, we can, but it's not something that he can answer.

9            THE COURT:  I thought we already had this information in

10   the record, the date of the Uqla fatwa.

11           MR. MAC MAHON:  Do you want us to approach, Your Honor?

12           THE COURT:  Yes, you'd better.

13           (Bench conference on the record.)

14           THE COURT:  Don't you have that date in this record

15   already?

16           MR. KROMBERG:  We have it in in Arabic, but we don't

17   have it translated into what's the American date.

18           MR. MAC MAHON:  And the reason this is important, I

19   stayed away from it on direct, but in the -- the date that is on

20   the original one is an Arabic date.  It's a completely different

21   calendar.

22           Ali Al-Timimi told them in the 302s that his translation

23   of the date is that it didn't even get issued until Monday, which

24   would show it wasn't even available for the dinner on the 16th.

25   But the only person that could try to date this thing, but it's in

1  the -- it's a lunar calendar that has the date on it. For him --

2  he doesn't -- if he can qualify him as an expert in the Islamic

3  lunar calendar --

4          MR. KROMBERG: Your Honor, I believe that Special Agent

5  Wyman had to learn this from someone else, and our next witness

6  will be the translator, who's going to bring with him the copies

7  of the Saudi and Egyptian newspapers with the Arabic date.

8          Since Mr. -- the same is true with the date on the

9  Hawaali fatwa, so I thought I could just do it the same way, but

10 if we need to bring the translator in with the Arabic newspapers,

11 we'll do that, and that's the next step, Judge.

12         THE COURT: What is he going to say?

13         MR. KROMBERG: He's going to say that the Arabic

14 newspapers issued in Saudi Arabia and Egypt for that particular

15 day that's on the Uqla fatwa also says on those very Arabic

16 newspapers September 16, 2001.

17         MR. MAC MAHON: And there's no connection from a Saudi

18 or an Egyptian newspaper to this defendant. We have these two

19 witnesses. One said he read it there, and one says he didn't, and

20 I'll have to --

21         THE COURT: Well, I think you have to put the evidence

22 in. The date is obviously important, so I think put it in through

23 your witness.

24         MR. KROMBERG: The next witness, Judge.

25         THE COURT: Yes.

# Wyman - redirect

1          MR. KROMBERG:  That's fine.

2          MR. MAC MAHON:  Excuse me.

3          THE COURT:  Wait, Mr. Kromberg.

4          MR. MAC MAHON:  If he's going to do that, he's already

5    opened the door.  I left that out of what was in the 302s, so I'll

6    have to revisit that on my recross because that issue was

7    something that he discussed with him.

8          MR. KROMBERG:  That's fine.

9          THE COURT:  Ask Agent Wyman first, and then if you need

10   to, put the translator on the stand.

11         MR. KROMBERG:  That's fine.

12         (End of bench conference.)

13   BY MR. KROMBERG:

14   Q.   Special Agent Wyman, did the issue of the -- did the question

15   of the date of the Uqla fatwa come up in your conversation with

16   Mr. Timimi?

17   A.   Yes, it did.

18   Q.   What did he tell you the date of the Uqla fatwa was?

19   A.   He thought that the date of the Uqla fatwa was September 17,

20   2001.

21   Q.   Have you found information to the contrary?

22   A.   Yes.

23   Q.   Based on the translator for -- the FBI translator?

24   A.   Yes.

25   Q.   Who went to the Library of Congress and picked out the

**Wyman - recross**

1    newspapers for --

2            THE COURT:  Whoa, whoa, whoa.

3            MR. MAC MAHON:  If he's going to put on the witness on

4    the --

5            THE COURT:  We're going to hear from the translator.

6            MR. KROMBERG:  That will be it.  Okay.

7            Thank you, Special Agent Wyman.

8            THE COURT:  All right.  Any recross?

9                      RECROSS EXAMINATION

10   BY MR. MAC MAHON:

11   Q.   Special Agent Wyman, you don't know anything about the lunar

12   calendar, do you?

13   A.   Know anything about it?  I know some.  I guess --

14   Q.   The Uqla fatwa --

15   A.   I know there's a difference between the lunar and --

16   Q.   Yeah.  And the Uqla fatwa in Arabic contains a date under a

17   lunar calendar, right?

18   A.   Or a hijra date, yes.

19   Q.   But it's not a date that you or I could actually tell by

20   looking at it, is it?

21   A.   Actually, it's -- the numbers are written in English, so you

22   can -- you can tell, yes.

23   Q.   To translate them into the proper date?

24            Let me ask you this:  Al-Timimi told you that one of the

25   reasons why he didn't believe he had read the Uqla fatwa was

**Wyman - recross**

1 because to his knowledge, it wasn't even in existence at the time

2 of the Kwon dinner; isn't that correct?

3 A.   That's what he said.  He thought it came out the 17th.

4 Q.   Now, we heard a tape of something from The New World Order.

5 Tell the jury when and where that speech was recorded.

6 A.   I don't know the exact time.  I think it was about '96, in

7 the U.K.

8 Q.   And that's, what, six tapes?

9 A.   That was -- the tape set that was entered was a six-tape set.

10 Q.   Did you find any other tapes where he talked about Star Trek?

11 A.   I don't recall any, no.

12 Q.   Or whether President Clinton was a Muslim?

13 A.   I don't recall that, no.

14 Q.   Didn't look for that, Special Agent?

15 A.   ·Look for whether President Clinton was a Muslim?

16 Q.   Right.

17 A.   It wasn't part of the investigation.

18 Q.   Well, it's something he said on that tape, right?

19        MR. KROMBERG:  Objection, Judge.  This is not -- this is

20 just harassment.  It's not serious cross examination.

21        THE COURT:  Well, it's not relevant.  I'm going to

22 sustain the objection.

23        MR. MAC MAHON:  Thank you, Your Honor.

24 Q.   Did you, did you listen to tape 2, side A of "New World

25 Order"?

**Wyman - recross**

1   A.   I've listened to parts of it.  I don't recall what was on

2   each side of each tape, though.

3   Q.   You didn't --

4   A.   Listened to it at different times, different places, not all

5   at one sitting.

6   Q.   Do you know where it said, "Every single Muslim youth must

7   think of himself as a soldier in an army.  This doesn't mean you

8   have a gun in your hand and do something crazy, but it means you

9   have a purpose in your life, and you have a role to fulfill in the

10  ummah and see yourself as fulfilling that role, not by carrying on

11  day by day, month by month, year by year, engaging in a lot of

12  useless discussion concerning a lot of matters which really bring

13  you no benefit neither in your religion nor in the hereafter"?

14  A.   I think that's the one you asked me earlier, and I don't

15  recall hearing that one.

16          MR. MAC MAHON:   Just a second, Your Honor.

17  Q.   How about tape 4, side B?  Did you listen to that?

18  A.   Same answer as before.  Might have.

19  Q.   Where it said, "When these issues are not understood and

20  people take -- ignorant people, or people that do not have insight

21  even though they may have some knowledge of the shariah, a lot of

22  problems occur for the ummah, and we can think of many examples,

23  for instance.  Those Muslims who decide to do violent acts in the

24  West, now, because they did not take this matter to those people

25  who had knowledge, those people who had knowledge of the shariah

**Wyman - recross**

1   and knowledge of the affairs of the Muslims, what happens?  They

2   follow people who are ignorant and might have knowledge of the

3   shariah but do not have wisdom, do not have insight.

4            "They therefore feel it is jihad to do an act of

5   violence in our weakness, and therefore, they bring the wrath of

6   the West, of the country the Muslims are in, upon us.  This is

7   something that is very dangerous.

8            "Likewise, you also find this among some Muslim

9   countries, where people might have knowledge or they might lack

10  knowledge, and they feel if they did a political assassination or

11  they did some other act which they will be able to change the

12  affairs, and what it results in is chaos and confusion and a worse

13  situation than it started in."

14           Did you read that?

15  A.   No.

16  Q.   Okay.  The, the Word of Advice to the Salafis, tell the jury

17  when that was -- that speech was given.

18  A.   I don't know.

19  Q.   1996?

20  A.   I don't know.

21  Q.   It was given in England, wasn't it?

22  A.   That's what it sounded like, yes.

23  Q.   You don't recognize all this as religious speech, Special

24  Agent Wyman?

25  A.   It sounds like --

## Daghestani - direct

1    MR. KROMBERG:  Objection, Judge.  Relevance of religious
2  speech is not an issue.

3    THE COURT:  Sustained.  Again, the opinion of the agent
4  is not relevant.

5    MR. MAC MAHON:  Just a second, Your Honor.

6    Nothing further, Your Honor.

7    THE COURT:  All right, thank you, Agent Wyman.  You may
8  step down.

9              (Witness excused.)

10    THE COURT:  All right, Mr. Gibbs, Mr. Kromberg, call
11  your next witness.

12    MR. GIBBS:  Alex Daghestani, Your Honor.

13    THE COURT:  I'm sorry?

14    MR. GIBBS:  Alex Daghestani.

15    THE COURT:  Ah, the interpreter.  All right.

16    Mr. Daghestani, I don't think we got you affirmed
17  yesterday or whenever it was you were last here, so we're going to
18  go ahead and do it at this time.

19         ALEX DAGHESTANI, GOVERNMENT'S WITNESS, AFFIRMED

20                    DIRECT EXAMINATION

21  BY MR. GIBBS:

22  Q.   Good afternoon, sir.

23  A.   Good afternoon.

24  Q.   Sir, will you please state your name for the record and also
25  spell your name for the record?

# Daghestani - direct

1  A.   Alex Daghestani, A-l-e-x D-a-g-h-e-s-t-a-n-i.

2  Q.   And, sir, where do you work?

3  A.   At the FBI.

4  Q.   And is that the FBI Washington Field Office?

5  A.   That's correct.

6  Q.   And what is your position at the FBI?

7  A.   Language analyst.

8  Q.   And what type of language analyst are you?

9  A.   Arabic.

10  Q.   All right.  Sir, were you trained to translate from Arabic
11  into English and from English into Arabic?

12  A.   That's correct.

13  Q.   And what is your particular training to do that?

14  A.   I, I have my high school degree from Syria; I am born in
15  Syria; and also, I taught Arabic at university here in the United
16  States as graduate student and was involved in, in teaching at the
17  National Guard.

18        In addition, I work as project leader in machine,
19  machine translation project, Arabic machine translation project,
20  and a couple of years ago, I joined the FBI, where I took a couple
21  of exams, and I passed them, and that is my qualifications.

22  Q.   And that's a proficiency exam in Arabic, correct?

23  A.   That's correct.

24  Q.   And you're a native Arabic speaker, right?

25  A.   That's correct.

**Daghestani - direct**

```
 1            MR. GIBBS:  Judge, at this time, I would tender Mr. Alex
 2   Daghestani as an expert in translating from Arabic to English and
 3   English to Arabic.
 4            THE COURT:  Any objection?
 5            MR. MAC MAHON:  No objection, Your Honor.
 6            THE COURT:  All right, he's deemed an expert.
 7            MR. GIBBS:  Thank you, Judge.
 8            And, Joe, if we could pull up Government's Exhibit
 9   10A34?  And this is in evidence.  This was a multi-page document
10   that was located in Timimi's house.  If we can page forward to the
11   Arabic portion?
12            Okay.  If you'd stop there just briefly?  If you could
13   blow that up?
14   Q.  And, Mr. Daghestani, can you see that on your TV screen
15   there?
16   A.  Yes, sir.
17   Q.  And do you recognize that?
18   A.  Yes, sir.
19   Q.  What is that?
20   A.  This is a statement by, by Sheikh Hammoud Bin Abdullah
21   Ash-Shuaibi regarding the incidents that took place in America.
22   Q.  And you said the name of the individual is Shuaibi Bin Uqla,
23   correct?
24   A.  Right.  Hammoud Bin Abdullah Ash-Shuaibi.  I'm just reading
25   from the screen.
```

# Daghestani - direct

1        MR. GIBBS:  All right.  And if we go to the last page of

2   that Arabic document, please?  And specifically if we could blow

3   up this portion?

4   Q.   Mr. Daghestani, what is that, the numbers that I've circled

5   there?

6   A.   This is the date, the Islamic date of this fatwa, which is

7   the sixth month, day 28, 1422, the year 1422.

8   Q.   And as part of your duties with the FBI, did you determine

9   what the English corresponding date is to that date?

10  A.   Yes, sir.  I -- actually, I went to the -- I went to the

11  Library of Congress, and I checked the newspapers that belonged to

12  that date, and I checked a few of them, and here I have a couple

13  of samples actually.

14  Q.   All right, I think we have those in evidence as well, or at

15  least -- okay.

16        And, Judge, what I'd like to do is, if there's no

17  objection, move 10F4 into evidence.

18        THE COURT:  Any objection?

19        MR. MAC MAHON:  It's in Arabic, Your Honor.  No.

20        THE COURT:  All right, it's in.

21        (Government's Exhibit No. 10F4 was received in

22  evidence.)

23        MR. GIBBS:  And if we could, first, let's start here.

24  Blow up that portion, if we could.

25        THE COURT:  Well, can you just tell us, what is this a

# Daghestani - direct

1  picture of in general?  What are we looking at?

2          THE WITNESS:  We are looking at the front page of

3  Al-Alhram.

4          THE COURT:  I'm sorry, of what?

5          THE WITNESS:  We're looking at the front page of

6  Al-Alhram newspaper.  It's an Egyptian newspaper.

7          THE COURT:  Can you spell that title as best you can in

8  English?

9          THE WITNESS:  Yes.  The title, or actually what is shown

10  on the screen, it says, "Bush:  America is in a State of War."

11          THE COURT:  No, no, I mean the title of the newspaper.

12          THE WITNESS:  Al-Alhram.

13          THE COURT:  Can you spell that?

14          THE WITNESS:  Oh, certainly.

15          THE COURT:  Yes.

16          THE WITNESS:  A-l A-l-h-r-a-m.

17          THE COURT:  Thank you.

18          THE WITNESS:  Al-Alhram, yeah.

19  BY MR. GIBBS:

20  Q.    And, Mr. Daghestani --

21  A.    Yes.

22  Q.    -- you testified that you used a couple of newspapers to

23  determine what the exact date on the Uqla fatwa was, correct?

24  A.    Yes.

25  Q.    Now, this Egyptian newspaper, the Al-Alhram newspaper, is

# Daghestani - direct

1  this one of the papers you used in order to do that?

2  A.   Yes, sir.

3  Q.   And can you explain to the jury what you did?

4  A.   Well, I checked this newspaper, and I looked on the dates of

5  this issue, and if you look on the first line here that gentleman

6  was highlighting --

7  Q.   Well, actually, let me do this.  If I circle on the

8  right-hand side there --

9  A.   Exactly.

10 Q.   -- is that what you were looking at?

11 A.   That's correct.

12       Here it says Sunday 28, Jumada the 2nd, 1422, the

13 Islamic year, and that corresponds to September 16, 2001.

14 Q.   And that Jumada date that you talked about, that's the Arabic

15 date, right?

16 A.   That's correct.

17 Q.   And does that correspond to the date on the Uqla fatwa in

18 Government Exhibit 10A34?

19 A.   Exactly.

20 Q.   And, in fact, on the Egyptian paper -- if we can blow that

21 up?

22 A.   Yes.  It reads September 16, 2001.

23 Q.   Now, was that the only newspaper you looked at, or were there

24 other newspapers you looked at?

25 A.   No, actually, also I checked Al-Shark Awsat newspaper, which

# Daghestani - direct

1    also a Saudi newspaper.

2            THE COURT:  Spell that as well.

3            THE WITNESS:  Certainly.  A-l-S-h-a-r-k and then

4    A-w-s-a-t, Shark Al-Awsat.

5            MR. GIBBS:  Thank you, Judge.

6            And if we can pull up 10F5, the second government

7    exhibit?

8            THE COURT:  Is there any objection to 10F5?

9            MR. MAC MAHON:  No, Your Honor.

10           (Government's Exhibit No. 10F5 was received in

11   evidence.)

12   BY MR. GIBBS:

13   Q.   And, Mr. Daghestani, what is this item, 10F5?

14   A.   This is Shark Al-Awsat, the copy of the front page of the

15   issue that goes to that date.

16   Q.   And unless your eyes are much better than mine, I think we'll

17   need to blow up the masthead.  Is that where the date is located?

18   A.   Yes.

19           MR. GIBBS:  Let's blow that up then.

20           THE WITNESS:  Actually, here in the middle.

21           THE COURT:  And what country is this paper from?

22           THE WITNESS:  It's -- actually, the head office is in

23   London, but they have different editions for different parts of

24   the, of the world.

25   BY MR. GIBBS:

**Daghestani - direct**

1  Q.  And is this a Saudi paper?

2  A.  Yes, it's owned by a Saudi publishing firm.

3  Q.  And the part that we've highlighted there, can you see that?

4  A.  Yes.

5  Q.  And will you explain to the jury what you did using this

6  particular paper, 10F5, to determine the correct date of the Uqla

7  fatwa?

8  A.  And again, this newspaper give me the date of Sunday, 28

9  Jumada the 2nd, 1422, the Islamic year, correspond to September

10  16, 2001.

11  Q.  All right.  Now, which part of the, the masthead, because I

12  want to circle it, is 28 Jumada 1422?

13  A.  It's actually at the very beginning.

14  Q.  It's on the far left-hand side?

15  A.  That's -- the right side, sorry.

16  Q.  Okay.  And you read it from right to left, correct?

17  A.  Exactly.

18  Q.  So is it in there?

19  A.  Yes.

20  Q.  Did I get it right?

21  A.  Yes.

22  Q.  And then what portion -- and that's in Arabic, correct?

23  A.  Yes.

24  Q.  And that says 28 Jumada 1422, which is the same date that was

25  on the Uqla fatwa?

**Daghestani - cross**

1  A.    Exactly.

2  Q.    And then there's also in Arabic there September 16, 2001?

3  A.    Right.  The few words before 2001, these correspond to the

4  month and the date.

5  Q.    And is it -- and actually, I think you can -- okay, yeah.

6  Thank you.

7  A.    Exactly.  Now you are highlighting the Gregorian date.

8  Q.    Which is September 16, 2001?

9  A.    2001, correct.

10 Q.    And you testified that the first paper was Egyptian, the

11 second paper published in London but it's a Saudi paper.

12 A.    I -- perhaps I should also add that perhaps this is the Cairo

13 edition.  As I mentioned, the same newspaper have different

14 edition just like the Wall Street Journal, so this is the Cairo

15 edition.

16 Q.    And Cairo is actually ahead in time from the East Coast to

17 the United States, correct?

18 A.    That's correct, by eight hours.

19          MR. GIBBS:  Eight hours ahead.

20          All right, Mr. Daghestani, that's all the questions I

21 have for you.  Thank you very much.  Mr. MacMahon will have some

22 questions for you now.  Thank you.

23                    CROSS EXAMINATION

24 BY MR. MAC MAHON:

25 Q.    Good afternoon, sir.

**J.A. 1935**

## Daghestani - cross

```
 1  A.    Good afternoon.

 2            MR. MAC MAHON:  Could we put the last page of Exhibit

 3  10J2 up, please?

 4            THE COURT:  Any objection?  No?  10J2?

 5            MR. GIBBS:  No, Your Honor.  It's in evidence.

 6            THE COURT:  There are six, six pages.

 7            MR. MAC MAHON:  I'm sorry.

 8            THE COURT:  Do you want to put it on the overhead?

 9            MR. MAC MAHON:  I'll try it, Your Honor.  We can't find

10  it.

11            THE WITNESS:  I think that's -- you have it now.

12  BY MR. MAC MAHON:

13  Q.    Sir, this is the, this is the Uqla document that you were

14  talking about, correct?

15  A.    Yes, sir.

16  Q.    Okay.  Can you read for the jury what it says above the date?

17  A.    It says, "Dictated by Sheikh -- by His Excellency" -- or "His

18  Eminence, Sheikh A. Hammoud Bin Ash-Shuaibi."

19  Q.    So that's the date it was actually dictated, right?

20  A.    That's correct.

21  Q.    How is the -- the lunar date in the -- I'm losing my term

22  here, but how is it determined what day it is under the calendar?

23  A.    It's depending on the, on the seeing of the moon, and this is

24  just like, you know, this is why some months there are 29 days,

25  other months would be 30 days, depending -- this is for months, I
```

**Daghestani - cross**

1   mean, especially important regarding the months of Ramadan, or

2   Al-Hajj.

3           The reason I went to check the library, printed

4   newspaper, is because when you run computer program that convert

5   Islamic date to Gregorian date or vice versa, sometimes you don't,

6   may not get the right date because they don't make any allowance

7   for having, you know, 29-day months.  They usually have them just

8   like 30 days.

9   Q.  Where -- who actually sees the moon and decides what day it

10  is?

11  A.  In each -- again, I'm really not an expert on these issues.

12  However, what I recall, that usually in each community, they have

13  a person who will go and watch the moon, and during, you know, the

14  critical days or at the end of each Islamic month, to determine

15  the beginning of, you know, the following month.

16          In the past, each big city, they have their own person

17  who will go and do practice that.  Currently, most countries, they

18  may go and follow what the government of Saudi Arabia decide as

19  the beginning of the Islamic month, but not everybody agree with

20  this.

