No. 14-4451

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH COURT

————————

UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

v.

ALI AL-TIMIMI,
*Defendant/Appellant.*

————————

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)

————————

JOINT APPENDIX

VOLUME IX of XIII (pages 2059 - 2318)

————————

**ERIC S. SIEBERT**
**United States Attorney**

**Gordon D. Kromberg**
**Assistant U.S. Attorney**
**Counsel for Appellee**
**2100 Jamieson Avenue**
**Alexandria, VA 22314**
**(703) 299-3700**

**Joseph Attias**
**Attorney**
**Counsel for Appellee**
**Nat'l Security Division**
**U.S. Dep't of Justice**
**Washington, DC 20530**

**GEREMY C. KAMENS**
**Federal Public Defender**

**Geremy C. Kamens**
**Federal Public Defender**
**Counsel for Dr. Al-Timimi**
**1650 King Street, Suite 500**
**Alexandria, VA 22314**
**(703) 600-0800**

This page intentionally left blank for double-sided pagination and printing

# TABLE OF CONTENTS

## VOLUME I (pages 1 - 122)

District Court Docket Sheet (as of Apr. 28, 2025) ......................................1

Indictment (Sept. 23, 2004, Doc. 1).........................................................49

Superseding Indictment (Feb. 3, 2005, Doc. 47) .......................................64

Government's Proposed Jury Instructions (Mar. 28, 2005, Doc. 84).............80

## VOLUME II (pages 123 - 372)

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 294) (defense opening
    statement)...........................................................................................123

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 148) .........................144

    Opening statements ........................................................................148

        By the government...................................................................148
        By the defense.........................................................*see* J.A. 126

    Government's evidence ....................................................................167

        Stipulation..............................................................................167

        Nabil Gharbieh        Direct examination...................................171
                                       Cross examination....................................233
                                       Redirect examination ..............................274
                                       Recross examination ...............................281

        Muhammad Aatique        Direct examination...................................283

    Concluding matters ........................................................................369

VOLUME III (pages 373 - 656)

Transcript, Jury Trial, Day 2 (Apr. 5, 2005, Doc. 149) .........................................373

    Preliminary matters ...................................................................................377

    Government's evidence, cont'd .................................................................377

        Muhammad Aatique       Direct examination (resumed) ................378
                                   Cross examination....................................398
                                   Redirect examination ..............................468
                                   Recross examination ...............................489

        Stipulations ....................................................................................492

        Donald Surratt             Direct examination...................................504
                                     Cross examination....................................570
                                   Redirect examination ..............................585
                                   Recross examination ...............................588

        Detective John Hodge     Direct examination...................................589
                                   Cross examination....................................592
                                   Redirect examination ..............................592

        Stipulations ....................................................................................594

        Playing of audiotapes......................................................................598

        Yong Ki Kwon            Direct examination...................................604

    Concluding matters ...................................................................................655


VOLUME IV (pages 657 - 972)

Transcript, Jury Trial, Day 3 (Apr. 6, 2005, Doc. 150) .........................................657

    Preliminary matters ...................................................................................661

ii

Government's evidence, cont'd ........................................................665

    Evan Francois Kohlmann    Direct examination..................................665
                                   Cross examination...................................817
                                   Redirect examination ............................895
                                   Recross examination .............................903

    Stipulations ....................................................................905

    Playing of audiotape .......................................................914

Concluding matters .......................................................................970


VOLUME V (pages 973 - 1270)

Transcript, Jury Trial, Day 4 (Apr. 7, 2005, Doc. 151) ........................973

Preliminary matters..........................................................................977

Government's evidence, cont'd ........................................................980

    Playing of audiotapes and videotape ..........................................980

    S.A. Tracy Kneisler    Direct examination................................1093
                                     Cross examination.................................1099

    S.A. Christopher Paul Mamula  Direct examination................................1100

    S.A. Donald L. Monday    Direct examination................................1105
                                     Cross examination.................................1127

    Stipulations ..................................................................1131

    Yong Ki Kwon    Direct examination (resumed) ..............1146
                                     Cross examination.................................1238

Concluding matters .....................................................................1268

## VOLUME VI (pages 1271 - 1550)

Transcript, Jury Trial, Day 5 (Apr. 11, 2005, Doc. 152) .................................... 1271

    Preliminary matters ....................................................................... 1275

    Government's evidence, cont'd ..................................................... 1279

| | | |
|---|---|---|
| Yong Ki Kwon | Cross examination (resumed) | 1279 |
| | Redirect examination | 1446 |
| | Recross examination | 1475 |
| S.A. Wade Ammerman | Direct examination | 1481 |
| | Cross examination | 1539 |

    Concluding matters ....................................................................... 1548

## VOLUME VII (pages 1551 - 1804)

Transcript, Jury Trial, Day 6 (Apr. 12, 2005, Doc. 153) .................................... 1551

    Government's evidence, cont'd ..................................................... 1555

| | | |
|---|---|---|
| S.A. Wade Ammerman | Cross examination (resumed) | 1556 |
| | Redirect examination | 1582 |
| | Recross examination | 1593 |

    Stipulations ................................................................................... 1600

    Playing of audiotapes .................................................................... 1610

| | | |
|---|---|---|
| S.A. John Wyman | Direct examination | 1656 |

    Concluding matters ....................................................................... 1799

iv

## VOLUME VIII (pages 1805 - 2058)

Transcript, Jury Trial, Day 7 (Apr. 13, 2005, Doc. 154) ..................................1805

    Preliminary matters ..................................................1808

    Government's evidence, cont'd ..................................1810

        S.A. John Wyman        Direct examination (resumed) ..............1810
                                Cross examination..................................1852
                                Redirect examination ...........................1916
                                Recross examination ............................1923

        Alex Daghestani        Direct examination................................1927
                                  Cross examination..................................1935

        Andre Thompson        Direct examination................................1940
                                  Cross examination..................................1951

        Playing of audiotapes............................................1954

        Government rests ..........................................1955, 1965

    Defendant's Rule 29 motion ..................................1958

    Defendant's evidence ...............................................1965

        Sherdil Loynab        Direct examination................................1966
                                  Cross examination..................................1970
                                  Redirect examination ...........................1976

        Yousuf Jaafar Idris        Direct examination................................1977
                                    Cross examination..................................2018

    Concluding matters ...................................................2056

## VOLUME IX (pages 2059 - 2318)

Transcript, Jury Trial, Day 8 (Apr. 14, 2005, Doc. 155) ....................................2059

    Defendant's evidence, cont'd ........................................................2063

        Yousuf Jaafar Idris      Cross examination (resumed) ...............2063

        Luther Kennedy      Direct examination.................................2136
                Cross examination..................................2144
                Redirect examination .............................2163
                Recross examination ..............................2168

        Curtis Jamison      Direct examination.................................2172
                Cross examination..................................2189

        Defendant rests .........................................................2198

    Government's rebuttal evidence .....................................................2198

        Khwaja Mahmood Hasan      Direct examination.................................2199
                Cross examination..................................2235
                Redirect examination .............................2278
                Recross examination ..............................2284

        Muhammad Aatique, recalled  Direct examination.................................2290

        Conclusion of evidence ...........................................2293

    Preliminary charge conference ....................................................2306

## VOLUME X (pages 2319 - 2568)

Transcript, Jury Trial, Day 9 (Apr. 18, 2005, Doc. 156) ....................................2319

    Charge conference ..........................................................2322

vi

Closing arguments ........................................................2346

    By the government....................................................2346
    By the defense...........................................................2376
    Rebuttal by the government......................................2415

Jury charge ...................................................................2429

Jury deliberations .......................................................2500

    Jury question ............................................................2500

Transcript, Jury Trial, Day 10 (Apr. 19, 2005, Doc. 157).........................2506

    Jury deliberations, cont'd........................................2507

    Jury question ............................................................2507

Transcript, Jury Trial, Day 11 (Apr. 20, 2005, Doc. 158)....................2515

    Jury deliberations, cont'd........................................2517

    Jury question ............................................................2517

    Jury questions ..........................................................2520

Transcript, Jury Trial, Day 12 (Apr. 22, 2005, Doc. 159)....................2535

    Jury deliberations, cont'd........................................2537

Transcript, Jury Trial, Day 13 (Apr. 25, 2005, Doc. 160)....................2540

    Jury deliberations, cont'd........................................2542

    Jury questions ..........................................................2542

Transcript, Jury Trial, Day 14 (Apr. 26, 2005, Doc. 161)....................2553

    Return of verdict .....................................................2555

Concluding matters ............................................................................2560

Verdict Form (Apr. 26, 2005, Doc. 107) ............................................2566


### VOLUME XI (pages 2569 - 2770)

Defendant's Motion for Judgment of Acquittal (June 6, 2005, Doc. 118)..........2569

Defendant's Corrected Motion for New Trial (June 14, 2005, Doc. 124) ..........2630

Government's Response to Defendant's Post-Trial Motions (June 20, 2005, Doc. 125)....................................................................................2647

Defendant's Reply to the Government's Response to Defendant's Post-Trial Motions (June 28, 2005, Doc. 126) (attachments omitted from appendix)...........................................................................2688

Transcript, Sentencing Hearing (July 13, 2005, Doc. 147) ................................2719

    Argument and ruling on Rule 29 motion....................................2720
    Argument and ruling on Rule 33 motion....................................2724
    Ruling on Guidelines objections..................................................2735
    Argument on sentencing ...............................................................2739
    Allocution .....................................................................................2746
    Imposition of sentence .................................................................2750

Judgment in a Criminal Case (July 13, 2005, Doc. 132)....................................2758

Notice of Appeal (July 15, 2005, doc. 133)........................................................2765

Fourth Circuit Judgment (corrected) (with copy of Apr. 25, 2006 order) (May 19, 2006, Doc. 168).............................................................2767


### VOLUME XII (pages 2771 - 2998)

Transcript, Hearing (Aug. 24, 2007, Doc. 239)..................................................2771

Transcript, Hearing (Nov. 20, 2007, Doc. 245)......................................................2790

Transcript, Hearing (May 16, 2008, Doc. 263) ....................................................2795

Transcript, Hearing (Oct. 23, 2008, Doc. 272)....................................................2802

Transcript, Hearing (Feb. 19, 2009, Doc. 297)....................................................2827

Transcript, Hearing (Oct. 4, 2013, Doc. 340) ......................................................2834

(Redacted) Memorandum Opinion (denying motions to compel) (Apr. 28, 2014, Doc. 350)......................................................................................................2864

Order (May 21, 2014, Doc. 357)..........................................................................2887

Notice of Appeal (June 4, 2014, Doc. 358) ..........................................................2889

Fourth Circuit Order (remanding case for further proceedings) (Aug. 4, 2015, Doc. 406)......................................................................................................2892

Fourth Circuit Order (expanding scope of remand) (July 26, 2016, Doc. 431)..............................................................................................................2894

Government's Response in Opposition to Defendant's Second Motion for Acquittal on Count 1 (Aug. 29, 2018, Doc. 447) ...........................................2896

Defendant's Reply to Government's Supplemental Memorandum on *United States v. Davis* (Aug. 19, 2019, Doc. 459) .........................................2905

Government's Reply in Further Support of Its Supplemental Memorandum on *United States v. United States* (Aug. 26, 2019, Doc. 461) .......................2936

(Redacted) Memorandum Opinion (granting release pending appeal) (Aug. 18, 2020, Doc. 519) ...........................................................................................2953

Order (granting release pending appeal) (Aug. 18, 2020, Doc. 520) .................2969

Fourth Circuit Order (affirming grant of release pending appeal) (Aug. 31, 2020, Doc. 535)...............................................................................................2971

ix

Memorandum Opinion (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 549)......................................................................................2972

Order (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 550)..........................2998


VOLUME XIII (pages 2999 - end)

Selected Government Trial Exhibits..................................................................2999

Gov't Exh. 1B1a: transcript of Apr. 7, 2003 consensually monitored call between Kwon and Royer.........................................................................2999

Gov't Exh. 1B2a: transcript of Apr. 8, 2003 consensually monitored call between Kwon and Royer.........................................................................3053

Gov't Exh. 1B4a: transcript of Apr. 17, 2003 consensually recorded CCTV hotel meeting between Kwon and Royer.......................................3084

Gov't Exh. 1D27: Taiba Bulletin, Oct. 17, 2000............................................3131

Gov't Exh. 1D28: Taiba Bulletin, Oct. 27, 2000............................................3134

Gov't Exh. 1D29: Taiba Bulletin, Nov. 7, 2000.............................................3137

Gov't Exh. 1D45: Taiba Bulletin, Sept. 26, 2001 (post from nadqpk@yahoo.com)....................................................................................3139

Gov't Exh. 1D48: Taiba Bulletin, Oct. 13, 2001 (post from nadqpk@yahoo.com)....................................................................................3141

Gov't Exh. 1D52: Taiba Bulletin, June 24, 2001 (post from nadqpk@yahoo.com)....................................................................................3144

Gov't Exh. 1F1: LET Poster, image 1 ............................................................3151

Gov't Exh. 1F3: LET Poster, image 3 ............................................................3152

Gov't Exh. 1F4: LET Poster, image 4 ............................................................3153

Gov't Exh. 1G10a: transcript of Apr. 1, 2003 recorded telephone call (Hammad and Royer call Al-Timimi) .......................................................3154

Gov't Exh. 4G7: email dated June 19, 2001 from pballaz@yahoo.com, regarding praying in a moving car.............................................................3164

Gov't Exh. 7A19: Uqla fatwa on events of 9/11, in English, taken from Surratt's residence on May 8, 2003 ...........................................................3168

Gov't Exh. 7A23; Hawali's *Statement to the Ummah* in English .................3178

Gov't Exh. 7A39a: translation of website containing Space Shuttle article in Arabic ........................................................................................3200

Gov't Exh. 7C31: email dated Sept. 20, 2001 from Kwon to Belton Harris ...............................................................................................................3203

Gov't Exh. 7D3: email dated Oct. 15, 2001 from Surratt re. Hawali's *Statement to the Ummah* ....................................................................3204

Gov't Exh. 7F24a: UPI News article dated Sept. 16, 2001 titled *Taliban Leaders Seek Islamic Support*.....................................................................3206

Gov't Exh. 7H12: plea agreement and statement of facts for Muhammed Aatique.............................................................................................................3207

Gov't Exh. 10A3: document entitled *Suicide Attacks, Are They Suicide? A Shariah Viewpoint* ....................................................................................3223

Gov't Exh. 10A41: email dated Oct. 23, 2000 from Nabil to Timimi re: trip to Delaware ...........................................................................................3227

Gov't Exh. 10D19: email dated Oct. 21, 2001 email from altimimi@yahoo.com to aqdcksa@yahoo.com re. "Utter Nonsense" ......3229

Gov't Exh. 10H1A: record of instant messaging session with Bin Laden statement preamble ....................................................................................3233

Gov't Exh. 10J7: article, *Sheikh Ali Timimi on the Taliban and the Statues* ..............................................................................................................3260

Gov't Exh. 10J9: email dated December 13, 2001 from Timimi re. "A call to reflect and repentance" .................................................................3262

Gov't Exh. 10J15: affidavit of Youseff Idris.................................................3265

Gov't Exh. 10S1: summary chart of Timimi / Kwon telephone calls, Sept. 16, 2001 ................................................................................3266

Gov't Exh. 10S2: summary chart of Timimi / Kwon telephone calls, Sept. 19, 2001 ................................................................................3267

Gov't Exh. 10S3: summary chart of Kwon telephone calls, Sept. 16, 2001 ................................................................................3268

Gov't Exh. 10T1: photograph, package of "New World Order" cassette tapes ................................................................................3272

Gov't Exh. 12-1: stipulation re. background facts............ 3273; *see* J.A. 167-171

Gov't Exh. 12-60: stipulation re. electronic surveillance of calls and email.................................................................................3277

Gov't Exh. 12-61: stipulation re. Al-Timimi lectures ............3278; *see* J.A. 2344

Selected Defense Trial Exhibits..........................................................3280

Def't Exh. 33: Al-Timimi lecture titled *Muslims in America in the Face of Accusations of "Fundamentalism" and "Terrorism"* delivered at Purdue University on Oct. 20, 1993 ........................................3280

Def't Exh. 57: letter dated from AUSA Gordon Kromberg to Yong Kwon's attorneys ................................................................3293

Def't Exh. 80: stipulation regarding Al-Timimi's unsubscription from Taiba Bulletin List ................................................................3295

Def't Exh. 81: summary report of an interview with Ismail Royer by Evan Kohlmann ................................................................3298

Def't Exh. 82: photo of front of Yong Kwon's apartment ...........................3303

Def't Exh. 83: photo of back of Yong Kwon's apartment .............................3304

Def't Exh. 85: summary of Yong Kwon's phone calls on Sept. 16, 2001 ................................................................................................ 3305

Def't Exh. 86: summary of Yong Kwon's phone calls on Sept. 13-15, 2001 .................................................................................3306

Def't Exh. 87: summary of Al-Timimi's calls on evening of Sept. 19, 2001 .................................................................................3307

Def't Exh. 90: summary of Al-Timimi's calls on evening of Sept. 19, 2001 .................................................................................3308

This page intentionally left blank for double-sided pagination and printing

1912

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,             .        Criminal No. 1:04cr385
                                      .
        vs.                           .        Alexandria, Virginia
                                      .        April 14, 2005
ALI AL-TIMIMI,                        .        10:10 a.m.
                                      .
            Defendant.                .
                                      .

.  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME VIII

APPEARANCES:

FOR THE GOVERNMENT:              GORDON D. KROMBERG, AUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314
                                    and
                                 JOHN T. GIBBS, ESQ.
                                 Counterterrorism Section
                                 Criminal Division
                                 United States Department of Justice
                                 601 D Street, N.W.
                                 Washington, D.C. 20004

FOR THE DEFENDANT:               EDWARD B. MAC MAHON, JR., ESQ.
                                 107 East Washington Street
                                 P.O. Box 903
                                 Middleburg, VA 20118
                                    and
                                 ALAN H. YAMAMOTO, ESQ.
                                 643 S. Washington Street
                                 Alexandria, VA 22314

ALSO PRESENT:                    S.A. WADE AMMERMAN
                                 BOBBY WILLIAMS
                                 S.A. JOHN WYMAN

(Pages 1912 - 2171)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1913

```
 1   OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Fifth Floor
 2                                   401 Courthouse Square
                                     Alexandria, VA 22314
 3                                   (703)299-8595

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1914

1        I N D E X

2                                    DIRECT   CROSS   REDIRECT   RECROSS

3   WITNESSES ON BEHALF OF
    THE GOVERNMENT:
4
    Khwaja Mahmood Hasan            2052    2088     2131      2137
5

6   Muhammad Aatique               2143
       (Recalled)
7

8   WITNESSES ON BEHALF OF
    THE DEFENDANT:
9
    Yousuf Jaafar Idris                    1916
10     (Resumed)

11  Luther Kennedy                 1989    1996     2016      2021

12  D. Curtis Jamison              2025    2042

13

14                          EXHIBITS

15                                         MARKED      RECEIVED

16  GOVERNMENT'S:

17  No.  7H2                                           2082
         10J15                                         1969
18

19  DEFENDANT'S:

20  No.  2                                             2045
         3                                             2045
21       11                                            2034
         19                                            2034
22       29                                            2029

23       30                                            2031
         31                                            2039
24       32                                            2046
         41                                            2030
25       51                                            2046

**J.A. 2061**

1915

```
 1                        EXHIBITS (Cont'd.)

 2                                          MARKED    RECEIVED

 3    DEFENDANT'S:

 4    No. 59                                            2116
         61                                             2047
 5       89                                             2156
         91                                             2033
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Idris - cross**

1    P R O C E E D I N G S

2                (Defendant and Jury present.)

3          THE COURT:  Good morning, Ladies and Gentlemen.

4          MR. GIBBS:  Thank you, Judge.

5          THE COURT:  Before we get started, I do want to put on

6    the record it has been impossible for Ms. Thomson to adequately

7    take down the clips that have been played, and it's not the

8    Court's job to do transcripts for the government.  Therefore, the

9    official transcript will not have any of that information

10   indicated.  It will simply say "clip of Exhibit such-and-such."

11   That's going to be the official record.  It is just not possible

12   for her to do that.  All right?

13         MR. GIBBS:  Understood, Judge.  Thank you.

14         YOUSUF JAAFAR IDRIS, DEFENDANT'S WITNESS,

15                PREVIOUSLY AFFIRMED, RESUMED

16              CROSS EXAMINATION (Cont'd.)

17   BY MR. GIBBS:

18   Q.   Good morning, Mr. Idris.

19   A.   Good morning.

20   Q.   Mr. Idris, you testified yesterday about Ali Timimi's

21   lectures both at the Dar al-Arqam and on the tapes at Dar

22   al-Arqam.  Do you recall that?

23   A.   Yes.

24   Q.   And you testified that his lectures dealt with the oneness of

25   God?

**Idris - cross**

1  A.    Mainly.  This is the theme that he would discuss generally in
2  his lectures, talking about the oneness of God, the names of God,
3  the attributes of God, and so forth, but he obviously discussed
4  other things as well.  For example, in the Purification of the
5  Soul classes that he gave in Dar al-Arqam, I remember him talking
6  about patience, for example, for a couple of classes.  He talked
7  about truthfulness, sincerity for a couple of classes and so
8  forth.
9  Q.    And you also testified that his lectures tended to be
10  theologically based.  Do you recall that?
11  A.    Yes.
12  Q.    And you described them as being beautiful lectures, right?
13  A.    Yes.  What I attended was -- I liked what he was saying.
14  Q.    All right.  Well, I'd like to play you another clip.  This is
15  clip 3, and this is from "Principles of Fiqh."
16          MR. YAMAMOTO:  Could we have a date on the lecture, if
17  we can?
18          MR. GIBBS:  I don't believe there was one on that,
19  Judge.  This is tape 5, side A, but I don't believe the tapes
20  themselves had dates on them.
21          MR. YAMAMOTO:  Do we know if it was given at the Dar
22  al-Arqam?
23          THE WITNESS:  He didn't give classes in Dar al-Arqam
24  about principles of fiqh.  This was a set, I think, six tapes or
25  something like that that wasn't given at Dar al-Arqam.

**Idris - cross**

```
 1  BY MR. GIBBS:
 2  Q.    Okay.  And this was a six-tape series that was sold at Dar
 3  al-Arqam?
 4  A.    Yes, it was sold in Dar al-Arqam.
 5  Q.    Thank you.
 6              THE COURT:  Hold on one second.  We need an exhibit
 7  number for this.
 8              MR. GIBBS:  This one, I think, is 10 -- it's 10T13,
 9  Judge.
10              THE COURT:  10T13 is not yet in evidence.
11              MR. YAMAMOTO:  Your Honor, again, I'm sorry, I didn't
12  hear what Mr. Gibbs --
13              THE COURT:  10T --
14              MR. YAMAMOTO:  No, no, Your Honor, with respect to
15  whether the lecture was given at the center or not.
16              MR. GIBBS:  I believe the testimony was it was not given
17  there, but it was sold there.
18              MR. YAMAMOTO:  And we have no idea what the date of the
19  lecture was?
20              MR. GIBBS:  I don't believe it's on the tape.
21              MR. YAMAMOTO:  There's a 302 that gives the date, Your
22  Honor.  I don't know if --
23              THE COURT:  Well, can you consult for a second and if
24  you want to put it on the record for the date?
25              In other words, there's a 302 that discusses this
```

**Idris - cross**

```
1   particular tape.  Is that what you-all are telling the Court?
2             MR. YAMAMOTO:  I believe so, Your Honor.
3             THE COURT:  All right.  Perhaps that reflects the date.
4             MR. MAC MAHON:  It does, Your Honor.
5             THE COURT:  All right.
6             MR. MAC MAHON:  Excuse me.
7             MR. YAMAMOTO:  Your Honor, I'm told that the tape that's
8   going to be played was given in D.C. in the early '90s.
9             THE COURT:  All right.
10            MR. YAMAMOTO:  The "Purification of the Soul" tapes, I
11  believe, started in 2001 at the center of Dar al-Arqam for about
12  18 weeks.
13            THE COURT:  That's fine.  And if you-all want to put
14  that in a stipulation of the various dates or the various
15  lectures, that might be a very useful stipulation for the jury to
16  have, all right?
17            MR. YAMAMOTO:  That's fine.
18            MR. GIBBS:  That's fine, Judge.
19            THE COURT:  All right.
20            MR. GIBBS:  All right, if we can go ahead and play clip
21  3, please?
22            (Government's Exhibit No. 10T13, Clip No. 3, was played;
23  no government transcript provided.)
24            THE COURT:  Counsel?
25  BY MR. GIBBS:
```

**Idris - cross**

1  Q.   Now, Mr. Idris, did you understand Timimi to take the
2  position that the best act of worship in the time of jihad is to
3  fight?
4  A.   Yes, I understand that, and I understand jihad as eliminating
5  injustice, whether that injustice was done by a Muslim or it was
6  done by a non-Muslim.  If there is a type of injustice, then
7  people need to struggle, people need to exert their efforts in
8  eliminating this injustice.
9         So, for example, the example that was given in the tape,
10  for example, what the Muslims were facing in Bosnia, if it was a
11  type of injustice, that injustice has to be lifted.
12         For example, what people went through here, I guess, in
13  the United States a long time ago, the African Americans, for
14  example, they needed justice, so they had to struggle, they had
15  to, as we say in Arabic, do mujahida, or exert their efforts in
16  bringing justice, and then this justice came, and this is why we
17  see a lady, for example, black lady being -- judging in an
18  important situation like this, because she exerted -- her parents
19  or grandparents exerted their effort in bringing justice.  There
20  are so many other examples from so many other nations.
21  Q.   And the example that Ali Timimi gave, Bosnia, this was a war
22  between the Muslims and Bosnia and the kafir, correct?
23  A.   As far as I know, yes, it was a war between the Bosnians --
24  I'm not very good with politics, by the way; I don't think I'm
25  here to answer questions about politics -- but as far as I

**Idris - cross**

1  understood it at that time, I was younger at that time, I guess,
2  that the war in Bosnia were these poor Bosnians who didn't have
3  anything, and there were other people who came and did some acts
4  of injustice towards them, and this is why the United Nations and
5  the whole world went to help them and to lift this injustice from
6  them.

7  Q.    All right.  And you testified that you understood that it was
8  Timimi's position that the best act of worship in a time of jihad
9  is to fight.  Now, is that an opinion that he expressed at the Dar
10 al-Arqam during his speeches there?

11 A.    I don't remember exactly someone saying the same exact words
12 as Dr. Timimi expressed them in his tape, but I would say that
13 this is the understanding of, of people in general, that whenever
14 there is an injustice, then this injustice needs to be lifted.

15          For example, I remember during the Gulf War, when the
16 dictator of Iraq invaded Kuwait, which is a Muslim country, I
17 remember that my father was of the opinion that kicking out Saddam
18 Hussein out of Kuwait back to his country, even though he claims
19 that he was a Muslim, this was an act of jihad, and on the Muslim
20 side, there was the United States helping them lifting that
21 injustice that was inflicted upon the Kuwaitis from a neighboring
22 Muslim country.

23 Q.    Now, you also testified that you're familiar with this
24 principle that Ali Timimi has expressed.  When he lectured at Dar
25 al-Arqam, would he use contemporary examples like Bosnia when he

**Idris - cross**

1  was lecturing about jihad, as he did in the clip you just heard

2  from "Principles of Fiqh"?

3  A.   You said that when he was lecturing about jihad.  I don't

4  really remember him lecturing about jihad in Dar al-Arqam, but if

5  he gave examples from jihad in Dar al-Arqam, he might have given

6  them.  I don't really remember specific incidences or specific

7  situations that he mentioned, but the word, it could have been

8  mentioned.  It's in the Holy Koran.  It's in the words of the

9  Prophet Muhammad, sallallahu alaihi wasallam, and it's a reality

10 of life.

11 Q.   How about Chechnya or Kashmir?  Did he ever use those

12 examples when he lectured at Dar al-Arqam?

13 A.   He might have.  He might have.  I'm not sure.

14 Q.   All right, just one quick side point:  You mentioned earlier

15 that back when Bosnia was a big event back in the mid-'90s, you

16 were still pretty young at that time.

17 A.   I think so.

18 Q.   Right.  You testified yesterday you're 31 years old?

19 A.   Yes.

20 Q.   All right.  So back in September of 2001, how old were you?

21 A.   Again, back to math.  September 11, you say?

22 Q.   Yeah, just at any point in September of 2001.

23 A.   That was, like, four years ago.  That was four years ago.

24 Q.   Correct.

25 A.   So that means I was 27.

**Idris - cross**

1  Q.  Twenty-seven.  And you know Randall Royer, correct?

2  A.  Who?

3  Q.  Ismail Royer?

4  A.  Ismail Royer?  Yes.

5  Q.  And actually, he's older than you, correct?

6  A.  Ismail Royer, he -- I don't know whether he's older than me

7  or he's younger than me.  I'm not sure.

8  Q.  But he's a contemporary of yours, correct?

9  A.  Meaning close in age or so?

10  Q.  Correct.

11  A.  Correct.

12  Q.  And same for Yong Kwon?

13  A.  Yong Kwon, I don't know how old is he.

14  Q.  How about Mahmood Hasan?

15  A.  He's, I think, in his 20s, late 20s, I would say.

16  Q.  In his late 20s, and you're 31?

17  A.  Yes.

18  Q.  Mr. Idris, are you familiar with another lecture by Ali

19  Timimi called The Role of Muslim Students in North American

20  Universities?

21  A.  Yes.

22  Q.  That was actually sold at Dar al-Arqam as well, correct?

23  A.  I believe so.  I believe so.

24       MR. GIBBS:  And if we could play clip 4, which is side B

25  from "Role of Muslim Students"?

1924

**Idris - cross**

```
 1              THE COURT:  Just for the record, give us the exhibit
 2   number.  Is that 10T --
 3              MR. GIBBS:  I'll get it in just a second, Judge.
 4              MR. YAMAMOTO:  10T4, Your Honor.
 5              MR. GIBBS:  Yeah.  And that is in evidence, Judge.
 6              THE COURT:  I know that's in.  10T4, okay.
 7              (Government's Exhibit No. 10T4, Clip No. 4, was played;
 8   no government transcript provided.)
 9   BY MR. GIBBS:
10   Q.   Mr. Idris, did you understand Timimi to take the position
11   that if there's a Muslim land under attack and someone had a
12   special skill, like being an army general, it might be obligatory
13   upon that person to go and help in the fight?
14   A.   From the clip that I just heard, I think I would get this
15   impression, yes.
16   Q.   But other than hearing the tape, in your dealings with
17   Mr. Timimi and being a friend to him, is that a position that you
18   understood him to express?
19   A.   I've never really heard him talking about this issue.  I
20   mean, like, if there is a Muslim, for example, who had military
21   experience or something like that, he has to go and help and so
22   forth, no.  Maybe it's just in this clip or in this tape.
23   Q.   Okay.  So this is the first time you ever heard Timimi
24   express that?
25   A.   No, no.  I heard parts of this tape before, but I didn't hear
```

**Idris - cross**

1  him, like, directly talking to me about it or in the class or

2  anything like that.

3  Q.  And did you ever hear Timimi express this concept at Dar

4  al-Arqam?

5  A.  No.  I don't recall really him mentioning that.

6  Q.  And the concept that he talked about where he said that there

7  may be some people with special skills who would be required to go

8  and help defend a Muslim land even if they were here in America,

9  that concept is what's known at fard ayn, correct?

10  A.  I mean, if we're going to get into areas of jurisprudence,

11  what is permissible and what is prohibited and so forth, I can't

12  really talk about this issue without, you know, refreshing my

13  memory by reading some books or reviewing the issue and so forth.

14  I guess you are getting too much into whether it's obligatory,

15  whether it's not obligatory, and so forth.

16        These are not really my concerns very much, so I can't

17  really talk about it just like in a lecture forum without

18  refreshing my memory about this issue.

19  Q.  Okay.  And again, I don't want to get too deep into this

20  because -- I mean, I couldn't get too deep into it, but in terms

21  of the term "fard ayn," can you just explain to the jury what that

22  means?

23        THE COURT:  Let's spell that term.  I don't think it's

24  been spelled for the jury.

25        MR. GIBBS:  Okay.  F-a-r-d a-y-n.

**Idris - cross**

1        THE COURT:  Is that how you spell it, sir?

2        THE WITNESS:  Yes.  It's written in Arabic, so it could

3    be --

4        THE COURT:  I realize that.

5        THE WITNESS:  The English translation could be.

6        You said what is "fard ayn"?

7    BY MR. GIBBS:

8    Q.   And if you would just give a basic definition of what "fard

9    ayn" means, please?

10   A.   "Fard ayn" means something that is incumbent upon every

11   Muslim to, to perform when he has the ability to do it, such as,

12   for example, praying the five daily prayers and so forth, standing

13   and praying them.  This is something that every Muslim should do.

14   For example, fasting the month of Ramadan, you have to do it

15   unless, for example, you are traveling or, for example, you have

16   an excuse, such as when you are sick and so forth, then you don't

17   have to do it.

18        So it's like an obligation.

19   Q.   Okay.  So it would not be incorrect to say that "fard ayn"

20   means obligatory?

21   A.   Yes.  It's something obligatory upon the person to do when he

22   has the ability and the means to do it.

23   Q.   Okay.  Thank you.

24        Now, Mr. Idris, are you familiar with another lecture by

25   Ali Timimi called A Word of Advice to the Salafis of the UK?

**Idris - cross**

1  A.    I just saw this tape, I remember, but I've never heard it

2  really.

3        MR. YAMAMOTO:  Your Honor, can we have a date and

4  location, please?

5        THE COURT:  A date and location of what?

6        MR. YAMAMOTO:  The lecture.

7        THE COURT:  A date of the lecture?  All right.

8        MR. GIBBS:  Judge, this one -- this particular tape is

9  in evidence.  It's 10T10.

10        THE COURT:  And I think the question is since we've been

11  trying to give the jury some chronological context, is if it's in

12  the record, the date of this particular --

13        MR. GIBBS:  And again, Judge, I don't believe on the

14  audiotapes -- and that's primarily what we were working with;

15  these were either seized in search warrants or from a subpoena at

16  Dar al-Arqam -- the tapes themselves don't have dates on them by

17  and large.

18        MR. YAMAMOTO:  They may have them.

19        THE COURT:  But they may be in a report.

20        MR. GIBBS:  Judge, in the 302, Timimi stated that it was

21  given in the U.K. between '94 and '96 at some point.

22        THE COURT:  All right.

23        MR. YAMAMOTO:  Thank you, Your Honor.

24  BY MR. GIBBS:

25  Q.    And what was your answer regarding your familiarity with the

**Idris - cross**

1  "Word of Advice to the Salafis of the UK"?

2  A.    Oh, I said that I saw this tape, but I never really sat and

3  listened to the lecture.

4  Q.    Okay.  I want to play you one clip from that, and then I want

5  you to -- I want to ask you if you've heard Timimi make similar

6  arguments at Dar al-Arqam or elsewhere, okay?

7  A.    Sure.

8           MR. GIBBS:  And it's clip 25.  Pull that up.

9           (Government's Exhibit No. 10T10, Clip No. 25, was

10  played; no government transcript provided.)

11  BY MR. GIBBS:

12  Q.    And, Mr. Idris, have you ever heard Timimi to express this

13  philosophy about offensive and defensive jihad?

14  A.    To really make a long story short, as they say, I don't

15  really remember Dr. Ali Timimi talking about the issue of jihad

16  and giving all of these different explanations and so forth in Dar

17  al-Arqam.  He might have, because this is an issue that usually

18  Muslim scholars talk about.  Whether he talked about it in Dar

19  al-Arqam in these words or not is not something that I really

20  remember, but he might have.

21           He might have, because this is, as I said, this issue of

22  jihad and the struggle to eliminate injustice, whether it's done

23  by Muslims or non-Muslims, it is part of, part of Islam and part

24  of, I think, every nation's beliefs that you need to struggle

25  against injustice.

**Idris - cross**

1  Q.   And in terms of the clip that we heard dealing with offensive
2  and defensive jihad, you can't recall him specifically talking
3  about that topic at Dar al-Arqam, right?
4  A.   No, I can't recall him really talking about this topic in Dar
5  al-Arqam.
6  Q.   All right.  Now, the lecture itself was given over in London,
7  out of this country.  Did Timimi tend to be a little bit more
8  controversial in his speeches when he was outside of Dar al-Arqam?
9            MR. YAMAMOTO:  If he knows, Your Honor.
10           THE COURT:  Yes, if you know.  Don't guess.
11           THE WITNESS:  Okay.
12           THE COURT:  All right.
13           THE WITNESS:  The talks that I attended for Timimi that
14  were here in Washington, D.C., were in Dar al-Arqam.  I never
15  traveled with him, for example, to Britain or any other places
16  that he went to.
17  BY MR. GIBBS:
18  Q.   So you've never seen him speak overseas?
19  A.   No.
20  Q.   Did anyone from Dar al-Arqam ever accompany him when he spoke
21  overseas?
22  A.   I think that I remember Mahmood Hasan once told me that he
23  wanted to go with him.  I'm not sure whether he went with
24  Dr. Timimi to, to Britain or he didn't.  He might have.
25           My father definitely saw him speaking in Britain.  They

**Idris - cross**

 1  were once invited or more than once to a conference together.

 2  Q.   Okay.  And just to go back to the clip we heard a moment ago

 3  in London, Ali Timimi at the very end, after he talked about the

 4  offensive and defensive jihad, said that the person who made this

 5  comment might be going against his own sheikh.  Do you recall

 6  that?

 7  A.   In this clip?

 8  Q.   Yeah, right at the end.

 9  A.   No.  If you can play it for me, if you play this part again

10  to me, that would be good.

11          MR. GIBBS:  Sure.

12          Is that possible?  About the last 15 seconds.

13          (Excerpt of Government's Exhibit No. 10T10, Clip No. 25,

14  was played; no government transcript provided.)

15  BY MR. GIBBS:

16  Q.   And my question, sir, I just wanted to see if you can

17  explain, what are the implications of going against your own

18  sheikh?

19  A.   The implications of going against your own sheikh?

20  Q.   Correct.

21  A.   It's just like, for example, saying that if your teacher

22  teaches you something and then you oppose him or something like

23  that, a sheikh could be -- it's just like a religious term for a

24  person who teaches people.

25  Q.   And is it considered improper to go against your own sheikh?

**Idris - cross**

1  A.  Oh, this is something that happens all the time in Islamic
2  jurisprudence, that, that the great scholars will have certain
3  opinions, and then their students will, will comment to them, and
4  they will reply to them, and they would correct them, but they
5  would correct them with, with good manners and in good ways,
6  because as it was stressed over and over by many of the scholars,
7  that in Islam, the only two sources that are infallible are the
8  words of God and the words of the Prophet of God, and human beings
9  make mistakes.

10        So if it's the word of God, then we take it.  If it's
11  the word of the Prophet of God, we definitely accept it because he
12  receives the revelation from God.  But the rest of humanity are
13  human beings.  They make mistakes, and, and they say things that
14  aren't right.  So if they say something that is right that goes
15  with accordance to what God says, to what the Prophet of God says,
16  we respect it, and we take it, and if it opposes what God says,
17  what the Prophet says, then we do not take it, no matter who said
18  it.
19  Q.  Okay.  So in your view, there's no significance to going
20  against your own sheikh?
21  A.  Yes, if your sheikh or your teacher teaches you something and
22  then you go back home and you read the Book of God and you find
23  that the word of God opposes the words of your human being
24  teacher, you just disregard your teacher's words.
25  Q.  And so there's really no significance to the fact that Timimi

**Idris - cross**

1  talked about going against your own sheikh in that clip?

2  A.   Maybe just in the sense of arguing that maybe, that maybe

3  your sheikh didn't mean that; go back and ask him; because as I

4  said, that when you correct your teacher, you have to do it with

5  good manners and with respect.

6  Q.   Okay.  And Timimi was actually talking about a sheikh who

7  said that there is currently no jihad in the world.

8  A.   Okay.  As I say, just go back to him and tell him, "Why did

9  you say that?," and so forth.

10  Q.   But, I mean, on that clip, that's what Timimi took issue

11  with, correct?

12  A.   Excuse me?

13  Q.   That's what Timimi took issue with?

14          MR. YAMAMOTO:  I'm not sure he understands what he took

15  issue with or not.  He heard the clip, and that's all we have.

16          THE COURT:  I'm going to sustain the objection.  And,

17  Mr. Gibbs, this is getting repetitive again, so you need to move

18  on.

19          MR. GIBBS:  I'll move on.

20  Q.   Mr. Idris, are you familiar with one of Timimi's lectures

21  called Tawheed and Shirk?

22  A.   Tawheed and Shirk.  I believe this is one of his -- either it

23  was a lecture, or it was a set of lectures, I believe.

24  Q.   Okay.  And the actual set of lectures --

25          MR. YAMAMOTO:  Again, Your Honor, may we have time and

**J.A. 2079**

**Idris - cross**

1  place?

2          THE COURT:  Well, the first thing I want is a spelling

3  of the title.

4          MR. GIBBS:  Sure.  T-a-w-h-e-e-d and Shirk, S-h-i-r-k.

5          THE COURT:  All right.  Now, do we have the time and

6  place?

7          MR. GIBBS:  It was a lecture Timimi conducted as part of

8  a seminar at a mosque in New York City in the early 1990s.

9          MR. YAMAMOTO:  Thank you, Your Honor.

10  BY MR. GIBBS:

11  Q.  And, Mr. Idris, it's your testimony that "Tawheed and Shirk"

12  was sold at the Dar al-Arqam?

13  A.  As far as I remember, yes.  I saw the -- saw it either as one

14  single tape or set of tapes.

15          MR. GIBBS:  And if we could play now from Tawheed and

16  Shirk, it's side B of that tape?

17          THE COURT:  And the exhibit number?

18          MR. GIBBS:  10T2, Judge.

19          (Excerpt of Government's Exhibit No. 10T2 was played; no

20  government transcript provided.)

21          THE WITNESS:  I can't understand --

22          THE COURT:  It's undecipherable.  We're wasting time on

23  these.

24          MR. GIBBS:  All right.

25  Q.  Mr. Idris, that one was very difficult to hear, correct?

**Idris - cross**

1  A.    (Laughing.)

2  Q.    You have to say "yes" or "no."

3  A.    Yes.

4  Q.    Okay.  Now, the next lecture series I wanted to ask you about

5  was one called "The Acts of Worship During Shawwal,"

6  S-h-a-w-w-a-l.  Do you recall this tape series being sold at the

7  Dar al-Arqam?

8  A.    No.  I think -- no, I don't.

9          MR. YAMAMOTO:  Again, may we have a time and place, Your

10 Honor?

11         MR. GIBBS:  We will try to see.  I'm not sure we have

12 that one.

13         Yeah, I don't believe we have a date on that one.  This

14 was one of the tapes, Judge, that was subpoenaed from Dar

15 al-Arqam.

16         THE COURT:  Well, how many more of these do you intend

17 to play?

18         MR. GIBBS:  I have about six more, Judge.

19         THE COURT:  I think you should use some discretion and

20 cut it to three.  Take your three best.  This is not going very

21 far, and most of these tapes without a transcript are difficult to

22 hear.  The last one was impossible.  Take your three best.

23         MR. GIBBS:  All right, we'll stick with "Acts of Worship

24 During Shawwal," and we'll play clip 16.

25         THE COURT:  All right, what's the exhibit number for

**J.A. 2081**

**Idris - cross**

1  this one?

2          MR. GIBBS:  10T11, Judge.

3          THE COURT:  All right.

4          (Government's Exhibit No. 10T11, Clip No. 16, was

5  played; no government transcript provided.)

6  BY MR. GIBBS:

7  Q.  And, Mr. Idris, in your dealings with Ali Timimi, have you

8  ever heard him express this concept that the better jihad is the

9  jihad against the kafir?

10 A.  To be honest with you, I'm getting confused with all of these

11 clips one after the other because what I am used to is listening

12 to a whole talk, where I can understand the circumstances of

13 everything so I can understand what's going on, but the clip after

14 clip after clip after clip, this is kind of confusing me.

15 Q.  Well, in any of the lectures you've listened to, even the

16 entire lecture, have you ever heard Ali Timimi say that the better

17 jihad is the jihad against the kafir?

18 A.  I don't really remember him saying these words, but he may

19 have said them.

20 Q.  And what -- could you explain to the jury what the term

21 "kafir" means?

22 A.  The kafir is the one who knows the truth and then rejects

23 that truth.  This is an Arabic called kafir, and people say it has

24 some kind of relevance linguistically to the English language

25 where you say "cover" and "coffer," because the person who rejects

**Idris - cross**

1  the truth, he's kind of sealing it.  He's kind of rejecting it.
2  He doesn't want it to come and enter into his heart.

3           So the person who rejects the truth, it would be
4  considered kafir, rejection.

5  Q.   And the truth that they reject is that Allah is the one true
6  God, correct?

7  A.   The person, if he rejects that God, there is only one God to
8  be worshipped, and he's unique in his names and in his attributes,
9  there is no like unto him, and the person who rejects the
10  messengers of God, he says that God never sent messengers and so
11  forth, we say yes about this person, that this person is rejecting
12  the truth.

13           But not every person, obviously, who just, for example,
14  hears these words from me now and then he says, "No, I don't want
15  it," is considered in Islam a kafir, or a person who covers it.
16  No.  You need to sit with the person and talk with him for a long
17  time and so forth, present the truth, and then afterwards, if the
18  person rejects, then he's rejected it.

19  Q.   And so in sort of the relationship you've just explained, it
20  probably wouldn't be helpful in that relationship to say that the
21  best jihad is jihad against you, correct?

22  A.   Excuse me?  If what?

23  Q.   In the sort of welcoming relationship you've just described
24  of trying to talk to the kafir, it wouldn't be real helpful to say
25  that the best jihad is the jihad against the kafir, would it?

**Idris - cross**

1  A.   I'm not really sure I understood your question very well.   If
2  you can rephrase it or something?

3  Q.   That's fine.   I'll move on.

4  A.   Okay.

5       MR. GIBBS:   Judge, I just have two more clips.

6  Q.   Before I get to that, though, Mr. Idris, did you ever hear
7  Ali Timimi say at the Dar al-Arqam or anywhere else that Allah
8  hates those who can wage jihad and don't?

9  A.   Hates those who can wage it and they don't?  I don't remember
10 a verse in the Koran that says that or a statement from the
11 Prophet Muhammad, may God's peace and blessings be upon him,
12 saying that, and I don't, I don't remember Dr. Timimi saying that,
13 either.

14 Q.   Well, I'm not asking about if it's in the Koran.  I'm asking
15 if Mr. Timimi ever said that to your knowledge.

16 A.   Oh, sorry, because usually what Dr. Timimi says to me, it
17 goes back to what God says in the Holy Koran or what's mentioned
18 in the sayings of the Prophet.  So I'm sorry about that.  I don't
19 remember him saying that.

20       MR. GIBBS: All right.  And if we could play -- the next
21 clip is from that same tape, "Acts of Worship During Shawwal,"
22 clip 19.

23       (Government's Exhibit No. 10T11, Clip No. 19, was
24 played; no government transcript provided.)

25 BY MR. GIBBS:

# Idris - cross

1   Q.   Now, Mr. Idris, have you ever heard Ali Timimi express the

2   idea that wouldn't it be great to have $60,000 to be able to take

3   care of your family?

4   A.   Excuse me, if you can play this clip again to me?  I really

5   didn't understand anything from it.  If you can play it again,

6   that would be beautiful.

7            MR. YAMAMOTO:  I agree, Your Honor.

8            THE COURT:  I also agree, but we're not going to hear it

9   again.  Move on to the next one, Mr. Gibbs.

10           MR. GIBBS:  All right, that's fine, Judge.

11  Q.   Mr. Idris, are you familiar with another lecture by Timimi

12  that was sold at the Dar al-Arqam called "The Luminous Creed"?

13  A.   Yes.  It's -- yes, I'm familiar with it.

14  Q.   And did you actually hear him give that lecture?

15           MR. YAMAMOTO:  Date and place, Your Honor?

16           MR. GIBBS:  We're checking, Judge.

17           THE COURT:  I'm sorry, but I think the question was did

18  you actually hear the lecture presented at the center?

19           THE WITNESS:  No, no, it wasn't presented in Dar

20  al-Arqam, The Luminous Creed.

21           THE COURT:  You've just seen the tapes?

22           THE WITNESS:  Yeah, I've just seen the tapes.  Right.

23           MR. GIBBS:  Mr. Timimi told the agents that it was given

24  in the U.K. in the mid-'90s.

25           THE COURT:  All right, we need a number for this.

**J.A. 2085**

1            MR. GIBBS:  I'll get that in just a second.  10T7,
2   Judge.
3            THE COURT:  10T7, all right.
4            MR. GIBBS:  And this is tape 1, side B.
5            (Excerpt of Government's Exhibit No. 10T7, tape 1, side
6   B, was played; no government transcript provided.)
7   BY MR. GIBBS:
8   Q.  All right, Mr. Idris, are you familiar with that concept --
9   or strike that.
10           Have you heard Timimi express that concept, that jihad
11  is the pinnacle or the apex of Islam?
12  A.  This is, this is one of the words of Prophet Muhammad, may
13  God's peace and blessings be upon him.
14  Q.  And have you heard Ali Timimi express that at the Dar
15  al-Arqam?
16  A.  He might have.  I mean, it's one of the sayings of the
17  Prophet, and he often quotes the Prophet Muhammad, yes.  He might.
18  I don't remember a specific incident where he mentioned this
19  specific saying.
20  Q.  All right.  Thank you, sir.
21           Mr. Idris, I'm going to move to a different area now.
22  You testified earlier that you were born in the Sudan?
23  A.  Yes, I was.
24  Q.  How old were you when you moved to the United States?
25  A.  About 24, I would say.

**Idris - cross**

1  Q.  So what year was that?

2  A.  1997.

3  Q.  And when you entered the U.S. in 1997, what was your

4  immigration status then?

5  A.  I was a student.  I came to the United States as a student.

6  Q.  Okay.  And at some point, did your immigration status change?

7  A.  Yes.

8  Q.  And what changed about your immigration status?

9  A.  I was a student for some time, maybe two years or something

10 like that, and then I was out of status for some time, and then

11 after that, I became what they call, I think, 485 pending or

12 something like that, for, like, three years now or four years.

13 Q.  Okay.  And did there come a time that you stopped being a

14 student and you actually started working in the United States?

15 A.  Stopped being a student and started working?  What do you

16 mean exactly?

17 Q.  Well, did you, did you get a job here in the United States?

18 A.  Oh, yes.  I got a job in the United States.

19 Q.  And where did you get a job?

20 A.  I worked with the Muslim World League Organization.

21 Q.  And can you explain what the Muslim World League Organization

22 is?

23 A.  It's one of the biggest Muslim organizations, and it's, what

24 do you call it, like their main office is located in Mecca, Saudi

25 Arabia, and they have offices all over the world, and their

**Idris - cross**

1  mission is to teach people about the beauty and the harmony of

2  Islam, and they have an office here in Washington, D.C., and I'm

3  in this office -- I mean, in Virginia, and I am in this office.

4  Q.  Okay.  Out in Herndon, Virginia, correct?

5  A.  Herndon, Virginia?  No.  It's in Falls Church, Virginia.

6  Q.  Okay.  Falls Church.

7       Now, does the Muslim World League have any affiliation

8  with the Saudi government?

9  A.  It has as far as I know affiliations with all Muslim

10  countries, meaning it is supported by all Muslim countries.

11  Q.  So it's also supported by the Saudi government, correct?

12  A.  Saudi government and other Muslim governments as well.

13  Q.  And what is your position, what do you do at the Muslim World

14  League?

15  A.  What I do is an Arabic term, an Arabic term, which oftentimes

16  it's translated in different ways, which they call dawa, d-a-w-a-h

17  or d-a-w-a, and it means to teach people and to educate people

18  about Islam through different ways, such as classes that you might

19  hold, seminars that you might participate in, conferences.  This

20  is why I go all over the, I mean, to many places in the United

21  States doing so, teaching people about Islam.

22  Q.  Okay.  It seemed like you were describing more what the

23  Muslim World League -- I was specifically trying to get at what

24  you yourself do.

25  A.  Yeah, this is what I myself do.

**Idris - cross**

1   Q.   You go around the country?

2   A.   Yeah, yeah.  I travel to so many states and so forth,

3   participate in many conferences and giving lectures about Islam

4   and so forth.

5   Q.   Now, wasn't the Muslim World League Office here in Virginia

6   the subject of a criminal search warrant back in 2002?

7           MR. YAMAMOTO:  Objection, Your Honor.

8           THE COURT:  Approach the bench.

9           (Bench conference on the record.)

10          THE COURT:  I just want you to give me a proffer as to

11  where you're going to go with the rest of this cross examination.

12          MR. GIBBS:  I'm going to finish up in this area.  I'm

13  going to talk about his --

14          THE COURT:  The fact that something has been the subject

15  of a search warrant really doesn't mean anything, and I don't --

16  while you're certainly allowed on cross examination to impeach the

17  credibility of a witness, the fact that a person works for an

18  entity that might have been the subject of a search warrant I

19  don't think is proper impeachment.

20          So do you have something else you're going to in that

21  respect?

22          MR. GIBBS:  On this?  Yeah, I just want to find out

23  about the nature of the -- it's a Wahhabi organization, and find

24  out how that relates to, you know, Mr. Timimi being a Salafi and

25  if he can explain that since he's got this expertise.

### Idris - cross

1  THE COURT: All right, I will strike this question and
2  tell the jury it's irrelevant whether something was the subject of
3  a search warrant or not. Search warrants are issued for various
4  reasons. And there's no evidence that this defendant -- this
5  witness is a subject of a criminal charge, right?

6  MR. GIBBS: Not that I know of, Judge, no.

7  THE COURT: All right, okay. Then get away from that.
8  It's not fair. And in terms of the Wahhabi and Salafi, I think
9  you've already got that in this case. Unless he's going to have
10 to say something different, I don't want the jury to keep hearing
11 this two or three times. So unless there's something new you're
12 going to get from him, you need to move on.

13 MR. GIBBS: That was it, Judge.

14 THE COURT: All right.

15 MR. YAMAMOTO: Thank you, Judge.

16 (End of bench conference.)

17 THE COURT: Ladies and Gentlemen, I know you're a very
18 attentive jury, and I've said this before, and I have to sometimes
19 say things many times: Remember, the questions of lawyers are not
20 evidence at all unless a witness says, "Yeah, that's what
21 happened."

22 This question about a search warrant is absolutely
23 irrelevant to this case. I'm striking the question, and you
24 should disregard it. The fact that an entity might be the subject
25 of a search warrant doesn't mean that there's necessarily been

**Idris - cross**

1  criminal activity going on, and the fact that somebody may work
2  for a company that's been the subject of a search warrant, I mean,
3  there are a lot of corporations these days that have been the
4  subject of the search warrants.  It doesn't mean that the
5  individual employees of that corporation have done anything wrong.
6         So disregard that, and we're going to move on.
7  BY MR. GIBBS:
8  Q.   Now, Mr. Idris, I want to move forward to the summer of 2003.
9  A.   Um-hum.
10 Q.   Do you recall that summer that there were a number of people
11 that had attended the Dar al-Arqam that were the subject of a
12 criminal investigation and ultimately they were indicted?
13         MR. YAMAMOTO:  Your Honor, we're outside of the scope of
14 the conspiracy at this point.  I'm not sure where we're going with
15 this.
16         MR. GIBBS:  Judge, I'm going to his relationship with
17 this defendant.
18         THE COURT:  Well, then I think we should go right to
19 that.  I'll sustain the objection to that particular question.
20         MR. GIBBS:  All right.
21 Q.   Mr. Idris, do you recall having a conversation with Ali
22 Timimi about a, an article in the Washington Post that he was
23 upset with?
24 A.   What is it exactly, if you can --
25         MR. YAMAMOTO:  Your Honor --

1          THE WITNESS:  -- remind me of what --

2          MR. GIBBS:  Let me just show the witness something that

3    may refresh --

4          THE COURT:  Wait, wait, wait.  Is this article in

5    evidence?

6          MR. GIBBS:  I'm just using it to refresh.  I'm not using

7    it as an exhibit.

8          THE COURT:  Well, then you don't show it to the jury.

9    You just give a copy of it to the witness.

10          THE WITNESS:  Which part do you want me to read?

11    BY MR. GIBBS:

12    Q.  Well, first look at the title, the beginning, and then if you

13    could turn to the second page?

14    A.  Oh, the highlighted part, "But he has not lectured at Dar

15    al-Arqam" --

16          THE COURT:  Wait, wait, don't read it out.  I don't want

17    the jury to hear that.

18          MR. GIBBS:  Right.

19          THE WITNESS:  Sorry about that.

20          THE COURT:  Mr. Idris, have you ever seen that article

21    before to your knowledge?

22          THE WITNESS:  Yes, yes, I did.

23          THE COURT:  Did you read it a while ago?

24          THE WITNESS:  I think I read it at the time, yes.

25          THE COURT:  And was it in a newspaper or --

**Idris - cross**

```
 1              THE WITNESS:  Yes, yes, yes.  I remember now, yes.
 2              THE COURT:  All right.  So the witness has read the
 3   article.  Now, is there any objection to the article going in at
 4   this point so we're not talking in this abstract way,
 5   Mr. Yamamoto?
 6              MR. MAC MAHON:  Just a second, Your Honor.  Could we
 7   look at the article?
 8              THE COURT:  Yes.
 9              MR. YAMAMOTO:  I'm not sure what it gets us, Your Honor.
10   It's a subject that was covered yesterday.
11              THE COURT:  Well, I think -- if it's what I think it is,
12   I think cross examination is not improper in going into this, just
13   briefly.
14              MR. YAMAMOTO:  Well, they crossed on it yesterday, Your
15   Honor, and I think the Court made a ruling with respect to this.
16   May we approach?
17              MR. GIBBS:  Judge, we didn't cross on this yesterday.
18              THE COURT:  Yes.
19              (Bench conference on the record.)
20              THE COURT:  Let me see the article.
21              MR. YAMAMOTO:  I don't think they need to put the
22   article in, Your Honor.
23              THE COURT:  All right, maybe not.  Let me see.
24              What are you going to ask him?  You already know he
25   hasn't lectured there in years.
```

**Idris - cross**

1    MR. GIBBS:  No, I'm going to ask him about his

2  conversation with Timimi as a result of this article and the

3  interaction that the two had.  I don't have to enter the article.

4  I just want to refresh his --

5        THE COURT:  What do you think he's going to say?

6        MR. GIBBS:  He can say one of two things.  Either Timimi

7  came to him and said he was upset about the fact that the Dar

8  al-Arqam had said this and he wanted him to write some sort of

9  statement saying he was a peaceful guy and, you know, he left

10  there voluntarily -- and, Judge, I mean --

11        THE COURT:  All right.  You called the witness in part

12  as almost a character witness, and I think that's not

13  inappropriate cross examination, so -- but let's keep it short and

14  pointed.

15        MR. GIBBS:  Sure.

16        THE COURT:  All right.

17        MR. YAMAMOTO:  Thank you, Your Honor.

18        MR. MAC MAHON:  The article is not coming in, Your

19  Honor?

20        THE COURT:  The article is not coming in.

21        MR. MAC MAHON:  Thank you.

22        (End of bench conference.)

23  BY MR. GIBBS:

24  Q.  All right, Mr. Idris, do you recall in the summer of 2003,

25  the defendant, Ali Timimi, indicating that he was upset that the

**Idris - cross**

1  Dar al-Arqam had said in the Washington Post that he had not

2  lectured there in several years?

3  A.    Yes, yes, I remember that.  I remember him saying that.

4  Q.    And he said that to you, correct?

5  A.    Yes, he did.

6  Q.    And did he ask you to do anything for him?

7  A.    Yes.  He -- this is -- I mean, this article is very good.

8  It's very refreshing.  He said that someone said, "Did you read

9  the newspaper?," or something like that.  "Someone said in the

10  Washington Post that I didn't give lectures there in years," or

11  something like that.

12         And then I remembered I, I went to Dar al-Arqam, and

13  there was a, a guy who worked there for a few months or so.  I

14  told him what happened or something like that, and then he told me

15  someone came, I'm not sure whether he told him he was from the

16  Washington Post or not, and he said he asked about Dr. Timimi, and

17  then he said he didn't lecture here for years.

18         And I remember telling him, "This is not your job.  You

19  should just -- you shouldn't answer these reporters.  It is the,

20  the job of Mr. Haytham Hantash."  As I said yesterday, he's the

21  one who actually answers these reporters.

22  Q.    And was Timimi upset with you when he talked to you about

23  this article?

24  A.    Yes.  I remember that he wasn't, he wasn't very pleased for

25  what this person said that, in years and so forth.  It indicates

**Idris - cross**

1   that for a long time, Dr. Timimi didn't give lectures, while in

2   reality, just I think in 2000 or the beginning of 2001, he was

3   still lecturing, while it sounds like for decades or something,

4   the man didn't give a lecture.

5   Q.   And did Ali Timimi ask you to release a statement or say

6   anything on behalf of Dar al-Arqam to say that, in fact, that

7   article really wasn't that accurate?

8   A.   He might have.  He might have.  And if he did, usually I

9   don't think he would talk to me about this.  Maybe he would talk

10  to, to Haytham about it.

11  Q.   So you don't think he talked to you about that subject?

12  A.   I'm not saying he didn't, but I'm saying he might have.

13          MR. GIBBS:  All right.  Judge, we've got an exhibit we'd

14  like to play at this point.  It's a telephone call in Arabic, and

15  we've got transcripts here.  And this is Government's Exhibit

16  10B8.

17          THE COURT:  Mr. Yamamoto, is there any objection?  Let

18  me take a look at it while the defense is looking at it.

19          MR. YAMAMOTO:  Your Honor, this is the first time we're

20  seeing this transcript.

21          THE COURT:  Well, this is cross examination.  Let me

22  take a look at this.

23          MR. YAMAMOTO:  May we approach, Your Honor?

24          THE COURT:  Yes, sir.

25          (Bench conference on the record.)

**Idris - cross**

1          MR. YAMAMOTO:  Your Honor, this appears to be a phone

2   call that was the subject of the FISA warrant that the government

3   obtained.

4          THE COURT:  Is it?

5          MR. GIBBS:  It is, yeah.

6          MR. YAMAMOTO:  We -- I don't recall getting this

7   material from the government previously under rule 16, and we

8   haven't heard -- we haven't heard the --

9          THE COURT:  I'm letting the jury take a break.

10         (End of bench conference.)

11         THE COURT:  Ladies and Gentlemen, I think we've reached

12  the point where I'm going to have to spend more time than you want

13  to sit listening to the white noise machines, so I'm going to need

14  to give you your morning break until 11:30, and I'm sure we can

15  get started up again at that time.  Thank you.

16                        (Jury out.)

17         THE COURT:  I'm going to also require the courtroom --

18  you-all can leave.

19         I'm going to require the courtroom to be sealed at this

20  point.  The witness will need to step out, and everybody out of

21  the courtroom, please.

22         MR. MAC MAHON:  Him, too, Your Honor?

23         THE COURT:  Yes.  Thank you.

24         (Recess from 11:05 a.m., until 11:44 a.m.)

25         (CIPA HEARING NOT TRANSCRIBED IN THIS VOLUME.)

**Idris - cross**

```
1                      (Defendant and Jury out.)
2            THE COURT:  Is there anything else?
3            MR. GIBBS:  I have one matter, Judge.  I've spoken with
4    Mr. Yamamoto --
5            THE COURT:  Should the defendant be present for this?
6            MR. GIBBS:  Yes.
7            THE COURT:  Should Mr. Timimi come back in?
8                      (Defendant present.)
9            MR. GIBBS:  Judge, just briefly, I spoke to Mr. Yamamoto
10   during the break, and they were kind enough to give us their
11   witness list and their witness order.  One of the witnesses we
12   thought they were going to be calling may not be testifying.  We
13   had a couple of clips to play for him.  They are very short ones.
14           I'd like to play it for this witness if I could, and I
15   just wanted to let the Court and defense know that before the jury
16   comes out, because I know the Court had given the earier ruling.
17   Again, they're short.  I believe they're relevant.  I can ask this
18   witness a couple of questions about them and move on, but I just
19   wanted to let everyone know that's what I was intending to do.
20           THE COURT:  When you say "clips," you mean more from the
21   10T series?
22           MR. GIBBS:  Correct, Judge.
23           MR. YAMAMOTO:  Can we get a sort of proffer to see
24   whether or not, one, it's going to be intelligible, and two, what
25   it is?
```

**J.A. 2098**

**Idris - cross**

1    THE COURT:  The intelligibility issue is really a

2  problem.  I've got to tell the government I think the jury is

3  getting a real bad impression.  Basically, you know, you're

4  scraping the bottom of the barrel if you're giving them evidence

5  that's so difficult to hear.  Without a transcript, that makes it

6  almost impossible.  That's why again this transcript for the Court

7  of Appeals is going to be interesting because there are big chunks

8  of evidence that they're not going to see in the transcript.

9    MR. KROMBERG:  Your Honor, these last two clips,

10  Mr. Timimi comes through loud and clear.  One of them is a

11  question to him.  The question you cannot make out -- you can only

12  make out a little bit of the question, but then the answer comes

13  in loud and clear.

14    THE COURT:  All right.  Well, that's fine, as long as

15  they're loud and clear, but, I mean, some of the other ones were

16  really tough.

17    MR. YAMAMOTO:  Then the whole thing is out of context,

18  Your Honor.  We don't know what the question is, but we've got

19  this statement.

20    THE COURT:  I'm assuming the context will be clear?

21    MR. KROMBERG:  Oh, yeah, Judge.

22    THE COURT:  All right, that's fine.  I'm going to go

23  with that.  So all right.

24    MR. YAMAMOTO:  Your Honor?

25    THE COURT:  Yes.

**Idris - cross**

1    MR. YAMAMOTO: I have one issue to bring before the

2    Court's attention. I talked to my witnesses on the break. It

3    turns out Mr. Kennedy came into the courtroom and sat down for a

4    period of time while Mr. Idris was on the stand, and he heard part

5    of the tape -- of a tape, I don't know which tape, and then he

6    heard some question and answer, a little bit of it, and then he

7    left.

8          THE COURT: Who is Mr. Kennedy?

9          MR. YAMAMOTO: Mr. Kennedy would be my next witness.

10          THE COURT: But what is he? I don't remember his name

11    from the other case, so who is he?

12          MR. YAMAMOTO: He's not. He's not from the other case.

13    He's just an individual who attended the center, who is

14    ex-military, worked for the Department of Defense.

15          MR. GIBBS: Judge, we understand. That's not a problem.

16    We don't have a problem with that.

17          THE COURT: All right, thank you for telling us. All

18    right.

19          Now, Ms. Travers will bring the jury in. Mr. Wood, you

20    can bring the public in.

21          MR. YAMAMOTO: Could you buy some pitchers that don't

22    leak?

23          THE COURT: Is that leaking?

24          MR. YAMAMOTO: Just when you pour.

25          THE COURT: Maybe it's your pouring, Mr. Yamamoto. I

**Idris - cross**

1   don't know if we have any other ones.  We'll see.

2                         (Jury present.)

3            THE COURT:  All right, we're ready to continue with the

4   cross examination of Mr. Idris.

5   BY MR. GIBBS:

6   Q.   All right.  Mr. Idris, isn't it true that in June of 2003,

7   after that Washington Post article, you spoke with Ali Timimi, and

8   he wanted you to come up with a statement for him?

9   A.   I don't remember him saying, "I want you to come up with a

10  statement," or something like that.

11  Q.   Well, do you remember him doing anything to assist you right

12  around the time that the indictment in this case came out?

13            MR. YAMAMOTO:  If he knows when the indictment came out,

14  Your Honor.

15            THE COURT:  I think you misphrased that question anyway.

16  Why don't you rephrase that question.

17  BY MR. GIBBS:

18  Q.   At the end of June in 2003, do you recall Mr. Timimi asking

19  you to do anything on his behalf?

20  A.   On his behalf?

21  Q.   Correct.

22  A.   Are you talking about the -- when he asked for, what do you

23  call it, like, when the Washington Post article said that he

24  didn't give lectures in, what is it called, years or something

25  like that?

**J.A. 2101**

**Idris - cross**

1  Q.   Correct.

2  A.   Yeah.  When they said that, I remember Dr. Timimi talking to

3  me over the phone, and he was saying that this is not true or

4  something like that, and I agreed that this is not right, and I

5  believe after that, I talked to the person in charge, as I said

6  earlier, Mr. Haytham Hantash, or something regarding this.

7        THE COURT:  But I think the question is did he ask you

8  to do anything on his behalf in connection with the Washington

9  Post article?

10       THE WITNESS:  Doing something in his behalf I don't

11 really remember very well.

12       THE COURT:  All right.

13       MR. GIBBS:  All right, Judge, I'd like to have him

14 review the transcript, if I could.

15       THE COURT:  Go ahead.

16       THE WITNESS:  There is something here that I don't

17 understand.

18 BY MR. GIBBS:

19 Q.   Actually, just read it to yourself first.

20 A.   Okay.

21 Q.   And see if it refreshes your recollection.

22 A.   Okay.  Okay.

23       There is something here that says --

24 Q.   Sir, read the whole thing.  See if it refreshes your

25 recollection, okay?  And then I'll ask you some questions about

**J.A. 2102**

**Idris - cross**

1   it.

2   A.    Okay.  Yeah.

3   Q.    Have you had a chance to read this?

4   A.    I did, but to be very honest with you, I didn't understand it

5   very well the way it's written.

6              THE COURT:  Well, wait.  The question simply is having

7   read that transcript --

8              THE WITNESS:  Yes.

9              THE COURT:  -- does it refresh your memory?

10             THE WITNESS:  It does.  It does kind of.

11             THE COURT:  Then go ahead, Mr. Gibbs.  Just ask your

12  questions with the refreshed memory of the witness.

13             MR. GIBBS:  Thank you.

14  Q.    And, Mr. Idris, this is an English transcript of a telephone

15  call that you and Ali Timimi had --

16  A.    Okay.

17  Q.    -- back in June of 2003, correct?

18  A.    Okay.  I don't know the date, but it's something that

19  happened in the past.

20  Q.    And do you now remember that telephone call?

21  A.    I remember it.  I don't remember it, obviously, exactly, but

22  I remember that this phone call took place, yes.

23  Q.    Well, in that phone call, isn't it true that Ali Timimi said

24  to you that since the incidents, I did not frequent either your

25  place or any other place?

**Idris - cross**

1  A.  Can you say that again?  Since?

2  Q.  Let me finish the question.  Isn't it true that Ali Timimi

3  said in that phone call --

4          THE COURT:  Now, wait.  I'm sorry, Mr. Gibbs, you're

5  using this document to refresh memory, not to get the document in,

6  so you need to ask the witness if his memory has been refreshed

7  and then re-put to him the question that he could not remember the

8  answer to.

9          MR. GIBBS:  That's fine, Judge.

10 Q.  Mr. Idris, having had a chance to review this transcript,

11 isn't it true that in June of 2003, Ali Timimi called you and

12 asked you to prepare a note for him that he could send to his

13 attorney?

14 A.  You mean -- I don't know what you are referring to, but can I

15 tell you what I think you might be referring to?

16 Q.  No.  Turn to page 4 of that document --

17 A.  Okay.

18 Q.  -- and look at the largest paragraph, about seven lines up

19 from the bottom, and read that to yourself.

20 A.  Okay.  I don't remember him exactly saying these words, but

21 he might have.  I don't remember him saying these exact words that

22 are in front of me.

23 Q.  Well, didn't he call you, though, and ask you to prepare a

24 note for him that he could provide to his attorney?

25 A.  I don't really remember him exactly asking me for a note for

**Idris - cross**

1   his attorney.

2   Q.   All right.  What do you remember regarding that topic?

3   A.   I remember that he -- Dr. Timimi was upset about this

4   statement that he didn't give lectures in Dar al-Arqam for years.

5   I remember that I said, yeah, that this -- the meaning of what I

6   said, that this is not true, it's not that you didn't give

7   lectures there for years, and I remember I didn't like the, the

8   impression that the person who reads this article would get, that

9   this is just a person who's dumped or something like that.

10  Q.   And what was going on around that time that caused Timimi to

11  want to get out a better impression about his relationship with

12  Dar al-Arqam?

13           MR. YAMAMOTO:  If he knows, Your Honor.

14           THE COURT:  If you know.

15           THE WITNESS: ' You said something that was going on

16  during that time?

17  BY MR. GIBBS:

18  Q.   Isn't it true that there were 11 people that had gone to Dar

19  al-Arqam who were indicted at the end of June 2000?

20  A.   I don't know the date, but yes, there are 11 people who I

21  think most of them used to go to Dar al-Arqam.

22  Q.   That included Masaud Khan?

23  A.   Masaud Khan, I don't remember seeing him really in Dar

24  al-Arqam --

25  Q.   Muhammad Aatique?

**Idris - cross**

1  A.    -- very much.

2        Muhammad Aatique, I don't remember seeing him very much.

3  Q.    No.  He was indicted, though?

4  A.    Oh, yeah, yeah.

5  Q.    And Masaud Khan was indicted?

6  A.    Yes, yes.

7  Q.    And this was big news amongst the people at Dar al-Arqam,

8  correct?

9  A.    Oh, yeah, all over Virginia, the Muslim community as a whole.

10 Q.    And did Ali Timimi tell you that he had actually gotten a

11 draft of the indictment before it came out?

12 A.    A draft of the indictment?

13 Q.    A draft copy of the indictment before it came out.

14 A.    I don't remember something like that.

15 Q.    Had Ali Timimi told you that he was meeting with the FBI and

16 speaking to them before the indictment came out?

17 A.    Yes, I remember him saying that he met with the, with the

18 FBI, and he hopes that his problem is going to be solved and so

19 forth.

20 Q.    And the problem that was going to be solved, he was hoping he

21 wouldn't get charged, correct?

22 A.    Yes, sure.  Everyone in the Muslim community was hoping that

23 he wouldn't be charged.

24 Q.    And, in fact, didn't, didn't you know that Ali Timimi was

25 listed as Unindicted Coconspirator No. 1 in that indictment?

**Idris - cross**

1      MR. YAMAMOTO:  Objection, Your Honor.  He's got no way
2  of knowing who's what.  I mean, it's an unindicted coconspirator.
3      THE COURT:  Well, I think if he knows -- I mean, if this
4  was discussed between the defendant and the witness, I think that
5  is fair game.
6      MR. YAMAMOTO:  If he's seen the indictment.
7      MR. GIBBS:  I can show him a copy, Judge.
8      THE COURT:  Or if it was discussed.  So I'll overrule
9  the objection.
10 BY MR. GIBBS:
11 Q.  Didn't Ali Timimi talk with you and discuss the fact that he
12 had been listed as Unindicted Coconspirator No. 1 in that
13 indictment?
14 A.  I don't remember him saying that exactly, like, I was
15 such-and-such and such-and-such.
16 Q.  Well, he didn't say that exactly, but what did he say about
17 his role in the indictment?
18 A.  I don't remember him saying, as I said earlier, that I am
19 such-and-such, or this such-and-such is going to happen to me, but
20 I remember that there was a worry about him and so forth.  This is
21 from my memory now.
22 Q.  And your memory is not that good?
23 A.  It is good.  It is good, I guess.
24 Q.  You guess it's good.
25 A.  Well, like every human being, there are things that you

**Idris - cross**

1  remember crystal clear, there are things that you don't remember
2  very well, and there are things in your life that you forget.
3  Q.   Well, let's talk about the things you remember crystal clear.
4  How many times has Ali Timimi come to you and asked for a favor?
5  A.   I can't, I can't remember.
6  Q.   How many times has he come to you and asked you to prepare
7  something for his attorney?
8  A.   For his attorney?  There is one incident that I remember very
9  well.
10 Q.   And that's when you prepared an affidavit for him, correct?
11 A.   Yes, yes.
12 Q.   All right, we'll get to that in a minute.
13 A.   Sure.
14 Q.   On the phone call back in June, though, how many other times
15 has he called you up and asked you to prepare a note for his
16 attorney saying that he's a good brother and a peaceful man?
17 A.   I really don't remember how many times.  It's, it's not easy
18 to remember how many times he called me and said, Can you please
19 say such-and-such?  As I said earlier, when I read this statement,
20 I said I can't remember it.
21 Q.   All right, let's try to avoid the such-and-suches.  How many
22 times other than this phone call in June of 2003 has Ali Timimi
23 called you and asked you to prepare a note for his attorney?
24            MR. YAMAMOTO:  He said he doesn't remember, Your Honor.
25            THE COURT:  I'm allowing it one more time.

**Idris - cross**

1              THE WITNESS:  I don't, I really don't remember.

2   BY MR. GIBBS:

3   Q.    You don't remember any?

4   A.    No.

5   Q.    And when Ali Timimi called you in June of 2003 and asked you

6   to prepare a note for his attorney saying that he's a peaceful

7   man, did you do that?

8   A.    As I said earlier, I don't remember him saying that he said

9   to me, "Write a note saying that I'm a peaceful person."  I don't.

10  Q.    And at any point, did he tell you that in the indictment that

11  was filed against the people at Dar al-Arqam, that it alleged that

12  he had, he had solicited them to go overseas to fight?

13  A.    Can you say that question again?

14  Q.    Sure.  At any time --

15              MR. YAMAMOTO:  Objection.

16              THE COURT:  Is there an objection?

17              MR. YAMAMOTO:  Your Honor, he's asked the question

18  already.  He's talking about the indictment.  He said he's never

19  seen the indictment.

20              THE COURT:  I'll sustain the objection.  It's been asked

21  and answered already.

22  BY MR. GIBBS:

23  Q.    Now, Mr. Idris, you testified that -- well, when Ali Timimi

24  asked you to write the note saying he was a peaceful man, at that

25  time, did you believe that he was a peaceful man?

**Idris - cross**

1   A.   As I said earlier, I don't remember him saying, "Write a note

2   saying that I'm a peaceful person," but if you ask me now, "Do you

3   think that he's a peaceful person?," yes, I think he's a peaceful

4   person.

5   Q.   And what do you base that upon?

6   A.   Upon my long relationship with him.  I see him as a normal,

7   peaceful human being.  I don't see him hurting people.  I

8   witnessed him, saw him at night, at 11:30 at night or so, going

9   with food and giving it to some orphans and to some widows in

10  Falls Church.  These are acts of a peaceful person.

11  Q.   And did you ever hear him say things that are not peaceful,

12  that were violent in other words?

13  A.   No.

14          MR. GIBBS:  Judge, at this time, we'd like to play the

15  two clips I mentioned earlier.  They're both from the tape

16  "Shiaism," and I don't believe we have a date on those.

17          MR. YAMAMOTO:  Do you have a location, Your Honor?

18          THE COURT:  Where do they come from?  And we need an

19  exhibit number, too.

20          MR. GIBBS:  These were seized from Aatique and Chandia's

21  residence.  We also got them from the Dar al-Arqam, and Ali Timimi

22  in the interviews didn't give us a date or time.  And I'll get you

23  an exhibit number.

24          It's two clips, Judge, from 10T16.

25          THE COURT:  All right.  And the clip numbers are?

**Idris - cross**

```
 1              MR. GIBBS:  60 and 61.
 2              THE COURT:  All right.
 3              (Government's Exhibit No. 10T16, Clip No. 60, was
 4   played; no government transcript provided.)
 5   BY MR. GIBBS:
 6   Q.   Now, Mr. Idris, have you ever heard Mr. Timimi saying that
 7   type of thing before?
 8   A.   If you don't mind playing it again, that would be good for
 9   me.
10              MR. GIBBS:  Sure.  We'll play it again.
11              (Government's Exhibit No. 10T16, Clip No. 60, was
12   played.)
13   BY MR. GIBBS:
14   Q.   And have you ever heard Ali Timimi espouse that type of
15   rhetoric?
16   A.   No.
17   Q.   So he's never lectured on that topic at Dar al-Arqam?
18   A.   He never gave a lecture in Dar al-Arqam about Shiaism.  I
19   don't remember him giving any lectures in Dar al-Arqam about
20   Shiaism.
21   Q.   All right.  And can you explain for the jury who the Shiah
22   are?
23   A.   You would need really a theologian to really explain things
24   about Shiaism, but Shias in general, they are a sect of Muslims
25   who they are about maybe 10 percent or so of the Muslim
```

**Idris - cross**

1  population.  This is what I heard from one of the scholars.  I'm
2  not sure whether I'm right or I'm wrong.

3        The mainstream of Muslims are those who are called
4  Sunnah, and Sunnah means they follow the way of the Prophet,
5  Prophet Muhammad, sallallahu alaihi wasallam, and they respect the
6  companions of the Prophet and so forth.  While one of the main
7  differences between them and the Sunnis is that some of them say
8  that the message of Islam was sent to the wrong person, it wasn't
9  sent to the right prophet, and they have certain beliefs like
10  that.

11        Some of them disrespect some of the companions of the
12  Prophet and so forth.  So what they, what they believe in is
13  considered to the, to the mainstream Muslims going astray; they
14  are not on the, they are not on the real practice of Islam.

15        Now, many of them, obviously, are, are people who are
16  ignorant.  They were born as Shiah.  They're just, you know, doing
17  what their forefathers were doing.  So this is really what I
18  remember.

19  Q.  Okay.  So in effect, the Shiah are not really on the correct
20  path, right?

21  A.  In general, yes.

22  Q.  And do you know what Ali Timimi's attitude is as far as
23  Shiites being on the correct path?

24  A.  As I said earlier, I never heard him giving a lecture about
25  Shiaism.

**Idris - cross**

1    MR. GIBBS:  All right.  Let's play that second clip.
2  It's clip 61 from the same lecture, "Shiaism."

3    (Government's Exhibit No. 10T16, Clip No. 61, was
4  played; no government transcript provided.)

5  BY MR. GIBBS:

6  Q.   All right, Mr. Idris, you testified earlier about the Shiah,
7  that they're not on the correct path.  Have you ever heard Ali
8  Timimi express the opinion that their heads should be lopped off?
9  A.   No, not in front of me, but this is something that you read
10  in many of the Muslims' book -- books, where they talk, for
11  example, about a person who insults the Prophet of God and what
12  would be a greater insult than saying that you are not the right
13  person who received the message?

14    So they say for a person like this, you don't just bring
15  him and cut his head off.  No one will say that.  But the -- many
16  of the Muslim jurists say that a person like this, he should be
17  brought, and you should argue with him, and you should convince
18  him about the truth and the fact that they are -- what they are,
19  what they are, what they are saying is completely wrong and it's
20  an insult to the Prophet, and an insult to the Prophet of God
21  ultimately leads the person to insulting God himself, meaning he
22  did not know who to send his message to.

23    And as a right of God or as a right of a Prophet of God,
24  you might find some of the jurists saying that after this person
25  does not accept the truth, he might be executed.

**Idris - cross**

1  Q.  All right, I'm not asking you about a book now.  I'm asking
2  you about Ali Timimi.
3  A.  Ali Timimi, I didn't hear him saying that.
4  Q.  Okay.  And did you ever hear him lecturing at Dar al-Arqam
5  saying anybody's head should be lopped off?
6  A.  No.
7  Q.  So the rhetoric on that tape is different from the rhetoric
8  you heard from Ali Timimi at the Dar al-Arqam?
9          MR. YAMAMOTO:  Your Honor, that's an answer to a
10  question that was asked, and to call it rhetoric is --
11          MR. GIBBS:  I'll change the words, Judge.
12          THE COURT:  Change the question.
13  BY MR. GIBBS:
14  Q.  The statements on that tape that you just heard, is it fair
15  to say they're different from the statements you heard Ali Timimi
16  make when he spoke at the Dar al-Arqam?
17  A.  I haven't heard every single lecture that Ali Timimi gave in
18  Dar al-Arqam.  From the lectures that I attended when Dr. Timimi
19  gave the lectures, I didn't hear him saying this statement.
20  Q.  Thank you.
21  A.  No problem.
22  Q.  Now, you testified earlier that during the June phone call
23  with Ali Timimi when he asked you to write a note saying he was a
24  man of peace, you don't recall if you ever wrote a note, correct?
25  A.  I said I don't recall him asking.  I said this like five

**Idris - cross**

1  times now I guess.  I don't recall him asking me to write a note

2  saying that he's a peaceful person.

3  Q.   All right.  But you testified that there was a time that you

4  were asked to do an affidavit for Ali Timimi, correct?

5  A.   Yes.  And that is something different, yes.

6          MR. GIBBS:  And if I could show the witness --

7          THE WITNESS:  Yes, I remember this affidavit.

8          MR. GIBBS:  Before we get to that, Judge, I think given

9  the fact that the witness still denies that he recalls being asked

10 that by Timimi, we ask to play the call in Arabic and see if that

11 refreshes his recollection.

12         THE COURT:  No.  Let's move on.

13 BY MR. GIBBS:

14 Q.   All right, Mr. Idris, you have before you what?

15 A.   Excuse me?

16 Q.   What's the document you have before you?

17 A.   Oh, this is an affidavit from myself, Yousuf Idris.  Do you

18 want me to read it or what?

19         MR. GIBBS:  No.

20         Actually, Judge, I'd like to go ahead and put it up on

21 the Elmo at this time.

22         THE COURT:  Any objection?

23         MR. GIBBS:  No, Your Honor.

24         THE COURT:  What's the exhibit number?

25         MR. GIBBS:  I'll get one for you, Judge.

**Idris - cross**

1           THE COURT:  Is this going to be a new number?

2           MR. GIBBS:  It is, Judge.

3           THE COURT:  All right.

4           MR. GIBBS:  We just need to get the next one in the

5   series.

6           Judge, this will be 10J15.

7           MR. YAMAMOTO:  Your Honor, I think this is outside the

8   scope of direct.

9           MR. GIBBS:  Judge, given the witness's testimony, the

10  fact that this is what he came up with in August of 2003, clearly,

11  this is within the scope of the direct.

12          THE COURT:  I think it's within the scope.

13          MR. GIBBS:  This is very relevant.

14          THE COURT:  I'm going to permit it.  Overruled.

15          And 10J15 is in evidence.

16          (Government's Exhibit No. 10J15 was received in

17  evidence.)

18          MR. GIBBS:  Thank you, Judge.

19  Q.  Now, Mr. Idris, if you could just explain to the jury what

20  was going on in August of 2003 that caused you to write this to --

21  to draft this affidavit?

22  A.  Oh, I remember Mr. Chris Smith calling me from the lawyer's

23  office.

24  Q.  And Chris Smith is -- was Ali Timimi's attorney?

25  A.  Yes.  Yes, was Dr. Ali Timimi's attorney.  And he said -- he

**Idris - cross**

1 asked me to write an affidavit for Dr. Ali Timimi stating what I
2 know, something that had happened between me and Dr. Timimi.
3 Q.   And did -- at that time, isn't it true that the 11 people
4 from Dar al-Arqam had already been indicted, and Mr. Timimi was
5 still concerned that he might be indicted?
6         MR. YAMAMOTO: If he knows, Your Honor.
7         THE COURT: Again, if he discussed that with you.
8         THE WITNESS: I don't really remember whether it was
9 before, after, during, but I remember that it was during the times
10 where Dr. Timimi was having discussions with the FBI.
11 BY MR. GIBBS:
12 Q.   Okay. And did he -- did Ali Timimi ever have any discussions
13 with you, his friend, where he said the FBI was still looking at
14 him as a target and he was concerned about being indicted?
15 A.   He might have mentioned something similar to that, yes.  I
16 wouldn't be surprised if he did.
17 Q.   And if he had mentioned something like that, don't you think
18 it would have stuck in your memory?
19 A.   Yes, yes.  I mean, in your words.  Exact words, I don't
20 really remember.  I want to be very exact.
21 Q.   And -- but -- back in August of 2003, you didn't want to see
22 your friend get indicted, did you?
23 A.   Of course, until now.
24 Q.   Of course not, right?
25 A.   Yes.

**Idris - cross**

1  Q.   And, in fact, you were hoping you could do whatever you could
2  to prevent him from getting indicted, correct?
3  A.   Yes, whatever, because there is a very clear verse in the
4  Holy Koran where it says that if the witnesses are called to
5  witness, then they should not, like, conceal their testimony.  So
6  for me, I knew something, and I said I have to come and say it.
7  Q.   Okay.  The witnesses should not conceal their testimony.
8  A.   Yes, meaning they -- when they're -- when they are called,
9  I'm sorry, the witnesses should not refuse when they are called to
10  testify, meaning for something that they know something about.
11  Q.   And when Chris Smith came to you to put together this
12  affidavit, what did he tell you, if anything?
13  A.   I don't remember the exact words of Chris Smith, but it was
14  along the lines of that, that I know something about this
15  paintball and I know that Dr. Timimi was against it, and he told
16  me, Can you write this affidavit about the fact that you know that
17  there are people playing this paintball and that one of them, I'm
18  pretty sure it was Yong Kwon, he came to Dr. Timimi and he told
19  him that, that he's the leader, also, and that Dr. Timimi, when he
20  was dropping me home, he told me that I told them, "Stop this
21  nonsense."
22        I remember this statement very well.
23  Q.   All right, we'll get to that in a moment.
24  A.   Sure.
25  Q.   You said a moment ago that the witnesses must not be silent,

**Idris - cross**

1   something along those lines, correct?

2   A.   Yes.   If the person is called to testify, he should come and

3   testify.   If you know the truth about a matter, then morally you

4   have to come and testify for it.

5   Q.   Well, last month, back on March 18, didn't John Wyman, who's

6   here in court, and Wade Ammerman, who's here in court, didn't they

7   come visit you at your place of work?

8   A.   Oh, yes, they did.   They did.

9   Q.   And didn't you say that you'd been expecting them when they

10  walked in?

11  A.   Excuse me?

12  Q.   Didn't you say that you'd been expecting them when they

13  walked in?

14  A.   What I said exactly is this:   Mr. John Wyman came to me and

15  Mr. Ammerman, they came to my office, and I told them in the

16  beginning, "Have a seat," and then I remembered the Golden Rule to

17  say, which Muslim lawyers have been giving people:   Don't talk to

18  the FBI without a lawyer present.

19          So I told them, "I'm sorry, guys.   I think we have to do

20  it the normal way."

21          They asked me, "What is the normal way?"

22          I said, "Get a lawyer."

23          They told me, "You are not a suspect or anything like

24  that.   You didn't do anything wrong."

25          I told them, "I know that I didn't do anything wrong,

**Idris - cross**

1    but I want to -- I want a lawyer," because we have a saying in my
2    country, in Sudan, if two people tell you that your head doesn't
3    exist, you'd better touch your head.  So I told them that there
4    are hundreds of people in the Muslim community emphasizing the
5    fact that you shouldn't talk to FBI without a lawyer.

6         So they went ahead and tried to ask me questions anyway.
7    I told them, "Please do it in the frame that makes me comfortable.
8    Let's -- I can get a lawyer.  I want you to respect my privacy.
9    We can get a lawyer and sit and talk."

10         And after that, they never contacted me again.
11   Q.   Well, didn't you leave it with them, though, that you would
12   contact them if you got a lawyer?
13   A.   Yes, that's true.
14   Q.   And did you get a lawyer?
15   A.   I asked a lawyer, and he told me, "It's up to you.  If you
16   want to call them and talk to them, you can.  If you, if you don't
17   want to call them, you don't have to call them.  Legally, you
18   don't have to call them back."

19         So I said to myself, If they call me back again, I'll
20   get a lawyer and sit and talk to them.
21   Q.   And who was that lawyer you talked to?
22   A.   I remember talking to Mr. Nubani in the mosque.  I met him
23   after one of the prayers, and I asked him as we were, I think,
24   getting out of the mosque or something.
25   Q.   That was Ashraf Nubani?

**Idris - cross**

1  A.   Yes.

2  Q.   And he told you you could talk to the FBI?

3  A.   He said, "Yes.  If there is a lawyer present, you can sit and

4  talk to them."

5  Q.   And didn't the agents tell you that they wanted to talk to

6  you about Ali Timimi and that it was a very important matter?

7  A.   No, they didn't mention Ali Timimi.  Agent Wyman said that

8  today in the morning, we talked to Mahmood Hasan, and he said

9  something about meeting with you or you knowing about his travels.

10 So we want to talk to you about that, and it's not going to take

11 time, and so forth.

12       I said, "I don't mind.  Just I want a lawyer to be

13 present."

14 Q.   Well -- and didn't the agent tell you that time was of the

15 essence and that it was very important they talk to you?  Yes or

16 no?

17 A.   Yes, they did.

18 Q.   And didn't the conversation end with you saying you would try

19 to get a lawyer and contact them again?

20 A.   Yes, it did.

21       MR. YAMAMOTO:  Objection.  That's been asked and

22 answered.

23       THE COURT:  All right.

24       MR. YAMAMOTO:  I think he's starting to badger the

25 witness.

**Idris - cross**

1       THE COURT:  Well, I don't think this is badgering.  I'll

2  overrule the objection.

3  BY MR. GIBBS:

4  Q.   And so isn't it fair to say that they were waiting for a call

5  back from you, correct?

6  A.   No.  Because I think if they were really concerned about it

7  and so forth, the person would call again.  The person would

8  follow up, would say, "What did you do?  Can we sit and talk?"

9  And so forth.

10      Plus, I know that this is my right.  If I choose to sit

11 and talk with a lawyer, I can.  If I don't choose to do that,

12 it's, it's my, it's my right.

13 Q.   It is your right.

14      And you knew that after they told you you weren't a

15 target or a subject, there was nothing that they were going to ask

16 you about that could implicate you, correct?

17      MR. YAMAMOTO:  Objection, Your Honor.  That's --

18      THE COURT:  All right, I think now it's getting

19 cumulative.  I'll sustain the --

20      MR. GIBBS:  I'll move on, Judge.

21 Q.   All right, let's get back to the affidavit, Mr. Idris.

22 A.   Sure.

23 Q.   At this time in August of 2003 --

24 A.   Um-hum.

25 Q.   -- had Ali Timimi talked to you about some of his concerns

**Idris - cross**

1  related to the indictment in this case?

2  A.    In the summer of --

3              MR. YAMAMOTO:  Your Honor, we've gone through this.

4              MR. GIBBS:  Judge, I'm trying to tie it to the

5  indictment.  The witness is being very evasive.

6              THE COURT:  Wait, wait, wait.  I don't want editorial

7  comments in front of the jury, but this is cross examination, and

8  they're now probing the affidavit, not the other issue, so I don't

9  think this has been fully developed.

10             MR. YAMAMOTO:  He's talking about the indictment.

11             THE COURT:  Well, but that's the background for how this

12 affidavit comes about.  So all right, overruled.

13 BY MR. GIBBS:

14 Q.    Now, Mr. Idris, wasn't the indictment designed to try to help

15 Ali Timimi not be indicted by the government?

16             THE COURT:  Whoa, whoa, whoa.  Not indictment.  You

17 misspoke in your question.  You mean the affidavit.

18             MR. GIBBS:  I'm sorry if I said it.

19 Q.    The affidavit that you put together for Ali Timimi, this was

20 something that it was hoped his lawyers could use to help argue

21 for why he should not be indicted, correct?

22 A.    Oh, yes, sure.

23 Q.    And Chris Smith came to you and wanted some information to

24 help in that, correct?

25 A.    Yes.

1  Q.  And he met with you, and you provided him with an incident

2  that occurred back in 2000 or 2001, correct?

3  A.  Let me see the date.

4         Yes.

5  Q.  And you told him that there was some time Ali Timimi gave you

6  a ride home after one of his lectures, and when you got home, he

7  said he was angry, right?

8  A.  Um-hum, yes.

9  Q.  Did he look angry?

10 A.  Yes, he did.  He looked so disturbed.

11 Q.  He looked so disturbed?  Have you ever seen him get that

12 angry before?

13 A.  Yes.

14 Q.  And can you describe for the jury what it was about his

15 demeanor that causes you to say he looked so disturbed?

16 A.  Well, I remember him when he stopped -- he was the one giving

17 me the ride home.  So I was sitting next to him, and when he

18 parked, when I was about to get out of my car, then he told me, he

19 told me that, he told me that -- I'm sorry, when I see someone

20 smiling or laughing or something, it disturbs me, so I need to

21 look this way, I guess.

22         When I -- when he stopped the car, he told me that one

23 of the brothers --

24 BY MR. GIBBS:

25 Q.  Sir, if I could stop you again, try to focus on the question

**Idris - cross**

1    at hand.

2              MR. YAMAMOTO:  Your Honor, he answered the question.

3              THE COURT:  Overruled.

4    BY MR. GIBBS:

5    Q.   The question is what was it about him that made you say he

6    looked so angry?  Just focus on that one question.

7    A.   Because if you have people playing this paintball thing and

8    they are --

9    Q.   Sir, I'm asking -- you're describing him physically.  You're

10   describing something you saw, correct?

11   A.   Yes.

12   Q.   What was it in Ali Timimi back in 2000 or 2001 that makes you

13   say that he, he looked so angry?

14   A.   What is it?  Meaning something like his face features?

15   Q.   Right.  Was his face red?

16   A.   Well, a Middle Easterner, it's very difficult to turn red,

17   but kind of, yeah.  His face looked different.

18   Q.   And did he -- did his voice get loud?

19   A.   Not loud, but one of the things that I think because he has,

20   as my hope God cures him, that sometimes you feel that he's

21   breathing in a different way or so.

22   Q.   His breathing was sort of heavy?

23   A.   Kind of.

24   Q.   Or fast?

25   A.   Maybe, something like that.

**Idris - cross**

1  Q.   All right.  And is there anything else about him that makes
2  you say he was so angry?
3  A.   The way he said the statement, "I told them to stop this
4  nonsense."  He said it this way.  So when a person says something
5  like that, you feel like he's saying it in a very strong way.
6  Q.   All right.  Well, let's go on just for a second.  You said he
7  learned from a paintball player.  Did he tell you who that was?
8  A.   I'm sure it was one of the paintball players.  I am not sure
9  whether it was Yong Kwon or not, but it might have been Yong Kwon
10 who said that.
11 Q.   Well, did he say it was Yong Kwon?
12 A.   As I said, I am not sure whether he mentioned Yong Kwon or
13 not, but I'm sure that he said one of the people who played, this
14 paintball player, and he was, like, like, leader or something like
15 that, going to appoint a leader or something.
16 Q.   All right.  And you put that in there, that they had -- the
17 area had been and were organizing paintball games and had selected
18 a leader, correct?
19 A.   Yes.
20 Q.   And you recall Timimi saying that?
21 A.   Yes, yes, he said that.  When they came to him, they told him
22 that we selected a leader for this paintball that we are playing
23 and so forth, and then he said, "Stop this nonsense."  He said, "I
24 told them, 'Stop this nonsense.'"
25 Q.   Well, you just said he said they came to him and told him

**Idris - cross**

1   about the paintball and told him they had selected a leader.

2   A.   Um-hum.

3   Q.   Was that because Ali Timimi was someone that they all looked

4   up to at the Dar al-Arqam?

5   A.   Of course.  He's a respected person, I mean, in Dar al-Arqam

6   and other places.

7   Q.   And they all called him "Sheikh," correct?

8   A.   Yeah, they called him "Sheikh"; they called him "Ali"; they

9   call him "Brother Ali."

10  Q.   So Timimi knew about the paintball when it started, correct?

11  Because these people had come and told him, right?

12  A.   I don't know if he knew when it started, but in Dar al-Arqam

13  in general, there are people who knew that there are people

14  playing paintball.

15  Q.   And do you have any -- well, strike that.

16          All right.  So at least during some of the period when

17  the paintball was going on, Timimi knew about it because he had

18  been told by some of the paintball players, right?

19  A.   I would assume so.

20  Q.   And that was either in 2000 or 2001, correct?

21  A.   Yes.

22  Q.   Now -- and you said Mr. Timimi told one of the paintball

23  players, "This is nonsense," and they need to stop this now,

24  correct?

25  A.   Yes, that they need to stop this nonsense.

**Idris - cross**

1  Q.   And you put that in quotes, right?  So is that a direct quote

2  of what he said?

3  A.   Extremely close to what he said:  "This is nonsense, and they

4  need to stop this."

5  Q.   And in August of 2003, you remembered his exact words from

6  2000 or 2001?

7  A.   2000, yes.

8  Q.   And what was it that Timimi was so upset about?  I mean, do

9  you know that there's anything illegal about playing paintball?

10            MR. YAMAMOTO:  If he knows.

11  BY MR. GIBBS:

12  Q.   If you know?

13  A.   No.  Illegal?  No.  I don't think there is anything illegal

14  about paintball.

15  Q.   And so what was it that Ali Timimi was so upset about

16  regarding an activity that's not illegal?

17  A.   Well --

18            MR. YAMAMOTO:  If he knows, Your Honor.

19            THE COURT:  Yes, only if you know.  Don't try to guess.

20            THE WITNESS:  Okay.

21            THE COURT:  Did he tell you why he was upset about them

22  playing paintball?

23            THE WITNESS:  No, he didn't tell me why he was upset.

24  BY MR. GIBBS:

25  Q.   And when you talk about being upset, was there anything about

**Idris - cross**

1  Timimi's demeanor that day as far as being upset that

2  distinguished him from the way Haytham acted on September 11 when

3  he was talking to Timimi?

4          MR. YAMAMOTO:  Objection, Your Honor.

5          THE COURT:  Well, there was the discussion about the way

6  in which people emote and that there might be cultural differences

7  in that.  I'm going to permit that question.  You raised it in

8  your direct.

9  BY MR. GIBBS:

10  Q.  Do you want me to repeat the question?

11  A.  No, you don't have to repeat it, but I think they were

12  similar.  You know, it's difficult to remember how the person's

13  face looked in one incident and then how it looked, you know,

14  again after a year or something.  But yeah, he looked different.

15  Q.  Well, he looked -- who looked different?

16  A.  Dr. Timimi's face and so forth looked different.

17  Q.  And different in what way from the way Haytham's face looked?

18  A.  Oh, Haytham is very white, so his face was completely,

19  completely red.  You can see that his -- yes, it's like, like, as

20  the judge said, like a heated discussion or so.

21  Q.  Okay.  It's heated.  And his face was -- so, I mean, his face

22  you really could see was red?

23  A.  Yeah.

24  Q.  And was he breathing heavily?

25  A.  I don't remember.

**Idris - cross**

1  Q.  And was he waving his arms around?

2  A.  He might have been, yes.  I don't remember him waving.

3  Q.  Just back to the affidavit real briefly, you said that Timimi

4  said that the paintball players had selected a leader for those

5  games.  Did he tell you who that leader was?

6  A.  As I said earlier, he might have told me that it was Yong

7  Kwon who talked to him and said that he was the leader, but it

8  might not -- it might have not been that he mentioned him.

9  Q.  Well, you've mentioned Yong Kwon's name a couple of times

10  today.  Is there a reason you didn't put Yong Kwon's name in the

11  affidavit back in August of 2003?

12  A.  Well, it might have been the lawyer's decision.  He might

13  have been just wanting the exact things that I know, because until

14  now, the things that are here are the things that I'm 100 sure

15  about, the things that I signed on.

16  Q.  And this affidavit was put together -- well, first of all,

17  did you give this affidavit to Timimi, or did you give it to one

18  of his attorneys?

19  A.  No, no, it was in the attorney's office, with just me and the

20  attorney in his office.

21  Q.  And once this was typed up, you read it, you signed it, and

22  you dated it, correct?

23  A.  Yes.

24  Q.  And you felt like this could possibly help Timimi avoid being

25  charged by the government?

**Idris - cross**

1   A.   Yes.

2   Q.   And obviously, it didn't work out so well, huh?

3   A.   Well, you never know.

4   Q.   And did you -- was it your intention to write an affidavit

5   that would be as helpful to him as possible?

6   A.   Excuse me?

7   Q.   Was it your intention to write an affidavit for Timimi that

8   would be as helpful as possible?

9        MR. YAMAMOTO:  Your Honor, he was asked to write the

10  affidavit by the attorney, so I think he's following the

11  attorney's directions.

12       THE COURT:  I think the proper question is, "In your

13  answers, what was your intention?," all right?  Go ahead, rephrase

14  your question.

15       MR. GIBBS:  Right.

16  Q.   In, in signing, dating, and agreeing to this affidavit, what

17  was your intention?

18  A.   What was my intention?

19  Q.   Yes.

20  A.   My intention was that I definitely know something that is

21  true, and I need to write it down, especially that the lawyer was

22  hoping that this is going to help him, and if this is something

23  true and I know about it, it is, you know, it's my obligation to

24  come in and write it.

25  Q.   All right.  And it was clear to you in 2003 that Timimi knew

**Idris - cross**

1  about the paintball, correct?

2  A.   Yes.

3  Q.   All right.  Do you know why he would tell anyone in 2003 that

4  he did not know about the paintball?

5  A.   No.  In 2003?

6  Q.   Yes, sir.

7  A.   You have to ask Timimi, I guess.

8  Q.   Okay.  But you don't have any explanation for that yourself?

9  A.   That he says in 2003 that he doesn't know anything about the

10  paintball?

11  Q.   Correct.

12  A.   No, I don't know about whether he said that or he didn't.  I

13  don't know.

14  Q.   All right.  Now, I just want to go back briefly to the

15  Haytham thing.  You said that Haytham -- you testified earlier

16  that you didn't think that he was angry, correct?

17  A.   Haytham?

18  Q.   Yeah.

19  A.   Yeah, he looked obviously different.  I said that in the

20  beginning, that the way that, that Dr. Timimi and Haytham Hantash

21  were talking and arguing, it was, it was different.  It's not like

22  just a normal conversation, but I also said that it is kind of

23  not, not unusual in our Arab culture I would say.

24  Q.   So with Haytham, that's not unusual, that's not a big deal,

25  but with Timimi talking about the paintball, it's your testimony

**J.A. 2132**

**Idris - cross**

1  that he was clearly angry?

2  A.   I didn't say that.  Timimi, when he told me about this --

3         MR. YAMAMOTO:  Your Honor, the affidavit indicates that

4  Dr. Timimi said he was angry.  Now, I'm not sure why --

5  BY MR. GIBBS:

6  Q.   Judge, the witness testified specifically --

7         THE COURT:  Wait, wait.  I think you've been over this

8  many times.  Let's move on to something else.  I'll sustain the

9  objection.

10        MR. GIBBS:  If I could just have a moment, Judge?

11  Q.   All right, Mr. Idris, after you provided this affidavit,

12  Chris Smith was the attorney you dealt with, correct?

13  A.   Yes.  In this matter, it was Chris Smith who called me.

14  Q.   Right.  And he was representing Ali Timimi at that time,

15  correct?

16  A.   I believe so.

17  Q.   Okay.  And didn't Chris Smith tell you after this affidavit

18  was provided to the FBI that the FBI wanted to talk to you?

19  A.   After this, yes.  I think he did.  I'm not sure, but I, I do

20  kind of remember that they wanted to talk to me about this.

21  Q.   And, in fact, didn't Chris Smith schedule an interview with

22  the FBI that you never showed up for?

23        MR. YAMAMOTO:  If he knows, Your Honor.

24        THE COURT:  All right.  If he knows.

25        MR. GIBBS:  All right.

**Idris - cross**

1   Q.   If you know, did Chris Smith schedule an interview with John
2   Wyman and the FBI that you failed to show up for?
3   A.   I don't know whether he really did schedule an appointment
4   with John Wyman or someone else, but I do remember him wanting me
5   to sit and talk to the FBI about, about Dr. Timimi.
6   Q.   And did you agree?
7   A.   I don't think I did.
8   Q.   And is there a reason you didn't?
9   A.   Yes, there are reasons.  If, if you -- if there is a door
10  that you don't want to open upon yourself, you shouldn't open it.
11  I mean, usually what happens is that after that, you would expect,
12  unfortunately, that you might be harassed by the FBI, that people
13  might try to come and do unpleasant things to you or to your
14  family or things like that.
15          So I didn't, I didn't want it, and I deeply in my heart,
16  I didn't feel that there is, like, a very strong need to do it.  I
17  thought that this affidavit was more than enough.
18  Q.   So you didn't think talking to the FBI might help your
19  friend, Ali Timimi?
20  A.   Talking to the FBI?
21  Q.   Correct.
22  A.   It might.  This is probably what I thought, and I don't
23  really remember exactly what was in my mind at that time.
24  Q.   But ultimately, you didn't talk to the FBI, correct?
25  A.   No, no, I didn't.  I just gave my affidavit, and that's it.

**Idris - cross**

1   Q.   And, in fact, you haven't talked publicly about the events

2   you've testified about the last two days until yesterday and

3   today, correct?

4   A.   Excuse me?

5   Q.   You haven't spoken publicly about the events of your

6   testimony until yesterday and today, correct?

7   A.   Publicly about these events?

8   Q.   Yes.

9   A.   Like what I said yesterday?

10  Q.   Yes, yesterday and today.

11  A.   Oh, yeah.

12  Q.   This is the first time you've talked about that?

13  A.   Like from yesterday until today?

14  Q.   Right.

15  A.   Yes.

16          MR. GIBBS:  Thank you.

17          THE COURT:  Is that it?

18          MR. GIBBS:  That's it.  Thank you, Judge.

19          THE COURT:  All right.  Mr. Yamamoto?

20          MR. YAMAMOTO:  No redirect.

21          THE COURT:  No redirect?

22          All right, does anybody anticipate the possibility of

23  calling Mr. Idris later in the trial?

24          MR. GIBBS:  Not the government, Judge.

25          THE COURT:  How about from the defense?

# Kennedy - direct

1              MR. YAMAMOTO:  No, Your Honor.

2              THE COURT:  All right, Mr. Idris, then you're excused as

3    a witness.  That means you can stay in court and watch the

4    proceedings or leave, but you're not to discuss your --

5              MR. YAMAMOTO:  Your Honor, I'm sorry, we may.

6              THE COURT:  All right.  Then, sir, then you cannot stay

7    in court.

8              THE WITNESS:  Oh.

9              THE COURT:  You're going to have to leave.  Thank you.

10   And do not discuss your testimony with any witness who has not yet

11   testified.

12             THE WITNESS:  Okay.  Thank you.

13                       (Witness stood down.)

14             THE COURT:  All right, your next witness?

15             MR. YAMAMOTO:  Luther Kennedy, Your Honor.

16             THE COURT:  All right.

17             MR. YAMAMOTO:  I'm hoping this will take us to the lunch

18   break and we'll be done with him by the lunch break, Your Honor.

19             THE COURT:  All right.

20             MR. YAMAMOTO:  I'm hoping.

21             THE COURT:  I understand.

22            LUTHER KENNEDY, DEFENDANT'S WITNESS, AFFIRMED

23                     DIRECT EXAMINATION

24   BY MR. YAMAMOTO:

25   Q.   Please state your name for the Court, and spell your name,

**Kennedy - direct**

1  please.

2  A.   Luther Kennedy, L-u-t-h-e-r K-e-n-n-e-d-y.

3  Q.   Thank you.

4         Mr. Kennedy, what's your present occupation?

5  A.   I'm a systems engineer.

6  Q.   Speak into the microphone.

7  A.   Systems engineer.

8  Q.   And back in 1999, did you start attending the Dar al-Arqam?

9  A.   Yes, sir.

10  Q.   And how did you hear about it?

11  A.   I was visiting the Pentagon, and someone mentioned that they

12  give lectures at Dar al-Arqam and they will be going over a book,

13  I believe the title was Purification of the Soul.

14  Q.   Are you Muslim?

15  A.   Yes, sir.

16  Q.   Had you always been Muslim?

17  A.   No, sir.

18  Q.   When did you become Muslim?

19  A.   '95.

20  Q.   And in '99, you indicated you were visiting the Pentagon.

21  What was your occupation then?

22  A.   Systems engineer.

23  Q.   For who?

24  A.   For the Defense Intelligence Agency in the Air Force, United

25  States Air Force.

# Kennedy - direct

1  Q.   Did -- you started to attend the Purification of the Soul

2  lectures?

3  A.   Yes, sir.

4  Q.   When were -- they were given on Fridays at the center?

5  A.   Yes, every Friday.

6  Q.   How many did you attend?

7  A.   I would, I would attend regularly every Friday.  So I

8  couldn't give you an exact number.  I've probably heard over 50 of

9  his lectures.

10  Q.   Lectures meaning Dr. Al-Timimi's lectures?

11  A.   Yes.  Well, he was the main lecturer, but there would be

12  other lecturers.  He's not the sole lecturer.

13  Q.   Okay.  You're saying 50 lectures total, not just

14  Dr. Al-Timimi?

15  A.   The majority would have been of Dr. Al-Timimi.

16  Q.   Okay.  And were his lectures all about purification of the

17  soul?

18  A.   That was the major topic, but, you know, there would be

19  always a question-and-answer session in which one could ask about

20  any topic, but the main topic during those lectures was

21  purification of the soul.

22  Q.   During the question-and-answer sessions, would terrorism or

23  jihad, things like that, come up?

24  A.   When I first went there, you know, I didn't know much about

25  Islam, so I would take those opportunities to ask him, you know,

**Kennedy - direct**

1  various questions.  I do recall him speaking about terrorism.  I

2  remember him saying terrorism in itself is un-Islamic.  In fact,

3  those Muslims who commit terrorist acts do more harm to Muslims

4  because they bring the wrath of the West upon the defenseless

5  Muslims.

6  Q.   Now, was this a lecture, or was this in response to a

7  question?

8  A.   I know that information.  I know I learned -- I know I heard

9  it from Dr. Timimi.  What lecture on what format I couldn't -- I

10  can't really say.

11  Q.   But it was at the center?

12        MR. KROMBERG:  Objection.  Could we let the witness

13  finish the answer?

14        MR. YAMAMOTO:  I'm sorry.

15        THE COURT:  One at a time.  Let the witness finish.

16  BY MR. YAMAMOTO:

17  Q.   I'm sorry, you can finish.

18  A.   Oh.

19  Q.   Were you done?

20  A.   I heard Dr. Timimi say that about terrorism.

21        MR. KROMBERG:  Judge, forgive me, I didn't catch the end

22  of the answer when the witness was answering the question, did you

23  hear it in a lecture or in the question-and-answer session, when

24  he was answering it.

25        THE COURT:  All right, we'll go over it again.

# Kennedy - direct

1          THE WITNESS:  Could you repeat the question, and I'll

2   answer it again?

3          MR. YAMAMOTO:  Can we have his answer read?

4          THE COURT:  No, let's just ask the question again,

5   please.

6   BY MR. YAMAMOTO:

7   Q.   Do you recall if it was given in a lecture or in

8   question-and-answer sessions?

9   A.   I don't recall.

10  Q.   Now, when you went to these sessions, were you dressed in

11  civilian clothes or military clothes?

12  A.   Civilian clothes.

13  Q.   Did Dr. Al-Timimi know you were in the military?

14  A.   Yes, sir.

15  Q.   Did he talk to you about that?

16  A.   We talked about -- the topic came up about what are good

17  jobs, you know.  Is selling alcohol a good job?  Is -- you know, I

18  mentioned that I was in the military.

19          We went down a series of what would be good jobs.  The

20  best job would be, you know, helping people like if you're a

21  doctor or along those lines, those jobs that physically help

22  people.  It was just a basic topic about employment and what jobs

23  would be good jobs and what jobs would be bad jobs, and that's

24  how -- that's how he discovered that I was in the military.

25  Q.   Were people telling him what their occupations were?

**Kennedy - direct**

1  A.    Exactly.

2  Q.    And what did he say about your occupation?

3  A.    Nothing really specific that I can recall. He just basically

4  went down the line of what would be good jobs, and, you know,

5  obviously, selling alcohol for a Muslim is not a good job.

6  Q.    Did he say being in the military is good or bad?

7          MR. KROMBERG:  Objection, Judge. The witness just said

8  he did not remember what Timimi said about his job.

9          THE COURT:  I believe that was the testimony.

10          MR. YAMAMOTO:  That's fine, Your Honor.

11  Q.    Do you recall if you brought up the topic of being in the

12  military and having to fight Muslims?

13  A.    Oh, yes, sir. He, he said -- okay. Yeah, he did say that in

14  itself, being in the military is not in itself a bad thing, but,

15  you know, obviously, Muslims can't kill Muslims, something along

16  those lines.

17  Q.    Did he say it was ever okay to kill Muslims?

18  A.    I learned from Dr. Timimi that there was a case when Muslims

19  were being tyrannical, for example. I believe it was in the case

20  of, I believe it was his, name was Ibn Taimiya. There was a case

21  of tyrannical Muslims, and the Muslims had to make a decision

22  whether or not to defend themselves against other Muslims, and it

23  was clear that although they were of the same faith as you, it's,

24  you know, it's a Muslim's responsibility to stop tyranny from

25  other Muslims. So something along those lines.

## Kennedy - direct

1  Q.   Was this told to you with a religious basis or a political

2  basis?

3  A.   No politics was discussed at Dar al-Arqam, so there was no --

4  you know, over the lectures, this is something I remember hearing,

5  that there was a case where there was an opportunity -- where

6  Muslims were confused what to do when being attacked by Muslims,

7  and someone had to make a decision, and the decision was, you

8  know, we have to defend ourselves.

9  Q.   Did -- do you recall in any of his lectures if he espoused

10  jihad and going on jihad?

11  A.   There was, there was no espousal or recruitment or anything

12  along those lines.  If someone was to ask a question, he would --

13  he'd be more than happy to answer your question if it was

14  concerning jihad, but there was no jihad or any type of

15  conversation along those lines.

16  Q.   What would you have done had he done something like that?

17  A.   Well, as far as, you know, you know, terrorism, as far as

18  terrorism and those types of things are concerned, you know, I

19  take those things personally because, you know, September 11, for

20  most Americans, that was your first exposure to terrorism, but

21  being in the military, you know, I've had my barracks blown up.

22  I've had restaurants blown up.  I've had -- you know, I was

23  interacting with the Marines who were blown up in Lebanon.

24       So I take those type of things personally.  So I would

25  be one of the first persons to identify an individual who is

**Kennedy - direct**

1    trying to threaten the United States of America.

2    Q.   And in listening to Dr. Al-Timimi's lectures, did you ever

3    feel like you had to report him?

4    A.   No, sir.  In fact, one of the -- one of the first lectures, I

5    guess one of the speakers, I believe it was a Dr. Idris, he said,

6    "The first thing I want to" --

7            MR. KROMBERG:  Judge, object to what Dr. Idris said

8    coming through this witness.

9            THE COURT:  Well, it depends on whether it's being

10   offered for the truth of its contents or, I mean, a lecture --

11           MR. KROMBERG:  What other reason could there be?

12           THE COURT:  I don't know.

13           Where were you going with this, Mr. Yamamoto?

14           MR. YAMAMOTO:  I don't know what the answer is, Your

15   Honor.

16           THE COURT:  Well, then you shouldn't ask the question.

17   He's your witness.  So I'll sustain --

18           MR. YAMAMOTO:  I didn't -- I wasn't looking for this.

19           THE COURT:  Then I'll sustain the objection.  Rephrase

20   your question.

21           THE WITNESS:  I don't even remember the question.

22           THE COURT:  There's no question pending.

23           MR. YAMAMOTO:  I have no further questions, Your Honor.

24           THE COURT:  All right.  Cross examination?

25                          CROSS EXAMINATION

# Kennedy - cross

```
 1  BY MR. KROMBERG:
 2  Q.   Good afternoon, Mr. Kennedy.  My name is Gordon Kromberg.
 3  We've never met, have we?
 4  A.   No, sir.
 5  Q.   Have you met anyone, either Mr. Gibbs or Agent Wyman or
 6  Mr. Ammerman or Mr. Alter before?
 7  A.   I've met Dr. Timimi.  I've met --
 8           MR. YAMAMOTO:  He's met me, Your Honor.
 9           THE WITNESS:  I met the lawyer.
10  BY MR. KROMBERG:
11  Q.   But nobody on this side of the court?
12  A.   Oh, no.
13  Q.   You say, Mr. Kennedy, that you attended the Purification of
14  the Soul lectures?
15  A.   Yes, sir.
16  Q.   At Dar al-Arqam?
17  A.   Yes, sir.
18  Q.   In 2001?
19  A.   I started in 1999 probably up to May of 2000.
20  Q.   And you didn't hear Ali Timimi talking in the Purification of
21  the Soul about jihad?
22  A.   If you could refresh my memory?  Because --
23  Q.   Well, do you recall him saying that jihad is no good if it's
24  for fame or buthe?
25  A.   No, sir.
```

1  Q.    That the sustenance of the ummah -- that's the Muslim word,
2  right?

3  A.    Um-hum.

4  Q.    The sustenance of the ummah is through jihad?  Did he say
5  that; do you recall?

6  A.    He may or may not have said that; I do not recall.

7  Q.    Do you recall him asking, "Why are the Muslims the poorest
8  people in the world?  Because there is no jihad.  Jihad in the
9  path of Allah is the way to make the ummah rich, not through the
10 IMF or World Bank loans"?  Do you recall that in the Purification
11 of the Soul lecture?

12 A.    Must have missed that meeting, sir.

13 Q.    How about, "When the lands are conquered, the riches of those
14 lands will be distributed.  Then there won't be any poor people.
15 This time will come"?  Do you recall that?

16 A.    Say that again?

17 Q.    Well, let me just play the tape then, and maybe you'll --
18 maybe this will jog your memory.  This is 10T9, clip 14,
19 "Purification of the Soul," that we obtained from Dar al-Arqam.

20 A.    But I will clarify one thing.  Usually when a non-Muslim says
21 "jihad" to me, that means some type of rape and pillage and kill
22 the infidel, okay?  When you're referring to jihad, I think it
23 helps to define it because if he's saying jihad, I need to
24 understand exactly what you're talking about.

25 Q.    How about when he says, "When the lands are conquered, the

1  riches of those lands will be distributed.  Then there won't be
2  any poor people"?  Would that be a reference to violent jihad
3  maybe?
4  A.    When the lands are --
5  Q.    Are conquered.
6  A.    When the lands are conquered.  That's, that's futuristic.
7  Q.    That's true.  That's futuristic.  Does that refer to a
8  violent jihad in any way?
9  A.    It could be -- jihad could be an internal.  You see, if --
10 Q.    Excuse me, could you conquer a land with --
11        MR. YAMAMOTO:  Objection.
12        THE WITNESS:  Well, let me answer the question.
13        THE COURT:  Just a minute, sir.  We can't have three
14 people talking at the same time, and when I'm talking, no one's
15 talking, all right?
16        Now, let the witness answer the question.
17        MR. KROMBERG:  Yes, ma'am.
18        THE WITNESS:  If people don't internally, okay, if, for
19 example, if I'm doing, committing acts that are harmful to myself,
20 if I don't take care of the internal struggle, the internal jihad
21 for myself, and if I sit back and, and do nothing, it could be
22 physical, or it could be spiritual, or yes, it could be violent,
23 but it really depends on the context of the, of the total topic.
24        And if you don't get it clarified -- in other words, you
25 could be listening to Dr. Timimi, and you could say, Well, you

**Kennedy - cross**                                    2000

1  said X, Y, and Z.  I didn't understand it.  And he clarifies it,

2  and he will say, Well, I was speaking of internal/I was speaking

3  of external.

4          The word "jihad" for a Muslim, the word -- it's a very

5  comprehensive word.  So the way that you're saying it is not how I

6  heard it.  I mean, to me, maybe I was at that lecture, but the way

7  that you're saying it, it's almost like the first time that I've

8  heard it.

9  BY MR. KROMBERG:

10  Q.   When Ali Timimi says -- excuse me.

11          During the Purification of the Soul lecture, Ali Timimi

12  said -- referred to when the lands are conquered, the riches of

13  those lands will be distributed.  Does that to you suggest that

14  he's talking about violent jihad?

15  A.   It doesn't seem like he's talking about us doing jihad.  It

16  seems like he's talking about someone else being attacked.  When

17  another country is attacked, being the Muslim country is being

18  attacked, raped, and pillaged.  I mean, that's what I'm hearing.

19  Q.   So --

20  A.   The Muslim is going out and conquering lands.  That's what

21  I'm hearing.  I'm hearing, in other words, there's a Muslim land,

22  and its lands are being attacked, and its riches are being robbed.

23          MR. KROMBERG:  Let's play clip 14 from 10T9 and ask you

24  if you recall hearing this.

25          (Government's Exhibit No. 10T9, Clip No. 14 was played;

**J.A. 2147**

1  no government transcript provided.)

2  BY MR. KROMBERG:

3  Q.   Now, Mr. Kennedy, do you recall hearing that part of the

4  Purification of the Soul lecture?

5  A.   Yes, sir.

6  Q.   You were there for that?

7  A.   Yes.

8  Q.   Now, in your view, did you understand Mr. Timimi to be

9  referring to violent jihad when he was talking about killing the

10  kafir?

11  A.   I heard him explain -- this is how I took it, you know, at

12  the time.  This is how I took it:  He was explaining the condition

13  of the current state of the Muslims, and the current state of the

14  Muslim is going out -- he described someone going out, fighting on

15  the battlefield, waging jihad for the sole -- for purposes other

16  than Islam, and in this case, he described purification for all

17  Muslims through jihad, in this case, violent jihad, but he said

18  there's a time will come when a mahdi will come, I believe.

19        So we're talking sometime in the future.  But it was not

20  like at the end of this, "Okay, guys, let's go wage a jihad.

21  Let's go."  No.

22        What he was doing was going through talking points in

23  the book.  In the book, the book mentions jihad.  This is the case

24  of Muslims today when it comes to jihad.  If they're waging jihad,

25  they're doing it for the purpose of money or buthe or something

**J.A. 2148**

**Kennedy - cross**                                    2002

1   insignificant concerning jihad, you know?  And then the next
2   topic, then the next topic, whatever was in the book.
3            But it was not to me, it was not an atmosphere of, okay,
4   let's go wage jihad.  It was next topic.
5   Q.   So you would agree with me that this part of Purification of
6   the Soul, Mr. Timimi was referring to violent jihad?
7   A.   Yes, sir.
8   Q.   Now, you also testified, did you not, that no politics were
9   discussed at Dar al-Arqam, correct?
10  A.   That I paid any attention to.
11  Q.   Well, the clip we just heard, when Mr. Timimi said that jihad
12  in the path of Allah is the way to make the ummah rich, not
13  through the IMF or World Bank loans, is that something in the
14  Koran about World Bank or IMF?
15  A.   It wasn't a political discussion.  He, he mentioned IMF.
16  Technically, you could put it in the political category.  Was it a
17  political discussion about IMF and what Muslims should do
18  politically?  Yes, it was political in that regard.
19  Q.   So you would correct your statement, your testimony, would
20  you not, that Dar al-Arqam -- politics was discussed by Ali Timimi
21  at Dar al-Arqam during Purification of the Soul?
22  A.   No, sir.
23  Q.   You would not correct your testimony?
24  A.   Not in the, not in the sense in which I'm talking about as
25  far as it was -- the main topics were best ways to make Salot,

1  best ways to purify one's soul, those types of things.  If you

2  want to talk about Palestine and Israel and what should we do

3  against those rulers who are robbing the Muslim countries and X,

4  Y, and Z, all sorts of things, were not discussed at Dar al-Arqam.

5           Were political topics mentioned intertwined between,

6  between normal conversations about Salot?  I would say yes.  Was

7  political discussions a, a theme?  No.

8  Q.    Do you recall in "Purification of the Soul" Ali Timimi

9  telling you it's -- it was not enough to merely want to know what

10 was going on in Chechnya or Kashmir; it was crucial to go forth

11 fighting in the path of Allah?

12 A.    I don't recall that.

13 Q.    Do you recall him saying -- ever saying in "Purification of

14 the Soul" anything about Chechnya?

15 A.    I would have to listen to the entire "Purification of the

16 Soul" and say yes, he said it.  As far as memory is concerned,

17 I --

18 Q.    You don't recall?

19 A.    I don't recall.

20           MR. KROMBERG:  I'd like to play clip 15 from 10T9 and

21 ask if that refreshes your memory.

22           (Government's Exhibit No. 10T9, Clip No. 15, was played;

23 no government transcript provided.)

24 BY MR. KROMBERG:

25 Q.    Mr. Kennedy, do you recall that portion of "Purification of

**Kennedy - cross**

1  the Soul"?

2  A.    I don't particularly recall it, no, sir.

3  Q.    Do you recall Mr. Timimi's telling you in the Purification of

4  the Soul lectures that the sign of a good death is to die as a

5  shaheed on the battlefield or on the way to the battlefield?

6  A.    I mean, I don't want to play tapes all day, but this has been

7  a couple years since I've heard this lecture.  I don't recall

8  that, either.  You can, I mean, you can play that, also.

9          MR. KROMBERG:  Let's try clip 8, 10T9, "Purification of

10  the Soul."

11          (Government's Exhibit No. 10T9, Clip No. 8, was played;

12  no government transcript provided.)

13  BY MR. KROMBERG:

14  Q.    Now, does that refresh your recollection in any way of

15  whether you've heard that?

16  A.    I heard it.  I don't remember if it was at the lecture.  I do

17  remember maybe at least reading it.

18          THE COURT:  All right, Mr. Kromberg, how much longer?

19  I'm not trying to rush you, but I --

20          MR. KROMBERG:  I'm guessing ten minutes.

21          THE COURT:  I think we ought to take our break then for

22  lunch so we don't get badly off schedule for the afternoon.  We'll

23  reconvene at 5 after two.

24          (Recess from 1:05 p.m., until 2:05 p.m.)

25

1                  A F T E R N O O N   S E S S I O N

2                          (Defendant and Jury present.)

3              THE COURT:  All right, where is the witness?

4                          (Witness present.)

5              THE COURT:  All right, Mr. Kromberg?

6                      CROSS EXAMINATION (Cont'd.)

7    BY MR. KROMBERG:

8    Q.    Good afternoon, Mr. Kennedy.

9    A.    Good afternoon, sir.

10   Q.    We were talking about "Purification of the Soul" before the

11   lecture (sic).  Did you buy that lecture by any chance?

12   A.    I bought the book.

13   Q.    The book, okay.  On sale at Dar al-Arqam?

14   A.    Yes, sir.

15   Q.    Did you buy any other tapes at -- excuse me, did you buy any

16   tapes of Mr. Timimi's lectures at Dar al-Arqam?

17   A.    Yes, sir.

18   Q.    Which did you buy?

19   A.    I think he had a tape called "The New World Order."  I think

20   there was a tape, there was a tape about an individual from

21   history.  I forget his name, though.  There was a series of tapes

22   about the mistakes of the youth or something along those lines,

23   the intellectual, intellectual mistakes of the youth, something

24   along those lines.

25   Q.    "The New World Order," "Mistakes of the Youth," and was there

**Kennedy - cross**                                    2006

1  another one?

2  A.   Yes, sir, but I -- it was -- I can't remember the name of the

3  tapes.

4  Q.   Okay.  Can you take a look at what we've marked as Government

5  Exhibit 10T1, which is in evidence?

6        And if we can put that one on the screen?

7        Is that the one you bought, "The New World Order"?

8  A.   That was the title.  This is not the cover.

9  Q.   When did you buy your copy of "New World Order"?

10 A.   Probably about five or six years ago.

11 Q.   So you're thinking 1999 to 2000?

12 A.   Yes, sir.

13 Q.   Did you ever see that particular copy -- that cover for "New

14 World Order" at Dar al-Arqam?

15 A.   No, sir.

16 Q.   If you turn over the back, it says "Dar al-Arqam

17 Publications," right?

18 A.   Yes, sir.

19 Q.   But you never saw that?

20 A.   I never saw this cover.

21 Q.   Sir, how old are you?

22 A.   42, 43 in June.

23 Q.   What is your job?

24 A.   I'm an information systems specialist.

25 Q.   Information systems specialist?

1   A.   Computers.

2   Q.   Information systems specialist for the Defense Intelligence

3   Agency?

4   A.   Currently for BAE Systems.  BAE Systems.

5   Q.   BAE Systems.  Is that a defense contractor?

6   A.   Yes, sir.

7   Q.   Okay.  Were you in the military before this?

8   A.   Yes, sir.

9   Q.   When were you in the military?

10  A.   From 1981 to 2001.

11  Q.   When in 2001 were you -- did you get out of the military?

12  A.   September 27 was my final day.

13  Q.   And what was your rank at that time?

14  A.   Technical sergeant, E-6.

15  Q.   I think you had testified earlier that Ali Timimi told you

16  that Muslims in the U.S. Army could not fight against Muslims.  Do

17  I have that right?

18  A.   Muslims cannot kill -- a Muslim cannot kill another Muslim.

19  Q.   And that's what he told you?

20  A.   Yes, sir.

21  Q.   When did he tell you that?

22  A.   It's something that I understand from, from going to the

23  lectures.  I couldn't give you an exact date.

24  Q.   What I'm getting at is, is this while you were in the U.S.

25  military that he told you that?

1  A.   Yes, sir.

2  Q.   Did you disagree with him about that?

3  A.   That Muslims could not kill other Muslims?

4  Q.   Right.

5  A.   No, sir, I don't disagree with it.

6  Q.   But what -- didn't you take an oath to defend the

7  Constitution of the United States in the military?

8  A.   Yes, sir.

9  Q.   Well, what happens -- was there a conflict between the oath

10 to defend the Constitution of the United States and the United

11 States Air Force and the obligation never to kill another Muslim?

12 A.   I never was put in a position to kill another Muslim.

13 Q.   But if you were sent to Iraq before 2001, you would not have

14 killed another Muslim?

15 A.   Yes, sir.

16 Q.   Yes, you would not have?

17 A.   Yes, I would not have killed another Muslim.

18 Q.   So you would -- if that situation had come up, you would have

19 broken your oath to the United States Air Force because that was

20 not as important as the principle that a Muslim does not kill

21 another Muslim?

22        MR. YAMAMOTO:  I think he's asking a hypothetical, and

23 I'm not sure this individual was in combat, so I don't think it

24 was a situation that he would have encountered.

25        THE COURT:  Well, I think the issue, though, about

**Kennedy - cross**                    2009

1   allegiance is relevant among other things to credibility, and so
2   I'll overrule the objection. You may ask the question.
3          MR. KROMBERG: Thank you, Your Honor.
4   Q.   Did you understand the question, Mr. Kennedy?
5   A.   Yes, sir. I would have done -- I would have done everything
6   in my power -- it's my opinion that they would have worked with
7   me.
8   Q.   Say again?
9   A.   It's my opinion that the military would have worked with me.
10  Q.   But what if there was a conflict between what the military
11  said to do and the enforcing the No Fly Zone over Iraq, for
12  example, which was the issue at the time?
13  A.   I actually enforced the No Fly Zone over Iraq as a Muslim.
14  Q.   Okay. Was that an issue -- so there was no issue to you
15  there of possibly killing another Muslim?
16  A.   It didn't, it didn't occur to me.
17  Q.   Okay. How about after 9/11, when you were still in the
18  military? Obviously, you got out on September 27, but right at
19  that time, if you had been ordered to go to Afghanistan to fight
20  against the Taliban, would you have done that?
21  A.   At that time, when they ran two aircraft into the Empire
22  State Building, I could have done anything to anybody.
23  Q.   That's a fair answer.
24          But what I'm getting at, if there came a time when your,
25  your military duty was to kill another Muslim as part of being in

1  the Air Force, what would you have done?

2  A.   Well, let me, let me explain it this way.

3          MR. YAMAMOTO:  Your Honor --

4          THE WITNESS:  I can answer this question clearly.

5          THE COURT:  Wait, wait, wait, I'm sorry.  You don't

6  control that situation.  The attorney who puts you on the stand

7  does.

8          Mr. Yamamoto, are you objecting?

9          MR. YAMAMOTO:  Your Honor, I think he's answered the

10  question.

11          THE COURT:  Yes, I think now we're beyond where we need

12  to be on a witness, so I'm going to sustain the objection.  You

13  can move on to something else if you have another topic.

14  BY MR. KROMBERG:

15  Q.   So is it correct then that you would break your oath to the

16  United States Air Force if necessary to protect another Muslim?

17          MR. YAMAMOTO:  He didn't say that, Your Honor.  That's

18  putting words in his mouth, and he said --

19          THE COURT:  Wait, don't have an argument on this.

20          MR. YAMAMOTO:  -- "I would do something else."

21          THE COURT:  I don't want the questions, although this is

22  cross examination, they can be leading, but they can't be

23  misleading, all right?

24          MR. KROMBERG:  I'm trying to -- I would love to have --

25          THE COURT:  Well, let's rephrase it, Mr. Kromberg.  Less

**Kennedy - cross**                                    2011

1  argument in the question.

2  BY MR. KROMBERG:

3  Q.   Is it correct that if ever you were -- if when you were on

4  active duty, if you had been put in the position where you would

5  have been ordered to do something that would kill another Muslim,

6  that you would have broken your oath to the Air Force?

7  A.   I would defend the United States of America to the best of my

8  ability.

9  Q.   Okay.  Does that mean you would comply with your oath?

10 A.   In a normal situation, for example, I was amongst Muslims.

11 If in Saudi Arabia, in United Emirates, like I said, in those two

12 Muslim countries, had our base been attacked, I would have

13 defended the base.

14 Q.   I'm not -- I appreciate that answer.

15 A.   Put it this way:  I would defend the United States to the

16 best of my ability.  There's no conflict between me being a Muslim

17 and defending the United States of America.  I don't know how more

18 I could plainly put this.

19 Q.   Well, how do you reconcile that with the principle --

20         MR. YAMAMOTO:  I think he's answered the question, Your

21 Honor.

22         THE COURT:  Yes, and I've already ruled we've done

23 enough on this.  Let's move on to another topic, Mr. Kromberg.

24 BY MR. KROMBERG:

25 Q.   Now, it's correct, is it not, that everyone who knew you knew

1   you would defend the United States of America against all enemies,

2   foreign and domestic?

3   A.   Yes, sir.

4   Q.   And all throughout Dar al-Arqam, everybody knew that Luther

5   Kennedy was going to stand up for America against any enemy?

6   A.   I have not talked to this particular topic with everybody at

7   Dar al-Arqam.

8   Q.   To your knowledge, everybody who knew you would think that?

9   A.   To my knowledge, I was a student trying to learn more about

10  Islam.   That's, that's as much as I can give you on that one.

11  Q.   Do you have any reason to believe that anyone at Dar al-Arqam

12  thought that you were anything less than a loyal patriotic

13  American who would defend his country against any enemy?

14  A.   I do not know the answer to that question.

15  Q.   The question is do you have any reason to believe.

16  A.   You're asking me -- ask me it again?

17  Q.   Do you have any reason to believe that anyone at Dar al-Arqam

18  might have questioned your loyalty to the United States?

19  A.   We never had any other topics as far as the military was

20  concerned, or there was no where is your loyalty or -- there was

21  no conversations along that line, so in my opinion, loyalty to the

22  United States, I'm assuming that everyone in there is loyal to the

23  United States.   So it's not like I was in some foreign country.   I

24  was in -- I'm assuming I'm in a place with other Americans.

25  Q.   Mr. Kennedy, please focus on my question.   Are you --

1          MR. YAMAMOTO:  He's answered the question, Your Honor.

2          THE COURT:  His answer is no.  That's what he's saying

3   without saying it.

4          MR. KROMBERG:  That's fine.  That's fine.  The answer is

5   no.

6          THE WITNESS:  No.

7          THE COURT:  You're saying you had no reason to believe

8   that they had that.

9          THE WITNESS:  I had no reason to believe, no.

10  BY MR. KROMBERG:

11  Q.   Okay.  And Mr. Timimi had no reason to believe that you were

12  anything else than a loyal, patriotic American?

13  A.   That question should be addressed to Mr. Timimi.

14  Q.   To your knowledge.

15  A.   To my knowledge, I would see no reason -- he knew I was a

16  member of the United States military.  I see no reason -- he

17  didn't say -- he didn't ask anything specific from me of being in

18  the military.  The conversation clicked to another topic

19  basically.

20          So, I mean, if you're talking to someone who's in the

21  United States military for 18 years, you have to think that they

22  have some loyalty to the United States of America.

23  Q.   So to your knowledge, Randall Royer -- did you know Randall

24  Royer?

25  A.   No, sir.

**Kennedy - cross**                    2014

1  Q.  Did you know Ismail Royer?

2  A.  No, sir.

3  Q.  Did you know Yong Kwon?

4  A.  No.  Well, these, these are new names to me from the press.

5  Q.  Okay.  Thank you for clarifying that.  I'm just focusing

6  on --

7  A.  Right.

8  Q.  -- before September -- before 2002.

9      Before 2002, you didn't know Yong Kwon, right?

10 A.  They may have been in the -- they may have been in the

11 audience, sitting around.  I may have said, "As-salamu alaikum,

12 how are you doing?," those type of things, but they probably never

13 heard of me, and the first time I heard of them was through the

14 press.

15 Q.  So you never engaged in any paintball activities with them,

16 right?

17 A.  No, sir.

18 Q.  And you never went down to the shooting range with them?

19 A.  No, sir.

20 Q.  You never watched jihad videos with them?

21 A.  No, sir.

22 Q.  Had you ever indicated to Ali Timimi in any way that you were

23 interested in going to fight in a violent jihad someplace in the

24 world?

25 A.  No, sir.

1  Q.   Had you ever indicated that to anyone at Dar al-Arqam?

2  A.   No, sir.

3  Q.   And it's correct -- is it correct that no one who knew you

4  would ever think there was any way you would do such a thing?

5         MR. YAMAMOTO:   That's an awfully broad question.

6         THE COURT:   Yes, I don't think there's any way someone

7  can say that they have reason to believe what other people might

8  know or expect of them.   I mean, it's one thing if they had

9  conversations, but trying to opine what people's impressions are,

10  I think, is too broad.   Sustained.

11  BY MR. KROMBERG:

12  Q.   Is it correct that you never intended to tell anyone that you

13  were interested in fighting in a violent jihad somewhere around

14  the world?

15         MR. YAMAMOTO:   That's not a very good question because

16  it's -- there's no good answer to that.

17         MR. KROMBERG:   Sure there is, Judge.

18         THE COURT:   Wait, wait.

19         MR. YAMAMOTO:   It implies an answer, whether it's a yes

20  or a no.

21         THE COURT:   I'm not sure.   Do you think you can answer

22  that question, sir?

23         THE WITNESS:   At the time, I was on jihad for the United

24  States of America in the United States Air Force.

25         MR. KROMBERG:   Thank you, Judge.   I have nothing further

**Kennedy - redirect**                                    2016

1   for Mr. Kennedy.

2          Thank you, Mr. Kennedy.

3          THE COURT:  All right.  Mr. Yamamoto, is there anything

4   further?

5                      REDIRECT EXAMINATION

6   BY MR. YAMAMOTO:

7   Q.   Mr. Kennedy, you were assigned to the Defense Intelligence

8   Agency?

9   A.   Yes, sir.

10  Q.   What were your duties there?

11  A.   Technical, computers, maintain the computer systems.

12  Q.   Did you have a security clearance?

13  A.   Yes, sir.

14  Q.   What was that?

15  A.   Top secret.

16  Q.   Did you have access to classified information?

17  A.   Yes, sir.

18  Q.   Were you assigned in a combat area?

19  A.   Yes, sir.

20  Q.   Where was that?

21  A.   I was assigned -- the No Fly Zone, Panama.

22  Q.   And you said you were in the Middle East?

23  A.   Yes, sir.

24  Q.   Where?

25  A.   Saudi Arabia and the United Arab Emirates.

# Kennedy - redirect

1  Q.    What were you doing there?

2  A.    Supporting the No Fly Zone and -- basically just supporting

3  the No Fly Zone.

4  Q.    Now, you went to hear these lectures -- what's a better way

5  to say this?

6          The lectures you attended, what was the basis for these

7  lectures?

8          MR. KROMBERG:  Objection, Judge.  How could, how could

9  the witness know what the basis for the lectures is?

10         THE COURT:  Well, I'm not sure it's a good question.

11 You need to rephrase that.

12 BY MR. YAMAMOTO:

13 Q.    The Purification of the Soul lectures, were they based on a

14 book?

15 A.    Yes, sir.

16 Q.    And that book was --

17         MR. KROMBERG:  Objection, Judge.  How does the witness

18 know whether a lecture was based on a book or not?  He wasn't the

19 one giving it, and he doesn't know what it was based on.  There's

20 a witness who can explain this, but it's not this witness.

21         THE COURT:  All right.  You can't -- the real problem is

22 you can't lead this witness.  He is your witness.

23         MR. YAMAMOTO:  I understand, Your Honor.

24         THE COURT:  All right?

25         MR. YAMAMOTO:  I'm sorry.

**Kennedy - redirect**                                   2018

1                    THE COURT:  So I'll sustain the objection.

2   BY MR. YAMAMOTO:

3   Q.   What book did you purchase for these lectures?

4   A.   Purification of the Soul.

5   Q.   And was the lectures based on the book?

6   A.   Yes, sir.

7                    MR. KROMBERG:  Objection, Judge.

8                    THE COURT:  What, if any, relationship was there between

9   the tapes and the book, if you know?  If you know.

10                   THE WITNESS:  Each book has each chapter.  Each chapter,

11  the first one could be about, you know, you could purify your soul

12  through prayer, for example, you know, and he would have talking

13  points on prayer.  The next chapter, more talking points, next

14  chapter, more talking points.

15  BY MR. YAMAMOTO:

16  Q.   So the -- how many lectures were there?

17  A.   I don't know the answer to that question.

18  Q.   Pardon?

19  A.   I don't know how many lectures there were, but I'd say at

20  least eight -- I attended at least eight weeks' worth.

21  Q.   Eight weeks' worth that you were aware of that you attended?

22  A.   I believe about eight weeks, yes.

23  Q.   And the lectures were based on specific chapters of the book?

24  A.   Each -- yes.  Each chapter, we'd read something from that

25  chapter, and he'd have talking points about that chapter.  He'd go

1   to the next chapter, more talking points.

2   Q.   Now, the government played you a number of tapes -- well,

3   before that, did, did he have the book with him?

4   A.   Yes, sir.

5   Q.   Where was it?

6   A.   He'd have his book -- we'd have the book -- each person would

7   have a book, and he'd have a book with his notes for each chapter.

8   Q.   Would you read from it?

9   A.   Would I read from the book?

10  Q.   Would he read from it?

11  A.   Yes.

12  Q.   And then would you talk based on what he'd read?

13  A.   Yes.

14  Q.   Now, they, they have played you a number of tapes with

15  respect to various portions of these lectures.  Are all these

16  based on the book and your talking points?

17  A.   If it, if it came from Purification of the Soul, that was the

18  whole -- the whole period was about that book, and the lectures

19  were based on that book.

20  Q.   So if he was talking about jihad or some of these other

21  things, they, they were based on what was in the book?

22  A.   Yes, sir.

23  Q.   You bought a number of other tapes, you indicated.

24  A.   Yes, sir.

25  Q.   You didn't hear those lectures live?

## Kennedy - redirect

ĬW

1  A.  From the tapes that I bought?

2  Q.  Yeah.

3  A.  No, sir.

4  Q.  Did any of those tapes talk about jihad or war that you

5  can -- if you can recall?

6  A.  Not that I can recall.

7  Q.  Okay.  The Purification of the Soul lectures, did they cause

8  you concern about the security of the United States?

9  A.  No, sir.

10  Q.  Did you consider any of those topics political?

11  A.  No, sir.

12  Q.  Were the topics anything other than theological?

13  A.  No, sir.

14  Q.  The questions that were asked, would they sometimes be beyond

15  the scope of the lecturß2120Xes?

16  A.  Yes, sir.

17  Q.  And would he answer them?

18  A.  Occasionally.  Sometimes he would want to stick to the topic.

19  Q.  Okay.

20  A.  Based on time.  There would be other times where if it had

21  some relevance, then he would answer some question even though it

22  was off the topic.

23  Q.  Now, in answering the question, would he have any reference

24  to either the Koran or hĭdeeths or some other religious area?

25  A.  Yes, sir.

**Kennedy - recross**                                        2021

1  Q.    Would he ever stray from that?

2  A.    No, sir.

3            MR. YAMAMOTO:  Thank you.

4            Nothing further, Your Honor.

5            THE COURT:  All right.  Is there any recross?

6            MR. KROMBERG:  Yes, Your Honor.

7                       RECROSS EXAMINATION

8  BY MR. KROMBERG:

9  Q.    Mr. Kennedy, you didn't just say that "The New World Order"

10  didn't have anything to do with jihad or warfare, did you?

11  A.    To be honest with you, I don't even -- it was history.  I

12  really don't remember the tape.  It's been a couple of years, but

13  to the best of my opinion, it was based on the original Christian

14  history and how it evolved into what it currently is and where it

15  possibly could go.

16  Q.    You don't --

17  A.    That's -- like I say, it's been --

18  Q.    You don't recall Ali Timimi saying in "The New World Order"

19  that there was an unrelenting attack to annihilate Islam from the

20  face of the earth?

21  A.    I wouldn't be surprised if that's on the tape.

22  Q.    You don't recall him saying in "The New World Order" that we

23  have to break the attack by any means necessary, including

24  physical attack?

25  A.    I'd have to -- I'm sure it's on the tape, sir.

**Kennedy - recross**

1  Q.    You don't recall him saying that the summit of peacemakers to

2  discuss the suicide bombing of Israeli buses was really a

3  declaration of war against Islam?

4  A.    I've heard a lot of things over the -- I've heard a lot of

5  things from the past five or six years.  If that's on the tape,

6  it's on the tape.  Ali Timimi said it, it's on the tape.

7  Q.    You don't recall him saying in "The New World Order" that the

8  New World Order is a -- the unit -- excuse me, you don't recall

9  him stating that the New World Order is a big, heavy, single stick

10 to clobber the Muslims, and the Middle East peace process is to

11 make the Arabs slave laborers for the Jewish finance houses

12 controlling Muslim resources?

13 A.    That's heavy, but it's been five-six years since I've heard

14 that tape.

15 Q.    Should I -- should we draw from this that you don't recall

16 what's on that tape?

17 A.    It's on the tape; I believe it's on the tape.  I haven't

18 heard it in five-six years, but you wouldn't be bringing it up if

19 it wasn't on the tape.

20 Q.    Well, when you were responding to Mr. Yamamoto when he asked

21 you was there anything involving jihad or warfare in the tapes you

22 bought, you were mistaken, correct?

23 A.    When we say was there anything on jihad or warfare, when I

24 listened to the tapes, I was listening to it from a New World

25 Order, and this is the current state we're in.  I didn't, I didn't

**Kennedy - recross**

1  listen to it and it was calling to anything.

2          So when you say jihad was on the tape, the tapes didn't

3  call me to anything.  I was drawn by the history portion of it,

4  and if there's jihad, that didn't stick out to me.

5  Q.  You said that it didn't call you to anything.  You don't

6  recall in "The New World Order" where Mr. Timimi said, "There will

7  not be a day of peace in the Middle East until the Day of

8  Judgment, when the Christians and the Jews are eradicated.  We

9  should fight in jihad in the Middle East for our own salvation

10 because if we don't, Allah will bring some other Muslims who

11 will"?

12         MR. YAMAMOTO:  Your Honor, Mr. Kennedy has indicated he

13 doesn't recall what's on the tapes.

14         THE COURT:  Well, I'm going to give one or two more of

15 these questions, and then we'll stop.  It's getting repetitive.

16 BY MR. KROMBERG:

17 Q.  If we could go back, Mr. Kennedy, didn't you just say that he

18 wasn't calling you in, in that tape to do anything?

19 A.  I didn't feel called to do anything.

20 Q.  Okay.

21 A.  And -- I didn't feel called to do anything from listening to

22 those tapes.

23 Q.  Now, I would like to distinguish between what you felt called

24 to do and what he said.  Do you recall -- don't you recall him

25 saying that we should fight in the jihad in the Middle East for

**Kennedy - recross**                                    2024

1  our own salvation because if we don't, Allah will bring some other
2  Muslims who will?
3  A.    I don't want to say I recall it, but I believe they're on the
4  tape.  I believe that's on the tapes.
5  Q.    You recall, don't you, that he discussed HAMAS in "The New
6  World Order" tape?
7  A.    No, sir.
8  Q.    You don't recall him being asked a question regarding the
9  permissibility under the sunnah of HAMAS suicide bombings killing
10  innocent people and his answer that HAMAS has a lot of beliefs
11  that we might find disagreeable.  Some of them are positions that
12  are soft with respect to the Shiah in Iran?
13  A.    That's not on the version of tapes that I have.
14  Q.    Did you buy your version at Dar al-Arqam?
15  A.    Yes, sir -- oh, I can't say that it had it on there.  I can't
16  recall hearing that.
17  Q.    Do you recall him in "The New World Order" saying, "Our enemy
18  until the Day of Judgment is the Christians, the Europeans, and
19  the Westerners"?
20  A.    Say again?
21  Q.    That our enemy until the Day of Judgment is the Christians,
22  the Europeans, and the Westerners?
23  A.    No, sir.
24  Q.    Let me refresh your recollection -- well, never mind.
25         THE COURT:  All right.

**Jamison - direct**                                    2025

1              MR. KROMBERG:  Thank you, Judge.  I have nothing
2     further.
3              THE COURT:  I assume no one's going to call Mr. Kennedy
4     again?
5              MR. YAMAMOTO:  No, Your Honor.
6              THE COURT:  All right, Mr. Kennedy, you're excused as a
7     witness.  You can stay in court and watch the proceedings or
8     leave, but you're not to discuss your testimony or anything you
9     hear with any witness who has not yet testified.  All right,
10    you're free to go.
11                        (Witness excused.)
12             THE COURT:  Call your next witness.
13             MR. YAMAMOTO:  Curt Jamison, Your Honor.
14             CURTIS JAMISON, DEFENDANT'S WITNESS, AFFIRMED
15                        DIRECT EXAMINATION
16    BY MR. YAMAMOTO:
17    Q.   Please speak into the microphone, Professor.  Please state
18    your name and spell your name for the Court.
19    A.   My name is Curtis Jamison.  That's C-u-r-t-i-s J-a-m-i-s-o-n.
20    Q.   Professor Jamison, where do you teach?
21    A.   George Mason University.
22    Q.   What do you teach?
23    A.   Computational biology.
24    Q.   What is that?
25    A.   It's the use of computers to solve biological problems and to

**Jamison - direct**

1  manage biological information.

2  Q.   Do you know Dr. Ali Al-Timimi?

3  A.   Yes, I do.

4  Q.   How do you know him?

5  A.   He was my student.

6  Q.   When?

7  A.   From about 2001 through 2004.

8  Q.   And was he more than your student at any point?

9  A.   Yes.  I'm glad to say he became my friend over the course of

10 the studies together.

11 Q.   And in the course of his studies, did he have occasion to

12 work for you or with you?

13 A.   Yes.  At one point, I was able to hire him on a grant that I

14 had.  He worked with us for a year and a half on that grant.

15 Q.   Now, approximately when do you recall he started working for

16 you?

17 A.   As far as I can remember, it was in fall 2001.

18        MR. YAMAMOTO:   Okay.  Can you hand him Defendant's

19 Exhibit 29, please?

20 Q.   Professor, you're going to be -- during the fall of 2001, was

21 there a project you two worked on?

22 A.   Yes.  We were working on a database to handle patient

23 information.

24 Q.   And was that presented anywhere?

25 A.   Yes, that was presented at a meeting in Cold Spring Harbor.

**Jamison - direct**

1  Q.   And take a look at Exhibit 29.

2  A.   Yes.

3  Q.   Is that familiar?

4  A.   Yes.  That is the program from the, from the meeting, the

5  abstract book.

6  Q.   And did Dr. Al-Timimi do work for that project?

7  A.   Yes.  We put together a -- we did some work, and we put

8  together a poster for this meeting.

9  Q.   And what was that poster you put together?

10  A.   It was a book -- it was a poster on creating a patient

11  database to study gene expression.

12  Q.   Can you give us a short layman's explanation of what you're

13  talking about?

14  A.   Yes.  With the completion of the genome project, we -- as

15  scientists, we can now measure the expression pattern of all the

16  genes in the human, and these are coupled with clinical trials and

17  clinical studies, and so we needed a way to tie together the gene

18  expression data with the patient data.

19  Q.   Was this the beginning of that project or the end of the

20  project?

21  A.   This was approximately the midpoint of that project.

22  Q.   And what did Dr. Al-Timimi do for that?

23  A.   For this, he had created a database schema and a -- and

24  database tables that we were presenting as a first pass.

25  Q.   And how much time did that take; do you recall?

# Jamison - direct

1  A.    I believe we worked on it over the course of three or four

2  months.

3  Q.    On a regular basis?

4  A.    Roughly, yes.

5  Q.    How many hours a week or --

6  A.    I met with him weekly for an hour or two, and he worked full

7  time on it, 40 hours a week, I presume.

8  Q.    At home and at school?

9  A.    Yes, sir.

10  Q.    Would he use his computers --

11  A.    Yes.

12  Q.    -- for this project?

13  A.    His computers and my computers, yes.

14  Q.    And were you putting something together?  Is this -- was it a

15  new idea that you-all were working on?

16  A.    It was an extension of putting together a bunch of existing

17  ideas into a format that was usable for our specific purposes of

18  doing -- building a patient cancer database.

19  Q.    This conference was, it looks like, September 28 to September

20  30.

21  A.    Yes.

22  Q.    How much time did it take to prepare for this conference?

23  A.    To put together the poster, I'm guessing we probably spent a

24  week or two on it.

25  Q.    And prior to that, were you working on the data?

**Jamison - direct**

1  A.    Prior to that, we were working on the design of the database

2  and gathering the requirements of all the information that we were

3  going to be storing in it.

4  Q.    To put on the poster?

5  A.    Yes.

6  Q.    Now, did Dr. Al-Timimi talk to you about traveling to New

7  York and some problems he may have been concerned with?

8  A.    Yes, he did.

9  Q.    Can you take a look at Defendant's Exhibit 41, please?

10          THE COURT:   Now, 29 is in evidence, right?   There was no

11  objection to 29?

12          MR. GIBBS:   There's no objection, Judge.

13          THE COURT:   All right.

14          (Defendant's Exhibit No. 29 was received in evidence.)

15          MR. GIBBS:   Judge, I would interpose an objection if

16  we're going to start getting into Mr. Timimi's statement again.

17  It sounds like there's some conversation coming up.

18          MR. YAMAMOTO:   I don't think so.

19          THE COURT:   Well, we're not there, so let's not have

20  preemptive strikes.

21          MR. GIBBS:   Thank you, Judge.

22          THE COURT:   Exhibit 41.

23  BY MR. YAMAMOTO:

24  Q.    Take a look at -- don't show it yet.

25          Take a look at Exhibit 41.

**Jamison - direct**

1   A.   Yes.

2   Q.   What is that?

3   A.   This is a letter that I wrote for Ali so that he could

4   forfend any possible issues traveling to this conference.

5           MR. YAMAMOTO:  I would like to enter the exhibit.

6           THE COURT:  Any objection?

7           MR. GIBBS:  No, Judge.

8           THE COURT:  All right, 41 is in.

9           (Defendant's Exhibit No. 41 was received in evidence.)

10          MR. YAMAMOTO:  May I publish it, Your Honor?

11          THE COURT:  Yes, sir.

12  BY MR. YAMAMOTO:

13  Q.   Without telling this Court what he said, why did you prepare

14  this letter?

15  A.   This was soon after the 9/11 terrorist attacks, and there was

16  some concern about traveling to this, to this conference.

17  Q.   With his traveling to the conference?

18  A.   With his traveling to the conference, yes.

19  Q.   Thank you.

20          Now, that conference was in Cold Spring Harbor, Long

21  Island, New York?

22  A.   Yes, correct.

23  Q.   Did you travel together?

24  A.   No.  I drove up myself, Ali came up later on the train, and

25  then we drove back together.

**Jamison - direct**

1  Q.   Did you-all present in this conference?  What did you do?

2  A.   We put the poster up.  Typically during a conference, there

3  is a poster session and chair sessions.  The chair sessions are

4  20-minute talks, and then the poster session is attended by

5  everybody at, at the conference, and all the results are put up on

6  posters.  And so we just presented at the posters.

7  Q.   Okay.  Can you take a look at Defendant's 30, please?  What

8  is that?

9  A.   Those are some notes that I made and gave to Ali with my cell

10  phone number, my home number, and routing, train routings.

11  Q.   This is for the trip to Cold Spring Harbor?

12  A.   Yes.

13  Q.   So he could contact you?

14  A.   Correct, yes.

15  Q.   Thank you.

16          THE COURT:  Are you moving that in, Mr. Yamamoto?

17          MR. YAMAMOTO:  Yes, Your Honor.

18          THE COURT:  Any objection to Defense 30?

19          MR. GIBBS:  No, Judge.

20          THE COURT:  All right, it's in.

21          (Defendant's Exhibit No. 30 was received in evidence.)

22          MR. YAMAMOTO:  Thank you.

23  Q.   So those were just telling him how to travel and in case he

24  was -- needed to get ahold of you, he had numbers for you?

25  A.   Correct, yes.

**J.A. 2178**

**Jamison - direct**

1  Q.   Did you have occasion to travel other places with

2  Dr. Al-Timimi?

3  A.   Yes.   The following September 2002, we went to a meeting in

4  Cambridge, England.

5  Q.   I'm going to hand you Defendant's 91.  Do you recognize that?

6  A.   Yes.   This is the program to the meeting that we went to in

7  2002.

8  Q.   And are you-all listed in there?

9  A.   Yes, we are.

10 Q.   And what did you present there?

11 A.   There we presented a different type of program that was --

12 intelligent agents, computer programs that go out to existing

13 databases and retrieve data automatically.

14 Q.   Now, is there a relationship between the conference that was

15 at Cold Spring Harbor and the conference in -- I want to say

16 Cambridge, but that's not what you said.  Wherever that is?

17 A.   Cambridge, Kingstowne.

18        Yes.  The work that we presented in England a year later

19 was pretty much a direct outgrowth of the work that we had been

20 doing before with the databases.  We discovered that we needed

21 mechanisms of collecting the data from external databases and

22 incorporating them into our gene expression database.

23 Q.   Now, were you also his professor?

24 A.   Yes.

25 Q.   And taught him some of his classes?

**Jamison - direct**

1   A.   Yes, I did.

2   Q.   Can you take a look at Defendant's 11 and 19, please?

3        THE COURT:  Are you moving 91 in?

4        MR. YAMAMOTO:  Yes, please.

5        THE COURT:  Is there an objection to 91?

6        MR. GIBBS:  I just need to see what it is, Judge.  We

7   don't have a copy in our book.

8        Oh, I'm sorry; it's in.

9        (Defendant's Exhibit No. 91 was received in evidence.)

10       THE COURT:  The next one you're looking at is 30?

11       MR. YAMAMOTO:  Defendant's 11 and 19, Your Honor.

12  Q.   What is that?

13  A.   These appear to be statements from GMU for graduate courses.

14  Q.   Do you recognize any of those courses?

15  A.   Yes.

16  Q.   What do you recognize?

17  A.   On No. 11, the fall '01, CSI 730, Biological Sequence

18  Analysis, was a course that I taught, and then -- yeah, it's the

19  same.

20  Q.   What does "CSI" stand for?

21  A.   It stands for computational sciences and informatics.

22  Q.   Is that your department?

23  A.   That is our old department, yes.  We merged and created a,

24  something called the School of Computational Sciences.

25  Q.   So it appears that all three of these courses are in that

1  department?

2  A.   Yes, they are.

3  Q.   Do you recognize the other two courses?

4  A.   739, Programming for Biologists, that may be a class that I

5  developed.  I'm not sure whether I was teaching it that semester

6  or not.  I think I was.

7           And then 899 is our colloquium, our seminar series.

8           MR. YAMAMOTO:  I'd like to move Defendant's 11 and 19

9  in, Your Honor.

10          MR. GIBBS:  No objection.

11          THE COURT:  All right, they're both in.

12          (Defendant's Exhibit Nos. 11 and 19 were received in

13  evidence.)

14  BY MR. YAMAMOTO:

15  Q.   Now, how many hours of class work did your course involve?

16  A.   The sequence analysis was, well, met from 7:20 to 10 p.m. on

17  Mondays, and then we expected another ten hours or so

18  approximately out of class in terms of homework and readings and

19  so forth.

20  Q.   Was there lab work?

21  A.   There were homeworks, yes.  Not lab per se.  Not -- computer

22  work.

23  Q.   This is biology.  You guys weren't dissecting frogs and

24  stuff?

25  A.   No.  No, it's computational biology.  We just touch

**Jamison - direct**

1  keyboards.

2  Q.   And the other two courses, are you familiar with the course

3  material and the coursework?

4  A.   Yes.   The programming course would have actually had a higher

5  requirement for out-of, out-of-class work, so that probably would

6  have taken up 15 to 20 hours a week.   And then the colloquium is a

7  one-credit hour, and that mostly involves showing up and listening

8  to the seminar and writing a report on it.

9  Q.   Do these classes require a knowledge of computers?

10  A.   Yes, they do.

11  Q.   Extensive knowledge of computers and programs?

12  A.   Yes, extensive.

13  Q.   And these courses were during what semester, can you tell?

14  A.   Yeah.   They were in the fall of 2001.

15  Q.   So September to January?

16  A.   September to December.

17  Q.   Now, in addition to these courses, he was working for you on

18  this project?

19  A.   Yes.

20  Q.   I take it the project was funded at some point?

21  A.   Yes.   It was funded by the Commonwealth Research Foundation.

22  Q.   And how long did the project last?

23  A.   That project lasted until June of 2003, I believe.   Is that

24  right?   I'm sorry.   It lasted -- that was a two-year project, so

25  it, I think it ended in, in 2003 or around 2003-2004.

**Jamison - direct**

1   Q.   Were there subsequent projects?

2   A.   I moved him for a little while on to another grant, but he --

3   we kept the same project going.

4   Q.   Was Dr. Al-Timimi a good student?

5   A.   Excellent.

6   Q.   Was he a good employee or worker for you?

7   A.   Yes.  He was an excellent employee.

8   Q.   Was he knowledgeable about the area?

9   A.   Very.

10  Q.   Did the coursework require more than just a knowledge of

11  biology or computational biology?

12  A.   The coursework itself, not really.

13  Q.   How about the project?

14  A.   The projects, they did.  For the projects, we needed the

15  ability to synthesize and think clearly and be imaginative.

16  Q.   And when did he work -- do work on the project if he had so

17  much schoolwork?

18  A.   That's a good question.  It's -- we squeeze it in.

19  Q.   You worked together?

20  A.   We worked together, yes, and as a graduate student, you're

21  expected to put in many, many hours.

22  Q.   At some point, did you take on another role with

23  Dr. Al-Timimi?

24  A.   As a friend?

25  Q.   With respect to his either schoolwork or degree work.

**Jamison - direct**

1  A.   Oh, yes, I'm sorry.  I misunderstood.  Yes.

2        In late 2003, he asked me to be his research advisor for

3  his dissertation.

4  Q.   Okay.  Now, when you were beginning this project in September

5  and October, I take it you guys were starting up on the project at

6  that point?

7  A.   Yeah.

8  Q.   Was there more work at that point than later, or was it all

9  about the same?

10  A.   It was all about the same.  It was pretty much even

11  throughout -- evenly distributed throughout the program that we

12  were working on.

13  Q.   Would you work weekends and evenings?

14  A.   Sometimes.  I tried not to, but we would go -- when we had

15  to, like, for example, we had to take a trip down to Charlotte to

16  meet with some folks, so we went down on a Saturday and spent a

17  Saturday down at University of Virginia.

18  Q.   Do you know if he would work on weekends and evenings?

19  A.   Yes.  Yes, he would.

20  Q.   Would he contact you about things?

21  A.   Yes.

22  Q.   The dissertation, what was your function with respect to

23  that?

24  A.   I was his advisor, so I helped him formulate the idea, and we

25  discussed his findings as he progressed through it, and then when

**Jamison - direct**                      2038

1   he was finished with it, I helped him write his dissertation, and

2   then he presented it to the committee.

3   Q.   Can you take a look at Defendant's 31, please?

4   A.   Yes.

5   Q.   Is it -- do you recognize that?

6   A.   Yes.   This is a copy of his dissertation.

7   Q.   And this is the project you worked with him on -- or, excuse

8   me, were his advisor for?

9   A.   Yes, correct.

10  Q.   And it was subsequently published or published at the same

11  time in hardbound; is that right?

12  A.   It -- after one -- one of the university requirements is

13  after it's submitted, it gets bound and placed into the library

14  and into the departmental library and so forth.

15  Q.   And do you have copies?

16  A.   Yes, I do have copies.

17          MR. YAMAMOTO:   May he just show them to the jury, Your

18  Honor?

19          THE COURT:   Well, we've got them -- I assume you're

20  going to move 31 into evidence?

21          MR. YAMAMOTO:   I am, Your Honor.

22          THE COURT:   All right, that's fine.   I assume there's no

23  objection?

24          MR. GIBBS:   There is none, Your Honor.

25          THE COURT:   All right, it's in evidence.

**Jamison - direct**

1          (Defendant's Exhibit No. 31 was received in evidence.)

2     BY MR. YAMAMOTO:

3     Q.   I take it he had to defend this?

4     A.   Yes, he did.

5     Q.   When did he do that?

6     A.   He did it in early December.

7     Q.   And I take it since I'm calling him Dr. Al-Timimi --

8     A.   Yes, he was successful.

9     Q.   -- he was successful.

10          Now, going back to 2001, that period in September, we

11    had the 9/11 tragedy.

12    A.   Yes.

13    Q.   Did you-all work -- continue working and continue going to

14    school?

15    A.   Yes, we did.

16    Q.   And the Cold Spring project, that wasn't deterred or slowed

17    down because of the --

18    A.   No, it was not.

19    Q.   Was school closed at any point?

20    A.   School -- yes.  The university closed the day of the attacks

21    at noon, and then I believe it was closed for a day or two after,

22    and then it reopened.

23    Q.   Now, those days that the school was closed, did Dr. Al-Timimi

24    continue to work on the project?

25    A.   Yes.

**Jamison - direct**

1  Q.  And you worked with him?

2  A.  Yes.

3  Q.  And that continued on throughout the rest of the -- I guess

4  you worked through -- on beyond the end of the semester.

5  A.  Yes, that's correct.  We worked, we worked through that

6  semester and into the next year.

7  Q.  So I guess -- I'm not familiar with George Mason, but the

8  Christmas break is at Christmastime?  Is that the end of the

9  semester?

10  A.  Yes.  That's the normal end of the semester, yes.

11  Q.  And so the two of you continued to work on through the

12  Christmas holidays?

13  A.  Yes.

14  Q.  So from September on -- did you work through the summer?

15  A.  Through some of the summer, yes.

16  Q.  So this was --

17  A.  He was a full-time employee at that juncture.

18  Q.  So this project began in September.  He's working pretty much

19  full time and going to school through December of that year and on

20  through the next year --

21  A.  Yes.

22  Q.  -- through the summer at some point?

23  A.  Correct, yes.

24  Q.  You-all take off some time during the summer?

25  A.  Sure, as needed.

1  Q.   But you continued to work on the project?

2  A.   Yes.

3  Q.   And it, it continued to be a full-time project?

4  A.   It did continue to be a full-time project.  The emphasis

5  shifted around a little bit, depending on the lab that we were

6  working with, but it was pretty much the same project.

7  Q.   Was the project successful?

8  A.   Yes, it was.  We presented a paper at a conference and had it

9  published in the IEEE Journals, and so that was a fairly

10 successful project.

11 Q.   What's the IEEE Journal?

12 A.   That's the Institute of Electronics and -- IEEE.  It's a

13 computational society.

14 Q.   Is this something, is this something that relates to disease

15 or anything?

16 A.   No.  It was a computer conference that we put our paper into

17 because it was actually a computational -- of computational

18 interests with the way that the program was implemented.

19 Q.   I'm sorry, the project that you were working on, did that

20 deal with a disease?

21 A.   That dealt with cancer, yes.

22 Q.   And what -- can you give us a little idea of what it was that

23 you were doing?

24 A.   Okay.  Yes.  The project was in conjunction with Inova and

25 Massey Cancer Center in Richmond and the NVCU to collect various

1    types of cancer samples, study the gene expression, and see what

2    genes are turned on and which genes are turned off in cancer, and

3    that was the biological end of it.  The computational end was to

4    analyze all of this data and to perform analysis of the data.

5    Q.    Are you, are you projecting what cells might become

6    cancerous?

7    A.    More we're looking to see what the common causes of the

8    cancer are and to see if, if there are any commonalities that we

9    can see between the cells.

10   Q.    The biological bases?

11   A.    Yes.

12   Q.    What's your degree in?  What's your doctoral in?

13   A.    Molecular biology.

14            MR. YAMAMOTO:  Okay.  Thank you.

15            I have no further questions, Your Honor.

16            THE COURT:  All right.  Any cross?

17            MR. GIBBS:  Briefly, Judge.  Thank you.

18                    CROSS EXAMINATION

19   BY MR. GIBBS:

20   Q.    Good afternoon, Professor Jamison.  My name is John Gibbs.

21   I'm one of the prosecutors in the case.  I just have a couple of

22   questions for you.

23            You talked about your relationship with Ali Timimi, that

24   he was a student and a friend, correct?

25   A.    Yes.

**Jamison - cross**

1  Q.  How open was Ali Timimi with you about his life outside of
2  work and outside of school?
3  A.  Fairly open.
4  Q.  Okay.  So did you know that he lectured Friday nights at the
5  Dar al-Arqam Islam Center?
6  A.  I knew that he lectured, yes.
7  Q.  Okay.  Did you ever go see any of his lectures?
8  A.  I did not.
9  Q.  Okay.  And you yourself are not Muslim, correct?
10  A.  No, sir.
11  Q.  Okay.  Did Ali Timimi ever comment to you about the fact that
12  you are not Muslim?
13  A.  No.
14  Q.  Okay.  And the two of you had a very warm, cordial
15  relationship both as a student-teacher and as colleagues, correct?
16  A.  Yes.
17  Q.  And always got along well?
18  A.  Absolutely.
19  Q.  Okay.  Now, you said you never went to any of his lectures at
20  the Dar al-Arqam.  Did you ever meet any of the people that he
21  lectured to at the Dar al-Arqam?
22  A.  I do not know.  I met many people.  I don't know whether they
23  attend his lectures or not.
24  Q.  Okay.  But it's fair to say that on September 16, 2001, you
25  were not at the home of Yong Kwon along with Ali Timimi, correct?

## Jamison - cross

1   A.    No, I was not.

2   Q.    You never met Yong Kwon before?

3   A.    No.

4           MR. GIBBS:  That's all I have.  Thank you, Professor.

5           THE COURT:  Any redirect?

6           MR. YAMAMOTO:  No, Your Honor.

7           THE COURT:  All right.  I assume nobody's going to call

8   the professor again?

9           MR. YAMAMOTO:  No, Your Honor.

10          MR. GIBBS:  No, Judge.

11          THE COURT:  All right.  Sir, then you're free to stay in

12  court and watch the proceedings or leave, but you're not to

13  discuss your testimony with any witness who has not yet testified.

14  Thank you.

15                      (Witness excused.)

16          THE COURT:  Call your next witness.

17          MR. MAC MAHON:  Your Honor, we just want to try to put

18  in some exhibits that we have.

19          THE COURT:  All right.

20          MR. MAC MAHON:  These are all documents, so I don't

21  think we're going to have a problem with them.  Defendant's

22  Exhibit No. 2 is a Borders Books and Music receipt.

23          THE COURT:  Hold on a second.

24          Any objection?

25          MR. KROMBERG:  Yes, Judge.  Maybe I'm missing something.

2045

1    I don't know who authenticated this as anything relevant to what
2    we're dealing with.
3              THE COURT:  Well, is authenticity or relevance the
4    objection?
5              MR. MAC MAHON:  This came from what was seized from his
6    house, what I got back from the government, Your Honor.  That's
7    where this document came from.  This is a receipt that was in his
8    home.
9              THE COURT:  To show that he purchased a particular book?
10             MR. MAC MAHON:  Yes, on September 13, 2001, Your Honor.
11   And the book -- we have the book as well.  That's the next
12   exhibit.
13             MR. KROMBERG:  No objection.
14             THE COURT:  All right.
15             MR. MAC MAHON:  That's 2 and 3.
16             THE COURT:  2 is in.
17             (Defendant's Exhibit No. 2 was received in evidence.)
18             THE COURT:  3 is apparently the book that was purchased
19   at that time.  That's in.
20             (Defendant's Exhibit No. 3 was received in evidence.)
21             THE COURT:  Go ahead.
22             MR. MAC MAHON:  I believe 11 was just admitted.
23             THE COURT:  Yes.
24             MR. MAC MAHON:  19 was admitted.
25             THE COURT:  Yes.

**J.A. 2192**

2046

1              MR. MAC MAHON:  32, Exhibit 32 are Randall Royer's phone
2   records from the government.
3              MR. KROMBERG:  No objection.
4              THE COURT:  All right.  All right, 32 is in.
5              (Defendant's Exhibit No. 32 was received in evidence.)
6              MR. MAC MAHON:  Exhibit 51.
7              THE COURT:  I'm going to need the other book.  Hold on a
8   second.  These are phone records apparently.  Is the government
9   objecting to any of this?
10             MR. KROMBERG:  No objection.
11             THE COURT:  All right, 51 is -- is it all phone records?
12             MR. MAC MAHON:  Yes, Your Honor.
13             THE COURT:  All right, 51 is in.
14             (Defendant's Exhibit No. 51 was received in evidence.)
15             MR. MAC MAHON:  52.  The Court may want to look at 52
16   before I --
17             MR. KROMBERG:  The government objects to 52, Judge.
18             THE COURT:  I think you'll need to lay a foundation for
19   52.  That's not in yet.
20             MR. MAC MAHON:  And 61.  The original of that -- the
21   original of that document is in the Court's file.
22             THE COURT:  Is there any objection to 61?
23             MR. KROMBERG:  Judge, we -- no, no objection.
24             MR. MAC MAHON:  That's why we have the original.  I
25   didn't get a --

1          THE COURT:  All right, 61 is in.

2          (Defendant's Exhibit No. 61 was received in evidence.)

3          MR. MAC MAHON:  Just a second, Your Honor.

4          Your Honor, the only other issue is some of the -- we

5     haven't -- Special Agent Wyman hasn't given us -- or maybe he

6     still has them -- some of the other documents that were brought in

7     by --

8          THE COURT:  Wait, wait.

9          MR. YAMAMOTO:  May I speak to counsel for a second,

10    please?

11         THE COURT:  Yes.

12         MR. MAC MAHON:  I take it he spoke to Mr. Yamamoto.  I'm

13    sorry.

14         THE COURT:  Go ahead.

15         MR. MAC MAHON:  Apparently, the government doesn't have

16    the documents that were brought in, so we can't put any of those

17    exhibits in as authenticated through the, through the agent.

18         THE COURT:  I don't know what you're talking about.

19         MR. MAC MAHON:  Do you remember a few days -- do you

20    want us to approach?

21         THE COURT:  Yes, come on up.

22         (Bench conference on the record.)

23         THE COURT:  All right.

24         MR. MAC MAHON:  I could be confused, Your Honor, but --

25    I'm sorry; I'm exhausted.

2048

1          THE COURT:  All right, I know.

2          MR. MAC MAHON:  But the -- when Agent Wyman testified,

3  he had documents that were shown, he said, to Al-Timimi.  There

4  were other ones in addition to the ones that the government got in

5  that we were going to put in because -- on the same basis, and my

6  understanding --

7          THE COURT:  In other words, these were documents that

8  Mr. Timimi had brought with him to the interview about which there

9  may have been some discussion?

10          MR. MAC MAHON:  Yes.  And those were the -- and my

11  understanding is that the agent didn't -- either doesn't know

12  where they are -- somehow, they're not there for whatever reason

13  there is, so I can't -- those ones I was hoping to put in I can't

14  get in.

15       .   MR. KROMBERG:  Your Honor, there were documents that

16  were provided, but the particular documents that Mr. MacMahon is

17  referring to the agent says he never got.  He did not get a resume

18  and did not get articles on the space shuttle.

19          Now, that's all I can say.  That's what he reports, that

20  he had -- he received documents from Ali Timimi and his lawyer,

21  but there's no resume, no articles --

22          THE COURT:  Well, one of the ways to get this in

23  without -- would be to call the attorney who was with Mr. Timimi.

24  I mean, Mr. Timimi is not the only one who was at those meetings.

25  There was the agent and, I assume, Nubani or whoever it was,

**J.A. 2195**

2049

1   Smith, who was representing him.

2           MR. MAC MAHON:  We're hoping just to -- see, the 302s

3   list some of these documents, and apparently, there's some concern

4   about which ones are which between the government and the defense.

5           THE COURT:  Just a second.  It's 3:00.  Today is

6   Thursday.  How many, if any, other witnesses do you have?

7           MR. MAC MAHON:  We're on the verge of resting, Your

8   Honor, once I can get all these documents sorted out.

9           THE COURT:  Okay.  How long is your rebuttal case?

10          MR. KROMBERG:  We were going to call --

11          THE COURT:  You don't have to tell me.  Just how long?

12          MR. KROMBERG:  -- one significant witness and two short

13  ones.

14          THE COURT:  Two or three hours at the rate we're going.

15          MR. KROMBERG:  I would think so.

16          THE COURT:  If all the testimonial evidence is finished

17  today, we're not going to do anything more on this case until

18  Monday.  You've got a three-day weekend to see if you can find the

19  documents or work this particular issue out.

20          MR. KROMBERG:  I think we can work this out, but I think

21  the Court can help on this one because the resumes issue can be

22  resolved; I know that.  It's the issue about these articles about

23  whether other people saw the crash of the space shuttle as an

24  omen.

25          We object to them even if they exist as irrelevant

**J.A. 2196**

2050

1  because the point here is not that Mr. Timimi saw that as an omen
2  but that he characterized it as a good omen and glad tidings.  So
3  we would say that even if Mr. Timimi -- we'll stipulate, we'll
4  stipulate for purposes of this discussion that he -- that there
5  are articles out there that other people saw the crash of the
6  space shuttle as an omen, but we say it's not relevant because the
7  relevance of Mr. Timimi's space shuttle statement is that he saw
8  it as a good omen and glad tidings.

9           MR. MAC MAHON:  And the way I read some of those
10  articles, Your Honor, some of these people have, I mean, it may
11  not have the exact same words, but some of them are even -- they
12  say good omens and other things.  I mean, it puts it in
13  perspective.

14           THE COURT:  This is Exhibit 52?

15           MR. MAC MAHON:  Yes, it's Exhibit 52.

16           THE COURT:  Well, I'll look at 52.  If that's what's
17  holding us up, let's get the testimonial evidence in.  Are you
18  going to ask any questions about 52?

19           MR. MAC MAHON:  No.  I'm just going to put that in.

20           THE COURT:  I'm holding them open.  Let me look at them.
21  There's a bunch of them, and I'll make a decision.

22           MR. KROMBERG:  I'll also add, Judge, even if other
23  people did say similar things about characterizing the omen, even
24  if they did, that's irrelevant.

25           THE COURT:  All right.  But that's it?  I'll want to

**J.A. 2197**

2051

1   make sure for the record, Mr. Timimi, I'm sure you've discussed

2   thoroughly with your counsel your right to testify and your right

3   not to testify.

4            THE DEFENDANT:  Yes, Your Honor.

5            THE COURT:  And you're comfortable with whatever

6   decision you-all have made?

7            THE DEFENDANT:  Yes, Your Honor.

8            THE COURT:  I just want that on the record.

9            MR. MAC MAHON:  Thank you, Your Honor.

10            (End of bench conference.)

11            THE COURT:  All right, Mr. MacMahon, subject to Exhibit

12   52, which, as I said, I'm taking under advisement, is there

13   anything further from the defense?

14            MR. MAC MAHON:  No.  Subject to what we took under

15   advisement, the defense rests, Your Honor.

16            THE COURT:  All right.  Now, does the government have a

17   rebuttal case it wants to put forward, and are you ready to

18   proceed?

19            MR. KROMBERG:  Yes, Your Honor.  We went faster than we

20   expected.  I'm not sure who's here.

21            THE COURT:  Well, I would rather try to keep the break

22   on schedule around 4:00, if we could do that, so can you ask

23   Ms. Spinks or somebody to go out and see who's here?

24            MR. KROMBERG:  Well, we're talking about inmate

25   witnesses, Judge.

**J.A. 2198**

2052

# Hasan - direct

```
 1              THE COURT:  Do we have anybody in the lockup?
 2              THE DEPUTY MARSHAL:  Your Honor, there's going to be a
 3   couple of minutes, depending on who you're going to call.
 4              THE COURT:  All right, let's do this:  We'll take a very
 5   short, five-minute stretch break so we can get the people up here,
 6   all right?
 7              MR. KROMBERG:  Thank you, Your Honor.
 8              THE COURT:  All right.
 9              (Recess from 3:10 p.m., until 3:19 p.m.)
10                          (Defendant and Jury present.)
11              THE COURT:  All right, Mr. Gibbs?
12              MR. GIBBS:  Judge, the government calls Mahmood Hasan to
13   the stand.
14              THE COURT:  All right.
15       ·   KHWAJA MAHMOOD HASAN, GOVERNMENT'S WITNESS, AFFIRMED
16                          DIRECT EXAMINATION
17   BY MR. GIBBS:
18   Q.   Good afternoon, sir.
19   A.   Good afternoon.
20   Q.   Sir, will you please state your name for the record and also
21   spell it for the record?
22   A.   It's Khwaja Mahmood Hasan.  First name, K-h-w-a-j-a; middle,
23   M-a-h-m-o-o-d; last name, H-a-s-a-n.
24   Q.   Mr. Hasan, when were you born?
25   A.   03/24/76.
```

**Hasan - direct**

1  Q.  Is that March 24, 1976?

2  A.  That's right.

3  Q.  And what country were you born in?

4  A.  Born in Pakistan.

5  Q.  Now, did there come a time that you moved to the United

6  States permanently?

7  A.  That's correct.

8  Q.  When was that?

9  A.  In late -- in early '90s, '90-'91.

10 Q.  And when you first moved to -- yeah, when you first moved to

11 the United States permanently, what was your immigration status at

12 that time?

13 A.  I had a green card.

14 Q.  And did that immigration status change at some point?

15 A.  Yes, I became a citizen.

16 Q.  Of the United States?

17 A.  That's correct.

18 Q.  When was that?

19 A.  In 1998, I believe.

20 Q.  Mr. Hasan, you are currently in custody?

21 A.  That's correct.

22 Q.  And what were you convicted of?

23 A.  Conspiracy and also a weapons charge.

24 Q.  Okay.  And was the conspiracy to violate the Neutrality Act

25 and to enlist in armed hostility?

**Hasan - direct**

1    A.   That's correct.

2    Q.   Against the United States, right?

3    A.   That's correct.

4    Q.   And it was also a conviction for using a firearm during a

5    crime of violence, correct?

6    A.   That's correct.

7    Q.   Where were you convicted of those offenses?

8    A.   In Alexandria, this court.

9    Q.   Right here in this courthouse?

10   A.   That's right.

11   Q.   How long of a sentence did you get for those offenses?

12   A.   I got eleven years and three months.

13   Q.   Why are you testifying here today?

14   A.   It's part of the plea agreement.

15   Q.   So you have a plea agreement in this case?

16   A.   That's correct.

17   Q.   And by the terms of that plea agreement, how are you

18   obligated to testify if you're called as a witness?

19   A.   Truthfully.

20   Q.   And do you understand what a rule 35 motion is?

21   A.   That's correct.

22   Q.   What is a rule 35 motion?

23   A.   It's a reduction of sentence.

24   Q.   And it's a reduction of sentence for doing what?

25   A.   For cooperation.

**Hasan - direct**

1   Q.   And who gets to decide whether the sentence is reduced or
2   not?
3   A.   The judge.
4   Q.   And is it your hope in this case to get a reduction in your
5   sentence?
6   A.   That's correct.
7   Q.   Mr. Hasan, I'd like to take you back to the year 2001,
8   specifically, right around the terrorist attacks on September 11,
9   2001.  Do you recall that period?
10  A.   That's correct.
11  Q.   Now, at some point after September 11, 2001, were you invited
12  to go to a gathering at the home of Yong Kwon?
13  A.   That's correct.
14  Q.   How did that come about?
15  A.   It was a coincidence.  I was just trying to -- I called him,
16  trying to find out how he's doing.
17  Q.   And did he invite you to his house?
18  A.   Yes.
19  Q.   And did you go to his house?
20  A.   Yes, I did.
21  Q.   And did you know what was planned at his house when you went
22  there?
23  A.   I was not sure.
24  Q.   And when you first got to Yong Kwon's house, who did you see
25  when you arrived?

**Hasan - direct**

1  A.    I can't recall, but I saw some people there.

2  Q.    Okay.  Can you give us the names of some of the people you

3  saw at Kwon's house?

4  A.    It was Aatique, it was Masaud, it was Ismail Royer, it was

5  Calipha, it was Yong Kwon, it was -- that's what I remember.

6  Q.    Okay.  And Aatique, that's Muhammad Aatique; is that right?

7  A.    Muhammad Aatique, yes.  And Ali Timimi, yes.

8  Q.    And Ali Timimi?

9  A.    That's right.

10  Q.    You said Masaud, that's Masaud Khan, correct?

11  A.    Masaud Khan, correct.

12  Q.    And Caliph is Caliph Basha?

13  A.    That's correct.

14  Q.    You mentioned Yong Kwon and Timimi.  How about Hammad

15  Abdur-Raheem.  Do you know him?

16  A.    Yes, I do.

17  Q.    And was he at that meeting?

18  A.    Right now, I don't recall.

19  Q.    Okay.  That's fine.

20        Now, who got to Yong Kwon's house first, yourself or

21  Timimi?

22  A.    I don't -- I don't know.  I don't know.  I don't remember.

23  Q.    All right.  And how did you get to Yong Kwon's house?

24  A.    I drove.

25  Q.    Okay.  So you drove your car?

**Hasan - direct**

1  A.  That's correct.

2  Q.  And do you know how Timimi got there?

3  A.  I am not sure, no.

4  Q.  Okay.  Now, was there anything unique or unusual about the

5  particular group of people that was at Kwon's house on that day?

6  A.  They owned guns.

7  Q.  And you say, "They owned guns."  With the exception of

8  Timimi, to your knowledge, did everyone at Kwon's house that day

9  own guns?

10  A.  I didn't own a gun.

11  Q.  Okay.  How about the other people there?

12  A.  Masaud Khan did.  Ismail did.  I believe Caliph Basha did.

13  Aatique didn't.  I don't believe Aatique had a gun, so --

14  Q.  How about Yong Kwon?

15  A.  Yong Kwon had a gun, yes.

16  Q.  Now, of the people you mentioned that owned guns, what type

17  of guns did they own?

18  A.  They had AKs, AK-47s.

19  Q.  And that's a type of rifle; is that correct?

20  A.  That's correct.

21  Q.  Now, other than that night at Yong Kwon's house, had you ever

22  been in a private home with Ali Timimi before?

23  A.  Before that?

24  Q.  Yes, sir.

25  A.  At a private home?  Maybe Ibrahim Hamdi's.

**Hasan - direct**

1   Q.   Okay.  And you had been in Ibrahim Hamdi's house previously

2   when Timimi was there?

3   A.   That's correct.

4   Q.   But other than that, Yong Kwon's was the first time that

5   happened?

6   A.   I can't recall, but --

7   Q.   Now, once everyone got to Yong Kwon's house, did Timimi speak

8   to the group?

9   A.   Yes.

10  Q.   And how were the people arranged in the room when Timimi

11  spoke to them?

12  A.   We were told to close down the blinds.  We were told to close

13  down our phones, shut off our phones.

14  Q.   And who told you to do that?

15  A.   I believe Ali Timimi did.

16  Q.   All right.  And did he say anything else other than closing

17  down the blinds -- and when you say closing down the phones, you

18  mean turning off phones?

19  A.   That's correct.

20  Q.   Other than that, did he say anything else regarding secrecy?

21  A.   That this meeting is an amana.

22  Q.   What does the term "amana" mean?

23  A.   Trust.

24  Q.   And when Ali Timimi told you to shut your phones off, did you

25  shut your phone off?

# **Hasan - direct**

1  A.   Yes, I did.

2  Q.   Now, had Ali Timimi ever told you to do these types of things

3  before?

4  A.   Not that I could recall, no.

5  Q.   And other than yourself, did everyone comply when Timimi told

6  them to shut their phones off?

7  A.   Yes.

8  Q.   Now, when Timimi asked you to do that, did you know why you

9  needed to shut your cell phone off?

10  A.   No, I did not.

11  Q.   And did anyone leave the meeting at that point?

12  A.   No.

13  Q.   Now, after telling everyone in the meeting to shut their cell

14  phones off, what did Timimi then go on to say?

15  A.   I remember him stating that Mullah Omar has called upon the

16  Muslims to defend Afghanistan.

17  Q.   Okay.  And when he said Mullah Omar, do you know who Mullah

18  Omar is first of all?

19  A.   Yes.

20  Q.   Who is Mullah Omar?

21  A.   He was, I guess, the amir of Afghanistan at that time or in

22  the country of Afghanistan.

23  Q.   And he said Mullah Omar has called on Muslims to help defend

24  Afghanistan?

25  A.   That's correct.

**Hasan - direct**

```
 1   Q.   And when he said that, did he elaborate on that point at all?
 2   A.   I remember, like, the three options that were given was that
 3   either to, either to go make hijra, which is to leave the country,
 4   or to go and defend Afghanistan and defend the Muslims in
 5   Afghanistan, or to, like, lay as a rug in your house as an
 6   analogy.
 7   Q.   All right.  And in terms of defending Afghanistan, who did
 8   you understand Afghanistan needed help defending from?
 9   A.   As I understood it, from against the Americans.
10   Q.   And why was that your understanding?  How did you know that
11   it was the Americans that the mullah of Afghanistan needed help
12   defending?
13            MR. MAC MAHON:  Your Honor, objection unless it's
14   something the defendant said.
15            MR. GIBBS:  Judge, I could follow that up if --
16            THE COURT:  All right, go ahead.
17   BY MR. GIBBS:
18   Q.   Were you following the news at that time regarding
19   Afghanistan?
20   A.   Yes, I was.
21   Q.   And what was your understanding of what was happening in
22   terms of a possible invasion of Afghanistan?
23   A.   I knew that there was -- that we assumed the Americans would
24   be invading Afghanistan.
25   Q.   And how did you know that?
```

**Hasan - direct**

1   A.   Because of the news and because of after 9/11 attacks.

2   Q.   So this was widely reported in the news?

3   A.   That's correct.

4   Q.   And you said that Timimi said the amir of -- or the mullah,

5   Mullah Omar needs help in defending Afghanistan, and he gave the

6   three choices.  While he was talking to the people there, did he

7   refer to anything as he was speaking?

8   A.   I remember that he had a paper which was Sheikh Uqla's fatwa.

9   Q.   And where was this paper while he was speaking?

10  A.   It was in his hand.

11  Q.   And do you know what language this paper was written in?

12  A.   It was in Arabic.

13  Q.   Do you speak Arabic?

14  A.   Very little.

15  Q.   Now, how do you know that it was Sheikh Uqla's fatwa?

16  A.   Later on, I got to find out when I was shown the copy of it.

17  Q.   Who did?

18  A.   The FBI did in translation.

19  Q.   But at the meeting itself, when Ali Timimi was talking with

20  the paper in his hand, did anyone there in the, in the group ask

21  him anything about it?

22  A.   Masaud Khan requested to get the fatwa.

23  Q.   And what did Masaud Khan say to request the fatwa?

24  A.   He just requested to see it.

25  Q.   And how was everybody arranged in the room then when Masaud

**Hasan - direct**

1  Khan asked to see it?

2  A.   In a circle on the floor.

3  Q.   And was everyone seated on the floor?

4  A.   Yes.

5  Q.   And did Timimi give Masaud Khan the document when he asked

6  for it?

7  A.   That's correct.

8  Q.   And what did -- what, if anything, did Timimi say to Masaud

9  Khan when he gave him that document?

10 A.   He told him to, once he was done with it, to burn it.

11 Q.   And did he say anything else about the document?

12 A.   I don't recall anything else.

13 Q.   Now, at any point during that meeting, did the people that

14 Timimi was speaking to get a chance to ask him any questions about

15 what he had said?

16 A.   I asked him a question regarding whether I should ask my

17 parents to -- whether I should go or not, and he said it was

18 something that was fard, meaning obligatory for me to go.  That's

19 why I don't have to ask.

20 Q.   Try to keep your voice up a little bit.

21        But the question that you asked him specifically was

22 what?

23 A.   Whether this was obligatory for me to go or not.

24 Q.   Obligatory to go where?

25 A.   To go to Afghanistan to fight.  And he said -- to ask my

1  parents regarding permission, and he said, "You don't have to ask
2  your parents for permission."
3  Q.   And did Timimi tell you why you didn't have to ask your
4  parents' permission to go to Afghanistan to fight?
5  A.   It was obligatory.
6  Q.   And did he use a particular term to describe how it's
7  obligatory?
8  A.   It was fard ayn, just obligatory.  That's how I remember.
9  Q.   Do you know how to spell that term?
10 A.   F-a-r-d.
11 Q.   Fard?
12 A.   Yes.
13 Q.   And what does that term mean?
14 A.   Obligatory.
15 Q.   And what is the significance of an obligatory jihad?
16 A.   What I understand is that you -- is that it's something that
17 everybody has to do.
18 Q.   And is there a difference between an obligatory jihad and a
19 nonobligatory jihad?
20 A.   It's not -- it's not incumbent on any other -- just the
21 people who are living in the country to participate in it, but
22 nobody has to come from outside to do it.
23 Q.   And what you just described there, is that the obligatory
24 type or the nonobligatory type?
25              MR. MAC MAHON:  Your Honor, objection unless this is

**Hasan - direct**

1  something that Mr. Timimi told him.

2          MR. GIBBS:  Judge, if this witness --

3          THE COURT:  Wait just a second.

4          MR. MAC MAHON:  The intent of the witness is to be

5  determined by what he said.  What was in this witness's mind can't

6  be determinative of that.

7          MR. GIBBS:  Judge, if the defendant was using terms that

8  he's familiar with and he can describe, then he can certainly

9  testify to them.

10         THE COURT:  I'm going to overrule the objection, but

11  have you -- are these terms that you had heard before?

12         THE WITNESS:  Yes, I have.

13         THE COURT:  All right.

14  BY MR. GIBBS:

15  Q.   And the description you just gave about it's not incumbent on

16  everybody, is that the obligatory type or the nonobligatory type

17  of jihad?

18  A.   That's nonobligatory.

19  Q.   And on September 16, 2001, when Ali Timimi told you these

20  things about Mullah Omar and Afghanistan, were you inspired by

21  this message?

22  A.   Yes, I was.

23  Q.   Now, had you ever considered going abroad to fight before you

24  heard Timimi speak that night?

25  A.   No.

**Hasan - direct**

1  Q.    And after hearing him speak that night, were you then

2  inspired to go fight?

3  A.    Yes, I was.

4  Q.    And fight against whom?

5  A.    Fight against the invaders, Americans.

6  Q.    And what did you understand was the relationship between the

7  Taliban and Al-Qaeda at that time on September 16, 2001?

8  A.    I know they were hosting Al-Qaeda in Afghanistan.  That's

9  what I knew.

10  Q.    And who was hosting the Al-Qaeda in Afghanistan?

11  A.    The Taliban were.

12  Q.    And what was the significance of the fact that the Taliban

13  was hosting Al-Qaeda in terms of what Timimi said to you that

14  night?

15  A.    I don't recall.  If you can repeat that question again

16  actually?

17  Q.    Well, what was the significance in terms of what Timimi was

18  talking about that night of the fact that the Taliban was hosting

19  Al-Qaeda in Afghanistan?

20        MR. MAC MAHON:  Again, Your Honor, it's limited to what

21  he said.  If it's something that's in his mind, that's different.

22        THE COURT:  I think if it was explained, it's proper,

23  so -- do you understand the question?

24        THE WITNESS:  Yeah, I do.

25        THE COURT:  All right, go ahead and answer it.

**Hasan - direct**

1           THE WITNESS:  I don't -- I don't know.

2   BY MR. GIBBS:

3   Q.   Now, you testified that you had been following the news

4   during this time.  Was there news regarding a decision that the

5   Taliban was faced with at that time?

6   A.   Yeah.  The, the decision was to either -- to kick out the

7   Al-Qaeda from the country, but the Taliban had requested that they

8   be given all the evidence and they will prosecute them in

9   Afghanistan.

10  Q.   Thank you.

11          Now, Mr. Hasan, was it clear to you on the day that

12  Timimi spoke to you at Kwon's house that a U.S. invasion of

13  Afghanistan was likely to occur soon?

14  A.   Yeah.

15  Q.   And that's from the news reports you testified about earlier?

16  A.   That's correct.

17  Q.   Now, at any point during that meeting at Yong Kwon's house,

18  did Nabil Gharbieh show up?

19  A.   Yes, he did.

20  Q.   Who is Nabil Gharbieh?

21  A.   He was a regular member of the paintball and Dar al-Arqam.

22  Q.   And this is the paintball that a number of people in that

23  meeting took part in, correct?

24  A.   That's correct.

25  Q.   And you said he was a regular member of that group.  Did

1  Nabil Gharbieh show up with anyone who was not a regular member of
2  that group?
3  A.   With Sherdil.
4  Q.   Do you know Sherdil's full name?
5  A.   No, I don't know.
6  Q.   And what happened when Nabil Garbieh first walked into the
7  meeting with this Sherdil person?
8  A.   It went silent, and we stopped talking.
9  Q.   When you say "it went silent," who was actually talking
10 before Nabil got there?
11 A.   Ali Timimi was.
12 Q.   And when Nabil got there with Sherdil, you said it went
13 silent?
14 A.   Yes.
15 Q.   And did Nabil and Sherdil stay there at Kwon's house?
16 A.   No.
17 Q.   Why not?
18 A.   I think Nabil understood that he --
19 Q.   Well, I mean, without telling us what somebody else said, are
20 you able to do that?
21 A.   No, I -- just from the meeting, I can understand that --
22          MR. MAC MAHON:  Well, Your Honor, if it's his
23 impression, that's not admissible.
24          THE COURT:  I'll sustain the objection.
25          MR. MAC MAHON:  Thank you.

**J.A. 2214**

**Hasan - direct**

1  BY MR. GIBBS:

2  Q.   Well, what happened with Nabil and Sherdil after they came

3  into the meeting?

4  A.   It went quiet, silent.

5  Q.   But, I mean, in terms of whether they stayed or not.

6  A.   No, they didn't stay.

7  Q.   And how long did Nabil and Sherdil actually -- or how long

8  were they actually there at Kwon's house?

9  A.   I don't think they stayed for a minute.

10  Q.   And after they left, did everyone else stay behind?

11  A.   Yes.

12  Q.   And did that include Timimi?

13  A.   Yes.

14  Q.   Now, what was Timimi's reaction after Nabil and Sherdil left

15  the meeting?

16  A.   I think it was -- he was not pleased with the fact that Nabil

17  had brought Sherdil, who was not a regular member of the paintball

18  group or the --

19  Q.   And do you say that because of something Timimi said or just

20  because of the way he looked?

21  A.   I can't recall exactly if he said anything, but the way he

22  looked, I guess.

23  Q.   And after Nabil and Sherdil left, what did Timimi go on to

24  do?

25  A.   He kept on discussing the issue.

**Hasan - direct**

1  Q.   And what was the issue?

2  A.   About going to -- about the events of 9/11 and discussing the

3  events of 9/11 and what we should do.

4  Q.   Now, at some point, did Ali Timimi leave the meeting at Yong

5  Kwon's house?

6  A.   Yes.

7  Q.   And during the time while he was there, did he do most of the

8  talking in the meeting?

9  A.   Yes.

10  Q.   And do you recall anyone else at Kwon's house saying anything

11  while Timimi was there besides asking him some questions?

12  A.   Could you repeat that question again?

13  Q.   Sure.  While Timimi was there at Kwon's house, do you recall

14  anybody else talking other than asking him questions?

15  A.   No.

16  Q.   Now, after Timimi left the meeting, did everyone else stay

17  behind?

18  A.   I can't recall.

19  Q.   Did you stay behind?

20  A.   Yes.

21  Q.   And after Timimi left the meeting, was it discussed what you

22  would have to do before getting into Afghanistan?

23  A.   Ismail Royer had suggested to us that we should first get

24  training.

25  Q.   And did he specifically say where you should get training?

1   A.    In LET.

2   Q.    And what is LET?

3   A.    Lashkar-e-Taiba.

4   Q.    And where is Lashkar-e-Taiba located?

5   A.    In Pakistan, Kashmir.

6   Q.    Now, were you familiar with Lashkar-e-Taiba before this

7   meeting?

8   A.    I've heard about it, yes.

9   Q.    And what had you heard about Lashkar-e-Taiba before this

10  meeting?

11  A.    That some people had gone there before for training.

12  Q.    And the group there was discussing going to Lashkar-e-Taiba

13  for training.  This was training in order to be able to do what?

14  A.    To go to Afghanistan.

15  Q.    And at any point during that meeting, did Randall Royer talk

16  about what would happen to him if he went to Afghanistan?

17  A.    That he would --

18            MR. MAC MAHON:  Objection, Your Honor.  Mr. Royer is

19  available if the government wants to call him as a witness.  To

20  put all these statements in through him is not --

21            MR. GIBBS:  Judge, this is a clear coconspirator

22  statement.

23            THE COURT:  It's a coconspirator statement, and I'm

24  going to allow it.  Overruled.

25            THE WITNESS:  That he might be considered as a spy

**Hasan - direct**

1  because he's white.

2  BY MR. GIBBS:

3  Q.   If he went to Afghanistan?

4  A.   That's correct.

5  Q.   Now, do you remember during what part of the meeting it was

6  that Royer said that?

7  A.   I don't recall.

8  Q.   Do you remember who was there when he said it?

9  A.   I don't recall.

10 Q.   But you were there, correct?

11 A.   Yes.

12 Q.   Now, at some point on September 16, 2001, did that meeting

13 eventually break up?

14 A.   That's correct.

15 Q.   And when the meeting broke up, what had you decided to do?

16 A.   Me, Yong Kwon, and Ismail, we went to go and -- to a 7-Eleven

17 to get a calling card, and we called a number that Ismail had

18 brought with him.

19 Q.   And what was the purpose of this trip to the 7-Eleven to make

20 a phone call?

21 A.   To give our -- I guess to give our contacts to LET.

22 Q.   All right.  So this was part of the plan, to go to LET and

23 get training; is that correct?

24 A.   That's correct.

25 Q.   And did you, in fact, make contact through Royer with

# Hasan - direct

1  Lashkar-e-Taiba and give them your contact information?

2  A.    That's correct.

3  Q.    And during the next several days, is it fair to say that you

4  and Yong Kwon were together preparing to travel?

5  A.    That's correct.

6  Q.    And can you just describe briefly for the jury what

7  preparations you and Yong Kwon made prior to your departure?

8  A.    We, we got some thermal wear.  We got some boots.  We got our

9  socks.  That's what I remember.

10  Q.    All right.  Did you buy any -- did you buy a jacket?

11  A.    I didn't buy a jacket, but I think Yong did.

12  Q.    Yong had bought some jackets, correct?

13  A.    That's correct.

14  Q.    And one of these was actually one that you used, correct?

15  A.    That's correct.

16        MR. GIBBS:  If we could pull up 7A41, please?

17  Q.    We're going to enlarge that, but if you could take a look at

18  the screen to your left, it's probably going to be the easiest one

19  to see.

20        Mr. Hasan, do you recognize that item?

21  A.    Yes.

22  Q.    And what is that item?

23  A.    That's the jacket that I wore to the camps.

24  Q.    And by "the camps," to Lashkar-e-Taiba in Pakistan?

25  A.    That's correct.

**J.A. 2219**

**Hasan - direct**

1  Q.   And again, what were the circumstances under which you got
2  this jacket?
3  A.   It was given to me by Yong Kwon.
4  Q.   Now, I don't know if you said this earlier about your
5  preparations, but did you and Yong Kwon get visas so you could
6  travel to Pakistan?
7  A.   That's correct.
8  Q.   And where did you go to get those visas?
9  A.   Pakistani embassy in Washington, D.C.
10 Q.   And at that time, what did you claim the purpose of your trip
11 to Pakistan was?
12 A.   Marriage.
13 Q.   And was that true?
14 A.   Not, not in totality, no.
15 Q.   Okay.  Ultimately, you did go to a wedding there, correct?
16 A.   That's correct.
17 Q.   But when you say "not in totality," why do you say that?
18 A.   Because the main purpose was to go to the camps.
19 Q.   And ultimately on to Afghanistan?
20 A.   That's correct.
21 Q.   Now, when you, when you and Yong Kwon went to the Pakistani
22 embassy, did you see anybody else there that you knew?
23 A.   Masaud Khan.
24 Q.   And Masaud Khan was the other -- one of the other individuals
25 at the meeting on 9/16?

**Hasan - direct**

1   A.    That's correct.

2   Q.    And what, if anything, did you discuss with Masaud Khan?

3   A.    He told me -- we asked him what did he put on the visa, and

4   he said that he had some property issues.

5   Q.    And did you discuss with him your travel arrangements for

6   getting over to Pakistan?

7   A.    I think he told me that he wanted -- are you asking me what I

8   told him or --

9   Q.    Well, was there any discussion about his preparations to get

10  over to Pakistan?

11  A.    He told me he needed a ride to Pennsylvania from his house in

12  Maryland.

13  Q.    And did he tell you why he needed a ride to Pennsylvania from

14  his house in Maryland?

15  A.    To fly out from New York.

16  Q.    Okay.  So he, so he had arrangements to go out of New York,

17  correct?

18  A.    That's correct.

19  Q.    And where were you and Yong Kwon planning to fly out of?

20  A.    From Dulles.

21  Q.    And -- so what did you do about Yong Kwon -- or -- strike

22  that.

23         What did you do about Masaud Khan needing a ride to

24  Pennsylvania?

25  A.    I -- me and Kwon drove to Maryland, picked him up, and took

1  him to Pennsylvania, to Aatique's place.

2  Q.   And do you remember roughly what the date was that you picked

3  up Khan and took him up to Pennsylvania?

4  A.   I have no idea.

5  Q.   Was it shortly after the meeting at Yong Kwon's house?

6  A.   That's correct.

7  Q.   And when you got Masaud Khan up to Aatique's house in

8  Pennsylvania, was this the first time that the four of you,

9  meaning you, Kwon, Khan, and Aatique, were all together since the

10  meeting with Ali Timimi?

11  A.   That's correct.

12  Q.   How long did you and Yong Kwon stay at Aatique's place in

13  Pennsylvania?

14  A.   I can't recall.

15  Q.   Was it a long period of time or short period of time?

16  A.   Short period of time.

17  Q.   Now, other than taking Masaud Khan up to Aatique's place, did

18  you later meet with Timimi prior to your departure for Pakistan?

19  A.   That's correct.

20  Q.   How did that come about?

21  A.   I don't recall.

22  Q.   And where did that come about?

23  A.   It was in a, a halal, this kabob place.

24  Q.   And this meeting at the halal kabob place with Timimi, was

25  this before or after you got your visa for Pakistan?

# Hasan - direct

1   A.   This was after.

2   Q.   And who was there when you met with Timimi at the halal kabob

3   place?

4   A.   Timimi was there.  Ali Timimi was there.

5   Q.   And was there anybody else besides he and you?

6   A.   No.

7   Q.   Yong Kwon was there?

8   A.   Kwon was.  Kwon was with me.

9   Q.   In fact, were you and Yong Kwon pretty much together the

10  whole time until you departed?

11  A.   That's correct.

12  Q.   And what did you and Yong Kwon tell Timimi about your plans

13  when you met with him at the kabob place?

14  A.   That we were planning to leave.

15  Q.   Planning to leave and do what?

16  A.   Planning to go, to go to LET or go to Pakistan.

17  Q.   And what was Timimi's response when you told him that you

18  were planning to go to LET in Pakistan?

19  A.   I can't recall.

20  Q.   And do you recall what he said to you when you and Kwon told

21  him you were planning to go to LET and Pakistan?

22  A.   He told us to take some precautions.

23  Q.   Okay.  Precautions on your trip?

24  A.   That's correct.

25  Q.   And what precautions specifically did Timimi tell you to take

**Hasan - direct**

1  on your trip?

2  A.    To carry a magazine.  If they stop you, you should cry like a

3  baby.  That's what, that's what I remember.

4  Q.    All right.  So he's telling you and Kwon, "Take a magazine."

5  For what purpose?

6  A.    So that you can, I guess, not too much -- not have attention

7  on you.

8  Q.    And he said, "If they stop you, cry like a baby"?

9  A.    That's correct.

10  Q.    Did he tell you anything else about precautions you should

11  take when you and Yong were traveling to Pakistan?

12  A.    Also, keep a distance with each other.

13  Q.    So try to look like you're not traveling together?

14  A.    Um-hum.

15          THE COURT:  Is that a "yes" or "no"?

16          THE WITNESS:  Yes, excuse me.

17          MR. GIBBS:  Thank you, Judge.

18  Q.    Now, did Timimi appear surprised at all about your plans?

19  A.    No.

20  Q.    And was what you talked about at the kabob place consistent

21  with what you had talked about at Kwon's place on September 16?

22  A.    Yes.

23  Q.    And did Timimi say anything at the kabob place to discourage

24  you or Kwon from going to LET?

25  A.    No.

1  Q.   Now, prior to your departure, did you tell anybody else that
2  was not there at the meeting at Kwon's house on September 16 about
3  your plans?
4  A.   I remember talking to Mohammad Qahtani and also to Yousuf
5  Idris.
6  Q.   All right.  And first of all, who is Mohammad Qahtani?
7  A.   He was one of the, I guess, board members of Dar al-Arqam.
8  Q.   And do you know how to spell his name for the record?
9  A.   It's M-o-h-a-m-m-e-d, and Qahtani, K-a-h-a-t-i -- I'm
10  sorry -- t-a-n-i.
11  Q.   -- t-a-n-i, okay.
12       And -- well, first of all, what did you tell Mohammad
13  Qahtani about your plans?
14  A.   I did some convention work for him, and so we were just in a
15  van, and I recall that I told him that I was leaving, and he
16  understood that, that I was probably leaving to Pakistan, and
17  that's what I remember.
18  Q.   So you didn't elaborate on exactly where you were going, but
19  you had the impression he understood where you were going?
20  A.   Yes.  I mean, I told him I was going to -- I was traveling to
21  Pakistan.
22  Q.   And other than Mohammad Qahtani, who else did you say you
23  spoke to?
24  A.   To Yousuf Idris.
25  Q.   How did that come about?

**Hasan - direct**

1  A.   Me and Kwon had gone to, to Sheikh Jaafar's house.

2  Q.   And who was Sheikh Jaafar?

3  A.   Father of Yousuf Jaafar.

4  Q.   And what was the reason you went over to Sheikh Jaafar's

5  house?

6  A.   I can't recall that.

7  Q.   And what happened related to you telling Yousuf Idris about

8  your plans to go to Pakistan?

9  A.   I told him, like, regarding that we were traveling to

10  Pakistan, and he had, he had discouraged me.  He said, "It's not a

11  good idea you should do that."

12  Q.   And was there anything about your appearance that had changed

13  prior to that meeting with Yousuf Idris?

14  A.   I, I had trimmed my beard substantially.

15  Q.   And what was the reason you trimmed your beard substantially?

16  A.   Just to be more inconspicuous.

17  Q.   And did he comment on that when he spoke to you at his

18  father's house?

19  A.   He joked about it, you know.

20  Q.   And other than telling you that he didn't think you should

21  go, did he tell you anything else?

22  A.   No, I don't remember anything else.

23  Q.   And this was at his father's house?  Is that where the

24  conversation took place?

25  A.   I remember that this conversation took place in, either it

**Hasan - direct**

1  was in his car -- in my car, when I was taking him to the office,

2  or I can't specifically recall, but I know that the conversation

3  took place.

4  Q.   And you say it was either the house or the car.

5  A.   Um-hum.

6  Q.   Regardless of the location between those two, was this a

7  private conversation between you and he?

8  A.   That's correct.

9  Q.   And it didn't take place in a Borders Bookstore?

10 A.   No, no.

11 Q.   And did -- at any point during the conversation, did he talk

12 about Ali Timimi's position on this?

13 A.   No, I don't remember anything.

14 Q.   Now, you testified that after the meeting, you were very --

15 for the first time, you had determined you would go overseas to go

16 fight, correct?

17 A.   I'm sorry, say again?

18 Q.   After the meeting at Kwon's house, you had decided you would

19 go overseas to go fight, correct?

20 A.   That's correct.

21 Q.   And did Yousuf Idris telling you that you shouldn't do, you

22 know, go overseas anyway, go to Pakistan, did that deter you in

23 any way?

24 A.   No.

25 Q.   Why not?

**Hasan - direct**

1  A.    I had made up my mind.  I just didn't want to change my mind

2  in going and doing -- and not going.

3  Q.    And Yousuf Idris's opinion was not enough to cause you to

4  change your mind?

5  A.    That's correct.

6  Q.    Now, what if Ali Timimi had told you you shouldn't go over to

7  Pakistan?  Would that have made a difference?

8  A.    Yes.

9  Q.    Now, why would that have made a difference?

10  A.    Because the advice was given to me earlier from him to go.

11  That's why I'm -- I didn't feel that Yousuf was enough for me to

12  change my mind.

13  Q.    And was -- at that time in your life, was Ali Timimi a more

14  influential figure for you than Yousuf Idris?

15  A.    Sure.

16  Q.    Now, why do you say, "Sure"?

17  A.    Because I used to attend his lectures, and he used to give me

18  advice on other things as well.

19  Q.    And you used to look up to him?

20  A.    Yes.

21  Q.    And ultimately, Mr. Hasan, the trip to Pakistan did take

22  place.  You did make it to the camps at Lashkar-e-Taiba, correct?

23  A.    That's correct.

24          MR. GIBBS:  If I could just have a moment?

25  Q.    Now, in terms of the trip to Pakistan, if we could pull up

**Hasan - direct**

```
 1   Government Exhibit 7H2?
 2            THE COURT:  Is a break around 4:15 all right?  Does that
 3   work on the schedule?
 4            MR. GIBBS:  That's fine, Judge.
 5            THE COURT:  Okay.
 6            MR. GIBBS:  Judge, for the record, this will be 7H2.
 7            THE COURT:  7?
 8            MR. GIBBS:  7H.
 9            THE COURT:  7H as in Harry?
10            MR. GIBBS:  H as in Harry.  It's not in evidence yet, so
11   if we could have the witness take a look at it first?
12            THE COURT:  Is there any objection to 7H2?
13            MR. MAC MAHON:  No objection, Your Honor.
14            THE COURT:  All right, it's in.
15            (Government's Exhibit No. 7H2 was received in evidence.)
16            THE COURT:  That means you can put it on the screen if
17   you want.
18            MR. GIBBS:  All right, let's go ahead and put it up on
19   the screen.
20   Q.   Mr. Hasan, do you recognize that?
21   A.   Yes.
22   Q.   And if we could go to the, let's see --
23            THE COURT:  Well, just for the record, what is that,
24   Mr. Hasan?
25            THE WITNESS:  That seems to be the, the work permit for
```

1  Saudi Arabia, where I worked at a school.

2  BY MR. GIBBS:

3  Q.   And what's underneath that, can you tell?

4  A.   Underneath?

5  Q.   Well, let's page through the first page.  It will be easier

6  to see.

7         And do you recognize that?

8  A.   Yes.

9  Q.   And what is that?

10 A.   That's my passport.

11        MR. GIBBS:  All right.  And if we could page into, I

12 believe it's seven pages into the passport?

13        Go to the next page.  Let's see what we've got.

14        And if we could enlarge this?

15 Q.   All right, Mr. Hasan, do you recognize what's on the screen?

16 A.   That's correct.

17 Q.   What is that?

18 A.   It's the visa.

19        MR. GIBBS:  Okay.  And if we could go back to that page,

20 and, let's see, if you could enlarge that?

21 Q.   22 September 2001, do you know what that is?

22 A.   Yes.

23 Q.   What is that?

24 A.   That's the entry for -- in Pakistan.

25 Q.   All right.  And just above that, it's got the date of 13

**Hasan - direct**

1   December 2002.  Do you know what that is?

2              Actually, no, that's not the right one.  When did you

3   depart Pakistan?

4   A.    When did I come back?

5   Q.    Yeah.

6   A.    I came back on January 20.

7   Q.    Of 2002?

8   A.    That's correct.

9   Q.    Okay.  Yeah, and I think -- it's inverted, but I think you

10  can see that.

11  A.    Um-hum.

12  Q.    Do you see that?

13  A.    Yes.

14  Q.    All right.  Now, when you were in Pakistan, you ultimately

15  made it to the Lashkar-e-Taiba camps, correct?

16  A.    That's correct.

17  Q.    And that's up in the Kashmir region of Pakistan?

18  A.    That's correct.

19  Q.    Now, how many camps did you go to at Lashkar-e-Taiba?

20  A.    I went to three camps.

21  Q.    And during that time at the three camps at Lashkar-e-Taiba,

22  what specific weapons training did you receive?

23  A.    I trained in AK-47 automatic.  I trained in RPG.

24  Q.    What's an RPG?

25  A.    That's a rocket-propelled grenade.

**Hasan - direct**

1          I trained in -- I saw somebody throw a grenade.  I
2  trained in M-60 Russian automatic.
3  Q.   What type of weapon is an M-60?
4  A.   It's a, it's an automatic weapon.
5  Q.   Okay.  Any other guns besides the AK-47?
6  A.   Pistols.
7  Q.   And when you say trained with these, you actually fired them,
8  correct?
9  A.   Yes.
10  Q.   Including the RPG and the AK-47?
11  A.   That's correct.
12  Q.   And approximately how long was your training at
13  Lashkar-e-Taiba?
14  A.   Four to five weeks.
15  Q.   And you testified earlier that your plan at the outset was to
16  go get training in order to go to Afghanistan to fight, correct?
17  A.   That's correct.
18  Q.   Did you ultimately make it to Afghanistan?
19  A.   No.
20  Q.   And is there a reason you didn't ultimately make it to
21  Afghanistan?
22  A.   First of all, we got the news from BBC that things were
23  moving very fast and that, you know, the Taliban were losing very
24  quickly.
25  Q.   All right.  So when you were at the camps, you could actually

**Hasan - direct**                                    2086

1   get some news from the BBC?

2   A.    That's correct.

3   Q.    So you were hearing what was going on with the war?

4   A.    Um-hum, yes.

5   Q.    All right.  And you said that was one reason you didn't go.

6   Were there any others?

7   A.    Other reasons was that the trainers had not encouraged us to

8   go over there.  They were not very -- I didn't see that they were

9   promoting the foreigners to going into fighting anywhere

10  basically.

11  Q.    And specifically, did the trainers tell you anything about

12  the feasibility of actually getting into Afghanistan?

13  A.    It was very --

14          MR. MAC MAHON:  Objection to what the trainers said,

15  Your Honor.  They're not part of this conspiracy.

16          MR. GIBBS:  Judge, but this goes directly to what he

17  did.

18          THE COURT:  Yes.  If it's not being offered for the

19  truth of its contents, I'll permit it.

20          THE WITNESS:  They said it was very difficult to get in

21  there.

22  BY MR. GIBBS:

23  Q.    And did they say why, what had happened to make it very

24  difficult to get into Afghanistan?

25  A.    I can't remember specifically.

**Hasan - direct** 2087

1  Q.    But it was just difficult to get in?

2  A.    It was difficult to get in.

3  Q.    And what was the reaction of the other trainees in your group

4  with the news that the war was almost over and it was very

5  difficult to get into Afghanistan?

6  A.    The -- some of the Saudis had -- were upset that they were

7  not able to go.

8  Q.    And again, when the trainers said it was very difficult to

9  get in, did they indicate that they -- that LET would not help

10  assist people in getting to Afghanistan?

11  A.    That's correct.

12            MR. GIBBS:  All right, Mr. Hasan, I want to thank you

13  very much.  I believe Mr. MacMahon has some questions for you.

14            THE COURT:  Maybe this is a good time to take the

15  afternoon break, all right?

16            MR. GIBBS:  That's fine, Judge.  Thank you.

17            THE COURT:  We'll start the cross examination at 20

18  after.

19            MR. MAC MAHON:  Thank you, Your Honor.

20            (Recess from 4:00 p.m., until 4:20 p.m.)

21                    (Defendant present, Jury out.)

22            THE COURT:  All right, Mr. Kromberg?

23            MR. KROMBERG:  Your Honor, during the break, in the

24  bathroom, I started talking to Mr. Kennedy, who's been excused, to

25  tell him that he should understand that I was not trying to impugn

1   his integrity, and somebody in the stall I didn't know was in the

2   stall said, "Whoa, whoa, whoa, whoa, whoa," and we stopped

3   talking.

4           THE COURT: One of the jurors?

5           MR. KROMBERG: And it was one of the jurors.

6           And I mentioned it to Mr. MacMahon, I mentioned it to

7   Mr. Yamamoto, and I bring it up to the Court, but nothing

8   substantive had been said at that point.

9           THE COURT: All right. Does anyone need me to voir dire

10  the juror?

11          MR. MAC MAHON: No, Your Honor.

12          THE COURT: All right, that's fine. Thank you,

13  Mr. Kromberg.

14          We can bring the jury in.

15                      (Jury present.)

16          THE COURT: Let me just tell the jury, I'm advised -- I

17  was advised by Mr. Kromberg as to the very minor incident during

18  the break, and it's not a problem, so whoever was involved with

19  that, we're just fine, okay?

20          All right, go ahead.

21          MR. MAC MAHON: Thank you, Your Honor.

22                      CROSS EXAMINATION

23  BY MR. MAC MAHON:

24  Q.  Mr. Hasan, my name is Edward MacMahon. I'm an attorney for

25  Ali Al-Timimi.

**Hasan - cross**

1    Did you testify in your direct examination that you pled

2  guilty to a conspiracy to wage war against the United States?

3  A.   Yes.

4  Q.   You didn't do that, did you?

5  A.   That's what I did.

6  Q.   You pled to a violation of the Neutrality Act, didn't you,

7  sir?

8  A.   Yes, sir.

9  Q.   And that was because you were -- had been training for a long

10 time to wage war in India -- against India in Kashmir, right?

11 A.   But the intention was to go to Afghanistan.

12 Q.   Did you tell the jury that, that you before the dinner on

13 September 16 had no intention of ever going overseas to fight

14 jihad?

15 A.   That's what I remember.

16 Q.   That's absolutely false, isn't it, sir?

17 A.   That's what I remember, sir.

18 Q.   You don't remember having any intention of fighting jihad

19 overseas before September 16, 2001?

20 A.   I don't remember anything like that, sir.

21 Q.   Didn't your wife leave you in early 2001 because you were

22 obsessed with jihad videos at your house, Mr. Hasan?

23 A.   No, I was not, sir.

24 Q.   You didn't have any jihad videos at your house?

25 A.   Yes, I did.

**Hasan - cross**                                    2090

1   Q.   Did you have "Russian Hell 2000"?

2   A.   It was on the Internet, sir.

3   Q.   And you watched it a lot, didn't you?

4   A.   Sometimes.

5   Q.   That was one of your favorites, wasn't it?

6   A.   No.

7   Q.   Which was your favorite?

8   A.   I don't remember.

9   Q.   How many did you have?

10  A.   It was on the Internet, sir.

11  Q.   How many jihad videos did you watch before September 16,

12  2001?

13  A.   I can't recall.

14  Q.   Lots of them, right?

15  A.   I can't recall, sir.

16  Q.   Did you watch them with Yong Kwon?

17  A.   Specifically Yong Kwon?

18  Q.   Yes.

19  A.   I don't remember, sir.

20  Q.   Did you watch with him the scene over and over again of the

21  Russian prisoner being executed?

22        MR. GIBBS:  Judge, I'd object.  He said he doesn't

23  remember watching them with Yong Kwon.

24        THE COURT:  This is cross examination.  I'm permitting

25  some leeway.  Overruled.

**Hasan - cross**                                    2091

1  BY MR. MAC MAHON:

2  Q.   You did, didn't you, Mr. Hasan?

3  A.   I don't remember, sir.

4  Q.   You don't ever remember seeing a video where a Russian

5  prisoner is executed by a Muslim, right?

6  A.   I do remember that, sir.

7  Q.   Okay.  Do you remember watching that with Ibrahim Al-Hamdi?

8  A.   Maybe.

9  Q.   Okay.  And all this was well before September 16, 2001,

10 wasn't it?

11 A.   That's correct, sir.

12 Q.   And Ali Al-Timimi never once gave you a jihad video or told

13 you to watch one or even suggested it, did he?

14 A.   No.

15 Q.   In fact, you don't even remember having a conversation with

16 him about jihad at all, do you?

17 A.   I don't recall, sir.

18 Q.   In fact, you barely knew him as of September 16, 2001,

19 correct?

20 A.   I'm sorry?

21 Q.   You barely knew this man on September 16, 2001, right?

22 A.   I knew him.

23 Q.   You knew him because you sat in an audience and watched him

24 speak, but you weren't a personal friend of his, were you?

25 A.   No, I was not a personal friend, sir.

**J.A. 2238**

**Hasan - cross** 2092

1  Q.  You've never been to his house?

2  A.  I've been to his house before that.

3  Q.  You had been to his house to help him move?

4  A.  Yes.

5  Q.  And other than that, you never went over there for a meal or

6  to meet his wife or anything else, right?

7  A.  Maybe once, sir.

8  Q.  You never even had a private conversation with him, had you?

9  A.  Private conversation?

10  Q.  Yes.

11  A.  I had private conversations.

12  Q.  You went to -- and the private conversations were at the Dar

13  al-Arqam; is that right?

14  A.  Yes.

15  Q.  And you listened to his lectures there as well, correct?

16  A.  That's correct, sir.

17  Q.  Okay.  In your plea agreement, you have an obligation to

18  cooperate with the federal government, right?

19  A.  Yes.

20  Q.  And how many times have you testified on behalf of the

21  federal government against a Muslim?

22  A.  This is the third time, sir.

23  Q.  And the first time was in the Khan trial, right?

24  A.  That's correct, sir.

25  Q.  All right.  And the second time was in Mr. Benkahla's trial,

**Hasan - cross**                                    2093

1  right?

2  A.    No, that's not correct.

3  Q.    What was the second time?

4  A.    It was in the Idaho case.

5  Q.    In the Sami Al-Hussayen case?

6  A.    That's correct.

7  Q.    And in that case, the government asked you to say that the

8  reason you went and fought jihad was because you watched the Qoqaz

9  website; isn't that correct?

10          MR. GIBBS:  Judge, objection.  He was called to testify

11  truthfully, not --

12          THE COURT:  Whoa, whoa, whoa, whoa, whoa.  We don't need

13  editorial comments.  On redirect, you can correct it, but this is

14  cross, so I'm overruling the objection.

15  BY MR. MAC MAHON:

16  Q.    You testified in the case of United States v. Sami

17  Al-Hussayen, didn't you?

18  A.    Yes, I did.

19  Q.    Okay.  In your testimony in that case, Mr. Hussayen was the

20  webmaster of the Qoqaz website, right?

21  A.    I found that out later, yes.

22  Q.    And the Qoqaz website was where videos like "Russian Hell

23  2000" were, right?

24  A.    That's correct.

25  Q.    And you testified in that case that watching the videos that

**J.A. 2240**

**Hasan - cross**

1   Mr. Hussayen had put up on the Internet was what made you go do

2   jihad, didn't you?

3   A.    That was part of the reason.

4   Q.    And when did you start looking at Qoqaz?

5   A.    Before 2000.

6   Q.    Before 2000, correct?

7         So you were already being influenced to go do jihad by

8   someone named Sami Al-Hussayen before the year 2000, correct?

9   A.    It was on the website.

10  Q.    And it influenced you to want to go make jihad?

11  A.    That's correct.

12  Q.    And that's what you told the jury in Idaho, right?

13  A.    Yes, I did.

14  Q.    And you told them that Ali Al-Timimi was just a part of the

15  whole mix of things that you were doing, right?

16  A.    He was the one who inspired me to go.

17  Q.    Okay.  Now, in your plea agreement, you know that the

18  government can withdraw the agreement if they're unsatisfied with

19  your cooperation, right?

20  A.    Sure.

21  Q.    Okay.  And tell the jury what sentence you face if the

22  government withdraws your plea agreement.

23  A.    It's a life sentence.

24  Q.    You don't want to do life in prison, do you, sir?

25  A.    No, I do not.

**Hasan - cross**

1  Q.  You want to get out of prison?

2  A.  Sure.

3  Q.  And soon, right?

4  A.  Sure.

5  Q.  And you've cooperated in investigations with the Australian

6  police?

7  A.  Yes, I have.

8  Q.  The British police?

9  A.  Yes, I have.

10  Q.  Anybody that wants to the government brings in, you'll talk

11  to, right?

12  A.  Truthfully, yes.

13  Q.  Okay.  And did you talk to Yong Kwon in the last week?

14  A.  Yong Kwon?

15  Q.  Yes.

16  A.  Last week?  No.

17  Q.  Did you talk to him this week?

18  A.  I didn't see him.

19  Q.  How about Muhammad Aatique?

20  A.  He was down there in the cell, but no, I didn't see him.  I

21  didn't talk to him.

22  Q.  You've talked to the agents this week, haven't you?

23  A.  Huh?

24  Q.  You've talked to the agents this week, didn't you?

25  A.  Yes, yes.

**Hasan - cross**                                         2096

1  Q.  Who did you talk to?

2  A.  It was John Wyman and Ammerman.

3  Q.  Okay.  And what did, what did Mr. Wyman tell you?

4  A.  What did he tell me?  He didn't tell me anything.  He just

5  came to ask -- they asked me questions.

6  Q.  Did they tell you how the trial was going?

7  A.  Specifically, no, but they were saying it was going fine.

8  Q.  Okay.  Now, in your statement of facts in support of your

9  plea, you reread that statement of facts before you signed it,

10 didn't you, sir?

11 A.  Yes, I did.

12 Q.  Okay.  And paragraph 3 of that says that starting in or about

13 January of 2000, Khwaja Mahmood Hasan trained with others who

14 appeared to be preparing for violent jihad on behalf of Muslims in

15 Kashmir, Chechnya, the Philippines, and other countries and

16 territories, against countries, governments, military forces, and

17 peoples that the conspirators believed to be the enemies of Islam.

18 Early on, the defendant and his coconspirators agreed to conduct

19 their training.

20         Do you remember that?

21 A.  Yes.

22 Q.  And that's true, isn't it?

23 A.  Yes.

24 Q.  So in -- sometime in January of 2000, you actually began with

25 others to prepare for violent jihad, right?

**Hasan - cross**

1   A.   Yes.

2   Q.   And you never talked to Al-Timimi about that at all in

3   January of 2000, did you?

4   A.   No, I did not.

5   Q.   In fact, you never told him about your plans -- before what

6   you testified on September 16, 2001, you never talked to him about

7   your plans with your other friends to prepare for violent jihad in

8   Chechnya?

9   A.   I did not.

10  Q.   Never told him at all, right?

11  A.   No.

12  Q.   Never told him you were -- did you use firearms yourself in

13  Virginia?

14  A.   I shot one bullet, sir.

15  Q.   Okay.  And who did you do that with?

16  A.   Yong Kwon.

17  Q.   Yong Kwon?

18  A.   Yes.

19  Q.   Okay.  And you never told this man here (indicating) that you

20  were using firearms in Virginia, did you?

21  A.   No.

22  Q.   In fact, you knew from attending the lectures that he thought

23  it was a bad idea for Muslims to own guns in this country; isn't

24  that right?

25  A.   I don't recall anything like that.

**Hasan - cross**

1  Q.   You -- paragraph 4 of your agreement, "Khwaja Mahmood Hasan
2  and other coconspirators used paintball guns and equipment to
3  practice small unit military tactics and simulate actual combat on
4  private property near Fredericksburg, Virginia.  Khwaja Mahmood
5  Hasan knew that at least some of the conspirators engaged in this
6  practice for the purpose for training for violent jihad in
7  Kashmir, Chechnya, and elsewhere around the world."
8         That's correct, isn't it?
9  A.   Um-hum, yes.
10 Q.   All right.  And this man never had anything to do with any of
11 your paintball training, did he?
12 A.   No.
13 Q.   No.  You never saw him at the paintball field or anything
14 else, right?
15 A.   No, I did not.
16 Q.   And you never told him that your paintball -- anything about
17 the paintball, much less that you were simulating actual combat,
18 right, Mr. Hasan?
19 A.   I don't remember talking to him about that, no.
20 Q.   No mention of it at all at any time, right?
21 A.   No, I did not.
22 Q.   So he didn't know in any way, shape, or form that you were
23 preparing for actual combat?
24 A.   He did not know, no.
25 Q.   And Mr. Kwon was one of the people that was training for

**Hasan - cross**

1  actual combat with you, correct?

2  A.    Yes.

3  Q.    Okay.  And sometime -- excuse me.

4         Paragraph 5 of your plea agreement says that Khwaja

5  Mahmood Hasan understood that in 2000, Ibrahim Al-Hamdi and

6  Randall Todd Royer traveled from the United States to join

7  Lashkar-e-Taiba at its camps in Pakistan.  After Royer and

8  Al-Hamdi returned from Pakistan in 2000, each described to Khwaja

9  Mahmood Hasan and others his experience serving with

10 Lashkar-e-Taiba.  Hasan understood that while there, Al-Hamdi and

11 Royer used firearms, including AK-47 rifles, and that at least

12 Al-Hamdi fired at Indian positions in Kashmir.  Khwaja Mahmood

13 Hasan knew that after Al-Hamdi and Royer returned to Virginia,

14 each encouraged other coconspirators to go to Pakistan and serve

15 with Lashkar-e-Taiba as well.

16        Do you remember that?

17 A.    Yes.

18 Q.    That's true, too, isn't it?

19 A.    Yes.

20 Q.    So sometime in the year 2000, you knew that Randall Royer was

21 encouraging people to go to Pakistan and serve with

22 Lashkar-e-Taiba, right?

23 A.    That's correct.

24 Q.    And you were, in fact, one of the people that he asked to go

25 over there, weren't you?

**Hasan - cross**

1  A.   I don't recall that.

2  Q.   You don't recall Mr. Royer asking you to go to Pakistan and

3  train at LET?

4  A.   No, sir.

5           MR. GIBBS:  Judge, can we get a time frame on this?

6           MR. MAC MAHON:  At any time.

7           THE COURT:  All right.

8  BY MR. MAC MAHON:

9  Q.   At any time.

10 A.   I don't remember, sir.

11 Q.   And you don't recall Yong Kwon asking you if you wanted to go

12 to Pakistan and train at LET before September 11, 2001?

13 A.   I don't remember, sir.

14 Q.   You have no recollection of that at all?

15 A.   No, sir.

16 Q.   You didn't ever tell Mr. Al-Timimi any of this stuff about

17 your friends going to LET camps or anything, did you?

18 A.   No.  I don't remember discussing that, no.

19 Q.   Who is Sheikh Estes?

20 A.   Sheikh Estes is someone who I used to work with.  He's a

21 preacher who used to be -- became Muslim.

22 Q.   And you called him from Pakistan, didn't you?

23 A.   Yes, I did.

24 Q.   And you were -- at the time you called Sheikh Estes, were you

25 still planning on waging war against the United States?

**Hasan - cross**

1  A.   No, I was with my aunt.

2  Q.   Excuse me?

3  A.   I was with my aunt, and I was -- there was a program that was

4  coming up, and since I worked with him, I knew who he was, so I

5  called him up and said -- I just wanted to let him know that he

6  was on TV.

7  Q.   And this was in October of 2001, right?

8  A.   Yes.

9  Q.   And Sheikh Estes has a popular television show, right?

10 A.   It's well known over there.

11 Q.   Right.  And so at the time you were in Pakistan supposedly

12 bent on war with the United States, you were watching cable

13 television and calling Sheikh Estes back in the United States,

14 right?

15 A.   Yes.

16 Q.   And you told him that you had gone to Pakistan for a wedding;

17 isn't that correct?

18 A.   Yes, I did.

19 Q.   You lied to him, didn't you?

20 A.   Yes, I did.

21 Q.   And you lied to your parents before you left, right?

22 A.   Yes.

23 Q.   This man never asked you to lie to your parents, did he?

24 A.   He told me I didn't have to have permission.

25 Q.   Did he tell you to lie to them?

**Hasan - cross**

1  A.  No.

2  Q.  You did that on your own, right?

3  A.  Yes.

4  Q.  Did you ever receive an e-mail from Yong Kwon telling you

5  that there was going to be a dinner at his house?

6  A.  I don't remember, sir.

7  Q.  Did you receive an e-mail canceling paintball on September

8  11?

9  A.  I don't remember, sir.

10  Q.  Do you remember being excited and gleeful over the attacks

11  that occurred in New York and Washington?

12  A.  At one point, sir.

13  Q.  Right when they happened, when the people were falling out of

14  the building, you, Mahmood Hasan, thought that was great, didn't

15  you?

16  A.  At one time, sir.

17  Q.  You thought that at the very moment when the people were

18  falling out of the buildings in New York, that it was the most

19  exciting thing you had ever seen; isn't that right?

20        MR. GIBBS:  Objection, Your Honor.  Asked and answered.

21        THE WITNESS:  That's not correct.

22        THE COURT:  Wait, wait, wait.

23        MR. GIBBS:  That's exactly almost identical to the

24  question he asked before that.

25        THE COURT:  Yes, you've made your point.

**Hasan - cross**

```
 1           MR. MAC MAHON:  Thank you, Your Honor.
 2  Q.  So your, your testimony would be that you were just invited
 3  by coincidence by Yong Kwon to this dinner, right?
 4  A.  That's correct, sir.
 5  Q.  You'd been talking to him on the phone a lot that week,
 6  weren't you?
 7  A.  I don't remember, sir.
 8  Q.  You don't remember?
 9  A.  No.
10  Q.  You don't remember him telling you that the purpose of the
11  dinner was to discuss his plan to take everybody to LET?
12  A.  No, sir.
13  Q.  Did Mr. Kwon tell you in September of 2001 that he'd met an
14  LET recruiter at the -- during the hajj in Mecca, Saudi Arabia?
15  A.  Could you repeat that again, please?
16  Q.  Did Mr. Kwon tell you in September of 2001 that he had met an
17  LET recruiter at the hajj in Mecca?
18  A.  No, sir.
19  Q.  And you'd been to Mecca the year before, right?
20  A.  I'd been to hajj, yes.
21  Q.  Did Mr. Royer tell you that he had connections at LET?
22  A.  No.  He never told me, sir.
23  Q.  You didn't know that Mr. Royer could get you into a camp at
24  LET before September 16, 2001; is that your testimony?
25  A.  That's correct, sir.
```

**Hasan - cross**

1  Q.  You used to spend a lot of time with him before that?

2  A.  With Royer?

3  Q.  Yes.

4  A.  No.  Not a lot of time, no.

5  Q.  Did you know that he'd gotten Mr. Al-Hamdi all the

6  connections he needed to get there?

7  A.  Yes.

8  Q.  And you knew that he'd done that for Mr. Aatique as well,

9  right?

10  A.  I don't know, sir.

11  Q.  Was Mr. Aatique a close friend of yours?

12  A.  No, not at that time.

13  Q.  Did you even know him on September 16, 2001?

14  A.  Could you repeat that question again?

15  Q.  Did you even know Mr. Aatique on September 16, 2001?

16  A.  Yeah, I -- yes, of course.

17  Q.  Okay.  Had you played paintball with him?

18  A.  Yes.

19  Q.  And did you know that on September 10, 2001, that he had

20  already purchased a ticket to go to Pakistan?

21  A.  No, I did not know that.

22  Q.  Did you know that Mr. Royer had given him a reference letter

23  to take to the LET camp sometime in August of 2001?

24  A.  No, I did not know that.

25  Q.  Nobody ever told you that?

**Hasan - cross**

1  A.   No, sir.

2  Q.   Now, you did know that Mr. Chapman had gone to an LET camp,

3  right?

4  A.   Yes.

5  Q.   And you knew that Mr. Royer was the one who gave him a

6  reference letter and a kunya name and told him how to reach the

7  camps undetected, right?

8  A.   I can't recall that, sir.

9  Q.   You don't remember any of that?

10  A.   No, sir.

11  Q.   Sir, isn't it a fact that Mr. Chapman actually asked you to

12  join him on the trip that he went on in the summer of 2001 to the

13  LET camps?

14  A.   I don't remember that, sir.

15  Q.   You have no recollection of that?

16  A.   No, sir.

17  Q.   When -- on September 16, you remember Al-Timimi coming into

18  the house and telling everybody to pull the shades?

19  A.   Yes.

20  Q.   And you have a very clear recollection of that, right?

21  A.   Yes, sir.

22  Q.   Can I show you Defendant's Exhibit 82?

23        Have you seen that before, sir?

24  A.   I haven't seen that picture, no, but --

25  Q.   Have you seen that building?

**Hasan - cross**

1  A.   Yes.

2  Q.   What is it?

3  A.   It's Yong Kwon's apartment, sir, house.

4  Q.   And what floor was Mr. Kwon's apartment on?

5  A.   I think the third floor, I believe.

6  Q.   And was it dark when Al-Timimi made it to the residence?

7  A.   I don't know, sir.

8  Q.   You don't remember whether it was during the day?

9  A.   No -- your question was, sir, again?

10  Q.   Was it dark when Al-Timimi arrived at Mr. Kwon's home?

11  A.   I don't know, sir.

12  Q.   So he pulled the curtains down because it was light out and

13  people could see in?  Is that your understanding as to why he did

14  that?

15  A.   My understanding is, sir, that it was light inside, and it

16  was dark outside.  That's why he told us to do that.

17  Q.   Was somebody looking in the third floor window to your

18  knowledge?

19  A.   Oh, no.

20  Q.   And you said he asked you to shut the phone off, right?

21  A.   That's correct, sir.

22  Q.   And you have a very distinct recollection of that?

23  A.   Yes, sir.

24  Q.   Okay.  Did he ask you to help turn off the answering machine?

25  A.   I don't remember that, sir.

**Hasan - cross**

1   Q.   Were you sitting next to him when he said, "Turn off your

2   phone"?

3   A.   Yes.

4   Q.   Where was Yong Kwon when that happened?

5   A.   I don't know, sir.

6   Q.   Was he sitting in the circle?

7   A.   I don't remember, sir.

8   Q.   You have no recollection of that?

9   A.   No, sir.

10  Q.   You said that Al-Timimi gave you three choices that night,

11  correct?

12  A.   Yes, sir.

13  Q.   One was to make hijra?

14  A.   Yes, sir.

15  Q.   And you took that to mean to go to what?

16  A.   A Muslim country.

17  Q.   All right.  And you are Pakistani.  You are Pakistani,

18  correct?

19  A.   Yes, sir.

20  Q.   And he told you you could go wage war against the Americans,

21  right?

22  A.   Yes, sir.

23  Q.   And the third thing was to lay on the -- be a bug in a rug?

24  I'm sorry, what was that last one?

25  A.   It was to be like a rug in a house.

**Hasan - cross**                                        2108

1   Q.   Okay.  And you have a distinct recollection of that, too?

2   A.   Yes, sir.

3   Q.   And then he told you after giving you three choices that one

4   of them was obligatory, right?

5   A.   That -- to me, yes.

6   Q.   Did you ask him, "Why did you give me three choices if one of

7   them is obligatory?"

8   A.   I didn't ask, sir.

9   Q.   You just were -- blindly did whatever he said?

10  A.   What I thought to be the best choice.

11  Q.   That was your own decision, wasn't it?

12  A.   Yes, sir.

13  Q.   He didn't make you do anything, did he?

14  A.   He didn't make me do anything.

15  Q.   And he doesn't have any kind of control over your mind to

16  tell you, Khwaja Hasan, I've got to go overseas and fight, right?

17  A.   No, he doesn't have control over my mind, but he inspired me.

18  Q.   To do hijra, why didn't you get inspired to do hijra?

19  A.   I don't know.

20  Q.   And when he said "hijra," you knew he didn't mean jihad,

21  right?

22  A.   No.

23  Q.   Okay.  Can you tell us in more detail what he said about

24  being a rug on the floor or whatever?

25  A.   It's to just stay in the house and not go out until things

1  calm down.

2  Q.   Okay.  Were you able to, to equate the advice of going

3  overseas to kill Americans with staying in your house like a rug?

4  A.   No, sir.

5  Q.   That -- you were able to see that that was a different option

6  other than killing people?

7  A.   Yeah, of course.

8  Q.   Did he tell you to go down to the Pentagon and kill anybody?

9  A.   No.

10 Q.   Well, if you were going to go kill Americans, why did you

11 need to go overseas?

12 A.   Because as I said, they were being invaded in Afghanistan.

13 Q.   So there was no discussion of you waging war anywhere else,

14 right?

15 A.   No.

16 Q.   You testified that Al-Timimi had a document with him, right?

17 A.   Yes.

18 Q.   Okay.  What did it look like?

19 A.   It was a document in Arabic.

20 Q.   And how, how many pages was it?

21 A.   I don't recall, sir.

22 Q.   One or two?

23 A.   More than one, sir.

24 Q.   More than two?

25 A.   Probably more than two.  I'm not sure.

**Hasan - cross**

1   Q.   Was he carrying it in his hand?

2   A.   Yes, sir.

3   Q.   You couldn't read it, right?

4   A.   That's correct.

5   Q.   And he never used the word "Uqla," did he?

6   A.   I don't remember that, sir.

7   Q.   And the only time you ever found out there even was an Uqla

8   fatwa was when one of the special agents in this case showed it to

9   you; isn't that correct?

10  A.   That's correct, sir.

11  Q.   And they showed it to you and suggested to you, "Isn't this

12  what you think he was reading that night?," correct?

13  A.   Yes, sir.

14  Q.   Okay.  And they also showed you a fatwa from someone named

15  Hawaali, too, right?

16  A.   That's correct, sir.

17  Q.   They showed you a whole bunch of them?

18  A.   No, just two, sir.

19  Q.   Just two.

20       And they gave you a choice of which one you thought it

21  was?

22  A.   Which one matched the discussion that was going on.

23  Q.   Have you looked at the Uqla fatwa?

24  A.   Not for a long time.

25  Q.   Anything in there about Mullah Omar?

**Hasan - cross** 2111

1  A.  I don't recall, sir.

2  Q.  Didn't look for that?

3  A.  I don't recall, sir.

4  Q.  Didn't want to check your testimony to see if there was

5  anything in there about Mullah Omar calling for troops?

6  A.  No, sir.

7  Q.  Didn't concern you at all?

8  A.  No, sir.

9  Q.  Now, your testimony is that after the dinner, Al-Timimi left,

10  right?

11  A.  Yes, sir.

12  Q.  Okay.  And it was at that time that you-all started making

13  your plans to go overseas, right?

14  A.  Yes, sir.

15  Q.  And that night, you went to a 7-Eleven with Randall Royer; is

16  that correct?

17  A.  That's correct, sir.

18  Q.  Did you go directly there?

19  A.  I believe so.

20  Q.  How long did it take you to get there?

21  A.  It was close by.  Probably, like, five-ten minutes maybe.

22  Q.  So what time do you think it was at night that you went to

23  the 7-Eleven with Randall Royer?

24  A.  I'm not exactly sure.

25  Q.  Before midnight?

**Hasan - cross**

1  A.   Yes, sir.

2  Q.   Okay.  You have a distinct recollection of leaving the

3  meeting with Mr. Royer and Mr. Kwon and going to the 7-Eleven?

4  A.   Yes, sir.

5  Q.   And at the 7-Eleven, Mr. Royer just happened to have a phone

6  number for LET in his pocket, right?

7  A.   That seems to be the case.

8  Q.   Were you surprised that Mr. Royer had a contact phone for a

9  Pakistani organization in his pocket?

10  A.   I don't know why he had it, but I don't know.

11  Q.   Did you ask him why he had it?

12  A.   No, sir.

13  Q.   Well, he didn't give you a number for anybody in Pakistan to

14  call, did he?

15  A.   That's correct, sir.

16  Q.   And you gave him your kunya name, right?

17  A.   That's correct.

18  Q.   And how did you come up with that?

19  A.   Just by myself, I guess.

20  Q.   And on the, the night of September 16, when Mr. Royer took

21  you to the 7-Eleven, what did he tell the LET people that you

22  heard?

23  A.   I'm sorry?

24  Q.   Did you hear him on the phone?

25  A.   Oh, yes.  He gave my kunyas, my aliases.

**J.A. 2259**

**Hasan - cross** 2113

1  Q.   And he gave a physical description of you?

2  A.   I don't remember him giving a physical description, but --

3  Q.   Did he give a physical description of Mr. Kwon?

4  A.   I don't recall, sir.

5  Q.   Did you recall him saying, "I'm sending two, and two more are

6  coming over"?

7  A.   No, I don't recall that.

8  Q.   You don't recall that.

9        You testified that, that Mr. Royer said that he couldn't

10 go to Afghanistan because as a white guy, he'd be shot as a spy,

11 right?

12 A.   That's correct.

13 Q.   Did Mr. Kwon ask what would happen to him as a Korean?

14 A.   I don't know.

15 Q.   Didn't -- Mr. Kwon didn't say, "If they're going to shoot

16 you, Mr. Royer, what are they going to do to me?"

17 A.   Well, it was because he was white, and obviously, people

18 think of, I guess, the Americans as being white, and so that's my

19 assumption, sir.

20 Q.   But Mr. Kwon didn't say anything in response about the fact

21 that he didn't look like somebody from Afghanistan or Pakistan,

22 either, right?

23 A.   No, sir.

24 Q.   He doesn't look Arab at all, does he?

25 A.   No.

**Hasan - cross**

1  Q.   So after -- do you know what time it was that Mr. Royer
2  finished making the phone calls for you at the 7-Eleven on the
3  night of the 16th?
4  A.   I'm sorry, sir?
5  Q.   Do you know what time it was when Mr. Royer finished making
6  the phone calls to the, to the people in Pakistan?
7  A.   I don't recall, sir.
8  Q.   Did you buy the calling card?
9  A.   I don't recall, sir.
10 Q.   Did you notice on the night of the 16th that Mr. Khan had a
11 document with him when he showed up at the house?
12 A.   I don't recall, sir.
13 Q.   Did Mr. Khan have a catalog page from an outdoors magazine at
14 the meeting?
15 A.   I don't recall, sir.
16 Q.   You never saw such a thing?
17 A.   No, sir.
18 Q.   Okay.  And you, you didn't hear Mr. Khan tell Mr. Kwon
19 anything about good jackets to buy to go train in the Himalayas
20 with?
21 A.   No, sir.
22 Q.   That didn't happen, right?
23 A.   No, sir.  I don't recall that.
24 Q.   Okay.  And you weren't there when Mr. Kwon ordered the
25 jackets or anything else, right?

**Hasan - cross**                                                    2115

1    A.    I don't recall that, either, sir.

2    Q.    Do you recall that he did order jackets?

3    A.    I recall that he did order jackets.

4    Q.    Did you go buy them at Galyan's?

5    A.    The jackets?

6    Q.    Yes.

7    A.    No, we did not.

8    Q.    When did he order the jackets?

9    A.    I have no -- I just know that the jackets were ordered, sir.

10   Q.    You weren't there when that happened?

11   A.    No, sir.

12   Q.    But he gave you a jacket at some point, correct?

13   A.    That's correct, sir.

14   Q.    And you used that jacket when you were in Pakistan, correct?

15   A.    That's correct.

16   Q.    And then you went to the Pakistani embassy the next morning,

17   right?

18   A.    Yes, sir.  I don't know exactly when, but I did go to the

19   Pakistani embassy.

20          MR. MAC MAHON:  Let me put up a demonstrative exhibit,

21   if I could, Your Honor.

22          THE COURT:  Has the government seen it?

23          MR. MAC MAHON:  I'll show them -- yeah, I've given it to

24   them, Your Honor.

25          Excuse me, Your Honor.

**J.A. 2262**

1           THE COURT:  Take a look at --

2           MR. MAC MAHON:  Exhibit 59.

3           THE COURT:  59, yes.

4           Is there an objection to that exhibit?

5           MR. GIBBS:  No, Judge.

6           THE COURT:  All right.  Are you moving it in,

7  Mr. MacMahon?

8           MR. MAC MAHON:  Yes, Your Honor.

9           THE COURT:  All right, Defense 59 is in.

10          (Defendant's Exhibit No. 59 was received in evidence.)

11  BY MR. MAC MAHON:

12  Q.   Sir, have you seen the document -- do you have Exhibit 59 in

13  front of you?

14  A.   No, sir.

15          Yeah, I see it now.

16  Q.   Does that look like the kind of form you filled out at the

17  Pakistani embassy?

18  A.   Maybe.  I don't know.  I don't recall.

19  Q.   Do you remember filling it out?

20  A.   I have no idea, sir.

21  Q.   Do you remember going to the Pakistani embassy --

22  A.   Yes.

23  Q.   -- on -- in September?

24  A.   Yes, sir.

25  Q.   And was Mr. Kwon with you?

**Hasan - cross**

1  A.   Yes, sir.

2  Q.   And he, he gave you money to help pay for the, the tickets

3  and everything else, too, right?

4  A.   Yes, sir.

5  Q.   And that day, did you do all the talking at the embassy?

6  A.   Yes, I did.

7  Q.   Because you spoke Urdu, right?

8  A.   Yes, sir.

9  Q.   And you filled out -- you put false information on the visa

10 application, right?

11 A.   Yes, I did.

12 Q.   And that was something that you and Mr. Kwon had decided on

13 your own to do before you went to the Pakistani embassy, right?

14 A.   That's correct.

15 Q. · All right.  You decided -- you and Mr. Kwon got together and

16 agreed that you would lie to the embassy and say you were going to

17 a wedding, correct?

18 A.   That's correct.

19 Q.   And that was completely false?

20 A.   That's correct, sir.  Well, it's not completely false.  I did

21 go to a marriage.

22 Q.   And he (indicating) didn't tell you that you should put false

23 information on a visa form, right?

24 A.   That's correct.

25 Q.   And I think you -- did you tell the jury that you saw

**Hasan - cross**                                              2118

1    Mr. Khan there?

2    A.    Yes, I did.

3    Q.    Had you not been in touch with Mr. Khan?

4    A.    No.

5    Q.    Well, you took Mr. Khan up to Pennsylvania that day, didn't

6    you?

7    A.    That's correct.

8    Q.    And is that just a -- are you telling the jury it was a

9    coincidence that you gave Mr. Khan a ride to Mr. Aatique's house?

10   A.    No.   I volunteered to do it, sir.

11   Q.    And that's because you knew that Mr. Aatique already had a

12   plane ticket to go overseas, right?

13   A.    No, I did not know that.

14   Q.    Did you find that out when you got there?

15   A.    I don't recall, sir.

16   Q.    You don't remember that?

17   A.    No, sir, I don't.

18   Q.    Do you remember giving Mr. Aatique advice as to how to reach

19   the camps undetected?

20   A.    Did I give -- I'm sorry?

21   Q.    Do you remember that you and Yong Kwon went to Mr. Aatique's

22   house, and do you remember the conversation that you had with

23   Mr. Aatique?

24   A.    I don't remember, sir.

25   Q.    And you didn't tell him to travel apart from Mr. Khan?

2119

## Hasan - cross

1  A.  I don't recall, sir, having any conversation with him.

2  Q.  Did you hear Mr. Kwon have a conversation with him about how

3  to --

4  A.  No, I did not, sir.

5  Q.  You didn't hear any of that?

6  A.  No, sir.

7  Q.  And so you gave him no advice on how to reach the camps

8  undetected?

9  A.  No, sir.

10  Q.  Now, you were -- you told the jury that you, you came back to

11  Virginia and you were very busy, right?  You were shopping at

12  Galyan's?

13  A.  Yeah.

14  Q.  And you were -- Mr. Kwon was paying for everything, right?

15  A.  No.

16  Q.  Were you in touch with Mr. Royer at this time?

17  A.  I don't recall, sir.

18  Q.  You don't remember talking to Mr. Royer if I --

19  A.  Maybe I did.  Maybe.

20  Q.  Well, Mr. Royer encouraged you to go, didn't he?

21  A.  To go to LET, yes.

22  Q.  Yes.  And he had told you to go -- asked you to go before,

23  hadn't he?

24  A.  I don't recall, sir.

25  Q.  You don't have any recollection of that?

**Hasan - cross**

1  A.   No, sir.

2  Q.   Do you remember how it is that you ended up having lunch with

3  Mr. Al-Timimi?

4  A.   No, sir.

5  Q.   And at that lunch, you actually told him you were going to a

6  wedding in Pakistan, didn't you?

7  A.   No.

8  Q.   You didn't tell him that?

9  A.   No, sir.

10 Q.   Now, before you had lunch with Mr. Al-Timimi, did you go to a

11 Borders Bookstore in Falls Church?

12 A.   I don't recall.

13 Q.   Mr. Hasan, do you remember going to a Borders Bookstore in

14 Falls Church --

15         MR. GIBBS:  Objection, Judge.  Asked and answered.  He

16 said he doesn't recall.

17         THE COURT:  Well, I'm going to allow it one more time.

18 Go ahead.

19 BY MR. MAC MAHON:

20 Q.   -- before you left for Pakistan, where you met Sheikh Jaafar

21 Idris?

22 A.   Maybe, sir.  I'm, I'm not sure.

23 Q.   Did you talk to Sheikh Jaafar Idris before you left for

24 Pakistan?

25 A.   I believe so.

1  Q.   And where did that take place?

2  A.   I remember talking to him at his house definitely.

3  Q.   Okay.  And was Yong Kwon with you?

4  A.   Yes, sir.

5  Q.   And Sheikh Jaafar Idris at that meeting told you not to

6  travel to Pakistan, didn't he?

7  A.   I remember Yousuf Jaafar definitely telling me not to go,

8  sir.

9  Q.   I said his father, Sheikh Jaafar, is who I'm talking about.

10 A.   I don't remember, sir, about Sheikh Jaafar telling me.

11 Q.   But you did have a discussion with him before you left,

12 didn't you?

13 A.   I don't recall, sir.  Not specifically, no.

14 Q.   You don't recall asking Yousuf Idris to, to stay in the car

15 at a Borders Bookstore while you talked to his father?

16 A.   No, sir, I do not.

17 Q.   And you said that you talked to Yousuf Idris before you left

18 as well, right?

19 A.   Yes, sir.

20 Q.   And he told you not to go to Pakistan, too, didn't he?

21 A.   Yes, sir.

22 Q.   Now, when you were interviewed by the FBI in -- last month,

23 you told them for the first time that you remembered having a

24 conversation with Yousuf Idris in which he discouraged you to

25 travel to jihad in Pakistan, right?

1  A.   That's correct, sir.

2  Q.   And why didn't you tell him that before?

3  A.   I didn't remember, sir.

4  Q.   You had no recollection of that?

5  A.   No, sir.

6  Q.   What, what, what prompted you to remember it?

7  A.   The FBI had asked me again regarding the people who I had

8  told before I left, and they had mentioned me names, and I said

9  no, I remembered people -- did remember the fact that I did go to

10 Yousuf Jaafar's house and Sheikh Jaafar's house and, and having

11 that conversation.

12 Q.   And Mr. Kwon was with you when that happened, wasn't he?

13 A.   That's what I remember, sir.

14 Q.   And in that conversation, that occurred when you dropped off

15 some software for Sheikh Jaafar; isn't that right?  Some gift for

16 Sheikh Jaafar before you left, right?

17 A.   Yeah, yeah.

18 Q.   This was a pretty momentous time in your life, wasn't it,

19 sir?

20 A.   I guess so.

21 Q.   And you didn't remember talking to Sheikh Jaafar before you

22 left?

23 A.   I just don't recall specifics, no, sir.

24 Q.   Well, isn't -- what is Sheikh Jaafar's position -- what was

25 it on September 18 or 19th of 2001?  What is his position in the

**Hasan - cross**

1  community?

2  A.   Very high esteem.

3  Q.   Right.  He's one of the most respected men in your community,

4  isn't he?

5  A.   That's correct, sir.

6  Q.   And his, his son is a very respected member of your community

7  as well, right?

8  A.   That's correct, sir.

9  Q.   Now, you say that in -- on, excuse me, March 11, 2005, you

10  told the FBI that you had no idea how Yousuf learned that you were

11  traveling overseas for jihad; isn't that correct?

12  A.   I'm sorry, sir?

13  Q.   On March 11, 2005, you told the FBI that you have no idea how

14  Yousuf learned of your travel plans, correct?

15  A.   Yes, sir.

16  Q.   And you told the FBI that Ali Al-Timimi certainly had nothing

17  to do with it, right?

18  A.   Yes, sir.

19  Q.   Well, you don't have any idea what conversations Ali Timimi

20  had with Yousuf Idris before you went over to the house, do you?

21         MR. GIBBS:  Objection, Judge.  It calls for speculation.

22         THE COURT:  Well, if he made that answer, he can

23  certainly probe how it was that he came up with that answer.

24  Overruled.

25  BY MR. MAC MAHON:

**Hasan - cross**

1  Q.   You don't have any idea what conversations Ali Timimi had

2  with Yousuf Idris?

3  A.   No, sir.

4  Q.   And you'd already told Mohammad Al-Qahtani, right?

5  A.   Yes, sir.

6  Q.   Did you tell him you were going overseas to do jihad?

7  A.   No, I did not tell him specifically.

8  Q.   But you told him you were going overseas to make hijra,

9  right?

10  A.   To go to Pakistan.

11  Q.   Right.  The land of your home, right?

12  A.   Yes.

13  Q.   Now, you don't recall -- you told the FBI that you had no

14  recollection of Yousuf mentioning Al-Timimi during the

15  conversation, right?

16  A.   No, sir, I don't remember anything like that.

17  Q.   And it's your -- is it your testimony that just because

18  your -- you believed because you had trimmed your beard, that

19  Yousuf Idris would have known you were going overseas for jihad?

20  A.   I believe that was the starting point of the conversation.

21  Q.   What, he said to you, "What did you do with your beard?"

22  A.   Yeah.

23  Q.   And you said, "You must be able to tell I'm going overseas

24  for jihad"?

25  A.   Well, I mean, I was dropping off something, and I probably

**J.A. 2271**

**Hasan - cross**

1   told him that I was going overseas and I was taking care of
2   matters.  And I don't know exactly why, why I went to his house.
3   I know I remember dropping off that software which you've
4   mentioned, but I don't remember how that conversation led to him
5   discouraging me from going.
6   Q.  Okay.  Before you -- he knew you were going overseas before
7   you mentioned it to him, didn't he, Yousuf Idris, that night?
8   A.  I believe I -- well, I have a feeling that I mentioned it to
9   him.
10  Q.  Well, I thought the meeting you went to was a secret.  You
11  weren't supposed to tell anybody anything about what you were
12  doing.
13  A.  Well, you know, that was, that was the intention of the
14  meeting.
15  Q.  When you left the meeting, you told at least three people
16  what you were up to, right?
17  A.  That's correct, sir.
18  Q.  Did the FBI show you Ali Timimi's phone records from
19  September 19, 2001?
20  A.  I just remember showing them -- they showing them one time.
21  I don't know which records exactly.
22  Q.  Did they show you this?
23  A.  No, sir, not this one.
24  Q.  Did they show you his phone bill?
25  A.  No, sir.

**Hasan - cross**

1  Q.   Did they ask you -- did they tell you that Mr. Timimi had

2  tried to call you at 10:35 p.m. on the night of the 19th -- 10:30,

3  excuse me?

4  A.   No, sir, I did not know any of this.

5  Q.   They didn't tell you that he tried to call Mr. Kwon at 10:35?

6  A.   No, sir.

7  Q.   Did they ask you if you had any, if you had any information

8  as to why Mr. Timimi at the same time was talking to Yousuf Idris

9  and Mohammad Al-Qahtani?

10 A.   No idea, sir.

11 Q.   And those just happen to be two of the people you told you

12 were going overseas, right?

13 A.   That's correct.

14 Q.   But you never, you never talked to Al-Timimi on the night of

15 the 19th because you were already leaving, right?

16 A.   I don't recall the date, sir.

17 Q.   Did you check your voice mail when you got home whether you

18 had any messages from him?

19 A.   I don't recall.  I don't recall that, sir.

20 Q.   You told the FBI that you weren't even sure that Yousuf Idris

21 mentioned that his father had talked to you before, right?

22 A.   That's correct, sir.  I don't recall that.

23 Q.   Mr. Hasan, isn't it a fact that what was said to you by

24 Yousuf Idris that night was that his father had told you not to

25 travel and had told Yong Kwon not to travel and that Al-Timimi had

**Hasan - cross**

1  told him the -- told you the exact same thing?  Isn't that what he

2  said to you that night?

3  A.   No, sir, I don't remember any of that.

4  Q.   You don't remember any of that?

5  A.   No, sir.

6  Q.   You don't even remember Yousuf Idris telling you that his

7  father had told you not to travel?

8  A.   No, sir, I don't remember that.

9  Q.   And the advice that Al-Timimi gave you to go overseas was to

10  carry a magazine; is that right?

11  A.   Carry a magazine.

12  Q.   Was that some kind of special training that you thought he

13  had on teaching young Muslim men how to reach overseas?

14  A.   I have no idea, sir.

15  Q.   Did he suggest a specific magazine?

16  A.   I don't remember anything, sir.

17  Q.   Okay.  Was there something he told you that made you believe

18  he knew how to teach a young Muslim man to reach a camp overseas?

19  A.   I have no idea, sir.

20  Q.   He's never been to a camp, has he?

21  A.   I don't remember anything like that.

22  Q.   He's never told you he's been to a camp, has he?

23  A.   No, sir.

24  Q.   He's never told you he's even been to Pakistan, has he?

25  A.   No, sir.

**Hasan - cross**

1   Q.   And he told you to cry like a baby if you were caught; is
2   that right?
3   A.   Yes, sir.
4   Q.   Did you consider that pretty professional advice?
5   A.   I don't know, sir.
6   Q.   You were just enthralled with what he was saying, that this
7   man knows everything.  If I'm arrested by the FBI, if I cry like a
8   baby, I'll get to go home, right?
9   A.   That's the advice that he gave me, sir.
10  Q.   And you believe that?
11  A.   I believe it, sir.
12  Q.   Did you write it down somewhere?
13  A.   No, sir.
14  Q.   Did you write it down with the numbers you had for the LET
15  camp that Mr. Royer had given you?
16  A.   No, sir.
17  Q.   You did have such a piece of paper, didn't you, sir?
18  A.   Not me, sir.
19  Q.   Mr. Kwon did, right?
20  A.   I think so.
21  Q.   He didn't tell you that you should ask for a lawyer, did he?
22  A.   I'm sorry?
23  Q.   At the luncheon before you left, this man did not tell you if
24  you were caught by the police, the first thing you should do is
25  ask for a lawyer, right?

**Hasan - cross**

1   A.   No.

2   Q.   And he didn't tell you you should ask for your mother, did

3   he?

4   A.   Well, he did say to cry like a baby and ask for your mother,

5   yes.

6   Q.   Oh, he did say ask for your mother, too.

7        And he told you guys to stay apart, right?

8   A.   Yes, sir.

9   Q.   And then you bought a ticket -- you had a ticket where you

10  sat next to each other, right?

11  A.   Yes, sir.

12  Q.   The -- you've testified about the dinner at Mr. Kwon's house

13  when Sherdil walked into the room?

14  A.   Yes, sir.

15  Q.   Okay. And it's your recollection that everybody stopped

16  talking, right?

17  A.   Yes, sir.

18  Q.   Did everybody turn and look up at Sherdil?

19  A.   Yes, sir.

20  Q.   Including Mr. Timimi?

21  A.   As far as I can recall, yes.

22  Q.   The room just went dead quiet, right?

23  A.   Yes, sir.

24  Q.   You have a very specific recollection of that, right?

25  A.   Yes, sir, I do.

**Hasan - cross**

1  Q.   Did you know, did you know that -- whether Al-Timimi knew any
2  of the other people in the room?
3  A.   Yes, sir.
4  Q.   Did he know that they were all engaged in this conspiracy
5  that you've been practicing at your paintball game?
6  A.   As far as I recall, yes, sir, he knew that.
7  Q.   Oh, he knew that?
8  A.   He knew about the paintball, yes.
9  Q.   He knew about the paintball, but he didn't know that you were
10 training to go overseas for violent jihad, did he?
11 A.   I don't know that, sir.
12 Q.   And he didn't know that about anybody else that was in the
13 room, either, did he?
14 A.   I don't know that, sir.
15 Q.   So why is it that, that he stopped talking the minute that
16 Sherdil walked in the room?
17 A.   I guess because of the fact that he knew the type of people
18 that were in the room, sir.
19 Q.   How well did he know Mr. Aatique?
20 A.   I don't know that.
21 Q.   How well did he know Mr. Hammad Abdur-Raheem?
22 A.   I don't know that, sir.
23 Q.   Was there any discussion before the meeting about how this
24 was some trusted circle of people and we could say anything we
25 want in front of these people?

# Hasan - redirect

```
 1  A.   I don't know that, sir.
 2          MR. MAC MAHON:  May I have a second, Your Honor?
 3          Thank you.
 4          THE COURT:  All right, anything further from the
 5  government?
 6          MR. GIBBS:  Yes, Judge.
 7                  REDIRECT EXAMINATION
 8  BY MR. GIBBS:
 9  Q.   Now, Mr. Hasan, I'm going to go back to the beginning of
10  Mr. MacMahon's cross examination.  He asked you first of all about
11  these jihad videos.
12  A.   Yes, sir.
13  Q.   "Russian Hell 2000" and some other ones off the Internet.
14          Do you recall that?
15  A.   Yes, sir.
16  Q.   And you admitted that you did watch those, correct?
17  A.   Yes, sir.
18  Q.   Now, did watching any of those videos inspire you to actually
19  leave the country and travel for jihad?
20  A.   No.
21  Q.   But on September 16, you did.  What was different about that
22  day?
23  A.   Because of the talk that was given by Sheikh Ali Timimi.
24  Q.   Sheikh Ali Timimi?
25  A.   Yes.
```

**Hasan - redirect** 2132

1  Q.   Now, you were asked about your testimony in the Hussayen

2  trial out in Idaho, correct?  Do you recall that?

3  A.   Yes, sir.

4  Q.   And you testified that you did talk about the videos that you

5  watched in that trial, but you also talked about Timimi in that

6  trial, correct?

7  A.   That's correct.

8  Q.   All right.  Do you remember how many times during your

9  testimony you talked about Ali Timimi?

10 A.   I don't recall, sir.

11 Q.   All right.  Would it help to refresh your recollection to

12 look at your trial transcript?

13 A.   Sure.

14        MR. GIBBS:  Judge, I'd like to provide it to the

15 witness.

16        THE COURT:  Well, we're not going to have him sit there

17 and read an entire transcript, so I assume you have specific pages

18 you want him to look at?

19        MR. GIBBS:  I do, Judge.

20        THE COURT:  All right.

21 BY MR. GIBBS:

22 Q.   Do you recognize that, Mr. Hasan?

23 A.   Yes.

24 Q.   If you could turn to page 7, line 18?

25 A.   Yes.

**Hasan - redirect**

1   Q.   And were you asked about what inspired you to go overseas

2   there?

3   A.   I'm sorry, No. 7, right?

4   Q.   Well, page 7, line 18.

5   A.   Okay.  Yes, sir.

6   Q.   And what was your answer to that -- well, let me catch up

7   with you here.  Do you recall being asked the following question

8   and giving the following answer:

9          "Question:  Describe generally that belief for the

10  Court.

11          "Answer:  That at that time, there was fatwas that

12  were -- we were told by a scholar, who advised us this is what you

13  should do at this moment in time, and so that is the action I

14  took."

15          Do you recall giving that answer?

16  A.   Yes, sir.

17  Q.   Who is the scholar you were speaking about there?

18  A.   I was talking about Ali Timimi.

19  Q.   If you'd go to page 14, lines 3 and 4?

20  A.   Yes.

21  Q.   And actually starting at line 2:

22          "Answer:  I learned in Islam a great act is to fight for

23  jihad, and then I made my decision to go after meeting Al-Timimi

24  after the night of September 11.

25          "Question:  Tell the Court who Al-Timimi is.

**Hasan - redirect**

1    "Answer:  He is one of the scholars in the regime."

2    Do you recall being asked that question and giving that

3  answer?

4  A.   Yes.

5  Q.   If you'd turn to page 16, starting down at line 22?

6  A.   Yes.

7  Q.   Do you recall being asked the following question and giving

8  the following answer:

9    "Question:  And Al-Timimi said that Mullah Omar, who is

10  the leader of the Afghanistan Taliban, had asked that all Muslims

11  come to the defense of Afghanistan; is that correct?

12    "Answer:  That is correct.

13    "Question:  And he told you it was your obligation to

14  go, correct?

15    "Answer:  That is correct"

16    Were those the answers you gave in the trial in Idaho?

17  A.   Yes, sir.

18  Q.   If you'd turn to page 21, lines 1 to 3?

19  A.   Yes.

20  Q.   Starting at line 1:

21    "Question:  Ali Al-Timimi had gotten you fired up on

22  September 15 to go, correct?

23    "Answer:  That is one of the things, yes."

24    Was that the answer you gave in that trial?

25  A.   Yes.

**Hasan - redirect**                                          2135

1  Q.    Turning to page 22, line 13, do you recall being asked this

2  question and giving this answer:

3          "Question:  Isn't it true that you had not considered

4  going to the LET camp before the night of September 15, when Ali

5  Al-Timimi told you it was your obligation to go?"

6          And your answer was, "I had taken a step after Al-Timimi

7  had talked to me about jihad, yes."

8          Do you recall giving that answer?

9  A.    Yes.

10 Q.    If you'd go to page 24?  Starting at lines 9 and 10 -- well,

11 beginning at 8, there was an objection.  The court said, "Let the

12 witness explain," and you provided the answer, "The decision to go

13 to the camp, yes, the final decision was from Al-Timimi, yes."

14          Do you recall giving that answer?

15 A.    Yes.

16 Q.    And down at line 23 on that same page, do you recall giving

17 the answer that we were told by Al-Timimi that it was obligatory

18 jihad to go?

19 A.    Yes.

20 Q.    That was the answer you gave in Idaho?

21 A.    Yes, yes.

22 Q.    And that was some of the testimony you provided out there,

23 correct?

24 A.    Yes.

25 Q.    All right, you can set that to the side now, sir.  Thank you.

**Hasan - redirect**

1          Now, you were also asked on cross examination about your
2    activities in the years 2000 and 2001, where amongst the group
3    that played paintball, there was talk about Lashkar-e-Taiba,
4    correct?
5    A.    That's correct.
6    Q.    All right.  What was it about that period of time during the
7    talk about LET -- well, strike that.
8          Why didn't you go over to LET back at that time?
9    A.    I didn't think it was -- I didn't think it was the right
10   decision to go there.
11   Q.    And you testified on cross examination that when you left for
12   Pakistan after the meeting with Ali Timimi on September 16, that
13   you didn't tell your parents about what your true intentions were,
14   correct?
15   A.    That's true.
16   Q.    You told them a story about what you were going to be doing?
17   A.    Yes.
18   Q.    And why was it that you didn't tell your parents the truth
19   about what you were planning to do?
20   A.    They wouldn't let me go.
21   Q.    And did the fact that Ali Timimi had said that this jihad was
22   obligatory and you didn't have to tell your parents, did that
23   absolve you of the need to tell them what your true plans were?
24   A.    That's correct.
25   Q.    And you were asked by Mr. MacMahon about the three choices

**Hasan - recross**

1  that Ali Timimi provided: defending the amir of Afghanistan,

2  making hijra, or lying around the house like a rug, correct?

3  A.    Yes, sir.

4  Q.    Of those three choices, which ones of those did Ali Timimi

5  tell you were obligatory on 9/16?

6  A.    To go for Afghanistan.

7  Q.    Now, you were asked about the conversation with Yousuf Idris,

8  and the defense asked you if -- well, they asked you that you

9  didn't know what Ali Timimi had said to Yousuf Idris before,

10 correct?

11 A.    Yes, I did not know that.

12 Q.    You did not know.

13        But during your conversation with Yousuf, did he mention

14 Ali Timimi's name in any way?

15 A.    No, sir.

16        MR. GIBBS:  All right, Mr. Hasan, I want to thank you

17 again.  Mr. MacMahon may have a few more questions for you.

18        THE COURT:  Any recross, Mr. MacMahon?

19        MR. MAC MAHON:  Just a few, Your Honor.

20                RECROSS EXAMINATION

21 BY MR. MAC MAHON:

22 Q.    What -- in your decision to go overseas, how much of an

23 impact was the fact that you so enjoyed the events of September 11

24 in your decision, sir?

25        MR. GIBBS:  Judge, I'd object.  That's outside the scope

**J.A. 2284**

**Hasan - recross**

1  of my redirect. I didn't ask him anything about --

2          MR. MAC MAHON: He asked him why he went overseas, Your

3  Honor.

4          THE COURT: I'm going to allow this briefly. Go ahead.

5          THE WITNESS: Should I answer?

6  BY MR. MAC MAHON:

7  Q.   In making your decision to go overseas after September 11,

8  what -- did the fact that you were approving or overjoyed by the

9  events of September 11, did that play any impact in your decision

10 to go overseas?

11 A.   I didn't approve of 9/11, and I was -- at one point, yes, I

12 was overjoyed about it, but then later on, no, I was not.

13 Q.   When were you overjoyed?

14 A.   When I saw it, when I was at Sears, the first time I saw it.

15 Q.   Right when you saw the planes hit the building, your first

16 reaction was to be overjoyed?

17 A.   Yes, sir.

18 Q.   Now, with respect to the -- I thought Mr. Gibbs asked you why

19 didn't you go to LET before September 11. Did he ask you that

20 question?

21 A.   I believe so.

22 Q.   Okay. Is it your testimony that someone did invite you to go

23 over to LET before September 11?

24 A.   I don't believe going there, sir, or somebody inviting me.

25 Q.   No one ever mentioned it to you at all?

**Hasan - recross**

1  A.   No, sir.

2  Q.   And you testified that Al-Timimi told you that you going

3  overseas was obligatory, correct?

4  A.   Yes, sir.

5  Q.   Did you ask him why he gave you choices if one of them was

6  obligatory?

7  A.   I don't know why, sir.

8  Q.   And after he left the house, I assume the conversation

9  continued on into how this is obligatory and we've all got to go,

10  right?

11  A.   I don't recall the exact conversation, sir.

12  Q.   In fact, there was no discussion at all about the word

13  "obligatory" at all, was there?

14  A.   I don't recall, sir.

15  Q.   Do you remember testifying in the Khan trial?

16  A.   Yes, sir.

17  Q.   Page 1360.

18  A.   I have to see it in front of me.

19         THE COURT:  You need a copy of the transcript for the

20  witness.

21         MR. MAC MAHON:  I will, Your Honor.

22         And this, unfortunately, has some scribble on the top of

23  it, but --

24         THE COURT:  As long as he can read it.

25         MR. MAC MAHON:  He can, Your Honor.

**Hasan - recross**

1    Do you want a copy of it, Your Honor?  It's brief.

2    THE COURT:  That's all right.

3  BY MR. MAC MAHON:

4  Q.   Page 1360, the question starting on line 13:

5    "Question:  Mr. Hasan, one question I wanted to ask.

6  Going back to the meeting at Yong Kwon's house for a moment, after

7  Ali Timimi left the meeting" --

8    THE COURT:  Mr. MacMahon, slow down just a bit.

9    MR. MAC MAHON:  I'm sorry, Your Honor.  I'll start over

10  again.

11  Q.   "Mr. Hasan, one question I wanted to ask.  Going back to the

12  meeting at Yong Kwon's house for a moment, after Ali Timimi left

13  the meeting and the rest of the group stayed behind, did you make

14  any comments to the rest of the group regarding this jihad in

15  Afghanistan being obligatory?"

16    And your answer was, "No."

17    "Question:  Did anyone else at the house discuss Ali

18  Timimi's advice that this jihad in Afghanistan was obligatory?

19    "Answer:  I cannot recall."

20    That was your testimony in the prior trial, right?

21  A.   That's correct.

22  Q.   So nobody -- the word "obligatory" was never mentioned again,

23  right?

24  A.   That's why I said that he -- I asked him the question.

25    MR. MAC MAHON:  Just one second, Your Honor.

**Hasan - recross**

1  Q.   Now, when you were interviewed by the FBI last week, you told

2  them that you didn't remember -- recall at all whether Al-Timimi's

3  name came up in your conversation with Yousuf Idris, right?

4  A.   Yes, sir.

5  Q.   So your testimony isn't that it wasn't -- the name Al-Timimi

6  wasn't mentioned in that conversation, was it?

7  A.   No, sir.

8  Q.   Could have been?

9  A.   It wasn't mentioned, sir.

10  Q.   You say now that it wasn't mentioned at all?

11  A.   I just remember that it wasn't mentioned, sir.

12  Q.   And you told the FBI that Yousuf is not as knowledgeable

13  about Islam as Al-Timimi, right?

14  A.   That's correct.

15        MR. MAC MAHON:   I don't have anything further, Your

16  Honor.

17        THE COURT:   All right.   Then Mr. Hasan can be returned,

18  correct?

19        MR. GIBBS:   That's correct, Judge.

20        THE COURT:   All right, thank you.   The witness is

21  remanded.

22                    (Witness excused.)

23        THE COURT:   Your next witness?

24        MR. KROMBERG:   Mr. Aatique.

25        MR. MAC MAHON:   Your Honor, his name didn't come up in

2142

1  our case at all.

2          THE COURT:  Well, his name doesn't have to come up.

3  This is rebuttal, and if they're rebutting some fact --

4          MR. MAC MAHON:  I don't know what --

5          THE COURT:  We'll see.  It can't just be repetition.  It

6  has to be rebuttal.

7          Do you have any witness you can get while you're

8  bringing him up?

9          MR. KROMBERG:  No, Your Honor.

10          THE COURT:  You don't have another witness?

11          MR. KROMBERG:  No, but there is -- there are other

12  matters I would like to take up.

13          THE COURT:  Well, let's take them up while we're

14  bringing him up.  Do you need to approach the bench?

15          MR. KROMBERG:  Yes, Your Honor.

16          THE COURT:  Oh, all right.

17          (Bench conference on the record.)

18          THE COURT:  It's late in the day.  I don't want a whole

19  lot of bench conferences.  The jury is tired.

20          MR. KROMBERG:  Your Honor, Government Exhibit 7D2 was an

21  e-mail by Surratt reporting on a lecture that he saw that Sheikh

22  Jaafar gave shortly after 9/11 which is completely contrary to

23  what the positions of Dar al-Arqam is according to the defense

24  exhibit where they said all the right things about 9/11.

25          Surratt in the e-mail 7D2 is talking about what Sheikh

## Aatique (recalled) - direct

1  Jaafar said, which were not all the right things, and we think
2  that is now -- it has been authenticated, Surratt said it was his
3  e-mail.  It's now relevant because Yousuf Idris was talking about
4  how Sheikh Jaafar would never countenance anyone going to fight,
5  when we have Sheikh Jaafar now on this document written by Surratt
6  when it happened saying all sorts of bad things about 9/11.
7              THE COURT:  Let me take a look at it.
8              MR. KROMBERG:  7D2.
9              THE COURT:  Look, I'm going to interrupt this now.  The
10 witness is here.  Let's get the witness on.  I'll look at this.
11 You start the examination.
12             (End of bench conference.)
13             THE COURT:  All right, Mr. Aatique, you're still under
14 your affirmation from when you testified previously.  Do you
15 understand?
16             THE WITNESS:  Okay.
17             THE COURT:  All right.
18                 MUHAMMAD AATIQUE, GOVERNMENT'S WITNESS,
19                    PREVIOUSLY AFFIRMED, RECALLED
20                         DIRECT EXAMINATION
21 BY MR. KROMBERG:
22 Q.  Good afternoon, Mr. Aatique.  I'd like -- before we start,
23 I'd like to ask you to speak slowly.
24 A.  Okay.
25 Q.  Now, the question for you is I want to turn your attention to

# Aatique (recalled) - direct

1  September 16, 2001.  We talked about the meeting at Kwon's house,
2  right?  After that meeting and before you left for Pakistan, did
3  Ali Timimi communicate with you in any way to discourage you from
4  going to the Lashkar camp?
5  A.   No.
6  Q.   Before you got to the meeting on September 16, 2001, what
7  information, if any, did you have that Yong Kwon was already
8  planning to go to a Lashkar camp?
9  A.   I had no information.
10 Q.   You had no information?
11 A.   I had no information that he had any plans to go to an LET
12 camp.
13 Q.   Before you arrived at Kwon's house that day, what
14 information, if any, did you have that Yong Kwon was already
15 planning to order a jacket from Cabela's to use in Pakistan?
16       MR. YAMAMOTO:  Your Honor, this is -- this was covered
17 in the government's case on cross.  I don't know --
18       THE COURT:  Well, it was, but then issues were raised
19 during the defendant's case that I think allow this to come back
20 in for rebuttal, so I'm overruling the objection.  This may come
21 in, and you'll get a chance to cross-examine the witness.
22 BY MR. KROMBERG:
23 Q.   Mr. Aatique, did you -- do you recall the question?
24 A.   Could you repeat that, please?
25 Q.   Before you arrived at Mr. Kwon's house on September 16, 2001,

# Aatique (recalled) - direct

2145

1  what information, if any, did you have that Mr. Kwon was already

2  planning to order a jacket from Cabela's to use at a Lashkar camp

3  in Pakistan?

4  A.   I don't have any recollection about, about him ordering any

5  jacket before I went to that meeting.

6          MR. KROMBERG:  Okay.  Thank you.  Nothing further for

7  Mr. Aatique.

8          Mr. Yamamoto or Mr. MacMahon may have questions for you.

9          MR. YAMAMOTO:  No questions, Your Honor.

10         THE COURT:  All right, the witness may be remanded.

11 Thank you.

12         MR. KROMBERG:  Thank you.

13                    (Witness excused.)

14         MR. KROMBERG:  Your Honor, with the exception of the

15 issue that's before you right now --

16         THE COURT:  All right.

17         MR. KROMBERG:  -- and the issue of the summary chart

18 that we still have to deal with --

19         THE COURT:  All right.

20         MR. KROMBERG:  -- we have no further witnesses, unless

21 we need a witness for the summary chart or -- who would be Agent

22 Wyman, who compiled it, or the document that Your Honor has before

23 you now.

24         We also -- there are a couple more documents I'd like to

25 move in.

2146

1          THE COURT:  All right.  Well, the jury doesn't need to
2  be here for that.  Is there any other evidence that the defense
3  wants to present in terms of a surrebuttal?

4          MR. MAC MAHON:  No, Your Honor.

5          THE COURT:  All right.  Then, Ladies and Gentlemen,
6  we've actually pretty much stayed on schedule.  We have completed
7  all of the evidence unless for some reason there needs to be a
8  mop-up witness of some sort, and I'm not going to keep you here
9  while I look at these exhibits.  So we are finished for this week.

10          And when we come back on Monday, most likely we'll start
11  right away with closing arguments.  There could be a 15- or
12  20-minute evidence issue if I don't resolve things today, all
13  right?

14          So I do expect you will get this case for deliberation
15  sometime on Monday.  When, I can't guarantee you.  There tend to
16  be a lot of starts and stops on the very last day of a trial, but
17  we're going to try to get it to you as quickly as possible on
18  Monday.

19          I think so that we don't waste your time, we will start
20  Monday at 10:00, all right?  And otherwise, we're going to stay
21  pretty much on the same schedule.

22          Now, I also want you to know that after Monday, for
23  deliberation purposes, I'm going to move the jury down to my
24  regular courtroom because we aren't going to need all this
25  technology.  So after Monday, you'll be reporting to the courtroom

2147

1  on the sixth floor. It's right underneath this one, and the
2  Clerk's Office will help you get there. But I just didn't want
3  you to be surprised. That's the reason why we're doing it. I
4  don't need this technology, and this is not my regular courtroom.

5         All right, if there's nothing further for the jury then,
6  again, remember my cautions. It's still extremely important that
7  you not begin any deliberation because you don't have the whole
8  picture. Have a good weekend. Tomorrow is not the weekend yet;
9  it might feel that way for some of you; but we'll see you back
10 here Monday at 10:00. Thank you. We'll stay in session.

11                        (Jury out.)

12        THE COURT: All right. Now, so I don't forget to say
13 this, we have been, as you know -- you-all can have a seat for a
14 second. We've been -- although we haven't needed it, there has
15 been a -- the second courtroom across the hall has been available
16 for overflow.

17        We will have a visiting judge up here next week who is
18 going to be trying an unrelated case across the hall, so to the
19 extent that some of you may be planning to have extra people come
20 to watch the closing argument, I'm alerting you that once this
21 courtroom is filled, that's it. There's no overflow, and I don't
22 want anyone to be surprised about that.

23        All right, let me take 30 seconds to look at this
24 document, all right? Because I want to resolve as much stuff as I
25 can today.

2148

1          MR. MAC MAHON:  What's the number again, Your Honor?

2          THE COURT:  It's 7D -- as in David -- 2.

3          MR. MAC MAHON:  Thank you.

4          THE COURT:  And it's, it's from shaisurratt@hotmail.com,

5    to Al-Jazeera.  All right.

6          All right, Mr. Kromberg, I'm not allowing this in

7    because this is apparently Surratt's view or version of what he

8    believed Sheikh Jaafar was saying, and that's just too far removed

9    from this case.  I mean, if Jaafar were here, you could ask him

10   about it, but I'm not having it go in like this.

11         MR. KROMBERG:  Judge, what we're left with then is

12   defense puts in this flowery statement from Dar al-Arqam saying

13   all the right things, and then the defense is going to argue that,

14   oh, Yousuf Idris is a very -- a wonderful man because he's just

15   like his father, when his father was not like that at all.

16         THE COURT:  Look, if you were listening, there was a lot

17   of very effective cross examination that occurred of that witness

18   as well.  I don't think, I don't think you have quite that -- that

19   characterization of the evidence I don't think is totally

20   accurate, but regardless of that, this is not in my view

21   sufficiently reliable evidence, so I'm not permitting it in.

22         All right.  Now, what other -- the other issue, I read

23   your memo on your motion to admit the summary chart.  The summary

24   chart for the record is in and of itself -- and I recognize this

25   is a complex case, but the chart's 27 pages.  The jury will not be

**J.A. 2295**

2149

1    overly assisted by this, and the potential prejudicial impact on

2    the defense will be overwhelming.  There's way too much detail.

3         I don't have a problem and I would recommend both sides,

4    if they could, work out a summary chart, but this level of detail

5    is just basically giving one view of all the evidence that went

6    in.  That's what closing argument is all about.  And this amount

7    of detail, especially with extensive quotes from the Taiba

8    Bulletins, I mean, the problem is the Taiba Bulletins have lots of

9    things in them.

10        MR. KROMBERG:  Right.  Your Honor, I have to say we have

11   an updated version where we took out the quotes from the Taiba

12   Bulletin for that reason, to make the chart smaller, but it isn't

13   here yet, but we've been working to that, and I'm still waiting

14   for the defense to tell me what they want.

15        THE COURT:  All right.

16        MR. KROMBERG:  I mean, we're doing this in a vacuum.

17   We're doing the best we can, but we're not -- I mean, everybody

18   has been very busy, obviously --

19        THE COURT:  Right.

20        MR. KROMBERG:  -- but I haven't got word one yet on what

21   is acceptable in a summary chart.

22        So that's where we are.

23        MR. YAMAMOTO:  Your Honor, why can't we just -- I think

24   the Court indicated at one point to give to the jury our exhibit

25   list of the exhibits that are admitted.  Then they can, they can

**J.A. 2296**

2150

1   look at it, pull out the document of whatever it is they want,

2   tape or whatever.

3           MR. KROMBERG:  Your Honor, they asked for a timeline,

4   and it is helpful -- there is no prejudicial value -- it's purely

5   facts to put in this is the exhibit that is dated a certain time.

6           THE COURT:  Well, for example, it might help both sides

7   if you can sit down and work out a timeline.  I would think, for

8   example, the defense may want to get into the timeline the, I

9   think it's the September 19 telephone call pattern that supports

10  to some degree your view.

11          MR. YAMAMOTO:  I don't think they're going to want that

12  in there.

13          THE COURT:  Well, the point is you're going to have to

14  do some give-and-take, because if you can't work it out, I'm not

15  letting any chart go.  How's that?

16          MR. YAMAMOTO:  That's fine with me.

17          THE COURT:  It's totally discretionary with the Court

18  what goes to the jury or not.

19          MR. KROMBERG:  Your Honor, you just said if we can't

20  work it out, you're not going to let anything in.  What kind of,

21  what kind of a negotiating position are they in now?

22          THE COURT:  Because they can't use a summary chart then,

23  either.

24          MR. KROMBERG:  But they don't want a summary chart.

25          THE COURT:  Mr. Kromberg, the one that I'm looking at,

**J.A. 2297**

2151

1   and that's the only one I've got, is not acceptable to the Court.

2   If you can work out one that is more acceptable, of course I will

3   look at it.

4          If you want, we will come back tomorrow -- I really

5   don't want to do this because I thought we'd all want a day away

6   from this case and get a chance to get ready for Monday -- but

7   I've got time in the afternoon tomorrow if we need to come back to

8   court and work on things.

9          MR. KROMBERG:  I will be glad to submit another one with

10  less detail, with fewer quotes, but I can't be put in the position

11  that if they don't agree with it, then you're not going to accept

12  it.

13         THE COURT:  All right, I'll back off on that a little

14  bit, but it's got to be reasonable.  Again, a summary chart is not

15  in my view a subterfuge for a shadow closing argument in the jury

16  room.  That's what I'm trying to avoid.  A summary chart, if it

17  will help the jury get through a great deal of technical evidence,

18  I don't have a problem with that.

19         MR. MAC MAHON:  Your Honor, I'm happy to try to work

20  with it, but this is clearly a piece of advocacy --

21         THE COURT:  All right.  I just said that.

22         MR. MAC MAHON:  -- with newspaper articles and other

23  things in it that aren't even in evidence in the case.

24         THE COURT:  I understand that.

25         MR. MAC MAHON:  It needs a lot of work, and we haven't

**J.A. 2298**

2152

 1  had a lot of time to sit down and --

 2          THE COURT:  Well, you're getting the time now.  All

 3  right, you've half an hour tonight or later tonight, and you've

 4  got tomorrow, and you've got the weekend.

 5          MR. KROMBERG:  Well, that --

 6          THE COURT:  All right.

 7          MR. KROMBERG:  Mr. MacMahon brings up an interesting

 8  point:  the newspaper articles.  Judge, Mr. MacMahon just

 9  cross-examined Hasan about Hasan's statement that Timimi said

10  Mullah Omar called for help.

11          The fact that the newspapers reported that, in fact,

12  Mullah Omar had called for help means that it corroborates Hasan

13  when he said Timimi said that.  And so at this point, after the

14  cross examination of Hasan, we'd like to move in again Government

15  Exhibits 7F5d, 7F24a, 7F24b, and 7F24c.

16          THE COURT:  Look, I thought we had talked about this

17  before.  The Washington Post or the New York Times or whatever it

18  is, it says what it says.  That ought not to be a fact that's in

19  dispute, and I don't see why we're wasting the jury's time having

20  to look at the whole article.  Can't that be a stipulation?

21          MR. MAC MAHON:  Because, Your Honor, he's arguing about

22  what these articles say.

23          THE COURT:  No, no.

24          MR. MAC MAHON:  So if an article says that he's asking

25  neighboring nations to help, Mr. Kromberg thinks that that says

J.A. 2299

2153

1   he's -- Mullah Omar is calling for troops.  There's another
2   witness who says it was in the fatwa.  It wasn't -- we now know
3   from an expert it didn't even exist that day in the United States.

4           THE COURT:  Whether -- wait a minute.

5           MR. MAC MAHON:  So these are being used to bootstrap
6   something else.

7           THE COURT:  Whether Mohammad Omar called for troops or
8   not is irrelevant.  If the media were misreporting what was going
9   on, the point is that report would have been in the common
10  knowledge or understanding of people.  The understanding may be
11  wrong, but the point is that was the whole thing.  They were
12  operating on that information.

13          The government wants to introduce newspaper articles.
14  What I'm suggesting is that's the kind of thing, it seems to me,
15  that could be a stipulation; that is, Washington Post article of
16  September 20, 2001, states he calls for troops.  That's all.

17          MR. MAC MAHON:  The problem -- we've stipulated to a
18  hundred things in this case, Your Honor.

19          THE COURT:  All right.

20          MR. MAC MAHON:  We've worked very well with the
21  government, and I know that he's appreciated what we've done, but
22  this -- the issue of Mullah Omar calling for the troops, every
23  witness has said it came out of the fatwa.  And Aatique, you heard
24  he said when he finally got the thing, it wasn't even in there.

25          And so to backdoor this with a newspaper article that

2154

1   says something about Mullah Omar on September 16 in Islamabad
2   asking for -- when there's no linkup to any of these people,
3   isn't -- it doesn't do anything other than put in evidence that's
4   obviously hearsay, that isn't even relevant to the case. We, of
5   course, a long time ago in this case didn't get to go talk to the
6   people that would have known the answer to that question.

7           And so, I mean, to try to bring it in now at this late
8   date after everybody has rested, I think, would be prejudicial to
9   the defense. We stipulated to the dates of the war that he
10  thought he was going to be -- that they sent him into hiding, the
11  things that are indisputable from what they read in the papers,
12  but when it says that he asked for help from his allies -- and, in
13  fact, if you look at one of Mr. Timimi's 302s, they show him a
14  newspaper: "Wasn't this the day that he asked for troops?"

15          And he says, "No, that's a far cry" -- quote-unquote in
16  the 302 -- "from what you guys have in your plea agreements with
17  these guys," or words to that effect.

18          So it's not -- it just isn't proper. This jury has got
19  all the information they want about it.

20          MR. KROMBERG: Your Honor, we'd be happy to agree that
21  what the Court just stated, that on such-and-such date, Reuters --
22  on September 16, at 5:08 p.m., Reuters reported Mullah Omar called
23  on, whatever the exact quote is, and we'll say it's not in for the
24  truth of whether he actually did it or not. It's only there for
25  what was reported at that time.

**J.A. 2301**

2155

1          THE COURT:  What are the exhibit numbers you're talking

2  about?

3          MR. KROMBERG:  7F5d is the Washington Post article,

4  which is not as important to us, Judge, as 7F24a, b, and c.

5          THE COURT:  All right.  So there are those exhibits.

6  There is the summary chart.  What else is still outstanding?

7          MR. KROMBERG:  I'd like to go to the well one more time,

8  Judge, on 7D8.

9          THE COURT:  No.

10         MR. KROMBERG:  Then could the Court -- well, if I could

11 say --

12         THE COURT:  Wait, 7D8?

13         MR. KROMBERG:  Yeah.  That's the Shibli Zaman e-mail.

14 The Court told us earlier today that this was a very close case,

15 and in that respect, then it may no longer appear as cumulative as

16 the Court had ruled before.

17         THE COURT:  I'm not letting this in.  I've ruled on it

18 half a dozen times.  It's not in.  Nice try, Mr. Kromberg.  You

19 don't get it.

20         All right.  So it's the 7F series.  It's four exhibits

21 there.  It's the summary chart.  Is there anything else?

22         MR. KROMBERG:  No, Your Honor.

23         THE COURT:  All right.  Now, there was still some

24 unfinished exhibit business from the defense.

25         MR. KROMBERG:  Oh, I'm sorry, we have agreed that the

**J.A. 2302**

2156

1  translation of -- actually, not the translation -- the transcript
2  of one of our exhibits, 10T4, I believe "The Role of Muslim
3  Students," either 10T4 or 10T10 that defense had provided us
4  yesterday --

5          THE COURT:  It's 10T4.

6          MR. KROMBERG:  We've agreed that that is a substantially
7  accurate translation, and we don't object to its being admitted if
8  they want as their exhibit.

9          MR. MAC MAHON:  Is that "The Role of the Muslim
10 Students"?

11         MR. KROMBERG:  Yes.

12         THE COURT:  What defense exhibit number is that?

13         I'm told it's 89.  Is that right?  I think Ms. Travers
14 knows them better than anybody else at this point.

15         MR. YAMAMOTO:  If it says it is, it must be.

16         MR. MAC MAHON:  I see an "89 Yes" in front of me, Your
17 Honor, so I think that's the answer.

18         THE COURT:  All right, so it's in.

19         (Defendant's Exhibit No. 89 was received in evidence.)

20         MR. KROMBERG:  And we've also, Your Honor, in response
21 to the Court's instructions yesterday, we've come up pictures of
22 people with their names.  It isn't final because we still have to
23 tinker with it, but we expect that we're going to have for the
24 jury pictures with people's names ready for next -- for Monday.

25         THE COURT:  All right.

1            MR. MAC MAHON:  And we don't have any objection to that.
2   We don't think they need this picture, though, Your Honor.

3            THE COURT:  Do you need any of the technology for
4   Monday?  Is anyone planning to use any of this stuff during the
5   closing argument?

6            MR. KROMBERG:  Yes, Your Honor.

7            THE COURT:  All right.  Because otherwise, I would have
8   it downstairs, but -- all right, hold on a second.

9            All right, Mr. Kromberg, something else because we're
10  anticipating questions:  This jury, I think, will be aggressive in
11  asking questions.  The clips that you had played, all right, from
12  the larger speeches, the entire speech is in evidence, correct?
13  Or the entire document is in evidence?

14            MR. KROMBERG:  "New World Order," "The Role of Muslim
15  Students," and the "Word of Advice to the Salafis" is in evidence.
16  We did not introduce "Purification of the Soul" because we were
17  waiting for someone who would say they actually saw the tapes.  We
18  got them from Dar al-Arqam -- oh, that is one thing.

19            We were going to do a stipulation about when lectures
20  were given on the basis of what Mr. Timimi said.

21            THE COURT:  Yes.

22            MR. KROMBERG:  And perhaps we'll work out a stipulation
23  to put the tapes in that we talked about as well.

24            MR. YAMAMOTO:  Is that the Purification tapes?

25            MR. KROMBERG:  Yeah, that we played before.

2158

1          THE COURT:  All right, but the problem is this:  What
2   the jury heard during the trial were the clips.  We have to have a
3   quick and easy way if the jury wants to replay the clip.

4          Now, again, I've told them during the trial and I'll
5   tell them again that they need to understand these are taken out
6   of context, and it's up to the jury to determine how they're going
7   to work with the evidence.

8          MR. KROMBERG:  We can provide the Court with a CD-Rom
9   with the clips indexed by the number -- and an index of the number
10  of the ones that -- only the ones that were played in court.  We
11  have to make it.  Again, it's going to take some time to do it,
12  but we can provide a CD-Rom with those particular clips.

13         THE COURT:  All right.  Now, the government must provide
14  that to the defense, and if there's any dispute about the clips,
15  you need to let me know.

16         MR. MAC MAHON:  We think they should just -- if they're
17  going to listen to the tapes, Your Honor, I don't think -- we
18  could have gone back and forth playing clips for another couple of
19  days if we'd wanted to, and I think they should just -- if they
20  want to hear these tapes, they're going to have to pull them out
21  and listen to them.

22         THE COURT:  I'm not making the jury's job that
23  difficult, and the law doesn't require that.  I've told them once
24  during the trial and I'll tell them again that they should be very
25  cautious and careful about taking anything out of context.

2159

1      However, if they want them -- and I'm not going to give

2   it to them in that format.  Let them ask for it.  But if they ask

3   for the clips, I'm going to let them get it, but I want to make

4   sure it's doable so that we don't have a long gap.

5           MR. KROMBERG:  It will be ready for Monday, Judge.

6           THE COURT:  All right.  Now, remember, we need an index,

7   and that's why you may want to spend a tiny bit of time with

8   Ms. Travers either this afternoon or tomorrow afternoon; I don't

9   want to have her stay too late tonight.

10          You need to make sure as to all the exhibits that you

11  believe have been introduced, obviously, I have to get back to you

12  on these few, and need to have a clean index that you can give to

13  the jury, and since I have had this issue arise in the past, I

14  want you to exchange the indexes with each other so that there's

15  no dispute about how something is titled, because I don't think

16  that will happen given the quality of counsel, but I've had that

17  happen in cases before.

18          So, I mean, if there's a problem with how something is

19  labeled, you work it out.  Obviously, the labels can't argue the

20  case, a neutral description of what the item is but enough

21  information so the jury understands what it is.  I mean, that's

22  the whole point about an index.  Okay?

23          Now, we still haven't done a charging conference, and I

24  don't intend to do it this afternoon, and I actually haven't

25  focused a whole lot yet on that.  The defense has filed certain

2160

1  objections to the government's instructions.  Did you tender --
2  other than your reference to Sand's, do you have a set you've
3  tendered to us of instructions, or are you just asking the Court
4  to go to Sand's to pull them?
5          MR. YAMAMOTO:  Your Honor, I have -- the standard
6  instructions are from Devitt and Blackmar or whatever volume the
7  fifth edition is now.
8          THE COURT:  All right.
9          MR. YAMAMOTO:  Those I just gave you the cite numbers.
10          THE COURT:  The cites for, okay.
11          MR. YAMAMOTO:  The Sand's, I believe I gave you the
12  instruction that I was asking for and then cited to it.
13          THE COURT:  All right.
14          MR. YAMAMOTO:  Now, as far as -- in our objections, I
15  just list what the Sand's instruction is, but it should be listed
16  in our proposed instructions.  If it's not, I can provide it to
17  the Court.
18          THE COURT:  I mean, I've read your objections, and
19  then -- all right, you do have the proposed ones here.  Most of
20  them are coming out of Sand's, but there are a few that have been
21  made up, correct?  You have one from Brandenburg v. Ohio.
22          MR. YAMAMOTO:  Right.
23          THE COURT:  You've got --
24          MR. YAMAMOTO:  The First Amendment one is from the Sami
25  Hussayen case and from Brandenburg.

**J.A. 2307**

2161

```
 1              THE COURT:  All right.

 2              MR. YAMAMOTO:  I think all the other ones --

 3              THE COURT:  Well, you have one from Salazar, right, on

 4    Counts 7 to 10?  I'll take a better look at this.

 5              Did the government file any objections to the

 6    defendant's proposed instructions?

 7              MR. KROMBERG:  I'm not sure -- I mean, I'm sure

 8    Mr. Yamamoto gave them to me, but I'm not sure where they are or

 9    when he gave them.

10              THE COURT:  All right.

11              MR. YAMAMOTO:  I'll get him another set, Your Honor.

12              MR. KROMBERG:  I will get back to the Court tomorrow --

13              THE COURT:  All right.

14              MR. KROMBERG:  -- on that.

15              THE COURT:  Okay.  That's fine.

16              We obviously will probably need to do -- I mean, I don't

17    think there's a major substantive dispute as I looked at these

18    quickly earlier this week, a major substantive dispute.  I mean,

19    Sand's is a reputable source, as is Devitt, and it's a matter of

20    different stylistic, but I'll be looking only at substantive

21    differences.

22              MR. YAMAMOTO:  I think substantively, the levy war

23    instruction --

24              THE COURT:  Right.

25              MR. YAMAMOTO:  -- and the First Amendment instruction
```

**J.A. 2308**

2162

1    are the only two that are really different.

2            THE COURT:  That's what I think as well.  And, you know,

3    I have some standard ones that I give because I've been giving

4    them, you know, since the beginning of time.

5            MR. YAMAMOTO:  Right.

6            THE COURT:  I am going to give -- I will make up an

7    instruction for the jury on this issue about statements out of

8    context because I think they need to be reminded of that again,

9    and I'll get that to you.

10           We'll most likely, what I think I want to do is meet

11   with you-all at 9:00 Monday morning, all right, so that we can

12   have a charging conference at that point and see if there are any

13   matters that have to be resolved.

14           Obviously, with the case like this, my hope is to have a

15   set of written instructions to give to the jury after I've given

16   them the charge.  I don't let juries have the instructions while

17   I'm reading.  I think it distracts them.

18           If there's anything else that comes up, as I said, I'm

19   around tomorrow afternoon.  Just call chambers, and we'll address

20   anything that comes up at the last minute.  I will get you

21   tomorrow afternoon my ruling on these exhibits, all right?

22           MR. MAC MAHON:  You don't want to hear any further

23   argument on these three exhibits, Your Honor?

24           THE COURT:  On the newspaper articles?

25           MR. MAC MAHON:  Yeah.  They're pretty short actually.

2163

1    If you don't want to hear any more argument --

2             THE COURT:  Frankly, I want to look at my notes.  I've

3    been taking very careful notes.  I want to see what references, if

4    any, there have been, and I want to think about them a little bit.

5    So I actually do want to have a few minutes more than just sitting

6    up here and doing this.

7             Now, did you get -- the issue about -- have you resolved

8    the issue about the spaceship Columbia documents?  That was the

9    other thing that we had talked about at one of the bench

10   conferences, right?  Where are we with that issue?  In other

11   words, remember --

12            MR. KROMBERG:  We have not progressed since that,

13   whenever that bench conference was.

14            THE COURT:  All right.

15            MR. KROMBERG:  We said that we did not have the

16   documents that, that were given -- that apparently -- that the

17   defense says were given to us, but in any event, we still agree --

18   we still argue that they're not relevant even if they did say

19   anything about characterizing the omen, and they certainly aren't

20   relevant if they didn't characterize the omen.

21            THE COURT:  What's that defense exhibit number again?

22            52.  All right, 52 is not yet in, and that's the other

23   one I need to look at.  That's that collection of Columbia --

24            MR. MAC MAHON:  Right.  And we think that shows -- if

25   the government is using that to show intent, we think that puts it

**J.A. 2310**

2164

1  in context with some other things that were going on at that time.

2          THE COURT:  The problem is we don't have any testimony

3  or any evidence about those documents.

4          MR. MAC MAHON:  Well, we -- the reason we didn't is

5  because we had -- under the rule we were proceeding under --

6  excuse me, Your Honor -- the rule we were proceeding under was if

7  they were given by the FBI and they came in through the 302s.

8  That's why we --

9          THE COURT:  But the problem is, as I understand it, now

10  Agent Wyman could be called back on the stand Monday morning, but

11  the problem is Agent Wyman, as I understand his testimony, he

12  cannot say that these are the documents that were shown to him or

13  presented to him during that interview.

14          MR. MAC MAHON:  In my conversation with him in the hall,

15  which I'm always loathe to discuss in court, I think he remembers

16  one or two of them but not all of them.  He remembers one of them.

17  Whether it was Pat Robertson or Jerry Falwell, there was one --

18          S.A. WYMAN:  Do you want me to speak?

19          THE COURT:  Yes.  Agent, why don't you come up to the

20  lectern.  Okay.

21          S.A. WYMAN:  There were documents provided during

22  interviews.  The two that were shown to me, the resume and the one

23  about the space shuttle, I did not recognize.

24          So I wanted to be sure -- it was my understanding that I

25  need to be sure that the documents I had back at the office did

2165

1   not match those documents, and I had someone check because the
2   documents that were provided to me we, we put together, we
3   retained, and those documents were not in there.
4           THE COURT:  All right.  So as I -- which attorney was
5   with the defendant when he came to see you that time; do you know?
6           S.A. WYMAN:  It would have been either --
7           THE COURT:  Mr. White?
8           S.A. WYMAN:  -- Ed MacMahon --
9           MR. MAC MAHON:  No, no.
10          S.A. WYMAN:  Martin McMahon or his associate, Chris
11  Smith.
12          THE COURT:  All right.  And anytime the defendant met
13  with the FBI and showed you documents, you kept them?
14          S.A. WYMAN:  Yes.
15          THE COURT:  All right.
16          S.A. WYMAN:  And we checked those documents for the ones
17  that were shown to me, and we do not have them.
18              We discussed, as I mentioned in the testimony --
19          THE COURT:  Yes.
20          S.A. WYMAN:  -- that there were other people putting out
21  messages about the space shuttle, but I didn't have -- you know,
22  we talked about it, and that's what I said yesterday, but I didn't
23  have the document that they showed me.
24          THE COURT:  Do you have any documents that were
25  presented to you by the defendant other than his own statement

**J.A. 2312**

2166

1  about the space ship -- the space shuttle?

2         S.A. WYMAN:  About the space shuttle?

3         THE COURT:  Yes.

4         S.A. WYMAN:  No.  I can confirm again.  That's what I

5  asked them to look for.

6         THE COURT:  Okay.

7         S.A. WYMAN:  I asked them to look for any documents

8  other than his own about the space shuttle, and the response back

9  from the agents who went through the 1A envelopes was that there

10 were not any others.

11        MR. KROMBERG:  Your Honor, if I may, I recall myself

12 seeing such things that were presented by Martin McMahon as -- in

13 the course of negotiations and discussions, and I don't dispute

14 that these things existed.

15        I'm not conceding that they were particular documents

16 that were turned over to the FBI, but we concede that if such

17 things are relevant, then we're not going to dispute the

18 authenticity of them.  The bottom line is we're not going to fight

19 about whether they were given to Special Agent Wyman or not, but

20 we just think that they're just not relevant.

21        THE COURT:  Well, and I understand your argument on

22 that.  I will look at Defense Exhibit 52 as well, all right?  And

23 I'll get you a ruling tomorrow afternoon so that you can prepare

24 your exhibit lists accordingly, all right?

25        Are there any other loose ends that either side thinks

2167

1    we need to address?

2         MR. KROMBERG:  Judge, I guess we will need to discuss

3    how long closing argument is going to be.

4         THE COURT:  I was thinking about an hour.  That's a lot

5    of time.  You know, every time -- I've never yet had it happen

6    where lawyers really needed all the time they got.

7         The level of detail -- you can only go so far in a

8    closing argument.  And I know it's a complex case, but it's no

9    more complex than Ebersole or some of these other cases I've

10   tried, and I think an hour, 45 minutes and 15 or 40 and 20, is

11   more than enough.

12        MR. KROMBERG:  Your Honor --

13        MR. MAC MAHON:  You mean total, Your Honor?

14        THE COURT:  Total, one hour per side.

15        MR. MAC MAHON:  I don't think we need that much time.  I

16   don't know if I can talk for that long, but after practicing here

17   for so long, I don't know -- I'd be shocked.

18        THE COURT:  I think an hour is generous.

19        MR. KROMBERG:  Your Honor, but it did happen during the

20   course of the trial that when, when I was trying to use the

21   summary witness to show connections, the Court said, "No, save

22   that for argument."  It just is a complicated thing in order to

23   show the corroboration.  Could we have an hour and a half?

24        THE COURT:  No.  I mean, if you're over by two minutes,

25   I'm not going to, you know, throw you out of the courtroom, but, I

2168

1   mean, you really -- the jury has -- some of them have three

2   notebooks.  They've been listening carefully.  It's a very

3   attentive jury.  As warm as it's been in the courtroom and as many

4   breaks as we've had, I haven't seen anyone even begin to doze off.

5   They're listening, all right?

6           And, you know, in Northern Virginia, we have a very

7   well-educated, intelligent jury pool.  So, I mean, you're all

8   spoiled by that because these jurors are very sharp.  They've

9   already asked, you know, they're not shy about letting us know

10  what they want.  We'll have the white board and the markers all

11  ready for them on Monday.  We usually get that question after

12  they've started.  So --

13          MR. KROMBERG:  Actually, I hope that means that we'll

14  have a summary chart -- I mean, a timeline, because that will make

15  it a lot easier --

16          THE COURT:  Well, as I said, a simple -- it isn't going

17  to have every detail in it -- a simple timeline might be very

18  appropriate.  Nothing like a 20-page, I mean, that's almost as

19  much evidence as are in some cases, all right?  I don't want to

20  get the jury hung up on that.

21          It's the same reason I don't normally send in -- and I'm

22  not going to in this case unless you want it, I know you don't --

23  is the indictment.  That will not go to the jury.  But the

24  instructions will, and I think the instructions will give them

25  enough.

2169

1          Now, on the verdict form, that was the only other thing
2  I haven't had a chance to talk to you about.  Did the defense have
3  an objection to the verdict form as presented by the government,
4  or have you not looked at it?

5          MR. YAMAMOTO:  It seemed awfully long, Your Honor.

6          THE COURT:  Yes, I'm concerned about that.  You know,
7  we're not any longer in the Blakely world.  I don't think we have
8  to go into that detail, do we?

9          MR. KROMBERG:  My concern was, Judge, that the defense
10 had asked for a bill of particulars on what were the underlying
11 crimes of violence for the firearms charge, and that is what took
12 up so much of the, of the verdict.

13         It's fine with us if, if the defense waives any
14 objection later that, oh, well, the jury may not have found him
15 guilty -- they may not have found a particular crime which was a
16 crime of violence because they want to preserve some, they want to
17 preserve some motion on what's a crime of violence.

18         My understanding is that every one of the charges that
19 we're alleging are crimes of violence are crimes of violence, and
20 therefore, if the jury finds that the use of firearms was in
21 furtherance or in connection with any of them, then each -- those
22 firearms charges are fine.

23         But I put that in in an abundance of caution to protect
24 against the defense on appeals, if there is such a thing, saying
25 no, this charge fails because the jury might have found that the

J.A. 2316

2170

1   use of firearms furthered a conspiracy which was not a crime of
2   violence, for example.

3           THE COURT:  All right.

4           MR. MAC MAHON:  And the problem with the way it's done,
5   Your Honor, is it's almost as if there's -- you know, one of them
6   is material support to Al-Qaeda in one of the crimes of violence
7   that they listed, and we'd have to go and do a rule 29 as to every
8   one of those to see if there was any -- I mean, I'm not sure how
9   the Court handles it otherwise.

10          But the way that one was done is exceedingly complex and
11  suggestive as to the whole series of crimes that actually aren't
12  even charged in the case.

13          MR. KROMBERG:  And they're not charged, Judge, but when
14  the bill of particulars -- when the defense asked for a bill of
15  particulars to say what are the crimes of violence that the
16  government alleges that the use of firearms furthered, we gave
17  them this list, and we think there is evidence for each and every
18  one of them.

19          THE COURT:  All right.  Well, I'm going to take a look
20  at that, and I'm sure I'm going to pare it down somewhat, but I
21  have learned over time that a somewhat special verdict form can be
22  really helpful, and so I suspect it will have to be along those
23  lines.

24          But again, I encourage you if there's an alternate form
25  you want the Court to look at, you need to get it to me, all

**J.A. 2317**

2171

1  right?  Otherwise, I'm just working off of the government's.

2              MR. MAC MAHON:  We'll do that, Your Honor.

3              THE COURT:  All right, that's fine.

4              All right, anything further?

5                         (No response.)

6              THE COURT:  So unless I hear from you about needing some

7  kind of an emergency hearing tomorrow afternoon -- and I'm not

8  going to be available before 2:00, so if something comes up that

9  we have to have court time on, you know, let me know early, but

10 you won't be over here before two -- but if that's not an issue,

11 then I'll see you back here at 9:00 Monday morning, all right?

12             MR. MAC MAHON:  Thank you, Your Honor.

13             THE COURT:  All right.

14             MR. KROMBERG:  Thank you, Your Honor.

15        (Recess from 5:52 p.m., until 9:00 a.m., April 18, 2005.)

16

17                    CERTIFICATE OF THE REPORTER

18        I certify that the foregoing is a correct transcript of the

19 record of proceedings in the above-entitled matter.

20

21

22        _____
                    Anneliese J. Thomson

23

24

25

**J.A. 2318**