No. 14-4451

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH COURT**

———————

**UNITED STATES OF AMERICA,**
*Plaintiff/Appellee,*

**v.**

**ALI AL-TIMIMI,**
*Defendant/Appellant.*

———————

**On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)**

———————

**JOINT APPENDIX**

**VOLUME X of XIII (pages 2319 - 2568)**

———————

| | | |
|---|---|---|
| **ERIC S. SIEBERT**<br>**United States Attorney** | | **GEREMY C. KAMENS**<br>**Federal Public Defender** |
| **Gordon D. Kromberg**<br>**Assistant U.S. Attorney**<br>**Counsel for Appellee**<br>**2100 Jamieson Avenue**<br>**Alexandria, VA 22314**<br>**(703) 299-3700** | **Joseph Attias**<br>**Attorney**<br>**Counsel for Appellee**<br>**Nat'l Security Division**<br>**U.S. Dep't of Justice**<br>**Washington, DC 20530** | **Geremy C. Kamens**<br>**Federal Public Defender**<br>**Counsel for Dr. Al-Timimi**<br>**1650 King Street, Suite 500**<br>**Alexandria, VA 22314**<br>**(703) 600-0800** |

This page intentionally left blank for double-sided pagination and printing

# TABLE OF CONTENTS

### VOLUME I (pages 1 - 122)

District Court Docket Sheet (as of Apr. 28, 2025) ........................................1

Indictment (Sept. 23, 2004, Doc. 1) .........................................................49

Superseding Indictment (Feb. 3, 2005, Doc. 47) ........................................64

Government's Proposed Jury Instructions (Mar. 28, 2005, Doc. 84) .............80

### VOLUME II (pages 123 - 372)

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 294) (defense opening
    statement) ............................................................................................123

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 148) ...........................144

    Opening statements ..........................................................................148

        By the government ........................................................................148
        By the defense ..................................................*see* J.A. 126

    Government's evidence .....................................................................167

        Stipulation ....................................................................................167

        Nabil Gharbieh          Direct examination ...................................171
                                          Cross examination .....................................233
                                          Redirect examination ................................274
                                          Recross examination .................................281

        Muhammad Aatique      Direct examination ...................................283

        Concluding matters ......................................................................369

i

## VOLUME III (pages 373 - 656)

Transcript, Jury Trial, Day 2 (Apr. 5, 2005, Doc. 149) ..........................373

   Preliminary matters .................................................377

   Government's evidence, cont'd ......................................377

      Muhammad Aatique     Direct examination (resumed) ................378
                                Cross examination...................................398
                                Redirect examination ............................468
                                Recross examination ..............................489

      Stipulations .........................................................492

      Donald Surratt        Direct examination...................................504
                                  Cross examination...................................570
                                Redirect examination ............................585
                                Recross examination ..............................588

      Detective John Hodge   Direct examination...................................589
                                  Cross examination...................................592
                                  Redirect examination ............................592

      Stipulations .........................................................594

      Playing of audiotapes...............................................598

      Yong Ki Kwon       Direct examination...................................604

   Concluding matters .................................................655

## VOLUME IV (pages 657 - 972)

Transcript, Jury Trial, Day 3 (Apr. 6, 2005, Doc. 150) ..........................657

   Preliminary matters .................................................661

ii

Government's evidence, cont'd ....................................................................665

    Evan Francois Kohlmann    Direct examination ...................................665
                                       Cross examination ....................................817
                                       Redirect examination ...............................895
                                       Recross examination ................................903

    Stipulations .............................................................................905

    Playing of audiotape ...............................................................914

Concluding matters .....................................................................970


### VOLUME V (pages 973 - 1270)

Transcript, Jury Trial, Day 4 (Apr. 7, 2005, Doc. 151) ..........................973

    Preliminary matters...................................................................977

    Government's evidence, cont'd ..................................................980

    Playing of audiotapes and videotape ........................................980

    S.A. Tracy Kneisler    Direct examination.................................1093
                                       Cross examination.................................1099

    S.A. Christopher Paul Mamula  Direct examination.................................1100

    S.A. Donald L. Monday    Direct examination.................................1105
                                       Cross examination.................................1127

    Stipulations ............................................................................1131

    Yong Ki Kwon    Direct examination (resumed) ..............1146
                                       Cross examination.................................1238

    Concluding matters .................................................................1268

## VOLUME VI (pages 1271 - 1550)

Transcript, Jury Trial, Day 5 (Apr. 11, 2005, Doc. 152) ....................................1271

    Preliminary matters ....................................................................1275

    Government's evidence, cont'd ....................................................1279

| | | |
|---|---|---|
| Yong Ki Kwon | Cross examination (resumed) | 1279 |
| | Redirect examination | 1446 |
| | Recross examination | 1475 |
| S.A. Wade Ammerman | Direct examination | 1481 |
| | Cross examination | 1539 |

    Concluding matters ....................................................................1548

## VOLUME VII (pages 1551 - 1804)

Transcript, Jury Trial, Day 6 (Apr. 12, 2005, Doc. 153) ....................................1551

    Government's evidence, cont'd ....................................................1555

| | | |
|---|---|---|
| S.A. Wade Ammerman | Cross examination (resumed) | 1556 |
| | Redirect examination | 1582 |
| | Recross examination | 1593 |

    Stipulations ..............................................................................1600

    Playing of audiotapes ................................................................1610

| | | |
|---|---|---|
| S.A. John Wyman | Direct examination | 1656 |

    Concluding matters ....................................................................1799

VOLUME VIII (pages 1805 - 2058)

Transcript, Jury Trial, Day 7 (Apr. 13, 2005, Doc. 154) ....................................1805

Preliminary matters ................................................................1808

Government's evidence, cont'd ................................................1810

S.A. John Wyman          Direct examination (resumed) ..............1810
                         Cross examination..................................1852
                         Redirect examination ............................1916
                         Recross examination ............................1923

Alex Daghestani          Direct examination................................1927
                         Cross examination..................................1935

Andre Thompson           Direct examination................................1940
                         Cross examination..................................1951

Playing of audiotapes.............................................................1954

Government rests .......................................................1955, 1965

Defendant's Rule 29 motion ....................................................1958

Defendant's evidence ............................................................1965

Sherdil Loynab           Direct examination................................1966
                         Cross examination..................................1970
                         Redirect examination ............................1976

Yousuf Jaafar Idris      Direct examination................................1977
                         Cross examination..................................2018

Concluding matters ................................................................2056

## VOLUME IX (pages 2059 - 2318)

Transcript, Jury Trial, Day 8 (Apr. 14, 2005, Doc. 155) .....................................2059

    Defendant's evidence, cont'd .........................................................................2063

        Yousuf Jaafar Idris      Cross examination (resumed) ...............2063

        Luther Kennedy          Direct examination..................................2136
                                              Cross examination....................................2144
                                              Redirect examination ............................2163
                                              Recross examination .............................2168

        Curtis Jamison            Direct examination..................................2172
                                                  Cross examination....................................2189

        Defendant rests ...........................................................................2198

    Government's rebuttal evidence ....................................................................2198

        Khwaja Mahmood Hasan    Direct examination..................................2199
                                                Cross examination....................................2235
                                              Redirect examination ............................2278
                                            Recross examination .............................2284

        Muhammad Aatique, recalled  Direct examination..................................2290

        Conclusion of evidence ...............................................................2293

    Preliminary charge conference ....................................................................2306

## VOLUME X (pages 2319 - 2568)

Transcript, Jury Trial, Day 9 (Apr. 18, 2005, Doc. 156) .....................................2319

    Charge conference ..........................................................................................2322

vi

Closing arguments ........................................................2346

    By the government.................................................2346
    By the defense......................................................2376
    Rebuttal by the government................................2415

Jury charge ..................................................................2429

Jury deliberations .......................................................2500

    Jury question .......................................................2500

Transcript, Jury Trial, Day 10 (Apr. 19, 2005, Doc. 157)........2506

    Jury deliberations, cont'd.....................................2507

    Jury question .......................................................2507

Transcript, Jury Trial, Day 11 (Apr. 20, 2005, Doc. 158)........2515

    Jury deliberations, cont'd.....................................2517

    Jury question .......................................................2517

    Jury questions .....................................................2520

Transcript, Jury Trial, Day 12 (Apr. 22, 2005, Doc. 159)........2535

    Jury deliberations, cont'd.....................................2537

Transcript, Jury Trial, Day 13 (Apr. 25, 2005, Doc. 160)........2540

    Jury deliberations, cont'd.....................................2542

    Jury questions .....................................................2542

Transcript, Jury Trial, Day 14 (Apr. 26, 2005, Doc. 161)........2553

    Return of verdict ................................................2555

Concluding matters ........................................................................2560

Verdict Form (Apr. 26, 2005, Doc. 107) ........................................2566


VOLUME XI (pages 2569 - 2770)

Defendant's Motion for Judgment of Acquittal (June 6, 2005, Doc. 118)..........2569

Defendant's Corrected Motion for New Trial (June 14, 2005, Doc. 124) ..........2630

Government's Response to Defendant's Post-Trial Motions (June 20, 2005, Doc. 125)................................................................2647

Defendant's Reply to the Government's Response to Defendant's Post-Trial Motions (June 28, 2005, Doc. 126) (attachments omitted from appendix)................................................................2688

Transcript, Sentencing Hearing (July 13, 2005, Doc. 147) ................................2719

    Argument and ruling on Rule 29 motion....................................2720
    Argument and ruling on Rule 33 motion....................................2724
    Ruling on Guidelines objections................................................2735
    Argument on sentencing ...........................................................2739
    Allocution ..................................................................................2746
    Imposition of sentence ..............................................................2750

Judgment in a Criminal Case (July 13, 2005, Doc. 132)....................................2758

Notice of Appeal (July 15, 2005, doc. 133)........................................................2765

Fourth Circuit Judgment (corrected) (with copy of Apr. 25, 2006 order) (May 19, 2006, Doc. 168)................................................................2767


VOLUME XII (pages 2771 - 2998)

Transcript, Hearing (Aug. 24, 2007, Doc. 239)................................................2771

Transcript, Hearing (Nov. 20, 2007, Doc. 245)....................................................2790

Transcript, Hearing (May 16, 2008, Doc. 263) ..................................................2795

Transcript, Hearing (Oct. 23, 2008, Doc. 272)....................................................2802

Transcript, Hearing (Feb. 19, 2009, Doc. 297)....................................................2827

Transcript, Hearing (Oct. 4, 2013, Doc. 340) ....................................................2834

(Redacted) Memorandum Opinion (denying motions to compel) (Apr. 28, 2014, Doc. 350)....................................................................................2864

Order (May 21, 2014, Doc. 357)..........................................................................2887

Notice of Appeal (June 4, 2014, Doc. 358) ........................................................2889

Fourth Circuit Order (remanding case for further proceedings) (Aug. 4, 2015, Doc. 406)....................................................................................2892

Fourth Circuit Order (expanding scope of remand) (July 26, 2016, Doc. 431)....................................................................................................2894

Government's Response in Opposition to Defendant's Second Motion for Acquittal on Count 1 (Aug. 29, 2018, Doc. 447) ...........................................2896

Defendant's Reply to Government's Supplemental Memorandum on *United States v. Davis* (Aug. 19, 2019, Doc. 459) .........................................2905

Government's Reply in Further Support of Its Supplemental Memorandum on *United States v. United States* (Aug. 26, 2019, Doc. 461) .......................2936

(Redacted) Memorandum Opinion (granting release pending appeal) (Aug. 18, 2020, Doc. 519) ..............................................................................2953

Order (granting release pending appeal) (Aug. 18, 2020, Doc. 520) .................2969

Fourth Circuit Order (affirming grant of release pending appeal) (Aug. 31, 2020, Doc. 535)..............................................................................2971

ix

Memorandum Opinion (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 549)..............................................................................................2972

Order (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 550)..........................2998


VOLUME XIII (pages 2999 - end)

Selected Government Trial Exhibits...................................................................2999

Gov't Exh. 1B1a: transcript of Apr. 7, 2003 consensually monitored call between Kwon and Royer.........................................................................2999

Gov't Exh. 1B2a: transcript of Apr. 8, 2003 consensually monitored call between Kwon and Royer.........................................................................3053

Gov't Exh. 1B4a: transcript of Apr. 17, 2003 consensually recorded CCTV hotel meeting between Kwon and Royer.......................................3084

Gov't Exh. 1D27: Taiba Bulletin, Oct. 17, 2000...........................................3131

Gov't Exh. 1D28: Taiba Bulletin, Oct. 27, 2000...........................................3134

Gov't Exh. 1D29: Taiba Bulletin, Nov. 7, 2000............................................3137

Gov't Exh. 1D45: Taiba Bulletin, Sept. 26, 2001 (post from nadqpk@yahoo.com)....................................................................................3139

Gov't Exh. 1D48: Taiba Bulletin, Oct. 13, 2001 (post from nadqpk@yahoo.com)....................................................................................3141

Gov't Exh. 1D52: Taiba Bulletin, June 24, 2001 (post from nadqpk@yahoo.com)....................................................................................3144

Gov't Exh. 1F1: LET Poster, image 1 ...........................................................3151

Gov't Exh. 1F3: LET Poster, image 3 ...........................................................3152

Gov't Exh. 1F4: LET Poster, image 4 ...........................................................3153

Gov't Exh. 1G10a: transcript of Apr. 1, 2003 recorded telephone call (Hammad and Royer call Al-Timimi) .......................................................3154

Gov't Exh. 4G7: email dated June 19, 2001 from pballaz@yahoo.com, regarding praying in a moving car .............................................................3164

Gov't Exh. 7A19: Uqla fatwa on events of 9/11, in English, taken from Surratt's residence on May 8, 2003 ...........................................................3168

Gov't Exh. 7A23; Hawali's *Statement to the Ummah* in English .................3178

Gov't Exh. 7A39a: translation of website containing Space Shuttle article in Arabic ........................................................................................3200

Gov't Exh. 7C31: email dated Sept. 20, 2001 from Kwon to Belton Harris ..................................................................................................3203

Gov't Exh. 7D3: email dated Oct. 15, 2001 from Surratt re. Hawali's *Statement to the Ummah* .................................................................................3204

Gov't Exh. 7F24a: UPI News article dated Sept. 16, 2001 titled *Taliban Leaders Seek Islamic Support* ....................................................................3206

Gov't Exh. 7H12: plea agreement and statement of facts for Muhammed Aatique ........................................................................................................3207

Gov't Exh. 10A3: document entitled *Suicide Attacks, Are They Suicide? A Shariah Viewpoint* ........................................................................................3223

Gov't Exh. 10A41: email dated Oct. 23, 2000 from Nabil to Timimi re: trip to Delaware ........................................................................................3227

Gov't Exh. 10D19: email dated Oct. 21, 2001 email from altimimi@yahoo.com to aqdcksa@yahoo.com re. "Utter Nonsense" .......3229

Gov't Exh. 10H1A: record of instant messaging session with Bin Laden statement preamble ....................................................................................3233

Gov't Exh. 10J7: article, *Sheikh Ali Timimi on the Taliban and the Statues* ........................................................................................................3260

xi

Gov't Exh. 10J9: email dated December 13, 2001 from Timimi re. "A call to reflect and repentance" ................................................................3262

Gov't Exh. 10J15: affidavit of Youseff Idris..................................3265

Gov't Exh. 10S1: summary chart of Timimi / Kwon telephone calls, Sept. 16, 2001 ...............................................................................3266

Gov't Exh. 10S2: summary chart of Timimi / Kwon telephone calls, Sept. 19, 2001 ...............................................................................3267

Gov't Exh. 10S3: summary chart of Kwon telephone calls, Sept. 16, 2001 ...............................................................................................3268

Gov't Exh. 10T1: photograph, package of "New World Order" cassette tapes ...............................................................................................3272

Gov't Exh. 12-1: stipulation re. background facts............ 3273; *see* J.A. 167-171

Gov't Exh. 12-60: stipulation re. electronic surveillance of calls and email................................................................................................3277

Gov't Exh. 12-61: stipulation re. Al-Timimi lectures ............3278; *see* J.A. 2344

Selected Defense Trial Exhibits...........................................................3280

Def't Exh. 33: Al-Timimi lecture titled *Muslims in America in the Face of Accusations of "Fundamentalism" and "Terrorism"* delivered at Purdue University on Oct. 20, 1993 .........................................3280

Def't Exh. 57: letter dated from AUSA Gordon Kromberg to Yong Kwon's attorneys .........................................................................3293

Def't Exh. 80: stipulation regarding Al-Timimi's unsubscription from Taiba Bulletin List ...............................................................................3295

Def't Exh. 81: summary report of an interview with Ismail Royer by Evan Kohlmann .......................................................................3298

Def't Exh. 82: photo of front of Yong Kwon's apartment .............................3303

Def't Exh. 83: photo of back of Yong Kwon's apartment ............................3304

Def't Exh. 85: summary of Yong Kwon's phone calls on Sept. 16, 2001
.................................................................................. 3305

Def't Exh. 86: summary of Yong Kwon's phone calls on Sept. 13-15, 2001 .................................................................3306

Def't Exh. 87: summary of Al-Timimi's calls on evening of Sept. 19, 2001 .................................................................3307

Def't Exh. 90: summary of Al-Timimi's calls on evening of Sept. 19, 2001 .................................................................3308

This page intentionally left blank for double-sided pagination and printing

2172

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,        .        Criminal No. 1:04cr385
                                 .
        vs.                      .        Alexandria, Virginia
                                 .        April 18, 2005
ALI AL-TIMIMI,                   .        9:30 a.m.
                                 .
            Defendant.           .
                                 .
.   .   .   .   .   .   .   .   .   .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME IX

APPEARANCES:

FOR THE GOVERNMENT:           GORDON D. KROMBERG, AUSA
                              United States Attorney's Office
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                                and
                              JOHN T. GIBBS, ESQ.
                              Counterterrorism Section
                              Criminal Division
                              United States Department of Justice
                              601 D Street, N.W.
                              Washington, D.C. 20004

FOR THE DEFENDANT:            EDWARD B. MAC MAHON, JR., ESQ.
                              107 East Washington Street
                              P.O. Box 903
                              Middleburg, VA 20118
                                and
                              ALAN H. YAMAMOTO, ESQ.
                              643 S. Washington Street
                              Alexandria, VA 22314

ALSO PRESENT:                 S.A. WADE AMMERMAN
                              BOBBY WILLIAMS
                              S.A. JOHN WYMAN

(Pages 2172 - 2358)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2173

1  OFFICIAL COURT REPORTER:      ANNELIESE J. THOMSON, RDR, CRR
                                 U.S. District Court, Fifth Floor
2                                401 Courthouse Square
                                 Alexandria, VA 22314
3                                (703)299-8595

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2174

1                    I N D E X

2  Closing Argument by Mr. Gibbs:              Page 2199

3  Closing Argument by Mr. MacMahon:           Page 2229

4  Rebuttal Argument by Mr. Kromberg:          Page 2268

5

6                    EXHIBITS

7  GOVERNMENT'S:                    MARKED    RECEIVED

8  No. 7F5d                                    2198

9     7F24a                                    2198

10    7F24b                                    2198

11    7F24c                                    2198

12    12-61                                    2198

13

14

15

16

17

18

19

20

21

22

23

24

25

2175

1                    P R O C E E D I N G S

2                       (Defendant present, Jury out.)

3              THE COURT:  So, Mr. Yamamoto, did you bring your

4      toothbrush?

5              MR. YAMAMOTO:  I apologize, Your Honor; I was in the

6      basement.  Am I going to jail?

7              THE COURT:  No, I don't think so.  And the reason for

8      it, I actually was rather pleased.  I did not think there were

9      many issues we had to address this morning, but we obviously have

10     a couple we do need to address.

11             Let me just tell you that I realized in the order I gave

12     you this morning, we misnumbered.  The last instruction is not 79;

13     it's 78.  I figured you'd figure that out.  So that's the final

14     charge to the jury.  We have made the changes the defense

15     requested, but I just wanted to make sure that you are not having

16     problems with that.

17             I just for the very last time want to ask counsel again

18     whether there was any objection to the verdict form because we

19     need to have those things ready to go, and I assume both

20     sides have looked carefully at that.

21             MR. KROMBERG:  No objection.

22             MR. YAMAMOTO:  No objection, Your Honor.

23             THE COURT:  All right.  And then again, depending upon

24     what happens with the jury, if the jury were to convict on one of

25     these counts that has a predicate crime of violence, for purposes

J.A. 2322

2176

1   of the record, if we need to have the jury indicate in a
2   supplemental special verdict, we can send it to them at that
3   point.  It may not be necessary.  We'll have to see, all right?

4           MR. YAMAMOTO:  That's fine, Your Honor.

5           THE COURT:  Okay.  Then that is definitely set.

6           Now, Mr. Kromberg, I'm assuming you had no major
7   objections to the requested changes from the defense.

8           MR. KROMBERG:  I have gotten --

9           MR. YAMAMOTO:  I apologize, Your Honor.

10          MR. KROMBERG:  I got them a minute ago, Judge.

11          MR. YAMAMOTO:  I sent them last night.

12          THE COURT:  Oh, you didn't get them?  All right.  Well,
13  some of it's just stylistic.  I mean, let's go over this now.
14  I'll go over my order now and make sure we don't have a problem.
15  The "shall be guilty of a crime" substituted for "shall be
16  punished."

17          MR. KROMBERG:  No objection.

18          THE COURT:  All right, I figured you wouldn't on that.
19  And obviously, some of these instructions do come from my
20  instruction bank, and we'll clean up any cites -- I think there
21  may be more than just two that had it -- or any headings that
22  indicate government or defendant's proposed instruction.

23          In the defense objection No. 3, which was to instruction
24  44, that is, that we do have to distinguish because the law
25  distinguishes between a crime of violence and a, what I'm calling

2177

1  a federal felony, and we do have a substantive issue there.

2       Mr. Yamamoto has -- or the defense has raised a

3  legitimate concern about these predicate offenses.  This is jury

4  instruction 44.  And as I understand the defendant's objection, it

5  would be basically to the last six of those nine offenses; is that

6  right?

7       MR. YAMAMOTO:  That's correct, Your Honor.  Yes.

8       THE COURT:  Yes.  Now, it is interesting that I reread

9  this indictment for about the 50th time, and my experience with

10 the U.S. Attorney's Office and I think the way indictments are

11 supposed to be drafted is that normally if one is alleging a

12 conspiracy in violation of certain acts or a crime of violence,

13 you normally specify that in the charging language of the

14 indictment itself, and I can't recall whether that was a subject

15 of a motion for a bill of particulars.

16      MR. KROMBERG:  It was, Judge, and --

17      THE COURT:  All right.

18      MR. KROMBERG:  -- Mr. Yamamoto, I'm sure, would agree

19 that it was the subject of a bill of particulars, and that's where

20 these particular offenses came from, the bill of particulars.

21      The Court may recall the government said in opposition

22 to one of the defense's motions that the Fourth Circuit has said

23 that you don't have to specify the underlying crime of violence

24 under 924(c) at all, but, okay, we're going to do it in a bill of

25 particulars, which we did.

2178

1          THE COURT:  Do you recall getting that bill of
2   particulars?

3          MR. YAMAMOTO:  Yes, Your Honor, but again, even though
4   we have a bill of particulars, some of these offenses really
5   were -- had no evidence with respect to what they were.

6          THE COURT:  Well --

7          MR. YAMAMOTO:  Particularly e, which charges an offense
8   of murder or maiming.  There's no allegation, there's no testimony
9   that anybody was contemplating murder, murdering or maiming
10  anybody.  Same with the other five counts.  There's no testimony
11  or evidence with respect to any of those matters.

12          THE COURT:  I would -- e and f, I think, are a little
13  problematic.

14          MR. KROMBERG:  Can I respond to that, Judge?

15          THE COURT:  Well, f in particular, because the statute
16  itself says "specific property," so if it were the Red Fort, I
17  could see that, but, I mean, the word "specific" means specific.

18          MR. KROMBERG:  But it also says "and any railroad,
19  canal, bridge, airport, airfield and other public utility, public
20  conveyance, and public structure, and any religious, educational,
21  and cultural property."  Not -- it doesn't have to be specific.

22          Yes, it has to be specific for the first clause, but
23  after that, that's why if you blow up a bridge or you blow up a
24  bus like Laskar-e-Taiba says it does routinely in the Taiba
25  Bulletins, that's 956(b), which by the way was the predicate in

2179

1   the last year's trial for how Hammad and Khan and Chapman got

2   convicted of the 2339(a) material support to terrorists predicated

3   on a 956(b), which was exactly this.

4          The 956(a), Judge, is the defendants were conspiring to

5   go someplace to kill people they were not lawfully authorized to

6   kill.  If they had ever followed through on their intention to

7   kill Indian soldiers, that would have been murder because they

8   were not lawful combatants if they were with Laskar-e-Taiba.  If

9   they were trying to kill an Indian soldier, they were -- that was

10  an act that would have been a murder had it been committed in the

11  United States.

12         THE COURT:  All right.  Well, as long as these nine

13  specific offenses were provided to the defense in the bill of

14  particulars, then the argument that, you know, it's unfair for the

15  defendant to have to mount his defense in surprise really doesn't

16  apply, and the government is, I think, correct that if one draws

17  inferences as broadly as possible, and one can do that, that these

18  specific acts are within the scope of -- I mean, when one conducts

19  armed -- if one is involved in armed conflict, then there is a

20  likelihood of people being maimed or killed, and there is also the

21  possibility of buildings and bridges being destroyed.

22         So I'm going to go ahead and leave these nine object

23  offenses in.

24         MR. YAMAMOTO:  Your Honor, just one last point I'd make

25  is that he's charged with aiding and abetting, not with being an

2180

1   active member of the conspiracy.  I think there's a difference in

2   that situation.

3          THE COURT:  Well, I don't.  I mean, I think the issue

4   is -- this is a tough case because it's almost a third level of

5   culpability; that is, you've got the underlying offense, an

6   inchoate offense such as conspiracy to do it, then you've got him

7   one step further removed, aiding and abetting or soliciting or

8   procuring the conspiracy.  It certainly is a unique set of legal

9   structure.

10          But, you know, at this point, I'm going to let it go

11  forward.  So I'm going to use the nine that are there only

12  because, as I said, you had notice of them.  Had they not been

13  included in the bill of particulars, with all due respect to any

14  appellate law on that issue, I think it would just be patently in

15  a case like this unfair to have to wage a defense against it, but

16  since you knew what they were, that's adequate notice.

17          MR. YAMAMOTO:  Well, Your Honor, the government could

18  have raised lots of other things.  Again, there was no evidence

19  with respect to these.  I understand the Court's ruling.

20          THE COURT:  All right.  All right.  So that took care

21  of, I think, the issue then on 44.  So we're going to let the

22  instruction, the proposed instruction 44 go forward as it was in

23  your packet.

24          MR. YAMAMOTO:  Fine, Your Honor.

25          THE COURT:  All right?

**J.A. 2327**

2181

1          MR. YAMAMOTO:  Is the Court going to make a distinction
2  in there between --

3          THE COURT:  I did.  If you didn't get it, I indicated
4  there for purposes of Count 1 as well as for Counts 7 and 8 of the
5  indictment, it also constitutes felonies which may be prosecuted
6  in a court of the United States for purposes of Counts 9 and 10.

7          Now, your argument -- your secondary argument on 44 is
8  that some of these nine, you argue, do not qualify as a crime of
9  violence.  I mean, all nine of these are federal felonies.

10         MR. YAMAMOTO:  Correct.  There's no question of that.

11         THE COURT:  Which ones do you claim would not constitute
12  a crime of violence and why?

13         MR. YAMAMOTO:  Your Honor, we would contend -- I just
14  lost it --

15         THE COURT:  Well, the statute -- doesn't the book,
16  924(c) define crimes of violence?

17         MR. YAMAMOTO:  It does, Your Honor, in some respects,
18  but -- I can't find my 44.

19         MR. KROMBERG:  Here.

20         THE COURT:  Where's the definitional section of this
21  again?

22         MR. YAMAMOTO:  I don't think it's defined.  The only
23  place they talk about crime of violence that I've found that helps
24  us is in 924, and there the only thing that, that they talk about
25  that really is different than a robbery or carrying a gun would be

2182

1  escape.  Other than that, like in item d, enlisting oneself isn't
2  a crime of violence per se.

3         THE COURT:  Well, now wait a minute, though.  The
4  crime -- if I'm looking at this correctly, 924 --

5         MR. YAMAMOTO:  (C) and (n).

6         THE COURT:  Well, (c)(3) defines, "For purposes of this
7  subsection, the term 'crime of violence' means an offense that is
8  a felony and has as an element the use, attempted use, or
9  threatened use of physical force against the person or property of
10 another, or that by its nature, involves a substantial risk that
11 physical force against the person or property of another may be
12 used in the course of committing the offense."

13         I would think all nine of these would certainly meet
14 that definition.

15         MR. YAMAMOTO:  I would contend, Your Honor, that, for
16 instance, in d, enlisting and entering a foreign service, doesn't
17 in and of itself mean that you're going to be carrying a weapon or
18 shooting anybody.  You could be doing some other thing.

19         Same with g and h and i.  In attempting to provide
20 material support, the providing of the material support is not a
21 crime of violence.  The other people may be committing a crime of
22 violence, but the individual is not committing a crime of
23 violence.

24         Same with h, attempting or conspiring to provide
25 material support, and in i.  I is more problematic.

2183

1          THE COURT:  I think what we'll do is we'll take care of
2    this problem if the jury convicts, we will send a special verdict
3    form to see what of these offenses they were unanimous about, and
4    then we can argue -- you have a better record for arguing whether
5    or not it was a genuine crime of violence as to those three counts
6    where that's required.

7          MR. KROMBERG:  Your Honor, I might remind the Court
8    these issues were briefed voluminously last year, and very similar
9    issues came up in the John Walker Lindh case, whether support to
10   the Taliban was a crime of violence, and the Court ruled in last
11   year's case that the material support to the Taliban was a crime
12   of violence.

13         The only charge that was not -- that Mr. Yamamoto brings
14   up now that was not an issue last year was, I think, 2390,
15   enlisting and engaging with intent to serve -- no, not -- I'm
16   sorry, what was the other one you said?  G is material support,
17   and that's the one that was -- that the Court, this Court ruled on
18   last year.  H this Court ruled on last year.

19         THE COURT:  Well, in any case, I think the easier thing
20   is let's see what the jury does because these are -- the case is
21   complicated enough.  It may simplify -- as I say, if the jury
22   acquits, we don't have to address the issue.  If they convict,
23   then we can find out exactly what they did, all right?

24         MR. YAMAMOTO:  Fine, Your Honor.

25         THE COURT:  So 44 is going to go in just as given to

**J.A. 2330**

2184

1  you-all in the original stack.

2          I think 45 is a clearer and better statement of the

3  difference between the two.  And the government did not include

4  this instruction, but I am sure the law supports it.

5          MR. KROMBERG:  I don't have any problem with it, Judge.

6          THE COURT:  All right, fine.  But I'm going to use the

7  defendant's proposed substituted instruction for 45.  So I'm using

8  yours, Mr. Yamamoto.

9          MR. YAMAMOTO:  Thank you, Your Honor.

10         THE COURT:  All right?  All right.

11         Now, the next issue where I think there is a significant

12 dispute is the definition of "to levy war."  I'm a little

13 concerned about using language from 1809, although there doesn't

14 appear to be a lot of case law.  I did take a look at Black's, and

15 Black's says, "levying war," and their quote is, "In criminal law,

16 the assembling of a body of men" -- I would change that to

17 "people" -- "for the purpose of effecting by force a treasonable

18 object; and all who perform any part, however minute, or however

19 remote from the scene of action, and who are leagued in the

20 general conspiracy, are considered as engaged in levying war,

21 within the meaning of the constitution."

22         Now, that's from, you know, a standard legal dictionary.

23 But I'd like to hear the government on that because the defense is

24 asking for a somewhat different instruction from the one you-all

25 tendered.

2185

1          MR. KROMBERG:  I'm not sure how to respond.  I don't
2    have the defense's proposed instruction in front of me.

3          Judge --

4          THE COURT:  Yes.

5          MR. KROMBERG:  -- the defense -- and Mr. Yamamoto did,
6    in fact, give this to me a week ago.

7          MR. YAMAMOTO:  That's treason.  Here it is.

8          THE COURT:  I mean, the word "treason" has never come up
9    in this trial, not once, and I was concerned about -- you know,
10   that's a different context altogether.

11         MR. KROMBERG:  So what the defense is saying, "to
12   constitute a levying of war, there must be an assemblage of
13   persons."  Well, that may or may not be, but what the defendant is
14   charged with is soliciting others to levy war.

15         Well, levy -- the term "levy war" is a term that is not
16   used very often in common usage these days, but what it means is
17   if you look in the dictionary, to wage war, and I don't think it
18   helps to talk about what levying war means with respect to the
19   assembling persons for the effect of effecting by force a
20   treasonable purpose.  Levying war is waging war.

21         I don't know that giving the defendant's definition of
22   levying -- to constitute a levying of war is going to help the
23   jury when they're trying to figure out whether the defendant
24   solicited others to levy war.

25         THE COURT:  Well, the proposed instruction as the

2186

1  defendant had it, I felt, mischaracterized the charge in the case

2  because it is soliciting others to do it.  It's not himself doing

3  it.  Right, Mr. Yamamoto?

4          MR. YAMAMOTO:  That's correct, Your Honor.

5          THE COURT:  Yes.

6          MR. YAMAMOTO:  But in order to levy war, you've got to

7  assemble an army, and that army has to be prepared to go to battle

8  or in the process of going to battle.  So if anything, he would

9  have to be -- I mean, Aaron Burr was charged with levying war, had

10  a group of people to go into Mexico, but he was not convicted of

11  levying war because they hadn't taken the step necessary.

12          Here, even if he's soliciting it, all he's telling

13  people to do is to go join this group.  That still falls short for

14  the requirement for levying war, soliciting the levying of war.

15  You would have to get the arms and material and men together and

16  be in the process of trying to get these people to go.  We're not

17  there.

18          MR. KROMBERG:  Your Honor, if I can respond?

19          THE COURT:  I would think that waging war, which is for

20  the government's proposed instruction in some respects a tougher

21  one for the government to meet --

22          MR. KROMBERG:  Well, once again, it's soliciting to wage

23  war.

24          THE COURT:  Right.

25          MR. KROMBERG:  To some degree, it's unfortunate we're

2187

1   dealing with these issues right now, but these were the subject of
2   motions -- or could have been the subject of motions in the Blind
3   Sheikh case in New York.  The Blind Sheikh was accused of
4   seditious conspiracy, basically aiding and abetting others in
5   conspiring to levy war against the United States, and that was a
6   very similar case where you have a cleric saying, "You should do
7   this.  You should blow up the New York subway system."  And that
8   case was upheld in the Second Circuit.

9          So there are analogous instances a lot more relevant
10  than Aaron Burr.

11         THE COURT:  And the instruction that you've tendered to
12  the Court comes from that case in terms of defining "levying war"?

13         MR. KROMBERG:  I think not, Judge.  I think I just
14  looked it up from the dictionary and just gave it to the Court, I
15  mean, just took it from the dictionary.  I don't think I took
16  that -- there are some instructions I proffered to the Court from
17  the Abdul Rahman case, but I don't think I took that one from it.

18         MR. YAMAMOTO:  Judge, the instruction we gave to the
19  Court is really part and parcel of the Aaron Burr case.  They were
20  some of the codefendants and coconspirators in that case --

21         THE COURT:  I understand.

22         MR. YAMAMOTO:  -- and they were going to destroy
23  property in the United States before going on to fight.

24         So I think we have a closer definition.

25         THE COURT:  Well, the government's proposed instruction

2188

1   is clear as a bell.  If it's wrong and if the defendant is

2   convicted of that charge, it will come back.  But I think it

3   captures the essence of what the older language has, and I will

4   therefore continue to use the instruction that I have as 52

5   because I think that is accurate.

6          Now, instruction 64 I have modified.  That's this overt

7   act instruction.  Before we get to that, Mr. Kromberg, as you can

8   see from my order, I believe that the 371 -- 371 is the only --

9   the only count in which a 371 conspiracy is alleged, if I've read

10  your indictment correctly, is Count 6.

11         MR. KROMBERG:  That's correct, Judge.

12         THE COURT:  And Count 6 does have performance of one of

13  the overt acts as a necessary element.

14         On the other conspiracies, I am assuming that an overt

15  act is not a necessary element of that conspiracy.  Is that

16  correct?

17         MR. KROMBERG:  I think that's correct, Judge.

18         THE COURT:  The indictment doesn't charge that.  I

19  mean -- and this issue about conspiracies and overt acts is

20  sometimes confusing.  But I'm going to go ahead then, the way my

21  instruction reads, only Count 6 do we talk about overt acts being

22  an issue, all right?

23         And I am going to use different prefatory language,

24  Mr. Yamamoto.  You had requested a change.  I don't think I did

25  exactly what you've asked for, but the language there would be,

2189

1  "The government alleges that the defendant and the coconspirators
2  he aided, abetted, counseled, and induced committed the following
3  overt acts."

4          MR. YAMAMOTO:  That's fine, Your Honor.

5          THE COURT:  All right.

6          MR. YAMAMOTO:  That's similar to the language I gave the
7  Court.

8          THE COURT:  All right.  Then the photocopier must have
9  cut off some of the overt act language.  It was in my set
10 complete, and you should now have that corrected.

11         MR. YAMAMOTO:  That's fine.

12         THE COURT:  All right.  Both of you questioned whether
13 the Court should give both instructions 39 and 73.  I've read
14 those -- again, I mean, the only fault I find with them is they
15 are somewhat repetitious, but I do not think that they're
16 confusing, and frankly, I think they may help the jury absorb what
17 are very abstract concepts because they -- I don't see any
18 material difference between the two instructions.

19         I like to define terms when they first arise, and that's
20 why I think we need to define "aiding and abetting" up front when
21 we're talking about Count 1, but I think the instruction 73 is a
22 good summary of this issue about these inchoate crimes.

23         If either side has a substantive problem with giving
24 both instructions, I mean, that's why we're having this
25 conference.

**J.A. 2336**

2190

1          MR. KROMBERG:  No, Judge, it was not a substantive
2    issue.

3          THE COURT:  It's just repetitive.

4          MR. KROMBERG:  Well, it wasn't even that.  When I was
5    going through them, the earlier instruction I didn't think was as
6    on point about aiding and abetting as the later instruction about
7    commanding and inducing.  If the Court would consider giving those
8    two instructions right next to each other, that might -- that
9    would satisfy our concern.

10         THE COURT:  Mr. Yamamoto.

11         MR. YAMAMOTO:  That's probably right, Your Honor.

12         THE COURT:  All right, we'll switch the order.  What
13   we'll do, 73 will become 39A.  I don't want to have to renumber
14   the whole set, all right?

15         MR. YAMAMOTO:  And my recollection is -- and I don't
16   mean to --

17         THE COURT:  Yes.

18         MR. YAMAMOTO:  -- take us off track, but I thought I
19   recalled another instruction where we gave something relating to
20   conspirators or coconspirators in the beginning, and then there's
21   a conspiracy instruction down with the counts, and I was thinking
22   it was -- might have been out of place at that time.

23         THE COURT:  I don't think so, but I'm going to give you
24   a few minutes before you close just to make sure.

25         MR. YAMAMOTO:  Take a look.

**J.A. 2337**

2191

1          THE COURT:  All right.  So we'll just put one, 73 right

2     after 39.  It will have to be renumbered.

3          The defendant's proposed change to instruction 75, that

4     was the one that I felt we needed to discuss in open court.

5     Mr. Kromberg, what's your view about adding that extra sentence to

6     the freedom of association?

7               MR. KROMBERG:  If I can read it at this moment, Judge?

8               THE COURT:  Go ahead.

9               MR. KROMBERG:  Judge, I apologize, I do not know enough

10    about the intricacies of First Amendment law to know whether this

11    was a correct statement of law.  I thought that what the Court had

12    written was a correct statement of law.  I just don't know enough

13    to know at this point whether --

14              THE COURT:  Well, the advocacy of illegal activity in

15    and of itself if it's mere words, I suspect, is pretty much

16    protected.  It's when you have the additional fact of evidence of

17    intent to further those goals.  I mean, the line, frankly, is

18    very, very fact specific.

19              But I think the full instruction with the word "and"

20    bracketed -- and I think because I did instruct the jury on the

21    disjunctive, to make it crystal clear so they don't get mixed up

22    on that, I think I would add the words "unless it is established

23    that both the -- unless the following two facts are established,"

24    so there's no question we're not doing a disjunctive.

25              MR. YAMAMOTO:  Fine, Your Honor.

**J.A. 2338**

2192

1          THE COURT:  That's not a problem?  All right.  And I
2   think that clearly captures what the government is talking about
3   there, that is -- so I'm going to go ahead and with that change
4   give a revised instruction 75.

5          And then that -- that takes care of the defendant's
6   concerns.

7          On Mr. Chandia, was there any objection from the defense
8   to the proposed instruction?  In other words, the first time his
9   name comes up is in instruction 46, which instructs on Count 1,
10  where he's named as a -- Count 1 names Coconspirator No. 2, and I
11  would just add that additional four sentences at the end of that
12  instruction so it would stay as part of instruction 46.  That's
13  what you should have in your packet.

14         MR. YAMAMOTO:  I guess that's fine, Your Honor.  I know
15  his name came up, and for the life of me, I couldn't understand
16  why it kept coming up so much during the course of the trial.

17         THE COURT:  Isn't his name referenced in one of the
18  overt acts, too?  It may not be.

19         MR. YAMAMOTO:  I don't believe so.  I think he's called
20  Coconspirator 2 throughout the indictment, so I just thought it
21  would confuse the jury to have Coconspirator 2 and then this other
22  individual and try to --

23         THE COURT:  The only problem is I could see this jury
24  asking us, "Who's No. 2?"  So it's sort of a preemptive strike,
25  and I don't really think it does any --

**J.A. 2339**

2193

1          MR. YAMAMOTO:  Tell them it's none of their business who

2   No. 2 is.

3          THE COURT:  All right.  So I'm going to go ahead and

4   give it.

5          I've corrected the spelling problem in 67, and the

6   general allegations in the indictment are not going in.

7          The overt acts, however, have gone in because it's

8   necessary, and I think because the overt acts have gotten in, that

9   is a sufficient timeline for the jury, and unless the defense has

10  agreed with the government, I'm not going to allow even that

11  revised summary chart to go in.  The jury does have a structural

12  framework that they can look at through the overt acts, there are

13  some, what, 19 or 20, 25 of them, and I think that gives them

14  enough framework.  All right?

15         Now, is there anything else of a preliminary sort we

16  need to take care of?

17         MR. MAC MAHON:  No, Your Honor.

18         THE COURT:  No?

19         How about you, Mr. Kromberg?

20         MR. KROMBERG:  Judge, we have the Court's order from

21  Friday allowing in several government exhibits --

22         THE COURT:  Yes.

23         MR. KROMBERG:  -- and we wanted to publish them.

24         We also have an additional stipulation about the

25  lectures of the tapes that Ms. Travers should have in front of her

2194

1  now, 12-61, and I don't think we need to read that one to the
2  jury.  I think we've already said these things.

3            MR. YAMAMOTO:  Correct.  I believe that's correct.

4            MR. KROMBERG:  But it is now -- that means additional --
5  there are additional exhibits that are now admitted.

6            THE COURT:  All right.  Well, I think rather than using
7  up your closing argument time, it's fair to just tell that to the
8  jury.  That's not part of closing argument, all right?  And then
9  we'll start the clock ticking after that.

10           Now, what I intend to do is the following, because if --
11  I assume both sides are ready to start closing arguments?  Yes?

12           MR. GIBBS:  Yes, Judge.

13           MR. MAC MAHON:  Yes, Your Honor.

14           THE COURT:  All right.  What I'm going to do is we're
15  going to go ahead and do the closing arguments now this morning.
16  We may take a break in between the government's and the
17  defendant's just to give the jury a stretch break.

18           I'm then going to recess the jury for an early lunch
19  break so that we can get these minor changes to the jury
20  instructions done so that we'll have good, clean copies for
21  you-all as I read the instructions and for the jury, and that way
22  I don't have to break up the instructions because I think it's
23  going to take well over an hour.

24           That also means we don't want people coming and going in
25  the courtroom while the instructions are going on.  Anyone who

**J.A. 2341**

2195

1  doesn't want to sit through them can have left, and so that's my

2  plan unless that's a problem for anybody.

3       MR. KROMBERG:  That will be fine, Judge.  I'd also note

4  that I passed up to -- I think I passed up to Ms. Travers color

5  photos of the individuals with the spelling of their names and a

6  list of entered government exhibits with more detail than the

7  original list but not much detail.

8       THE COURT:  Well, now, is there any objection by the

9  defense to the government's proposed index of exhibits, and is

10  there a defense exhibit list as well that's been prepared?

11       MR. YAMAMOTO:  Yes and yes, Your Honor -- no and yes,

12  Your Honor.  I'm sorry.

13       THE COURT:  No objections, and yes, you have your list?

14       MR. YAMAMOTO:  That's correct.

15       THE COURT:  That's fine.

16       MR. YAMAMOTO:  And I e-mailed them to Ms. Travers last

17  night.  I've got a hard copy set of them here.

18       THE COURT:  All right.  The other thing we will do over

19  the lunch break is if you don't all yet have the exhibits sorted

20  out, because that can hold the case up in terms of going to the

21  jury, I want that taken care of during the lunch break.  So we'll

22  come back from lunch, I'll instruct the jury, any last-minute

23  housekeeping matters get taken care of, the exhibits are ready to

24  go, and the jury will have the case for deliberation by

25  midafternoon.  All right?  Is everybody set?

**J.A. 2342**

2196

1          MR. YAMAMOTO:  Fine for the defense.

2          THE COURT:  All right.  Mr. Kromberg, are you going to

3  be using any of the electronics for your --

4          MR. GIBBS:  Actually, Judge, I'll be doing the first

5  closing argument.  I'll be using some of the electronics.

6          THE COURT:  All right, Mr. Gibbs.

7          45 and 15?  How do you want to break up your time?

8          MR. GIBBS:  45 and 15.  If you can give me, just say

9  "time" within a minute of 45, I'd appreciate it.

10         THE COURT:  Yes.  I mean, I'm not going to hold you to

11 the second.

12         MR. GIBBS:  Okay.

13         THE COURT:  I mean, it's a strong ballpark figure.  All

14 right.

15         Now, we'll bring the jury in, and then just somebody put

16 on the record the additional information that we're putting in.

17 All right?

18                  (Jury present.)

19         THE COURT:  Good morning, Ladies and Gentlemen.  Guess

20 what?  We're actually starting right to the minute today.  We are

21 on schedule.

22         And what's going to happen just so you know what today

23 looks like, there'll be a few minutes in which I think Mr. Gibbs

24 is going to just explain to you there are a few more exhibits that

25 either through stipulation or a court ruling have gone into

1    evidence I want you to know about, and then we're going to have

2    the closing arguments, and I think I told you last week I've

3    allocated about an hour for each side for the closing arguments.

4         I would like to try to get through that this morning,

5    and then what we're going to do is take the lunch break early

6    today.  The reason for that is we need to get the exhibits ready

7    for you, and I want to have good, clean copies of the instructions

8    ready for you, and I have a few typographical things that have to

9    be fixed.

10        When you come back after lunch, the instructions are

11   going to take between an hour and an hour and a half.  There's a

12   lot of law that you're going to have to be given, and I want you

13   to have time to absorb it.  So you'll get the instructions, and

14   then once that's done, it will take a few minutes to start getting

15   the exhibits in to you, but then it will be your job to

16   deliberate.

17        So that's what today looks like.  You will have the case

18   by midafternoon today, all right?

19        All right, Mr. Gibbs or Mr. Kromberg?

20        MR. KROMBERG:  Judge, it will be me just for a moment.

21        THE COURT:  Okay.

22        MR. KROMBERG:  Ladies and Gentlemen, there are a couple

23   of issues -- a couple of pieces of evidence that have come in

24   since last we saw each other.  First, we have a stipulation,

25   Stipulation No. 61, which has been marked Government Exhibit

2198

1   12-61, which incorporates the, where the lectures were given that
2   we were listening to earlier. I'm not going to read it to you
3   because it's somewhat lengthy, and you'll forget, and you'll have
4   this stipulation before you that says where the various lectures
5   were given and when they were given as best, as best we know.

6   　　　　Also, there are four exhibits that, as the judge will
7   instruct you, are not being admitted for the truth of the matter,
8   but they're newspaper articles just to -- that are in for the
9   purpose of disclosing when things were printed in a newspaper, and
10  they are 7F5d, which is a Washington Post article from -- the
11  front page of the Washington Post from September 16, 2001; and
12  then there is a UPI, United Press International, article, 7F24a;
13  and two Reuters news reports, 7F24b and 7F24c, all from September
14  16, 2001.

15  　　　　The Reuters article 7F24b is headlined "Taliban Leader
16  Asks for Help." There were words in the middle there, but you'll
17  see that. You'll have that. I don't have it with me to publish
18  to the jury.

19  　　　　(Government's Exhibit Nos. 7F5d, 7F24a, 7F24b, 7F24c,
20  and 12-61 were received in evidence.)

21  　　　　THE COURT: All right.

22  　　　　MR. KROMBERG: Thank you, Judge.

23  　　　　Thank you.

24  　　　　THE COURT: All right, Mr. Gibbs?

25  　　　　MR. GIBBS: Thank you, Judge.

1           CLOSING ARGUMENT
2           BY MR. GIBBS:
3       On the morning of September 11, 2001, two commercial
4   airliners crashed into the World Trade Centers in New York.  A
5   third plane slammed into the Pentagon.  Finally, a fourth
6   commercial airliner crashed into a field in rural Pennsylvania.
7   It was the worst day of terrorism in this nation's history.  When
8   it was over, nearly 3,000 people had died.
9       This case is about the way in which one individual, the
10  defendant, Ali Timimi, responded to that day.  This case is about
11  how he used that day to declare war on the United States.  This
12  case is about how he used his influence with a number of young men
13  here in Northern Virginia to solicit, command, induce, and
14  endeavor to persuade them to go wage that war.
15      We know what he said on the night of September 11.
16  Speaking to a group at the Dar al-Arqam in Falls Church, Virginia,
17  Timimi let his customary guard down.  When Haytham Hantash
18  condemned the attacks, Timimi disagreed.  He said that America had
19  this coming.  He said the people who give monetary support to the
20  United States should be considered combatants.  He said that
21  killing civilians was not murder; it was mere collateral damage,
22  like using a catapult in a time of war.
23      These comments on the very day that so many people had
24  died caused a heated exchange between Timimi and Haytham.  The
25  defense will contend that no such argument took place, but the

**Closing argument - Mr. Gibbs**

1  reality is that after that day, Ali Timimi, the most prolific

2  speaker at the Dar al-Arqam, never spoke there again.  In fact,

3  the leaders of the Dar al-Arqam actually stopped selling some of

4  his tapes, and they even removed the cover from his "New World

5  Order" series, and we recall that cover.

6         Now, Timimi himself corroborated this version.  He told

7  John Wyman that on September 11, 2001, he said at the Dar

8  al-Arqam, "If Usama Bin Laden did this, it was because the Taliban

9  considered Mullah Omar to be the Khalifa, and it is part of their

10  offensive."  And he told the agent that there are conditions in

11  which innocents can be killed, like with human shields.

12         Those were Timimi's own words to the agent.  The only

13  thing that he denied was that he was kicked out of the Dar

14  al-Arqam, but we know that isn't true, and Ali Timimi knows that

15  isn't true:

16         When you go back in the jury room, take a look at

17  Exhibit 10H1a, the instant message chat which includes the Bin

18  Laden fatwa.  It was found in Ali Asad Chandia's house.  The

19  entire chat is very insightful.  Timimi talks about Sheikh Hawaali

20  and Sheikh Uqla among others, names you've heard throughout this

21  trial, and at page 5 of the instant message chat, he says, "I

22  basically have been kicked out of Dar al-Arqam."

23         In fact, the things that Timimi said to John Wyman

24  contradicted his own witness.  The only witness of substance the

25  defense called in this case was Yousuf Idris.  You could watch his

**Closing argument - Mr. Gibbs**

1   demeanor and see him smiling and smirking over at Timimi.  It was
2   clear.  This was Timimi's good friend who would say anything to
3   help him.  He would do anything to help him.  He would lie to help
4   his friend.  And he was utterly unbelievable.

5        Even when he tried to help Timimi, he couldn't get it
6   right.  He said that there was no fight on 9/11, that Haytham just
7   looked upset because that's part of his culture, and all Timimi
8   was said such-and-such.

9        That is the defense's star witness, Ladies and
10  Gentlemen.  He would say anything he could to help his good
11  friend, no matter how implausible.

12       But use your common sense, Ladies and Gentlemen.  Do you
13  think that Dar al-Arqam would have kicked Timimi out unless he
14  said something highly offensive that night?  The severity of the
15  action that was taken, banning a very popular lecturer and leader
16  in the community, tells you how severe his words were that day.

17       But, Ladies and Gentlemen, that's all they were:  words.
18  Offensive as they may seem to us, there is nothing illegal in what
19  he said on September 11.  They may give a window into how Timimi
20  thinks, but they are not in themselves illegal.

21       September 11 was a very intense day.  It was a heated
22  time.  Had Timimi simply gone on with his life at that point, we
23  would not all be here in this courtroom, but, Ladies and
24  Gentlemen, we are all here in this courtroom.  We are all here in
25  this courtroom because five days later, on September 16, 2001,

## Closing argument - Mr. Gibbs

1    Timimi turned from words to actions.

2            Now, it's often said that September 11 changed

3    everything, and for Timimi, that was clearly true.  We know that

4    in January of 2003, when Timimi learned of the crash of the space

5    shuttle Columbia, he was overjoyed at the calamity that befell

6    what he believed to be the greatest enemy of Islam, the United

7    States, his native country.

8            We heard his voice here in court as he dictated that

9    screed to Soliman Al-Buthe where he hoped that the crash would be

10   a sign that the United States would fall and disappear.

11           Now, let's think about that.  If the news of the space

12   shuttle crashing and killing six American astronauts and one

13   Israeli astronaut in 2003 had this kind of effect on Ali Timimi,

14   can you imagine what 9/11 must have been like?

15           Well, fortunately, we don't have to imagine.  We know

16   because we have witnesses who told us about it.  We know that five

17   days after September 11, Timimi did something that he almost never

18   did:  He went to the home of one of his followers at the Dar

19   al-Arqam.

20           Now, the defense has gone to great pains in this case to

21   demonstrate what a towering figure Ali Timimi was within his

22   community.  They continually refer to him as Dr. Timimi, and in

23   truth, he has a Ph.D. from George Mason.  He was a revered scholar

24   in the Muslim community:  Sheikh Ali.

25           So what could possibly draw a person like this to the

## Closing argument - Mr. Gibbs

1  home of Yong Kwon five days after September 11?  Why would he meet
2  with a group of individuals whose defining characteristic was the
3  fact that almost all of them owned guns and almost all of them had
4  taken part in the personal jihad training that you have heard
5  about and that Timimi knew about?

6           I want to show you some of these guns right now if I
7  could.  You heard testimony in this trial, and you saw the weapons
8  that were put into evidence, that Hammad Abdur-Raheem, Caliph
9  Basha, Nabil Gharbieh, Randall Royer, Masaud Khan, Ibrahim Hamdi,
10 and Donald Surratt all had these weapons, these AK-47-style
11 weapons that are used in jihad movements throughout the world.

12          Ladies and Gentlemen, it was not a coincidence that Ali
13 Timimi was meeting with these people on September 16, and when he
14 told them what they needed to do, the harm that he was attempting
15 to cause was imminent.

16          And the fact is that on September 16, the attraction of
17 this group to Timimi was the fact that they would do what he said.
18 They hung on his every word.  They revered him.  They were
19 enormously flattered that he had come and spoken only to them in a
20 private meeting.  He could control them.

21          And so for the first time in his life, Ali Timimi went
22 to the home of Yong Kwon.  He showed up there to meet with this
23 very select group of brothers.  He made it clear right from the
24 outset that things would be different on this night.  He made them
25 turn off their cell phones and promise that the meeting would be

1    an amana, a trust.

2          As you saw from the toll records in this case, Yong Kwon

3    had no activity on his cell phone from 7:51 p.m. on September 16

4    until 11:18 a.m. on September 17.  Why?  Because as he told you,

5    he followed Sheikh Ali's instructions and turned off his cell

6    phone, just like everyone else in that meeting.

7          And then what did Timimi say?  He said that the attacks

8    of 9/11 were legitimate because the U.S. taxpayers helped to fund

9    a government that is at war with Islam.  He said that the war in

10   Afghanistan was imminent and that Mullah Omar, the amir of

11   Afghanistan, had called for their help.

12         And, in fact, as you will see, on September 16, Reuters

13   news reported that Mullah Omar had, in fact, called for help.

14   That's Exhibit 7F24b.

15         Timimi said that it was obligatory -- fard ayn -- for

16   the people in that room to go help the people in Afghanistan from

17   this imminent American attack by fighting side by side with them

18   against the Americans.  He said that since this was an obligatory

19   jihad, they did not need to ask the permission of anyone to go.

20   He said that the people at the meeting could get training with LET

21   because they were on the sunnah, the correct path.

22         And we know that Timimi knew all about LET because

23   that's what he told John Wyman.  He said that he was well

24   acquainted with LET and he knew that they had military training

25   camps.  He received the Taiba Bulletins and visited the website

## Closing argument - Mr. Gibbs

1   regularly.  He knew about battle reports.  He was aware of rumors
2   that LET helped send fighters to Afghanistan.  He said his views
3   were similar to LET's.  He said he was aware that Royer had fought
4   in Bosnia, and before 9/11, Timimi went to a dinner where Royer
5   talked about his experiences with LET.

6   Timimi well knew that by soliciting these men to go to
7   LET, he was sending them to a place where they would receive
8   lethal weapons training with a group that was easily capable of
9   getting them to Afghanistan.

10   And we know that Timimi had a great affinity for the
11   Taliban.  Even before September 11, he had said in his Buddhist
12   statutes lecture, Exhibit 10J7, that we are obliged to support all
13   they do that is in agreement with Islam, and that was before
14   September 11.

15   Now, as he spoke to the group at Kwon's house, Timimi
16   referred to the Uqla fatwa in Arabic which we've heard so much
17   about.  It had come out that very day, on September 16.  Copies of
18   that fatwa in both Arabic and English were found in Timimi's house
19   when it was searched in the year 2003.

20   And what does the Uqla fatwa say?  Was it consistent
21   with the things that Aatique and Kwon and Hasan said about that
22   meeting, or was it consistent with what Timimi wanted you to
23   believe about that meeting?  It's Exhibit 10A34.

24   At page 1, the Uqla fatwa said that any American who
25   voted for war is a fighter.  At page 2, it said, "America is a

## Closing argument - Mr. Gibbs

1  Kufr State that is totally against Islam and Muslims."

2          At page 3, it said that America is an enemy of the

3  Muslim nations and at war with them. At page 4, it talks about

4  the use of catapults in a time of war. And finally, at page 8, it

5  says, "Thus, it is compulsory to assist this Islamic nation,

6  Afghanistan, in jihad." Those are some of the things the Uqla

7  fatwa said.

8          Now, why would Timimi, who had thousands of documents to

9  choose from at his house, pick this fatwa out of everything he

10 could choose to underscore what he told the people at Kwon's

11 house? Because it fit perfectly with what he was telling them to

12 do.

13         And make no mistake, he was telling them what to do.

14 This was not a suggestion or a mere exercise of free speech. He

15 was telling them that this was obligatory.

16         Now, the judge will instruct you on the law in this

17 case, and with regards to the charges, she will explain that it is

18 a crime to aid, abet, solicit, counsel, and induce other people to

19 commit crimes intending for those crimes to occur.

20         Now, when Timimi spoke to the people at Kwon's house, he

21 was not simply expressing an opinion. Timimi's word served to

22 direct those people on a course of criminal conduct. He intended

23 by his words to procure their active involvement in that criminal

24 conduct, and he successfully convinced several of them to actually

25 take part in that criminal conduct.

## Closing argument - Mr. Gibbs

1    And we know that there was nothing innocent about that
2  first meeting on September 16 because of Timimi's reaction to
3  seeing Nabil Gharbieh show up with Sherdil. Once Timimi saw that
4  Nabil had Sherdil, an outsider, with him, a person who was not
5  involved in the weapons and the training that you heard about, the
6  room went quiet. No one had ever seen Timimi stop so suddenly.

7    Randall Royer confronted Nabil and asked why he'd
8  brought an outsider. He told him to get rid of Sherdil and come
9  back.

10    Do you really think that Nabil and Sherdil would have
11  received that sort of reaction if Timimi was simply talking about
12  what Muslims in the United States should do in the wake of 9/11?

13    And when you consider the evidence relating to that
14  first meeting in which Timimi solicited people to go wage war
15  against the United States, think back to what Timimi himself told
16  John Wyman about that meeting. He said that Kwon invited him over
17  to his house and he came. He said that Nabil showed up with
18  someone and left.

19    He told the people at Kwon's that the U.S. would use the
20  9/11 attack to initiate a large-scale attack, especially in
21  Afghanistan. He may have said the mujahideen would flow into
22  Afghanistan. When he left the meeting, he said he heard talk
23  about a phone number in Pakistan. He surmised that this was LET.

24    In a June 2003 interview, he said he admonished Royer
25  for considering that. In June 2004, he said he just made a --

1   some sort of disapproving hand gesture.

2          Now, Timimi's version corroborates a lot of what

3   happened in that meeting, but his explanation of what he did is

4   simply implausible.

5          Now, the testimony of Aatique, Kwon, and Hasan on the

6   other hand was very consistent and very believable, and if you

7   believe those three: Aatique, Kwon, and Hasan, Ali Timimi should

8   be convicted in this case. So all the defense can try to do is

9   claim that these witnesses are all liars. It is a claim that is

10  laughable.

11         Now, three points about that are worth making. First,

12  if you believe the defense, Timimi is the unluckiest guy in the

13  world. He had the great misfortune of just coincidentally showing

14  up in the middle of and then leaving a meeting that involved a

15  large-conspiracy about going overseas to fight in jihad.

16         If you believe the defense, all the witnesses who

17  testified about that meeting are now falsely casting blame on

18  Timimi. They are risking their plea agreements, perjury charges,

19  and the shame of falsely implicating an innocent man in order to

20  gain what? To have to keep a phony story straight?

21         And bear in mind if everyone at Kwon's with the

22  exception of Timimi was in on this plan to go fight in jihad, that

23  is a great case. There is no reason to bring Timimi into this to

24  try to improve it.

25         Second, Timimi was absolutely revered by this group.

## Closing argument - Mr. Gibbs

1   You heard the testimony.  Gharbieh said he called him Sheikh out
2   of respect for him as a person of knowledge and as an older
3   person.  Aatique said that he looked up to Timimi for guidance.
4   Surratt described him as brilliant.  Timimi himself said young men
5   were in awe of him.

6           Kwon described Timimi as someone who was not on a peer
7   level; rather, he was like a religious teacher.  He said that on
8   almost everything, if he said it, I'd accept it.

9           Kwon didn't want to do an undercover call with Timimi
10  because Timimi is someone I respect and admire and he would see
11  right through it.  When Kwon was considering becoming a U.S.
12  citizen, it was Timimi he asked about the permissibility under
13  Islam of becoming a U.S. citizen, and when Kwon left to go on
14  hajj, it was Timimi that he gave his will to, because as he said,
15  "I knew he was very knowledgeable.  He'll do it the right way."

16          Ladies and Gentlemen, this is the person that they would
17  falsely cast blame on?  You heard how difficult it was for Aatique
18  to be deceptive on the phone with Khan and how hard it was for
19  Kwon to even call Timimi on the phone when he was asked to do so
20  by the FBI.  Do you really think these witnesses could come into
21  court and stick to a phony story implicating Timimi hour and hour
22  under rigorous cross examination?

23          Not only that, Ladies and Gentlemen, but the third and
24  final point is this:  The defense expects you to believe that
25  Royer -- Royer -- was the big criminal mastermind here, and that

1    Timimi was some hapless victim.  Let's just dispense with that
2    nonsense right now.

3         What did we hear about Royer?  There were five people at
4    that first meeting and one at the second who tried to get to LET,
5    and who was the only person who couldn't make it?  It was Royer,
6    who made it only as far as Bosnia.

7         Aatique said Royer had no influence over him.  Kwon said
8    that Royer was not very important compared to Timimi, and in
9    truth, one of the first things Kwon told the FBI to try to protect
10   Timimi and the others was that he and Royer had come up with this
11   plan to go on jihad during a walk around a pond.  In doing that,
12   he tried to protect everybody in the case except for Royer.

13        Now, you heard Royer's voice on these undercover calls.
14   This guy wasn't a mastermind.  He was a valley girl, calling the
15   wrong phone numbers, forgetting to call an attorney for Hammad,
16   saying that there were 30 days in March.  That, Ladies and
17   Gentlemen, is the defense's mastermind, and that's what they want
18   you to believe.

19        But when you consider the testimony of the witnesses in
20   this case, Ladies and Gentlemen, you should ask does the other
21   evidence that you received corroborate their testimony or
22   contradict it?  When we look at the evidence, we'll see that it
23   points inescapably to Ali Timimi's guilt.

24        Now, let's examine some of that evidence starting in
25   September of 2001.  On September 14, 2001, Yong Kwon pays to

1   register his car in Virginia, something that makes no sense if he

2   was planning to leave the country already.

3          September 15, 2001, Masaud Khan orders a coat from

4   Cabela's but has it shipped regular mail, something which was

5   perfectly consistent with what Timimi told Kwon on September 11,

6   that he needed to gather the brothers together to discuss a plan

7   about going up into the mountains.

8          At this point, there is no sense of urgency, but the

9   next day, the meeting with Timimi occurs.  Suddenly, everything

10  changes.  Five of the seven people from that very small group

11  meeting with Timimi on 9/16 make plans to leave the United States,

12  to travel to a jihadi training camp in Pakistan, to join a group,

13  LET, that says on its own website that they will sacrifice their

14  lives with other Muslims against America.  And you saw that in

15  Exhibit 1D45, one of the Taiba Bulletins.

16         Again, use your common sense, Ladies and Gentlemen.  If

17  this larger-than-life figure, Sheikh Ali, had simply given some

18  harmless advice to this group or in his own very implausible

19  version told them not to go on jihad, is there even the remotest

20  possibility that five people would have responded by doing the

21  very thing that he had cautioned them against?

22         On September 17, 2001, at approximately 1:30 in the

23  morning, Yong Kwon orders three coats from Cabela's.  Masaud Khan

24  calls Cabela's that day and has them express ship his coat now.

25         What had occurred between September 15 and September 17

## Closing argument - Mr. Gibbs

1    to cause such a big change?  It was obviously that meeting with
2    Timimi.

3            That same day, the 17th, Masaud Khan renews his
4    passport.  The next day, on September 18, 2001, Masaud Khan runs
5    into Kwon and Hasan at the Pakistani embassy, where they're all
6    getting visas, and he asks for a ride up to Aatique's place in
7    Pennsylvania.  On September 19, 2001, Khan and Aatique fly out of
8    New York on their way to Pakistan.  On September 20, 2001, Kwon
9    and Hasan fly out of Dulles on their way to Pakistan.

10           This is three and four days, respectively, after that
11   meeting with Ali Timimi, and four people fly out to Pakistan.
12   Again, Ladies and Gentlemen, imminence of the harm.

13           Now, Kwon, Hasan, Aatique, and Khan all make it to LET.
14   Afghanistan is halfway around the world from the United States,
15   but now four people from that meeting with Timimi have made it to
16   within a couple hundred miles of the front, where the war with
17   Afghanistan will soon begin.

18           And as the United States prepares to launch strikes
19   against the Taliban and Al-Qaeda, Kwon, Hasan, and the others are
20   making their own preparations.  They are training with machine
21   guns, AK-47s, and RPGs, just as Timimi knew they would.

22           With the exception of Aatique, who leaves early, they
23   stay for nearly 40 days, and at the end, they're told that it is
24   too late, the war is almost over, and the borders into Afghanistan
25   are closed.  LET will not help anyone get in anymore.

## Closing argument - Mr. Gibbs

1          Kwon, Hasan, and Khan were not the only ones who were
2   planning to use LET as a launching pad to Afghanistan.  Several
3   Saudi trainees in their group were visibly upset at the news that
4   they couldn't get into Afghanistan anymore.  LET was obviously the
5   right gateway into Afghanistan for them as well.  LET is the place
6   that according to Ali Timimi was on the sunnah, the correct path.

7          Later on in September, Nabil Gharbieh meets with Royer,
8   who says, "You know what Sheikh Ali and the scholars are saying.
9   You should be going on hijra or going to a camp.  Which are you
10  going to do?"

11         We know who the scholars are, Sheikh Uqla and the
12  others.  If as the defense wants you to believe this was all
13  concocted by everyone in that meeting except for Timimi, why did
14  Royer need to start his comments to Nabil by saying, "You know
15  what Sheikh Ali says"?  Nabil is not interested.

16         Now, this comment to Nabil by Royer is very similar to
17  what Hammad Abdur-Raheem said to Donald Surratt after that first
18  meeting.  He told Surratt that he had been to a meeting where
19  Timimi gave a very powerful talk, and now some of the brothers are
20  going overseas.

21         And three weeks later, in approximately mid-October,
22  there's a second meeting, this time at Timimi's house.  Timimi,
23  who claims not to know these people very well, invites a number of
24  them into his home.

25         One of the ones he invited was Donald Surratt, who now

## Closing argument - Mr. Gibbs

1   gets to hear one of Timimi's powerful talks in person.  Surratt
2   testified that some of the other attendees were Ali Asad Chandia
3   and Ibrahim Hamdi.  He said that Timimi told them it was
4   obligatory to help the Muslims in Afghanistan and Pakistan by
5   supporting them physically.

6        It was clear to Surratt that he was being told to help
7   defend against the Americans, and he felt conflicted because of
8   his responsibility to his wife.  So he told Timimi that he
9   couldn't go to Pakistan or Afghanistan because of her.

10        Think about that for a minute.  Why would Surratt feel
11   the need to tell Timimi that he wouldn't be able to go to Pakistan
12   or Afghanistan unless that was exactly the place that Timimi was
13   urging him to go?

14        Now, during the second meeting, Timimi also read from a
15   single document:  the Hawaali fatwa, Exhibit 7A23, and we saw this
16   during the course of the trial.

17        Now, again, Ladies and Gentlemen, Timimi could have
18   taken anything in the world into that meeting with him.  He has
19   access to thousands of documents, and what did he choose?  That
20   document.  And that document, Ladies and Gentlemen, gives a clear
21   indication of what Timimi's message was that day.

22        At page 8 of the Hawaali fatwa, he says that it is a
23   duty to guard the religion from all sides.  At page 11, he
24   describes Al-Qaeda as the front line of jihad against the
25   Crusaders.  At page 14, he describes the Pentagon and the World

## Closing argument - Mr. Gibbs

1  Trade Center as being anything but innocent targets, and at page
2  18, he said that when the 9/11 attacks occurred, Muslims
3  everywhere rejoiced.

4         Now, two people at that meeting other than Surratt took
5  Timimi's message to heart:  Ibrahim Hamdi and Ali Asad Chandia.
6  We heard the testimony of Andre Thompson, who said that in late
7  October, after that meeting with Timimi, Hamdi came and pitched
8  him to go to Afghanistan, the very place that Timimi said it was
9  obligatory to defend.

10        Ali Asad Chandia got pretty busy, too.  On October 15,
11 2001, he renewed his Pakistani passport, and soon thereafter, he
12 resigned at Costco and flew to Pakistan.  He arrived on November
13 5, 2001.  Kwon testified that he saw Chandia at the Lahore office
14 of LET when he was leaving the camps.

15        Now, at this point in the chronology, Ladies and
16 Gentlemen, we start to see some of Timimi's own words.  Do they
17 reflect that he is the leading voice of moderation in the Muslim
18 world today, as he told John Wyman, or do they reflect something
19 far different?

20        Let's talk about him being the leading voice of
21 moderation in the Muslim world today.  Now, I'm not going to tell
22 you to ignore the defense exhibits in this case.  Far from it.  I
23 want you to look at them.  Take a good look at Defense Exhibit 33,
24 the Purdue University lecture from October 20, 1993.  Pick it up.
25 Read it.  Think about it.

## Closing argument - Mr. Gibbs

1    Now, we didn't hear from a single witness who could
2  confirm that lecture was given, but let's assume it was.  Timimi
3  says all the right things in there about violence and terrorism.
4  If he had said those things after 9/11, he would probably still be
5  speaking at Dar al-Arqam on Friday nights, and we would not all be
6  here.

7    But it is incredibly telling that the most moderate
8  lecture they could find is nearly 12 years old.  Where are the
9  lectures in '96, '98, 2000 with those same themes?

10    The fact is there are numerous exhibits of Timimi's
11  writings and his speeches in this case, and Purdue '93 sticks out
12  like a sore thumb.  The fact is if Timimi ever believed what is
13  said in that lecture, his views changed drastically, and the fact
14  is Timimi's words in the year 2001 and beyond tell you everything
15  you need to know about him.

16    On October 15, 2001, we see Government's Exhibit 7D3, a
17  post on the Jazeera list by Donald Surratt.  Surratt testified
18  that he posted this because he was trying to get a copy of the
19  Hawaali statement which Timimi told him in the meeting was
20  available on the Internet.

21    And we also know that Timimi was on this same Jazeera
22  list, and in this posting, a person named Shibli Zaman, whom
23  Timimi claimed to John Wyman he didn't know, made some very
24  critical comments.  If we can go to the bottom of page 1, among
25  other things, Shibli Zaman says, "So far of the Peninsular

**J.A. 2363**

## Closing argument - Mr. Gibbs

1  shaykhs, Shaykh Shuaybi, Shaykh Salman, Shaykh Ibn Jibreen, Shaykh
2  Safar, and others of their genre have spoken out in this regard
3  loud and clear without any ambiguity.  Why is this no surprise
4  that they are the ones to speak so boldly and truthfully when we
5  are in trouble?!

6        "This is not the first time they have been the
7  harbingers of truth while others have remained silent or spoken
8  utter falsehood."

9        And he's saying in there, "Uqla and Hawaali are showing
10 courage, and the rest of you are out there being silent."  These
11 are critical comments.

12       And six days later, Timimi makes some pretty critical
13 comments of his own.  On October 21, 2001, he responds to an
14 e-mail which criticizes a fatwa on the Taliban by an individual
15 named Sheikh Ghunayman.  Ghunayman's fatwa, which was found in
16 Timimi's house, is 10A33b, and in it, Ghunayman said things like
17 it is obligatory to help the Muslims of Afghanistan.

18       It also says that the goal of the United States is to
19 humiliate the Muslim nations, to force them into subservience to
20 America, and to protect the Jewish land from any danger that may
21 threaten it.  That's the Ghunayman fatwa.

22       And on October 21, 2001, Timimi responds with Exhibit
23 10D19.  His response is contemptuous.  He says that this student
24 of knowledge still has a lot of studying to do.  He says that this
25 is the height of ignorance.

1          And then he winds up responding to this individual who
2   criticized the Ghunayman fatwa, which was supportive of the
3   Taliban, and in the last paragraph, what does he say?  Timimi
4   says, "As Muslims, we are to deal with the facts.  If the Taliban
5   and Mullah Umar and the Arabs with them turn out to be the
6   Dajjaal" -- the anti-Christ -- "and his army, we will deal with
7   that then when it is apparent.  Until that time they are Muslim
8   whom we are obligate to support by body, wealth and word even if
9   some find that distasteful."

10         Ladies and Gentlemen, who are the Arabs with the
11  Taliban?  As Evan Kohlmann testified, Al-Qaeda.

12         On October 21, 2001, how could you support the Taliban
13  with your bodies?  By fighting against the kafir, the invading
14  Americans.  This is exactly what Timimi told Aatique, Kwon, Hasan,
15  Khan, Royer, Surratt, Hamdi, Chandia, and the others, and this is
16  exactly what Timimi believed.

17         And on October 21, 2001, Timimi says himself in
18  black-and-white that Muslims are obliged to defend the Taliban
19  with their bodies.  It can't get much more clearer than that.

20         Now, two months later, Timimi responds to Shibli Zaman's
21  e-mail on October 15 to explain his own silence.  That was the
22  e-mail I showed you a moment ago where he said that Uqla and
23  Hawaali are speaking out and everyone else is remaining silent.

24         When you look at that e-mail from Shibli Zaman, you'll
25  realize that he was calling out Timimi and the other Muslim

## Closing argument - Mr. Gibbs

1    leaders, and it had to sting a little bit.  By criticizing the
2    silence of those who have not spoken out as clearly as Sheikh Uqla
3    and Sheikh Hawaali, he is saying that they lack courage, and
4    Timimi knew that this was unwarranted.  Yes, he was being silent,
5    but only to protect himself, and he was doing his part to make the
6    mujahideen flow into Afghanistan.  He was as courageous in his own
7    way as Uqla and Hawaali.

8          And so on December 13, 2001, he says that.  He sends an
9    e-mail, a call to reflect and repentance.  It's Exhibit 10J9.  And
10   he sends it out to Shibli Zaman and others, Shibli Zaman, who he
11   claimed to John Wyman he didn't know.  And he starts out on page 1
12   by saying first that he found the comments that he had recently
13   read on the Jazeera list disturbing.

14         Further down on page 1, he goes on to explain his
15   silence.  He says that many of you have noticed my silence on the
16   recent events.  This is not because I am not with opinion, but
17   rather I have decided to apply the Prophetic ordinance (upon our
18   Prophet) (Whoever is silent will be saved).

19         He then goes on to say, "Those brothers in my area have
20   been able to benefit from what I have had to say, but this
21   unfortunately due to the circumstances has been limited to private
22   visits and not public statements."

23         Note the tense of that:  visits, plural.  We know of two
24   visits in September -- on September 16 and in mid-October 2001.
25   We know that in those two meetings, he solicited people to go

## Closing argument - Mr. Gibbs

1  fight against America.

2          And then at page 2 of his e-mail, he refers to Sheikh
3  Safar's Statement to the Ummah, the statement that he read in that
4  October meeting.  We know that Hawaali's Statement to the Ummah
5  was supportive of September 11, and we know what Timimi told John
6  Wyman about Hawaali, that Hawaali is a Muslim scholar that Timimi
7  studied under, that he respects, and that he uses for guidance,
8  and that after 9/11, he called Hawaali himself to get his take on
9  the events.  He said their views on Islam are similar, and he knew
10  that he was reputed to be one of Bin Laden's spiritual advisors.

11          And Timimi also said that the Statement to the Ummah
12  should be taken as his own opinion since he didn't disagree with
13  anything in there.

14          And on December 13, 2001, Timimi related that he agreed
15  with Hawaali, that he was having private visits here in the United
16  States with some of his followers, and he advised them all to quit
17  from public commentary of the events, and for a while at least,
18  that's what Timimi did as well.

19          Now, Ladies and Gentlemen, are these the words of the
20  leading voice of moderation in the Muslim world today?  Of course
21  not.  Timimi is no moderate.

22          Recall the point that Evan Kohlmann made when he
23  testified about a public transcript and a private transcript.
24  Timimi's public transcript is in those taped lectures you heard.
25  That's his public side, which means that's his more moderate side.

## Closing argument - Mr. Gibbs

1      And if that's the moderate side, what sort of rhetoric
2   do you suppose he was engaging in on September 16 and in
3   mid-October 2001?  It was powerful enough that five people
4   actually went to LET, halfway around the world.  It was powerful
5   enough that mild-mannered people like Aatique and Hasan wanted to
6   go fight Americans in Afghanistan.  It was powerful enough that a
7   month after becoming a U.S. citizen, Yong Kwon decided he would go
8   fight against the armed forces of his newly adopted country.

9      Ladies and Gentlemen, let's move forward to the year
10  2003.  The space shuttle Columbia crashes; seven astronauts die.
11  Timimi views this as wonderful news.  What does he say?  The heart
12  of each believer was overjoyed by the crash.  The United States is
13  the greatest enemy of Muslims.  He hoped that America would fall
14  and disappear like the space shuttle had.

15      We are a long way from Purdue 1993 here, folks.

16      Also in late 2002 and early into 2003, Masaud Khan is
17  corresponding with Abu Khalid, johninformation, the individual
18  from LET that he was assisting to purchase an unmanned aerial
19  vehicle at a time when LET was designated as a foreign terrorist
20  organization.  Unlike Kwon, Khan was continuing to assist the
21  terrorist organization that Timimi had sent him to.

22      Now, next in the chronology as we move forward, we see
23  evidence from the wiretaps and the consensual phone calls.  Now,
24  what do we know about these phone calls?  Keep in mind the
25  brothers knew that they were under a great deal of scrutiny by the

## Closing argument - Mr. Gibbs

1  spring of 2003.  The first search warrants in this case were on
2  February 25, 2003, as you heard, and Timimi's house was one of the
3  first places searched.

4          Timimi at least had enough sense to know that his phone
5  was tapped.  So these calls are not going to consist of people
6  saying, "Okay.  Let's talk about all the incriminating things we
7  did."  They are going to consist of people trying to get their
8  stories straight and downplaying what happened to try to make it
9  as innocuous as possible.

10          And the calls were also revealing because there is never
11 a single conversation that you heard during this trial where
12 anyone says, "Hey, why are they looking at Sheikh Ali?  He just
13 came into that meeting for a short time and said to go make hijra.
14 Why do they keep asking about him?  He was the one guy who was
15 discouraging us from going."  You never heard a conversation like
16 that.

17          Again, you have to ask yourselves did the conversations
18 you heard corroborate Aatique, Kwon, Hasan, and Surratt, or did
19 they corroborate what Timimi told John Wyman?

20          Well, let's start on March 26, 2003.  Hammad and Royer
21 talk about a brother who cracked, Caliph Basha, who was at the
22 9/16 meeting.  They're trying to figure out what the other
23 brothers are saying to the FBI and to figure out what they should
24 say.

25          Four days later, on March 30, 2003, Hammad and Royer

## Closing argument - Mr. Gibbs

1  talk about how the government is obviously trying to get people to
2  say something about Sheikh Ali.  There is no discussion that the
3  government is obviously barking up the wrong tree with Sheikh Ali
4  since he never told them to do anything wrong.  During that same
5  call, Hammad says he got rid of his computer.

6          On April 1, 2003, Royer and Hammad call Timimi to see if
7  they should get together to talk.  Timimi says the phone is
8  obviously tapped, and he adds that, hey, we weren't really the
9  best of friends anyway, but then he proceeds to tell Royer in that
10 call that he is welcome to have tea at his house and that my house
11 is always open to you and your family.

12          But during that call, Timimi never says any of the
13 things about the 9/16 meeting with Hammad and Royer that he later
14 claimed to John Wyman.

15          April 7, 2003, it's the first undercover call with Kwon
16 and Royer.  And what were some of the things that Royer said on
17 that phone call to Kwon, who was playing the role of a brother who
18 was in Korea but was being contacted by the FBI?

19          What did he say?  He said, "It was never my intentions
20 to, to send anyone to fight America per se and, and to go fight
21 America at all."

22          Why would he say "per se"?  Why would he use that term?
23 Because they had to talk around it, because Afghanistan is exactly
24 what Timimi had said, and they knew it, and if nothing else, Royer
25 wanted to make sure Kwon didn't reveal that detail to the FBI.  He

## Closing argument - Mr. Gibbs

1   also said that Sheikh Ali told them to go be with the mujahideen

2   and that he did say Kashmir.

3           Do these comments suggest that on 9/16, Timimi told the

4   people at Kwon's house to simply lay low or leave the country?

5   No.  Where are the mujahideen located?  In Pakistan among other

6   places.  Where are the LET training camps?  In Kashmir.

7           On April 8, 2003, Royer says in this call to Kwon, "I

8   told Sheikh Ali I would never tell anyone what was said at that,

9   ah, meeting, something that I sworn to a lot."  Doesn't that sound

10  like the amana from Kwon's place?

11          April 11, 2003, Kwon calls Timimi.  He is visibly upset

12  about trying to deceive Sheikh Ali.  He won't respond to the

13  agent's notes.  The call is a bust.

14          Do you really believe that Yong Kwon, who testified here

15  over the course of two days, was making all of this up about

16  Sheikh Ali?

17          On April 16, 2003, Kwon calls Khan.  Again, he is unable

18  to be deceptive.

19          On April 17, 2003, there's the hotel meeting on video

20  that you saw.  And what does Royer say?  He says, "And they're

21  going to ask about Afghanistan in such a way that you're not going

22  to be able to deny it."

23          How is that possible if the meeting with Timimi had

24  nothing to do with Afghanistan?  And Royer says, "Like, you know,

25  you just -- you remember how at that time when everyone was all

## Closing argument - Mr. Gibbs

1  jazzd up and stuff?"

2          What did Aatique, Kwon, and Hasan say about Timimi's

3  message on 9/16?  That it inspired them to want to go to LET to

4  train and then to go fight in Afghanistan.  Timimi is clearly an

5  inspiring speaker.

6          What was Surratt's term?  "Powerful."  It was his

7  inspirational message that got them all jazzed up.

8          And near the end, Royer says, "Me, you, and Ali are the

9  key people."

10          On May 9, 2003, we have the Aatique-Khan phone call.

11  Again, this is the one where Aatique stammers and stutters, but

12  he's unable to be deceptive.

13          Do you really think that that guy could sit here in

14  front of Sheikh Ali and lie about what he had said during hours of

15  cross examination and look believable?  Aatique looked believable

16  because he was telling you the truth.

17          On June 27, 2003, Timimi meets with the FBI.  He's seen

18  a copy of the indictment by then, and he's already spoken to

19  Yousuf Idris.

20          On August 12, 2003, Yousuf Idris signs that affidavit

21  that you saw.  Let's talk about that affidavit for a minute.  The

22  defense wants you to believe that Yousuf Idris exonerates Timimi

23  because Timimi told Idris to stop Kwon and Hasan from going.

24          First of all, does it make any sense that Timimi's

25  telling people not to go on jihad, when he claims that he never

## Closing argument - Mr. Gibbs

1  told them to do that in the first place?  And second, there were

2  seven people in that first meeting with Timimi.  Where's the

3  evidence he tried to stop Khan, Aatique, Royer, Hammad, or Caliph?

4  Not even the defense or Yousuf Idris in his ridiculously

5  self-serving testimony will say that.

6          THE COURT:  One minute.

7          MR. GIBBS:  Thank you, Judge.

8          And finally, Ladies and Gentlemen, it is clear Yousuf

9  Idris wanted to do whatever he could to help his friend.  If

10  Timimi had really told him to stop some of them -- some of the

11  defendants that were indicted in June 2003 from going to LET, is

12  there any doubt that that information would have been in the

13  affidavit?  No.

14          And what did we see in that affidavit?  We saw Yousuf

15  Idris recounting a conversation from 2000 or 2001 where Timimi

16  talked about some unnamed brother who was playing paintball.

17          The bottom line is Yousuf Idris deserves a very little

18  credit for trying to tell Hasan and only Hasan not to go, but

19  simply because the defense has found a couple of toll records

20  showing connections between Timimi and Idris and the fact that

21  they talked would have surprised their friends does not mean that

22  Timimi deserves any credit for that.  As Hasan made clear, Idris

23  telling him not to go meant nothing, but if Timimi had said not to

24  go, it would have been a completely different story.

25          Ladies and Gentlemen, that is just a small slice of the

## Closing argument - Mr. Gibbs

1  evidence in this case.  You will soon receive that evidence.  You
2  will have a chance to go over it, and I want to thank you on
3  behalf of the government and, I'm sure, on behalf of the defense
4  for your diligence in following this case so carefully and so
5  closely.

6          I think when you go back in the jury room, you will find
7  that when you look at all of the evidence, hold it up to the light
8  of reason, you will find that there is no reasonable doubt as to
9  the defendant's guilt, and that's why I would ask that you find
10  the defendant guilty on all charges in this indictment.

11          Now, I want to close briefly with a final thought.  The
12  preamble to the Constitution of the United States of America reads
13  as follows:  "We the People of the United States, in Order to form
14  a more perfect Union, establish Justice, insure domestic
15  Tranquility, provide for the common defence, promote the general
16  Welfare, and secure the Blessings of Liberty to ourselves and our
17  Posterity, do ordain and establish this Constitution for the
18  United States of America."

19          Ali Timimi was given the blessings of liberty, and
20  that's what it was, a gift.  It was handed to him without question
21  or reservation.

22          Living here in the United States, he was able to get a
23  superb education, to marry, to live in a home in a peaceful
24  community.  And if the Constitution means anything, it means that
25  he lives in a society where he can say whatever he wants virtually

## Closing argument - Mr. Gibbs

1  without limit.

2          This is a great country, but it is not a perfect

3  country, and it is important that people be able to speak out, to

4  criticize, to complain, to shout at injustice.

5          That is another gift that was given to Ali Timimi, that

6  he had the opportunity to participate in the great rambling

7  conversation that is this country.  He could express virtually any

8  opinion he wanted, no matter how abhorrent or offensive, but this

9  case isn't about his opinions.  We are not here because of his

10  opinions.  We are here because of his actions.

11          Ali Timimi didn't express an opinion.  He told people

12  what to do, knowing full well that they would do it, and he was

13  right; they did.  Ali Timimi declared war on this country, not war

14  in a metaphorical sense; a real war, a war where American troops

15  in a combat zone truly could have even American citizens and

16  American visa holders trained in a Pakistani training camp

17  fighting against them, trying to kill them, as Ali Timimi wanted.

18          Now, that it didn't happen is one of the few happy

19  events in this entire case, but that it didn't happen does not

20  change the fact that Timimi did everything in his power to make it

21  happen, and in doing so, Ali Timimi violated the laws of this

22  country, and that is why you should find him guilty on all counts

23  in this case.

24          Thank you very much, Ladies and Gentlemen.

25          THE COURT:  All right, I think we'll take a five-minute

## Closing argument - Mr. MacMahon

2229

1  break before we start the defense closing argument.

2        MR. MAC MAHON:  Thank you, Your Honor.

3        THE COURT:  And Mr. Gibbs went over a couple of minutes,

4  so, Mr. Kromberg, you lost a couple of minutes on that.

5        All right, we'll recess court until 11:00.

6        (Recess from 10:55 a.m., until 11:09 a.m.)

7        THE COURT:  Mr. MacMahon?

8                CLOSING ARGUMENT

9                BY MR. MAC MAHON:

10        May it please the Court, Your Honor, Mr. Gibbs,

11  Mr. Kromberg.  Ladies and Gentlemen of the Jury:  On behalf of

12  Mr. Yamamoto and Dr. Al-Timimi, I do want to thank you for your

13  attention in this case.  We've noticed how diligently you've been

14  working, some of you with your notebooks, and this is, as you

15  know, a very important case to everyone in the room, and the

16  service that you're performing for us is greatly appreciated.

17        I told you in my opening statement many things, and I

18  tell you now that I proved to you each and every one of those

19  things that I promised to you.  I told you that this man's life

20  was an open book.  The government has seized thousands and

21  thousands of documents from his house, thousands of hours of

22  surveillance videos -- excuse me, telephone calls and e-mails and

23  everything, and this is all that we came up with, what we've heard

24  in this case.

25        There isn't any statement in any of these documents,

## Closing argument - Mr. MacMahon

2230

1  phone calls, or anything else that you heard of Ali Timimi
2  advocating violence against anyone.  There isn't any evidence of
3  him advocating that anyone commit a crime.

4          And just based upon that, the government hasn't proven
5  its case, Ladies and Gentlemen.  They haven't proven beyond a
6  reasonable doubt at all that Al-Timimi solicited a crime, that
7  anyone would solicit a crime at all.

8          And he's presumed innocent.  The judge will tell you
9  when she gives her instructions that this man comes before you
10  with a clean slate, and I'd say that there's nothing that the
11  government has done that would require you to write "guilty" on
12  that slate in this case based upon the evidence that you have
13  heard alone.

14          Now, let's back up a little bit.  How is it that we got
15  here?  Mr. Gibbs says it's because of what happened on September
16  16, and I tell you that that isn't true.  There are lots of things
17  that he missed to tell you about in this case.

18          First of all, September 11 was a terrible day.  You
19  didn't need Mr. Gibbs to tell you what happened on September 11.
20  Everyone in this country knows where they were.  They know what
21  happened.  They know it was an awful day.  There isn't anybody in
22  this country that supported what happened on September 11, and
23  that includes Ali Al-Timimi.

24          You heard that his, his heart broke that day.  You heard
25  that he had a theological discussion with another person there.

## Closing argument - Mr. MacMahon                    2231

1   Mr. Idris told you exactly what happened.

2           But what else did we find on that day?  That every

3   Muslim in this country was soon to be caught up in the world's

4   largest criminal investigation, a dragnet.  You know that

5   Al-Timimi was questioned, approached by the FBI in the middle of

6   September 2001, at a time that Mr. Gibbs and the government would

7   have you believe he was out plotting the overthrow of the United

8   States.

9           And why, Ladies and Gentlemen, did the FBI go to

10  Al-Timimi's home and question him about the events of September

11  11?  Was it because a hijacker had lived at his house?  Was it

12  because he had given money to a hijacker or given somebody a plane

13  ticket?

14          No, Ladies and Gentlemen.  It was only because of his

15  religion and because of his prominence.

16          You heard Agent Wyman tell you that Muslims all over the

17  country were targeted.  You know from that same e-mail message,

18  instant message the government likes because it says, "I was

19  basically kicked out of Dar al-Arqam," it also says in it that

20  Al-Timimi's brother is scared to death.  The FBI has raided his

21  home and seized his computer.

22          And why again?  Just on the assumption that because of

23  his religion, that this man is a terrorist, just like the people

24  that committed these awful acts.

25          And what did they find?  Nothing.  Absolutely nothing.

## Closing argument - Mr. MacMahon

1  He went in, voluntarily met with the FBI, answered every question
2  they had about September 11.  There was nothing.

3       The FBI asked him if he was the mastermind of September
4  11.  He's a bright guy, a biologist; maybe he was behind this.

5       We know that Muslims in this country were scared after
6  September 11.  The speech at Dar al-Arqam that even Mr. Kwon
7  agrees that he heard was Al-Timimi telling them to be safe, to not
8  go out if their women wore veils, to try to be careful, because
9  they were all scared.

10       You've seen -- you heard Idris -- Yousuf Idris tell you
11  about Muslim -- violence against Muslims in this country.  You
12  know that Al-Timimi asked his boss, Curt Jamison, if he would
13  write him a letter so that he could go up to New York and not be
14  molested on the train up to -- just to go to a conference on
15  genome sequence, and that was September 28 through the 30th of
16  2001.

17       What's the government do to Curt Jamison?  They ask him
18  if he's a Muslim.  Did you like that question, Ladies and
19  Gentlemen?

20       What's next?  Secret surveillance of Al-Timimi's phones
21  and his e-mails, thousands of calls.  And how much of that is used
22  to show this man is a criminal, a person who would seek to
23  overthrow the country he was born in?  Absolutely nothing.
24  Nothing at all.

25       They did capture the space shuttle call, and I will

## Closing argument - Mr. MacMahon

1   return to that again at a later time.

2          Now, then we have the search of Al-Timimi's home, and

3   what did Special Agent Ammerman tell you that they were looking

4   for in this person who was studying for a Ph.D. in Biology at

5   George Mason?  Evidence of Weapons of Mass Destruction.  Evidence

6   of smallpox, anthrax, maybe even nuclear materials in a townhouse

7   off of Route 50 in the Greenbriar section, Ladies and Gentlemen.

8          Does that give you a flavor of what they think they're

9   dealing with?  And what did they find?  Nothing.  Absolutely

10  nothing.

11         I asked this man if he took any of the books to the, to

12  the weapons lab to have them tested for anthrax, and what did he

13  tell you?  "No, I didn't, but we've always been concerned with

14  Usama Bin Laden blowing up a nuclear weapon in this country."

15         And I'm concerned about that, but there isn't any reason

16  to be searching Ali Timimi's house looking for those things.

17         So what are we left with in this case?  We've gone from

18  him being questioned as the mastermind of September 11 to a person

19  who would be responsible for the anthrax attacks on the Congress

20  perhaps or someone thinking of leaking smallpox all over the

21  place, to a person who maybe solicited Hasan, Kwon, Khan, and

22  Royer to violate the laws of this country.

23         We've come a long way, Ladies and Gentlemen, and the

24  government doesn't give up very easily once they've got somebody

25  in their sights.

## Closing argument - Mr. MacMahon                    2234

1           And the answer to whether he committed these crimes
2   soliciting these men whose names I've just read is the same as it
3   was in the September 11 allegations, and it's the same as it was
4   to the Weapons of Mass Destruction.  The answer is no.

5           September 11, the dinner at Dar al-Arqam, one thing I
6   did promise you, that you wouldn't hear any testimony of any kind
7   of criminal actions at Dar al-Arqam.  Mr. Kromberg would have
8   portrayed it as Bin Laden's cave somewhere.  And you've heard
9   everybody testify that not once at Dar al-Arqam did Al-Timimi or
10  anyone else ever advocate violence against anyone.

11          Nabil says -- Nabil Gharbieh, the government's first
12  witness, he says that Timimi said that the U.S. had this coming
13  with its foreign policy.  He also said that Timimi said that the
14  attacks were Islamically impermissible.  The government forgot to
15  tell you that in their closing argument.

16          Now, folks, it's true, there's many people that agree
17  with what Dr. Al-Timimi said that night.  Our policies in the
18  Middle East enrage Muslims all over the world.  We've been dealing
19  with terrorism -- Muslim fundamentalism terrorism in this country
20  since at least the first World Trade Center attacks.

21          Richard Clarke testified at the 9/11 Commission that
22  it's our policies and not our beliefs --

23          MR. KROMBERG:  Objection, Judge.  There's no evidence of
24  what Richard Clarke testified at the 9/11 hearings.

25          THE COURT:  I think that's beyond the scope.

**Closing argument - Mr. MacMahon**

2235

1     MR. MAC MAHON:  Thank you, Your Honor.

2     THE COURT:  Sustained.

3     MR. MAC MAHON:  That it's against our policies that

4  enrages so many people.

5          Now, Mr. Gibbs didn't even try to tell you that Yong

6  Kwon took Ali Timimi home from the Dar al-Arqam on September 11.

7  That's because it never happened.  It's a complete fabrication by

8  Yong Kwon.  Nothing in the phone records indicates that he picked

9  him up or called him beforehand or anything else.

10         And what else do you know?  Mr. Kwon told you that

11  Mahmood Hasan was with them, and the government didn't even ask

12  him a question:  Were you with Al-Timimi and Yong Kwon on that

13  evening?

14         And what did Yong Kwon, what, what fabrication did he

15  come up with for that night?  In the very first private

16  conversation, if you believe him, he ever had in his life with

17  this man, he was told to gather up all the Muslims and to figure

18  out a plan and to get canned food and batteries and water and head

19  up into the mountains.

20         You know that never happened.  It's patently absurd.

21  They don't even speak again.

22         Kwon says to you under cross examination, "You know, I

23  never did talk to anyone again about the plan."

24         The plan.  Do you remember the plan, Ladies and

25  Gentlemen, the plan that involved bringing people down from

## Closing argument - Mr. MacMahon

1  Pennsylvania to defend Muslims as well?  That didn't happen at
2  all.  It just is a joke.

3           And to suggest that Masaud Khan somehow was buying
4  jackets on the night of September 15 because of the plan defies
5  both the testimony of their witness, who said that it never
6  happened, and your own common sense, which you do bring with you
7  into the jury box.

8           So what do we have?  We have the word of three convicted
9  felons, who have the utmost interest to lie about Ali Al-Timimi.

10          Mr. Gibbs said to you in his argument, "What do they
11 have to gain?"  Well, they each told you, Ladies and Gentlemen,
12 life in prison.  If their plea agreements are rejected, they get
13 life in prison.  If they continue to tell the government's story,
14 what happens?  They're going to get reduced sentences.

15          We talked about these rule 35 motions:  They have the
16 utmost -- you can't think of a better reason to lie than for these
17 young men not to spend the rest of their lives in prison.

18          So what else did I tell you in the opening statement?  I
19 showed you a slide of Randall Royer's behavior because I told you
20 that you would find there was a reason why all these people went
21 to LET, and it didn't have anything to do with Ali Al-Timimi.

22          And, folks, I showed you this timeline, and I suggest to
23 you that everything that I promised to you is true in this
24 timeline.

25          This is a valley girl?  A valley girl with an AK-47

## Closing argument - Mr. MacMahon

1  fighting in Bosnia?  A valley girl who helps Ibrahim Al-Hamdi
2  apply for a visa in the year 2000 to go to Pakistan?  A valley
3  girl who in April of 2000 reaches LET, fires at Indian positions,
4  and establishes the Lashkar Bulletin?

5          Is this a valley girl who returned to the U.S. as an LET
6  recruiter, purchases AK-47s from who?  Yong Kwon, not Ali Timimi.

7          In March of 2001, what did the valley girl do?
8  Mr. Gibbs didn't even mention this to you.  He arranges for Donald
9  Surratt and Yong Kwon to meet with the representative of LET at
10 the annual pilgrimage in Mecca, one of the holiest things that a
11 Muslim can do, and what is in Randall Royer, the valley girl's
12 mind?  LET.  That's all he's thinking about on that trip.

13         Mr. Kwon told you all about that.  Yeah, they talked
14 about military training.  They talked about lots of things.  He
15 didn't deny that, but he didn't tell the government about it until
16 almost December of 2003.  Why?  Because he was lying to protect
17 himself.  He didn't want the government to know that he had agreed
18 in March of 2001 to be a recruiter for LET.

19         And that's exactly what he did.  He purchases jihad
20 videotapes.  And when he returns, the paintball becomes serious.

21         Do you remember that?  He wants to say it had something
22 to do with a meeting with Yousuf -- excuse me, Seif Chapman.  If
23 you look at this, the timeline shows you what happened.  Kwon and
24 Royer decided it was time to really get ready to go to LET.  He
25 assists Muhammad Aatique in July of 2001.

**Closing argument - Mr. MacMahon**

1        That's something else Kwon couldn't remember.  Did I
2   really help Muhammad Aatique get a fake letter to go to LET before
3   September 11?  I didn't remember that until the government just
4   kindly put me in the same jail cell with him while this trial was
5   going on.

6        And yes, that is what happened.  Why is he lying about
7   that?  To protect himself.

8        Muhammad Aatique told you that the reason he found out
9   about LET -- Mr. Royer could help him was because of who?  Yong
10  Kwon.  We know that -- and Mr. Kwon admitted it -- that before
11  September 11, they had called over to LET and that Mr. Royer had
12  done it for them.

13       And I won't bore you with the rest of these details, but
14  is there really any doubt in your mind who it is that's the
15  driving force in all these people going to LET?  Is it someone
16  who's never been overseas to Pakistan in his life?

17       I've given you his visa -- excuse me, his passport.  You
18  can look at his phone bells, everything you want.  This man is no
19  jihadi.  He's never been overseas.  He's not the kind of person
20  they look up to.

21       Now, what else do we know about the weakness of the
22  government's case that can be highlighted from this, this slide?
23  The paintball group.  The biggest lie in the government's case is
24  that Ali Timimi somehow knew that the paintball that was going on
25  was military training, personal jihad training to use the terms

**J.A. 2385**

## Closing argument - Mr. MacMahon

1  that these gentlemen like to use.

2          Every witness who testified in this case for the

3  government said that Ali Timimi had no knowledge whatsoever of any

4  of the military training that was going on at paintball.  He

5  didn't know they had guns.  He never told them to buy guns.  He

6  never told them to look at jihad videos.  All of the things that

7  would lead -- the government wants you to believe that this man

8  recruited these people to do military things -- are absolutely

9  false and completely unsupported by the evidence.

10          If I picked up one of those guns and gave it to Ali

11  Timimi right now, it would be the first time in his life he ever

12  held a gun.  There's no evidence at all to support that.

13          So when you hear the government say, oh, he's got these

14  paintball guys together, what a coincidence, that's no evidence of

15  anything because they all said they were playing paintball.

16          What did Mr. Nabil Gharbieh tell you about that?  He

17  said that Timimi asked him two questions when he brought up

18  paintball.  He said, one, "Are you doing anything illegal?,"

19  and two, "Why don't you play soccer?"

20          Do you guys remember that testimony?  Now, there's no

21  military training or experience going to come from somebody

22  learning to play soccer, is there?  That shows of truth of this

23  case, which is he didn't know anything about it.

24          Now, we know also that there was, in fact, a criminal

25  conspiracy already underway involving Kwon and Royer and these

## Closing argument - Mr. MacMahon

1    other people.  Royer -- excuse me, Mr. Kwon told you that he had

2    in the year 2000 already agreed to launch a military expedition

3    against India by going to Pakistan to train.  And what did he tell

4    you?

5          I asked him, "Did you ever tell this man that you had

6    entered into such a conspiracy?"

7          His answer was, "No."

8          Aatique was asked the same question:  "Did you ever tell

9    this man that you had started a conspiracy to fight in India in

10   the year 2000?"

11         "No."

12         I asked Mr. Kwon if Al-Timimi ever even asked him to

13   commit a crime, asked him to use a gun or anything, and he said no

14   to every one of those questions.

15         So the idea that -- you just forget about the idea the

16   government has proven to you that Timimi had any knowledge that

17   paintball was personal jihad training.  People play paintball all

18   over the country.  There's nothing for him to know about that.

19         Mahmood Hasan, by the way, the government's star witness

20   at the end, he even testified -- excuse me, Mr. Gibbs asked

21   him, "Did you ever think about jihad before September 16, when you

22   met this man?"  Do you remember that question with a great

23   flourish to it?

24         And he said, "Of course.  That's the only reason I went

25   overseas."

1           And then what do we find out?  He's pled guilty to a

2    conspiracy that began at least 18 months before that.

3           And then I asked him, "Did you ever tell Ali Timimi that

4    you were part of a conspiracy that began in the year 2000 to go

5    overseas and train?"

6           He said, "Of course not.  No, I never did that."

7           That's the truth, folks, okay?  That's their witnesses

8    telling you those things.

9           On 9/11, Yong Kwon, who I told you was the worst liar

10   you are ever going to see, he cancels paintball, saying something

11   about the weather.  Do you remember that?  So he's -- do you

12   remember how paranoid he was about the police?  "Oh, I can't talk

13   on the phone.  I can't do this.  The police are watching me."

14          What is that all about?  That's the ravings of a

15   lunatic.  Nobody's watching Yong Kwon on September 11, 2001.

16   Who's worried about his own security on the telephone?  It's Yong

17   Kwon.  It's nothing Ali Timimi told him to do, to make up a bogus

18   e-mail and cancel paintball.

19          And what do we know?  This same time frame, the

20   government tells you that Al-Timimi was filled up with hatred,

21   preparing to launch a military expedition against the United

22   States.

23          Look at Defendant's Exhibits 2 and 3.  On the night of

24   September 13, 2001, Al-Timimi bought a book, Statistical Methods

25   in Bioinformatics."  You'll get this back in the jury room.  This

## Closing argument - Mr. MacMahon

1  is what he was doing, Ladies and Gentlemen.

2       You heard Curt Jamison saying they were working.  "He

3  was studying for his Ph.D.  He was my research assistant."

4       This isn't someone contemplating waging war against the

5  United States.  This is a student with homework, and there isn't

6  any evidence to rebut that.

7       What is Yong Kwon doing in this same time?  Look at

8  Exhibit 86, for example, the phone bills, which nobody made up in

9  this case, Ladies and Gentlemen.  These are authentic phone bills.

10       He's talking to Muhammad Aatique on September 13.  And

11  you'll remember Mr. Kwon saying, "Oh, the FBI showed me my phone

12  bills.  I remember that now in jail.  You know, I talk to Aatique

13  all the time.  Talk to him all the time."

14       Now, we know that on September 10, the day before

15  September 11, obviously, Muhammad Aatique had already bought --

16  had gotten the money for his tickets to go to LET.  We know that

17  Randall Royer had already given him a reference letter.  We know

18  he called over to Pakistan to tell the people he was coming.  We

19  know that Yong Kwon was his sponsor, to use for lack of a better

20  word.

21       And surprise, surprise, Ladies and Gentlemen, Muhammad

22  Aatique has an eight-minute phone call on September 13 with Yong

23  Kwon.  Why?  Who knows?

24       The next day, we know that Aatique gets in his car at a

25  time when Al-Timimi is essentially looking for letters so he can

### Closing argument - Mr. MacMahon

1   travel, Muhammad Aatique drives all by himself down to Virginia.
2   What for?  To talk about the plan?  Why?  Ali Timimi has never had
3   any contact with Muhammad Aatique.

4         What did Kwon tell him in that call?  You know what he
5   told him.  He told him, "We're still going to LET, and come down
6   here.  We're going to have a meeting."  It's obvious.

7         He talks on the 14th to Masaud Khan for eight minutes.
8   He talks to Mahmood Hasan.  On the 15th, he calls the Khan
9   residence again, and that night, he calls Mahmood Hasan.

10        Again, where are the calls to Ali Timimi about the plan?
11  "Are you getting the water up?  Are you heading up into the
12  mountains?  Have you found a place for us to go?"  That's absurd.

13        But what is going on?  And you do remember Yong Kwon
14  said that he never once spoke to Masaud Khan about the plan, okay,
15  Ladies and Gentlemen?  What does Masaud Khan do at 10:45 p.m. on
16  Saturday the 15th?  He purchases a jacket from Cabela's suitable
17  for wearing in the Himalayas at an LET training camp.

18        Now, why did he do that?  Don't you think that there was
19  a plan involving Masaud Khan and Yong Kwon at the very least to go
20  to LET as of that time?

21        The government cannot explain this evidence to you at
22  all, and the reason is because it totally destroys their theory of
23  the case.  So what if Masaud Khan hurried up his order?  The whole
24  purpose of the meeting was for Royer and Kwon to go and get people
25  together and take them over to go to LET.  We know that.

## Closing argument - Mr. MacMahon

1    The next day, the 16th, it's another compilation of Yong
2   Kwon's phone calls.  You'll see who he invited to his dinner.  He
3   told you that Timimi had nothing to do with it, remember?  "He
4   didn't know who I was inviting.  He didn't even know there was a
5   meeting.  I didn't tell him anything about it."

6    He calls Mr. Surratt, Mr. Royer, Mr. Al-Hamdi, Mr. Royer
7   for seven minutes, Mr. Gharbieh, Mr. Hasan, Mr. Hasan, and
8   Mr. Khan.  Do you see that?  Those are his friends who he wants to
9   take overseas.

10    And then Abdullah Zikria, you remember that person?
11   That's the person that Yong Kwon claimed he told he was going
12   overseas before he left.  Timimi, as I told you in the opening
13   statement, makes a mistake that brings him here today, and he
14   calls Yong Kwon.

15    Special Agent Wyman said Timimi said he told Kwon his
16   wife didn't want him to leave the house.  Do you remember that?  I
17   told you that there was some, a family reason why he left.  This
18   guy lived in the neighborhood, and he went over there.  It was a
19   mistake.

20    But did he know that there was a criminal conspiracy at
21   this meeting, that these people were going to be planning to go
22   overseas and wage war against the United States?  No.  There's no
23   evidence of that at all.  Yong Kwon even told you that.

24    What happens at the meeting?  Folks, again, it's Kwon
25   who's paranoid.  It's Kwon who suggested any restrictions, if

## Closing argument - Mr. MacMahon

1   there were any, before Timimi ever arrived.

2           What good does it do to turn off your answering machine?
3   Is that a complete fabrication?  How about turning off everybody's
4   phones?  Someone said, "Pull the shades"; someone said, "Don't
5   pull the shades."

6           The third floor of a building at night, it's Kwon who's
7   already worried about his communications being intercepted, and
8   you can be sure that it was Yong Kwon who suggested, if at all,
9   that any precautions take place.  There's no evidence that
10  Al-Timimi knew anything about security arrangements for a meeting
11  at all.

12          Timimi repeated the advice that he had given on
13  September 11 about a problem for Muslims and being safe and smart,
14  keeping the women inside if they were threatened, and he suggested
15  they could make hijra if they felt that it was going to be
16  difficult for them in this country.

17          What happened?  Mr. Kwon says that someone may have
18  asked him a question about Afghanistan.  Now, everybody's dinner
19  party, I would imagine, on September 16 involved the events of
20  September 11 and Afghanistan and other things.

21          Kwon said that Timimi told him that he could make hijra
22  to Korea.  Do you remember that?  What jihad is going on in Korea,
23  Ladies and Gentlemen?  That was the government's own witness who
24  said, "He suggested I go to Korea."  He said that Royer could go
25  to Bosnia and Hasan, who is a Pakistani, could go to Pakistan.

## Closing argument - Mr. MacMahon

1  That's hijra.

2          And you saw earlier an e-mail that Special Agent Wyman

3  showed him where hijra as jihad is the seventh definition.  It's

4  like the second page in a dictionary definition.

5          But all these people knew what they were doing, and

6  that's what he was doing is telling them to leave if they felt

7  unsafe.  He didn't tell anybody it was obligatory to go overseas

8  and fight.

9          What did Mahmood Hasan -- excuse me, Yong Kwon say?  He

10  said, "After I brought Timimi home, we began to discuss our plan."

11  Do you remember that?  "Our plan."

12          And "our plan," according to him, was a plan that he had

13  agreed to with the people that were going overseas.  And I asked

14  him if Timimi was there to hear that, and he said no.

15          "Our plan."  That was the people that are already

16  convicted of these crimes.  There isn't any credible evidence of a

17  solicitation at all.

18          Muhammad Aatique, credible witness?  He says Timimi got

19  up and spoke of the signs of the Day of Judgment and that the

20  battle in Mecca was going to start between the anti-Christ, and I

21  can't even remember all these details of this story that he told.

22  It was preposterous.  Nobody else there even said that.

23          He says maybe it was the Uqla fatwa, but what happened

24  with the Uqla fatwa?

25          Do you remember Mr. Daghestani, Ladies and Gentlemen,

## Closing argument - Mr. MacMahon

1    the nice gentleman from the FBI, the translator?  Al-Timimi told

2    Special Agent Wyman that he did not bring any fatwa to this

3    meeting; in fact, he brought nothing, and that the Uqla fatwa was

4    not even available in the United States of America.

5           Now, does he have a lot of documents that none of us

6    have in our house?  Of course he does.  You saw the pictures of

7    that.  He's a scholar; he collects all kinds of things.  But the

8    FBI never found a copy of the Uqla fatwa that had a download date

9    or a print date or anything at Al-Timimi's house that would have

10   showed it was available on the 16th.  And God knows he saves every

11   piece of paper.

12          But what did Mr. Daghestani tell you?  He told you that

13   the best evidence the government could have was that this fatwa

14   was dictated in Saudi Arabia on the 16th of September, dictated

15   somewhere in the desert perhaps by a blind man somewhere.

16          Now, I asked him, "Can you say that this fatwa was

17   available in the United States on September 16, 2001?"

18          He said, "Of course not."

19          And you know the government has spared not a nickel in

20   this case, Ladies and Gentlemen.  If they could have found an

21   article, an e-mail, anything that showed that this document would

22   have been available to -- for Mr. Al-Timimi to take with him to

23   Yong Kwon's house on the night of the 16th, don't you think you

24   would have seen it?

25          What did Mr. Hasan say?  He said he didn't know anything

## Closing argument - Mr. MacMahon

1  about the Uqla fatwa until the FBI showed it to him.  Do you

2  remember that?  Isn't that nice?

3      Mr. Aatique, what did he say?  He said that once they

4  showed him a couple of fatwas, he knew it wasn't that one.

5      But Yong Kwon, he's firm and strong as could be.  He's

6  definitely sure that that's exactly what happened.

7      And there's nothing even in that fatwa that deals with

8  Mullah Omar, the one-eyed, blind Taliban leader, calling for

9  troops to come save the poor people of Afghanistan.

10      So what does the government do now?  We get a Reuters

11  report Mr. Gibbs just showed you.

12      Nobody at that meeting says they saw a Reuters report.

13  Nobody at that meeting says that Timimi was talking about the

14  Washington Post or Reuters or UPI.  I'm expecting a Ouija board

15  next, Ladies and Gentlemen.  There's no evidence of this at all.

16  It's a complete fabrication.  They bring these things in to these

17  guys that are looking at life, and they'll say whatever, whatever

18  they're asked to say.

19      It was apparently a barn burner of a talk Al-Timimi

20  gives:  Wage war.  Let's kill Americans.

21      And what does Caliph Basha do?  He falls asleep, right?

22  Fell asleep right in the middle of this meeting.

23      What else do we know about this dinner?  Masaud Khan

24  thinks to bring a catalog page with him, Ladies and Gentlemen.

25  Obviously, Masaud Khan thought somebody at the meeting might need

## Closing argument - Mr. MacMahon

1  another coat.  Why else would he bring that catalog page with him?

2  And who would have needed the coats?  And how did he know to bring

3  it?

4          The government can't answer that question because the

5  answer is that the conspiracy to take people to LET and go

6  overseas predated the dinner.  That's how he knows to bring the

7  catalog page with him.

8          What did Mr. Kwon say when he was first arrested?  He

9  took a walk with Randall Royer around a pond soon after 9/11, and

10  they agreed to go overseas and try to get training at LET and take

11  other people with them.  Do you remember that?  And he told the

12  FBI that the purpose of the dinner was to follow up on that and

13  take his friends to LET.

14          We know that the government actually agreed with that at

15  one time, but that's not a good enough story if you're going to

16  try to get a great sentence reduction and make something up

17  against Ali Al-Timimi, so we had to keep working on that story

18  until we came up with fatwas and e-mails and search warrants and

19  everything else.

20          What else do we know about that meeting?  Exhibit 32,

21  well, you'll see that Randall Royer at 10:25 called ABC News on

22  the way home.  I'm sure that was not to remind them or to inform

23  them that he was about to -- had just entered into a conspiracy to

24  wage war against the United States.

25          We know that the meeting went on until at least 1:15 in

## Closing argument - Mr. MacMahon

1  the morning because that's when Yong Kwon placed the order for
2  three more jackets, and he paid for them himself.  We know that
3  Timimi was gone for a long time after that.  You'll see an exhibit
4  from Citibank that shows that by 11:00, Timimi was back in
5  Washington, D.C., withdrawing money from his bank account.  He
6  told the FBI he didn't spend long at the meeting, and that's the
7  absolute truth.

8          The next day, Royer calls the Bosnian embassy.  You'll
9  see that on Exhibit 32 as well.  He didn't call the Pakistani
10  embassy.  Everybody knows the Pakistani embassy was open that's
11  been sitting here for the last three weeks because that's where
12  Hasan and Kwon went.  That's where they went to make up their
13  story about going to a wedding.

14          I told you in my opening statement that Bosnia was a
15  long way from Afghanistan, and Bosnia is a long way from
16  Afghanistan.  It was Randall Royer's intention to make hijra with
17  his wife and kids, which he did, and he went over to Pakistan.

18          What happens next?  Kwon and Hasan go to Pennsylvania.
19  They miraculously see Masaud Khan at the embassy the next day, and
20  then they take him up to Muhammad Aatique's house, and there
21  Muhammad Aatique said that Kwon told them how to reach the camps
22  undetected.  Do you remember that?

23          Kwon gave them all kinds of advice:  Stay together, stay
24  apart, say this, carry a magazine, all these things, and
25  strangely, that's exactly the same information that Kwon and Hasan

## Closing argument - Mr. MacMahon                                2251

1   now attribute to Al-Timimi as telling them a few days later.
2   That's why it's a fabrication about Ali Al-Timimi.  This is what
3   these men did themselves and are now trying to pin on this
4   defendant.

5          Hasan, he doesn't even remember that.  He certainly
6   never spoke to Al-Timimi about any advice of what to call Aatique
7   and Khan.

8          So the next thing that happens is the lunch on September
9   19, 2001.  Timimi told the FBI that he met with Kwon and Hasan.
10  He told them that they said they were going to Pakistan for a
11  wedding.  He says he told the FBI that he told them to make sure
12  their intention was for hijra and not to make jihad because he was
13  worried about the drumbeat of war and otherwise.  He was concerned
14  about these kids and what they were actually doing.  I call them
15  kids, but they're grown men.

16         But he didn't give them any instruction as to what to
17  do, but he did tell the FBI that he called somebody else who he
18  thought was more respected than he was to try to dissuade them
19  from going overseas, and what did the FBI do?  They asked him,
20  "When can a Muslim lie?  Why are you lying to us, sir?  What are
21  you" -- did they ever go look at his phone bills to see who he was
22  talking to?

23         Now, you saw Yousuf Idris testify in this case, and I
24  suggest to you that he was a perfectly credible witness.
25  Everything that he said is backed up by records.

## Closing argument - Mr. MacMahon

1    Is he a Muslim?  Yes.  Is he a friend of Al-Timimi's?
2  Yes.  But isn't everything he told you exactly true?

3    Mahmood Hasan agrees with him.  Mahmood Hasan says that
4  he may have gone to the Borders bookstore, he doesn't really
5  remember that, but that he does recall that he went and met with
6  Al-Timimi -- excuse me, went and met with Yousuf Idris.

7    And what did Yousuf Idris tell him?  He said that his
8  father had been the person who told them not to go overseas for
9  any purpose, and he also says from this witness stand that
10  Al-Timimi said the exact same thing.  That's what Yousuf Idris
11  told you.

12    And what evidence do we have to back that up?  First of
13  all, you may recall, it may have sounded like a silly question
14  when I asked it, but I asked these government witnesses, "Who is
15  the most respected and honest person in your community?"  Do you
16  remember those questions?

17    And what did they all say?  "Yousuf Idris."  Yong Kwon,
18  Aatique, and Hasan all said that Mr. Idris was the most honest and
19  respected man in their community.

20    What does the government think?  Oh, this guy's a liar.
21  He should have told us these things before.  He should have just
22  come in and told the FBI everything he knows.

23    Ladies and Gentlemen, these people are scared of the
24  FBI.  They don't just voluntarily come in and talk to the FBI.
25  They have lots of advice on not to do that.

**Closing argument - Mr. MacMahon**                    2253

1        And what else do we have?  We have Al-Timimi's phone
2   bill from the day in question.  Look at, look at this bill.  Who
3   did Kwon -- by the way, Mahmood Hasan said that Yong Kwon was with
4   him when Yousuf Idris received the advice not to go overseas.
5   Yong Kwon denied it altogether, but they also said they may have
6   told Mohammad Al-Qahtani.

7        So on September 19, 2001, Timimi calls Yousuf Idris,
8   talks to Mohammad Al-Qahtani, Yousuf Idris, Mohammad Al-Qahtani
9   again, then Yousuf Idris.  He then talks to Yousuf Idris again.

10       Yousuf Idris says that they were concerned that these
11  men were going overseas and they would get in trouble, and so they
12  called them.  They tried to call them.

13       This is Ali Timimi's phone bill, Ladies and Gentlemen,
14  10:30 and 10:35 on the night just before Hasan and Kwon left to go
15  overseas.  No lying, interested, disloyal Muslim made up this
16  phone bill, Ladies and Gentlemen.  This is an AT&T phone record.
17  You can look at it for yourself.  And I suggest to you that this
18  phone bill proves beyond any doubt a burden I don't even have in
19  this case, that Timimi told the FBI the truth.  They tried to
20  dissuade these -- everybody from going overseas.

21       Now, again, the government doesn't look up these phone
22  records or do anything else, right?  What do they say to you?  Ah,
23  but Muhammad Aatique and Masaud Khan never got a phone call.

24       And, folks, they are so myopic, so intent upon making
25  everything that's innocent look criminal, that they don't

**J.A. 2400**

## Closing argument - Mr. MacMahon

1  understand that that's absolutely the truth, because Al-Timimi did
2  not know that Aatique or Khan were traveling.  The only reason he
3  knew that Kwon and Hasan were traveling was because of the lunch.

4        Yes, I submit to you that if he had known other men were
5  going to go travel overseas given the way things were going at
6  that time, he would, in fact, have called and tried to get them
7  not to travel.  He didn't have Muhammad Aatique's phone number
8  anyway.  Remember, he barely even knows all these people.  They're
9  not his followers.

10       Now, Mr. Kromberg in his opening statement told you that
11 he would prove a pattern of criminal solicitation.  I'm sure you
12 remember that in the opening statement.

13       He says, "Meanwhile, back in Virginia, the proof is
14 going to show that that meeting on September 16 was not an
15 anomaly.  Timimi had another meeting, this one early in October,
16 and this group included people you've heard before:  Surratt,
17 Caliph.  This time the evidence will show Timimi spoke from a
18 fatwa, and at that meeting, he said that Islam was going to be
19 under attack and people were obliged to go overseas."

20       Ladies and Gentlemen, Donald Surratt testified in this
21 case, and he said that nothing of the sort ever happened.  He told
22 you that Timimi never asked him to fight, never asked him to
23 commit a crime, never asked him to do anything.

24       Chandia is a free man.  Yeah, he may have gone to
25 Pakistan in October of 2001.  Nobody puts Chandia in a camp.

## Closing argument - Mr. MacMahon

1   Nobody puts Chandia fighting anywhere.  They have him perhaps
2   somewhere at an office.

3           And what do we know?  That LET offices, as Mr. Kohlmann
4   told us, are essentially like 7-Elevens.  They're everywhere in
5   Pakistan.  He was in Lahore, the same place that Kwon and Hasan
6   went surfing when they got to Pakistan.

7           What else do we know?  There's no evidence of any
8   further contact between Timimi and any of these people until --
9   especially of Masaud Khan, who he's supposedly conspiring with to
10  buy some kind of unarmed manned vehicle.

11          We know the FBI taps his phone in 2003, and what do they
12  get?  The space shuttle comment.

13          Now, in my opening, I told you that you weren't going to
14  like a lot of the things that this man would say, that some of it
15  would rise possibly to the level of hate speech, and this is a
16  pretty rough speech; there's no question about it.

17          Mr. Kromberg told you that it was a message to his
18  followers.  Folks, it's a private telephone call in Arabic to
19  someone in Saudi Arabia, which no one in this case, no one person
20  testified in this case that they ever heard it or saw it or did
21  anything because of that, that talk.  Not one government witness
22  said, "Oh, my, I read the space shuttle comment, and I decided to
23  go do something criminal."  Nobody ever saw it.

24          What did Timimi say in that call?  He said, "You can
25  ignore these thoughts if you want.  Don't do anything with them."

## Closing argument - Mr. MacMahon                    2256

1   He said, "It's the ravings of a lunatic," words to that effect.

2           And also, that talk is purely religious and political

3   speech.  Is it the kind of speech that I want to give?  No.  Is it

4   a speech that he has the right to make?  Yes.

5           He reads the Koran, the holiest scripture for Islams.

6   He makes anti-Israeli statements, which can't be any surprise that

7   a Muslim might have comments to make that are anti-Israeli.  He

8   calls for the defeat of President Bush in the upcoming election,

9   which is part of a political process and in a crude way actually

10  shows that he's working within the political process.

11          He's not asking for anything untoward to happen to the

12  president.  He's not asking for any call to arms, any military

13  actions to take place.  All he's doing is exercising his free

14  speech.

15          He sees names and places and associations, that

16  Palestine, Texas, where part of the shuttle crashed, could mean

17  Israel.  Okay, that's fine.  You don't have to agree with anything

18  he said to agree with me that there's nothing in there that

19  solicits a crime or indicates before that he solicited a crime.

20          There are thousands of hours of speeches that Timimi has

21  made that you've heard.  I was thinking last night it's kind of

22  like a Muslim Name This Tune game that the government played,

23  where they would pull out speeches and little snippets of them

24  here and there and play them for you.

25          Some of those tapes are ten, some of them are twelve

## Closing argument - Mr. MacMahon

1  years old, and none of them, not one of them is evidence of a

2  crime, of him committing a crime at all.

3        The government said to you -- they read a lot to you

4  about "The New World Order" tape, and, folks, first of all, do we

5  need to see the cover of "The New World Order" tape again?  Do you

6  remember the testimony about that?  Somebody in Australia put that

7  cover together.  Do you remember that?  Al-Timimi had nothing to

8  do with putting together the fiery picture on the cover of that

9  box.

10        And in that tape, it starts with this, because

11 apparently we're not -- we don't have enough anti-terrorism

12 comments for the government:  "The issue is cast in the terms of

13 terrorism, and a Muslim is against terrorism.  It is forbidden in

14 our religion to kill the innocent.  Even in jihad, I mean, in a

15 situation where Muslims were attacked, and not one where they

16 began the aggression but one where they were aggressed upon, like

17 in Bosnia, for instance, it was forbidden for the Muslims of

18 Bosnia to kill Serbian children, and it is forbidden for the

19 Muslims of Bosnia to kill noncombatant Serbians, because this is

20 the religion of Allah."

21        There's another consistent statement just like the one

22 you heard that I read from the speech at Purdue University.

23        How does this tape end?  "Every single Muslim youth must

24 think of himself as a soldier in an army.  This doesn't mean you

25 have a gun in your hand and do something crazy, but it means you

## Closing argument - Mr. MacMahon                    2258

1   have a purpose in your life and have a role to fulfill in your

2   ummah and see yourself fulfilling that role, not by carrying on

3   day by day, month by month, year by year, engaging in a lot of

4   useless discussion."

5            That's the truth, folks.  No witness on this stand ever

6   testified that they ever heard Al-Timimi advocate violence in any

7   of his public speeches whatsoever.

8            So what do we have left?  We have what I will call the

9   Kohlmann analysis of this case, which is that there is if you're a

10  Muslim no distinction whatsoever between politics and religion.

11  Kohlmann told you that.  Everything that's religious is political,

12  and everything that's political is religious.  Everything conveys

13  a hidden meaning, but that meaning can only be described and found

14  by people truly enlightened in how to read these things.

15           So when Timimi tells Yong Kwon on the phone, "I don't

16  even know your last name," that means he knows his last name.

17  When Timimi tells Kwon, "Just tell the truth," that means he's

18  asking him to lie.

19           And when Randall Royer says that he never mentioned

20  Afghanistan at that meeting, not once, that means that he did.

21           And when he -- he says that when he read the fatwa, "I

22  assumed he approved it," or when he says that Ali said, mentioned

23  the word "mujahideen," and Royer says in that tape, "I took that

24  to mean Kashmir," and Kwon says, "Yeah, I did, too," that means

25  that Timimi sent them to Kashmir to prepare to fight.

## Closing argument - Mr. MacMahon                    2259

1   But you-all are smarter than this, okay?  Timimi hasn't
2   said anything in any of these tapes, in any of these e-mails, or
3   in anything else in which he is soliciting someone to wage war
4   against the United States or carry weapons or explosives or
5   anything else.

6   My favorite example is Mr. Kennedy, cross-examined
7   extensively with snippets from the "Purification of the Soul"
8   tape, and what does he say?  Timimi was reading a book.  The man's
9   sitting there with a book in his lap, reading.  The book's
10  available for the FBI to seize, and he reads it out loud, and
11  that's evidence in a crime -- that's a crime for him to read that
12  stuff to Mr. Kennedy.

13  We also note Mr. Kohlmann agrees with our own
14  government's policies that LET should have been illegal, this was
15  all a mistake.  Who's his No. 1 source about LET?  Randall Royer.
16  Who arranged for him to talk to Randall Royer?  Mr. Kromberg, he
17  said.

18  Do you remember the speech where -- that we heard here
19  in court where someone asked Timimi if he cared if the Klingons in
20  Star Trek were Muslims?  That's the depths to which they've gone,
21  to look at thousands of hours of tapes to find little snippets for
22  you to hear in an effort to try to blind you to the fact that
23  there really isn't any evidence at all in this case other than the
24  word of three felons to show that Timimi did anything criminal in
25  this case.

## Closing argument - Mr. MacMahon

1          To believe the government, you would have to believe
2   that a man who barely knew people in a room in Fairfax, Virginia,
3   walked in, not knowing that they owned guns, not knowing that they
4   were training for jihad, not knowing that all of them were
5   planning and had already been solicited to go overseas, and he
6   could just sense it, Ladies and Gentlemen:  This is the crowd.
7   These are the guys.  I finally found somebody that I can solicit
8   to wage war against the United States.

9          That is preposterous.  That is absolutely preposterous,
10  and there is no evidence that it ever happened before, there's no
11  evidence that it will ever happen again, and the reason for that
12  is because it didn't happen in the first place.

13         Mr. Kromberg told you at the beginning that this case
14  was not about Islam.  My father always told me that when someone
15  says he's not arguing with you about money, you're about to have
16  an argument about money, and the same goes here, Ladies and
17  Gentlemen.

18         Have you learned enough about Islam yet in this case?
19  Do you know who the dajjal is?  Do you know when the end of time
20  battle is going to be?  Have you heard enough speeches about the
21  IMF and Muslims?  Have you heard other people talk about their
22  religious beliefs?  Have you heard Curt Jamison be asked about his
23  religious beliefs in this case?

24         The government wants you to think that Islam is your
25  enemy and that this man, who's a scholar, should be incarcerated

## Closing argument - Mr. MacMahon

1  just because he teaches that religion.  And they want you to

2  dislike him so much because of the things that he said that you'll

3  disregard all the credible lack of evidence in this case.

4         Again, that's why they showed you the guns, because they

5  think that would scare you.  There's no evidence that he ever

6  owned or used a gun.

7         How about the terrorism manual?  You'll look at that.

8  That says it's from the leading provider of bogus documents,

9  Virginia Tech University.

10         So when I say this case is about Islam, I want you to

11  consider the abuse that was heaped upon Luther Kennedy in this

12  case when he came in to tell the truth about who Dr. Al-Timimi

13  really is.

14         Do you remember Mr. Kromberg's opening statement?  He

15  said, "I will show you that Timimi has said that Muslims with

16  military training must go overseas for jihad."  Do you remember

17  that?

18         And we've already been through this, folks.  There's no

19  evidence that he ever knew any of the paintballers -- of which

20  there were 50 or 60 of them, folks, it wasn't just this crowd --

21  were training for jihad.

22         But I did find for you in Mr. Luther Kennedy a Muslim

23  with military training who went to the Dar al-Arqam.  He was a

24  decorated veteran.  He was a man who said he knew about terrorism

25  firsthand and took it personally.  He said he knew about the

## Closing argument - Mr. MacMahon

1    bombings in Beirut, Top Secret clearance, and he works at the
2    Defense Intelligence Agency.

3         He told you that he went to the Dar al-Arqam regularly,
4    and he never heard anything that concerned him as an American.  He
5    appreciated the lectures that he got.  He wasn't a personal friend
6    of Al-Timimi's.

7         So what did the government do?  They went right on the
8    attack.  And why?  Because of his religion, Ladies and Gentlemen.
9    They asked him if he could be loyal to his oath as a military
10   officer and be a Muslim.  What an obnoxious question, and what a
11   telling question as to the motivations in this case.

12        Did Mr. Kromberg or Gibbs ever ask Andre Thompson, the
13   snitch who works for the government, who works for the -- some
14   branch of the military, whether he was able to maintain his oath
15   of office and be loyal to the United States?  No.

16        Did they ask Mr. Surratt, the convicted felon, if there
17   was a conflict between his religious beliefs and his military
18   status?  No.

19        And what prompted this, this awful question?  It was
20   that Timimi had once told him that as a Muslim, he was
21   theologically prohibited from killing other Muslims.

22        Well, guess what, folks?  The Bible contains similar
23   language.  It's called "Thou shalt not kill."  The Bible offers
24   solace, it helps soldiers who have to kill in battle.  There's
25   many, many stories of violence and death and destruction in the

## Closing argument - Mr. MacMahon

2263

1   Bible, and soldiers who kill in battle under the Bible have not

2   committed a mortal sin.  They are not condemned to hell because

3   they kill somebody in the course of battle.

4        Would I be attacked for mentioning to a soldier the fact

5   that there are exceptions to "Thou shalt not kill" in the Bible

6   for soldiers?  Can I sing "Onward Christian Soldiers," Ladies and

7   Gentlemen?  Can I tell the story of the battle of Jericho, where

8   Joshua killed every man and woman in the city?  That's in the

9   Bible.

10       Could somebody say that?  Can we talk about things that

11  are in the religion without having them become criminal?  Are you

12  appalled that the federal government is reading the Koran to you

13  in a federal courtroom?

14       I say this to you because this case represents a

15  fundamental assault on the liberties that we really all hold so

16  dear.  Our freedoms of religion, speech, and association are all

17  at risk in this case.

18       Did Timimi associate with these criminals?  Yes.  Did he

19  know that they were criminals?  Did he know of their plans?  Is

20  there any evidence of that other than the word, that disputed and

21  inconsistent word of these three liars?  No.

22       Is freedom of religion under attack when the government

23  plays snippets of lectures given all over the world, pulled out of

24  everywhere, because a man is preaching Islam or teaching Islam to

25  other people?  That should concern you greatly because if --

## Closing argument - Mr. MacMahon

1  otherwise, if you don't believe these, these freedoms are under
2  attack by this prosecution, then you haven't been sitting here.

3      If this case was just about what happened on 9/16,
4  that's all we should have heard about, but instead, we go back to
5  the year 1992, and we start hearing things he may have said in
6  Australia or England, or we found a little note, someone asked him
7  a question about suicide.

8      Now, the judge will give you an instruction about these
9  freedoms, and I want you to listen to them very attentively
10 because you'll see all this man has done is exercise the rights
11 that all citizens have under this country.  He hasn't committed
12 any crimes.

13     He has uttered mere words, folks, mere words.  They
14 don't put a gun in his hand.  They don't have him taking anybody
15 to the embassy.  They don't have him doing anything.  And there
16 was nothing imminent.

17     What did I ask Yong Kwon:  "Why didn't you go down to
18 the Pentagon and kill somebody?"

19     "Oh, he didn't ask me to do that."

20     You know, and Mahmood Hasan, I asked the same question.
21 And who was he?  He was the only person in the room on September
22 11 who was overjoyed by the events.  He told you -- I asked him
23 which did he prefer more, the crash of the plane or the people
24 jumping out of the building.  That was the government's witness,
25 Ladies and Gentlemen.  That wasn't anything that Al-Timimi ever

1  said.

2          So I want you to go back and do your duty and fill out

3  this verdict form "not guilty" on all charges.

4          And I have for you a slide that I want to show you which

5  has five simple questions that when Mr. Kromberg rises, I want him

6  to be able to answer, because if he can't answer these questions

7  to your satisfaction, you are duty bound to acquit in this case,

8  Ladies and Gentlemen.  And I'll read them to you:

9          1.  Why was Aatique invited by Royer to a meeting at

10 Kwon's house when Kwon allegedly had not yet scheduled the meeting

11 or even discussed it with Royer unless Kwon and Royer had already

12 agreed to try to recruit people to go overseas to Pakistan before

13 September 13, 2001?

14         Do you remember, we had the phone call from September 13

15 of Kwon and Aatique.

16         2.  Why after speaking to Kwon twice on September 15 --

17 14 and 15, 2001, did Khan order on the evening of September 15 a

18 Cabela's jacket suitable for use at an LET training camp in the

19 Himalayas unless Kwon and Khan had already agreed to go?

20         3.  How is it that Khan knew to bring to Kwon's house a

21 catalog page from Cabela's that displayed the jacket he bought for

22 use at LET unless Khan, Hasan, and Kwon had already agreed to go

23 overseas and were looking for more recruits?

24         4.  Is it only a coincidence that every person with the

25 exception of Dr. Al-Timimi invited by Kwon to the dinner on

## Closing argument - Mr. MacMahon                                2266

1   September 16, 2001, was a person that Kwon or Royer had before

2   September 11, 2001, already recruited on behalf of LET to travel

3   to Pakistan for training?

4           Do you remember when Mr. Kwon told us that?  What a

5   coincidence, he said.  Everybody that I invited was somebody --

6   had already invited to go to LET was somebody I brought over to my

7   house.  That answers the question in this case, folks.

8           5.  Do not the phone records of Kwon and Dr. Al-Timimi

9   coupled with the testimony of Yousuf Idris prove that Al-Timimi

10  actually sought to discourage Kwon and Hasan from traveling

11  overseas for any purpose?

12          Now, to disregard the documentary evidence that I gave

13  you, you would also have to credit Mahmood Hasan's unbelievable

14  testimony that when he walked up and saw Yousuf Idris the night

15  before he left, that Yousuf Idris said, "Did you trim your beard?

16  You must be going to Pakistan to fight."

17          That's absurd, Ladies and Gentlemen.  You know that's

18  not what happened.  What happened is exactly what Dr. Al-Timimi

19  told the FBI, which is that he was looking for someone to try to

20  dissuade these people to go, and that person talked to them, and

21  they went anyway.  And then Al-Timimi tried to call them again.

22          It's the absolute opposite of what the government wants

23  you to believe happened in this case.

24          As I close, I want to remind you that you as jurors are

25  empowered to do something more than just be judges, as Judge

## Closing argument - Mr. MacMahon

1    Brinkema reminded you in the initial instructions, where she told
2    you you should each get a robe.  The right to a jury trial is a
3    fundamental right in our system of justice, and it's there for a
4    reason.  It's a check on the over- and overzealous use of the
5    government of criminal laws, and it's a right that was granted to
6    the peasants in England by the Magna Carta, and it's something
7    that was guaranteed to all of us by the Founding Fathers in this
8    country.

9            The government can act tyranically, Ladies and
10   Gentlemen, at times of war and for other reasons.  Sometimes it
11   locks its sights on one person and just won't let go no matter
12   what they find.

13           Some people are so unpopular that governments can just
14   try to prosecute them and lock them up, but it's your obligation,
15   Ladies and Gentlemen, to check that power by assuring that no
16   person -- and in this case, this man here is not deprived of his
17   liberty based upon incomplete, false, destroyed, lost evidence.
18   In a case where the government cannot bear its burden of proof
19   beyond a reasonable doubt, there's a reason the government has
20   this burden of proof, and there's a reason that they can't make it
21   in this case, and that is because this man is innocent and he
22   should be acquitted of all charges.

23           Like all of you there sitting in the jury box, I don't
24   believe that you need our government to protect us from speech.
25   Speech and political and religious disputes in this country are

## Closing argument (rebuttal) - Mr. Kromberg          2268

1  worked out in the marketplace of ideas.  They are not to be worked

2  out in the criminal courts, and that's exactly what's going on in

3  this case, and I ask you to put a stop to it and find this man not

4  guilty.

5          Thank you.

6          THE COURT:  All right.  Mr. Kromberg?

7                  REBUTTAL ARGUMENT

8                BY MR. KROMBERG:

9          Thank you, Your Honor.

10          Ladies and Gentlemen, when Tony Soprano says, "Go whack

11  that guy," that's not protected speech.  And when Tony Soprano's

12  lawyer said, "My client didn't say, 'Go whack that guy,' but if he

13  did, it was protected speech," that's not a good argument.

14          Ali Timimi does not speak for Muslims.  No matter how

15  many times Mr. MacMahon says that Ali Timimi speaks for Muslims

16  and all Muslims agree with Ali Timimi, it doesn't make it true.

17          Ali Timimi speaks for his sect of Salafi Muslims, who

18  believe, if you listen to Yousuf Idris, that there's no compulsion

19  of religion, he told you that there's no compulsion of religion in

20  Islam?  He also conceded that, yeah, except for if you're a

21  Shiite, in which case, if you don't repent, you have your head

22  lopped off.

23          That's the Muslims that Ali Timimi and Yousuf Idris

24  speak for.  They don't speak for Muslims around the world.  They

25  speak for Safar Al-Hawaali, the guy that was jailed by the Saudis

## Closing argument (rebuttal) - Mr. Kromberg          2269

1   and that caused Bin Laden to declare war on the United States
2   because, hey, the Saudis jailed Al-Ouda and Hawaali, the awakening
3   sheikhs, because of the United States of America in Bin Laden's
4   mind.   That's who Ali Timimi speaks for.

5           Mr. MacMahon suggests that our witnesses don't agree.
6   Some say one thing and others don't -- they all don't remember the
7   very same things.

8           Let me predict to you when you go back to the jury room,
9   you will have been paying attention, taking notes, knowing that
10  you're going to have to remember this stuff, and, you know, you're
11  not going to agree on what happened in this courtroom over the
12  past couple of weeks.

13          So the fact that Kwon and Hasan and Aatique don't
14  remember everything the very same way is not a mark of dishonesty.
15  It's a mark of humanity.

16          The biggest lie in the government's case, Mr. MacMahon
17  said the biggest lie in the government's case, do you remember
18  what it was?  Ali Timimi had no way of knowing, no way of knowing
19  that the people gathered at Kwon's house on September 16 were
20  anything other than just ordinary guys off the street.  He had no
21  way of knowing that they were involved in jihad training.  You
22  heard him say that.  He said it's the biggest lie in the
23  government's case.

24          All right.  You heard what Kwon said about how they had
25  the disagreement about praying in a moving car.  These guys

**J.A. 2416**

**Closing argument (rebuttal) - Mr. Kromberg**    2270

1  couldn't figure out how to tie their shoelaces without asking Ali

2  Timimi.  They didn't know whether they should stop on the road to

3  Spotsylvania County or not.  They had to get an opinion.

4          Kwon said, "Well, we got an opinion.  Royer sent out the

5  e-mail, it came from either Qahtani or Timimi."

6          Andre Thompson came and testified to you:  "Yeah, Ali

7  Timimi provided the information that Royer sent out, passed out

8  the e-mail."

9          4G7, if you haven't seen this one yet, 4G7, it's about

10  praying in a moving car and telling you about whether you can pray

11  in a moving car, whether you can shorten your prayers, what to do

12  if you come across a scorpion.  Do you kill the scorpion first

13  before you pray?

14          Down at the end, it says, "J-word, I heard the Prophet,

15  peace be upon him, recite when he was on the pulpit, 'And make

16  ready against them all you can of power, including steeds of war,'

17  planes, tanks, etc.  Surely strength is in shooting.  Surely

18  strength is in shooting.  Surely strength is in shooting."

19          This is the opinion that Ali Timimi gave to the guys

20  playing paintball.  This is why when Chapman reported that the FBI

21  had approached him, Ali Timimi said, "Well, you shouldn't be so

22  conspicuous.  Be like Joseph's brothers entering Egypt."

23          If they were playing paintball recreationally, who cared

24  whether everybody was gathering together?  Ali Timimi knew full

25  well that the paintball was personal jihad training.  Just as of

## Closing argument (rebuttal) - Mr. Kromberg          2271

1  all the things Mr. MacMahon said he was going to prove to you

2  every one, the first thing he said to you was every single one of

3  the government's witnesses is going to be an inmate wearing jail

4  uniforms.

5          The first government inmate, Nabil Gharbieh, told you

6  about his conversations with Ali Timimi, not an inmate.  Andre

7  Thompson the snitch?  What grounds is there to say that Andre

8  Thompson was a snitch?  A U.S. Navy active duty person coming in

9  and testifying to what he knows, he's a snitch.

10          Right under where it says "J-word," it says, "Obeying

11  the amir.  Oh, ye who believe, obey Allah and obey the messenger

12  and those charged with authority among you."

13          Who might that be?  These guys who couldn't tie their

14  shoes without asking Ali Timimi what to do?  Do you think when Ali

15  Timimi sent out this message, it might have been, "Listen to me"?

16          MR. MAC MAHON:  Your Honor, I object.  This is not an

17  e-mail from Ali Timimi.  This is misleading the jury.

18          THE COURT:  Well, it will be the jury's recollection of

19  the evidence that will prevail when they decide this case, but as

20  I've said many times before, folks, how the lawyers characterize

21  things isn't how necessarily you should characterize things.

22          Go ahead.

23          MR. KROMBERG:  Thank you, Your Honor.

24          It's worth going over this again:  Kwon said the e-mail

25  was passed on by Royer from either Al-Qahtani or Timimi.  Thompson

**Closing argument (rebuttal) - Mr. Kromberg**

1    said yes, he remembered it; it was passed on from Timimi.

2           Do you think Royer wrote this?  Go back and read it.

3    See if you think Royer wrote what to do if you come across a

4    scorpion while you're praying.

5           When Timimi said to get the brothers together, as Kwon

6    testified, he wasn't talking about getting Luther Kennedy.  He

7    wasn't talking about getting patriotic Americans together.  He was

8    talking about the guys who were already engaged in training for

9    jihad, who were fixated on jihad, and that's who Kwon got

10   together.

11          One of the questions that Mr. MacMahon put up there I

12   should answer for you in my limited time:  What about Masaud

13   Khan's jacket?  Mr. MacMahon asked Kwon, "Isn't it true that you

14   told Masaud Khan about the plan that Ali Timimi gave you about

15   getting together for your canned food to go up into the

16   mountains?"

17          And Kwon said, "That's, that's probably true."

18          And when Mr. MacMahon asked Kwon, "Why was it that Khan

19   brought the copy of that catalog paper with him?," Kwon said to

20   him, "Well, that's because -- I guess it's because we had already

21   talked about the plan to go up in the mountains, and he was

22   bringing the catalog paper about getting the, getting the jacket."

23          There is no evidence that Timimi came to Kwon's house

24   because he was having a fight with his wife.  That's not even what

25   Timimi told John Wyman.  The only person who said that, now twice,

## Closing argument (rebuttal) - Mr. Kromberg    2273

1  is Mr. MacMahon.  Timimi came to Kwon's house because he knew who

2  those guys were, and he knew what he wanted to get done.

3       Yousuf Idris.  Yousuf Idris says that he's told -- he

4  told Hasan that Timimi told you not to go overseas for any reason.

5       We just heard the defense story.  The defense story is

6  that Timimi said to go.  You just heard Mr. MacMahon say, "Didn't

7  he tell Kwon to go to South Korea?  Didn't he tell Hasan to go to

8  Pakistan?"

9       If that's true, how can it be true that Idris is saying,

10 "Timimi is saying you shouldn't go overseas for any reason"?

11       Another question for you.  Think about this in the jury

12 room:  Why was Timimi having lunch with Hasan and Kwon right after

13 that 9/16 meeting anyway?  He barely knew those boys.  He didn't

14 know their last names.  He wasn't friends with them.  If they

15 hadn't discussed at the meeting on 9/16 the plan to go overseas,

16 why in the world was Timimi having lunch with them?

17       If Yousuf Idris was telling the truth, then what was

18 Timimi talking about in his e-mail, 10J9, "A call to reflect and

19 repentance," that I haven't really been silent, you know, that

20 I've been silent publicly because he who is silent would be saved,

21 because after all, if I came out and said those things that I said

22 in the Purdue University speech in 1993, I'd be in big trouble?

23       Not a single witness ever saw the Purdue University

24 speech.  Evan Kohlmann has seen a lot.

25       Mr. MacMahon asked Mr. Kohlmann, "Have you ever seen

1   this before?"

2        "No."

3        They called Luther Kennedy.  Luther Kennedy had listened

4   to Purification of the Soul, and he heard about the IMF and the

5   World Bank and how the Muslim Ummah is going to get rich by

6   conquering western lands.  He heard that.  And he went out and

7   bought New World Order.  No mention that Luther Kennedy knew

8   anything about the Purdue University speech.

9        So what was Ali Timimi silent about?  And when he

10  said in 10J9, "I really haven't been completely silent.  I've been

11  silent publicly because he who is silent will be saved, but

12  privately I've had these meetings with the brothers around my

13  area, and they've gotten the benefit of what I've had to say,"

14  what would that be if what Yousuf Idris says is true?

15       Do you want some reasons why Yousuf Idris is a liar?

16  Let me give you ten.

17       10.  If Yousuf Idris was telling the truth, why did

18  Timimi repeatedly refuse with the FBI, to tell the FBI who his

19  witness was until, Timimi said in his words, he could check to

20  make sure he'd say the same thing to the FBI, which, of course, he

21  never did?

22       9.  Idris is Timimi's good friend.  Not only is he his

23  good friend; he's tied up with Dar al-Arqam.

24       You have all these guys from Dar al-Arqam who have been

25  involved in going to overseas terrorist camps.  If it turns out

**Closing argument (rebuttal) - Mr. Kromberg**          2275

1    that the most frequent lecturer at Dar al-Arqam is the ring

2    leader, what does that say for Dar al-Arqam?  What does that say

3    for the Muslim World League, the Saudi-funded organization that

4    pays the Sudanese guy to preach Islam at Dar al-Arqam?

5         You heard Yousuf Idris say "my country."  He wasn't

6    referring to the United States of America.

7         8.  He testified that Timimi never asked him to write

8    something for his lawyers after that Washington Post article came

9    out in June of 2003, and then after being confronted with a

10   telephone call transcript, "Well, that might have happened."

11        7.  He testified that Haytham Hantash was red-faced,

12   gesticulating, yelling, but that he wasn't angry, because it's a

13   cultural thing, and you can't tell with Arabs, and yet he knew

14   that Timimi was angry when in 2000 or 2001, somebody told him that

15   those Muslim brothers were playing paintball.  Why would Timimi be

16   angry at that?

17        When asked about what the argument was about, he could

18   remember that Haytham said that the attacks were murder, and what

19   did Idris remember what Timimi had said?  Oh, that -- he said,

20   "What if they said it was" such-and-such?

21             "Who's they?"

22             "I don't remember."

23             "What's" such-and-such?

24             "I don't know.  I actually was across the room with

25   Hasan, but I know that it was not an argument."

## Closing argument (rebuttal) - Mr. Kromberg    2276

1          6.   He testified that Timimi was never barred from

2    speaking at Dar al-Arqam.  Well, it just happened that way.

3    Timimi never said, "I'm not going to come back," and nobody from

4    Dar al-Arqam told him not to come back, but after Timimi was

5    harassed by the FBI, he didn't come back.

6          Well, you know about the harassment from the FBI.

7    Yousuf Idris himself told you that when he told Agent Wyman that

8    he, Idris, would call Agent Wyman back once Idris got a lawyer,

9    the FBI didn't call him back.

10         But anyway, Idris says Timimi was barred from -- excuse

11   me, was never barred from Dar al-Arqam.  You see in 10H1a, the

12   instant messaging chat, read that.  Timimi says, "I was barred

13   from Dar al-Arqam."

14         It's actually a fascinating instant messaging session

15   because in it Timimi is arguing with his friend in Saudi Arabia

16   about why the guy in Saudi Arabia doesn't post more fatwas from

17   sheikhs who are in favor of helping the Taliban because apparently

18   the only ones that have been posted so far were by the Chief Mufti

19   of Saudi Arabia and by the Chairman of the Islamic Council, who

20   were saying it was prohibited to help the Taliban.  So read that

21   one.  It's fascinating.

22         You'll see later on that Timimi says --

23              THE COURT:  Two minutes, Mr. Kromberg.  Two minutes.

24              MR. KROMBERG:  Thank you, Your Honor.

25              You'll see later on that Timimi says that he's in favor

**Closing argument (rebuttal) - Mr. Kromberg**          2277

1  of -- he likes the Taliban because Saudi Arabia is too secular.
2  They're not tough enough on enforcing virtue and prohibiting vice.

3       5.  He testified, as I mentioned before, that he was
4  angry -- that Timimi said he was angry to find out about
5  paintball.  We know that's not true.

6       4.  He gave the affidavit to Timimi to help Timimi in
7  August of 2003 but omitted all the important stuff that he's now
8  testifying about.

9       3.  He testified that he gave the affidavit because one
10 has to give testimony when one has information, but, of course, he
11 refused to speak to Agent Wyman when Agent Wyman approached him,
12 and that was because, oh, you have to do it the right way, when
13 you had the lawyer.

14      Well, then it turns out that he had the lawyer in 2003
15 but wouldn't show up to the meeting to speak to Agent Wyman
16 because in his words, "I didn't want to open that door."

17      2.  Timimi's lectures were beautiful lectures about
18 angels?  He was the one who was taping Purification of the Soul,
19 talking about IMF and the World Bank and Chechnya and Kashmir, but
20 he came and testified to you they were about angels.

21      And then he said, "Oh, it might be a different
22 Purification of the Soul.  The one that I did was digital."

23      The parties have stipulated the one you have, the one
24 you can listen to is the one that was taped at Dar al-Arqam the
25 summer of 2001.

**J.A. 2424**

## Closing argument (rebuttal) - Mr. Kromberg

1      1.  Timimi said he sent -- he refused to tell the FBI
2  who he sent to stop Hasan and Kwon, but he did say who he sent to
3  stop Chandia.  That was Hamdi, the very same time that, as Andre
4  Thompson said, Hamdi was recruiting Thompson to go to Afghanistan.
5  If Hamdi is recruiting Thompson to go to Afghanistan, how likely
6  is it that Timimi had sent Hamdi to go stop Chandia?

7      I'm not going to have time to play one last clip, but
8  you're going to have a CD with the clips.  This is clip 63 from
9  World of Advice to the Salafis, where Timimi says, "Waging jihad
10  in the path of Allah is an unceasing obligatory duty until the Day
11  of Judgment, not to be forsaken because of the lack of a khalifa,"
12  and he says it again, and he says it again, and he says it again.

13      Listen to that one.  You'll get some sense of how
14  forceful he is when he's speaking about the necessity of waging
15  war.

16      You're going to get Exhibit 10A36, Songs of the
17  Mujahideen, that was seized from Timimi's car.  This is what he
18  listens to in his car, and you're going to -- you can compare it
19  to the music that was playing when Ibn Khatab, the great warrior,
20  murdered the Russian soldier.

21      You heard Evan Kohlmann testify about the double-track
22  messages --

23      THE COURT:  Mr. Kromberg, it is time.  We have to wrap
24  it up.

25      MR. KROMBERG:  Yes, ma'am.

## Closing argument (rebuttal) - Mr. Kromberg

1    You heard him talk about the double-track messages.  You
2  heard Special Agent Wyman testify about how Timimi admitted that
3  war is deception and that authorizes lying to the kafir.  If
4  you're a kafir, Timimi believes in time of war, he's supposed to
5  lie to you.

6    Don't fall for it.  Find him -- find Sheikh Ali Timimi
7  guilty as charged.  Thank you.

8    THE COURT:  All right, Ladies and Gentlemen, you've had
9  an intense morning.  I'm going to give you your lunch break.  When
10  you come back at 25 after, and we'll be up here, I will start
11  giving you the instructions, where you're going to get your primer
12  of the law that applies to this case.

13    I have decided to give you a set of the instructions
14  actually while I'm going over them, so you can take notes on them.
15  Feel free to do that.  They're going to be your aid to
16  understanding the law in this case.  After you've gotten the
17  instructions, then you'll have the case for deliberation.

18    That means again, follow my earlier cautions about not
19  beginning any kind of discussion about the case or any
20  deliberation because you don't have yet all the information you
21  need.  And we'll see you back here at 25 after.  Thank you.

22    (Recess from 12:23 p.m., until 1:25 p.m.)

23

24

25

2280

1               A F T E R N O O N   S E S S I O N

2                    (Defendant and Jury present.)

3          THE COURT:  Counsel, would you approach the bench,

4     please?

5               (Bench conference on the record.)

6          THE COURT:  We received a note from Juror No. 41.  It

7     goes, "I was approached by a lady reporter with the group, was I

8     involved with Al-Timimi's case?"  I guess that's the question that

9     was asked.

10              "I replied, 'No,' to the reporter.  I was lying to her."

11              Now, I don't know who these reporters are.  I'm going to

12    tell our information officer that he's to instruct the press that

13    the press have no business in trying to talk to our jurors in a

14    case like this.

15         MR. KROMBERG:  Your Honor, I'm aware of two female

16    reporters that were in the courtroom.  One was from the New York

17    Times; one was a blond woman from the Pittsburgh Press that's been

18    watching the whole case.

19         MR. MAC MAHON:  Erdley is her name.  I've never seen the

20    juror from the New York Times before.

21         MR. KROMBERG:  It was a dark-haired woman who came up to

22    me after the closing arguments and said, "Could you tell how long

23    the jury is going to be?"

24              I was like, "Huh?"

25         THE COURT:  Anyway, I mean, I don't want this jury being

**J.A. 2427**

2281

 1  bothered, and I don't want to get them spooked about things.

 2  They're doing exactly what I asked them to do, but I may require

 3  Mr. Wood to escort them around the building, I think, from here on

 4  out, okay?

 5          MR. MAC MAHON:  The defense agrees with that, Your

 6  Honor.

 7          THE COURT:  We've all invested too much time with this

 8  case.  I don't want to have a problem with the jury.

 9          MR. MAC MAHON:  Nobody wants that.

10          THE COURT:  No.  And I'm going to thank the juror for

11  letting us know.

12          MR. MAC MAHON:  Thank you, Your Honor.

13          MR. GIBBS:  Thank you.

14          (End of bench conference.)

15          THE COURT:  Ladies and Gentlemen, you continue to

16  impress all of us with how carefully you've taken your obligations

17  here.

18          Juror No. 41, I want to thank you for bringing to our

19  attention the fact that you were approached by a reporter and

20  asked about whether you were involved in this case.

21          Mr. Adams, as our public information person, I hope

22  you'll get the word out to any media people they're not to be

23  talking to a jury while the jury is actively involved in a case.

24  I mean, it's not your fault, but I am concerned about that.

25          And you did exactly the right thing by telling them,

## District court's instructions to the jury          2282

1  "No," and hopefully, that will not happen again, but keep us

2  posted if anything like that does happen, all right?  Thank you.

3          THE COURT:  All right, we're now going to start the

4  instructions.  We have given to -- or we are about to give to the

5  jury each of your own set of instructions.  You can go ahead and

6  put your number on your package so that they don't get mixed up,

7  and you're free to read along with me or watch me.  I try to keep

8  eye contact with you as much as possible so that if some of you

9  seem to be, you know, dozing off, I can stop or tell a joke or do

10  something.

11                  (Laughter.)

12          THE COURT:  These are complicated instructions, more so

13  than normal, and if any of you do feel that you need a break while

14  I'm going through these instructions, don't be shy about raising

15  your hand and letting me know, all right?

16          And again, as I said earlier, you're free to put notes,

17  scribble, do anything you want on these instructions.  They're for

18  your use in deciding this case.

19          Now that all of the evidence has been presented and now

20  that you have heard all of the arguments of counsel, it becomes my

21  duty to give you the final instructions as to the law as it

22  applies to this case.

23          All of the instructions of law given to you by the

24  Court -- those given at the beginning of the trial, those given

25  during the trial, and these final instructions -- must guide and

1  govern your deliberations.

2          It is your duty as jurors to follow the law as stated in
3  all of these instructions and to apply them to the facts as you
4  find them from the evidence received during the trial.

5          Counsel have quite properly referred to some of the
6  applicable rules of law in their arguments to you.  If, however,
7  any difference appears to you between the law as stated by counsel
8  and that as stated by the Court in these instructions, you are, of
9  course, to be governed by the instructions given to you by the
10 Court.

11         You are not to single out any one instruction alone as
12 stating the law but must consider the instructions as a whole in
13 reaching your decisions.  Neither are you to be concerned with the
14 wisdom of any of these instructions.

15         Regardless of any opinion you may have as to what the
16 law ought to be, it would be a violation of your sworn duty to
17 base any part of your verdict upon any view of the law other than
18 that given in these instructions, just as it would be a violation
19 of your sworn duty as judges of the facts to base your verdict
20 upon anything but the evidence received during the trial.

21         You were chosen as jurors for this trial in order to
22 evaluate all of the evidence received during the trial and to
23 decide each of the factual allegations brought by --
24 unfortunately, we pulled a -- and nobody caught it last night --
25 we pulled a civil instruction rather than criminal, but let me

## District court's instructions to the jury

1   just change the word "complaint" to "indictment," and what we have

2   here is by the allegations brought by the government in the

3   indictment and the defendant through his pleas of not guilty.  And

4   that should be changed accordingly.

5           In deciding the issues presented to you for decision in

6   this trial, you must not be persuaded by bias, prejudice, or

7   sympathy for or against any of the parties to this case or by any

8   public opinion.

9           Justice through trial by jury depends upon the

10   willingness of each individual juror to seek the truth from the

11   same evidence presented to all the jurors here in the courtroom

12   and to arrive at a verdict by applying the same rules of law as

13   now are being given to each of you in these instructions.

14           Now, the evidence in this case consists of the sworn

15   testimony of the witnesses, regardless of who may have called

16   them; all exhibits received in evidence, regardless of who may

17   have produced them; and all facts which have been agreed to or

18   stipulated.

19           When the attorneys on both sides stipulate or agree as

20   to the existence of a fact, you may accept the stipulation as

21   evidence and regard that fact as proved.

22           Any proposed testimony or proposed exhibit to which an

23   objection was sustained by the Court and any testimony or exhibit

24   ordered stricken by the Court must be entirely disregarded.

25           Anything you may have seen or heard outside the

## District court's instructions to the jury

1  courtroom is not proper evidence and must be entirely disregarded.

2          Questions of the lawyers are not evidence.  Only the

3  witness's answers are evidence.  Objections, statements, and

4  arguments of counsel are not evidence in the case.

5          You are to base your verdict only on the evidence

6  received during the trial.  In your consideration of the evidence

7  received, however, you are not limited to the literal statements

8  of the witnesses or to the literal assertions in the exhibits.  In

9  other words, you are not limited solely to what you see and hear

10 as the witnesses testify or as the exhibits are admitted.

11          Instead, you are permitted to draw from the testimony

12 and exhibits which you find reliable such reasonable inferences as

13 you find justified in the light of your experience and common

14 sense.  Inferences are simply conclusions which can reasonably be

15 drawn from the evidence received during the trial.

16          Now, you are to perform the duty of finding the facts

17 without bias or prejudice as to any party.  You are to perform

18 your final duty in an attitude of complete fairness and

19 impartiality.

20          The case is important to the government for the

21 enforcement of criminal laws is a matter of prime concern to the

22 community.  Equally, it is important to the defendant, who is

23 charged with serious crimes.

24          The fact that the prosecution is brought in the name of

25 the United States of America entitles the government to no greater

## District court's instructions to the jury

1  consideration than that accorded to any other party to a
2  litigation.  By the same token, it is entitled to no less
3  consideration.  All parties, whether government or individuals,
4  stand as equals at the bar of justice.

5          Now, during the trial, I permitted you to take notes.
6  Many courts do not permit note-taking by jurors, and a word of
7  caution is in order.  There is always a tendency to place undue
8  importance to matters which one has written down.  Some testimony
9  which is considered unimportant at the time presented and thus not
10 written down takes on greater importance later in the trial in
11 light of all the evidence presented.

12          Therefore, you are instructed that your notes are only a
13 tool to aid your own individual memory, and you should not compare
14 your notes with other jurors in determining the content of any
15 testimony or in evaluating the importance of any evidence.  Your
16 notes are not evidence and are by no means a complete outline of
17 the proceedings or a list of the highlights of the trial.  Above
18 all, your memory should be your greatest asset when it comes time
19 to deliberate and render a decision in this case.

20          If any reference to witness testimony or the exhibits by
21 the Court or by counsel does not coincide with your own memory of
22 that evidence, it is your memory of the evidence which controls
23 during your deliberations and not that of the Court or of counsel.
24          It is the duty of the Court to admonish an attorney who
25 out of zeal for his or her cause does something which I feel is

## District court's instructions to the jury

1   not in keeping with the rules of evidence or procedure. You are

2   to draw absolutely no inference against the side to whom an

3   admonition of the Court may have been addressed during the trial

4   of this case.

5       During the course of the trial, I occasionally asked

6   questions of a witness. Do not assume that I hold any opinion on

7   the matters to which my questions may relate. The Court may ask a

8   question simply to clarify a matter, not to help one side of the

9   case or hurt the other side.

10      It is the sworn duty of the attorney on each side of a

11  case to object when the other side offers testimony or exhibits

12  which that attorney believes is not properly admissible. Only by

13  raising an objection can a lawyer request and obtain a ruling from

14  the Court on the admissibility of the evidence being offered by

15  the other side. You should not be influenced against an attorney

16  or his or her client because the attorney has made objections.

17      Do not attempt, moreover, to interpret my rulings on

18  objections as somehow indicating to you who I believe should win

19  or lose the case.

20      Now, the law of the United States permits a federal

21  judge to comment to the jury on the evidence in the case. Such

22  comments are, however, only expressions of the Court's opinion as

23  to the facts, and the jury may disregard them entirely.

24      And I haven't actually commented on the evidence, but in

25  the course of ruling on some objections, I sometimes have made

## District court's instructions to the jury

1  statements about things, and so that's the spirit in which I offer

2  you this instruction.

3          The jurors are the sole judges of the facts in this

4  case.  It is your recollection and evaluation of the evidence that

5  is important to the verdict in this case.

6          Although you must follow the Court's instructions

7  concerning the law applicable to this case, you are totally free

8  to accept or reject my observations concerning the evidence

9  received in this case.

10          There is nothing particularly different in the way that

11  a juror should consider the evidence in a trial from that in which

12  any reasonable and careful person would treat any very important

13  question that must be resolved by examining facts, opinions, and

14  evidence.  You are expected to use your good sense in considering

15  and evaluating the evidence in the case for only those purposes

16  for which it has been received and to give such evidence a

17  reasonable and fair construction in the light of your common

18  knowledge of the natural tendencies and inclinations of human

19  beings.

20          If the defendant be proved guilty beyond a reasonable

21  doubt, say so.  If not proved guilty beyond a reasonable doubt,

22  say so.

23          Keep constantly in mind that it would be a violation of

24  your sworn duty to base a verdict upon anything other than the

25  evidence received in the case and the instructions of the Court.

## District court's instructions to the jury    2289

1  Remember as well that the law never imposes upon a defendant in a

2  criminal case the burden or duty of calling any witnesses or

3  producing any evidence because the burden of proving guilt beyond

4  a reasonable doubt is always assumed by the government.

5          Now, my instructions are going to shift to talk a little

6  bit about evidence in sort of a general context.  There are two

7  types of evidence which are generally presented during a trial --

8  direct evidence and circumstantial evidence.  Direct evidence is

9  the testimony of a person who claims to have actual knowledge of a

10  fact, such as an eyewitness.

11          Circumstantial evidence is proof of a chain of facts and

12  circumstances indicating the existence of a fact.

13          An example that I normally use is you leave your home in

14  February around noon.  It's cold that day, but it has not been

15  snowing, so your front yard is bare.  You come back four hours

16  later, and in the meantime, it started to snow, so your front yard

17  has a blanket of white snow on it, and when you come home, you see

18  in your front yard a footprint.

19          Well, from the facts I've just given you, that is,

20  sometime between noon and four, it had started to snow, and you

21  see the footprint, and you know from common experience that a

22  human being is often associated with a footprint, you can draw the

23  conclusion there was somebody in your yard between noon and four

24  that day.

25          Now, you don't have direct evidence of that fact because

## District court's instructions to the jury

1  you didn't actually see the person.  You have indirect or

2  circumstantial evidence of that fact.

3          The law makes absolutely no distinction between the

4  weight or value to be given to either direct or circumstantial

5  evidence, nor is a greater degree of certainty required of

6  circumstantial evidence than of direct evidence.  You should weigh

7  all of the evidence in the case.  After weighing all the evidence,

8  if you are not convinced of the guilt of the defendant beyond a

9  reasonable doubt, you must find him not guilty.

10         Now, charts and summaries have been prepared by the

11 parties and shown to you during the trial for the purpose of

12 explaining facts that are allegedly contained in books, records,

13 and other documents which are in evidence in the case.  Although

14 these charts or summaries have been admitted as evidence during

15 this trial, if you find that these charts or summaries do not

16 correctly reflect the facts or figures shown by the underlying

17 evidence in the case, you should disregard the charts or

18 summaries.

19         In other words, such charts or summaries are used only

20 as a matter of convenience for you, and to the extent that you

21 find they are not in truth summaries of facts or figures shown by

22 the evidence in the case, you can disregard them entirely.

23         Tape recordings of conversations have been received in

24 evidence and have been played for you.  Typewritten transcripts of

25 these tape-recorded conversations have been furnished to you

**District court's instructions to the jury**  2291

1  solely for your convenience in assisting you in following the
2  conversation or in identifying the speakers.

3        Only the tapes themselves are evidence in the case.  The
4  typewritten transcripts are not evidence.  What you hear on the
5  tapes is evidence.  What you read in the transcript is not.  If
6  you perceive any variation between the two, you must be guided
7  solely by the tapes and not by the transcripts.

8        If you cannot, for example, determine from the tape
9  recording that particular words were spoken or if you cannot
10 determine from the tape recording who said a particular word or
11 words, you must disregard the transcripts insofar as those words
12 or that speaker are concerned.

13       The same instruction applies to the tapes of various
14 lectures by the defendant.  No transcripts were prepared for those
15 tapes.  To the extent the jury is unable to determine what was
16 said, you must disregard that portion of the lecture.  You should
17 also be careful in determining the meaning or intention behind any
18 lecture solely on the basis of samples of those lectures unless
19 you are satisfied that the sample has not been unfairly taken out
20 of context and is an accurate representation of what the defendant
21 intended to communicate.

22       Exhibits -- and this should be Government's Exhibits,
23 and you may want to put the word "Government" in front of it
24 because I omitted that -- but Government's Exhibits 7F5d and
25 7F24a, b, and c are newspaper and wire service reports from

## District court's instructions to the jury
2292

1  September 16, 2001, reporting that Mullah Mohammad Omar, the head
2  of the Taliban, had made certain statements.  These articles have
3  been admitted into evidence for the limited purpose of
4  establishing that the media -- should be "were" -- were reporting
5  this information about Omar and the Taliban.  These exhibits do
6  not establish that in fact Omar actually called for jihad against
7  the United States or asked other Muslim nations to aid the
8  Taliban.

9         In evaluating the evidence, always consider the quality
10 of the evidence over the quantity.  You are not bound to decide
11 any issue of fact in accordance with the testimony of any number
12 of witnesses which does not produce in your minds belief in the
13 likelihood of truth as against the testimony of a lesser number of
14 witnesses or other evidence which does produce such belief in your
15 mind.

16        In other words, the test is not which side brings the
17 greater number of witnesses or presents the greater quantity of
18 evidence, but rather, which witness and which evidence appeals to
19 your minds as being most accurate and otherwise trustworthy.

20        The testimony of one witness or just a few witnesses in
21 whom you have complete confidence may outweigh the testimony of
22 several witnesses in whom you do not have such confidence.
23 Similarly, one or two exhibits which you find compelling may
24 outweigh numerous exhibits with you find less compelling.

25        The next series of instructions have to do with the

## District court's instructions to the jury

1  credibility of witnesses, that is, how you go about deciding how

2  much, if any, of a particular witness's testimony you're going to

3  accept.

4         You are the sole judges of the credibility of each of

5  the witnesses called to testify.  Only you determine the

6  importance or the weight that their testimony deserves.  After

7  evaluating the credibility of a witness, you may decide to believe

8  all of that witness's testimony, only a portion of it, or none of

9  it at all.

10        In evaluating a witness's credibility, you should

11 carefully consider all of the testimony given, the circumstances

12 under which each witness has testified, and every matter in

13 evidence which tends to show whether a witness in your opinion is

14 worthy of belief.  Consider each witness's intelligence, motive to

15 falsify, state of mind, and appearance and manner while on the

16 witness stand.  Consider the witness's ability to observe the

17 matters as to which he or she has testified, and consider whether

18 he or she impresses you as having an accurate memory or

19 recollection of these matters.

20        Consider also any relation a witness may bear to either

21 side of the case, the manner in which each witness might be

22 affected by your verdict, and the extent to which, if at all, each

23 witness is either supported or contradicted by other evidence in

24 the case.

25        Inconsistencies or discrepancies in the testimony of a

## District court's instructions to the jury

2294

1  witness or between the testimony of different witnesses may or may
2  not cause you to disbelieve or discredit such testimony.  Two or
3  more persons witnessing an incident may simply see or hear it
4  differently.  Innocent mistakes in remembering something, like
5  being unable to remember something, is not an uncommon human
6  experience.

7          In evaluating the effect of a discrepancy, however,
8  always consider whether it pertains to a matter of importance or
9  an insignificant detail, and consider whether the discrepancy
10  results from innocent error or from intentional falsehood.

11          After making your own judgment or assessment concerning
12  the believability of a witness, you can then attach such
13  importance or weight to that testimony, if any, that you feel it
14  deserves.

15          The rules of evidence ordinarily do not permit witnesses
16  to testify as to their own opinions or their own conclusions about
17  issues in the case.  An exception to this rule exists as to those
18  witnesses who are described as expert witnesses.

19          An expert witness is someone who by education or by
20  experience may have become knowledgeable in some technical,
21  scientific, or very specialized area.  If such knowledge or
22  experience may be of assistance to you in understanding some of
23  the evidence or in determining a fact, an expert witness in that
24  area may state an opinion as to relevant and material matter in
25  which he or she claims to be an expert.

## District court's instructions to the jury

2295

1    You should consider each expert opinion received in
2  evidence in this case and give it such weight as you may think it
3  deserves.  You should consider the testimony of expert witnesses
4  just as you consider other evidence in the case.

5    If you decide -- if you should decide that the opinion
6  of an expert witness is not based upon sufficient education or
7  experience or if you should conclude that the reasons given in
8  support of the opinion are not sound or if you should conclude
9  that the opinion is outweighed by other evidence, including that
10 of other expert witnesses, you may disregard the opinion in part
11 or in its entirety.

12    Now, you have heard the testimony of law enforcement
13 officials.  The fact that a witness may be employed by the federal
14 or state government as a law enforcement official does not mean
15 that his or her testimony is necessarily deserving of more or less
16 consideration or greater or lesser weight than that of an ordinary
17 witness.

18    At the same time, it is quite legitimate for defense
19 counsel to try to attack the credibility of a law enforcement
20 witness on the grounds that the testimony may be colored by a
21 personal or professional interest in the outcome of the case.

22    It is your decision after reviewing all the evidence
23 whether to accept the testimony of a law enforcement witness and
24 to give that testimony whatever weight, if any, you find it
25 deserves.

## District court's instructions to the jury

1        The testimony of a witness may be discredited -- the
2   technical legal term is, we say "impeached" -- or impeached by
3   evidence showing that the witness has been convicted of a felony,
4   that is, a crime for which a person may receive a prison sentence
5   of more than one year.  Such a conviction is one of the
6   circumstances which you may consider in determining the
7   credibility of that witness.  Several government witnesses,
8   including Muhammad Aatique, Yong Kwon, Donald Surratt, and Khwaja
9   Mahmood Hasan, have been convicted of felonies.

10       It is the sole and exclusive right of the jury to
11  determine the weight to be given to any prior conviction as
12  impeachment and the weight to be given to the testimony of anyone
13  who has previously been convicted of a felony.

14       The testimony of an alleged accomplice, that is, someone
15  who said he participated with another person in the commission of
16  a crime, must be examined and weighed by the jury with greater
17  care than the testimony of a witness who did not participate in
18  the commission of that crime.

19       Aatique, Kwon, Surratt, and Hasan -- which I've spelled
20  two different ways now in these instructions but it's the same
21  person -- may be considered to be alleged accomplices in this
22  case.  The fact that an alleged accomplice has agreed to enter a
23  plea of guilty to the offense charged is only evidence of that
24  person's guilt and is not evidence of the guilt of any other
25  person, including the defendant.

**District court's instructions to the jury**                2297

1           The jury must determine whether the testimony of the
2  accomplice has been affected by self-interest or by an agreement
3  he may have with the government or by his own interest in the
4  outcome of the case or by prejudice against the defendant.

5           And in this case, there has been testimony from several
6  government witnesses -- again, Aatique, Kwon, Surratt, and
7  Hasan -- who pled guilty after entering into an agreement with the
8  government to testify.  There is evidence that the government
9  agreed to dismiss some charges against the witnesses and agreed
10 not to prosecute them on other charges in exchange for the
11 witnesses' agreement to plead guilty and testify at this trial
12 against the defendant.  The government also promised to bring the
13 witnesses' cooperation to the attention of the sentencing court.

14          The government is permitted to enter this kind of plea
15 agreement.  You, in turn, may accept the testimony of such a
16 witness and convict the defendant on the basis of this testimony
17 alone if it convinces you of the defendant's guilt beyond a
18 reasonable doubt.

19          However, you should bear in mind that a witness who has
20 entered into such an agreement has an interest in this case
21 different than any ordinary witness.  A witness who realizes that
22 he may be able to obtain his freedom or receive a lighter sentence
23 by giving testimony favorable to the prosecution has a motive to
24 testify falsely.  Therefore, you must examine his testimony with
25 caution and weigh it with great care.  If after scrutinizing his

## District court's instructions to the jury

2298

1  testimony you decide to accept it, you may give it whatever
2  weight, if any, you find it deserves.

3          Evidence has been received in this case that certain
4  persons, such as Randall Royer, Masaud Khan, Yong Kwon, Muhammad
5  Aatique, Khwaja Mahmood Hasan, and Donald Surratt, who are alleged
6  in the indictment to be coconspirators, have done or said things
7  during the existence or life of the alleged conspiracies in order
8  to further or advance their goals.

9          Such acts and statements of these other individuals may
10  be considered by you in determining whether or not the government
11  has proven the charges in the indictment against the defendant.

12          The reason for allowing this evidence to be received
13  against the defendant has to do with the nature of the crime of
14  conspiracy.  A conspiracy is often referred to as a partnership in
15  crime.  Thus, as in other types of partnerships, when people enter
16  into a conspiracy to accomplish an unlawful end, each and every
17  member becomes an agent for the other conspirators in carrying out
18  the conspiracy.

19          Accordingly, the reasonably foreseeable acts,
20  declarations, statements, and omissions of any member of the
21  conspiracy and in furtherance of the common purpose of the
22  conspiracy are deemed under the law to be the acts of all of the
23  members, and all of the members are responsible for each -- all of
24  the members are responsible for such acts, declarations,
25  statements, and omissions.

## District court's instructions to the jury

 1            As to each conspiracy charged, if you find beyond a
 2   reasonable doubt that the defendant whose guilt you are
 3   considering was a member of the conspiracy charged in the
 4   indictment, then any acts done or statements made in furtherance
 5   of the conspiracy by persons also found by you to have been
 6   members of that conspiracy may be considered against the
 7   defendant.  This is so even if such acts were done and statements
 8   were made in the defendant's absence and without his knowledge.

 9            However, before you may consider the statements or acts
10   of a coconspirator in deciding the issue of a defendant's guilt,
11   you must first determine that the acts and statements were made
12   during the existence and in furtherance of the unlawful
13   conspiracy.  If the acts were done or the statements made by
14   someone whom you do not find to have been a member of the
15   conspiracy or if they were not done or said in furtherance of the
16   conspiracy, they may be considered by you as evidence only against
17   the member who did or said them.

18            This is now the last two instructions on witnesses, and
19   then we're going to move on to the indictment itself.

20            The testimony of a witness may be discredited -- or as I
21   said earlier, impeached -- by showing that he or she previously
22   made statements which are different than or inconsistent with his
23   or her testimony here in court.  The earlier inconsistent or
24   contradictory statements are admissible only to discredit or
25   impeach the credibility of the witness and not to establish the

## District court's instructions to the jury

1   truth of these earlier statements made somewhere other than here

2   during this trial.  It is the province of the jury to determine

3   the credibility, if any, to be given the testimony of a witness

4   who has made prior inconsistent or contradictory statements.

5          If a person is shown to have knowingly testified falsely

6   concerning any important or material matter, you obviously have a

7   right to distrust the testimony of such an individual concerning

8   other matters.  You may reject all of the testimony of that

9   witness or give it such weight or credibility as you may think it

10  deserves.

11         The defendant in a criminal case has an absolute right

12  under our Constitution not to testify.  The fact that the

13  defendant did not testify must not be discussed or considered by

14  the jury in any way when deliberating and in arriving at your

15  verdict.  No inference of any kind may be drawn from the fact that

16  a defendant decided to exercise his privilege under the

17  Constitution and did not testify.

18         As stated before, the law never imposes upon a defendant

19  in a criminal case the burden or duty of calling any witnesses or

20  of producing any evidence.

21         The law does not require any party to call as witnesses

22  all persons who may have been present at any time or place

23  involved in the case or who may appear to have some knowledge of

24  the matters in issue at this trial.  Nor does the law require any

25  party to produce as exhibits all papers and things mentioned in

## District court's instructions to the jury

1  the evidence in the case.

2          Now we're going to shift to talking about the indictment

3  and the specific charges that are involved in this case.  A few

4  general instructions first.  I want to first of all caution you

5  that the defendant is not on trial for any act or any conduct not

6  specifically charged in the indictment.

7          An indictment is but a formal method of accusing a

8  defendant of a crime.  It is not evidence of any kind against the

9  defendant.

10          The defendant has pleaded not guilty to this indictment

11  and therefore denies that he is guilty of the charges.

12          The indictment charges that the offenses alleged were

13  committed on or about a certain date.  Although it is necessary

14  for the government to prove beyond a reasonable doubt that the

15  offense was committed on a date reasonably near the dates alleged

16  in the indictment, it is not necessary for the government to prove

17  that the offense was committed precisely on the date charged.

18          A separate crime is charged in each count of the

19  indictment, and this is a ten-count indictment, which we'll start

20  going over with you in a few minutes.  Each charge and the

21  evidence pertaining to it should be considered separately by the

22  jury.  The fact that you may find the defendant guilty or not

23  guilty as to one of the offenses charged should not control your

24  verdict as to any other offense charged.

25          A person may violate the law even though he does not

## District court's instructions to the jury

2302

1  personally do each and every act constituting the offense if he
2  counseled or induced or solicited or commanded or otherwise
3  endeavored to persuade others to commit the crime or if he aided
4  and abetted the commission of the offense, or if he otherwise
5  procured its commission.

6          It is not a prerequisite to the conviction of one who
7  counsels or induces a criminal act or aids and abets it or
8  solicits it or otherwise procures it that the principal be tried
9  and convicted or, in fact, even be identified.  It is not
10 necessary that such an individual know all the details of the
11 crime or all the persons who were perpetrating the crime.

12         Now we're going to proceed -- and the way this part of
13 the instructions is structured, we are giving you the text of the
14 various charges of the indictment, so you're now getting the
15 text -- the essential text for Count 1 of the indictment, and
16 we'll go this way through all ten counts, and then just so you can
17 follow along, the basic structure is the specific count, the
18 charging language of that count; you'll have a reference to the
19 statutes that are involved in that count; an explanation of the
20 elements, that is, the specific facts that have to be established
21 beyond a reasonable doubt in order for that count -- in order for
22 there to be a violation of that count; and then hopefully, the
23 necessary definitions of terms that are being used in that
24 particular count.

25         And many of the terms that apply to Count 1 apply to

## District court's instructions to the jury

1  many of the other counts in the indictment as well, so I'm not
2  going to repeat them every time, but I'll try to remind you about
3  that.

4         But starting with Count 1, Count 1 of the indictment
5  charges that from on or about September 16, 2001, and continuing
6  thereafter up to on or about May of 2003, within Fairfax County,
7  in the Eastern District of Virginia and elsewhere, defendant Ali
8  Al-Timimi did unlawfully and knowingly aid, abet, counsel, and
9  induce Masaud Khan, Randall Royer, Yong Kwon, Muhammad Aatique,
10 Khwaja Hasan, Donald Surratt, and others known and unknown to the
11 grand jury, to combine, conspire, confederate, and agree together
12 and with others known and unknown to the grand jury to use, carry,
13 possess, and discharge firearms during, in relation to, and in
14 furtherance of crimes of violence for which he and they may be
15 prosecuted in a court of the United States, in violation of Title
16 18, United States Code, section 924(c), and did procure the
17 commission of such offense.

18        Count 1 -- now, I'm going to give you the two provisions
19 that are involved in that count.  Section 2 of Title 18, United
20 States Code, provides in part:  Whoever commits an offense against
21 the United States or aids, abets, counsels, commands, induces, or
22 procures its commission is punishable as a principal.

23        Whoever willfully causes an act to be done which if
24 directly performed by him or another would be an offense against
25 the United States is punishable as a principal.

## District court's instructions to the jury

2304

1           Title 18, United States Code, sections 924(c) and (n)
2   provide in pertinent part: A person who conspires to [use or
3   carry] a firearm . . . during and in relation to any crime of
4   violence . . . for which the person may be prosecuted in a court
5   of the United States, or who, in furtherance of any such crime,
6   possesses a firearm . . . shall be [guilty of a crime].

7           Now, the essential elements for Count 1, to establish
8   the offense of aiding, abetting, counseling, and inducing others
9   to engage in a conspiracy to use firearms in relation to crimes of
10  violence as charged in Count 1 of the indictment, the government
11  is required to prove that:

12          1.  The defendant, Ali Al-Timimi, knew that an unlawful
13  conspiracy was to be undertaken or already in existence to use,
14  carry, possess, and/or discharge firearms in furtherance of crimes
15  of violence;

16          2.  The defendant, Ali Al-Timimi, aided, abetted,
17  counseled, or induced others or undertook some other action with
18  the intent to procure the engagement of those others in that
19  unlawful conspiracy; and

20          3.  At least one person who Ali Al-Timimi aided,
21  abetted, counseled, or induced to engage in that unlawful
22  conspiracy ultimately did so.

23          Now, when I talk about the elements -- and again, you'll
24  see ten of these instructions, one for each count, that's going to
25  have the title "Essential Elements."  Every crime has essential

**J.A. 2451**

## District court's instructions to the jury

1   elements.  I often tell juries it's much like a recipe if some of
2   you are cooks.  You know, a recipe calls for eggs and butter and
3   flour, whatever.  And basically, in the law, it means you have to
4   have all the essential elements proven beyond a reasonable doubt
5   in order for a jury to find a defendant guilty of that offense.

6         Let's say, for example, you have an offense like this
7   one that has three essential elements, and let's say the jury was
8   satisfied beyond a reasonable doubt that the government had proven
9   two of the essential elements but not the third.  The jury cannot
10  find the person guilty of that offense.

11        The government's burden is to prove each and every one
12  of the specific essential elements for each crime alleged in order
13  for there to be a conviction of the defendant, and that's why we
14  give you these essential elements so you can be absolutely sure
15  about that.

16        Now, I'm instructing the jury that although the
17  indictment may charge a defendant with committing the offense in
18  several ways, using conjunctive language -- and conjunctive
19  language is the word "and," all right?  And I gave you an example,
20  such as -- in Count 1, it says "such as aid, abet, counsel and
21  induce" as used in Count 1, for example, I instruct you that it is
22  not necessary for the government to prove that the defendant did
23  each of those things.  It is sufficient if the government proves
24  beyond a reasonable doubt that the defendant did any of the
25  charged alternative acts, that is, in the example of Count 1,

## District court's instructions to the jury

1  either aid, abet, counsel, or induce the particular conspiracy.

2          And frankly, if you folks want to go through your

3  instructions and change the "ands" to an "or," that's fine.  I

4  have to give it to you as the law provides it, but then this --

5  this Instruction 34 is important in understanding that difference.

6          Now, the term "knowingly" -- and this term is going to

7  be used throughout these instructions, so I'm giving you the

8  definition now, but you can refer back to it as you look at the

9  elements in the other counts as well -- the term "knowingly" as

10  used in these instructions to describe the alleged state of mind

11  of the defendant means that he was conscious and aware of his

12  action, realized what he was doing or what was happening around

13  him, and did not act because of ignorance, mistake, or accident.

14          The word "intentionally" will also be used extensively

15  in these instructions, and I'm giving you the definition now, but

16  it will apply throughout all of the instructions as well.  The

17  term "intentionally" as used in these instructions to describe the

18  alleged state of mind of the defendant means that he knowingly

19  performed an act deliberately and intentionally, on purpose, as

20  contrasted with accidentally, carelessly, or unintentionally.

21          Now, the intent of a person or the knowledge that a

22  person possesses at any given time may not ordinarily be proved

23  directly because there is no way of directly scrutinizing the

24  workings of the human mind.  In determining the issue of what a

25  person knew or what a person intended at a particular time, you

## District court's instructions to the jury

1    may consider any statements made or acts done or omitted by that

2    person and all other facts and circumstances received in evidence

3    which made aid in your determination of that person's knowledge or

4    intent.

5        You may infer but you are certainly not required to

6    infer that a person intends the natural and probable consequences

7    of acts knowingly done or knowingly omitted.  It is entirely up to

8    you, however, to decide what facts to find from the evidence

9    received during this trial.

10       The government may prove that the defendant acted

11   knowingly by proving beyond a reasonable doubt that the defendant

12   deliberately closed his eyes to what would otherwise have been

13   obvious to him.  No one can avoid responsibility for a crime by

14   deliberately ignoring what is obvious.

15       A finding beyond a reasonable doubt of an intent of the

16   defendant to avoid knowledge or enlightenment would permit the

17   jury to infer knowledge.  Stated another way, a defendant's

18   knowledge of a particular fact may be inferred from a deliberate

19   or intentional ignorance or deliberate or intentional blindness to

20   the existence of that fact.

21       It is, of course, entirely up to you as to whether you

22   find any deliberate ignorance or deliberate closing of the eyes

23   and the inferences to be drawn from any such evidence.

24       You may not infer that a defendant had knowledge,

25   however, from proof of a mistake, negligence, carelessness, or a

## District court's instructions to the jury

1   belief in an inaccurate proposition.  Instead, the government must
2   prove beyond a reasonable doubt that the defendant purposely and
3   deliberately contrived to avoid learning of all the facts.

4            Now, under the aiding and abetting statute, it is not
5   necessary for the government to show that a defendant himself
6   physically committed the crime with which he is charged in order
7   for the government to sustain its burden of proof.  A person who
8   aids or abets another to commit an offense is just as guilty of
9   that offense as if he committed it himself.

10           And earlier, I used the word "principal."  Somebody
11  might be wondering what is a principal.  A principal is the person
12  who commits the act himself, all right?

13           Accordingly, you may find a defendant guilty of the
14  offense charged if you find beyond a reasonable doubt that the
15  government has proven that another person actually committed the
16  offense with which the defendant is charged and that the defendant
17  aided or abetted that person in the commission of the offense.

18           As you can see, the first requirement is that you find
19  that another person has committed the crime charged.  Obviously,
20  no one can be convicted of aiding or abetting the criminal acts of
21  another if no crime was committed by the other person in the first
22  place.  But if you do find that a crime was committed, then you
23  must consider whether the defendant aided or abetted the
24  commission of that crime.

25           In order to aid or abet another to commit a crime, it is

**District court's instructions to the jury**          2309

1   necessary that the defendant knowingly associate himself in some
2   way with the crime and that he participate in the crime by doing
3   some act to help make the crime succeed.

4          To establish that a defendant knowingly associated
5   himself with the crime, the government must establish that the
6   defendant knew of the illegal activity and intended to help the
7   activity succeed.  The necessary knowledge and intent depend upon
8   the essential elements of the crime which the defendant is alleged
9   to have aided and abetted.

10          To establish that defendant aided and abetted the
11  commission of a crime as charged in Count 1, the government must
12  prove that the defendant knew that an unlawful conspiracy to use
13  firearms in furtherance of crimes of violence was to be undertaken
14  or already was in existence and intended to help that conspiracy
15  to succeed.

16          And now I'm sort of projecting ahead, but -- I'm giving
17  this to you now, but it applies to other counts as well.  For
18  Count 3, the government must prove that the defendant knew that an
19  unlawful conspiracy to levy war against the United States was to
20  be undertaken or already was in existence and intended to help
21  that conspiracy to succeed.

22          For Count 5, the government must prove that the
23  defendant knew that an unlawful attempt to provide services to the
24  Taliban was to be undertaken or already was in existence and
25  intended to help that attempt succeed.

**J.A. 2456**

## District court's instructions to the jury

1         For Count 6, the government must prove that the
2  defendant knew that an unlawful conspiracy to violate the
3  Neutrality Act was to be undertaken or already was in existence
4  and intended to help that conspiracy to succeed.

5         And for Counts 7 through 10, the government must prove
6  that the defendant knew that Kwon or Hasan intended to undertake
7  the unlawful possession of firearms in furtherance of crimes of
8  violence, which is Counts 7 and 8, or unlawful carrying of
9  explosives in furtherance of a felony crime, Counts 9 and 10, and
10 intended to help their actions succeed.

11        In regard to Counts 7 and 8, the government must also
12 prove that the defendant facilitated or encouraged the use,
13 carrying, or possession of the firearm in some way in addition to
14 proving that the defendant knew that a firearm would be used or
15 carried during the commission of the offense.

16        In addition, to establish that the defendant aided or
17 abetted the commission of the specific crime charged in Counts 1,
18 3, and 5 through 10, the government must prove beyond a reasonable
19 doubt that defendant engaged in some affirmative conduct or overt
20 act for the specific purpose of bringing about that crime and that
21 the particular crime was, in fact, committed.

22        The mere presence of a defendant where a crime is being
23 committed, even coupled with knowledge by the defendant that a
24 crime is being committed, or merely associating with others who
25 were committing a crime is not sufficient to establish aiding and

## District court's instructions to the jury                2311

1  abetting.  Moreover, one who has no knowledge that a crime is
2  being committed or is about to be committed but inadvertently does
3  something that aids in the commission of that crime is not an
4  aider and abettor.  An aider and abettor must know that the crime
5  is being committed and act in a way which is intended to bring
6  about the success of the criminal venture.

7           To determine whether the defendant aided or abetted the
8  commission of the crimes charged in Counts 1, 3, and 5 through 10,
9  ask yourself these questions in relation to each count:

10          Did he -- did the defendant participate in the specific
11  crime charged in the respective count as something he wished to
12  bring about?

13          Did he knowingly associate himself with the criminal
14  venture?

15          Did he seek by his actions to make the criminal venture
16  succeed?

17          If he did, then the defendant is an aider and abettor
18  and therefore guilty of the offense.  If on the other hand your
19  answer to any of these questions is no, then the defendant is not
20  an aider and abettor.

21          Let me give you a simple example that may help you in
22  thinking about these distinctions.  Let's say that John is a bank
23  teller, and one of his best friends, who we'll call Bob, wants to
24  rob that bank.  I'll give you two scenarios.

25          In the first scenario, John and Bob go out for a drink,

## District court's instructions to the jury

1   and Bob starts asking John -- John is the teller -- Bob starts

2   asking the teller innocently enough, you know, "Hey, you know, how

3   many doors does your bank have?," and, you know, "Do you have any

4   special guards there?," in other words, asking information about

5   the bank, and the teller quite innocently is just, you know,

6   telling his friend about his job, etc., and the next day, his

7   friend comes in and robs the bank.

8         Now, the teller may have actually helped that bank

9   robber be successful because he gave information to the robber

10  that the robber was able to use, but in the eyes of the law under

11  the scenario I just gave you, the teller, John, would not be

12  criminally liable because there's no evidence that he knew why

13  this information was being requested, and there's no evidence that

14  he intended to help Bob rob the bank.

15        But change the facts slightly.  Let's say that Bob goes

16  to his friend John, the bank teller, and said, "Hey, you know, I'm

17  really interesting in doing something in that bank of yours.  I

18  know you're off tomorrow, but can you just tell me, how is that

19  bank set up?  I mean, if I tried to rob it, would there be a guard

20  in my way?," blah, blah, blah.

21        And John, the teller, understanding why Bob wants this

22  information and interested in helping him rob the bank, gives him

23  the information.

24        Now, John is off from the bank that day.  He's sitting

25  at home watching television when the bank is robbed.  Under that

## District court's instructions to the jury                    2313

1  second scenario, he could be charged as an aider and abettor.  He
2  could be charged with the crime of bank robbery just like a
3  prinicipal, just as if he walked in there and committed the
4  robbery.

5           And that's the kind of distinction that we're trying to
6  make in the law.  That's why you have to look so carefully at the
7  knowledge and the intent of the defendant.

8           Now, I'm going to give you a slightly different version
9  of this instruction because in addition to aiding and abetting, we
10  have other language in Count 1 talking about inducing and
11  procuring, so this second instruction, 39A, is very similar to the
12  first but slightly expands upon it.

13           One who counsels or induces or commands a criminal act
14  or aids and abets it or otherwise procures it is liable for any
15  criminal act which in the ordinary course of things was the
16  natural and probable consequence of the crime that he advised or
17  commanded, although such consequences may not have been intended
18  by him.

19           Before a defendant may be held responsible for
20  counseling or inducing or commanding others to commit a crime,
21  aiding and abetting others in the commission of a crime, or
22  procuring the commission of a crime, it is necessary that the
23  government prove beyond a reasonable doubt that the defendant
24  knowingly and deliberately associated himself in some way with the
25  crime charged and took some action to enable the crime to be

## District court's instructions to the jury

1  committed.

2  Counseling or inducing another to commit a crime

3  constitutes doing an act for the purpose of procuring the

4  commission of the crime.  Similarly, providing advice to another

5  with regard to how the crime should be committed or law

6  enforcement eluded constitutes an act for the purpose of aiding

7  and abetting the commission of the crime.

8  Before a defendant may be found guilty as a counselor or

9  inducer of the crimes charged in Counts 1, 3, and/or 5 through 10

10 as an aider or an abettor to the crime or as a procurer of the

11 crime, the government must also prove beyond a reasonable doubt

12 that someone committed each of the essential elements of the

13 offense charged.

14 With respect to Count 2, which we're going to get to in

15 a second, however, it is not necessary that someone committed the

16 crime that the defendant is alleged to have solicited, commanded,

17 induced, or otherwise endeavored to persuade others to commit.

18 In other words, for the defendant to be found guilty of

19 Counts 1, 3, and/or 5 through 10 of the indictment, the government

20 must prove that someone committed each of the essential elements

21 of the offenses the defendant is alleged to have aided, abetted,

22 counseled, induced, or procured.  However, for the defendant to be

23 found guilty of Count 2 of the indictment, the government need not

24 prove that anyone whom the defendant is alleged to have solicited,

25 commanded, or induced to levy war against the United States

**District court's instructions to the jury**            2315

1  actually did so.

2          Merely being present at the scene of the crime or merely
3  knowing that a crime is being committed or is about to be
4  committed is not sufficient conduct for the jury to find that a
5  defendant induced, counseled, aided, abetted, or procured the
6  commission of that crime.

7          The government must prove that a defendant knowingly and
8  intentionally associated himself with the crime in some way as a
9  participant, someone who wanted the crimes to be committed, not as
10 a mere spectator.

11         Now, many of these instructions talk about a conspiracy.
12 I want to give you a basic legal definition of "conspiracy."  A
13 criminal conspiracy is an agreement or a mutual understanding
14 knowingly made or knowingly entered into by at least two people to
15 violate the law by some joint or common plan or course of action.
16 A conspiracy is in a very true sense a partnership in crime.

17         A conspiracy or agreement to violate the law, like any
18 other kind of agreement or understanding, need not be formal,
19 written, or even expressed directly in every detail.

20         The government must prove that at least two individuals
21 knowingly and deliberately arrived at an agreement or
22 understanding that they and perhaps others would violate some laws
23 by means of some common plan or course of action as alleged in
24 Counts 1, 3, and 6 of the indictment.  It is proof of this
25 conscious understanding and deliberate agreement by the alleged

**J.A. 2462**

## District court's instructions to the jury

1  members that should be central to your consideration of the charge
2  of conspiracy.

3          To prove the existence of a conspiracy or an illegal
4  agreement, the government is not required to produce a written
5  contract between the parties or even produce evidence of an
6  express oral agreement spelling out all the details of the
7  understanding.  To prove that a conspiracy existed, moreover, the
8  government is not required to show that all of the people named in
9  the indictment as members of the conspiracy were, in fact, parties
10 to the agreement, or that all of the members of the alleged
11 conspiracy were named or charged, or that all of the people whom
12 the evidence shows were actually members of a conspiracy agreed to
13 all of the means or methods set out in the indictment.

14         And the government is not required to prove that any
15 conspiracy that the defendant induced or counseled others to join
16 was successful in achieving any of its objectives.  Similarly, the
17 government is not required to prove that any conspiracy that the
18 defendant aided or abetted was successful in achieving any of its
19 objectives.  And the government is not required to prove that any
20 conspiracy the defendant otherwise procured was successful in
21 achieving any of its objectives.

22         The term "firearm" as used in Count 1 of the indictment
23 means any weapon which will or is designed to or may readily be
24 converted to expel a projectile by the action of an explosive or
25 the frame or receiver of any such weapon.  The term does not

1   include an antique firearm.

2         A firearm is said to be possessed in furtherance of a
3   crime of violence offense when the firearm was possessed to
4   advance, assist, or promote the commission of the offense.
5   However, mere presence of a firearm is not sufficient.

6         In considering whether or not a firearm was possessed in
7   furtherance of a crime of violence, you may consider the type of
8   activity that is being conducted, the location of the activity,
9   the accessibility of the firearm, the type of weapon, whether the
10  weapon is loaded, and the time and circumstances under which the
11  weapon was possessed.

12        Instruction 44 is going to define for you various
13  offenses that constitute crimes of violence or felony which may be
14  prosecuted in a court of the United States, and these are
15  technical terms that are used in the statute, so you do need to
16  know them.

17        The following offenses constitute crimes of violence for
18  purposes of Count 1 of the indictment as well as for Counts 7 and
19  8 of the indictment and also constitute felonies which may be
20  prosecuted in a court of the United States for purposes of Counts
21  9 and 10 of the indictment.

22        And in some of the other sections of the, of the
23  instructions, I may have shortened that latter term, just calling
24  them federal felonies, but a federal felony would be a felony
25  which can be prosecuted in a court of the United States, all

**District court's instructions to the jury**                    2318

1    right?  And now I'm listing these.

2            A.  Levying war against the United States and conspiring

3    to do so, in violation of Title 18, United States Code, sections

4    2381 and 2384;

5            B.  Attempting and conspiring to supply services to the

6    Taliban, in violation of Title 50, United States Code, section

7    1705;

8            C.  Beginning, providing for, preparing a means for, and

9    taking part in military expeditions and enterprises to be carried

10   on from the United States against the territory and dominion of

11   foreign states, districts, and peoples with whom the United States

12   was at peace -- and conspiring to do so -- in violation of Title

13   18, United States Code, sections 371 and 960;

14           D.  Enlisting and entering oneself or another to go

15   beyond the jurisdiction of the United States with intent to be

16   enlisted and entered in the service of any foreign prince, state,

17   colony, district, and people as a soldier -- and conspiring to do

18   so -- in violation of Title 18, United States Code, sections 371

19   and 959;

20           E.  Conspiring to commit at any place outside the United

21   States acts that would constitute the offense of murder or maiming

22   if committed in the special maritime and territorial jurisdiction

23   of the United States, in violation of Title 18, United States

24   Code, section 956(a);

25           F.  Conspiring to damage or destroy specific property

## District court's instructions to the jury

1  situated within a foreign country and belonging to a foreign

2  government or to any political subdivision thereof with which the

3  United States is at peace, and any railroad, canal, bridge,

4  airport, airfield, and other public utility, public conveyance,

5  and public structure and any religious, educational, and cultural

6  property so situated, in violation of Title 18, United States

7  Code, section 956(b);

8          G.  Attempting and conspiring to provide material

9  support and resources, knowing or intending that they are to be

10  used in preparation for or in carrying out a violation of section

11  956 of Title 18, United States Code, in violation of Title 18,

12  United States Code, section 2339(a);

13          H.  Attempting and conspiring to provide material

14  support and resources to Al-Qaeda, in violation of Title 18,

15  United States Code, section 2339(b); and

16          I.  Enlisting and engaging with intent to serve in armed

17  hostility against the United States -- and conspiring to do so --

18  in violation of Title 18, United States Code, sections 371 and

19  2390.

20          Now, Counts 1, 7, and 8 include an element referring to

21  crimes of violence, and Counts 9 and 10 refer to "a felony which

22  may be prosecuted in a court of the United States," which I'm

23  shortening to a federal felony.

24          To find this element, the jury must be unanimous as to

25  which of the nine enumerated crimes was involved.  And the nine

**District court's instructions to the jury** 2320

1  enumerated crimes are the ones that you have listed there in
2  Instruction 44.  The jury may unanimously find more than one crime
3  of violence or federal felony; however, to satisfy that element,
4  the jury must unanimously find at least one such crime for each
5  count.

6          We're moving on to Count 2.  Does anyone need a break
7  yet, or are you all okay?  All right?  Okay.

8          Count 2 of the indictment charges that between on or
9  about September 16, 2001, and continuing up to on or about October
10  21, 2001, in Fairfax County, in the Eastern District of Virginia,
11  the defendant, Ali Al-Timimi, with intent that another person
12  engage in conduct constituting a felony that has as an element the
13  use, attempted use, or threatened use of physical force against
14  property or the person of another in violation of the laws of the
15  United States, and under circumstances strongly corroborative of
16  that intent, did knowingly and unlawfully solicit, command,
17  induce, and otherwise endeavor to persuade Masaud Khan, Yong Kwon,
18  Khwaja Hasan, Muhammad Aatique, Randall Royer, Hammad
19  Abdur-Raheem, Donald Surratt, Unindicted Coconspirator No. 2,
20  Caliph Basha Ibn Abdur-Raheem, and others known and unknown to the
21  grand jury, to levy war against the United States and adhere to
22  their enemies, while owing allegiance to the United States, giving
23  aid and comfort to the Taliban in the United States and
24  Afghanistan and elsewhere, in violation of Title 18, United States
25  Code, section 2381.

## District court's instructions to the jury

1    Now, you will see in the reference in this instruction,
2  which is Instruction 46, as well as in Instructions 49, 56, and
3  59, and also in Instruction 64 in the references to overt acts 19,
4  20, and 24, references to unindicted coconspirator No. 2.  I am
5  instructing you that Ali Asad Chandia is coconspirator No. 2, so
6  if you want to write his name in wherever you see coconspirator
7  No. 2 in your instructions if that helps you be clear about that.

8    Now, Count 2, which is in ordinary English described as
9  the offense of solicitation of others to levy war against the
10  United States, involves section 373 and section 2381 of the United
11  States Criminal Code, which is Title 18.

12    Section 373 provides in part that whoever, with intent
13  that another person engage in conduct constituting a felony that
14  has an element -- that has as an element the use, attempted use,
15  or threatened use of physical force against property or against
16  the person of another in violation of the laws of the United
17  States, and under circumstances strongly corroborative of that
18  intent, solicits, commands, induces, or otherwise endeavors to
19  persuade such other person to engage in such conduct, shall be
20  [guilty of a crime].

21    And section 2381 provides:  Whoever owing allegiance to
22  the United States levies war against them or adheres to their
23  enemies, giving them aid and comfort within the United States or
24  elsewhere, is guilty [of a crime].

25    The elements of the offense of soliciting others to levy

## District court's instructions to the jury

1  war, in order to convict the defendant of the offense charged in
2  Count 2, you must find beyond a reasonable doubt that the
3  defendant first solicited, commanded, induced, or otherwise tried
4  to persuade another person to levy war against the United States;
5  and

6          Two, that the defendant's actions strongly indicated
7  that he intended the other person or persons to levy war against
8  the United States, that has as an element the use, attempted use,
9  or threatened use of physical force against the person or property
10 of another in violation of the laws of the United States.

11         Count 3, which alleges in ordinary English inducing
12 others to conspire to levy war against the United States, alleges
13 that between on or about September 16, 2001, and continuing
14 thereafter up until May of 2003, within Fairfax County, in the
15 Eastern District of Virginia and elsewhere, the defendant, Ali
16 Al-Timimi, did unlawfully and knowingly aid, abet, counsel, and
17 induce Masaud Khan, Randall Royer, Yong Kwon, Muhammad Aatique,
18 Donald Surratt, Mr. Chandia -- again, that's unindicted
19 coconspirator No. 2 -- and Khwaja Hasan and others known and
20 unknown to the grand jury to combine, conspire, confederate, and
21 agree together and with others known and unknown to the grand jury
22 to levy war against the United States and did procure the
23 commission of such offense.

24         And the statute involves -- I've already read the aiding
25 and abetting statute; I'm not going to read it again, but that's

**District court's instructions to the jury**                2323

1   that section 2 of Title 18 which you've already seen, and then the
2   second portion of that is section 2384 of Title 18, which provides
3   that if two or more persons in any state or territory or in any
4   place subject to the jurisdiction of the United States conspire to
5   levy war against the United States, they shall be guilty of a
6   crime.

7           In Count 3 of the indictment, the defendant is charged
8   with counseling and inducing others to engage in a conspiracy to
9   levy war against the United States and aiding and abetting their
10  entry into such a conspiracy, and procuring their entry into such
11  a conspiracy.  The essential elements of this offense are -- and
12  there are three of them -- one, that the defendant knew that an
13  unlawful conspiracy to levy war against the United States was to
14  be undertaken or already in existence;

15          Two, that the defendant aided, abetted, counseled, or
16  induced others or undertook some other action with the intent to
17  procure the engagement against those in that unlawful conspiracy;
18  and

19          Three, at least one person who the defendant aided,
20  abetted, counseled, or induced to engage in that unlawful
21  conspiracy ultimately did so.

22          In Counts 2 and 3 -- Counts 2 and 3 use the term "to
23  levy war" against the United States.  As used in the indictment
24  and in the underlying criminal laws, the term "to levy war" means
25  to wage war or to carry on war.

**District court's instructions to the jury**                    2324

1          Count 4, which again is captioned "Attempting to Aid the
2     Taliban," charges that between on or about September 16, 2001, and
3     on or about October 21, 2001, in Fairfax County, in the Eastern
4     District of Virginia and elsewhere, the defendant did unlawfully,
5     knowingly, and willfully violate a regulation issued under Chapter
6     35 of Title 50 of the United States Code in that the defendant
7     attempted to supply services to the Taliban, to the territory of
8     Afghanistan controlled by the Taliban, and to persons whose
9     property and interests in property were blocked pursuant to Title
10    31, Code of Federal Regulations, section 545.204.

11          Title 50 of the United States Code, section 1705,
12    provides in part:  Whoever willfully violates, or willfully
13    attempts to violate, any . . . regulation issued under this
14    chapter . . . shall be punished.

15          At all times pertinent to this indictment until June of
16    2002, Title 31, Code of Federal Regulations, sections 545.201,
17    .204, and .206 prohibited any attempt or conspiracy to supply
18    services to the territory of Afghanistan controlled by the Taliban
19    or to the Taliban, directly or indirectly, from the United States
20    or by a U.S. person, wherever located.

21              Count 4 of the indictment has three essential elements:
22              One, an attempt to make any contribution of services;
23              Two, to or for the benefit of the Taliban;
24          Three, in the knowledge that making such a contribution
25    was contrary to law.

## District court's instructions to the jury

```
 1              Count 5, which is captioned "Inducing Others to Attempt
 2   to Aid the Taliban," Count 5 of the indictment charges that
 3   between on or about September 16, 2001, and on or about October
 4   21, 2001, within Fairfax County, in the Eastern District of
 5   Virginia and elsewhere, the defendant, Ali Al-Timimi, did
 6   unlawfully and knowingly aid, abet, counsel, and induce Masaud
 7   Khan, Randall Royer, Yong Kwon, Muhammad Aatique, Donald Surratt,
 8   and Chandia, and Khwaja Hasan and others known and unknown to the
 9   grand jury to attempt to violate a regulation issued under Chapter
10   35 of Title 50 of the United States Code, by willfully and
11   unlawfully attempting to supply services to the Taliban, to the
12   territory of Afghanistan controlled by the Taliban, and to persons
13   whose property and interests in property were blocked pursuant to
14   Title 31, Code of Federal Regulations, section 545.204, in
15   violation of Title 50, United States Code, section 1705, and did
16   procure the commission of such offense.
17              Again, I'm not going to read to you section 2 of Title
18   18.  It's the same statute that you've seen before.
19              And Title 50 of section -- I'm sorry, Title 50, section
20   1705 of the code, provides that whoever willfully violates or
21   willfully attempts to violate any regulation issued under this
22   chapter shall be punished.
23              At all times pertinent to this indictment -- and again,
24   I think this is exactly the same instruction I gave you
25   previously, so you can just read it for yourselves.
```

## District court's instructions to the jury

1          All right.  Now, there are three essential elements of
2   Count 5, which is again the charge of inducing others to attempt
3   to aid the Taliban.  The essential elements are:

4          One, that the defendant knew that an unlawful attempt to
5   provide services to the Taliban was to be undertaken or already in
6   existence;

7          Two, that the defendant aided, abetted, counseled, or
8   induced others or undertook some other action with the intent to
9   procure the engagement of those others in that attempt; and

10         Three, at least one person who the defendant aided,
11  abetted, counseled, or induced to attempt to provide services to
12  the Taliban ultimately attempted to do so.

13         And the word "attempt" is an ordinary word.  It means
14  try.  That's not a fancy technical word.  An attempt is an effort
15  to do something or to try to do something.

16         All right, Count 6 of the indictment, which is again,
17  the heading for it is "Inducing Others to Conspire to Violate the
18  Neutrality Act," Count 6 charges that between on or about
19  September 16, 2001, and May of 2003, within Fairfax County, in the
20  Eastern District of Virginia and elsewhere, the defendant did
21  unlawfully and knowingly aid, abet, counsel, and induce Masaud
22  Khan, Randall Royer, Yong Kwon, Muhammad Aatique, Donald Surratt,
23  Chandia, and Hasan, and others known and unknown to the grand
24  jury, to combine, conspire, confederate and agree together and
25  with others known and unknown to the grand jury, to begin, provide

## District court's instructions to the jury

1  for, prepare a means for, and take part in military expeditions
2  and enterprises to be carried on from the United States against
3  the territory and dominion of foreign states, districts, and
4  peoples with whom the United States was at peace, in violation of
5  Title 18, United States Code, section 960, and did procure the
6  commission of such offense.

7         Again, we have the same section 2 of Title 18, which I'm
8  not going to read for you, but it's the same as you've heard
9  before.

10        The general conspiracy statute of the Federal Code is
11 section 371, which says: "If two or more persons conspire either
12 to commit any offense against the United States . . . in any
13 manner or for any purpose, and one or more of such persons do any
14 act to effect the object of the conspiracy . . . an offense
15 against the United States has been committed."

16        And section 960 provides that whoever within the United
17 States knowingly begins or sets on foot or provides or prepares a
18 means for or furnishes the money for, or takes part in, any
19 military or naval expedition or enterprise to be carried on from
20 thence against the territory or dominion of any foreign prince or
21 state or of any colony, district, or people with whom the United
22 States is at peace, shall be guilty of a crime.

23        And section 960 is known as the Neutrality Act.  You've
24 heard some references to that.

25            There are three essential elements for the charge in

## District court's instructions to the jury

1  Count 6, which is the charge of aiding, abetting, counseling, and
2  inducing others to engage in a conspiracy to violate the
3  Neutrality Act.  These are:

4          No. 1, that the defendant knew that an unlawful
5  conspiracy to set out on, prepare for, or take part in a military
6  enterprise against the territory of countries with whom the United
7  States was at peace was to be undertaken or already in existence;

8          Two, that the defendant aided, abetted, counseled, or
9  induced others or undertook some other action with the intent to
10  procure the engagement of those others in that unlawful conspiray;
11  and

12          Three, at least one person who the defendant aided,
13  abetted, counseled, or induced to engage in that unlawful
14  conspiracy ultimately did so.

15          For purposes of this case and your deliberations, I'm
16  advising you that the United States was at peace with both India
17  and Russia.

18          Now, in order to sustain its burden of proof as to the
19  conspiracy alleged in Count 6 of the indictment, the government
20  must prove beyond a reasonable doubt that one of the members of
21  the alleged conspiracy knowingly performed at least one overt act,
22  and this overt act was performed during the existence or life of
23  the conspiracy and was done to somehow further the goals of the
24  conspiracy or agreement.

25          The term "overt act" means some type of outward

**District court's instructions to the jury**

1  objective action performed by one of the parties to or one of the

2  members of the agreement or conspiracy which evidences that

3  agreement.

4          Although you must unanimously agree that the same overt

5  act was committed, the government is not required to prove more

6  than one of the overt acts charged.  And the overt acts charged in

7  the indictment are attached to the next page.

8          The overt act may but for the illegal agreement appear

9  totally innocent and legal.

10         Now, Instruction 64 lists the 26 specific overt acts

11  that are charged in the indictment.  They are:

12         First, No. 1, on or about September 16, 2001, Ali

13  Al-Timimi came to the house of Yong Kwon in Fairfax, Virginia, to

14  speak about the events of 9/11 to a group of Muslim men who had

15  trained for violent jihad and most of whom possessed AK-47-style

16  firearms.

17         2.  On or about September 16, 2001, at Kwon's house, Ali

18  Al-Timimi told Kwon, Randall Royer, Masaud Khan, Hammad

19  Abdur-Raheem, Caliph Basha Abdur-Raheem, Muhammad Aatique, and

20  Khwaja Hasan that the time had come for them to go abroad to join

21  the mujahideen engaged in violent jihad in Afghanistan.

22         3.  On or about September 16, 2001, at Kwon's house, Ali

23  Al-Timimi told his listeners that American troops likely to arrive

24  in Afghanistan would be legitimate targets of the violent jihad in

25  which his listeners had a duty to engage.

**J.A. 2476**

## District court's instructions to the jury

1          4.   On or about September 16, 2001, the individuals
2    gathered at Kwon's house discussed obtaining military-style
3    training from Lashkar-e-Taiba in order to join the mujahideen
4    expected to engage in violent jihad against American troops in
5    Afghanistan.

6          5.   On or about September 16, 2001, at Kwon's house, Ali
7    Al-Timimi told the gathered individuals considering whether to
8    obtain military-style training from -- I'm going to say LET now;
9    it's just easier and faster -- from LET in Pakistan that the
10   organization was on the correct path.

11         6.   On or about September 16, 2001, at the meeting at
12   Kwon's house, Ali Al-Timimi told the conspirators that what he
13   said at the meeting must be kept secret.

14         7.   On or about September 17, 2001, Ali Al-Timimi
15   advised Kwon and Hasan how to reach the LET camp undetected.

16         8.   On or about September 17, 2001, Yong Kwon and Khwaja
17   Hasan traveled to the Pakistani Embassy in Washington, D.C., to
18   apply for visas to travel to Pakistan.

19         9.   On or about September 18, 2001, Masaud Khan traveled
20   to the Pakistani Embassy in Washington, D.C., to apply for a visa
21   to travel to Pakistan.

22         10.  On or about September 18, 2001, Yong Kwon and
23   Khwaja Hasan drove Masaud Khan to Pennsylvania to spend the night
24   at the home of Muhammad Aatique.

25         11.  On or about September 19, 2001, Muhammad Aatique

# District court's instructions to the jury

1  and Masaud Khan traveled from JFK Airport in New York to Karachi,

2  Pakistan.

3      12.  On or about September 20, 2001, Yong Kwon and

4  Khwaja Hasan traveled to Dulles Airport to board their flights for

5  Pakistan via New York and Manchester, England.

6      13.  On or about September 20, 2001, Muhammad Aatique

7  and Masaud Khan arrived in Karachi, Pakistan.

8      14.  On or about September 22, 2001, Yong Kwon and

9  Khwaja Hasan arrived in Karachi, Pakistan.

10     15.  In or about late September 2001, Muhammad Aatique

11  traveled to an LET camp near Muzafrabad, Pakistan.

12     16.  In or about early October 2001, Yong Kwon, Khwaja

13  Hasan, and Masaud Khan traveled to an LET camp near Muzafrabad,

14  Pakistan.

15     17.  In or about early October 2001, at LET's Masada

16  camp near Muzafrabad, Pakistan, Muhammad Aatique fired an AK-47

17  automatic rifle and machine gun.

18     18.  In or about October 2001, at LET's ibn Masood camp

19  near Muzafrabad, Pakistan, Muhammad Aatique fired an antiaircraft

20  gun and a rocket-propelled grenade.

21     19.  On or about October 15, 2001, at a meeting at his

22  home in Fairfax, Virginia, Ali Al-Timimi told Donald Surratt,

23  Ibrahim Al-Hamdi, Hammad Abdur-Raheem, Caliph Abdur-Raheem, and

24  Chandia and others that America was at war with Islam and would

25  still attack the Taliban in Afghanistan.

**District court's instructions to the jury**

1    20.  On or about October 15, 2001, during the meeting,
2  Ali Al-Timimi told Donald Surratt, Ibrahim Al-Hamdi, Hammad
3  Abdur-Raheem, Caliph Abdur-Raheem, Chandia, and others that they
4  were obligated to help the Taliban in the face of an attack by the
5  United States.

6    21.  On or about October 21, 2001, Ali Al-Timimi
7  counseled an associate that they were obligated to support the
8  Taliban, Mullah Omar, and the Arabs with them by "body, wealth,
9  and word even if some find that distasteful."

10    22.  In or about mid-October 2001, at LET's Masada camp
11  near Muzafrabad, Pakistan, Masaud Khan, Khwaja Hasan, and Yong
12  Kwon each fired AK-47-style automatic rifles and machine guns.

13    23.  In or about late October 2001, at LET's ibn Masood
14  camp near Muzafrabad, Pakistan, Masaud Khan, Khwaja Hasan, and
15  Yong Kwon each fired AK-47-style automatic rifles, machine guns,
16  an antiaircraft gun, and a rocket-propelled grenade.

17    24.  In or about November 2001, Masaud Khan, Yong Kwon,
18  Khwaja Hasan, and Chandia traveled to an LET office in Lahore,
19  Pakistan.

20    25.  On February 1, 2003, Ali Al-Timimi provided a
21  message to his followers concerning the crash of the Columbia.

22    26.  On or about May 28, 2003, in Gaithersburg,
23  Maryland, Masaud Khan possessed an AK-47-style rifle, a document
24  entitled "The Terrorist's Handbook" containing instructions
25  regarding how to manufacture and use explosives and chemicals as

1  weapons, and a fatwa from Usama Bin Laden from October 2001.

2          All right.  Counts 7 and 8, and these counts are --

3  anybody need a break yet?  No?  All right -- inducing and

4  counseling the use of firearms in connection with a crime of

5  violence.

6          In Counts 7 and 8 of the indictment, the government

7  alleges that between on or about September 16 and September 18 of

8  2001, in Fairfax County, in the Eastern District of Virginia, the

9  defendant unlawfully and knowingly aided, abetted, counseled,

10  induced, and procured the commission of offenses against the

11  United States, namely, the discharge of a light machine gun by

12  Yong Kwon in mid-October 2001 in an LET camp known as Masada, and

13  the discharge of an AK-47-style rifle by Khwaja Hasan in early

14  November 2001 at the LET camp known as ibn Masood, during, in

15  relation to, and in furtherance of crimes of violence for which

16  the defendant, Kwon, and Hasan could be prosecuted in a court of

17  the United States.

18          Again, the same section 2 of Title 18 is there, and I'm

19  not going to read that for you again.

20          And then Title 18, section 924(c), which I think we've

21  seen before but just one more time, "Any person who, during and in

22  relation to any crime of violence . . . for which the person may

23  be prosecuted in a court of the United States, uses or carries a

24  firearm or who in furtherance of any such crime, possesses a

25  firearm [shall be guilty of a crime]."

## District court's instructions to the jury

1        In Counts 7 and 8 of the indictment, the defendant is
2   charged with aiding and abetting, counseling, inducing, and
3   procuring the discharge of firearms by Kwon and Hasan, in
4   furtherance of crimes of violence which could be prosecuted in
5   courts of the United States, and there are three essential
6   elements for Counts 7 and 8.

7        1.  That the defendant knew that the unlawful possession
8   of firearms in furtherance of crimes of violence which could be
9   prosecuted in courts of the United States was to be undertaken by
10  Kwon and/or Hasan.

11       2.  That the defendant aided, abetted, counseled, or
12  induced Kwon and/or Hasan or undertook some other action with the
13  intent to procure the engagement of Kwon and/or Hasan in that
14  possession of firearms; and

15       3.  That Kwon and/or Hasan ultimately possessed or
16  discharged a firearm in furtherance of crimes which could be
17  prosecuted in courts of the United States.

18       And I'm advising you that the term "machine gun" as used
19  in the indictment means any weapon which shoots, is designed to
20  shoot, or can be readily restored to shoot, automatically more
21  than one shot, without manual reloading, by a single function of
22  the trigger.  The term shall also include the frame or receiver of
23  any such weapon, any part designed and intended solely and
24  exclusively, or combination of parts designed and intended, for
25  use in converting a weapon into a machine gun, and any combination

**J.A. 2481**

**District court's instructions to the jury**

1  of parts from which a machine gun can be assembled if such parts
2  are in the possession or under the control of a person.

3          The last two counts to be discussed are inducing --
4  Counts 9 and 10, which are inducing others to carry explosives
5  during the course of felonies.

6          In Counts 9 and 10 of the indictment, the government
7  alleges that between on or about September 16 and/or September
8  18 -- and on or about September 18, 2001, the defendant unlawfully
9  and knowingly procured the commission of crimes against the United
10 States by counseling and inducing Khwaja Hasan and Yong Kwon to
11 carry rocket-propelled grenades during the commission of felonies
12 which may be prosecuted in a court of the United States, and aided
13 and abetted them in doing so.  In specific, the indictment alleges
14 that the defendant counseled, induced, aided, abetted, and
15 procured the carrying of rocket-propelled grenades by Kwon in
16 mid-October 2001 in an LET camp known as Aqsa, and by Hasan in
17 early November 2001 in an LET camp known as ibn Masood during the
18 commission of felonies which may be prosecuted in a court of the
19 United States.

20         Title 18, United States Code, section 844(h)(2), which
21 is what's involved in Counts 9 and 10, provides in pertinent part
22 that whoever carries an explosive during the commission of any
23 felony shall be prosecuted in a court of the United States.

24         And there -- for Counts 9 and 10, there are three
25 essential elements:

## District court's instructions to the jury

1    First, that the defendant knew that the unlawful
2  carrying of explosives during the course of the felony crime that
3  could be prosecuted in a court of the United States was to be
4  undertaken by Kwon and/or Hasan;

5    Two, that the defendant aided, abetted, counseled, or
6  induced Kwon and/or Hasan or undertook some other action with the
7  intent to procure the engagement of Kwon and/or Hasan in that
8  carrying of explosives; and

9    Three, that Kwon and/or Hasan ultimately carried an
10  explosive during the course of a felony crime that could be
11  prosecuted in a court of the United States.

12    The offense of counseling or inducing the use of a
13  firearm during a crime of violence, or aiding and abetting the use
14  of such a firearm during a crime of violence, or otherwise
15  procuring the use of a firearm during a crime of violence, does
16  not require proof that the defendant was physically present when
17  the person he counseled, induced, aided, abetted, or procured to
18  commit the offense actually used the firearm; rather, it is
19  sufficient that the defendant knew that a firearm was at least
20  available to the other person and took some action to counsel or
21  induce such other person to use it, to aid and abet his use of it,
22  or otherwise to procure the other's commission of the offense.

23    Similarly, the offense of counseling or inducing the
24  carrying of an explosive during the commission of a felony or
25  aiding and abetting the carrying of such an explosive during the

**District court's instructions to the jury**

1  commission of a felony or otherwise procuring the carrying of an
2  explosive during the commission of a felony does not require proof
3  that the defendant was physically present when the person he
4  counseled, induced, aided, abetted, or procured to commit the
5  offense carried the explosive; rather, it is sufficient that the
6  defendant knew that an explosive was at least available to the
7  other person and took some action to counsel or induce such other
8  person to carry it, to aid and abet his carrying of it, or
9  otherwise procured the other's commission of the offense.

10       Now, evidence that an act was done or that an offense
11  was committed by the defendant at some other time is not, of
12  course, any evidence or proof whatever that at another time the
13  defendant performed a similar act or committed a similar offense,
14  including the offense charged in the indictment.

15       Evidence of a similar act or offense may not be
16  considered by the jury in determining whether the defendant, Ali
17  Al-Timimi, actually performed the physical acts charged in this
18  indictment.  Nor may such evidence be considered for any other
19  purpose whatever unless the jury first finds beyond a reasonable
20  doubt from other evidence in the case, standing alone, that the
21  defendant physically did the act charged in the indictment.

22       If the jury should find beyond a reasonable doubt from
23  other evidence in the case that the defendant did the act or acts
24  alleged in the particular count under consideration, the jury may
25  then consider evidence as to an alleged earlier act of a like

## District court's instructions to the jury

1  nature in determining the state of mind or intent with which the
2  defendant, Ali Al-Timimi, actually did the act or acts charged in
3  the particular count.

4          Again, the defendant is not on trial for any act or
5  crime not alleged in the indictment.  Nor may a defendant be
6  convicted of the crime charged even if you were to find that he or
7  she committed other crimes, even crimes similar to the one charged
8  in this indictment.

9          And we're almost finished, Ladies and Gentlemen.  Just a
10  few more.

11          The First Amendment to the United States Constitution
12  guarantees certain rights and liberties to all individuals living
13  in America.  These rights and liberties include:

14          1.  Freedom of speech.  Freedom of speech protects the
15  right to advocate beliefs even if those beliefs advocate the use
16  or force of violation of law unless the speech is directed to
17  inciting or producing imminent lawless action and is likely to
18  incite or produce such action.

19          2.  Freedom of religion.  Freedom of religion protects
20  the right to believe, profess, practice, and exercise religion.
21  Freedom of religion, however, does not allow one to engage in
22  conduct or actions based on their religious beliefs where those
23  actions have been statutorily defined as criminal conduct.

24          3.  Freedom of association.  Freedom of association
25  protects the right to associate with individuals, groups, or

**District court's instructions to the jury**

1   organizations, even those individuals, groups, or organizations
2   that advocate illegal activity, unless the following two facts are
3   established:  one, the individuals, groups, or organizations have
4   unlawful goals; and two, they specifically intend to further those
5   unlawful goals.

6        In sum, the First Amendment protections of speech,
7   religious activity, or association are not absolute and may not
8   protect a person from criminal prosecution if that speech,
9   religious activity, or association was intended to generate or was
10  likely to generate imminent criminal action by others or
11  constituted criminal activity in and of itself.

12       Now, the law presumes a defendant to be innocent of
13  crime.  Thus, a defendant, although accused, begins the trial with
14  a clean slate, that is, with no evidence against him.  As you
15  already know, the indictment is merely an accusation and not
16  evidence.

17       The law permits nothing but legal evidence presented
18  before the jury to be considered in support of any charge against
19  the accused.  So the presumption of innocence alone is sufficient
20  to acquit a defendant unless the jurors are satisfied beyond a
21  reasonable doubt of the defendant's guilt after careful and
22  impartial consideration of all the evidence in the case.

23       It is not required that the government prove guilt
24  beyond all possible doubt.  The test is one of reasonable doubt.
25       And I cannot give you a definition of that term other

### District court's instructions to the jury

1   than to say both words, "reasonable" and "doubt," are ordinary

2   English language words.  So you can use your understanding of what

3   those words mean in thinking about that test.

4          The jury will remember that a defendant is never to be

5   convicted on mere suspicion or conjecture.  The burden is always

6   upon the prosecution to prove guilt beyond a reasonable doubt.

7   This burden never shifts to a defendant, for the law never imposes

8   upon a defendant in a criminal case the burden or duty of calling

9   any witnesses or producing any evidence.

10          So if the jury after careful and impartial consideration

11   of all the evidence in the case has a reasonable doubt that a

12   defendant is guilty of the charge, it must find the defendant not

13   guilty.

14          As I have said many times during this trial and these

15   instructions, your verdict must be based solely upon the evidence

16   developed at trial or the lack of evidence.  It would be improper

17   for you to consider in reaching your decision as to whether the

18   government sustained its burden of proof any personal feelings you

19   may have about the defendant's Middle Eastern ancestry or

20   religious beliefs.  All persons are entitled to the presumption of

21   innocence.

22          It would be equally improper for you to allow any

23   personal feelings you might have about the events of September 11,

24   2001, the United States' war on terrorism, or the nature of the

25   crimes charged to interfere with your decision-making process.

## District court's instructions to the jury

2341

1        To repeat, your verdict must be based exclusively upon

2  the evidence or the lack of evidence in this case.

3        Now, upon retiring to your jury room to begin your

4  deliberations, your first order of business is to elect one of

5  your members to act as your foreperson.  The foreperson will

6  preside over your deliberations and will be your spokesperson here

7  in court.

8        Your verdict must represent the collective judgment of

9  the jury.  In order to return a verdict, it is necessary that each

10  juror agree to it.  Your verdict, in other words, must be

11  unanimous.

12        It is your duty as jurors to consult with one another

13  and to deliberate with one another with a view towards reaching an

14  agreement if you can do so without violence to your individual

15  judgment.  Each of you must decide the case for yourself, but do

16  so only after an impartial consideration of the evidence in the

17  case with the other jurors.

18        In the course of your deliberations, do not hesitate to

19  reexamine your own views and to change your opinion if convinced

20  it is erroneous.  Do not surrender your honest conviction,

21  however, solely because of the opinion of the other jurors or for

22  the mere purpose of returning a verdict.

23        Remember at all times you're not partisans.  That means

24  you don't represent the government, and you don't represent the

25  defendant.  Instead, you are judges, and your job is to judge the

## District court's instructions to the jury

1  facts of this case.  Your sole interest is to seek the truth from

2  the evidence received during the trial.

3          Your verdict must be based solely upon the evidence

4  received in the case, and nothing you have seen or read outside of

5  the Court may be considered.  Nothing that I have said or done

6  during the course of this trial is intended in any way to somehow

7  suggest to you what I think your verdict should be.

8          The punishment provided by law for the offenses charged

9  in the indictment is a matter exclusively within the province of

10  the Court and should never be considered by the jury in any way in

11  arriving at an impartial verdict as to the offenses charged.

12          Nothing said in these instructions and nothing in any

13  form of the verdict prepared for your convenience is to suggest or

14  convey to you in any way or manner any intimation as to what

15  verdict I think you should return.  What the verdict shall be is

16  the exclusive duty and responsibility of the jury.  As I have told

17  you several times now, you are the sole judges of the facts.

18          Now, I'm going to go over the verdict form with you.

19  We've tried to make it as clear and simple as possible, but this

20  will also help you in keeping track of things.

21          We have the caption of the case, and then we have the

22  verdict form, and we've simply put them out count by count.  So,

23  for example, Count 1, and then we've given you the sort of caption

24  for that account.

25          So Count 1, aiding, abetting, counseling, or inducing

**District court's instructions to the jury**

1  others to conspire to use firearms in furtherance of a federal
2  crime of violence, and then there's a blank, and here's where the
3  foreperson will write "Guilty" or "Not Guilty."  We're leaving it
4  up to you to write whatever your answer is on that.
5           Count 2, soliciting others to levy war against the
6  United States;
7           Count 3, aiding, abetting, counseling, or inducing
8  others to conspire to levy war against the United States;
9           Count 4, attempting to contribute services to the
10 Taliban;
11          Count 5, aiding, abetting, counseling, or inducing
12 others to attempt to aid the Taliban;
13          Count 6, aiding, abetting, counseling, or inducing
14 others to conspire to violate the Neutrality Act;
15          Count 7, aiding, abetting, counseling, inducing, or
16 procuring Yong Kwon to discharge an automatic weapon during, in
17 relation to, or in furtherance of a federal felony-level crime of
18 violence;
19          Count 8, aiding, abetting, counseling, inducing, or
20 procuring Khwaja Mahmood Hasan to discharge an automatic weapon
21 during, in relation to, or in furtherance of a federal
22 felony-level crime of violence;
23          Count 9, aiding, abetting, counseling, inducing, or
24 procuring Yong Kwon to carry explosives, that is, a
25 rocket-propelled grenade, during the commission of a federal

## District court's instructions to the jury

 1   felony-level crime of violence; and

 2           Count 10, aiding, abetting, counseling, inducing, or

 3   procuring Khwaja Mahmood Hasan to carry explosives (rocket-

 4   propelled grenade) during the commission of a federal felony-level

 5   crime of violence.

 6           So the jury is to write down their answers as to each of

 7   the ten counts.  The foreperson will then sign the verdict form,

 8   and we ask that he or she print his or her name on it as well

 9   because it's very difficult to tell, and then we will need the

10   date the decision is made.

11           When you go into the jury room to begin your

12   deliberations, you will take this verdict form to the jury room,

13   and when you have reached your decision, knock on the door, let

14   Mr. Wood know that you've reached a verdict.  You should have the

15   form folded over, so nobody should see it.  And the foreperson

16   brings it into the courtroom with him or her, and then we'll ask

17   you to hand it up, and I will look at it, and then Ms. Travers

18   will read the verdict publicly in court.

19           Now, if it becomes necessary during your deliberations

20   to communicate with the Court, you may send a note, and you-all

21   have not been shy about doing that, so you know the procedure.  It

22   should be signed and dated by your foreperson or by one of the

23   jury members -- and again, we've been using numbers in this case,

24   so I just assume you continue using your number, although we will

25   need the foreperson's signature on the verdict form -- and knock

## District court's instructions to the jury

1  on the door, and again, as you've been doing, give it to Mr. Wood,
2  the court security officer.

3        Obviously, Mr. Wood is forbidden to communicate in any
4  way with you about the case, and anything that you do communicate
5  to us -- and you've been great about this -- has to be in writing.

6        No member of the jury should attempt to communicate with
7  the Court by any means other than a signed writing, and the Court
8  will never communicate with any member of the jury on any subject
9  touching the merits of the case other than in writing or here
10 orally in court.

11       And be very careful never to reveal to any person -- not
12 even to me -- how you stand numerically or otherwise on any of the
13 questions that you have under consideration.

14       Now, it will -- I'm sure you're going to want a break,
15 and I have just a couple of other informal things to tell you.  As
16 I said at the very beginning of the trial, you are twelve coequal
17 judges, and in a minute, two of you are going to be chosen to be
18 alternates, so there will only be twelve of you who will finally
19 decide this case, but it is extremely important that the jurors
20 hear each other talking about the evidence.

21       Jury deliberation is really group thinking is what it
22 is.  You each have your own individual view of the evidence and
23 memory of the evidence, but then you're supposed to listen to
24 everybody else and talk with each other about seeing if you can
25 reach a unanimous decision.

2346

## District court's instructions to the jury

1      So the foreperson needs to make sure that if somebody is
2  in the restroom, for example, you stop deliberating, because
3  during the time that that person is out of the room, he or she is
4  not hearing what you're saying, and that undercuts the whole
5  deliberative process.

6      It also means that at any time when you're not together,
7  you shouldn't be deliberating.  If two or three of you go for a
8  walk or for lunch, you shouldn't be talking about the case because
9  you would be cutting out the other jurors from hearing that
10  discussion.

11      So whoever the foreperson is, just make sure,
12  understanding that dynamic, that you make sure that, you know,
13  deliberation is always, all twelve of you are together.

14      You will most likely because this is a complex case,
15  maybe not, but you may have questions as you're deliberating, and
16  we will -- I will try to get back to you with an answer as quickly
17  as possible.  I obviously cannot answer any question without
18  running it by the attorneys, and for that reason, I require that
19  at least one lawyer for each side must remain on this floor while
20  you're deliberating so that we don't have to hold you up a long
21  time to get an answer for your question.

22      At the same time, if we know that you're on a break,
23  then we know we don't have to be hanging around the courtroom
24  because you're not going to be asking any questions.  So it's
25  really important for the foreperson to let us know by a note if

**J.A. 2493**

**District court's instructions to the jury**

1  you're taking a 15-minute coffee break or an hour lunch break or
2  whatever, if you'll just put it on a note and give it to Mr. Wood,
3  then we all know we can for that period of time not worry about
4  you.

5          I do have several other matters that I'm going to be
6  having to handle this week.  It is possible if one of your notes
7  comes out and you don't get an immediate answer, I just can't
8  break what I'm doing.  You do have a very high priority, but there
9  are a couple of other things that could interfere, so understand
10  we don't want to waste your time but -- and we'll try to get back
11  to you as quickly as possible, but sometimes there is a little bit
12  of a delay.

13          Now, we are going to -- I think I mentioned this to you
14  Friday -- we're going to finish today up here -- and that's the
15  other thing is your foreperson and you-all might want to talk
16  about how you want to run the day.  We've been starting at 9:30
17  and running to between 5:30 and 6:00.  It would be nice for us if
18  we also had an idea about how you want to run things, the same
19  schedule, but frankly, you can come in earlier and leave earlier
20  if you want to.  That's really up to you.  We just would like to
21  know because again, we can make plans accordingly.

22          We will provide you with the flip chart.  I think we
23  have that already, don't we?  All right.

24          So this afternoon, I'm sure you'll want your afternoon
25  break, and if you'll let us know how long you're going to take,

**District court's instructions to the jury**

1   that's great.

2           Ms. Travers is going to get all the exhibits in to you.

3   I did have the lawyers write out indexes for the exhibits, so we

4   have an index for the plaintiff -- for the government's exhibits

5   and an index for the defendant's exhibits.  You'll have this

6   verdict form, and you have your jury instructions which you can

7   take with you, and obviously, if you need anything else, you'll

8   let us know.

9           All right, counsel, approach the bench.

10          (Bench conference on the record.)

11          THE COURT:  Mr. Kromberg, any objection to the Court's

12  charge?

13          MR. KROMBERG:  No, Your Honor.  I would ask, though,

14  that on Instruction 45, you've asked the jurors to pick which of

15  the predicates of crimes of violence that they agree on.

16          THE COURT:  Right.

17          MR. KROMBERG:  I think it would be useful to ask them to

18  make a decision on all of them so that if they come to a unanimous

19  decision on one and the Court later determines that it's not a

20  crime of violence, for example, we'll know if there is an

21  alternate.

22          THE COURT:  Before we do that, I'm going to wait and see

23  what they do, because if they were to acquit, there's no sense in

24  taking that time.  If they convict, we're going to send a

25  supplemental verdict.

# District court's instructions to the jury

1    MR. KROMBERG:  Then the only other matter I had, Judge,
2  when you said that the foreperson is going to sign his name, I
3  didn't know if that was something that was -- needs to be done in
4  a public manner.
5    THE CLERK:  Because of the privacy issues now, the
6  original verdict form is redacted for the public file.
7    THE COURT:  I will tell the jury that.
8    MR. KROMBERG:  Okay.
9    THE COURT:  And that's across the board.
10   THE CLERK:  Across the board.
11   MR. KROMBERG:  Nothing else.
12   THE COURT:  No additional instructions you want given?
13   THE CLERK:  Wait.
14   THE COURT:  To avoid a problem, I basically said it in
15 the verdict form, but do you have any objection if I tell the jury
16 that a rocket-propelled grenade is an explosive?
17   MR. YAMAMOTO:  No.
18   THE COURT:  All right.  I just don't want that question
19 coming up.
20   MR. YAMAMOTO:  That's fine.
21   MR. KROMBERG:  That's fine.
22   THE COURT:  Because we did it with the firearm, so I
23 will tell them that, okay.
24   Are there any additional instructions the defense wants
25 given?

2350

## District court's instructions to the jury

```
 1              MR. YAMAMOTO:  No, but there is a correction to the
 2    verdict form.
 3              THE COURT:  Oh, dear.  Okay.  After how many times did
 4    I --
 5              MR. YAMAMOTO:  I'm sorry, Your Honor.
 6              THE COURT:  I missed a few, too.
 7              MR. YAMAMOTO:  On the last two, they are not crimes of
 8    violence.  They're just federal crimes.
 9              THE COURT:  It should be a federal felony?  I think
10    that's right.
11              MR. KROMBERG:  For Counts 9 and 10, that's correct.
12              THE COURT:  All right.  So we're going to redo the
13    verdict form and just stop it at "commission of a federal felony."
14    Are you satisfied with that?
15              Mr. Kromberg, are you satisfied?
16              MR. KROMBERG:  Federal crime, period, Judge.
17              MR. YAMAMOTO:  That's fine.
18              THE COURT:  Well, a misdemeanor is a federal crime.
19    It's got to be a federal felony.
20              MR. KROMBERG:  Correct.  Federal felony crime, period.
21              THE COURT:  All right.  A federal felony-level crime.
22    All right.  Federal felony-level crime.
23              MR. YAMAMOTO:  That's fine.
24              THE COURT:  Okay?  All right, is there anything else?
25              MR. YAMAMOTO:  No, Your Honor.
```

2351

### District court's instructions to the jury

1          THE COURT:  All right.  I will tell them that
2   rocket-propelled grenades, and what else am I telling them -- oh,
3   and the foreperson.

4          While you're here -- and let me tell them first.  Okay.
5          (End of bench conference.)

6          THE COURT:  All right, Ladies and Gentlemen, let me give
7   you just two other little points.  For purposes of Counts 9 and
8   10, you may consider a rocket-propelled grenade to be an
9   explosive.

10         The second thing is under the new Privacy Act that
11  applies -- and Ms. Travers reminded me of this -- although the
12  foreperson is going to sign the verdict form, we do not put the
13  verdict form with the foreperson's name on it in the public
14  record.  It goes under seal.

15         And so whoever the foreperson is doesn't need to be
16  concerned about his or her name being on the verdict form.  The
17  official record of this case has you-all listed simply as a
18  number.  Your name is not publicly available as to your being
19  jurors in this case, and that same does apply to the foreperson,
20  all right?

21         Now, we're going to select the alternates.  Alternate
22  No. 1 will be the first name Ms. Travers pulls out.

23         THE CLERK:  Juror No. 22.

24         THE COURT:  All right, Juror No. 22, where are you?

25         I'm sorry -- wait, wait, wait.  Don't run.

**J.A. 2498**

2352

1                          (Laughter.)

2              THE COURT:  All right.  You are Alternate No. 1.  That

3    means if for any reason one of the twelve jurors were to become

4    sick or for some reason be unable to finish deliberating, we would

5    call you back.  You're the first person who we'd call back.

6    Therefore, I'll ask you to return to Mr. Wood your jury

7    instructions, but we'll have -- you have your number on it, so if

8    you have to come back, we will give them back to you.

9              You are to maintain the same -- following the same rules

10   I've given all the other jurors; that is, until we can totally

11   excuse you from this case, avoid any media coverage, avoid any

12   media people if they try to talk to you about it.  Continue not to

13   think about the case, to do any investigation, etc., just as if

14   you were going to be one of the jurors, because were you to be

15   tainted, we couldn't use you as an alternate, all right?

16             We do want to thank you for these three weeks.  I am

17   assuming Ms. Travers has your phone number, but if she does not,

18   if you can give us contact numbers so we can let you know for

19   certain when your obligation here is finished, I'm sure you'd like

20   to know that as well, all right?

21             Just stay one more second because we're going to go

22   ahead and dismiss the other person.

23             THE CLERK:  It's 107.

24             THE COURT:  107, who is 107?

25             My, that was the end -- all right, sir, you are

**J.A. 2499**

2353

1  Alternate No. 2.  So the same rules apply.  If you'll give us your
2  jury instructions, make sure your number is on them, and if
3  Alternate No. 1 is unavailable or we lose two jurors, then you'll
4  be the second one in, all right?  And you'll remember to follow
5  everything.

6          Okay, is that it?

7          THE CLERK:  Yes.

8          THE COURT:  All right.  What we're going to do then is
9  we're going to recess to await the decision of the jury.  I'm sure
10 you want a break.  Just let us know how long you're going to be.
11 And Ms. Travers will start getting things in to you.

12         I am going to -- if you want to let us know how late you
13 want to go tonight, because I will want to talk to you for just a
14 second before I let you go home for the evening, and if you just
15 tell me how late you're going to stay today, then I know when to
16 be back up here with the lawyers, all right?

17         Anything further, counsel?

18         MR. KROMBERG:  No, Your Honor.

19         MR. MAC MAHON:  No, Your Honor.

20         THE COURT:  Then we'll recess court to await the
21 decision of the jury.

22         (Recess from 3:27 p.m., until 4:30 p.m.)

23                  (Defendant present, Jury out.)

24         THE COURT:  We have a question from the jury:  "Is the
25 transcript of testimony available to us?"  And the answer is no, I

**J.A. 2500**

2354

1  believe.

2          Ms. Thomson, do you have any of the transcript -- I'm

3  just curious.

4          THE COURT REPORTER:  The direct of Yong Kwon and the

5  opening of the government are finished.

6          THE COURT:  All right.  Well, as you-all know, I seem to

7  recall Judge Bryan getting reversed years and years ago by telling

8  a jury preemptively that they couldn't get transcripts, so that's

9  why I bother to run this question by you-all, but the reality of

10  it is it's a trial that lasted for eight full days.

11          What I would tell the jury is we don't have a transcript

12  available of the trial, and it would be -- realistically, it would

13  take at least a week or two -- 30 days?

14          THE COURT REPORTER:  I'd say at least a month.

15          THE COURT:  All right, at least a month to get a

16  transcript for them.

17          I mean, anything else you want me to tell the jury?

18          MR. MAC MAHON:  No, Your Honor.  I think their memory

19  controls.  There's an instruction you just read that --

20          THE COURT:  And I'll remind them they have to rely on

21  their memories and what notes they took.  Yes?

22          MR. KROMBERG:  That will be fine, Judge.

23          THE COURT:  All right, let's just bring them in then.

24          You got the note that the jury is going to leave at 5:00

25  today and run basically a nine-to-five day?

**J.A. 2501**

2355

```
 1          MR. KROMBERG:  Yes, Your Honor.  And should we be on the
 2  sixth floor from now on?
 3          THE COURT:  Correct.  Yes, don't report up here.
 4          MR. KROMBERG:  Is there any way that we can prevail upon
 5  Your Honor if we bring Mr. Yamamoto, Mr. Timimi, and Mr. MacMahon
 6  to our office and sit them down in a conference room in our office
 7  so we could all be within a phone call away and just come on up
 8  whenever you call us?
 9          THE COURT:  If you were truly a phone call away.  The
10  trouble is you-all walk away from a phone, and then we're looking
11  for you.
12          MR. KROMBERG:  I can have my cell phone on my -- in my
13  office, I can have my cell phone on.
14          THE COURT:  We'll see.
15                     (Jury present.)
16          THE COURT:  All right, now you're taking different
17  chairs.
18          All right, Ladies and Gentlemen, we've received your
19  note, and the answer is it will take about 30 days to have a
20  transcript of this case prepared.  Even as fast as Ms. Thomson is,
21  and she ranks, I think, No. 3 in the nation, you can understand
22  with the amount of -- especially in this case, with the amount of
23  Arabic and the names of people and everything else, we can't give
24  you a transcript that's not accurate, and it just takes a huge
25  amount of time to prepare an accurate transcript.
```

1          So the answer is we can't give you a transcript.  You
2   need to rely on your 12 collective memories, and a lot of you took
3   notes to help refresh those memories, and that's how you'll have
4   to decide the case.

5          The other reason I brought you back in is because it's
6   so close to five, I know you're going to leave at five today.
7   Rather than bring you back in at five, I'm going to give you your
8   evening caution now, and at 5:00, you can leave, and at that
9   point, we'll let the lawyers go as well and Mr. Timimi.

10         Remember, tomorrow and from tomorrow on, you're going to
11  be working on the sixth floor.  The sixth floor is set up exactly
12  like the seventh floor except it's one floor below, and the jury
13  room other than a different color scheme is set up the same way.
14  So Ms. Travers will have the exhibits moved down there for you.
15  She'll have the coffee for you and all that stuff, but that's
16  where you should report from tomorrow on, and so I didn't want you
17  to be surprised by that, all right?

18         So again, please remember the cautions.  You've been an
19  excellent jury in listening to my instructions.  Everything
20  applies now even more so because it's so important when a jury
21  starts deliberating that nothing taint your thought process, and
22  so when you leave at 5:00, just remember you're under that
23  standing order of how to conduct yourselves, and we'll see you
24  here -- unless you have another question before five.  We'll come
25  in, of course, and see at that point.

2357

1          Yes, sir?

2          THE FOREPERSON:  Will there be somebody to sign us in

3  down there?

4          THE COURT:  I'm sorry?

5          THE FOREPERSON:  Will there be somebody to sign us in in

6  the morning?  Normally, they're locked at 9:00.

7          THE COURT:  Ms. Travers will take care of that for you,

8  all right?  That's a good question.

9          Anything else?

10                    (No response.)

11         THE COURT:  All right.  Then unless you have another

12  question, we'll see you, you know, either before 5:00 if there's

13  another question or sometime tomorrow.  And when you come in

14  tomorrow morning at 9:00, again, once the 12 of you are in the

15  room, as you dribble in, obviously, you have small talk and chat.

16  No work.

17         Once all 12 of you are there, then the foreperson can

18  start your deliberations, and I don't bring you back in court and

19  do any kind of formal start with you, so you can just start as

20  soon as you're all together, all right?  All right, we'll recess

21  court.

22         (Recess from 4:36 p.m., until 9:00 a.m., August 19, 2005.)

23

24

25

2358

1                    CERTIFICATE OF THE REPORTER

2          I certify that the foregoing is a correct transcript of the

3    record of proceedings in the above-entitled matter.

4

5

6                              _____
                                      Anneliese J. Thomson
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2359

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,      .        Criminal No. 1:04cr385
                               .
        vs.                    .        Alexandria, Virginia
                               .        April 19, 2005
ALI AL-TIMIMI,                 .        10:38 a.m.
                               .
             Defendant.        .
                               .

.   .   .   .   .   .   .   .   .   .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME X

APPEARANCES:

FOR THE GOVERNMENT:            GORDON D. KROMBERG, AUSA
                              United States Attorney's Office
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                                and
                              JOHN T. GIBBS, ESQ.
                              Counterterrorism Section
                              Criminal Division
                              United States Department of Justice
                              601 D Street, N.W.
                              Washington, D.C. 20004

FOR THE DEFENDANT:            EDWARD B. MAC MAHON, JR., ESQ.
                              107 East Washington Street
                              P.O. Box 903
                              Middleburg, VA 20118

ALSO PRESENT:                 S.A. WADE AMMERMAN
                              S.A. JOHN WYMAN

OFFICIAL COURT REPORTER:      ANNELIESE J. THOMSON, RDR, CRR
                              U.S. District Court, Fifth Floor
                              401 Courthouse Square
                              Alexandria, VA 22314
                              (703)299-8595

(Pages 2359 - 2368)
COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2360

```
 1                    P R O C E E D I N G S
 2                 (Defendant present, Jury out.)
 3         THE COURT:  All right, the following question we have
 4  from the jury:  "We request the following:  The list of five
 5  questions posed by the defense during closing arguments, and more
 6  flip chart paper."
 7         Obviously, the flip chart paper we can take care of.
 8  I'm not prepared to pick bits and pieces of the record to give to
 9  the jury, so I would be denying this request unless both sides
10  want me to do it.  However, the other option we might have,
11  although it would probably take a day or two, would be -- I don't
12  know again how long it would take Ms. Thomson to do the two
13  closing arguments, and I would be prepared to give them the full
14  text of both closing arguments out of a sense of fairness to both
15  sides or nothing, but I think that's the correct approach.
16         So what's the government's position, and what's the
17  defense position?
18         MR. KROMBERG:  We agree with the Court, Your Honor.
19         THE COURT:  So you have no objection to both closing
20  arguments going --
21         MR. KROMBERG:  That's correct.
22         THE COURT:  -- if we can do that within a reasonable
23  amount of time?
24         And again, I'm not going to kill Ms. Thomson.  You know,
25  her schedule is also committed to various things.
```

2361

1          How about the defense?

2          MR. MAC MAHON:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. MAC MAHON:  I'd just as soon have them keep

5    deliberating, Your Honor.  If they have to wait a couple of days

6    to get this, I don't think it, it would be helpful to them.

7          THE COURT:  All right.

8          MR. MAC MAHON:  Obviously, I'd rather have them get my

9    five questions, but I know that you're not --

10          THE COURT:  Well, I will then bring the jury in, and

11   what I will tell them is we're unable to pick pieces of the record

12   because that unnecessarily focuses attention on one thing.  I

13   mean, are you comfortable on this?  I'm going to have to give them

14   an explanation as to why they're not going to get it.

15          MR. MAC MAHON:  Sure.  No, I don't have any objection,

16   Your Honor.

17          THE COURT:  All right.

18          MR. MAC MAHON:  But I don't think we have to wait.

19          THE COURT:  All right, that's fine.

20          I never got back to you yesterday about whether you

21   could stay at your office and be on phone call.  Are you both

22   hanging around the floor right now since I didn't resolve that

23   issue?

24          MR. KROMBERG:  We alternated, but we were both here just

25   now.

**J.A. 2508**

2362

1          THE COURT:  Well, remind me to address that again.

2          MR. KROMBERG:  Yes, Your Honor.

3          THE COURT:  Maybe we can accommodate you on it.

4          They can come in.

5                          (Jury present.)

6          THE COURT:  It's very interesting.  I know that the jury

7     is working hard; every one of the men in court is without his

8     jacket, which I think is great.  They've rolled up their shirt

9     sleeves for the record, and they're working on this case.

10         Good morning, Ladies and Gentlemen.  Thank you for your

11    note.  Flip chart paper is not a problem.  We'll have that for you

12    in a second.

13         As to the other request, that you get the list of the

14    five questions posed by the defense during closing arguments, I

15    cannot give that to you, and the reason why I can't is I can't

16    pick and choose pieces of the record to give to you because that

17    would be considered unfairly focusing on aspects of the case.

18    It's kind of an all-or-nothing thing, and as I said to you

19    yesterday, because of the length of the trial, it's not possible

20    to give you, you know, the full transcript of the proceedings in

21    the, you know, relatively near future.

22         The only way I could give you the list of the five

23    questions would be to give you the entire transcript for both

24    closing arguments.  That would sort of even the playing field, but

25    again, that's going to take a significant amount of time, and so

2363

1  I've got to urge you to continue your deliberations with your 12
2  collective memories, all right?
3          If you absolutely feel that you cannot do anything
4  without the closing arguments, then I will see if Ms. Thomson
5  could prioritize getting that prepared, but again, it takes time,
6  and we're in court on and off all week, and so it's very difficult
7  for us to get that for you quickly enough, and we don't want to
8  hold up your deliberations, all right?
9          So do the best you can, and again, if you just realize
10 that you cannot do it without that, then we'll see about getting
11 the two -- I mean, the full set of closing prepared for you, all
12 right?  Thank you.
13         We're going to stay in session.  I have some
14 housekeeping matters, but you-all can go back to your
15 deliberations.
16                      (Jury out.)
17         THE COURT:  Again, I want to try to keep the playing
18 field even.  If, Mr. Kromberg and Mr. Gibbs, you swear, you know,
19 on your reputation with the Court that I can get instantaneous
20 contact with you, I don't have a problem releasing you from having
21 to be here.
22         Mr. MacMahon, you and Mr. Yamamoto, I know, have other
23 things to be working on.  Is there a number where we could reach
24 you?  And I'll get you a pass to carry a cell phone if you
25 absolutely guarantee that it will never go off in court just while

2364

1    this case is in progress.

2            MR. MAC MAHON: Your Honor, first of all, I don't have

3    any problem with them going over to their office and sitting. You

4    know, Mr. Al-Timimi has to stay here. I don't mind staying here.

5            THE COURT: All right, that's fine. So then there's no

6    appearance of unfairness.

7            MR. MAC MAHON: And I couldn't bear if my phone actually

8    went off, and I could see the look in your eyes. I don't even

9    want it here, Judge.

10           THE COURT: Okay. Then what we'll go ahead and do is

11   just make sure that Ms. Travers and Mr. Fitzpatrick have the phone

12   number.

13           MR. KROMBERG: Thank you. And I appreciate that.

14           THE COURT: All right, that's fine.

15           MR. KROMBERG: I will have my cell phone at all times

16   other than when I'm coming in here.

17           THE COURT: Yes, absolutely.

18           All right, we'll recess court.

19           (Recess from 10:43 a.m., until 2:35 p.m.)

20

21

22

23

24

25

2366

1                    (Jury present.)

2           THE COURT:  All right, have a seat, Ladies and

3  Gentlemen.  I understand that one of you has a family emergency,

4  and, obviously, I'm going to let -- which juror is it?  Just raise

5  your hand.

6           THE FOREPERSON:  It's me.

7           THE COURT:  You're the foreperson, too?  Okay.

8           Obviously, the jury needs to go home today.  It needs

9  all 12 of you to be here, and I'm going to certainly release you.

10          Do you have an idea about -- I mean, is your

11  mother-in-law in this area, or is she out of town?

12          THE FOREPERSON:  She lives with us.

13          THE COURT:  She does, all right.

14          THE FOREPERSON:  So she's being taken to Alexandria

15  Hospital right now.

16          THE COURT:  All right.  So you don't have any idea what

17  the situation is or whether you'll be able to be here tomorrow?

18          THE FOREPERSON:  All I know is that she was being taken

19  by ambulance to the hospital.

20          THE COURT:  Has she had that problem before?

21          THE FOREPERSON:  Yeah.  She has a bad history.

22          THE COURT:  Oh, she does?  All right.

23          Well, obviously, I think the best thing would be all 12

24  of you make sure that Ms. Travers has your phone number, and I

25  would ask you, sir, to call Ms. Travers this evening if you could

J.A. 2512

2367

1  to just give us an idea.  If you feel you need to be with your

2  family tomorrow, we certainly understand.  Then we will call all

3  the other jurors and tell you not to come in tomorrow, all right?

4  I don't want you to come to the courthouse unnecessarily.

5        At the same time, if you think you can be here even for

6  maybe half a day, if that works, then we'll make that arrangement.

7  But I think that's the best thing.

8        Again, some of you, I know, come from some distance, and

9  I don't want you to get here, you know, if you can't work.  So if

10  you will call Ms. Travers, I guess, before seven, would you have a

11  good sense by then?

12        Wait just a second.

13        All right, I'm going to let Ms. Travers go into the jury

14  room with you, and you can all exchange phone numbers, all right?

15  But the main thing is, folks, do not come to the courthouse

16  tomorrow unless you've talked with Ms. Travers.  I don't want you

17  to make a step here unless necessary, all right?

18        And keep us posted.

19        THE FOREPERSON:  Yes.

20        THE COURT:  I mean, I don't want to pull an alternate in

21  yet.  I know you've been working hard on the case, especially

22  since you're the foreperson, but take care of your family first.

23        THE FOREPERSON:  Thank you.

24        THE COURT:  And everybody understands.

25        If there's nothing further then, folks, you get an early

2368

1    end of the day.  Please make sure that you don't take any

2    materials home with you, not your notebooks, not the instructions,

3    any evidence.  Just relax, and hopefully, we'll see you tomorrow.

4              And I hope she does well.

5              THE FOREPERSON:  Thank you.

6              THE COURT:  All right, we'll recess court until

7    tomorrow.

8        (Recess from 2:37 p.m., until 9:00 a.m., April 20, 2005.)

9

10                    CERTIFICATE OF THE REPORTER

11       I certify that the foregoing is a correct transcript of the

12   record of proceedings in the above-entitled matter.

13

14

15   _____
                    / Anneliese / J.  Thomson

16

17

18

19

20

21

22

23

24

25

**J.A. 2514**

2369

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,          .          Criminal No. 1:04cr385
                                   .
        vs.                        .          Alexandria, Virginia
                                   .          April 20, 2005
ALI AL-TIMIMI,                     .          2:01 p.m.
                                   .
            Defendant.             .
                                   .
.   .   .   .   .   .   .   .   .   .   .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME XI

APPEARANCES:

FOR THE GOVERNMENT:            GORDON D. KROMBERG, AUSA
                              United States Attorney's Office
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                                and
                              JOHN T. GIBBS, ESQ.
                              Counterterrorism Section
                              Criminal Division
                              United States Department of Justice
                              601 D Street, N.W.
                              Washington, D.C. 20004


FOR THE DEFENDANT:            EDWARD B. MAC MAHON, JR., ESQ.
                              107 East Washington Street
                              P.O. Box 903
                              Middleburg, VA 20118
                                and
                              ALAN H. YAMAMOTO, ESQ.
                              643 S. Washington Street
                              Alexandria, VA 22314


(Pages 2369 - 2388)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2370

OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                U.S. District Court, Fifth Floor
                                401 Courthouse Square
                                Alexandria, VA 22314
                                (703)299-8595

2371

```
1                    P R O C E E D I N G S
2                    (Defendant present, Jury out.)
3          THE COURT:  We have the following question from the
4  jury:  "Can we receive defense timeline?  Prosecution timeline if
5  available?"
6          And we do not have any timelines to give them other than
7  what they already have, which they do have a timeline to some
8  degree in that the listing of the overt acts gives a little time
9  structure, and you've got some phone call exhibits I think both
10 sides introduced that have some timelines.  But I'm not going to
11 get into that level of detail.  I'm just going to tell them we
12 don't have any generalized timelines that we can give them.
13         Everybody in agreement?  Unless you-all want to work one
14 out.
15         MR. MAC MAHON:  No, Your Honor, we're happy with what
16 they have.
17         MR. KROMBERG:  We're in the same position we were in
18 before, where we agreed to the admission of their timelines with
19 their phone calls and then our timeline was not allowed in.
20         THE COURT:  Whoa, whoa, whoa.  You mean your summary
21 exhibit?
22         MR. KROMBERG:  Yes.
23         THE COURT:  That was far more than a timeline.  That
24 was, as I said, the skeletal structure of your whole case.
25         MR. KROMBERG:  Then we reduced that from 20 pages down
```

2372

1  to 7 pages.

2          THE COURT:  I still looked at it; it was too much.

3          All right.  The answer I will give them is we can't.

4          Then they wanted a CD player.  Some recorded evidence is

5  on CD, and I understand Ms. Travers called Mr. Kromberg or

6  Mr. Gibbs, and we have the equipment; is that right?

7          MR. KROMBERG:  That's correct.

8          THE COURT:  So the equipment will go in so they can

9  listen.

10          Then, "Can we get an overhead projector?  Because there

11  is a great deal of written evidence, e-mails, etc.  It would be

12  reviewed as a group."  And then "Elmo" with a question mark after

13  that.

14          And what was our answer on that?  Can we do it?

15          THE CLERK:  It's done.

16          THE COURT:  It's been done.  So they have an overhead

17  projector in there so that they can, I guess, project it up on the

18  wall so everybody can be looking at the same exhibit at the same

19  time.

20          And then they went to lunch, which you already know

21  about.  So I'm going to bring them in just to tell them that we

22  can't give them timelines, and that will be all.

23          Anything else?  No?

24          MR. KROMBERG:  No, Your Honor.

25          THE COURT:  All right, let's bring them in.

**J.A. 2518**

2373

```
 1                      (Jury present.)
 2          THE COURT:  Good afternoon, Ladies and Gentlemen.
 3   You've certainly been busy, and -- you-all please have a seat.
 4          I understand we've been able to get all the equipment
 5   for you.  I'm going to be taking some miscellaneous pleas in court
 6   for about the next hour, so if there are any other technical
 7   questions that you have, we should be able to get an answer back
 8   to you immediately, and again, I know you won't be shy about
 9   knocking on the door.
10          As to the substantive question, which was can the jury
11   receive a defense timeline or prosecution timeline if available,
12   the answer is they are not available.  I cannot give them to you.
13   You're going to have to again rely on your individual memories to
14   come up with whatever chronology you're struggling with, all
15   right?
16          All right, anything further?
17                      (No response.)
18          THE COURT:  If not, we'll let the jury go back to work,
19   and I'll start my pleas.  Thank you.
20          MR. MAC MAHON:  Thank you, Your Honor.
21                      (Jury out.)
22          THE COURT:  All right.  Now, let's see, Mr. MacMahon and
23   Mr. Yamamoto, did you get recent things from my chambers from this
24   morning?
25          MR. YAMAMOTO:  No.
```

2374

1          THE COURT:  If you want to go by the door, I think
2    Ms. Dudley may have -- it's nothing major, just a copy of the
3    order from today.
4          MR. MAC MAHON:  She gave me a, she gave me an oral
5    message, but we'll go get an order, Your Honor.
6          THE COURT:  Okay.  That's fine.
7          MR. MAC MAHON:  Thank you very much.
8          MR. YAMAMOTO:  Thank you, Your Honor.
9          MR. GIBBS:  Thank you, Judge.
10          (Recess from 2:05 p.m., until 4:14 p.m.)
11                    (Defendant present, Jury out.)
12          THE COURT:  All right, we have the following two
13    questions:  "1.  Does the prosecution or defense have access as a
14    general rule to witnesses incarcerated between a first appearance
15    in court as a witness and a second appearance?"
16          And "2.  Did the prosecution or government in this case
17    have access to Kwon in the time between his first testimony and
18    his second testimony?"
19          Now, they said "prosecution or government."  I don't
20    know if that means the prosecuting lawyers and FBI agents or
21    whatever, but anyway, that's two interesting questions.
22          Now, I mean, the reality of it is that either -- I think
23    the right answer is either the prosecutor or the defense does have
24    access as a general rule to an incarcerated witness and are not
25    prevented from speaking to them between multiple appearances on

**J.A. 2520**

2375

1   the stand as long as they don't improperly communicate information
2   that is developed during the trial, in other words, they don't
3   violate the rule on witnesses, but you tell me what your response
4   is on that.

5           Mr. Kromberg?

6           MR. KROMBERG:  Judge, I think that is correct, but I
7   don't know that the jury is going to understand when the Court
8   says as long as they don't violate the rule on witnesses.  I think
9   if the Court instructs them that either party has access but
10  neither party is allowed to talk about the testimony that has
11  occurred, I think that would be sufficient.

12          I mean, we can put on the record that we did not speak
13  to Kwon because we were -- the borders of what constitutes the
14  rule on witnesses was not something that was very clear to us, and
15  we just thought that we would not go near -- we would not speak to
16  the witnesses between the time we were here and the time they're
17  to come back.

18          THE COURT:  And your agents did not, either.

19          MR. KROMBERG:  And the agents did not, either.

20          So it would be fine with us if we just said we were
21  interpreting the rule on witnesses that we were not supposed to
22  talk to them other than to say, "Don't talk to anybody," from the
23  time they first were on to the time they came back.

24          THE COURT:  All right.  Mr. MacMahon?

25          MR. MAC MAHON:  I don't have any problem with the first

2376

1   answer to the question, and, of course, I take the agents at their

2   word they didn't talk to him.  With respect to Mr. Kwon

3   specifically, his counsel informed me that he refused to talk to

4   us in any circumstances.  We tried to talk to him.

5           So whether that's something that is --

6           THE COURT:  Well, I'm perfectly willing to say if you

7   want me to that both sides -- because they asked the question

8   first in general.  So as a general rule -- maybe this is the right

9   answer -- as a general rule, both sides have access to an

10  incarcerated witness unless that witness's attorney doesn't want

11  the witness to speak to a prosecutor or a defense attorney, and

12  that clearly is --

13          MR. MAC MAHON:  That's clearly the answer to the first

14  question.

15          THE COURT:  All right.  And then in this case, there was

16  a rule on witnesses that would have prevented the lawyers or

17  agents from speaking to any witness who was on possible recall to

18  testify a second time.

19          MR. MAC MAHON:  And for the record, there were three,

20  three of the incarcerated defendants who through counsel refused

21  to speak to either me or Mr. Yamamoto, and that was Mr. Hasan,

22  Mr. Kwon, and Mr. Royer, and I don't, I don't --

23          THE COURT:  Royer didn't testify.

24          MR. MAC MAHON:  Right.  I'm just making full disclosure

25  to the Court.  The other ones that talked did talk to us.  But the

ÏW

**J.A. 2522**

2377

1   question is just about Kwon, so --

2           THE COURT:  Well, the first one is general.  The first

3   one is, "Does the prosecution or defense have access as a general

4   rule to witnesses incarcerated between a first appearance in court

5   as a witness and a second appearance?"

6           I mean, as a rule, yes, they have access if their lawyer

7   permits them to talk to anybody, but in this case, there was a

8   rule on the witnesses, and no lawyers for either side spoke to

9   them.

10          MR. MAC MAHON:  That's correct.  With -- yeah, that's

11  correct with respect to all the witnesses from our -- on our side.

12          THE COURT:  Does that satisfy everybody?

13          MR. KROMBERG:  I believe that is correct.  Well, if the

14  judge -- if the Court is going to go farther along the lines that

15  Mr. MacMahon is saying, I'd point out that Mr. MacMahon was

16  speaking to inmates as prospective witnesses in this case that

17  would not speak to us so --

18          THE COURT:  I'm not going to go into that.  I'm just

19  going to say -- all right, I think I have it right.  Both sides

20  would in general have access to incarcerated witnesses if the

21  witness's lawyer permits the witness to talk to a lawyer, but --

22          MR. MAC MAHON:  Judge, can I ask you a question just so

23  I'm sure again --

24          THE COURT:  Yes.

25          MR. MAC MAHON:  -- if you could maybe rephrase

**J.A. 2523**

2378

1   the question?

2           Is the question as to between the first trial -- and I'm

3   going to question 2.

4           THE COURT:  Okay.

5           MR. MAC MAHON:  I understand the answer to question 1.

6   I think we all understand that.

7           THE COURT:  I think it's between a first appearance in

8   court as a witness and a second appearance.

9           MR. MAC MAHON:  And the question is whether that

10  means -- I don't know whether the jury's question is as to between

11  the Khan trial and this trial or between when we broke and then

12  came back and saw them.

13          THE COURT:  Well, I can ask them to refine the question

14  for us, all right?  But --

15          MR. KROMBERG:  We could just say, Judge, that there's no

16  doubt that the government spoke to the witnesses in the last year

17  between the Khan trial and this trial but that we didn't speak to

18  them between the times --

19          THE COURT:  Fine.

20          MR. MAC MAHON:  I'm not, I'm not sure that was the

21  question.  I just don't know if that was the question.

22          THE COURT:  Okay.  Well, I'll give it to them both ways.

23          Now, the second question is more specific as to Kwon.

24  "Did the prosecution or government" -- and so I would understand

25  that to be either our prosecutors or the FBI agents -- "in this

**J.A. 2524**

2379

1  case" -- you're right; that means that that might have been a

2  differential from the first one -- "have access to Kwon in the

3  time between his first testimony and his second testimony?"

4       And that question, I mean, they had access.  I think the

5  question really is did they contact him, did they have access, did

6  they have a contact.  And you're telling me that nobody did.

7       MR. KROMBERG:  No.  As I say, Judge, we thought -- we

8  discussed this question of what the rule on witnesses meant, and

9  we decided it was not worth finding out whether we were allowed to

10  speak to a witness about something other than his testimony, and

11  we just decided we were not going to talk to a witness who there

12  was a rule on witnesses on until after the trial.

13       THE COURT:  All right.  Do you have any problem with my

14  telling them that?

15       MR. MAC MAHON:  No, I accept -- excuse me, Your Honor --

16  I accept him at his word on that.  The question is obviously a

17  different answer if we're dealing with between the Khan trial and

18  this trial.  I assume they talked to their witnesses in the

19  interim.

20       THE COURT:  All right, let's bring the jury in.  I think

21  I have this right.  If I misstate it, you-all don't be shy about

22  approaching the bench.

23                    (Jury present.)

24       THE COURT:  All right, two questions.  First question:

25  "Does the prosecution or defense have access as a general rule to

2380

1   witnesses incarcerated between a first appearance in court as a
2   witness and a second appearance?"

3        Now, the answer to that is as a general rule, either
4   side, the prosecution or the defense, does have access to an
5   incarcerated witness if that witness's attorney allows the witness
6   to talk to an attorney.  Many times a witness's lawyer for various
7   reasons doesn't want the witness either talking to the prosecutor
8   or the defendant or either side, and that is obviously between the
9   witness and his attorney.

10       Now, we were not clear as to whether when you talked
11  about appearances, you meant from one trial to another.  Kwon, for
12  example, testified in a different trial, and then he testified in
13  this trial, and again, either side, government or the defense,
14  would have had access to Mr. Kwon between the two trials if
15  Mr. Kwon's attorney permitted them to speak with him.

16       In terms of our case, because Kwon, he did -- did he
17  come back in rebuttal?  He did.

18       MR. KROMBERG:  Yes, he did.

19       THE COURT:  Yes.  So Kwon testified twice in this case.
20  There was a rule on witnesses that prohibited any discussion of
21  what a witness had said with that witness or with any witness who
22  was not yet going to testify, and when a witness was held for
23  possible recall, since he might be coming back into court, what
24  the lawyers did in this case was to fully abide by the rule on the
25  witnesses, and they did not speak to Mr. Kwon or any of these

2381

1  other witnesses who had testified one time in the trial and then
2  came back a second time.  All right?

3           And I think that pretty much answers the second
4  question, which is, "Did the prosecution or government" -- and I
5  assume by that you meant perhaps the FBI agents -- "in this
6  case" -- which is our case -- "have access to Kwon in the time
7  between his first testimony and his second testimony?"

8           And again, the answer is they did not.  My understanding
9  is they abided by the rule on witnesses, and there was no such
10 contact.

11          Any objection to what I've just told the jury, counsel?
12          MR. KROMBERG:  No, that's fine, Your Honor.
13          MR. MAC MAHON:  Just if that was the question, I assume
14 from the jury's reaction that question didn't relate to between
15 the first trial --
16          THE COURT:  Yes.  The second question applied just to
17 this case, right?
18          THE FOREPERSON:  Yes.
19          THE COURT:  That's what I'm getting from the jury.
20 Okay.
21          Did I answer -- I could answer two questions for you.
22          A JUROR:  Yes.
23          THE COURT:  Very good.  All right.
24          And is it terribly warm in the jury room?
25          A JUROR:  It's fine.

2382

1           THE COURT:  Okay.  Great.  Because it's a bit warm in
2    the courtroom, so I didn't want you to be uncomfortable.
3           All right, Ladies and Gentlemen, I assume you're
4    stopping at five again today?
5           THE FOREPERSON:  Yes.
6           THE COURT:  Yes, I know traffic was terrible this
7    morning, and somebody had trouble getting here.  Again, we
8    appreciate the time you're giving this case.  Unless you have
9    another question, and at five, you're, you know, free to go.  Just
10   remember my earlier cautions.
11          The one thing you might want to think about, because
12   today is Wednesday, is usually my practice is if a case is being
13   deliberated, if the jury wants to work on Friday, there's no bar
14   to that, and that is certainly an option that you've got.  You
15   might want to decide for your scheduling purposes and also for our
16   purposes.
17          If you are going to be working on Friday, I'm going to
18   be fairly unavailable from about 3:30 on for a while, although I
19   may be able to see you later that day, but there's going to be a
20   definite gap on Friday when I will not be able to help you out.
21   So if you come in on Friday, you also might want to think about
22   leaving early if you haven't reached your decisions because after
23   3:30, I'm not sure I'd be available before five.  Okay?
24          All right, if we don't see you again, then remember my
25   cautions, and we'll see you tomorrow.  We'll recess court.

2383

```
 1              (Recess from 4:25 p.m., until 4:26 p.m.)
 2                  (Defendant present, Jury out.)
 3          THE COURT:  Yes, Mr. MacMahon?
 4          MR. MAC MAHON:  Your Honor, I'm sorry, I should have
 5  brought this up before you brought the jury back in, but I am
 6  concerned with because now that it's a public order, what you have
 7  to do on Friday afternoon, that if this jury doesn't come back by
 8  then, given the unbelievable amount of press that's going to be
 9  generated by that and given the fact that Mr. Yamamoto and I are
10  counsel for Mr. Moussaoui, I would hate for this jury to end up --
11  I don't even know what to ask you to do, but I don't want them to
12  think that, that, I don't know how to say it other than to equate
13  him with, with my other client.
14          THE COURT:  First of all, my sense of the types of
15  questions this jury is asking is they're asking extremely
16  probative and good questions, and so I think that they are a jury
17  that can filter.  I had thought about, I mean, you know, they're
18  not an uninformed jury, and they must see what's going around the
19  courthouse.  I don't have any problem tomorrow alerting them that,
20  you know, that, I mean, we could -- yes, I know.
21          MR. MAC MAHON:  Frankly, I can't tell whether I should
22  bring it up or I shouldn't with this jury.  I mean, I'm sure they
23  can filter it out.  But we're appointed counsel in that case, as
24  you well know, and I just don't know whether I'm better ignoring
25  it or asking them.  Maybe it's something we should think about
```

**J.A. 2529**

2384

1  overnight, but they're going to find out in the next day or so

2  that Alan and I represent --

3          THE COURT:  The only one who I'm allowing to speak on

4  Friday is going to be Mr. Yamamoto if any lawyer speaks at all,

5  okay?

6          MR. MAC MAHON:  Oh, I'm fine not saying anything on

7  Friday, Your Honor.

8          THE COURT:  You're off the hook on that.

9          MR. MAC MAHON:  Yes, thank you.

10          THE COURT:  And I will certainly be guided by any advice

11  that you give me.  I mean, I could certainly give the jury an

12  instruction such as you may be aware that this Court is handling

13  that case and that through complete, you know, random assignments,

14  Mr. Yamamoto and Mr. MacMahon years before any involvement with

15  Mr. Timimi were assigned by the Court to that case, and that we

16  are not specialists in these types of --

17                          (Knock on courtroom door from jurors.)

18          THE COURT:  It's good that we're here.  Okay.

19          Their schedule.  They're staying until 5:50 today,

20  Thursday from 9:00 to 5:50, and Friday from 9:00 to 3:00, okay?

21  So we have their schedule.

22          That also suggests that they are quite properly

23  expecting to be here a long time, which is my prediction because

24  there is so much for them to consider, which again is an excellent

25  sign.

2385

1    Think about overnight what, if anything, you want the
2    Court to say.  That's a tough call.  I mean, I could instruct the
3    jury that, you know, they're to draw absolutely no inferences
4    against Mr. Timimi because of, you know, the fact that you happen
5    to be court appointed to the other case and that I happen to be
6    the judge that was assigned to that.  That all occurred almost
7    four years ago, and it's, you know, we've had all of us hundreds
8    of cases in between, and it's just a coincidence.

9    MR. MAC MAHON:  I just fear that one of them -- because
10   their eyes, I'm sure, are gazing away from any articles, and there
11   haven't been many about this case, but everybody's -- they're
12   going to read these Moussaoui articles.  I haven't been talking to
13   the reporters, so my name shouldn't be in any of them, but it's
14   going to be, you know, there could be old pictures run.  There
15   could be -- I'm just worried.

16   THE COURT:  Well, and the other thing is, I mean, his
17   name came up in two brief references at one moment during this
18   trial.  I mean, I could tell them to absolutely avoid any media
19   coverage of the Moussaoui matter if you want me to.

20   MR. MAC MAHON:  Oh, I don't think that's going to work,
21   Your Honor.

22   THE COURT:  I know.  It's one of those difficult things.

23   MR. MAC MAHON:  Let me think about it overnight, and
24   I'll talk to the government about it as well.  Maybe it's much ado
25   about nothing in my own head, but it is a concern that's swimming

**J.A. 2531**

2386

1   around up there.

2            THE COURT:  I think it's legitimate, okay?  All right.

3            MR. MAC MAHON:  Thank you, Your Honor.

4            THE COURT:  And again --

5            MR. KROMBERG:  Your Honor, I actually have a question

6   much more mundane than Mr. MacMahon has mentioned, but as long as

7   we're on the subject of the rule on witnesses, it would be helpful

8   if we could learn from the Court what the rule on witnesses means

9   with respect to someone who has testified and is being retained so

10  that he might testify again.

11           THE COURT:  I usually say to the witness, and

12  occasionally I get tired of saying it, or if it's somebody like

13  Andre Thompson, who's just disappearing, I may not have said it to

14  him, but I usually say to the witness, "You're not to discuss your

15  testimony or anything you've heard in court with any witness who

16  has not yet testified," and I guess by implication, that would

17  mean if you're coming back as a witness, you're another witness.

18           But there is a case in which I believe there was a

19  problem where a lawyer was forbidden to speak, I don't recall

20  whether it was his own client or with somebody while that witness

21  was on the stand, you know, during one of the breaks, and so I

22  usually just don't get into this business about a recalled

23  witness, because I assume, I assume that the rule would apply that

24  you couldn't, because the danger if you approach that witness is

25  that you might violate the rule.

2387

1          Even if, you know, in good conscience you thought you
2    were just going to ask totally new questions, you've got the
3    benefit of what the other witnesses have said during the course of
4    the trial, and so that's the danger with doing that.
5          MR. KROMBERG:  And that's the reason that we took the
6    approach.
7          THE COURT:  That was the correct interpretation.
8          MR. KROMBERG:  But I was thinking maybe that was overly
9    cautious and --
10         THE COURT:  No.  I think you would have run the risk --
11   in fact, frankly, when Kwon said he'd been talking to Aatique, I
12   was sort of surprised about that because I thought we had
13   separation orders for all these people, but -- you know.  And
14   obviously, the jury is listening very carefully to that sort of
15   thing.
16         MR. KROMBERG:  Okay.  Thank you, Your Honor.
17         THE COURT:  Okay?  All right, anything further?
18         MR. KROMBERG:  No, Your Honor.
19         THE COURT:  All right.  So we are here then until 5:50
20   today, not 5:00.  All right, we'll recess court.
21      (Recess from 4:35 p.m., until 9:00 a.m., April 21, 2005.)
22
23
24
25

2388

1                    CERTIFICATE OF THE REPORTER

2        I certify that the foregoing is a correct transcript of the

3    record of proceedings in the above-entitled matter.

4

5

6                    _____
                              Anneliese J. Thomson
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2389

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,    .     Criminal No. 1:04cr385
                         .
    vs.              .     Alexandria, Virginia
                         .     April 22, 2005
ALI AL-TIMIMI,           .     10:58 a.m.
                         .
          Defendant.   .
                         .

.  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME XII

APPEARANCES:

FOR THE GOVERNMENT:        GORDON D. KROMBERG, AUSA
                         United States Attorney's Office
                         2100 Jamieson Avenue
                         Alexandria, VA 22314
                           and
                         JOHN T. GIBBS, ESQ.
                         Counterterrorism Section
                         Criminal Division
                         United States Department of Justice
                         601 D Street, N.W.
                         Washington, D.C. 20004

FOR THE DEFENDANT:          EDWARD B. MAC MAHON, JR., ESQ.
                         107 East Washington Street
                         P.O. Box 903
                         Middleburg, VA 20118
                           and
                         ALAN H. YAMAMOTO, ESQ.
                         643 S. Washington Street
                         Alexandria, VA 22314

ALSO PRESENT:              S.A. WADE AMMERMAN
                         S.A. JOHN WYMAN

(Pages 2389 - 2393)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2390

```
 1  OFFICIAL COURT REPORTER:      ANNELIESE J. THOMSON, RDR, CRR
                                  U.S. District Court, Fifth Floor
 2                                401 Courthouse Square
                                  Alexandria, VA 22314
 3                                (703)299-8595

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                     P R O C E E D I N G S

2                   (Defendant and Jury present.)

3          THE COURT:  Good morning, Ladies and Gentlemen.  I

4   wanted to bring you in to give you an additional instruction that

5   I think is extremely important for you to have at this point since

6   I'm sure you've noticed all the activity in the courthouse today,

7   and as some of you may have noticed either from the newspapers or

8   on television or just from what's happening around the courthouse,

9   I am the judge presiding over the case of United States v.

10  Moussaoui, and that case is scheduled for a change of plea hearing

11  at 3:30 this afternoon, which is why I advised you I could not

12  assist you this afternoon.

13          You should also know by complete coincidence that

14  several years ago, the Court appointed both Mr. MacMahon and

15  Mr. Yamamoto to act along with the Federal Public Defender Office

16  for this district as court-appointed counsel for Mr. Moussaoui,

17  and I want to make sure you understand that there is absolutely no

18  connection whatsoever between the fact that two of the attorneys

19  in this case are also working on that case or that this judge is

20  presiding over both cases.

21          Judges in this Court are randomly assigned to cases.

22  I'm not a specialist judge in a particular type of case.  It just

23  happened to be the way the chance allocation occurred.

24          And as I said, you are to draw absolutely no inferences

25  of any kind from the coincidence of counsel and the judge being

2392

 1  assigned to both cases.

 2          I also want to make sure that you avoid any contact with

 3  the many members of the media and others who may be in the

 4  courthouse today, so I do want you to know that if you want to eat

 5  lunch in the jury room today, you're allowed to do so.  Just be

 6  very careful about not spilling anything on the evidence or in the

 7  court -- and in the room, and try to, you know, keep it in a plain

 8  brown bag, because again, people are not allowed to eat in the

 9  courthouse itself, and so I don't want people to think that

10  there's a break in that rule.

11          I also am instructing you that you are not to try to

12  attend that hearing, and I think -- I know it's going to be

13  difficult -- you should try to avoid any media coverage about that

14  case.  I just don't want your minds getting all worked up about

15  that.  These are unrelated cases.

16          Anything further, counsel, that you would like the Court

17  to address with the jury at this time?

18          MR. MAC MAHON:  No, Your Honor.  And thank you for

19  giving that instruction.

20          THE COURT:  All right.  And, Ladies and Gentlemen,

21  obviously, if you have a question before 3:00, I'm available to

22  respond to it, but if not and you go home at three, again, you

23  need to leave us a schedule so we know what to plan for for next

24  week.

25          But I want to again wish you a comfortable, relaxing

2393

1   weekend.  Stay away from the case.  Stay away from the media.  And
2   we'll see you if not later today, then Monday, all right?
3            Anything further, counsel?  If not, then I'm going to
4   excuse the jury at this time.
5            MR. MAC MAHON:  Not for the defense, Your Honor.
6            MR. KROMBERG:  Not for the government.
7            THE COURT:  All right.  Thank you, Ladies and Gentlemen.
8   You can go back to the deliberation room.
9       (Recess from 11:05 a.m., until 9:00 a.m., April 25, 2005.)
10
11                  CERTIFICATE OF THE REPORTER
12    I certify that the foregoing is a correct transcript of the
13   record of proceedings in the above-entitled matter.
14
15
16   _____
17                 Anneliese J. Thomson
18
19
20
21
22
23
24
25

**J.A. 2539**

2394

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA,      .      Criminal No. 1:04cr385
                               .
     vs.                       .      Alexandria, Virginia
                               .      April 25, 2005
ALI AL-TIMIMI,                 .      11:45 a.m.
                               .
          Defendant.           .
                               .
.   .   .   .   .   .   .   .   .   .
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME XIII

APPEARANCES:

FOR THE GOVERNMENT:        GORDON D. KROMBERG, AUSA
                           United States Attorney's Office
                           2100 Jamieson Avenue
                           Alexandria, VA 22314
                             and
                           JOHN T. GIBBS, ESQ.
                           Counterterrorism Section
                           Criminal Division
                           United States Department of Justice
                           601 D Street, N.W.
                           Washington, D.C. 20004

FOR THE DEFENDANT:         EDWARD B. MAC MAHON, JR., ESQ.
                           107 East Washington Street
                           P.O. Box 903
                           Middleburg, VA 20118
                             and
                           ALAN H. YAMAMOTO, ESQ.
                           643 S. Washington Street
                           Alexandria, VA 22314

ALSO PRESENT:              S.A. WADE AMMERMAN
                           S.A. JOHN WYMAN

(Pages 2394 - 2406)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2395

```
 1   OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Fifth Floor
 2                                   401 Courthouse Square
                                     Alexandria, VA 22314
 3                                   (703)299-8595
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2396

1                  P R O C E E D I N G S

2                (Defendant present, Jury out.)

3          THE COURT:  All right, counsel, we've received questions

4    from the jury on Count 4 and Count 5.  We have given you

5    photocopies of the questions because they're fairly detailed, and

6    have you had enough time to go over the questions?

7          MR. KROMBERG:  Yes, Your Honor.

8          THE COURT:  All right.  All right, Mr. Kromberg, how do

9    you want the Court to respond?  I think I know, but let me just

10   hear it from you.

11         MR. KROMBERG:  I think the answer to it is, Judge, is

12   that the defendant has to understand what he's doing is illegal.

13   He doesn't have to have specific knowledge of the words of a

14   regulation, but he has to -- but to act willfully means that you

15   have to know that what you're doing is illegal.

16         MR. MAC MAHON:  If it please the Court, Your Honor?

17         THE COURT:  Hold on one second.

18         MR. MAC MAHON:  Thank you.

19         THE COURT:  Yes, Mr. MacMahon.

20         MR. MAC MAHON:  Thank you, Your Honor.  I mean, I think

21   the question is they just have to follow what the instruction

22   says, which he has to have knowledge.  I mean, I think I'm saying

23   the same thing as Mr. Kromberg does, but the instruction you gave

24   them said that he had to have knowledge that making such a

25   contribution was contrary to law.  That would apply to Counts 4

**J.A. 2542**

2397

1    and 5.  I believe that's right in the statute.

2            THE COURT:  So the defendant must know that what he is

3    doing is illegal.

4            MR. MAC MAHON:  That's correct.  And in that sense,

5    ignorance of the law would be an excuse.

6            THE COURT:  And do you agree with that, Mr. Kromberg?

7            MR. KROMBERG:  Yes, but for the Court already gave the

8    willful blindness instruction, so I think -- but I agree with

9    Mr. MacMahon and the Court that if the defendant really did not

10   know that what he was doing was illegal, then he could not be

11   found guilty of Count 4 or Count 5.

12           MR. MAC MAHON:  Or if the government didn't show that

13   there was knowledge, which is why I think this is a Title 50 crime

14   instead of a Title 18 crime, and it's written the same way that it

15   is, that there's -- the element of knowledge is, in fact, an

16   element in the offense.

17           THE COURT:  All right.  Are you both satisfied with this

18   instruction to the jury:  To find the defendant guilty of Count 4

19   or Count 5 -- or I could say "and" -- but of either of these two

20   counts, the government must prove beyond a reasonable doubt that

21   the defendant knew what he was doing was illegal?

22           MR. KROMBERG:  That's correct, Judge.

23           MR. MAC MAHON:  That's fine, Your Honor.

24           THE COURT:  All right.  If you'd bring them in?

25           Very astute questions, you must admit.  Again, they're

J.A. 2543

2398

 1  thinking very carefully about this case.

 2                     (Jury present.)

 3          THE COURT:  Good morning, Ladies and Gentlemen.  Please

 4  have a seat.  And again, we want to thank you for all the time

 5  you're spending on this case and all your hard work.  Your

 6  questions continue to show us how carefully you're thinking about

 7  this case.  And I am going to be able to give you an answer on

 8  this, this question -- or these two questions.

 9          Your questions address both Count 4 and Count 5.  To

10  find the defendant guilty of Count 4 and Count 5, the government

11  must prove beyond a reasonable doubt that the defendant knew what

12  he was doing was illegal, all right?  I hope that that answers

13  your question.  In other words, they must be able to prove that

14  the defendant knew, all right?

15          Anything further either side want me to add?

16          MR. MAC MAHON:  Not for the defense, Your Honor.

17          THE COURT:  Or any objection?

18          MR. KROMBERG:  No, Your Honor.

19          THE COURT: All right.  If that answer doesn't quite

20  address what was bothering you, I know you will not be shy about

21  sending us a second line of questionings, and that's fine.

22          Also, I'm going to assume unless you tell us otherwise

23  that you're going to break for lunch around 1:00.  Is that about

24  where you're planning to do it?

25                     (Jurors nodding heads.)

**J.A. 2544**

2399

1          THE COURT:  So from one to two, is that the hour?

2                    (Jurors nodding heads.)

3          THE COURT:  All right.  So, counsel, you don't need to

4    ask the jury that question.

5          And I thank you for your note yesterday.  I did raise

6    the issue with counsel.  They know not to talk to you about, you

7    know, whether you're on break or not.

8          There shouldn't be any reporters in the building today.

9    So again, I appreciate the fact that you're letting me know if you

10   have media contact, and that's just fine.  I did get your note on

11   that.

12         MR. KROMBERG:  Your Honor, I apologize, there are.

13         THE COURT:  Some media?  Well, all right.  But the

14   regular ones covering this case know they're not supposed to talk

15   to you, and if there are people covering other cases in the

16   building, again, just do exactly what you've been doing, which is

17   avoiding any contact with them and letting me know just so we can

18   monitor the situation.

19         All right, anything further we need to address with the

20   jury at this time?

21         MR. MAC MAHON:  No, Your Honor.

22         MR. KROMBERG:  No, Your Honor.

23         THE COURT:  All right.  Then, Ladies and Gentlemen,

24   we'll let you go back, and as I said, if that answer, there's

25   still something else, a more nuanced question that's out there,

2400

1   write it down for me, and we'll try to address it.  Thank you.

2           We'll recess court.

3               (Recess from 11:50 a.m., until 12:50 p.m.)

4                   (Defendant present, Jury out.)

5           THE COURT:  You know, sometimes it's a great idea to

6   give the jury instructions to the jury, and sometimes it's not,

7   but in this case, it had to be done.

8           I think as I read these two questions, what I think has

9   happened is that section 2381 can be violated in two different

10  ways:  either if someone who owes allegiance to the United States

11  levies war against them or adheres to their enemies, giving them

12  aid and comfort within the United States or elsewhere.

13          So I think there are two different courses of conduct

14  that violate 2381, and what we did in the instructions is we

15  really only gave the jury help on the first half of that, which is

16  the levy war, because instruction 48 gives the elements of

17  soliciting others to levy war, and then we moved on to Count 3.

18          What we did not give the jury and I don't recall whether

19  either of you actually tendered an instruction on what is meant to

20  adhere to their enemies, giving them aid and comfort.  I think

21  that's what they're looking for because what the question was:

22  "Why is giving aid and comfort included in the indictment for

23  Count 2 and in the statutory language, while not included in the

24  elements?  Can Count 2 instructions" -- then they question about

25  48:  "Does an element of waging war include giving aid and comfort

2401

1  to the enemy as well as the attempted use or threatened use of

2  physical force?"  And the second question is, "Likewise, what

3  about adheres to their enemies?"

4          So that's what I think is the problem with the

5  instructions that went to the jury, and let me hear from you-all

6  as to your take on this.  I have some thoughts as to how to

7  instruct.

8          MR. KROMBERG:  Judge, I don't think it's a problem.  The

9  reason that the government's instruction was drafted the way it

10 was is because solicitation under 18 U.S.C. 373 is restricted to a

11 crime involving force.  So there are -- there's more than one way

12 of violating 2381, but you can't -- I don't think you can charge

13 under 373 soliciting someone to give aid and comfort or adhere to

14 their enemies unless it's a violence.

15         THE COURT:  Then the answer to the jury's question

16 should be the only -- only one-half of -- or only one kind of

17 conduct of 2381 is at issue in this case, that is, the first half

18 of the disjunctive.  In other words, the issue about adhering to

19 the enemies or giving them aid and comfort is irrelevant to this

20 case.  They should strike that from consideration.

21         MR. KROMBERG:  Except, except for Count 3, Judge, where

22 that -- the conspiracy -- the aiding and abetting inducing a

23 conspiracy under 2384, I think, does encompass the -- can

24 encompass adhering to one's enemies but not in Count 2.  I think

25 Count 2 has to be limited to waging war, but I don't think the

2402

1 | same is necessarily true of Count 3.

2 | THE COURT: Well, that's not how they've asked the
3 | question, so I would not -- well, their question is, "Why is
4 | giving aid and comfort included in the indictment for Count 2 and
5 | in the statutory language, while not included in the elements for
6 | Count 2 in the instruction No. 48?"

7 | And, see, 48, that instruction only defines the elements
8 | of soliciting others to levy war.  All right.  And I think
9 | actually that is the defense instruction that I gave, as I recall.

10 | MR. MAC MAHON:  I think our instruction, Your Honor,
11 | dealt with the issue of assembling people for a treasonous
12 | purpose.  I mean, I think that's the problem here is that what we
13 | have is 2381 is a treason statute, and what the government has
14 | done is try to turn it into a firearms charge, solicitation to
15 | levy war, and the jury -- that's why we, we proffered an
16 | instruction that described even levying war had to be for an
17 | assemblage of people for a treasonous purpose, like in the Aaron
18 | Burr statute.

19 | So I think what we've been left with is we have the
20 | language, giving aid and comfort to the enemy is clearly a
21 | treasonable act and that the way that the evidence came in,
22 | they're confused because it's not a complete answer to the
23 | question.

24 | I don't believe it's fair to say that there's
25 | treasonable issues in this case, which is what they're asking, at

**J.A. 2548**

2403

1    all.  There's no evidence of it whatsoever or that 2381 can be
2    violated in a bunch of different ways when everything leads to
3    treason in that statute.

4         THE COURT:  Well, I think what I'm going to do is the
5    jury is going to go to lunch at 1:00.  I mean, I don't think
6    they're waiting to go to lunch to get the answer to this, and this
7    is -- my intention on this one, because we're dealing with Count
8    2, is that unless you give me some case law that suggests to the
9    contrary, I think for the ease of the jury understanding its role
10   in this case and the way in which we instructed them and there was
11   no discussion about aid and comfort, that we're going to keep this
12   to just the levying war against the United States.

13        And what I will tell them is we gave them the entire
14   statute, but, in fact, for this particular case, the adhering to
15   their enemies, giving them aid, comfort, etc., that does not
16   apply, and that what they're looking at is whether or not 2381, to
17   the extent it's an object here, the only object we're looking at
18   is levying war against the United States.

19        I think that's how I'm inclined to give them the answer
20   on this one, just to not worry about "adheres to their enemies" or
21   the "aid and comfort" business, and we can address the other legal
22   issues down the road, depending upon what the jury does.

23        So that would simplify it for them.  They're not going
24   to worry about that at all.

25        If anyone disagrees with that -- I mean, I could tell

2404

1   the jury that now before they go to lunch if you want me to.

2          MR. MAC MAHON:  Does that make Counts 2 and 3

3   duplicitous then, Your Honor?  We're dealing with two identical

4   charges then if that's what we have.

5          THE COURT:  Count 3 is the actual offense of inducing

6   others --

7          MR. MAC MAHON:  They're all inchoate offenses.

8          MR. KROMBERG:  One is soliciting others to wage war, the

9   other is inducing others to engage in a conspiracy to wage war,

10  which are different things, Judge.

11         THE COURT:  Again, we'll have to sort this out after we

12  see what the jury does.  There are subtle differences between the

13  two, but in either case, it's going to be simply to levy war

14  against the -- I'm going to make Count 3 consistent with Count 2

15  and tell them not to worry about this adhering and aid and comfort

16  business.

17         MR. MAC MAHON:  Thank you, Your Honor.  We'll look for

18  some cases, but subject to our prior objection, I understand the

19  Court's ruling.

20         THE COURT:  Do you want me to instruct them before they

21  go to lunch or just wait until they come back at 2:00?

22         MR. MAC MAHON:  It's up to you, Your Honor.  I know the

23  Court's ruled, so if that's what you want to do, that's fine.  I

24  don't think other than the Aaron Burr case and the case after that

25  and then the Blind Sheikh's case, I don't believe there's any law

2405

1  on -- I don't think the statute has even been used.

2         THE COURT:  I think that may be correct.  I think that

3  was raised in some of the pretrial motions, too, but that still

4  doesn't mean -- I mean, until some court comes along and strikes

5  the statute as unconstitutional or somehow defective, I mean, it's

6  still on the books, and it can be used, and whether the jury --

7  you know, when the jury does whatever it does on this, we can

8  address the legal issue even after that has been done.

9         All right, let's see if the jury is still in there,

10 let's just give them some help on this.

11                        (Jury present.)

12         THE COURT:  All right, Ladies and Gentlemen, I think I

13 might have made your job a little bit easier.  The questions

14 you've sent us out have to do with the language "giving aid and

15 comfort" as well as "adhering to their enemies," that portion of

16 the language in Title 18, U.S. Code, section 2381.

17         We probably gave you more information than you needed in

18 this case, and sometimes, as I indicated, an indictment will

19 charge multiple acts where they don't really have to but it does.

20         For purposes of your analysis, just in your own minds,

21 strike that half of 2381.  2381 says, "Whoever owing allegiance to

22 the United States levies war against them" -- all right, so that's

23 one form of prohibited activity under section 2381 -- "or" -- so a

24 different type of action that would also violate 2381 -- "adheres

25 to their enemies, giving them aid and comfort within the United

2406

1  States or elsewhere."

2          That second half of 2381 does not apply to this case.

3  The government's theory in Counts 2 and 3 addresses the first half

4  only, that is, levy war against the United States, which is why we

5  gave you a definition of what it means to levy war, but we did not

6  give you a definition as to adhere to their enemies or give them

7  aid and comfort.  All right?  So I hope that that answers your

8  question.

9          And I think it's about lunchtime, so we'll let you go to

10 lunch.  You can ponder on that issue.  And we'll let the lawyers

11 go to lunch, so nobody will be around until after 2:00, all right?

12 Thank you.

13         All right, we'll recess court.

14     (Recess from 1:00 p.m., until 9:00 a.m., April 26, 2005.)

15

16                 CERTIFICATE OF THE REPORTER

17     I certify that the foregoing is a correct transcript of the

18 record of proceedings in the above-entitled matter.

19

20

21     _____
                 Anneliese J. Thomson

22

23

24

25

**J.A. 2552**

2407

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA,        .     Criminal No. 1:04cr385
                                 .
          vs.                    .     Alexandria, Virginia
                                 .     April 26, 2005
ALI AL-TIMIMI,                   .     10:52 a.m.
                                 .
          Defendant.             .
                                 .
.  .  .  .  .  .  .  .  .  .  .
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME XIV

APPEARANCES:

FOR THE GOVERNMENT:            GORDON D. KROMBERG, AUSA
                              United States Attorney's Office
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                                and
                              JOHN T. GIBBS, ESQ.
                              Counterterrorism Section
                              Criminal Division
                              United States Department of Justice
                              601 D Street, N.W.
                              Washington, D.C. 20004

FOR THE DEFENDANT:            EDWARD B. MAC MAHON, JR., ESQ.
                              107 East Washington Street
                              P.O. Box 903
                              Middleburg, VA 20118
                                and
                              ALAN H. YAMAMOTO, ESQ.
                              643 S. Washington Street
                              Alexandria, VA 22314

ALSO PRESENT:                 S.A. WADE AMMERMAN
                              S.A. JOHN WYMAN

(Pages 2407 - 2419)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2408

```
 1   OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Fifth Floor
 2                                   401 Courthouse Square
                                     Alexandria, VA 22314
 3                                   (703)299-8595

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2409

                    P R O C E E D I N G S

1                        (Defendant and Jury present.)

2          THE CLERK:  Mr. Foreperson, has the jury reached its

3  verdicts?

4          THE FOREPERSON:  Yes, we have.

5          THE CLERK:  Would you hand it to Mr. Wood, please?

6          THE COURT:  Our foreperson needs to date -- I know

7  you've lost track of time, folks.  It's April 26, 2005.

8          THE CLERK:  Will the defendant please stand and face the

9  jury?

10          "Criminal Case 2004-385, United States of America v. Ali

11  Al-Timimi.

12          "Count 1.  Aiding, abetting, counseling or inducing

13  others to conspire to use firearms in furtherance of a federal

14  crime of violence.  Guilty.

15          "Count 2.  Soliciting others to levy war against the

16  United States.  Guilty.

17          "Count 3.  Aiding, abetting, counseling or inducing

18  others to conspire to levy war against the United States.  Guilty.

19          "Count 4.  Attempting to contribute services to the

20  Taliban.  Guilty.

21          "Count 5.  Aiding, abetting, counseling, or inducing

22  others to attempt to aid the Taliban.  Guilty.

23          "Count 6.  Aiding, abetting, counseling, or inducing

24  others to conspire to violate the Neutrality Act.  Guilty.

J.A. 2555

2410

1          "Count 7.  Aiding, abetting, counseling, inducing, or
2    procuring Yong Kwon to discharge an automatic weapon during, in
3    relation to, or in furtherance of a federal felony level crime of
4    violence.  Guilty.

5          "Count 8.  Aiding, abetting, counseling, inducing, or
6    procuring Khwaja Mahmood Hasan to discharge an automatic weapon
7    during, in relation to, or in furtherance of a federal felony
8    level crime of violence.  Guilty.

9          "Count 9.  Aiding, abetting, counseling, inducing or
10   procuring Yong Kwon to carry explosives (rocket-propelled grenade)
11   during the commission of a federal felony level crime.  Guilty.

12         "Count 10.  Aiding, abetting, counseling, inducing, or
13   procuring Khwaja Mahmoud Hasan to carry explosives (rocket-
14   propelled grenade) during the commission of a federal felony level
15   crime.  Guilty.

16         "Juror No. 30, April 26, 2005."

17         Ladies and Gentlemen of the Jury, are these your
18   unanimous verdicts?

19         ALL JURORS:  Yes.

20         THE COURT:  Does anybody wish to have the jury polled?

21         MR. MAC MAHON:  Yes, Your Honor.

22         THE COURT:  As we call your number, Ladies and
23   Gentlemen, you will be asked to affirm whether these ten verdicts
24   represent your individual verdicts in this case.

25         THE CLERK:  Juror No. 41, are these your verdicts?

**J.A. 2556**

2411

1          JUROR NO. 41:  Yes.

2          THE CLERK:  Juror No. 105, are these your verdicts?

3          JUROR NO. 105:  Yes.

4          THE CLERK:  Juror No. 89, are these your verdicts?

5          JUROR NO. 89:  Yes.

6          THE CLERK:  Juror No. 30, are these your verdicts?

7          JUROR NO. 30:  Yes.

8          THE CLERK:  Juror No. 31, are these your verdicts?

9          JUROR NO. 31:  Yes.

10          THE CLERK:  Juror No. 58, are these your verdicts?

11          JUROR NO. 58:  Yes.

12          THE CLERK:  Juror No. 101, are these your verdicts?

13          JUROR NO. 101:  Yes.

14          THE CLERK:  Juror No. 62, are these your verdicts?

15          JUROR NO. 62:  Yes.

16          THE CLERK:  Juror No. 75, are these your verdicts?

17          JUROR NO. 75:  Yes.

18          THE CLERK:  Juror No. 55, are these your verdicts?

19          JUROR NO. 55:  Yes.

20          THE CLERK:  Juror No. 33, are these your verdicts?

21          JUROR NO. 33:  Yes.

22          THE CLERK:  Juror No. 65, are these your verdicts?

23          JUROR NO. 65:  Yes.

24          THE COURT:  All right.  Counsel, would you approach the

25  bench for just a second, please?

2412

1                    (Bench conference on the record.)

2              THE COURT:  I think given the nature of the overall

3    verdict, we don't need to ask the jury to make specific findings

4    as to a specific act of violence --

5              MR. KROMBERG:  I agree, Judge.

6              THE COURT:  -- for purposes of this record.

7              Do you agree?

8              MR. MAC MAHON:  Yes, Your Honor.

9              THE COURT:  All right.  Otherwise, I was going to give

10   them Jury Instruction No. 44 and have them circle it, but I think

11   because of the nature of the verdicts, that that's crystal clear

12   what they did, all right?

13             MR. KROMBERG:  Thank you, Judge.

14             THE COURT:  Then I'm going to excuse the jury unless

15   there's anything further that either side wants to address.

16             MR. KROMBERG:  No, Judge.

17             THE COURT:  Thank you.

18             MR. MAC MAHON:  Thank you, Your Honor.

19             (End of bench conference.)

20             THE COURT:  Ladies and Gentlemen, I want to thank you

21   for the incredibly long period of time that you have given to this

22   Court.  It is never easy sitting in judgment of another human

23   being, and you have spent, I think this was your seventh day or

24   sixth -- yes, seventh day of deliberations.  So we all know how

25   hard you worked on this case.  This was a complex case, and on

**J.A. 2558**

2413

1  behalf of the government and the defendant and the Court, I want
2  to thank you for the incredible dedication you showed to this
3  very, very difficult job.

4        Now, I want to let you know that we have a local rule in
5  this Court that does not permit any of the attorneys to in any
6  respect contact or talk with you about the case.  We've used your
7  number to try to minimize any bother that you might receive, any
8  questions from the media.  We cannot prevent the media from trying
9  to talk to you.  As you know, they've tried to do that here in the
10 courthouse.

11        I want to tell you that you are not under a gag order.
12 You have First Amendment rights to speak if you wish to.  However,
13 I would caution you to be -- if you choose to speak to anyone
14 about this case, to be judicious and respect the confidentiality
15 of the other 11 jurors.  It is important that when juries
16 deliberate, they feel confident in being able to talk about the
17 case and their views of the evidence.

18        And so I cannot tell you that you cannot speak to
19 anyone, but I want to make sure you understand you do not have to
20 speak to anyone, and certainly the lawyers who participate in this
21 case cannot speak to you, all right?

22        So at this point, your service to the Court has been
23 completed, and you are free to go.  If you want to just leave your
24 notebooks and any papers in the jury room, we'll clean that up for
25 you-all, and if you would just check out with the Clerk's Office,

2414

1    and again, I want to thank you for your service to the Court.

2          We'll stay in session because I have some issues I have

3    to take up with the parties, but thank you.  You're released at

4    this time, all right?

5                         (Jury excused.)

6          THE COURT:  Given the complexity of the issues in this

7    case, I will direct that any posttrial motions be filed within 20

8    days unless there's an objection to that amount of time.  Any

9    objection to that?

10          MR. MAC MAHON:  No, Your Honor.

11          MR. KROMBERG:  No.

12          THE COURT:  No?  All right.

13          Whether we need to address those before sentencing, if

14    you-all want those addressed before the sentencing hearing, then I

15    will, you know, just go ahead and notice it for a Friday.  There

16    will be some Fridays in the next two months when I'm not around,

17    but we can schedule this, you know, for a non-Friday as well.

18          We're going to go ahead at this point and schedule this

19    case for sentencing, and we are into the month of July at this

20    point.  Unless counsel have an objection, how would Wednesday,

21    July 13, be for the sentencing?

22          MR. KROMBERG:  That would be fine, Judge.

23          THE COURT:  Is that all right for the defense counsel,

24    Mr. Yamamoto and Mr. MacMahon?

25          MR. MAC MAHON:  What time, Your Honor?

1          THE COURT:  Wednesday, July 13.  To accommodate your
2    schedule, I don't mind setting that at 10:00 if that makes it
3    easier for you to get in.

4          MR. MAC MAHON:  That's fine, Your Honor.

5          THE COURT:  All right.  Now, the defendant, although
6    convicted of very, very serious crimes, nevertheless has been on
7    bond throughout these proceedings and has been around since 2001,
8    when he was first questioned for the FBI, and I do not see any
9    reason to remand him at this point.

10         MR. KROMBERG:  Judge, I think it's required.  He's been
11   convicted of crimes of violence and offenses for which the maximum
12   sentence is life, and if that's the case, unless the judge finds
13   there's a substantial likelihood that a motion for acquittal or
14   new trial will be granted or the government recommends no sentence
15   of imprisonment, which is obviously not the case, then the
16   defendant by 3143(a)(2) is required to be remanded now.

17         MR. MAC MAHON:  And we, of course, are going to file
18   the -- renew the rule 29 motions and file some other motions as
19   well, Your Honor.  He's been scrupulous in keeping the terms of
20   his bail, and I would hope that the Court would, would leave him
21   out just while we do this and leading up to the sentencing in the
22   case so that we can have his assistance in preparing motions and
23   otherwise.  He's not going anywhere, Your Honor, hasn't -- he's
24   been here every day.

25              And some of these, some of these counts, I think the

2416

1  Court, you know, as we talked about when the jury was
2  deliberating, some of these we're hopeful that you might consider
3  on a rule 29 or renewed motion because of some of the complexity
4  in the questions that we had.  So we think there is grounds for
5  you to vacate some of these convictions hopefully and to let him
6  stay out on bail, Your Honor.  So that would be our request.

7          THE COURT:  I recognize that the -- under normal
8  circumstances, convictions for these types of offenses would
9  result in bond being revoked, but Mr. Ali Timimi has not indicated
10  in any respect that there's any likelihood of flight.  As I said,
11  he's known that he was under investigation for serious charges for
12  some time.  He has not absconded, and he has been here every day
13  on time.

14          Although the underlying crimes are crimes of violence,
15  again, the second- to third-degree-removed nature of the
16  defendant's activities here is such that I'm not going to revoke
17  his bond at this point.  So the government's request is denied.

18          MR. KROMBERG:  Your Honor, I would note that the
19  defendant is now facing a -- mandatory sentences of life plus 30
20  years plus whatever guideline sentence is, and the statute says
21  that the Court shall order that he be detained under these
22  circumstances.

23          THE COURT:  Unless the Court finds that there might be a
24  reasonable basis for some revocation -- or some reversal of the
25  jury's verdict.  I think the legal issues in this case are

**J.A. 2562**

2417

1  sufficiently dense that I'm going to give the defendant the
2  benefit of the doubt, and I'm going to let him remain out on bond.
3         He is being electronically monitored by the Pretrial
4  Services Office, correct?
5         MR. YAMAMOTO:  No.
6         THE COURT:  He is not?
7         All right, I think then the appropriate thing would be
8  to add that as an additional condition.  All right?
9         MR. KROMBERG:  Judge, he's on a bond of $75,000 at this
10 point.  This is a man who has traveled around the world, has
11 contacts around the world, traveled to Saudi Arabia after 9/11,
12 is -- and even if the Court were to find that some of the charges
13 were -- there was a grounds for reversal on some of the charges,
14 which obviously we expect the Court not to do, but unless he's
15 going to be acquitted of all the charges, he's going to be facing
16 a significant amount of jail time, and this should not be -- he
17 should not be out now by the law.
18        THE COURT:  All right, Mr. Kromberg.  I'm nevertheless
19 going to let the defendant remain out on bond.  I'm going to
20 increase the bond conditions and require electric monitoring, and
21 that means, Mr. Ali Timimi, that you're going to have to remain in
22 your home at all times unless you've gotten a specific time-out.
23        Now, your time-outs that are permitted are for you to
24 visit with your counsel, to visit with the Probation Office, to
25 come to court, and I will allow you a once-and-week time-out to

2418

1   attend services on Fridays.  You cannot be out for any other
2   reason without explicit permission from the Court.
3           Do you understand that?
4           THE DEFENDANT:  Yes, Your Honor, I do understand that.
5   I'm appreciative of the conditions.  Thank you.
6           THE COURT:  All right.
7           MR. KROMBERG:  If I could add one more thing, Judge?
8           THE COURT:  Mr. Kromberg.
9           MR. KROMBERG:  What happened in the last -- last year,
10  we asked that Pretrial Services be directed to notify the FBI of a
11  person that we designate immediately if the person -- if the
12  defendant on electric monitoring does not appear to be where he's
13  supposed to be.
14          THE COURT:  All right, I will ask them -- include in
15  that direction to Pretrial Services that they do that
16  notification.
17          MR. KROMBERG:  Thank you.
18          THE COURT:  And do you want -- and again, I'm saying
19  electronic surveillance.  If the Probation Office thinks that the
20  global positioning, whatever technology they've got, but basically
21  it's that the defendant is going to be under essentially house
22  arrest with electronic or technological monitoring so that we know
23  exactly where the defendant is at all times, all right?
24          Now, Mr. Timimi, from here today, you need to go first
25  to Pretrial Services, where they will change the conditions of

2419

1  your bond, and then basically across the hall to the Probation

2  Office, where you will sign up for the pre-sentence investigation.

3  Do you understand that?

4         THE DEFENDANT:  Yes, I do, Your Honor.

5         THE COURT:  All right.  And if you fail to comply with

6  any condition of bond or fail to appear, let me just alert you

7  that that would be a new offense called bond jumping, and the

8  government could prosecute you separately for that, and they'll

9  find you, but I have actually no doubt that you'll be here based

10  on your track record to date.

11        So if there's nothing further then, this matter is

12  finished, and we'll call the next matter.  Thank you.

13        MR. KROMBERG:  Thank you, Your Honor.

14        MR. MAC MAHON:  Thank you, Your Honor.

15                    (Which were all the proceedings

16                    had at this time.)

17

18             CERTIFICATE OF THE REPORTER

19     I certify that the foregoing is a correct transcript of the

20  record of proceedings in the above-entitled matter.

21

22

23  _____
                 Anneliese J. Thomson

24

25

**J.A. 2565**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

FILED IN OPEN COURT

APR 2 6 2005

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VA

UNITED STATES OF AMERICA,           )
                                    )
v.                                  )  1:04cr385 (LMB)
                                    )
ALI AL-TIMIMI,                      )
                                    )
        Defendant.                  )
                                    )

## VERDICT FORM

Count I        Aiding, abetting, counseling, or inducing others
               to conspire to use firearms in furtherance of a
               federal crime of violence

               Guilty

Count II       Soliciting others to levy war against the United
               States

               Guilty

Count III      Aiding, abetting, counseling, or inducing others
               to conspire to levy war against the United States

               Guilty

Count IV       Attempting to contribute services to the Taliban

               Guilty

Count V        Aiding, abetting, counseling, or inducing others
               to attempt to aid the Taliban

               Guilty

*ORIGINAL FILES UNDER SEAL*

Count VI          Aiding, abetting, counseling, or inducing others
                  to conspire to violate the Neutrality Act

                  _Guilty_

Count VII         Aiding, abetting, counseling, inducing, or
                  procuring Yong Kwon to discharge an automatic
                  weapon during, in relation to, or in furtherance
                  of a federal felony level crime of violence

                  _Guilty_

Count VIII        Aiding, abetting, counseling, inducing, or
                  procuring Khwaja Mahmoud Hasan to discharge an
                  automatic weapon during, in relation to, or in
                  furtherance of a federal felony level crime of
                  violence

                  _Guilty_

Count IX          Aiding, abetting, counseling, inducing, or
                  procuring Yong Kwon to carry explosives (rocket-
                  propelled grenade) during the commission of a
                  federal felony level crime

                  _Guilty_

Count X           Aiding, abetting, counseling, inducing, or
                  procuring Khwaja Mahmoud Hasan to carry explosives
                  (rocket-propelled grenade) during the commission
                  of a federal felony level crime

                  _Guilty_

4-26-05

**REDACTED**

#30

Date:

This page intentionally left blank for double-sided pagination and printing