No. 14-4451

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH COURT

————————

### UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

**v.**

### ALI AL-TIMIMI,
*Defendant/Appellant.*

————————

**On Appeal From the United States District Court**
**for the Eastern District of Virginia**
**Alexandria Division (The Hon. Leonie M. Brinkema)**

————————

## JOINT APPENDIX

**VOLUME XI of XIII (pages 2569 - 2770)**

————————

**ERIC S. SIEBERT**
**United States Attorney**

**Gordon D. Kromberg**
**Assistant U.S. Attorney**
**Counsel for Appellee**
**2100 Jamieson Avenue**
**Alexandria, VA 22314**
**(703) 299-3700**

**Joseph Attias**
**Attorney**
**Counsel for Appellee**
**Nat'l Security Division**
**U.S. Dep't of Justice**
**Washington, DC 20530**

**GEREMY C. KAMENS**
**Federal Public Defender**

**Geremy C. Kamens**
**Federal Public Defender**
**Counsel for Dr. Al-Timimi**
**1650 King Street, Suite 500**
**Alexandria, VA 22314**
**(703) 600-0800**

This page intentionally left blank for double-sided pagination and printing

# **TABLE OF CONTENTS**

## VOLUME I (pages 1 - 122)

District Court Docket Sheet (as of Apr. 28, 2025) ....................................................1

Indictment (Sept. 23, 2004, Doc. 1)...................................................................49

Superseding Indictment (Feb. 3, 2005, Doc. 47) ............................................64

Government's Proposed Jury Instructions (Mar. 28, 2005, Doc. 84).....................80

## VOLUME II (pages 123 - 372)

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 294) (defense opening
    statement)...............................................................................................123

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 148) .........................................144

    Opening statements ......................................................................................148

        By the government.........................................................................148
        By the defense.........................................................*see* J.A. 126

    Government's evidence ...............................................................................167

        Stipulation.................................................................................167

        Nabil Gharbieh           Direct examination..................................171
                                                   Cross examination...................................233
                                                   Redirect examination ..............................274
                                                   Recross examination ...............................281

        Muhammad Aatique         Direct examination..................................283

    Concluding matters .....................................................................................369

i

## VOLUME III (pages 373 - 656)

Transcript, Jury Trial, Day 2 (Apr. 5, 2005, Doc. 149) ..........................373

    Preliminary matters ....................................................................377

    Government's evidence, cont'd .....................................................377

        Muhammad Aatique    Direct examination (resumed) ................378
                                        Cross examination...................................398
                                        Redirect examination ..............................468
                                        Recross examination ...............................489

        Stipulations ........................................................................492

        Donald Surratt    Direct examination...................................504
                                          Cross examination...................................570
                                          Redirect examination ..............................585
                                        Recross examination ...............................588

        Detective John Hodge    Direct examination...................................589
                                          Cross examination...................................592
                                        Redirect examination ..............................592

        Stipulations ........................................................................594

        Playing of audiotapes............................................................598

        Yong Ki Kwon    Direct examination...................................604

    Concluding matters ....................................................................655

## VOLUME IV (pages 657 - 972)

Transcript, Jury Trial, Day 3 (Apr. 6, 2005, Doc. 150) ..........................657

    Preliminary matters ....................................................................661

Government's evidence, cont'd ...................................................................665

    Evan Francois Kohlmann    Direct examination...................................665
                               Cross examination....................................817
                               Redirect examination ..............................895
                               Recross examination ...............................903

    Stipulations .............................................................................905

    Playing of audiotape ..............................................................914

Concluding matters ............................................................................970


VOLUME V (pages 973 - 1270)

Transcript, Jury Trial, Day 4 (Apr. 7, 2005, Doc. 151) .........................................973

Preliminary matters........................................................................977

Government's evidence, cont'd ...................................................................980

    Playing of audiotapes and videotape ...........................................980

    S.A. Tracy Kneisler    Direct examination.................................1093
                                 Cross examination..................................1099

    S.A. Christopher Paul Mamula  Direct examination.................................1100

    S.A. Donald L. Monday    Direct examination.................................1105
                                 Cross examination..................................1127

    Stipulations ...........................................................................1131

    Yong Ki Kwon    Direct examination (resumed) ..............1146
                                 Cross examination..................................1238

Concluding matters ..........................................................................1268

## VOLUME VI (pages 1271 - 1550)

Transcript, Jury Trial, Day 5 (Apr. 11, 2005, Doc. 152) .................................1271

    Preliminary matters ...................................................................1275

    Government's evidence, cont'd ...................................................1279

        Yong Ki Kwon      Cross examination (resumed) ...............1279
                                  Redirect examination ...........................1446
                                  Recross examination ............................1475

        S.A. Wade Ammerman      Direct examination................................1481
                                  Cross examination................................1539

    Concluding matters ...................................................................1548

## VOLUME VII (pages 1551 - 1804)

Transcript, Jury Trial, Day 6 (Apr. 12, 2005, Doc. 153) .................................1551

    Government's evidence, cont'd ...................................................1555

        S.A. Wade Ammerman      Cross examination (resumed) ...............1556
                                  Redirect examination ...........................1582
                                  Recross examination ............................1593

    Stipulations .............................................................................1600

    Playing of audiotapes................................................................1610

        S.A. John Wyman      Direct examination................................1656

    Concluding matters ...................................................................1799

VOLUME VIII (pages 1805 - 2058)

Transcript, Jury Trial, Day 7 (Apr. 13, 2005, Doc. 154) ....................................1805

Preliminary matters ...................................................................1808

Government's evidence, cont'd ....................................................1810

S.A. John Wyman          Direct examination (resumed) ..............1810
                         Cross examination..................................1852
                         Redirect examination ............................1916
                         Recross examination ..............................1923

Alex Daghestani          Direct examination.................................1927
                         Cross examination..................................1935

Andre Thompson           Direct examination.................................1940
                         Cross examination..................................1951

Playing of audiotapes...................................................................1954

Government rests ...............................................................1955, 1965

Defendant's Rule 29 motion ......................................................1958

Defendant's evidence.................................................................1965

Sherdil Loynab           Direct examination.................................1966
                         Cross examination..................................1970
                         Redirect examination ............................1976

Yousuf Jaafar Idris      Direct examination.................................1977
                         Cross examination..................................2018

Concluding matters .................................................................2056

## VOLUME IX (pages 2059 - 2318)

Transcript, Jury Trial, Day 8 (Apr. 14, 2005, Doc. 155) ....................................2059

    Defendant's evidence, cont'd ........................................................................2063

        Yousuf Jaafar Idris        Cross examination (resumed) ...............2063

        Luther Kennedy        Direct examination...................................2136
                                       Cross examination....................................2144
                                       Redirect examination ..............................2163
                                       Recross examination ..............................2168

        Curtis Jamison        Direct examination...................................2172
                                       Cross examination....................................2189

        Defendant rests ..................................................................2198

    Government's rebuttal evidence ....................................................................2198

        Khwaja Mahmood Hasan        Direct examination...................................2199
                                       Cross examination....................................2235
                                       Redirect examination ..............................2278
                                       Recross examination ..............................2284

        Muhammad Aatique, recalled   Direct examination...................................2290

        Conclusion of evidence ..........................................................2293

    Preliminary charge conference ....................................................................2306

## VOLUME X (pages 2319 - 2568)

Transcript, Jury Trial, Day 9 (Apr. 18, 2005, Doc. 156) ....................................2319

    Charge conference ..........................................................................................2322

vi

Closing arguments ........................................................................2346

    By the government.................................................................2346
    By the defense........................................................................2376
    Rebuttal by the government...................................................2415

Jury charge ...................................................................................2429

Jury deliberations .........................................................................2500

    Jury question ..........................................................................2500

Transcript, Jury Trial, Day 10 (Apr. 19, 2005, Doc. 157) ..........2506

    Jury deliberations, cont'd........................................................2507

    Jury question ..........................................................................2507

Transcript, Jury Trial, Day 11 (Apr. 20, 2005, Doc. 158) ..........2515

    Jury deliberations, cont'd........................................................2517

    Jury question ..........................................................................2517

    Jury questions ........................................................................2520

Transcript, Jury Trial, Day 12 (Apr. 22, 2005, Doc. 159) ..........2535

    Jury deliberations, cont'd........................................................2537

Transcript, Jury Trial, Day 13 (Apr. 25, 2005, Doc. 160) ..........2540

    Jury deliberations, cont'd........................................................2542

    Jury questions ........................................................................2542

Transcript, Jury Trial, Day 14 (Apr. 26, 2005, Doc. 161) ..........2553

    Return of verdict ....................................................................2555

Concluding matters ...................................................................2560

Verdict Form (Apr. 26, 2005, Doc. 107) ................................2566


## VOLUME XI (pages 2569 - 2770)

Defendant's Motion for Judgment of Acquittal (June 6, 2005, Doc. 118)..........2569

Defendant's Corrected Motion for New Trial (June 14, 2005, Doc. 124) ..........2630

Government's Response to Defendant's Post-Trial Motions (June 20, 2005, Doc. 125)................................................................2647

Defendant's Reply to the Government's Response to Defendant's Post-Trial Motions (June 28, 2005, Doc. 126) (attachments omitted from appendix)................................................................2688

Transcript, Sentencing Hearing (July 13, 2005, Doc. 147) ................................2719

    Argument and ruling on Rule 29 motion...................................2720
    Argument and ruling on Rule 33 motion...................................2724
    Ruling on Guidelines objections................................................2735
    Argument on sentencing .........................................................2739
    Allocution ................................................................................2746
    Imposition of sentence ...........................................................2750

Judgment in a Criminal Case (July 13, 2005, Doc. 132)....................................2758

Notice of Appeal (July 15, 2005, doc. 133).......................................................2765

Fourth Circuit Judgment (corrected) (with copy of Apr. 25, 2006 order) (May 19, 2006, Doc. 168)................................................................2767


## VOLUME XII (pages 2771 - 2998)

Transcript, Hearing (Aug. 24, 2007, Doc. 239)................................................2771

Transcript, Hearing (Nov. 20, 2007, Doc. 245)....................................................2790

Transcript, Hearing (May 16, 2008, Doc. 263) ..................................................2795

Transcript, Hearing (Oct. 23, 2008, Doc. 272)...................................................2802

Transcript, Hearing (Feb. 19, 2009, Doc. 297)....................................................2827

Transcript, Hearing (Oct. 4, 2013, Doc. 340) .....................................................2834

(Redacted) Memorandum Opinion (denying motions to compel) (Apr. 28, 2014, Doc. 350)..................................................................................................2864

Order (May 21, 2014, Doc. 357)...........................................................................2887

Notice of Appeal (June 4, 2014, Doc. 358) ..........................................................2889

Fourth Circuit Order (remanding case for further proceedings) (Aug. 4, 2015, Doc. 406)..................................................................................................2892

Fourth Circuit Order (expanding scope of remand) (July 26, 2016, Doc. 431)..................................................................................................................2894

Government's Response in Opposition to Defendant's Second Motion for Acquittal on Count 1 (Aug. 29, 2018, Doc. 447) ...........................................2896

Defendant's Reply to Government's Supplemental Memorandum on *United States v. Davis* (Aug. 19, 2019, Doc. 459) ..........................................2905

Government's Reply in Further Support of Its Supplemental Memorandum on *United States v. United States* (Aug. 26, 2019, Doc. 461) ........................2936

(Redacted) Memorandum Opinion (granting release pending appeal) (Aug. 18, 2020, Doc. 519) ..........................................................................................2953

Order (granting release pending appeal) (Aug. 18, 2020, Doc. 520) ..................2969

Fourth Circuit Order (affirming grant of release pending appeal) (Aug. 31, 2020, Doc. 535)................................................................................................2971

ix

Memorandum Opinion (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 549)................................................................................2972

Order (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 550)..........................2998


VOLUME XIII (pages 2999 - end)

Selected Government Trial Exhibits..................................................................2999

Gov't Exh. 1B1a: transcript of Apr. 7, 2003 consensually monitored call between Kwon and Royer.........................................................................2999

Gov't Exh. 1B2a: transcript of Apr. 8, 2003 consensually monitored call between Kwon and Royer.........................................................................3053

Gov't Exh. 1B4a: transcript of Apr. 17, 2003 consensually recorded CCTV hotel meeting between Kwon and Royer.......................................3084

Gov't Exh. 1D27: Taiba Bulletin, Oct. 17, 2000..........................................3131

Gov't Exh. 1D28: Taiba Bulletin, Oct. 27, 2000..........................................3134

Gov't Exh. 1D29: Taiba Bulletin, Nov. 7, 2000...........................................3137

Gov't Exh. 1D45: Taiba Bulletin, Sept. 26, 2001 (post from nadqpk@yahoo.com)....................................................................3139

Gov't Exh. 1D48: Taiba Bulletin, Oct. 13, 2001 (post from nadqpk@yahoo.com)....................................................................3141

Gov't Exh. 1D52: Taiba Bulletin, June 24, 2001 (post from nadqpk@yahoo.com)....................................................................3144

Gov't Exh. 1F1: LET Poster, image 1 ..........................................................3151

Gov't Exh. 1F3: LET Poster, image 3 ..........................................................3152

Gov't Exh. 1F4: LET Poster, image 4 ..........................................................3153

Gov't Exh. 1G10a: transcript of Apr. 1, 2003 recorded telephone call (Hammad and Royer call Al-Timimi) .......................................................3154

Gov't Exh. 4G7: email dated June 19, 2001 from pballaz@yahoo.com, regarding praying in a moving car.............................................................3164

Gov't Exh. 7A19: Uqla fatwa on events of 9/11, in English, taken from Surratt's residence on May 8, 2003 ...........................................................3168

Gov't Exh. 7A23; Hawali's *Statement to the Ummah* in English .................3178

Gov't Exh. 7A39a: translation of website containing Space Shuttle article in Arabic .......................................................................................3200

Gov't Exh. 7C31: email dated Sept. 20, 2001 from Kwon to Belton Harris ...............................................................................................................3203

Gov't Exh. 7D3: email dated Oct. 15, 2001 from Surratt re. Hawali's *Statement to the Ummah* ...................................................................................3204

Gov't Exh. 7F24a: UPI News article dated Sept. 16, 2001 titled *Taliban Leaders Seek Islamic Support*.....................................................................3206

Gov't Exh. 7H12: plea agreement and statement of facts for Muhammed Aatique..........................................................................................................3207

Gov't Exh. 10A3: document entitled *Suicide Attacks, Are They Suicide? A Shariah Viewpoint* ................................................................................3223

Gov't Exh. 10A41: email dated Oct. 23, 2000 from Nabil to Timimi re: trip to Delaware ..........................................................................................3227

Gov't Exh. 10D19: email dated Oct. 21, 2001 email from altimimi@yahoo.com to aqdcksa@yahoo.com re. "Utter Nonsense" ......3229

Gov't Exh. 10H1A: record of instant messaging session with Bin Laden statement preamble ...................................................................................3233

Gov't Exh. 10J7: article, *Sheikh Ali Timimi on the Taliban and the Statues* ......................................................................................................3260

Gov't Exh. 10J9: email dated December 13, 2001 from Timimi re. "A call to reflect and repentance" ...................................................3262

Gov't Exh. 10J15: affidavit of Youseff Idris....................................3265

Gov't Exh. 10S1: summary chart of Timimi / Kwon telephone calls, Sept. 16, 2001 ...............................................................................3266

Gov't Exh. 10S2: summary chart of Timimi / Kwon telephone calls, Sept. 19, 2001 ...............................................................................3267

Gov't Exh. 10S3: summary chart of Kwon telephone calls, Sept. 16, 2001 ..............................................................................................3268

Gov't Exh. 10T1: photograph, package of "New World Order" cassette tapes ...............................................................................................3272

Gov't Exh. 12-1: stipulation re. background facts............ 3273; *see* J.A. 167-171

Gov't Exh. 12-60: stipulation re. electronic surveillance of calls and email.................................................................................................3277

Gov't Exh. 12-61: stipulation re. Al-Timimi lectures ............3278; *see* J.A. 2344

Selected Defense Trial Exhibits...........................................................3280

Def't Exh. 33: Al-Timimi lecture titled *Muslims in America in the Face of Accusations of "Fundamentalism" and "Terrorism"* delivered at Purdue University on Oct. 20, 1993 ........................................................3280

Def't Exh. 57: letter dated from AUSA Gordon Kromberg to Yong Kwon's attorneys .................................................................................3293

Def't Exh. 80: stipulation regarding Al-Timimi's unsubscription from Taiba Bulletin List .....................................................................................3295

Def't Exh. 81: summary report of an interview with Ismail Royer by Evan Kohlmann ....................................................................................3298

Def't Exh. 82: photo of front of Yong Kwon's apartment ...............................3303

Def't Exh. 83: photo of back of Yong Kwon's apartment .............................3304

Def't Exh. 85: summary of Yong Kwon's phone calls on Sept. 16, 2001 ................................................................................................ 3305

Def't Exh. 86: summary of Yong Kwon's phone calls on Sept. 13-15, 2001 ...............................................................................3306

Def't Exh. 87: summary of Al-Timimi's calls on evening of Sept. 19, 2001 ...............................................................................3307

Def't Exh. 90: summary of Al-Timimi's calls on evening of Sept. 19, 2001 ...............................................................................3308

This page intentionally left blank for double-sided pagination and printing

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

FILED

JUN – 6 2005

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA,                )
                                         )
                                         )
v.                                       )    **Case No. 04-385-A**
                                         )
**ALI AL-TIMIMI,**                       )
                                         )
        **Defendant.**                   )
_____)

### DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

Defendant Ali Al-Timimi, by and through counsel, hereby moves this Honorable Court, pursuant to Fed. R. Crim. P. 29, to grant his Motion for Judgment of Acquittal and to vacate the findings of guilt in this case.

### I.  STANDARD OF REVIEW

The standard for reviewing the sufficiency of the evidence to support a conviction is "whether, viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982).  Accord *Jackson v. Virginia*, 433 U.S. 307, 319 (1970).

When the Court reserves decision on the Rule 29 motion before the close of all the evidence, Rule 29(b) requires the Court to decide the motion on the basis of the evidence at the time the ruling was reserved.

The standard for reviewing whether the defendant's statements are protected by

-1-

118

the First Amendment is de novo as issues of law are reviewed de novo. *United States v. Wilhelm*, 80 F.3d 116, 118 (4th Cir. 1996) citing *Bose Corp. v. Consumers Union of the United States*, 466 U.S. 485 (1984).

## II. SUMMARY OF THE TRIAL TESTIMONY

### A. Conspiracy Begins In January 2000

The statement of facts contained in the plea agreements of Yong Ki Kwon, Khwaja Mahmood Hasan, Donald Surratt and Irbrahim Ahmed al-Hamdi all indicate that a conspiracy began in or about January 2000 to prepare for violent jihad on behalf of Muslims in Kashmir, Chechnya, and other countries and territories, against countries, governments, military forces, and peoples that the conspirators believed to be the enemies of Islam. The conspirators agreed to conduct their training in secrecy.

Kwon corroborated this when he testified that when the conspiracy started in January 2000, they had no set plans to go overseas and fight, but that they "did these things in preparation that maybe some day that we might go overseas and fight," and that it "was . . . training for what might happen in the future." (Kwon April 7th cross, p. 21 lines 20-23 and p. 22 lines 15-18). Aatique likewise testified that his purpose in playing paintball "was to be militarily trained and militarily capable in case if it's ever needed in the future." (Aatique cross, p. 62 lines 12-14).

Kwon testified that Dr. Al-Timimi was unaware of the conspiracy that began in 2000. (Kwon April 7th cross, p. 20, lines 12-17 and p. 23, lines 5-24). Hasan, likewise, testified that he never talked with Dr. Al-Timimi about the conspiracy which began in 2000. (Hasan cross, p. 48 lines 20-25, p. 49 lines 1-4).

-2-

**J.A. 2570**

Additionally, as will be detailed below both Kwon and Hasan further testified that Dr. Al-Timimi was likewise unaware of the various means and methods employed in furtherance of the conspiracy such as the use and purchase of firearms, the playing of paintball as a means for combat training, and the watching of jihad videos. This was also acknowledged by government witnesses Aatique, Gharbieh, Surratt, and Thompson.

Kwon, Aatique and Khan knew each other from their days attending Virginia Tech University. Kwon and Aatique knew one another from college. (Kwon April 5th direct, p. 9 lines 21-25; Kwon April 11th cross, p. 6 lines 23-24; Aatique April 4th direct, p. 9 lines 22-23). Kwon likewise first met Omar Khan in college. (Kwon April 11th cross, p. 7 lines 11-12). Later, Kwon met Omar Khan's brother Masoud. (Kwon April 11th cross, p. 7 lines 9-10). Aatique met Omar Khan while in college. Omar Khan then introduced Aatique to his brother Masaud as well as Kwon. (Aatique April 4th direct, p. 10 lines 12-16; Aatique cross, p. 38 lines 17-19). In college (1996 and 1997), Aatique, the Khans and Kwon would hang out and talk about jihad in Kashmir and other places. (Aatique cross, p. 38 lines 22-25 and p. 39 lines 1-18). Aatique and Kwon maintained regular contact even after Aatique graduated in 1997 and moved to California. (Aatique April 4th direct, p. 10 lines 2-4).

Kwon became "very close" to the Khan brothers with whom he socialized and with whom he talked on many occasions about jihad and the plight of the Muslims in Chechnya and Indonesia. (Kwon April 11th cross, p. 11 lines 12-25, p. 12 lines 1-6, p. 12, p. 13 lines 1-17). Kwon moved in with Omar Khan for two months between April and June 1998. (Kwon April 11th cross, p. 11 lines 2-6). Kwon testified that he was not

-3-

introduced to the Khans by Dr. Al-Timimi. (Kwon April 11th cross, p. 7 lines 20-21).

Likewise Kwon met Hammad Abdur-Raheem, who provided the paintball group with

tactical training. at an NRA range in the year 2000. (Kwon April 11th cross, p. 19 lines

9-12; Aatique April 4th direct, p. 12 lines 6-7).

### B. Paintball

Kwon played a leadership role in the paintball sessions. He would pay for a lot

of the paintball expenses. (Kwon April 11th cross, p. 20, lines 4-9). Kwon also created

a password protected paintball website for the paintball group through which he would

also send out e-mails on jihad. (Kwon April 11th cross, p. 46 lines 9-22).

While the paintball group was initially organized by Kwon and Gharbieh, Kwon

testified that the most important figure in the paintball group Randall Royer, whom

Kwon would see most frequently at the Dar al-Hijra mosque. (Kwon April 5th direct, p.

9 lines 1-15).

Paintball sessions continued up to September 11th, 2001. After 9/11 Kwon sent

a cryptic email stating that Sunday's picnics were now canceled due to weather. Kwon

was cryptic out of caution so that their activities would not be traceable by the FBI back

to the group. (Kwon April 11th cross, p. 53 lines 16-25, p. 54, and p. 55 lines 1-12).

Since Dr. Al-Timimi was not a paintball player, he was not on Kwon's paintball e-

mail list. (Kwon April 11th cross, p. 46 lines 23-25). Dr. Al-Timimi did not tell Kwon to

send out the cryptic email canceling paintball after the events of 9/11 nor did he receive

Kwon's email. (Kwon April 11th cross, p. 54 lines 19-23).

When the group started paintball, Kwon testified that he asked Nabil what Dr.

Al-Timimi thought of paintball. Kwon testified that Nabil told him that Dr. Al-Timimi

-4-

thought paintball was a good idea. (Kwon April 5th direct, p. 43 lines 21-25, p. 44 line 1). Kwon stated that when they asked Dr. Al-Timimi about playing paintball they were not doing anything illegal at that time. (Kwon April 7th cross, p. 26 lines 19-24).

Kwon further testified that while Dr. Al-Timimi knew people were playing paintball, he did not specifically know who played. Nor does Kwon know if Dr. Al-Timimi knew paintball was for jihad training. (Kwon April 5th direct, p. 43 lines 9-15 and 20-21). Kwon also testified that he never told Dr. Al-Timimi that they were learning maneuvers and tactics from ex-military people. (Kwon April 11th cross, p. 20 lines 17-19).

After Chapman was approached by the FBI, Kwon with Gharbieh spoke to Dr. Al-Timimi regarding their paintball activities. This was the only time Kwon spoke directly to Dr. Al-Timimi regarding paintball. (Kwon April 7th cross, p. 27 lines 7-8).

According to Kwon, Dr. Al-Timimi's advice was to continue playing because if you stop you will look more suspicious. Dr. Al-Timimi said to be more discreet and recited a Koranic parable. (Kwon April 5th direct, p. 45 lines 3-25 and p. 46 lines 1-10). Kwon testified that he did not tell Dr. Al-Timimi that the paintball had anything to do with violent jihad or that they were preparing for an expedition against a country that the United States is at peace. (Kwon April 7th cross, p. 27 lines 4-7 and 12-18).

Gharbieh also testified that during this conversation Dr. Al-Timimi asked if they were doing something illegal, to which Gharbieh replied that they were not, (Gharbieh testimony; Kwon April 7th cross, p. 26 lines 22-25 and p. 27 lines 1-3) and that Dr. Al-Timimi suggested that they just play soccer instead of paintball.

Hasan testified that he never spoke to Dr. Al-Timimi about paintball, never saw

-5-

him at the paintball field, and never had anything to do with Hasan's paintball training. (Hasan cross p. 50 lines 3-14). Hasan further testified that Dr. Al-Timimi had no knowledge "in any way, shape, or form" that they were preparing for combat through paintball. (Hasan cross p. 50 lines 15-17).

Aatique, like Hasan, testified that Dr. Al-Timimi was never at the paintball field and Aatique never spoke to him regarding paintball. (Aatique April 4th direct p. 12 lines 12-13; Aatique cross, p. 45 lines 2-5, p. 46 lines 21-22, p. 63 lines 23-25, and p. 64 lines 1-2).

### C. Firearms

Kwon provided detail testimony as to his own gun ownership, as well as that of Royer, Khan, Al-Hamdi, Chapman, Surratt, Gharbieh, Hammad Abdur-Raheem, and Caliph Abdur-Raheem. Kwon mentioned approximately thirteen different guns owned by both him and other individuals. (Kwon April 5th direct, pp. 23-27). Kwon also sold a gun to Royer. This was after Royer has begun playing paintball and after Royer had informed Kwon of his jihad experiences in Bosnia. (Kwon April 11th cross, p. 25 lines 15-18).

Kwon would go to the range every other week with various members of the conspiracy like Hammad Abdur-Raheem, Surratt, Royer, Chapman and Khan. (Kwon April 11th cross, p. 19 lines 9-25 and p. 20, lines 1-3). Royer would relate his jihad experiences in Bosnia to Kwon while they were at the range. (Kwon April 11th cross, p. 25 lines 22-25, p. 26 lines 1-4).

Kwon testified that he had no information that Dr. Al-Timimi knew that any of the other group members owned firearms. (Kwon April 11th cross, p. 82 lines 1-3).

-6-

According to Kwon, even with the group's extensive gun ownership and use, Dr. Al-Timimi was totally unaware of the firearms. Kwon testified that Dr. Al-Timimi never told them to buy a gun. (Kwon April 11th cross, p. 18 line 6). Kwon never showed his gun to Dr. Al-Timimi (Kwon April 7th cross, p. 24 line 25 and p. 25 lines 1-2) or told him that he owned a gun (Kwon April 7th cross, p. 24 lines 22-24) or that he sold a gun to Royer (Kwon April 11th cross, p. 25 lines 19-21). Kwon never went to the range with Dr. Al-Timimi nor did he ever tell him that he was going to the range nor did he ever see him at the range. (Kwon April 7th cross, p. 25 lines 13-20 and April 11th cross, p. 19 lines 13-15).

Nor did any other witness testify that Dr. Al-Timimi knew about the ownership of any firearms or that he advocated the use or ownership of firearms.

### D. Videos

There was frequent watching, distribution and discussion of jihad videos by Kwon, Hasan, Chapman, Gharbieh, Hammad Abdur-Raheem, Al-Hamdi, Surratt, and Royer. (Aatique cross p. 58 lines 1-3 and 11-5; Kwon April 5th direct, p. 21 lines 17-25; Kwon April 7th cross, p. 20 lines 22-25 and p. 21 lines 1-3; Hasan cross, p. 41 lines 17-22).

One popular video watched by the group was "Russian Hell 2000." Kwon watched the entire video once and then he would skip over the non-combat parts and watch the combat scenes "over and over." One of those parts he saw many times was the prisoner execution scene shown by the government during the trial (Kwon April 11th cross, p. 21 lines 5-17). Hasan also watched "Russian Hell 2000" a number of times and remembers the prisoner execution scene. (Hasan cross, p. 41 lines 19-22 and p.

-7-

42 lines 22-24).

Aatique testified that the "Russian Hell 2000" video romanticized the war in Chechnya, idealized martyrdom, and encouraged people to go and fight (Aatique cross, p. 70, lines 22-25, p. 71 lines 1-4). Kwon gained inspiration and motivation to become a martyr as a result of watching the "Russian Hell 2000" video. (Kwon April 5th direct, p. 20 lines 13-16). Hasan further testified that part of the reason for his going to jihad after September 11th, 2001 was because of the jihad videos he began watching on the Qoqaz website prior to the year 2000. (Hasan cross, p. 45 lines 9-25, and p. 46 lines 1-6).

The witnesses all testified that Dr. Al-Timimi had no role in their video watching and that Dr. Al-Timimi was not even aware their video watching. Kwon testified that he never watched "Russian Hell 2000" with Dr. Al-Timimi nor did he ever tell him about it. (Kwon April 11th cross, p. 21 lines 24-25 and p. 22 lines 1-2). Nor did Kwon tell Dr. Al-Timimi that he was fascinated with the prisoner execution scene. (Kwon April 11th cross, p. 22 lines 3-5). Kwon further added that he had no information whether Dr. Al-Timimi knew that any of the group watched jihad videos. (Kwon April 11th cross, p. 82 lines 4-6). Hasan likewise testified that Dr. Al-Timimi never gave him a jihad video, told him to watch one, or even suggested to him to watch one. (Hasan cross, p. 43 lines 5-7). Aatique similarly testified that he never watched jihad videos with Dr. Al-Timimi nor does he know if Dr. Al-Timimi ever watched these videos. (Aatique cross, p. 69, lines 19-22 and p. 70. lines 20-21).

Because of these jihad videos, like "Russian Hell 2000," Kwon viewed Chechen jihad commanders Khattab and Basayev as his role models (Kwon April 11th cross, p.

-8-

41 lines 18-25, p. 42 line 1).

### E. Lashkar e Taiba

Kwon hears about LET for the first time when Royer returns from Pakistan before 9/11. (Kwon April 5th direct, p. 27 lines 24-25 and p. 28, lines 1-3). Royer told Kwon about his military experiences in Bosnia and LET and Kwon thought it was cool and was impressed by his experiences. (Kwon April 7th cross, p. 28 lines 19-25 and p. 29 lines 1-16; Kwon April 11th cross, p. 26 lines 1-4). Kwon was also impressed with Royer's LET contacts. (Kwon April 11th cross, p. 26 lines 1-4). Aatique also knew from the paintball that Royer had fought in Bosnia. (Aatique cross, p. 64 lines 10-12). Royer's stories encouraged Aatique to go to LET. (Aatique cross, p. 73 lines 13-15). Aatique said even though in other respects Royer was their peer, he was distinct due to his combat experience. (Aatique redirect, p. 103 lines 17-19).

Kwon was also aware that Al-Hamdi went to LET through Royer in 2000 and Al-Hamdi shared his experiences at LET with Kwon. (Kwon April 5th direct, p. 34 lines 4-8; Kwon April 11th cross, p. 26 lines 5-18). As a result of Al-Hamdi's experiences Kwon looked up to Al-Hamdi and aspired in 2000 to do so as well. (Kwon April 11th cross, p. 27 lines 12-20). Aatique heard from a third person that Royer assisted Al-Hamdi in reaching LET. (Aatique cross, p. 72 lines 17-23).

In 2000 Aatique went with Al-Hamdi to the airport when Al-Hamdi left for LET to train and seek martyrdom in Kashmir. Aatique saw him off. (Aatique cross, p.64 lines 18-21, p. 65, p. 66, p. 67 lines 4-20, p. 68 lines ). Al-Hamdi's stories to Aatique about his experiences "had a great impact" and led Aatique to want to go to LET. (Aatique April 4th direct ,p. 34 lines 18-20; Aatique April 5th direct, p. 70 lines 3-4; Aatique cross,

-9-

p. 73 lines 3-7).

Masoud Khan told Kwon about his jihad experiences fighting the Russians. Kwon was impressed by this and looked up to Khan. (Kwon April 11th cross, p. 13 lines 6-23). Kwon never told Dr. Al-Timimi about these conversations with Khan (April 11th cross, p. 13 lines 24-25, p. 14 line 1). Aatique was also aware of Khan's experiences in Afghanistan. (Aatique redirect, p.101 lines 7-9).

Kwon knew that Chapman went to LET and had thought he would run into him when he left. Kwon also suspected Royer had helped Chapman get to LET. (Kwon April 11th cross, p. 31 lines 15-23). Kwon testified that Aatique reminded him in prison that when Aatique sought to go to LET through Al-Hamdi, Kwon directed him to go through Royer instead. (Kwon April 11th cross, p. 32 lines 14-25 and p. 33). Kwon testified that before Dr. Al-Timimi spoke on September 16th, while he had no set plan to go to LET, it was something that he and the guys he was involved with would talk about. Going to LET was for Kwon a "fantasy something he might do one day." (Kwon redirect p. 177 lines 6-14).

The only persons in the United States whom Kwon knew had contacts with LET was Royer initially and then al-Hamdi. (Kwon April 11th cross, p. 31 lines 24-25 and p. 32 lines 1-2). In March 2001, Kwon, Royer and Surratt went on pilgrimage to Mecca, the hajj. There Royer arranged for Kwon and Surratt to meet a LET official who informed them of LET's military camps and recruited both Kwon and Surratt. (Kwon April 11th cross, p. 34 lines 16-25, pp. 35-36, and p. 37 lines 1-20). Kwon never told Dr. Al-Timimi of this incident. (Kwon April 11th cross, p. 37 line 25 and p. 38 lines 1-2).

Kwon, at the behest of Royer, began recruiting for LET among the paintball

-10-

group. This was in 2001 and perhaps even before the hajj of March 2001. (Kwon April 11th cross, p. 48 lines 24-25, p. 49). Those whom Kwon recruited included Chapman, Hammad Abdur-Raheem, Caliph Abdur-Raheem, Surratt, Gharbieh, and perhaps Khan. (Kwon April 11th cross, p. 50 lines 13-25, p. 51, and p. 52 lines 1-10). Kwon never recruited Dr. Al-Timimi nor did he ever tell Dr. Al-Timimi that he was recruiting for LET. (Kwon April 11th cross, p. 52 lines 11-14 and p. 53 lines 6-9).

Like Kwon, Hasan was aware of LET and that previously members of the group had traveled to LET for training. (Hasan direct, p. 21 lines 20-25 and p. 22 lines 1-4). However, Hasan never told Dr. Al-Timimi about his friends going to LET camps for training. (Hasan cross p. 52, lines 9-11). Hasan knew Royer, as well as Al-Hamdi, were both in 2000 encouraging others to go to LET. (Hasan cross, p. 51 lines 5-16). But Hasan does not recall Royer recruiting him to go to LET. (Hasan cross, p. 51 lines 17-22; p. 71 lines 15-19).

Aatique, a Pakistani citizen, would read Pakistani newspapers via the Internet on a regular basis. As a result he was aware of LET and warfare being carried on by the various guerilla groups in Kashmir against India. (Aatique April 4th direct, p. 16 lines 17-24). Aatique was unimpressed with LET in comparison to other groups fighting in Kashmir until Hamdi returned and described his experiences. Then for a period of six to eight months, Aatique kept a closer eye on LET in the news. (Aatique April 4th direct, p. 20 lines 22-25 and p. 21 line 1). Aatique researched LET and knew it was not associated with al-Qaeda. (Aatique cross, p. 94 lines 13-15). Aatique described LET as a Sunni/Salafi religious and social organization with a military wing. Part of their social organization is that they run schools, libraries and hospitals. LET had offices in a

-11-

lot of towns and cities in Pakistan, in some cities and towns more than one office. (Aatique cross, p. 77 lines 18-25 and p. 78 lines 1-16).  Kwon also testified that the LET recruiter he met in Mecca discussed with him LET's schools and camps.  (Kwon April 11th cross, p. 37 line 8).

Al-Hamdi told Aatique that he was designated as a reference for whomever wanted to go.  When Aatique mentioned that to Kwon, Kwon directed him to Royer. (Aatique April 4th direct, p. 34 lines 22-25).  Based on Kwon's advice, Aatique contacted Royer and made preparations to go in August 2001.  Royer's role consisted of a reference letter, an introductory phone call to Pakistan, and a phone number for use once in Pakistan.  (Aatique April 4th direct, p. 35 lines 1-10; Aatique cross, p. 73 lines 16-25 and p. 74 lines 1-12 and 17-24).  Dr. Al-Timimi was not present when Royer provided Aatique with the assistance.  (Aatique cross, p. 76 lines 2-4). Nor did Aatique tell Dr. Al-Timimi about this nor did Dr. Al-Timimi find out about this.  (Aatique cross, p. 73 lines 13-16).  Aatique affirmed that Dr. Al-Timimi had no impact on his initial pre 9/11 decision to go to the camp.  (Aatique redirect, p. 100 lines 6-9).

### F. Dar al-Arqam Center

Kwon and Aatique testified that Dar al-Arqam was a "lecture gathering place" where local Muslims would come to learn about Islam.  (Aatique April 4th direct, p. 8 lines 7-11; Kwon April 5th direct, p. 7 lines 18-19; Kwon April 11th cross, p. 15 lines 3-5).  Dar al-Arqam grew out of the lectures given at Jaafar Idris' house.  (Idris testimony).  The Dar al-Arqam Center opened in 2000.  (Aatique April 4th direct, p. 8 line 22; Idris testimony).

Kwon first began to attend the lectures in late 1998 when they were still given at

-12-

Sheikh Jaafar Idris' house. (Kwon April 5th direct, p. 7 lines 20-21). He began to regularly attend the weekly Friday lecture from late 1999 until his departure in September 2001. (Kwon April 11th cross, p. 14 lines 9-10). Aatique began to attend the lectures in late 1999 when they were being held at the American Open University. (Aatique April 4th direct, p. 8 lines 20-25, p. 9 lines 1-3; Aatique cross p. 42 lines 6-10). He became a regular with the opening of Dar al-Arqam in spring or summer of 2000. (Aatique cross p. 42 lines 23-25).

Dr Al-Timimi was not the only speaker. Other speakers included Jaafar Idris, his son Yousuf, and, once in a while, guest speakers. (Kwon April 11th cross, p. 14 lines 12-16; Aatique cross, p. 43 lines 1-10). Dr. Al-Timimi's lectures at Dar al-Arqam and by tape had considerable impact on Aatique. (Aatique April 4th direct, p. 14 lines 21-22 and p. 15 lines 5-6).

Kwon testified that Dar al-Arqam taught not to blindly follow one's religious leaders but to ask for religious evidence. This was taught by Dr. Al-Timimi and Jaafar Idris. (Kwon April 11th cross, p. 16 lines 1-17). This is was unlike other Muslim groups, like the Sufis, who blindly follow their leaders. (Kwon April 11th cross, p. 15 lines 20-25).[1]

---

[1]     When a controversy arose regarding the religious permissibility to execute a prisoner as seen in the Russian Hell 2000 video, Kwon found the answer in the form of a fatwa at a jihad website, azzam.com. (Kwon April 5th direct testimony, p. 37 lines 3-4; Kwon April 11th cross, p. 22 lines 6-22). Kwon stated that he understood the arguments presented on the website and determined that they made sense to him and as a result he accepted the ruling embodied in the fatwa. (Kwon April 11th cross, p. 22 lines 20-25 and p. 23 lines 1-12; Kwon redirect, p. 187 lines 14-15). Kwon added that he accepted most of what was placed on the jihad websites, Azzam and Qoqaz (Kwon redirect, p. 187 lines 16-17).

-13-

The primary means of contact between Kwon, Hasan and Aatique with Dr. Al-Timimi was through the latter's public weekly lectures at Dar al-Arqam. (Kwon April 7th cross, p. 6 lines 14-19). Kwon describes that he was one of about fifty people who would attend these lectures. (Kwon April 7th cross, p. 7 lines 4-7; Hasan cross, p. 44 lines 8-9).

Kwon recalls a series of lectures given by Dr. Al-Timimi on the Signs of the Day of Judgment and a second series on the Purification of the Soul. From the testimony of Aatique and Kennedy these lectures consisted of Dr. Al-Timimi reading from a book by that title and then commenting on that book. Kwon also added that "from time to time," Dr. Al-Timimi would "lecture on current affairs, what's going on, how it relates to Islam." (Kwon April 7th cross, p. 6 lines 20-25, p. 7 line 1).

Aatique testified that "almost all the time . . . his lectures were not directly related to jihad" but were on "lots of different topics, although the topic of jihad might come in." (Aatique April 5th direct, p. 15 lines 3-5). Neither Dr. Al-Timimi nor anyone else at Dar al-Arqam would advocate combat jihad but sometimes the topic of jihad or the mujahideen would come up it was mentioned in a noble manner, meaning these people were fighting for a noble cause. (Aatique cross, p. 44 lines 7-13).

Aatique said that Dr. Al-Timimi's lectures were "all related to Islam" and he cannot recall anything "that can be called political." Sometimes current events would crop up in these lectures. (Aatique April 5th cross, p. 43 lines 11-19). Aatique further

---

Kwon did not know what Dr. Al-Timimi's opinion was on the executing of a prisoner in the Russian Hell 2000" video. (Kwon recross, p. 200 lines 24-25 and p. 201 line 1).

-14-

testified that he does not remember any appreciable difference between Dr. Al-Timimi's public and private positions. Although Dr. Al-Timimi appeared more relaxed in a private setting among a smaller group there was no "considerable difference" in how he spoke about a topic. (Aatique April 5th direct, p. 15 lines 18-21 and p. 16 lines 1-9).

Aatique testified that when he heard about what was asked of Dr. Al-Timimi regarding the latter's opinion on the question of whether it was obligatory to obey Mullah Omar since the latter declared himself the 'Amir of the Believers,' that Dr. Al-Timimi's position made no difference to him as Aatique was from that region and he would follow the news very carefully and had formed his own personal attitude (Aatique April 4th direct, p. 55 lines 4-15).

### G. Kwon's Contacts With Dr. Al-Timimi

Kwon (Kwon April 5th direct p. 15, lines 23-25 and p. 16 lines 3-4) and Hasan (Hasan cross p. 43, lines 21-22) testified that they helped Dr. Al-Timimi move.

Kwon testified that he once visited Dr. Al-Timimi's house for a meal after Dr. Al-Timimi moved near him and that no one else was there but Kwon and Dr. Al-Timimi. (Kwon April 5th direct p. 16, lines 14-25; Kwon April 7th cross, p. 5 lines 15-25). Kwon testified that the only private conversation he had with Dr. Al-Timimi was when Kwon drove Dr. Al-Timimi from Dar al-Arqam on the night of September 11, 2001. (Kwon cross p. 60, lines 9-11). Outside of September 16th, 2001, Dr. Al-Timimi never called Kwon to ask if he could visit him at his home (Kwon April 5th direct p. 49 lines 22-24) nor did he ever visit Kwon at his home (Kwon April 5th direct, p. 16 lines 11-13 and p. 50 lines 20-22).

Kwon testified that "the only, only thing" he ever recalls Dr. Al-Timimi asking of

-15-

him "was to give him a ride to Dar al-Arqam." (Kwon April 11th redirect, p. 196 lines 7-9). After Dr. Al-Timimi moved into Kwon's neighborhood and was "literally a few minutes away" (Kwon April 7th cross, p. 7 lines 16-17), Kwon would sometimes on Fridays give Dr. Al-Timimi rides to Dar al-Arqam. (Kwon April 5th direct, p. 11 lines 12-14). Kwon testified that the reason that Dr. Al-Timimi "sometimes" asked for a ride as the latter would be "tired" since he was "very busy" as "he was working, and doing his Ph.D., and . . . giving lectures at Dar al-Arqam" and further Kwon would be "going to Dar al-Arqam anyway." (Kwon April 5th direct, p. 11 lines 23-24 and p. 12 lines 16-18). During these rides, Dr. Al-Timimi would just be "a passenger" (Kwon April 5th direct, p. 11 lines 17) and would scribble notes for his lecture. (Kwon April 7th cross, p. 7 lines 19-22). Kwon provided a ride for Dr. Al-Timimi on two other occasions: 1) on the night of September 11, 2001 and 2) to and from Dr. Al-Timimi's home to Kwon's home on the night of September 16. 2001.

Outside of September 16 and 19, 2001, Dr. Al-Timimi did not call Kwon "very often," "only" when Dr Al-Timimi needed a ride to Dar al-Arqam. (Kwon April 5th direct, p. 49 lines 18-21). Kwon acknowledged that according to the phone records only two phone calls were placed between Kwon and Dr. Al-Timimi from 1999 to September 2001. (Kwon April 11th cross, p. 56 lines 9-13).

Kwon never had a single private conversation with Dr. Al-Timimi about dying as a martyr, or shaheed. (Kwon re-cross p. 202, lines 15-17). Kwon believes that the first private conversation he had with Dr. Al-Timimi was when Kwon was driving Dr. Al-Timimi home on 9/11 from Dar al-Arqam. (Kwon April 11th cross, p. 60 lines 8-11).

Kwon prepared a will in February 2001 (Kwon April 5th direct, p. 19 lines 11-13)

-16-

J.A. 2584

when he was leaving for the hajj, or pilgrimage, as "anything can happen while you're traveling à especially hajj, there are 2 million people." (Kwon April 11th cross p. 41, lines 2-4). Dr. Al-Timimi had no role in preparing the will (Kwon April 5th direct, p. 19 lines 6-9) but Kwon designated Dr. Al-Timimi as the will's executor.   (Kwon April 5th direct, p. 17 lines 10-13). Kwon never told Dr. Al-Timimi that he was going to impose obligations upon him through the will nor did Kwon ask Dr Al-Timimi if he was willing to take on these obligations, Kwon simply gave Dr. Al-Timimi his signed will to hold while he went on hajj. (Kwon April 11th cross p. 38, lines 18-25).

### H.  Dinner at Dar Al Arqam on September 11, 2001

There was a previously planned dinner for Dr. Jaafar Idris for the evening of September 11th, 2001. (Kwon April 11th cross, p. 56 lines 18-19). Kwon described his and others emotional state as one of being nervous and uncertain. (Kwon April 5th direct, p. 37 lines 11-16).

Dr. Al-Timimi did not justify the events of that day. Gharbieh testified Dr. Al-Timimi states that Islamically the attacks were not justified but they were brought on by the foreign policy of the United States. Kwon testified that Dr. Al-Timimi stated that Islamically you cannot kill innocent people. (Kwon April 5th direct, p. 38 lines 10-13; Kwon April 11th cross, p. 59 lines 15-17).

Kwon testified that Dr. Al-Timimi began by saying they should not dwell too much on what happened but rather should be worried about their future. (Kwon April 11th cross, p. 57 lines 6-9). Dr. Al-Timimi advised those present to be careful, not to go outside unnecessarily, not to engage others in discussions regarding the event, and to "just be safe . . . [and] take care of yourself." Al-Timimi further advised veiled women

-17-

should not go outside. (Kwon April 5th direct, p. 37 lines 20-25; Kwon April 11th cross, p. 58 lines 7-13). Dr. Al-Timimi also remarked that dawa (or preaching to Islam) in America was finished and they should all be on guard for anti-Muslim violence. (Kwon April 11th cross, p. 58 lines 16-21).

Following that there was a discussion between Dr. Al-Timimi and Hantash regarding the definition of combatants in Islamic law. (Kwon April 5th direct, p. 38 lines 13-18). Hantash was not satisfied with Dr. Al-Timimi's answer and they went back and forth for a few minutes. (Kwon April 5th direct, p. 38 lines 19-21). Kwon also understood that this was a theological discussion. (Kwon April 11th cross, p. 60 lines 3-4).

After the meeting ended, Kwon gave Al-Timimi a ride home. (Kwon April 11th cross, p. 60 lines 5-7). During the ride, Kwon said that Dr. Al-Timimi stated that September 11th was a punishment from God but that he had not expected something like this but rather an earthquake. (Kwon April 5th direct, p. 39 lines 7-10). Kwon further testified that Dr. Al-Timimi said to expect anti-Muslim activities and hostilities and that he and the brothers should come up with a contingency plan "to defend themselves and their families" in case of "mass hostility towards Muslims in America." (Kwon April 5th direct, p. 39 lines 11-16 and p. 42 lines 8-14).

This was the first time that Dr. Al-Timimi had a private conversation with Kwon. (Kwon April 11th cross, p. 60 lines 8-11). Dr. Al-Timimi also suggested that Kwon leave the United States in order to avoid paying taxes so that Kwon would not be partially responsible for what is going to happen to the Muslims. Dr. Al-Timimi suggested that he could return to Korea to live or, alternatively, go overseas to study in Saudi Arabia or

-18-

Egypt. (Kwon April 11th cross, p. 60 lines 12-24 and p. 61 lines 3-5). At no time during the discussion did LET camps come up. (Kwon April 11th cross, p. 61 lines 15-17).

According to Kwon, Dr. Al-Timimi also asked him to work with the brothers and come up with a contingency plan in case something happened to Muslims in the United States. (Kwon April 11th cross, p. 60 line 25 and p. 61 lines 1-2).

After dropping off Dr. Al-Timimi, Kwon had no interaction with him for the next five days until 6:30 p.m. on September 16th, 2001. Kwon never informed Dr. Al-Timimi that he was planning a meeting to discuss the plan Dr. Al-Timimi entrusted with him, let alone who was coming to the meeting. (Kwon April 11th cross, p. 75 lines 18-25 and p. 76 line 1).

Kwon testified that part of Dr. Al-Timimi's plan included having canned food and water in their cars and to have a contingency plan to get together and protect themselves, and go the mountains to survive. (Kwon April 11th cross, p. 61 lines 21-25). When asked if he went to the store after dropping of Al-Timimi to buy canned food and water, Kwon replied he might of but cannot recall. (Kwon April 11th cross, p. 62 lines 1-3). Kwon does not recall shopping for these items and he already had enough ammunition. (Kwon April 11th cross, p. 62 lines 11-16). Kwon cannot recall telling anybody about getting canned food and water and further admits he did not tell anybody to do so. (Kwon April 11th cross, p. 63 lines 5-7).

Kwon also admitted at that time he had no survivalist training nor did he have any Muslim family to protect. (Kwon April 11th cross, p. 62 lines 21-25 and p. 63 line 1). When asked why then was he selected to execute the plan, Kwon replied "maybe because I was the person driving home." (Kwon April 11th cross, p. 62 lines 17-18).

-19-

### I. Kwon Invites Brothers For Dinner

Dr. Al-Timimi told Kwon to get the brothers but he said nothing about which ones, so Kwon selected the brothers based on what his "understanding" of what the plan was going to be who he felt was best for the task.  Kwon selected brothers who he felt were better fit due to physical training and had firearm experience.  (Kwon direct April 5th p. 40 lines 2-25, p. 41 lines 1-11; p. 42 lines 21-25, p. 43 lines 1-4).  He emailed the brothers, Nabil Gharbieh, Royer, Khan, Hamdi, Surratt, Hammad, Caliph, and Mahmood but not Aatique to come to his home for dinner that weekend.  (Kwon April 5th direct, p. 39 lines 17-25,p. 40 lines 1,p. 41 lines 15-19, p. 42 lines 5-8)  Kwon says, "I don't remember exactly what it said. But basically, I said, "I'm having a dinner. Please come over."  (Kwon April 11th cross, p. 78 lines 1-2).

Royer, Hammad, Caliph, Mahmood, Masaud, Aatique, and Al-Timimi attended the dinner.  Kwon April 5th direct, p. 46 lines 21-25, p. 47 lines 1-12.  Neither Hamdi nor Surratt attended and Gharbieh showed up late.  (Kwon April 5th direct, p. 51 lines 4-8; p. 51 lines 9-14).  Neither Aatique nor Al-Timimi were invited by Kwon to attend the dinner. (Kwon April 5th direct, p. 47 lines 13-15).

Because of the events of September 11th, Aatique was "sort of dicey" of whether he should continue with his plans of going to the LET camp which he had made preparations for in August 2001.  (Aatique April 5th direct, p. 36 lines 10-19 and p. 67 lines 19-22).  He called Royer and sought his advice.  Royer asked him in a slightly forceful way to drive down to Virginia to Kwon's house (Aatique April 5th direct, p. 37 lines 1-13). By driving down to Kwon's house, Aatique was hoping to get Royer's advice if he should continue with his plans of going to LET or skip that.  (Aatique April 5th

-20-

**J.A. 2588**

direct, p. 37 lines 14-18).  At some time after Aatique's arrival, Kwon left to get

Al-Timimi but Aatique did not know where he was going.  (Aatique April 4th direct, p. 38

lines 2-15, cross, p. 87 line 25 and p. 88 line 1).

### J.  Dr. Al-Timimi Calls Kwon

When Kwon ordered dinner at 5:01 p.m., it was not his intent that Dr. Al-Timimi

would attend this dinner.  (Kwon April 11th cross, p. 78 line 25 and p. 79 lines 1-2).

Then when Kwon was picking up the food, Dr. Al-Timimi just happened to call and

asked what Kwon was up.  Kwon said he had invited some brothers to talk about what

Dr. Al-Timimi had asked of Kwon.  Dr. Al-Timimi asked if he could come and Kwon said

it was OK as he felt it better that they hear it from Dr. Al-Timimi himself.  Kwon picked

up Dr. Al-Timimi but Kwon did not say who was going to be over his house, nor did Dr.

Al-Timimi say why he wanted to come over.  (Kwon April 5th direct p. 47 lines 24-25, p.

48 lines 1-5, p. 49 lines 13-17, p. 49 lines 25, p. 50 lines 1-6).  At another point in his

testimony, Kwon says I don't remember telling him anything about what the meeting

was about.  (Kwon April 5th direct, p. 50 lines 16-19).  Kwon does not know how Dr.

Al-Timimi came to know about the meeting.  (Kwon April 5th direct, p. 50 lines 23-24).

Kwon was expecting Dr. Al-Timimi to give a talk because he was the most

knowledgeable and because the whole meeting was about his plan that Dr. Al-Timimi

had recommended Kwon to come up with.  (Kwon April 5th direct, p. 50 lines 10-17).

### K.  Meeting At Kwon's On September 16

Aatique described the emotional state of everyone before Al-Timimi spoke as

quiet and tense.  (Aatique April 5th direct, p. 38 lines 21-22).  People were

apprehensive and fearful. (Aatique cross, p. 86 lines 16-20). For example, Aatique remembers Khan saying "something on the lines of" that Muslims were going to be attacked in their homes and be persecuted by having their homes burnt and being chopped pieces as has occurred to Muslims in India. (Aatique cross, p. 88 lines 2-6). Aatique also remembers somebody else saying, "What should we do? Should we gather our families?" (Aatique cross, p. 88 lines 8-10).

Kwon also testified that the emotional state at the meeting was one of uncertainty and nervousness from the after effects of 9/11. Because of that the meeting was set to "come up with this plan." (Kwon p. 51, lines 17-20).

### 1. Phones, Answering Machine, Curtains

Before Dr. Al-Timimi started speaking, Dr. Al-Timimi said something like, "'Unplug the phone; unplug the answering machine,' or something like that." (Kwon April 5th direct, p. 51, lines 23-24 and p. 53 lines 2-3; Kwon April 11th cross, p. 91 lines 22-23 and p. 92 lines 17-18). Kwon testified that he remembers getting up and unplugging my answering machine and the phone jack. (Kwon April 11th cross, p. 92 lines 18-19). Kwon explained that "My phone shares the same jack with the answering machine, so I unplugged the whole thing." (Kwon April 11th cross, p. 93 lines 7-8). Kwon did not ask Dr. Al-Timimi why should we unplug the answering machine. Kwon said, "I don't recall asking why. I thought it was kind of obvious, you know." (Kwon April 11th cross, p. 92 lines 1-3). When pressed as to what type of eavesdropping device would have been employed in an answering machine, Kwon responded, "I don't know. I'm not an electrical engineer. I was just a computer guy, systems engineer, but I don't know. I don't know these things very well other than what I've seen in the movies, you

-22-

know."  (Kwon April 11th cross, p. 92 lines 22-25 and p. 93 lines 1-2).  Kwon was then asked did he see a movie where someone asked someone to unplug an answering machine? (won replied, "No. No."  (Kwon April 11th cross, p. 93 lines 3-5).

Kwon then added that he did not collect the cell phones of the brothers nor did he check to see if they were turned off.  (Kwon April 11th cross, p. 93 lines 9-13).  Then Kwon testified, "I seem to remember turning [my cell phone] off. I think the other brothers turned off theirs, too, but I didn't check . . . I remember turning off my phone, but I don't know if Dr. Ali Timimi told us to turn off their cell phones as well?" (Kwon April 11th cross, p. 93 lines 13-14, 17-18).

Kwon testified that Dr. Al-Timimi did not instruct anything else regarding curtains. (Kwon April 5th direct, p. 52, line 22, p. 53, 4-5).  Kwon repeated that he doesn't recall anything about the blinds being drawn but that was something that Aatique claimed in a recent conversation he had with him in jail.  (Kwon April 11th cross, p. 89 lines 7-11).

When shown pictures of his apartment complex, Kwon identifies his apartment as being on the third floor. He testified that when he brought Dr. Al-Timimi there, "the sun had just gone down, recently, something like around that time."  (Kwon April 11th cross, p. 90 lines 11, 13-14).  When asked was he worried about someone looking into the window, Kwon replied, "Oh, no, I wasn't. My apartment was on the third floor." (Kwon April 11th cross, p. 91 lines 11-13).

According to Aatique before Dr. Al-Timimi spoke, Dr. Al-Timimi had the curtains drawn and the phone cords unplugged. Aatique understood this to prevent electronic monitoring and further commented "if somehow the phone can be used for this purpose?" (Aatique April 5th direct, p. 39 lines 6-10).  Aatique also indicated that

-23-

Kwon's apartment was on the top floor, which would be the third or fourth floor. (Aatique cross, p. 89 lines 19-20).

Hasan believes that Dr. Al-Timimi told them to "close down the blinds . . . shut off our phones." (Hasan direct, p. 10 lines 5-6, 8; Hasan cross, p. 57 lines 10-14 and p. 58 lines 13-16). Both Hasan and others did shut off their phones. (Hasan direct, p. 10 lines 17-18, 23-25). Hasan does not know why their cell phones needed to be shut off. (Hasan direct, p. 11 lines 1-3). Hasan recalls that he was sitting next to Dr. Al-Timimi at this point but he does not know where Kwon was. (Hasan cross, p. 58 lines 19-23). Hasan does not remember being asked to help turn off the answering machine. (Hasan cross, p. 58 lines 17-18).

### 2. Amana

Aatique testified that Dr. Al-Timimi, quoting a saying of the Prophet, said "a meeting is an amana." (Aatique April 4th direct, p. 39 lines 13-14). Hasan also testified that Dr. Al-Timimi said that this meeting is an amana. (Hasan direct, p. 10 lines 14). Hasan defined amana to mean trust. (Hasan direct, p. 10 line 16). Aatique clarified that the Prophet's saying means, "something like that a meeting is a trust, which is that it's not supposed to be spoke outside unless it's meant for, meant for this purpose." (Aatique April 4th direct, p. 39 lines 14-16). Kwon did not describe the meeting as an amana but testified only that Dr. Al-Timimi said that "we should not repeat anything that was said in the meeting outside of the people who are present." (April 5th direct, p. 53 lines 10-11).

### L. Dr. Al-Timimi's Statements

-24-

J.A. 2592

### 1. Kwon's Testimony

According to Kwon second sequence of events, Dr. Al-Timimi began his talk by discussing our situation as Muslims and saying that because of 9/11 dawah, or calling people to Islam, "in America is finished." (April 5th direct, p. 53 lines 21-22, 24 and p. 54 lines 5-7; April 7th direct, p. 5 lines 1; April 11th cross, p. 99 lines 3-5, 13-14). And while Kwon does not remember details, he does remember that some of the things Dr. Al-Timimi spoke about "were the same things he talked about there at Dar al-Arqam on 9/11." (April 11th, p, 99 lines 17-19).

Kwon testified that Dr. Al-Timimi told them that need to do three things: first, repent; second, leave the United States; and third, join the mujahideen if you can. (Kwon April 7th direct, p. 5 lines 1-4; Kwon April 11th cross p. 107, lines 15-16, p. 108 lines 3-4). Kwon also said these were not options given by Al-Timimi but rather, "First, you have to repent, and after you do that, if you can, try to leave the United States, and if you can do that, then try to join the mujahideen." (Kwon April 11th cross, p. 108 lines 13-15 and 18-22). Kwon also testified that this was the last message he remembered Al-Timimi giving. (Kwon April 11th cross, p. 108 line 3).

Kwon explained repentance as follows, "We all commit sins. So, you know, we always need to repent to, you know, purify ourselves." (Kwon April 11th cross, p. 107 lines 13-15). Kwon identified "No. 2, leave the United States" to mean make hijra which Kwon defined as "when you migrate to a Muslim country." (April 11th cross, p. 107 lines 11-12, 14-15). Kwon clarified that joining the mujahideen can be anywhere in the world. (April 11th cross, p. 108 lines 6-7). And in joining the mujahideen, "it doesn't matter if we fight the Indians or the Russians or the Americans, that this is all legitimate

-25-

jihad." (April 7th direct, p. 6 lines 15-18). At another point in his testimony, Kwon described the third matter as follows, "He told us, 'Go overseas and join any mujahideen,' he actually mentioned, you know, fighting the Indians and the Russians and the Americans. I mean, from that I took that as to be India and Chechnya and Afghanistan." (April 11th cross, p. 113 lines 13-17).

Kwon testified, "Actually, at the meeting, [Al-Timimi] also mentioned Korea again. I remember him saying that since I'm Korean -- he told Mahmood that since he's Pakistani, he shouldn't have any problem getting into Pakistan, but since I'm Korean, it might be hard. Being a Korean, I would have no business being in Pakistan. So he said, you know, 'Maybe you can still go to Korea. It's still better than United States -- staying in the United States.'" (Kwon April 11th cross, p. 107 lines 19-25; Kwon April 7th direct, p. 11 lines 5-6, 12-13).

And even though going to Korea would, according to Kwon, not technically be considered hijra as "Korea is not a Muslim country . . . but in his case, since I'm from Korea -- my parents are from Korea. It's better than staying here." (Kwon April 11th cross, p. 109 lines 12, 14-17). Kwon explained that the reason for leaving the United States was "That way, you know, I don't have to pay taxes to this government." (Kwon April 7th direct, p. 12 lines 13-14). Kwon added, "At that point, I asked him what about if I can go to Pakistan with Mahmood? And he said to me that's better" than Korea. (Kwon April 5th direct, p. 12 lines 13-19).

According to Kwon, the original plan and purpose of the meeting never materialized, because the topic shifted to Afghanistan. (Kwon p. 100 lines 8-9).

### 2. Aatique's Testimony

-26-

**J.A. 2594**

According to Aatique everyone was sitting in a circle and initially people started asking questions so Dr. Al-Timimi said, "everybody ask one question, and then I'm going to talk" (Aatique April 5th direct p. 40 lines 21-24 and p. 42 lines 8-12; Aatique redirect, p. 105 lines 18-20). Dr. Al-Timimi then spoke uninterruptedly except for a couple of minutes when Gharbieh arrived. After everyone asked their one question, Dr. Al-Timimi talked for a while and then there was a general discussion. (Aatique April 5th direct, p. 42 lines 8-13). Food was then served and it was a more free flowing discussion and people were asking questions. (Aatique redirect, p. 105 lines 22-25 and p. 106 lines 1-3).

After everyone asked their one question, Aatique said that Dr. Al-Timimi's first words, which he can almost recall verbatim, were "Now you're going to see the signs and the promises come true" (Aatique April 5th direct, p. 42 lines 14-18). In light of Al-Timimi's series of lectures about "The Signs of the End of Times" at Dar al-Arqam given the previous year, and his tapes which he had given much earlier entitled "The New World Order," Aatique understood Al-Timimi's words to mean that "we are approaching the end of time and the battles near the end of time and the promise for the truth." (Aatique April 5th direct, p. 42 lines 20-25 and p. 43 lines 1-4; Aatique redirect p. 112, lines 3-7 and 11-15).

Aatique testified that Al-Timimi said that "the battle in Afghanistan is imminent and that the Americans are going to attack," and that Al-Timimi then said that this will be "a conflict global in nature" mostly "centered around three places -- Palestine, Arabia, and the south Asian region." The global nature of the battle gave Aatique the impression that this referred to the end of time battles. (Aatique April 5th direct, p. 43

-27-

lines 17-25 and p. 52 lines 8-10). Aatique understood that this would turn out to be one of the major events because one of the signs is an unparalleled battle between Muslims and Western Christians. (Aatique redirect, p. 112 lines 11-21). Aatique clarified that this battle is "around the same time when the Mehdi is here" and that the Mehdi has not appeared at this point. (Aatique recross, p. 118 lines 10-16).

Aatique testified that Al-Timimi said although the Taliban "have problems in how they interpret or implement Islam, but we are Muslims, and they need help, so we should help them" (Aatique April 5th direct, p. 48 line 25 and p. 49 lines 1-2). And that since the 9/11 attacks on America were justified as America was at war with Islam then any attack on the Taliban was unjustified. (Aatique April 5th direct, p. 50 line 25 and p. 51 line 1).

According to Aatique the "gist" of Dr. Al-Timimi's "recommendation on that day was he, he encouraged the people to go out and take part in the fighting, or he also encouraged them to leave, leave America, go with the Muslims, and also, if the can't go to the fighting, then, then leave and live with the good Muslims anywhere --- not anywhere. He said in one of these three places that he mentioned." Further the only "good Muslims" he recalls Dr. Al-Timimi mentioning was "about in Pakistan the LET folks." (Aatique April 5th direct, p. 62 lines 8-16).

Aatique testified that Dr. Al-Timimi recommended two or three things none of them in exclusion to the other. He said that go and fight, encouraged them to be with the mujahideen wherever they are, and also, of course, he said about that you should leave this country and be with the good folks. (Aatique cross, p. 85 lines 7-11). He did encourage us to go and be with the mujahideen, take part of these battles if we can or

-28-

be with the good people or just leave the country.  He gave us these two or three things to do.  (Aatique cross, p. 85 lines 20-22).  Aatique described these things as choices.

Dr. Al-Timimi's recommendation of hijra answered those who "are worried about [their] safety here, then leave" and go to a Muslim country and be safe with other Muslims.  (Aatique cross, p. 88 lines 24-25; and p. 89 lines 1-4).  Aatique said the concept of hijra is not inconsistent in with jihad as it can precede it.  (Aatique redirect, p. 108 lines 22-23).

Part of Dr. Al-Timimi's talk dealt with safety but the topic of discussion was more about the impending attack on Afghanistan.  (Aatique cross, p. 89 lines 7-13).

Aatique does not remember any choice for those who could not leave but he "remembers very strongly encouraging to leave" but "not necessarily to fight."  (Aatique cross, p. 86 line 2-6).

Aatique does not remember anything being said about staying home and praying and repenting.  (Aatique cross, p. 85 lines 15-17).

On redirect Aatique testified, " That's what I'm saying, my impression of him saying, was that he was recommending that you should either, I think the most better of the options that you can take is to, is to go and join the mujahideen, go and fight."

"And also, when he had said that okay, fighting might be in one of these three places, so you should go there and be with the good people, an example was given of LET -- in Pakistan, the example was given of the LET people."

"And also, the topic of hijra came up, generally leaving this country. So one may also leave this country, just leave the country and leave to the Muslim lands."  (Aatique redirect, p. 108 lines 6-16).

-29-

J.A. 2597

Aatique testified that upon leaving Al-Timimi said, "Don't talk about these things in your homes, in your cars. Assume they're electronically monitored" (Aatique April 5th direct, p. 71 lines 8-10).

### 3. Hasan's Testimony

Dr. Al-Timimi gave "three options . . . either to go make hijra, which is to leave the country, or to go and defend Afghanistan and defend the Muslims in Afghanistan, or to, like lay as a rug in your house as an analogy." (Hasan direct, p. 11 lines 20-24). Hasan understood that hijra did not mean jihad. (Hasan cross, p. 60 lines 13-15). Hasan testified that Dr. Al-Timimi did not tell them go to the Pentagon and kill anybody. Hasan said that they needed to go overseas because "they were being invaded in Afghanistan." (Hasan cross, p. 61 lines 1-5). Hasan also testified that there was no discussion of waging war anywhere else besides Afghanistan. (Hasan cross, p. 61 lines 6-8).

Although Dr. Al-Timimi gave three options, he told Hasan that for him jihad was the one that was obligatory. (Hasan cross, p. 59 lines 21-23; Hasan redirect, p. 88 line 25). Hasan did not ask Dr. Al-Timimi why did he give him three choices if one was obligatory; but rather Hasan said he decided what he thought to be the best choice. (Hasan cross, p. 60 lines 1-5).

### M. Uqla Fatwa and Mullah Omar

#### 1. Kwon's Testimony

Kwon testified, "At one point, some -- one of the brothers asked him about Afghanistan." (Kwon April 11th cross, p. 100 lines 9-10). Kwon testified that while he

-30-

**J.A. 2598**

does not remember the question word for word but it was "what about Afghanistan?" (Kwon April 11th cross, p. 102 lines 1-2). While Kwon is "not exactly sure," he thinks that the one who posed the question on Afghanistan was either Khan or Royer. Kwon thinks that because "somebody sitting next to [Al-Timimi] asked this question" and Royer was on Dr. Al-Timimi's left and Khan was on his right. (Kwon April 11th cross, p. 101 lines 16-18, 20-24). Kwon agreed that Al-Timimi did not bring up Afghanistan on his own but that it was brought up due to a question. (Kwon April 11th cross, p. 101, lines 8-9).

Upon being asked about Afghanistan, Kwon said, "I remember he had with him in, like, a blue, blue envelope, postal envelope-type thing, he had Sheikh Uqla's fatwa in Arabic, and I remember him pulling that out and reading. You know, I don't know if he was translating word for word, but he just started talking about, you know, Afghanistan." (Kwon April 11th cross, p. 100 lines 16-20). Kwon further testified when Dr. Al-Timimi "had the fatwa in front of him, he said that the fatwa said that it's fard ayn on all Muslims to go defend Afghanistan." (April 7th direct, p. 8 lines 19-21). And that while reading the fatwa, Dr. Al-Timimi said, "the amir of Afghanistan has called for help – called for assistance and that it is obligatory on all Muslims to go and defend Afghanistan." (April 7th direct, p. 5 lines 8-10)

Later Kwon appeared not as definitive and restricted his testimony to "I seem to remember something like, something like the amir of Afghanistan has asked for assistance." (April 11th cross, p. 104, lines 8-9).

Kwon acknowledged that while he at the time was watching "some news" and reading Muslim websites on the Internet, yet still never saw a call by Mullah Omar for

-31-

Muslims to come and defend Afghanistan. (April 11th cross, p. 104 lines 12-18). Kwon explains this discrepancy, stating "just because I didn't read it doesn't mean it didn't happen. I thought at the time it was part of the fatwa, you know. I mean, he was reading from it. It was Arabic. I mean, like I said, I don''t know if he was translating it word for word or putting his opinions into it, but I seem to recall him mentioning something, amir of Afghanistan has asked for assistance, which makes it obligatory." (Kwon April 11th cross, p. 104 lines 22-25 and p. 105 lines 1-3).

Kwon added that he has "never known [Al-Timimi] to lie" and "at that point, you know, I mean, Ali Timimi said it, so why should he -- why should he make it up, you know?" (Kwon April 11th cross, p. 103 lines 4-5, 7). Kwon assumed that Dr. Al-Timimi was supportive of the fatwa as "Why else would he read it to us?" But admitted that Dr. Al-Timimi never said that he was supportive of the fatwa. (April 11th cross, p. 105 lines 6-13). Kwon admits he can't read Arabic. (p. 102, lines 24-25).

### 2. Aatique's Testimony

Aatique testified that Dr. Al-Timimi mentioned a fatwa by a Saudi scholar al-Uqla which he quoted as an evidence that those killed on 9/11 were not innocent civilians but combatants. (Aatique April 5th direct p. 55 lines 23-24 and p. 56 lines 6-10). Aatique testified that Dr. Al-Timimi produced the fatwa either during the meeting or later from his bag or briefcase. (Aatique April 5th direct, p. 60 lines 13-15). He further testified that while he did not see the papers himself they were referred to as the Uqla fatwa. (Aatique April 5th direct, p. 60 lines 16-20). Aatique said he is not sure what happened to those papers. (Aatique April 5th direct, p. 61 lines 3-4).

Although Aatique did not actually see the Uqla fatwa on September 16th (Aatique

-32-

April 5th direct p. 58 lines 23-24) he did come to know about it through the news. (Aatique April 5th direct, p. 59 line 4). Aatique "seems to remember" that Dr. Al-Timimi mentioned that "Mullah Omar had called for the Muslims to help" and that is why we need to help them. Further, Al-Timimi was quoting out of the fatwa. (Aatique April 5th direct, p. 62 lines 19-21 and p. 63 lines 5-6). Although when Aatique saw the fatwa in jail, he did not find the Mullah Omar portions. (Aatique April 5th direct, p. 63 lines 22-23). Aatique testified that as of the day of his testimony, it is no longer his recollection that Al-Timimi had mentioned Mullah Omar. (Aatique April 5th direct, p. 63 lines 8-13).

### 3. Hasan's Testimony

According to Hasan after telling everyone to shut off their cell phones, Dr. Al-Timimi said, "Mullah Omar has called upon the Muslims to defend Afghanistan." (Hasan direct, p. 11 lines 7-9). Masaud Khan then requested to see the fatwa, Dr. Al-Timimi gave it to him and told him, "Once he was done with it, to burn it." (Hasan direct, p. 13 lines 17 and 25, p. 14 line 3). Hasan testified that it he has not looked at the translation of the Uqla fatwa provided by the FBI for a long time. He does not remember if the translation mentioned Mullah Omar calling for assistance or even if he looked to see if the translation mentioned that. Hasan neither wanted to see if Mullah Omar called for troops nor was he concerned if his testimony corresponded to the fatwa. (Hasan cross, p. 62 lines 16-25 and p. 63 line 1).

### N. Going to LET Camp

#### 1. Kwon's Testimony

-33-

Al-Timimi characterized LET that night as being "on the Sunnah" which Kwon defined means the correct path. (Kwon April 7th direct, p. 11 lines 9-14). Kwon also testified, "there was a discussion that we should get training before we engage ourselves in any combat." (Kwon April 7th direct, p. 13 lines 24-25). Royer said that he could help us get to LET camps in Pakistan. (Kwon April 7th direct, p. 11 lines 6-7). At that point, Dr. Al-Timimi was sitting with them but Kwon does not recall him saying anything. (Kwon April 7th direct, p. 14 lines 1-8).

But at the same time Kwon provided other contradictory testimony that Al-Timimi said that "we should join the LET and get some training from the LET camps." (Kwon April 7th direct, p. 11 lines 9-10) and that Al-Timimi advised them to get to Pakistan through Royer. (Kwon April 7th direct, p. 13 lines 17-18).

### 2. Aatique's Testimony

The discussion of getting training at LET came up while Al-Timimi was present and also continued after his departure. (Aatique April 5th direct, p. 66 lines 19-22; Aatique cross, p. 82 lines 22-24). Aatique testified that when the issue of training at LET came up, Aatique announced his previous plans for traveling to LET on Wednesday 19th and said that if anybody wants they can go with him. (Aatique April 5th direct, p. 67 lines 2-6 and p. 72 lines 4-7; Aatique cross, p. 82 lines 24-25 and p. 83 line 1). Aatique decided to announce his plans on his own and was not asked to do so by anyone. (Aatique cross, p. 83 line 8). Other people then began to discuss this thing of going there (Aatique April 5th direct, p. 67 lines 7-8). Aatique was already planning on going to Pakistan to pick up his wife and child and since he was there he could attend LET for a few days.

-34-

### 3. Hasan's Testimony

Hasan testified that after Dr. Al-Timimi left the meeting, Ismail Royer suggested that they get training from LET before going to Afghanistan. (Hasan direct, p. 21 lines 14-17, 22 lines 14-23).

### O. Decision to Travel

Although Aatique was initially hesitant about going to LET because of 9/11, he decided to go through with the plans because of the impact of the talk. (Aatique April 5th direct, p. 68 lines 2-4). Aatique also testified that he never had any plans of fighting anyone but that after the talk he decided "I will definitely go to training and see how events turn out, and if it turns -- turns out to be a conflict of this magnitude, then I'll see where I end up." (Aatique April 5th direct, p. 69 lines 4-9). He also said, "I never explicitly imagined any place or any, any enemy that I'd fight against, but at the meeting and maybe for a couple of days later, I was thinking, okay, I'm going to go there, and I'll see what happens, and I may go and fight somewhere. That was my intention." (Aatique cross, p. 90 lines 2-6).

When asked why would he get training if he was never planning on fighting, Aatique responded that "he had these plans before, from the summer of 2001 . . . and personally for me . . . I like military things and I like to be militarily trained . . . it was sort of an extension of the paintball training that we were doing . . . and when Ibrahim Al-Hamdi came back and described his experience, it was very encouraging to the other people there." (Aatique April 5th direct, p. 69 lines 4-9).

Aatique believes that while he is not sure if he influenced Khan. He did,

-35-

however, in his opinion, influence Kwon and Hasan to go. (Aatique April 5th cross, p. 83 lines 11-17). Aatique believes that he did not influence Khan because Khan was more enthusiastic than others there and because he had previously fought against the Russians and Communists in Afghanistan. (Aatique redirect, p. 101 lines 5-9). Aatique stated that perhaps one of the reasons that Kwon, Hasan, and Aatique made their arrangements to go about the same time as he was to meet him up in the camp. (Aatique April 5th cross, p. 83 lines 20-21). Aatique also said that the whole atmosphere of the talk encouraged people to go. (Aatique cross, p. 83 lines 20-21). Aatique did not mention he was only going for a week and that he would be returning. (Aatique cross, p. 83 lines 24-25 and lines 1-3). He attributed his silence because he was in an excited state of mind and he was going to see what was going to happen at the camps if any of the signs mentioned would appear. (Aatique cross, p. 84 lines 6-20).

According to Aatique, Dr. Al-Timimi said "In general, these attacks are Islamically legitimate and that Muslims -- I mean, he encouraged us to go, and participate in the coming fighting and jihads." (Aatique April 5th direct p. 40 lines 15-17). Aatique says Al-Timimi was highly encouraging of jihad. (Aatique April 4th direct, p. 15 lines 16-17).

Kwon affirmed that on the night of September 16th after hearing Al-Timimi speak he was willing to fight for the Taliban. (Kwon April 7th direct, p. 10 lines 8-10). Kwon decided to be leave immediately "because I felt that if you don't act as soon as possible, then we won't be able to get there due to all the, all the security reasons and things like that;" there meaning "initially to a Pakistan LET and then to Afghanistan." (Kwon April 7th direct, p. 16 lines 21-25).

-36-

Hasan also testified that on 9/11 he himself was pleased with the attacks. (Hasan cross, p. 54 lines 3-9; Hasan redirect, p. 90 lines 1-11). Upon hearing Dr. Al-Timimi, Hasan was inspired go and fight "against the invaders, the Americans." (Hasan direct, p. 16 lines 19-21, 23). Hasan had never considered going to fight previous to hearing Al-Timimi speak. (Hasan direct, p. 16 lines 16-18).

After Kwon took Al-Timimi home, he went back to his house. Kwon testified, "The brothers were discussing what they want to do. At this point, Masaud expressed that à he wants to go over to Afghanistan to fight. Well, Mahmood, myself, and Masaud, we expressed that we want to go to LET and get some training." (Kwon April 7th direct, p. 14 lines 21-22, 24-25 and p. 15 line 1).

Kwon added that Khan said, "You know, I hope you brothers understand what 'fard ayn' means. It means obligatory on all the Muslims." (April 7th direct, p. 15 lines 16-18)

Kwon clarified that "at that time, our idea was that, you know, after we get the training, we'll go to Afghanistan." (Kwon April 7th direct, p. 15 lines 7-8). Kwon further testified that regarding LET by the time Al-Timimi left his house, "There were no confirmations. The confirmation was after I, after I dropped off Al-Timimi and came back, you know, we confirmed that Mahmood, myself, Masaud, and Aatique will also attend the training for a few days, but as for myself, Mahmood and Masaud, we decided we would go." (Kwon April 11th cross, p. 112 lines 18-22). Regarding going to Afghanistan and fighting, Kwon said, "I don't recall any solid answer before [Al-Timimi] left." (Kwon April 11th cross, p. 112 lines 23-25 and p. 113 line 1).

Kwon admitted that it was his plan to go to Afghanistan and that plan was one

-37-

that he agreed with Khan and Hasan after he came back from dropping off Dr. Al-Timimi at his house. (Kwon April 11th cross, p. 112 lines 5-10). Hasan concurred with Kwon's testimony that it was after Al-Timimi left that they started to make their plans to travel overseas. (Hasan cross, p. 63 lines 2-7).

Aatique testified that after Al-Timimi's departure for the next hour or two they discussed logistics on "how to go to Pakistan, what to do there, how to arrange tickets, how to get a visa, what to carry." (Aatique April 5th direct, p. 71 lines 18-20).

As for the others there Hammad Abdur-Raheem said "he was concerned for his wife and his infant child, and you know, he had problems leaving them behind at the moment." (April 7th direct, p. 15 lines 11-13). While Caliph Abdur-Raheem "expressed that he didn't want to go anywhere . . . he doesn't know about this whole thing." (April 7th direct, p. 15 lines 20-22).

### P. Cabela's Jackets

Kwon ordered jackets from Cabela's based on Khan's recommendation. Khan brought a page ripped out from a Cabela's catalog with him to the meeting, Kwon does not know when Khan order the jacket. (Kwon direct, p. 18 lines 3-25, p. 19lines 1-3). Kwon had a discussion with Khan regarding the jacket they had talked about in the past regarding purchasing warm clothes for possible use in jihad or for survival purposes. Kwon cross, p. 72lines 4-5, p. 72lines 16-25,p. 73lines 1-12). Kwon talked with Khan about Cabela's before 9/16, and might of discussed Cabela's with Khan on the 15, but he doesn't remember. (Kwon cross, p. 73 lines 13-21). Kwon did not know that Khan had purchased a jacket before 9/16. (Kwon cross, p. 73lines 22-25, p. 74).

Kwon and Hasan took Khan to Aatique's home in Pennsylvania so that Khan

-38-

could leave on the same flight with Aatique. (Kwon April 7 direct, p. 25 lines 13-25, p. 26 lines 1-9). They arrived at Aatique's home at approximately 3:00 or 4:00 the morning. Kwon and Hasan advised Aatique not to take anything that would identify him as a religious Muslim, like the Koran, and not to take his camouflage boots. (Aatique recross, p. 117 lines 1-5). Kwon only remembers his advice to Aatique regarding the boots. (Kwon April 11th cross, p. 125 lines 2-5). Kwon said that the group told Aatique "You don't want to take anything suspicious, you know, especially after 9/11." (Kwon April 11th cross, p. 125 lines 17-19, 23).

Kwon did want Aatique to get to the camps undetected, however, he did not consider this to be helping Aatique to get to the camps undetected but merely "just giving him advice so that he won't get into trouble when he was still at the airport." (Kwon April 11th cross, p. 125 lines 8-14 and p. 126 lines 16-19).

According to Kwon, Aatique and Khan decided on their own that they would travel as they don't know each other and that this was Khan's suggestion. (Kwon April 11th cross, p. 125 lines 17-18, 22-24 and p, 126 line 1). Kwon testified that he does not know what he said when he heard this, "but it seemed like a good idea." It seemed wise given that they had bought their tickets at different times. (Kwon April 11th cross, p. 126 lines 3-4, 10-13). They also discussed what Khan and Aatique should say if they got stopped by the authorities. (Aatique recross, p. 117 lines 14-15). However Kwon testified that he did not hear them talking about that nor did he hear them discussing crying like babies and asking for their mothers or lawyers. (Kwon April 11th cross, p. 127 lines 2-10).

### Q. Meeting With Dr. Al-Timimi On September 19

-39-

After taking Al-Timimi home on the night of September 16th, Kwon did not see Al-Timimi until Wednesday September 19th. (Kwon April 7th direct, p. 22 line 21). Hasan testified that after he got his visa, he meet with Al-Timimi again at the kabob place. (Hasan direct, p. 27 lines 17-19). Kwon does not remember whether it was he or Hasan who called Al-Timimi, or if Al-Timimi called them. But they told Al-Timimi that they were leaving and Al-Timimi then wanted to meet them for lunch. They then picked Al-Timimi up from his workplace. (Kwon April 7th direct, p. 22 lines 21-25 and p. 23 line 1). Hasan and Kwon told Al-Timimi "they were planning to go, go to LET or go to Pakistan." (Hasan direct, p. 28 lines 9). Hasan testified that he did not recall Al-Timimi's response to that. (Hasan direct, p. 28 line 12). Although Hasan's testimony did not specify if the purpose of their trip was to "LET or Pakistan," Kwon testified that they told Al-Timimi "they were going to Pakistan to, to get to LET training camps." (Kwon April 7th direct, p. 23 lines 9-10; Kwon April 11th cross, p. 151 lines 1-9). Hasan further testified that Al-Timimi did not seem surprised about their plans (Hasan direct, p. 29 lines 11-12) nor did Al-Timimi say anything to discourage them from going to LET. (Hasan direct, p. 29 lines 16-18). While Kwon surmised that by Al-Timimi giving advice "he was approving of our going." (Kwon April 7th direct, p. 24 lines 14-15)

Hasan testified that Al-Timimi "told us to take some precautions." (Hasan direct, p. 28 lines 20). Hasan elaborated on these precautions as follows: (1) carry a magazine (Hasan direct, p. 28 lines 20; p. 79 lines 2-9) which Hasan guesses that the purpose behind that was not to draw attention. (Hasan direct, p. 28 lines 24-25); (2) if stopped cry like a baby and ask for your mother (Hasan direct, p. 28 lines 20-21 and p. 29 lines 1-2; Hasan cross, p. 79 lines 19-25, p. 80 lines 1-9, 22-23); (3) keep a distance

-40-

from one another (Hasan direct, p. 29 line 5).

However even though Hasan said that Al-Timimi told them to stay apart, both Kwon and he testified that they sat next to each other on the airplane (Hasan cross, p. 79 line 25 and 80 lines 1-4; Kwon April 7th direct, p. 45, line 2). Kwon also added "there were immigration offices interviewing everybody boarding the flight from New York City to Pakistan." They asked Kwon, "Are you traveling with Mahmood?" and to that Kwon replied yes. (April 7th direct, p. 44 lines 18-25).

Kwon did not agree that Al-Timimi told him and Hasan to travel apart. (Kwon April 11th cross, p. 155 lines 20-22). Rather Kwon's testimony was that Al-Timimi "told us that . . . when we traveled, don't take anything suspicious. He told us that if Mahmood was to get stopped for some reason at the airport, that I should also stop my trip, because I won't be able to find my way around Pakistan, but he said . . . if I was to be stopped Mahmood should go one since he can get his way around Pakistan." (Kwon April 7th direct, p. 23 lines 12-17; Kwon April 11th recross, p. 155 lines 22-25, and p. 156 lines 1-4). Kwon added that Al-Timimi advised that if at the airport they were stopped by the authorities to "act scared and nervous, ask for a lawyer, ask for your mothers, or stuff like that." (Kwon April 7th direct, p. 23 lines 20-21; Kwon April 11th cross, p. 154 lines 19-20; Kwon April 11th cross, p. 155 lines 6-10). Regarding the value of asking for your mothers, Kwon admitted that he "didn't really see how that would help, but I guess to show that -- to -- I guess to fool the Immigration or something that we are scared and we're innocent or something. I don't know." (Kwon April 11th cross, p. 154 lines 24-25 and p. 155 line 1). Kwon added that Al-Timimi did not tell them to cry. (Kwon April 11th cross, p. 154 line 19).

-41-

However, Hasan denied that Al-Timimi told them that if they were to be caught that they should ask for their lawyers but only that they should cry like babies and ask for their mothers. (Hasan cross, p. 80 lines 16-23).

Hasan admitted that never at any time did Al-Timimi say that he been to Pakistan let alone a camp. (Hasan cross, p. 79 lines 15-18).

Hasan testified that prior to leaving for Pakistan he and Kwon went to Sheikh Jaafar Idris' house and that Yousuf Idris told he and Kwon not to go to Pakistan. (Hasan April 14 cross, p. 72 lines 16-22, p. 73 lines 10-14, 25, p. 74 lines 1-6). Hasan did not know how Yousuf Idris found out that he and Kwon were traveling to Pakistan but he did not believe that Dr. Al-Timimi told him. (Hasan cross, p. 75 lines 2-11).

Yousuf Idris testified that Dr. Al Timimi had told him to tell Hasan and Kwon not to travel to Pakistan.

After arriving in Pakistan, Kwon and Hasan spend two weeks with Hasan's uncle. During that period Kwon and Hasan went shopping for supplies and spent leisure time. (Kwon April 7 direct, p. 45 lines 5-8; cross p. 160 1-17). Kwon and Hasan also spent time with Khan and his brother Omar. (Kwon April 7 direct, p. 45 lines 9-11). Kwon testified that their urgency was to "get out of the United States as quick as possible -- as quickly as possible." (Kwon April 11 redirect, p. 200 lines 3-4). Once they reached Karachi they had a sense of relief. (Kwon April 11 cross, p. 160 lines 15-17; redirect, p 199 lines 23-25).

### R. LET Camp

Kwon testified that in the LET Camp Masada they used various weapons including AK-47's and light machine guns (Kwon direct April 7, p. 49 lines 3-25) and at

-42-

Adbullah Ibn Masoud Camp they received training on rocket propelled grenades (Kwon direct April 7, p. 51 lines 16-25, p. 52 lines 1-8). Khan and Hasan also fired rocket propelled grenades at Masoud Camp. (Kwon direct April 7, p. 52 lines 1-8). On cross examination, Kwon testified that Dr. Al-Timimi never asked them to commit any crime with a gun, nor to carry explosives in the course of a crime, nor to fire a machine gun in the course of a crime. (Kwon cross April 7, page 27 lines 23-25, page 28 lines 1-7).

Hasan testified that he was at three LET camps but does not name them. (Hasan direct April 14, p. 36 lines 12-13). He testified that he trained in AK-47 and RPG. (Hasan p. 36 lines 14-18).

## III. DR. AL-TIMIMI'S SEPTEMBER 16 STATEMENTS ARE PROTECTED BY THE FIRST AMENDMENT

3. The Defendant's Statements at the September 16 Dinner are Protected Speech.

As the court is well aware, the United States Supreme Court has held that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing *imminent* lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio,* 395 U.S. 444 (1969) The Court recognized that this case involved significant First Amendment issues regarding freedoms of speech, religion and association. In such a case, the Supreme Court has ruled that courts must make "an independent constitutional judgment on the facts of the case." *Bose Corp. v Consumers Union of United States*, 466 U.S. 485, 522 n. 27 (1984) In criminal and civil cases, where issues of constitutionally protected speech arise, the Courts must "exercise independent judgment on the question of whether

-43-

particular remarks are "so inherently inflammatory as to come within that small class of 'fighting words' which are 'likely to provoke the average person to retaliation and therefore cause a breach of peace,'" *Street v. New York*, 394 U.S. 576, 592 (1969), and on the analogous question whether advocacy is directed to inciting or producing imminent lawless action." *Hess v. Indiana*, 414 U.S. 105, 108-109 (1973), cited in *Bose* supra. As such, the Court is required to examine the alleged criminal statements de novo and determine whether the speech at issue is protected as a matter of constitutional law. As such, with respect to the constitutional issues set forth below, the jury verdict on this issue is entitled to no weight whatsoever.

Even in the light most favorable to the government, the statements attributed to Dr. Al-Timimi on September 16, 2001, are, as a matter or law, protected speech that cannot be criminalized. There is simply no basis for this court to find, on the record before it, that Dr. Al-Timimi's statements were intended to or did provoke imminent violence or lawlessness. These statements were made, it is obvious, in a religious context and all of the witnesses agreed that non-criminal, purely religious advice, was provided at the same time. Moreover, these statements are so far removed from imminent violence that they cannot meet the *Brandenburg* test. First, there was no war in Afghanistan at the time that these statements were allegedly made. While it was certainly possible that war was in the offing, it was not imminent and was a mere potentiality. On the evening of September 16, 2001, it was possible that the following events might occur: that a war might come some day, that these men might receive training in some far off land, that they might then travel to Afghanistan - something that not one government witness even tried to do - that they might, at some time even

-44-

further into the future get to Afghanistan during a war in which United States troops were involved and might then, at an even more distant hypothetical date, actually fight against U.S. military personnel they might happen to encounter. There is, in this recitation, a complete absence of imminence of actual violence.

In fact, there is much less imminence in this case than there was in *Hess*. In *Hess*, the defendant yelled to an assembled crowd of anti-war protesters that they could take back a street that had been taken over by law enforcement authorities. *Hess* at 107. There were, when Hess made these remarks, actual law enforcement authorities present who could have been injured had the demonstrators acted to take Hess' advice and "take back the street." Even in that situation, when there was a real and immediate possible threat to the police at the very time that the statements were uttered, the Supreme Court vacated the conviction of Hess stating "At best, however, the statement could be taken as counsel for present moderation; at worst, it amounted to nothing more than advocacy of illegal action at some indefinite future time. This is not sufficient to permit the State to punish Hess' speech." *Hess* at 108.

Like the defendant in *Hess*, there is no evidence Dr. Al-Timimi intended that his words cause any imminent disorder or criminality. In addition to the fact that he offered several non-criminal options to each person, each and every government witness testified that they had begun to train for jihad in early 2000, that their conspiracy had begun by that time, and that they never informed Dr. Al-Timimi that such a conspiracy existed. There was no imminence to the formation of a criminal conspiracy - it already existed unbeknownst to the defendant by all accounts. Moreover, Kwon and Hasan

-45-

both testified that the urgency that they felt after hearing Dr. Al-Timimi speak was only to get out of the United States. Aatique already had a plane ticket for Pakistan and a letter of introduction to LET from Royer. When Kwon and Hasan went to Pakistan they went shopping and to the beach. Hasan even testified that as of the middle of October, he was still in Lahore, Pakistan watching television at his aunt's home. He testified that as of that date, he was no longer planning to wage war against the United States.

Q. Who is Sheikh Estes?

A. Sheikh Estes is someone who I used to work with. He's a preacher who used to be – become Muslim.

Q. And you called him from Pakistan, didn't you?

A. Yes, I did.

Q. And you were – at the time you called Sheikh Estes, were you still planning war against the United States?

A. No, I was with my aunt.

(Hasan April 14 cross, p. 52)

Whatever fire that Dr. Al-Timimi may have lit under Hasan had apparently extinguished itself by that date. Regardless, on September 16, 2001, there was no imminent violence or lawlessness that arose from what the defendant allegedly said. When asked why they did not just go down to the Pentagon and kill someone, Hasan responded that "that was not the plan." Not one person was ever actually or potentially threatened with any violence as a result of what the defendant allegedly said. Not one American soldier was ever threatened by any of these individuals in any way. As such, the jury verdict, which is premised upon the imminence of violence must be vacated.

-46-

This analysis is applicable to all the counts in the indictment.

## IV. THE INDICTMENT

### A.    Count 1: Inducing Others to Conspire to Use Firearms in violation of 18 U.S.C. §§ 2 and 924(n).

1. Elements of the offense. In order to find Dr. Al-Timimi guilty of Count 1, the government must prove that he induced others to conspire to use firearms in furtherance of crimes of violence.

a. Aiding, abetting, counseling and inducing, 18 U.S.C. § 2.

The elements of aiding and abetting, 18 U.S.C. § 2 are: 1) associating with a venture, 2) participating in it as something the defendant wished to bring about, and 3) seeking by action to make the venture succeed.

b. Conspiracy to use firearms, 18 U.S.C. § 924(o).

In order to be convicted of conspiracy to use firearms, the government must prove that at least two individuals knowingly and deliberately arrived at an agreement or understanding that they, and perhaps others, would use firearms in furtherance of one of the nine enumerated crimes which would have to be found unanimously found by the jury.

2. Evidence adduced at trial. According to Kwon, Dr. Al-Timimi just happened to call him and asked what he was doing. Kwon said he had invited some brothers to talk about what Dr. Al-Timimi had asked of Kwon. Dr. Al-Timimi asked if he could come and Kwon said it was OK as he felt it better that they hear it from Dr. Al-Timimi himself. Kwon picked up Dr. Al-Timimi but Kwon did not tell him who was going to be at his house, nor did Dr. Al-Timimi tell Kwon why he wanted to come over.

-47-

(Kwon April 5th direct p. 47 lines 24-25, p. 48 lines 1-5, p. 49 lines 13-17, p. 49 lines 25, p. 50 lines 1-6). At another point in his testimony, Kwon says I don't remember telling him anything about what the meeting was about. (Kwon April 5th direct, p. 50 lines 16-19). Kwon was expecting Dr. Al-Timimi to give a talk because he was the most knowledgeable and because the whole meeting was about the plan that Dr. Al-Timimi had told Kwon to come up with. (Kwon April 5th direct, p. 50 lines 10-17). According to Kwon, the original plan[2] and purpose of the meeting never materialized, because the topic shifted to Afghanistan. (Kwon p. 100 lines 8-9). Dr. Al-Timimi never raised the topic of Afghanistan but was speaking about the US, when a question was asked of him Afghanistan.

Dr. Al-Timimi was not aware of the conspiracy which began in or about January 2000 and was not aware that those in attendance at Kwon's on September 16 possessed firearms. Dr. Al-Timimi was not aware of the nature of the paintball training nor was he aware of the ownership of any firearms listed in the indictment. Kwon testified that he had no information that Dr. Al-Timimi knew that any of the other group members owned firearms. (Kwon April 11th cross, p. 82 lines 1-3). According to Kwon, even with the group's extensive gun ownership and use, Dr. Al-Timimi was totally unaware of the firearms. Kwon testified that Dr. Al-Timimi never told them to buy a gun. (Kwon April 11th cross, p. 18 line 6). Kwon never showed his gun to Dr. Al-Timimi

---

[2]      This was the contingency plan "to defend themselves and their families" in case of "mass hostility towards Muslims in America." (Kwon April 5th direct, p. 39 lines 11-16 and p. 42 lines 8-14). The plan included having canned food and water in their cars and to have a contingency plan to get together and protect themselves, and go the mountains to survive. (Kwon April 11th cross, p. 61 lines 21-25).

-48-

(Kwon April 7th cross, p. 24 line 25 and p. 25 lines 1-2) or told him that he owned a gun (Kwon April 7th cross, p. 24 lines 22-24) or that he sold a gun to Royer (Kwon April 11th cross, p. 25 lines 19-21). Kwon never went to the range with Dr. Al-Timimi nor did he ever tell him that he was going to the range nor did he ever see him at the range. (Kwon April 7th cross, p. 25 lines 13-20 and April 11th cross, p. 19 lines 13-15).

No witness testified that Dr. Al-Timimi knew about the ownership of any firearms or that he advocated the use or ownership of firearms. Nor did any witness testify that Dr. Al-Timimi induced anyone to conspire to use firearms to commit a crime of violence. No witness testified that Dr. Al-Timimi ever mentioned firearms. As such, there was no evidence presented to satisfy the elements of this charge.

In addition, as argued above, Dr. Al-Timimi's statements were protected by the First Amendment.

**B.    Count 2:  Soliciting Others to Levy War in violation of 18 U.S.C. §373.**

1. Elements of the offense of soliciting others to levy war are:  a) soliciting, commanding, inducing or otherwise trying to persuade another person to levy war against the United States; and b) the defendant's actions strongly indicated that he intended that the other person or persons to levy war against the United States, that had as an element the use, attempted use, or threatened use of physical force against the person or property of another in violation of the laws of the United States.

2. Evidence adduced at trial. According to Kwon, Dr. Al-Timimi began his talk by discussing our situation as Muslims and saying that because of 9/11 dawah, or calling people to Islam, "in America is finished." (April 5th direct, p. 53 lines 21-22, 24 and p. 54 lines 5-7; April 7th direct, p. 5 lines 1; April 11th cross, p. 99 lines 3-5, 13-14).

-49-

Kwon testified that Dr. Al-Timimi told them that need to do three things: first, repent; second, leave the United States; and third, join the mujahideen if you can. (Kwon April 7th direct, p. 5 lines 1-4; Kwon April 11th cross p. 107, lines 15-16, p. 108 lines 3-4). Kwon explained repentance as follows, "We all commit sins. So, you know, we always need to repent to, you know, purify ourselves." (Kwon April 11th cross, p. 107 lines 13-15). Kwon identified "No. 2, leave the United States" to mean make hijra which Kwon defined as "when you migrate to a Muslim country." (April 11th cross, p. 107 lines 11-12, 14-15). Kwon clarified that joining the mujahideen can be anywhere in the world. (April 11th cross, p. 108 lines 6-7). And in joining the mujahideen, "it doesn't matter if we fight the Indians or the Russians or the Americans, that this is all legitimate jihad." (April 7th direct, p. 6 lines 15-18). At another point in his testimony, Kwon described the third matter as follows, "He told us, 'Go overseas and join any mujahideen,' he actually mentioned, you know, fighting the Indians and the Russians and the Americans. I mean, from that I took that as to be India and Chechnya and Afghanistan." (April 11th cross, p. 113 lines 13-17). Kwon testified that Dr. Al-Timimi never raised the topic of Afghanistan but was speaking about the US, when a question was asked of him Afghanistan. He answered with the Uqla fatwa and Omar call, and concluded with his advice.

Kwon indicated that Dr. Al-Timimi told him to go to Korea. Kwon testified, "Actually, at the meeting, [Al-Timimi] also mentioned Korea again. I remember him saying that since I'm Korean -- he told Mahmood that since he's Pakistani, he shouldn't have any problem getting into Pakistan, but since I'm Korean, it might be hard. Being a Korean, I would have no business being in Pakistan. So he said, you know, 'Maybe

-50-

J.A. 2618

you can still go to Korea. It's still better than United States -- staying in the United States.'" (Kwon April 11th cross, p. 107 lines 19-25; Kwon April 7th direct, p. 11 lines 5-6, 12-13).

Aatique said that Dr. Al-Timimi's first words, which he can almost recall verbatim, were "Now you're going to see the signs and the promises come true" (Aatique April 5th direct, p. 42 lines 14-18). Aatique testified that Al-Timimi said that "the battle in Afghanistan is imminent and that the Americans are going to attack," and that Al-Timimi then said that this will be "a conflict global in nature" mostly "centered around three places -- Palestine, Arabia, and the south Asian region." The global nature of the battle gave Aatique the impression that this referred to the end of time battles. (Aatique April 5th direct, p. 43 lines 17-25 and p. 52 lines 8-10). Aatique understood that this would turn out to be one of the major events because one of the signs is an unparalleled battle between Muslims and Western Christians. (Aatique redirect, p. 112 lines 11-21).

According to Aatique the "gist" of Dr. Al-Timimi's "recommendation on that day was he, he encouraged the people to go out and take part in the fighting, or he also encouraged them to leave, leave America, go with the Muslims, and also, if they can't go to the fighting, then, then leave and live with the good Muslims anywhere --- not anywhere. He said in one of these three places that he mentioned." Further the only "good Muslims" in Pakistan he recalls Dr. Al-Timimi mentioning were the LET folks. (Aatique April 4th direct, p. 62 lines 8-16).

Hasan testified that Dr. Al-Timimi gave "three options . . . either to go make hijra, which is to leave the country, or to go and defend Afghanistan and defend the Muslims in Afghanistan, or to, like lay as a rug in your house as an analogy." (Hasan direct, p. 11

-51-

lines 20-24). Hasan understood that hijra did not mean jihad. (Hasan cross, p. 60 lines 13-15).

Dr. Al-Timimi did not solicit others to levy war against the United States. According to the witnesses, Dr. Al-Timimi talked of a future conflict involving Afghanistan and the United States. He indicated that fighting in that upcoming battle was an option for them as Muslims but he also gave them other options, going to any Muslim country to live and staying in the United States. In telling them what their options were as Muslims, Dr. Al-Timimi was not soliciting or advocating war against the United States. There is no imminent danger or immediate call to action in Dr. Al-Timimi's words. Nor were Dr. Al-Timimi's words intended to incite immediate lawless action on the part of anyone at the meeting.

Dr. Al-Timimi's words do not rise to the level of soliciting others to levy war. To constitute a levying of war, there must be an assemblage of persons for the purpose of effecting by force a treasonable purpose. Enlistment of men to serve against the United States is not sufficient. *Ex Parte Bollman and Ex Parte Swartwout,* 8 U.S. 75, 126 (1807). Under the government's construct of this offense, any solicitation that may involve potential injury to a soldier, even in the absence of treasonous intent, would be a crime under this section. That simply cannot be the case. Furthermore, as has been argued above, statements such as Dr. Al-Timimi's have been determined by the Supreme Court to be speech protected by the First Amendment.

### C.    Count 3: Inducing Others to Conspire to Levy War in violation of 18 U.S.C. §§ 2 and 2384.

1. Elements of the offense. In order to find Dr. Al-Timimi guilty of Count

-52-

3, the government must prove that he induced others to conspire to levy war.  The elements of inducing others to conspire to levy war that the government must prove are: 1) that Dr. Al-Timimi knew that an unlawful conspiracy to levy war against the United States was to be undertaken or already in existence; 2) that Dr. Al-Timimi aided, abetted, counseled, or induced others or undertook some other action with the intent to procure the engagement of those others in that unlawful conspiracy; and 3) at least one person who Dr. Al-Timimi aided, abetted, counseled, or induced to engage in that unlawful conspiracy ultimately did so.

2.  Evidence adduced at trial.  Dr. Al-Timimi did not advocate levying war against the United States.  Dr. Al-Timimi told the group that they had a number of options open to them as Muslims including joining mujahideen anywhere in the world, going to a Muslim country to live and staying in the United States and doing nothing. As argued above, Dr. Al-Timimi's words during the course of the September 16 meeting at Kwon's were protected speech under the First Amendment.  In addition, as argued in Count 2, Dr. Al-Timimi's words were not intended to induce anyone to assemble for the purpose of effecting by force a treasonable purpose.  Enlistment of men to serve against the United States is not sufficient.  *Ex Parte Bollman and Ex Parte Swartwout,* 8 U.S. 75, 126 (1807).

### D.    Count 4:  Attempting to Contribute Services to the Taliban in violation of 50 U.S.C. § 1705.

1.  Elements of the offense.  In order to find Dr. Al-Timimi guilty of Count 4, the government must prove that 1) Dr. Al-Timimi attempted to make a contribution of services; 2) to or for the benefit of the Taliban; and 3) with the knowledge that making

-53-

such a contribution was contrary to law.

2. Evidence adduced at trial.  As stated in Count 1, the evidence according to Kwon, was that Dr. Al-Timimi call him and asked what he was doing. Kwon told Dr. Al-Timimi about the dinner and meeting to talk about the contingency plan.  Dr. Al-Timimi asked if he could come.  Dr. Al-Timimi had no idea who was to be at the dinner at Kwon's.  At another point in his testimony, Kwon says I don't remember telling him anything about what the meeting was about.  (Kwon April 5th direct, p. 50 lines 16-19).  Kwon was expecting Dr. Al-Timimi to talk about the contingency plan to have canned food and water and be prepared to go live in the mountains in case of "mass hostility towards Muslims in America." (Kwon April 5th direct, p. 39 lines 11-16 and p. 42 lines 8-14).  Discussions about the contingency plan never occurred because the topic shifted to Afghanistan.  (Kwon p. 100 lines 8-9).  Dr. Al-Timimi never raised the topic of Afghanistan but was speaking about the US, when a question was asked of him Afghanistan.  He answered with the Uqla fatwa and Omar call, and concluded with his advice.  Dr. Al-Timimi was not aware of the conspiracy which began in or about January 2000 and was not aware that those in attendance at Kwon's possessed firearms.

There was no evidence adduced at trial to indicate that Dr. Al-Timimi had any knowledge of Executive Order Nos. 13224 or 13129, 50 U.S.C. § 1705 or any other law prohibiting the contribution of services to or for the benefit of the Taliban.  There was no evidence that Dr. Al-Timimi knew that providing services to the Taliban was prohibited by law and there is no evidence that he actually attempted to or did aid and abet such an attempt.  During the course of the jury's deliberation, the government conceded that

-54-

in order for Dr. Al-Timimi to be guilty of this offense he would have to have known of the existence of the laws prohibiting the contribution of services to the Taliban and had willfully violated those provisions.

"To establish a 'willful' violation of the statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *United States v. Homa International Trading Corp.*, 387 F3d 144 (2d Cir. 2004) citing *Bryan v. United States,* 524 U.S. 184, 191-92 (1998). Therefore, as a matter of law, the evidence adduced at trial was insufficient to convict Dr. Al-Timimi of attempting to contribute services to the Taliban in violation of 50 U.S.C. § 1705 since no such evidence was produced.

### E.    Count 5: Inducing Others to Aid the Taliban in violation of 18 U.S.C. § 2 and 50 U.S.C. § 1705.

1. Elements of the offense. In order to find Dr. Al-Timimi guilty of Count 5, the government must prove that 1) Dr. Al-Timimi knew that an unlawful attempt to provide services to the Taliban was to be undertaken or already in existence; 2) that Dr. Al-Timimi aided, abetted, counseled, or induced others or undertook some other action with the intent to procure the engagement of those others in that attempt; and 3) at least one person who Dr. Al-Timimi aided, abetted, counseled, or induced to attempt to provide services to the Taliban ultimately attempted to do so.

2. Evidence adduced at trial. As with Count 4, the government must prove that Dr. Al-Timimi knew of the existence of the laws prohibiting the contribution of services to the Taliban and had willfully violated those provisions. As stated in the argument to Count 4, the evidence, even in the light most favorable to the government,

-55-

**J.A. 2623**

failed to prove that Dr. Al-Timimi knew of the existence of any laws prohibiting providing aid to the Taliban since no such evidence was produced. . In addition, in order to be guilty of aiding and abetting, Dr. Al-Timimi must have undertaken some action with the intent to assist others who were aiding the Taliban. There was no evidence that Dr. Al-Timimi took any such action.

### F.     Count 6: Inducing Others to Conspire to Violate the Neutrality Act in violation of 18 U.S.C. §§ 2 and 371.

1. Elements of the offense. In order to find Dr. Al-Timimi guilty of Count 6, the government must prove that 1) Dr. Al-Timimi knew that an unlawful conspiracy to set out on, prepare for, or take part in a military enterprise against the territory of countries with whom the United States was at peace was to be undertaken or already in existence; 2) Dr. Al-Timimi aided, abetted, counseled, or induced others or undertook some other action with the intent to procure the engagement of those others in that unlawful conspiracy; and 3) at least one person who Dr. Al-Timimi aided, abetted, counseled, or induced to engage in that unlawful conspiracy ultimately did so.

2. Evidence adduced at trial. The only testimony regarding fighting India or some other country at peace with the United States was provided by Kwon. Kwon testified that Dr. Al-Timimi told them that they should join the mujahideen anywhere in the world. (April 11th cross, p. 108 lines 6-7). And in joining the mujahideen, "it doesn't matter if we fight the Indians or the Russians or the Americans, that this is all legitimate jihad." (April 7th direct, p. 6 lines 15-18). At another point in his testimony, Kwon stated "He told us, 'Go overseas and join any mujahideen,' he actually mentioned, you know, fighting the Indians and the Russians and the Americans. I mean, from that I took that

-56-

J.A. 2624

as to be India and Chechnya and Afghanistan." (April 11th cross, p. 113 lines 13-17).

3. The evidence does not support a guilty verdict. The evidence does not show that there was a conspiracy to violate the Neutrality Act at all. At most, one of the options given by Dr. Al-Timimi was joining the mujahideen in India to fight. The evidence does not show that there was any conspiracy to set out on, prepare for, or take part in a military enterprise against a country the United States was at peace with or that Dr. Al-Timimi was aware of any such conspiracy. If the members of the conspiracy were planning to fight anywhere it was in Afghanistan and not India. No one at the meeting suggested fighting against, intended to fight against or did fight against India or any other country that the United States was a peace in violation of the Neutrality Act. Moreover, all of the government witnesses who were convicted under this section testified that they never told Timimi about the conspiracy, a conspiracy which pre-dated the September 16, 2001, dinner.

**G.    Counts 7 and 8: Inducing Others to Use Firearms in violation of 18 U.S.C. §§ 2 and 924(c).**

1. Elements of the offense. In order to find Dr. Al-Timimi guilty of Counts 7 and 8, that he aided, abetted, counseled, induced, and procured the discharge of firearms by Yong Kwon and Khwaja Hasan in furtherance of crimes of violence which could be prosecuted in the courts of the United States, the government must prove that: 1) Dr. Al-Timimi knew that the unlawful possession of firearms in furtherance of crimes of violence which could be prosecuted in court of the United States was to be undertaken by Kwon and/or Hasan; 2) Dr. Al-Timimi aided, abetted, counseled, or induced Kwon and/or Hasan or undertook some other action with the intent to procure

-57-

J.A. 2625

the engagement of Kwon and/or Hasan in that possession of firearms; and 3) Kwon and/or Hasan ultimately possessed or discharged a firearm in furtherance of crimes of violence which could be prosecuted in courts of the United States.

      2. Evidence adduced at trial. As a matter of law, the evidence adduced at trial was insufficient to convict Dr. Al-Timimi of aiding, abetting, counseling, commanding, inducing or procuring Kwon's use of the light machine gun in Pakistan in October 2001 as alleged in Count 7 and Hasan's use of the AK-47-style automatic rifle in Pakistan in November 2001 as alleged in Count 8. Dr. Al-Timimi never traveled to Pakistan and there was no evidence that Dr. Al-Timimi had ever seen or knew about either Hasan's AK-47-style automatic rifle or Kwon's light machine gun. Nor was there any evidence adduced at trial that Dr. Al-Timimi had knowledge of or had anything to do with Kwon's use of the light machine gun in Pakistan or Hasan's use of the AK-47-style automatic rifle in Pakistan.

In order to be guilty of Counts 7 and 8, the evidence must show 1) that Dr. Al-Timimi knew that specific light machine gun listed in the indictment was available for Kwon to use and that specific AK-47-style automatic rifle listed in the indictment was available for Hasan to use and 2) that Dr. Al-Timimi took some action to assist Kwon in the use of that specific light machine gun and to assist Hasan in the use of that specific AK-47-style automatic rifle. The weapons that Dr. Al-Timimi aided and abetted Kwon and Hasan use must be the specific weapon that they were alleged to have used in the indictment and not another similar weapon. *United States v. Wilson*, 135 F.3d 291, 304 (4th Cir. 1998); *United States v. Salazar*, 66 F.3d 723 (5th Cir. 1995)(The defendant knew that guns were to be used in the jail escape; stored the guns; and told the co-

-58-

defendant to be careful with the guns.); *United States v. Masotto*, 73 F.3d 1233 (2nd Cir.
1995)(In order to be convicted as an aider and abettor of 924(c), one must perform
some act that directly facilitated or encouraged the use or carrying of the firearm.);
*United States v. Medina*, 32 F.3d 40 (2nd Cir. 1994)(The specific crime that the
defendant must have aided and abetted was using or carrying a firearm in relation to a
crime of violence not the robbery that was planned.)

There was no evidence that Dr. Al-Timimi aided and abetted the use of carrying
of any firearm by Kwon or Hasan and certainly not the machine gun listed in the
indictment that Kwon used or the AK-47 listed in the indictment that Hasan used.
Therefore, as a matter of law, the evidence was insufficient to convict Dr. Al-Timimi of
aiding, abetting, counseling, or procuring the using or carrying of firearms by Kwon and
Hasan.

### H.    Counts 9 and 10:  Inducing Others to Carry Explosives in violation of 18 U.S.C. §§ 2 and 844(h).

1. Elements of the offense.  In order to find Dr. Al-Timimi guilty of Counts
9 and 10, that he aided, abetted, counseled, induced, and procured the carrying of
explosives by Yong Kwon and Khwaja Hasan in furtherance of crimes of violence which
could be prosecuted in the courts of the United States, the government must prove that:
1) Dr. Al-Timimi knew that the unlawful carrying of explosives during the course of a
felony crime that could be prosecuted in a court of the United States was to be
undertaken by Kwon and/or Hasan; 2) Dr. Al-Timimi aided, abetted, counseled, or
induced Kwon and/or Hasan or undertook some other action with the intent to procure
the engagement of Kwon and/or Hasan in that carrying of explosives; and 3) kwon

-59-

**J.A. 2627**

and/or Hasan ultimately carried an explosive during the course of a felony crime that could be prosecuted in a court of the United States.

2. Evidence adduced at trial.  The evidence adduced at trial in the light most favorable to the government was that Dr. Al-Timimi told the gathering on September 16 that they had a number of options as a result of the events of 9/11. Based on Dr. Al-Timimi's statements, Kwon, Hasan, Aatique and Khan went to train with LET in Pakistan.  There was no evidence that Dr. Al-Timimi was aware of what training that Kwon and Hasan were receiving or what, if any, weapons they were training with.  While training in Pakistan, Kwon and Hasan fired rocket-propelled grenades (RPG).  Kwon testified that at Adbullah Ibn Masood Camp they received training on rocket propelled grenades (Kwon direct April 7, p. 51 lines 16-25, p. 52 lines 1-8).  Kwon never testifies that he received RPG training at Camp Aqsa.  Hasan testified that he was at three LET camps but does not name them.  (Hasan direct April 14, p. 36 lines 12-13).  He testified that he trained in AK-47 and RPG.  (Hasan p. 36 lines 14-18).  Hasan does not testify that he fired an AK-47 and RPG at Camp Ibn Masood in early November as alleged in the indictment.  There was no testimony that Dr. Al-Timimi took any action to aid, abet, counsel, induce or procure the carrying of RPG's by Kwon and Hasan.  In fact, there was not testimony that Dr. Al-Timimi even knew of the existence of RPG's in the LET camps.

As with Counts 7 and 8, the evidence failed to show 1) that Dr. Al-Timimi knew that the specific RPG's listed in the indictment were available for Kwon and Hasan to use, and 2) that Dr. Al-Timimi took some action to assist Kwon and Hasan in the use of the RPG's that they fired.  Therefore, as a matter of law, the evidence was insufficient

-60-

to convict Dr. Al-Timimi of aiding, abetting, counseling, or procuring the carrying of explosives by Kwon and Hasan.

## V.  CONCLUSION

For the foregoing reasons, the defendant asks the Court to grant his Motion for Judgment of Acquittal on all counts.

Respectfully submitted,

Ali Al-Timimi
By Counsel

Edward B. MacMahon, Jr.   VSB #25432
107 East Washington Street
P.O. Box 903
Middleburg, Virginia 20117
540-687-3902

Alan H. Yamamoto   VSB #25872
643 S. Washington Street
Alexandria, Virginia 22314
703-684-4700

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing motion was hand-delivered to Gordon Kromberg, Esq., Assistant United States Attorney, 2100 Jamieson Ave., Alexandria, Virginia, 22314 this 6th day of June 2005.

I.

Alan Yamamoto

-61-

**J.A. 2629**

FILED                                                                    FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
2005 JUN 14 ℙ 2: 30  **Alexandria Division**          2005 JUN 14 ℙ 2: 30

CLERK US DISTRICT COURT                              CLERK US DISTRICT COURT
**UNITED STATES OF AMERICA,**                          ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| vs. | )     **Case No. 04-385-A** |
| | ) |
| **ALI AL-TIMIMI,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

Corrected

## DEFENDANT'S MOTION FOR A NEW TRIAL

COMES NOW Ali Al-Timimi, by counsel, and for his Motion for a New Trial,

states as follows:

    1.   <u>Introduction and Standard of Review.</u>

Ali Al-Timimi, hereinafter "Timimi" or "defendant," hereby moves this Court to

grant him a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure

and upon the general supervisory powers of the Court.  Fed. R. Crim. Pro. 33(a)

provides that "the court may vacate any judgment and grant a new trial if the interest of

justice so requires."  As is set forth in detail below, a new trial is required in this case

because of prosecutorial misconduct and because of the prejudicial impact of several

pre-trial rulings made by the court that, in total, made it impossible for the defendant to

receive a fair trial.  This case was one in which the credibility of the various witnesses

was the central issue for the jury to resolve.  The items complained of below all relate to

the credibility of the government's witnesses, the defendant and his witnesses, and the

government's portrayal of Islam as a religion that compels its'  adherents to commit

crimes and kill non-Muslims and Americans.  As such, these rulings had a patently

prejudicial effect upon the defendant's right to a fair trial.   While the law allows the

prosecutor to prosecute with vigor, the government may not misstate the evidence to

the jury or appeal directly to issues of religious bias.  Or, as the United States Supreme

Court wrote over seventy years ago, the prosecutor "is the representative not of an

ordinary party to a controversy, but of a sovereignty whose obligation to govern at all;

and whose interest, therefore, in a criminal prosecution is not that it shall win a case,

but that justice shall be done...  He may prosecute with earnestness and vigor - indeed,

he should do so.  But while he may strike hard blows, he is not at liberty to strike foul

ones." *Berger v. United States*, 295 U.S. 78, 88 (1935).  The actions detailed below,

especially as it relates to the deliberate misstatements of material fact and religious

bigotry displayed by the rebuttal argument, are the precise type of foul blows that are

offensive to our system of justice.

    2.    <u>The Prosecution's Closing Argument Contained Material Misstatements of</u>
<u>the Evidence and Contained an Unprecedented Appeal to Religious</u>
<u>Bigotry.</u>

    When this Court reviews the government's closing argument in this case, and in

particular,  the rebuttal argument, the Court will see that the government made

significant prejudicial statements that were unsupported by the evidence and otherwise

misstated evidence that had been admitted in the case.  "A misstatement is error `when

it amounts to a statement of fact to the jury not supported by proper evidence

introduced during trial, regardless of whether counsel's remarks were deliberate or

made in good faith'." *United States v. Gartmon*, 146 F. 3d 1015, 1025 (D.C. Cir. 1997)

cited in *United States v. Watson*, 171 F. 3d 695 (D.C. Cir. 1999).  Moreover, the

-2-

prosecutor may not make appeals to prejudice and bias - in this case religious - in its

closing. *United States v. Doe,* 903 F. 2d 16, 25 (D.C. Cir. 1990)   To determine whether

a defendant has suffered significant prejudice to warrant a new trial, the Court should

apply the three part test set forth in *Gartmon*.   In doing so, the Court should review "the

closeness of the case, the centrality of the issue affected by the error, and the steps

taken to mitigate the effects of the error." *Gartmon* at 1026.  The Court determines how

the prosecutor's misstatements prejudiced the defendant in light of the "evidence

presented, asking to whether evidence was sufficient to convict notwithstanding the

error, but rather whether the Court can say that the error did not affect the jury's verdict;

if in `grave doubt,' the court cannot affirm" the defendant's conviction. *Kotteakos v.*

*United States*, 328 U.S. 750, 764-65 (1946), cited in *Watson*, supra at 699. (Citations

omitted).

    In this case, as is demonstrated below, the prosecution violated all of the prongs

of these tests and the defendant is, as a result, entitled to a new trial.[1]

    A.    The Appeal to Religious Bigotry was Overt and Prejudicial.

    As the Court well recalls, the jury in this case was treated to a government

sponsored crash course in Islam.  Portions of the Koran, hadeeths, and Timimi's

religious speeches, including some when he was merely reading books to an audience,

were played without regard to the fact that almost none of these items were ever heard

---

[1] The defense filed pretrial motions seeking to prevent the government from introducing many of these issues into this case.  The defense is not required to repeat those objections at trial or during a closing argument to preserve its objections. *United States v. Mendiola*, 42 F. 3d 259, 260 n. 2 (5th Cir. 1994), *United States v. Wilson*, 26 F. 3d 142, 158-60 (D.C. Cir. 1994).

-3-

by any government witness. The government, except in very limited circumstances, did

not even bother to proffer that any witness had ever heard any of the body of speeches

by Timimi made over a 15 year time period. The jury was even told that Muslims were

supposed to lie to non-Muslims, a group that included each and every member of the

jury. The government even attempted, through one of its witnesses, to show that Islam

is a religion bounded by or spread through violence. Mr. Kromberg and Aatique had the

following exchange:

> Q:  One of the questions was, I think, was whether jihad is always to protect Muslims who are oppressed. Do you recall that?
> A:  There was some questions along these line.
> Q:  Is jihad a violent jihad only used for defense?
> A:  This is a theological question, but from what I know, defense would, of course, be jihad, but it can be an offensive, in certain circumstances, it can be an offensive word also.
> Q.  Where did Islam start?
> A.  We believe that Adam was the first Muslim.
> Q.  Where did Muhammad live?
> A.  Arabia, Mecca. That's where he was born.
> Q.  What relationship did offensive jihad have to the spread of Islam from Arabia to elsewhere in the world, if any?
> A.  This is, a historical debate, because a lot of Orientalists accuse that Islam was spread by the sword, but we Muslims don't believe that...
> Q.  How did Arabia become unified? Excuse me, what relationship did jihad by the sword have to the unification of Arabia under Islamic rule?

(Aatique, April 5, pp. 96-99)

When Mr. Kromberg rose to make his rebuttal argument, the purpose for

introducing all of this evidence became apparent. That argument contains

unprecedented appeals to religious bigotry and bias that went far beyond what is

allowable in a court in the United States. That argument stated, without any

sophistication or obfuscation, that Islam is a violent religion whose adherents, especially

the defendant, are predisposed to violence and crime as a matter of religion.

-4-

Specifically, after seeking vainly to claim that he was not attacking any Muslims other than those he names, Mr. Kromberg argued:

> Ali Timimi speaks for his sect of Salafi Muslims, who believe, if you listen to Yusef Idris, that there is no compulsion of religion, he told you that there's no compulsion of religion in Islam? He also conceded that, yeah, except for if you're a Shiite, in which case, if you don't repent, you have your head lopped off.
>
> That's the Muslims that Ali Timimi and Yusef Idris speak for. They don't speak for Muslims around the world. They speak for Safar Hawali, the guy that was jailed by the Saudi's and that caused Bin Laden to declare war on the United States because, hey, the Saudis jailed Al Ouda and Hawali, the awakening sheiks, because of the United States of America in Bin Laden's mind. That's who Ali Timimi speaks for.

Rebuttal Argument, p. 4 lines 9-24.

He then goes on to attack Yusef Idris' and, especially Timimi's credibility on religious grounds stating that they have a religious obligation to lie. (P. 14) "You heard Special Agent Wyman testify about how Timimi admitted that war is deception and that authorizes lying to the kafir. If you're a kafir, Timimi believes in time of war, he supposed to lie to you." He attacks the alleged funding source for Idris' evangelical work as the "Muslim World League, the Saudi-funded organization that pays the Sudanese guy to preach Islam at Dar al-Arqam." (P. 10)

The overt bigotry and prejudicial nature of this argument would be impossible to overstate. First, perhaps the government can explain precisely what it meant when it argued that there was a compulsion of religion in Islam. The Koranic verse that Mr. Kromberg was citing actually states the opposite. ( "No Compulsion Is There In Religion" Koran Verse 2:256) Is it a different compulsion that attaches to members of the Christian, Buddist or Jewish faith? Is it a compulsion to "rectitude" as the Koran

-5-

J.A. 2634

says or is it a compulsion to crime and violence. It is clear to counsel that the point that

the government was trying to make to the jury was that Muslims are religiously

obligated to wage war against the United States, to lie and to kill. That context is clear

from the next statement regarding the age-old disputes between Shiites and Sunnis.

The government was arguing, by insinuation, that this defendant was prepared to lop

off the heads of the jurors if just given a chance. This Court should not allow this

verdict to stand when it is even potentially premised upon such an argument. A similar

argument made against any other minority or group would be obvious on its face and

similarly offensive to the First Amendment and the rule of law. *Dawson v. Delaware*,

503 U.S. 159 (1992). Here, as in *Dawson*, the government has impermissibly used its

view of the "abstract beliefs" of Islam, as evidence of bad character.

Moreover, there is no evidence in the record whatsoever to support a claim that

Timimi ever supported Bin Laden in any manner at any time. There were two witnesses

in the case who supported Bin Laden or expressed approval for the events of

September 11. Those persons were Kwon and Hasan. Garbieh, Kwon and Idris all

testified that Timimi said that the events of September 11 were Islamically

impermissible. (Kwon, April 5, p. 38, April 11, p. 58). Mr. Gharbieh testified that

Timimi stated that the attacks were Islamically impermissible but that the foreign policy

of the United States played a role in the attacks. The government, in its closing, twisted

these statements beyond the bounds of acceptable argument and claimed that Timimi

approved the attacks. This was false and misleading. It would be difficult again to

overstate the prejudicial nature of an unfounded link between any defendant and the

world's most notorious criminal - Osama Bin Laden.

-6-

Moreover, there was no evidence in the record regarding the "sect of Salafis" that the government referenced. Of course, as the Court knows, the main strain of the Muslim religion of one of the United States largest trading partners and allies - Saudi Arabia - is Salafism. Mr. Aatique, testified that Salafis are "people whose understanding of religion and practice is based upon the example" of Islam's first three generations. (Aatique p. 79, lines 1-6). There was no evidence to show that Bin Laden is a Salafi or that Salafis are likely to lie or wage war any different from any other Muslim much less non-Muslim. The message to this non-Muslim jury, however, was unmistakable and clear - this defendant wants to kill you, he is a terrorist like Bin Laden, and all of his friends will lie to protect him. It was in anticipation of precisely such an argument that the defense moved, in limine, to preclude the government from seeking, by association, from trying to link the defendant to Bin Laden. [2] The defendant's prediction was prescient as the government, in its closing, and without any support in the record, argued to the jury that Timimi and Bin Laden are essentially partners - that Timimi speaks for Bin Laden. The prejudicial nature of this bigoted and unsupported argument cannot be questioned or overstated.

When counsel filed its Motion in Limine Regarding Religious Beliefs, the defense predicted that "the government would seek to admit these statements...to attempt to

---

[2] Motion in Limine Regarding Items Found in Search of Masoud Khan's House and Motion in Limine Regarding Government's Expert Witnesses. "Such and `opinion is inadmissible because it carries with it the risk of prejudice that the jury will see the defendant as part of the al-Qaeda organization when there is no evidence even cited in the Superseding Indictment that would support admission of such outlandish and prejudicial statements as opinion'." Motion in Limine Regarding Experts, p. 11. The defendant objected to the admission of all evidence about al-Qaeda and Bin Laden in this case on the grounds of relevance and undue prejudice.

-7-

show the jury that Muslims, with the exception, we assume of Muslim government witnesses while working on behalf of the government, are liars because their religious beliefs permit them to lie. From that, the government will argue that Timimi and likely any Muslim who testifies on his behalf is not credible because their religion permits them to lie." (Motion in Limine Regarding Religious Beliefs, p. 2). The defense continues to believe that these statements should not have been admitted under F. R. Evid. 610, however, it is plain from the context of the closing argument that the introduction and later emphasis at argument regarding these statements made it impossible for the defendant to receive a fair trial. The penultimate argument made to the jury was that Timimi, and any Muslim who would testify for him, are "supposed to lie to you." (pp. 14). In a case where the credibility of the witnesses was the key issue for the jury to determine, appeals to religious beliefs as a basis for disregarding the testimony of a witness cannot be acceptable. This concern is heightened when it is made in the context of a charge of waging war and when the reason for the alleged lie is that the person who is supposedly lying, would do so because he was actually waging war against the United States. This problem is illustrated best by Mr. Kromberg's own argument to the jury, a jury he knew contained no Muslims and was Christian. "If you're a kafir, Timimi believes in time of war, he's supposed to lie to you." This is as reprehensible as it is prejudicial. Here, a government attorney tells the jury - who he defines as kafir,[3] that Timimi is "supposed" to lie because he is at war with the United States. In one sentence, he falsely and prejudicially tells the jury that Timimi

_____

[3]Aatique, upon request from the government to define the term kafir as all non-Muslims.

-8-

believes that they are kafir, or his enemy, that he is in a state of war, and that they should disregard the Muslim testimony in Timimi's favor as a matter of religious beliefs. This admonition obviously included Yusef Idris, a man's whose testimony was unrebutted on the material points and supported by documentary evidence. For the jury to convict Timimi, it had to disregard the testimony of Idris and the documentary evidence that supported his testimony. And, since the government could not dispute the facts that Idris related as to the substance of his discussions with Hasan and Timimi - which should have compelled an acquittal - the government resorted to calling him a liar because of his religious beliefs. The prejudice from this argument should be presumed.

> B.      The Claim that Timimi was the "Ringleader" of Paintball was False.

In his closing, Mr. Kromberg referred to Timimi as the ringleader of the Dar al-Arqam[4] group that Mr. Kromberg described as involved in going overseas to terrorist training camps. (P. 10). He cited an e-mail, Government Exhibit 4G7, as evidence that the paintballers could not "tie their shoelaces without asking Timimi." (P. 5). This argument was entirely false, unsupported by the evidence, and the defense interposed an objection to that argument at that time. This argument was used to support another false, misleading and baseless argument. That is, that Timimi was aware of and was in fact the ringleader of the jihadis playing paintball. "When Timimi said to get the brothers together, as Kwon testified, he wasn't talking about getting Luther Kennedy.

---

[4] Of course, this reference is totally unsupported by the evidence. The paintball group was centered around the Dar Al-Hijrah mosque. And, since LET was not a "terrorist" training camp under the law until after all of these persons had departed, it should not be described as a terrorist camp.

-9-

He wasn't talking about getting patriotic Americans together. He was talking about the guys who were already engaged in training for jihad, who were fixated on jihad, and that's who Kwon got together." (Pp. 7-8). This argument is misleading as there is no evidence in the record whatsoever to support it. And the argument is prejudicial because it presupposes a leadership role for Timimi in a group with which he was almost entirely uninvolved.

First, the sum total of the government's proof regarding the interaction between Timimi and the paintballers consists of three, perhaps four, meetings over a time span of four years.[5] If you include the September 16, 2001, dinner as lasting 2 hours, and the September 19, 2001, lunch as 1 hour, it is perhaps four hours total. The only other interaction shown was the alleged discussion after Chapman was interviewed by the F.B.I. in 2000 and the brief time that a few people assisted Timimi when he moved. There are no phone calls, no letters, no emails regarding jihad, and only one e-mail involving Surratt's personal life in 2003. Upon this evidence, Timimi cannot be called the ringleader and it was false for the government to portray him as such. The prejudice from such a baseless argument is obvious.

Second, Mr. Kromberg's argument stands in stark contrast to the evidence that the government introduced. There was no direct or circumstantial evidence that Timimi was the "emir" as described by Mr. Kromberg in reference to the Exhibit 4G7. The emirs of paintball, as testified by Kwon and Gharbieh, were Royer, Kwon and Gharbieh. There was no evidence regarding the source of the e-mail which, even in the light most

---

[5]The factual issues in support of this motion incorporates by reference the Statement of Facts set forth in the Rule 29 Motion filed herewith.

-10-

**J.A. 2639**

favorable to the government, only supports the other bigoted arguments that were advanced in the closing.   It would hardly be evidence of a crime for a person to ask a respected scholar a question about prayer and travel.   There was no evidence who actually asked that question, when it was asked or in what context the question may have been posed.   The same answer to that question would apply to any Muslim traveling for any reason or purpose whatsoever.   There was absolutely no evidence that any question posed by anyone to Timimi regarding prayer while traveling was made in the context of jihad or some criminal conspiracy.   The government put forth no evidence that as of the date of Exhibit 4G7, Timimi had any knowledge, as Mr. Kromberg claims, that these people were training for jihad.   All of the evidence introduced in the case was expressly to the contrary.   Not one witness ever stated that Timimi even had a single jihad discussion with any of them other than as alleged on September 16, 2001, well after Exhibit 4G7 was e-mailed.   The criminals that testified for the government may have respected Timimi's opinion on many matters, but that is an insufficient basis for the government to argue that he was their ringleader in the face of overwhelming and uncontroverted evidence to the contrary.

Kwon testified that the conspiracy for which he was convicted, and which Timimi was convicted of aiding and abetting, started in 2000.  (Kwon April 4, p. 20).  He, as did Hasan, readily admitted that they never told Timimi that of the conspiracies that they were engaged in with others.  (Hasan p. 38).  All of the government's witnesses agreed that Timimi did not know that they owned firearms, were watching jihad videos or otherwise preparing for jihad.  All of them admitted that they never once saw Timimi at paintball.  Kwon and Gharbieh started paintball and both were the emirs of paintball.

-11-

Timimi was not part of the paintball intranet and never received any of the paintball e-mails. (Kwon, April 11, p. 46). Kwon, but not Gharbieh, testified that Timimi knew that paintball had begun and thought it a good idea. (Kwon, April 5 p. 44). At that time, according to Kwon, there was nothing illegal about the games. (Kwon, April 7, p. 26). Kwon said that Timimi did not know who was playing and that he did not know whether Timimi knew that paintball was for jihad training. (Kwon, April 5, p. 43). Kwon never told Timimi that ex-military people were teaching military maneuvers at paintball. (Kwon, April 11, p. 20). Kwon only spoke to Timimi once about paintball. Kwon never told Timimi that paintball had anything to do with violent jihad or that they were preparing any expedition against any foreign country. (Kwon, April 7, line 27). Gharbieh was present for the one conversation that Timimi had with Kwon regarding paintball. Gharbieh told an entirely different story. Gharbieh testified that Timimi asked if they were doing anything illegal and they said no. Timimi suggested that they play soccer to get fit. Aatique and Hasan agreed that Timimi had nothing to do with paintball. Hasan specifically said that Timimi had no knowledge in "any way, shape or form" that they were preparing for jihad through paintball. (Hasan p. 50). Aatique never once discussed any of these issues with Timimi. (Aatique, pp. 12, 45, 63 and 64).

No witness in the trial linked Timimi to the possession, much less the use of any firearm. No witness ever testified that Timimi approved of or was aware of any person owning or using a firearm for any reason.

No witness testified that Timimi was aware of the possession or viewing of LET posters, jihad websites, or any video. All of the government's witnesses admitted that they frequently watched jihad videos that had been procured from a number of sources.

-12-

There was no link between Timimi and any of these videos. When specifically asked, Kwon stated that he never discussed these videos with Timimi. (Kwon, April 11, p. 21-22). Russian Hell 2000 inspired Kwon to become a martyr. (Kwon, April 5 p. 20). Kwon, like every other government witness, never had a single discussion with Timimi about becoming a martyr. (Kwon, April 11 p. 28, 202). Kwon never sent a jihad email to Timimi nor received one from him. (Kwon, April 11, 46). Kwon began recruiting paintballers for LET in early 2001 and perhaps even before the trip to Mecca at which Royer introduced him to an LET official. (Kwon, April 11, p. 48-9). Kwon never recruited Timimi and never once told Timimi that he was recruiting for LET. (Kwon, April 11, p. 53).

Given this background, there is no evidence that Timimi was the ringleader of the paintball group and it was false and prejudicial for the government to suggest otherwise. Likewise, the government's argument as to the types of people that Timimi supposedly asked Kwon to assemble after September 11, 2001, is also patently false. Contrary to the government's assertion, Timimi did not tell Kwon, even if Kwon is to be believed, to assemble people fixated on jihad. Had Timimi been the "ringleader" of this jihad cell, he should have been able to tell Kwon who to invite by name, not some amorphous and shifting category. Kwon's testimony bears no resemblance to what Mr. Kromberg argues and his case cannot rise any higher than that. In fact, in that conversation at issue, in which Kwon was allegedly told to assemble the brothers, Timimi also told him to return to Korea or perhaps Saudi Arabia to study. There was no mention on that evening of LET or LET camps or any travel overseas for jihad. (Kwon, April 11, 60-61). Kwon was, he says, asked to work with the brothers to develop a plan in case

-13-

something happened to Muslims in the U.S. (Kwon id.). Kwon never once mentions the word jihad or terrorism or paintball in connection with this conversation with Timimi yet the government impermissibly fills in the blanks for him. Also, after dropping off Timimi at his home, Kwon never called him again to discuss the plan, how it was proceeding and never once told him who he was inviting to a meeting at his home or that he was having a meeting at his home. (Kwon, April 11, pp. 75-76). Kwon sent out an email setting up the meeting and he alone selected who would attend. (Kwon, April 5, pp. 40-43). Kwon admitted that there was never any intention of inviting Timimi to the meeting even after he went to get the food he was preparing to serve. (Kwon, April 11 p. 78-79).

In this light, is it simply preposterous for the government to argue that Timimi asked Kwon to assemble the persons obsessed with jihad, or as Mr. Kromberg once claimed, those who owned guns. This deliberate falsehood followed inexorably from the false claim that Timimi was the ringleader of paintball. These statements were false and prejudicial because they portray, when there is no evidence to support the argument, that Timimi played some leadership role in the paintball that was not even alleged in the Indictment. In a case as close as this one was, unsupported and prejudicial statements justify a new trial. *Gartmon*, supra at 1026.

### 3. Additional Objections.

Several additional incidents in the trial were also so prejudicial to the defendant that a new trial is required in the interests of justice. They will be addressed below. First, the government was allowed, after the case was closed, to enter into evidence two newspaper articles that no witness had ever seen much less relied upon. The

-14-

defense had unsuccessfully sought access to witnesses in Cuba who could have told the truth about these matters. The Court, at that time, ruled that the government could introduce no evidence of Mullah Omar calling for troops[6]. During the testimony of Kwon, the government sought to introduce newspapers again and the Court rejected that motion finding the articles "too potentially prejudicial." (Kwon, April 11, p. 180). To allow the government to introduce this information, at a time when the defense could not rebut the allegation, was prejudicial.

Second, there was no reason in the law or fact for the Court to have allowed the introduction of the many firearms and ammunition that was paraded before the jury in this case.[7] (E.g. Government Exhibits 1H1, 1H2, 3A2, 3A2a and 7A42). The government was never able to tie any of these weapons to the defendant, despite several offers to the contrary. Nor was the government evan able to show that any of the weapons were used in furtherance of any of the crimes alleged in the Indictment. The introduction of this evidence in this case was grossly prejudicial.

Third, the Space Shuttle message was never tied to any witness in this case and therefore was not a "message to his followers" as was promised to the Court by the government. In its Opposition to the defendant's Motion in Limine Regarding Allegations set forth in Paragraph 25 of the Superseding Indictment, the government claimed that the space shuttle message was a "communication to his followers that the

---

[6]Motion For Access to Certain Detainees in Guantanamo, Cuba.

[7] Motion in Limine Regarding Items found in Search of Khan Home. In the government's response to that motion, the government proffered that it would prove that the gun was used in the conspiracy alleged in the Indictment. No such evidence was produced as to a single weapon or any ammunition in this case.

-15-

J.A. 2644

United States was the greatest enemy of Muslims and his wish that it be destroyed is relevant and material to the charge that he was engaged in counseling and inducing others to levy war against the United States.  Proof at trial will show that those that Timimi counseled his listeners to help terrorists seeking to destroy the United States long past the fall of the Taliban in Afghanistan."  (Opposition, p. 2)

At trial, the government produced no evidence that would have supported either of these claims.  Not one government witness testified that he even heard the space shuttle message[8] much less viewed it as a communication to urge them to wage war. There was no evidence whatsoever that Timimi counseled anyone, much less a "terrorist" to seek to destroy the United States at any time much less "long past the fall of the Taliban."  As such, the government failed to show that these statements were material to this case and the evidence, admitted in the face of a failed proffer, should never have been submitted to the jury.

Respectfully submitted,

Ali Al-Timimi
By Counsel

---

[8] Another example of the government misleading the jury in the closing was the claim that "no witness" ever saw the Purdue University speech in which Timimi publicly denounced terrorism.  (Rebuttal Argument p. 9) That argument was made to seek to tell the jury that the speech was never given and was contrived by the defense.  Contrary to the argument, Agent Wyman or Ammerman, at the very least, saw and heard the speech after it was subpoenaed from Dar al-Arqam in 2003. That speech is widely available over the internet as well.

-16-

Edward B. MacMahon, Jr.   VSB #25432
107 East Washington Street
P.O. Box 903
Middleburg, Virginia 20117
540-687-3902

Alan H. Yamamoto   VSB #25872
643 S. Washington Street
Alexandria, Virginia 22314
703-684-4700

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was hand-delivered to the U.S. Attorney's box located in the U.S. District Court Alexandria Clerk's this 6th day of June 2005 to Gordon Kromberg, Esq., Assistant United States Attorney, 2100 Jamieson Ave., Alexandria, Virginia, 22314.

Edward B. MacMahon, Jr.

-17-

**J.A. 2646**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

**FILED**

2005 JUN 20  P  12

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:04cr385 |
| | ) | |
| ALI AL-TIMIMI | ) | Hon. Leonie M. Brinkema |

GOVERNMENT'S RESPONSE
TO DEFENDANT'S POST-TRIAL MOTIONS

The United States of America hereby responds to defendant's post-trial motions.

I.    Legal Standard

The standard of review for a motion for judgment of acquittal filed under Rule 29 is

whether, viewing the evidence in the light most favorable to the prosecution, and giving all

benefit of reasonable inferences to the government, "any rational trier of fact could have found

the defendant guilty beyond a reasonable doubt." *Evans-Smith v. Taylor*, 19 F.3d 899, 905 (4th

Cir.1994).  Further,

> the critical inquiry on review of the sufficiency of the evidence to support
> a criminal conviction must be . . . to determine whether the record
> evidence could reasonably support a finding of guilt beyond a reasonable
> doubt. . . .  [T]he relevant question is whether, after reviewing the
> evidence in the light most favorable to the prosecution, *any* rational trier of
> fact could have found the essential elements of the crime beyond a
> reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original).

Obtaining a new trial after a verdict of guilt pursuant to F.R.Cr.P. 33 is equally difficult.

In general, the remedy of a new trial is sparingly used, and then only where there would be a

miscarriage of justice and where the evidence preponderates heavily against the verdict:

**J.A. 2647**

125

> When the evidence weighs so heavily against the verdict that it would be unjust to enter judgment, the court should grant a new trial. . . . Nevertheless, the trial court's discretion should be exercised sparingly, and a new trial should be granted only when the evidence weighs heavily against the verdict . . . . The denial of the motion will not be overturned unless the court has abused its discretion.

*United States v. Arrington*, 757 F.2d 1484, 1485-1486 (4th Cir. 1985) (internal citations omitted).

In this case, the jury considered the evidence carefully. After long deliberations and several thoughtful questions for the Court, it returned its verdicts. In light of these standards, the defendant is not entitled to the relief he now seeks.

II.    Motion for a New Trial

Timimi argues that he is entitled to a new trial because in its rebuttal closing argument, the government made significant prejudicial statements that were unsupported by the evidence, and otherwise misstated the evidence. Timimi cannot identify a single misstatement of the evidence or a single statement in the argument that was unsupported by the evidence. Not only were these arguments squarely based on the facts presented at trial - - particularly including Timimi's own words - - they were directly relevant to the charges against Timimi that he endeavored to persuade others to commit treason and support the Taliban.

A.    In Light of Charges of Soliciting Treason, Seditious Conspiracy, and Attempting to Aid the Taliban, the Government's Arguments Were Appropriate

Timimi's essential argument rests on the false premise that it was unfairly prejudicial for the government to argue that Timimi hated the United States, supported its worst enemies, and desired the country to be destroyed. While such argument may be unfairly prejudicial in a case involving a typical bank robbery, drug trafficking, or mail fraud, Timimi was charged with much different offenses. Timimi was charged with such a endeavoring to persuade Americans to go to

2

Afghanistan to help the Taliban kill the American troops expected to invade that country to

destroy Al Qaeda and capture Usama Bin Laden. In light of the charges against Timimi, the

government's arguments were directly relevant to his prosecution and fairly made.

Proof at trial reflected that Timimi acted much like Omar Ahmed Ali Abdel Rahman

("the Blind Sheik"), who was convicted of seditious conspiracy in the Southern District of New

York. In affirming his conviction, the Second Circuit stated:

> The Government adduced evidence at trial showing the following:
> Abdel Rahman, a blind Islamic scholar and cleric, was the leader of
> the seditious conspiracy, the purpose of which was "*jihad,*" in the
> sense of a struggle against the enemies of Islam. Indicative of this
> purpose, in a speech to his followers Abdel Rahman instructed that
> they were to "do *jihad* with the sword, with the cannon, with the
> grenades, with the missile ... against God's enemies." Govt. Ex.
> 550 at 22. Abdel Rahman's role in the conspiracy was generally
> limited to overall supervision and direction of the membership, as
> he made efforts to remain a level above the details of individual
> operations. However, as a cleric and the group's leader, Abdel
> Rahman was entitled to dispense "*fatwas,*" religious opinions on
> the holiness of an act, to members of the group sanctioning
> proposed courses of conduct and advising them whether the acts
> would be in furtherance of *jihad.*

*United States v. Rahman*, 189 F.3d 88, 104 (2d Cir. 1999).

Further:

> According to his speeches and writings, Abdel Rahman perceives
> the United States as the primary oppressor of Muslims worldwide,
> active in assisting Israel to gain power in the Middle East, and
> largely under the control of the Jewish lobby. Abdel Rahman also
> considers the secular Egyptian government of Mubarak to be an
> oppressor because it has abided Jewish migration to Israel while
> seeking to decrease Muslim births. Holding these views, Abdel
> Rahman believes that *jihad* against Egypt and the United States is
> mandated by the Qur'an. [FN1] Formation of a *jihad* army made
> up of small "divisions" and "battalions" to carry out this *jihad* was
> therefore necessary, according to Abdel Rahman, in order to beat

3

> back these oppressors of Islam including the United States.   Tr.
> 2197.

*Id.* One cannot help but note that the description of Rahman's role in that seditious conspiracy is

very similar to what the evidence showed Timimi's role in his own seditious conspiracy.[1]

A virtually identical claim challenging the fairness of the government's closing argument

was considered by the Second Circuit in *Rahman.* Fadil Abdelgani, one of Rahman's co-

defendants, argued that reversal of his conviction was required on the ground that the

Government appealed to the jury's "sense of fear" when the prosecution stated during summation

---

[1] This pleading refers to the Second Circuit's decision in *United States v. Rahman*, 189
F.3d 88 (2d Cir. 1999) many times.  This is so because many of the issues raised by Timimi
today were previously raised by defendants in that case (particularly Rahman).  One of the many
parallels between Rahman and Timimi is that before Rahman's followers planned to actually
wage war against the United States, they engaged in paramilitary training and discussed that
training with Rahman.  The Second Circuit described the paramilitary training in words eerily
reminiscent of the testimony at the Timimi trial:

> In late 1992, the paramilitary training resumed, led by Siddig Ali and
> Hampton-El on weekends between October 1992 and February 1993.
> Defendants Amir and Fadil Abdelgani and Elhassan all participated in the
> training camp, as did Abdo Haggag, an Egyptian spy who testified for the
> Government during the trial.   The purpose of the training was to teach the
> participants *jihad* tactics.  There was talk that *jihad* was needed in Bosnia, and
> that some of the trainees might go there. As Siddig Ali later explained to Salem,
> the training was meant to prepare the trainees for *jihad* wherever it was needed.
> During training, Siddig Ali reported to Abdel Rahman, and Abdel Rahman
> offered his insights into the training.

*Id*. at 107.  *See also id.* at 106 ("Abdel Rahman specifically praised Salem for attempting to
restart paramilitary training with the group, noting that there would come a day when the
training would be needed").  Like Timimi, Rahman was convicted of seditious conspiracy.  Like
Timimi, Rahman argued that his speeches and writings were unfairly used against him.  Like
Timimi, Rahman argued that he had no operational role in the conspiracy that he encouraged and
inspired.  The Second Circuit analyzed Rahman's arguments at length, and its reasoning is
directly applicable to the arguments now raised by Timimi.

4

that "[t]he defendants in this room conspired to steal from Americans their freedom from fear, and for that they must be held accountable." *Rahman*, 189 F.3d at 140. The Second Circuit rejected that argument, reasoning:

> The Government has "broad latitude in the inferences it may reasonably suggest to the jury during summation." *Casamento*, 887 F.2d at 1189. Accordingly, defendants who contend that a prosecutor's remarks warrant reversal "face a heavy burden, because the misconduct alleged must be so severe and significant · as to result in the denial of their right to a fair trial." *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir.1993). The Government's remark was not inappropriate because the conspiracies in question were designed to commit acts of terrorism, which by their nature are intended to instill fear in a population. There was no breach of Abdelgani's fair trial rights.

*Rahman*, 189 F.3d at 140. Just as with respect to Abdelgani, the government's arguments with respect to Timimi were not inappropriate because his involvement in the conspiracies in question was the result of his hatred for American and desire for its destruction.

Timimi repeatedly notes that the government's arguments were made to a jury that it knew contained no Muslims, MNT @ 4. 8. Yet, he omits that the only Muslim considered for service in the jury panel was excused upon *Timimi's* challenge; after all, despite his arguments that he represents Muslims generally and that Muslims generally share his beliefs, Timimi well knows that Muslims generally do *not* share his beliefs, that he represents only an extremist portion of Islam, and that the presence of an American Muslim on the jury who was repelled by his views would have inhibited him from trying to convince the jury otherwise.

5

B.    Timimi Waived His Objections to Statements Made in the
Government's Closing Argument by Failing to Object
While the Court Could Still Instruct the Jury to Correct Any Error

In any event, Timimi waived any right to object to the statements of which he now

complains by his failure to do so when they were made so that any error could be corrected.

Timimi was not entitled to sit on an objection in the hopes of obtaining an acquittal, and then

raise his objection to obtain a new trial after learning of his conviction:

> [H]owever strong [defendant's] case for a mistrial might have been had
> the court been immediately notified, counsel's deliberate inaction
> amounted to a conscious decision to find out what the jury was going to
> do. Obviously, counsel preferred to proceed in hopes that the jury might
> acquit. Counsel's approach, were we to grant the requested . . . new trial,
> would allow the defendant two bites at the apple. . . .

*Gray v. Hutto*, 648 F.2d 210, 212 (4th Cir. 1981).   If any error occurred, Timimi was required to

object in a timely manner so that the error could be cured before the jury reached its verdict.

In light of Timimi's failure to raise his objections in a timely manner, the issue should be

decided under F.R.Cr.P. 52(b), which provides that plain errors or defects affecting substantial

rights may be noticed although they were not brought to the attention of the court. *See United*

*States v. Ringwalt*, 213 F.Supp.2d 499, 520 n.25 (E.D. Pa. 2002) (motion for a new trial premised

on allegation that prosecutor's closing argument was not supported by the evidence should be

evaluated under the "plain error" rule where defense failed to object to the argument during

closing), *aff'd.*, 66 Fed.Appx. 446, 2003 WL 21356963,(3rd Cir.(Pa.) Jun 10, 2003); Wright,

King, Klein & Welling, 3 Fed.Prac. & Proc. Crim.3d § 551(2005) (new trial should not be

granted unless the substantial rights of a defendant were affected).

6

J.A. 2652

Under the plain error standard, relief should be denied unless there was plain or obvious error that actually prejudiced the defendant and seriously affected the fairness, integrity, or public reputation of the trial. *United States v. Cotton*, 535 U.S. 625, 631-632, (2002); *Johnson v. United States*, 520 U.S. 461, 466-467 (1997); *United States v. Olano*, 507 U.S. 725, 732 (1993). Timimi cannot meet this test.

Here, there was no error because, as noted herein, the government's arguments were supported by the record and fairly raised in light of the charges. Moreover, even if this was somehow not the case, any error in this regard surely was not "plain" or "obvious" under the second prong of the *Johnson* test. Finally, no error seriously affected the fairness, integrity, or public reputation of judicial proceedings. The jury considered the evidence thoroughly and at length. There is no reason to doubt the defendant's guilt, or believe that the verdicts were based on anything other than the evidence.

C.    Timimi's Specific Allegations are Meritless

As noted above, Timimi claims that it was unfair for the government to argue that he hated the United States, supported its worst enemies, and desired the country to be destroyed, is simply incorrect because of the nature of the charges against him. In support of his overarching claim, Timimi makes several false statements with respect to more particular matters, and we address them here in the order in which Timimi made them in his Motion for a New Trial ("MNT").

1. Timimi asserts that "the jury in this case was treated to a government sponsored crash course in Islam." MNT @ 3. That assertion is false. If anything, the jurors received a crash course in the views on Islam of Sefer Hawali, Hafez Sayeed, Sheik Uqla, Sheik Ghunayman, and

7

Ali Timimi.  Timimi may contend that the views of those individuals constitute Islam, but the

government did not and does not take that position.

2.  Timimi claims that his speeches and lectures were irrelevant because "almost none of

these items were ever heard by any government witness."  MNT @3-4.  It is preposterous to

suggest that Timimi's lectures and articles were not heard and seen by the government's

witnesses.[2]  Notwithstanding the fact that Timimi's writings and lectures were well known to the

government's witnesses and the rest of the jihad trainees that followed Timimi at Dar al Arqam,

those writings and lectures were most assuredly relevant because they were probative of

Timimi's motivations and intent.

The reasoning of the Second Circuit in *Rahman* is directly applicable to Timimi's claim

that his writing and lectures were irrelevant to the case against him:

> Abdel Rahman also protests the Government's use in evidence of
> his speeches, writings, and preachings that did not in themselves
> constitute the crimes of solicitation or conspiracy.  He is correct
> that the Government placed in evidence many instances of Abdel
> Rahman's writings and speeches in which Abdel Rahman
> expressed his opinions within the protection of the First
> Amendment.

*United States v. Rahman*, 189 F.3d 88, 117-18 (2d Cir. 1999).

Rahman's argument, however, was squarely rejected:

---

[2]  The *New World Order* series of lectures (with the cover of the city skyline in flames),
Government Exhibit ("GX") 10T1, was seized from Surratt (but the government seized other
copies of the same series from Khan and Caliph Basha).  *Shi'ism*, GX10T16, and *Reflections*,
GX 7A3, were seized from Aatique.  GX 12-61.  Copies of *Tawheed and Shirk*, GX 10T2, and *A
Word of Advice to the Salafis of the UK*, GX10T10, were seized from Khan.  *Principles of Fiqh*,
GX 10T13, was seized from Al-Hamdi.  Moreover, Yusef Idris and Luther Kennedy both
testified that Timimi's lecture series entitled *Purification of the Soul*, GX 10T9, was given at Dar
al Arqam in the summer of 2001; multiple witnesses testified that Kwon, Hasan, Khan, Garbieh,
and Surratt, among others, were at that time regularly attending Timimi's lectures there.

8

> However, while the First Amendment fully protects Abdel
> Rahman's right to express hostility against the United States, and
> he may not be prosecuted for so speaking, it does not prevent the
> use of such speeches or writings in evidence when relevant to
> prove a pertinent fact in a criminal prosecution. The Government
> was free to demonstrate Abdel Rahman's resentment and hostility
> toward the United States in order to show his motive for soliciting
> and procuring illegal attacks against the United States and against
> President Mubarak of Egypt. *See Mitchell,* 508 U.S. at 487, 113
> S.Ct. 2194 ("The First Amendment ... does not prohibit the
> evidentiary use of speech to establish the elements of a crime or to
> prove motive or intent."); *United States v. Hoffman,* 806 F.2d 703,
> 708-09 (7th Cir.1986) (evidence of religious affiliation relevant to
> show defendant's motive to threaten President, because defendant
> leader of religious group was imprisoned by Government at time of
> threats).

*Id.* at 118. Timimi's argument should be rejected for the same reasons that Rahman's was.

3.  Timimi claims that "the jury was even told that Muslims were supposed to lie to non-Muslims, a group that included each and every member of the jury." MNT @ 4. Contrary to Timimi's allegations, no one told the jury that Muslims generally were supposed to lie to non-Muslims generally. The relevant evidence was a statement of Timimi; according to *Timimi*, Muslims are authorized to lie to infidels *when they are war*. Inasmuch as the evidence established that Timimi sought the destruction of the United States and endeavored to persuade his followers to go to war with the United States, the admission surely was relevant.

4. Timimi claims that it was unfairly prejudicial for the government to produce evidence that "Islam is a religion founded on violence." MNT @ 4. The government merely produced evidence that the concept of jihad includes both defensive jihad and offensive jihad. Timimi himself lectured about offensive jihad.

9

**J.A. 2655**

Yusuf Idris testified that Timimi's lectures were beautiful lectures about angels. Idris testified that he recorded Timimi's lecture series *Purification of the Soul* at Dar al Arqam during the summer of 2001. Idris Luther Kennedy testified that he heard *Purification of the Soul*, and it was not about politics. Notwithstanding the testimony of Timimi's witnesses, *Purification of the Soul* included Timimi's statements that Muslims were the poorest people in the world because there is no jihad, that the way to make the ummah rich was through jihad rather than through the IMF or World Bank loans, and that there would not be any poor people when the lands of the western world were conquered and their riches distributed.

When Timimi exhorted his listeners to strive for the day when Muslims would conquer the Western world and redistribute its riches to Muslims, he was lecturing about *offensive* jihad. Inasmuch as Timimi himself lectured about the advantages of offensive jihad to his followers at Dar al Arqam, it surely was not unfair to ask his listeners about that same topic.

5. Timimi claims that the government's rebuttal closing contained

> unprecedented appeals to religious bigotry and bias that went far beyond what is allowable in a court of the United States. That argument stated, without any sophistication or obfuscation, that Islam is a violent religion whose adherents, especially the defendant, are predisposed to violence and crime as a matter of religion.

MNT @ 4. Timimi obviously has a copy of the transcript, but failed in support of his allegation to refer to the particular language where these "unprecedented appeals to religious bigotry and bias" were made. While Timimi quotes that section of the government's rebuttal argument noting that Timimi did *not* speak for Muslims generally, MNT at 5, he fails to quote the portions of the government's rebuttal argument in which the assertions he complains of were made.

10

The reason that Timimi fails to quote to the particular portions of the government's rebuttal arguments in which the challenged assertions allegedly were made is because they were not, in fact, made in the first place. It was *Timimi* who argued that Muslims generally shared his beliefs. Indeed, at several points in the trial, Timimi attempted to argue that his political views were shared by all Muslims - - even, according to his counsel, worldwide! In contrast, the government argued that while Timimi and Hawali encouraged violence, neither represented all Muslims - - and it was a slander on Muslims generally to assert that they did.

The government repeatedly responded that Timimi did *not* speak for Muslims generally, either worldwide or in the United States. As Timimi helpfully quoted, the government argued that:

> [Ali Timimi and Youseff Idris] speak for Safar Hawali, the guy that was jailed by the Saudis and that caused Bin Laden to declare war on the United States because, hey, the Saudis jailed al-Ouda and Hawali, the awakening sheiks, because of the United States of America in Bin Laden's mind. *That's* who Ali Timimi speaks for.

MNT at 5. Indeed, the proof was that Timimi did, indeed, speak for Hawali. Timimi was Hawali's student and later his translator. Timimi contacted Hawali for advice immediately after 9/11, and then adopted Hawali's position on the Muslim response to the events of 9/11. Arguing that Timimi spoke for Hawali surely was supported by the evidence.

6. Timimi argues that the government unfairly attacked Yusuf Idris's credibility by arguing that he was a Sudanese national in the United States as an employee of the Muslim World League, an organization based in and funded from Saudi Arabia to spread a version of Islam adhered to by Timimi. Idris admitted all of those facts during his testimony. Timimi's solicitation of others to wage war against the United States was based on a religious justification.

11

Idris's credibility was central to his defense.   As a result,  it was appropriate to argue to the jury that Idris was a Sudanese employee of the Muslim World League to draw its attention to his bias.

7.  Timimi claims that the government unfairly argued about the issue of compulsion of religion in Islam because "[i]t is clear to counsel that the point that the government was trying to make to the jury was that Muslims are religiously obligated to wage war against the United States, to lie and to kill."  MNT @ 6.  Notwithstanding the fact that "counsel" missed the point of the issue regarding compulsion in religion, Timimi once again misleadingly attempts to portray a statement about Idris or him as a statement about Muslims generally.  As we have previously stated, it is an insult to Muslims in America and around the world for Timimi to claim that the beliefs he and Idris hold are shared by Muslims generally.  Timimi is responsible for his own actions, and he should gain no sympathy by proclaiming that others share the beliefs that motivated those actions.

It is not for the United States to argue what Muslims are religiously obligated to believe or how many others share Timimi's religious beliefs.   Yet, where Timimi was charged with soliciting treason, it was proper to argue to the jury what *Timimi* believed Muslims were religiously obligated to do, because his intent was an essential element of the charges against him.  Accordingly, it plainly was for the United States to argue that the evidence established that, after 9/11, *Timimi* believed that Muslims were obligated to fight against American troops in Afghanistan, because that belief helped to establish his criminal intent.

Contrary to Timimi's assertions, the government made no argument about compulsion in religion in Islam generally, nor about whether Muslims generally were religiously obligated to wage war against the United States or to lie and to kill.  The government's arguments were that

12

*Timimi* told his followers that *they* were religiously obligated to wage war against the United States, and that Yusuf Idris should not be believed for a whole host of reasons. One of those reasons was that Idris told the jury plainly inconsistent stories about whether non-believers should have their heads lopped off for their failure to accept his version of Islam, and that this inconsistency was evidence of his unwillingness or inability to tell the truth to the jury.

In fact, Idris testified that there was no compulsion of religion in Islam. Yet, he also testified that he agreed with Timimi that Shia Muslims are "kaffir" who deserve nothing better than to have their heads lopped off if they do not repent from their beliefs about Islam. *See* GX 10T16. Whether there is, in fact, compulsion of religion in Islam was irrelevant to Timimi's guilt or innocence. What *was* relevant to Timimi's guilt or innocence was Idris's credibility, and it surely was probative of Idris's credibility that contradicted himself during his testimony about whether kaffirs should be beheaded for their failure to share his religious beliefs.

The same is true with respect to the argument that Timimi's exculpatory story to SA Wyman should not be believed because of Timimi's belief that Islam authorized him to lie to infidels in time of war. Regardless of whether Muslims in general share Timimi's belief, the pertinent facts were that *Timimi* believed that Muslims were at war with their greatest enemy and under such circumstances, *Timimi* believed that *he* was authorized to lie to American authorities. *See United States v. Abel*, 469 U.S. 45 (1984) (evidence of bias arising from group affiliation is always relevant). On cross-examination, Evan Kohlmann explained that Lashkar-e-Taiba simultaneously disseminated peaceful messages to outsiders and warlike messages to insiders as a tactic in its strategy for global jihad. Timimi believed Lashkar to be on the "right path." In

13

J.A. 2659

light of the evidence, it was appropriate to argue to the jurors that they should not fall for the same tactic.

8. Timimi argues that "there is no evidence in the record whatsoever to support a claim that Timimi ever supported Bin Laden in any manner in any time." MNT @ 6. In making this argument, Timimi would have the Court divorce his support for Mullah Omar and the Taliban from any support for Bin Laden, even though we went to war in Afghanistan because of the Taliban's protection of Bin Laden. Notwithstanding the fact that the United States did not argue that Timimi supported Bin Laden, the fact of the matter is that Timimi *did* so support Bin Laden, and the jury saw ample evidence of that support.

Even without more, Timimi's assertion that he did not support Bin Laden should be rejected, but there *is* more that clearly establishes Timimi's support for Bin Laden. Timimi would have the Court forget GX 10D19, his email of October 21, 2001, in which he asserted that Muslims were obligated to support Mullah Omar, the Taliban, "and the Arabs with them" with their bodies, their wealth, and their words - - and that it is uncontroverted that "the Arabs with them" was a reference to Usama Bin Laden and Al-Qaeda. In other words, Timimi's own words prove that he espoused support for Bin Laden's terrorist organization even after the American war in Afghanistan started.

Timimi argues that the "prejudicial nature of this bigoted and unsupported argument cannot be questioned or overstated." MNT @ 7. Probative evidence presented by the government in a criminal case by definition is intended to be "prejudicial" to the interests of the defendant seeking to avoid conviction; "prejudicial" evidence is excluded only if its probative value is outweighed by the danger of *unfair* prejudice, confusion of the issues, likelihood of

14

**J.A. 2660**

misleading the jury, or considerations of undue delay, waste of time, or if it is cumulative. F.R.E. 403. None of those factors are present here. As explained above, the argument was well supported by the evidence and Timimi's own written words. Thus, in light of the charges that Timimi solicited others to engage in treason by fighting for the Taliban in their fight to protect Bin Laden and Al Qaeda from American troops, the argument was perfectly proper.

9. Timimi argues that the facts proven at trial did not support the government's argument that he approved of the 9/11 attacks. MNT @ 6. Despite his access to the transcript, he fails to identify where the government allegedly made this argument. This failure is not surprising, because the government's argument was not that Timimi approved of the attacks, but that he reacted to them with joy.[3]

In any event, in making this argument, Timimi ignores his own written words. GX 10J9 was an email from Timimi on December 13, 2001, in which he noted that Hawali had written in his Statement to the Ummah that the reaction of Muslims to the events of 9/11 was uniform until the scholars began to speak. In the email, Timimi explicitly declined to identify the reaction that Hawali had specified as uniform across the Muslim world, and suggested to his readers that they ascertain the reaction that Hawali had specified by remembering their own initial reaction to the events of 9/11.

According to Hawali's *Statement to the Ummah*, however, the uniform reaction of Muslims across the world to the events of 9/11 was *joy*. GX 7A23. Thus, Timimi's email of December 2001, GX 10J9, in conjunction with Hawali's *Statement to the Ummah*, GX 7A23,

---

[3] As best we can tell, Timimi thought the attacks premature, and that the hijackers should have consulted the "scholars" before acting.

15

established that Timimi believed the reaction across the Muslim world to the events of 9/11 to have uniformly been joy, and that his readers could figure out that Hawali had characterized the uniform reaction as joy by recalling their own joy upon learning of the events of 9/11.    J.

10.  Timimi argues that "there was no evidence in the record regarding the 'sect of Salafis' that the government referenced." MNT@ 7.  In fact, there was ample evidence regarding Salafis, not least of which was Timimi's lecture, *A Word of Advice to the Salafis of the UK*, in which he expounded on the essential beliefs of Salafism.  GX 10T10.  That lecture, of course, was the one in which he stridently proclaimed that "waging jihad is an unceasing obligatory duty until the Day of Resurrection;" that Salafis should "wage jihad against the unbelievers and be harsh with them;" that Salafis should wage jihad with your person," and that the jihads in Chechnya and Kashmir were valid jihads.[4]  *See also* GX 10A3 (Timimi's article, *Suicide Attacks Are They Sharia?*); GX 10A16 (Timimi's outline entitled *The Strangers*); and GX 10J11 (the article from the Supporters of Shariah website, *An American Born Shaheed* sent by Timimi to his brother).

11.  Timimi argues that the government falsely argued to the jury that Timimi believes that they were kafir or his enemy and that he was in a state of war with the United States.  The government's argument was soundly based on the evidence, because the evidence plainly established that Timimi believed that he was at war with the United States and that the citizens of the United States were kafir.

---

[4] The "jihad" of which Timimi spoke was not an "internal" or a peaceful struggle.  The evidence established that, when Timimi spoke of jihad, he meant the violent kind.  As he stated in his lecture entitled *Shi'ism*, "throughout history, our swords have dripped with the blood of Christians, Jews, and idol-worshipers [i.e., Hindus and Buddhists], as we wage jihad as Allah has commanded us."  GX 10T16.

16

J.A. 2662

First, Kwon, Hasan, and Aatique, testified that Timimi endeavored to persuade them to fight against the United States. GX 10D19 contained Timimi's own writing on October 21, 2001 - - as the war of the United States against the Taliban and Al Qaeda was begining - - that Muslims were obligated to support Mullah Omar, the Taliban, and the "Arabs with them." Moreover, the jurors had before Timimi's lectures and articles, in which he repeatedly said that Muslims were at war with unbelievers and that the United States was the greatest enemy of Islam..

For example, in Timimi's article that was seized from Aatique's residence, entitled *Reflections,* he advised that, through concepts known as "walaa and baraa," Muslims were required to show love and loyalty to other Muslims, and to show hatred to non-Muslims. GX7A3.[5] In his lecture series, *New World Order,* GX10TT1, Timimi stated that "there is an unrelenting attack to annihilate Islam from the face of the earth" and that "we have to break the attack by any means necessary." He said that "the greatest power in the world inimical to Islam is the United States." In response to a question about Muslims living in the West, he referred to the non-Muslms as "kufr." GX10T1.

In *A Word of Advice to the Salafis*, he said that "we are under attack, a barbaric attack;" that "the Islamic lands are invaded by unbelief," a "demonic global attack with unlimited financial resources against Islam; that "when someone attacks you, you must break that attack by any means capable;" and that they should "wage jihad against the unbelievers and be harsh with them. Wage jihad with your person." GX 10T10.

---

[5] Indeed, Aatique testified that he understood the concept of "baraa" to require him to disavow non-Muslims but not necessarily - - as Timimi advised - - to hate them.

17

In *Tawheed and Shirk*, he proclaimed that Christians are disbelievers whom Muslims must show enmity towards, and that, when there is jihad, Muslims must wage jihad against disbelievers. He proclaimed that Muslims must show enmity to disbelievers, and that when there is jihad, "you must wage jihad against them." GX10T2. In *The Acts of Worship During Shawwal*, Timimi lectured that, of the two types of jihad, the first and better type was the one against the kufr. GX10T11. In sum, the evidence plainly established that Timimi believed that he was at war with the United States and that the citizens of the United States were kafir.

12. Timimi argues that the government resorted to calling Idris a liar on the basis of his religious beliefs because it could not dispute the facts of his testimony; Timimi claims that Yusef Idris's testimony was "unrebutted on the material points." MNT @ 9. Timimi's characterization is absurd. Timimi overlooks the fact that Hasan and Kwon directly contradicted Idris's testimony. After all, Hasan and Kwon both denied that Idris told them that Timimi had advised them not to go overseas. Moreover, Idris's testimony was even rebutted by the exculpatory statements that Timimi himself made to SA Wyman.

Idris testified that he told Kwon and Hasan that Timimi told them not to go overseas. Yet, while Timimi denied to SA Wyman that he advised Kwon and Hasan to go overseas *to fight*, he admitted that he *did* tell them to go overseas for hijra. Thus, if Timimi's exculpatory statement to SA Wyman was true, then Idris's testimony was not. Inasmuch as Idris's testimony was not even consistent with Timimi's own exculpatory story, an argument that Idris's testimony was "unrebutted on the material points" is simply incorrect.

Idris's testimony was incredible in light of the other evidence in this case. After all, as Kwon, Hasan, and Aatique each testified, they went to the Lashkar camps after 9/11 because they

18

were induced to do so by Timimi, and they never would have done so had Timimi told them not to. Moreover, Royer was overheard on tape telling Kwon in April 2003 that Timimi had told them at the meeting in September 2001 that they should go join the mujahideen. If Royer's statement to Kwon as overheard on the tape was correct, then Idris's testimony was not.

Further, Garbieh testified that Royer told him, shortly after the September 16, 2001 meeting, that Timimi had said that the brothers were obligated to join the mujahideen. Surratt testified that Hammad told him, shortly after the September 16, 2001 meeting, that several of the brothers had left the country for a mujahideen camp after hearing Timimi give a powerful lecture. Surratt also testified that, in response to Timimi's recommendation in October 2001 that he should go to help the Muslims in Afghanistan and Pakistan, he told Timimi that he could not go fight because of his family responsibilities. Idris's testimony is plainly inconsistent with Royer's statements to Kwon and Garbieh, Hammad's statement to Surratt, and the testimony of Surratt and Garbieh. If the testimony of Garbieh and Surratt was accurate, then Idris's testimony was not.

Timimi himself wrote in October 2001 that Muslims were *obligated* to help Mullah Omar, the Taliban, and "the Arabs with them" with their bodies, wealth, and word. GX 10D19. In light of Timimi's own emailed statement, Idris's testimony could not be correct.

Finally, the testimony of Andre Thompson indicates that Idris's testimony could not be correct. SA Wyman testified that Timimi told him that, upon surmising that Ali Asad Chandia was leaving the country to join the mujahideen, Timimi sent Hamdi to discourage Chandia from doing so. Chandia renewed his passport on October 15, 2001, and left the country on November 5, 2001. GX 7H21. Yet, Thompson testified that, within the last two weeks of October, Hamdi

19

J.A. 2665

recruited him (Thompson) to go fight in Afghanistan. Thus, at the very time that -- according to Timimi -- Hamdi was at Timimi's behest discouraging Chandia from going overseas to fight, Hamdi was actually recruiting others to go overseas to fight. Thompson's testimony makes it extremely unlikely that in the months after 9/11, Timimi sent *either* Hamdi or Idris to discourage *anyone* from going overseas to fight.

Notwithstanding the incredibility of Idris's testimony in light of the other evidence, his credibility was thoroughly impeached for many reasons -- and these reasons were totally unrelated to his religion. Among them were:

a. Idris was Timimi's good friend, and from the witness stand was seen by the jurors to be exchanging smirks with Timimi.

b. Idris was closely associated with the Dar al Arqam Islamic Center, as was his father, Jaffar Idris. Idris had a motive to try to prevent the conviction of the Center's primary lecturer for soliciting treason because conviction of Timimi for soliciting treason would cast a shadow over the Dar al Arqam, Idris, his father, and the Muslim World League.

c. Timimi admitted in his instant message session with a Saudi friend that he had been barred from speaking at Dar al Arqam after 9/11 because of his extremist opinions. GX 10H1a. Yet, Idris falsely denied that Timimi had been so barred  In his capacity as Timimi's good friend and one of the central figures at Dar al Arqam -- as well as Timimi's replacement as the primary lecturer there -- Idris surely knew that Timimi had, in fact, been barred from speaking there. Idris's testimony that Timimi had not been barred apparently was made to hide the fact that Timimi's statements after 9/11 were too extreme even for Dar al Arqam.

20

J.A. 2666

d. Idris falsely denied being contacted by Timimi to produce a false statement to the *Washington Post* in June 2003 to the effect that Timimi had not been barred from speaking at the Dar al Arqam after 9/11. He only conceded that he may have been involved in such an attempt after the existence of a taped telephone conversation was disclosed to him while he was testifying.

e. In describing the disagreement between Hantash and Timimi on 9/11 at Dar al Arqam, Idris asserted that, despite the fact that Hantash was red-faced and gesticulating in a manner that would manifest anger in someone other than an Arab, Hantash was *not* angry. Idris recounted the words that Hantash said, but summarized Timimi's part of the conversation by using the phrase "but what if they said such and such?" Idris declined to identify who were the "they" that Timimi referenced, or what the term "such and such" referenced. Later, he conceded that he had not heard the specifics of the conversation because he was across the room. His version of the argument appeared designed to hide the fact that Hantash was angry at Timimi for justifying the 9/11 attacks.

f. Idris testified that the Timimi lectures that he heard were "beautiful" lectures "about angels." He testified that he listened to *Purification of the Soul* - - indeed, he conceded that he had recorded it so that Dar al Arqam could sell the tapes of the lecture series - - but never heard Timimi say during that lecture that the muslim ummah would get rich, not through the World Bank, or the IMF, but by conquering other countries through jihad and distributing their money to Muslims. He testified that he never heard Timimi advocate fighing jihad in Kashmir or Chechnya, even though Timimi did so in parts of *Purification of the Soul* that were played at trial. Idris testified that the *Purification of the Soul* lectures that *he* listened to and taped for Dar

21

al Arqam must have been different from the one that was played for him at trial.  Yet, the parties

stipulated that the *Purification of the Soul* tapes played at trial were the ones sold at Dar al

Arqam and recorded in the summer of 2001  - - the very time when Idris testified that he was

responsible for taping Timimi's lectures for Dar al Arqam.  GX 12-61.

g.  Idris produced an affidavit for Timimi in August 2003 that ostensibly was designed to

exculpate Timimi, but it failed to mention that Idris "knew" that Timimi had tried to discourage

Kwon and Hasan from going to fight after 9/11.  Instead, the affidavit merely stated that Timimi

had been "angry" upon learning that some of the brothers were playing paintball.  By August

2003, the indictment of Khan, Royer, Hamdi, Chapman, *et al,* publicly alleged that shortly after

9/11, Timimi told Kwon and Hasan to go overseas to fight.  Accordingly, if Idris actually knew

that Timimi had tried to stop Kwon and Hasan from leaving the country, he surely would have

included that exculpatory information in his affidavit.  That he failed to include that information

in the August 2003 affidavit indicated that he did not have that knowledge.

h.  Idris's August 2003 affidavit stated that Timimi was "angry" upon learning that some

of the brothers were playing paintball, but that assertion is contrary to Timimi's own version of

events.  Timimi had no reason to be "angry" that paintball was being played because, after all, he

contended that he was ignorant of the fact that his followers were using paintball to train for

jihad.  The substance of Idris's affidavit suggests that, in order to attempt to help Timimi avoid

prosecution in the summer of 2003,  Idris agreed to aver to the truth of facts of which he had no

knowledge.

i.  Timimi refused on multiple occasions in 2003 and 2004 to disclose to the government

the identity of the individual that he allegedly had sent after 9/16/01 to discourage Kwon and

22

Hasan from going to fight. He justified his refusal on the grounds that he needed to ensure that the individual would provide the same story to the government that he had provided to Timimi. When SA Wyman approached Idris in 2005 to ascertain whether Idris was the individual Timimi referenced, Idris said that he would not speak to SA Wyman without a lawyer, but would contact SA Wyman after acquiring a lawyer. Idris testified that he had provided the affidavit to Timimi's attorneys in August 2003 because he believed that he had a religious duty to provide relevant information. Yet, Idris never contacted SA Wyman in 2005 after promising to do so. Moreover, he admitted that he had refused to speak to SA Wyman in *2003* even though he then *had* a lawyer, on the grounds that he "didn't want to open that door."

The fact of the matter was that Idris was simply not worthy of belief, and the jurors saw him to be so.

13. Timimi further claims that the government misstated the evidence by arguing that Timimi knew that the brothers gathered at Kwon's residence on September 16, 2001, had been engaged in training for jihad. MNT @ 9. Unlike the other aspects of the government's argument with respect to which Timimi now claims were unfairly made, an objection with respect to this portion of the argument was made at trial and overruled. The ruling was correct and should not be changed.

Kwon testified that Timimi was present at Hamdi's house when Royer described his adventures at the Lashkar camp. Multiple witnesses testified that the brothers solicited Timimi's advice about how to proceed regarding paintball after Chapman was approached by the FBI. Kwon testified that the email that settled a dispute among the brothers regarding the necessity to stop for praying on the way to the paintball field, GX 4G7, was forwarded based on the religious

23

opinion of Al-Khatani or Timimi. Thompson testified that it was forwarded based on the religious opinion of Timimi.

After rendering the ruling on praying, that email also included a subheading, "J-Word." Thompson explained that the "J-Word" was a cryptic way of referring to "jihad." Under that heading, the email exhorted the readers to train for jihad. Inasmuch as substantial evidence indicated that this email was generated upon the ruling of Timimi, there can be no question but that ample evidence supported the government's argument - - and, indeed, the jury's verdict.[6]

In sum, Timimi cannot establish that the evidence weighs heavily against the verdict to justify a new trial. *Arrington*, 757 F.2d 1484. Indeed, ample evidence supported the verdicts in this case. Accordingly, the motion for a new trial should be denied.

III.    Motion for Judgment of Acquittal

Timimi argues that, with the evidence viewed in the light most favorable to the government, no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. The jury considered the evidence carefully and deliberately. There is no basis to overturn its findings.

---

[6] Timimi argues that the failure of the government's witnesses to specifically recall telling him before 9/11 that they were training for jihad establishes that Timimi did not know that they were so training, but the evidence proves the opposite. Notwithstanding the proof outlined above that Timimi *did* know that the jihad training had been underway, the fact remains that Timimi was closer to Royer and Hamdi than to Kwon, Hasan, Aatique, or Surratt, and it would have been natural for Timimi also to learn about the jihad training from them (after all, he listened to Royer describing his own experiences at Lashkar at a dinner at Hamdi's house). Moreover, Timimi also likely heard about the training from Al-Khatani, who was one of his best friends.

24

A.    Timimi's Speech Was Not Protected by the First Amendment

Timimi now argues that his solicitation of his followers to fight in Afghanistan and elsewhere is protected speech under the First Amendment because it was not directed to inciting or producing imminent lawless action or likely to incite or produce such action.  According to Timimi, his solicitation of treason was protected because actual fighting in Afghanistan was not imminent in that the United States had not actually yet invaded Afghanistan when the statements were made.  The Court should give short shrift to the argument.

"The first amendment does not provide a defense to a criminal charge simply because the actor uses words to carry out his illegal purpose.  Crimes, including that of aiding and abetting, frequently involve the use of speech as part of the criminal transaction." *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 245 (4th Cir. 1997), *citing United States v. Barnett*, 667 F.2d 835, 842 (9th Cir. 1982).  Similarly, as the *Rahman* court stated in affirming Rahman's conviction:

> It remains fundamental that while the state may not criminalize the expression of views-- even including the view that violent overthrow of the government is desirable-- it may nonetheless outlaw encouragement, inducement, or conspiracy to take violent action.

*Rahman*, 189 F.3d at 115.

Indeed, the law is now "well established" that

> the First Amendment, and Brandenburg's "imminence" requirement in particular, generally poses little obstacle to the punishment of speech that constitutes criminal aiding and abetting, because "culpability in such cases is premised, not on defendants' 'advocacy ' of criminal conduct, but on defendants' successful

25

J.A. 2671

> effort to assist others by detailing to them the means of accomplishing the crimes."

*Paladin Enterprises, Inc.*, 128 F.3d at 246. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234,

253 (2002) (Enforcement of the Child Pornography Prevention Act of 1996 violated the First

Amendment because "[t]here is here no attempt, incitement, solicitation, or conspiracy").

In *Rahman*, the Second Circuit reiterated the test of *Brandenburg v. Ohio*, 395 U.S. 444

(1969) (a state may proscribe subversive advocacy only when such advocacy is directed towards,

and is likely to result in, "imminent lawless action"), and then stated:

> The prohibitions of the seditious conspiracy statute are much further removed from the realm of constitutionally protected speech than those at issue in *Dennis* [341 U.S. 494 (1951)], upholding the constitutionality of the Smith Act, which made it a crime to advocate, or to conspire to advocate, the overthrow of the United States government by force or violence] and its progeny. To be convicted under Section 2384, one must conspire to *use* force, not just to *advocate* the use of force. We have no doubt that this passes the test of constitutionality.

*Rahman*, 189 F.3d at 115.

The Second Circuit continued:

> Our view of Section 2384's constitutionality also finds support in a number of the Supreme Court's more recent First Amendment decisions. These cases make clear that a line exists between expressions of belief, which are protected by the First Amendment, and threatened or actual uses of force, which are not. *See Wisconsin v. Mitchell,* 508 U.S. 476, 484, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993) ("A physical assault is not ... expressive conduct protected by the First Amendment"); *R.A.V. v. City of St. Paul,* 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("[T]hreats of violence are outside the First Amendment"); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 916, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) ("The First Amendment does not protect violence"); *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (Congress may outlaw threats

26

**J.A. 2672**

> against President, provided that "[w]hat is a threat [is]
> distinguished from what is constitutionally protected speech.");
> *see also Hoffman v. Hunt,* 126 F.3d 575, 588 (4th Cir.1997)
> (upholding constitutionality of Freedom of Access to Clinic
> Entrances Act, as Act prohibits only use of force, physical
> obstruction, or threats of force); *Terry v. Reno,* 101 F.3d 1412,
> 1418-20 (D.C.Cir.1996) (same); *Cheffer v. Reno,* 55 F.3d 1517,
> 1521 (11th Cir.1995) (same).

*Rahman*, 189 F.3d at 115.  Timimi stands in the same position that Rahman stood earlier; he did

not merely *advocate* that others use force against the United States, he also induced and

counseled them to conspire to *use* force.

Further:

> Words of this nature--ones that instruct, solicit, or persuade others
> to commit crimes of violence--violate the law and may be properly
> prosecuted regardless of whether they are uttered in private, or in a
> public speech, or in administering the duties of a religious ministry.
> The fact that his speech or conduct was "religious" does not
> immunize him from prosecution under generally-applicable
> criminal statutes.  *See Smith,* 494 U.S. at 879, 110 S.Ct. 1595,
> *reaffirmed in Boerne,* 521 U.S. at 507, 117 S.Ct. 2157.

*Id.* This exact reasoning applies to Timimi.

Timimi's arguments today mirror those earlier made by Sheik Rahman in challenging his

own conviction for seditious conspiracy:

> Abdel Rahman also argues that he was convicted not for entering
> into any conspiratorial agreement that Congress may properly
> forbid, but "solely for his religious words and deeds" which, he
> contends, are protected by the First Amendment.   In support of
> this claim, Abdel Rahman cites the Government's use in evidence
> of his speeches and writings

*Rahman,* 189 F.3d at 116.

27

**J.A. 2673**

We cannot respond to Timimi's arguments better than with the words the Second Circuit

used to reject the virtually identical claims of Rahman:

> There are two answers to Abdel Rahman's contention.  The first is that freedom of speech and of religion do not extend so far as to bar prosecution of one who uses a public speech or a religious ministry to commit crimes.  Numerous crimes under the federal criminal code are, or can be, committed by speech alone.  As examples:  Section 2 makes it an offense to "counsel[ ]," "command[ ]," "induce[ ]" or "procure[ ]" the commission of an offense against the United States.  18 U.S.C. § 2(a).  Section 371 makes it a crime to "conspire ... to commit any offense against the United States." 18 U.S.C. § 371.  Section 373, with which Abdel Rahman was charged, makes it a crime to "solicit[ ], command[ ], induce[ ], or otherwise endeavor[ ] to persuade" another person to commit a crime of violence.  18 U.S.C. § 373(a).  Various other statutes, like Section 2384, criminalize conspiracies of specified objectives, *see, e.g.,* 18 U.S.C. § 1751(d) (conspiracy to kidnap); 18 U.S.C. § 1951 (conspiracy to interfere with commerce through robbery, extortion, or violence);  21 U.S.C. § 846 (conspiracy to violate drug laws).  All of these offenses are characteristically committed through speech.  Notwithstanding that political speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from prosecution for such speech-based offenses merely because one commits them through the medium of political speech or religious preaching.  Of course, courts must be vigilant to insure that prosecutions are not improperly based on the mere expression of unpopular ideas.  But if the evidence shows that the speeches crossed the line into criminal solicitation, procurement of criminal activity, or conspiracy to violate the laws, the prosecution is permissible.  *See United States v. Spock,* 416 F.2d 165, 169-71 (1st Cir.1969).

*Rahman*, 189 F.3d at 117.

The Second Circuit continued:

> The evidence justifying Abdel Rahman's conviction for conspiracy and solicitation showed beyond a reasonable doubt that he crossed this line.  His speeches were not simply the expression of ideas;  in some instances they constituted the crime of conspiracy to wage

28

J.A. 2674

war on the United States under Section 2384 and solicitation of
attack on the United States military installations, as well as of the
murder of Egyptian President Hosni Mubarak under Section 373.

For example:

Abdel Rahman told Salem he "should make up with God ... by
turning his rifle's barrel to President Mubarak's chest, and kill[ing]
him."  Tr. 4633.

On another occasion, speaking to Abdo Mohammed Haggag about
murdering President Mubarak during his visit to the United States,
Abdel Rahman told Haggag, "Depend on God. Carry out this
operation.   It does not require a fatwa ... You are ready in training,
but do it.  Go ahead."  Tr. 10108.

The evidence further showed that Siddig Ali consulted with Abdel
Rahman about the bombing of the United Nations Headquarters,
and Abdel Rahman told him, "**Yes, it's a must, it's a duty**."  Tr.
5527-29.

*Id.* at 117 (emphasis added).

Timimi's argument that the threats that he espoused and encouraged were not sufficiently

imminent to be prosecuted echoes the one made earlier by the Blind Sheik.  As the *Rahman* court

explained:

> One of the beneficial purposes of the conspiracy law is to permit
> arrest and prosecution before the substantive crime has been
> accomplished.   The Government, possessed of evidence of
> conspiratorial planning, need not wait until buildings and tunnels
> have been bombed and people killed before arresting the
> conspirators.   Accordingly, it is well established that the
> Government may criminalize certain preparatory steps towards
> criminal action, even when the crime consists of the use of
> conspiratorial or exhortatory words.  *See, e.g., United States v.
> Jeter,* 775 F.2d 670, 678 (6th Cir.1985)

*Rahman*, 189 F.3d at 116.

29

J.A. 2675

While the Fourth Circuit has not yet reviewed a conviction for seditious conspiracy, it has

considered the First Amendment claims of convictions of individuals who encouraged others to

commit more mundane crimes.  *Paladin Enterprises, Inc.*, 128 F.3d at 245 ("Our own circuit,

and every other circuit to address the issue, has likely concluded that the First Amendment is

generally inapplicable to charges of aiding and abetting violations of the tax laws").  For

example, in *United States v. Fleschner*, 98 F.3d 155 (4th Cir. 1996), the Court rejected the claims

of defendants convicted for tax fraud who argued that the First Amendment protected them from

prosecution for advocating violation of the tax laws:

> Defendants claim that the most they did was openly advocate violation of
> the tax laws and that they were entitled to requested instructions on a First
> Amendment defense. . . .  The evidence in this case, however, does not
> support a First Amendment defense.  The defendants' words and acts were
> not remote from the commission of the criminal acts.  The evidence shows
> that the defendants held meetings and collected money from attendees
> whom they instructed and advised to claim unlawful exemptions and not
> to file income tax returns or pay tax on wages in violation of the United
> States Tax Code.  The evidence show that the attendees followed the
> instruction and advice of the defendants, that the attendees' unlawful
> actions were solicited by the defendants, and that the defendants were
> aware that the attendees were following their instructions and advice. . . .
>
> As in *Kelley*, "[i]t was no theoretical discussion of noncompliance with
> law; action was urged; the advice was heeded and false forms were filed."
> *Kelley*, at p. 217.

*Fleschner*, 98 F.3d at 158-59, *citing United States v. Kelley*, 769 F.2d 215 (4th Cir. 1985)

(defendant who urged others to file false tax returns was properly convicted of aiding and

abetting preparation of false tax forms despite the fact that he only provided advice that the other

individuals were free to accept or reject, because "action was urged, the advice was heeded, and

false forms were filed").

30

In fact, Timimi incited imminent lawless action. His listeners immediately proceeded with a seditious conspiracy in violation of 18 U.S.C. § 2384, a conspiracy to use firearms in furtherance of crimes of violence in violation of 18 U.S.C. § 924(o), a conspiracy to mount a military expedition against a country with whom we were at peace, in violation of 18 U.S.C. § 960, and a conspiracy to assist the Taliban in violation of 50 U.S.C. § 1705. Kwon, Khan, Hasan, and Aatique acted immediately to get to Pakistan as fast as they could; the many steps they took in furtherance of those conspiracies immediately after hearing Timimi's words were detailed as overt acts in the Superseding Indictment. Indeed, Kwon, Khan, and Hasan likely could not have acted in accordance with Timimi's counsel any faster.

As the defendants did in *Rahman*, *Fleschner* and *Kelley*, Timimi urged lawless action, the advice was heeded, and action was taken in furtherance of the criminal conspiracies. Timimi's actions were no more protected by the First Amendment than were Rahman's, Fleschner's or Kelley's.

### B. Ample Evidence Supported the Verdict on Count 1

The testimony of Kwon, Hasan, and Aatique established that Timimi induced them to go to the Lashkar camps to get jihad training in furtherance of a plan to fight against American troops expected to arrive in Afghanistan - - or at least to fight on behalf of mujahideed elsewhere in the world. The evidence clearly established that Timimi well knew the types of weapons they would use at those camps.

Kwon testified that Timimi heard Royer describe at Hamdi's house his experiences at the Lashkar camps. Moreover, SA Wyman testified that Timimi admitted that he knew that jihad trainees at Lashkar camps used automatic weapons. Timimi admitted that he sent his brother an

31

article from the Supporters of Shariah website, "An American Born Shaheed," GX 10J11a,

which recounted the training of a young American Muslim at Lashkar-e-Taiba, and his death in

combat in Kashmir shortly thereafter. That article stated:

> We were test firing the mounted grenade launcher on our
> kalashnikovs (AK-47 assault rifle) We were firing old grenades
> that in had been in storage for quite a long time. . . . I walked
> outside only to see abu adaam [the American] practicing his firing
> stances and maneuvers with his AK-47 in the hot sun.

10J11a, at pages 4-5. In sum, the evidence established that Timimi counseled and induced

Kwon, Hasan, Aatique, and Khan to conspire to use firearms in furtherance of crimes of

violence, that Timimi well knew the types of weapons that they would conspire to use, and that

they did, in fact, conspire to use - - and use - - those weapons in furtherance of the crimes

procured by Timimi.

### C. Ample Evidence Supported the Verdict on Count 2

The testimony of Kwon, Hasan, and Aatique  - - as corroborated by the recordings of

Royer, the testimony of Surratt, and the testimony of Garbieh  - - established that in September

2001, Timimi endeavored to persuade them to fight against American troops expected to arrive

in Afghanistan. Timimi's intent to persuade them to wage war against America is further

corroborated by his email of October 21, 2001, when he wrote that Muslims were obligated to

support Mullah Omar, the Taliban, "and the Arabs with them" with their bodies, their wealth,

and their words. GX 10D19.

With respect to the Blind Sheik, the Second Circuit wrote:

> While there is no evidence that Abdel Rahman personally
> participated in the performance of the conspiracy, when conspiracy
> is charged, the Government is not required to show that the

32

> defendant personally performed acts in its furtherance: it is
> sufficient for the defendant to join in the illegal agreement. The
> evidence showed that Abdel Rahman was in constant contact with
> other members of the conspiracy, that he was looked to as a leader,
> and that he accepted that role and encouraged his co-conspirators
> to engage in violent acts against the United States.

*Rahman*, 189 F.3d at 124. Further, the Blind Sheik "discussed the results of the paramilitary

training with Abouhalima and Nosair, and encouraged his followers to conduct *jihad,* including

acts of violence, against the United States." *Id*. Finally, "particularly relevant to the finding of

Abdel Rahman's membership are the statements of Siddig Ali to Salem that Abdel Rahman had

issued a *fatwa* for the Spring 1993 bombing plot, and had called it a 'must' and a 'duty.'" *Id*. at

125.

As was true with respect to the Blind Sheik, there was no evidence that Timimi

participated in the performance of the conspiracies in this case other than as an advisor, solictor,

inducer, counselor, and procurer. Yet, as in *Rahman*, the evidence showed that Timimi was in

constant contact with other members of the conspiracy, that he was looked to as a leader, and that

he accepted that role and encouraged the conspirators to engage in violent acts against the United

States. Like the Blind Sheik, Timimi discussed paramilitary training with his followers, and

encouraged them to conduct jihad, including acts of violence, against the United States.

Particularly relevant to the basis of his convictions was the testimony of Kwon, Hasan, and

Aatique that Timimi had described to them the Uqla fatwa regarding assistance to the Taliban,

and called it "obligatory." Accordingly, as was true with respect to the case against the Blind

Sheik, the evidence in this case established that Timimi solicited Kwon, Hasan, Aatique, Khan,

and others to levy war against the United States.

33

### D.  Ample Evidence Supported the Verdict on Count 3

The testimony of Kwon, Hasan, and Aatique  - -  as corroborated by the recordings of Royer, the testimony of Surratt, and the testimony of Garbieh  - - established that in September 2001, Timimi counseled and induced them to conspire to fight against American troops expected to arrive in Afghanistan.  Timimi's intent to counsel and induce them to conspire to wage war against America is further corroborated by his email of October 21, 2001, when he wrote that Muslims were obligated to support Mullah Omar, the Taliban, "and the Arabs with them" with their bodies, their wealth, and their words.  GX 10D19.  The testimony of Kwon, Hasan, and Aatique established that they (as well as Khan) did, indeed, conspire to wage war against the United States.  Accordingly, the evidence established that Timimi counseled and induced, Kwon, Hasan, Aatique, and Khan to conspire to levy war against the United States, and procured the commission of that offense.

### E.  Ample Evidence Supported the Verdicts on Counts 4 and 5

The testimony of Kwon, Hasan, and Aatique  - -  as corroborated by the recordings of Royer, the testimony of Surratt, and the testimony of Garbieh  - - established that in September 2001, Timimi attempted to provide support to the Taliban himself, and counseled and induced others to conspire to provide support to the Taliban.  Timimi's intent to attempt to provide support to the Taliban and to counsel and induce others to conspire do so is further corroborated by his email of October 21, 2001, when he wrote that Muslims were obligated to support Mullah Omar, the Taliban, "and the Arabs with them" with their bodies, their wealth, and their words. GX 10D19.

34

**J.A. 2680**

Timimi argues that there was no proof that he acted willfully, in that there was no proof that he knew of the prohibition on providing support to the Taliban. To the contrary, there was ample proof of such knowledge. SA Wyman testified that Timimi asserted that he was widely knowledgeable with respect to all matters affecting the Islamic world; it defies credulity to assert that Timimi's wide knowledge somehow missed the sanctions against the Taliban.

Moreover, in Timimi's article of March 7, 2001, entitled *Shaikh Ali Timimi on the Taliban and the Statues*, Timimi wrote that Muslims were obligated to support the Taliban in everything that they did that was in accordance with Islam. In reaching that conclusion, Timimi explicitly and favorably referenced "Shaikh Ibn Uqla's recent fatwa." GX 10J7. The Uqla fatwa referenced by Timimi was entitled *Fatwa of Sheik Hammoud Al-Uqlaa' on the Taliban*. GX 7D13. In pertinent part, it stated:

> Amongst the evidences that the Taliban Government is a Shariah Government is the fact that the disbelieving countries who are enemies of Islam and the Muslims are hostile towards it, *have imposed economic boycott on it*, isolated it, and tightened their grips on it for no reason other than its adherence [to] the Deen of Islam.

*Id.* (emphasis added). Clearly, if on no other basis, Timimi knew from the Uqla fatwa of November 2000 that "the disbelieving countries" had imposed an economic boycott on the Taliban.[7] Obviously, the sanctions imposed on the Taliban by the United States was a topic of interest in the Islamic world, and Timimi well knew about them.

---

[7] Similarly, SA Wyman testified that Timimi admitted that he was familiar with Hawali's *Statement to the Ummah Concerning the Recent Events*. In that document, Hawali specifically referred to the American sanctions on the Taliban. GX 7A23, at page 11 ("Millions suffered in Sudan and Afghanistan due to the scarcity of medicine and the imposing of a boycott").

35

In any event, Timimi did not have to know of the specific regulation prohibiting the provision of support to the Taliban, but only that providing such support was illegal. Timimi's instructions at Kwon's house on 9/16 to turn off the phones and close the blinds indicate that Timimi well knew that what he was proposing was against the law. Similarly, his assertion that what was said at that meeting must be held as an "amana" reflect that he knew of the criminality that he was inducing.

Finally, Royer was captured on tape telling Kwon that he "swore" to Sheik Ali that he would never tell what happened at that meeting; the fact that Sheik Ali accepted Royer's oath never to reveal what happened at that meeting indicates that Sheik Ali well knew that soliciting his listeners to go fight for the Taliban against the looming American invasion was against the law. Accordingly, the evidence established that Timimi willfully attempted to provide support to the Taliban, and counseled and induced Kwon, Hasan, Aatique, and Khan to conspire to provide support to the Taliban, and procured the commission of that offense.

### F.  Ample Evidence Supported the Verdict on Count 6

The testimony of Kwon, Hasan, and Aatique  -- as corroborated by the recordings of Royer, the testimony of Surratt, and the testimony of Garbieh - - established that in September 2001, Timimi counseled and induced them to conspire to mount a military expedition against India or Russia, countries with whom we were at peace, in violation of the Neutrality Act. As the tapes of Royer's conversations with Kwon reflected, Timimi told his listeners that they should join the mujahideen anywhere in the world if they could not fight against American troops expected to arrive in Afghanistan. The testimony of Kwon, Hasan, and Aatique established that they (as well as Khan) did, indeed, conspire to violate the Neutrality Act. Accordingly, the

36

**J.A. 2682**

evidence established that Timimi counseled and induced Kwon, Hasan, Aatique, and Khan to conspire to violate the Neutrality Act, and procured the commission of that offense.

### G.  Ample Evidence Supported the Verdicts on Counts 7 and 8

"A defendant may be convicted of a § 924(c) charge on the basis of a coconspirator's use of a gun if the use was in furtherance of the conspiracy and was reasonably foreseeable to the defendant." *United States v. Wilson*, 135 F.3d 291, 305 (4th Cir. 1998).  A conviction under 18 U.S.C. § 924(c) may properly be based on the acts of co-conspirators, even if the defendant is absent from the scene of the crime.  Indeed, in *Wilson*, the conviction of defendant Wilson under § 924(c) for the use of firearms by his co-conspirators to beat a victim at a location from which Wilson was absent was affirmed, on the grounds that such use was reasonably foreseeable to Wilson.

Timimi argues that he cannot be convicted of a § 924(c) violation on the basis of weapons used by Kwon and Hasan at the Lashkar camps in Pakistan because he did not know precisely which weapons they would use there.  That argument should be rejected, for - - regardless of the fact that Timimi well knew the *types* of weapons Kwon and Hasan would use in Pakistan - - the law of this Circuit squarely holds that Timimi is liable for the acts of Kwon and Hasan that were reasonably foreseeable to him.  *United States v. Cummings*, 937 F.2d 941, 945 (4th Cir. 1991) ("The Fourth Circuit recognizes the full breadth of the conspiracy doctrine described in *Pinkerton . . .* [which] makes conspirators liable for all reasonably foreseeable acts of their co-conspirators done in furtherance of the conspiracy").

37

As the Fourth Circuit explained in the course of rejecting an argument by one Alvin Truesdale that he could not be convicted of a § 924(c) offense for the use of a firearm by someone else:

> In Count 11 of the indictment, Alvin Truesdale was charged with using and carrying a firearm during and in relation to a drug trafficking offense, and aiding and abetting another in the using and carrying of a firearm, in violation of 18 U.S.C. § 924(c)(1) and (2). The offense underlying this § 924(c) violation was conspiracy. The conspiracy doctrine makes conspirators liable for all reasonably foreseeable acts of their coconspirators done in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 646-48, 66 S.Ct. 1180, 1183-85, 90 L.Ed. 1489 (1946). In *Cummings*, 937 F.2d at 944-45, we held that a defendant could be convicted of a § 924(c) charge predicated on conspiracy when the use of a gun by a coconspirator was reasonably foreseeable to the defendant.

*United States v. McManus*, 23 F.3d 878, 883 (4th Cir. 1994) (affirming § 924(c) conviction based on use of a firearm by co-conspirators because such use was reasonably foreseeable to the defendant).

The offense underlying Truesdale's § 924(c) violation was conspiracy. *Id.* Similarly, the offenses underlying Timimi's § 924(c) convictions were conspiracies to levy war against the United States, aid the Taliban, and violate the Neutrality Act. Inasmuch as the conspiracy doctrine made Truesdale liable under Section 924(c) for all reasonably foreseeable acts of the conspirators done in furtherance of that drug conspiracy, Timimi is similarly liable under § 924(c) for the reasonably foreseeable acts of the conspirators done in furtherance of the conspiracies to wage war against the United States, aid the Taliban, and violate the Neutrality Act.

38

**J.A. 2684**

The analysis is the same regardless of whether Timimi was a conspirator himself or merely an aider and abettor of the conspiracy. The *Pinkerton* doctrine makes conspirators liable for all reasonably foreseeable acts of their co-conspirators done in furtherance of the conspiracy. Kwon and Hasan used firearms in furtherance of the conspiracies Timimi aided, abetted, induced, and counseled. Thus, conspirators such as Royer and Khan clearly were liable under *Pinkerton* for the use of those firearms by Kwon and Hasan.[8] Pursuant to 18 U.S.C. § 2, however, one who aids, abets, counsels or induces another to commit a crime is also punishable as a principal. Inasmuch as Royer and Khan were also liable as conspirators under *Pinkerton* for the use of firearms by Kwon and Hasan, Timimi shares that same liability because he aided, abetted, counseled, and induced them all to engage in those conspiracies.

In this case, as noted above, Timimi admitted that he knew that jihad trainees at Lashkar camps used automatic weapons. Kwon testified that Timimi heard Royer describe at Hamdi's house his experiences at the Lashkar camps. The testimony of Kwon and Hasan established that Timimi induced them to go to the Lashkar camps to get jihad training in furtherance of a plan to fight against American troops expected to arrive in Afghanistan - - or at least to fight on behalf of mujahideen elsewhere in the world. Their testimony further established that, while at those camps, they fired the automatic weapons alleged in the indictment. Accordingly, the evidence established that Timimi counseled and induced Kwon and Hasan to use automatic weapons in furtherance of crimes of violence, and procured the commission of those crimes. Their use of automatic weapons was surely reasonably foreseeable to him in furtherance of the conspiracies;

---

[8] Indeed, Royer pled guilty in this Court to aiding and abetting the use of firearms by Khan, Kwon, and Hasan in Pakistan in the fall of 2001.

39

indeed, he knew that they would, in fact, use automatic weapons in furtherance of crimes of

violence. Thus, the evidence sufficed to convict Timimi upon Counts 7 and 8.

### H. Ample Evidence Supported the Verdicts on Counts 9 and 10

Timimi admitted that he knew that jihad trainees at Lashkar camps used rocket propelled

grenades. The testimony of Kwon and Hasan established that Timimi induced them to go to the

Lashkar camps to get jihad training in furtherance of a plan to fight against American troops

expected to arrive in Afghanistan - - or at least to fight on behalf of mujahideen elsewhere in the

world. Their testimony further established that, while at those camps, they handled or carried

the rocket propelled grenades alleged in the indictment. Accordingly, the evidence established

that Timimi counseled and induced Kwon and Hasan to use explosives in furtherance of felony

crimes, and procured the commission of those explosives crimes.

Respectfully submitted,

Paul J. McNulty
United States Attorney

By: _____

Gordon D. Kromberg
Assistant United States Attorney

40

**J.A. 2686**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, this _20_ day of June 2005, I caused a copy of the attached

GOVERNMENT'S RESPONSE TO DEFENDANT'S POST-TRIAL MOTIONS to be served by

e-mail and first class mail, postage paid, addressed as follows:

> Edward B. MacMahon, Jr.
> P.O. Box 903
> 107 East Washington Street
> Middleburg, Virginia 20118
>
> ebmjr@verizon.net
> yamamoto.law@verizon.net

FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

2005 JUN 28 P 6:

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | )    **Case No. 04-385-A** |
| | ) |
| **ALI AL-TIMIMI,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE TO
DEFENDANT'S POST-TRIAL MOTIONS**

**1.    Introduction.**

The government's response to the defendant's Motion for a New Trial is plainly

premised upon the hope that if a false story is told enough times, and is grandiose

enough, it will become true even in the face of contrary evidence.  This is best

demonstrated by the government's hyperbolic reliance on the case of the Blind Sheikh,

a terrorist who was the ringleader of a terrorist organization and who actually planned

and encouraged terror operations in the United States.  In that case, the government

did not have to "interpret" an e-mail, or cut snippets from old public speeches, to

determine the Blind Sheikh's support for terrorism.  The Blind Sheikh advertised himself

as a terrorist and even warned the government before his followers were prepared to

attack in the United States.  What the government did in this trial - obviously following

the blueprint of the Blind Sheikh's case - was to falsely portray Dr. Al-Timimi as a

ringleader of a terrorist organization while producing no evidence that it was true and by

-1-

**J.A. 2688**

intentionally misstating the limited evidence of his involvement with the paintballers as evidence of terrorism. The government did not even charge Dr. Al-Timimi with a terrorism offense but now seeks, at all opportunities, to portray the defendant as a terrorist.

The government, in its response, does not even quibble with the fact that the proof at trial showed that Dr. Al-Timimi spent perhaps four hours with his alleged "followers" in the entire time frame of this case. The government does not even bother to respond to the fact that the guns and ammunition so prominently displayed to the jury were never tied to the defendant. And, its explanation as to why it employed appeals to religious discrimination is patently unbelievable and only proves the claims made by the defense. As is detailed below, the motion should be granted.

## 2. The Government Concedes That There Was No Evidence That Dr. Al-Timimi Was Aware That Paintball Was Jihad Training.

Buried in the government's response is the admission that there was no evidence, contrary to what was explicitly argued to the jury, that Dr. Al-Timimi was aware any of the persons who attended the dinner at Kwon's home were engaged in jihad training. That testimony came directly from the mouths of the government's witnesses and is not subject to interpretation. Indeed, the government's witnesses did not, as the government states, fail to "recall telling him before 9/11 that they were training for jihad." (Response p. 24, n.6) Rather, as was detailed in the prior motion, each and every witness called by the government specifically stated that they did **not** tell Dr. Al-Timimi that they were engaged in personal jihad training at any time before the Kwon dinner. In fact, there was only one time that Kwon, the admitted emir of

-2-

paintball, even spoke to Dr. Al-Timimi about paintball and then Dr. Al-Timimi had to ask

if they were doing anything illegal. (Trial transcript April 7, p. 27) Kwon testified that he

did not tell Dr. Al-Timimi that paintball had anything to do with violent jihad. (April 7, p.

27) Kwon stated that Dr. Al-Timimi did not know who was playing paintball much less

why.[1] Dr. Al-Timimi was never a recipient of any mail from the paintball intranet site

and had no access to the site.  Gharbieh stated that Dr. Al-Timimi advised them to play

soccer instead of paintball.  There was no evidence that Thompson even knew Dr. Al-

Timimi.  Aatique never had a private discussion of any sort with Dr. Al-Timimi.  Hasan

testified that he never had a single discussion with Dr. Al-Timimi regarding paintball and

that Dr. Al-Timimi has no knowledge "in any way shape or form" that the paintballers

were preparing for combat through paintball.  (Hasan p. 50) Hasan testified that he

never saw Dr. Al-Timimi at the paintball field and stated that Dr. Al-Timimi had nothing

to do with his paintball training.  No witness tied Dr. Al-Timimi to any knowledge of any

of the various conspiracies that existed before 9/11 and not one shred of evidence tied

Dr. Al-Timimi to any knowledge much less use or ownership of any firearms or

explosive.  Every witness stated that Dr. Al-Timimi was entirely ignorant of the watching

of jihad videos and Kwon admitted that he never told Dr. Al-Timimi that he was a

recruiter for LET.  The government called no other witnesses about paintball.

In this light it was patently false for the government to argue that Dr. Al-Timimi

was the ringleader of the paintball group.  In doing so, the government lied to the jury

and "violated the fundamental rule, known to every lawyer, that argument is limited to

---

[1]     The court recalls that there were many people playing paintball and only a
few of them were even arrested.

-3-

J.A. 2690

the facts in evidence." United States v. Wilson, 135 F. 3d 291, 298 (4th Cir. 1998).

And, the government's argument deprived the defendant of a fair trial. A review of the government's response and the reasons why it believes that this argument was appropriate, demonstrates why it was not. First, the government says that "Kwon said that Dr. Al-Timimi was present at a dinner at Hamdi's when Royer described his adventures at a Laskar camp." (Response p. 32) There is no evidence in the record that paintball or jihad training through paintball was discussed at that dinner much less that Dr. Al-Timimi became the emir of paintball or the leader of a group of terrorists as a result of attending the dinner. Even Kwon, a virtual wind-up doll of perjury for the government, never tied Dr. Al-Timimi to any knowledge of paintball for any illegal purpose much less for jihad. To accept this argument, the government must agree that Kwon is a liar when he stated that Dr. Al-Timimi had no knowledge of paintball for jihad training. Regardless, there is no evidence in this record to support even an inference from Dr. Al-Timimi's attendance at a dinner to support an argument that Dr. Al-Timimi was, thus, the ringleader of a group of terrorists. Second, witnesses approached him about paintball after Chapman was approached by the FBI. The same analysis set forth above controls. No witness to those conversations testified that Dr. Al-Timimi was aware of the jihad nature of paintball. They all testified to the contrary. The e-mail referenced by the government also proves nothing and was actually used falsely by the government. Thompson testified that he believed that one portion of the e-mail was based upon a religious opinion of Dr. Al-Timimi but that opinion has nothing to do with jihad - it has to do with prayer while traveling and it is the rankest form of hearsay that even links this to Dr. Al-Timimi. The unrebutted testimony was that the emirs of

-4-

paintball were Kwon, Royer and Gharbieh. The testimony at trial was that the emir

referenced in the e-mail was Royer. Dr. Al-Timimi is not listed as either the drafter or a

recipient of this e-mail. There was no evidence that he knew about this e-mail or

participated in it in any manner. As such, this evidence does not support the argument

that was made in any way.

Finally, the argument set forth in footnote 6 shows just how desperate the

government is to avoid the fact that it misled this jury about a key issue in the case.[2]

There, the government suggests that the court rely upon testimony from witnesses that

it did not even bother to call in its case.

> Notwithstanding the proof outlined above that Dr. Al-Timimi *did* know that
> jihad training was underway, the fact remains that Dr. Al-Timimi was
> closer to Royer and Hamdi than Kwon, Hasan, Aatique, or Surratt, and it
> would have been natural for Dr. Al-Timimi to learn about the jihad training
> from them (after all, he listened to Royer describing his own experiences
> at Lashkar at Hamdi's house). Moreover, Dr. Al-Timimi likely heard about
> the training from Al-Khatani, who was one of his best friends."

Government response, p. 24 n.6.

This argument, while it may reflect the government's opinion of their

investigation, is grossly speculative as well as entirely unsupported by the record. The

government never called either Royer or Khatani as a witness so it can hardly rely on

what they may have said if called. Nothing in any of the tapes of Royer even mentioned

---

[2]    This "argument" should be compared to the Blind Sheikh's case. As to
the jihad training of the other defendants, the evidence was that the co-conspirators
called the Blind Sheikh in Egypt "to discuss various issues including the progress of
their military training, tape-recording these conversations for distribution among Abdel-
Rahman's followers. Nosair told Abdel-Rahman, 'we have organized an encampment,
we are concentrating here.'" United States v. Rahman, 189 F. 3d. 88, 105 (2nd Cir.
1999) From that evidence, an argument could be made that Rahman knew of the
others' jihad training. There is no such evidence in this record.

-5-

paintball much less Dr. Al-Timimi's involvement in or knowledge of it.  There is no evidence as to the friendship, if any, between Royer and Dr. Al-Timimi, Hamdi and Dr. Al-Timimi or Khatani and Dr. Al-Timimi.  Arguing that some item of evidence is proven by what is "natural" is not proper and only serves to highlight what was not proven. There is not even evidence in the record that Khatani knew anything about paintball. Similarly, the possibility that Dr. Al-Timimi "likely" heard something from a witness that was never called is hardly a basis for a closing argument in which the government paints a person as a leader of a group of terrorists.

It bears reminding just how prejudicial this exact misstatement of the evidence was to the defense.  The defense had challenged the government to respond to the argument that because Dr. Al-Timimi knew nothing about paintball as jihad, he would not have known that the people at Kwon's home were receptive to the criminal entreaties attributed to Dr. Al-Timimi.  This argument was made by counsel knowing that there was no evidence in the record that would have supported any claim that Dr. Al-Timimi possessed any such knowledge.  In response, the government elected simply to lie - and lie in a big way - and tell the jury that Dr. Al-Timimi was the ringleader of a group of terrorists, that they could not tie their shoes without consulting with him.   The jury apparently accepted this argument on its face.  Since this was false and misleading, the defendant is entitled to a new trial on this basis alone.

> **3.      The Government Confirms That It Made Unprecedented Appeals to Religious Bigotry in Its Closing Argument.**

The government's attempts to explain the heated and bigoted arguments that it

made about the Muslim religion only serve to prove the point made by the defense.[3]

First, the government declines to say exactly what he meant when he argued that there

is a compulsion of religion in Islam.[4]  This is because it is obvious that the argument

that was made has been exposed for what it really was - a bigoted appeal to cast the

defendant as a member of a religious group pre-disposed to crime and violence.  This

argument is offensive to the rule of law and the concepts of separation of church and

state, here represented by the Department of Justice.  This argument clashes as well

with the "understanding, reached . . . after decades of religious war, that liberty and

social stability demand a religious tolerance that respects the religious views of all

citizens."  Zelman v. Simmons-Harris, 536 U.S. 639, 718 (2002) (Breyer, J. dissenting)

This same rule applies to Fed. R. Evid. 610.

Moreover, the government's explanation - that this was impeachment evidence

as to Idris - is plainly bogus and also unsupported by the record.  There was no

evidence in the record to support even an argument that Dr. Al-Timimi or Idris[5] believe

---

[3]      The one Muslim member of the original jury panel - out of approximately
125 potential jurors -  was struck by the Court for refusing to respond to questions
posed by the Court regarding his wife's employment not by the defense because of his
religion.  The government's argument to the contrary is preposterous.

[4]      Counsel was hoping that the government would expound upon this point.
Instead, the government simply ran away from its own argument now claiming that what
was said was irrelevant.  The government also fails to state why it asked Aatique about
Islam being spread by the sword.

[5]      The government misstates Idris' testimony.  Idris testified that he met
Kwon and Hasan before they left for Pakistan on two occasions.  He stated that Kwon
and Hasan, on the second meeting, told him that Dr. Al-Timimi and Idris' father said that
it was acceptable for them to travel to Pakistan for a wedding or to make hijrah.  Dr. Al-
Timimi told the F.B.I. that he told Kwon and Hasan not to go unless they intended to
make hijrah.  Hasan testified that he told Idris that he was going to make jihad and

-7-

that there is a compulsion to the Muslim religion much less a compulsion to commit

violent crimes.   Neither of these men even had a criminal record.  Had a single witness

testified that, yes indeed, there was a compulsion of religion in Islam, perhaps Mr.

Kromberg would have been permitted to make such a vile religious argument on the

basis of the evidence.  Yet the Opposition correctly admits that the only testimony in the

case was the that Idris denied that there was a compulsion of religion in Islam.  From

that testimony, Mr. Kromberg believes that it is appropriate to argue that Idris was lying

because the jury heard a short portion of a 15 year old tape of Dr. Al-Timimi discussing

Islamic legal issues regarding the death penalty, Shiites and the Koran.[6]  Thus, Mr.

Kromberg impermissibly told the jury that - in his opinion - there is a compulsion of

religion in Islam.  Otherwise, how could he be impeaching the witness who testified to

the contrary.  It is not the role of a criminal jury - much less a prosecutor - to interpret

the religious beliefs of a defendant and argue them as evidence of a propensity to

commit violent crimes.

The tape that the government played at trial regarding the treatment of Shiites by

Sunnis goes a long way to proving why such religious matters should never have been

---

when Idris told Dr. Al-Timimi what he had heard, they attempted to call Kwon and
Hasan that evening to tell them again not to leave for jihad.  The phone records confirm
these events.  Kwon denies the story entirely.

[6]    The defense does not agree that either Dr. Al-Timimi or Idris advocated
the beheading of Shiities.  This passage shows the danger of allowing religious
arguments to be made in a court of law.  The possibility of prejudice and misleading
testimony is obvious when no one in the courtroom or the jury is an expert on the
particular religious issues being discussed.

-8-

introduced into this case because of the possibility of confusion and prejudice.[7]  The

actual  tape, containing the discussion of the Sunni/Shiite rift and prayer by Sunnis

when led by Shiites, was made by Dr. Al-Timimi sometime during the build-up to the

Desert Storm campaign which would date the tape in late 1990.  The government never

provided notice, as it did under Fed. R. Evid. 404 for other tapes, that it intended to

introduce this tape in evidence at the trial.  No wonder, since it contains no orders or

suggestions for Muslims to go defend Iraq.  Moreover, now that the government

concedes that this tape was used to impeach Idris, the tape should never have been

admitted under Fed. R. Evid. 404 and because Idris should not have been impeached

with Dr. Al-Timimi's words.  The word Salafi, used by Mr. Kromberg to attempt to limit

the scope of his screed in the closing argument, does not appear on the tape.  The

actual language in the tape, that the government now argues somehow shows that Dr.

Al-Timimi believes there is a compulsion to the Muslim religion, is as follows:

The lecture starts and discusses differences between Sunnis and Shiites in

belief and religious practice (prayer and fasting).  Then from minute 29:35 to minute

31:4, it  concludes with a historical observation:

> And if you look at their history just compare the Shi'a - with their history to
> our history and compare the history of Ahl as-Sunna. The blood of the
> swords of the Sunni Muslims are dripping with the blood of Christians,

---

[7]       The government continues to argue that Dr. Al-Timimi is somehow
responsible for the packaging of the New World Order Tape.  (Response p. 8, n. 2) The
government's first witness testified that Dr. Al-Timimi had nothing to do with the cover
much less the sale or marketing of the tape. The cover was prepared in Australia.
Similarly, rather than a statement of Dr. Al-Timimi, the saying "waging jihad is an
unceasing obligatory duty until the day of judgement" (Response p. 16) is a saying
attributed to the Prophet Muhammad and repeated by Dr. Al-Timimi while he reads
from a book.

-9-

Jews and idol worshipers and Allah has commanded us to make jihad against the enemies of Allah. This is what our blood our dripping with. Their blood is dripping with the blood of the Muslims - their swords are dripping with the blood of the Muslims. The Shiites throughout history have always whenever the Muslims are fighting they always unite themselves with enemies.

For instance when the Crusaders attacked the Muslims, five six hundred years ago, they were with the Crusades. When the Mongolians attacked the Muslims, the armies of Genghis Khan, they were with the Mongolians. And even now, you ask those brothers who Allah (subhanahu wa ta'ala) allowed them to go to Afghanistan, ask them where were the Shia? Where they with the Muslims making jihad against the Communists or where they with the Russians and the Communists?

This is their history . . . history of hypocrisy, you see. So they never know anything to the believers except to kill them and so forth.

And when the Jews were in Lebanon killing the Muslims, the Palestinian Muslims, in the camps, they were with them there also.

So as I said that while Ahl as-Sunnah, our swords are dripping with the blood of the Christians, the Jews, and other enemies of Allah; their swords are dripping with the blood of the believers in Allah. Just like the Jews, the ones who started the message in this religion. Because you know, the blood . . . they tried to poison the meat, you know what I am saying and even when he died the Prophet (s) said: I feel the illness of that poison meat you see. So this is the history of the Jews they . . . their swords drip with the blood of the prophets and the believers. The ones who started this religion was a Jew. Because the first Shia was a guy called 'Abdullah ibn Saba' and he was a Yemeni . . . a Yemeni, a Jewish Yemeni, from Yemen. And he claimed that he was . . . became a Muslim and he started to spread this religion. So it is the same characteristic, you know. And that book Shiites and Shiaism talks about that in detail in your library.

At minute 46:48 there is a question about praying behind Shiites:

I mean it is a very good question, as for the question of praying behind the people of bida' . . . the people of bida'. Now obviously if the person is a kafir, if he apostates from the religion, I mean if you find them . . . you know . . . invoking Ali, you find them invoking Husain, you find them saying the Quran has been changed, you find them . . . calling 'A'isha saying . . . accusing 'A'isha of what Allah has said that she is pure of, that she had . . . you know . . . that she had sex outside of the . . . you know ... outside of the Islamic marriage of the Prophet Muhammad (sallallahu

-10-

'alaihi wa sallam): These people are all kuffar. Ok, you can't pray behind any of these people.

In fact if you were in an Islamic state these people their heads . . . you know . . . should be lopped off, that's what . . . you know . . . should be done to these people. They deserve nothing better than to cut their necks if we were in an Islamic country to be brought, to be given a chance to make repentance and if they don't repent, to cut their necks. That's what these people deserve.

However, though what about those Shias who are not necessarily preaching to that from what you know. Can a person from Ahl as-Sunna pray behind a person from Ahl al-Bid'a, that's the point? And in general you cannot . . . you are not supposed to pray behind the people of bid'a except in situations where if you were to pray 'id prayer and that you found that the imam of the 'id prayer has some sort of bid'a. You know what I am saying.

Or if you . . . like sometimes during the 'id with the people . . . many times those imams who lead us in the 'id in Washington DC. If you know them or read their writings or their books or hear their khutbas, they have bid'a. They have some sort of heresy in their beliefs, some sort of deviation from the Qur'an and Sunna, whether they . . . it doesn't mean they are from a sect, they might claim that they are Sunnis but they are still deviant beliefs and stuff. So in this situation . . .

Or you find yourself in the imam . . . the imam . . . of the jumu'a prayer. Ok sometimes you are in a situation where you are in the jumu'a in your area, the imam is not an adherent trying to uphold the Qur'an and Sunna . . . is a deviant or a fasiq - an outright sinner. Ok in this situation it is permitted to pray behind him. Ok to preserve the unity. He is not a kafir now, mind you. Let me make this crystal clear.

But as far as the general salawat - the general five salah - then it is . . . you pray behind whoever you want to pray and it is best not to pray behind the Shi'a especially if you know that they're calling to this thing. By you praying behind them you are giving them a check that their beliefs are correct. So always you should try to remove yourselves from this situation without of course causing a lot of confusion.

I mean if you were in prison for instance with some of the brothers and you are giving da'wa to them in a prison the person leading them is a Shi'a in prayer you wouldn't want to . . . it might not be wise at that point to make a big confusion or something like that; or if you were in a masjid when you know yourself that you were the only one calling to the Sunnah.

-11-

J.A. 2698

A lot of the brothers are just ignorant. It might not be wise at that time to make an issue because you were trying to bring those brothers step by step.

That tape did not say that there was a compulsion of religion in Islam or even that Sunnis should kill all of the Shiites. To twist this tape into the argument that Dr. Al-Timimi believes that there is compulsion in religion, and thus impeach Idris with that alleged belief, is baseless and discriminatory and violates the holding in *Dawson v. Delaware*, 503 U.S. 159 (1992). Even the "cut their necks" language is limited to a legal proceeding of some sort in a Muslim country. There is no call to kill anyone in the speech and, instead, Dr. Al-Timimi issues a call "to remove yourselves from this situation without of course causing a lot of confusion" when faced with the problem addressed by the tape. The word "compulsion" cannot be found in the speech. While Mr. Kromberg may believe that there is a criminal compulsion of religion in the sect he describes, the law requires that lawyers not appeal to religious beliefs as evidence of criminal behavior of a group - even a sect of a religious group. Mr. Kromberg cannot act as an expert witness and argue that a witness should be disbelieved because of some religious belief that he expresses that contradicts Mr. Kromberg's view of the religion, even if he ascribes those views just to the sect that just happens to include the Kingdom of Saudi Arabia. Thus, counsel did not "miss the point" of the government's argument about compulsion of religion. If there is was no relevance to the issue of compulsion of religion as it relates to Dr. Al-Timimi's innocence or guilt, as the government now belatedly concedes, then the government should not have used the argument to try to show same. Stated again, similar appeals to the religious beliefs of

-12-

J.A. 2699

other religions as evidence in a criminal trial would never be tolerated, would be recognized as bigoted on their face, and would never be used to obtain a conviction.

Also, the government again repeats the lies that it told the jury regarding what Dr. Al-Timimi told the agents regarding Muslims and lying. Attached hereto is the FBI 302 of the interview that Dr. Al-Timimi gave to the F.B.I. on June 27, 2003. Again, this record shows that the government has simply intentionally misstated the evidence in its argument to the jury. At that interview, the agents recorded that "Timimi stated that a Muslim can lie only when the Muslim is under penalty of death, that is when the Muslim's life is threatened. Timimi advised that this rule would apply to a situation when a Muslim is at war, which in itself is deception." (F.B.I. Interview, p. 7) Agent Wyman stuck very close to the language of the 302. Whether this is a correct statement of Islamic law or not, these statements are not support for the government's argument that Dr. Al-Timimi and Idris are "supposed to lie." A party is allowed to argue inferences but they are not allowed to simply create evidence. Dr. Al-Timimi never told the F.B.I. that he was at war with the United States or that he would lie to them at any time. In fact, he corrected them as to many items about their investigation and met them on many occasions. He has not been charged with perjury. Again, the government has used what it believes are the religious beliefs of a Muslim as evidence to show that their testimony should be disregarded as a matter of religion.[8] This is and was plainly inappropriate.

---

[8]    The government appears to have abandoned its argument that Islam is a political movement.

-13-

Finally, as to the argument that tying Dr. Al-Timimi to Bin Laden through Hawali was not prejudicial, the government again misstates the case. Dr. Al-Timimi did, at one point in time actually speak for Hawali. That was before the war in Iraq started and Dr. Al-Timimi and Hawali wrote a letter to the U.S. Congress seeking to stop the United States from invading Iraq. The Court, upon the government's objection, refused to allow this evidence to be introduced thus allowing the United States to present a grossly misleading portrait of Dr. Al-Timimi's actual relationship with Hawali. A copy of that letter, which was given to the F.B.I., is produced herewith. The views taken by Dr. Al-Timimi in this letter are totally at odds with the false portrayal put forth by the government in the closing about Dr. Al-Timimi, Hawali and, thus, Bin Laden.

### 3.    The Statements Attributed to Dr. Al-Timimi Are Protected Under the First Amendment.

As an initial matter, the government does not dispute the fact that this Court is obligated, as a matter of constitutional law, to make an "independent judgment on the facts of the case." Bose Corp. v. Consumers Union of United States, 466 U.S. 485, 522 n. 27 (1984) As was stated in the Motion for Judgment of Acquittal, and not controverted by the government:

> In criminal and civil cases, where issues of constitutionally protected speech arise, the Courts must "exercise independent judgment on the question of whether particular remarks are "so inherently inflammatory as to come within that small class of 'fighting words' which are 'likely to provide the average person to retaliation and therefore cause a breach of peace,'" Street v. New York, 394 U.S., 576, 592 (1969), and on the analogous question whether advocacy is directed to inciting or producing imminent lawless action." Hess v. Indiana, 414 U.S. 105, 108-109 (1973), cited in Bose supra. As such, the Court is required to examine the alleged criminal statement de novo and determine whether the speech at issue is protected as a matter of constitutional law. As such, with respect to the

-14-

constitutional issues set forth below, the jury verdict on this issue is entitled to no weight whatsoever.

Motion for Judgment of Acquittal at page 46.

Instead, the government cites to the case of the Blind Sheikh, *United States v. Rahman*, 189 F. 3d 88 (2nd Cir. 1999) as if all issues raised in this case have been conclusively determined in the *Rahman*[9] case. To the contrary, the facts of the *Rahman* case, when compared to the facts of this case, demonstrate why the instant motions should be granted as a matter of law.

For example, it was fair to call Rahman the ringleader of a group of terrorists. The Court found that Rahman began to organize a "jihad army" in New York even before he came to the United States in 1999. Id. at 104. Rahman instructed his followers to "do jihad with the sword, the cannon, with the grenades and the missile." Id. Rahman was fully aware of the military training that his group was undertaking and was requested to discuss "the progress of their military training." These conversations were tape recorded for distribution to his followers. One conspirator told Rahman, "we have organized an encampment, we are concentrating here." Id. at 105. On of his conspirators killed Rabbi Kehane in New York. Later, Rahman told yet another conspirator to assassinate the president of Egypt "the loyal dog to the Americans." Id. at 106. In early 1992, Rahman encouraged the others to restart their "paramilitary training . . . noting that there would come a day when the training would be needed." Id.

---

[9]    Rahman was not an American citizen and thus could not be charged with treason. Here, the government did not obtain and indictment against Dr. Al-Timimi for treason but wishes to argue - including in press releases and for sentencing - that it obtained a treason conviction.

-15-

When the training resumed, Rahman "offered his insights into the training." Id. at 107
In that same time period, Rahman was calling a phone number in Pakistan that was
also used by Ramzi Yousef, the Pakistani convicted - along with several of Rahman's
co-conspirators - with crimes arising from the first World Trade Center bombing. Id. at
107. The bombers of the World Trade Center kept in close contact with Rahman while
they were building the bomb they later used. Id. Rahman stated publicly in 1993 that
he was fine with his group being called terrorists, "so long as they were terrorizing[10] the
enemies of Islam, the foremost of which was the United States and its allies." Id. After
the World Trade Center was bombed, one of the co-conspirators called the U.A.E.
seeking additional funds for more terror operations. That person used Rahman as a
reference. These additional plots, the bombing of the Holland Tunnel and/or the United
Nations were all approved by Rahman as targets for the men whose training he had
overseen. Id. In 1993, Rahman told one of the co-conspirators to "plan carefully" and
to try to "inflict damage on the American Army itself." Id. at 109, 117. Rahman was
secretly taped and admitted knowing the persons who bombed the World Trade Center
and their plans of escape. Id. Rahman told one conspirator to "make up with God...by
turning his rifle's barrel to President Mubarak's chest." Id. at 117 The bombers, all
affiliated with Rahman, began to look for detonators for their bombs. Stolen cars were
obtained and the components of bombs were obtained for detonation in New York City.
Id. at 110. Fertilizer and fuel was actually mixed and targets in New York videotaped.

---

[10]     The government never produced a single shred of evidence that Dr. Al-
Timimi ever supported terrorism. As the Court recalls, Dr. Al-Timimi stated that the 9/11
attacks were Islamically impermissible and had been on record opposing terrorism of at
least a decade.

-16-

Id. at 111. Violence, it can easily be stated, was imminent when the fuel and fertilizer was mixed. That, constitutionally, is a simple call.

To compare the facts of the *Rahman* case, to this case, then, would be to erect a monument to hyperbole. First, as has been discussed below, there is no evidence that Dr. Al-Timimi even knew that the paintballers were training for jihad much less who they all were. Where Dr. Al-Timimi was ignorant, Rahman was offering insights into the jihad training. Where Dr. Al-Timimi was never alleged to have even made a single phone call to Pakistan, Rahman is in touch with the same person that Ramzi Yousef had contacted before he bombed the World Trade Center. Whereas Dr. Al-Timimi is alleged to have told a few people - one time on one day[11] - to either pray, make hijra or go to Afghanistan and fight, Rahman offered his followers jihad advice over a long period of time and told them that they were obligated to fight with swords, grenades, missiles and bombs. The government has no similar statements from Dr. Al-Timimi other than his repetition of a few Koranic verses or statements of the Prophet Muhammad. While Dr. Al-Timimi is charged with advocating the use of force in a conflict that had not yet begun, in a place that was thousands of miles away, against an enemy that may or may not ever arrive, Rahman was advocating the bombing of landmarks in New York City with weapons that were being assembled and readied for delivery to their targets. While there can be no doubt that violence was "imminent" when Rahman approved targets in New York while knowing that the bombs were ready,

---

[11]     There was no evidence in this case that Dr. Al-Timimi ever advocated any crime either before or after the dinner at Kwon's home. Donald Surratt did not testify that Dr. Al-Timimi told him he was obligated to fight and Ali Chandia did not testify at all.

-17-

there can similarly be no doubt that violence was not "imminent" at Yong Kwon's home in September of 2001. All of the government's witnesses agreed that Dr. Al-Timimi did not advise them to use violence against anyone in the United States, at the Pentagon, or anywhere else. Despite the government's claim to the contrary, not one witness ever said that Dr. Al-Timimi discussed jihad with any of them. Dr. Al-Timimi never issued a fatwa of any sort and Dr. Al-Timimi did not have the religious authority that Rahman had to do so.

Thus, the comparison between the facts of these two cases show beyond cavil that the statements attributed to Dr. Al-Timimi on September 16, 2001, are in fact protected speech. When Dr. Al-Timimi left Kwon's home, there was no agreement to use force against the United State for any purpose. Id. at 114. To the contrary, Kwon testified that it was when he returned from Dr. Al-Timimi's home that the discussion turned to "our plan" to go to Afghanistan. "Our plan" he agreed, did not include Dr. Al-Timimi. Then, when they got to Pakistan, Kwon and Hasan went to the beach and went shopping. There is no reference in the Rahman case to any "terrorists" going to the beach or shopping with their relatives in Pakistan. Not one of the paintball defendants ever even tried to reach Afghanistan. Not one was ever within shooting distance of an American soldier except when they were in Northern Virginia which was not, according to Hasan and Kwon, "part of the plan." The only threat that the paintballers ever posed to an American soldier or citizen would have occurred had one been in the Himalayas when Kwon or Hasan fired a shot into a mountain. Nothing that Dr. Al-Timimi has ever done or said has caused any risk to a single American. Under these facts, at best, Dr. Al-Timimi advocated some future violent action in some far off place at some unknown

-18-

time.  Such facts simply will not sustain a criminal conviction under *Brandenburg*.

Rahman was prepared to kill innocent  people in New York City on a certain date at a

certain place.  His "followers" had aided the first World Trade Center bombers and he

was friends with Ramzi Yousef, the mastermind of the World Trade Center attacks.  Dr.

Al-Timimi, to the contrary, is a cancer researcher who espouses many unpopular

political and religious views.  His convictions must, as a matter of constitutional law, be

overturned.

### 4.    Count 1

There was insufficient evidence adduced at trial to support Dr. Al-Timimi's guilt in

Count 1 of inducing others to conspire to use firearms even in the light most favorable

to the government.  As argued in more detail later in defendant's argument regarding

Counts 7, 8, 9 and 10 and in his Motion for Judgment of Acquittal, and as this Court has

previously determined in dismissing various aiding and abetting counts[12] in *United

States v. Khan*:

> In order to aid or abet another to commit a crime, it is necessary that the
> defendant willfully and knowingly associate himself in some way with the
> crime and that he willfully and knowingly seek by some act to help make
> the crime succeed. . . .
>
> To determine whether a defendant aided or abetted the commission of the
> crime with which he is charged, ask yourself these questions. . . .
>
> Did he participate in the crime charged as something he wished to bring
> about?  Did he associate himself with the criminal venture knowingly and

---

[12]     The Court dismissed Counts 8, 10, 19 and 24 through 27 of the indictment
charging Hammad Abdur-Raheem and Seifullah Chapman with aiding and abetting and
Counts 8 and 10 charging Masoud Khan with aiding and abetting.  Abdur-Raheen
taught others how to clean, assemble and discharge the same types of firearms used in
Pakistan.

-19-

J.A. 2706

willfully?  Did he seek by his actions to make the criminal venture
succeed?  And if he did, then the defendant is an aider and abettor.

*Khan* February 20, 2004 trial transcript at 2132-33.

Assuming arguendo that Dr. Al-Timimi told Kwon, Hasan and Aatique to go to
the LET camps to train or to fight on behalf of mujihadeen somewhere in the world, that
still does not establish that Dr. Al-Timimi as an aider and abettor induced others to
conspire to use any firearms, let alone the firearms described in Count 1 of the
indictment.  First of all, the members of the conspiracy had conspired to train and use
firearms before Dr. Al-Timimi ever spoke to them on September 16, 2001.  Members of
the conspiracy went to firing ranges to shoot their weapons and bought and sold
weapons among themselves without Dr. Al-Timimi being aware of any of this activity.
Nor did any of the conspirators tell Dr. Al-Timimi about their conspiracy to prepare for
jihad.  While Dr. Al-Timimi acknowledged that he knew that LET ran military style
training camps in Pakistan, there was no evidence that Dr. Al-Timimi was aware of the
various types of weapons used in the LET training camps nor was Dr. Al-Timimi aware
of the various weapons used by Kwon, Hasan, Aatique, Khan and others in Pakistan as
alleged in Count 1 of the indictment.

The government points to an article that Dr. Al-Timimi sent to his brother
regarding an American Muslim who was killed in combat in Kashmir.  The portion of the
article cited by the government is not about the American Muslim's training but was
about test firing weapons and preparation before his group infiltrated into an occupied
valley in Kashmir and attacked an Indian army post.  The only aspect about the
American Muslim's training contained in the article was about how he prepared himself

-20-

physically by wearing heavy boots to run, running with a long rope tied around his waist with a cinder block tied to the end, choosing to train in mid-winter - the hardest time of the year, marching day and night with a 35 pound backpack, running for a mile and a half with a backpack filled with 50 pounds of bricks and stones, climbing a tall water tower with the 50 pound backpack on.

The government contends that Kwon was present when Dr. Al-Timimi heard Royer describe at Hamdi's house his experiences at the LET camps.  What Dr. Al-Timimi recalled about the dinner at Hamdi's house which occurred prior to 9/11/-1 was that Royer spoke to those in attendance about LET.  Royer advised that he helped set up the LET website, but Royer did not indicate that he had participated in military activities with LET.  (FBI 302, 6/27/03, p. 5).  In another interview, Dr. Al-Timimi told the FBI that he was aware that Royer had spent time in an LET office in Pakistan and that Royer had told him about assisting in setting up internet communications for the LET. (FBI 302, 6/24/04, p. 5).

Thus, the evidence is insufficient to support defendant's conviction on Count 1 for aiding and abetting by inducing others to conspire to use firearms.

## 5.    Count 2

There was insufficient evidence adduced at trial to support Dr. Al-Timimi's guilt in Count 2 of soliciting others to levy war even in the light most favorable to the government.  As argued in more detail in defendant's Reply to the Government's Response, the government's attempts to equate the actions of Abdel Rahman, the Blind Sheik, to Dr. Al-Timimi's are completely misplaced.  Abdel Rahman was the leader and assembled a group of conspirators to commit violent acts against the United

-21-

J.A. 2708

States. These actions by Abdel Rahman are closer to levying war than the alleged

actions of Dr. Al-Timimi. *Ex Parte Bollman and Ex Parte Swartwout*, 8 U.S. 75, 126

(1807). There is no evidence that Dr. Al-Timimi was a leader or solicited others to levy

war. Contrary to the government's assertion, Dr. Al-Timimi was not in constant contact

with members of the conspiracy; he was not the leader of conspiracy; he did not

discuss paramilitary training with the members of the conspiracy except to suggest to

them that they should play soccer instead of playing paintball; and did not encourage

the conspirators to conduct jihad including acts of violence against the United States.

The government does not point to any evidence to support any of these assertions.

With regard to the Uqla fatwa, Dr. Al-Timimi did not call it "obligatory."

Furthermore, as argued by the government, Counts 2 and 3 are duplicitous.

### 6.    Count 3

There was insufficient evidence adduced at trial to support Dr. Al-Timimi's guilt to

Count 3 of inducing others to conspire to levy war even in the light most favorable to the

government. As argued in more detail later in defendant's argument regarding Counts

7, 8, 9 and 10 and in his Motion for Judgment of Acquittal, and as this Court has

previously determined in dismissing various aiding and abetting counts[13] in *United*

*States v. Khan*:

> In order to aid or abet another to commit a crime, it is necessary that the
> defendant willfully and knowingly associate himself in some way with the
> crime and that he willfully and knowingly seek by some act to help make
> the crime succeed. . . .

---

[13]     The Court dismissed Counts 8, 10, 19 and 24 through 27 of the indictment
charging Hammad Abdur-Raheem and Seifullah Chapman with aiding and abetting and
Counts 8 and 10 charging Masoud Khan with aiding and abetting.

-22-

To determine whether a defendant aided or abetted the commission of the crime with which he is charged, ask yourself these questions. . . .

Did he participate in the crime charged as something he wished to bring about? Did he associate himself with the criminal venture knowingly and willfully? Did he seek by his actions to make the criminal venture succeed? And if he did, then the defendant is an aider and abettor.

*Khan* February 20, 2004 trial transcript at 2132-33.

At the meeting at Kwon's on September 16, 2001, Dr. Al-Timimi was asked what they as Muslims could do in the aftermath of 9/11. He told those gathered there that there were a number of options available to them, including leaving the United States to live an a Muslim country and staying home and doing nothing. The testimony of the witnesses was that one of the options that Dr. Al-Timimi gave was to go join the Mujihadeen anywhere in the world which those in attendance felt included Afghanistan. Kwon testified that Dr. Al-Timimi told him to go to Korea since he was Korean.

The government's reliance on Dr. Al-Timimi's email of October 21, 2001 is misplaced. By October 21, Kwon, Hasan, Aatique and Khan had already been in Pakistan for a month and no one else made any attempt to travel to Pakistan. In his email which he captions "Utter nonsense," Dr. Al-Timimi is commenting on an email sent to him by someone else. While Dr. Al-Timimi does indicate that as Muslims there is an obligation to support Mullah Omar and the Arabs with them "by body, wealth and word even if some find that distasteful" he qualifies that support indicating unless they turn out to be "Dajjaal" [the Antichrist] at which time they will be dealt with.

### 7.    <u>Counts 4 and 5</u>

Even in the light most favorable to the government, there was insufficient evidence adduced at trial to support Dr. Al-Timimi's guilt to Count 4, attempting to

-23-

contribute services to the Taliban and Count 5 inducing others to conspire to aid the

Taliban. Assuming arguendo that Dr. Al-Timimi attempted to provide support to the

Taliban and attempted to induce others to aid the Taliban, there must still be evidence

in the record to show that Dr. Al-Timimi was aware of the statutes and regulations

imposing sanctions against the Taliban. The government conceded that point in

response to an inquiry from the Court during jury deliberations.

   The government now assumes that Dr. Al-Timimi was aware of the statutes and

regulations prohibiting providing support to the Taliban. But there was no evidence

adduced at trial that Dr. Al-Timimi was aware of the statutory and regulatory prohibition

on providing support to the Taliban. The government now attempts to point to various

exhibits contending that they demonstrate Dr. Al-Timimi's awareness of the sanctions.

The government cites to Dr. Al-Timimi's article Shaikh Ali Timimi on the Taliban and the

Statutes in which he states that "Shaikh Ibn Uqla's recent fatwa . . . is a positive step in

the right direction but there still is a need for more voices to be heard on the topic so a

consensus or majority opinion may be formed." (GX 10J7). Dr. Al-Timimi's article is

about the destruction of centuries old Buddhist statues in Afghanistan. There is nothing

in Dr. Al-Timimi's article regarding sanctions against the Taliban and he says nothing

further about Shaikh Uqla's fatwa. There is no indication that the Uqla fatwa that Dr. Al-

Timimi is referring to is the one that the government cites, Fatwa on the Shariah

Implementation of the Taliban Government in Afghanistan issued approximately

November 29, 2000. The Hawali statement referred to in footnote 7, page 35 of the

government's response was issued sometime after the meeting at Kwon's on

September 16 but before the United States invasion of Afghanistan. The Hawali

-24-

statement does not put Dr. Al-Timimi on notice of any statutory or regulatory prohibition on providing support to the Taliban. Dr. Al-Timimi never indicated to the FBI in any of this meetings that he was aware of the statutes and regulations prohibiting providing support to the Taliban.

With respect to Count 5, inducing others to aid the Taliban, the aiding and abetting argument is provided in more detail in defendant's argument regarding Counts 7, 8, 9 and 10 and in his Motion for Judgment of Acquittal, and in this Court's hearing in which it dismissed various aiding and abetting counts[14] in *United States v. Khan*.

### 8. **Count 6**

Even in the light most favorable to the government, there was insufficient evidence adduced at trial to support Dr. Al-Timimi's guilt to Count 6, inducing others to conspire to violate the Neutrality Act. There was no testimony that Dr. Al-Timimi aided and abetted others by inducing them to conspire to mount a military expedition against India or Russia. The government's contention that Dr. Al-Timimi told them on September 16 to join the mujihadeen anywhere in the world is tantamount to mounting a military expedition against India and Russia in violation of the Neutrality Act is totally misplaced and wrong. The government's argument is completely contrary to its previous position that Dr. Al-Timimi was attempting to induce individuals to go and fight with the Taliban in Afghanistan against the United States.

---

[14]    The Court dismissed Counts 8, 10, 19 and 24 through 27 of the indictment charging Hammad Abdur-Raheem and Seifullah Chapman with aiding and abetting and Counts 8 and 10 charging Masoud Khan with aiding and abetting.

-25-

In addition, the analysis to determine guilt is the same aiding and abetting analysis found in defendant's arguments for Counts 7 and 8 and in defendant's Motion for Judgment of Acquittal and in the Court's previous rulings in the *Khan* case.

There is no evidence, even in the light most favorable to the government, to support the defendant's conviction on this count.

### 9.    **Counts 7 and 8**

The government is mistaken in its reliance on *United States v. Cummings*, 937 F.2d 941 (4th Cir. 1991) and *United States v. McManus*, 23 F.3d 878 (4th Cir. 1994), cases that stand for the *Pinkerton*[15] proposition that a defendant is liable for all reasonably foreseeable acts of their co-conspirators done in furtherance of the conspiracy, as support for its contention that Dr. Al-Timimi is guilty of Counts 7 and 8 as an aider and abettor of inducing Kwon and Hasan to use firearms in Pakistan.

The government is wrong in its contention that the analysis for aider and abetter liability is the same as the analysis for *Pinkerton* co-conspirator liability. The government then proceeds to ignore the court of appeal's analysis in *United States v. Wilson*, 135 F.3d 291 (4th Cir. 1998) in attempting to support its *Pinkerton* argument for aider and abettor liability. While the government is correct that a Wilson was convicted of a § 924(c) violation for the pistol whipping of a victim by his co-conspirators while he was not present, it fails to recognize that there were two Wilsons charged and convicted in the *Wilson* case, William who was convicted of aiding and abetting a § 924(c) violation and Norman who was convicted of the § 924(c) violation on the basis of

---

[15]     *Pinkerton v. United States*, 328 U.S. 640 (1946).

-26-

J.A. 2713

*Pinkerton* liability. The court of appeals went through a completely different analysis in determining aiding and abetting liability than it did in determining *Pinkerton* co-conspirator liability.

In order to determine whether there was sufficient evidence to support William Wilson's conviction for aiding and abetting a § 924(c) violation, the court of appeals stated that there must have been "participation at some stage accompanied by knowledge of the result and intent to bring about that result." *Wilson* at 305, citing *United States v. Arrington*, 719 F.2d 701, 705 (4th Cir. 1983)(quoting *United States v. Hathaway*, 534 F.2d 386, 399 (1st Cir. 1976).[16] The Court of Appeals then went on to find that William Wilson had the requisite intent to "bring about" the pistol whipping of David Williams as an aider and abettor.

> William Wilson knew of the pistol whipping of David Williams because he (Wilson) saw it happen. He made it possible by admitting the perpetrators into Ms. Hall's apartment despite her specific instruction that he 'not let them back in [her] house.' J.A. 213. During a lull in the beating William Wilson told the victim that he, too, should have participated in the assault. Wilson then stood by and watched as the pistol whipping resumed.

*Wilson* at 305.

The court of appeals then went on to determine whether there was sufficient evidence to convict Norman Wilson of a § 924(c) violation on the basis of *Pinkerton* liability "on the basis of a coconspirator's use of a gun . . . in furtherance of the conspiracy and [that] was reasonably foreseeable to the defendant." *Id.* In determining that there was sufficient evidence to support Norman Wilson's conviction for a § 924(c) violation based on *Pinkerton* liability, the court of appeals stated:

---
16

-27-

> Several of Norman Wilson's co-conspirators used firearms to club David Williams. The evidence supports a finding that this gun was use was in furtherance of the drug conspiracy. . . . the aims of the conspiracy were furthered by the co-conspirators use of guns against someone (Williams) who had tried to deprive the conspirators of a needed hideout. And . . . it is reasonable to infer that such an active employment of guns would be foreseeable to the absent co-conspirator, Norman Wilson.

*Id.* at 305-306.

The court of appeals clearly did not view aiding and abetting liability as the same as *Pinkerton* liability when it used completely different methods of analysis to determine liability as an aider and abettor and liability as a *Pinkerton* co-conspirator. In order to be held liable as an aider and abettor, an individual must "associate himself with the venture, . . . participate in it as in something he wishes to bring about, . . . [and] seek by his action to make it succeed. *United States v. Hathaway,* 534 F.2d at 399. Thus, as argued in his Motion for Judgment of Acquittal, and as this Court has previously determined in dismissing various aiding and abetting counts[17] in *United States v. Khan*:

> In order to aid or abet another to commit a crime, it is necessary that the defendant willfully and knowingly associate himself in some way with the crime and that he willfully and knowingly seek by some act to help make the crime succeed. . . .

> To determine whether a defendant aided or abetted the commission of the crime with which he is charged, ask yourself these questions. . . .

> Did he participate in the crime charged as something he wished to bring about? Did he associate himself with the criminal venture knowingly and willfully? Did he seek by his actions to make the criminal venture succeed? And if he did, then the defendant is an aider and abettor.

*Khan* February 20, 2004 trial transcript at 2132-33.

---

[17]    The Court dismissed Counts 8, 10, 19 and 24 through 27 of the indictment charging Hammad Abdur-Raheem and Seifullah Chapman with aiding and abetting and Counts 8 and 10 charging Masoud Khan with aiding and abetting.

-28-

**J.A. 2715**

The criminal venture that the defendant aided and abetted is the use or carrying firearms by Kwon and Hasan in Pakistan. *United States v. Medina*, 32 F.3d 40 (2nd Cir. 1994)(The specific crime that the defendant must have aided and abetted was using or carrying a firearm in relation to a crime of violence not the robbery that was planned.) Furthermore, the defendant must have aided and abetted the use of the weapons used or carried by Kwon and Hasan in Pakistan and not similar weapons used or carried in the United States. *United States v. Salazar*, 66 F.3d 723 (5th Cir. 1995)(The defendant knew that guns were to be used in the jail escape; stored the guns; and told the co-defendant to be careful with the guns.); *United States v. Masotto*, 73 F.3d 1233 (2nd Cir. 1995)(In order to be convicted as an aider and abettor of 924(c), one must perform some act that directly facilitated or encouraged the use or carrying of the firearm.)

### 10. Counts 9 and 10

For the reasons stated in the defense arguments to Counts 7 and 8, the evidence in the light most favorable to the government is insufficient to find Dr. Al-Timimi guilty of Counts 9 and 10 as an aider and abettor inducing Kwon and Hasan to carry rocket-propelled grenades (RPG) in Pakistan. "A defendant is guilty of aiding and abetting if he has 'knowingly associated himself with and participated in the criminal venture.'" *United States v. Burgos*, 94 F.3d 849, 873 (4th Cir. 1996) citing *United States v. Winstead*, 708 f.2d 925, 927 (4th Cir. 1983). "'To be convicted of aiding and abetting, [participation in every stage of an illegal venture is not required, only participation at some stage accompanied by knowledge of the result and intent to bring about that

-29-

result.'" *United States v. Burgos* at 873, citing *United States v. Arrington*, 719 F.2d 701, 705 (4th Cir. 1983)(quoting *United States v. Hathaway*, 534 F.2d 386, 399 (1st Cir. 1976).

      Contrary to the government's assertion, it did not adduce any evidence that Dr. Al-Timimi was aware that trainees in LET camps used rocket-propelled grenades.[18]

    **11.**   **Conclusion**

      For these reasons, the defendant's Motion for New Trial and Motion for Judgment of Acquittal should be granted.

                      Respectfully submitted,

                      Ali Al-Timimi
                      By Counsel

                      Edward B. MacMahon, Jr.  VSB #25432
                      107 East Washington Street
                      P.O. Box 903
                      Middleburg, Virginia 20117
                      540-687-3902

                      Alan H. Yamamoto  VSB #25872
                      643 S. Washington Street
                      Alexandria, Virginia 22314
                      703-684-4700

---

    [18]    A rocket-propelled grenade is not a grenade launcher mounted on an AK-47 but is a different type of weapon.  RPG-7, RPG-16 and RPG-22 were used in Afghanistan by the Soviets and subsequently by the Muslims.

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing reply was placed in the United States Attorney's box in the Clerk's Office, United States District Court, 401 Courthouse Square, Alexandria, VA 22314 for Gordon Kromberg, Esq., Assistant United States Attorney, 2100 Jamieson Ave., Alexandria, Virginia, 22314 this 28 day of June 2005.

_____
Alan Yamamoto

-31-

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,      .      Criminal No. I:04cr385
                               .
     vs .                      .      Alexandria, Virginia
                               .      July 13, 2005
ALI AL-TIMIMI,                 .      9:00 a.m.
                               .
          Defendant.           .
                               .
. . . . . . . . . . .

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:          GORDON D. KROMBERG, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314
                               and
                             JOHN T. GIBBS, ESQ.
                             Counterterrorism Section
                             Criminal Division
                             United States Department of Justice
                             601 D Street, N.W.
                             Washington, D.C. 200

FOR THE DEFENDANT:           EDWARD B. MAC MAHON, JR.,ESQ.
                             107 East Washington Street
                             P.O. Box 903
                             Middleburg, VA 20118
                               and
                             ALAN H. YAMAMOTO, ESQ.
                             643 S. Washington Street
                             Alexandria, VA 22314

OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR,CRR
                             U.S. District Court, Fifth Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595

(Pages 1 - 39)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

1                   P R O C E E D I N G S

2                      (Defendant present.)

3           THE CLERK:  Criminal Case 2004-385, United States of

4    America v. Ali Al-Timimi. Will counsel please note their

5    appearance for the record.

6           MR. KROMBERG:  Good morning, Your Honor. Gordon

7    Kromberg and John Gibbs for the United States.

8           THE COURT:  Goodmorning.

9           MR. MAC MAHON: Good morning, Your Honor. Edward

10   MacMahon and Alan Yamamoto for Dr. Al-Timimi, who's present in

11   court.

12          THE COURT:  All right.  Now, this matter is set firstof

13   all for the argument and the Court's ruling on the motions that

14   are pending by the defense, a motion for judgment of acquittal and

15   motion for new trial.

16          These were both extensive motions. The government has

17   responded to both of them. The Court has had an opportunity to go

18   through them and does not need to have what's within them

19   repeated. Are there any additional issues, however, that the

20   defense wants to raise first as to the motion for judgment of

21   acquittal -- and, Mr. MacMahon, I assume that -- are you arguing

22   both of these motions?

23          MR. MAC MAHON:  Thank you, Your Honor. Mr. Yamamoto

24   prepared most of the judgment of acquittal arguments --

25          THE COURT:  Allright.

3

1          MR. MAC MAHON:  -- other than the First Amendment

2     argument, which are thoroughly briefed there.

3          THE COURT:  The First Amendment argument is thoroughly

4     briefed. I have considered it with care, but I am satisfied that

5     under the, first of all, theories of prosecution in this case and

6     under the evidence that was presented during the trial, that this

7     case does not violate any of the defendant's First Amendment

8     rights.

9          Again, this was not a case about speech. This was a

10    case about intent. Speech was an aspect of the proof of that

11    intent. The jury was clearly informed of that. The instructions

12    clearly reflected that.

13         And the real issue in this case was what the defendant

14    intended by his speech and actions and whether he intended to

15    incite, induce, or otherwise involve the codefendants in this case

16    in the criminal acts named in the indictment.

17         I'm satisfied that the government has not violated the

18    defendant's First Amendment rights, and to that extent, that

19    aspect of the motion for judgment of acquittal will therefore be

20    denied.

21         Mr. Yamamoto, was there anything additional you wanted

22    to argue? Because the basic thrust of the motion for judgment of

23    acquittal was first of all the First Amendment argument, which as

24    I said, I find unpersuasive, and the second issue was

25    insufficiency of the evidence to support the convictions.

4

1              MR. YAMAMOTO: Correct, YourHonor.

2              THE COURT: All right. And with that argument, I mean,

3   you-all spent a lot of time going over with great care the

4   evidence in the case. As we all know, a significant portion of

5   the evidence came from the testimony of witnesses.

6              It is ironic that much of your motion, you're quoting

7   testimony.from Kwon or Hasan or Al-Hamdi to support your position

8   that there was insufficient evidence, and yet obviously, the

9   government goes back and points to other portions of their

10  testimony that supports the conviction.

11             And as you know, with the motion for judgment of

12  acquittal, we take -- the standard of review for the Court is to

13  look at the evidence presented during the trial and then to

14  consider whether a reasonable jury could have reached the

15  conclusions that it did based upon that evidence, and clearly, the

16  evidence of the very witnesses whom you want the Court to look at

17  at times and rely upon, that same evidence in my view could

18  strongly support and did strongly support a rational juror's

19  decisions consistent with the judgments in this case.

20             So unless there's something else you want to add to the

21  motion as to the insufficiency of the evidence, the Court intends

22  to deny the motion.

23             MR. YAMAMOTO: Well, Your Honor, with respect toCounts

24  7, 8, 9, and 10, I think it's also a legal argument that the

25  government didn't prove the elements necessary because 7, 8, 9,

J.A. 2722

5

1   and 10 were all aiding and abetting counts, 7 and 8 with respect

2   to the 924(c) counts and 9 and 10 with respect to, I want to say,

3   844, with respect to the explosives, the RPGs.

4              And what -- the case law is fairly clear that in

5   addition to proving the 924(c) aspect of those counts, the

6   government then has to prove that the defendant did something to

7   further the use of those weapons or the explosives and that he had

8   to know about those particular weapons or explosives and their

9   use, not just weapons in general, and so in that respect. Counts

10  7, 8, 9, and 10 fail with respect to the evidence.

11             THE COURT:  All right. Is that the only thing you

12  wanted to highlight that's left in the motion?

13             MR. YAMAMOTO:  Yes, Your Honor.

14             THE COURT:  All right. Mr. Kromberg?

15             MR. KROMBERG:  .Your Honor, I think -- I don't think the

16  law is -- I don't think Mr. Yamamoto is correct about the 924 (c) 's

17  and 844's. If one person tells another, "I want you to go to the

18  sixth floor of the Texas School Book Depository and kill President

19  Kennedy as he drives along in a motorcade on the road," even --

20  that person can be -- is liable under 924(c) even though he didn't

21  know what weapon was going to be used because he knew that

22  inherent in that crime was going to be a rifle.

23             In this case, the proof was that Ali Timimi knew what

24  the training was at Lashkar-e-Taiba; the individuals, Kwon and

25  Hasan, used the very weapons that Ali Timimi knew were going to be

**J.A. 2723**

1  used for; and therefore, Ali Timimi is guilty for aiding and

2  abetting them in their use of those weapons. Okay.

3          THE COURT: As the <u>Wilson</u> case, which you both cite to

4  in your papers, points out, to be convicted of aiding and

5  abetting, participation in every stage of an illegal venture is

6  not required, only participation at some stage accompanied by

7  knowledge of the result and intent to bring about that result.

8          And although the evidence may have been circumstantial

9  in nature, I'm satisfied first of all that I correctly instructed

10 the jury on the elements necessary for those four counts and that

11 there was sufficient circumstantial if not direct evidence to

12 again support a reasonable trier of fact's conclusion, and so I am

13 going to deny the defendant's motion for judgment of acquittal.

14         Now, there was also filed a motion for a new trial, and

15 the essence or the main categories of issues raised in that motion

16 were allegations of misconduct by the prosecution during the

17 closing argument; concerns about the evidence; rulings of the

18 Court, particularly as to various statements, written statements,

19 such as the space shuttle Columbia commentary of the defendant;

20 and there was also a complaint about the Court's decision at the

21 close of the evidence but before the closing arguments to admit

22 some exhibits that had previously been ruled out of the case, but

23 at the end of the case, the government came back and asked the

24 Court to reconsider in light of the way the defense had put the

25 case on; and the Court reconsidered that.

7

1          Now, Mr. Kromberg, in your response to the motion for a
2   new trial, you focused almost all of your attention on the
3   arguments concerning prosecutorial misconduct in the closing
4   argument. You didn't really address in any respect, as I recall
5   the motion, the issue about the late-admitted exhibits or the
6   issue about the Court's previous rulings on -- I'm sorry, you did
7   address the statements as well.

8          I went ahead and looked at the record, Mr. MacMahon and
9   Mr. Yamamoto, and I did note that we actually gave a jury
10  instruction, instruction No. 14, which I had felt was a
11  sufficiently curative instruction, and I had a chance to look at a
12  draft of the transcript that surrounded that situation, and it was
13  quite clear that again this issue about whether or not there had
14  been a formal call from Afghanistan asking for aid to the Taliban,
15  whether or not that had, dn fact, been made, that was an issue
16  that was discussed throughout this case. You-all had tried to get
17  evidence from Cuba which I had denied, finding it wasn't relevant,
18  and I still don't think it's relevant.

19         The government moved again to reintroduce these exhibits
20  which were 7F5d, 7F24a, b, and c, which were newspaper and wire
21  service reports from the September 16, 2001 time period that did
22  discuss the Mullah Omar's call for help and concern about an
23  impending invasion of Afghanistan in reaction to the September 11
24  events.

25         The Court invited you-all to try to stipulate to the

8

1    fact that the wire services were carrying such clippings. You-all

2    didn't want to do that, which was perfectly, you know, your right,

3    but I made the judgment call at that point that the issue had been

4    sufficiently raised that it was not fair not to let those exhibits

5    in at that point. The defense had essentially made them relevant.

6            And the jury instruction which I gave, which clearly

7    limited them, I think, was sufficient. Even if I introduced or

8    allowed those cases -- those issues -- those exhibits to go in

9    earlier in the trial, you still weren't going to get access to

10   people in Cuba for the issue because as I had said many times

11   before, it wasn't important whether the statements were true or

12   false. What was important was whether they were being reported

13   and would have been -- and it would have been reasonable to expect

14   that people would have read them and been aware of them. That was

15   what was important to the case.

16           So to that degree, even though the government didn't

17   respond to it, I looked with care at that issue, and I'm satisfied

18   that that was not unfairly prejudicial to the defense, nor was it

19   some kind of an unfair surprise since those particular exhibits

20   have been floating around this case for some time.

21           As to the issues about prosecutorial misconduct in the

22   way in which the case was argued, there's no question this was a

23   heated case on both sides. There was a great deal of emotion and

24   commitment to the respective sides, but I, frankly, think you have

25   unfairly characterized the government's closing argument.

1          You argue in your motion in part that the government

2    tried to besmirch Muslims, that the government knew it had an all

3    non-Muslim jury, and that it was pandering to anti-Muslim bias.

4          The government points out that the one Muslim who was in

5    the jury pool was stricken by the defense.

6          And also, in reviewing the transcript, any fair reading

7    of the transcript would clearly show that what Mr. Kromberg did

8    particularly in his rebuttal was to clearly separate Mr. Timimi

9    from Muslims as a group. He says, for example, "Ali Timimi does

10   not speak for Muslims. No matter how many times Mr. MacMahon says

11   that Ali Timimi speaks for Muslims and all Muslims agree with Ali

12   Timimi, it doesn't make it true."

13         And then he goes on to say, "Timimi speaks for his sect

14   of Salafi Muslims, who believe if you listen to Yousuf Idris that

15   there's no compulsion of religion, he told you that there's no

16   compulsion of religion in Islam. He also conceded that, yeah,

17   except for if you're a Shiite, in which case, if you don't repent,

18   you have your head lopped off. That's the Muslims that Ali Timimi

19   and Yousuf Idris speak for. They don't speak for Muslims around

20   the world." And he goes on and on and on.

21         So, I mean, clearly, you painted, I think, with too

22   broad a brush that picture of what the government was doing in its

23   case, and although there may have been some hyperbole and some

24   description of the evidence perhaps in a more dramatic fashion

25   than how it came in, I don't see any misstatement of the evidence

1  or mischaracterization of it that would be sufficient to
2  constitute prosecutorial misconduct or that would justify a new
3  trial.

4           So unless I've missed any general issue that was raised
5  in your motion, and I'll give you a chance if there's something
6  you want to specifically address, it would be my intention to rule
7  on the motion at this point.

8           Is there anything further, Mr. MacMahon?

9           MR. MAC MAHON:  Yes, Your Honor. With respect to the
10 motion for a new trial, the prosecutorial misconduct comes up in
11 the language of the cases. But to say there's a compulsion of
12 religion or that it's just limited to this one sect of people is
13 just as violative of the Supreme Court rule about saying people
14 should be judged as a group or otherwise as it would be if it was
15 just limited to a small group of Salafi Muslims, which is a huge
16 group of people, to say they are compelled to cut other people's
17 heads off and are compelled to lie and to do all these things just
18 as a matter of their religion.

19           And we continue to believe -- I'm sorry if the Court
20 thinks we painted with too broad of a brush. That's exactly what
21 it says in the pleadings:  that Muslims lie, they want to knock
22 people's heads off.

23           And so the only juror that was stricken that was a
24 Muslim here didn't answer the Court's question, and it's, I think,
25 unfair to say the defense struck this witness trying to keep

11

1    Muslims off of the jury. So, I mean, that's just, that's just not

2    what happened in the case. The juror wouldn't answer your

3    questions about what his wife did for a living, and you struck

4    him.

5              And so, you know, I don't know why the defense would be

6    tarred with having done that, but --

7              THE COURT:  That's not a major, that's not a major

8    factor. But I understand your position, and you've made it clear,

9    but I don't think in reviewing this case that there was any kind

10   of inappropriate or improper biasing of the jury against Muslims

11   or that that actually played any role in this decision in this

12   case.

13             MR. MAC MAHON: And the issue with respect to Timimi as

14   a ring leader of a group of terrorists, Your Honor, there's no

15   evidence in the record whatsoever to support that. All the

16   government comes up with in their response is that it would be

17   natural that another witness that they didn't call would have said

18   that that was true, and that was one of the key issues in the

19   case:  What happened? How did he come to this dinner? How would

20   he know that the people at this dinner were people that he could

21   just come up to and talk about soliciting a crime to?

22             And the government produces absolutely no evidence to

23   support that. They give an e-mail -- they put in an e-mail, which

24   we objected to as it came in, saying that Timimi is the person who

25   told someone how to pray when they traveled, and the government

12

1    twists that into the leader of a group of terrorists.

2            And there was no evidence in the record and they don't

3    even point to any evidence in the record that shows that Timimi

4    knew they had guns, that they were watching jihad videos, that

5    they were training for jihad. Every one of the government's

6    witnesses said the same thing.

7            So to come up and then argue in front of the jury that

8    he's actually the ring leader of this group is grossly

9    prejudicial, and it does misstate the evidence in the case, and

10   that's where the language of prosecutorial misconduct arises in

11   those cases, from a duty to argue the evidence. That's where that

12   language comes from.

13           So I still see nothing in the government's response that

14   would justify arguing to this jury that he was the ring leader of

15   a group of terrorists, when that's apparently what the jury finds',

16   that he was actually helping people launch military expeditions

17   all over the world, Russia if he violated the Neutrality Act,

18   India, Pakistan, Afghanistan. It's just an incredible verdict.

19           When you look, he couldn't have done all those things at

20   the same time, and the only way the jury could have found that was

21   if they bought this argument that he was the ring leader of this

22   group, and that's just simply untrue and unsupported by the

23   evidence.

24           THE COURT:  Well, how do you get around the fact that

25   there was clear evidence in the record that these people, Kwon and

13

1  Company, looked to Mr. Timimi as a scholar, which, of course, is a
2  position of great respect among these people -- among the
3  defendnats in this case?

4           I think the government referenced the fact that he was
5  sometimes considered like an amir, like a leader, and that they
6  were asking him for advice on things that you would only ask a
7  person whose opinion you highly respected and who you were going
8  to be guided by.

9           I mean, that's the kind of evidence that was in this
10 case.

11          MR. MAC MAHON:   That's -- in the whole government's
12 case. Your Honor, there's maybe four hours of time over a
13 multi-year period that they have that Timimi spent with any of
14 these guys. If they listened to his tapes, if they, if they asked
15 him a question about haw to pray in travel, that can't possibly
16 under the law make him the ring leader of their group unless they
17 tell him that that's what they're doing.

18          And every -- Kwon, Hasan, Aatique, all the government's
19 witnesses said that he was completely unaware of what they were
20 doing and what they were planning. So the fact that they may have
21 looked up to him is probably true. They probably did.

22          But the one e-mail, the government exhibit that we were
23 arguing about, the witnesses said the amir referenced in that was
24 Mr. Royer. Nobody ever said that Mr. Timimi was the amir of
25 paintball. The amir of paintball was Royer, it was at one point

14

1   in time Gharbieh, and it was Kwon, but there's no evidence -- it
2   would almost be like saying that if a client came to me and asked
3   me for legal advice, not knowing what they were doing, then they
4   went out and committed a crime, that I would have somehow aided
5   and abetted them by doing that. If they tell me they have
6   criminal plans and I help them, that would be one thing.

7        But the fact that they looked up to him is -- that's
8   exactly what's wrong with how this argument was done, Your Honor.
9   There isn't any question they looked up to Timimi, but that can't
10  possibly make him the ring leader of their group without some kind
11  of actual knowledge of the plans that they're doing.

12       And the fact that they looked up to him as a religious
13  leader and a religious scholar, he's not a cleric of any sort, is
14  what brings the First Amendment issues in to bear. It's not like
15  they looked up to him as the capo of some, some criminal gang-.

16       So, I mean, I still don't see any evidence in the record
17  that would justify arguing that Timimi was the ring leader of a
18  group of terrorists. There isn't even a terrorism charge in the
19  case against any of them. There isn't any evidence whatsoever
20  that he ever owned a gun, that he told somebody to get a gun, that
21  he even -- Kwon even said nobody asked him even to commit a crime.

22       So, I mean, the record is missing that evidence, and
23  there has to be something in there other than the government
24  saying that it would be natural for Al-Qahtani to have told him
25  these things or that maybe Royer told him that, because it's not

1  there. Your Honor. It's just completely missing.

2        And it was the central issue in the case that was

3  misrepresented to the jury.

4        THE COURT: All right. Mr. Kromberg, do you want to

5  respond?

6        MR. KROMBERG:  Yeah. I challenge Mr. MacMahon to point

7  out in the record where the government said Mr. Timimi was the

8  ring leader of a group of terrorists.

9        THE COURT:  All right. Well, we're not going to do

10 challenges back and forth.

11       MR. KROMBERG:  Well, the point is this is a hoax that

12 he's perpetrating for the media, because the Court was here; the

13 Court listened. The government never referred to Ali Timimi as

14 the ring leader of a group of terrorists.

15       So when Mr.. MacMahon gets up here to say that the

16 government engaged in misconduct by saying he was a ring leader of

17 a group of terrorists, it's very difficult to point to the -- to

18 justify it because, well, it never happened. Now, the fact of the

19 matter is he was the ring leader of people who were going to

20 protect terrorists, but the government didn't even say that.

21       Mr. MacMahon had the transcript. He put in the -- in

22 his pleading the parts of the government's argument he thought

23 were the worst that the government said, and the worst that he

24 could come up with was that the government said that Ali Timimi

25 did not represent Muslims. That's what this prosecutorial

1  misconduct argument is about.

2          Thank you. Judge.

3          MR. MAC MAHON:  If I may, Your Honor, I don't wish to

4  engage in this. When Mr. Kromberg was describing the ten reasons

5  why Yousuf Idris was a liar, one of them was that he said he

6  couldn't come back to his people -- I don't have the transcript

7  right in front of me -- and tell them that his friend was the ring

8  leader of a group of terrorists at the Dar al-Arqam.

9          That was clearly a reference to Al-Timimi. That's

10  plainly what he said in that argument. It's right near the end,

11  when he was doing his Top 10 list. So --

12          THE COURT:  Well, as I've said, I've gone over the

13  closing argument, I've gone over both your positions on that, and

14  I'm satisfied, as I said, there may have been hyperbole, but I

15  don't think there was a sufficiently material misrepresentation of

16  the evidence to justify a finding of prosecutorial misconduct or

17  to justify a new trial, so the motion is denied.

18          And that means we will proceed to the sentencing. Now,

19  I know because I've gotten extensive briefings that counsel have

20  carefully gone over the pre-sentence report, but just for the

21  record, other than the changes, some of which I think have been

22  made, and I know you dispute the statement of facts, but I'm not

23  going to get into that because it's -- the entire trial record is

24  the proper statement of facts, and we'll have a transcript of the

25  entire record, if it doesn't already exist, but are there any

1  factual corrections, additions, or deletions that you want made to

2  the pre-sentence report, Mr. MacMahon?

3          MR. MAC MAHON:  Thank you. Your Honor. Nothing, nothing

4  in addition to what's in the position on sentencing that we

5  provided.

6          THE COURT:  All right.  Now, there are someguideline

7  factors that are in dispute here. Both sides have raised issues

8  that they are dissatisfied with some of the calculations by the

9  Probation Office.

10          The Probation Office gave the defendant' a four-point

11  increase for a leadership role, managerial leadership role in the

12  offenses, and a two-point increase for obstruction of justice

13  based on a series of what were described as false statements made

14  to FBI agents during the course of the pretrial investigation.

15          The defendant did not testify at trial, so there's no

16  inconsistent statements between any testimony at trial and any

17  evidence in the case.

18          And the government is objecting to the fact that the

19  probation officer did not give the terrorism factor, which would

20  have raised the offense level, I think it was 12 points or 12

21  levels had that been given.

22          So I've considered the argument as to all of those three

23  issues, and I believe those are the only three specific guideline

24  issues that you-all were disputing. Have I missed any?

25          MR. YAMAMOTO:  No, YourHonor.

18

1           THE COURT:  Okay.

2           MR. KROMBERG:  Not by the government.

3           THE COURT:  All right. I've looked at the issues

4    carefully. I've discussed them with Mr. Bubenhofer, the probation

5    officer. I am, in fact, going to grant the defendant's motion as

6    to the obstruction. I am satisfied that that two-points should

7    not have been given.

8           The statements that were made to the FBI agents were,

9    first of all, could go one way or the other. They're not that

10   clearly in my view so false as to be perjurious. In any case,

11   false exculpatories, I don't think, unless they significantly

12   mislead the agents or somehow cause justice to be delayed, I don't

13   think should get that kind of an increase, and so I'm not -- I

14   asked the Probation Office to reduce the offense level those two

15   points.

16           I'm also not granting the government's request to

17   increase the offense level with the terrorism increase. In this

18   post-Booker environment, without a specific finding by the jury, I

19   believe first of all that is the more appropriate cautionary way

20   to proceed.

21           Secondly, however, that ruling is essentially consistent

22   with what I did in the Royer case with those defendants who

23   themselves did not get involved with a -- I think only Chapman and

24   Khan got that increase. The others who were convicted did not.

25           And because the defendant himself, you know, because of

**J.A. 2736**

1  the sort of second- and third-tiered levels of the defendant's

2  activity, I'm satisfied that the terrorism increase would not be

3  appropriate without a specific finding by the jury in that

4  respect. It's an inference one could draw, but I'm uncomfortable,

5  as I said, in the post-Booker environment doing that.

6          In terms, however, of the issue about whether the

7  defendant should get the four-point increase as a leader, I am

8  going to go ahead and continue with that increase. I think the

9  defendant's overall role as the highly respected person to whom

10  these defendants clearly looked, the testimony at trial is

11  sufficient in my view to establish that he had a significant role

12  in affecting the behavior in these people, and even though others

13  such as Royer or Chapman might have inspired them or gotten them

14  started on the path, I think it was -- especially in that

15  post-September 11 environment, it was Mr. Al-Timimi who had the

16  power and the authority and the ability to really affect their

17  conduct, and I think given the number of people involved and the

18  way in which it all happened, there's sufficient evidence to

19  support that.

20          So having done that, that does change the calculations

21  in the guidelines to this extent:  The Probation Office originally

22  calculated the offense level as a level 34. The Court is reducing

23  that offense level to a 32.

24          The defendant has a criminal history I, and that would

25  effectively change only the guideline ranges, the advisory

1   guideline ranges for Counts 1, 2, and 3, which would reduce to 121

2   to 151 months rather than the 151 to 188 months that was

3   calculated at the offense level 34.

4           These offenses all carry between three and five years of

5   supervised release under the guidelines -- or, I'm sorry, Counts

6   1, 7, 8, 9, and 10 have three to five years of supervised release.

7   Counts 2, 3, 4, 5, and 6 have two to three years of supervised

8   release.

9           The fine ranges for all of these counts are from 17,500

10  to 175,000 dollars. The special assessments that are mandatory

11  are $100 per count of conviction, and there are ten counts of

12  conviction, which would require a total special assessment of

13  $1,000.

14          Now, within that, obviously, some of these offenses

15  also -- and this has nothing to do with the guidelines; it has to

16  do with the statutes for which this defendant was convicted and

17  the congressionally enacted mandatory minimums or mandatory

18  sentences that apply.

19          So as you know. Count 7 carries with it a 360-month

20  mandatory minimum consecutive sentence. Count 8 carries a

21  mandatory life sentence consecutive, Count 9 carries 120 months

22  mandatory consecutive, and Count 10 carries a mandatory 240 months

23  consecutive. So there are some -- those four counts are very

24  draconian, but that's what they are.

25          All right. Let me ask Mr. Kromberg first whether

1    there's any argument you want to make in terms of sentencing.

2         MR. KROMBERG:  I do, Judge. I want to clarify a couple

3    of things that -- mostly in response to the defense position of

4    the parties. Timimi suggests that he was not in favor of

5    terrorism and that he's never been in favor of terrorism, and he

6    says that what his e-mail of October 21, 2001, when he said that

7    we are obligated as Muslims to support Mullah Omar, the Taliban,

8    and the Arabs with them, that that doesn't really mean that we're

9    obligated to support terrorists, because at that time, many

10   Muslims still didn't believe that Usama Bin Laden was involved in

11   9/11.

12         What he would have the Court forget is that Usama Bin

13   Laden was a designated terrorist for two years at that point; that

14   Bin Laden had declared war against the United States long before

15   that, partly as a result of the jailing of Safar Hawaali; and that

16   he knew that just two weeks earlier. Bin Laden had released a

17   statement -- that we know that he knew that Bin Laden had released

18   a statement because Timimi sent it as part of that Internet

19   messaging session to his friend in Saudi Arabia. That's the one

20   that was key because he admitted that he had been kicked out of

21   Dar al-Arqam. And that's in the statement that Timimi sent to his

22   friend in Saudi Arabia of Bin Laden.

23         Bin Laden said, "As for America, I say to it and its

24   people just a few words. I swear by Allah, the greatest who

25   raised the heavens without pillars, neither America nor those who

1   live there will dream of security until we live it in reality in

2   Palestine and before all the infidel armies leave the land of

3   Muhammad."

4            That's who Timimi espoused to support for two weeks

5   later in that e-mail of October 21, 2001, and he can say that he

6   didn't support terrorists, but that's who he was supporting.

7            In his position of the parties -- on position of

8   sentencing, he quotes from his "New World Order" series that that

9   somehow justifies that he's anything other than a purveyor of hate

10  and war, and page 13, he writes, "And we can think of many

11  examples, for instance, those Muslims" -- sorry, I have to get my

12  own pages straight -- "those Muslims who decide to do violent acts

13  in the West. Now, because they do not take this matter to the

14  people who had knowledge, those people who had knowledge of the

15  shariah and knowledge of the affairs of Muslims, what happens?

16  They follow people who are ignorant or who might have knowledge of

17  the shariah but do not have wisdom, do not have insight. They

18  therefore feel it is jihad to do an act of violence in our

19  weakness, and therefore, they bring the wrath of the West of the

20  country the Muslims are in upon us. This is something very

21  dangerous."

22           Timimi is not a man of peace. If he counsels against

23  9/11, it's because it brings the wrath of the West upon the

24  Muslims in the West. It's not expedient.

25           You know, I'm not -- that's not a coincidence. His next

1   paragraph says, "Likewise, you also find this amongst some Muslim

2   countries, where people might have knowledge or they might lack

3   knowledge and they feel that if they did a political assassination

4   or they did some sort of act, they'll be able to change the

5   affairs, and what it results in is chaos and confusion and a worse

6   situation than it started in."

7            Once again, Timimi didn't say that assassinating Sadat

8   was an immoral act or a bad thing for any reason other than it's

9   inexpedient, that the jihadis should check with the scholars first

10  to see if the acts of violence in the West or political

11  assassinations in the Middle East are expedient.

12           And it's true he calls the jihadists ignorant or lacking

13  in wisdom and insight, but regardless of whether they're ignorant

14  or lacking in insight, Muslims are obligated to support the Usama

15  Bin Ladens of the world.

16           The other excerpt that he provided the Court I thought

17  was even more telling. That's the one on page 14 of his pleading.

18  There he's answering a question. Somebody says, a would-be jihadi

19  possibly, asked the scholar, asked Timimi, "Well, is being a

20  suicide bomber on the correct path or not?"

21           And the scholar says, "I don't know." He goes on to say

22  that -- in the excerpt that he gave to the Court in his sentencing

23  pleading, that HAMAS has a lot of ideas and disbeliefs that are

24  disagreeable, and putting the pleading in, putting it that way in

25  the pleading suggests that what maybe disagreeable, that the

 1 | belief that HAMAS has is disagreeable maybe about the blowing up a
 2 | bus in the city, but I'm sure this was an inadvertent mistake,"
 3 | but the pleading that got filed publicly skips the part where
 4 | Timimi talks about what is disagreeable about HAMAS and instead
 5 | inserts an editorial comment that Timimi didn't say, "an example
 6 | of their position regarding the Shiah and their overall knowledge
 7 | of Islam is cited," and if you read that on page 14, you think
 8 | that's what -- it appears that's what Timimi said.

 9 |         That's not what Timimi said. What Timimi said, "HAMAS
10 | has a lot of ideas and beliefs that are disagreeable because
11 | they're too close to Iran and the Shiah," nothing about blowing up
12 | buses and inner-city buses. That doesn't rise to the level of
13 | perhaps being one of those disagreeable things about HAMAS.

14 |         But the key, the key conclusion, Timimi can't say
15 | whether suicide bombing is good or bad, on the correct path .or
16 | not, but what he can say is no matter what you think about HAMAS,
17 | "one does not want to take a stance against them to such a degree
18 | that it's an issue that you are giving victory by implication to
19 | the Jews and Christians."

20 |         That's the conclusion that the man of peace provides in
21 | answer to the question, "Is suicide bombing good or bad?"

22 |         Judge, Ali Timimi hates the United States, calls for its
23 | destruction. He's allowed to do that in this country. He's not
24 | allowed to solicit treason. That's what he did, and he deserves
25 | every day of the time that he can be sentenced to.

1              Thank you, Judge.

2              THE COURT:  All right.  Mr. MacMahon?

3              MR. MAC MAHON:  Thank you, Your Honor. If you didn't

4    until now understand the political and religious basis of this

5    prosecution, Mr. Kromberg's last argument would give it to you.

6              Bin Laden? We had to defend ourselves against Usama Bin

7    Laden in this case. There's no evidence whatsoever of this man

8    ever supporting Usama Bin Laden.

9              Read the Blind Sheikh's case. You want to see somebody

10   that supports terrorism? You don't have to pull out an e-mail

11   called Utter Nonsense and interpret it with an expert witness to

12   find out who somebody supports and who they don't. You don't have

13   to find a 1996 tape in where there's an interpretation of a

14   religious question about suicide, where you can argue it either

15   way from your own perspective about somebody's religion to decide

16   what it is. You don't have to talk about HAMAS to figure out what

17   happened on September 16 at Yong Kwon's house.

18             There's going to be cases tried in this courthouse

19   involving terrorists, and I bet you we don't hear a word about

20   Muslim ideology, we don't read from Scripture, we don't try to

21   figure out what people say in e-mails, we don't try to understand

22   what their motivations are.

23             We're dealing with a person with no criminal record at

24   all who Mr. Kromberg elevates to the most dangerous man in the

25   United States. The government never even indicted him for

1 | treason, and all they want to do is say the man solicited treason.
2 | If that was right, the jury instructions were all wrong.

3 |          We didn't have that in this case. Most of those people
4 | weren't even U.S. citizens. He couldn't have solicited treason
5 | even if they were to be believed.

6 |          You know, what I want to say to you. Your Honor, is
7 | that, you know, I know this has been a heated case, and it's been,
8 | you know, well tried on both sides, I understand that, but in the
9 | course of this representation, I have, have gone out into the
10 | community and seen the support they have for this man, and the
11 | local Muslim community is not a group of terrorists that need to
12 | be watched every moment by the FBI and chased around in the way
13 | that they are, and when I see the level of support that the
14 | community has for this man, the way they, they did lots of things
15 | for him in terms of offering support to help with the tr-ial, I
16 | believe that he would not have this kind of support if he wasn't
17 | actually a man of peace.

18 |          Does he have ideas that I find disagreeable? Of course.
19 | I don't agree with his statements about the space shuttle or
20 | otherwise. Do I understand his religious beliefs? No. I don't
21 | know anything about his religious beliefs. Am I appalled to hear
22 | about them in a courtroom? Yes, I am appalled to hear about them.

23 |          But I've also gotten to know Ali Al-Timimi as well, Your
24 | Honor, and he's not a man of violence. He's not a man who has
25 | ever solicited anyone to commit a crime.

1           You read all these speeches, it's unfortunate for him

2   that he left the FBI with hundreds of hours of speeches for them

3   to pull things out of. But nobody goes from having no criminal

4   record to committing the most heinous crimes in the criminal code

5   just overnight, and to think that that's what happened in this

6   case, given the fact that -- the way I've interacted with him and

7   I know that Mr. Yamamoto has as well, he's a, he's a gentle man.

8   He's not a criminal, Your Honor.

9           And I realize the sentence that the Court is going to

10  have to impose given the mandatory minimums, and we've objected to

11  them as cruel and unusual punishment in this case.

12          What happened in this case in the light most favorable

13  to the government, Your Honor, is that Ali Timimi was investigated

14  for 9/11. The FBI came to his house looking for him for 9/11, as

15  if he had something to do with that. They came to his house

16  looking for Weapons of Mass Destruction once. They found nothing.

17          And what in the end did they find? That there are a

18  couple of Pakistani nationals who went back to Pakistan with one

19  Korean guy, and they tried to go to a camp, and they did, a couple

20  of them, and they fired a gun up into a hill. That's what really

21  happened here.

22          Nobody ever tried to go to Afghanistan. No one ever

23  tried to aid the Taliban. This is just -- there was no evidence

24  to support the hyperbole in this case, and there's no evidence to

25  support a life sentence in this case, which I know the Court is

1   bound to give, but -- and for that reason, I'm very saddened today

2   that this has come to this, but that's the way our justice system

3   works, and we'll just have to deal with it from there, Your Honor.

4           Thank you.

5           THE COURT:  All right. Mr. Al-Timimi, come up to the

6   lectern. This is your chance to say whatever you'd like to before

7   the Court imposes sentence.

8           THE DEFENDANT:  Thank you.  May it please the Court,

9   I'll begin with, typical with Muslims, a small statement of faith.

10  All praise is due to God, and may God's blessings and peace be

11  upon all his prophets, particularly Noah, Abraham, Moses, Jesus,

12  and Muhammad.

13          Your Honor, it is customary at the time of sentencing

14  that those found guilty give a statement during which they admit

15  their guilt and thereupon entreat the Court to show them leniency.

16  I stand before this Court having been found guilty of ten

17  felonies. However, I will not admit guilt nor seek the Court's

18  mercy. I do not do this out of any disrespect to the Court. I do

19  this simply because I am innocent.

20          My claim to innocence is not because of any inherent

21  misunderstanding on my part as to the nature of the crimes for

22  which I was convicted, nor is it because my Muslim belief

23  recognizes shariah law rather than secular law, as somebody might

24  argue. It is merely because I am innocent.

25          Few in the history of this country have been charged

1   with what I was charged. None, I believe, have ever been so

2   removed from the charges. My experience is therefore unique and

3   is thus worthy of some comment and reflection.

4           During its closing argument, the government read to the

5   jury the preamble to the Constitution. I frankly found it to be a

6   poor recitation. I will not be in need of any paper to recite

7   those words, for I faithfully committed them to memory as a

8   schoolboy long before I was taught or learnt any passage of the

9   Koran.

10          "We the People of the United States, in Order to form a

11  more perfect Union, establish Justice, insure domestic

12  Tranquility, provide for the common defence, promote the general

13  Welfare, and secure the Blessings of Liberty to ourselves and our

14  Posterity, do ordain and establish this Constitution for the

15  United States of America."

16          I declare the government's recitation poor, as it

17  stripped those words of their meaning. Allow me to explain why.

18  The first aim of the Constitution after the immediate raison

19  d'etre -- of forming a more perfect union -- is to establish

20  justice. The establishment of justice was mentioned before the

21  aim of providing for the common defense. Common defense is what

22  we would call today security. The reason as to why justice

23  preceded security should be obvious to all:  True securitycan

24  never be attained without true justice.

25          I, as many of my community since 9/11, have been denied

1  justice. I am not a lawyer, Your Honor, so I am unable to cite

2  case law to demonstrate this. I will instead have to appeal to

3  the very philosophy upon which the law is based. Aristotle

4  teaches us that justice means to equate similar things and

5  distinguish between dissimilar things.

6       Let us recall for a moment the crimes to which I was

7  charged:  advocating treason, soliciting war against the United

8  States, providing aid and comfort to the enemy, conspiring to levy

9  war against Israel, Russia, India, and Indonesia, and, of course,

10 at every turn the informal charge of terrorism, charges, I must

11 say -- and if I can quote Aaron Burr -- "abounding in crudities

12 and absurdities."

13      For to accept these charges, we must believe that a

14 solitary man who would spend his days working full time at one of

15 Fortune magazine's 100 best companies and then spend his evenings

16 and weekends engaged in cancer research for a doctorate in

17 computational biology, an individual who has never owned or used a

18 gun, never traveled to a military camp, never set foot in a

19 country in which a war was taking place, never raised money for

20 any violent organization, would be -- could be -- the author of so

21 much harm. "Crudities and absurdities," Your Honor.

22      Someone who did not observe the proceedings might

23 justifiably ask, "How then was he convicted?" The answer, of

24 course, was simply out of fear.

25      The eminent jurist, Stephen L. Carter, cautions us with

1    these words:   "When the secular sovereign decides to try a citizen
2    on a charge that amounts to serving a separate sovereign, the jury
3    should be pressed toward the sobriety of democratic respect rather
4    than the intoxicating fury of the witch hunt."

5            If this is his admonition for a charge that "amounts" to
6    serving a separate sovereign, how much more so should it be when
7    the charge is the actual raising of arms against the sovereign.

8            It is said that historically two trials have captured
9    the imagination of Western civilization:  the trial of Jesus
10   Christ and that of Socrates. Rome was a brutal empire. Athens
11   was a democracy. Plato relates to us that during his trial,
12   Socrates said the following: "They" -- in reference to the
13   prosecutors -- "are headed by Meletus, that good man and true
14   lover of his country, as he calls himself. Against these, too, I
15   must try to make a. defense. Let their affidavit be read. It
16   contains something of this kind:  It says that Socrates is a doer
17   of evil, who corrupts the youth and who does not believe in the
18   gods of the state, but has other new divinities of his own. Such
19   is the charge, and now let us examine the particular counts. He
20   says that I am a doer of evil and corrupt the youth; but I say, O
21   men of Athens, that Meletus is a doer of evil in that he pretends
22   to be in earnest when he is only in jest and is so eager to bring
23   men to trial from a pretend zeal and interest about matters in
24   which he never really" -- excuse me -- "he really never had the
25   smallest interest."

1        In the coming months, this courthouse will witness the

2   trial of another individual accused of betraying his country, and

3   the reference here is to Larry Franklin and the AIPAC case. Let

4   us wait and see if the government's zealotry to prosecute that

5   case will be as was with mine.

6        In the end, Your Honor, I, too, like Socrates, am

7   accused and found guilty of nothing more than corrupting the youth

8   and practicing a different religion than that of the majority.

9   Socrates was mercifully given a cup of hemlock; I was handed a

10  life sentence.

11       Imprisonment of any term, as this Court well knows, is a

12  crisis for both the incarcerated and his or her loved ones. I am

13  no exception to that.

14       But the real crisis brought on by my imprisonment, I

15  sincerely believe, is America's, for if my conviction is to-stand,

16  it would mean that 230 years of America's tradition of protecting

17  the individual from the tyrannies and the whims of the sovereign

18  will have come to an end, and that which is exploited today to

19  persecute a single member of a minority will most assuredly come

20  back to haunt the majority tomorrow.

21       Thank you.

22       Ali Al-Timimi, Prisoner of Conscience, Fairfax,

23  Virginia, July 13, 2005.

24       THE COURT:  All right.  This was, as I know I said many

25  times during the trial, a difficult case because of the various

1    issues which we've discussed today. The environment in which we
2    live is a different environment than it was 10-15 years ago, and
3    that requires, therefore, that all people approach things with a
4    greater degree, I think, of responsibility and sensitivity than
5    they might have 15 or 20 years ago.

6         I don't think any well-read person today can doubt the
7    fact that training camps are an essential element of the new
8    terrorism that is permeating the world right now. These camps are
9    the lifeblood to trained, armed persons who go into subways and
10   into airplanes and cause great havoc to innocent people. People
11   of good will need to do whatever they can to stop that, to defuse
12   that.

13        And the evidence that came through this trial in my view
14   was sufficient, or I would have found you not guilty, as I found
15   some of the other paintball people not guilty when I tried those
16   cases, but the evidence of September 16 in my view was graphic, it
17   was consistent, it was more than strong enough to support the
18   government's charges against you.

19        I think it is unfortunate that you and perhaps others
20   think that you were particularly singled out because of your
21   religion. I am not at all convinced that was the case.

22        I am also satisfied that a very intelligent jury spent
23   days thinking about this case. There was no rush to judgment by
24   the community in this case.

25        And so I am satisfied that these verdicts are

J.A. 2751

1   appropriate, that there has not been a violation of our concept of

2   justice, and that therefore, I can go ahead and sentence you at

3   this point.

4          Because of the way in which these statutes work, the

5   sentence of the Court is that you be committed to the custody of

6   the Bureau of Prisons for a period of life imprisonment followed

7   by three years of supervised release, which I have to impose

8   because of the way the statute works.

9          The terms and conditions of the supervised release are

10  your uniform good behavior, which means you cannot violate any

11  federal, state, or local laws; your complying with all the

12  conditions of release; and your having absolutely nothing to do

13  with any of the people named in this case as coconspirators. Do

14  you understand that?

15         THE DEFENDANT:  Yes, I do. Thank you.

16         THE COURT:   The mandatory drug testing is waived.

17  There's no history of substance abuse in your background. The

18  probation officer could request a drug test at any time. Do you

19  understand that?

20         THE DEFENDANT:  Yes, Ido.

21         THE COURT:   Now, the way in which the sentence is

22  constructed and for the purposes of the record, specifically, as

23  to Counts 1, 2, and 3, I find that a sentence within the advisory

24  guideline range is appropriate. As to those three counts, the

25  sentence of the Court is 121 months of incarceration in the

1   custody of the Bureau of Prisons. That 121 months is concurrent
2   as to each of those three counts, followed by three years of
3   supervised release.

4          As to Counts 4 and 5, which carry a statutory maximum of
5   120 months, it is the sentence of the Court that you be committed
6   to the custody of the Bureau of Prisons for a period of 120
7   months, concurrent as to Counts 4 and 5, and then those 120-month
8   sentences are concurrent with the 121-month sentence on Counts 1,
9   2, and 3, again with three years of supervised release, all
10  concurrent.

11         As to Count 6, where the statutory maximum is 60 months'
12  incarceration, the Court imposes the maximum, which is 60 months
13  in the custody of the Bureau of Prisons, again concurrent with all
14  the previously imposed sentences, and a three-year period of
15  supervised releas.e.

16         As to Count 7, which is the first of the four firearms
17  counts, the sentence of the Court is 360 months in the custody of
18  the Bureau of Prisons, to run consecutive to the 121 months in
19  Counts 1 through 6, with three years of supervised release, that
20  supervised release is run, however, concurrent with the other
21  three-year period.

22         As to Count 8, that requires the life sentence
23  consecutive, but that is the sentence that drives this case, again
24  with three years of supervised release.

25         Count 9 is 121 -- I'm sorry, 120 months consecutive to

J.A. 2753

1   all previously imposed sentences and a three-year period of
2   supervised release.

3           And Count 10 requires a sentence of 240 months
4   consecutive to all previously imposed sentences, with three years
5   of supervised release.

6           The Court finds you are unable to afford the costs of
7   incarceration, supervision, or any of the statutory fines, so
8   those are not imposed, but $100 per count of conviction, for a
9   total of' $1,000 in special assessments, is imposed, and that
10  should be paid immediately.

11          The defendants have requested -- or defense counsel
12  requested in the sentencing memorandum that if the defendant were
13  incarcerated, that the Court recommend a designation as close to
14  this area as possible and recommend to the Bureau of Prisons that
15  a SAM not be imposed in this case, correct?

16          MR. YAMAMOTO:  Yes, YourHonor.

17          THE COURT:  I think those were the two specific
18  requests.

19          Mr. Kromberg, do you want to address either? I know you
20  wouldn't have any concern --

21          MR. KROMBERG:  I don't have any position on where the
22  defendant -- whether the Court recommends where. I think it is --
23  I don't know about whether the Bureau of Prisons would want to
24  impose a SAM, but I think the Bureau of Prisons should be left to
25  its discretion in that, especially when a crime that part of what

1  happened in this case you saw so much went, involved e-mail and

2  phone conversations, so I don't know that the SAM is appropriate

3  or not.

4          THE COURT:  Well, there's no national security issues in

5  this case. The SAM is a very burdensome aspect of incarceration.

6          I can't control, Mr. Timimi, what they do with you. I

7  can recommend and I am going to recommend in this case that I

8  think based upon your background and the fact that there's no

9  national security information that you are privy to that is one of

10 the justifications for that kind of special treatment, that you

11 should not be subject to a SAM, but you need to understand that

12 the Bureau of Prisons does not have to follow that recommendation,

13 but it will be reflected in the judgment order. All right?

14          THE DEFENDANT:  Thank you. Your Honor.

15          THE COURT:  Are there any other issues before the

16 defendant is remanded?

17          If not, Mr. Timimi, I want to just advise you that

18 because you pled not guilty and went to trial and are still

19 maintaining your innocence -- and obviously, there are real issues

20 that have been raised in the posttrial motions -- you have a right

21 to appeal both your conviction and your sentence. If you are

22 planning to file an appeal, it must be done within ten days of

23 today's date.

24          If you are unable to afford counsel to handle the

25 appeal, we will appoint counsel for you at taxpayers'' expense. Do

```
 1   you understand that?

 2              THE DEFENDANT:  Yes, I do.  Thank you.

 3              THE COURT:  All right. Mr. Yamamoto?

 4              MR. YAMAMOTO:  Your Honor, we would ask the Court to

 5   continue his bond pending the appeal.

 6              THE COURT:  I think at this point, as you know, I

 7   overrode the vehement objection of the government. Unless the

 8   government has no objection to that request.

 9              MR. KROMBERG:  The government does object. It's time,

10   Judge.

11              THE COURT: All right, it is time at this point. I gave

12   the defendant a couple of extra months to be in the community to

13   hopefully get his affairs in order. Given the nature of these

14   convictions and the fact that having reviewed the record, I'm

15   satisfied that the convictions, at least some of them if not all

16   of them, will hold up, I'm going to go ahead and remand the

17   defendant at this time. You need to get this sentence behind you.

18   Thank you.

19              MR. KROMBERG:  Thank you. Your Honor.

20              THE DEFENDANT:  Thank you.

21                              (Which were all the proceedings

22                               had at this time.)

23

24

25
```

1                      **CERTIFICATE OF THE REPORTER**

2        I certify that the foregoing is a correct transcript of the

3   record of proceedings in the above-entitled matter.

4

5

6                              _____

7                                   Anneliese J. Thomson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AO 245 S (Rev. 2/99)(EDVA rev.1) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division



FILED

JUL 1 3 2005

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

    v.                                      Case Number 1:04CR00385-001

**ALI AL-TIMIMI,**

Defendant.

## JUDGMENT IN A CRIMINAL CASE

The defendant, ALI AL-TIMIMI, was represented by Edward B. MacMahon, Esquire and Alan H. Yamamoto, Esquire.

The defendant was found guilty on count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 of the Superseding Indictment after a plea of not guilty. Accordingly, the defendant is adjudged guilty of the following count(s), involving the indicated offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. §§ 2 and 924(n) | Inducing Others to Conspire to Use Firearms (Felony) | 05/2003 | 1 |
| 18 U.S.C. § 373 | Soliciting Others to Levy War Against the United States (Felony) | 10/21/2001 | 2 |
| 18 U.S.C. §§ 2 and 2384 | Inducing Others to Levy War Against the United States (Felony) | 05/2003 | 3 |
| 50 U.S.C. § 1705(b), 18 U.S.C. §2, 31 C.F.R. §§ 545.204 and 545.206, Executive Order No. 13224, 66 Fed. Reg. 49079 (2001); 65 Fed. Reg. 41549 (2000); Executive Order 13129, 64 Fed. Reg. 36759 (1999) | Attempting to Contribute Services to the Taliban (Felony) | 10/21/2001 | 4 |

As pronounced on July 13, 2005, the defendant is sentenced as provided in pages 3 through 8** of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Signed this 13th day of July, 2005.

Leonie M. Brinkema
United States District Judge

** Page 8 of this document contains sealed information

**J.A. 2758**

132

AO 245 S (Rev. 2/99)(EDVA rev.1) Sheet ... - Continuation of counts from page 1

Judgment--Page 2 of 8

Defendant: ALI AL-TIMIMI
Case Number: 1:04CR00385-001

## Continuation of Counts from Page 1

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 50 U.S.C. § 1705(b), 18 U.S.C. § 2, 31 C.F.R. §§ 545.204 and 545.206, Executive Order No. 13224, 66 Fed. Reg. 49079 (2001); 65 Fed. Reg. 41549 (2000); Executive Order 13129, 64 Fed. Reg. 36759 (1999) | Counseling and Inducing Others to Aid the Taliban | 10/21/2001 | 5 |
| 18 U.S.C. §§ 2 and 371 | Counseling and Inducing Others to Conspire to Violate the Neutrality Act | 05/2003 | 6 |
| 18 U.S.C. §§ 924(c) and 2(a) | Inducing Others to Use Firearms in Connection with a Crime of Violence | 09/18/2001 | 7 |
| 18 U.S.C. §§ 924(c) and 2(a) | Inducing Others to Use Firearms in Connection with a Crime of Violence | 09/18/2001 | 8 |
| 18 U.S.C. §§ 844(h)(2) and 2(a) | Inducing Others to Carry Explosives During Commission of a Felony | 09/18/2001 | 9 |
| 18 U.S.C. §§ 844(h)(2) and 2(a) | Inducing Others to Carry Explosives During Commission of a Felony | 09/18/2001 | 10 |

AO 245 S (Rev. 2/99)(EDVA rev.1) Sheet — Imprisonment

Judgment--Page 3 of 8

Defendant: ALI AL-TIMIMI
Case Number: 1:04CR00385-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of LIFE IMPRISONMENT, consisting of:

ONE-HUNDRED TWENTY-ONE (121) MONTHS concurrent as to each of Counts 1, 2, and 3;

ONE-HUNDRED TWENTY (120) MONTHS concurrent as to each of Counts 4 and 5, to be served concurrently with the terms of imprisonment imposed in Counts 1, 2, and 3.

SIXTY (60) MONTHS as to Count 6, to be served concurrently with the terms of imprisonment imposed in Counts 1, 2, 3, 4, and 5.

THREE-HUNDRED SIXTY (360) MONTHS as to Count 7, to be served consecutively to the terms of imprisonment imposed in Counts 1, 2, 3, 4, 5, and 6.

LIFE IMPRISONMENT as to Count 8;

ONE-HUNDRED TWENTY (120) MONTHS as to Count 9, to be served consecutively to the terms of imprisonment imposed in Counts 1, 2, 3, 4, 5, 6, 7, and 8;

TWO-HUNDRED FORTY (240) MONTHS as to Count 10, to be served consecutively to the terms of imprisonment imposed in Counts 1, 2, 3, 4, 5, 6, 7, 8, and 9.

The Court makes the following recommendations to the Bureau of Prisons:

Defendant to be designated to a facility as close to the Washington D.C. area as possible.

The Court recommends the defendant not be placed under Special Administrative Measures (SAM) while in custody.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this Judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____ at _____
_____, with a certified copy of this Judgment.

c: P.O. (2) (3)
  Mshl. (4) (2)
  U.S.Atty.
  U.S.Coll.
  Dft. Cnsl.                              _____
  PTS                                      United States Marshal
  Financial
  Registrar                          By  _____
  Ob                                       Deputy Marshal

**J.A. 2760**

AO 245 S (Rev. 2/99)(EDVA rev.1) Shee    Supervised Release

Judgment--Page 4 of 8

Defendant: ALI AL-TIMIMI
Case Number: 1:04CR00385-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of THREE (3) YEARS, as to all Counts of conviction to be served concurrently.

The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of supervised release.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

While on supervised release, the defendant shall not commit another federal, state, or local crime.

While on supervised release, the defendant shall not illegally possess a controlled substance.

While on supervised release, the defendant shall not possess a firearm or destructive device.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

## STANDARD CONDITIONS OF SUPERVISED RELEASE

The defendant shall comply with the standard conditions that have been adopted by this Court (set forth below):
1) The defendant shall not leave the judicial district without the permission of the Court or probation officer.
2) The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month.
3) The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
4) The defendant shall support his or her dependents and meet other family responsibilities.
5) The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons.
6) The defendant shall notify the Probation Officer within 72 hours, or earlier if so directed, of any change in residence.
7) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by physician.
8) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered.
9) The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.
10) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer.
11) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.
12) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court.
13) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

**J.A. 2761**

AO 245 S (Rev. 3/99)(EDVA rev.) Sheet      ont'd) - Supervised Release     •

Judgment--Page 5 of 8

Defendant: ALI AL-TIMIMI
Case Number: 1:04CR00385-001

## SPECIAL CONDITIONS OF SUPERVISION

While on supervised release, pursuant to this Judgment, the defendant shall also comply with the following additional conditions:

1)   Although mandatory drug testing is waived pursuant to 18 U.S.C. §3563(a)(4), defendant must remain drug free and his probation officer may require random drug testing at any time.

2)   Defendant shall not have any contact with his co-defendants.

AO 245 S (Rev. 3/99)(EDVA rev.) Sheet ⸱ 'inancial Penalties

Judgment--Page 6 of 8

Defendant: ALI AL-TIMIMI
Case Number: 1:04CR00385-001

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total monetary penalties in accordance with the schedule of payments set out below.

| Count | Special Assessment | Fine |
|-------|-------------------|------|
| 1 | $100.00 | |
| 2 | $100.00 | |
| 3 | $100.00 | |
| 4 | $100.00 | |
| 5 | $100.00 | |
| 6 | $100.00 | |
| 7 | $100.00 | |
| 8 | $100.00 | |
| 9 | $100.00 | |
| 10 | $100.00 | |
| **Total** | **$1,000.00** | |

### FINE

No fines have been imposed in this case.

### SCHEDULE OF PAYMENTS

Payments shall be applied in the following order: (1) assessment; (2) restitution; (3) fine principal; (4) cost of prosecution; (5) interest; (6) penalties.

The special assessment is due in full immediately. If not paid immediately, the Court authorizes the deduction of appropriate sums from the defendant's account while in confinement in accordance with the applicable rules and regulations of the Bureau of Prisons.

Any special assessment, restitution, or fine payments may be subject to penalties for default and delinquency.

If this judgment imposes a period of imprisonment, payment of Criminal Monetary penalties shall be due during the period of imprisonment.

All criminal monetary penalty payments are to be made to the Clerk, United States District Court, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program.

**J.A. 2763**

AO 245 S (Rev. 3/99)(EDVA rev.) Sheet   Statement of Reasons

Judgment—Page 7 of 8

Defendant:  ALI AL-TIMIMI
Case Number:  1:04CR00385-001

## STATEMENT OF REASONS

[X]      The Court adopts the factual findings in the Presentence Report, except the Court does not impose the 2 point increase to the offense level for obstruction of justice.

### Advisory Guideline Range Determined by the Court:

Total Offense Level:  __32__

Criminal History Category:  __I__

Imprisonment Range:  __121__ to __151__ months as to Counts 1, 2, and 3;
                     __120__ Months statutory maximum as to Count 4;
                     __120__ Months statutory maximum as to Count 5;
                     __60__ Months statutory maximum as to Count 6;
                     __360__ Months statutory minimum consecutive as to Count 7;
                     __Life Imprisonment__ statutory minimum consecutive as to Count 8;
                     __120__ Months statutory consecutive as to Count 9;
                     __240__ Months statutory consecutive as to Count 10.

Supervised Release Range:  __3__ to __5__ years as to Counts 1, 7, 8, 9, and 10
                           __2__ to __3__ years as to Counts 2, 3, 4, 5, and 6

Fine Range:  $ 17,500.00  to $ 175,000.00

     [X] Fine waived or below the guideline range because of inability to pay.

Restitution:  $_____

     [X] Full restitution is not ordered for the following reason(s):

     Not Applicable

[X]      The sentence adequately reflects the seriousness of the offense, adequate punishment and deterrence as well as protection of the community.

**J.A. 2764**

FILED

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

2005 JUL 15  P 12: 1

Alexandria Division

CLERK US DISTRICT COU
ALEXANDRIA, VIRGIN

UNITED STATES OF AMERICA      )
                              )
        Plaintiff,            )
                              )
v.                            )   Criminal No. 1:04cr385-A
                              )
ALI AL-TIMIMI                 )
                              )
        Defendant             )

## NOTICE OF APPEAL

Notice is hereby given that Defendant ALI AL-TIMIMI hereby appeals to the United

States Court of Appeals for the Fourth Circuit from the judgment and sentence entered in

this action on the 13th day of July 2005.

Respectfully submitted,

ALI AL-TIMIMI
By Counsel

Edward B. MacMahon, Jr.  VSB #25432
107 East Washington Street
P.O. Box 903
Middleburg, Virginia 20117
540-687-3902

Alan H. Yamamoto  VSB #25872
643 S. Washington Street
Alexandria, Virginia 22314
703-684-4700


133

**J.A. 2765**

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was hand-delivered to the U.S. Attorney's box located in the U.S. District Court Alexandria Clerk's Office and sent via facsimile this 14th day of July 2005 to Gordon Kromberg, Esq., Assistant United States Attorney, 2100 Jamieson Ave., Alexandria, Virginia, 22314.

Alan Yamamoto

CORRECTED JUDGMENT

FILED: April 26, 2006

UNITED STATES COURT OF APPEALS

for the

Fourth Circuit



No. 05-4761
CR-04-385

UNITED STATES OF AMERICA

        Plaintiff - Appellee

   v.

ALI AL-TIMIMI

        Defendant - Appellant

---------------------
Appeal from the United States District Court for the
Eastern District of Virginia at Alexandria
---------------------

    The Court hereby corrects a clerical error in its judgment
of April 25, 2006. The Court's judgment, as corrected, is as follows:

    In accordance with the Court's order of April 25, 2006, this
appeal is vacated and the case is remanded to the district court
for further proceedings consistent with that order.

    A certified copy of this judgment will be provided to the
district court upon issuance of the mandate.  The judgment will take
effect upon issuance of the mandate.

                     /s/ Patricia S. Connor
                              CLERK

A True Copy, Teste:
Patricia S. Connor, Clerk
BY _Sharon A. Wiley_
    Deputy Clerk

(168)

**J.A. 2767**

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

FILED
April 25, 2006

No. 05-4761
CR-04-385

UNITED STATES OF AMERICA

        Plaintiff - Appellee

  v.

ALI AL-TIMIMI

        Defendant - Appellant

---

O R D E R

---

Appellant has filed a motion to vacate his appeal and remand his case for further proceedings before the trial court.  Previously, this Court granted a motion to stay the briefing schedule pending resolution of outstanding issues.

The motion to vacate and to remand raises appellant's concern, based on recent developments, that the government may have undisclosed intercepts of either the appellant or various individuals material to his trial. While this is the main purpose of the requested order, appellant has also raised questions relating to alleged violations of attorney-client communications and access to evidence claimed as classified by the government.

Appellee, the United States, has consented to the motion while emphasizing that its consent to the motion does not reflect its views

**J.A. 2768**

on the merits of Al-Timimi's contentions, or its views on the
jurisdiction of the district court in the Eastern District of
Virginia over Al-Timimi's allegations regarding conditions of his
incarceration.

Having considered the motion and positions of the parties, IT IS
HEREBY ORDERED

(1) Appellant's motion to vacate and to remand his case pending
further proceedings is GRANTED.

(2) IT IS FURTHER ORDERED, without ruling on the government's
jurisdictional question regarding the prison conditions,
that the district court may consider upon remand issues
raised by appellant and order whatever relief or changes in
the case, if any, that it considers appropriate.

(3) IT IS FURTHER ORDERED that, following a final order by the
district court, appellant may timely file without prejudice
a new notice of appeal with this Court.

This order is entered at the direction of Judge Widener, with
the concurrences of Judge Michael and Judge Hamilton, and with
the agreement of the parties.

For the Court,

/s/  Patricia S. Connor
_____
                CLERK

**J.A. 2769**

This page intentionally left blank for double-sided pagination and printing