No. 14-4451

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH COURT

————————————

### UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

**v.**

### ALI AL-TIMIMI,
*Defendant/Appellant.*

————————————

**On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)**

————————————

### JOINT APPENDIX

### VOLUME XII of XIII (pages 2771 - 2998)

————————————

**ERIC S. SIEBERT**
**United States Attorney**

**Gordon D. Kromberg**
**Assistant U.S. Attorney**
**Counsel for Appellee**
**2100 Jamieson Avenue**
**Alexandria, VA 22314**
**(703) 299-3700**

**Joseph Attias**
**Attorney**
**Counsel for Appellee**
**Nat'l Security Division**
**U.S. Dep't of Justice**
**Washington, DC 20530**

**GEREMY C. KAMENS**
**Federal Public Defender**

**Geremy C. Kamens**
**Federal Public Defender**
**Counsel for Dr. Al-Timimi**
**1650 King Street, Suite 500**
**Alexandria, VA 22314**
**(703) 600-0800**

This page intentionally left blank for double-sided pagination and printing

# <u>TABLE OF CONTENTS</u>

### VOLUME I (pages 1 - 122)

District Court Docket Sheet (as of Apr. 28, 2025) ......................................1

Indictment (Sept. 23, 2004, Doc. 1)..............................................................49

Superseding Indictment (Feb. 3, 2005, Doc. 47) ..........................................64

Government's Proposed Jury Instructions (Mar. 28, 2005, Doc. 84).....................80

### VOLUME II (pages 123 - 372)

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 294) (defense opening
    statement)............................................................................123

Transcript, Jury Trial, Day 1 (Apr. 4, 2005, Doc. 148) ........................144

  Opening statements .....................................................................148

    By the government..................................................................148
    By the defense.........................................................*see* J.A. 126

  Government's evidence .................................................................167

    Stipulation..............................................................................167

    Nabil Gharbieh      Direct examination..................................171
                             Cross examination...................................233
                             Redirect examination ..............................274
                             Recross examination ...............................281

    Muhammad Aatique      Direct examination..................................283

  Concluding matters .......................................................................369

i

## VOLUME III (pages 373 - 656)

Transcript, Jury Trial, Day 2 (Apr. 5, 2005, Doc. 149) ........................................373

    Preliminary matters ...........................................................................377

    Government's evidence, cont'd .........................................................377

        Muhammad Aatique        Direct examination (resumed) ................378
                                          Cross examination ....................................398
                                          Redirect examination ..............................468
                                          Recross examination ...............................489

        Stipulations ...........................................................................492

        Donald Surratt            Direct examination ...................................504
                                              Cross examination ....................................570
                                            Redirect examination ..............................585
                                            Recross examination ...............................588

        Detective John Hodge       Direct examination ...................................589
                                            Cross examination ....................................592
                                            Redirect examination ..............................592

        Stipulations ...........................................................................594

        Playing of audiotapes ...........................................................598

        Yong Ki Kwon            Direct examination ...................................604

    Concluding matters ...........................................................................655


## VOLUME IV (pages 657 - 972)

Transcript, Jury Trial, Day 3 (Apr. 6, 2005, Doc. 150) ........................................657

    Preliminary matters ...........................................................................661

Government's evidence, cont'd ...................................................................665

    Evan Francois Kohlmann    Direct examination...................................665
                             Cross examination....................................817
                             Redirect examination ...............................895
                             Recross examination ................................903

    Stipulations ....................................................................................905

    Playing of audiotape .......................................................................914

Concluding matters ...................................................................................970


VOLUME V (pages 973 - 1270)

Transcript, Jury Trial, Day 4 (Apr. 7, 2005, Doc. 151) .........................973

    Preliminary matters........................................................................977

Government's evidence, cont'd ...................................................................980

    Playing of audiotapes and videotape ............................................980

    S.A. Tracy Kneisler    Direct examination.................................1093
                             Cross examination.................................1099

    S.A. Christopher Paul Mamula  Direct examination.................................1100

    S.A. Donald L. Monday    Direct examination.................................1105
                             Cross examination.................................1127

    Stipulations ..................................................................................1131

    Yong Ki Kwon    Direct examination (resumed) ..............1146
                             Cross examination.................................1238

Concluding matters .................................................................................1268

## VOLUME VI (pages 1271 - 1550)

Transcript, Jury Trial, Day 5 (Apr. 11, 2005, Doc. 152) ................................. 1271

    Preliminary matters .................................................................. 1275

    Government's evidence, cont'd ................................................ 1279

        Yong Ki Kwon          Cross examination (resumed) ............... 1279
                                     Redirect examination ............................ 1446
                                     Recross examination ............................ 1475

        S.A. Wade Ammerman     Direct examination ................................ 1481
                                     Cross examination ................................. 1539

    Concluding matters .................................................................. 1548

## VOLUME VII (pages 1551 - 1804)

Transcript, Jury Trial, Day 6 (Apr. 12, 2005, Doc. 153) ................................. 1551

    Government's evidence, cont'd ................................................ 1555

        S.A. Wade Ammerman     Cross examination (resumed) ............... 1556
                                     Redirect examination ............................ 1582
                                     Recross examination ............................ 1593

    Stipulations .............................................................................. 1600

    Playing of audiotapes .............................................................. 1610

        S.A. John Wyman         Direct examination ................................ 1656

    Concluding matters .................................................................. 1799

iv

VOLUME VIII (pages 1805 - 2058)

Transcript, Jury Trial, Day 7 (Apr. 13, 2005, Doc. 154) ....................................1805

Preliminary matters ..................................................................................1808

Government's evidence, cont'd .................................................................1810

S.A. John Wyman            Direct examination (resumed) ...............1810
                           Cross examination....................................1852
                           Redirect examination .............................1916
                           Recross examination ..............................1923

Alex Daghestani            Direct examination..................................1927
                           Cross examination....................................1935

Andre Thompson            Direct examination..................................1940
                           Cross examination....................................1951

Playing of audiotapes...........................................................................1954

Government rests ........................................................................1955, 1965

Defendant's Rule 29 motion .....................................................................1958

Defendant's evidence ...............................................................................1965

Sherdil Loynab            Direct examination..................................1966
                          Cross examination....................................1970
                          Redirect examination .............................1976

Yousuf Jaafar Idris        Direct examination..................................1977
                           Cross examination....................................2018

Concluding matters ..................................................................................2056

## VOLUME IX (pages 2059 - 2318)

Transcript, Jury Trial, Day 8 (Apr. 14, 2005, Doc. 155) ....................................2059

    Defendant's evidence, cont'd ........................................................................2063

        Yousuf Jaafar Idris        Cross examination (resumed) ...............2063

        Luther Kennedy            Direct examination.................................2136
                                                   Cross examination.................................2144
                                                   Redirect examination ............................2163
                                                   Recross examination .............................2168

        Curtis Jamison              Direct examination.................................2172
                                                   Cross examination.................................2189

        Defendant rests ........................................................................2198

    Government's rebuttal evidence ....................................................................2198

        Khwaja Mahmood Hasan     Direct examination.................................2199
                                                Cross examination.................................2235
                                           Redirect examination ............................2278
                                           Recross examination .............................2284

        Muhammad Aatique, recalled  Direct examination.................................2290

        Conclusion of evidence ........................................................2293

    Preliminary charge conference ....................................................................2306

## VOLUME X (pages 2319 - 2568)

Transcript, Jury Trial, Day 9 (Apr. 18, 2005, Doc. 156) ....................................2319

    Charge conference ........................................................................2322

vi

Closing arguments ..........................................................................2346

    By the government.................................................................2346
    By the defense.......................................................................2376
    Rebuttal by the government..................................................2415

Jury charge ....................................................................................2429

Jury deliberations ..........................................................................2500

    Jury question .........................................................................2500

Transcript, Jury Trial, Day 10 (Apr. 19, 2005, Doc. 157) ...............2506

    Jury deliberations, cont'd.....................................................2507

    Jury question .........................................................................2507

Transcript, Jury Trial, Day 11 (Apr. 20, 2005, Doc. 158) ...............2515

    Jury deliberations, cont'd.....................................................2517

    Jury question .........................................................................2517

    Jury questions .......................................................................2520

Transcript, Jury Trial, Day 12 (Apr. 22, 2005, Doc. 159) ...............2535

    Jury deliberations, cont'd.....................................................2537

Transcript, Jury Trial, Day 13 (Apr. 25, 2005, Doc. 160) ...............2540

    Jury deliberations, cont'd.....................................................2542

    Jury questions .......................................................................2542

Transcript, Jury Trial, Day 14 (Apr. 26, 2005, Doc. 161) ...............2553

    Return of verdict ..................................................................2555

Concluding matters ..........................................................................2560

Verdict Form (Apr. 26, 2005, Doc. 107) .........................................2566


## VOLUME XI (pages 2569 - 2770)

Defendant's Motion for Judgment of Acquittal (June 6, 2005, Doc. 118)..........2569

Defendant's Corrected Motion for New Trial (June 14, 2005, Doc. 124) ..........2630

Government's Response to Defendant's Post-Trial Motions (June 20, 2005, Doc. 125)..........................................................................2647

Defendant's Reply to the Government's Response to Defendant's Post-Trial Motions (June 28, 2005, Doc. 126) (attachments omitted from appendix)................................................................2688

Transcript, Sentencing Hearing (July 13, 2005, Doc. 147) ................................2719

    Argument and ruling on Rule 29 motion....................................................2720
    Argument and ruling on Rule 33 motion....................................................2724
    Ruling on Guidelines objections...............................................................2735
    Argument on sentencing ...........................................................................2739
    Allocution ................................................................................................2746
    Imposition of sentence .............................................................................2750

Judgment in a Criminal Case (July 13, 2005, Doc. 132)....................................2758

Notice of Appeal (July 15, 2005, doc. 133)........................................................2765

Fourth Circuit Judgment (corrected) (with copy of Apr. 25, 2006 order) (May 19, 2006, Doc. 168)................................................................2767


## VOLUME XII (pages 2771 - 2998)

Transcript, Hearing (Aug. 24, 2007, Doc. 239)..................................................2771

Transcript, Hearing (Nov. 20, 2007, Doc. 245)....................................................2790

Transcript, Hearing (May 16, 2008, Doc. 263) ...................................................2795

Transcript, Hearing (Oct. 23, 2008, Doc. 272)....................................................2802

Transcript, Hearing (Feb. 19, 2009, Doc. 297)....................................................2827

Transcript, Hearing (Oct. 4, 2013, Doc. 340) .....................................................2834

(Redacted) Memorandum Opinion (denying motions to compel) (Apr. 28, 2014, Doc. 350)......................................................................................................2864

Order (May 21, 2014, Doc. 357)..........................................................................2887

Notice of Appeal (June 4, 2014, Doc. 358) .........................................................2889

Fourth Circuit Order (remanding case for further proceedings) (Aug. 4, 2015, Doc. 406)..................................................................................................2892

Fourth Circuit Order (expanding scope of remand) (July 26, 2016, Doc. 431)............................................................................................................2894

Government's Response in Opposition to Defendant's Second Motion for Acquittal on Count 1 (Aug. 29, 2018, Doc. 447) ..........................................2896

Defendant's Reply to Government's Supplemental Memorandum on *United States v. Davis* (Aug. 19, 2019, Doc. 459) ..........................................2905

Government's Reply in Further Support of Its Supplemental Memorandum on *United States v. United States* (Aug. 26, 2019, Doc. 461) .......................2936

(Redacted) Memorandum Opinion (granting release pending appeal) (Aug. 18, 2020, Doc. 519) ..........................................................................................2953

Order (granting release pending appeal) (Aug. 18, 2020, Doc. 520) .................2969

Fourth Circuit Order (affirming grant of release pending appeal) (Aug. 31, 2020, Doc. 535)................................................................................................2971

Memorandum Opinion (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 549).................................................................................2972

Order (vacating Counts 1, 7, and 8) (July 18, 2024, Doc. 550)...........................2998


VOLUME XIII (pages 2999 - end)

Selected Government Trial Exhibits................................................................2999

Gov't Exh. 1B1a: transcript of Apr. 7, 2003 consensually monitored call between Kwon and Royer.........................................................................2999

Gov't Exh. 1B2a: transcript of Apr. 8, 2003 consensually monitored call between Kwon and Royer.........................................................................3053

Gov't Exh. 1B4a: transcript of Apr. 17, 2003 consensually recorded CCTV hotel meeting between Kwon and Royer .......................................3084

Gov't Exh. 1D27: Taiba Bulletin, Oct. 17, 2000..........................................3131

Gov't Exh. 1D28: Taiba Bulletin, Oct. 27, 2000..........................................3134

Gov't Exh. 1D29: Taiba Bulletin, Nov. 7, 2000...........................................3137

Gov't Exh. 1D45: Taiba Bulletin, Sept. 26, 2001 (post from nadqpk@yahoo.com)......................................................................3139

Gov't Exh. 1D48: Taiba Bulletin, Oct. 13, 2001 (post from nadqpk@yahoo.com)......................................................................3141

Gov't Exh. 1D52: Taiba Bulletin, June 24, 2001 (post from nadqpk@yahoo.com)......................................................................3144

Gov't Exh. 1F1: LET Poster, image 1 .........................................................3151

Gov't Exh. 1F3: LET Poster, image 3 .........................................................3152

Gov't Exh. 1F4: LET Poster, image 4 .........................................................3153

Gov't Exh. 1G10a: transcript of Apr. 1, 2003 recorded telephone call (Hammad and Royer call Al-Timimi) ....................................................3154

Gov't Exh. 4G7: email dated June 19, 2001 from pballaz@yahoo.com, regarding praying in a moving car............................................................3164

Gov't Exh. 7A19: Uqla fatwa on events of 9/11, in English, taken from Surratt's residence on May 8, 2003 ............................................................3168

Gov't Exh. 7A23; Hawali's *Statement to the Ummah* in English ..................3178

Gov't Exh. 7A39a: translation of website containing Space Shuttle article in Arabic ........................................................................................3200

Gov't Exh. 7C31: email dated Sept. 20, 2001 from Kwon to Belton Harris ....................................................................................................3203

Gov't Exh. 7D3: email dated Oct. 15, 2001 from Surratt re. Hawali's *Statement to the Ummah* ..................................................................3204

Gov't Exh. 7F24a: UPI News article dated Sept. 16, 2001 titled *Taliban Leaders Seek Islamic Support*..................................................................3206

Gov't Exh. 7H12: plea agreement and statement of facts for Muhammed Aatique...........................................................................................3207

Gov't Exh. 10A3: document entitled *Suicide Attacks, Are They Suicide? A Shariah Viewpoint* ....................................................................3223

Gov't Exh. 10A41: email dated Oct. 23, 2000 from Nabil to Timimi re: trip to Delaware ........................................................................3227

Gov't Exh. 10D19: email dated Oct. 21, 2001 email from altimimi@yahoo.com to aqdcksa@yahoo.com re. "Utter Nonsense" ......3229

Gov't Exh. 10H1A: record of instant messaging session with Bin Laden statement preamble ....................................................................3233

Gov't Exh. 10J7: article, *Sheikh Ali Timimi on the Taliban and the Statues* ....................................................................................3260

Gov't Exh. 10J9: email dated December 13, 2001 from Timimi re. "A call to reflect and repentance" ..................................................3262

Gov't Exh. 10J15: affidavit of Youseff Idris..................................3265

Gov't Exh. 10S1: summary chart of Timimi / Kwon telephone calls, Sept. 16, 2001 .............................................................................3266

Gov't Exh. 10S2: summary chart of Timimi / Kwon telephone calls, Sept. 19, 2001 .............................................................................3267

Gov't Exh. 10S3: summary chart of Kwon telephone calls, Sept. 16, 2001 ............................................................................................3268

Gov't Exh. 10T1: photograph, package of "New World Order" cassette tapes ...............................................................................................3272

Gov't Exh. 12-1: stipulation re. background facts............ 3273; *see* J.A. 167-171

Gov't Exh. 12-60: stipulation re. electronic surveillance of calls and email.....................................................................................................3277

Gov't Exh. 12-61: stipulation re. Al-Timimi lectures ............3278; *see* J.A. 2344

Selected Defense Trial Exhibits..........................................................3280

Def't Exh. 33: Al-Timimi lecture titled *Muslims in America in the Face of Accusations of "Fundamentalism" and "Terrorism"* delivered at Purdue University on Oct. 20, 1993 .........................................3280

Def't Exh. 57: letter dated from AUSA Gordon Kromberg to Yong Kwon's attorneys .........................................................................3293

Def't Exh. 80: stipulation regarding Al-Timimi's unsubscription from Taiba Bulletin List ...................................................................3295

Def't Exh. 81: summary report of an interview with Ismail Royer by Evan Kohlmann ...........................................................................3298

Def't Exh. 82: photo of front of Yong Kwon's apartment ............................3303

Def't Exh. 83: photo of back of Yong Kwon's apartment ............................3304

Def't Exh. 85: summary of Yong Kwon's phone calls on Sept. 16, 2001
    ............................................................................................ 3305

Def't Exh. 86: summary of Yong Kwon's phone calls on Sept. 13-15,
    2001 ................................................................................3306

Def't Exh. 87: summary of Al-Timimi's calls on evening of Sept. 19,
    2001 ................................................................................3307

Def't Exh. 90: summary of Al-Timimi's calls on evening of Sept. 19,
    2001 ................................................................................3308

This page intentionally left blank for double-sided pagination and printing



1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | . | Criminal No. 1:04cr385 |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | August 24, 2007 |
| ALI AL-TIMIMI, | . | 10:38 a.m. |
| | . | |
| Defendant. | . | |
| | . | |

. . . . . . . . . .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:          GORDON D. KROMBERG, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314

FOR THE DEFENDANT:           JONATHAN TURLEY, ESQ.
                             The George Washington University
                             Law School
                             2000 H Street, N.W.
                             Washington, D.C. 20052
                               and
                             WILLIAM E. OLSON, ESQ.
                             Bryan Cave LLP
                             700 13th Street, N.W.
                             Washington, D.C. 20005-3960

ALSO PRESENT:                JASON R. BARON, ESQ.
                             S.A. CHRISTOPHER P. MAMULA
                             MATTHEW OLSEN

OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                             U.S. District Court, Fifth Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595

(Pages 1 - 19)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

1                    P R O C E E D I N G S

2                  (Defendant present.)

3          THE CLERK:  Criminal Case No. 04-385, United States of

4   America v. Ali Al-Timimi.  Counsel, please note their appearance

5   for the record.

6          MR. KROMBERG:  Good morning, Your Honor.  Gordon

7   Kromberg for the United States.  With me at counsel table is

8   Special Agent Chris Mamula, who you know, and Jason Baron, the

9   counsel for the National Archives and Records Administration, and

10  also Mr. Matt Olsen from the National Archives and Records

11  Administration.

12         I think Mr. Gibbs was here, but he had to leave for

13  something else.

14         THE COURT:  All right, that's fine.

15         And for the defense?

16         MR. TURLEY:  Good morning, Your Honor.  Jonathan Turley

17  here for Dr. Ali Al-Timimi.  With me is my co-counsel and local

18  counsel, Will Olson.

19         THE COURT:  All right.  Now, before the Court are two

20  motions.  We have the defendant's motion for access to ex parte

21  filings, which appears to be a repeat of a motion previously

22  filed, and then we have a motion for access to the National

23  Archives.

24         Now, obviously, much of the Archives is open to any

25  member of the public, right, who wants to go there, I'm assuming?

3

1  That's correct?

2        MR. KROMBERG:  Judge, I think the motion is really for

3  the 9/11 Commission records.

4        THE COURT:  That's really what's involved here.

5        I've had a chance to once again go over this file, and

6  I've had a chance to review in depth the government's submission

7  of the Archives' documents that were retrieved that are

8  classified.

9        It's unfortunate that they don't have Bates numbers

10 running sequentially.  There are all sorts of numbers all over the

11 place.  I could not find a rational way of articulating exactly

12 what I saw, but as you know, what we've been looking for

13 essentially in this case is to some degree a needle in a haystack,

14 that is, this document which Mr. MacMahon thought he had seen as

15 he was doing discovery in the *Moussaoui* case.

16        I want to make sure, Mr. Kromberg, that I understand

17 what you did, but in the Archives submission, it's about, I'd say,

18 two-and-a-half, three inches thick, you had tabbed every document

19 that you could see where Mr. Timimi's name came up.

20        MR. KROMBERG:  Correct, Judge, and we --

21        THE COURT:  And on one of them, you put a star.

22        MR. KROMBERG:  And probably we should have put a star on

23 three of them in going -- Agent Mamula was going back over them.

24 To the extent that what we're looking for is a document like what

25 Mr. MacMahon said, we don't know what document Mr. MacMahon saw,

**J.A. 2773**

4

1 but to the extent he saw a document that referenced an

2 investigation prior to 9/11, those -- there are several documents

3 that might be that document.

4       Even if it's not the exact document, which I don't know

5 if we can ever tell if it's the exact document, the information

6 that the Court would need to determine whether there's been any

7 discovery violation, I think, at this point is before the Court,

8 because the Court has information about any investigation that may

9 have occurred prior to 9/11 in great detail, and I was shocked in

10 reading this to find out how much information Mr. MacMahon was

11 able to find about the genesis of many investigations going on in

12 the course of looking at the *Moussaoui* documents.

13       But for purposes of this Court, this Court can see --

14 look at those documents and, well, this is how this particular

15 investigation got started, and if there was a reference to an

16 investigation prior to 9/11, this is what it consisted of, and the

17 Court should be able to make a determination that there was no

18 discovery violation based on the documents that it has before it

19 without determining whether there is some, maybe another document

20 that makes this similar reference.

21       THE COURT:  Well, again, this -- the posture of this

22 case if it comes back, as we know, in the midst of the appeal

23 process, and the issue is whether or not there were any violations

24 by the government -- not the prosecutors, because the prosecutors

25 are not at issue in this case.  This arose out of the revelation

5

1  of the warrantless NSA intrusions that raised the issue of whether

2  or not Mr. Timimi had been the victim of any of that and, if so,

3  whether the results of such intrusions led to his prosecution.

4        One has to rely on the representations of the government

5  with perhaps a healthy bit of skepticism, which we have tried to

6  use judiciously.  I have looked at that mass of documents, and

7  although there are references to Mr. Timimi before September 11 of

8  2001, they are either in just passing or are of such a nature as

9  they could not possibly have assisted him in his defense.

10        I tried the case and therefore am very familiar with the

11  line of defense that was raised by counsel, and it is

12  inconceivable to me that any of that information was in any

13  respect relevant to the defenses that were made.  Either it would

14  simply be repetitive of issues that have been raised or actually

15  was inculpatory and not exculpatory if one looked at it that way.

16        But in any case, the question is whether or not there is

17  within that set of documents which this Court has reviewed

18  anything suggesting that there had been a violation of the

19  discovery obligations of the government.  I do not see it there;

20  and so the question then is, you know, I don't see it; should

21  defense counsel nevertheless be allowed to look at it?

22        Counsel has clearance, but as the government points out,

23  just because an attorney has clearance doesn't mean that he has a

24  right to just look at classified information which is not material

25  or relevant, and in this case, I cannot authorize this access,

6

1  because I think it, No. 1, exposes counsel to a lot of other

2  information that's absolutely not relevant to this case, and the

3  information that mentions Mr. Timimi is just not of such a nature

4  that it is appropriate or necessary or required by the law.

5          So, Mr. Turley, the issue about the ex parte pleadings

6  which this Court has reviewed in connection with these motions,

7  I've issued a ruling on that once before, and there's nothing that

8  I have seen in the submissions from the government that would

9  change my conclusion on that issue.

10          MR. TURLEY:  May I present some argument on that issue,

11  Your Honor?

12          THE COURT:  Yeah.

13          MR. TURLEY:  I -- thank you first of all for the

14  explanation of Your Honor's position on the case, but I would just

15  like to add a couple of things for the record.  The motions are

16  not just pure duplications of earlier motions.  We were relying

17  upon what information the government has given to the defense.

18          And part of the problem in both these motions, as I

19  think the Court has established as well, are linked.  I mean, they

20  both get to this question of why it is that, for example, an

21  archivist can be employed to make a determination as to whether a

22  document is material or not, that came out in the examination of

23  the special agents, the prosecutors are allowed to make decisions

24  of whether they're material.

25          Prosecutors have always said, you know, not only -- it's

1  one of two things.  Either there's no documents here or no
2  documents that we think is material.  And then finally, we have
3  FBI agents through the Archives that have made these
4  determinations.

5       The only people that have not been able to look at the
6  question of materiality would be his own lawyers, who happen to
7  have clearances, and what we are arguing, Your Honor, is that by
8  any reasonable definition of materiality under *Brady* or rule 16,
9  any investigation of terrorism involving Dr. Al-Timimi would be
10  viewed as material.

11       If he was either found not to be someone who came up on
12  the radar screen of an investigation or if he was somebody who was
13  under prior investigation, the weight of that evidence is
14  something that the defense should have been allowed to see and
15  make its own judgment.

16       And what the Court is referring to is the view that this
17  would not materially affect the outcome of the trial.  What we're
18  saying is that the question is whether it's material in the legal
19  sense, and the judgment of the defense of how important they are
20  is something that goes into argument.

21       So what we're left with is the sort of strange world
22  where I'm allowed to hear everyone else's account as to whether
23  this would have helped my client, but neither my client nor I can
24  make that determination.

25       My final point, Your Honor --

1          THE COURT:  But let me just, Mr. Turley, for the record,
2    the reason why this is different from other types of criminal
3    cases is that the nature of the information you're seeking access
4    to isn't just the ordinary information that's on the street.  It
5    has been classified.

6          Now, we may not always agree that the classification
7    decisions are necessary or wise, but the way the law is structured
8    right now, if the executive branch brands this stuff as
9    classified, it's classified, and that puts that category of
10   information in a different posture from just any other general
11   information that might be out there.

12         I agree with you and I'm not unsympathetic with the
13   frustration the defense has that you-all can't make that decision
14   for yourselves.  To some extent, I mean, you've got a judicial
15   officer who's also made that review.

16         Now, the caveat is -- and I agree with you on this --
17   I've made the judgment call based upon the universe of what I've
18   seen.  If there's something else out there that hasn't been
19   brought to my attention, I have not been able to evaluate that.
20   That's why I said to a certain degree, we have to trust that what
21   we've gotten is, in fact, what's there.  That, I think, is really
22   what's frustrating you.

23         But the point is there's no way that I -- no rational
24   way that I can see of solving that problem short of giving you
25   literally a blank check to check everything that is in the

1  Archives, and that's not feasible.

2         MR. TURLEY:  May I propose such a solution, Your Honor?

3  And that is, not only -- I mean, I agree with you, both of us have

4  been in a lot of classified cases.  I've never been in a case like

5  this one.  I've never been -- I mean, the King espionage case,

6  there was -- the Joint Chiefs of Staff room was filled with

7  classified evidence that far exceeds this, and I simply had to

8  continually sign agreements that I would not reveal what I had

9  seen, and that is how it was handled.

10        Here there's no indication the level of classification

11 of this information.  I have a TS/SCI that I've been told is well

12 above any classified information we're talking about, but we're

13 not even going down that road.  That is, there's lots of things

14 that we could do to see if access would be granted.

15        There could be redactions.  The government hasn't been

16 even asked to produce redactions.  There could be an index.  The

17 government has not produced indexes.

18        Of the documents the government has admitted that it

19 found, those, in my view, are all clearly material.  They're all

20 stuff that should have been turned over at trial.

21        Now, they might not have won the case, and they may not

22 have had much weight, or they might have been redundant in the

23 Court's views, but they were clearly material that should have

24 been turned over.

25        And when you look at what the government has defined as

1    materiality, it defies logic.  The government is saying, for

2    example, that it does not consider it material if they've got any

3    evidence in terms of captured lectures or conversations where

4    Dr. Al-Timimi is not advocating jihad.

5            Well, I don't know of anybody who would agree with that

6    proposition.  They used his public lectures to say that here's

7    snippets to show that he was this frothing, spitting,

8    anti-American and anti-Semite.

9            Obviously, if they've got captured lectures that

10   indicate that he was not frothing and spitting and that he was, in

11   fact, speaking on other subjects of peace as opposed to jihad is

12   clearly material, but as an example, and that's on page 16 of the

13   opposing filing, when you look at page 16, you can understand

14   exactly why the judge has very little information given to her,

15   because they have defined "materiality" so narrowly.

16           And so one of the things that I was going to suggest to

17   the Court is that first of all, the government should be at least

18   asked why it cannot produce a redaction or indexed submission to

19   counsel.  Second, I think the government should establish the

20   level of classification of the material that has been withheld.

21   If this is just labeled as Secret, I can't imagine why we're being

22   denied.

23           But then finally -- and we can do this through motion,

24   and it was what we're planning to raise today and we've referenced

25   in the past -- I think that we finally have to resolve a

11

1   definition of materiality, because what we have is all of these
2   filings by the government referring to materiality like we agree
3   on it, and what we know of their definition of materiality, I
4   don't think anyone would agree with logically.

5        And I believe that what is clearly material is any
6   document that refers to Dr. Al-Timimi or material witnesses or the
7   Islamic Center that's the center of this or the Islamic jihad.
8   All those would clearly be relevant at a trial, but the
9   government's never been required to state that was the standard
10  they used, and they stand by their earlier filings.

11       And what I would propose, Your Honor, is I can submit a
12  motion to that effect both for redactions or indexes or an
13  explanation or a declaration why not and also to suggest what I
14  think is an unassailable definition of materiality, and if the
15  government and its agents are willing to sign that materiality
16  agreement, if they agree with it, then I think we've made great
17  progress, and we can go to the names, and we can have done with
18  this.

19       But I think that ending it without defining the core
20  term means that this is all pretty much this sort of unfocused,
21  fluid debate, and that's what the government's been avoiding, but,
22  Your Honor, if you will look at page 16 of the government's
23  memorandum, you'll see that we are in different continents when it
24  comes to what we think is material.

25            THE COURT:  Well, what you think is material and what

12

1   the government thinks is material, ultimately, I've looked at it,

2   and I have determined that the information could not possibly have

3   assisted your client in his defense.  For example, the fact that

4   your client was present at a particular mosque on a particular

5   day, that's the report, that adds nothing one way or the other to

6   the case, or the fact that his name appears on a list of eight

7   names, which is often all that you get, the government in going

8   through and being apparently quite thorough, anytime the name

9   Timimi and some variations of the spelling came up, that

10  document -- this is again from the Archives set -- was in my

11  package, and a number of times, it was just a name seriatim, a

12  whole bunch of names, no particular -- nothing of any

13  significance.

14          That's not how this case would be made or broken.  The

15  fact that a great many of the documents are absolutely repeats of

16  the information that came out at the trial, you know, dinner party

17  with some of the codefendants, that's it.  It adds nothing that

18  you didn't already have in the massive discovery presented in the

19  original case and presented to the jury during the trial, which is

20  why as I looked at it, there weren't any things even close to

21  smoking guns in the Court's view.

22          So under any standard definition of materiality, that

23  is, evidence that could be relevant to either undercutting the

24  government's case, undercutting its witnesses, or undercutting its

25  theory of the case or any evidence that might assist the defense

13

1  in making its case simply wasn't there, and even to the extent

2  where it was cumulative or repetitive of what was already in the

3  trial, it was so minorly repetitive that it would never have added

4  anything to the case.

5          So that's my view of materiality as I've looked at these

6  documents and why my conclusion is that within the Archives

7  package, there is nothing that is -- that raises any suggestion

8  that the discovery obligations of the prosecutor's office was

9  not -- were violated.

10          Again, the only issue we don't know is whether the

11  Archives missed something.  That one is out there, and I know of

12  no rational way other than literally opening up every single

13  record that every agency ever deposited into the Archives, and I

14  just don't see a basis for even beginning to address that issue.

15          MR. TURLEY:  May I respond to that, Your Honor?

16          THE COURT:  Yeah.

17          MR. TURLEY:  I appreciate being given that opportunity.

18  First of all, with regard to the Archives, I think at a minimum --

19  and this is why we waited so long for the transcript is that I

20  think the transcript really shows how meaningless that search was.

21  I mean, this is not a criticism of the special agent.  This is

22  simply the methodology used.

23          And what the special agent said was that we went along

24  the index, and we just looked at the index, and if the titles of

25  the index seemed to us likely to have relevant information, we

14

1    asked for those documents, but we only asked for documents really

2    from the FBI, and we let the archivist in the one document that we

3    found look at that and make the determination for all of us

4    whether it was material, and then the agent went ahead, when I

5    said, "Don't you think it's a bit odd that you found no other

6    agencies with reports of the 9/11 Commission that dealt with

7    domestic terrorism?" and Agent Mamula said, "Yeah, when you put it

8    that way, I do think it's odd."

9            And you read that transcript, and that doesn't come

10   close to anything that would be viewed as an exhaustive or

11   adequate search.

12           Now, I don't want to belabor the point, but my client's

13   freedom is at stake.  And I'm not asking to go through the

14   Archives.  I don't want to go see the Declaration of Independence.

15   I'm simply asking about the 9/11 Commission files, which by the

16   way are all going to be made public.  Most of them are in the

17   process of being made public.

18           So we have this bizarre situation where the government

19   is acting like I'm trying to find the nuclear codes when the vast

20   majority of this information is going to be made public.

21           So one alternative is I can go with the government, we

22   can go to the Archives together, and I can look at the index, and

23   I can identify things that I believe we should be able to look at

24   and look firsthand at how this process was done.

25           Finally, Your Honor, I respectfully disagree with the

15

1  standard of materiality that what Your Honor has addressed is, in

2  fact, where ultimately we might go, whether a new trial would be

3  granted in light of the new evidence, and Your Honor has already

4  indicated that you don't believe it would be enough to justify a

5  new trial, but what my client's being denied is a formal decision

6  of materiality.  That's what I'm trying to establish, that even

7  with these four documents, I think it is beyond question that they

8  should have been released.

9          And what the judge just did -- and I appreciate your

10 efforts to do as much as you can to get this out, and I really do

11 appreciate everything the Court has done -- but what the Court

12 just did was effectively gave me an oral redaction; that is, you

13 gave a general description, and if the Court can do that, so can

14 the government, and we can have some idea of what is in these

15 files so that we can hold forth as to whether they're material,

16 and then if we decide they are material, then this Court can still

17 rest with its view that there's probably not any more documents

18 and what's there won't make a difference, but for me to go to

19 appeal right now, I would be as lost as I was before, because the

20 Court of Appeals will ask me, "Well, were these documents

21 material?"

22          And I'd say, "I think so."

23          THE COURT:  No.  What the Court of Appeals can do is you

24 can argue that the judge didn't let you look at the documents,

25 made a ruling ex parte, so to speak, that they were not material.

16

1   The Court of Appeals itself can review the same documents that
2   we've reviewed.  I've left all the tabs on the documents as the
3   government gave them to us.  If the Court of Appeals thinks that
4   we acted injudiciously in not opening up access, then they will
5   send it back, and we will be glad then to open it up.

6          But at this point, as I said, having looked at it and
7   having looked at it, I think, with a critical eye from the defense
8   standpoint, whether this could help the defense or not -- and I'm
9   not saying I'm thrilled to be in that position -- but I'm
10  balancing the interests of -- the national security interests of
11  the United States that has chosen to put these documents under a
12  classification, I've looked at them in that respect, and I've
13  determined that they would not have assisted Mr. Timimi in any
14  respect in making his defense, nor would they conceivably have led
15  you down to an investigative path that could have helped him.

16         In fact, as I said, if anything, I bumped into a couple
17  of things there that looked to me to be inculpatory or perhaps a
18  bit stronger than they were portrayed to be at the trial.

19         And so that is the ruling that we have in this case, and
20  it may very well set you up for an interlocutory appeal of some
21  kind if you want to pursue that; I'm not sure; but I think we
22  should complete this process, get this record finished.

23         As you know, the government is, is urging the Court to
24  get this resolved, as are you, and they're asking the Court for an
25  order directing you-all to identify those individual witnesses

**J.A. 2786**

17

1  about whom you want further, you know, information so that we can

2  get that last step of this process resolved, and I think we're at

3  that point now.

4            MR. TURLEY:  Thank you, Your Honor.  I mean, our

5  objections are noted --

6            THE COURT:  Obviously.

7            MR. TURLEY:  -- but I would like to ask if the Court

8  would entertain a formal motion for redacted copies and a motion

9  asking for a declaration as to materiality from the government.

10            THE COURT:  You can -- I'm not telling you what you can

11  or can't file.  You can file what you want to file, but I still

12  don't want that to hold up the other aspect of this, which is we

13  need to get those witnesses identified and that last step of this

14  discovery process completed.

15            Now, how much time do you need to do that?

16            MR. TURLEY:  I -- we could -- we'll probably file the

17  three motions around the same time, and if we could have three

18  weeks, it would be helpful.

19            THE COURT:  All right.  Now, in three weeks' time then,

20  this will be the last set of discovery requests from the defense

21  where you're going to specify the particular witnesses as the

22  government has indicated, you know, they need that specificity,

23  all right?

24            MR. TURLEY:  Yes.  The only caveat I have, Your Honor,

25  obviously, if the government comes back in a sudden burst of

**J.A. 2787**

18

1  disclosure and reveals that there are other names we don't know
2  about, I would like to reserve the right to come back and raise
3  that first-time disclosure to the Court.

4          THE COURT:  I mean, obviously, if there's something
5  major that changes, but let's get this done, all right?

6          So within three weeks, we'll have that information,
7  Mr. Kromberg, all right?

8          MR. TURLEY:  Yes, Your Honor.

9          THE COURT:  Now, you brought people from the Archives,
10 etc.  Was there anything further you wanted to put on the record?

11         MR. KROMBERG:  I've just been advised by Mr. Baron to
12 put on the record, which is already in our pleading, that it's not
13 correct that the 9/11 Archives are going to be open to the public
14 in 2009.

15         THE COURT:  That's what I understood from your papers.

16         MR. KROMBERG:  Parts that are not classified are going
17 to be open to the public starting in 2009, but the classified
18 parts may not be opened for a significant period of time.  They
19 have to go through declassification review.

20         THE COURT:  And you know how long it took to get our
21 little transcript --

22         MR. KROMBERG:  And there are many agencies involved,
23 obviously, as the Court knows.

24         I think the Court also knows that after the names are --
25 that Mr. Turley wants to have a search of the NSA, the NSA

19

1  records, I am not -- the people at this table are not allowed to

2  know what goes on with that, but we will make sure that that

3  happens, but I think that we also may be before the Court again to

4  contest the scope of what Mr. Turley in his vigor is, I fear is

5  going to ask for.

6          THE COURT:  Well, that's all preemptive strikes.  Let's

7  wait and see what happens, and if we need a CIPA hearing, give us

8  plenty of notice.  I mean, continue to run these things by our

9  court security officer just so that we don't inadvertently bump

10 into something that we shouldn't bump into, all right?

11         MR. KROMBERG:  Thank you, Your Honor.

12         THE COURT:  Thank you.  Anything further?

13         MR. TURLEY:  Thank you, Your Honor.

14                         (Which were all the proceedings

15                          had at this time.)

16

17            CERTIFICATE OF THE REPORTER

18     I certify that the foregoing is a correct transcript of the

19 record of proceedings in the above-entitled matter.

20

21

22  _____

23              Anneliese J. Thomson

24

25

**J.A. 2789**

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA      .      Criminal No. 1:04cr385
                              .
     vs.                      .      Alexandria, Virginia
                              .      November 20, 2007
ALI AL-TIMIMI,                .      9:45 a.m.
                              .
          Defendant.          .
                              .
.  .   .   .   .   .   .   .   .   .
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:           GORDON D. KROMBERG, AUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314

FOR THE DEFENDANT:            JONATHAN TURLEY, ESQ.
                                 The George Washington University
                                 Law School
                                 2000 H Street, N.W.
                                 Washington, D.C. 20052
                                   and
                                 WILLIAM E. OLSON, ESQ.
                                 Bryan Cave LLP
                                 700 13th Street, N.W.
                                 Washington, D.C. 20005-3960

<u>ALSO PRESENT</u>:              SA MELISSA GODBOLD
                                 PATRICK ROWAN, ESQ.
                                   LISA TURNER, ESQ.

OFFICIAL COURT REPORTER:      ANNELIESE J. THOMSON, RDR, CRR
                                 U.S. District Court, Fifth Floor
                                 401 Courthouse Square
                                 Alexandria, VA 22314
                                 (703)299-8595

(Pages 1 - 5)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

```
 1                     P R O C E E D I N G S

 2                    (Defendant present.)

 3          THE CLERK:  Criminal Case 1:04-385, United States of

 4   America v. Ali Al-Timimi.  Will counsel please identify themselves

 5   for the record.

 6          MR. KROMBERG:  Good morning, Your Honor.  Gordon

 7   Kromberg for the United States.  With me at counsel table is

 8   Mr. Pat Rowan, who's a deputy assistant attorney general from the

 9   National Security Division.  The last time we talked about -- the

10   last time an issue like this came up, the Court expressed an

11   interest in having someone who actually could see some of the ex

12   parte pleadings in this case.  Mr. Rowan is that person.

13          Also is Case Agent Special Agent Melissa Godbold from

14   the FBI, and with us also is Lisa Turner, who is a deputy

15   associate general counsel for litigation from the National

16   Security Agency.

17          THE COURT:  Good morning.

18          MR. TURLEY:  Good morning, Your Honor.  Jonathan Turley

19   here representing Dr. Ali Al-Timimi.  With me today is my

20   co-counsel and local counsel, Will Olson.

21          I apologize, I have a slight cold, and so I'll work as

22   hard as I can to be understood.

23          THE COURT:  All right, Mr. Turley.  Well, I don't think

24   you're going to need to do a whole lot of talking today, because I

25   think what's going to happen today is not going to be a resolution
```

3

1    of the issue.  Rather, it's going to be a direction from the Court

2    that I am no longer willing to work under the circumstances where

3    both the prosecuting team and defense counsel are not getting any

4    kind of access to these materials.

5           I am sorry to have to say this, but I have lost a great

6    deal of confidence in the representations made to me by folks in

7    the intelligence world, and I'm responding, frankly, to something

8    that happened not in this case but in the *Moussaoui* case.

9           As you know because the letter in a redacted form has

10   been made public, on October 25, 2007, I received a letter from

11   one of the prosecuting attorneys in that case reflecting that

12   although I had been sure that it was not reasonable that key

13   witnesses in their interrogations had not been tape-recorded

14   and/or videotaped, I was assured on numerous occasions that that

15   had not happened and we went ahead with that case with that

16   understanding, and, of course, as that letter reveals, that was

17   not, in fact -- the representations that were made to me were not,

18   in fact, accurate.

19          Now, this was not the line prosecutors; this was people

20   back across the river; but because of the concept that lawyers who

21   appear on a regular basis before a court are subject to the

22   court's discipline, they know that their reputation rises or falls

23   upon the accuracy of their representations, a court has no way of

24   controlling or adequately policing what is said to it if it's made

25   by attorneys whom we have no connection with, and given the mess

4

1    that occurred in the *Moussaoui* case, it's not going to result, I

2    don't think, in any change in the posture of that case, but this

3    case is in a different situation.

4            This defendant did not plead guilty.  He has insisted

5    that he is innocent of the crimes.  The case is on appeal.

6            I read again with care the petition you filed with the

7    Fourth Circuit, the basis upon which the Fourth Circuit sent this

8    case back to this Court, and I don't think I would be doing my job

9    as an Article III judge appropriately if I did not assure both

10   myself and you-all that an absolutely thorough and accurate review

11   had been conducted.

12           And again, I think you make a good argument that defense

13   counsel have a right under our legal system to be involved to a

14   reasonable degree in making judgment calls as to whether material

15   is, in fact, exculpatory or not exculpatory.  It is absolutely, in

16   my view, ludicrous that somebody of Mr. Kromberg's background does

17   not have the ability, a limited ability to see what's involved in

18   this case.  I'm also unable at the present time to use any of my

19   law clerks to address this material.

20           So I am not going to resolve the pending motions, but

21   instead, I'm directing the government if they want this Court to

22   be able to make this evaluation, then I need to have the trial

23   team, at least Mr. Kromberg, read in.  I need to have defense

24   counsel, who have already gone through the hassle of getting

25   clearances -- if you're not cleared highly enough, then so be it,

5

1   get the clearance, and if you're not qualified for it, then we

2   need to get Mr. Timimi counsel who can be cleared; and I insist on

3   my at least the one law clerk who's working on this case being

4   cleared so that among other things, I'm not having to type any

5   orders that I might have to produce in this case.

6           Once that's been done, then we can address the issue as

7   to the extent to which you can have access to certain materials,

8   but I'm not resolving this case in this posture, and frankly, if I

9   can't get some flexibility on the government's part, then I'm

10  going to be inclined to grant a motion for a new trial, and that's

11  what I'm doing today.

12          Thank you.

13          MR. TURLEY:  Thank you, Your Honor.

14          THE COURT:  We'll recess court until 10:00.

15                      (Which were all the proceedings

16                       had at this time.)

17

18              CERTIFICATE OF THE REPORTER

19      I certify that the foregoing is a correct transcript of the

20  record of proceedings in the above-entitled matter.

21

22

23          _____

                          Anneliese J. Thomson

24

25



smb
JUN 6 2008
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | . | Criminal No. 1:04cr385 |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | May 16, 2008 |
| ALI AL-TIMIMI, | . | 9:45 a.m. |
| | . | |
| Defendant. | . | |
| | . | |

. . . . . . . . . .

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:                     GORDON D. KROMBERG, AUSA
                                        United States Attorney's Office
                                        2100 Jamieson Avenue
                                        Alexandria, VA 22314
                                          and
                                        JOHN T. GIBBS, ESQ.
                                        Counterterrorism Section
                                        Criminal Division
                                        United States Department of Justice
                                        601 D Street, N.W.
                                        Washington, D.C. 200

FOR THE DEFENDANT:                      JONATHAN TURLEY, ESQ.
                                        The George Washington University
                                        Law School
                                        2000 H Street, N.W.
                                        Washington, D.C. 20052
                                          and
                                        WILLIAM E. OLSON, ESQ.
                                        Bryan Cave LLP
                                        700 13th Street, N.W.
                                        Washington, D.C. 20005-3960

ALSO PRESENT:                           LISA TURNER, ESQ.

(Pages 1 - 8)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

263

2

```
 1   OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Fifth Floor
 2                                   401 Courthouse Square
                                     Alexandria, VA 22314
 3                                   (703)299-8595

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S
 2                 (Defendant not present.)
 3          THE CLERK:  Criminal Case 04-385, United States of
 4   America v. Ali Al-Timimi.  Would counsel please note their
 5   appearances for the record.
 6          MR. KROMBERG:  Good morning, Your Honor.  Gordon
 7   Kromberg and John Gibbs for the United States.  With us in front
 8   of the bar is Lisa Turner from the National Security Agency
 9   General Counsel's Office.
10          THE COURT:  All right.
11          MR. TURLEY:  Good morning, Your Honor.  Jonathan Turley
12   for Dr. Ali Al-Timimi.  I'm joined by my colleague, Will Olson,
13   from the law firm of Bryan Cave.
14                 (Defendant present.)
15          THE COURT:  All right.  We are here again on the
16   defendant's motion for modification of the Court's March 14 order
17   and a hearing on access to ex parte filings.  Obviously, we have
18   an open courtroom today, and therefore, I need to be sensitive to
19   that fact in discussing this matter, and I'm going to cut to the
20   quick on this, all right, because I am concerned about the status
21   of this case, and in particular, I am concerned about the theme
22   that I've repeated several times previously, and that is, the
23   difficulty of respecting the principles of an adversary system
24   when defense counsel are being completely shut out of the loop so
25   to speak.  So far we've had a dialogue to some degree between the
```

4

1    Court and the prosecutors, and you-all have been on the outside.

2         What I am proposing to do, Mr. Kromberg, is I am

3    proposing to set a conference with you, Ms. Gunning, somebody from

4    the agency, and the Court, and we're going to sit down, and we're

5    going to take these ex parte filings that you've been filing, and

6    we are going to talk about the degree to which they can be

7    redacted so that defense counsel can get some sense as to what has

8    been spoken about or talked about in those documents.

9         It is simply inconceivable to me that there cannot be

10   reasonable redactions made to the extent that counsel can at least

11   have some sense as to what is going on so that depending upon how

12   I rule, at least they have some understanding of the basis upon

13   which the Court ruled and can articulate their position in a more

14   meaningful fashion.

15        I have to tell you that some of the matters that are

16   claimed to be classified simply cannot qualify for any

17   classification in a rational system, and I can't even articulate

18   in an open courtroom those matters, but we will do that.

19        Now, Mr. Turley does have a security clearance, and

20   we've talked about this before.  If we're going to go through the

21   expense and bother of getting a defense attorney cleared, then

22   obviously, to some degree, that attorney is going to have a right

23   to have some kind of access to these documents.

24        That's what I want to discuss with you, and so what I'm

25   going to do is yet again put this on a short hold to set up this

5

1   meeting, and I think that is the fastest way of doing it.

2          There is no question in my mind that, for example, the

3   most recent pleading that you filed, Mr. Kromberg, there are

4   significant portions of that that cannot possibly be classified,

5   because you are reciting case law, you are making legal arguments,

6   you're quoting from cases, and the concept of redaction even for

7   classified information is you only redact that which you have to

8   redact.

9          There are whole paragraphs, I am convinced, in your

10  pleading that if properly looked at, do not deserve to be

11  classified, and so even if ultimately what Mr. Turley sees is a

12  document where 50 percent of it is blacked out, at least it's more

13  than what he's got now, and it would give him as counsel some

14  sense as to what's going on.

15         I also want to remind the government that if we were in

16  a CIPA analysis, which we're not quite there yet, but frequently

17  the government's approach with CIPA is to take classified

18  materials and present to the Court alternative substitutions which

19  the government can live with which counsel can get.  Now, those

20  substitutions are themselves sometimes still classified.  It's a

21  level of classification where the compromise, which I think is an

22  intelligent compromise of balancing the competing interests, the

23  need for defense counsel to have sufficient information to

24  evaluate the case, to be able to advise the client, to understand

25  what their litigation strategy is going to be.

6

1          So that's how I intend to proceed, and we will

2   coordinate with you and the necessary people from the intelligence

3   community, and I intend to sit down with you-all, and we're going

4   to go through this.  That's the only way I can see getting this

5   case off dead center, all right?

6          MR. TURLEY:  Thank you, Your Honor.  And we appreciate

7   your intervention.  The only thing I would like to, to add to the

8   record is that not only do I have a clearance, but I've had a

9   TS/SCI since the Reagan administration, and in past cases with the

10  government, I've actually never had a redaction on a classified

11  document.

12         I've had to sign nondisclosure forms, but I've had cases

13  as classified or more classified than this, and I've never

14  actually had a single document redacted as long as I signed the

15  NDAs, so I just simply put that out for the Court's --

16         THE COURT:  All right.  Now, the other thing is you've

17  requested that your co-counsel also be read in.  I have to tell

18  you that again in the constant compromising, in the balancing that

19  we do in this area, I understand the intelligence community's

20  concern about need to know and the fewer number of people, the

21  better.

22         As you'll recall, at one point, Mr. Kromberg didn't have

23  access, and the government was telling me that my law clerks

24  couldn't have access.  Now, we compromised.  Number one, I forced

25  them to let Mr. Kromberg get access, which to me should not have

7

1  been an issue, and I agreed to only have one of my clerks,

2  although both of them are cleared, have access to this

3  information.  So since I'm living with just half my staff, you

4  will have to do that as well, all right?

5          But again, I'm trying to meet the government in where I

6  think is a reasonable playing field, but we're going to have to

7  have compromise on this or else, as I have said, the final result

8  could be having to try this case all over again, which you may

9  want to do, but I know Mr. Kromberg doesn't want to do, and, you

10  know, we're here to try cases.  I don't have a position one way or

11  the other on that, but I want to make sure that the process is

12  proper, and that's what we're going to do.

13          So we will get back to you as quickly as we can, but

14  we're going to definitely, I can assure you, work hard on getting

15  you as much information as we possibly can, all right?

16          MR. TURLEY:  Thank you, Your Honor.

17          THE COURT:  Very good.

18          All right.  Now, the last case, Mr. Gardiner, you're

19  here.

20          Mr. Timimi, you're remanded.

21                          (Which were all the proceedings

22                            had at this time.)

23

24

25

**J.A. 2801**

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA     .      Criminal No. 1:04cr385
                                .
     vs.                      .      Alexandria, Virginia
                                .      October 23, 2008
ALI AL-TIMIMI,                .      10:10 a.m.
                                .
            Defendant.      .
                                .
.   .   .   .   .   .   .   .   .   .   .

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:          GORDON D. KROMBERG, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314
                               and
                             JOHN T. GIBBS, ESQ.
                             Counterterrorism Section
                             Criminal Division
                             United States Department of Justice
                             601 D Street, N.W.
                             Washington, D.C. 200

FOR THE DEFENDANT:            JONATHAN TURLEY, ESQ.
                             The George Washington University
                             Law School
                             2000 H Street, N.W.
                             Washington, D.C. 20052
                               and
                             WILLIAM E. OLSON, ESQ.
                             Bryan Cave LLP
                             700 13th Street, N.W.
                             Washington, D.C. 20005-3960

COURT SECURITY OFFICER:      DANIEL HARTENSTINE

ALSO PRESENT:                LISA M. TURNER, ESQ.

(Pages 1 - 25)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

```
1   OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Fifth Floor
2                                    401 Courthouse Square
                                     Alexandria, VA 22314
3                                    (703)299-8595
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

                    P R O C E E D I N G S

1                   (Defendant present.)

2        THE CLERK:  Criminal Case 04-385, United States of

3   America v. Ali Al-Timimi.  Would counsel please note their

4   appearances for the record.

5        MR. KROMBERG:  Good morning, Your Honor.  Gordon

6   Kromberg and John Gibbs for the United States.  With us at counsel

7   table is Lisa Turner from the National Security Agency.

8        THE COURT:  Good morning.

9        MR. GIBBS:  Good morning.

10       MS. TURNER:  Good morning.

11       MR. TURLEY:  Good morning, Your Honor.  Jonathan Turley

12  for Dr. Al-Timimi, and with me is my co-counsel, Will Olson, from

13  Bryan Cave.

14       THE COURT:  All right, good morning.  This matter is

15  technically on a status hearing filed, I think, by the

16  government's request, but we do have several open motions that

17  have been filed over the last couple of months, the most recent

18  motion having been filed on October 15 by Mr. Timimi, and I want

19  to address that motion first.

20       Mr. Kromberg, I know you haven't had a chance to respond

21  to it, and we need to talk cryptically at this point.  I want to

22  try to do this hearing as much as possible with Mr. Timimi

23  present, because obviously, it's his case, and he has a right to

24  be present as much as possible, so we may have to talk

4

1  elliptically, all right?

2          But I assume you've had a chance to read the most recent

3  filing, the motion to compel discovery motion?

4          MR. KROMBERG:  I have, Judge.

5          THE COURT:  All right.  Now, there are five specific

6  pieces of information that the defense has requested you look

7  into, and in some respects, I wish some of the earlier discovery

8  had been that pinpointed, because part of the problem in this

9  case, I think, has been that the discovery has to some degree been

10  like looking for needles in a haystack, but now we have a more

11  specific set of parameters which struck the Court as being quite

12  specific and quite reasonable, and I realize you haven't had a

13  chance to fully brief a response, but just in general, do you see

14  any problem in responding to those five requests?

15          MR. KROMBERG:  Judge, I think we did.  I think we have

16  identified everything that there was and that we described it, and

17  that's what there is, that what the defense has is what there is.

18          THE COURT:  Well, for example, there's reference in that

19  motion to calls made on cell phones.  Now, when whatever check was

20  done was done, was it looking solely at landlines, or was it also

21  looking at cell phones?

22          MR. KROMBERG:  Judge, we looked at -- well, we had a

23  list of numbers that were, that were identified as relating to the

24  defendant, and we looked at those.

25          THE COURT:  And that would include cell phone, phone

**J.A. 2805**

5

1   cards, or whatever numbers were given to you?

2           MR. KROMBERG:  Hang on just a moment.

3           I'm advised by Special Agent Wyman, who compiled the

4   list of the numbers, yes, that the answer is yes.

5           THE COURT:  Let me take a look at those again.

6           All right.  So in paragraph 1 on page 10 of the defense

7   memo, there's a specific phone call that's designated as having

8   occurred on September 13, 2001, which would have been two days

9   after September 11, and the number identified there was

10  202-361-7081, and was that one of the numbers that was looked at?

11          MR. KROMBERG:  Judge, I don't know the number off the

12  top of my head, but if it was a number that we had any reason to

13  know that was connected with the defendant, that's what we looked

14  for.

15          THE COURT:  All right.  Well, then that could be very

16  quickly just confirmed.  There's been so much -- I don't mean you

17  have to do it right now.  I'm not putting you at a disadvantage,

18  but I'm just telling you that was a very concrete, specific

19  request.  Either you've got it, or you don't have it, all right?

20          MR. KROMBERG:  Well, Judge, for the reasons expressed in

21  the ex parte pleading, the answer should be clear on what the

22  answer -- the answer to that question.

23          THE COURT:  In this age, what seems clear sometimes is

24  not always clear.

25          MR. KROMBERG:  Well --

6

1          THE COURT:  I just -- a second confirmation should be

2     relatively easy to do.  These are very specific requests.

3          MR. KROMBERG:  And that's -- and you're right, Judge.

4          THE COURT:  Yes.

5          MR. KROMBERG:  But I think in speaking elliptically as I

6     can, if the courtroom were to be cleared of everyone except those

7     who were cleared for the pleading that we gave to Your Honor in

8     May -- on May 14, I think the answer is not only clear but

9     unequivocal.

10          THE COURT:  Well, I'm not so sure about that, but in any

11     case, we'll address that.

12          Then paragraph 2 of the motion discusses various phone

13     calls with Al-Hawali.  The third one actually does not -- may be

14     beyond the scope of what we've been looking at so far, because

15     that discusses the Royer LET call, all right, and that, I believe,

16     may be the first time -- I haven't gone back over the whole

17     history of all of these older discovery motions, but that would be

18     requesting confirmation of a phone call that was certainly

19     discussed at the trial.

20          MR. KROMBERG:  That's true, and the defense has gotten

21     everything that they are entitled to with -- including with

22     respect to that phone call.  We searched for it, and we gave our

23     response about that, that in an elliptical manner, they are not

24     entitled to anything more with respect to that, and that was a

25     topic that was searched for.

J.A. 2807

7

1          We said, Judge, that we were looking for all Jencks,

2     which this would have been Jencks -- well, no, it wouldn't have

3     been Jencks.  It would have been -- but it would have been --

4          THE COURT:  Well, depending upon the content, it could

5     have been *Brady*.

6          MR. KROMBERG:  Correct.

7          THE COURT:  Yeah.

8          MR. KROMBERG:  But we did search for it, and it was not

9     produced, and it was not produced because it --

10         THE COURT:  The problem Mr. Kromberg has is he can't say

11    whether it was found or not found.

12         MR. KROMBERG:  Thank you.

13         THE COURT:  That particular representation has been

14    deemed to be classified, and, Mr. Turley, as I've expressed to you

15    before, I understand and appreciate your frustration, but as you

16    know, the status of the law -- now, whether the law should be

17    changed is an issue that Congress may want to address.

18         Whether inspector general's offices should have expanded

19    powers in certain cases to review whether the way in which

20    agencies are classifying things is appropriate in the context of

21    criminal prosecutions are legitimate issues to be addressed at

22    some point and, unfortunately, in a different forum, because as a

23    judge, I do not have the authority and I cannot order these

24    agencies to reevaluate their classification -- well, I can order

25    them to reevaluate, but if they come back with the same position,

**J.A. 2808**

8

1    then this Court cannot go beyond that.

2          The problem we have here is that things are classified

3    in such a way that it's very difficult, obviously, to speak about

4    them and very difficult to in many respects understand them.  I

5    recognize in some of the motions that are still open where you

6    want things unsealed or at least further redacted so that

7    significant portions of pleadings can at least be shared with your

8    cocounsel and the defendant, you point out that there are many

9    paragraphs of documents which are pure legal argument or simply

10   repeat in paper what's been said in an open, unsealed courtroom

11   and yet now are classified or are in a situation where you can't

12   even discuss them with cocounsel, and we'll address some of that

13   in a minute, but right now, I'm going to need to have -- what I'm

14   going to want from you, Mr. Kromberg, is an executive summary --

15   because again, there's such a long history of this case, and as

16   you know, I have other things, as do you, on our docket -- and I

17   want to make sure I haven't missed anything, but since these are

18   five very specific categories of request, you can refer me back in

19   your next pleading to we answered that on page such-and-such in

20   this pleading.  That's fine.  I'll go back and look at it, or

21   there may be some revised answer, but I want to have in this

22   record a specific response to these particular areas, because

23   these areas do sound as though if there were something there, it

24   might very well be fruitful.

25          I will say at this point, so far what this Court has

9

1    seen -- and I recognize, Mr. Turley, you're at a disadvantage

2    because you haven't seen it all -- I don't think there has been

3    anything that the government has revealed to this Court that would

4    be of such a nature as to have made a material difference to the

5    outcome of your case.

6          Technically, some of it might be considered rule 16 that

7    should have been turned over.  Mr. Kromberg in previous pleadings

8    has argued that there was no 16, rule 16 violation, because the

9    line prosecutors and the U.S. Attorney's Office prosecuting the

10   case did not have any idea this information existed, and as you

11   know when we discussed this before, I had to push a little bit,

12   put some pressure on some folks to even get Mr. Kromberg cleared

13   to get into this program, and it took several months for that to

14   happen.

15         So in terms of there being anything amiss by the line

16   prosecutors or the U.S. Attorney's Office, clearly, there was no

17   rule 16 violation in that respect.  However, I believe I've

18   already said and I'll say it again for the record that the United

19   States government is still one government, and if one branch of

20   the government, especially when they are aware that there's an

21   ongoing civilian criminal prosecution going, and they would be in

22   possession of information that would be relevant to requests for

23   discovery, then the United States government has an absolute

24   obligation to turn that over to the prosecutors and at least bring

25   it to the Court's attention in a CIPA or other type of sealed

10

1  proceeding so that there can be a judicial evaluation as to

2  whether or not that information must, in fact, be turned over to a

3  defendant.

4           So clearly, whatever results from this case, the result

5  is not going to be that a criminal prosecution is saved if

6  material information that could have made a difference has been

7  withheld by the U.S. government even if the prosecutors were not

8  at fault.  In other words, I think that has got to be the proper

9  rule, or else we could go down a very, very slippery slope in

10 terms of our legal system.

11          However, the bottom line is still whether or not

12 whatever it was that might have existed that should perhaps have

13 been turned over, whether it could have reasonably made a

14 difference.  In the end, that's got to be the final thing the

15 Court looks at, and I will say at this point, I haven't seen it.

16          The reason why I am interested in these five more

17 specific things -- and again, they may have worked within some of

18 your previous requests, but I think this very specifically focuses

19 on particular areas of the case that could be relevant -- is that

20 it gives, in my view, Mr. Kromberg a much easier job in terms of

21 pinpointing his response.

22          It gives the Court one last chance to evaluate whether

23 any information that could reasonably have been expected to assist

24 in the defendant's case either because -- certainly if it were

25 exculpatory, this would be over by now, but if it were simply

11

1  cumulative, I understand your view that even that can be valuable

2  to counsel, even exculpatory evidence may be valuable in

3  evaluating a case, I understand that, but it allows this Court at

4  least to make that decision, and then if I'm wrong, we have

5  another year or two of appellate review that can look at it.

6          So I -- how long, Mr. Kromberg, do you think it will

7  take you to be able to respond to this?  There are five

8  paragraphs, and as I said, they're pretty specific.

9          MR. KROMBERG:  I don't recall them in specific --

10          THE COURT:  That's all right.

11          MR. KROMBERG:  -- but I'm pretty confident that it can

12  be done with everyone that's here today later this afternoon,

13  because I think the answers to what you're asking have already

14  been provided in a -- in other pleadings that have -- that we just

15  have to put together and put it in a format that --

16          THE COURT:  Well, I'm not going to force you to do it in

17  24 hours, but, I mean, realistically, you think within a week?

18          MR. KROMBERG:  Oh, absolutely, Judge.

19          THE COURT:  All right.  Then if I -- by next Friday --

20  I'm sorry, by next Thursday, we should have the response, and I

21  want you when you file that response to bend over backwards with

22  the agency to keep as much of that response in a format that

23  Mr. Turley can get.  He's got to be able to understand what you're

24  saying, all right, so we don't have to go back and forth on this

25  issue about redaction.

12

 1          MR. KROMBERG:  Well, Judge, I think that what has
 2    happened to date is that there have been materials that were
 3    provided to Mr. Turley that initially the government did not wish
 4    to provide to Mr. Turley and the Court directed that it be
 5    provided and it has been provided, and that's what it is, and
 6    that's -- there isn't any more.  That's just it.
 7          So that's where we are.
 8          THE COURT:  All right.  Mr. Turley?
 9          MR. TURLEY:  Thank you, Your Honor.  Just a couple of
10    points.  And I appreciate the Court's continued intervention in
11    this matter to try to bring some adversarial aspects to the
12    case -- or more adversarial aspects.
13          The only two things I wanted to raise is first of all,
14    we'll rely, obviously, on the classified motions, which even
15    speaking elliptically is going to be difficult to talk about, but
16    one of the things that I was hoping the Court could clarify is
17    that the government should not confine the scope of its search to
18    particular dates or agencies.
19          THE COURT:  Well, let me ask you this, because I don't
20    have in my case file your motion to the Fourth Circuit, or if I
21    do, I can't find it.  I've got the order from the Fourth Circuit,
22    and the order did not explicitly reference that particular
23    program, but it was my understanding that the background of all of
24    this came out of public, in the newspaper revelations that there
25    had been these NSA taps going on just after October -- just after

13

1    September 11, and it was in light of some of the public statements

2    that were made about that that you filed your motion with the

3    Fourth Circuit.

4            Am I correct about that?

5            MR. TURLEY:  That was, in fact, the catalyst, but we did

6    not limit our request to the Fourth Circuit or to this Court by

7    particular agency that -- what we argued was that it was clear

8    that surveillance programs existed that had not been previously

9    disclosed, and more importantly, it is clear that the way that

10   intelligence is shared from agency to agency, that a particular

11   agency may not be housing that information.  It may not even have

12   been the original gatherer of the information, that you have these

13   data banks, you have these collection points.  So the information

14   that we're seeking could very well be at another agency.

15           And one of the things that I was hoping to put forward

16   to the Court is that whatever is in the classified filings, I

17   believe what is there is sufficient to, to require the government

18   to do a full criminal discovery disclosure; that is, they

19   should -- that there's obviously grounds for concern, and what we

20   would hope is that the government is not applying any limitations

21   at this point but instead looking at whether material evidence

22   that should have been disclosed was not, and that's something

23   that, that will help bring clarity and closure to the record.

24           The other thing that I wanted to note is that we have

25   not been given information, substantive information where I can

14

1   look at whatever evidence there may be in these disclosures.  One

2   of the motions addresses that, of the need for us to be able to

3   review material, and as the federal law establishes, a cleared

4   counsel is entitled to review that material, and the Supreme Court

5   in *Kyles* and other cases said it should not be narrowly defined,

6   and so what we're in a rather curious position now is that we have

7   the prosecution continuing to perform the role of counsel and

8   saying, We don't believe that this is material.

9           THE COURT:  But then they submit it to the Court, and so

10  we then look at it, all right?  That's really what CIPA is all

11  about.  We look at it and say, Well, here it is.  Here's a

12  redacted substitution that the government is proposing to give, or

13  in some cases, you're asking the Court to say nothing goes to

14  counsel, and it's my job to look at it and say is this arguably

15  something that would help counsel in representing this defendant.

16          Given the fact the sensitive posture of all this stuff,

17  it's again the traditional balancing act, and as I said, at this

18  point up to now, I haven't seen anything that would indicate that

19  it is of such sufficient merit that it would in any respect, in

20  any possible rational calculus have assisted counsel, and that's

21  why the Court has not had to go into this issue of pushing further

22  for a further refinement or balancing.  It's -- unlike the witness

23  statements in the *Moussaoui* case that were dead-on relevant to the

24  case, that's not what we have here.

25          Now, the very specific things as you describe them in

15

 1  this more recent memo, if such conversations have been captured,

 2  that's a different story.

 3      MR. TURLEY:  The one thing that I wanted to make -- to

 4  put in the record again is that the prosecution has said

 5  repeatedly, acknowledged repeatedly that any intercepts of

 6  Dr. Al-Timimi would fall under rule 16 and possibly other rules of

 7  disclosure, and I think that it's imperative at this point,

 8  particularly due to what has been, what is contained in classified

 9  filings, that, that the government should understand that it

10  should in any final representation to this Court establish that no

11  part of the government is holding material evidence that could

12  have been disclosed and that most certainly any undisclosed

13  interceptions of Dr. Al-Timimi, as Mr. Kromberg has said

14  repeatedly, that those would be rule 16 evidence, have been

15  disclosed.

16      THE COURT:  Well, it gets even more complicated than

17  that, because in the *Moussaoui* case, a revelation that has come

18  out more recently again in the papers is that private contractors

19  under contract to the U.S. government may, in fact, have been

20  involved, not in this case, but in capturing evidence and perhaps

21  still having it.  So, you know, this slippery slope gets steeper

22  and more slippery as we move along in these cases.

23      I want to take this, as I have, incredibly cautiously,

24  one step at a time, all right?  I'm not convinced that the Fourth

25  Circuit ever intended for this remand to result in an nth degree

16

 1   evaluation of every bit of intelligence gathering that U.S.

 2   government and/or its contractors have been involved in in this

 3   case.  I don't think that was on anybody's radar screen when a

 4   remand occurred.

 5           I will at the end of this entire process require that

 6   the line prosecutors basically certify what they have given to

 7   this Court.  I'm sort of putting the pressure on Mr. Kromberg and

 8   his office to really put their money, you know, where their mouth

 9   is.

10           In other words, they have got to be as officers of the

11   court absolutely satisfied that the evaluation has been as

12   thorough as is reasonably possible and that what they have given

13   the Court is, in fact, accurate, because again, neither you nor I

14   can get behind what's going on in the various agencies in the

15   executive branch.  That really is where the prosecutors must do

16   their job, and I think Mr. Kromberg, from everything I've seen so

17   far, and the agents working with him have been diligently trying

18   to do that.

19           So what I want to do right now is in terms of other

20   agencies, you've got the main players:  NSA and the FBI and I'm

21   assuming the CIA was involved in some of these searches as well or

22   that, I mean, when you went to the Archives -- Mr. Kromberg went

23   to the Archives or his people went to the Archives, they would

24   have been looking for any of the agencies that were putting that

25   information in, and --

17

1          MR. TURLEY:  There's also DOD, Your Honor.

2          THE COURT:  Well, was DOD explicitly referenced in your

3   motion to the Court of Appeals?

4          MR. TURLEY:  No.  The Court of Appeals, the reference

5   was that there was evidence of undisclosed surveillance programs,

6   and so --

7          THE COURT:  Right.  But the program was the TSA program.

8          MR. TURLEY:  Yes, but we felt that that was sufficient

9   to bring it back, not the sole reason to bring it back, and more

10  importantly, everything we know publicly is it's an artificial

11  distinction to focus on one agency, because we know from what is

12  already available in Congress that much of this information is fed

13  into central points, and at least -- I would hope at least in the

14  interim for the five or so conversations the Court has expressed

15  an interest in, at least for those, that the prosecution will make

16  a broader discovery request, because that is not an exhaustive

17  amount, and it seems --

18         THE COURT:  But -- well, Mr. Kromberg, I think what you

19  will need to do just so we have a full record on this is I'm going

20  to assume, although I have no reason to believe this is the case,

21  but just from what I've read in the newspapers, I would assume

22  because everything that you read in the papers about the NSA is

23  that it is the technical guru agency that has all of this

24  technical ability, that we would not have two or three parallel

25  agencies with that degree of technology doing the exact same

**J.A. 2818**

18

1    thing.

2         If the, if the NSA captures various signals and sends

3    them to other agencies for further evaluation, I would be

4    surprised if there were not still some indices or some way in

5    which the NSA signals could be evaluated as to whether a

6    particular name or number came up.  I would assume that would be

7    the case.  And therefore, if the NSA were checked, that would

8    capture it completely, all right?

9         So I guess the only thing I would need from you,

10   Mr. Kromberg, is some representation as to whether there is any

11   other executive branch agency that is -- or subcontractor thereto

12   that is basically duplicating the NSA's efforts.

13        MR. KROMBERG:  I understand why the Court asks that, but

14   I don't understand how if such a secret program existed and such a

15   secret agency did this, how I would go about ascertaining that.

16        THE COURT:  Well --

17        MR. KROMBERG:  I can ask my NSA colleague and I can ask

18   my FBI colleague --

19        THE COURT:  That's maybe the best you can do, okay?  But

20   the point is this:  The other way in answering that is -- and you

21   may or may not have already done that -- is to reiterate your

22   understanding of the scope of what the NSA does or does not

23   capture.

24        MR. KROMBERG:  Right.  And that what --

25        THE COURT:  Yeah.

19

1          MR. KROMBERG:  -- it will be able to say it did or did

2     not capture --

3          THE COURT:  Correct.

4          MR. KROMBERG:  -- regardless of whether it was

5     disseminated to somewhere else.

6          THE COURT:  Correct.  Because again, if the NSA is the,

7     is the gateway, if it, if it is the capturing agency that captures

8     it all, then to the extent that Mr. Kromberg has reviewed whatever

9     they have or have not done, it would already be there.

10         MR. TURLEY:  Your Honor, I would just, just for the

11    record, I believe that there is public support to show that the

12    DOD has separate programs because of this war on terror, that they

13    had an enhanced role, and that indeed some intercepted material

14    would not originate in NSA, it could very well be shared with NSA,

15    and all I would suggest at least for the Court's consideration is

16    that for these limited five calls, the prosecution just do a

17    standard discovery request to confirm from the main players that

18    the Court has already discussed that none of that information is

19    contained in any of those agencies.

20         That's a fairly limited request.  It is not going to the

21    nth degree at all, and I would hope that at least to that extent,

22    we would have an answer from the prosecution.

23         THE COURT:  All right.  Well, Mr. Kromberg, if you can,

24    give me something about whether or not DOD --

25         MR. KROMBERG:  I'll try.

**J.A. 2820**

20

1          THE COURT:  That's the specific agency that's been
2     identified, though.  There isn't, you know, some widget agency we
3     don't know about.  So it's DOD we're talking about, all right?

4          All right.  And in terms of the time frame, again, that
5     was another issue you were, you were disputing.  Mr. Kromberg's
6     position has been that Mr. MacMahon, who would have been the trial
7     attorney involved in all of this at that point, got all of the
8     FISA interception information.

9          Correct, Mr. Kromberg?

10         MR. KROMBERG:  That's correct, Judge.

11         THE COURT:  And therefore, that the time period for
12    which the FISA was operating, it would be at most redundant with
13    whatever else was going on, that you got everything.

14         MR. TURLEY:  We believe that that is an artificially
15    narrow construct.  For one thing, we know from Mr. MacMahon's
16    letter himself that he found evidence that was not disclosed to
17    him in the National Archives that we haven't been able to locate,
18    but it may not be FISA evidence.

19         We have a lot of programs, we're finding programs beyond
20    the one that was specifically mentioned that have, that have been
21    disclosed recently, discussed by Congress, discussed by the
22    administration, and we don't believe that you can honestly and
23    safely just say if we had -- if we told you before that we
24    disclosed everything, that must be true.

25         I would submit to the Court that the classified filings

1  indicate that that assumption is not valid.

2          THE COURT:  Well, the FISA warrants themselves were,

3  were authorized interception of which phones?

4          MR. KROMBERG:  If I could have a moment, Judge?

5          THE COURT:  Yeah.

6          MR. TURLEY:  Your Honor, while Mr. Kromberg is

7  conferring --

8          THE COURT:  I think he's ready.

9          MR. KROMBERG:  Your Honor, in consultation with Special

10 Agent Wyman, he reminds me that the, the identity of the

11 telephones that were subject to the FISA is something that is

12 classified, which we could talk about in, if with only people who

13 are cleared.  That being said, I don't think we remember at this

14 point the particular numbers that were involved.

15         THE COURT:  All right.  Well -- all right.  Now, again,

16 based solely on what I've read in *The Washington Post* or actually

17 seen in movies, which may be inaccurate completely about the NSA's

18 prowess, FISA would be attached to particular phone numbers, as I

19 understand how FISA warrants work.  They're like a Title III

20 warrant that I would issue; is that correct?

21         MR. KROMBERG:  That's correct.  That's my understanding,

22 Judge.

23         THE COURT:  All right.  So let's say there are six phone

24 numbers, maybe a couple of cell numbers and a couple of landline

25 numbers for which a FISA warrant has been issued, and clearly, any

22

```
 1   discussions over those lines would have been picked up during the
 2   FISA interception.
 3           MR. KROMBERG:  And that's true regardless of whether the
 4   NSA also picked it up.
 5           THE COURT:  I understand that.  However, if the target
 6   were speaking on a different phone, let's say that Mr. Timimi went
 7   to a phone booth at 7-Eleven and was talking to Royer, okay, it is
 8   possible that that conversation could have been intercepted by the
 9   NSA.
10           Again, the papers describe -- and I don't believe any
11   government agency is that good -- but, you know, that all these
12   signals are floating around the ether and the NSA is able to pick
13   everything out and then depending upon algorithms and whatever, if
14   they're looking for a, you know, a needle in a haystack, sometimes
15   the computers can pull that out.  I think that's what we're
16   talking about.
17           MR. KROMBERG:  And Your Honor is correct that it is
18   possible that a call that was -- that involved Timimi that --
19   existed that was captured by NSA but was not on the FISA.  That
20   being said, I think the answers are still the answers on the basis
21   of the -- of what was looked at at NSA and other places.
22           MR. TURLEY:  Your Honor, my only comment to this would
23   be that first of all, we have a concern that there could have been
24   earlier FISAs or collateral FISAs that intercepted communications.
25   We -- this was focused on during the trial on a period of the FISA
```

23

1    intercepts, but we believe that there is evidence that there was

2    interest in Dr. Al-Timimi before 9/11.  That goes to some of the

3    National Archives stuff.  It goes to some of the 9/11 stuff.

4            And the main point here is that what we know already

5    from the classified filings is -- should give us a reason to

6    believe that full disclosure was not made, and what I'm suggesting

7    to the Court is that before we resolve this, I don't see the great

8    burden to the government, certainly not with the five that the

9    Court has identified, but I don't see the great burden to the

10   government to say, all right, let's start with these five.  Let's,

11   you know, let's do a basic criminal discovery search.

12           Simply contact the main agencies:  FBI, DOD, NSA, CIA,

13   like you would do in any case, ask specifically about these

14   communications, whether they have them, not particular dates, not

15   telling them just ignore anything between these months.

16           These aren't a lot of discovery requests, and I can't

17   imagine that's a heavy burden, but at the end of the process at

18   least for those five communications, we'll have finally a full and

19   clear record that we don't have to debate about.

20           THE COURT:  All right.  All right.  So then what we're

21   going to do is I'm going to refine this:  As to the five

22   categories that are listed in the most recent pleading of the

23   defendant, what the Court is going to require the government to

24   do -- and I think that will probably be the last thing before we

25   wrap this up in terms of discovery unless something comes out --

24

1  is that a thorough search of not just the NSA but it must include

2  the DOD and just to confirm that the CIA has been checked as well

3  and the FBI, those will be the four agencies, that will satisfy

4  Mr. Turley, as to what, if anything, they have that responds to

5  what I think are five fairly specific categories.  So it's not

6  like a full range, looking for a needle in a haystack.

7          And, Mr. Kromberg, if you need more time than next

8  Friday, because you'll be asking other agencies --

9          MR. KROMBERG:  Well, Judge, now that seems a different

10  animal than before.  Typically, when it comes to asking the CIA

11  and DOD for things, we take a long time.

12          THE COURT:  I understand.  Well, then, then you'll

13  need --

14          MR. KROMBERG:  We send them a letter and we ask --

15  that's often 30 to 60 days is what we --

16          THE COURT:  I don't think there's any rush here.  I'd

17  rather have a thorough record so we don't have to come back and do

18  this again, all right?

19          MR. KROMBERG:  That will be fine.

20          THE COURT:  So why don't we do this:  Rather than giving

21  you a deadline, why don't you check with the folks you need to

22  check with, get a time estimate from them.  We are going into the

23  holidays.  There's a little bit of a distraction in early

24  November, I mean, I recognize that, and just give us a ballpark,

25  all right, as to when you think you'd have a response.

25

```
 1              MR. KROMBERG:  Yes.  Yes, ma'am.

 2              THE COURT:  All right?  Very good.

 3              Now, is there any reason why this transcript needs to

 4    remain classified?  No?

 5              MR. KROMBERG:  No, Judge.

 6              THE COURT:  So it can be unsealed as well then, right?

 7    This is an open transcript --

 8              MR. KROMBERG:  Correct.

 9              THE COURT:  -- for whatever that's worth.

10              All right?  Anything further?  If not --

11              MR. TURLEY:  No, Your Honor.  Thank you, Your Honor.

12              THE COURT:  All right, we'll recess court for the day.

13              MR. TURLEY:  Thank you, Your Honor.

14                          (Which were all the proceedings

15                           had at this time.)

16

17                    CERTIFICATE OF THE REPORTER

18       I certify that the foregoing is a correct transcript of the

19    record of proceedings in the above-entitled matter.

20

21

22              _____

23                          Anneliese J. Thomson

24

25
```

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA      .      Criminal No. 1:04cr385
                              .
                              .
     vs.                      .      Alexandria, Virginia
                              .      February 19, 2009
ALI AL-TIMIMI,                .      11:05 a.m.
                              .
          Defendant.          .
                              .
.  .  .  .  .  .  .  .  .  .  .
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:          GORDON D. KROMBERG, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314
                               and
                             JOHN T. GIBBS, ESQ.
                             Counterterrorism Section
                             United States Department of
                             Justice
                             601 D Street, N.W.
                             Washington, D.C. 20004


FOR THE DEFENDANT:           JONATHAN TURLEY, ESQ.
                             The George Washington
                             University Law School
                             2000 H Street, N.W.
                             Washington, D.C. 20052
                               and
                             WILLIAM E. OLSON, ESQ.
                             Bryan Cave LLP
                             700 13th Street, N.W.
                             Washington, D.C. 20005-3960


(Pages 1 - 7)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

1    APPEARANCES:  (Cont'd.)

2    ALSO PRESENT:                LISA TURNER, ESQ.
                                  SA JOHN WYMAN
3

4    COURT SECURITY OFFICERS:     CHRISTINE GUNNING
                                  DAN HARTENSTINE
5

6    OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                                  U.S. District Court, Fifth Floor
7                                 401 Courthouse Square
                                  Alexandria, VA 22314
8                                 (703)299-8595

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

                     P R O C E E D I N G S

1
2                     (Defendant present.)

3          THE CLERK:  Criminal Case 04-385, United States of

4   America v. Ali Al-Timimi.  Would counsel please note their

5   appearances for the record.

6          MR. KROMBERG:  Good morning, Your Honor.  Gordon

7   Kromberg and John Gibbs for the United States.  With me at

8   counsel -- with us at counsel table is Lisa Turner from NSA,

9   and also on this side of the bar is Special Agent John Wyman

10  from the FBI.

11         THE COURT:  All right, good morning.

12         MR. TURLEY:  Good morning, Your Honor.  Jonathan

13  Turley for Dr. Ali Al-Timimi.  With me is Mr. Will Olson from

14  the law firm of Bryan Cave.

15         THE COURT:  All right.  We're going to begin this

16  matter as an open hearing, and then we will have to go to our

17  sealed session in a few minutes.

18         One preliminary matter:  Mr. Turley, the Clerk's

19  Office has sent up to me a federal bond provided by Seneca

20  Insurance Company.  This was in the original case.  It was in

21  the amount of $75,000.  I don't believe there's any further

22  need for the bond, and before we ever destroy bonds, we always

23  check with counsel of record.

24         I'm going to have my law clerk show this to you.  If

25  there's no objection from the defense, we will go ahead and

4

1   just destroy this, or we can return it, but we need to know

2   what you want to do with it.  As I recall, Dr. Timimi was on

3   bond during the pendency of the trial.

4           MR. KROMBERG:  That's correct.  And he was ordered to

5   surrender after sentencing, Judge.

6           THE COURT:  Right.  And so in my view, the bond has

7   been fully satisfied.

8           Do you agree with that, Mr. Turley?

9           MR. TURLEY:  That's my understanding, Your Honor.

10          THE COURT:  All right.  Then if you'll just return it

11  to us, then the Clerk's Office as part of their -- Mr. Wood, if

12  you'd get that? -- as part of their practice will just go ahead

13  and destroy the bond.  All right, we've taken care of that.

14          Now, the other housekeeping matter that I want to put

15  on the record, and this can be done publicly, as I've said to

16  the government several times before, I am not going to function

17  with my hands tied behind my back as a federal judge.  This

18  case was brought by the Executive Branch in the Judicial

19  Branch, and therefore, to a significant degree, the game has to

20  be played by the rules of the Judicial Branch.

21          I have still not gotten my law clerk who is assigned

22  to this case cleared to have access to all of the documents to

23  which the Court has had access.  I will not and do not function

24  that way.  That means I cannot have the assistance of my clerk

25  in drafting any opinions, in having my own in-house person to

5

1   discuss any legal or other issues.  I have been asking the

2   government for several probably months at this point.  She has

3   a full clearance but is not cleared for the particular issues

4   involved in this case.  Until that is done, this Court is not

5   going to rule definitively on any of those issues that require

6   that information be addressed.

7            So I'm letting the government know if they want to

8   get this matter resolved expeditiously, they need to do

9   whatever is necessary to get her cleared, and that's all I'm

10  going to say about that.

11           Mr. Kromberg, you have no control over that, but you

12  can go up the chain of command on your side of the, of the

13  podium to get things moving.

14           MR. KROMBERG:  That's true, but I would like to put

15  on the record, Judge, that when the Executive Branch brought

16  the case, the facts were the facts, and the -- and then when

17  the defense makes an accusation that something happens that has

18  no basis in fact, that cannot cause -- that cannot come back on

19  the government that the Executive Branch's decision was somehow

20  short-sighted.

21           The decision that was made was based on a set of

22  facts that Mr. Turley doesn't know them, so it's not to his

23  discredit that he's making these accusations that things might

24  have happened, but the existence of the facts, the way they

25  were was that the Executive Branch made the decision and it

6

1    was -- there was nothing wrong with it, and I think that the

2    Court knows that now.

3              THE COURT:  Well, the merits of the decision have not

4    been addressed by this Court yet.  What I'm saying is I will

5    not work and I will not address the final merits of this

6    issue -- these issues until I have a clerk who is cleared.

7    There's no reason that she's not cleared, none.  We had to

8    fight to get you cleared, if you remember.

9              So this is ridiculous, and I think with the new

10   administration, I would expect this will not be so difficult.

11   I could be wrong on that, but in any case, that's the status of

12   things, and you need to take that message up to whoever you

13   need to take it to.

14             MR. KROMBERG:  Yes, Your Honor.

15             MR. TURLEY:  Your Honor, without addressing any

16   specifics, I just wanted to object to one aspect of what

17   Mr. Kromberg said, and that is, we cannot get into this because

18   we'll be going into the sealed discussion, but it is not true

19   that allegations that we have made, without getting into what

20   those allegations are, have been found to be invalid and

21   without substance, and I think that the representation the

22   government just made in open court is not supported by the

23   record in this case.

24             THE COURT:  All right.  Well, again, we're going

25   to -- substantive issues are not really before us today.

7

1          At this point, unless there are any other

2   nonclassified matters that need to be discussed, I think the

3   safest approach is we're going to have to close the courtroom,

4   and Mr. Timimi and cocounsel will not be present because

5   they're not cleared, and as soon as we have taken care of the

6   courtroom, we'll go back into session.  All right, we'll recess

7   court briefly.

8                         (Which were all the proceedings

9                          had at this time.)

10

11                  CERTIFICATE OF THE REPORTER

12      I certify that the foregoing is a correct transcript of

13   the record of proceedings in the above-entitled matter.

14

15

16                              _____
                                        /s/
17                                Anneliese J. Thomson

18

19

20

21

22

23

24

25

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA     .        Criminal No. 1:04cr385
                             .
     vs.                     .        Alexandria, Virginia
                             .        October 4, 2013
ALI AL-TIMIMI,               .        11:00 a.m.
                             .
             Defendant.      .
                             .
.  .  .  .  .  .  .  .  .  .  .
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

```
FOR THE GOVERNMENT:          GORDON D. KROMBERG, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314
                               and
                             JOHN T. GIBBS, ESQ.
                             Counterterrorism Section
                             Criminal Division
                             United States Department of
                             Justice
                             601 D Street, N.W.
                             Washington, D.C. 20004

FOR THE DEFENDANT:           JONATHAN TURLEY, ESQ.
                             The George Washington University
                             Law School
                             2000 H Street, N.W.
                             Washington, D.C. 20052
                               and
                             V. MANU KRISHNAN, ESQ.
                             Bryan Cave LLP
                             1155 F Street, N.W.
                             Washington, D.C. 20004

ALSO PRESENT:                SA SARAH LINDEN
```

(Pages 1 - 30)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

J.A. 2834

2

```
1   OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                    U.S. District Court, Fifth Floor
2                                   401 Courthouse Square
                                    Alexandria, VA 22314
3                                   (703)299-8595

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1              P R O C E E D I N G S

 2                   (Defendant present.)

 3         THE CLERK:  Criminal Case 04-385, United States of

 4    America v. Ali Al-Timimi.  Would counsel please note their

 5    appearances for the record.

 6         MR. KROMBERG:  Good morning, Your Honor.  Gordon

 7    Kromberg for the United States.  With me at counsel table is

 8    John Gibbs, my cocounsel on the trial, and standing in as the

 9    case agent, FBI Special Agent Sarah Linden, whose testimony you

10    heard in this case in 2007 involving the National -- search at

11    the National Archives.

12         THE COURT:  Good morning.

13         MR. TURLEY:  Good morning, Your Honor.  Jonathan

14    Turley representing the defendant, who is with me at table,

15    Dr. Ali Al-Timimi.  With me is our new local counsel, Manu

16    Krishnan, who is also at the law firm of Bryan Cave.

17         THE COURT:  All right.  Well, we have on the docket

18    today several motions.  One of the problems we have in this

19    case right now is that there's been some real difficulty in how

20    things have been filed, and I just want you to know that I'm

21    going to be meeting with our court information security

22    officers, and we are going to probably re-docket a fair number

23    of items.

24         Things that were filed initially under seal because

25    they had not yet been cleared, many of them are now completely
```

4

1    public.  Others, I believe, are public with some redactions,

2    and we need to get the docket in shape.  So you may find

3    pleading numbers changing, and so I alert you to watch the

4    docket as it, as it shifts.

5         All right, I've had a chance to go through these

6    motions, and the one motion, Mr. Kromberg, that I don't think

7    I've got an adequate response to, all the other ones I think

8    the government fully answered to my satisfaction, is the motion

9    No., docket No. 300 to compel discovery related to Anwar

10   al-Aulaqi.

11        As I understand it, what the defense is trying to get

12   is information about the meeting that Mr. Aulaqi had with

13   Dr. Timimi at which Mr. Gharbieh was also present.  Is that

14   correct?

15             MR. TURLEY:  Yes, Your Honor.

16             THE COURT:  All right.  Now, didn't Gharbieh testify

17   at your trial -- at the trial?

18             MR. KROMBERG:  He was the first witness, Judge.

19             THE COURT:  He testified in both trials.  I know

20   he -- I remember he testified clearly in the *Royer* case.

21             MR. KROMBERG:  That's when the lights went out in the

22   middle of his testimony.  But no, he was -- I believe he was

23   the first witness --

24             THE COURT:  The first witness.

25             MR. KROMBERG:  -- the first cooperator witness in the

5

1    *Timimi* case.

2         He might have been the first witness altogether.

3         THE COURT:  All right.  So, Mr. Turley, why was

4    Mr. Gharbieh not asked the kinds of questions you're trying to

5    get out by asking the government for further evidence about

6    Mr. Aulaqi?

7         MR. TURLEY:  Your Honor, we have submitted a

8    declaration from the former lead trial counsel, Mr. MacMahon,

9    who states that he was never given any information that has

10   come out since quite recently about the involvement of the

11   Department of Justice not only in bringing Aulaqi into the

12   country but specifically the involvement of Mr. Ammerman.

13        THE COURT:  But that's beside the point.  My point is

14   your concern, as I understand it, is that that meeting could be

15   critical to your defense because you believe that there may

16   have been a discussion in which your client objected to

17   Aulaqi's request that he help recruit people to take up arms

18   against the United States in essence.  Isn't that really what

19   you're saying?

20        MR. TURLEY:  Yes, Your Honor.  What occurred is that

21   Mr. Aulaqi suddenly came to Dr. Al-Timimi's house and

22   encouraged him to recruit and to -- he actually raised issues

23   of possible terrorist acts, and Dr. Al-Timimi said consistently

24   throughout, "I told him that I would not do that."

25        THE COURT:  Well, was Gharbieh present at that

**J.A. 2838**

6

1    meeting?

2           MR. TURLEY:  Our understanding is that this

3    conversation might have occurred in Arabic, and Mr. Gharbieh

4    does not speak that language.  The -- he left -- and this is

5    what Mr. Al-Timimi made clear, is that he left at the critical

6    moment when that conversation began.  So he was not a witness

7    necessarily to what was said, and even if he was there, he

8    might not have understood it.

9           But what Mr. MacMahon has said is that, you know,

10   much of what he did at trial was based on assurances that he

11   received from the prosecutors, and they said they didn't have

12   information on that meeting, that it was a dry hole.

13          THE COURT:  But unless -- I'm sorry, but unless that

14   meeting had been surreptitiously tape-recorded, that is, either

15   Gharbieh or Aulaqi was wearing a wire, how else would you have

16   access to what that meeting was about?

17          MR. TURLEY:  Your Honor, we believe that that

18   information should have been turned over for a number of

19   reasons.

20          THE COURT:  No, no, no.  I'm asking you, what, so

21   that they didn't have a wire?  You're trying to find out what

22   went on at that meeting.  Either Gharbieh was present and was

23   wearing a wire, in which case you would have a transcript

24   available of an in Arabic possibly conversation, or Aulaqi was

25   cooperating at that point and he was wearing a wire, but

USCA4 Appeal: 14-4451   Doc: 166-12   Filed: 04/30/2025   Pg: 86 of 244 Total Pages:(86 of 244)
Case 1:04-cr-00385-LMB   Document 340   Filed 11/13/13   Page 7 of 30 PageID# 661

7

1    there's none of that in this -- there's no evidence of that.

2           MR. TURLEY:  Your Honor, what we have in terms of

3    recent evidence is an indication that there was a government

4    asset involved during that period, the specific period of the

5    meeting directly connected to Anwar Aulaqi.  It was never

6    revealed that the government had that, had an asset involved

7    with Aulaqi during that time.  That asset still has not been

8    disclosed to counsel in either classified or unclassified fora.

9           We believe that clearly should have been revealed,

10   and we have no idea who that asset is.  We don't know if it's

11   Aulaqi, we don't know if it's Gharbieh, we don't know if it's

12   someone else, but we do know that there is a report that makes

13   reference to an asset in Aulaqi during that time that we've

14   never seen.

15          And what Mr. MacMahon says in his declaration is that

16   none of that was revealed to him any more than the Abu Khalid

17   or the pre-2003 FISA, and that had a material impact on his

18   inquiries before trial.  It also had a material impact on his

19   questioning at trial.

20          THE COURT:  All right.  Mr. Kromberg, do you want to

21   respond to that?

22          MR. KROMBERG:  I don't understand what Mr. Turley

23   just talked about, so there's no response I can --

24          THE COURT:  I'm sorry?

25          MR. KROMBERG:  I don't understand what he just said.

8

1          THE COURT:  Well, you need to try to understand what
2    he said.
3          MR. KROMBERG:  He's suggesting that the government
4    had an asset in to Mr. Aulaqi?  Assuming that were true, what
5    does that have to do with whether we know what happened at a
6    private meeting between Timimi and Aulaqi?
7          Mr. Turley has no right to know whether there was an
8    asset in to Aulaqi at that time.  He has no right to know
9    whether Aulaqi was a government asset at that time, but you
10   asked me eight years ago whether we had a recording of what
11   happened, and I said no.  We still don't.
12         I don't know what happened at that meeting, and we
13   don't -- and he doesn't get to find out the status of the
14   government's coverage of Aulaqi other than to know that the
15   government has no recording of the meeting between Aulaqi and
16   Timimi.
17         I'd also note that Gharbieh wasn't a government
18   cooperator at that time.  His house was searched the same day
19   Timimi's house was searched in February 2003, and he decided to
20   cooperate after that point, and that's when we learned that
21   there had been a meeting between Aulaqi and Timimi, but he
22   wasn't a cooperator before that time, and we didn't, we didn't
23   know about it at the time it happened.
24         THE COURT:  All right.
25         MR. TURLEY:  Your Honor, may I be heard in response?

**J.A. 2841**

9

1          THE COURT:  Yes, yes.

2          MR. TURLEY:  Thank you, Your Honor.  First of all,

3   I'm a little surprised -- I guess we're both surprised with

4   each other into what we're arguing, but I'm surprised to hear

5   that the government can have an asset that may have been

6   involved in a critical meeting with the defendant, have

7   pretrial inquiries as to evidence as to that meeting, and not

8   disclose that there was an asset.

9          Mr. Kromberg says, "I just don't know.  I don't know

10  who was the asset.  For all we know, Aulaqi's the asset."

11         What if Aulaqi was an asset?  The government

12  specifically told defense counsel that there was no evidence

13  that they had on this.  If the government engineered the

14  meeting, if the government's asset engineered the meeting, that

15  obviously is quite relevant, but we also want to note Ammerman

16  testified as to his, when he first became aware of Ali

17  Al-Timimi.

18         That testimony stands in direct contradiction to much

19  of the new evidence that we had found, and had we known his

20  role with Aulaqi, that evidence also would have been material

21  to his testimony.  We would have been able to impeach him on

22  that.

23         And I just want to also note, Your Honor, in terms of

24  government's responses, I assume Your Honor is referring to the

25  public motions as to the government's response.  The government

10

1    response on Aulaqi says virtually nothing about the factual

2    statements or representations in Aulaqi, but I just want to

3    note that the government as far as I know has not responded to

4    at least five or six motions in the SCIF, and I've never been

5    in a case where we just file motions and the government just

6    leaves it up to the Court to respond.  Those motions have been

7    pending for years, and the government just has never responded

8    to them, so we have no response at all.

9          THE COURT:  Well, which ones are those?  Just give us

10   the numbers.  We will see, because there are no gavels showing.

11         MR. TURLEY:  Your Honor, I -- the record that I have

12   in the SCIF shows no response on the classified motions from

13   2008 that I could find.  These include docket 265, 273, 277,

14   and 287.

15         And I believe that the two -- of the two classified

16   filings done recently, the government chose to respond to one

17   of them in a public filing by making reference to an ex parte

18   letter, and I do not believe they responded to the other, but

19   at least five of these motions from my records have had no

20   response at all from the government.

21         THE COURT:  Mr. Kromberg?

22         MR. KROMBERG:  Judge, I'm sorry, but you should give

23   very short shrift to that.  265, defendant's motion for a

24   finding of materiality regarding his intercepted communications

25   with an individual that we talked about at length in 2008, and

USCA4 Appeal: 14-4451    Doc: 166-12    Filed: 04/30/2025    Pg: 90 of 244    Total Pages:(90 of 244)
Case 1:04-cr-00385-LMB   Document 340   Filed 11/13/13   Page 11 of 30 PageID# 665

11

1    as this Court said in 2008, "I will say at this point so far

2    what this Court has seen -- and I recognize, Mr. Turley, you're

3    at a disadvantage because you haven't seen it all -- I don't

4    think there has been anything that the government has revealed

5    to this Court that would be of such a nature as to have made a

6    material difference to the outcome of your case.  In the end,

7    it's got to be the final thing the Court looks at.  I will say

8    at this point I haven't seen it."

9         Back in 2007, you said on January 24, 2007, in an

10   order, you wrote that the in camera pleadings, 48, 66, 185, and

11   200, establish either that the defendant has not been the

12   subject of any investigations other than the one which resulted

13   in this trial or that any other investigations in which he was

14   a subject or during which he was referenced contained no

15   information that would constitute *Brady* material or which was

16   required to be produced under the discovery orders entered in

17   this case.

18        He makes the same motion again and again and again.

19   We've answered them.  I think -- as far as I can tell, he's

20   made the same motion three times just since July.  We only

21   answer them once, and he says, well, we haven't answered each

22   motion.  Every -- I divide them up into Aulaqi, Ajmal Khan,

23   FISA, presidential surveillance, I think there was one more,

24   but I tried to respond to each group of motions even if I

25   didn't file one that's classified merely because remember,

USCA4 Appeal: 14-4451    Doc: 166-12    Filed: 04/30/2025    Pg: 91 of 244  Total Pages:(91 of 244)
Case 1:04-cr-00385-LMB   Document 340   Filed 11/13/13   Page 12 of 30 PageID# 666

12

1    Judge, the reason his are filed with the court security officer

2    is because in 2008, we filed an ex parte TS pleading, and the

3    Court encouraged us to file it under CIPA to make redactions so

4    that he could see it.

5         We did that, and then it turned up in the newspaper.

6    After it turned up in the newspaper, he was directed to file

7    everything in this case through the court security officer.

8    That's why there are so many classified pleadings at this time

9    even though at this point, as you can tell from what we're

10   talking about, we're not talking generally about classified

11   materials.

12        THE COURT:  All right.

13        MR. TURLEY:  First of all, Your Honor, I would like

14   to incorporate Mr. Kromberg's argument in our own response.

15   What he just read to you was not a ruling on any motion.  It

16   was an observation of the Court.  It was obviously that.

17        The way that at least I've practiced in the past is

18   you file a motion, the government files a response.  As usual,

19   Mr. Kromberg just blithely names one and says the rest of them

20   are repetitive.  That's not how my understanding of this works.

21   You are supposed to respond on the record so we can keep the

22   record.

23        I'm also very surprised to hear Mr. Kromberg quoting

24   from the Court in terms of previous investigations.  One of our

25   motions, of course, deals with the FISA business, and I believe

USCA4 Appeal: 14-4451    Doc: 166-12    Filed: 04/30/2025    Pg: 92 of 244  Total Pages:(92 of 244)
Case 1:04-cr-00385-LMB  Document 340  Filed 11/13/13  Page 13 of 30 PageID# 667

13

1    he's quoting from the same, same hearing.  Mr. Kromberg stood

2    here in our last go-round and said that he didn't have any

3    pre-2003 evidence, and this Court stated it was your

4    understanding, as it was the record, that there wasn't pre-2003

5    investigations, but more importantly, Mr. Kromberg says now,

6    "Well, except for these pre-2003 investigations," and says, "I

7    actually did reveal that to counsel."

8            We have a respected defense attorney in this

9    jurisdiction saying that is absolutely untrue.  We have a

10   second defense attorney who repeats basically the same type of

11   representation in his case from Mr. Kromberg, but more

12   importantly, we have Mr. Kromberg.  We have a letter from

13   Mr. Kromberg on November 19, 2004, in terms of the material he

14   now says is FISA, telling counsel then all of this is non-FISA

15   derived.

16           And then quite recently, he made reference to some

17   CDs and said, "You know, I really -- I know before we talked

18   about pre-2003, but now I'm saying that we did reveal 2003."

19           And so we went to former counsel, who, of course,

20   gave us his declaration, we went through all the files, and we

21   believe we found the CDs that Mr. Kromberg was referring to.

22   There's actually two sets of CDs.  One of them is composed of

23   30-something telephone intercepts that are clearly identified

24   as FISA by Mr. Kromberg.

25           None of those, as we put in a custodial affidavit,

1    none of those is pre-2003.  None of them involve any e-mails,

2    but then we have the second CD, and on that CD, we have

3    material that is referenced in that letter, November 19, 2004,

4    where Mr. Kromberg expressly says this is non-FISA derived.

5           That happens to include the 4G series and includes

6    4G7, which is the very document that we opposed being

7    introduced at trial that Mr. Kromberg introduced, and now

8    Mr. Kromberg says, "Oh, well, of course that was FISA derived,"

9    when he told the defense it was not.

10          We see the same pattern with Abu Khalid, and yet

11   Mr. Kromberg continually comes in here and expresses disbelief

12   of where the confusion comes from, and when I read the

13   transcript from 2008, it's like a different Mr. Kromberg.

14          THE COURT:  Mr. Kromberg, do you want to respond?

15          MR. KROMBERG:  I know that Mr. Turley has worked very

16   hard to reconstruct what happened years ago, but he hasn't

17   worked hard enough.  In his materials, he included government

18   discovery letter No. 8 but not discovery letter No. 9, which

19   I'll pass up to the Court, which says, "Here are the e-mails

20   and phone calls that I can now provide to you that were

21   collected by FISA, "and in Mr. Turley's materials, he has the

22   e-mail from me to Mr. MacMahon asking if he received them, and

23   Mr. MacMahon said, "I don't know.  I'll have to count them.  I

24   gave them to my client this morning."  That was January 5,

25   2005.

USCA4 Appeal: 14-4451    Doc: 166-12    Filed: 04/30/2025    Pg: 94 of 244  Total Pages:(94 of 244)

1           The reason that happened that way, first we gave

2    materials to him unclassified that we got from the search

3    warrant.  Then we gave him the materials classified that we got

4    from the FISA, because we didn't have use authority until the

5    end of December 2004 to give him the classified ones.

6           So when we had the FISA in 2003 that had these

7    e-mails, we had to replicate that because we didn't have use

8    authority.  We went with a criminal search warrant back to

9    Yahoo!, got the same things, and we didn't need use authority

10   for that anymore.  So we gave that to him first.

11          The next month, well, six weeks later, we gave him

12   the FISA ones.  He says he doesn't find them.  Well, I have the

13   message from MacMahon that Mr. MacMahon says he got them.

14          We've talked about this multiple times in open court,

15   once, once in the first trial and once in the second trial, and

16   those materials are, are before you now.

17          The -- and the next fundamental misunderstanding --

18   so the first misunderstanding is from the first set of

19   pleadings is, oh, well, if there was an intelligence

20   investigation pre-2003, that means there must have been FISA

21   pre-2003.

22          So we explained just because there's an intelligence

23   investigation doesn't mean that investigation was using the

24   tool of a FISA intercept or FISA search.

25          Well, now Mr. Turley comes back, "Okay.  Well, I

USCA4 Appeal: 14-4451    Doc: 166-12    Filed: 04/30/2025    Pg: 95 of 244   Total Pages:(95 of 244)

1    understand that, but you have FISA collection from 2001 in

2    these Chapman e-mails."

3          Well, that's because he misunderstands that a FISA

4    search of an e-mail account will take whatever is in that

5    e-mail account in 2003, when it was executed, and that includes

6    e-mails from 2001.  So yes, we did obtain through FISA evidence

7    from 2001, but the FISA was executed in 2003.

8          Mr. Turley's motion, oh, we didn't turn over to him

9    information about Ajmal Khan, well, except for the 302s from

10   Kwon and Hasan, the two main witnesses in the case who

11   identified Ajmal Khan as Abu Khalid with a johninformation

12   e-mail address.  But for that, we didn't tell him that we knew

13   Ajmal Khan was Abu Khalid.

14         Well, okay.  And, "All right.  Well, maybe you buried

15   it in there.  We weren't looking at those Kwon and Hasan 302s."

16         Mr. MacMahon cross-examined Kwon about that 302.  I

17   don't -- I mean, in some sense, it's understandable that

18   Mr. Turley doesn't know this, because you'd have to really go

19   over the record with a fine-toothed comb to see where

20   Mr. MacMahon asks Hasan about the 302, excuse me, asked Kwon

21   about the 302, but it's there.

22         I could go on, but each one of these allegations

23   about things that weren't turned over, were turned over, it

24   turns out they were turned over.

25         THE COURT:  All right.

USCA4 Appeal: 14-4451    Doc: 166-12    Filed: 04/30/2025    Pg: 96 of 244    Total Pages:(96 of 244)

1          MR. TURLEY:  Your Honor, I have to disagree with my

2    esteemed colleague.  On the letter No. 9 referenced in the

3    document from January 3, 2005, we believe that that refers to

4    that first set of FISA, those 30-something FISA-generated 2003

5    and later telephone intercepts.

6          What's, what's disconcerting here is obviously we

7    have very clear contradictions in the factual record.  We have

8    Mr. MacMahon saying quite clearly, "I kept asking for pre-2003

9    and was told there was no pre-2003."

10          But we also have hearings before this Court in which

11    you yourself expressed your view that there was not any

12    significant pre-2003 FISA interceptions.  That is also what

13    Mr. MacMahon understood.

14          This letter that is being referred to, we believe, is

15    that first CD, not the second one with the 4G series in it.

16          But as for the statement about Abu Khalid, we've

17    already argued this, and I don't see how this is even a close

18    question.  If the government -- the government does not deny

19    that it knew the identity of Abu Khalid.

20          THE COURT:  But they're also saying you got access to

21    that through the 302s that were given pretrial to defense

22    counsel, that you had Kwon's statement and Hasan's statement.

23    Plus, the government also argues, I think quite wisely, that

24    even if you had gotten the name, I mean, you had the name, but

25    with the name, what you were going to do with it, that man was,

18

1   I don't know whether he was in custody at that point or not,

2   but he was facing and, I guess, has been convicted in England

3   of certain charges, and the odds of him sitting down and

4   talking to you-all would have been -- you're a defense

5   attorney -- highly unlikely.

6          So No. 1, from this record, I'm satisfied that

7   defense counsel had the information; No. 2, it wouldn't have

8   done you any good because it was highly unlikely he was ever

9   going to talk to you; and No. 3, what he said might have made

10  it even worse because the evidence about his interaction with

11  those two coconspirators was pretty straightforward,

12  well-documented, and I don't see how that would have been in

13  any respect exculpatory.

14         MR. TURLEY:  Your Honor, where I would respectfully

15  disagree is that we do not believe that having two documents

16  from third parties giving their view of who the identity is is

17  the same as the government confirming the identity of Abu

18  Khalid, and this is why:

19         The record as it stood was actually in confusion.  A

20  year before, in the *Khan* trial, the government clearly stated

21  that Abu Khalid was an individual named Pal Singh; and the

22  government's own expert at that time said that in his

23  expertise, that was true; it was Pal Singh.

24         And so the official record, including Your Honor's

25  own statement about the identity of who Abu Khalid, said it was

USCA4 Appeal: 14-4451    Doc: 166-12    Filed: 04/30/2025    Pg: 98 of 244  Total Pages:(98 of 244)

1   a totally different person.  If the defense was going to assume

2   anything, it would likely be that it was Pal Singh, who was

3   acquitted in the English proceedings in terms of the terrorism

4   charges, but then the government is saying, "Well, I can't

5   imagine where the confusion is coming from.  We've cited to the

6   record, where we've had hearings with Mr. MacMahon saying, 'I

7   don't know who this is.  I don't know where this e-mail is

8   coming from.  How can we introduce it at trial?'"

9          Mr. Kromberg sat through those hearings.  He didn't

10  stand up and say, "Oh, well, you're mistaken.  We actually did

11  identify Abu Khalid."

12         Through the entire trial, he never said that they

13  understood who Abu Khalid was, and in fact, it was different

14  from what the government previously identified at the behest of

15  the government testimony, that it was an entirely different

16  person.

17         I would find it strange that, that a prosecutor can

18  go through these hearings where the identity of a key party is

19  raised, defense counsel says, "I don't know who this is," and

20  to say, "Well, we had no obligation to give you that

21  information. "

22         But my other point is that in addition to speaking

23  with the real Abu Khalid, we would have been able to seek

24  things like travel records, and in fact, those travel records

25  were introduced at another trial.  Why?  Because his identity

1    was, was confirmed by the government at a different trial.

2           THE COURT:  But how would those travel records have

3    helped you?

4           MR. TURLEY:  Well, the reason they would help is that

5    we understand that Abu Khalid came in in March 2003, and during

6    that period, Mr. Al-Timimi was under FISA, was under

7    investigation, and he had been searched.

8           We -- had we known the movements of Abu Khalid, we

9    could have pressed this point of here's this guy, this

10   mysterious figure who's trying to obtain remote-operated

11   aircraft technology, something that is clearly going to be

12   prejudicial with the jury and is being introduced at trial, and

13   we would have been able to say, "Well, we know who this guy is,

14   and here's his travel records," and we would have been able to

15   press the government witnesses.

16          Here he is a few miles away from Al-Timimi.  Here he

17   is in the country.  Was there any calls made during that

18   period?  Was there any context?  These are standard examination

19   questions.  They're also the type of basis that allows us to

20   make -- ask questions pretrial, but Mr. Kromberg denied that to

21   us by going -- first of all, having a record that says it's an

22   entirely different person, and then sitting through hearings

23   with you, where he doesn't say, "We actually know who Abu

24   Khalid is," who by the way they then turn around and identify

25   the real Abu Khalid.

1           Now, that may be discovery for the purposes of the

2    government.  It's not discovery as I understand it.

3           I will note that, you know, the Abu Khalid matter was

4    not only raised at trial over the objections of the defense,

5    this was an issue that was heavily contested by Mr. MacMahon,

6    but when we had, I believe, a motion 29 proceeding to try to --

7    a motion to try to knock out some of the counts, and who is it

8    the government references?  Abu Khalid.

9           So here's this integral part of the trial and the

10   posttrial, and Mr. Kromberg is sitting on his identification,

11   just leaving it uncertain as to who he is.  That clearly had a

12   material impact on us.  It also once again had a material

13   impact on the government witnesses.

14          We have direct contradictions in this new evidence to

15   what people like Mr. Ammerman testified on the stand, direct

16   contradictions, and this is the type of information that would

17   have allowed a cross-examination with knowledge of Agent

18   Ammerman.

19          THE COURT:  All right.  Mr. Kromberg, do you want to

20   add anything to that?

21          MR. KROMBERG:  I'm curious on what the direct

22   contradiction with Agent Ammerman -- with Special Agent Wade

23   Ammerman, who's one of the finest agents and most respected in

24   the country, and I'd be surprised to find out what the direct

25   contradiction that Mr. Turley has identified, and you'd think

22

1      in the mounds of pleadings, he would have identified it by now.

2              THE COURT:  All right, let's move on to the next

3      motion.

4              MR. TURLEY:  Should I answer that, Your Honor?

5              THE COURT:  No, I don't need to hear any more on it.

6              In terms of the FISA evidence, I think Mr. Kromberg

7      today for the first time has made it crystal clear why there

8      does appear to be this discrepancy between 2003 and 2001

9      because he has just said that a FISA warrant in 2003 for e-mail

10     could among other things pull in 2002, 2001, whatever is in

11     that e-mail box, if I understand you correctly, Mr. Kromberg.

12             MR. KROMBERG:  In fact, it's very -- okay.  I don't

13     know if I should -- I don't know how much I can say, but the

14     results tend to be similar to what happens when you do a

15     criminal search warrant of an e-mail account.

16             THE COURT:  In other words, it's thorough.  Whatever

17     is there gets picked up.

18             MR. KROMBERG:  Correct.

19             THE COURT:  All right.  And that would clearly

20     explain the discrepancy -- or not the discrepancy but the way

21     in which these dates seem to at first blush be inconsistent.

22             MR. TURLEY:  Your Honor, we don't believe it explains

23     it for the following reason:  First of all, this indicates that

24     there was FISA captures in 2001.

25             THE COURT:  No, no.  It indicates that there are FISA

1    captures in 2003 of 2001 information.  That's what it

2    indicates.

3            MR. TURLEY:  Well, I'm working, obviously, in the

4    blind because we have not been able to see the type of

5    supporting evidence for that, but the most important thing is

6    that we have representations before trial that there was not

7    pre-2003 FISAs.

8            Now, the government here is making --

9            THE COURT:  Well, that -- wait a minute.  There's

10   nothing inconsistent with what Mr. Kromberg has just said.

11   Listen to what he said.  He said that a FISA warrant in 2003,

12   issued in 2003 would capture whatever was in that e-mail box.

13           Now, I would assume if it was a brand new e-mail box

14   that was opened in 2003, right, there wouldn't be any 2002 or

15   2001 messages picked up that way.  I'm assuming therefore that

16   this mailbox had been in place or this e-mail address had been

17   used for some period of time, and evidently, whatever was there

18   was picked up.

19           MR. TURLEY:  Your Honor, where we disagree is that

20   first of all, we've put into the record various sources that

21   indicate 2001 FISA on the Virginia Jihad, and we included in

22   that the Wainwright MFR in 2003 that said that once this wall

23   went down between the FISA collection in terms of intelligence

24   and the criminal side in terms of prosecutions, that the

25   Virginia Jihad investigation came out of that, and this is a

24

1    reference to 2002 in terms of that wall coming down.

2          We also have a second MFR that specifically says that

3    when that wall came down, the Eastern District of Virginia U.S.

4    Attorney's Office was specifically noted as going to look at

5    that FISA material.  So we know that there's FISA material

6    before 2003 and these MFRs we just recently learned of.  So you

7    have these MFRs citing, yeah, a wall came down.  The Eastern

8    District of Virginia U.S. Attorney's Office went there and

9    looked at the FISA material.  We have statements that that's

10   what prompted the Virginia Jihad, which the government is

11   claiming was headed by Dr. Al-Timimi, and that would not fit

12   the narrative expressed by Mr. Kromberg, and we also have the

13   previous objection to that letter in terms of what that is

14   referring to, but the other thing that I want to note, Your

15   Honor, is that we don't have any record at all in terms of

16   where or what of this evidence was used.

17         What we do have is testimony from Mr. -- from Special

18   Agent Ammerman saying, "You know, I first looked into

19   Dr. Al-Timimi because of a confidential informant call in 2003,

20   and I went to the Internet and looked up his name," and now we

21   find out that there was this pre-2003 FISA material that was

22   reviewed by the Eastern District of Virginia U.S. Attorney's

23   Office, we know now that Ammerman was involved with Aulaqi, who

24   happened to just go to Al-Timimi's house, that was pre-2003,

25   and what stands in contradiction is this account by Ammerman of

USCA4 Appeal: 14-4451    Doc: 166-12    Filed: 04/30/2025    Pg: 104 of 244 Total Pages:(104 of 244)

1    how he learned of Al-Timimi.

2           So we have this complete contradiction coming out of

3    the Department of Justice.  You've got some agents saying this

4    Virginia Jihad investigation was the result of the wall coming

5    down and the Eastern District of Virginia prosecutors going to

6    see that.

7           Now, I don't know if Mr. Kromberg was one of those

8    prosecutors, but I would be surprised because when we were here

9    before you last time, Mr. Kromberg said, "Look, I can't be

10   expected to know programs that I don't know of, evidence that

11   I've not been, had not been disclosed to me."

12          So I don't know who from the Eastern District of

13   Virginia saw that evidence, but it couldn't possibly be

14   Mr. Kromberg, but the fact is that's referring to FISA

15   material.

16          THE COURT:  Well, you're not sure about that.  There

17   are other ways -- as Mr. Kromberg pointed out in one of his

18   responses, there are other ways of getting intelligence besides

19   FISA.

20          MR. TURLEY:  There are, Your Honor, but the problem

21   is we don't know.  I mean, we can't -- we have no record.  The

22   government has chosen not to disclose a single document to

23   cleared counsel.  It has not produced any actual document of

24   evidence in terms of material that was not disclosed before.

25   We have no record because the government won't give us a

USCA4 Appeal: 14-4451    Doc: 166-12    Filed: 04/30/2025    Pg: 105 of 244 Total Pages:(105 of 244)
Case 1:04-cr-00385-LMB   Document 340   Filed 11/13/13   Page 26 of 30 PageID# 680

26

1    record, and I don't understand.

2         This is rather old material.  We, we have

3    Mr. Ammerman giving media interviews on this case, and yet the

4    government continues to classify as much as they can, to say

5    that they're not going to give defense counsel these documents.

6         We don't know, and I think that it's incumbent to

7    create that record in light of the new material that we found,

8    material evidence, and I will simply note without getting into

9    the SCIF stuff, the motions in the SCIF include material

10   evidence that was withheld.

11        THE COURT:  All right.  Well, these have been

12   extensively briefed.  I'm going to look with care -- obviously,

13   I'm not going to try to speak a decision today because I don't

14   want to bump into anything that may be considered classified.

15        Mr. Kromberg, I -- you are satisfied that you've

16   responded to everything?

17        MR. KROMBERG:  I believe I've responded to every

18   topic.  I'm not sure whether I've responded -- there were

19   multiple motions that I was getting partly because of docketing

20   issues --

21        THE COURT:  Right.

22        MR. KROMBERG:  -- that I would get them and I'd go,

23   is this the same one I already got?

24        THE COURT:  Because there are some duplicative

25   motions.

27

1          MR. KROMBERG:  Right.  I thought I responded to every

2    topic.  If there's a topic I haven't responded to, I'll be

3    happy to do so.

4          THE COURT:  All right.  We will also have to go back

5    through, we're actually going to try to audit the file this

6    afternoon, and if we find that there hasn't been in our view an

7    adequate response from the government, we'll direct you to fill

8    it out, all right?

9          But other than that, you'll need to wait for our

10   decision, and as you know, Mr. Kromberg, part of the logistical

11   problem for the Court has been the limitation that's even been

12   put on the Court's resources in terms of handling this matter.

13   I have finally figured out a way, having been back through the

14   pleadings that only I can see, how to handle that.

15         MR. KROMBERG:  I'm glad to hear that, Judge.

16         THE COURT:  Yeah.

17         MR. KROMBERG:  We've tried -- I've tried in writing

18   the TS pleadings that your clerks are cleared for, to refer to

19   one particular sentence of one particular pleading or maybe two

20   different pleadings, but I think it's a very, very limited task

21   that -- and I think the Court's point has been made over the

22   last years, and I think that it would be -- it's time to --

23         THE COURT:  It's time, I agree.  I will let you know,

24   and you can go back and audit your stuff to tell me if I'm

25   wrong on this, but I think the most seminal and most pivotal

28

1    piece of evidence in the record is something which defense

2    counsel can't see because my clerks can't even see it, is 185.

3              MR. KROMBERG:  Absolutely.

4              THE COURT:  All right.

5              MR. KROMBERG:  And, Judge, there's one sentence, I

6    believe, in 185 that is the most seminal part in that.

7              THE COURT:  Well, but that, that is -- essentially,

8    that portion of my opinion is probably just going to say for

9    the reasons in 185, whatever my ruling is.  I can't do more

10   than that, and so -- and I'm doing it that way because my

11   resources have been restrained in that respect.

12             But I will say for the public record that 185 does

13   satisfy me significantly on all -- almost all of these issues.

14   So unless I find that there's still something that's missing,

15   I'll resolve this matter on what's been filed to date, and

16   that's how it is.  That's how it is.

17             MR. TURLEY:  I understand, Your Honor.  I just want

18   to voice our objection that we've made before, that we don't

19   see why these ex parte communications need to be barred

20   entirely from cleared counsel.

21             THE COURT:  Look, if a judge's law clerk can't get

22   access -- and Mr. Kromberg, as I recall, didn't have access, I

23   think, until 2008 -- there's no way in which private counsel is

24   going to get it.  That is the way it is.

25             If I ran the world, it might be different, but I

USCA4 Appeal: 14-4451 Doc: 166-12 Filed: 04/30/2025 Pg: 108 of 244 Total Pages:(108 of 244)
Case 1:04-cr-00385-LMB Document 340 Filed 11/13/13 Page 29 of 30 PageID# 683

29

1    don't run the world.  I have to work within the rules that are

2    given to me, but I will tell you that for what it's worth,

3    because I know one of your discomforts is the concept that the

4    government -- that the prosecution would be the sole arbiter of

5    what is discoverable or not discoverable.  At least in this

6    case, you've got an Article III judge looking at it, you'll

7    have a Court of Appeals looking at it, so there'll be another

8    entity with no stake in the case looking at the material, and

9    that's all I can tell you.

10           But there are things that this Court will have seen

11   that you will not have seen that will certainly feed into the

12   decision.

13           MR. TURLEY:  Your Honor, just two small points, and I

14   hate -- I'm sorry to delay you further:  One is at one point,

15   you had stated your intention to require the government to

16   certify all of the representations that have been made as to

17   the record.

18           THE COURT:  I think that's been done adequately.  If

19   people are filing declarations under the penalty of perjury,

20   that's sufficient certification.

21           MR. TURLEY:  Okay.  And, Your Honor, regardless of

22   how you may rule on these motions, our final motion is likely

23   to be a formal motion for a new trial.  We've already actually

24   asked for and we've been talking about a new trial, but to

25   complete the record, we would like to bring all of this

1    material into a motion for a new trial.

2              THE COURT:  I think I'm not sure I'm going to permit

3    that.  I thought you already had filed one.

4              MR. TURLEY:  Well, we have, but this is mainly for

5    the convenience of the Court and potentially the Court of

6    Appeals to bring in this most recent evidence that we've

7    discovered, which we find very troubling.

8              THE COURT:  Well, we'll face that when we face it.

9    There've been enough motions filed in this case.  We need to

10   get this case back down to Richmond, which I hope will be

11   fairly soon, all right?

12             All right, if there's nothing further, we'll recess

13   court for the day.

14             MR. KROMBERG:  Thank you.

15             MR. TURLEY:  Thank you, Your Honor.

16                            (Which were all the proceedings

17                             had at this time.)

18

19                    CERTIFICATE OF THE REPORTER

20        I certify that the foregoing is a correct transcript of

21   the record of proceedings in the above-entitled matter.

22

23

24                              _____
                                        /s/
                                Anneliese J. Thomson
25

REDACTED / CLEARED FOR PUBLIC RELEASE

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

Filed with Classified
Information Security Officer

CISO _____
Date ____ 4 | 28 | 201 4

UNITED STATES OF AMERICA,                )
                                         )
                                         )
        v.                               )
                                         )    1:04cr385 (LMB)
                                         )
ALI AL-TIMIMI,                           )
                                         )
            Defendant.                   )

## MEMORANDUM OPINION

Before the Court are several post-conviction motions by defendant to compel discovery. For the reasons stated in open court and in this Memorandum Opinion, each such motion will be denied.

## I.    BACKGROUND

This is a complex criminal case, the history of which now spans more than a decade. In the interest of brevity, only the essential events are recounted here. By 2000, defendant Ali al-Timimi was a principal lecturer at the Dar al-Arqam Islamic Center, a mosque located in Falls Church, Virginia. Among the worshippers there was a group of devout young men who were ultimately convicted of various crimes relating to their preparations for violent jihad, the so-called Virginia Jihad Network. See generally United States v. Khan, 309 F. Supp. 2d 789 (E.D. Va. 2004). On September 16, 2001, five days after terrorists attacked the Pentagon and World Trade Center,

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

defendant attended a group dinner meeting with several of these men to speak about the events. Upon arriving, defendant first instructed those present to disconnect the phones and draw the blinds. He then proceeded to advise the men that it would become necessary to defend Islam by engaging in violent jihad against enemies of their faith, including the United States military in Afghanistan. Some of the men present heeded defendant's words and shortly thereafter flew to Pakistan to obtain military training at a camp run by Lashkar-e-Taiba ("LET"), a group which landed on the State Department's Foreign Terrorist Organization list in December 2001.

A criminal investigation of defendant began in early 2003 after the Federal Bureau of Investigation ("FBI") received an anonymous tip from someone associated with Dar al-Arqam. This was not the first time defendant had come to the attention of federal authorities. His name appears in internal FBI memoranda as far back as 2000. The FBI had also contacted him directly in 2001 to arrange multiple interviews a week after the September 11 attacks. Defendant even complained a month later that the FBI had started harassing his brother because of their relationship. Once the criminal investigation launched, defendant's phone was routinely tapped, his home was searched, and he was eventually brought in for an interview with the FBI.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

On September 23, 2004, a grand jury returned an indictment charging defendant with six terrorism-related counts, including conspiring to levy war against the United States, in violation of 18 U.S.C. §§ 371 and 2384; attempting to contribute services to the Taliban, in violation of 50 U.S.C. § 1705; aiding and abetting the use of firearms in connection with a crime of violence, in violation of 18 U.S.C. § 924(c); and aiding and abetting the carrying of explosives during the commission of a felony, in violation of 18 U.S.C. § 844(h). Dkt. No. 1. On February 3, 2005, a ten-count superseding indictment was returned, charging defendant with additional counts for soliciting others to levy war against the United States, in violation of 18 U.S.C. § 373; inducing others to conspire to violate the Neutrality Act, in violation of 18 U.S.C. §§ 371 and 960; and inducing others to conspire to use firearms, in violation of 18 U.S.C. § 924(n). Dkt. No. 47. After a jury trial in which several of the previously convicted young men testified, defendant was convicted on all counts. Dkt. No. 107. As a result, on July 13, 2005, the Court sentenced him to life imprisonment. Dkt. No. 132.

Defendant filed a notice of appeal. Dkt. No. 133. On April 25, 2006, while his appeal was pending, the Fourth Circuit remanded the case for additional proceedings after defendant raised concerns stemming from public reports of previously

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

undisclosed government surveillance programs, arguing that withheld evidence derived from such programs might constitute Brady material.  The Fourth Circuit directed the Court to address defendant's concerns "and order whatever relief or changes in the case, if any, that it considers appropriate." Dkt. No. 164.

Defendant thereafter filed a series of motions requesting disclosure of intercepted communications and other documents by the government.  Among a bevy of actions, the Court ordered the government to bring forth for inspection all documents used to support a relevant Foreign Intelligence Surveillance Act ("FISA") warrant, Dkt. No. 182; denied defendant's request for access to classified portions of the National Archives, Dkt. No. 231; and ordered the government to search the records of the Central Intelligence Agency ("CIA"), Department of Defense ("DoD"), National Security Agency ("NSA"), and FBI to provide a response to five specific inquiries made by defendant, Dkt. No. 271.  Since 2006, defendant has on several occasions sought to compel the government to make available allegedly undisclosed surveillance evidence within its possession.[1]

---

[1] The delay in resolving some of these motions has been due to the government's refusal to clear any of this Court's term judicial clerks for access to certain classified materials.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

In the immediate aftermath of Edward Snowden's revelatory leaks about NSA surveillance activities, defendant filed seven new motions seeking to compel discovery of evidence relating to various individuals and surveillance programs.  These motions are currently before the Court:  Motion to Compel Discovery Related to Anwar al-Aulaqi, Dkt. No. 300; Motion to Compel Discovery Related to Abu Khalid, Dkt. No. 306; Motion to Compel Discovery of Undisclosed Material Intercept Evidence Captured Pursuant to Foreign Intelligence Surveillance Act, Dkt. No. 312; Motion to Compel Discovery of Evidence Gathered Pursuant to the Presidential Surveillance Program and "Other Intelligence Activities," Dkt. No. 319; Motion to Compel Discovery of Any Classified Evidence Gathered Pursuant to the Presidential Surveillance Program and "Other Intelligence Activities," Dkt. No. 320; Motion to Compel Classified Discovery Related to Khwaja Mahmood Hasan, Dkt. No. 323; Motion to Compel Discovery Related to Khwaja Mahmood Hasan, Dkt. No. 325.

## II.    LEGAL STANDARD

Each of defendant's motions invokes Brady v. Maryland, 373 U.S. 83 (1963), which introduced a now-familiar standard: "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id. at 87.  A

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Brady violation therefore has three components: (1) the evidence
must be favorable to the defendant; (2) the evidence must have
been suppressed by the government; and (3) the evidence must be
material to the guilt or innocence of the defendant.  See id.;
see also United States v. McLean, 715 F.3d 129, 142 (4th Cir.
2013) (enumerating the requirements of a Brady claim).  Evidence
is considered "favorable" if it is exculpatory, Brady, 373 U.S.
at 87, or if it is impeaching, Giglio v. United States, 405 U.S.
150, 154-55 (1972).  Evidence is considered "material" if there
is "a reasonable probability that [its] disclosure . . . would
have produced a different outcome" at trial.  McLean, 715 F.3d
at 142 (citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)).  In
other words, the materiality determination turns on whether
nondisclosure deprived the defendant of "a fair trial" and a
resulting "verdict worthy of confidence."  Kyles, 514 U.S. at
434.  That means the suppression of evidence merely marginal or
cumulative of the evidence introduced at trial is not sufficient
to establish a Brady violation.  Nor does it suffice to show
"the mere possibility that an item of undisclosed information
might have helped the defense."  See United States v. Agurs, 427
U.S. 97, 110 (1976).

Defendant's motions also invoke Fed. R. Crim. P. 16, which
is similar in principle to Brady, if slightly broader in scope.
Specifically, Rule 16 requires the government to make available

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

for inspection "item[s] . . . material to preparing the defense"
if such items are "within the government's possession, custody,
or control." Fed. R. Crim. P. 16(a)(1)(E)(i). This language
would seem to cast a somewhat wider net than the Brady doctrine.
See United States v. Caro, 597 F.3d 608, 620 (4th Cir. 2010);
accord United States v. Baker, 453 F.3d 419, 424 (7th Cir. 2006)
("Rule 16 . . . is broader than Brady."). Even so, the items
sought by the defendant must still be "material" — that is, in
this context, the defendant must establish "a strong indication"
that the evidence would have "play[ed] an important role in
uncovering admissible evidence, . . . corroborating testimony,
or assisting impeachment or rebuttal." Caro, 597 F.3d at 621
(internal quotation marks and citation omitted).

Beyond Brady and Rule 16, there is an additional wrinkle
where, as here, the government information in question is
classified or unclassified but especially important to national
security interests. In Roviaro v. United States, 353 U.S. 53
(1957), the Supreme Court recognized a general governmental
privilege to withhold law enforcement methods and sources —
e.g., surveillance techniques — if disclosure would endanger the
secrecy of that information. Id. at 59-60; accord United States
v. Moussaoui, 382 F.3d 453, 471-72 (4th Cir. 2004) (applying
Roviaro in the context of classified information). Such
privilege "give[s] way," however, where disclosure would be

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

"relevant and helpful to the defense of an accused" or would be "essential to a fair determination of a cause." Rovario, 353 U.S. at 60-61. Courts consider a number of factors in applying the Rovario balancing test. One factor is whether the defendant can make more than "a mere showing of theoretical relevance." United States v. Yunis, 867 F.2d 617, 623 (D.C. Cir. 1989). In other words, courts consider whether the privileged information sought would be "useful to counter the government's case or to bolster a defense." United States v. Aref, 533 F.3d 72, 80 (2d Cir. 2008) (internal quotation marks and citation omitted). Another factor is whether "the assertion of privilege by the government is at least a colorable one." Yunis, 867 F.2d at 623. But there is no "fixed rule" regarding disclosure. See Rovario, 353 U.S. at 628-29. Ultimately, courts must make a pragmatic determination after engaging in the fact-intensive task of balancing a defendant's right to discovery against the government's legitimate assertion of privilege. Id. at 629.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

### III.    DISCUSSION

Defendant generally argues that the government flouted its obligations under Brady and Rule 16 by failing to disclose that certain evidence introduced against him at trial was derived from then-unknown electronic surveillance programs.  The Court will consider each of defendant's motions to compel in turn.

### A.  Motion to Compel Discovery Related to Anwar al-Aulaqi

Defendant seeks "surveillance evidence, field reports, and recordings" of a brief meeting in October 2002 between himself and Anwar al-Aulaqi,[2] an American-born cleric killed by a drone strike in Yemen more than two years ago.[3]  Dkt. No. 301, at 3. Defendant contends that the meeting "could not have happened without the government's knowledge or facilitation" because al-Aulaqi was the subject of intense FBI scrutiny at the time.  In support, defendant cites a number of public sources to the same effect, including a book by national security journalist Catherine Herridge and a list of search results of classified documents provided by the National Archives.  Defendant goes so far as to suggest that at the time of their meeting al-Aulaqi

---

[2] Although his last name is also spelled "al-Awlaki" at various points in the record, the Court will defer to defendant's preferred spelling for the sake of clarity.

[3] Defendant requested substantially similar discovery from the government in a letter dated September 14, 2007, pursuant to an Order of the Court, Dkt. No. 231, but was rebuffed.

REDACTED / CLEARED FOR PUBLIC RELEASE

9

REDACTED / CLEARED FOR PUBLIC RELEASE

may have been a government "asset" or, at the very least, was accompanied to defendant's residence by someone who was an asset.

Defendant argues that any information regarding what was said that night, if it exists, must be disclosed under Brady or Rule 16 for two reasons. First, it would impeach the testimony of FBI Special Agent Wade Ammerman, who led the criminal investigation and testified at trial that the investigation only began after receipt of an anonymous tip in November 2002, one month after the meeting with al-Aulaqi took place, implying that Ammerman lied to obscure the existence of illegal surveillance. Second, the evidence sought would be exculpatory to the extent it shows that defendant turned down al-Aulaqi's entreaty to recruit young men at Dar al-Arqam for violent jihad against the United States. Id. at 18. The government curtly responds that defendant "has been provided with all information to which he is entitled by law." Dkt. No. 304, at 2. In its public position, the government neither concedes nor denies that such evidence exists.

In a highly classified document to which only the Court, and none of the Court's cleared staff, has been allowed access, the government has provided sufficient information to satisfy the Court that the government has not violated its obligations under either Brady or Rule 16. See Dkt. Nos. 185, 331

REDACTED / CLEARED FOR PUBLIC RELEASE

(classified). Moreover, the government's position — that defendant cannot compel disclosure "of the extent and nature of the government's investigative tools or tactics" in this instance — has merit. Dkt. No. 304, at 1. Under Rovario, it appears to the Court that disclosing whether or not agents were listening in on the meeting or had an asset listening in for them "would endanger the secrecy of that information." 353 U.S. at 59-60. This concern is only heightened by the government's legitimate interest in preserving the integrity of ongoing counterterrorism operations. Defendant cannot make a correspondingly weighty showing — in this context, that a record likely exists of defendant making an explicitly exculpatory statement to al-Aulaqi. Short of that, the balance between defendant's need for any information relating to al-Aulaqi and the government's interest in nondisclosure favors the latter. See id. at 60-61.

B. Motion to Compel Discovery Related to Abu Khalid

Defendant seeks evidence relating to "Abu Khalid," a shadowy terrorist figure now known to be Muhammad Ajmal Khan.[4] According to defendant, Khan was the LET operative responsible for orchestrating a plot to obtain technology for unmanned

---

[4] Like al-Aulaqi, Khan's name is subject to various spellings throughout the record. The Court will again defer to defendant's preferred spelling.

REDACTED / CLEARED FOR PUBLIC RELEASE

11

aerial vehicles ("UAVs") in the period following September 11,
2001. Dkt. No. 306, at 1. Khan is also associated with an
email account that played a pivotal role in the separate
prosecution of the Virginia Jihad Network members.[5] At
defendant's trial, the government introduced evidence regarding
"Abu Khalid" for the purpose of establishing that some of
defendant's co-conspirators maintained an active relationship
with LET after defendant encouraged them to train with LET.
Yet, some degree of confusion existed then as to Khalid's true
identity. Defendant now contends that the government knew
Khalid's true identity was Khan all along and withheld that
information. Defendant requests such evidence on the theory
that locating and speaking with Khan before trial would have
allowed defendant "to refute the government's repeated and
damaging insinuation" that defendant was associated with LET.
Id.

The government makes two points in response. First, it
claims Abu Khalid was in fact identified to defendant as Khan
twice in pre-trial discovery: in an FBI interview report in
which Mahmood Hasan positively identified a photo of Khan as
"Abu Khalid" and gave a physical description of him, Dkt. No.

---

[5] Some of defendant's co-conspirators allegedly corresponded with
Khan at johninformation@yahoo.uk.co regarding the purchase of
technology for a remote-controlled aircraft. Khan, 309 F. Supp.
2d at 812.

REDACTED / CLEARED FOR PUBLIC RELEASE

308-2; and again in a statement made to British authorities by Yong Kwon in which Kwon identified Khan as Khalid and described the latter's association with LET, Dkt. No. 308, at 1. Second, the government claims that any undisclosed evidence relating to Khan is outside the scope of Brady and Rule 16 because "Khan was never a significant part of the case" against defendant. Id. at 4. More specifically, the government claims that whether Khan did or did not know defendant was irrelevant because "the linkage that was of significance to the government was not the one between [defendant] and [the plot to] purchase the UAV, but the one between [defendant's] followers and Abu Khalid because [those connections] tended to prove that [defendant's] followers had, in fact, followed his counsel to train with and support LET." Id. at 5.

The government's argument is well-taken. The evidence supports its position that information linking the two names had, in fact, been turned over to defendant. Moreover, under Brady, it is difficult to imagine how evidence relating to Khan is either "favorable" to defendant's cause or "material" to his guilt or innocence. See 373 U.S. at 87. The ability to show that defendant had no contact with or awareness of Khan does not exculpate him of taking steps to incite his followers to engage in violent jihad, including taking up arms against the United States military in Afghanistan. Nor does it refute the core

REDACTED / CLEARED FOR PUBLIC RELEASE

13

REDACTED / CLEARED FOR PUBLIC RELEASE

evidence introduced at trial of defendant's statements at a
dinner meeting with his co-conspirators on September 16, 2001 —
not to mention other inflammatory statements made at other
points in time.  Accordingly, disclosure almost certainly would
not have produced a different outcome at trial.  See McLean, 715
F.3d at 142; see also Kyles, 514 U.S. at 434.  Khan existed on
the periphery of the series of events leading to defendant's
conviction.  Indeed, the plot to obtain a UAV took root well
after defendant's followers heeded his advice at the dinner
meeting and departed for the LET training camp in Pakistan.
That some of his followers were at some later point involved in
both conspiracies is unlikely to have absolved defendant in the
eyes of the jury.  Evidence of Khan's identity is therefore too
marginal to trigger the government's obligations under Brady.
See Agurs, 427 U.S. at 110.  Nor does information about Khan's
identity come within the scope of Rule 16, which also has a
materiality requirement.  See Caro, 597 F.3d at 621.  Finally,
the implication that Khan would have communicated with
defendant's counsel is pure conjecture.

Absent a basic articulation of how additional discovery
regarding Khan could have changed the calculus at trial,
disclosure by the government is not required here under either
Brady or Rule 16.  See Agurs 427 U.S. at 110 (noting that "the

REDACTED / CLEARED FOR PUBLIC RELEASE

14

REDACTED / CLEARED FOR PUBLIC RELEASE

mere possibility that an item of undisclosed information might have helped the defense" is insufficient).

### C. Motion to Compel Discovery of Undisclosed Material Intercept Evidence Captured Pursuant to Foreign Intelligence Surveillance Act

Defendant seeks production of all FISA surveillance evidence relating to his communications — specifically, email and telephone intercepts from surveillance conducted before the criminal investigation began in 2003. Dkt. No. 312, at 1. Defendant's request cites recently obtained documents, many from the National Archives, showing that the government may have been monitoring his activities going back several years. Id. at 7. Defendant suggests his criminal investigation grew out of the then-forbidden practice of sharing FISA-derived intelligence with prosecutors, contradicting testimony to the contrary from Ammerman. Id. at 1. The government, for its part, readily admits that defendant was the subject of an intelligence investigation predating the criminal investigation. Dkt. No. 322, at 1. It also insists that all relevant FISA intercepts were disclosed to defendant before trial.[6] The government explicitly rejects defendant's assertion that the existence of

---

[6] The government references a letter, sent to defendant on December 28, 2004, in which the government confirmed that he "received all [CDs] with the telephone calls and emails that were captured under the FISA surveillance over [defendant]." Dkt. No. 312, Ex. D.

REDACTED / CLEARED FOR PUBLIC RELEASE

15

REDACTED / CLEARED FOR PUBLIC RELEASE

an intelligence investigation necessarily implies the existence of additional discoverable electronic surveillance. Id. at 4.

Defendant's motion is simply too vague to grant. The Court cannot evaluate it under the rubrics provided by Brady and Rule 16 because defendant does not describe the evidence sought with any particularity. Indeed, he merely seeks all "withheld material intercept evidence captured pursuant to" FISA. Dkt. No. 312, at 1, 18. Even acknowledging that defendant faces the difficult prospect of specifying the nature of the material to which he does not have access, the Court cannot issue an order granting him "unsupervised authority to search through" the government's files — that plainly is not a facet of the right to discover exculpatory evidence. See Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987). Moreover, defendant's motion is poorly calibrated to uncover evidence that might establish that he never possessed the requisite intent to commit the crimes for which he was convicted. Defendant's motion thus amounts to little more than a fishing expedition in the end. Perhaps emboldened by recent leaks detailing the extent of previously unknown government surveillance programs, defendant's request rests heavily on plausible-sounding speculation. But that is not enough to state a viable Brady claim. See Caro, 597 F.3d 608 ("Because Caro can only speculate as to what the requested information might reveal, he cannot satisfy Brady's requirement

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

of showing that the request evidence would be favorable to the accused." (internal quotation marks and citation omitted)).

In addition, defendant's claim that any evidence at all of pre-2003 surveillance would impeach Ammerman's testimony is dubious.  Ammerman testified that the government received an anonymous tip about defendant from someone at Dar al-Arqam in November 2002 and, as a result, launched a criminal investigation in February 2003.  Defendant takes this as an affirmative statement that no investigation was undertaken before then.  Dkt. No. 312, at 4.  But such a literal interpretation of Ammerman's statement is unjustified for a number of reasons.  As the government correctly observes, defendant and his counsel were well aware of FBI interviews of defendant in 2001 immediately following the September 11 attacks.  Dkt. No. 322, at 3.  Defendant's counsel was also aware that defendant complained that his brother was harassed by the FBI because of their relationship as far back as October 2001.  In other words, there was a mutual understanding before trial that defendant had been on the government's radar for several years before the criminal investigation started in 2003. Interpreting Ammerman's testimony to deny this obvious fact is

REDACTED / CLEARED FOR PUBLIC RELEASE

17

REDACTED / CLEARED FOR PUBLIC RELEASE

uncharitable at best,[7] and it provides no basis for the Court to
grant defendant's motion.

On another level, the bulk of defendant's arguments are not
a particularly good fit for this type of procedural vehicle.
Rule 16 does not by its terms apply to information that could
only yield grounds for a motion to suppress — e.g., evidence of
illegal warrantless electronic surveillance — because such
information is not, generally speaking, material to the
fundamental question of guilt or innocence. Fed. R. Crim. P.
16(a)(1)(E)(i); see Caro, 597 F.3d at 621. The same thing can
be said of the Brady doctrine — discoverable evidence does not
necessarily include the fact of illegal surveillance, as long as
any exculpatory fruits of that surveillance were disclosed. See
373 U.S. at 87. And even if such fruits existed and were used
against him at trial, defendant in this instance has not
demonstrated that they ought to be suppressed in light of the
government's extensive use of lawful means of investigation.
Cf. United States v. Smith, 155 F.3d 1051, 1059-61 (9th Cir.
1998) (declining to suppress evidence allegedly derived from an

---

[7] The government explains that Ammerman's testimony "refer[ed] to
the criminal investigation rather than an intelligence
investigation," Dkt. No. 322, at 3, which is a much more
plausible interpretation given how those distinct types of
investigations were conducted before September 11, 2001.

REDACTED / CLEARED FOR PUBLIC RELEASE

18

REDACTED / CLEARED FOR PUBLIC RELEASE

illegally intercepted voicemail message because the causal chain
was sufficiently weak to dissipate any taint).

### D. Motions to Compel Discovery of Evidence Gathered Pursuant to the Presidential Surveillance Program and "Other Intelligence Activities"

Defendant has filed two motions seeking production of
surveillance evidence derived from the President's Surveillance
Program ("PSP"). Because these motions are coterminous,[8] they
will be discussed together. Both request "all material evidence
captured pursuant to the President's Surveillance Program, a
collection of intelligence activities authorized by President
George W. Bush in the weeks following the terrorist attacks of
September 11, 2001." Dkt. No. 319, at 1. Defendant suspects
undisclosed evidence of this nature exists in part because of a
report published by the Inspectors General of several
intelligence agencies revealing the vast extent of warrantless
surveillance activities and in part because of the results of a
2012 Freedom of Information Act ("FOIA") request. Id. at 2; see
Dkt. No. 319-A. Accordingly, defendant seeks an order directing
the government to confirm that its prior searches encompassed
all surveillance programs and to submit a report on what
information investigators reviewed from the PSP and related

---

[8] The second motion appears to be entirely duplicative of the
first motion save for a few references to classified exhibits.
Dkt. Nos. 319, 320. Defendant claims to have filed it in
classified form only out of an abundance of caution.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

programs. Defendant does not specify in any meaningful way what such information might look like or how it might help his cause.

The government responds that "[t]here is no need for the requested orders because the scope of the prior search encompassed the PSP, and the Court already has detailed reports on what information was reviewed by investigators. . . . No new report is necessary or appropriate . . . because detailed reports providing that information were submitted to this Court" on three separate occasions.[9] Dkt. No. 330. The government also filed an ex parte declaration of an NSA officer. Dkt. No. 331. This highly classified declaration satisfies the Court that the government has fulfilled its obligations under Brady and Rule 16.

Defendant's motion seeking PSP evidence also fails for the same reasons as his motion seeking FISA evidence — that is, defendant falls short of meeting the basic requirements of a Brady claim. Defendant cannot show that the evidence sought is "favorable" or "material" because he does not offer the slightest hint as to what particular exculpatory evidence he seeks. See Brady, 373 U.S. at 87. To his credit, defendant does note that the DOJ Inspector General confirmed the existence

---

[9] The reports were filed with the Court on March 6, 2008 (Dkt No. 249); on May 14, 2008 (Dkt. No. 258); and on May 27, 2008 (Dkt. No. 259).

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

of PSP materials ███████████ though such materials remain classified. Dkt. No. 319, at 4. But that limited admission is not sufficient on its own to trigger the government's obligations under Brady or Rule 16. Even more than the preceding motions, defendant makes a request here which the Court has no power to approve. Ritchie, 480 U.S. at 59 (holding that defendants do not have a right to rummage through the government's files).

Further, defendant does not explain why the mere fact of surveillance conducted pursuant to the PSP is discoverable evidence in this context. Nor does he address inevitable questions regarding attenuation and independent sources that would work against suppression of any PSP-derived evidence used against him at trial (assuming, of course, the existence of such evidence).

**E.** **Motions to Compel Discovery Related to Khwaja Mahmood Hasan**

Defendant has filed two motions seeking production of the phone records of co-conspirator Khwaja Mahmood Hasan[10] — specifically, to prove the existence of a voice message left for Hasan in which defendant allegedly discouraged him (and Kwon)

---

[10] As with the PSP motions, defendant filed two essentially identical motions — one for unclassified evidence and another for classified evidence of the same nature. These motions will be discussed together.

REDACTED / CLEARED FOR PUBLIC RELEASE

21

J.A. 2884

REDACTED / CLEARED FOR PUBLIC RELEASE

from going to Pakistan to train with LET.  Dkt. No. 323, at 2.
Defendant asserts that he left this message sometime around
September 19, 2001.  He also asserts that the government has
been withholding records of calls made to and from Hasan's phone
in its possession, citing public sources that indicate the
government obtained such records from telecommunications
companies and conducted its own surveillance activities at the
time.  Id. at 4.  Defendant suggests that such evidence proving
he made a call to Hasan on the date in question would be
exculpatory to the extent it corroborates his account of the
voice message allegedly discouraging his followers from
traveling abroad for purposes of levying war against the United
States.

The government counters that it "has no records of the
calls involving Hasan in [the] key period, other than those that
were obtained from the [phone records] of [defendant] and Kwon,"
both of which were introduced at trial.  Dkt. No. 329, at 1.
The government similarly disclaims any attempt to obtain Hasan's
phone records by subpoena or National Security Letter.  Id. at
3.  The Court has no good reason to doubt the government's
representations, nor has defendant provided one.  Mere
insinuation and speculation are not sufficient to demonstrate
that the government actually suppressed discoverable material.
See Brady, 373 U.S. at 87.

REDACTED / CLEARED FOR PUBLIC RELEASE

22

REDACTED / CLEARED FOR PUBLIC RELEASE

More importantly, the evidence sought is not discoverable in any event. Defendant seeks mere confirmation that a call was made to Hasan's phone from his own, rather than evidence detailing the contents of the call or alleged voice message, which would not appear in the transactional records provided by a telecommunications company. Only the latter could be properly considered exculpatory. At best, the evidence sought is cumulative of defendant's testimony that he indeed made a call to Hasan on the night of September 19, 2001, a fact that was already corroborated through his own phone records, which were introduced at trial. Dkt. No. 329, at 4. Accordingly, defendant cannot satisfy the requirements of Brady or Rule 16.

### IV.    CONCLUSION

For all these reasons, each of defendant's motions to compel will be denied by an Order to be issued with this Memorandum Opinion.

Entered this _28_ day of April, 2014.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

REDACTED / CLEARED FOR PUBLIC RELEASE

23

J.A. 2886

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
UNITED STATES OF AMERICA,      )
                               )
                               )
        v.                     )     1:04cr385  (LMB)
                               )
                               )
ALI AL-TIMIMI,                 )
                               )
        Defendant.             )
```

## ORDER

On May 13, 2014, defendant filed a Motion for Reconsideration [Dkt. No. 351], in which he requests clarification of two Orders, entered on April 28, 2014, and May 8, 2014, respectively, and further requests a status hearing before the Court.  The basis for the latter request is defendant's assertion that the Court has failed to rule on four of his motions [Dkt. Nos. 265, 273, 277, 287], each of which was filed between October 2008 and February 2009.  Defendant seeks to have these motions "resolved" so that "the record [can] be made clear and complete."

One of the motions in question [Dkt. No. 273] was granted by an Order of this Court [Dkt. No. 276] on November 4, 2008.  Defendant is correct that the other three motions [Dkt. Nos. 265, 277, 287], all seeking to compel discovery, remain pending; however, they suffer from the same defects as the recently denied motions, that is, defendant generally fails to describe the evidence sought with sufficient particularity, and where he does, he cannot show that such evidence even exists.  Accordingly, consistent with the grounds for

**J.A. 2887**

denial stated in the Memorandum Opinion of April 28, 2014, it is

hereby

ORDERED that defendant's Motion for a Finding of Materiality

Regarding His Intercepted Communications with Dr. Al-Buthe [Dkt. No.

265]; Under Seal Motion [Dkt. No. 277]; and Under Seal Motion to

Compel Discovery [Dkt. No. 287] be and are DENIED; and it is further

ORDERED that defendant's Motion for Reconsideration [Dkt. No.

351] be and is DENIED; and it is further

ORDERED that the hearing currently scheduled for June 13, 2014,

at 9:00 a.m. be and is CANCELLED.

The Clerk is directed to forward copies of this Order to counsel

of record and the Classified Information Security Officer.

Entered this 21st day of May, 2014.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES, | § |
| | § |
| **Plaintiff,** | § |
| | § |
| **V.** | §    CR-04-385 |
| | § |
| **ALI AL-TIMIMI** | § |
| | § |
| **Defendant.** | § |

### NOTICE OF APPEAL

Notice is hereby given that Dr. Ali al-Timimi, Defendant in the above named case, hereby appeals to the United States Court of Appeals for the Fourth Circuit from the Order entered in this action on the 21st day of May, 2014. (Dkt. No. 357).[1]  That Order, which denied defendant's pending motions and resolved the outstanding issues in this remand, constitutes a final order.

Notice is also hereby given that Dr. al-Timimi appeals to the United States Court of Appeals for the Fourth Circuit from this Court's July 13, 2005 post-trial judgment. (Dkt. No. 132).  Dr. al-Timimi incorporates by reference his original Notice of Appeal (Dkt No. 133), filed on July 15, 2005, which appealed that July 13, 2005 judgment.  In its April 25, 2006 order remanding this case before this Court, the Court of Appeals for the Fourth Circuit stated that "following a final order by the district court, appellant may timely file without prejudice a new notice of appeal with this Court." (Ex. A).

---

[1] In its May 21, 2014 order, the District Court denied all pending motions and further denied Defendant's request for a status hearing.  The District Court previously indicated that it would not welcome additional motions and that it intended to resolve all outstanding issues and send the case back to the Fourth Circuit.  Hearing Transcript of 10/4/2013 at 29:13-30:11.

**J.A. 2889**

Respectfully submitted,

Ali al-Timimi
By Counsel

Jonathan Turley (*pro hac vice* lead counsel)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001 (phone)
(202) 994-9811 (facsimile)

Vishant Manu Krishnan, Bar No. 82308
BRYAN CAVE LLP
1155 F St, N.W.
Washington, D.C. 20004
Phone: (202) 508-6000
Facsimile: (202) 508-6200
manu.krishnan@bryancave.com

Samuel Cagle Juhan, Bar No. 84030
BRYAN CAVE LLP
1155 F Street, N.W.
Washington, D.C. 20004
Telephone: (202) 508-6000
Facsimile: (202) 508-6200
cagle.juhan@bryancave.com

By: _____/s/_____
Samuel Cagle Juhan (Bar No. 84030)

Dated: June 4, 2014

## <u>CERTIFICATE OF SERVICE</u>

I certify that this Notice of Appeal was caused by me to be served via the Court's ECF

system, on the 4th day of June, 2014, which will then send a notification of such filing (NEF) to

the following:

Mr. Gordon Kromberg, Esq.
Assistant United States Attorney
2100 Jamieson Ave.
Alexandria, Virginia 22314-5794


_____/s/_____
Samuel Cagle Juhan
*Local Co-Counsel for Dr. Ali Al-Timimi*

FILED:   August 4, 2015

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 14-4451
(1:04-cr-00385-LMB-1)
———————————

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

ALI AL-TIMIMI,

        Defendant - Appellant.

———————————

O R D E R

———————————

Upon consideration of submissions relative to appellant's motion to remand, the court grants the motion and remands this case to the district court for further proceedings.

The appeal will remain on this court's active docket.  The parties shall file a status report on September 3, 2015 and every thirty days thereafter and shall

**J.A. 2892**

immediately notify this court in writing when the district court has rendered a

decision.

The clerk is directed to attach a copy of the motion to remand to this order

and to send a copy of the order and attachment to the district court.

For the Court

/s/ Patricia S. Connor, Clerk

FILED:   July 26, 2016

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 14-4451
(1:04-cr-00385-LMB-1)
_____

UNITED STATES OF AMERICA,

         Plaintiff - Appellee,

    v.

ALI AL-TIMIMI,

         Defendant - Appellant.

_____

O R D E R
_____

Upon consideration of the unopposed motion for modification of remand

order in light of intervening Supreme Court authority, the court grants the motion

and modifies the current remand order to allow the district court to reconsider the

appellant's  section 924(c) convictions in light of <u>Johnson v. United States</u>, 135

S. Ct. 2551 (2015).

The parties shall continue to file status reports as set forth in the court's

August 4, 2015 order.  The clerk shall send a copy of this order, accompanied by the unopposed motion for modification of remand order, to the district court.

For the Court

/s/ Patricia S. Connor, Clerk

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA          )
                                   )
                v.                 )          Criminal No.  1:04cr385
                                   )
ALI AL-TIMIMI                      )

OPPOSITION TO RENEWED MOTION OF ACQUITTAL ON COUNT 1

Ali Timimi argues that his conviction on Count 1 should be vacated, because his actions could not have involved a substantial risk of such physical force, when - - as this Court previously found - - those of Masoud Khan did not.  Regardless of the merits of the Court's finding regarding Khan, that finding does not help Timimi.  This is so because the risk of physical force created by Timimi's offenses was not dependent on what Khan himself did.

To the contrary, the proper measurement of the risk of physical force involved with Timimi's offenses must be based on the crimes that he *counseled* or *solicited* his followers to commit.   The crimes that he counseled or solicited them to commit included waging war against the United States in Afghanistan - - and that crime that inherently involved a substantial risk of physical force being used against the person or property of another.

In Count 1, Timimi was indicted for aiding, abetting, counseling, and inducing others to use firearms during and in relation to crimes of violence, as follows:

> Between on or about September 16, 2001, and continuing thereafter up to on or about May 2003, within Fairfax County in the Eastern District of Virginia and elsewhere, defendant ALI AL-TIMIMI did unlawfully and knowingly *aid, abet, counsel, and induce* Masoud Khan, Randall Royer, Yong Kwon, Muhammad Aatique, Khwaja Hasan, Donald Surratt, and

others known and unknown to the grand jury, to combine, conspire, confederate, and agree together and with others known and unknown to the grand jury to use, carry, possess, and discharge firearms during, in relation to, and in furtherance of crimes of violence for which he and they may be prosecuted in a court of the United States, in violation of Title 18, United States Code, Section 924(c), and did procure the commission of such offense.

(emphasis added).

Count 1 of the indictment specifically alleged that Timimi's actions violated both 18 U.S.C. § 924(n) *and* 18 U.S.C. § 2. Section 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2. Thus, the risk of force analysis for Timimi's offenses properly is based not on whether Khan actually used force against the person or property of others, but on whether Timimi counseled or solicited Khan (and others) to do so. This Timimi surely did.

Proof at Timimi's trial established that Timimi encouraged Khan, Royer, Kwon, Aatique, Hasan, Surratt, and others, to go to Afghanistan to fight against the American troops that Timimi expected soon to invade there. Proof established that Timimi encouraged his followers to train with LET in order better to fight against U.S. troops in Afghanistan. No proof, however, indicated that Timimi helped his followers to reach the LET camps. To the contrary, helping them reach the LET camps was *Royer's* role. In other words, proof did not establish that Timimi significantly "aided and abetted" them in doing so.

Instead, trial evidence established that Timimi's culpability was based on his soliciting his followers to fight the United States in Afghanistan, and his counseling them to do so. That is

2

why he was convicted of soliciting treason as alleged in Count 2 (in violation of Sections 373 and 2381); counseling conspiracies to levy war against the United States and violate the Neutrality Act, as alleged in as alleged in Counts 3 and 6 (in violation of Sections 960, 2384, and 2); and inducing others to attempt to aid the Taliban, as alleged in Count 5 (in violation of 50 U.S.C. § 1705 and 18 U.S.C. § 2).[1]  In sum, Timimi's convictions were based not so much on proof that he "aided and abetted" the charged crimes, or that he induced or procured their commission, but on proof that he *solicited* and *counseled* them.

The risk of physical force created by Timimi's solicitation to fight against the United States, as well as his counsel to support the Taliban by fighting on its behalf, should be measured by what he solicited and counseled his followers to do, rather than what they ultimately did. What he solicited and counseled his followers to do, was to fight against U.S. troops in Afghanistan.  Trial evidence established that their failure to do so was not the result of any action of Timimi; instead, their failure was the result of LET's decision to withhold them from the fight in Afghanistan, after the Taliban's defense collapsed before their training was completed.[2]

After listening to Timimi's solicitation and counsel, Khan, Kwon, Hasan, and Aatique left the United States for Pakistan, with plans to fight in Afghanistan after obtaining training from LET.  Royer and Surratt, among others, received the same solicitation and counsel, but did not

---

[1]  Timimi also was convicted of attempting to contribute services to the Taliban himself, in violation of 50 U.S.C. § 1705, as charged in Count 4.  Khan and Chapman each were convicted of conspiring to provide material support to LET, in violation of 18 U.S.C. § 2339A, but Timimi was not charged with soliciting, aiding, abetting, counseling, or inducing that offense.

[2]  Aatique's situation was different, because he had second thoughts on the whole concept, and left the LET camps after a week.

3

**J.A. 2898**

go to fight.  The fact that Royer and Surratt did not act in accordance with Timimi's counsel was irrelevant to the risk of violence caused by Timimi's solicitation and counsel.  In fact, the failure of Khan, Kwon, and Hasan ever to reach Afghanistan to fight was no more relevant to the risk of violence caused by Timimi's solicitation and counsel, than was the failure of Royer and Surratt ever to decide to fight at all.

Indeed, the test for Section 924(c)(3)(B) is not whether the defendant's conduct caused physical harm, but whether his conduct created a substantial *risk* of harm.  The fact that no one was ultimately harmed as a result of Timimi's offenses does not detract from the *risk* of harm his offenses created.  Moreover, the *risk* of harm from his offenses must be measured in September 2001 - when he counseled and solicited his followers to fight - - and not in December 2001, when his most fervent followers gave up on the idea of doing so.

The inadequacy of Timimi's argument can be seen from a different perspective through the conviction of Ali Asad Chandia.  Like Khan, Kwon, Hasan, and Aatique, Chandia also received Timimi's counsel to fight in Afghanistan.  Unlike Khan, Kwon, Hasan, and Aatique, however, Chandia traveled to Pakistan to join LET by himself.  As a result, the government was unable to prove much of what Chandia did while he was with LET.  *See generally United States v. Chandia,* 675 F.3d 329 (4th Cir. 2012).

Like Royer and Hamdi, while at the LET camps, Chandia *might* have fired on Indian positions in Kashmir.  Or, like Kwon, Hasan, Khan, and Aatique, he might not have done so; we simply have no evidence one way or another.  The uncertainty of whether Chandia actually fired on Indian positions in Kashmir is irrelevant, however, to whether Timimi's counseling him to join LET involved a substantial risk of physical force.  This is so because, when properly

4

**J.A. 2899**

measured at the time that Timimi provided the counsel and solicitation to go fight, that counsel and solicitation created the same risk of physical harm, regardless of what Chandia actually did while in Pakistan with LET.

If a drug kingpin orders the assassination of a rival, that order involves a substantial risk of physical force against the person or property of another, regardless of whether the hit ever is carried out. If a gang leader directs his posse to rob a bank, that direction involves a substantial risk of such physical force, regardless of whether the bank ever is robbed. If a bombmaker arranges for his conspirator to deliver a detonator to a truck containing a load of fertilizer, that arrangement involves a substantial risk of such physical force, regardless of whether the fertilizer ever is ignited. In short, the proper measure of whether a criminal solicitation or counseling involves a substantial risk of physical force is the likelihood of violence occurring upon the listeners' receipt of the counsel, and not upon whether the listeners ultimately engage in the violent activity that was solicited and counseled.

In light of the violence that Timimi solicited and counseled, his crimes surely involved a substantial risk of physical force being used against the person or property of another. The fact that Timimi's most avid followers ultimately failed to fight against U.S. forces in Afghanistan does not affect the substantiality of the risk created by Timimi's conduct months earlier, when he solicited and counseled them to fight.

Timimi also argues that his criminal actions could not have involved a substantial risk of physical harm to the person or property of another because he, himself, fired no weapon. This Court previously determined that none of Khan's actions involved either Khan's actual use of force or a substantial risk that he would use force. Nevertheless, the fact that Timimi himself

5

handled no weapons is irrelevant.  That is so because, under traditional principles of co-conspirator liability, Timimi is liable for the actions of those he counseled.  *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946).  Accordingly, the absence of weapons handled by Timimi himself is irrelevant to any determination of the culpability attributed to him for the crimes that he solicited or counseled.

In reaching its conclusion that Khan's actions did not involve either the actual use of force or a substantial risk that he would use force, this Court relied on *United States v. Fuertes*, 805 F.3d 485 (4th Cir. 2015).  This Court pointed to the statement in *Fuertes* that, under § 924(c)(3)(B), "the relevant inquiry is not whether there is a risk of <u>any</u> person using force in any way tangentially related to an on-going offense, but rather whether there is a substantial risk of the <u>defendant</u> doing so."  *Khan,* slip op. at p.31, n.19 (emphasis in original).

*Fuertes* does not support Timimi's argument, because *Fuertes* was not a prosecution for a conspiracy to commit violence (much less a prosecution for the solicitation of violence or counseling violence).  The language from *Fuertes* that ostensibly limits the risk to that caused by actions of the defendant himself simply does not apply to a conspiracy case.  That is so because because, under traditional principles of co-conspirator liability, Timimi is liable for the actions of those he counseled.  *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946).  As the Fourth Circuit has written, "a conspiracy can itself be a separate crime of violence providing its own predicate for § 924(c)(1) liability."  *United States v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010).[3]

---

[3]  Internal quotations and citations are omitted throughout this pleading.

"The Fourth Circuit recognizes the full breadth of the conspiracy doctrine described in *Pinkerton*." *United States v. Cummings*, 937 F.2d 941, 945 (4th Cir. 1991). "A defendant may be convicted of a § 924(c) charge on the basis of a coconspirator's use of a gun if the use was in furtherance of the conspiracy and was reasonably foreseeable to the defendant." *United States v. Wilson*, 135 F.3d 291, 305 (4th Cir. 1998).

In *United States v. Blackman*, 746 F.3d 137, 140–42 (4th Cir. 2014), the Fourth Circuit upheld a defendant's conviction under § 924(c) for brandishing a firearm during two robberies for which the defendant was not present. The Fourth Circuit reasoned that the defendant was guilty under *Pinkerton* principles, since "the use of a firearm was both reasonably foreseeable to him and in furtherance of the goals of the conspiracy." *Id.* at 141–42. For purposes of liability under § 924(c), the fact that the defendant was not present for each robbery was "irrelevant." *Id.* at 141.

Moreover, because conspiracy cases involve an agreement to achieve some unlawful goal, they raise special considerations when the goal of the conspiracy is itself violent. Under Section 924(c)(3)(B), "a conspiracy is itself a crime of violence when its objectives are violent crimes." *Ayala*, 601 F.3d at 267. This is because "[w]hen conspirators have formed a partnership in crime to achieve a violent objective . . . they have substantially increased the risk that their actions will result in serious physical harm to others." *Id.* (bracketed text and ellipsis in original). Here, Timimi solicited and counseled his followers to conspire to engage in combat against the United States. By counseling them to form "a partnership in crime to achieve a violent objective," they "substantially increased the risk that their actions [would] result in serious physical harm to others."

**J.A. 2902**

If a mob boss commands his crew to use machine guns to rob a bank, he cannot persuasively claim that his conduct did not involve a substantial risk of force simply because during the robbery, he, himself, remained outside the bank without a gun.  Likewise, a gangster who orders a henchman to murder a rival cannot persuasively claim that his conduct did not involve a substantial risk of force simply because he, himself, did not lay a hand on the victim. Similarly, a terrorist who builds a bomb cannot persuasively claim that his conduct did not involve a substantial risk of force simply because he, himself, remained at home while someone else planted the bomb on a bus.  In short, the language of *Fuertes* simply cannot apply to conspiracy cases, or to cases of the solicitation of violence.

For the foregoing reasons, Timimi's motion should be denied.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

_____/s_____

By:    Gordon D. Kromberg
       Assistant United States Attorney
       Virginia Bar No. 33676
       Assistant United States Attorney
       Attorney for the United States
       2100 Jamieson Avenue
       Alexandria, VA  22314
       (703) 299-3700
       (703) 837.8242 (fax)
       gordon.kromberg@usdoj.gov

8

**J.A. 2903**

CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of August 2018, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification of such filing

(NEF) to all attorneys of record.


_____/s_____
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Assistant United States Attorney
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:04-cr-385 (LMB) |
| | ) | |
| ALI AL-TIMIMI, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## AL-TIMIMI'S REPLY TO GOVERNMENT'S SUPPLEMENTAL MEMORANDUM ON *UNITED STATES v. DAVIS*

Dr. Ali Al-Timimi's convictions under Counts 1, 7, and 8 all depend on the residual clause that the Supreme Court has invalidated in *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). Although the government attempts three final arguments for sustaining certain predicates under the force clause, all are foreclosed by the categorical approach that governs that clause's interpretation, and in any event, none are supported by the record. As such, his convictions are unconstitutional, and he respectfully requests that the Court grant his motions and adjust his sentence as described in the attached proposed order.

In addition, Al-Timimi is also prepared to show that the invalidation of the Count 1 conspiracy taints the *Pinkerton* theory that Counts 9 and 10 depend upon. Accordingly, he respectfully seeks leave to file and brief a motion for a new trial in the event of such acquittal as described in the separate motion he files today at Dkt. No. 460.

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................... i

TABLE OF AUTHORITIES........................................................................... iii

BACKGROUND ................................................................................................1

ARGUMENT .....................................................................................................2

I.     Because *Davis* has invalidated § 924(c)'s residual clause, only force-clause offenses may now qualify as crimes of violence under the act ..........................................................2

II.    None of the government's three asserted predicates satisfy the force clause .....................2

     A.    All three predicates incorporate the crime of conspiracy, which the government concedes is not a force-clause offense .................................................3

     B.    In any event, none qualify as force-clause offenses even without reference to conspiracy. ...........................................................6

          1.    The Neutrality Act is not a force-clause offense .........................................6

          2.    Treason is not a force-clause offense..........................................................7

              a.    The treason statute can be violated without the use of force ...........................................................7

              b.    Defendant has not waived his right to challenge the government's attempt to premise its §§ 924(c) and (o) convictions on the treason statute ...................................................8

              c.    The categorical approach does not permit the government to exclude the "aid and comfort" prong from the treason statute ....................................................10

              d.    The crime of treason is not "divisible" into two different crimes ...................................................11

          3.    Section 2390 is not a force-clause offense.................................................13

III.   The government cannot sustain Counts 1, 7, or 8 on indeterminacy grounds ..................15

     A.    Because the government can no longer point to any valid predicate after *Davis*, there is no indeterminacy issue in this case.........................................15

B.    In any event, the Supreme Court's rule in *Yates* requires a conviction to be set aside where, as here, verdict indeterminacy results from a constitutional or statutory defect ................................................................15

    1.    Any *Yates* error in this case would not be harmless ...................17

        a.    The record does not support the use of the Section 2390 enlistment statute as a force-clause predicate for Counts 1, 7, or 8 ..........................................................17

        b.    The record does not support the use of the Neutrality Act as a force-clause predicate for Counts 1, 7, or 8 ..........................19

        c.    The record does not support the use of the treason statute as a force-clause predicate for Count 1 ..........................................20

    2.    Should this Court sustain a predicate in a manner that results in an indeterminate verdict, Al-Timimi requests leave to seek a new trial as alternative relief ................................................21

IV.    Remedy ................................................................................................21

CONCLUSION ................................................................................................24

# TABLE OF AUTHORITIES

## CASES

*BMG Rights Mgmt. (US) LLC v. Cox Communs., Inc.*,
  881 F.3d 293 (4th Cir. 2018) ............................................................... 19

*Chapman v. United States*,
  326 F. Supp. 3d 228 (E.D. Va. 2018) ................................................... 18

*Class v. United States*,
  138 S. Ct. 798 (2018) ............................................................................. 9

*Descamps v. United States*,
  570 U.S. 254 (2013) ............................................................................. 11

*Ex parte Bollman*,
  8 U.S. (4 Cranch) 75 (1807) ...................................................... 8, 13, 21

*Griffin v. United States*,
  502 U.S. 46 (1991) ............................................................................... 16

*Hedgpeth v. Pulido*,
  555 U.S. 57 (2008) ............................................................................... 16

*Henderson v. United States*,
  568 U.S. 266 (2013) ............................................................................... 9

*Johnson v. United States*,
  520 U.S. 461 (1997) ............................................................................... 9

*Johnson v. United States*,
  559 U.S. 133 (2010) ............................................................................. 11

*Khan v. United States*,
  330 F. Supp. 3d 1076 (E.D. Va. 2018) ................................................. 18

*Mathis v. United States*,
  136 S. Ct. 2243 (2016) .................................................................... 11, 12

*Moncrieffe v. Holder*,
  133 S. Ct. 1678 (2011) ......................................................................... 11

*Neder v. United States*,
  527 U.S. 1 (1999) ................................................................................. 17

*Pinkerton v. United States*,
    328 U.S. 640 (1946) ............................................................................ 5, 23

*Rosemond v. United States*,
    572 U.S. 65 (2014) ................................................................................ 19

*Royer v. United States*,
    324 F. Supp. 3d 719 (E.D. Va. 2018) ..................................................... 18

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) ........................................................................... 9

*United States v. David*,
    83 F.3d 638 (4th Cir. 1996) .................................................................... 9

*United States v. Davis*,
    139 S. Ct. 2319 (2019) ........................................................................ 1, 2

*United States v. Dozier*,
    848 F.3d 180 (4th Cir. 2017) ................................................................. 13

*United States v. Khan*,
    309 F. Supp. 2d 789 (E.D. Va. 2004) ....................................... 4, 14, 18, 20

*United States v. Khan*,
    461 F.3d 477 (4th Cir. 2006) .............................................................. 4, 14

*United States v. McFadden*,
    823 F.3d 217 (4th Cir. 2016) ................................................................. 17

*United States v. Resendiz-Ponce*,
    549 U.S. 102 (2007) .............................................................................. 14

*United States v. Simms*,
    914 F.3d 229 (4th Cir. 2019) (en banc) ................................................ 3, 14

*United States v. St. Hubert*,
    909 F.3d 335 (11th Cir. 2018) ................................................................ 9

*United States v. Terrell*,
    731 F. Supp. 473 (S.D. Fla. 1989) ........................................................... 7

*Yates v. United States*,
    354 U.S. 298 (1957) .............................................................................. 16

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. CONST., ART. III, § 3 ................................................................................. 7

18 U.S.C. § 371 ....................................................................................... 3, 4, 5

18 U.S.C. § 373 ......................................................................................... 8, 9

18 U.S.C. § 844(h)(2) ................................................................................... 23

18 U.S.C. § 924(c) ................................................................................. passim

18 U.S.C. § 924(o) ................................................................................. passim

18 U.S.C. § 960 ..................................................................................... passim

18 U.S.C. § 2381 .............................................................................. 2, 20, 21

18 U.S.C. § 2384 ...................................................................................... 2, 4, 5

18 U.S.C. § 2390 ............................................................................ 3, 13, 17

## OTHER AUTHORITIES

Fed. R. Crim. P. 12(b)(3) .......................................................................... 8, 10

Fed. R. Crim. P. 52(b) ................................................................................... 9

Model Penal Code § 5.01 ............................................................................. 14

U.S. Dept. of Justice, USAM Criminal Resource Manual § 2483 ................................. 5

# BACKGROUND

1.      Before this Court are Al-Timimi's pending motions for acquittal on Count 1, 7, and 8.[1] On June 24, the Supreme Court in *United States v. Davis*, 139 S. Ct. 2319 (2019) invalidated the "residual clause" portion of the "crime of violence" definition that underlies Al-Timimi's convictions on all three counts. The following day, this Court ordered the government to show cause as to why Al-Timimi's motions should not be granted in light of the Supreme Court's decision. Dkt. No. 453.

2.      The present dispute concerns *Davis*' impact on Jury Instruction No. 44, which provided the jury with nine predicates—labeled A through I—that it was permitted to select from at trial. *See* Trial Tr., April 18, 2005 [Dkt. No. 156] at 2317-20. The defense's position, as argued in Al-Timimi's opening brief, is that all nine depend on the residual clause because none require the use, threatened use, or attempted use of force as an element. *See* Dkt. No. 433 at Ex. A (statutory addendum comparing each predicate against § 924(c)(3)). The government's opposition brief had taken the position that the crime of conspiracy could be sustained under the force clause based on an argument that conspiracy "portends"—and thus threatens—the use of force. *See* Dkt. No. 437 at 18-19; *see also* Dkt. No. 442 at 10-11 (response to 2018 *Dimaya* show-cause order).

3.      The government has now filed a response to this Court's show-cause order. Dkt. No. 455 ("Govt. Br."); Dkt. No. 456 (addendum). The government concedes that conspiracy is no longer a valid predicate, *see* Govt. Br. at 12, but instead asserts three others related to the Neutrality Act, the treason statute, and the enlistment statute of § 2390. Govt. Br. at 13-20. This

---

[1]      A complete procedural background to each motion can be found in Al-Timimi's opening briefs. *See* Dkt. No. 433 at 4-6 (Counts 7 and 8) and Dkt. No. 446 at 1-3 (Count 1).

reply follows.

## ARGUMENT

**I.    Because *Davis* has invalidated § 924(c)'s residual clause, only force-clause offenses may now qualify as crime of violence under the act.**

The parties have no disagreement concerning *Davis*'s legal impact on 18 U.S.C. §§ 924(c) and (o)—the statutes on which Counts 1, 7, and 8 are based. Both statutes define the term "crime of violence" to be "an offense that is a felony" and

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). Subsection A is commonly known as the "force clause" or "elements clause," whereas Subsection B comprises the "residual clause." *See*, *e.g.*, *Davis*, 139 S. Ct. at 2324. *Davis* invalidated the residual clause as unconstitutionally vague under the Due Process Clause. *Id.* at 2323-24; 2336; *see also* Govt. Br. at 1. As a result, only force-clause offenses may now qualify as "crimes of violence" under the act.

**II.    None of the government's three asserted predicates satisfy the force clause.**

The heart of the government's argument is that three of the predicates enumerated in Jury Instruction 44—Predicate C, Predicate A, and Predicate I—can be sustained as crimes of violence under the force clause instead of the now-invalid residual clause. Govt. Br. at 13. These predicates (each incorporating the crime of conspiracy) were read to the jury as follows:

A.    Levying war against the United States *and conspiring do so*, in violation of Title 18, United States Code, sections 2381 and 2384; [ . . . ]

C.    Beginning, providing for, preparing a means for, and taking part in military

expeditions and enterprises to be carried on from the United States against the territory and dominion of foreign states, districts, and peoples with whom the United States was at peace—*and conspiring to do so*—in violation of Title 18, United States Code, sections 371 and 960; [ . . . ]

I.      Enlisting and engaging with intent to serve in armed hostility against the United States—*and conspiring to do so*—in violation of Title 18, United States Code, sections 371 and 2390.

Trial Tr., April 18, 2005 [Dkt. No. 156] at 2318-19 (emphasis added). As detailed below, however, the government's argument fails. All three predicates relied on § 924(c)(3)'s residual clause and thus none remain viable in light of *Davis*.

### A.      All three predicates incorporate the crime of conspiracy, which the government concedes is not a force-clause offense.

The simplest and most straightforward reason that the government's theory breaks down is that all three predicates could be satisfied by the mere formation of a conspiracy—an offense that the government itself concedes depends on the residual clause. *See* Govt. Br. at 12; *see also United States v. Simms*, 914 F.3d 229, 233-34 (4th Cir. 2019) (en banc). Because conspiracy does not require the use, threatened use, or attempted use of force, none are valid force-clause predicates.

Perhaps seeking to avoid this complication, the government's brief does not address it directly, but instead appears to simply conflate the overarching § 924(o) conspiracy charged in Count 1 with the individual conspiracy prongs associated with each predicate. [2] So with respect

---

[2]      Although the government does not address the issue while arguing its three asserted predicates under the force clause, it does mention it later when attempting to support those same predicates with evidence. *See* Govt. Br. at 20, n.9. Notably though, the position it takes is the same as the defense's: that each predicate's use of the word "and" serves to incorporate conspiracy into that predicate by allowing the jury to select from "any of the charged alternative acts." *Id.*; *see also* Trial Tr., April 18, 2005 [Dkt. No. 156] at 2305-06 (jury instruction on conjunctive language). This would appear to concede that each predicate can be satisfied by the mere formation of a conspiracy.

3

**J.A. 2913**

to Predicate C, for example, the government conceptualizes Count 1 *solely* as a § 924(o) conspiracy to violate the Neutrality Act. It ignores the ability of the jury to have predicated the § 924(o) conspiracy on a separate § 371 conspiracy to violate the Neutrality Act—even though § 371 was plainly incorporated into Predicate C as read to the jury.

But the government is wrong to lump these conspiracies together because treating them as separate and distinct is precisely how it obtained the § 924(o) convictions of Seifullah Chapman and Masoud Khan—principals to the same § 924(o) conspiracy that Count 1 charges Al-Timimi with aiding and abetting. *See*, *e.g.*, Dkt. No. 47 at 4, ¶ 2 (superseding indictment naming Khan as a principal to Count 1). Notably, Khan and Chapman were both *acquitted* of charges that they committed direct violations of the Neutrality Act. *See United States v. Khan*, 309 F. Supp. 2d 789, 823-24 (E.D. Va. 2004). Instead, Chapman was convicted of a § 371 *conspiracy* to violate the Neutrality Act, *id*. at 818, and Khan of (among other things) a § 2384 conspiracy to commit treason. *Id*. at 820-21. The government then used these § 371 and § 2384 conspiracies as the predicates for their separate § 924(o) conspiracy conviction. *Id*. at 823.

As a result, Khan and Chapman's conviction for the § 924(o) conspiracy was predicated entirely on *other conspiracy offenses*, as the Fourth Circuit made clear in affirming Khan's conviction on appeal:

> Count Eleven alleged a conspiracy to use firearms in connection with a conspiracy to commit a crime of violence. Because one cannot 'conspire to conspire,' defendants argue, these Counts should be dismissed. We disagree. . . . . [*T*]*he conspiracy to use or possess a firearm represents a distinct offense with different objectives from the predicate conspiracy to violate the Neutrality Act or provide services to the Taliban*. Therefore, the underlying conspiracies may properly serve as predicates for the overarching conspiracies alleged. More fundamentally, the statutes in question expressly contemplate allowing one conspiracy to serve as the predicate offense for another conspiracy.

*United States v. Khan*, 461 F.3d 477, 492-93 (4th Cir. 2006) (emphasis added) (citations omitted). Although Al-Timimi was tried separately, the doctrinal theory is the same. The

government is in no position to ignore the § 371 and § 2384 conspiracy prongs of Predicates A,

C, and I, when these conspiracy prongs were precisely what it relied upon to secure the § 924(o)

convictions of the principals.

Moreover, the aggressive use of expansive (and at times unprecedented) theories of

inchoate liability was a recurring theme in the government's prosecution of this case. Count 1,

for example, did not even charge Al-Timimi with membership in the § 924(o) conspiracy at all,

but only with aiding and abetting it. As this Court remarked during argument over jury

instructions:

> . . . I think the issue is -- this is a tough case because it's almost a third level of
> culpability; that is, you've got the underlying offense, an inchoate offense such as
> conspiracy to do it, then you've got him one step further removed, aiding and abetting or
> soliciting or procuring the conspiracy. It certainly is a unique set of legal structure.

Trial Tr., April 18, 2015 [Dkt. No. 156] at 2180.[3] The government's use of conspiracies as

predicates to other conspiracies further highlights the extent to which it pushed the boundaries of

inchoate liability. Count 1 combined with Predicate C, for example, charges Al-Timimi with the

crime of (1) aiding and abetting a (2) § 924(o) conspiracy to use firearms in relation to a (3)

separate underlying § 371 conspiracy to (4) violate the Neutrality Act of § 960. Stretching the

theory further still, the government then used this Count 1 conspiracy to invoke the *Pinkerton*

doctrine throughout its post-trial briefs in support of Counts 7-10. *See, e.g.*, Dkt. No. 125 at 37-

40 (government's 2005 post-trial brief, basing Counts 7-10 on *Pinkerton*); *see also* Dkt. No. 447

at 5-7. Having aggressively pursued these expansive theories of inchoate liability at trial, the

government should not be permitted to retreat from them now.

---

[3]    *See also* U.S. Dept. of Justice, USAM Criminal Resource Manual § 2483, available at
http://www.justice.gov/usam/criminal-resource-manual-2483-conspiracy-aid-and-abet ("The
concept of aiding and abetting a conspiracy has not been widely adopted. . . . Even in the
Seventh Circuit, the concept has been criticized.") (citations omitted).

**B.    In any event, none of the asserted predicates qualify as force-clause offenses even without reference to conspiracy.**

Because each of the government's asserted predicates incorporates the crime of conspiracy, none can serve as valid force-clause offenses and the government's theory fails. But regardless, the predicates cannot satisfy the force clause standing alone either. They are discussed below in the order that the government presents them in its brief.

**1.    The Neutrality Act is not a force-clause offense.**

The government first argues that 18 U.S.C. § 960 (commonly known as the "Neutrality Act") is a force-clause offense. The government is incorrect. Section 960 provides as follows:

> Whoever, within the United States, knowingly begins or sets on foot *or provides or prepares a means for or furnishes the money for*, or takes part in, any military or naval expedition or enterprise to be carried on from thence against the territory or dominion of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 960 (emphasis added). As the defense points out in its opening brief, *see* Dkt. No. 433, Ex. A, this statute can be violated without the use of force—namely, by providing money or preparatory assistance for such an enterprise without actually participating in it. Accordingly, it fails to meet the criteria of 18 U.S.C. § 924(c)(3)(A).

In response, the government suggests that a person who violates § 960 by furnishing money can be viewed as an accomplice who is aiding and abetting a force-clause offense committed by a principal. This too is incorrect. Under the statute's plain text, a person who furnishes money for an enterprise subject to the Neutrality Act is a principal—not an accomplice. And this is undoubtedly by design, as many Neutrality Act enterprises can be expected to be located outside the United States and thus comprised of persons not chargeable as principals under the Act.

6

As an example, an American who, from within the United States, funded a group of guerilla rebels in a friendly country would be in plain violation of the Neutrality Act. But he or she would be guilty as a *principal*, not an accomplice, as the foreign rebels themselves would be outside the purview of § 960.[4] Because this hypothetical defendant would be guilty of violating Section 960 without having used force against the person or property of another, Section 960 is not a force-clause offense.

### 2. Treason is not a force-clause offense.

#### a. The treason statute can be violated without the use of force.

The government next argues that treason is a force-clause offense. The crime of treason is the only crime defined in the United States Constitution[5] and is statutorily codified at Section 2381, which provides as follows:

> Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason and shall suffer death, or shall be imprisoned not less than five years and fined under this title but not less than $10,000; and shall be incapable of holding any office under the United States.

18 U.S.C. § 2381.

As the defense observed in its opening brief, the treason statute is not a force-clause offense because it can be violated without the use, attempted use, or threatened use of force— namely, by giving aid or comfort to an enemy of the United States engaging in any fighting. *See*

---

[4]     *See United States v. Terrell*, 731 F. Supp. 473, 474-77 (S.D. Fla. 1989) (defendants charged with violating Neutrality Act for shipping weapons to Contra rebels in Nicaragua. Indictment was dismissed only on District Court's conclusion that Nicaragua was not a country "at peace" with the United States at the time of the charged act).

[5]     Article III, Section 3 provides that "Treason against the United States, shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort. No person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court."

7

Dkt. No. 433, Ex. A. Alternatively, under the jury instructions used at trial (which defined "levy war" as "to wage war or to carry on war," Trial Tr., April 18, 2005 [Dkt. No. 156] at 2323),[6] one might also commit treason by "carry[ing] on war" in a non-combat role that does not involve the use of force. *See also Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 126 (1807) ("It is not the intention of the court to say that no individual can be guilty of this crime who has not appeared in arms against his country. On the contrary, if war be actually levied, that is, if a body of men be actually assembled for the purpose of effecting by force a treasonable purpose, *all those who perform any part, however minute, or however remote from the scene of action*, and who are actually leagued in the general conspiracy, *are to be considered as traitors*.") (emphasis added).

Either scenario prevents the treason statute from qualifying as a force-clause offense, and thus ends the inquiry. Although the government responds with several novel arguments to the contrary, all are unavailing. They are discussed in turn.

### b. Defendant has not waived his right to challenge the government's attempt to premise its §§ 924(c) and (o) convictions on the treason statute

The government's first argument is that the defense should not be permitted to challenge treason as a § 924(c) predicate it all, based on its claim that the defense did not challenge the government's use of treason as a predicate to the force clause of § 373—a separate statute used to charge Count 2. The government then characterizes the defense's Rule 29 motion as a challenge to a procedural defect in the indictment, which it claims Fed. R. Crim. P. 12(b)(3)

---

[6] The defense objected to this definition at trial, asking instead for an instruction that defined "levying war" as requiring that "a body of men be actually assembled for the purpose of effecting by force a treasonable purpose" under *Bollman*, 8 U.S. (4 Cranch) at 126 ("[T]here must be an actual assembling of men for the treasonable purpose, to constitute a levying of war"). *See* Dkt. No. 96 at 2 (defendant's objections to government's proposed jury instructions); *see also* Trial Tr., April 13, 2005 [Dkt. No. 154] at 1816-18 & April 18, 2005 [Dkt. No. 156] at 2184-88 (argument over levy war instructions); Dkt. No. 118 at 52 (2005 post-trial motion).

required the defense to raise in a pre-trial motion. *See* Govt. Br. at 14-15. The government is incorrect.

As a starting point, §§ 373 and 924(c) are two different statutes; regardless of how the defense may have approached § 373 in a pre-*Davis* landscape,[7] the government cites no authority for imputing this alleged position to § 924(c). But more crucially, the government's characterization of the current Rule 29 motion is inaccurate: A conviction based on an unconstitutional predicate is not a mere procedural defect; it is a conviction that is invalid as a matter of law.[8] The Supreme Court has made clear that when a trial-court ruling becomes plainly erroneous on direct review due to intervening changes in the law, plain error applies under Rule 52(b). *Henderson v. United States*, 568 U.S. 266, 268-69 (2013); *see also Johnson v. United States*, 520 U.S. 461, 468 (1997); *United States v. David*, 83 F.3d 638, 645 (4th Cir. 1996) ("the purposes of the contemporaneous objection rule and considerations of sound judicial administration counsel in favor of plain error review where an objection at trial would have been indefensible because of existing law, but a supervening decision prior to appeal reverses that well-settled law, rendering defendant's claim clearly meritorious."). Moreover, even if the issue of an invalid predicate offense were subject to Rule 12(b)(3), the rule has since been amended to clarify that it applies only "if the basis for the motion is then reasonably available." Fed. R.

---

[7]    As Count 2 is not currently before the Court, the defense makes no representations or concessions concerning its right to address it on further review. As described above, the question of how to define treason to the jury for purposes of Count 2 was a matter of significant dispute between the parties, and the defense objected to the definition of "levy war" used at trial. *Supra* at 8, n.6.

[8]    As the Supreme Court recently held in *Class v. United States*, 138 S. Ct. 798, 802; 805-807 (2018), even a guilty plea does not waive a defendant's right to challenge the constitutionality of the statute of conviction. *See also United States v. St. Hubert*, 909 F.3d 335, 344 (11th Cir. 2018) (challenge to § 924(c) conviction under *Dimaya* is jurisdictional and cannot be waived).

Crim. P. 12(b)(3); *see also id.*, Notes of Advisory Committee on 2104 amendments. No party could reasonably have anticipated *Davis*' impact on the residual clause at the time of Al-Timimi's trial in 2005.

The government is also in a particularly unfavorable position to argue that the defense is time-barred from challenging the government's assertion of treason as a predicate. The defense's opening brief, filed in 2016, analyzed and explained why each of the nine predicates—including treason—failed to satisfy the force clause. *See* Dkt. No. 433, Ex. A. The government's opposition brief did not answer the defense's arguments under the treason statute at all, but instead limited its force-clause arguments to conspiracy, based on an unsuccessful argument that a conspiracy might be conceptualized as "portend[ing]"—and thus threatening—the use of force. *See* Dkt. No. 437 at 18-19. Its assertion of treason as a force-clause offense is a new argument that it makes for the first time here. Thus, to the extent any party is making belated arguments, it is not the defense.

### c.    The categorical approach does not permit the government to exclude the "aid and comfort" prong from the treason statute.

Next, the government argues that the jury instructions should be read as excluding the "aid and comfort" prong of the treason statute based on how they were delivered to the jury. *See* Govt. Br. at 16-17. The government suggests that because the jury instructions emphasized the "levy war" prong of the statute for purposes of defining Count 2, the "aid and comfort" prong should be excluded for purposes of evaluating the treason statute under Sections 924(c) and (o). Thus, according to the government, a statute that can be violated without the use of force can nonetheless be transformed into a force-clause offense by simply removing or deemphasizing any non-conforming prongs and instructing the jury with this partial version of the statute.

In so arguing, the government is advocating precisely what the categorical approach

prohibits: the transformation of an elements-based inquiry into a case-specific one. The question of whether a predicate qualifies as a "crime of violence" under § 924(c)(3) is a categorical determination that is made as a matter of law. An offense either is or is not a crime of violence; its statutory language cannot be customized to fit a particular case. *See*, e.g., *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1684 (2011) (observing that under the categorical approach, a court "must presume that the conviction 'rested upon nothing more than the least of the acts' criminalized.") (*quoting Johnson v. United States*, 559 U.S. 133, 137 (2010)).

And in any event, the argument is ultimately moot. As noted above, even without reference to "aid and comfort," the government's argument fails because the jury instructions used at trial would allow one to "levy war" by "carry[ing] on war" in a non-combat role that does not involve the use of force, and so too would the Supreme Court's decision in *Bollman*. *See supra* at 7-8.

### d. The crime of treason is not "divisible" into two different crimes.

Finally, the government suggests that the treason statute be divided into two separate crimes—one that covers levying war and the other that covers the giving aid or comfort—by using the "divisibility" doctrine that the Supreme Court established in *Descamps v. United States*, 570 U.S. 254, 258 (2013) and *Mathis v. United States*, 136 S. Ct. 2243 (2016). As a starting point, that doctrine applies in the specialized context of the "modified categorical approach" and deals with the unique complexities associated with evaluating various *state* statutes against their generic federal analogues. *See Descamps*, 571 U.S. at 261-62; *Mathis*, 136 S. Ct. at 2248-49. A state burglary statute, for example, might define several forms of burglary, with each having distinct elements and punishment criteria. Accordingly, the divisibility doctrine allows a reviewing court to treat these as different crimes in evaluating whether they qualify as

generic burglary under statutes such as the Armed Career Criminal Act. But this specialized

doctrine has no obvious applicability to § 924(c) and indeed the government cites no cases

applying it in that context.

In any event, the doctrine would not help the government here. For a statute to be

divisible, and thus define multiple crimes, each crime must have a distinct set of elements that

the jury is required to reach unanimous agreement upon. *Mathis*, 136 S. Ct. at 2248-49 & 2256-

57. Federal treason, by contrast, is one crime—indeed, it is the only crime specifically defined by

the United States Constitution. Neither the Constitution nor the treason statute make any legal

distinction between whether treason is committed by levying war against the United States or

giving aid to others who are doing so; both means of commission are punishable by death and

require the same essential elements (*i.e.*, a duty of loyalty to the United States, a treasonous act,

and the testimony of two witnesses or a confession).

Contrary to the government's suggestion, the line between levying war and providing aid

and comfort is not always a clear one, and there should be no reason to expect jury unanimity

over the issue. For example, an American caught assisting an enemy on a battlefield may have

been firing on American troops, or providing logistical aid or assistance, or both. Similarly, if a

defendant is charged with participating in armed insurrection, there may be some dispute over

whether his or her battlefield activity is better characterized as fighting or instead some form of

non-combat assistance. But these distinctions should not be relevant for the purposes of the

treason statute, and indeed the Constitution confirms that they are not. Irrespective of whether an

American is caught directly attacking American troops or aiding an enemy's efforts to do the

same, that person has committed treason and is subject to penalties that include death. Its

defining characteristic is the breach of loyalty to one's country, regardless of whether that breach

takes form in a combat or non-combat role.

And regardless, this argument too is ultimately moot as applied to this case. As noted above, the jury instructions used at trial defined "levy war" to include "carry[ing] on war," which would allow one to levy war in a non-combat role, as would the Supreme Court's decision in *Bollman*. *See* supra at 7-8.

### 3. Section 2390 is not a force-clause offense.

Third and finally, the government argues that Section 2390 is a force-clause offense. The statute provides as follows:

> Whoever enlists or is engaged within the United States or in any place subject to the jurisdiction thereof, with intent to serve in armed hostility against the United States, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 2390.

As the defense observes in its opening brief, Section 2390 is not a force-clause offense because it can be committed without the use, attempted use, or threatened use of force—namely, by enlisting with intent to serve in armed hostility and making basic preparations to do so, without taking any substantial steps toward participation in combat or otherwise reaching a point where fighting is imminent. *See* Dkt. No. 433, Ex. A.

In response, the government claims that Section 2390 can be sustained under the force clause because (according to the government) it requires the *attempted* use of force. In support, it points to the federal definition of attempt (based on the Model Penal Code) that requires "(1) culpable intent to commit the crime charged and (2) a substantial step toward completion of the crime." Govt. Br. at 18 (*citing United States v. Dozier*, 848 F.3d 180, 186 (4th Cir. 2017)). A substantial step, as the government observes, is a "direct act in a course of conduct planned to culminate in commission of a crime that is strongly corroborative of the defendant's criminal

purpose." *Dozier*, 848 F.3d at 186 (internal citations and quotations omitted); *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 107 (2007) ("As was true at common law, the mere intent to violate a federal criminal statute is not punishable as an attempt unless it is also accompanied by significant conduct.")

Crucially though—and left out of the government's analysis—is that a substantial step always requires "*more than mere preparation*." *Id.* (emphasis added); *see also* Model Penal Code § 5.01, Explanatory Note ("where the actor has not yet completed his own conduct, . . . the problem is to distinguish between acts of preparation and a criminal attempt."). This distinction between attempt and mere preparation is precisely what prevents the "attempt" prong of the force clause from swallowing other intent-oriented offenses such a conspiracy—a crime that both parties acknowledge is not a force-clause offense. *See*, *e.g.*, *Simms*, 914 F.3d at 233-34.

Operating under this standard, Section 2390 cannot be a force-clause offense because enlistment *does* encompass mere preparations; nothing in the statute's language purports to incorporate the attempted use of force as an element. As this Court held in *Khan* (one of the few cases to ever construe Section 2390), "[t]he plain language of the statute 'enlists or is engaged' is not limited to formal enrollment in an enemy military force, but can reach preparations within the United States for joining an enemy force overseas." *Khan*, 309 F. Supp. 2d at 819; aff'd, remanded, 461 F.3d 477 (4th Cir. 2006). And indeed, this interpretation is further corroborated by its maximum prison sentence of just three years—a punishment cap difficult to reconcile with the government's suggestion that it requires the actual attempted use of force against United States troops.

III.    **The government cannot sustain Counts 1, 7, or 8 on indeterminacy grounds.**

The jury in this case issued only a general verdict; neither party requested that it be specifically polled on Jury Instruction 44. *See* Trial Tr., April 26, 2005 [Dkt. No. 161] at 2412; (transcript also attached to Dkt. No. 433 as Ex. C). Accordingly, both parties now agree that the record does not indicate which of the nine asserted predicates the jury selected to support Counts 1, 7, and 8. *See* Dkt. No. 433 at 8-9 (Def. opening brief); *see also* Govt. Br. at 4.

As such, even assuming that the government could sustain one of its predicates under the force clause, it would have no way of demonstrating that this predicate was in fact one that the jury actually selected. As described below, verdict "indeterminacy" problems of this sort ordinarily require that the verdict be set aside. Although an exception exists under the harmless error doctrine, the government cannot meet its burden here.

A.    **Because the government is no longer able to point to *any* valid predicate after *Davis*, there is no indeterminacy issue in this case.**

As a starting point, the defense emphasizes its position that verdict indeterminacy only becomes relevant if the government can sustain at least one of its predicates under the force clause. As described above, the government's asserted predicates fail to do so because all incorporate the crime of conspiracy. Moreover, even standing alone, none require the use, attempted use, or threatened use of force. Accordingly, the defense's position is that it is unnecessary to conduct an "indeterminacy" analysis of this case at all. Only if the government is able to sustain at least one of its predicates does it become necessary for the analysis to proceed.

B.    **In any event, the Supreme Court's rule in *Yates* requires a conviction to be set aside where, as here, verdict indeterminacy rests on a constitutional or statutory defect.**

The government contends that if it can demonstrate that just one predicate is a crime of violence under the force clause, it can sustain the convictions on the evidence for purposes of

Rule 29. Govt. Br. 11-12. The government is incorrect.

The Supreme Court's rule in *Yates* "requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates v. United States*, 354 U.S. 298, 312 (1957); *see also Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) ("A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one."). *Yates* involved a group of defendants convicted under Section 2385 with conspiring to advocate the overthrow of the United States government; the jury had been instructed to convict if it found that they had conspired either to (1) advocate the overthrow of the United States by force, or (2) organize a group (in the form of the Communist Party) for the purpose of doing the same. *See id.* at 300-304. On appeal, however, the Supreme Court construed the "organize" prong of the statute to exclude the defendants' conduct. *Id.* at 310-11. As a result, the case was left with a verdict supportable on only one of the two possible grounds for conviction, with no way of ascertaining which one the jury had selected. *Id.* at 311-12. Under these circumstances, the Court concluded that the verdict was unsustainable and had to be set aside. *Id.* at 312.

The Supreme Court has described two limitations on *Yates*, neither of which applies here. First, the Court has clarified that the rule is limited to cases where, as here, the source of indeterminacy stems from a constitutional or statutory interpretation defect (as opposed to, for example, a mere evidentiary one). *See Griffin v. United States*, 502 U.S. 46, 58-59 (1991). Second, *Yates* is subject to ordinary harmless error analysis, *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008), which places on the government the burden of demonstrating beyond a reasonable doubt that verdict would have returned the same way absent the defective instruction. This it plainly cannot do.

### 1. Any *Yates* error in this case would not be harmless.

To establish harmless error, "the government must show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. McFadden*, 823 F.3d 217, 224 (4th Cir. 2016) (internal quotations and citations omitted). The reviewing court must "conduct a thorough examination of the record, and if the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error . . . it should not find the error harmless." *Id.* (*citing Neder v. United States*, 527 U.S. 1, 19 (1999)).

The government is unable to make such a showing here. To the contrary, its theory for sustaining the verdict under the three predicates it now asserts is simply irreconcilable with both the record in this case and how the principals were charged and prosecuted.

### a. The record does not support the use of the Section 2390 enlistment statute as a force-clause predicate for Counts 1, 7, or 8.

Even assuming for argument the government's claim that the enlistment statute requires the attempted use of force as an element (and thus incorporates a substantial step requirement that goes beyond mere preparation), the government would be unable to apply that theory here. Under this conception of enlistment, sustaining Count 1 would require the government to demonstrate beyond a reasonable doubt that, absent the now-defective instruction, the jury would have concluded that Al-Timimi (1) aided and abetted a (2) § 924(o) conspiracy to (3) use firearms in connection to a (4) violation of the § 2390 enlistment statute that necessarily involved an attempted use of force.

No evidence of any principal making any such attempted use of force exists here. To the contrary, Khan—a named principal to the § 924(o) conspiracy that Count 1 charges Al-Timimi with aiding and abetting, Dkt. No. 47 at 4, ¶2 (superseding indictment)—had his conspiracy

conviction vacated based on this Court's determination that his activities at LET camp were limited to training exercises, noting that "there is insufficient evidence in this record that these actions involved either Khan's actual use of force or a substantial risk that Khan would use force." *Khan v. United States*, 330 F. Supp. 3d 1076, 1098 (E.D. Va. 2018); see also *Chapman v. United States*, 326 F. Supp. 3d 228, 248 (E.D. Va. 2018) (same for charged coconspirator Chapman); *Royer v. United States*, 324 F. Supp. 3d 719, 742 (E.D. Va. 2018) (same for named coconspirator Royer).

Although Khan was convicted of conspiracy to violate Section 2390, *Khan*, 309 F. Supp. 2d at 819, that conviction was based on mere preparatory activities—which, again, are insufficient to meet the federal definition of attempt. There were no claimed instances of his attempting to use of force against the United States and indeed the government cites no evidence in Al-Timimi's record to suggest otherwise.

The same is true of Kwon and Hasan, principals to the § 924(c) offenses that Counts 7 and 8 charge Al-Timimi with aiding and abetting. Neither testified that they ever affirmatively attempted to use force against United States troops, and none of the government's asserted evidence suggests that they ever came close to doing so. *Accord Royer*, 324 F. Supp. 3d at 742 ("*Kwon's*, *Hasan's*, Aatique's, and Khan's § 371 violation involved the four men traveling to the LET camps in Pakistan and, while there, discharging various firearms in military training. There is no suggestion . . . to indicate that any of these co-conspirators traveled to the front lines or engaged in active fire. . . . *[N]one of the actions involved either one of these four men actually using force or a substantial risk that any of these four men would use force*.") (emphasis added) (citations omitted).

Finally, the defense notes that accomplice liability requires the government to prove the

accomplice's complete foreknowledge of every element of the underlying offense; thus, the government would need to show Al-Timimi's advance knowledge of each element. *See, e.g.*, *Rosemond v. United States*, 572 U.S. 65, 76-77 (2014); *see also BMG Rights Mgmt. (US) LLC v. Cox Communs., Inc.*, 881 F.3d 293, 309 (4th Cir. 2018). But as outlined in the defense's reply brief, no trial witness testified to having had any communications with Al-Timimi about their use of any firearms at any time—much less their specific activities at LET camp. *See* Dkt. No. 449 at 6-8 (record citations). This is particularly notable, given that the principals had been training with firearms for almost two years prior to attending LET as part of an independent conspiracy that Al-Timimi was not involved with. *See id.* at 2-3 (record citations).

### b. The record does not support the use of the Neutrality Act as a force-clause predicate for Count 1, 7, or 8.

As outlined above, *supra* at 6-7, the Neutrality Act cannot be a force-clause offense because it can be violated by merely funding a hostile enterprise against a friendly nation without joining in its fighting; accordingly, it does not incorporate the use of force as an element. But even if it did, the government could not demonstrate that any principal violated the act. Under such a conception of the Neutrality Act, sustaining Count 1 would require the government to demonstrate beyond a reasonable doubt that, absent the now-defective instruction, the jury would have concluded that Al-Timimi (1) aided and abetted (2) a § 924(o) conspiracy to (3) use firearms in connection to (4) a violation of the Neutrality Act that necessarily required and involved the use of force.

As also noted above, however, Khan and Chapman—named principals to the § 924(o) conspiracy that Count 1 charges Al-Timimi with aiding and abetting—were both *acquitted* at trial of charges that they directly violated the Neutrality Act. *Khan*, 309 F. Supp. 2d at 824; *see also supra* at 4. Chapman's § 924(o) conviction was predicated in part on a separate § 371

*conspiracy* to violate the Neutrality Act, *see Khan*, 309 F. Supp. 2d at 823, but as both parties agree, conspiracy is not a force-clause offense.

With respect to Counts 7 and 8, the government's argument fails because it is undisputed that neither Kwon nor Hasan ever used force against a friendly nation, and indeed the government presents to evidence to that effect. See Dkt. No. 456 (government addendum brief presents no evidence of Kwon or Hasan using force in any capacity).

Finally, the government's case again also fails because it has presented no evidence of any of the principals ever discussing their firearms activities with Al-Timimi. *Supra* at 18-19.

        **c.**    **The record does not support the use of the treason statute as a force-clause predicate for Count 1.**

The government concedes that the treason statute cannot serve as a valid predicate for Counts 7 and 8 and thus asserts it only in support of Count 1. Govt. Br. at 23, n.10. As described above, *supra* at 7-8, the treason statute cannot be a force-clause offense because "levying war" and providing "aid and comfort" to the enemy can each be accomplished in a non-combat role that does not involve the use of force. But to the extent the government *could* establish that treason does require the use of force, sustaining Count 1 would require it to demonstrate beyond a reasonable doubt that, absent the now-defective instruction, the jury would have concluded that Al-Timimi (1) aided and abetted (2) a § 924(o) conspiracy to (3) use firearms in connection with (4) the commission of treason in a manner that requires the use of force.

But none of the principals are alleged to have committed treason at all, much less in a manner that involved the use of force. Although Khan was convicted as a principal to the § 924(o) conspiracy based in part on a separate § 2384 conviction for *conspiracy* to commit treason, *see Khan*, 309 F. Supp. 2d at 796, 820-21, 823, his conviction was *not* predicated on the separate § 2381 treason statute that the government attempts to assert here. Again, both parties

agree that conspiracy is not a force-clause offense.

Furthermore, as described above, the question of how to define the treason statute to the jury was a matter of significant dispute at trial. *Supra* at 8, n.6. The defense continues to maintain that Supreme Court requires the definition of "levying war" to include additional aggravating factors not present or instructed here—including the assembling of persons for a treasonable purpose. *See Bollman*, 8 U.S. (4 Cranch) at 126; *see also supra* at 8, n.6.

And finally, the government's case again fails because it has presented no evidence of any of the principals ever discussing their firearms activities with Al-Timimi. *Supra* at 18-19.

> **2.** **Should this Court sustain a predicate in a manner that results in an indeterminate verdict, Al-Timimi requests leave to seek a new trial as alternative relief.**

In light of all of the foregoing, the defense's position is that the government is unable to sustain Counts 1, 7, or 8 on any of its asserted predicates—on either the law or the evidence—and therefore Al-Timimi's motions for acquittal should be granted. But in the event that this Court should sustain any predicate on the evidence in a manner that creates an indeterminate verdict on any count, the defense respectfully requests leave to move for new trial as an alternative form of relief.

## IV.    Remedy

This Court's show-cause order directs that "[t]he parties should address not only whether defendant is entitled to acquittal but also what the appropriate remedy would be in the event of such an acquittal." Dkt. No. 453. The defense responds as follows.

At trial, Al-Timimi was charged with and convicted of 10 counts. Counts 1-6 resulted in concurrent prison sentences ranging from 60 to 121 months, all of which have now been fully

served as indicated below. Counts 7-10 resulted in mandatory consecutive prison sentences

ranging from 120 months to life, as also outlined below:

| Count | Sentence imposed | Status |
|---|---|---|
| **1**—Aiding/abetting a § 924(o) firearms conspiracy | 121 months | Sentence Complete |
| **2**—Soliciting others to levy war under § 373 | 121 months (concurrent) | Sentence Complete |
| **3**—Aiding/abetting a conspiracy to levy war under §2384 | 121 months (concurrent) | Sentence Complete |
| **4**—Attempting to contribute services to Taliban under 50 USC § 1705(b) | 120 months (concurrent) | Sentence Complete |
| **5**—Inducing others to aid the Taliban under 50 USC § 1705(b) | 120 months (concurrent) | Sentence Complete |
| **6**—Aiding/abetting a conspiracy to violate the Neutrality Act under § 371 | 60 months (concurrent) | Sentence Complete |
| **7**—Inducing others to use firearms under § 924(c) | 360 months (consecutive to counts 1-6) | Approximately 26 years left to serve |
| **8**—Inducing others to use firearms under § 924(c) | Life Imprisonment | (Life) |
| **9**—Inducing others to carry explosives under § 844(h)(2) | 120 months (consecutive to counts 1-8) | Full 10 years left to serve (to begin consecutive to above) |
| **10**—Inducing others to carry explosives under § 844(h)(2) | 240 months (consecutive to counts 1-9) | Full 20 years left to serve (to begin consecutive to above) |

*See* Dkt. No. 132 (Judgment) pp. 1-3 (also attached to Dkt. No. 433 as Ex. E).

With Al-Timimi's convictions under Counts 1, 7, and 8 no longer sustainable in light of

*Davis*, he moves this Court to amend the Judgment accordingly by vacating the corresponding

prison sentences as reflected in the attached proposed order. He also moves to have his sentences

recalculated by the United States Probation Office to reflect good-behavior credit that previously

went uncalculated due to the lifetime nature of his prison sentence.

Although Al-Timimi's time has been fully served on Counts 2-6, a judgment of acquittal

in light of *Davis* would still leave prison time remaining on Counts 9 and 10. These counts

charged him as an accomplice to Kwon and Hasan's alleged carrying of an RPG weapon during training exercises at the LET camps they attended. *See* Dkt. No. 47 at 16 (superseding indictment). At trial, the jury was directed to evaluate whether principals Kwon and Hasan had carried explosives during the commission of a "felony" in violation of 18 U.S.C. § 844(h)(2) by reference to Jury Instruction No. 44—the same list of predicate crimes used in Counts 1, 7, and 8. *See* Dkt. No. 156 at 2319-20.

Section 844(h)(2) does not require a crime of violence, and thus has no residual clause issue. But as outlined in Al-Timimi's separate motion for leave that he files today, Dkt. No. 460, Counts 9 and 10 rely on a *Pinkerton* theory that in turn relies on the conspiracy charged in Count 1. Accordingly, the invalidation of Count 1 leaves the parties with no way of ascertaining the jury's verdict on Counts 9 and 10. As such, Al-Timimi seeks leave to file and brief a motion for new trial on Counts 9 and 10.

## CONCLUSION

WHEREFORE, Defendant Dr. Ali Al-Timimi respectfully requests that the Court grant

his pending Rule 29 motions for acquittal on Counts 1, 7, and 8 in light of the Supreme Court's

intervening authority in *Davis*, *Dimaya*, and *Johnson*, enter corresponding judgments of

acquittal, adjust his sentence accordingly, and order any other relief this Court deems

appropriate.

Respectfully submitted,

_____/s/_____
Thomas Michael Huff, Virginia Bar No. 73587
Thomas M. Huff, Attorney-at-Law
P.O. Box 2248
Leesburg, VA 20177
Telephone: 703.665.3756
Facsimile: 571.354.8985
thuff@law.gwu.edu

Jonathan Turley (*pro hac vice*)
The George Washington University Law School
2000 H Street, NW
Washington, D.C. 20052
(202) 994-7001 (telephone)
(202) 508-6200 (facsimile)
jturley@law.gwu.edu

Attorneys for Defendant Dr. Ali Al-Timimi

Dated: August 19, 2019

## CERTIFICATE OF SERVICE

I certify that on August 19, 2019, I will file the foregoing document on the CM/ECF

system, which will then serve it by electronic notification on all parties of record.

_____/s/_____

Thomas Michael Huff, Virginia Bar No. 73587
Thomas M. Huff, Attorney-at-Law
P.O. Box 2248
Leesburg, VA 20177
Telephone: 703.665.3756
Facsimile: 571.354.8985
thuff@law.gwu.edu

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:04-cr-385 |
| | ) | |
| ALI AL-TIMIMI, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S REPLY IN FURTHER SUPPORT OF ITS
SUPPLEMENTAL MEMORANDUM ON *DAVIS V. UNITED STATES***

In response to the Court's order to show cause why it should not grant the defendant's

motions to vacate his convictions on Counts 1, 7, and 8 of the superseding indictment (ECF

No. 453), the government has filed a supplemental memorandum on the effect of *United States v.

Davis*, 139 S. Ct. 2319 (2019), on the present litigation.  (ECF No. 455.)  The defendant has also

filed his response.  (ECF No. 459.)  The government files this reply in further support of its

supplemental memorandum.

**Argument**

**I.      The Government Has Not Conflated Invalid Conspiracy Predicates with Valid
         Force-Clause Predicates.**

In its supplemental memorandum, the government explicitly stated that it was not relying

on conspiracy offenses to support the defendant's convictions on Counts 1, 7, and 8.  (ECF No.

455 at 12.)  Instead, the government identified three predicate offenses on which the Court

instructed the jury—contravening the Neutrality Act, in violation of 18 U.S.C. § 960; treason, in

violation of 18 U.S.C. § 2381; and enlisting and engaging with intent to serve in armed hostility

against the United States, in violation of 18 U.S.C. § 2390—and argued that each of those

offenses is a valid crime of violence under 18 U.S.C. § 924(c)(3)(A).  (*Id.* at 13–20.)  In

response, the defendant claims that the government is confusing invalid conspiracy predicates with valid substantive offenses.  It is not.

*First*, the Court's jury instructions do not require acquittal.  To be sure, the Court instructed the jury that committing these three offenses, or "conspiring to do so," could serve as a predicate for Counts 1, 7, and 8.  (*See* Trial Tr. 2318–19.)[1]  But the Court also told the jury that where its instructions used conjunctive language, "[i]t was sufficient if the government prove[d] beyond a reasonable doubt that the defendant did any of the charged alternative acts."  (Trial Tr. 2305.)  The government is thus not "seeking to avoid [a] complication" in the case, as the defendant claims.  (ECF No. 459 at 3.)  When a jury is instructed on two theories of liability, one proper and one improper, the solution is not simply to set aside the conviction.  *Skilling v. United States*, 561 U.S. 358, 414 n.46 (2010).  Instead, "for purposes of Rule 29, the only question is whether substantial evidence supports the conclusion that the jury could have found a *substantive* violation of §§ 960, 2381, and 2390."  (ECF No. 455 at 20 n.9 (emphasis added).)

The simultaneous charging of conspiracy and substantive predicates is, at most, an alternative-theory error under *Yates v. United States*, 354 U.S. 298 (1957), which is subject to harmless-error review on appeal.  *See Skilling*, 561 U.S. at 414.  If the Fourth Circuit ultimately were to agree with the defendant that any alternative-theory error created by *Davis*'s invalidation of § 924(c)'s residual clause is not harmless, the remedy should not be a judgment of acquittal but rather a new trial on the problematic counts.  *See, e.g.*, *United States v. Ellyson*, 326 F.3d 522, 533 (4th Cir. 2003) (remanding a case for re-trial in light of a *Yates* error where "[a]ny insufficiency in proof was caused by [a] subsequent change in the law . . . [and] not the government's failure to muster evidence"); *accord United States v. Ford*, 703 F.3d 708, 710

---

[1] The transcript of the Court's jury instructions appears at ECF Nos. 455-1 and 455-2.

(4th Cir. 2013).

The defendant nonetheless encourages the Court to conduct a harmlessness review of its own record in order to resolve the pending motions. The Court should decline the invitation.[2] In the first place, the standards governing such analyses are radically different. The Rule 29 standard is deferential, such that "[a] defendant bringing a sufficiency challenge must overcome a heavy burden, and reversal for insufficiency must be confined to cases where the prosecution's failure is clear." *United States v. Edlind*, 887 F.3d 166, 172 (4th Cir.), *cert. denied*, 139 S. Ct. 203 (2018) (internal citations and quotation marks omitted). By contrast, in the harmlessness context, "[t]he essential question is whether 'it [is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *United States v. Pratt*, 915 F.3d 266, 273 (4th Cir. 2019) (quoting *United States v. Garcia-Lagunas*, 835 F.3d 479, 488 (4th Cir. 2016)).

The defendant at times seems to toggle between these standards in attacking the strength of the government's evidence. For example, he repeatedly claims that the record lacks evidence that he "had any communications" about the use of firearms in LET camps. (ECF No. 459 at 19.) But, contrary to this claim, the record in fact establishes that he had extensive knowledge of LET's violent tactics generally and the use of weaponry at its training camps in particular. *See, e.g.*, **Attachment 1** (a compendium of relevant trial testimony); Gov't Exs. 1D25, 1D28, 1D44, 1D52 (LET bulletins detailing the organization's violent conduct). Moreover, the jury

---

[2] If the Court were reviewing the record in the context of a habeas petition under § 2255, a claim of instructional error would be reviewed for harmlessness to determine whether the error had a substantial and injurious effect. *See, e.g.*, *United States v. Smith*, 723 F.3d 510, 515–16 (4th Cir. 2013). In these circumstances, however, the Court is simply entertaining renewed motions for judgment of acquittal under Rule 29. Resolving those motions requires the Court only to assess the quantum of inculpatory evidence appearing in the record.

convicted the defendant of soliciting others to levy war against the United States (Count 2) and of inducing others to conspire to levy war (Count 3), to aid the Taliban (Count 5), and to conspire to violate the Neutrality Act (Count 6)—all based on the defendant's exhortations to others to engage in violent conduct abroad. The record citations appearing in the government's attachments to its post-*Davis* memorandum (ECF Nos. 455-3 & 456-1) also make plain that the defendant's co-conspirators both agreed to commit force-clause crimes (Count 1) and were successful in doing so (Counts 7 and 8). In any event, the harmlessness or non-harmlessness of any *Yates* error is better left for the Fourth Circuit to address when the case returns there.

*Second*, the defendant makes a series of arguments that sound in estoppel, but these are not persuasive. To begin, the defendant claims that the government is advancing inconsistent positions in light of the fact that the defendants' convictions for § 924 offenses in *United States v. Khan*, 309 F. Supp. 2d 789 (E.D. Va. 2004), arose from conspiracy predicates. But in *Khan*, the relevant predicates were explicitly charged in the superseding indictment and included only conspiracy offenses. (*See* case no. 1:03-cr-296 (ECF No. 167).) The relevant predicates here, by contrast, appeared in the government's opposition to the defendant's motion for a bill of particulars (ECF No. 23 at 6–7) and in the Court's jury instructions, and these nine predicates included *both* conspiracy *and* substantive offenses. The two cases were thus charged under different theories of liability and are not the same for purposes of assessing any *Davis* errors.

The defendant also argues that the government "aggressively pursued . . . expansive theories of inchoate liability at trial" and is now seeking "to retreat from them." (ECF No. 459 at 5.) Not so. The government's argument now, as previously articulated in its opposition to the defendant's post-trial motions over a decade ago, is that the defendant was *either* a co-conspirator of Hasan and Kwon (whose firearms-related conduct underlies Counts 7 and 8) or he

4

J.A. 2939

solicited them to engage in conspiracies under 18 U.S.C. § 2.  Either way, the doctrine of co-conspirator liability under *Pinkerton v. United States*, 328 U.S. 640 (1946), applies.[3]

Accordingly, "[t]he analysis is the same regardless of whether Timimi was a conspirator himself or merely an aider and abettor of the conspiracy."  (ECF No. 125 at 39.)  It is true that, in post-trial briefing, the government also stated that "the offenses underlying Timimi's § 924(c) convictions were conspiracies to levy war against the United States, aid the Taliban, and violate the Neutrality Act."  (*Id.* at 38.)  But, again, the post-*Davis* problems with such an argument lead, at most, to a *Yates* alternative-theory error.  Such an error is not, by itself, a sufficient reason to grant a motion under Rule 29.

In short, the key questions remain whether any of the nine predicates charged to the jury are force-clause crimes, and whether there is substantial evidence in the record to support those valid predicates.  Because the answer to both questions is "yes," the defendant's motions should be denied.

## II.    The Defendant Was Convicted on Counts 1, 7, and 8 Based on One or More Valid Force-Clause Predicates.

Next, the defendant argues that violations of the Neutrality Act, the modern treason statute, and the statute prohibiting enlistment with intent to serve in armed hostility against the United States are not force-clause crimes.  His arguments are unavailing.

---

[3] What's more, the government's post-trial briefing did not disclaim the simple argument that, notwithstanding *Pinkerton*, the defendant is liable on Counts 7 and 8 as an aider-and-abettor or a solicitor of Hasan's and Kwon's firearms offenses.  Indeed, the jury was instructed on such a theory.  (Trial Tr. 2334.)  To the extent that the defendant now argues that such a theory is impermissible under *Rosemond v. United States*, 572 U.S. 65 (2014) (*see* ECF No. 459 at 19), that claim does not appear to have been preserved at trial and would be reviewed on appeal for plain error.  Any assertion of *Rosemond* error now would exceed the scope of the Fourth Circuit's limited remand.

5

J.A. 2940

*First*, a violation of the Neutrality Act is a force-clause crime because it necessarily involves either aiding and abetting or participating in a military or naval expedition against an American ally. The defendant does not argue that military expeditions do not inherently involve the use or threatened use of force. Instead, he claims that one who, for example, "furnishes the money for" such an expedition, 18 U.S.C. § 960, is guilty as a principal, not as an aider and abettor. But this confuses liability for the substantive offense with the dictates of the categorical approach as applied to § 924(c). The relevant inquiry is whether the defendant is liable for an offense "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." Because aiders and abettors are "responsible for the acts of the principal as a matter of law," *In re Colon*, 826 F.3d 1301, 1305 (11th Cir. 2016), and because a military expedition necessarily involves the use or threatened use of force, aiding and abetting such an expedition by furnishing money necessarily makes a defendant liable for using or threatening that same force. *See United States v. Dinkins*, 928 F.3d 349, 359 (4th Cir. 2019) (affirming application of the Armed Career Criminal Act's force clause under North Carolina's accessory-before-the-fact statute). Thus, a defendant who furnishes money for a military expedition is both liable as a principal for a § 960 violation and liable as an aider and abettor for the use or threatened use of force that his crime entails, thereby triggering § 924(c). There is no logical reason why it would be dispositive, for purposes of the categorical approach, that the relevant aiding-and-abetting language appears in the text of the Neutrality Act itself rather than in a standalone statute like 18 U.S.C. § 2.

*Second*, levying war against the United States, in violation of 18 U.S.C. § 2381, is a force-clause crime. The defendant makes two counter-arguments, neither of which is persuasive. First, he argues that one can levy war non-violently by, for example, engaging "in a non-combat

**J.A. 2941**

role that does not involve the use force." (ECF No. 459 at 8.) But, as with the Neutrality Act, levying war by assisting others in their war-making efforts is to aid and abet those efforts. Given that war necessarily involves the use or threatened use of force, a defendant should not be able to escape liability under § 924(c) because he wages war by proxy.

Second, the defendant argues that the two prongs of § 2381—levying war and "adher[ing] to [the country's] enemies, giving them aid and comfort"—are indivisible. Here, he faces two different obstacles. The first relates to claim preservation. In response to the government's argument that the defendant waived any claim that a violation of § 2381 is a force-clause crime by failing to seek dismissal of Count 2, the defendant cites several cases for the proposition that such a forfeited claim should be reviewed on appeal for plain error. (*See* ECF No. 459 at 9.) This is true. But, given the total paucity of authority on the divisibility of § 2381, the defendant cannot succeed on plain-error review for the simple reason that he cannot show that any divisibility error was plain. *See, e.g.*, *United States v. Williams*, 931 F.3d 570, 574 (7th Cir. 2019) (where divisibility is "unclear," a defendant "would still lose on plain-error review because only a 'plain' error could justify reversal"); *United States v. Bain*, 874 F.3d 1, 31 (1st Cir. 2017), *cert. denied*, 138 S. Ct. 1593 (2018) (stating that a divisibility argument could not succeed on plain-error review where "the statute's divisibility is unclear").

Additionally, the defendant asserts that "[f]ederal treason . . . is one crime" which can be committed by multiple means. (ECF No. 459 at 12.) This fails to account for the relevant historical evidence, which makes clear that "levying war" and giving "aid and comfort" to the country's enemies have long been understood to be separate offenses that, for present purposes, are better conceptualized as distinct elements. *See Cramer v. United States*, 325 U.S. 1, 15–16, 17 n.22 (1945) (discussing the Treason Act of 1351, 25 Edw. III, Stat. 5, Ch. 2, and its several

**J.A. 2942**

different provisions); *id.* at 20 & n.26 (citing "eleven reported English cases antedating the Constitution . . . involving *distinct charges* of adherence to the King's enemies" (emphasis added)); *United States v. Greiner*, 26 F. Cas. 36, 38 (E.D. Pa. 1861) (explaining that "the two species of treason mentioned in the constitution are described in it in language borrowed from that of the English statute of treasons"); *cf.* Charles Warren*, What Is Giving Aid and Comfort to the Enemy?*, 27 Yale L.J. 331, 332–33 (1918) ("The two branches of treason, 'levying war,' and 'adhering to their enemies, giving them aid and comfort,'—are distinct, and do not embody synonymous actions."). This is to say nothing of the fact that the Court's jury instructions, as the government has argued, did not actually permit the jury to convict the defendant on an aid-and-comfort theory. (*See* ECF No. 455 at 16–17.)

*Third*, enlisting and engaging with intent to serve in armed hostility against the United States, in violation of 18 U.S.C. § 2390, is a force-clause crime. A violation of this statute necessarily entails an attempted use of force—*i.e.*, the specific intent to serve in armed hostility, coupled with a substantial step towards that goal (enlistment or engagement). The defendant disagrees, arguing that the statutory terms "enlist" and "engage" encompass mere preparation insufficient to constitute a substantial step under federal attempt law. In support of this assertion, he quotes the Court's opinion in *Khan*:

> As we held in considering motions to dismiss the indictment, the only armed hostility alleged against the United States occurred in Afghanistan. The plain language of the statute "enlists or is engaged" is not limited to formal enrollment in an enemy military force, but *can reach preparations* within the United States for joining an enemy force overseas. As to Khan, we find that at the September 16, 2001 meeting at Kwon's house, Khan agreed with Royer, Kwon, Aatique, and Hasan to enlist or engage in armed hostility, and that by joining together within the United States to plan a trip abroad, the four conspirators enlisted to serve against the United States.

*Khan*, 309 F. Supp. 2d at 819 (emphasis added).

8

**J.A. 2943**

The Fourth Circuit has explained that the distinction between "mere preparation" and a "substantial step" under federal attempt law "is inherently fact-intensive, and it is not always a clear one." *United States v. Pratt*, 351 F.3d 131, 136 (4th Cir. 2003). This is because "if preparation comes so near to the accomplishment of the crime that it becomes *probable* that the crime will be committed absent an outside intervening circumstance, the preparation may become an attempt. " *Id.* There are therefore two responses to the defendant's argument. First, when the Court stated in *Khan* that enlistment and engagement can encompass preparations to join an enemy force overseas, it was assessing the sufficiency of the evidence regarding a charge that the defendants *conspired* to violate § 2390. This is an entirely different inquiry from whether the *Khan* defendants' conduct crossed the line from "mere preparation" to "substantial step" for purposes of federal attempt doctrine; indeed, there was no attempt issue in *Khan* at all. In context, therefore, *Khan* does not stand for the asserted proposition that a defendant can violate § 2390 by engaging in "mere preparation" as that phrase is used in the Model Penal Code and federal attempt law.

Second, the Fourth Circuit has expressly stated that "while words and discussions would usually be considered preparations for most crimes, a specific discussion could be so final in nature that it left little doubt that a crime was intended and would be committed," thus constituting a substantial step. *Pratt*, 351 F.3d at 136. This perfectly captures the import of the key meeting overseen by the defendant on September 16, 2001:

> At the meeting, Al–Timimi stated that the September 11 attacks were justified and that the end of time battle had begun. He said that America was at war with Islam, and that the attendees should leave the United States. The preferred option was to heed the call of Mullah Omar, leader of the Taliban, to participate in the defense of Muslims in Afghanistan and fight against United States troops that were expected to invade in pursuit of Al–Qaeda. As support for this proposition, Al–Timimi cited "fatwas," or religious rulings, that called on Muslims to defend Afghanistan against impending American military action. According to Hasan and Kwon, Khan asked

**J.A. 2944**

> to review the fatwa, and Al–Timimi gave it to him to read, but advised Khan to
> burn it after he had read it.  The other option presented to the attendees was to make
> "hijrah," that is, to relocate their families to a Muslim country.  Royer said that
> anyone who wanted to fight in Afghanistan would first need to participate in
> military training, that the LET camps in Pakistan were a good place to receive that
> training, and that Royer could facilitate their entry to the LET camps.

*Khan*, 309 F. Supp. 2d at 810 (exhibit citation omitted).  The discussion on September 16 was

thus "so final in nature that it left little doubt that a crime was intended and would be

committed."  *Pratt*, 351 F.3d at 136; s*ee also United States v. Muratovic*, 719 F.3d 809, 816

(7th Cir. 2013) (defendant's conduct exceeded mere preparation when, among other inculpatory

acts, he "discussed with his co-conspirators disguises the team would wear during the robbery");

*United States v. Brown*, 604 F.2d 347, 350 (5th Cir. 1979) (defendant who "made a firm

agreement . . .  for acquisition of the explosives needed to blow up [a] store" and sent others "to

reconnoiter and inspect the building in preparation for its destruction" was guilty of an attempt).

Of course, *Davis* held that when Congress passed § 924(c), it intended that courts would

interpret its crime-of-violence provision using the categorical approach rather than a conduct-

specific one.  *Davis*, 139 S. Ct. at 2331.  Accordingly, the government's submission is that, for

purposes of § 2390 and federal attempt doctrine, enlistment and engagement will always

constitute a substantial step rather than mere preparation.  Seeking to join in armed hostilities

against the United States is such a consequential act, and requires such a particularized specific

intent, that doing so necessarily makes it probable that a use or threatened use of force will

occur.  Under *Pratt*, this is sufficient for a violation of § 2390 to constitute an attempted use of

force.

## III.    The Court Should Defer Action on the Defendant's Motion for Leave to Seek a New Trial on Counts 9 and 10.

Finally, the defendant has also sought the Court's leave to file a new motion attacking his

convictions on Counts 9 and 10 for violating 18 U.S.C. § 844(h). This statute requires a predicate offense that is a federal felony, not a crime of violence. Even so, the defendant argues that because Count 1 is no longer valid, the guilty verdicts on Counts 9 and 10 are also infirm.

The defendant is wrong. While the government reserves its right to more fully oppose a future motion, it is important to state now that the defendant's request rests on a faulty premise. The crux of the defendant's argument is that, because Count 1 was "the only weapons conspiracy charged" (ECF No. 460 ¶ 5), the jury's verdicts on Counts 9 and 10 necessarily flowed from *Pinkerton* liability arising from Count 1. But this is not so. The Fourth Circuit has held that *Pinkerton* liability for § 924(c) offenses can arise from any conspiracy, so long as the use of firearms in furtherance of that conspiracy was reasonably foreseeable and in furtherance of the conspiracy. *See, e.g.*, *United States v. Blackman*, 746 F.3d 137, 141 (4th Cir. 2014) (holding that the "evidence was plainly sufficient to support Blackman's conviction under *Pinkerton* for brandishing a firearm during and in relation to a crime of violence in violation of § 924(c)," where the relevant conspiracy was one to commit Hobbs Act robbery). The defendant here was also convicted of inducing others to conspire to levy war against the United States (Count 3), inducing others to aid the Taliban (Count 5), and inducing others to conspire to violate the Neutrality Act (Count 6). It is entirely consistent with the record that the use of firearms in support of these conspiracy offenses—entirely unaffected by *Davis*—was reasonably foreseeable to the defendant.

In any event, if the Court were to conclude that Count 1 remains valid, the defendant's motion to further challenge Counts 9 and 10 would become moot. Accordingly, the government respectfully submits that the Court should defer action on the defendant's request until after it rules on the defendant's renewed motions for judgment of acquittal.

**J.A. 2946**

**Conclusion**

For the foregoing reasons, as well as those stated in the government's initial

memorandum, the Court should deny the defendant's motions for judgment of acquittal on

Counts 1, 7, and 8.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:    _____/s/_____

Daniel T. Young
Gordon D. Kromberg
John T. Gibbs
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Office:    (703) 299-3700
Fax:       (703) 299-3980
Email:    daniel.young@usdoj.gov

**J.A. 2947**

## CERTIFICATE OF SERVICE

I certify that on August 26, 2019, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF)

to all counsel of record.


By: _____/s/_____

Daniel T. Young
Assistant United States Attorney
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office:   (757) 441-6331
Fax:      (757) 441-6689
E-mail:   daniel.young@usdoj.gov

**Citations to the Record Showing that the Defendant Understood that Firearms and Other Weapons Would be Used at LET Camps**

| Witness | Date | Page | Testimony |
|---|---|---|---|
| Aatique | 4/4/05[1] | 202-03 | Do you know whether the defendant was present when this discussion was going on?<br><br>THE WITNESS: You mean the discussion about LET and going to training?<br><br>THE COURT: Yes.<br><br>THE WITNESS: I remember him being present for, for this discussion, although I'm sure part of it happened also after he had gone.<br><br>    *        *        *<br><br>Q. What was said to your recollection about the need for training while Mr. Timimi was present?<br>A. After he had given his talk, this thing came up about -- he was still there -- about going to LET and getting the training, and at that time . . . |
| Kwon | 4/5/05 | 470-71 | Q. How often did you see him at the houses of your friends from Dar al-Arqam?<br>A. Not very often. I only recall twice at the house of Ibrahim Hamdi. . . Once before [Hamdi] left for LET and once after he had come back from LET camp. . . . I remember that was before because the talk we had that night was regarding LET, where Randall Royer was talking about it, and Ibrahim hadn't gone yet, so, you know, we were listening to him talk about LET.[2] |
| Kwon | 4/5/05 | 490 | It was, it was just a talk [Timimi] was giving to us, and he said this in prelude for Royer to talk about his experience at LET. |
| Kwon | 4/7/05 | 28 | [Royer] just told us that, you know, how when he was at the camp, that his faith was very high. He one time also told me when he was with LET, he traveled with a group of LET mujahideen to the border, where they shot mortar fires into Indian positions. |

[1] The transcript citations are associated with each date (*i.e.*, the first row references pages 202 and 203 of the transcript from April 4, 2005).

[2] At the meeting at Hamdi's house in 2000, before Hamdi left for LET, Royer described his own time at LET, when Royer was allowed to fire against Indian positions in Kashmir. Then, at the meeting that occurred after Hamdi returned, Hamdi talked about his own firing on Indian positions in Kashmir.

Page 1 of 4

**J.A. 2949**

| Witness | Date | Page | Testimony |
|---|---|---|---|
| Kwon | 4/7/05 | 30 | Q. Do you remember testifying that there was a meeting at Ibrahim Al-Hamdi's house where LET was discussed?<br>A. Correct.<br>Q. And was it your testimony that, that Ali Al-Timimi was present at that meeting?<br>A. Correct. |
| Kwon | 4/11/05 | 27 | Q. Now, in -- didn't Al-Hamdi tell you that at LET, he got to shoot firearms at Indian positions?<br>A. Yes, that's what he told me. |
| Kwon | 4/11/05 | 118 | Because I remember the subject of LET came up [at the meeting on 9/16/01] because we were talking about how you need some training before you get to, get to the front lines.<br>THE COURT: Now, when did this discussion come up?  While the defendant's still there, or had he left?<br>THE WITNESS: He was there. He was still there |
| Kwon | 4/11/05 | 151 | I remember telling [Timimi, after 9/16/01] we were going over to Pakistan to join -- to attend an LET camp. |
| Kwon | 4/11/05 | 154 | Mahmood and I were pretty much together all the time [after the meeting on 9/16/01], and we had called Ali Timimi to let them know that we were leaving to go to Pakistan to join the LET. |
| Kwon | 4/11/05 | 183 | Q. Did Ali Timimi ever counsel or advise you to go to the LET camp? . . . .<br>A. Yes, he did. |
| Kwon | 4/11/05 | 184 | Q. What -- when you said that Ali said [before 9/11] you should be knowledgeable about these things, do you recall what things you  were referring to?<br>A. I mean, I remember one time he mentioned some hadeeth about knowing how to shoot, and in general, as a Muslim, you know, you should be -- you should be, you know, fit and knowledgeable about these things and, you know, just be ready, you know, physically. |
| Hasan | 4/14/05 | 51 | Al-Hamdi returned from Pakistan in 2000, [Hamdi and Royer] each described to Khwaja Mahmood Hasan and others his experience serving with Lashkar-e-Taiba. Hasan understood that while there, Al-Hamdi and Royer used firearms, including AK-47 rifles, and that at least Al-Hamdi fired at Indian positions in Kashmir. |
| Wyman | 4/12/05 | 1592 | Q. What did [Timimi] tell you about his knowledge of Lashkar-e-Taiba?<br>A. Well, he said, he said he was well aware of being -- based on his experience and his knowledge and his awareness of various Islamic topics, he said he was well acquainted with Lashkar. |

| Witness | Date | Page | Testimony |
|---|---|---|---|
| Wyman | 4/12/05 | 1593 | Q.  Who, if anyone, from Lashkar-e-Taiba did Ali Timimi say that he knew?<br>A.  Hafiz Saeed, head of Lashkar.<br>Q.  And he had met him where?<br>A.  He said that -- he estimated somewhere between '93 and '95, 1993 and '95, at a conference in England |
| Wyman | 4/12/05 | 1596 | Q.  What did [Timimi] say was the level of his awareness of the tactics employed by LET?<br>A.  He said he was well aware of their tactics.  They were well publicized.  He said that they conduct cross-border shelling, raids on police stations and military camps.  They use guerilla tactics and also the use of what he called fidayeen attacks, which are also referred to as suicide missions. |
| Wyman | 4/12/05 | 1596 | He said that [LET] was well publicized and over the years he'd kept up with various forms of media, including the Washington Post newspaper, later he also talked about receiving the Taiba Bulletin, also getting news from the Internet. |
| Wyman | 4/12/05 | 1596-97 | Q.  Well, what did he say regarding his awareness of the type of training that was offered by LET?<br>A.  He said it was well known or common knowledge that Lashkar, Lashkar-e-Taiba had military-style training camps in Pakistan.<br>Q.  For, for -- to train who?<br>A.  The purpose was to train fighters to go fight in, in Kashmir.<br>Q.  What did he tell you about -- what did he tell you that he knew about the types of training offered at the LET camps?<br>A.  Well, he said he hadn't been there personally, but based on his knowledge of the types of military tactics they use and his knowledge of what Lashkar does, he knows that they, you know, conduct training on weapons and other forms of military tactics that will enable someone to go fight in a battle. |
| Wyman | 4/12/05 | 1610 | Q.  What did Ali Timimi say about the instances in which LET was accused of attacking civilian targets?<br>A.  We talked about LET's attacks on the Indian Parliament and the Red Fort, and Mr. Al-Timimi said that he was well aware of that, he had read all about it, and he knew that they were civilian targets, but he said that he had his doubts as to whether LET actually carried out the attack on the Indian Parliament |

| Witness | Date | Page | Testimony |
|---------|------|------|-----------|
| Wyman | 4/12/05 | 1611 | Q. What did he say about visiting the Lashkar-e-Taiba website? |
| | | | A. He said he did so regularly. |
| | | | Q. What did he say about any of his lectures being posted on the LET website? |
| | | | A. He said one time while surfing the websites, he realized that his lectures were posted on the LET website. |
| | | | Q. What did he say about the Taiba Bulletin? |
| | | | A. He said that he received the Taiba Bulletin. |
| | | | Q. Did he explain what was the period of time that he received it? |
| | | | A. Well, he, he tried to estimate for us, but the length of time was broad. He said it was not as long as back to the mid-'90s, but it wasn't as short as just a couple weeks. |
| | | | Q. Did he tell you when he unsubscribed from it? |
| | | | A. Yes. He said that he unsubscribed after learning that Lashkar was designated as a terrorist organization. |
| | | | Q. Which was when? |
| | | | A. That was in December 2001. |
| Wyman | 4/12/05 | 1612 | Q. What did he recall were topics included within the Taiba Bulletins that he read? |
| | | | A. He said the Taiba Bulletins he read contained military reports, battle reports, and also statements by the leader of LET, Hafiz Saeed. |
| | | | Q. What did he say about his awareness of the battle reports regarding use of explosives to blow up bridges and buildings? |
| | | | A. He said he, he was aware of that. |
| Wyman | 4/13/05 | 1629 | Q. Did Ali Timimi tell you whether he had ever heard Royer speak publicly about Lashkar-e-Taiba? |
| | | | A. Yes. He said prior to 9/11, he had attended a private dinner meeting where Royer talked about Lashkar. |

Page 4 of 4

J.A. 2952

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) 1:04-cr-385 (LMB) |
| ALI AL-TIMIMI, | ) REDACTED |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION[1]

On April 27, 2020, defendant Ali Al-Timimi ("defendant" or "Al-Timimi") filed a

Motion for Release from Custody Pending Appeal ("Motion") under 18 U.S.C. § 3145(c) in

which he seeks to be released from United States Penitentiary Florence ("USP Florence")

pending the appeal of his 2005 convictions and sentence. The government opposes the Motion.

For the following reasons, the Motion will be granted and Al-Timimi will be released under the

conditions set out in the Order accompanying this Memorandum Opinion after a 14-day

quarantine controlled by the Bureau of Prisons ("BOP").

I. BACKGROUND

This is a complex criminal case the history of which now spans more than 15 years. In

the interests of brevity, only the essential events are recounted here. In 2001, Al-Timimi was a

principal lecturer at the Dar al-Arqam Islamic Center, a mosque located in Falls Church,

Virginia. Among the worshippers there was a group of devout young men with whom Al-Timimi

grew close. On September 16, 2001, five days after terrorists attacked the World Trade Center

and the Pentagon, Al-Timimi attended a dinner with these men at which they spoke about the

---

[1] This Memorandum Opinion contains limited redactions of personal medical information. An
unredacted version has been filed under seal.

events that had occurred. Al-Timimi advised the men that it would become necessary to defend

Islam by engaging in violent jihad against its enemies, including United States military forces

expected to be deployed to Afghanistan. Some of these men heeded Al-Timimi's words and

shortly thereafter flew to Pakistan, where they obtained military training at a camp run by

Lashkar-e-Taiba ("LET"), a group which the United States Department of State would later

designate as a Foreign Terrorist Organization. Many of those who attended the dinner, including

Al-Timimi, were subsequently charged with and convicted of multiple criminal offenses. See

generally United States v. Khan, 309 F. Supp. 2d 789 (E.D. Va. 2004) (explaining these events in

detail).

On February 5, 2005, a federal grand jury returned a superseding indictment against Al-

Timimi which charged him with the following 10 counts.

Count 1: Inducing others to conspire to use, carry, possess, and discharge firearms
during, in relation to, and in furtherance of crimes of violence, in violation of 18
U.S.C. §§ 924(o) and 2.

Count 2: Soliciting others to levy war against the United States, in violation of 18
U.S.C. §§ 2381 and 373.

Count 3: Inducing others to conspire to levy war against the United States, in
violation of 18 U.S.C. §§ 2384 and 2.

Count 4: Attempting to contribute services to the Taliban, in violation of 50
U.S.C. § 1705 and associated regulations and executive orders.

Count 5: Inducing others to attempt to aid the Taliban, in violation of 50 U.S.C.
§ 1705 and associated regulations and executive orders.

Count 6: Inducing others to conspire to violate the Neutrality Act, in violation of
18 U.S.C. §§ 960, 371, and 2.

Counts 7 and 8: Inducing others to use firearms during and in relation to crimes of
violence, in violation of 18 U.S.C. §§ 924(c) and 2.

Counts 9 and 10: Inducing others to carry explosives during the commission of
federal felonies, in violation of 18 U.S.C. §§ 844(h)(2) and 2.

**J.A. 2954**

[See Dkt. 47]. On April 26, 2005, following a jury trial, Al-Timimi was convicted of all 10 counts. [See Dkt. 107]. He subsequently filed a motion for judgment of acquittal as to all 10 counts. [See Dkt. 118]. At his July 13, 2005 sentencing hearing, his motion for judgment of acquittal was denied and he was sentenced to the following terms of imprisonment.

> Counts 1–3: 121 months' imprisonment, to run concurrently.
>
> Counts 4 and 5: 120 months' imprisonment, to run concurrently with the sentences on Counts 1–3.
>
> Count 6: 60 months' imprisonment, to run concurrently with the sentences on Counts 1–5.
>
> Count 7: 360 months' imprisonment, to run consecutively to the sentences on Counts 1–6.
>
> Count 8: life imprisonment, to run consecutively to the sentences on Counts 1–7.
>
> Count 9: 120 months' imprisonment, to run consecutively to the sentences on Counts 1–8.
>
> Count 10: 240 months' imprisonment, to run consecutively to the sentences on Counts 1–9.

[See Dkt. 131–32]. To date, by having served approximately 180 months in prison, Al-Timimi has satisfied the sentences imposed on Counts 1–6, is currently serving the sentence imposed on Count 7, and has yet to serve the sentences imposed on Counts 8–10.

Despite having served a significant portion of his sentence, due to a number of procedural hurdles, Al-Timimi has not completed his direct appeal. Although Al-Timimi filed a notice of appeal two days after his sentencing, the Fourth Circuit has twice remanded his appeal with instructions to consider his arguments that the government failed to disclose certain material, exculpatory evidence. [See Dkt. 133, 164, 406]. Most recently, in 2016, the Fourth Circuit expanded its second remand order with additional instructions to reconsider Al-Timimi's 18

3

J.A. 2955

U.S.C. § 924(c) convictions in light of the Supreme Court's decision in <u>Johnson v. United States</u>, 135 S. Ct. 2441 (2015). [<u>See</u> Dkt. 431]. Al-Timimi subsequently filed renewed motions for judgment of acquittal as to Counts 1, 7, and 8, which have gone through multiple rounds of briefing addressing additional Supreme Court decisions, including <u>United States v. Davis</u>, 139 S. Ct. 2319 (2019). [<u>See</u> Dkt. 432, 455]. These decisions have changed much of the legal landscape underlying those counts. Al-Timimi has also filed a motion for leave to file a motion for new trial as to Counts 9 and 10, which largely hinges on the disposition of his renewed motions for judgment of acquittal. [<u>See</u> Dkt. 460]. These motions will be resolved in due course.

On April 27, 2020, Al-Timimi filed the pending Motion. [<u>See</u> 465]. The government has filed a brief in opposition to which Al-Timimi has replied. [<u>See</u> Dkt. 473, 477]. On June 11, 2020, a telephonic oral argument was held. [<u>See</u> Dkt. 480]. Following oral argument, with leave of court, the parties filed supplemental briefing. [<u>See</u> Dkt. 482, 488, 495, 503]. The parties have also filed several notices regarding intervening factual developments and supplemental legal authority. [<u>See, e.g.</u>, Dkt. 506–07, 511, 514–15, 517]. The Motion is ripe for review.

## II. DISCUSSION

Al-Timimi is presently subject to mandatory detention pending appeal due to the sentence to which he was exposed as a result of his convictions; however, 18 U.S.C. § 3145(c) establishes a "safety valve" from certain mandatory detention rules. <u>United States v. Harris</u>, 2020 WL 1503444, at *5 (D.D.C. Mar. 27, 2020); <u>see also</u> <u>United States v. Marshall</u>, 2020 WL 2614817, at *3 (D. Md. May 22, 2020). As relevant here, under § 3145(c), a defendant subject to mandatory detention pending appeal pursuant to 18 U.S.C. § 3143(b)(2) may be released during the pendency of his appeal if he satisfies the two conditions set out in 18 U.S.C. § 3143(b)(1) and demonstrates that there are "exceptional reasons" why his detention is not appropriate. <u>United</u>

States v. Wilder, 2020 WL 2319136, at *5 (D. Md. May 11, 2020); see also United States v.

Brizuela, 2019 WL 5684508, at *1 (W.D. Va. Nov. 1, 2019). The two conditions in § 3143(b)(1)

require the defendant to demonstrate that he is not likely to flee or pose a danger to others, and

that his appeal raises a substantial question of law or fact likely to result in reversal, a new trial,

or a sentence less than time served plus the expected duration of the appeal process. Wilder,

2020 WL 2319136, at *5; see also Brizuela, 2019 WL 5684508, at *1.

Here, Al-Timimi is subject to mandatory detention pursuant to § 3143(b)(2) because his

18 U.S.C. § 924(c) convictions under Counts 7 and 8 exposed him to a maximum sentence of

"life imprisonment." 18 U.S.C. § 3142(f)(1)(B); see also Marshall, 2020 WL 2614817, at *3.

Accordingly, to justify release during the pendency of his appeal, Al-Timimi must demonstrate:

(1) by clear and convincing evidence that he is not likely to flee or pose a danger to others; (2)

that his appeal raises a substantial question of law or fact likely to result in reversal, a new trial,

or a sentence less than time served plus the expected duration of the appeal process; and (3) that

there are exceptional reasons why his detention is not appropriate. See also Harris, 2020 WL

1503444, at *5 (explaining that all three requirements for release under § 3145(c) must be

"'clearly' satisfied"). As explained in this Memorandum Opinion, Al-Timimi has clearly

satisfied each of these requirements.

### A. **Likelihood of Flight or Danger to Others**

Whether a defendant is likely to flee or pose a danger to others is typically evaluated by

reference to the factors listed in 18 U.S.C. § 3142(g). See, e.g., Marshall, 2020 WL 2614817, at

*3; Wilder, 2020 WL 2319136, at *5. These factors broadly include, among other considerations,

"the nature and circumstances of the offense charged," "the weight of the evidence" against the

defendant, and "the history and characteristics" of the defendant. 18 U.S.C. § 3142(g). Here,

**J.A. 2957**

although the parties do not specifically cite to the § 3142(g) factors, their arguments bear on

them. Al-Timimi correctly argues that the Court "allowed him to remain free" on bond

throughout his trial and until his sentencing based on findings that he was not likely to flee or

pose a danger to others, and that he "scrupulously followed" all of the conditions of his release.

[Dkt. 466 at 8, 17]. The government's only argument in response, that Al-Timimi "has not met

his burden to show he is not a danger to the community given the gravity of his offenses of

conviction," is thoroughly unpersuasive.[2] [Dkt. 505 at 3].

　　　Although the offenses for which Al-Timimi was convicted are undoubtedly serious, the

record clearly shows that he has consistently adhered to court orders throughout this case. For

example, Al-Timimi remained free on bond with certain conditions from his initial appearance

through his sentencing and the United States Probation Office reported that he fully complied

with all of the conditions during that 10-month period. [See Dkt. 2, 466-4]. Indeed, the minute

entry for Al-Timimi's initial appearance indicates that the government consented to his release at

that time, when any likelihood of his flight or danger to others was one of the primary

considerations before the Court. Additionally, in the approximately 180 months that Al-Timimi

has been in custody since his sentencing, he has received only one disciplinary sanction. [See

Dkt. 482-1]. That sanction, which was imposed in 2019 for "disruptive conduct," was based on

Al-Timimi having told a USP Florence staff member that he would "beat [another inmate's] ass"

---

[2] In an under seal supplemental brief, the government initially attempted to argue that Al-Timimi had not met his burden given certain allegations which formed the basis on which the BOP has imposed Special Administrative Measures ("SAMs") on Al-Timimi since 2010. SAMs are "restrictions placed on a prisoner in the interests of national security." United States v. Moussaoui, 591 F.3d 263, 267 (4th Cir. 2010). For the many reasons set out in Al-Timimi's under seal supplemental brief, there were significant concerns regarding the veracity of those allegations. [See Dkt. 488, 503]. Indeed, the government subsequently "withdr[ew] reliance" on those allegations "in support of [its] argument that [Al-Timimi] is a danger to the community." [Dkt. 505 at 3].

if they were housed together. Id. ¶ 10. Significantly, it appears that the inmate to whom Al-Timimi was referring had previously threatened to harm both Al-Timimi and other inmates at USP Florence, and the sanction imposed on Al-Timimi was merely a $20 fine and the loss of 27 days of good conduct time. [See Dkt. 482-1, 495]. All indications are that Al-Timimi has otherwise been a model inmate. For instance, during the ongoing coronavirus ("COVID-19") pandemic, Al-Timimi, who was previously an assistant professor at the George Mason University Center for Biomedical Genomics, utilized his educational background to advocate on behalf of other inmates, including by urging the warden at USP Florence to take detailed, "proactive steps" to prevent an outbreak there. [Dkt. 477-2 at 7]. In light of his compelling track record since this case began, Al-Timimi has clearly satisfied the first requirement for release, that he does not pose a risk of flight or danger to others.[3]

### B. **Substantial Question of Law or Fact**

Whether a defendant's appeal raises a substantial question of law or fact "must be determined on a case-by-case basis." United States v. Steinhorn, 927 F.2d 195, 196 (4th Cir. 1991) (quotation omitted). A "substantial question" is "a 'close' question or one that could very well be decided the other way." Id. (quotation omitted). In evaluating this requirement, "[o]ne natural and human difficulty that the trial judge has . . . is to treat the matter as wholly objectively as is possible and not to be influenced in his [or her] determination by any subjective considerations." United States v. Warring, 16 F.R.D. 524, 527 (D. Md. 1954). "[I]t should be

---

[3] In a notice of supplemental legal authority, the government attempted to characterize the offenses of which Al-Timimi was convicted as terrorism offenses; however, as Al-Timimi explained in his response, which the government did not dispute, he was neither charged with nor convicted of any terrorism offenses. [See Dkt. 515–16]. Indeed, although the government argued in favor of a terrorism enhancement at Al-Timimi's sentencing, no such enhancement was applied. [See Dkt. 147].

**J.A. 2959**

borne in mind that the determination of whether to [release a defendant] pending appeal is quite a different question legally from that posed by the original decision, and the determination that there is a substantial question does not properly imply that the judge who grants [release] personally remains in doubt as to the question involved." Id.

Here, the parties agree that to satisfy this requirement, Al-Timimi must demonstrate that his appeal raises a substantial question as to the validity of his convictions under Counts 7–10, his two 18 U.S.C. § 924(c) convictions and his two 18 U.S.C. § 844(h)(2) convictions. Al-Timimi argues that his appeal raises a substantial question regarding the validity of these convictions because they "are the subject of active motions" before the Court which "have at least a substantial likelihood of success," and because "several other intervening developments further bolster his likelihood of success" on appeal. [Dkt. 466 at 13, 15]. In response, the government "accepts for argument's sake" that Al-Timimi's appeal raises a substantial question regarding the validity of his § 924(c) convictions, but argues that it does not raise a substantial question regarding the validity of his § 844(h)(2) convictions because there are two "alternative pathways to sustain th[ose] convictions." [Dkt. 473 at 9–10]. Al-Timimi has the better argument.

At the outset, the Court previously found that Al-Timimi's convictions sufficiently raised questions of law which could result in reversal or a new trial when permitting him, over the government's objection, to remain free on bond between his convictions and his sentencing. Indeed, that finding was made pursuant to § 3143(b)(1), the same provision at issue here through its incorporation by reference into § 3145(c). In overruling the government's objection to Al-Timimi remaining free on bond pending his sentencing, the Court stated: "I think the legal issues in this case are sufficiently dense that I'm going to give the defendant the benefit of the doubt, and I'm going to let him remain out on bond." [Dkt. 161 at 2416–19]. That statement is as true

8

today as it was then. In fact, if anything, intervening Supreme Court authority has added complexities to this case. As but one example, the Supreme Court's decisions in <u>Johnson</u> and <u>Davis</u> have resulted in the parties' substantial litigation regarding the validity of Al-Timimi's § 924(c) convictions, and it is "[i]n view of th[at] extensive briefing" that the government concedes that Al-Timimi's appeal raises a substantial question as to the validity of his convictions for the § 924(c) charges in Counts 7 and 8. [Dkt. 473 at 9].

Although the government has conceded the point, because Al-Timimi's § 924(c) convictions are also relevant to the third requirement for release, a brief discussion of the litigation regarding the validity of those convictions is necessary. After the Supreme Court's decision in <u>Davis</u>, § 924(c) convictions for using a firearm during and in relation to crime of violence remain valid only if they are predicated on an offense that constitutes a crime of violence under 18 U.S.C. § 924(c)(3)(A), which is often referred to as the "force clause." <u>See, e.g.</u>, <u>United States v. Mathis</u>, 932 F.3d 242, 263–64 (4th Cir. 2019). In determining whether an offense constitutes a crime of violence under the force clause, courts are bound to apply the "categorical approach," which "consider[s] only the crime as defined, not the particular facts in the case," and asks "whether the statutory elements of the offense necessarily require the use, attempted use, or threatened use of physical force." <u>United States v. Simms</u>, 914 F.3d 229, 233 (4th Cir. 2019). Under the categorical approach, "[w]hen a statute defines an offense in a way that allows for both violent and nonviolent means of commission, that offense is not . . . a crime of violence under the force clause" and cannot support a § 924(c) conviction. <u>Id.</u>

In his renewed motions for judgment of acquittal, Al-Timimi has argued that his § 924(c) convictions are invalid because there is no crime of violence upon which they could have been predicated. [<u>See</u> Dkt. 432]. The government has responded that Al-Timimi's § 924(c)

**J.A. 2961**

convictions remain valid because they could have been predicated on either of two offenses which it argues constitute crimes of violence under the force clause: expedition against a friendly nation in violation of 18 U.S.C. § 960, and enlistment to serve against the United States in violation of 18 U.S.C. § 2390. [See Dkt. 455]. Al-Timimi's renewed motions for judgment of acquittal are pending and will be resolved in due course; however, as to Counts 7 and 8, a judgment of acquittal will likely be granted because both § 960 and § 2390 define the respective offenses "in a way that allows for both violent and nonviolent means of commission." Simms, 914 F.3d at 233. As a result, Al-Timimi's § 924(c) convictions under Counts 7 and 8 will likely be invalidated before his appeal returns to the Fourth Circuit.

As to Al-Timimi's § 844(h)(2) convictions, Counts 9 and 10, the parties largely agree on the relevant question but strongly disagree on the answer. Specifically, the relevant question is whether these convictions can "rest on one [of two potential] theor[ies] of vicarious liability"— "aiding-and-abetting liability (under Rosemond v. United States, 572 U.S. 65 (2014)) [or] co-conspirator liability (under Pinkerton v. United States, 328 U.S. 640 (1946))." [Dkt. 473 at 10]. The government asserts that Al-Timimi's convictions can be sustained through either of these "alternative pathways." [Dkt. 473 at 10]. Al-Timimi asserts that "[a] multitude of intervening legal developments" cast doubt on both of these "pathways." [Dkt. 477 at 3]. Although the government's argument may ultimately prevail on appeal, Al-Timimi's argument at least raises "close question[s]" on these issues. Steinhorn, 927 F.2d at 196.

With regard to co-conspirator liability, it is undisputed that Al-Timimi's § 844(h)(2) convictions are based on the unusual theory that he "aid[ed] and abet[ted] a conspiracy." [Dkt. 466 at 16; Dkt. 473 at 18]. Indeed, during Al-Timimi's trial, the Court stated: "I think . . . this is a tough case because it's almost a third level of culpability; that is, you've got the underlying

10

**J.A. 2962**

offense, an inchoate offense such as conspiracy to do it, then you've got him one step further removed, aiding and abetting or soliciting or procuring the conspiracy. It certainly is a unique . . . legal structure." [Dkt. 156 at 2180]. As relevant here, courts are split on whether aiding and abetting a conspiracy is a viable theory of criminal liability. Compare, e.g., United States v. Ulbricht, 2015 WL 413426, at *5–6 (S.D.N.Y. Feb. 2, 2015) ("Defendant is correct that 'aiding and abetting a conspiracy' is not a valid theory of liability." (citing United States v. Perry, 643 F.2d 38, 46–47 (2d Cir. 1981))) with United States v. Marino, 277 F.3d 11, 30 (1st Cir. 2002) ("Federal law allows for the crime of aiding and abetting a conspiracy."); see also United States Department of Justice Criminal Resource Manual § 2483 ("The concept of aiding and abetting a conspiracy has not been widely adopted[;] [a] number of district courts have rejected the concept." (collecting cases)). Significantly, the Fourth Circuit has yet to weigh in on this split in authority. In similar circumstances of unsettled law, district courts in this circuit have consistently held that a defendant's appeal raises a substantial question of law or fact. See, e.g., United States v. Catone, 2013 WL 6198313, at *2 (W.D.N.C. Nov. 27, 2013); United States v. Maher, 10 F. Supp. 2d 594, 596 (W.D. Va. 1998); United States v. Barton, 1993 WL 669448, at *5 (S.D.W. Va. Sept. 2, 1993).

With regard to aiding-and-abetting liability, it is undisputed that Rosemond, which was decided nine years after Al-Timimi was convicted, "clarified . . . the mens rea requirement for aiding and abetting a firearms offense," explaining that aiding and abetting such an offense requires "advance knowledge" of the firearm. Hopkins v. United States, 2018 WL 8619643, at *8 (S.D.W. Va. Mar. 22, 2018); see also Kerr v United States, 2016 WL 958202, at *3 (E.D.N.C. Mar. 8, 2016). Indeed, since Rosemond, the Fourth Circuit has frequently been tasked with evaluating whether the government's evidence or a district court's jury instructions complied

11

with that decision. See, e.g., United States v. Benson 957 F.3d 218, 237 (4th Cir. 2020); United States v. Hare, 820 F.3d 93, 104 (4th Cir. 2016). Because these inquiries are fact-specific, it is "difficult to extrapolate a consistent pattern" from case law, Karn v. PTS of Am., LLC, 2017 WL 4162251, at *8 n.7 (D. Md. Sept. 19, 2017); see also Clark v. United States, 2018 WL 1033455, at *6 (E.D. Wisc. Feb. 21, 2018), particularly where, as here, the defendant's convictions are based on an extensive factual record. For example, both the government and Al-Timimi highlight competing evidence introduced at trial regarding Al-Timimi's knowledge of the use of explosives at the LET camp in Pakistan, which formed the basis for his § 844(h)(2) convictions. [See Dkt. 473, 477]. Such "uncertainty" as to the proper outcome is the hallmark of a substantial question of law or fact. Catone, 2013 WL 6198313, at *2; see also United States v. Reed, 2017 WL 947274, at *4 (E.D. La. Mar. 9, 2017) (explaining that release pending appeal is appropriate in "cases in which the defendant faces certain prison time while appealing an uncertain conviction"); United States v. Ajrawat, 2016 WL 2853863, at *1 (D. Md. May 16, 2016) (explaining that, when evaluating whether release pending appeal is appropriate, "federal courts are not to be put in the position of 'bookmakers' who trade on the probability of [the] ultimate outcome" (quotation omitted)). Accordingly, Al-Timimi has satisfied the second requirement for release, that his appeal presents a substantial question of law or fact.[4]

---

[4] Even if Al-Timimi's appeal did not raise a substantial question regarding aiding-and-abetting liability under Rosemond, the government has left entirely uncontested his assertions that there are additional substantial questions of law or fact involved in his appeal. For example, Al-Timimi has asserted that his appeal "presents a substantial First Amendment question over whether his alleged advocacy . . . would meet the high specificity threshold required for criminal solicitation" under the Supreme Court's intervening decision in United States v. Williams, 553 U.S. 285, 297 (2008). [Dkt. 466 at 15–16]. He has also asserted that there is a substantial question regarding the "newly released evidence" which led the Fourth Circuit to remand his appeal in 2015 over the government's objection. Id. at 15.

12

J.A. 2964

### C. **Exceptional Reasons**

"Although the Fourth Circuit has not yet considered what constitutes 'exceptional reasons' under § 3145(c), other courts have generally defined 'exceptional reasons' as circumstances which are 'clearly out of the ordinary, uncommon, or rare.'" Brizuela, 2019 WL 5684508, at *2; see also Marshall, 2020 WL 2614817, at *3. "The exceptional-reasons analysis is flexible and permits courts to respond to real-world circumstances in a pragmatic and common-sense manner." Harris, 2020 WL 1503444, at *6. "A 'wide range of factors may bear upon [this] analysis,' and a district court has 'broad discretion to consider all the particular circumstances of the case before it.'" Id. at *5 (quotation omitted). Here, Al-Timimi argues that both the "ongoing COVID-19 pandemic" and the "unusually complex posture of this case" constitute exceptional reasons why his continued detention is not appropriate. [Dkt. 466 at 2]. In response, the government "accepts for argument's sake that the risk of contracting COVID-19 could constitute an 'exceptional reason' in an appropriate case," but argues that Al-Timimi has not made a sufficiently "particularized" showing of such risk in this case. [Dkt. 473 at 21]. Again, Al-Timimi has the better argument.

First, "[c]ourts have held that the risk the COVID-19 pandemic presents to persons who are incarcerated may constitute an exceptional reason justifying release" under § 3145(c). Marshall, 2020 WL 2614817, at *3 (collecting cases); see also Wilder, 2020 WL 2319136, at *3 (explaining that the COVID-19 pandemic has had an "unprecedented . . . effect on virtually every sector of public life" and poses a particularly "serious[]" threat to "individuals who are incarcerated" (quotation omitted)). Of course, "generalized concern" about the COVID-19 pandemic "falls far short" of the exceptional reasons necessary under § 3145(c). United States v. Childs, 2020 WL 1910097, at *4 n.3 (D.S.C. Apr. 20, 2020). Instead, there must be a

13

**J.A. 2965**

"particularized" showing of risk. such as evidence that the defendant has underlying health

conditions which would place him at increased risk of severe illness were he to contract COVID-

19. Id. at *3.

Here.


### PERSONAL MEDICAL INFORMATION REDACTED


. The Court finds that

these conditions sufficiently increase Al-Timimi's risk of severe illness from COVID-19 such

that there are exceptional reasons why his continued detention is not appropriate.[5] See Centers

for Disease Control and Prevention. People at Increased Risk for Severe Illness. available at:

---

[5] The government portrays Al-Timimi's risk of severe illness from COVID-19 as low, primarily
because Al-Timimi's particular facility within USP Florence has not yet reported any COVID-19
cases; however, there is no way to know with any certainty what the future holds when it comes
to this virus. Such uncertainty "is endemic in the present circumstances" and "cannot preclude
courts from acting until the damage has been done"; rather, it is simply "one of the many factors
courts must consider" in deciding whether there are exceptional reasons why detention would not
be appropriate. Harris, 2020 WL 1503444, at *5. Here. the government's portrayal of Al-
Timimi's risk of severe illness from COVID-19 is unpersuasive because although no facility
within USP Florence had reported any COVID-19 cases when the Motion was filed, two
facilities have since reported a total of at least seven cases. [See Dkt. 517]. These developments
illustrate precisely why courts "need not wait until COVID-19 is present" in a defendant's
particular facility to grant relief. United States v. Jackson. 2020 WL 2735724. at *4 n.7 (W.D.
Va. May 26. 2020). Ultimately, there is "[a] very real risk" that COVID-19 will spread to Al-
Timimi's particular facility within USP Florence. "as evidenced by the spread of COVID-19
throughout . . . the BOP," and that risk "is sufficient." Id.

14

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited August 17, 2020). Indeed, many courts in this circuit have recently granted various forms of release to defendants who suffer from a combination of these conditions. See, e.g., United States v. Hardy, 2020 WL 4436376 (D. Md. Aug. 3, 2020); United States v. Oaks, 2020 WL 3433326 (D. Md. June 23, 2020); Wise v. United States, 2020 WL 2614816 (D. Md. May 22, 2020); United States v. Creek, 2020 WL 2097692 (D. Md. May 1, 2020); United States v. Harper, 2020 WL 2046381 (W.D. Va. Apr. 28, 2020); United States v. Handy, 2020 WL 2041666 (D. Md. Apr. 28, 2020).

Second, even if Al-Timimi's significant risk of severe illness from COVID-19 were insufficient to constitute exceptional reasons why his detention should not be continued, it certainly is sufficient in combination with the previously discussed procedural and legal posture of this case. It bears emphasizing just how unusual that posture is. Despite having served almost 15 years in prison, Al-Timimi has yet to complete the direct appeal as of right of his convictions and sentence. Should Al-Timimi succeed in having his convictions under Counts 7, 8, 9, and 10 reversed, he would have already served more time in prison than warranted. In a similar vein, Al-Timimi correctly points out that most, if not all, of the principal offenders who were prosecuted as a result of conduct originating at the Dar al-Arqam Islamic Center, including those who actually handled explosives at the LET camp in Pakistan, have already served their sentences and been released.

Lastly, it is also worth emphasizing that Al-Timimi is only required to demonstrate exceptional reasons why his detention is not appropriate because he was exposed to a maximum sentence of life based on his § 924(c) convictions under Counts 7 and 8. If not for those convictions, the requirements for release pending appeal would be far less onerous. Significantly,

**J.A. 2967**

as previously discussed, Al-Timimi's § 924(c) convictions under Counts 7 and 8 will likely be

invalidated before his appeal returns to the Fourth Circuit. Accordingly, Al-Timimi has satisfied

the third requirement for release, the existence of exceptional reasons why his continued

detention is not appropriate.

### III. CONCLUSION

For the reasons stated above, Al-Timimi's Motion for Release from Custody Pending

Appeal will be granted by an Order accompanying this Memorandum Opinion.

Entered this 18 day of August, 2020.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

16

J.A. 2968

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:04-cr-385 (LMB) |
| ALI AL-TIMIMI, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

For the reasons stated in the accompanying Memorandum Opinion, defendant Ali Al-

Timimi's ("defendant" or "Al-Timimi") Motion for Release from Custody Pending Appeal [Dkt.

465] is GRANTED, and it is hereby

ORDERED that the Bureau of Prisons ("BOP") immediately place Al-Timimi in a 14-

day quarantine after which he must be released and must fully comply with the following

conditions of release:

1. He must serve the entirety of his term of release pending appeal under home
confinement in his mother Dr. Sehara Al-Timimi's home in Washington, D.C. with
electronic monitoring or global positioning satellite ("GPS") tracking. Al-Timimi is
allowed out of his mother's home only for the following reasons: (a) to meet with his
Probation Officer; (b) to meet with his legal counsel; (c) to appear at any court
hearings; (d) to attend to any of his medical needs; and (e) to attend religious services
on Fridays. Al-Timimi must give advance notice to his Probation Officer of any
departure from his mother's home, including departure for the reasons listed above,
and must receive advance approval from the Court for any departure from his
mother's home for any other reason. Al-Timimi must pay the costs of the electronic
monitoring or GPS tracking to the extent he is able and must fully comply with the
Probation Office's policies governing the monitoring. The Probation Office will
immediately alert the designated officials at the Federal Bureau of Investigation if Al-
Timimi violates any of these travel restrictions.[1]

---

[1] The request that Al-Timimi be allowed to exercise outside of his mother's home by walking in
the neighborhood is not unreasonable; however, until he has settled into supervision, this request
will not be granted. It may be renewed in the future.

2. He must contact United States Probation Office Home Confinement/Location Monitoring Specialist Jeffrey M. Smihal at 703-366-2103 no later than two business days after being released from BOP custody to arrange for the installation of the electronic monitoring or GPS tracking device.

3. He must not possess or use any device to access any online computer services at any location, including any internet service providers, bulletin board systems, and any other public or private computer network, without the prior approval of his Probation Officer.

4. He must comply with the requirements of the Probation Office's computer monitoring program, and must consent to the installation of computer monitoring software on any computer to which he has access. The software will be installed by the supervising Probation Officer and it will restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations, with the exception of any communications between Al-Timimi and his legal counsel. A notice will be placed on the computer at the time of the software's installation to warn others of the existence of the software. Al-Timimi must also notify others of the existence of the software, and must not remove, tamper with, reverse engineer, or in any way circumvent the software.

5. He shall not have on-line communications in any language other than English unless approved in advance by his Probation Officer, and he must not have any communications with: (a) any of the other defendants prosecuted as a result of conduct originating at the Dar al-Arqam Islamic Center; (b) any of the witnesses who testified at his trial; (c) any of the jurors at his trial; or (d) any cooperating witness whose identity was revealed during the litigation of his Motion for Release from Custody Pending Appeal.

The Clerk is directed to forward copies of this Order and the accompanying

Memorandum Opinion to counsel of record, United States Probation Officers Jeffrey M. Smihal

and Franklin Weaver, and the United States Marshals Service.

Entered this _18_ day of August, 2020.

Alexandria, Virginia

_____
/s/
Leonie M. Brinkema
United States District Judge

2

**J.A. 2970**

FILED: August 31, 2020

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 20-4441
(1:04-cr-00385-LMB-1)
_____

UNITED STATES OF AMERICA

       Plaintiff - Appellant

v.

ALI AL-TIMIMI

       Defendant - Appellee

_____

O R D E R
_____

Upon consideration of the submissions relative to the government's motion
for stay pending appeal, the court denies the motion.

Upon review of this bail appeal, the court affirms the district court's order
regarding release.

Entered at the direction of Judge Keenan with the concurrence of Judge
Thacker and Judge Harris.

       For the Court

       /s/ Patricia S. Connor, Clerk

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | )  1:04-cr-385 (LMB) |
| ALI AL-TIMIMI, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

The United States Court of Appeals for the Fourth Circuit has remanded the direct appeal of defendant Ali Al-Timimi ("defendant" or "Al-Timimi") to this Court for consideration of two issues—whether the government improperly withheld material, exculpatory evidence at trial regarding prior investigations of Al-Timimi and whether Al-Timimi's 18 U.S.C. § 924 convictions must be vacated in light of the Supreme Court's decision in Johnson v. United States, 576 U.S. 591 (2015).  Before the Court are four motions filed by Al-Timimi subsequent to the Fourth Circuit's remand, all of which have been fully briefed and are ripe for review: Motion to Compel Disclosure of Unredacted Documents to Cleared Defense Counsel and Production of Index of Undisclosed Evidence [Dkt. No. 417] ("Motion to Compel"); Renewed Motion for Acquittal on Counts 7 and 8 in Light of Intervening Authority [Dkt. No. 432] ("Motion for Acquittal on Counts 7 and 8"); Renewed Motion for Acquittal on Count 1 in Light of Intervening Authority [Dkt. No. 445] ("Motion for Acquittal on Count 1"); and Unopposed Motion for Leave to File and Brief a Motion for New Trial on Counts 9 and 10 [Dkt. No. 460] ("Motion for Leave").  For the following reasons, the Motion to Compel and Motion for Leave will be denied, and the Motions for Acquittal will be granted.

I

A. **Factual Background**

This is a complex criminal case that focuses on the role Al-Timimi played in encouraging

and inspiring over a dozen young Muslim men to leave the United States after the terrorist

attacks on September 11, 2001, to obtain military training at a camp run by Lashkar-e-Taiba

("LET")—a group that the United States Department of State would later designate as a Foreign

Terrorist Organization—and to then go to Afghanistan to protect the Taliban from anticipated

attacks by the United States military. See United States v. Royer, Case No. 1:03-cr-296 (E.D.

Va. Sept. 25, 2003), [Dkt. No. 167]. All of those men were subsequently charged with, and

convicted of, committing multiple federal crimes. See generally United States v. Khan, 309 F.

Supp. 2d 789 (E.D. Va. 2004) (explaining these events in detail). Many of those crimes involved

the use of firearms during the commission of crimes of violence; however, due to significant

changes in the law concerning what qualifies as a crime of violence, several of those convictions

have been vacated. See United States v. Royer, Case No. 1:03-cr-296. Al-Timimi was not

charged in that case.

Al-Timimi was a well-known lecturer on Islam who had authored several books and

produced several tapes, many of which focused on violent jihad between Muslims and non-

Muslims. He regularly lectured at the Dar al-Arqam Islamic Center, a mosque in Falls Church,

Virginia, where he was esteemed by many as an authoritative figure. Given the attacks on

Muslims in Chechnya, Bosnia, Kosovo, and Afghanistan, as well as the United States' strong

support for Israel, several young male members of the mosque were influenced by Al-Timimi to

begin preparing for jihad. Three of these men, Khwaja Mahmood Hasan ("Hasan"), Yong Ki

Kwon ("Kwon"), and Muhammed Aatique ("Aatique"), testified at Al-Timimi's trial and

explained how Al-Timimi inspired and encouraged them to prepare for jihad. For example,

2

Kwon testified, "I remember him telling us, one time, you know, the teachings of the Prophet, you know, like, shooting, you know, shooting is power, and he said it's something the Muslims should know." Trial Tr. at 1148:21–23 (Kwon testimony—Volume V).[1] Kwon and several others bought firearms, joined rifle ranges, and engaged in paintball games, which they described as ways to prepare for combat, as well as being a form of recreation. Trial Tr. at 23:1–5; 26:7 (Kwon Testimony). He also explained how before the attacks on September 11, 2001, Al-Timimi had praised Ibn al-Khattab, a commander in the Chechnya conflict with the Russians. Several of the paintball players watched a video, "Russian Hell 2000" that showed al-Khattab executing a captured Russian soldier.

Aatique testified about a course entitled "The Signs of the End of Times" that Al-Timimi taught at the mosque for about a year before the September 11, 2001 attacks and a taped lecture entitled "The New World Order." Trial Tr. 179:3–12 (Aatique Testimony—Volume I). Aatique understood those materials as describing a battle between Muslims and non-believers who Al-Timimi referred to as "kuffar." Id. at 19.

At some point before September 11, 2001, the FBI had become aware of the paintball exercises and had interviewed one of the participants, Seifullah Chapman. Kwon told Al-Timimi about the FBI interview and asked him for advice. In response, Al-Timimi told Kwon that the men should continue playing because it would look suspicious if they stopped; however, Al-Timimi instructed Kwon that they should be more discreet. Trial Tr. 40:20–25 (Kwon Testimony).

On the evening of September 11, 2001, in response to the attacks on the World Trade

---

[1] Because the trial took place in 2005, the Court has only paper copies of the transcripts. As a result, citations to the trial transcripts may differ slightly from transcripts in the appeal record.

J.A. 2974

Center and the Pentagon, there was an emotional gathering at the mosque. Kwon testified that

Al-Timimi told him and his friends "to be careful." Trial Tr. 33:22–25 (Kwon Testimony). At

some point, one of the attendees characterized the September 11, 2001 attacks as evil, to which

Al-Timimi responded that, although Islam does not condone killing innocent people, it allows for

combatants to be killed. Trial Tr. 34:10–18 (Kwon Testimony). He further explained that a

combatant "is not just a person who goes and fights but also a person who supports, you know,

who supports monetarily in those fights can be categorized as combatant." Id.

     Kwon drove Al-Timimi home after that meeting. During the drive, Al-Timimi said "this

event . . . was a punishment from God, but, you know, he hadn't expected something like this.

He expected something like an earthquake." Trial Tr. 35:7–10 (Kwon Testimony). Kwon also

testified that Al-Timimi told him "to gather some brothers and come up with a, with a

contingency plan in case . . . there will be . . . mass hostility towards Muslims in America." Id.

at 13–16. In response, Kwon emailed several of the paintball players and other Muslims he had

met at firing ranges to meet at his home on Sunday, September 16, 2001. Although Al-Timimi

was not invited, he asked to join them when Kwon told him about the meeting. Trial Tr. 42:1–3

(Kwon Testimony).

     Kwon, Hasan, and Aatique described how, before Al-Timimi began speaking at that

meeting, he instructed Kwon to unplug his answering machine, and he told everyone to turn off

their phones, draw the curtains, and "not repeat anything that was said in the meeting outside of

the people who are present." Trial. Tr. 47:2–11 (Kwon Testimony).[2] Kwon described Al-

Timimi as saying that "the amir of Afghanistan has called for help—called for assistance and

---

[2] Hasan also described Al-Timimi as telling them to close the blinds as well as turn off their
phones, and that the meeting was "amama" which means "trust." Trial Tr. 9:5–16 (Hasan
Testimony).

that it is obligatory on all Muslims to go and defend Afghanistan," and "it doesn't matter if we fight the Indians or the Russians or the Americans, that is all legitimate jihad." Trial Tr. 5:8–10; 6:15–18 (Kwon Testimony). Al-Timimi also told the attendees that they "should join the LET and get some training from the LET camps." He described LET as being on the "sunnah," or the correct path. Some of the paintballers, including Randall Royer ("Royer"), had previously visited the LET camps, and, after Al-Timimi left the meeting, Royer provided the attendees with contact information for the LET. Trial Tr. 10:11–25; 11:6–7 (Kwon Testimony).

The next day, Kwon and Hasan went to the Pakistani Embassy to obtain visas. Trial Tr. 18:14–15 (Kwon Testimony). On September 19, 2001, Hasan and Kwon met Al-Timimi and told him they were going to Pakistan to train with the LET. Al-Timimi did nothing to discourage them but warned them not to look suspicious. Trial Tr. 21:22–25 (Kwon Testimony).

As a result of the September 16, 2001 meeting, nearly all of the attendees went to Pakistan where they received training from LET on various weapons, including RPGs and machine guns; however, because the United States' invasion of Afghanistan occurred so quickly, none of the attendees entered Afghanistan, none fired any weapons at United States personnel or property, and all returned to the United States and were convicted of various offenses by trial or guilty pleas.

### B. Procedural History

On September 23, 2004, a federal grand jury returned a six-count Indictment against Al-Timimi. On February 3, 2005, a Superseding Indictment was returned, which charged Al-Timimi with the following 10 counts:

> <u>Count 1</u>: Counseling and inducing a conspiracy to use firearms during, in relation to, and in furtherance of crimes of violence, in violation of 18

U.S.C. §§ 924(o)[3] and 2.

Count 2: Solicitation to levy war against the United States, in violation of 18 U.S.C. §§ 2381 and 373.

Count 3: Counseling and inducing a conspiracy to levy war against the United States, in violation of 18 U.S.C. §§ 2384 and 2.

Count 4: Attempting to contribute services to the Taliban, in violation of 50 U.S.C. § 1705.

Count 5: Counseling and inducing an attempt to aid the Taliban, in violation of 50 U.S.C. §§ 1705 and 2.

Count 6: Counseling and inducing a conspiracy to violate the Neutrality Act, in violation of 18 U.S.C. §§ 371 and 2.

Counts 7 and 8: Inducing others to use firearms during, in relation to, and in furtherance of crimes of violence, in violation of 18 U.S.C. §§ 924(c) and 2.

Counts 9 and 10: Inducing others to carry explosives during the commission of federal felonies, in violation of 18 U.S.C. §§ 844(h)(2) and 2.

See [Dkt. No. 47].

As relevant here, Count 1 specifically charged Al-Timimi with "unlawfully and knowingly aid[ing], abet[ting], counsel[ing], and induc[ing] Masoud Khan, Randall Royer, Yong Kwon, Muhammad Aatique, Khwaja Hasan, Donald Surratt, and others . . . to combine, conspire, confederate, and agree together and with others . . . to use, carry, possess, and discharge firearms during, in relation to, and in furtherance of crimes of violence." Id. at 4. Counts 7 and 8 charged Al-Timimi with "unlawfully and knowingly aid[ing], abet[ting], counsel[ing], induc[ing], and

---

[3] Due to a typographical error, Count 1 of the Superseding Indictment cites 18 U.S.C. § 924(n), which covers the unrelated offense of traveling across state lines to illegally obtain firearms, as its underlying offense instead of § 924(o). This citation error carried over into trial, and as a result, the Court's Judgment contains the same citation mistake, see [Dkt. No. 449] at 2 n.1; however, the Superseding Indictment and all trial documents use the correct language of § 924(o) when referring to Count 1.

procur[ing] . . . the discharge of firearms . . . by Khwaja Hasan and Yong Kwon in Pakistan during, in relation to, and in furtherance of crimes of violence . . . including the conspiracy alleged in Count 1." Id. at 15.

The Superseding Indictment did not allege the particular crimes of violence on which Counts 1, 7, and 8 were predicated; however, in its response to Al-Timimi's Motion for a Bill of Particulars as to the original Indictment, the government had "give[n] notice" of "the . . . crimes of violence for which Al-Timimi and those he induced to act may be prosecuted." [Dkt. No. 23] at 6. Specifically, the government identified the following offenses in response to defendant's Motion for a Bill of Particulars:

a. Enlisting and entering oneself or another to go beyond the jurisdiction of the United States with intent to be enlisted and entered in the service of any foreign prince, state, colony, district, and people as a soldier—and conspiring to do so—in violation of [18 U.S.C. §§ 371, 959];

b. Beginning, providing for, preparing a means for, and taking part in military expeditions and enterprises to be carried on from the United States against the territory and dominion of foreign states, districts and people with whom the United States was at peace, in violation of [18 U.S.C. § 960];

c. Conspiring to commit at any place outside the United States acts that would constitute the offense of murder or maiming if committed in the special maritime and territorial jurisdiction of the United States, in violation of [18 U.S.C. § 956(a)];

d. Conspiring to damage or destroy specific property situated within a foreign country and belonging to a foreign government or to any political subdivision thereof with which the United States is at peace, and any railroad, canal, bridge, airport, airfield and other public utility, public conveyance, and public structure and any religious educational and cultural property so situated, in violation of [18 U.S.C. § 956(b)];

7

J.A. 2978

    e.    Attempting and conspiring to provide material support and resources, knowing or intending that they are to be used in preparation for, or in carrying out a violation of [18 U.S.C. § 956], in violation of [18 U.S.C. § 2339A];

    f.    Attempting and conspiring to supply services to the Taliban, to the territory of Afghanistan controlled by the Taliban, and to persons whose property and interests in property were blocked pursuant to [31 C.F.R. § 545.201], in violation of [50 U.S.C. § 1705];

    g.    Attempting and conspiring to provide material support and resources to foreign terrorist organizations, in violation of [18 U.S.C. § 2339B];

    h.    Levying war against the United States in violation of [18 U.S.C. § 2381]; and

    i.    Enlisting and engaging with intent to serve in armed hostility against the United States – and conspiring to do so – in violation of [18 U.S.C. §§ 371, 2390].

Id. at 7–8. After the Superseding Indictment was returned, defense counsel did not file a renewed motion for a Bill of Particulars, and the government did not amend the list of predicate offenses, which were referenced throughout the proceeding against Al-Timimi.

After the charging conference in which defense counsel objected to many of the predicate offenses included for the jury's consideration, the Court gave the following instruction to the jury:

Instruction 44 is going to define for you various offenses that constitute crimes of violence . . . and these are technical terms that are used in the statute, so you do need to know them.

The following offenses constitute crimes of violence for purposes of Count 1 of the indictment as well as for Counts 7 and 8 of the indictment . . .

A. Levying war against the United States and conspiring to do so, in violation of [18 U.S.C. §§ 2381, 2384];

B. Attempting and conspiring to supply services to the Taliban, in violation of [50 U.S.C. § 1705];

8

J.A. 2979

C. Beginning, providing for, preparing a means for, and taking part in military expeditions and enterprises to be carried on from the United States against the territory and dominion of foreign states, districts, and peoples with whom the United States was at peace—and conspiring to do so—in violation of [18 U.S.C. §§ 371, 960];

D. Enlisting and entering oneself or another to go beyond the jurisdiction of the United States with intent to be enlisted and entered in the service of any foreign prince, state, colony, district, and people as a solider—and conspiring to do so—in violation of [18 U.S.C. §§ 371, 959];

E. Conspiring to commit at any place outside the United States acts that would constitute the offense of murder or maiming if committed in the special maritime and territorial jurisdiction of the United States, in violation of [18 U.S.C. § 956(a)];

F. Conspiring to damage or destroy specific property situated within a foreign country and belonging to a foreign government or to any political subdivision thereof with which the United States is at peace, and any railroad, canal, bridge, airport, airfield, and other public utility, public conveyance, and public structure and any religious, educational, and cultural property so situated, in violation of [18 U.S.C. § 956(b)];

G. Attempting and conspiring to provide material support and resources, knowing or intending that they are to be used in preparation for or in carrying out a violation of Section 956 of Title 18, United States Code, in violation of [18 U.S.C. § 2339(a)];

H. Attempting and conspiring to provide material support and resources to Al-Qaeda, in violation of [18 U.S.C. § 2339(b)]; and

I. Enlisting and engaging with intent to serve in armed hostility against the United States—and conspiring to do so—in violation of [18 U.S.C. §§ 371, 2390].

Now, Counts 1, 7, and 8 include an element referring to crimes of violence . . . . To find this element, the jury must be unanimous as to which of the nine crimes was involved. And the nine enumerated crimes are the ones that you have listed there in Instruction 44. The jury may unanimously find more than one crime of violence . . . ; however, to satisfy that element, the jury must unanimously find at least one such crime for each count.

9

J.A. 2980

[Dkt. 455-1] at 2317–20. The jury was not given any further definition of the offenses listed in Instruction No. 44 in connection with Counts 1, 7, and 8.

On April 26, 2005, the jury returned guilty verdicts on all 10 counts. [Dkt. No. 107]. After the verdicts, a bench conference was held, during which both the government and defense counsel agreed that the Court did not need to ask the jury to identify the particular crime or crimes of violence on which it had based its verdicts.[4] [Dkt. No. 433-3] at 2412.

Following the guilty verdicts, Al-Timimi moved for judgment of acquittal on all counts [Dkt. No. 118]. At his July 13, 2005 sentencing hearing, Al-Timimi's motion for judgment of acquittal was denied, and he was sentenced to life imprisonment, consisting of the following:

> Counts 1–3: 121 months' imprisonment, to run concurrently to each other.
>
> Counts 4 and 5: 120 months' imprisonment, to run concurrently with the sentences on Counts 1–3.
>
> Count 6: 60 months' imprisonment, to run concurrently with the sentences on Counts 1–5.
>
> Count 7: 360 months' imprisonment, to run consecutively to the sentences on Counts 1–6.
>
> Count 8: life imprisonment.
>
> Count 9: 120 months' imprisonment, to run consecutively to the

---

[4] Although this case presents a stark issue of verdict indeterminacy given that a special verdict form was not used to ascertain which crime(s) of violence the jury found, the parties agree that such indeterminacy does not automatically necessitate a judgment of acquittal. Typically, "when a general verdict on a single criminal charge rests on two alternative theories of prosecution, one valid and the other invalid, the verdict should be set aside if it is 'impossible to tell which [theory] the jury selected;'" however, "an alternative-theory error is nevertheless subject to harmless error review." Bereano v. United States, 706 F.3d 568, 577 (4th Cir. 2013) (citation omitted). "Accordingly, a reviewing court is not entitled to reverse a conviction that could rest on either a valid or invalid legal theory" if it "can conclude 'beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" United States v. Jefferson, 674 F.3d 332, 361 (4th Cir. 2012) (citation omitted).

10

J.A. 2981

sentences on Counts 1–8.

Count 10: 240 months' imprisonment, to run consecutively to the sentences on Counts 1–9.

[Dkt. No. 132]. Two days later, Al-Timimi filed a notice of appeal as to the Judgment. [Dkt. No. 133].

Due to several procedural hurdles, Al-Timimi's direct appeal has not been resolved. While his appeal was pending, public reports revealed the existence of previously undisclosed government surveillance programs. In light of these reports, Al-Timimi asked the Fourth Circuit to remand his case for further proceedings, arguing that the government failed to disclose material communications obtained through such programs. On April 25, 2006, the Fourth Circuit granted Al-Timimi's motion and remanded the case with instructions to "consider upon remand [the] issues raised by [defendant] and order whatever relief or changes in the case, if any, that [the Court] considers appropriate." [Dkt. No. 164].

Over the next eight years, which included further revelations about the government surveillance programs at issue, Al-Timimi filed a series of motions seeking the disclosure of any of his communications that the government had obtained through the previously undisclosed surveillance programs, as well as other related documents. The Court resolved these motions in April and May of 2014. [Dkt. Nos. 349, 357]. The delay in their resolution was largely due to the government's refusal to clear any of the Court's staff for access to certain classified materials.

On June 4, 2014, Al-Timimi filed a notice of appeal as to the May 2014 Order, and the case returned to the Fourth Circuit. [Dkt. No. 358]. While that appeal was pending, defendant's counsel obtained what he believed to be a previously undisclosed FBI document regarding the government's prior investigation of Al-Timimi. In light of this revelation, Al-Timimi asked the

11

**J.A. 2982**

Fourth Circuit to again remand his case for further proceedings, arguing that the government failed to disclose this document before trial. On August 4, 2015, the Fourth Circuit granted Al-Timimi's motion and remanded the case "for further proceedings" but kept his appeal on its active docket and ordered that the parties file monthly status reports. [Dkt. No. 406]. Al-Timimi subsequently filed the Motion to Compel that is a subject of this Memorandum Opinion. [Dkt. No. 417].

On July 8, 2016, Al-Timimi asked the Fourth Circuit to expand its remand order in light of the Supreme Court's decision in Johnson v. United States, 576 U.S. 591 (2015), in which the Supreme Court held that the "residual clause" of 18 U.S.C. § 924(e)(2)(B) was unconstitutionally vague. Al-Timimi argued that the holding in Johnson should invalidate his convictions for Counts 7 and 8, which charged violations of 18 U.S.C. § 924(c). On July 24, 2016, the Fourth Circuit granted Al-Timimi's motion and instructed the Court to "reconsider [his] § 924(c) convictions in light of Johnson." [Dkt. No. 431]. Al-Timimi subsequently filed his pending Motions for Acquittal and Motion for Leave. [Dkt. Nos. 432, 445, 460].

On August 18, 2020, Al-Timimi was granted release from custody pending his appeal pursuant to 18 U.S.C. § 3145(c).[5] [Dkt. No. 520]. At the time of his release, Al-Timimi had served 180 months in prison, thereby satisfying the sentences imposed on Counts 1–6, and was

---

[5] The Court granted Al-Timimi's Motion for Release from Custody Pending Appeal because he successfully demonstrated that he was not likely to flee or pose a danger to others; his appeal raised a substantial question of law or fact likely to result in reversal, a new trial, or a sentence less than time served plus the expected duration of the appeal process; and there were exceptional reasons why his continued detention was not appropriate, namely, the risk of contracting severe illness from COVID-19. [Dkt. No. 519]. Multiple restrictions were imposed to ensure that Al-Timimi did not abscond or pose a risk to the health or safety of others, including home confinement with GPS monitoring and several limitations on his ability to communicate with others.

serving the sentence imposed on Count 7.  He had not started serving the sentences imposed on Counts 8–10.  [Dkt. No. 519].

II

### A.  <u>Motion to Compel</u>

In his Motion to Compel, Al-Timimi claims that the government violated its discovery obligations under Fed. R. Crim. P. 16 and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), by failing to provide defense counsel with two unredacted documents from the National Archives and Record Administration ("NARA"): a document describing FBI Squad IT-3's involvement in terrorism investigations and a 9/11 Commission memorandum detailing an interview with FBI Special Agent Ammerman ("SA Ammerman") who was one of the case agents involved in the investigation of defendant.  [Dkt. No. 418] at 1–2.  Al-Timimi argues that both unredacted documents constitute <u>Brady</u> material, in that they corroborate his defense by undercutting evidence of his intent to encourage acts of aggression against the United States.  Al-Timimi also argues that these documents are inconsistent with SA Ammerman's trial testimony in which he stated that he first began investigating Al-Timimi in 2003.

Under <u>Brady</u>, a prosecutor violates a defendant's right to due process if he or she fails to provide evidence favorable to the defendant upon his request "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.  A <u>Brady</u> violation has three components: (1) the evidence must be favorable to the defendant; (2) the evidence must have been suppressed by the government; and (3) the evidence must be material to the guilt or innocence of the defendant.  <u>See id.</u>; <u>see also United States v. McLean</u>, 715 F.3d 129, 142 (4th Cir. 2013).  Evidence is considered "favorable" if it is exculpatory, <u>Brady</u>, 373 U.S. at 87, or if it is impeaching, <u>Giglio v. United States</u>, 405 U.S. 150, 154–55 (1972).  Evidence is considered "material" if there is "a reasonable probability that [its]

13

**J.A. 2984**

disclosure . . . would have produced a different outcome" at trial. <u>McLean</u>, 715 F.3d at 142 (citing <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995)).

Defendant's Motion to Compel also invokes Fed. R. Crim. P. 16, which requires the government to make available for inspection "item[s] . . . material to preparing the defense" if such items are "within the government's possession, custody, or control." Similar to the requirements under <u>Brady</u>, the items sought by the defendant must be "material." In this context, the defendant must establish a "strong indication" that the evidence would have "play[ed] an important role in uncovering admissible evidence . . . corroborating testimony, or assisting impeachment or rebuttal." <u>United States v. Caro</u>, 597 F.3d 608, 621 (4th Cir. 2010).

Although the Supreme Court in <u>Rovario v. United States</u>, 353 U.S. 53 (1957), recognized a general governmental privilege to withhold discovery that could reveal legal methods and sources, such as surveillance techniques, that privilege "give[s] way" where disclosure would be "relevant and helpful to the defense of an accused," or would be "essential to a fair determination of a cause." <u>Id.</u> at 60–61.

Given the extensive amount of classified and unclassified discovery that was provided in this case, both the Court and the prosecution failed to realize that the government had provided the unredacted Squad IT-3 document to the Court in February 2007 as attachment 10 to the government's <u>ex parte</u> and under seal classified filing regarding documents from the NARA Database [Dkt. No. 212], and the unredacted SA Ammerman memorandum was attachment 32 to that same pleading. As the government correctly responds, the Court reviewed those two documents <u>in camera</u> and determined that they did not have to be disclosed to defense counsel as they did not contain information that constituted <u>Brady</u> material and were not otherwise relevant to defendant's theory of defense. [Dkt. No. 231]. Indeed, allowing defense counsel access to the

unredacted versions of these documents would not only have provided Al-Timimi discovery to which he was not entitled but would also have defeated the protections to national security created by the document classification system that seeks to preserve the integrity of ongoing counterterrorism operations. Accordingly, because the government did not violate its obligations under either Brady or Rule 16, defendant's Motion to Compel [Dkt. No. 417] will be denied.

## B. Motions for Acquittal

Al-Timimi argues that his § 924 convictions under Counts 1, 7, and 8 must be vacated in light of the Supreme Court's decision in United States v. Davis, 588 U.S. 445 (2019),[6] which held that the residual clause in § 924(c) was unconstitutionally vague. [Dkt. No. 455] at 1.[7] In response, the government argues that Al-Timimi's § 924 convictions under Counts 1, 7, and 8 remain valid because they could have been based on multiple predicate offenses, which today would qualify as crimes of violence. [Dkt. No. 461] at 5–10. Specifically, the government argues that Counts 1, 7, and 8 could have been predicated on either the crime of conducting an expedition against a friendly nation in violation of 18 U.S.C. § 960 or enlistment to serve against the United States in violation of 18 U.S.C. § 2390, and that Count 1 could also have been predicated on the crime of treason in violation of 18 U.S.C. § 2381.

---

[6] Following the Fourth Circuit's 2016 instruction to the Court to "reconsider [Al-Timimi's] § 924(c) convictions in light of Johnson," [Dkt. No. 431], defendant filed a supplemental memorandum in 2019 explaining that because Davis directly addressed § 924(c) on which Counts 1, 7, and 8 depend, Davis "resolves the pending motions in Al-Timimi's favor." [Dkt. No. 452] at 2.

[7] In addition to challenging his convictions for the § 924(c) violations charged in Counts 7 and 8, Al-Timimi also challenges his § 924(o) conviction charged in Count 1. Count 1 is within the scope of the Fourth Circuit's remand because § 924(o) incorporates § 924(c). Specifically, § 924(o) states, "A person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both; and if the firearm is a machine gun or destructive device, or is equipped with a firearm silencer or muffler, shall be imprisoned for any term of years or life." Therefore, any analysis of § 924(c) necessarily applies equally to § 924(o).

15

Under Fed. R. Crim. P. 29, a district court may "enter a judgment of acquittal for 'any offense on which the evidence is insufficient to sustain a conviction,'" United States v. Diana Shipping Servs., S.A., 985 F. Supp. 2d 719, 723 (E.D. Va. 2013) (citing Fed. R. Crim. P. 29(a)). This includes situations in which there is no longer any legal basis for the conviction, such as where there has been an intervening change in law. See United States v. Abu Khatallah, 316 F. Supp. 3d 207 (D.D.C. 2018) (considering Rule 29 motion given an intervening change in law). "The question raised by a motion for judgment of acquittal is whether 'as a matter of law the government's evidence is insufficient to establish factual guilt on the charges in the indictment.'" United States v. Montejo, 353 F. Supp. 2d 643, 646 (E.D. Va. 2005) (citation omitted). "It goes without saying that, as a matter of law, the government bears the burden of proving the essential elements of the offense[s] charged beyond a reasonable doubt." Id. "Thus, in reviewing a motion for judgment of acquittal, the court must, 'considering the evidence and all reasonable inferences that can be drawn from it in the light most favorable to the government, determine whether any rational factfinder could have found the essential elements of the crimes charged beyond a reasonable doubt.'" Id. (citation omitted). If a rational factfinder could have so found, the conviction must stand; if not, the verdict must be set aside and a judgment of acquittal entered. See, e.g., United States v. Eychaner, 326 F. Supp. 3d 76, 85 (E.D. Va. 2018).

    1.   Crime of Violence—Defined

Federal law criminalizes using or carrying a firearm during and in relation to any "crime of violence." 18 U.S.C. § 924(c)(1)(A). When Al-Timimi was sentenced, a "crime of violence" was defined as a felony offense that:

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

            (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Id. § 924(c)(3); see also United States v. Khan, 309 F. Supp. 2d 789, 823 (E.D. Va. 2004) (citing § 924(c)(3)). Courts commonly refer to the first prong of this definition as the "force clause" and to the second prong of this definition as the "residual clause." See, e.g., United States v. Khweis, 971 F.3d 453, 464 (4th Cir. 2020). In United States v. Davis, 588 U.S. 445 (2019), the Supreme Court held that the residual clause is unconstitutional. As a result, § 924(c) convictions for using or carrying a firearm during and in relation to a crime of violence remain valid only if they are predicated on an offense that qualifies as a crime of violence under the force clause. See, e.g., Khweis, 971 F.3d at 456. Because new rules from the Supreme Court "are always fully retroactive on direct appeal," this major change to § 924's jurisprudence applies to Al Timimi's convictions for Counts 1, 7, and 8. United States v. Mathur, 685 F.3d 396, 402 (4th Cir. 2012).

      To determine whether an offense qualifies as a crime of violence under the force clause, courts must apply the categorical approach, which asks "whether the statutory elements of the [predicate] offense necessarily require the use, attempted use, or threatened use of physical force." United States v. Simms, 914 F.3d 229, 233 (4th Cir. 2019). Under the categorical approach, courts "focus on 'the elements of the [] offense rather than the conduct underlying the conviction,'" and must determine "whether those elements 'necessarily require the use, attempted use, or threatened use of physical force.'" United States v. Bryant, 949 F.3d 168, 172 (4th Cir. 2020) (citation omitted). "If the 'minimum conduct necessary' to sustain a conviction under the predicate statute does not require the use, attempted use, of threatened use of force, . . . then the offense 'is not categorically a crime of violence under the force clause.'" Id. at 172–73 (citation omitted). "In undertaking this inquiry," courts "must ensure that there is a 'realistic

probability,' rather than a 'theoretical possibility,' that the minimum conduct would actually be punished under the statute." Id. at 173 (citation omitted).

### 2. Instruction Incongruity

This case presents multiple issues of instruction incongruity because nearly all of the predicate crimes of violence in Instruction No. 44 listed both the substantive offense and conspiracy to commit the substantive offense. Al-Timimi argues that because "conspiracy does not require the use, threatened use, or attempted use of force, none [of the listed crimes of violence] are valid force-clause predicates." See [Dkt. No. 459] at 9 (citing Simms, 914 F.3d at 233–34).

Although the parties agree that none of the conspiracy offenses in Instruction No. 44 would, under current law, qualify as a crime of violence under the force clause, the government argues that three of the substantive offenses in Instruction No. 44—expedition against a friendly nation, enlistment to serve against the United States, and treason—qualify as crimes of violence under the force clause.[8]  Because substantive offenses and conspiracy offenses are analyzed separately under the categorical approach, Simms, 914 F.3d at 233–34, each of those substantive offenses will be addressed in turn. See United States v. Chandia, 514 F.3d 365, 372 (4th Cir. 2008) (recognizing the "'settled principle' that 'the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses'").

---

[8] In Simms, the Fourth Circuit held that conspiracy to commit Hobbs Act robbery was not a force-clause crime because, similarly to the offenses for conspiracy in this case, "the Government must prove only that the defendant agreed with another to commit actions," which does not require the use, attempted use, or threatened use of physical force.  914 F.3d at 233–34.

### i.  Expedition Against a Friendly Nation

Under 18 U.S.C. § 960,

> Whoever, within the United States, knowingly begins or sets on foot or provides or prepares a means for or furnishes the money for, or takes part in, any military or naval expedition or enterprise to be carried on from thence against the territory or dominion of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace, shall be fined under this title or imprisoned not more than three years, or both.

Al-Timimi argues that this offense does not qualify as a crime of violence under the force clause because a person can be convicted of the offense merely by furnishing money or preparing a means for a military or naval expedition against a friendly nation without actually using, attempting to use, or threatening to use physical force.  [Dkt. No. 459] at 17.  In response, the government argues that a person who furnishes money to, or prepares a means for, a military or naval expedition against a friendly nation "is, by definition, aiding and abetting" a military expedition, and therefore "is himself guilty of participating in" that expedition "under federal principles of accomplice liability."  [Dkt. 455] at 14.

Contrary to the government's argument, the Court finds that the offense of expedition against a friendly nation does not qualify as a crime of violence under the force clause because, as the text of § 960 makes clear, a person can commit the offense by furnishing money or preparing a means for a military or naval expedition against a friendly nation, neither of which requires the use, attempted use, or threatened use of physical force.  Bryant, 949 F.3d at 172–73 ("If the 'minimum conduct necessary' to sustain a conviction under the predicate statute does not require the use, attempted use, or threatened use of physical force, . . . then the offense 'is not categorically a crime of violence under the force clause.'").  Indeed, although this question has not been addressed by the Fourth Circuit, other federal courts have convicted or upheld

J.A. 2990

convictions for expedition against a friendly nation offenses based on non-violent conduct, such as providing funds for efforts to overthrow allied governments. See, e.g., United States v. Chhun, 744 F.3d 1110 (9th Cir. 2014) (defendant convicted of expedition against a friendly nation for raising funds and supplies and planning an overthrow); United States v. Ramirez, 765 F.2d 438 (5th Cir. 1985) (defendant convicted of expedition against friendly nation for their thwarted scheme to overthrow the government of Haiti); United States v. Black, 685 F.2d 132 (5th Cir. 1982) (defendants convicted of expedition against a friendly nation for recruitment efforts); United States v. Jack, 2010 WL 4718613 (E.D. Cal. Nov. 12, 2010) (defendants convicted of expedition against a friendly nation for fund-raising activities and procurement of arms); United States v. Chakraberty, 244 F. 287 (S.D.N.Y. 1917) (defendants convicted of expedition against a friendly nation for providing funds); United States v. Tauscher, 233 F. 597 (S.D.N.Y. 1916) (defendants convicted of expedition against a friendly nation for recruitment and furnishment of arms and funds).

The government's claim that "[b]ecause aiders and abettors are 'responsible for the acts of the principles as a matter of law,' and because a military expedition necessarily involves the use or threatened use of force, aiding and abetting such an expedition necessarily makes a defendant liable for using or threatening that same force" is unpersuasive. [Dkt. No. 461] at 6. The logic of this argument is flawed because, as recognized by other federal courts, expedition against a friendly nation can be based on solely non-violent conduct. The only case the government cites in support of its position, United States v. Dinkins, 928 F.3d 349 (4th Cir. 2019), determined that a defendant's conviction for accessory before the fact to armed robbery under North Carolina common law qualified under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), as a "violent felony." Id. at 358. The Fourth Circuit based its holding on the

20

J.A. 2991

fact that "a completed act of armed robbery is an element of the offense of being an accessory

before the fact [to] armed robbery under North Carolina law," and that the court "previously

ha[d] held that the offense of North Carolina armed robbery is a violent felony under the

ACCA's force clause." Id. at 359. The Fourth Circuit's decision in Dinkins is inapplicable in

this case. As previously discussed, supra at 20, the offense of expedition against a friendly

nation does not qualify as a crime of violence because, unlike armed robbery under North

Carolina law, this offense can be carried out without the use, attempted use, or threatened use of

physical force. Accordingly, the expedition against a friendly nation offense cannot support Al-

Timimi's § 924 convictions.

### ii. Enlistment to Serve Against the United States

Under 18 U.S.C. § 2390, "Whoever enlists or is engaged within the United States or in

any place subject to the jurisdiction thereof, with intent to serve in armed hostility against the

United States, shall be fined under this title or imprisoned not more than three years, or both."

Al-Timimi argues that this offense does not qualify as a crime of violence under the force clause

because a person can enlist to serve against the United States without using, attempting to use, or

threatening to use physical force. [Dkt. No. 459] at 23. Defendant supports this argument by

citing to United States v. Taylor, 596 U.S. 845 (2022), in which the Supreme Court held that

attempted Hobbs Act robbery is not a "crime of violence" for purposes of § 924(c) because it

fails to satisfy the plain text of the force clause, and argues that enlistment to serve against the

United States similarly does not involve "the use, attempted use, or threatened use of force"

required to satisfy the force clause. [Dkt. No. 542] at 1. In its opposition, the government argues

that enlistment to serve against the United States "necessarily involves an attempted use of

21

J.A. 2992

physical force—i.e., the specific intent to engage in 'armed hostilities,' plus a substantial step in furtherance of that goal (enlisting or engaging for that purpose)." [Dkt. No. 455] at 19.

The offense of enlistment to serve against the United States plainly does not qualify as a crime of violence under the force clause because, as the text of § 2390 makes clear, a person can commit the offense simply by enlisting, which conduct does not require the use, attempted use, or threatened use of physical force. As this Court has previously explained, "The plain language of the statut[ory] [phrase] 'enlists or is engaged' is not limited to formal enrollment in an enemy military force, [and] can reach preparations within the United States for joining an enemy force overseas." Khan, 309 F. Supp. 2d at 819. Indeed, a defendant may be convicted of enlistment to serve against the United States by making basic preparations to serve in armed hostility without taking any steps toward participation in combat. See id. at 819. Because "the only relevant question [under the force clause] is whether the federal felony at issue always requires . . . the use, attempted use, or threated use of force," Taylor, 596 U.S. at 850, enlistment to serve against the United States does not qualify as a "crime of violence" under the force clause.

Moreover, the government's argument is undermined by its acknowledgement that "the line between mere preparation and a substantial [step] [taken] toward the commission of a crime is inherently-fact intensive, and it is not always a clear one." United States v. Pratt, 351 F.3d 131, 136 (4th Cir. 2003); [Dkt. No. 461] at 9. "To determine whether conduct is preparation or an attempt, a court must assess how probable it would have been that the crime would have been committed—at least as perceived by the defendant—had intervening circumstances not occurred." Pratt, 351 F.3d at 136. Given this requisite, fact-intensive assessment, § 2390 cannot be read to categorically require the attempted use of physical force.

J.A. 2993

### iii. Treason

Under 18 U.S.C. § 2381, "Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason and shall suffer death, or shall be imprisoned not less than five years and fined under this title but not less than $10,000; and shall be incapable of holding any office under the United States." Al-Timimi argues that that this offense does not qualify as a crime of violence under the force clause because a person can adhere to the country's enemies, giving them aid and comfort, without using, attempting to use, or threatening to use physical force. [Dkt. No. 459] at 26. In opposition, the government argues that § 2381 is divisible into two separate offenses—"adher[ing] to the country's enemies, giving them aid and comfort," and "lev[ying] war"—and that Instruction No. 44 confirms that the jury was only permitted to convict Al-Timimi based on the offense of levying war, which does involve the use of physical force.[9] [Dkt. No. 455] at 14.

If § 2381 is considered as a whole, treason does not qualify as a crime of violence under the force clause because, as the text makes clear, a person can violate § 2381 merely by adhering to the enemies of the United States through aiding and comforting the enemies, which does not necessarily require the use, attempted use, or threatened use of physical force. Indeed, numerous

---

[9] The government also argues that Al-Timimi has forfeited his argument that treason does not qualify as a crime of violence under the force clause because he did not argue at trial that Count 2, which charged treason as the predicate offense under a similar force clause in 18 U.S.C. § 373(a), should be dismissed on that basis. The government's position is unpersuasive because forfeiture "is a non-jurisdictional doctrine that calls for flexible application," and its application is not justified here given that Al-Timimi's argument that treason does not qualify as a crime of violence under the force clause does not involve either Count 2 or § 373(a). W.V. Dep't of Health and Human Resources v. Sebelius, 649 F.3d 217, 222 (4th Cir. 2011) (citation omitted). Moreover, neither party could have anticipated the unusual procedural history of this case or how much the legal landscape underlying Al-Timimi's convictions would change.

convictions for treason, either under § 2381 or under the treason clause of the Constitution of the United States on which § 2381 is based, have involved non-forceful conduct, including distributing enemy propaganda and intelligence, interpreting enemy orders, and harboring enemy operatives. See, e.g., United States v. Provoo, 215 F.2d 531 (2d Cir. 1954) (defendant convicted of treason for radio broadcasting, reporting, and offering services); D'Aquino v. United States, 192 F.2d 338 (9th Cir. 1951) (defendant convicted of treason for working as a radio speaker, announcer, script writer and broadcaster for the Imperial Japanese Government and the Broadcasting Corporation of Japan during World War II); Best v. United States, 184 F. 2d 131 (1st Cir. 1950) (defendant convicted of treason for engaging in radio broadcasting activities in Germany and Austria during World War II); United States v. Haupt, 152 F.2d 771 (7th Cir. 1945) (defendant convicted of treason for harboring and assisting enemy operatives).

The government responds that § 2381, which criminalizes both "lev[ying] war" against the United States and "adher[ing] to the country's enemies, giving them aid and comfort," is divisible, and that the "lev[ying] war" prong qualifies as a crime of violence because it requires the use of force. Although no court has directly addressed whether the two prongs of § 2381 constitute separate offenses and are thus divisible, this Court finds that both the structure of the statute—namely, the use of "or" between the two statutory phrases—and the significant behavioral differences required by each statutory phrase support divisibility. See United States v. Allred, 942 F.3d 641, 649–651 (4th Cir. 2019) (explaining that a statute is likely divisible "[w]here the behavior underlying one statutory phrase 'differs so significantly from the behavior underlying' another").

Having found that § 2381 is divisible, the Court also finds that legal precedent supports the conclusion that "levying war" necessarily requires the use of force. In Ex parte Bollman, 8

24

U.S. (4 Cranch) 75 (1807), the Supreme Court defined "levying war" as a "body of men []
actually assembled for the purpose of effecting by force a treasonable purpose," id. at 126.  In
that decision, the Supreme Court carefully distinguished between conspiracy to levy war and the
act of levying war, the former of which does not require that "war [be] actually levied."  Id. at
127.  Al-Timimi cites to Ex parte Bollman to support his argument that force is not necessary to
violate the treason statute by quoting a portion of the decision that states, "[T]hose who perform
any part, however, minute, or however remote from the scene of action, and who are actually
leagued in the general conspiracy, are to be considered as traitors."  Id. at 126.  That quote does
not help Al-Timimi because all it addresses is the "aid and comfort" prong and not the "levying
war" prong of § 2381.  Indeed, in Kawakita v. United States, 343 U.S. 717, 739 (1952), the
Supreme Court cited to that precise language in Ex parte Bollman and intimated support for
§ 2381's divisibility by stating that the cited language supports convictions for overt acts that
"plainly g[i]ve aid and comfort to the enemy in the constitutional sense," id.  Given the
divisibility of § 2381, the act of "levying war" against the United States, as opposed to
conspiring to levy war or adhering to the country's enemies, requires some use, attempted use, or
threatened use of physical force.

     Even though the "lev[ying] war" prong of § 2381 qualifies as a crime of violence, given
that, during the trial, the government provided no evidence that either Al-Timimi or any of the
men he encouraged to fight against American troops in Afghanistan ever traveled to Afghanistan
or engaged in armed conflict of any kind against a United States soldier, no reasonable juror
could have found Al-Timimi guilty of this offense.  "The question raised by a motion for
judgment of acquittal is whether 'as a matter of law the government's evidence is insufficient to
establish factual guilt on the charges in the indictment.'"  Montejo, 353 F. Supp. at 646.  Here, it

is irrefutable that no reasonable jury could have found that either Al-Timimi or any of the men

he advised actually levied war against the United States.

Accordingly, because the offenses of expedition against a friendly nation and enlistment

to serve against the United States do not qualify as predicate offenses to support Al-Timimi's

§ 924 convictions and because there was insufficient evidence to support treason as a predicate

offense, Al-Timimi's Motion for Acquittal on Counts 1, 7 and 8 will be granted, and his § 924

convictions under these Counts will be vacated.

### C. Motion for Leave

In his Motion for Leave, Al-Timimi seeks "leave to file and brief a motion for new trial

on Counts 9 and 10," which he argues "rel[y] on the conspiracy charged in Count 1 that has been

rendered unsustainable in light of Davis." [Dkt. No. 460] at 1.  Although this motion is

unopposed, and the Court has found that Count 1 must be vacated, the leave Al-Timimi seeks is

well outside the scope of the Fourth Circuit's expanded remand order, which only instructed the

Court to "reconsider [his] § 924(c) convictions." [Dkt. No. 431].  Because all of Al-Timimi's

§ 924(c) convictions have been reconsidered and vacated in light of Johnson and its progeny, this

Court's review is complete.  As a result, this case is ready to return to the Fourth Circuit.

III

For these reasons, by an Order to be issued with this Memorandum Opinion, defendant's

Motion to Compel and Motion for Leave will be denied, his Motions for Acquittal will be

granted, and, as a result of these decisions, defendant's convictions under Counts 1, 7, and 8 will

be vacated.

Entered this 18 day of July, 2024.

/s/ _____
Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

26

J.A. 2997

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA )
)
v. )
) 1:04-cr-385 (LMB)
ALI AL-TIMIMI, )
)
Defendant. )

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, defendant Ali Al-

Timimi's ("Al-Timimi") Motion to Compel Disclosure of Unredacted Documents to Cleared

Defense Counsel and Production of Index of Undisclosed Evidence [Dkt. No. 417] and

Unopposed Motion for Leave to File and Brief a Motion for New Trial on Counts 9 and 10 [Dkt.

No. 460] are DENIED; and Al-Timimi's Renewed Motion for Acquittal on Counts 7 and 8 in

Light of Intervening Authority [Dkt. No. 432] and Renewed Motion for Acquittal on Count 1 in

Light of Intervening Authority [Dkt. No. 445] are GRANTED.  Accordingly, it is hereby

ORDERED that Al-Timimi's convictions for Counts 1, 7, and 8 of the Superseding

Indictment be and are VACATED; and it is further

ORDERED that the Clerk promptly refund any special assessment payments that Al-

Timimi has made with respect to his convictions for Counts 1, 7, and 8.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this 18 day of July, 2024.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

J.A. 2998