IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 14-4451

———————————

UNITED STATES OF AMERICA,
*Appellee,*

v.

ALI AL-TIMIMI,
*Appellant.*

———————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Alexandria

*Leonie M. Brinkema, District Judge*

———————————

RESPONSE BRIEF OF THE UNITED STATES

———————————

Eric S. Siebert
United States Attorney

Gordon D. Kromberg
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

*Attorneys for the United States of America*

# Table of Contents

**Page**

Table of Authorities.................................................................................v

Introduction.........................................................................................1

Issues Presented ..................................................................................1

Statement of the Case ...........................................................................5

Factual Background ............................................................................14

    I.      Before 9/11 ...........................................................................14

              A.   Ali Al-Timimi ..............................................................14

              B.   Lashkar-e-Taiba .........................................................17

              C.   Al-Timimi's Knowledge of LET ...................................19

              D.   Al-Timimi and Dar-al-Arqam ......................................22

    II.     After 9/11 ...........................................................................26

               A.  Around the World ........................................................26

               B.   In Virginia ................................................................27

    III.    The Meeting on September 16, 2001................................................28

              A.   The Beginning of the Meeting........................................29

              B.   Al-Timimi's Talk .......................................................30

              C.   Discussions about LET and Travel to Pakistan.................33

    IV.    After the Meeting on September 16, 2001 .........................................34

              A.  Al-Timimi's Lunch with Kwon and Hasan.......................34

B. Kwon, Hasan, Aatique, and Khan in Pakistan ............................................. 35

C. Al-Timimi's Activities After Kwon and Hasan Left for Pakistan ............ 36

V.     The Investigation in 2003 and 2004......................................................... 38

Summary of Argument ...................................................................................... 44

Argument.................................................................................................……..48

I.     Al-Timimi's Statements Suffice to Constitute Aiding and Abetting………..48

II.   Al-Timimi's Statements Incited Imminent and Concrete Harm …………...50

III.  Sufficient Evidence Supports Al-Timimi's Convictions……………………56

A. Sufficient Evidence Supports Al-Timimi's Conviction on Count 2…….58

1.     Levying War is a Crime of Violence …………………………58

2.     Proof Established Circumstances Strongly
       Corroborative of Al-Timimi's Intent to Solicit
       His Followers to Levy War Against the United States…………..65

B.  Sufficient Evidence Supports Al-Timimi's Conviction
    on Count 3 for Seditious Conspiracy …………………………….……68

C.  Sufficient Evidence Supports Al-Timimi's Convictions
    on Counts 4 and 5…………………. …………………………….……73

1.   Al-Timimi Took Substantial Steps Towards
     Providing Assistance to the Taliban....………………………73

2.   The District Court Did Not Plainly Err in
     Instructing on the Meaning of "Attempt"…………......……......77

3.   Substantial Evidence Established that Al-Timimi Knew
     that it was Illegal to Provide Assistance to the Taliban ……....78

iii

        4.     The Court Should Decline to Notice Any
              Multiplicity Error in Counts 4 and 5 …….................................81

   D.    Sufficient Evidence Supports Al-Timimi's Conviction on Count 6
       for Aiding and Abetting a Violation of the Neutrality Act…….…..…83

   E.    Sufficient Evidence Supports Al-Timimi's Conviction on
       Counts 9 and 10, and that He Knew in Advance that Kwon
       and Hasan Would Possess Explosives at the Terrorist Camps…..……...84

        1.     The District Judge Properly Instructed the Jury that
              Al-Timimi Could Be Guilty of Counts 9 and 10 Only
              If He Knew in Advance that Hasan and Kwon Would
              Possess Explosives at the Terrorist Camps...…………………90

        2.     Alternatively, A Reasonable Jury Could Have
              Convicted Al-Timimi Under *Pinkerton*..……………………..97

           a.   The *Pinkerton* Doctrine Applies …………………………..97

           b.   Dismissal of Count 1 Has No Effect
               On Counts 9 and 10 …………………….………………...104

Conclusion...........................................................................................................111

Statement Regarding Oral Argument ..............................................................112

Certificate of Compliance ...............................................................................113

Certificate of Service. ……………………………………………………..114

**Page**

## Cases

*Bates v. United States*,
   522 U.S. 23 (1997)……………………………………………….…70

*Brandenburg v. Ohio,*
   395 U.S. 444 (1969)……………………………………….............52, 54-55

*Brogan v. United States*,
   522 U.S. 398 (1998) ……………………………………………………70

*Consumer Product Safety Commission v. GTE Sylvania, Inc.,*
   447 U.S. 102 (1980)………………………………………….......................69

*D'Aquino v. United States*,
   192 F.2d 338 (9th Cir. 1951) ...........................................................…72

*Ex parte Bollman*,
   8 U.S. (4 Cranch) 75 (1807)............................................................ 63

*Guevara-Solorzano v. Sessions*,
   891 F.3d 125 (4th Cir. 2018) ......................................................... 62

*Hedgpeth v. Pulido*,
   555 U.S. 57 (2008)………………………………………….……………104

*In re Colon*,
   826 F.3d 1301 (11th Cir. 2016) ...................................................…101

*Johnson v. United States*,
   576 U.S. 591 (2015)……………………………………………...…..11, 12

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
   591 U.S. 657 (2020) ………………………………………………………70

*Noel v. Artson,*
   641 F.3d 580 (4th Cir. 2011)……..……………………………..….…57

*Nye & Nissen v. United States*,
    336 U.S. 613 (1949) ................................................................ …101

*Pinkerton v. United States*,
    328 U.S. 640 (1946)……………………………………….…*passim*

*Rice v. Paladin Enterprises, Inc.*,
    128 F.3d 233 (4th Cir. 1997)………………………………………48-49, 51

*Rosemond v. United States*,
    572 U.S. 65 (2014) .............................................................. …*passim*

*United States v. Al-Hamdi*,
    356 F.3d 564 (4th Cir. 2004) …….……………………………………64

*United States v. Abu Ali*,
    528 F.3d 210 (4th Cir. 2008)…………………………….…………….6

*United States v. Ahmad*,
    213 F.3d 805 (4th Cir. 2000)…………………………….…………69

*United States v. Ali*,
    991 F.3d 561 (4th Cir. 2021)…………………………….……….....*passim*

*United States v. Allred*,
    942 F.3d 641 (4th Cir. 2019)…………………….…………………...62

*United States v. Al-Timimi*, .
    No. 1:05-4761 (4th Cir.)………………………………………………9

*United States v. Al-Timimi*,
    No.  24-1485 (4th Cir.) …………………………………………………12

*United States v. Bain*,
    874 F.3d 1 (1st Cir. 2017) ................................................ 65

*United States v. Barnette*,
    211 F.3d 803 (4th Cir. 2000) ........................................... 85

*United States v. Benkahla*,
530 F.3d 300 (4th Cir. 2008) ............................................................... .6

*United States v. Benson*,
957 F.3d 218 (4th Cir. 2020)…………………………….………….89-90

*United States v. Blackman*,
746 F.3d 137 (4th Cir. 2014)……………..……………………….98, 100

*United States v. Buffington*,
815 F.2d 1292 (9th Cir. 1987)................................................ ...75-76

*United States v. Burgos*,
94 F.3d 849 (4th Cir. 1996) (*en banc*)………………………….…………57

*United States v. Carthorne*,
726 F.3d 503 (4th Cir. 2013) …………………………………………64

*United States v. Chandia*,
514 F.3d 365 (4th Cir. 2008) ....................................................... ….5

*United States v. Davis*,
588 U.S. 445 (2019)   ................................................ 12, 13, 47, 107

*United States v. Dennis,*
19 F.4th 656 (4th Cir. 2021)………………………………………14, 56

*United States v. Donel,*
211 F. App'x 180 (4th Cir. 2006) ................................................ 89

*United States v. Fleschner*,
98 F.3d 155 (4th Cir. 1996).................................................... 49, 56

*United States v. Flores-Granados*,
783 F.3d 487 (4th Cir. 2015) ...................................................... 110

*United States v. Fulks,*
128 F.4th 126 (4th Cir. 2024)................................................107-09

*United States v. Garcia,*
    752 F.3d 382 (4th Cir. 2014) ............................................................95

*United States v. Gillespie,*
    27 F.4th 934 (4th Cir. 2022) ...............................................................97

*United States v. Greiner*,
    26 F. Cas. 36 (E.D. Pa. 1861)............................................................. 63

*United States v. Hansen,*
    599 U.S. 762 (2023).................................................................. 44, 48

*United States v. Hare*,
    820 F.3d 93 (4th Cir. 2016)...............................................................102

*United States v. Hosseini,*
    679 F.3d 544 (7th Cir. 2012) .......................................................... 103

*United States v. Horton,*
    921 F.2d 540 (4th Cir. 1990)..........................................................98-99

*United States v. Jackson*,
    32 F.4th 278 (4th Cir. 2022) ............................................................. 63

*United States v. Kelley*,
    769 F.2d 215 (4th Cir. 1985)...................................................... 49, 56

*United States v. Khan*,
    309 F. Supp. 2d 789 (E.D. Va. 2004),
    *aff'd.,* 461 F.3d 477 (4th Cir. 2006) .............................................5, 39

*United States v. Lane,*
    514 F.2d 22 (9th Cir. 1975)...............................................................103

*United States v. Langston,*
    970 F.2d 692 (10th Cir.1992) ...........................................................103

*United States v. Lawson,*
    810 F.3d 1032 (7th Cir. 2016)......................................................78, 96

*United States v. Marino,*
  277 F.3d 11 (1st Cir. 2002)……………………………………………...102-03

*United States v. Millender*,
  970 F.3d 523 (4th Cir. 2020)………………………………………………53

*United States v. Miller,*
  41 F.4th 302 (4th Cir. 2022)………………………………………....59, 64

*United States v. Miselis,*
  972 F.3d 518 (4th Cir. 2020)……….……………………..………48, 54

*United States v. Naum,*
  134 F.4th 234 (4th Cir. 2025)…..................................................*passim*

*United States v. Olano,*
  507 U.S. 725 (1993)………………………..………………………99

*United States v. Oloyede*,
  933 F.3d 302 (4th Cir. 2019) .......................................................... 95

*United States v. Oreto,*
  37 F.3d 739 (1st Cir. 1994) ........................................................ 103

*United States v. Prado,*
  815 F.3d 93 (2d Cir. 2016)………………..……………………………96

*United States v. Pratt,*
  351 F.3d 131 (4th Cir. 2003) ................................................... 74, 76

*United States v. Rahman,*
  189 F.3d 88 (2d Cir. 1999) ....................................................*passim*

*United States v. Ressam,*
  553 U.S. 272 (2008)..................................................................... 85

*United States v. Richardson,*
  948 F.3d 733 (6th Cir. 2020) ...................................................... 101

*United States v. Robinson,*
    627 F.3d 941 (4th Cir. 2010) ...................................................................107-08

*United States v. Rodriguez,*
    803 F.2d 318 (7th Cir. 1986) ............................................................... 71

*United States v. Rodriguez,*
    609 Fed.Appx. 8 (1st Cir. 2015) ................................................. 103

*United States v. Rodriguez-Lopez,*
    756 F.3d 422 (5th Cir. 2014) ........................................................ 103

*United States v. Rosemond,*
    695 F.3d 1141 (10th Cir. 2012,
    *rev'd,* 572 U.S. 65 (2014)…………………………………………..100

*United States v. Siegler,*
    990 F.3d 331 (4th Cir. 2021)………………………………….…………57, 65

*United States v. Sirois,*
    87 F.3d 34 (2d Cir. 1996) ............................................................ …..99

*United States v. Spinney,*
    65 F.3d 231 (1st Cir. 1995)………………………………………….88-89

*United States v. Stockton,*
    349 F.3d 755 (4th Cir. 2003)…………………………….……………56

*United States v. Tipton,*
    95 F.4th 831 (4th Cir. 2024) ....................................................... 107

*United States v. Ulbricht,*
    2015 WL 413426 (S.D.NY. Feb. 2, 2015) ................................... 103

*United States v. Udeozor,*
    515 F.3 260 (4th Cir. 2008) ........................................................ 107

*United States v. Williams,*
    553 U.S. 285 (2008) .................................................................... 48

*United States v. Williams*,
   931 F.3d 570 (7th Cir. 2019) ............................................................... 65


**Statutes**

18 U.S.C. § 2…………………………………………………………1, 8, 100-02

18 U.S.C. § 371……………………………………...…………… 7, 8, 105-06

18 U.S.C. § 373………………………………...……..……….8, 58-59

18 U.S.C. § 844……………………………………………………8, 107, 109

18 U.S.C. § 924(c)…………………………...…………………………*passim*

18 U.S.C. § 924(e) …………………………………………………… 11

18 U.S.C. § 924(n)…………………………………………………110

18 U.S.C. § 924(o)………………………………………………8, 110

18 U.S.C. § 956…………………………………………..………105

18 U.S.C. § 959…………………………………………………105

18 U.S.C. § 960………………………………………………… *passim*

18 U.S.C. § 2339A………………………………………………105-06

18 U.S.C. § 2339B………………………………………………106

18 U.S.C. § 2381……………………………………………..*passim*

18 U.S.C. § 2384……………………………………………..*passim*

18 U.S.C. § 2390……………………………………………106

50 U.S.C. § 1705………………………………………………..*passim*

**Other Authorities**

Charles Warren, *What Is Giving Aid and Comfort to the Enemy?*,
27 Yale L.J. 331, 332–33 (1918).............................................................................63

<u>Introduction</u>

Because of an odd and complicated procedural history, this Court is only now called upon to resolve the direct appeal of a conviction and sentence imposed more than 20 years ago.  In some respects, the law has changed in important ways in the last 20 years.  Despite the passage of time, however, the appeal can readily be resolved, because the changes in the law do not affect appellant Ali Al-Timimi's conviction or sentence, and virtually all of the myriad issues he now raises essentially are challenges to the sufficiency of the evidence - - of which there was much.

<u>Issues Presented</u>

1.      Al-Timimi's culpability was based on his contacts with his followers at the Dar al-Arqam Islamic Center and his statements to them.  Can accomplice liability under 18 U.S.C. § 2 be based solely on those meetings and statements?

2.      Al-Timimi publicly stated that the United States was the greatest enemy of Islam, and that Muslims were obligated to protect the Taliban.  Multiple witnesses testified that, as a result of Al-Timimi's urgings and advice, they together immediately sought military-style training with the terrorist group known as Lashkar-e-Taiba ("LET") in Pakistan so that they could fight against the U.S. troops that Al-Timimi said would soon invade Afghanistan.  Under the circumstances, could a rational jury find that Al-Timimi aided and abetted conspiracies to levy war

against the United States, aid the Taliban, and violate the Neutrality Act, the harm from which were concrete and imminent?

3.      The jury found that Al-Timimi solicited his followers to levy war against the United States.  Did the district court commit plain error by failing to vacate the conviction on the grounds that levying war against the United States was not a "crime of violence"?

4.      Could a rational jury find that Al-Timimi, under circumstances strongly corroborative of an intent that his followers levy war against the United States, actually solicited his followers to do so?

5.      The jury found that, right after 9/11, Al-Timimi aided and abetted his followers' entry into an agreement to attempt to fight against the United States in Afghanistan, in violation of 18 U.S.C. § 2381.  Did the district court commit plain error by failing to vacate the conviction on the grounds that the statute did not criminalize attempts to fight the United States outside the United States?

6.      Immediately after 9/11, Al-Timimi relayed to his followers a religious ruling that obligated them to try to fight the United States in Afghanistan, affirmed that LET could provide them training to engage in that fight, and then contacted them to meet so that he could advise them how to best evade airport security, and explain why one should continue if the other was stopped, but not vice-versa.  Under the circumstances, could a rational jury find that Al-Timimi took a substantial step

2

when he attempted to provide aid to the Taliban and aided and abetted others in doing so?

7.     The district court instructed the jury that an "attempt" is "an effort to do something or to try to do something."  In providing that definition, did the district court commit plain error?

8.     In the months before 9/11, the sanctions the United States placed on the Taliban were regularly in the news.  By his own admission, Al-Timimi was well-informed about the Muslim world.  Under the circumstances, could a rational jury find that Al-Timimi knew that he acted illegally when he attempted to provide aid to the Taliban and aided and abetted others in doing so?

9.     Count 4 alleged that Al-Timimi attempted to contribute services to the Taliban, and Count 5 alleged that he aided and abetted others to do so.  Even if the conviction on Count 5 was a lesser included offense of Count 4, did the district court commit plain error that should be corrected now, by failing to vacate the conviction on Count 5, when the sentences imposed on those counts ran concurrently and have already been served?

10.     Al-Timimi knew that part of the training provided by LET consisted of firing weapons at Indian positions in Kashmir.  Under the circumstances, could a rational jury find that Al-Timimi aided and abetted a conspiracy for his followers to attack a country with which the United States was at peace?

3

11. Al-Timimi knew that part of the training provided in Pakistan by LET consisted of firing rocket-propelled grenades at Indian positions in Kashmir. Could a rational jury find that Al-Timimi understood that Yong Kwon and Khwaja Hasan would carry and use rocket-propelled grenades in the course of training at the LET camps that Al-Timimi urged them to join?

12. The district court explicitly instructed the jury that, in order to convict Al-Timimi on Counts 9 and 10, it was necessary to find that Al-Timimi knew that Kwon and Hasan would handle explosives at the LET camps that he urged them to join. In light of that explicit instruction, did the district court somehow err by also instructing that the jury that it also was necessary to find that he knew that explosives would be available to them at those LET camps?

13. Where the government did not argue to the jury that Al-Timimi was liable under *Pinkerton* for the actions of his followers in carrying and using explosives at LET camps in Pakistan, did the district court commit plain error by instructing the jury about *Pinkerton* liability?

14. The district court identified for the jury 16 separate predicate offenses for Counts 9 and 10, but did not include among those 16 predicates the conspiracy to use firearms alleged in Count 1. After the jury returned a guilty verdict on all 10 counts, Al-Timimi waived the opportunity to obtain a special verdict to specify the predicates for the jury's findings on Counts 9 and 10. Years later, Al-Timimi's

4

conviction on Count 1 was vacated.  Can the convictions on Counts 9 and 10 survive, in light of the possibility that the conspiracy to use firearms alleged in the Count 1 was the only predicate felony found by the jury?

Statement of the Case

This is a complex criminal case that focuses on the role that, immediately after the terrorist attacks on September 11, 2001, Ali Al-Timimi played in urging and facilitating the departure from the United States of a group of young Muslim men to obtain military training at a camp run by Lashkar-e-Taiba ("LET") - - a group that the United States Department of State would later that year designate as a Foreign Terrorist Organization - - and to then go to Afghanistan to protect the Taliban from anticipated attacks by the United States military.  Many of those men were subsequently charged with, and convicted of, committing multiple federal crimes relating to their preparations for violent jihad. *See generally United States v. Khan*, 309 F. Supp. 2d 789 (E.D. Va. 2004) (explaining these events in detail), *aff'd.,* 461 F.3d 477 (4th Cir. 2006); *United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008). Although Al-Timimi was deeply involved in the events that predicated those prosecutions, he was not charged in those cases.  JA2973.[1]

---

[1]  "JAxxx (name)" refers to the pertinent page of the Joint Appendix filed in connection with this appeal, with the name of the witness (if applicable) identified. "GX xxx" refers to the pertinent "Government Exhibit" introduced at trial.  "Def. Br. xx" refers to the pertinent page of the opening brief filed by Al-Timimi in this appeal.  While this brief provides a detailed summary of the relevant facts in a

Before September 11, 2001, Al-Timimi was the primary lecturer at the Dar al-Arqam Islamic Center in Falls Church, Virginia,[2] and was known around the world for his public writings and lectures on issues relating to Islam. At Dar al-Arqam, Al-Timimi attracted a following of young Muslim men eager to prepare to engage in violent jihad. JA2864-2865, JA2973.

