No. 14-4451

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

ALI AL-TIMIMI,
*Defendant/Appellant.*
_____

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)
_____

REPLY BRIEF OF THE APPELLANT
_____

Geremy C. Kamens
Federal Public Defender for the
 Eastern District of Virginia
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Geremy_Kamens@fd.org

## **TABLE OF CONTENTS**

Table of Authorities .................................................................................iv

Introduction .........................................................................................1

Argument..............................................................................................6

I.    The First Amendment Requires De Novo Review of Speech Alleged to
      Support Criminal Liability................................................................6

      A.    The Court Does Not Apply Deferential Review to the
            Determination of Whether Speech Is Constitutionally Protected.........6

      B.    Al-Timimi's Speech Did Not Constitute Criminal Solicitation............8

      C.    Al-Timimi's Speech Did Not Constitute Incitement. .........................11

II.   Substantial Evidence Does Not Establish That Al-Timimi Knowingly
      and Actively Participated in or Facilitated the Charged Violations of 18
      U.S.C. § 844(h) in Counts 9 and 10 ................................................17

      A.    No Evidence Established That Al-Timimi Had Advance
            Knowledge of RPG Training by Kwon and Hasan............................17

            1.    The Trial Record Contains No Prior Discussions Between
                  Al-Timimi and Kwon or Hasan About Explosives
                  Training. ..................................................................18

            2.    The Government's Reliance on Constructive Knowledge
                  of Explosive Use by LET Is Foreclosed by *Rosemond*. ...........20

            3.    The District Court's Jury Instruction Failed to Require
                  Proof of Actual Foreknowledge of Kwon and Hasan's Use
                  or Possession of Explosives. ......................................25

      B.    No Evidence Established Al-Timimi's "Active Participation" in
            Kwon and Hasan's § 844(h) Violations. ..................................27

            1.    Al-Timimi's September 16 Speech Did Not Assist
                  Anyone to Commit a Crime. ......................................30

i

2.      Al-Timimi's Statements on September 19 that Kwon and Hasan Should Carry a Magazine While Traveling, Travel Separately, and Cry if Stopped Does Not Constitute "Active Participation" in Violations of 18 U.S.C. § 844(h). ..................................................................................31

3.      Alternatively, a New Trial is Required Because of the Centrality of Protected Speech in the Trial..............................34

C.      The Government's Alternative *Pinkerton* Theory of Liability Fails on Multiple Grounds...................................................36

1.      The Jury Was Not Instructed as to *Pinkerton* Liability. ...........36

2.      Even if the District Court Instructed the Jury on *Pinkerton* Liability, It Could Not Circumvent *Rosemond*'s Mens Rea Requirement, and Aiding and Abetting a Conspiracy Is Not a Viable Theory of Criminal Liability. ...............................39

III.    Count 2 – Solicitation of a Crime of Violence .............................................42

A.      The Government Fails to Respond to the Argument That the "Levying War" Prong of 18 U.S.C. § 2381 Is Not Categorically a Crime of Violence. .........................................................42

B.      The Trial Record Contains Insufficient Evidence of Criminal Solicitation of Others to Levy War Against the United States. ..........45

IV.     Count 3 – Aiding and Abetting Seditious Conspiracy in Violation of 18 U.S.C. § 2384...............................................................48

A.      Al-Timimi's Speech Was Constitutionally Protected and Does Not Support Accomplice Liability. .....................................................48

B.      Section 2384 Solely Proscribes Conspiracies Directed at U.S. Governing Authority. ...........................................................50

V.   Counts 4 and 5 – Attempted Unlawful Provision of Services to the Taliban ................................................................................................53

   A.   Al-Timimi Did Not Help Anyone to Attempt to Provide Services to the Taliban.................................................................................54

   B.   No Evidence of Wilfulness Exists....................................................56

   C.   The Jury Instruction Defining Attempt Was Plainly Erroneous .........56

   D.   Counts Four and Five Are Multiplicitous and the Error is Plain. .......57

VI.   Insufficient Evidence Supports Conviction on Count 6. ...............................58

Conclusion ................................................................................................61

Certificate of Compliance

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ..........................................3

*Bachellar v. Maryland*, 397 U.S. 564 (1970) ................................................3, 34, 35

*Balogh v. Virginia*, 120 F.4th 127 (4th Cir. 2024) ...........................................14, 15

*Bates v. United States*, 522 U.S. 23 (1997)....................................................50

*Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228 (6th Cir. 2015) ...................15

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984)................6, 7, 8

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)....................... 13, 14, 15, 16, 48, 49, 54

*Ex parte Bollman*, 8 U.S. 75 (1807) ........................................................................43

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) .............................14

*Francis v. Franklin*, 471 U.S. 307 (1985) ...............................................................25

*Gillars v. United States*, 182 F.2d 962 (D.C. Cir. 1950) .......................................51

*Graves v. Lioi*, 930 F.3d 307 (4th Cir. 2019)...........................................................41

*Griffin v. United States*, 502 U.S. 46 (1991)...........................................................35

*Hallenbeck v. Penn Mut. Life Ins. Co.*, 323 F.2d 566 (4th Cir. 1963)....................52

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989) ......................7

*Henderson v. United States*, 568 U.S. 266 (2013)...................................................57

*Hess v. Indiana*, 414 U.S. 105 (1973)...............................................................15, 16

*Hillman v. I.R.S.*, 263 F.3d 338 (4th Cir. 2001)......................................................45

*Howard v. Antilla*, 294 F.3d 244 (1st Cir. 2002)......................................................7

*Jackson v. Virginia*, 443 U.S. 307 (1979) ................................................. 6

*Kawakita v. United States*, 343 U.S. 717 (1952) .................................... 51

*Neder v. United St*ates, 527 U.S. 1 (1999) ............................................ 34

*Noto v. United States*, 367 U.S. 290 (1961) .......................................... 46

*Nwanguma v. Trump*, 903 F.3d 604 (6th Cir. 2018) ............................... 14

*Nye & Nissen v. United States*, 336 U.S. 613 (1949) ............................ 38

*Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233 (4th Cir. 1997) ............ 29

*Pinkerton v. United States*, 328 U.S. 640 (1946) ........... 4, 36, 37, 38, 39, 40, 41, 42

*Rosemond v. United States*, 572 U.S. 65 (2014) ................................. *passim*

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 145 S. Ct. 1556 (2025) ................................................................................. 30

*Snyder v. Phelps*, 580 F.3d 206 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011) ........... 7

*Stokes v. Stirling*, 64 F.4th 131 (4th Cir. 2023) ................................... 44

*The Apollon*, 22 U.S. (9 Wheat.) 362 (1824) ........................................ 51

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) ................................... 32

*Udeozor v. United States*, 2010 WL 3000008 (D. Md. July 29, 2010) ................. 36

*United States v. Al-Hamdi*, 356 F.3d 564 (4th Cir. 2004) ...................... 42

*United States v. Ashley*, 606 F.3d 135 (4th Cir. 2010) ......................... 57

*United States v. Bartow*, 997 F.3d 203 (4th Cir. 2021) ....................... 6, 8

*United States v. Bell*, 988 F.2d 247 (1st Cir. 1993) ........................... 41-42

*United States v. Bennafield*, 287 F.3d 320 (4th Cir. 2002) .................... 58

*United States v. Benson*, 957 F.3d 218 (4th Cir. 2020) ........................ 23

*United States v. Bly*, 510 F.3d 453 (4th Cir. 2007)....................................7

*United States v. Buffington*, 815 F.2d 1292 (9th Cir. 1987)...................55

*United States v. Cardwell*, 433 F.3d 378 (4th Cir. 2005) .......................37

*United States v. Carter*, 19 F.4th 520 (1st Cir. 2021)............................21

*United States v. Clay*, 627 F.3d 959 (4th Cir. 2010) ..............................45

*United States v. Coby*, 65 F.4th 707 (4th Cir. 2023) ..............................38

*United States v. Colton*, 231 F.3d 890 (4th Cir. 2000) ...........................58

*United States v. Cone*, 714 F.3d 197 (4th Cir. 2013)..............................34

*United States v. Delgado*, 972 F.3d 63 (2d Cir. 2020) ...........................32

*United States v. Fleschner*, 98 F.3d 155 (4th Cir. 1996) ........................29

*United States v. Greiner*, 26 F. Cas. 36 (E.D. Pa. 1861) ........................43

*United States v. Hansen*, 599 U.S. 762 (2023) ....................... 3, 8, 27, 29, 30, 46, 57

*United States v. Hunt*, 123 F.4th 697 (4th Cir. 2024)..............................45

*United States v. Kelley*, 769 F.2d 215 (4th Cir. 1985)............................28

*United States v. Kissell & Harned*, 218 U.S. 601 (1910) .......................37

*United States v. Labat*, 905 F.2d 18 (2d Cir. 1990)................................38

*United States v. McCaskill*, 676 F.2d 995 (4th Cir. 1982).......................21

*United States v. McNeill*, 887 F.2d 448 (3d Cir. 1989) ..........................48

*United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020) ...................*passim*

*United States v. Mousavi*, 604 F.3d 1084 (9th Cir. 2010) .......................56

*United States v. Nielsen*, 640 F. App'x 224 (4th Cir. 2016)....................58

*United States v. Nordean*, 2022 WL 17583799 (D.D.C. Dec. 11, 2022) ...............52

*United States v. O'Nan*, 452 F. App'x 280 (4th Cir. 2011) ......................................6

*United States v. Pipola*, 83 F.3d 556 (2d Cir. 1996) ...............................................33

*United States v. Pratt*, 351 F.3d 131 (4th Cir. 2003)............................53, 55, 56, 57

*United States v. Rahman*, 83 F.3d 89 (4th Cir. 1996)..............................................37

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999)...........................................8, 49

*United States v. Rhodes*, 610 F. Supp. 3d 29 (D.D.C. 2022)...................................53

*United States v. Rodriguez*, 803 F.2d 318 (7th Cir. 1986)......................................52

*United States v. Rundo*, 990 F.3d 709 (9th Cir. 2021)............................................28

*United States v. Spinney*, 65 F.3d 231 (1st Cir. 1995)..........................21, 22, 23, 24

*United States v. Stockton*, 349 F.3d 755 (4th Cir. 2003) .........................................6

*United States v. Thomas*, 58 F. App'x 952 (4th Cir. 2003) ........................20, 21, 22

*United States v. Williams*, 553 U.S. 285 (2008) .....................................................31

*United States v. Winstead*, 708 F.2d 925 (4th Cir. 1983) ..................................30, 33

Constitutional Provisions, Statutes, and Rules

U.S. Const. amend. I .......................................................................................*passim*

18 U.S.C. § 2 ..............................................................................................................39

18 U.S.C. § 373 ....................................................................................................42, 45

18 U.S.C. § 844(h) ......................................................... 5, 18, 20, 26, 30, 33, 34

18 U.S.C. § 924(c) ............................................................................17, 18, 21, 22

18 U.S.C. § 2113 .................................................................................................21, 22

18 U.S.C. § 2381 ................................................... 4, 41, 42, 43, 44, 45, 48, 51, 52

18 U.S.C. § 2384 ................................................................................49, 50, 51, 52

50 U.S.C. § 1705 ...............................................................56, 57

Act of July 31, 1861, ch. 33, 12 Stat. 284 ............................51

Fed. R. App. P. 10 .................................................................10

Fed. R. Crim. P. 29 ................................................................12

<u>Other Authorities</u>

American Bar Ass'n Antitrust Section, Model Jury Instr. in Civil Antitrust Cases (A.B.A. Chicago, Ill) .................................36

Black's Law Dictionary (12th ed. 2024) ................................22

Sir Michael Foster, *A Report of Some Proceedings on the Commission for the Trial of the Rebels in the Year 1746 in the County of Surry, and of other Crown Cases* 218 (3d ed. London 1792) ...................................43

Thomas Healy, *Brandenburg in a Time of Terror*, 84 Notre Dame L. Rev. 655 (2009) ...............................................16

Majid Khadduri, War and Peace in the Law of Islam (1955) ...................................46

Modern Federal Jury Instructions § 19.01 (2010) ..................36

2 O'Malley, Grenig, & Lee, Fed. Jury Prac. & Instr. (6th ed. 2008) .....................36

Catherine M. Tarrant, *To "Insure Domestic Tranquility": Congress and the Law of Seditious Conspiracy*, 1859-1861, 15 Am. J. of Legal Hist. 107 (1971) ...........................................51

No. 14-4451

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH COURT

_____

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

ALI AL-TIMIMI,
*Defendant/Appellant*.