21  Q.  All right.  So in your opinion, a date of something that

22  could have been dictated in Saudi Arabia may not be the same day

23  as a newspaper published in London, right?

24          MR. GIBBS:  Judge --

25          THE WITNESS:  Here the reason --

**J.A. 1937**

## Daghestani - cross

```
 1              THE COURT:  Wait, there's an objection.

 2              MR. GIBBS:  He's testifying as an expert on translating

 3   the language, not on the lunar calendar, so I would object on that

 4   basis, and the question called for an opinion regarding the lunar

 5   calendar.

 6              THE COURT:  Well, I mean, the government did also call

 7   this witness to explain the lunar calendar.  He's at this point

 8   the only expert or the only person we have who can talk about

 9   that.

10              MR. GIBBS:  Well, Judge, we simply tendered him to

11   translate the newspapers as they're relevant to the Uqla fatwa,

12   not to have him testify as to his expertise in the lunar calendar.

13              THE COURT:  Well, this is more than the expertise on the

14   lunar calendar.  This has to do with when things are dictated and

15   when they appear, and I think that's way beyond the scope of his

16   expertise, so I'm sustaining the objection.

17              MR. GIBBS:  Thank you, Judge.

18   BY MR. MAC MAHON:

19   Q.   Okay.  Sir, did you -- the government asked you to -- were

20   you just asked to go look at newspapers to try to find similar

21   dates?

22   A.   No.

23   Q.   You were asked --

24   A.   They give me that date, they ask me part of my job to decide

25   or to give the right Gregorian date, and knowing about this issue,
```

**J.A. 1938**

## Daghestani - cross

```
 1   that the computer program does not give you the accurate date, I
 2   went to the Library of Congress, and I get copies, one of a Saudi
 3   newspaper, another of a newspaper published in London, and another
 4   from Egypt, Cairo.  So I guess this is cover it all.
 5   Q.   The computer program you're talking about is one where you
 6   can try to convert, and if you type this date in, it would give
 7   you a range of days, wouldn't it?
 8   A.   No, no.  It won't give me a range of days, but it will give
 9   me an approximate date, a day that perhaps one day or two days is
10   different than the real one.  So for that reason, it's not
11   reliable.
12   Q.   And Exhibit 10FF -- 10F5, excuse me, did you read that
13   newspaper?
14   A.   Which one is this?
15   Q.   10F5, the one that you just were reading to us, sir.
16           THE COURT:  I think it's on the screen, sir.
17           THE WITNESS:  Yeah, 10F5.  Yes, sir, I read it.
18   BY MR. MAC MAHON:
19   Q.   Okay.  And in that newspaper, there was no reference to any
20   statement by Sheikh Uqla, was there?
21   A.   Not on, on the page that I'm seeing here.  This is a portion
22   of the first page.
23   Q.   And, and the same question with respect to 10F4:  You read
24   that newspaper, too, didn't you?
25   A.   Yes, sir.
```

# Thompson - direct

1  Q.   And there wasn't any reference to any statement by Sheikh
2  Uqla in that statement, either, right?
3  A.   That's correct.  Nothing in this portion of this newspaper.
4  Q.   So you can't tell us when it was that Sheikh Uqla's statement
5  may have been available in the United States of America, correct?
6  A.   Based on these two screens, I cannot make determination.
7          MR. MAC MAHON:  Nothing further, Your Honor.  Thank you.
8          THE COURT:  All right, any redirect?
9          MR. GIBBS:  No, Judge.  Thank you.
10         Thank you, sir.
11         THE COURT:  Thank you, sir, for your testimony.  You're
12  free to go at this point.
13         THE WITNESS:  Thank you.
14                    (Witness excused.)
15         THE COURT:  All right.
16         MR. KROMBERG:  Mr. Andre Thompson.
17         THE COURT:  All right, Mr. Thompson.
18         ANDRE THOMPSON, GOVERNMENT'S WITNESS, AFFIRMED
19                  DIRECT EXAMINATION
20  BY MR. KROMBERG:
21  Q.   Good morning, sir.  Please state your full name for the
22  record, and spell your last name for the record.
23  A.   Andre Thompson, T-h-o-m-p-s-o-n.
24  Q.   Do you use another name as an Islamic name?
25  A.   Yes.  My Islamic name is Rasheed.

# Thompson - direct

1  Q.  Can you spell that for the record?

2  A.  R-a-s-h-e-e-d.

3  Q.  Mr. Thompson, how are you employed?

4  A.  I work for the United States Navy.

5  Q.  Are you active duty?

6  A.  Yes, I'm active duty.

7  Q.  How long have you been in the Navy?

8  A.  In July, I will have served 17 years.

9  Q.  What position do you have in the Navy?

10  A.  I'm a leading pay officer of support equipment.

11  Q.  What's your grade?

12  A.  E-6, sorry.

13  Q.  Between 1999 and 2002, where were you stationed?

14  A.  I was stationed here at Andrews Air Force Base.

15  Q.  Have you since been transferred?

16  A.  Yes.

17  Q.  And you're now transferred someplace else within the

18  Continental U.S.?

19  A.  Yes, I am.

20  Q.  What agreement or agreements do you have with the government

21  in connection with your testimony?

22  A.  None.

23  Q.  What promises has the government made to you in connection

24  with your testimony?

25  A.  The government hasn't made me any promises.

**Thompson - direct**

1  Q.   Other than reimburse you for expenses, what payments have you

2  received from the government?

3  A.   No payments.

4  Q.   Did there come a time when you converted to Islam?

5  A.   Yes.

6  Q.   When was that?

7  A.   I converted to Islam in 1998.

8  Q.   After you converted to Islam, did you engage in activities to

9  further your understanding of Islam?

10 A.   Yes, I did.

11 Q.   What did they include?

12 A.   I was -- I went to, like, a class at Sheikh Jaafar Idris's

13 home.

14          THE COURT:  Mr. Thompson, can you speak up just a little

15 bit more?

16          THE WITNESS:  I'm sorry.

17          THE COURT:  Yes.

18          THE WITNESS:  I began to attend a class of what I

19 thought was understanding of Islam at Sheikh Jaafar Idris's home.

20 BY MR. GIBBS:

21 Q.   Where was that?  Where was the home?

22 A.   It's in the area of Falls Church, Virginia.

23 Q.   How did you come to know Sheikh Jaafar Idris?

24 A.   Actually, it was recommended to me to go to his class by

25 Donald Surratt.

**Thompson - direct**

1   Q.   How often did these classes take place?

2   A.   It was approximately once a week.  It was once a week.

3   Q.   What happened to the class if Sheikh Idris was unavailable to

4   teach the class?

5   A.   If he was unavailable, then Ali Timimi would teach the class.

6   Q.   Approximately how many times did that happen?

7   A.   It actually was quite a few times when I first started.

8   Q.   Did you ever attend lectures by Ali Timimi on Islamic topics

9   elsewhere besides Jaafar Idris's house?

10  A.   Yes, I did.

11  Q.   And where was that?

12  A.   It was at Dar al-Arqam, an Islamic center.

13  Q.   Did there come a time when you became involved with a group

14  of Muslim men who engaged in paintball activities?

15  A.   Yes, I did.

16  Q.   When was that?

17  A.   It was approximately the year 2000, in July of 2000.

18  Q.   How did you get involved with that?

19  A.   Donald Surratt also recommended that -- or asked me if I

20  wanted to attend some paintball outing.

21  Q.   Do you recall the individuals that were most centrally

22  involved or regularly involved with the paintball activities?

23  A.   A few of them.  Ibrahim Hamdi, of course myself, Donald

24  Surratt.

25  Q.   Did you know Yong Kwon?

**Thompson - direct**

1  A.    Yong Kwon, Seif Chapman, Brother Hammad.

2  Q.    Did you know -- I'm sorry, I didn't mean to interrupt you.

3  What did you say?

4  A.    Brother Hammad.

5  Q.    Was his full name Hammad Abdur-Raheem?

6  A.    I believe so, yes.

7  Q.    Do you recall in 2000 or 2001 a disagreement with any of the

8  individuals engaged in this activity regarding whether prayers

9  could be shortened during the trip to the paintball field?

10  A.    Yes, I do.

11  Q.    Can you explain to the Ladies and Gentlemen of the Jury what

12  that disagreement was about?

13  A.    Well, because we were driving approximately 45 minutes, a few

14  of the brothers felt that we were what's considered travelers, so

15  when you're in the condition when you're a traveler, you have to

16  shorten your -- or it's permissible to shorten your prayer and

17  combine your prayer.  So some of the brothers wanted to shorten

18  the prayer and combine the prayer because it made the paintball

19  easier, and some of the brothers disagreed with that opinion.

20  Q.    How was the issue resolved?

21  A.    Ismail Royer had sent us an e-mail basically stating that it

22  would be permissible for us to combine our, our prayers.

23  Q.    But wasn't Ismail Royer one of the brothers who was involved

24  in the disagreement?

25  A.    Yes, he was.

**J.A. 1944**

```
1   Q.   So what was it about the e-mail that resolved the
2   disagreement?
3   A.   Well, he told us that he had talked to Sheikh Ali.
4   Q.   I'd like to -- if you'd take a look, please, at an exhibit
5   that's not yet in evidence, Government Exhibit 4G7?  And you'll
6   get the book from the deputy marshal.  4G7.
7            THE COURT:  I go -- my book doesn't have it.  Are you
8   sure it's in the book?
9            MR. KROMBERG:  This was a later edition, Judge, which
10  might have been put on Ms. Travers' desk.
11           THE COURT:  Okay.  Is it in·that notebook?
12           THE CLERK:  Yes.
13           THE COURT:  Yes?  All right, that's the important thing.
14  BY MR. KROMBERG:
15  Q.   Mr. Thompson, do you recognize 4G7?
16  A.   Yes, I do.
17  Q.   Is that your e-mail address that's listed on there as
18  ironknuckle@prodigy.net?
19  A.   Yes, it is.
20           MR. KROMBERG:  Okay.  Your Honor, the government moves
21  in 4G7.
22           THE COURT:  Any objection?
23           MR. MAC MAHON:  No objection, Your Honor.
24           THE COURT:  All right, it's in.
25           (Government's Exhibit No. 4G7 was received in evidence.)
```

**J.A. 1945**

1           MR. KROMBERG:   Could we have 1J2, Government Exhibit
2    1J2?  That's already in evidence.
3    Q.   Do you recognize the guy on your screen?
4    A.   Yes, I do.
5    Q.   Who is that?
6    A.   This is Ibrahim.
7    Q.   Ibrahim Al-Hamdi?
8    A.   Al-Hamdi, yes.
9    Q.   After September 11, did there come a time when you had a
10   conversation with Ibrahim Al-Hamdi regarding Afghanistan?
11   A.   Yes, I did.
12   Q.   Approximately when did this conversation take place?
13   A.   I believe it was the end of October.
14   Q.   How do you know -- or why do you think it was the end of
15   October?
16   A.   It was at the time when the American soldiers were about to
17   go into Afghanistan.
18   Q.   Where were you at this point?
19   A.   Oh, also, I was attending a military Islamic lay leader
20   course at that time.
21   Q.   Where was that course taking place?
22   A.   The course itself was being held at the -- a mosque on
23   Electronic Avenue.  It's --
24   Q.   Islamic Foundation of America?
25   A.   Yes, the Islamic Foundation of America.

**J.A. 1946**

## Thompson - direct

1  Q.    Was Ibrahim Al-Hamdi connected with Islamic Foundation of
2  America?
3  A.    Yes.  He -- I believe he worked there.
4  Q.    So how did it happen that you -- what was the context of when
5  you met Ibrahim Al-Hamdi at that course?
6  A.    Actually, we were -- it was -- we were in the course.  We
7  were taking a break.  We had stopped for the prayer.  We prayed,
8  and just when I looked up from the prayer, I noticed he was there.
9  Previously, I didn't know that he had worked there.
10 Q.    What did -- did you have a conversation with him at that
11 point?
12 A.    Yes, I did.
13 Q.    What did he say to you?
14 A.    Actually, he -- when we recognized one another, he pulled me
15 to the side, and he asked me how I was doing, asked me about a few
16 of the brothers in Laurel.  Then he asked me if I was interested
17 in going over.
18 Q.    Where did he indicate he was talking about?
19 A.    Over to Afghanistan.
20 Q.    How did you respond?
21 A.    Oh, initially, I said, you know, I questioned him, you know,
22 "Where?"  You know, and then I, I said, "Well, you know, I can't
23 -- I'm active duty military.  I couldn't go over."  And he said
24 that would be okay.
25              I said, "I have a family."

# Thompson - direct

1    He said, "Your family would be taken care of."  I

2  wouldn't have to worry about my family.

3  Q.   What did he say about any others having done the same thing?

4  A.   I don't recall him saying at that time.

5  Q.   What did -- after you said that you couldn't go and he said

6  that it was okay, what happened next?

7  A.   Oh, he -- well, he gave me his number.  I basically kind of

8  brushed him off, told him I'd think about it, and then he gave me

9  his number.

10  Q.   What, if anything, did he say during this conversation about

11  Ali Al-Timimi?

12  A.   This conversation?  He didn't say anything about Ali

13  Al-Timimi.

14  Q.   Was -- did you have another conversation with Hamdi after the

15  one you just talked about?

16  A.   Oh, he had called me, and I basically told him that I wasn't

17  interested in, in -- I was busy; I didn't have anything going on.

18  Q.   When he called you, what did -- what did he ask you to do?

19    MR. MAC MAHON:  Your Honor, as long as this isn't being

20  offered for the truth of the matter asserted, unless -- he's not a

21  member of this conspiracy, at least I didn't see him listed as

22  one.

23    MR. KROMBERG:  He's not a member of this conspiracy,

24  Judge.

25    THE COURT:  I'm not sure I understand the objection.

**J.A. 1948**

## Thompson - direct

```
 1              MR. MAC MAHON:  It's a hearsay objection, Your Honor.
 2    What was he saying, what was he doing, Mr. Al-Hamdi doing, none of
 3    it has been tied into the case as far as I can tell.
 4              THE COURT:  Oh, I think Al-Hamdi has been tied into the
 5    case, and his statements are admissible at this point.  Go ahead.
 6    BY MR. KROMBERG:
 7    Q.   Let's just be clear here.  You met him at the Islamic
 8    Foundation of America, and he solicited you to go to Afghanistan,
 9    and you said no, correct?
10    A.   Yes.
11    Q.   Okay.  What was your next contact with him?
12    A.   Oh, later, later, he had asked me if I was going to attend a
13    lecture at his home at which Ali Timimi would be giving that
14    lecture.
15    Q.   What did you tell him?
16    A.   Well, I said I would think about attending the lecture, but I
17    never attended the lecture.
18    Q.   Now, when did he say the lecture was going to be at his home?
19              MR. MAC MAHON:  I'm sorry, Your Honor, was this at
20    Al-Hamdi's home or whose house?
21              THE COURT:  That's what I understood, but find out.
22              THE WITNESS:  At Al-Hamdi's home.
23    BY MR. KROMBERG:
24    Q.   Okay.  When did he say this lecture at Al-Hamdi's home was
25    going to be?
```

# Thompson - direct

1  A.    It was in November.

2  Q.    Okay.  And you didn't go.

3  A.    No, I did not.

4  Q.    All right.  Did you ever hear from -- did you ever hear from

5  one of the paintball players whether Al-Hamdi actually had the

6  meeting that he told you he was planning to have?

7         MR. MAC MAHON:  Your Honor, objection if he can't be

8  more specific as to get inside the conspiracy.

9         MR. KROMBERG:  All right.

10        MR. MAC MAHON:  There's lots of paintball players.

11  BY MR. KROMBERG:

12  Q.    Did you ever hear from Donald Surratt that the meeting

13  actually occurred and that Ali Timimi spoke?

14        MR. MAC MAHON:  Then I object to that, Your Honor,

15  because Mr. Surratt was just called as a government witness.  They

16  could have asked him that question.  They can't bring it in

17  through this witness.

18        THE COURT:  Well, I think just asking whether somebody

19  had a meeting or not, it doesn't -- isn't going into a statement

20  per se, so I'm going to allow this.  If it gets any further than

21  that, Mr. Surratt can be called back.

22        MR. KROMBERG:  Thank you, Your Honor.

23  Q.    What, what did Mr. Surratt tell you that -- about whether

24  there was a meeting that Ali Timimi spoke at?

25  A.    He said that there was, in fact, a meeting.

**Thompson - cross**

1  Q.  And what was the topic of the meeting?

2  A.  He said that they had gone over a book that was recently

3  translated into English by Jamaal Zarabozo, Extremism in Islam.

4          MR. KROMBERG:  Okay.  Thank you, Mr. Thompson.  Please

5  answer Mr. MacMahon's questions.

6                      CROSS EXAMINATION

7  BY MR. MAC MAHON:

8  Q.  Good afternoon, Mr. Thompson.  Mr. Kromberg asked you about

9  money you've received from the federal government.  You've been --

10  you've received money to testify before, haven't you?

11  A.  I've never received money to testify.

12  Q.  Well, you've been given money to participate in an

13  investigation, haven't you?

14  A.  I was called to drive to various locations, and they gave me

15  money for my gas and for travel.

16  Q.  Who gave you the money?

17  A.  NCIS.

18  Q.  What is NCIS for the jury's understanding?

19  A.  Naval Criminal Investigative Service.

20  Q.  Okay.  And you played paintball, right?

21  A.  Yes, I did play paintball.

22  Q.  Okay.  And if you could look at Exhibit 4G7?

23          If we could pull that up, I'd appreciate that.

24  A.  I have it.

25  Q.  Okay.  This is an e-mail from Randall Royer to the

**Thompson - cross**

1  paintball -- Paint Ballaz web group for a lack of any other way to
2  say it, correct?
3  A.  Yes, it is.
4  Q.  You were a person that received things -- the Paint Ballaz --
5  how would you describe it?  I don't have enough computer knowledge
6  to describe, what is this?
7  A.  I imagine it's a group website which, you know, it had
8  basically the group -- the paintballer group on it, and he could
9  e-mail everybody at one time.
10  Q.  Okay.  And you got a lot of e-mails from this website?
11  A.  Yes, I did.
12  Q.  Okay.  And this one is dated June 19, 1991 -- 1991, excuse
13  me, Your Honor -- 2001, and Ali Al-Timimi is not a recipient of
14  this e-mail, is he?
.15  A.  I'm not sure.  I don't know if his name is on here.
16  Q.  And could you turn to the last page?  This is an e-mail from
17  Mr. Royer, and it says "Obeying the Ameer" at the end.  What did
18  you understand that to mean in June of 2001?
19  A.  Just that it was referring to whoever was the leader of the
20  paintball.
21  Q.  And that was Mr. Royer, wasn't it?
22  A.  Well, there were several amirs.
23  Q.  Was Mr. Royer one of them?
24  A.  I believe so, yes.
25  Q.  And Mr. Kwon was one, too, right?

1  A.   Yes, he was.

2  Q.   And on or about June of 2001, Mr. Kwon actually tried to sell

3  you a weapon, didn't he?

4  A.   He just made it -- noted that it was for sale.

5  Q.   Okay.  What kind of gun was that?

6  A.   He was -- I think at the time, he was showing some type of

7  semiautomatic rifle.

8  Q.   Did he tell you how much he wanted for it?

9  A.   I'm not sure.

10 Q.   How many times did you play paintball?

11 A.   I played paintball many times both years.

12 Q.   And above, it says "Obeying the Ameer," it says "J-Word."

13 J-Word?

14 A.   Yes.

15 Q.   What did you understand that to mean in June of 2001 in the

16 e-mail from Mr. Royer?

17 A.   He was speaking about jihad.

18 Q.   Sir, you, you spoke to the FBI on May 12 of 2003, right?

19 A.   Yes, I did.

20 Q.   And that day, you told the FBI that you have no recollection

21 of Hamdi ever saying the words "Afghanistan" or "Pakistan" or

22 "fighting in Afghanistan," but that you know from the context of

23 your conversation that that is what the source and Hamdi were

24 talking about.

25          Do you remember telling the FBI that?

**Thompson - cross**

1  A.   Yes.

2          MR. MAC MAHON:  I don't have anything further, Your

3  Honor.

4          THE COURT:  All right.  Any redirect?

5          MR. KROMBERG:  No, Your Honor.

6          THE COURT:  All right, thank you, Mr. Thompson.  You're

7  excused as a witness.

8                       (Witness excused.)

9          MR. GIBBS:  Judge, we have some more clips from "New

10 World Order" that we'd like to --

11          THE COURT:  All right.

12          MR. GIBBS:  -- publish to the jury by playing.

13          THE COURT REPORTER:  Do you have a transcript of these?

14          MR. KROMBERG:  No, we do not.

15          THE COURT:  All right.  Before you stop that --

16          MR. KROMBERG:  This clip, Judge, that we're going to

17 play is about seven minutes long.

18          THE COURT:  Identify it, please.

19          MR. KROMBERG:  Say again?

20          THE COURT:  Identify it.

21          MR. KROMBERG:  Oh, this is 10T1.  This is a clip from

22 tape 1, side A of "New World Order."

23          (Excerpt of Government's Exhibit No. 10T1 was played; no

24 government transcript provided.)