Five days after September 11, 2001, Al-Timimi met a handful of his followers in a private meeting. After telling them to close the curtains, unplug the phone and the answering machine, and swear never to tell anyone else about his words at that meeting, he told them that they were now religiously obligated to fight to help the Taliban in Afghanistan defend against the American invasion that he predicted would occur. JA2864, JA2954, JA2975. He told them that the

---

separate section devoted to those facts, we provide at this point a brief overview of the background facts for purposes of placing into context the unique procedural history of this appeal. Detailed narratives of the procedural background of this appeal also can be found in the district court's opinions resolving post-remand motions, of April 28, 2014 (JA2864-2886); August 18, 2020 (JA2953-2968); and July 18, 2024 (JA2972-2998). Except as otherwise noted, the record citations in this "Statement of the Case" portion of the brief are to the district court's narratives.

[2] *See, e.g., United States v. Benkahla,* 530 F.3d 300, 303-04 (4th Cir. 2008) ("[a]n organization in Falls Church, Virginia, known as the Dar al-Arqam Islamic Center, has figured in no fewer than fourteen terrorism prosecutions so far" . . . "Benkahla was arrested in Saudi Arabia in 2003, where he had been studying Islamic law and traveling with Ahmed Omar Abu Ali, a friend from Dar al-Arqam and a member of al Qaeda (eventually convicted of conspiracy to assassinate the President of the United States, among other crimes)"); *United States v. Abu Ali,* 528 F.3d 210 (4th Cir. 2008).

obligation was so compelling that they need not tell their parents of their plans. JA1151-1152 (Kwon).

When the subject arose that they lacked the skills to fight in combat, Al-Timimi told them that they could get the military training necessary to enable them to help defend the Taliban by traveling to Pakistan and joining LET. JA2976. Three days later, after two of his followers (Khan and Aatique) left for Pakistan to join LET in order to fight in Afghanistan, and another two (Kwon and Hasan) told him of their plans to travel to Pakistan to train with LET, he asked Kwon and Hasan to meet him for lunch. At that lunch, he advised them how best to evade detection at the airport, and how to act if they were stopped by law enforcement officials, as well as how to proceed if one of them was stopped but not the other. JA2976; JA1165 (Kwon).

Within a week of that private meeting with his followers on September 16, 2001, Khan, Aatique, Kwon, and Hasan all left for Pakistan and joined LET, where they trained with firearms and explosives. None ultimately made it to Afghanistan, because the Taliban fell from power before their training at LET ended. JA2976.

In September 2004, Al-Timimi was indicted for conspiring to levy war against the United States, in violation of 18 U.S.C. §§ 371 and 2384; attempting to contribute services to the Taliban, in violation of 50 U.S.C. § 1705; aiding and abetting the use

of firearms in connection with a crime of violence, in violation of 18 U.S.C.

§ 924(c); and aiding and abetting the carrying of explosives during the commission

of a felony, in violation of 18 U.S.C. § 844(h). JA49-63.

In February 2005, a superseding indictment was returned, charging Al-Timimi

with the following counts:

Count 1: Inducing others to conspire to use, carry, possess, and discharge firearms during, in relation to, and in furtherance of crimes of violence, in violation of 18 U.S.C. §§ 924(o) and 2.

Count 2: Soliciting others to levy war against the United States, in violation of 18 U.S.C. §§ 2381 and 373.

Count 3: Inducing others to conspire to levy war against the United States, in violation of 18 U.S.C. §§ 2384 and 2.

Count 4: Attempting to contribute services to the Taliban, in violation of 50 U.S.C. § 1705 and associated regulations and executive orders.

Count 5: Inducing others to attempt to aid the Taliban, in violation of 50 U.S.C. § 1705 and associated regulations and executive orders.

Count 6: Inducing others to conspire to violate the Neutrality Act, in violation of 18 U.S.C. §§ 960, 371, and 2.

Counts 7 and 8: Inducing Yong Kwon and KhwaJAHasan to use firearms at LET camps in Pakistan in October 2001, during and in relation to crimes of violence, in violation of 18 U.S.C. §§ 924(c) and 2.

Counts 9 and 10: Inducing Kwon and Hasan to carry explosives at LET camps in Pakistan in October 2001, during the commission of federal felonies, in violation of 18 U.S.C. §§ 844(h)(2) and 2.

JA64-79.

In 2005, after two weeks of trial and one week of deliberations, a jury convicted Al-Timimi of all ten counts in the superseding indictment. After motions for a judgment of acquittal and for a new trial were denied, JA2719-2750, he was sentenced to the following terms of imprisonment:

Counts 1–3: 121 months' imprisonment, to run concurrently;

Counts 4 and 5: 120 months' imprisonment, to run concurrently with the sentences on Counts 1–3;

Count 6: 60 months' imprisonment, to run concurrently with the sentences on Counts 1–5;

Count 7: 360 months' imprisonment, to run consecutively to the sentences on Counts 1–6;

Count 8: life imprisonment, to run consecutively to the sentences on Counts 1–7;

Count 9: 120 months' imprisonment, to run consecutively to the sentences on Counts 1–8; and

Count 10: 240 months' imprisonment, to run consecutively to the sentences on Counts 1–9.

JA2758-2764.

Al-Timimi appealed. JA2765. In this Court, that appeal was No. 05-4761. JA2767.

In 2006, and before any briefs were filed in appeal No.05-4761, Al-Timimi moved for the case to be remanded to the district court so that the district court could consider his claims that the government had failed to disclose exculpatory

statements by Al-Timimi that he claimed the National Security Agency must have intercepted through a sensitive method that recently had been leaked to the press. This Court directed the district court to address Al-Timimi's concerns "and order whatever relief or changes in the case, if any, that it considers appropriate." JA2767-2769.

Al-Timimi thereafter filed a series of motions requesting disclosure of intercepted communications and other documents by the government. Al-Timimi's claims proved to be baseless, but the district judge did not rule on them for years, on the stated grounds that the government had refused to clear her clerk to see the materials about the highly classified intelligence technique that Al-Timimi claimed had been used to intercept his statements.[3] JA2830-2831.

---

[3] When Al-Timimi's claims were first made in 2006, neither the prosecutors nor the agents assigned to the case were cleared to look at the highly classified NSA collection technique, either. As a result, the government's responsive filing was made by an official from U.S. Department of Justice ("DOJ") headquarters. Dkt. #185 (July 31, 2006). That pleading was classified at such a high level that it was unavailable to the prosecutors and the agents assigned to the case. In November 2007, the district judge said that, as a result of her dissatisfaction with DOJ attorneys on a different case, she would not resolve the outstanding motions in *this* case unless an AUSA from EDVA examined the NSA materials at issue to confirm the accuracy of the earlier pleading filed by the DOJ official. JA2790-2794. Ultimately, under-signed counsel was cleared to see the NSA materials at issue, and in 2008, filed pleadings that showed that Al-Timimi's claims were baseless. *See* JA27–28 (Dkt. ## 257, 258, 259).

In 2014, the district court finally denied the motions made by Al-Timimi after the 2006 remand, JA2864-2888, and Al-Timimi appealed again. JA2889. None of the motions made or decided after that first remand, between 2006 and 2014, had any merit, and none are at issue in this appeal.

In 2015, however, this Court granted Al-Timimi another remand to pursue still more discovery motions in the district court, upon his renewed claims that the government had failed to disclose exculpatory evidence. JA2892. The government filed with the district court the information to show that this claim, too, was baseless. *See* JA38 (Dkt. #420).[4]

In 2015, however, in *Johnson v. United States*, 576 U.S. 591 (2015), the Supreme Court held that the definition of "crime of violence" in 18 U.S.C.

---

[4] Al-Timimi's complaint that his post-remand motions for discovery were denied on the basis of *ex parte* government pleadings, Def. Br. 24 n.7, is ironic. The central allegation of myriad pleadings filed by Al-Timimi between 2006 and 2015, was that the government failed to disclose that, when Al-Timimi met with notorious terrorist Anwar Awlaki in 2002, Awlaki was actually (according to Al-Timimi) a government agent, and that Al-Timimi rebuffed Awlaki's attempts to get Al-Timimi to recruit fighters for jihad. In fact, in 2015, the government publicly filed a report of an interview that originally had been provided to Al-Timimi more than 10 years earlier. That interview was of a witness who told the government all about the key 2002 meeting between Awlaki and Al-Timimi, but said nothing about Awlaki soliciting Al-Timimi to do anything. The identity of the witness? Al-Timimi himself, who was, in 2004, attempting to convince the government not to seek an indictment against him. *See* JA38 (Dkt. #420). The lawyers who represented Al-Timimi in 2015 apparently never realized that their speculation about what Awlaki might have said to Al-Timimi in 2002 was refuted by the statements about the meeting with Awlaki that Al-Timimi made to the government in 2004.

§ 924(e)(2)(B)(ii) was unconstitutionally vague. In light of the similarity between the definition of "crime of violence" in that statute and the definition of "crime of violence" in the statute upon which Al-Timimi's firearms convictions were based (18 U.S.C. § 924(c)(3)(B)), Al-Timimi challenged the validity of the district court's instructions regarding the definition of "crimes of violence" at his trial. Accordingly, in 2016, this Court expanded the scope of the second remand of Al-Timimi's appeal for the district court to consider whether, in light of *Johnson*, Al-Timimi's convictions for the use of firearms in Pakistan by Kwon and Hasan remained valid. JA2894.

Al-Timimi subsequently filed renewed motions for judgment of acquittal as to Counts 1, 7, and 8, and the parties then briefed the issues regarding "crimes of violence." JA2896–2952.

The merits of Al-Timimi's motions with respect to Counts 7, and 8, were greatly strengthened in 2019, when the Supreme Court ruled that the definition of "crime of violence" in 18 U.S.C. § 924(c)(3)(B) was unconstitutionally vague. *United States v. Davis*, 588 U.S. 445 (2019).

In 2020, the district court released Al-Timimi from custody, partly on the grounds that the validity of his convictions on Counts 1, 7, and 8 were undermined by *Davis*, and partly on the grounds of what the district court determined to be his

risk of severe illness in prison from COVID-19. JA2953-2970. The government appealed his release, but this Court affirmed the release order. JA2971.

In 2024, in Appeal No. 24-1485, the United States petitioned this Court for a writ of mandamus directing the district court to rule on Al-Timimi's outstanding motions. That proceeding was mooted when, in July 2024, the district court issued its decision. JA2972-2997. In its decision, the district court denied the motions regarding the alleged discovery violations that were the initial basis for the second remand. JA2984-2986.[5] In light of *Davis*, however, and in accordance with the scope of the expanded remand, the district court granted motions to dismiss Counts 1, 7, and 8, based on the infirmity of 18 U.S.C. § 924(c)(3)(B). JA2986-2997.

This appeal followed. In this appeal, Al-Timimi raises a plethora of issues - - most of which were never raised when the case was tried more than 20 years ago.

At this point, Al-Timimi has served approximately 15 years of his sentence to imprisonment. The sentences to imprisonment on Counts 2, 3, 4, 5, and 6 were to run concurrently; the sentence on Count 9 runs consecutively to those imposed on Counts 2 through 6, and the sentence on Count 10 runs consecutively to all the others. Accordingly, the sentences to imprisonment on Counts 2 through 6 have

---

[5] The denial of those motions is not a subject of this appeal.

been served, but part of the sentence on Count 9 and all of the sentence on Count 10 remain pending.

Factual Background[6]

I.     Before 9/11

A.     Ali Al-Timimi

Before 9/11, Ali Al-Timimi was a well-known lecturer on Islam, JA1589-1590 (Ammerman), who had produced several recordings of his public lectures, many of which focused on violent jihad.  JA1240-1241 (Kwon); JA1730 (Wyman); JA3278-3279 (GX 12-61).   Al-Timimi lectured internationally, and recordings of those lectures were distributed worldwide.  JA1729 (Wyman).  According to Al-Timimi, he was well known throughout the world not just for Islamic issues, but for secular issues as well.  JA1780 (Wyman).

Al-Timimi studied under and was a follower of Safar Hawaali, JA1821 (Wyman), a Saudi sheikh who provided ideological and religious justification for al-Qaeda.  Hawaali's imprisonment in Saudi Arabia was one of the reasons that Osama bin Laden cited for his declaration of war against the United States. JA736-737 (Kohlmann); JA1586-93 (Ammerman).

---

[6]  Viewed "in the light most favorable to the government, evidence adduced at trial established the following facts."  *United States v. Dennis*, 19 F.4th 656, 660 (4th Cir. 2021).

Al-Timimi prided himself on his knowledge of current issues in the Islamic world.  JA1739 (Wyman).  He said that his knowledge about issues involving the Islamic world was "very broad," and essentially said that he was "very knowledgeable about . . . every aspect of Islam."  JA1729-1730 (Wyman).

In his lectures and in his writings, Al-Timimi regularly and publicly emphasized the importance in Islam of jihad.  The "jihad" of which Al-Timimi publicly wrote and spoke was not an "internal" jihad, or a peaceful struggle.  When Al-Timimi referred to jihad, he meant the violent kind.  As he stated in his lecture entitled *Shi'ism*, "throughout history, our swords have dripped with the blood of Christians, Jews, and idol-worshipers, as we wage jihad as Allah has commanded us."  JA2111-2114 (GX 10T16).

Al-Timimi claims today that, in his lectures, "he never advocated violence and spoke of 'jihad' only in abstract theological terms."  Def. Br. 7.  A more accurate view of the tenor of his advocacy in those public lectures can be measured by what he actually said in them.  For example, in the following lectures played for the jury at trial, he said:

| Gov't Ex. | Clip | Title of Lecture | Excerpt |
|-----------|------|------------------|---------|
| 10T2 | 4 | Tawheed and Shirk | "When there is jihad, you must wage jihad against them." |
| 10T4 | 4 | Role of Muslim Students in North American Universities | [When there is a jihad] "If you have military skills, it may not be permissible to stay in America." |

15

| | | | |
|---|---|---|---|
| 10T7 | 24 | The Luminous Creed | "One characteristic [of Muslims to be emulated] is that they fight their enemies, not in a theoretical sense, but in a literal sense. They subdue their enemies. They fight. Jihad is the pinnacle or apex of Islam." |
| 10T9 | 14 | Purification of the Soul | "Why are the Muslims the poorest people in the world? Because there is no jihad. Jihad in the path of Allah is the way to make the ummah rich, not through the IMF or World Bank loans. When the lands are conquered, the riches of those lands will be distributed, then there won't be any poor people." |
| 10T10 | 10 | A Word of Advice to the Salafis of the UK | "There is a demonic global attack with unlimited financial resources against Islam. Face up to it with all legitimate means. When someone attacks you, you must break that attack by any means capable." |
| 10T10 | 63 | A Word of Advice to the Salafis of the UK | "Wage jihad against the unbelievers and be harsh with them. Wage jihad with your person." |
| 10T11 | 17 | Acts of Worship During Shawwal | "You might have some excuse why you are not out there with the mujahideen. Allah hates those who have the means to wage jihad, but they fail to do so." |
| 10T13 | 3 | Principles of Fiqh | "For men, if they are able bodied, if there is a jihad, the best act of worship is to fight in jihad." |

JA1736-1737; JA2030-2031; JA2066; JA2070; JA2080; JA2086; JA2425.[7]

---

[7]  Most of the audio clips of Al-Timimi's lectures that were played at trial were not transcribed by the court reporter.  The audio clips of Al-Timimi's lectures that were played at trial are listed in the "Index of Audio Clips from Lectures by the

B.      Lashkar-e-Taiba

Lashkar-e-Taiba, also known as "LET," was the military wing of an
organization in Pakistan founded to organize Pakistani mujahideen participating in
the violent jihad against the Russians in Afghanistan. From the time the Russians left
Afghanistan until 9/11, the primary - - but not exclusive - - focus of LET was on
conducting violent jihad against the Government of India.  JA771-773 (Kohlmann).

LET saw Western civilization as its enemy.  JA789 (Kohlmann).  The Taiba
Bulletin reported the LET leader's proclamation that Muslims of Europe teeming
with Jihadic passions "would strike an end to Western civilization."  JA789; GX
1D29.  He said "The real Jihad, in fact, is to target the Jews and to "kill them in their
own homes."  JA789, GX 1D27.

Before 9/11, LET operated training camps for individuals from around the
world seeking to be mujahideen, and claimed to have trained thousands to fight in
Afghanistan, Kashmir, Bosnia, Chechnya, Kosovo, and the Philippines.  JA770-781.

<<

<<

<<

_____

Defendant filed by USA as to Ali Al-Timimi."  *See* JA15 (Dkt. #103).  A "clip"
refers to a short section of a longer lecture that was, in fact, played at trial.

LET published a newsletter known as the "Taiba Bulletin." In its newsletter,

LET advertised that it offered free jihad training to Muslims around the world:

```
5.0 Jihad Training Abroad

There are some countries where one can obtain Jihad
training but we are not in a position to comment on
the suitability or insuitability of any particular
country. Contact individuals you know and trust and
they will be able to advise you better. If you are
true to Allah, Allah will be true to you and He will
find you a way to do what you want to do.

_____
NOTE:
Jihadi military training is provided free in Pakistan
from the training centers of Mujahideen
Lashkar-e-Taiba. You can contact them on
markazdawa@hotmail.com for more details.


=====
"And what is wrong with you that you fight not in the Cause of Al
and for those weak, illtreated and oppressed among men, women, an
children, whose cry is: "Our Lord! Rescue us from this town whose
people are oppressors; and raise for us from You one who will pro
and raise for us from You one who will help." Qur'an: Surah Al-ni
Ayah 75)
```

GX 1D52. *See* JA785-787 (Kohlmann).[8]

In its newsletter, LET routinely disseminated news of its ideology, its

activities, and its battles. JA782-783 (Kohlmann). In virtually every issue of the

<<

<<

_____

[8] The joint appendix includes a partial copy of GX 1D52, but the last page of that
exhibit is missing. The screenshot inserted above is taken from the last page of GX 1D52.

Taiba Bulletin between 2000 and September 2001, LET reported on its use of

grenades, rockets, and explosives.  For example:

| Gov't Ex. | Date | Use of Explosive | JA Page |
|-----------|------|------------------|---------|
| GX 1D24 | 9/21/00 | hand grenade attack | ------ |
| GX 1D25 | 9/27/00 | rocket attack | ------ |
| GX 1D26 | 10/13/00 | artillery shelling | ------ |
| GX 1D27 | 10/17/00 | land mine explosion | 3132 |
| GX 1D28 | 10/27/00 | volleys of rockets | 3134 |
| GX 1D29 | 10/13/00 | land mine explosion | 3138 |
| GX 1D30 | 11/14/00 | Bomb attack | ------ |
| GX 1D31 | 11/19/00 | rocket attack | ------ |
| GX 1D34 | 12/24/00 | hand grenade attack | ------ |
| GX 1D35 | 1/24/01 | rocket attack | ------ |
| GX 1D36 | 2/14/01 | hand grenade attack | ------ |
| GX 1D37 | 2/16/01 | rockets, grenades, and bombs | ------ |
| GX 1D38 | 2/18/01 | rocket attack | ------ |
| GX 1D39 | 3/14/01 | rocket and grenade attack | ------ |
| GX 1D41 | 4/08/01 | Landmine | ------ |

In December 2001, after LET conducted terrorist attacks on civilian targets

such as the historic Red Fort and the Indian Parliament (when it was in session), the

United States designated LET as a foreign terrorist organization.  JA171, JA1757

(Wyman).