_____

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)

_____

REPLY BRIEF OF THE APPELLANT

_____

## **INTRODUCTION**

The government's "inspirational speech" theory of liability is that Dr. Ali Al-Timimi committed crimes based upon his words on September 16, 2001, that "inspired [listeners] to want to go to [Lashkar-e-Taiba (LET)] to train and then to go fight in Afghanistan." J.A. 2348-2352, J.A. 2372 (closing argument); Gov't Br. 33 (citing testimony that individuals were "inspired" and "moved" by Al-Timimi's words). In its closing argument at the trial, the government claimed that Al-Timimi "should be convicted" if the jury believed the testimony of three cooperating

witnesses, "[Muhammad] Aatique, [Yong Ki] Kwon, and [Khwaja Mahmood] Hasan," J.A. 2355, who testified that Al-Timimi encouraged them by saying that (1) the leader of Afghanistan had called for help from Muslims around the world; (2) it was obligatory for Muslims to help; and (3) attendees should leave the United States and be with any mujahadeen around the world. J.A. 1381-1384; J.A. 1388 (Kwon); J.A. 458 (Aatique); J.A. 2207, J.A. 2254-2256 (Hasan).

On appeal, the government claims that Al-Timimi at the September 16 meeting encouraged attendees to fight against the United States in Afghanistan and provided assistance to do so. Gov't Br. 48-56. The government's attempt on appeal to circumvent First Amendment protection by labeling Al-Timimi's speech as "assistance" rather than "advocacy" fails for multiple reasons.

First, the government's own evidence demonstrates that Al-Timimi provided no concrete assistance whatsoever to help anyone commit a crime. In over 100 pages of briefing, the government fails to identify a single instance where Al-Timimi provided logistical support, financial aid, training materials, contact information, or any other tangible assistance to help anyone engage in criminal conduct. Instead, the government's case rests almost entirely on Al-Timimi's "inspirational" speech— precisely the type of "mere encouragement" that this Court has held is constitutionally protected. *United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020).

Nor is there evidence that Al-Timimi requested that anyone commit a specific crime, as even the government agrees that Al-Timimi endorsed a range of choices in broadly general terms, including recommendations to simply leave the United States in anticipation of possible anti-Muslim violence in the wake of September 11, or stay at home as much as possible.

Words that merely "move by persuasion or influence" non-imminent conduct remain fully protected from criminal liability. *United States v. Hansen*, 599 U.S. 762, 763 (2023). "Indeed, because mere encouragement is quintessential protected advocacy, the Supreme Court has recognized that '[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it'[.]" *Miselis*, 972 F.3d at 536 (quoting *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002)). Consequently, the complete absence of evidence that Al-Timimi provided tangible assistance to help anyone to commit a crime is fatal to all convictions based upon an aiding and abetting theory of liability.

Alternatively, the fact that the central evidence against Al-Timimi at trial consisted of constitutionally-protected speech requires that this Court vacate the convictions below even if this Court were to conclude that some evidence could have supported a reasonable jury's decision to find guilt. *See Bachellar v. Maryland*, 397 U.S. 564, 571 (1970) (holding that convictions for disturbing the peace had to be set aside because they "may have rested" on constitutionally-protected speech).

Furthermore, with respect to Counts 9 and 10, the complete absence of evidence that Al-Timimi had advance knowledge that Kwon and Hasan would necessarily train with explosives (rocket-propelled grenade launchers) when they went overseas requires reversal of the convictions. The government's post-trial *Pinkerton* theory also fails because: (a) Al-Timimi was not charged as a conspirator; (b) no *Pinkerton* instruction was given at the trial; and (c) the theory of aiding and abetting a conspiracy has no precedent in this Circuit and would eliminate the settled distinction between conspiracies and substantive offenses.

Finally, it is noteworthy that on several critical issues, the government simply ignores Al-Timimi's arguments and responds to different arguments he did not make on appeal. This constitutes waiver under well-established precedent.

Most egregiously, despite Al-Timimi's detailed argument in his opening brief with respect to Count 2 that the "levying war" prong of 18 U.S.C. § 2381 is not categorically a crime of violence, App. Br. 80-84, the government inaccurately claims that "Al-Timimi does not argue that the levying war variant of § 2381 can be committed without the use, attempted use, or threatened use of physical force." Gov't Br. 64 (citing App. Br. 81-83). This mischaracterization cannot cure the government's failure to address the substance of Al-Timimi's argument.

Similarly, the government fails to respond to Al-Timimi's argument that the district court's post-trial dismissal of Count 1 undermines any *Pinkerton* theory of

liability for Counts 9 and 10, instead responding to an entirely different argument about the predicate felonies for 18 U.S.C. § 844(h) offenses that Al-Timimi did not make. Gov't Br. 104-05. This pattern of evasion violates the government's obligation to provide adversarial briefing on disputed legal issues. Accordingly, the government's failure to respond to these arguments should be considered an abandonment of these issues.

For all of the reasons outlined above and in the opening brief, all counts of conviction should be vacated and the case remanded for the entry of judgments of acquittal.

The reply brief is structured as follows: first, the brief addresses the standard of review with respect to the determination of whether speech supporting criminal liability falls outside of First Amendment protection, and the government's claim that prompt conduct by listeners determines whether speech is constitutionally protected. Second, the brief addresses the government's arguments as to Counts 9 and 10 (because only the sentences on those counts remain to be served). Third, it responds to the government's arguments with respect to the remaining outstanding convictions, Counts 2, 3, 4, 5, and 6.

**ARGUMENT**

I.  **THE FIRST AMENDMENT REQUIRES DE NOVO REVIEW OF SPEECH ALLEGED TO SUPPORT CRIMINAL LIABILITY**

   A.  **The Court Does Not Apply Deferential Review to the Determination of Whether Speech Is Constitutionally Protected.**

The government emphasizes that challenges to the sufficiency of evidence must be rejected "if there is substantial evidence, taking the view most favorable to the Government, to support" conviction. Gov't Br. 56 (quoting *United States v. Stockton*, 349 F.3d 755, 761 (4th Cir. 2003)); *see also* Gov't Br. 14 n.6, 53, 81; App. Br. 33-35 (citing *Jackson v. Virginia*, 443 U.S. 307 (1979), among other cases). The government also cites the district court's description of the jury trial and case background in various post-trial opinions. Gov't Br. 6-7 (citing *e.g.*, J.A. 2864, J.A. 2973).

But the deferential review typically afforded in evaluating sufficiency challenges is subordinated in "cases raising First Amendment issues, [in which] an appellate court has the obligation to make an independent examination of the whole record to ensure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Bose Corp. v. Consumers Union of U.S.*, *Inc.*, 466 U.S. 485, 486 (1984); *see also* App. Br. 97-98 (citing *United States v. Bartow*, 997 F.3d 203, 208 (4th Cir. 2021), *United States v. O'Nan*, 452 F. App'x 280, 282 (4th Cir. 2011), and *Bose Corp.*, 466 U.S. at 505, 508 n.27). As such, this Court "must

examine for [itself] the statements in issue and the circumstances under which they were made to see … whether they are of a character which the principles of the First Amendment … protect." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (citation omitted).

With respect to whether challenged statements are protected by the First Amendment, this Court's de novo review of the record supersedes the standard applied "[i]n the ordinary case," in which appellate courts "review the evidence in the light most favorable to the prevailing [party] to determine if the evidence permits a reasonable jury to find in favor of [that party] on any permissible theory." *See Howard v. Antilla*, 294 F.3d 244, 249 (1st Cir. 2002) (noting that appellate court conducts "plenary" review of facts and law "which implicate core First Amendment concerns"); *see also United States v. Bly*, 510 F.3d 453, 457 (4th Cir. 2007) (citing *Bose Corp.*, 466 U.S. at 506-11, and stating "[w]hether a written communication contains either constitutionally protected 'political hyperbole' or an unprotected 'true threat' is a question of law and fact that we review de novo."). As such, "enhanced appellate review" is required as a rule of federal constitutional law to be conducted without deference to the trial court's factual findings. *See Snyder v. Phelps*, 580 F.3d 206, 218 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011); *see also Bose Corp.*, 466 U.S. at 510 ("The requirement of independent appellate review reiterated in *New York Times Co. v. Sullivan* is a rule of federal constitutional law.").

Moreover, appellate review must ensure that "the perimeters of any unprotected category" of speech remains "within acceptably narrow limits." *Bartow*, 997 F.3d at 208 (quoting *Bose Corp.*, 466 U.S. at 505). Accordingly, this Court must carefully police the distinction between First Amendment-protected speech designed merely "to influence, to prevail on, to move by persuasion or influence," or "inspire with courage, spirit, or hope," and the much narrower and "specialized, criminal-law" categories of speech that solicits or facilitates criminal conduct. *See United States v. Hansen*, 599 U.S. 762, 774 (2023).

### B. Al-Timimi's Speech Did Not Constitute Criminal Solicitation.

The government argues that Al-Timimi's words on September 16, 2001, were not protected by the First Amendment because they incited, solicited, and helped others to commit criminal offenses. Gov't Br. 50-51. Citing *United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999), the government claims that Al-Timimi's speech was not protected by the First Amendment because he "encouraged the conspirators to engage in violent acts against the United States" and "solicited" them "to levy war against the United States." Gov't Br. 52-53. The government's brief fails, however, to respond to the argument that criminal solicitation is limited to concrete proposals that another person engage in specific conduct constituting a crime. App. Br. 100-02. In this case, unlike in *Rahman*, no such specific proposal occurred. *Id.* at 87.

Although the legal classification of Al-Timimi's speech is subject to a de novo rather than a deferential standard of review, in this case the government agrees that Al-Timimi's challenged statements on September 16, 2001, consisted of options in which the attendees could choose to engage. Specifically, the government's account of Al-Timimi's statements represents that he told the attendees they "needed to repent, to leave the United States; and to 'join [any] mujahideen.'" Gov't Br. 32; *id.* at 84 ("Al-Timimi told his listeners that they should join the mujahideen anywhere in the world if they could not fight against American troops expected to arrive in Afghanistan."). "[I]f one could not go to fight," Al-Timimi purportedly said, "then at least leave for a Muslim land." *Id.* at 32.

To be clear, even Al-Timimi's statements about "defending" Muslims in Afghanistan were conditional statements predicated on events that had not yet occurred. As noted in the opening brief, App. Br. 106, the United States did not threaten military action against the leaders of Afghanistan until September 20, four days after the September 16 meeting. J.A. 170. Furthermore, the United States did not invade with ground forces until a month later on October 21, 2001. J.A. 168. As such, any statement made on September 16 that Muslims were obligated to defend Afghanistan was contingent on events that had not yet happened. Finally, while the publicly-issued fatwa by a Saudi cleric read by Al-Timimi on September 16 said that

Muslim support for Afghanistan was "obligatory," such support could consist of prayers. J.A. 537-539 (Surratt); J.A. 3175-3176 (Uqla fatwa).[1]

---

[1] Citing recordings of Al-Timimi's speeches, the government also claims on appeal that Al-Timimi made extremist statements. Gov't Br. 15-16 (summarizing purported excerpts from Gov't Exhibits 10T2, 10T4, 10T7, 10T9, 10T10 (clips 10 and 63), 10T11, and 10T13). Its brief even includes a picture of cover art it says "appeared to be the New York skyline in flames." Gov't Br. 22. As the district court noted, however, the recordings played during trial were not transcribed, and the government did not provide a transcript. J.A. 2063. The district court even remarked that "this transcript for the Court of Appeals is going to be interesting because there are big chunks of evidence that they're not going to see in the transcript." J.A. 2099.