25          MR. KROMBERG:  Next is tape 2, side A, still 10T1.  This

**J.A. 1954**

1809

1   will be clip 32.

2            (Government's Exhibit No. 10T1, Clip No. 32, was played;
3   no government transcript provided.)

4            MR. KROMBERG:  Next is tape 2, side B, from "New World
5   Order."  This would be clip 33.

6            (Government's Exhibit No. 10T1, Clip No. 33, was played;
7   no government transcript provided.)

8            MR. KROMBERG:  Track -- this would be tape 2, side B,
9   clip No. 34, 10T1.

10           (Government's Exhibit No. 10T1, Clip No. 34, was played;
11  no government transcript provided.)

12           MR. KROMBERG:  I'd like to go to side 5, excuse me, tape
13  5, side B, Clip No. 41.

14           (Government's Exhibit No. 10T1, Clip No. 41, was
15  played.)

16           MR. KROMBERG:  Judge, with the reservation that we still
17  would move in the summary -- we'd like to deal with the summary
18  chart issue, the government rests.

19           THE COURT:  All right.  Ladies and Gentlemen, then this
20  is a good time for you to take your afternoon break.  I'm going to
21  give you until 25 after.  I have some matters I need to take up
22  with counsel, so I'm not positive we'll start at 25 after, but
23  you're clear until that point, all right?  Thank you.

24                        (Jury out.)

25           THE COURT:  All right.  Now, first of all, the

**J.A. 1955**

1810

```
1   stipulation Government Exhibit 12-60 we still need to get for the
2   record, all right?
3           In terms of the summary chart, again, I'm not letting
4   the one as proffered go in.  I would hope you-all -- obviously,
5   the jury is also requesting some assistance with some kind of a
6   summary, and perhaps you can work one out together.  There are
7   several issues that are not in dispute, and that might give them
8   enough of a skeleton.
9           MR. MAC MAHON:  We'll work together, Your Honor.
10          THE COURT:  All right, that's fine.
11          Anything else?  Obviously, because there's been so much
12  evidence, I'm going to assume that all the exhibits the government
13  intended to move in they've moved in, but you should check,
14  Mr. Kromberg, with Ms. Travers if there's anything that you
15  think --
16          MR. KROMBERG:  Thank you, Judge.  I'd like to ask the
17  Court to reconsider one last time on 7D8, which was the Al-Jazeera
18  posting from Shibli Zaman.
19          THE COURT:  I'm not reconsidering that.  All right.
20          The one thing is, though, since you did not have
21  transcripts of all these clips and we want as accurate a record as
22  possible, I'm going to require the government to provide
23  Ms. Thomson as quickly as possible with copies -- with these tapes
24  or a set of these tapes so that she can listen to them and make
25  sure she got everything down, all right?  Because these are tough.
```

**J.A. 1956**

1811

```
1          MR. KROMBERG:  Judge, does that -- I mean, the tapes are
2   in evidence.  The physical tapes are in evidence.  Will that be
3   sufficient?
4          THE COURT:  Those clips.  In other words, you get with
5   her and work it out.
6          MR. KROMBERG:  Okay.
7          THE COURT:  But this is very difficult.
8          MR. KROMBERG:  Oh, I see -- okay.  We can do that.
9   That's no problem.  We can do that.
10         THE COURT:  All right, that's fine.
11         Now, the other thing is just looking down the road for
12  when the jury gets this case, you need to make sure that we have
13  the necessary hardware because this jury may very well want to
14  play some of these tapes again, and I don't recall whether these
15  are on CD disk or how you got them.
16         MR. KROMBERG:  These are audiotapes.  It will be very
17  difficult to find particular clips that way --
18         THE COURT:  If the entire exhibit is in, I mean, they
19  may listen to the whole thing, but if we get to the point where
20  they're asking to get to certain spots, we'll have to work that
21  out down the road, but just make sure that we have the equipment
22  because it's going to have to go into the jury room so they can
23  listen to those things.
24         MR. KROMBERG:  There's obviously audiotapes, Judge.
25  There's also the "Russian Hell 2000" CD in digital format, and
```

1812

1   there's the videotape of the Kwon-Royer meeting.  We can provide
2   all these things, I think -- well, we'll work on providing them.
3               THE COURT:  Right.
4               MR. KROMBERG:  There are different media that we have to
5   deal with.
6               THE COURT:  I understand that.  So we want to make sure
7   we have all the appropriate hardware here so it can be played for
8   the jury, all right, if they want to see it again.  They may not,
9   some of that.

10              All right, Mr. MacMahon or Mr. Yamamoto, any motions?
11              MR. YAMAMOTO:  Your Honor, at this time, we'd move for a
12  rule 29 with respect to the entire indictment to start with.  With
13  respect to Count 1, Your Honor, inducing others to conspire to use
14  firearms, our contention is that there is no evidence -- it's a
15  two-part count:  the 924(n) count, which is the conspiracy
16  portion, and the 18 U.S.C. 2 count, which is aiding and abetting.
17  Dr. Al-Timimi is alleged to have aided and abetted in inducing
18  others to use the firearms.

19              In this case, and I don't have a copy of the indictment
20  for some reason, but the firearms they're talking about are the
21  firearms that were used in Pakistan.  There is no showing that he
22  induced or took any action with respect to those firearms.  He may
23  or may not have -- thank you.

24              He may or may not have induced them to go to Pakistan to
25  take part in training, but that is different than conspiring to

1813

1  use the firearms.  He would have to have done some act under the
2  aiding and abetting statute with respect to the firearms
3  themselves.

4          And this is tied in really with Counts 7 and 8 and 9 and
5  10, which are inducing others to use firearms and inducing others
6  to carry explosives.  I think it's more direct there because
7  there's no conspiracy involved, that he would have to have done
8  something with respect to the firearms that are charged in Counts
9  7 and 8 and with respect to the RPGs that are charged in Counts 9
10  and 10 and the individuals who used them, and there is no showing
11  that he did anything with respect to those four counts.

12          It's a little bit more problematic with respect to Count
13  1, but I think the analysis is still the same except it's a little
14  broader picture in that you're talking about the conspiracy as
15  opposed to an individual, but he still has to do some act to aid
16  and abet that particular use of that particular firearm -- or
17  those particular firearms, meaning the firearms in Pakistan.

18          THE COURT:  All right, Mr. Kromberg, do you want to
19  respond to that argument first?

20          MR. KROMBERG:  Your Honor, Count 1 alleges that on or
21  about -- that during this time frame, Ali Timimi aided, abetted,
22  counseled, and induced them to agree with each other and with
23  others to use, carry, possess, and discharge firearms.

24          Well, the evidence that we've heard shows that he
25  said, "You guys should go.  Royer can help you go to the camp."

**J.A. 1959**

1814

1 And Agent Wyman testified that Mr. Timimi well knew about the
2 training that went on at the camp at the very least.

3          So there shouldn't be any question that -- but that Ali
4 Timimi induced, counseled, and otherwise procured the offense of
5 the conspiracy between Kwon, Hasan, Royer, Aatique, and Khan and,
6 for that matter, Abu Khalid and other folks at Lashkar.  There was
7 a conspiracy.  A lot of guys got convicted of a conspiracy.  He
8 induced them to engage in that conspiracy, he counseled them to do
9 it, and he procured them to do it.

10         THE COURT:  Well, I mean, as you know, at the end of the
11 government's case, when the Court looks at a rule 29 motion, it's
12 required to draw all inferences in favor of the government.  If
13 the jury believes the testimony of Aatique and Kwon, in my view,
14 that's more than enough evidence upon which to find the defendant
15 guilty of the counts that are at issue not only, frankly, in
16 Counts 1 and 8 through -- 7, 8, 9, and 10, but frankly, the other
17 counts in the indictment as well.

18         This case does come down, as I've said even in the
19 pretrial matters, to one of determining the intention of the
20 defendant, that's a significant issue, and No. 2, the extent to
21 which, if at all, the defendant's words and actions aided and
22 abetted, induced, or caused the events that are alleged in the
23 other counts of the indictment, and drawing all inferences in
24 favor of the government, there is in my view sufficient evidence
25 to let all counts go to the jury.

1815

1    Mr. Yamamoto, for the record, you should just quickly
2  put on the record what other argument you would have made on the
3  other ones, but I think the basic analysis runs through all of
4  them.  I mean, the Neutrality Act one is even stronger because
5  India is a country with which the United States is at peace.

6    MR. YAMAMOTO:  Correct, Your Honor.  The Neutrality Act
7  count is the count we would have the most trouble with.

8    I would point out to the Court, Your Honor, that in the
9  previous Khan trial, the Court looked at the aiding and abetting
10 with respect to the firearms and found that in that situation,
11 where these people were in more of a conspiracy and more contact
12 with each other and doing more support, that there was no aiding
13 and abetting with respect to those firearms that the particular
14 individuals used because they were not involved in Pakistan with
15 those individuals and those firearms.

16    THE COURT:  But that decision came when in that case?

17    MR. YAMAMOTO:  That came after the government's case,
18 Your Honor.

19    THE COURT:  All right.  Mr. Timimi was not in that case,
20 and again, the Court can revisit this issue later on.

21    MR. YAMAMOTO:  Yes, Your Honor.

22    THE COURT:  But for purposes of the rule 29 motion right
23 now, I'm going to deny it.

24    MR. YAMAMOTO:  Yes.  That's fine, Your Honor.

25    MR. KROMBERG:  If I could just clarify for the record,

1816

1   if it helps the Court, the issue in that case was Chapman and
2   Hammad in particular training the -- training the people in the
3   U.S., and we had charged them with aiding and abetting the use of
4   firearms by the guys who went to Pakistan by the fact that Chapman
5   and Hammad trained them here, and the Court said there wasn't a
6   close enough connection between what Chapman and Hammad were
7   training them for generally and the specific things that they did
8   in Pakistan.

9            THE COURT:  All right.

10           MR. YAMAMOTO:  Your Honor, with respect to Count 2 and
11  really Count 3, Count 2, inducing others to levy war, and Count 3,
12  inducing others -- excuse me, Count 2, soliciting others to levy
13  war, Count 3, inducing others to conspire to levy war, in
14  violation of 18 U.S.C. 2384 and 18 U.S.C. 2, Your Honor, in order
15  to constitute the levying of war, there must -- there must be an
16  assemblage of persons for the purpose of effecting a force for a
17  treasonable purpose at that time, and there must be immediacy to
18  that.

19           Here at most, Dr. Al-Timimi said, okay, you guys have a
20  choice.  You can do this, or you can do this.  That doesn't fall
21  within the elements that would be required to meet both Counts 2
22  and 3, the soliciting and the inducing.

23           Again, the aiding and abetting, he would have to have
24  aided and abetted the conspiracy itself in doing the levying
25  portion.  What he -- he at most advocated a choice.  He didn't

**J.A. 1962**

1817

1  say, You go do this.  He said, You can go do this, or you can go
2  do this.

3        So I don't think that falls within the requirements of
4  Counts 2 and 3 to levy war.

5        Now, as Kwon indicated, once they reached Pakistan,
6  there was no immediacy to going to training to go to levy war, to
7  do anything.  They went to the beach, spent time shopping, buying
8  things, going to the beach, having fun, and then they went to
9  train, and then they came home.

10        With respect to Count 4, attempting to contribute
11  services to the Taliban, in violation of 50 U.S.C. 1705, and Count
12  5, inducing others to aid the Taliban, in violation of 50 U.S.C.
13  1705 and 18 U.S.C. 2, and in Count 6, inducing others to conspire
14  to violate the Neutrality Act, for both Counts 4 and 5, again,
15  there's been no evidence that he was trying to induce anybody to
16  go to Afghanistan in aid of the Taliban.

17        He indicated you could go to Pakistan to train.  There
18  is some talk perhaps of going to Kashmir but nothing about the
19  Taliban or Afghanistan, and we would contend that again, it
20  doesn't meet the requirements of the statute to pass the rule 29
21  test.

22        The Neutrality Act violation, Your Honor, is problematic
23  for us.

24        THE COURT:  All right.  Mr. Kromberg, do you want to
25  respond just on the levy war issue?

1818

1    MR. KROMBERG:  Judge, he's not charmed with levying war.
2  He's charged with endeavoring to persuade others to levy war, and
3  therefore, the requirements of actual levying war don't have to be
4  there.  The question is did he solicit them to levy war.

5    There was evidence that each of the people who
6  traveled -- and the people, even the people who didn't travel but
7  people at the meetings knew that America was going to invade -- I
8  shouldn't say they knew -- they expected that America was going to
9  invade Afghanistan, they expected that the people that they were
10  going to fight to help, fight on behalf of, the Taliban, was going
11  to be fighting against America, and when Ali Timimi endeavored to
12  persuade them to go to fight on behalf of the Taliban, he was
13  endeavoring to persuade them to fight against America, which
14  constitutes soliciting them to levy war against the United States.

15    THE COURT:  Again, I mean, these are subtle charges.  A
16  lot of it is circumstantial evidence, but again, all inferences
17  get drawn in favor of the government, and I think because of the
18  inchoate nature of these charges, that there's sufficient evidence
19  to let them go forward.  Again, we can revisit this issue down the
20  road, but at this point, I'm denying the motion.

21    Now, how much time does Mr. Timimi need now?  Because
22  this is going to be the main afternoon break, and I know you-all
23  have to get ready for your case as well.  Is 15 minutes enough?

24    THE DEFENDANT:  I didn't hear the question.

25    THE COURT:  How much time do you need for your afternoon

1819

1   break?

2          MR. TIMIMI:  Fifteen minutes will be more than

3   sufficient.

4          THE COURT:  Then I'm going to have Mr. Wood tell the

5   jury it will be another 15 minutes.  We'll be in a 15-minute

6   break, and I guess we'll start up at 25 of.

7          MR. MAC MAHON:  Thank you, Your Honor.

8          (Recess from 3:19 p.m., until 3:35 p.m.)

9                    (Defendant and Jury present.)

10         THE COURT:  All right, Ladies and Gentlemen, the

11  government has rested.  That means the government has believed

12  it's presented all the evidence it needs, and now we're going to

13  see whether the defense wishes to present any evidence.

14         Mr. MacMahon or Mr. Yamamoto?

15         MR. YAMAMOTO:  Your Honor, we would call Sherdil Loynab.

16         THE COURT:  You're going to need to spell that name for

17  us, please.

18         MR. YAMAMOTO:  He's going to spell it for you.

19         THE COURT:  That's fine.

20         We're going to need a witness list both for the Court

21  and for the court security officer.

22         MR. YAMAMOTO:  I left it downstairs, Your Honor.

23  Somebody went to get it.

24         THE COURT:  Thank you.

25         SHERDIL LOYNAB, DEFENDANT'S WITNESS, AFFIRMED

**J.A. 1965**

# Loynab - direct

```
 1                       DIRECT EXAMINATION
 2   BY MR. YAMAMOTO:
 3   Q.   Please state your name, and spell both your first and last
 4   names.
 5   A.   My name is Sherdil Loynab, and it's -- the first name is
 6   S-h-e-r-d-i-l, last name, L-o-y-n-a-b.
 7   Q.   Mr. Loynab, are you a student?
 8   A.   Yes, I am.
 9   Q.   Where?
10   A.   NOVA, Northern Virginia Community College.
11            MR. MAC MAHON:  Your Honor, I'm having trouble hearing
12   him.  I think maybe the speaker is not working over there.
13            THE COURT:  The speakers are -- they're working.  Just
14   speak right in --
15   BY MR. YAMAMOTO:
16   Q.   You need to speak right into the microphone.
17   A.   I'm at student at NOVA.
18   Q.   Okay.  Are you familiar with the Dar al-Arqam?
19   A.   Yes, I am.
20   Q.   Do you attend that facility?
21   A.   Yes, I do.
22   Q.   And when did you start attending?
23   A.   I would say before 9/11.
24   Q.   About how long before?
25   A.   Maybe, I'd say, six months.
```

**Loynab - direct**

1   Q.   And why did you start attending?

2   A.   Actually, Nabil took me there the first time.

3   Q.   Who's Nabil?

4   A.   Nabil is one of my friends.

5   Q.   What's his last name?

6   A.   Gharbieh.

7   Q.   And why did he take you there?

8   A.   Just so we can listen to a lecture.

9   Q.   Why did you want to go?

10  A.   I was interested in listening to the lecture, learning more

11  about Islam.

12  Q.   Were you born Muslim?

13  A.   Yes, I was.

14  Q.   Were you a practicing Muslim?

15  A.   No, I wasn't.

16  Q.   Did you want to begin to practice your religion?

17  A.   Yes, I did.

18  Q.   That was your reason for going?

19  A.   To the lecture?

20  Q.   Yes.

21  A.   Yes.

22  Q.   Sometime after September 11, were you with Mr. Gharbieh when

23  he received a call from Yong Kwon?

24  A.   Yes, I was.

25  Q.   And can you tell me where you were?

**Loynab - direct**

1    A.    I was in the -- in his car.

2    Q.    And what did he say to you after he received the call?

3    A.    He turned to me and asked me if I wanted to go eat, if I

4    wanted to go eat dinner.

5    Q.    And what did you say?

6    A.    And I was like, "Yes."

7    Q.    Where did you go?

8    A.    We went to Yong's apartment.

9    Q.    Do you know where his apartment is located?

10    A.    I can't remember.

11    Q.    Is it an apartment? house? condo?

12    A.    I think it was a condo.

13    Q.    What floor?

14    A.    I don't remember.

15    Q.    Okay.  And were there people there when you entered?

16    A.    Yes, there were.

17    Q.    Do you recall who was there?

18    A.    I know Sheikh Ali was there.

19    Q.    Go on.

20    A.    Yong was there and Mahmood.

21    Q.    How many people do you think were there?

22    A.    I would say maybe approximately about eight, nine.

23    Q.    And how were they situated?

24    A.    They were sitting on the floor.

25    Q.    In a line? in a square?

**Loynab - direct**

1  A.  No, they were in a circle.

2  Q.  What did you do when you entered?

3  A.  I walked in, and I proceeded to sit down.

4  Q.  Did you say anything to anybody?

5  A.  I just said, "As-salamu alaikum," when I walked in.

6  Q.  And did anybody say anything to you?

7  A.  I can't remember if they said, "Wa alaikum as-salam," but

8  usually they say that when you say, "As-salamu alaikum."

9  Q.  Would you have noticed if they hadn't said anything?

10 A.  Yes, I would have.

11 Q.  And what did you do after you sat down?

12 A.  I sat down, and I was just looking around, looking around the

13 room, and I didn't really recognize anybody.

14 Q.  Were people staring at you?

15 A.  No, they weren't.

16 Q.  What was Dr. Al-Timimi doing?

17 A.  When I walked in, he was, he was talking.

18 Q.  And do you know if he continued to talk or not?

19 A.  I can't remember if he stopped, but I remember when I walked

20 in, he was talking.

21 Q.  As you were sitting down, he was still talking?

22 A.  Yes.

23 Q.  Did anybody look at you like you didn't belong?

24 A.  No.

25 Q.  What happened next?

# Loynab - cross

1  A.    Then, well, Nabil separated from me when I walked in.  Nabil

2  came over, and he was like, "Let's leave," and so we left.

3  Q.    How long were you there?

4  A.    I would say maybe no longer than a minute.

5  Q.    And what did you do when he said, "Let's go"?

6  A.    I waited until we got outside of the apartment, and I asked

7  him, I was like, "Why are we leaving?  I thought we were going to

8  eat."

9          And he was like, "Don't worry about it.  You don't need

10  to know."

11          And I asked him again, and I asked him two or three

12  times, and he was like, "Trust me, you don't want to know."  He

13  was like, "You don't need to know."

14  Q.    Do you recall what Dr. Al-Timimi was talking about?

15  A.    No, I don't.

16  Q.    Did anybody say anything when you got up?

17  A.    No.

18          MR. YAMAMOTO:  No further questions, Your Honor.

19          THE COURT:  All right.  Is there any cross, Mr. Gibbs?

20          MR. GIBBS:  Thank you, Judge.

21                    CROSS EXAMINATION

22  BY MR. GIBBS:

23  Q.    Good afternoon, Mr. Loynab.

24  A.    Good afternoon.

25  Q.    My name is John Gibbs.  I'm one of the prosecutors on this

**Loynab - cross**

1  case.

2           When was the first time that you were contacted by the

3  defense about being a witness in this case?

4  A.   With the defense?

5  Q.   Yeah.  This is the defense here.  When is the first time any

6  of these gentlemen --

7  A.   I would say maybe three weeks ago.

8  Q.   And who was it that specifically contacted you?

9  A.   Mr. MacMahon.

10 Q.   And how many times did you meet with Mr. MacMahon?

11 A.   Meet him or talk to him on the phone?

12 Q.   All right.  Well, which one was it?

13 A.   Well, I -- I talked to him on the phone first, and then the

14 only time I met him was at Dar al-Arqam to pick up the subpoena.

15 Q.   Okay.  And at any -- during either of those conversations

16 either on the telephone or in meeting with him in person, did he

17 provide you with anything to help you refresh your recollection

18 about the events at Yong Kwon's house?

19 A.   No, he didn't.

20 Q.   So as we sit here today in 2005, you can remember the events

21 of that night as you've testified to them here today, correct?