C.    Al-Timimi's Knowledge of LET

Al-Timimi said that he was well acquainted with LET, and personally knew its

leader.  JA1738-1739, JA1873-1874 (Wyman).   He said that he knew of LET's annual

conferences and had been invited to attend one (but didn't go).  JA1741-1742.  Contrary

19

to Al-Timimi's claim today, that he disagreed with LET's beliefs, Def. Br. 11, he told

the FBI in 2003 that LET's belief system was very similar to his own.  JA1764.

Al-Timimi said LET's tactics were well publicized, and that he was well aware of

them.  JA1742 (Wyman).  Specifically, he said that he knew that LET conducted cross-

border shelling, as well as attacks on police stations and military camps.  JA1743.  He

said that he received the Taiba Bulletin for several years, until he unsubscribed from it

after LET was designated as a terrorist organization in December 2001.  JA1757.  He

said that the Taiba Bulletins he read contained military reports, battle reports, and

statements by the leader of LET.  JA1758.  He said that he visited the LET website

regularly, and that one of his lectures was posted on the LET website.  JA1757.

Al-Timimi said that it was common knowledge that LET had military-style

training camps in Pakistan to train fighters to fight in Kashmir.   He said that he knew

of the battle reports regarding LET's use of explosives to blow up bridges and

buildings, and knew that LET conducted training on weapons and other forms of

military tactics that would enable its trainees to go fight in a battle. JA1743, JA1758

(Wyman).

Al-Timimi admitted to the FBI in 2003 that, in August 2001, he sent his

brother an article recounting the story of an American who died fighting for LET in

Kashmir.  JA1759, JA1772, JA1898 (Wyman).  The article quoted the American's

expression of happiness that, being with LET, for the first time in his life, he was able

to possess a rifle, a knife, and grenades:



GX 10J11a. That article further quoted him as describing how he and his fellow

fighters tested the grenade launchers mounted on their rifles:

GX 10J11a, at pages 4-5.

D.    Al-Timimi and Dar-al-Arqam

Until 9/11, Al-Timimi regularly lectured at the Dar al-Arqam Islamic Center, an Islamic center in Falls Church, Virginia, where his lectures were routinely attended by between 50 and 100 people, JA1773 (Wyman), and where he was esteemed by many as an authority figure.  JA515 (Surratt); JA612-614 (Kwon).  His lectures at Dar al-Arqam were taped, JA1291 (Kwon), and recordings of dozens of his lectures or series of lectures were publicly sold there.  JA1558 (Ammerman).

One set of lectures given by Al-Timimi and recorded and sold at Dar al-Arqam, was titled "*New World Order*."  JA221 (Gharbieh).  That series was published by Dar al-Arqam, with a cover photograph of what appeared to be the New York City skyline in flames:



JA3272.  In those lectures, Al-Timimi described a battle between Muslims and non-believers.  JA322 (Aatique).  In those lectures, Al-Timimi stated that "the greatest

power in the world inimical to Islam is the United States;" that "there is an unrelenting attack to annihilate Islam from the face of the earth;" and that "we have to break the attack by any means necessary." JA1954-1955 (GX 10T1).

Among those who attended his lectures was a group of young men who looked up to Al-Timimi as a religious leader and scholar, JA476 (Aatique); JA2732 (Al-Timimi's trial counsel, McMahon); they purchased recordings of his lectures. For example, Gharbieh, Hammad, Surratt, and Aatique each purchased the *New World Order* set of lectures. JA509-511 (Surratt), JA404 (Aatique).

They asked his advice on matters great and small, and followed it.[9] Kwon, for example, could not recall a single instance in which he did not act in accordance with what he knew to be Al-Timimi's opinion on something involving Islam. JA1471-1472 (Kwon). Al-Timimi himself said that he frequently encountered young men who were in awe of him. JA1780 (Wyman).

Several young members of Dar al-Arqam were influenced by Al-Timimi to begin preparing for jihad, including by practicing military tactics using paintball guns. Five of these men, Gharbieh, Aatique, Kwon, Hasan, and Surratt, testified at Al-Timimi's trial, and explained how Al-Timimi inspired and encouraged them to prepare for jihad. *See, e.g.,* JA1148 (Kwon). Nearly all of the members of the group

---

[9] Just weeks before 9/11, Kwon became a U.S. citizen. Before doing so, he asked Al-Timimi whether it was permissible for him to become a citizen of a non-Muslim country like the United States. JA1237 (Kwon).

had firearms and occasionally conducted target practice with those weapons at various ranges in the Northern Virginia area. JA207-209 (Gharbieh); JA628 (Kwon); JA3218 (Aatique).

The purpose of paintball was to train for physical fighting, jihad. JA194 (Gharbieh); JA291 (Aatique). Playing paintball simulated combat for the day that they might have to participate in a real jihad on behalf of Muslims, and was a form of preparation for attending the LET jihad training camp. JA3218 (Aatique); JA1254-1261 (Kwon). The group playing paintball received some military tactical training from Hammad, Chapman, Surratt (each of whom had prior service in the U.S. military), and Royer (who had fought in Bosnia). JA201-209, JA261 (Gharbieh). The group tried to keep their activities secret, lest the FBI figure out that they were training for jihad. JA276 (Gharbieh).

Despite their efforts to keep their jihad training secret, the FBI approached Chapman in the summer of 2000 to question him about the activities of the paintball players. After Chapman told his fellow jihad trainees about the approach from the FBI, they decided to ask Al-Timimi what they should do in response. JA195-197 (Gharbieh); JA1252 (Kwon).

When Kwon and Gharbieh told Al-Timimi about the FBI's questioning of Chapman, JA2126-2128 (Idris), Al-Timimi told them that the attention from the FBI was their own fault, because they met publicly in a big group while dressed in

24

camouflage. Al-Timimi recommended that they be more discreet. In light of Al-Timimi's advice, the group changed its practice and only met up at the paintball field after arriving in separate cars. JA198 (Gharbieh).

In 2000, first Royer and then Hamdi traveled from the United States to join LET at its camps in Pakistan. JA211 (Gharbieh). Upon their return later that year, each told their colleagues that, while with LET, they used various weapons to fire at Indian positions in Kashmir. JA3218 (Aatique). Each encouraged other members of the jihad training group to go to Pakistan to serve with LET as well. JA3218 (Aatique).

Al-Timimi admitted that, sometime prior to 9/11, he had attended a private dinner meeting where Royer talked about Royer's experiences at LET. JA1775 (Wyman). At that dinner meeting, Al-Timimi said that LET was on the "sunnah,"[10] and then introduced Royer so that Royer could describe his experiences at the LET camps earlier that year. JA614, 630-34 (Kwon). Royer said that when he was with LET, he traveled with a group of LET mujahideen to the Kashmir border, where they fired mortars into Indian positions. JA1262; (Kwon); JA3218 (Aatique). Al-Timimi

<<

<<

<<

_____

[10] The "sunna" is the "correct path" in Islam. JA631 (Kwon).

25

said that none of the audience should repeat anything that was said at the dinner to anyone outside of the people in attendance. JA654 (Kwon).[11]

In the summer of 2001, encouragement from Royer and Hamdi led Chapman to travel to Pakistan to train with LET, JA2252 (Hasan), and led Aatique to consider doing so. Aatique made arrangements to travel to Pakistan in late September of that year, but was still unsure whether he actually wanted to attend the camps during this visit. JA3219.

II.    After 9/11

    A.    Around the World

On September 11, 2001, al-Qaeda terrorists hijacked four commercial airliners. They flew two of the planes into the World Trade Center towers in Manhattan, and one into the Pentagon in Virginia. The fourth plane crashed in Pennsylvania. Thousands of victims were killed or injured. JA169.

Immediately after 9/11, the United States demanded that the Taliban turn over bin Laden. After the Taliban refused those demands, the United States invaded Afghanistan and engaged the Taliban in combat to prevent it from allowing al-Qaeda

_____

[11]    Al-Timimi's claim that Kwon "was recruiting people to train with LET", Def. Br. 10, 16, is unsupported by the record. To the contrary, it was Royer and Hamdi who encouraged their associates to train at LET. JA3219 (Aatique). More-over, on September 16, 2001, when Kwon needed to obtain contact information for LET so that he and Hasan could join LET, he needed to obtain it from Royer. JA1394 (Kwon); JA3219 (Aatique).

to use Afghanistan as a base for terrorist acts against the United States and around the world.  JA170.

By September 13, 2001, newspapers reported that the Taliban was bracing for an imminent attack by the United States.  JA169-170.  By September 16, 2001, newspapers reported that the Taliban's leader, Mullah Omar, had asked Muslims for assistance in defending against such an attack.  JA2345; JA3206.

On September 16, 2001, the Saudi cleric known as Sheikh Uqla issued a fatwa ruling that jihad against the Americans in Afghanistan was compulsory.  JA3176 (GX 7A19); JA1932 (Daghestani).

American troops started the ground war against the Taliban on or about October 20, 2001.  In November 2001, the Taliban was driven from power.  JA167-170.

On December 24, 2001, the United States designated LET as a foreign terrorist organization.  JA171.

B.    In Virginia

On the evening of September 11, 2001, and in response to the attacks on the World Trade Center and the Pentagon, there was an emotional gathering at Dar al-Arqam.  One of the attendees characterized the attacks earlier that day against civilians as evil.  In response, Al-Timimi justified the attacks on the grounds that civilians who paid taxes to support the U.S. military were combatants just as much as

people in the U.S. military. JA639 (Kwon). As a result of espousing those positions, Al-Timimi was barred from Dar al-Arqam. JA3237 (GX 10H1a). The leadership at Dar al-Arqam then destroyed the cover photograph for the *New World Order* lectures. JA218-219 (Gharbieh); JA3272 (GX 10T1).

Kwon drove Al-Timimi home after that meeting. During the drive, Al-Timimi told Kwon to get together with his fellows and come up with a contingency plan in case there were to be mass hostility toward Muslims in America. JA640. In response, Kwon emailed several members of the jihad training group to meet at his home on September 16, 2001. JA641-643.

Shortly after the terrorist attacks of September 11, 2001, Aatique concluded that it was a poor time to attend the LET camp during his upcoming visit to Pakistan. JA3219. Royer, however, asked Aatique to come to a meeting at Kwon's house, and Aatique agreed to do so. JA3219.

On September 14, 2001, Kwon renewed his car registration, and paid his rent for September; at the time, he had no intention of leaving the country or fighting in Afghanistan. JA1181, JA1453 (Kwon).

III.    The Meeting on September 16, 2001

In light of the guidance that Kwon received from Al-Timimi while driving him on 9/11, Kwon hosted at his home on September 16, 2001, members of the jihad training group, including Royer, Khan, Aatique, Hasan, Hammad, and Calipha.

JA223 (Gharbieh); JA318 (Aatique); JA647-648 (Kwon).  Although Kwon had not

initially invited Al-Timimi, Al-Timimi asked to join them when Kwon told him about

the meeting. JA648 (Kwon).  Kwon picked Al-Timimi up and drove him to Kwon's

house.  JA650 (Kwon).

> A.    The Beginning of the Meeting

Before Al-Timimi began speaking at that meeting, he instructed Kwon to draw

the curtains, unplug his answering machine, and pull out the phone cords so there could

be no electronic monitoring.  JA350 (Aatique); JA1367-1368 (Kwon).  He told

everyone in attendance to turn off their phones, and not to repeat anything that was said

in the meeting to anyone else. JA652 (Kwon); JA2252-2254 (Hasan).  Al-Timimi said

that what was to be said at that meeting must be held as an "amana", a trust, which

means it must not be spoken about outside.  JA318 (Aatique); JA2205 (Hasan).[12]  "He

said don't talk about these things in your homes, in your cars.  Assume that they're

electronically monitored."  JA350 (Aatique).

At no lecture at Dar Al-Arqam had Al-Timimi ever said anything about

unplugging phones and closing curtains.  JA477-478 (Aatique); JA653-654 (Kwon);

JA2206 (Hasan).  The only other time Al-Timimi had said that nothing should be

---

[12]    In a recorded conversation with Kwon in 2003, before Royer learned that
Kwon was cooperating with the government, Royer told Kwon that "I told Sheikh
Ali I would never tell anyone what was said at that ah, meeting."  JA1016.

repeated was in the summer of 2000, when he introduced Royer to recount his experiences with LET earlier that year. JA634 (Kwon).

Gharbieh was one of the members of the jihad training group that Kwon had invited to hear Al-Timimi at Kwon's house, JA222, but Gharbieh did not arrive until after Al-Timimi started speaking. When Gharbieh arrived, he entered Kwon's house with his friend "Sherdil," who was not a member of the jihad training group. When Sherdil entered, Al-Timimi abruptly ended his talk. JA1149, JA1386 (Kwon); JA2214-2215, JA2276 (Hasan). Al-Timimi never wrapped up a lecture at Dar al-Arqam as abruptly as he did when Gharbieh walked in with Sherdil. JA1149 (Kwon). It was obvious that Al-Timimi's talk was aborted because of the entry of Gharbieh and Sherdil. JA341 (Aatique).

When Al-Timimi stopped talking, Royer told Gharbieh to take Sherdil out. JA225 (Gharbieh); JA933 (Royer recording). In response to Sherdil's repeated question as to why they had to leave, Gharbieh told him "Trust me, you don't want to know." JA1970 (Sherdil). As soon as Gharbieh left with Sherdil, Al-Timimi resumed his talk, and said "the brothers need to be more intelligent." JA341 (Aatique).

B.    Al-Timimi's Talk

At the meeting at Kwon's house, Al-Timimi said that Mullah Omar had called upon the Muslims to defend Afghanistan against the Americans who were expected

30

to invade.  JA2206-2209, JA2212, JA2254, JA2281 (Hasan) JA342, JA397, JA3219 (Aatique); JA1379 (Kwon).  Al-Timimi explained that, since Afghanistan was hosting Al-Qaeda, the United States' attack on Afghanistan was imminent. JA322-323, JA330 (Aatique); JA1152 (Kwon); JA2207 (Hasan), and that the United States was going to use the 9/11 attacks as an excuse to start another war against Muslims. JA330 (Aatique); JA1382 (Kwon).

Al-Timimi said that the 9/11 attacks were justified.  JA321 (Aatique).  He said that they were approaching the start of the "end of time" battles against the disbelievers. JA322-323 (Aatique).  He stated that the attacks of 9/11 signaled that the final battle between Islam and the infidels, as foretold in the Koran and Sunna, was drawing near, and urged all in attendance to go and fight in the coming war if they were able to do so.  JA322-323 (Aatique).  He said that the final battle was to take place in Palestine, Saudi Arabia, Pakistan, India, and/or Afghanistan. JA3219 (Aatique).

Al-Timimi read the men a fatwa by Sheikh Uqla, which ruled that the jihad in Afghanistan against the Americans was obligatory rather than voluntary.  JA397 (Aatique); JA2208 (Hasan); JA1376, JA1388-1389 (Kwon).  Al-Timimi said that the Taliban are Muslims who needed their help, and that it was obligatory on all Muslims to go and defend Afghanistan against the Americans. JA1150 (Kwon); JA2209 (Hasan).  Al-Timimi said that the only thing that mattered is that their brothers and

31

sisters in Afghanistan needed help against imminent attack, so the men had a duty to go to defend them. JA325, JA328 (Aatique); JA1153 (Kwon). Under the circumstances of an obligatory jihad, the men would not be required first to pay off their loans, or even tell their parents. JA344-345 (Aatique); JA1151-1152 (Kwon).

Al-Timimi gave Khan his copy of the Uqla fatwa, and told him to burn it after reading it. JA2209 (Hasan).

Al-Timimi said that the men needed to do three things. He said they needed to repent; to leave the United States; and to "join the mujahideen." He said that the best option was to join the mujahideen and fight. JA481 (Aatique). He said "go overseas and join any mujahideen," and that it did not matter if they fought the Indians or the Russians or the Americans, because it was all a legitimate jihad. JA1147-1148; JA1382-1384 (Kwon). India, Chechnya, and Afghanistan were all possibilities, but the first choice obviously was Afghanistan because the jihad there was obligatory. JA1244 (Kwon). Al-Timimi said that if one could not go to fight, then at least leave for a Muslim land. JA341 (Aatique).

Al-Timimi gave the option of joining LET. JA481 (Aatique); JA953, JA959-960 (Royer recorded speaking to Kwon in 2003).

In the circle of Dar al-Arqam, if an esteemed scholar such as Al-Timimi told a young man that it was obligatory to go and fight, then such a call should be heeded. JA483 (Aatique).

C.    Discussions about LET and Travel to Pakistan

After Al-Timimi's presentation, everybody was excited and "charged up."
JA350 (Aatique).  Hasan was for the first time inspired to go fight.  JA2278 (Hasan).
Aatique had been uncertain about going to LET, but he was so moved by Al-Timimi
that he decided to attend the LET camp during his upcoming trip to Pakistan after all.
JA346-347, JA350, JA3219 (Aatique).  Kwon was inspired to go as well, and
immediately resigned his job.  JA1174-1181; JA3203 (Kwon).

The members of the jihad training group discussed the need to get more
military training before entering the fight in Afghanistan.  Al-Timimi told the
attendees that they should go through Royer to "join the LET and get some training
from the LET camps."  JA1150-1156, JA1458 (Kwon).  Al-Timimi described LET as
being on the "sunnah," or the correct path.  JA1153 (Kwon).  He referred to LET as
the "good Muslims," JA341 (Aatique), and said that LET were the best people in
Pakistan.  JA296 (Aatique).

Aatique told his fellows at the meeting that he was already planning to leave
for Pakistan on September 19, 2011, and that he had previously made arrangements
to attend military training at an LET camp.  Kwon, Hasan, and Khan expressed their
willingness to go to Pakistan as well and then possibly Afghanistan to defend the
Taliban against possible attacks by U.S. forces - - or to Chechnya, Kashmir or other
locations to engage in jihad.  JA3220 (Aatique).

33

Royer said that he could help his fellows with the contacts to enable them to reach the LET camps. JA1394 (Kwon).

At the close of the meeting, Al-Timimi said that to minimize suspicion when the men left Kwon's house, they should leave in ones and twos, with some time interval, and that they should not leave all at once in a big group. JA1156, JA1389 (Kwon). Kwon then drove Al-Timimi home. Royer then provided his fellows with contact information for LET. JA1188 (Kwon).

Shortly after the meeting at Kwon's house, Royer told Gharbieh that Al-Timimi said to leave the country or go to a camp for combat training. Gharbieh responded that his jihad was taking care of his parents. JA228 (Gharbieh).

IV.     After the Meeting on September 16, 2001

A.     Al-Timimi's Lunch with Kwon and Hasan

On September 19, 2001, Aatique and Khan flew to Pakistan, on their way to the LET camps. JA3220 (Aatique).     That same day, Kwon and Hasan called Al-Timimi to tell him that they were leaving to go to Pakistan to join LET the next day. JA1429 (Kwon). Al-Timimi said that he wanted to meet them for lunch.[13] They picked him up and went to a local restaurant. JA1165 (Kwon).

_____

[13]     Al-Timimi's claim that Kwon and Hasan "saw Al-Timimi at a restaurant and told him that they were planning to go to LET, Def. Br. 17, is misleading. True, they "saw" him at a restaurant, but only after they called him to tell him of their plans, and after he said that he wanted to meet them for lunch. JA1165 (Kwon).