The audio recordings themselves are not included in the Joint Appendix, and the government has not sought to supplement the record under Federal Rule of Appellate Procedure 10(e) when "anything material to either party" is omitted from the record. The Court therefore should not rely on the government's summary table in its brief at 15-16. As for the cover, "[n]obody at Dar al-Arqam" had anything "to do with the cover" art. J.A. 265. It was done by "some guys … in Australia who we did our printing with because they did it for cheap." J.A. 219.

To the extent the Court considers the summaries, when Exhibit 10T2 was played, the witness said "I can't understand," and the district court remarked, "It's indecipherable. … [M]ost of these tapes without a transcript are difficult to hear. The last one was impossible." J.A. 2080-2081. Others, such as Exhibit 10T7, in which Al-Timimi purportedly said that "jihad is the pinnacle or the apex of Islam," simply repeated "words of the Prophet Muhammad." J.A. 2086. For Exhibits 10T10 clip 10 and 10T11 clip 17, the government fails to identify the portion of the trial in which these clips were mentioned or supposedly played for the jury. The government's citation corresponding to Exhibit 10T10 clip 63, J.A. 2425, refers to closing argument.

In any event, Al-Timimi had made numerous public statements reflecting mainstream viewpoints, such as condemning the 1993 World Trade Center bombing as "forbidden in Islam," and stating that Muslims should be the first "to condemn and reject actions of violence by other Muslims." J.A. 1882-1883. At the trial, the government claimed that while Al-Timimi's "public" statements were "more moderate," J.A. 2367, his statements in private reflected extremist views, J.A. 2367; J.A. 2415-2416.

But even by the government's own account, Al-Timimi did not propose a concrete plan to engage in specific criminal conduct, but instead offered a range of recommendations as to non-mutually exclusive morally-responsible conduct. Gov't Br. 32, 84; *see also* J.A. 458 (Aatique); J.A. 1147 (Kwon); J.A. 2207, J.A. 2255 (Hasan). As the evidence shows, he told attendees they should try to leave the United States, and "if you can, join the mujahideen anywhere in the world," but another option was simply to "lay low" in the United States. J.A. 1383-1384, J.A. 1147 (Kwon); J.A. 458 (Aatique); J.A. 2207 (Hasan). Having provided recommendations for "three choices" of possible conduct, it was up to the listener to make their "own decision" about the "best choice" of what to do. J.A. 2255 (Hasan); *see also* J.A. 458-459 (Aatique). The fact that Al-Timimi recommended multiple options, including lawful alternatives, that listeners should consider taking demonstrates that his speech was not a specific solicitation of specific criminal conduct.

## C. Al-Timimi's Speech Did Not Constitute Incitement.

At trial and in post-trial briefing, the government's theory of criminal liability was premised on the broad claim that inspirational encouragement of another who subsequently commits a criminal offense suffices to constitute aiding and abetting. J.A. 2372; J.A. 2677; J.A. 2897.

In closing arguments at the trial, for example, the government emphasized that Al-Timimi was guilty because he was "absolutely revered," J.A. 2355, "larger-than-

life," J.A. 2358, and "an inspiring speaker" whose "powerful" and "inspirational message" "inspired [Aatique, Kwon, and Hasan] to want to go to LET to train and then to go fight in Afghanistan," J.A. 2372. Moreover, in response to Al-Timimi's post-trial Rule 29 motion, the government argued that the First Amendment did not protect Al-Timimi's words because he "urged lawless action." J.A. 2677.

On appeal, the government similarly argues that Al-Timimi's criminal liability is supported by the fact that he was "looked to as a leader, and [] he embraced that role and encouraged the conspirators to engage in violent acts against the United States." Gov't Br. 52. As discussed below, the offenses at issue impose criminal liability in this case only if Al-Timimi's words actually helped or solicited others to commit crimes. And based on the evidence at the trial, Al-Timimi's words, regardless of how inspiring they may have been, did not do either.

Furthermore, the evidence established that Kwon, Hasan, Aatique, and others had been preparing to go overseas and potentially participate in armed conflicts long before September 16, entirely without Al-Timimi's knowledge or involvement. App. Br. 8-9. Their decision to travel to Pakistan and obtain military training took place without Al-Timimi. J.A. 1388-1389 (Kwon); J.A. 2216-2217, J.A. 2258 (Hasan). And Aatique, who had already planned to travel to Pakistan before the September 16 dinner, testified that his decision "influenced Kwon and Hasan" to go too. J.A. 456.

But the government is also wrong that Al-Timimi's speech constituted "incitement" that falls outside of First Amendment protection. For speech that does not aid or solicit others to commit crimes, the First Amendment prohibits the imposition of criminal liability unless it was "directed to inciting or producing imminent lawless action and [was] likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

The government argues that Al-Timimi's speech was not protected because "within a week of when Al-Timimi's statements were made, four men who heard his statements were motivated to leave the United States to join LET[,]" and he thus "incited imminent lawless action." Gov't Br. 50, 51. This argument misstates the facts. Aatique was already planning to obtain military training from LET before the September 16 dinner, and had purchased his plane tickets. J.A. 314-315: J.A. 346-347. When attendees began discussing training on September 16, he said "I'm already going there." *Id.* 346. Kwon likewise "talked to a bunch of brothers about going to LET … before September 11," 2001. J.A. 1325. Hasan began preparing in January 2000 to go overseas to engage in "violent jihad," J.A. 2243-2244, and knew that two friends, Ibrahim Al-Hamdi and Randall Royer, had obtained military training from LET camps in Pakistan. J.A. 2246. But he "never talked to Al-Timimi about that[.]" J.A. 2244.

The government's argument also misapprehends *Brandenburg* and the First Amendment's protection of speech. "[I]n the world of *Brandenburg*, 'incite' most sensibly refers to speech that is directed and likely to produce an imminent lawlessness." *United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020). Put differently, the focus of the *Brandenburg* test is on the words spoken by a speaker, not the subjective reaction of listeners. *Balogh v. Virginia*, 120 F.4th 127, 135 (4th Cir. 2024) ("a state can't 'silence[ ] *particular* speech or a *particular* speaker due to an anticipated disorderly or violent reaction of the audience.'"). That's because "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *accord Nwanguma v. Trump*, 903 F.3d 604, 610 (6th Cir. 2018) ("the fact that audience members reacted by using force does not transform Trump's protected speech into unprotected speech. The reaction of listeners does not alter the otherwise protected nature of speech.").

The government's argument that Al-Timimi's speech was not protected by the First Amendment because of Kwon, Hasan, and Aatique's subsequent conduct conflates the First Amendment's protection of speech with the reaction of listeners. Put differently, that some listeners later committed crimes doesn't transform protected speech into criminal incitement. *See Nwanguma*, 903 F.3d at 610. The government also ignores the reaction of listeners to Al-Timimi's words on September 16 who decided to stay home.

But again, the First Amendment's protection of speech does not depend upon an accounting of how many listeners subsequently engage in prohibited conduct. Nor does it turn on the speed with which listeners engage in such conduct. As this Court explained in *Balogh v. Virginia*, restricting speech based upon how an audience reacts is "one of the most persistent and insidious threats to [F]irst [A]mendment rights." 120 F.4th at 135 (citation omitted).

Similarly, the government cannot circumvent *Brandenburg*'s imminence requirement by classifying speech it seeks to prohibit as advocacy that others *immediately conspire* to engage in lawless action. *See Miselis*, 972 F.3d at 535 ("*Brandenburg* mandates [an] adequate relation between words and *lawless action*") (emphasis added). As noted above, *Brandenburg*'s test focuses on incitement of lawless "action," not lawless "agreements." *Brandenburg*'s plain language thus limits the category of incitement to speech that incites imminent violent *action*. *See Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 246 n.10 (6th Cir. 2015).

That test excludes "incitement" to *immediately conspire* to commit violence at some point in the future. *See Hess v. Indiana*, 414 U.S. 105, 108 (1973) (noting that "advocacy of illegal action at some indefinite future time" remains protected by the First Amendment). Holding to the contrary would eviscerate the distinction between protected advocacy and criminal incitement. Because "[a]lmost any speaker who advocates unlawful conduct can be viewed as also advocating a conspiracy to

commit unlawful conduct[,] [a]nd because listeners can form conspiracies far more quickly than they can commit the underlying crime, the government could gut *Brandenburg*'s requirements by simply charging speakers with advocating conspiracy." Thomas Healy, *Brandenburg in A Time of Terror*, 84 Notre Dame L. Rev. 655, 680 (2009).

In this case, what the government characterizes as "induce[ment] [of] the conspiracies to commit sedition (Count 2) [sic, Count 3] and violate the Neutrality Act (Count 6)," Gov't Br. 102, remains protected speech under the First Amendment that encourages, promotes, or advocates, but was not directed to or likely to produce imminent violent action. *See Miselis*, 972 F.3d at 541. Indeed, the charged conspiracies here were not to commit imminent violent action, but to travel overseas, obtain training, and potentially engage in combat at some indefinite future time contingent upon events (such as a U.S. invasion of Afghanistan) that had not yet occurred and were not imminent on September 16, 2001. Speech encouraging such conspiracies fits the category of "advocacy of illegal action at some indefinite future time" that remains protected under *Hess v. Indiana*, 414 U.S. at 108.

*Brandenburg* itself overturned a conviction under an Ohio statute that prohibited "voluntarily assembl[ing] with a group or assemblage of persons formed to advocate the doctrines of criminal syndicalism." 395 U.S. at 449 n.3. "Assembly with others merely to advocate" the commission of violent acts, the Court held, is

16

"distinguished from incitement to imminent lawless *action*." *Id.* at 448-49 (emphasis added). Accordingly, advocacy that others conspire to commit violence at some future time remains protected speech under the First Amendment.

## II. SUBSTANTIAL EVIDENCE DOES NOT ESTABLISH THAT AL-TIMIMI KNOWINGLY AND ACTIVELY PARTICIPATED IN OR FACILITATED THE CHARGED VIOLATIONS OF 18 U.S.C. § 844(H) IN COUNTS 9 AND 10

### A. No Evidence Established That Al-Timimi Had Advance Knowledge of RPG Training by Kwon and Hasan.

On appeal, the government's response confirms what the trial record already establishes: there is no evidence whatsoever that Al-Timimi possessed advance knowledge that Kwon and Hasan would handle explosives. The government's entire argument relies on speculation that because Al-Timimi knew in general that LET used explosives, he possessed advance knowledge that Kwon and Hasan would handle explosives when they attended LET training camps. Gov't Br. 84-90.

*Rosemond v. United States* unequivocally held that "[a]n aiding and abetting conviction requires not just an act facilitating one or another element, but also a state of mind extending to the entire crime." 572 U.S. 65, 75-76 (2014). This "state of mind" requirement demands that the accomplice have "advance knowledge" of the specific criminal conduct charged. *Id.* at 76, 81.

In the context of 18 U.S.C. § 924(c)—a compound crime prohibiting the use or carrying of a firearm during and in relation to (or possession in furtherance of) a

predicate offense—a defendant must have "advance knowledge of a firearm's presence" to be held liable as an accomplice to a § 924(c) offense. *Id.* at 81. The government agrees that the same principle applies with equal force to convictions for violating 18 U.S.C. § 844(h) as charged in Counts 9 and 10. Gov't Br. 85 n.19.