22 A.   Yeah, from what I remember.

23 Q.   Okay.  Do you recall about two years ago, specifically,

24 May 1 -- or April 1, rather, 2003, being interviewed by the FBI?

25 A.   Yes, I do.

**Loynab - cross**

1  Q.    All right.  And do you remember that John Wyman, who's

2  sitting over here, was one of the agents?

3  A.    Um-hum.

4           THE COURT:  You have to say "yes" or "no."

5           THE WITNESS:  Yes.

6  BY MR. GIBBS:

7  Q.    And, Mr. Loynab, at that time, do you recall telling the

8  agents that back in the year 2001, you had started taking Paxil,

9  and it affected your memory to some degree?

10 A.    I didn't say it affected my memory.  I told them that I had

11 panic attacks, and I was basically, like, I wasn't really worried

12 about what was around me, and I was, like, more so in a zone, but

13 it didn't affect my memory.

14 Q.    Okay.  So it was more if you had a panic attack, you couldn't

15 focus on what was going on around you --

16 A.    Yes.

17 Q.    -- because of that fact, right?

18 A.    Yes.

19 Q.    And is it your testimony you were not having a panic attack

20 at Yong Kwon's house that night?

21 A.    No, I wasn't.

22 Q.    All right.  Do you know what the date of that meeting was?

23 A.    No, I have no idea.

24 Q.    Well, you testified a moment ago that you first got invited

25 to Yong Kwon's house because he called Nabil Gharbieh and invited

**J.A. 1972**

**Loynab - cross** 1827

1  him over to dinner.  Do you recall saying that?

2  A.    He was, he was -- I don't know if Yong -- I don't know what

3  Yong said to Nabil on the phone, but Nabil turned to me on his

4  phone -- when he was on his phone and asked me if I wanted to go

5  eat.

6  Q.    Okay.  Do you recall telling the FBI back in April of 2003

7  that you didn't recognize the names Hammad Abdur-Raheem, Yong

8  Kwon, Ibrahim Hamdi, Caliph Basha, or Ismail Royer?  Do you recall

9  saying that?

10  A.    Yong, I know who Yong is.

11  Q.    Yong Kwon.

12  A.    Yeah.

13  Q.    So if they had noted that you said you didn't know Yong Kwon,

14  that would not be correct?

15  A.    Yeah, that would not be correct.

16  Q.    And did you also tell the FBI back in April of 2003 that you

17  did not recall going to a meeting with Gharbieh shortly after

18  9/11/2001 where Al-Timimi was providing a lecture and during which

19  he and Gharbieh were asked to leave?

20  A.    Yes, because at that time, I had no idea that that was a

21  meeting and that we were asked to leave.  At that time, I had no

22  recollection of going to a meeting or being asked to leave a

23  meeting.  I thought we were just going to a dinner and the reason

24  we were asked -- I didn't know we were asked to leave.  I thought

25  we were leaving because Nabil had some maybe family problems or

**Loynab - cross**

1  something like that.

2  Q.   But didn't the FBI ask you if you had gone to any meeting

3  with Nabil Gharbieh after September 11, 2001?

4  A.   Yeah.  I didn't think that was a meeting.  I didn't even

5  think that it would be considered that we were going to.

6  Q.   Well, what did you think it was back in April of 2003?

7  A.   I thought it was just simply dinner, and the reason why we

8  were leaving was because maybe Nabil had, like, personal problems

9  or something like that.

10  Q.   So at the time back in April of 2003, you couldn't even

11  remember the meeting.  Now you can actually remember a phone call

12  that Nabil Gharbieh received from Yong Kwon in his car?

13  A.   Yes.

14  Q.   And you testified that the only people you recall at Yong

15  Kwon's were Sheikh Ali; is that correct?

16  A.   Yes.

17  Q.   All right.  And what does the term "sheikh" mean?

18  A.   "Sheikh"?

19  Q.   Yes.

20  A.   Scholar.

21  Q.   Okay.  And is that why you use the term with him?  You

22  consider Mr. Timimi to be a scholar?

23  A.   I consider him a scholar of Islam.

24  Q.   And the only other people you recall there were Yong and

25  Mahmood Hasan, correct?

**Loynab - cross**                                                    1829

1   A.    Yes, and Nabil.

2   Q.    And Nabil.

3           And you never gave any of that information to the FBI
4   back in April of 2003?

5   A.    Because when the FBI asked me if I remember, they
6   specifically said "a meeting," and I was trying to think of a
7   meeting, not a dinner.  I had no idea that that was supposedly a
8   meeting.

9   Q.    And they didn't ask about that particular gathering in more
10  than one way back in April of 2003?

11  A.    No.   They asked me -- from what I remember, they asked me two
12  times.   They were like, "Did you attend a meeting where you were
13  asked to leave?"

14          And I said, "No," because I had no clue that I was asked
15  to leave that meeting until the other trial, when people started
16  giving me information that, oh, you know, your name is coming up
17  in trial, and I was wondering why, and they told me, "That you
18  were asked to leave a meeting."

19  Q.    And the dinner at Yong's house, your testimony is you were
20  there for about a minute?

21  A.    Yes, somewhere about a minute.

22  Q.    You can't recall -- I'm sorry?

23  A.    About a minute or so.

24  Q.    Okay.   And you can't recall anything specifically that was
25  said during that minute?

**Loynab - redirect**                                          1830

1  A.    No, I don't.  I wasn't really paying attention to what he was
2  saying.
3  Q.    And obviously, after you left, you have no idea what happened
4  at Yong Kwon's house?
5  A.    No, I don't.
6          MR. GIBBS:  Mr. Loynab, I want to thank you very much.
7  That's all the questions I have.
8          THE WITNESS:  Thank you.
9          THE COURT:  Any redirect?
10         MR. YAMAMOTO:  Just short, Your Honor.
11                    REDIRECT EXAMINATION
12 BY MR. YAMAMOTO:
13 Q.    You were taking Paxil because of panic attacks.  What
14 happened when you'd have a panic attack?
15 A.    You just start hyperventilating.  You lose breath.
16 Q.    What does the Paxil do?
17 A.    Basically, I think it's supposed to calm your nerves down
18 supposedly.  I mean, you're supposed to take it on a daily basis.
19 It's supposed to do something with your nerves and your brain.
20 Q.    Does it affect your ability to function?
21 A.    No.
22 Q.    Does it affect your ability to see -- recognize your
23 surroundings?
24 A.    No.
25 Q.    Does it affect your ability to go to school or participate in

**J.A. 1976**

**Idris - direct**                                                    1831

```
 1   anything?
 2   A.   No.
 3           MR. YAMAMOTO:  Thank you.  Nothing further.
 4           THE COURT:  Any recross?
 5           MR. GIBBS:  No, Judge, thank you.
 6           THE COURT:  All right.  Is anyone going to call this
 7   witness again?
 8           MR. YAMAMOTO:  No, Your Honor.
 9           MR. GIBBS:  No, Your Honor.
10           THE COURT:  Then, sir, you're free to stay and watch the
11   proceedings or leave, but don't discuss your testimony with
12   anybody who has not yet testified.
13           THE WITNESS:  All right, thank you.
14                      (Witness excused.)
15           THE COURT:  All right, your next witness?
16           MR. YAMAMOTO:  Your Honor, I'm going to hand up to the
17   Court at this time and give the government our witness list.
18           THE COURT:  All right, thank you.
19           MR. YAMAMOTO:  Your Honor, at this time, we'd call
20   Yousuf Idris.
21           THE COURT:  All right.
22           MR. YAMAMOTO:  And again, he will spell his name.
23        YOUSUF JAAFAR IDRIS, DEFENDANT'S WITNESS, AFFIRMED
24                    DIRECT EXAMINATION
25   BY MR. YAMAMOTO:
```

**Idris - direct**                                          1832

1   Q.   Mr. Idris, you're going to have to speak loudly into the
2   microphone so everybody can hear you.
3   A.   Sure.
4   Q.   Please state your name, and spell your first and last name.
5   A.   My name is Yousuf Jaafar Idris, and my first name is spelled
6   as Y-o-u-s-u-f, and the last name is spelled I-d-r-i-s.
7   Q.   Mr. Idris, where do you work?
8   A.   I work at an organization called the Muslim World League.
9   Q.   Okay.  Where were you born?
10  A.   I was born in Sudan.
11  Q.   And when did you come to the United States?
12  A.   1997.
13  Q.   Where were you educated?
14  A.   I went to a university in Saudi Arabia called the Imam
15  University, and I got my degree from there.
16  Q.   What's your degree?
17  A.   It's in Islamic studies, Islamic jurisprudence, and my
18  specialization was what we call in Arabic the sunnah, which means
19  the statements and sayings of Prophet Muhammad, may God's
20  blessings be upon him and upon all of the prophets.
21  Q.   And did you have any other education?
22  A.   I took many computer courses.  I like graphics and so forth,
23  so I took some courses in, in that.  That's about it.
24  Q.   And your work today, is it related to your degree or related
25  to computers?

**J.A. 1978**

**Idris - direct**

1  A.    No, it's related to my degree.

2  Q.    Are you familiar with Dar al-Arqam?

3  A.    Yes, I am, definitely.

4  Q.    Can you tell us how that came to be?

5  A.    Dar al-Arqam, it started as a small class with my father,

6  Dr. Jaafar Idris, in our house in Falls Church, and -- in the

7  basement, with very few people and so forth, university students,

8  and then this class got larger and larger and bigger and bigger,

9  and then there was the need to open a bigger place, especially

10 that many of the sisters, they wanted to attend the class, and the

11 place was jammed with just, you know, male people and so forth.

12 So we opened Dar al-Arqam, and one of the reasons was so that

13 these sisters can come and attend the classes and learn and so

14 forth.

15 Q.    Now, when you say so sisters can attend, do men and women sit

16 together in class?

17 A.    In Islamic culture, there is some kind of respect for the

18 other gender, so we do not really mingle in the way it is in the

19 Western society, and it's part of our culture that the women will

20 be on one side and the men will be in the other side, and they

21 would both learn from the same teacher at the same time.

22 Q.    Well, is it women sit on one side of the aisle and men sit on

23 the other side?

24 A.    It could be this way.  It could be that the men could be in

25 certain rows and then the women could be in the other rows.

**Idris - direct**

1   Q.    Is there anything to keep them apart or a partition or
2   anything?
3   A.    It's not a necessity.  For example, during the time of
4   Prophet Muhammad, may God's peace and blessings be upon him, there
5   wasn't any partitions, but later on, when you have smaller places
6   and so forth, some people prefer to have these partitions.
7   Q.    How about in Dar al-Arqam?
8   A.    In Dar al-Arqam, we do have this, like, curtain between the
9   brothers who attend the class and the sisters who attend the
10  class.
11  Q.    But everybody is in the same room?
12  A.    Oh, yeah, definitely.
13  Q.    How big is the room?
14  A.    It's not that big.  It's very small.  I would say maybe it's
15  as big as this place or maybe smaller.
16  Q.    Pretty big.
17  A.    Maybe smaller.
18  Q.    Okay.  How many people usually --
19  A.    I mean, it's not as big as some of the Islamic centers that
20  you, that you see, like some of the mosques and so forth.  So when
21  you compare it to other mosques, it's a small place.
22  Q.    Well, the center is not a stand-alone facility, is it?
23  A.    No, it's part of a building.
24  Q.    An office building?
25  A.    Yes, an office building.

**Idris - direct**

1  Q.    How often are classes held there?

2  A.    The main class is a class that's held every Friday, every

3  Friday night, but there are other classes during the week.  There

4  are, for example, some classes on Sundays.  Every once in a while,

5  there are intensive courses in, for example, Islamic belief,

6  Islamic jurisprudence, and so forth, so that will take a whole

7  week and then so forth.

8  Q.    And how do people find out about these classes?

9  A.    There's an e-mail list where we send e-mails telling the

10  people what the class is going to be about.  We put out fliers,

11  for example, in other Islamic centers.  For example, when we had

12  an activity for some of the history and English teachers in the

13  public schools, we sent letters to all available English and

14  history teachers inviting them for that activity.

15  Q.    This -- people on your list or people in general outside the

16  list?

17  A.    It's for everybody, but whoever wants to join the e-mail

18  list, they just go to the website and add their name to the

19  website.

20  Q.    So anybody can join?

21  A.    Oh, yeah, definitely.

22  Q.    And can anybody come to the lectures?

23  A.    Oh, yeah, definitely.

24  Q.    Is there a fee?

25  A.    No.  There is no fee except that one time I guess we tried to

**Idris - direct**

1  have a very small fee for some of the activities, like $20, $25,

2  just for the food that the people are going to be eating or so.

3  Q.    How did that work?

4  A.    Not very well, I guess.

5  Q.    Well, if you didn't pay the fee, could you not come in?

6  A.    No, everyone can come in.  The purpose is education about

7  Islam for Muslims and non-Muslims alike.  Whoever wants to come is

8  more than welcome to come.

9  Q.    You say this started in your father's home.  Was your father

10  the main lecturer in the home?

11  A.    When my -- my father travels a lot, so when my father is

12  there, he would, he would give the lectures.  Sometimes whoever

13  has something to present from the people who are present, they

14  will come up and present it.  Especially in the beginning of the

15  class, it was more like where everybody just shares their

16  experiences and stories and things like that.

17  Q.    As time went on, would there be more and more different

18  speakers?

19  A.    Well, it started with my father, and as I said, there was

20  different people who would sometimes come and speak until

21  Dr. Timimi started to give the lectures.

22  Q.    Mr. Idris, how old are you?

23  A.    I am 31.

24  Q.    Thirty-one?

25  A.    Yeah.

**Idris - direct**

1  Q.  How old is your dad?

2  A.  Seventy-four.

3  Q.  How old were you when you came here?

4  A.  Are you testing my math?

5                    (Laughter.)

6  Q.  Your memory.

7  A.  I think I was 20 -- 24.

8  Q.  Okay.  Do you also do some lecturing and teaching?

9  A.  Yes, I do.

10  Q.  And what are the topics you usually lecture on?

11  A.  I like to talk about manners usually, so with what we call in

12  Arabic adaab, so I give so many lectures in that.

13         THE COURT:  I'm sorry, can you spell that term?

14         THE WITNESS:  Okay.  It's a-d-a-a-b.

15         THE COURT:  Thank you.

16         THE WITNESS:  It's Islamic manners.  So usually, I like

17  to talk about these issues.

18  BY MR. YAMAMOTO:

19  Q.  Are they different from Christian or Buddhist manners?

20  A.  It's just going -- you go in the Buddhist, for example, he

21  would depend on different sources that the Muslim will depend

22  upon, but definitely all religions, there are things that

23  everyone, for example, in them would share, for example, being

24  sincere, being truthful, and so forth.  Every sane person would

25  agree upon these principles.

**Idris - direct**

1  Q.   This is generally the same types of, of manners in Islam as
2  would be in other cultures then?
3  A.   Yes, I would say so.
4  Q.   Why do you have to teach it?
5  A.   It's important.  Many times this is what I say usually in the
6  beginning of these courses that I teach:  I say that many times
7  when we talk about religion, we concentrate on issues of belief,
8  that you have to believe in this, you have to believe in that, and
9  many times we forget about building the person's character.

10       Many times when we talk, for example, about improving
11  yourself, we say, "Pray more," for example, or, "Try to fast,"
12  while we find the prophets concentrated also very much on the
13  issues of manners, the way you deal with other people, the way you
14  respect your spouse, for example.

15       This in itself is a great act of worship as well, and
16  this is one of the reasons why I try to talk about it.
17  Q.   Your dad, what does he lecture on?
18  A.   Everything, I guess.  He's, he's very knowledgeable.  He's
19  one of the few people who are considered extremely knowledgeable
20  in theology and at the same time very knowledgeable in Western
21  thought.  His Ph.D. was in Philosophy of Science.  So he has so
22  many things integrated, I guess.
23  Q.   Where did he get his Ph.D.?
24  A.   From London.
25  Q.   You know Dr. Al-Timimi?

# Idris - direct

1  A.    Definitely.

2  Q.    How long have you known him?

3  A.    Um, very well, I guess, since I came to the States.  That's,

4  like, seven years ago, but before that, the first time I guess I

5  met him was when he was still a student of biology in Georgetown

6  University, and he was the one actually or one of the people who

7  encouraged me to study the sayings of Prophet Muhammad and so

8  forth.  Maybe he doesn't remember that, but he's one of those

9  people.

10  Q.    Well, you've got a very religious dad.  Were you not

11  religious?

12  A.    Oh, well, at one point of my life, I wasn't religious until,

13  I think, I finished high school or towards the end of school, I

14  started to practice Islam.

15  Q.    And you and he and your dad and some other people formed the

16  center?

17  A.    Myself, Dr. Timimi, my brother, Dr. Mohammad Al-Qahtani,

18  Mr. Haytham Hantash.  These are the main people really.

19  Q.    So a number of people?

20  A.    Yes.

21  Q.    How did you get funding for the center?

22  A.    I think we begged.  We make fundraisings once a year, and the

23  Muslims from different types of backgrounds and so forth and

24  different Islamic centers, they come, they attend that

25  fundraising, and we say that for this whole year, for example,

**J.A. 1985**

**Idris - direct**

1  we're going to need $40,000, or something like that, and we'll get

2  the money.

3         And there is a donation box, so whenever people come to

4  attend the Friday sessions or other sessions, they will, you know,

5  give a donation.  There is also something that started recently,

6  maybe three years ago or something like that, and that is the

7  selling of CDs and lectures, tapes, and so forth.

8  Q.   Are there any employees for the center?

9  A.   No.   They are just all volunteers.

10 Q.   So your overhead would be rent, heat, utilities, that kind of

11 thing?

12 A.   Yes.

13 Q.   And that's where all the money goes to?

14 A.   Yes.

15 Q.   Does it go to anything else?

16 A.   Not that I know of.

17 Q.   You say you -- now you sell tapes and CDs.  How is that

18 going?

19 A.   I'm not really in the tapes and CDs department, but I think

20 it's going okay.

21 Q.   Do you sell Dr. Al-Timimi's tapes?

22 A.   Yes, we do.

23 Q.   Today you sell Dr. Al-Timimi's tapes?

24 A.   Yes, we do.

25 Q.   Do you know which tapes you sell, if you recall?

**Idris - direct**

1  A.   One of the new, beautiful lectures of Dr. Timimi is called

2  Fulfilling the Purpose, and it is an explanation of the opening of

3  the Holy Koran.  He gives a beautiful explanation to Muslims and

4  to non-Muslims, and it's very good in educating people about

5  Islam.  So this is one of the hot lectures, I guess.

6  Q.   Is this like an introduction to Islam?

7  A.   It's sort of.

8  Q.   What would you describe it as?

9  A.   I would describe it as talking about the oneness of God,

10  which is most of the lectures of Dr. Timimi are about the oneness

11  of God, some of the qualities and attributes and names of God.

12  Q.   What other lectures or tapes of Dr. Al-Timimi can you recall

13  selling?

14  A.   One of the -- one of his most famous tapes, I guess, is

15  called "Explanation of the Wasitah."  "Wasitah" is spelled

16  W-a-s-i-t-a-h.  It's six tapes, and it's also, it explains the six

17  pillars of Islam, six pillars of faith.

18  Q.   And the six pillars of faith are -- mean what or stand for

19  what?

20  A.   Believing in God alone; believing in all the prophets of God,

21  concluded by Prophet Muhammad; believing in the angels; believing

22  in the books that were sent; believing in the reality of the Day

23  of Judgment; and believing in the decree.

24  Q.   Any other tapes you can recall?

25  A.   I think these are the most famous ones.

**Idris - direct**

1  Q.   How about "New World Order"?

2  A.   "New World Order," it was in Dar al-Arqam, yes, for some

3  time, but I don't know if it's very famous, if it's not very

4  famous, or not.

5  Q.   "Purification" tapes?

6  A.   Purification, I don't even think that these lectures of

7  purification are out.  I know that he gave lectures in

8  Purification of the Soul in Dar al-Arqam, but not everything

9  that -- all the lectures that he gave were edited and so forth,

10 because it takes a long process to edit them and put them out on

11 the market.

12 Q.   You're being asked to speak up or speak more directly into

13 the microphone.

14 A.   Sure.

15 Q.   Everybody's lectures are taped; is that right?

16 A.   Excuse me?

17 Q.   Everybody that lectures at Dar al-Arqam are taped?

18 A.   Yes, yes.  Everything that the person -- any lecture that's

19 given in Dar al-Arqam is recorded directly to the computer.

20 Q.   And they may or may not be sold?

21 A.   Yes, they may and may not be sold.

22 Q.   Do you -- have you heard most of Dr. Al-Timimi's lectures?

23 A.   Not most of them, to be honest with you, but I heard some of

24 them.