Over lunch, Al-Timimi warned them to take precautions as they made their way to LET, and not to take anything suspicious on the plane. JA1429 (Kwon); JA2223-2224 (Hasan). They told him that they had a cover story that they were going to a wedding. JA1426 (Kwon). He told them to make sure that they coordinated their stories, and to try to look like tourists going to a wedding. He told them that, if they got stopped at the airport, pulled off the airplane, or held at the airport, they should act scared, cry like babies, and ask for their lawyers and their mothers. JA1165, JA1430 (Kwon); JA2224, JA2275 (Hasan).

Al-Timimi told them that, if Hasan was to get stopped for some reason at the airport, then Kwon should also stop his trip, because Kwon would not be able to find his way around Pakistan. On the other hand, he said that, if Kwon were to get stopped, then Hasan should continue the trip because Hasan could speak Urdu and make his way around Pakistan. JA1431 (Kwon).

B.      Kwon, Hasan, Aatique, and Khan in Pakistan

In fact, Kwon and Hasan flew to Pakistan without incident, joined up with Khan, and found their way to LET to obtain jihad training. JA1187-1192 (Kwon). At the camps, they found that Aatique was already there, but that Chapman had gone home. JA1192, JA1307 (Kwon); JA3221 (Aatique).

Aatique stayed at the LET camp for only about five days, and ultimately returned to the United States on October 7, 2001. JA3221 (Aatique).

35

Kwon, Hasan, and Khan attended only the first two of the three stages of the LET jihad training camps.  JA1195-1198 (Kwon).  They dropped the plan to go fight because, by the time they were ready to go to the third stage of training, LET was no longer sending anyone to Afghanistan because the Taliban had fallen so quickly and the war by then was virtually over.  JA1203 (Kwon); JA2232-2234 (Hasan).

At two of the LET camps, Kwon, Hasan, and Khan trained on rocket propelled grenades.  At one of the camps, they learned how such a weapon worked, and then took it outside and shot one round each. JA1193-1194 (Kwon); JA2231-2232 (Hasan).

### C. Al-Timimi's Activities After Kwon and Hasan Left for Pakistan

In early October 2001, Al-Timimi had a meeting at his house for his followers, including members of the jihad training group such as Hamdi, Surratt, and Chandia, who had not been at Kwon's house on September 16, 2001.  JA528 (Surratt).  Hammad had told Surratt that several members of the jihad training group had left the country for a mujahideen camp after hearing Al-Timimi give a powerful lecture.  JA524 (Surratt).  Accordingly, Surratt chose to attend the meeting at Al-Timimi's house in order to hear what Al-Timimi had to say.  JA526 (Surratt).

At the October meeting, Al-Timimi told his audience that it was obligatory to help the mujahadeen in Afghanistan and Pakistan.  JA536-539 (Surratt).  In support for his position, Al-Timimi relied heavily on "*A Statement to the Ummah Concerning*

*the Recent Events*" by his former teacher, Hawali.  JA545-548 (Surratt); JA3178-3199 (GX 7A23).

Surratt searched for, found, and read his own copy of Hawali's statement. JA543 (Surratt; GX 7D3).  He told Al-Timimi that he could not go fight because of his family responsibilities.  Chandia, on the other hand, renewed his passport on October 15, 2001, and left the country for Pakistan and LET on November 5, 2001. GX 7H21, GX 7H22; GX 12-51; JA1198 (Kwon).  Hamdi, in turn, tried to recruit Thompson to go fight in Afghanistan.  JA1947-1948 (Thompson).

In an email of October 21, 2001, Al-Timimi asserted that Muslims were obligated to support Mullah Omar, the Taliban, "and the Arabs with them" with their bodies, their wealth, and their words.  JA3232.  "The Arabs with them" was a reference to bin Laden and al-Qaeda.  JA698-699 (Kohlmann).

On December 13, 2001, Al-Timimi responded to posts on an electronic bulletin board criticizing Islamic scholars (such as himself) for failing to publicly espouse support for the Taliban and al-Qaeda.  He wrote that, although he had been publicly silent, he had not been silent in private meetings:

> The reason for this unexpected e-mail on my behalf is the disturbing comments I recently read from the brothers on the Jazirah list. . . .  Many of you have noticed my silence on the recent events. This is not because I am not with opinion; but rather I have decided to apply the prophetic ordinance . . .[w]hoever is silent will be saved . . . .

[T]those brothers in my area have been able to benefit from what I have had to say . . . . But this unfortunately due to the circumstances has been limited to private visits and not public statements.

JA3262.

V.     The Investigation in 2003 and 2004

In February 2003, the investigation into the jihad training group became overt when search warrants were executed at the homes of Hamdi, Gharbieh, and Al-Timimi.  JA1482 (Ammerman).

In March 2003, Royer was intercepted in a phone call telling Hammad that Calipha (a member of the jihad training group that had attended the meeting at Kwon's house on September 16, 2001) had "cracked" and spoken to the FBI.  In a videotaped conversation with Kwon (who was, unbeknownst to Royer, then acting as a government cooperator), Royer warned Kwon against telling the government that Al-Timimi said anything at the September 16, 2001, meeting about Afghanistan, and said that he had promised Al-Timimi (and sworn) that he himself would never tell anyone what Al-Timimi said at that meeting.  JA1016-1017 (GX 1B2).

In May 2003, additional search warrants were executed at the residences of Khan, Chandia, Hammad, Surratt, and Calipha.

In June 2003, eleven of Al-Timimi's followers at Dar al-Arqam (including Kwon, Hasan, Khan, Aatique, Royer, Hamdi, Hammad, Surratt, and Calipha) were indicted for charges related to their jihad training; the indictment alleged that, on or

38

about September 15, 2001, "Unindicted Conspirator #1" told them that the time had come to join the mujahadeen, and that Royer could connect them with LET so that they could get training to do so in Pakistan. JA1773 (Wyman); JA2105 (Idris).[14]

That same month, Al-Timimi answered questions of investigators in the hopes of convincing the government not to prosecute him as well, and did so again in August 2003, November 2003, and June 2004. JA1727-1728 (Wyman). Under the terms of the interviews, Al-Timimi chose to answer questions about some subjects, but not about all. JA1855 (Wyman).

In his interviews, Al-Timimi admitted to knowing Gharbieh, Kwon, Hasan, Royer, Hamdi, Chandia, and Surratt. JA1774-1776 (Wyman). He admitted that he went to Kwon's house on September 16, 2001, and said that Kwon asked him to provide his comments in the wake of the events that had transpired on 9/11. JA1778 (Wyman). He admitted that he told his audience to leave the United States for Muslim countries, but denied that he told them to go fight. JA1780 (Wyman).

Al-Timimi admitted that he said that the United States was going to use the 9/11 attacks as a catalyst to launch an attack and that war in Afghanistan was likely. JA1781. He admitted that he said that mujahideen would flow to Afghanistan. JA1782. He admitted that he may have told the attendees that the jihad in

---

[14]    *See Khan*, 309 F. Supp. 2d 789; *aff'd,* 461 F.3d 477 (4th Cir. 2006). By the time Al-Timimi was indicted, the government had identified the date of the meeting as September 16, 2001.

Afghanistan was permissible, but denied that he said that it was obligatory. JA1782-1783 (Wyman). He admitted that Uqla was a Saudi scholar who wrote a fatwa right after 9/11 that justified the attacks, but denied that he told the audience at Kwon's house about it. JA1786-1787.

Al-Timimi admitted that, as he was leaving Kwon's house, he overheard Royer giving other men a contact number for what Al-Timimi suspected was LET, but denied that he had encouraged anyone to join LET. He claimed that he admonished Royer and the others with a disapproving hand motion for them even to consider going to join LET. JA1787-1788 (Wyman).

Al-Timimi admitted having lunch with Kwon and Hasan before they left for Pakistan, but denied that they told him that they would be joining LET. JA1789. He denied encouraging them to join LET, or advising them on how best to avoid detection. He said that, to the contrary - - and even though they did not tell him anything about going to participate in jihad in Pakistan or Afghanistan - - he warned them *not* to go participate in jihad. Al-Timimi claimed that he gave them that warning (even though they never said that they were going to join LET) because war drums were beating at the time, and it was clear that the United States was going to invade Afghanistan. JA1789.

Although Al-Timimi said at the interview in June 2003, that he had no further contact with Kwon or Hasan after their lunch, he claimed at the interview in August

2003, that he had sent an individual to discourage Kwon and Hasan from going to fight. Al-Timimi declined, however, to identify that individual. He justified his refusal on the grounds that he needed to ensure that the individual would provide the same story to the government that he had provided to Al-Timimi. JA1790-1791 (Wyman). At his subsequent interviews in November 2003 and June 2004, he continued his refusal to identify such person. JA1791-1792 (Wyman).

At trial, Al-Timimi's friend, Idris, testified that, at Al-Timimi's behest, it was Idris himself who contacted Kwon and Hasan, and tried to talk them out of going to join LET. JA2013-2014 (Idris). In August 2003,[15] however, Idris had submitted an affidavit to support Al-Timimi's efforts to avoid prosecution, but mentioned nothing about Al-Timimi asking him to contact Kwon or Hasan to try to talk them out of leaving the country for jihad. JA3265 (GX 10J15), JA2116, JA2130 (Idris). Moreover, in March 2005, when FBI agents tried to follow up on Al-Timimi's exculpatory story by contacting Idris on the possibility that he was the friend who ostensibly contacted Kwon and Hasan at Al-Timimi's behest, Idris refused to speak with them. JA1792 (Wyman); JA2119-2123 (Idris).

Al-Timimi admitted that, in October 2001, he held private meetings at his house with individuals including Hamdi, Hammad, and Caliph. JA1794-1795

---

[15] By August 2003, Idris knew that Kwon, Hasan, and the other members of the jihad training group had been indicted for acting upon the statements that Al-Timimi was alleged to have made to them in September 2001. JA2117 (Idris).

(Wyman). He said that, in those meetings, he did not talk about jihad or Afghanistan or LET or anything like that. JA1794-1795 (Wyman). He admitted that he knew that Chandia was leaving the country, but denied knowing that Chandia was leaving to join LET. JA1795 (Wyman). He claimed, nevertheless, that he suspected that Chandia was leaving the country to join LET, because Chandia, like all young Muslim men, was very interested in the concept of jihad and martyrdom; he asked many questions about jihad, and he had expressed his desire to participate in jihad before. JA1795 (Wyman).

Al-Timimi said that, because of his suspicions, he sent Hamdi to contact Chandia and discourage Chandia from going to join LET. JA1796 (Wyman). Al-Timimi would not explain why he would tell the FBI that it was Hamdi that he sent to stop Chandia, but he would not tell the FBI who it was that he sent to stop Kwon and Hasan. JA1796 (Wyman).[16]

Al-Timimi admitted that, on December 13, 2001, he had responded to posts on an electronic bulletin board criticizing Islamic scholars (such as himself) for failing to espouse public support for the Taliban and al-Qaeda, and he admitted that he wrote that, although he had been publicly silent, he had not been silent in private visits. JA3262. When asked whether his mention of "private visits" referred to the meetings

_____

[16] Proof at trial showed that, at the very time that Al-Timimi claimed that he sent Hamdi to talk Chandia out of going to join LET, Hamdi tried to talk Thompson into going overseas to join the mujahideen. JA1947-1948 (Thompson).

that he had at Kwon's house on September 16, 2001, and at his house in early October 2001, he said he that he did not remember what he was referring to when he mentioned those "private visits." JA1814-1815 (Wyman).

Al-Timimi told the FBI that he used Hawali's opinion for guidance when reaching his own opinions. JA1820 (Wyman). Al-Timimi admitted that he agreed with every statement in Hawali's *Statement to the Ummah on the Recent Events,* JA1900-1902 (Wyman), but denied that, at the meeting at his house in October 2001, he relied on that statement to encourage Chandia, Hamdi, and Surratt to join LET. JA1794-1795 (Wyman). Specifically, he agreed with Hawali that the World Trade Center was the "pit of espionage, the nest of the Mafia, the centre of usury and the washer away of wealth," JA3191 (GX 7A23); that it was not possible for anyone who looks with justice and fairness at the issue of whether the Taliban should turn over the "Arab Mujahideen" to do anything but adopt the humane and correct position of the Taliban, JA3198 (GX 7A23); and that Islam requires the terrorizing of its enemies. JA3183 (GX 7A23).

In his interviews, he admitted that, in February 2003, upon the occasion of the destruction of the space Shuttle Columbia, he had distributed an article in Arabic, in which he had called for the destruction of the United States; he admitted that he wrote that "No doubt that the heart of every believer flew in happiness at the calamity that befell their greatest enemy." JA1840 (Wyman); JA3200 (GX 7A39a).

43

Al-Timimi's main arguments center around his claims that merely talking to his followers at Dar al-Arqam (1) could not predicate criminally liability generally; (2) could not constitute a "substantial step" in furtherance of any attempt to violate the law; and (3) could not have aided and abetted a conspiracy to levy war against the United States and aid the Taliban that was concrete and imminent. The law is clear, however, that words alone can suffice to constitute such criminal activity. "Aiding and abetting" is also called "facilitation". *United States v. Hansen,* 599 U.S. 762, 771 (2023). "Neither solicitation nor facilitation requires lending physical aid; for both, words may be enough." *Id.*

In any event, Al-Timimi took actions in addition to "merely" speaking to his followers; for example, after two of his followers told him they were leaving for Pakistan to prepare to fight against the American troops he predicted would soon invade Afghanistan, he sought them out, met them for lunch, and advised them how best to avoid airport security, and how to react if one was stopped but the other was not.

Others of Al-Timimi's myriad arguments are that no rational jury could have found (4) that he actually solicited his followers to levy war against the United States in Afghanistan under circumstances that were strongly corroborative of his intent that they do so; (5) that he actually knew that attempting to aid the Taliban

was illegal; (6) that he actually knew that his followers would, at his urging, attempt to help the Taliban in order to repel the American invasion that he predicted would occur; (7) that he actually knew that his followers understood that, in the course of their training at terrorist camps, they would fire weapons against Indian positions in Kashmir (and, thereby, attack a country with which the United States was at peace); or (8) that he actually knew that his followers would handle explosives at the terrorist camps in Pakistan to which he urged them to join.

To the contrary, (a) Al-Timimi admitted that he knew that LET jihad training consisted of training on explosives; (b) he admitted that he was extremely knowledgeable about all issues involving the Muslim world (so that he obviously knew of the U.S. sanctions against the Taliban); and (c) he admitted that he knew that others of his followers who had previously gone to LET for jihad training had fired on Indian positions in Kashmir.

Further, Al-Timimi admitted that, after his lecture on September 16, 2001, he suspected that his followers would travel to LET camps to join the jihad in Afghanistan against the American invasion that he expected would occur. In any event, Kwon, Hasan, and Aatique, all testified about Al-Timimi's words on September 16, 2001, and Royer was recorded telling Kwon in 2003 about Al-Timimi's words on that night. Moreover, Surratt testified that Al-Timimi said virtually the same thing at a private meeting in October 2001, and Thompson

testified that Hamdi (another attendee at that October 2001 meeting) tried after that meeting to recruit Thompson to go overseas to fight as well. In short, there was ample evidence to support the jury's verdicts.

Finally, Al-Timimi claims that the district judge failed to instruct the jury properly, but none of those claims were made before he was convicted and sentenced, so they are reviewed for "plain" error - - of which there was none.

The judge properly instructed the jury that, in order to convict Al-Timimi on Counts 9 and 10, the jury had to find that Al-Timimi knew that Kwon and Hasan would handle explosives at the LET camps in Pakistan. The district court instructed:

> [T]he government must prove that the defendant knew that Kwon or Hasan intended to undertake . . . the unlawful carrying of explosives in furtherance of a felony crime, Counts 9 and 10, and intended to help their actions succeed.

JA2457. Accordingly, there was no error, much less "plain" error. Similarly, the district court properly instructed the jury that seditious conspiracy encompasses plans to fight American troops outside the United State. In any event, even if that instruction were erroneous, any error certainly was not "plain," and should not be recognized now.

While Al-Timimi proffers today a definition of the word "attempt" that might be better than the perfectly correct one that the district court gave in 2005, he did not object to that definition at the time, and the provision of the perhaps better definition

that he provides now would have made no difference in the jury's verdicts 20 years ago.

Al-Timimi further argues that, because the government did not argue to the jury that Al-Timimi was liable under *Pinkerton* for the actions of his followers in carrying and using explosives at LET camps in Pakistan, the district court committed "plain" error by instructing the jury about *Pinkerton* liability. There was no error, plain or otherwise.

Al-Timimi attacks his convictions for Counts 9 and 10 on the grounds that it was *possible* that the jury predicated those convictions only on Al-Timimi's liability for a count (Count 1) that has now been dismissed under *Davis*. Inasmuch as the district court instructed the jury that there were 16 possible predicates for the convictions on Counts 9 and 10 - - and a conviction on Count 1 was *not even included among that 16* - - Al-Timimi's attack must fail, because he cannot make even a plausible showing that the verdicts on Counts 9 and 10 were predicated on the now-dismissed Count 1.

Finally, Al-Timimi's conviction on Count 4 was for his actions as a principal, but his conviction on Count 5 was for his actions as an accessory to offenses committed by his followers. Even if it was error to sentence Al-Timimi on both counts, that error was not plain, and this Court should not notice it now. Inasmuch as the sentences for the two convictions ran concurrently - - and that sentence has

been served - - there was no prejudice to Al-Timimi for any such error. Particularly in light of the nature of his other convictions (as well as the myriad issues raised in the course of two remands), any such error should not be recognized now.

Argument

## I.   Al-Timimi's Statements Sufficed to Constitute Aiding and Abetting

Al-Timimi claims that his culpability for aiding and abetting cannot be based simply on his statements. To the contrary, "'[m]any long established criminal proscriptions — such as laws against conspiracy, incitement, and solicitation — criminalize speech . . . that is intended to induce or commence illegal activities." *United States v. Williams*, 553 U.S. 285, 298 (2008). As the Supreme Court recently wrote:

> Facilitation—also called aiding and abetting—is the provision of assistance to a wrongdoer with the intent to further an offense's commission. . . . Neither solicitation nor facilitation requires lending physical aid; for both, words may be enough.

*United States v. Hansen,* 599 U.S. 762, 771 (2023).

As stated in *Williams* and in *Hansen,* the law is clear that accomplice liability can be based solely on statements. *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 245 (4th Cir. 1997). In *United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020), this Court clearly stated that speech taking a form other than "abstract advocacy" does not implicate the First Amendment. *Miselis*, 972 F.3d at 533.

48

"The first amendment does not provide a defense to a criminal charge simply because the actor uses words to carry out his illegal purpose. Crimes, including that of aiding and abetting, frequently involve the use of speech as part of the criminal transaction." *Paladin Enterprises,* 128 F.3d at 245.[17] *See United States v. Rahman*, 189 F.3d 88, 114 (2d Cir. 1999) (speech that "constitutes an agreement to use force against the United States" is not protected).

This Court has considered First Amendment challenges to convictions of individuals who encouraged others to commit crimes perhaps more mundane than seditious conspiracy and aiding the Taliban. For example, in *United States v. Fleschner*, 98 F.3d 155, 158-59 (4th Cir. 1996), the Court rejected the claims of defendants convicted for tax fraud who argued that the First Amendment protected them from prosecution for advocating violation of the tax laws. In *United States v. Kelley*, 769 F.2d 215, 217 (4th Cir. 1985), this Court found that a defendant who urged others to file false tax returns was properly convicted of aiding and abetting preparation of false tax forms despite the fact that he only provided advice that the other individuals were free to accept or reject, because "action was urged, the advice was heeded, and false forms were filed." *See Paladin Enterprises*, 128 F.3d at 245 ("Our own circuit, and every other circuit to address the issue, has likely concluded

---

[17] Internal quotation marks and citations are omitted throughout the citations in this brief.

that the First Amendment is generally inapplicable to charges of aiding and abetting violations of the tax laws").