Al-Timimi's liability for aiding and abetting Kwon and Hasan's violations of § 844(h) thus requires proof that he had advance knowledge that these two specific individuals would carry explosives while committing felonies during their training at two separate LET camps four (Kwon) or six (Hasan) weeks later at the time of Al-Timimi's communications with them between September 16 and September 18, 2001. J.A. 79 (superseding indictment, Counts 9 and 10).

### 1. The Trial Record Contains No Prior Discussions Between Al-Timimi and Kwon or Hasan About Explosives Training.

As an initial matter, the trial record is devoid of any evidence that Al-Timimi engaged in prior discussions with Kwon and Hasan about explosives training, or weapons training of any kind. The government's bare assertions—unsupported by any citation to trial testimony contained in the joint appendix—that Al-Timimi "participated in the planning of travel to a terrorist camp to get trained on military weapons, knowing that the camp had previously used such weapons as rocket launchers, artillery, and grenades," Gov't Br. 90, "well understood from the start that Kwon and Hasan would handle explosives," *id.* 89, and that Al-Timimi "understood

in advance" that Kwon and Hasan "would gain proficiency in LET's signature tactics—the use of automatic weapons and explosives," *id.*, simply have no support in the evidentiary record.

In fact, the government's own cooperating witnesses flatly repudiated such claims. Both Kwon and Hasan testified that concrete discussions about traveling to Pakistan and training with LET did not occur until after Al-Timimi had left the September 16 dinner. J.A. 1388-1389 (Kwon); J.A. 2216-2217, J.A. 2258 (Hasan). According to Hasan, there was "no discussion" when Al-Timimi was present about going to Pakistan. J.A. 2256. Although Kwon, contradicting himself, also said Al-Timimi was present for part of the discussion about training, he testified that Al-Timimi did not participate in the discussion. J.A. 1156.

Kwon also explicitly testified that Al-Timimi "never asked [him] to carry explosives in the course of a crime." J.A. 1261-1262. Hasan similarly testified that Al-Timimi did not discuss military training with him, J.A. 2274, J.A. 2245, J.A. 2247, and "didn't make [him] do anything," J.A. 2255. In sum, no evidence supports the government's claim that Al-Timimi had any discussion with Kwon and Hasan about weapons or explosives training of any kind or participated in the planning discussion about attending an LET training camp.

### 2. The Government's Reliance on Constructive Knowledge of Explosive Use by LET Is Foreclosed by *Rosemond*.

The government's response with respect to the mens rea element of Counts 9 and 10 relies entirely on a theory of constructive knowledge that *Rosemond* and this Court's opinion in *United States v. Thomas*, 58 F. App'x 952 (4th Cir. 2003), explicitly rejects. Specifically, the government argues that Al-Timimi's general awareness of LET military tactics derived from news bulletins and his 2003 admission during an FBI interview that he was aware that LET "conduct[s] training on weapons and other forms of military tactics that will enable someone to go fight in a battle," J.A. 1743, somehow constitutes advance knowledge in 2001 that Kwon and Hasan were going to train with explosives. Gov't Br. 84-87. This argument fails for several reasons.

For starters, the government's reliance on Al-Timimi's general knowledge about LET's use of explosives fundamentally misunderstands what accomplice liability requires for a compound offense like § 844(h). As this Court explained in *Thomas*, "*proof of constructive knowledge will not suffice* …. The government must [] prove the defendant had actual knowledge that a gun would be used [to commit the predicate offense]." 58 Fed. App'x at 959 (emphasis added). That's precisely what *Rosemond* held is required to support accomplice liability as to a compound offense: "prior knowledge of the [weapon's] involvement" at the time the defendant

actively participates in the charged offense. *Rosemond v. United States*, 572 U.S. 65, 82 (2014).

Actual knowledge is also akin to what the First Circuit held was required to support accomplice liability for a § 924(c) offense: "practical certainty," a standard it explained "calls for proof verging on actual knowledge." *United States v. Spinney*, 65 F.3d 231, 238 (1st Cir. 1995); *see also United States v. Carter*, 19 F.4th 520, 526 n.3 (1st Cir. 2021) (stating that "knowledge 'to a practical certainty' corresponds to a conventional understanding of 'knowledge' that future events will come to pass[,]" and noting that circuit "precedent distinguishes 'practical certainty' from a lower threshold of constructive knowledge.").[2]

---

[2] To be clear, both this Court in *Thomas* and the First Circuit in *Spinney* applied a lower standard of intent to evaluate the sufficiency of the evidence to support convictions for aiding and abetting an armed bank robbery in violation of 18 U.S.C. § 2113(d). Citing *United States v. McCaskill*, 676 F.2d 995, 998 (4th Cir. 1982), and *Spinney*, 65 F.3d at 236-37, this Court held that aiding and abetting an armed bank robbery only required proof that the accomplice "was on notice of the likelihood that a gun or other dangerous weapon would be used in the robbery." *Thomas*, 58 Fed. App'x at 956.

In *Spinney*, the court explained that unlike "aiding and abetting firearms charges brought under 18 U.S.C. § 924(c)," "[a] participant in the holdup of a bank will be found to be an aider and abettor of an armed robbery [] if the government" presents "proof that the accomplice 'knew a dangerous weapon would be used … or at least … *was on notice of the likelihood of its use*." *Spinney*, 65 F.3d at 236-37 (emphasis added). This is the portion of *Spinney*—discussing armed bank robbery, not § 924(c)—that the government cites. Gov't Br. 89 (citing *Spinney*, 65 F.3d at 237). The *Spinney* court goes on to reject the use of a constructive knowledge standard as applied to a 924(c) conviction, just as this Court did in *Thomas* (a decision the government fails to respond to). It also remains unclear to what extent

Proof by which the jury could conclude that Al-Timimi *actually knew* Kwon and Hasan would train with RPGs is distinct from constructive knowledge, which focuses on what Al-Timimi should have known. Black's Law Dict. (12th ed. 2024) (defining "actual knowledge" as "[d]irect and clear knowledge, as distinguished from constructive knowledge"). The premise of the government's response, however, is that Al-Timimi should have known Kwon and Hasan would receive training on RPGs because of Al-Timimi's general knowledge that LET used explosives.

The government's theory of constructive knowledge is directly contrary to *Rosemond*, *Thomas*, and *Spinney*. By the government's logic, general awareness of the possibility that a weapon could be used by a co-defendant would satisfy the advance knowledge requirement. That is precisely the argument that both this Court in *Thomas* and the First Circuit in *Spinney* rejected with respect to 18 U.S.C. § 924(c). *See Thomas*, 58 F. App'x at 959 ("The standard of knowledge required to convict an aider and abettor is greater for brandishing a firearm than armed bank robbery."); *Spinney*, 65 F.3d at 238 (rejecting government's argument that would "collapse the linguistically different standards for aiding and abetting liability under 18 U.S.C. §§ 2113(d) and 924(c)").

---

this lower standard of proof for accomplice liability of armed bank robbery survives *Rosemond*'s explanation that accomplice liability requires "full knowledge" in advance "of the circumstances constituting the charged offense." 572 U.S. at 76-77.

In *Spinney*, the "government's argument boil[ed] down to an assertion that the jury could infer that Spinney was practically certain of [a confederate's] anticipated use of a gun based on the evidence … [of] the confederates' joint design of the robbery." 65 F.3d at 239. Yet, "the government adduced no evidence suggesting that firearms were actually contemplated in the planning stages, or that Spinney had any actual knowledge that [his confederate] would be armed." *Id.* Notwithstanding evidence that "Spinney helped to mastermind the robbery," "taken in the light most favorable to the verdict," the court held the evidence "insufficient to support the requisite inference of practical certainty [that his confederate would be armed]." *Id.*

The government cites *United States v. Benson*, 957 F.3d 218 (4th Cir. 2020), Gov't Br. 89, but as noted in the opening brief, App. Br. 51-52, *Benson* is very different from this case. The defendant in *Benson* "extensively participated in the planning of a robbery of the type that would generally necessitate the use of firearms," traveled with his confederates to the robbery, and continued participating after his confederates used a firearm during the robbery. 957 F.3d at 237-39. Based on this strong circumstantial evidence tied to the charged conduct, a reasonable jury could conclude that the defendant "knew his codefendants would be armed." *Id.* at 239.

By contrast, no analogous evidence of knowledge exists in this case. Al-Timimi did not participate in the planning for Kwon and Hasan to obtain training

from LET, did not discuss weapons or explosive training with them, did not travel with them, and did not interact with them during or after their training concluded. Again, the government's argument simply conflates evidence of general knowledge of LET's tactics with circumstantial evidence supporting the inference that Al-Timimi actually knew Kwon and Hasan would train with RPGs. The latter is entirely absent in this case.

In this case, as in *Spinney*, the government "adduced no evidence" suggesting that Al-Timimi "had any actual knowledge that [Kwon and Hasan] would be armed" with RPGs during training, or even that Al-Timimi participated "in the planning stages" of Kwon and Hasan's decision to train at LET camps in Pakistan. *See* 65 F.3d at 239; J.A. 1389 (testimony by Kwon that discussion "about what everybody was going to do" took place "after Ali left."); J.A. 2216-2217 (testimony by Hasan that "after Timimi left the meeting," Royer "suggested to us that we should first get training" with LET). The evidence adduced at trial was thus insufficient to establish actual prior knowledge that a confederate would use an explosive to support accomplice liability for a compound firearms offense. *See Rosemond*, 572 U.S. at 81.

In sum, the government's response simply stacks impermissible inferences based upon Al-Timimi's thin general knowledge of LET's military tactics from published news reports to arrive at the conclusion that he had advance knowledge that Kwon and Hassan would receive training in how to fire an RPG at an LET

training camp—even though another person who attended LET training camps, Aatique, did not receive such training. Such speculation does not satisfy *Rosemond*'s evidentiary requirements. As the Supreme Court emphasized, advance knowledge must be proven, not presumed. *Id.* at 82. The government's failure to point to specific evidence of Al-Timimi's advance knowledge is dispositive, and requires this Court to vacate the convictions on Counts 9 and 10 and remand for dismissal.

### 3. The District Court's Jury Instruction Failed to Require Proof of Actual Foreknowledge of Kwon and Hasan's Use or Possession of Explosives.

The government argues that the district court's instructions as to the requisite mens rea required to establish Al-Timimi's liability on Counts 9 and 10 as an aider and abettor were sufficient because (1) the court's general aiding and abetting instructions required that the jury find that Al-Timimi knew of the illegal activity at issue, and (2) the Court should not grant relief on plain error. Gov't Br. at 92-94.

First, the government is wrong that the "general instructions" as to aiding and abetting liability could "dissipate the error in the challenged portion of the instructions." *Francis v. Franklin*, 471 U.S. 307, 320 (1985) (addressing general instructions on burden of persuasion). As acknowledged in the opening brief, the district court did instruct the jury that to find Al-Timimi guilty as an aider and abettor, it was required to find that he "knew that Kwon or Hasan intended to undertake the … unlawful carrying of explosives" in furtherance of the crime of

"conspiracy to levy war against the United States." Gov't Br. 93 (citing J.A. 2457); *see* App. Br. 53.[3]

But twenty pages later in the transcript, when it was explicating the actual elements of Counts 7 through 10, the district court clarified that if a defendant was not present when the crime was committed, "it is sufficient that the defendant knew that a firearm" or "knew that an explosive was *at least available* to [Kwon and Hasan] and [he] took some action to counsel or induce such other person to carry it, to aid and abet his carrying of it, or otherwise procured the other's commission of the offense." J.A. 2383-2384 (emphasis added). The latter instruction explained the earlier instructions in the context of offenses in which the accomplice is not present when the crime is committed—as in this case—and lowered the evidentiary bar below what *Rosemond* requires.