25 Q.   Are all his lectures theologically based?

**Idris - direct**

1  A.    This is his area.  I mean, he's known to all Muslims as a
2  person who, who concentrates on the issue of Islamic belief.  He
3  talks about that a lot.  And this is what we call, like,
4  theologian.
5  Q.    And are his lectures based on the Koran and the hadeeths?
6  A.    Yes.  This is what makes them stand out.  They are based on
7  the sayings of God and the sayings of the Prophet of God.
8  Q.    The hadeeths are the sayings of the --
9  A.    Yes, the sayings and the actions of the Prophet.
10 Q.    Now, when somebody gives a lecture, do people ask questions
11 during the lecture?
12 A.    Yes, after the lecture usually.  Sometimes if there is
13 something that's not clear, they would raise their hands, they
14 would interrupt the speaker, and they would ask a question.
15 Q.    And how did the women ask questions?
16 A.    They have a microphone, also, and if they want to ask their
17 questions, they ask.  Some of them prefer to just write their
18 answers and pass them to the speaker.  So it depends on how she
19 wants to ask.
20 Q.    They can either use the microphone, you're saying --
21 A.    Yes, there is a wireless microphone that they can use.
22 Q.    -- or write --
23 A.    Or write their questions and pass them to the speaker.
24 Q.    I thought you said answers.
25       So they write their questions and pass it up?

**Idris - direct**

1  A.   Yes.

2  Q.   Is that common?

3  A.   Very common.  It happens every -- in every lecture.

4  Q.   How about in other mosques or centers?

5  A.   Some of them the women ask directly if there is a microphone.

6  Like the mosque, for example, close to us, the closest mosque to

7  Dar al-Arqam, there is also a microphone for women.  If they want

8  to ask a question, they would ask, and there are some sisters who

9  would prefer to just write their questions and pass them to the

10 speaker.

11 Q.   Do you know if all questions get answered?

12 A.   If all of the questions that are presented to Dr. Timimi were

13 answered, we would stay until dawn, but gladly, not all the

14 questions are answered.  We'd just spend, like, an hour or so

15 after the lecture answering the questions.

16 Q.   Who determines which questions get answered?

17 A.   No one.  Usually people just either give the questions to

18 Dr. Timimi or to the speaker directly, or many, I mean, very few

19 times when there is a guest speaker who's coming, for example,

20 from another state or something like that, as -- to show a respect

21 for that speaker, we will have a moderator, and the moderator will

22 pass the questions to the speaker.

23 Q.   So if there's not a moderator, it's the speaker that

24 determines what questions are answered?

25 A.   Yes.  They just give the speaker the questions.  He will look

**Idris - direct**

1   at them and answer them.

2   Q.   Okay.  When did the center open?

3   A.   I don't remember really exactly when it opened, but I think

4   it might have been, like, five years or something like that, five

5   years ago maybe.

6   Q.   Approximately 2000?

7   A.   Something like that.

8   Q.   What's the attendance like?

9   A.   What do you mean?

10  Q.   How many people usually come to the lectures?

11  A.   I would say it varies, according to who's going to give the

12  lectures.  It depends on sometimes what the subject is.  So it

13  could go from, I would say, like, 50 people to 75.  The maximum

14  maybe would be 90 or something like that.

15  Q.   The maximum meaning that's how much the facility can hold?

16  A.   The facility can hold and also the people who attend.  I

17  mean, I don't think it ever exceeded, like, 90 people.

18  Q.   Is it open year round?

19  A.   Yes, it is.  Not every single day, because as I said, there

20  isn't an employee in Dar al-Arqam, so whenever there is an

21  activity, it's open, but --

22  Q.   But lectures are usually planned for each Friday?

23  A.   Yes.

24  Q.   Year round?

25  A.   Definitely.

**Idris - direct**

1  Q.  Except, I guess, maybe holidays or something?

2  A.  Yes.

3  Q.  September 11, 2001, what was that day?  What happened on that

4  day?

5  A.  You mean in Dar al-Arqam, obviously.

6  Q.  Right.

7  A.  There was a, a dinner for my father, and it was -- we planned

8  to have that dinner, obviously, long time ago, maybe a week or ten

9  days before the September 11 day.

10       I remember one of the people who attend Dar al-Arqam,

11  his name is Mahmood Hasan, he said always Dr. Idris comes and we

12  never say thank you to him.  We have to give him some kind of a

13  thank you dinner, so we thought that it's a good idea.

14       And I think also some people had participated in one of

15  the conferences, and we said that it would be also a good idea to

16  say thank you to them.  So we planned to have this dinner, yeah.

17  Q.  And it went forward even though the tragic events of the day

18  occurred?

19  A.  Yes.

20  Q.  How many people attended?

21  A.  I can't really remember how many people were there, but I

22  would say about maybe ten people, I don't know, more or less.  I

23  don't remember.

24  Q.  Now, this is a dinner.  Was it catered?

25  A.  Yes.

**Idris - direct**

1  Q.   Do you sit at tables?

2  A.   We usually sit on the floor.  This is part of our culture,

3  that we like to sit on the floor.  We feel that it's just more

4  comfortable.

5  Q.   On this day -- you spread tablecloths and sit on the floor;

6  is that right?

7  A.   Oh, yeah, yeah.

8  Q.   You take your shoes off, too, don't you?

9  A.   Oh, yeah, we do.

10  Q.   So everybody is sitting on the floor on this day.

11  A.   Um-hum.

12  Q.   I imagine the topic of conversation are the events of the

13  day.

14  A.   Definitely.

15  Q.   What was the feeling among the people there that day?  What

16  was your feelings and thoughts?

17  A.   I mean, definitely everyone was frightened because of it's a

18  horrific event.  People were sad because of, you know, the killing

19  of all of these people and so forth, and this was the general

20  feeling among every person, I guess.

21  Q.   Did you know if Dr. Al-Timimi said anything or if -- could

22  you tell what his feelings were?

23        MR. GIBBS:   Judge, I object to what Ali Timimi said and

24  certainly knowing what his feelings are.

25        THE COURT:   I'll sustain that portion of the objection.

**Idris - direct**

1    Certainly the witness can testify as to what the defendant said.

2              MR. GIBBS:  Well, Judge, I mean, again, this is Ali

3    Timimi's self-serving hearsay coming in through another witness.

4              THE COURT:  Oh, but you've already gotten this in in

5    your case, too.  No, I think it's not improper, and you can cross

6    examine about this.

7              MR. GIBBS:  Thank you, Judge.

8              THE WITNESS:  Yeah, I think that Dr. Timimi said a

9    couple of things.  One of them is something which everyone was

10   saying that day.  We're just saying that we pray that this thing

11   is not done by Muslims, and I remember Dr. Timimi saying that I

12   hope that this is not done by Muslims, because if it's done by

13   Muslims, I'm afraid that the government is going to go after

14   Muslim activists, Muslim organizations, and so forth.  I remember

15   him saying that very well.

16   Q.   Did he say anything else?

17   A.   Yes, he did say other things.  There was, you know, there is

18   a -- the president of Dar al-Arqam, his name is Haytham Hantash,

19   he was sitting maybe, I would say, at the head of the --

20   Q.   Before we get to that, did he express his feelings in words?

21             THE COURT:  He, who?

22             MR. YAMAMOTO:  Dr. Al-Timimi.

23             THE WITNESS:  What do you mean?

24   BY MR. YAMAMOTO:

25   Q.   Did he express how he felt in words?

**Idris - direct**

1  A.   I remember him, for example, saying that his heart breaks for
2  these people.
3  Q.   Which people?
4  A.   The people who died in this.
5  Q.   Now, you say there was also a conversation between he and
6  Haytham?
7  A.   Yes, there was.
8  Q.   Who's Haytham?
9  A.   Haytham is the president of Dar al-Arqam.
10 Q.   And did you hear that conversation?
11 A.   Yes, I heard the conversation.  I wouldn't say I heard every
12 single part of it because Mahmood Hasan and myself were busy, you
13 know, preparing the food and giving it to the people and so forth,
14 but I heard the conversation.
15 Q.   What did you hear Dr. Al-Timimi say, if you can recall?
16 A.   From what I can remember is that Haytham would say something
17 like, "Oh, this is a murder.  These people who died are innocent
18 people," and so forth.
19      And then Dr. Timimi will say something, "What if they
20 tell you such-and-such?"
21      And this is something, by the way, meaning people who
22 oppose this, what Haytham might be saying, I remember Dr. Timimi
23 saying, "What if they tell you such-and-such?"  Then he will bring
24 some kind of an argument.  Then Haytham will say something in
25 return.

**Idris - direct**

1      And this might sound a little bit awkward or something
2   like that, but this is something that we have in Islamic
3   jurisprudence.  This is how we study Islamic jurisprudence.
4      For example, let's say you and I agree on a certain
5   issue that it is wrong or something, and then you will present an
6   argument to me, and then I tell you, "What if the opponent, for
7   example, says such-and-such to you?  What would you say?"
8      Then you reply.  Then you say something else, and then I
9   reply to you, "What if the opponent says such-and-such?"
10      So this is, I mean, this is the feeling that I got.
11   This is what was, what was going on.
12   Q.   Were they angry, could you tell?
13   A.   I mean, to be honest to you, to a non-Arab person, okay, they
14   will seem very angry and they maybe are about to get into a fight
15   or something, but, for example, to an Arab person, this is so
16   normal.  I mean, this is just how, the way we talk sometimes.
17   We're very loud in the way we talk and things like that.
18      I mean, I remember, if it's okay to mention this, but my
19   brother, for example, told me that one time he was in one of his
20   English classes, and he was arguing with one of his friends,
21   another Arab friend taking an ESL class, and he said, "We were
22   talking and arguing," and he said, "Everyone around us was
23   scared," and one of the people told him, "I thought that you guys
24   were going to get into fistfight."
25      And he told him, "No, this is just the way sometimes we

# Idris - direct

1  talk.  This is the way we argue."

2  Q.  So Muslims are loud and obnoxious arguers?

3  A.  Oh, they are.

4  Q.  You're vocal, and you're animated?

5  A.  Yes.  Especially some people, they like to move their hands a

6  lot.

7  Q.  Like you.

8  A.  I think so.

9  Q.  Now, that was the discussion that evening?

10  A.  Yes, that was the discussion.

11  Q.  A debate between the two of them?

12  A.  I wouldn't say a debate.  I wouldn't say a debate.  I would

13  say that it was a discussion.  And if you ask me further what was

14  really my feeling about it, I would say that I think that

15  Dr. Timimi was trying to make a point --

16          MR. GIBBS:  Judge, I object to what he's speculating

17  about Dr. Timimi --

18          THE COURT:  I'm going to sustain that objection.  Sir,

19  you can only testify as to what was said, not your impression of

20  it.

21          THE WITNESS:  Yeah, but he said something --

22          MR. GIBBS:  Judge, again --

23          THE COURT:  Yes, I'm going to sustain the objection.

24          THE WITNESS:  Sure, sure.

25  BY MR. YAMAMOTO:

**J.A. 1997**

**Idris - direct**

1  Q.   Did Dr. Al-Timimi say anything to justify the attacks of that
2  day?
3  A.   Not at all, no.
4  Q.   At that time, you had no idea who committed those atrocities?
5  A.   Yes.  No one knew.
6  Q.   How concerned were you for your own safety and your family's
7  safety?
8  A.   I mean, it was just like everyone else.  We were very scared,
9  frightened.  We're just praying that God will save people and
10  everyone will be safe and so forth.  So everyone was just
11  frightened, I guess.
12  Q.   And when you found out it was Muslims that committed the
13  atrocities, were you scared? more scared? less scared?
14  A.   Definitely, because, I mean, the first thing that comes to my
15  mind is that this is just going to make Muslims' life very
16  difficult in the United States if it's done by Muslims.
17  Q.   And did it make your life more difficult?
18  A.   In a sense, I guess.  This is why I'm here.
19  Q.   Why is that?
20  A.   Well, I think it did definitely.  Definitely.
21  Q.   Are you still concerned today about just the safety of you
22  and your family?
23  A.   Yes, I am.
24  Q.   Would you be more concerned being here in a metropolitan area
25  or out somewhere else in the United States?

**Idris - direct**

1  A.    I think that people who -- the Muslims who are in the

2  metropolitan area, to be very honest, are afraid and worried.

3  Unfortunately, they are afraid of what the government might do to

4  them because I guess main Muslim organizations and so forth are in

5  this area.  But if you go to other areas outside, for example,

6  like some other states, you find that people might be afraid of

7  other people who might be racist or something like that.

8  Q.    Have there been, if you know, an increase in attacks on

9  Muslims since 9/11?

10  A.    Definitely.  Definitely.

11         MR. GIBBS:  Judge, that's hearsay.

12         MR. YAMAMOTO:  If he knows, Your Honor.

13         THE COURT:  Wait, wait.

14         MR. YAMAMOTO:  If he knows.

15         MR. GIBBS:  The only way he can know is from, you know,

16  statements of other people.

17         THE COURT:  Well, look, this is not a fact that we need

18  to be disputing, all right?  But I don't think it's overly

19  relevant to the issues of this case.  I thought that was going to

20  be the objection.

21         MR. YAMAMOTO:  I'm leaving the area --

22         THE COURT:  All right.

23         MR. YAMAMOTO:  -- after this question.

24         THE COURT:  All right.  Overruled.

25  BY MR. YAMAMOTO:

**Idris - direct**

1  Q.   Can you answer that?

2  A.   Excuse me?

3  Q.   Have there been -- is there -- has there been an increase in

4  attacks on Muslims?

5  A.   Yes, there is.  I mean, if you just go to any Muslim

6  organization that's concerned with civil rights and so forth, such

7  as CAIR or so, they will give you statistics, and they might

8  actually pull for you all the, all the concerns of Muslims.  They

9  will show you, for example, in the year 1999, the Muslims were

10 facing such-and-such number of harassments, and in the year 2004

11 or '5, it increased by tenfold or so.  I mean, it's a fact.

12 Q.   So it has increased?

13 A.   Definitely.

14 Q.   After 9/11, did the center close for a while?

15 A.   Yes.  Not only Dar al-Arqam, most of the Islamic

16 organizations or, let's say, places of worship, they either

17 delayed or they canceled their classes for a couple of weeks or a

18 few weeks because they were afraid.

19 Q.   Just Dar -- the center -- I have a hard time saying Dar

20 al-Arqam -- the center, how long were you closed?

21 A.   I think for two or three weeks, we stopped the activities.

22 Q.   And after it reopened, Dr. Al-Timimi no longer lectured

23 there; is that right?

24 A.   No.  For, for a few years, he only gave a couple of talks.  I

25 think last year or so, he started to give a couple of talks.

**Idris - direct**

1  Q.   Why was he no longer lecturing there?

2  A.   I mean, to me, it's very simple.  It's just the fact that

3  after two or three weeks from these horrific events, the FBI

4  contacted him many times, his brother's office was raided and so

5  forth, and these were days where everyone was frightened and we

6  just --

7  Q.   So you didn't want to bring any attention on yourselves

8  through Dr. Al-Timimi?

9  A.   You can say that maybe.

10        MR. YAMAMOTO:  Would you show Mr. Idris Defendant's

11 Exhibit 70, please?

12 Q.   Do you recognize that?

13 A.   Yes.

14 Q.   What is it?

15 A.   This is a statement from Dar al-Arqam that was posted in the

16 website regards to the position from these attacks.

17        THE COURT:  Is there any objection to this exhibit?

18        MR. GIBBS:  No, Judge.

19        THE COURT:  All right, Defense Exhibit 70 is in

20 evidence.

21        (Defendant's Exhibit No. 70 was received in evidence.)

22        MR. YAMAMOTO:  We can see part of it, Your Honor, at

23 this point.

24 Q.   Can you summarize for us what that says?

25        MR. MAC MAHON:  Hold on.  I'm getting good at this.

**Idris - direct**

1  Hold on, Your Honor.

2        THE WITNESS:  It's basically what I can see is verses

3  from the Holy Koran in the prohibition of, you know, killing

4  innocent people and so forth, and the example that the Holy Koran

5  gives is that killing one innocent person is like the killing of

6  all of humanity, and giving life to one person is like giving life

7  to all of humanity.

8        And some of the phrases from the words of the Prophet

9  Muhammad, may God's peace and blessings be upon him as well, that

10  would also assure some of these verses of the Holy Koran as well.

11  BY MR. YAMAMOTO:

12  Q.    So essentially what you -- you-all were horrified by the

13  events.  And let me read the first paragraph:  "We in the Center

14  for Islamic Information and Education as well as Muslims

15  throughout the United States and the world were shocked and

16  horrified by the attack which took place September 11, 2001, in

17  New York and Washington, D.C.  We would like to make it clear that

18  these acts constitute clear violations to the teachings of Islam.

19  Here are some of many proofs from the Quran, the authentic

20  traditions of the Prophet Muhammad, peace be upon him, and

21  commentary of Muslims scholars regarding killing innocent people

22  or committing suicide."

23        And then you go on to quote from various portions of the

24  Holy Koran and hadeeths?

25  A.    Yes, verses from the Holy Koran and words from the Prophet

**J.A. 2002**

1857

**Idris - direct**

1   Muhammad.

2   Q.   Thank you.

3        Now, you had a bunch of Ali -- Dr. Al-Timimi's tapes.

4   What did you do with them after 9/11?

5        THE COURT:   When you say "you," do you mean --

6        MR. YAMAMOTO:   "You" meaning the center.  I'm sorry,

7   Your Honor.

8   Q.   What did the center do with Dr. Ali Timimi's tapes?

9   A.   You can still see Dr. Ali Timimi's tapes at the center's

10  websites.  If you go to that website, ciie.org, you'll find his

11  lectures, some summaries of some of these lectures and other

12  lectures that are still in the center itself.

13  Q.   But right after 9/11, what did you do with the tapes you had?

14  A.   As far as I know, they are still in their place.

15  Q.   So you didn't, you didn't do anything that you're aware of?

16  A.   Nothing except --

17  Q.   Were you in charge of the tapes or was someone else?

18  A.   No, I was not in charge of the tapes really.

19  Q.   So you would not --

20  A.   But I could still see his tapes on the tables and the racks,

21  everything.

22  Q.   Okay.  Now, sometime between September 11 and September 20,

23  did you have occasion to go to Borders bookstore with your father?

24  A.   Yes.

25  Q.   Why did you go there?

1858

**Idris - direct**

1  A.   I went there after I either received a call on my cell phone
2  or my father received a call on his cell phone from Mahmood Hasan
3  and Yong Kwon, and they said that they wanted to meet with my
4  father, and they suggested Borders because they know that my
5  father likes going to Borders bookstore.

6       So I took my father to Borders bookstore.

7  Q.   Where is it located?

8  A.   The one, the one in Falls Church, the intersection of Route 7
9  and Columbia Pike.  Yeah.

10 Q.   Why did you have to take your father?

11 A.   You know, my father is, like, 74 years old, and he kind of
12 stopped driving, so I have the honor of taking him whatever places
13 he wanted to go to.

14 Q.   So you are his chauffeur?

15 A.   (Nodding head.)

16 Q.   You took him there, and what happened when you went there?

17 A.   When we went there, we entered to Borders.  We went to the
18 cafe area, and there was Mahmood Hasan and Yong Kwon.  You know,
19 they greeted us with Islamic greeting, you know, peace and
20 blessings of God be on you and so forth, as-salamu alaikum, and
21 then they asked if I could leave so that they could talk privately
22 to my father.

23 Q.   So you weren't part of the discussion?

24 A.   No, I wasn't.

25 Q.   What happened subsequent to that?

1859

**Idris - direct**

1  A.   Ten minutes later or 15 minutes later, my father came out.   I
2  was waiting in my car, and my father came out, and his face looked
3  completely different, and he told me --

4         MR. GIBBS:  Objection, Judge.  This witness is available
5  to the defense.  They've chosen not to call him.

6         THE COURT:  All right.

7         MR. GIBBS:  They can't get his statements in through
8  this witness.

9         THE COURT:  This would be hearsay.  I will sustain the
10 objection.

11        MR. GIBBS:  Thank you.

12        THE COURT:  You cannot testify to what someone else told
13 you, all right?

14        MR. YAMAMOTO:  Your Honor, can we approach for a second?

15        THE COURT:  Yes.

16        (Bench conference on the record.)

17        MR. YAMAMOTO:  Mr. Gibbs is correct in what he says.
18 The problem we have is we have -- we had -- we were going to do a
19 rule 15 deposition of Dr. Jaafar Idris.  We --

20        THE COURT:  Where is he located?

21        MR. YAMAMOTO:  We then thought that, thought he was
22 going to come into the country so we could have him here for
23 court.

24        THE COURT:  Oh.

25        MR. YAMAMOTO:  We have subsequently found out in the

**J.A. 2005**

### Idris - direct

1  past few days that he can't get an exit visa from Sudan for ten
2  days or so, so we're stuck.

3         And I just object to the government's characterization
4  that we could have him here to testify.

5         MR. KROMBERG:  If I may respond to that, Judge, we
6  talked about this months ago, and Mr. MacMahon told me for the
7  first -- and I had said that I will help get him here if he's
8  having any problem, and Mr. MacMahon told me yesterday -- excuse
9  me, Mr. Nubani told me yesterday that, oh, they told him in
10  wherever he is that he needs to apply ten days in advance, and I
11  found this out yesterday.  There's nothing that I could do
12  yesterday, when we were in trial and I found out.

13         MR. YAMAMOTO:  And that's correct, Your Honor.  We're
14  not saying the government's at fault in this, but we're not at
15  fault.  We thought he could come, and we were then under the
16  impression that --

17         THE COURT:  I will tell the jury that the fact that he's
18  not here is not an issue in the case, but that still doesn't open
19  the door as to hearsay.  You're not able to bring those statements
20  in.