Here, the district court correctly instructed the jury that "counseling or inducing another to commit a crime constitutes doing an act for the purpose of procuring the commission of the crime." JA2461. Further, the district court correctly instructed that "providing advice to another with regard to how the crime should be committed or law enforcement eluded constitutes an act for the purpose of aiding and abetting the commission of the crime." JA2461. Those instructions were correct 20 years ago, and they are still correct today.

## II.    Al-Timimi's Statements Incited Imminent and Concrete Harm

Al-Timimi argues that, even if he counseled his followers to help the Taliban, join LET, attack India, and join the jihad in Afghanistan against the American forces he expected soon to invade, his words constituted mere advocacy, and were not designed to encourage any concrete harm that was imminent. His argument ignores the facts of the case. After all, within a week of when Al-Timimi's statements were made, four men who heard his statements were motivated to leave the United States to join LET, aid the Taliban, and levy war against the United States in Pakistan. That was a harm that was both concrete and imminent.

<<

<<

50

In any event, the law is well established that

> the First Amendment, and *Brandenburg*'s "imminence" requirement in particular, generally poses little obstacle to the punishment of speech that constitutes criminal aiding and abetting, because culpability in such cases is premised, not on defendants''advocacy of criminal conduct, but on defendants' successful effort to assist others by detailing to them the means of accomplishing the crimes.

*Paladin Enterprises, Inc.*, 128 F.3d at 246. In this case, Al-Timimi's convictions were based on his successful effort to assist others by detailing to them the means of accomplishing the crimes.

On September 16, 2001, Al-Timimi knew that his statements that day were very different than the statements that he made at his public lectures. As noted previously, he knew that his statements on that day were targeted to a very different audience with a very different purpose than his more general public lectures that were aimed at a wider audience. He knew that his audience on September 16th was exclusively young Muslim men who had practiced for the day that they could engage in an actual jihad. And, as noted previously, his statements incited imminent lawless action - - both at the meeting at Kwon's house on September 16, 2001, and at the lunch with Kwon and Hasan days later.

The district court correctly instructed that the First Amendment protections of speech, religious activity, or association are not absolute and may not protect a person from criminal prosecution if that speech, religious activity, or association was

51

intended to generate or was likely to generate imminent criminal action by others or constituted criminal activity in and of itself.  JA2486.

Al-Timimi's argument that the threats that he espoused and encouraged were not sufficiently imminent to be prosecuted echoes the one made by "the Blind Sheik" and rejected 25 years ago in *Rahman*.  There, the Second Circuit reiterated the test of *Brandenburg v. Ohio*, 395 U.S. 444 (1969) - - that a state may proscribe subversive advocacy only when such advocacy is directed towards, and is likely to result in, "imminent lawless action" - -  and then stated that it was "well established that the Government may criminalize certain preparatory steps towards criminal action, even when the crime consists of the use of conspiratorial or exhortatory words."  *Rahman*, 189 F.3d at 115-16.

As the *Rahman* court explained:

> Words of this nature -- ones that instruct, solicit, or persuade others to commit crimes of violence -- violate the law and may be properly prosecuted regardless of whether they are uttered in private, or in a public speech, or in administering the duties of a religious ministry. The fact that his speech or conduct was "religious" does not immunize him from prosecution under generally-applicable criminal statutes.

*Id.* at 117.  This exact reasoning applies to Al-Timimi.

As was true with respect to the Blind Sheikh, the evidence showed that Al-Timimi was looked to as a leader, and that he embraced that role and encouraged the conspirators to engage in violent acts against the United States. Like the Blind

Sheikh, Al-Timimi discussed paramilitary training with his followers, and encouraged them to conduct jihad, including acts of violence, against the United States. He told them that their assistance to the Taliban was not voluntary but obligatory.

Al-Timimi stands in the same position in which the Blind Sheikh stood earlier; he did not merely advocate that others use force against the United States, he also induced and counseled them to conspire to use force. Accordingly, and as was true with respect to the case against the Blind Sheikh, the evidence in this case established that Al-Timimi solicited his followers to levy war against the United States; that same evidence established that he attempted to aid the Taliban.

Absent any instructional error, the defendant makes only a sufficiency argument—and he cannot prevail by highlighting "competing evidence." Rather, after viewing the evidence in the light most favorable to the prosecution, he must show that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020). He cannot do so.

Regardless of whether all of Al-Timimi's public statements before 9/11 about preparing for jihad somewhere and someday were protected by the First Amendment, his private statements on September 16, 2001, about joining the jihad in Afghanistan that very day, were not. Before 9/11, in his public speeches, Al-Timimi regularly

engaged in what was perhaps abstract advocacy. In his public lectures, he regularly encouraged his audience to look favorably on jihad generally. Al-Timimi had those lectures recorded, and openly sold them around the world.

In contrast, on September 16, 2001, Al-Timimi swore his listeners to secrecy, and swore them never to repeat what he was about to say. Unlike in his public lectures, he took safeguards against being recorded. Unlike in his public lectures, he stopped speaking when someone unknown to him (Sherdil) entered the room to hear him. Unlike in his public lectures, he instructed one of his listeners (Khan) to burn after reading the source document (the Uqla fatwa) upon which Al-Timimi based his statements.

Rather than engage in abstract advocacy about the benefits of jihad in general someday and somewhere (as he often did in his public lectures), in his private meeting on September 16, 2001, he counseled his followers to travel to a specific place (Pakistan) to get training with a specific terrorist organization (LET), in order to engage in a specific jihad (to protect the Taliban), at a specific time (immediately), because the American invasion of Afghanistan was *imminent*.

This conduct is akin to "organizing" or "inciting" sedition, which is not constitutionally protected. *See Miselis*, 972 F.3d at 537 (explaining that organizing a riot "comes much closer to 'preparing a group for violent action' than merely 'teaching ... the moral propriety' of violence in the abstract" (quoting *Brandenburg v.*

54

*Ohio,* 395 U.S. 444, 448 (1969)), and is akin to aiding and abetting criminal conduct, which "doesn't qualify for First Amendment protection").

The testimony of Kwon, Hasan, and Aatique  - -  as corroborated by the recordings of Royer and the testimony of Surratt and Gharbieh  - - established that, in September 2001, Al-Timimi endeavored to persuade them to fight against the American troops that he expected shortly to arrive in Afghanistan, and that he recommended that they obtain the training to do so by joining LET in Pakistan.  Al-Timimi's intent to persuade them to wage war against America is further corroborated by his email of October 21, 2001, when he wrote that Muslims were obligated to support Mullah Omar, the Taliban, "and the Arabs with them" with their bodies, their wealth, and their words.  GX 10D19.

In fact, Al-Timimi incited imminent and concrete lawless action.  His listeners immediately proceeded with a seditious conspiracy in violation of 18 U.S.C. § 2384, a conspiracy to mount a military expedition against a country with whom the United States was at peace, in violation of 18 U.S.C. § 960, and a conspiracy to assist the Taliban in violation of 50 U.S.C. § 1705.  Kwon, Khan, Hasan, and Aatique acted immediately to travel to Pakistan as quickly as they could.  Indeed, they likely could not have acted in accordance with Al-Timimi's counsel any faster than they actually did.

As did the defendants in *Rahman*, *Fleschner* and *Kelley*, Al-Timimi urged

lawless action, the advice was heeded, and action was taken in furtherance of the

criminal conspiracies.   Al-Timimi's actions were no more protected by the First

Amendment than were those of Rahman, Fleschner, or Kelley.

Finally, if there were any doubt about Al-Timimi's culpability, it is important

to underscore that, even after September 16th, he asked Kwon and Hasan to meet

him for lunch right before they left for Pakistan, and at that lunch he advised them on

how best to avoid detection in order to successfully reach Pakistan.  At that lunch, he

advised them how to react if one was stopped by law enforcement but the other was

not.  Al-Timimi's statements hardly could be less "abstract," and the harm flowing

from his statements more "imminent."   In short, his First Amendment claim is

meritless.

### III.    Sufficient evidence supports Al-Timimi's convictions.

Al-Timimi raises numerous arguments challenging the sufficiency of the

evidence supporting his convictions.  A defendant challenging the sufficiency of the

evidence "faces a heavy burden."  *Dennis*, 19 F.4th at 665.  "When considering a

sufficiency of the evidence challenge to a guilty verdict," this Court "must sustain the

jury's verdict if there is substantial evidence, taking the view most favorable to the

Government, to support it."  *United States v. Stockton*, 349 F.3d 755, 760–61 (4th

Cir. 2003).  Substantial evidence "is evidence that a reasonable finder of fact could

56

accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (*en banc*).

This Court "may not overturn a substantially supported verdict merely because it finds the verdict unpalatable or determines that another, reasonable verdict would be preferable." *Burgos*, 94 F.3d at 862. Instead, "appellate reversal on grounds of insufficient evidence . . . will be confined to cases where the prosecution's failure is clear." *Id*. "In considering whether substantial evidence exists," this Court "recognize[s] that credibility determinations, weighing of the evidence, and determining which among different, reasonable interpretations of the evidence to believe are all functions left solely to the jury." *United States v. Seigler*, 990 F.3d 331, 338 (4th Cir. 2021). The Court does "not analyze evidence in a piecemeal manner, but must consider its cumulative effect." *Burgos*, 94 F.3d at 871.

Additionally, several of Al-Timimi's sufficiency arguments incorporate challenges to the jury instructions. A "party challenging the jury instructions faces a heavy burden," because this Court "accord[s] the district court much discretion to fashion the charge." *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011). In reviewing the instructions, the Court asks "whether the instructions as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Id*.

57

Because substantial evidence supports each of Al-Timimi's convictions, and the district court properly instructed the jury, the Court should affirm.

## A. Sufficient evidence supports Al-Timimi's conviction on Count 2.

Count 2 charged Al-Timimi with soliciting others to levy war against the United States, in violation of 18 U.S.C. §§ 2381 and 373. Section 373 applies to a person who:

(1) "with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against the property or against the person of another in violation of the laws of the United States,"

(2) "under circumstances strongly corroborative of that intent,"

(3) "solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct."

In turn, Section 2381 applies to a person who, "owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere." § 2381. Al-Timimi raises two challenges to his conviction on Count 2, neither of which has merit.

## 1. Levying war is a crime of violence.

Al-Timimi claims that his conviction on Count 2 is invalid because levying war, in violation of § 2381, is not categorically a crime of violence. As Al-Timimi concedes, *see* Def. Br. 83–84, this claim is reviewable only for plain error because he

failed to raise this argument in the district court. *See United States v. Naum*, 134 F.4th 234, 240 (4th Cir. 2025). "To establish plain error, the appealing party must shown that an error (1) was made, (2) is plain . . . , and (3) affects substantial rights." *United States v. Miller*, 41 F.4th 302, 310 (4th Cir. 2022). "[E]ven if an appellant makes this three-part showing, an appellate court may exercise its discretion to correct the error only if it seriously affects the fairness, integrity[,] or public reputation of judicial proceedings." *Id.*

By its terms, the "solicitation" statute of which Al-Timimi was convicted in Count 2, 18 U.S.C. § 373, is limited to the solicitation of crimes of violence. Accordingly, Al-Timimi properly could be guilty of soliciting his followers to levy war against the United States, as alleged in Count 2, only if the crime of levying war against the United States, in violation of 18 U.S.C. § 2381, is a "crime of violence" encompassed by Section 373. At trial, the district judge instructed the jurors that levying war against the United States is, in fact, a crime of violence. JA2464-2465. Although Al-Timimi did not challenge that instruction at trial, he does so now, and claims that levying war is not a crime of violence.

To be more precise, Al-Timimi argues that a violation of 18 U.S.C. § 2381 is not *categorically* a crime of violence. According to Al-Timimi, this is so because the statute can be violated without necessarily involving violence, such as by adhering to the enemies of the United States, or giving them aid and comfort. That argument

59

might be persuasive in another case, but in *this* case, neither adhering to enemies, or giving them aid and comfort, was a crime that the jury was instructed to consider. To the contrary, the *only* crime that the jury was instructed to consider for purposes of Count 2 was levying war against the United States.

With respect to Count 2, the district court instructed the jury as follows:

> The elements of the offense of soliciting others to levy war, in order to convict the defendant of the offense charged in Count 2, you must find beyond a reasonable doubt that the defendant first solicited, commanded, induced, or otherwise tried to persuade another person to levy war against the United States; and
>
> Two, that the defendant's actions strongly indicated that he intended the other person or persons to levy war against the United States, that has as an element the use, attempted use, or threatened use of physical force against the person or property of another in violation of the laws of the United States.

JA2468-69.

Further, the district court also instructed:

> In Counts 2 and 3 -- Counts 2 and 3 use the term "to levy war" against the United States. As used in the indictment and in the underlying criminal laws, the term "to levy war" means to wage war or to carry on war.

JA2470.

Later, after a receiving a question from the jury, the district court instructed the jury that it was permitted to convict Al-Timimi for violating Section 2381 *only* if it

concluded that he solicited his followers to levy war, and it was not permitted to

convict the defendant on an aid-and- comfort theory:

> All right, Ladies and Gentlemen, I think I might have made
> your job a little bit easier. The questions you've sent us out have
> to do with the language "giving aid and comfort" as well as
> "adhering to their enemies," that portion of the language in Title
> 18, U.S. Code, section 2381.
>
> We probably gave you more information than you needed in
> this case, and sometimes, as I indicated, an indictment will
> charge multiple acts where they don't really have to but it does.
>
> For purposes of your analysis, just in your own minds,
> strike that half of 2381. 2381 says, "Whoever owing allegiance
> to the United States levies war against them" -- all right, so
> that's one form of prohibited activity under section 2381 -- "or"
> -- so a different type of action that would also violate 2381 --
> "adheres to their enemies, giving them aid and comfort within
> the United States or elsewhere."
>
> That second half of 2381 does not apply to this case. The
> government's theory in Counts 2 and 3 addresses the first half
> only, that is, levy war against the United States, which is why
> we gave you a definition of what it means to levy war, but we
> did not give you a definition as to adhere to their enemies or
> give them aid and comfort. All right? So I hope that that
> answers your question.

JA2551-52. Based on the instructions from the district court, Al-Timimi obviously

was convicted not for soliciting his followers to adhere to enemies of the United

States, or for giving them aid and comfort, but for soliciting them to levy war against

the United States.

Section 2381 sets forth a divisible offense, such that the modified categorical approach applies. Applying the modified categorical approach, Al-Timimi was specifically convicted of soliciting the levying-war variant of § 2381, which categorically qualifies as a crime of violence.

A defendant can violate Section 2381 in one of two ways: by "levying war" against the United States, or by "adher[ing] to their enemies, giving them aid and comfort within the United States or elsewhere." Regardless of whether the latter prong necessarily involves the use of force, the former does, and the statute is divisible.

In order to determine whether a statute is 'divisible', courts must evaluate whether it lists elements in the alternative, and thereby defines multiple crimes. *Guevara-Solorzano v. Sessions*, 891 F.3d 125, 131 (4th Cir. 2018). A statute is divisible where the behavior underlying one statutory phrase "differs so significantly from the behavior underlying another." *United States v. Allred*, 942 F.3d 641, 650 (4th Cir. 2019) (internal quotations omitted).

We are not aware of any case that directly addresses whether the two prongs of Section 2381 constitute separate offenses. The underlying conduct and jury instructions, however, suggest that this statute is divisible into its two halves. As the district court correctly found, Section 2381 is divisible into two separate offenses - -

"adher[ing] to the country's enemies, giving them aid and comfort," and "lev[ying] war."  JA2995.

"Levying war" and giving "aid and comfort" to the country's enemies have long been understood to be separate offenses that, for present purposes, are better conceptualized as distinct elements. "The two branches of treason, 'levying war,' and 'adhering to their enemies, giving them aid and comfort,'—are distinct, and do not embody synonymous actions."  Charles Warren*, What Is Giving Aid and Comfort to the Enemy?*, 27 Yale L.J. 331, 332–33 (1918).  *See  United States v. Greiner*, 26 F. Cas. 36, 38 (E.D. Pa. 1861) (explaining that "the two species of treason mentioned in the constitution are described in it in language borrowed from that of the English statute of treasons").

To "levy war" is to assemble a body of men for the purpose of effecting by force a treasonable purpose.  *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 126 (1807) ("if war be actually levied, that is, if a body of men be actually assembled for the purpose of effecting *by force* a treasonable purpose. . . ") (emphasis added).  Thus, "the underlying conduct" for levying war "differs significantly from the underlying conduct" for giving aid and comfort.  *See United States v. Jackson*, 32 F.4th 278, 286 (4th Cir. 2022).

Based on the instructions from the district court, Al-Timimi was convicted not for soliciting his followers to adhere to enemies of the United States, or for giving them aid and comfort, but for soliciting them to levy war against the United States.

Al-Timimi does not argue that the levying-war variant of § 2381 can be committed without the use, attempted use, or threatened use of physical force. *Cf.* Def. Br. 81–83; *see, e.g.*, *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned.").[18]  Accordingly, the district court properly determined that levying war against the United States qualifies as a crime of violence, and the conviction remains valid.

Alternatively, even if § 2381 is not divisible, any error is not plain.  A plain error must be "clear or obvious." *Miller*, 41 F.4th at 311.  "An error is plain if the settled law of the Supreme Court or this circuit establishes that an error has occurred." *United States v. Carthorne*, 726 F.3d 503, 516 (4th Cir. 2013).  Al-Timimi has not cited, and the government has not located, any authority other than the district court's decision in this case addressing whether § 2381 is divisible, or

_____

[18]  The Al-Hamdi who was the defendant in the cited case is the same Al-Hamdi who was a follower of Al-Timimi and a member of the jihad training group referenced in this brief.  The *Al-Hamdi* opinion's reference to execution of a search warrant at Al-Hamdi's residence on February 25, 2003, 356 F.3d at 567, refers to the search referenced above, that was conducted simultaneously with the searches executed at the residences of Al-Timimi and Gharbieh.

whether any offense proscribed by § 2381 qualifies as a crime of violence. Given the total paucity of authority, the defendant cannot show that any divisibility error was plain. *See, e.g.*, *United States v. Williams*, 931 F.3d 570, 574 (7th Cir. 2019) (where divisibility is "unclear," a defendant "would still lose on plain-error review because only a 'plain' error could justify reversal"); *United States v. Bain*, 874 F.3d 1, 31 (1st Cir. 2017) (stating that a divisibility argument could not succeed on plain-error review where "the statute's divisibility is unclear").

### 2. Proof established circumstances strongly corroborative of Al-Timimi's intent to solicit his followers to levy war against the United States

Al-Timimi also challenges whether the jury heard sufficient evidence of circumstances corroborating an intent that another person engage in levying war against the United States. Al-Timimi highlights the corroborative circumstances featured in other cases that are not present here. *See* Def. Br. 84–85. This Court's focus, however, "must remain fixed on the sufficiency of the evidence that *is* in the record rather than on what other evidence there *could be*." *Seigler*, 990 F.3d at 338 (emphasis in original). Here, the circumstances in which, on September 16, 2001, Al-Timimi exhorted his followers to join the jihad in Afghanistan were strongly corroborative of his intent to solicit his followers to levy war against the United States.