Because the trial record contains absolutely no evidence that Al-Timimi discussed weapons or explosives training with Kwon and Hasan, and because no evidence establishes that he did anything to help or assist them to violate 18 U.S.C. § 844(h), a reasonable probability exists that the outcome would have been different

---

[3] In response to the question whether "there was [an] agreement by any of [the attendees] to go to Afghanistan and fight before Al-Timimi left and went home," Kwon responded, "I don't recall any solid answer before he left." J.A. 1388. Nor did Kwon or Hasan mention any intention to "go to Afghanistan and fight" when Al-Timimi met them for lunch on September 19. J.A. 1165 (Kwon); J.A. 2223 (Hasan). No evidence thus supports the claim that Al-Timimi "knew that Kwon or Hasan" had "conspire[ed] to levy war against the United States" in Afghanistan.

had the district court provided a correct instruction to the jury. Likewise, the severity of the sentence imposed upon Al-Timimi compared to the sentences imposed on Kwon (38 months) and Hasan (37 months), the people who actually handled the charged weapons, App. Br. 32 n.9, supports a finding that ignoring this error would seriously impact the fairness, integrity, and public reputation of judicial proceedings.

### B. No Evidence Established Al-Timimi's "Active Participation" in Kwon and Hasan's § 844(h) Violations.

The government claims that Al-Timimi's brief argues that aiding and abetting liability cannot be supported solely by a defendant's words alone. Gov't Br. 48-49 (quoting *United States v. Hansen*, 599 U.S. 762, 771 (2023)). That's false. In the opening brief, Al-Timimi argued that criminal liability for aiding and abetting the commission of a substantive crime by a principal—whether based on a defendant's speech or any other conduct—requires proof of "active participation" that includes "the provision of assistance to a wrongdoer with the intent to further an offense's commission." *Hansen*, 599 U.S. at 771; *accord Rosemond*, 572 U.S. at 71 (describing aiding and abetting as the provision of "knowing aid to persons committing federal crimes"); App. Br. 35-40. Consequently, "an aiding and abetting conviction requires" proof of: (1) "an act facilitating one or another element" of the charged offense; and (2) "a state of mind extending to the entire crime." *Rosemond*, 572 U.S. at 75-76.

For example, in the context of a federal statute that prohibited travel with intent to, among other things, "organize, promote, encourage, participate in, or carry on a riot," this Court held that "speech tending to organize a riot serves not to persuade others to engage in a hypothetical riot, but rather to facilitate the occurrence of a riot that has already begun to take shape." *United States v. Miselis*, 972 F.3d 518, 537 (4th Cir. 2020); *but see United States v. Rundo*, 990 F.3d 709, 717 (9th Cir. 2021) (agreeing with *Miselis* as to "urging," "encouraging," and "promoting," but holding that the "verb 'organize' is similarly overbroad" and statutory prohibition "punishes protected speech"). As examples, this Court explained that "speech tending to organize a riot might thus include communicating with prospective participants about logistics, arranging travel accommodations, or overseeing efforts to obtain weapons needed to carry out the planned violence." *Miselis*, 972 F.3d at 537. Such speech, the Court concluded "consists not of mere abstract advocacy, but rather of concrete aid." *Id.*

The cases cited by the government all involve similar examples where a defendant provided concrete assistance—through speech—with the intent of helping others to commit crimes. Providing forms to paying customers and "detailed instructions" about how to "file false [tax] returns," *United States v. Kelley*, 769 F.2d 215, 216-17 (4th Cir. 1985), instructions about how to "claim unlawful exemptions and not to file income tax returns or pay tax on wages in violation of the United

States Tax Code[,]" *United States v. Fleschner*, 98 F.3d 155, 159 (4th Cir. 1996), and detailed factual instructions on how to commit murder with the intention "to provide assistance to murderers and would-be murderers," *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 241-42 (4th Cir. 1997), do not constitute "mere abstract advocacy, but rather [] concrete aid." *Miselis*, 972 F.3d at 537.

None of these cases involve general statements about religious obligations and reading text from a publicly-available religious opinion in which a speaker provides no specific instructions, no operational details, and no concrete guidance as to how to commit any particular offense. While the government briefly mentions *United States v. Hansen* for the proposition that "words may be enough" for aiding and abetting liability, Gov't Br. 44, 48, it ignores *Hansen*'s central distinction between criminal facilitation and protected speech that merely encourages or inspires violations of law. 599 U.S. at 774. The government's theory of liability in this case rests almost entirely on Al-Timimi's inspirational speech to listeners—precisely the type of "abstract advocacy" that is distinct from criminal facilitation.

The government's failure to explain how the trial evidence shows "assistance" rather than mere encouragement leaves a fatal gap in its argument. *Hansen* makes plain that aiding and abetting liability requires "assistance to a wrongdoer," and cannot be satisfied by evidence showing only that Al-Timimi's words inspired or motivated listeners, without any concrete help in committing specific crimes.

Because no evidence supports the conclusion that Al-Timimi's words facilitated one or another element of Counts 9 or 10, this evidentiary failure independently requires the Court to vacate the convictions on those counts and remand for dismissal.

### 1. Al-Timimi's September 16 Speech Did Not Assist Anyone to Commit a Crime.

As explained above, accomplice liability requires proof of knowing assistance provided to another to help in their commission of a crime. *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 145 S. Ct. 1556, 1565 (2025); *Hansen*, 599 U.S. at 774. In other words, aiding and abetting liability requires proof that "the defendant knowingly associated himself with and participated in the criminal venture." *United States v. Winstead*, 708 F.2d 925 (4th Cir. 1983). Al-Timimi was not a participant in Kwon and Hasan's violations of 18 U.S.C. § 844(h).

Specifically, the record in this case contains no evidence that Al-Timimi's statements on September 16 provided any assistance "facilitating one or another element" of Counts 9 and 10. *See Rosemond*, 572 U.S. at 75-76. His generalized comments about the moral obligation of Muslims to help other Muslims in Afghanistan, and his suggestion of various options including "lay[ing] low," leaving the United States to live among other Muslims, or joining mujahideen "anywhere in the world," provided no specific guidance, instruction, or assistance that would help anyone commit a violation of 18 U.S.C. § 844(h), or any of the charged offenses for that matter.

Aiding and abetting liability requires proof of "concrete aid," not inspiration or "abstract advocacy." *Miselis*, 972 F.3d at 537. The trial testimony that Al-Timimi offered choices such as remaining at home, or leaving the United States to live among other Muslims, or that he endorsed joining the mujahideen "anywhere in the world," illustrates the abstract nature of his advocacy. These generalized statements provided no specific guidance about particular groups, locations, or criminal activities. At most such statements are analogous to the abstract general encouragement found constitutionally protected in *Williams* and *Miselis*, with the caveat that—unlike possessing child pornography or rioting—merely "joining the mujahideen" is not a crime. *See* App. Br. 99-100 & n.21; *United States v. Williams*, 553 U.S. 285, 300 (2008) (noting that phrase, "I encourage you to obtain child pornography" is protected speech); *Miselis*, 972 F.3d at 538 (holding that statute that prohibited "urging" others to riot violated First Amendment).

> **2.** **Al-Timimi's Statements on September 19 that Kwon and Hasan Should Carry a Magazine While Traveling, Travel Separately, and Cry if Stopped Does Not Constitute "Active Participation" in Violations of 18 U.S.C. § 844(h).**

The government also points to Al-Timimi's statements to Kwon and Hasan when they met for lunch on September 19, 2001, as evidence of criminal liability.

Gov't Br. 34-35, 56.[4] Of course, in post-trial briefing below (which the government now ignores), the government conceded that "proof did not establish that Timimi significantly 'aided and abetted'" anyone "to reach the LET camps." J.A. 2897.

It made that concession below because its theory of liability was not that Al-Timimi helped anyone to commit a crime; it was that his words inspired others to commit crimes. Indeed, the government said almost nothing in its closing argument at trial about Al-Timimi's encounter with Kwon and Hasan over lunch, other than to say that the second meeting supported the testimony that a "plan to go overseas" was discussed "at the first meeting on 9/16." J.A. 2420.

But in any event, "the concept of 'helping' in the commission of a crime [] has never been boundless." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 488 (2023). Put differently, "the actus reus element of federal accomplice liability is not so capacious as to encompass any act taken in relation to some identified criminal activity." *United States v. Delgado*, 972 F.3d 63, 75 (2d Cir. 2020). Rather, such liability encompasses only acts by an aider and abettor that constitute "contribut[ions] to the

---

[4] The government says in a footnote that Al-Timimi's brief was "misleading" by stating that "Kwon and Hasan *saw* Al-Timimi at a restaurant," without mentioning that Al-Timimi "said that he wanted to meet them for lunch." Gov't Br. 34 n.13 (emphasis added). The trial testimony on this point was conflicting. Kwon said on direct that "we got in contact with [Al-Timimi]. We told him that we're leaving, and he wanted to meet with us for lunch." J.A. 1165. On cross-examination, however, Kwon responded "Yes" to the statements that "on September 19, you called Al-Timimi," and "you told him you wanted to meet him, didn't you?" J.A. 1425. Hasan said he "[didn't] recall" how the meeting came about. J.A. 2222.

success of 'the specific underlying crime' for which the defendant is charged with aiding and abetting." *Id.* (quoting *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996)); *accord Rosemond*, 572 U.S. at 75 (accomplice liability requires proof of help to "one or another element").

As this Court has explained, aiding and abetting liability requires proof that a defendant "knowingly associate[] [themselves] with and participate[] in the criminal venture." *United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983). This requirement ensures that accomplice liability attaches only to those who meaningfully contribute to the criminal enterprise, not to mere bystanders or individuals who provide only incidental or ineffective assistance.

Al-Timimi's statements at the lunch meeting with Hasan and Kwon fail to meet the threshold for aiding and abetting liability as to Kwon and Hasan's violations of 18 U.S.C. § 844(h). His suggestions about carrying a magazine, sitting separately, and "cry[ing] like a baby" if stopped, J.A. 2224, do not constitute the "active participation" or "concrete aid" required to establish accomplice liability. As Kwon testified at the trial, he "didn't really see how that would help." J.A. 1429. In other words, Al-Timimi's general statements did not facilitate "one or another element" of Counts 9 and 10. *Rosemond*, 572 U.S. at 75. Accordingly, as the government rightly observed in post-trial proceedings below, "proof did not

establish that Timimi significantly 'aided and abetted'" Kwon and Hasan "to reach the LET camps" where they committed violations of § 844(h). J.A. 2897

Furthermore, Al-Timimi had no ongoing involvement in their activities or travel, did not communicate with them, and otherwise did not assist them in any way. In sum, the evidence at trial established that Al-Timimi was neither active nor a participant in Kwon and Hasan's unlawful conduct. The Court therefore should reject the government's attempt to transform his general advice into active participation in a criminal enterprise.

### 3. Alternatively, a New Trial is Required Because of the Centrality of Protected Speech in the Trial.

Alternatively, even if this Court were to conclude that some evidence could support Al-Timimi's convictions, the convictions must still be vacated because they "may have rested" on constitutionally protected speech. *Bachellar v. Maryland*, 397 U.S. 564, 571 (1970); *see also Neder v. United St*ates, 527 U.S. 1, 8 (1999); App. Br. 70-71. Where, as here, the government's theory of liability was premised on the legally unsound claim that speech that inspires others to commit crimes constitutes aiding and abetting, the Court cannot conclude beyond a reasonable doubt that the jury would have convicted based solely on unprotected conduct. *See United States v. Cone*, 714 F.3d 197, 211 (4th Cir. 2013) (submission of invalid legal theory requires vacating conviction).

As noted above, the prosecution's closing argument emphasized that Al-Timimi was guilty because he was an "inspiring speaker" whose "powerful" and "inspirational message" motivated listeners. J.A. 2372. The jury heard extensive testimony about Al-Timimi's religious teachings and his influence as a spiritual leader. Because the jury returned general verdicts without distinguishing the government's "inspirational speech" theory of liability, there is no way to determine whether their decision rested on protected advocacy or on any supposedly unprotected conduct.