21         MR. YAMAMOTO:  Well, it's not being offered for the
22  truth.

23         THE COURT:  No, no, no.  All right.

24         (End of bench conference.)

25         THE COURT:  Ladies and Gentlemen, through no fault of

## Idris - direct

1   the attorneys for the defendant or the attorneys for the

2   government, the witness's father is unable to be here as a

3   witness, and therefore, he's not here as a witness.  However, this

4   witness also cannot testify to hearsay --

5           MR. YAMAMOTO:  Thank you, Your Honor.

6           THE COURT:  -- so we're going to move on.

7   BY MR. YAMAMOTO:

8   Q.  Without telling me what your father said, I take it you guys

9   went on and did whatever your business was?

10  A.  Yes.  I think we just went home or we had lunch afterwards or

11  something like that.

12  Q.  Now, did you have occasion to talk to Dr. Al-Timimi

13  subsequent to this visit with -- at Borders?

14  A.  Yes.  He asked me -- actually, he said --

15  Q.  When was it, do you recall?

16  A.  I remember events, but unfortunately, the sequence of the

17  events, you know, we're talking about something that happened

18  maybe four years ago.

19  Q.  Let me hand up something to you to see if it refreshes your

20  recollection.

21          THE COURT:  And what is that, Mr. Yamamoto?

22          MR. YAMAMOTO:  It's -- they're being passed up to the

23  Court now, Your Honor.

24          THE COURT:  Now, there are no numbers on these.  Do you

25  want us to give them numbers?

# Idris - direct

1862

1        MR. YAMAMOTO:  Well, I was going to do it just to
2  refresh his recollection, but we can have them admitted if there's
3  no objection from the government.  All they are are the calls.
4        THE COURT:  Well, wait.
5        Are there any objections, Mr. Gibbs?
6        MR. GIBBS:  Judge, the one that's captioned "Ali
7  Al-Timimi's Calls Activities 9/18/01," there's stuff in there
8  about sunset prayer, the isha prayer, something about IHOP.  The
9  phone information, I think, is based on the phone records, but the
10  rest of it we'd object to because I don't know that anybody has
11  testified to this.
12        THE COURT:  Well, is it just the phone issues that
13  you're trying to get in or something else?
14        MR. YAMAMOTO:  Well, the IHOP portion of it, Your Honor,
15  is going to come in -- or we hope it will come in through a credit
16  card receipt showing that that occurred on that evening.
17        THE COURT:  Why don't you -- you can show the exhibit to
18  the witness at this time simply to refresh his memory, but do not
19  publish it.
20        MR. YAMAMOTO:  That's fine, Your Honor.
21        THE COURT:  It's not in yet.
22  BY MR. YAMAMOTO:
23  Q.   Mr. Idris, do you recall when you talked to Dr. Al-Timimi
24  after the meeting at the Borders?
25  A.   It might have been the same, the same day, and he asked me

**J.A. 2008**

1 | whether --

2 |         MR. GIBBS:  Objection to what Mr. Timimi said to

3 | Mr. Idris.

4 |         THE COURT:  Well, it's not responsive to the question.

5 | The question was simply, "Do you remember when?"  So just please

6 | answer the question.

7 |         THE WITNESS:  Sure.

8 |         THE COURT:  All right.

9 |         THE WITNESS:  I think it was either the same day at

10 | night after Mahmood Hasan and Yong Kwon talked to my father or the

11 | following day, I can't remember, but it might have been the same

12 | day at night.

13 | BY MR. YAMAMOTO:

14 | Q.   Okay.  And what did he say to you?

15 |         MR. GIBBS:  Again, Judge, objection to what the

16 | defendant said to this witness.

17 |         THE COURT:  Well, I've been allowing that in.  I allowed

18 | you to get a lot of that in, and I don't think -- again, this is

19 | allegedly a statement made back close to the events at issue,

20 | so --

21 |         MR. GIBBS:  If I could be heard, Judge, part of the

22 | Court's ruling, as I understood it, was because the agent had

23 | testified about specific inculpatory statements the defendant

24 | made, and based on fairness, they were able to bring out

25 | exculpatory statements.

# Idris - direct

1      We haven't introduced any statements that the defendant
2  made to this witness, and this is the first chance we've even had
3  to talk to him, and the defense is attempting to bring in --

4           THE COURT:  All right, all right.

5           MR. GIBBS:  -- Mr. Timimi's entire story through this
6  witness.

7           THE COURT:  I think actually there is merit to that
8  claim.  I'm going to sustain the objection.

9           MR. YAMAMOTO:  Well, Your Honor, the government brought
10  this up in the 302s about Dr. Al-Timimi refusing to tell who his
11  source of information was about certain events, and they made a
12  big deal about that.  What I'm -- all I'm trying to do is --

13          THE COURT:  Why don't you approach the bench for a
14  second?

15          (Bench conference on the record.)

16          THE COURT:  Now, without saying it so loud that the jury
17  hears it, give me a quick proffer of what you think this witness
18  is going to say.

19          MR. YAMAMOTO:  Dr. Al-Timimi asked Yousuf if his father
20  had talked to Hasan and Kwon, and he will say that his father did
21  talk to them and told them not to go, and that will be about the
22  substance of the conversation for that day.

23          The next day, they come by to the Idris home to drop off
24  some software, and as they're leaving, he's going to say that he
25  told them that they shouldn't go, that my father told you not to

**Idris - direct**

1  go and Dr. Al-Timimi told you not to go and I'm telling you not to
2  go.

3          THE COURT:  Well --

4          MR. YAMAMOTO:  And they're going to say they were going
5  to Pakistan for a wedding.

6          THE COURT:  Wait.  These statements are actually not
7  statements of fact, and I think they think you're opening a
8  problem for the defendant, because I think these are inconsistent
9  with what he told the agents.  So, I mean, if that's what you're
10  going to put on --

11          MR. GIBBS:  Well, the problem we have with that, Judge,
12  is the statement -- I mean, I'm not sure how Ali Timimi told them
13  not to go, how that fits in, but clearly, that's Timimi talking to
14  Yousuf, passing it on to these witnesses, and relating it here in
15  court.

16          We have no way to test that.  We have no way to question
17  that.  We have no way to examine that witness.  If Timimi wants to
18  get up -- yeah, I think it actually is Timimi to Sheikh Jaafar
19  Idris to Yousuf Idris to these two witnesses, if I understand --

20          MR. YAMAMOTO:  Yousuf can certainly testify that he told
21  them not to go.

22          MR. GIBBS:  Sure.

23          MR. YAMAMOTO:  And he can testify that they told him
24  they were going to a wedding and that, that he was told by Ali
25  that they told him they were going to a wedding, but -- and the

224 of 270

1   rest he can't get into, what the real reason that he thought they

2   were going was.

3          MR. GIBBS:  Judge, just to be clear on this, our

4   objection is that this witness saying anything that Ali Timimi

5   told him to pass on to Hasan and Kwon, obviously, Yousuf Idris can

6   say whatever he said.  There's no objection to that, but for

7   Yousuf Idris to talk about his father, who is unavailable, or the

8   defendant and what they said to pass on is impermissible hearsay.

9          THE COURT:  Well, the statements are not offered for the

10  truth of their contents, because they're not making an assertion.

11         MR. GIBBS:  But they're saying not to go, or as I

12  understand the proffer -- wait a minute, that goes to the heart of

13  the case.  I mean, this, Judge, it goes right to intent.  If

14  Timimi, you know, intended for these witnesses to go, he would not

15  have done that.

16         The defense now thinks they have a way through

17  impermissible hearsay to show his intent by trying to prove that

18  he told at least two people not to go, and I expect they're going

19  to argue the heck out of that in closing, and it's all based on

20  this impermissible --

21         THE COURT:  Yes.

22         MR. YAMAMOTO:  He can tell them what -- he can say what

23  they said.

24         THE COURT:  The only thing he can say is he can say what

25  he said to them, but he can't say what other people said to him.

**Idris - direct**                                    1867

1          MR. YAMAMOTO:  But he can say what he told them, that

2   Dr. Al-Timimi and my father both told you not to go.  He made --

3   that's his statement.

4          MR. GIBBS:  We've never seen that statement.  We've had

5   no chance to test that.

6          THE COURT:  Well, you don't get a right to.

7          MR. GIBBS:  Yeah.

8          THE COURT:  You've got Hasan on call, don't you?  And

9   you've got Kwon.  You can put a rebuttal case on.

10         MR. GIBBS:  I understand that, Judge, but I still don't

11  think that allows them to --

12         THE COURT:  He can testify to what he told them.  I

13  mean, he can say, "Don't go," and he can say, "Dr. Timimi told you

14  not to go, and I'm telling you not to go."  I think he can say

15  that.

16         In other words, he can say what it is that he said, and

17  if he quoted other people or invoked other people's names, if

18  that's what he said, then you have to live with that testimony,

19  and, you know, you've got a right to rebut it, all right?  That's

20  how it goes in.

21         MR. YAMAMOTO:  Okay.

22         THE COURT:  All right?

23         MR. MAC MAHON:  Thank you, Your Honor.

24         (End of bench conference.)

25  BY MR. YAMAMOTO:

**Idris - direct**

1  Q.    Mr. Idris, when was the next time you saw Kwon and Hasan?

2  A.    When they visited us in our house to bring my father some

3  kind of an Islamic software.  I think it's a Holy Koran software

4  or something like that.

5  Q.    And in relation to the Borders meeting, when was that?

6  A.    It could have been maybe the next day or two days after that,

7  something like that.

8  Q.    Okay.  And they brought the software, gave it to your dad?

9  A.    Yeah.  They greeted my dad, gave him the software, and then

10 they greeted him back and said, "as-salamu alaikum," and so forth.

11 Q.    And did you talk to them?

12 A.    Yes, I did.  It's part of our culture that when you have a

13 guest over, you take them and walk them out the door, sometimes

14 all the way to their cars.  So I walked with them outside, and

15 they were greeting me and so forth, and then they told me that --

16 Q.    Based on what they told you, what did you tell them?

17        They told you something?

18 A.    Yes.

19 Q.    The government is going to object to what they told you.

20 A.    Okay.

21 Q.    So I want you to skip that part and just tell me what you

22 told them based on what they said.

23 A.    I told them that they should listen to Dr. Al-Timimi and my

24 father and they shouldn't --

25 Q.    Shouldn't what?

**Idris - direct**

1  A.    Shouldn't travel.

2  Q.    Did they tell you where they were traveling to?

3  A.    Yes, Pakistan.

4  Q.    Did they tell you why they were traveling?

5  A.    They just said that they were going to travel, and they

6  showed their concern, especially Mahmoud Hasan, he was saying that

7  he feels that he's -- that the police is, you know, after him or

8  something like that, some things that sound more like a paranoid

9  person or someone who was scared or something.

10  Q.    Well, it wasn't so paranoid, was it?

11  A.    Maybe it was a little bit of paranoia, I guess.

12  Q.    Did you say anything else to them?

13  A.    I just reminded them of what Dr. Timimi said, what Dr. -- my

14  father said, an objection of them traveling, and they know also

15  that I objected to that, and I remember them very well, both of

16  them kind of smiling or laughing.  One of them said that, no,

17  we're just going to get married, and the other person said that,

18  no, we're just going to attend the wedding, or something like

19  that.

20         And then they said as-salamu alaikum greetings, and they

21  left.

22  Q.    Now, when you said they know your objection, did you tell

23  them?

24  A.    Yes.  I reminded them of what my father said.

25  Q.    No, just did you tell them about you, that you were saying

**Idris - direct**

1  for them not to go?

2  A.   Yes.

3  Q.   Did you have occasion to see Hasan again?

4  A.   Again?  No.

5  Q.   Later on in time.  Days? months? weeks? later?

6  A.   Yes.  When he came back from his trip, he, he visited me in

7  my office.

8  Q.   And did he tell you what the trip was about?

9  A.   I told him, "How was your trip?  How was Pakistan?," and so

10 forth.

11          And he used an Arabic term, he said it was an excellent

12 dawa trip -- dawa, d-a-w-a-h -- which means, you know, sharing

13 Islam with other people.  He said, "It was an excellent dawa trip

14 to my family.  We read such-and-such book together."  And that's

15 it.

16 Q.   Did he mention anything about going to an LET camp for

17 training?

18 A.   Not at all.

19 Q.   Did he mention going on jihad?

20 A.   Not at all.

21 Q.   Let me back up a second.  After you saw them and they left,

22 did you again try to contact them?

23 A.   Yes, with Dr. Timimi present.  He asked me actually to call

24 them.

25 Q.   And, and did you try to call them?

**J.A. 2016**

**Idris - direct**

1   A.   Either I tried to call them from my cell phone to talk to

2   them about not going, or it might have been Dr. Timimi's cell

3   phone.

4   Q.   And why were you trying to call them?

5   A.   Because of what Dr. Timimi requested, that they shouldn't go.

6        MR. GIBBS:   Objection.

7   BY MR. YAMAMOTO:

8   Q.   What were you going to say to them?  Not what Dr. Timimi --

9   A.   Oh, just to tell them not to go, not to travel.

10  Q.   This is after you had told them earlier in the day?

11  A.   This was -- I think it happened twice:  one time on that same

12  day, when we were in the Borders, after the Borders, they met with

13  my father in Borders, and we met later on at night, and another

14  time where I remember calling them and there was, there was just

15  an answering machine.

16       MR. YAMAMOTO:   Okay.  Your Honor, not the 9/18 chart but

17  the 9/19 chart I would like to move in.  That just lists phone

18  calls.

19       MR. GIBBS:   Judge, again, we're in favor of summary

20  charts.  We have no objection to this.

21       THE COURT:   All right.  The exhibit number will be

22  Defense Exhibit 90.

23       MR. YAMAMOTO:   Thank you, Your Honor.

24       THE COURT:   It's in.

25       (Defendant's Exhibit No. 90 was received in evidence.)

**Idris - cross**                                            1872

1              MR. YAMAMOTO:  May I publish it, Your Honor?
2              THE COURT:  Yes, sir.
3  BY MR. YAMAMOTO:
4  Q.   Do you recall if those are the approximate times that you
5  tried to make that call?  This is Dr. Al-Timimi's phone calls on
6  his phone?
7  A.   These are the phone calls that Dr. Timimi made?
8  Q.   These are his, his phone.  I'm just asking you if the
9  times --
10 A.   I remember that it was at night definitely that we tried to
11 call, to call, to call Mahmood and Yong, so it could be.  Yeah, at
12 10:30 or 10:35, that makes much sense.
13             MR. YAMAMOTO:  Thank you.
14             Nothing further, Your Honor.
15             THE COURT:  All right.  Mr. Gibbs?
16             MR. GIBBS:  Thank you, Judge.
17                      CROSS EXAMINATION
18 BY MR. GIBBS:
19 Q.   All right, Mr. Idris, I want to go back to the start of your
20 testimony.  You testified a little bit about the Dar al-Arqam
21 Islamic Center, correct?
22 A.   Yes, I did.
23 Q.   And it was started in large part by your father, who's an
24 older gentleman, correct?
25 A.   As a class in our home, yes.

**Idris - cross**

1  Q.  Correct.  And then it moved to 360 South Washington Street,
2  right?
3  A.  Yes, it did.
4  Q.  Now, what's the relationship between your father, Sheikh
5  Jaafar, and the defendant, Ali Timimi?
6  A.  Oh, he considers him a friend, he considers him, I think,
7  also a student, and I see them a lot sharing many things that
8  relate to knowledge and so forth.
9  Q.  They're very close in other words, correct?
10  A.  They are close.
11  Q.  And your father in many ways is sort of a mentor for Ali
12  Timimi, correct?
13  A.  I don't know -- we don't use the word "mentor" in our Islamic
14  culture, but I would say maybe Dr. Timimi considers him one of his
15  teachers, yes.
16  Q.  And how about yourself?  What's your relationship with Ali
17  Timimi?
18  A.  Well, I'm honored, I guess, to have him as a friend, and I
19  learned many good things from him as well.
20  Q.  All right.  And you feel close to him as well?
21  A.  I am close to him.
22  Q.  All right.  Is there anybody else here in the United States
23  that you're closer to than Ali Timimi?
24  A.  I guess my wife.  I'd better say that.
25                          (Laughter.)

**Idris - cross**                                          1874

1   Q.   Trust me, you definitely want to get that on the record.

2   A.   Especially if that's going to be on the record.

3   Q.   Yeah.   That's a smart move on your part.

4        But among people that are not part of your immediate

5   family, is there anyone you're closer to than the defendant, Ali

6   Timimi?

7   A.   I think many people.   I'm friends with so many people.

8   Q.   All right.   Now, you testified about some of the lectures at

9   the Dar al-Arqam, and you testified about the way it's done where

10  notes are passed up to the speakers from the women's side,

11  correct?

12  A.   Yeah, two ways.   Either they pass notes, whichever they may

13  feel comfortable doing, or they can use the wireless microphone

14  and ask their questions.

15  Q.   Now, has there ever been a female lecturer at the Dar

16  al-Arqam?

17  A.   Female lecturer?

18  Q.   Yes, sir.

19  A.   Yes.   A couple of times, there were female lecturers

20  discussing women's issues and so forth with, with some women, I

21  believe.

22  Q.   And do you know the names of any of those lecturers?

23  A.   Specific names of specific lecturers I don't really remember,

24  but -- no.

25  Q.   And you testified that at times, questions would be passed up

**Idris - cross**

1   to Ali Timimi, and it would be so many that it would take all

2   night if he answered them all; is that correct?

3   A.   Yes, so many questions.  Many times, many questions.

4   Q.   And this is at the Dar al-Arqam here in Northern Virginia,

5   correct?

6   A.   Yes, sir.

7   Q.   All right.  Did you ever go to a speaking engagement with Ali

8   Timimi in Suffolk, England?

9   A.   In what?

10  Q.   Suffolk, England.

11  A.   No.

12  Q.   So if he had any questions from a function there, you

13  wouldn't know where they came from, correct?

14  A.   Oh, I don't think so.  I don't know the future or what's

15  happening in other countries.

16  Q.   And, in fact, Ali Timimi lectures all over the world, doesn't

17  he?

18  A.   Yes.

19  Q.   To many different audiences, correct?

20  A.   Yes, sir.

21  Q.   And your father, Sheikh Jaafar Idris, he also is a lecturer,

22  correct?

23  A.   Yes.  Jaafar Idris is a lecturer and a scholar.

24  Q.   And, in fact, he is a lecturer, he's a scholar, and he

25  lectured at Dar al-Arqam quite a bit, correct?

**Idris - cross**

1   A.    Yes, he did.

2   Q.    As well as at other places all over Northern Virginia, right?

3   A.    Yes, all over the world.  He almost traveled all over the

4   world.

5           MR. GIBBS:  Okay.  If we could pull up Government

6   Exhibit 7D2?

7           Actually, if we could have the witness first look at

8   7D2?

9   Q.    I think you have 7D2 on there.  If you could take a look at

10  it and read through it?

11  A.    Excuse me?

12  Q.    Pardon?

13  A.    What did you say?  I'm sorry?

14  Q.    Do you have 7D2 in front of you?

15  A.    7D2, yes.

16  Q.    Okay.  Could you read through that?

17  A.    The whole thing or just the highlighted part?

18  Q.    Read through the part about Sheikh Jaafar Idris.

19  A.    I don't see it.  Is it the highlighted parts that you're

20  asking me to read, or where exactly in the document?

21          MR. YAMAMOTO:  Your Honor --

22  BY MR. GIBBS:

23  Q.    It starts about --

24          MR. YAMAMOTO:  -- I don't think this witness knows

25  anything about this document.

**Idris - cross**

1          MR. GIBBS:  Well, that's why I'm asking him, Judge.

2          THE COURT:  Well, just if you'd look at the document,

3  have you ever seen it before?

4          THE WITNESS:  No, I have never seen this before.

5  BY MR. GIBBS:

6  Q.   Okay.  But do you recall the lecture that it describes here

7  by your father?

8          MR. YAMAMOTO:  Objection, Your Honor.

9          THE COURT:  Well, now they're talking about -- it's a

10  different question.  It's not about the document, so I don't know

11  what the basis for the objection is.

12          MR. YAMAMOTO:  Well, if he knows this particular lecture

13  he may be talking about.

14          THE COURT:  Well, I think that was the question that was

15  going to be asked.  So let me hear what the question is again,

16  Mr. Gibbs.

17          MR. GIBBS:  Yeah.

18  Q.   Sir, do you recall the lecture that's described here in this

19  e-mail?

20  A.   Let me just read through it.

21  Q.   Sure.

22  A.   If you can give me some time?

23          I don't really remember this lecture, but I do remember

24  my father saying in a Friday sermon that he gave right after

25  September 11, it happened Tuesday, then my father gave the

**Idris - cross**

1   lecture, I mean, he gave the Friday sermon on Friday, and that was

2   recorded by CNN and so forth, and he said that this is unjust and

3   this is wrong what happened on 9/11, and then he mentioned also

4   something where he said that I want to also give a word of advice

5   to the leaders of the United States, and he said that sometimes

6   the United States acts internally or nationally in a democratic

7   way, but when it goes overseas, it happens more like a

8   dictatorship.  He said that.