First, Al-Timimi's own words could not have been more corroborative of his intent to solicit his followers to levy war against the United States, because that is exactly what he said they should do. After all, he was kicked out of Dar al-Arqam on 9/11 because he argued that the attacks of that day were justified, and the leadership at Dar al-Arqam then destroyed the cover photograph for Al-Timimi's *New World Order* lectures, apparently depicting the New York City skyline in flames. JA218-219 (Gharbieh); JA3272 (GX 10T1).

Even before that, Al-Timimi publicly asserted that, "[w]hen there is jihad, you must wage jihad against them," GX 10T2, and "it may not be permissible to stay in America" if "you have military skills." GX 10T4. He publicly asserted that Muslims "fight their enemies, not in a theoretical sense, but in a literal sense. They subdue their enemies. They fight. Jihad is the pinnacle or apex of Islam." GX 10T7. He publicly urged his listeners to "[w]age jihad against the unbelievers and be harsh with them." GX 10T10. He warned his listeners that, although they "might have some excuse why you are not out there with the mujahideen, Allah hates those who have the means to wage jihad, but fail to do so." GX 10T11. And, although LET called for the destruction of Western civilization, JA789; GX 1D27; GX 1D29; Al-Timimi agreed with its ideology, JA1764, and characterized LET as being on the right path. JA630.

Moreover, the testimony of Kwon, Hasan, and Aatique  - -  as corroborated by the recordings of Royer, the testimony of Surratt, and the testimony of Gharbieh  - - established that in September 2001, Al-Timimi counseled and induced his listeners to conspire to fight against American troops expected to arrive in Afghanistan.

Second, the testimony of Kwon, Hasan, and Aatique established that they (as well as Khan) did, indeed, follow Al-Timimi's counsel to conspire to wage war against the United States.  The fact that they acted upon Al-Timimi's words constitute circumstances that were strongly corroborative of Al-Timimi's intent to solicit his followers to levy war against the United States.

Third, Al-Timimi's own actions on September 16, 2001, constitute circumstances that were strongly corroborative of his intent to solicit his followers to levy war against the United States.  The actions he took to protect the secrecy of the meeting that evening were completely inconsistent with his actions in connection with his public speeches.  His actions to maintain the secrecy of his statements on that date reflect his knowledge that his statements were intended to precipitate concrete and imminent action.  In short, Al-Timimi knew that his statements on September 16, 2001, could result in his arrest, and constitute circumstances that were strongly corroborative of his intent to solicit his followers to levy war against the United States.

Fourth, Al-Timimi's provision of advice to Kwon and Hasan as to how best to evade law enforcement at the airport on their way to Pakistan constitutes further corroboration for his intent. After all, the only reason for Al-Timimi to counsel them as to how best to evade law enforcement was that he knew that they were embarking on illegal action.

Finally, Al-Timimi's intent to induce his audience to conspire to wage war against America is further corroborated by his email of October 21, 2001, in which he wrote that Muslims were obligated to support Mullah Omar, the Taliban, "and the Arabs with them" with their bodies, their wealth, and their words. GX 10D19. And, of course, he publicly characterized the United States as the greatest enemy of Islam, and called for its destruction. JA1840 (Wyman); JA3200 (GX 7A39a). Those messages constituted circumstances that were strongly corroborative of his intent to solicit his followers to levy war against the United States.

Accordingly, the evidence established that circumstances existed that were strongly corroborative of Al-Timimi's intent to solicit his followers to levy war against the United States.

### B. Sufficient evidence supports Al-Timimi's conviction on Count 3 for seditious conspiracy.

Next, Al-Timimi challenges his conviction on Count 3 for aiding and abetting a seditious conspiracy, claiming there was insufficient evidence of a conspiracy

targeting "the Government of the United States" under 18 U.S.C. § 2384. But Al-Timimi's argument regarding the reach of Section 2384 is wrong. By the language of the statute, the object of a seditious conspiracy does not have to be domestic. The geographic limitation in Section 2384 relates to the place of the conspiracy, not the place where the object of the conspiracy is to occur.

"[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980). Statutory construction begins with examining the language of the statute, and when the language is clear, the judicial inquiry "in all but the most extraordinary circumstance, is finished." *United States v. Ahmad,* 213 F.3d 805, 810 (4th Cir. 2000).

The statute provides:

> If two or more persons in any State or Territory, or in any place subject to the jurisdiction of the United States, conspire to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof, they shall each be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 2384.

By its terms, the statute plainly encompasses only conspiracies that occur within the United States or "any place subject to the jurisdiction of the United States." That said, the statute just as plainly places no geographic limitation on the location where actions in furtherance of the conspiracy are to occur - - *i.e.*, where war is to be levied against the United States, or the authority of the United States is to be opposed by force.

Courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997). "It is a fundamental principle of statutory interpretation that "absent provision[s] cannot be supplied by the courts." *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020). "Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so." *Brogan v. United States*, 522 U.S. 398, 408 (1998). In light of these principles, Al-Timimi's argument to engraft a limitation onto Section 2384 should be rejected.

Al-Timimi also argues that Section 2384 encompasses a conspiracy directed at the United States government but not against its military. Def. Br. 73. A conspiracy to levy war against the United States government implicitly encompasses an agreement to wage war against the United States military; after all, it is through the United States military that the United States government would fight against those who would levy war against it.

70

Further, a conspiracy started in America to levy war against the United States government is a seditious conspiracy regardless of where the war is to take place. To claim otherwise would be to contend that a conspiracy planned in America to bomb the federal building in Oklahoma City in 1995 could constitute a seditious conspiracy in violation of 18 U.S.C. 2384, but a similar conspiracy planned in America to bomb the U.S. military housing facilities at Khobar Towers in Saudi Arabia in 1996 could not.

Al-Timimi's textual comparison of Sections 2381 and 2384 also is misguided. Def. Br. 74. Section 2384 applies only where the conspiracy occurs in the U.S. or subject to its jurisdiction, while Section 2381 applies wherever a defendant "owing allegiance to the United States" acts.

To support his argument that Section 2384 applies only domestically, Al-Timimi relies on *dicta* from *United States v. Rodriguez*, 803 F.2d 318 (7th Cir. 1986), in which the Seventh Circuit distinguished the elements of Section 2384 from those of Section 2381. Def. Br. 74. In that case, the issue of whether Section 2384 reached beyond the territorial limits of the United States was not before the court. Yet, in passing, the *Rodriguez* court stated that, in contrast to Section 2381, Section 2384 "does not extend beyond United States jurisdictional boundaries." That appears to be imprecise language, in the sense that, by its terms, Section 2384 criminalizes only conspiracies *some part of which* occur within U.S. jurisdiction. In contrast,

71

Section 2381 criminalizes conduct anywhere it occurs - - so long as it is committed by a U.S. person.

"Tokyo Rose" was an American woman of Japanese descent who was convicted of treason following her broadcasts on Radio Tokyo during World War II. She was guilty of treason, even though her actions took place outside the United States. *D'Aquino v. United States*, 192 F.2d 338 (9th Cir. 1951). It is possible, however, that had she been in a conspiracy with another American in Japan at the time, Section 2384 would not have applied to her, because such a conspiracy took place only outside the United States. *Id.* at 352.

In Al-Timimi's case, however, part of the conspiracy clearly took place *inside* the United States. For example, when they all were in Virginia on September 16, 2001, Royer provided Kwon, Hasan, and Khan with contact information for LET. Further, just days later, Kwon and Hasan discussed with Al-Timimi in Virginia the cover story they had agreed to use to get through security at the airport on their way to Pakistan. Accordingly, the statute did apply to him, and the Court should sustain the jury's verdict.

Al-Timimi's suggestion that Section 2384 does not contemplate the presence of an enemy foreign state or an actual war, Def. Br. 74, presumably refers to the fact that the statute, unlike Section 2381, applies to situations *beyond* war. Nevertheless,

the text of Section 2384 clearly includes "levying war" as a prohibited object of the conspiracy.

In passing, Al-Timimi suggests that the district court incorrectly instructed the jury on Count 3.  *See* Def. Br. 75.  But Al-Timimi did not object to the instructions regarding the Section 2384 count, so any instructional error is reviewed for plain error. In light of the paucity of authority on the point, if there was any error, it certainly was not "plain."

### C. Sufficient evidence supports Al-Timimi's convictions on Counts 4 and 5.

Counts 4 and 5 charged Al-Timimi with attempting to contribute services to the Taliban and inducing others to attempt to aid the Taliban, respectively, both in violation of 50 U.S.C. § 1705 and associated regulations and executive orders.  Al-Timimi asserts four challenges to these convictions, none of which establishes reversible error.

#### 1. Al-Timimi took substantial steps toward providing assistance to the Taliban

Al-Timimi argues that the government failed to prove that he attempted to provide assistance to the Taliban because everything that he did was "mere preparation."  *See* Def. Br. 91.  This argument neglects the facts that were established at trial.

The distinction between "mere preparation" and a "substantial step" under federal attempt law "is inherently fact-intensive." *United States v. Pratt*, 351 F.3d 131, 136 (4th Cir. 2003). If "preparation comes so near to the accomplishment of the crime that it becomes *probable* that the crime will be committed absent an outside intervening circumstance, the preparation may become an attempt." *Id.*

"[W]hile words and discussions would usually be considered preparations for most crimes, a specific discussion could be so final in nature that it left little doubt that a crime was intended and would be committed," thus constituting a substantial step. *Id.* This perfectly captures the import of the key meeting led by Al-Timimi on September 16, 2001. After all, the discussion at the meeting was so final in nature that, immediately after the meeting, Kwon, Hasan, Aatique, and Khan quit their jobs, abandoned their families, and left for Pakistan to levy war against America. JA1429 (Kwon); JA3220 (Aatique).

At trial, there was ample evidence that Al-Timimi took substantial steps to assist the Taliban, including:

- Calling Kwon to arrange to speak to the group at Kwon's house on September 16;

- Traveling to Kwon's house to speak to the group on September 16;

- Swearing the group at Kwon's house on September 16 to secrecy, and instructing them to close the curtains, unplug the answering machine, and turn off their phones;

74

- Telling the group at Kwon's house on September 16 that it was obligatory for them to leave the United States and join the mujahideen;

- Telling the group at Kwon's house on September 16 that their obligation to fight in Afghanistan now was so compelling that they did not have to first pay off their loans or even tell their parents where they were going;

- Telling the group at Kwon's house on September 16 that they should get combat training through LET in Pakistan, and that Royer could help arrange that for them;

- Asking Kwon and Hasan to join him for lunch on September 19;

- Advising Kwon and Hasan at their lunch on September 19 as to how to avoid detection at the airport, and how to react if they were stopped.

This is not a case of a man with a mask and a gun sitting in a car outside a bank, charged with attempted bank robbery; in that case, a substantial additional step may be needed before we necessarily can say that a bank robbery was attempted, because the man ultimately may have decided to remain in the car, go home, and never rob the bank. *See, e.g., United States v. Buffington,* 815 F.2d 1292, 1303 (9th Cir. 1987).

In *Buffington*, the Ninth Circuit reasoned that

> For conduct to be "strongly corroborative of the firmness of the defendant's criminal intent," [p]reparation alone is not enough, there must be some appreciable fragment of the crime committed, it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter, and the act must not be equivocal in nature.

*Buffington*, 815 F.2d at 1302.

Here, in contrast, Al-Timimi's statements and actions were not equivocal in nature, and they set in motion a series of events involving his followers that he could not have stopped upon reconsideration even had he wanted to. After all, on September 19, 2001, after Al-Timimi asked to see Kwon and Hasan for lunch, he advised them as to how best to evade security at the airport, and how to act if stopped by law enforcement authorities - - and they left for Pakistan the next day. JA1186 (Kwon).

Of course, by that time, Aatique and Khan had already arrived in Pakistan. JA3220. In the words of the Ninth Circuit in *Buffington*, the crime was already in "such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter." *Buffington*, 815 F.2d at 1302. For Al-Timimi, by that time, there was no longer any opportunity to "remain in the car, go home, and never rob the bank."

In sum, Al-Timimi's discussions with his followers in September 2001 were sufficiently specific and final in nature to leave no doubt that a crime was intended and would be committed - - thus constituting substantial steps. *Pratt*, 351 F.3d at 136.

<<

<<

<<

76

## 2. The district court did not plainly err in instructing on the meaning of "attempt"

Al-Timimi argues that, in the context of the conviction on Count 4, for attempting to contribute services to the Taliban, the district judge failed to properly define the word "attempt." The district judge instructed the jury as follows:

> And the word "attempt" is an ordinary word. It means try. That's not a fancy technical word. An attempt is an effort to do something or to try to do something.

JA2326. Al-Timimi argues today that the district judge should have defined "attempt" as a "substantial step towards the completion of a crime with the requisite mens rea," but, as Al-Timimi concedes, *see* Def. Br. 95, he did not ask for that definition at the trial in 2005. As a result, the question is considered for plain error. *Naum*, 134 F.4th at 240. There was none.

As an initial matter, the district court did not err. We do not disagree that the definition for "attempt" that Al-Timimi provides today is accurate, and perhaps more helpful than the instruction that actually was given 20 years ago. That being said, the actual instruction was perfectly accurate.

In any event, any error in the actual instruction was not "clear and obvious," and it would not have affected his substantial rights. After all, there was ample evidence that Al-Timimi took substantial steps in furtherance of his attempt to assist the Taliban, including the actions and statements listed in the previous section of this

brief related to his argument that the United States failed to prove that he took a substantial step in furtherance of his attempt to assist the Taliban. Consistent with the trial judge's instructions, those are examples of Al-Timimi making an effort to do something or to try to do something - - but they also are examples of the taking of substantial steps toward the completion of crimes with the requisite mens rea.

In short, the provision of the instruction in 2005 that Al-Timimi proposes today would not have resulted in a different verdict. *See, e.g., United States v. Lawson*, 810 F.3d 1032, 1041–42 (7th Cir. 2016) (concluding that "[t]he theoretical possibility of a conviction" on erroneous instruction grounds did not merit *vacatur* where "it appear[ed] beyond a reasonable doubt that the error complained of did not have any effect on the verdict"). Accordingly, even if the instruction constituted plain error, it should not now be corrected because it did not "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Naum,* 134 F.4th at 240.

### 3. Substantial evidence established that Al-Timimi knew that it was illegal to provide assistance to the Taliban

The jury also heard substantial evidence that Al-Timimi knew that it was illegal to provide assistance to the Taliban. The district judge clearly instructed the jury that, in order to convict Al-Timimi on Counts 4 and 5, it had to find beyond a

reasonable doubt that Al-Timimi knew what he was doing was illegal. In answering

a jury question, the district judge instructed:

> Your questions address both Count 4 and Count 5. To find the defendant guilty of Count 4 and Count 5, the government must prove beyond a reasonable doubt that the defendant knew what he was doing was illegal, all right? I hope that that answers your question. In other words, they must be able to prove that the defendant knew, all right?

JA2544.

Al-Timimi argues that there was no proof that he acted willfully, in that there

was no proof that he knew of the prohibition on providing support to the Taliban.

To the contrary, there was ample proof of such knowledge. SA Wyman testified that

Al-Timimi asserted that he was widely knowledgeable with respect to all matters

affecting the Islamic world; it defies credulity to assert that Al-Timimi's wide

knowledge somehow missed the sanctions against the Taliban. Obviously, the

sanctions imposed on the Taliban by the United States was a topic of interest in the

Islamic world, and Al-Timimi well knew about them.

Moreover, in Al-Timimi's article of March 7, 2001, entitled *Shaikh Ali Al-Timimi on the Taliban and the Statues*, Al-Timimi wrote that Muslims were

obligated to support the Taliban in everything that they did that was in accordance

with Islam. JA3260. In reaching that conclusion, Al-Timimi explicitly and

favorably referenced "Shaikh Ibn Uqla's recent fatwa." *Id.* The Uqla fatwa

referenced by Al-Timimi was entitled *Fatwa of Sheikh Hammoud Al-Uqlaa' on the Taliban*, from November 29, 2000. GX 7D13. In pertinent part, it stated:

> Amongst the evidences that the Taliban Government is a Shariah Government is the fact that the disbelieving countries who are enemies of Islam and the Muslims are hostile towards it, *have imposed economic boycott on it*, isolated it, and tightened their grips on it for no reason other than its adherence [to] the Deen of Islam.

*Id*. (emphasis added). If on no other basis, the jury reasonably could conclude that Al-Timimi knew from the Uqla fatwa of November 2000 that "the disbelieving countries" had imposed an economic boycott on the Taliban.

In any event, Al-Timimi did not have to know of the specific regulation prohibiting the provision of support to the Taliban, but only that providing such support was illegal. After all, Al-Timimi's attempt to provide support to the Taliban was designed to assist the Taliban in defending itself against the United States. In that context, his instructions at Kwon's house on September 16, 2001, to turn off the phones and close the blinds indicate that Al-Timimi well knew that what he was proposing was against the law.

Similarly, Al-Timimi's assertion at the September 16 meeting that what was said at that meeting must be held as an "amana", and his instruction to Khan to burn the Uqla fatwa after reading it, reflect that he knew of the criminality that he was inducing.

Al-Timimi's knowledge of the illegality of his actions also is demonstrated by his advice to Kwon and Hasan on September 19, 2001. As noted above, he contacted them and arranged to share lunch before they left. At the lunch, he advised them how best to evade airport security, and how to react if one was prevented from traveling to Pakistan but the other was not. As noted previously, the only reason for Al-Timimi to provide such advice to Kwon and Hasan was because he knew that they were embarking on an illegal course.

Finally, Royer was captured on tape telling Kwon that he promised Al-Timimi and swore that he would never tell what happened at that meeting. The fact that Al-Timimi accepted Royer's promise never to reveal what happened at that meeting indicates that Al-Timimi well knew that soliciting his listeners to go fight for the Taliban against the looming American invasion was against the law. Viewed in the light most favorable to the government, the evidence established that, when Al-Timimi attempted to provide support to the Taliban, and when he counseled and induced Kwon, Hasan, Aatique, and Khan to conspire to provide support to the Taliban, Al-Timimi knew that his actions were illegal.

### 4. The Court should decline to notice any multiplicity error in Counts 4 and 5

In the district court, Al-Timimi did not raise a multiplicity challenge to Counts 4 and 5. As a result, his appeal of this issue is subject to plain error review.

81

Timimi argues that the violation charged in Count 4 is a lesser-included offense of the violation charged in Count 5, and that the two offenses are multiplicitous for purposes of sentencing. If they are multiplicitous, then Al-Timimi could not be punished for violations of both Count 4 and Count 5. Even if there was a multiplicity error, however, it should not now be noticed.

As alleged in Count 4, Al-Timimi attempted to supply services to the Taliban by attempting to induce his followers to fight for the Taliban in Afghanistan. For his conviction on that count, Al-Timimi was liable as a principal, and he committed that offense regardless of whether any of his followers chose to follow his guidance. In contrast, his liability for the offense alleged in Count 5 was that of an accomplice; that offense occurred only after Aatique, Hasan, Khan, and Kwon themselves committed a separate crime by attempting to supply services to the Taliban. For Count 5, Al-Timimi could be guilty as an accomplice only after one of his followers committed that separate crime.

In any event, the sentences for the two convictions ran concurrently, and already have been served. In light of the validity of Al-Timimi's outstanding convictions on the most serious of charges, as well as the painstaking detail with which those convictions have been reviewed over the course of two remands spanning almost 20 years, any multiplicity error did not "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Naum,* 134 F.4th at 240.

### D. Sufficient evidence supports Al-Timimi's conviction on Count 6 for aiding and abetting a violation of the Neutrality Act.