This uncertainty is fatal to the convictions. As the Supreme Court has held, when "a case is submitted to a jury on two or more alternate theories, one of which is legally inadequate," and "it is impossible to discern the basis on which the jury actually rested its verdict," reversal is required. *Griffin v. United States*, 502 U.S. 46, 55 (1991). Because the focus of the government's theory of criminal liability at the trial was on what Al-Timimi said at the meeting on September 16, 2001, and that speech was constitutionally protected, the Court must vacate Al-Timimi's convictions and remand for a new trial. *Bachellar*, 397 U.S. at 571 (holding that disturbing the peace convictions had to be set aside because they "may have rested" on constitutionally-protected speech).

**C.    The Government's Alternative *Pinkerton* Theory of Liability Fails on Multiple Grounds.**

**1.    The Jury Was Not Instructed as to *Pinkerton* Liability.**

The government concedes that it neither advanced a *Pinkerton* theory of co-conspirator liability to the jury at trial nor requested a *Pinkerton* instruction from the district court at the charge conference. *See* Govt. Br. 4, 47. Indeed, nothing in the entirety of the parties' closing arguments at trial so much as hinted at the concept of co-conspirator *Pinkerton* liability. Nevertheless, the government points to a routine instruction that the district court delivered on the acts and statements of co-conspirators as a *sua sponte Pinkerton* instruction. Gov't Br. 97-98.

As explained in the opening brief, the district court's instruction was a near-verbatim copy of other model instructions on the "acts and statements" of co-conspirators that reflect two canonical principles of federal conspiracy law. App. Br. 58-59.[5] First, although most federal conspiracy statutes incorporate an "overt act" requirement (a departure from the common law), the overt act need not be committed

---

[5]    Al-Timimi's brief cited to near-identical language regarding the admissibility of co-conspirator acts and declarations in 2 O'Malley, Grenig, & Lee, Fed. Jury Prac. & Instr. § 31:06 at 295 (6th ed. 2008), and American Bar Ass'n Antitrust Section, Model Jury Instr. in Civil Antitrust Cases (A.B.A. Chicago, Ill). Identical language to the district court's instruction also appeared in Modern Federal Jury Instructions § 19.01 (2010), although the current version of that instruction in that publication has been revised. *See Udeozor v. United States*, 2010 WL 3000008, at *3 n.1 (D. Md. July 29, 2010) (quoting instruction as to "the statements and acts of co-conspirators").

by each member. *United States v. Kissell & Harned*, 218 U.S. 601, 608 (1910) ("an overt act of one partner may be the act of all."). The standard instruction regarding "acts" by co-conspirators being attributed to other conspirators explains the principle that "each co-conspirator need not take an overt act in order to be convicted of conspiracy so long as one conspirator does so." *United States v. Cardwell*, 433 F.3d 378, 391 (4th Cir. 2005). Second, the "statements made" language explains that the jury may consider out-of-court declarations of co-conspirators, per the exception to the hearsay rule under Federal Rule of Evidence 801(d)(2)(E).

The government does not dispute that the instruction was given in the context of instructions on witness testimony, not criminal liability, J.A. 2444-2446, that the evidentiary admissibility of co-conspirator acts and statements is distinct from substantive criminal liability under the *Pinkerton* doctrine, that instructions as to Al-Timimi's liability on Counts 9 and 10 solely referred to an aiding and abetting theory of liability, and that neither party mentioned *Pinkerton* liability either in proposed jury instructions, arguments about instructions, or in closing arguments to the jury. *See* App. Br. 56-63. Viewing the instructions "as a whole and in the context of the entire charge," *United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996), the trial contains no hint of *Pinkerton* liability because the government rested its entire case on a theory of standard accomplice liability.

Nor does the government dispute that a jury instruction explaining the basis for *Pinkerton* liability as to charged substantive criminal offenses is a prerequisite to affirming criminal liability on that ground. *See Nye & Nissen v. United States*, 336 U.S. 613, 618 (1949); *United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990). Specifically, the jury must be instructed that a defendant, who has been charged and found guilty of conspiracy beyond a reasonable doubt, may also be found guilty of a charged substantive criminal offense committed by another conspirator in furtherance of the conspiracy, within the scope of the defendant's conspiratorial agreement, and that was reasonably foreseeable. *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946); *see also United States v. Coby*, 65 F.4th 707, 709-10 (4th Cir. 2023) (quoting *Pinkerton* instruction).

That didn't happen in this case, which explains why neither the district court nor either party mentioned the word "*Pinkerton*" during the trial. No one mentioned *Pinkerton* because Al-Timimi was charged in Counts 1, 3, and 6 as an aider and abettor of conspiracies, but not as an actual conspirator. Accordingly, there was no reason to "object to [a] *Pinkerton* instruction at trial," Gov't Br. 103, because no *Pinkerton* instruction was given at the trial. Moreover, the government's failure to request and the district court's failure to give a *Pinkerton* instruction forecloses the government's ability to support criminal liability on that ground. *Labat*, 905 F.2d at 23.

**2. Even if the District Court Instructed the Jury on *Pinkerton* Liability, It Could Not Circumvent *Rosemond*'s Mens Rea Requirement, and Aiding and Abetting a Conspiracy Is Not a Viable Theory of Criminal Liability.**

The government's claim that "independently of *Rosemond*, [] by application of 18 U.S.C. § 2 and *Pinkerton*, [Al-Timimi] is liable as a principal for the reasonably foreseeable consequences of the conspiracies he induced," Gov't Br. 101, is wrong for the same reason and two more. First, accomplice liability "as a principal" under § 2 requires that the defendant's intent "must go to the specific and entire crime charged," not merely "[a]n intent to advance some different or lesser offense." *Rosemond*, 572 U.S. at 76. This limitation on the scope of accomplice liability is not eliminated simply because a defendant is convicted as an accomplice to a conspiracy. Accordingly, without evidence that an accomplice to a conspiracy intended that a substantive offense be committed in furtherance of the conspiracy, and not merely that it was reasonably foreseeable, § 2 does not permit accomplice liability for that substantive offense.

Second, aside from citing out-of-circuit precedent (which Al-Timimi's brief also disclosed, App. Br. 65-66 & n.14), the government fails to respond to the argument that accomplice liability—which is premised on proof of helping another to commit a substantive criminal offense—cannot support liability as a conspirator

without eliminating the distinction between a conspiracy and substantive offenses. *Id.* at 66-67.

The government also misunderstands Al-Timimi's argument as to the significance of the dismissal of Count 1—which charged aiding and abetting a conspiracy to use firearms in furtherance of crimes of violence—to the government's *Pinkerton* theory of liability. *Pinkerton* liability for a substantive offense committed by a coconspirator is premised on a defendant's conviction beyond a reasonable doubt of membership in the conspiracy. Al-Timimi argued that, assuming the district court properly instructed the jury on *Pinkerton* liability, the dismissal of Count 1 eliminated the most likely conspiracy charge upon which the jury could have convicted Al-Timimi on a *Pinkerton* theory as to Counts 9 and 10. App. Br. 68-72. Without a conspiracy conviction on Count 1, there's no basis for *Pinkerton* liability on substantive offenses committed by co-conspirators in furtherance of the conspiracy charged in Count 1. The government does not respond to this argument.

Instead, the government responds to a different argument that Al-Timimi did not make: that because the *predicate felony offenses* charged in Counts 7 through 10 of the superseding indictment explicitly included Count 1, J.A. 60-61, the dismissal of Count 1 undermined Al-Timimi's convictions on Counts 9 and 10, notwithstanding the existence of other viable predicate offenses that were not dismissed. Gov't Br. 104-05. The government's response to an argument Al-Timimi

did not make on appeal is irrelevant to the application of *Pinkerton* liability for *substantive firearms charges* in Counts 9 and 10 that would have been (again, if a valid *Pinkerton* instruction was given) likely premised on membership in a now-vacated *conspiracy to use firearms* in furtherance of crimes of violence.

The government is also wrong that this argument is subject to plain error review. Gov't Br. 104. This argument only became viable in July 2024 *after* the district court vacated and dismissed Count 1—the firearms conspiracy that served as a premise for the government's post-trial *Pinkerton* theory of liability as to Counts 7 through 10. J.A. 2997. The defense was not permitted to raise any argument in the district court on remand beyond the challenges to Counts 1, 7 and 8 pursuant to the limited remand order from this Court. *Id.*

Finally, the government's claim that the Court can reject this argument on the alternate ground that the district court improperly dismissed Count 1—because a predicate offense, levying war in violation of 18 U.S.C. § 2381 remained valid notwithstanding the absence of evidence that any conspirator violated that statute— should be rejected. Gov't Br. 110. Because the government did not appeal the dismissal of Count 1, it is now law of the case. *See Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) ("The law-of-the-case doctrine recognizes that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."); *United States v. Bell*, 988 F.2d 247, 250

(1st Cir. 1993) ("a legal decision made at one stage of a civil or criminal case, unchallenged in a subsequent appeal despite the existence of ample opportunity to do so, becomes the law of the case for future stages of the same litigation"). Whether the district court was correct or not, *Pinkerton* liability on a substantive offense cannot survive vacatur of the conspiracy conviction. App. Br. 68-69. As discussed below, moreover, the government has abandoned the argument that levying war in violation of 18 U.S.C. § 2381 is categorically a crime of violence.

## III. COUNT 2 – SOLICITATION OF A CRIME OF VIOLENCE

### A. The Government Fails to Respond to the Argument That the "Levying War" Prong of 18 U.S.C. § 2381 Is Not Categorically a Crime of Violence.

Al-Timimi argued in the opening brief that his conviction in violation of 18 U.S.C. § 373, solicitation of a crime of violence, was invalid because the charged predicate offense, levying war in violation of 18 U.S.C. § 2381, is not categorically a crime of violence. Inexplicably and erroneously, the government claims that "Al-Timimi does not argue that the levying war variant of § 2381 can be committed without the use, attempted use, or threatened use of physical force. *Cf.* Def. Br. 81-83." Gov't Br. 64. The government also cites *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004), for the proposition that "contentions not raised in the argument section of the opening brief are abandoned." *Id.*

The argument that the levying war variant of § 2381 can be committed without the use, attempted use, or threatened use of physical force is contained on pages 80 through the top of page 84 of Al-Timimi's opening brief. The sub-heading on page 80 states "'Levying War' in Violation of 18 U.S.C. § 2381 Is Not Categorically a Crime of Violence." App. Br. 80.

Al-Timimi argued that the "levying war" prong of § 2381, now defined on appeal by both the defense and the government as the "assemblage of men for the purpose of executing a treasonable design," Gov't Br. 63; App. Br. 80, "does not categorically require proof of the use, attempted use, or threatened use of force." App. Br. 80-81. Specifically, "assembling" to use force does not categorically require using, attempting to use, or threatening force. *Id.*; *see also Ex parte Bollman*, 8 U.S. 75, 134 (1807) ("The meeting of particular bodies of men, and their marching from places of partial to a place of general rendezvous, would be such an assemblage."); *United States v. Greiner*, 26 F. Cas. 36, 39 (E.D. Pa. 1861) ("When a body, large or small, of armed men, is mustered in military array for a treasonable purpose, every step which any one of them takes in part execution of this purpose, is an overt act of levying war. This is true, though not a warlike blow may have been struck."); Sir Michael Foster, *A Report of Some Proceedings on the Commission for the Trial of the Rebels in the Year 1746 in the County of Surry, and of other Crown Cases* 218 (3d ed. London 1792) ("An assembly armed and arrayed in a warlike

manner for any treasonable purpose is *bellum levatum*, though not *bellum percussum*. [Enl]isting and marching are sufficient overt acts without coming to a battle or action.").