9           But this specific speech here, I don't really remember

10  it.

11          MR. GIBBS:  Well, Judge, at this time, I would move 7D2

12  in.

13          MR. YAMAMOTO:  Objection, Your Honor.

14          THE COURT:  Just a second.

15          MR. GIBBS:  It's been authenticated by Donald Surratt.

16  This witness has now testified about the position at Dar al-Arqam

17  after 9/11.  He's now indicated that he recognizes at least

18  possibly not a statement from this particular speech that's

19  recounted but something similar that his father said.

20          I'd like to move it in and ask him some further

21  questions about that speech.

22          THE COURT:  I think you can ask questions along the

23  lines that are discussed here, but the document itself still does

24  not come in.  I'm not satisfied there's an adequate basis for it.

25          MR. GIBBS:  All right, Judge, that's fine.

**Idris - cross**

1  Q.   Now, Mr. Idris, do you recall your father giving a speech in
2  which he talked about America in its world policies and said that
3  it resembled a fascist country and that he remembers that before
4  the Muslims were trying to apply shariah in Sudan, their leader
5  who opposed shariah once made the statements that you're either
6  with them or against them, which is exactly what Bush has made in
7  his speech?
8  A.   No, I don't say I remember my father saying all of that.  I
9  just remember him indicating that the United States many times,
10 when it's in its national level, it applies democracy, but when it
11 goes overseas and so forth, many times it acts like a
12 dictatorship.  He said that.
13 Q.   Okay.  Was this several weeks after September 11, 2001?
14 A.   This was a couple of days after September 11.  He started his
15 talk by saying that what happened on September 11 was, was wrong,
16 it was not justified, and he gave an advice to the Muslims on how
17 to be patient and so forth, and then he said, "I also have a word
18 of advice for the American leaders."
19 Q.   All right.  And do you recall him at any time speaking about
20 the fact -- I'm sorry?
21 A.   I didn't say anything, I'm sorry.
22 Q.   Okay.  No, that's fine.
23       Do you recall him saying anything about he has a
24 difficult time in believing that any true Muslim could help the
25 kafir kill Muslims even if the Muslims are wrong in any matter?

**Idris - cross**

1    A.    Even if the Muslims are wrong?

2    Q.    Yes.

3    A.    I don't think he would say something like that because there

4    is a clear statement in the Holy Koran that opposes this.  If the

5    Muslim does something wrong, then that Muslim should be corrected.

6    Q.    Well, but let's put it in the context of the war with --

7    between the United States and Afghanistan against the Taliban.  At

8    any time as the war was about to begin, do you recall your father

9    making any statements publicly where he talked about how he would

10   have a hard time seeing Muslims help the kafir kill other Muslims

11   in Afghanistan?

12   A.    He might have said that.  I don't really remember if he said

13   that or not, but he might have said that.  I don't know.

14   Q.    And is the reason that even if he had said it you might not

15   remember because that's not that unusual a statement for him to

16   make?

17   A.    Usually he says different things at different times, and I

18   don't remember whether he said this or he didn't say it.

19   Q.    And do you recall if your father ever spoke about seeing

20   Sheikh Hammoud Bin Uqla Ash-Shuaibi's fatwa on the events in

21   Afghanistan?

22   A.    Anything about that?

23   Q.    Yes.

24   A.    I remember, to be honest with you, that someone said that may

25   God forgive us all, but someone, because this man died -- someone

**Idris - cross**

1   said that this guy who gave this fatwa about September 11 and

2   saying that it's justified, this guy is an idiot, and I remember

3   my father laughing.  That's it.

4   Q.   Laughing in agreement or laughing because he disagreed with

5   him?

6   A.   Well, obviously, he agreed with him, because this is what my

7   father said, and this was recorded by the CNN, as I said earlier.

8   Q.   No, but I'm talking about Sheikh Uqla's fatwa.  Are you

9   saying your father disagreed with it, or he agreed with it?

10  A.   Oh, he definitely thinks that it's nothing -- doesn't make

11  any sense.

12  Q.   And how about yourself?  You agreed with it or disagreed with

13  it?

14  A.   I heard of it.  To be honest with you, I didn't even bother

15  to read it, because this man is known to be a person who lives in

16  some kind of a deserted area in Saudi Arabia, he's just busy with

17  his farm and so forth.  So you wouldn't listen to him in these

18  kinds of matters.

19  Q.   And did you ever discuss it with Ali Timimi?

20  A.   This fatwa?

21  Q.   Yeah, Uqla's fatwa.

22  A.   I don't remember.  Maybe he remembers, but I don't remember

23  talking to him about it at all.

24         MR. MAC MAHON:  I'm sorry, you can't look to him for an

25  answer.

1           THE COURT:  Wait, wait, wait, wait.  He's not your
2    witness, Mr. MacMahon.
3           MR. MAC MAHON:  I know.  It's just he was looking --
4    BY MR. GIBBS:
5    Q.   Now, you've testified about some of the things your father
6    said after September 11.  Your father continued to speak at Dar
7    al-Arqam after September 11 once it reopened, correct?
8    A.   Yeah.  Whenever he visits the States, he would give the talks
9    as usual.
10   Q.   Right.  And there was no problem with that?  He was welcome
11   at Dar al-Arqam, correct?
12   A.   My father?
13   Q.   Yes.
14   A.   Yeah.  I mean, no one could say anything to my father like,
15   "You can't give a speech," or anything.  It's a given.  Once he
16   comes to the country, everyone is happy to see him there, and
17   they'll ask him to give a talk.
18   Q.   All right.  And -- but after 9/11, Ali Timimi never spoke
19   again at Dar al-Arqam, correct?
20   A.   Oh, yeah, because the FBI never approached my father.  They
21   approached Ali.
22   Q.   Sir, we'll get to that in a moment.
23   A.   Sure.
24   Q.   But in terms of his speeches at Dar al-Arqam -- I'm talking
25   about Ali Timimi now -- in terms of his speeches there before

**Idris - cross**                                        1883

1   September 11 -- because after that, he didn't speak there anymore,
2   right?
3   A.   He did.  Last year, he gave a couple of talks.
4   Q.   Okay.  2004.
5   A.   During the month of Ramadan, he gave a couple of talks that I
6   recorded.
7   Q.   Okay.  In 2004.
8   A.   It might be 2004, yes.
9   Q.   Okay.  But until then, from September 11 until the talks on
10  Ramadan in 2004, he didn't speak there again, correct?
11  A.   In the middle, between this and that, I don't remember him
12  speaking at Dar al-Arqam.
13  Q.   Okay.  Now, my questions now relate to his speaking prior to
14  September 11, 2001.
15  A.   Um-hum.
16  Q.   Now, you testified that his lectures tended to focus on --
17  they were beautiful lectures.  That was your testimony, right?
18  A.   Yeah, he gave very good lectures.
19  Q.   And they focused on the oneness of God?
20  A.   The oneness of God, and he, he usually from the lectures that
21  I attended by Dr. Timimi is that he approaches this issue from
22  different angles.  So he talked about the oneness of God through
23  the Purification of the Soul, and in that Purification of the Soul
24  series, he discussed different things such as sincerity,
25  truthfulness, and things like that.

**Idris - cross**

1  Q.    All right.  And I'm glad you mentioned Purification of the

2  Soul, because that was actually one of the lectures that he gave

3  at Dar al-Arqam, correct?

4  A.    I don't know if he gave only one series of lectures titled

5  Purification of the Soul at Dar al-Arqam or he gave it in some

6  other places also with the same title, because I notice that this

7  happens with many of the lectures that he gives, same title,

8  different places.

9  Q.    Okay.  But you do know that there's a lecture series called

10 Purification of the Soul that Ali Timimi gave that's actually for

11 sale at Dar al-Arqam?

12 A.    No, it's not for sale.  I don't even think that it is out.

13 It was just lectures that he gave, and I don't even think that

14 these lectures are edited.  I don't think they are in the market.

15 Q.    All right.  Well, let me actually play you a couple of clips,

16 because we've got some tape recordings of "Purification of the

17 Soul."

18 A.    Is it the one in Dar al-Arqam or other places?

19 Q.    It's one of the tapes for sale from Dar al-Arqam.

20 A.    Oh, okay.

21         MR. GIBBS:    It's clip 14.

22         THE COURT:    This is 10T or whatever?

23         MR. GIBBS:    This is -- let me give you the number for

24 the record, Judge.  That's 10T9.  The tape series is "Purification

25 of the Soul," and this one for our records, for our purposes is

**J.A. 2030**

**Idris - cross**                                           1885

1  clip 14.

2          (Government's Exhibit No. 10T9, Clip No. 14, was played;

3  no government transcript provided.)

4  BY MR. GIBBS:

5  Q.   All right.  Now, Mr. Idris, when you talked about the

6  beautiful lectures that Ali Timimi gave, was that what you were,

7  you were referring to, talking about how many kafirs someone had

8  killed and living under the shadow of the javelin?

9  A.   To be honest with you, this is the first time I hear this,

10  this, this portion of the lecture.

11  Q.   Okay.  So --

12  A.   The lectures that I attended in Dar al-Arqam and so forth, I

13  don't remember anything like that.

14  Q.   Okay.  And is it fair to say then that Ali Timimi gives

15  different lectures depending on the audience he's speaking to?

16  A.   I think everyone does that, yeah.

17  Q.   Yeah.  I mean, fair enough, but I'm talking about Ali Timimi

18  here.  I mean, you were testifying earlier about specific lectures

19  he gave, but that's one that you said you had never heard before,

20  correct?

21  A.   Can you say that again?

22  Q.   Right.

23  A.   I didn't really get your point.

24  Q.   You testified about specific lectures that he's given

25  previously, but the clip you've just heard from "Purification of

**Idris - cross**

1   the Soul," this is one you have not heard before, correct?

2   A.   This is -- no, I haven't heard this before.

3   Q.   All right.  Is this a, a theme of Ali Timimi's that you're

4   unfamiliar with?

5   A.   Unfamiliar with?

6   Q.   Yes.

7   A.   No.  You mean the theme of jihad?

8   Q.   Correct.

9   A.   No, this is any Muslim scholar or speaker and so forth, he

10  would address this issue, I think, in different ways and explain

11  it to people and what is jihad and so forth.

12  Q.   All right.  Well, let's go -- there's one other clip I want

13  to play for you.  It's clip 15, and again, this is from 10T9,

14  "Purification of the Soul."

15        ˙    (Government's Exhibit No. 10T9, Clip No. 15, was played;

16  no government transcript provided.)

17  BY MR. GIBBS:

18  Q.   Mr. Idris, have you heard that lecture before?

19  A.   No.  I don't really remember hearing Dr. Timimi saying this

20  in one of the lectures.  I don't really remember.

21  Q.   All right.  Do you recall him making similar statements at

22  the Dar al-Arqam during his lectures there?

23  A.   Discussing the issue of jihad or what it is and so forth, he

24  might have, but specific days or specific lectures and so forth I

25  don't really remember, but the theme, it might have come up.

**Idris - cross**                                                    1887

1  Q.   And when he would discuss that, would he ever discuss it in

2  talking about specific areas of the world, like he did there,

3  talking about Kashmir and Chechnya?

4  A.   I don't really remember him specifically mentioning,

5  mentioning Chechnya or Kashmir or anything like that.  No, I don't

6  remember that.

7  Q.   Okay.  So that would be a new topic for you, for him to

8  discuss that?

9  A.   Not a new topic but --

10        MR. YAMAMOTO:  Your Honor, can we get a date of these

11  tapes?  We seem to --

12        THE COURT:  The "Purification of the Soul" tape?

13        MR. GIBBS:  I'm not sure we --

14        MR. YAMAMOTO:  Is that the title of the tape?

15        MR. GIBBS:  Yeah.  For the record, the title is

16  "Purification of the Soul."  I don't believe that the audiotapes

17  had dates on them.

18        MR. YAMAMOTO:  Well, whether we know that these came,

19  were given at the center or some other --

20        MR. GIBBS:  Judge, I believe Kwon's testimony was

21  Purification of the Soul was given the summer of 2001.

22        THE WITNESS:  The one thing that I remember very well --

23        MR. GIBBS:  Actually, sir, there's not a question before

24  you at the moment.

25        THE WITNESS:  Okay.

**J.A. 2033**

**Idris - cross**

1      THE COURT:  I'll check my notes on that, too, but at
2  this point, if no one knows, I mean, unless it's on the tape
3  itself, some of these I think we did have dates for some of the
4  speeches.  If we don't, we don't at this point.
5      MR. GIBBS:  Right.
6      MR. YAMAMOTO:  Do we know that the lecture was given at
7  the center, as opposed to some other location?
8      MR. GIBBS:  Well, I mean, this is a witness that can
9  answer the question.
10      MR. YAMAMOTO:  He doesn't know --
11      THE WITNESS:  If you don't mind, I can just share
12  something that might help in this situation.  The lectures that
13  are recorded in Dar al-Arqam, they are digitally recorded, so
14  they're crystal clear usually, and this doesn't sound to me like a
15  new way of recording them like digitally.  It sounds like
16  something that was just recorded by a regular tape recorder or
17  something like that.
18  BY MR. GIBBS:
19  Q.   Well -- and when did you start digitally recording from Dar
20  al-Arqam?
21  A.   Oh, from Day One.  We bought these minidisks when they were
22  brand new on the market and very expensive.  We started recording
23  them with these digital recorders, and then we moved to recording
24  the lectures directly to the, to the computer using a program
25  called Cool Edit.

**Idris - cross**                                          1889

1            THE COURT:  Are the only tapes that you sell at the
2    center tape recordings of speeches presented at the center?
3            THE WITNESS:  No, no.  There are so many lectures, so
4    many titles, maybe they would reach a hundred titles or something
5    like that, and many different speakers, many different lectures --
6            THE COURT:  All right.
7            THE WITNESS:  -- given at many different times.
8    BY MR. GIBBS:
9    Q.   Now -- and wasn't Ali Timimi your biggest seller in terms of
10   the lectures that were sold at the Dar al-Arqam?
11   A.   I really don't know whether he was the biggest seller or not.
12   I don't really know.  You would maybe have to ask someone who was
13   really into the audio department.
14   Q.   Okay.  Well, can you think of any other speaker whose
15   speeches you sold at Dar al-Arqam that had more tapes for sale
16   than Ali Timimi?
17   A.   Than Ali -- I think a person who should answer a question
18   like this is a person whose area is related to the audio area, the
19   sales and so forth.
20   Q.   All right.  So your answer is --
21   A.   I don't even know how many of my lectures they sold or
22   anything like that.
23   Q.   Okay.  So the answer is you don't know.
24   A.   Yes, yes.
25   Q.   Now, we heard the two clips from "Purification of the

**Idris - cross**

1  Soul" --

2  A.    Um-hum.

3  Q.    -- and Ali Timimi was talking about jihad; he talked about

4  Chechnya and Kashmir.

5         Let's talk about the people that attended Dar al-Arqam

6  for a little bit.  This was a center where they could study Islam

7  in English, correct?

8  A.    Yes, in English, and if someone wants to read in Arabic,

9  there are so many books also available in Arabic.

10 Q.    Right.  But the reality is there were a lot of recent

11 converts who couldn't speak Arabic --

12 A.    Oh, yeah.

13 Q.    -- and Dar al-Arqam was a great place to go to study Islamic

14 topics, correct?

15 A.    Yes, yes, many.

16 Q.    So is it fair to say that a number of attendees at Dar

17 al-Arqam were young, impressionable men?

18 A.    I would say that many young people, like college age people,

19 would attend.  We have also people who are in their sixties.  We

20 have people who are, you know, they have gray hair all over their

21 beards and their hair and so forth.  So different types of people

22 would come and attend the classes.

23 Q.    All right, let's talk about the college age people.  Some of

24 the college age people that came to Dar al-Arqam were very

25 enthusiastic about learning about Islam, correct?

**Idris - cross**

1   A.   Oh, yeah.  Most of the people who attended the classes were

2   enthusiastic about learning about Islam.

3   Q.   And part of that was the fact they didn't really know a lot,

4   and this was a place where they could get knowledge, correct?

5   A.   In my opinion, it was the fact that they knew about Islam and

6   they just wanted a -- something that is, that is spoken in proper

7   English from a person that they feel that, you know, he has a good

8   grasp of the English language and at the same time good grasp of

9   Islamic knowledge.  So I think this was the main attracting thing.

10  Q.   Okay.  And when we talk about people that have a good grasp

11  of Islamic knowledge, there were very few people at Dar al-Arqam

12  that were higher up than Ali Timimi, correct?

13  A.   That were?

14  Q.   That had more Islamic knowledge that they shared with the

15  people at Dâr al-Arqam than Ali Timimi?

16  A.   More knowledge than Ali Timimi?

17  Q.   Correct.

18  A.   That would be only my father, I believe.

19  Q.   Okay.

20  A.   He's the only one who would.

21  Q.   So except for your father, in terms of the hierarchy, Ali

22  Timimi was right below him, correct?

23  A.   In terms of amount of knowledge and so forth, yes, I would

24  say so.

25  Q.   And the young people that went to Dar al-Arqam looked up to

**Idris - cross**

1   Ali Timimi very much, didn't they?

2   A.    Yes.

3            MR. YAMAMOTO:  If he knows, Your Honor.

4            THE WITNESS:  They respected him.

5            THE COURT:  He seems to know since he answered that

6   quite quickly.

7            THE WITNESS:  They respected him.

8   BY MR. GIBBS:

9   Q.    They respected him?

10  A.    Yes.

11  Q.    They call him Sheikh Ali, which means a scholar?

12  A.    Yeah.  Some people would call him Brother, and the other

13  people call him Sheikh Ali.  I have a few people who call him Ali.

14  Q.    Sometimes some of the young men at the center would drive him

15  to and from the Friday night services at Dar al-Arqam?

16  A.    I think usually he just drives his brown Altima, but most of

17  the time, he just comes to Dar al-Arqam driving his car.

18  Q.    Do you know if anybody ever -- anybody that went to Dar

19  al-Arqam ever drove him?

20  A.    Drove him?  I don't know.  It might be.

21  Q.    Well, when you say it might be, I mean, can you be more

22  definite than that?

23  A.    I mean, it might have happened.  I don't know.

24  Q.    Now, you talked earlier about September 11, 2001, at Dar

25  al-Arqam.  I want to go back to that for a minute.

**Idris - cross**

1  A.    Sure.

2  Q.    You said that Ali Timimi made some comments condemning the

3  attacks and saying his heart breaks.

4  A.    Yes.

5  Q.    You then went and said that Haytham -- and that's Haytham Abu

6  Hantash, correct?

7  A.    Yes.

8  Q.    And he's part of the administration at Dar al-Arqam, right?

9  A.    Yes.

10 Q.    How about yourself?  Are you part of the administration

11 there?

12 A.    Yes.  I give classes there if they need help with anything

13 like inviting a speaker or something like that.  I would help in

14 inviting speakers and so forth.

15        So the environment of Dar al-Arqam is more really like

16 a, not like formal relationships and so -- more like just, you

17 know, Muslim brothers and sisters and so forth.  So whoever can

18 help with something, he would help.  I am one of these people.

19 Q.    Well, what I was getting at, though, if there's a group at

20 Dar al-Arqam that would have to make a decision for the entire

21 organization, Haytham would obviously be one of those people,

22 right?

23 A.    Yes.

24 Q.    Sheikh Jaafar Idris?

25 A.    Not necessarily, because he's not in the country all the

**Idris - cross**

1  time.

2  Q.  Well, who else besides Haytham?

3  A.  Haytham Hantash, maybe myself.  Dr. Mohammad Al-Qahtani when

4  he was here before he left to Saudi Arabia, he would help with

5  that before.

6  Q.  That's Mohammad Al-Qahtani?

7  A.  Yes.

8  Q.  Could you spell that for the court reporter, please?

9  A.  I think he spells his name M-u-h-a-m-m-a-d.  Qahtani is

10  spelled K-a-h-t-a-n-i.

11  Q.  And on September 11, 2001, Haytham, who's one of the leaders

12  at Dar al-Arqam for lack of a better term --

13  A.  Um-hum.

14  Q.  -- responded to what Timimi said, and Timimi said something

15  about how his heart breaks for those people who died, correct?

16  A.  Yes, he did.  I mean, this -- he said this, I remember, when

17  he was standing --

18  Q.  Actually, it was just a yes-or-no question.

19  A.  Oh.

20  Q.  He said his heart breaks for those people, right?

21  A.  Yes.  I remember him saying that, yes.

22  Q.  And Haytham responded saying, "This is murder," correct?

23  A.  Not to what Timimi said, obviously, that this is

24  heart-breaking and then he says that this is murder.  You're

25  asking me about something that happened four years ago,

**Idris - cross**

1  obviously --

2  Q.    So is your memory --

3  A.    -- so I just remember that --

4          THE COURT:  Mr. Gibbs, you have to let the witness

5  finish.

6          MR. GIBBS:  Sorry, Judge.

7          THE WITNESS:  So -- what was I saying anyway?

8  BY MR. GIBBS:

9  Q.    Well, let me go back.  You were mentioning that it's four

10 years ago.  How good is your recollection of those events because

11 it was four years ago?