Al-Timimi argues that insufficient evidence supports his conviction on Count 6 because the proof failed to establish that he did anything that constituted aiding and abetting a violation of the Neutrality Act, 18 U.S.C. § 960. The proof established that he certainly did so.

Section 960 makes it a crime to "knowingly begin[] or set[] on foot or provide[] or prepare[] a means for or furnish[] the money for, or take[] part in, any military or naval expedition or enterprise . . . against the territory or dominion of any foreign prince or state . . . with whom the United States is at peace."

It was undisputed at trial that, in September 2001, the United States was at peace with India and Russia. GX 7H17 and GX 7H18. The testimony of Kwon, Hasan, and Aatique  - -  as corroborated by the recordings of Royer, the testimony of Surratt, and the testimony of Gharbieh  - - established that in September 2001, Al-Timimi counseled and induced them to conspire to mount a military expedition against India or Russia, countries with whom the United States was at peace, in violation of the Neutrality Act.

Al-Timimi knew that the jihad trainees at LET camps likely would engage in combat against India. SA Wyman testified that Al-Timimi admitted sending to his brother the article about the American killed in action fighting for LET in Kashmir,

and admitted attending a dinner in the summer of 2000, at which Royer recounted Royer's own experiences at LET. Kwon testified that Al-Timimi introduced Royer to make those remarks, and at that dinner, said that LET was on the "sunnah." JA614, JA630-634; JA1263-1264. Kwon and Aatique both testified that, at that dinner, Royer described firing explosive mortar shells on Indian positions while a trainee at the LET camps. JA1262; JA3218.

As Aatique testified (and as Royer told Kwon in a recorded call), Al-Timimi told them to train at the LET camps in Pakistan. JA481 (Aatique). And, as the tapes of Royer's conversations with Kwon reflected, Al-Timimi told his listeners that they should join the mujahideen anywhere in the world if they could not fight against American troops expected to arrive in Afghanistan. JA953, JA959-960 (GX 1B1). The testimony of Kwon, Hasan, and Aatique established that they (as well as Khan) did, indeed, conspire to violate the Neutrality Act. Accordingly, the evidence established that Al-Timimi counseled and induced Kwon, Hasan, Aatique, and Khan to conspire to violate the Neutrality Act, and procured the commission of that offense.

### E. Sufficient evidence supports Al-Timimi's convictions on Counts 9 and 10, and that he knew in advance that Hasan and Kwon would possess explosives at the terrorist camps.

Al-Timimi devotes the majority of his brief to challenging the validity of his convictions on Counts 9 and 10 for inducing Kwon and Hasan to carry explosives at

LET camps, during the commission of federal felonies, in violation of 18 U.S.C. §§ 844(h).

Al-Timimi argues that, for purposes of culpability on Counts 9 and 10, his § 844(h) convictions are invalid under *Rosemond v. United States*, 572 U.S. 65 (2014), because, he claims, the government failed to prove that he knew in advance that Hasan and Kwon would possess explosives at the LET camps.[19] That claim flies in the face of the evidence, and *Rosemond* does not help him at all. To the contrary, the evidence established Al-Timimi's actual foreknowledge that Kwon and Hasan would carry explosives at the LET camps in Pakistan.

Al-Timimi admitted to the FBI that, before September 11, 2001, he regularly visited the LET website and was well aware of LET's tactics. Al-Timimi said that he knew that LET fired artillery shells into India, and attacked police stations, military camps, and civilian targets. JA1742-1743, JA1756-1758.

Al-Timimi admitted to the FBI that he received LET's Taiba Bulletin newsletter, and that such newsletters regularly contained military and battle reports. He admitted that he knew of the battle reports regarding LET's use of explosives to blow up bridges and buildings. JA1757-1758.

---

[19] Although *Rosemond* concerned aiding-and-abetting liability under § 924(c), § 844(h) was "modeled after" § 924(c). *United States v. Ressam*, 553 U.S. 272, 275 (2008). Accordingly, this Court has applied similar constructions to both statutes. *See, e.g.*, *United States v. Barnette*, 211 F.3d 803, 813 (4th Cir. 2000).

In fact, virtually every issue of the Taiba Bulletin in the year before September 11, 2001, contained reports of the use by LET of grenades, rockets, and other explosives. JA3132-3146; GX 1D24 (hand grenade attack); GX 1D25 (rocket attack); GX 1D26 (artillery shelling); GX 1D27 (land mine explosion); GX 1D28 (volleys of rockets); GX 1D29 (land mine explosion); GX 1D30 (bombs); GX 1D31 (rockets); GX 1D34 (grenade attack); GX 1D35 (rocket attack); GX 1D36 (grenade attack); GX 1D37 (rockets, grenades, and bombs); GX 1D38 (rocket attack); GX 1D39 (rocket and grenade launcher attack); GX 1D41 (landmine).

Al-Timimi admitted to the FBI that he knew that LET had camps in Pakistan intended to train fighters to fight in Kashmir, and that LET conducted training on weapons and military tactics that would enable its trainees to go fight in battle. JA1743. He admitted to the FBI that, in August 2001, he sent his brother an article that recounted the story of an American who died fighting for LET in Kashmir. JA1759, JA1772, JA1898. The article contained words the American wrote before his death about being with LET, in which he specifically enthused about finally achieving his goal of having "my grenades," and described how he and his fellows used grenade launchers. GX 10J11a.

Finally, Al-Timimi admitted to the FBI that he attended a dinner in the summer of 2000, at which Royer talked about Royer's experiences at LET. Kwon testified that Al-Timimi introduced Royer to make those remarks, and at that dinner,

said that LET was on the "sunnah." JA614, JA630-634. Kwon and Aatique both testified that, at that dinner, Royer described firing explosive mortar shells on Indian positions while a trainee at the LET camps. JA1262; JA3218. Kwon testified that Al-Timimi said that none of the audience should repeat anything that was said at the dinner to anyone outside of the people in attendance. JA654.

In short, the evidence was overwhelming that Al-Timimi knew that LET regularly used grenades, rockets, and other explosives - - and that its trainees did so as part of their training. Unlike in *Rosemond* - - when the accomplice may or may not have known whether the principal was going to use a firearm in the course of committing the underlying drug-trafficking crime - - in this case, the opportunity for Kwon and Hasan to handle explosives was inherent in the plan for them to obtain training at LET; it was, in fact, the *point* of why Al-Timimi recommended that they go to the LET camps in the first place.

Unlike in *Rosemond*, in this case, it was Al-Timimi who urged Kwon and Hasan to get training on using military weapons from LET in the first place, so it could not have been a surprise to him that, upon their arrival in Pakistan, they would actually obtain from LET the very training on military weapons that he recommended that they seek out in the first place.

In a case presenting a true *Rosemond* problem, the defendant agrees to participate in a crime (there, a drug deal), but maintains that he did not realize others

87

were going to use firearms. *Rosemond*, 572 U.S. at 71–72. But that kind of scenario, where a defendant honestly might not realize that weapons are part of the plot, is entirely different from the situation here.

By contrast, the entire point of Al-Timimi's exhortations was to send others abroad to garner the weapons training they would then use to kill Americans. And in that kind of case, there is simply no doubt that Al-Timimi understood, in advance, that weapons and explosives were going to be handled at the LET camps.

Al-Timimi's argument is akin to a crime boss who, in the course of planning for the robbery of an armored car, directs his underlings to practice setting off grenades in a remote quarry, so that they will be more likely to be able to disable the armored car when they see it. Then, when convicted on a theory of aiding and abetting the use of explosives at the quarry, he might argue that he could not possibly have known to a "practical certainty," *United States v. Spinney*, 65 F.3d 231, 237 (1st Cir. 1995), that the people whom he directed to train for the robbery would handle explosives at the quarry. That argument would readily be rejected; after all, he sent the underlings to the quarry in the first place for the purpose of enabling them to practice with grenades in preparation for the robbery. Al-Timimi's situation is no different.

Ultimately, Al-Timimi argues that a conviction for aiding-and-abetting another's handling of explosives requires that a defendant know to a "practical

certainty" that such explosives will be used during the contemplated offense. *United States v. Donel*, 211 F. App'x 180, 181 (4th Cir. 2006) (quoting *Spinney*, 65 F.3d at 237. Def. Br. 51. *Spinney* itself, however, went on to explain "that a conviction can be grounded on something less than actual knowledge," such as evidence proving "that the defendant knew the salient details of the plot." 65 F.3d at 237. *Rosemond* likewise embraced that "the factfinder can draw inferences about a defendant's intent based on all the facts and circumstances of a crime's commission." 572 U.S. at 78 n.9. Here, Al-Timimi well understood from the start that Kwon and Hasan would handle explosives, and his original purpose in urging Kwon and Hasan to get training from LET in Pakistan was so that they could gain experience in the use of firearms and explosives, that later could be used against American troops in Afghanistan.

Proof of advance knowledge under *Rosemond* need not rely on direct evidence, so long as, under a "deferential review of the jury's findings, [the Court] can conclude [that] a rational trier of fact could have concluded that this element of the crime had been proven beyond a reasonable doubt." *United States v. Benson*, 957 F.3d 218, 238 (4th Cir. 2020). This is such a case. A rational jury could have concluded that by directing his followers to train at the LET camps in preparation to fight Americans, Al-Timimi understood in advance that those men would gain proficiency in LET's signature tactics - - the use of automatic weapons and explosives.

89

In *Benson*, this Court noted that "[o]ther circuits have concluded that where there is evidence that a defendant extensively participated in the planning of a robbery of the type that would generally necessitate the use of firearms, such evidence is sufficient to fulfill this requirement." *Id.* Here, there is evidence that Al-Timimi participated in the planning of travel to a terrorist camp to get trained on military weapons, knowing that the camp had previously used such weapons as rocket launchers, artillery, and grenades.

In this case, the jury considered the evidence carefully. After long deliberations and several thoughtful questions, it returned its verdicts. Because a rational jury could have concluded that, by directing his followers to train at the LET camps to gain experience in military weaponry as preparation to fight Americans expected to invade Afghanistan, Al-Timimi understood in advance that those men would carry explosives, he is not entitled to the relief he now seeks.

1. **The district judge properly instructed the jury that Al-Timimi could be guilty of Counts 9 and 10 only if he knew in advance that Kwon and Hasan would possess explosives at the terrorist camps**

Because Al-Timimi failed to object to this instruction at trial, he correctly concedes, *see* Def. Br. 53–54, that whether the district court erred in its instruction to the jury on the knowledge that Al-Timimi was required to have to be culpable for aiding and abetting the use of explosives by Kwon and Hasan is reviewed for plain

error. *Naum*, 134 F.4th at 240. Under plain-error review, the defendant must show that the court's jury instructions not only included an error, but also that the error was "clear and obvious," and that the error impacted the outcome of the district court proceedings. *Id.* Further, even if these elements are met, this Court does not correct the plain error unless the error "seriously affects the fairness, integrity or public reputation of judicial proceedings. *Id*.

In this case, the district court did not err because its charge to the jury substantially covered the advance knowledge requirement. Al-Timimi concedes that the district judge did, in fact, instruct the jurors that, to convict on the explosives counts, "the government must prove that the defendant *knew* that Kwon or Hasan intended to undertake the . . . unlawful carrying of explosives in furtherance of a felony crime, Counts 9 and 10, and intended to help their actions succeed." JA2457 (emphasis added). Def. Br. 53. He argues, however, that the import of that instruction was undercut by a separate instruction in which the district judge later instructed that it was "sufficient that the defendant knew that an explosive was at least available to the other person. . ." *Id*.

The instruction cited by Al-Timimi was focused not on the requirement of the defendant's knowledge, but on the principle that he could be liable as an aider and abettor even if he was not physically present when the explosives were used. JA2483-2484. Nevertheless, even if this instruction introduced any ambiguity, a jury

91

that followed both instructions could have convicted only after finding that Al-Timimi knew that explosives would be available to Kwon and Hasan, *and* that they would use them.

The snippet of instruction upon which Al-Timimi now focuses was just a small part of the relevant instructions, which, as a whole, clearly conveyed the advance knowledge requirement. First, the court instructed the jury on the general requirements for aiding-and-abetting liability:

> In order to aid or abet another to commit a crime, it is necessary that the defendant knowingly associate himself in some way with the crime and that he participate in the crime by doing some act to help make the crime succeed.
>
> To establish that a defendant knowingly associated himself with the crime, the government must establish that the defendant *knew of the illegal activity* and intended to help the activity succeed. The necessary knowledge and intent depend upon the essential elements of the crime which the defendant is alleged to have aided and abetted.

JA2455–2456 (emphasis added).

For Counts 9 and 10, the illegal activity of which Al-Timimi was required to know was the conspiracy to levy war against the United States, in the preparation for which Kwon and Hasan would obtain training in firearms and explosives at the very LET training camps which Al-Timimi induced them to attend in the first place. In light of this instruction, the jury could not have convicted Al-Timimi without first finding that he *knew* of the possession of explosives in the first place.

Next, the court instructed the jury regarding the specific requirements to find Al-Timimi guilty as an aider and abettor on the firearms and explosives counts:

> As for Counts 7 through 10, the government must prove that the defendant *knew that Kwon or Hasan intended to undertake the unlawful possession of firearms* in furtherance of crimes of violence, which is Counts 7 and 8, or unlawful carrying of explosives in furtherance of a felony crime, Counts 9 and 10, and intended to help their actions succeed.

JA2457 (emphasis added). Thus, the district court repeatedly instructed the jurors that, in order to convict Al-Timimi on Counts 7 and 8 and Counts 9 and 10, they had to conclude that Al-Timimi knew that Kwon and Hasan would carry firearms and explosives, respectively.

Still, the district court further instructed:

> In addition, to establish that the defendant aided or abetted the commission of the specific crime charged in Counts 1, 3, and 5 through 10, the government must prove beyond a reasonable doubt that defendant engaged in some affirmative conduct or overt act *for the specific purpose of bringing about that crime* and that the particular crime was, in fact, committed.

JA2457 (emphasis added). Once again, the illegal activity of which Al-Timimi was required to know was the conspiracy to levy war against the United States, in the preparation for which Kwon and Hasan would obtain training at the very LET training camps which Al-Timimi induced them to attend. In light of this instruction, the jury could not have convicted Al-Timimi without first finding that he acted for

93

the specific purpose of bringing about the possession of explosives by Kwon and Hasan.

Further, the district court provided a rubric for the jury to apply in evaluating Al-Timimi's liability as an aider and abettor:

> To determine whether the defendant aided or abetted the commission of the crimes charged in Counts 1, 3, and 5 through l0, ask yourself these questions in relation to each count:
>
> Did he -- did the defendant participate in the specific crime charged in the respective count *as something he wished to bring about?*
>
> Did he knowingly associate himself with the criminal venture?
>
> Did he seek by his actions to make the criminal venture succeed?
>
> If he did, then the defendant is an aider and abettor and therefore guilty of the offense. If on the other hand your answer to any of these questions is no, then the defendant is not an aider and abettor.

JA2458 (emphasis added). In light of this instruction, the jury could not have convicted Al-Timimi without first finding that Kwon and Hasan obtaining training with explosives at the LET camps was something that Al-Timimi wished to bring about.

The jury instructions expressly required the jury to conclude - - in keeping with *Rosemond* - - that the defendant understood, in advance, that others were going to carry explosives in furtherance of federal felonies. The key instructions

comprise multiple transcript pages and deploy a series of elaborate hypotheticals to underscore the importance of advance knowledge. JA2458-2460. On their face, these instructions satisfy *Rosemond* and cases applying it. *United States v. Garcia,* 752 F.3d 382, 389 n.6 (4th Cir. 2014) (aiding-and-abetting liability arises when a defendant "knowingly associated himself with and participated in the criminal venture," *citing*, among other cases, *Rosemond*); *accord United States v. Oloyede*, 933 F.3d 302, 317 (4th Cir. 2019) (sustaining a similar jury instruction post-*Rosemond*).

As the Fourth Circuit explained in *Oloyede*, a *Rosemond* error occurs when a district court's instructions permit the jury to impose aiding-and-abetting liability in the absence of a finding that the defendant knew, in advance, that the substantive offense would occur, as opposed to that the predicate offense would occur. *See* 933 F.3d at 317. But here, the district court was explicit that Al-Timimi could be found guilty only if the jury found that he knew about the possession of explosives as charged in Counts 9 and10. Consistent with *Oloyede*, that instruction was *Rosemond*-compliant.

In short, in order for a *Rosemond* error to have occurred here, the jury would need to have listened to these instructions and found Al-Timimi guilty on Counts 9 and 10 without concluding that he knew, in advance, that Kwon and Hasan would get

trained at the LET camps to use firearms and carry explosives. But the district court's comprehensive instructions foreclosed that possibility.

When considering jury instruction challenges, this Court does not view a single instruction in isolation, but assesses the allegedly erroneous instruction in the context of the entire charge, and whether the instructions, taken as a whole, accurately and fairly state the controlling law. *Naum*, 134 F.4th at 240. Here, the district court's jury instructions complied with *Rosemond*, by requiring the jury to find that the defendant had advance knowledge that Kwon and Hasan would use firearms and explosives at the LET camps. JA2455. Taken as a whole, the instructions properly required the jury to find that Al-Timimi knew that Hasan and Kwon would handle the explosives that were the subject of Counts 9 and 10.

Even if the Court concludes that the instructions were deficient, however, any plain error did not affect Al-Timimi's substantial rights because it surely did not impact the outcome of the district court proceedings. *See, e.g., United States v. Prado,* 815 F.3d 93, 105 (2d Cir. 2016) (a *Rosemond* error did not affect a defendant's substantial rights where the court could not "say that there [was] a reasonable probability of a different outcome at trial had the jury been properly instructed"); *Lawson,* 810 F.3d at 1041-42 (same). Finally, any such error cannot be determined to have seriously affected "the fairness, integrity or public reputation of judicial proceedings." *Naum,* 134 F.4th at 240.

### 2. Alternatively, a reasonable jury could have convicted Al-Timimi under *Pinkerton*

Even if the Court concludes there is insufficient evidence to sustain Al-Timimi's convictions on Counts 9 and 10 under an aiding-and-abetting theory of liability, the Court should sustain his convictions on the alternate ground that he was liable as a coconspirator under *Pinkerton v. United States*, 328 U.S. 640 (1946). "Under the *Pinkerton* doctrine, defendants are vicariously liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy." *United States v. Gillespie*, 27 F.4th 934, 941 (4th Cir. 2022). Al-Timimi raises a series of inter-related arguments centered around the applicability of *Pinkerton*, none of which has merit.

### a. The Pinkerton doctrine applies

First, he argues that the *Pinkerton* doctrine is inapplicable to this case because the jury was not instructed as to *Pinkerton* liability. Def. Br. 56. In fact, the district judge instructed the jurors correctly as to *Pinkerton* liability.

The district court properly instructed the jury that, if it found that Al-Timimi was a member of a conspiracy charged in the indictment, then he would be liable as a member of that conspiracy. She instructed:

> As to each conspiracy charged, if you find beyond a reasonable doubt that the defendant whose guilt you are considering was a member of the conspiracy charged in the indictment, then any acts done or statements made in furtherance of the conspiracy by

97

> persons also found by you to have been members of that
> conspiracy may be considered against the defendant. This is so
> even if such acts were done and statements were made in the
> defendant's absence and without his knowledge

JA2446.  That instruction was correct, and Al-Timimi cannot now dispute its accuracy.  In any event, Al-Timimi did not object to it at trial.