At trial, however, the government objected to the "assembly" instruction and persuaded the court to give a broader definition of "levying war" as meaning to "wage war or to carry on war." J.A. 2332-2335. Al-Timimi likewise argued that this instruction as to the meaning of "levying war" did not categorically require proof of the use, attempted use, or threatened use of force. App. Br. 81-82. Specifically, "carrying on" war can include logistical or other non-violent support provided to a belligerent. *Id.*

Rather than addressing these substantive arguments about whether the "levying war" prong of § 2381 categorically requires force, the government responds to an entirely different argument about the divisibility of § 2381 that Al-Timimi does not make on appeal (although he did make it below on remand, J.A. 2920-2923). Indeed, Al-Timimi's brief noted that the jury was advised to disregard the adhering-to-enemies prong of § 2381, App. Br. 79 n.16, and did not challenge the divisibility of § 2381.

The government's failure to address the substance of an issue raised prominently in the opening brief constitutes a waiver, as "[e]ven appellees waive arguments by failing to brief them." *Stokes v. Stirling*, 64 F.4th 131, 137 (4th Cir.

2023) (citation omitted). Indeed, "[i]t is well-established that '[a] party's failure to raise or discuss an issue in [its appellate] brief is to be deemed an abandonment of that issue.'" *Id.*; *see also United States v. Hunt*, 123 F.4th 697, 701 (4th Cir. 2024) ("[T]he government's failure to respond to an argument featured prominently in an opening brief [] deprive[s] this Court of an adversarial presentation about a disputed legal issue."); *United States v. Clay*, 627 F.3d 959, 966 n.2 (4th Cir. 2010) (noting that argument made by government for the first time at oral argument was "waived in this appeal"); *Hillman v. I.R.S.*, 263 F.3d 338, 343 n.6 (4th Cir. 2001) ("[Federal] Rule [of Appellate Procedure] 28(b) requires Rule 28(a)(9) compliance by appellees at the risk of abandonment of an argument."). Accordingly, the Court should vacate Count 2 and remand for dismissal on the ground that the government abandoned its argument against the conclusion that § 2381 is not categorically a crime of violence.

### B. The Trial Record Contains Insufficient Evidence of Criminal Solicitation of Others to Levy War Against the United States.

The government argues that Al-Timimi violated § 373 by soliciting others to levy war because he "counseled and induced his listeners to conspire to fight against American troops expected to arrive in Afghanistan." Gov't Br. 67. But it identifies nothing in the trial record to show that Al-Timimi said that anyone should fight against U.S. troops, or that solicited an "assembly" of soldiers, which is the gravamen of levying war in violation of § 2381.

Criminal solicitation, to be distinct from constitutionally-protected mere encouragement of others to violate the law, requires proof of a request for "another person to engage in specific [unlawful] conduct," with "an intent to bring about a particular unlawful act." *United States v. Hansen*, 599 U.S. 762, 771-72 (2023) (bracket in original); App. Br. 79. By contrast, abstract advocacy even of unlawful conduct is protected speech. *United States v. Miselis*, 972 F.3d 518, 533 (4th Cir. 2020).

On September 16, 2001, Al-Timimi recommended that Muslims leave the United States to live with other Muslims, and be with mujahideen anywhere in the world if they could. App. Br. 13-16. While the government makes much of the testimony that Al-Timimi said Muslims were obligated to defend Afghanistan (to be clear, including in the press and with prayers), it is well settled that language discussing "the moral propriety or even moral necessity for a resort to force and violence" remains protected by the First Amendment. *Noto v. United States*, 367 U.S. 290, 297-98 (1961).[6] In fact, the only reference in the record to fighting against U.S. troops contradicts the claim of an assembly, in reference to the moral justification for fighting against "the Indians or the Russians or the Americans, that

---

[6] Under Islamic doctrine, jihad remains a collective obligation "unless the Muslim community is subjected to a sudden attack and therefore all believers … are under the obligation to fight[,]" and it becomes an "individual dut[y] (fard 'ayn)[.]" Majid Khadduri, War and Peace in the Law of Islam 60 (1955).

this is all legitimate jihad." J.A. 1148. Accordingly, the trial record fails to contain evidence that Al-Timimi made a specific request that anyone commit the specific unlawful act of assembling to fight U.S. troops in Afghanistan.

In response to the argument that the evidence fails to establish "circumstances strongly corroborative" of an intent that others assemble to fight U.S. troops in Afghanistan, the government seeks to paint Al-Timimi as an extremist based upon his public statements about the concept of jihad, *compare* Gov't Br. 15-16, 66, with *infra* 10 n.1, even though during the trial it sought to distinguish Al-Timimi's public statements as hiding extremist views that he kept private. J.A. 2367; J.A. 2415-2416. It also notes that he took efforts to avoid surveillance of his comments on September 16, that Kwon, Hasan, and Aatique decided to seek training from LET after the September 16 meeting, that Al-Timimi told Kwon and Hasan to carry a magazine, not sit together, and cry for their mother or a lawyer, he engaged in a purported dispute with other members of Dar al-Arqam over the September 11 attacks, and he said during a FISA-captured 2003 phone call that the crash of the space shuttle Columbia was a sign of the decline of American supremacy in the world. Gov't Br. 66-68.

None of this generalized evidence amounts to "strongly corroborating circumstances" that are "highly probative" of an intention on September 16, 2001, to solicit an assembly of soldiers to fight U.S. troops in Afghanistan, as opposed to

mere abstract advocacy in the fraught days after the September 11 attacks. Specifically, none of the evidence cited by the government is equivalent to "offers or promises of payment," threats of "harm or other detriment" if the person solicited doesn't agree, "repeated[] solicitations," belief that "the person solicited had previously" committed similar offenses; or acquisition of "weapons, tools, or information suited for use by the person solicited." *See United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1989) (enumerating examples of strongly corroborating circumstances supporting intent to solicit crime).

The government's recitation of evidence, by contrast, simply tries to portray Al-Timimi as having anti-American views. But nothing in this record reflects circumstances that are "highly probative" of a serious effort by Al-Timimi to wage or carry on war in anticipation of a future invasion by American troops in Afghanistan based upon a 45-minute talk five days after September 11.

## IV. COUNT 3 – AIDING AND ABETTING SEDITIOUS CONSPIRACY IN VIOLATION OF 18 U.S.C. § 2384.

### A. Al-Timimi's Speech Was Constitutionally Protected and Does Not Support Accomplice Liability.

For the reasons described above, the charged offense conduct of encouraging others *to conspire* to levy war against the United States is indistinguishable from constitutionally-protected encouragement or persuasion to violate the law because it does not satisfy *Brandenburg*'s test. *See United States v. Miselis*, 972 F.3d 518, 533

(4th Cir. 2020). As Al-Timimi noted in his opening brief, quoting the Second Circuit's opinion in *United States v. Rahman*, "[t]o be convicted under Section 2384, one must conspire to *use* force, not just to *advocate* the use of force." App. Br. 72 (quoting 189 F.3d at 115, emphasis in orig.). Criminal liability under § 2384 is thus narrowly limited to members of the conspiracy, and cannot—because of the First Amendment—extend to people who are not conspirators but merely advocate that others "overthrow, put down, [] destroy by force the Government of the United States, or [] levy war against them." *See Miselis*, 972 F.3d at 533 (describing shift away from "clear-and-present-danger" test in *Brandenburg*).

Al-Timimi was not charged as a *member* of a seditious conspiracy; he was charged and convicted as an accomplice to a seditious conspiracy based upon his advocacy. Indeed, Al-Timimi's conviction on Count 3 for encouraging others to conspire to levy war is analogous to the Ohio statute at issue in *Brandenburg* that prohibited assembling "to advocate the doctrines of criminal syndicalism." 395 U.S. at 449 n.3. The Court therefore should vacate this conviction and remand for dismissal on the ground that it is based on constitutionally-protected speech.

The Court should also vacate and remand for dismissal based upon the absence of evidence that Al-Timimi provided any "concrete aid" or assistance to justify criminal liability as an accomplice. *See Miselis*, 972 F.3d at 537. And the Court should vacate and remand for dismissal on the ground that aiding and abetting

a conspiracy is not a viable theory of criminal liability because it eliminates the settled distinction between a conspiracy and a substantive offense. Furthermore, it is not viable on the facts of this case, in which a conspiracy to defend Muslims overseas was formed by Kwon, Hasan, and others long before September 16, 2001, and was formed without any knowledge or involvement by Al-Timimi. *See* App. Br. 68.

## B. Section 2384 Solely Proscribes Conspiracies Directed at U.S. Governing Authority.

Claiming that 18 U.S.C. § 2384 "implicitly" encompasses conspiracies to fight against the U.S. military in foreign countries abroad, Gov't Br. 70, the government contradicts itself on the same page of its brief by arguing that statutory construction must focus on § 2384's text. *Id.* (citing *Bates v. United States*, 522 U.S. 23, 29 (1997)). The text of § 2384 prohibits conspiracies to:

> overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof ….

§ 2384. The statutory language is directed squarely at conspiracies to overthrow or oppose the government of the United States within any State or territory where it exercises its lawful authority. Nothing in the text of § 2384 indicates that it encompasses U.S. presence in foreign countries where it possesses no sovereign or governing authority.

By contrast, 18 U.S.C. § 2381, section 2384's statutory neighbor, explicitly prohibits levying war or adhering to enemies "within the United States *or elsewhere*." 18 U.S.C. § 2381 (emphasis added); *see also Gillars v. United States*, 182 F.2d 962, 979 (D.C. Cir. 1950). The treason statute is limited to defendants who owe allegiance to the United States, and that allegiance authorizes the exercise of U.S. law wherever such a defendant resides. *The Apollon*, 22 U.S. (9 Wheat.) 362, 370 (1824) (opinion of Story, J.) (noting that the "laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens."); *Kawakita v. United States*, 343 U.S. 717, 736 (1952) ("An American citizen owes allegiance to the United States wherever he may reside.").

The focus of § 2384's text, however, is domestic—and not merely as to where a proscribed conspiracy must be formed, but also as to its object. Originally enacted after the onset of the Civil War in 1861, the offense of seditious conspiracy was aimed at prohibiting conspiracies directed at the government of the United States. *See* Act of July 31, 1861, ch. 33, 12 Stat. 284; Catherine M. Tarrant, *To "Insure Domestic Tranquility": Congress and the Law of Seditious Conspiracy*, 1859-1861, 15 Am. J. of Legal Hist. 107, 121-22 (1971). As it does today, the statute proscribed a conspiracy "to overthrow, or to put down, or to destroy by force, the Government of the United States, or to levy war against the United States …." 12 Stat. 284.

Moreover, in contrast to the text of the treason statute, § 2384 does not proscribe conduct within the United States "*or elsewhere*." While the government disparages as dicta the Seventh Circuit's observation in *United States v. Rodriguez*, 803 F.2d 318, 320 (7th Cir. 1986), that "[u]nlike treason, seditious conspiracy does not extend beyond United States jurisdictional boundaries," this conclusion is entirely consonant with the text and history of § 2384. Omission of the words, "or elsewhere," makes clear that § 2384 was enacted solely to prohibit seditious plots directed at overthrowing or undermining the government's authority over states and territories.

Section 2381 and 2384 should be considered in pari materia. *See Hallenbeck v. Penn Mut. Life Ins. Co.*, 323 F.2d 566, 571 (4th Cir. 1963) ("It is well settled that statutes which relate to the same persons or things, or the same class of persons or things, or have a common purpose may be regarded as in 'pari materia.' Furthermore, similar statutory provisions in pari materia should receive similar and harmonious construction."). Given the explicit text in § 2381 applicable to levying war or aiding enemies within the United States or elsewhere, the absence of corresponding text in § 2384, coupled with the statute's focus on the U.S. government "writ large," § 2384 does not encompass conspiracies that are not directed at undermining domestic governing authority. *See United States v. Nordean*, 2022 WL 17583799, at *3 (D.D.C. Dec. 11, 2022) (noting that § 2384 defines a

crime "against the government writ large—not those against any particular government official or action"); *United States v. Rhodes*, 610 F. Supp. 3d 29, 39 (D.D.C. 2022) ("Congress viewed conspiracies under that provision as crimes against the government.").