12 A.    There are things that you remember, obviously, like anything

13 in life, there are things that you remember very well; there are

14 things that you vaguely remember; but I remember one of the things

15 that Haytham said was that this is a murder or this is killing of

16 innocent people and so forth.

17 Q.    But then you got into a discussion about how Ali Timimi

18 responded and said, "What if they tell you such-and-such?"

19 A.    Yeah.

20 Q.    Now, we need to have some elaboration on that.  We don't know

21 what "such-and-such" means, so can you explain?

22 A.    As far as I remember, he said, "What if they tell you -- what

23 if they tell you, for example, that, okay, America also is killing

24 people in, in other parts of the world that they're innocent or

25 something like that?  What would you say?"  Things of that sort.

**Idris - cross**

1        So that was the theme of, of what was being said.

2  Q.   So Haytham says, "This is murder," and Timimi responds,

3  "Well, what if they" -- do you know who he was talking about by

4  saying "they," "What if they tell you?"

5  A.   The people who did this, obviously, are people who did

6  something like that.  And as I said earlier, I'm just giving,

7  like, general words of what Dr. Timimi said.  This not like I'm

8  remembering the exact conversation, Haytham said this, Timimi said

9  that, then Haytham said this, then Timimi said that.

10 Q.   Okay.  But just to try to make it more precise than

11 "such-and-such," Al-Timimi said, "What if they" -- meaning the

12 hijackers, the people behind September 11 -- "tell you that

13 Americans are killing people in other places?"

14        MR. YAMAMOTO:  Your Honor, I think we're getting some

15 editorializations here.

16        THE COURT:  Well, no, if that's not what was said, then

17 you should say that's not what was said.  But I think it was a

18 vague description of the statement, and this is cross, so leading

19 is permissible.

20        MR. YAMAMOTO:  I understand that, Your Honor, but I

21 think there's some characterization about what Timimi said, and I

22 think words that Mr. Idris has not said are being added into this

23 conversation.

24        THE COURT:  Well, the question, Mr. Idris, is do you

25 remember who the "they" referred to in Mr. Timimi's statement?

**Idris - cross**

```
 1              THE WITNESS:  To be honest with you, Your Honor, I mean,
 2   when I said that Dr. Timimi said what if they say something like
 3   that, I really didn't have anything in -- I mean, there is nothing
 4   really in one's mind.  It could mean the ones who did this
 5   hijacking.  It could mean the people who, who, for example, don't
 6   like what America is doing in some other parts of the world or
 7   things like that.
 8              So it wasn't really a specific --
 9              THE COURT:  But as I understand, he was responding to
10   Haytham's categorical statement --
11              THE WITNESS:  Yes.
12              THE COURT:  -- "This is murder"?
13              THE WITNESS:  Yes.
14              THE COURT:  All right.  Go ahead, Mr. Gibbs.
15              MR. GIBBS:  Thank you.
16   Q.  And in responding to that, I believe you testified on direct
17   examination that they engaged in what appeared to be an argument,
18   although you said there were some cultural reasons for that
19   perhaps.
20   A.  Yes, yes.
21   Q.  Now, what was it -- I mean, if Haytham is saying, "This is
22   murder," what was it Timimi said that caused them to argue?
23   A.  As I said --
24              MR. YAMAMOTO:  Objection to the characterization as
25   argued.
```

**Idris - cross**

1           THE COURT:  To speak heatedly.  How's that, all right?

2           MR. GIBBS:  Thank you, Judge.

3           THE WITNESS:  Thank you.  Can you always help me?

4  BY MR. GIBBS:

5  Q.   Can you answer the question?

6  A.   Can you ask it again, please?

7  Q.   Sure.  If Haytham said, "This is murder," what was Timimi's

8  response that caused them to speak heatedly?

9  A.   Well, as I said, it's something -- Timimi might have said

10  something similar to, "The people who oppose this opinion would

11  say -- and will present an argument, and they will tell you

12  such-and-such.  So how are you going to respond to that?"  And --

13  um-hum.

14  Q.   Didn't Timimi say that America had this coming and that's why

15  Haytham got upset?

16  A.   Had this coming?

17  Q.   Yes.

18  A.   I don't remember him saying that.

19  Q.   Well, didn't Timimi say that American taxpayers are

20  legitimate targets because their tax money buys the bombs that

21  kills Muslims?

22  A.   I don't think he would say something like that.  I don't

23  think a scholar of Islam would say something like that because

24  that would mean that you could kill all the Muslims who are in the

25  States because they also pay taxes.  I don't think --

**Idris - cross**

1   Q.   And I'm not asking if you think he said that.  I'm asking on
2   September 11 --
3          MR. YAMAMOTO:  Objection.
4          THE COURT:  Wait.  You are moving too fast because
5   you're clipping the last statement that the witness is saying.
6   It's making it very difficult for the court reporter and for the
7   jury to hear it, all right?  Let's just slow it down a bit.  All
8   right.
9   BY MR. GIBBS:
10  Q.   I wasn't asking what you think he would have said.  I'm
11  asking on September 11 --
12  A.   Um-hum.
13  Q.   -- did he make that statement?
14  A.   No, I don't remember him saying something like that.
15  Q.   And it's your testimony that you and Mahmood Hasan were off
16  in the back during at least part of that evening, correct?
17  A.   Yeah.  Dr. Timimi, my father, and Haytham were kind of on one
18  side of the, kind of like the dinner place, and Mahmood and myself
19  were kind of at the other side.
20  Q.   Now, you testified on direct examination that after that
21  night at the Dar al-Arqam -- well, let's go back briefly.  Before
22  that night, Ali Timimi was probably the most regular lecturer at
23  the Dar al-Arqam on Friday nights, correct?
24  A.   That's true.
25  Q.   And you testified a moment ago that after that night, he

**Idris - cross**

1  didn't lecture there again until 2004, correct?

2  A.    I don't know if in between that he gave little talks or

3  things like that.  I really can't remember.  He might have.

4  Q.    And was it difficult to find another speaker to replace him?

5  A.    No, it wasn't.

6  Q.    And you testified that the reason that he stopped speaking

7  there is that after two to three weeks, the FBI contacted him many

8  times?

9  A.    Well, this is what I got from what Dr. Timimi had told me.

10  He said that the FBI called him or called and also they contacted

11  his brother and raided his office and things like that.

12  Q.    All right.  What does the FBI raiding Ali Timimi's brother's

13  office have to do with him lecturing at Dar al-Arqam?

14  A.    Oh, because he told me they were asking him all questions

15  about Ali, not about Dr. Timimi's brother.  They were asking

16  Dr. Timimi's brother about Dr. Timimi and his lectures and so

17  forth.  So --

18  Q.    All right.  So agents in California were asking Ali Timimi's

19  brother about his lectures here in Virginia, and that caused him

20  to stop lecturing?

21  A.    This is going into too much details, I guess, that I can't

22  really say what the FBI exactly asked Dr. Timimi's brother in

23  California.  You have to ask Ali this question, I guess.

24  Q.    All right.  So you don't know what was said to the brother in

25  California?

**J.A. 2046**

## Idris - cross

1  A.    No.

2  Q.    How about Ali Timimi here?  You said he was contacted many

3  times by the FBI.  How many times did the FBI contact him?

4  A.    I don't know, but what I got from Dr. Timimi, the feeling

5  that I got is that he was contacted many times by the FBI.

6  Q.    And -- but again, how many times?

7  A.    I have no idea.

8  Q.    And what was it about Ali Timimi being contacted by the FBI

9  that caused him to stop speaking at the Dar al-Arqam?

10  A.    Just the fact that -- if I understood your question

11  correctly, just the fact that the person has been contacted by the

12  FBI so many times and things like that he's going through, I don't

13  think it is wise to ask him, "Hey, why don't you come and please

14  deliver some lectures?," or something like that.

15  Q.    Why not, though?  These were beautiful lectures about

16  theology.  What was the concern with him speaking at Dar al-Arqam?

17  A.    It's just the fact that he was contacted.  I mean, if the FBI

18  came during those horrifying and difficult times so many times to

19  me and they tried to talk to me or harass me or something like

20  that, I would expect the brothers in Dar al-Arqam to ask me not to

21  talk, or I would just by myself not give lectures.

22  Q.    And, in fact, the brothers at Dar al-Arqam did ask Ali

23  Al-Timimi not to come back, didn't they?

24  A.    I don't know that I remember anyone contacting Dr. Timimi and

25  asking him not to give lectures.

## Idris - cross

1    Q.   So this was purely voluntary?  He decided to stop?

2    A.   I can just say that no one from the Dar al-Arqam contacted

3    Dr. Timimi and said, "Please don't give lectures here anymore," or

4    that Dr. Timimi said, "Oh, I don't want to give lectures anymore

5    in Dar al-Arqam."  Nothing like this happened.

6    Q.   He just stopped?

7    A.   He stopped.

8    Q.   Now, you were asked to identify on direct examination Defense

9    Exhibit 70, which was the statement that Dar al-Arqam released

10   after September 11 condemning the attacks, correct?

11   A.   Yes.

12   Q.   And who actually wrote that?

13   A.   I really don't know who exactly wrote it.  I didn't write it

14   myself definitely, but I don't know who wrote it.

15   Q.   You didn't write it, and Ali Timimi had no role in putting

16   this document together, did he?

17   A.   I can't say he did or he didn't.  I don't know.

18   Q.   Well, he had stopped lecturing at Dar al-Arqam.  That's for

19   sure, right?

20   A.   Oh, yeah, but that didn't mean that we didn't contact him at

21   all.

22   Q.   And you testified that -- on direct examination that after

23   September 11, there were no tapes that were removed from Dar

24   al-Arqam?

25   A.   Not, not that I know of.  I just -- I mean, I've noticed that

**Idris - cross**

1  all the tapes of the lectures that Dr. Timimi gave, I could still

2  see the tapes sitting in the racks and everything, but whether

3  they were removed, I don't know about that. I don't know. Maybe.

4  Q.    How about the covers for any of the tapes? Were any of those

5  removed?

6  A.    Covers of the tapes without the tapes?

7  Q.    Yes.

8  A.    I have no idea about that. It might have; it might not. I

9  can't really reply to this.

10  Q.    All right. If we can pull up Government's Exhibit 10T1?

11  Actually, you need to look at your TV screen. I think it's around

12  to your left.

13  A.    Sure.

14  Q.    Now, do you recognize Government's Exhibit 10T1?

15  A.    Yeah. I saw it in one of the conventions actually.

16  Q.    Okay. And this is a convention where?

17  A.    Which convention? I don't really remember exactly which

18  convention, but I remember that in one of the conventions, there

19  was a booth for Dar al-Arqam, and this was the first time I saw

20  this tapes -- tape cover.

21  Q.    Wasn't this "New World Order" tape series, wasn't it sold at

22  the Dar al-Arqam?

23  A.    Maybe after that convention, it might have been. I don't

24  really remember this particular one, but I just remember in

25  general that the tapes of Dr. Timimi were still in Dar al-Arqam.

1904

**Idris - cross**

1  Q.   Well, wasn't this particular cover removed from the tapes of

2  Dar al-Arqam because of the way it looked after 9/11?

3  A.   Maybe someone had removed it.  I have no idea about that.

4  Q.   Well, I mean, it's not very useful that maybe somebody did

5  something.  Do you have any knowledge that this cover for this

6  tape series was removed after 9/11?

7          MR. YAMAMOTO:  It's been asked and answered, Your Honor.

8          THE COURT:  I think the witness has said he doesn't

9  know.  That's the answer.  Sustained.

10         MR. GIBBS:  Thank you, Judge.

11 Q.   Mr. Idris, you testified that after September 11, Dar

12 al-Arqam released a statement condemning the attacks of 9/11,

13 correct?

14 A.   Yes.

15 Q.   And were those your feelings as well, that you personally

16 condemned the attacks of September 11?

17 A.   What do you mean?

18 Q.   The statement that you testified about on direct of Dar

19 al-Arqam, did you agree with that statement?

20 A.   Oh, yeah.  I think any sane Muslim or any sane human being

21 would agree with this.

22         MR. GIBBS:  All right, if we could pull up Government

23 Exhibit 7A23, which is in evidence?

24         MR. YAMAMOTO:  Your Honor, we would object to this.

25 This is going beyond the scope of the direct, way beyond the scope

1905

**Idris - cross**

1  of the direct.  There's no -- there's nothing in the direct
2  regarding this fatwa or this individual.
3        MR. GIBBS:  Judge, this witness went into great detail
4  talking about particular beliefs of the defendant, beliefs at Dar
5  al-Arqam.  This door has been opened.
6        THE COURT:  I think you've opened that broad range of
7  issues, and I'm going to overrule the objection.
8  BY MR. GIBBS:
9  Q.  All right, if we can just first enlarge the top there, and,
10  Mr. Idris, you can take a look at this.  Do you recall seeing "A
11  Statement to the Ummah Concerning the Recent Events," by Sheikh
12  Safar Hawaali?
13  A.  What was your question?  What's your question about it
14  exactly?
15  Q.  Have you ever seen this document before?
16  A.  No.  This is the first time I see it, I guess.
17  Q.  And did you ever discuss it with Ali Timimi?
18        MR. YAMAMOTO:  Objection if he's never seen it before.
19        THE COURT:  I'm going to sustain the objection.  You can
20  rephrase the question, but that certainly is not the right
21  question.
22  BY MR. GIBBS:
23  Q.  Have you ever discussed Safar Hawaali with Al-Timimi?
24  A.  I don't really remember talking about Safar Hawaali and Ali
25  Timimi on this thing, no.

**Idris - cross**

1  Q.   Well, you knew that Ali Timimi actually studied under Safar

2  Hawaali, correct?

3  A.   Studied under him?  You have to ask Ali this question, but to

4  my knowledge is that when Ali went to Saudi Arabia, he went to

5  Madini, and Safar Hawaali, I believe he lives in Mecca, so I don't

6  think he's his student.  I don't know.  I don't know.

7  Q.   And you don't know of Ali Timimi studying under Safar Hawaali

8  at the University of Medina?

9           MR. YAMAMOTO:  He just answered that, Your Honor.

10           THE COURT:  Yes, I think he said he does not know.

11  Sustained.

12  BY MR. GIBBS:

13  Q.   Now, if we can go to page 18 of 7A23, please?

14           MR. YAMAMOTO:  I'm not sure where we're going, Your

15  Honor.  He said he's never seen it before.

16           THE COURT:  You can ask the witness if he discussed

17  particular topics with the defendant.  I think that's fair, but

18  asking him or quoting from this article does no good because he

19  said he has not seen it, and that's it.

20           MR. GIBBS:  All right, that's fine, Judge.  I'll move

21  on.

22  Q.   Now, you testified earlier that after September 11, Ali

23  Timimi stopped lecturing there for some period of time, correct?

24  A.   Yes.

25  Q.   And it was your testimony that it was based upon the fact

**Idris - cross**

1  that he and his brother had been visited by the FBI?

2  A.    I believe that his brother's office was raided by the FBI.

3  They took his computers.  This is what Dr. Timimi, I remember him

4  telling me.  They took his computers and things like that, not

5  just a visit.

6  Q.    And that was a search warrant, right?

7  A.    I don't know.  It might have been.

8  Q.    And as a result of that, Ali Timimi stops lecturing at Dar

9  al-Arqam, correct?

10         THE COURT:  That's been asked and answered a million

11  times.  Move on, please, Mr. Gibbs.

12  BY MR. GIBBS:

13  Q.    Now, didn't there come a time that in 2003, that a Washington

14  Post story came out that indicated that Ali Timimi had not

15  lectured at the Dar al-Arqam in several years?

16         MR. YAMAMOTO:  I don't know where we're going with this.

17  He said he stopped lecturing.

18         THE COURT:  Unless you're getting to something new, the

19  witness has been quite clear about this.

20         MR. GIBBS:  Judge, I am getting into something new.

21         THE COURT:  All right.  Well, get right to it, please.

22         MR. GIBBS:  All right.

23  Q.    Do you know who the Washington Post interviewed from the Dar

24  al-Arqam about the story where they said Ali Timimi had not

25  lectured there in several years?

# Idris - cross

1  A.   They interviewed someone from Dar al-Arqam?

2  Q.   I'm asking do you know who they interviewed from Dar

3  al-Arqam?

4  A.   As far as I know, the Dar al-Arqam policy is if that there is

5  a reporter or something, they will tell them to send them an

6  e-mail, and to my knowledge, usually the one who answers these

7  e-mails or so, I mean, it should be Mr. Hantash.

8  Q.   All right.  So it's your testimony if The Post would have

9  interviewed anybody at Dar al-Arqam, it would have been

10  Mr. Hantash?

11  A.   It would have been --

12          MR. YAMAMOTO:  He's not saying that, Your Honor.

13          THE COURT:  All right, approach the bench.

14          (Bench conference on the record.)

15          THE COURT:  Mr. Gibbs, I'm not trying to rush you,

16  though I want you to stop going over the same old stuff.

17          MR. GIBBS:  Sure.

18          THE COURT:  How much longer do you need for cross?

19          MR. GIBBS:  It's going to go past six.

20          THE COURT:  We've reached the point where I'm going to

21  close it down for today.

22          MR. KROMBERG:  Could we go another five minutes?

23          THE COURT:  It should be Mr. Gibbs anyway.  This is your

24  witness.

25          MR. GIBBS:  I just need to ask him a few more questions.

**Idris - cross**

1  Then I've got two -- one more exhibit to play.

2         THE COURT: No, we're going to start tomorrow morning

3  fresh because this is getting repetitive. Look, you've had it

4  clearly established that he did not speak at the center for that

5  period of time. Whether the center told him, "Get away," or

6  whether he chose not to does not add a whole lot in my view.

7         I don't know that Hantash -- he testified last time. I

8  don't know if you're going to call him again or not, but in any

9  case, this is, I think, getting to a point of no return.

10        So get a night's sleep and come back tomorrow. The jury

11  is getting tired. It's been a long day for them. I'm not saying

12  you can't start on this topic tomorrow, but just make it go

13  faster, and it's repetitive.

14        MR. YAMAMOTO: Your Honor, I'm not sure what tape

15  they're going to play, but I think they're going to play another

16  one of Ali's tapes.

17        THE COURT: Well, if he says he was fired by the center,

18  I suppose that would be what they're going to do.

19        MR. GIBBS: I think the clips are fair game at this

20  point.

21        THE COURT: I think the clips are fair game.

22        MR. GIBBS: That's what I'm saying.

23        THE COURT: Don't forget, they were very hard to hear,

24  and you've got to get them for Ms. Thomson. That's your job to

25  get them for her.

# Idris - cross

 1          MR. GIBBS:  I will, Judge.  Thank you.

 2          (End of bench conference.)

 3          THE COURT:  All right, Ladies and Gentlemen, it's been a

 4   long day.  For some reason, I don't know whether the building just

 5   decides to heat up at the end, but it seems to get warm when we're

 6   the most tired, and we start to go around in circles.  So I'm

 7   sending you home for tonight.

 8          Now, unfortunately -- or you might find it fortunate --

 9   tomorrow morning, I have to take an unrelated matter, and it

10   involves an interpreter.  It's going to take me more time than

11   normal, so I don't think I can start this trial until 10:00

12   tomorrow morning, so you have a little extra time in terms of

13   coming here, all right?  And that's the same for counsel.  So

14   we'll start up at 10:00 tomorrow, all right?

15          Mr. Idris, you'll need to be back at 10:00, all right?

16          THE WITNESS:  Okay.

17          THE COURT:  And if there's nothing further, then we're

18   going to recess court.

19          MR. KROMBERG:  Your Honor --

20          THE COURT:  Let me let the jury go then.

21          MR. KROMBERG:  I'm sorry.

22          THE COURT:  Ladies and Gentlemen, you go ahead and

23   leave.  Remember my cautions from the past, and we'll see you

24   tomorrow morning at 10:00.

25          Mr. Idris, you can also leave at this point.

**Idris - cross**

1          THE WITNESS:  Okay.

2          THE COURT:  We'll see you back here at 10:00.

3          MR. KROMBERG:  Your Honor, one thing before Mr. Idris

4   leaves?

5          THE COURT:  All right, wait a minute.

6          MR. KROMBERG:  Could you give the standard instruction?

7          THE COURT:  Oh, yes.  I mean, there is a rule on the

8   witnesses, Mr. Idris, so you're not to discuss questions you've

9   been asked with any witness.  Do you understand that?

10          THE WITNESS:  Yes.

11          THE COURT:  All right.  Now, counsel can talk to him.

12   That's permissible, all right?  But obviously, with nobody else.

13          THE WITNESS:  Okay.

14          THE COURT:  All right?

15          Anything further?  No?

16          MR. GIBBS:  No, Judge, thank you.

17          THE COURT:  All right, we'll recess court until 9:00

18   tomorrow morning, 10:00 here.

19      (Recess from 5:45 p.m., until April 14, 2005, at 10:00 a.m.)

20

21                    CERTIFICATE OF THE REPORTER

22      I certify that the foregoing is a correct transcript of the

23   record of proceedings in the above-entitled matter.

24

25                                _____
                                   Anneliese J. Thomson

**J.A. 2057**

This page intentionally left blank for double-sided pagination and printing