Second, Al-Timimi argues that he could not be liable under *Pinkerton* because he was charged only with aiding and abetting conspiracies, and not as an actual member of a conspiracy.  Def. Br. 57.  While it is correct that the indictment alleged - - and the government argued at trial - - that Al-Timimi should be convicted as an aider and abettor, the jury properly could find him guilty as a principal.  The *Pinkerton* doctrine "need not be charged in the indictment, even when it later acts as the legal basis for the defendant's conviction."  *United States v. Blackman,* 746 F.3d 137, 141 (4th Cir. 2014).  As this Court has held, the fact "that a party did not pursue a particular theory does not preclude the trial judge from giving an instruction on that theory where it deems such an instruction to be appropriate."  *United States v. Horton*, 921 F.2d 540, 546 (4th Cir. 1990).

In *Horton*, this Court ruled that the trial judge was not precluded from giving an instruction on a theory of aiding and abetting even though the government's theory at trial was that the defendant was liable as a principal:

> In Horton's view, the government's tactical decision to try the
> case in this manner prevented it from requesting an aiding and

98

abetting instruction, even if there was sufficient evidence to support it. While appellant correctly states that when a party chooses not to advance a particular theory, it is not entitled to an instruction on that theory even if there is evidentiary support for the theory in the record, the court is not precluded from giving any instruction for which there is evidentiary support. *The fact that a party did not pursue a particular theory does not preclude the trial judge from giving an instruction on that theory where it deems such an instruction to be appropriate.*

*Id.* at 544 (emphasis added). *See also United States v. Sirois*, 87 F.3d 34, 43 (2d Cir. 1996) (affirming conviction where government argued that defendant was liable as a principal and as an aider and abettor, because "a jury may consider alternate theories of criminal liability").

In *United States v. Ali*, 991 F.3d 561 (4th Cir. 2021), the defendant argued that there was uncertainty as to whether the jury found him guilty of the § 924(c) counts on a conspiracy theory or an aiding and abetting theory. This Court noted that, although it did not know for certain which theory of guilt the jury accepted, such ambiguity is insufficient under plain error review. This Court stated:

As we have frequently explained, a showing of uncertainty as to "whether the verdict returned by the jury rested solely on the mis- instruction" does not meet the defendant's burden of establishing actual prejudice under the third *Olano* prong.
.

(internal citations and quotations omitted). *Ali,* 991 F.3d at 575 (*citing to United States v. Olano,* 507 U.S. 725 (1993)).

In short, *Pinkerton* provides an independent basis to sustain the defendant's convictions on Counts 3, 5, 9, and 10. *Blackman,* 746 F.3d at 141 ("Because we find Blackman's conviction appropriate under *Pinkerton,* we need not address aiding and abetting liability as an alternate basis of conviction").

Nor, as Al-Timimi claims, is holding him liable under *Pinkerton* inconsistent with *Rosemond.* As discussed *supra*, *Rosemond* holds that, to be guilty of aiding and abetting a violation of 18 U.S.C. § 924(c), a defendant must have "advance knowledge of a firearm's presence." 572 U.S. at 81. Because the defendant in *Rosemond* did not face *Pinkerton* liability, the Supreme Court did not address *Pinkerton* liability.[20]

Third, Al-Timimi argues that aiding and abetting a conspiracy does not establish the agreement necessary for *Pinkerton* liability. Def. Br. 63. In light of the

---

[20] The firearms charge in *Rosemond* was predicated only on a substantive crime:

> Count II specifically charged that Rosemond, "during and in relation to the drug trafficking offense set forth in Count I [possessing marijuana with the intent to distribute it], did knowingly use, carry, brandish and discharge a firearm, to wit, a 9mm handgun, and did aid and abet therein; in violation of 18 U.S.C. § 924(c)(1)(A) and 18 U.S.C. § 2."

*United States v. Rosemond,* 695 F.3d 1151, 1153 (10th Cir. 2012), *rev'd, Rosemond v. United States*, 572 U.S. 65 (2014). As a result - - and unlike Al-Timimi - - the defendant in *Rosemond* did not face *Pinkerton* liability.

text of 18 U.S.C. § 2, however, that argument cannot succeed.  After all, Section 2 plainly states that "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."  Section 2 does not create a separate crime. It simply makes an aider and abettor liable as a principal, and one who aids and abets a violation of a statute has violated that statute. *Nye & Nissen v. United States*, 336 U.S. 613, 618-20 (1949).

"Aiding and abetting is simply an alternative theory of liability indistinct from the substantive crime."  *United States v. Richardson*, 948 F.3d 733, 741–42 (6th Cir. 2020), *quoted in Ali,* at 991 F.3d at 574.  Further, "the acts of the principal become those of the aider and abettor as a matter of law."  *In re Colon*, 826 F.3d 1301, 1305 (11th Cir. 2016), quoted in *Ali,* 991 F.3d at 574.  Accordingly, Al-Timimi is liable for the handling of explosives by Kwon and Hasan independently of *Rosemund,* because, by application of 18 U.S.C. 2 and *Pinkerton*, he is liable as a principal for the reasonably foreseeable consequences of the conspiracies that he induced.  After all:

1. Kwon and Hasan were members of the conspiracies to commit sedition (Count 2) and violate the Neutrality Act (Count 6) that Al-Timimi was convicted of aiding and abetting;

2. In furtherance of conspiracies to commit sedition (Count 2) and violate the Neutrality Act (Count 6) - - that Al-Timimi was convicted of aiding and abetting - -  Kwon and Hasan handled explosives at the LET camps;

3. Pursuant to 18 U.S.C. § 2(a), a defendant who aids and abets a criminal offense is liable as a principal of that offense;

4. Pursuant to 18 U.S.C. § 2(a), a defendant who aids and abets a criminal conspiracy is liable as a principal of that criminal conspiracy;

5. Pursuant to *Pinkerton*, a principal of the conspiracies to commit sedition (Count 2) and violate the Neutrality Act (Count 6) - - that Al-Timimi was convicted of aiding and abetting - - would be subject to liability for the reasonably foreseeable actions of Kwon and Hasan in furtherance of those conspiracies; and

6. The handling of explosives by Kwon and Hasan in furtherance of the conspiracies to commit sedition (Count 2) and violate the Neutrality Act (Count 6) - - that Al-Timimi was convicted of aiding and abetting - - was reasonably foreseeable to Al-Timimi.

Accordingly, because Al-Timimi induced the conspiracies to commit sedition (Count 2) and violate the Neutrality Act (Count 6), he is subject to *Pinkerton* liability as a principal for the handling of explosives by Kwon and Hasan. That liability, under *Pinkerton,* is a basis to sustain his convictions under Counts 9 and 10 that is independent of the more straightforward application of the "aiding and abetting" language of Section 2. *United States v. Hare*, 820 F.3d 93, 105 (4th Cir. 2016) (a firearm conviction may be valid under the *Pinkerton* doctrine even assuming a *Rosemond* error).

Finally, Al-Timimi argues that aiding and abetting a conspiracy is not a crime. Def. Br. 65. As a matter of law, he is incorrect. "Federal law allows for the crime of aiding and abetting a conspiracy." *United States v. Marino*, 277 F.3d 11, 30 (1st Cir.

2002). *See United States v. Oreto,* 37 F.3d 739, 751 (1st Cir. 1994) ("most if not all courts to consider the issue have held that a defendant may be convicted of aiding and abetting a conspiracy."); *United States v. Rodriguez*, 609 F. App'x 8 (1st Cir. 2015) (*Oreto* is still good law and "has never been "called into serious question").

In *Marino*, the First Circuit explained that federal courts and commentators "have stated the concern that without a rule which allows for conviction for aiding and abetting a conspiracy, people who knowingly help an illegal conspiracy would go unpunished." *Id. See, e.g., United States v. Rodriguez-Lopez*, 756 F.3d 422, 433 (5th Cir. 2014) (upholding conviction for aiding and abetting a conspiracy); *United States v. Hosseini,* 679 F.3d 544, 559 (7th Cir. 2012) (same); *United States v. Langston*, 970 F.2d 692, 705–06 (10th Cir.1992) (sustaining a conspiracy conviction where the jury was instructed to consider finding the defendants guilty either as principals in the conspiracy or as aiders and abettors to the conspiracy); *United States v. Lane*, 514 F.2d 22, 27 (9th Cir. 1975) (same). *But see United States v. Ulbricht*, 2015 WL 413426, at *5-6 (S.D.NY. Feb. 2, 2015) ("'aiding and abetting a conspiracy' is not a valid theory of liability").

Because Al-Timimi did not object to any *Pinkerton* instruction at trial, the review on appeal is for plain error. *Naum,* 134 F.4th at 240. Any error in the actual instruction was not "clear and obvious," and it would not have affected his substantial rights. Accordingly, even if the instruction constituted plain error, it

103

should not now be corrected because it did not "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Id*.

### b. Dismissal of Count 1 has no effect on Counts 9 and 10

Alternatively, Al-Timimi argues that, even if *Pinkerton* applies, his convictions on Counts 9 and 10 are nonetheless invalid because the jury could have convicted him on an invalid theory of liability. Where the defendant did not raise this argument in the district court, whether Counts 9 and 10 should be dismissed on the grounds that Count 1 was not a crime of violence is evaluated for plain error. *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (harmless or plain error analysis is mandated in the "context of a jury instructed on multiple theories of guilt, one of which is improper" and one of which is proper).

In Counts 9 and 10, Al-Timimi was convicted of aiding and abetting the carrying of rocket-propelled grenades at LET camps in Pakistan by Kwon and Hasan, during the commission of federal felonies. In its instructions, the court identified for the jury 16 different federal felonies that could constitute predicate offenses sufficient to support conviction on Counts 9 and 10:

1. Levying war against the United States in violation of Title 18, United States Code, sections 2381;

2. Conspiring to Levy war against the United States in violation of Title 18, United States Code, section 2384;

3. Attempting to supply services to the Taliban, in violation of Title 50, United States Code, section 1705;

104

4. Conspiring to supply services to the Taliban, in violation of Title 50, United States Code, section 1705;

5. Beginning, providing for, preparing a means for, and taking part in military expeditions and enterprises to be carried on from the United States against the territory and dominion of foreign states, districts, and peoples with whom the United States was at peace, in violation of Title 18, United States Code, section 960;

6. Conspiring to begin, provide for, prepare a means for, and take part in military expeditions and enterprises to be carried on from the United States against the territory and dominion of foreign states, districts, and peoples with whom the United States was at peace, in violation of Title 18, United States Code, sections 371 and 960;

7. Enlisting and entering oneself or another to go beyond the jurisdiction of the United States with intent to be enlisted and entered in the service of any foreign prince, state, colony, district, and people as a soldier, in violation of Title 18, United States Code, sections 959;

8. Conspiring to enlist and enter oneself or another to go beyond the jurisdiction of the United States with intent to be enlisted and entered in the service of any foreign prince, state, colony, district, and people as a soldier, in violation of Title 18, United States Code, sections 371 and 959;

9. Conspiring to commit at any place outside the United States acts that would constitute the offense of murder or maiming if committed in the special maritime and territorial jurisdiction of the United States, in violation of Title 18, United States Code, section 956(a);

10. Conspiring to damage or destroy specific property situated within a foreign country and belonging to a foreign government or to any political subdivision thereof with which the United States is at peace, and any railroad, canal, bridge, airport, airfield, and other public utility, public conveyance, and public structure and any religious, educational, and cultural property so situated, in violation of Title 18, United States Code, section 956(b);

11. Attempting to provide material support and resources, knowing or intending that they are to be used in preparation for or in carrying out a violation of section 956 of Title 18, United States Code, in violation of Title 18, United States Code, section 2339A;

12. Conspiring to provide material support and resources, knowing or intending that they are to be used in preparation for or in carrying out a

violation of section 956 of Title 18, United States Code, in violation of Title 18, United States Code, section 2339A;

13. Attempting to provide material support and resources to Al-Qaeda, in violation of Title 18, United States Code, section 2339B;

14. Conspiring to provide material support and resources to Al-Qaeda, in violation of Title 18, United States Code, section 2339B;

15. Enlisting and engaging with intent to serve in armed hostility against the United States, in violation of Title 18, United States Code, section 2390; and

16. Conspiring to enlisting and engage with intent to serve in armed hostility against the United States, in violation of Title 18, United States Code, sections 371 and 2390.

JA2464-2466. The court further instructed the jury that it "may unanimously find more than one crime of violence or federal felony; however, to satisfy that element, the jury must unanimously find at least one such crime for each count." JA2466-2467.

After long deliberations, the jury returned verdicts of guilty on all counts. In light of that verdict, it was "crystal clear" that the jury had determined that Kwon and Hasan carried the rocket propelled grenades in furtherance of multiple federal felonies - - including the ones that Al-Timimi was convicted of inducing them to undertake. JA2558. Accordingly, when the Court asked for the position of the parties as to the necessity of a special verdict for the jury to specify which of the possible predicate federal felonies it used to convict the defendant on Counts 9 and 10, the defense agreed that no such special verdict form was necessary. JA2558,

JA2981. *See, e.g., United States v. Udeozor*, 515 F.3 260, 271 (4th Cir. 2008) (whether to use a special verdict form "is a matter of the district court's discretion").

Nineteen years later, Al-Timimi's conviction on Count 1 was vacated on the grounds of the constitutional infirmity of 18 U.S.C. § 924(c)(3)(A). Now, Al-Timimi argues that, because Count 1 has been dismissed on *Davis* grounds, his convictions on Counts 9 and 10 must be dismissed as well, because they may have rested on his conviction on the now-vacated Count 1. Def. Br. 68-72. As this Court recently wrote in rejecting a similar argument, "[o]ur precedent forecloses this argument." *Fulks,* 128 F.4th at 162.

A § 844 conviction is valid "even if the jury based its verdict on an invalid predicate, so long as the jury also relied on a valid predicate." *United States v. Tipton*, 95 F.4th 831, 844 (4th Cir. 2024) (referring to a § 924(c) conviction). Further, where a verdict form does not specify which of multiple predicates a jury relied upon in finding the defendant guilty, the conviction will be upheld unless the defendant shows "more than a reasonable possibility" that the conviction rested solely on an invalid predicate offense. *Fulks,* 128 F.4th at 162. "Mere uncertainty," "speculation," or "ambiguity" as to which predicate the jury relied on are not enough to undermine the verdict. *Id.*

In *United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010), this Court reviewed a § 924(c) conviction with one proper and one improper jury instruction on

107

plain error. As recounted in *Ali,* this Court held that "the defendant bears the burden of showing that the erroneous instruction given resulted in his conviction, not merely that it was impossible to tell under which prong the jury convicted." *Ali,* 991 F.3d at 575 (internal quotations and citations omitted).

Moreover, if the trial evidence shows that the two predicate offenses were "inextricably intertwined," then any error was harmless. *Fulks,* 128 F.4th at 162. In *Fulks*, the appellants argued that their § 924 convictions were invalid because, even though those convictions might have been based on their convictions for carjacking (which was categorically a "crime of violence"), they might also have been based on their convictions for kidnapping (which was not). *Fulks,* 128 F.4th at 161.

This Court rejected that argument because the carjacking and kidnapping offenses were intertwined and committed simultaneously, so that the idea that the convictions might have rested solely on kidnapping was untenable. *Id.* Indeed, this Court wrote that it was

> nonsensical to claim that kidnapping was the sole predicate offense because the carjacking and the kidnapping happened in one fell swoop. The time, the location, and the victim were so intertwined that one cannot separate one offense from the other.

*Id.* at 163. There was "no reasonable possibility that the jury based its § 924 verdicts solely on the kidnapping predicate." *Id.* at 162.

The same analysis applies to Al-Timimi's case. As in *Fulks*, the idea is nonsensical that the Al-Timimi jury based its conclusion that the § 844 offenses committed by Kwon and Hasan were predicated on the offense charged in Count 1 of the indictment (that was not identified for them by the judge as a predicate for Counts 9 and 10), rather than any of the 16 offenses that the judge did identify for them as available predicates. Indeed, there was "no reasonable possibility" that the jury based its § 844 verdicts solely on the "Count 1" predicate. *Fulks,* 128 F.4th at 162.

As set forth above, when the district judge instructed the jury on the 16 possible federal felonies upon which convictions for Counts 9 and 10 could be predicated, the violation charged in Count 1 was not even one of them. Further, Al-Timimi cannot now fault the court's failure to obtain a special verdict to clarify the predicates found by the jury, because he waived any right to such a form. JA2558.

Moreover, even 20 years later, Al-Timimi's convictions remain valid for inducing others to conspire to levy war against the United States (Count 3), inducing others to aid the Taliban (Count 5), and inducing others to conspire to violate the Neutrality Act (Count 6). Inasmuch as it was obvious that, to predicate its verdicts on Counts 9 and 10, the jury found multiple predicate felonies that remain valid, there is no basis to challenge Counts 9 and 10 today. Considering the overwhelming weight of the evidence the government presented at trial, the defendant cannot meet

his burden of establishing that the outcome would have been different absent the improper instruction.

Alternatively, the Court can reject Al-Timimi's argument because the district court vacated Count 1 on a theory that did not, in fact, render it invalid. This Court is "entitled to affirm on any ground appearing in the record, including theories not relied upon or rejected by the district court." *United States v. Flores-Granados*, 783 F.3d 487, 491 (4th Cir. 2015).

Count 1 charged Al-Timimi with counseling and inducing a conspiracy to use firearms in furtherance of crimes of violence, in violation of 18 U.S.C. § 924(n) (1998).[21] The district court correctly found that, even though levying war, in violation of Section 2381, did constitute a "crime of violence" for purposes of Section 924(c), such a violation could not predicate the completed § 924(c) violations alleged in Counts 7 and 8, because the government had neither alleged nor proved that any such substantive violations of Section 2381 actually had been committed. JA2997.

In doing so, however, the district court wrongly included Count 1 among the counts to be dismissed. After all, Count 1 alleged a *conspiracy* to commit a "crime of violence;" and the conspirators obviously had *conspired* to levy war against the

---

[21] Section 924(n) was the precursor to the present-day § 924(o), which makes it a crime to "conspire[] to commit an offense under" § 924(c).

United States. Since levying war against the United States *was* a "crime of violence," the violation charged in Count 1 was predicated on at least one valid "crime of violence." As a result, Count 1 did not depend on an invalid theory of liability, as Al-Timimi maintains.

Thus, the district court did not err in failing to dismiss Counts 9 and 10 because Count 1 remained valid. Accordingly, any improper instruction did not affect the defendant's substantial rights, and the Court should decline to notice any plain error. *Ali,* 991 F.3d at 576.

## Conclusion

For the foregoing reasons, this Court should affirm the conviction and sentence of Ali Al-Timimi.

Respectfully submitted,

Eric S. Siebert
United States Attorney

_____

By:  Gordon D. Kromberg
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700

## STATEMENT REGARDING ORAL ARGUMENT

The Court has tentatively calendared this appeal for oral argument during the September 9–12, 2025, argument session.  Doc. No. 172.

Certificate of Compliance

I certify that this motion response was written using 14-point Times New Roman typeface and Microsoft Word 2016.  I further certify that this brief does not exceed 30,000 words, as authorized by this Court's order of May 6, 2025, and is more specifically 26,955 words (plus approximately another 550 words contained in graphics pasted into the text of pages 18 and 21 of the brief).  I understand that a material misrepresentation can result in the Court's striking the response and imposing sanctions.

_____
Gordon D. Kromberg
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700
Gordon.Kromberg@usdoj.gov

Certificate of Service

I certify that on July 1, 2025, I filed electronically the foregoing brief with the

Clerk of Court using the CM/ECF system, which will send notice of the filing to

counsel of record.

By:     _____

Gordon D. Kromberg
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700
Gordon.Kromberg@usdoj.gov