## V.    COUNTS 4 AND 5 – ATTEMPTED UNLAWFUL PROVISION OF SERVICES TO THE TALIBAN

Once again mischaracterizing attendees at the September 16 dinner as "followers," the government argues that Al-Timimi both attempted to provide unlawful aid and aided and abetted such attempts by "attempting to induce his followers to fight for the Taliban in Afghanistan." Gov't Br. 82. Specifically, the government argues that just as "a specific discussion could be so final in nature that it left little doubt that a crime was intended and would be committed," "the key meeting led by Al-Timimi on September 16, 2001" constituted a "substantial step" in the attempt to unlawfully provide aid to the Taliban. *Id.* at 74 (quoting *United States v. Pratt*, 351 F.3d 131, 136 (4th Cir. 2003)).

The government also claims that evidence of the willfulness element is established by Al-Timimi's "wide[] knowledge[]" of the Islamic world, as well as by a reference he once made in a March 2001 article to a November 2000 fatwa by an Islamic cleric who said that "disbelieving countries who are enemies of Islam" have "imposed economic boycott on" the Taliban. *Id.* at 79-80. Finally, the government essentially concedes that the same evidence it cites to support Al-

Timimi's conviction on Count 4—his statements at the September 16 dinner and at the lunch on September 19—also provides the basis for his aiding and abetting conviction on Count 5. *Id.* at 74-75.

### A. Al-Timimi Did Not Help Anyone to Attempt to Provide Services to the Taliban.

As an initial matter, the government ignores the evidence that the discussion of "what was everybody going to do" took place after Al-Timimi left Kwon's apartment. J.A. 1389. Before Al-Timimi left, no one had "confirm[ed]" plans "to go overseas and join LET," and no "solid answer" about whether "to go to Afghanistan and fight." J.A. 1388 (Kwon); *see also* J.A. 2216-2217, J.A. 2258 (Hasan). As such, Al-Timimi did not participate in the "specific discussion" that was "final in nature" about what attendees at the dinner were going to do—which is why Al-Timimi was not charged as an actual coconspirator in those plans.

Other than claiming that his speech satisfied the *Brandenberg* test (which it did not), the government has no answer to the argument that speech that merely encourages others to provide illicit aid to the Taliban remains protected by the First Amendment and cannot support criminal liability. *See United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020). Nor does the government respond to the argument that Al-Timimi's generalized speech endorsing the moral obligation of Muslims to support the Taliban in whatever way they can, including in the press and by prayer,

does not constitute a "substantial step" toward the commission of a crime. App. Br. 92-94.

As explained earlier, the government aptly conceded below that Al-Timimi did not facilitate anyone to "reach the LET camps." J.A. 2897. As such, the trial evidence fails to establish that Al-Timimi engaged in the requisite "affirmative act" and "active participation" required to support liability as an accomplice.

Finally, the government fails to explain how travel to *Pakistan* for training with *LET* constitutes "preparation [that came] so near to the accomplishment of the crime [of providing illicit support to the *Taliban* in *Afghanistan*] that it [was] *probable* that the crime [would have been] committed absent an outside intervening circumstance." *Pratt*, 351 F.3d at 136. As the district court found in its ruling on remand, no one "ever traveled to Afghanistan or engaged in armed conflict of any kind against a United States soldier[.]" J.A. 2996.

The government's citation to *United States v. Buffington*, 815 F.2d 1292 (9th Cir. 1987), does not help its argument. Gov't Br. 75-76. The court in that case found insufficient evidence to support attempted bank robbery based on evidence that the defendants were armed and "may have appeared to be" surveilling a bank, "but not [had] made any move toward the bank." *Buffington*, 815 F.2d at 1303. In this case, no one made any move toward Afghanistan, and Aatique decided to return home after attending training at several LET camps. Aatique's decision to leave Pakistan

and return home illustrates that travel to Pakistan for training was attenuated from an attempt to provide illicit aid to the Taliban, and thus amounted at most to mere preparation rather than conduct that "comes so near to the accomplishment of the crime [of aiding the Taliban] that it bec[ame] *probable* that the crime [would] be committed absent an outside intervening circumstance." *Pratt*, 351 F.3d at 136.

## B. No Evidence of Wilfulness Exists

The government's anemic evidence of "willfulness" is likewise insufficient to satisfy that element of 50 U.S.C. § 1705(c). Courts evaluating the sufficiency of circumstantial evidence that a defendant understood the unlawfulness of their conduct have focused on the depth of a defendant's experience and knowledge of the country at issue. *See, e.g.*, *United States v. Mousavi*, 604 F.3d 1084, 1088-89, 1094-95 (9th Cir. 2010) (concluding that defendant's extensive ties, contacts, travel, and business arrangements before and after sanctions were imposed on Iran supported finding of willfulness). No such evidence exists in this case. Knowledge about "matters affecting the Islamic world" in general, and an attenuated reference to another fatwa by an Islamic cleric, does not establish knowledge of the unlawfulness of providing support to the Taliban in particular.

## C. The Jury Instruction Defining Attempt Was Plainly Erroneous

The government's claim that the jury instruction defining criminal attempt to mean to "try" did not constitute a "clear and obvious" error is specious. It's an error,

56

*United States v. Hansen*, 599 U.S. 762, 774-75 (2023), that is obvious now on direct appeal (which is what matters), *Henderson v. United States*, 568 U.S. 266, 273 (2013), and was obvious in 2005. *Pratt*, 351 F.3d at 135 (describing the specialized criminal meaning of attempt).

And because no one "ever traveled to Afghanistan or engaged in armed conflict of any kind against a United States soldier," J.A. 2996, the government is wrong that no reasonable probability of a different outcome would have existed if the district court had properly instructed the jury. The jury did not have the correct legal instruction to assess the evidence as to the very issue that divides the parties on appeal: whether Al-Timimi, or anyone he supposedly aided and abetted, took a substantial step toward providing unlawful aid to the Taliban in Afghanistan.

### D. Counts Four and Five Are Multiplicitous and the Error is Plain.

Similarly, the fact that the substantive offense of attempting to violate 50 U.S.C. § 1705 constitutes the same offense as aiding and abetting an attempted violation of 50 U.S.C. § 1705 is clear and obvious. Aiding and abetting a substantive offense does not "itself create a separate offense" from the substantive offense. *United States v. Ashley*, 606 F.3d 135, 143 (4th Cir. 2010). Indeed, the government's recitation of the evidence it believes supports Al-Timimi's liability for aiding and abetting others to aid the Taliban is the same evidence it believes supports his liability for attempting to aid the Taliban. Gov't Br. 74-75.

Although the sentences for these offenses have already been served, the separate special assessment is reason enough, if the Court finds sufficient evidence of these offenses, to vacate and remand for the dismissal of one or the other. *See United States v. Bennafield*, 287 F.3d 320, 324 (4th Cir. 2002) (finding plain error and prejudice from multiplicitous convictions based on additional special assessment); *United States v. Colton*, 231 F.3d 890, 910 (4th Cir. 2000) (remedying multiplicitous convictions by remanding "case to the district court with instructions to vacate the convictions on [those counts] and resentence accordingly"); *United States v. Nielsen*, 640 F. App'x 224, 232 (4th Cir. 2016) (finding that multiplicitous convictions resulting in concurrent sentences but "special assessment fees on eight convictions instead of four" satisfied plain error standard).

## VI. INSUFFICIENT EVIDENCE SUPPORTS CONVICTION ON COUNT 6.

The government's argument that Al-Timimi "counseled and induced Kwon, Hasan, Aatique, and Khan to conspire to violate the Neutrality Act" fails on multiple grounds. Gov't Br. 83-84.

First, Al-Timimi could not have "induced" a conspiracy to violate the Neutrality Act because it already existed without his knowledge or involvement. The trial evidence established that the conspiracy to travel overseas for training was formed before the September 16 meeting. J.A. 444: J.A. 447; J.A. 585; J.A. 1254;

J.A. 1259-1261; J.A. 2243-2244. The government cannot bootstrap criminal liability by claiming Al-Timimi "induced" a conspiracy that had already been established.

Second, the government's theory that Al-Timimi "counseled" others to conspire with each other violates the First Amendment's protection for advocacy. The government essentially argues that Al-Timimi can be held liable as an aider and abettor because his words encouraged others to follow through on plans they had already decided to make. This is the precise type of "speech having a mere tendency to encourage others" to violate the law that this Court held in *Miselis* is constitutionally protected. 972 F.3d at 536.

Third, the government provides no evidence that Al-Timimi's words provided any concrete assistance to help form or advance the conspiracy. In other words, Al-Timimi's general statements provided no operational assistance, no contact information, no funding, and no specific guidance about how to implement plans to attack India or Russia. Nor is there any evidence that Al-Timimi possessed the "specific intent or purpose that a hostile military expedition be made against Russia or India." App. Br. 77. Accomplice liability is therefore not supported on this record.

Finally, the factual premise of the government's argument—that Al-Timimi told the attendees at the September 16 dinner "to train at the LET camps in Pakistan," Gov't Br. 84—is not supported by the record. The government cites to testimony by Aatique in which he recounted that Al-Timimi recommended "options that you can

take" that included "to go and join the mujahideen, go and fight[,]" but that also included "just leav[ing] the country and leav[ing] to the Muslim lands." J.A. 481. Aatique said that when Al-Timimi talked about "be[ing] with the good people, an example was giv[en] of LET—in Pakistan, the example was given of the LET people." *Id.* Aatique did not testify that Al-Timimi recommended training with LET, and he did not testify that Al-Timimi said anything about attacking Indian troops. In fact, Aatique "never imagined [fighting against] any specific enemy or [in a] specific place." J.A. 463.

Hasan, moreover, testified that the idea of training with LET was suggested by Randall Royer "after Timimi left the meeting." J.A. 2216-2217. Kwon likewise remembered Royer as discussing how to get in contact with LET to arrange training, J.A. 1394, said that Al-Timimi did not "say[] anything" about training, J.A. 1156, and that "confirmation" of his decision to attend training at an LET camp along with Hasan, Aatique, and Masaud Khan came "after [he] dropped off Al-Timimi and came back" to his apartment, J.A. 1388.

In sum, the Court should vacate Al-Timimi's conviction on Count 6 not only because of the absence of evidence that he committed an affirmative act in furtherance of the offense and that he possessed the requisite mens rea, but also because the government's basic theory of liability is founded upon the criminal-ization of First Amendment protected speech.

## **CONCLUSION**

For the reasons set forth in the opening brief and in the foregoing, we respectfully request that the Court vacate all convictions and remand for dismissal.

Respectfully submitted,

s/  Geremy C. Kamens

Geremy C. Kamens
Federal Public Defender for the
  Eastern District of Virginia
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Geremy_Kamens@fd.org

Dated August 1, 2025

## CERTIFICATE OF COMPLIANCE

1.    This reply brief has been prepared using Microsoft Word for Office 365 software, Times New Roman font, 14-point proportional type size.

2.    Excluding the table of contents, table of authorities, signature block, and this certificate of compliance, this brief contains no more than 15,000 words, specifically 14,620 words.[7]

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

|  August 1, 2024  |  s/  Geremy C. Kamens  |
| :---: | :---: |
| Date | Geremy C. Kamens |
|  | Federal Public Defender |

---

[7] By order dated May 6, 2025, the Court granted leave to file a reply brief of not more than 15,000 words. Doc. 171.